UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SVITLANA DOE, *et. al*.,<br><br>        Plaintiff,<br><br>  v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et. al*.,<br><br>        Defendants. | Civil Action No. 1:25-cv-10495-IT<br><br>**CERTIFICATION OF ADMINISTRATIVE RECORD** |

## CERTIFICATION

I, Juliana Blackwell, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.    I am employed with the U.S. Department of Homeland Security ("DHS"), as the Deputy Executive Secretary. I am responsible for the oversight and management of the Office of the Executive Secretary, which oversees the management of written communications intended for, and originated by, the Secretary and Deputy Secretary of Homeland Security, and the maintenance of official Department records. I have held this position since August 2019.

2.    I certify that, to the best of my knowledge, information, and belief, the documents listed in the accompanying Index and annexed hereto constitute the nonprivileged documents and materials directly or indirectly considered by DHS and that these documents constitute the administrative record the agency considered in issuing the Federal Register Notice entitled *Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans*, 90 Fed. Reg. 58032 (Dec. 15, 2025).

I certify under penalty of perjury that the foregoing is true and correct.

Executed on: <u>January 13, 2026</u>

JULIANA J
BLACKWELL

Digitally signed by JULIANA J
BLACKWELL
Date: 2026.01.13 09:08:07
-05'00'

Juliana Blackwell

Deputy Executive Secretary

## Certified Administrative Record

*Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans*, 90 Fed. Reg. 58032 (Dec. 15, 2025)

| Starting Bates No. | Document |
|---|---|
| FRP-FRN-00001 | Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans, 90 FR 58032 (CIS No. 2806-25, RIN 1615-ZC12) |
| FRP-FRN-00017 | Decision Document, USCIS Notice: Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans |
| FRP-FRN-00018 | Certain DHS Immigration Fees Required by HR-1 Fiscal Year 2026 Adjustments for Inflation, 90 FR 52085 |
| FRP-FRN-00021 | Circumvention of Lawful Pathways, 88 FR 31314 |
| FRP-FRN-00160 | Cuban Family Reunification Parole Program, 72 FR 65588 |
| FRP-FRN-00161 | Designating Aliens for Expedited Removal, 90 FR 8139 |
| FRP-FRN-00163 | Determination: Foreign Affairs Functions of the United States, 90 FR 12200 |
| FRP-FRN-00164 | E.O. 14150, America First Policy Directive to the Secretary of State, 90 FR 8337 |
| FRP-FRN-00165 | E.O.14165, Securing Our Borders, 90 FR 8467 |
| FRP-FRN-00168 | E.O. 14194, Imposing Duties to Address the Situation at our Southern Border, 90 FR 9117 |
| FRP-FRN-00172 | E.O. 14159, Protecting the American People Against Invasion, 90 FR 8443 |
| FRP-FRN-00178 | E.O. 14198, Progress on the Situation at Our Southern Border, 90 FR 9185 |
| FRP-FRN-00180 | E.O. 14227, Amendment to Duties to Address the Situation at Out Southern Border, 90 FR 11371 |
| FRP-FRN-00182 | EOP, E.O. 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, 90 FR 8439 |
| FRP-FRN-00184 | Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generación, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana, 90 FR 10030 |
| FRP-FRN-00185 | Foreign Terrorist Organization Designations of Viv Ansanm and Gran Grif, 90 FR 19065 |
| FRP-FRN-00186 | Immigration Parole Fee Required by HR-1 Reconciliation Bill, 90 FR 48317 |
| FRP-FRN-00188 | Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 |
| FRP-FRN-00199 | Implementation of a Family Reunification Parole Process for Ecuadorians, 88 FR 78762 |

| Starting Bates No. | Document |
|---|---|
| FRP-FRN-00212 | Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 |
| FRP-FRN-00223 | Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 |
| FRP-FRN-00233 | Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 |
| FRP-FRN-00245 | Implementation of Changes to the Cuban Family Reunification Parole Process, 88 FR 54639 |
| FRP-FRN-00250 | Implementation of Changes to the Haitian Family Reunification Parole Process, 88 FR 54635 |
| FRP-FRN-00255 | Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 |
| FRP-FRN-00258 | Inflation Adjustment to HR-1 Immigration Fees, 90 FR 52693 |
| FRP-FRN-00261 | Notice of Changes to Application Procedures for the Cuban Family Reunification Parole Program, 79 FR 75579 |
| FRP-FRN-00264 | Proclamation 10773 of June 3, 2024, Securing the Border, 89 FR 48487 |
| FRP-FRN-00271 | Proclamation 10817 of September 27, 2024, Amending Proclamation 10773, 89 FR 80351 |
| FRP-FRN-00274 | Securing the Border, 89 FR 48710 |
| FRP-FRN-00337 | Securing the Border, 89 FR 81156 |
| FRP-FRN-00467 | Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 FR 13611 |
| FRP-FRN-00479 | USCIS Immigration Fees Required by HR-1 Reconciliation Bill, 90 FR 34511 |
| FRP-FRN-00485 | CBP, DHS, CBP Releases December 2024 Monthly Update |
| FRP-FRN-00497 | CBP, DHS, Nationwide Encounters Filtered for Region-Southwest Land Border, Citizenship-Haiti |
| FRP-FRN-00506 | CBP, DHS, Nationwide Encounters, Filtered for Region - Southwest Land Border, Citizenship - Ecuador |
| FRP-FRN-00512 | CBP, DHS, Nationwide Encounters |
| FRP-FRN-00520 | CBP, DHS, Nationwide Encounters |
| FRP-FRN-00523 | CBP, DHS, U.S. CBP Nationwide Encounters, filtered by Region (Southwest Land Border) and Citizenship (Columbia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras) |
| FRP-FRN-00532 | DHS, DHS CBP PIA – 021 TECS System-Platform |
| FRP-FRN-00533 | DHS, DHS Announces Historic Travel Assistance and Stipend for Voluntary Self-Deportation |
| FRP-FRN-00534 | DHS, DHS CBP PIA-021 TECS System, Platform - August 2016 - Appendix Update - April 2022 |

| Starting Bates No. | Document |
|---|---|
| FRP-FRN-00588 | DHS, DHS Reinstates Migrant Protection Protocols, Allowing Officials to Return Applicants to Neighboring Countries |
| FRP-FRN-00589 | DHS, Nat'l Environmental Protection Act, Memo for Record for Categorical Excluded Actions, FRP |
| FRP-FRN-00605 | DHS, System of Records Notices (SORNs) _ Homeland Security |
| FRP-FRN-00618 | OHSS, DHS, Lawful Pathways and Processes Report |
| FRP-FRN-00632 | USCIS, DHS, Jan. 23, 2025 Acting Director Higgins, Securing Our Borders EO and Parole Processing Email |
| FRP-FRN-00633 | USCIS, DHS, Supp. Statement for Online Request to be a Supporter and Declaration of Financial Support, OMB Control No. 1615-0157, Form I-134A, page 10, question 12 |
| FRP-FRN-00646 | USCIS, DHS, The Cuban Family Reunification Parole Program, (Process Steps) |
| FRP-FRN-00663 | Cong. Rsch. Serv., Straut-Eppsteiner, H., FY2024 EOIR Immigration Court Data, Caseloads and the Pending Cases Backlog |
| FRP-FRN-00667 | Congress, H.R. Rep. 104-469, pt. 1, at 140 |
| FRP-FRN-01217 | DOS, Dispatch Magazine (1995), U.S.-Cuba Joint Communique on Migration, Article 5 |
| FRP-FRN-01220 | DOS, Migration and Refugees, Joint Statement Between the United States and Cuba |
| FRP-FRN-01231 | DOS, Press Release, Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente |
| FRP-FRN-01233 | DOS, Press Release, Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente |
| FRP-FRN-01235 | DOS, Press Release, Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente |
| FRP-FRN-01237 | DOS, Press Releases, Visa Restrictions on Travel Agencies Facilitating Illegal Immigration to the United States |
| FRP-FRN-01239 | DOS, Press Statement, Priorities and Mission of the Second Trump Administration's Department of State |
| FRP-FRN-01243 | DOS, Readout, Secretary Rubio's Meeting with Salvadoran President Nayib Bukele |
| FRP-FRN-01247 | DOS, Secretary Rubio's Meeting with Panamanian President Mulino |
| FRP-FRN-01250 | EOP, Office of the Press Secretary, Joint Statement |
| FRP-FRN-01251 | EOP, Readout of President Donald J. Trump's Call with President Nayib Bukele |
| FRP-FRN-01254 | EOP, Statement From the Press Secretary |
| FRP-FRN-01258 | Council on Foreign Relations, Why Six Countries Account for Most Migrants at the U.S.-Mexico Border |
| FRP-FRN-01290 | George J. Borjas, The Earnings of Undocumented Immigrants, National Bureau of Economic Research |

| Starting Bates No. | Document |
|---|---|
| FRP-FRN-01333 | Meryl Sebastian, Trump Says India 'Will Do What's Right' on Illegal Immigration, BBC News |
| FRP-FRN-01337 | Panama Receives First US Deportation Flight Under Trump Administration, The Tico Times |
| FRP-FRN-01341 | The Dialogue, Family Remittances in 2024 Looking Ahead amid Possible Shifts in Flows |
| FRP-FRN-01354 | The Dialogue, Family Remittances to Latin America and the Caribbean 2023, Slide 6, Leadership for the Americas |
| FRP-FRN-01397 | The Dialogue, Orozco, M., Future Flows of Family Remittances to Latin America and the Caribbean |
| FRP-FRN-01484 | OHSS, DHS, OHSS analysis of December 2024 OHSS Persist Dataset [OHSS tab 2] |
| FRP-FRN-01485 | OHSS, DHS, OHSS analysis of May 2025 OHSS Persist Dataset [OHSS tab 1] |
| FRP-FRN-01486 | USCIS, DHS, Data pulled from internal DHS reports on parole processing [OHSS tab 12] |
| FRP-FRN-01487 | USCIS, DHS, USCIS analysis of CBP FRP parole data as of Jan. 23, 2025 [OHSS tab 5, 7, 8, 9] |
| FRP-FRN-01527 | USCIS, DHS, USCIS analysis of CBP FRP parole data as of Jan. 23, 2025 [OHSS tab 6] |
| FRP-FRN-01570 | USCIS, DHS, USCIS analysis of FRP response rates as of Feb. 18, 2025 [OHSS tab 3] |
| FRP-FRN-01571 | USCIS, DHS, USCIS analysis of legacy FRP filings as of Apr. 2, 2025 [OHSS tabs 10 & 11] |

4

national interest. *See* INA sec. 244(d)(3), 8 U.S.C. 1254a(d)(3).[25] Accordingly, the termination of the Ethiopia Temporary Protected Status designation will be effective 60 days from this notice's publication date.[26]

DHS recognizes that Ethiopian Temporary Protected Status beneficiaries continue to be authorized to work during the 60-day transition period.[27] Accordingly, through this **Federal Register** notice, DHS automatically extends the validity of certain Employment Authorization Documents previously issued under the Temporary Protected Status designation of Ethiopia through February 13, 2026. Therefore, as proof of continued employment authorization through February 13, 2026, Temporary Protected Status beneficiaries can show their Employment Authorization Documents that have the notation A–12 or C–19 under Category and a "Card Expires" dates of June 12, 2024 and December 12, 2025.

The Secretary has considered putative reliance interests in the Ethiopia Temporary Protected Status designation, especially when considering whether to allow for an additional transition period akin to that allowed under certain previous Temporary Protected Status terminations. Temporary Protected Status, as the name itself makes clear, is an inherently temporary status. Temporary Protected Status designations are time-limited and must be periodically reviewed, and Temporary Protected Status notices clearly notify aliens of the designations' expiration dates. Further, whether to allow for an orderly transition period is left to the Secretary's unfettered discretion. *See* INA sec. 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3). The statute inherently contemplates advance notice of a termination by requiring timely publication of the Secretary's determination and delaying the effective date of the termination by at least 60 days after publication of a **Federal Register** notice of the termination or, if later, the existing expiration date. *See* INA sec. 244(b)(3)(A)–(B), (d)(3); 8 U.S.C. 1254a(b)(3)(A)–(B), (d)(3).

**Notice of the Termination of the Temporary Protected Status Designation of Ethiopia**

By the authority vested in me as Secretary under INA section 244(b)(3), 8 U.S.C. 1254a(b)(3), I have reviewed, in consultation with the appropriate U.S. Government agencies, (a) conditions in Ethiopia; (b) whether permitting the nationals of Ethiopia (and aliens having no nationality who last habitually resided in Ethiopia) to remain temporarily in the United States is contrary to the national interest of the United States; (c) whether Ethiopia is experiencing ongoing armed conflict that poses a serious threat to the personal safety of Ethiopian nationals, and (d) whether extraordinary and temporary conditions in Ethiopia that prevent Ethiopian nationals from returning in safety continue to exist. Based on my review, I have determined that Ethiopia no longer continues to meet the conditions for Temporary Protected Status under INA section 244(b)(1)(A) or (C), 8 U.S.C. 1254a(b)(1)(A) or (C).

Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B), and considering INA section 244(d)(3), 8 U.S.C. 1254a(d)(3), the designation of Ethiopia for Temporary Protected Status is terminated effective at 11:59 p.m., local time, on February 13, 2026.

(2) Information concerning the termination of Temporary Protected Status for nationals of Ethiopia (and aliens having no nationality who last habitually resided in Ethiopia) under the designation will be available at local USCIS offices upon publication of this notice and through the USCIS Contact Center at 1–800–375–5283. This information will also be published on the USCIS website at *www.uscis.gov*.

**Kristi Noem,**
*Secretary of Homeland Security.*
[FR Doc. 2025–22746 Filed 12–12–25; 8:45 am]
**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

[CIS No. 2806–25]

RIN 1615–ZC12

**Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans**

**ACTION:** Notice.

**SUMMARY:** The Department of Homeland Security ("DHS") is terminating the categorical parole processes for aliens from Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras, and their immediate family members, under the Family Reunification Parole processes announced, or updated, by DHS in 2023 (hereinafter referred to as "modernized FRP programs"). DHS is also terminating the residual processing of legacy cases under the Cuban Family Reunification Parole program ("legacy CFRP") and the Haitian Family Reunification Parole program ("legacy HFRP") first implemented by USCIS in 2007 and 2014, respectively (collectively, the "legacy FRP programs"). This **Federal Register** notice is intended to provide context and guidance to the public regarding the termination of all nine programs (hereinafter "the FRP programs"), termination of parole for aliens paroled under the FRP programs, and revocation of employment authorization based on being an alien paroled under the FRP programs.

**DATES:** DHS is terminating the FRP programs as of December 15, 2025. The temporary parole period of aliens who have been paroled into the United States under the FRP programs, and whose initial period of parole has not already expired by January 14, 2026 will terminate on that date. There are two circumstances where an alien's parole will not terminate: (1) the alien filed a Form I–485, Application to Register Permanent Residence or Adjust Status, that is postmarked or electronically filed as of December 15, 2025 that is still pending adjudication as of December

---

[25] Whether to allow for an additional "orderly departure" period following a Temporary Protected Status designation termination (beyond the statutory minimum of 60 days) is an "option" left to the Secretary's unfettered discretion. INA 244(d)(3), 8 U.S.C. 1254a(d)(3). Although DHS has allowed such extended periods for certain Temporary Protected Status terminations, *see, e.g., Termination of the Designation of Sudan for Temporary Protected Status,* 82 FR 47228 (Oct. 11, 2017) (12-month orderly transition period); *Termination of the Designation of Sierra Leone Under the Temporary Protected Status Program; Extension of Employment Authorization Documentation,* 68 FR 52407 (Sept. 3, 2003) (6-month orderly transition period), certain other Temporary Protected Status designations were terminated without allowing for such transition periods, *see, e.g., Termination of Designation of Angola Under the Temporary Protected Status Program,* 68 FR 3896 (Jan. 27, 2003) (no orderly transition period); *Termination of Designation of Lebanon Under Temporary Protected Status Program,* 58 FR 7582 (Feb. 8, 1993) (same).

[26] *See* 8 CFR 244.19 ("Upon the termination of designation of a foreign state, those nationals afforded temporary Protected Status shall, upon the sixtieth (60th) day after the date notice of termination is published in the **Federal Register**, or on the last day of the most recent extension of designation by the [Secretary of Homeland Security], automatically and without further notice or right of appeal, lose Temporary Protected Status in the United States. Such termination of a foreign state's designation is not subject to appeal.").

[27] *See* INA 244(a)(1)(B), 8 U.S.C. 1254a(a)(1)(B); *see also* 8 CFR 244.13(b).

15, 2025; or (2) the Secretary of Homeland Security ("the Secretary") determines otherwise on a case-by-case basis. Aliens without a lawful basis to remain in the United States following the termination of their parole must depart the United States before their parole termination date.

**FOR FURTHER INFORMATION CONTACT:**
Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 240–721–3000.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

Over the previous two years, DHS implemented updates to the modernized FRP programs.[1] The modernized FRP programs were available by invitation only to certain petitioners with approved Forms I–130, Petition for Alien Relative, filed on behalf of principal beneficiaries who were nationals of designated countries and their immediate family members. DHS also updated the legacy FRP programs to align with the procedures used for the modernized FRP programs.[2] Under the modernized FRP programs, qualified beneficiaries who were outside the United States could be considered, on a case-by-case basis, for advanced authorization to travel to the United States to seek a temporary period of parole for urgent humanitarian reasons or significant public benefit. Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Ecuadorians, 88 FR 78762 (Nov. 16, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023); Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023); Implementation of Changes to the Cuban Family Reunification Parole Process, 88 FR 54639 (Aug. 11, 2023);[3] Implementation of Changes to the Haitian Family Reunification Parole Process, 88 FR 54635 (Aug. 11, 2023).[4]

On January 20, 2025, President Trump issued Executive Order ("E.O.") 14165, "Securing Our Borders."[5] Section 2 of the E.O. establishes the policy of the United States to take all appropriate action to secure the borders of our Nation through a range of means, including deterring and preventing the entry of illegal aliens into the United States, and removing promptly all aliens who enter or remain in violation of Federal law. Section 7 of the E.O. directs the Secretary of Homeland Security ("Secretary") to, consistent with applicable law, take all appropriate action to "[t]erminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders."[6]

Consistent with the President's direction, and for the independent reasons stated in this notice, this notice terminates the FRP programs. Although DHS established the categorical program for each country through a separate notice in the **Federal Register**, the justification for the establishment of each of the seven categorical programs was very similar,[7] as is the rationale for terminating them. Therefore, DHS is announcing the termination of all seven modernized FRP programs, in addition to any continued processing under the legacy FRP programs, by publishing this single notice in the **Federal Register**. Consistent with the Secretary's statutory and regulatory authority, the parole of all aliens who have been paroled into the United States under the FRP programs described in this notice, and whose initial period of parole has not already expired by January 14, 2026, will terminate on that date, subject to certain exceptions.

**II. DHS Parole Authority**

The Immigration and Nationality Act ("INA") confers upon the Secretary the narrow discretionary authority to parole aliens into the United States "temporarily under such conditions as [DHS] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." INA 212(d)(5)(A); 8 U.S.C. 1182(d)(5)(A); *see* 8 CFR 212.5(a), (c)–(e) (discretionary authority for establishing conditions of parole and for terminating parole). Additionally, upon a finding by DHS that the purpose of the temporary, discretionary parole has been served, the alien shall "return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

A review of the legislative history of the parole statute supports the contention that Congress has sought to limit the use of the parole authority to specific instances rather than as a means of circumventing established immigration laws or processing times.[8]

---

[1] The five new categorical parole programs implemented in 2023 for Colombia, Ecuador, El Salvador, Guatemala, and Honduras, and the two existing programs for Cuba and Haiti that were updated in August 2023, all utilize the online Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, to initiate the process of being considered for parole by DHS. Collectively, these seven Form I–134A-reliant programs will be referred to as the "modernized FRP programs." The FRP programs created in 2007, for Cuba, and 2014, for Haiti, utilized Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records, to request parole from USCIS. Collectively, these Form I–131-reliant programs will be referred to as the "legacy FRP programs." All nine programs combined, both modernized and legacy, are referred to as the "FRP programs."

[2] Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007); Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014). These programs were superseded by the modernized processes implemented on August 11, 2023. No new filings were accepted for these programs after August 11, 2023, except for certain add-on derivative beneficiaries of principal beneficiaries with a pending legacy CFRP application. However, processing of applications that were pending under legacy CFRP continued according to the process established in December 2014. *See* Notice of Changes to Application Procedures for the Cuban Family Reunification Parole Program, 79 FR 75579 (Dec. 18, 2014). Requests for re-parole have continued to be processed under legacy HFRP.

[3] *See* 72 FR 65588 (legacy CFRP was originally established in 2007 with a process started by filing the paper-based Form I–131 with USCIS, but the process was changed for new filings in August 2023 to adopt use of the online Form I–134A and other processing steps used in the five FRP programs established by DHS in July 2023).

[4] *See* 79 FR 75581 (legacy HFRP was originally established in 2014 with a process started by filing the paper-based Form I–131 with USCIS, but the process was changed in August 2023 to adopt use of the online Form I–134A and other processing steps used in the five FRP programs established by DHS in July 2023).

[5] *See* Executive Order 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025).

[6] *Id.*

[7] *Compare, e.g.,* 88 FR at 43593–43596, *with* 88 FR at 78765–78768, 72 FR at 65588, and 79 FR at 75582 (setting out the justifications for the parole programs for Colombia, Ecuador, Cuba, and Haiti, respectively).

[8] Parole was codified into immigration law in the 1952 INA. As envisioned then, the 1952 Act authorized the Attorney General to parole aliens temporarily under such conditions as he may prescribe for emergent reasons or reasons deemed strictly in the public interest. As expressed then, "the parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted." *Leng May Ma v Barber,* 357 U.S. 185, 190 (1958). However, the parole authority, whether intended to be narrow or broad, has in fact been used in an increasingly broad manner since its inception, often earning the criticism of Congress. For example, the House Report for the Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRIRA") stated:

[i]n recent years, parole has been used increasingly to admit entire categories of aliens who
Continued

Under the law, the determination to parole an alien into the country should only be made on a discretionary, case-by-case basis, taking into account each alien's unique circumstances. The ultimate determination whether to parole an alien into the United States upon the alien's arrival at a U.S. port of entry ("POE") is made by U.S. Customs and Border Protection ("CBP") officers. *See* 8 CFR 212.5(a).

Parole is inherently temporary, and parole alone is not an underlying basis for obtaining any immigration status, nor does it constitute an admission to the United States. *See* INA 101(a)(13)(B), 212(d)(5)(A); 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A). Once an alien is paroled into the United States, the parole allows the alien to stay temporarily in the United States for the duration of the parole period unless and until the parole expires or is otherwise terminated. *Case* 8 CFR 212.5(e).

Paroled aliens, including those paroled under the FRP programs, may apply for any immigration benefit or status for which they may be eligible, including discretionary employment authorization under the (c)(11) employment eligibility category. *See* 8 CFR 274a.12(c)(11); *see also* One Big Beautiful Bill Act, Public Law 119–21, secs. 100003(b), 100010(a), 139 Stat 72, 366, 372 (July 4, 2025) (8 U.S.C. 1803(b), 1809(a)) (prescribing fees and specific validity periods for parole-based EADs). In the absence of any subsequent application conferring an immigration benefit or status, and upon termination of parole, such alien will remain an applicant for admission. *See* INA 212(d)(5)(A), 1182(d)(5)(A); *see also* 8 CFR 1.2 ("An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked."), 1001.1(q) (same).

### III. Rationale for Termination

When DHS established the FRP programs, DHS wrote that the programs

do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.

*See* H.R. Rep. 104–469, pt. 1, at 140 (1996). In IIRIRA, Congress struck from INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), the phrase, "for emergent reasons or for reasons deemed strictly in the public interest" as grounds for granting parole into the United States and inserted "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." Public Law 104–208, div. C, § 602(a). "The legislative history indicates that this change was animated by concern that parole under [INA 212(d)(5)(A)] was being used by the executive to circumvent congressionally established immigration policy." *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011).

would provide a significant public benefit for the United States by: (i) promoting family unity; (ii) furthering important foreign policy objectives; (iii) providing a lawful pathway and timely alternative to unlawful migration at the southwest land border; (iv) reducing strain on limited U.S. resources; and (v) addressing the root causes of migration through economic stability and development supported by increased remittances.[9]

For the reasons discussed below, DHS has determined that it is now appropriate to terminate the FRP programs. These programs do not serve a significant public benefit, are not necessary to reduce levels of unlawful immigration, and are not serving all their intended purposes.[10] These reasons, independently and cumulatively, support termination of the FRP programs.[11]

Accordingly, the Secretary, in her discretion, is terminating the FRP programs. Consistent with her statutory authority, the Secretary retains discretion to grant a new period of parole, also known as re-parole, to any alien who was paroled into the United States under the FRP programs, temporarily under such conditions as she may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit. *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). The decision to do so, or not do so, is committed to the Secretary's sole discretion.

[9] *See, e.g.,* 88 FR at 43593–96; *see also* 72 FR 65588 (The legacy CFRP initial implementation notice in 2007 relied on family unification, discouragement of unlawful migration, and furtherance of the U.S.-Cuba Migration Accords as justifications); 79 FR at 75582 (The legacy HFRP initial implementation notice in 2014 relied on family unification and reconstruction and development assistance for Haiti through remittances).

[10] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) ("[W]hen the purposes of such parole shall, in the opinion of the [Secretary of Homeland Security], have been served the alien shall forthwith return or be returned to the custody from which he was paroled. . . .").

[11] The FRP programs were promulgated under the theory that they would, in general, provide a significant public benefit to the United States. *See, e.g.,* 88 FR at 43613 ("The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy . . ."). Although the Secretary retained the authority to parole eligible aliens on a case-by-case basis based on "urgent humanitarian reasons," the driving impetus for the creation of the FRP programs or attendant grants of parole was the significant public benefit justification. But for the significant public benefit justification, DHS would not have established the FRP programs.

### 1. Promote Family Unity

According to the notices that announced their creation, the FRP programs were designed to provide a faster pathway for U.S. citizens and lawful permanent residents (LPRs) to reunite with family members in the United States while awaiting availability of their immigrant visas. The notices justified the action by stating that nationals of those countries often face long waits for immigrant visas before they can travel to the United States and apply for admission.[12]

DHS acknowledges that aliens paroled into the United States under the FRP programs may have been able to reunite with family members in the United States. However, upon further review of the scope and impact of the FRP programs in their totality, and in line with Executive Orders issued by President Trump, DHS has determined that national security and fraud concerns, and the current Administration's priorities outweigh those interests and weigh in favor of terminating the programs.

The modernized FRP programs, based on their specific procedures, created security gaps not present in other paths for family members pursuing LPR status, such as through consular processing. Through consular processing, potential beneficiaries chose to remain outside the United States until their immigrant visa priority dates are current. Once a visa is available based on their priority date, the potential beneficiary completes consular processing with the Department of State ("State"), including submission of biometrics, an in-person interview outside the United States, and submission of various documents to establish the necessary family relationship with the petitioner before a visa is issued. The use of biometrics for background and security checks as part of consular processing allows for robust public safety and national security vetting of the potential beneficiary before travel to the United States on a commercial air carrier is authorized and completed.

In contrast, under the modernized FRP programs, potential beneficiaries would travel to the United States to seek parole at a POE, and if paroled, they could then apply to adjust status to that of an LPR once their immigrant visa priority dates became current. Under these programs, DHS conducted minimal public safety and national security vetting of the supporters based on biographic information the supporter

[12] *See, e.g.,* 88 FR at 43593–94; *see also* 72 FR 65588; 79 FR at 75582.

provided on the Form I–134A. For example, DHS only vetted to ensure that the supporter was the named petitioner on the Form I–130 for the principal beneficiary and that supporters that were LPRs had not lost their LPR status, in addition to TECS [13] checks. Additionally, DHS conducted minimal public safety and national security vetting of potential beneficiaries by only reviewing biographic information and photos that each beneficiary provided before being considered for an advance travel authorization (ATA). Moreover, biometrics were not submitted by each potential beneficiary until they arrived at the interior POE to seek parole from CBP. Therefore, additional vetting, that could otherwise be completed as part of consular processing before travel is authorized, did not occur prior to issuance of an ATA or before the potential beneficiary boarded a plane to travel to the United States. Many of the security screening systems used by the U.S. government to evaluate applicants for immigration benefits rely on biometrics. Since beneficiaries were not fingerprinted before arriving at a U.S. POE, these checks could not be conducted beforehand to thoroughly vet the alien. Furthermore, beneficiaries under the modernized FRP programs were not interviewed by USCIS, unlike beneficiaries of the legacy FRP programs. In the legacy CFRP program and legacy HFRP program, interviews provided an opportunity to gather additional information about the beneficiary and identify any discrepancies between their application and their in-person statements, as well as to surface any other potential concerns through their testimony. However, these programs were replaced by the modernized FRP programs for Cuba and Haiti for prospective beneficiaries in 2023.[14]

Given these critical differences, the procedures set forth under the modernized FRP programs created an untenable likelihood that malicious actors could enter the interior of the United States without proper vetting, thereby posing an unacceptable level of risk to the United States' national security and public safety.

The FRP programs also presented an unacceptable risk of abuse and fraud. When biometrics collection and interviews do not occur prior to a beneficiary's arrival in the U.S., the risk of fraud increases. U.S.-based petitioners may misrepresent family relationships (*e.g.,* falsely claiming a familial tie) to facilitate the entry of unauthorized aliens. Moreover, reliance solely on an approved Form I–130 does not guarantee the ongoing legitimacy of a relationship, particularly in cases involving spouses where circumstances may have changed since the petition was filed. Even with an approved Form I–130, adjudicators may have missed key indicators of fraud, and adding another layer of scrutiny, such as an interview, can be valuable in verifying eligibility. Additionally, beneficiaries from countries with weak civil registry systems may submit fraudulent documents (such as birth certificates or other identity documents) to support their claims. Having in-country experts, such as consular officers familiar with local documentation, can be critical in identifying and preventing document fraud during the visa process. The process of interviewing beneficiaries overseas and collecting their biometrics plays a critical role in preventing fraud and abuse of the immigration system—steps that were entirely bypassed under the modernized FRP programs. Accordingly, the FRP programs' lack of procedural and vetting guardrails created an unacceptable level of risk of fraud and abuse.

DHS has determined that the desire to reunite families before their priority dates are current does not outweigh the U.S. government's responsibility to prevent fraud and abuse of these programs and to uphold national security and public safety for the American people.

Moreover, the FRP programs no longer accord with the Administration's current enforcement-based priorities, namely to better "achieve the total and efficient enforcement, including through lawful incentives and detention capabilities" of U.S. immigration law.[15] The modernized FRP programs, initiatives of the prior administration, do not align with this Administration's emphasis on enforcing immigration law, deterring unlawful immigration, and

eliminating fraud and abuse. Indeed, E.O. 14165, "Securing Our Borders," embodies the priorities of this Administration and makes clear that "all future parole determinations fully comply with [the order to terminate all categorical parole programs] and with applicable law." [16]

## 2. Further Important Foreign Policy Objectives

One of the stated goals of the modernized FRP programs established in July 2023 was to promote the foreign policy objectives of the prior administration.[17] Indeed, DHS explained consistently in its notices promulgating the FRP programs that implementation would advance the foreign policy objectives of the then-current administration.[18]

Furthermore, DHS established the legacy CFRP Program in 2007, and modernized it in August 2023, in part to further enable the United States to meet its commitment to ensure the lawful migration of a minimum of 20,000 Cubans each year under the U.S.-Cuba Migration Accords.[19] DHS also established the legacy HFRP Program in 2014 to support "U.S. goals for Haiti's long-term reconstruction and development," [20] and modernized it in August 2023, in part because "[i]mproving the efficiency and accessibility of HFRP is necessary to ensure our foreign partners' continued collaboration on migration issues." [21] The foreign policy objectives underlying the FRP programs, however, are not consistent with those of the current Administration and may be achieved through other means.[22]

E.O. 14150, "America First Policy Directive to the Secretary of State", clearly sets out the President's vision that "the foreign policy of the United States shall champion core American interests and always put America and American citizens first." [23] E.O. 14159, "Protecting the American Against Invasion" states that "[i]t is the policy of the United States to faithfully execute the immigration laws against all

---

[13] TECS, not an acronym, is a data system and platform owned by U.S. Customs and Border Protection (CBP). See *DHS/CBP/PIA–021 TECS System: Platform* for more information, available at *https://www.dhs.gov/publication/dhscbppia-021-tecs-system-platform* (last updated Apr. 10, 2025).

[14] While legacy CFRP and legacy HFRP programs were replaced by the modernized FRP programs for Cuba and Haiti in 2023, USCIS continued to interview pending legacy CFRP beneficiaries at the USCIS Field Office in Havana, Cuba through January 2025 when processing was paused.

[15] *See* E.O. 14159, Protecting the American People Against Invasion, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025); *see also FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) ("[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates.").

[16] *See* E.O. 14165, Securing Our Borders, 90 FR 8467 (Jan. 30, 2025) (published Jan. 30, 2025).

[17] *See, e.g.,* 88 FR at 43594.

[18] *See, e.g., Id.* ("[T]he parole of noncitizens, on a case-by-case basis, under [the FRP program for Colombians] will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.").

[19] 72 FR 65588; 88 FR at 54640.

[20] 79 FR at 75582.

[21] 88 FR at 54639.

[22] U.S. commitments under the Cuban Migration Accords, for example, may be met through immigrant visa processing.

[23] *See* 90 FR 8337 (Jan. 20, 2025) (published Jan. 29, 2025).

inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities."[24]

To reiterate, E.O. 14165, "Securing Our Borders" states that DHS shall "terminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders."[25] In the same E.O., the President directed that as soon as practicable, the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to resume the Migrant Protection Protocols in all sectors along the southwest border of the United States and ensure that, pending section 240 removal proceedings, aliens described in INA 235(b)(2)(C), 8 U.S.C. 1225(b)(2)(C), are returned to the territories from which they came.

The President has pursued the cooperation of foreign partners on migration issues in other ways as well. For instance:

• On January 23, 2025, President Trump in his call with Salvadoran President Nayib Bukele discussed working together to stop illegal immigration and crack down on transnational gangs like Tren de Aragua.[26]

• On January 26, 2025, the Government of Colombia agreed to the unrestricted acceptance of all illegal aliens from Colombia returned from the United States, including on U.S. military aircraft, without limitation or delay.[27]

• On January 27, 2025, President Trump had a productive conversation with Indian Prime Minister Narendra Modi, who agreed to "do what's right" in regard to illegal migration.[28]

• Since February 1, 2025, President Trump has issued several tariff-related executive orders in connection with the situation at the southwest border.[29]

• On February 16, 2025, Panama received a first U.S. military plane transporting 119 deportees of various nationalities, with the plan to repatriate them to their own respective countries. Panamanian President Jose Raul Mulino has offered his country as a stopover for aliens expelled from the United States.[30]

• On May 19, 2025, a Department of State spokesperson announced steps "to impose visa restrictions on owners, executives, and senior officials of travel agencies based and operating in India for knowingly facilitating illegal immigration to the United States."[31]

• Secretary Rubio had calls with Mexican Foreign Secretary de la Fuente on March 31, 2025,[32] May 30, 2025[33] and July 2, 2025,[34] during which they discussed efforts to secure the U.S.-Mexico border, dismantle cartels, stop the flow of illicit drugs, firearms, and illegal aliens.

Multiple agencies of the U.S. government are actively pursuing the President's foreign policy goals. For instance, the Department of State has announced discussions with neighboring countries regarding DHS's ability to remove or return illegal aliens,[35] consistent with Secretary of State Rubio's January 22, 2025, announcement that a key priority of the Department of State is to curb mass migration and secure our borders.[36] In that announcement, the Department of State made clear that it "will no longer undertake any activities that facilitate or encourage mass migration" and that "[o]ur diplomatic relations with other countries, particularly in the Western Hemisphere, will prioritize securing America's borders, stopping illegal and destabilizing migration, and negotiating the repatriation of illegal immigrants."[37] Additionally, pursuant to his authority under INA 219, 8 U.S.C. 1189, Secretary of State Rubio designated the gang Mara Salvatrucha (active in El Salvador, Guatemala, and Honduras, among other countries), along with other cartels and gangs, as Foreign Terrorist Organizations.[38] On May 5, 2025, Secretary Rubio also designated two Haitian criminal organizations, Viv Ansanm and Gran Grif, as designated Foreign Terrorist Organizations under INA 219, 8 U.S.C. 1189.[39]

The actions set forth in this notice complement and underscore the Administration's pivot to a foreign policy that prioritizes the United States' interests in reducing and deterring unlawful immigration. Regardless of whether the prior Administration saw the FRP programs as a component of a regional migration management strategy, the current Administration is not

---

[24] 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025).

[25] *See* 90 FR 8467, 8468 (Jan. 20, 2025) (published Jan. 30, 2025).

[26] The White House, "Readout of President Donald J. Trump's Call with President Nayib Bukele" (Jan. 23, 2025), *https://www.whitehouse.gov/briefings-statements/2025/01/readout-of-president-donald-j-trumps-call-with-president-bukele/.*

[27] The White House, "Statement From the Press Secretary" (Jan. 26, 2025), *https://www.whitehouse.gov/briefings-statements/2025/01/statement-from-the-press-secretary/.*

[28] Meryl Sebastian, "Trump Says India 'Will Do What's Right' on Illegal Immigration," BBC News (Jan. 27, 2025), *https://www.bbc.com/news/articles/cj91z842wlmo.*

[29] *See, e.g.,* Executive Order 14194, Imposing Duties to Address the Situation at our Southern Border, 90 FR 9117 (Feb. 1, 2025) (published Feb. 7, 2025); Executive Order 14198, Progress on the Situation at Our Southern Border, 90 FR 9185 (Feb. 3, 2025) (published Feb. 10, 2025); Executive Order 14227, Amendment to Duties to Address the Situation at Our Southern Border, 90 FR 11371 (Mar. 2, 2025) (published Mar. 6, 2025).

[30] *Panama Receives First US Deportation Flight Under Trump Administration,* The Tico Times (Feb. 16, 2025), *https://ticotimes.net/2025/02/16/panama-receives-first-us-deportation-flight-under-trump-administration.*

[31] U.S. Department of State, Press Releases: Visa Restrictions on Travel Agencies Facilitating Illegal Immigration to the United States, May 19, 2025, *https://www.state.gov/releases/office-of-the-spokesperson/2025/05/visa-restrictions-on-travel-agencies-facilitating-illegal-immigration-to-the-united-states/.*

[32] U.S. Department of State, Press Release: Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente, March 31, 2025, *https://www.state.gov/secretary-rubios-call-with-mexican-foreign-secretary-de-la-fuente-3/.*

[33] U.S. Department of State, Press Release: Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente, May 30, 2025, *https://www.state.gov/releases/office-of-the-spokesperson/2025/05/secretary-rubios-call-with-mexican-foreign-secretary-de-la-fuente/.*

[34] U.S. Department of State, Press Release: Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente, July 2, 2025, *https://www.state.gov/releases/office-of-the-spokesperson/2025/07/secretary-rubios-call-with-mexican-foreign-secretary-de-la-fuente-3/.*

[35] *See, e.g.,* U.S. Department of State, Readout, Secretary Rubio's Meeting with Salvadoran President Nayib Bukele (Feb. 3, 2025) ("President Bukele agreed to take back all Salvadoran MS–13

gang members who are in the United States unlawfully. He also promised to accept and incarcerate violent illegal immigrants, including members of the Venezuelan Tren de Aragua gang, but also criminal illegal migrants from any country."), *https://www.state.gov/secretary-rubios-meeting-with-salvadoran-president-nayib-bukele/;* U.S. Department of State, Readout, Secretary Rubio's Meeting with Panamanian President Mulino (Feb. 2, 2025) ("Secretary Rubio also emphasized the importance of collaborative efforts to end the hemisphere's illegal migration crisis and thanked President Mulino for his support of a joint repatriation program, which has reduced illegal migration through the Darien Gap."), *https://www.state.gov/secretary-rubios-meeting-with-panamanian-president-mulino/.*

[36] U.S. Department of State, Press Statement, Priorities and Mission of the Second Trump Administration's Department of State (Jan. 22, 2025), *https://www.state.gov/priorities-and-mission-of-the-second-trump-administrations-department-of-state/.*

[37] *Id.*

[38] Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generación, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana, 90 FR 10030 (Feb. 20, 2025); *see also* Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists, 90 FR 8439 (Jan. 20, 2025) (published Jan. 29, 2025).

[39] Foreign Terrorist Organization Designations of Viv Ansanm and Gran Grif, 90 FR 19065 (May 5, 2025).

pursuing that strategy given it is no longer consistent with current Administration's priorities. Rather, as described above, the current Administration continues to focus its foreign policy attention on other measures to deter and prevent the entry of illegal aliens into the United States.

These measures will allow DHS to better "achieve the total and efficient enforcement" of U.S. immigration law and, as such, champion a core American interest in accordance with the President's vision for American foreign policy.[40] In short, the continued implementation of the FRP programs does not accord with the President's stated priorities and foreign policy objectives.

*3. Provide a Lawful Pathway and Timely Alternative to Unlawful Migration*

DHS intended for the FRP programs to provide a lawful, safe, and orderly alternative to unlawful migration to the United States as part of a regional migration management strategy developed by the prior Administration.[41] Because the INA allocates a certain number of immigrant visas each year, beneficiaries of approved Form I–130 petitions often face years-long waits before a visa becomes available. The prior Administration claimed that the FRP programs were designed to discourage unlawful migration during this period by offering a faster, lawful pathway for U.S. citizens and LPRs to reunite with family members while awaiting availability of immigrant visas.[42] These programs were specifically aimed at nationals of countries who often face especially long wait times for immigrant visas.[43] DHS now finds, as explained below, that the FRP programs did not adequately realize the goal of discouraging unlawful migration, as the confirmed beneficiaries of the FRP programs constitute a tiny fraction of the total population of aliens from the seven FRP countries that unlawfully attempted to enter the country during this time period.[44] Since the implementation of the modernized FRP programs beginning in July 2023 and the

modernization of the legacy FRP programs, approximately 16,100 aliens have been granted parole under the FRP programs.[45] In contrast, CBP encounters of aliens from the seven FRP countries at and between POEs on the U.S. southwest land border totaled over 888,000 in FY2024.[46]

DHS acknowledges that some aliens who have been paroled into the United States under the FRP programs may have otherwise sought to enter unlawfully along the southwest border. However, upon review and further consideration of the number of aliens that were determined to be eligible to participate in the programs, the relatively small number who actually chose to participate, and other more recent measures that have dramatically reduced southwest border encounters, DHS has ultimately determined that the FRP programs did not meaningfully reduce unlawful migration at the southwest border and are not needed to achieve that goal. DHS ultimately determined that policy actions such as increasing interior enforcement actions, ramping up removals, building physical barriers along the border, and deploying advanced surveillance technology represent a more prudent approach to the short and long-term challenges presented at the southwest border.

The FRP programs required that a petitioner with an approved Form I–130, Petition for Alien Relative, first receive an invitation to submit a request to be a supporter on behalf of the principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. Generally, invitations were issued based on operational capacity and the period of time until the principal beneficiary's immigrant visa was expected to become available,

among other factors. Considering the limitation on the number of aliens who have family-sponsored immigrant visas that are expected to become available within any given period, the number of invitations sent was minimal compared to the flow of aliens coming from the countries for which an FRP program existed.[47] Even if every one of the approximately 36,000 petitioners invited to participate in the modernized FRP programs had filed a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, on behalf of each eligible beneficiary of the approved Form I–130, and all such Form I–134A requests were confirmed and the beneficiaries granted advance travel authorization by DHS, the number of beneficiaries who could have been paroled into the United States would still account for a fraction of the approximately 890,000 aliens from the FRP program countries who were encountered by CBP in Fiscal Year (FY) 2024. DHS did not intend for the FRP programs to, on their own, substantially decrease the number of encounters along the southwest border. The FRP programs were just one part of the previous administration's broader strategy of expanding access to lawful pathways to aliens who may otherwise travel to the United States as part of the unlawful migration flows at the southwest border.[48] In practice, at the time DHS paused processing under the FRP programs in late January 2025,[49] the participation rate for petitioners who had been invited to these programs was approximately 30%.[50] Overall, other policy actions represent a more prudent and effective path to addressing unlawful immigration generally and especially at the southwest border.

The decision to terminate discretionary and temporary parole programs like the FRP programs is further informed by the actions of the prior administration, which found the parole programs for Cubans, Haitians, Nicaraguans, and Venezuelans [51]

---

[40] *See* 90 FR 8443 (Jan. 29, 2025).

[41] *See, e.g.,* 88 FR at 43595.

[42] *See, e.g.,* 88 FR 78762, 88 FR 43591, 72 FR 65588.

[43] *Id.; see also* 72 FR 65588; 79 FR 75581.

[44] As of Feb. 18, 2025, the overall responsiveness rate to invitations sent under the modernized FRP programs was approximately 30% based on an internal USCIS analysis. This means that 70% of petitioners who received FRP invitations did not opt to participate in FRP programs and did not file an I–134A as of Feb. 18, 2025. *See* USCIS analysis of FRP response rates as of Feb. 18, 2025 [OHSS tab 3].

[45] The information provided here is based on analysis of internal data from U.S CBP tracking aliens paroled under the FRP programs performed in June 2025. CBP shows 14,069 aliens paroled under FRP class of admission (COAs) (Colombian Family Reunification Parole (RCO), Cuban Family Reunification Parole (RCU), Ecuadorian Family Reunification Parole (RED), Guatemalan Family Reunification Parole (RGT), Honduran Family Reunification Parole (RHN), Haitian Family Reunification Parole (RHT), and El Salvadoran Family Reunification Parole (RSV)) as of January 20, 2025. *See* USCIS analysis of CBP FRP parole data as of Jan. 23, 2025. USCIS estimates there are 1,852 aliens with valid parole under the legacy CFRP program and 108 aliens with valid parole under the legacy HFRP program as of April 2, 2025. *See* USCIS analysis of legacy FRP filings as of Apr. 2, 2025 [OHSS tabs 10 & 11].

[46] *See* U.S. CBP Nationwide Encounters *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited Apr. 30, 2025) (filtered by Region (Southwest Land Border) and Citizenship (Columbia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras)).

[47] In FY2024, CBP encounters of unlawful aliens on the U.S. southwest land border from the seven FRP countries totaled 888,023. *See* U.S. CBP Nationwide Encounters *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited Apr. 30, 2025).

[48] *See, e.g.,* 88 FR at 43593.

[49] Email from Jennifer Higgins, Acting Director, USCIS (Jan. 23, 2025).

[50] Responsiveness rate is based on internal USCIS analysis whereby a total of 35,666 FRP invitations were issued over the life of the modernized FRP programs, and of those, a total of 10,608 invitees filed requests as of Feb. 18, 2025. *See* USCIS analysis of FRP response rates as of Feb. 18, 2025 [OHSS tab 3].

[51] Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 FR
Continued

(''CHNV parole programs'') and FRP programs, even when paired with the *Circumvention of Lawful Pathways* rule, to be insufficient to address very high levels of illegal immigration.[52] For example, following the implementation of the FRP programs and the *Circumvention of Lawful Pathways* rule, DHS and the Department of Justice (''DOJ'') promulgated the *Securing the Border* rule[53] as an emergency measure to address ongoing high levels of unlawful immigration between the southwest border POEs.[54] DHS and DOJ then explained that ''at current levels of encounters and with current resources, [DHS] cannot predictably and swiftly deliver consequences to most noncitizens who cross the border without a lawful basis to remain . . . [DHS's] ability to refer and process noncitizens through expedited removal thus continues to be overwhelmed, creating a vicious cycle.''[55] This conclusion—that DHS's ability to swiftly impose consequences for unlawful immigration ''continue[d] to be overwhelmed''[56]—followed more than a year of the *Circumvention of Lawful Pathways* framework, nearly a year of the modernized FRP programs, and two years of the CHNV parole programs, with the implementation of each being justified as facilitating operational control of the southwest border of the United States by discouraging unlawful immigration. The promulgation of the *Securing the Border* interim final rule in June 2024 underscored the stark failure of categorical parole programs, like the FRP programs and CHNV parole programs, as well as the *Circumvention of Lawful Pathways* rule to deliver on their promises. These policies not only fell short of enhancing border security but also failed to curb the persistent surge of unlawful immigration along the southwest border.

The *Securing the Border* framework[57] and implementation of President Trump's subsequent policies have resulted in a dramatic reduction in unlawful migration to the U.S. southwest border. For example, encounters between southwest border POEs decreased from an average of about 4,910 per day in the six months prior to the *Securing the Border* interim final rule to an average of 1,880 per day between June and December 2024.[58] Moreover, southwest border encounters have declined even more dramatically since President Trump took office on January 20, 2025, and issued a series of proclamations and orders designed to address the urgent situation at our borders, including Proclamation 10888, *Guaranteeing the States Protection Against Invasion,* 90 FR 8333 (Jan. 20, 2025) (published Jan. 29, 2025). Indeed, in the 161 days from January 21 through June 30, 2025, encounters between POEs averaged fewer than 290 per day, down from over 1,600 per day in the last 161 days of the prior administration, while encounters at POEs averaged about 120 per day, down from over 1,580 per day.[59] Accordingly, even assuming the FRP programs had any impact on reducing unlawful migration, the FRP programs are no longer needed due to reduction in southwest border encounters as a result of other, more effective, policies.

Ultimately, the FRP programs failed in their stated intention to sufficiently deter unlawful migration. A July 2024 report found that, prior to the implementation of the *Securing the Border* framework, ''in the first five months of the year [2024], CBP agents encountered more than nine hundred thousand migrants and asylum seekers at the U.S.-Mexico border. The majority hailed from just six countries: Mexico, Guatemala, Venezuela, Cuba, Ecuador, and Colombia, in descending order.''[60] Despite the categorical parole programs that the previous administration put in place, four out of six of the nationalities with the highest entry numbers in the first half of 2024 had a dedicated FRP program.[61] The modernized FRP program for Haiti was implemented on August 11, 2023. CBP data indicates that in FY2022, 53,910 Haitian nationals were encountered at the Southwest border, in FY2023, 76,130 and in FY2024, 88,673.[62] This year-on-year substantial increase in encounters of Haitian nationals at the Southwest border show that the modernized FRP program for Haiti failed to slow the increase in unlawful migration to the Southwest border. This data reflects that the FRP programs did not noticeably decrease unlawful migration, or at the very least were not nearly as effective as other policies implemented at the same time to reduce unlawful migration.

When the modernized FRP programs were established, they were promoted as timely alternatives to unlawful migration and as tools to address the root causes of migration. However, it was not adequately recognized that the populations served by these programs were often fundamentally different from those undertaking unlawful migration. FRP beneficiaries had approved I–130 petitions and U.S.-based supporters who were LPRs or U.S. citizens, and thus had a lawful immigration pathway available to them, even if it involved a significant wait. In contrast, aliens arriving at the southwest border may lack U.S. family ties or access to any lawful immigration channel. It is therefore unlikely that someone with an existing legal pathway would risk compromising their eligibility by pursuing unlawful entry. Economic migrants and asylum seekers, on the other hand, may resort to appearing at the border regardless, due to the absence of viable legal alternatives. Perhaps most significantly, although the previous administration argued that the FRP programs would decrease unlawful migration, there is no data to support this argument. For example, the FRP program for Ecuadorians was implemented on November 16, 2023. CBP data indicates that in FY2022, 24,060 Ecuadorian nationals were encountered at the

---

[13611 (Mar. 25, 2025). *See also* ''CBP Released December 2024 Monthly Update'', *https://www.cbp.gov/newsroom/national-media-release/cbp-releases-december-2024-monthly-update* (last modified Jan. 14, 2025) (providing that over 531,000 aliens were granted parole under the CHNV parole programs).

[52] *See* Circumvention of Lawful Pathways 88 FR 31314 (May 16, 2023).

[53] *See* Securing the Border, Interim Final Rule, 89 FR 48710 (June 7, 2024); Securing the Border, Final Rule, 89 FR 81156 (Oct. 7, 2024).

[54] ''On June 3, 2024, the President signed Proclamation 10773 under sections 212(f) and 215(a) of the INA, finding that because border security and immigration systems of the United States were unduly strained, the entry into the United States of certain categories of [aliens] was detrimental to the interests of the United States, and suspending and limiting the entry of such [aliens].'' 89 FR at 81157–58.

[55] 89 FR at 48714.

[56] 89 FR at 48715.

[57] On May 9, 2025, a district court vacated and set aside the *Securing the Border* rule's limitation on asylum eligibility and manifestation of fear requirement that allowed the rule's ''reasonable probability'' standard to remain in effect. *See Las Americas Immigr. Advocacy Ctr. v. DHS*, No. 1:24–cv–1702–RC,—F. Supp. 3d—, 2025 WL 1403811, at *21 (D.D.C. May 9, 2025).

[58] OHSS analysis of December 2024 OHSS Persist Dataset [OHSS tab 2].

[59] OHSS analysis of May 2025 OHSS Persist Dataset and CBP data downloaded from UIP on July 2, 2025 [OHSS tab 1].

[60] Council on Foreign Relations, ''Why Six Countries Account for Most Migrants at the U.S.-Mexico Border'' July 9, 2024, *https://www.cfr.org/article/why-six-countries-account-most-migrants-us-mexico-border.*

[61] It should be noted that Venezuela, one of the six highest entry populations by nationality mentioned, also had a parole program which is not addressed in this FRN. The Venezuelan parole program, largely premised on the same justifications as those contained in the FRP parole programs, has been terminated in another notice. *See* Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 FR 13611 (Mar. 25, 2025).

[62] CBP, ''Nationwide Encounters'' Filtered for Region: Southwest Land Border, Citizenship: Haiti, *https://www.cbp.gov/newsroom/stats/nationwide-encounters.*

Southwest border, in FY2023, 116,229 and in FY2024 122,072.[63] Petitioners with an approved Form I–130 filed for an alien abroad were invited to submit Form I–134A which served as a declaration of financial support. Neither petitioners nor beneficiaries were asked through a form or an interview prior to applying for admission at a POE in the U.S. whether they had any intention of attempting entry to the U.S. unlawfully as an alternative to waiting for consular processing in their countries. DHS believes, based on available data, that the FRP programs had no meaningful deterrent effect on nationals from these countries considering travel to the Southwest border. The programs do not appear to have influenced the number of attempted entries in any meaningful way. Moreover, any limited impact they may have had on reducing unlawful border encounters falls far short when compared to the effectiveness of other enforcement-focused policies implemented by the current administration.

The Department has determined that terminating the FRP programs will allow the Administration to adopt and implement more prudent, durable, and appropriate strategies that will lead to a sustainable reduction of encounters at the southwest border. The Department's objective of breaking the vicious cycle of unlawful immigration supports termination of the FRP programs along with the implementation of enforcement-based actions that are consistent with the policy objectives outlined in the new presidential directives calling for enhanced border security beyond the 2024 *Securing the Border* framework.[64]

*4. Reduce Strain on Limited U.S. Resources*

The FRP programs were designed with the goal of easing pressure on DHS resources and personnel by lowering the number of encounters at the Southwest border enough to offset the added

processing and administrative burden; but that outcome never materialized. Instead, the programs failed to reduce encounters at the Southwest border and only added to DHS' workload. There was no reduction in burden with regards to detention, monitoring, processing, and removal of aliens for DHS personnel and resources, and, at the same time, there was an increased burden in for both CBP and USCIS components who processed these applications from receipt of Form I–134A to arrival at a U.S. POE.

As discussed in the previous section of this notice, the number of aliens who chose to participate in the FRP programs and who otherwise would have chosen to unlawfully migrate as an alternative option is too uncertain or limited towards meaningfully realizing the original justifications for their implementation and the current Administration's shift in policy focus to deter unlawful migration and achieve operational control of the southwest border.[65]

After a thorough review assessing the costs of implementing these programs, preliminary findings show that the programs have not met their stated goal of burden-reduction. On the contrary, these programs have led to an increased strain on DHS personnel and resources to process, review, and adjudicate parole requests, especially when considering the programs did not meaningfully result in any reduction of encounters at or between POEs.[66] For USCIS, there have been approximately 35,700 Form I–134A filed with USCIS under the modernized FRP programs since July 2023, which includes approximately 420 pending review, 19,500 confirmed by USCIS, and 15,450 non-confirmed by USCIS.[67] It has required significant USCIS resources to administer these parole programs. CBP has also expended considerable

resources implementing the FRP programs. Under the modernized FRP programs, CBP has received 16,976 advance travel authorization (ATA) requests, including 1,987 pending review or CBP One submission, 13,983 approved by CBP, 975 denied by CBP, and 31 that expired after being approved.[68]

Due to the originating location of beneficiaries of the FRP programs and available travel routes via commercial air, approximately 70% of beneficiaries of these programs who were issued an ATA flew to Florida POEs.[69] With the addition of three POEs in Texas and New York City, these POEs in just three states account for nearly 85% of all arrivals of FRP beneficiaries requesting parole.[70] Processing an alien requesting parole under the modernized FRP programs requires secondary processing and enrollment of biometrics, resulting in a more extensive interaction with the alien and prolonged time in CBP facilities.

Although DHS, under the previous administration, argued that aliens who had been paroled into the U.S. may have otherwise sought to enter unlawfully along the southwest border, there is little to no evidence to support this argument. DHS has no way of determining whether aliens paroled into the U.S. under the respective FRP programs might have otherwise attempted to enter unlawfully, as they were never asked this question at any point, either before or after the programs were implemented. Instead, these aliens with lawful pathways available to them likely would have remained overseas while waiting for an immigrant visa to become available and then would have completed consular processing so they could be admitted to the United States as an LPR. Aliens in this portion of the population would have been processed by the Department of State if they had gone through consular processing. Under the FRP programs, DHS reassigned personnel from other caseloads to work on processing Forms I–134A, requests for ATAs, and for parole processing at interior POEs. Therefore, the FRP programs not only shifted the strain from the Department of State to DHS personnel, they also increased the overall strain on DHS

---

[63] CBP, "Nationwide Encounters" Filtered for Region: Southwest Land Border, Citizenship: Ecuador, *https://www.cbp.gov/newsroom/stats/nationwide-encounters.*

[64] As explained above, southwest border encounters decreased following implementation of the *Securing the Border* framework and complementary actions, and border encounters decreased even more dramatically following implementation of President Trump's policies. Another example of President Trump's policy directives include the Presidential Proclamation "Guaranteeing the States Protection Against Invasion" which suspends entry of aliens across the southwest border, imposes restrictions on entry for aliens, and suspends and restricts entry for aliens posing public health, safety, or national security risks. *See* Guaranteeing the States Protection Against Invasion, 90 FR 8333 (Jan. 29, 2025).

[65] 90 FR 8467, Sec. 2(g).

[66] See discussion above concerning drops in southwest land border encounters from the months of December 2024 to June 2025. DHS has determined, based on the available evidence, that other enforcement-based policies, including the *Circumvention of Lawful Pathways* and *Securing the Border* rules, proved more effective at reducing southwest land borders. OHSS analysis of December 2024 OHSS Persist Dataset [OHSS tab 2]; OHSS analysis of May 2025 OHSS Persist Dataset [OHSS tab 1].

[67] Data pulled from internal DHS reports on parole processing [OHSS tab 12]. Further, "Confirmed" in this context meant that that USCIS had determined that the supporter was eligible to be a supporter and that they demonstrated the ability to financially support the beneficiary, while "non-confirmed" meant that USCIS had determined that the potential supporter had been determined to be ineligible to be a supporter or failed to demonstrate ability to financially support the beneficiary.

[68] ATA request data is based on an internal USCIS analysis of information provided by CBP. *See* USCIS analysis of CBP FRP parole data as of Jan. 23, 2025 [OHSS tab 6].

[69] Data provided on arrivals at specific POE is based on an internal USCIS analysis of arrival information provided by CBP. *See* USCIS analysis of CBP FRP parole data as of Jan. 23, 2025 [OHSS tab 5, 7, 8, 9].

[70] *Id.*

resources because of the extra processing required under the programs combined with the little to no concomitant reduction of unlawful entries of nationals from the seven FRP countries.

The reallocation of limited DHS personnel resources caused by the FRP programs is unsustainable, especially given DHS' critical need to address border and interior enforcement and other Administration priorities. Implementation of these programs resulted in increased expenditure of DHS personnel and resources on administering the programs without any related burden reduction for processing, detention, monitoring, and removal of aliens unlawfully entering or present within the United States.

As previously noted, reports indicate that nationals of the countries eligible for the FRP programs have continued to migrate unlawfully at some of the highest rates among all nationalities. CBP personnel, in particular, experienced no relief. In contrast, the implementation of the FRP programs introduced additional demands on DHS, increasing workloads across multiple USCIS directorates including the Service Center Operations Directorate (SCOPS) and Field Operations Directorate (FOD).

The FRP programs have also resulted in expanded eligibility for Federal public benefits. This is because, for instance, an alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year is considered a "qualified alien." *See* 8 U.S.C. 1641(b)(4). Because DHS generally issued three-year periods of parole from the outset, FRP parolees generally were considered qualified aliens. Although qualified aliens are generally subject to a five-year waiting period before becoming eligible for certain Federal public benefits, *see, e.g.,* 8 U.S.C. 1613(a) (five-year waiting period for Federal means-tested public benefits); 8 U.S.C. 1612(a)(2)(L) (general five-year waiting period before a qualified alien can receive supplemental nutrition assistance program (SNAP) benefits), such waiting periods do not apply to all FRP parolees with respect to all public benefit programs. For instance, a parolee under the age of 18 may be eligible for SNAP benefits, *see* 7 CFR 273.4(a)(6)(ii)(J), as might "a Cuban or Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980)," *see* 7 CFR 273.4(a)(6)(ii)(E). Similarly, some states have extended Medicaid and Children's Health Insurance Program benefits without a five-year waiting period to "lawfully residing" children and

pregnant women, which includes an alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year.[71] Overall, the domestic impact of the FRP programs counsel against their continued operation.

*5. Address the Root Causes of Migration Through Economic Stability and Development Supported by Increased Remittances*

Finally, DHS intended for the FRP programs to aid in encouraging development and addressing economic concerns in the eligible countries by increasing the flow of remittances to those countries.[72] Aliens paroled into the United States under the FRP programs are eligible for discretionary employment authorization, and aliens with employment authorization typically enjoy higher wages than those without employment authorization, allowing them the opportunity to send greater amounts of money back to their home country in the form of remittances.[73] However, upon review of the modernized FRP programs more than a year and a half[74] after they were made available, DHS has determined that a relatively low percentage of invited petitioners decided to participate in the programs. Because of the low acceptance rate of invited petitioners, the volume of remittances sent by supporters or beneficiaries was minimal and had little to no measurable impact on the economies of their home countries. Consequently, the FRP programs fell short of addressing the underlying economic drivers of unlawful migration. The modernized FRP programs' failure to address the economic motivations behind illegal immigration weighs in favor of terminating the FRP programs.

In 2023 and 2024, the countries whose nationals were eligible for consideration for parole under the FRP programs had remittance volumes ranging from a low of $2.5 billion in Cuba to a high of $21.6 billion in Guatemala.[75] The remittance volumes

referenced were not tied exclusively to aliens paroled into the United States under the FRP programs, that is, those remittances could have been sent from anyone in the United States, regardless of immigration status. From 2020 to 2023, remittance volumes in 6 of the 7 countries whose nationals were eligible for an FRP process grew between 8% and 43%.[76] Only Haiti experienced a lower growth rate at just 1%.[77] In 2023, remittances accounted for over 20% of the GDP of Guatemala, with similar increases noted in El Salvador (24.5%), and Honduras (28.0%).[78] Comparing the high volumes of remittances in each of the FRP countries to the small populations from each country that were invited to participate in the FRP programs and the even smaller populations that did participate, DHS has determined that any contribution FRP parolees may make to the remittance volumes in their home country is too small to substantially impact the overall economic stability of the country or address the root causes of migration.

The FRP programs failed in their intention of addressing the root causes of migration. A July 2024 report stated "The Joe Biden administration has responded by designing policies to mitigate 'root causes' of migration and displacement, enacting temporary humanitarian protections for individuals from certain countries, while making it more difficult for migrants to apply for asylum in the United States. But push factors— including organized crime-fueled violence and extortion and a lack of economic opportunities—combined with the pull of a strong U.S. labor market, make it unlikely migration flows will decrease substantially in the near future."[79] Due to the low numbers of participants in the FRP programs, it is also unlikely that the remittances provided by the FRP participant population would meaningfully impact migration flows. As previously stated, it is unlikely that someone with an existing legal pathway would risk

[71] *See* 42 U.S.C. 1396b(v)(4) (Medicaid); 42 U.S.C. 1397gg(e)(1)(O) (CHIP).

[72] *See, e.g.,* 88 FR at 43596.

[73] George J. Borjas, "The Earnings of Undocumented Immigrants," National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that aliens without authorization to work earn less than those with employment authorization).

[74] The FRP process for Ecuadorians was established in November 2023 so has been available for approximately four fewer months. *See* 88 FR 78762.

[75] Family Remittances in 2024: Looking Ahead amid Possible Shifts in Flows, Table 2, The Dialogue: Leadership for the Americas (Aug. 6, 2024), *https://thedialogue.org/family-remittances-*

*in-2024-looking-ahead-amid-possible-shifts-in-flows.*

[76] *Id.* at table 1 (The growth rates in each country were: Cuba—43%; Guatemala—15%; Honduras— 14%; Ecuador—11%; Colombia—10%; and El Salvador—8%.).

[77] *Id.*

[78] Family Remittances to Latin America and the Caribbean 2023, Slide 6, The Dialogue: Leadership for the Americas (Sept. 9, 2023), *https://thedialogue.org/analysis/family-remittances-to-latin-america-and-the-caribbean-2023/.*

[79] Council on Foreign Relations, "Why Six Countries Account for Most Migrants at the U.S.-Mexico Border" July 9, 2024, *https://www.cfr.org/article/why-six-countries-account-most-migrants-us-mexico-border.*

compromising their eligibility by pursuing unlawful entry to the United States. Economic migrants and asylum seekers, on the other hand, may resort to the border route regardless, due to the absence of viable legal alternatives and the push and pull factors that remain unaddressed by the FRP programs.

More broadly, the United States cannot bear sole responsibility for the development and economic stability of other nations. In line with the America First Policy Directive, the President instructed the Secretary of State to "issue guidance bringing the Department of State's policies, programs, personnel, and operations in line with an America First foreign policy, which puts America and its interests first." [80] While strategic partnerships and targeted support can play a role, U.S. immigration policy cannot serve as a surrogate for long-term development solutions in foreign countries.

Lessons Learned

The FRP programs did not achieve their stated objectives. They failed to reduce unlawful migration or alleviate operational burdens on DHS—particularly CBP—and instead increased administrative strain across multiple USCIS directorates and CBP ports of entry. Moreover, the programs had no measurable effect on addressing root causes of migration and introduced additional vulnerabilities that actively undermined the integrity of the U.S. immigration system and posed risks to public safety and national security.

While the modernized FRP programs established a framework for vetting, the processes in place proved insufficient and introduced significant opportunities for fraud. For instance, a recent internal audit revealed that over 700 requests to be a supporter were filed under the names of deceased individuals of which USCIS confirmed approximately half. Generally, if a Form I–130 petitioner dies after approval, the Form I–130 is automatically revoked. [81] Under program requirements, the individual submitting the request to be a supporter must be the same petitioner who filed the original family-based immigrant visa petition—the same petitioner to whom the Department of State issued the parole invitation. Additionally, the same internal audit concluded that the vetting standards applied to co-supporters under the modernized FRP programs were even weaker than those for

primary supporters, further compromising program integrity.

Taken together, these operational shortcomings, security vulnerabilities, and policy failures underscore that the FRP programs not only failed to meet their intended goals, but actively strained DHS resources and undermined public trust. For these reasons, termination of the FRP programs is a prudent course of action.

**IV. Reliance Interests of Prospective Supporters and Parolees**

In deciding whether and how to terminate the FRP programs, DHS has considered potential reliance interests of a range of potential supporters and beneficiaries of these programs. At the outset, however, DHS observes that the temporary and discretionary nature of parole indicates that reliance on the continued existence of the FRP programs would be unwarranted. *See* INA 101(a)(13)(B), 212(d)(5)(A); 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A). Further, the notices establishing the modernized FRP programs expressly advise the public that, "[t]he Secretary retains the sole discretion to terminate this FRP process at any point" [82] and that "DHS may terminate parole upon notice in its discretion at any time." [83] The FRP programs were "being implemented as a matter of the Secretary's discretion. [They are] not intended to and [do] not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal." [84]

Notwithstanding that DHS made very clear that reliance on these programs would be inappropriate, and the additional notice provided in E.O. 14165, DHS has analyzed the effects of this action on any potential reliance interests in an abundance of caution. DHS recognizes that this notice announces a reversal of a prior policy of which many stakeholders have taken advantage after being invited to participate. To analyze the reliance interests of affected parties, DHS describes the main steps in the process below and analyzes the reliance interests of parties who have reached that point in the process.

*1. Reliance Interests of Potential Supporters and Beneficiaries*

DHS first considered the potential reliance interests of those U.S.-based I–130 petitioners invited by DHS to participate in the FRP programs and who had intended to file or have filed a Form I–134A or Form I–131,

Application for Travel Documents, Parole Documents, and Arrival/Departure Records, in support of a potential parolee. [85] In general, the costs associated with Form I–134A filings are minimal. While there is no fee for the petitioner to file a Form I–134A and there is no fee for a potential beneficiary to seek consideration under the FRP programs, petitioners who have already filed Form I–134A, or who have completed the Form I–134A in anticipation of filing, may have incurred the opportunity cost of completing Form I–134A, estimated at 2.60 hours per response. [86]

There are currently over 15,000 pending initial requests for parole under the legacy CFRP program at various stages of adjudication. There are no pending initial requests under the legacy HFRP program, so there are no reliance interests for potential petitioners or beneficiaries under that program. Petitioners under the legacy CFRP program were required to pay the filing fee for Form I–131, unless they were eligible for a fee waiver. For a Form I–131 filed before December 23, 2016, petitioners paid $360. For a Form I–131 filed after December 23, 2016, petitioners paid $575. For a Form I–131 filed after April 1, 2024, petitioners generally paid $630, although CFRP add-on derivatives were exempt from the fee.

At this early stage in the process, the costs incurred by a potential beneficiary in both the Form I–134A-based modernized FRP programs, as well as the Form I–131-based legacy CFRP program are minimal. In the Form I–134A-based process, once a petitioner's Form I–134A is confirmed, the potential beneficiary receives instructions to create an online account with myUSCIS, confirms biographic information in the online account, and attests to meeting the eligibility requirements, including the completion of a medical examination by a panel physician. Potential beneficiaries who received notification that the Form I–134A filed on their behalf was confirmed were instructed on next steps in the process,

---

[80] 90 FR 8337.

[81] *See generally* 8 CFR 205.1(a)(3)(i)(B) and (C). There are certain noted exceptions, such as INA 204(*l*) and humanitarian reinstatement of a revoked petition.

[82] *E.g.,* 88 FR at 43598; 88 FR at 54643.

[83] *E.g.,* 88 FR at 43593; *see also* 88 FR at 54643.

[84] *E.g.,* 88 FR at 43598–99; 88 FR at 54643.

[85] The information collection approval of Form I–134A has expired and it is no longer available for submission. DHS sent its most recent invitation for a petitioner to submit a Form I–134A on June 28, 2024, and has not accepted a request from a prospective supporter since January 28, 2025. Only 420 Forms I–134A are pending, and USCIS will send them each nonconfirmation notices.

[86] See SUPPORTING STATEMENT FOR Online Request to be a Supporter and Declaration of Financial Support, OMB Control No.: 1615–0157, COLLECTION INSTRUMENT(S): Form I–134A, page 10, question 12, *https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202409-1615-006* (last visited Feb. 7, 2025).

including completion of the medical requirements. The medical examination required being cleared of any Class A medical conditions and receiving certain required vaccinations. Therefore, it is possible that a potential beneficiary took the time to complete the medical examination and receive the required vaccinations. After confirming biographic information and properly completing the medical examination, the beneficiary received instructions to access the CBP One mobile application to enter biographic information and submit a live photo. The alien was required to complete these steps prior to being considered for authorization to travel to the United States to seek parole. The total estimated time to complete the CBP One part of the ATA process was 10 minutes.[87]

In the Form I–131-based legacy process, the adjudication of the Form I–131 took place in two stages. First, a designated USCIS Service Center adjudicator would review the application package submitted by the petitioner and confirm that the petitioner had received a U.S. government invitation to apply to the legacy process, and that all documentary filing requirements were met. If the petitioner failed to submit the required evidence, adjudicators would issue a Request for Evidence to obtain the missing information. Unless a sufficient response was received, the filing would be denied. For cases where all required evidence was provided and eligibility was established, USCIS conditionally approved the Form I–131. There were no costs to the potential beneficiary during this first stage of the process. However, the second stage of the process required the potential beneficiary to report for an in-person interview at a USCIS office overseas, which could result in travel costs and medical exam costs. During this stage, USCIS would verify the identity and qualifying familial relationship between the petitioner and a potential beneficiary.

In general, the costs to petitioners and potential beneficiaries are not significant and pale in comparison to the U.S. government's sovereign interest in determining who may be paroled into the United States. DHS issued invitations as a use of administrative grace that could end at any time and made no assurances that each invitation would result in a grant of parole. DHS made no assurances that each Form I–134A would be processed, nor did DHS assure that each Form I–134A or Form I–131 would ultimately result in a grant

of parole to a potential beneficiary. For petitioners/beneficiaries who received a conditional approval of Form I–131 from USCIS under the legacy CFRP program, the conditional approval made it clear that additional steps were required—including completion of a medical examination and in-person interview—before parole could be authorized.[88] Therefore, neither the petitioner nor the potential beneficiary has a significant reliance interest in continuation of the process at this stage. Any costs incurred by a potential beneficiary in the Form I–131 or Form I–134A-based process, both for completing the medical examination and for receiving the required vaccinations, can be impactful, depending on the country and the relative cost of these items compared to the average wage received by that country's population and the rate of unemployment in the country. However, both the costs of the vaccinations and the medical examination are offset by their attendant benefit to the beneficiary of identifying health issues that may have existed and preventing future illness. Once again, the interest of petitioners and potential beneficiaries in preserving the FRP programs is minimal compared to the U.S. government's interest in exercising its discretion to decide which programs to continue and which benefits to provide, based on the policy priorities of the current administration.

Accordingly, DHS will issue a notice of non-confirmation for all pending Forms I–134A. DHS will also rescind the confirmation of all Forms I–134A that were previously confirmed and issue updated notices of non-confirmation for any potential beneficiaries who have not yet traveled to a POE to seek parole. Potential beneficiaries will no longer be able to execute any attestations or seek ATA through a USCIS online account based on a previously confirmed Form I–134A. DHS also intends to issue denial notices for all conditionally approved Form I–131 under the legacy CFRP program that have not been issued a travel document. The Form I–131 filing fee will not be refunded as USCIS has already expended resources in partially completing their adjudication.

*2. Reliance Interests of Potential Beneficiaries With Approved ATAs and Their Petitioners*

DHS has canceled all pending requests for advance authorization to travel to the United States to seek a discretionary grant of parole under the FRP programs.

DHS considered allowing any approved ATAs to remain in place until they were used or expired by their terms. However, DHS did not want aliens to fly to the United States at significant personal expense to seek parole under policies that DHS no longer supports or appear to encourage aliens to incur additional expenses based on a belief that they will be paroled upon arrival at the POE. DHS wants to be as transparent as possible and not exacerbate the problems created by the FRP programs. As is always the case, however, CBP may consider a request for parole under DHS's existing parole authority, on a case-by-case basis for urgent humanitarian reasons or significant public benefit, in the exercise of discretion. If parole is not granted, aliens may be removed to their home country at U.S. government expense or processed for another appropriate disposition under the INA.

In sum, the FRP programs have failed to achieve their stated objectives. They are inconsistent with the current Administration's enforcement priorities, do not advance current U.S. foreign policy goals, did not meaningfully reduce unlawful migration, did not alleviate the strain on DHS personnel and resources, nor address the root causes of migration through economic development. Instead, the programs imposed additional administrative burdens on DHS and introduced vulnerabilities that significantly undermined the integrity of the U.S. immigration system. While some petitioners and beneficiaries may have relied on the availability of FRP programs, those reliance interests are limited in scope and involved minimal financial or procedural burdens. Even if the reliance interests were greater, DHS has determined that the federal government's interest in controlling the circumstances under which foreign nationals may be paroled into the United States outweigh those interests. Accordingly, terminating the FRP programs is both lawful and reasonable.

**V. Effect of Termination on Current Parolees Under the FRP Programs and Corresponding Reliance Interests**

The notices establishing the FRP programs explain that parole is not an admission of the alien to the United

---

[87] *See* 88 FR 62810, 62812 (Sept. 13, 2023).

[88] *See* USCIS, "The Cuban Family Reunification Parole Program," *https://www.uscis.gov/humanitarian/humanitarian-parole/the-cuban-family-reunification-parole-program* ("Process Steps") (last updated Oct. 11, 2024).

States, and a parolee remains an applicant for admission during the period of parole in the United States. *See also* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS may set the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole. *Id.* Aliens may be granted advance authorization to travel to the United States to seek parole. *See* 8 CFR 212.5(f). The Secretary may terminate parole in her discretion at any time when, in her opinion, neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of the alien in the United States, and parole shall be terminated when the purpose for which it was authorized has been accomplished. *See* 8 CFR 212.5(e). And, finally, aliens who are paroled into the United States, including those paroled through the FRP programs, may generally apply for and be granted employment authorization under the (c)(11) employment eligibility category. *See* 8 CFR 274a.12(c)(11).

As noted above, since July 10, 2023, approximately 14,000 aliens were granted parole into the United States pursuant to the modernized FRP programs. While some aliens in this population have subsequently pursued other lawful immigration statuses and benefits, all aliens within this population are still within the 3-year initial period of parole under the modernized FRP programs. Approximately 1,060 Cubans are currently in the United States with a valid period of parole under the legacy CFRP program. Approximately 100 Haitians are currently in the United States with a valid period of parole under the legacy HFRP program.

Parolees under the FRP programs may be able to seek an additional period(s) of parole ("re-parole") by filing Form I–131, and demonstrating urgent humanitarian reasons or significant public benefit specific to his or her case and that he or she merits a favorable exercise of discretion for re-parole. These cases and any such pending cases will be assessed on a case-by-case basis.

DHS has determined that as one aspect of the termination of the FRP programs, and consistent with the Secretary's statutory and regulatory authority,[89] the parole of all aliens who

have been paroled into the United States under the FRP programs described in this notice, and whose initial period of parole has not already expired by January 14, 2026, will terminate on that date. There are two circumstances where an alien's parole will not terminate: (1) the alien filed a Form I–485 before December 15, 2025 that is still pending adjudication as of January 14, 2026; or (2) the Secretary determines otherwise on a case-by-case basis. The parole of an alien with a pending Form I–485 will remain valid until either the expiration date provided on the alien's Form I–94, Arrival/Departure Record, or the date a final adjudication of the Form I–485 is completed, whichever is sooner. If the Form I–485 is denied, the alien's parole period will be terminated as of the date of the denial and the alien is expected to depart the United States immediately if they have no other lawful basis for remaining. Pending Form I–131 requests for re-parole filed by aliens initially paroled under the FRP programs will be adjudicated and may be approved on a case-by-case basis.[90] Note that with respect to re-parole requests filed by aliens who were initially paroled under one of the FRP programs, facial eligibility under those programs does not entitle an alien to re-parole. The alien still must demonstrate urgent humanitarian reasons or significant public benefit specific to his or her case and that he or she merits a favorable exercise of discretion for parole, as required by section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A).

Following this termination, and consistent with the direction in Executive Order 14165, DHS generally intends to promptly remove aliens, consistent with law, who entered the United States under the FRP programs and who stay in the United States beyond their parole termination date with no lawful basis to remain in the United States. DHS retains its discretion to commence enforcement action, consistent with law, against any alien at any time, including during the 30-day waiting period created by this notice. Once parole is terminated, and if no exception applies and no lawful immigration status, relief, classification,

or protection is obtained, aliens must return to their home country to maintain their path to lawful immigration status or be removed from the United States subject to a final order of removal. Parolees without any other lawful basis to remain in the United States following the termination of the FRP programs should depart the United States before their parole termination date. As detailed below, aliens whose parole period is terminated are encouraged to submit their intent to depart through the CBP Home Mobile App. Aliens departing the United States via land border POEs should report their departure once outside the United States via the CBP Home Mobile App. Aliens should visit *https:// i94.cbp.dhs.gov/home* for more information about voluntarily reporting their departure.

DHS has recently announced a historic opportunity for aliens to receive both financial and travel assistance to facilitate travel back to their home country or another country in which they have lawful status through the CBP Home App. Once unlawful aliens submit their intent to depart through the CBP Home Mobile App and pass vetting, they will be deprioritized by ICE for enforcement action, detention and removal before their scheduled departure, as long as they demonstrate they are making meaningful strides in completing the departure.[91]

In implementing this approach, DHS intends to prioritize for removal those whose parole is terminated and who have not, prior to the publication of this notice, submitted an immigration benefit request to obtain a lawful basis to remain in the United States. Aliens who have since obtained a lawful immigration status or other basis that permits them to remain in the United States are not required to depart the United States pursuant to this notice.

Parole-based employment authorization under 8 CFR 274a.12(c)(11) automatically terminates upon (1) the expiration date specified on the employment authorization document, (2) DHS' institution of removal proceedings against the alien, or (3) a grant of voluntary departure. *See* 8 CFR 274a.14(a). Such employment authorization may also be revoked on notice consistent with the procedures in 8 CFR 274a.14(b). DHS has determined that, after termination of the parole, the condition upon which the employment authorization was granted no longer

---

[89] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) ("when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States"); 8 CFR 212.5(e)(2) (". . . Upon accomplishment of the

purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph(a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, *parole shall be terminated upon written notice to the alien*[.]." (emphasis added)).

[90] Note that aliens paroled into the United States have been able, and will continue to be able, to apply for re-parole on a case-by-case basis by filing Form I–131. Aliens will not, however, be able to apply for re-parole under the legacy FRP programs.

[91] DHS, "DHS Announces Historic Travel Assistance and Stipend for Voluntary Self-Deportation" May 5, 2025, *https://www.dhs.gov/ news/2025/05/05/dhs-announces-historic-travel-assistance-and-stipend-voluntary-self-deportation.*

exists and thus DHS intends to revoke parole-based employment authorization consistent with the revocation on notice procedures. *See* 8 CFR 274a.14(b).

DHS has considered the impacts on parolees who are affected by this discretionary decision to terminate their parole prior to the expiration of the parole period. DHS recognizes the costs incurred by some aliens who have been granted parole and moved to the United States.[92] Parolees will have departed their native country; traveled to the United States; obtained housing, employment authorization, and means of transportation; and perhaps commenced the process of building connections to the community where they reside. In addition, employers who employ parolees may incur costs related to lost productivity and finding new employees. Property owners who rent homes, condos, or apartments to parolees may lose steady rent payments. Retailers and restaurants in the communities the parolees have been living in will lose customers. Aliens paroled under the modernized FRP programs have been in the United States for as long as 20 months, while some aliens initially paroled under the legacy FRP programs and subsequently granted additional parole periods may have been in the United States for years.[93]

However, any assessment of the reliance interests of FRP parolees must account for FRP parolees' knowledge at the outset that (1) the Secretary retained the discretion to terminate the parole programs at any point in time, and to terminate any grants of parole at any time when, in her opinion, the purposes of such parole have been served;[94] and (2) the initial period of parole would be limited to a maximum of three years. These clear, limiting conditions of the FRP programs served to attenuate any long-term expectations and interests amongst FRP parolees. Accordingly, DHS has taken these limiting conditions, along with FRP parolees' knowledge of them, into consideration

when weighing their reliance interests.[95]

To the extent that current parolees have obtained housing and employment authorization, or created new ties within the community while in the United States, DHS notes these interests are qualitatively less than any reliance interests that might be attributed to the Deferred Action for Childhood Arrival (DACA) recipient population consistent with the discussion in *DHS* v. *Regents of the University of California.*[96] In *Regents,* the Supreme Court reviewed whether DHS had appropriately considered the reliance interests of DACA recipients when rescinding DACA.[97] The reliance interests of DACA recipients, all of whom had been present in the United States for far longer than most FRP parolees have been, included their enrollment in degree programs, the beginning of their careers, the starting of businesses, and the purchasing of homes.[98] As the Court noted, these interests, though noteworthy, were not ''necessarily dispositive,'' and ''DHS may determine, in the particular context before it, that other interests and policy concerns [in rescinding DACA] outweigh any reliance interests.''[99] For the purposes of the actions announced in this notice, DHS notes the reliance interests of those paroled under the FRP programs are far less than the population in *Regents.* Furthermore, as stated above, consideration of the reliance interests under the FRP programs must take into account the express, discretionary terms of the parole programs. Accordingly, the reliance interests are outweighed by the U.S. government's strong interest in promptly returning parolees when the basis for the underlying parole no longer exists.

Third parties, including employers, landlords, and others, may also have indirect reliance interests in the availability of individual FRP parolees, but even if DHS had allowed the grants of parole to expire at the end of their designated terms, such third parties would have experienced the effects of such expiration. By providing 30 days' notice and allowing the parole period of parolees with pending Forms I–485 to continue, DHS balances the benefits of

a wind-down period for aliens and third parties with the exigency of promptly enforcing the law against those aliens lacking a lawful basis to remain in the United States. For the same reasons set forth above, the Department finds the U.S. government's interest in terminating these grants of parole outweigh any reliance interest of third parties.

DHS considered several alternatives to termination of parole after a 30-day wind-down period, including, (1) allowing the current period of parole for each FRP beneficiary to expire and notifying the beneficiary to either seek lawful immigration status or voluntarily depart the United States prior to expiration; (2) allowing each FRP beneficiary to continue to seek FRP re-parole until an immigrant visa is available and the beneficiary may qualify to file Form I–485; and (3) announcing the termination of parole for each beneficiary following a wind down period of longer than 30 days from the date of publication of the termination notice. After due consideration, DHS has opted to not pursue these routes.

Option 1 would require individualized outreach and ongoing monitoring by DHS, imposing a significant administrative burden on the agency. Staggered parole expirations could result in extended unauthorized stays and generate confusion among parolees due to differing timelines. Option 2 fails to meaningfully implement the policy shift outlined in this **Federal Register** notice, as it would allow continued reliance on parole as a pathway to adjustment of status—effectively maintaining the existing parole framework for current beneficiaries. Moreover, permitting current parolees under the FRP programs to repeatedly seek re-parole would do little to reduce the current administrative workload borne by DHS and USCIS in processing these cases. Critically, both Option 1 and 2 dilute the intended impact of the policy change and fail to communicate the urgency of this administration's shift in direction. A protracted off-ramp could be perceived as a reluctance to fully enforce key policy priorities aimed at realigning parole authority with the original congressional intent. Moreover, allowing parolees under the FRP programs to continue to remain in the United States despite the lackluster or insufficient vetting they received prior to entry creates vulnerabilities for the U.S., undermining efforts to safeguard national security and public safety.

When determining whether to adopt the alternative of a longer than 30-day

---

[92] *See Encino Motorcars, LLC* v. *Navarro,* 579 U.S. 211, 221–22 (2016) (''Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change. . . . But the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy. In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'' (cleaned up)).

[93] As noted earlier in this section, there are approximately 100 aliens in this category.

[94] *See e.g.,* 88 FR at 43593; 88 FR at 54643; 88 FR at 54638; *see also* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); 8 CFR 212.5(e)(2)(i).

[95] *See DHS* v. *Regents of the Univ. of Cal.,* 591 U.S. 1, 32 (2020) (noting that DHS could conclude that reliance is ''unjustified in light of the express limitations'' in relevant immigration policy). Note that aliens paroled into the United States have been able, and will continue to be able, to apply for re-parole on a case-by-case basis by filing Form I–131.

[96] *Id.*

[97] *Id.* at 31.

[98] *Id.*

[99] *Id.*

wind-down period, DHS determined such an alternative was not the best path forward. First, regardless of the wind-down period, parolees, their employers, their landlords, their friends, and their communities may incur costs. Given this reality, DHS decided to employ the path that will most expeditiously allow the Department to reallocate resources currently assigned to handle the FRP programs to issues deemed essential to securing our borders and protecting the American people against invasion. Accordingly, the Department has determined that a 30-day wind down period provides the affected parties sufficient notice while also preserving the Department's interest in promptly terminating attendant grants of parole for which the Department deems no longer provide significant public benefit to the United States. Accordingly, the Department is opting not to increase the wind-down period to more than 30 days.

## VI. Federal Register Notice as Constructive Notice

This **Federal Register** notice serves as notice of the termination of the FRP programs and satisfies the requirement that DHS provide written notice upon the termination of parole.[100] For the reasons set forth above, the Secretary has concluded that neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of aliens paroled under the FRP programs and the purposes of such parole therefore have been served. This constructive notice accordingly serves as written notice to FRP parolees. DHS has determined that publication of this notice in the **Federal Register** is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance.[101]

DHS finds **Federal Register** publication of the decision to terminate existing grants of parole to be the most practicable approach in light of the potential noncompliance with change-of-address reporting requirements and the potential for outdated email addresses. *See* 8 U.S.C. 1305; 8 CFR

265.1. Nevertheless, all FRP parolees under the modernized programs should have a USCIS online account and all processing under these parole programs took place electronically, DHS will also provide individual notice to each parolee through their USCIS online account.[102] For legacy FRP parolees, USCIS will provide personal, individual notice by mail if the parolee does not have a myUSCIS account. This notice, and the individual notice through the USCIS online account or sent by mail, each independently constitute "written notice to the alien" under 8 CFR 212.5(e)(2)(i).

## VII. Administrative Procedure Act

This notice is exempt from notice-and-comment rulemaking requirements because DHS is merely adopting a general statement of policy, 5 U.S.C. 553(b)(A), *i.e.*, a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [103] By terminating the FRP programs—which themselves constituted general statements of policy, *see, e.g.*, 88 FR at 43599—DHS is explaining how it will implement the Secretary's broad discretion for exercising her narrow parole authority. Accordingly, this notice of termination constitutes a general statement of policy and is exempt from the notice-and-comment rulemaking requirements under the Administrative Procedure Act ("APA").[104]

When an agency merely explains how it will enforce a statute or regulation by describing how it will exercise its broad enforcement discretion, as was the case with the FRP programs, it is a general statement of policy. *See Lincoln*, 508 U.S. at 197. Section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A) provides the Secretary broad discretion in exercising the parole authority, with parole decisions made by the Secretary "in [her] discretion." The FRP programs therefore were general statements of policy.

Because the FRP programs constitute general statements of policy and were exempt from notice-and-comment

rulemaking requirements under the APA, their termination likewise is a mere general statement of policy exempt from the notice-and-comment rulemaking requirements. Through the termination of the FRP programs and for the reasons given, DHS is merely making a change to a previous policy statement on the exercise of its discretionary parole authority.[105] Accordingly, there is no requirement to publish notice prior to the termination's effective date, and it is therefore amenable to immediate issuance and implementation. *See* 5 U.S.C. 553(d)(2).

Even if the changes were considered to be a legislative rule that would normally be subject to notice and comment rulemaking and a delayed effective date, these changes—like the implementation of the parole programs themselves [106]—pertain to a foreign affairs function of the United States, and are exempt from such procedural requirements on that basis.[107] Consistent with the Secretary of State's February 21, 2025, determination that "all efforts, conducted by any agency of the federal government, to control the status, entry, and exit of people, and the transfer of goods, services, data, technology, and other items across the borders of the United States, constitute a foreign affairs function of the United States[,]" DHS finds that these changes are connected to the entry and exit of people and thereby constitute a foreign affairs function.[108]

Moreover, although the APA does not require the agency to show that such procedures may result in "definitely undesirable international consequences" to invoke the foreign affairs exemption to notice-and-

---

[100] *See* 8 CFR 212.5(e)(2)(i) (". . . Upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, *parole shall be terminated upon written notice to the alien*. . . ." (emphasis added)).

[101] *See* 44 U.S.C. 1507; *Friends of Sierra R.R., Inc.* v. *I.C.C.*, 881 F.2d 663, 667–68 (9th Cir. 1989); *see also Fed. Crop Ins. Corp.* v. *Merrill*, 332 U.S. 380, 385 (1947) ("Congress has provided that the appearance of rules and regulations in the **Federal Register** gives legal notice of their contents.").

[102] *Cf., e.g.*, 8 CFR 103.2(b)(19)(ii)(B) ("For applications or petitions filed electronically, USCIS will notify both the applicant or petitioner and the authorized attorney or accredited representative electronically of any notices or decisions. . . .").

[103] *See Lincoln* v. *Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown*, 441 U.S. 281, 302 n.31 (1979)).

[104] *Cf. Perez* v. *Mortgage Bankers Ass'n*, 575 U.S. 92, 101 ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.").

[105] *See Encino Motorcars*, 579 U.S. at 221 ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.").

[106] *See* 5 U.S.C. 553(a)(1); *see, e.g.*, 88 FR at 43599.

[107] *See Am. Ass'n of Exporters & Importers— Textile & Apparel Grp.* v. *United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985) (noting that foreign affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country"); *Yassini* v. *Crosland*, 618 F.2d 1356, 1361 (9th Cir. 1980) (because an immigration directive "was implementing the President's foreign policy," the action "fell within the foreign affairs function and good cause exceptions to the notice and comment requirements of the APA").

[108] U.S. Department of State, Determination, *Foreign Affairs Function of the United States*, 90 FR 12200 (Feb. 21, 2025) (published Mar. 14, 2025). The Secretary of State's determination references and implements numerous Presidential actions reflecting the President's top foreign policy priorities, including Executive Order 14165. As noted above, Executive Order 14165 specifically directs the Secretary of Homeland Security to, consistent with applicable law, take all appropriate action to terminate categorical parole programs.

comment rulemaking, some courts have required such a showing,[109] and DHS can make one here. Delaying termination of the FRP programs to undertake rulemaking would undermine the U.S. government's ability to conduct foreign policy, including the ability to shift governmental policies and engage in delicate and time-sensitive negotiations following a change in Administration. It is the view of the United States that the termination of these parole programs will fulfill important foreign policy goals that the President has repeatedly articulated and urged DHS to implement swiftly; any delay in achieving such goals is definitely undesirable.

As explained in the notices implementing the modernized FRP programs, they were implemented as an integral part of negotiations with regional neighbors, including Colombia, Costa Rica, Ecuador, and Guatemala, to address unlawful migratory flows challenging immigration systems throughout the region.[110] For instance, in announcing the FRP program for Colombians, DHS explained that even if the program were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the program would be exempt from such requirements because it involves a foreign affairs function of the United States.[111] DHS explained that ''the expansion of lawful pathways for aliens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of [Safe Mobility Offices or SMOs].'' [112] DHS continued that ''[t]he success of SMOs and other new measures to reduce unlawful migration to the [southwest border] is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs.'' [113] DHS noted that the U.S. government continued ''to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and [was] building goodwill and momentum to seek SMOs in still more countries in the region.'' [114]

When implementing changes to the FRP programs for Cubans and Haitians, DHS invoked the foreign affairs exemption on similar grounds.[115]

However, as discussed in this notice, U.S. foreign policy has changed in critical respects, and DHS must expeditiously align its policies to that change. Whereas implementation of the FRP programs was one part of a broader strategy to collaboratively manage unlawful migration with neighboring countries, the U.S. government is pursuing a range of other policy initiatives that would allow DHS to return or remove FRP program nationals, including re-implementation of the Migrant Protection Protocols and improved cooperation and coordination with other countries regarding return or removal of their or third country nationals.[116]

In the context of these complex and time-sensitive diplomatic negotiations, it would be counterproductive to retain vestiges of a foreign policy approach that the United States is no longer pursuing, even temporarily, to allow for a period of public comment about matters that implicate our foreign affairs and are ultimately within the Executive's discretion. Continuing to administer the FRP programs pending notice-and-comment would adversely affect the United States' ability to pivot rapidly to a more effective approach in these negotiations and may result in an even greater number of FRP program nationals requiring removal or return. Further delay in pursuing these more effective approaches would be particularly pernicious in the context of ongoing negotiations, as discussed in section III.2 of this notice, with countries to accept the return of their nationals, including FRP program nationals.

Finally, and for the same reasons that a delay in implementing this action would result in undesirable international consequences, even if notice-and-comment and a delayed effective date were required, DHS has determined that the good cause exemptions to notice-and-comment rulemaking and the 30-day effective date apply and that the delay associated with implementing these changes through notice-and-comment rulemaking or delaying the effective date would be impracticable and contrary to the public interest. 5 U.S.C.

553(b)(B), (d)(3). Any delay for such procedures would harm the U.S. government's ability to timely implement the current Administration's foreign policy approach and exacerbate the challenges associated with the FRP programs, as explained throughout this notice, contrary to the President's direction to protect the American people against invasion and to secure the border.[117] Such an outcome would also be inconsistent with the fundamentally discretionary nature of DHS's parole authority.

## VIII. Severability

DHS intends for the decisions announced in this notice to be severable from each other and to be given effect to the maximum extent possible, such that if a court holds that any provision is invalid or unenforceable—whether in their entirety or as to a particular person or circumstance—the other provisions will remain in effect as to any other person or circumstance.[118] The various decisions in this notice are designed to function sensibly without the others, and DHS intends for them to be severable so that each can operate independently.

For example, DHS would intend that the termination of the FRP programs be implemented immediately, even if the termination of ATAs or existing grants of parole were to be enjoined in whole or in part. This approach ensures that DHS is able to implement its policy choices, and the President's direction in Executive Order 14165, to the maximum extent possible.

## IX. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new or modified reporting requirements they impose. The termination of the programs announced by this notice requires changes to the collections of information on Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records (OMB control number 1615–0013). Form I–131 will be revised in

---

[109] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[110] *See, e.g.,* 88 FR at 43594.

[111] *See, e.g.,* 88 FR at 43599.

[112] *Id.*

[113] *Id.* at 43600.

[114] *Id.*

[115] *See* 88 FR at 54643 (Cuba); 88 FR at 54639 (Haiti).

[116] DHS, DHS Reinstates Migrant Protection Protocols, Allowing Officials to Return Applicants to Neighboring Countries, *https://www.dhs.gov/news/2025/01/21/dhs-reinstates-migrant-protection-protocols* (updated Mar. 21, 2025).

[117] 5 U.S.C. 553(b)(B); 553(d)(3); *see Util. Solid Waste Activities Grp.* v. *EPA,* 236 F.3d 749, 754–55 (D.C. Cir. 2001) (''a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required''); *see also* Executive Order 14159, 90 FR 8443 (Jan. 29, 2025).

[118] Courts have uniformly held that the APA, 5 U.S.C. 706(2), authorizes courts to sever and set aside ''only the offending parts of the rule.'' *Carlson* v. *Postal Regulatory Comm'n,* 938 F.3d 337, 351 (D.C. Cir. 2019); *see, e.g., K Mart Corp.* v. *Cartier, Inc.,* 486 U.S. 281, 294 (1988).

connection with this notice by removing specific mention of the FRP programs. As of the date of this notice Form I–131 may not be used to request an initial or new period of parole under one of the FRP programs, but it may be used by a previous FRP beneficiary to request a new period of parole, or re-parole, under DHS's existing parole authority, on a case-by-case basis for urgent humanitarian reasons or significant public benefit.

**Kristi Noem,**
*Secretary of Homeland Security.*
[FR Doc. 2025–22744 Filed 12–12–25; 8:45 am]
**BILLING CODE 9111–97–P**

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

**[Docket No. FWS–HQ–ES–2025–0613; FXES111609M0000–256–FF09420000; OMB Control Number 1018–0194]**

### Agency Information Collection Activities; Approval Procedures for Incidental Harassment Authorizations of Marine Mammals

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of information collection; request for comment.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995 (PRA), we, the U.S. Fish and Wildlife Service (Service), are proposing to renew an information collection without change.

**DATES:** Interested persons are invited to submit comments on or before February 13, 2026.

**ADDRESSES:** Send your comments on the information collection request (ICR) by one of the following methods (please reference 1018–0194 in the subject line of your comments):
• *Internet (preferred): https:// www.regulations.gov.* Follow the instructions for submitting comments on Docket No. FWS–HQ–ES–2025– 0613.
• *Email: Info_Coll@fws.gov.*
• *U.S. mail:* Service Information Collection Clearance Officer, U.S. Fish and Wildlife Service, 5275 Leesburg Pike, MS: PRB (JAO/3W), Falls Church, VA 22041–3803.

**FOR FURTHER INFORMATION CONTACT:** Madonna L. Baucum, Service Information Collection Clearance Officer, by email at *Info_Coll@fws.gov,* or by telephone at (703) 468–8211. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY,

TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** In accordance with the Paperwork Reduction Act (PRA; 44 U.S.C. 3501 *et seq.*) and its implementing regulations at 5 CFR 1320.8(d)(1), all information collections require approval under the PRA. We may not conduct or sponsor and you are not required to respond to a collection of information unless it displays a currently valid Office of Management and Budget (OMB) control number.

As part of our continuing effort to reduce paperwork and respondent burdens, we invite the public and other Federal agencies to comment on new, proposed, revised, and continuing collections of information. This helps us assess the impact of our information collection requirements and minimize the public's reporting burden. It also helps the public understand our information collection requirements and provide the requested data in the desired format.

We are especially interested in public comment addressing the following:
(1) Whether or not the collection of information is necessary for the proper performance of the functions of the agency, including whether or not the information will have practical utility;
(2) The accuracy of our estimate of the burden for this collection of information, including the validity of the methodology and assumptions used;
(3) Ways to enhance the quality, utility, and clarity of the information to be collected; and
(4) How might the agency minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology (*e.g.,* permitting electronic submission of response).

Comments that you submit in response to this notice are a matter of public record. We will include or summarize each comment in our request to OMB to approve this ICR. Before including your address, phone number, email address, or other personal identifying information in your comment, you should be aware that your entire comment—including your personal identifying information—may be made publicly available at any time. While you can ask us in your comment

to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

*Abstract:* Section 101(a)(5)(D) of the Marine Mammal Protection Act of 1972 (MMPA; 16 U.S.C. 1361 *et seq.*) authorizes the Secretary of the Interior (Secretary) to allow, upon request, the incidental, but not intentional, taking by harassment of small numbers of marine mammals of a species or population stock by U.S. citizens who engage in a specified activity (other than commercial fishing) within a specific geographic region for periods of not more than 1 year. The Service may authorize incidental take by harassment if statutory and regulatory procedures are followed and the Service finds: (i) take is of a small number of marine mammals of a species or stock, (ii) take will have a negligible impact on the species or stock, and (iii) take will not have an unmitigable adverse impact on the availability of the species or stock for taking for subsistence uses by Alaska Natives.

The term "take" means to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill, any marine mammal. Harassment means any act of pursuit, torment, or annoyance which (i) has the potential to injure a marine mammal or marine mammal stock in the wild (the MMPA defines this as "Level A harassment"), or (ii) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering (the MMPA defines this as "Level B harassment").

The terms "negligible impact," "small numbers," and "unmitigable adverse impact" are defined in 50 CFR 18.27 (*i.e.,* the Service's regulations governing small takes of marine mammals incidental to specified activities). "Negligible impact" is an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival. "Unmitigable adverse impact" means an impact resulting from the specified activity (1) that is likely to reduce the availability of the species to a level insufficient for a harvest to meet subsistence needs by (i) causing the marine mammals to abandon or avoid hunting areas, (ii) directly displacing subsistence users, or (iii) placing physical barriers between the marine mammals and the subsistence hunters; and (2) that cannot be sufficiently mitigated by other measures to increase

Decision Document

**USCIS Notice ("Notice"): Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans**



Approve the Notice: (1) Approve publication in the *Federal Register* and (2) Direct ESEC to electronically sign the Notice with the *Federal Register* signature card.

_____    Date.

**Signing Authority**

Rodney S. Scott, Commissioner, having reviewed and approved this document, has delegated the authority to electronically sign this document to the Director (or Acting Director, if applicable) of the Regulations and Disclosure Law Division of U.S. Customs and Border Protection, for purposes of publication in the **Federal Register**.

**Robert F. Altneu,**

*Director, Regulations & Disclosure Law Division, Regulations & Rulings, Office of Trade, U.S. Customs and Border Protection.*

[FR Doc. 2025–20270 Filed 11–18–25; 8:45 am]

**BILLING CODE 9111–14–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Customs and Border Protection**

**Certain DHS Immigration Fees Required by HR–1: Fiscal Year 2026 Adjustments for Inflation**

**AGENCY:** U.S. Customs and Border Protection, DHS.

**ACTION:** Notice of inflationary fee adjustment.

**SUMMARY:** The Department of Homeland Security (DHS) is announcing Fiscal Year (FY) 2026 inflationary adjustments to certain immigration-related fees required by the One Big Beautiful Bill Act (HR–1). HR–1 requires that DHS annually adjust certain immigration-related fees for inflation. This notice sets the inflation-adjusted FY 2026 fee amounts for the following immigration fees required by HR–1: the fee for enrollment in the Electronic Visa Update System (EVUS), the Electronic System for Travel Authorization (ESTA) fee, and the fee for an alien paroled into the United States. In accordance with HR–1, the existing fee for Form I–94 Arrival/Departure Record applications will not change for FY 2026.

**DATES:**

*HR–1 Parole Fee:* U.S. Customs and Border Protection (CBP), U.S. Citizenship and Immigration Services (USCIS), and U.S. Immigration and Customs Enforcement (ICE) will begin assessing the FY 2026 amount for the HR–1 parole fee described in this notice on January 1, 2026.

*HR–1 I–94, ESTA, and EVUS Fees:* CBP will begin assessing the FY 2026 amounts for the HR–1 I–94, ESTA, and EVUS fees described in this notice on January 1, 2026.

**FOR FURTHER INFORMATION CONTACT:**

*For questions regarding the HR–1 parole fee, by component:*

*CBP:* Office of Field Operations, U.S. Customs and Border Protection, Department of Homeland Security, 1300 Pennsylvania Avenue NW, Suite 1500N, Washington, DC 20229, email address: *parolenotification@cbp.dhs.gov.*

*USCIS:* Office of Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746, telephone (240) 721–3000 (not a toll-free number).

*ICE:* Office of Regulatory Affairs and Policy, U.S. Immigration and Customs Enforcement, Department of Homeland Security, 500 12th Street SW, Washington, DC 20536; telephone (202) 732–6960 (not a toll-free number).

*For questions regarding the HR–1 I–94, ESTA, and EVUS fees:*

Melanie Mataxas, Director, Electronic Systems Travel Authorization, Office of Field Operations, U.S. Customs and Border Protection, at 202–325–1372 or at *melanie.d.mataxas@cbp.dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. Background and Legal Authority**

On July 4, 2025, the President signed into law the One Big Beautiful Bill Act, Public Law 119–21, 139 Stat. 72 (HR–1). HR–1 was a comprehensive legislative package that changed many laws and added new laws that touch many areas of the United States Government. Among those changes, the law established new immigration fees and increased existing fees for certain immigration-related actions. The statute established minimum fees for Fiscal Year (FY) 2025 and required annual adjustments to the fees in subsequent fiscal years based on the Consumer Price Index for All Urban Consumers (CPI–U).[1]

Among other immigration fees specified in HR–1, the Secretary of Homeland Security must require the payment of a fee by any alien who is paroled into the United States, unless an exception in Public Law 119–21 section 100004(b) applies (the HR–1 parole fee). *See* Public Law 119–21 sec. 100004. Several Department of Homeland Security (DHS) components, including U.S. Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), and U.S. Customs and Border Protection (CBP), have responsibilities for assessing and collecting the HR–1 parole fee. DHS published a joint notice in the **Federal Register** on October 16, 2025,

announcing the implementation of the HR–1 parole fee and the FY 2025 rate for the HR–1 parole fee.[2]

CBP also administers several other fees specified in HR–1,[3] including requiring fees for submitting an application for a CBP Form I–94 Arrival/Departure Record, for using the Electronic System for Travel Authorization (ESTA) and receiving ESTA travel authorizations, and for enrolling in the Electronic Visa Update System (EVUS). *See* Public Law 119–21 secs. 100008, 100014, 100015. CBP announced the implementation of these fees, including the initial FY 2025 rates for these fees, through a notice published in the **Federal Register** on August 28, 2025, and began assessing and requiring those fees on September 30, 2025.[4]

**II. FY 2026 Inflation Adjustments to Certain Immigration Fees Required by HR–1**

In accordance with HR–1, most immigration-related fees required by HR–1 are subject to annual inflation adjustments. This notice states the FY 2026 rates for the HR–1 parole, I–94, ESTA, and EVUS fees (collectively, the HR–1 fees).

Generally, HR–1 requires the multiplication of an HR–1 fee or a portion of an HR–1 fee from the prior FY by the percentage, if any, by which the CPI–U for the month of July preceding the date on which the adjustment takes effect exceeds the CPI–U for the July of the preceding calendar year (the inflation adjustment). In July 2024, the CPI–U was 314.540, and in July 2025, the CPI–U was 323.048. Therefore, between July 2024 and July 2025, the CPI–U increased by 2.70 percent.[5] To determine the total FY–1 fee for each FY, the inflation adjustment is then added to the HR–1 fee or portion of the HR–1 fee used in the calculation of the inflation adjustment, pursuant to the statutorily prescribed formula. The specifics of the statutory inflation adjustment formulas differ for each HR–1 fee. The following table provides a summary of the inflation-adjusted FY 2026 HR–1 fees described in this notice

---

[1] *See* Public Law 119–21 secs. 100004(d), 100008(b)(2), 100014(3), 100015(b)(2), codified as 8 U.S.C. 1804(d), 8 U.S.C. 1807(b)(2), 8 U.S.C. 1187(h)(3)(B)(iv), and 8 U.S.C. 1813(b)(2).

[2] 90 FR 48317 (Oct. 16, 2025).

[3] The Secretary of Homeland Security has delegated the authority to enforce and administer the immigration laws to the Commissioner of U.S. Customs and Border Protection. *See* DHS Delegation No. 07010.3, Delegation of Authority to the Commissioner of U.S. Customs and Border Protection, (Rev. No. 03.2, Incorporating Change 2) at II.B.1 (Dec. 11, 2024).

[4] 90 FR 42025 (Aug. 28, 2025).

[5] Bureau of Labor Statistics, Consumer Price Index—July 2025, August 12, 2025, *https://www.bls.gov/news.release/archives/cpi_08122025.htm* (last visited Oct. 21, 2025).

and the following subsections further detail the HR–1 inflation adjustment requirements.

CERTAIN FY 2026 FEES, AS REQUIRED BY HR–1

| HR–1, Public Law 119–21 (139 Stat. 72) section | Action | Total FY 2025 fee (existing fee) | FY 2026 inflation adjustment | Total FY 2026 fee (revised fee) |
|---|---|---|---|---|
| 100004 ................ | Parole into the United States ............................................................ | $1,000 | +$20 | $1,020 |
| 100008 ................ | Application for CBP Form I–94 at land border ports of entry ............ | 30 | [6]+0 | [7]30 |
| 100014 ................ | ESTA authorization ............................................................................ | 40 | +0.27 | [8]40.27 |
| 100015 ................ | EVUS enrollment ................................................................................ | 30 | +0.75 | 30.75 |

### A. DHS HR–1 Parole Fee

Pursuant to HR–1, the Secretary of Homeland Security must require the payment of a fee by any alien who is paroled into the United States, unless an exception in Public Law 119–21 section 100004(b) applies. *See* Public Law 119–21 sec. 100004 (8 U.S.C. 1804). Specifically, this fee is required each time an alien is granted parole under sec. 212(d)(5)(A) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(d)(5)(A), including initial parole from outside the United States, parole in place, re-parole, or parole from DHS custody. *See* 90 FR 48317, 48318.

During FY 2026 and each subsequent FY, DHS is required to adjust the HR–1 parole fee for inflation. *See* Public Law 119–21 sec. 100004(d). This notice announces the FY 2026 inflation-adjusted HR–1 parole fee for all DHS components, including ICE, USCIS, and CBP.

Pursuant to HR–1, DHS is required to adjust the HR–1 parole fee by adding an inflation adjustment amount, rounded to the next lowest multiple of $10, to the amount of the fee for the most recently concluded fiscal year. *Id.* For FY 2025, HR–1 set an initial minimum fee amount of $1,000. *See* Public Law 119–21 sec. 100004(c). The FY 2026 inflation adjustment amount is $27.05 rounded to the next lowest multiple of $10, which is $20.

Accordingly, the inflation-adjusted HR–1 parole fee for FY 2026 will be $1,020 ($1,000 + $20). The HR–1 parole

fee will not be assessed if the alien establishes, to the satisfaction of DHS, on an individual, case-by-case basis, that the circumstances of the alien's parole align with at least 1 of the 10 exceptions found in HR–1. *See* Public Law 119–21 sec. 100004(b). The operative event that triggers the statutory obligation to pay the HR–1 parole fee is the actual grant and effectuation of parole at or into the United States—not the filing of an application or request. Thus, unless statutorily excepted, the FY 2026 inflation-adjusted HR–1 parole fee will be collected from any alien who is granted parole on or after January 1, 2026, regardless of when the underlying application or request was submitted.

The $1,020 HR–1 parole fee is required in addition to any other fee authorized by law. *See* Public Law 119–21 sec. 100004(a).

### B. CBP Form I–94 Arrival/Departure Record

CBP issues an electronic CBP Form I–94 Arrival/Departure Record to all arriving aliens who are legally required to submit that form (unless otherwise exempted). *See* parts 1.4 and 235.1(h) of title 8 of the Code of Federal Regulations (8 CFR 1.4, 235.1(h)). CBP Form I–94 serves as evidence of the terms of the alien's admission or parole and is generally issued at the time the alien is admitted or paroled at a U.S. port of entry. *See* 8 CFR 235.1(h). Aliens arriving at a land border port of entry who are legally required to submit a CBP Form I–94 must apply for that form.

Pursuant to HR–1, the Secretary of Homeland Security must require the payment of a fee for any alien who submits an application for a Form I–94 Arrival/Departure Record (the HR–1 I–94 fee). *See* Public Law 119–21 sec. 100008 (8 U.S.C. 1807). For FY 2025, the statute set an initial minimum fee amount of $24. *See* Public Law 119–21 sec. 100008(b)(1).

During FY 2026 and each subsequent FY, CBP is required to adjust the HR–1 I–94 fee for inflation. *See* Public Law 119–21 sec. 100008(b)(2). The statutory formula requires adding an inflation adjustment amount, rounded down to the nearest dollar, to the amount of the fee required under Public Law 119–21 sec. 100008(b) for the most recently concluded fiscal year. *Id.* For FY 2026, the inflation adjustment required by Public Law 119–21 sec. 100008(b)(2)(B) is $0.65 rounded down to the nearest dollar, which is $0. Thus, the HR–1 I–94 fee for FY 2026 will remain at $24 ($24 + $0).

The HR–1 I–94 fee is required in addition to any other fee authorized by law. *See* Public Law 119–21 sec. 100008(a). Currently, CBP imposes a $6 fee for aliens who are legally required to be issued, or request to be issued, CBP Form I–94 and who intend to arrive at a land border port of entry. *See* 8 CFR 103.7(d)(4), 235.1(h)(1), and 286.9(b)(1). Accordingly, the total fee to apply for a CBP Form I–94 at a land border port of entry for FY 2026 will continue to be $30, consisting of the $6 land border fee and the $24 HR–1 fee. CBP will not assess a fee for aliens arriving at an air or sea port of entry because such aliens are not required to submit an application for a CBP Form I–94.

### C. Electronic System for Travel Authorization (ESTA)

ESTA is the online system through which aliens intending to enter the United States under the Visa Waiver Program (VWP) must obtain an electronic travel authorization in advance of travel to the United States.[9] Each alien intending to travel by air, sea, or land to the United States under the VWP must receive a travel authorization via ESTA prior to travel. *See* INA sec. 217 (8 U.S.C. 1187) and 8 CFR part 217. Prior to the enactment of HR–1, CBP required a fee of $21 for each

---

[6] Section II.B. explains the inflation adjustment formula for the HR–1 I–94 fee and details why, upon applying the inflation adjustment formula and rounding down to the nearest dollar, the fee amount will not increase in FY 2026.

[7] This $30 total includes the $6 land border fee. Payment of the $6 land border fee is required pursuant to 8 CFR 103.7(d)(4), 235.1(h)(1), and 286.9(b)(1), and is not a fee that is required by HR–1.

[8] Section II.C. explains the inflation adjustment formula found in Public Law 119–21 sec. 100014(3) (8 U.S.C. 1187(3)(B)(iv)) and the resulting FY 2026 ESTA fee calculations for CBP processing of ESTA applications and travel authorizations.

[9] For additional information on the Visa Waiver Program, see 8 U.S.C. 1187 and 8 CFR part 217.

ESTA authorization. Section 100014 of Public Law 119–21 amended section 217(h)(3)(B) of the INA (8 U.S.C. 1187(h)(3)(B)) to increase the fee for ESTA authorizations to $40 in FY 2025.

The FY 2025 ESTA authorization fee of $40, as required by HR–1, is the sum of three fees, including: $17 per travel authorization as provided for in 8 U.S.C. 1187(h)(3)(B)(i)(I), $10 as provided for in 8 U.S.C. 1187(h)(3)(B)(i)(II) to ensure recovery of the full costs of providing and administering the ESTA System, and $13 per travel authorization as provided for in 8 U.S.C. 1187(h)(3)(B)(i)(III). The 8 U.S.C. 1187(h)(3)(B)(i)(II) cost recovery fee is required for all applications, regardless of authorization or denial; thus, in the event the ESTA application is denied, HR–1 set a $10 fee for FY 2025. *See* 8 U.S.C. 1187(h)(3)(B).

During FY 2026 and each subsequent FY, CBP is required to adjust the 8 U.S.C. 1187(h)(3)(B)(i)(II) cost recovery fee for inflation. *See* 8 U.S.C. 1187(h)(3)(B)(iv). Under HR–1, the adjusted 8 U.S.C. 1187(h)(3)(B)(i)(II) cost recovery fee is calculated by adding the amount required under 8 U.S.C. 1187(h)(3)(B)(i)(II) for the previous FY to the inflation adjustment amount. *See* 8 U.S.C. 1187(h)(3)(B)(iv). For FY 2025, the amount required under 8 U.S.C. 1187(h)(3)(B)(i)(II) was $10. The inflation adjustment for FY 2026 is $0.27. HR–1 does not direct CBP to round the HR–1 ESTA inflation adjustment. Thus, for FY 2026, the 8 U.S.C. 1187(h)(3)(B)(i)(II) cost recovery fee will be $10.27 ($10 + $0.27).

As noted previously, the 8 U.S.C. 1187(h)(3)(B)(i)(II) cost recovery fee is one of three fees that, when combined, comprise the total ESTA authorization fee for each FY. This notice does not alter the $17 or $13 fees required under 8 U.S.C. 1187(h)(3)(B)(i)(I) and 8 U.S.C. 1187(h)(3)(B)(i)(III), respectively. Thus, as required by HR–1, the inflation-adjusted FY 2026 ESTA fee will be $40.27 ($17 + $10.27 + $13) per travel authorization. In the event the ESTA application is denied, the FY 2026 fee is $10.27 to ensure recovery of the costs of providing and administering the ESTA System.

*D. Electronic Visa Update System (EVUS)*

EVUS is an online system currently used by nationals of the People's Republic of China (PRC) holding a 10-year B–1, B–2, or B–1/B–2 (visitor) visa to provide required information to DHS prior to travel to the United States. *See* 8 CFR part 215, subpart B.[10] PRC nationals with an approved U.S.-issued visa of a designated category must enroll in EVUS and provide or update personal and travel information to receive a determination of travel eligibility. *See* 8 CFR 215.24.

Pursuant to HR–1, the Secretary of Homeland Security must require the payment of a fee by any alien enrolling in EVUS. Public Law 119–21 sec. 100015 (8 U.S.C. 1813). The alien must pay the fee at the time of enrollment. *Id.* For FY 2025, the statute set a minimum fee amount of $30. *See* Public Law 119–21 sec. 100015(b)(1).

During FY 2026 and each subsequent FY, CBP is required to adjust the HR–1 EVUS fee for inflation. *See* Public Law 119–21 sec. 100015(b)(2). The statutory formula requires adding an inflation adjustment amount, rounded down to the next lowest multiple of $0.25, to the amount of the fee required under Public Law 119–21 sec. 100015(b) for the most recently concluded fiscal year. *Id.* For FY 2026, the inflation adjustment under Public Law 119–21 sec. 100015(b)(2)(B) is $0.81 rounded down to the next lowest multiple of $0.25, which is $0.75. Thus, the inflation-adjusted HR–1 EVUS fee for FY 2026 is $30.75 ($30 + $0.75).

This $30.75 HR–1 EVUS fee is required in addition to any other fee applicable by law. *See* Public Law 119–21 sec. 100015(a).

**Kristi L. Noem,**

*Secretary of Homeland Security.*

[FR Doc. 2025–20304 Filed 11–18–25; 8:45 am]

**BILLING CODE 9111–14–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Customs and Border Protection

### Accreditation and Approval of Camin Cargo Control, Inc. (Tampa, FL) as a Commercial Gauger and Laboratory

**AGENCY:** U.S. Customs and Border Protection, Department of Homeland Security.

---

[10] In a **Federal Register** notice published on October 20, 2016 (81 FR 72600), DHS identified the PRC as an EVUS country and designated B–1, B–2, and B–1/B–2 visas issued without restriction for the maximum validity period and contained in a passport issued by the PRC as designated visa categories for purposes of EVUS.

---

**ACTION:** Notice of accreditation and approval of Camin Cargo Control, Inc. (Tampa, FL), as a commercial gauger and laboratory.

---

**SUMMARY:** Notice is hereby given, pursuant to CBP regulations, that Camin Cargo Control, Inc. (Tampa, FL), has been approved to gauge petroleum and certain petroleum products and accredited to test petroleum and certain petroleum products for customs purposes for the next three years as of August 22, 2024.

**DATES:** Camin Cargo Control, Inc. (Tampa, FL) was approved and accredited as a commercial gauger and laboratory as of August 22, 2024. The next triennial inspection date will be scheduled for August 2027.

**FOR FURTHER INFORMATION CONTACT:** Robert P. Munivez, Laboratories and Scientific Services, U.S. Customs and Border Protection, 4150 Interwood South Parkway, Houston, TX 77032, tel. 281–560–2900.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given pursuant to 19 CFR 151.12 and 19 CFR 151.13, that Camin Cargo Control, Inc., 8402 Laurel Fair Circle, Suite 110, Tampa, FL 33610, has been approved to gauge petroleum and certain petroleum products and accredited to test petroleum and certain petroleum products for customs purposes, in accordance with the provisions of 19 CFR 151.12 and 19 CFR 151.13.

Camin Cargo Control, Inc. (Tampa, FL) is approved for the following gauging procedures for petroleum and certain petroleum products from the American Petroleum Institute (API):

| API chapter | Title |
|---|---|
| 3 ................... | Tank Gauging. |
| 7 ................... | Temperature Determination. |
| 8 ................... | Sampling. |
| 12 ................. | Calculation of Petroleum Quantities. |
| 17 ................. | Marine Measurement. |

Camin Cargo Control, Inc. (Tampa, FL), is accredited for the following laboratory analysis procedures and methods for petroleum and certain petroleum products set forth by the U.S. Customs and Border Protection Laboratory Methods (CBPL) and American Society for Testing and Materials (ASTM):

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Part 208**

[CIS No. 2744–23; Docket No: USCIS 2022–0016]

**RIN 1615–AC83**

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Parts 1003 and 1208**

[A.G. Order No. 5660–2023]

**RIN 1125–AB26**

**Circumvention of Lawful Pathways**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security; Executive Office for Immigration Review, Department of Justice.

**ACTION:** Final rule; request for comments on expanded applicability in maritime context.

**SUMMARY:** The Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") are issuing a final rule in anticipation of a potential surge of migration at the southwest border ("SWB") of the United States following the termination of the Centers for Disease Control and Prevention's ("CDC") public health Order. The rule encourages migrants to avail themselves of lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel, thereby reducing reliance on human smuggling networks that exploit migrants for financial gain. The rule does so by introducing a rebuttable presumption of asylum ineligibility for certain noncitizens who neither avail themselves of a lawful, safe, and orderly pathway to the United States nor seek asylum or other protection in a country through which they travel. In the absence of such a measure, which would apply only to those who enter at the southwest land border or adjacent coastal borders during a limited, specified date range, the number of migrants expected to travel without authorization to the United States would be expected to increase significantly, to a level that risks undermining the Departments' continued ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system, in the face of exceptionally challenging

circumstances. Coupled with an expansion of lawful, safe, and orderly pathways into the United States, the Departments expect the rule to lead to a reduction in the number of migrants who seek to cross the SWB without authorization to enter, thereby reducing the reliance by migrants on dangerous human smuggling networks, protecting against extreme overcrowding in border facilities, and helping to ensure that the processing of migrants seeking protection in the United States is done in an effective, humane, and efficient manner. In addition, the Departments are requesting comment on whether applicability of the rebuttable presumption should be extended to noncitizens who enter the United States without documents sufficient for lawful admission during the same temporary time period at a maritime border.

**DATES:**

*Effective date:* This rule is effective on May 11, 2023.

*Comment period for solicited comments:* Comments on expanded applicability in maritime context identified in Section V of this preamble must be submitted on or before June 15, 2023. The electronic Federal Docket Management System will accept comments before midnight eastern time at the end of that day.

**ADDRESSES:**

*Docket:* To view comments on the proposed rule that preceded this rule, search for docket number USCIS 2022–0016 on the Federal eRulemaking Portal at *https://www.regulations.gov.*

*Comment period for solicited additional comments:* You may submit comments on the specific issue identified in Section V of this preamble via the electronic Federal Docket Management System at *https://www.regulations.gov,* to DHS Docket Number USCIS 2022–0016. Follow the website instructions for submitting comments. Comments submitted in a manner other than the one listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the rulemaking and may not receive a response from the Departments. Please note that the Departments cannot accept any comments that are hand-delivered or couriered. In addition, the Departments cannot accept comments contained on any form of digital media storage devices, such as CDs/DVDs or USB drives. The Departments are not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov,* please contact the Regulatory Coordination Division, Office of Policy

and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (240) 721–3000 (not a toll-free call) for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**

*For DHS:* Daniel Delgado, Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, U.S. Department of Homeland Security; telephone (202) 447–3459 (not a toll-free call).

*For Executive Office for Immigration Review ("EOIR"):* Lauren Alder Reid, Assistant Director, Office of Policy, EOIR, Department of Justice, 5107 Leesburg Pike, Falls Church, VA 22041; telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

**I. Public Participation**

Interested persons are invited to submit comments on the specific issue identified in Section V of this preamble by submitting relevant written data, views, or arguments. To provide the most assistance to the Departments, comments should explain the reason for any recommendation and include data, information, or authority that supports the recommended course of action. Comments must be submitted in English, or an English translation must be provided. Comments submitted in a manner other than those listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the rulemaking and may not receive a response from the Departments.

*Instructions:* If you submit a comment, you must submit it to DHS Docket Number USCIS 2022–0016. All submissions may be posted, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to the Departments. The Departments may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy and Security Notice available at *https://www.regulations.gov.*

**II. Executive Summary**

*A. Purpose of Action*

Economic and political instability around the world is fueling the highest

levels of migration since World War II, including in the Western Hemisphere. Analysis by the DHS Office of Immigration Statistics ("OIS") found that even while CDC's Title 42 public health Order[1] has been in place, encounters at our SWB[2]—referring to the number of times U.S. officials encounter noncitizens[3] attempting to cross the SWB of the United States without authorization to do so—reached an all-time high in 2022, driven in large part by an unprecedented exodus of migrants at different times from countries such as Brazil, Colombia, Cuba, Ecuador, Haiti, Nicaragua, Peru, and Venezuela.[4] The U.S. Border Patrol ("USBP") completed 221,710 encounters between ports of entry in December 2022, second only to May 2022 (224,371 encounters) for the most monthly encounters since at least Fiscal Year ("FY") 2000 (the period for which detailed records are available), and very likely the most ever.[5] Daily encounters between Ports of Entry ("POEs") averaged 7,152 for December 2022 and exceeded 8,000 per day 11 times during the month, as compared to average daily encounters of 1,977 for all of 2000–2019 and average daily encounters of 1,265 in the immediate pre-pandemic period, 2014–2019.[6] Smuggling networks enable and exploit this unprecedented movement of people, putting migrants' lives at risk for smugglers' financial gain.[7] Meanwhile, the current asylum system—in which a high number of migrants are initially determined eligible to pursue their claims, even though most ultimately are not granted asylum in the subsequent EOIR removal proceedings[8]—has contributed to a growing backlog of cases awaiting review by asylum officers ("AOs") and immigration judges ("IJs"). The practical result of this growing backlog is that those with meritorious claims may have to wait years for their claims to be granted, while individuals who are ultimately denied protection may spend years in the United States before being issued a final order of removal.[9] As the demographics of border encounters have shifted in recent years to include larger numbers of non-Mexicans—who are far more likely to assert asylum claims— and as the time required to process and remove noncitizens ineligible for protection has grown (during which individuals may become eligible to apply for employment authorization), the deterrent effect of apprehending noncitizens at the SWB has become more limited.[10]

While the CDC's Title 42 public health Order remains in effect, migrants who do not have proper travel documents have generally not been processed into the United States; they instead have been expelled to Mexico or to their home countries under the Order's authority without being processed under the authorities set forth in Title 8 of the United States Code, which includes the Immigration and Nationality Act ("INA" or "the Act"). When the Order is lifted, however, the United States Government will process all migrants into the United States under Title 8 authorities, as required by statute. At that time, the number of migrants seeking to cross the SWB without authorization is expected to increase significantly, unless other policy changes are made. Such challenges were evident in the days following the November 15, 2022, court decision that, had it not been stayed on December 19, 2022, would have resulted in the lifting of the Title 42 public health Order effective December 21, 2022.[11] Leading up to the expected termination date, migrants gathered in various parts of Mexico, including along the SWB, waiting to cross the border once the Title 42 public health Order was lifted.[12] According to internal Government sources, smugglers were also expanding their messaging and recruitment efforts, using the expected lifting of the Title 42 public health Order to claim that the border was open, thereby seeking to persuade would-be migrants to participate in expensive and dangerous human smuggling schemes. In the weeks between the November 2022 announcement that the Title 42 public health Order would be lifted, and the December 19, 2022, stay order that kept the Title 42 public health Order in place, encounter rates jumped from an average of just under 7,700 per week (early November) to nearly 8,800 per

---

[1] See Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

[2] United States Government sources refer to the U.S. border with Mexico by various terms, including "SWB," "the southern border," "U.S.- Mexico border," or "the land border with Mexico." In some instances, these differences can be substantive, referring only to portions of the border, while in others they simply reflect different word choices. The "southern border" is both a land and maritime border extending from beyond California to the west to beyond Florida to the east. This rule applies along the entirety of the U.S. land border with Mexico, referred to in the regulatory text as the "southwest land border," but the Departments use different terms in the preamble to describe the border. This is in large part to reflect the source material supporting the rule, but the Departments believe that the factual circumstances described in the preamble call for applying the rule across the entirety of the U.S. land border with Mexico, referred to throughout as the "SWB." As discussed in greater detail below, the Departments believe that the factual circumstances described in this preamble call for applying the rule to coastal borders adjacent to that land border as well; accordingly, this final rule applies to those who enter the United States from Mexico, whether at the southwest land border or adjacent coastal borders.

[3] For purposes of this discussion, the Departments use the term "noncitizen" to be synonymous with the term "alien" as it is used in the Immigration and Nationality Act. See INA 101(a)(3), 8 U.S.C. 1101(a)(3); Barton v. Barr, 140 S. Ct. 1442, 1446 n.2 (2020).

[4] OIS analysis of OIS Persist Dataset based on data through March 31, 2023; OIS analysis of historic U.S. Border Patrol data.

[5] OIS analysis of OIS Production data based on data through March 31, 2023.

[6] OIS analysis of OIS Production data for fiscal year ("FY") 2000–March 2023 and OIS Yearbook data for FY 1925–FY 1999. As discussed further below, daily encounters between ports of entry fell sharply in January 2023 following the launch of the Cuba, Haiti, and Nicaragua parole processes, and daily encounters between ports of entry at the SWB averaged just over 5,200 a day the 30 days ending April 10, 2023. OIS analysis of Unified Immigration Portal (UIP) data pulled on April 13, 2023.

[7] Miriam Jordan, Smuggling Migrants at the Border Now a Billion-Dollar Business, N.Y. Times, July 25, 2022, https:// www.nytimes.com/2022/07/ 25/us/migrant-smuggling-evolution.html.

[8] See EOIR, Executive Office for Immigration Review Adjudication Statistics: Asylum Decision and Filing Rates in Cases Originating with a Credible Fear Claim (Jan. 16, 2023), https:// www.justice.gov/eoir/page/file/1062976/download. The EOIR adjudication outcome statistics report on the total number of cases originating with credible fear claims resolved on any ground in a FY, without regard to whether an asylum claim was adjudicated. The asylum grant rate is a percentage of that total number of cases.

[9] OIS analysis of EOIR data as of March 31, 2023.

[10] For noncitizens encountered at the SWB in FY 2014–FY 2019 who were placed in expedited removal, nearly 6 percent of Mexican nationals made fear claims that were referred to U.S. Citizenship and Immigration Services for adjudication, compared to nearly 57 percent of people from Northern Central America (i.e., El Salvador, Guatemala, and Honduras), and just over 90 percent of all other nationalities. OIS analysis of Enforcement Lifecycle data as of December 31, 2022. Of note, according to OIS analysis of historic EOIR and CBP data, there is a clear correlation since FY 2000 between the increasing time it takes to complete immigration proceedings, which results in a lower share of noncitizens being removed, and the growth in non-Mexican encounters at the SWB. Both trends accelerated in the 2010s, as non-Mexicans became the majority of border encounters, and they have accelerated further since FY 2021, as people from countries other than Mexico and Northern Central America now account for the largest numbers of border encounters.

[11] See Huisha-Huisha v. Mayorkas, No. 21–100, 2022 WL 16948610 (D.D.C. Nov. 15, 2022), cert. and stay granted, Arizona v. Mayorkas, 143 S. Ct. 478 (2022).

[12] See, e.g., Leila Miller, Asylum Seekers Are Gathering at the U.S.-Mexico Border. This Is Why, L.A. Times, Dec. 23, 2022, https:// www.latimes.com/world-nation/story/2022-12-23/ la-fg-mexico-title-42-confusion.

**31316**    **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

week (mid-December), a change not predicted by normal seasonal effects.[13]

While a number of factors make it particularly difficult to precisely project the numbers of migrants who would seek to cross the SWB without authorization or present at a U.S. POE without documents sufficient for admission after the lifting of the Title 42 public health Order, DHS encounter projections and planning models from early April suggest that encounters could rise to 11,000 per day, absent policy changes and absent a viable mechanism for removing Cuban, Haitian, Nicaraguan, and Venezuelan ("CHNV") nationals who do not have a valid protection claim.[14] As discussed in greater detail below, data indicate that recently announced enforcement processes, as applied to CHNV nationals, which couple new parole processes with prompt returns of those who attempt to cross the SWB without utilizing these processes, are effectively deterring irregular migration[15] from those countries to the United States,

thus yielding a substantial decrease in encounter numbers for CHNV countries.[16]

However, DHS will no longer have a means to promptly expel migrants without a legal basis to stay in the United States following the termination of the Title 42 public health Order, which means that an important disincentive associated with the parole processes would no longer be present. In addition, there are a number of factors that could contribute to these gains being erased after the lifting of the Title 42 public health Order, including the presence of several large diaspora populations in Mexico and elsewhere in the hemisphere, the unprecedented recent growth in migration from countries of origin not previously typical, the already large number of migrants in proximity to the SWB, and the general uncertainty surrounding the expected impact of the termination of the Title 42 public health Order on the movement of migrants. Thus, the high end of the estimated encounter rate remains a possibility for which the Departments need to prepare. In the absence of the policy changes included in the rule, most non-Mexicans processed for expedited removal under Title 8 would likely establish credible fear and remain in the United States for the foreseeable future despite the fact that many of them will not ultimately be granted asylum,[17] a scenario that would likely incentivize an increasing number of migrants to the United States and further increase the likelihood of sustained, high encounter rates.

A sustained, high encounter rate risks overwhelming the Departments' ability to effectively process, detain, and

remove, as appropriate, the migrants encountered. This would put an enormous strain on already strained resources, risk overcrowding in already crowded USBP stations and border POEs in ways that pose significant health and safety concerns, and create a situation in which large numbers of migrants—only a small proportion of whom are likely to be granted asylum—are subject to exploitation and risks to their lives by the networks that support their movements north.

In response to this urgent and extreme situation, the Departments are issuing a rule that—

• incentivizes migrants to use lawful, safe, and orderly means for noncitizens to enter the United States to seek asylum and other forms of protection;

• provides core protections for noncitizens who would be threatened with persecution or torture in other countries; and

• builds upon ongoing efforts to share the responsibility of providing asylum and other forms of protection to eligible migrants with the United States' regional partners.

At the same time, the rule addresses the reality of unprecedented migratory flows, the systemic costs those flows impose on the immigration system, and the ways in which increasingly sophisticated smuggling networks cruelly exploit the system for financial gain. Specifically, this rule establishes a presumptive condition on asylum eligibility for certain noncitizens who fail to take advantage of the existing and expanded lawful pathways[18] to enter the United States, including the opportunity to schedule a time and place to present at a POE, and thus seek asylum or other forms of protection in a lawful, safe, and orderly manner, or to seek asylum or other protection in one of the countries through which they travel on their way to the United States.

This effort draws, in part, on lessons learned from the successful Venezuela parole process,[19] as well as the similar processes for Cubans, Haitians, and Nicaraguans,[20] under which DHS

---

[13] Month over month change from November to December for all of FY 2013–FY2022 averaged negative 2 percent. OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[14] OIS analysis of DHS SWB Encounter Planning Model generated April 18, 2023. The complexity of international migration limits the Department's ability to precisely project border encounters under the best of circumstances. The current period is characterized by greater than usual uncertainty due to ongoing changes in the major migration source countries (*i.e.*, the shift from Mexico and Northern Central America to new countries of origin, discussed further below), the growing impact of climate change on migration, political instability in several source countries, the evolving recovery from the COVID–19 pandemic, and uncertainty generated by border-related litigation, among other factors.

OIS leads an interagency SWB Encounter Projections Working Group that generates encounter projections every two to four weeks, with ongoing refinements to the model based on feedback from the working group and model diagnostics. The enterprise encounter projection utilizes a mixed method blended model that combines a Bayesian structural time series statistical model produced by OIS with subject matter expert input to account for real-time policy developments and pending litigation, among other factors, that are not captured by the statistical model. The blended model is run through a standard statistical process (Monte Carlo simulations) to generate 68 percent and 95 percent confidence intervals for each of 33 separate demographic groupings. In light of the greater-than-usual uncertainty at the current time, the Departments' planning models are designed to prepare the Departments for all reasonably likely eventualities, and therefore focus on the upper bounds of the blended model's 68 and 95 percent confidence intervals. As noted in Section IV.B.2 of this preamble, in the current context, the Departments must focus their planning efforts on the high and moderately high planning models rather than plan to an optimistic scenario that could leave enforcement efforts badly under-resourced and harm efforts to provide a safe and orderly process.

[15] In this preamble, "irregular migration" refers to the movement of people into another country without authorization.

[16] In the week prior to the announcement of the parole processes (ending October 12, 2022, for Venezuela and January 6, 2023, for Cuba, Haiti, and Nicaragua), the daily average of CHNV encounters was nearly 2,000 between POEs. A month after the parole announcements, daily encounters of CHNV nationals averaged just under 300 encounters. In the most recent seven days ending April 10, 2023, CHNV daily encounters averaged 195. OIS analysis of OIS Persist dataset based on data through March 31, 2023, and OIS analysis of CBP UIP data downloaded April 13, 2023.

[17] See Section III.C of the preamble to the notice of proposed rulemaking, Circumvention of Lawful Pathways, 88 FR 11704, at 11715–11716 (Feb. 23, 2023). Overall, 63 percent of non-Mexicans placed in expedited removal from 2014–2019 made fear claims, and 85 percent of those claiming fear (54 percent of all those placed in expedited removal) established fear or were otherwise placed in section 240 removal proceedings as a result of their fear claim. These rates are likely to be higher after May 11, 2023, because of the growing prevalence of extra-regional nationals (*i.e.*, noncitizens not from Mexico or Northern Central America), who are more likely than those from Northern Central American countries to make fear claims and to establish fear. OIS analysis of OIS Enforcement Lifecycle data based on data through February 28, 2023.

[18] The terms "lawful pathways" and "lawful, safe, and orderly pathways," as used in this preamble, refer to the range of pathways and processes by which migrants are able to enter the United States or other countries in a lawful, safe, and orderly manner and seek asylum and other forms of protection as described in this rule.

[19] See DHS, Press Release, *DHS Announces New Migration Enforcement Process for Venezuelans* (Oct. 12, 2022), *https://www.dhs.gov/news/2022/10/12/dhs-announces-new-migration-enforcement-process-venezuelans; see also* DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[20] See DHS, Press Release, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and*

coupled a mechanism for noncitizens from these countries to seek entry into the United States in a lawful, safe, and orderly manner, with the imposition of new consequences for those who cross the border without authorization to do so—namely returns to Mexico.[21] Prior to the implementation of these processes, the Government of Mexico had not been willing to accept the return of such nationals; the Government of Mexico's independent decision to allow such returns was predicated, in primary part, on the implementation of these processes.

A week before the announcement of the Venezuela parole process on October 12, 2022, Venezuelan encounters between POEs at the SWB averaged over 1,100 a day from October 5–11. About two weeks after the announcement, Venezuelan encounters averaged under 200 per day between October 18 and 24.[22] U.S. Customs and Border Protection ("CBP") encountered an average of 106 Venezuelans between POEs per day in March 2023, about one-tenth the number of encounters prior to the announcement of the parole process.[23] Similarly, the number of Cuban, Haitian, and Nicaraguan ("CHN") nationals encountered between POEs dropped significantly in the wake of the introduction of the new processes, which coupled a lawful, safe, and orderly way for such nationals to seek parole in the United States with consequences (in the form of prompt returns to Mexico) for those who crossed the SWB without authorization. Between the announcement of these processes on January 5, 2023, and January 21, 2023, the number of daily encounters between POEs of CHN nationals dropped from 928 to 73, a 92

percent decline.[24] CHN encounters between POEs continued to decline to an average of fewer than 17 per day in March 2023.[25] DHS estimates that the drop in CHNV encounters in January through March was almost four times as large as the number of people permitted entry under the parole processes.[26]

This rule, which draws on these successful processes, and which will apply only to those who enter during a limited, specified date range at the southwest land border or adjacent coastal borders, will discourage irregular migration by encouraging migrants to use lawful, safe, and orderly pathways and allowing for swift returns of migrants who bypass such pathways, even after the termination of the Title 42 public health Order. It responds to the expected increase of migrants seeking to cross the SWB following the termination of the Title 42 public health Order that would occur in the absence of a major policy shift by encouraging reliance on lawful, safe, and orderly pathways, thereby shifting the incentives that otherwise encourage migrants to make a dangerous journey to the SWB. It is also responsive to the requests of foreign partners that have lauded the sharp reductions in irregular migration associated with the aforementioned process for Venezuelans and have urged that the United States continue and build on this kind of approach, which couples processes for individuals to travel directly to the United States with consequences at the land border for those who do not avail themselves of these processes. The United States has, as noted above, already extended this model to Cuba, Haiti, and Nicaragua, and the Government of Mexico and the United States recently announced a set of additional measures on migration, including the United States' continued commitment to welcoming CHNV nationals under these parole processes and Mexico's commitment to continue to accept back migrants on

humanitarian grounds after May 11, 2023.[27] The Departments assess that continuing to implement and build on this approach is critical to the United States' ongoing engagements with regional partners, in particular the Government of Mexico, regarding migration management in the region.[28]

Consonant with these efforts, over the past two years, the United States has taken significant steps to expand safe and orderly options for migrants to lawfully enter the United States. The United States has, for example, increased and will continue to increase—

• refugee processing in the Western Hemisphere;

• country-specific and other available processes for individuals seeking parole for urgent humanitarian reasons or significant public benefit on a case-by-case basis; and

• opportunities to lawfully enter the United States for the purpose of seasonal employment.

In addition, once the Title 42 public health Order is terminated, the United States will expand implementation of the CBP One™ mobile application ("CBP One app"),[29] an innovative mechanism for noncitizens to schedule a time to arrive at POEs along the SWB, to allow an increasing number of migrants who may wish to claim asylum to request an available time and location to present and be inspected and processed at certain POEs, in accordance with operational limitations at each POE.[30] Use of this app keeps

---

*Orderly Processes* (Jan. 5, 2023), *https:// www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.*

[21] While the Title 42 public health Order has been in place, those returns have been made under Title 42. As noted below, after the Title 42 public health Order is lifted, affected noncitizens may instead be subject to return or removal to Mexico under Title 8. *See* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/ briefing-room/statements-releases/2023/05/02/ mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* [hereinafter The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023)]; Government of Mexico, *México y Estados Unidos fortalecen Plan Humanitario Conjunto sobre Migración* (May 2, 2023), *https://www.gob.mx/ presidencia/prensa/mexico-y-estados-unidos-fortalecen-plan-humanitario-conjunto-sobre-migracion?state=published.*

[22] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[23] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[24] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[25] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[26] In December 2022, prior to the announcement of the CHN parole processes, the OIS Enterprise Encounter Projection predicted 273,000 total encounters of CHNV nationals in January through March 2023, a projection equivalent to 265,000 unique encounters given CHNV repeat encounter rates. During that same period, following the enactment of the CHN parole processes, unique SWB encounters (excluding scheduled arrivals via the CBP One app) of CHNV nationals was 20,204–245,000 fewer unique encounters than had been predicted. By comparison, a total of 61,967 CHNV nationals entered the United States pursuant to the CHNV parole processes during the same period. OIS analysis of OIS Persist Dataset based on data through March 31, 2023, and of CBP OFO CHNV Advance Travel Authorization reports.

[27] The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023).

[28] *See also* The White House, *Joint Statement by President Biden and Prime Minister Trudeau* (Mar. 24, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/24/joint-statement-by-president-biden-and-prime-minister-trudeau/* (reaffirming commitment of United States and Canada to a collaborative regional approach to migration centered on expanding legal pathways and humane border management, including deterrence of irregular migration).

[29] The Departments note that unless otherwise specified, references to the CBP One app refer to usage of the CBP One tool, which can be accessed via the smartphone application. Although there is a desktop version of the CBP One app, it does not currently allow users to submit their information in advance. CBP is developing the capability to use the desktop version for this purpose.

[30] As of January 12, 2023, this mechanism is currently available for noncitizens seeking to cross SWB land POEs to request a humanitarian exception from the Title 42 public health Order. *See* CBP, *Fact Sheet: Using CBP One™ to Schedule an Appointment* (last modified Jan. 12, 2023), *https:// www.cbp.gov/document/fact-sheets/cbp-one-fact-sheet-english.* Once the Title 42 public health Order is terminated, and the POEs open to all migrants who wish to seek entry into the United States, this mechanism will be broadly available to migrants in central and northern Mexico, allowing them to
Continued

migrants from having to wait in long lines of unknown duration at the POEs, and enables the POEs to manage the flows in a safe and efficient manner, consistent with their footprint and operational capacity, which vary substantially across the SWB. Once present in the United States, those who use this mechanism can make claims for asylum and other forms of protection and are exempted from this rule's rebuttable presumption on asylum eligibility. They are vetted and screened, and assuming no public safety or national security concerns, may be eligible to apply for employment authorization as they await resolution of their cases.[31]

Moreover, on April 27, 2023, DHS and the Department of State announced several new measures to further reduce irregular migration across the Western Hemisphere, significantly expand lawful pathways for protection, and facilitate the safe, orderly, and humane processing of migrants.[32] These new measures include—

• creating family reunification parole processes for El Salvador, Guatemala, Honduras, and Colombia, as well as modernizing the longstanding Haitian Family Reunification Parole process and the Cuban Family Reunification Parole process;

• committing to referring for resettlement thousands of additional refugees per month from the Western Hemisphere, with the goal of doubling the number of refugees the United States committed to welcome as part of the Los Angeles Declaration on Migration and Protection ("L.A. Declaration");

• establishing regional processing centers in key locations throughout the Western Hemisphere to reduce irregular migration;

• launching an aggressive anti-smuggling campaign targeting criminal networks in the Darién Gap and combating smuggler misinformation;

• surging AOs to complete credible fear interviews at the SWB more quickly; and

• ramping up coordination between state and local officials and other federal agencies to provide resources, technical assistance, and support.[33]

These measures will be implemented in close coordination with regional partners, including the governments of Mexico, Canada, Colombia, and Guatemala, as well as the government of Spain.[34]

Available pathways provide lawful, safe, and orderly mechanisms for migrants to enter the United States and make their protection claims. Consistent with the CHNV processes, this rule also imposes consequences on certain noncitizens who fail to avail themselves of the range of lawful, safe, and orderly means for entering the United States and seeking protection in the United States or elsewhere. Specifically, this rule establishes a rebuttable presumption that certain noncitizens who enter the United States without documents sufficient for lawful admission are ineligible for asylum, if they traveled through a country other than their country of citizenship, nationality, or, if stateless, last habitual residence, unless they were provided appropriate authorization to travel to the United States to seek parole pursuant to a DHS-approved parole process; presented at a POE at a pre-scheduled time or demonstrate that the mechanism for scheduling was not possible to access or use due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or sought asylum or other protection in a country through which they traveled and received a final decision denying that application. Unaccompanied children ("UC") are excepted from this presumption.[35] This presumption may be rebutted, and would necessarily be rebutted if, at the time of entry, the noncitizen or a member of the noncitizen's family with whom they are travelling had an acute medical emergency, faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder,[36] or satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11(a). The presumption also may be rebutted in other exceptionally compelling circumstances.

The rebuttable presumption is a "condition[ ]" on asylum eligibility, INA 208(b)(2)(C) and (d)(5)(B), 8 U.S.C. 1158(b)(2)(C) and (d)(5)(B), that applies in affirmative and defensive asylum application merits adjudications, as well as during credible fear screenings. Individuals who are subject to and do not rebut the presumption remain eligible for statutory withholding of removal and protection under the regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").[37]

With the ability to schedule a time and place to arrive at POEs and the availability of other orderly and lawful pathways, this system is designed to (1) protect against an unmanageable flow of migrants arriving at the SWB; (2) further ongoing efforts to share the responsibility of providing asylum and other forms of protection with the United States' regional partners; (3) ensure that those with valid asylum claims have an opportunity to seek protection, whether in the United States or elsewhere; (4) enable the Departments to continue administering the immigration laws fairly and effectively; and (5) reduce the role of exploitative transnational criminal organizations and smugglers.

The rule applies to noncitizens who enter the United States without authorization from Mexico at the southwest land border or adjacent coastal borders on or after the date of termination of the Title 42 public health Order and before a specified date, 24 months from the rule's effective date. However, the rule will continue to apply to such noncitizens who entered the United States during the 24-month time frame in their Title 8 proceedings and in any subsequent asylum applications, except for those applications filed after the two-year period by those who entered the United

---

request an available time and location to present and be inspected and processed at certain POEs.

[31] Under current employment authorization regulations, there is no waiting period before a noncitizen parolee in this circumstance may apply for employment authorization, except where the noncitizen is in expedited removal proceedings, including after a positive credible fear determination, and paroled from custody. *See* 8 CFR 274a.12(c)(11), 235.3(b)(2)(iii), (b)(4)(ii).

[32] *See* DHS, Fact Sheet, *U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration* [hereinafter DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023)].

[33] *See id.*

[34] *See id.; see also* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023) (committing to increase joint actions to counter human smugglers and traffickers, address root causes of migration, and continue to combine expanded lawful pathways with consequences for irregular migration).

[35] The term "unaccompanied child" as used in this rule is the same as "unaccompanied alien child," which is defined at 6 U.S.C. 279(g)(2) to mean "a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody."

[36] The term "imminent" refers to the immediacy of the threat; it makes clear that the threat cannot be speculative, based on generalized concerns about safety, or based on a prior threat that no longer poses an immediate threat. The term "extreme" refers to the seriousness of the threat; the threat needs to be sufficiently grave, such as a threat of rape, kidnapping, torture, or murder, to trigger this ground for rebuttal.

[37] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984, 1465 U.N.T.S. 85, 114.

States as minors and who apply as principal applicants. The Departments intend that the rule will be subject to review to determine whether the entry dates provided in 8 CFR 208.33(a)(1)(i) and 1208.33(a)(1)(i) should be extended, modified, or remain as provided in the rule.

### B. Effective Date

Issuance of this rule is justified in light of the migration patterns witnessed in recent months, and the concern about the possibility of a surge in irregular migration upon, or in anticipation of, the lifting of the Title 42 public health Order. The Departments seek to underscore that migrants will not be able to cross the border without authorization to enter without consequence upon the eventual lifting of the Order. Under this rule, the Departments will use their Title 8 authorities to process, detain, and remove, as appropriate, those who enter the United States from Mexico at the southwest land border or adjacent coastal borders without authorization and do not have a valid protection claim.

The Departments are issuing this rule without the 30-day delayed effective date typically required by the Administrative Procedure Act ("APA")[38] because the Departments have determined that it is necessary to implement the rule when the Title 42 public health Order is lifted. The lifting of the Order could occur as a result of several different litigation and policy developments, including the vacatur of the preliminary injunction entered in *Louisiana* v. *CDC*, 603 F. Supp. 3d 406 (W.D. La. 2022), *appeal pending*, No. 22–30303 (5th Cir. June 15, 2022); the lifting of the stay entered by the Supreme Court in *Arizona* v. *Mayorkas*, 143 S. Ct. 478 (2022); or "the expiration of the Secretary of HHS' declaration that COVID–19 constitutes a public health emergency," Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 86 FR 42828, 42829 (Aug. 5, 2021). The expiration of the declaration by the Secretary of Health and Human Services ("HHS") that COVID–19 constitutes a public health emergency is expected to occur on May 11, 2023, in light of the recent announcement that "[a]t present, the Administration's plan is to extend" the public health emergency to May 11 and then allow it to expire "on that

---

[38] *See* 5 U.S.C. 553(d). The Departments further address this requirement in Section VI.A of this preamble.

date." [39] The Departments have thus sought to move as expeditiously as possible, while also allowing sufficient time for public comment.

### C. Changes From Proposed Rule to Final Rule

On February 23, 2023, the Departments issued a notice of proposed rulemaking ("NPRM" or "proposed rule")[40] in anticipation of a potential surge of migration at the SWB following the eventual termination of the CDC's public health Order. Following careful consideration of public comments received, the Departments have made modifications to the regulatory text proposed in the NPRM, as described below. The rationale for the proposed rule and the reasoning provided in the proposed rule preamble remain valid, except as distinguished in this regulatory preamble.

#### 1. Removing Provisions Implementing the Proclamation Bar IFR and the TCT Bar Final Rule

Consistent with the proposed rule, Circumvention of Lawful Pathways, 88 FR 11704, 11727–28 (Feb. 23, 2023), the Departments have added amendatory instructions to remove provisions enacted to implement the bars to asylum eligibility established in an interim final rule ("IFR") entitled, Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934 (Nov. 9, 2018) ("Proclamation Bar IFR"), and a final rule entitled, Asylum Eligibility and Procedural Modifications, 85 FR 82260 (Dec. 17, 2020) ("TCT Bar Final Rule").[41]

To remove the provisions enacted to implement the Proclamation Bar IFR and TCT Bar Final Rule, the

---

[39] Office of Mgmt. & Budget, Exec. Office of the President, Statement of Administration Policy (Jan. 30, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/01/SAP-H.R.-382-H.J.-Res.-7.pdf; see also* HHS, *Fact Sheet: COVID–19 Public Health Emergency Transition Roadmap* (Feb. 9, 2023), *https://www.hhs.gov/about/news/2023/02/09/fact-sheet-covid-19-public-health-emergency-transition-roadmap.html* ("Based on current COVID–19 trends, the Department of Health and Human Services (HHS) is planning for the federal Public Health Emergency (PHE) for COVID–19, declared under Section 319 of the Public Health Service (PHS) Act, to expire at the end of the day on May 11, 2023.").

[40] 88 FR 11704.

[41] The TCT Bar Final Rule amended an earlier IFR on the same topic. *See* Asylum Eligibility and Procedural Modifications, 84 FR 33829 (July 16, 2019). The IFR was vacated prior to the issuance of the TCT Bar Final Rule. Additionally, where the Departments refer to the "Proclamation Bar" or "TCT Bar" without including "IFR" or "Final Rule," the Departments are referring to the bars as applied and not to the rulemaking documents that implemented them.

Departments have made the following changes:

• removed and reserved paragraphs 8 CFR 208.13(c)(3) and 1208.13(c)(3), which previously included the requirements for the Proclamation Bar IFR's applicability;

• removed and reserved paragraphs 8 CFR 208.13(c)(4) and 1208.13(c)(4), which previously included the requirements for the TCT Bar Final Rule's applicability;

• removed and reserved paragraphs 8 CFR 208.13(c)(5) and 1208.13(c)(5), which provided that determinations made with regard to whether an applicant met one of the exceptions to the TCT Bar Final Rule would not bind Federal departments or agencies with respect to certain later adjudications;

• amended 8 CFR 208.30(e)(5) to remove paragraphs (ii) and (iii), which regard application during credible fear of the Proclamation Bar IFR and TCT Bar Final Rule, respectively;

• removed reference to 8 CFR 208.30(e)(5)(ii) through (iv) from what was previously (i) and redesignated (i) as (e)(5);

• amended 8 CFR 1003.42(d) to remove paragraphs (1) and (2) and redesignated paragraph (3) as (d) because paragraphs (d)(1) and (2) provided the standard of review for Proclamation Bar and TCT Bar determinations made during credible fear screenings; and

• removed and reserved 8 CFR 1208.30(g)(1), which provided instructions to IJs regarding the application of the Proclamation Bar and the TCT Bar during credible fear reviews.

#### 2. Applicability of Rebuttable Presumption After the Two-Year Period

The rule applies to certain noncitizens who enter during the two-year period in any asylum application they submit, regardless of when the application is filed or if the noncitizen makes subsequent entries. *See* 8 CFR 208.13(f) ("For applications filed by aliens who entered the United States between May 11, 2023, and May 11, 2025, also refer to the provisions on asylum eligibility described in § 208.33."); 8 CFR 1208.13(f) (same); 8 CFR 208.33(a)(1), 1208.33(a)(1) (providing that the rebuttable presumption applies to noncitizens who enter the United States from Mexico at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission between the effective date and a date 24-months later and after the end of implementation of the Title 42 public health Order with certain exceptions).

To remove any potential ambiguity regarding the ongoing applicability of the lawful pathways rebuttable presumption, the final rule makes the presumption's ongoing applicability explicit in 8 CFR 208.33(c)(1) and 1208.33(d)(1) by stating that the lawful pathways condition on eligibility shall apply to "any asylum application" that is filed by a covered noncitizen "regardless of when the application is filed and adjudicated."

The Departments have exempted from this ongoing application of the rebuttable presumption certain noncitizens who enter the United States during the two-year period while under the age of 18 and who later seek asylum as principal applicants after the two-year period. In the NPRM, the Departments requested comment on "[w]hether any further regulatory provisions should be added or amended to address the application of the rebuttable presumption in adjudications that take place after the rule's sunset date." 88 FR at 11708. After reviewing comments raising concerns about the impact of the rule on children who arrive as part of a family unit and who are thus subject to the decision-making of their parents, the Departments have decided to adopt a provision excepting such children from the rule in certain circumstances after the two-year period ends. *See* 8 CFR 208.33(c)(2), 1208.33(d)(2). The Departments recognize that children who enter with their families are generally traveling due to their parents' decision-making. Exempting children from the rebuttable presumption entirely would mean, under the rule, that all family units that include minor children would also be exempted, which could incentivize families who otherwise would not make the dangerous journey to do so. And if the rule were amended to only exempt the child, it could inadvertently lead to the separation of a family in many cases because every child would have to be treated separately from their family during the credible fear screening as they would not be subject to the rebuttable presumption but their parents could be.

Although accompanied children remain subject to the rebuttable presumption generally, the Departments have determined that the presumption should not apply to them in any application for asylum they file after the two-year period, but only if they apply as a principal (as opposed to a derivative) applicant. The Departments believe this exception to the general applicability provision balances the interest in ensuring the rebuttable presumption has an impact on behavior,

while at the same time recognizing the special circumstance of children who enter in a manner that triggers the rebuttable presumption, likely without intending to do so or being able to form an understanding of the consequences. Specifically, if the Departments were to extend this exception to all children after the two-year period, even if they applied only as a derivative, the Departments would risk incentivizing families to seek to prolong their proceedings to file their asylum applications after the two-year period expires, undermining the Departments' interest in efficient adjudications. In addition, any family that did so would be able to avoid the applicability of the presumption entirely, by virtue of the rule's family unity provision. The Departments have decided not to include such a broad exemption, in light of the urgent need to disincentivize a further surge in irregular migration.

### 3. Expansion of Applicability to Adjacent Coastal Borders

As proposed in the NPRM, the rule would apply to certain noncitizens who enter the United States at the SWB—that is, "along the entirety of the U.S. land border with Mexico." 88 FR at 11704 n.1. The Departments received comments that applying the rule only to those who enter the United States from Mexico across the U.S.-Mexico land border would inadvertently incentivize noncitizens without documents sufficient for lawful admission to circumvent the land border by making a hazardous attempt to reach the United States by sea. In this final rule, the Departments have decided to modify 8 CFR 208.33(a)(1) and 8 CFR 1208.33(a)(1) to provide that the rule's rebuttable presumption of ineligibility for asylum applies to noncitizens who enter the United States from Mexico at "adjacent coastal borders." The term "adjacent coastal borders" refers to any coastal border at or near the U.S.-Mexico border. This modification therefore means that the rule's rebuttable presumption of ineligibility for asylum applies to noncitizens who enter the United States at such a border after traveling from Mexico and who have circumvented the U.S.-Mexico land border.

This modification mirrors the geographic reach of the CDC's Title 42 public health Order, which likewise applied—as relevant here—to certain covered noncitizens traveling from Mexico who would otherwise be introduced into a congregate setting "at or near the U.S. land and adjacent coastal borders." *See* 86 FR at 42841. Because the Title 42 public health Order

did not define the phrase "adjacent coastal borders," its meaning was developed during the public health Order's implementation. Specifically, as implemented by CBP, the term "adjacent coastal borders" was interpreted to apply to the same population as the Amended CDC Order issued in May 2020, which first introduced the concept of "coastal" application. The Amended Order applied to "persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land or coastal POE or Border Patrol station at or near the U.S. border with Canada or Mexico, subject to exceptions." [42] With regard to persons traveling from Mexico, in line with the interpretation above, CBP implemented the Title 42 public health Order as covering any coastal border adjacent to the U.S.-Mexico border reached by an individual traveling from Mexico and landing within the United States having circumvented the U.S.-Mexico land border. Applying the same geographic reach that has been applied by CBP for the past three years to this rule will avoid the risk that smugglers would exploit what could be perceived as a new "loophole" following the lifting of the Title 42 public health Order to persuade migrants to make a perilous crossing to the United States from Mexico by sea. In DHS's experience, that risk may well materialize, as smugglers routinely prey on migrants using perceived changes in U.S. immigration law.[43] Any such campaign by smugglers to persuade more migrants to circumvent the land border would result in life-threatening risks for migrants and DHS personnel, given the elevated danger associated with maritime crossings. As just one example of how dangerous such attempts can be, the Departments note that in March 2023, two suspected human smuggling boats from Mexico capsized and eight

---

[42] *See* Amendment and Extension of Order Under Sections 362 and 365 of the Public Service Act; Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 FR 31503 (May 26, 2020); CBP, CBP COVID–19 Response: Suspension of Entries and Imports Concept of Operations 1–3 (May 20, 2020), *https://www.cbp.gov/document/foia-record/title-42.*

[43] *See* Tech Transparency Project, *Inside the World of Misinformation Targeting Migrants on Social Media* (July 26, 2022), *https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media* ("A review of social media groups and pages identified by migrants showed . . . dubious offers of coyote or legal services, false claims about conditions along the route, misinformation about points of entry at which officials waive the rules, and baseless rumors about changes to immigration law.").

people died off the coast near San Diego, California.[44] This incident, as well as the increases in maritime migration over the past few years, as discussed further in Section V of this preamble, and commenters' concerns that the NPRM would have encouraged migration by sea, as discussed further in Section IV.B.8.i of this preamble, have led the Departments to extend the rebuttable presumption to the adjacent coastal borders. Specifically, in the interest of ensuring that this rule is not used to encourage intending migrants to undertake attempts that could end in similar tragedies, the Departments believe it is important that the text of 8 CFR 208.33(a)(1) and 8 CFR 1208.33(a)(1) make clear that the rule's presumption applies equally to noncitizens who arrive from Mexico on coasts adjacent to the southwest land border.

### 4. Clarification of Meaning of ''Final Decision''

As was proposed in the NPRM, the rule excepts from the rebuttable presumption noncitizens who sought asylum or other protection in another country through which they traveled and received a ''final decision'' denying that application. *See* 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). The Departments have amended this paragraph to further define what constitutes a ''final decision'' for the purposes of this exception. With this change, the final rule specifies that a ''final decision includes any denial by a foreign government of the applicant's claim for asylum or other protection through one or more of that government's pathways for that claim.'' *Id.* The provision further states that a ''final decision does not include a determination by a foreign government that the noncitizen abandoned the claim.'' *Id.* The Departments have made this change in response to comments, as discussed below, and to provide clarity that a noncitizen must in fact pursue the claim since a denial based on abandonment would be insufficient.

### 5. Exception for Unaccompanied Children

The NPRM provided that ''[u]naccompanied alien children, as defined in 6 U.S.C. 279(g)(2), are not subject to paragraph (a)(1) of this section.'' *See* 88 FR at 11750–51 (proposed 8 CFR 208.33(b), 1208.33(b)). The Departments have modified the proposed language to explicitly state that this exception applies to noncitizens who were UCs at the time of entry.[45] 8 CFR 208.33(a)(2)(i), 1208.33(a)(2)(i).

This added language makes clear that the UC exception aligns with other exceptions in this rule, which are based upon conditions at the time of a noncitizen's presentation at a POE, *see* 8 CFR 208.33(a)(2), 1208.33(a)(2), and more closely aligns the regulatory text with the Departments' stated purpose in the NPRM that ''unaccompanied children would be categorically excepted from the rebuttable presumption,'' 88 FR at 11724.

### 6. Expansion of Family Unity Provision

The NPRM provided that where a principal applicant is eligible for statutory withholding of removal or CAT withholding and would be granted asylum but for the presumption, and where an accompanying spouse or child does not independently qualify for asylum or other protection from removal, the presumption shall be deemed rebutted as an exceptionally compelling circumstance. *See* 88 FR at 11752 (proposed 8 CFR 1208.33(d)). Commenters raised concerns that excluding asylum applicants who travel without their families may inadvertently incentivize families to engage in irregular migration together so as not to risk that the principal applicant would be prevented from later applying for their family members to join them. This could involve making a dangerous journey with vulnerable family members, such as children. Accordingly, as discussed in Section IV.E.7.ii of this preamble, in response to these comments, the Departments have expanded the provision to also cover principal asylum applicants who have a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A). *See* 8 CFR 1208.33(c).

### 7. Other Changes

In addition to the changes this final rule makes to the NPRM detailed above, this final rule also makes other changes to the regulatory text set out in the NPRM.

First, the Departments have reorganized and made other edits to proposed 8 CFR 208.33(a) and 1208.33(a) to improve clarity for noncitizens, counsel appearing before the Departments, other members of the public, and adjudicators. For example, the Departments added the exception for unaccompanied children to 8 CFR 208.33(a)(2)(i) and 1208.33(a)(2)(i) rather than maintaining it as a standalone paragraph at 8 CFR 208.33(b) and 1208.33(b). Similarly, the Departments added headings and additional guideposts within 8 CFR 208.33(a) and 1208.33(a). Second, the Departments revised 8 CFR 208.33 and 1208.33 to move instructions from 8 CFR 208.33 to 8 CFR 1208.33 regarding IJ review that are better placed in EOIR's regulations. For example, the Departments removed the sentence at proposed 8 CFR 208.33(c)(2)(ii) stating that noncitizens may apply for asylum, withholding of removal, and protection under the CAT in removal proceedings and included that at new 8 CFR 1208.33(b)(4). These revisions do not change the meaning of those provisions.

### D. Rule Provisions

The rule contains the following key provisions:

• The rule imposes a rebuttable presumption of ineligibility for asylum upon certain noncitizens who enter the United States from Mexico at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission as described in INA 212(a)(7), 8 U.S.C. 1182(a)(7). *See* 8 CFR 208.33(a)(1), 1208.33(a)(1). The rebuttable presumption applies to only those noncitizens whose entry was (1) between May 11, 2023 and May 11, 2025; (2) subsequent to the end of implementation of the Title 42 public health Order; and (3) after the noncitizen traveled through a country other than the noncitizen's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 (''Refugee Convention'') or 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 268 (''Refugee Protocol''). *See* 8 CFR 208.33(a)(1)(i) through (iii), 1208.33(a)(1)(i) through (iii).

---

[44] *See* Karen Kucher et al., *8 Reported Dead After 2 Suspected Smuggling Boats Crash at Black's Beach in San Diego,* L.A. Times, Mar. 12, 2023, *https://www.latimes.com/california/story/2023-03-12/8-reported-dead-after-2-suspected-smuggling-boats-crash-at-blacks-beach-in-san-diego;* Wendy Fry, *An Endless Fight: As Border Infrastructure on Land Improves, Smugglers Take to the Water,* San Diego Tribune, Nov. 6, 2019, *https://www.sandiegouniontribune.com/news/border-baja-california/story/2019-11-06/an-endless-fight-as-border-infrastructure-on-land-improves-smugglers-take-to-the-water.*

[45] Numerous commenters recognized that the NPRM proposed an exception for UCs, but did not indicate a clear understanding of whether this exception applied to those who were UCs at the time of entry or at the time of adjudication.

• The rule excepts from the rebuttable presumption any noncitizen who is an unaccompanied child as defined in 6 U.S.C. 279(g)(2). *See* 8 CFR 208.33(a)(2)(i), 1208.33(a)(2)(i).

• The rule also excepts from the rebuttable presumption a noncitizen if the noncitizen or a member of the noncitizen's family with whom the noncitizen is traveling (1) was provided appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process; (2) presented at a POE, pursuant to a pre-scheduled time and place, or presented at a POE without a pre-scheduled time and place, if the noncitizen demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or (3) sought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application. *See id.* 208.33(a)(2)(ii), 1208.33(a)(2)(ii).

• The rule allows a noncitizen to rebut the presumption by demonstrating by a preponderance of the evidence that exceptionally compelling circumstances exist. A noncitizen necessarily rebuts the presumption if they demonstrate by a preponderance of the evidence that the noncitizen, or a member of the noncitizen's family with whom the noncitizen is traveling, (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.11(a). *See id.* 208.33(a)(3), 1208.33(a)(3). In addition, as a measure to ensure family unity, the rule provides that in removal proceedings pursuant to section 240 of the INA, 8 U.S.C. 1229a (''section 240 removal proceedings''), where a principal asylum applicant is eligible for statutory withholding of removal or CAT withholding and would be granted asylum but for the rebuttable presumption, and where an accompanying spouse or child does not independently qualify for asylum or other protection from removal or where the principal asylum applicant has a spouse or child who would be eligible to follow to join them if they are granted asylum, as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), the presumption is deemed rebutted as an exceptionally compelling circumstance. *See* 8 CFR 1208.33(c).

• The rule establishes procedures, applicable in the expedited removal context, under which AOs will determine whether the noncitizen has made a sufficient showing that the rebuttable presumption does not apply or that they meet an exception to or can rebut the presumption. *See id.* 208.33(b). If the AO determines that the rebuttable presumption does not apply or the noncitizen falls within an exception or has rebutted the presumption, the general procedures in 8 CFR 208.30 apply. *See id.* 208.33(b)(1)(ii). On the other hand, if the AO determines that the rebuttable presumption does apply and no exception or rebuttal ground applies, the AO will consider whether the noncitizen has established a reasonable possibility of persecution or torture with respect to the identified country or countries of removal. *See id.* 208.33(b)(1)(i), 208.33(b)(2).

• The rule provides that an AO's adverse determination as to the applicability of the rebuttable presumption, whether an exception applies or the presumption has been rebutted, and whether the noncitizen has established a reasonable possibility of persecution or torture, are all subject to de novo IJ review. *See id.* 208.33(b)(2)(iii) through (v), 1208.33(b). The noncitizen must request such review by so indicating on a Record of Negative Fear Finding and Request for Review by Immigration Judge. *See id.* 208.33(b)(2)(iv) and (v), 1208.33(b)(1).

• The rule establishes procedures for such IJ review. Specifically, if the IJ determines that the noncitizen has made a sufficient showing that the rebuttable presumption does not apply to them or that they meet an exception to or can rebut the presumption, and that the noncitizen has established a significant possibility of eligibility for asylum, statutory withholding of removal, or CAT withholding, the IJ issues a positive credible fear finding and the case proceeds under existing procedures at 8 CFR 1208.30(g)(2)(iv)(B). *See id.* 208.33(b)(2)(v)(A), 1208.33(b)(2)(i). If the IJ determines that the rebuttable presumption applies and has not been rebutted and no exception is applicable, but the noncitizen has established a reasonable possibility of persecution or torture with respect to the identified country or countries of removal, the IJ will issue a positive credible fear finding and DHS will issue a Form I–862, Notice to Appear, to commence section 240 removal proceedings. *See id.* 208.33(b)(2)(v)(B), 1208.33(b)(2)(ii). And finally, if the IJ issues a negative credible fear determination, the case is returned to DHS for removal of the

noncitizen. *See id.* 208.33(b)(2)(v)(C), 1208.33(b)(2)(ii). In such a circumstance, the noncitizen may not appeal the IJ's decision or request that U.S. Citizenship and Immigration Services (''USCIS'') reconsider the AO's negative determination, although USCIS may, in its sole discretion, reconsider a negative determination. *See id.* 208.33(b)(2)(v)(C).

• The rule provides that a noncitizen who is found to be subject to the lawful pathways condition during expedited removal proceedings may, if placed in section 240 removal proceedings, apply for asylum, statutory withholding of removal, or CAT protection, or any other form of relief or protection for which the noncitizen is eligible during those removal proceedings. *See id.* 1208.33(b)(4).

• The rule declines to adopt the Proclamation Bar IFR on a permanent basis and removes the language effectuating the Proclamation Bar. Specifically, the rule removes and reserves paragraphs 8 CFR 208.13(c)(3) and 1208.13(c)(3), which previously included the requirements for the bar's applicability.

• The rule removes regulatory provisions implementing the TCT Bar Final Rule. The rule removes and reserves paragraphs 8 CFR 208.13(c)(4) and 1208.13(c)(4), which previously included the requirements for the TCT Bar Final Rule's applicability. The rule also removes and reserves paragraphs 8 CFR 208.13(c)(5) and 1208.13(c)(5), which provided that determinations made with regard to whether an applicant met one of the exceptions to the TCT Bar Final Rule would not bind Federal departments or agencies with respect to certain later adjudications. Given the removal of the TCT Bar Final Rule and its implementing provisions, these provisions are no longer necessary.

• The rule also amends the CFR to remove provisions implementing the Proclamation Bar IFR and TCT Bar Final Rule during the credible fear process. The rule removes 8 CFR 208.30(e)(5)(ii) and (iii), which implemented the Proclamation Bar IFR and TCT Bar Final Rule, respectively. The rule also removes reference to (ii) though (iv) from what was previously (i) and redesignates (i) as (e)(5). Similarly, the rule also amends provisions relating to IJ standard of review for Proclamation Bar and TCT Bar determinations by removing 8 CFR 1003.42(d)(2) and (3), and redesignates 8 CFR 1003.42(d)(1) as paragraph (d). Finally, the rule removes and reserves 8 CFR 1208.30(g)(1), which provided instructions to IJs regarding the application of the Proclamation Bar

and the TCT Bar during credible fear reviews.

• The rule contains a special provision providing that the rebuttable presumption does not apply to an asylum application filed after May 11, 2025, if the noncitizen was under the age of 18 at the time of entry, and the noncitizen is applying for asylum as a principal applicant. *See id.* 208.33(c)(2), 1208.33(d)(2).

• The rule contains a severability clause reflecting the Departments' intention that the rule's provisions be severable from each other in the event that any aspect of the new provisions governing the rebuttable presumption is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance. *See id.* 208.33(d), 1208.33(e).

### III. Legal Authority

The Secretary and the Attorney General jointly issue this rule pursuant to their shared and respective authorities concerning asylum, statutory withholding of removal, and CAT determinations. The Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to it many functions related to the administration and enforcement of Federal immigration law while maintaining many functions and authorities with the Attorney General, including concurrently with the Secretary.

The INA, as amended by the HSA, charges the Secretary "with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens," except insofar as those laws assign functions to other agencies. INA 103(a)(1), 8 U.S.C. 1103(a)(1). The INA also grants the Secretary the authority to establish regulations and take other actions "necessary for carrying out" the Secretary's authority under the immigration laws, INA 103(a)(1) and (3), 8 U.S.C. 1103(a)(1) and (3); *see also* 6 U.S.C. 202.

The HSA charges the Attorney General with "such authorities and functions under [the INA] and all other laws relating to the immigration and naturalization of aliens as were [previously] exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to [EOIR]." INA 103(g)(1), 8 U.S.C. 1103(g)(1); *see also* 6 U.S.C. 521. In addition, under the HSA, the Attorney General retains authority to "establish such regulations, . . . issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority,

and perform such other acts as the Attorney General determines to be necessary for carrying out" his authorities under the INA. INA 103(g)(2), 8 U.S.C. 1103(g)(2).

Under the HSA, the Attorney General retains authority over the conduct of section 240 removal proceedings. These adjudications are conducted by IJs within DOJ's EOIR. *See* 6 U.S.C. 521; INA 103(g), 8 U.S.C. 1103(g). With limited exceptions, IJs within DOJ adjudicate asylum, statutory withholding of removal, and CAT protection applications filed by noncitizens during the pendency of section 240 removal proceedings, including asylum applications referred by USCIS to the immigration court. INA 101(b)(4), 8 U.S.C. 1101(b)(4); INA 240(a)(1), 8 U.S.C. 1229a(a)(1); INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 1208.2(b), 1240.1(a); *see also Dhakal* v. *Sessions,* 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals ("BIA"), also within DOJ, in turn hears appeals from IJ decisions. *See* 8 CFR 1003.1(a)(1) and (b)(3); *see also Garland* v. *Ming Dai,* 141 S. Ct. 1669, 1677–78 (2021) (describing appeals from IJ to BIA). In addition, the INA provides that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." INA 103(a)(1), 8 U.S.C. 1103(a)(1).

In addition to the separate authorities discussed above, the Attorney General and the Secretary share some authorities. Section 208 of the INA, 8 U.S.C. 1158, authorizes the "Secretary of Homeland Security or the Attorney General" to "grant asylum" to a noncitizen "who has applied for asylum in accordance with the requirements and procedures established by" the Secretary or the Attorney General under section 208 if the Secretary or the Attorney General determines that the noncitizen is a refugee. INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A). Section 208 thereby authorizes the Secretary and the Attorney General to "establish[]" "requirements and procedures" to govern asylum applications. *Id.* The statute further authorizes them to "establish," "by regulation," "additional limitations and conditions, consistent with" section 208, under which a noncitizen "shall be ineligible for asylum." INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see also* INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B) (authorizing the Secretary and the Attorney General to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent

with [the INA]").[46] The INA also provides the Secretary and Attorney General authority to publish regulatory amendments governing their respective roles regarding apprehension, inspection and admission, detention and removal, withholding of removal, deferral of removal, and release of noncitizens encountered in the interior of the United States or at or between POEs. *See* INA 235, 236, 241, 8 U.S.C. 1225, 1226, 1231.

The HSA granted DHS the authority to adjudicate asylum applications and to conduct credible fear interviews, make credible fear determinations in the context of expedited removal, and to establish procedures for further consideration of asylum applications after an individual is found to have a credible fear. INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); *see also* 6 U.S.C. 271(b) (providing for the transfer of adjudication of asylum and refugee applications from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services, now USCIS). Within DHS, the Secretary has delegated some of those authorities to the Director of USCIS, and USCIS AOs conduct credible fear interviews, make credible fear determinations, and determine whether a noncitizen's asylum application should be granted. *See* DHS, Delegation to the Bureau of Citizenship and Immigration Services, No. 0150.1 (June 5, 2003); 8 CFR 208.2(a), 208.9, 208.30.

The United States is a party to the Refugee Protocol, which incorporates Articles 2 through 34 of the Refugee Convention. Article 33 of the Refugee Convention generally prohibits parties to the Convention from expelling or returning ("refouler") "a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." 120%

Congress codified these obligations in the Refugee Act of 1980, creating the precursor to what is now known as statutory withholding of removal.[47] The Supreme Court has long recognized that the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the

---

[46] Under the HSA, the references to the "Attorney General" in the INA also encompass the Secretary, either solely or additionally, with respect to statutory authorities vested in the Secretary in the HSA or subsequent legislation, including in relation to immigration proceedings before DHS. 6 U.S.C. 557.

[47] Public Law 96–212, 94 Stat. 102 ("Refugee Act").

**31324**    **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), which provides that a noncitizen may not be removed to a country where their life or freedom would be threatened on account of one of the protected grounds listed in Article 33 of the Refugee Convention.[48] *See* INA 241(b)(3), 8 U.S.C. 1231(b)(3); *see also* 8 CFR 208.16, 1208.16. The INA also authorizes the Secretary and the Attorney General to implement statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* INA 103(a)(1) and (3), (g)(1) and (2), 8 U.S.C. 1103(a)(1) and (3), (g)(1) and (2).

The Departments also have authority to implement Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85 (entered into force for United States Nov. 20, 1994). The Foreign Affairs Reform and Restructuring Act of 1998 (''FARRA'') provides the Departments with the authority to ''prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention.'' Public Law 105–277, div. G, sec. 2242(b), 112 Stat. 2681, 2681–822 (8 U.S.C. 1231 note). DHS and DOJ have implemented the United States' obligations under Article 3 of the CAT in the CFR, consistent with FARRA. *See, e.g.,* 8 CFR 208.16(c) through 208.18, 1208.16(c) through 1208.18; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999), as corrected by 64 FR 13881 (Mar. 23, 1999).

This rule does not change the eligibility requirements for statutory withholding of removal or CAT protection. As further discussed below, the rule applies a ''reasonable possibility'' standard in screenings for statutory withholding of removal and CAT protection in cases where the

---

[48] *See INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 426–27 (1999); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 440–41 (1987) (distinguishing between Article 33's non-refoulement prohibition, which aligns with what was then called withholding of deportation and Article 34's call to ''facilitate the assimilation and naturalization of refugees,'' which the Court found aligned with the discretionary provisions in section 208 of the INA, 8 U.S.C. 1158). The Refugee Convention and Protocol are not self-executing. *E.g., Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) (''The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.'').

presumption of asylum ineligibility is applied and not rebutted. While the application of this standard is a change from the prior practice in the expedited removal context, it is the same standard used in protection screenings in other contexts and is consistent with both domestic and international law. *See* 8 CFR 208.31.

## IV. Public Comments and Responses

The Departments received 51,952 comments on the proposed rule, the majority of which expressed opposition to the proposal. A range of governmental and non-governmental entities, public officials, and private persons submitted comments. The Departments summarize and respond to the public comments below.

### A. General Support

#### 1. General Support

*Comment:* Many commenters stated their support for the rule overall. Commenters emphasized the importance of border security, stating that the Government must do what is necessary to both manage workloads at the border and stop migrants from entering the United States without permission.

*Response:* Promulgation of this rule is needed because, once the Title 42 public health Order is lifted, the number of migrants traveling to the United States without authorization is expected to increase significantly, to a level that risks undermining the Departments' ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system. Such a surge would also place additional pressure on States, local communities, and non-governmental organization (''NGO'') partners both along the border and in the interior of the United States.

To address these issues, the rule imposes a rebuttable presumption of asylum ineligibility for certain migrants who enter the United States outside of safe, orderly, and lawful pathways and without first seeking protection in a third country they have traveled through en route to the SWB, during a designated period of time. The rule (1) incentivizes the use of multiple existing lawful, safe, and orderly means for noncitizens to enter the United States to seek asylum and other forms of protection; (2) continues to provide core protections for noncitizens who would be threatened with persecution or torture in other countries; and (3) builds upon ongoing efforts to share the responsibility of providing asylum and other forms of protection to deserving

migrants with the United States' regional partners.

The successful implementation of the CHNV parole processes has demonstrated that an increase in lawful pathways, when paired with consequences for migrants who do not avail themselves of such pathways, can incentivize the use of such pathways and undermine transnational criminal organizations, such as smuggling operations. The rule, which is fully consistent with domestic and international legal obligations, provides the necessary consequences to maintain this incentive under Title 8 authorities. In short, the Departments expect the rule, coupled with an expansion of lawful, safe, and orderly pathways, to reduce the number of noncitizens seeking to cross the SWB without authorization to enter the United States.

The benefits of reducing the number of encounters include protecting against overcrowding in border facilities; allowing for the continued effective, humane, and efficient processing of noncitizens at and between ports of entry; and helping to reduce reliance on dangerous human smuggling networks that exploit migrants for financial gain. Even where the rule applies, the presumption against asylum eligibility may be rebutted in certain circumstances, such as where, at the time of the noncitizen's entry into the United States, they or a family member with whom they are traveling are experiencing an acute medical emergency or an extreme and imminent threat to life or safety, or are a victim of a severe form of trafficking. Moreover, DHS will still screen migrants who cannot overcome the rebuttable presumption to determine if the migrant has established a reasonable possibility of persecution for the purposes of statutory withholding of removal or a reasonable possibility of torture for the purposes of protection under the regulations implementing the CAT. *See* 8 CFR 208.33(b)(2)(i). Should a migrant receive a negative credible fear determination, they can also seek review of the determination by an IJ. *See* 8 CFR 208.33(b)(2)(iii) through (v). Those who are found to have credible fear due to a reasonable possibility of persecution or torture will then have the opportunity for further consideration of their protection claims via a section 240 removal proceeding. *See* 8 CFR 208.33(b)(2)(ii).

#### 2. Need, Effectiveness, and Rationale for the Rule

*Comment:* Commenters described the rule as a common-sense approach to managing migration at the border and

discouraging illegal migration, while others stated that the rule would contribute to the "rule of law" at the border. Other commenters noted that a change such as that made by this rule is necessary, as it is simply impossible to admit all migrants who want to enter the United States. Some commenters stated that the rule is a reasonable solution until Congress can take legislative action to address the issue. Other commenters supported the rule's encouragement for migrants to first seek protection in third countries they pass through before requesting asylum at the SWB and asserted that such a requirement is standard in international law; commenters further stated that the rule would discourage "asylum shoppers." Commenters stated that allowing migrants to cross multiple countries en route to the United States before claiming asylum defeats the true purpose of asylum. Some commenters stated that migrants know that claiming asylum allows them entry into the United States, and thus take advantage of the process.

*Response:* As noted above, the Departments have designed this rule in response to the number of migrants expected to travel without authorization to the United States after the lifting of the Title 42 public health Order, absent a policy change such as this one. In that case, the circumstances likely to occur include the following: an additional number of migrants anticipated to arrive at the border; the severe strain on resources that this influx of migrants would cause DHS; and a substantial resulting impact on U.S. Government operations, as well as local communities. DHS's successful Uniting for Ukraine ("U4U") and CHNV parole processes—under which DHS coupled a mechanism for noncitizens from these countries to seek entry to the United States in a lawful, safe, and orderly manner with the imposition of new consequences for those who cross the SWB without authorization—have demonstrated that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can incentivize the use of lawful pathways and undermine transnational criminal organizations, such as smuggling operations. The Departments expect similar benefits from this rule, especially a reduced number of encounters at the border, which will help to protect against overcrowding in border facilities; allow for the continued effective, humane, and efficient processing of noncitizens at and between ports of entry; and reduce

reliance on dangerous human smuggling networks that exploit migrants for financial gain.

The Departments designed the rule to strike a balance that maintains safe and humane processing of migrants while also including safeguards to protect especially vulnerable individuals. The rule provides exceptions to the rebuttable presumption and allows migrants to rebut the presumption in exceptionally compelling circumstances. These exceptions and opportunities for rebuttal are meant to ensure that migrants who are particularly vulnerable, who are in imminent danger, or who could not access the lawful pathways provided are not made ineligible for asylum by operation of the rebuttable presumption. Those who are not excepted from and are unable to rebut the presumption of ineligibility may still pursue statutory withholding of removal and protection under the CAT. In addition, to further aid migrants, the Departments plan to continue to work with foreign partners to expand lawful pathways for migration, as well as expand the Departments' mechanisms for lawful processing. Thus, the rule will disincentivize irregular migration and instead incentivize migrants—including those intending to seek asylum—to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel.

### 3. Mitigate Irregular Migration and the Associated Impacts

*Comment:* Many commenters expressed support for the rule for a variety of reasons. Commenters supported the change in policy, noting that this rule would result in a more efficient use of government resources at the border. Commenters also supported the proposed rule's use of a formal process for asylum applicants. Some commenters stated their support for the rule because the journey to the SWB is dangerous due to harsh conditions and smugglers, and this rule would weaken smugglers and transnational criminal enterprises and reduce their exploitation of migrants. Commenters also stated that incentivizing migrants to present themselves at POEs would reduce their risk of exploitation by human traffickers or other harm when attempting to cross between POEs. Commenters commended the Departments for prioritizing safe and orderly processing methods for those seeking refuge. Some commenters indicated that border security is critical and expressed concerns that malicious

actors could enter the United States more easily during a surge in migration.

*Response:* The Departments recognize these commenters' support for the rule and agree that maintaining border security is critical. The Departments agree that irregular migration is dangerous and can lead to increased strain on SWB operations and resources, increased illegal smuggling activity, and increased pressure on communities along the SWB. The United States has taken several measures to meet the influx of migrants crossing the SWB and is taking new steps to address increased flows throughout the Western Hemisphere.[49]

However, the anticipated increase in the number of migrants following the lifting of the Title 42 public health Order threatens to exceed the Departments' capacity to safely and humanely process migrants. By coupling the rule with additional lawful pathways and allowing migrants to schedule their arrival at a SWB POE, currently via the CBP One app, the rule will reduce the number of noncitizens seeking to cross the SWB without authorization to enter the United States. This reduction will protect against overcrowding in border facilities; allow for the continued effective, humane, and efficient processing of noncitizens at and between ports of entry; and help to reduce reliance on dangerous human smuggling networks that exploit migrants for financial gain. The Departments expect that this rule will result in decreased strain on border states, local communities, and NGOs and, accordingly, allow them to better absorb releases from CBP border facilities and provide support to the migrant community. Ultimately, this rule will disincentivize irregular migration and instead incentivize migrants to use safe, orderly, and lawful pathways to the United States or to seek protection in third countries.

### 4. Positive Impacts on Operations and Resources

*Comment:* Commenters supported the rule, stating that allowing migrants to remain in the United States at the government's expense while waiting for their asylum claim to be adjudicated is a waste of government resources. Commenters said that the rule— specifically when coupled with the expanded use of the CBP One app and the ability for migrants to schedule appointments—would allow for more efficient processing at the SWB. Commenters stated that, by decreasing

---

[49] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

**31326** **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

the number of migrants seeking asylum, the Departments would adjudicate asylum claims much faster and decrease the amount of time migrants must wait in the United States before receiving a final decision in their case.

*Response:* The Departments recognize these commenters' support and agree that the rule will have benefits for both those granted asylum and the U.S. immigration system. The rule encourages noncitizens to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel. The rule is designed to channel the high numbers of migrants expected to seek protection in the United States following the termination of the Title 42 public health Order into lawful, safe, and orderly pathways and ensure they can be processed in an effective, humane, and efficient manner. In addition, the Departments anticipate that the use of the CBP One app—the current scheduling mechanism that provides migrants with a means to schedule a time and place to present themselves at a SWB POE—will allow CBP to streamline the processing of noncitizens at POEs on the SWB and process significantly more individuals in a safe and orderly manner.

Adjudication on the merits of an asylum claim for those who establish credible fear and are placed into removal proceedings can be a long process. Thirty-eight percent of all noncitizens who entered along the SWB, received a positive credible fear determination, and were placed into proceedings before EOIR between FY 2014 and FY 2019 remained in EOIR proceedings as of December 31, 2022.[50] Further, almost half (47 percent) of those in EOIR cases who received positive credible fear determinations resulting from FY 2019 encounters (referrals to EOIR) remained in proceedings as of December 31, 2022.[51] Excluding *in absentia* orders, the mean completion time for EOIR cases in FY 2022 was 3.7 years.[52] Thus, those who have a valid claim to asylum in the United States often wait years for a final relief or protection decision; likewise, noncitizens who will ultimately be found ineligible for asylum or other protection—which occurs in the majority of cases—often have spent many years in the United States prior to being ordered removed.

This lengthy adjudications process means that migrants who can establish credible fear can expect to remain in the United States for an extended period regardless of whether they will ultimately obtain asylum status at an EOIR hearing on the merits. Allowing a migrant to remain in the United States for years before ultimately determining the migrant is ineligible for asylum or other protection is inefficient, risks creating a pull factor for other intending migrants, and runs counter to principles of judicial fairness, including the swift adjudication of claims. As discussed in the NPRM, *see* 88 FR at 11737, and below at Section IV.B.2 of this preamble, the Departments have determined that this rule will lead to increased efficiencies in the asylum adjudications process so that claims can be adjudicated without a lengthy delay.

5. Other Support

*Comment:* Commenters agreed that the Departments have the legal authority to restrict asylum eligibility based on a migrant's failure to seek protection in a third country that they have traveled through on route to the SWB and that such a policy is consistent with both domestic and international law. Commenters stated that the rule was necessary because most migrants do not have legitimate asylum claims, noting low grant rates by EOIR, and are instead seeking economic opportunities in the United States. Other commenters expressed general support for the rule and stated a belief that asylum seekers do not have legitimate claims because they may be coached by NGOs or other organizations.At least one commenter stated that if a migrant traveled through a third country with a legitimate asylum process on their way to the United States, DHS should assume that the migrant is not really in fear for his life; otherwise, the U.S. asylum system would be used for economic migration, the demand for which should be addressed by other means. Another commenter said that the proposed rule encourages asylum-seekers to use the "front door" by presenting at POEs and fulfills domestic and international legal obligations by removing eligibility for asylum for those who fail to do so while maintaining access to statutory withholding of removal and protection under the CAT. The commenter noted that countries are within their rights to limit access to asylum. The commenter also stated that many individuals are barred from asylum eligibility for reasons such as fraud, criminal convictions, and illegal reentry, and that the proposed rule would add those who do not avail themselves of asylum in the

nearest country and do not apply at a POE to this list, which should limit further unlawful entries and use of government resources. Some commenters supported the rule and suggested that the Government disseminate information about the rule in other countries to ensure migrants planning to seek asylum are aware of both the asylum process and the consequences of non-compliance.

*Response:* As discussed further below in Section IV.B.D, the Departments agree that the rule is consistent with U.S. obligations under both domestic and international law, including the INA; the Refugee Convention; the Refugee Protocol, which incorporates Articles 2 through 34 of the Refugee Convention; and the CAT. While the Departments appreciate these commenters' support for the rule, the Departments emphasize that this rule is necessary to prevent the expected increase in the number of migrants who would otherwise seek to travel without authorization to the United States after the termination of the Title 42 public health Order, which would risk undermining the Departments' ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system. In other words, the Departments do not rely on the alternative goals or bases of support for the rule expressed in the comments summarized above.

The Departments appreciate the importance of disseminating information about the rule to the public, including intending migrants, and are planning a robust communication effort in conjunction with and immediately following the publication of this rule.

*B. General Opposition*

1. General Opposition

*Comment:* The Departments received many comments expressing general opposition to the rule. Some commenters expressed opposition to the rule and encouraged the Administration to withdraw it, without further explanation. Commenters also stated, without explanation, that the rule would allow future administrations the ability to decide which nationalities are afforded protections, instead of making protections available for everyone in need. Other commenters stated the rule creates barriers, not pathways, for asylum seekers.

*Response:* The Departments take seriously the concerns expressed by commenters who generally oppose the rule. Because some of these comments failed to articulate specific reasoning underlying the general opposition, the

---

[50] *See* OIS analysis of OIS Enforcement Lifecycle data based on data through December 31, 2022.
[51] *Id.*
[52] *See* OIS analysis of DOJ EOIR data based on data through March 31, 2023.

Departments are unable to provide a more detailed response to those comments. In general, the Departments emphasize that this rule is necessary to ensure that, after the lifting of the Title 42 public health Order, protection claims made by noncitizens encountered at the SWB can be processed in a manner that is effective, humane, and efficient. The rule is also designed to reduce overcrowding at DHS facilities and reduce migrants' reliance on exploitive smuggling networks. The Departments intend this rule to work in conjunction with other initiatives that expand lawful pathways to enter the United States, and thereby incentivize safe, orderly, lawful migration over dangerous, irregular forms of migration. Although some lawful pathways, which exist separate from this rule, are available only to particular nationalities, this rule does not deny protection on the basis of nationality. A noncitizen of any nationality may avoid the rebuttable presumption by, for instance, presenting at a POE pursuant to a pre-scheduled time and place. As discussed in the NPRM and further below, the rule's presumption against asylum eligibility only applies to those who enter during a 2-year period, is rebuttable, and contains multiple exceptions to prevent undue harm to noncitizens with meritorious protection claims.

## 2. Need, Effectiveness, and Rationale for the Rule

*Comment:* Commenters asserted that the Departments' concerns about a future surge of migration after the end of the Title 42 public health Order are speculative and unsupported. One commenter said that the surge numbers were unreliable at best, that entries between POEs were higher two decades ago, and that the surge could in part be the result of attempted suppression of normal migration. Some commenters questioned the Departments' planning projection of the number of border encounters it expects when the Title 42 public health Order is lifted as a valid justification of the NPRM. Another commenter stated that the numbers of unauthorized unique individuals detained at the border are far from an all-time high or a record, and that attempts to enter the country undetected have plummeted. One commenter stated that the Title 42 public health Order increased the percentage of individuals attempting repeated crossings at the border, which has artificially inflated CBP's border apprehension statistics, and thereby overstated the scale of the problem at the border. Some commenters stated that the public is

unable to properly evaluate the Departments' data used to justify the rule because the ''DHS SWB Encounter Planning Model generated January 6, 2023'' cited in the NPRM, *e.g.,* 88 FR at 11705 n.11, does not have a link to the model and it does not provide information on methodology, data sources, and alternative figures.

*Response:* The Departments strongly disagree that the concerns stated in the NPRM regarding an ongoing and potential further surge of migration are speculative or unsupported. As noted in the NPRM, for the 30 days ending December 24, 2022, total daily encounters along the SWB consistently fluctuated between approximately 7,100 and 9,700 per day, averaging approximately 8,500 per day, with encounters exceeding 9,000 per day on 12 different occasions during this 30-day stretch.[53] 88 FR at 11704–05. While commenters are correct that the Title 42 public health Order has increased the percentage of repeat crossing attempts relative to the 2010s, since 2022 over 97 percent of extra-regional migrants (*i.e.,* migrants not from Mexico or Northern Central America [54])—the people representing the greatest processing challenge—are unique encounters.[55] Encounter totals reached an all-time high in FY 2022, and they remain at historically high levels even as encounters of CHNV nationals have fallen in recent months.[56]

OIS leads an interagency working group that produces a roughly bi-weekly SWB encounter projection used for operational planning, policy development, and short-term budget planning. The model used to produce encounter projections every two to four weeks is a mixed-method approach that combines a statistical predictive model

with subject matter expertise intended to provide informed estimates of future migration flow and trends. The mixed methods approach blends multiple types of models through an ensemble approach of model averaging.[57] The model includes encounter data disaggregated by country and demographic characteristics going back to FY 2013, data on apprehensions of third country nationals by Mexican enforcement agencies, and economic data. DHS uses the encounter projection to generate a range of planning models, including ''moderately-high'' planning models that are based on the 68 percent upper bound of the forecast interval and ''high'' planning models based on the 95 percent upper bound of the forecast interval.

Encounter projections are, of course, subject to some degree of uncertainty. International migration is an exceedingly complex process shaped by family and community networks, labor markets, environmental and security-related push factors, and rapidly evolving criminal smuggling networks, among other factors. Recent unprecedented changes in migration flows have further complicated the task of predicting future migration flows with precision. As recently as the 2000s, unauthorized migration to the SWB consisted almost entirely of single adults from Mexico.[58] Families and UCs accounted for increasing shares of unauthorized migrants in the 2010s, as did migrants from Northern Central America; and ''extra-regional'' migrants have driven increased flows in the 2020s, accounting for an absolute majority of encounters in FY 2023

---

[53] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[54] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[55] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[56] Concrete data on unique versus repeat encounters are only available since 2010. During that period, for the years prior to the implementation of Title 42 expulsions, the percentage of encounters that were unique increased each year from 2010–2019. OIS analysis of OIS Persist Dataset based on data through March 31, 2023. While specific data on numbers of unique encounters are not available prior to 2010, it is widely accepted that the years before the 2010, and particularly the years before 2000, were characterized by much larger numbers of repeat encounters, as most encounters were of Mexican nationals who were permitted to return to Mexico without being subject to formal removal proceedings or other enforcement consequences. *See also* DHS, *FY 2021 Border Security Metrics Report* (Apr. 27, 2022), *https://www.dhs.gov/ immigration-statistics/border-security/border-security-metrics-report.*

[57] Blending multiple models and basing predictions on prior data has been understood to improve modeling accuracy. *See, e.g.,* Spyros Makridakis et al., *Forecasting in Social Settings: The State of the Art,* 36 Int'l J. Forecasting 15, 16 (2020) (noting that it has ''stood the test of time [that] combining forecasts improves [forecast] accuracy''); The Forecasting Collaborative, *Insights into the Accuracy of Social Scientists' Forecasts of Societal Change,* Nat. Hum. Behaviour, Feb. 9, 2023, *https://doi.org/10.1038/s41562-022-01517-1* (comparing forecasting methods and suggesting that forecasting teams may materially improve accuracy by, for instance, basing predictions on prior data and including scientific experts and multidisciplinary team members).

[58] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 97 percent of all administrative arrests by the legacy Immigration and Nationality Service from 1981–1999. According to OIS Production data, Mexican nationals also accounted for 97 percent of SWB encounters from 2000–2003. Mexico's share of SWB border encounters fell to 94 percent in 2004, an all-time low, then averaged 91 percent for the remainder of the 2000s. OIS analysis of OIS Yearbook on Immigration Statistics, 1981– 1999; OIS Production Data, 2000–2009.

**31328**    **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

YTD.[59] The OIS working group takes these recent changes in migration flows into account in preparing its roughly bi-weekly encounter projection models.

Demographic changes in migration flows have introduced new challenges in the field of border enforcement. For decades the challenge was to detect and interdict Mexican nationals seeking to evade detection and to return them to Mexico, which generally was cooperative in accepting back its nationals across the land border. Today's set of challenges is broader; the United States Government must humanely process family units and UCs and consider tens of thousands of asylum claims, granting relief or protection where appropriate and imposing enforcement consequences (such as removal or return, and in some cases criminal charges), all with limited processing resources and challenges relating to barriers to repatriations for nationals from certain countries. These changes have significant implications, requiring substantial resources from CBP, ICE, USCIS, EOIR, and HHS.

An additional consideration in how the Departments utilize encounter projections for operational planning and budgeting is that it takes weeks or months to put new enforcement resources in place, while removing such resources takes much less time. For this reason, DHS generally must be conservative in its enforcement planning because the failure to have adequate resources in place at the start of a migration surge risks vicious cycles in which inadequate capacity to implement critically needed tools to disincentivize irregular migration, coupled with persistent and strong ''push factors,'' contribute to cascading adverse effects as the enforcement system becomes overwhelmed. Such effects include overcrowding in DHS facilities (which can endanger both migrants and DHS personnel), more noncitizens being released into the interior pending immigration

proceedings, and additional flows of migrants. In the current context of added uncertainty in the encounter projection and evolving enforcement challenges, DHS focuses its operational planning efforts on the high and moderately-high planning models rather than planning for an optimistic scenario that could leave enforcement efforts badly under-resourced. As for this policymaking effort, the Departments believe the policies in this rule are justified ''in light of the migration patterns witnessed in late November and December of 2022, and the concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order.'' 88 FR at 11708.

With respect to the suggestion that the Departments should have subjected the OIS planning model to more detailed review by commenters, the Departments respectfully disagree. In addition to the Departments' description of the planning model in the NPRM, *see* 88 FR at 11705 n.11, the Departments presented a range of the underlying data clearly demonstrating the scope of the problem the Departments face. *See, e.g.,* 88 FR at 11704–05 (''For the 30 days ending December 24, 2022, total daily encounters along the SWB consistently fluctuated between approximately 7,100 and 9,700 per day, averaging approximately 8,500 per day, with encounters exceeding 9,000 per day on 12 different occasions during this 30-day stretch''); *id.* at 11708–14 (describing the historically unique nature of current migratory trends and the role of shifting demographics and other factors on these trends). Although the Departments did not describe the planning models in minute detail, the data make clear the basis for the proposed rule and no commenters submitted data suggesting that the Departments do not currently face, and will not imminently face, an urgent circumstance requiring a policy response.

*Comment:* One commenter stated that concerns that NGOs and shelter networks have or are close to reaching their ''outer limit'' of capacity is unfounded, because according to the commenter, none of the $800 million newly allocated for humanitarian reception had been distributed as of the NPRM's publication in late February of this year. The commenter wrote that there are numerous ways that the Administration can work with Congress and NGO partners to continue to build shelter capacity and effectively respond to the needs of arriving migrants and asylum seekers. Similarly, a commenter

noted that the Government pays private, for-profit detention facilities $320/day to detain noncitizens, but only pays shelters $25 for a single bed. The commenter wrote that they had been asking the Government for more than two years to provide more funding to shelters and increase cooperation with NGOs, to no avail.

*Response:* The Departments acknowledge commenters' concerns about funds dedicated for NGOs and shelter networks as they work to respond to migratory flows and note that one expected effect of this rule is to disincentivize irregular migration, which may in turn result in reduced demand for certain NGO and shelter services. With respect to grant funding generally, as noted in the NPRM, the Federal Emergency Management Agency (''FEMA'') spent $260 million in FYs 2021 and 2022 on grants to non-governmental and state and local entities through the Emergency Food and Shelter Program—Humanitarian (''EFSP–H'') to assist migrants arriving at the SWB with shelter and transportation. *See* 88 FR at 11714. In November 2022, FEMA released $75 million through the program, consistent with the Continuing Appropriations and Ukraine Supplemental Appropriations Act, 2023.[60] In addition, the Bipartisan Year-End Omnibus, which was enacted on December 29, 2022, directed CBP to transfer $800 million in funding to FEMA to support sheltering and related activities for noncitizens encountered by DHS. The Omnibus authorized FEMA to utilize this funding to establish a new Shelter and Services Program and to use a portion of the funding for the existing EFSP–H, until the Shelter and Services Program is established.[61] On February 28, 2023, DHS announced a $350 million funding opportunity for EFSP–H.[62] This is the first major portion of funding that is being allocated for humanitarian assistance under the Omnibus funding

---

[59] Families and unaccompanied children accounted for an estimated 11 percent of SWB encounters in 2013, rising to 62 percent in 2019, and have averaged 30 percent from 2020 through March 2023. Data on unaccompanied children were first collected in 2008 and data on other family statuses were first collected in 2013, but not universally collected until 2016. Mexican nationals accounted for an average of 57 percent of SWB encounters from 2013–2015, fell to an all-time low of 24 percent in 2019 (when Northern Central Americans accounted for 64 percent of the total), and have averaged 35 percent of encounters from 2021 through March 2023. Extra regional nationals accounted for an average of 9 percent of SWB encounters from 2013–2018, 12 percent from 2019–2020, and accrued 35 percent in the first six months of FY 2023. OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[60] Public Law 117–180, Division A, Sec. 101(6), Continuing Appropriations Act, 2023.

[61] Public Law 117–328, Division F, Title II, Security Enforcement, and Investigations, U.S. Customs and Border Protection, Operations and Support.

[62] *See* DHS, Press Release, *The Department of Homeland Security Awards $350 Million for Humanitarian Assistance Through the Emergency Food and Shelter Program* (Feb. 28, 2023), *https:// www.dhs.gov/news/2023/02/28/department-homeland-security-awards-350-million-humanitarian-assistance-through;* DHS Grant Opportunity DHS–23–DAD–024–00–03, Fiscal Year 2023 Emergency Food and Shelter National Board Program—Humanitarian (EFSP) ($350M) (Feb. 28, 2023), *https://www.grants.gov/web/grants/view-opportunity.html?oppId=346460.*

approved in December.[63] For the new Shelter and Services Program, FEMA and CBP have held several public listening sessions and are developing plans to release a Notice of Funding Opportunity prior to September 2023 for the second major portion of funding allocated by Omnibus to assist migrants encountered by DHS.

The Departments emphasize that the reference to an "outer limit" in the NPRM was a prediction that the expected increase in migration at the border following the end of the Title 42 public health Order, without any other policy changes, could exceed the capacity of the Department of State, local governments, and NGOs to provide assistance to migrants. 88 FR at 11715. While commenters are correct that the $800 million in funding approved in the recent Omnibus is still being distributed and allocated, the Departments disagree that this ongoing funding conflicts with the statement in the NPRM. In other words, funding allocated to date, and funding slated for further allocation under the Omnibus funding approved in December, is insufficient to address the impending further surge of migration expected after the termination of the Title 42 public health Order.

*Comment:* Multiple commenters stated their opposition to "deterrence-oriented" rules. At least one commenter stated the NPRM makes clear the Administration wants to make the asylum system "cumbersome and difficult to navigate" to deter potential asylum seekers from coming to the United States, stating Vice President Harris' comment of "do not come" in 2021 was a message that those fleeing danger should not seek protection in the United States. Another commenter stated the proposed rule would not be an effective deterrent because of its similarity to the Migrant Protection Protocols ("MPP") and the Title 42 public health Order in the past, which the commenter claimed "outsourced and exacerbated the situation" by leaving thousands of individuals in dangerous conditions in Mexican border cities waiting to see if, or when, they will get into the United States. Another commenter stated the rule does not serve as a deterrent, as evidenced by the growing numbers of asylum seekers at the border.

Some commenters disagreed that the rule would reduce arrivals at the SWB.

Commenters disagreed with the premise underlying the proposed rule—that the rebuttable presumption would disincentivize migrants from entering the United States except through a lawful and orderly pathway and lead to a reduction in encounters at the SWB. Another commenter argued that the rule is providing an opportunity to smuggling organizations and also providing an additional tool for extortion for noncitizens seeking to enter the United States. Another commenter stated that there is no evidence that the NPRM will deter asylum seekers from crossing the border and suggested that arrivals at the border would increase due to suppression of entries at POEs.

*Response:* The Departments disagree that the rule generally seeks to discourage asylum seekers from coming to the United States. Rather, the rule seeks to strike a balance: It is intended to reduce the level of irregular migration to the United States, but also to preserve sufficient avenues for migrants with valid claims to apply for asylum or other protection, either in the United States or in third countries through which they travel. This rule is also intended to disincentivize the use of smugglers. To those ends, the rule encourages those with meritorious claims to either apply for asylum or other protection in the first safe country they reach or pursue available lawful pathways to the United States as set forth in the rule.

The Departments also disagree with the comparison some commenters made between this rule and certain past policies, including MPP and application of the Title 42 public health Order. The rule's operation as a rebuttable presumption, and the rule's operation in conjunction with multiple available lawful pathways, are two of the multiple ways in which this rule differs from certain past policies, including MPP or expulsions under the Title 42 public health Order. As it relates to MPP in particular, the purpose and effect of this rule is not to return noncitizens to Mexico pending their removal proceedings. *See* INA 235(b)(2)(C), 8 U.S.C. 1225(b)(2)(C). Instead, it is to incentivize migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel. Although some migrants may wait for some period of time in Mexico before obtaining a CBP One app appointment and before attending that appointment, the purpose and duration of such a stay would be different than under MPP. Absent this

rule, DHS anticipates that its ability to process noncitizens at POEs, as well as continue to facilitate regular travel and trade, would be adversely impacted by the shifting of resources and personnel from POEs to help process individuals encountered between POEs.

The Departments disagree with commenters' claim that this rule will not reduce entries and that it will incentivize irregular migration. The Departments have shown that an increase in the availability of lawful pathways, paired with immediate consequences for irregular migration, can incentivize the use of lawful pathways and thus reduce irregular migration. *See* 88 FR at 11705–06. Furthermore, the Departments disagree with commenters' assertion that the rule will push individuals away from POEs to cross between POEs. The rule incentivizes noncitizens who might otherwise attempt to enter without inspection between POEs to take advantage of expanded lawful pathways. The availability of lawful pathways, such as the ability to schedule an appointment through the CBP One app and the DHS-approved parole processes, and the rule's operation as a rebuttable presumption are two of the multiple ways in which this rule differs from certain efforts of the past Administration.

*Comment:* Commenters raised concerns with Departmental data cited in the NPRM. For example, commenters referred to two of the Departments' statements in the NPRM: (1) that 83 percent of the people who were subject to expedited removal and claimed to have a credible fear of persecution or torture from 2014 to 2019 were referred to an IJ for section 240 proceedings, but only 15 percent of those cases that were completed were granted asylum or some other form of protection, *see* 88 FR at 11716; and (2) while only 15 percent of all case completions result in relief or protection, OIS estimates that 28 percent of cases decided on their merits are grants of relief, 88 FR at 11716 n.97. Commenters stated that the 15 percent figure is misleading, because it is based on the total percentage of completed removal cases, and not the total percentage of cases decided on the merits of the asylum claim. Commenters claim that this method artificially deflates the asylum grant rate and creates the false impression that many asylum seekers were ineligible for asylum even where there was no decision on their asylum claim. Commenters also stated that the 28 percent figure itself was too low because, as described by the Departments, this figure excludes

[63] DHS, Press Release, *The Department of Homeland Security Awards $350 Million for Humanitarian Assistance Through the Emergency Food and Shelter Program* (Feb. 28, 2023), *https://www.dhs.gov/news/2023/02/28/department-homeland-security-awards-350-million-humanitarian-assistance-through.*

withholding of removal, deferral of removal, cancellation of removal, and claimed status reviews.

Commenters also claimed that asylum policies of the previous Administration artificially deflated asylum grant rates. Other commenters stated that it is logical that the percentage of cases passing the credible fear interview stage is far higher than the cases that eventually qualify for asylum, given that the credible fear process is supposed to have a low bar for passage. Another commenter stated that, by the Departments' logic, no asylum applicant should be entitled to an initial credible fear determination and full asylum merits hearing because their claims will probably be denied given the low approval rating of asylum.

*Response:* The Departments cited relevant Departmental statistics—which date back to 2014, prior to the implementation of any policies of the prior Administration—to demonstrate the general point that there is a significant disparity between positive credible fear determinations and ultimate relief in section 240 removal proceedings. *See* 88 FR at 11716. Whether one uses the 15-percent figure or the 28-percent figure, ultimately, the number of individuals who are referred to an IJ at the beginning of the expedited removal process greatly exceeds the number who are granted asylum or some other form of relief or protection.

*Comment:* A commenter stated that numerous factors beyond merit impact whether an asylum seeker's case is ultimately granted (*e.g.,* access to counsel, availability of experts, changing regulations and procedures, and backlogs that affect the availability of evidence). Another commenter noted that many who seek asylum in the United States ultimately lose their cases not due to a lack of merit but instead because of "our convoluted and dysfunctional" immigration system, which the commenter claimed is difficult for asylum seekers to navigate and results in denial of many asylum claims on bases unrelated to the merits of the claim. One commenter asserted that modifying the legal requirements for asylum will not stop migrants from fleeing armed conflict, poverty or other dangers, because many are unaware of their right to apply for asylum. Another commenter stated that the number of migrants arriving is irrelevant to the merits of their asylum claims; the commenter also argued that the rule would screen out asylum seekers regardless of the merit of their case.

*Response:* The Departments acknowledge commenters' concerns that factors unrelated to the merits of the

claim, such as access to counsel and unfamiliarity with the asylum process, could affect the ultimate determination of an asylum claim, but disagree that these potential issues are exacerbated by the rule. As discussed in more detail later in Section IV.B.5 of this preamble, this rule does not deprive noncitizens of access to counsel during credible fear proceedings. Additionally, all AOs are trained to conduct interviews in a non-adversarial manner and elicit relevant testimony from noncitizens. Specific training for implementation of this rule will include training on eliciting testimony related to whether a noncitizen can establish an exception or rebut the presumption of asylum ineligibility; therefore, noncitizens are not required to be familiar with the rule to remain eligible for asylum. The Departments emphasize that in all credible fear determinations, a noncitizen's credible testimony may be sufficient to overcome or establish an exception to the presumption against asylum ineligibility in this rule. INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii). As discussed later in Section IV.D.1.iii of this preamble, the Departments note that the overall standard of proof for rebutting or establishing an exception to the presumption of asylum ineligibility during credible fear proceedings remains the "significant possibility" standard; that standard must be applied in conjunction with the standard of proof required for the ultimate determination (*i.e.,* preponderance of the evidence that an exception applies or that the presumption has been rebutted).

As discussed throughout the NPRM, the lawful pathways condition, and the related modification of the withholding and CAT screening standard applied to noncitizens subject to the condition, would improve overall asylum processing efficiency by increasing the speed with which asylum claims are considered. *See* 88 FR at 11737. By encouraging noncitizens seeking to travel to the United States, including those seeking asylum, to pursue lawful pathways and processes, the rule promotes orderly processing and reduces the number of individuals who would be placed in lengthy section 240 removal proceedings and released into the United States pending such proceedings. *Id.* at 11736. Moreover, by reducing the number of noncitizens permitted to remain in the United States despite failing to avail themselves of a safe and lawful pathway to seek protection, the rule reduces incentives for noncitizens to cross the SWB, thus

reducing the anticipated further surge that is expected to strain DHS resources. The Departments reiterate that the rule is not being promulgated to generally prevent noncitizens from seeking asylum in the United States but to strike a balance—reducing the level of irregular migration to the United States while providing sufficient avenues for migrants with valid claims to apply for asylum or other protection. The rule is needed because, absent this rule, after the termination of the Title 42 public health Order, the number of migrants expected to travel without authorization to the United States is expected to increase significantly, to a level that risks undermining the Departments' ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system.

*Comment:* One commenter asserted that the real purpose of the rule is to incentivize an increasing number of migrants to use the CBP One app to make fraudulent asylum claims. The same commenter also stated "that the proposed rule and the CBP One app will incentivize increased rates of illegal immigration into the United States." The commenter further stated that because there is insufficient capacity to process all of the asylum claims of those using the CBP One app, the rule will simply increase the number of individuals who are paroled into the United States, incentivizing further illegal immigration. Another commenter argued that current migration levels result from the current Administration's actions to "weaken border security, promote the influx of illegal immigration, and to remove integrity from the administration of both the legal immigration process (including asylum and credible fear measures) and overall enforcement of the laws." Similarly, another commenter stated that the root cause of this crisis was "the Administration's reckless open borders policies."

*Response:* While the Departments acknowledge the commenters' concerns about increased rates of unauthorized immigration into the United States, the Departments disagree that the rule and use of the CBP One app will incentivize noncitizens to enter the United States to make fraudulent asylum claims. If anything, by adding a rebuttable presumption of ineligibility, this rule creates a strong disincentive for irregular migration relative to the status quo. The Departments note that no commenter submitted data suggesting that the rule will result in an increase in fraud or misrepresentation. As explained in Section IV.B.5.iii of this

preamble, the Departments are confident that AOs have the training, skills, and experience needed to assess credibility and appropriately determine whether a noncitizen has met an exception to or rebutted the presumption of ineligibility for asylum codified in the rule. Regarding commenters' concerns that use of the CBP One app will increase the number of individuals who are paroled into the United States and thus incentivize irregular migration, the Departments note that the rule does not provide for, prohibit, or otherwise set any policy regarding DHS's discretionary authority to make parole determinations for those who use the CBP One app. Even so, as outlined in the NPRM and later in Section IV.E.3.ii of this preamble, the expanded use of the CBP One app is expected to create efficiencies that will enable CBP to safely and humanely expand its ability to process noncitizens at POEs, including those who may be seeking asylum. *See* 88 FR at 11719. Notably, the rule, coupled with an expansion of lawful, safe, and orderly pathways, is expected to reduce the number of noncitizens seeking to cross the SWB without authorization to enter the United States. Additionally, the United States is undertaking a range of efforts to address irregular migration, including, for instance, working with partner countries to address the causes of migration, significantly increasing the availability of H–2 temporary worker visas and refugee processing in the Western Hemisphere, successfully implementing the CHNV parole processes, and addressing the pernicious role of human smugglers. *See* 88 FR at 11718–21.

The Departments strongly disagree with commenters who assert that the current migration levels are a result of any action by the Departments to "weaken" security at the border. Rather, as noted in the NPRM, economic and political instability around the world is fueling the highest levels of migration since World War II, including in the Western Hemisphere. *See* 88 FR 11704. Additionally, even while the Title 42 public health Order has been in place, the total number of encounters at the SWB reached an all-time high in FY 2022, and they remain at historically high levels even as encounters of CHNV nationals have fallen in recent months.[64] *See id.* at 11704–05. During this time, the United States has been working to build on a multi-pronged, long-term strategy with countries

throughout the region to support conditions that would decrease irregular migration while continuing efforts to increase immigration enforcement capacity and streamline processing of asylum seekers and other migrants. *See* 88 FR at 11720–23. This rule ensures that the United States meets its obligations under both U.S. and international law while ensuring that vulnerable migrants are able to seek asylum or other protection through lawful, safe, and orderly pathways.

*Comment:* Commenters stated that the rule is unnecessary because the goals of discouraging migrants from seeking asylum and swiftly removing migrants are invalid. These commenters further stated that immigration is good; there is no need to quickly remove asylum seekers, regardless of backlogs; and that overwhelmed immigration facilities are problems created by the Government that would be solved by welcoming migrants rather than treating them as a problem or as dangerous. A few commenters critiqued the need for the rule, writing that the proposed rule is unnecessary and the Administration should take responsibility for actions that have created an overloaded immigration system. Other commenters questioned whether restrictive border measures and quickly removing individuals actually reduce migratory flows. At least one commenter did not understand how this rule was a "good thing" that would change immigration policy in the United States, which the commenter described as a "disaster." A commenter stated that the proposed rule is not needed and instead recommended implementing practical and humane solutions, including funding and coordinating with civil society organizations on the border and throughout the country. Another commenter stated that she lives within 100 miles of the border and does not feel threatened by the influx of migrants to her community, and thus the rule is unnecessary.

One commenter stated that the U.S. immigration system is not broken but the current laws need to be strictly enforced, while another commenter stated that DHS should be strengthened so it can address each case instead of lumping people into categories. At least one commenter stated that there is no reason why DHS cannot process applicants more quickly, noting that the United States received a significant number of migrants in the early 1900s with far less technology, so the government should be able to do so much more efficiently now with the sophisticated technology, medical equipment, fingerprinting, and other

means available now. Another commenter stated that the rule would not fix backlogs in immigration court, while a number of commenters suggested that it would actually increase the backlogs.

A commenter questioned the need for the rule because the Departments had not demonstrated that they had considered other options. Another commenter requested that the Departments expressly consider a range of factors, such as the U.S. economic outlook and the role of other external variables (such as climate change) in driving migration. The commenter suggested that such factors may influence migration patterns to such a degree that the rule is unnecessary or likely to be ineffective.

*Response:* The Departments disagree that the rule is unnecessary. The Departments reiterate that the goal of the rule is not to generally discourage migrants with valid claims from applying for asylum or other protection, but rather to encourage the use of lawful, safe, and orderly pathways into the United States. The Departments agree that the United States' historical openness to immigration has enriched our culture, expanded economic opportunities, and enhanced our influence in the world. However, the U.S. immigration system has experienced extreme strain with a dramatic increase of noncitizens attempting to cross the SWB in between POEs without authorization, reaching an all-time high of 2.2 million encounters in FY 2022.[65] The Departments believe that without a meaningful policy change, border encounters could dramatically rise to as high as 11,000 per day after the Title 42 public health Order is lifted.[66] As described in the NPRM, DHS does not currently have the resources to manage and sustain the processing of migratory flows of this scale in a safe and orderly manner, even with the assistance of modern technology. *See* 88 FR at 11712–13. In response to this urgent situation, the rule will establish a rebuttable presumption of asylum ineligibility for certain noncitizens who fail to take advantage of the existing and expanded lawful pathways to enter the United States, including the opportunity to schedule a time and place to present at a SWB POE, where they may seek asylum or other forms of protection, in a lawful, safe, and orderly manner, or to seek asylum or other protection in one of the countries through which they

---

[64] OIS analysis of OIS Persist Dataset based on data through March 31, 2023; OIS analysis of historic USBP data.

[65] OIS analysis of historic USBP data.
[66] OIS analysis of DHS SWB Encounter Planning Model generated April 18, 2023.

travel on their way to the United States. *See id* at 11706. The Departments believe that this rule is necessary to address the anticipated surge in irregular migration.

The Departments also believe the rule is necessary to improve the overall functioning and efficiency of the immigration system. *See* INA 208(b)(2)(C) and (d)(5)(B), 8 U.S.C. 1158(b)(2)(C) and (d)(5)(B). Specifically, the rule would efficiently and fairly provide relief to noncitizens who are in the United States and are eligible for relief, while also efficiently denying relief and ultimately removing those noncitizens who are determined to be ineligible for asylum and do not qualify for statutory withholding of removal or protection under the regulations implementing the CAT. The Departments acknowledge that despite the protections preserved by the rule and the availability of lawful pathways, the rebuttable presumption adopted in the rule will result in the denial of some asylum claims that otherwise may have been granted, but the Departments believe that the rule will generally offer opportunities for those with valid claims to seek protection. Moreover, the Departments have determined that the benefits to the overall functioning of the system, including deterrence of dangerous irregular migration and smuggling, justify the rule. In sum, the rule permissibly pursues efficient asylum processing while preserving core protections, which is within the Departments' authority conferred by section 208 of the INA, 8 U.S.C. 1158.

The Departments acknowledge commenters' support for enforcing existing immigration laws. However, the Departments do not believe that current laws and regulations are sufficient to address the current levels of migratory flows and the anticipated increase in the number of migrants who will attempt to enter the United States following the lifting of the Title 42 public health Order. Likewise, a policy is necessary to ensure lawful, safe, and orderly processing of those migrants. Absent further action, POEs will be congested, migrants will be forced to wait in long lines for unknown periods of time, and once processed they will be released into local communities that are already at or near their capacity to absorb them. *See* 88 FR at 11715. By incentivizing noncitizens to use lawful pathways, this rule aims to encourage migrants to either pursue options that would allow them to avoid making the journey to the SWB, or to schedule in advance a time for arrival at a POE, which will alleviate additional strain on DHS resources. The Departments believe it would be inappropriate to elect inaction on the basis of conjecture regarding U.S. economic outlook and similar factors and the potential effects of such factors on the impending surge of irregular migration.

In response to comments asserting that the Departments did not consider other options before promulgating this final rule, the Departments note that alternative approaches for managing the expected surge in migration were discussed in the NPRM and the Departments ultimately assessed, and continue to assess, that the rule is the best option for responding to the current situation at the border and the expected surge in migration after the lifting of the Title 42 public health Order. *See* 88 FR at 11730–32. Concerns regarding backlogs, government resources and funding are addressed in Sections IV.B.5.iv and IV.C.2 of this preamble.

The Departments acknowledge commenters' suggestion that DHS "strengthen" its resources to respond to the anticipated surge in migrants to the SWB. The Departments note that they have already deployed additional personnel, technology, infrastructure, and resources to the SWB and that continuing this "strengthening" of the SWB would require additional congressional actions, including significant additional appropriations, which are outside of the scope of this rulemaking.

i. Concerns Regarding the Sufficiency of the Lawful Pathways

*Comment:* Commenters stated that in general, the available lawful pathways are insufficient to meet the significant demand for migration to the United States. Commenters stated that increasing legal pathways for some should not come at the expense of restricting access for asylum seekers seeking protection. Commenters stated that the existing lawful pathways are "extremely narrow and unavailable to many people," and that it is fundamentally unjust to fault individuals for seeking safety and stability in the only way possible. Commenters stated that migrants who seek asylum in the United States rather than another country are doing so rationally and intentionally and they would seek asylum in a closer country if it was truly safe.

Multiple commenters stated that H–2 temporary worker visas are insufficient substitutes for asylum. One commenter stated that the Administration is "misguided" in touting its efforts in the proposed rule to expand two of the most "exploitative and troubled U.S. work visa programs—H–2A and H–2B" because these programs are "deeply flawed and in desperate need of reform." The same commenter stated that expanding temporary work visa programs like H–2B and H–2A makes little sense for those seeking asylum because they do not provide a permanent pathway to remain in the United States and would put migrants in danger by returning them to dangerous situations after the visa certification expires. Similarly, other commenters stated that the H–2 programs do not provide or guarantee safety for migrants because they are not permanent or durable solutions and they do not allow for family unity in the United States.

*Response:* The United States is both a nation of immigrants and a nation of laws. The Departments are charged with enforcing those laws and endeavor to do so humanely. The rule is needed because, absent this rule, after the termination of the Title 42 public health Order, the number of migrants expected to travel without authorization to the United States is expected to increase significantly, to a level that risks undermining the Departments' ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system. The rule, coupled with an expansion of lawful, safe, and orderly pathways, is expected to reduce the number of noncitizens seeking to cross the SWB without authorization to enter the United States.

Though the Departments acknowledge that existing lawful pathways may not be available to every migrant, the Departments disagree with comments stating that the existing lawful pathways are extremely narrow. The United States Government has been working to significantly expand access to lawful pathways and processes for migrants since January 2021. In addition to the new processes DHS has implemented for CHNV nationals, which are discussed at length in the NPRM, DHS has been working with other Federal departments and agencies to increase access to labor pathways; restart, streamline, and expand family reunification parole programs; and significantly rebuild and expand refugee processing in the region. *See* 88 FR at 11718–23.[67]

For example, DHS has worked with the Department of State and the Department of Labor ("DOL") to significantly expand access to the H–2A and H–2B temporary agricultural and nonagricultural worker visas in order to

---

[67] *See also* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

help address labor shortages and provide safe and orderly pathways for migrants seeking economic opportunity in the United States. On December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the total number of noncitizens who may receive an H–2B nonimmigrant visa by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). In particular, the number of H–2 visas issued to nationals of El Salvador, Honduras, and Guatemala has increased by 250 percent between FYs 2020 and 2022: in FY 2022, the Department of State issued 19,295 H–2 visas to those three countries, compared to just 5,439 in FY 2020.[68] The Departments disagree that expanding use of these programs is misguided; although improvements are possible, these programs are established features of the immigration system and an appropriate mechanism to support lawful, safe, and orderly travel to the United States. Moreover, these programs represent two of several available lawful pathways, some of which provide protection that is not temporary and does allow for derivative protection for family members. For example, the United States Government has restarted the Central American Minors Refugee and Parole Program, which provides certain qualified children who are nationals of El Salvador, Guatemala, and Honduras, as well as certain family members of those children, an opportunity to apply for refugee status and possible resettlement in the United States.[69]

The United States Government also provides durable solutions for humanitarian protection through the U.S. Refugee Admissions Program for qualifying applicants. In 2022, concurrent with the announcement of the L.A. Declaration, the United States announced that it intends to refer for resettlement at least 20,000 refugees from Latin America and the Caribbean in FY 2023 and FY 2024, which would put the United States on pace to more than triple refugee admissions from the Western Hemisphere this fiscal year alone.[70] On April 27, 2023, DHS

announced that it would commit to welcoming thousands of additional refugees per month from the Western Hemisphere—with the goal of doubling the number of refugees the United States committed to welcome as part of the L.A. Declaration.[71] The United States Government also continues to work with our partners to expand access to refugee resettlement more broadly throughout the Western Hemisphere. For instance, Canada recently announced that it will take significant steps to expand safe and orderly pathways for migrants from the Western Hemisphere to enter Canada lawfully. Building on prior commitments, Canada will provide an additional 15,000 migrants from Latin America and the Caribbean with access to legal pathways to Canada; and enter into arrangements with the United States and like-minded countries to promote lawful labor mobility pathways.[72]

Comments asserting insufficiencies associated with the CHNV parole processes and other lawful pathways identified in the rule are further addressed in Section IV.3 of this preamble.

The rule will not impact those who use these lawful pathways that the United States is offering for migrants to obtain entry into the United States. Additionally, the rule will not apply to noncitizens who enter the United States with documents sufficient for admission. Instead, the rule is meant to promote the use of these lawful pathways and disincentivize irregular migration.

ii. Similarity to Actions of Past Administration

*Comment:* Many commenters stated that the proposed rule is functionally indistinguishable from prior asylum-related rules that were issued by the prior Administration, particularly the TCT Bar IFR and Final Rule, which have been enjoined, or would cause similar harm to asylum seekers. At least one commenter criticized that the addition of the "rebuttable presumption" in this rule is not enough to distinguish it from previous rules. For example,

commenters described the rule as "resurrect[ing] Trump-era categorical bans on groups of asylum seekers." Similarly, some commenters stated that this rule is similar to the "asylum bans" the past Administration attempted to advance. Another commenter asserted that this rule operates similarly to rules from the prior Administration because it would operate as a ban for asylum seekers based on factors that do not relate to their fear of return and would result in asylum denials for all who are unable to establish that they qualify for exceptions the commenter characterized as extremely limited. A commenter claimed that while the Departments repeatedly assert throughout the NPRM that the rebuttable presumption is distinguishable from the TCT Bar, the opportunity to rebut the presumption would occur only under the most extreme scenarios and in excess of what would ordinarily be sufficient to claim asylum. Another commenter predicted that the proposed rule would revive attempts to "rig the credible fear process." While comparing the rebuttable presumption standards to the non-refoulement screening standard used under MPP, the commenter argued that the proposed rule would impose a "more likely than not" screening standard that far exceeds the standard for an asylum grant. The commenter further stated that the "deficient" non-refoulement screenings carried out during MPP foreshadow the dangers asylum seekers would face under the proposed rule if finalized.

In comparing this rule to those issued by the prior Administration, commenters stated that the previous rules led to asylum denials, prolonged detention for many with bona fide claims, and family separations. At least one commenter stated that a recent congressional investigation found that not one person sent to Guatemala under the prior Administration's Asylum Cooperative Agreements received asylum; instead, migrants were forced to return to their originating country. A commenter also stated that the rule attempts to differentiate itself from prior policies via exceptions and alternative pathways to asylum but that the exceptions are insufficient because they would fail to protect the most vulnerable. Several commenters stated that asylum bans have been proven to be ineffective at deterring noncitizens from seeking safety. One commenter stated that calling the rule a "rebuttable presumption" was merely a semantic difference from prior asylum bans, which had narrow exceptions.

*Response:* The Departments acknowledge these commenters'

---

[68] *See* Department of State, *H–2 Visa Data for El Salvador, Guatemala, and Honduras, FY 2015–FY2023 Mid-Year* (last reviewed Feb. 24, 2023).

[69] *See* USCIS, Central American Minors (CAM) Refugee and Parole Program, *https://www.uscis.gov/CAM* (last visited Apr. 5, 2023).

[70] *See* The White House, *Fact Sheet: The Los Angeles Declaration on Migration and Protection*

*U.S. Government and Foreign Partner Deliverables* (June 10, 2022) ("L.A. Declaration Fact Sheet"), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/fact-sheet-the-los-angeles-declaration-on-migration-and-protection-u-s-government-and-foreign-partner-deliverables/*.

[71] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

[72] *See* DHS, Press Release, *United States and Canada Announce Efforts to Expand Lawful Migration Processes and Reduce Irregular Migration* (Mar. 24, 2023), *https://www.dhs.gov/news/2023/03/24/united-states-and-canada-announce-efforts-expand-lawful-migration-processes-and.*

**31334** **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

concerns but disagree that the final rule is indistinguishable from asylum-related rulemakings and policies issued by the prior Administration. The TCT Bar IFR and Final Rule and the Proclamation Bar IFR, for instance, categorically barred covered individuals from certain types of relief. While the TCT Bar Final Rule only allowed limited exceptions to its eligibility bar, including for trafficking victims and other grounds, this rule includes a number of broader exceptions and means for rebutting the presumption. A noncitizen can rebut the presumption by, for example, demonstrating exceptionally compelling circumstances by a preponderance of the evidence during a full merits hearing. *See* 8 CFR 208.33(a)(3); 8 CFR 1208.33(a)(3). A noncitizen can rebut the presumption if they establish that they or a member of their family with whom the noncitizen is traveling meet any of the three per se grounds for rebuttal, which provide that, at the time of entry: (1) they faced an acute medical emergency; (2) they faced an imminent and extreme threat to their life or safety; or (3) they were a "victim of a severe form of trafficking in persons" as defined in 8 CFR 214.11. In addition to the per se grounds for rebuttal, a noncitizen could also rebut the presumption in other exceptionally compelling circumstances. One exceptionally compelling circumstance recognized by the rule is included specifically to avoid family separations. *See* 8 CFR 1208.33(c). Protecting against family separation is one example of how this rule includes appropriate safeguards for vulnerable populations. Depending on individual circumstances, AOs and IJs may find that certain especially vulnerable individuals meet the exceptionally compelling circumstances standard.

The Departments acknowledge concerns about opportunities to rebut the presumption but disagree that the rule would impose a higher standard for rebutting the presumption than the standard to establish asylum eligibility. The "significant possibility" standard is the overall assessment applied during credible fear screenings; that standard must be applied in conjunction with the standard of proof required for the ultimate determination (*i.e.,* preponderance of the evidence that the presumption has been rebutted or an exception established). As discussed below in Section IV.E.1 of this preamble, a noncitizen can satisfy their burden of proof through credible testimony alone; the rule does not require any particular evidence to rebut or establish an exception to the

presumption under 8 CFR 208.33(a)(3), 1208.33(a)(3). *See* INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii); INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Accordingly, the Departments believe that the means of rebutting or establishing an exception to the presumption are not unduly burdensome.

The Departments have considered the approaches taken in multiple rulemaking efforts of the last few years and now believe that the more tailored, time-limited approach in this final rule is better suited to address the increased migrant flows into the United States expected after the Title 42 public health Order terminates. *See* 88 FR at 11728. This rule encourages use of lawful, safe, and orderly pathways to enter the United States and, unlike those prior rulemakings, retains a noncitizen's ability to be found eligible for asylum should they enter through an enumerated lawful pathway or otherwise overcome the condition imposed by this rule. The Departments believe that the rule's more balanced approach renders the TCT Bar Final Rule and the Proclamation Bar IFR unnecessary, and that those rules conflict with the approach taken in this rule.[73] As proposed in the NPRM and discussed at Sections IV.E.9 and IV.E.10 of this preamble, the Departments have decided to remove those prior rules from the CFR. *See* 88 FR at 11728.

The Departments disagree with some commenters that this final rule will cause harms similar to those attributed to the TCT Bar Final Rule and the Proclamation Bar IFR, which commenters allege include asylum denials, prolonged detention, and family separation. This rule's scope and effect are significantly different from the TCT Bar Final Rule. Unlike the TCT Bar Final Rule, the presumption would not completely bar asylum eligibility based on the availability of protection in a third country. First, while this rule takes into account whether individuals sought asylum or other forms of protection in third countries while traveling to the United States, the rule would not require that all noncitizens make such an application to be eligible for asylum, unlike the TCT Bar Final Rule. For example, if the noncitizen received authorization to travel to the United States to seek parole or scheduled an appointment through the CBP One app to present themselves at a POE, then the condition on asylum eligibility would not apply to that noncitizen regardless

of whether the noncitizen sought protection in a third country. Second, while the TCT Bar Final Rule only allowed limited exceptions to its eligibility bar, including for trafficking victims and other grounds, this rule includes a number of exceptions and means for rebutting the presumption, including an exception for trafficking victims. This rule encourages noncitizens to use orderly, lawful pathways to enter the United States, and it will only become relevant whether the noncitizens applied for protection in a third country through which they traveled in cases in which noncitizens do not avail themselves of one of the pathways.

The Departments acknowledge commenters' concerns with the effectiveness of Safe Third Country Agreements ("STCA") or asylum cooperative agreements. The Departments acknowledge that negotiating such agreements is a lengthy and complicated process that depends on the agreement of other nations. *See* 88 FR at 11732. The Departments note that the only such agreement in effect is the Canada-U.S. STCA. *See generally* Implementation of the 2022 Additional Protocol to the 2002 U.S.-Canada Agreement for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries, 88 FR 18227 (Mar. 28, 2023). The rule does not implement or change the framework for negotiating STCAs, which involves extensive diplomatic negotiations. As discussed more in Section IV.E.3.iv of this preamble, the safe-third-country provision in section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A), indicates that a noncitizen may be removed, pursuant to "a safe-third-country agreement," and the noncitizen may not apply for asylum "unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States." This rule operates differently. Under this rule, noncitizens may apply for asylum and other protection in the United States. While the rule would create a rebuttable presumption, it specifies circumstances in which that presumption is necessarily rebutted as well as other exceptions. By encouraging noncitizens seeking to travel to the United States, including those intending to seek asylum, to use lawful pathways and processes, the Departments expect the rule to promote orderly processing, reduce the anticipated surge that is expected to strain DHS resources, reduce the number of individuals who would be placed in lengthy removal proceedings pursuant to section 240 of

---

[73] Both the TCT Bar Final Rule and the Proclamation Bar IFR are discussed further in Sections IV.E.9 and IV.E.10 of this preamble.

the INA and released into the United States pending such proceedings, allow for the expeditious removal of noncitizens who failed to avail themselves of a safe and lawful pathway to seek protection, and reduce incentives for noncitizens to cross the border using dangerous smuggling networks. *See* 88 FR at 11736. Regarding comments about the ineffectiveness of the rule to deter migrants from seeking safety, the rule does not discourage migrants with valid claims from applying for asylum or other protection. The rule encourages those with meritorious claims to either apply for asylum or other protection in the first safe country they find or pursue available lawful pathways, such as the U4U and CHNV parole processes—which early data indicate are deterring irregular migration from those areas, *see* 88 FR at 11706—or presenting at a POE at a pre-scheduled time and place.

*Comment:* Some commenters noted the rise in recidivist encounters following the end of the prior Administration despite many efforts to restrict asylum access and stated that removals under this rule would increase rates of recidivism.

*Response:* The Departments disagree that removals under this rule will increase the rate of recidivism. The Departments note that a range of external considerations (such as the COVID–19 pandemic, litigation resulting in injunctions or vacatur of those rules prior to or during initial stages of their implementation,[74] and differences in the operation of the Title 42 public health Order and this rule) prevent the Departments from drawing any firm conclusions applicable to this

rulemaking based solely on recidivism numbers following the end of the prior Administration. The application of the Title 42 public health Order at the border has had unpredictable impacts on migration. Because Title 42 expulsions have no consequence, aside from the expulsion itself, DHS has seen a substantial increase in recidivism for individuals processed under Title 42 as compared to those processed under Title 8 authorities. In March 2023, for example, 26 percent of encounters at the SWB involved individuals who had at least one prior encounter during the previous 12 months, compared to an average 1-year re-encounter rate of 14 percent for FYs 2014–2019.[75]

Overall, since the start of the pandemic and the initiation of Title 42 expulsions, 39 percent of all Title 42 expulsions have been followed by a re-encounter of the same individual within 30 days versus a 9 percent 30-day re-encounter rate for Title 8 repatriations.[76] Similarly, the 12-month re-encounter rates are 51 percent for Title 42 expulsions versus 20 percent for Title 8 repatriations.[77] While a portion of the overall gap between Title 42 and Title 8 re-encounter rates is likely explained by the fact that many Title 42 expulsions are to Mexico and almost all Title 8 repatriations are to individuals' countries of citizenship, it is notable that a large gap between Title 42 and Title 8 re-encounter rates is also observed in the case of Mexican nationals, all of whom are repatriated to Mexico.[78]

This gap is likely, in part, because a removal under Title 8 carries with it at least a five-year bar to admission, among other legal consequences. As a result, it is the Departments' assessment that a return to Title 8 processing of all noncitizens will likely reduce recidivism at the border. Moreover, the Departments believe it would be unwarranted to conclude that, based on recidivist apprehensions while the Title 42 public health Order has been in place, conditions on asylum eligibility do not discourage attempts to enter the

United States unlawfully. This rule, which will take effect upon the lifting of the Title 42 public health Order, anticipates that those who receive negative credible fear determinations will be removed upon issuance of final orders of removal and be subject to at least a five-year bar on admission in addition to having the rebuttable presumption apply to any subsequent asylum application the noncitizen may file in the future.

### iii. Unnecessary Given the Asylum Processing IFR

*Comment:* Some commenters questioned why this proposed rule is necessary given that the Asylum Processing IFR was adopted less than one year ago. *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022) ("Asylum Processing IFR"). In referencing the Asylum Processing IFR, one commenter noted that this rule is an "abrupt change in reasoning from less than a year ago," which, according to the commenter, indicates that the rule is "political" rather than based on reasoned decision making. Some commenters noted that in the Asylum Processing IFR, the Departments explained that applying the TCT Bar Final Rule at the credible fear stage as proposed by the past Administration was inefficient and consumed considerable resources so there is "no basis to suddenly reverse course again." A commenter argued that the proposal would depart from conclusions DHS reached within the last year in the Asylum Processing IFR recommitting agencies to the statutory "significant possibility" standard for asylum claims. One commenter asserted that while the proposed rule is premised on the idea that applying a higher "reasonable possibility" standard can weed out non-meritorious asylum cases, the Departments recently acknowledged in the Asylum Processing IFR that the higher standard is not effective at screening out such claims. The same commenter expressed concern that the Government's "abrupt about-face" is not based on new data, but rather on the lack of evidence that the reasonable possibility standard is not effective in the context in which it is currently used. Another commenter similarly wrote that the application of the reasonable possibility standard at the credible fear screening stage represents a "stark reversal" from DHS's position in the Asylum Processing IFR that asylum eligibility bars should not be applied at the initial screening stage and

---

[74] Federal courts have either vacated or enjoined the Departments from implementing the TCT Bar IFR and Final Rule, Procedures for Asylum and Bars to Asylum Eligibility, 85 FR 67202 (Oct. 21, 2020) ("Criminal Asylum Bars Rule"), and Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 80274 (December 11, 2020) ("Global Asylum Rule"). See, e.g., *Capital Area Immigrants' Rights Coal.* v. *Trump,* 471 F. Supp. 3d 25 (D.D.C. 2020) (vacating the TCT Bar IFR); *E. Bay Sanctuary Covenant* v. *Garland,* 994 F.3d 962 (9th Cir. 2020) ("*East Bay I*") (affirming injunction of the TCT Bar IFR); *E. Bay Sanctuary Covenant* v. *Barr,* 519 F. Supp. 3d 663 (N.D. Cal. 2021) ("*East Bay II*") (enjoining the TCT Bar Final Rule); *Pangea Legal Servs.* v. *DHS,* 501 F. Supp. 3d 792 (N.D. Cal. 2020) (enjoining the Criminal Asylum Bars Rule) ("*Pangea I*"); *Pangea Legal Servs.* v. *U.S. Dep't of Homeland Sec.,* 512 F. Supp. 3d 966, 977 (N.D. Cal. 2021) ("*Pangea II*") (preliminarily enjoined the Departments "from implementing, enforcing, or applying the [Global Asylum Rule] . . . or any related policies or procedures."); *E. Bay Sanctuary Covenant* v. *Biden,* 993 F.3d 640, 681 (9th Cir. 2021) ("*East Bay III*"); *see O.A.* v. *Trump,* 404 F. Supp. 3d 109 (D.D.C. 2019) (recounting the history of the litigation over the Proclamation Bar IFR and vacating it).

[75] Including CBP enforcement encounters at or between ports of entry. OIS Persist based on data through March 31, 2023.

[76] Title 8 repatriation, as used here, refers to both removals (noncitizen required to depart based on a removal order) and returns (noncitizen required to depart leaves without a formal order of removal).

[77] OIS analysis of OIS Enforcement Lifecycle based on data through December 31, 2022.

[78] For Mexican nationals, since the start of the pandemic, the 30-day re-encounter rates are 44 percent for Title 42 expulsions versus 15 percent for Title 8 repatriations, and the 12-month re-encounter rates are 55 percent for Title 42 expulsions versus 26 percent for Title 8 repatriations. OIS analysis of OIS Enforcement Lifecycle based on data through December 31, 2022.

that the "significant possibility" standard should be applied when screening for all protection claims (*i.e.*, asylum, withholding of removal, and CAT protection). A commenter stated that the proposed rule introduces conflict with the Asylum Processing IFR and expressed concern that implementation of the new rule would be difficult for AOs. One commenter stated that the Departments should make greater use of the recent 2022 asylum merits interview process, which would provide a solution to the problems the Departments asserted in the NPRM.

*Response:* The Departments recognize that under the Asylum Processing IFR issued in March 2022, certain noncitizens determined to have a credible fear are referred to an AO, in the first instance, for further review of the noncitizen's asylum application. *See* 87 FR at 18078. For noncitizens subject to that IFR, following a positive credible fear determination, AOs conduct an initial asylum merits interview instead of referring the case directly for removal proceedings pursuant to section 240 of the INA. If USCIS does not grant asylum, the individual is referred to EOIR for streamlined removal proceedings pursuant to section 240. In issuing the Asylum Processing IFR, the Departments concluded that protection determinations during the expedited removal process could be made more efficient. *See* 87 FR at 18085. The purpose of the Asylum Processing IFR was to simultaneously increase the promptness, efficiency, and fairness of the process by which noncitizens who enter the United States without appropriate documentation are either removed or, if eligible, granted relief or protection. *Id.* at 18089. Additionally, the Asylum Processing IFR enables meritorious cases to be resolved more quickly, reducing the overall asylum system backlog, and using limited AO and IJ resources more efficiently. *Id.* at 18090. The entire process is designed to take substantially less time than the average of over four years it takes to adjudicate asylum claims otherwise. *See* 88 FR at 11716. This final rule builds upon this existing system while implementing changes, namely that AOs will apply the lawful pathways rebuttable presumption during credible fear screenings.

The Departments disagree with commenters' suggestion that the proposed rule was political and not based on reasoned decisions. Rather, the rule's primary purpose is to incentivize migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel. The rule establishes procedures for AOs and IJs to follow when determining whether the rebuttable presumption applies to a noncitizen and, if it does, whether the noncitizen has established any exceptions to or rebutted the presumption. *See* 8 CFR 208.33(b). In addition, for noncitizens found to be ineligible for asylum under 8 CFR 208.33, the rule establishes procedures for AOs to further consider a noncitizen's eligibility for statutory withholding of removal or protection under the regulations implementing the CAT. *See* 8 CFR 208.33(c)(2). Individuals subject to the lawful pathways condition will still be placed into removal proceedings under section 240 if they meet the "reasonable possibility" of persecution or torture standard. One of the goals of the Asylum Processing IFR is to streamline the expedited removal process, and this rule is complementary to that goal, but is also necessary to incentivize lawful, safe, and orderly migratory flows. This rule does not foreclose processing noncitizens through the process established by the Asylum Processing IFR.

The Departments acknowledge that the approach in this rule is different in certain respects from that articulated in the Asylum Processing IFR issued in March 2022. However, the Departments believe the current and impending situation on the ground along the SWB warrants departing in some respects from the approach generally applied in credible fear screenings. *See* 88 FR at 11742. The Asylum Processing IFR was designed for non-exigent circumstances. However, as noted in the NPRM, encounters of non-Mexican nationals at the SWB between POEs have reached a 10-year high of 1.5 million in FY 2022,[79] driven by smuggling networks that enable and exploit this unprecedented movement of people. This heightened migratory flow has overburdened the current asylum system, resulting in a growing backlog of cases awaiting review by AOs and IJs. *See* 88 FR at 11705. The exigent circumstances giving rise to this rule arose after the Asylum Processing IFR was issued and require departing from the general approach in the Asylum Processing IFR in specific ways—*i.e.*, applying the condition on eligibility during credible fear screenings, applying the "reasonable possibility" standards to individuals who cannot show a "significant possibility" of eligibility for asylum based on the presumption established in the rule, requiring an affirmative request for IJ review of a negative credible fear determination, and limiting requests for reconsideration after IJ review and instead providing for reconsideration based only on USCIS's discretion.

The Departments believe that the condition on eligibility and this rule's departures from the Asylum Processing IFR are reasonable and necessary for the reasons discussed in the NPRM. *See* 88 FR at 11744–47. The rule will help achieve many of the goals outlined in the Asylum Processing IFR, including improving efficiency; streamlining the adjudication of asylum, statutory withholding of removal, and CAT protection claims; and reducing the strain on the immigration courts by screening out and removing those with non-meritorious claims more quickly. *See* 87 FR 18078.

The Departments note that the rule does not apply a higher "reasonable possibility" standard to asylum claims; rather, the rule applies the statutory "significant possibility" standard to asylum claims, as explained elsewhere in this preamble. The rule only applies the "reasonable possibility" standard to statutory withholding and CAT claims, and only if a noncitizen is subject to and has not established an exception to or rebutted the presumption at the credible fear screening. Additionally, the Asylum Processing IFR did not conclude that the higher standard was "not effective" at screening out non-meritorious statutory withholding and CAT claims, but rather made a policy determination that the higher standard was inefficient given the circumstances of that particular rule. *See* 87 FR at 18092. The Departments reached a different policy conclusion after the Asylum Processing IFR was issued and believe that this rule is necessary to address the current and exigent circumstances described throughout the NPRM. *See* 88 FR at 11744–47.

The Departments appreciate commenters' support for the asylum merits interview process, but the Departments reiterate the discussion from the NPRM that the asylum merits interview process should not be used for noncitizens subject to the presumption. *See* 88 FR at 11725–26. This is because each such proceeding, in which the noncitizen would only be eligible for forms of protection that the AO cannot grant (withholding of removal or CAT protection), would have to ultimately be adjudicated by an IJ. Further, the Departments note that the processes relating to management of those who have already established a credible fear

---

[79] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

are different from the processes for migrants seeking entry into the United States who are making an initial claim of fear.

iv. Unnecessary Given Parole Processes

*Comment:* Some commenters objected that although the Departments stated that they anticipate a surge in CHNV individuals claiming fear at the SWB after the termination of the Title 42 public health Order, the proposed rule also claims that the parole processes for these populations are working to limit irregular migration from these countries.

*Response:* In an effort to address the significant increase in CHNV migrants at the SWB, the United States has taken significant steps to expand safe and orderly processes for migrants from these countries to lawfully come to the United States. Specifically, these processes provide a lawful and streamlined way for eligible CHNV nationals and their family members to apply to come to the United States without having to make the dangerous journey to the SWB.[80] Individuals can request an advance authorization to travel to the United States to be considered on a case-by-case basis for a grant of temporary parole by CBP. Noting the success of the CHNV parole processes coupled with enforcement measures in limiting irregular migration of CHNV nationals, the Departments also recognize that there are a number of factors that could prevent the same level of success after the lifting of the Title 42 public health Order absent additional policy changes. *See* 88 FR at 11706. These factors include the presence of large CHNV populations already in Mexico and elsewhere in the hemisphere as a result of past migratory flows and the already large number of migrants from these countries in the proximity of the SWB after they were expelled to Mexico under the Title 42 public health Order. *See id.* In addition, as the Departments noted in the NPRM, the incentive structure created by the CHNV parole processes relies on the availability of an immediate consequence, such as the application of expedited removal under this rule, for those who do not have a valid protection claim or lawful basis to stay in the United States. *See* 88 FR at 11731. The parole processes thus work with this rule in a complementary manner to address the expected surge in migration

after the Title 42 public health Order is lifted.

v. Unnecessary Given Lack of Access to Asylum

*Comment:* Some commenters stated that the rule would not succeed at meeting its goal of deterring irregular immigration since migrants are already aware, even without the rule, that there is a low chance of actually receiving asylum in the United States.

*Response:* The Departments reiterate that the rule's primary goal is to incentivize migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel. The rule is intended to reduce the level of irregular migration to the United States without discouraging migrants with valid claims from applying for asylum or other protection. Even assuming migrants are aware of the relative likelihood of success of their asylum claims, the Departments do not believe the low ultimate approval rate for asylum and other forms of protection, which has long been the status quo, has served as a strong disincentive against making protection claims given the comparatively high chance of receiving a positive credible fear determination (83 percent for FYs 2014–19, *see* 88 FR at 11716) after which migrants are able to wait in the United States to present their claims, the multi-year backlog of immigration court cases,[81] and the fact that many migrants who are denied asylum are not ultimately removed, *see id.* Additionally, many noncitizens who are encountered at the border and released pending their immigration proceedings will spend years in the United States, regardless of the outcome of their cases. *See id.* Indeed, most noncitizens who receive a positive credible fear determination will be able to live and work in the United States for the duration of their removal proceedings—which, on average, take almost 4 years.[82] This reality provides a powerful incentive for noncitizens to make protection claims. Therefore, a low approval rate for asylum applications does not necessarily offer much disincentive against making protection claims.

vi. Ineffective Without Changes to Withholding of Removal or CAT Adjudications

*Comment:* Some commenters stated that if the process for applying for statutory withholding of removal or CAT protection stays the same, the rule would not be an effective deterrent for people who do not have a meritorious claim for asylum who are seeking to delay their removal from the United States. One commenter suggested that because those subject to the rule can seek protection through statutory withholding of removal and CAT, even with this rule in place, they will likely continue to arrive without using a lawful pathway. The commenter further stated that people fleeing unlivable conditions at home, the overwhelmingly majority of whom have no real knowledge of U.S. immigration law, are unlikely to carefully dissect the rule's subtle changes to eligibility standards. And as long as migrants know there is the possibility of protection in the United States—no matter whether through asylum or another form of relief—they will likely continue to make the dangerous trek to the border, where they will then cross.

*Response:* The Departments note that the rule would implement changes to the existing credible fear screening process. Specifically, if noncitizens cannot make a sufficient showing that the lawful pathways condition on eligibility for asylum is inapplicable or that they are subject to an exception or rebuttal ground, then the AO will screen the noncitizen for statutory withholding of removal and protection under the CAT using the higher "reasonable possibility" standard. *See* 8 CFR 208.33(b)(2)(i). This "reasonable possibility" standard is a change from the practice currently applied for statutory withholding of removal and CAT protection in the credible fear process. As explained in the NPRM, the Departments have long applied—and continue to apply—the higher "reasonable possibility" of persecution or torture standard in reasonable-fear screenings because this standard better predicts the likelihood of succeeding on the ultimate statutory withholding of removal or CAT protection application than does the "significant possibility" of establishing eligibility for the underlying protection standard, given the higher burden of proof for statutory withholding of removal and CAT protection. *See* 88 FR at 11746–47. The Departments also assess that applying the "reasonable possibility" of persecution or torture standard where the lawful pathways condition renders

---

[80] *See* DHS, Press Release, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), *https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.*

[81] *See* TRAC, *Immigration Court Asylum Backlog through February 2023, https://trac.syr.edu/phptools/immigration/asylumbl/* (last visited Mar. 14, 2023) (average 1,535 days from I–589 filing to merits hearing).

[82] OIS analysis of DOJ EOIR data based on data through March 31, 2023.

the noncitizen ineligible for asylum will result in fewer individuals with non-meritorious claims being placed into removal proceedings under section 240 of the INA, and more such individuals being quickly removed. The Departments believe that using the "reasonable possibility" standard to screen for statutory withholding and CAT protection in this context, and quickly removing individuals who do not have a legal basis to remain in the United States, may serve as a disincentive for migrants who would otherwise make the perilous journey to the United States without first attempting to use a lawful pathway or seeking protection in a country through which they travel.

vii. Ineffective Because Exceptions Will Swallow the Rule

*Comment:* Some commenters raised concerns that the rebuttable presumption of ineligibility could be too easily overcome or perceived as easy to overcome, due to the number of exceptions and means of rebuttal. One commenter referred to the proposed rule as "a facially stricter threshold" than under current practice and said that the rebuttable presumption was "a tougher standard in name only." Another commenter opined that the proposed rule would be largely ineffective and urged the Departments to eliminate exceptions to the presumption against asylum eligibility, which they said are overbroad, easy to exploit, and threaten to swallow the rule. Similarly, other commenters stated that there should be no exceptions to the condition on asylum. Commenters stated that migrants would quickly learn the various exceptions to the presumption and how to fraudulently claim them to obtain asylum. One commenter alleged, without evidence, that various NGOs and legal organizations coach people on which "magic words" they must utter to gain entry into the United States. One commenter stated that noncitizens may falsely claim to be Mexican nationals to circumvent the rule.

One commenter proposed that the rule's exceptions be limited to (1) those who received a final judgment denying them protection in at least one country through which they transited; (2) victims of a severe form of trafficking; (3) those who have transited only through countries that are not parties to the Refugee Convention, the Refugee Protocol, or CAT; and (4) UCs. Another commenter proposed that the Departments should eliminate the CBP One app exception and should apply the presumption to UCs. One commenter stated that the rule should

require, not encourage, migrants to use lawful, safe, and orderly pathways.

*Response:* The Departments acknowledge these concerns but believe it is necessary to maintain the exceptions to and means of rebutting the presumption of ineligibility for asylum to prevent undue hardship. The Departments have limited the means of rebutting the presumption to "exceptionally compelling circumstances," where it would be unreasonable to require use of the DHS appointment scheduling system or pursuit of another lawful pathway. The rule lists three examples of exceptionally compelling circumstances that would be considered at both the credible fear and merits stages: acute medical emergencies, imminent and extreme threats to life or safety, and victims of severe forms of human trafficking. *See* 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). AOs and IJs will assess the noncitizen's testimony, along with any other evidence in the record, to determine whether the noncitizen meets an exception to or rebuts the presumption against asylum eligibility. INA 208(b)(1)(B), 8 U.S.C. 1158(b)(1)(B); INA 240(c)(4)(B), 8 U.S.C. 1229a(c)(4)(B); 8 CFR 208.30.

The Departments do not believe that the rule creates significant incentive for migrants to falsely pose as Mexican nationals. Even if successful, this would only be a plausible strategy for migrants who are hoping to voluntarily return to Mexico instead of being placed in expedited removal. Once in expedited removal, any incentive to pose as a Mexican national dissipates quickly. It will likely be difficult for the noncitizen to establish a credible fear of persecution or torture in Mexico, a country with which they are less familiar than their actual country of nationality. The noncitizen will not be able to seek any assistance from their consulate without disclosing their true country of nationality. And it will become very difficult for the noncitizen to qualify for asylum or other protection before an IJ, where they will need to prove identity.[83] Noncitizens who falsify their nationality could face serious consequences, as any such false pretenses would be likely to have an adverse effect on their credibility and

could result in a permanent bar from all future immigration benefits.[84]

3. Concerns Related to Impacts on Asylum Seekers or Conflicts With Humanitarian Values

i. Belief That the Rule Is Motivated by Unlawful Intent and Inconsistent With U.S. Values

*Comment:* Some commenters generally asserted that the rule targets certain nationalities, groups, or types of claims and that it was motivated by racial animus; that it has discriminatory effects; and that it was intended to address political issues or to mollify those harboring racial animus. Commenters stated that issuing this rule would advance the agendas of anti-immigration groups. At least one commenter stated that the proposed rule could fuel existing anti-immigrant and anti-Latinx sentiments in the United States by sensationalizing immigration. Another commenter expressed opposition to the proposed rule stating that it would continue to uphold an "ableist, xenophobic, and white supremacist" notion of accessibility into the United States. One commenter urged DHS to consider the impact that previous white supremacist and race-based policies have had on the U.S. immigration system. Furthermore, a commenter opposed the rule concluding that it continues a "legacy of structural racism" in U.S. immigration policy.

Commenters compared the rule to race-based historical immigration laws in the United States, such as the Chinese Exclusion Act and other past immigration actions, including actions of the prior Administration. Another commenter compared the rule to nationality-based quotas instituted by the Immigration Act of 1924 and stated that the rule serves a similar purpose of excluding "undesirable" migrant populations, while others compared the rule to limits on migration before, during, and after World War II, including turning away Jewish refugees seeking protection on the ship the St. Louis. At least one commenter stated that asylum seekers from countries located geographically further away would have a higher burden for no reason beyond their national origin. Further, commenters stated that differentiating between the "types" of people admitted to the United States or

---

[83] *See Matter of O–D–,* 21 I&N Dec. 1079, 1081 (BIA 1998) ("A concomitant to such claim is the burden of establishing identity, nationality, and citizenship."); INA 208(d)(5)(A)(i), 8 U.S.C. 208(d)(5)(A)(i) ("[A]sylum cannot be granted until the identity of the applicant has been checked."); 8 CFR 1003.47 (Identity, law enforcement, or security investigations or examinations relating to applications for immigration relief, protection, or restriction on removal).

[84] *See* INA 208(b)(1)(B)(iii), 8 U.S.C. 1158(b)(1)(B)(iii) (credibility determinations in asylum proceedings); INA 208(d)(6), 8 U.S.C. 1158(d)(6) (frivolous asylum applications); 8 CFR 1003.47(g) (preventing IJs from granting asylum applications until they can consider complete and current identity, law enforcement, and security investigations).

detained at the border is akin to authoritarian regime policies that have prohibited entry to "undesirables" and "other inconvenient group[s]."

Some commenters stated that the proposed rule is inhumane, xenophobic, and against everything the current Administration is supposed to stand for. Other commenters noted that the rule would only affect migrants seeking to enter at the SWB, but that migrants crossing the northern border from Canada are excluded, which the commenter called "inequitable" and evidence of racism. Some commenters stated that limiting who to help in the time of a "global crisis" is "shameful" because the United States is one of the richest countries in the world. Some commenters stated that with all the terrible things happening in the world we should be making it easier and not harder to seek asylum. An advocacy group expressed further concern that the rule may instead reinforce a notion that immigrants are unwelcome or otherwise do not belong in the United States. Another advocacy group expressed disappointment that words like "surge" in the NPRM could frame asylum seekers as a problem that needs to be mitigated or reduced. Some commenters stated that the rule was only written in response to political pressure by political opponents to address the situation at the SWB, thus placing migrants in danger for the sake of a political agenda. One commenter stated that they expected the United States to "treat migrants as human beings rather than playing pieces that could affect political outcomes."

*Response:* The Departments reject these commenters' claims concerning the Departments' basis for promulgating the rule. As explained in the NPRM, 88 FR at 11704, the Departments are promulgating the rule to address the following considerations. First, the reality of large numbers of migrants crossing the SWB has placed a substantial burden on the resources of Federal, State, and local governments. *See* 88 FR 11715. While the United States Government has taken extraordinary steps to address this burden, the current level of migratory movements and the anticipated increase in the numbers of individuals seeking entry into the United States following the lifting of the Title 42 public health Order, without policy changes, threaten to exceed the capacity to maintain the safe and humane processing of noncitizens who cross the SWB without authorization. *See id* at 11704. Second, this reality allows pernicious smuggling networks to exploit migrants—putting migrants' lives at risk for the smugglers'

financial gain. Finally, the unprecedented migratory flow of non-Mexican migrants, who are far more likely to apply for protection,[85] has contributed to a growing backlog of cases awaiting review by AOs and IJs. As a result, those who have a valid claim to asylum may have to wait years for their claims to be granted, while individuals who will ultimately be found ineligible for protection may spend years in the United States before being ordered removed. None of these considerations are racially motivated, inhumane, or xenophobic.

The Departments reiterate that the United States Government has implemented, and will continue to implement, a number of measures designed to enhance and expand lawful pathways and processes for noncitizens who may wish to apply for asylum to come to the United States. DHS has recently created new processes for up to 30,000 CHNV nationals per month to apply for advance authorization to seek parole into the United States, enabling them to travel by air to the United States.[86] DHS and its interagency partners have also increased H–2B nonimmigrant visa availability and refugee processing for countries within the Western Hemisphere. *See* 88 FR at 11718. Noncitizens who are not eligible for these pathways can schedule an appointment to present at a southwest land border POE through the CBP One app and be exempted from the rule. Finally, the rule does not apply to migrants crossing into the United States from Canada because, as discussed in more detail below, the STCA between the United States and Canada, along with the Additional Protocol of 2022, announced March 24, 2023, already enable sufficient management of migration from Canada.[87] The Additional Protocol expands the STCA to apply to migrants who claim asylum or other protection after crossing the U.S.-Canada border between POEs, thus

providing another disincentive for irregular migration.[88]

*Comment:* Other commenters stated that there is a disconnect between President Biden's remarks in Poland in February 2023 regarding accepting and welcoming refugees and this rule. Some commenters stated that the proposed rule is not in line with the American value of welcoming refugees and asylum seekers. Many commenters referenced the Statue of Liberty and the American tradition of welcoming the poor and other vulnerable immigrants and quoted Emma Lazarus' poem. Commenters stated that the ability to seek asylum is a legally recognized right and that the proposed rule would effectively deny that right to many asylum seekers, as well as that the United States should instead live up to its legal responsibilities and ideals. Commenters stated that the need to reduce strain at the border is an insufficient reason to support the reduction in asylum access that would result from the rule.

*Response:* The Departments acknowledge that the United States has a long tradition of accepting and welcoming refugees and note that in the past two years, the United States Government has taken steps to significantly expand refugee admissions from Latin America and the Caribbean. However, simply welcoming migrants into the United States without a policy in place to ensure lawful, safe, and orderly processing of those migrants would exceed DHS's already limited resources and facilities—especially given the anticipated increase in the numbers of migrants who will attempt to enter the United States following the lifting of the Title 42 public health Order.

The Departments underscore that the rebuttable presumption will not apply to noncitizens who availed themselves of safe, orderly, and lawful pathways to enter the United States or sought asylum or other protection in a third country and were denied. The rule lists three per se grounds for rebuttal: if a noncitizen demonstrates that, at the time of entry, they or a member of their family as described in 8 CFR 208.30(c) with whom the noncitizen is traveling faced an acute medical emergency; faced an imminent and extreme threat to their life or safety; or were a "victim of a severe form of trafficking in persons" as defined in 8 CFR 214.11. *See* 8 CFR 208.33(a)(3), 1208.33(a)(3). The rule also

---

[85] For noncitizens encountered at the SWB in FYs 2014–2019 who were placed in expedited removal, 6 percent of Mexican nationals made fear claims that were referred to USCIS for adjudication compared to 57 percent of people from Northern Central America and 90 percent of all other nationalities. OIS analysis of Enforcement Lifecycle data as of December 31, 2022.

[86] *See* 87 FR 63507 (Oct. 19, 2022); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023).

[87] *See* DHS, Press Release, *United States and Canada Announce Efforts to Expand Lawful Migration Processes and Reduce Irregular Migration* (Mar. 24, 2023), *https://www.dhs.gov/news/2023/03/24/united-states-and-canada-announce-efforts-expand-lawful-migration-processes-and.*

[88] *See* 8 CFR 208.30(e)(6); 8 CFR 1003.42(h); Implementation of the 2022 Additional Protocol to the 2002 U.S.-Canada Agreement for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries, 88 FR 18227 (Mar. 25, 2023).

contains a specific exception to the rebuttable presumption for unaccompanied children. *See* 8 CFR 208.33(a)(2)(i), 1208.33(a)(2)(i). Noncitizens who are subject to the lawful pathways condition on eligibility for asylum and who do not qualify for an exception or rebut the presumption of the condition's applicability, remain eligible to apply for CAT protection or for statutory withholding of removal, which implements U.S. non-refoulement obligations under the 1967 Protocol. *See, e.g., Mejia* v. *Sessions,* 866 F.3d 573, 588 (4th Cir. 2017); *Cazun* v. *U.S. Att'y Gen.,* 856 F.3d 249, 257 n.16 (3d Cir. 2017).

Exceptionally compelling circumstances will also be found if, during section 240 removal proceedings, the noncitizen is found eligible for statutory withholding of removal or CAT withholding, they would be granted asylum but for the presumption against asylum, and their accompanying spouse or child does not independently qualify for asylum or other protection against removal or the noncitizen has a spouse or child who would be eligible to follow to join them as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), if they were granted asylum. *See* 8 CFR 1208.33(c). As discussed in the NPRM, the Departments have determined that applying the lawful pathways condition on eligibility for asylum is necessary to ensure the Departments' continued ability to safely, humanely, and effectively enforce and administer U.S. immigration laws and to reduce the role of exploitative and dangerous smuggling and human trafficking networks.

*Comment:* Many commenters stated that if the United States cannot be a safe place for people being persecuted, then it is not living up to constitutional and moral values. A commenter stated that anyone not of Native American ancestry is here because our relatives came here for a better life for themselves and their family. Some commenters stated that America is a nation of immigrants, while others stated that we should remember our ancestors, as many were immigrants too, and invoked their family's migration to the United States as examples. A commenter stated that it is inherently evil to ignore, mistreat, or in any way harm desperate people fleeing their homes because they would likely suffer or even die if they stay. Commenters described the rule as inhumane, not in alignment with Christian or Judeo-Christian morals, and immoral and contrary to American values. A commenter stated that the use of the term "humane" in connection with the proposed rule was cynical and

cruel. Another commenter stated that the rule would inevitably lead to unnecessary harm and death. One commenter stated that the rule would cause survivors and victims of crime to distrust systems.

Many commenters cited the harms resulting from the United States' failure to provide protection for those fleeing Nazi persecution, which commenters said led to the development of the modern asylum system. Multiple commenters stated that, as a wealthy country that claims to be a leader in democracy, the United States has a special obligation to make it easy to seek asylum here, and that the proposed rule would put barriers in the way of desperate people. Commenters stated that the Departments should not forget the contributions of immigrants to the United States' workforce and diversity and should not deny protection to people in need. Some commenters stated that the asylum seekers who would be denied under the rule would be contributing members of society that the country needs. One commenter stated the rule conflicts with the American tradition of "innocent until proven guilty," another protested "the presumption of guilt of undocumented immigrants which underlies this proposed rule," and others stated that refugees should not be treated as criminals. At least one commenter stated that the rule would amount to "cruel and unusual punishment" and other commenters described it as "cruel" or "wrong" and "un-American." One commenter stated that the rule imposes an arbitrary punishment on the very individuals whom the asylum laws were intended to protect. At least one commenter stated that the rule should have a presumption in favor of applicants. Another commenter said that one of America's principles is that "all men are created equal," noting that it says "men" and does not refer to U.S. citizens only.

*Response:* The Departments disagree that this rule is inhumane or contrary to morals and values. For decades, U.S. law has protected vulnerable populations from return to a country where they would be persecuted or tortured. The Departments note that the rule is designed to safely, effectively, and humanely process migrants seeking to enter the United States, and to reduce the influence and role of the lawless and pernicious human smuggling organizations that put migrants' lives in peril for profit. *See* 88 FR at 11713–14. The Departments considered the dangerous journeys made by migrants who put their lives at risk trying to enter the United States without authorization.

The rule is designed to disempower criminal enterprises that seek to take advantage of desperate migrants, leading to untold human suffering and far too many tragedies. *See id.* The rule pursues this goal by encouraging migrants to seek protection in other countries in the region and to use lawful pathways and processes to access the U.S. asylum system, including pathways and processes that do not require them to take a dangerous journey. In order to ensure that particularly vulnerable migrants are not unduly affected by the rule, the Departments have included exceptions and multiple ways that migrants may rebut the presumption and thereby remain eligible for asylum, as well as access to other protection. A noncitizen who seeks to apply for asylum can also schedule their arrival at a land border POE through the CBP One app and be exempted from the rule.

Regarding comments stating that the rule conflicts with "innocent until proven guilty," or that the rule attaches a presumption of guilt to migrants, or that the rule amounts to "cruel and inhumane treatment," the Departments note that this rule is not intended to ascribe guilt or innocence or punishment to anyone but rather to encourage the use of lawful, safe, and orderly pathways to enter the United States. The rule also does not subject anyone to "cruel and inhumane treatment," and indeed ensures that individuals who fear torture or persecution can seek statutory withholding of removal or CAT protection. Similarly, the Departments disagree with comments recommending a presumption in the rule that favors eligibility for asylum. The Departments note that asylum eligibility requirements set forth in section 208(b)(1) of the INA place the burden on the noncitizen. Creating a presumption in the rule to favor eligibility for asylum would remove that burden from the noncitizen and would not achieve the Departments' goals of disincentivizing migrants from crossing the SWB without authorization. Finally, as explained in Section IV.D.1.ii of this preamble, the rule is fully consistent with the Departments' legal authority and obligations on asylum eligibility pursuant to section 208 of the INA, 8 U.S.C. 1158.

*Comment:* Commenters described this rule as a "broken promise" to fix the asylum system and stated that President Biden had criticized the Title 42 public health Order and indicated that he would pursue policies that reflect the United States' commitment to asylum seekers and refugees. A commenter urged the Departments to withdraw the

rule, reasoning that it would contravene the Biden Administration's values by putting vulnerable migrants at greater risk for violence without shelter or protection. Another commenter expressed concern that the proposed rule would be antithetical to President Biden's prior promises to reduce migrants' reliance on smuggling networks, to reduce overcrowding in migrant detention facilities, and to provide effective humane processing for migrants seeking protections in the United States. Other commenters stated that the rule would contravene President Biden's promise to uphold U.S. laws humanely and to preserve the dignity of "immigrant families, refugees, and asylum seekers." One commenter stated that during the presidential election, President Biden campaigned to "restore the soul of America" and cutting off asylum seekers is not part of that promise. Another commenter urged that President Biden be held accountable for the "promises he made before his election." A commenter likewise stated that the proposed rule would fail to uphold the Biden Administration's commitments to promote regional cooperation and shared migration management.

*Response:* Political and economic instability, coupled with the lingering adverse effects of the COVID–19 global pandemic, have fueled a substantial increase in migration throughout the world. This global increase is reflected in the trends on the SWB, where the United States has experienced a sharp increase in encounters of non-Mexican nationals over the past two years, and particularly in the final months of 2022. *See* 88 FR at 11708. DHS was encountering an average of approximately 8,800 noncitizens per day during the first ten days of December 2022—a new record—and expects that encounter numbers could increase to 11,000 per day following the termination of the Title 42 public health Order.[89] The rule is a response to the even more urgent situation that the Departments could face after the lifting of the Title 42 public health Order. The Departments believe that these circumstances warrant this policy, which will encourage those migrants who wish to seek asylum to avail themselves of lawful, safe, and orderly pathways into the United States.

Consistent with the principle of establishing a fair, orderly, and humane asylum system, the United States Government has implemented a multi-

pronged approach to managing migration throughout North and Central America. The United States Government is working closely with international organizations and the governments in the region to establish a comprehensive strategy for addressing the causes of migration in the region; build, strengthen, and expand Central and North American countries' asylum systems and resettlement capacity; and increase opportunities for vulnerable populations to apply for protection closer to home. *See* E.O. 14010, Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, 86 FR 8267, 8270 (Feb. 2, 2021). These commitments were further enshrined and expanded beyond Central and North America in the June 2022 L.A. Declaration endorsed by the United States and 19 nations in the Western Hemisphere.[90] Indeed, the L.A. Declaration specifically outlines "the need to promote the political, economic, security, social, and environmental conditions for people to lead peaceful, productive, and dignified lives in their countries of origin" and states that "addressing irregular international migration requires a regional approach." [91] At the same time, the United States is expanding efforts to protect refugees by increasing refugee admissions and expanding refugee processing within the Western Hemisphere. In fact, on April 27, 2023, DHS announced that it would commit to welcoming thousands of additional refugees each month from the Western Hemisphere—with the goal of doubling the number of refugees the United States committed to welcome as part of the L.A. Declaration.[92] Therefore, the United States is enhancing lawful pathways for migration to this country while improving efficiencies within the U.S. asylum system.

*Comment:* Commenters stated that the United States should welcome and not punish asylum seekers because the United States is responsible for creating the conditions and other problems that have caused many of the migrants seeking asylum to leave their countries, such as through American military, intelligence, political, or economic

actions. Commenters also stated that the United States should not limit access to asylum for migrants coming from countries where the United States Government supported a regime change that created the circumstances that the migrants are fleeing. For example, one commenter referenced the United States' support in prior conflicts in Guatemala and El Salvador and the current support for the controversial leadership in El Salvador as reasons the commenter believed the United States was the cause of migration. One commenter stated that the United States has played a role in creating the political instability that cause many Central American refugees to flee and seek asylum in the United States. Other commenters expressed a belief that many migrants are fleeing because of climate change, to which the United States has greatly contributed, or because of challenging conditions in some countries, including Haiti. Another commenter argued that the U.S. war on drugs has contributed to the circumstances from which migrants are fleeing to seek asylum at the SWB.

*Response:* The Departments recognize commenters' concerns that numerous factors may have contributed to migrants seeking asylum. As noted in the preceding comment response, political and economic instability, coupled with the lingering adverse effects of the COVID–19 global pandemic, have fueled a substantial increase in migration throughout the world. This global increase is reflected in the trends on the SWB, where the United States has experienced a sharp increase in encounters of non-Mexican nationals over the past two years, and particularly in the final months of 2022. *See* 88 FR at 11708. This rule addresses the Departments' continued ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system, in anticipation of a potential further surge of migration at the SWB, regardless of any factors that may have contributed to migration flows. The Departments have sought to address this situation by increasing lawful pathways while also imposing consequences for not using those pathways. The Departments further note that the United States has worked closely with its regional partners to prioritize and implement a strategy that advances safe, orderly, legal, and humane migration, including taking measures to address the root causes of lawful pathways, improve the U.S. asylum system, and address the pernicious role of smugglers. For

---

[89] *See* DHS Post-Title 42 Planning Model generated April 18, 2023; *see also* OIS analysis of CBP UIP data downloaded January 13, 2023.

[90] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[91] *Id.*

[92] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

**31342** **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

instance, the United States Government has implemented new parole processes for CHNV nationals that have created a strong incentive for these individuals to wait where they are to access an orderly process to come to the United States.[93] Additionally, the United States has expanded refugee processing in the region which provides another orderly option for refugees to lawfully enter the United States. *See* 88 FR at 11719. Consistent with these processes, this rule would further incentivize noncitizens to avail themselves of other lawful, safe, and orderly means for seeking protection in the United States or elsewhere.

*Comment:* Some commenters stated that the United States is applying inconsistent policy by ending expulsions of noncitizens under the Title 42 public health Order while simultaneously creating new restrictions on asylum. Commenters stated that the United States Government should not use the end of the Title 42 public health Order as an excuse to resurrect asylum restrictions. Commenters stated that the United States has expelled individuals from "Central America, Haiti, and . . . Venezuela," nearly 2.5 million times while the Title 42 public health Order has been in place, which, according to commenters, has led to increasing numbers of deaths along the border. One commenter stated that it is "ludicrous" that the Government has acted as if the pandemic is over except in the context of welcoming asylum seekers. Conversely, some commenters stated that the ending of Title 42 is within the Administration's control and is not a necessary justification for the rule, and further critiqued the recent actions of the Departments to prepare for the termination of the Departments as causative of the recent border crisis.

*Response:* The Departments respectfully disagree that this action is inconsistent with the lifting of the Title 42 public health Order. It is important to note that the CDC's April 2022 decision to terminate the Title 42 public health Order and HHS's separate decision to not renew the public health emergency after May 11, 2023, resulting in the impending termination of the Title 42 public health Order, were based on considerations of public health, not immigration policy. HHS and CDC exercise authority under Title 42 of the U.S. Code to make public health

determinations for a range of purposes. *See* 42 U.S.C. 265, 268; section 319 of the Public Health Service Act; 42 CFR 71.40. Throughout the COVID–19 pandemic, DHS and DOJ have relied and will continue to rely on the public health expertise of CDC and HHS, and DHS will implement relevant CDC orders to the extent that they remain in effect.

After the Title 42 public health Order is lifted, migrants will be subject to Title 8 processing. The Departments anticipate that in the absence of this rulemaking, a significant further surge in irregular migration would then occur. Such a surge would risk (1) overwhelming the Departments' ability to effectively process, detain, and remove, as appropriate, the migrants encountered; and (2) placing additional pressure on States, local communities, and NGO partners both along the border and in the interior of the United States. This rule will disincentivize irregular migration and instead incentivize migrants to take safe, orderly, and lawful pathways to the United States or to seek protection in a third country.

**ii. Ports of Entry Should Be Open to Anyone To Make an Asylum Claim**

*Comment:* Commenters stated that everyone escaping persecution should be able to seek safety in the United States by presenting at a POE, and that migrants should not be required to make appointments to present themselves or to seek asylum in third countries where they may face harm. Another commenter stated that the rule would limit asylum to the "privileged and connected" despite longstanding legal precedent holding that individuals should be able to access asylum regardless of manner of entry. One commenter stated that even if migrants have a relatively low chance of approval, they have a right to enter the United States and apply for asylum, because some claims will be successful. Commenters stated that the United States denies visas to many people who face persecution, so those same people should not be denied asylum for failing to travel with a visa. For example, at least one commenter stated that an average person from Central America would struggle to get a tourist, student, or other visa. Another commenter stated that everyone, regardless of manner of entry, manner of transit, nationality, or other arbitrary restriction, should have the right to seek asylum in the United States.

*Response:* As discussed in more detail in Section IV.D.1 of this preamble, this rule does not deny anyone the ability to apply for asylum or other protection in

the United States; instead, the Departments have exercised their authority to adopt additional conditions for asylum eligibility by adopting a rebuttable presumption of ineligibility for asylum in certain circumstances. The Departments acknowledge and agree that any noncitizen who is physically present in the United States may apply for asylum, but note that there is no freestanding right to enter or to be processed in a particular manner. *See U.S. ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 357, 452 (1950) ("At the outset we wish to point out that an alien who seeks admission to this country may not do so under any claim of right. Admission of aliens to the United States is a privilege granted by the sovereign United States Government"). Importantly, under this rule, any noncitizen will be able to present at a POE, and no individual—regardless of manner of entry into the United States—will be turned away or denied the opportunity to seek protection in the United States under this rule. Noncitizens who lack documents appropriate for admission to the United States are encouraged and incentivized, but not required, to make an appointment using the CBP One app to present themselves at a POE for inspection.

The use of the CBP One app will contribute to CBP's efforts to expand its SWB POE migrant processing capacity well beyond the 2010–2016 daily POE average,[94] resulting in increased access for noncitizens to POEs. Those who arrive at a POE without an appointment via the CBP One app may be subject to longer wait times for processing at the POE depending on daily operational constraints and circumstances. And this rule does not preclude such noncitizens, or other noncitizens who cross the southwest land border or adjacent coastal borders, from filing an asylum application. Indeed, in all cases, any noncitizen who is being processed for expedited removal may express or indicate a fear of return during the expedited removal process, and will be referred to USCIS for a credible fear interview, as appropriate. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). Also, noncitizens in section 240 removal proceedings have the opportunity to present information asserting fear or concern of potential removal. *See* INA 240(c)(4), 8 U.S.C. 1229a(c)(4). Although such individuals

---

[93] *See* DHS, Press Release, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), *https:// www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.*

[94] *See* CBP STAT Division, *U.S. Customs and Border Protection (CBP) Enforcement Encounters— Southwest Border (SBO), Office of Field Operations (OFO) Daily Average* (internal data report, retrieved Apr. 13, 2023).

may be presumptively ineligible for asylum under this rule, they may seek to establish that they are subject to an exception or to rebut that presumption, and they may also still seek statutory withholding of removal and CAT protection in the United States, as outlined in Section IV.E.8 of this preamble. The Departments also note that a purpose of this rule is to facilitate safe and orderly travel to the United States. Individuals who lack a visa are generally inadmissible to the United States, *see* INA 212(a)(7), 8 U.S.C. 1182(a)(7), and will remain so under this rule.

iii. Belief That the Rule Will Result in Denial of Valid Asylum Claims

*Comment:* Commenters stated that the rule would result in the denial of valid asylum claims and described the right to seek asylum as a human right. One commenter emphasized that, when Congress created the credible screening process, the premise of the screening was for adjudicators to err on the side of protection. Multiple commenters expressed concern that implementing the proposed rule would increase the likelihood that asylum seekers would be refouled or migrants returned to harmful conditions. One commenter said that denying a bona fide asylum claim and putting a would-be applicant at risk of danger is a greater mistake than making a positive credible fear determination that does not result in asylum. At least one commenter disagreed with the proposed rule's assertion that noncitizens who forgo certain lawful or orderly procedures are less likely to have a well-founded fear than those who do and stated that this assertion is unsupported.

Commenters stated that the rule imposes conditions on noncitizens' access to asylum that have nothing to do with the merits of their asylum claims and merely puts up bureaucratic hurdles. One commenter stated that people often have no control or choice in how they get to the United States, which is a matter of survival. Another commenter stated that rushed procedure created by this rule would result in what the commenter describes as false negatives, as asylum seekers subjected to this process would be disoriented from their days in CBP's holding facilities, especially after undergoing a harrowing journey to the United States that likely included violence, persecution, and trauma. Commenters stated that instead of filtering out migrants with weak asylum claims, the rule would stop the most vulnerable from being able to apply for asylum. One commenter stated that it may be

necessary for asylum seekers to cross the border by unscrupulous means to escape their persecutors and that this bolsters their case for asylum rather than detracts. Commenters stated that the exceptions to the proposed rule do little to provide meaningful safeguards for asylum seekers and would result in erroneous denials and forced return to countries where the noncitizen would face danger. Commenters stated that asylum seekers who are otherwise eligible for asylum but banned by the rule would likely be deported to danger. Other commenters stated that the framework of the rebuttable presumption would have negative effects and de facto be dispositive of asylum eligibility before noncitizens have a ''fair shot at making their case.'' One commenter wrote that, concerning the one-year asylum filing deadline, numerous reports have shown the impact of such bars on returning individuals to harm.

*Response:* The Departments disagree that the rule creates an unwarranted risk of denial of valid asylum claims. The U.S. asylum system is governed by statute and implementing regulations. To receive asylum, noncitizens must establish that (1) they meet the definition of a ''refugee,'' under section 101(a)(42) of the INA, 8 U.S.C. 1101(a)(42), (2) they are not subject to a bar to applying for asylum or a bar to the granting of asylum, and (3) they merit a favorable exercise of discretion. *See* INA 208(a)(2), 8 U.S.C. 1158(a)(2); INA 208(b)(1), 8 U.S.C. 1158(b)(1); INA 240(c)(4)(A), 8 U.S.C. 1229a(c)(4)(A); 8 CFR 1240.8(d); *see also Moncrieffe* v. *Holder,* 569 U.S. 184, 187 (2013) (describing asylum as a form of ''discretionary relief from removal''); *Delgado* v. *Mukasey,* 508 F.3d 702, 705 (2d Cir. 2007) (''Asylum is a discretionary form of relief . . . . Once an applicant has established eligibility . . . it remains within the Attorney General's discretion to deny asylum.''). Because asylum is a discretionary form of relief from removal, the assumption that this rule will result in the risk of denial of valid asylum claims is incorrect because the noncitizen bears the burden of showing both eligibility for asylum and why the Attorney General or Secretary should exercise the discretion to grant relief. *See* INA 208(b)(1), 8 U.S.C. 1158(b)(1); INA 240(c)(4)(A), 8 U.S.C. 1229a(c)(4)(A)(ii); 8 CFR 1240.8(d); *Romilus* v. *Ashcroft,* 385 F.3d 1, 8 (1st Cir. 2004).

The Departments acknowledge that despite the protections preserved by the rule and the availability of lawful pathways, the rebuttable presumption adopted in the rule will result in the

denial of some asylum claims that otherwise may have been granted, but the Departments believe that the rule will generally offer opportunities for those with valid claims to seek protection through asylum, statutory withholding of removal, or protection under the CAT. Moreover, the Departments have determined that the benefits to the overall functioning of the system, including deterrence of dangerous irregular migration and smuggling, justify the rule.

The rule encourages those with meritorious claims to either apply for asylum or other protection in the first safe country they reach or pursue available lawful pathways as set forth in the rule. Noncitizens who apply for and are denied protection in a third country are not barred from asylum eligibility under this rule. The rule will preserve core asylum protections by permitting noncitizens subject to the presumption of asylum ineligibility to rebut it by showing exceptionally compelling circumstances that excuse their failure to pursue lawful pathways or processes. Furthermore, under the rule, noncitizens who are ineligible for asylum due to the lawful pathways condition remain eligible for protections from persecution and torture. Indeed, noncitizens who establish a reasonable possibility of persecution or torture are placed in section 240 removal proceedings where they can apply for asylum, statutory withholding of removal, and protection under CAT. 8 CFR 1208.33(b)(2)(ii), (b)(4). Thus, the rule does not prevent noncitizens from pursuing asylum nor does the rule create an unwarranted risk of denial of valid asylum claims.

iv. Belief That the Rule Will Increase Smuggling or Trafficking

*Comment:* Commenters agreed that human trafficking is a serious concern, but asserted that this rule would make the problem worse. Commenters stated the proposed rule will not result in asylum seekers relying less on smuggling networks, but will actually increase their reliance on smugglers and increase their vulnerability to trafficking. One stated that desperate people turn to traffickers because they fear being turned away by authorities, and that the most effective way to remove traffickers' leverage is to open safe and legal pathways for immigration. Another commenter stated that the United States should make it easier to legally enter for work as a way to discourage trafficking by smugglers rather than implement the proposed rule. Some commenters stated human smuggling and trafficking were

**31344**    **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

problems of the Government's own making, and by discouraging migrants from coming to the border in a legal manner, the rule would increase the interactions between migrants and smugglers, as well as increasing the number of noncitizens without lawful immigration status in the United States. Commenters also stated that closing off the SWB and trapping migrants in dangerous parts of Mexico for a prolonged time exposes them to greater violence, exploitation, and other dangers, and heightens their risk of being trafficked. One commenter stated that in the event that people are unable to get an appointment through the CBP One app and are blocked from access to asylum, smuggling operations and organized crime in Mexico will only gain more power, take individuals on more treacherous routes to evade detection, and cause USBP to invest more resources to detain individuals. Another commenter stated that the rule would further embolden organized crime, corrupt state actors, and criminals, making migrants even more of a target and placing them at greater risk of being trafficked. One commenter stated, without evidence, that the TCT Bar Final Rule advantaged drug cartels and criminal organizations that target vulnerable populations, and asserted that this rule would have the same result.

Commenters said that technical difficulties associated with the CBP One app have opened new avenues for exploitation; for example, traffickers claiming an ability to obtain appointments, or scams charging fees for completing a CBP One app registration. Similarly, one commenter said that individuals who lack access to stable Wi-Fi in dangerous places may seek Wi-Fi in dangerous places, including cities controlled by cartels. Another commenter wrote that the need for migrants to borrow a smartphone from a third party could create an opportunity to take advantage of migrants trapped at the U.S.-Mexico border to target them for extortion, sexual violence, or other harm. In contrast, based on its field monitoring, a different commenter stated that the CBP One app has led to a reduction in instances of fraud and abuse of migrants who previously relied on local actors to get on lists to request an exception to the Title 42 public health Order.

Another commenter expressed concern that the proposed rule may discourage migrants from contacting U.S. law enforcement for fear of deportation, increasing the likelihood of trafficking and smuggling. One comment stated that the rule would

continue the Administration's shameful legacy of facilitating mass trafficking and smuggling of vulnerable noncitizens because it is "all bark and no bite" due to its "numerous loopholes and exceptions," unlike the TCT Bar rulemaking, which the commenter described as part of a multi-pronged strategy to secure the border.

*Response:* The Departments acknowledge the commenters' concerns about smuggling and trafficking, but disagree with the either/or approach urged by some commenters. To prevent migrants from falling victim to smugglers and traffickers, the Departments believe it is necessary to both increase the availability of lawful pathways for migration and discourage attempts to enter the United States without inspection. The Departments anticipate that the newly expanded lawful pathways to enter the United States, in conjunction with the rule's condition on asylum eligibility for those who fail to exercise those pathways, will ultimately decrease attempts to enter the United States without authorization, and thereby reduce reliance on smugglers and human traffickers.

DHS has recently created alternative means for migrants to travel to the United States via air through the CHNV parole processes, increased refugee processing in the Western hemisphere, and increased admissions of nonimmigrant H–2 workers from the region. 88 FR at 11718–20. DHS also recently announced that it plans to create new family reunification parole processes for nationals of El Salvador, Guatemala, Honduras, and Colombia, and to modernize the existing Haitian Family Reunification Parole process and the Cuban Family Reunification Parole process.[95] In addition, noncitizens' use of the CBP One app to schedule appointments to present at land border POEs is expected to enhance DHS's ability to process such individuals in a safe, orderly manner. As discussed later in Section IV.E.3.ii.a of this preamble, CBP anticipates processing several times more migrants each day at SWB POEs than the 2010–16 daily average,[96]

[95] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

[96] *See* CBP STAT Division, *U.S. Customs and Border Protection (CBP) Enforcement Encounters—Southwest Border (SBO), Office of Field Operations (OFO) Daily Average* (internal data report, retrieved Apr. 13, 2023); Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

including through the use of the CBP One app. While the CBP One app provides noncitizens access to schedule arrivals at a POE, no CBP officer will dissuade or prevent any noncitizen who lacks a scheduled appointment from applying for admission to the United States. *See* INA 235(a)(4), U.S.C. 1225(a)(4); 8 CFR 235.1, 235.4 (decision to withdraw application for admission must be made voluntarily).

The Departments disagree that the CBP One app or accessibility issues associated with the CBP One app will increase reliance on smugglers and traffickers. The CBP One app is a free, public-facing application that can be downloaded on a mobile phone. 88 FR at 11717. As noted in the received comments, the International Organization for Migration ("IOM") has, during its recent field monitoring, observed that the CBP One app has led to a reduction in instances of fraud and abuse of migrants who previously relied on local actors to get on lists to request an exception to the Title 42 public health Order, and recommended that CBP further develop the CBP One app to prevent glitches and incorporate improvements suggested by IOM and other stakeholders. CBP is continuing to improve the CBP One app and engage with stakeholders on potential improvements. The rule also contains an exception for situations where it was not possible to access or use the app due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. 8 CFR 208.33(a)(2)(B), 1208.33(a)(2)(B).

The Departments also disagree with the assertion that, due to its exceptions and means of rebuttal, the rule will facilitate mass trafficking and smuggling of vulnerable noncitizens. The recently expanded lawful pathways are designed to allow migrants to travel directly to the United States without having to travel through Central America, where they might rely on smugglers or traffickers. In addition, some of the specific examples of exceptionally compelling circumstances are designed to protect victims or those at risk of trafficking. *See* 8 CFR 208.33(a)(3)(i)(B) and (C), 1208.33(a)(3)(i)(B) and (C).

Finally, the Departments do not believe that the rule will encourage migrants from contacting U.S. law enforcement due to fear of deportation, and thereby place them at further risk of trafficking and smuggling. Migrants who enter the United States without inspection or apprehension by CBP are already subject to removal, *see* INA 212(a)(6)(A), 8 U.S.C. 1182(a)(6)(A), and victims of severe forms of trafficking or other crimes may be eligible to apply for

T or U nonimmigrant status, *see* INA 101(a)(15)(T) and (U), 8 U.S.C. 1101(a)(15)(T) and (U).

4. Negative Impacts and Discrimination Against Particular Groups

i. General Comments on Discrimination

*Comment:* Commenters raised concerns that the proposed rule could have a disproportionate impact on certain populations that may be vulnerable, including those without legal representation, those with limited English proficiency ("LEP"), families and children, victims of domestic and gender-based violence, victims of human trafficking, women, the LGBT community, those with mental impairments and associated competency issues, elderly individuals, those with limited technological literacy, those with physical disabilities, those with health problems or who are otherwise in need of medical attention, people of color, indigenous groups, survivors of persecution or torture, and those with post-traumatic stress disorder ("PTSD"), among others.

For example, commenters stated that those without legal representation or with limited English proficiency may have difficulty understanding and complying with the process proposed by the rule, which commenters claimed requires access to technology, technological proficiency, and an understanding of the requirements prior to attempting entry at the SWB. Likewise, commenters suggested that groups including survivors of persecution or torture, the LGBT community, victims of domestic and gender-based violence, women, and noncitizens with mental impairments and associated competency issues may have difficulty applying for relief in a third country, as those countries may not have sufficiently robust humanitarian-relief systems to accommodate the particular issues faced by these and similar groups. For instance, many such individuals may have difficulty recounting the harms they suffered in their home countries without specialized procedures, and some third countries may not recognize their harms as qualifying for asylum in the same way that U.S. asylum law does. Similarly, commenters stated, some groups may also face particular discrimination or violence in third countries based on the same immutable characteristics for which they were persecuted in their home countries. Other commenters highlighted anecdotally that membership in one group has often intersected with membership in another, compounding

the harm noncitizens have experienced in transit.

*Response:* The Departments are committed to the equal treatment of all persons. This rule is intended to promote lawful, safe, and orderly pathways to the United States and is intended to benefit particularly vulnerable groups by removing the incentive to make a dangerous irregular migration journey and reducing the role of exploitative transnational criminal organizations and smugglers. *See* 88 FR at 11707. As detailed in the NPRM, irregular migration journeys can be particularly fraught for vulnerable groups, including those discussed in the following sections. *See* 88 FR at 11713 (explaining that women and children are "particularly vulnerable to attack and injury" as well as illness along an important migratory route). The incentivizing of the lawful pathways described in the NPRM is intended in part to encourage vulnerable groups to avoid such journeys while simultaneously preserving their ability to apply for asylum consistent with existing law and regulations. *See, e.g.,* 88 FR at 11718 (explaining that the United States has taken "meaningful steps" to enhance lawful pathways for migrants to access protection). In addition, depending on individual circumstances, AOs and IJs may find that certain especially vulnerable individuals meet the exceptionally compelling circumstances standard.

ii. Children and Families

*Comment:* Commenters raised concerns about the proposed rule's impact on children and families. In general, commenters stated that the United States has a legal and moral obligation to act in the best interest of children by preserving family unity and should be doing whatever it can to protect children seeking asylum, especially after prior family separation policies at the border. Commenters generally asserted that the proposed rule would expose children and families to continued violence and danger, limit their right to seek asylum, and deny children the opportunity to be safe and protected. Commenters provided anecdotal examples of migrant families and children who had been harmed or killed while waiting at the border to secure an appointment through the CBP One app or while attempting to travel to POEs with available appointments. Commenters asserted that the proposed rule would prevent accompanied children from presenting their own asylum claims independent of a claim presented by their parent or guardian. Commenters were concerned that the

asylum ineligibility presumption would encourage families to separate at the SWB and prevent noncitizens from petitioning for their eligible derivatives, which commenters claimed would be a form of family separation, and described potential attendant negative consequences for children and families, such as trauma, familial instability, developmental delays, vulnerability to harm and exploitation, detention, placement in orphanages, and detention in inhumane conditions.

Further, commenters asserted that all children, because of their unique needs and challenges, deserve additional procedural protections and child-sensitive considerations not included in the proposed rule. Commenters highlighted the vulnerability of children, the fact that children process trauma differently than adults do, and children's varied ability to understand complex immigration requirements, stating that the law recognizes the need for additional protections for children and to account for their best interests. Commenters also suggested that the proposed rule and any detention that it may require would re-traumatize children who have already experienced trauma, including trauma from their journey to the SWB. Other commenters suggested that any required detention may have serious ramifications on a child's well-being, mental health, and development.

Additionally, commenters posited that the proposed rule could incentivize entire families to make a potentially dangerous journey to the United States together. Commenters stated that prior to the proposed rule, one family member might have journeyed alone to the United States to seek asylum with the understanding that they would be able to petition for family members upon being granted asylum. But under the proposed rule, those commenters stated, many families may be incentivized by what commenters consider a lack of asylum availability to undertake an unsafe journey to the SWB together rather than risk permanent family separation. Relatedly, commenters indicated that children compelled to wait at the SWB with a member of their family, so as not to be subject to the NPRM's condition on eligibility, may be deprived of access to other forms of status for which they may be eligible in the United States, such as Special Immigrant Juvenile classification. Commenters urged the Departments to prioritize processing family unit applications to keep families together and expressed that families deserve a chance to live together in the

United States to escape violence in their home countries.

One commenter stated that children have little control over whether their parents can pre-schedule their arrival at a POE or choose to apply for protection in transit countries, but the proposed rule would condition asylum eligibility for the child on whether their parent did so. Similarly, other commenters stated that the proposed rule failed to consider or make an exception for the fact that children and young people generally have less control and choice with respect to their movement and may depend on the assistance of a parent, who may have been jailed or killed by persecutors, or who may themselves have harmed the child or young person, to apply and be approved for a visa.

*Response:* The Departments share commenters' concerns about the vulnerability of children and note that UCs are entitled to special protections under the law. *See* 88 FR at 11724 (citing INA 208(a)(2)(E), 8 U.S.C. 1158(a)(2)(E) (providing that safe-third-country bar does not apply to UCs); INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C) (stating that an AO has initial jurisdiction over the asylum claims of UCs); and 8 U.S.C. 1232(d)(8) (''Applications for asylum and other forms of relief from removal in which an unaccompanied alien child is the principal applicant shall be governed by regulations which take into account the specialized needs of unaccompanied alien children and which address both procedural and substantive aspects of handling unaccompanied alien children's cases.'')). The Departments also recognize commenters' concerns that children may be at risk for exploitation by criminal actors at and around the SWB, and the Departments note that UCs are of particular concern.

Because of UCs' unique vulnerability and the special protections granted to them by law, the rule contains a provision categorically excepting UCs from the rebuttable presumption of ineligibility for asylum. 8 CFR 208.33(a)(2)(i), 1208.33(a)(2)(i). Accordingly, because UCs will not be subject to the rebuttable presumption of ineligibility for asylum created by this rule, the Departments emphasize that UCs do not need to wait, potentially vulnerable, in Mexico before seeking entry to the United States or rely on smugglers to undertake a potentially dangerous journey across the SWB. Further, the Departments expect that the rule, by creating efficiencies and freeing up resources due to non-UC migrants pre-scheduling their arrival at SWB POEs, will allow for faster, smoother processing of UCs presenting at the

SWB. *See* 88 FR at 11719–20 (describing anticipated efficiencies from implementation of pre-scheduling through the CBP One app). The Departments believe that the rule sufficiently recognizes the unique situation of UCs and provides appropriate safeguards. For discussion of the exception to the condition on asylum eligibility for UCs, and comments suggesting a similar exception for accompanied children, please see Section IV.E.3.v of this preamble.

The Departments acknowledge commenter concerns that children may not have the autonomy to make decisions about their transit or manner of entry into the United States. With those important realities in mind, the Departments have amended the language proposed in the NPRM to ensure that the presumption of asylum ineligibility will not apply to certain noncitizens who entered as children and who file asylum applications after the date range set forth in 8 CFR 208.33(a)(1)(i) and 1208.33(a)(1)(i)— specifically, those who are applying as principal applicants. *See* 8 CFR 1208.33(d)(2). Further, the Departments recognize that some children could be traveling with an adult but still meet the definition of UC at 6 U.S.C. 279(g)(2), for example, where the adult is not the child's parent or legal guardian. Such children would also be excepted from the presumption against asylum eligibility as UCs. *See* 8 CFR 208.33(a)(2)(i), 1208.33(a)(2)(i). The Departments believe that the aforementioned provisions of the rule prevent those who entered as children from facing a continuing impact on asylum eligibility based upon decisions that others likely made for them.

As discussed in more detail in Section IV.E.3.ii.b of this preamble, the Departments emphasize that family units traveling together should schedule their appointments together through the CBP One app. Families or groups traveling together who do not register together on one CBP One app account may not be accommodated at the same POE or date. Further, as stated in the NPRM, when family units are subject to a credible fear screening, USCIS will find that the entire family passes the screening if one family member establishes a credible fear. 88 FR at 11724; *see* 8 CFR 208.30(c). Likewise, when the reasonable possibility standard applies, USCIS will continue to process claims from family units in this way. 88 FR at 11724 (''USCIS will continue to process family claims in this manner even when applying the reasonable possibility standard.'').

The Departments also acknowledge commenter concerns related to the impact that any potential detention may have on children and families, as well as the effects of trauma on children. However, this rule neither addresses nor expands detention policies, and therefore specific concerns related to detention are outside the scope of this rule. Further, with respect to the effects of trauma on children and concerns about re-traumatization, the Departments are confident in the ability of AOs and IJs to follow appropriate safeguards available for children in processing with USCIS and the immigration courts and note that adjudicators receive training and guidance related to special considerations in cases involving children.[97]

However, the Departments disagree with commenters' contention that children waiting for an appointment to present at a POE together with their family unit would be deprived of Special Immigrant Juvenile classification. Whether a noncitizen enters alone or with a family unit is not dispositive to the statutory definition of a ''special immigrant.'' *See* INA 101(a)(27)(J), 8 U.S.C. 1101(a)(27)(J) (defining ''special immigrant,'' in part, as an immigrant who is present in the United States ''who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States,'' and whose reunification with one or both of the immigrant's parents ''is not viable due to abuse, neglect, abandonment, or a similar basis found under State law''). Further, the Departments highlight that nothing in this rulemaking prevents a noncitizen child from obtaining Special Immigrant Juvenile classification after entering the United States, provided that they are otherwise eligible for such status.

Moreover, the Departments disagree with the characterization of this rule as contributing to family separation rather

---

[97] *See, e.g.,* Department of Justice, EOIR, *OPPM 17–03: Guidelines for Immigration Court Cases Involving Juveniles, Including Unaccompanied Alien Children* (Dec. 20, 2017), *https:// www.justice.gov/eoir/file/oppm17-03/download* (recognizing unique circumstances presented by immigration cases involving children and providing guidance for those cases); USCIS, RAIO Directorate—Officer Training: Children's Claims (last revised Dec. 20, 2019), *https://www.uscis.gov/ sites/default/files/document/foia/Childrens_ Claims_LP_RAIO.pdf* [hereinafter USCIS, *Children's Claims*] (providing guidelines for adjudicating children's claims).

than focusing on family unity. The Departments drafted this rule with the goal of eliminating the risk of separating families. As explained above, the rule has several provisions to ensure that family units are processed together. For example, if any noncitizen in a family unit traveling together meets an exception to, or is able to rebut, the asylum ineligibility presumption, the presumption will not apply to anyone in the family unit traveling together. 8 CFR 1208.33(a). Similarly, the rule contains an explicit family unity provision applicable in removal proceedings. *Id.* 1208.33(c). The provision states that if a principal applicant for asylum is eligible for statutory withholding of removal or withholding of removal under the CAT and would be granted asylum but for the rebuttable presumption created by this rule, the presumption ''shall be deemed rebutted as an exceptionally compelling circumstance'' where an accompanying spouse or child does not independently qualify for asylum or other protection or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), if the applicant were granted asylum. *Id.* This provision is intended to prevent the separation of families. Additionally, this provision is intended to avoid incentivizing families to engage in irregular migration together, so as not to risk that the principal applicant be prevented from later applying for their family members to join them. This may involve making a dangerous journey with vulnerable family members such as children.

Further, the rule incentivizes families, as well as individuals traveling without their families, to take advantage of the lawful pathways outlined in this rule, rather than rely on smugglers or criminal organizations to facilitate a potentially dangerous journey. The rebuttable presumption is intended to disincentivize making such irregular journeys. *See, e.g.,* 88 FR at 11730 (''The proposed rule aims to achieve that shift in incentives by imposing a rebuttable presumption of asylum ineligibility.''). The Departments believe that the meaningful pathways detailed in the rule, combined with the exceptions and rebuttals to the presumption, provide sufficient opportunities for individuals to meet an exception to or rebut the presumption, which could preclude asylee status and the ability to later petition for eligible derivatives. Finally, commenter concerns related to placing separated children in orphanages are

outside the scope of this rulemaking, but the Departments emphasize that nothing in this rule would authorize such a process.

For additional discussion of concerns related to due process, see Section IV.B.5 of this preamble. For more discussion of the family unity provision applicable in removal proceedings, please see Section IV.E.7.ii of this preamble.

### iii. Individuals With LEP

*Comment:* Commenters expressed the belief that the proposed rule would function as a complete ban on asylum for noncitizens who are not sufficiently proficient or literate in the languages they would need to use to successfully navigate available lawful pathway options. As a foundational issue, commenters voiced the opinion that due to language and literacy barriers, many noncitizens, particularly those who speak rare languages and those with limited literacy in their native languages, would not be able to understand what lawful pathways are available to them or the consequences that may result from not pursuing a lawful pathway under the proposed rule. For example, some commenters stated that many asylum seekers who are unfamiliar with U.S. immigration law may not know what steps to take to preserve their eligibility for asylum.

Commenters also indicated that many noncitizens would be unable to meaningfully access the CBP One app due to inadequate proficiency or literacy in the app's supported languages and therefore would be unable to pre-schedule their appearance at a POE, making them subject to the rule's presumption of asylum ineligibility. Commenters provided examples of individuals who they asserted would be disproportionately impacted by the rule and face particular challenges, including those who speak an Afghan dialect of the Persian language, monolingual speakers of indigenous languages, and members of the Asian-Pacific Islander community whose primary languages do not utilize the Latin script.

*Response:* Due to the safeguards crafted into the rule and the success of similar, recently implemented parole processes, the Departments disagree with commenters' contentions that language and literacy barriers will prevent many noncitizens from foundationally understanding what lawful pathway options are available to them.

The Departments acknowledge commenters' concerns that some noncitizens who wish to use the lawful

pathway of pre-scheduling their arrival may have language and literacy-related difficulty with accessing and using the CBP One app. Accordingly, the rule provides an exception to application of the rebuttable presumption of asylum ineligibility for noncitizens who present at a POE without a pre-scheduled appointment who can demonstrate through a preponderance of the evidence that, because of a language barrier or illiteracy, it was not possible for them to access or use the DHS scheduling system to pre-schedule an appointment. 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). AOs will follow established procedures for interviewing individuals to determine applicability of this exception. Similarly, IJs will follow established procedures for soliciting testimony and developing the record, as appropriate.

The Departments also believe the processes highlighted in this rulemaking will be navigable for noncitizens—regardless of language spoken—as evidenced by the success of the recent, similar U4U and CHNV parole processes, both of which are offered to noncitizens from countries where the primary language is one other than English. *See, e.g.,* 88 FR at 11706–07 (noting that the U4U and CHNV parole processes resulted in vastly fewer irregular border crossings, demonstrating that noncitizens from Ukraine, Cuba, Haiti, Nicaragua, and Venezuela were able to take advantage of the U4U and CHNV parole processes). The success of the U4U and CHNV parole processes suggests that these noncitizens are broadly aware of changes to U.S. immigration processes, that such information is being communicated to noncitizens outside the United States, and that noncitizens are changing migration behaviors in response. In addition, the Departments intend to engage in robust regional public awareness campaigns to promote understanding of the rule, building on ongoing efforts to encourage intending migrants to avail themselves of lawful pathways and publicize the perils of irregular migration. Therefore, the Departments believe that, irrespective of language spoken, noncitizens outside of the United States will become apprised of the lawful pathway options laid out in this rule.

### iv. Individuals With Mental Impairments and Associated Mental Competency Issues

*Comment:* Commenters raised concerns about the proposed rule's effect on noncitizens who have mental impairments and associated mental competency issues. Commenters stated

**31348**    **Federal Register**/Vol. 88, No. 94/Tuesday, May 16, 2023/Rules and Regulations

that some mental impairments result in symptoms that would impact an individual's ability to apply for asylum under any circumstances, especially if access to medical services is unavailable. Moreover, commenters stated that downloading, registering for, and using the CBP One app may be too difficult for some noncitizens with mental impairments and associated mental competency issues. Thus, commenters recommended exempting such persons from the rule.

*Response:* The Departments recognize the difficulties faced by noncitizens with mental impairments and associated competency issues. Under this rule, AOs and IJs may consider, on a case-by-case basis, whether a noncitizen's or accompanying family member's mental impairments or associated competency issues presented an "ongoing and serious obstacle" to accessing the DHS scheduling system. 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). In addition, depending on the noncitizen's or accompanying family member's particular circumstances, any serious mental impairments or associated competency issues may qualify as an "exceptionally compelling circumstance" sufficient to rebut the presumption of ineligibility for asylum. 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). Notably, the "acute medical emergency" ground for rebutting the presumption of asylum ineligibility is not limited to physical medical ailments but could include mental health emergencies. 8 CFR 208.33(a)(3)(i)(A), 1208.33(a)(3)(i)(A).

Procedurally, DHS has discretion to place noncitizens in expedited removal proceedings or refer noncitizens to EOIR for section 240 removal proceedings. *Matter of E–R–M- & L–R–M,* 25 I&N Dec. 520 (BIA 2011). Therefore, DHS may choose to refer noncitizens who exhibit indicia of mental incompetency to EOIR for removal proceedings under section 240 of the INA, where an IJ may more fully consider whether the noncitizen shows indicia of incompetency and, if so, which safeguards are appropriate. *See, e.g., Matter of M–A–M–,* 25 I&N Dec. 474 (BIA 2011).

v. Low-Income Individuals

*Comment:* Commenters asserted that the proposed rule discriminates against noncitizens who cannot afford to arrive in the United States by air or sea and favors individuals with more financial resources. In general, commenters stressed that a noncitizen's method of arrival in the United States—whether by land, air, or sea—should not dictate their eligibility for asylum and stated that asylum laws should not have a

"wealth test" for access to protection from persecution. Pointing to the fact that the proposed rule would only apply to noncitizens arriving by land at the SWB, commenters said that the proposed rule would have a disparate impact on individuals, particularly working-class, non-white migrants, who do not have the economic means to purchase a plane ticket or obtain a visitor visa or passport and may not have existing supportive relationships within the United States. Commenters stated that the lawful pathways identified in the proposed rule—including parole programs and use of DHS scheduling technology—prioritize individuals with financial means over those who are indigent.

At least one commenter stated that the proposed rule would cause migrants financial hardship, as not all migrants have the financial resources to travel to a third country to seek asylum before attempting to cross the SWB. Commenters also suggested that the proposed rule would privilege migrants with the economic means to maintain a working smartphone capable of operating the CBP One app and either pay for data roaming capability or remain in an area with internet access. Commenters also stated that the proposed rule unfairly benefits wealthier noncitizens who are more likely to be able to use an approved parole process because such noncitizens may be immediately eligible for employment authorization while low-income noncitizens who are not able to use such a parole process remain without immediate employment authorization. Commenters concluded that the proposed rule would amount to a de facto ban on asylum that targets economically disadvantaged noncitizens without options other than arriving at the SWB.

*Response:* As explained in the NPRM, the Departments are issuing this rule specifically to address an anticipated surge of migration at the SWB following the lifting of the CDC's Title 42 public health Order. 88 FR at 11704. Through this rule, the Departments have decided to address such a surge one step at a time, beginning with the SWB, where the Departments expect a surge to focus most intensely and immediately. So, tailoring the rule to apply exclusively to migrants arriving from Mexico at the southwest land border or adjacent coastal borders[98] who meet certain

conditions but not to migrants arriving via other means is appropriate based on existing and anticipated conditions at the SWB, many of which the Departments outlined in the NPRM. *See id.* at 11705–07. Where conditions necessitate, the Departments can reevaluate the scope of the rule. *Cf. FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 522, 129 S. Ct. 1800, 1815 (2009) (stating that "[n]othing prohibits federal agencies from moving in an incremental manner"); *City of Las Vegas* v. *Lujan,* 891 F.2d 927, 935 (D.C. Cir. 1989) (explaining that "agencies have great discretion to treat a problem partially" including through a "step toward a complete solution"). Indeed, as stated above, the Departments intend that the rule will be subject to review to determine whether the entry dates provided in 8 CFR 208.33(a)(1)(i) and 1208.33(a)(1)(i) should be extended, modified, or remain as provided in the rule.

Commenters who expressed concerns that this rule would cause financial hardship to migrants by requiring them to travel to a third country to seek asylum before arriving at the SWB misunderstand the terms of this rule. The rule does not require any migrant to travel to a third country to overcome the rebuttable presumption—indeed, the rebuttable presumption does not apply to those who did not travel through a third country—and seeking protection in a third country is merely one of several means to qualify for an exception to or rebut the presumption. Moreover, this rule is intended in part to address existing conditions impacting low-income individuals by reducing opportunities for smugglers to recruit migrants to participate in "expensive and dangerous human smuggling schemes." 88 FR at 11705.

Further, except for those for whom Mexico is their country of nationality or last habitual residence, individuals arriving at the southwest land border or adjacent coastal borders, whether they have traveled by land, air, or sea, to arrive there, necessarily travel through another country—and, often, more than one other country—en route to the United States. Also, while individuals traveling from their country of nationality or last habitual residence to the United States may arrive directly in the United States without transiting another country, they generally are not permitted to board an aircraft or vessel to a U.S. location without first demonstrating that they have the travel documents required for entry into the United States. *See, e.g.,* INA 211, 8 U.S.C. 1181 (setting forth requirements for immigrant admission); *see also* INA

---

[98] As explained in Section II.C.3 of this preamble, the Departments have decided to apply this rule to migrants arriving from Mexico not only at the southwest land border but also at "adjacent coastal borders," which matches the geographic scope of the CDC's Title 42 public health Order.

217, 8 U.S.C. 1187 (visa waiver requirements); INA 221 through 224, 8 U.S.C. 1201 through 1204 (visas); INA 231, 8 U.S.C. 1221 (establishing air and vessel manifest requirements including mandating the collection of passport numbers); *see also* 8 CFR 212.5(f) (providing that DHS may issue ''an appropriate document authorizing travel'' for those seeking to travel to the United States without a visa).

This rule does not intend to penalize migrants based on economic status, a lack of travel documents, lack of phone or internet access, or exigent circumstances, nor does it do so in effect. Indeed, the Departments recognize that many individuals are only able to enter the United States via the SWB due to just such circumstances and, in recognition of this reality, have identified several pathways and processes through which such individuals may travel to the SWB in a safe and orderly fashion and, once present, seek asylum or other protection. One such pathway or process includes pre-scheduling their arrival, which at this time can be accomplished via the CBP One app. Without a pre-scheduling system, migrants seeking to travel to the SWB may have to wait for an indeterminate amount of time for CBP to have resources available to process them. *See* 88 FR at 11720. Pre-scheduling provides noncitizens seeking to present at a SWB POE with a clear understanding of when CBP expects to process them, which allows them to plan for safer transit and reduces opportunities for smugglers and criminal organizations. *See id.* at 11707. Moreover, the rule excepts from application of the condition on asylum eligibility those noncitizens who presented at a POE and can establish, based on the preponderance of the evidence, that it was not possible for them to access or use the DHS scheduling system, including because they had insufficient phone or internet access. *See* 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B) (providing the presumption does not apply ''if the alien demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to . . . significant technical failure, or other ongoing and serious obstacle'').

In response to commenters' concerns about differences in eligibility for employment authorization depending on whether a migrant entered the United States following use of the CBP One app, a DHS-approved parole process, or some other means, the Departments acknowledge that the employment authorization rules may

vary depending on the pathway that a noncitizen uses to enter the United States and how the noncitizen is processed. This has always been the case, and although this rule recognizes certain lawful pathways as a basis to avoid the rebuttable presumption, such pathways would exist irrespective of this rulemaking. The Departments also note that individuals in expedited removal proceedings, including those determined to have a credible fear who are then paroled from custody, remain ineligible to apply for employment authorization on the basis of this exercise of parole. 8 CFR 235.3(b)(2)(iii), (b)(4)(ii). The NPRM did not propose to revise any regulations governing employment authorization eligibility, and the final rule does not make any such changes either.

*vi. Allegations of Discrimination on Race, Ethnicity, or Nationality Grounds*

*Comment:* Commenters raised concerns that the proposed rule would have a discriminatory impact based on nationality and effectively deny protection to migrants from certain countries. For example, commenters alleged that the proposed rule would have a disproportionately negative impact on noncitizens from countries in Africa, the Caribbean, Central America, and Latin America who do not currently fall under any large-scale parole initiatives and are more likely to seek asylum via arrival at the SWB, with some commenters describing the rule as a de facto ban for these populations. Commenters also stated that noncitizens from China specifically, and Asia more generally, would be disproportionately impacted by the rule as a result of lasting effects from reduced refugee admissions under the prior Administration, which, commenters said, increased the number of individuals from these countries seeking entry to the United States at the SWB. Likewise, commenters noted that noncitizens from Afghanistan would be disproportionately impacted by the rule due to potential danger in third countries.

Further, commenters noted that the Administration has created special immigration programs for citizens of certain countries—including Cuba, Haiti, Nicaragua, Ukraine, and Venezuela—in response to various political and humanitarian conditions in those countries, but has not done so for citizens of certain other countries. Commenters questioned why citizens from these countries are offered special programs to enter the United States while citizens from other countries do not have the same opportunities, which

commenters claimed was discriminatory and raised equal protection concerns.

Commenters also raised equal protection concerns because noncitizens subject to the rule's rebuttable presumption would be treated differently from those not subject to the rule based on the date, location, and manner of their entry into the United States. As a result, commenters argued that the rule would have a disparate impact on asylum applicants from less affluent countries, who do not have easy access to air travel or nonimmigrant visas.

Additionally, commenters asserted that the rule discriminates based on race and ethnicity and would have a disproportionate impact on persons of certain races and ethnicities for equal protection purposes. Commenters pointed to the Government's response to Ukrainian refugees as evidence that the United States is capable of accepting asylum seekers and refugees and stated that the difference in treatment between Ukraine and other countries was racially motivated.

Lastly, commenters suggested that it was facially discriminatory to require migrants from countries other than Mexico to first apply for asylum in transit countries, as it would result in their quick removal and force them to wait for a number of years before they could reapply for asylum in the United States.

*Response:* The rule does not classify noncitizens based on race, ethnicity, nationality, or any other protected trait. Nor, as elaborated below, are the Departments issuing the rule with discriminatory intent or animus. As the Departments explained in the NPRM, the rule is intended to address an anticipated increase in migrants arriving at the SWB following the lifting of the Title 42 public health Order and the resultant strain the anticipated surge would put on DHS and DOJ resources. *See* 88 FR at 11728. As such, the rule's scope and applicability are intended to address this anticipated migration surge. *See generally id.*

Additionally, although the rule imposes a rebuttable presumption of ineligibility if noncitizens seek to enter the United States at the SWB outside of an established lawful pathway and do not seek protection in a third country through which they travel en route to the United States, that presumption does not constitute a ''de facto ban'' on asylum for noncitizens of any race, ethnicity, or nationality, given the opportunities to avoid the presumption and, for those unable to do so, to establish an exception to or rebut it. Irrespective of race, ethnicity, or

nationality, noncitizens will not be subject to the presumption if they apply for and are denied asylum or other protection in a third country they transit while en route to the United States, but no noncitizen is required to do so. *See* 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). Likewise, regardless of race, ethnicity, or nationality, noncitizens will not be subject to the presumption if they schedule an appointment to present at a POE using the CBP One app. *See* 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). In addition, irrespective of race, ethnicity, or nationality, noncitizens who are subject to the rule's presumption will have the opportunity to rebut it in certain circumstances, including if at the time of their entry they or a family member with whom they traveled was experiencing an acute medical emergency, an imminent and extreme threat to life or safety, a severe form of trafficking, or another exceptionally compelling circumstance. 8 CFR 208.33(a)(3), 1208.33(a)(3). Further, noncitizens of every race, ethnicity, and nationality may apply for other relevant immigration processes that are applicable to them. The rule's approach balances the needs to address current and expected circumstances at the SWB, to avoid unduly negative consequences for noncitizens, to avoid unduly negative consequences for the U.S. immigration system, and to provide ways for individuals to seek protection in the United States and other countries in the region. 88 FR at 11730.

The Departments disagree that the rule violates the Equal Protection Clause [99] to the extent that the rule applies to noncitizens who arrive in the United States at a particular location, by a particular method, or after a particular date. Noncitizens who utilize a lawful pathway, meet an exception to the rule's presumption, or rebut the presumption will not be subject to the rule's condition on eligibility, irrespective of their country of origin or the method by which they arrive. The ability to afford a plane ticket or qualify for a visa is not a requirement to meet an exception to or rebut the presumption of ineligibility

under the rule. And with respect to concerns about dates of entry, the Departments note that Federal immigration laws, including regulations that impose conditions on asylum, routinely apply to migrants who arrive or file their application for relief after, but not before, a particular effective date. *See, e.g.,* INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B); 8 CFR 208.4(a) (imposing filing deadline on asylum applications filed after April 1, 1997, and tying that deadline to the applicant's date of arrival in the United States); 8 CFR 208.13(b)(3), 1208.13(b)(3) (2020) (imposing conditions related to internal relocation, applied per 8 CFR 208.1(a) to applications filed after the regulatory effective date of April 1, 1997).[100]

Further, as detailed in the NPRM, the United States previously has, and is still, committed to taking significant steps to expand pathways and processes for migrants to enter the country in a safe and lawful way. 88 FR at 11718–20. In addition to creating parole processes for citizens of certain countries, the United States has announced "significant increases to H–2 temporary worker visas and refugee processing in the Western Hemisphere" and worked closely with other countries in the region "to prioritize and implement a strategy that advances safe, orderly, legal, and humane migration, including access to international protection for those in need, throughout the Western Hemisphere." *Id.* at 11718, 11720. Moreover, the Departments remain committed to continuing to work with foreign partners on expanding their legal options for migrants and expanding the Departments' own mechanisms for processing migrants who lawfully arrive in the United States. *Id.* at 11720, 11722, 11729.

As to certain commenters' concerns that the rule discriminates among noncitizens based on whether their country of nationality has a parole process, the Departments did not promulgate the rule, or design its applicability and scope, with a discriminatory purpose or intent. Instead, the rule is designed to "encourage migrants to avail themselves of lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in

countries through which they travel, thereby reducing reliance on human smuggling networks that exploit migrants for financial gain." *Id.* at 11704. As elaborated on later in this preamble, lawful pathways are available to noncitizens from all countries, and country-specific processes are available without regard to race or ethnicity. *See, e.g., id.* at 11704, 11706 (listing and explaining processes and programs). Thus, the existence of special processes and programs for qualifying noncitizens from certain countries does not demonstrate that the rule was promulgated "for a discriminatory purpose or intent," as required to show a violation of the Equal Protection Clause. *United States* v. *Barcenas-Rumualdo,* 53 F.4th 859, 864 (5th Cir. 2022) (citing *Village of Arlington Heights* v. *Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265–66 (1977)). Moreover, Congress regularly makes laws that distinguish among individuals on the basis of nationality; indeed, the "whole of Title 8 of the United States Code, regulating aliens and nationality, is founded on" such distinctions. *Mathews* v. *Diaz,* 426 U.S. 67, 78 n.12, 80 (1976). Yet, "such disparate treatment" is not by itself "'invidious.'" *Id.* at 80.

vii. Other Underserved or Vulnerable Populations

a. Women, Domestic Violence Survivors, and LGBT Individuals

*Comment:* Commenters raised concerns that the rule would have a disproportionate impact on certain particularly vulnerable populations, such as women, including domestic violence and sexual assault survivors and younger, pregnant, and indigenous women, as well as the LGBT community, and those noncitizens who are disabled, elderly, or HIV positive, among others. Commenters stated that these populations would face discrimination, violence, extortion, and persecution in transit countries. Commenters also asserted that applying for a parole process and waiting for approval in one's home country may not be a viable option for such groups who need to leave a dangerous situation immediately. As a result, commenters stated that such groups should be exempted from the rule.

Commenters asserted, for example, that women and girls would be at high risk for sexual and gender-based violence in transit countries or if forced to wait in Mexico for their scheduled SWB POE appointments. Similarly, commenters raised concerns that the LGBT community would face persecution, violence, and inadequate

---

[99] Although the Equal Protection Clause of the Fourteenth Amendment does not apply to the United States Government, the Supreme Court in *Bolling* v. *Sharpe,* 347 U.S. 497, 499 (1954), held that while "'equal protection of the laws' is a more explicit safeguard of prohibited unfairness than 'due process of law,' . . . discrimination may be so unjustifiable as to be violative of due process." The Court concluded that "[i]n view of [its] decision that the Constitution prohibits the states from maintaining racially segregated public schools, it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government." *Id.* at 500.

[100] This provision was amended by a prior rulemaking, Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 80274, 80281 (Dec. 11, 2020), which was preliminarily enjoined and its effectiveness stayed before it became effective. *See Pangea II,* 512 F. Supp. 3d at 969–70 (preliminarily enjoining the rule). The district court's order remains in effect, and thus the 2020 version of this provision—the version immediately preceding the enjoined amendment—is currently effective.

access to medical care, among other harms, in transit countries, particularly if required to wait to schedule an SWB POE appointment through the CBP One app or apply for asylum in those countries. Commenters also noted that it is unclear if claims related to persecution based on sexual orientation and gender identity would be recognized in many common transit countries. Additionally, commenters stated that the rule, particularly the family unity provision, would exclude LGBT families, as legal protections such as marriage or LGBT-inclusive family protections are unavailable or inaccessible to LGBT individuals and families in many countries.

Further, commenters noted that many of these groups, including domestic violence survivors, torture survivors, and those with PTSD, may, as a result of psychological trauma, have difficulty recounting their claims during credible fear screenings—a difficulty that commenters said would be exacerbated if members of such groups must also present evidence about the rebuttable presumption of asylum ineligibility. As a result, commenters stated that traumatized noncitizens would not have sufficient time to gather their thoughts or collect relevant evidence. Moreover, commenters stated that recounting such incidents may risk retraumatizing such individuals. Similarly, commenters asserted that such groups are often reluctant to speak about what happened to them and may not express their fear of return to someone in a third country who could inform them of their right to apply for asylum.

*Response:* The Departments recognize that certain populations may be particularly vulnerable during transit to the United States. Accordingly, the purpose of the rule is to encourage migrants, including those who may be seeking asylum, to pursue safe, orderly, and lawful pathways to the United States rather than attempt irregular migration journeys, which often subject migrants to dangerous human smuggling networks. *See, e.g.,* 88 FR at 11713–14 (noting that women face particular vulnerabilities along certain portions of the irregular migration route to the SWB). The rule details multiple potential pathways and processes available to many migrants, including those who seek protection, that do not involve a dangerous journey to the United States. *See id.* at 11718–23. Notably, amongst those options, the rule does not require noncitizens to apply for asylum in third countries where they may also face persecution or other harm. Moreover, applying for asylum in a

third country is only one of multiple options migrants may pursue. For a more in-depth examination of third-country safety for migrants, please see the further discussion of specific third countries later in this preamble in Section IV.E.3.iv ("Third Countries"). *See also* 88 FR at 11720–23 (NPRM discussing "Increased Access to Protection and Other Pathways in the Region"). Additionally, the Departments note that the rule provides that its presumption of asylum ineligibility can be rebutted by noncitizens, including those with particular vulnerabilities, who do not utilize a lawful pathway but who face imminent and extreme threats to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder, or who were victims of a severe form of trafficking in persons. *See* 8 CFR 208.33(a)(3)(i)(B) and (C), 1208.33(a)(3)(i)(B) and (C).

The Departments also recognize that migrants' protection claims may be premised on past traumatic events in their home countries, which can be difficult to recount. However, the rule does not change the credible fear process that Congress has instituted, which involves detailing these events to a DHS officer so that the officer can make a credible fear determination. *See generally* INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); 8 CFR 208.30(d) and (e). The rule merely adds a condition on asylum eligibility in the form of a rebuttable presumption. During the credible fear screening, noncitizens may demonstrate why they believe that the presumption is inapplicable or an exception or rebuttal ground exists. The rule does not impose an infeasible requirement for noncitizens with meritorious claims to show that the presumption does not apply, or that they qualify for an exception or rebuttal to the presumption, during the credible fear screening process. *See* 8 CFR 208.30(d)(4). In addition, AOs and IJs have conducted credible fear assessments for many years and are well-trained in accounting for any potential trauma that may be relevant.

b. Unrepresented Individuals

*Comment:* Commenters raised concerns that unrepresented noncitizens would not understand the rule's requirements, particularly the need to take affirmative steps outside of the United States, such as through applying for protection in a third country or scheduling an SWB POE appointment through the CBP One app. Commenters also expressed that the proposed rule did not explain how information about the rule's requirements would be disseminated. Similarly, commenters

stated that unrepresented noncitizens may have received little or no information during the screening process and may not understand their rights during the process or the consequences of failing to assert them. Commenters also asserted that unrepresented individuals may not understand the burdens of proof in the rule and may be unable to present a legal argument sufficient to overcome its presumption of ineligibility. Additionally, commenters were concerned that the rule would dramatically increase the likelihood of denials for relief for unrepresented noncitizens who are subject to the asylum ineligibility presumption and stated that individuals with meritorious claims are no less deserving of asylum because they do not have counsel. Further, commenters pointed to various statutory provisions that they claimed showed a recognition by Congress that unrepresented noncitizens need assistance to present their claims. As a result, commenters suggested that unrepresented noncitizens should be exempted from the rule or be provided more resources to navigate the immigration system.

*Response:* The Departments recognize that unrepresented noncitizens can have additional difficulties navigating the U.S. immigration system, as compared to those with counsel. This is to be expected with respect to any unrepresented individuals in a legal setting. As a general matter, the Departments strongly support efforts for noncitizens to obtain or confer with counsel in immigration proceedings.[101]

However, for those noncitizens who do not retain counsel, the Departments do not believe that the rule presents an overly complicated process for migrants seeking protection, including asylum. The rule does not change the right to confer with a person or persons of the noncitizen's choosing in the existing expedited removal and credible fear screening processes. *See* 8 CFR 208.30(d)(4). Rather, the rule simply adds a determination about the asylum ineligibility presumption to the credible fear screening. As such, the Departments decline to create a wholesale exception from the rule for unrepresented noncitizens, which would significantly reduce the incentives for using the lawful pathways described in the rule, as well as disincentivize obtaining counsel as needed.

---

[101] *See, e.g.,* EOIR Director's Memorandum ("DM") 22–01, *Encouraging and Facilitating Pro Bono Legal Services* (Nov. 5, 2021), *https://www.justice.gov/eoir/book/file/1446651/download.*

**31352**    **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

The rule is intended to provide clear options for migrants, including asylum seekers, to follow, such as applying for asylum in a third country or presenting at an SWB POE at a pre-scheduled time and place. *See generally* 8 CFR 208.33(a)(2), 1208.33(a)(2). Noncitizens may also be able to pursue other pathways to the United States that would not trigger the rule's presumption, such as an employment-based visa or refugee admission through the United States Refugee Admissions Program ("USRAP"). 88 FR at 11719 (describing expansions of labor pathways and increases in USRAP processing). If unrepresented noncitizens choose to forgo such options and instead unlawfully enter the United States, they will be subject to the rule's rebuttable presumption of asylum ineligibility, with an opportunity to establish an exception to or rebut the presumption, including for exceptionally compelling circumstances. *See* 8 CFR 208.33(a)(3), 1208.33(a)(3). For instance, such noncitizens who present at a POE without a pre-scheduled appointment may be excepted from the presumption if they can demonstrate that they were unable to access or use the DHS scheduling system due to ongoing and serious obstacles, such as a language barrier, illiteracy, or a significant technical failure. *See* 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B).

The Departments believe these processes will be navigable for unrepresented noncitizens based on the significant usage and success of other recent processes for Cuban, Haitian, Nicaraguan, Ukrainian, and Venezuelan nationals. *See, e.g.,* 88 FR at 11706, 11711–12 (explaining, for example, that the Venezuela process has had a "profound impact" and that, in one measured period, there was an over 95 percent decrease in SWB unlawful encounters with Venezuelan migrants). These statistics, along with the success of the U4U and CNHV parole processes, show that noncitizens outside the United States are broadly aware of information about changes to U.S. immigration processes and that noncitizens alter migration behaviors accordingly, regardless of their representation status. As for commenters' desire for additional information about how the rule's requirements will be communicated, the Departments note that they have numerous, non-regulatory tools at their disposal that they may use to disseminate information to the public, as appropriate, including press

releases,[102] policy memoranda, web-based tools,[103] and other statements in public fora, among others. The Departments further describe their efforts to communicate the rule's requirements to the public in Section IV.B.5.iv of this preamble.

c. Climate Migration

*Comment:* Commenters noted that global migration is increasingly driven in part by the effects of climate change and that governments of many migrants' home countries are unable to stop or redress such effects. As such, commenters expressed concerns that the proposed rule would unlawfully deny noncitizens from countries disproportionately affected by climate change the right to be meaningfully heard on their asylum claims. Commenters also asserted that ecological disasters resulting from climate change, such as famine and flooding, would prevent noncitizens from countries experiencing such disasters from being able to pursue a lawful pathway so as not to be subject to the rule's rebuttable presumption. As a result, commenters recommended expanding asylum eligibility to account for displacement caused by climate change.

*Response:* Comments related to climate change are generally outside the scope of this rulemaking, which focuses on incentivizing migrants to use lawful pathways to pursue their claims. To the extent that commenters raised concerns about the effects of climate change—such as a severe environmental disaster—creating a necessity for noncitizens to enter the United States outside of the lawful pathways described in the rule, the Departments note that the rule includes an exception to its asylum ineligibility presumption for "exceptionally compelling circumstances." *See* 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). Evidence of exceptionally compelling circumstances will be considered on a case-by-case basis.[104]

To the extent that commenters argued that the rule's application in the context of the alleged exigencies of climate change migration would violate the due process rights of noncitizens, the Supreme Court has held that the rights of noncitizens applying for admission at the U.S. border are limited to "only those rights regarding admission that Congress has provided by statute." *DHS* v. *Thuraissigiam,* 140 S. Ct. 1959, 1983 (2020).

d. Indigenous People and People of Color

*Comment:* Commenters raised concerns that the rule would have a particularly detrimental impact on members of indigenous communities and people of color. As a result, commenters recommended exempting these groups from the rule and for the Departments to articulate actions taken to mitigate any disparate impacts on such groups.

Commenters stated that such populations would face discrimination, racism, persecution, prolonged detention, medical neglect, homelessness, erasure of indigenous identity, and other harms in transit countries. Commenters also believed that these groups would face difficulty applying for asylum or related protection in a third country, due to discrimination and insufficiently robust asylum systems, among other reasons. Additionally, commenters asserted that persons from predominantly Black countries had higher rates of visa denials, which limit their lawful pathways when compared to other groups. In support of these contentions, commenters stated that immigration court asylum denial rates increased for these groups while the TCT Bar Final Rule was in effect.

Further, commenters maintained that the proposed rule would disproportionately impact indigenous migrants and people of color because such groups often lack the means or ability to enter the United States other than by land through the SWB and, therefore, would be more likely to be subject to the rule's rebuttable presumption of ineligibility. Relatedly,

---

[102] *See* EOIR, *Communications and Legislative Affairs Division, https://www.justice.gov/eoir/ communications-and-legislative-affairs-division* (last visited Apr. 25, 2023) ("The Communications and Legislative Affairs Division (CLAD) serves as the Executive Office for Immigration Review's liaison with Congress, the news media, and other interested parties by communicating accurate and timely information about the agency's activities and programs.").

[103] *See, e.g.,* EOIR, *Immigration Court Online Resource, https://icor.eoir.justice.gov/en/* (last visited Apr. 25, 2023) (providing information about immigration processes in Chinese, Haitian Creole, Portuguese, Punjabi, and Spanish).

[104] The Departments note that, to the extent commenters have substantive comments related to the interaction of climate change and immigration

or asylum law, such as how adjudicators should consider the effects of climate change in making asylum determinations, commenters may raise those concerns as relevant in response to future potential Departmental rulemakings that address other substantive asylum provisions. *See, e.g.,* Introduction to the Unified Agenda of Federal Regulatory and Deregulatory Actions—Fall 2022, 88 FR 10966, 11054, 11088–89 (Feb. 22, 2023) (including a future rulemaking addressing particular social groups and related definitions and interpretations for asylum and withholding of removal).

commenters maintained that these populations have disproportionately low access to the technology commenters stated is mandated by the rule, thereby precluding such groups from taking advantage of the available lawful pathways. Similarly, commenters raised a number of concerns with the CBP One app and its use by indigenous migrants and people of color, including language barriers and difficulties experienced by those with darker skin tones in taking valid pictures.

*Response:* As previously stated, the rule includes various exceptions to the rebuttable presumption—including for instances where noncitizens have been denied asylum or other protection in a third country or show, by a preponderance of the evidence, that it was not possible to access or use the CBP One app—and the rule allows noncitizens to rebut the presumption where they face certain safety issues. *See* 8 CFR 208.33(a)(2) and (3), 1208.33(a)(2) and (3). For additional material addressing commenter concerns about the CBP One app and indigenous migrants and people of color, please see Section IV.E.3.ii.a of this preamble.

Further, if any noncitizens, including members of indigenous communities and people of color, do not believe that they will be able to meaningfully access protection in a third country, then those noncitizens may be excepted from the presumption of ineligibility by availing themselves of other lawful pathways to enter the United States, such as by pre-scheduling an appointment to present themselves at a POE, or by obtaining appropriate authorization to travel to the United States to seek parole pursuant to a DHS-approved parole process. *See* 8 CFR 208.33(a)(2)(ii), 1208.33(a)(2)(ii). Such noncitizens may also be able to pursue other pathways to entering the United States that would not trigger the rule's application, such as an employment-based visa or refugee admission through USRAP. 88 FR at 11719 (describing expansions of labor pathways and increases in USRAP processing). Accordingly, the Departments believe that the rule provides sufficient flexibility to account for issues identified by commenters as related to indigenous communities and people of color.

5. Due Process and Procedural Concerns

i. General Due Process and Procedural Concerns

*Comment:* Commenters voiced general concerns that the rule violates due process and is thus unconstitutional or arbitrary. One commenter argued that

due process standards for asylum cases should be consistent with criminal procedure in the United States. At least one commenter said that the proposed rule would violate due process in that it would separate families, restrict access to asylum, and prohibit the granting of asylum to those who travel by land through a safe third country. Specifically, one commenter argued that for family members whose asylum cases are connected, separation obstructs family members' opportunities to present necessary corroborating witness testimony or access critical evidence in presenting their claims for relief, which may violate their constitutional and statutory rights to present evidence and can result in inconsistent case timelines and outcomes that permanently sever family relationships. Another commenter said that the rule would make it easier for the United States Government to simply deny entry to asylum seekers and deport migrants without due process. Other commenters stated that no asylum seekers should be prevented from presenting their case to a judge. Further, commenters said that the rule would violate due process by requiring asylum seekers to affirmatively request IJ review of negative credible fear findings and eliminating USCIS reconsideration of such findings. Commenters also stated that due process concerns would be magnified because of the plan to conduct credible fear interviews within days or hours of an asylum seeker's arrival in custody in what commenters characterized as notoriously difficult conditions, such as where they lack food, water, showers, sleep, and access to counsel. Another commenter echoed these concerns regarding conditions for individuals in CBP custody and stated that poor conditions were not conducive to asylum seekers being able to clearly articulate their claims. Commenters asserted that these obstacles are so high as to render success unachievable for most noncitizens, regardless of the merits of their claims. Finally, one commenter stated that the rule would raise the standard from "credible" to "reasonable" fear and would thereby give rise to a procedural due process violation, as it would alter the intended purpose of the screening interview.

*Response:* The Departments disagree that the rule would violate the Due Process Clause of the Fifth Amendment or impermissibly restrict access to asylum. With respect to application of the rule in the expedited removal process, the Departments note that the rule does not have any impact on where noncitizens may be detained pending

credible fear interviews. Additionally, noncitizens who are encountered in close vicinity to and immediately after crossing the border and are placed in expedited removal proceedings, including those in the credible fear screening process, have "only those rights regarding admission that Congress has provided by statute." [105] *Thuraissigiam,* 140 S. Ct. at 1983; *see also Mendoza-Linares* v. *Garland,* 51 F.4th 1146, 1148 (9th Cir. 2022) (concluding that "an arriving immigrant caught at the border . . . 'has no constitutional rights regarding his application' for asylum" (quoting *Thuraissigiam,* 140 S. Ct. at 1982)). Regarding arguments by commenters that the due process standards that apply in criminal proceedings should also apply in the context of asylum and credible fear interviews, the Departments first note that Congress has created, by statute, a process applicable to individuals in expedited removal that is significantly different from the process that applies in criminal cases. The Departments decline to use this rule to change the due process rights of noncitizens, and the rule ensures that noncitizens receive a fair process consistent with the law.

As to the allegation that the rule raises the standard in expedited removal proceedings from "credible" fear to "reasonable" fear, the Departments note that the rule does not change the standard except to the extent that a noncitizen cannot show a significant possibility of establishing eligibility for asylum due to operation of the rule's condition on asylum eligibility. In that circumstance, the AO or IJ will determine whether the noncitizen has a reasonable fear of persecution or torture in the country or countries of removal, as has long been the process for other

---

[105] Courts also have held that noncitizens do not have an independently cognizable substantive due process interest in the receipt of asylum because asylum is a discretionary form of relief. *See, e.g., Jin* v. *Mukasey,* 538 F.3d 143, 157 (2d Cir. 2008) (holding that "an alien who has already filed one asylum application, been adjudicated removable and ordered deported, and who has nevertheless remained in the country illegally for several years, does not have a liberty or property interest in a discretionary grant of asylum"); *Ticoalu* v. *Gonzales,* 472 F.3d 8, 11 (1st Cir. 2006) ("Due process rights do not accrue to discretionary forms of relief, . . . and asylum is a discretionary form of relief."); *Mudric* v. *Att'y Gen.,* 469 F.3d 94, 99 (3d Cir. 2006) (holding that an eight-year delay in processing the petitioner's asylum application was not a constitutional violation because the petitioner "had no due process entitlement to the wholly discretionary benefits of which he and his mother were allegedly deprived"); *cf. Munoz* v. *Ashcroft,* 339 F.3d 950, 954 (9th Cir. 2003) ("Since discretionary relief is a privilege created by Congress, denial of such relief cannot violate a substantive interest protected by the Due Process clause.").

noncitizens who are screened for eligibility for statutory withholding of removal and CAT protection and who are not eligible for asylum, as discussed in more detail in Section IV.D.1.iii of this preamble.

Moreover, although the rule changes some procedures, as discussed throughout the rule, it leaves much of the process unaltered. Individuals in the credible fear process maintain the right to consult with an attorney or other person or persons of their choosing prior to their interview, and such persons may be present for the interview itself. 8 CFR 208.30(d)(4). Asylum seekers also may present evidence relevant to their claim during the interview. *Id.* Additionally, USCIS provides interpreter services to noncitizens who are unable to proceed effectively in English at the agency's expense. 8 CFR 208.30(d)(5). And noncitizens may request review of a negative fear determination before an IJ. *Compare* 8 CFR 208.30(g)(1) (providing the standard process for requesting IJ review in credible fear proceedings), *with* 8 CFR 208.33(b)(2)(iii) through (v) (explaining the process for requesting IJ review for those subject to and unable to rebut the rule's presumption). Although the rule amends the standard process so that noncitizens must affirmatively request such review when asked, rather than the review being granted upon a failure to respond, IJ review remains available in all cases with a negative credible fear determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 1208.30(g)(2). These procedural safeguards are therefore not undermined by the rule, which is fully consistent with the Departments' legal authority and obligations.

Furthermore, the rule does not violate any procedural due process rights noncitizens may have in section 240 removal proceedings. The rule's condition on eligibility will be litigated in those proceedings before an IJ with all the attendant procedural rights that apply in section 240 removal proceedings. In addition, the rule provides several procedural protections to ensure that asylum applicants receive a full and fair hearing before an IJ and that the condition on eligibility applies only to noncitizens properly within the scope of 8 CFR 208.33(a) and 1208.33(a). If an AO finds a noncitizen is subject to the rule's condition on eligibility, the noncitizen may request review of that determination, and an IJ will evaluate de novo whether the noncitizen is subject to the presumption and, if so, whether the noncitizen has established any exceptions to or rebutted the

presumption. 8 CFR 208.33(b)(2)(iii) through (v), 1208.33(b). Furthermore, even where an IJ denies asylum because the presumption applies and has not been rebutted and no exception applies, if the noncitizen has demonstrated a reasonable possibility of persecution or torture in the country or countries of removal, they will have an opportunity to apply for statutory withholding of removal, protection under the CAT regulations, or any other form of relief or protection for which the noncitizen is eligible in section 240 removal proceedings. 8 CFR 208.33(b)(2)(ii) and (v)(B), 1208.33(b)(4). These standards help to ensure—in contrast to commenters' concerns—that the outcome of the process delineated in the rule is not predetermined and that noncitizens potentially subject to the condition on eligibility receive a full and fair hearing that satisfies any due process rights they may have.

To the extent commenters raised due process concerns related to arguments that the rule would result in separation of families, these arguments are addressed above in Section IV.B.4.ii of this preamble. As elaborated there, for example, the rule includes provisions designed to prevent the separation of families. Moreover, to the extent that commenters argued that the rule would separate families and thereby raise due process concerns by preventing individuals from presenting evidence, the Departments note that the rule does not change the provision on the treatment of family units with respect to credible fear screenings, found at 8 CFR 208.30(c), which provides that when family units are subject to a credible fear screening, USCIS will find that the entire family passes the screening if one family member establishes a credible fear. Further, the rule contains provisions to promote family unity both by making exceptions and providing rebuttal grounds applicable to family units traveling together, and by providing a family unity provision for those in removal proceedings. *See* 8 CFR 208.33(a)(2)(ii) and (3)(i), 1208.33(c).

To the extent commenters argued that these concerns implicate the constitutional rights of specific groups of noncitizens, the rule does not deprive any group of the rights that Congress provided by statute, and the rule is one of equal application that does not bar any particular classes of noncitizens from seeking asylum or other protection due to the nature of the harm the noncitizen has suffered or their race, religion, nationality, political opinion, or membership in a particular social group. *See* 8 CFR 208.33(a)(1) through

(3), 1208.33(a)(1) through (3) (defining scope of rule's application and creating condition on eligibility and a rebuttable presumption rather than a bar). Additionally, to the extent that commenters claimed there would be due process implications because of the language and certain technical limitations of the CBP One app, the same commenters acknowledged that due process rights are limited to individuals located on U.S. soil. Because users of the CBP One app will, by definition, be located outside of the United States, the commenters' CBP-One-app-related due process concerns are misplaced. Moreover, these commenters provided no specific citations to show that the CBP One app's limited set of foreign languages or technical limitations violate any other Federal law. For instance, the Departments note that Executive Order 13166, Improving Access to Services for Persons with Limited English Proficiency, 65 FR 50121 (Aug. 11, 2000), "does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies, its officers or employees, or any person." *Id.* at 50121–22.

In addition, notwithstanding the above, the rule contains multiple means for particularly vulnerable noncitizens to potentially overcome the presumption against eligibility for asylum where applicable, depending on the individual's circumstances. To the extent that commenters are concerned about the ability of noncitizens who have a language barrier, disability, mental incompetence, or past trauma to pre-schedule a time and location to appear at a POE, these noncitizens may be able to establish an exception to the presumption if they present at a POE and establish that "it was not possible to access or use the DHS scheduling system due to a language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle." *See* 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). And among the "exceptionally compelling circumstances" that may rebut the presumption against eligibility, the rule includes acute medical emergencies and other situations where the noncitizen faces an imminent and extreme threat to life or safety at the time of entry. *See* 8 CFR 208.33(a)(3)(i)(A) and (B), 1208.33(a)(3)(i)(A) and (B). Furthermore, the Departments note that even if a noncitizen is found ineligible for asylum, if they fear persecution on account of a protected ground, or torture in another country that has been

designated as a country of removal, they may seek statutory withholding of removal or CAT protection to avoid being returned to that country.

Finally, to the extent that commenters expressed concerns about how the fact of noncitizens' detention, the conditions in DHS facilities, and the timing of credible fear screenings allegedly impact such screenings and the ability of noncitizens to meet their burden to show a credible fear, those concerns are predominantly addressed below in Section IV.D.1.iii of this preamble, where the Departments discuss the nature of the evidence that may be available to the AO during credible fear interviews. As to commenters' concerns about the timing of the credible fear process and where noncitizens are detained pending credible fear interviews, these concerns are misplaced, as the rule does not have any impact on the steps in the credible fear process or where noncitizens may be detained pending credible fear interviews. To the extent that commenters have concerns about detention and conditions in CBP custody, such concerns are beyond the scope of this rule, as discussed further in Section IV.B.5.v of this preamble.

*Comment:* Commenters expressed a range of other concerns that the rule does not establish sufficient procedural protections for noncitizens subject to the presumption against eligibility for asylum. Some commenters expressed concern that AOs are likely to make errors in assessing whether applicants are subject to the rule's condition on asylum eligibility. Commenters likewise asserted that credible fear interviews are quick screenings, during which individuals usually lack documentary evidence for their claims, and that migrants would not be able to present evidence of country conditions in connection with such interviews. Further, one commenter stated that expedited removal denies children the opportunity to make a claim for protection independent of their parent or legal guardian, and specifically raised concerns about CBP agents questioning children.

*Response:* The Departments acknowledge the commenters' concerns but disagree that there are insufficient procedural protections for individuals subject to the rule. All AOs are trained in non-adversarial interview techniques to elicit relevant and useful information. 8 CFR 208.1(b). A noncitizen's testimony and evidence available to the AO may be sufficient to establish an exception to or rebut the condition on asylum. AOs are trained to consult country conditions information. *Id.* All

credible fear determinations are reviewed by a Supervisory AO. 8 CFR 208.30(e)(8). Those who receive negative determinations may request review from an IJ. *See* 8 CFR 208.33(b)(2)(iii) through (v). If the IJ affirms a negative credible fear determination, USCIS may also reconsider the determination at its own discretion. *See* 8 CFR 208.33(b)(2)(v)(C). For those who are initially found subject to the rule's condition on asylum eligibility but who establish a reasonable possibility of persecution or torture upon removal, the IJ will make a de novo determination of whether the noncitizen is subject to the condition on asylum eligibility during removal proceedings. *See* 8 CFR 208.33(b)(2)(v).

The Departments disagree that the rule denies children the opportunity to make a claim for protection independent of their parent or legal guardian. As explained above, the rule does not change the provision on treatment of family units with respect to credible fear evaluations, found at 8 CFR 208.30(c). The rule further provides at 8 CFR 208.33(c)(2) and 1208.33(d)(2) that its ineligibility presumption does not apply to an asylum application filed by a noncitizen after the two-year period in 8 CFR 208.33(a)(1)(i) and 1208.33(a)(1)(i), if the noncitizen was under the age of 18 at the time of the entry referenced in 8 CFR 208.33(a)(1) and 1208.33(a)(1), respectively, and the noncitizen is applying as a principal applicant.

ii. Concerns Regarding Access to Counsel, Unrepresented Applicants, and the Ability or Time To Obtain Evidence and Prepare

*Comment:* Some commenters stated that the rule raises serious questions about access to counsel during the credible fear process. In addition to the general comments regarding due process described and addressed above, commenters also expressed specific concerns that the rule violates the Fifth Amendment's Due Process Clause because it allegedly deprives noncitizens of access to counsel or decreases their already limited access to counsel. For instance, some commenters expressed concern that individuals in CBP detention facilities lack meaningful access to counsel to prepare for their credible fear interviews because it takes time to find counsel and the rule will amplify the problems of a fast-tracked removal process, and because there is a lack of free or low-cost attorneys in border areas where credible fear interviews take place. Other commenters stated that individuals awaiting their CBP One app

appointments abroad lack meaningful access to counsel to prepare for their credible fear interviews. These commenters stated that attorneys located in the United States face obstacles to representing individuals outside the United States due to ethics concerns and liability insurance coverage, while asylum seekers awaiting appointments would be unable to meet with counsel in person prior to their appointments, allegedly leading to representation deficiencies and difficulty obtaining assistance in navigating the CBP One app. For example, citing data from the Human Trafficking Institute, one commenter wrote that 80 percent of migrants awaiting their asylum hearings in the United States can find representation, compared to 7.6 percent of migrants waiting in Mexico.

Other commenters characterized the rule's provisions as complicated and punitive, making access to counsel even more important and exacerbating the access-to-counsel issues commenters identified above. Commenters who are legal services providers said that the rule would increase the time and resources needed to provide adequate legal advice and representation to asylum seekers, leading to diversion of limited resources and increased pressure on staff. Some commenters recommended that the United States Government increase funding for representation of asylum seekers or provide migrants with legal counsel and release them swiftly rather than detain them, stating that it would assist with backlogs and protect due process rights.

Multiple commenters remarked that a person who could retain an attorney is far more likely to succeed in immigration court. Commenters said concerns relating to fast-tracked immigration proceedings, known as the "Dedicated Docket," would be amplified by the addition of a new evaluation of a rebuttable presumption against asylum eligibility. Commenters claimed that those individuals subject to the rebuttable presumption who pass the heightened "significant possibility" screening standard applied under the rule and are placed on the Dedicated Docket during the resulting section 240 removal proceeding would find it even more difficult to obtain counsel because of its accelerated timelines.

Finally, some commenters alleged that the United States Government currently restricts access to counsel for noncitizens in credible fear proceedings. Commenters similarly claimed that EOIR's Immigration Court Practice Manual ("ICPM") denies asylum seekers

the right to counsel in credible fear review hearings before IJs.

*Response:* The rule does not deprive noncitizens of access to counsel in violation of the Fifth Amendment's Due Process Clause. As explained above, the Supreme Court has held that the rights of individuals seeking asylum at the border are limited to "only those rights regarding admission that Congress has provided by statute." *Thuraissigiam,* 140 S. Ct. at 1983. And the INA provides only that a noncitizen "may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General," and the statute specifies that "[s]uch consultation shall be at no expense to the Government and shall not unreasonably delay the process." INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). Thus, due process and the INA do not guarantee that every noncitizen in expedited removal proceedings will have counsel, for example, if a noncitizen involved in such proceedings cannot find an attorney who is willing and able to provide representation. The rule does not bar noncitizens in expedited removal proceedings from exercising their statutory rights under the INA, and therefore cannot violate such noncitizens' rights to due process. *See Guerrier* v. *Garland,* 18 F.4th 304, 313 (9th Cir. 2021) (*Thuraissigiam* clarified that "the due process rights of noncitizens who have not 'effected an entry' into the [United States] are coextensive with the statutory rights Congress provides").

Nor does the rule deprive noncitizens of access to counsel in violation of the Fifth Amendment's Due Process Clause insofar as it allegedly creates additional matters for attorneys and noncitizens to discuss prior to a noncitizen's credible fear interview, including when the noncitizen is outside the United States. The statutory right to consult, described above, does not attach until a noncitizen becomes eligible for a credible fear interview. *See* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv) ("An alien who is eligible for such interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General."). And the regulations that implement expedited removal elaborate that "[s]uch consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained[.]" 8 CFR 235.3(b)(4)(ii). "Read together, the text of these provisions provides noncitizens with a right to consultation

while they are detained pending expedited removal, but also plainly establish that the consultation right is subordinate to the expedition that this removal process is designed to facilitate, and that the scope of the right to consult is determined by the facility in which these noncitizens are detained." *Las Americas Immigrant Advoc. Ctr.* v. *Wolf,* 507 F. Supp. 3d 1, 25 (D.D.C. 2020) (Jackson, J.). Thus, the INA does not guarantee, and the Constitution does not require, that noncitizens who have not entered the United States must have an opportunity to consult with any other individual concerning an anticipated asylum application.

The Departments decline to amend existing practices with respect to credible fear proceedings around a noncitizen's ability to obtain and consult with counsel, including with regard to the availability of counsel or time it takes to secure counsel in areas near the SWB. The Departments disagree with any implication by commenters that the Departments have control over where free or low-cost immigration attorneys choose to locate their practices within the United States. In any event, nothing in the rule alters a noncitizen's existing ability to consult with persons of their choosing prior to the credible fear interview, *see* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv), or prior to IJ review of a negative credible fear determination, *see* 8 CFR 1003.42(c). The Departments acknowledge commenters' concerns but do not believe that the rule makes it more challenging for detained noncitizens to access legal representation. To the extent that commenters seek improved access to counsel during the credible fear process in general, that issue lies outside the scope of this rulemaking. Commenters' concerns regarding the Dedicated Docket similarly fall beyond the scope of the rulemaking. As discussed later in Section IV.B.5.iv of this preamble, the Departments do not believe that the rule greatly adds to the complexity of U.S. asylum law or that noncitizens in the credible fear process will require the assistance of an attorney to establish an exception to or rebut the rule's presumption against asylum eligibility. During the credible fear process, AOs will elicit relevant testimony in a non-adversarial manner to determine whether the rebuttable presumption against asylum eligibility applies and, if so, whether the presumption is rebutted or any exception exists.[106] Therefore,

noncitizens will not need to be familiar with every aspect of the rule to overcome the presumption.

With regard to commenter claims that EOIR's ICPM restricts the right to counsel during credible fear review, the Departments first note that the contents of the ICPM are outside of the scope of this rulemaking. In any event, the ICPM is consistent with the INA and regulations, all of which make clear that noncitizens have the right to consult with a person or persons of their choosing prior to a credible fear interview and any subsequent review. *See* ICPM, Chapter 7.4(d)(4)(C) (Nov. 14, 2022); INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); 8 CFR 1003.42(c). Beyond such consultation, any ability of such persons to attend or participate in a credible fear proceeding is fully within the discretion of the IJ. *See* 8 CFR 1003.10(b) (describing IJs' discretion to take any action consistent with their authorities under the INA and regulations that is appropriate and necessary for the disposition of a case).

*Comment:* Commenters said that represented individuals receive relief more frequently than non-represented individuals, and expressed concern that many asylum seekers who lack counsel would not be able to pass their credible fear screenings. One commenter claimed, without specific evidence, that AOs are less thorough when adjudicating credible fear cases of unrepresented noncitizens. Commenters argued that unrepresented individuals may not receive meaningful notice about the CBP One app, asylum procedures, or the exceptions to the rule's condition on eligibility that may apply in their cases. One commenter wrote that the rule's preponderance of the evidence standard for rebutting the presumption against asylum eligibility would create another hurdle for asylum seekers who lack counsel.

*Response:* To the extent that commenters expressed concern that unrepresented individuals might face difficulty understanding the credible

---

[106] *See, e.g.,* USCIS, *RAIO Directorate—Officer Training: Interviewing: Eliciting Testimony* 12 (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/*

*document/foia/Interviewing_-_Eliciting_Testimony_LP_RAIO.pdf* [hereinafter USCIS, *Eliciting Testimony*] ("In cases requiring an interview, although the burden is on the applicant to establish eligibility, equally important is your obligation to elicit all pertinent information."); USCIS, *RAIO Directorate—Officer Training: Interviewing: Introduction to the Non-Adversarial Interview* 13 (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/Interviewing_-_Intro_to_the_NonAdversarial_Interview_LP_RAIO.pdf* [hereinafter USCIS, *Non-Adversarial Interview*] ("You control the direction, pace, and tone of the interview and have a duty to elicit all relevant testimony."); Comment Submitted by National Citizenship and Immigration Services Council 119 at 16 (Mar. 27, 2023), *https://www.regulations.gov/comment/USCIS-2022-0016-12267.*

fear process, the INA provides that "[t]he Attorney General shall provide information concerning the asylum interview . . . to aliens who may be eligible." INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); 8 CFR 235.3(b)(4)(i). The rule does not change that obligation. As for commenters' concerns that noncitizens may not receive adequate notice regarding the CBP One app or other aspects of the rule, "the general rules concerning adequacy of notice through publication in the **Federal Register** apply in the immigration context." *Williams* v. *Mukasey,* 531 F.3d 1040, 1042 (9th Cir. 2008) (holding that publication of CAT regulations in the **Federal Register** provided notice that due process required).

As discussed earlier and in Section IV.B.5.iv of this preamble, the rule does not affect noncitizens' current access to counsel during credible fear proceedings or significantly increase the complexity of U.S. asylum law, and noncitizens should not require the assistance of an attorney to establish an exception to or rebut the presumption against asylum eligibility. Prior to conducting a credible fear interview, an AO must verify that the noncitizen "has received in writing the relevant information regarding the fear determination process" and "has an understanding of" that process. 8 CFR 208.30(d)(2); *see also* USCIS, Form M–444, *Information About Credible Fear Interview* (May 31, 2022). AOs are trained to conduct interviews in a non-adversarial manner and elicit relevant testimony,[107] and they will ask relevant questions to determine whether the rebuttable presumption against asylum eligibility applies, so noncitizens need not be familiar with the rule to remain eligible for asylum. Regarding the standard of proof for rebutting the presumption against asylum eligibility during credible fear proceedings, as discussed later in Section IV.D.1.iii of this preamble, the overall standard remains the significant possibility standard, but that standard must be applied in conjunction with the standard of proof required for the ultimate determination on eligibility for asylum (*i.e.*, preponderance of the evidence that an exception to the presumption applies or that the presumption has been rebutted). Other concerns about rebutting the rule's presumption of ineligibility are addressed in Section IV.E.1 of this preamble.

iii. CBP Official, AO, and IJ Conduct and Training

a. CBP Official Conduct and Training

*Comment:* Some commenters expressed concerns about the actions of CBP officials, including with respect to the use of the CBP One app. Regarding the CBP One app generally, one commenter stated that migrants are often unable to seek asylum at a POE due to metering policies and that migrants have no other option to access safety than to cross the SWB without permission. Another commenter stated that the requirement to use the CBP One app would effectively cap the number of people who may seek asylum based on the number of appointments available. Commenters also stated that the CBP One app equates to another metering system imposed by CBP officials, including causing turnbacks of children, which Federal courts have found to be illegal. In particular, one commenter stated that, even with appointments, some families are not able to cross the border, or they receive appointments at a POE far from their current location, requiring them to travel long distances within Mexico. Various commenters alleged that requiring use of the CBP One app raises concerns that access to the system will be based not on wait time but on luck, technological skills, or resources to secure an appointment. Other commenters similarly stated that the CBP One app has very limited appointment slots and turns asylum access into a lottery. And at least one commenter expressed concern that the CBP One app does not ask if a migrant is seeking asylum in the United States, nor are migrants interviewed by CBP officials upon arrival to determine if they have any vulnerabilities that may show eligibility for asylum.

As for alleged misconduct by CBP officials, one commenter expressed concern that CBP officials at POEs have turned away many asylum seekers without cause, been affirmatively hostile to claims of protection, or only allowed a handful of individuals per day to present themselves for processing. The commenter also suggested that there would not be a meaningful opportunity under the rule for asylum seekers to present themselves and demonstrate that they were unable to use the CBP One app to request an appointment. Similarly, another commenter stated that the rule would allow CBP officers to turn away individuals without a smartphone.

Additionally, commenters alleged that CBP officials regularly fail to protect the rights of individuals in expedited removal proceedings, including through failing to ask questions related to fear claims, failing to refer individuals for credible fear interviews, and subjecting individuals to harassment, directly or indirectly.

Other commenters raised concerns that there are inadequate protections against rogue CBP officer behavior more generally, noting that individuals with appointments in February 2023 were rejected at POEs, including those with Title 42 exception appointments being rejected even though they had valid appointments. One commenter asserted that when families expressed concern about the Title 42 exception process, CBP officials threatened to call Mexican police and urged people to depart. Another commenter noted that CBP officers use abuse, threats and intimidation, coercion, and misrepresentations, make unfounded claims about capacity restrictions, use waitlists, and illegally deny access to the asylum process. Some commenters alleged that CBP officers harassed and physically and sexually abused noncitizens at POEs, stole their documents, and failed to record statements by noncitizens expressing a fear of return. Another commenter expressed concerns that Mexican officials, at the request of the United States Government, improperly intercepted individuals at its own southern border so that those individuals would not come to the United States.

*Response:* As an initial matter, the Departments note that migrants do not apply for asylum with CBP at a POE. At POEs, CBP is responsible for the inspection and processing of all applicants for admission, including individuals who may intend to seek asylum in the United States. 8 CFR 235.1(a) (concerning all applicants for admission at POEs), 235.3(b)(4) (concerning individuals processed for expedited removal and claiming fear of persecution or torture). CBP's ability to process undocumented noncitizens in a timely manner at land border POEs is dependent on CBP resources, including infrastructure and personnel; CBP is committed to continuing to increase its capacity to process undocumented noncitizens at SWB POEs.[108] The CBP

---

[107] *See* USCIS, *Non-Adversarial Interview;* USCIS, *Eliciting Testimony;* Comment Submitted by National Citizenship and Immigration Services Council 119 at 16 (Mar. 27, 2023), *https://www.regulations.gov/comment/USCIS-2022-0016-12267.*

[108] Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/*

Continued

**31358** **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

One app is one key way that CBP is streamlining and increasing its capacity to process undocumented noncitizens.[109] Noncitizens are able to schedule appointments through the CBP One app at one of eight POEs along the SWB, providing noncitizens with options to choose the POE that works best for them geographically. The app is not a method of seeking asylum in the United States, and CBP officers do not determine the validity of any claims for protection. Noncitizens are not required to make an appointment in the CBP One app to present at a POE, and CBP policy provides that in no instance will an individual be turned away from a POE. All noncitizens who arrive at a POE will be inspected for admission into the United States. *See* 8 CFR 235.1(a). That said, those noncitizens who arrive at a POE without a pre-scheduled appointment will be subject to the rule's presumption of asylum ineligibility unless they establish the applicability of an exception to or a ground for rebutting the presumption.

The Departments disagree that the CBP One app is a "metering system," and CBP and DHS have rescinded all previous metering policies. Following the termination of the Title 42 public health Order, CBP will process noncitizens without documents sufficient for admission who present at an SWB land POE in accordance with its November 2021 memorandum "Guidance for Management and Processing of Undocumented Noncitizens." Moreover, as noted, CBP remains committed to processing as many noncitizens at POEs as is operationally feasible.[110]

To the extent that commenters' reference to metering policies relates to any allegation of misconduct by CBP officers, and with respect to any other commenter concerns about such alleged misconduct, the Departments note that CBP takes allegations of employee misconduct very seriously. Under a uniform system, allegations of misconduct are documented and referred to the DHS Office of Inspector General ("OIG") for independent review and assessment.[111] Cases are either

retained by the DHS OIG for investigation or referred to CBP's Office of Professional Responsibility ("OPR") for further handling. Allegations of misconduct by a CBP employee or contractor can be sent to CBP OPR's Joint Intake Center via email at *JointIntake@cbp.dhs.gov* or via phone at 1–877–2INTAKE (246–8253) Option 5.[112] Such allegations can also be sent to the DHS OIG Hotline via OIG's website, *https://www.oig.dhs.gov/hotline,* or via phone at 1–800–323–8603. Upon completion of an investigation, CBP management reviews all evidence, the CBP Standards of Conduct, the CBP Table of Offenses and Penalties, and how the agency has handled similar misconduct in the past, in order to determine what, if any, disciplinary action is appropriate.[113]

Commenter concerns about the processing of individuals seeking exceptions to the Title 42 public health Order at POEs are misplaced. As an initial matter, the rule will take effect only once the Title 42 public health Order is lifted, at which time CBP will inspect and process all noncitizens who arrive at a POE under Title 8. Title 42 is a statutory scheme that operates separate from Title 8. Thus, concerns about the Title 42 exception process in and of itself are not relevant to this rulemaking. And while noncitizens seeking to enter a POE under Title 8 may experience some wait times, those wait times are not equivalent to rejections; CBP policy provides that in no instance will an individual be turned away or "rejected" from a POE.

*Comment:* One commenter stated that use of the CBP One app to schedule an appointment to present at a POE conflicts with the inspection requirement in 8 U.S.C. 1225(a)(3), requiring that all applicants for admission be inspected by CBP officers. The commenter specifically referred to the district court's order in *Al Otro Lado, Inc.* v. *McAleenan,* 394 F. Supp. 3d 1168 (S.D. Cal. 2019), holding that this provision applies to migrants who are approaching a POE but have not yet entered the United States. The commenter stated that, because the

number of appointments provided does not approach the demand, the CBP One app is functionally a system of metering. Another commenter also asserted that it was not clear whether noncitizens without an appointment who approach a POE would, in fact, be inspected and processed, or whether they would be turned away in violation of CBP's mandatory duty to inspect and process noncitizens at POEs.

*Response:* The Departments respectfully disagree that the use of the CBP One app to schedule an appointment to present at a POE conflicts with CBP's duties under 8 U.S.C. 1225(a)(3), unlawfully withholds access to the asylum process, or operates as a form of metering (though the Departments maintain that DHS's prior metering policies are lawful). The Departments acknowledge the district court's holding in *Al Otro Lado*—which the Government has appealed—but the use of CBP One app appointments as contemplated by this rule does not implicate that holding. CBP's policy is to inspect and process all arriving noncitizens at POEs, regardless of whether they have used the CBP One app. In other words, the use of the CBP One app is not a prerequisite to approach a POE, nor is it a prerequisite to be inspected and processed under 8 U.S.C. 1225(a)(3). Individuals without appointments will not be turned away. CBP is committed to increasing the number of noncitizens processed at POEs and to processing noncitizens in an expeditious manner.[114]

In addition, any noncitizen who is inspected and processed for expedited removal upon arrival at a POE and who expresses a fear of return, whether or not they use the CBP One app, will be referred to USCIS for a credible fear interview with an AO. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). The AO will determine whether the presumption applies or whether the individual can rebut or establish an exception to the presumption. CBP officers do not determine or evaluate the merits of any claim of fear, nor do they make determinations on whether the rule's presumption applies. *See id.* (providing that credible fear interviews are conducted by AOs).

---

*default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

[109] *See id.*

[110] *See id.*

[111] *See, e.g.,* DHS OIG, Hotline Poster, *https://www.oig.dhs.gov/sites/default/files/DHS_OIG_Hotline-optimized_without_fax.jpg* (last visited Apr. 17, 2023); CBP, DHS/CBP/PIA–044, *Privacy Impact Assessment for the Joint Integrity Case Management System (JICMS)* at 1–2 (July 18, 2017), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-cbp044-jicms-july2017.pdf;* CBP, CBP Pub. No. 1686–0322, *Report on Internal*

*Investigations and Employee Accountability—Fiscal Year 2021* at 11–12 (Mar. 2022), *https://www.cbp.gov/sites/default/files/assets/documents/2022-May/fy21-cbp-opr-internal-investigation-accountability_1.pdf.*

[112] CBP, *How to Make a Report, https://www.cbp.gov/about/care-and-custody/how-make-report* (last visited Apr. 17, 2023).

[113] *See* CBP, CBP Pub. No. 1686–0322, *Report on Internal Investigations and Employee Accountability Fiscal Year 2021* at 17 (2022), *https://www.cbp.gov/sites/default/files/assets/documents/2022-May/fy21-cbp-opr-internal-investigation-accountability_1.pdf.*

[114] *See* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

## b. AO Conduct and Training

*Comment:* Several commenters expressed concern that the rule would lead to erroneous asylum decisions made by AOs, given alleged deficiencies in AO conduct and training. Commenters asserted that the rule would lead to asylum decisions that are too swift. Multiple commenters also expressed concern that AOs have conducted inadequate credible fear screenings and made erroneous decisions in such screenings, resulting in errors in adjudicating asylum claims. For instance, citing an investigation by the DHS Office for Civil Rights and Civil Liberties, one commenter alleged that AOs have misapplied or failed to apply existing asylum law, ignored relevant portions of asylum seekers' testimony, failed to perform pattern and practice analysis and consider country conditions, failed to ask relevant follow-up questions and develop the record, and failed to take accurate notes. In addition, the same commenter said some AOs can be hostile and belligerent, and even the best trained and most effective AOs have limited time for credible fear interviews. Another commenter stated that AOs are ill-equipped to conduct the additional analysis required by the rule, given alleged deficiencies in the credible fear lesson plan, failure of AOs to apply current legal standards, failure to provide appropriate language interpretation, failure to interview vulnerable populations within agency guidelines, and interference with access to counsel.

Some commenters also stated that AOs are not medical experts and lack the required expertise to evaluate whether something is or is not an acute medical emergency. Another commenter stated that DHS should train all staff who interact with LGBT asylum seekers. Some commenters likewise stated that the rule should explicitly instruct AOs to affirmatively elicit information about whether a person could qualify for an exception to the rule or rebut its ineligibility presumption, such as details about any family or personal medical emergencies, threats of violence, difficulties using the CBP One app, and other matters that bear on the exceptions and grounds for rebuttal.

One commenter expressed concerns that noncitizens who are subject to the rule's rebuttable presumption of asylum ineligibility would be deprived of the right to be meaningfully heard on their claims because adjudicators applying the rule to favor overall deterrence of asylum seeking, such that

decisionmakers would allegedly err on the side of denying asylum or making negative credible fear determinations. This commenter also argued that the expedited removal system leads to a systemic, unjustified skepticism amongst adjudicators toward meritorious claims.

*Response:* The Departments acknowledge these commenter concerns but disagree that AOs lack the competence, expertise, or training to make determinations on whether the presumption of ineligibility for asylum applies or an exception or rebuttal ground has been established. AOs frequently assess physical and psychological harm when adjudicating asylum applications and are trained to do so in a sensitive manner.[115] AOs already evaluate harm resulting from the unavailability of necessary medical care or specific medications when assessing ''other serious harm'' under 8 CFR 208.13(b)(1)(iii)(B).[116] Additionally, all AOs receive specific training on adjudicating asylum claims of LGBT individuals.[117] As for commenters' requests that the rule explicitly instruct AOs to affirmatively elicit information about the presumption, such an instruction is unnecessary, as AOs conducting credible fear interviews are already required to specifically ask questions to elicit all relevant testimony in a non-adversarial manner.[118] This will necessarily include information related to whether the rule's presumption applies or an exception or rebuttal ground has been established, regardless of whether the noncitizen affirmatively raises these issues.

USCIS takes any allegations of AO misconduct seriously and is aware of the ongoing investigation by the DHS Office of Civil Rights and Civil Liberties cited by commenters. However, the Departments strongly disagree with any claims that AOs systematically exhibit an unjustified skepticism or

insensitivity toward asylum claims, that they routinely fail to follow law or procedure, or that they would do so when applying this rule. AOs are career government employees and are selected based on merit. They undergo special training on non-adversarial interview techniques, cross-cultural communication, interviewing children, and interviewing survivors of torture and other severe trauma.[119] While the Departments disagree with the commenters' premise, the Departments also note that government officials are entitled to the presumption of official regularity in the way they conduct their duties. *See United States* v. *Chem. Found., Inc.,* 272 U.S. 1, 14–15 (1926). Commenters failed to provide persuasive evidence of systematic bias or misapplication of the law or procedure by AOs.

## c. IJ Conduct and Training

*Comment:* Several commenters expressed concern with IJ conduct and their training *vis-à-vis* application of the rule's condition on asylum eligibility. One commenter expressed concerns that noncitizens who are subject to the rule's rebuttable presumption of asylum ineligibility would be deprived of the right to be meaningfully heard on their claims because adjudicators applying the presumption would understand the proposed rule to favor overall deterrence, such that IJs would allegedly err on the side of denial or negative credible fear findings. The commenter argued that the expedited removal system and prior hiring practices within EOIR lead to a systemic inclination toward unjustified skepticism among IJs with respect to meritorious claims.

Commenters also averred that IJs are not medical experts with the required expertise to evaluate medical issues implicated by the rebuttable presumption. Commenters stated that a significant number of IJs hired in the past several years lacked prior immigration law experience, yet, as IJs, they make complex legal determinations in brief credible fear proceedings. Commenters also asserted that some IJs have engaged in unprofessional and

[115] For example, AOs adjudicate cases involving forms of persecution like female genital mutilation, forced abortion, or forced sterilization. *See Matter of Kasinga,* 21 I&N Dec. 357 (BIA 1996); INA 101(a)(42)(B), 8 U.S.C. 1101(a)(42)(B); *see also* USCIS, *RAIO Directorate—Officer Training, Gender-Related Claims* at 24–28 (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/Gender_Related_Claims_LP_RAIO.pdf.*

[116] *See* USCIS, *RAIO Directorate—Officer Training: Definition of Persecution and Eligibility Based on Past Persecution,* Supp. B at 60 (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/Persecution_LP_RAIO.pdf.*

[117] *See generally* USCIS, *RAIO Directorate—Officer Training: Guidance for Adjudicating Lesbian, Gay, Bisexual, Transgender, and Intersex (LGBTI) Refugee and Asylum Claims* (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/LGBTI_Claims_LP_RAIO.pdf.*

[118] *See generally* USCIS, *Non-Adversarial Interview;* USCIS, *Eliciting Testimony.*

[119] *See* 8 CFR 208.1(b); *see also* USCIS, *Non-Adversarial Interview;* USCIS, *Eliciting Testimony;* USCIS, *RAIO Directorate—Officer Training: Cross-Cultural Communication and Other Factors that May Impede Communication at an Interview* (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/CrossCultural_Communication_LP_RAIO.pdf;* USCIS, *Children's Claims;* USCIS, *RAIO Directorate—Officer Training: Interviewing Survivors of Torture and Other Severe Trauma* (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/Interviewing_-_Survivors_of_Torture_LP_RAIO.pdf* [hereinafter USCIS, *Interviewing Survivors of Torture*].

**31360**    **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

hostile behavior toward asylum seekers and noted that some IJs have asylum denial rates of 90 percent or higher. Additionally, commenters expressed concern about potential IJ bias or lack of sufficient training for IJs related to, in particular, asylum claims of LGBT individuals.

*Response:* The Departments respectfully disagree with commenters' concerns about IJs' conduct and training. IJs, like AOs, are career employees who are selected through a competitive process. Likewise, IJs receive "comprehensive, continuing training and support" directed at "promot[ing] the quality and consistency of adjudications." 8 CFR 1003.0(b)(1)(vii). Relatedly, the Chief Immigration Judge has the authority to "[p]rovide for appropriate training of the immigration judges and other OCIJ staff on the conduct of their powers and duties." 8 CFR 1003.9(b)(2). Regulations also require IJs to "resolve the questions before them in a timely and impartial manner consistent with the [INA] and regulations." 8 CFR 1003.10(b).

The Departments likewise do not share commenters' concerns regarding newly hired IJs' professional experience or ability to make appropriate legal determinations in the context of credible fear reviews or section 240 removal proceedings. The Departments believe that IJs' diverse professional backgrounds contribute to their ability to address complex legal issues in all cases arising before them. Notably, IJs are selected on merit with baseline qualifications, including possession of a J.D., LL.M., or LL.B. degree; active membership in a State bar; and seven years of experience as a licensed attorney working in litigation or administrative law. Upon entry on duty, new IJs receive extensive training, and throughout their tenure, all IJs receive both annual and periodic training on specialized topics as necessary. IJs are also expected to maintain professionalism and competence in the law.[120]

Moreover, the Departments disagree with commenter concerns about IJs' ability to assess medical records. Nothing in the rule requires adjudicators to make a formal medical diagnosis to determine whether a noncitizen is exempt from or has rebutted the rule's condition on eligibility. Rather, adjudicators will make a factual determination regarding whether certain exigencies, such as an

acute medical emergency, caused a noncitizen to enter the United States outside of an available lawful pathway. 8 CFR 208.33(a)(2), 1208.33(a)(2). Given the IJ's role as the finder of fact in proceedings before EOIR, IJs are well-equipped to make such fact-based determinations.

Further, to the extent that commenters' concerns amount to allegations that IJs are biased or fail to comport themselves in a manner consistent with their duties, the Departments note that IJs are attorneys, 8 CFR 1003.10(a), and must comply with all ethical conduct and training requirements for DOJ attorneys. *See, e.g.,* 5 CFR 2635.101.[121] Additionally, as evidenced by the existence and work of EOIR's Judicial Conduct and Professionalism Unit ("JCPU"), "[a]lleged misconduct by [IJs] is taken seriously by [DOJ] and [EOIR]." [122] EOIR strives to adjudicate every case in a fair manner and to treat all parties involved with respect. Individuals or groups who believe that an IJ or other EOIR adjudicator has engaged in misconduct may submit a complaint to EOIR's JCPU via mail at Executive Office for Immigration Review, attn.: Judicial Conduct and Professionalism Unit, 5107 Leesburg Pike, Suite 2600, Falls Church, VA 22041 or via email at *judicial.conduct@usdoj.gov.* Additionally, JCPU may launch its own investigation if information related to potential misconduct comes to JCPU's attention by other means, including through news reports, Federal court decisions, and routine reviews of agency proceedings.[123] JCPU will review all complaints, docket cases alleging judicial misconduct, gather relevant materials, and forward the complaint, relevant documents, and a summary of JCPU's preliminary fact-gathering to the IJ's supervisor for investigation and resolution.[124] Complaints can be resolved by dismissal, conclusion, corrective action, or disciplinary action, and JCPU will provide written notice to the complainant when the matter is closed.[125]

While the Departments disagree with the commenters' premise, moreover, the Departments also note that government officials are entitled to the presumption of official regularity in the way they conduct their duties, *Chem. Found.,* 272 U.S. at 14–15, and commenters failed to provide persuasive evidence of systematic bias amongst IJs.

### iv. Concerns Regarding Confusion, Delays, Backlog, and Inefficiencies

*Comment:* Commenters described the rule as "convoluted," "elaborate," or "unclear," and expressed concerns that it would be confusing to migrants and make it difficult for legal services organizations to advise clients, partner organizations, and the communities that they serve. Commenters said that the proposed rule would impose a two-tier approach and additional fact-intensive queries for credible fear interviews, thereby increasing interview times and complexity of credible fear cases and adding to the burden and confusion of AOs. Additionally, commenters stated that prior asylum policy changes have led to confusion amongst attorneys and migrants and resulted in erroneous deportations. Moreover, one commenter stated that a confusing legal framework does not prevent and sometimes promotes an increase of irregular migration. Another commenter recommended that the Government provide guidance or an FAQ document to accompany and explain the rule's exceptions and means of rebuttal.

In addition, commenters expressed concern that, by adding to the evidentiary requirements, complexity, and length of asylum adjudications, the rule would exacerbate delays and backlogs, inefficiently prolong the asylum process for legitimate asylum seekers, increase erroneous denials, decrease the number of attorneys available to help clear backlogs, and strain limited government resources. Commenters also pointed to previous instances where changes in procedure led to an increased backlog, citing the Citizenship and Immigrant Services Ombudsman 2022 annual report to highlight this dynamic. Another commenter stated that cases wrongly referred to the immigration court by the Asylum Office due to erroneous applications of the rule would unnecessarily add to immigration court backlogs. And commenters stated that the NPRM failed to provide any evidence or explanation that the proposed rule would mitigate backlogs. In response to these efficiency concerns, one commenter suggested that the Departments should pursue alternate solutions for addressing the USCIS and

---

[120] *See* EOIR, *Ethics and Professionalism Guide for Immigration Judges* 2 (Jan. 31, 2011), *https://www.justice.gov/sites/default/files/eoir/legacy/2013/05/23/EthicsandProfessionalismGuideforIJs.pdf.*

[121] *See also* ICPM, Chapter 1.3(c) (Nov. 14, 2022) ("Immigration judges strive to act honorably, fairly, and in accordance with the highest ethical standards, thereby ensuring public confidence in the integrity and impartiality of immigration court proceedings.").

[122] *See id.*

[123] *See* EOIR, *Judicial Complaint Process* (Feb. 2023), *https://www.justice.gov/eoir/page/file/1100946/download* (explaining the steps of the judicial complaint process).

[124] *Id.*

[125] *Id.; see also* EOIR, *Statistics and Reports, https://www.justice.gov/eoir/statistics-and-reports* (last visited Apr. 19, 2023) (providing IJ complaint statistics).

EOIR backlogs, such as more dedicated dockets, smarter prioritization of cases, expanded use of administrative closure or deferred action, or establishing an independent immigration court. One commenter likewise maintained that the Departments, in their efforts to help the immigration court system function more efficiently and effectively must still respect the due process rights of asylum seekers.

*Response:* The Departments do not believe that the rule's provisions are unduly confusing or complex. However, as described in Section II.C.7 of this preamble, the Departments have streamlined the regulatory text significantly to improve clarity, and the Departments believe this final rule publication should provide much of the guidance sought by commenters. Substantively, the rule simply outlines a circumstance in which a noncitizen will be presumed ineligible for asylum, and includes a list of exceptions to and means of rebutting the presumption. As explained in Section IV.B.5.iii.a of this preamble, AOs conducting credible fear interviews will specifically ask questions to elicit all relevant testimony in a non-adversarial manner, including with respect to whether the presumption applies or any exception or rebuttal ground is applicable in a given case, regardless of whether the noncitizen affirmatively raises these issues. Furthermore, noncitizens who are found by an AO to be subject to the condition on eligibility may request review of that determination, and an IJ will evaluate de novo whether the noncitizen is subject to the presumption, and if so, whether the noncitizen has established an exception to or rebutted the presumption. 8 CFR 208.33(b)(1), (2). And even where the presumption applies and no exception or rebuttal ground has been established at the credible fear stage, if the noncitizen has demonstrated a reasonable possibility of persecution or torture, they will have an opportunity to apply for asylum, statutory withholding of removal, CAT protection, or any other form of relief or protection for which the noncitizen is eligible in removal proceedings under section 240 of the INA. *See* 8 CFR 208.33(b)(2)(ii), (b)(2)(v)(B); *id.* 1208.33(b)(4).

In relation to the concern that the rule's provisions are unclear or that additional public-facing materials may be necessary to clarify and raise awareness about provisions of the rule, the Departments intend to execute a robust communications plan to notify and inform the public of the rule's requirements. This plan entails engagement with stakeholders, including NGOs, international organizations, legal services organizations, and others. The Departments also plan to mount communications campaigns as appropriate throughout the Western Hemisphere in coordination with interagency partners and partner governments in order to educate potential migrants about the rule's requirements, including consequences of failing to use available lawful pathways.

These efforts are in addition to preexisting and ongoing communications efforts, including publicization of removal and enforcement statistics, English-, Spanish-, Portuguese-, and Haitian Creole-language interviews with media outlets in the region, and regularly updated Web resources on which the Departments can provide additional information in response to demand from the public.

The Departments acknowledge concerns regarding delays, backlogs, and limited government resources, but believe that these concerns are outweighed by the anticipated benefits of the rule. The rule is expected to ultimately reduce the number of cases pending before the immigration courts and reduce ancillary benefit requests to USCIS. *See* 8 CFR 208.7 (employment authorization for pending asylum applicants). This would also alleviate the burden on ICE of removing non-detained noncitizens who receive final orders of removal at the conclusion of removal proceedings under section 240 of the INA but who do not comply with their orders. *See, e.g.,* 8 CFR 241.4(f)(7) (in considering whether to recommend further detention or release of a noncitizen, an adjudicator must consider "[t]he likelihood that the alien is a significant flight risk or may abscond to avoid removal"). The Departments also anticipate that the rule will redirect migratory flows towards lawful, safe, orderly pathways in ways that make it easier to process their requests for admission. 88 FR at 11729. The Departments believe that this will ultimately result in fewer credible fear cases than would otherwise be processed, and that these improvements in efficiency would outweigh a potential increase in credible fear interview times. The Departments do not anticipate that the rule will be applied frequently in affirmative asylum cases decided by the Asylum Office, since only a small percentage of these applicants enter the United States from Mexico across the southwest land border or adjacent coastal borders, apart from UCs who are not subject to the rule.[126] When all the effects are considered on balance, this rule will serve one of the key goals of the U.S. asylum system, which is to efficiently and fairly provide protection to noncitizens who are in the United States and have meritorious claims, while also efficiently denying and ultimately removing those who are not deemed eligible for discretionary forms of protection and do not qualify for statutory withholding of removal or protection under the CAT. *See* 88 FR at 11729.

Comments advocating for other immigration policy changes or statutory reforms that could potentially create efficiencies in immigration proceedings are outside the scope of this rulemaking. However, as stated in the NPRM, the Departments note that EOIR has created efficiencies by reducing barriers to access immigration courts. *See* 88 FR at 11717. In that regard, EOIR has expanded the Immigration Court Helpdesk program to several additional courts, issued guidance on using the Friend of the Court model to assist unrepresented respondents, and reconstituted its pro bono liaison program at each immigration court. The above measures promote efficiency as, where a noncitizen is represented, the IJ is less likely to have to engage in time-consuming discussions at hearings to ascertain whether the noncitizen is subject to removal and potentially eligible for any relief. In addition, a noncitizen's counsel can assist the noncitizen in gathering evidence, can prepare the noncitizen to testify, and can work with DHS counsel to narrow the issues the IJ must decide. While critically important, these process improvements are not, on their own, sufficient to respond to the significant resource needs associated with the increase in migrants anticipated following the lifting of the Title 42 public health Order.

To the extent commenters argued that adjudication timeline concerns implicate the due process rights of noncitizens, as explained above, the Supreme Court has held that the due process rights of noncitizens applying for admission at the border are limited to "only those rights regarding admission that Congress has provided by statute." *Thuraissigiam,* 140 S. Ct. at 1983. However, upon referral of a fear

---

[126] The annual percentage of affirmative asylum applicats who entered between POEs and were not UCs has steadily declined over the past two decades. The percentage for 2020-22 have been 16.00 percent, 14.85 percent, and 13.92 percent, respectively. So far in fiscal year 2023, the percentage has been 9.06 percent. USCIS Data Collection, Apr. 13, 2023.

claim, USCIS seeks to issue credible fear determinations for detained noncitizens in a timely manner. Furthermore, the statute that governs expedited removal provides that upon a noncitizen's request for review of an AO's negative credible fear determination, an IJ will review the determination "in no case later than 7 days after the date of the determination." INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). In any event, because there is no statute guaranteeing any noncitizen that their expedited removal or credible fear process will be completed in a given amount of time, any failure to meet this obligation is not in the nature of a due process violation. *See Thuraissigiam,* 140 S. Ct. at 1983.

*Comment:* Commenters expressed concerns that a lack of notice about the rule for asylum seekers could lead to confusion and due process violations. Some expressed concern that noncitizens who are traveling to the United States when the rule becomes effective would not have sufficient notice about the CBP One app or the need to schedule an appointment in order to seek asylum without being subject to a rebuttable presumption of ineligibility. Commenters expressed concern that individuals who had contracted with smugglers in transit would receive disinformation from the smugglers about lawful pathways, thereby preventing them from using a lawful pathway to enter the United States. Other commenters said that noncitizens should receive notice of the rebuttable presumption prior to their credible fear interviews.

*Response:* The Departments believe that comments about lack of notice are misguided for several reasons. First, as just discussed, the rule's requirements are not unduly confusing or complex, and the Departments intend to implement a robust communications plan to notify and inform the public of requirements under the rule, minimizing any potential confusion. Second, the Departments provided advance notice of the potential issuance of this policy by issuing the NPRM on February 23 of this year, and by announcing the impending issuance of such proposed rule in January.[127] Third, any lack of notice would not constitute a violation of the Fifth Amendment's Due Process Clause. As explained above, the Supreme Court has held that

the rights of noncitizens applying for admission at the border are limited to "only those rights regarding admission that Congress has provided by statute." *Thuraissigiam,* 140 S. Ct. at 1983. The Departments are aware of no statutory requirement that notice regarding any of the INA's provisions be provided to individuals outside the United States, including those who may be subject to expedited removal provisions or conditions on asylum eligibility upon arrival. Finally, courts have long held that "ignorance of the legal requirements for filing an asylum application" is "no excuse" for failing to comply with such requirements, particularly where, as here, the enactment of such requirements is published in the **Federal Register**. *Alquijay* v. *Garland,* 40 F.4th 1099, 1103 (9th Cir. 2022) (quotation marks omitted) (citing, *e.g., Jerman* v. *Carlisle, McNellie, Rini, Kramer & Ulrich LPA,* 559 U.S. 573, 581 (2010)); *see Williams* v. *Mukasey,* 531 F.3d 1040, 1042 (9th Cir. 2008).

v. Other Procedural Concerns

*Comment:* Commenters stated that it would be extremely challenging or impossible for many asylum seekers to show that the rule does not apply to them or to establish an exception to or rebut the presumption of ineligibility, despite having bona fide claims. According to these commenters, the expedited removal process is extremely flawed and rife with erroneous removals due to a number of factors. Asylum seekers are detained in remote areas (in abusive and dangerous conditions of confinement), where attorney access is limited and they have no chance to gather evidence. Credible fear screenings typically occur over the phone (often with poor call quality and sporadic connection, with little or no privacy). The commenters also stated that the lack of privacy during these screenings makes it more difficult and potentially retraumatizing for applicants to share their stories and make their cases. One commenter stated that, although the noncitizen may be in a private room, there is often a lot of noise and commotion in the passageways that can be distracting. One commenter wrote that trauma severely impacts a survivor's ability to coherently and compellingly present an asylum claim by negatively affecting memory and emotional state and causing them to behave in ways that untrained people may read as indicating a lack of credibility. Another commenter stated that credible fear screenings can trigger increased traumatic response, rather than increased disclosure about the

circumstances of persecution or torture. The presence of noncitizens' children during the interview can be distracting or deter the person from disclosing sensitive elements of their persecution story. Commenters also stated that language barriers, including English-only availability for written notices, make the process more difficult. One commenter also stated that translators may be unfamiliar with certain dialects and slang. Commenters stated that these alleged factors would worsen if the Administration were to pursue its reported plan to conduct credible fear interviews within days of asylum seekers' arrival in CBP custody, based on the conditions in CBP custody and lack of access to counsel, as shown by the increase in negative credible fear determinations during the Prompt Asylum Case Review ("PACR") program and the Humanitarian Asylum Review Program ("HARP").

*Response:* To the extent commenters argued that conditions in which credible fear interviews take place, such as location, interview procedures, and surrounding circumstances, implicate the due process rights of noncitizens, as explained above, the Supreme Court has held that the due process rights of noncitizens applying for admission at the border are limited to "only those rights regarding admission that Congress has provided by statute." *Thuraissigiam,* 140 S. Ct. at 1983. As further explained above, the statute that governs expedited removal provides only that the noncitizen may "consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process." INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv).

In any event, the Departments disagree with these characterizations of credible fear interviews. With regard to commenter concerns about lack of privacy during credible fear interviews, the Departments note that these interviews are conducted "separate and apart from the general public." 8 CFR 208.30(d). The Departments are mindful of their duties under 8 CFR 208.6 and 1208.6 to prevent unauthorized disclosure of records pertaining to any credible fear determination, and AOs are required to explain these confidentiality requirements to noncitizens prior to credible fear interviews.[128] Noncitizens in credible

---

[127] *See* DHS, Press Release, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), *https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.*

[128] *See* USCIS, *Non-Adversarial Interview; see also* Form M–444, Information About Credible Fear

fear proceedings are also informed that interpreters are sworn to keep their testimony confidential.[129] All AOs receive training on working with interpreters, which includes assessing competency and recognizing other factors that may affect the accuracy of interpretation.[130] Credible fear interviews are conducted ''in a nonadversarial manner, separate and apart from the general public.'' 8 CFR 208.30(d). AOs are trained to elicit all relevant testimony during credible fear interviews,[131] and will not preemptively issue negative credible fear determinations due to phone connectivity issues. All AOs receive training on interviewing survivors of torture and other severe trauma.[132]

Finally, commenters' concerns related to the potential for conducting credible fear interviews where noncitizens are in CBP custody are outside the scope of this rule. This rule does not specify where noncitizens may be held in custody during credible fear proceedings. Any decision to conduct credible fear interviews while the noncitizen is in CBP custody will take into account a range of factors, including operational limitations associated with the facility, staffing, and throughput. Additionally, to the extent that commenters have concerns about conditions in CBP custody, such comments are outside the scope of this rule. DHS notes, however, that it is committed to providing safe, sanitary, and humane conditions to all individuals in custody, and that it is committed to transferring individuals out of CBP custody in an expeditious manner. The Departments further note that one anticipated effect of this rule is to alleviate overcrowding in DHS detention facilities. *See* 88 FR at 11704.

6. Recent Regional Migration Initiatives

*Comment:* Commenters stated that the rule conflicts with several migration declarations and other compacts into which the United States has recently entered. For example, at least one commenter stated that the rule conflicts with the L.A. Declaration, in which the United States committed ''to promote access to protection and complementary pathways for asylum seekers, refugees, and stateless persons in accordance with national legislation and with respect for the principle of non-refoulement.'' [133] One commenter stated the former presidents of Colombia and Costa Rica object to the proposed rule on the basis that it is not in line with the L.A. Declaration.

*Response:* The Departments disagree that the rule conflicts with any recent regional migration initiatives. The Departments' rule is fully consistent with the United States' commitments under the L.A. Declaration, including our responsibility as a signatory country to ''manage mixed movements across international borders in a secure, humane, orderly, and regular manner.'' [134] As described in the NPRM, political and economic instability, coupled with the lingering adverse effects of the COVID–19 global pandemic, have fueled a substantial increase in migration throughout the world. *See, e.g.,* 88 FR at 11708–14.

Current DHS encounter projections and planning models suggest that encounters at the SWB could rise to 11,000 encounters per day after the lifting of the Title 42 public health Order.[135] Absent policy changes, most non-Mexicans processed for expedited removal under Title 8 would likely establish credible fear and remain in the United States for the foreseeable future despite the fact that many of them will not ultimately be granted asylum, a scenario that would likely incentivize an increasing number of migrants to the United States and further increase the likelihood of sustained high encounter rates.

The Departments' promulgation of this rule is an attempt to avert this scenario in line with the United States and other signatory nations' responsibility to manage migration responsibly and humanely as described in the L.A. Declaration. Contrary to commenters' assertion, the rule is consistent with the Collaborative Migration Management Strategy (''CMMS'') [136] and the L.A. Declaration's support for a collaborative and regional approach to migration and forced displacement, pursuant to which countries in the hemisphere commit to implementing programs to stabilize communities hosting migrants and asylum seekers, providing increased regular pathways and protections for migrants and asylum seekers who reside in or traveled through their countries, and humanely enforcing existing immigration laws.

The rule works in combination with several other policy actions to secure the SWB while upholding the principles enshrined in the L.A. Declaration. These policy actions include resumption of the Cuban and Haitian Family Reunification Parole Programs, the plans to streamline those programs and extend them to nationals of certain other countries, the establishment of regional processing centers, expansion of refugee resettlement commitments globally and in the region, expansion of labor pathways, including expanded access in the region to H–2B temporary nonagricultural worker visas, creation of the parole processes for CHNV nationals, the Asylum Processing IFR, and other processing improvements geared toward expanding access to lawful pathways. 88 FR at 11716–19.[137] These actions are consistent with the specific goal laid out in the L.A. Declaration to collectively ''[e]xpand access to regular pathways for migrants and refugees.'' Together with the rule, these policy actions will help address unprecedented migratory flows, the systemic costs those flows impose on the immigration system, and the ways in which a network of increasingly sophisticated human smuggling networks cruelly exploit the system for financial gain.

7. Negative Impacts on the Workforce and Economy

*Comment:* Some commenters stated that the Departments should not enact restrictions on immigration due to current labor shortages and the general benefits of immigration. Commenters stated that the rule will stifle the flow of immigration to American communities, which will suffer because immigrants are central to community development, economic prosperity, and maintaining a strong workforce. A commenter stated that U.S. history has shown that immigrants, even those who

---

Interview 1 (May 31, 2022) (''U.S. law has strict rules to prevent the government from telling others about what you say in your credible fear interview.'').

[129] Form M–444, Information About Credible Fear Interview 2 (May 31, 2022) (''The interpreter will be sworn to keep the information you discuss confidential.'').

[130] USCIS, RAIO Directorate—*Officer Training, Interviewing—Working with an Interpreter* (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/Interviewing_-_Working_with_an_Interpreter_LP_RAIO.pdf.*

[131] USCIS, *Eliciting Testimony* 12 (''In cases requiring an interview, although the burden is on the applicant to establish eligibility, equally important is your obligation to elicit all pertinent information.''); USCIS, *Non-Adversarial Interview* 13 (''You control the direction, pace, and tone of the interview and have a duty to elicit all relevant testimony.'').

[132] USCIS, *Interviewing Survivors of Torture.*

[133] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[134] *Los Angeles Declaration.*

[135] OIS analysis of DHS SWB Encounter Planning Model generated April 18, 2023.

[136] *See* The White House, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[137] *See also* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

**31364** **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

arrive here in the weakest of circumstances, strengthen our country in the long run. Commenters said that the U.S. population is stagnating or shrinking, so the United States should welcome migrants—especially young migrants—who can support the economy, fill jobs, and contribute to Social Security. A commenter stated that beginning in 2019, levels of immigration to the United States dropped significantly, and that by the end of 2021 there were close to 2 million fewer working-age immigrants in the United States than there would have been if pre-pandemic immigration continued unchanged, according to researchers from the University of California, Davis.

Some commenters opposed the proposed rule on the ground that immigrants are willing to work difficult jobs that many already in the United States are not willing to take. Commenters stated that there is currently a severe shortage of certain workers in the United States, such as in the health care, agriculture, and service industries, and that migrants who undertake an arduous overland journey to the United States are likely to work hard and become productive members of U.S. society. One commenter noted that immigrant-owned businesses account for over 8 million jobs and 1.3 trillion dollars in the U.S. economy. Another commenter stated that individuals in the asylum process who are working with work authorization contribute about $11 billion to the economy each year. Commenters also stated that migrants do not have a significant negative impact on the wages of local-born residents and that migrants contribute more to the U.S. economy than the cost of community and government services they use. One commenter stated that the proposed rule improperly restricts asylum seekers being integrated into the workforces of the States and that State-funded services for asylum seekers would be put under strain as a result.

*Response:* The Departments agree that immigrants make important contributions to the U.S. economy. However, the Departments disagree that the benefits of immigration render this rule unnecessary or invalid. The Departments emphasize that the U.S. immigration system has experienced extreme strain with a dramatic increase of noncitizens attempting to cross the SWB in between POEs without authorization, reaching an all-time high of 2.2 million encounters in FY 2022. Without a meaningful policy change, border encounters could dramatically rise to as high as 11,000 per day after

the Title 42 public health Order is lifted,[138] and DHS does not currently have the resources to manage and sustain the processing of migratory flows of this scale in a safe and orderly manner. *See* 88 FR at 11712–13. This rule is therefore designed to incentivize migrants to choose lawful, safe, and orderly pathways to entering the United States over dangerous, irregular pathways.

Over the last several months, DHS has endeavored to promote and expand lawful, safe, and orderly pathways. For instance, in January 2023, DHS implemented new parole processes for CHN nationals that built on the successful process for Venezuelans and created an accessible, streamlined way for eligible individuals to travel to and enter the United States via a lawful and safe pathway. Through a fully online process, individuals can seek advance authorization to travel to the United States and be considered, on a case-by-case basis, for a temporary grant of parole for up to two years. Individuals who are paroled through these processes can apply for employment authorization immediately following their arrival to the United States.[139]

Furthermore, the United States Government has significantly expanded access to the H–2 labor visa programs to address labor shortages and provide safe and orderly pathways for migrants seeking to work in the United States. For example, on December 15, 2022, DHS and the Department of Labor ("DOL") jointly published a temporary final rule increasing the total number of noncitizens who may receive an H–2B nonimmigrant visa by up to 64,716 for the entirety of FY 2023. 87 FR 76816 (Dec. 15, 2022). In 2022, concurrent with the announcement of the L.A. Declaration, the United States announced that it intends to welcome at least 20,000 refugees from Latin America and the Caribbean in FY 2023 and FY 2024, which would put the United States on pace to more than triple the number of refugee admissions from the Western Hemisphere this fiscal year alone.[140] On April 27, 2023, DHS announced that it would commit to referring for resettlement thousands of additional refugees per month from the Western Hemisphere—with the goal of doubling the number of refugees the

United States committed to welcome as part of the L.A. Declaration.[141] The Departments also note that the United States admitted significantly more noncitizens in nonimmigrant status in fiscal year 2022 (96,700,000) than in previous years.[142]

The Departments believe that these new or expanded lawful pathways, and particularly employment-based pathways, are effective ways to address labor shortages and encourage lawful migration. The Departments also believe that, by reducing migrants' incentives to use human smugglers and traffickers to enter the United States, this final rule will reduce the likelihood that newly arrived migrants will be subjected to labor trafficking. The Departments further reiterate that noncitizens who avail themselves of any of the lawful, safe, and orderly pathways recognized in this rule will not be subject to the rebuttable presumption.

### 8. Other Opposition

#### i. Encourages Migration by Sea or Other Dangerous Means

*Comment:* A commenter predicted that the proposed rule may increase the number of migrants seeking to travel to the United States by sea, which is dangerous and could lead to an increase in migrant deaths and drownings, and another suggested that attempted immigration directly by sea would pose a significant burden on Coast Guard and other resources. One commenter expressed concern that the rule would incentivize migrants to avoid detection by CBP, remarking that migrants may attempt to enter the United States by crossing the Rio Grande River or along the Pacific coast, where they face a high risk of drowning.

Commenters stated that the proposed rule would do nothing to stem the flow of migrants to the United States but would instead force people to seek out other means of coming to the United States and leave people with few choices, including the very choices the rule purports to wish to avoid. Some commenters stated that the rule will result in migrants, who are in a desperate humanitarian situations or

---

[138] OIS analysis of DHS SWB Encounter Planning Model generated April 18, 2023.

[139] *See* USCIS, Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (Mar. 22, 2023), *https://www.uscis.gov/humanitarian/frequently-asked-questions-about-the-processes-for-cubans-haitians-nicaraguans-and-venezuelans.*

[140] *See* L.A. Declaration Fact Sheet.

---

[141] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

[142] *Compare* OIS, Legal Immigration and Adjustment of Status Report Fiscal Year 2022, Quarter 4, *https://www.dhs.gov/immigration-statistics/special-reports/legal-immigration,* with OIS, Annual Flow Report: U.S. Nonimmigrant Admissions: 2021 (July 2022), *https://www.dhs.gov/sites/default/files/2022-07/2022_0722_plcy_nonimmigrant_fy2021.pdf,* and OIS, Annual Flow Report: U.S. Nonimmigrant Admissions: 2018 (Oct. 2018), *https://www.dhs.gov/sites/default/files/publications/immigration-statistics/yearbook/2018/nonimmigrant_admissions_2018.pdf.*

fear for their lives, resorting to more dangerous routes between POEs to enter the United States. One commenter stated that these dangerous border crossings can result in severe injuries, dehydration, starvation, and drownings as well as kidnappings and other violent attacks by cartels and other organized criminal groups that exert influence at the U.S.-Mexico border. Another commenter claimed that data shows that CBP's ''prior metering program'' increased border apprehensions by 36 percent, which suggests that making the CBP One app mandatory may in fact increase border crossings and make them riskier.

*Response:* First, the Departments share commenters' concerns that noncitizens seeking to avoid the rebuttable presumption may take dangerous sea routes, leading to migrant deaths and drownings. Because applying the rule only to those who enter the United States from Mexico across the southwest land border would inadvertently incentivize noncitizens without documents sufficient for lawful admission to circumvent that land border by making a hazardous attempt to reach the United States from Mexico by sea, the Departments have determined that it is appropriate to apply the rebuttable presumption to those who enter the United States from Mexico at both the southwest land border and adjacent coastal borders. Similar considerations that led the Departments to pursue this rulemaking with respect to land arrivals at the SWB apply in this specific maritime context, as the anticipated increase in migration by land could lead migrants attempting to avoid the rebuttable presumption to make the final portion of their journey from Mexico by sea. In light of the inherent dangers such attempts could create for migrants and DHS personnel, and to avoid a significant further increase in maritime interdictions and landfall by noncitizens along the adjacent coastal borders as compared to the already significant surge that the Departments have seen in recent years, the Departments have extended the rebuttable presumption to apply to noncitizens who enter the United States from Mexico at adjacent coastal borders. 8 CFR 208.33(a)(1), 1208.33(a)(1).

Extension of the rebuttable presumption to noncitizens who enter the United States from Mexico at adjacent coastal borders is supported by the growing number of migrants taking to sea under dangerous conditions, which puts lives at risk and stresses DHS's resources. The IOM Missing Migrants Project reported at least 321 documented deaths and disappearances

of migrants throughout the Caribbean in 2022, signaling the highest recorded number since it began tracking such events in 2014 and a 78 percent overall increase over the 180 documented cases in 2021.[143] Total migrants interdicted at sea by the U.S. Coast Guard (''USCG'') increased by 502 percent between FY 2020 (2,079) and FY 2022 (12,521).[144] Interdictions continued to rise in FY 2023 with 8,822 migrants interdicted at sea through March, almost 70 percent of the total in FY 2022 within six months.[145] Interdictions occurred primarily in the South Florida Straits and the Caribbean Sea.[146] The USCG views its migrant interdiction mission as a humanitarian effort to rescue those taking to the sea and to encourage noncitizens to pursue lawful pathways to enter the United States. By allocating additional assets to migrant interdiction operations and to prevent conditions that could lead to a maritime mass migration, the USCG assumes certain operational risk to other statutory missions. Recently, some USCG assets have been reallocated from other key mission areas, including counter-drug operations, protection of living marine resources, and support for shipping navigation. The Departments expect that the strategy of coupling expanded lawful, safe, and orderly pathways into the United States with this rule's application of the rebuttable presumption to noncitizens who make landfall at adjacent coastal borders after traveling through Mexico, would lead to a reduction in the numbers of migrants who would otherwise undertake a dangerous journey to the United States by sea. By avoiding a further increase in maritime migration, USCG can in turn avoid incurring greater risk to its other statutory missions.

Second, the Departments disagree with commenters' concerns that this rule will incentivize more migrants to use other dangerous means of entering the United States, such as concealment in a vehicle crossing a SWB POE or crossing between POEs at remote locations. As noted in Section IV.B.3.iv of this preamble, the Departments anticipate that the newly expanded lawful pathways to enter to the United States, in conjunction with the rule's

condition on asylum eligibility for those who fail to exercise those pathways, will ultimately decrease attempts to enter the United States without authorization, and thereby reduce reliance on smugglers and human traffickers.

The Departments further disagree with the commenter's claims that the use of the CBP One app to schedule an appointment to present at a POE is a ''metering program'' or that use of the CBP One app will increase irregular migration or incentivize riskier irregular migration routes. CBP will inspect and process all arriving noncitizens at POEs, regardless of whether they have used the CBP One app. In other words, the use of the CBP One app is not a prerequisite to approach a POE, nor is it a prerequisite to be inspected and processed under the INA. CBP will not turn away individuals without appointments. CBP is committed to increasing the number of noncitizens processed at POEs and is committed to processing noncitizens in an expeditious manner.[147]

Moreover, the Departments intend for this rule to work in conjunction with other initiatives that expand lawful pathways to enter the United States, and thereby incentivize safe, orderly, lawful migration over dangerous, irregular forms of migration. Noncitizens who enter the United States in vehicles without scheduling an appointment to present at a POE and who are inadmissible under section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7), are subject to the rebuttable presumption. Similarly, noncitizens who attempt to cross the southwest land border between POEs are subject to the rebuttable presumption. Likewise, noncitizens who attempt to enter the United States from Mexico at adjacent coastal borders are subject to the rebuttable presumption. Additionally, DHS has changed the respective parole processes for Cubans and Haitians, such that Cubans and Haitians who are interdicted at sea after April 27, 2023, are ineligible for such parole processes. *See* Implementation of a Change to the Parole Process for Cubans, 88 FR 26329 (Apr. 28, 2023); Implementation of a Change to the Parole Process for Haitians, 88 FR 26327 (Apr. 28, 2023). The Departments anticipate that these

---

[143] Int'l Org. for Migration, *Missing Migrants in the Caribbean Reached a Record High in 2022* (Jan. 24, 2023), *https://www.iom.int/news/missing-migrants-caribbean-reached-record-high-2022.*

[144] OIS analysis of USCG data through March 31, 2023.

[145] *Id.*

[146] Testimony of Jonathan Miller, ''Securing America's Maritime Border: Challenges and Solutions for U.S. National Security'' at 4 (Mar. 23, 2023), *https://homeland.house.gov/media/2023/03/3.23.23-TMS-Testimony.pdf.*

[147] *See* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

disincentives, coupled with the newly expanded pathways for lawful migration and the rule's exceptions and means of rebuttal, will ultimately lead fewer noncitizens to attempt to enter the United States in an unsafe manner.

ii. Inconsistent With Actions of Other Countries and Harmful to Foreign Relations

*Comment:* Commenters stated that the proposed rule would almost completely abandon the United States' commitment to work with other countries to meet growing refugee and asylum seeker protection needs, instead placing the burden on transit countries. Commenters stated that many European countries have opened their borders to millions of immigrants, and that the United States should do the same to help people who are facing desperate situations at home. Commenters observed that other countries in Latin America or the Western hemisphere have taken in many more migrants and taken on a greater burden than the United States. One commenter expressed concern that other countries may seek to follow in the United States' footsteps and enact similar restrictive asylum measures. Another commenter stated the rule will not improve foreign relations with hemispheric partner nations.

*Response:* The Departments acknowledge the comments and reiterate that the purpose of this rule is to encourage migrants to choose safe, orderly, and lawful pathways of entering the United States, while preserving the opportunity for individuals fleeing persecution to pursue protection-based claims consistent with the INA and international law. The rule is needed because, absent this rule, after the termination of the Title 42 public health Order, the number of migrants expected to travel without authorization to the United States is expected to increase significantly, to a level that risks undermining the Departments' ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system. This rule is one policy within a broad range of actions being implemented to ensure that there is a regional framework for addressing and responding to historic levels of migration within the hemisphere.[148]

The United States Government is expanding its efforts to protect refugees, those seeking asylum, and those fleeing civil conflict. Since FY 2020, the United States has increased its annual refugee admissions ceiling eightfold and expanded refugee processing within the Western hemisphere.[149] On April 27, 2023, DHS and the Department of State announced that they would commit to referring for resettlement thousands of additional refugees per month from the Western Hemisphere—with the goal of doubling the number of refugees the United States committed to welcome as part of the L.A. Declaration.[150] Similarly, DHS and the Department of State recently announced enhancements to the Central American Minors Refugee and Parole Program, which expands eligibility criteria for those who may request USRAP access for qualifying children.[151] DHS has also implemented comprehensive processes to facilitate the lawful, safe, and orderly migration of CHNV nationals by introducing the CHNV parole processes.[152] Additionally, DHS has recently implemented special lawful processes for nationals of Ukraine.[153]

iii. Other

*Comment:* A commenter stated that the rule would allow noncitizens who entered the United States after lying on a visa petition to remain eligible for asylum while barring those who never submitted false information and objected to this outcome as "absurd."

*Response:* The Departments acknowledge the commenter's concern but reiterate that the purpose of this rulemaking is to address an anticipated

further surge of migration at the SWB following the expiration of the CDC's Title 42 public health Order, which may compromise the Departments' ability to process claims for asylum and related forms of protection in a manner that is effective, humane, and efficient. The Departments do not anticipate that noncitizens who attempt to enter on nonimmigrant visas obtained through misrepresentation will contribute to this surge in any substantial way.

In addition, the Departments disagree with the premise of this comment. Willful misrepresentations in connection with a nonimmigrant visa application may affect an applicant's eligibility for asylum or adjustment of status. Prior misrepresentations to immigration officials can affect credibility determinations, *see* INA 208(b)(1)(B)(iii), 8 U.S.C. 1158(b)(1)(B)(iii), and may be negative discretionary factors in asylum and adjustment of status determinations.[154] Applicants for adjustment of status under section 209(b) of the INA, 8 U.S.C. 1159(b), who have previously sought to obtain immigration benefits through fraud or willful misrepresentation of material fact are inadmissible under section 212(a)(6)(C)(i) of the INA, 8 U.S.C. 1182(a)(6)(C)(i), unless they obtain a discretionary waiver of inadmissibility under section 209(c) of the INA, 8 U.S.C. 1159(c).

*Comment:* One commenter stated that the application of the presumption against asylum eligibility at the credible fear stage would lead to absurd and irrational results. As an example, the commenter stated a noncitizen may admit to terrorism in their home country and still receive a positive credible fear determination, whereas a noncitizen subject to the rule who fails to rebut the presumption would receive a negative determination.

*Response:* The Departments strongly dispute the commenter's suggestion that noncitizens who admit to terrorism would receive superior treatment than noncitizens who are subject to the rule. Noncitizens subject to the INA's terrorism-related inadmissibility grounds ("TRIG"), *see* INA 212(a)(3)(B), 8 U.S.C. 1182(a)(3)(B), may not be ordered released by an IJ during removal proceedings irrespective of any relief

---

[148] *See* The White House, FACT SHEET: The Biden Administration Blueprint for a Fair, Orderly and Humane Immigration System (July 27, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/27/fact-sheet-the-biden-administration-blueprint-for-a-fair-orderly-and-humane-immigration-system/;* The White

House, FACT SHEET: Update on the Collaborative Migration Management Strategy (Apr. 20, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/04/20/fact-sheet-update-on-the-collaborative-migration-management-strategy/;* L.A. Declaration Fact Sheet.

[149] *Compare* Presidential Determination on Refugee Admissions for Fiscal Year 2021, 85 FR 71219 (Nov. 6, 2020) (15,000), *with* White House, Memorandum on Presidential Determination on Refugee Admissions for Fiscal Year 2023 (Sept. 27, 2022), *https://www.whitehouse.gov/briefing-room/presidential-actions/2022/09/27/memorandum-on-presidential-determination-on-refugee-admissions-for-fiscal-year-2023/* (125,000).

[150] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

[151] Notice of Enhancements to the Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[152] *See* USCIS, Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (Mar. 22, 2023), *https://www.uscis.gov/humanitarian/frequently-asked-questions-about-the-processes-for-cubans-haitians-nicaraguans-and-venezuelans.*

[153] *See* DHS, Uniting for Ukraine (Mar. 21, 2023), *https://www.dhs.gov/ukraine;* DHS, Operation Allies Welcome (Mar. 13, 2023), *https://www.dhs.gov/allieswelcomes.*

[154] *See Matter of Pula,* 19 I&N Dec. 467, 473 (BIA 1987) (finding that the circumvention of immigration laws can be considered as a negative discretionary factor in asylum adjudications); USCIS Policy Manual, Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion [7 USCIS–PM A.10] (Apr. 21, 2023), *https://www.uscis.gov/policy-manual/volume-7-part-a-chapter-10#footnote-31.*

from removal for which they may be eligible. INA 236(c), 8 U.S.C. 1226(c); 8 CFR 1003.19(h)(2)(i)(C); INA 241(a)(2), 8 U.S.C. 1231(a)(2); INA 236A(a), 8 U.S.C. 1226a(a). Noncitizens subject to TRIG are ineligible for asylum, statutory withholding of removal, or withholding of removal under the CAT, absent a discretionary exemption from DHS, INA 208(b)(2)(v), 8 U.S.C. 1158(b)(2)(v); INA 241(b)(3)(B)(iv), 8 U.S.C. 1231(b)(3)(B)(iv); 8 CFR 208.16(d)(2); INA 212(d)(3)(B)(i), 8 U.S.C. 1182(d)(3)(B)(i), as are noncitizens for whom there are reasonable grounds to regard as dangers to the security of the United States, INA 208(b)(2)(iv), 8 U.S.C. 1158(b)(2)(iv); INA 241(b)(3)(B)(iv), 8 U.S.C. 1231(b)(3)(B)(iv); 8 CFR 208.16(d)(2).

*Comment:* A local government voiced concern that the five-year re-entry ban if the asylum seeker violates the rule creates additional roadblocks for the most vulnerable individuals.

*Response:* The five-year ground of inadmissibility for those ordered removed following expedited removal proceedings is based on statute, INA 212(a)(9)(A)(i), 8 U.S.C. 1182(a)(9)(A)(i), and cannot be changed through administrative rulemaking. This statute applies equally to noncitizens who are not subject to this rule. Despite prior removal, noncitizens can still seek statutory withholding of removal or protection under the CAT within the five-year period. *See* INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 208.16, 1208.16.

## C. Alternatives and Other General or Mixed Feedback

### 1. Address Root Causes of Migration

*Comment:* A number of commenters requested additional information on the Administration's ongoing efforts to address the root causes of migration, and suggested that, instead of implementing this rule, the United States should focus on providing economic, social, and political support to the countries from which the migrants are fleeing. Another commenter stated that long-term solutions are needed, such as investing in regional stability and humanitarian aid that contribute to human security, addressing the precursors of forced migration, and diminishing the threats that put vulnerable communities at risk. Some commenters suggested that there should be a comprehensive plan to both improve the conditions in Latin American and Caribbean countries by eliminating U.S. sanctions, as well as "offering asylum to large groups of refugees" in the United States.

Commenters also stated that we should devote more resources to helping people from countries such as Haiti, Venezuela, and other Central American countries. Similarly, commenters stated that the United States should provide additional aid to the region and promote democratic values and good governance with an eye towards creating meaningful reforms, particularly in areas that drive irregular migration such as corruption and lack of opportunity. Other commenters stated that in determining eligibility for asylum, the proposed rule would fail to consider significant dangers such as gang violence, starvation, and natural disasters. A commenter expressed further concern that the proposed rule attempts to control the border by reducing the number of USBP encounters with migrants, reasoning that this approach would not address the root cause of increased migration.

One commenter stated that, while deterrence programs may result in temporary dips in the number of people presenting or apprehended at the border, they have no long-term effect because they do not address the root causes forcing people from their homes. Another commenter stated that for many individuals, fleeing their countries in haste and without resources is not optional and they will continue to do so unless the situation in their countries changes. Another commenter stated that the United States should support Latin and Central American governments' capacity to strengthen humanitarian protections and migration management systems by investing in technical assistance and institutional capacity and investing in sustainable infrastructural needs and social safety nets (including education, stable employment, public safety, and economic support) in Mexico and Central America.

*Response:* The Departments agree that the United States must consistently engage with partners throughout the Western Hemisphere to address the hardships that cause people to leave their homes and come to our border. The migratory trends at the SWB today will persist long into the future if the root causes of migration are not addressed. The United States has been engaging with regional partners to address the root causes of migration, but this rule is nonetheless necessary to address a potential surge of migrants at the SWB in the near term.

In June 2022, the United States partnered with 19 other countries in the Western Hemisphere by endorsing the L.A. Declaration, which asserts "the need to promote the political, economic, security, and environmental

conditions for people to lead peaceful, productive, and dignified lives in their countries of origin. Migration should be a voluntary, informed choice and not a necessity." [155] In addition, nations including the United States committed to implementing programs to stabilize communities hosting migrants and asylum seekers, providing increased lawful pathways and protections for migrants and asylum seekers residing in or traveling through their countries, and humanely enforcing existing immigration laws.[156]

Earlier, in July 2021, the United States began working closely with countries in Central America to prioritize and implement a strategy that addresses the root causes of irregular migration with the desired end-state being "a democratic, prosperous, and safe Central America, where people advance economically, live, work, and learn in safety and dignity, contribute to and benefit from the democratic process, have confidence in public institutions, and enjoy opportunities to create futures for themselves and their families at home." [157] At the same time, the United States also presented the CMMS, which aims to advance safe, orderly, legal, and humane migration, including access to international protection for those in need throughout North and Central America.[158] On April 27, 2023, DHS and the Department of State announced plans to establish regional processing centers and expand refugee resettlement commitments in the region.[159] Existing high levels of irregular migration, however, make clear that such efforts are, on their own, insufficient in the near term to fundamentally influence migrants' decision-making, to reduce the risks associated with current levels of irregular migration and the anticipated further surge of migrants to the border after the Title 42 public health Order is terminated, or to protect migrants from human smugglers that profit from their vulnerability. *See* 88 FR at 11716. The United States will continue to work with our regional

---

[155] The White House, Los Angeles Declaration on Migration and Protection (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*.

[156] *Id.*

[157] *See, e.g.,* National Security Council, U.S. Strategy for Addressing the Root Causes of Migration in Central America 5 (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf*.

[158] *See, e.g.,* The White House, Fact Sheet: The Collaborative Migration Management Strategy (July 29, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/29/fact-sheet-the-collaborative-migration-management-strategy/*.

[159] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

partners to manage migration across the Hemisphere.

## 2. Prioritize Funding and Other Resources

*Comment:* Many commenters urged the Government to prioritize funding, other resources, or alternative policies, reasoning that these would make border processing and asylum adjudications more effective and efficient. Some commenters focused on funding, suggesting that the Government should request additional funding from Congress, that the Departments should be prioritizing funding and staffing for the HHS, Office of Refugee Resettlement, USCIS, and U.S. immigration courts, or that the Government should prioritize investing in community-based alternatives, including robust funding and expansion of asylum processing at POEs and investment in NGOs and civil society organizations.

Other commenters suggested more generally that the Government devote other resources to immigrant arrivals. For example, one commenter said that DHS should focus on ''increasing the number of resources at the SWB to safely and fairly process the influx of migration at the border itself,'' including creating shelters near the southern border for noncitizens without family and friends to support them while they await processing of their claim. Another commenter, however, instead suggested that asylum seekers be transferred to communities throughout the United States, along with resources to ensure that asylum seekers and receiving communities are supported. One commenter stated that, instead of the proposed rule, DHS should train border officials to identify asylum claims or assess credible fear. Conversely, another commenter stated that more AOs, not CBP officers, are needed to interview asylum seekers. Commenters also stated the Departments should address significant failures in structure, functioning, and processing through staffing, budget review, training for AOs and judges to reduce appeals, training for DHS attorneys about docket management, and other means.

Another commenter requested that DHS consider ''improving border infrastructure for high volume facilities,'' and noted that DHS did not explain why it lacked the infrastructure, personnel, and funding to sustain processing levels of high numbers of migrants. One commenter expressed concern that CBP does not have sufficient resources in sectors along the SWB to patrol the border and detain migrants and expressed concern about

the number of migrants who successfully evade USBP and enter the country.

Some commenters suggested alternative policy proposals to pursue instead of the proposed rule. For example, commenters recommended that DHS widely advertise the need for sponsors for asylum seekers and facilitate their applications for sponsorship. One commenter suggested providing additional resources to Mexico and other transit countries to improve their asylum-processing capacities.

*Response:* The Departments acknowledge commenters' suggestions for increasing resources, both financial and otherwise, to account for migrant arrivals at the SWB. The Departments first note that they have already deployed additional personnel, technology, infrastructure, and resources to the SWB and that additional financial support would require additional congressional actions, including significant additional appropriations, which are outside of the scope of this rulemaking. The Departments agree with commenters that additional resources would provide benefits for managing the border. The Departments have, for example, significantly increased hiring of AOs and IJs over the past decade.[160] AOs and IJs possess experience in handling asylum and related adjudications; receive regular trainings on asylum-related country conditions and legal issues, as well as non-adversarial interviewing techniques; and have ready access to country-conditions experts.[161] However, it is not feasible for the Departments to quickly hire sufficient qualified personnel or increase other resources to efficiently, effectively, and fairly handle the volume of encounters projected by May 2023, when a further surge of migrants to the SWB is expected following the lifting of the Title 42 public health Order.

Furthermore, the Departments note that they are leading ongoing Federal Government efforts to support NGOs and local and state governments as they work to respond to migratory flows impacting their communities. As noted in the NPRM, FEMA spent $260 million in FYs 2021 and 2022 on grants to non-governmental and state and local entities through the EFSP–H to assist

migrants arriving at the SWB with shelter and transportation. *See* 88 FR at 11714. In November 2022, FEMA released $75 million through the program, consistent with the Continuing Appropriations and Ukraine Supplemental Appropriations Act, 2023.[162] In addition, the Bipartisan Year-End Omnibus, which was enacted on December 29, 2022, directed CBP to transfer $800 million in funding to FEMA to support sheltering and related activities for noncitizens encountered by DHS. The Omnibus authorized FEMA to utilize this funding to establish a new Shelter and Services Program and to use a portion of the funding for the existing EFSP–H, until the Shelter and Services Program is established.[163] On February 28, 2023, DHS announced a $350 million funding opportunity for EFSP–H.[164] This is the first major portion of funding that is being allocated for humanitarian assistance under the Omnibus funding approved in December.[165] For the new Shelter and Services Program, FEMA and CBP have held several public listening sessions and are developing plans to release a Notice of Funding Opportunity prior to September 2023 for the second major portion of funding allocated by Omnibus to assist migrants encountered by DHS.

Additionally, on April 27, 2023, DHS announced that it has awarded more than $135 million to communities to date this fiscal year and will award an additional $290 million in the coming weeks.[166] The Departments are also ramping up coordination between state and local officials and other Federal agencies to provide resources, technical assistance, and support, including through regular information sessions with stakeholders to ensure that the program is broadly understood and the funds are accessible.[167] The Departments will continue to mobilize

---

[160] EOIR, Adjudication Statistics: Immigration Judge Hiring (Jan. 2023), *https://www.justice.gov/eoir/page/file/1242156/download;* Citizenship and Immigration Services Ombudsman, Annual Report 2020 at 45 (June 30, 2020), *https://www.dhs.gov/sites/default/files/publications/20_0630_cisomb-2020-annual-report-to-congress.pdf.*

[161] *See* 8 CFR 208.1(b).

[162] Public Law 117–180, Division A, sec. 101(6), 131 Stat. 2114, 2115.

[163] Public Law 117–328, Division F, Title II, Security Enforcement, and Investigations, U.S. Customs and Border Protection, Operations and Support.

[164] *See* DHS, Press Release, *The Department of Homeland Security Awards $350 Million for Humanitarian Assistance Through the Emergency Food and Shelter Program* (Feb. 28, 2023), *https://www.dhs.gov/news/2023/02/28/department-homeland-security-awards-350-million-humanitarian-assistance-through;* DHS Grant Opportunity DHS–23–DAD–024–00–03, Fiscal Year 2023 Emergency Food and Shelter National Board Program—Humanitarian (EFSP) ($350M) (Feb. 28, 2023), *https://www.grants.gov/web/grants/view-opportunity.html?oppId=346460.*

[165] *Id.*

[166] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

[167] *See id.*

faith-based and non-profit organizations supporting migrants, including those providing temporary shelter, food, transportation, and humanitarian assistance as individuals await the outcome of their immigration proceedings.[168]

With regard to CBP resources at the border, CBP continues to increase facility capacity and to look to new facilities to further expand capacity. *See* 88 FR at 11714. In addition, CBP continues to take steps to facilitate more efficient processing of encountered migrants so that agents are able to remain in the field and patrol the border. For example, USBP has deployed non-uniformed Border Patrol Processing Coordinators (''BPPCs''), who can provide crucial support to USBP facilities, including humanitarian care to individuals in custody, transportation, and processing assistance.[169] As of March 15, 2023, USBP had hired 961 BPPCs, with more individuals in the hiring process.[170] Additionally, CBP has invested in virtual and mobile processing technologies, which enables USBP agents and officers to assist SWB sectors without needing to be physically present in these locations.[171] All of these steps enable USBP agents to return to the field to conduct their law enforcement duties, while ensuring safe conditions for individuals in custody. However, as noted in the NPRM, the increased numbers of migrants entering the United States—and the anticipated surge following the lifting of the Title 42 public health Order—will continue to strain CBP resources. *See* 88 FR at 11706. Thus, the Departments believe that this rule is necessary to disincentivize migrants from attempting to enter the United States without authorization.

The Departments do not agree with commenters' suggestions that alternative policies should be pursued in place of this rule. For example, advertising the need for asylum sponsors would not sufficiently address the anticipated influx of migration at the SWB. The Departments have created, and continue to expand, lawful pathways to enter the United States, which will be available alongside this rule to encourage the use of all lawful pathways and discourage irregular migration to the United States. In contrast, were the Departments to take a hiring-only approach that does

not expand lawful pathways or consequences for unlawful entry, the Departments estimate that irregular arrivals would likely increase after the expiration of the Title 42 public health Order, adding to the current backlog of asylum cases. Such a policy would likely have no immediate effect on arrivals at the SWB, necessitating continued surges of DHS resources to POEs and the SWB to support processing.

The Departments note that the rule requires collaboration across the Departments. CBP, USCIS, and DOJ are all part of the whole-of-government approach necessary to address irregular migration and ensure that the U.S. asylum system is fair, orderly, and humane. The Departments acknowledge comments suggesting that CBP officials should be trained to conduct credible fear screenings. The Asylum Processing IFR clarified that a ''USCIS asylum officer'' will conduct the credible fear interview. 8 CFR 208.30(d). This is consistent with the INA, which specifies that only AOs (as opposed to immigration officers) conduct credible fear interviews, *see* INA 235(b)(1)(B)(i), 8 U.S.C. 1225(b)(1)(B)(i); 8 CFR 208.30(d), and make those determinations, *see* INA 236(b)(1)(B)(iii), 8 U.S.C. 1225(b)(1)(B)(iii); *see also* 8 CFR 208.30(c) through (e); 87 FR at 18136. AOs receive training and possess experience in handling asylum and related adjudications; receive regular trainings on asylum-related country conditions and legal issues, as well as non-adversarial interviewing techniques; and have ready access to country conditions experts. *See* 87 FR at 18136. As noted above, hiring of additional AOs is ongoing, and DHS recently announced that it is surging AOs to complete credible fear interviews at the SWB more quickly.[172]

*Comment:* Some commenters suggested that DHS should better utilize or increase its detention capacity to account for the anticipated migratory flow, as an alternative to the approach adopted in this rule. One commenter suggested that DHS increase its detention capacity to account for the mandatory detention requirements at section 235(b)(1)(B)(ii) of the INA, 8 U.S.C. 1225(b)(1)(B)(ii), and to better use the capacity it has, citing unused detention space in the summer of 2021. The same commenter noted that section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), allows DHS to parole noncitizens into the United States in

limited circumstances, but claimed that the proposed rule makes parole the default and detention the exception, contrary to statute. The commenter argued that expanded use of detention would serve as a greater deterrent than this rule and objected to a reduction in detention capacity it identified in the Administration's FY 2024 budget. Similarly, another commenter stated that the Departments should request from Congress the resources necessary to expand detention centers' capacity to handle the current migratory flow.

*Response:* To the extent that the commenters are contending that DHS is capable of obtaining bedspace sufficient for detaining all inadmissible noncitizens predicted to enter the United States who could potentially be subject to detention pursuant to section 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii), following the lifting of the Title 42 public health Order, the Departments strongly disagree. DHS's ability to detain an individual on any given day is determined by many different factors, including the availability of appropriated funds; the number and demographic characteristics of individuals in custody, as well as those encountered at or near the border or within the interior of the United States; and the types of facilities with available bedspace. In addition, there are capacity restrictions at individual facilities imposed for a variety of reasons ranging from public health requirements to court-ordered limitations that also constrain the availability of detention space.

The Departments also disagree with the commenter's assertion that this rule makes parole the default. This rule does not address parole or change DHS's detention practices. Rather, this rule creates a rebuttable presumption regarding eligibility for asylum.

### 3. Further Expand Refugee Processing or Other Lawful Pathways

*Comment:* Several commenters suggested increasing access to protection and improving processes to encourage noncitizens to seek asylum in lawful and orderly ways, but without imposing a condition on eligibility for asylum for noncitizens who fail to do so. Commenters suggested that the United States should expand regional refugee processing, increase asylum processing and humanitarian programs, and expand and create new lawful pathways, in lieu of pursuing the proposed rule. One commenter said the Administration should use Temporary Protected Status broadly, including for the countries focused on in the proposed rule and other countries

---

[168] *See id.*

[169] Testimony of Raul Ortiz, ''Failure by Design: Examining Sec'y Mayorkas' Border Crisis'' (Mar. 15, 2023), *https://www.cbp.gov/about/congressional-resources/testimony/Ortiz-CHS-15MAR23.*

[170] *Id.*

[171] *Id.*

[172] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

where safe return is impossible. Others recommended creating viable alternatives to asylum for lawful admission to the United States, including decreasing waits for family-based immigration or increasing and streamlining migration opportunities based on skilled labor, citing the Canadian Federal Skilled Worker Express Entry policy as a successful example. Another commenter stated that the Departments should consider policies facilitating fast-track arrival in the United States, including quickly approved in-country visas and widely available humanitarian parole, and streamlining asylum regulations to more broadly encompass the types of dangers and persecution migrants are fleeing today.

*Response:* The United States has made and will continue to make extensive efforts to expand refugee processing and lawful pathways generally. *See* Section IV.B.2.i of this preamble. For example, on April 27, 2023, DHS and the Department of State announced they will establish regional processing centers in several countries in the Western Hemisphere, including Guatemala and Colombia, "to reduce irregular migration and facilitate safe, orderly, humane, and lawful pathways from the Americas."[173] Individuals from the region will be able to make an appointment to visit the nearest regional processing center before traveling, receive an interview with immigration specialists, and if eligible, be processed rapidly for lawful pathways to the United States, Canada, and Spain, including USRAP.[174] Existing levels of unlawful migration, however, make clear that such efforts are, on their own, insufficient in the near term to change the incentives of migrants, reduce the risks associated with current levels of irregular migration and the anticipated surge of migrants to the border, and protect migrants from human smugglers that profit from their vulnerability. *See* 88 FR at 11716. The Departments' recent experience has shown that an increase in lawful pathways coupled with consequences for not using such pathways can significantly—and positively—affect behavior and undermine smuggling networks, as described in Section II.A of this preamble. The Departments also note that while they will consider the commenters' specific suggestions for other lawful pathways or alternatives for entry to the United States, this rule does not create, expand, or otherwise

constitute the basis for any lawful pathways.

## 4. Require Migrants To Wait in Mexico or Other Countries

*Comment:* Some commenters stated that the United States should reimplement the MPP, with one stating that MPP caused a drop in border crossings. A commenter argued that reinstating MPP would have all the benefits that the Departments are seeking to achieve via the proposed rule, but without the rule's downsides, which the commenter argued include increasing incentives for irregular migration. The commenter also stated that the Departments' justifications for ending MPP, including a lack of infrastructure and cooperation from Mexico, are insufficient, arguing that if attempted border crossings are deterred by MPP then many fewer resources will be required, and that the Administration has not sufficiently explained why Mexico would not be willing to cooperate with a reimposition of MPP when it agreed to do so in the recent past. Another commenter suggested that MPP should be restarted and the United States pay for safe housing and food for migrants who are waiting in Mexico during their legal proceedings.

*Response:* The Departments disagree with commenters' contentions that the explanation given in the NPRM regarding why the Departments are not reinstituting MPP is insufficient. *See* 88 FR at 11731. The Secretary of Homeland Security weighed the full range of MPP's costs and benefits, explaining, among other things, that MPP is not the best tool for deterring unlawful migration; that MPP exposes migrants to unacceptable risks to their physical safety; and that MPP detracts from the Executive's efforts to manage regional migration. Moreover, given the Departments' knowledge and understanding of their own resources and infrastructure constraints, as well as the Government of Mexico's statement on February 6, 2023, affirming its willingness to cooperate in international agreements relating to refugees (including the L.A. Declaration) and endorsing lawful pathways, including the CHNV processes,[175] the Departments continue to believe that promulgation of this rule is the appropriate response to manage and avoid a significant further surge in

irregular migration after the Title 42 public health Order is lifted.

As explained in the NPRM, programmatic implementation of the contiguous-territory return authority requires Mexico's concurrence and ongoing support and collaboration. *See* 88 FR at 11731. When DHS was previously under an injunction requiring it to re-implement MPP, the Government of Mexico would only accept the return of MPP enrollees consistent with available shelter capacity in specific regions, and indeed had to pause the process at times due to shelter constraints. Notably, Mexico's shelter network is already strained from the high volume of northbound irregular migration happening today. In February 2023, the Government of Mexico publicly announced its independent decision that it would not accept the return of individuals pursuant to section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C).[176]

Additionally, the resources and infrastructure necessary to use contiguous-territory return authority at the scale that would be required given current and anticipated flows are not currently available. To employ the contiguous-territory return authority at a scale sufficient to meaningfully address the anticipated migrant flows, the United States would need to rebuild, redevelop, and significantly expand infrastructure for noncitizens to be processed in and out of the United States and attend immigration court hearings throughout the duration of their removal proceedings. This would require, among other things, the construction of substantial additional court capacity along the border. It would also require the reassignment of IJs and ICE attorneys to conduct the hearings and CBP personnel to receive and process those who are coming into and out of the country to attend hearings.

*Comment:* Other commenters suggested numerous ideas that would require migrants to wait for cases to be heard outside the United States or to create additional opportunities to apply for asylum from outside of the United States. One commenter suggested that the United States allow asylum seekers to present themselves at embassies, refugee camps, or U.S. military bases to make their claims without the need to undertake the dangerous journey to the U.S. border. A commenter suggested setting up a controlled process to allow a fixed number of migrants into the United States this year, managed through embassies abroad, and stated

---

[173] DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

[174] *See id.*

[175] Government of Mexico, *SRE rechaza reimplementación de estancias migratorias en México bajo la sección 235(b)(2)(C) de la Ley de EE.UU.* (Feb. 6, 2023), *https://www.gob.mx/sre/prensa/sre-rechaza-reimplementacion-de-estancias-migratorias-en-mexico-bajo-la-seccion-235-b-2-c-de-la-ley-de-inmigracion-y-nacionalidad-de-eeuu.*

[176] *Id.*

that it is inhumane to allow migrants to travel to the border only to turn them down. The same commenter also stated that such a controlled process would stop trafficking, drugs, and criminals from entering the country.

Commenters suggested implementing remote teleconferencing technology so that credible fear interviews could be conducted over Zoom or another platform from outside the United States in lieu of using the CBP One app to make appointments, with at least one suggesting that if the migrant's credible fear claim is accepted, they be sent an email stating that the migrant can be granted humanitarian parole into the United States for a final asylum hearing. Another commenter suggested that, instead of implementing this rule, DHS should create a virtual application and video hearing system that would allow migrants to apply and be processed for asylum while still abroad. At least one commenter suggested that migrants be given a temporary work card and ID and be required to pay a penalty tax and U.S. taxes to cover the expenses of managing immigration services. At least one commenter suggested creating a single border crossing dedicated to processing asylum claims, similar to the historical practice at Ellis Island.

*Response:* Pursuant to section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), only noncitizens who are ''physically present in the United States or who arrive[] in the United States'' can apply for asylum. Similarly, the expedited removal provisions in section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1), apply only to noncitizens within the United States. Thus, while credible fear interviews may be conducted remotely (*i.e.,* telephonically), such interviews cannot be conducted for those who are abroad and have not—as required for such interviews—entered the United States, been processed for expedited removal, and asserted a fear of persecution or torture or of return to their country or an intention to apply for asylum.[177] In any event, the intent of this rule is to address the expected surge of migration following the lifting of the Title 42 public health Order on May 11, 2023. Commenters' suggestion that the Departments should create opportunities for noncitizens who have not entered the United States to apply for asylum at U.S. embassies, military bases, a virtual application abroad, or other locations, even if legally available, would not be available in the short-term or at the scale that would be required given current and anticipated flows. Similarly, creating a single border

crossing dedicated to processing asylum claims, even if legally permissible, would not be operationally feasible, particularly in the short term.

However, as noted elsewhere in this document, USRAP is expanding its operations in the Western Hemisphere, which is the appropriate pathway for noncitizens outside the United States to seek admission as a refugee. *See* INA 207, 8 U.S.C. 1157. On April 27, 2023, DHS and the Department of State announced that the United States Government in cooperation with other countries of the L.A. Declaration will establish regional processing centers in several locations throughout the Western Hemisphere to reduce irregular migration.[178] The United States Government will commit to welcoming thousands of additional refugees per month from the Western Hemisphere— with the goal of doubling the number of refugees the United States as part of the L.A. Declaration.[179] The Departments also note that Congress has provided that asylum applicants may receive employment authorization no less than 180 days subsequent to the filing of their asylum application. *See* INA 208(d)(2), 8 U.S.C. 1158(d)(2). Additionally, it is not within the Departments' authority to impose taxes.

5. Additional Measures

*Comment:* Commenters suggested that the United States adopt more restrictive measures instead of this rule, such as requiring all SWB arrivals to seek asylum in Mexico first; requiring all migrants to be returned to their country of origin for two years to wait for their cases to be heard; or creating a bar to asylum for those who are denied asylum in other countries. Another commenter recommended that the rule require that a migrant must seek and be denied protection in each country through which they travel, rather than just one country.

One commenter suggested that the President should use the authority provided by section 212(f) of the INA, 8 U.S.C. 1182(f), to suspend the entry of migrants in order to address the border crisis. This commenter also suggested that DHS make efforts to enforce all deportation orders, expand the use of expedited removal to the fullest extent authorized by Congress, and post ICE agents in courtrooms to immediately enforce removal orders.

Another commenter suggested the rule should also apply to the Northern

border and the maritime borders of the United States.

*Response:* The Departments acknowledge the commenters' suggestions but do not believe the alternatives proposed by the commenters are suitable to address operational concerns or meet the Departments' policy objectives.

As an initial matter, a categorical requirement that all individuals arriving at the SWB seek asylum in Mexico first would be inconsistent with the United States' ongoing efforts to share the responsibility of providing asylum and other forms of protection with the United States' regional partners. The United States Government remains committed to working with regional partners to jointly address historic levels of migration in the hemisphere and will continue to engage with the governments of Mexico and other regional partners to identify and implement solutions. Furthermore, there may be individuals for whom Mexico is not a safe alternative.

The Departments disagree with the commenter's suggestion that noncitizens be required to seek and be denied protection in each country through which they travel. Mexico or other countries through which certain individuals travel en route to the United States may not be a safe alternative for particular individuals, as discussed elsewhere in this preamble, *see* Sections IV.B.4.vii and IV.E.3.iv.d–(e). The rule therefore strikes a balance: It provides an exception from its presumption of ineligibility for individuals who seek and are denied protection in a third country, but it recognizes that for some individuals, particular third countries— or even all third countries—may not be a viable option. The rule therefore provides additional exceptions and rebuttal grounds for the presumption of ineligibility it creates.

Additionally, U.S. obligations under international and domestic law prohibit returning noncitizens to a country where their life or freedom would be threatened because of a protected ground, or where they would be subject to torture.[180] DHS cannot remove a

---

[177] *See* INA 235(b)(1), 8 U.S.C. 1225(b)(1).

[178] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

[179] *See id.*

[180] INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 1208.16, 1208.17. The Departments note that 8 CFR 208.16(b)(3), 1208.16(b)(3) were amended by the by Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 80274 (December 11, 2020), which was preliminarily enjoined and its effectiveness stayed before it became effective. *See Pangea Legal Servs.* v. *U.S. Dep't of Homeland Sec.,* 512 F. Supp. 3d 966, 969–70 (N.D. Cal. 2021) (''*Pangea II*'') (preliminarily enjoining the rule). Similarly, 8 CFR 208.16(e), 1208.16(e) were removed by the Criminal Asylum Bars Rule, Procedures for Asylum and Bars
Continued

noncitizen without first obtaining a removal order and cannot remove a noncitizen to a country about which the noncitizen has expressed fear of return without first determining whether they are entitled to protection pursuant to the withholding of removal statute and the regulations implementing the CAT.

The Departments disagree with the recommendation to establish a bar to asylum for those who are denied asylum in other countries. Those denials may be due to a variety of factors unrelated to the applicant's underlying claim, such as the foreign country's unique restrictions on asylum. Furthermore, such a proposal could discourage asylum seekers from applying for asylum in other countries, since a denial from other countries would result in the harsher consequence of also being ineligible for asylum in the United States.

Regarding the suggestion to suspend entry pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), the Departments note that suspension of entry requires a presidential proclamation, which is beyond the Departments' authorities. With this rule, which is fully consistent with domestic and international legal obligations, the Departments are exercising their authorities to address current and expected circumstances at the SWB, to avoid unduly negative consequences for noncitizens, to avoid unduly negative consequences for the U.S. immigration system, and to provide ways for individuals to seek protection in the United States and other countries in the region. 88 FR at 11730.

Separate from this rulemaking, DHS has been increasing and enhancing the use of expedited removal for those noncitizens who cannot be processed under the Title 42 public health Order.[181] The Departments have been dedicating additional resources, optimizing processes, and working with the Department of State and countries in the region to increase repatriations.[182] On April 27, 2023, DHS announced that the United States, in coordination with regional partners, has dramatically

scaled up the number of removal flights per week, which will double or triple for some countries.[183] With this increase in removal flights, migrants who cross the U.S. border without authorization and who fail to qualify for protection should expect to be swiftly removed and subject to at least a five-year bar to returning to the United States.[184] Regarding the suggestion to expand the use of expedited removal, the Departments note that this rule works in conjunction with expedited removal, as the rebuttable presumption will be applied during credible fear interviews for noncitizens placed in expedited removal after claiming a fear. To the extent that the commenter is suggesting that the Secretary should exercise his "sole and unreviewable discretion" to extend expedited removal proceedings to certain other categories of noncitizens who have not shown that they have been physically present in the United States for two years, that suggestion lies outside the scope of this rulemaking. *See* INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii).[185] Finally, the Departments note the process for taking noncitizens into custody for the execution of removal orders also is beyond the scope of this rule.

With respect to a commenter's suggestion that the rule apply to the Northern border, the Departments do not currently assess that application of the rebuttable presumption to such entries is necessary at the U.S.-Canada land border. With limited exceptions, these noncitizens are ineligible to apply for asylum in the United States due to the safe-third-country agreement with Canada, *see* INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A); 8 CFR 208.30(e)(6), and the United States is implementing other measures to address irregular migration at that border, such as the Additional Protocol of 2022 to the STCA between the United States and Canada. The Additional Protocol expands the STCA to apply to migrants who claim asylum or other protection after crossing the U.S.-Canada border between POEs. Under the STCA, migrants who cross from Canada to the United States, with

limited exceptions, cannot pursue an asylum or other protection claim in the United States and are instead returned to Canada to pursue their claim.[186]

With respect to a commenter's suggestion that the rule apply to maritime borders, the Departments have determined it is appropriate to extend the application of the rebuttable presumption not only to the U.S.-Mexico southwest land border, but also to adjacent coastal borders. The term "adjacent coastal borders" refers to any coastal border at or near the U.S.-Mexico border. This modification therefore means that the rule's rebuttable presumption of ineligibility for asylum applies to noncitizens who enter the United States at such a border after traveling from Mexico and who have circumvented the U.S.-Mexico land border. Moreover, the Departments are also considering and requesting comment on whether to apply the rebuttable presumption to noncitizens who enter the United States at a maritime border without documents sufficient for lawful admission during the same temporary time period, whether or not they traveled through a third country, *see* Section V of this preamble.

*Comment:* A commenter also suggested pursuing STCAs with transit countries as an alternative to the rule, stating that the proposed rule's reasoning on that point was insufficient. The commenter noted that the proposed rule stated that STCAs require long negotiations, but that the proposed rule itself is time-limited to noncitizens who enter within a two-year period. The commenter also stated that the proposed rule's claim that STCAs would provide lesser protection to noncitizens failed to account for the costs to states of allowing such noncitizens to have their claims adjudicated in the United States.

*Response:* The Departments agree that STCAs can be an important tool for managing the border. For example, on March 28, 2023, the Departments announced an update to the preexisting STCA between the United States and Canada. *See* 88 FR at 18227. That rule implemented a supplement to the U.S.-Canada STCA to extend its application to individuals who cross between the POEs along the U.S.-Canada shared border, including certain bodies of water as determined by the United States and Canada, and make an asylum or other protection claim relating to fear

---

to Asylum Eligibility, 85 FR 67202 (Oct. 21, 2020), which was also preliminarily enjoined. *Pangea Legal Servs.* v. *U.S. Dep't of Homeland Sec.,* 501 F. Supp. 3d 792, 827 (N.D. Cal. 2020). These orders remain in effect, and thus the 2020 version of these provisions—the version immediately preceding the enjoined amendments—are currently effective. The current version of 8 CFR 208.16 is effective with regard to all other provisions of that section.

[181] DHS, Press Release, *DHS Continue to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), *https:// www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.*

[182] *See id.*

[183] *See* DHS, *New Actions to Manage Regional Migration* (Apr. 27, 2023).

[184] *See id.*

[185] Section 235 of the INA continues to refer to the Attorney General, but the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, transferred immigration enforcement authorities to the Secretary of Homeland Security and provided that any reference to the Attorney General in a provision of the INA describing functions that were transferred from the Attorney General or other Department of Justice officials to DHS by the HSA "shall be deemed to refer to the Secretary" of Homeland Security. 6 U.S.C. 557 (codifying HSA sec. 1517); *see also* 6 U.S.C. 542 note; 8 U.S.C. 1551 note.

[186] *See* 8 CFR 208.30(e)(6); 8 CFR 1003.42(h); 88 FR 18227; Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR 69480 (Dec. 29, 2004).

of persecution or torture within 14 days after such crossing. *Id.*

However, as noted in the NPRM, development of an STCA is a lengthy process. 88 FR at 11731. The recent supplement to the U.S.-Canada STCA aptly demonstrates this point; the negotiations that led to the supplement began in early 2021, over two years prior to its eventual publication. *Id.* at 18232. For this reason, the Departments find that the enactment of this rule is preferable to pursuing additional STCAs at this time because the Departments need a solution in the immediate short-term to manage the significant increase in the number of migrants expected to travel without authorization to the United States after the termination of the Title 42 public health Order.

Regarding commenters' belief that an STCA could be preferable to this rule because a STCA would prevent affected noncitizens from having their claims adjudicated in the United States, the Departments reiterate that the goal of this rule is to incentivize migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel, and they expect it to reduce the number of noncitizens seeking to cross the SWB without authorization.

*Comment:* A commenter suggested amending the rule to prioritize the cases of noncitizens who follow the lawful pathways outlined in the NPRM, rather than implementing the rebuttable presumption against those who do not. This commenter argued that doing so would encourage use of lawful pathways but not risk returning noncitizens to countries where they may be persecuted or tortured.

*Response:* The Departments agree that prioritizing the cases of those noncitizens who follow lawful, safe, and orderly pathways to entering the United States may result in some noncitizens with valid claims to asylum more quickly being granted asylum. However, noncitizens who do not follow such lawful, safe, and orderly pathways, including those noncitizens ultimately found ineligible for asylum or other protection, would continue to wait years for a decision on their claim for asylum or other protection. As previously noted in this preamble, the expectation that noncitizens will remain in the United States for a lengthy period during the adjudication of their claims for asylum or other protection may drive even more migration to the United States. Under this rule, such noncitizens, however, will remain in the United States for less time before a final order is entered in

their case. Furthermore, prioritization alone will not address the need for quick processing of those who arrive at the SWB and the lack of resources to do so safely and efficiently. Moreover, the success of the CHNV parole processes demonstrates that the United States can effectively discourage irregular migration by coupling incentives for use of lawful pathways with disincentives to cross the SWB irregularly.

*Comment:* One commenter recommended the United States advance dissuasive messaging, including announcements of legal action, against relatives, friends, and criminal organizations that may promote and finance migration to the United States. Another commenter recommended that an education and awareness campaign across the Western Hemisphere and a clearer definition of the "significant possibility" standard could prove a potent combination of policies to restore the integrity and manageability of the U.S. asylum system at the SWB, while also preserving the country's long-standing commitment to humanitarian values.

*Response:* The Departments understand and agree with the need for robust messaging relating to the dangers of irregularly migrating to the United States SWB. Strengthening regional public messaging on migration is one of the eight lines of effort outlined in the CMMS.[187] In addition, the Departments regularly publicize law enforcement action and efforts against human trafficking, smuggling, and transnational criminal organizations that profit from irregular migration, often in conjunction with partners in the region.[188] The Departments intend to continue these efforts once the rule is in place.

The Departments acknowledge the commenter's concern regarding the "significant possibility" standard but disagree that there is a need for clarifying regulations on the statutory standard at section 235(b)(1)(B)(v) of the INA, 8 U.S.C. 1225(b)(1)(B)(v). In the context of the condition established by this rule, however, the Departments have provided additional clarification regarding the "significant possibility" standard in Section IV.D.1.iii of this preamble.

---

[187] The White House, *FACT SHEET: The Collaborative Migration Management Strategy* (July 29, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/29/fact-sheet-the-collaborative-migration-management-strategy/*.

[188] *See, e.g.,* L.A. Declaration Fact Sheet ("The United States will announce a multilateral 'Sting Operation' to disrupt human smuggling networks across the Hemisphere.").

## D. Legal Authority and Background

### 1. Immigration and Nationality Act

i. Section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1)

*Comment:* Commenters claim that the proposed rule would violate both the Refugee Act and the INA. Specifically, commenters cited the Refugee Act, which they say both contains principles of non-refoulement and bars any distinction, including based on nationality, for noncitizens who are "physically present in the United States or at a land border or port of entry." Refugee Act of 1980, 94 Stat. at 105. Additionally, commenters stated this proposed rule goes further by adding additional requirements that did not exist in the Refugee Act and do not exist in the INA. While some commenters acknowledge and agree that the proposed rule is within the scope of the Departments' authority and is consistent with the INA, other commenters expressed concern that the proposed rule would be contrary to the plain language of section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), which states, "Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." Commenters asserted that the INA does not require those seeking protection to apply before entering or at a POE or to schedule an appointment through a website or app in order to make an application, but instead allows applications from anywhere along the border. Some commenters described a fundamental right to apply for asylum for anyone inside the United States. Commenters asserted that entering the United States either through a POE or across the SWB and asking for asylum constitutes a "lawful pathway." Another asserted that the proposed rule effectively creates a new legal framework by which to evaluate asylum claims in conflict with the statutory process provided by Congress, while another commenter stated that the proposed rule will cause confusion among asylum seekers. Commenters stated that the proposed rule would result in migrants who seek refuge at the SWB being turned away. At least one commenter asserted that the proposed rule violates the Refugee Act because it violates the right to uniform treatment.

**31374**    **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

Another commenter described the proposed rule as disparate treatment based on manner of entry, with particular concern for those who entered between POEs. Commenters stated that Congress clearly intended to allow noncitizens to apply for asylum regardless of manner of entry without requiring that a noncitizen first apply for asylum elsewhere while in transit. Commenters further asserted that analyzing an asylum application should focus on the applicant's reasonable fear of persecution rather than their manner of entry. Commenters similarly stated that the Departments should not and cannot categorically deny asylum for reasons unrelated to the merits of the claim itself. Commenters also asserted that, under *Matter of Pula,* 19 I&N Dec. 467 (BIA 1987), manner of entry may not be the dispositive factor in deciding whether a noncitizen is eligible for asylum. Similarly, commenters argued that *Matter of Pula* is binding precedent and precludes consideration of manner of entry over all other factors.

*Response:* This rule is consistent with U.S. law. As a threshold response, the rule does not require the Departments to turn away migrants at the SWB or to categorically deny all asylum applications filed by migrants who enter the United States from Mexico at the southwest land border or adjacent coastal borders. Nor does the rule prohibit any noncitizen from seeking protection solely because of the manner or location of entry into the United States. Rather, the rule is a lawful condition on eligibility for asylum, as authorized by section 208(b)(2)(C), (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C), (d)(5)(B).

In response to comments that the rule violates the non-refoulement provision of the Refugee Act, as stated elsewhere in this preamble, the United States has implemented its non-refoulement obligations through section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and the regulations implementing CAT protections at 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, 1208.18, and the conditions provided by this rule are not a penalty in violation of international law.

Regarding comments that the Refugee Act and subsequent amendments to the INA provide access to applying for asylum for any noncitizen "physically present in" or arriving in the United States, "whether or not at a designated port of arrival" and regardless of status, the Departments respond that this rule is not inconsistent. INA 208(a)(1), 8 U.S.C. 1158(a)(1); *see* Refugee Act of 1980, 94 Stat. at 105 (providing that the Attorney General establish "a procedure

for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum"); Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Public Law 104–208, 110 Stat. 3009, 3009–690 (amending INA 208(a)(1), 8 U.S.C. 1158(a)(1), to permit any noncitizen "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . .)" to apply for asylum "irrespective of the noncitizen's immigration status). Critically, the rule does not prevent anyone from applying for asylum. IIRIRA separated and distinguished the ability to apply for asylum from the conditions for granting asylum. *Compare* INA 208(a)(1), 8 U.S.C. 1158(a)(1), *with* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A); *see also* INA 208(d)(5)(A), 8 U.S.C. 1158(d)(5)(A) (establishing procedures for consideration of asylum applications). Section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1) retains the ability for most noncitizens who are physically present in the United States to apply for asylum irrespective of whether they arrived in the United States at a POE, except that Congress created three categories of noncitizens who are barred from making an application. INA 208(a)(2)(A) through (C), 8 U.S.C. 1158(a)(2)(A) through (C).[189] Separately, Congress provided "[c]onditions for granting asylum," which include six statutory exceptions to demonstrating eligibility for asylum as well as authority for the Departments to promulgate additional conditions and limitations on eligibility for asylum. INA 208(b)(2)(A)(i) through (vi), (C), 8 U.S.C. 1158(b)(2)(A)(i) through (vi), (C).[190] As some commenters noted, by creating exceptions to who is eligible to receive asylum and by authorizing the Departments to create new exceptions to

eligibility, Congress saw nothing inconsistent in barring some individuals who may apply for asylum from receiving that relief.[191] *See R–S–C* v. *Sessions,* 869 F.3d 1176, 1187 (10th Cir. 2017).

Additionally, under this rule and contrary to commenter assertions, manner of entry, standing alone, is never dispositive. *Cf. E. Bay Sanctuary Covenant* v. *Biden* ("*East Bay III*"), 993 F.3d 640, 669–70 (9th Cir. 2021) (enjoining the Proclamation Bar IFR as "effectively a categorical ban on migrants who use a method of entry explicitly authorized by Congress in section 1158(a)"). Rather, the rule provides that a subset of noncitizens seeking asylum—*i.e.,* those who travel through a specified third country, enter the United States during a two-year period after the effective date of the rule, and are not subject to one of four enumerated categories of excepted individuals, including those who use an identified lawful pathway to enter the United States—are subject to a rebuttable presumption of ineligibility. 8 CFR 208.33(a)(1) through (3), 1208.33(a)(1) through (3); 88 FR at 11707. This presumption is not categorical, but rather involves a case-by-case consideration of facts and factors. Indeed, as discussed in Sections IV.B.2.ii and IV.D.2 of this preamble, the narrower application and numerous exceptions and methods of rebutting the presumption demonstrate the differences between the prior, categorical bars that are now enjoined, and one of which is vacated. *See also* Sections IV.E.9 and IV.E.10 of this preamble (removing the TCT Bar Final Rule and the Proclamation Bar IFR from the CFR).

Furthermore, the rule is within the scope of the Departments' authority because it adds a condition on eligibility for asylum permitted under section 208(b)(2)(C), (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C), (d)(5)(B), not a sweeping categorical bar that would preclude a grant of asylum solely based

---

[189] *See* INA 208(a)(2)(A) through (C), 8 U.S.C. 1158(a)(2)(A) through (C) (enumerating: (A) noncitizens who may be removed to a safe third country pursuant to a bilateral or multilateral agreement; (B) noncitizens who did not file for asylum within one year after arriving in the United States unless they demonstrate the existence of extraordinary or materially changed circumstances; and (C) noncitizens who previously applied for asylum and had that application denied unless they demonstrate the existence of extraordinary or materially changed circumstances).

[190] *See* INA 208(b)(2)(A)(i) through (vi), 8 U.S.C. 1158(b)(2)(A)(i) through (vi) (barring asylum for individuals who: participate in the persecution of others, have been convicted of a particularly serious crime, have committed a serious nonpolitical crime outside the United States, are regarded as a danger to the security of the United States, have engaged in certain terrorism-related activities, or were firmly resettled in another country prior to arriving in the United States).

[191] One important distinction between the exceptions enumerated in subsection 208(a)(2) of the INA, 8 U.S.C. 1158(a)(2), and those enumerated in 208(b)(2)(A), 8 U.S.C. 1158(b)(2)(A), is that noncitizens who may apply for asylum but may be ineligible due to a (b)(2)(A) bar on eligibility may seek work authorization while their application is being adjudicated. 8 CFR 208.7(a)(1). A noncitizen who is barred from applying, *i.e.,* someone subject to a subsection (a)(2) bar, cannot obtain work authorization during this time. Because this rule does not create a bar on applying for asylum under section 208(a)(2) of the INA, 8 U.S.C. 1158(a)(2), there is no inconsistency with the provision of immediate work authorization to noncitizens who use one of the provided lawful parole processes to enter the United States and apply for asylum. 88 FR at 11707 n.26.

on manner of entry, which some courts have found to conflict with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1). 88 FR at 11735, 11740. *Cf. East Bay III,* 993 F.3d at 669–70 (concluding that the Proclamation Bar was "effectively a categorical ban" on migrants based on their method of entering the United States, and that such a categorical bar is in conflict with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1)). Section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), provides that the Attorney General and Secretary "may by regulation establish additional limitations and conditions, consistent with [section 208], under which an alien shall be ineligible for asylum." Similarly, section 208(d)(5)(B) of the INA, 8 U.S.C. 1158(d)(5)(B), specifies that the Attorney General and Secretary "may provide by regulation for any other conditions or limitations on the consideration of an application for asylum," so long as those conditions or limitations are "not inconsistent with this chapter." *See* INA 208(d)(5), 8 U.S.C. 1158(d)(5) (establishing certain procedures for consideration of asylum applications). As the Tenth Circuit explained, "carving out a subset of" noncitizens seeking asylum and placing a condition or limitation on their asylum applications falls within the limitations allowed by sections 208(b)(2)(C), (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C), (d)(5)(B), and is not inconsistent with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1). *R–S–C,* 869 F.3d at 1187 n.9. Precluding such a regulation would "render 1158(b)(2)(C) [and (d)(5)(B)] meaningless, disabling the Attorney General from adopting further limitations while the statute clearly empowers him to do so." *Id.*

Consistent with this authority, the Departments have promulgated other limitations or conditions on asylum eligibility, including some provisions that Congress later adopted and codified in the INA. *See Aliens and Nationality; Refugee and Asylum Procedures,* 45 FR 37392, 37392 (June 2, 1980) (imposing firm resettlement bar); *Aliens and Nationality; Asylum and Withholding of Deportation Procedures,* 55 FR 30674, 30678, 30683 (July 27, 1990) (promulgating 8 CFR 208.14(c) (1990), which provided for mandatory regulatory bars to asylum for those who have been convicted in the United States of a particularly serious crime and who constitute a danger to the security of the United States while retaining a prior regulatory bar to asylum for noncitizens who have been firmly resettled); *Asylum Procedures,* 65 FR 76121, 76127 (Dec. 6, 2000)

(including internal relocation); *see also, e.g., Afriyie* v. *Holder,* 613 F.3d 924, 934–36 (9th Cir. 2010) (discussing internal relocation). Restraining the Departments' authority to promulgate additional limitations and conditions on the ability to establish eligibility for asylum would be contrary to congressional intent. *See Thuraissigiam,* 140 S. Ct. at 1966 (recognizing that the "theme" of IIRIRA "was to protect the Executive's discretion from undue interference by the courts") (alteration and quotation marks omitted); *R–S–C,* 869 F.3d at 1187 (reasoning that the "delegation of authority" in section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), "means that Congress was prepared to accept administrative dilution" of section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1)); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 444–45 (1987); 88 FR at 11740.

Regarding comments that the condition created by the rule is inconsistent with the statute because it does not relate to whether a noncitizen qualifies as a refugee, the Departments respond that bars, limitations, and conditions on asylum do not necessarily and need not directly relate to whether a noncitizen satisfies the definition of a "refugee" within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A), but instead can embrace policy considerations that justify a finding of ineligibility. *See, e.g., Zheng* v. *Mukasey,* 509 F.3d 869, 871 (7th Cir. 2007) (noting that IIRIRA enacted several provisions, including the one-year bar, "intended to reduce delays and curb perceived abuses in removal proceedings"); *Ali* v. *Reno,* 237 F.3d 591, 594 (6th Cir. 2001) (recognizing that asylum law "was never intended to open the United States to refugees who had found shelter in another nation and had begun to build new lives") (internal marks and quotation omitted); *Matter of Negusie,* 28 I&N Dec. 120, 125 (A.G. 2020) (discussing the history of the persecutor bar, and noting that Congress intended to make "certain forms of immigration relief," including asylum, "unavailable to persecutors").

This rule also does not, contrary to commenter concerns, violate the Refugee Act by establishing a non-uniform procedure for applying for asylum. The rule, consistent with the Refugee Act's objective to provide systematic and comprehensive procedures, establishes procedures and conditions to support the lawful, orderly processing of asylum applications. 88 FR at 11704, 11728; *see* Refugee Act, sec. 101(b), 94 Stat. at 102 ("The objectives of this Act are to provide a permanent and systematic

procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted."). To be sure, the rule will not lead to the same result for each noncitizen: For example, the rebuttable presumption will not apply to noncitizens who enter the United States using a lawful pathway but will apply to noncitizens who enter the United States from Mexico at the southwest land border or adjacent coastal borders and do not establish an exception to the presumption or otherwise rebut the presumption. But the rule will apply in a uniform way to all asylum applications filed by noncitizens who are subject to its terms during the applicable time period.

The rule is likewise within the Departments' broad authority, within existing statutory bounds, to establish procedures that are tailored to different situations. INA 208(d)(1), 8 U.S.C. 1158(d)(1) (requiring the Attorney General to "establish a procedure for the consideration of asylum applications"). Notably, asylum applicants navigate several procedurally different paths depending on their arrival in the United States and timing of their applications; some noncitizens file affirmative applications with USCIS after arriving in the United States, and others file defensive applications after being placed in expedited removal proceedings and found to have a credible fear of persecution. Others submit defensive applications while in section 240 removal proceedings. Contrary to commenter concerns, the lawful pathways to enter the United States outlined in this rule do not eliminate any of these existing procedures or categorically bar any of these applications for asylum.

Furthermore, it is not inconsistent with the INA to provide a lawful pathway that relies on use of the CBP One app. The Departments note that it is not uncommon to implement policies that encourage the use of new technologies as they become available to create efficiencies in processing, including with respect to asylum applications, such as new forms, e-filing, the use of video teleconference hearings, and digital audio recording of hearings.[192] *See, e.g.,* Executive Office

---

[192] In 1998, Congress passed the Government Paperwork Elimination Act, which requires federal agencies to provide the public with the ability to conduct business electronically, when practicable, with the Federal government. *See* Public Law 105–277, 1701–10, 112 Stat. 2681, 2681–749 to –751
Continued

for Immigration Review Electronic Case Access and Filing System, 86 FR 70708 (Dec. 13, 2021) (implementing EOIR's electronic case management system); Immigration Court Practice Manual, Chapter 4.7 (Apr. 10, 2022) (providing guidance for video teleconference hearings); *id.* at Chapter 4.10(a) (providing for electronic recording of hearings). In this rule, the Departments are implementing a rebuttable presumption of ineligibility that will encourage the use of lawful pathways, including use of the CBP One app, which the Departments expect will enable POEs to manage migratory flows in a safe and efficient manner. Importantly, those who present at a POE without a CBP One appointment and demonstrate that it was not possible to access or use the CBP One app due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle will not be subject to the presumption. 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). Further, using the app is not required in order to qualify for an exception from or to rebut the presumption, such as where a noncitizen applied for asylum or other protection in a third country and received a final decision denying that application or where the noncitizen shows exceptionally compelling circumstances. Thus, although the rule encourages increased use of the CBP One app, which is expected to facilitate more efficient and streamlined processing along the SWB, use of the app is not required.

In response to commenters' assertions that crossing the SWB and applying for asylum is in itself a "lawful pathway," the Departments reiterate that this rule does not bar a noncitizen from entering the United States from Mexico at the southwest land border or adjacent coastal borders and subsequently seeking asylum. 88 FR at 11707. However, crossing the southwest land border or adjacent coastal borders without authorization is not one of the lawful pathways provided to encourage and increase safe, orderly transit to the United States. Thus, noncitizens who choose to cross the southwest land border or adjacent coastal borders without making an appointment to present at a POE during the period covered by this rule, and who do not otherwise qualify for an exception enumerated in 8 CFR 208.33(a)(2),

(1998). Similarly, in 2002, Congress passed the E-Government Act of 2002, which promotes electronic government services and requires agencies to use internet-based technology to increase the public's access to government information and services. *See* Public Law 107–347, 116 Stat. 2899 (2002).

1208.33(a)(2), will have to address the rebuttable presumption as part of establishing eligibility for relief, but they will nevertheless be able to apply for asylum.

As to commenters' statements that the Departments' reliance on *Matter of Pula* is misplaced, the Departments respond that the rule is consistent with historical consideration of manner of entry as a relevant factor in considering an asylum application. In *Matter of Pula,* the BIA identified—as relevant factors as to whether a noncitizen warrants the favorable exercise of discretion in granting asylum—the noncitizen's "circumvention of orderly refugee procedures," including their "manner of entry or attempted entry"; whether they "passed through any other countries or arrived in the United States directly"; "whether orderly refugee procedures were in fact available to help" in any transit countries; and whether they "made any attempts to seek asylum before coming to the United States." *Matter of Pula,* 19 I&N Dec. at 473–74. The BIA explained that section 208(a) of the INA, 8 U.S.C. 1158(a), required the Attorney General to establish procedures for adjudicating applications filed by any noncitizen, "irrespective of such alien's status," but the BIA did not preclude consideration of the manner of entry in assessing whether to grant asylum. *Id.* at 472. The BIA also stated that while the manner of entry could "be a serious adverse factor, it should not be considered in such a way that the practical effect is to deny relief in virtually all cases." *Id.* at 473. The BIA cautioned against placing "too much emphasis on the circumvention of orderly refugee procedures" because "the danger of persecution should generally outweigh all but the most egregious of adverse factors." *Id.* at 473–74.

The Departments acknowledge that this rule places more weight on manner of entry than the Board did in *Matter of Pula.* 88 FR at 11736. But in line with *Matter of Pula,* the rule also considers factors other than manner of entry, including providing a categorical rebuttal ground for noncitizens who faced an imminent and extreme threat to life or safety at the time of entry. *Id.;* 8 CFR 208.33(a)(3)(i)(B), 1208.33(a)(3)(i)(B). And like *Matter of Pula,* this rule provides for consideration of manner of entry in assessing eligibility for some asylum seekers, but this factor is not considered in "a way that the practical effect is to deny relief in virtually all cases." 19 I&N Dec. at 473. Rather, the manner of entry is only impactful for individuals who do not enter the United States

using a lawful pathway, do not establish an exception to the rebuttable presumption, and do not rebut the presumption. 88 FR at 11707, 11735–36.

The Departments also recognize that the specific analysis discussed in *Matter of Pula* (considering manner of entry in the discretionary decision of whether to grant asylum) is distinct from how the rule considers manner of entry (as part of provisions governing eligibility for asylum). *See Matter of Pula,* 19 I&N Dec. at 472. Nevertheless, *Matter of Pula* supports the proposition that it is lawful to consider, and in some cases rely on, manner of entry for asylum applicants. Moreover, adjudicators are not precluded from considering the same facts when evaluating both eligibility and discretion. Indeed, it is possible for a single fact to be relevant to both determinations but dispositive as to only one. *See Kankamalage* v. *INS,* 335 F.3d 858, 864 (9th Cir. 2003) (concluding that a conviction did not render a noncitizen ineligible for asylum, but stating that the Board was "not prohibited from taking into account Kankamalage's robbery conviction when it decides whether or not to grant asylum as a matter of discretion"); *Matter of Jean,* 23 I&N Dec. 373, 385 (A.G. 2002) (concluding that even a noncitizen who "qualifies as a 'refugee'" and whose criminal conviction did "not preclude her eligibility" for asylum could nevertheless be "manifestly unfit for a *discretionary* grant of relief").

Moreover, the Departments, in exercising their broad discretion to issue regulations adopting additional limitations and conditions on asylum eligibility, are not bound to consider manner of entry only as a factor contributing to whether a particular noncitizen warrants a favorable exercise of discretion. The Departments similarly disagree with the commenter who stated that the Departments are seeking to "excuse themselves from complying with long-established Board precedent simply because the 'regulatory regime' in place today is different than the regime at the time the Board decided *Matter of Pula.*" This rule is not in conflict with *Matter of Pula,* which remains the applicable standard for discretionary determinations. And the rule takes *Matter of Pula* as providing support for the proposition that it is lawful to consider, and in some cases rely on, manner of entry for asylum applicants. 88 FR at 11735–36.

In sum, as with other conditions and limitations imposed by section 208(b)(2) of the INA, 8 U.S.C. 1158(b)(2), this rule is grounded in important policy objectives, including providing those

with valid asylum claims an opportunity to have their claims heard in a timely fashion, preventing an increased flow of migrants arriving at the SWB that will overwhelm DHS's ability to provide safe and orderly processing, and reducing the role of exploitative transnational criminal organizations and smugglers. 88 FR at 11704. In seeking to enhance the overall functioning of the immigration system and to improve processing of asylum applications, the Departments are, in the exercise of the authority to promulgate conditions and limitations on eligibility for asylum, placing greater weight on manner of entry to encourage migrants to seek protection in other countries in the region and to use lawful pathways and processes to enter the United States and access the U.S. asylum system.

ii. Statutory Bars to Asylum

*Comment:* Commenters stated that the proposed rule would be inconsistent with the statutory firm-resettlement and safe-third-country bars. *See* INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi); INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A). Commenters argued that Congress intended for these two bars to be the sole means by which a noncitizen may be denied asylum based on a relationship with a third country. Commenters disagreed with the proposed rule, asserting it would bar asylum for anyone who travels through what the United States deems a "safe third country." Similarly, another commenter stated that the proposed rule would penalize migrants who do not live adjacent to a safe third country to which they could travel directly in order to seek protection.

*Response:* This rule is within the Departments' broad authority to create new conditions on eligibility for asylum, and the Departments disagree that the rule conflicts with any of the exceptions to a noncitizen's ability to apply for asylum or a noncitizen's eligibility for asylum under sections 208(a)(2) or (b)(2) of the INA, 8 U.S.C. 1158(a)(2) or (b)(2). The INA's safe-third-country provision prohibits a noncitizen from applying for asylum if the noncitizen "may be removed, pursuant to a bilateral or multilateral agreement" to a safe third country in which the noncitizen would not be subject to persecution and "would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A). The firm-resettlement provision precludes a noncitizen who "was firmly resettled in another country prior to arriving in the United States" from demonstrating

eligibility for asylum. INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi); *see also* 8 CFR 208.15 (2020), 1208.15 (2020).[193] The two provisions provide categorical bars to asylum for noncitizens who have available, sustained protection in another country, and help protect against forum shopping. *Sall* v. *Gonzales,* 437 F.3d 229, 233 (2d Cir. 2006) (per curiam) (noting that the policy behind the safe-third-country statutory bar includes the principle that "[t]he United States offers asylum to refugees not to provide them with a broader choice of safe homelands, but rather, to protect those arrivals with nowhere else to turn."); *Rosenberg* v. *Yee Chien Woo,* 402 U.S. 49, 55, 56 (1971) (noting that the concept of firm resettlement is historically rooted in the notion of providing "a haven for the world's homeless people" while encouraging "other nations to do likewise."); *see also Maharaj* v. *Gonzales,* 450 F.3d 961, 988–89 (9th Cir. 2006) (en banc) (O'Scannlain, J., concurring, in part) (recognizing that the firm-resettlement bar protects against forum shopping, an issue "that our immigration laws have long sought to avoid."); *United States* v. *Malenge,* 294 F. App'x 642, 645 (2d Cir. 2008) (noting that a purpose of the safe-third-country agreement with Canada was to prevent forum shopping).

The Departments disagree with commenters because the INA permits the Attorney General and Secretary to create new eligibility conditions and does not limit this authority based on the content of the existing statutory conditions. *See Trump,* 138 S. Ct. at 2411–12 (recognizing that the INA "did not implicitly foreclose the Executive from imposing tighter restrictions" in "similar" areas); *E. Bay Sanctuary Covenant* v. *Garland,* 994 F.3d 962, 979 (9th Cir. 2020) ("*East Bay I*") (acknowledging that the INA does not limit the Departments' "authority to the literal terms of the two safe-place statutory bars"); *R–S–C,* 869 F.3d at 1187 (noting that Congress's delegation of authority in section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C) "means that Congress was prepared to accept administrative dilution" of the right to

seek asylum). Indeed, section 208(b)(2)(C), (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C), (d)(5)(B), provides no subject-matter limit, other than requiring any regulation be "consistent with" section 208 of the INA, 8 U.S.C. 1158. *See R–S–C,* 869 F.3d at 1187 n.9. The condition created by this rule is consistent with section 208 of the INA, 8 U.S.C. 1158, as a whole, and it is consistent with the safe-third-country and firm-resettlement bars in particular. 88 FR at 11736.

Critically, unlike the safe-third-country bar, the rule does not consider whether the noncitizen could now safely relocate to a third country, and unlike the firm-resettlement bar, this rule does not categorically preclude a noncitizen from demonstrating eligibility for asylum because they are no longer in flight from persecution. *Cf. Ali,* 237 F.3d at 594 (noting that the firm-resettlement bar does not conflict with Congress's intent in providing for asylum relief "[b]ecause firmly resettled aliens are by definition no longer subject to persecution") (marks and citation omitted). Rather, as discussed in the NPRM, the rule encourages use of lawful pathways for migrants seeking to come to the United States, including noncitizens wishing to seek asylum in the United States. 88 FR at 11707. The rule is designed to improve processing of such asylum applications. *Id.* at 11704, 11706–07. Noncitizens will not be subject to the rebuttable presumption if they travel through a third country and seek entry into the United States through a lawful, safe, and orderly pathway. *Id.* at 11707; 8 CFR 208.33(a)(2)(ii), 1208.33(a)(2)(ii). They also will not be subject to the rebuttable presumption if they seek and are denied asylum or other protection in a third country. 88 FR at 11707; 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). And unaccompanied children are excepted from the presumption. 8 CFR 208.33(a)(2)(i), 1208.33(a)(2)(i). Moreover, even if a noncitizen is subject to the presumption of ineligibility under 8 CFR 208.33(a)(1), 1208.33(a)(1), the noncitizen may rebut that presumption in any of several ways that account for protecting the safety of those fleeing imminent harm. 88 FR at 11707; 8 CFR 208.33(a)(3), 1208.33(a)(3). Accordingly, the rule encourages noncitizens seeking to enter the United States, including those seeking asylum who have transited through a third country before arriving in the United States, to enter through lawful, safe, and orderly pathways by imposing an additional condition on the asylum eligibility of individuals who did not avail

---

[193] These provisions were amended by Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 80274 (December 11, 2020), which was preliminarily enjoined and its effectiveness stayed before it became effective. *See Pangea Legal Services* v. *U.S. Dep't of Homeland Security* (*Pangea II*), 512 F. Supp. 3d 966, 969–70 (N.D. Cal. 2021). This order remains in effect, and thus the 2020 version of these provisions—the version immediately preceding the enjoined amendment— is currently effective.

themselves of such pathways. 88 FR at 11706–07. The rule does not preclude noncitizens who have transited through third countries without applying for protection in those countries from obtaining asylum in the United States. *Id.* at 11706–07. In addition, the rule expressly accounts for migrants who have been denied a safe haven elsewhere; if an applicant seeks asylum in a third country and is denied, the rebuttable presumption does not apply. 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C).

*Comment:* Commenters stated that the proposed rule would conflict with the firm-resettlement bar to asylum eligibility or render the firm-resettlement bar superfluous because it would negate the need to determine whether the noncitizen has firmly resettled or whether any potential or obtained status in a third country would not be reasonably available or reasonably retained due to issues such as processing backlogs in the third country. Commenters were also concerned that the proposed rule would not account for the risk of harm that the noncitizen might face in the third country. Commenters stated that the proposed rule would ignore congressional intent that the noncitizen have a more significant relationship with the third country—*i.e.,* be firmly resettled in that country rather than be merely transiting through the country—to be effectively rendered ineligible for asylum. Commenters asserted that requiring individuals to apply for protection in a third transit country would create a new hurdle for them because it could subject them to the firm-resettlement bar.

*Response:* As discussed above, the INA does not limit the Departments' authority regarding eligibility conditions relating to a noncitizen's conduct in third countries to the boundaries of the firm-resettlement statutory bar. *Trump,* 138 S. Ct. at 2411–12 (recognizing that the INA "did not implicitly foreclose the Executive from imposing tighter restrictions" in "similar" areas); *see also East Bay I,* 994 F.3d at 979 (noting that the INA does not limit the Departments' "authority to the literal terms of the two safe-place statutory bars"). The Departments disagree that the rule conflicts with the firm-resettlement bar, which focuses on protecting against forum shopping when a migrant has already found a safe refuge. INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi); *Bonilla* v. *Mukasey,* 539 F.3d 72, 80 (1st Cir. 2008); *Ali,* 237 F.3d at 594. This rule focuses on encouraging migrants to use safe, orderly, and lawful pathways to enter

the United States. 88 FR at 11707, 11736. Accordingly, the relevant facts and analysis for considering firm resettlement and the application of the rebuttable presumption are materially different.

Additionally, the rule does not overlook commenter concerns about the accessibility to or processing times of applications in third countries. Even if noncitizens determine that protection in a third country is inaccessible or would take more time than the noncitizens believe they can wait, the rule provides other ways that the noncitizen can seek protection. Seeking protection in a third country and receiving a denial excepts a noncitizen from the presumption but is not a requirement—the noncitizen may still either enter using a lawful pathway, pre-schedule an appointment to present themselves at a POE, or show one of several other circumstances that allow an individual to be excepted from the rule's rebuttable presumption. 8 CFR 208.33(a)(2), 1208.33(a)(2). The rule also explicitly protects family unity by providing that if one member of a family traveling together is excepted from the presumption of asylum ineligibility or has rebutted the presumption then the other members of the family are similarly treated as excepted from the presumption or having rebutted the presumption. 8 CFR 208.33(a)(2)(ii), (3), 1208.33(a)(2)(ii), (3); 88 FR at 11730. And if during removal proceedings a principal applicant is eligible for statutory withholding of removal or CAT withholding and would be granted asylum but for the presumption and has either an accompanying spouse or child who would not qualify for asylum or protection from removal or a spouse or child who would be eligible to follow to join them as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), if the principal applicant were granted asylum, the applicant will be deemed to have established an exceptional circumstance that rebuts the presumption. 8 CFR 1208.33(c). Additionally, any principal asylum applicants who enter the United States during the two-year period of the rebuttable presumption while under the age of eighteen and apply for asylum after the two-year period are not subject to the presumption. 8 CFR 208.33(c)(2), 1208.33(d)(2). Furthermore, the rule does not affect a noncitizen's ability to apply for statutory withholding of removal and CAT protection. 88 FR at 11730.

The rule also does not render the firm-resettlement bar superfluous; instead, this rule and the firm-resettlement bar apply independently. The operative firm-resettlement

regulations provide that a noncitizen is barred from receiving asylum in the United States if they have received an offer of safe, established permanent resettlement that is not substantially and consciously restricted. 8 CFR 208.15, 1208.15 (2020). The firm-resettlement bar is divorced from any inquiry into how or when a noncitizen enters the United States. INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi); 8 CFR 208.15, 1208.15 (2020). Put differently, the firm-resettlement bar applies with equal force to noncitizens who enter the United States using an identified lawful pathway and those who do not. *Abdalla* v. *INS,* 43 F.3d 1397, 1400 (10th Cir. 1994) ("The pertinent regulations specifically focus on resettlement status prior to the alien's entry into this country . . . ."). Conversely, this rule does not turn exclusively on whether the noncitizen received an offer of permanent resettlement in a third country. 88 FR at 11723. Under the rule, a migrant's time in a third country is primarily relevant in two circumstances: (1) when a noncitizen travels through a third country and does not enter the United States through established lawful pathways, or (2) if the noncitizen applied for protection in the third country and was denied. 8 CFR 208.33(a)(1)(iii), (2)(ii)(C), 1208.33(a)(1)(iii), (2)(ii)(C). In the first circumstance, the noncitizen is subject to the rule's condition on asylum eligibility unless they can demonstrate an applicable exception or successfully rebut the presumption. 8 CFR 208.33(a)(2) and (3), 1208.33(a)(2) and (3). In the second circumstance, the noncitizen is categorically not subject to the rebuttable presumption of asylum ineligibility regardless of whether they entered the United States through established lawful pathways. 8 CFR 208.33(a)(2)(ii)(C),1208.33(a)(2)(ii)(C). But neither circumstance involves determining whether the noncitizen was firmly resettled, as defined in 8 CFR 208.15, 1208.15 (2020), before traveling to the United States.[194] Thus, the firm-resettlement bar and this rule are simply different conditions with different scopes.

In addition, the rule properly accounts for the risk of harm a noncitizen might face in the third country. As at least one commenter in favor of the rule noted, not all migrants

---

[194] Indeed, the firm-resettlement bar, if applicable to a particular noncitizen, would not be applied by an AO in credible fear proceedings and would be applied only if the noncitizen's application is considered by an IJ in section 240 removal proceedings or an AO during an asylum merits interview. 8 CFR 208.30(e)(5)(i).

who travel through third countries are actively fleeing persecution and some choose to come to the United States for other reasons. But should the noncitizen be fleeing harm, one of the enumerated grounds that will necessarily rebut the presumption of asylum ineligibility is that the noncitizen faced an imminent and extreme threat to life or safety at the time of entry into the United States. 8 CFR 208.33(a)(3)(i)(B), 1208.33(a)(3)(i)(B); 88 FR at 11704, 11707, 11736. In response to the comment that requiring a noncitizen to seek protection in a transit country would add a hurdle to obtaining asylum in the United States insofar as that noncitizen may need to address the firm-resettlement bar, the Departments note that noncitizens subject to the firm-resettlement bar are not in need of protection in the United States. *See Ali,* 237 F.3d at 594 (recognizing that asylum law ''was never intended to open the United States to refugees who had found shelter in another nation and had begun to build new lives'' (quoting *Rosenberg* v. *Yee Chien Woo,* 402 U.S. 49, 56 (1971)); *East Bay I,* 994 F.3d at 977 (recognizing ''the 'core regulatory purpose of asylum,' which is 'to protect [refugees] with nowhere else to turn,' because 'by definition' an applicant barred by a safe-place provision has somewhere else to turn'' (quoting *Matter of B–R-,* 26 I&N Dec. 119, 122 (BIA 2013), overruled on other grounds by *Zepeda-Lopez* v. *Garland,* 38 F.4th 315, 326 (2d Cir. 2022)); Constitution of the International Refugee Organization, ch. V, sec. (D)(c), Dec. 15, 1946, 18 U.N.T.S. 20 (determining that a refugee or displaced person ''will cease to be the concern of the Organization . . . when they have . . . become otherwise firmly established''). Likewise, the rule does not deny asylum to a noncitizen who obtained asylum in a third country (and therefore presumably has a cognizable claim to refugee status) but thereafter comes to the United States and seeks asylum. That person may seek to enter through a lawful pathway and file an asylum application like any other migrant, at which point they would likely need to address the firm-resettlement bar. Should they enter the United States from Mexico at the southwest land border or adjacent coastal borders without authorization or at a POE without an appointment and not otherwise be covered by an exception, they, like any other noncitizen in that situation, will be able to address the rebuttable presumption.

Finally, the Departments disagree that the rule ignores congressional intent underlying the firm-resettlement bar. As explained above, this rule has the policy objective of encouraging the use of safe, orderly, and lawful pathways by noncitizens, including those seeking asylum, to enter the United States to present their claims, 88 FR at 11704, 11707, and is distinct from the firm-resettlement bar, which is grounded in the policy objective of protecting against forum shopping by migrants who have already found a safe refuge, *East Bay I,* 994 F.3d at 977; *Bonilla,* 539 F.3d at 80; *Ali,* 237 F.3d at 595.

*Comment:* Commenters stated that the proposed rule would be inconsistent with or would circumvent the safe-third-country bar to applying for asylum because the safe-third-country bar was intended to ensure that any third country was safe and had a fair procedure for asylum or temporary protection before requiring that a noncitizen avail themselves of protection in that country. Commenters asserted that the proposed rule essentially or implicitly declares Mexico, Guatemala, or other transit countries to be safe third countries without obtaining the requisite bilateral or multilateral agreements. Commenters also claimed that this proposed rule, which would apply regardless of whether the United States has an agreement with the transit country, would not adequately consider or require an individualized determination as to whether a third country is ''safe'' for asylum seekers or has an adequate system for granting protection against persecution and torture. Instead, commenters explained that this proposed rule relies on a third country being a party to specified international accords, which commenters stated are not sufficient to ensure the noncitizen's safety and, therefore, would result in refugees being returned to the countries where they will be persecuted—in conflict with the non-refoulement principles of the Refugee Act. One commenter specified that the asylum structures in Mexico, El Salvador, Honduras, and Guatemala do not meet the international standard for refugee protection and thus cannot constitute a safe third country.

*Response:* As a threshold matter, the Departments distinguish the categorical safe-third-country bar found in section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A), from this rule because this rule, unlike the safe-third-country bar, is neither a categorical bar on the ability to apply for asylum nor does it hinge exclusively on the availability of protection in a third country. 88 FR at 11723, 11736. While the Departments believe that protection is available for many noncitizens in third countries through which they transit before arriving in the United States from Mexico at the southwest land borders or adjacent coastal borders, the Departments have carefully refrained from making asylum eligibility in the United States turn exclusively on whether the noncitizen could have sought protection in any third country. Nor does this rule act as or constitute a third-country agreement for purposes of section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A). 88 FR at 11732. Critically, the purpose behind this rule is to encourage noncitizens to take advantage of existing and expanded safe, orderly, and lawful pathways for noncitizens to enter the United States to present asylum claims. 88 FR at 11704, 11719. And the rule does not, contrary to commenters' suggestions, require a noncitizen to return to or go to a third country without evaluating the safety of that country simply because of their method of entering the United States. *Cf. East Bay I,* 994 F.3d at 977. Rather, the rule is more limited. The rule provides that noncitizens who have traveled through a third country and enter the United States through a provided lawful pathway may seek asylum through an orderly and directed process. 88 FR at 11707, 11723; *see* 8 CFR 208.33(a)(2)(ii), 1208.33(a)(2)(ii). Noncitizens who travel through a third country that is a party to the Refugee Convention or Protocol and do not enter the United States through a provided lawful pathway, and who do not first seek (and are denied) protection in that third country, may still present a claim for relief and protection based on fear of persecution—but, in order to be eligible for asylum, they must first establish an exception to or rebut a presumption of ineligibility for asylum. 88 FR at 11707, 11723; *see* 8 CFR 208.33(a)(3), 1208.33(a)(3). And even if the noncitizen is subject to the presumption of ineligibility for asylum, the noncitizen may still seek and be eligible for statutory withholding of removal or CAT protection. 88 FR at 11737; *see* 8 CFR 208.33(b)(2)(i) and (ii), 1208.33(b)(2)(i) and (ii). Simply put, the rule imposes a condition on asylum (and only asylum) eligibility relating to whether the noncitizen availed themselves of a lawful pathway, but the rule does not direct an inquiry as to whether the noncitizen can or should return to a third country. 88 FR at 11737–38.

iii. Expedited Removal

*Comment:* Some commenters stated that the proposed rule creates a higher standard of proof (preponderance of the evidence) for rebutting the presumption

against asylum, as compared to the "significant possibility" standard for establishing a credible fear. Commenters expressed a belief that the rule requires noncitizens "to actually establish, at their credible fear interview, that they *are* eligible for asylum" (emphasis in original), not simply that they have a significant possibility of demonstrating eligibility. These commenters expressed concern that the rule could be read to require AOs to make a finding that a noncitizen is ineligible for asylum without assessing the presumption under the "significant possibility" standard. These commenters further argued that the touchstone of the "significant possibility" standard was whether a noncitizen "*could* show, after a full hearing with factual development," that the presumption does not apply.

*Response:* The "significant possibility" standard is required by statute, and the rule does not impose a different standard during the credible fear process.[195] The INA mandates that, when determining whether a noncitizen has a "credible fear," the AO must determine whether there is a "significant possibility . . . that the alien could establish eligibility for asylum." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). When it comes to the rebuttable presumption, the AO will determine whether there is a significant possibility that the noncitizen would be able to show at a full hearing by a preponderance of the evidence that the presumption does not apply or that they

meet an exception to or can rebut the presumption. 8 CFR 208.33(a)(2), (3)(i), 1208.33(a)(2), (3)(i). In other words, the "significant possibility" standard is the overall assessment applied at the credible fear stage, but that standard must be applied in conjunction with the standard of proof required for the ultimate merits determination. Although the "significant possibility" standard applies when determining the presumption's applicability and whether it has been rebutted, the Departments expect that noncitizens rarely would be found exempt from or to have rebutted the presumption for credible fear purposes and subsequently be found not to be exempt from or to have rebutted the presumption at the merits stage. The "significant possibility" standard asks a predictive question: whether there is a "significant possibility" that the noncitizen "could establish" asylum eligibility at a merits hearing. INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). And given the nature of the inquiry under this rule's presumption, the Departments expect that AOs or IJs will almost always be able to determine based on the evidence before them at the credible fear stage whether a noncitizen would be unable to establish asylum eligibility at the merits stage.

First, the evidence necessary to determine whether a person is excepted from or can rebut the presumption should generally be available to the AO at the time of the credible fear interview, whether from the noncitizen or otherwise. Unlike some of the more complex factual inquiries required for other elements of asylum eligibility, such as nexus or particular social group, which often require evidence about country conditions or other evidence, and often regard events that did not happen recently, AOs will—except in exceptional circumstances—be able to assess eligibility for such exceptions or rebuttal circumstances at the credible fear interview through consideration of the noncitizen's credible testimony and available evidence, including government records relating to their circumstances at the time of their entry into the United States.

For instance, a noncitizen should not generally need testimony from a witness in their home country or evidence of country conditions to show that they faced an acute medical emergency at the time of entry or that it was not possible to access or use the CBP One app due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. *See* 8 CFR 208.33(a)(2)(ii)(B), (3)(i)(A), 1208.33(a)(2)(ii)(B), (3)(i)(A). In some

cases, the absence of documentation and DHS records—such as a record that a noncitizen was provided appropriate authorization to travel to the United States to seek parole—may make it unlikely that the noncitizen could make the requisite showing at a full merits hearing. In other situations, the noncitizen's credible testimony may be sufficient to prove the noncitizen's claims, although AOs also may consider any evidence noncitizens have with them at the time they entered the United States from Mexico at the southwest land border or adjacent coastal borders, and evidence regarding the State in which they were encountered at or near the border. Thus, AOs should have all the necessary evidence before them during the credible fear interview to determine whether a noncitizen will be exempt from or able to rebut the presumption, and additional evidence is not likely to change whether an exception to or rebuttal of the presumption applies.

Second, as with factual determinations, the legal analysis for determining whether a person is exempt from or can rebut the presumption is straightforward because most of the enumerated grounds for those determinations are narrow and clearly defined. There is little gray area in determining whether a noncitizen transited through a third country, and the rule provides clear examples of the types of threats that constitute an imminent and extreme threat to life or safety—that is, an imminent threat of rape, kidnapping, torture, or murder. *See* 8 CFR 208.33(a)(1)(iii), (3)(i)(B), 1208.33(a)(1)(iii), (3)(i)(B). As a result, the question of whether a noncitizen has a "significant possibility" of meeting these standards should not require much legal analysis after the AO has considered the evidence before them. That again differs from other questions that may arise during a credible fear inquiry—such as whether the noncitizen is a member of a cognizable particular social group—which can be quite complex; AOs or IJs may reasonably defer such difficult questions by finding credible fear. *See* 8 CFR 208.30(e)(4) ("In determining whether the alien has a credible fear of persecution . . . or a credible fear of torture, the asylum officer shall consider whether the alien's case presents novel or unique issues that merit a positive credible fear finding . . . in order to receive further consideration of the application for asylum and withholding of removal."). Hence, in this unique context, applying the "significant possibility" standard will almost always

---

[195] Previous limitations on asylum eligibility have used similar regulatory language that does not explicitly include the phrase "significant possibility" while also stating in the rules' preambles that the "significant possibility" standard applied to those limitations. *See, e.g.,* Security Bars and Processing, 85 FR 84160, 84175 (Dec. 23, 2020) ("Security Bars Rule") (explaining that "[t]he rule does not, and could not, alter the standard for demonstrating a credible fear of persecution, which is set by statute"); Asylum Eligibility and Procedural Modifications, 84 FR 33829, 33837 (July 16, 2019) ("TCT Bar IFR") (providing that "[t]he asylum officer will ask threshold questions to elicit whether an alien is ineligible for a grant of asylum pursuant to the third-country-transit bar. If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates that there is a significant possibility that he or she can establish eligibility for asylum), then the alien will have established a credible fear."); Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934, 55943 (Nov. 9, 2018) ("Proclamation Bar") (providing that "[t]he asylum officer will ask threshold questions to elicit whether an alien is ineligible for a grant of asylum pursuant to a proclamation entry bar. If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates sufficient facts pertaining to asylum eligibility), then the alien will have established a credible fear.").

lead to a similar conclusion as applying the ultimate eligibility standard.

However, the Departments acknowledge that in some rare cases the outcome from applying the "significant possibility" standard may differ from application of the ultimate merits standard, such that a noncitizen who is found to have met the "significant possibility" standard may ultimately be found after a merits hearing to be subject to the presumption of ineligibility. It is the Departments' expectation that such cases will be rare, and that applying the "significant possibility" standard will not differ meaningfully from application of the ultimate merits standard in this context.

*Comment:* Commenters stated that Congress intended to set a low screening standard for the credible fear process and alleged that the proposed rule raised the screening for statutory withholding of removal and CAT protection during this process without providing a justification for doing so. Commenters argued that Congress intended the plain language of the statute, which uses a "significant possibility" standard for asylum, to also apply to related fear claims, such as statutory withholding of removal and CAT protection.

*Response:* As a preliminary matter, this rule does not change the screening standard for asylum claims. Instead, it imposes an additional condition on asylum eligibility: a rebuttable presumption of asylum ineligibility for certain noncitizens who neither avail themselves of a lawful, safe, and orderly pathway to the United States nor seek asylum or other protection in a country through which they travel. 88 FR at 11750; INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). AOs will continue to apply the statutory "significant possibility" standard to determine credible fear. *Id.* In considering whether a noncitizen can establish a significant possibility of eligibility for asylum, the AO will be required to consider whether the noncitizen has shown a significant possibility that they could establish that the presumption does not apply or that they meet an exception to or can rebut the presumption. 88 FR at 11750. Only after determining that a noncitizen could not demonstrate a "significant possibility" of eligibility for asylum would the AO apply the long-established "reasonable possibility" standard to assess whether further proceedings on a possible statutory withholding or CAT protection claim are warranted. *Id.* at 11746, 11750.

In contrast to the establishment of a statutory "significant possibility" standard to screen for asylum, Congress

did not specify a statutory standard for screening statutory withholding of removal or CAT protection claims in expedited removal proceedings. *See* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v) (referencing only "asylum"). Since 1999, AOs have applied the "reasonable possibility" standard to statutory withholding of removal and CAT protection claims in streamlined proceedings for reinstatement and administrative removal where noncitizens are statutorily ineligible for asylum. *See* 8 CFR 208.31, 1208.31 (2020) [196] (implementing the reasonable fear process for noncitizens subject to administrative removal orders); 8 CFR 241.8(e) (implementing the reasonable fear process for noncitizens subject to reinstatement of a prior order of removal). While the "reasonable possibility" standard is lower than the "clear probability" standard required to demonstrate eligibility for statutory withholding or CAT protection, it is a more demanding standard than the "significant possibility" standard used in credible fear proceedings to screen for asylum. Regulations Concerning the Convention Against Torture, 64 FR 8474, 8485 (Feb. 19, 1999). At the time the CAT regulations were implemented, the goal of the reasonable fear process was to ensure that the United States complied with its non-refoulement obligations under the CAT "without unduly disrupting the streamlined removal processes applicable." *Id.* at 8479. The justification for using the reasonable possibility standard was also explained at the time the reasonable fear proceedings were created: "[b]ecause the standard for showing entitlement to these forms of protection (a probability of persecution or torture) is significantly higher than the standard for asylum (a well-founded fear of persecution), the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher." *Id.* at 8485.

For the purpose of this rule, the Departments have judged that, in those cases where an applicant cannot establish a significant possibility of eligibility for asylum due to the lawful pathways condition, the use of the "reasonable possibility" standard to assess statutory withholding of removal and CAT claims better reflects the goals

of the rule as a whole. As explained in the NPRM, while this is a different judgment than what was made by the Asylum Processing IFR, the application of the heightened standard is in line with the goal of identifying non-meritorious claims at the screening stage, allowing the heavily burdened immigration courts to focus on those claims most likely to warrant protection. 88 FR at 11742. The Departments believe that applying the "reasonable possibility" standard, which is tailored to statutory withholding of removal and CAT claims, "better predicts the likelihood of succeeding" on an application for statutory withholding of removal or CAT protection because it appropriately accounts for the higher burden of proof. 88 FR at 11746–47. The use of the standard specific to statutory withholding and CAT claims, since its inception, has allowed the United States to meet its obligations under international law while simultaneously balancing the need to expeditiously identify non-meritorious claims. Moreover, as stated in the NPRM, the Departments seek to protect those who have viable claims while also considering the "downstream effects" on immigration courts. 88 FR at 11746. The application of standards tailored to the type of relief for which the noncitizen is eligible is designed to accomplish that goal.

### 2. TCT Bar and Proclamation Bar Litigation

*Comment:* Several commenters argued that the proposed rule is no different than the TCT Bar Final Rule and the Proclamation Bar IFR. Many commenters submitted only a general reference to precedent issued in litigation regarding the Proclamation Bar IFR and the TCT Bar rules, without any discussion or consideration of the distinctions provided in the proposed rule. Some asserted that the proposed rule conflicts with or violates the injunctions issued regarding those rules, or that the existing injunction should apply to the proposed rule. Commenters also asserted that the proposed rule is similar to the TCT Bar rules and Proclamation Bar IFR and will cause confusion. An organization expressed concern that members of a certified class for purposes of injunctive relief, *see Al Otro Lado, Inc.* v. *McAleenan,* No. 17–CV–02366–BAS–KSC, 2022 WL 3142610 (S.D. Cal. Aug. 5, 2022), would be subject to the rebuttable presumption. The commenter stated that application of the rebuttable presumption to such class members would likely violate the injunction in that case because that injunction

---

[196] These provisions were amended by the Global Asylum Rule, which was preliminarily enjoined and its effectiveness stayed before it became effective. *See Pangea II,* 512 F. Supp. 3d at 969–70. This order remains in effect, and thus the 2020 version of these provisions—the version immediately preceding the enjoined amendments is currently effective.

requires that the Departments apply "pre-Asylum Ban practices for processing the asylum applications" of class members. *See id.*

*Response:* The Departments reiterate that this rule is materially different from the TCT Bar IFR and Final Rule and Proclamation Bar IFR. 88 FR at 11738–39; *see also* Section IV.B.2.ii of this preamble. And contrary to commenter concerns, there is no risk of confusion because neither the TCT Bar nor the Proclamation Bar is in effect. *Capital Area Immigrants' Rights Coal.* v. *Trump,* 471 F. Supp. 3d 25 (D.D.C. 2020) (vacating the TCT Bar IFR); *East Bay Sanctuary Covenant* v. *Barr,* 964 F.3d 832 (9th Cir. 2020) (enjoining the TCT Bar IFR); *E. Bay Sanctuary Covenant* v. *Barr* ("*East Bay II*"), 519 F. Supp. 3d 663, 668 (N.D. Cal. 2021) (enjoining the TCT Bar Final Rule); *East Bay III,* 993 F.3d at 681; *see O.A.* v. *Trump,* 404 F. Supp. 3d 109 (D.D.C. 2019) (recounting the history of the litigation over the Proclamation Bar IFR and vacating it).[197] As discussed later in Sections IV.E.9 and IV.E.10 of this preamble, removal of provisions implementing the TCT Bar Final Rule and the Proclamation Bar IFR is warranted. But even separate from the removal of provisions implementing those rules, the Departments respond that the litigation surrounding those rules does not mean that this distinct rule is invalid, unenforceable, or arbitrary and capricious.

The Departments also disagree with the generalized comparisons between this rule and the Proclamation Bar IFR and the TCT Bar rules. 88 FR at 11736. As stated in the NPRM, this rule is substantively distinct from the eligibility bars in those rules. The TCT Bar rules focused exclusively on the noncitizen's travel prior to entering the United States, *see* 85 FR at 82261–62, and the Proclamation Bar IFR imposed a strict eligibility bar for anyone entering outside a POE, *see* 83 FR at 55935. In comparison, this rule is not a categorical bar on asylum eligibility, but instead is a rebuttable presumption, including several exceptions that are adjudicated on a case-by-case basis, for

certain noncitizens who enter the United States without availing themselves of any of numerous lawful pathways during a temporary period of time. 88 FR at 11707, 11739–40; 8 CFR 208.33(a)(2) and (3), 1208.33(a)(2) and (3). Notably, and contrary to claims by some commenters, the rule does not block access to asylum for those who need it most. *Cf. East Bay I,* 994 F.3d at 980. The rule contains exceptions to and ways to rebut the presumption, including several ways to avoid the presumption that account for protecting the safety of those fleeing imminent harm. In addition, the rule is intended to better manage already-strained resources, thereby protecting against overcrowding in border facilities and helping to ensure that the processing of migrants seeking protection in the United States is done in an effective, humane, and efficient manner. 88 FR at 11704, 11713–16, 11730. In that vein, as discussed in Sections IV.E.9 and IV.E.10 of this rule, the TCT Bar IFR and Final Rule and Proclamation Bar IFR pursued approaches and policies that differ in important respects from this rule. *Compare* TCT Bar IFR, 84 FR at 33831, *and* Proclamation Bar IFR, 83 FR at 55935, *with* 88 FR at 11706–07. Moreover, this rule is designed to address a specific exigency that did not exist when the TCT Bar rules and Proclamation Bar IFR were promulgated. 88 FR at 11705–06.

Second, this rule is not in conflict with or precluded by existing injunctions and court precedent relating to litigation surrounding those rules. *See United States* v. *Cardales-Luna,* 632 F.3d 731, 735 (1st Cir. 2011) (recognizing that "a decision dependent upon its underlying facts is not necessarily controlling precedent as to a subsequent analysis of the same question on different facts and a different record") (marks and citation omitted); *Overseas Shipholding Group, Inc.* v. *Skinner,* 767 F. Supp. 287, 296 (D.D.C. 1991) (noting that neither the law of the case nor stare decisis doctrines applied in "an entirely separate rulemaking process"); *cf. Associated Builders and Contractors, Inc.* v. *Brock,* 862 F.2d 63, 67 (3d Cir. 1988) (considering the adequacy of notice of proposed rulemaking and concluding that an argument was foreclosed because a prior panel "applied the law" to facts that had "not changed"). Procedurally, the injunctions issued against the TCT Bar rules and Proclamation Bar IFR were limited to the specific facts and specific rules at issue in those cases and do not bar the issuance of this materially distinct rule.

*See E. Bay Sanctuary Covenant* v. *Barr,* 385 F. Supp. 3d 922, 960 (N.D. Cal. 2019) (enjoining the Departments "from taking any action continuing to implement" the TCT Bar IFR), *affirmed by East Bay I,* 994 F.3d at 988; *East Bay II,* 519 F. Supp. 3d at 668 (enjoining the Departments "from taking any action continuing to implement the [TCT Bar] Final Rule"); *E. Bay Sanctuary Covenant* v. *Trump,* 349 F. Supp. 3d 838, 868 (N.D. Cal. 2018), *affirmed by East Bay III,* 993 F.3d at 680–81; *see also California* v. *Texas,* 141 S. Ct. 2104, 2115 (2021) (noting that remedies "do not simply operate on legal rules in the abstract") (quotation marks and citation omitted). Substantively, the opinions in those cases were limited to categorical eligibility bars premised on manner of entry or whether a noncitizen first sought asylum in another country, and this rule creates no such categorical bar. The more nuanced approach in this rule will have different effects and is premised on different factual circumstances and new reasoning, including an increased focus on available lawful pathways. 88 FR at 11739.

Regarding the application of the proposed rule to *Al Otro Lado* injunction class members, as noted in the NPRM, the Departments do not view the permanent injunction in the *Al Otro Lado* litigation—*see Al Otro Lado, Inc.* v. *Mayorkas,* No. 17–CV–02366–BAS–KSC, 2022 WL 3970755 (S.D. Cal. Aug. 23, 2022)—which they have appealed to the Ninth Circuit,[198] as limiting the Departments' discretionary authority to apply new asylum limitations conditions consistent with section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), to the injunction class. *See, e.g., Milliken* v. *Bradley,* 433 U.S. 267, 281–82 (1977) ("The well-settled principle that the nature and scope of the remedy is to be determined by the violation means simply that federal-court decrees must directly address and relate to the [alleged wrongful conduct] itself."); *Meinhold* v. *U.S. Dep't of Def.,* 34 F.3d 1469, 1480 (9th Cir. 1994); *see also, e.g., Thomas* v. *Cty. of Los Angeles,* 978 F.2d 504, 509 (9th Cir. 1992) (reversing injunction that "fail[ed] to specify the act or acts sought to be restrained as required by" Federal Rule of Civil Procedure 65(d)).[199] In any

---

[197] The district court in *O.A.* vacated the Proclamation Bar IFR for similar substantive reasons to those articulated in *East Bay III. O.A.* v. *Trump,* 404 F. Supp. 3d 109 (D.D.C. 2019). *O.A.* v. *Trump* is subject to a pending appeal that is presently held in abeyance. *O.A.* v. *Biden,* No. 19–5272 (D.C. Cir. Oct. 11, 2019). Similarly, in *Al Otro Lado, Inc.* v. *Mayorkas,* No. 17–cv–2366, 2022 WL 3970755 (S.D. Cal. Aug. 23, 2022), a different district court issued an injunction relating to application of the TCT Bar rules that the Departments disagree with and have appealed. *Al Otro Lado, Inc.* v. *Mayorkas,* Nos. 22–55988, 22–56036 (9th Cir. Nov. 7, 2022).

[198] *See Al Otro Lado, Inc.* v. *Mayorkas,* Nos. 22–55988, 22–56036 (9th Cir. Oct. 25, 2022)

[199] Further, the commenter's position that the *Al Otro Lado* injunction applies to this rule is inconsistent with *Al Otro Lado* Class Counsel's website: "[T]he Biden Administration proposed a similar rule in February 2023, but the *Al Otro Lado* v. *Mayorkas court order does not cover the new rule. The court order only applies to the rule*

event, certain injunction class members whose cases are reopened or reconsidered under the *Al Otro Lado* injunction because they were removed following application of the TCT Bar may follow a DHS-established process to request "appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process," as outlined in 8 CFR 208.33(a)(2)(ii)(A), 1208.33(a)(2)(ii)(A), to participate in renewed removal proceedings. Injunction class members who follow those procedures would thus not be subject to the rebuttable presumption.

*Comment:* Many commenters noted that the courts, in addressing the TCT Bar rules and the Proclamation Bar IFR, held that the Departments could not promulgate a regulation that restricts access to asylum based on manner or location of entry into the United States or transit through a third country. Commenters similarly asserted, citing the Ninth Circuit's decision in *East Bay III,* that the proposed rule is not "consistent with" section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), and also violates international law.

*Response:* The holdings relating to the TCT Bar rules and the Proclamation Bar IFR do not undermine this rule. As discussed in Section IV.D.1.ii of this preamble, this rule does not conflict with the INA's safe-third-country and firm-resettlement bars. 88 FR at 11736; *see R–S–C,* 869 F.3d at 1187 n.9. While the applicability of the rebuttable presumption of ineligibility turns in part on transit through a third country, 8 CFR 208.33(a)(1)(iii), 1208(a)(1)(iii), the ultimate eligibility decision requires case-by-case evaluation of whether an exception applies and whether the noncitizen rebutted the presumption. 8 CFR 208.33(a)(2) and (3), 1208.33(a)(2) and (3); *cf. East Bay I,* 994 F.3d at 982–83 (indicating that the Departments cannot rely "solely" on a noncitizen's decision not to seek asylum in a third country in denying their asylum application in the United States).

Regarding the Proclamation Bar, *East Bay III* enjoined a categorical entry bar as inconsistent with the statutory provision allowing "migrants arriving anywhere along the United States's border" to apply for asylum. 993 F.3d at 669. Unlike the Proclamation Bar, this rule involves a rebuttable presumption that includes consideration of numerous factors unrelated to the manner of entry,

including transit through a third country. 88 FR at 11707; 8 CFR 208.33(a)(1)(iii), (2) and (3), 1208.33(a)(1)(iii), (2) and (3). And, as discussed in Section IV.D.1.i of this preamble, the rule is consistent with INA section 208, 8 U.S.C. 1158. *See* 88 FR at 11707, 11740; 8 CFR 208.33(a)(2), 1208.33(a)(2) (providing for exceptions to applicability of the rebuttable presumption); 8 CFR 208.33(a)(3), 1208.33(a)(3) (providing ways to rebut the presumption of ineligibility). The provided lawful pathways, third country transit components, exceptions to the presumption, and the fact-intensive, case-by-case analysis for rebutting the presumption demonstrate that the condition imposed by this rule is distinct from the "categorical ban" enjoined in *East Bay III,* 993 F.3d at 669–70. Notwithstanding this distinction, the Departments reiterate that they disagree with the holding in *East Bay III* that the Proclamation Bar IFR was inconsistent with section 208(a) of the INA, 8 U.S.C. 1158(a). 88 FR at 11739; *see E. Bay III,* 993 F.3d at 670; *see also* Section IV.D.1.i of this preamble.

The rule also does not violate the United States' obligations under international treaties. As discussed in Section IV.D.3 of this preamble, the rule is not a penalty based on manner of entry and does not violate treaty commitments regarding non-refoulement. The Departments also disagree with the decision in *East Bay III* on this point as applied to the Proclamation Bar IFR. 88 FR at 11739; *see East Bay III,* 993 F.3d at 672–75. In any event, *East Bay III* does not render this rule unlawful. In *East Bay III,* the Ninth Circuit determined that the Proclamation Bar IFR "ensure[d] neither" "the safety of those already in the United States" nor "the safety of refugees," which were the purposes behind the asylum bars in the INA and in the Refugee Convention. 993 F.3d at 673. Conversely, as explained in the NPRM, a purpose of this rule is to reduce reliance on dangerous routes to enter the United States used by criminal organizations and smugglers, thus protecting the safety of refugees. 88 FR at 11707. Furthermore, one of the enumerated categories for rebutting the presumption in the rule is demonstrating that the noncitizen faced an imminent and extreme threat to life or safety at the time of entry into the United States. 8 CFR 208.33(a)(3)(i)(B), 1208.33(a)(3)(i)(B). The Ninth Circuit's concerns are therefore not present in this rule.

*Comment:* Relying on cases enjoining the TCT Bar rules and the Proclamation

Bar IFR, commenters asserted that the proposed rule is invalid because the condition in the proposed rule is unrelated to the merits of the asylum claim.

*Response:* The Departments disagree that the cases involving the TCT Bar rules demonstrate that this rule is invalid. As discussed in Section IV.D.1.i of this preamble, the INA provides the Departments with the authority to impose limitations or conditions on asylum eligibility. INA 208(b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(2)(C), (d)(5)(B). But the statute neither qualifies what types of limitations or conditions may be imposed—except insofar as such limitations or conditions must be consistent with the INA—nor states that any such limitations or conditions must relate to whether the noncitizen has demonstrated or can demonstrate that they meet the definition of a refugee under section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A). Indeed, several of the statutory restrictions on asylum eligibility are unrelated to whether the noncitizen has established that they are a refugee within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A). *See, e.g.,* INA 208(b)(2)(A)(i), 8 U.S.C. 1158(b)(2)(A)(i) (participating in the persecution of others); INA 208(b)(2)(A)(iv), 8 U.S.C. 1158(b)(2)(A)(iv) (reasonable grounds for considering the noncitizen a danger to the security of the United States). And section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), provides for the promulgation of "*additional limitations and conditions.*" (emphasis added). The existence of exceptions and conditions that are unrelated to the refugee definition both demonstrates that it is lawful for the Departments to promulgate this condition on asylum eligibility and undermines the Ninth Circuit's limitation on scope of any regulatory condition. *E. Bay I,* 994 F.3d at 979. There is no basis to assume that Congress intended to circumscribe the scope of limitations or conditions that the Departments can promulgate when the statute does not do so and Congress itself provided for exceptions unrelated to the meaning of "refugee" in section 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A). *R–S–C,* 869 F.3d at 1187 n.9 (rejecting a statutory construction that would circumscribe the type of limitations or conditions promulgated under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), because such restrictions "would render [section] 1158(b)(2)(C) meaningless, disabling the Attorney General from adopting further

implemented on July 16, 2019. See American Immigration Council, *Your Rights Under Al Otro Lado* v. *Mayorkas, https://www.americanimmigrationcouncil.org/al-otro-lado-mayorkas* (last visited Apr. 21, 2023).

**31384**    **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

limitations while the statute clearly empowers him to do so.'').

In addition, the rule is not precluded by either *East Bay I* or *East Bay III*. Neither of these decisions require that a condition on asylum eligibility relate to the definition of refugee under section 101(a)(42)(A), 8 U.S.C. 1158(a)(42)(a). Accordingly, the injunctions and vacatur decisions relating to the TCT Bar rules and the Proclamation Bar do not render this rule unlawful.

3. International Law

*Comment:* Commenters expressed concern that the NPRM, if finalized, would violate the United States' non-refoulement obligations under international law, including Article 33 of the Refugee Convention, which the commenters generally explained as prohibiting the return of asylum seekers to a country where their lives or freedom would be threatened on account of a protected ground. Specifically, commenters voiced apprehension that the NPRM would ''bar'' most protection-seeking noncitizens from being eligible for asylum, leaving them able to apply only for statutory withholding of removal or CAT protection. Commenters predicted that many noncitizens would not be able to satisfy the comparatively higher standards of proof for statutory withholding and CAT claims and that, in turn, would lead to the refoulement of persons who, if not for the NPRM's ''bar'' to asylum eligibility, would have been granted asylum.

Applying similar reasoning, some commenters raised that the proposed rule may violate Article 3 of the CAT, which prohibits state parties from returning people to a country where there is sufficient likelihood that they would be tortured. One commenter stated that conditioning asylum based on manner of entry would be in violation of the CAT.

Commenters also argued the rule conflicted with other provisions of the Refugee Convention and Protocol. Commenters noted that Article 31 of the Refugee Convention prohibits states from imposing improper penalties for irregular entry, which commenters argued included administrative penalties and limits on access to asylum. Commenters also stated the proposed rule would violate Article 3, which prohibits non-discrimination, and Article 16, which protects refugees' access to the courts. One commenter stated that the proposed rule is more expansive than the Refugee Convention's exclusion for migrants who secured residency or status in another country.

Relatedly, several commenters pointed to United Nations High Commissioner for Refugees (''UNHCR'') statements and guidance interpreting the Refugee Convention and the Refugee Protocol. Specifically, commenters pointed to UNHCR guidance interpreting those documents as providing that asylum seekers are not required to apply for protection in the first country where protection is available. Further, commenters noted that UNHCR interprets those documents as not requiring refugees to be returned to a country through which they transited. Commenters further noted UNHCR's positions that asylum should not be refused only on the basis that it could have been sought in another country and that asylum seekers should not be required to seek protection in a country to which they have no established links. A commenter also noted that UNHCR has repeatedly denounced attempts to impose similar bans, and that such rules undermine international human rights and refugee law, because the right to seek asylum is a human right regardless of the person's origin, immigration status, or manner of arrival at the border.

Several commenters also argued that the rule violated the United States' obligations under other international documents. Some commenters simply made a general assertion that the rule would violate international treaties and degrade the United States' international standing. Several commenters stated that the proposed rule is contrary to the Universal Declaration of Human Rights (''UDHR''). Commenters argued that the UDHR protects the right to seek asylum, and that any restriction or limitation to access asylum is a violation of the letter and spirit of the UDHR. Other commenters stated that the rule violated the United Nations Convention on the Rights of the Child (''CRC'') because it did not provide for a robust, individualized assessment of a child's asylum claim. One commenter stated that the rule would place migrant children and their families at a higher risk of exploitation and trafficking, in contravention of obligations pursuant to the Optional Protocol on the Sale of Children and the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children (''The Palermo Protocol''). Another commenter contended the rule violates Article 7 of the International Covenant on Civil and Political Rights (''ICCPR''), which forbids subjecting individuals to ''torture or to cruel, inhuman or degrading treatment or punishment,'' and violates Article 12,

which confirms the rights of individuals to leave any country. Several commenters claimed that the rule would violate anti-discrimination principles in a variety of agreements and declarations including the ICCPR, International Convention on the Elimination of All Forms of Racial Discrimination (''ICERD''), the American Declaration on the Rights and Duties of Man, Vienna Declaration, and San Jose Action Statement. Another commenter stated the proposed rule violates the right to life, human dignity, and equality before the law in the ICCPR because the proposed rule was ''discriminatory'' and establishes ''great inequality.'' Commenters also claimed conflicts with treaties including Article 6 of the Rome Statute of International Criminal Court, which prohibits genocide, and Article 32 of the Geneva Convention.

*Response:* This rule is consistent with the United States' obligations under international law. Three primary documents govern the rights of refugees and corresponding obligations of states in international law: the Refugee Convention; the Refugee Protocol, which incorporates Articles 2 through 34 of the Refugee Convention; and the CAT. Together, these documents provide a framework for states to provide protection to migrants fleeing persecution or torture and establish the principle of non-refoulement, which prohibits states from returning refugees to territories in specific circumstances. While the United States is a party to the Refugee Protocol and the CAT, these treaties are not directly enforceable in U.S. law. *See INS* v. *Stevic,* 467 U.S. 407, 428 & n.22 (1984); *Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) (''The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.''). Instead, the United States has implemented its obligations through domestic legislation and implementing regulations, and the Protocol ''serves only as a useful guide in determining congressional intent in enacting the Refugee Act.'' *Barapind* v. *Reno,* 225 F.3d 1100, 1107 (9th Cir. 2000). The Refugee Convention's non-refoulement obligation is contained in Article 33.1, which prohibits contracting states from returning a refugee to a territory ''where his life or freedom would be threatened'' on account of an enumerated ground. The United States has implemented the non-refoulement provisions of Article 33.1 of the Refugee Convention through the withholding of removal provisions at section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), rather than through the

asylum provisions at section 208 of the INA, 8 U.S.C. 1158. *See Cardoza-Fonseca,* 480 U.S. at 429, 440–41. The CAT's non-refoulement provision is in Article 3, which prohibits the return of a person to a country where there are ''substantial grounds for believing'' the person will be tortured. The United States implemented its obligations under the CAT through regulations. *See* Foreign Affairs Reform and Restructuring Act of 1998 (''FARRA''), Public Law 105–277, sec. 2242(b), 112 Stat. 2681, 2631–822 (8 U.S.C. 1231 note); 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, 1208.18. The rule does not change or limit eligibility for statutory withholding of removal or CAT protection. Instead, applicants subject to the rule's rebuttable presumption will be screened for eligibility for statutory withholding of removal and CAT protection under a reasonable possibility standard. As explained earlier in Section IV.D.1.iii of this preamble, the reasonable possibility standard is the same standard that has been used to ensure the United States complies with its non-refoulement obligations under international law in withholding-only proceedings for decades.

The rule's rebuttable presumption will limit asylum eligibility for some noncitizens. But as the Supreme Court has explained, asylum ''does not correspond to Article 33 of the Convention, but instead corresponds to Article 34,'' which provides that contracting countries ''shall as far as possible facilitate the assimilation and naturalization of refugees.'' *Cardoza-Fonseca,* 480 U.S. at 441 (quotation marks omitted). Article 34 ''is precatory; it does not require the implementing authority actually to grant asylum to all those who are eligible.'' *Id.* Because application of the presumption does not affect eligibility for statutory withholding of removal or protection under the CAT regulations, the rule is consistent with U.S. non-refoulement obligations under the Refugee Protocol (incorporating, inter alia, Article 33 of the Refugee Convention) and the CAT. *See R–S–C,* 869 F.3d at 1188 n.11 (explaining that ''the Refugee Convention's non-refoulement principle—which prohibits the deportation of aliens to countries where the alien will experience persecution—is given full effect by the Attorney General's withholding-only rule''); *Cazun* v. *U.S. Att'y Gen.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017); *Ramirez-Mejia* v. *Lynch,* 813 F.3d 240, 241 (5th Cir. 2016).

The Departments agree that asylum is an important protection in international

law and acknowledge that the right to seek asylum has been recognized under the UDHR, Art. 14, G.A. Res. 217A (III), U.N. Doc. A/810 (1948). The UDHR is a non-binding human rights resolution of the UN General Assembly, and thus it does not impose legal obligations on the United States. *See Sosa* v. *Alvarez-Machain,* 542 U.S. 692, 734–35 (2004) (''[T]he [UDHR] does not of its own force impose obligations as a matter of international law.''). Instead, the right enshrined in the UDHR—''to seek and to enjoy in other countries asylum from persecution,'' UDHR, Art. 14, G.A. Res. 217A (III), U.N. Doc. A/810 (1948)—is also reflected in the non-refoulement provisions of the Refugee Protocol and the CAT. As previously explained, the rule does not impact eligibility for statutory withholding of removal or CAT protection, and accordingly does not implicate the United States' non-refoulement obligations. Moreover, the rebuttable presumption in the rule does not prohibit any person from seeking asylum, statutory withholding of removal, or CAT protection. Instead, the rule creates a condition on eligibility for asylum by creating a rebuttable presumption of ineligibility for those who neither avail themselves of a lawful pathway to the United States nor apply for asylum or seek other protection, and await a decision thereon, in a country they travel through. The rule similarly does not bar those seeking asylum from procedures that protect them from refoulement. All noncitizens processed for expedited removal who express a fear of return are entitled to a credible fear interview. As with any eligibility criteria, the presumption will apply in some cases to limit eligibility for noncitizens based on the individual circumstances presented, including at the credible fear stage. Even in those cases where the AO determines that the noncitizen cannot demonstrate a significant possibility of being granted asylum because the presumption has not been rebutted, the noncitizen may still demonstrate credible fear by showing a reasonable possibility of persecution or torture. Similarly, after applying for asylum before an IJ, if the presumption has not been rebutted, noncitizens may still demonstrate eligibility for statutory withholding of removal or CAT protection.

The rule is also consistent with the Refugee Convention and the corresponding obligations under international law, including specific provisions cited by commenters. The rule does not violate the non-discrimination requirement in Article 3 of the Refugee Convention. Article 3

prohibits discrimination on the basis of ''race, religion or country of origin.'' The rule does not discriminate on the basis of any of these protected characteristics. Instead, it is a rule of equal application based on the actions of the noncitizen. The application of the rule is limited to those circumstances where the noncitizen who is not excepted from its coverage has neither utilized an available lawful pathway nor sought protection and received a decision denying protection in a country traveled through, and cannot demonstrate that the failure to do so was excusable under the rule or otherwise rebut the presumptive ineligibility. For the same reason, the rule does not violate other anti-discrimination requirements in international law, including the ICERD, Dec. 21, 1965, 660 U.N.T.S. 195, 212, and the ICCPR, Dec. 16, 1966, 999 U.N.T.S. 171.

Neither is the rule inconsistent with Article 16 of the Refugee Convention. Article 16 establishes that refugees should be given ''free access to the courts,'' and in the country of a refugee's habitual residence, access should be equivalent to that of a national. This enshrines the right of the refugee to sue and be sued in practice—not merely in name—by removing barriers to participating in court such as access to government-provided counsel (where the government otherwise provides it), ensuring court fees are not higher for refugees than nationals, and prohibiting *cautio judicatum solvi,* the practice of requiring a bond for the costs of litigation as a pre-requisite to filing a complaint. *See* Refugee Convention, Art. 16, Travaux Préparatoires & Commentaries. These rights are not implicated by the rule.

Similarly, the rule is not inconsistent with Article 31 of the Refugee Convention, which prohibits states from ''impos[ing] penalties'' on refugees based on ''illegal entry or presence.'' As the commentary to the Refugee Convention explains, the term ''penalties'' in Article 31 refers ''to administrative or judicial convictions on account of illegal entry or presence, not to expulsion.'' Refugee Convention Art. 31, commentary; *see Cazun* v. *Att'y Gen. U.S.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017) (rejecting argument that the reinstatement bar to asylum was a ''penalty'' within the meaning of Article 31). The rule does not change any rules or policies relating to detention or convictions for unlawful entry or presence. The Departments acknowledge that the Ninth Circuit concluded in *East Bay III,* 993 F.3d at 674, that the bar to asylum at issue in that case violated Article 31 of the

Refugee Convention because it imposed a "penalty." As described in the NPRM, the rule here does not create a categorical bar to asylum, but instead a rebuttable presumption, and *East Bay III* accordingly does not address the lawfulness of this rule. 88 FR at 11739. Moreover, the Ninth Circuit's conclusion was erroneous because the denial of discretionary relief is not a penalty within the meaning of Article 31. *Id.*

Some commenters correctly observed that the Refugee Convention does not require refugees to apply for asylum in the first country they pass through. This rule, however, does not require noncitizens to apply for asylum in the first—or any—country through which they travel. Instead, the rule applies a rebuttable presumption to certain noncitizens who failed to avail themselves of a lawful pathway. One such pathway is to apply for asylum and receive a final denial in a transit country, but it is not the sole lawful pathway available. Noncitizens who fail to avail themselves of a lawful pathway may still rebut the presumption of ineligibility for asylum. Regardless, the Convention does not require the United States to grant asylum to every person who qualifies as a "refugee" under the INA; instead, the United States implements the Convention's prohibitions on refoulement through statutory withholding of removal. UNHCR has stated that "the primary responsibility to provide protection rests with the State where asylum is sought." [200] But UNHCR also acknowledges that "refugees do not have an unfettered right to choose their 'asylum country.'" [201]

In any event, UNHCR's interpretations of or recommendations regarding the Refugee Convention and Refugee Protocol are "not binding on the Attorney General, the BIA, or United States courts." *INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 427 (1999). "Indeed, [UNHCR's Handbook on Procedures and Criteria for Determining Refugee Status] itself disclaims such force, explaining that 'the determination of refugee status under the 1951 Convention and the 1967 Protocol . . . is incumbent upon the Contracting State in whose territory the refugee finds himself.'" *Id.* at 427–

28 (quoting *Cardoza-Fonseca,* 480 U.S. at 439 n. 22). Such guidance "may be a useful interpretative aid," *id.* at 427, but it does not create obligations for the United States.

The rule similarly does not violate the United States' obligations under other international laws and treaties, including the Geneva Conventions, the Rome Statute, the ICCPR, the CRC, or customary international law. First, the Geneva Conventions, a series of treaties that regulate the conduct of armed conflict, have no bearing on the rule. Commenters pointed to Articles 32 and 33 of the Fourth Geneva Convention, which prohibit corporal punishment or mass punishment against protected persons. Geneva Convention Relative to the Protection of Civilian Persons in Time of War ("Fourth Geneva Convention"), 12 Aug. 1949, 75 UNTS 287. Under Article 4, "protected persons" are limited to those who, during a conflict or occupation, are "in the hands of a Party to the conflict or Occupying Power." As the rule does not implicate a conflict or occupation, there is no conflict with the Geneva Conventions. While at least one commenter pointed to the definition of genocide in Article 6 of the Rome Statute, the United States is not a party to and has no obligations pursuant to the Rome Statute. In any event, the rule plainly does not constitute or involve genocide in any way. *See* Rome Statute of the International Criminal Court, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, July 17, 1998, U.N. Doc. A/CONF.183/9 (1998). Similarly, the United States has not ratified the CRC and thus has no obligations under that instrument, 1577 U.N.T.S. 3, reprinted in 28 I.L.M. 1448, 1456 (Nov. 20, 1989).[202] Again, even if considered customary international law—although the United States maintains that it is not—the CRC requires only that States take appropriate measures to protect children who are refugees. *See* CRC, Article 22. The rule accounts for the interests of children through creating robust screening procedures, exempting unaccompanied children from the application of the rule, having a family unity exception, and exempting certain noncitizens who enter as children from ongoing application of the presumption after the two-year period. Additionally, the adjudicator may consider on a case-by-case basis whether the child's situation presents exceptionally

compelling circumstances, including considering the circumstances surrounding the child's manner of entry, thus rebutting the presumption.

### 4. Recent Executive Orders

*Comment:* Some commenters stated without explanation that the rule is contrary to Executive Order 14012, Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans, 86 FR 8277 (Feb. 2, 2021). Other commenters stated that to restore faith in the U.S. asylum system as the Executive Order aims to do, the "government" should take various steps, including "adequately fund[ing] a fair asylum system" rather than "wast[e] money on immigration enforcement that separates families, traumatizes children, and tears our communities apart." Commenters further stated that the Administration should end the use of expedited removal, increase the scale and pace of refugee admissions, and expand lawful pathways for people "fleeing from countries with failed government and uncontrolled violence." On the other hand, some commenters were critical of the rule because they believed it was not strict enough and, accordingly, averred that the rule is consistent with the Executive Order because it will "remov[e] barriers to immigration."

*Response:* As a threshold matter, Executive Order 14012 does not require DOJ or DHS to adopt any specific policies but rather to (1) identify barriers that impede access to immigration benefits and fair, efficient adjudications of these benefits and make recommendations on how to remove these barriers; (2) identify any agency actions that fail to promote access to the legal immigration system and recommend steps, as appropriate and consistent with applicable law, to revise or rescind those agency actions; (3) submit a plan describing the steps they will take to advance these policies; and (4) submit reports regarding implementation of those plans. 86 FR 8277. Because Executive Order 14012 does not require the adoption of specific policies, the actions taken here do not violate that Executive Order.

To the extent commenters believe that the rule is inconsistent with Executive Order 14012, the Departments disagree. Consistent with Executive Order 14012's promotion of removing barriers to accessing immigration benefits and access to the legal immigration system, DHS has created multiple parole processes to provide certain migrants with pathways to temporarily enter and remain in the United States. During

---

[200] UNHCR, Guidance Note on bilateral and/or multilateral transfer arrangements of asylum-seekers, para. 3(i) (May 2013), *http://www.refworld.org/docid/51af82794.html.*

[201] UNHCR, Legal Considerations Regarding Access to Protection and a Connection Between the Refugee and the Third Country in the Context of Return or Transfer to Safe Third Countries, at 1 (Apr. 2018), *https://www.refworld.org/pdfid/5acb33ad4.pdf.*

[202] *See* Status of Ratification, Office of the High Commissioner for Human Rights, *https://indicators.ohchr.org/.*

those periods of stay, those noncitizens may seek asylum and related protection or other benefits for which they may be eligible. The rule furthers the policy discussed in the Executive Order by encouraging noncitizens to use those parole processes, as well as the CBP One app to enter the United States through a safe, orderly process. This rule also discourages unlawful border crossings that overwhelm limited government resources along the SWB. The Departments believe that there will be efficiency gains from having noncitizens pre-register for appointments—saving considerable processing time—and from decreased encounters between POEs with persons who claim a fear of persecution or torture, the processing of whom requires more resources than processing noncitizens who pursue a lawful pathway. It is correct that implementing the rule will increase the duration of some credible fear screenings. However, the Departments expect that fewer individuals with non-meritorious claims will receive positive screening determinations, which will result in a more efficient asylum system overall.

The Departments acknowledge commenters' recommendations to provide additional funding for the asylum system and end expedited removal. Both of those actions are outside the Departments' authority and would require congressional action. Ending the use of expedited removal in the absence of congressional action is outside the scope of this rulemaking. The Departments have considered commenters' recommendation of adding lawful pathways for people leaving countries with failed governments. This rule does not create any lawful pathways and thus this comment is outside the scope of this rulemaking.

*Comment:* Commenters expressed concern that the rule is inconsistent with Executive Order 14010, 86 FR 8267, because they believe it contradicts the instruction to develop policies and procedures for the safe and orderly processing of asylum claims at the U.S. land borders. Commenters stated that rather than developing policies for the safe and orderly processing of asylum claims, the rule instead would restrict the availability of asylum in a way that would make it impossible for most asylum seekers to access the asylum system. Commenters further asserted that rather than restoring faith in the U.S. asylum system, the rule attempts to ''deport refugees to danger based on manner of entry and transit in circumvention of existing refugee law and treaty obligations.'' Commenters also suggested that the rule resurrects

the PACR and HARP programs that the Executive Order ended.

Commenters also criticized the Departments for not following ''the collaborative process called for in'' the Executive Order. Specifically, commenters stated that Departments have failed to ''follow Executive Order 14010's mandate to consult with affected organizations'' as they are unaware of any ''consultation or planning'' that has occurred between when the Executive Order was issued and the publication of the NPRM.

*Response:* The Departments disagree with these commenters because the rule, as directed by Executive Order 14010, encourages use of lawful pathways to enter the United States, which will foster safe, orderly, and more efficient processing of asylum claims for those individuals seeking asylum, while discouraging unlawful border crossings that overwhelm limited resources and unfairly delay the adjudication of meritorious claims for asylum and other forms of protection. The rule is designed to incentivize noncitizens to avail themselves of a lawful pathway to enter the United States, which allows for more efficient use of DHS resources. By incentivizing the pursuit of lawful pathways, the Departments are promoting safe and orderly processing along the SWB as Executive Order 14010 instructs—processing that seeks to minimize the role of criminal organizations that prioritize profits over migrants' lives.

The Departments disagree with commenters that the rule resurrects PACR and HARP. Those programs were developed by DHS to promptly address credible fear claims of single adults and family units while the noncitizens remained in CBP custody.[203] This rule, in contrast, does not change the timeline for credible fear screenings. Nor does it affect where noncitizens are located during such screenings. Thus, commenters' comparisons to PACR and HARP are misplaced.

Commenters are similarly mistaken regarding DHS's responsibilities under the Executive Order. Commenters are correct that the Executive Order instructed the Secretary and Director of the CDC, ''in coordination with the Secretary of State, . . . [to] promptly begin consultation and planning with international and non-governmental organizations to develop policies and procedures for the safe and orderly processing of asylum claims at United

States land borders, consistent with public health and safety and capacity constraints.'' 86 FR at 8269. DHS has worked with NGOs to implement the exceptions to the Title 42 public health Order and continues to seek collaboration through seeking comment on this rule.

*Comment:* Some commenters stated that the rule violates Executive Order 14011, Establishment of Interagency Task Force on the Reunification of Families, 86 FR 8273 (Feb. 2, 2021), and amounts to the legalization of family separation, in contravention of that Executive Order.

*Response:* In Executive Order 14011, President Biden announced the creation of a task force to identify children who were separated from their families between January 20, 2017, and January 20, 2021, and, among other things, to the greatest extent possible, facilitate and enable the reunification of those children with their families. 86 FR at 8273. In doing so, President Biden stated that his Administration ''will protect family unity and ensure that children entering the United States are not separated from their families, except in the most extreme circumstances where a separation is clearly necessary for the safety and well-being of the child or is required by law.'' *Id.* The rule is consistent with this policy statement. The rule includes multiple provisions aimed at ensuring that families who enter the United States from Mexico at the SWB or adjacent coastal borders are not inadvertently separated. For example, where an exception or rebuttal circumstance applies to one member of a family, it is applied to all members of the family. *See* 8 CFR 208.33(a)(2)(ii), (3)(i), 1208.33(a)(2)(ii), (3)(i). And where asylum is denied to a noncitizen because of the presumption of ineligibility but one member of the noncitizen's family who traveled with the noncitizen obtains protection from removal through statutory withholding of removal or CAT, the circumstance will be deemed exceptionally compelling for the noncitizen denied such relief, allowing the family to remain together. *See* 8 CFR 1208.33(c). Finally, as described in Section IV.E.7.ii of this preamble, the Departments have expanded the family unity provision to cover spouses and children who would be eligible to follow to join the applicant if that applicant were granted asylum, as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A). 8 CFR 1208.33(c). Such measures were adopted in accordance with Executive Order 14011 to ensure that family units will not be separated as a result of this rule.

---

[203] *See* Mem. of Law in Opp'n to Pls.'s Mot. for Summ. J. & in Supp. of Defs.' Cross-Mot. for Summ. J. at 8–11, *Las Ams. Immigrant Advoc. Ctr.* v. *Wolf,* No. 19-cv-3640 (D.D.C. Feb. 6, 2020).

**31388** **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

*Comment:* Commenters stated that the Departments should take into account Executive Order 13985, Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, 86 FR 7009 (Jan. 20, 2021), and the more recent Executive Order 14091, Further Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, 88 FR 10825 (Feb. 16, 2023), and stated that the agencies have not considered these underserved populations and that this rule is evidence that these Executive Orders were not considered in the rule-making process. Commenters more broadly criticized the rule as "betraying promises" made in the Executive Orders because they believe the rule will have a disproportionate effect on certain groups of noncitizens and argued that the rule is generally out of line with the Executive Orders. Commenters also suggested that "[o]verly relying on the [CBP One] app . . . will significantly thwart the Biden administration's stated commitment to racial justice and equity." Commenters further stated that the rule undermines the commitment in the Executive Orders and "will endanger Black, Brown, and Indigenous asylum seekers." Commenters asserted that the rule "will perpetuate systemic and institutional racism and injustice," noting concerns about the accessibility of the CBP One app for those who speak languages other than English, Spanish, and Haitian Creole; "the app's widely reported misidentification of people of color"; the exacerbation of "existing discrepancies in outcome[s] for individuals without legal representation"; and the "further solidif[ication of] inequities and injustice in our immigration system."

*Response:* On President Biden's first day in office, January 20, 2021, he issued Executive Order 13985. On February 16, 2023, he issued Executive Order 14091, which reiterated the policy goals detailed in Executive Order 13985 and discussed the ways in which those policy goals had been furthered since that Executive Order. Both Executive Orders describe President Biden's policy of "advancing equity for all, including communities that have long been underserved, and addressing systemic racism in our Nation's policies and programs." 88 FR at 10825. As discussed throughout this preamble, the Departments have designed the rule to include a tailored rebuttable presumption in order to address a specific problem along the SWB. As discussed in Section IV.B.4.vi of this preamble, the Departments do not have

any discriminatory purpose in adopting the rule. The Departments have addressed concerns about the disparate impact of the rule on various communities in Section IV.B.4 of this preamble, the concerns relating to the CBP One app's liveness software are addressed in Section IV.E.3.ii of this preamble, and concerns about pro se individuals are discussed in Section IV.B.5.ii of this preamble. Finally, as discussed in Section IV.E.3 of this preamble, the rule provides an exception to the application of the rebuttable presumption for those who appear at a POE without a pre-scheduled appointment and for whom scheduling an appointment was impossible due to a language barrier. *See* 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B).

5. Other Comments on Legal Authority

*Comment:* One commenter noted that the proposed rule "is not a legislative act" and is instead subject to the Administrative Procedure Act, but "the persons to whom the rule applies are excluded from appearing within the USA to challenge the administrative requirement for exhaustion of remedies."

*Response:* The Departments agree that this rule is not a legislative act but instead the promulgation of agency regulations pursuant to the APA. The Departments disagree that the rule implicates or changes the exhaustion requirements in administrative law. The Departments note that the rule does not apply to noncitizens in other countries; the rule only applies to noncitizens who enter the United States and thereafter file applications for asylum. Put differently, it will only apply to noncitizens within the United States, who are not precluded from filing an APA challenge by virtue of being outside of the United States, but who may be limited in the types of challenges they can bring to its application during the credible fear process under section 242(e) of the INA, 8 U.S.C. 1252(e). The Departments further note that noncitizens who avail themselves of a lawful pathway to enter the United States will not otherwise need to address the provisions of this rule, as any subsequently filed asylum application will not be subject to the rebuttable presumption. Any noncitizen subject to the rebuttable presumption will be able to address its application to them and any applicable exceptions or rebuttal grounds before an AO or IJ, and in any available administrative appeal. Thus, the commenter's concern about being able to bring an APA challenge

from a foreign jurisdiction are unfounded.

*Comment:* Commenters stated that litigation over and injunctions against the rule would only exacerbate the confusion at the SWB.

*Response:* As explained previously in Section IV.D of this preamble, the Departments believe this rule is lawful and that it should not be subject to an injunction or otherwise halted in litigation. To the extent it is possible that the rule will be halted or enjoined, the Departments believe the risks are outweighed by the need to ensure safe and orderly processing at the SWB.

*Comment:* Commenters stated that the proposed rule was silent as to retroactive applicability and urged the Departments to "make an affirmative pronouncement" that the rule will not apply retroactively. Commenters were specifically concerned about the rule applying to "anyone whose latest entry into the United States was prior to the effective date(s) of the rule," which commenters stated is required by section 551(4) of the APA, 5 U.S.C. 551(4). Commenters further raised concerns that application of the rule to those who enter before its effective date would "infringe upon due process rights."

*Response:* As written, the rule will not apply to anyone who enters the United States before the rule is effective. The Departments believe the NPRM's proposed language and the final language in this rule clearly provide that the rebuttable presumption may only be applied to those who enter the United States between the rule's effective date and a date 24 months later. *See* 8 CFR 208.13(f), 208.33(a)(1)(i), 1208.13(f), 1208.33(a)(1)(i). The Departments decline to address the applicability or requirements of due process or the APA in this regard because the rule is explicit that it is only potentially triggered by entries that take place after its effective date.

*Comment:* A commenter argued that the proposal fails to account for "refugees'" reliance interests. The commenter wrote that refugees have an interest and right against refoulement and in the United States upholding domestic and international refugee law generally. The commenter argued that the Departments only have "circumscribed" discretion in administering asylum, citing INA 208, 8 U.S.C. 1158, and case law on establishing refugee status, and thus that refugees have a cognizable reliance interest in asylum.

*Response:* As described earlier in Section IV.D.3 of this preamble, the United States implements its non-

refoulement obligations through statutory withholding of removal, not asylum. Thus, it is incorrect to suggest that the non-refoulement obligations can raise a reliance interest in asylum. Additionally, asylum is a discretionary form of relief to which no applicant is entitled. *See* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A) ("The Secretary of Homeland Security or the Attorney General may grant asylum . . . ."). Although "longstanding policies may have 'engendered serious reliance interests that must be taken into account,'" *Encino Motorcars, LLC* v. *Navarro,* 579 U.S. 211, 222 (2016) (quoting *Fox Television,* 556 U.S. at 515), the commenter does not explain in what way noncitizens who are outside the United States have relied upon U.S. asylum law. To the extent noncitizens outside the United States have any cognizable reliance interests in the current rules governing asylum, the Departments believe those interests would be outweighed by the interest in incentivizing noncitizens to pursue safe, orderly, and lawful pathways to seek protection, and preventing a potential surge of migration at the southern border that threatens to overwhelm the Departments' ability to process asylum claims in a safe and orderly manner.

*Comment:* Commenters stated that the rule would violate the *Pangea* injunction. *See Pangea Legal Servs.* v. *DHS,* 512 F. Supp. 3d 966 (N.D. Cal. 2021).

*Response:* The court's order preliminarily enjoining the implementation of Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 80274 (December 11, 2020) ("Global Asylum Rule") and related policies in *Pangea II,* 512 F. Supp. 3d 966, does not prohibit the Departments from issuing this rule or otherwise limit the Departments' discretionary authority to adopt new asylum limitations consistent with section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). *See, e.g., Milliken* v. *Bradley,* 433 U.S. 267, 281–82 (1974) ("The well-settled principle that the nature and scope of the remedy are to be determined by the violation means simply that federal-court decrees must directly address and relate to the [alleged wrongful conduct] itself."); *Meinhold* v. *U.S. Dep't of Def.,* 34 F.3d 1469, 1480 (9th Cir. 1994); *see also Thomas* v. *Cty. of Los Angeles,* 978 F.2d 504, 509 (9th Cir. 1992) (reversing injunction that "fail[ed] to specify the act or acts sought to be restrained as required by" Federal Rule of Civil Procedure 65(d)).

### E. Comments on the Rule Provisions

#### 1. General Feedback on the Rebuttable Presumption of Ineligibility

*Comment:* Commenters expressed concern that the requirements to overcome the presumption would deprive asylum seekers of a meaningful opportunity to seek protection, subject them to removal if they could not meet the elevated standard for statutory withholding of removal, and put them at risk of violence or other harmful conditions. Commenters said that the proposed rule would require noncitizens to gather evidence and present arguments to rebut the presumption against asylum eligibility, establish an exception, or prove that they are not subject to the rule. Some said it would be difficult or impossible for noncitizens arriving at the SWB to do so, given that most are detained during credible fear proceedings; that they may lack access to supporting documentation; that CBP officers may confiscate their property; and that the determination is made in a single interview. Therefore, commenters stated, the rule would categorically deny relief, bar asylum, or result in "automatic ineligibility" for most or all noncitizens who would be subject to it. Commenters stated that noncitizens would be at the mercy of the AOs' credibility assessment and discretion. Some commenters said there was no indication that AOs would have to elicit relevant testimony and suggested this requirement should be included in the rule. One commenter wrote that individuals who had previously experienced any of the per se exemptions for rebuttal may still be experiencing long-lasting effects that limit their ability to rebut the presumption in the present. A commenter stated that children and families would be unable to rebut the presumption due to limited language access, absence of legal counsel, and having their belongings confiscated.

Some commenters said that the grounds for rebutting the presumption against asylum eligibility were too narrow, limited, or extreme and did not relate to the merits of an asylum claim; they recommended that the grounds be expanded. One commenter stated that the current examples of exceptionally compelling circumstances would not protect the vast majority of refugees who would qualify for asylum under U.S. law, including many who enter the United States without an appointment due to safety risks, medical issues, and other protection needs. Some stated that narrow terms like "exceptionally compelling," "imminent and extreme,"

and "severe" made the presumption too difficult to rebut, while others expressed concern about the perceived vagueness of these terms and said the rule provided inadequate guidance on them. One commenter wrote that the nature of the grounds and exceptions make them inherently difficult to corroborate with physical evidence. One commenter expressed concerns that the proposed means of rebuttal do not reference a subjective component, such as where the asylum seeker believed they faced an acute medical emergency or imminent and extreme threat. A legal services provider compared the proposed rule to the one-year deadline to apply for asylum and stated that the one-year deadline allows for even greater opportunities for rebuttal by allowing an individual to show a number of exceptional circumstances beyond those in the NPRM. Some commenters expressed concern about possible lack of clarity in the evidentiary requirements to rebut the presumption against asylum eligibility. Some stated that the lack of definitions and documentary evidence requirements in the NPRM would leave the adjudicator with an inordinate amount of discretion to decide whether the presumption had been rebutted. Some commenters urged the Departments to reverse the presumption or apply a rebuttable presumption of eligibility for torture survivors.

*Response:* The Departments acknowledge these concerns but disagree with them. As discussed throughout Section IV.B.5 of this preamble, AOs conducting credible fear interviews have an affirmative duty to elicit all testimony relevant to assessing eligibility for protection, which will necessarily include testimony relevant to the rebuttable presumption.[204] Similarly, credible fear review by an IJ "include[s] an opportunity for the alien to be heard and questioned by the [IJ]." INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). In section 240 proceedings, IJs have a duty to develop the record, which again will necessarily include facts and testimony relevant to the rebuttable presumption. 8 CFR 1003.10(b) ("[I]Js shall administer oaths, receive evidence, and interrogate, examine, and cross-examine aliens and any witnesses."); *Quintero* v. *Garland,* 998 F.3d 612, 626 (4th Cir. 2021). A noncitizen may be able to satisfy their burden of proof through credible testimony alone, INA 208(b)(1)(B)(ii), 8

---

[204] USCIS, *Eliciting Testimony;* USCIS, *Non-Adversarial Interview* 13 ("You control the direction, pace, and tone of the interview and have a duty to elicit all relevant testimony.").

**31390**    **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

U.S.C. 1158(b)(1)(B)(ii), and the rule does not require any particular evidence, including documentary evidence, to rebut or establish an exception to the presumption under 8 CFR 208.33(a) and 1208.33(a).

The Departments believe that the exceptions to and means of rebutting the presumption are appropriate in scope and detail and that they need not be expanded by, for example, incorporating means of rebuttal similar to the exceptions to the one-year deadline for applying for asylum. To the extent that, at the time of entry, a noncitizen reasonably believed that they faced an acute medical emergency or imminent and extreme threat to life or safety, the rule permits adjudicators to consider whether this situation may constitute an "exceptionally compelling circumstance[.]" 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). As to concerns about disparate application amongst AOs, all credible fear determinations undergo supervisory review to ensure consistency, 8 CFR 208.30(e)(8), and noncitizens can request IJ review of a negative determination, 8 CFR 208.33(b), 1208.33(b). Determinations made by IJs in section 240 proceedings, including determinations about the presumption, are subject to review by the BIA. *See* 8 CFR 1003.1(b). Comments regarding AO and IJ conduct and training are further addressed in Section IV.B.5.iii of this preamble. The Departments decline to "reverse" the presumption of ineligibility for certain cases, which would function as an additional exception to the rule and undermine the rule's goal of incentivizing migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States or seek asylum or other protection in another country through which they travel. However, even if ineligible for asylum due to the presumption against asylum eligibility, noncitizens who establish a reasonable possibility of persecution or torture, 8 CFR 208.33(b)(2)(i), 1208.33(b)(2)(ii), remain eligible to apply for statutory withholding of removal and protection under the CAT. 8 CFR 208.16.

*Comment:* Commenters expressed opposition to the proposed requirement that noncitizens satisfy the preponderance of the evidence standard to rebut the presumption of ineligibility. Commenters stated that using the preponderance of the evidence standard violates section 235(b)(1)(B)(v) of the INA, 8 U.S.C. 1225(b)(1)(B)(v), by imposing a different, higher standard than the "significant possibility" standard. Citing a 1996 statement from U.S. Senator Orrin Hatch, one

commenter stated that the application of the "preponderance of the evidence" standard during the credible fear stage was considered and rejected by Congress and that the Departments lack the authority to resurrect and implement that standard through regulation. Some commenters emphasized that the "significant possibility" standard is an intentionally low screening standard for credible fear interviews established by Congress. Some commenters stated that the "preponderance of the evidence" standard is even higher than the "reasonable possibility" standard to show a well-founded fear, which in turn is higher than the "significant possibility" standard. Some commenters stated that the "preponderance of the evidence" standard imposes too high a burden on noncitizens in credible fear proceedings. Commenters said it would be particularly difficult for detained, unrepresented individuals to satisfy this burden and that the rule would be hardest on disadvantaged noncitizens. One commenter recommended that this heightened standard of proof not be implemented and that the existing standard of proof be revised for consistency with international norms to exclude only cases that are "manifestly unfounded or clearly abusive."

*Response:* Commenters' concerns are based on an incorrect premise. At the credible fear stage, AOs will apply the "significant possibility" standard in assessing whether a noncitizen may ultimately rebut the presumption of asylum ineligibility by a preponderance of the evidence during a full merits adjudication. Because the "significant possibility" standard is set by statute, *see* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), the Departments lack the authority to alter it through rulemaking. For further discussion of this issue, see Section IV.D.1.iii of this preamble.

*Comment:* Commenters stated that applying the rule's presumption of ineligibility at the credible fear stage is different from how other eligibility bars function in credible fear determinations. Some commenters stated that the complex means of rebuttal would require a lengthy, fact-based interview and "intensive factual analysis," which they claimed are not appropriate for credible fear interviews because those interviews offer insufficient procedural protections. Another commenter stated that the Departments recently recognized due process problems with this approach when they rescinded the requirement that certain mandatory bars to asylum be considered at the credible fear screening stage.

One commenter expressed concern with the perceived discretion of border officials during the proposed rebuttable presumption process, asserting that the NPRM gave no clear indication of how, when, or in front of whom the asylum seeker will have to present their evidence. One commenter stated that DHS has a poor track record of making similar determinations in the past, citing instances where noncitizens were erroneously enrolled in the MPP, and stated that DHS has historically failed to effectively screen asylum seekers for certain characteristics and processes. One commenter stated that, under the NPRM, AOs would determine whether individuals presented at the SWB without documents sufficient for lawful admission pursuant to section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7), but that AOs do not receive the same training as CBP officers regarding that section.

*Response:* The Departments acknowledge that statutory bars to asylum eligibility have not historically applied at the credible fear stage. However, the Departments have authority to apply conditions on asylum eligibility at that stage. The INA authorizes AOs to assess whether there is a significant possibility that the noncitizen could establish eligibility for asylum, INA 235(b)(1)(v), 8 U.S.C. 1225(b)(1)(v), which may include additional eligibility conditions that the Departments establish by regulation, *see* 88 FR at 11742. Moreover, the Departments believe that the rebuttable presumption of ineligibility under this rule is less complex than the mandatory bars provided in section 208(b)(2)(A) of the INA, 8 U.S.C. 1158(b)(2)(A) (barring from asylum eligibility noncitizens (1) who have participated in persecution; (2) who have been convicted of a particularly serious crime; (3) for whom there are serious reasons to believe committed a serious nonpolitical crime; (4) for whom there are reasonable grounds to regard as a danger to the United States; (5) who are described under certain provisions relating to terrorist activity; or (6) who were firmly resettled before coming to the United States). Also, most of the facts relevant to the applicability of, exceptions to, and means of rebutting the presumption involve circumstances at or near the time of the noncitizen's entry. Because credible fear interviews occur near the time of entry when the events and circumstances giving rise to the presumption's exceptions and rebuttal grounds occur, the Departments believe noncitizens will have a sufficient opportunity to provide testimony regarding such events and

circumstances while they are fresh in noncitizens' minds. Furthermore, delaying application of the presumption against asylum eligibility until the final merits stage would undermine the Departments' goals of incentivizing migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States or seek asylum or other protection in another country through which they travel.

This rule provides that AOs and IJs, not CBP officers, will assess whether noncitizens are subject to the rule's presumption of asylum ineligibility and can rebut the presumption. 8 CFR 208.33(b), 1208.33(b). Also, the Departments note that the "significant possibility" standard applied at the credible fear stage is lower than the "more likely than not" standard that was used by DHS to assess whether a noncitizen could be returned to Mexico pursuant to the MPP.[205] The Departments disagree that the rule requires AOs to assess whether noncitizens are inadmissible under section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7), and subject to expedited removal. CBP officers will continue to determine whether a noncitizen is subject to, and will be placed in, expedited removal.

*Comment:* Commenters stated that the term "rebuttable presumption" as used in the rule is misleading and inaccurate and that the rule instead creates an outright bar with exceptions.

*Response:* The Departments believe that the description of the rule's main provision as a rebuttable presumption accurately reflects the operation of that provision, including the availability of exceptions and bases to rebut the presumption. Unlike the TCT Bar Final Rule, which included only narrow, categorical exceptions to its application, under this rule, if the noncitizen is not exempted from this rule's application, the lawful pathways condition may be rebutted where the noncitizen demonstrates to the adjudicator's satisfaction that exceptionally compelling circumstances are present. *See* 8 CFR 208.33(a)(3), 1208.33(a)(3). Because a noncitizen to whom the condition applies and for whom an exception is not available under 8 CFR 208.33(a)(2), 1208.33(a)(2), may nevertheless avoid its effect in certain non-categorical circumstances, the

Departments believe that referring to it as a "rebuttable presumption" is accurate.

### 2. Grounds for Rebutting the Presumption

#### i. Acute Medical Emergency

*Comment:* Commenters expressed concerns regarding the acute medical emergency means of rebuttal. One commenter asserted that this was a novel concept under immigration law and that the NPRM's description of this ground of rebuttal made clear that this standard is designed to be impossible to meet. Some commenters stated that the proposed rule failed to provide definitions or guidance to inform assessments of what constitutes an acute medical emergency. Some commenters wrote that this means of rebuttal should include non-life-threatening and other non-medical needs. One commenter, who is a doctor, stated that the definition of "medical emergency" should include curable conditions that would be fatal in the short term and conditions that could be commonly treated in the United States to restore health and function, assuming that sufficient care would not be available in the originating country. Commenters expressed concern regarding how people living with HIV will be assessed under this provision, given that their condition could lead to a life-threatening emergency without treatment. Commenters also expressed concern that the proposed rule gave inadequate consideration to the unique attributes of children's physical and mental health and noted that signs differentiating a child with illness from one with severe illness are quite subtle. Some commenters also expressed concern that the proposed rule would not require that children be assessed by trauma-informed physicians. Another commenter expressed concerns that the rule would not account for potential emergencies for pregnant women.

Some commenters stated that the "preponderance of the evidence" standard for establishing an acute medical emergency is too high. Commenters said that the rule did not explain how an individual would prove that their medical issue was "acute," and one stated that this determination is possible only after medical care is already being provided. Some commenters stated that noncitizens may lack medical documentation or knowledge of the severity of their condition and that AOs and IJs are not medical experts with the required expertise to evaluate these types of medical issues. Other commenters

stated that the proposed rule does not specify which officials will be making this determination or whether any medical training or expertise would be required. Commenters expressed concerns that asking immigration officials to make medical assessments would yield inconsistent application of the rebuttable presumption and undermine the welfare of asylum seekers. Commenters expressed concern that this means of rebutting the presumption would require noncitizens to share private details about their medical histories and bodies with a stranger on the phone. One commenter said that an individual may not know that they are suffering an acute medical emergency, while another stated that a noncitizen's medical condition could worsen by the time that the AO decides whether the presumption has been rebutted. Some commenters added that the rule should specify what would occur in scenarios where families rebut the presumption based on the acute medical emergency ground and the individual with the medical emergency subsequently dies or the individual lacks access to medical care to address their medical emergency.

Commenters said that CBP had denied Title 42 health exceptions to those with acute medical needs, despite extensive documentation of their conditions, which raised the concern that the term "acute medical emergency" would also be applied stringently under the rule. Another commenter stated that the rule would "restrict access to medical care and humanitarian aid if asylum seekers are denied by CBP," which would impede the gathering of evidence needed to rebut the presumption of asylum ineligibility.

Another commenter expressed concern that an acute medical emergency may also be easy to feign or fabricate, though the commenter did not provide any example of how that could be done.

*Response:* The Departments believe the acute medical emergency means of rebuttal at 8 CFR 208.33(a)(3)(i)(A) and 1208.33(a)(3)(i)(A), is drafted so that those noncitizens with acute medical emergencies can rebut the condition on asylum eligibility. In general, as stated in the NPRM, acute medical emergencies include situations in which someone faces a life-threatening medical emergency or faces acute and grave medical needs that they cannot adequately address outside of the United States. *See* 88 FR at 11723. If a noncitizen rebuts the presumption based on the acute medical emergency of a family member with whom they were traveling, the noncitizen's

---

[205] USCIS, *PM 602–0169, Policy Memorandum: Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols* (Jan. 28, 2019), *https://www.uscis.gov/sites/default/files/document/memos/2019-01-28-Guidance-for-Implementing-Section-35-b-2-C-INA.pdf.*

**31392** **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

eligibility for asylum will not change if the family member who faced the medical emergency subsequently passes away; this is because the language of the rebuttal circumstance focuses on whether the family member faced an acute medical emergency "at the time of entry." 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i).

The Departments believe that, in general, broadening this means of rebuttal would undermine the purpose of the rule, which is to incentivize noncitizens to utilize lawful, safe, and orderly pathways of migration. A medical condition that is not an acute emergency would not ordinarily or necessarily justify failing to pursue a lawful pathway. However, while an acute medical emergency is a per se example of an exceptionally compelling circumstance to rebut the presumption of ineligibility, AOs and IJs may determine, on a case-by-case basis, whether less severe health-related situations also qualify as "exceptionally compelling circumstances." *See* 8 CFR 208.33(a)(3), 1208.33(a)(3).

The Departments also disagree with comments concerning the ability of AOs and IJs to properly assess this rebuttal ground and the ability of noncitizens to establish it. As discussed in Section IV.D.1.iii of this preamble, AOs will apply the "significant possibility" standard during credible fear interviews to determine whether a noncitizen would be able to rebut the presumption because they faced an acute medical emergency at the time of entry. Again, the Departments emphasize that noncitizens may be able to rebut the presumption of asylum ineligibility through testimony alone, and the rule does not require any particular evidence to rebut the presumption under 8 CFR 208.33(a)(3) and 1208.33(a)(3). AOs are trained to elicit all relevant testimony in a non-adversarial manner, which will necessarily include testimony related to this ground for rebuttal.[206] As discussed earlier in Section IV.B.5.iii.a of this preamble, AOs frequently assess physical and psychological harm when adjudicating asylum applications and are trained to do so in a sensitive manner. As discussed in Section IV.B.5.iii.c of this preamble, the rule does not require adjudicators to make a formal medical diagnosis or analyze whether a noncitizen meets specific

medical criteria to determine whether a noncitizen has rebutted the rule's condition on eligibility. Instead, adjudicators will make a factual determination of whether an acute medical emergency existed at the time of entry. 8 CFR 208.33(a)(3)(i)(A), 1208.33(a)(3)(i)(A). To the extent that a noncitizen experienced such a medical emergency during their time in CBP custody, AOs may be able to consult CBP records. Specifically, if a noncitizen experiences a medical issue during their time in CBP custody, CBP medical staff will evaluate the noncitizen, and, if appropriate based on the severity of the issue, refer them to a local medical facility. This treatment would be documented.[207] Regarding the concerns raised about sharing private medical details, noncitizens in credible fear proceedings, as discussed in Section IV.B.5.v of this preamble, are advised of the confidential nature of the interview. As noted earlier in Sections IV.B.5.i and IV.E.1 of this preamble, credible fear determinations undergo multiple levels of review to ensure consistency, and decisions made in section 240 proceedings are subject to administrative appeal.

The Departments note that, like all exceptionally compelling circumstances, AOs in credible fear proceedings or IJs in immigration court, not CBP officers at POEs, will determine whether a noncitizen faced an acute medical emergency. Accordingly, to the extent commenters are concerned by how CBP officers have considered medical issues in the context of the application of the Title 42 public health Order, such concerns are inapplicable to this rule. Additionally, CBP will process all noncitizens who arrive and seek admission at a POE without regard to whether the presumption may ultimately be found to apply.

Regarding concerns of fraud, the commenter did not provide any explanation or example of how an acute medical emergency would be easy to fabricate, and AOs and IJs will assess the credibility of any claims that the noncitizen faced an acute medical emergency. INA 208(b)(1)(B)(2), 8 U.S.C. 1158(b)(1)(B)(2); INA 240(c)(4)(B), 8 U.S.C. 1229a(c)(4)(B); 8 CFR 208.30(e)(2).

**ii. Imminent and Extreme Threat to Life and Safety**

*Comments:* Commenters expressed concern over the high level of risk

required to rebut the presumption based on an imminent and extreme threat to life and safety. Some commenters stated this means of rebuttal requires a higher degree of risk than is required for eligibility for asylum or statutory withholding of removal. One commenter stated that it would require migrants to "predict the future" in deciding whether to wait for an appointment at the border, which can be dangerous because violence happens randomly and unexpectedly. Some said that, if an asylum seeker is forced to remain in Mexico until a threat is imminent, it may well be too late to avoid such harm, thus putting the person in a "catch-22." A commenter stated that the rule appears to exclude anyone who has already been gravely harmed while in Mexico but who cannot prove that another harm is "imminent," while others recommended that if an individual circumvents other pathways to cross the U.S.-Mexico border due to the severity of past threats or harms, the "imminent and extreme threat" ground should automatically apply. Another commenter stated that, due to the complicated and lengthy regulatory definition of torture, that term should be replaced with "severe pain or suffering."

Commenters also expressed concern about the ability for specific populations to meet this rebuttal ground. Commenters stated that the rule forces LGBT and HIV-positive people, who already face significant hostility in Mexico, to put themselves in even worse danger to satisfy the imminence requirement of the "imminent and extreme" ground for rebuttal. Commenters wrote that this rebuttal ground should be broadened so that adjudicators may favorably consider circumstances involving threats to life or safety that might not necessarily be considered imminent or extreme. For example, one commenter noted that there are many forms of gender-based harm that are unlikely to meet the requirement that the threat to life or safety is "imminent and extreme" because such forms of harm are not always highly violent acts. One commenter wrote that pervasive discrimination or physical abuse—as, for example, experienced by LGBT individuals in Mexico, where discrimination against such persons is still commonplace—would not meet the threshold of "imminent and extreme threat to life and safety" if experienced in either a transit country or their home country. The commenter also stated that individuals forced to hide their identity

---

[206] USCIS, *Eliciting Testimony* 12 ("In cases requiring an interview, although the burden is on the applicant to establish eligibility, equally important is your obligation to elicit all pertinent information."); USCIS, *Non-Adversarial Interview* 13 ("You control the direction, pace, and tone of the interview and have a duty to elicit all relevant testimony.")

[207] CBP, *Directive 2210–004, Enhanced Medical Support Efforts* (Dec. 31, 2019), *https:// www.cbp.gov/document/directives/directive-2210-004-cbp-enhanced-medical-efforts.*

to avoid discrimination would be hindered in their ability to meet this ground for rebuttal.

Commenters expressed concern that noncitizens would not have sufficient evidence to show an "imminent and extreme" threat to rebut the presumption. Similar to their comment regarding the "acute medical emergency" means of rebuttal, one commenter asserted that the "imminent and extreme" threat means of rebuttal is a novel concept under immigration law and that the description of this ground of rebuttal in the NPRM made clear that this standard is designed to be impossible to meet. One commenter stated that proving a specific threat may be near impossible because individualized threats are frequently made orally and in person, not in writing, and hence are not amenable to proof in a formalized setting. The commenter also stated that such threats are usually directly followed by the harm itself. One commenter wrote that the most deserving individuals in the asylum process will be hard-pressed to produce evidence of an "imminent threat" because persecution frequently does not leave documentary evidence. A few commenters emphasized that survivors of sexual assault would face extreme difficulty in obtaining documentation to meet the evidentiary burden from another country unless they had others assisting them; some survivors, for example, may have only their own account of the assault. A legal services provider expressed concern that survivors of violence would not necessarily have the proof, language, or support needed to explain what imminent danger they faced, leading to the denial of bona fide asylum claims and the refoulement of individuals facing extreme persecution.

Commenters expressed concerns that the lack of definition of an "extreme and imminent threat to life or safety" left adjudicators with an inordinate amount of discretion. One commenter stated that asylum seekers in Mexican border regions so often face a serious risk to their safety that it is unclear what an asylum seeker would need to show to establish an "imminent and extreme" threat to life. Commenters expressed concern that this ground of rebuttal calls for a subjective assessment of the temporality and qualitative extremity of the threats faced by asylum seekers, which may exclude many genuine refugees.

Other commenters stated concerns that this means of rebuttal was overly broad or would lead to fraud. One commenter said that AOs and IJs would have difficulty determining whether

someone has fabricated evidence to support a claim that they faced an imminent threat to life or safety, especially when strong evidence exists that migrants who travel to the U.S.-Mexico border by way of smuggling networks are frequently subject to such violence. Another commenter stated that the journey to the southwest border of the United States is inherently a journey where migrants will face extreme threats to life and safety from beginning to end; adding this means of rebuttal would thus exempt the entire population of migrants who have traveled with the assistance of smugglers and other criminal enterprises.

*Response:* The Departments acknowledge these concerns but believe that only imminent and extreme threats to life or safety should constitute a per se ground to rebut the presumption of asylum ineligibility. For threats that are less imminent or extreme, noncitizens may attempt to demonstrate on a case-by-case basis that they otherwise present "exceptionally compelling circumstances" that overcome the presumption of ineligibility. Including lesser threats in the per se grounds for rebuttal would undermine the Departments' goal of incentivizing migrants to use lawful, safe, and orderly pathways to enter the United States or seek asylum or other protection in another country through which they travel.

As noted in the NPRM, threats cannot be speculative, based on generalized concerns about safety, or based on a prior threat that no longer posed an immediate threat at the time of entry. 88 FR at 11707 n.27. The term "extreme" refers to the seriousness of the threat; the threat needs to be sufficiently grave, such as a threat of rape, kidnapping, torture, or murder, to trigger this ground for rebuttal. *Id.* Where the noncitizen is a member of a particularly vulnerable group (*e.g.,* LGBT or HIV-positive people), their membership in such a group may be a relevant factor in assessing the extremity and immediacy of the threats faced at the time of entry. In response to the recommendation that the word "torture" be replaced with "severe pain and suffering," the Departments note that the imminent and extreme threats to life and safety listed in the rule are not exhaustive and that this means of rebuttal may in certain circumstances encompass imminent and extreme threats of severe pain and suffering.

The Departments disagree that noncitizens will have to "predict the future" to rebut the presumption against asylum in this manner. For this per se

rebuttal ground to apply, the noncitizen must demonstrate there was an imminent and extreme threat to life or safety, not that the feared harm was actively taking place or certain to occur. *See* 8 CFR 208.33(a)(3)(i)(B), 1208.33(a)(3)(i)(B). The Departments also note that "imminent" and "extreme" are standards that are commonly used in asylum adjudications. *See, e.g., Fon* v. *Garland,* 34 F.4th 810, 813 (9th Cir. 2022) ("'[P]ersecution is an extreme concept" (quoting *Ghaly* v. *INS,* 58 F.3d 1425, 1431 (9th Cir. 1995))); *Li* v. *Att'y Gen. of U.S.,* 400 F.3d 157, 164 (3d Cir. 2005) ("[U]nfulfilled threats must be of a highly imminent and menacing nature in order to constitute persecution" (citing *Boykov* v. *INS,* 109 F.3d 413, 416–17 (7th Cir. 1997))). As already discussed in Section IV.E.1 of this preamble, noncitizens may be able to rebut the presumption against asylum eligibility through credible testimony alone. In response to commenter concerns about inconsistent application of the rule, the Departments note that an AO's decision is subject to supervisory and potentially IJ review, and determinations made in section 240 proceedings may be administratively appealed.

The Departments acknowledge commenters' concern about fraud, but during credible fear screenings, AOs will assess the credibility of a noncitizen's testimony regarding dangers faced at the time of entry, which will necessarily include an evaluation of the whether a claimed threat is fraudulent. As discussed earlier in Section IV.D.1.iii of this preamble, whether a noncitizen is able to establish an exception to the rule or rebut the presumption will generally involve a straightforward analysis, and the Departments expect that, except in rare cases, application of the "significant possibility" standard will not meaningfully differ from application of the ultimate merits standard. The Departments believe that this ground of rebuttal is sufficiently narrow to prevent broad application to all citizens who attempt to enter the United States from Mexico across the SWB or adjacent coastal borders.

iii. Other Exceptionally Compelling Circumstances

*Comment:* Some commenters stated that the provision allowing a noncitizen to show "exceptionally compelling circumstances" to rebut the presumption was not sufficiently defined and hence that applying it would lead to disparate results amongst adjudicators. One commenter stated that

**31394**    **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

the rule does not clarify whether the exceptionally compelling circumstance must be one that prevented the asylum seeker from scheduling an appointment or whether it may be an equitable factor that mitigates in favor of granting humanitarian protection. Another commenter expressed concerns that the adverb "exceptionally" is redundant or excessive and would result in different interpretations by adjudicators. The same commenter stated that applying the term "exceptionally compelling circumstances" would also be difficult because the term is rarely used in immigration law and is restrictively defined by the Departments.

While some commenters expressed concern that requiring noncitizens to show "exceptionally compelling circumstances" by a preponderance of the evidence would be too demanding of a standard, which they asserted renders the provision inaccessible to many asylum seekers and will result in unfair denials, other commenters claimed that the standard would, in practice, allow for any official to create an exemption for any reason.

*Response:* The Departments respectfully disagree with commenters' concerns about the "exceptionally compelling circumstances" standard being insufficiently defined or not amenable to consistent determinations. The rule provides that a noncitizen necessarily demonstrates exceptionally compelling circumstances if, at the time of entry, they or a family member with whom they were traveling (1) had an acute medical emergency; (2) faced an imminent and extreme threat to life or safety; or (3) satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11. *See* 8 CFR 208.33(a)(3), 1208.33(a)(3). The non-exhaustive nature of this list preserves flexibility and ensures that the rule does not foreclose adjudicators from considering facts giving rise to exceptionally compelling circumstances.

The Departments emphasize that exceptionally compelling circumstances are not limited to the examples enumerated in 8 CFR 208.33(a)(3)(i) and 1208.33(a)(3)(i). In fact, the rule recognizes additional per se exceptionally compelling circumstances in section 240 removal proceedings to, along with other provisions in the rule, eliminate the possibility that this rule will cause separation of family members who traveled together or long-term separation that would result by preventing family members from following to join principal applicants who would be granted asylum but for the presumption. 8 CFR 1208.33(c).

The Departments also note that AOs and IJs regularly apply various standards in the course of their adjudications, such as the "extraordinary circumstances" standard to determine whether an asylum applicant qualifies for an exception to the one-year filing deadline, *see* INA 208(a)(2)(D), 8 U.S.C. 1158(a)(2)(D), and the discretionary "compelling reasons" standard to determine whether an applicant who has suffered past persecution but lacks a well-founded fear of future persecution should be granted asylum in the exercise of discretion, *see* 8 CFR 208.13(b)(1)(iii)(A); 1208.13(b)(1)(iii)(A). Hence, although the Departments acknowledge the concerns of some commenters about noncitizens' ability to demonstrate "exceptionally compelling circumstances," the Departments believe that the best way to assess the variety of fact patterns presented by noncitizens is to use a fact-specific approach on a case-by-case basis. Using this fact-specific approach on a case-by-case basis is consistent with other aspects of asylum adjudication, such as establishing an exception to the one-year filing deadline, *see* INA 208(a)(2)(D), 8 U.S.C. 1158(a)(2)(D), determining whether harm rises to the level of persecution, *see Stevic,* 467 U.S. at 423 n.18, or determining whether an individual was harmed on account of a protected ground, *see* 8 CFR 208.13(b)(1).

AOs receive extensive training that is designed to enable them to conduct non-adversarial interviews, assess testimony, and exercise their judgment in a fair and impartial manner.[208] Likewise, IJs have extensive experience and training in applying such concepts to individual cases.[209] Accordingly, the Departments strongly believe that IJs and AOs will fairly and competently examine the facts and circumstances of

an individual's case to determine whether they demonstrated exceptionally compelling circumstances to rebut the lawful pathways presumption of asylum ineligibility. In response to commenter concerns about consistency of determinations, credible fear determinations, as noted above, are subject to review by a Supervisory AO, and determinations made in section 240 proceedings are subject to administrative appeal.

#### iv. Victim of Severe Form of Trafficking in Persons

*Comment:* A number of commenters stated concern about noncitizens' ability to rebut the presumption by satisfying the definition of a "victim of a severe form of trafficking in persons." Some commenters stated that trafficking victims cannot be expected to have evidence prepared to demonstrate, by a preponderance of the evidence, that they were trafficked. A few commenters expressed concern that it would be very difficult for the population that is vulnerable to trafficking to rebut the presumption due to lack of evidence and the exemption being narrowly applied. Others stated that the NPRM's reference to 8 CFR 214.11, which defines victims of severe forms of trafficking, was not sufficiently specific. Some commenters wrote that this ground of rebuttal should be broadened to apply to circumstances in which individuals may be at risk of trafficking and to apply regardless of severity. One commenter stated that the victims of trafficking rebuttal ground is very narrow and fails to take into account the many other forms of gender-based persecution, including domestic violence, sexual assault, stalking, female genital cutting, and forced marriage. A few other commenters expressed concerns that officials may retraumatize individuals in the process of validating a claim for rebutting the presumption and may end up returning them to their traffickers if they find that the noncitizen did not rebut the presumption of asylum ineligibility. One commenter wrote that, because the severity of human trafficking is hard to "grade," it is important to apply the broadest understanding of new trends and definitions provided under the universal human rights instruments to prevent underreporting and insufficient identification of victims of this human rights violation.

One commenter wrote that the definition of "victim of a severe form of trafficking" is highly technical and requires a thorough analysis of several components usually (in the T nonimmigrant status context, from

---

[208] *See* USCIS, *Non-Adversarial Interview.*

[209] *See* 8 CFR 1003.0(b)(1)(vii) (EOIR Director's authority to "[p]rovide for comprehensive, continuing training and support" for IJs); 8 CFR 1003.9(b)(1) and (2) (Chief Immigration Judge's authority to issue "procedural instructions regarding the implementation of new statutory or regulatory authorities" and "[p]rovide for appropriate training of the [IJs] . . . on the conduct of their powers and duties"); DOJ EOIR, *Legal Education and Research Services Division* (Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division* ("The Legal Education and Research Services Division (LERS) develops and coordinates headquarters and nationwide substantive legal training and professional development for new and experienced judges, attorneys, and others within EOIR who are directly involved in EOIR's adjudicative functions. LERS regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations.").

**Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations **31395**

which the definition derives) completed after review of a complete application package, including extensive supporting evidence and briefing prepared by legal counsel. The same commenter added that a survivor presenting at the border under the circumstances described above is unlikely to be able to meet this standard. Some commenters stated that the rule would force trafficking victims to rebut the presumption at a higher legal standard—preponderance of the evidence—rather than "any credible evidence" as would be required if they were already in the United States and applying for T nonimmigrant status.

One commenter stated that the Departments should remove the trafficking rebuttal ground because migrants who voluntarily utilized smugglers would falsely claim to have been trafficked to qualify for the exception.

*Response:* The Departments acknowledge commenters' concerns about victims of human trafficking but disagree that the existing rebuttal ground should be revised or expanded.

As described in the NPRM, *see* 88 FR at 11730, the presumption in this rule is necessarily rebuttable in certain circumstances, including if, at the time of entering the United States, the noncitizen satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11. *See* 8 CFR 208.33(a)(3)(i)(C), 1208.33(a)(3)(i)(C). The Departments disagree with the premise that this rule's reference to the definition of "victim of a severe form of trafficking in persons" found in 8 CFR 214.11 is insufficiently specific. This final rule relies upon, and is consistent with, the definition used in the T nonimmigrant status context, which itself is consistent with the applicable statutory definition.[210]

The Departments also emphasize that they are not applying the "preponderance of the evidence" standard to trafficking victims who are initially seeking to rebut the lawful pathways presumption during credible fear screenings. The standard of proof applied in credible fear screening is a "significant possibility . . . that the alien could establish eligibility for asylum," INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), which also applies to "exceptionally compelling circumstances." During credible fear screenings, then, a noncitizen would have to show a significant possibility that they could satisfy the definition of victim of a severe form of trafficking by

a preponderance of the evidence in a full hearing. The Departments recognize that many victims of trafficking are unlikely to possess written evidence of their trafficking; however, the credible fear screening process involves eliciting testimony from individuals seeking protection and does not require noncitizens to provide written statements or other documentation. *See* INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); 8 CFR 208.30(d). Moreover, the Departments note that, in addition to receiving extensive training in substantive law and procedure, AOs are also trained to identify and interview vulnerable individuals, including victims of trafficking.[211] For merits adjudications, both AOs [212] and IJs [213] receive training and have experience assessing evidence and the credibility of noncitizens who appear before them for interviews or hearings, even in the absence of other documentation. Indeed, the INA explicitly provides that "testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration." INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii).

With respect to the commenter's suggestion that the Departments should remove the trafficking-victims ground for rebuttal because the commenter believed that noncitizens who are smuggled will falsely claim they are trafficked, the Departments strongly believe it is important to treat trafficking as an exceptionally compelling circumstance. The Departments included this provision to allow this

vulnerable population to rebut the lawful pathways presumption and seek protection in the United States. The Departments note that the commenter did not include any reliable evidence or data to support their allegation that individuals who are smuggled will falsely claim to be trafficked. In addition, the TCT Bar IFR also included a limited exception for victims of severe forms of trafficking, and the Departments are unaware of evidence that it was abused while that IFR was in effect.

Commenters' suggestions regarding broadening the grounds to rebut the presumption are addressed below in Section IV.E.3 of this preamble.

3. Exceptions to the Presumption

i. Proposed Exceptions for Migrants Facing Danger in Third Countries

*Comment:* Commenters expressed concern that the rule contains no exceptions for asylum seekers who would face danger in transit countries even though many asylum seekers are at serious risk in common transit countries. Multiple commenters suggested that the exemption for imminent threat of rape, kidnapping, torture, or murder should be expanded to include general threats of violence, as many individuals within the asylum process would be forced to stay in Mexico or other countries where general threats of violence are much more common and put their lives or safety at risk. Another commenter stated that, when asylum seekers are waiting in some of the most dangerous towns and cities in the world, they face real threats that the rule should recognize as an exception to the presumption.

Several commenters noted that the members of one family, when using the Title 42 exception process, tried to travel more than 1200 miles across Mexico and were kidnapped and taken hostage during that travel, only to be expelled from the United States when they sought help from the USBP. Another commenter noted that movement along the U.S.-Mexico border is notoriously difficult and unsafe. In contrast, one commenter stated that reports of localized violence in certain areas of Mexico is not indicative of the conditions in Mexico as a whole.

*Response:* The Departments acknowledge the concerns raised by commenters and reiterate that noncitizens who face an extreme and imminent threat to life or safety in Mexico at the time of entry can rebut the presumption of asylum ineligibility, *see* 8 CFR 208.33(a)(3)(i)(B), 1208.33(a)(3)(i)(B), without needing to

---

[210] *See* 8 CFR 214.11(b) (cross-referencing INA 101(a)(15)(T)(i), 8 U.S.C. 1101(a)(15)(T)(i)).

[211] *See* USCIS, *RAIO Directorate—Detecting Possible Victims of Trafficking Lesson Plan* (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/Trafficking_LP_RAIO.pdf; see also* USCIS, *Asylum Division Training Programs* (Dec. 19, 2016), *https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/asylum-division-training-programs.*

[212] USCIS, *RAIO Directorate—Officer Training: Decision Making* (Dec. 20, 2019), *https://www.uscis.gov/sites/default/files/document/foia/Decision_Making_LP_RAIO.pdf.*

[213] *See* 8 CFR 1003.0(b)(1)(vii) (EOIR Director's authority to "[p]rovide for comprehensive, continuing training and support" for IJs); 8 CFR 1003.9(b)(1) and (2) (Chief Immigration Judge's authority to issue "procedural instructions regarding the implementation of new statutory or regulatory authorities" and "[p]rovide for appropriate training of the [IJs] . . . on the conduct of their powers and duties"); DOJ EOIR, *Legal Education and Research Services Division* (Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division* ("[LERS] develops and coordinates headquarters and nationwide substantive legal training and professional development for new and experienced judges, attorneys, and others within EOIR who are directly involved in EOIR's adjudicative functions. LERS regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations.").

qualify for any additional exception. In addition, the rule provides that they may rebut the presumption by showing that, at the time of entry, they faced an acute medical emergency or were victims of a severe form of trafficking. *See* 8 CFR 208.33(a)(3)(i)(A) and (C), 1208.33(a)(3)(i)(A) and (C). However, the Departments decline to enumerate additional, broader ways to rebut the presumption, such as a ground based on general threats of violence; and the Departments likewise believe that they need not enumerate additional exceptions to the presumption. In the absence of other exceptionally compelling circumstances, *see* 8 CFR 208.33(a)(3)(i), 1208(a)(3)(i), the Departments believe that danger in Mexico generally would justify failing to pre-schedule a time and place to appear at a POE and eschewing lawful and orderly pathways for entering the United States only when it amounts to an extreme and imminent threat to life or safety. For noncitizens who face dangers in other countries besides Mexico, or who face less imminent and extreme threats in Mexico, there ordinarily remain reasonable opportunities to take advantage of other lawful pathways contemplated by the rule. To the extent a noncitizen's individual circumstances make lawful pathways unavailable, or otherwise warrant rebuttal of the presumption, noncitizens may attempt to demonstrate as much on a case-by-case basis under the ''exceptionally compelling circumstances'' means of rebuttal. Noncitizens may choose to apply for asylum or other protection in a different country where they do not face dangers or schedule appointments to appear at a SWB POE using the CBP One app. CHNV nationals may also apply for advanced authorization for parole while outside their country of nationality. With regard to concerns about traveling along the U.S.-Mexico border to access available CBP One app appointments, CBP intends to increase the number of available appointments when the Title 42 public health Order is lifted, as detailed in Section IV.E.3.ii.a of this preamble. As detailed in Section IV.E.3.ii.b of this preamble, CBP is implementing updates to the CBP One app process that will enable noncitizens to request a preferred POE to schedule an appointment, thus helping noncitizens avoid unpredictable travel along the U.S.-Mexico border.

ii. Concerns About the Exception for Scheduled Arrivals at Ports of Entry

a. General Comments Regarding the CBP One App

*Comment:* One commenter, a legal services provider, expressed concern about the future impact of the CBP One app based on their experiences with the use of the app in the context of seeking Title 42 exceptions. Specifically, the commenter stated that the use of the app had barred ''thousands'' from seeking exceptions to the Title 42 public health Order. This commenter stated that, before January 2023, it was able to schedule appointments for its clients with POEs directly, without using the app. The organization said that this process was ''orderly and calm'' and that clients rarely waited more than four to six weeks for an appointment. The organization stated that, following the implementation of the scheduling capability, many of their clients had been unable to secure appointments, and the process takes longer. The organization stated that CBP did not provide notice that the CBP One app would be the sole way to seek exceptions to Title 42.

*Response:* To the extent that commenters have concerns about the processing of individuals seeking exceptions to the Title 42 public health Order at POEs, including concerns about the number of appointments available under the Title 42 exception process, these concerns are outside the scope of this rule. This rule is designed to manage the anticipated increase in the number of individuals expected to travel to the United States without documents sufficient for lawful admission following the termination of the Title 42 public health Order and will take effect once the Title 42 public health Order is lifted. At that time, CBP will inspect and process all noncitizens who arrive at a POE under Title 8 authorities, which include the INA, as required by statute. Title 42 is a separate statutory scheme that operates separately from Title 8.

Additionally, following the termination of the Title 42 public health Order, CBP intends to increase the number of available appointments in the CBP One app and is committed to processing as many noncitizens as is operationally feasible. Further, in no instance will CBP turn a noncitizen away from a POE, regardless of whether they utilize the CBP One app.

*Comment:* Commenters expressed concern about the security of the personally identifiable information (''PII'') that users submit through the CBP One app. A commenter asserted

that the CBP One app poses serious privacy concerns regarding the collection, storage, and use of private personal information and alleged that requiring use of the CBP One app is ''another means of enlarging what is an already expansive surveillance infrastructure that relentlessly targets immigrant communities.'' A commenter also stated that, while the Departments have previously indicated that use of the CBP One app is voluntary, the rule will significantly expand use of the app, with the result that it will be the only way for certain noncitizens to seek asylum in the United States and thus that ''many people do not have a genuine choice in whether to consent.'' Commenters questioned the wisdom of encouraging migrants to disclose personal details while in transit in temporary shelters and non-secure settings.

Particularly in light of a recent ICE data breach, commenters expressed concern about what measures CBP and DHS will take to secure the PII that applicants will have to provide in order to secure an appointment through the CBP One app. The commenters expressed concern that a similar breach regarding CBP One app data could place applicants waiting for appointments outside the United States at a greater risk than individuals affected by the recent breach, who were primarily in the United States. Commenters alleged that this risk could have a chilling effect on otherwise meritorious applications.

Commenters expressed a range of PII-related concerns regarding the use of the CBP One app in the context of asylum seekers and asylum applications. For example, a commenter expressed concern that use of the CBP One app and the need to rely on publicly accessible internet connections may violate 8 CFR 208.6, which establishes limits on the disclosure to third parties of information contained in or pertaining to records related to credible fear determinations, asylum applications, and similar records. Another commenter similarly noted that use of the app may be tracked by government officials or persecutors, placing migrants in further danger.

A commenter also expressed concern that the lack of privacy may be particularly harmful for those fleeing domestic violence and that use of a smart device to access the CBP One app may permit GPS tracking and put the noncitizen at heightened risk of being located by their abuser, as well as put them at risk of financial abuse. A commenter expressed concern that information provided by migrants through the CBP One app could be

shared with law enforcement agencies beyond CBP, which are not bound by CBP privacy and information-sharing policies. A few commenters expressed concern with requiring the use of a *Login.gov* account because the underlying provider for that site has a history of data breaches.

*Response:* The Departments disagree with the statement that migrants must use, or are unable to meaningfully consent to using, the CBP One app. While noncitizens who present at a POE without scheduling an appointment using the CBP One app will be subject to the rebuttable presumption unless otherwise excepted, noncitizens are not required to use the app in order to be processed at a POE.[214] The Departments note that the rebuttable presumption does not apply to noncitizens who either were provided authorization to travel to the United States to seek parole pursuant to a DHS-approved parole process or who sought asylum or other protection in a country through which they traveled and received a final decision denying that application. 8 CFR 208.33(a)(2)(ii)(A) and (C), 1208.33(a)(2)(ii)(A) and (C). The presumption also does not apply to noncitizens who arrive at a port of entry without scheduling an appointment if the scheduling system was not possible to access or use due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B).

For those who choose to utilize the CBP One app to schedule an appointment, CBP has taken steps to protect users' information. First, in accordance with DHS policy, apps developed by DHS—including the CBP One app—must meet certain baseline privacy and security requirements.[215] These requirements include app-specific privacy and notice policies; limitations on the collection of sensitive content, including PII; and appropriate encryption for the transmission of data.[216] The app was reviewed for compliance prior to development and is reviewed again every time a change is made that impacts the collection and use of PII.[217] All CBP systems have

undergone comprehensive testing and evaluation to assess the respective security features and have been granted an Authority to Operate ("ATO").[218] In particular, the app serves only as a tool for the collection of information.[219] Once the information is received, CBP temporarily retains the submitted CBP One app photographs of undocumented individuals within the Automated Targeting System ("ATS"). Upon an individual's arrival at a POE, the advance information is imported into a Unified Secondary ("USEC") event.[220] The information is then verified by an officer and stored as part of standard CBP processes.[221] All data in ATS and USEC is treated and retained in accordance with the relevant retention schedules.[222] These systems are subject to continuous evaluation of security protocols so that CBP may quickly respond if there is a change in the risk posture in any of the systems. The information CBP collects via the CBP One app and transmits to downstream systems is the same information CBP already collects when a noncitizen encounters a CBP officer at a POE—it is simply collected earlier to make processing at the POE more orderly and efficient.[223] CBP has published a Privacy Impact Assessment ("PIA") for the CBP One app generally and a standalone, function-specific PIA for the collection of advance information from certain undocumented noncitizens.[224]

With regard to the commenters' concerns regarding privacy notices related to biometrics and facial recognition technology, CBP takes such concerns seriously. In the referenced GAO audit, GAO–20–568, GAO made five recommendations to CBP, with which CBP concurred. Three of the recommendations were related to privacy considerations, including (1) ensuring privacy notices are complete and current, (2) ensuring notices are available at all locations using facial recognition technology, and (3) developing and implementing a plan to audit its program partners for privacy compliance.[225] At the time of the publication of the NPRM, all of these privacy-related recommendations had been implemented, and the recommendations were closed by GAO.[226] CBP has since created a new website that outlines the locations (air, land, and seaports) where CBP uses facial comparison technology, and CBP continues to take steps to ensure that appropriate notice is provided to travelers.[227]

With regard to commenters' concerns about *Login.gov*, the Departments note that *Login.gov* is owned and operated by the General Services Administration ("GSA"),[228] and thus the Departments have no control over the data privacy or data security considerations of that platform. However, the Departments note that GSA has a system security plan for *Login.gov*, and *Login.gov* has an ATO.[229]

*Comment:* At least one commenter raised a concern that the CBP One app is an untested pilot program.

*Response:* The Departments respectfully disagree. The CBP One app was initially launched in October 2020 to serve as a single portal to access CBP services.[230] In May 2021, CBP updated the app to provide the ability for certain NGOs to submit information to CBP on

---

[214] *See, e.g.,* CBP, *DHS/CBP/PIA–076, Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* 18 (Jan. 19, 2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf.*

[215] *See* DHS, *Instruction 047–01–003 (Rev. 00.1), Privacy Policy for DHS Mobile Applications* 7–10 (Dec. 14, 2018), *https://www.dhs.gov/publication/privacy-policy-dhs-mobile-applications.*

[216] *Id.*

[217] *See id.* at 10.

[218] *See* DHS, *DHS 4300A Sensitive Systems Handbook* 47 (Nov. 15, 2015), *https://www.dhs.gov/publication/dhs-4300a-sensitive-systems-handbook.*

[219] *See* CBP, *DHS/CBP/PIA–068, Privacy Impact Assessment for CBP One™ Mobile Application* 4 (Feb. 19, 2021), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp068-cbpmobileapplication-jan2023.pdf.* CBP has updated this impact assessment multiple times since February 19, 2021.

[220] *See id.* at 15.

[221] *See* CBP, *DHS/CBP/PIA–076, Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* 11–12, 21 (Jan. 19, 2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf.*

[222] *See* CBP, *DHS/CBP/PIA–076, Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* 10, 13 (Jan. 19, 2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf.*

[223] *See id.* at 17–18.

[224] CBP, *DHS/CBP/PIA–068, Privacy Impact Assessment for CBP One™ Mobile Application* (Feb. 19, 2021), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp068-cbpmobileapplication-jan2023.pdf;* CBP, *DHS/CBP/PIA–076, Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* (Jan. 19, 2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf.*

[225] *See* GAO, *Facial Recognition: CBP and TSA are Taking Steps to Implement Programs, but CBP Should Address Privacy and System Performance Issues* 72–73 (Sept. 2020), *https://www.gao.gov/assets/gao-20-568.pdf.*

[226] GAO, *Facial Recognition: CBP and TSA are Taking Steps to Implement Programs, but CBP Should Address Privacy and System Performance Issues, https://www.gao.gov/products/gao-20-568* (reporting on the changes that CBP made that resulted in closure of the recommendations).

[227] CBP, *Say Hello to the New Face of Speed, Security and Safety: Introducing Biometric Facial Comparison, https://biometrics.cbp.gov/* (last visited May 1, 2023).

[228] *See* GSA, *Privacy Impact Assessment for Login.gov* 1, 5 (Mar. 17, 2023), *https://www.gsa.gov/cdnstatic/Logingov_PIA_March2023.pdf.*

[229] *See id.* at 27.

[230] CBP, *CBP One™ Mobile Application* (Apr. 10, 2023), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

**31398** **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

behalf of an undocumented noncitizen and schedule a time for such undocumented noncitizens to present at a POE to be considered for an exception from the Title 42 public health Order.[231] This functionality included submitting individuals' information in advance, including a photo, and scheduling a date and time to present at a POE.[232] In April 2022, CBP expanded the ability for noncitizens to directly submit information and schedule appointments to present at a land border POE to noncitizens seeking to enter the United States under the U4U process.[233] To further expand the accessibility of the CBP One Title 42 exception process, in January 2023, the advance information submission and scheduling process was made publicly available to all undocumented noncitizens seeking to travel to a land POE to be considered for an exception to the Title 42 public health Order.[234] Significant enhancements and changes to the CBP One app have been and will continue to be made in response to user and stakeholder feedback.[235]

*Comment:* Commenters stated that the CBP One app is not workable. For example, commenters stated that there are more migrants seeking asylum than there are appointments available, that the number of appointments was entirely too limited, that the rule does not provide for a minimum number of appointments, and that after a final rule is issued, demand for appointments would only increase. Another commenter noted that the INA does not limit the number of people who may arrive at a POE, nor does the rule provide information about how the government will apportion daily appointments. This commenter also noted that the number of appointments at the border is currently "capped," but that this limitation is not legally binding and could be increased. At least one commenter said it would be "inherently unjust to demand" that individuals use an information system that cannot handle the number of people expected to use it. Commenters argued that

requiring use of this system will create a backlog and require people to wait for their appointments for a significant period of time in Mexico.

Other commenters raised concerns about flaws in the CBP One app and suggested it would empower smugglers. Commenters noted that the CBP One app was created for other purposes and not as an appointment system for asylum seekers. A commenter noted that some individuals have to create a new account every day because of flaws in the app. Another commenter asserted that there is a significant risk that appointments will be resold, pointing to a lack of security within the app that would permit such resale. Commenters also stated that CBP indicated that criminal groups were creating fraudulent appointments to obtain information and funds from asylum seekers seeking entry to the United States. A commenter stated that requiring use of the CBP One app has already led to increased exploitation by criminal groups and others who seek to take advantage of migrants and is likely to push individuals to travel by more dangerous routes. Another commenter noted that the availability of appointments only at certain POEs had led to migrants traversing dangerous parts of Mexico to travel to a POE for their appointment. The commenter stated that traversing Mexico was particularly difficult because transportation companies and Mexican authorities impede migrants' ability to travel through Mexico. Another commenter recommended the creation of a process parallel to the CBP One app process for highly vulnerable migrants to be considered for entry into the United States in an expedited manner. At least one commenter stated that the CBP One app should allow for prioritization based on vulnerability. Another commenter stated that smugglers will have more power because of the limited number of appointments, as people will pay smugglers to find alternate routes into the United States.

*Response:* The Departments acknowledge that there are currently many migrants waiting to present at a POE and that demand for CBP One app appointments may exceed the number of appointments that can reasonably be made available on a given day. However, CBP is committed to processing as many individuals at POEs as operationally feasible, based on available resources and capacity, while executing CBP's mission to protect national security and facilitate lawful

trade and travel.[236] While the Title 42 public health Order remains in effect, the CBP One app is being used to schedule appointments for individuals who are seeking to present at a land POE to be considered for an exception from the Title 42 public health Order. During this time, the number of appointments available has been limited. However, when the Title 42 public health Order is lifted, CBP intends to increase the number of available appointments and anticipates processing several times more migrants each day at SWB POEs than the 2010 through 2016 daily average, including through use of the CBP One app.[237] While CBP recognizes and acknowledges that demand for appointments may exceed the number of appointments that can reasonably be made available on a given date, there has been a large number of migrants waiting in Mexico since long before the introduction of the app, and CBP expects that use of the app will help facilitate the processing of such individuals. The CBP One app is a scheduling tool that provides efficiencies and streamlines processing at POEs. Additionally, while CBP acknowledges that some noncitizens who are unable to schedule an appointment might conceivably turn to smuggling or more dangerous routes, CBP is implementing changes to the CBP One app to permit noncitizens to select a preferred arrival POE in an effort to mitigate any perceived need to travel to another location. Additionally, CBP is transitioning scheduling in the CBP One app to a daily appointment allocation process to allow noncitizens additional time to complete the process. This process change will allow noncitizens to submit a request for an appointment, and available appointments will then be allocated to those who made such a request, and the app will now provide a 23-hour period

[231] CBP, *DHS/CBP/PIA–076, Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* 4 (Jan. 19, 2023), *https://www.dhs.gov/publication/dhscbppia-076-collection-advance-information-certain-undocumented-individuals-land.*

[232] *Id.*

[233] CBP, *DHS/CBP/PIA–068, Privacy Impact Assessment for CBP One™ Mobile Application* 16–17 (Feb. 19, 2021), *https://www.dhs.gov/publication/dhscbppia-068-cbp-one-mobile-application.*

[234] *Id.* at 17–18.

[235] CBP, *CBP One™ Mobile Application* (Apr. 10, 2023), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[236] Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

[237] *See* CBP STAT Division, *U.S. Customs and Border Protection (CBP) Enforcement Encounters—Southwest Border (SBO), Office of Field Operations (OFO) Daily Average* (internal data report, retrieved Apr. 13, 2023); Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

for individuals allotted appointments to complete the scheduling process and confirm their appointments. In addition to the increased number of appointments made available after the end of the Title 42 public health Order, it is anticipated that these changes will reduce the likelihood of noncitizens seeking to travel by alternate routes.

The capacity to process migrants at POEs and the utilization of the CBP One app to secure appointments are separate and distinct issues. Officers will process all individuals who present at a POE regardless of a CBP One app appointment. Although a noncitizen who presents at a POE without an appointment may be subject to the rebuttable presumption under this rule, they will be able to present any protection claims, as well as any evidence to rebut the presumption or establish an exception to its application—including evidence related to their inability to access the CBP One app due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle—during either expedited removal or section 240 removal proceedings, with an AO or IJ, as applicable. Processing times will vary based on capacity and available resources, and those without a CBP One app appointment may be subject to longer wait times before being processed by a CBP officer.

With regard to commenters' suggestions regarding the prioritization of vulnerable individuals, the Departments decline to adopt such a process. As an initial matter, the Departments reiterate that the CBP One app is a method of facilitating entry into the United States. Once individuals are present in the United States at a POE, CBP must inspect and process all noncitizens, regardless of vulnerability. *See, e.g.,* INA 235(a)(3), 8 U.S.C. 1225(a)(3); 8 CFR 235.1(a). While in some cases an individual who is particularly vulnerable may warrant more expeditious processing, such prioritization and processing does not occur until the individual is physically present in the United States. In other words, while an individual's vulnerability may, in some cases, be a factor in the noncitizen's processing disposition at the time of processing, this vulnerability is not validated or taken into account prior to a migrant's arrival in the United States in the context of the CBP One app.

*Comment:* Commenters raised concerns about limitations on where and when an appointment can be made using the CBP One app. One commenter noted that the geofencing portion of the app does not perform accurately, as

indicated by individuals who are present in Mexico receiving error messages saying they are not. Another commenter noted that, since the geofencing limits where people can be to make appointments, they have no option but to make a dangerous journey before they even begin a lawful process; the commenter urged instead that individuals be permitted to schedule appointments prior to embarking on their journey to ensure that appointments are provided in a fair manner. At least one commenter expressed concern that individuals would use Virtual Private Networks to do an end run around the geofencing. Another commenter stated that the app allows for scheduling appointments up to 13 days in advance, but that individuals accessing the app from their home countries may not be able to make it to the United States in 13 days. Similarly, a commenter stated that, although the rule contemplated expanding CBP One access to locations beyond the SWB, such an expansion would not alleviate the risk of harm that migrants face, as it would not be possible for the migrant to schedule a date and time to present at a POE before leaving their home country, and migrants seeking to access the app from their home countries would lack access to NGOs and other entities at the SWB that could provide assistance.

*Response:* At this time, the ability to schedule an appointment through the CBP One app is available only to migrants located in central and northern Mexico.[238] The geofenced area allows migrants to remain in shelters and other support networks instead of congregating at the border in unsafe conditions, facilitating a safe and orderly presentation at POEs. The app does not facilitate travel to Mexico in order to schedule an appointment to present at a POE. Individuals outside northern and central Mexico are encouraged to use various pathways available to lawfully travel to the United States, and they will be able to use the app once they are in the geofenced area and thus closer to the United States.

CBP is aware of reports of users attempting to circumvent the geofenced area and has taken steps to prevent this from occurring. CBP has also received reports of users who were in Mexico in close proximity to the SWB, but whose phones were showing that they were

[238] *See* CBP, *DHS/CBP/PIA–076, Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* 6 n.24 (Jan. 19, 2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf.*

within the United States, thus generating error messages. To address this issue, CBP adjusted the geofencing to accommodate individuals located in Mexico in close proximity to the SWB.

*Comment:* Some commenters stated that requiring people to wait in Mexico until their appointment date is dangerous, as indicated, for example, by the number of violent attacks on migrants who have been turned back under the Title 42 public health Order since President Biden took office and the dangers that individuals faced in Mexico during MPP. One commenter expressed concern that the rule included no exception to the rebuttable presumption for asylum seekers' inability to secure a timely opportunity to present themselves, even though CBP One appointments have been "extremely difficult to access" and have taken weeks or months to secure. Another commenter noted that the first-come, first-served scheduling design is haphazard, and that there is no priority for migrants who have been waiting for longer periods of time.

Another commenter cited a Human Rights First study that found that there were 1,544 reported cases of violence against asylum seekers—including two murders—during the first two years of MPP. One commenter stated that the delays caused by the CBP One app increase the dangers for those waiting for a POE appointment in Mexico. Commenters stated that asylum seekers who are unable to secure appointments through the CBP One app will be forced to remain indefinitely at the border in dangerous conditions, including conditions where they have no access to or must rely on third parties for safe housing, food, electricity, internet, or stable income, all while continuing to try to make an appointment. One commenter noted that this was particularly problematic for those with chronic or serious health problems because access to health care in areas where individuals must wait is limited. Commenters expressed concern that criminal organizations, including cartels, could exploit individuals during the period that they must remain in northern Mexico waiting for an appointment. Another commenter expressed concern that those individuals in Mexico awaiting an appointment are at risk of deportation to their home countries, where they could experience persecution.

A commenter also stated that the United States Government should engage with the Government of Mexico to ensure that noncitizens waiting in Mexico for a CBP One app appointment have documents authorizing a

temporary stay in Mexico for that purpose and that the lack of official documents regarding status in Mexico leaves noncitizens at risk of fraud and abuse. Another commenter recommended that CBP provide instruction on the use of the app to personnel in Mexico.

*Response:* The Departments acknowledge that individuals seeking to make an appointment to present at a POE will generally need to wait in Mexico prior to their appointment. The Departments also acknowledge that, in some cases, the conditions in which such individuals wait may be dangerous. However, noncitizens are currently waiting in northern Mexico, and, as addressed in the NPRM, the Departments anticipate that larger numbers of individuals will seek to enter the United States after the lifting of the Title 42 public health Order. *See* 88 FR at 11705. Therefore, as noted in the NPRM, the Departments have concluded that this anticipated influx warrants the implementation of a more transparent and efficient system for facilitating orderly processing into the United States. Although the use of the CBP One app may, as commenters noted, sometimes cause delays, the Departments believe that, on balance, the benefits of the more transparent and efficient system created by use of the app outweigh the drawbacks and that use of the app will ultimately inure to noncitizens' benefit by allowing the Departments to more expeditiously resolve their claims. CBP has conducted extensive outreach and communication with stakeholders who may be able to assist noncitizens in accessing the CBP One app to register and schedule an appointment, including shelters and other entities in Mexico.

The Departments also note that migrants are not categorically required to preschedule an appointment to present at a POE, and all migrants who arrive at a POE, regardless of whether they have an appointment, will be inspected and processed. Migrants who present without an appointment may be subject to the presumption, but, among other exceptions, the presumption will not apply for those for whom it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). Additionally, migrants who demonstrate "exceptionally compelling circumstances," such as an imminent and extreme threat to their life or safety, an acute medical emergency, or status as a victim of a severe form of trafficking,

may rebut the presumption, in accordance with 8 CFR 208.33(a)(3)(i)(A) through (C), 1208.33(a)(3)(i)(A) through (C).

b. CBP One App Accessibility

*Comment:* Commenters expressed a range of concerns regarding the accessibility of the CBP One app for migrants seeking to enter the United States.

Many commenters stated the CBP One app is not available to all migrants, especially those who do not have smartphones, reliable internet access, or passports, and that all appointments are claimed almost immediately because the supply is insufficient. Multiple commenters suggested that many low-income individuals do not have access to a working phone or the internet in their home country, making use of the CBP One app infeasible. Commenters stated that many oppressive regimes limit access to the internet and asked how the Departments planned to provide access to the CBP One app to migrants in such countries. Relatedly, at least one commenter conveyed, anecdotally, that some migrants with limited economic means are forgoing food so that they can purchase enough data to attempt to make an appointment on the CBP One app to cross the SWB and seek asylum in the United States. Some commenters noted that many migrants become victims of crime while traveling to the United States, and their phones may be stolen, lost, or broken. Another commenter pointed out that some individuals may have phones but cannot afford to pay for telephone services for the phone. A commenter stated that it was unreasonable to place the burden on migrants to obtain internet and broadband access, as some migrants must choose between "sustenance and digital access." The commenter stated that this requirement perpetuated the crisis of unequal access to justice. At least one commenter noted that individuals may dispose of their cell phones out of concern that those they fear could track them using that phone and so no longer have a smartphone to use the CBP One app. One commenter suggested finding donors to provide phones for families to schedule appointments.

Others stated concerns with relying on a web and mobile application because technology can fail. At least one commenter stated that the Departments should not rely only on the CBP One app because cellular signals along the SWB are inconsistent and Wi-Fi options are limited, and some migrants, such as Afghans who travel through South and Central America, do not have local

connectivity. At least one commenter asked how having a cell phone with good coverage so a migrant can obtain an appointment relates to the merits of their asylum claim, while another stated that migrants without internet access would effectively be held to a higher standard than those with internet access, which many would not be able to overcome due to the lack of legal representation in initial screenings.

Another commenter stated that the rule did not provide sufficient information on how the Government conducted a study of the number of migrants who may have smartphones. Another asserted that the study had a sampling bias since it only surveyed individuals seeking a Title 42 exception, which they claimed required the use of the CBP One app. A commenter provided data comparing the percentages of smartphone ownership in Mexico, Cuba, Haiti, Nicaragua, and Venezuela, which, they stated, showed that while Mexico and Haiti had a high percentage of users, Nicaragua and Venezuela did not. On the other hand, at least one commenter noted that cell phones, including smartphones, are very common and that as a result people should be able to apply for CBP One app appointments.

Other commenters noted that people who cannot use the application would be at a serious risk of being turned away at the border and disagreed with the Departments' statements to the contrary.

A commenter claimed that CBP has yet to implement a desktop version of the app and has provided little clarity on whether and when such a version would be available. The commenter also stated that many migrants lack regular access to desktop computers.

*Response:* The Departments disagree that the CBP One app is a barrier to seeking asylum. The Departments also disagree with the contention that this rule sets up a linkage between access to an adequate cell phone or internet and the merits of an individual's asylum claim. Rather, the CBP One app is a tool that DHS has established to process the flow of noncitizens seeking to enter the United States in an orderly and efficient fashion. CBP intends to increase the number of available appointments when the Title 42 public health Order is lifted and anticipates processing several times more migrants each day at the SWB POEs than the 2010–2016 daily average, including through use of the CBP One app.[239] Further, noncitizens who

---

[239] *See* CBP, CBP STAT, *U.S. Customs and Border Protection (CBP) Enforcement Encounters— Southwest Border (SBO), Office of Field Operations (OFO) Daily Average* (internal data report, retrieved

present at a POE without using the CBP One app are not automatically barred from asylum.[240] The determination of whether the rebuttable presumption applies will be determined by an AO during the credible fear process or by an IJ in section 240 removal proceedings, at which time the noncitizen can demonstrate it was not possible to use the CBP One app due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. CBP officers will not be making determinations about whether the rebuttable presumption is applicable.

The CBP One app is free to use and publicly available. As noted in the NPRM, a limited study conducted at two POEs in December 2022 found that individuals had a smartphone in 93 out of 95 Title 42 exception cases. At the time of this survey, migrants were not required to utilize the CBP One app to schedule an appointment to be considered for a Title 42 exception; that requirement was implemented in January 2023.[241] Additionally, independent studies demonstrate that approximately two-thirds of individuals worldwide had smartphones by 2020.[242] The Departments acknowledge that other studies provided by commenters show varying rates of smartphone access among migrants, that not all migrants may have access to a smartphone or be able to easily use the CBP One app, and that lack of smartphone access may hinder a migrant's ability to use the CBP One app. However, individuals who do not have a smartphone or who have other phone-related problems can seek assistance from trusted partners, who may be able to share their phones or provide translation or technical assistance if needed to submit

information in advance. In addition, CBP has conducted extensive engagement with NGOs and stakeholders and has received feedback and information about the challenges associated with the use of the CBP One app. Throughout these engagements, access to smartphones has been raised, although not as a significant concern for most individuals. CBP is aware that NGOs provide support and assistance with access to mobile devices and internet connectivity. CBP notes that from January 12, 2023, when appointment scheduling launched, through the end of March 2023, over 74,000 noncitizens scheduled an appointment via the CBP One app.[243]

Nevertheless, CBP acknowledges there can be connectivity gaps and unreliable Wi-Fi in central and northern Mexico. CBP reiterates that the use of the app to schedule an appointment to present at a POE is geofenced to only those migrants who are present in central and northern Mexico, and so commenters' concerns regarding internet censorship in other countries are misplaced. However, in response to feedback about connectivity issues, on February 18 and 23, 2023, CBP released updates to the CBP One app to improve the submission and scheduling process for individuals with lower bandwidth. In addition, based on user and stakeholder feedback, CBP will transition CBP One scheduling to a daily appointment allocation process to allow noncitizens additional time to complete the process. This process change will allow noncitizens to submit a request for an appointment, and then available appointments will be allocated to those who made such a request. Individuals who are issued an appointment will have a 23-hour period to complete the scheduling process and confirm their appointment. Each day, unconfirmed appointments will be reallocated among the current pool of registrations. This change will reduce the burden on the noncitizen to have connectivity at the precise moment of the daily appointment release, as is currently the case. This process will also enable noncitizens to request a preferred POE at which to schedule an appointment. Future and ongoing enhancements to the app are expected based on user and stakeholder feedback to ensure equity in the scheduling process.

The Departments acknowledge concerns about the availability of a

desktop app for scheduling appointments. There is currently a desktop version of the CBP One app,[244] but it is not currently available for noncitizens to submit advance information. CBP is updating the desktop capability to provide the ability for undocumented noncitizens to register via the desktop version. This update is expected to be available in summer 2023. However, CBP does not have plans to enable users to schedule an appointment using the desktop version of the CBP One app because the desktop version does not allow for specific requirements that CBP has determined are needed such as geofencing and a live photo. This scheduling functionality will only be available via a mobile device.

CBP notes that commenters' concerns about access to the CBP One app are misplaced. Noncitizens seeking to schedule an appointment to present at a land POE are not required to have a passport.[245] Other functions of the CBP One app, including the Advance Travel Authorization ("ATA") functionality used as part of the CHNV parole processes, require an individual to provide their passport information.[246]

*Comment:* One commenter expressed concerns that the Departments relied on use of the CBP One app among the Venezuelan population as part of the CHNV parole processes to justify use of the CBP One exception in this rule. In particular, the commenter asserted that the use of the app among the Venezuelan population seeking to travel to the United States to seek parole was not a good indicator of the app's use among other populations of migrants, many of whom were less technically savvy and required more assistance with the app.

*Response:* This commenter's concern is misplaced because the Departments have not relied on any data regarding Venezuelan migrants' access to CBP One in this rule. The Departments acknowledge and agree that use of the CBP One app in the ATA context is not comparable to the use of the app to seek an appointment to present at a POE and note that the ATA process is separate and distinct from the use of the CBP One app to schedule an appointment to present at a POE.

*Comment:* Commenters also stated that use of the CBP One app is particularly difficult for families who

---

Apr. 13, 2023); Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off of Field Operations, CBP, from Troy A. Miller, Acting Comm'r, CBP, *Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

[240] In addition, under this rule, any noncitizen will be able to present at a POE, and CBP will not turn away any individuals—regardless of manner of entry into the United States—or deny them the opportunity to seek admission to the United States. However, those who arrive at a POE without an appointment via the CBP One app may be subject to longer wait times for processing depending on daily operational constraints and circumstances.

[241] *See* CBP, *CBP One™ Mobile Application* (Apr. 10, 2023), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[242] Allan Jay, *Number of Smartphone and Mobile Phone Users Worldwide in 2022/2023: Demographics, Statistics, Predictions* (Mar. 16, 2023), *https://financesonline.com/number-of-smartphone-users-worldwide/.*

[243] CBP, *CBP Releases March 2023 Monthly Operational Update* (Apr. 17, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-releases-march-2023-monthly-operational-update.*

[244] *See* CBP, *DHS/CBP/PIA–068, Privacy Impact Assessment for CBP One™ Mobile Application* 15 (2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp068-cbpmobileapplication-jan2023.pdf.*

[245] *See id.* at 15 n.18.

[246] *See id.* at 21–22.

may be unable to make appointments together. Another commenter stated that families may not have time to register together before all of the appointments are taken. Other commenters noted that family separation may occur because of both stress and confusion. Another commenter noted that CBP officers told individuals that they had the option of leaving children behind, trying to get another appointment, or sending children alone, underscoring that the CBP One app increases the likelihood that families will separate themselves in order to get appointments or to enter the United States. At least one commenter noted that there should be an adequate number of appointments set aside for families. Commenters also stated that the CBP One app is insufficient as a lawful pathway because it does not allow families to register together. One commenter, a legal services provider, stated that it had raised concerns to CBP about the length of time that families were waiting to seek an appointment. The commenter stated that CBP told the entity that the delay for families was likely a result of criminal groups making fraudulent appointments, which the commenter concluded was evidence that expansion of the CBP One app would increase exploitation of migrants. One legal services clinic stated that it had been informed by a CBP Field Office on the SWB in March 2023 that officers had not interviewed any families with more than six members, which was concerning given the number of larger families waiting to enter. A commenter stated that children should not be held responsible, through their eligibility for asylum, for whether their parents used the CBP One app to enter. One commenter noted that in February 2023 a family was not permitted to enter because the appointment did not list the children's names.

*Response:* CBP acknowledges the concerns regarding the ability of families to submit appointments together and has been working to address such concerns. Following the initial implementation, CBP received feedback that the app was timing out during the registration process of families with babies or young children and determined that this was caused by delays in the third-party liveness verification (that is, the process to verify that each person listed is, in fact, a live person). In February 2023, CBP updated the workflow in the app to address this issue by removing liveness detection as part of the registration process. Users are now only required to take a still photo of each traveler at the time of registration, the same action as if taking

any photo from a mobile device, which only takes a few seconds. Following this update to remove liveness detection from the registration process, CBP has received feedback from NGOs that there are fewer reported errors.

CBP has also consolidated appointment slots to increase the number of available appointments at the same time, where feasible, making it easier for family units to get an appointment together. For example, if a POE previously had two separate appointment times with 10 appointments each, they might have been combined to create one appointment time with 20 slots, making it easier to accommodate larger groups.

CBP continues to advise users and NGOs that one member of the family should create a registration on behalf of the entire family. While each member of a family must have a unique appointment, one member of a family can create the submission on behalf of the entire family group and complete the scheduling process, including the photo capture, to secure appointments for all registered family members. Functionally, this is similar to buying airline tickets. A designated person accesses the website, the website ensures there are seats for the indicated number of people, and the designated person provides the details for each individual to complete the purchase. At this stage, only the individual submitting the registration on the family's behalf is required to provide a live photograph.

Following the rollout of these enhancements, as of April 18, 2023, CBP data show that, for appointments scheduled from March 8, 2023, through May 1, 2023, groups make up an average of 83 percent of the CBP One scheduled appointments. Families or groups who do not register together on one CBP One account may not be accommodated at the same POE or on the same date. The Departments acknowledge that challenges remain for larger families, but the Departments believe that these changes have significantly ameliorated the concerns raised by commenters that family groups have been unable to obtain appointments.

CBP shares commenters' concerns about fraud and exploitation and has taken several steps to try to mitigate such issues. Specifically, the app uses 1-to-1 facial matching, meaning that it compares still photos submitted by users during the registration process to subsequent photos submitted by the same users while scheduling an appointment. This photo matching helps to ensure that the individual making an appointment is the same

person who registered for the appointment. Additionally, the app's liveness detection verifies that a person submitting an appointment is, in fact, a live person. Finally, users have a limited number of submissions per *Login.gov* authenticated identity, helping to prevent one individual from submitting bulk appointment requests.

With respect to the comment stating that children should not be held responsible for whether their parents used the CBP One app to enter, the Departments note that they have exempted from this ongoing application of the rebuttable presumption noncitizens who entered the United States during the two-year period while under the age of 18 and who later seek asylum as principal applicants after the two-year period. 8 CFR 208.33(c)(2), 1208.33(d)(2).

*Comment:* Commenters noted that the app is only available in English, Spanish, and Haitian Creole, which limits accessibility for many, such as speakers of indigenous languages or other languages outside this limited list. A commenter referred to a study that, in January 2021, identified more than forty different languages spoken by individuals with pending MPP proceedings, which, according to the commenter, rendered it "alarming" that the app was available in only three. One commenter stated that, as of January 2023, the app was not available in Creole. Other commenters expressed concern about those who may be illiterate who are still seeking to access the app, including those who may not be literate in one of the languages available on the app. At least one commenter noted that *Login.gov* is also only available in English, Spanish, and French, noting that based on at least one report these are not the most common languages and that third party assistance does not adequately address this concern. Another commenter stated that due to limited resources and high demand, it is not clear whether non-profit service providers will be able to help asylum seekers overcome the CBP One app's language barriers.

Commenters also expressed concern about specific portions of the CBP One app that they stated are only available in English. Specifically, commenters stated that the CBP One app's advisals regarding the terms and conditions of use and the repercussions of fraud or willful misrepresentation are presented exclusively in English. Other commenters said that all answers entered into the app must be in English, resulting in many individuals requiring assistance, including Spanish and Haitian Creole speakers, even though

the CBP One app is available in their native language. Other commenters noted that the app's error messages are only in English, even if the user selects a different language, which makes using the app difficult for asylum seekers who cannot understand English. Commenters expressed that the limited availability of interpreters and the time required to enter information using interpreters added to difficulties in obtaining appointments through the CBP One app for non-English speakers. Commenters maintained that translating the CBP One app into additional languages would not resolve access issues for individuals with no or limited literacy.

Commenters also expressed concern about migrants' ability to meet the language barrier exception. One commenter stated that asylum seekers will struggle to meet the language barrier exception because the rule does not provide a clear process for how they can demonstrate that they were unable to use the CBP One app due to language issues. The commenter stated it is unclear whether the asylum seekers must show that they sought help from a third party before presenting themselves at a POE. One commenter stated that the rule does not explain how noncitizens with language, literacy, or technology issues can access this exception.

*Response:* As commenters noted, the CBP One app is currently available in English, Spanish, and Haitian Creole. The addition of Haitian Creole, on February 1, 2023, was based on stakeholder feedback. The translation of terms and conditions into all three languages was added on April 6, 2023. Initial analysis conducted in March 2023 indicated the current three languages account for 82 percent of the application users, with the next most common language being Russian, at 9 percent. Currently, CBP has not received any requests to make the app available in Russian. However, CBP will continue to consider the inclusion of additional primary languages, which will be made available based on analysis of populations encountered at the border and user feedback. Additionally, outside entities, including NGOs, or other persons may provide assistance with the appointment scheduling process in the CBP One app.

CBP is also implementing the translation of all drop-down menus as well as allowing for special characters, which is expected to be complete by May 11, 2023. This update will also allow users to input answers in the three available languages. While most of the error messages are translated, CBP acknowledges that not all messages are

translated, as a few system errors stem from different sources that do not have translation capabilities. However, CBP also has detailed user guides—which are available in English and Spanish (and Haitian Creole by the end of May 2023)—fact sheets—which are available in English, Spanish, Haitian Creole, Portuguese, and Russian—and video introductions available for free on the *CBP.gov* website, which provide visual overviews on how to submit information in advance.[247]

With regard to *Login.gov*, that website is an independent authentication service for government mobile applications, and therefore CBP has no authority to make changes to it. However, CBP has submitted a request to GSA to consider adding Haitian Creole as an additional language.

The Departments acknowledge commenters' concerns about application of the exception to the rebuttable presumption of asylum ineligibility for those who can demonstrate that it was not possible to access or use the CBP One app due to language barrier, illiteracy, or another serious and ongoing obstacle, 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B), and such concerns are discussed further in Section IV.E.3.ii.d of this preamble.

*Comment:* Commenters stated that the CBP One app is inaccessible for many migrants, particularly the most vulnerable. A commenter stated that they had done volunteer work with asylum seekers from a few African countries and from many Spanish-speaking countries, and that reliance on the CBP One app is unfair because it assumes that migrants have a level of literacy, electricity, and time that are often unavailable to those desperately seeking safety. Another commenter noted that those with mental impairments or physical impairments, including arthritis, may not be able to use the CBP One app. One commenter stated that there is no rebuttal available for people with educational, mental, or psychological disabilities or who are unable to secure a timely appointment. One commenter stated that the proposed rule does not provide reasonable accommodations related to difficulties of using the CBP One app for people with disabilities, which the commenter asserted violated section 504 of the Rehabilitation Act, 29 U.S.C. 701 *et seq.*

*Response:* CBP acknowledges that certain individuals may have difficulty accessing the CBP One app. However, CBP has taken several steps to facilitate awareness of and access to the app. In

particular, CBP has conducted extensive engagement with NGOs and stakeholders and has provided several opportunities to non-profit and advocacy organizations to provide feedback and receive information about the use of the CBP One app. Such entities may also serve as a resource for technological, humanitarian, and other assistance to migrants accessing the app. Management at POEs where the app is being utilized are also in regular contact with these support organizations to address any issues and concerns in real time.

Additionally, the CBP One app is undergoing a compliance review under section 508 of the Rehabilitation Act of 1973, which is expected to be completed by the end of May 2023. CBP expects a final certification by the end of August 2023. There are also several assistive technologies that can be utilized to translate the app independently, such as free apps that provide screen readers, magnification, and translation.

c. CBP One Technological Issues and Functionality

*Comment:* Commenters expressed concerns that the CBP One app has multiple glitches and problems, most notably that it allegedly does not capture or register darker skin tones and does not allow some individuals to upload their photos, instead displaying error messages. Some commenters referred to studies that demonstrated racial bias in facial recognition technology. One commenter stated that certain disabilities or conditions, including blindness and autism, prevented users from effectively capturing a live photograph for the app. A commenter expressed concern that transgender individuals may present differently at the border than they did at the time their photograph was taken.

*Response:* The Departments are committed to equal access to the CBP One app for individuals of all races and ethnicities. At this time, CBP has not found any indication of meaningful discrepancies in app functionality based on skin tone. The predominant reason for error messages during the photo process was the volume of submissions at one time with low connectivity and bandwidth of other technological platforms that supported the app. To ensure equity for all nationalities in the photo process, CBP is continuing to assess and study the software's performance.

For additional context, there are two photo capture technologies utilized in the CBP One process: the Traveler Verification Service ("TVS") and

---

[247] CBP, *CBP One™ Mobile Application, https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

"liveness detection." TVS is a facial recognition technology that allows a CBP One submitter's photo to be compared against subsequent submitted photos to ensure it is the same individual each time a photo is submitted.[248] This system is utilized at two different points in the process: (1) during the process of scheduling an appointment, to verify that the photo submitted matches the photo previously provided during registration; and (2) upon a noncitizen's arrival at a POE, where officers take another photo of the individual as part of the inspection process and verify that that photo matches the photograph submitted at the time of scheduling. However, there are alternative methods to verify that the individual presenting at the POE matches the individual who scheduled through CBP One if facial matching is not possible. For example, an officer can enter the unique confirmation number provided by the CBP One application or biographic data.[249] Additionally, CBP has partnered with the National Institute of Standards and Technology, the DHS Science and Technology Directorate, and the DHS Office of Biometric Identity Management to assess and test facial recognition technology and algorithms as part of efforts to improve the effectiveness of the process.[250] Additional information is publicly available in the TVS Privacy Impact Assessment.[251]

CBP One also relies on "liveness detection." The vast majority of feedback CBP has received regarding issues identifying people of color were identified as related to liveness detection during the registration process. As explained in more detail below, CBP One previously utilized liveness detection during both the registration and scheduling processes. For context, the CBP One app utilizes third-party software to verify "genuine presence" or "liveness" during registration and scheduling an appointment.[252] The liveness verification confirms the user is a live person and is not taking a photo of a photo or video.[253] Such verification ensures that appointments are given to bona fide individuals and family groups, rather than brokers or middlemen who might seek to book appointments in bulk and then sell them to migrants.

When the scheduling capability was initially implemented in January 2023, CBP originally required users to take a live photograph at the time they input their biographic information to register for the app, and, if they were unable to schedule an appointment at the same time, they were required to take a live photograph again at the time they scheduled an appointment. This requirement took significant bandwidth, which resulted in many users experiencing difficulty. However, based on feedback from users and stakeholders, and consistent with its security protocols, CBP has determined the liveness check is no longer required during the registration process and implemented this change in February 2023. Therefore, while users are required to submit a photo at the time of registration, this photo does not need to be a live photo. Rather, the user is only required to submit a live photo at the time of scheduling an appointment, so that the liveness check and facial matching only occur during the scheduling of the appointment. When scheduling an appointment on behalf of a family or group, only one member of that family group is required to submit a live photograph. At that time, the CBP One app utilizes the live photo and facial matching technology to match the photo submitted during scheduling to the original photo submitted upon initial registration to verify that both photos are of the same person. Thus, an individual must only present similarly in photographs at the time of registration and the time of submission. Following this change, as well as others made during February 2023 to increase bandwidth, CBP has received feedback that there are fewer errors.

In addition, with regard to concerns about disparities based on skin tone, the third-party vendor has conducted their own equality study, which was provided to CBP, and concluded that across their global platform, differences in performance between ethnicities are on the order of tenths of a percent. As of the end of March 2023, Haitians are one of the top three nationalities using the CBP One app.[254] Regarding concerns about the ability of the app to capture a live photograph from individuals with certain disabilities or conditions, including blindness and autism, such individuals are not required to submit a live photograph if they are part of a family or group, as another member of that family or group can submit the live photograph on their behalf. In the event that an individual is unable to submit a live photograph as part of the submission process, they are encouraged to seek assistance from another person to take the photo for them. In addition, CBP consistently evaluates the registration and scheduling process, including the use of live photographs, and will continue to make enhancements and adjust the process based on feedback and operations.

*Comment:* Commenters noted a range of technology-related concerns with the CBP One app. Commenters described the CBP One app as very difficult to use, stating that it often crashes or is prone to glitches. Another commenter stated that there have been reports of the CBP One app freezing when noncitizens try to send confirmation of their interview dates. Some commenters noted that those seeking to enter the United States may not have the technical ability to navigate the app. A commenter noted that, although the Departments stated in the NPRM that CBP had conducted "extensive testing" of the app's technical capabilities, such statement was not supported by any publicly available studies or information. Commenters also recommended that CBP develop timely and effective mechanisms to receive and address reports of errors in the CBP One app.

*Response:* The Departments recognize commenters' frustration with the CBP One app. As noted above in Section IV.E.3.ii.a of this preamble, CBP systems

---

[248] See CBP, *DHS/CBP/PIA–076, Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* 10 (2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf*; CBP, *DHS/CBP/PIA–056, Privacy Impact Assessment for the Traveler Verification Service* (2018), *https://www.dhs.gov/publication/dhscbppia-056-traveler-verification-service*.

[249] See CBP, *DHS/CBP/PIA–076, Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* 10–11 (2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf*.

[250] See CBP, *DHS/CBP/PIA–056, Privacy Impact Assessment for the Traveler Verification Service* 15–16 (2018), *https://www.dhs.gov/publication/dhscbppia-056-traveler-verification-service*.

[251] See generally *id.*

[252] See, e.g., CBP, *DHS/CBP/PIA–076, Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* 23 (2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf*; see also DHS, *News Release: DHS S&T Awards IPROOV $198K to Pilot Genuine Presence Detection and Anti-Spoofing Capability* (Nov. 6, 2020), *https://www.dhs.gov/science-and-technology/news/2020/11/06/news-release-st-award-genuine-presence-detection-and-anti-spoofing*.

[253] DHS, *News Release: DHS S&T Awards IPROOV $198K to Pilot Genuine Presence Detection and Anti-Spoofing Capability* (Nov. 6, 2020), *https://www.dhs.gov/science-and-technology/news/2020/11/06/news-release-st-award-genuine-presence-detection-and-anti-spoofing*.

[254] See CBP, *CBP Releases March 2023 Monthly Operational Update* (Apr. 17, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-releases-march-2023-monthly-operational-update*.

undergo comprehensive testing and evaluation to assess the respective security features as part of the process of being granted an ATO.[255] The advanced information and scheduling capabilities addressed in this rule in particular have undergone various rounds of testing prior to and post deployment. CBP also conducted limited user testing both internally and in partnership with an NGO partner. The primary issues identified by users since the app's implementation have been caused by issues that cannot be fully identified in a testing environment.

CBP continues to make improvements to the app based on stakeholder feedback, including updates to enhance usability in low bandwidth and connectivity scenarios, and to streamline the submission and scheduling process. CBP primarily receives reports of errors or other concerns through three mechanisms. The first and primary mechanism is the CBP One email inbox,[256] to which users may send an inquiry or concern about any capability within the CBP One app. Since CBP One has many capabilities and functionalities, and is available to a diverse audience, the inbox initially responds by asking the author to select the appropriate topic pertaining to their specific issue. Emails related to the ability to schedule appointments at POEs are addressed by one of three teams: CBP Customer Service, CBP's Office of Information Technology, or the CBP One team within CBP's Office of Field Operations. CBP also receives reports of errors or issues through recurrent briefings and sessions with NGOs. Third, CBP personnel both at local POEs and within CBP Headquarters receive direct email communications from NGOs.

The reported issues are a result of the volume of activity and the strain this may put on local bandwidth and connectivity. In an effort to improve app performance in low or limited bandwidth and connectivity situations, CBP determined the live photo could be removed as part of the registration process. This change was implemented in February 2023, and based on feedback from NGOs and stakeholders, it has reduced the number of reported errors users experienced. CBP is actively working to improve application hang-up-error logging and reporting to better

inform on user complaints and application improvements.

d. Exception for Certain Failures To Pre-Schedule a Time and Place To Present at a POE [257]

*Comment:* Commenters provided comments on the proposed exception to the presumption for individuals who present at a POE and demonstrate that it was not possible to access or use the CBP One app due to language barrier, illiteracy, significant technical failure, or another serious and ongoing obstacle.

Regarding the ''illiteracy'' and ''language barrier'' provisions, commenters questioned how noncitizens would prove that they cannot understand any of the languages offered by the CBP One app, and whether testimony about their language proficiency would suffice as evidence for an exemption. One commenter said the proposed rule does not provide a standard for how officials will determine asylum seekers' language proficiency, which could lead to erroneous denials. Another commenter said it is unclear whether asylum seekers with language barriers must show that they sought help from a third party before presenting themselves at a POE. A commenter expressed concern that refugees who have basic communication skills in English or Spanish, but who cannot read or write proficiently in either of those languages, would wrongly be found to not have a language barrier that would exempt them from the requirement to use the app. Another commenter wrote that the exemptions based on illiteracy and language barriers are reasonably clear but the rule should clarify that literacy in the dominant language of a country should not be presumed for citizens of that country because, for example, many indigenous people in Guatemala do not speak Spanish. One commenter expressed concern that individuals with limited English proficiency would face difficulty establishing this exception due to the unavailability of qualified interpreters and recommended that if the Government cannot obtain interpreters for individuals, they should

be placed directly in section 240 removal proceedings.

Multiple commenters said the proposed rule fails to clearly define what constitutes a ''significant technical failure.'' Several commenters said the proposed rule did not outline how individuals could document technical difficulties such as app malfunctions or inaccessibility. A commenter said it may not be possible to screenshot the app to document a glitch if the app is frozen and producing this evidence would be hard for migrants in detention where they may not have access to their phones. Another commenter asked if this exception would include inability to afford a smartphone, having a phone stolen or broken, or inability to access stable Wi-Fi. Another commenter stated that additional usage of the CBP One app after the Title 42 public health Order is terminated would likely exacerbate technical problems, leading migrants to irregularly cross the border and claim that the rebuttable presumption does not apply due to technical difficulties.

One commenter stated that the Departments should update the regulatory text to specify that ''significant technical failure'' refers to an inability of the DHS scheduling system to provide, on the date that the noncitizen attempted to use it, an appointment for entry within the two weeks after such attempt, together with the failure of that system, when access to it is sought at the POE at which the noncitizen has presented, to provide an appointment at that POE within the following two weeks. A commenter similarly recommended that, for the first 12–18 months after the lifting of the Title 42 public health Order, the Departments should assess the application of the exception based on a ''more liberal'' standard than the preponderance of the evidence, based on an assumption that the CBP One app is likely to have numerous technical failures.

Commenters stated that the proposed rule failed to clearly define what constitutes an ''ongoing and serious obstacle.'' Commenters questioned whether a failed attempt to make an appointment using the CBP One app is likely to be considered sufficient. A commenter also stated that the Departments should specify certain foreseeable obstacles in the regulations as ongoing and serious obstacles, such as mental impairments or physical conditions that affect one's ability to use a smartphone. One commenter questioned whether the dangers that marginalized asylum seekers face in parts of central and northern Mexico

---

[255] *See* DHS, *DHS 4300A Sensitive Systems Handbook* 47 (2015), *https://www.dhs.gov/ publication/dhs-4300a-sensitive-systems-handbook.*

[256] *See* CBP, *CBP One™ Mobile Application* (Apr. 10, 2023), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[257] This section describes comments and responses related to the exception to the rebuttable presumption for noncitizens who present at a POE without having pre-scheduled a time and place for an appointment. 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). Currently, as explained in the NPRM, the only available system for scheduling such an appointment is the CBP One app. 88 FR at 11723. Accordingly, this section's comments and responses are focused on the use of the CBP One app for this exception, although the exception would apply similarly to any other scheduling system developed for this purpose.

would be deemed an ongoing and serious obstacle. Another commenter said the Departments should provide a list of anticipated obstacles to prevent arbitrary and inconsistent determinations and recommended that the list "include, for example, mental impairments; physical impairments such as severe arthritis of the hands that prevent the use of a cell phone or other device to access the CBP One app; lack of access to such a device coupled with poverty such that the noncitizen could not reasonably purchase such a device; and a continuing lack of appointments in the near future to enter at the POE at which the noncitizen has presented."

One commenter recommended that if the app is crashing or the available appointments are so limited near where the asylum seeker is located that they cannot promptly obtain an appointment, then the affected asylum seeker should not have the burden of proving the impossibility of accessing the system. That commenter proposed that USCIS should assign an official to monitor the app and capacity of processing facilities and post on a public website whether the app was functioning and the availability of appointments. According to that commenter, this public information, showing that the app was functioning and that prompt entry appointments were available, would create a presumption that no significant failure had occurred. Similarly, another commenter suggested that the exception should also take into account the potential for human error, specifically referring to a situation in which a migrant believes they have an appointment, the app failed to register that appointment, and a CBP officer permits the individual to enter the POE. The commenter stated that, in such a case, the migrant "should not be punished when they are following the rules" and should not be required to show that there were significant technical failures. The commenter suggested amending the regulatory text so that the rebuttable presumption would not apply if the noncitizen shows "that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or human error." The commenter also recommended amending the regulatory text to include a statement that "such evidence may include data on the performance of the CBP One app which DHS will make publicly available as well as records of problems reported by users."

Commenters also noted potential procedural concerns with application of this exception. Some commenters stated that it will be difficult for noncitizens to

meet the burden of demonstrating this exception, since the issue will arise in credible fear interviews when people are not likely to be represented. One commenter said it was impossible for asylum seekers to show they meet this exception because it would require them to prove a negative. Another commenter stated that CBP often confiscates people's phones while they are in CBP custody or people may have borrowed phones to access the app, meaning that they would not have access to the evidence they need to prove they encountered obstacles using the CBP One app.

Commenters said it is unclear who will determine if this exception applies and expressed concern that some individuals would be turned away without the chance to seek asylum. One commenter wrote that it was unclear if the failure of an individual to indicate that they qualify for an exemption would be counted against them when an AO reviews their case. Another commenter recommended the creation of a standardized form of questions for officials to use when determining whether individuals should be exempted from the CBP One appointment requirement. One commenter wrote that the NPRM failed to consider the practicality of conducting the analysis for this exception at the credible fear interview stage.

Some commenters expressed concern that the exception is too broad or easy to exploit. One commenter stated that applying the significant possibility standard for this exception could result in "carte blanche" acceptance of testimony that such an obstacle was present and thereby undermine the intent of the rulemaking. Others said that this exception was broad and easy to exploit because it could encompass a wide variety of difficult-to-verify claims, such as losing one's mobile phone, losing access to cell service, and being unable to pay for a new mobile phone or data plan. One commenter also said that the CBP One app's publicized technical issues would make it easy to claim the exception. Another commenter stated that, based on the app's rating in the app store, the app almost appeared to be "designed to fail," to permit noncitizens to take advantage of the exception. Another commenter expressed general support for the inclusion of exceptions but predicted confusion and that migrants would prefer to present at a POE with an exception given the frequency of instances where it is not possible to access or use the DHS scheduling system. One commenter disagreed with

the proposed exception relating to language barriers to accessing the CBP One app, asserting that migrants would take advantage of this exception to appear at a POE without an appointment. Another commenter stated that the rule "impermissibly" shifts the burden onto DHS to refute a noncitizen's assertion that it was not possible to use the app and therefore expressed concern about "exploitation" of the standard.

Some commenters recommended that the Departments should expand the exception for failure to use the CBP One app when it is not possible to do so to include noncitizens who enter the United States without inspection, rather than only applying to noncitizens who present at a POE.

*Response:* The rule provides the same exception set forth in the NPRM to the applicability of the rebuttable presumption if the noncitizen presented at a POE and demonstrates by a preponderance of the evidence that it was not possible to access or use the CBP One app due to language barriers, illiteracy, significant technical failure, or other ongoing and serious obstacle. *See* 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). This exception captures a narrow set of circumstances in which it was truly not possible for the noncitizen to access or use the CBP One app. *See* 88 FR at 11723 n.173.

The Departments appreciate the commenters' suggestions about the scope of the exceptions in 8 CFR 208.33(a)(2)(ii)(B) and 1208.33(a)(2)(ii)(B). With regard to the "illiteracy" exception, the Departments acknowledge and agree that citizenship is not necessarily a proxy for literacy in a particular language, and there is no presumption in the CBP One app or in this rule regarding a particular migrant's language. The Departments note, however, that individuals may seek assistance, including translation assistance, in using the app. And, to the extent that an individual is unable to access the app due to their language barriers, they may be excepted from the presumption, as discussed earlier in this preamble. The Departments decline to specify precise ways by which a noncitizen must prove, or particular language standards by which an AO or IJ must assess, that the noncitizen qualifies for a language barrier or illiteracy exception. This is to preserve flexibility and account for the unique circumstances of certain noncitizens who are illiterate or who face language barriers. Exceptions under this part of the rule will be assessed on a case-by-case basis.

The Departments also acknowledge that the parameters of the exception do not include a specific definition of "significant technical failure" and thank the commenter for their suggested definition. However, the Departments decline to add this definition to the regulatory text, as the Departments believe that there may be any number of ways that an individual could show a "significant technical failure." The Departments also note that this exception is intended to cover technical failures of the app itself—*e.g.*, the app is not available due to a CBP network or server issue causing it to crash—rather than a situation in which a migrant is unable to schedule an appointment due to high demand or one where there is a fleeting, temporary technical error. In such a situation, the Departments encourage noncitizens to continue seeking to schedule an appointment, but, to the extent that they are prevented from doing so because of exigent circumstances, they may be able to show that they have experienced another "ongoing and serious obstacle," such that they are excepted from the presumption. The Departments likewise decline to amend the regulatory text to take into account human error or specific data on the performance of the CBP One app. As noted above, there may be any of number of ways to show a significant technical issue, or, as described in more detail below, an "ongoing and serious obstacle," which may be specific to the individual user. As noted below, the determination of whether the presumption applies will be made on a case-by-case basis.

The Departments appreciate commenters' concerns about what constitutes an "ongoing and serious obstacle." The Departments agree that an individual with a mental or physical impairment may have difficulty accessing the app but decline to add a new categorical exception to the regulatory text for individuals with mental or physical impairment. This is in part because the Departments do not intend to limit the exception to a specified category or group of conditions, and AOs and IJs will determine the application of the exception on an individualized basis. The Departments also decline to create further rules regarding which situations will generally or categorically qualify for this exception, including on the basis of failed attempts to make an appointment through the CBP One app. This will preserve flexibility and account for the unique circumstances that noncitizens may face while attempting to schedule an appointment

to appear at different POEs at different times. Exceptions under this part of the rule will be assessed on a case-by-case basis.

The Departments respectfully disagree with commenters' concerns as to noncitizens' ability to establish this exception. First, with regard to the commenters' concerns about access to counsel in credible fear interviews, that issue is discussed earlier in Section IV.B.5.ii of this preamble. The Departments decline to alter the burden of proof required for a migrant to show that it truly was not possible for them to access the CBP One app. As an initial matter, the Departments note that noncitizens outside of the United States have no freestanding right to enter, and no right to enter in a particular manner or at a particular time. *See, e.g., Shaughnessy,* 338 U.S. at 542. The CBP One app does not alter this longstanding principle, but rather is intended to incentivize and facilitate an orderly flow of travel into the United States. Thus, the Departments decline to change the burden of proof from the noncitizen to the Government or adopt a more liberal standard for noncitizens who enter the United States during the initial months after the rule takes effect.

Concerns about who will assess whether the exception applies are misguided. The rule tasks AOs and IJs, not CBP officers, with determining whether a noncitizen meets this exception to the rule. 8 CFR 208.33(b)(1) ("The asylum officer shall first determine whether the alien is covered by the presumption . . . ."); *id.* 1208.33(b)(2) ("The immigration judge shall first determine whether the alien is covered by the presumption . . . ."). So too are concerns as to an inability to access physical evidence to prove the exception while in custody. Noncitizens may be able to establish that they meet the exception through testimony so long as it is credible, persuasive, and refers to specific facts to establish the exception. INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii). A noncitizen also does not need to affirmatively raise this issue to qualify for the exception; adjudicators are trained to elicit testimony relevant to establishing a credible fear, as described in Section IV.B.5 of this preamble. However, if a noncitizen fails to disclose a technical failure or other obstacle when questioned about their failure to schedule an appointment using the CBP One app, this could potentially affect the credibility of their testimony if they later claim an exception in subsequent proceedings.

The Departments also disagree with commenters who claimed this exception is too broad or easy to exploit. The

Departments disagree with the assertion that this exception will cause noncitizens to appear at a POE without an appointment. Noncitizens are not required to make an appointment in the CBP One app to present at a POE, and in no instance will an individual be turned away from a POE. All noncitizens who arrive at a POE will be inspected for admission into the United States. 8 CFR 235.1(a). Those, however, who present at a POE without making an appointment in the CBP One app, and do not meet another exception, will be subject to the presumption. For the exception to apply, the noncitizen must do more than merely assert that they could not access the scheduling system for one of the identified reasons, without further explanation. Rather, AOs and IJs will assess whether the noncitizen has demonstrated that they meet the exception on a case-by-case basis as part of the credible fear process or in section 240 removal proceedings. Additionally, the Departments note the app is not intended or designed to "fail," and that AOs and IJs will evaluate on a case-by-case basis whether a noncitizen has shown that it was not possible to access the app due to language barriers, illiteracy, significant technical failure, or other ongoing serious obstacle.

Finally, the Departments decline to expand this exception to noncitizens to enter the United States without inspection instead of presenting at a POE. The Departments believe this would undermine the rule's purpose of incentivizing migrants to use lawful, safe, and orderly pathways to enter the United States. In cases where it was truly not possible for a noncitizen to access or use the CBP One app due to one of the rule's enumerated reasons, the Departments believe it would be preferable to incentivize that noncitizen to seek admission at a POE rather than attempt a potentially dangerous entry between POEs. The latter could require the assistance of smugglers or traffickers and could place further strain on DHS resources in apprehending the noncitizen and commencing removal proceedings.

### iii. Adequacy of Parole

*Comment:* While many commenters expressed support for the parole processes referenced in the NPRM, many also expressed a range of concerns about the role of the parole processes in the rule's rebuttable presumption. A commenter stated that the parole processes only account for small numbers of potential asylum seekers. One commenter stated that the parole programs have little bearing on asylum

**31408**    **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

access at the SWB or the Departments' stated goal to reduce border apprehensions. The commenter also stated that those who have the time and means to use these parole programs are not the same people who flee and approach the SWB. Another stated that the parole processes should not be the only way for migrants to come to the United States and petition for asylum. Another commenter stated that while Afghan migrants might be able to apply for humanitarian parole, the wait for the applications to be processed is too long for those who are living in danger in their country, and alleged that nearly 90 percent of humanitarian parole applications filed from outside the United States in the last year were denied.

Commenters stated that the CHNV parole processes are flawed because (1) they are limited to CHNV nationals; (2) they have a monthly cap, limiting the number of people who may enter the United States each month; (3) they require applicants to hold unexpired passports, which is uncommon for most citizens of Latin America and the Caribbean because of financial constraints; (4) they require a U.S.-based contact with the financial wherewithal to sponsor the applicant, which favors wealthy applicants and those with a broader network of support in the United States; (5) the applicant will need additional financial resources to afford a plane ticket and to meet vaccination and other requirements; and (6) humanitarian parole is not a substitute for asylum. Commenters stated that government officials may confiscate passports or target passport applicants at government offices, and noncitizens may not be able to wait for a passport or for receipt of advanced authorization due to the risk of harm or death. One commenter stated that huge backlogs related to the parole program have overwhelmed Haiti's passport system.

One commenter stated that the rule's impact on those who have been pre-approved by CBP to present for parole at POEs under section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5), due to urgent humanitarian reasons or significant public benefit is unknown because the rule does not clarify whether those pre-approved to present for parole by port officials will face the presumption of asylum ineligibility.

Another commenter expressed concern that the CHNV parole processes would simply add to the population of migrants present in the United States without status, which according to the commenter would impose a burden on American taxpayers, and that the parole processes simply "kicks the can down the road."

*Response:* The parole processes established for CHNV nationals are available lawful pathways—though not the only available lawful pathways—for qualifying individuals seeking to come to the United States. Each month, DHS issues advance travel authorizations for up to 30,000 CHNV nationals to travel to the United States to be considered by CBP on a case-by-case basis for a temporary grant of parole for a period of up to two years. Once the individuals have arrived in the United States, they may apply for immigration benefits for which they may be eligible, including asylum and other humanitarian protections. The Departments recognize that the parole processes are not universally available, even to the covered populations; in addition, the parole processes established for CHNV nationals and Ukrainians are distinct from applying for asylum and are not a substitute for applying for asylum. Although noncitizens who are eligible for these processes may apply for asylum after being paroled into the United States, there is no requirement that they do so. These processes do, however, represent one lawful, safe, and orderly pathway available to certain CHNV nationals seeking to enter the United States.

Similarly, while DHS recognizes that several commenters have raised concerns about the adequacy of the parole processes, this rule's reference to the parole processes is not intended to suggest that the parole processes are an alternative to or replacement for asylum. Rather, the parole processes are lawful, safe, and orderly pathways that the Departments wish to encourage in light of the urgent circumstances presented. Eligible noncitizens may use these processes to seek entry into the United States, and, thereafter, apply for asylum if desired. Moreover, with respect to the commenters' concern about the ongoing status of CHNV parolees—including obstacles they face in seeking parole and the impact that allowing parolees into the country will have on taxpayers—such concerns are outside the scope of this rulemaking because the parole processes exist separate and apart from this rule. To the extent that this rulemaking encourages noncitizens to use those parole processes and thereafter apply for asylum, rather than migrating irregularly, parolees who do so may remain in the United States to await the adjudication of any pending asylum application, and during that time may be eligible for employment authorization. *See* 8 CFR 274a.12(c)(11) (employment authorization available for duration of parole); *id.* 274a.12(c)(8) (employment authorization available for asylum applicants).

With respect to the commenter's suggestion that the CHNV parole processes have little bearing on the Departments' goal of reducing irregular migration, the Departments note that these processes have substantially reduced the number of encounters between POEs. For instance, between the announcement of the CHN processes on January 5, 2023, and January 21, 2023, the number of daily encounters between POEs of CHN nationals dropped from 928 to 73, a 92 percent decline.[258] CHN encounters between POEs continued to decline to an average of fewer than 17 per day in March 2023.[259] The Departments offer further metrics in support of these processes' efficacy in Section II of this preamble.

While CHNV and Ukrainian nationals who lack a supporter cannot take advantage of these parole processes, such individuals can present at a POE by using a DHS scheduling mechanism to schedule a time to arrive at POEs at the SWB and not be subject to the presumption of ineligibility. *See* 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). If the noncitizen can establish that the scheduling mechanism is not possible to access or use due to a language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle, then the noncitizen can present at a POE to seek asylum without a pre-scheduled appointment, and not be subject to the presumption of ineligibility. *Id.* This process is available to all noncitizens seeking protection, regardless of their nationality.

With respect to the commenters' concern about individuals "pre-approved" by CBP to present at the SWB, the Departments note that the rebuttable presumption does not apply to any noncitizen who presents at a land POE, pursuant to a pre-scheduled time and place. *See* 8 CFR 208.33(a)(2)(i)(B), 1208.33 (a)(2)(ii)(B). This is not limited to those who schedule a time through the CBP One app. Therefore, in the rare circumstance that noncitizens have scheduled a time to present at such a POE through another means, they would not be subject to the rebuttable presumption. Additionally, the Departments reiterate that the presumption does not apply to a noncitizen who has been provided appropriate authorization to travel to seek parole pursuant to a DHS-approved parole process, including the CHNV

---

[258] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[259] *Id.*

processes. *See* 8 CFR 208.33(a)(2)(ii)(A), 1208.33 (a)(2)(ii)(A).

*Comment:* Commenters recognized that the parole processes had positive results in the decrease of CHNV nationals encountered at the SWB, but predicted that the deterrence would decrease as more applicants are denied.

Commenters also stated that the requirement to travel directly to the United States by air may for some noncitizens be more challenging than traveling to the SWB, and raised the concern that the rebuttable presumption would apply to individuals who have received advance travel authorization under the CHNV processes, if those individuals arrive at the SWB rather than traveling directly by air. A commenter asserted that such a "disqualification" would be based on a "technicality," not on any material facts.

Commenters cited statistics stating that since January 2023, Haitian nationals had 11,300 approved paroles, but only 5,100 of those traveled to the United States. Commenters noted that parolees would add to the backlog of asylum applicants.

*Response:* With respect to commenters' caution that the magnitude of the CHNV processes' impact on unauthorized arrivals at the SWB may change over time, as discussed in Section II of this preamble, the CHNV parole processes have remained effective since the rollout of the Venezuela process in October. The Departments disagree that this will necessarily change as more applicants are denied, because any intending migrant who cannot access the CHNV parole processes may still be dissuaded from migrating irregularly because even those applicants who are denied authorization to travel under those processes may respond to the disincentives to irregular migration made possible by those processes and this rule. The Departments acknowledge, however, that since mid-April, there has been an increase in Venezuelan migrants crossing between POEs at the SWB, while others continue making the treacherous journey through the Darién Gap to reach the United States—even as encounters of Cubans, Nicaraguans, and Haitians remain near their lowest levels this year.[260] The Departments believe that this increase in Venezuelan migration has been driven in part by the current limited availability of CBP One app appointments

and misinformation campaigns by smugglers, in the aftermath of the fire in a Mexican government facility that killed a number of Venezuelan migrants in March.[261] Although the number of CBP One app appointments available has been limited while the Title 42 public health Order has been in place, as detailed in Section IV.E.3.ii.a of this preamble, when the Title 42 public health Order is lifted, CBP intends to increase the number of available appointments. In addition, as discussed in more detail in Section II.A of this preamble, DHS and the Department of State announced new measures on April 27, 2023, that are expected to significantly expand lawful pathways, which, along with the expanded ability to present at a land POE pursuant to a pre-scheduled time and place, are expected to further reduce the overall volume of irregular migration. The Departments also note that there has not been a similar rise in encounters of CHN nationals, and believe that the rule's approach of incentivizing the use of safe, orderly, and lawful pathways while imposing a meaningful consequence for those who fail to do so and cannot otherwise rebut the presumption against asylum eligibility will reduce the number of noncitizens seeking to cross the SWB without authorization.

With respect to commenters' objection regarding the CHNV parole processes' stated requirements with respect to air travel to an interior POE, the Departments are aware that some noncitizens may have trouble securing air travel, but also note the potentially significant costs associated with irregular migration, including substantial fees that some migrants pay to smugglers and cartels to facilitate such travel.[262] The specific requirements for participation in the CHNV parole processes are outside the scope of this rulemaking, but DHS is actively monitoring the effects of the

processes and may make adjustments as necessary.

The Departments also acknowledge that parolees who apply for asylum will add to the number of pending asylum applications; however, as discussed in Section II of this preamble, the net effect of the CHNV parole processes has been to significantly reduce rates of irregular migration and avoid a corresponding increase in the immigration court backlog.

*Comment:* A commenter stated that the Departments must consider how they would ensure that those migrants who use a parole program to enter the United States, such as Venezuelans or Nicaraguans, are not falling prey to scams. The commenter stated that there is reporting that those who do not have friends or relatives in the United States are going online to try to find sponsors, and stated that "there are posts online demanding up to $10,000.00 USD for financial sponsorship." The commenter stated that if the Departments require use of the parole processes, the Departments should make efforts to "end the financial abuse of potential parolees," similar to efforts to end human smuggling.

*Response:* As an initial matter, the specific requirements for participation in the CHNV parole processes are outside the scope of this rulemaking. In any event, the Departments recognize that immigration processes can be complex and that applicants, petitioners, and requestors are at risk of becoming victims of scams or fraud. The United States Government takes immigration scams and fraud seriously and is engaged in regular efforts to combat such behavior.[263] Additionally, the Departments conduct public-facing communications to advise all applicants to ensure that they only accept legal advice on immigration matters from an attorney or an accredited representative working for a DOJ-recognized organization.[264] The Departments also provide information to help applicants avoid immigration scams.[265]

DHS notes in public communications that access to the parole processes is free; neither the U.S.-based supporter nor the beneficiary is required to pay the United States Government a fee to

---

[260] *See* Reyes Mata III & Nick Miroff, *Surge of Migrants Strains U.S. Capacity Ahead of May 11 Deadline*, Wash. Post. Apr. 28, 2023, *https:// www.washingtonpost.com/nation/2023/04/28/ border-migrants-biden-title-42/*.

[261] *See, e.g., id.;* Nicole Acevedo & Albinson Linares, *Misinformation Fuels False Hopes Among Migrants after Deadly Fire in Mexico,* NBC News, Mar. 30, 2023, *https://www.nbcnews.com/news/ latino/misinformation-fuels-false-hopes-migrants- mexico-fire-rcna77398* ("Over 1,000 migrants lined up outside international bridges to El Paso, Texas, on Wednesday afternoon [March 29, 2023] after false information spread on social media and by word of mouth that the U.S. would allow them to enter the country.").

[262] *See, e.g.,* Ariel G. Ruiz Soto et al., *Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration* (Nov. 2021), *https:// www.migrationpolicy.org/sites/default/files/ publications/mpi-wfp-mit_migration-motivations- costs_final.pdf.*

[263] *See, e.g.,* USCIS, *Fraud Detection and National Security Directorate* (last updated June 15, 2022), *https://www.uscis.gov/about-us/ organization/directorates-and-program-offices/ fraud-detection-and-national-security-directorate.*

[264] *See, e.g.,* USCIS, *Find Legal Services* (last updated Mar. 27, 2023), *https://www.uscis.gov/ scams-fraud-and-misconduct/avoid-scams/find- legal-services.*

[265] *See, e.g.,* USCIS, *Avoid Scams* (last updated Feb. 17, 2023), *http://www.uscis.gov/scams-fraud- and-misconduct/avoid-scams.*

file the Form I–134A or to be considered for travel authorization, or parole.[266] DHS also provides a list of resources for victims of abuse, violence, or exploitation, as well as advice for protecting against immigration scams.[267]

*Comment:* One commenter noted the pending litigation regarding the CHNV parole processes and stated that the proposed rule presumes that the processes will continue to exist. If the parole processes are ultimately found to be unlawful, the commenter asserted that an injunction would nullify a central premise of the rule. The commenter also noted that the rule extends into the first several months of the next administration, which may end the parole processes. Another commenter argued that the parole processes are overbroad and contrary to statute, and that it is ''improper'' for the Departments to cite the parole processes as effective tools in support of the rule.

*Response:* The parole processes that DHS established in 2022 and 2023 for Ukrainian and CHNV nationals provide lawful pathways for individuals seeking to enter the United States. The Departments recognize that there is currently litigation over the CHNV parole processes. *See Texas* v. *DHS,* No. 6:23–cv–00007 (S.D. TX filed Jan. 24, 2023). The Departments are vigorously defending the processes as permitted under section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5), and believe that the CHNV parole processes are permitted under the statute, for the reasons described in the **Federal Register** notices announcing each process. Should this litigation result in an injunction or other hold on any parole process, the Departments do not believe that such an injunction or hold would affect the application of this rule.

The parole processes established for CHNV nationals do not represent the only available options for noncitizens seeking entry to the United States. If these parole processes are enjoined, Ukrainian and CHNV nationals would still be able to avoid the rebuttable presumption if they present at a POE pursuant to a pre-scheduled time and place. *See* 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). Moreover, if the noncitizen establishes that the mechanism for scheduling was not possible to access or use due to a language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle, then the noncitizen can

present at a POE without a pre-scheduled appointment and would not be subject to the presumption of ineligibility for asylum. *Id.* Similarly, these noncitizens would also be excepted from the presumption of ineligibility if they sought asylum or other protection in a country through which they traveled and received a final decision denying that application. 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). The Departments believe that these alternative pathways for a noncitizen to be excepted from or rebut the presumption against asylum eligibility are sufficient, such that the rule would be justified even if the CHNV parole processes were to end. The rule incentivizes migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways, not simply the CHNV parole processes, to enter the United States, or seek asylum or other protection in another country through which they travel and thus reduce the number of noncitizens seeking to cross the SWB without authorization to enter the United States.

As stated at 8 CFR 208.33(d) and 1208.33(e), the Departments intend for the provisions of this rule to be severable from each other such that if a court holds that any provision is invalid or unenforceable as to a particular person or circumstance, the presumption will remain in effect as to any other person or circumstance. *See also* 88 FR 11726–27. This intention for maximum severability extends to the parole processes themselves, which are authorized separate from this rulemaking and would exist even in the absence of 8 CFR 208.33(a)(2)(ii)(A), 1208.33(a)(2)(ii)(A).

### iv. Third Countries

#### a. 1951 Convention and 1967 Protocol Signatories Alone Insufficient

*Comment:* A commenter stated that migrants may not be able to apply for protection in third countries if such countries do not have functioning asylum systems. A commenter suggested that the Departments revise the rule to except noncitizens who demonstrate that the country or countries through which the noncitizen traveled, that are party to the 1951 Convention or 1967 Protocol, did not provide a minimally safe, orderly, expeditious, and effective protection process in the noncitizen's circumstances. Another noted that while many countries in South and Central America are taking on a significant portion of the burden of migration in the Western Hemisphere,

many of these countries cannot be considered ''safe'' for asylum seekers. Numerous commenters expressed a belief that the conditions and options in most or all third countries are insufficient to provide true or reasonable alternatives to seeking protection in the United States. Commenters stated that government records and NGO reports both make it clear that ''these countries have not developed working asylum systems and that, for many migrants, it would be pointless and life-threatening to stay and apply.'' Commenters noted that these conditions are the reason many migrants are fleeing and seeking to come to the United States in the first place. Further, some commenters noted that while Costa Rica has a successful asylum system, Costa Rica has significantly more asylum seekers per capita than the United States, and expressed a belief that Costa Rica is unlikely to be able to absorb more.

*Response:* The Departments do not agree with the commenter's suggestion to add an exception for noncitizens who demonstrate that a country did not provide an adequate protection process in that noncitizen's circumstances. First, the rule provides for several exceptions to, and means to rebut, the condition on asylum eligibility beyond having sought and been denied asylum or other protection in a third country. Second, the rule does not require that a noncitizen seek protection in any particular country. Finally, a noncitizen who seeks protection in a country through which they traveled, believes that the protection process was unfair in that country, and receives a final decision denying asylum or other protection from that country would still qualify for an exception to the presumption against asylum ineligibility.

The Departments do not agree with the generalizations that the nations through which a noncitizen might transit, including Mexico and countries in South and Central America, lack functioning asylum systems and invariably cannot be considered safe for those who apply for asylum in those countries. Many of these countries have taken substantial and meaningful steps in recent years that demonstrate their willingness to provide protection to those who need it, which is reflected in their international commitments and their efforts as described later in this response. To be relevant for the rebuttable presumption analysis, the country through which the noncitizen transited must be a party to the Refugee Convention or Protocol. Noncitizens traveling through the Western

---

[266] *See* USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last updated Mar. 22, 2023), *https://www.uscis.gov/CHNV.*

[267] *Id.*

Hemisphere have many options in this regard; of the countries in North, Central, and South America, only one is not party to the Convention or the Protocol.[268] Several countries through which noncitizens may transit have also joined the non-binding Cartagena Declaration on Refugees ("Cartagena Declaration").[269] Delegations from Belize, Colombia, Costa Rica, El Salvador, Guatemala, Honduras, Mexico, Nicaragua, Panama, and Venezuela joined the Declaration on November 22, 1984.[270] Among other things, the Cartagena Declaration includes a pledge to promote the adoption of national laws and regulations facilitating the application of the 1951 Convention and the 1967 Protocol.[271] The Cartagena Declaration also expands the definition of "refugee" to include those fleeing "generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances which have seriously disturbed public order."[272] This "refugee" definition is more expansive than that in U.S. law, *see* 8 U.S.C. 1101(a)(42)(A), thus providing some who may apply for protection, such as asylum, with more grounds on which to make their claim than they would have in the United States.

Nations throughout the Hemisphere are continuously demonstrating their commitment to providing protection to refugees, migrants, and asylum seekers. Colombia, Belize, and Mexico have made significant strides in developing their asylum systems and expanding protections for migrants. In 2021, Colombia adopted legislation that allows Venezuelans to apply for temporary protection status, which grants Venezuelans 10-year residency and allows them to access public education, health care, and employment.[273] By February 2022, about 2.4 million Venezuelans had

applied for that status, and Colombian migration authorities had approved nearly 1.4 million by July 2022.[274] Belize offers an amnesty program for registered asylum seekers and certain irregular migrants that provides permanent residence and a path to citizenship.[275] The Government of Mexico has made exceptional strides to improve conditions for asylum seekers, migrants, and refugees within its borders. Mexico's Federal Public Defender's Office offers legal counseling and support to asylum seekers and migrants who have filed claims with Mexico's Commission for Refugee Assistance ("COMAR") and has increased both its specialized staff and visits to migration stations.[276] Mexico has also committed to integrating 20,000 refugees into the Mexican labor market over the next three years and is expanding labor opportunities for Central American workers.[277]

*Comment:* Commenters stated that it is inhumane to require asylum seekers to first seek protection in third countries because they are particularly vulnerable in those countries to harms like exploitation, kidnapping, assault, rape, robbery, or extortion. Commenters noted that many transit countries struggle with high levels of violence, corruption, and ineffective judicial or political systems, citing a range of facts to illustrate political and other concerns in many transit countries, including the trial of Mexican officials for conspiracy with cartels and the extradition of the former Honduran president to face charges in the United States. One commenter asserted that requiring victims of persecution to expose their personal information to possibly corrupt or hostile governments is "an extension of the persecution they fled in the first place," while another stated that the act of applying for asylum in a third country would make migrants targets of the governments they are fleeing. Commenters also noted that most immigrants to the United States only travel through countries that also have a large number of emigrants seeking to

enter the United States, which the commenter believes demonstrates that those countries are not safe.

*Response:* The Departments recognize that certain noncitizens may feel unsafe seeking protection in certain nations through which they might transit, including Mexico and countries in South and Central America, due to the concerns commenters describe. However, as discussed above, the Departments do not agree with generalizations that these countries are universally unsafe and cannot provide protection to asylum seekers. The Departments also note that the rule does not require any noncitizen to seek protection in a country where they do not feel safe. Applying for, and being denied, asylum or other protection in a third country is one exception to the rebuttable presumption, but noncitizens who choose not to pursue this path may instead seek authorization to travel to the United States to seek parole pursuant to a DHS-approved process, or present at a POE at a pre-scheduled time or place (or demonstrate that it was not possible to do so for a reason covered by the rule). *See* 8 CFR 208.33(a)(2)(ii), 1208.33(a)(2)(ii).

Noncitizens may also rebut the presumption by showing that exceptionally compelling circumstances exist, including an acute medical emergency or an imminent and extreme threat to life or safety at the time of entry. 8 CFR 208.33(a)(3), 1208.33(a)(3). Although the Departments expect that many migrants seeking protection will be able to access asylum or other protection in at least one transit country, they recognize that not every country will be safe for every migrant and have provided other exceptions and means for rebutting the presumption to account for those circumstances. Although noncitizens may prefer to apply for asylum in the United States, it is not unreasonable to expect that they would pursue other safe options.[278]

**b. Concerns About Length of Process and Documentation Provided by Third Countries**

*Comment:* Several commenters stated that third countries are not efficient in providing proper documentation for asylum seekers, thus increasing wait times and creating additional issues in overcoming the presumption at the SWB. Another raised concerns that

[268] *See* Maja Janmyr, *The 1951 Refugee Convention and Non-Signatory States: Charting a Research Agenda,* 33 Int'l J. Refugee L. 188, 189 (2021); UNHCR, *States Parties, Including Reservations and Declarations, to the 1951 Refugee Convention, https://www.unhcr.org/us/media/38230* (last visited Apr. 25, 2023).

[269] *See* Cartagena Declaration on Refugees, Colloquium on the International Protection of Refugees in Central America, Mexico and Panama, Nov. 19–22, 1984, *https://www.oas.org/dil/1984_cartagena_declaration_on_refugees.pdf.*

[270] *Id.*

[271] *Id.*

[272] *Id.*

[273] Int'l Crisis Group, *Hard Times in a Safe Haven: Protecting Venezuelan Migrants in Colombia* (Aug. 2022), *https://www.crisisgroup.org/latin-america-caribbean/andes/colombia-venezuela/hard-times-safe-have-protecting-venezuela.*

[274] *Id.*

[275] Government of Belize, *Amnesty Background Information* (Dec. 7, 2022), *https://immigration.gov.bz/amnesty-background-information.*

[276] Comprehensive Regional Protection and Solutions Framework, *MIRPS in Mexico* (Aug. 2022), *https://mirps-platform.org/en/mirps-by-country/mirps-in-mexico.*

[277] Government of Mexico, Secretary of External Relations, *Mexico to Expand Labor Mobility Programs and Integrate Refugees into its Labor Market* (June 10, 2022), *https://www.gob.mx/sre/prensa/mexico-to-expand-labor-mobility-programs-and-integrate-refugees-into-its-labor-market?idiom=en.*

[278] *See* UNHCR, *Legal Considerations Regarding Access to Protection and a Connection Between the Refugee and the Third Country in the Context of Return or Transfer to Safe Third Countries* 1 (Apr. 2018), *https://www.refworld.org/pdfid/5acb33ad4.pdf* ("[R]efugees do not have an unfettered right to choose their 'asylum country.' ").

requiring migrants to first apply and be rejected for asylum in a third country could force them to wait for that third country's asylum adjudication for months before they can continue their journey to the SWB. One commenter stated that the proposed regulations require a noncitizen to produce documentation (paper or electronic) to show denial of asylum in a third country, which the commenter states is contrary to the INA's specification that noncitizens may establish asylum eligibility though testimony alone. One commenter expressed concern that the Departments have given no assurances that a denial of asylum in another country will not be used against an asylum applicant here in the United States, where our asylum eligibility guidelines are many times more stringent.

*Response:* To determine if an applicant has met their burden to demonstrate that they sought asylum or protection in a third county and were denied, adjudicators may weigh an applicant's credible testimony with other evidence. *See* INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii). Even when an applicant's testimony is credible, an adjudicator may, where appropriate, request evidence to corroborate this credible testimony, including documentation of the final denial. In that case, the applicant is not required to provide the evidence if they do not have the evidence and cannot reasonably obtain it. *Id.*

Regarding commenters' statements that requiring migrants to seek asylum in third countries will increase wait times, the Departments believe that wait times would likely be significantly longer in the absence of this rulemaking. For those who are unwilling or unable to seek asylum or other protection in a third country and wait for a final decision, the Departments note that there are multiple ways to avoid or rebut the rule's presumption of ineligibility, only one of which involves seeking asylum or other protection in a third country. *See* 8 CFR 208.33(a)(2) and (3), 1208.33(a)(2) and (3). Noncitizens who do not feel comfortable or safe applying for asylum outside the United States may avoid the rebuttable presumption by seeking parole under one of the authorized parole processes or using the CBP One app to present themselves at a pre-scheduled time at a POE. *See id.* 208.33(a)(2)(ii)(A) and (B), 1208.33(a)(2)(ii)(A) and (B). Additionally, noncitizens may rebut the presumption in exceptionally compelling circumstances, including where they faced an immediate and extreme threat to life and safety at the time of their entry into the United States. 8 CFR 208.33(a)(3)(i)(B), 1208.33(a)(3)(i)(B). Those who are not excepted from and are unable to rebut the presumption of ineligibility may still pursue statutory withholding of removal and protection under the CAT.

With respect to the comment that the Departments have given no assurances that a denial of asylum in another country will not be used against an asylum applicant here in the United States, the Departments note that AOs and IJs will consider the noncitizen's fear of returning to their country of origin on a case-by-case basis through the noncitizen's credible testimony and other relevant evidence demonstrating a fear of persecution.

### c. Concerns About Differential Treatment of Migrants

*Comment:* Commenters raised concerns about unintended inequitable treatment of migrants under the rule. For example, commenters raised concerns that the rule arbitrarily disfavors migrants who live farther away, stating that it would be unfair to penalize those who do not have the good fortune of living in a nation close enough to the United States that they do not have to pass through a third country in their journey to the SWB. Another commenter noted that migrants who travel through third countries en route to the United States have necessarily traveled a lengthy distance, which may suggest that their claims are in fact more likely than others' to be meritorious. Similarly, commenters noted that a migrant who does not live close to a country that provides strong protections may not realize until after they passed through a third country that they should have applied for asylum in that country, and that many migrants cannot afford what may be a months-long process of applying for protection in a third country.

Some commenters stated that the United States should not summarily deny asylum claims based on whether migrants have passed through another "safe third country," as the third country may not have been safe for each individual migrant, especially for vulnerable populations. At least one commenter stated that requiring migrants to seek asylum in third countries on their journey to the SWB is counterintuitive if the migrant has relatives or another support system in the United States. One commenter also noted that individuals with conditions that may cause cognitive difficulties or deficits, such as post-traumatic stress disorder, depression, or head trauma, may not be able to find the medical services that would allow them to participate in the asylum process of a country through which they transited, even if those countries had a functioning asylum system.

*Response:* The rule's primary purpose is to incentivize migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel. Migrants who do not avail themselves of such a lawful pathway or seek protection in a country through which they travel will be subject to a rebuttable presumption of ineligibility for asylum. That said, the Departments recognize that many migrants face challenging circumstances in their home countries and en route to the United States, and appreciate that not every country will be viable for every migrant, including those who may apply for asylum or other protection, depending upon their individual circumstances. With regards to concerns that migrants may not receive sufficient notice of the exception to seek and be denied asylum or other protection in a transit country, the Departments note that this is only one of multiple exceptions and means of rebuttal that the rule allows. As discussed in Section IV.B.5.iv of this preamble, the rule does not deprive noncitizens of notice in violation of the Fifth Amendment Due Process Clause.

With respect to concerns about "requiring" migrants to seek protection in a third country when they have relatives already in the United States, the Departments reiterate that the rule does not require any migrant to seek protection elsewhere; there are multiple ways to avoid or rebut that presumption of ineligibility, only one of which involves seeking asylum or other protection in a third country. Eligible noncitizens who cannot safely apply for asylum outside the United States may (while residing in any country) seek parole under an authorized parole process. Alternatively, they may use the CBP One app to present themselves at a pre-scheduled time at a POE. Additionally, the presumption may be rebutted in exceptionally compelling circumstances, such as by demonstrating that one faces an acute medical emergency or imminent and extreme threat to life or safety at the time of entry, or by satisfying the definition of a victim of a severe form of trafficking in persons under 8 CFR 214.11(a). 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). Those who are not excepted from and are unable to rebut the presumption of ineligibility may still pursue statutory withholding of

**Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations    **31413**

removal and protection under the CAT. The Departments are not aware, however, of any evidence establishing a direct link between distance traveled and validity of protection claims.

Finally, the Departments note that a location that may be unsafe for one person may not only be safe for, but may offer a much-needed refuge to, others. For example, some countries in the region may have a larger number of individuals who leave the country to seek protection elsewhere than who seek protection in the country, perhaps because those specific individuals experience a targeted threat of violence or fear of persecution in that country. At the same time, such a country may demonstrably provide protection for other individuals or groups of individuals, particularly those originating from third countries, who consider the country to be a safe option where they can be free from persecution or torture. To the extent commenters raise concerns about the ability of certain individuals to participate in the asylum processes of third countries, the Departments note that, as discussed above, many regional partners have protection frameworks that are in some respects more expansive than those of the United States. As detailed in the preamble to the NPRM, *see* 88 FR at 11720–23, many countries in the region have significantly increased protection options to address the unprecedented movement of migrants throughout the hemisphere. Finally, humanitarian protection is not the only available lawful pathway to intending migrants. In some instances, employment-based migration may be the best option for migrants for whom economic issues are a key factor motivating them (which studies have shown are a high percentage of those moving through the region).[279]

Further discussion of the potential effects of this rule with respect to specific groups is contained in Section IV.B.4 of this preamble.

d. Concerns About Conditions and Asylum Process in Third Countries Generally

*Comment:* Commenters stated that lawful pathways in third countries do not necessarily promote family unity,

and that opportunities for family unity depend on the specific pathway.

*Response:* The Departments acknowledge that countries in the region have differing asylum systems and requirements. However, this rule does not require that noncitizens apply for asylum or other protection in a specific third country in order to preserve family unity. Rather, such an application is one of multiple options for noncitizens under the rule. DHS-approved parole processes represent another set of options available to some noncitizens. Additionally, any noncitizen may present at a POE via an appointment that includes a pre-scheduled time and place or may present at a POE without a pre-scheduled time and place and be excepted from the presumption if the noncitizen demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. The Departments also note the discussion in Section IV.E.3.ii.b of this preamble of CBP's ongoing efforts to improve CBP One app functionality for families.

*Comment:* Numerous commenters stated that the third country exception would cause serious bodily harm to noncitizens, lengthening the amount of time noncitizens spend in unsafe transit countries, and exposing them to further risks of persecution, torture, and death in third countries. Multiple commenters expressed concern that the rule ignores the realities asylum seekers face, including violence, persecution, and inadequacy of asylum systems in third countries, and reflects a misunderstanding of the conditions of noncitizens fleeing persecution. Multiple other commenters stated that applying for asylum and awaiting a subsequent denial in a third country is nearly impossible for noncitizens. Several commenters argued that requiring noncitizens to apply for asylum in third countries and wait for a decision would prolong their journey to safety. Another commenter stated that it was unreasonable to require noncitizens to wait for extended periods of time in third countries and suggested that the Departments revise the rule to except noncitizens who waited for six months or more without a decision. Similarly, a commenter stated that the third country exception was a way to delay the safety and stability of noncitizens. A commenter also stated that prior ''safe third country'' policies relating to Guatemala, among other places, forced asylum seekers into

dangerous situations in third countries. A commenter said that although the NPRM states that preventing human trafficking is a consideration for the rule, the third country exception would drive people further into traffickers' hands. Numerous commenters provided narrative examples of noncitizens who had successfully gained asylum in the United States, and added that it would not have been possible for them to gain asylum if the third country exception was enacted.

*Response:* Regarding comments stating that ''safe third country'' and similar policies force those who might otherwise apply for asylum in the United States into dangerous situations in third countries, the Departments recognize that not all third countries will be safe for all noncitizens seeking asylum and acknowledge that some migrants may feel that the dangers noted by commenters, or the risk that a particular country's asylum system would be unduly delayed or leave them vulnerable to refoulement, make applying for protection in that country untenable. However, the rule does not require any noncitizen to seek protection in any particular country and therefore the Departments likewise decline to add an exception for noncitizens who waited for a certain period of time in a third country without a final decision.

The Departments also strongly disagree that the third country exception will heighten risks of human trafficking. Rather, the Departments expect that the rule will reduce reliance on dangerous human smuggling networks that exploit migrants for financial gain, including via human trafficking. If a noncitizen does not believe it would be safe to apply for asylum or related protection in any third country, they may avoid the presumption against asylum eligibility by availing themselves of any of the other available lawful pathways, or, if applicable, they may be able to rebut the presumption of ineligibility by demonstrating exceptionally compelling circumstances.

*Comment:* Some commenters oppose the rule because they believe it encourages individuals to remain in countries where they may not be safe and are closer to their feared persecutor(s) to avoid being disqualified from asylum should they try to enter at the SWB. For example, one commenter cited the experiences of individuals who are being imminently threatened by gangs and have to flee and therefore are unable to remain in their country to apply for a lawful pathway to the United States. Similarly, many

---

[279] *See, e.g.,* Ariel G. Ruiz Soto et al, *Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration,* 18 (Nov. 2021), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-wfp-mit_migration-motivations-costs_final.pdf* (reporting that 92 percent of respondents to a UN World Food Programme household survey ''cited economic reasons related to their livelihoods as being key motivating factors'' for migration).

commenters stated that it was unfair and unrealistic to expect noncitizens to seek asylum in areas that are unsafe and do not have meaningful protections for refugees.

*Response:* The Departments disagree that the rule encourages noncitizens to remain in dangerous conditions or remain close to their feared persecutors so as to preserve their chance to be eligible for asylum in the United States. The Departments understand that in some cases it would be dangerous for a noncitizen to remain in their home country while they seek a safe, orderly, and lawful pathway into the United States, but note that eligible migrants who have already left their country of origin may apply for the CHNV processes, and all migrants may, if within the appropriate area in Mexico, schedule an appointment to present at a POE. Moreover, the Departments note that lawful pathways such as applying for asylum in a country they transited through or scheduling an appointment through the CBP One app to present at a POE are recognized by the rule and are available to migrants who have already left their country of origin. The Departments do not agree that this rule creates a strong incentive for those facing danger to remain in their home countries.

e. Concerns About Conditions and Asylum Process in Mexico Specifically

*Comment:* Several commenters expressed concerns about the adequacy of the asylum process in Mexico in particular. For example, one commenter stated that they had worked as a lawyer with migrants in Mexico for a year, and that COMAR is extremely overwhelmed and lacks the staff and funds to process the hundreds of thousands of asylum applications they have received from people in Mexico in the past few years. The commenter stated that they had personally witnessed the inability to receive a timely decision, or even to get access to COMAR in order to file an application in many parts of Mexico. The commenter also stated that Mexican civil society cannot meet the legal and social service needs of hundreds of thousands of asylum seekers, because such organizations are underfunded and under-resourced and cannot begin to meet the basic humanitarian and legal needs of the many people in need of protection who transit through Mexico. Other commenters stated that COMAR is underfunded and that immigration advocates have documented mismanagement and instances of denials of meritorious claims.

One commenter stated that Mexico's asylum system is not prepared to

actually grant asylum to refugees from South and Central American countries, stating that conditions for refugees in Mexico are "harsh" and that Mexico does not provide refugees with "legal residence or adequate legal rights to keep them free of exploitation."

A commenter stated that unless an applicant is granted a transfer request by COMAR, they cannot leave the geographical area where they applied for asylum. The commenter added that many applicants move due to safety or economic concerns, and as a result, their cases are considered abandoned. The commenter stated that an abandoned case would not be considered a denial under Mexican law, and that a person who abandoned their application would not qualify under the NPRM. A commenter stated that they have not seen evidence that the Departments have reviewed the ability of asylum seekers to obtain protection in Mexico and that failure to do so would lead to arbitrary and capricious rulemaking.

*Response:* The Departments recognize that managing migration is a collective responsibility and, as part of a whole-of-government approach, requires working closely with countries throughout the region to prioritize and implement a strategy that advances safe, orderly, legal, and humane migration throughout the Western Hemisphere. With regard to Mexico's ability to handle asylum claims, as stated in the NPRM, 88 FR at 11721, Mexico is the third highest recipient of asylum claims in the world; in 2022, COMAR reported receiving 118,478 applicants for refugee status.[280] Of applications completed in 2021, COMAR granted asylum in 72 percent of cases; an additional two percent of applicants were granted complementary protection (a form of protection available to those who are not eligible for refugee status).[281] Of applications completed in 2022, COMAR granted asylum in 61 percent of cases; an additional two percent of applicants were granted complementary protection.[282] The average case takes 8–12 months to adjudicate.[283] With United

States Government funding and the support of international organizations, Mexico has also substantially increased its Local Integration Program, which relocates individuals granted asylum to safe areas of Mexico's industrial corridor and integrates them into such areas. These individuals are then matched with jobs and provided apartments, and their children are enrolled in local schools. In May 2022, the program reached the milestone of reintegrating 20,000 asylum seekers in Mexico.[284] And in June 2022, Mexico committed to support local labor integration for an additional 20,000 asylees over the next three years.[285] The Government of Mexico has announced substantial increases to its labor visa programs over the past two years to help those seeking protection enter the labor market.[286] The Departments acknowledge that, like the United States, Mexico has a significant asylum backlog. Nonetheless, it remains a viable option for many seeking protection in Mexico.[287]

As it relates to the comment regarding abandoned claims, the Departments note that, as discussed in Section IV.E.3.iv.f of this preamble, under this rule, a final decision does not include a determination by a foreign government that the noncitizen abandoned the claim. *See* 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). A noncitizen who has abandoned their asylum claim in Mexico would not qualify, on that basis, for an exception to the rebuttable presumption. Such noncitizens may nonetheless qualify for another exception to the rebuttable presumption or be able to rebut the presumption. For these reasons, the Departments have declined to revise the rule in response to this comment.

*Comment:* Other commenters stated that towns along Mexico's northern border are not equipped to provide food, shelter, health care, and sanitation services to migrants waiting for an

[280] Government of Mexico, La COMAR en Números, Diciembre 2022 (Jan. 16, 2023), *https://www.gob.mx/cms/uploads/attachment/file/792337/Cierre_Diciembre-2022__31-Dic._1.pdf.*

[281] *See id.;* UNHCR, *Asylum Capacity Support Group, Mexico: Granting Complementary Protection, https://acsg-portal.org/tools/mexico-granting-complementary-protection/* (last visited Apr. 26, 2023).

[282] Government of Mexico, La COMAR en Números, Diciembre 2022 (Jan. 16, 2023), *https://www.gob.mx/cms/uploads/attachment/file/792337/Cierre_Diciembre-2022__31-Dic._1.pdf.*

[283] Refugees Int'l, *Mexico's Use of Differentiated Asylum Procedures: An Innovative Approach to*

*Asylum Processing* (July 20, 2021), *https://www.refugeesinternational.org/reports/use-of-differentiated-asylum-procedures-an-innovative-approach-to-asylum-processing-#_ftn5.*

[284] UNHCR, *Más de 20.000 Reubicaciones como Parte de los Esfuerzos de Integración de Personas Refugiadas en México* (May 25, 2022), *https://www.acnur.org/noticias/press/2022/5/628e4b524/mas-de-20000-reubicaciones-como-parte-de-los-esfuerzos-de-integracion-de.html.*

[285] *See* L.A. Declaration Fact Sheet.

[286] *See id.*

[287] *See* Global Compact on Refugees, *Mexico, https://globalcompactrefugees.org/gcr-action/countries/mexico* (last visited Mar. 9, 2023); Government of Mexico, Law on Refugees, Complementary Protection, and Political Asylum, Article 28, January 27, 2011, *https://www.diputados.gob.mx/LeyesBiblio/pdf/LRPCAP.pdf.*

asylum hearing. Commenters also stated that migrant camps in Mexico are dangerous, unsanitary, and negatively impact migrants' mental health. A commenter stated that organized crime operates across Central America and Mexico with impunity, and that a target of organized crime fleeing one location would likely be found and targeted in Mexico as well. Another commenter stated that persecutors have followed asylum seekers into Mexico and harmed them there.

Commenters also stated conditions in Mexico are unsafe, especially for asylum seekers. Specifically, commenters stated that the proposed rule would cause additional harm for migrants forced to wait in Mexico before applying for asylum in the United States due to the risk of rape, murder, kidnapping, extortion, robbery, and other violence; violent detention by Mexican government officials; denial of medical care for serious illnesses; displacement and homelessness; discrimination or harassment due to race, gender, and sexual orientation; abusive employment arrangements; and denial of access to basic services and protections due to language barriers. One commenter expressed concern that migrants in Mexico face discrimination from drug cartels and other criminals as well as from Mexican authorities, including police and immigration officials. Some commenters pointed to advisories issued by the U.S. Department of State warning U.S. citizens not to travel to areas in Mexico, and stated that there are many examples of migrants being seriously harmed while waiting for asylum in Mexico or for the chance to enter the United States.

Commenters also stated that these risks were further heightened for members of vulnerable groups, such as women and children, Black, brown, and indigenous persons, and LGBT persons.

*Response:* The Departments recognize commenters' concerns about potential harm for members of vulnerable groups, but again note that more than 100,000 individuals felt safe enough to apply for asylum in Mexico in 2022. The Departments also emphasize that the rule does not require any noncitizen to apply for asylum or other protection in Mexico or any other country. Applying for and being denied protection in Mexico is only one of multiple ways to be excepted from or rebut the presumption of ineligibility for asylum. *See* 8 CFR 208.33(a)(2) and (3), 1208.33(a)(2) and (3). The rule also provides that the presumption of asylum ineligibility can be rebutted by noncitizens who do not utilize a lawful

pathway but who face an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder or who were victims of a severe form of trafficking in persons. *See* 8 CFR 208.33(a)(3)(i)(A) through (C), 1208.33(a)(3)(i)(A) through (C).

For further discussion of this rule and vulnerable populations, please see Section IV.B.4 of this preamble.

*Comment:* A commenter expressed concern that Mexican asylum seekers would have to wait for an appointment with CBP in the same country where they are experiencing persecution.

*Response:* This concern is based on a misunderstanding of the rule. The rebuttable presumption only applies to noncitizens who travel through a country other than their country of citizenship, nationality, or, if stateless, last habitual residence, and that is a party to the Refugee Convention or Protocol, and thereafter enter the United States from Mexico at the SWB or adjacent coastal borders without documents sufficient for lawful admission. *See* 8 CFR 208.33(a)(1), 1208.33(a)(1). Mexican nationals would not have traveled through a country other than Mexico en route to the SWB, and therefore are not subject to the rebuttable presumption. *See* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii).

### f. Final Decision of Foreign Government is Undefined

*Comment:* Commenters asked how U.S. officials would know the adjudication and appeal processes of third countries, such that they could confirm that a noncitizen's application for asylum or other protection in a third country had been denied in a final decision. Commenters stated that a requirement for a final decision could introduce years of uncertainty depending on the backlogs and resources of third countries. One commenter stated that proving the denial of protection in a third country may be entirely impossible in the context of a credible fear interview.

*Response:* The Departments agree that further clarity on the meaning of the term "final decision" will help noncitizens understand, and IJs and AOs apply, this provision. The Departments are therefore revising 8 CFR 208.33(a)(2)(ii)(C) and 1208.33(a)(2)(ii)(C) to except from the rebuttable presumption noncitizens who "[s]ought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application. A final decision includes any denial by a foreign government of the applicant's

claim for asylum or other protection through one or more of that government's pathways for that claim. A final decision does not include a determination by a foreign government that the noncitizen abandoned the claim.''

The Departments also acknowledge that, like the United States, many countries have asylum backlogs that contribute to significant wait times for applicants. However, this rule does not require noncitizens to apply for asylum in a third country and wait for a final decision before applying for asylum in the United States; rather, that is simply one of the lawful pathways recognized by the rule. As an alternative to applying for asylum in a third country and seeking a final decision before migrating to the United States, noncitizens can utilize the CBP One app to pre-schedule an appointment to present at a POE or seek parole pursuant to a lawful parole process (such as the CHNV parole processes). *See* 8 CFR 208.33(a)(2)(ii)(A) and (B), 1208.33(a)(2)(ii)(A) and (B). The rule also allows noncitizens to whom the presumption applies to rebut it in exceptionally compelling circumstances. 8 CFR 208.33(a)(3), 1208.33(a)(3).

The Departments acknowledge that each of the lawful pathways outlined in the rule is subject to limitations, including, *e.g.,* capacity constraints, limitations on eligibility, and geographic availability. The Departments further acknowledge that the pathways' combined limitations could constrain some individuals' ability to access pathways at a given time or place, and that some of those individuals may also not be able to establish an exception to, or rebut, the presumption. However, the Departments have concluded that the interests of migrants and the immigration system as a whole, including the asylum system, are best promoted by incentivizing noncitizens to pursue safe, orderly, and lawful pathways to enter the United States rather than failing to take adequate actions to respond to a potential further surge of irregular migrations at the SWB that threatens to overwhelm the immigration system and prevent orderly processing of claims for protection.

*Comment:* Commenters stated that the proposed exception for those who sought and were denied asylum or "other protection" was unduly vague, because the term "other protection" is undefined. Commenters stated that if a migrant applied for and was denied an immigration status other than asylum, they would not necessarily know such

denial would qualify them for an exception to the rebuttable presumption. Commenters further stated that the absence of a definition would result in inconsistent application of the exception.

*Response:* The preamble of the NPRM described the United States' efforts throughout the region to prioritize and implement a strategy that advances safe, orderly, legal, and humane migration, including access to international protection. Such efforts are put forward in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America;[288] the CMMS;[289] and the L.A. Declaration. The NPRM provided a detailed discussion of increased access to protection and other pathways in the region, specifically identifying available programs and processes in Mexico, Guatemala, Belize, Costa Rica, Colombia, Ecuador, and Canada. *See* 88 FR at 11720–23. While these countries provide an opportunity for individuals to apply for asylum or refugee status, they also offer other protection that is not dependent on the applicant meeting the definition of a refugee as provided by the Refugee Convention. For example, Mexico offers protection to individuals whose lives are in danger or where there are well-founded reasons to believe that they would be in danger of being subjected to torture or other cruel, inhuman, or degrading treatment or punishment.[290] Colombia, Costa Rica, and Ecuador have also offered other protection via regularization programs for individuals of specific nationalities.[291]

Because such protection and other pathways in the region are country-specific and, as exemplified by the increased access to protection in the region as a result of the CMMS and L.A. Declaration, are subject to change, the Departments have determined that appropriate pathways and other protections are best determined on a case-by-case basis, considering the evidence presented relating to the nature and basis of the noncitizen's application for protection in the third country. Nevertheless, the Departments note that the "final decision denying asylum or other protection" is intended to include denials of asylum and other forms of humanitarian protection related to fear of returning to one's home country as well as other temporary protections akin to that of temporary protected status under section 244 of the INA, 8 U.S.C. 1254a.

*Comment:* Commenters stated that the proposed rule gives preference to applicants who were denied asylum by another country over those who did not apply or who did apply and received asylum. Commenters stated that the proposed rule would not filter out people with weak asylum claims, as commenters believe the Departments intend, but would rather prevent the most vulnerable people from seeking asylum altogether.

*Response:* The Departments disagree with the assertions that this rule necessarily gives preference to applicants who were denied asylum by another country over those who do not apply and disagree that the rule would prevent the most vulnerable people from seeking asylum altogether. The rule imposes consequences on certain noncitizens who enter the United States without availing themselves of a lawful pathway for entering the United States. Seeking protection and receiving a final decision in a country through which a noncitizen traveled is one of the lawful pathways recognized by the rule, but it is not the only lawful pathway available. A noncitizen who does not seek protection in a third country may nonetheless establish an exception to the presumption—just as a noncitizen who has sought and been denied such protection would—by presenting at a POE at a pre-scheduled time, or by pursuing a DHS-approved parole process.

The rule incentivizes intending migrants to pursue lawful pathways as part of a regional approach to migration management, including by incentivizing migrants to seek protection in countries through which they travel. With respect to any concern that noncitizens denied protections in a third country are less

deserving of protection here, the Departments do not agree that a denial in a third country necessarily means that the applying individual would not merit protection under U.S. law.

In addition, the Departments do not agree that the rule necessarily gives preference to applicants who have been denied asylum in another country. Rather, the rule incentivizes migrants to avail themselves of lawful alternatives to irregular migration and see them through to completion (*e.g.,* receiving a final decision in another country). Those noncitizens meeting that requirement who are ultimately granted asylum or other protections in other countries would have no need to continue on to the United States and may, in many cases, be subject to the firm resettlement bar to asylum, and thus, in the Departments' view, such noncitizens need not be excepted from the rebuttable presumption. However, those who have been denied may still have a need for protection in the United States. Therefore, the Departments believe that maintaining asylum eligibility in the United States for those who have been denied asylum in third countries is appropriate and supports the larger goal of incentivizing noncitizens to pursue available lawful pathways, as part of an effort to build a regional approach to migration management.

Moreover, as noted above, there are additional lawful pathways to which noncitizens could avail themselves to avoid application of the rebuttable presumption as well as multiple circumstances in which the presumption of asylum ineligibility could be rebutted. *See* 8 CFR 208.33(a)(2) and (3), 1208.33(a)(2) and (3). The Departments acknowledge that each of the lawful pathways outlined in the rule is subject to limitations and that the pathways' combined limitations could constrain any individual's ability to access them at a given time or place. However, the Departments have concluded as a matter of policy that the interests of migrants and the immigration system as a whole are best promoted by incentivizing noncitizens to pursue safe, orderly, and lawful pathways to enter the United States rather than failing to take adequate actions to respond to a potential further surge of irregular migration at the SWB that threatens to overwhelm the immigration system and prevent orderly processing of claims for protection.

g. Pursuit of Lawful Pathways May be Improperly Used as Evidence

*Comment:* Some commenters expressed concern that taking time to

---

[288] The White House, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[289] The White House, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery.*

[290] Government of Mexico, Law on Refugees, Complementary Protection, and Political Asylum, Article 28, January 27, 2011, *https://www.diputados.gob.mx/LeyesBiblio/pdf/LRPCAP.pdf.*

[291] UNHCR, *Temporary Protection Status in Colombia (November 2021)* (Dec. 3, 2021), *https://reliefweb.int/report/colombia/temporary-protection-status-colombia-november-2021-0;* Costa Rica, *Special Temporary Category for Nationals of Cuba, Costa Rica and Nicaragua with Pending or Denied Refugee Claims* (Apr. 17, 2023), *https://www.migracion.go.cr/Paginas/Categor%C3%ADa%20Migratorias%20(Extranjer%C3%ADa)/Categor%C3%ADa-Especial-Temporal.aspx;* Reuters, *Ecuador Begins Regularization Process for Thousands of Venezuelan Migrants* Sept. 1, 2022, *https://www.reuters.com/world/americas/ecuador-begins-regularization-process-thousands-venezuelan-migrants-2022-09-01/.*

pursue lawful pathways may be used as evidence that noncitizens who do not flee their country immediately do not have a legitimate well-founded fear of persecution.

*Response:* The Departments disagree that the rule will increase the likelihood of adverse determinations against those noncitizens who choose to remain in their home countries while seeking access to one of the enumerated lawful pathways. As noted elsewhere in this section, this rule does not discourage any person from fleeing a dangerous circumstance, and in fact highlights the options potentially available to persons who do so. Moreover, such migrants may still provide relevant evidence to support their eligibility for asylum, including a well-founded fear of future persecution, notwithstanding their decision to remain in their country to seek a lawful pathway to the United States. *See* 88 FR at 11737; *see also* 8 CFR 208.13. In short, despite assertions made by some commenters, this rule will not result in the elimination of claims for asylum based on a well-founded fear of future persecution, even for applicants who spend some amount of time in their country of origin attempting to access an orderly and lawful pathway to the United States. AOs and IJs will still consider the noncitizen's fear of returning to their country of origin on a case-by-case basis through the noncitizen's credible testimony and other relevant evidence demonstrating a fear of persecution.

v. Unaccompanied Children

*Comment:* Commenters disagreed with the exception for UCs, stating that children need their parents to keep them safe during their journey to the SWB and that the proposed rule would discourage whole families from seeking asylum together. Some commenters stated that the UC exception would encourage family separation, arguing that families often separate as a perceived means to obtain protection for their children. Specifically, commenters stated that excepting UCs from the rebuttable presumption would incentivize families to send their children on a dangerous journey to the SWB unaccompanied, leading to a surge in the number of UCs arriving at the SWB. Similarly, commenters expressed that in lieu of waiting together in Mexico, many families may choose, or be "forced" by the lack of sufficient appointment slots for family members or concerns related to their children's safety, to send their children unaccompanied to the SWB while waiting to schedule their own appointment through the CBP One app.

Commenters pointed to reports of such voluntary separations under MPP and the Title 42 public health Order and said that the proposed rule would lead to similar outcomes, and that implementing a policy that would foment such separations would be inhumane and unacceptable. Commenters stated that family separations can cause severe emotional trauma to children and may increase the risk that a child will be exploited or trafficked.

Some commenters suggest that the Departments should remove the UC exception and instead award a higher priority to family unit applications, as this would keep family units together, grant asylum to those that qualify, and disincentivize sending UCs to the SWB. Other commenters asserted that accompanied children should also qualify for an exception, since the exception for UCs creates a perverse incentive to send children alone to the border if families are not first successful together. Another noted that children arriving with their families do not choose where to cross the border or whether to first obtain an appointment, nor do they choose whether to first apply for asylum in another country, especially when fleeing danger.

*Response:* The Departments fully agree with commenters that keeping families unified and avoiding family separation and the associated trauma is an important goal, but disagree that the rule, including the exception for UCs, will increase separations of families and result in more UCs arriving in the United States. *See, e.g.,* E.O. 14011, Establishment of Interagency Task Force on the Reunification of Families, 86 FR 8273 (Feb. 5, 2021). As noted in the preamble of the NPRM, applicability of the rebuttable presumption will be considered during the credible fear process for those noncitizens processed for expedited removal, as well as applied to merits adjudications. 88 FR at 11707. Pursuant to section 235 of the Trafficking Victims Protection Reauthorization Act of 2003 ("TVPRA"), UCs whom DHS seeks to remove cannot be processed for expedited removal and, thus, are never subject to the credible fear process. 8 U.S.C. 1232(a)(5)(D). As UCs are already excluded from expedited removal, the Departments do not expect—based on their experience implementing current law concerning expedited removal and asylum—that this exclusion of UCs from the rebuttable presumption would serve as a significant incentive for families to send their children unaccompanied to the United States.

In addition, under this rule, families may avail themselves of lawful pathways and processes to enter the United States to avoid application of the rebuttable presumption. The rule also states that if one member of a family travelling together, including both parents and children, is excepted from the presumption or has rebutted the presumption, all members of the family are treated as excepted from or as having rebutted the presumption. 8 CFR 208.33(a)(2)(ii) and (3)(i), 1208.33(a)(2)(ii) and (3)(i); 88 FR at 11730 (providing that "if one member of a family traveling together is excepted from the presumption that the condition applies or has rebutted the presumption, then the other members of the family as described in 8 CFR 208.30(c) are similarly treated as excepted from the presumption or as having rebutted the presumption"); *see* 8 CFR 208.30(c)(2) ("The asylum officer in the officer's discretion may also include other accompanying family members who arrived in the United States concurrently with a principal [applicant] in that [applicant's] positive fear evaluation and determination for purposes of family unity.").

To the extent commenters suggest that all children, including those traveling with a parent or legal guardian, be excluded from applicability of the rule, the Departments agree that children may have limited agency in their manner of arrival in the United States. The Departments have therefore added a provision to the rule that allows principal asylum applicants who were under the age of 18 at the time of entry to avoid the condition on asylum eligibility for applications if they file as principal applicants after May 11, 2025, as discussed in more detail at Section II.C.2 of this preamble. 8 CFR 208.33(c)(2), 1208.33(d)(2). However, the Departments do not wish to create an incentive for adults to arrive at the border with children falsely claiming to be a family unit in order to be excepted from the rule or for parents or legal guardians to bring their children with them on the dangerous journey to the United States when they otherwise would not do so, and therefore decline to add an exception for all accompanied minors. The Departments seek to encourage families that may choose to travel to the United States together to travel via a lawful pathway rather than by entrusting smugglers or criminal organizations to facilitate a potentially dangerous journey.

vi. Other General Comments on Exceptions

*Comment:* Several commenters stated that the exceptions to the rebuttable presumption are too narrow and, therefore, would preclude many noncitizens from obtaining asylum. One commenter suggested creating a broad fourth exception that would exempt particularly vulnerable demographics from the rebuttable presumption, much like the proposed rule already exempts unaccompanied children. Another commenter suggested creating an exception for the elderly, who are significantly less likely to be repeat unauthorized crossers.

*Response:* The Departments believe that the rule will generally offer opportunities for those with valid claims to seek protection, and decline to add additional exceptions to the rule. The Departments believe that the existing exceptions to application of the rebuttable presumption against asylum eligibility at 8 CFR 208.33(a)(2) and 1208.33(a)(2) provide the desired incentive for noncitizens seeking to enter the United States do so via safe, orderly, and lawful pathways, and that additional, broad exceptions, particularly broad exceptions such as those suggested by commenters, would be contrary to the purpose of the rule. Regardless of whether certain populations may be more or less likely to be repeat, unauthorized border crossers, the Departments believe that all noncitizens seeking to enter the United States should do so via safe, orderly, and lawful pathways if possible.

The Departments also note that in addition to the enumerated exceptions, the rule includes means of rebutting the presumption against asylum eligibility at 8 CFR 208.33(a)(3) and 1208.33(a)(3) where exceptionally compelling circumstances exist, including where at the time of entry the noncitizen or a member of their family with whom they are traveling faced an acute medical emergency, faced an imminent and extreme threat to life or safety, or were a victim of a severe form of trafficking in persons. The Departments believe that together, the exceptions and grounds for rebuttal strike the correct balance between incentivizing use of safe, orderly, and lawful pathways for entry into the United States while also recognizing that in certain limited circumstances use of these pathways may not be feasible.

4. Other General Comments on the Rebuttable Presumption

*Comment:* At least one commenter suggested that the Departments should permit an applicant to override the lawful pathways condition if they establish a reasonable possibility of persecution or torture.

*Response:* To best effectuate the policy aims underpinning this rulemaking, the Departments believe that even those noncitizens who establish a reasonable fear of persecution or torture generally should remain subject to this asylum eligibility condition. Such noncitizens remain eligible for statutory withholding of removal or for CAT protection, consistent with U.S. non-refoulement obligations under the Refugee Convention and Protocol and Article 3 of the CAT. *See Mejia* v. *Sessions,* 866 F.3d 573, 588 (4th Cir. 2017); *Cazun* v. *U.S. Att'y Gen.,* 856 F.3d 249, 257 n.16 (3d Cir. 2017). Additionally, as discussed in Section IV.E.7.ii of this preamble, the Departments have included protections for family members of principal asylum applicants who are eligible for statutory withholding of removal or CAT protection and would be granted asylum but for the lawful pathways rebuttable presumption, where an accompanying spouse or child would not qualify for asylum or other protection from removal on their own or where the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), if the applicant were granted asylum. In that context, the Departments have determined that the possibility of separating the family would constitute an exceptionally compelling circumstance that rebuts the lawful pathways presumption of ineligibility for asylum. *See* 8 CFR 1208.33(c).

*Comment:* One commenter stated that the United States and Mexico should establish certain parameters for non-Mexicans waiting in Mexico for an appointment or for entry by other means, which must take into account safety, security, and humanitarian conditions in the locations where asylum seekers may be forced to wait. The commenter suggested that those parameters should include permission to remain lawfully in Mexico while awaiting appointments and ensuring relevant standards of protection and treatment under the Refugee Convention and international human rights standards.

*Response:* It would be the Government of Mexico's prerogative to establish any such parameters. The Departments remain committed to continuing to work with foreign partners on expanding their legal options for migrants and expanding the Departments' mechanisms for processing migrants who lawfully arrive in the United States. *See* 88 FR at 11720.

5. Screening Procedures and Review

i. Requests for Reconsideration

*Comment:* Some commenters opposed eliminating noncitizens' ability to seek reconsideration of a negative fear determination by USCIS and contended that the proposed rule would eliminate AO reconsideration of negative credible fear determinations. Commenters stated that the use of reconsiderations is needed to safeguard the rights of and due process for asylum seekers where the AO in the first instance issues an erroneous decision. Commenters stated that reconsideration has shielded asylum seekers from deportation to persecution and torture for decades, and observed that between FYs 2019–21 requests for reconsideration resulted in 569 reversals of negative credible fear determinations. One commenter stated that even one reversal in the request for reconsideration process is significant enough. One commenter wrote that, contrary to the proposed rule's "theory that" requests for reconsideration "are a waste of resources because so few are granted," their experience was that so few are granted because migrants cannot adequately state their fear in the initial interview nor access assistance with the process. Another commenter said the elimination of the possibility of reconsideration leaves an applicant's fate entirely to the quality and circumstances of the initial interview. Another commenter stated that the Departments would not use USCIS's "abysmal grant rate to justify eliminating this critical opportunity for justice and to right a wrong in an asylum seeker's application for protection." Another commenter expressed concern that this proposed rule would apply only to people who receive negative credible fear determinations due to this proposed rule, thereby creating different sets of procedural rules for asylum seekers denied under this proposed rule and those denied for other reasons.

*Response:* At the outset, the Departments note that contrary to some commenters' assertions, the rule does not eliminate reconsideration of negative credible fear determinations. If the IJ upholds the AO's negative

determination, USCIS can still exercise its discretion to reconsider a negative determination. *See* 8 CFR 208.33(b)(2)(v)(C). The rule does eliminate the ability to request such reconsideration for noncitizens deemed ineligible for asylum by operation of the rebuttable presumption. While the Departments acknowledge concerns about eliminating a noncitizen's ability to request reconsideration in this context, they believe it is important to efficiently resolve credible fear cases that are subject to the rebuttable presumption against asylum eligibility. The rule's effectiveness in channeling migration into safe and orderly pathways depends in part on the efficient resolution of credible fear cases, and the inclusion of further review procedures in this context would unnecessarily prolong the credible fear process.

In response to concerns about fairness, the Departments note that there remain multiple safeguards to ensure that the process is fair and to guard against inadvertent error for those subject to the rule. All credible fear determinations undergo initial review by a Supervisory AO. 8 CFR 208.30(e)(8). If the supervisor concurs with the negative determination, the noncitizen can request review of that determination by an IJ. *See* 8 CFR 208.33(b)(2)(iii) through (v). Those who are found subject to the presumption against asylum eligibility but who are still placed in section 240 removal proceedings can seek a de novo decision regarding the presumption. *See* 8 CFR 1208.33(b)(4). Furthermore, the Departments note that few requests for review of negative credible fear determinations ultimately result in the reversal of those determinations. *See* 87 FR at 18132; 88 FR at 11747. The Departments assess that, in light of the safeguards in place and the low rate of reversal, efficiency interests outweigh the interest in providing further opportunity to request reconsideration; the Departments therefore respectfully disagree with the commenter stating that even one reversal would be significant enough to warrant the ability to request reconsideration. Regarding the claim that few requests for reconsideration are granted due to noncitizens' lack of opportunity to state their fear during the initial interview and lack of assistance with the process, the commenter offered only anecdotal evidence for this. Moreover, this assertion does not change the Departments' assessment that providing further opportunity to request reconsideration carries insufficient

benefits to justify its costs. To the extent that commenters argued that these limits on reconsideration implicate the due process rights of noncitizens, as explained previously in Section IV.B.5.i of this preamble, the Supreme Court has held that the due process rights of noncitizens applying for admission at the border are limited to "only those rights regarding admission that Congress has provided by statute." *Thuraissigiam,* 140 S. Ct. at 1983 (citing INA 235(b)(1)(B)(ii) and (v), 8 U.S.C. 1225(b)(1)(B)(ii) and (v)). The INA provides no statutory right to reconsideration of an AO's negative credible fear determination. *See* INA 235(b)(1), 8 U.S.C. 1225(b)(1).

The Departments acknowledge that noncitizens who are not subject to the presumption are subject to different rules for reconsideration. *See* 8 CFR 208.30(g)(1)(i). However, the Departments note that the decision to reconsider a negative credible fear determination under that rule is still subject to USCIS discretion and is also time limited. *Id.* By contrast, there are no time limits for USCIS to reconsider negative determinations in cases subject to this rule. 8 CFR 208.33(b)(2)(v)(C). And due to the exigent circumstances discussed throughout this rule, including in Sections II.A and IV.B.2 of this preamble, the Departments believe it necessary to limit requests for reconsideration in cases subject to this rule.

ii. "Significant Possibility" Standard and Mechanisms for Evaluating Asylum and Withholding of Removal

*Comment:* Some commenters alleged that the rule would elevate the "significant possibility" standard mandated by Congress to the "reasonable possibility" standard, which is much harder for asylum seekers to meet. One commenter stated that the complexity of the presumption of ineligibility will require "intensive factual analysis" during credible fear interviews and stated that application of the reasonable possibility standard for screenings for withholding of removal or CAT protection violates the Global Asylum Rule injunction. Other commenters suggest that it will be "an extremely onerous undertaking" for the Departments to apply a "reasonable fear" standard in cases where the lawful pathways condition applies, which could lead to more complex and resource-intensive credible fear screening interviews with a "high risk of error that would send bona fide refugees back to danger." Another commenter stated that, by applying the "reasonable possibility" standard to

cases subject to the rule, the rule would essentially turn the credible fear interview, which is intended to be a low-bar screening, into an asylum merits hearing for these individuals. One commenter said that procedural and judicial errors are likely to increase as AOs are asked to apply the more onerous "reasonable possibility" standard.

A commenter stated that the rule may not be necessary as long as statutory withholding of removal and protection under CAT are available, as migrants would not distinguish between asylum, withholding, and CAT protection and instead would arrive at the SWB with the intention of seeking whatever relief is available to them. Other commenters expressed concern that those who cannot rebut the presumption would then be forced to meet a more difficult standard to be able to present a claim to lesser protections in the form of statutory withholding of removal or CAT protection. One commenter stated that the fact that the Departments have long applied the higher standard in reasonable fear screenings is "inapposite," reasoning that the rule is not about reasonable fear screenings, which impact those who were previously ordered removed and then re-entered without inspection.

*Response:* To the extent commenters suggest that the "reasonable possibility" standard will apply at the credible fear stage to asylum claims under this rule, they are incorrect. The statutory "significant possibility" standard will continue to apply to such asylum claims. *See* Section IV.D.1.iii of this preamble. The rule would apply a "reasonable possibility" standard only to screen for claims of withholding of removal and CAT protection, and only where a noncitizen has failed to establish a significant possibility that they would be able to show at a full hearing by a preponderance of the evidence that the presumption does not apply or that they meet an exception to or can rebut the presumption of ineligibility. *See* 88 FR at 11724.

That said, the Departments acknowledge commenters' concerns that certain noncitizens will be subject to a higher burden of proof for statutory withholding of removal and CAT protection. The Departments acknowledge that use of the "reasonable possibility" standard is a change from the practice currently applied in the expedited removal context as articulated in the Asylum Processing IFR; however, it is the same standard used in other protection screening contexts. *See* 8 CFR 208.31; *see also* 88 FR 11742–44. Notably, this higher screening standard

accords with the higher standard a noncitizen must meet for statutory withholding of removal and protection under CAT in section 240 removal proceedings, 8 U.S.C. 1229a. *See INS.* v. *Cardoza-Fonseca,* 480 U.S. 421 (1987). As explained in the NPRM, the Departments therefore believe that the "reasonable possibility" standard "better predicts the likelihood of succeeding on the ultimate statutory withholding or CAT protection application than the 'significant possibility' of establishing eligibility for the underlying protection standard, given the higher burden of proof." 88 FR at 11746–47. The application of standards tailored to the type of relief or protection that the noncitizen is eligible for will not foreclose an opportunity for those with meritorious claims to seek protection.

While the INA specifies the "significant possibility" standard for the purpose of screening for potential asylum eligibility in credible fear proceedings, INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), the INA does not specify a standard to be used in screening for potential eligibility for statutory withholding of removal or CAT protection. Congress did not require the same eligibility standards for asylum, statutory withholding of removal, and protection under the CAT in the "credible fear" screening process. *See* INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); *see also* The Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Public Law 105–277, 112 Stat. 2681–822. Thus, the Departments have determined that, where the rebuttable presumption of asylum ineligibility applies and has not been rebutted, applying the "reasonable possibility" of persecution or torture standard to screen claims for statutory withholding of removal and CAT protection would better advance the Departments' systemic goal of processing protection claims in a manner that is efficient, orderly, and safe.

The Departments acknowledge that in multiple rulemaking efforts in recent years, the Departments promulgated divergent standards for screening for potential eligibility for asylum as compared with statutory withholding of removal and CAT protection, along with variable standards for individuals barred from certain types of protection, which are currently not in effect.[292] In

June 2020, the Departments published the Global Asylum Rule, which amended provisions relating to the expedited removal and credible fear screening process, including raising the standards of proof for screening all claims for statutory withholding of removal and CAT protection to a "reasonable possibility" of persecution or torture and applying all mandatory bars to asylum and statutory withholding of removal during the credible fear screening. *See* Global Asylum Rule, 85 FR at 80277–78. The Global Asylum Rule continues to be the subject of lawsuits challenging the rule on multiple grounds.[293] Most of the changes to the credible fear process in expedited removal made by the Global Asylum Rule were superseded by the Asylum Processing IFR. As explained in the NPRM, the considerations that led to those decisions do not apply here. *See* 88 FR at 11744. This rule implements the new condition on eligibility in credible fear screenings through a stand-alone provision rather than a catch-all as the Departments sought to do through the Global Asylum Rule. Moreover, the Departments have determined that it would be appropriate to apply the lawful pathways condition on asylum eligibility during the credible fear screening stage such that the "reasonable possibility" of persecution or torture standard would then be used to screen the remaining applications for statutory withholding of removal and CAT protection. *See id.*

The Departments disagree with commenters' assertions that applying a higher burden of proof to screen for statutory withholding of removal and CAT protection where the presumption of asylum ineligibility applies and is not rebutted will result in errors. AOs and IJs have long applied, and continue to apply, the "reasonable possibility" of persecution or torture standard successfully to noncitizens who are subject to administrative removal orders under section 238(b) of the INA, 8

U.S.C. 1228(b), or reinstated orders under section 241(a)(5) of the INA, 8 U.S.C. 1231(a)(5). *See generally* 8 CFR 208.31 and 1208.31. There is therefore no reason to conclude that AOs and IJs will not be able to appropriately apply that standard successfully in the context of this rule.

The Departments disagree with commenters' suggestion that the rule will increase irregular migration because noncitizens will still travel to the United States to pursue any avenue of relief available to them. The rule's primary purpose is to incentivize migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel. The rule, coupled with an expansion of lawful, safe, and orderly pathways, is expected to reduce the number of noncitizens seeking to cross the SWB without authorization to enter the United States. The rule is intended to reduce the level of irregular migration to the United States without discouraging migrants with valid claims from applying for asylum or other protection. The Departments believe the rule will generally offer opportunities for those with valid claims to seek protection.

The Departments' application of a higher standard for statutory withholding and CAT protection in "reasonable fear" screenings, *see* 8 CFR 208.31 and 1208.31, is not inapposite in the context of this rule, where a noncitizen does not meet an exception to or rebut the presumption of asylum ineligibility. As in the "reasonable fear" context, this standard would be applied only where noncitizens are ineligible for asylum—and because the standard for showing entitlement to statutory withholding and CAT protection (a probability of persecution or torture) is significantly higher than the standard for asylum (well-founded fear of persecution), the Departments have determined that the screening standard adopted for initial consideration of withholding and deferral requests in these contexts should also be higher.

In promulgating this rule, the Departments considered and drew upon the established framework for considering the likelihood of a grant of statutory withholding of removal or CAT protection in the reasonable-fear context. *See* 88 FR at 11743. The Departments have authority to establish screening procedures and standards for statutory withholding of removal and CAT protection. *See* INA 103(a)(1), 8 U.S.C. 1103(a)(1). The Departments have frequently invoked these authorities to

---

[292] *See* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934, 55939, 55943 (Nov. 9, 2018) ("Proclamation Bar IFR"); Asylum Eligibility and Procedural Modifications, 84 FR 33829 (July 16, 2019) ("Third Country Transit (TCT)

Bar IFR"); Asylum Eligibility and Procedural Modifications, 85 FR 82260 (Dec. 17, 2020) ("TCT Bar Final Rule"); Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 36264 (June 15, 2020) ("Global Asylum NPRM"); Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 80274 (Dec. 11, 2020) ("Global Asylum Rule"); Security Bars and Processing, 85 FR 84160 (Dec. 23, 2020) ("Security Bars Rule").

[293] *See Pangea Legal Servs.* v. *U.S. Dep't of Homeland Sec.,* 501 F. Supp. 3d 792 (N.D. Cal. 2020); *Immigration Equality* v. *U.S. Dep't of Homeland Sec.,* No. 3:20–cv–09258 (N.D. Cal. filed Dec. 21, 2020); *Human Rights First* v. *Mayorkas,* No. 1:20-cv-3764 (D.D.C. filed Dec. 21, 2020); *Tahirih Justice Ctr.* v. *Mayorkas,* No. 1:21–cv—00124 (D.D.C. filed Jan. 14, 2021).

establish or modify procedures in expedited removal proceedings. *See id.* Noncitizens who establish a reasonable fear of persecution or torture would still be able to seek protection in proceedings before IJs. *See* CFR 1208.33(b)(2)(ii).

*Comment:* One commenter supported the Departments' assessment that applying the higher standard would lead to fewer noncitizens with non-meritorious claims being placed in section 240 removal proceedings, and that using this standard would further systemic goals without violating statutory or international obligations. However, the commenter recommended that DHS raise the screening standard from "significant possibility" to "reasonable possibility" for statutory withholding of removal and CAT protection during all credible fear interviews. The commenter reasoned that such an approach would be consistent with the INA, the FARRA, and U.S. non-refoulement obligations, and would reduce "historic and unsustainable strains" on the U.S. asylum system by deterring unauthorized immigration into the United States.

*Response:* The Departments decline to apply the "reasonable possibility" standard to screen all withholding of removal and CAT claims. The Departments believe that continuing to use the "significant possibility" standard to screen for all three types of claims—asylum, statutory withholding of removal, and CAT protection—when the noncitizen is excepted from or has overcome the presumption would avoid AOs and IJs applying divergent standards to the same sets of facts in a credible fear interview, thus simplifying the screening process for those noncitizens.

The commenter did not provide any explanation or evidence regarding how applying a higher standard during the credible fear screening to all claims for protection will reduce fraudulent claims. While the Departments acknowledge the commenter's concern, the Departments emphasize that the rule's primary intent is not to identify fraudulent asylum claims, but rather to reduce the level of irregular migration to the United States without discouraging migrants with valid claims from applying for asylum or other protection.

6. Effective Date, Temporary Period, and Further Action

*Comments:* Commenters raised concerns regarding the effective date of the rule and the two-year temporary duration of the rule. Several commenters expressed a concern that

the two-year period is unexplained. Some commenters argued that two years was too short of a time period to assess the effectiveness of the program. Another commenter stated that the two-year temporary duration of the rule allowed for sufficient time to assess the effects of the rule and to deter migrants. Some commenters questioned why the rule would expire after two years and requested further explanation, stating that if the Departments believe it is sound policy, it is not clear why the changes are not permanent. Others stated that the two-year period was too long for a "temporary" program designed to address "exigent circumstances," and stated that the Departments should have considered a much shorter duration, such as 30 days or 90 days, reconsideration every 6 months, or a sunset before the end of 2025. Another commenter stated that the Departments should specify conditions that would trigger the expiration of the rule. Commenters also expressed concern that the rule does not sufficiently lay out the criteria for determining whether the rule should be extended at the end of the 24-month period, or that the criteria are highly subjective. Commenters also noted that previous immigration policies, including MPP and those stemming from the Title 42 public health Order, have been difficult to sunset.

*Response:* The Departments intend for the rule to address the surge in migration that is anticipated to follow the lifting of the Title 42 public health Order. For that reason, and consistent with the Departments' initial assessment as stated in the NPRM, *see* 88 FR at 11727, the rule will only cover those who enter during a specific time period, applying to those who enter the United States at the SWB during the 24-month period following the rule's effective date. The Departments believe that a 24-month period provides sufficient time to implement and assess the effects of the policy contained in this rule. In addition, the Departments believe that a 24-month period is sufficiently long to impact the decision-making process for noncitizens who might otherwise pursue irregular migration and make the dangerous journey to the United States, while a shorter duration, or one based on specified conditions, would likely not have such an effect.

During this time, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region,

and implement other measures as appropriate, including continued efforts to increase immigration enforcement capacity and streamline processing of asylum seekers and other migrants. Recognizing, however, that there is not a specific event or demarcation that would occur at the 24-month mark, the Departments will closely monitor conditions during this period in order to review and make a decision, consistent with the requirements of the APA, whether additional rulemaking is appropriate to modify, terminate, or extend the rebuttable presumption and the other provisions of this rule. Such review and decision would consider all relevant factors, including the following: current and projected migration patterns, including the number of migrants seeking to enter the United States or being encountered at the SWB; resource limitations, including whether the number of noncitizens seeking or expected to seek to enter the United States at the SWB exceeds or is likely to exceed the Departments' capacity to safely, humanely, and efficiently administer the immigration system, including the asylum system; the availability of lawful, safe, and orderly pathways to seek protection in the United States and partner nations; and foreign policy considerations. The Departments expect to consider their experience under the rule to that point, including the effects of the rebuttable presumption on those pursuing asylum claims. In addition, the Departments expect to consider changes in policy views and imperatives, including foreign policy objectives, in making any decision regarding the future of the rule. The Departments do not believe that establishment of specific metrics for renewal ex ante would be appropriate, given the dynamic nature of the circumstances at the SWB and the multifaceted domestic and foreign policy challenges facing the Departments.

*Comment:* Commenters expressed concern about the rationale for adopting the two-year duration and potential extensions of the rule in subsequent administrations. Some commenters stated that the Departments' rationale for the two-year temporary duration was pretextual, with the true motivations being political and partisan in nature. One commenter disagreed with allowing the rule to be effective after the end of the current presidential term because it could be indefinitely extended, and another similarly stated that the fact that the rule is "temporary" does not mean that a subsequent presidential administration could not renew it.

Commenters stated that, by sunsetting the rule after the end of the current presidential term, the Departments were inviting such a result.

*Response:* The Departments disagree that the rationale for the 24-month duration of the rule is political, partisan, or pretextual in nature. The rule's primary purpose is to incentivize migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States, or seek asylum or other protection in another country through which they travel. The rule is needed because, absent this rule, after the termination of the Title 42 public health Order, the number of migrants expected to travel without authorization to the United States is expected to increase significantly, to a level that risks undermining the Departments' ability to safely, effectively, and humanely enforce and administer U.S. immigration law, including the asylum system. The 24-month duration of the rule is discussed in more detail in Section IV.E.6 of this preamble.

*Comment:* Commenters questioned how the temporary nature of the rule would practically work, noting the range of new procedures, training, and other Notices required to start and stop such a large program. These commenters hypothesized that the time spent training and making other updates for implementation would directly cut into the limited time the rule would be in effect, reducing its effectiveness.

*Response:* The Departments agree that implementation of the rule requires training and guidance, and are taking steps to ensure that it can be implemented in a timely, fair, and efficient manner after it goes into effect. The Departments are confident that the new procedures required can be put into effect with minimal disruption or delay in both merits adjudications and credible fear screenings.

*Comment:* Commenters stated that although the rule proposed a two-year effective period, it would have a permanent impact. A few commenters expressed concern about the potential for two identical asylum seekers to be treated differently based on whether they seek asylum before or after the sunset date of the rule. One commenter urged the Departments to provide clarity regarding adjudications that take place after the rule's sunset date for individuals that entered prior to the sunset date.

*Response:* The Departments appreciate commenters' concerns that the rule, which would only apply to those entering during a specified, time-limited date range, could lead to

confusion, and appreciate the opportunity to clarify how it will be implemented. The Departments also recognize that due to the nature of the rule, noncitizens who enter during the specified date range will be subject to its terms while those who enter before or after the period will not. However, the Departments disagree that the effects of the condition should be time-limited in duration. The rule was designed to apply to anyone who entered during the specified time period in order to avoid the possibility of individuals entering without documents sufficient for lawful admission during the time period covered by the rule, then waiting out the condition imposed by the rule before applying for asylum, thereby contributing to the existing immigration court backlog and rendering the rule ineffective in its aims of reducing unauthorized arrivals to the SWB and encouraging utilization of available lawful pathways. To clarify to noncitizens and adjudicators that the rebuttable presumption has continuing effect, the Departments added language to the regulations stating that the rebuttable presumption will continue to apply to all asylum applications filed by people who enter in the specified manner during the 24-month period regardless of when the application is filed and adjudicated. *See* 8 CFR 208.33(c)(1), 1208.33(d)(1). To further clarify, and in response to commenters' concerns in relation to individuals who enter as minors in a family unit who may have entered during the rule's effective period through no fault or agency of their own, the Departments have added language to the rule to ensure children brought to the United States during the 24-month effective period are not subject to the lawful pathways rebuttable presumption of asylum ineligibility in the rule if they file an application for asylum as a principal applicant after expiration of the 24-month period. 8 CFR 208.33(c)(2), 1208.33(d)(2).

*Comment:* Several commenters stated that the rule is contrary to international law, and that its temporary nature, or the emergency rationale behind it, do not justify or excuse such a violation.

*Response:* For discussion of the rule's compliance with international law and U.S. treaty obligations, please see Section IV.D.3 of this preamble.

### 7. EOIR Proceedings

#### i. EOIR IJ Credible Fear Review Procedures

*Comment:* Commenters objected to the provision in the proposed rule that would require noncitizens to

affirmatively request IJ review of negative credible fear determinations, which differs from existing procedures where review is given to those who do not affirmatively decline review. Commenters stated that IJ review of negative credible fear determinations is an important safeguard that is guaranteed by statute, pointing to data detailing how many negative credible fear determinations were overturned by IJs. Commenters stated that this change favors expedience over access to protection in the United States and would inevitably result in an increase in deportations to countries where asylum seekers have a credible fear of return. Commenters stated that negative credible fear determinations should automatically receive IJ review unless the noncitizen affirmatively declines it, as expecting a noncitizen to know to affirmatively ask for an IJ's review is unrealistic and effectively denies the noncitizen the opportunity for a judicial review. Commenters explained that many individuals may not request review, or know to request review, even if asked whether they wish to seek further review before an IJ, for a variety of reasons. The provided reasons included unfamiliarity with the immigration system; lack of counsel or education; inability to identify legal errors by the AO; language issues; time in custody; mental health conditions; confusion; trauma; and deference to authority; among others. Further, commenters also stated that changing the explanations of the right to IJ review would not serve as a sufficient safeguard.

Commenters also stated that the Departments did not give a reasoned justification for this policy change and that the rationale in the NPRM for requiring noncitizens to affirmatively request IJ review contradicts the Asylum Processing IFR, which, after the Global Asylum Final Rule implemented a requirement that noncitizens affirmatively request review, reinstated the default rule that negative determinations would be automatically referred for IJ review absent explicit declination by the noncitizen. Moreover, commenters asserted that this rule change would cause confusion as DHS officers would be required to apply the automatic credible fear review provision differently for asylum seekers with negative credible fear determinations based on the rebuttable presumption in this rule, as compared to determinations made on another basis. Commenters also expressed concern that the NPRM did not include statistics regarding automatic IJ credible

fear review, including how many asylum seekers succeeded in their review without having articulated a desire for IJ review to the AO, or how many IJ credible fear reviews were expeditiously resolved after the IJ explained the asylum seeker's rights and the asylum seeker chose to not pursue further review.

Separately, regarding credible fear reviews more generally, commenters stated that it was unclear whether an IJ could review the asylum ineligibility presumption during a credible fear review. Commenters also stated that the proposed rule would cause a significant increase in negative credible fear reviews at EOIR, and that such reviews would require more adjudication time due to application of the rebuttable presumption. Moreover, commenters stated that the proposed rule would allow IJs to engage in speculation by looking outside of the record of proceedings during the credible fear review.

Commenters also proposed an additional hearing, prior to or concurrent with the IJ review, assessing whether a noncitizen's documents were sufficient for lawful admission pursuant to section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7). In contrast, other commenters proposed generally eliminating IJ review of credible fear determinations, asserting this would reduce the backlog of cases within the immigration system and would reduce the pull factor created by lengthy adjudications. Similarly, other commenters stated that IJ review is not necessary if a noncitizen knowingly declines review, so long as the Departments provide expanded rights advisals and explain the consequences of declining such review.

*Response:* As stated in the NPRM, the Departments acknowledge that the procedure for IJ review of negative credible fear determinations established by this rule differs from the credible fear review procedures implemented by the Asylum Processing IFR. *See* 88 FR at 11744 ("[U]nlike the process adopted by the Asylum Processing IFR, noncitizens must affirmatively elect immigration judge review of a negative credible fear determination when that choice is presented to them; noncitizens who fail or refuse to indicate a request for immigration judge review will not be considered to have requested such review."). While the Departments believe that "the need for expedition under the current and anticipated exigent circumstances" weighs in favor of requiring noncitizens to affirmatively request IJ review of a negative credible fear determination, they will also "seek

to ensure noncitizens are aware of the right to review and the consequences of failure to affirmatively request such review." *Id.* at 11747.[294]

In particular, if a noncitizen receives a negative credible fear determination after failing to rebut the presumption or to establish a "reasonable possibility" of persecution or torture, the rule requires AOs to provide noncitizens "with a written notice of decision and inquire whether the alien wishes to have an immigration judge review the negative credible fear determinations." 8 CFR 208.33(b)(2)(iii). The Departments believe that such notice sufficiently ensures that noncitizens who desire IJ review have the opportunity to elect it under this rule. Currently, USCIS explains to noncitizens that they may request review of a negative credible fear determination with an IJ, and that failure to do so may result in removal from the United States. USCIS also explains to noncitizens their right to consultation during the credible fear process, and provides noncitizens with a list of free or low-cost legal services providers whom they may wish to contact.[295] To ensure that noncitizens— including, among others, noncitizens who are unfamiliar with the immigration system, have suffered trauma, are without counsel, or are unable to read or speak English— understand what review is available to them, DHS "intends to change the explanations it provides to noncitizens subject to the . . . rule to make clear to noncitizens that the failure to affirmatively request review will be deemed a waiver of the right to seek such review." 88 FR at 11747. These explanations will be provided by trained asylum office staff through an interpreter in a language understood by the noncitizen. *See* 8 CFR 208.30(d)(5). As a result, the Departments believe that it is reasonable to conclude that noncitizens who do not request IJ review after receiving sufficient notice, *see* 8 CFR 208.30(d)(5), and the enhanced explanations described above do not wish for additional review. *See* 88 FR at 11747. The Departments note that, at the time that the Asylum Processing IFR was being considered, the Departments were assessing procedures that would require affirmative requests for IJ review through the lens of the Global Asylum Final Rule, which did not include a

planned rollout of enhanced explanations for noncitizens. Under this rule, DHS is now planning different protocols for implementing the requirement that noncitizens affirmatively request review by providing the above-described explanations coupled with enhanced notice procedures. The Departments also do not believe this change will cause unnecessary confusion for DHS officers and staff, as they are well trained in expedited removal and credible fear procedures. *See, e.g.,* 8 CFR 208.1(b) ("Training of asylum officers").

Separately, in response to more general comments about the IJ credible fear review process, the Departments clarify that IJs apply a de novo standard during credible fear reviews, including on the question whether the asylum ineligibility presumption applies. *See* 8 CFR 1208.33(b)(1) (stating that "the immigration judge shall evaluate the case de novo"). More generally, the Departments do not believe that the application of the rebuttable presumption presents a risk of creating significant inefficiencies during the IJ credible fear review process that would warrant amending the rule, as IJs have significant experience conducting credible fear reviews and applying asylum-related standards. Additionally, IJs will be able to review relevant evidence provided at the initial credible fear interview before the AO in making any determinations regarding the rebuttable presumption. As discussed above, the Departments anticipate that any increases in the time that it takes to review a negative credible fear decision will be outweighed by other efficiencies created by this rule. The Departments disagree with commenters that the rule allows IJs to engage in "speculation" during credible fear reviews, as the relevant evidentiary standards in credible fear reviews predate this regulation. *See* 8 CFR 1003.42(d)(1) (explaining that the IJ may take into account "such other facts as are known to the immigration judge").

In response to other commenters, the Departments also decline to completely eliminate IJ credible fear review, which is provided by statute and acts as an important safeguard during the expedited removal process. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III) ("The Attorney General shall provide by regulation and upon the alien's request for prompt review by an immigration judge of a determination . . . that the alien does not have a credible fear of persecution."). Similarly, the Departments decline to add additional

---

[294] Regarding commenters' data requests, the Departments note that EOIR does not maintain data regarding how many IJ credible fear reviews were initiated after a noncitizen failed to request such review.

[295] *See* USCIS Form M–444, Information About Credible Fear Interview.

hearings regarding inadmissibility determinations, which are properly determined within existing procedures. *See* INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i) (requiring DHS officer to determine document-related inadmissibility during the expedited removal process).

*Comment:* Commenters raised a number of concerns about IJ credible fear review proceedings generally, including the sufficiency and reliability of the evidentiary record before the AO, the abbreviated nature of IJ credible fear reviews in light of the complexity of the issues presented, the lack of counsel or limited participation of counsel in IJ credible fear reviews, the level of deference IJs demonstrate towards to the AO's determination, and the lack of appeal of an IJ negative credible fear determination, among others.

*Response:* As an initial matter, the Departments note that this rule does not alter the existing IJ credible fear review process, and comments regarding unaltered existing processes are outside the scope of this rule. Regardless, with respect to commenters who characterized the existing credible fear screening and review process as deficient or contrary to due process, the Departments note that Congress has established an expedited removal process that includes neither BIA review nor judicial review and requires any IJ review of credible fear determinations to be prompt. *See* INA 235(b)(1)(B)(iii)(III), (C), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (C). Additionally, existing regulations outline a robust process for IJ review of credible fear determinations. *See* 8 CFR 1003.42, 1208.30 (describing IJ review of credible fear determinations). Please also see discussion in Section IV.B.5 of this preamble responding to comments on the effects of the rule on due process.

As to the sufficiency and reliability of the record of determination, the Departments disagree with commenter contentions that this document does not provide a sufficient record for IJ review. The INA sets forth that the record of determination "shall include a summary of the material facts as stated by the applicant, such additional facts (if any) relied upon by the officer, and the officer's analysis of why, in light of such facts, the [noncitizen] has not established a credible fear of persecution." INA 235(b)(1)(B)(iii)(II), 8 U.S.C. 1225(b)(1)(B)(iii)(II). Further, as the record of determination is a government-created document, it is generally presumed to be reliable in the absence of evidence to the contrary. *See Matter of J–C–H–F–,* 27 I&N Dec. 211, 212 (BIA 2018) (citing *Espinoza* v. *INS,*

45 F.3d 308, 310 (9th Cir. 1995)). Should the reliability of a record of determination be challenged before the IJ, the IJ will consider the arguments raised as to its reliability. *Cf. id.* at 215–16 (setting forth the framework for IJ review when the reliability of a border interview is challenged); *see also Ye* v. *Lynch,* 845 F.3d 38, 45 (1st Cir. 2017) (requiring a totality-of-the-circumstances-based inquiry as to reliability of a DHS document); *Zhang* v. *Holder,* 585 F.3d 715, 725–26 (2d Cir. 2009) (requiring a factor-based inquiry as to reliability of a DHS document).

Moreover, during review of a negative credible fear determination, IJs are authorized to "receive into evidence any oral or written statement which is material and relevant to any issue in the review." 8 CFR 1003.42(c). Accordingly, noncitizens who believe that their credible fear interview is inaccurately described or who wish to provide additional testimony, context, or explanation have the opportunity to do so before an IJ. Furthermore, as an additional procedural precaution for noncitizens, the IJ review of a negative credible fear determination itself is subject to preservation-of-records requirements, as the IJ must create a Record of Proceeding in which to memorialize their review. *See* 8 CFR 1003.42(b).

As stated in the NPRM and consistent with existing practice, IJs will continue to evaluate such credible fear determinations using a de novo standard of review. *See* 8 CFR 1003.42(d)(1), 1208.33(b)(1) ("[T]he immigration judge shall evaluate the case de novo, as specified in paragraph (b)(2) of this section."); 88 FR at 11726. This includes reviewing an AO's determinations about the applicability of the presumption of asylum ineligibility and whether the presumption was rebutted. *See* 8 CFR 1208.33(b). Under 8 CFR 1208.33(b)(1), the IJ shall review de novo "[w]here an asylum officer has issued a negative credible fear determination pursuant to 8 CFR 208.33(b), and the alien has requested immigration judge review of that credible fear determination." 8 CFR 208.33(b)(2)(v) ("Immigration judges will evaluate the case as provided in 8 CFR 1208.33(b)."). In such an instance, de novo review serves to protect noncitizens from incorrect or unwarranted negative credible fear determinations that may have in part relied upon the rebuttable presumption.

Further, with respect to commenter concerns about timelines in credible fear review proceedings, the expedited removal statute requires "prompt review." INA 235(b)(1)(B)(iii)(III), 8

U.S.C. 1225(b)(1)(B)(iii)(III). Additionally, the statute states that "[r]eview shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the [negative credible fear] determination." *Id.*

Moreover, the Departments will not depart from existing procedures regarding IJ review of credible fear determinations to allow appeals from the IJs' review of such determinations. Prior to this rule, IJ decisions at the credible fear review stage were not reviewable, and this rule maintains that posture. *See* 8 CFR 1003.42(f) (2020) [296] ("No appeal shall lie from a review of an adverse credible fear determination made by an immigration judge."); 208.33(b)(2)(v)(C) ("No appeal shall lie from the immigration judge's decision and no request for reconsideration may be submitted to USCIS."). Such processes are in accordance with the INA. *See* INA 235(b)(1)(C), 8 U.S.C. 1225(b)(1)(C) (providing that removal orders issued under this section are not subject to administrative appeal other than review by an IJ). However, the Departments note that per the rule, USCIS retains the discretion to reconsider negative determinations. *See* 8 CFR 208.33(b)(2)(v)(C) ("Nevertheless, USCIS may, in its sole discretion, reconsider a negative determination."). Because noncitizens can request IJ review of a negative credible fear determination, and USCIS retains discretion to reconsider negative determinations, the Departments continue to believe, as explained in the NPRM, that the rule appropriately balances the availability of review and the efficient use of limited agency resources. *See* 88 FR at 11747.

In sum, the Departments believe that the established process for IJ review of credible fear determinations provides sufficient opportunity for noncitizens to present the necessary evidence, including testimony, relevant for evaluating the applicability of the presumption of asylum ineligibility created by this rule.

ii. Section 240 Removal Proceedings

*Comment:* Commenters stated that the rule would create confusion in section 240 removal proceedings, as the rule states that a noncitizen who is subject

---

[296] This provision was amended by the Global Asylum Rule, which was preliminarily enjoined and its effectiveness stayed before it became effective. *See Pangea II,* 512 F. Supp. 3d at 969–70. This order remains in effect, and thus the 2020 version of this provision—the version immediately preceding the enjoined amendment—is currently effective.

to the presumption but demonstrates a "reasonable possibility" of persecution or torture may apply for asylum during subsequent removal proceedings. Commenters also expressed concern that under the proposed rule, an IJ might re-adjudicate the condition on eligibility in section 240 removal proceedings despite an AO initial determination during the credible fear process that the presumption of ineligibility was not applicable or was rebutted. Commenters stated that it would be unfair to require asylum applicants to repeatedly demonstrate that they are able to rebut the presumption before different adjudicators, suggesting an AO's determination that the presumption is inapplicable should be final for all future proceedings.

*Response:* The Departments reiterate that noncitizens who are subject to the presumption of asylum ineligibility during a credible fear determination, but who demonstrate a "reasonable possibility" of persecution or torture, can apply for asylum during any subsequent removal proceedings. *See* 8 CFR 1208.33(b)(4). However, the provisions of this rule governing the presumption of asylum ineligibility will still apply, and an IJ will apply the relevant provisions de novo during removal proceedings. *See generally* 8 CFR 1208.33.

The Departments do not believe that it is unfair for IJs to consider the presumption of asylum ineligibility de novo where the AO already determined that the presumption did not apply or was rebutted. The IJ's determination would be based on all available evidence after the noncitizen is given the opportunity to present and examine such evidence. *See* INA 240(b)(4)(B), 8 U.S.C. 1229a(b)(4)(B) (explaining a noncitizen's evidentiary rights in section 240 removal proceedings). The Departments thus decline to deviate from existing practice in section 240 removal proceedings requiring IJs to determine asylum eligibility de novo once a matter is referred to EOIR after a positive credible fear determination. *See, e.g.,* 8 CFR 1208.13(a) ("The fact that the applicant previously established a credible fear of persecution for purposes of section 235(b)(1)(B) of the Act does not relieve the alien of the additional burden of establishing eligibility for asylum.").

*Comment:* Commenters provided generally positive feedback on the inclusion of a family unity provision but raised concerns about the operation of the provision itself. Commenters were concerned that the family unity provision was insufficient because it

would not apply to asylum applicants traveling without their families, including cases where family members are unable to travel together due to immediate danger, among other factors. Commenters stated that individual asylum applicants would be subject to the asylum ineligibility presumption and, as a result, would be unable to petition for eligible derivatives outside the United States if they are only able to receive statutory withholding of removal or CAT protection, providing anecdotal examples. In turn, commenters stated, this would result in family separation with spouses and children left in dangerous situations in their home country, unable to join their family members in the United States. Therefore, commenters suggested that the family unity provision should be expanded to individual asylum applicants who meet the provision's requirements if they have eligible derivatives abroad. Commenters also proposed that the rule include "families" as a general exception to application of the rebuttable presumption of ineligibility for asylum.

Commenters explained that, for the provision as currently drafted to apply, the noncitizen would have to first qualify for statutory withholding of removal or CAT withholding, which have higher standards of proof than asylum. Commenters stated that this would result in families with legitimate asylum claims being denied relief because they may be unable to meet the higher standards required for statutory withholding of removal or CAT withholding. Additionally, commenters claimed that this provision would create an inefficient and costly process, where noncitizens would be required to gather and present a significant amount of evidence on statutory withholding of removal and CAT withholding to meet their higher standards and IJs would have to adjudicate those forms of relief or protection separately before applying the exception, rather than potentially granting asylum in the first instance. Commenters noted that in removal proceedings, the family unity exception requires a determination that the noncitizen is eligible for withholding of removal or CAT withholding and that they would be granted asylum but for the presumption. Commenters also raised concerns that many applicants will face harm while those issues are adjudicated. Commenters raised further concerns that the family unity provision would only apply where no members of a family qualify for withholding of removal or CAT withholding, thus resulting in removal orders for entire

families who qualified for those forms of protection. Lastly, commenters expressed concern that the provision does not address family unity concerns where family members traveling together may not qualify as derivatives due to their relationship status. Commenters explained that this would result in the rebuttable presumption of asylum ineligibility applying and, assuming certain non-derivative family members cannot meet the standards for statutory withholding of removal or CAT withholding, de facto separation.

Commenters also expressed confusion about whether the family unity provision could work retroactively to grant asylum to individuals with statutory withholding of removal if their spouse or child subsequently journeyed to the United States and underwent adjudication. Further, commenters stated that the proposed rule leaves outstanding questions about what independent relief would disqualify families from availing themselves of the family unity provision.

One commenter claimed that the family unity provision would incentivize the smuggling of children and suggested eliminating it entirely. Separately, some commenters claimed that the provision would increase the incentives for family migration.

*Response:* The Departments fully agree with commenters that keeping families unified and avoiding family separation is an important goal. *See, e.g.,* E.O. 14011, Establishment of Interagency Task Force on the Reunification of Families, 86 FR 8273 (Feb. 5, 2021). This rule has been designed to eliminate the possibility that the rule's presumption will result in the separation of families.

With respect to family units traveling together, if any noncitizen in that family unit traveling together meets an exception to or is able to rebut the asylum ineligibility presumption, the presumption will not apply to anybody in the family traveling together. *See* 8 CFR 208.33(a)(2)(ii), 208.33(a)(3)(i); *see also* 88 FR at 11749. Additionally, even where no family members that are traveling together meet an exception or are able to rebut the presumption, the rule includes a family unity provision that sets forth a unity-based "exceptionally compelling circumstance" to rebut the asylum ineligibility presumption for certain noncitizens in order to avoid separating asylum applicants from potential derivative beneficiaries. 8 CFR 1208.33(c). More specifically, under this family unity provision, where a principal asylum applicant is subject to the presumption but is eligible for

**31426**    **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

statutory withholding of removal or CAT withholding,[297] and would be granted asylum but for the presumption, and where an accompanying spouse or child does not independently qualify for asylum or other protection from removal, the presumption shall be deemed rebutted as an exceptionally compelling circumstance. *See* 8 CFR 1208.33(c). Such principal applicants and their accompanying derivatives can then proceed with their asylum claims consistent with general asylum procedures. *See* INA 208(b)(3), 8 U.S.C. 1158(b)(3).

Additionally, in light of commenters' concerns, the Departments have expanded this provision to also cover principal applicants who have a spouse or children who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A). 8 CFR 1208.33(c). As commenters noted, excluding asylum applicants who travel without their families may inadvertently incentivize families to engage in irregular migration together so as not to risk that the principal applicant would be prevented from later applying for their family members to join them. This may involve making a dangerous journey with vulnerable family members, such as children. The expansion to the provision would apply only to migrants who are subject to the presumption, who are ultimately found eligible for statutory withholding of removal or CAT withholding, and who have spouses or children who would be eligible to follow to join them in the United States.

However, the Departments decline to modify the rule to categorically exempt families from the rebuttable presumption of asylum eligibility. Given the existing and expanded protections in the rule, such a change is not necessary to ensure family unity. And the Departments have determined that making such a change would significantly diminish the effectiveness of the rule and incentivize families to migrate irregularly. *See* 88 FR at 11708–09 (describing the significant increase in families seeking asylum in the United States). Further, the Departments do not want to create an incentive for adults to present at the SWB with children fraudulently claiming to be a family unit.[298]

Overall, the Departments have designed the family unity provision at 8 CFR 1208.33(c) and the other protections against family separation to ensure that the rule does not cause the separation of families. With regard to the family unity provision, the Departments believe that requiring the lead asylum applicant to first establish eligibility for protection under the higher standards of proof for statutory withholding of removal or CAT withholding before qualifying for the family unity provision serves as an incentive to choose a lawful pathway. Choosing a lawful pathway would enable applicants to remain eligible for asylum, which requires a lower burden of proof and includes the ability to include derivatives on their application or utilize follow-to-join procedures set forth in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A).

To the extent that commenters claim that some family members who traveled together may have, but for the presumption, qualified for asylum but not statutory withholding of removal, and therefore would not qualify for the family unity exception if subject to the rebuttable presumption of asylum ineligibility, the Departments reiterate that the family unity provision in 8 CFR 1208.33(c) is but one protection for family units included in this rule. For example, the rule includes options for families to stay together if any member of a family traveling together: uses an available lawful pathway (8 CFR 208.33(a)(2)(ii), 1208.33(a)(2)(ii)); establishes an exception from or rebuts the presumption of ineligibility (8 CFR 208.33(a)(2) and (3), 1208.33(a)(2) and (3)); or, if they do not pursue a lawful pathway and are unable to establish an exception from or rebut the presumption, meets the higher standard required for statutory withholding of removal or CAT withholding. Notably, exceptions from and rebuttals to the presumption consider circumstances involving both the noncitizen and members of the noncitizen's family with whom they are traveling, for example, whether the noncitizen or a member of the noncitizen's family faced an acute medical emergency at the time of entry. *See* 8 CFR 1208.33(a)(2) and (3), 208.33(a)(2) and (3). To reiterate, the rule also includes options for family members who do not pursue a lawful pathway and are unable to rebut the presumption to stay together or reunite if a principal asylum applicant is eligible for statutory withholding of removal or CAT withholding and would be granted asylum but for the presumption, if either (1) an accompanying spouse or child does not also independently qualify for asylum or other protection from removal, or (2) if the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant if granted asylum. These protections together ensure that the rule does not lead to the separation of families. The Departments strongly encourage noncitizens, including asylum-seeking families, to choose lawful pathways.

However, to the extent that some families may not use a lawful pathway, and are unable to rebut the presumption, the Departments believe that many noncitizens with approvable asylum claims would present claims for statutory withholding of removal or CAT protection on the same set of underlying facts, although the standards that apply to asylum, statutory withholding of removal, and CAT protection each differ from one another in some respects. *See Regulations Concerning the Convention Against Torture,* 64 FR 8478, 8485 (Feb. 19, 1999) (''Additionally, use of the Form I–589 will obviate the need for two separate forms that, in many cases, will elicit similar information. In many cases in which the alien applies both for asylum and withholding of removal under the Act and for withholding under the Convention Against Torture, the underlying facts supporting these claims will be the same.''); *Yousif* v. *Lynch,* 796 F.3d 622, 629 (6th Cir. 2015) (''An asylum claim and a withholding claim require consideration of 'the same factors' and proof of the same underlying facts about an applicant's probable persecution.'').

Separately, the Departments disagree with commenters that the family unity provision would encourage family

---

[297] The family unity provision at 8 CFR 1208.33(c) is not triggered by eligibility for deferral of removal under the CAT because a noncitizen only eligible for that that form of CAT must be subject to a bar to CAT withholding, which would also bar the noncitizen from asylum. *See* 8 CFR 1208.17(a) (providing that someone who is eligible for CAT withholding but who is subject to the mandatory bars to statutory withholding of removal at 8 CFR 1208.16(d)(2) and (3) shall be granted CAT deferral); 8 CFR 1208.16(d)(2) (providing that an application for CAT withholding will be denied if the noncitizen is subject to a bar to statutory withholding of removal under section 241(b)(3)(B) of the INA, 8 U.S.C. 1231(b)(3)(B)). Compare INA 241(b)(3)(B), 8 U.S.C. 1231(b)(3)(B) (providing mandatory bars to statutory withholding of removal), with INA 208(b)(2), 8 U.S.C. 1158(b)(2) (providing mandatory bars to asylum). Thus, such a noncitizen would never be ineligible for asylum solely due to the rebuttable presumption.

[298] *See* Tech Transparency Project, *Inside the World of Misinformation Targeting Migrants on Social Media* (July 26, 2022), *https:// www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media* (''A review of social media groups and pages identified by migrants showed . . . dubious offers of coyote or legal services, false claims about conditions along the route, misinformation about points of entry at which officials waive the rules, and baseless rumors about changes to immigration law.''); ICE, Press Release, *ICE HSI El Paso, USBP Identify More than 200 'Fraudulent Families' in Last 6 Months* (Oct. 17, 2019), *https://www.ice.gov/ news/releases/ice-hsi-el-paso-usbp-identify-more-200-fraudulent-families-last-6-months.*

migration or child smuggling. The strong incentives of the lawful pathways described in the rule, coupled with the disincentive of the rebuttable presumption of asylum ineligibility, are designed to encourage noncitizens, including families, to pursue lawful pathways. For example, after implementation of the Venezuelan parole process for eligible Venezuelan nationals and their families, migratory flows with respect to this group fell dramatically. *See* 88 FR at 11712, 11718. Based on this trend and the implementation of other initial parole processes implementations discussed in the NPRM, the Departments believe that the rule will reduce irregular family migration as well as child smuggling as part of an overall reduction in irregular migration.

To the extent that commenters raised concerns that the family unity provision is inefficient in operation, the Departments believe that the benefits from inclusion of the provision outweigh any potential inefficiencies. The Departments also note that asylum, statutory withholding of removal, and CAT withholding are forms of relief and protection that generally rely on the same set of underlying facts. *See Yousif,* 796 F.3d at 629. Therefore, IJs who determine that a noncitizen is eligible for statutory withholding of removal or CAT withholding will be able to apply the family unity provision and efficiently consider whether to exercise their discretion to grant asylum on the same facts. Additionally, in response to commenter concerns about noncitizens facing harm while the family unity exception is being adjudicated, the Departments note that this rule does not amend existing follow-to-join procedures.

8. Adequacy of Withholding of Removal and CAT

*Comment:* Commenters stated that statutory withholding of removal and CAT protection are insufficient alternative forms of protection for individuals who would be ineligible for asylum pursuant to the proposed rule, asserting that these forms of protection are more difficult to obtain and provide fewer benefits than asylum.

For example, commenters stated that such forms of protection are not sufficiently available to all those who require protection. Specifically, commenters stated that statutory withholding of removal and CAT protection require applicants to meet a higher burden of proof than asylum, as they would need to demonstrate that it is ''more likely than not'' that they would face persecution or torture.

Commenters stated that, because of this higher burden of proof, an applicant may be otherwise eligible for asylum, but be removed because they are unable to meet the burden for statutory withholding of removal or CAT protection. As a result, commenters alleged that an individual may be returned to a country where they would face persecution or death.

Commenters also stated that, even if an applicant were able to meet the higher burden of proof for statutory withholding of removal or CAT protection, the individual would not then be accorded the same benefits as asylees. For example, commenters expressed concern regarding the prohibition on international travel for recipients of statutory withholding of removal and CAT protection. Commenters noted that, unlike recipients of asylum, these individuals do not have access to travel documents and are unable to travel abroad.

Commenters also noted that recipients of statutory withholding of removal and CAT protection remain in a tenuous position because they are not granted lawful status, or any path to citizenship, to remain in the United States indefinitely. Commenters explained that recipients of statutory withholding of removal or CAT protection remain permanently subject to a removal order and may have their status terminated at any time. Commenters stated that the constant prospect of deportation or removal creates uncertainty for recipients of statutory withholding of removal or CAT protection, which can lead to community instability in the United States. Commenters stated that this uncertainty would prevent such noncitizens from processing the trauma that predicated their migration to the United States.

Similarly, commenters stated that recipients of statutory withholding of removal or CAT protection may be limited from fully participating in U.S. society. Commenters raised specific concerns about statutory withholding and CAT protection recipients' lack of access to public benefits, services, and healthcare. Commenters were also concerned about such individuals' need to apply annually and pay for work authorization and the impact that this requirement may have on related benefits, such as the ability to obtain a driver's license.

Commenters also claimed that granting statutory withholding of removal or CAT protection instead of asylum under the proposed rule would fail to ensure family unity. Commenters alleged that individuals who are granted statutory withholding of removal or

CAT protection would be unable to reunite with family in the United States because these forms of relief do not allow the recipient to petition for derivative beneficiaries. Due to this, commenters stated that the proposed rule would institute another policy of family separation that permanently separates noncitizens from their family members. Commenters also stated that family members applying for statutory withholding of removal are not able to request that their cases be consolidated and adjudicated together like asylum applicants can and stated that moving separately through the legal system makes them more likely to have uneven results for different family members, which may result in some members being ordered removed while others remain protected in the United States. Some commenters stated that they have experience with clients who have been permanently separated from family members, including young children, because they were granted statutory withholding of removal or CAT protection instead of asylum.

Commenters further raised concerns about the effect the proposed rule would have on availability of bond to those subject to the presumption of asylum ineligibility. Commenters asserted that adjudicators are less likely to grant bond to those who are eligible only for statutory withholding of removal or CAT protection as overly high flight risks due to the comparatively higher standards of proof. Commenters also expressed confusion over whether, under the proposed rule, individuals subject to the presumption of ineligibility will be treated as having entered without inspection, leaving them eligible for bond, or as arriving aliens, leaving them ineligible for bond.

*Response:* As described in the NPRM, the purpose of this rule is to discourage irregular migration by encouraging migrants, including those who may seek asylum, to use lawful, safe, and orderly pathways to the United States. *See generally* 88 FR at 11706–07. To do so, the rule includes a number of exceptions to the rebuttable presumption of ineligibility for asylum for prospective asylum applicants outside the United States, including whether they or a member of their family with whom they traveled (1) sought asylum or other protection in third countries through which they first transit, to avoid the need to continue an often-perilous journey to the United States in pursuit of protection unless absolutely necessary; (2) obtained appropriate authorization to travel to the United States to seek parole pursuant to a DHS-approved parole

process; or (3) presented at a POE pursuant to a pre-scheduled date and time or presented at the POE without an appointment but established that it was not possible to access or use the DHS scheduling system for a specified reason. *See* 8 CFR 208.33(a)(2), 1208.33(a)(2). In other words, this rule provides numerous ways in which noncitizens covered by this rule may pursue asylum. And to the extent that a noncitizen may not be able to pursue a lawful pathway due to exceptionally compelling circumstances, they may be able to rebut the presumption. *See* 8 CFR 208.33(a)(3), 1208.33(a)(3).

With respect to noncitizens, or family members with whom they traveled, who do not avail themselves of a lawful pathway or otherwise rebut the presumption, the Departments recognize that the standards for eligibility for statutory withholding of removal and CAT protection are each higher than that for asylum, as they require demonstrating it is more likely than not that noncitizens will be persecuted or tortured in another country, whereas asylum requires a lesser well-founded fear.[299] *See* 64 FR at 8485. Indeed, that difference in standards aligns with several objectives of this rule: to encourage noncitizens to avail themselves of the lawful pathways described above, where possible, as well as to discourage irregular migration, promote orderly processing at POEs, and ensure that protection from removal is still available for those who satisfy the applicable standards for mandatory protection under statutory withholding of removal or the regulations implementing CAT. *See, e.g.,* 88 FR at 11729 ("The Departments assess that the Government can reduce and redirect such migratory flows by coupling an incentive for migrants to pursue lawful pathways with a substantial disincentive for migrants to cross the land border unlawfully."). The higher ultimate standards of proof for statutory withholding of removal and CAT protection therefore serve as a disincentive for noncitizens to forgo the lawful pathways detailed in this rule, as noncitizens would risk having to satisfy those comparatively higher standards in the first instance if the presumption applied to their case and were unrebutted.[300]

Similarly, the Departments recognize the comparatively fewer benefits of statutory withholding of removal and CAT protection as compared to asylum, including the following: (1) no permanent right to remain in the United States; (2) the inability to adjust status to become a lawful permanent resident and, relatedly, later naturalize as a U.S. citizen; (3) the inability to affirmatively travel abroad; and (4) the need to affirmatively apply for, and annually renew, work authorization documents.[301] However, as explained above, the Departments promulgated this rule with the intention to encourage noncitizens to utilize a lawful pathway rather than a pathway that may limit them to statutory withholding of removal or CAT protection and their more limited benefits. The Departments also note the lack of derivative protection for statutory withholding of removal and CAT protection recipients.[302] *Compare* INA 208(b)(3)(A), 8 U.S.C. 1158(b)(3)(A) (providing for derivative asylum status for spouses and children), *with* INA 241(b)(3), 8 U.S.C. 1231(b)(3) (no derivative status for spouses and children under statutory withholding of removal), *and* 8 CFR 1208.16(c)(2) (no derivative status for spouses and children under the CAT).[303] The Departments are cognizant of these limitations and acknowledge the importance of family unity. *See, e.g.,* E.O. 14011, Establishment of Interagency Task Force on the Reunification of Families, 86 FR 8273 (Feb. 5, 2021) ("It is the policy of my

Administration to respect and value the integrity of families seeking to enter the United States."). To that end, as discussed in further detail at Section IV.E.7.ii in this preamble, this rule contains numerous measures to avoid the separation of family members, including applying any exceptions or rebuttals to the presumption to the entire family unit traveling together, as well as a "family unity" provision applicable in removal proceedings to ensure that the rule does not result in family separations when granting relief in the United States. *See* 8 CFR 1208.33(c) ("Family unity and removal proceedings.").

Separately, because this rule does not impact procedures for bond eligibility or consideration, commenter concerns with respect to these issues are outside of the scope of this rulemaking. Nevertheless, the Departments note that bond determinations will continue to be made on a case-by-case basis in accordance with the governing statutes and regulations. Similarly, this rulemaking does not impact determinations of whether to consolidate cases, although the Departments note that consolidation of cases is not limited to those who are pursuing or are eligible for asylum, and that such determinations are made at the IJ's discretion. *See* ICPM, Chapter 4.21(a) and (b) (Nov. 14, 2022) ("The immigration court may consolidate cases at its discretion or upon motion of one or both of the parties, where appropriate. For example, the immigration court may grant consolidation when spouses or siblings have separate but overlapping circumstances or claims for relief.").

### 9. Removal of Provisions Implementing the TCT Bar Final Rule

#### i. Support for Removal of Provisions Implementing the TCT Bar Final Rule

*Comment:* The Departments received several comments expressing opposition to the TCT Bar Final Rule and supporting removal of regulatory provisions implementing that rule. Some commenters expressed opposition to the TCT Bar Final Rule without explanation, while others asserted that the TCT Bar Final Rule conflicts with the INA and that the Departments lacked authority to promulgate the TCT Bar Final Rule. Commenters also objected to the TCT Bar as inconsistent with fundamental protections of refugee law, including the right to seek asylum, the principle of non-refoulement, and the prohibition against penalties for irregular entry. Commenters supporting the removal of provisions implementing

---

[299] As a general matter, the Departments note that this rule does not change any of the long-time standards relating to statutory withholding of removal and CAT protection outside of the initial credible fear screening stage.

[300] In response to commenters, the Departments note that they cannot quantify how many noncitizens subject to the asylum ineligibility presumption can qualify for statutory withholding

of removal or CAT protection, as those are case-by-case, fact-specific determinations.

[301] *See, e.g.,* American Immigration Council, The Difference Between Asylum and Withholding of Removal at 2 (Oct. 2020), *https://www.american immigrationcouncil.org/sites/default/files/research/ the_difference_between_asylum_and_withholding_ of_removal.pdf;* 8 CFR 274a.12(a) (explaining need for withholding recipients to affirmatively apply for work authorization).

[302] The Departments note that, although there is no derivative protection under statutory withholding of removal or CAT, certain U.S.-based qualifying parents or legal guardians, including those granted withholding of removal, may petition for qualifying children and eligible family members to be considered for refugee status and possible resettlement in the United States. *See* USCIS, Central American Minors (CAM) Refugee and Parole Program, *https://www.uscis.gov/CAM* (last visited Apr. 5, 2023).

[303] The Departments note that applicants will not be prevented from petitioning for family members because of this rule. Under the expanded family unity provision at 8 CFR 1208.33(c), any applicant who is found eligible for statutory withholding of removal or CAT withholding and who would be granted asylum but for the presumption will be deemed to have rebutted the presumption if they have a spouse or child who would be eligible to follow to join them, as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), and may pursue follow-to-join procedures if granted asylum.

that rule also faulted the Departments for not including proposed regulatory text removing the TCT Bar from the CFR. Many commenters who urged the Departments to withdraw the proposed rule did so while requesting that the Departments rescind the TCT Bar Final Rule.

Commenters suggested that the TCT Bar Final Rule is inconsistent with the INA because it conflicts with the safe-third-country exception to applying for asylum under section 208(a)(2)(A) of the INA, 8 U.S.C. 1158(a)(2)(A), and noted that courts have enjoined the rule, finding it inconsistent with the INA. Commenters further noted that the court in *East Bay Sanctuary Covenant* v. *Barr,* 385 F. Supp. 3d 922, 945 (N.D. Cal. 2019), concluded that "Congress requires reasonable assurances that any so-called 'safe' third country is actually safe, in line with the long-held understanding that categorical bars on asylum must be limited to people who have somewhere else to turn."

Commenters also objected to the TCT Bar as inconsistent with fundamental protections of refugee law, including the right to seek asylum, the principle of non-refoulement, and the prohibition against penalties for irregular entry. Commenters agreed with removal of provisions implementing that rule and expressed concern that the TCT Bar Final Rule imposes a sweeping, categorical ban on asylum. Commenters further raised concerns that, while in effect, the TCT Bar disproportionately impacted people of color and Black and brown migrants. At least one commenter claimed that the TCT Bar Final Rule discourages noncitizens from reporting crimes. Many commenters expressed concern over the TCT Bar Final Rule's effect on children, both accompanied and unaccompanied, and some commenters stated that the TCT Bar Final Rule does not adequately explain why the Departments omitted an exemption for UCs.

*Response:* The Departments acknowledge these commenters' support. Although the Departments did not include proposed regulatory text in the NPRM, the Departments have included amendatory text in this final rule, which will result in the TCT Bar's removal from 8 CFR 208 and 1208.

Since the TCT Bar Final Rule was promulgated and then enjoined, the Departments have reconsidered its approach and have determined that they prefer the tailored approach of the rebuttable presumption enacted by this rule to the categorical bar that the TCT Bar IFR and Final Rule adopted. Even if the rebuttable presumption had not been adopted, the Departments would

seek to remove provisions implementing the TCT Bar Final Rule as the Departments no longer agree with the approach taken in that rule. Additionally, in order to use the TCT Bar Final Rule, the Departments would have to continue litigating various appeals defending the policy, which the Departments now disagree with. Thus, the Departments consider the removal of provisions implementing that rule to be severable from the provisions of 8 CFR 208.13(b), 208.33, 1208.13(b), and 1208.33.

As discussed in Section IV.D.2 of this preamble, the TCT Bar IFR and Final Rule were enacted to address circumstances along the SWB. In the TCT Bar IFR, the Departments stated that increases in the number of noncitizens encountered along or near the SWB corresponds with an increase in the number of noncitizens claiming fear of persecution or torture, and that the processing of credible fear and asylum applications in turn "consumes an inordinate amount of the limited resources of the Departments." 84 FR at 33831. The Departments also stated that the increase in credible fear claims has been complicated by a demographic shift in the noncitizen population crossing the southwest border from Mexican single adult males to predominantly Central American family units and UCs. *See id.* at 33838. The Departments explained that while Mexican single adults who are not eligible to remain in the United States can be immediately repatriated to Mexico, often without requiring detention or lengthy court proceedings, it is more difficult to expeditiously repatriate family units and UCs who are not from Mexico or Canada. *See id.* The Departments also explained that, over the past decade, the overall percentage of noncitizens subject to expedited removal who, as part of the initial screening process, were referred for a credible fear interview on claims of a fear of return has jumped from approximately 5 percent to more than 40 percent, and that the number of cases referred to DOJ for proceedings before an IJ also rose sharply, more than tripling between 2013 and 2018. *See id.* at 33831. In the TCT Bar IFR, the Departments further stated that the growing number of noncitizens seeking protection in the United States and changing demographics created an untenable strain on agency resources. *See id.* at 33838–39. The TCT Bar IFR stated that in FY 2018, USCIS received 99,035 credible fear claims, a 175 percent increase from five years earlier and an 1,883 percent increase from ten

years earlier. *See id.* at 33838. In an attempt to address these increases in fear claims, the TCT Bar IFR reduced the availability of asylum to non-Mexicans entering or attempting to enter at the SWB by requiring most asylum seekers who transited through a third country to first seek protection in that transit country, subject to limited exceptions, and without recognizing other avenues for allowing migrants to access the U.S. asylum system.

In response to the TCT Bar IFR, the Departments received 1,847 comments. The commenters who expressed support for that rule indicated that it was an appropriate tool for processing noncitizens arriving at the SWB and would help close "loopholes" they asserted exist in the asylum process. *See* TCT Bar Final Rule, 85 FR at 82262. Those who expressed opposition to that rule raised concerns that the rule (1) was in conflict with the INA and U.S. obligations under international law; (2) imposed a sweeping and categorical ban on asylum; and (3) effectively denied asylum seekers the right to be meaningfully heard with respect to their asylum claims. *See id.* at 82263, 82270, 82275.

The Departments subsequently issued the TCT Bar Final Rule to address the comments received on the TCT Bar IFR. *See id.* at 82260. In the TCT Bar Final Rule, the Departments affirmed that they promulgated the IFR based on several policy objectives, including the following: (1) directing prompt relief to noncitizens who are unable to obtain protection from persecution elsewhere and noncitizens who are victims of a severe form of trafficking in persons; (2) the need to reduce the incentive for noncitizens with "meritless or non-urgent asylum claims" to seek entry to the United States; (3) relieving stress on immigration enforcement and adjudicatory authorities; (4) curtailing human smuggling; (5) strengthening the negotiating power of the United States regarding migration issues, including the flow of noncitizens into the United States; and (6) addressing humanitarian and security concerns along the SWB. *See id.* at 82285.

As also discussed in Section IV.D.2 of this preamble, a Federal district court vacated the TCT Bar IFR on June 30, 2020, in *Capital Area Immigrants' Rights Coal.* v. *Trump,* 471 F. Supp. 3d 25 (D.D.C. 2020). Additionally, in parallel litigation, on July 6, 2020, the Ninth Circuit Court of Appeals upheld an order enjoining the IFR. *See E. Bay Sanctuary Covenant* v. *Barr,* 964 F.3d 832 (9th Cir. 2020). After the TCT Bar Final Rule was issued, in February 2021, the U.S. District Court for the

Northern District of California also enjoined the Departments from implementing the TCT Bar Final Rule in its entirety. *See East Bay II,* 519 F. Supp. 3d at 668 (''Defendants are hereby *ordered and enjoined . . .* from taking any action continuing to implement the Final Rule and *ordered* to return to the pre-Final Rule practices for processing asylum applications.''). Thus, the TCT Bar Final Rule is not in effect. As discussed in Section IV.D.2 of this preamble, the injunction rested on a finding that the final rule is inconsistent with both the safe-third-country and firm-resettlement provisions of section 208 of the INA. *See id.* at 667–68; INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A); INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi). The court also stated that the TCT Bar Final Rule exacerbated the risk that asylum seekers and migrants would suffer violence and deprived asylum seekers of procedural safeguards meant to protect them from arbitrary denials of their asylum claims. *See East Bay II,* 519 F. Supp. 3d at 664.

The Departments have removed regulatory text implementing the TCT Bar Final Rule from the CFR because the Departments no longer support the TCT Bar Final Rule as a means of addressing capacity and other issues at the SWB. Throughout the NPRM and this rule, the Departments have explained that, absent this rule, the lifting of the Title 42 public health Order is expected to lead to a surge of migration at the SWB. At the same time, the Departments recognize the opportunity afforded to migrants via the provided lawful pathways, as well as the unique vulnerabilities of asylum applicants, the high stakes involved in the adjudication of applications for asylum, and the fundamental importance of ensuring that noncitizens with a fear of return have access to the U.S. asylum system, subject to certain exceptions. *See, e.g., INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 449 (1987) (explaining that removing a noncitizen to their home country ''is all the more replete with danger when the [noncitizen] makes a claim that [the noncitizen] will be subject to death or persecution if forced to return. . . .''); *Quintero,* 998 F.3d at 632 (''[N]eedless to say, these cases per se implicate extremely weighty interests in life and liberty, as they involve [noncitizens] seeking protection from persecution, torture, or even death.''); *Matter of O– M–O–,* 28 I&N Dec. 191, 197 (BIA 2021) (''The immigration court system has no more solemn duty than to provide refuge to those facing persecution or torture in their home countries, consistent with the immigration laws.'').

These concerns are echoed in E.O. 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border. *See, e.g.,* E.O. 14010, 86 FR at 8267 (Feb. 5, 2021) (''Securing our borders does not require us to ignore the humanity of those who seek to cross them.''). Accordingly, the Departments believe that when evaluating changes to the asylum system, as well as processing at the POEs, the potential adverse impacts to legitimate asylum seekers should be carefully considered, as they have been in this rule. The Departments believe that this rule is better suited to address current circumstances than the TCT Bar Final Rule's categorical ban on asylum for nearly anyone who traveled through a third country without applying for asylum in that third country.

The Departments recognize that the TCT Bar was in effect for nine months, and although multiple factors influence migration trends over time, the Departments' review does not indicate that the bar had a dramatic effect on the number of noncitizens seeking to cross the SWB between POEs.[304] Given the success of the CHNV parole processes, which paired lawful pathways with consequences for not pursuing such pathways, in decreasing encounters, the Departments believe that the TCT Bar's lack of such alternative pathways may have contributed to its failure to

---

[304] The Departments note that apprehensions along the SWB did not dramatically decrease while the TCT Bar IFR was in effect between September 11, 2019, and June 30, 2020. *See* CBP, *Southwest Border Migration FY 2019, https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019* (last visited Mar. 22, 2023); CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last visited Mar. 22, 2023). Encounters along the SWB increased dramatically starting in January 2019 until early May 2019, when they began to fall significantly. CBP, *Southwest Border Migration FY 2019, https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019* (last visited Mar. 22, 2023). The TCT Bar IFR, although issued on July 16, 2019, did not go into full effect until September 11, 2019, after encounters had already dropped from a high of 144,116 in May to 52,546 in September. *Id.* Encounters continued to trend downward more slowly from October 2019 to March 2020 when concerns over COVID–19 led to the suspension of MPP and the Title 42 public health Order and a steep decline of encounters to a low in April 2020. CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last visited Mar. 22, 2023). Thereafter, encounters increased steadily for the rest of the FY with no noticeable change after the TCT Bar IFR was enjoined and stopped being applied on June 30, 2020. Given this data, the Departments have no reason to believe that the TCT Bar IFR had any noticeable impact on encounters along the SWB while it was in effect.

dramatically decrease encounters between POEs. This informs the Departments' reasoning for adopting the more tailored approach in this rule— that is, pairing safe, orderly, and lawful pathways for entering the United States with negative consequences for forgoing those pathways, along with exceptions and means of rebutting the presumption against asylum eligibility where certain circumstances are present. Additionally, the fact that the TCT Bar has not been in effect for approximately three years undermines any assertion of reliance interests on the bar.

ii. Opposition To Removal of Provisions Implementing the TCT Bar Final Rule

*Comment:* Some commenters expressed general opposition to the removal of provisions implementing the TCT Bar Final Rule. Commenters stated that ''the concepts of limiting eligibility for asylum based on means of entry and criteria surrounding that entry are appropriate methods of controlling migrant flows at the southwest border'' and that the TCT Bar achieved this without including ''myriad of exceptions to effectively render it meaningless.'' Some commenters maintained the TCT Bar Final Rule was legally permissible and politically warranted based on factual conditions at the SWB. Commenters similarly urged the Departments to adopt on a permanent basis an amended version of the rule that would mirror the TCT Bar Final Rule's provisions, stating that this would better serve the NPRM's stated goal of ''distribut[ing] the asylum burden to countries that are able to provide protection against persecution within the Western Hemisphere.'' Commenters averred that this would limit asylum eligibility to those with the greatest need for protection and that the ''maintenance of effective deterrence policies is essential to stemming the flow of illegal immigration into the United States.''

*Response:* The Departments note these commenters' general opposition to rescinding the TCT Bar and their support for enforcing the Nation's immigration laws. The Departments believe that this rule results in the right incentives to avoid a significant further surge in irregular migration after the Title 42 public health Order is lifted, and that the approach taken in this rule is substantially more likely to succeed than the approach taken in the TCT Bar Final Rule. Specifically, the successful implementation of the CHNV parole processes has demonstrated that an increase in lawful pathways, when paired with consequences for migrants who do not avail themselves of such

pathways, can positively affect migrant behavior and undermine transnational criminal organizations, such as smuggling operations. This rule, which is fully consistent with domestic and international legal obligations, provides the necessary consequences to maintain this incentive under Title 8 authorities. In short, the rule aims to disincentivize irregular migration and instead incentivize migrants to take safe, orderly, and lawful pathways to the United States or to seek protection in a third country.

As compared to the TCT Bar Final Rule, this rule has been more carefully tailored to mitigate the potential for negative impact of the rule on migrants to the extent feasible while also recognizing the reality of unprecedented migratory flows, the systemic costs that those flows impose on the immigration system, and the ways in which increasingly sophisticated smuggling networks cruelly exploit the system for financial gain. The Departments remain committed to ensuring that those who apply for asylum or seek protection who most urgently need protection from persecution are able to have their claims adjudicated in a fair, impartial, and timely manner and believe that this rule, including the removal of provisions implementing the TCT Bar Final Rule, will be a more effective and efficient means of doing so.

*Comment:* Commenters averred that the rule would be too lenient in comparison to the TCT Bar Final Rule and would lead to "open borders." They claimed that the presumption of asylum ineligibility is not sufficiently stringent and therefore would be far less effective at disincentivizing unlawful migration.

*Response:* The Departments believe that the rule strikes the right balance in terms of incentivizing the use of lawful, safe, and orderly pathways to enter the United States while imposing negative consequences on a failure to do so. As has been shown with the CHNV parole processes, pairing such policies together can lead to meaningful decreases in the flow of irregular migration to the SWB.

## 10. Declining to Permanently Adopt the Proclamation Bar IFR

In addition to the 51,952 comments on this NPRM, the Departments received a total of 3,032 comments on the Proclamation Bar IFR and posted 3,000 of those comments. Of the 32 comments not posted, 30 were commenters' duplicates, one was untimely and did not address substantive or novel issues not already covered by other timely comments, and one was an internal test comment. Most of the comments came from one of three

mass-mail campaigns, containing the same or closely related variations of the same standard language. While 18 comments supported the IFR specifically or the prior Administration's efforts generally, the vast majority of the comments opposed the IFR. Below, the Departments address these comments in addition to the comments relating to removal of provisions implementing the Proclamation Bar IFR received in response to the NPRM.

### i. Support for Not Permanently Adopting the Proclamation Bar

*Comment:* Many commenters expressed general opposition to the Proclamation Bar IFR or support for removing provisions implementing that rule without providing any reasoning. Some commenters simply stated that their comments "express [their] strong opposition to the new Interim Final Rule." Some commenters, in stating their general opposition to the Proclamation Bar IFR, also made unrelated, general criticisms regarding the prior administration's immigration policies. Commenters supporting the removal of provisions implementing the Proclamation Bar IFR also faulted the Departments for not including proposed regulatory text removing that rule from the CFR. Many commenters who urged the Departments to withdraw the proposed rule did so while requesting that the Departments rescind the Proclamation Bar IFR.

Commenters expressed concern that the Proclamation Bar IFR violates multiple laws. Specifically, commenters stated that the Proclamation Bar IFR violates multiple sections of the Act: INA 208(a), 8 U.S.C. 1158(a) (eligibility to apply for asylum); INA 235(b)(1), 8 U.S.C. 1225(b)(1) (inspection of noncitizens arriving in the United States and certain other noncitizens who have not been admitted or paroled); INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C) (additional limitations on granting asylum); INA 208(a)(2)(C), 8 U.S.C. 1158(a)(2)(C) (previous asylum exception to authority to apply for asylum); INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C) (codifying the TVPRA). Some commenters asserted that only Congress may act to amend the law and that the prior administration circumvented the legislative process by issuing the Proclamation Bar IFR. Commenters also argued that the Proclamation Bar IFR violates 5 U.S.C. 706(2)(A) in that it was promulgated in a manner inconsistent with the APA, and that it violates multiple provisions of the U.S. Constitution. In particular, commenters argued that the

Proclamation Bar IFR violates due process rights, equal protection, and separation of powers; exceeds Executive authority; was promulgated with discriminatory intent; is similar to deterrence-focused policies that have been held unconstitutional; and is unlawful on the basis that the appointment of the then-Acting Attorney General violated the Appointments Clause. Commenters contended that the Proclamation Bar IFR also violates the APA by being arbitrary and capricious, in that it conditions asylum on a factor unrelated to persecution. Numerous commenters claimed that the Proclamation Bar IFR violates the APA's notice-and-comment requirements and that the good cause and foreign affairs exceptions do not apply. One commenter claimed that the Proclamation Bar IFR would, in fact, have federalism impacts, contrary to the Departments' federalism impact assessment, and some commenters disagreed with the Departments' position that it is not subject to the Congressional Review Act because its effect is less than $100 million. Commenters also expressed concern that the Proclamation Bar IFR violates international law, customary international law, and the Refugee Act.

Commenters noted that the court in *East Bay III* held that the Proclamation Bar directly conflicts with section 208(a) of the INA, 8 U.S.C. 1158(a), because "[i]t is effectively a categorical ban on migrants who use a method of entry explicitly authorized by Congress." Commenters further noted the Ninth Circuit's holding in *East Bay III* that the fact "[t]hat a refugee crosses a land border instead of a port-of-entry says little about the ultimate merits of her asylum application." They further cited *East Bay I* as holding that there is "no basis to support 'categorically disbelieving' non-citizens, or declaring them 'not credible,' simply because of their manner of entry" when applying the "reasonable possibility" standard to those who are determined ineligible for asylum.

Commenters voiced numerous policy concerns about the Proclamation Bar IFR. Specifically, commenters criticized the Proclamation Bar IFR as they believe that it relies on insufficient data or improperly interpreted data; exacerbates trauma by forcing migrants to remain indefinitely outside of the U.S. border in inhumane conditions; punishes those who lack the means to access designated POEs and the luxury to choose how and when they enter the United States; potentially increases risk of harm to children by narrowing safe options; forecloses legitimate asylum claims by

imposing an initial higher standard of proof on individuals who enter between POEs; fails to address the root causes of migration, for which some commenters believe the United States is at least in part responsible; violates religious and moral obligations; and is a "shameful abdication of the United States' obligation to serve as a haven for those individuals who meet the internationally agreed upon definition of a refugee." Further, commenters stated that, contrary to its purpose, the Proclamation Bar IFR would not encourage admission at POEs due to safety and procedural concerns at the SWB and would impede state and local services and non-governmental organizations by undermining policies and programs, imposing substantial additional costs, and discouraging engagement. Commenters also voiced concern that the Proclamation Bar IFR would harm U.S. diplomatic efforts and undermine the United States' international credibility by inflaming tensions and hindering diplomatic relations with Mexico and other nations, as well as encouraging other nations to abandon their humanitarian protection practices. Commenters expressed their belief that the Proclamation Bar IFR is cruel, unnecessary, and overly harsh and was issued "under the guise of streamlining the asylum process" but was actually intended to intimidate asylum seekers from entering the United States "out of fear that their presence in the United States guarantees inadmissibility." Additionally, commenters indicated that statutory withholding of removal and CAT protection are insufficient forms of relief.

*Response:* The Departments appreciate the commenters' submissions and agree that removal of provisions implementing the Proclamation Bar IFR is sound policy and accords with this Administration's priorities. Although the Departments did not include proposed regulatory text in the NPRM, the Departments have included amendatory text in this final rule, which will result in the Proclamation Bar's removal from 8 CFR 208 and 1208.

Since the Proclamation Bar IFR was promulgated, the Departments have reconsidered their approach and have determined that they prefer the tailored approach of the rebuttable presumption enacted by this rule to the categorical bar that the Proclamation Bar IFR adopted. Even if the rebuttable presumption were not paired with the decision not to adopt the Proclamation Bar permanently, the Departments would decline to permanently adopt the Proclamation Bar IFR and would

remove the bar's language from the regulatory text as the Departments no longer view it as their preferred policy choice and are not inclined to continue defending the Proclamation Bar IFR in court in order to be able to implement it at some indeterminate point in the future. Thus, the Departments consider the decision not to adopt the Proclamation Bar on a permanent basis and to remove the bar's language from the CFR to be severable from the provisions of 8 CFR 208.13(f), 208.33, 1208.13(f), and 1208.33.

The Proclamation Bar IFR was promulgated to address circumstances along the SWB. In the Proclamation Bar IFR, the Departments stated that "[i]n recent weeks, United States officials have each day encountered an average of approximately 2,000 inadmissible aliens at the southern border." 83 FR at 55935. They further noted "large caravans" of noncitizens, primarily from Central America, attempting to make their way to the United States, "with the apparent intent of seeking asylum after entering the United States unlawfully or without proper documentation." *Id.* The Departments noted that nationals of Central American countries were more likely to enter between POEs rather than present at a POE. *Id.* The Departments enacted the Proclamation Bar IFR to "channel inadmissible aliens to ports of entry, where such aliens could seek to enter and would be processed in an orderly and controlled manner." *Id.* The Departments also stated that the Proclamation Bar IFR would "facilitate the likelihood of success in future negotiations" with Mexico. *Id.* at 55951.

Rather than barring entry on its own, the Proclamation Bar IFR only barred entry between POEs when a presidential proclamation or other presidential order under section 212(f) or 215(a)(1) of the INA, 8 U.S.C. 1182(f) or 1185(a)(1), suspended entry along the SWB. 83 FR at 55952–53. Any exceptions to the operation of the bar would be set out in the presidential proclamation or order and were not within the Departments' control. *Id.* at 5934 ("It would not apply to a proclamation that specifically includes an exception for aliens applying for asylum, nor would it apply to aliens subject to a waiver or exception provided by the proclamation.").

The Proclamation Bar IFR was preliminarily enjoined soon after it became effective and was eventually vacated. *See generally O.A.* v. *Trump,* 404 F. Supp. 3d 109 (D.D.C. 2019) (recounting the history of the litigation over the Proclamation Bar IFR and vacating it). The Departments appealed the vacatur, and that case has been

stayed since February 24, 2021, to allow for rulemaking by the agencies. *O.A.* v. *Biden,* No. 19–5272 (DC Cir. filed Oct. 11, 2019).

As stated in the NPRM, the Departments have reconsidered the Proclamation Bar IFR and decline to adopt it permanently. *See* 88 FR at 11728. As an initial matter, the Proclamation Bar IFR conflicts with the tailored approach taken in this rule because, in combination with the proclamation the President issued, the Proclamation Bar IFR barred from asylum all individuals who entered the United States along the SWB unless they presented themselves at a POE. *See* 83 FR at 55935 ("The interim rule, if applied to a proclamation suspending the entry of aliens who cross the southern border unlawfully, would bar such aliens from eligibility for asylum and thereby channel inadmissible aliens to ports of entry, where such aliens could seek to enter and would be processed in an orderly and controlled manner."). The Departments do not believe barring all noncitizens who enter between POEs along the SWB is the proper approach in the current circumstances and have instead decided to pair safe, orderly, and lawful pathways for entry into the United States with negative consequences for not taking those pathways, with exceptions and means of rebutting the presumption against asylum eligibility.

Even if the rule's rebuttable presumption were not finalized and given effect, the Departments would nevertheless remove provisions implementing the Proclamation Bar IFR. The bar's categorical nature did not allow for case-by-case judgments to determine whether it should apply, which the Departments consider important to ensure that such bars are applied fairly. The Departments believe that this consideration further supports removing the regulatory language implementing the Proclamation Bar IFR. Finally, U.S. negotiations with Mexico have changed, and the Departments no longer believe that the Proclamation Bar IFR is necessary for those negotiations.

ii. Opposition to Not Adopting the Proclamation Bar IFR Permanently

*Comment:* Some commenters expressed general support for the Proclamation Bar IFR. Commenters stated that the prior Administration had not done enough to deter irregular migration, resulting in the undermining of compliance with U.S. laws, the rule of law, and national security and safety.

*Response:* The Departments acknowledge commenters' concerns regarding national security and safety

and note the commenters' support for the Proclamation bar IFR. Nevertheless, the Departments, after due consideration, believe this rule to be more appropriate as a matter of policy and law. This rule serves to encourage the safe and orderly processing of migrants at the SWB and is consistent with the United States' legal obligations under the INA, international treaties, and all relevant legal sources. Because these particular comments failed to articulate specific reasoning underlying expressions of general support for the Proclamation Bar IFR, the Departments are unable to provide a more detailed response.

*F. Statutory and Regulatory Requirements*

1. Administrative Procedure Act

i. Length of Comment Period

*Comment:* Commenters raised concerns that this rule violated the APA's requirements, as set forth in 5 U.S.C. 553(b) through (d). Commentors stated that the 30-day comment period was not sufficient, arguing that the Departments should extend the comment period to at least 60 days or should reissue the rule with a new 60-day comment period. Numerous commenters requested additional time to comment, citing the complex nature of the NPRM, its length, and the impact of the rule on asylum-seekers and commenters. Other commenters, such as legal services organizations, noted that they have a busy workload and that 30 days was not a sufficient period to prepare the fulsome comment they would have prepared had the comment period provided more time. For example, a legal services organization indicated that it would have provided additional information about asylum seekers the organization has assisted in the past and data about the population the organization serves but that it did not have time to do so. Other organizations stated they also would have included information on issues such as their clients' experiences with the CBP One app and experiences in third countries en route to the United States and would have consulted with experts. Another organization stated that it had to choose between providing comments on the rule and helping migrants prepare for the rule's implementation, and another organization stated that it was unable to provide fulsome comments because the comment period coincided with the implementation of the CBP One app as a means by which its clients could seek exceptions to the Title 42 public health Order. Commenters argued that the

Departments selected a 30-day comment period to reduce the volume of negative comments that will be filed in order to justify disregarding national sentiment against the rule.

Commenters asserted that the 30-day comment period is "risking that public comments will not be seriously considered before the rule is implemented," and additional time is needed to meet APA requirements that agencies provide the public with a "meaningful opportunity" to comment. These comments referenced Executive Orders 12866, Regulatory Planning and Review, 58 FR 51735 (Sept. 30, 1993) and 13563, Improving Regulation and Regulatory Review, 76 FR 3821 (Jan. 18, 2011), which recommend a comment period of not less than 60 days "in most cases," and case law, such as *Prometheus Radio Project* v. *FCC*, 652 F.3d 431 (3d. Cir. 2011), and *Centro Legal de la Raza* v. *EOIR*, 524 F. Supp. 3d 919 (N.D. Cal. 2021).

Commenters disagreed with the Departments' reliance on the impending termination of the Title 42 public health Order in May 2023 and the expected potential surge in migration that would result as justification for the 30-day comment period. These commenters emphasized that the Administration itself sought to formally end the Title 42 public health Order nearly a year ago and stated that the Departments have had sufficient time to prepare for the policy's end. For example, commenters cited to the December 13, 2022, statement issued by Secretary Mayorkas regarding the planning for the end of the Title 42 public health Order.[305]

Some commenters requested extension of the comment period due to reported technical difficulties with submitting comments and stated that technical problems had effectively shortened the comment period to less than 30 days or reduced the public's ability to fully participate in the rulemaking process. For example, one commenter stated that they had learned that there was a technical outage or other error in the application programming interface ("API") technology used to allow third-party organizations to submit comments through *regulations.gov*. This commenter expressed a belief that an unknown number of comments had been "discarded" without the commenters' knowledge. Another

commenter referenced an individual who had technical errors when trying to submit a comment online.[306] This commenter also noted that there was an alert banner on *regulations.gov* at 9:30 a.m. eastern time on March 27, 2023, that stated "*Regulations.gov* is experiencing delays in website loading. We apologize for the inconvenience. While we are working on a fix, please try to refresh when you encounter slow responses or error messages." Overall, these commenters referenced possible technical errors with the submission of comments from as early as March 20, 2023, through the close of the comment period on March 27, 2023.

Finally, commenters further stated that the comment period for the USCIS fee schedule NPRM[307] (from January 4, 2023, through March 13, 2023) overlapped with the comment period for the NPRM in this rulemaking, which caused challenges for commenting on this rule in the 30-day comment period. In addition, commenters stated that the 30-day comment period did not provide commenters who do not regularly work in immigration law with sufficient time to fully analyze the effects of the rule, and that the Departments should extend the 30-day comment period to provide sufficient time for respectful observance of Ramadan, which began during the comment period.[308]

*Response:* The Departments believe the comment period was sufficient to allow for meaningful public input, as evidenced by the almost 52,000 public comments received, including numerous detailed comments from interested organizations.

The comment period spanned 33 days, from February 23, 2023, through March 27, 2023. The January 5, 2023, announcement of the impending

---

[305] DHS, *Statement by Secretary Mayorkas on Planning for End of Title 42* (Dec. 13, 2022), *https://www.dhs.gov/news/2022/12/13/statement-secretary-mayorkas-planning-end-title-42#:~:text=%E2%80%9CNonetheless%2C%20we%20know%20that%20smugglers,United%20States%20will%20be%20removed.*

[306] This commenter also referenced a second individual who was able to eventually submit a timely comment but who posted a photo on twitter that the commenter described as a screenshot of an error screen from *regulations.gov. https://twitter.com/argrenier/status/1639989637413490689/photo/1.* The Departments note that this photo is actually a screenshot from a different website (*federalregister.gov*) and not *regulations.gov*, which is the website the instructions in the NPRM told the public to use to submit a comment. *Id.*

[307] *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 88 FR 402 (Jan. 4, 2023); U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; Extension of Comment Period, 88 FR 11825 (Feb. 24, 2023) (extending the comment period until March 13, 2023).

[308] This commenter also stated the Departments should extend the comment period due to the holidays of Passover and Easter, but both Passover (April 5 through April 13, 2023) and Easter (April 9, 2023 or later) do not occur in whole or in part during the rule's comment period.

issuance of the proposed rule [309] also provided an opportunity for public discussion of the general contours of the policy.[310] In addition, commenters could begin to familiarize themselves with the rule before the rule was published during the period before the comment period opened when the rule was on public inspection.

The APA does not require a specific comment period length, *see* 5 U.S.C. 553(b), (c), and although Executive Orders 12866 and 13563 recommend a comment period of at least 60 days, a 60-day period is not required. Much of the litigation on this issue has focused on the reasonableness of comment periods shorter than 30 days, often in the face of exigent circumstances. *See, e.g., N. Carolina Growers' Ass'n, Inc.* v. *United Farm Workers,* 702 F.3d 755, 770 (4th Cir. 2012) (analyzing the sufficiency of a 10-day comment period); *Omnipoint Corp.* v. *FCC,* 78 F.3d 620, 629–30 (D.C. Cir. 1996) (concluding 15 days for comments was sufficient); *NW. Airlines, Inc.* v. *Goldschmidt,* 645 F.2d 1309, 1321 (8th Cir. 1981) (finding 7-day comment period sufficient).

The Departments are not aware of any case law holding that a 30-day comment period is categorically insufficient. Indeed, some courts have found 30 days to be a reasonable comment period length. For example, the D.C. Circuit has stated that, although a 30-day period is often the "shortest" period that will satisfy the APA, such a period is generally "sufficient for interested persons to meaningfully review a proposed rule and provide informed comment," even when "substantial rule changes are proposed." *Nat'l Lifeline Ass'n* v. *FCC,* 921 F.3d 1102, 1117 (D.C. Cir. 2019) (citing *Petry* v. *Block,* 737 F.2d 1193, 1201 (D.C. Cir. 1984)). The Departments recognize, however, that some courts have held that a 30-day comment period was likely insufficient in certain circumstances. *See, e.g., Centro Legal de la Raza* v. *EOIR,* 524 F. Supp. 3d 919, 955 (N.D. Cal. 2021) (holding that DOJ's 30-day notice-and-comment period was likely insufficient for a rule that implemented extensive

changes to the immigration court system and noting, inter alia, the arguments by commenters that they could not fully respond during the comment period, the effect of the COVID–19 pandemic, and allegations of "staggered rulemaking"); *Pangea Legal Servs.* v. *DHS,* 501 F. Supp. 3d 792, 818–22 (N.D. Cal. 2020) (holding that the plaintiffs had at a minimum shown "serious questions going to the merits" of whether the 30-day comment period for a different asylum-related rulemaking was insufficient and noting, inter alia, the "magnitude" of the rule, that the comment period "spanned the year-end holidays," the comment periods of other rules by DHS, the number of comments received, and allegations of "staggered rulemaking").

Here, even assuming these cases were correctly decided, the Departments have concluded that the concerns raised in those circumstances are not borne out. First, the significant number of detailed and thorough public comments is evidence that the comment period here was sufficient for the public to meaningfully review and provide informed comment. *See, e.g., Little Sisters of the Poor Saints Peter & Paul Home* v. *Penn.,* 140 S. Ct. 2367, 2385 (2020) ("The object [of notice and comment], in short, is one of fair notice." (citation and quotation marks omitted)). Second, the 30-day comment period did not span any Federal holidays, and while commenters noted that the Muslim month of Ramadan began during the comment period, the Departments find that there is no evidence that the occurrence of the month of Ramadan during the comment period would substantively impact the ability of Ramadan observants to submit a timely comment. Third, because the Departments had not recently published other related rules on this topic or that affect the same portions of the CFR that would affect commenters' ability to comment, this rule does not present staggered rulemaking concerns. The last asylum-related rulemaking, the Asylum Processing IFR, was published on March 27, 2022, and was effective on May 31, 2022. 87 FR 18078.[311] Accordingly, commenters did not have to contend with the interplay of intersecting rules and related policy changes when drafting their comments. And though the Departments recognize that the USCIS fee rule's comment period partially overlapped with this rule's

comment period, this overlap does not render this rule's comment period unreasonable. The comment period for that rule—which addresses different subjects and portions of the CFR than this rule—opened on January 4, 2023, 50 days before opening of this rule's comment period, and ended on March 13, 2023, 14 days prior to the close of this comment period.

Finally, the Departments also believe that the 30-day comment period was preferable to a longer comment period since this rule involves concerns about the Departments' ability to safely, effectively, and humanely enforce and administer the asylum system and immigration laws given the surge of migrants that is expected to occur upon the lifting of the Title 42 public health Order if this rule were not in place. *Cf., e.g., Haw. Helicopter Operators Ass'n* v. *FAA,* 51 F.3d 212, 214 (9th Cir. 1995) (noting that the agency had good cause to not engage in notice and comment rulemaking at all because the rule was needed to protect public safety as demonstrated by numerous then-recent helicopter crashes). By proceeding with a comment period shorter than 60 days, the Departments were able to receive comments, review comments, and prepare a final rule to be promulgated in time for the May 11, 2023, expiration of the public health emergency and the corresponding expiration of the Title 42 public health Order. A 60-day comment period, on the other hand, would have run until April 24, 2023, and a final rule would have been impossible to prepare in the 17 days from April 24 to May 11, 2023. Having this rule in place for the expiration of the Title 42 public health Order will disincentivize the expected surge of irregular migration and instead incentivize migrants to take safe, orderly, and lawful pathways to the United States or to seek protection in third countries in the region. The rule will thus prevent a severe strain on the immigration system, as well as protect migrants from the dangerous journey to the SWB and the human smugglers that profit on their vulnerability. Contrary to some commenters' allegations, the Departments did not select a 30-day comment period to limit public involvement on the rule.

The Departments disagree with commenters' statements that the Departments' reliance on the end of the Title 42 public health Order is inapt because ending Title 42 was a government choice, and the Departments should have had time to prepare without a 30-day comment period. First, the Departments note that the Title 42 public health Order is ending based on factual developments,

---

[309] DHS, *DHS Continues to Prepare for End of Title 42: Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), *https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.*

[310] *See, e.g.,* Al Jazeera, *US Rights Groups Slam Bidens 'Unacceptable' Asylum Restrictions,* Jan. 6, 2023, *https://www.aljazeera.com/news/2023/1/6/us-rights-groups-slam-bidens-unacceptable-asylum-restrictions;* UN, *New US Border Measures 'Not in Line with International Standards', Warns UNHCR,* Jan. 6, 2023, *https://news.un.org/en/story/2023/01/1132247.*

[311] In addition, the Departments published a final rule extending the U.S.-Canada STCA on March 28, 2023, but that rule did not have any impact on the subject of this rule as it applies to the U.S.-Canada land border. 88 FR 18227.

and the Departments do not control either those factual developments or the decision to recognize those factual developments by terminating the public health Order. Second, litigation and the resulting injunctions over ending the Title 42 public health Order have made it difficult for the Departments to predict an exact end date. *See, e.g., Arizona* v. *Mayorkas,* 143 S. Ct. 478 (2022) (granting States' application for stay pending certiorari and preventing the District Court for the District of Columbia from giving effect to its order setting aside and vacating the Title 42 public health Order); *Louisiana* v. *CDC,* 603 F. Supp. 3d 406 (W.D. La. 2022) (granting States' motion for a preliminary injunction prohibiting enforcement of the CDC's order terminating Title 42). Accordingly, it was not until the Administration announced [312] its plan to have the public health emergency that underpins the Title 42 public health Order extend until May 11, 2023, that then expire that the end of the Title 42 public health Order changed from speculative to more concrete. The Departments then published the NPRM in short order, 24 days after the Administration's statement of intent. Finally, as discussed in the NPRM and elsewhere in this preamble, the CHNV parole processes that the Departments developed in October 2022 (Venezuela) and January 2023 (Cuba, Haiti, and Nicaragua) have shown significant success in reducing encounters and encouraging noncitizens to seek lawful pathways to enter the United States. This rule adopts a similar design as these programs—coupling the incentives of lawful pathways with disincentives for failing to pursue those pathways—based, in part, on the successes of those programs in decreasing irregular migration. Because those successes were not seen until as late as January 2023, commenters are incorrect that the Departments could have published it long before February 2023. Once the NPRM was published, it was reasonable to include a 30-day comment period in light of the impending end of Title 42 public health Order.

Finally, the Departments have investigated commenters' allegations of technical errors that led to comments being "discarded" or not submitted with the eRulemaking Program at the GSA. A GSA representative explained the following:

• The API, which allows the electronic submission of comments to regulations.gov by third-party software, was operating normally from March 20, 2023, to March 28, 2023.

• Commenters are incorrect that any submitted comments were "discarded" as comments that are received are not discarded.

• While some users reported errors on the submission of API comments, all unsuccessful transactions were successfully resubmitted within a maximum of 30 minutes.

• In addition, the eRulemaking Program accommodated one commenting organization with a temporary increase to the API posting rate limit so that the organization could submit approximately 26,000 comments by the close of the comment period.

• None of the help desk call logs reflect a call related to this rule nor a discussion indicating an unresolved error when posting comments.

Accordingly, the Departments do not believe that any technical errors prevented commenters from submitting comments within the 30-day comment period.

Overall, the Departments find that the time afforded by a 30-day comment period to prepare a final rule prior to the expiration of the Title 42 public health Order, which would not have been possible with a longer comment period, outweighs the arguments raised in support of a longer comment period by commenters. Commenters have provided numerous and detailed comments regarding the NPRM, and the Departments appreciate their effort to provide thorough commentary for the Departments' consideration during the preparation of this final rule.

### ii. Insufficient Consideration of Public Comments

*Comments:* Commenters stated that the timeline for the rule risks that the Departments will not seriously consider public comments before implementing a final rule and gives the appearance that the Departments have predetermined the outcome of the NPRM. Many commenters stated that the short time span between the scheduled close of the comment period (at the end of March 27, 2023) and the anticipated issuance of the final rule (no later than May 12, 2023) suggested that the Departments would not meaningfully consider public comments. Commenters stated that the Departments should have issued a proposed rule earlier than February 2023 to give the Departments more time to carefully consider comments received and revise policy plans prior to the issuance of a final rule.

*Response:* The Departments have included an extensive discussion of comments received as part of this preamble. The Departments strongly disagree with the commenters' assertions that the Departments failed to meaningfully consider public comments in issuing this final rule. The Departments' receptivity to public comments is demonstrated by, for instance:

• The extensive and substantive discussion of public comments in this preamble;

• Multiple revisions made by the Departments to the policy contained in the NPRM, including clarifications of policy requested by commenters, a reorganization of the regulatory text for clarity, and other policy changes that are responsive to public comments; and

• The Departments' choice to seek public comment in the first instance, notwithstanding that this rulemaking involves a foreign affairs function of the United States and addresses an emergency situation for which the Departments would have good cause to bypass notice and comment.[313]

### iii. Delayed Effective Date

*Comments:* Commenters stated that they anticipated that the Departments would issue the final rule in violation of the APA's requirement of a 30-day delayed effective date for substantive rules.[314] Commenters stated that by delaying so long in issuing the NPRM, the Departments had forfeited any argument for "good cause" to make the final rule effective immediately. Commenters noted that there has been litigation for years over the ongoing viability of Title 42 public health Order—itself an inherently temporary measure—and the April 2022 Title 42 termination Order. Commenters stated that the Departments could have conducted a notice-and-comment rulemaking with a 30-day delayed effective date had they begun this rulemaking sooner.

*Response:* As discussed in Section V.A. of this preamble, the Departments are invoking the foreign affairs and good cause exceptions for bypassing a 30-day delayed effective date. *See* 5 U.S.C. 553(a)(1) and (d). The Departments have determined that immediate implementation of this rule is necessary to fortify bilateral relationships and avoid exacerbating a projected surge in migration across the region following the lifting of the Title 42 public health Order.

---

[312] Office of Mgmt. & Budget, Exec. Office of the President, *Statement of Administration Policy* (Jan. 30, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/01/SAP-H.R.-382-H.J.-Res.-7.pdf.*

[313] *See* 5 U.S.C. 553(a)(1), (b)(B); *see also* Section VI.A. of this preamble.

[314] *See* 5 U.S.C. 553(d).

Case law suggesting that an agency's delay can effectively forfeit the agency's "good cause" relates primarily to the separate good cause exception applicable to notice-and-comment rulemaking requirements under 5 U.S.C. 553(b)(B).[315] Such case law has no bearing on the foreign affairs exemption under 5 U.S.C. 553(a)(1). In addition, it is not dispositive as to the good cause exception at 5 U.S.C. 553(d), which serves "different policies" and "can be invoked for different reasons." [316] Specifically, the 30-day delayed-effective-date requirement "is intended to give affected parties time to adjust their behavior before the final rule takes effect," [317] but in this context, affected parties have been subject to the Title 42 public health Order for years, and cannot reasonably argue that they require an additional 30 days to adjust their behavior to the new approach taken in this rule.

Even if the forfeiture doctrine is applied in this context, however, the Departments have pursued this rulemaking without delay, and in fact have proceeded as rapidly as possible under the circumstances. As discussed at length in the NPRM, this rulemaking addresses a range of dynamic circumstances, including major recent shifts in migration patterns across the hemisphere, altered incentives at the SWB created by the application of the Title 42 public health Order (which has carried no immigration consequences and resulted in many migrants trying repeatedly to enter the United States), and ongoing litigation regarding the Title 42 public health Order.[318] The Departments have sought to address these circumstances in a variety of ways, including the six-pillar strategy outlined in the April 2022 DHS Plan for Southwest Border Security and Preparedness; the issuance of the Asylum Processing IFR, 87 FR 18078; the expansion of lawful pathways throughout the region and via the CHNV

processes; and the introduction of the CBP One app, among other measures. The Departments' issuance of the proposed rule while the litigation over the Title 42 public health Order was ongoing, and within weeks of the Administration's announcement regarding the impending termination of that Order, reflects the high priority that the Departments have placed on issuing this rulemaking promptly via a notice and comment process.

2. Paperwork Reduction Act ("PRA")

*Comment:* A commenter stated that the Departments had not posted to the public docket any proposed revisions to the collection of information under Office of Management and Budget ("OMB") Control Number 1651–0140, *Collection of Advance Information from Certain Undocumented Individuals on the Land Border.* The commenter stated that such revision appeared particularly important given the NPRM's proposed codification of the required use of the CBP One app to access regular Title 8 asylum processing. The commenter stated that, as a consequence of the failure to post the proposed revisions, they were unable to comment on the proposed changes to the collection of information. A commenter expressed concern that CBP sought emergency approval to collect advance information on undocumented noncitizens and bypassed the standard notice and comment process.

*Response:* With respect to commenters' stated concerns about the public docket, the Departments note that like all proposed revisions to collections of information, the proposed revisions described in the NPRM were available for review throughout the comment period on OMB's website at *https://www.reginfo.gov,* under the Information Collection Review tab.[319] The Departments did not also post these comments to the public docket, but are unaware of any attempt by the commenter to request a copy of the proposed changes by using the contact information listed in the NPRM.

The Departments maintain that the nature of the proposed change to the collection of information was clear to commenters, as the proposed change was described at length in the NPRM and was the subject of many comments. The Supporting Statement that was available on OMB's website (and was the only document related to the information collection for which the

Departments had proposed revisions) described an NPRM that, if finalized, "would change the consequences, for some noncitizens and for a temporary period of time, of not using CBP One to schedule an appointment to present themselves at a POE." [320] The Supporting Statement explained that such noncitizens would "be subject to a rebuttable presumption of asylum ineligibility, unless the noncitizen demonstrates by a preponderance of the evidence that it was not possible to access or use CBP One due to a language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or that the noncitizen is otherwise not subject to the rebuttable presumption." [321] The Supporting Statement further clarified that "[t]here is no change to the information being collected under this collection or the use of the information by CBP, but this change would alter the consequences of not using the collection, and thus increases the estimated annual number of responses in the collection." [322]

Regarding the concern with using the emergency PRA approval process for the collection of information via the CBP One app, CBP notes that, although the initial collection was approved on an emergency basis,[323] the relevant PRA approval for the collection that is being used for this rule (OMB Control Number 1651–0140) was subsequently done using the normal PRA process, which included two **Federal Register** notices and an opportunity for public comment.[324] Further, this collection is being revised again through this rule, and the public was given additional opportunity to comment on the information collection in this rulemaking. *See* 88 FR at 11749–50.

Members of the public are welcome to submit comments to OMB on the collection of information via *https://www.reginfo.gov* for a period of 30 days following issuance of this final rule.

*Comment:* A commenter expressed that the NPRM is not in compliance with the APA because the CBP One app

---

[315] *See, e.g., Envt'l. Def. Fund* v. *EPA,* 716 F.2d 915, 921–22 (D.C. Cir. 1983) (holding that because the agency "failed to demonstrate that outside time pressures forced the agency to dispense with APA notice and comment procedures . . . the agency's action . . . [fell] outside the scope of the good cause exception"); *Nat'l Ass'n of Farmworkers Org.* v. *Marshall,* 628 F.2d 604, 622 (D.C. Cir. 1980) (rejecting a good cause argument for bypassing notice and comment because the time pressure cited by the agency "was due in large part to the [agency's] own delays").

[316] *Riverbend Farms, Inc.* v. *Madigan,* 958 F.2d 1479, 1485 (9th Cir. 1992) (The "30-day waiting period in no way relates to the notice and comment requirement, but the federal courts have not always been careful to maintain the distinction" (internal citation and quotation omitted)).

[317] *Id.*

[318] *See* 88 FR at 11708–14.

[319] *See* OMB, *ICR Documents: CLEAN Supporting Statement 1651–0140 Advance Information Collection NPRM Changes,* https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202302-1651-001 (last visited Mar. 29, 2023).

[320] *Id.*

[321] *Id.*

[322] *Id.*

[323] *See* OIRA, *OIRA Conclusion, OMB Control No. 1651–0140, Collection of Advance Information from Certain Undocumented Individuals on the Land Border* (May 3, 2021), *https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202104-1651-001.*

[324] *See* 86 FR 73304 (Dec. 27, 2021); 87 FR 53667 (Sept. 28, 2021). *See also* OIRA, *OIRA Conclusion, OMB Control No. 1651–0140, Collection of Advance Information from Certain Undocumented Individuals on the Land Border* (Dec. 18, 2022), *https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202112-1651-001.* The OIRA *Conclusion* includes citations and links to the notices published in the **Federal Register,** as well as the comments received in response.

has not gone through the normal notice-and-comment period required by the APA. The commenter stated that the Departments had not clearly described the app in a way that would provide the public with the necessary information to understand how the app works and that a noncitizen's failure to use the app when presenting themselves at a port of entry has serious implications on immigration relief.

*Response:* The Departments disagree with the contention that the use of the CBP One app, whether separate from or as described in this rule, fails to comply with the APA. The CBP One app serves as a single portal to a variety of CBP services.[325] Because there is not an overarching CBP One information collection, CBP has sought OMB approval under the PRA of each information collection contained in the CBP One app, pursuant to standard procedures. Regarding the particular use of the CBP One app that is described in this rulemaking—*i.e.,* the use of the app as the current "DHS scheduling system" described in 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B), to collect information from certain undocumented individuals on the land border—the PRA information referenced above, and available to the public, provided information sufficient to understand how the app works, and how it would work in connection with this rulemaking. Similarly, the Departments provided a description of the presumption and its application, including to those who do not utilize CBP One, in the NPRM and invited comment thereon.

### 3. Impacts, Costs, and Benefits (Executive Orders 12866 and 13563)

*Comment:* A few commenters expressed that the Departments have not met their obligations under Executive Order 12866 and Executive Order 13563. A commenter requested that the Departments investigate and develop quantitative estimates regarding a range of potential regulatory effects, such as estimates of the rule's potential impact on family unity, the lifetime cost of work permit renewals for those who are granted withholding of removal instead of asylum under the rule; the impact of life-long inability to travel internationally for those granted withholding of removal rather than asylum; and the potential costs on States and localities of vastly increasing the class of individuals ineligible for public benefits, services, and healthcare.

Another commenter requested that the Departments consider the downstream impacts of the rule on other noncitizens and their U.S. citizen family members who might be affected by additional backlogs in immigration court. A legal services provider expressed concern with the Departments' "evident implication" that the rebuttable presumption will not impact asylum seekers beyond their loss of a path to citizenship and inability to petition for family members to join them in the United States; the commenter cited challenges with retaining counsel and lost opportunities to collect evidence or consult family before an asylum decision is made. Some commenters stated that the rule's analysis of its costs and benefits is deficient because the rule lacked detailed estimates or further specifics with respect to costs for the Departments, the States, and other parties. Commenters stated that for this reason, the regulatory analysis in Section VI.A. of the NPRM's preamble failed to satisfy the requirements of Executive Order 12866.

*Response:* The Departments respectfully maintain that the regulatory analysis accompanying the NPRM adequately described the costs and benefits associated with this rulemaking. The concerns raised by the commenters have been addressed qualitatively in the preambles to the NPRM and this final rule. The Departments recognize that the rule will result in costs and benefits for the individual noncitizens who are subject to it, as well as a range of potential indirect effects on other persons and entities.[326] The Departments have further described these costs and benefits throughout this preamble. The Departments have also further revised the Executive Order 12866 discussion in Section VI.B. of this preamble to address some of the concerns described by the commenters, including concerns related to work permit renewal.[327]

Although the Departments have discussed the relevant policy considerations associated with this rulemaking at length, the Departments note that neither Executive Order 12866, nor any other executive order or law, requires more detailed quantitative analysis in these circumstances. The

fact that preparation of a regulatory impact analysis under Executive Order 12866 is a matter of Executive Branch discretion is underscored by the terms of Executive Order 12866, section 10:

Nothing in this Executive order shall affect any otherwise available judicial review of agency action. This Executive order is intended only to improve the internal management of the Federal Government and does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

Courts have recognized the internal, managerial nature of this and other similarly worded executive orders, and have concluded that actions taken by an agency to comply with such executive orders are not subject to judicial review. *See Cal-Almond, Inc.* v. *USDA,* 14 F.3d 429, 445 (9th Cir. 1993) (citing *State of Mich.* v. *Thomas,* 805 F.2d 176, 187 (6th Cir. 1986)).

### i. Quantitative Impacts on Federal and State Governments

*Comment:* A group of State Attorneys General stated that the proposed rule "completely ignores the increased costs to the States of higher levels of unlawful aliens precipitated by" the NPRM. Quoting the proposed rule, the commenters stated that the Departments "falsely claim[ed] that '[t]he costs of the proposed rule primarily are borne by migrants and the Departments.' " *See* 88 FR at 11748. Commenters further stated that States have significant reliance interests in the Federal Government's enforcement of the immigration laws and that the Departments should withdraw the rule because the Departments did not consider this reliance in the proposed rule. Commenters stated that the rule would cause additional noncitizens to enter the United States where they would cause the States to expend additional funds on law enforcement, education, and healthcare than the States otherwise would have spent.

In support of this assertion, commenters stated that irregular migration imposes significant costs on States. Commenters cited a study that stated "the net cost of illegal immigration to U.S. taxpayers is now $150.7 billion." Commenters provided specific examples of costs that the State of Indiana has incurred or could incur to provide services to noncitizens, including costs to provide English Language Learner Services and other education services. Commenters stated that as many as 5,000 family units that had been encountered and granted parole pursuant to the parole + ATD

---

[325] *See* CBP, *CBP One™ Mobile Application, https://www.cbp.gov/about/mobile-apps-directory/cbpone* (last visited Apr. 26, 2023).

[326] *See* Section VI.B of this preamble for a further discussion of the rule's costs and benefits.

[327] The Departments note that some, but not all, of the commenters that pressed for additional quantitative analysis expressed strong support for the TCT Bar IFR and Final Rule, which did not contain an Executive Order 12866 analysis due to their nexus to a foreign affairs function of the United States. *See* 84 FR at 33843 (IFR); 85 FR at 82289 (final rule).

policy settled in Indiana between July 2021 and February 2022. On the other hand, a state administrative agency wrote that immigrants and refugees are integral to that State's economy and generate $2.8 billion of business income and contribute over $21.4 billion in Federal, State, and local taxes, annually. The commenter wrote that immigrants and refugees have successfully rebuilt their lives and made positive social and economic contributions to the State by revitalizing neighborhoods and adding to the cultural vitality of the State and its communities.

*Response:* The Departments respectfully disagree with the characterization of the rule as precipitating higher levels of irregular migration. As discussed in the preamble to the proposed rule, *see, e.g.,* 88 FR at 11705–06, and in Section I of this preamble, in the absence of this rule, the Departments would anticipate a significant further surge in irregular migration after the Title 42 public health Order is lifted. This rule is expected to reduce irregular migration, not increase it.

This rule imposes a rebuttable presumption of asylum ineligibility for certain migrants who enter the United States at the southwest land border or adjacent coastal borders after traveling through a third country during a designated period. This rule excepts from its rebuttable presumption noncitizens who enter the United States pursuant to a lawful pathway, but the rule does not newly introduce or authorize any lawful pathways to enter the United States. While it is true that the rule excepts from the rebuttable presumption those who use some lawful pathways, such pathways would exist irrespective of this rule. Indeed, as stated in the NPRM, the term "lawful pathways" refers to the "range of pathways and processes by which migrants are able to enter the United States or other countries in a lawful, safe, and orderly manner and seek asylum and other forms of protection." 88 FR at 11706 n.15. One such lawful pathway is entry pursuant to the CHNV parole processes; such processes were established prior to and separate from the publication of the NPRM. In other words, the commenters have conflated the lawful pathways accounted for in this rule with the rule itself.

The Departments further note the evidence that the introduction of lawful pathways, particularly when coupled with a consequence for failing to use such processes, has significantly reduced levels of irregular migration. For instance, as noted in the proposed rule, in the week prior to the

announcement of the Venezuela parole process on October 12, 2022, encounters of Venezuelan nationals between POEs at the SWB averaged over 1,100 a day from October 5–11. About two weeks after the announcement, encounters of Venezuelan nationals averaged under 200 per day between October 18 and 24.[328] The low trend continued with a daily average of 106 in March 2023.[329] Similarly, the number of CHN nationals encountered dropped significantly in the wake of the January 2023 announcement of new processes for those countries. Between the announcement of the new processes on January 5, 2023, and January 21, the number of daily encounters between POEs of CHN nationals dropped from 928 to 73, a 92 percent decline.[330] Encounters between POEs of CHN nationals continued to decline to a daily average of fewer than 17 per day in March 2023.[331] These reductions in encounters have been sustained for months while the Title 42 public health Order has remained in effect.

With respect to commenters' statement that States have significant reliance interests in the Federal Government's enforcement of the immigration laws, this rule does not set any policy against enforcement of the immigrations laws. Commenters' objections to other enforcement policies, or any lack thereof, have little relationship to this rule, which, as previously stated, creates a rebuttable presumption of asylum ineligibility for certain migrants who enter the United States at the southwest land border or adjacent coastal borders after traveling through a third country during a designated period. The Departments are unaware of any existing policies altered by this rule in which States have a substantial reliance interest. For example, States cannot have substantial reliance interests in the Proclamation Bar IFR or TCT Bar Final Rule because neither rule is being enforced.

Ultimately, the commenters' objections are not to the proposed rule, but to the lawful pathways themselves, as well as to other aspects of the immigration system. The Departments believe that withdrawing the proposed rule would not achieve the Departments' or the commenters' goals.

---

[328] USBP encountered an average of 225 Venezuelans per day in November 2022 and 199 per day in December 2022. OIS analysis of OIS Persist Dataset based on data through March 31, 2023. Data are limited to USBP encounters to exclude those being paroled in through POEs.

[329] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[330] *Id.*

[331] *Id.*

*Comment:* Another group of State Attorneys General stated that if, as a consequence of the rule, noncitizens endure additional trauma seeking asylum in a third country or waiting at the SWB in potentially dangerous conditions for a CBP One appointment, such noncitizens will require more State-funded services, such as services related to healthcare, education, and legal assistance.

*Response:* The Departments acknowledge that various levels of government provide services to noncitizens for a range of purposes. The Departments have further revised the Executive Order 12866 discussion in Section VI.B of this preamble to note the potential effects on such entities.

*Comment:* Commenters stated that while the Departments acknowledge the cost and other impact that irregular migration has had on DHS operations, States and border communities, and NGOs, the Departments did not adequately consider the costs borne by other Federal agencies not directly associated with immigration enforcement. For example, commenters stated that some health programs (Medicaid; the Children's Health Insurance Program; the Supplemental Nutrition Assistance Program; and the Women, Infants, and Children program) and tax credits are available to noncitizens without employment authorization. Commenters also stated that UCs are eligible for a large number of Federal benefits immediately upon their entry. Commenters also stated that the expanded usage of humanitarian parole results in costs associated with providing parolees Federal benefits.

*Response:* The Departments agree that a high volume of irregular migration can have significant implications for other Federal agencies that provide services or assistance to migrants. For the reasons stated in the first comment response in Section IV.F.3.i of this preamble, however, the Departments do not believe it is reasonable to expect that the rule would result in an increase in irregular migration. This rule is designed to reduce levels of irregular migration, and to channel migrants into lawful, safe, and orderly pathways. In the absence of this rule, the Departments would anticipate a significant further surge in irregular migration after the Title 42 public health Order is lifted. This rule will reduce irregular migration and any costs associated with such migration, rather than increasing such migration and costs.

*Comment:* Some commenters also stated that the rule fails to adequately consider and address the administrative

costs that the Departments would incur in order to implement the rule. Regarding USCIS, these commenters stated that the Departments failed to consider, for instance, the following costs: new trainings, possible future hiring needs that could result from the rule, and possible collateral costs to petitioners before USCIS who could have adjudications delayed due to downstream delays. Some commenters expressed concern that USCIS, as a fee-funded agency, might have insufficient resources to implement the rule, and hypothesized that USCIS might seek to ask Congress for an appropriation to cover implementation costs, which would shift the burden of the cost to U.S. taxpayers. These commenters cited the requirements of the Anti-Deficiency Act and past reductions in USCIS fee revenues in support of the commenters' prediction of an appropriations request.

Regarding CBP, commenters stated that the Departments failed to consider, for instance, costs for training staff on the CBP One app and for app maintenance and updates.

Regarding ICE, commenters stated that if, as a result of the rule, more noncitizens receive negative credible fear determinations and request IJ review, there is a risk of overcrowding and other operational complications as bed space runs out for new arrivals. The commenters stated that this could increase the money paid by the U.S. taxpayer unnecessarily.

Regarding EOIR, these commenters stated that the Departments failed to consider, for instance, the following costs: training of IJs and staff; form updates; and an increase to the court backlog if adjudications take longer.

*Response:* The Departments agree that various agencies will expend resources to implement this rule. The discussion in Section VI.B of this preamble explains that the rule will require additional time for AOs and IJs, during fear screenings and reviews, respectively, to inquire into the applicability of the presumption and whether the presumption has been rebutted. Similarly, the rule will require additional time for IJs during section 240 removal proceedings. However, as discussed in the proposed rule and elsewhere in this preamble, in the absence of this rule, the Departments would anticipate a significant further surge in irregular migration after the Title 42 public health Order is lifted, which would require the expenditure of significant resources. This rule is therefore anticipated to substantially reduce net burdens on the Departments, including at the agencies referenced by the commenters.

## 4. Regulatory Flexibility Act (''RFA'')

*Comment:* At least one commenter disagreed with the certification in the NPRM that the proposed rule would not have a significant economic impact on a substantial number of small entities. *See* 88 FR at 11748. Some legal services providers gave examples of how the rule would impact their organization and workloads, without objecting to the RFA certification. But at least one commenter disputed the certification and wrote that as a nonprofit organization that helps asylum seekers prepare for credible fear interviews, IJ reviews, and merits hearings, the commenter would experience a significant time and cost burden associated with the new rule, such as the additional time spent gathering evidence from foreign countries, appearing at interviews and hearings, and explaining the law and outcome to clients and pro se respondents. The commenter stated that, as a consequence of the rule, the commenter would therefore be forced to serve fewer individuals, significantly reducing the number of people who would have access to legal services. The commenter further stated that due to the increased time burden, individuals would have to pay the commenter increased fees or donors would have to chip in more for each person.

*Response:* Consistent with longstanding case law, a regulatory flexibility analysis is not required when a rule has only indirect effects on small entities, rather than directly regulating those entities. *See, e.g., Mid-Tex Elec. Co-op., Inc.* v. *FERC,* 773 F.2d 327, 342–43 (D.C. Cir. 1985) (''[A]n agency may properly certify that no regulatory flexibility analysis is necessary when it determines that the rule will not have a significant economic impact on a substantial number of small entities that are subject to the requirements of the rule . . . . Congress did not intend to require that every agency consider every indirect effect that any regulation might have on small businesses in any stratum of the national economy.'').[332] This rule

---

[332] *See also Cement Kiln Recycling Coal.* v. *EPA,* 255 F.3d 855, 869 (D.C. Cir. 2001) (''The statute requires that the agency conduct the relevant analysis or certify 'no impact' for those small businesses that are 'subject to' the regulation, that is, those to which the regulation 'will apply'. . . . The rule will doubtless have economic impacts in many sectors of the economy. But to require an agency to assess the impact on all of the nation's small businesses possibly affected by a rule would be to convert every rulemaking process into a massive exercise in economic modeling, an approach we have already rejected.'' (citing *Mid-Tex,* 773 F.2d at 343)); *White Eagle Co-op. Ass'n* v. *Conner,* 553 F.3d 467, 480 (7th Cir. 2009) (''[S]mall entities directly regulated by the proposed [rulemaking]—whose conduct is circumscribed or mandated—may bring a challenge to the RFA

does not directly regulate any organizations; the rule imposes a rebuttable presumption of asylum ineligibility for certain migrants who enter the United States at the southwest land border or adjacent coastal borders after traveling through a third country during a designated period. The RFA does not require the Departments to estimate the rule's potential indirect effects on legal service organizations, law firms, and other service providers whose clients may be subject to the rule. Because this rule does not regulate small entities themselves, the Departments reaffirm their conclusion that no regulatory flexibility analysis is necessary.

## 5. Other Regulatory Requirements

*Comment:* A group of State Attorneys General disputed the statement in the proposed rule, made pursuant to Executive Order 13132, Federalism, 64 FR 43255 (Aug. 4, 1999), that the proposed rule would not have a substantial direct effect on the States, the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. *See* 88 FR at 11749.

*Response:* The Departments maintain that this rule will not have a substantial direct effect on the States, the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. This rule's only direct effects relate to asylum applicants and those being processed at the SWB. For the same reason, this final rule will not impose substantial direct compliance costs (indeed, any direct compliance costs) on State and local governments, or preempt State law. Accordingly, in accordance with section 6 of Executive Order 13132, this rule requires no further agency action or analysis.

*Comment:* A group of State Attorneys General stated that the Departments should withdraw the rule because it would impose significant unfunded mandates on the States but the Departments did not assess the impact on the States or their constituent local governments under the Unfunded Mandates Reform Act of 1995 (''UMRA''). Commenters disagreed with the Department's statement in the proposed rule that the rule would not

---

analysis or certification of an agency. . . . However, when the regulation reaches small entities only indirectly, they do not have standing to bring an RFA challenge.'').

impose an unfunded mandate because "[a]ny downstream effects on such entities would arise solely due to their voluntary choices, and the voluntary choices of others, and would not be a consequence of an enforceable duty imposed" by the rule. 88 FR 11748. Commenters cited cases regarding standing to sue in Federal court, such as *Department of Commerce* v. *New York,* 139 S. Ct. 2551 (2019) and *City & County of San Francisco* v. *USCIS,* 944 F.3d 773, 787 (9th Cir. 2019), arguing that if the fact patterns in those cases were sufficient to establish standing, they are sufficient to trigger the UMRA's requirements. Quoting 2 U.S.C. 1534(a), commenters stated that UMRA also requires that "[e]ach agency . . . develop an effective process to permit elected officers of State, local, and tribal governments . . . to provide meaningful and timely input in the development of regulatory proposals containing significant Federal intergovernmental mandates." The comments stated that the Departments never allowed elected leaders in their States to provide any such input.

*Response:* Case law on standing does not dictate UMRA's scope. The Departments maintain that the NPRM preamble's discussion of UMRA was correct. This rule does not contain a Federal mandate, or a significant Federal intergovernmental mandate, because it does not impose any enforceable duty upon any other level of government or private sector entity. Any downstream effects on such entities would arise solely due to their voluntary choices, and the voluntary choices of others, and would not be a consequence of an enforceable duty imposed by the rule. Similarly, any costs or transfer effects on State and local governments would not result from a Federal mandate contained in this rule, as that term is defined under UMRA.

*G. Out of Scope*

*Comment:* Commenters submitted a number of comments that were outside the scope of the rulemaking. For instance, some commenters stated that the United States should create a path to citizenship for undocumented immigrants; that the Government should otherwise engage in legislative immigration reform; that all noncitizens with disabilities should be eligible for asylum; that minors should not be released to individuals without lawful status; that the Government should focus on disparities among IJs in asylum grant rates; that the United States should expand resources focused on the development of civil society and

governments in the Northern Triangle; that countries from which asylum applicants flee should help fund humanitarian aid for their citizens who resettle in the United States; that POEs are already overwhelmed so asylum-seekers should be allowed to enter in other places; that the Government needs to focus on granting "Dreamers" citizenship; that the Government should call on the military to forcibly repel migrants from the border; that the United States should end birthright citizenship; that the American workforce is becoming automated, putting American citizens out of work; that the United States should subsidize the implementation of machinery that would fill the jobs that normally "attract" migrants (*e.g.,* agricultural work); that migrant children are being forced into child labor; that the U.S. birthrate is low and we need more workers to maintain Social Security and Medicare; that the United States is selling land to China, and India is buying oil from Russia; that the United States should systematically fund research that evaluates the racial disparities that exist in the efficiency with which Ukrainian humanitarian parole applications have been reviewed and evaluated versus those of Afghan applicants; that American taxpayers are suffering the effects of the border crisis, particularly in schools; that the United States should expand legal immigration; that asylum seekers will receive in absentia removal orders due to difficulties in contacting asylum seekers for court hearings; that they objected to the number of noncitizens present in the United States without lawful status.

*Response:* Such comments address matters well beyond the scope of the proposed rule and do not require further response.

*Comment:* Several commenters made statements related to CBP custody conditions, noting for instance that they are overcrowded, lack adequate access to hygiene, lack adequate space so that families are separated by gender, are cold, lack adequate bedding, have lights on at night, and do not have adequate showers. At least one commentor noted that CBP facilities should have more child friendly reception areas.

*Response:* The Department acknowledges the commenters' concerns. However, this rule does not have any impact on whether or how individuals are in custody or detained, and these comments are outside the scope of the rulemaking.

**V. Request for Comments on Proposed Extension of Applicability to All Maritime Arrivals**

In addition to the changes made in this final rule described in Section IV.B.8.i of this preamble, the Departments are considering and request comment on whether to apply the rebuttable presumption to noncitizens who enter the United States without documents sufficient for lawful admission during the same temporary time period at a maritime border,[333] whether or not they traveled through a third country. Such a modification would expand the scope of the rule's rebuttable presumption in two ways: both geographically (covering all entries by sea, not just those entering the United States from Mexico at coastal borders adjacent to the SWB) and with regard to the class of persons potentially subject to the rebuttable presumption (by covering persons who enter the United States by sea even if they did not travel through a country other than their country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of Refugees). In addition, the Departments are also considering and request comment on whether to expand the scope of the rule's rebuttable presumption geographically to noncitizens who enter the United States without documents sufficient for lawful admission during the same temporary time period at any maritime border, while continuing to limit the presumption's applicability to those who traveled through another country before reaching the United States. Finally, the Departments are considering and request comment on whether to expand the scope of the presumption to noncitizens who enter the United States by sea, but to limit the scope of that expansion to noncitizens who departed from the Caribbean or other regions that present a heightened risk of maritime crossings.

The Departments are considering extending the rule's rebuttable presumption to maritime arrivals to encourage any migrants intending to reach the United States by sea to instead avail themselves of lawful, safe, and orderly pathways into the United States,

---

[333] The STCA and Additional Protocol controls and applies as to individuals who cross the U.S.-Canada land border between POEs, including certain bodies of water along or across the U.S.-Canada land border, as described in 88 FR 18227, 18234. The Departments' use of "at a maritime border" includes individuals who enter the United States by sea, as in the Atlantic and Pacific coasts of the United States.

or otherwise to seek asylum or other protection in another country. As discussed in more detail below, DHS has recently experienced high levels of maritime interdictions, primarily of Cuban and Haitian nationals in the Caribbean, and is concerned that rates of attempted entries to the United States by sea may soon increase to levels that would greatly stress DHS's available resources and may lead to devastating loss of life and other consequences. The Departments expect that extending the strategy of coupling an expansion of lawful, safe, and orderly pathways into the United States with this rule's consequence for noncitizens who do not avail themselves of one of those options would lead to a reduction in the numbers of migrants who would otherwise undertake a dangerous sea journey to the United States.

*A. Maritime Migration Continues To Increase, With Devastating Consequences for Migrants*

Total migrants interdicted at sea by the U.S. Coast Guard ("USCG") increased by 502 percent between FY 2020 (2,079) and FY 2022 (12,521).[334] Interdictions continued to rise in FY 2023 with 8,822 migrants interdicted at sea through March, almost 70 percent of the total in FY 2022 within six months.[335] Interdictions occurred primarily in the South Florida Straits and the Caribbean Sea.[336]

Individuals departing from Cuba and Haiti make up the vast majority of maritime interdictions. Maritime migration from Cuba increased by nearly 600 percent in FY 2022, with 5,740 Cuban nationals interdicted at sea, compared to 827 in FY 2021.[337] Similarly, maritime migration from Haiti more than tripled in FY 2022, with 4,025 Haitian nationals interdicted at sea, compared to 1,205 in FY 2021 and 398 in FY 2020.[338] In the first six months of FY 2023, Cuban interdictions were nearly equal to the Cuban FY 2022 total, comprising 62 percent of all FY 2023 interdictions at sea; Haitian interdictions were over 60 percent of the Haitian FY 2022 total, comprising around 30 percent of all FY 2023 interdictions at sea.[339]

Meanwhile, USBP apprehensions of noncitizens who made landfall in southeast coastal sectors have also been increasing rapidly.[340] There were 5,978 such apprehensions in FY 2022, nearly triple the number of apprehensions in FY 2021 (2,045). And in FY 2023 to date, there have already been 6,364 USBP apprehensions of noncitizens who made landfall in southeast coastal sectors, more than the total for all of FY 2022.[341] Cuban and Haitian nationals made up 76 percent of these apprehensions in FY 2022 and 84 percent of apprehensions so far in FY 2023.

Several large group interdictions of Cubans and Haitians have caused challenges for the USCG in recent months. On January 22, 2023, the USCG interdicted a sail freighter suspected of illegally transporting migrants with nearly 400 Haitians aboard, necessitating repatriations of eligible individuals back to the Bahamas.[342] Days later, on January 25, the USCG interdicted and repatriated another 309 Haitians to Haiti.[343] USCG interdicted yet another large group of Haitians on February 15, resulting in the repatriation of all 311 Haitian migrants in that group,[344] and another group of 206 Haitians were repatriated on March 2 following two successive, separate interdictions on February 22 and 28.[345] On January 12, 2023, USCG repatriated 177 Cubans from 7 separate interdictions.[346] USCG repatriated an additional 67 Cubans between February 23–24 following prior interdictions.[347]

---

[340] Includes Miami, Florida; New Orleans, Louisiana; and Ramey, Puerto Rico sectors.

[341] OIS analysis of OIS Persist Dataset based on data through March 31, 2023.

[342] David Goodhue and Jacqueline Charles, *Coast Guard stops boat with 400 Haitians off the Bahamas and likely headed to Florida*, Miami Herald, Jan. 23, 2023, *https://www.miamiherald.com/news/nation-world/world/americas/haiti/article271514157.html.*

[343] USCG, *Coast Guard Repatriates 309 People to Haiti* (Jan. 31, 2023), *https://www.news.uscg.mil/Press-Releases/Article/3281802/coast-guard-repatriates-309-people-to-haiti.*

[344] USCG, *Coast Guard Repatriates 311 People to Haiti* (February 20, 2023), *https://www.news.uscg.mil/Press-Releases/Article/3302743/coast-guard-repatriates-311-people-to-haiti/.*

[345] USCG, *Coast Guard Repatriates 206 People to Haiti* (March 2, 2023), *https://www.news.uscg.mil/Press-Releases/Article/3314530/coast-guard-repatriates-206-people-to-haiti/.*

[346] USCG, *Coast Guard Repatriates 177 People to Cuba* (Jan. 12, 2023), *https://www.news.uscg.mil/Press-Releases/Article/3265898/coast-guard-repatriates-177-people-to-cuba/.*

[347] USCG, *Coast Guard Repatriates 29 People to Cuba* (Feb. 23, 2023), *https://www.news.uscg.mil/Press-Releases/Article/3306722/coast-guard-repatriates-29-people-to-cuba/*; USCG, *Coast Guard Repatriates 38 People to Cuba* (Feb. 24, 2023), *https://www.news.uscg.mil/Press-Releases/Article/3306850/coast-guard-repatriates-38-people-to-cuba/.*

---

Interdictions in the maritime environment can pose unique hazards to life and safety. On March 23, 2023, Rear Admiral Jo-Ann Burdian, Assistant Commandant for Response Policy, testified before a Congressional panel, stating: "Over the last year and a half, the Coast Guard observed an increase in irregular maritime migration, above historical norms, across our southern maritime border. This is a difficult mission for our crews. . . . For example, patrolling the waters of the South Florida Straits can be compared to patrolling a land area the size of Maryland with seven police cars limited to traveling at 15 miles per hour. It requires exceptional tactical coordination between aircraft, ships, boats, and supporting partners ashore."[348] Rear Admiral Burdian further stated that it is not uncommon for migrants encountered at sea to be non-compliant, threatening their own lives and those of other migrants on board to deter a Coast Guard rescue.[349] Additional challenges of maritime migration operations include ensuring adequate sanitation, security, and providing for food, medical, and shelter needs of migrants.[350]

Interdicting Haitian sail freighters poses unique challenges to DHS crews and migrants. *See* 88 FR at 26328. These types of vessels are often overloaded with more than 150 migrants onboard, including small children. *Id.* Because these vessels do not have sufficient safety equipment, including life jackets, emergency locator beacons, or life rafts in the event of an emergency, there is a great risk to human life if these vessels overturn or sink because such an overturning or sinking would create a situation where there could be hundreds of noncitizens in the water, many of whom may not know how to swim. *Id.* Often, noncitizens interdicted on these vessels have been at sea for several days, are dehydrated, need medical attention, or are otherwise experiencing elevated levels of stress. *Id.* These factors increase the risk to DHS personnel who rescue these migrants from these vessels because the number of migrants outnumber DHS crews. *Id.* DHS encounters with sail freighters are not uncommon, and because of sail freighter capacity to carry several hundred migrants, they can exceed the holding capacity of USCG cutters patrolling

---

[334] OIS analysis of USCG data through March 31, 2023.

[335] *Id.*

[336] Testimony of Jonathan Miller, "Securing America's Maritime Border: Challenges and Solutions for U.S. National Security" at 4 (Mar. 23, 2023), *https://homeland.house.gov/media/2023/03/3.23.23-TMS-Testimony.pdf.*

[337] OIS analysis of USCG data through March 31, 2023.

[338] *Id.*

[339] *Id.*

---

[348] Testimony of Rear Admiral Jo-Ann F. Burdian, Assistant Commandant for Response Policy, "Securing America's Maritime Border: Challenges and Solutions for U.S. National Security" (Mar. 23, 2023), *https://homeland.house.gov/media/2023/03/2023-03-23-TMS-Testimony.pdf.*

[349] *Id.*

[350] *Id.*

southeastern maritime smuggling vectors, increasing the risk not only to the migrants, but to cutter crews as well. *Id.* While maritime interdictions declined somewhat in February 2023, DHS assesses that the weather played a significant role in this reduced maritime movement in the Caribbean. *Id.* Through much of February, weather conditions were unfavorable for maritime ventures, particularly on smaller vessels. *Id.* However, DHS assesses that this was only temporary. Increasing levels of maritime interdictions put lives at risk and stress DHS's resources, and the increase in migrants taking to sea, under dangerous conditions, has led to devastating consequences.

Human smugglers and irregular migrant populations continue to use unseaworthy, overly crowded vessels, piloted by inexperienced mariners, without any safety equipment—including, but not limited to, personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons. In FY 2022, the USCG recorded 107 noncitizen deaths, including those presumed dead, as a result of irregular maritime migration. In January 2022, the USCG located a capsized vessel with a survivor clinging to the hull.[351] USCG crews interviewed the survivor, who indicated there were 34 others on the vessel who were not in the vicinity of the capsized vessel and the survivor.[352] The USCG conducted a multi-day air and surface search for the missing migrants, eventually recovering five deceased migrants, while the others were presumed lost at sea.[353] In November 2022, USCG and CBP rescued over 180 people from an overloaded boat that became disabled off of the Florida Keys.[354] They pulled 18 Haitian migrants out of the sea after they became trapped in ocean currents while trying to swim to shore.[355]

IOM's Missing Migrants Project reported at least 321 documented deaths and disappearances of migrants throughout the Caribbean in 2022, signaling the highest recorded number since they began tracking such events in 2014.[356] Most of those who perished or went missing in the Caribbean were from Haiti and Cuba.[357] This data represents a tragic 78 percent overall increase over the 180 deaths in the Caribbean documented in 2021, underscoring the perils of the journey.[358]

## B. A Further Increase in Maritime Migration is Reasonably Foreseeable

The Departments assess that maritime migration is likely to increase absent policy changes such as those being considered. For instance, Haiti continues to experience security and humanitarian crises caused by rampant gang violence, food and fuel shortages, a resurgence of cholera, and an August 2021 earthquake that killed 2,000 people.[359] And Cuba is undergoing its worst economic crisis since the 1990s[360] due to the lingering impact of the COVID–19 pandemic, reduced foreign aid from Venezuela because of that country's own economic crisis, high food prices, and U.S. economic sanctions.[361] These crises will likely continue to fuel irregular maritime migration.

Although the establishment of the CHNV parole processes has significantly reduced SWB encounters with Cuban and Haitian nationals as described above in Section II.A, maritime interdictions of Cuban and Haitian nationals in the Caribbean have increased in recent years and persist at high levels, as just described. Unlike noncitizens encountered at the SWB, noncitizens who reach the United States directly by sea without traveling from Mexico or Canada have not been subject to the CDC's Title 42 public health Order.[362] Instead, they are (and will continue to be) processed under Title 8, which as described above may entail years spent in the United States before a final order of removal is issued. DHS recently announced that in response to the increase in maritime migration and interdictions, and to disincentivize migrants from attempting the dangerous journey to the United States by sea, individuals who have been interdicted at sea after April 27, 2023, are ineligible for the parole processes for Cubans and Haitians. 88 FR 26327; 88 FR 26329. The Departments expect that this step will help but that, in light of the complicated mix of factors driving maritime migration, more is needed to discourage maritime migration and encourage the use of safe, lawful, orderly processes.

## C. Effects on Resources and Operations

USCG and its partners have surged assets to address the recent increase in maritime migration, but the increased flow of migrants overall led to a lower interdiction effectiveness rate (that is, the percentage of detected undocumented migrants of all nationalities who were interdicted by USCG and partners via maritime routes).[363] Between FY 2018 and FY 2020, USCG approached or exceeded its 75 percent effectiveness target.[364] In FY 2021 and FY 2022, effectiveness dropped to 47.2 percent and 56.6 percent, respectively, despite a surge response that resulted in 17 percent more interdictions in FY 2022 than in FY 2021.[365] That is, even though the USCG interdicted more migrants overall, those interdictions were a smaller percentage of total detected migrants on maritime routes than the USCG had interdicted between FY 2018 and 2019. A further surge in maritime migration risks further decreasing effectiveness (and thereby reducing deterrence of dangerous journeys by sea) and, as described below, would exacerbate USCG's overall capacity challenges and increase the risk to other key mission areas, such as counter-drug operations.

The United States Government's response to maritime migration in the Caribbean region is governed by executive orders, presidential directives, and resulting framework and plans that outline interagency roles and responsibilities. Homeland Security Task Force–Southeast ("HSTF–SE") is primarily responsible for DHS's response to maritime migration in the Caribbean Sea and the Straits of Florida. Operation Vigilant Sentry is the DHS interagency operational plan for responding to maritime migration in the Caribbean Sea and the Straits of

---

[351] Adriana Gomez Licon, Situation 'dire' as Coast Guard seeks 38 missing off Florida, Associated Press, Jan. 26, 2022, *https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe064304740c3a3019.*

[352] *Id.*

[353] Adriana Gomez Licon, Coast Guard suspends search for migrants off Florida, Associated Press, Jan. 27, 2022, *https://apnews.com/article/florida-lost-at-sea-79253e1c65cf5708f19a97b6875ae239.*

[354] Ashley Cox, More than 180 people rescued from overloaded vessel in Florida Keys, CBS News CW44 Tampa, Nov. 22, 2022, *https://www.cbsnews.com/tampa/news/more-than-180-people-rescued-from-overloaded-vessel-in-florida-keys/.*

[355] *Id.*

[356] IOM, Missing Migrants in the Caribbean Reached a Record High in 2022 (Jan. 24, 2023), *https://www.iom.int/news/missing-migrants-caribbean-reached-record-high-2022.*

[357] *Id.*

[358] *Id.*

[359] *See, e.g.,* CRS, Haiti: Recent Developments and U.S. Policy, R47394 (Jan. 23, 2023), *https://crsreports.congress.gov/product/pdf/R/R47394.*

[360] The Economist, Cuba is Facing Its Worst Shortage of Food Since 1990s (July 1, 2021), *https://www.economist.com/the-americas/2021/07/01/cuba-is-facing-its-worst-shortage-of-food-since-the-1990s.*

[361] CRS, Cuba: U.S. Policy in the 117th Congress (Sept. 22, 2022), *https://crsreports.congress.gov/product/pdf/R/R47246.*

[362] *See* 86 FR at 42841 (Order applies only to certain persons "traveling from Canada or Mexico").

[363] DHS, U.S. Coast Guard Budge Overview, Fiscal Year 2024 Congressional Justification, at USCG–3.

[364] *Id.*

[365] *Id.*

**Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations  **31443**

Florida.[366] The primary objectives of HSTF–SE are to protect the safety and security of the United States, deter and dissuade noncitizens from attempting the dangerous journey to the United States by sea, achieve U.S. humanitarian objectives, maintain the integrity of the U.S. immigration system, and prevent loss of life at sea through mobilizing DHS resources, reinforced by other Federal, State, and local assets and capabilities.

The USCG supports HSTF–SE and views its migrant interdiction mission as a humanitarian effort to rescue those taking to the sea and to encourage noncitizens to pursue lawful pathways to enter the United States. By allocating additional assets to migrant interdiction operations and to prevent conditions that could lead to maritime mass migration, the USCG assumes certain operational risk to other statutory missions. Some USCG assets were diverted from other key mission areas, including counter-drug operations, protection of living marine resources, and support for shipping navigation. *See* 88 FR at 26329. A reduction in maritime migration would reduce the operational risk to USCG's other statutory missions.

Maritime encounters also strain other DHS resources. For instance, during times of increased encounters in the maritime environment, the U.S. Border Patrol executes lateral decompression flights for processing. Once the Title 42 public health Order is lifted, based on DHS encounter projections and throughput models, southwest border sectors will likely lose the ability to accept decompression flights from coastal border sectors. This in turn would result in overcrowding in coastal border sectors' short-term holding facilities and impact local communities not prepared to receive migrants.

*D. Lawful, Safe, and Orderly Pathways*

As discussed in detail earlier in this preamble, the United States has taken significant steps to expand safe and orderly options for migrants, including migrants from the Caribbean region, to lawfully enter the United States. The United States has, for example, increased and will continue to increase refugee processing in the Western Hemisphere; country-specific and other available processes for individuals

seeking parole for urgent humanitarian reasons or significant public benefit, including the Cuba, Haiti, Nicaragua, and Venezuela parole processes; and opportunities to lawfully enter the United States for the purpose of seasonal employment. In addition, the United States has resumed the Cuban Family Reunification Program and resumed and increased participation in the Haitian Family Reunification Program.

The Departments are also aware that many individuals migrating out of island nations, such as Cuba and Haiti, do so via air travel.[367] For many individuals, travel by air to a third country may be an additional option for obtaining asylum or other protection. The Departments acknowledge, however, that there may be individuals for whom air travel is not an option. The Departments welcome data, other information, or comments on access to air travel and whether any aspect of this rule's presumption should be adjusted to account for differences among individuals in access to air travel.

*E. Alternatives Under Consideration*

The Departments are considering whether the rebuttable presumption should apply to noncitizens who enter the United States without documents sufficient for lawful admission during the same temporary time period at any maritime border, whether or not they traveled through a third country. Under this approach, the presumption would apply to any covered noncitizen who reached the United States by sea, including Cuban or Haitian nationals traveling directly to the United States from Cuba or Haiti. The Departments acknowledge, however, that eliminating the third-country travel component for

those arriving by sea would be a departure from the rest of the rule. The Departments are therefore considering whether this departure may be independently justified. The Departments believe that this additional measure could be warranted in light of the extreme hazard to both migrants and DHS personnel associated with maritime migration; the deterrence it would afford migrants who might undertake this dangerous journey to enter the United States irregularly and thus supplement interdiction efforts; the availability of lawful, safe, and orderly pathways for the primary populations at issue; and the safeguards incorporated into the rule. Applying the rule's rebuttable presumption of asylum ineligibility to persons who reach the United States by sea would not impose a categorical bar to asylum. To the contrary, the rule would still exempt noncitizens from the presumption if, instead of making a dangerous journey by sea, they arrived at the United States through a lawful pathway. It would also exempt certain noncitizens who arrive by sea, including unaccompanied children, and provide multiple ways for noncitizens to rebut the presumption, including in circumstances where—at the time the noncitizen entered the United States—the noncitizen or a member of their family with whom they were traveling faced an imminent and extreme threat to life or safety. The Departments request comment on how the various means of rebutting the presumption—including facing an "acute medical emergency," "imminent and extreme threat to life and safety," and "especially compelling circumstances"—should apply to noncitizens who reach the United States by sea. *See* 8 CFR 208.33(a)(3)(i); 8 CFR 1208.33(a)(3)(i).

The Departments are also considering whether to extend the geographic scope of the rule to certain noncitizens who enter the United States by sea, without regard to whether they departed from Mexico, while retaining the requirement that a noncitizen have traveled through another country on their way to the United States. This narrower application of the rule would limit covered noncitizens to those who, by and large, could have sought asylum or other protection in that other country. However, this alternative would mean that Cuban and Haitian nationals who reach the United States by sea directly from their country of origin would not fall within the rule's compass.

As another alternative, the Departments are considering whether to extend the scope of the presumption to certain noncitizens who enter the

---

[366] Homeland Security Task Force–Southeast, published through the U.S. Embassy in Cuba, *Homeland Security Task Force Southeast partners increase illegal migration enforcement patrols in Florida Straits, Caribbean* (Sept. 6, 2022), *https:// cu.usembassy.gov/homeland-security-task-force-southeast-partners-increase-illegal-migration-enforcement-patrols-in-florida-straits-caribbean/.*

[367] *See, e.g.,* Reuters, *Nicaragua eliminates visa requirement for Cubans,* Nov. 23, 2021, *https:// www.reuters.com/world/americas/nicaragua-eliminates-visa-requirement-cubans-2021-11-23/;* Ed Augustin, *Stars align for Cuban migrants as record numbers seek better life in US,* Guardian, June 12, 2022, *https://www.theguardian.com/world/ 2022/jun/12/cuban-migrants-us-record-numbers-migration* ("The U.S. Coast Guard has interdicted nearly 2,000 Cubans since October [2021]. But far more are flying to the Latin American mainland before journeying up to the U.S.-Mexico border: 114,000 have crossed into the U.S. since October [2021], according to U.S. Customs and Border Protection—1% of the island's entire population."); Julie Watson et al., *Charter business thrives as US-expelled Haitians flee Haiti,* AP, June 14, 2022, *https://apnews.com/article/covid-health-travel-caribbean-2e5f32f8781a06e74ef7ea7ec639575f;* Julie Watson et al., *Haitian trip to Texas border often starts in South America,* AP, Sept. 21, 2021, *https://apnews.com/article/technology-mexico-texas-caribbean-united-states-ac7f598bdf44 b3f95b786d2d800f3ce* ("Nearly all Haitians reach the U.S. on a well-worn route: Fly to Brazil, Chile or elsewhere in South America [then] move through Central America and Mexico.").

United States by sea, but only if they departed from the Caribbean or another region that presents a heightened risk of maritime crossings. This alternative may be more tailored to the specific geographic regions that have caused the increase in maritime interdictions in recent months, but it would not expand the rule to other regions that could be a source of maritime crossings in the future.

Finally, if rates of maritime migration rise substantially prior to the end of this comment period or prior to the issuance of a final rule that responds to these comments, the Departments intend to take appropriate action, consistent with the APA, which may include issuance of a temporary or interim final rule that implements one of the proposed modifications.

## VI. Regulatory Requirements

### A. Administrative Procedure Act

This final rule is consistent with the notice-and-comment rulemaking requirements described at 5 U.S.C. 553(b) and (c). For the reasons explained below, the Departments have determined that this rule is exempt from the 30-day delayed-effective-date requirement at 5 U.S.C. 553(d).

### 1. Foreign Affairs Exemption

This rule is exempt from the APA's delayed-effective-date requirement because it involves a "foreign affairs function of the United States." [368] 5 U.S.C. 553(a)(1). Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [369] In addition, although the text of the APA does not require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing. [370] This rule satisfies both standards.

The United States must work with foreign partners to address migration in the Western Hemisphere region, and this rule is clearly and directly related to, and responsive to, ongoing discussions with and requests by key foreign partners in the Western Hemisphere region in two ways. First, such partners have encouraged the

United States to take action to address unlawful migration to the SWB, which is particularly necessary now in light of the anticipated lifting of the Title 42 public health Order. [371] And by responding to these requests, the rule facilitates a key foreign policy goal—fostering a hemisphere-wide approach of addressing migration on a regionwide basis. Though the specific details of these discussions are not appropriate for extensive elaboration here due to the sensitive nature of government-to-government discussions, such partners have expressed concern that the lifting of the Title 42 public health Order—which provided an immediate consequence for many of those attempting to cross the SWB irregularly—may be misperceived by migrants as an indication that the U.S. border is open, which, in turn, could spur a surge of irregular migrant flows through their countries as migrants seek to enter the United States. One foreign partner opined that the formation of caravans in the spring of 2022 were spurred by rumors of the United States Government terminating the Title 42 public health Order and then the officially announced plans to do so. Such increases in irregular migration would further strain limited governmental and nongovernmental resources in partner nations. Already, partner nations have expressed significant concerns about the ways in which recent flows are challenging their own local communities and immigration infrastructure; they have expressed serious concerns that a dramatic increase in migrant flows could be overwhelming.

Some partner countries also have emphasized the possibility that criminal human smuggling organizations may seek to intentionally misrepresent the end of the Title 42 public health Order as leading to the opening of the U.S.-Mexico border in order to persuade would-be migrants to participate in expensive and dangerous human smuggling schemes. Such activity would put migrants' lives in danger and also contribute to the above-referenced adverse consequences associated with increased irregular migratory flows.

In connection with such discussions, a number of countries have lauded the sharp reductions in irregular migration associated with the aforementioned CHNV processes—which, like this rule, imposed consequences for irregular

migration alongside the availability of a lawful, safe, and orderly process for migrants to travel directly to the United States. Following the implementation of the Venezuela process in October 2022, some countries requested that the United States implement similar policies for other nationalities, which DHS did in January 2023. At the same time, however, partner nations have raised concerns that any changes to these processes or the circumstances in which they operate—including the perception that there will be no consequences for irregular entry once the Title 42 public health Order is no longer in place—will undermine their success. [372]

Implementation of this rule will therefore advance top foreign policy priorities of the United States, by responding to the aforementioned discussions with and feedback from foreign partners and demonstrating U.S. partnership and commitment to the shared goals of stabilizing migratory populations and addressing migration collectively as a region, both of which are essential to maintaining strong bilateral and multilateral relationships. [373] As noted earlier in this preamble and in the proposed rule, recent surges in irregular migration, including overland migration through the Darién Gap, have affected a range of regional neighbors, including Mexico, Colombia, Costa Rica, Peru, Ecuador, and Panama. *See, e.g.,* 88 FR 11710–11. A further spike in migration following the lifting of the Title 42 public health Order risks severely straining relations with the countries in the region, as each would be compelled to turn away from more sustainable policy goals, and employ its limited resources to address the humanitarian needs of a significant influx of irregular migrants.

Further, as described above, the United States faces constraints in removing nationals of certain countries—including Venezuela, Nicaragua, Cuba, and Haiti—to their home countries. With limited exceptions, such nationals can only be removed to a third country as a result. International partners have conveyed that their willingness to receive increased returns of migrants was contingent on expanding the model provided by the Venezuela process, which decreased irregular migration throughout the hemisphere by

---

[368] Although the Departments have voluntarily complied with the APA's notice and comment requirements, this rule is exempt from such requirements pursuant to the foreign affairs exception as well, for the same reasons that are described in this section.

[369] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[370] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[371] *See, e.g., Am. Ass'n of Exps. & Imps.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (exemption applies where a rule is "linked intimately with the Government's overall political agenda concerning relations with another country").

[372] *See, e.g.,* Alfredo Corchado, *Ahead of Title 42's end, U.S.-Mexico Negotiations called 'intense,' 'round-the-clock,'* Dallas Morning News, Dec. 13, 2022, *https://www.dallasnews.com/news/2022/12/13/ahead-of-title-42s-end-us-mexico-negotiations-called-intense-round-the-clock/.*

[373] *See* L.A. Declaration Fact Sheet.

**Federal Register**/Vol. 88, No. 94/Tuesday, May 16, 2023/Rules and Regulations    **31445**

increasing options for lawful pathways and adding consequences for noncitizens who bypass those opportunities to travel irregularly to the United States.[374]

In short, delaying issuance and implementation of this rule, including for purposes of incorporating a 30-day delayed effective date, would be inconsistent with the foreign policy imperative to act now. Such delay would not only forfeit an opportunity to fortify bilateral relationships, but would fail to address, and potentially exacerbate, DHS's projections of a surge in migration across the region following the lifting of the Title 42 public health Order. From a U.S. foreign policy perspective, such outcomes would have undesirable international consequences.

The Departments' invocation of the foreign affairs exemption here is consistent with recent precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[375] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[376]

### 2. Good Cause

This rule is also exempt from the APA's delayed-effective-date requirement because the Departments have for good cause found that a delay associated with that requirement would be impracticable and contrary to the public interest.[377] The Title 42 public health Order is ending due to developments over which the Departments do not exercise any direct control. It would be impossible to incorporate a 30-day delayed effective date and issue a rule prior to the

expiration of the Title 42 public health Order in that abbreviated time frame. As described above, such a delay would greatly exacerbate an urgent border and national security challenge that DHS has already taken multiple additional measures to address, and would miss a critical opportunity to reduce and divert the additional flow of irregular migration that is expected following lifting of the Title 42 public health Order.[378]

First, a 30-day delay of the effective date would be impracticable and contrary to the public interest because it would likely result in a significant further increase in irregular migration. As noted above, in recent years, the Departments, in coordination with other Executive Branch agencies and regional neighbors, have undertaken numerous measures to address such increases, which have been implemented via rulemakings,[379] voluntary processes paired with incentives against irregular migration,[380] and a wide range of significant resource surges and operational changes. A significant further increase in irregular migration, exacerbated by an influx of migrants from countries such as Venezuela, Nicaragua, and Cuba, with limited removal options, and coupled with DHS's limited options for processing,

detaining, or quickly removing such migrants, would unduly impede DHS's ability to fulfill its critical and varied missions.

Such challenges were evident in the days following the November 15, 2022, court decision vacating the Title 42 public health Order.[381] Within two days of the court's decision, total encounters at the SWB reached 9,583 in a single day on November 17, 2022, a 17 percent increase from the day before.[382] The baseline number of encounters decreased in March 2023, from April 2022, and also consisted of a much lower share of nationals from countries that have stopped or limited returns of their own nationals.[383] A delayed effective date could result in a substantial increase in irregular migration across multiple national borders, including our own.[384] As detailed above, these levels of irregular migration risk overwhelming DHS's ability to effectively process, detain, and remove, as appropriate, the migrants encountered. This, in turn, would result in potentially dangerous overcrowding at CBP facilities. The attendant risks to public safety, health, and welfare provide good cause to issue this rule without delay.[385]

The Departments expect that this effect would be particularly pronounced if noncitizens know that there is a specific 30-day period between the termination of the Title 42 public health Order and the effective date of this rule. That gap would incentivize even more irregular migration by those seeking to enter the United States before the process would take effect. It has long been recognized that agencies may use the good cause exception where significant public harm would result from using standard APA procedures.[386]

---

[374] *See* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2022) (committing to increase joint actions to counter human smugglers and traffickers, address root causes of migration, and continue to combine expanded lawful pathways with consequences for irregular migration).

[375] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[376] *See* 88 FR 1266 (Jan. 9, 2023); 88 FR 1243 (Jan. 9, 2023); 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 188 FR 1282 (Jan. 9, 2023); 87 FR 63507 (Oct. 19, 2022).

[377] 5 U.S.C. 553(d)(3). Although the Departments have voluntarily complied with the APA's notice and comment requirements, this rule is exempt from such requirements pursuant to the good cause exception at 5 U.S.C. 553(b)(B) as well, for reasons that are described in this section.

[378] The good cause exception to the 30-day effective date requirement is easier to meet than the good cause exception for forgoing notice and comment rulemaking. *See Riverbend Farms, Inc.* v. *Madigan,* 958 F.2d 1479, 1485 (9th Cir. 1992) (noting "good cause [is] more easily found as to [the] 30-day waiting period'' than the exception to notice and comment procedures); *Am. Fed'n of Gov't Emps., AFL–CIO* v. *Block,* 655 F.2d 1153, 1156 (D.C. Cir. 1981); *U.S. Steel Corp.* v. *EPA,* 605 F.2d 283, 289–90 (7th Cir. 1979). An agency can show good cause for eliminating the 30-day delayed effective date when it demonstrates either urgent conditions the rule seeks to correct or unavoidable time limitations. *U.S. Steel Corp.,* 605 F.2d at 290; *United States* v. *Gavrilovic,* 511 F.2d 1099, 1104 (8th Cir. 1977).

[379] *See, e.g.,* 87 FR 18078 (Mar. 29, 2022) (amending regulations to allow U.S. immigration officials to more promptly consider the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process); 87 FR 30334 (May 18, 2022) (authorizing an additional 35,000 supplemental H–2B visas for the second half of FY 2022, of which 11,500 were reserved for nationals of Central American countries and Haiti); 87 FR 4722 (Jan. 28, 2022) (authorizing an additional 20,000 H–2B visas for FY 2022, of which 6,500 were reserved for nationals of Central American countries, with the addition of Haiti); 87 FR 76818 (Dec. 15, 2022) (authorizing nearly 65,000 additional visas, of which 20,000 are reserved for nationals of Central American countries and Haiti).

[380] *See, e.g.,* DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022) (parole process for certain Venezuelan nationals and their immediate family members); DHS, Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022) (parole process for certain Ukrainian nationals and their immediate family members).

[381] *See Huisha-Huisha* v. *Mayorkas,* --- F. Supp. 3d ----, 2022 WL 16948610 (D.D.C. Nov. 15, 2022).

[382] OIS analysis of Persist Dataset based on data through March 31, 2023.

[383] *Id.*

[384] DHS SWB Encounter Planning Model generated April 18, 2023.

[385] *See, e.g., Hawaii Helicopter Operators Ass'n* v. *FAA,* 51 F.3d 212, 214 (9th Cir. 1995) (concluding agency's "concern about the threat to public safety'' justified notice and comment waiver).

[386] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 94–95 (D.C. Cir. 2012) (noting that the "good cause'' exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded'' (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the

Continued

**31446**    **Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations

If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice (and comment) need not be given.[387] A number of cases follow this logic in the context of economic regulation.[388]

The same logic applies here, where the Departments are responding to exceedingly serious challenges at the border, and a gap between the termination of the Title 42 public health Order and the implementation of this rule would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. The Departments' experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States. Smugglers routinely prey on migrants using perceived changes in domestic immigration law.[389] And those sudden

influxes overload scarce government resources dedicated to border security.[390]

For instance, on February 28, 2020, the Ninth Circuit lifted a stay of a nationwide injunction of MPP, a program implementing the Secretary's contiguous return authority under 8 U.S.C. 1225(b)(2)(C).[391] Almost immediately, hundreds of migrants began massing at POEs across the SWB attempting to immediately enter the United States, creating a severe safety hazard that forced CBP to temporarily close POEs in whole or in part.[392] Many others requested immediate entry into the country through their counsel, while others overwhelmed Border Patrol agents by attempting to illegally cross the SWB, with only some being apprehended successfully.[393] Absent the immediate and resource-intensive action taken by CBP, the number of migrants gathered at the border, whether at or between the POEs, could have increased dramatically, especially considering there were approximately 25,000 noncitizens who were in removal proceedings pursuant to MPP without scheduled court appearances, as well as others in Mexico that could have become aware of CBP's operational limitations and sought to exploit them.[394] And while CBP officers took action to resolve the sudden influx of migrants at multiple ports and prevent further deterioration of the situation at the border, they were diverted away from other critical missions, including detecting and confiscating illicit materials, and guarding efficient trade and travel.[395]

By contrast, as detailed above, immediate implementation of the parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans. Had the parole process, and the consequence that accompanied it (i.e., the return to Mexico of Venezuelan nationals encountered irregularly entering the United States without authorization between POEs) been announced weeks prior to its implementation, it likely would have had the opposite effect,

resulting in many hundreds and thousands of Venezuelan nationals attempting to cross the border between the POEs before the process went into effect. See 87 FR at 63516.

The Departments' determination here is consistent with past practice. For example, in addition to the parole process for Venezuelans described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "[p]re-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region."[396] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule."[397] DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations."[398] DHS concluded that "a surge could result in significant loss of human life."[399] Here, the Departments announced the proposed rule while a prior restrictive policy remained in place, but given the impending termination of the Title 42 public health Order, there is insufficient time for a delayed effective date.

Second, a delayed effective date is contrary to the public interest given that the anticipated termination of the Title 42 public health Order has drastically altered the framework governing processing of migrants. Courts find good cause satisfied where the immediate issuance of a rule is necessary to prevent public harm where a previously existing regulatory structure has been set aside by the courts.[400] A similar

---

public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline." (cleaned up)).

[387] See, e.g., Nader v. Sawhill, 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.").

[388] See, e.g., Chamber of Commerce of U.S. v. SEC., 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ['good cause'] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); Mobil Oil Corp. v. Dep't of Energy, 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.").

[389] See Nick Miroff and Carolyn Van Houten, The Border is Tougher to Cross Than Ever. But There's Still One Way into America, Wash. Post (Oct. 24, 2018); See Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on Social Media (July 26, 2022), https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media ("A review of social media groups and pages identified by migrants showed . . . dubious offers of coyote or legal services, false claims about conditions along the route, misinformation about points of entry at which officials waive the rules,

and baseless rumors about changes to immigration law.").

[390] Declaration of Enrique Lucero ¶¶ 6–8, Dkt. 95–3, Innovation Law Lab v. Wolf, No. 19–15716 (9th Cir Mar. 3, 2020); Declaration of Robert E. Perez, ¶ 15, Dkt. 95–2, Innovation Law Lab, No. 19–15716.

[391] See Innovation Law Lab v. Wolf, 951 F.3d 1073, 1095 (9th Cir. 2020), vacated as moot sub nom. Innovation Law Lab v. Mayorkas, 5 F.4th 1099 (9th Cir. 2021).

[392] See Declaration of Robert E. Perez, ¶¶ 4–15, Dkt. 95–2, Innovation Law Lab, No. 19–15716.

[393] Id. ¶¶ 4, 8.

[394] Id. ¶ 14.

[395] Id. ¶ 15.

[396] DHS, Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[397] Id.

[398] Id.

[399] Id.; accord, e.g., Department of State, Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

[400] See, e.g., United States v. Dean, 604 F.3d 1275, 1277–80 (11th Cir. 2010); Mid-Tex Elec. Coop., Inc. v. FERC, 822 F.2d 1123, 1124 (D.C. Cir.

**Federal Register** / Vol. 88, No. 94 / Tuesday, May 16, 2023 / Rules and Regulations **31447**

circumstance exists here: the Title 42 public health Order is ending based on factual developments, and the Departments do not control either those factual developments or the decision to recognize those factual developments by terminating the public health Order. Until May 11, 2023, the Title 42 public health Order requires DHS to expel hundreds of thousands of migrants without processing them under Title 8. Once the Title 42 public health Order is lifted, however, the Government must pivot, quickly, to process all migrants under its Title 8 authorities, at a time when the number of migrants seeking to cross the SWB without lawful authorization to do so is expected to surge significantly. The Departments therefore find good cause to forgo a delayed effective date in order to prevent the adverse consequences resulting from the termination of the Title 42 public health Order.

The Departments reiterate that they have only invoked the foreign affairs and good cause exceptions for the delayed-effective-date requirement. The Departments have solicited public comments and have given careful attention to comments that were received during the comment period, as reflected in Section III of this preamble.

*B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)*

Executive Order 12866, Executive Order 13563, and Executive Order 14094, Modernizing Regulatory Review, 88 FR 21879 (Apr. 6, 2023) direct agencies to assess the costs, benefits, and transfers of available alternatives, and, if regulation is necessary, to select regulatory approaches that maximize net benefits, including potential economic, environmental, public health and safety effects, distributive impacts, and equity. Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

The Office of Information and Regulatory Affairs of OMB reviewed the rule as a significant regulatory action under section 3(f)(4) of Executive Order 12866, as amended.

The expected effects of this rule are discussed above. The rule is expected to result in significantly reduced

incentives for irregular migration and illegal smuggling activity, and will help avert a significant further surge in irregular migration after the Title 42 public health Order is lifted. The rule will likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are ineligible for asylum and who lack a reasonable fear of persecution or torture would be present in the United States. Noncitizens who establish a reasonable fear of persecution or torture would still be able to seek protection in proceedings before IJs.

The benefits of the rule are expected to include large-scale reductions in strains on limited national resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; a reduction in the role of exploitative transnational criminal organizations and smugglers; and improved relationships with, and enhanced opportunities to coordinate with and benefit from the migration policies of, regional neighbors. Some of these benefits accrue to migrants who wish to pursue safe, orderly, lawful pathways and processes, such as the ability to schedule a time to apply for admission at a POE. These migrants' ability to present their claims might otherwise be hampered by the severe strain that a further surge in irregular migration would impose on the Departments.

The direct costs of the rule are borne by migrants and the Departments. To the extent that any migrants are made ineligible for asylum under the presumptive condition established by the rule but would have received asylum in the absence of this rule, such an outcome would entail the denial of asylum and its attendant benefits, although such persons may continue to be eligible for statutory withholding of removal and withholding under the CAT. Unlike asylees, noncitizens granted these more limited forms of protection do not have a path to citizenship and cannot petition for certain family members to join them in the United States.[401] Such migrants may also be required to apply for work authorization more frequently than an asylee would. Migrants who choose to wait in Mexico for a CBP One

appointment, rather than migrating irregularly across the southwest land border or adjacent coastal borders, also may incur some costs that are discussed earlier in this preamble, including potential safety risks for some migrants. The Departments note, in this regard, that noncitizens who establish "exceptionally compelling circumstances," including an imminent and extreme threat to life or safety or an acute medical emergency, can rebut the presumption against asylum eligibility. 8 CFR 208.33(a)(3)(i)(B), 1208.33(a)(3)(i)(B). The Departments further note that there are also potential benefits for migrants who choose to wait in Mexico for a CBP One appointment (for instance, avoiding a dangerous cross-border journey and interactions with smugglers).

The rule will also require additional time for AOs and IJs, during fear screenings and reviews, respectively, to inquire into the applicability of the presumption and whether the presumption has been rebutted. Similarly, the rule will require additional time for IJs during section 240 removal proceedings. However, as discussed throughout this preamble, the rule is expected to result in significantly reduced irregular migration. Accordingly, the Departments expect the additional time spent by AOs and IJs on the rebuttable presumption to be mitigated by a comparatively smaller number of credible fear cases than AOs and IJs would otherwise have been required to handle in the absence of the rule.

Other entities, such as legal service organizations and private attorneys, will also incur some indirect costs as a result of the rule, such as familiarization costs and costs associated with assisting noncitizens who may be subject to the rule. There are other potential downstream effects of the rule, including effects on NGOs and state and local entities that interact with noncitizens, such as by providing services to such persons or receiving tax revenues from them. The nature and scale of such effects will vary by entity and should be considered relative to the baseline condition that would exist in the absence of this rule. As compared to the baseline condition, this rule is expected to reduce irregular migration.

The lawful, safe, and orderly pathways described earlier in this preamble are authorized separately from this rule but are expected to yield significant benefits for noncitizens who might otherwise seek to migrate irregularly to the United States. For instance, the ability to schedule a time to arrive to apply for admission at POEs

---

1987), *Nat'l Fed'n of Fed. Emps.* v. *Devine,* 671 F.2d 607, 608 (D.C. Cir. 1982), *Block,* 655 F.2d at 1154; *Bayou Lawn & Landscape Servs.* v. *Johnson,* 173 F. Supp. 3d 1271, 1284 (N.D. Fla. 2016) (collecting cases).

[401] As discussed previously in Section IV.E.7.ii of this preamble, the rule includes a specific provision to ensure that applicants who in section 240 removal proceedings who have a spouse or child who would be eligible to follow to join them under section 208(b)(3)(A), 8 U.S.C. 1158(b)(3)(A), will be able to rebut the presumption if the presumption is the only reason for denying their asylum application.

is expected to significantly improve CBP's ability to process noncitizens at POEs, and available parole processes allow prospective irregular migrants to avoid a dangerous and expensive overland journey in favor of an arrival by air to the United States. To the extent that such pathways and this rule result in a substantial reduction in irregular migration, the benefits of such pathways may also accrue to the various entities that incur costs as a consequence of irregular migration.

### C. Regulatory Flexibility Act

The RFA requires Federal agencies to consider the potential impact of regulations on small entities during the development of their rules. See 5 U.S.C. 601 et seq. "Small entities" are small businesses, not-for-profit organizations that are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. Id. 601(6). This rule does not directly regulate small entities and is not expected to have a direct effect on small entities. Rather, the rule regulates individuals, and individuals are not defined as "small entities" by the RFA. Id. While some employers could experience costs or transfer effects, these impacts would be indirect. In the proposed rule, the Departments certified that the proposed rule would not have a significant economic impact on a substantial number of small entities. The Departments nonetheless welcomed comments regarding potential impacts on small entities. The Departments discuss comments from small entities earlier in the preamble, including in connection with the RFA. No such comments identified small entities that are subject to the rule within the meaning of the RFA. Accordingly, and for the same reasons stated in the proposed rule, the Departments certify that this rule will not have a significant economic impact on a substantial number of small entities.

### D. Unfunded Mandates Reform Act of 1995

UMRA is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may directly result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and Tribal governments, in the aggregate, or by the private sector. 2 U.S.C. 1532(a). The inflation-adjusted value of $100 million in 1995 was

approximately $177.8 million in 2021 based on the Consumer Price Index for All Urban Consumers (CPI–U).[402]

The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. See 2 U.S.C. 1502(1), 658(6). A "Federal intergovernmental mandate" in turn is a provision that would impose an enforceable duty upon State, local, or Tribal governments (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). See id. 658(5). And the term "Federal private sector mandate" refers to a provision that would impose an enforceable duty upon the private sector (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). See id. 658(7).

This rule does not contain a Federal mandate, because it does not impose any enforceable duty upon any other level of government or private sector entity. Any downstream effects on such entities would arise solely due to the entity's voluntary choices, and the voluntary choices of others, and would not be a consequence of an enforceable duty imposed by this proposed rule. Similarly, any costs or transfer effects on State and local governments would not result from a Federal mandate as that term is defined under UMRA. The requirements of title II of UMRA, therefore, do not apply, and the Departments have not prepared a statement under UMRA.

### E. Congressional Review Act

OMB has determined that this rule is not a major rule as defined by section 804 of the Congressional Review Act. 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets. The rule will be submitted to Congress and GAO consistent with the Congressional Review Act's requirements no later than its effective date.

### F. Executive Order 13132 (Federalism)

This proposed rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or

on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, the Departments believe that this proposed rule would not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### G. Executive Order 12988 (Civil Justice Reform)

This rule meets the applicable standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988, Civil Justice Reform, 61 FR 4729 (Feb. 5, 1996).

### H. Family Assessment

The Departments have reviewed this rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999, enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999. The Departments have reviewed the criteria specified in section 654(c)(1), by evaluating whether this regulatory action (1) impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local governments or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines a regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

The Departments have determined that the implementation of this rule will not impose a negative impact on family well-being or the autonomy or integrity of the family as an institution. Under the rule, adjudicators would consider the circumstances of family members traveling together when determining whether noncitizens are not subject to the presumption in §§ 208.33(a)(1) and 1208.33(a). The presumption will not apply to a noncitizen if the noncitizen or a member of the noncitizen's family who is traveling with the noncitizen establishes one of the conditions in § 208.33(a)(1)(i) through (iii). Similarly, the presumption in paragraph (a)(1) of those sections would be rebutted if the noncitizen demonstrates that, at the

---

[402] See BLS, Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. City Average, All Items by Month (Dec. 2021), https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202112.pdf.

time of entry, the noncitizen or a member of the noncitizen's family who is traveling with the noncitizen was subject to one of the circumstances enumerated in paragraph (a)(3).

Additionally, to protect against family separation, the Departments have determined that a principal applicant establishes an exceptionally compelling circumstance that rebuts the presumption of ineligibility for asylum where the principal asylum applicant is eligible for statutory withholding of removal or CAT withholding and would be granted asylum but for the lawful pathways rebuttable presumption, and where denial of asylum on that ground alone would lead to the applicant's family being or remaining separated because an accompanying spouse or child would not qualify for asylum or other protection from removal on their own, or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant if the applicant were not subject to the presumption. *See* E.O. 14011, Establishment of Interagency Task Force on the Reunification of Families, 86 FR 8273, 8273 (Feb. 5, 2021) (''It is the policy of my Administration to respect and value the integrity of families seeking to enter the United States.'').

*I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)*

This rule does not have ''tribal implications'' because it does not have substantial direct effects on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes. E.O. 13175, Consultation and Coordination With Indian Tribal Governments, 65 FR 67249 (Nov. 6, 2000). Accordingly, Executive Order 13175 requires no further agency action or analysis.

*J. Paperwork Reduction Act*

Under the Paperwork Reduction Act of 1995, 44 U.S.C. 3501 *et seq.* the Departments must submit to OMB, for review and approval, any collection of information contained in a rule, unless otherwise exempt. *See* Public Law 104–13, 109 Stat. 163 (May 22, 1995). The proposed rule proposed a revision to a collection of information under OMB Control Number 1651–0140, *Collection of Advance Information from Certain Undocumented Individuals on the Land Border.* Comments pertinent to the collection of information are discussed earlier in this preamble.

As discussed in Section IV.E.3.ii.b of this preamble, CBP will transition CBP One scheduling to a daily appointment allocation process to allow noncitizens additional time to complete the process. CBP has revised the burden estimate for this collection consistent with this change. CBP continues to make improvements to the app based on stakeholder feedback.

*Overview of information collection:*
(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Collection of Advance Information from Certain Undocumented Individuals on the Land Border.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* CBP.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:*

*Primary:* Individual undocumented noncitizens. Under this collection, CBP collects certain biographic and biometric information from undocumented noncitizens prior to their arrival at a POE, to streamline their processing at the POE. The requested information is that which CBP would otherwise collect from these individuals during primary and/or secondary processing. This information is provided by undocumented noncitizens, directly or through NGOs and International Organizations. Providing this information reduces the amount of data entered by CBP officers and the corresponding time required to process an undocumented noncitizen.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* This information collection is divided into three parts. The estimated annual number of respondents for the registration in the CBP One app is 500,000 and the estimated time burden per response is 12 minutes. The estimated annual number of respondents for the daily opt-in for appointments is 500,000 and the estimated time burden per response is 1 minutes. The estimated annual number of respondents for the confirmation of appointment in the app app is 456,250 and the estimated time burden per response is 3 minutes.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 372,813 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $7,605,385.

List of Subjects

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

**Regulatory Amendments**

**DEPARTMENT OF HOMELAND SECURITY**

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security amends 8 CFR part 208 as follows:

**PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; 8 CFR part 2; Pub. L. 115–218.

■ 2. Amend § 208.13 by removing and reserving paragraphs (c)(3), (4), and (5); adding and reserving paragraph (e); and adding paragraph (f), to read as follows:

**§ 208.13   Establishing asylum eligibility.**

\*     \*     \*     \*     \*

(c) \* \* \*

(3)–(5) [Reserved]

\*     \*     \*     \*     \*

(e) [Reserved]

(f) *Lawful pathways condition.* For applications filed by aliens who entered the United States between May 11, 2023, and May 11, 2025, also refer to the provisions on asylum eligibility described in § 208.33.

**§ 208.30   [Amended]**

■ 3. Amend § 208.30(e)(5) by:

■ a. Amending paragraph (e)(5)(i) by removing the phrase ''paragraphs (e)(5)(ii) through (iv), or'' from the first sentence;

■ b. Removing paragraphs (e)(5)(ii) and (iii); and

■ c. Redesignating paragraph (e)(5)(i) as (e)(5).

■ 4. Add subpart C, consisting of § 208.33, to read as follows:

## Subpart C—Lawful Pathways and Asylum Eligibility for Certain Aliens Who Entered Between May 11, 2023, and May 11, 2025

### § 208.33  Lawful pathways condition on asylum eligibility.

Notwithstanding any contrary section of this part, including §§ 208.2, 208.13, and 208.30—

(a) *Condition on eligibility.* (1) *Applicability.* A rebuttable presumption of ineligibility for asylum applies to an alien who enters the United States from Mexico at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission as described in section 212(a)(7) of the Act and whose entry was:

(i) Between May 11, 2023, and May 11, 2025,

(ii) Subsequent to the end of implementation of the Title 42 public health Order issued on August 2, 2021, and related prior orders issued pursuant to the authorities in sections 362 and 365 of the Public Health Service Act (42 U.S.C. 265, 268) and the implementing regulation at 42 CFR 71.40, and

(iii) After the alien traveled through a country other than the alien's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of Refugees.

(2) *Exceptions to applicability of the rebuttable presumption.* The rebuttable presumption described in paragraph (a)(1) of this section does not apply if:

(i) The alien was, at the time of entry, an unaccompanied alien child as defined in 6 U.S.C. 279(g)(2); or

(ii) The alien, or a member of the alien's family as described in § 208.30(c) with whom the alien is traveling:

(A) Was provided appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process;

(B) Presented at a port of entry, pursuant to a pre-scheduled time and place, or presented at a port of entry without a pre-scheduled time and place, if the alien demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or

(C) Sought asylum or other protection in a country through which the alien traveled and received a final decision denying that application. A final decision includes any denial by a foreign government of the applicant's claim for asylum or other protection through one or more of that government's pathways for that claim. A final decision does not include a determination by a foreign government that the alien abandoned the claim.

(3) *Rebuttal of the presumption.* (i) An alien subject to the presumption described in paragraph (a)(1) of this section can rebut the presumption by demonstrating by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the alien demonstrates that, at the time of entry, the alien or a member of the alien's family as described in § 208.30(c) with whom the alien is traveling:

(A) Faced an acute medical emergency;

(B) Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or

(C) Satisfied the definition of "victim of a severe form of trafficking in persons" provided in § 214.11(a) of this chapter.

(ii) An alien who demonstrates by a preponderance of the evidence any of the circumstances in paragraph (a)(3)(i) of this section shall necessarily rebut the presumption in paragraph (a)(1) of this section.

(b) *Application in credible fear determinations—*(1) *Initial determination.* The asylum officer shall first determine whether the alien is covered by the presumption in paragraph (a)(1) of this section and, if so, whether the alien has rebutted the presumption in accordance with paragraph (a)(3) of this section.

(i) If the alien is covered by the presumption in paragraph (a)(1) of this section and fails to rebut the presumption in accordance with paragraph (a)(3) of this section, then the asylum officer shall enter a negative credible fear determination with respect to the alien's asylum claim and continue to consider the alien's claim under paragraph (b)(2) of this section.

(ii) If the alien is not covered by the presumption in paragraph (a)(1) of this section or has rebutted the presumption in accordance with paragraph (a)(3) of this section, the asylum officer shall follow the procedures in § 208.30.

(2) *Additional procedures.* (i) In cases in which the asylum officer enters a negative credible fear determination under paragraph (b)(1)(i) of this section, the asylum officer will assess whether the alien has established a reasonable possibility of persecution (meaning a reasonable possibility of being persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion) or torture, with respect to the identified country or countries of removal identified pursuant to section 241(b) of the Act.

(ii) In cases described in paragraph (b)(2)(i) of this section, if the alien establishes a reasonable possibility of persecution or torture with respect to the identified country or countries of removal, the Department will issue a Form I–862, Notice to Appear.

(iii) In cases described in paragraph (b)(2)(i) of this section, if an alien fails to establish a reasonable possibility of persecution or torture with respect to the identified country or countries of removal, the asylum officer will provide the alien with a written notice of decision and inquire whether the alien wishes to have an immigration judge review the negative credible fear determinations.

(iv) The alien must indicate whether he or she desires such review on a Record of Negative Fear Finding and Request for Review by Immigration Judge.

(v) Only if the alien requests such review by so indicating on the Record of Negative Fear shall the asylum officer serve the alien with a Notice of Referral to Immigration Judge. The record of determination, including copies of the Notice of Referral to Immigration Judge, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination. Immigration judges will evaluate the case as provided in 8 CFR 1208.33(b). The case shall then proceed as set forth in paragraphs (b)(2)(v)(A) through (C) of this section.

(A) Where the immigration judge issues a positive credible fear determination under 8 CFR 1208.33(b)(2)(i), the case shall proceed under 8 CFR 1208.30(g)(2)(iv)(B).

(B) Where the immigration judge issues a positive credible fear determination under 8 CFR 1208.33(b)(2)(ii), DHS shall issue a Form I–862, Notice to Appear, to commence removal proceedings under section 240 of the Act.

(C) Where the immigration judge issues a negative credible fear determination, the case shall be returned to DHS for removal of the alien. No appeal shall lie from the immigration judge's decision and no request for reconsideration may be submitted to USCIS. Nevertheless, USCIS may, in its sole discretion, reconsider a negative determination.

(c) *Continuing applicability of condition on eligibility.* (1) Subject to

paragraph (c)(2) of this section, the condition on asylum eligibility in paragraph (a)(1) of this section shall apply to any asylum application filed by an alien who entered the United States during the time and in the manner specified in paragraph (a)(1) of this section and who is not covered by an exception in paragraph (a)(2) of this section, regardless of when the application is filed and adjudicated.

(2) The conditions on asylum eligibility in paragraph (a)(1) of this section shall not apply to an asylum application filed by an alien described in paragraph (c)(1) of this section if the asylum application is filed after May 11, 2025, the alien was under the age of 18 at the time of the entry referenced in paragraph (c)(1) of this section, and the alien is applying for asylum as a principal applicant.

(d) *Severability.* The Department intends that any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, should be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding is that the provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

## DEPARTMENT OF JUSTICE

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR parts 1003 and 1208 as follows:

## PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

■ 5. The authority citation for part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 6 U.S.C. 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to –328.

## § 1003.42   [Amended]

■ 6. Amend § 1003.42 by removing paragraphs (d)(2) and (3) and redesignating paragraph (d)(1) as paragraph (d).

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 7. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; Pub. L. 115–218.

■ 8. Amend § 1208.13 by removing and reserving paragraphs (c)(3), (4), and (5), and by adding paragraph (f), to read as follows:

## § 1208.13   Establishing asylum eligibility.

\*    \*    \*    \*    \*

(c) \* \* \*

(3)–(5) [Reserved]

\*    \*    \*    \*    \*

(f) *Lawful pathways condition.* For applications filed by aliens who entered the United States between May 11, 2023, and May 11, 2025, also refer to the provisions on asylum eligibility described in § 1208.33.

## § 1208.30   [Amended]

■ 9. Amend § 1208.30 by removing and reserving paragraph (g)(1).

■ 10. Add subpart C, consisting of § 1208.33, to read as follows:

## Subpart C—Lawful Pathways and Asylum Eligibility for Certain Aliens Who Entered Between May 11, 2023, and May 11, 2025

## § 1208.33   Lawful pathways condition on asylum eligibility.

Notwithstanding any contrary section of this part, including §§ 1208.2, 1208.13, and 1208.30—

(a) *Condition on eligibility.* (1) *Applicability.* A rebuttable presumption of ineligibility for asylum applies to an alien who enters the United States from Mexico at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission as described in section 212(a)(7) of the Act and whose entry was:

(i) Between May 11, 2023, and May 11, 2025,

(ii) Subsequent to the end of implementation of the Title 42 public health Order issued on August 2, 2021, and related prior orders issued pursuant to the authorities in sections 362 and 365 of the Public Health Service Act (42 U.S.C. 265, 268) and the implementing regulation at 42 CFR 71.40, and

(iii) After the alien traveled through a country other than the alien's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of Refugees.

(2) *Exceptions to applicability of the rebuttable presumption.* The rebuttable presumption described in paragraph (a)(1) of this section does not apply if:

(i) The alien was, at the time of entry, an unaccompanied alien child as defined in 6 U.S.C. 279(g)(2); or

(ii) The alien, or a member of the alien's family as described in § 208.30(c) with whom the alien is traveling:

(A) Was provided appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process;

(B) Presented at a port of entry, pursuant to a pre-scheduled time and place, or presented at a port of entry without a pre-scheduled time and place, if the alien demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or

(C) Sought asylum or other protection in a country through which the alien traveled and received a final decision denying that application. A final decision includes any denial by a foreign government of the applicant's claim for asylum or other protection through one or more of that government's pathways for that claim. A final decision does not include a determination by a foreign government that the alien abandoned the claim.

(3) *Rebuttal of the presumption.* (i) The presumption in paragraph (a)(1) of this section can be rebutted if an alien demonstrates by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the alien demonstrates that, at the time of entry, the alien or a member of the alien's family as described in § 208.30(c) with whom the alien is traveling:

(A) Faced an acute medical emergency;

(B) Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or

(C) Satisfied the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.11(a).

(ii) An alien who demonstrates by a preponderance of the evidence any of the circumstances in paragraph (a)(3)(i) of this section shall necessarily rebut the presumption in paragraph (a)(1) of this section.

(b) *Application in credible fear determinations.* (1) Where an asylum officer has issued a negative credible fear determination pursuant to 8 CFR 208.33(b), and the alien has requested

immigration judge review of that credible fear determination, the immigration judge shall evaluate the case de novo, as specified in paragraph (b)(2) of this section. In doing so, the immigration judge shall take into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the immigration judge.

(2) The immigration judge shall first determine whether the alien is covered by the presumption at 8 CFR 208.33(a)(1) and 1208.33(a)(1) and, if so, whether the alien has rebutted the presumption in accordance with 8 CFR 208.33(a)(3) and 1208.33(a)(3).

(i) Where the immigration judge determines that the alien is not covered by the presumption, or that the presumption has been rebutted, the immigration judge shall further determine, consistent with § 1208.30, whether the alien has established a significant possibility of eligibility for asylum under section 208 of the Act, withholding of removal under section 241(b)(3) of the Act, or withholding of removal under the Convention Against Torture. Where the immigration judge determines that the alien has established a significant possibility of eligibility for one of those forms of relief or protection, the immigration judge shall issue a positive credible fear finding. Where the immigration judge determines that the alien has not established a significant possibility of eligibility for any of those forms of relief or protection, the immigration judge shall issue a negative credible fear finding.

(ii) Where the immigration judge determines that the alien is covered by the presumption and that the presumption has not been rebutted, the immigration judge shall further determine whether the alien has established a reasonable possibility of persecution (meaning a reasonable possibility of being persecuted because of their race, religion, nationality, political opinion, or membership in a particular social group) or torture. Where the immigration judge determines that the alien has established a reasonable possibility of persecution or torture, the immigration judge shall issue a positive credible fear finding. Where the immigration judge determines that the alien has not established a reasonable possibility of persecution or torture, the immigration judge shall issue a negative credible fear finding.

(3) Following the immigration judge's determination, the case will proceed as indicated in 8 CFR 208.33(b)(2)(v)(A) through (C).

(4) If, under 8 CFR 208.33(b)(2), DHS issues a Form I–862, Notice to Appear, to commence removal proceedings under section 240 of the Act, the alien may apply for asylum, withholding of removal under section 241(b)(3) of the Act, withholding of removal under the Convention Against Torture, or any other form of relief or protection for which the alien is eligible during those removal proceedings.

(c) *Family unity and removal proceedings.* In removal proceedings under section 240 of the Act, where a principal asylum applicant is eligible for withholding of removal under section 241(b)(3) of the Act or withholding of removal under § 1208.16(c)(2) and would be granted asylum but for the presumption in paragraph (a)(1) of this section, and where an accompanying spouse or child as defined in section 208(b)(3)(A) of the Act does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the Act, the presumption shall be deemed rebutted as an exceptionally compelling circumstance in accordance with paragraph (a)(3) of this section.

(d) *Continuing applicability of condition on eligibility.* (1) Subject to paragraph (d)(2) of this section, the condition on asylum eligibility in paragraph (a)(1) of this section shall apply to any asylum application filed by an alien who entered the United States during the time and in the manner specified in paragraph (a)(1) of this section and who is not covered by an exception in paragraph (a)(2) of this section, regardless of when the application is filed and adjudicated.

(2) The conditions on asylum eligibility in paragraph (a)(1) of this section shall not apply to an asylum application filed by an alien described in paragraph (d)(1) of this section if the asylum application is filed after May 11, 2025, the alien was under the age of 18 at the time of the entry referenced in paragraph (d)(1) of this section, and the alien is applying for asylum as a principal applicant.

(e) *Severability.* The Department intends that any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, should be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding is that the provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

Dated: May 8, 2023.

**Merrick B. Garland,**
*Attorney General, U.S. Department of Justice.*

[FR Doc. 2023–10146 Filed 5–10–23; 8:45 am]

**BILLING CODE 9111–97–P; 4410–30–P**

**65588**    **Federal Register** / Vol. 72, No. 224 / Wednesday, November 21, 2007 / Notices

Dated: November 16, 2007.

**Richard A. Sloan,**

*Chief, Regulatory Management Division, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. E7–22771 Filed 11–20–07; 8:45 am]

**BILLING CODE 4410–10–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2426–07; DHS Docket No. USCIS–2007–0043]**

**RIN 1615–ZA61**

**Cuban Family Reunification Parole Program**

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

**SUMMARY:** This Notice announces U.S. Citizenship and Immigration Services' Cuban Family Reunification Parole Program. Under this program, U.S. Citizenship and Immigration Services is offering beneficiaries of approved family-based immigrant visa petitions an opportunity to receive a discretionary grant of parole to come to the United States rather than remain in Cuba to apply for lawful permanent resident status. The purpose of the program is to expedite family reunification through safe, legal, and orderly channels of migration to the United States and to discourage irregular and inherently dangerous maritime migration.

**DATES:** This Notice is effective November 21, 2007.

**FOR FURTHER INFORMATION CONTACT:**
Manpreet S. Dhanjal, Refugee Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., 8th Floor, Washington, DC 20529, Telephone (202) 272–1613.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

In furtherance of the U.S.-Cuba Migration Accords, the United States endeavors to provide a minimum of 20,000 travel documents annually to aspiring Cuban emigrants. *See* Joint Communiqué on Migration, U.S.-Cuba (Sept. 9, 1994) (known together with the May 2, 1995 Joint Statement as the U.S.-Cuba Migration Accords (hereinafter ''Migration Accords'')). In so doing, the United States offers a safe, legal, and orderly means of coming to the United States. To date, the majority of travel

documents issued under the Migration Accords fall into one of three programs: family-based immigrant visas; refugee resettlement; and parole under the Special Cuban Migration Program, also referred to as the Cuban Lottery. For information on the Cuban Lottery, see *http://havana.usinterestsection.gov/diversity_program.html.*

Two aspects of the existing array of migration programs limit the ability of the United States to effectively promote safe, legal, and orderly migration as an alternative to maritime crossings. First, with the exception of ''immediate relatives'' (*e.g.,* spouse, unmarried child) of U.S. citizens (USCs), the number of family-based immigrant visas that are available in any given year is limited by statute. *See* Immigration and Nationality Act (INA) sections 201(c), 202(a) & 203, 8 U.S.C. 1151(c), 1152(a) & 1153. The statutory caps have resulted in long waiting periods before family members remaining in Cuba may rejoin the USCs and lawful permanent residents (LPRs) residing in the United States who petitioned for them. Second, the United States has not been permitted to hold a new registration period since 1998 due to constraints placed on the Cuban Lottery program by the Cuban Government. This greatly reduces the pool of individuals to whom the United States may issue travel documents.

For these reasons, this Notice adds the Cuban Family Reunification Parole (CFRP) Program to the list of migrant programs based on which the United States issues travel documents under the Migration Accords.

**II. The CFRP Program**

Under the CFRP Program, USCIS may exercise its discretionary parole authority to permit eligible Cuban nationals to come to the United States to rejoin their family members. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (permits parole of an alien into the United States for urgent humanitarian reasons or significant public benefit); *see also* 8 CFR 212.5(c) & (d) (discretionary authority for granting parole). Granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States. Whether to parole a particular alien remains,

however, a case-by-case, discretionary determination.

**III. Participation in the CFRP Program**

USCIS will offer participation in the CFRP Program to Cuban nationals who reside in Cuba and who are the beneficiaries (including any accompanying or following to join spouse and children (see INA section 203(d), 8 U.S.C. 1153(d)) of a properly filed Form I–130, ''Petition for Alien Relative,'' that has been approved, but for which an immigrant visa is not yet immediately available.

Under the CFRP Program, USCIS or the Department of State's National Visa Center (NVC) will mail written notice to U.S.-based USC and LPR petitioners whose Forms I–130 have been approved regarding their beneficiary's eligibility to participate in the CFRP Program and the procedures for requesting parole. However, participation in the CFRP is voluntary. If USCIS exercises its discretion to grant parole, it will issue the necessary U.S. travel documents to the beneficiary in Cuba. These travel documents will enable the beneficiary to travel safely to the United States to rejoin his or her family members.

Participation in the CFRP Program is not available to aliens who qualify as ''immediate relatives'' under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i). The extraordinary benefit of parole is not needed for these aliens, since they may seek visas for travel to the United States immediately upon the approval of Form I–130.

Additional information about the CFRP Program will be posted at *http://www.uscis.gov.*

Dated: November 15, 2007.

**Emilio T. Gonzalez,**

*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. E7–22679 Filed 11–20–07; 8:45 am]

**BILLING CODE 4410–10–P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**[Docket No. FR–5123–N–16]**

**Notice of Proposed Information Collection for Public Comment: Notice of Funding Availability for the Tribal Colleges and University Programs**

**AGENCY:** Office of the Assistant Secretary for Policy Development and Research, HUD.

**ACTION:** Notice.

**SUMMARY:** The proposed information collection requirement described below will be submitted to the Office of

# DEPARTMENT OF HOMELAND SECURITY

## Office of the Secretary

## Designating Aliens for Expedited Removal

**AGENCY:** Office of the Secretary, Department of Homeland Security.

**ACTION:** Notice.

---

**SUMMARY:** This Notice rescinds the March 21, 2022 Notice, *Rescission of the Notice of July 23, 2019, Designation for Expedited Removal.* This Notice also restores the scope of expedited removal to the fullest extent authorized by Congress.

**DATES:** This designation is effective on 6:00 p.m. EST on Tuesday January 21, 2025.

**FOR FURTHER INFORMATION CONTACT:** Joseph Mazarra, Office of the General Counsel, Department of Homeland Security, 202–282–9256.

**SUPPLEMENTARY INFORMATION:**

## I. Background

This Notice rescinds the March 21, 2022 Notice, *Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal,*[1] which limited the application of expedited removal procedures to certain aliens under the Immigration and Nationality Act (INA), to the extent the March 21, 2022 Notice is inconsistent with this Notice. This Notice enables the U.S. Department of Homeland Security (DHS) to exercise the full scope of its statutory authority to place in expedited removal, with limited exceptions, aliens[2] determined to be inadmissible under sections 212(a)(6)(C) or (a)(7) of the INA who have not been admitted or paroled into the United States and who have not affirmatively shown, to the satisfaction of an immigration officer, that they have been physically present in the United States continuously for the two-year period immediately preceding the date of the determination of inadmissibility. Presently, immigration officers may apply expedited removal to aliens apprehended anywhere in the United States for up to two years after the alien arrived in the United States, provided that the alien arrived by sea and the other conditions for expedited removal were satisfied. For aliens who entered the United States by crossing a land border other than at a port of entry, with the March 21, 2022 Notice, the Secretary of DHS effectively exercised his discretion under the INA to limit the use of expedited removal to aliens apprehended by an immigration officer within 100 air miles of the United States international land border and who were continuously present in the United States for less than 14 days immediately prior to the date of encounter.

The INA grants the Secretary of Homeland Security the "sole and unreviewable discretion" to modify at any time the discretionary limits on the scope of the expedited removal designation. The Secretary is exercising his statutory authority through this Notice to designate for expedited removal the following categories of aliens not currently designated: (1) Aliens who did not arrive by sea, who are encountered anywhere in the United States more than 100 air miles from a U.S. international land border, and who have been continuously present in the United States for less than two years; and (2) aliens who did not arrive by sea, who are encountered within 100 air miles from a U.S. international land border, and who have been continuously present in the United States for at least 14 days but for less than two years. Therefore, the designation in this Notice restores the scope of expedited removal to the fullest extent authorized by Congress, as was previously established in the July 23, 2019 Notice, *Designating Aliens for Expedited Removal.* To the extent there is an ambiguity in this Notice, the intended effect of this notice is to apply expedited removal to the fullest extent authorized by statute.

The effect of this change will be to enhance national security and public safety—while reducing government costs—by facilitating prompt immigration determinations. In particular, the full application of expedited removal authority will enable DHS to address more effectively and efficiently the large volume of aliens who are present in the United States unlawfully, without having been admitted or paroled into the United States, and ensure the prompt removal from the United States of those not entitled to enter, remain, or be provided relief or protection from removal.

## II. This Notice Is Immediately Effective

In keeping with the practice followed in announcing the previous designations, and consistent with implementing regulations at 8 CFR 235.3(b)(1)(ii),[3] this designation is effective without prior notice and comment or a delayed effective date. *See, e.g.,* 67 FR 68923, 68925 (2002 Notice); 69 FR 48877, 48880 (2004 Notice); 82 FR 4769, 4769 (2017 elimination of exception for Cuban nationals arriving by air); 82 FR 4902, 4902 (2017 elimination of exception for Cuban nationals encountered in the United States or arriving by sea); 84 FR 35409, 35413 (2019 Notice); 87 FR 16022, 16024 (2022 Notice).

Congress explicitly authorized the Secretary to designate categories of aliens to whom expedited removal procedures may be applied. It also made clear that "[s]uch designation shall be in the sole and unreviewable discretion of the [Secretary] and may be modified at any time." *See* INA 235(b)(1)(A)(iii)(I), 8 U.S.C. 1225(b)(1)(A)(iii)(I)(emphasis added). Therefore, the Secretary's designation, within statutory bounds, is "committed to agency discretion by law and . . . there is no cause of action to evaluate the merits of the Secretary's judgment under APA standards." *Make the Road N.Y.* v. *Wolf,* 962 F.3d 612, 633–634 (D.C. Cir. 2020). Furthermore, as the D.C. Circuit held, based on the statutory language allowing for modification of the designation "at any time" and in his "sole and unreviewable discretion," the Department does not have to undertake the notice-and-comment rulemaking process. *Id.* at 635. As discussed above, the rulemaking procedures of the APA do not apply to this Notice and the expansion or contraction of a designation may be made "at any time." *Id.* at 634–635 (internal quotation marks omitted).

## III. Notice of Designation of Aliens Subject to Expedited Removal

Pursuant to INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii), and 8 CFR 253.3(b)(1)(ii), I order, in my sole and unreviewable discretion, as follows:

(A) The Notice titled *Designating for Expedited Removal,* 87 FR 16022 (March 21, 2022), is hereby rescinded, effective immediately.

(B) I designate for expedited removal the following categories of aliens not

---

[1] The 2022 notice was published at 87 FR 16022. The 2019 notice was published at 84 FR 35409.

[2] The term "alien" is defined in statute as "any person not a citizen or national of the United States." 8 U.S.C. 1101(a)(3). Going forward, DHS will adhere to statutory language and use the proper terminology.

[3] 8 CFR 235.3(b)(1)(ii) (providing that "[t]he Commissioner shall have the sole discretion to apply the provisions of section 235(b)(1) of the Act, *at any time,* to any class of aliens described in this section" and that this "designation shall become effective upon publication of a notice in the **Federal Register**" as well as that, "if the Commissioner determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of the United States or the effective enforcement of the immigration laws, the Commissioner's designation shall become effective immediately upon issuance, and shall be published in the **Federal Register** as soon as practicable thereafter" (emphasis added)).

currently designated: (1) Aliens who did not arrive by sea, who are apprehended anywhere in the United States more than 100 air miles from a U.S. international land border, and who have been continuously present in the United States for less than two years; and (2) aliens who did not arrive by sea, who are apprehended within 100 air miles from a U.S. international land border, and who have been continuously present in the United States for at least 14 days but for less than two years. Each alien placed in expedited removal under this designation bears the affirmative burden to show to the satisfaction of an immigration officer that the alien has been present in the United States continuously for the relevant period. This designation does not apply to aliens who arrive at U.S. ports of entry, because those aliens are already subject to expedited removal. Nor does this designation apply to or otherwise affect aliens who satisfy the expedited removal criteria set forth in any of the previous designations. *See* 82 FR 4902, 69 FR 48877; 67 FR 68923.

(C) With the exception of the March 21, 2022 Notice rescinded above, this Notice does not supersede, abrogate, or amend or modify any of the Pre-2019 Designations,[4] which shall remain in full force and effect in accordance with their respective terms.

Signed at Washington, DC.

**Benjamine C. Huffman,**

*Acting Secretary of Homeland Security.*

[FR Doc. 2025–01720 Filed 1–21–25; 4:45 pm]

**BILLING CODE 9110–9M–P**

---

## INTERNATIONAL TRADE COMMISSION

**[Investigation Nos. 701–TA–606 and 731–TA–1416 (Review)]**

## Quartz Surface Products From China

### Determinations

On the basis of the record[1] developed in the subject five-year reviews, the United States International Trade Commission ("Commission") determines, pursuant to the Tariff Act of 1930 ("the Act"), that revocation of the countervailing duty and antidumping duty orders on quartz surface products from China would be likely to lead to continuation or recurrence of material injury to an industry in the United

States within a reasonably foreseeable time.

### Background

The Commission instituted these reviews on June 3, 2024 (89 FR 47614) and determined on September 6, 2024 that it would conduct expedited reviews (89 FR 97653, December 9, 2024).

The Commission made these determinations pursuant to section 751(c) of the Act (19 U.S.C. 1675(c)). It completed and filed its determinations in these reviews on January 17, 2025. The views of the Commission are contained in USITC Publication 5578 (January 2025), entitled *Quartz Surface Products from China: Investigation Nos. 701–TA–606 and 731–TA–1416 (Review).*

By order of the Commission.

Issued: January 17, 2025.

**Lisa Barton,**

*Secretary to the Commission.*

[FR Doc. 2025–01632 Filed 1–23–25; 8:45 am]

**BILLING CODE 7020–02–P**

---

## INTERNATIONAL TRADE COMMISSION

**[Investigation No. 337–TA–1433]**

## Certain Glass Substrates for Liquid Crystal Displays, Products Containing the Same, and Methods for Manufacturing the Same; Notice of Institution of Investigation

**AGENCY:** U.S. International Trade Commission.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that a complaint was filed with the U.S. International Trade Commission on December 18, 2024, under section 337 of the Tariff Act of 1930, as amended, on behalf of Corning Incorporated, Corning, New York. A supplement to the Complaint was filed on January 7, 2025. The complaint, as supplemented, alleges violations of section 337 based upon the importation into the United States, the sale for importation, and the sale within the United States after importation of certain glass substrates for liquid crystal displays, products containing the same, and methods for manufacturing the same by reason of the infringement of certain claims of U.S. Patent No. 7,851,394 ("the '394 patent"); U.S. Patent No. 8,627,684 ("the '684 patent"); and U.S. Patent No. 9,512,025 ("the '025 patent"). The complainant, as supplemented, also alleges violations of section 337 based upon the importation and sale of certain glass substrates for liquid crystal displays, products

containing the same, and methods for manufacturing the same by reason of misappropriation of trade secrets the threat or effect of which is to destroy or substantially injure a domestic industry. The complaint, as supplemented, further alleges that an industry in the United States exists as required by the applicable Federal Statute. The complainant requests that the Commission institute an investigation and, after the investigation, issue a general exclusion order, or in the alternative a limited exclusion order, and cease and desist orders.

**ADDRESSES:** The complaint, except for any confidential information contained therein, may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov.* For help accessing EDIS, please email *EDIS3Help@usitc.gov.* Hearing impaired individuals are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on (202) 205–1810. Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at (202) 205–2000. General information concerning the Commission may also be obtained by accessing its internet server at *https://www.usitc.gov.*

**FOR FURTHER INFORMATION CONTACT:** Pathenia M. Proctor, The Office of Unfair Import Investigations, U.S. International Trade Commission, telephone (202) 205–2560.

**SUPPLEMENTARY INFORMATION:**

*Authority:* The authority for institution of this investigation is contained in section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337, and in section 210.10 of the Commission's Rules of Practice and Procedure, 19 CFR 210.10 (2024).

*Scope of Investigation:* Having considered the complaint, the U.S. International Trade Commission, on January 17, 2025, *ordered that*—

(1) Pursuant to subsection (b) of section 337 of the Tariff Act of 1930, as amended, an investigation be instituted to determine:

(a) whether there is a violation of subsection (a)(1)(B) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain products identified in paragraph (2) by reason of infringement of one or more of claims 1, 5, 6, and 8–10 of '394 patent; claims 1, 2, 4, 7, and 10–12 of the '684 patent; and claims 15–20 of the '025 patent, and whether an industry in the United States exists as required by subsection (a)(2) of section 337;

---

[4] *See, e.g.,* 82 FR 4902 (Jan. 17, 2017); 69 FR 48877 (Aug. 11, 2004); 67 FR 68924 (Nov. 13, 2002).

[1] The record is defined in § 207.2(f) of the Commission's Rules of Practice and Procedure (19 CFR 207.2(f)).

substantially prepared by the Exchange. The Exchange has designated this proposal for immediate effectiveness pursuant to Section 19(b)(3)(A) of the Act[4] and Rule 19b–4(f) thereunder.[5] The Commission is publishing this notice to solicit comments on the proposed rule change from interested persons.

## I. Self-Regulatory Organization's Statement of the Terms of Substance of the Proposed Rule Change

The Exchange proposes to amend its Price List to adopt fees for Directed Orders routed by the Exchange to an algorithm, effective March 3, 2025.

The proposed rule change, including the Exchange's statement of the purpose of, and statutory basis for, the proposed rule change, is available on the Exchange's website at *https://www.nyse.com* and on the Commission's website at *https://www.sec.gov/rules-regulations/self-regulatory-organization-rulemaking/national-securities-exchanges?file_number=SR-NYSE-2025-04.*

## II. Solicitation of Comments

Interested persons are invited to submit written data, views, and arguments concerning the foregoing, including whether the proposed rule change is consistent with the Act.[6] Comments may be submitted electronically by using the Commission's internet comment form (*https://www.sec.gov/rules-regulations/self-regulatory-organization-rulemaking/national-securities-exchanges?file_number=SR-NYSE-2025-04*) or by sending an email to *rule-comments@sec.gov.* Please include file number SR–NYSE–2025–04 on the subject line. Alternatively, paper

[4] 15 U.S.C. 78s(b)(3)(A).

[5] 17 CFR 240.19b–4(f). At any time within 60 days of the filing of the proposed rule change, the Commission summarily may temporarily suspend such rule change if it appears to the Commission that such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of the Act. If the Commission takes such action, the Commission will institute proceedings to determine whether the proposed rule change should be approved or disapproved.

[6] Copies of the submission, all subsequent amendments, all written statements with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for website viewing and printing in the Commission's Public Reference Room, 100 F Street NE, Washington, DC 20549, on official business days between the hours of 10 a.m. and 3 p.m. Copies of the filing also will be available for inspection and copying at the principal office of the Exchange.

comments may be sent to Secretary, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–1090. All submissions should refer to file number SR–NYSE–2025–04. To help the Commission process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's internet website (*https://www.sec.gov/rules-regulations/self-regulatory-organization-rulemaking/national-securities-exchanges?file_number=NYSE-2025-04*). Do not include personal identifiable information in submissions; you should submit only information that you wish to make available publicly. We may redact in part or withhold entirely from publication submitted material that is obscene or subject to copyright protection. All submissions should refer to file number SR–NYSE–2025–04 and should be submitted on or before April 4, 2025.

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[7]

**J. Matthew DeLesDernier,**
*Deputy Secretary.*

[FR Doc. 2025–04073 Filed 3–13–25; 8:45 am]

**BILLING CODE 8011–01–P**

# DEPARTMENT OF STATE

**[Public Notice: 12682]**

## Determination: Foreign Affairs Functions of the United States

1. Serving as America's 72nd Secretary of State is the highest honor of my professional life. In Executive Order 14150, President Trump has given me a clear direction to place our core national interests as the guiding mission of American foreign policy, and always put America and American citizens first.

2. Securing America's borders and protecting its citizens from external threats is the first priority foreign affairs function of the United States. This effort requires the United States to marshal all available resources and authorities. These resources and authorities also include, but are not limited to, those of the Department of State, the Department of Defense, the Department of Homeland Security, the Department of Justice, and many other federal agencies. See, *e.g.,* Executive Orders 14150, 14157, 14160, 14161, 14165.

3. The threats to U.S. citizens from an unsecured border can include foreign spies, contraband, and harmful

[7] 17 CFR 200.30–3(a)(12).

materials that flow across the border, as well as unchecked mass migration, narcotics trafficking, human smuggling and trafficking, and other destabilizing or unlawful activities, including the flow of dangerous drugs, weapons, and technology. Eliminating or mitigating these threats involves visa policies, export control enforcement policies and practices, and other foreign affairs functions entrusted to me, as Secretary of State, under the Constitution, at the direction of the President, and by statute.

4. The Department of State enjoys primacy among federal agencies in the conduct of our foreign policy. When he appointed me as Secretary of State, the President entrusted me with all matters respecting the conduct of foreign affairs, including my primary foreign affairs duty: the duty to protect the people of the United States from any threats originating from foreign actors or from foreign soil. For the Department of State, that includes all policy related to the protection and travel of U.S. citizens overseas, visa operations and visa issuance, implementation of the Arms Export Control Act, and implementation of the Mutual Educational and Cultural Exchange Act of 1961, as amended, among other authorities. But the scope of a foreign affairs function of the United States is much broader.

5. For these reasons, I hereby determine that all efforts, conducted by any agency of the federal government, to control the status, entry, and exit of people, and the transfer of goods, services, data, technology, and other items across the borders of the United States, constitute a foreign affairs function of the United States under the Administrative Procedure Act, 5 U.S.C. 553, 554.

Dated: February 21, 2025.

**Marco Rubio,**
*Secretary of State.*

[FR Doc. 2025–04116 Filed 3–13–25; 8:45 am]

**BILLING CODE 4710–10–P**

# SURFACE TRANSPORTATION BOARD

**[Docket No. FD 36842]**

## Mingus Mountain Railroad, LLC— Acquisition and Operation Exemption—Line of Clarkdale Arizona Central Railroad, L.C.

Mingus Mountain Railroad, LLC (MMRL), a noncarrier, has filed a verified notice of exemption under 49 CFR 1150.31 to acquire from Clarkdale Arizona Central Railroad, L.C. (CACR), and operate approximately 38.74 miles of rail line between milepost 0 + 15 feet

*Administration of Donald J. Trump, 2025*

## Executive Order 14150—America First Policy Directive to the Secretary of State
*January 20, 2025*

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

*Section 1*. *Purpose*. From this day forward, the foreign policy of the United States shall champion core American interests and always put America and American citizens first.

*Sec. 2*. *Policy*. As soon as practicable, the Secretary of State shall issue guidance bringing the Department of State's policies, programs, personnel, and operations in line with an America First foreign policy, which puts America and its interests first.

*Sec. 3*. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

The White House,
January 20, 2025.

[Filed with the Office of the Federal Register, 8:45 a.m., January 28, 2025]

NOTE: This Executive order was published in the *Federal Register* on January 29.

*Categories:* Executive Orders : Secretary of State, America-first policy directive.

*Subjects:* Foreign policy, U.S.; Secretary of State.

*DCPD Number:* DCPD202500117.

1

# Presidential Documents

**Executive Order 14165 of January 20, 2025**

## Securing Our Borders

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Over the last 4 years, the United States has endured a large-scale invasion at an unprecedented level. Millions of illegal aliens from nations and regions all around the world successfully entered the United States where they are now residing, including potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations, and other hostile actors with malicious intent.

Deadly narcotics and other illicit materials have flowed across the border while agents and officers spend their limited resources processing illegal aliens for release into the United States. These catch-and-release policies undermine the rule of law and our sovereignty, create substantial risks to public safety and security, and divert critical resources away from stopping the entry of contraband and fugitives into the United States.

We have limited information on the precise whereabouts of a great number of these illegal aliens who have entered the United States over the last 4 years.

This cannot stand. A nation without borders is not a nation, and the Federal Government must act with urgency and strength to end the threats posed by an unsecured border.

One of my most important obligations is to protect the American people from the disastrous effects of unlawful mass migration and resettlement.

My Administration will marshal all available resources and authorities to stop this unprecedented flood of illegal aliens into the United States.

**Sec. 2**. *Policy.* It is the policy of the United States to take all appropriate action to secure the borders of our Nation through the following means:

(a) Establishing a physical wall and other barriers monitored and supported by adequate personnel and technology;

(b) Deterring and preventing the entry of illegal aliens into the United States;

(c) Detaining, to the maximum extent authorized by law, aliens apprehended on suspicion of violating Federal or State law, until such time as they are removed from the United States;

(d) Removing promptly all aliens who enter or remain in violation of Federal law;

(e) Pursuing criminal charges against illegal aliens who violate the immigration laws, and against those who facilitate their unlawful presence in the United States;

(f) Cooperating fully with State and local law enforcement officials in enacting Federal-State partnerships to enforce Federal immigration priorities; and

(g) Obtaining complete operational control of the borders of the United States.

**Sec. 3**. *Physical Barriers.* The Secretary of Defense and the Secretary of Homeland Security shall take all appropriate action to deploy and construct temporary and permanent physical barriers to ensure complete operational control of the southern border of the United States.

**Sec. 4**. *Deployment of Personnel.* (a) The Secretary of Defense and the Secretary of Homeland Security shall take all appropriate and lawful action to deploy sufficient personnel along the southern border of the United States to ensure complete operational control; and

(b) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to supplement available personnel to secure the southern border and enforce the immigration laws of the United States through the use of sections 1103(a)(2) and (4)–(6) of the INA (8 U.S.C. 1103(a)(2) and (4)–(6)).

**Sec. 5**. *Detention.* The Secretary of Homeland Security shall take all appropriate actions to detain, to the fullest extent permitted by law, aliens apprehended for violations of immigration law until their successful removal from the United States. The Secretary shall, consistent with applicable law, issue new policy guidance or propose regulations regarding the appropriate and consistent use of lawful detention authority under the INA, including the termination of the practice commonly known as "catch-and-release," whereby illegal aliens are routinely released into the United States shortly after their apprehension for violations of immigration law.

**Sec. 6**. *Resumption of Migrant Protection Protocols.* As soon as practicable, the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to resume the Migrant Protection Protocols in all sectors along the southern border of the United States and ensure that, pending removal proceedings, aliens described in section 235(b)(2)(C) of the INA (8 U.S.C. 1225(b)(2)(C)) are returned to the territory from which they came.

**Sec. 7**. *Adjusting Parole Policies.* The Secretary of Homeland Security shall, consistent with applicable law, take all appropriate action to:

(a) Cease using the "CBP One" application as a method of paroling or facilitating the entry of otherwise inadmissible aliens into the United States;

(b) Terminate all categorical parole programs that are contrary to the policies of the United States established in my Executive Orders, including the program known as the "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans."

(c) Align all policies and operations at the southern border of the United States to be consistent with the policy of Section 2 of this order and ensure that all future parole determinations fully comply with this order and with applicable law.

**Sec. 8**. *Additional International Cooperation.* The Secretary of State, in coordination with the Attorney General and the Secretary of Homeland Security, shall take all appropriate action to facilitate additional international cooperation and agreements, consistent with the policy of Section 2, including entering into agreements based upon the provisions of section 208(a)(2)(A) of the INA (8 U.S.C. 1158(a)(2)(A)) or any other applicable provision of law.

**Sec. 9**. *DNA and Identification Requirements.* (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to fulfill the requirements of the DNA Fingerprint Act of 2005, title X of Public Law 109–162, for all aliens detained under the authority of the United States; and

(b) The Secretary of Homeland Security shall take all appropriate action to use any available technologies and procedures to determine the validity of any claimed familial relationship between aliens encountered or apprehended by the Department of Homeland Security.

**Sec. 10**. *Prosecution of Offenses.* The Attorney General and the Secretary of Homeland Security shall take all appropriate action to prioritize the

prosecution of offenses that relate to the borders of the United States, including the investigation and prosecution of offenses that involve human smuggling, human trafficking, child trafficking, and sex trafficking in the United States.

**Sec. 11.** *Additional Measures.* Within 14 days of the date of this order, the Secretary of State, the Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall provide recommendations to the President regarding the use of any other authority to protect the United States from foreign threats and secure the southern border.

**Sec. 12.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02015
Filed 1–29–25; 8:45 am]
Billing code 3395–F4–P

# Presidential Documents

Executive Order 14194 of February 1, 2025

## Imposing Duties To Address the Situation at Our Southern Border

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and section 301 of title 3, United States Code,

I, DONALD J. TRUMP, President of the United States of America, find that the sustained influx of illegal aliens and illicit opioids and other drugs has profound consequences on our Nation, endangering lives and putting a severe strain on our healthcare system, public services, communities, and schools. Since the end of my first term, U.S. Customs and Border Protection (CBP) within the Department of Homeland Security has recorded more than three times as many inadmissible encounters nationwide as during my first term.

These challenges threaten the fabric of our society. Gang members, smugglers, human traffickers, and illicit drugs of all kinds have poured across our borders and into our communities. Mexico has played a central role in these challenges, including by failing to devote sufficient attention and resources to meaningfully stem the tide of unlawful migration and illicit drugs.

Mexican drug trafficking organizations (DTOs) are the world's leading traffickers of fentanyl, methamphetamine, cocaine, and other illicit drugs, and they cultivate, process, and distribute massive quantities of narcotics that fuel addiction and violence in communities across the United States. These DTOs collaborate and conspire with transnational cartels and other global partners to smuggle drugs into the United States, utilizing clandestine airstrips, maritime routes, tunnels, and overland corridors, and both willing and unwilling human couriers.

The Mexican DTOs have an intolerable alliance with the government of Mexico. This alliance endangers the national security of the United States, and we must eradicate the influence of these dangerous cartels from the bilateral environment. The government of Mexico has afforded safe havens for the cartels to engage in the manufacturing and transportation of illicit drugs, which collectively have led to the overdose deaths of hundreds of thousands of American victims.

Mexican cartels are also implicated in human trafficking and smuggling operations, enabling the illegal migration of millions across our borders. These operations are often tied to organized crime, and they create pathways for cartel activities to expand into the United States. Furthermore, violent criminals originating from Central and South America easily transit into and through Mexico, and into the United States, where they cause irreparable harm to our citizens. These dangerous criminals are involved in drug-related violence, gang activity, and other crimes that endanger the safety of American communities.

Immediate action is required to address the national emergency I declared in Proclamation 10886 of January 20, 2025 (Declaring a National Emergency at the Southern Border of the United States), and to finally end the public

health crisis caused by opioid use and addiction, which will not happen unless the compliance and cooperation of the government of Mexico is assured.

I hereby determine and order:

**Section 1**. (a) As President of the United States, my highest duty is the defense of the country and its citizens. A Nation without borders is not a Nation at all. I will not stand by and allow our sovereignty to be eroded, our laws to be trampled, our citizens to be endangered, or our borders to be disrespected anymore.

I previously declared a national emergency with respect to the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States in Proclamation 10886. Pursuant to the NEA, I hereby expand the scope of the national emergency declared in that proclamation to cover the failure of Mexico to arrest, seize, detain, or otherwise intercept DTOs, other drug and human traffickers, criminals at large, and illicit drugs. In addition, this failure to act on the part of the government of Mexico constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States. I hereby declare and reiterate a national emergency under the NEA and IEEPA to deal with that threat. This national emergency requires decisive and immediate action, and I have decided to impose, consistent with law, ad valorem tariffs on articles that are products of Mexico as set forth in this order. In doing so, I invoke my authority under section 1702(a)(1)(B) of IEEPA, and specifically find that action under other authority to impose tariffs is inadequate to address this unusual and extraordinary threat.

**Sec. 2**. (a) All articles that are products of Mexico, as defined by the *Federal Register* notice described in section 2(d) of this order (the *Federal Register* notice), shall be, consistent with law, subject to an additional 25 percent ad valorem rate of duty. Such rate of duty shall apply with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern time on February 4, 2025, except that goods entered for consumption, or withdrawn from warehouse for consumption, after such time that were loaded onto a vessel at the port of loading or in transit on the final mode of transport prior to entry into the United States before 12:01 a.m. eastern time on February 1, 2025, shall not be subject to such additional duty, only if the importer certifies to CBP as specified in the *Federal Register* notice.

(b) The rates of duty established by this order are in addition to any other duties, fees, exactions, or charges applicable to such imported articles.

(c) Should the government of Mexico retaliate against the United States in response to this action through import duties on United States exports to Mexico or similar measures, the President may increase or expand in scope the duties imposed under this Executive Order to ensure the efficacy of this action.

(d) In order to establish the duty rate on imports of articles that are products of Mexico, the Secretary of Homeland Security shall determine the modifications necessary to the Harmonized Tariff Schedule of the United States (HTSUS) in order to effectuate this order consistent with law and shall make such modifications to the HTSUS through notice in the *Federal Register*. The modifications made to the HTSUS by this notice shall be effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern time on February 4, 2025, except as otherwise noted in subsection 2(a) of this section, and shall continue in effect until such actions are expressly reduced, modified, or terminated.

(e) Articles that are products of Mexico, except those that are eligible for admission under ''domestic status'' as defined in 19 CFR 146.43, which are subject to the duties imposed by this order and are admitted into a

United States foreign trade zone on or after 12:01 a.m. eastern time on February 4, 2025, except as otherwise noted in subsection 2(a) of this section, must be admitted as ''privileged foreign status'' as defined in 19 CFR 146.41. Such articles will be subject upon entry for consumption to the rates of duty related to the classification under the applicable HTSUS subheading in effect at the time of admittance into the United States foreign trade zone.

(f) No drawback shall be available with respect to the duties imposed pursuant to this order.

(g) For avoidance of doubt, duty-free *de minimis* treatment under 19 U.S.C. 1321 shall not be available for the articles described in subsection (a) of this section.

(h) Any prior Presidential Proclamation, Executive Order, or other presidential directive or guidance related to trade with Mexico that is inconsistent with the direction in this order is hereby terminated, suspended, or modified to the extent necessary to give full effect to this order.

(i) The articles described in subsection (a) of this section shall exclude those encompassed by 50 U.S.C. 1702(b).

**Sec. 3**. (a) The Secretary of Homeland Security shall regularly consult with the Secretary of State, the Attorney General, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security on the situation at our southern border. The Secretary of Homeland Security shall inform the President of any circumstances that, in the opinion of the Secretary of Homeland Security, indicate that the government of Mexico has taken adequate steps to alleviate the illegal migration and illicit drug crisis through cooperative actions. Upon the President's determination of sufficient action to alleviate the crisis, the tariffs described in section 2 of this order will be removed.

(b) The Secretary of Homeland Security, in coordination with the Secretary of State, the Attorney General, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security shall recommend additional action, if necessary, should the government of Mexico fail to take adequate steps to alleviate the illegal migration and illicit drug crises through cooperative enforcement actions.

**Sec. 4**. The Secretary of Homeland Security, in consultation with the Secretary of the Treasury, the Attorney General, and the Secretary of Commerce, is hereby authorized to take such actions, including adopting rules and regulations, and to employ all powers granted to me by IEEPA as may be necessary to implement this order. The Secretary of Homeland Security may, consistent with applicable law, redelegate any of these functions within the Department of Homeland Security. All agencies shall take all appropriate measures within their authority to implement this order.

**Sec. 5**. The Secretary of Homeland Security, in coordination with the Secretary of the Treasury, the Attorney General, the Secretary of Commerce, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security, is hereby authorized to submit recurring and final reports to the Congress on the national emergency under IEEPA declared in this order, consistent with section 401(c) of the NEA (50 U.S.C. 1641(c)) and section 204(c) of IEEPA (50 U.S.C. 1703(c)).

**Sec. 6**. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 1, 2025.*

[FR Doc. 2025–02407
Filed 2–6–25; 8:45 am]
Billing code 3395–F4–P

Federal Register / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents    8443

# Presidential Documents

Executive Order 14159 of January 20, 2025

## Protecting the American People Against Invasion

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq.*) and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Over the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States. Millions of illegal aliens crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws.

Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans. Others are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities. Many have abused the generosity of the American people, and their presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels.

Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. The American people deserve a Federal Government that puts their interests first and a Government that understands its sacred obligation to prioritize the safety, security, and financial and economic well-being of Americans.

This order ensures that the Federal Government protects the American people by faithfully executing the immigration laws of the United States.

**Sec. 2**. *Policy.* It is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.

**Sec. 3**. *Faithful Execution of the Immigration Laws.* In furtherance of the policies described in section 2 of this order:

(a) Executive Order 13993 of January 20, 2021 (Revision of Civil Immigration Enforcement Policies and Priorities), Executive Order 14010 of February 2, 2021 (Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border), Executive Order 14011 of February 2, 2021 (Establishment of Interagency Task Force on the Reunification of Families), and Executive Order 14012 of February 2, 2021 (Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans) are hereby revoked; and

(b) Executive departments and agencies (agencies) shall take all appropriate action to promptly revoke all memoranda, guidance, or other policies based on the Executive Orders revoked in section 3(a) of this order and shall employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all inadmissible and removable aliens.

**Sec. 4**. *Civil Enforcement Priorities.* The Secretary of Homeland Security shall take all appropriate action to enable the Director of U.S. Immigration and Customs Enforcement, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Citizenship and Immigration Services to set priorities for their agencies that protect the public safety and national security interests of the American people, including by ensuring the successful enforcement of final orders of removal. Further, the Secretary of Homeland Security shall ensure that the primary mission of U.S. Immigration and Customs Enforcement's Homeland Security Investigations division is the enforcement of the provisions of the INA and other Federal laws related to the illegal entry and unlawful presence of aliens in the United States and the enforcement of the purposes of this order.

**Sec. 5**. *Criminal Enforcement Priorities.* The Attorney General, in coordination with the Secretary of State and the Secretary of Homeland Security, shall take all appropriate action to prioritize the prosecution of criminal offenses related to the unauthorized entry or continued unauthorized presence of aliens in the United States.

**Sec. 6**. *Federal Homeland Security Task Forces.* (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to jointly establish Homeland Security Task Forces (HSTFs) in all States nationwide.

(b) The composition of each HSTF shall be subject to the direction of the Attorney General and the Secretary of Homeland Security, but shall include representation from any other Federal agencies with law enforcement officers, or agencies with the ability to provide logistics, intelligence, and operational support to the HSTFs, and shall also include representation from relevant State and local law enforcement agencies. The heads of all Federal agencies shall take all appropriate action to provide support to the Attorney General and the Secretary of Homeland Security to ensure that the HSTFs fulfill the objectives in subsection (c) of this section, and any other lawful purpose that fulfills the policy objectives of this order.

(c) The objective of each HSTF is to end the presence of criminal cartels, foreign gangs, and transnational criminal organizations throughout the United States, dismantle cross-border human smuggling and trafficking networks, end the scourge of human smuggling and trafficking, with a particular focus on such offenses involving children, and ensure the use of all available law enforcement tools to faithfully execute the immigration laws of the United States.

(d) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to provide an operational command center to coordinate the activities of the HSTFs and provide such support as they may require, and shall also take all appropriate action to provide supervisory direction to their activities as may be required.

**Sec. 7**. *Identification of Unregistered Illegal Aliens.* The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to:

(a) Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code;

(b) Ensure that all previously unregistered aliens in the United States comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code; and

(c) Ensure that failure to comply with the legal obligations of part VII of subchapter II of chapter 12 of title 8, United States Code, is treated as a civil and criminal enforcement priority.

**Sec. 8**. *Civil Fines and Penalties.* (a) The Secretary of Homeland Security, in coordination with the Secretary of Treasury, shall take all appropriate action to ensure the assessment and collection of all fines and penalties

that the Secretary of Homeland Security is authorized by law to assess and collect from aliens unlawfully present in the United States, including aliens who unlawfully entered or unlawfully attempted to enter the United States, and from those who facilitate such aliens' presence in the United States.

(b) Within 90 days of the date of this order, the Secretary of the Treasury and the Secretary of Homeland Security shall submit a report to the President regarding their progress implementing the requirements of this section and recommending any additional actions that may need to be taken to achieve its objectives.

**Sec. 9**. *Efficient Removals of Recent Entrants and Other Aliens*. The Secretary of Homeland Security shall take all appropriate action, pursuant to section 235(b)(1)(A)(iii)(I) of the INA (8 U.S.C. 1225(b)(1)(A)(iii)(I)), to apply, in her sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II). Further, the Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States.

**Sec. 10**. *Detention Facilities*. The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law.

**Sec. 11**. *Federal-State Agreements*. To ensure State and local law enforcement agencies across the United States can assist with the protection of the American people, the Secretary of Homeland Security shall, to the maximum extent permitted by law, and with the consent of State or local officials as appropriate, take appropriate action, through agreements under section 287(g) of the INA (8 U.S.C. 1357(g)) or otherwise, to authorize State and local law enforcement officials, as the Secretary of Homeland Security determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary of Homeland Security. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties. To the extent permitted by law, the Secretary of Homeland Security may structure each agreement under section 287(g) of the INA (8 U.S.C. 1357(g)) in the manner that provides the most effective model for enforcing Federal immigration laws in that jurisdiction.

**Sec. 12**. *Encouraging Voluntary Compliance with the Law*. The Secretary of Homeland Security shall take all appropriate action, in coordination with the Secretary of State and the Attorney General, and subject to adequate safeguards, assurances, bonds, and any other lawful measure, to adopt policies and procedures to encourage aliens unlawfully in the United States to voluntarily depart as soon as possible, including through enhanced usage of the provisions of section 240B of the INA (8 U.S.C. 1229c), international agreements or assistance, or any other measures that encourage aliens unlawfully in the United States to depart as promptly as possible, including through removals of aliens as provided by section 250 of the INA (8 U.S.C. 1260).

**Sec. 13**. *Recalcitrant Countries*. The Secretary of State and the Secretary of Homeland Security shall take all appropriate action to:

(a) Cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), with the Secretary of State, to the maximum extent permitted by law, ensuring that diplomatic

efforts and negotiations with foreign states include the foreign states' acceptance of their nationals who are subject to removal from the United States; and

(b) Eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. Any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out subsection (a) this section, and shall also be considered regarding the issuance of any other sanctions that may be available to the United States.

**Sec. 14**. *Visa Bonds.* The Secretary of Treasury shall take all appropriate action, in coordination with the Secretary of State and the Secretary of Homeland Security, to establish a system to facilitate the administration of all bonds that the Secretary of State or the Secretary of Homeland Security may lawfully require to administer the provisions of the INA.

**Sec. 15**. *Reestablishment of the VOICE Office and Addressing Victims of Crimes Committed by Removable Aliens.* The Secretary of Homeland Security shall direct the Director of U.S. Immigration and Customs Enforcement (ICE) to take all appropriate and lawful action to reestablish within ICE an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens, and those victims' family members. The Attorney General shall also ensure that the provisions of 18 U.S.C. 3771 are followed in all Federal prosecutions involving crimes committed by removable aliens.

**Sec. 16**. *Addressing Actions by the Previous Administration.* The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws. Such action should include, but is not limited to:

(a) ensuring that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised on only a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole;

(b) ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute; and

(c) ensuring that employment authorization is provided in a manner consistent with section 274A of the INA (8 U.S.C. 1324a), and that employment authorization is not provided to any unauthorized alien in the United States.

**Sec. 17**. *Sanctuary Jurisdictions.* The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called ''sanctuary'' jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

**Sec. 18**. *Information Sharing.* (a) The Secretary of Homeland Security shall promptly issue guidance to ensure maximum compliance by Department of Homeland Security personnel with the provisions of 8 U.S.C. 1373 and 8 U.S.C. 1644 and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law; and

Federal Register / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents    8447

(b) The Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall take all appropriate action to stop the trafficking and smuggling of alien children into the United States, including through the sharing of any information necessary to assist in the achievement of that objective.

**Sec. 19.** *Funding Review.* The Attorney General and the Secretary of Homeland Security shall:

(a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

(b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;

(c) Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements;

(d) Coordinate with the Director of the Office of Management and Budget to ensure that no funding for agreements described in subsection (c) of this section is included in any appropriations request for the Department of Justice or the Department of Homeland Security; and

(e) Initiate clawback or recoupment procedures, if appropriate, for any agreements described in subsection (c) of this section.

**Sec. 20.** *Denial of Public Benefits to Illegal Aliens.* The Director of the Office of Management and Budget shall take all appropriate action to ensure that all agencies identify and stop the provision of any public benefits to any illegal alien not authorized to receive them under the provisions of the INA or other relevant statutory provisions.

**Sec. 21.** *Hiring More Agents and Officers.* Subject to available appropriations, the Secretary of Homeland Security, through the Commissioner of U.S. Customs and Border Protection and the Director of U.S. Immigration and Customs Enforcement, shall take all appropriate action to significantly increase the number of agents and officers available to perform the duties of immigration officers.

**Sec. 22.** *Severability.* It is the policy of the United States to enforce this order to the maximum extent possible to advance the interests of the United States. Accordingly:

(a) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 23.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party

against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02006
Filed 1–28–25; 11:15 am]
Billing code 3395–F4–P

# Presidential Documents

Executive Order 14198 of February 3, 2025

## Progress on the Situation at Our Southern Border

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Background.* On February 1, 2025, I determined that the failure of Mexico to arrest, seize, detain, or otherwise intercept Mexican drug trafficking organizations, other drug and human traffickers, criminals at large, and illicit drugs constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States. To address that threat, I invoked my authority under section 1702(a)(1)(B) of IEEPA to impose ad valorem tariffs on articles that are products of Mexico.

**Sec. 2**. *Immediate Steps.* Pursuant to section 3 of my Executive Order of February 1, 2025, titled ''Imposing Duties to Address the Situation at Our Southern Border'' (''the Executive Order of February 1, 2025''), I have determined that the Government of Mexico has taken immediate steps designed to alleviate the illegal migration and illicit drug crisis through cooperative actions. Further time is needed, however, to assess whether these steps constitute sufficient action to alleviate the crisis and resolve the unusual and extraordinary threat beyond our southern border.

**Sec. 3**. *Pause.* (a) In recognition of the steps taken by the Government of Mexico, and in order to assess whether the threat described in section 1 of this order has abated, the additional 25 percent ad valorem rate of duty shall be paused and will not take effect until March 4, 2025, at 12:01 a.m. eastern time. Accordingly, sections 2(a), section 2(d), and section 2(e) of the Executive Order of February 1, 2025, are amended by striking the term ''February 4, 2025,'' where it appears in those sections and inserting in lieu thereof the term ''March, 4, 2025.'' The exceptions set forth in section 2(a) of the Executive Order of February 1, 2025, related to covered goods loaded onto a vessel at a port of entry or in transit on the final mode of transport prior to entry into the United States are, hereby, withdrawn.

(b) During this pause, the Secretary of Homeland Security, in consultation with the Secretary of State, the Attorney General, the Assistant to the President for National Security Affairs, and the Assistant to the President for Homeland Security, shall continue to assess the situation at our southern border, as provided in section 3 of the Executive Order of February 1, 2025.

(c) If the illegal migration and illicit drug crises worsen, and if the Government of Mexico fails to take sufficient steps to alleviate these crises, the President shall take necessary steps to address the situation, including by immediate implementation of the tariffs described in the Executive Order of February 1, 2025.

**Sec. 4**. *Severability.* If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 5**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 3, 2025.*

[FR Doc. 2025–02479
Filed 2–7–25; 8:45 am]
Billing code 3395–F4–P



# Presidential Documents

**Executive Order 14227 of March 2, 2025**

## Amendment to Duties To Address the Situation at Our Southern Border

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), section 604 of the Trade Act of 1974, as amended (19 U.S.C. 2483), and section 301 of title 3, United States Code, I hereby determine and order:

**Section 1**. *Amendment.* Executive Order 14194 of February 1, 2025 (Imposing Duties to Address the Situation at Our Southern Border), as amended by Executive Order 14198 of February 3, 2025 (Progress on the Situation at Our Southern Border), is further amended by revising section 2(g) to read as follows:

''(g) Duty-free *de minimis* treatment under 19 U.S.C. 1321 is available for otherwise eligible covered articles described in subsection (a) of this section. Such duty-free *de minimis* treatment shall cease to be available for such otherwise eligible covered articles upon notification by the Secretary of Commerce to the President that adequate systems are in place to fully and expeditiously process and collect tariff revenue applicable pursuant to subsection (a) of this section for covered articles otherwise eligible for *de minimis* treatment.''

**Sec. 2**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*March 2, 2025.*

[FR Doc. 2025–03729
Filed 3–5–25; 8:45 am]
Billing code 3395–F4–P

Federal Register / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents    8439

# Presidential Documents

Executive Order 14157 of January 20, 2025

## Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. 1701 *et seq.* it is hereby ordered:

**Section 1.** *Purpose.* This order creates a process by which certain international cartels (the Cartels) and other organizations will be designated as Foreign Terrorist Organizations, consistent with section 219 of the INA (8 U.S.C. 1189), or Specially Designated Global Terrorists, consistent with IEEPA (50 U.S.C. 1702) and Executive Order 13224 of September 23, 2001 (Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), as amended.

(a) International cartels constitute a national-security threat beyond that posed by traditional organized crime, with activities encompassing:

(i) convergence between themselves and a range of extra-hemispheric actors, from designated foreign-terror organizations to antagonistic foreign governments;

(ii) complex adaptive systems, characteristic of entities engaged in insurgency and asymmetric warfare; and

(iii) infiltration into foreign governments across the Western Hemisphere. The Cartels have engaged in a campaign of violence and terror throughout the Western Hemisphere that has not only destabilized countries with significant importance for our national interests but also flooded the United States with deadly drugs, violent criminals, and vicious gangs.

The Cartels functionally control, through a campaign of assassination, terror, rape, and brute force nearly all illegal traffic across the southern border of the United States. In certain portions of Mexico, they function as quasi-governmental entities, controlling nearly all aspects of society. The Cartels' activities threaten the safety of the American people, the security of the United States, and the stability of the international order in the Western Hemisphere. Their activities, proximity to, and incursions into the physical territory of the United States pose an unacceptable national security risk to the United States.

(b) Other transnational organizations, such as Tren de Aragua (TdA) and La Mara Salvatrucha (MS–13) pose similar threats to the United States. Their campaigns of violence and terror in the United States and internationally are extraordinarily violent, vicious, and similarly threaten the stability of the international order in the Western Hemisphere.

(c) The Cartels and other transnational organizations, such as TdA and MS–13, operate both within and outside the United States. They present an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. I hereby declare a national emergency, under IEEPA, to deal with those threats.

**Sec. 2.** *Policy.* It is the policy of the United States to ensure the total elimination of these organizations' presence in the United States and their ability to threaten the territory, safety, and security of the United States

through their extraterritorial command-and-control structures, thereby protecting the American people and the territorial integrity of the United States.

**Sec. 3**. *Implementation*. (a) Within 14 days of the date of this order, the Secretary of State shall take all appropriate action, in consultation with the Secretary of the Treasury, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to make a recommendation regarding the designation of any cartel or other organization described in section 1 of this order as a Foreign Terrorist Organization consistent with 8 U.S.C. 1189 and/or a Specially Designated Global Terrorist consistent with 50 U.S.C. 1702 and Executive Order 13224.

(b) Within 14 days of the date of this order, the Attorney General and the Secretary of Homeland Security shall take all appropriate action, in consultation with the Secretary of State, to make operational preparations regarding the implementation of any decision I make to invoke the Alien Enemies Act, 50 U.S.C. 21 *et seq.,* in relation to the existence of any qualifying invasion or predatory incursion against the territory of the United States by a qualifying actor, and to prepare such facilities as necessary to expedite the removal of those who may be designated under this order.

**Sec. 4**. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02004

Filed 1–28–25; 11:15 am]

Billing code 3395–F4–P

States as aforementioned is in the national interest. I have ordered that Public Notice of these determinations be published in the **Federal Register**.

**FOR FURTHER INFORMATION CONTACT:**
Reed Liriano, Program Coordinator, Office of the Legal Adviser, U.S. Department of State (telephone: 202–632–6471; email: *section2459@ state.gov*). The mailing address is U.S. Department of State, L/PD, 2200 C Street NW (SA–5), Suite 5H03, Washington, DC 20522–0505.

**SUPPLEMENTARY INFORMATION:** The foregoing determinations were made pursuant to the authority vested in me by the Act of October 19, 1965 (79 Stat. 985; 22 U.S.C. 2459), Executive Order 12047 of March 27, 1978, the Foreign Affairs Reform and Restructuring Act of 1998 (112 Stat. 2681, *et seq.;* 22 U.S.C. 6501 note, *et seq.*), Delegation of Authority No. 234 of October 1, 1999, Delegation of Authority No. 236–3 of August 28, 2000, and Delegation of Authority No. 257–1 of December 11, 2015.

**Rafik K. Mansour,**
*Deputy Assistant Secretary for Policy, Bureau of Educational and Cultural Affairs, Department of State.*

[FR Doc. 2025–02861 Filed 2–19–25; 8:45 am]

**BILLING CODE 4710–05–P**

---

**DEPARTMENT OF STATE**

[Public Notice: 12670]

**Notice of Determinations; Culturally Significant Objects Being Imported for Exhibition—Determinations: ''Rashid Johnson: A Poem for Deep Thinkers'' Exhibition**

**SUMMARY:** Notice is hereby given of the following determinations: I hereby determine that certain objects being imported from abroad pursuant to agreements with their foreign owners or custodians for temporary display in the exhibition ''Rashid Johnson: A Poem for Deep Thinkers'' at the Solomon R. Guggenheim Museum, New York, New York; the Modern Art Museum of Fort Worth, in Fort Worth, Texas; and at possible additional exhibitions or venues yet to be determined, are of cultural significance, and, further, that their temporary exhibition or display within the United States as aforementioned is in the national interest. I have ordered that Public Notice of these determinations be published in the **Federal Register**.

**FOR FURTHER INFORMATION CONTACT:**
Reed Liriano, Program Coordinator, Office of the Legal Adviser, U.S. Department of State (telephone: 202–

632–6471; email: *section2459@ state.gov*). The mailing address is U.S. Department of State, L/PD, 2200 C Street NW (SA–5), Suite 5H03, Washington, DC 20522–0505.

**SUPPLEMENTARY INFORMATION:** The foregoing determinations were made pursuant to the authority vested in me by the Act of October 19, 1965 (79 Stat. 985; 22 U.S.C. 2459), Executive Order 12047 of March 27, 1978, the Foreign Affairs Reform and Restructuring Act of 1998 (112 Stat. 2681, *et seq.;* 22 U.S.C. 6501 note, *et seq.*), Delegation of Authority No. 234 of October 1, 1999, Delegation of Authority No. 236–3 of August 28, 2000, and Delegation of Authority No. 257–1 of December 11, 2015.

**Rafik K. Mansour,**
*Deputy Assistant Secretary for Policy, Bureau of Educational and Cultural Affairs, Department of State.*

[FR Doc. 2025–02859 Filed 2–19–25; 8:45 am]

**BILLING CODE 4710–05–P**

---

**DEPARTMENT OF STATE**

[Public Notice: 12671]

**Specially Designated Global Terrorist Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana**

Acting under the authority of and in accordance with section 1(a)(ii)(A) of Executive Order 13224, as amended (''E.O. 13224'' or ''Order''), I have determined that the persons known as Tren de Aragua (also known as Aragua Train); Mara Salvatrucha (also known as MS–13); Cartel de Sinaloa (also known as Sinaloa Cartel, Mexican Federation, Guadalajara Cartel); Cartel de Jalisco Nueva Generacion (also known as New Generation Cartel of Jalisco, CJNG, Jalisco New Generation Cartel); Carteles Unidos (also known as United Cartels, Tepalcatepec Cartel, Cartel de Tepalcatepec, The Grandfather Cartel, Cartel del Abuelo, Cartel de Los Reyes); Cartel del Noreste (also known as CDN, Northeast Cartel, Los Zetas); Cartel del Golfo (also known as CDG, Gulf Cartel, Osiel Cardenas-Guillen Organization); and La Nueva Familia Michoacana (also known as LNFM) are foreign persons that have committed or have attempted to commit, pose a significant risk of committing, or have participated in training to commit acts of terrorism that threaten the security of United States nationals or the national security,

foreign policy, or economy of the United States.

Consistent with the determination in section 10 of E.O. 13224 that prior notice to persons determined to be subject to the Order who might have a constitutional presence in the United States would render ineffectual the blocking and other measures authorized in the Order because of the ability to transfer funds instantaneously, I have determined that no prior notice needs to be provided to any person subject to this determination who might have a constitutional presence in the United States, because to do so would render ineffectual the measures authorized in the Order.

This determination shall be published in the **Federal Register**.

Dated: February 6, 2025.

**Marco Rubio,**
*Secretary of State.*

[FR Doc. 2025–02870 Filed 2–19–25; 8:45 am]

**BILLING CODE 4710–05–P**

---

**DEPARTMENT OF STATE**

[Public Notice: 12672]

**Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana**

Based upon a review of the Administrative Records assembled in this matter, and in consultation with the Attorney General and the Secretary of the Treasury, I have concluded that there is a sufficient factual basis to find that the relevant circumstances described in section 219 of the Immigration and Nationality Act, as amended (hereinafter ''INA'') (8 U.S.C. 1189), exist with respect to: Tren de Aragua (also known as Aragua Train); Mara Salvatrucha (also known as MS–13); Cartel de Sinaloa (also known as Sinaloa Cartel, Mexican Federation, Guadalajara Cartel); Cartel de Jalisco Nueva Generacion (also known as New Generation Cartel of Jalisco, CJNG, Jalisco New Generation Cartel); Carteles Unidos (also known as United Cartels, Tepalcatepec Cartel, Cartel de Tepalcatepec, The Grandfather Cartel, Cartel del Abuelo, Cartel de Los Reyes); Cartel del Noreste (also known as CDN, Northeast Cartel, Los Zetas); Cartel del Golfo (also known as CDG, Gulf Cartel, Osiel Cardenas-Guillen Organization); and La Nueva Familia Michoacana (also known as LNFM).

foreign persons who have committed or have attempted to commit, pose a significant risk of committing, or have participated in training to commit acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States.

Consistent with the determination in section 10 of E.O. 13224 that prior notice to persons determined to be subject to the Order who might have a constitutional presence in the United States would render ineffectual the blocking and other measures authorized in the Order because of the ability to transfer funds instantaneously, I determine that no prior notice needs to be provided to any person subject to this determination who might have a constitutional presence in the United States, because to do so would render ineffectual the measures authorized in the Order.

This determination shall be published in the **Federal Register**.

Dated: April 22, 2025.

**Marco Rubio,**
*Secretary of State.*

[FR Doc. 2025–07468 Filed 5–2–25; 8:45 am]

**BILLING CODE 4710–AD–P**

---

## DEPARTMENT OF STATE

[Public Notice: 12720]

### Plenary Meeting of the Binational Bridges and Border Crossings Group in Mexico City

**SUMMARY:** Delegates from the U.S. and Mexican governments, the states of California, Arizona, New Mexico, and Texas, and the Mexican states of Baja California, Sonora, Chihuahua, Coahuila, Nuevo Laredo, and Tamaulipas will participate in an in-person plenary meeting of the U.S.-Mexico Binational Bridges and Border Crossings Group.

**DATES:** Tuesday, June 10, 2025, and Wednesday, June 11, 2025, in Mexico City.

**FOR FURTHER INFORMATION CONTACT:** For further information on the meeting and/or to attend the public session, please contact Beney Lee, Border Affairs Officer, via email at *WHA-BorderAffairs@state.gov,* by phone at 771–204–0192, or by mail at the Office of Mexican Affairs, Room 3924, Department of State, 2201 C Street NW, Washington, DC 20520.

**SUPPLEMENTARY INFORMATION:** The purpose of this meeting is to discuss operational matters involving existing and proposed international bridges and border crossings and their related infrastructure and to exchange technical information as well as views on policy. This meeting will include a public session on Tuesday, June 10, 2025, from 9 a.m. until 12 p.m. This session will allow interested parties with views on proposed bridges and border crossings and related projects to make presentations to the delegations and members of the public.

**Beney J. Lee,**
*Border Affairs Officer, Office of Mexican Affairs, Department of State.*

[FR Doc. 2025–07758 Filed 5–2–25; 8:45 am]

**BILLING CODE 4710–29–P**

---

## DEPARTMENT OF STATE

[Public Notice: 12717]

### Notice of Determinations; Culturally Significant Object Being Imported for Exhibition—Determinations: "Noah Davis" Exhibition

**SUMMARY:** Notice is hereby given of the following determinations: I hereby determine that a certain object being imported from abroad pursuant to an agreement with its foreign owner or custodian for temporary display in the exhibition "Noah Davis" at the Armand Hammer Museum of Art and Cultural Center, Los Angeles, California; the Philadelphia Museum of Art, Philadelphia, Pennsylvania; and at possible additional exhibitions or venues yet to be determined, are of cultural significance, and, further, that its temporary exhibition or display within the United States as aforementioned is in the national interest. I have ordered that Public Notice of these determinations be published in the **Federal Register**.

**FOR FURTHER INFORMATION CONTACT:** Reed Liriano, Program Coordinator, Office of the Legal Adviser, U.S. Department of State (telephone: 202–632–6471; email: *section2459@state.gov*). The mailing address is U.S. Department of State, L/PD, 2200 C Street NW (SA–5), Suite 5H03, Washington, DC 20522–0505.

**SUPPLEMENTARY INFORMATION:** The foregoing determinations were made pursuant to the authority vested in me by the Act of October 19, 1965 (79 Stat. 985; 22 U.S.C. 2459), Executive Order 12047 of March 27, 1978, the Foreign Affairs Reform and Restructuring Act of 1998 (112 Stat. 2681, *et seq.;* 220 U.S.C. 6501 note, *et seq.*), Delegation of Authority No. 234 of October 1, 1999, Delegation of Authority No. 236–3 of August 28, 2000, and Delegation of Authority No. 574 of March 4, 2025.

**Mary C. Miner,**
*Managing Director for Professional and Cultural Exchanges, Bureau of Educational and Cultural Affairs, Department of State.*

[FR Doc. 2025–07735 Filed 5–2–25; 8:45 am]

**BILLING CODE 4710–05–P**

---

## DEPARTMENT OF STATE

[Public Notice: 12710]

### Foreign Terrorist Organization Designations of Viv Ansanm and Gran Grif

Based upon a review of the Administrative Records assembled in this matter, and in consultation with the Attorney General and the Secretary of the Treasury, I have concluded that there is a sufficient factual basis to find that the relevant circumstances described in section 219 of the Immigration and Nationality Act, as amended (hereinafter "INA") (8 U.S.C. 1189), exist with respect to: Viv Ansanm (also known as Living Together, G–9, G9 Family and Allies, G9 Fanmi e Alye, The Revolutionary Forces of the G9 Family and Allies, Fòs Revolisyoné G9 an Fanmi e Alye, G-Pèp, G-People); and Gran Grif (also known as Gran Grif gang, Gran Grif de Savien, Savien gang, Baz Gran Grif).

Therefore, I hereby designate the aforementioned organizations and their respective aliases as Foreign Terrorist Organizations pursuant to section 219 of the INA.

This determination shall be published in the **Federal Register**. The designations go into effect upon publication.

Dated: April 22, 2025.

**Marco Rubio,**
*Secretary of State.*

[FR Doc. 2025–07464 Filed 5–2–25; 8:45 am]

**BILLING CODE P**

---

## SURFACE TRANSPORTATION BOARD

[Docket No. FD 36831]

### Marquette Rail, LLC—Lease and Operation Exemption Including Interchange Commitment—CSX Transportation, Inc.

Marquette Rail, LLC (MQT), a Class III railroad, has filed a verified notice of exemption pursuant to 49 CFR 1150.41 to continue to lease from CSX Transportation, Inc. (CSXT), and operate the following several segments of rail line in Michigan totaling approximately

*ACH Credit*

*Estimated Number of Respondents:* 144.

*Estimated Number of Total Annual Responses:* 144.

*Estimated Time per Response:* 5 minutes.

*Estimated Total Annual Burden Hours:* 12.

## VIII. Suspension of Regulations

For purposes of this test, any provision in title 19 of the CFR including, but not limited to, the provisions found in parts 24, 141, 142, and 143 thereof relating to entry summary filing and processing that are inconsistent with the requirements set forth in this notice are waived for the duration of the test. *See* 19 CFR 101.9(b). This document does not waive any recordkeeping requirements found in 19 CFR part 163 and the Appendix to part 163 (commonly known as the ''(a)(1)(A) list'').

**Susan S. Thomas,**

*Acting Executive Assistant Commissioner, Office of Trade.*

[FR Doc. 2025–19572 Filed 10–15–25; 8:45 am]

**BILLING CODE 9111–14–P**

## DEPARTMENT OF HOMELAND SECURITY

## Immigration Parole Fee Required by HR–1 Reconciliation Bill

**AGENCY:** U.S. Department of Homeland Security.

**ACTION:** Notice of immigration fee.

**SUMMARY:** The Department of Homeland Security (DHS) is announcing the implementation of the parole fee established in HR–1. Specifically, this notice announces the new immigration parole fee of $1,000 for any alien who is paroled into the United States who does not meet an exception. Through this notice, DHS notifies the public that DHS will begin assessing and collecting this fee as required by HR–1.

**DATES:** This action is effective on October 16, 2025. The parole fee will apply for any alien that has a request for parole filed or pending prior to the effective date of this notice because the fee attaches when an alien is paroled into the United States.

**FOR FURTHER INFORMATION CONTACT:** Office of Regulatory Affairs and Policy, U.S. Immigration and Customs Enforcement, Department of Homeland Security, 500 12th Street SW, Washington, DC 20536; telephone (202) 732–6960 (not a toll-free call).

Office of Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746, telephone (240) 721–3000 (not a toll-free number).

Office of Field Operations, U.S. Customs and Border Protection, Department of Homeland Security, 1300 Pennsylvania Avenue NW, Suite 1500N, Washington, DC 20229, email address: *parolenotification@cbp.dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background and Authority

On July 4, 2025, the President signed into law the One Big Beautiful Bill Act, Public Law 119–21, 139 Stat. 72 (HR–1). HR–1 was a comprehensive legislative package that changed many laws and added new laws that touch many areas of the United States Government. Among those changes, the law established several new fees related to immigration enforcement and lawful immigration programs.[1] The new immigration fees codified in HR–1 will be imposed on aliens in addition to any other fees authorized by law and by the Secretary of Homeland Security.[2] The fees are set for Fiscal Year (FY) 2025 and are, as established by statute, subject to annual increases based on the Consumer Price Index for All Urban Consumers.[3]

DHS has already issued three notices implementing the new fees.[4] The U.S. Citizenship and Immigration Services (USCIS) notice issued on July 22, 2025, noted that DHS was not announcing the immigration parole fee at that time because the multiple exceptions needed additional consideration.[5] DHS reviewed the exceptions and now believes that the fee can be implemented without further delay. This notice, therefore, implements the immigration parole fee. U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and USCIS will issue appropriate guidance and create or update forms, if necessary.

## II. Parole

The Immigration and Nationality Act (''INA'') confers upon the Secretary of Homeland Security (''Secretary'') the

---

[1] *See* HR–1, Title X, Subtitle A, Part I, sections 100001 through 100018.

[2] *See id.*

[3] *See id.*

[4] USCIS Immigration Fees Required by HR–1 Reconciliation Bill, 90 FR 34511 (July 22, 2025) (USCIS Notice); CBP Immigration Fees Required by HR–1 for Fiscal Year 2025, 90 FR 42025 (Aug. 28, 2025); and Certain DHS Immigration Enforcement-Related Fees Required by HR–1 Reconciliation Bill, 90 FR 43223 (Sept. 8, 2025).

[5] *See* 90 FR 34511 at 34516.

discretionary authority to parole an applicant for admission into the United States ''temporarily under such conditions as [DHS] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''[6] Moreover, an applicant for admission in DHS custody may be released pursuant to a parole under INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), for urgent humanitarian reasons or significant public benefit as long as the alien presents ''neither a security risk nor a risk of absconding.''[7] When the purpose of the temporary, discretionary parole has been served, the alien is required to ''return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.''[8]

DHS may authorize parole for aliens outside the United States who must travel to a U.S. port of entry to seek parole.[9] However, CBP has final discretionary authority to grant parole to aliens who appear for inspection at a U.S. port of entry.[10] USCIS and ICE have final discretionary authority to grant parole to any alien applicant for admission within their responsibility who is physically present in the United States.[11]

## III. New Immigration Parole Fee

This notice announces the imposition and collection of the new immigration parole fee of $1,000 for FY 2025 pursuant to HR–1. The fee must be paid by ''any alien who is paroled into the United States.''[12] DHS interprets this to

---

[6] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 8 CFR 212.5(a) and (c) through (e) (discretionary authority for establishing conditions of parole and for terminating parole).

[7] 8 CFR 212.5(b).

[8] INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[9] 8 CFR 212.5(f).

[10] *See Memorandum of Agreement Between United States Citizenship and Immigration Services (USCIS), United States Immigration and Customs Enforcement (ICE), and United States Customs and Border Protection (CBP) for the Purpose of Coordinating the Concurrent Exercise by USCIS, ICE, and CBP, of the Secretary's Parole Authority Under INA sec. 212(d)(5)(A) with Respect to Certain Aliens Located Outside of the United States,* dated Sept. 29, 2008 (relating to USCIS's, ICE's, and CBP's concurrent exercise of parole authority and the framework governing which DHS component is to exercise jurisdiction over parole requests).

[11] *See id.*

[12] See Public Law 119–21 sec. 100004. See Markup of legislative proposals to comply with the reconciliation directive included in section 2001 of the Concurrent Resolution on the Budget for Fiscal Year 2025, H. Con. Res. 14, April 30, 2025, at *https://www.congress.gov/event/119th-congress/house-event/118180* (last visited Sept. 12, 2025) (noting that the legislation is ''a mandate to restore immigration integrity, security, and enforcement'').

mean that each time an alien is granted parole under INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), including initial parole from outside the United States, Congressionally-authorized ''parole in place,'' re-parole, or parole from DHS custody, the fee will be required. The fee will not be due when an application is merely submitted or when a travel document is issued, but rather, DHS will collect the $1,000 fee after it determines that the alien merits a grant of parole as a matter of discretion and the alien either appears for inspection at a port of entry or is already physically present in the United States.

The operative event that triggers the statutory obligation to pay the fee is the actual grant and effectuation of parole at or into the United States—not the filing of an application or request. The timing of the fee attaches when parole is effectuated, regardless of when the underlying application or request was submitted. This means that any parole granted on or after the effective date of this notice must be conditioned on payment of the fee unless an exception applies, even if the request for parole was filed or remained pending prior to October 16, 2025.

HR–1 provides ten exceptions to the $1,000 fee provided the alien establishes to the satisfaction of the Secretary of Homeland Security that the alien is being paroled because of one of the enumerated exceptions:

(1) The alien has a medical emergency and the alien cannot obtain necessary treatment in the foreign state in which the alien is residing; or the medical emergency is life-threatening and there is insufficient time for the alien to be admitted to the United States through the normal visa process;

(2) The alien is the parent or legal guardian of an alien described in paragraph (1) and the alien described in paragraph (1) is a minor;

(3) The alien is needed in the United States to donate an organ or other tissue for transplant; and there is insufficient time for the alien to be admitted to the United States through the normal visa process;

(4) The alien has a close family member in the United States whose death is imminent; and the alien could not arrive in the United States in time to see such family member alive if the alien were to be admitted to the United States through the normal visa process;

(5) The alien is seeking to attend the funeral of a close family member; and the alien could not arrive in the United States in time to attend such funeral if the alien were to be admitted to the United States through the normal visa process;

(6) The alien is an adopted child who has an urgent medical condition; who is in the legal custody of the petitioner for a final adoption-related visa; and whose medical treatment is required before the expected award of a final adoption-related visa;

(7) The alien is a lawful applicant for adjustment of status under section 245 of the INA (8 U.S.C. 1255); and is returning to the United States after temporary travel abroad;

(8) The alien has been returned to a contiguous country pursuant to section 235(b)(2)(C) of the INA (8 U.S.C. 1225(b)(2)(C)); and is being paroled into the United States to allow the alien to attend the alien's immigration hearing;

(9) The alien has been granted the status of Cuban and Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980 (Pub. L. 96–422; 8 U.S.C. 1522 note); or

(10) The Secretary of Homeland Security determines that a significant public benefit has resulted or will result from the parole of an alien who has assisted or will assist the United States Government in a law enforcement matter; whose presence is required by the United States Government in furtherance of such law enforcement matter; and who is inadmissible or does not satisfy the eligibility requirements for admission as a nonimmigrant or for which there is insufficient time for the alien to be admitted to the United States through the normal visa process.[13]

The HR–1 fee will not be assessed if DHS finds, in its discretion, that the alien has established that the alien is being paroled under one of the ten enumerated exceptions.

**IV. Collection**

CBP will collect the parole fee described in this notice for aliens who apply for admission to the United States if (1) the alien requests parole by presenting themselves for inspection at a U.S. port of entry (including aliens who have been authorized by another DHS agency to travel to the port of entry and seek parole); (2) CBP, in its discretion, determines that the alien should be granted parole under INA sec. 212(d)(5)(A); and (3) the alien does not demonstrate, in CBP's discretion, they are eligible for a fee exception pursuant to H.R. 1, Public Law 119–21, 139 Stat. 367–68 (8 U.S.C. 1804). If CBP determines that an alien should be granted parole and the alien is subject to the parole fee described in this notice, CBP will notify the alien of the applicability of the parole fee and

provide instructions on how to pay the fee required as of October 16, 2025.

ICE will collect the fee when it grants parole under INA sec. 212(d)(5)(A) to aliens within its responsibility who are physically present in the United States. ICE will individually notify aliens to whom the $1,000 fee applies and, upon notification, provide instructions on how to pay the fee required as of October 16, 2025.

USCIS will collect the HR–1 fee when it grants parole under INA sec. 212(d)(5)(A) to aliens within its responsibility who are physically present in the United States. Beginning on October 16, 2025, when USCIS decides to favorably adjudicate a Form I–131 for parole in place or re-parole for aliens physically present in the United States, USCIS will issue a notice prior to final adjudication stating that the parole approval is conditioned upon payment of the HR–1 parole fee. This notice will contain payment instructions and a deadline. Parole will only be granted after the fee has been paid. Failure to pay within the time period provided in the conditional approval notice would result in denial of the request.

**V. Paperwork Reduction Act**

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to be submitted to the Office of Management and Budget (OMB), for review and approval, of any new reporting requirements they impose. The process announced here this notice requires the use of USCIS Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records, (OMB control number 1615–0013) but does not require any edits to the form or instructions.

**Kristi Noem,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2025–19564 Filed 10–15–25; 8:45 am]

**BILLING CODE 9112–FP–P**

---

**POSTAL SERVICE**

**International Product Change—Priority Mail Express International, Priority Mail International & First-Class Package International Service Agreements**

**AGENCY:** Postal Service.

**ACTION:** Notice.

---

**SUMMARY:** The Postal Service gives notice of filing requests with the Postal Regulatory Commission to add certain Priority Mail Express International, Priority Mail International & First-Class

---

[13] Public Law 119–21 sec. 100004(b).


enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Guatemalans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14473 Filed 7–7–23; 8:45 am]

BILLING CODE 9111–97–P; 9111–14–P

---

## DEPARTMENT OF HOMELAND SECURITY

[CIS No. 2749–23; DHS Docket No. USCIS–2023–0006]

RIN 1615–ZB99

## Implementation of a Family Reunification Parole Process for Colombians

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Colombians.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Colombians. Under this process, certain Colombian principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Colombia to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

This notice describes the implementation of a new parole process for certain Colombian nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Colombians and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This

---

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021)

Continued

strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options, where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States, as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at

the SWB.[10] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program;[15]

and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] *See id.*

[11] *Id.*

[12] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] *See id.* at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including

updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000

*Federal Register* / Vol. 88, No. 130 / Monday, July 10, 2023 / Notices **43593**

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [18] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who

are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

## III. The FRP Process for Colombians

As in the CFRP and HFRP processes, this FRP process for Colombians will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of Colombia who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Colombian principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the beneficiary will be permitted to travel to

the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Colombians, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process— Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives; (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### A. Promoting Family Unity

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family members from Colombia in the United

---

additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole'').

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as ''reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States,'' and stating that whether to parole a particular alien ''remains, however, a case-by-case, discretionary determination.'').

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) (''By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.'').

**43594** **Federal Register** / Vol. 88, No. 130 / Monday, July 10, 2023 / Notices

States. Currently, nationals of Colombia with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[26] While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29] joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-

---

[26] For example, under the May 2023 Department of State Visa Bulletin, a Colombian married child of a U.S. citizen—F3 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.* However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Colombian married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[28] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing "concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order"); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, ''[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration.''[38]

The USG also continues to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua.[40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.[41] Brazil's ''Operation Welcome'' helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

## C. Lawful Alternative to Irregular Migration

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In Fiscal Year 2022 (FY22), migration from Colombia significantly increased, with border enforcement encounters at the SWB more than 20 times greater in FY22 than in the prior year (6,202 in FY21 compared to 125,172 in FY22).[44] Encounters in FY23, through April 2023, were already at more than 107,000.[45] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from Colombia to the United States.[46]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[47] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Colombia and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration for which they may choose to wait.

## D. Reducing Strain on Limited U.S. Resources

The increase in monthly encounters of Colombians, from approximately 7,500 per month in the first seven months of Fiscal Year (FY) 2022 to more than 15,300 per month in the first seven months of FY 2023 has contributed to the strain on DHS's reception and processing capacity at the SWB.[48] By establishing a lawful pathway for some of these migrants from Colombia, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB,[49] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration.[50]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the NCA region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated

[37] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[38] *See id.*

[39] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.*

[40] *See id.*

[41] *See id.*

[42] *See id.*

[43] *See id.*

[44] U.S. Customs and Border Protection, Nationwide Encounters, May 17, 2023, *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited June 8, 2023).

[45] *Id.*

[46] U.S. Dep't of State, 2022 Country Reports on Human Rights Practices: Colombia (Apr. 2023) *https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/colombia/;* World Report 2023, Events of 2022 Colombia, Human Rights Watch (Jan. 2023) *https://www.hrw.org/world-report/2023/country-chapters/colombia;* ACAPS, Colombia Humanitarian overview: protection concerns and community protection responses (Nov. 17, 2022), *https://www.acaps.org/sites/acaps/files/products/files/20221117_acaps_colombia_analysis_hub_protection.pdf;* Reuters, More than 15 mln Colombians suffer food insecurity—UN (Feb. 16, 2023) *https://www.reuters.com/world/americas/more-than-15-mln-colombians-suffer-food-insecurity-un-2023-02-16/; see also* Paulina Villegas & Samantha Schmidt, *Two siblings tried reaching the U.S. by sea to reunite with their mother. Only one of them made it,* Wash. Post, Jan. 28. 2022, *https://www.washingtonpost.com/world/2022/01/28/siblings-bahamas-colombia/.*

[47] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145;* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.*

[48] U.S. Customs and Border Protection, Nationwide Encounters, May 17, 2023, *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited June 9, 2023).

[49] As of late May 2023, there are currently an estimated 17,400 Colombian nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Colombian nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[50] *See, e.g.,* INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

with irregular migration.[51] TCOs exploit irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[52] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[53] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

*E. Addressing Root Causes of Migration Through Remittances*

This FRP process will also aid U.S. efforts in addressing economic concerns in Colombia, which may be a factor driving the increasing numbers of Colombians crossing the Darién Gap.[54] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[55] Noncitizens

with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[56]

Additional remittances sent back to Colombia, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns, may promote economic development and address some of the root causes of migration.[57] Remittances from Colombian migrants already play an important role in the Colombian economy.[58] For the first nine months of 2022, remittances to Colombia increased 9 percent.[59] Additionally, Colombia receives the highest income from remittances in South America.[60] Overall, remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Colombia, potentially impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

## V. Eligibility

*A. Petitioners*

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Colombian principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved[61] Form I–130 filed on behalf of a Colombian principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Colombian principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of Colombia (or their immediate family member of any nationality) who is outside the United States and who may be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United

[51] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019) *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022) *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[52] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[53] *Id.*

[54] The number of Colombians crossing from Colombia into Panama has increased from approximately 300 in January 2023 to over 1,600 in April 2023. Servicio Nacional de Migración de Panamá, Tránsito Irregular por Darién 2023 (last visited June 9, 2023), *https://www.migracion.gob.pa/images/img2023/pdf/IRREGULARES_%20POR_%20DARI%C3%89N_ABRIL_2023.pdf.*

[55] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending

Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[56] George J. Borjas, ''The Earnings of Undocumented Immigrants,'' National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[57] *See* Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018), *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf;* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020), *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[58] Bloomberg Línea, *Remittances Remain Vital Source of Revenue for Latin America's Economies* (Oct. 27, 2022), *https://www.bloomberglinea.com/english/remittances-remain-vital-source-of-revenue-for-latin-americas-economies/.*

[59] The World Bank, *Remittances Grow 5% in 2022, Despite Global Headwinds* (Nov. 30, 2022), *https://www.worldbank.org/en/news/press-release/2022/11/30/remittances-grow-5-percent-2022.*

[60] Bloomberg Línea, *Remittances Remain Vital Source of Revenue for Latin America's Economies* (Oct. 27, 2022), *https://www.bloomberglinea.com/english/remittances-remain-vital-source-of-revenue-for-latin-americas-economies/.*

[61] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

States to seek a discretionary grant of parole at the POE, a beneficiary must:
• be outside the United States;
• be the principal beneficiary (or a derivative beneficiary spouse or child) [62] of an approved Form I–130, Petition for Alien Relative;
• be a national of Colombia or be a non-Colombian derivative beneficiary spouse or child [63] of a Colombian principal beneficiary;
• have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;
• have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;
• have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and
• have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter relative to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

• has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);
• has been interdicted at sea [64] after July 10, 2023; or
• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order. [65]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Colombia. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.*, international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children. [66]

A potential beneficiary of this process who enters the United States between POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and

will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution, [67] expedited removal proceedings, [68] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status [69] or for an immigrant visa [70] as a result of entering without inspection and not having been admitted or paroled. [71]

*C. Processing Steps*

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP. All steps of the process, except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online,

---

[62] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age"). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. These "add-on derivatives" are included within the term "derivative" in this notice.

[63] Certain non-Colombians may use this process if they are a derivative beneficiary of a Colombian principal beneficiary and traveling with that Colombian beneficiary.

[64] For purposes of this notice, "interdicted at sea" refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[65] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[66] *See* 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").

[67] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[68] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[69] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[70] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[71] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

**43598**    **Federal Register** / Vol. 88, No. 130 / Monday, July 10, 2023 / Notices

including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[72] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by

CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[73]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

*D. Termination and No Private Rights*

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights,

---

[72] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[73] 8 CFR 274a.12(c)(11).

substantive or procedural, enforceable by any party in any matter, civil or criminal.

## VI. Other Considerations in the Establishment of This FRP Process

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case-by-case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon

thereafter would, in general, have been admitted as immigrants).[74]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of Colombia still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without this process. For any such Colombian nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

## VII. Regulatory Requirements

### A. Administrative Procedure Act (APA)

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* DHS is merely adopting a general statement of policy,[75] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [76] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions.

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment

rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[77] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [78] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[79] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs.[80]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[81] These measures are being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to

---

[74] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

[75] 5 U.S.C. 553(b)(A).

[76] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[77] 5 U.S.C. 553(a)(1).

[78] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[79] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[80] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[81] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways which will continue to remain a central topic of bilateral relations.[82] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the L.A. Declaration.[83] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[84] These offices began accepting appointments on the website *movilidadsegura.org* on June 12, 2023.[85] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[86]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[87] The goal is to prevent irregular migration to the United States or other places in the hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[88] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[89]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an exploratory six-month implementation of SMOs.[90] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian and labor pathways.[91] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[92]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and enforcement penalties for unlawful

---

*from-the-united-states-and-guatemala-on-migration/.*

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/. See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/.*

[88] *Id*

[89] *Id.*

[90] *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[91] *Id.*

[92] *Id.*

---

[82] *See* Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[83] See The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-*

entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[93] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[94]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Colombians and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register**

notices seeking comment on these changes.[95]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14472 Filed 7–7–23; 8:45 am]

BILLING CODE 9111–97–P; 9111–14–P

## DEPARTMENT OF HOMELAND SECURITY

[CIS No. 2752–23; DHS Docket No. USCIS–2023–0009]

RIN 1615–ZC02

## Implementation of a Family Reunification Parole Process for Hondurans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Implementation of a Family Reunification Parole Process for Hondurans.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Hondurans. Under this process, certain Honduran principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Honduras to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial

Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

This notice describes the implementation of a new parole process for certain Honduran nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Hondurans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This

---

[93] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[94] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[95] Per the normal clearance procedures at 5 CFR 1320.10(e).

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

# DEPARTMENT OF HOMELAND SECURITY

[Docket No. CISA–2023–0012]

## Notice of President's National Infrastructure Advisory Council Meeting

**AGENCY:** Cybersecurity and Infrastructure Security Agency (CISA), Department of Homeland Security (DHS).

**ACTION:** Notice of open *Federal Advisory Committee Act* (FACA) meeting; request for comments.

**SUMMARY:** CISA is publishing this notice to announce the following President's National Infrastructure Advisory Council (NIAC) meeting.

**DATES:** *Meeting Registration:* Registration is required to attend the meeting and must be received no later than 5 p.m. eastern standard time (EST) on December 6, 2023. For more information on how to participate, please contact *NIAC@cisa.dhs.gov.*

*Speaker Registration:* Registration to speak during the meeting's public comment period must be received no later than 5 p.m. EST on December 6, 2023.

*Written Comments:* Written comments must be received no later than 5 p.m. EST on December 6, 2023.

*Meeting Date:* The NIAC will meet on December 12, 2023, from 1 p.m. to 4 p.m. EST. The meeting may close early if the council has completed its business.

**ADDRESSES:** The National Infrastructure Advisory Council's open session will be held in-person at 1650 Pennsylvania Ave. NW, Washington, DC; however, members of the public may participate via teleconference only. Requests to participate will be accepted and processed in the order in which they are received. For access to the conference call bridge, information on services for individuals with disabilities, or to request special assistance, please email *NIAC@cisa.dhs.gov* by 5 p.m. EST on December 6, 2023. The NIAC is committed to ensuring all participants have equal access regardless of disability status. If you require a reasonable accommodation due to a disability to fully participate, please contact Celinda Moening at *NIAC@ cisa.dhs.gov* as soon as possible.

*Comments:* The council will consider public comments on issues as listed in the **SUPPLEMENTARY INFORMATION** section below. Associated materials for potential discussions during the meeting will be available for review at *https://www.cisa.gov/niac* by December 5, 2023. Comments should be submitted by 5:00 p.m. EST on December 6, 2023 and must be identified by Docket Number CISA–2023–0012. Comments may be submitted by one of the following methods:

• *Federal eRulemaking Portal: www.regulations.gov.* Please follow the instructions for submitting written comments.

• *Email: NIAC@cisa.dhs.gov.* Include the Docket Number CISA–2023–0012 in the subject line of the email.

*Instructions:* All submissions received must include the words ''Department of Homeland Security'' and the Docket Number for this action. Comments received will be posted without alteration to *www.regulations.gov,* including any personal information provided. You may wish to read the Privacy & Security Notice which is available via a link on the homepage of *www.regulations.gov.*

*Docket:* For access to the docket and comments received by the National Infrastructure Advisory Council, please go to *www.regulations.gov* and enter docket number CISA–2023–0012.

A public comment period will take place from 2:30 p.m. to 2:40 p.m. Speakers who wish to participate in the public comment period must email *NIAC@cisa.dhs.gov* to register. Speakers should limit their comments to 3 minutes and will speak in order of registration. Please note that the public comment period may end before the time indicated, depending on the number of speakers who register to participate.

**FOR FURTHER INFORMATION CONTACT:** Celinda Moening, 571–532–4119, *NIAC@cisa.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** The NIAC is established under section 10 of E.O. 13231 issued on October 16, 2001, as amended and continued under the authority of E.O. 14109, dated September 30, 2023. Notice of this meeting is given under the Federal Advisory Committee Act (FACA), 5 U.S.C. Ch. 10 (Pub. L. 117–286). The NIAC provides the President, through the Secretary of Homeland Security, advice on the security and resilience of the Nation's critical infrastructure sectors.

*Agenda:* The National Infrastructure Advisory Council will meet in an open session on Tuesday, December 12, 2023, from 1 p.m. to 4 p.m. EST to discuss NIAC activities. The open session will include: (1) a period for public comment; (2) a keynote address on critical infrastructure security and resilience; (3) a report to the Council from the NIAC's Electrification Subcommittee; (4) deliberation and vote on Electrification Subcommittee recommendations; and (5) Additional Topics Discussion.

Dated: November 13, 2023.

**Celinda E. Moening,**
*Alternate Designated Federal Officer, National Infrastructure Advisory Council, Cybersecurity and Infrastructure Security Agency, Department of Homeland Security.*

[FR Doc. 2023–25348 Filed 11–15–23; 8:45 am]

**BILLING CODE 9110–9P–P**

# DEPARTMENT OF HOMELAND SECURITY

[CIS No. 2758–23; DHS Docket No. USCIS–2023–0014]

RIN 1615–ZC07

## Implementation of a Family Reunification Parole Process for Ecuadorians

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Ecuadorians.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole (FRP) process for Ecuadorians. Under this process, certain Ecuadorian principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Ecuador to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and to reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a

Supporter and Declaration of Financial Support, for this process on November 16, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

This notice describes the implementation of a new parole process for certain Ecuadorian nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing an avenue for certain Ecuadorians and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to collaboratively manage migration with its partners in the Western Hemisphere.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of noncitizens encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options, where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of access to lawful pathways through which migrants can come to the United States as one means of reducing irregular migration flows. On October 12, 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[8] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[9] Implementation of the parole process for Venezuelans

was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, would be subject to expulsion or removal.[10] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the existing parole process for Venezuelans to allow for its continued operation.[11]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[12] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[13]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program [14] and

---

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order (E.O.) 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021) *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2, 4.

[4] *See* National Security Council (NSC), *U.S. Strategy for Addressing the Root Causes of*

*Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[9] *See id.*

[10] *Id.*

[11] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[12] 88 FR 31314 (May 16, 2023).

[13] *See id.* at 31325.

[14] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. *See* U.S. Department of State, Restarting the Central American Minors Program, March 10, 2021, *https://www.state.gov/restarting-the-central-american-minors-program/* (last visited Aug. 3, 2023). In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). *See* U.S. Department. of State, Joint

Continued

expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[15] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for noncitizens in the region while enhancing worker protections.[16]

---

[15] See DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration;* U.S. Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The Department of State, Announcement of Safe Mobility Office in Ecuador, Oct. 19, 2023, *https://www.state.gov/announcement-of-safe-mobility-office-in-ecuador/.*

[16] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B temporary visas by up to 64,716 for the entirety of FY 2023. *See*

Statement by the U.S. Department of State and U.S. Department of Homeland Security on the Expansion of Access to the Central America Minors Program, June 15, 2021, *https://www.state.gov/joint-statement-by-the-u-s-department-of-state-and-u-s-department-of-homeland-security-on-the-expansion-of-access-to-the-central-american-minors-program/* (last visited Aug. 3, 2023). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to noncitizens who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Secretary of Homeland Security (the Secretary) has the discretionary authority under the Immigration and Nationality Act (INA) to parole an applicant for admission "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." [17] Parole is not an admission of the noncitizen to the United States, and a parolee remains an "applicant for admission" during the period of parole in the United States.[18] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[19] DHS may terminate parole upon notice in its discretion at any time.[20] By regulation, parolees may apply for and be granted

---

Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were reserved for nationals of the NCA countries and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[17] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole").

[18] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[19] See 8 CFR 212.5(c).

[20] See 8 CFR 212.5(e).

employment authorization to work lawfully in the United States.[21]

Past Secretaries have similarly exercised parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, Cuban Family Reunification Parole (CFRP) as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Forms I–130.[22] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[23] Similarly, in 2014, Haitian Family Reunification Parole (HFRP) was established, which allows USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[24] On July 10, 2023, DHS announced the implementation of four new FRP processes for certain nationals from Colombia, El Salvador, Guatemala, and Honduras, and their immediate family members, who have approved family-based petitions filed on their behalf by a U.S.C. or LPR.[25] On August 11, 2023, DHS announced updates to modernize the CFRP and HFRP processes by adopting the new, mostly

---

[21] See 8 CFR 274a.12(c)(11).

[22] See Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as "reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States," and stating that whether to parole a particular alien "remains, however, a case-by-case, discretionary determination.").

[23] Id.

[24] See Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) ("By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.").

[25] See Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023); Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023).

*Federal Register* / Vol. 88, No. 220 / Thursday, November 16, 2023 / Notices

online, processing steps implemented for the four new FRP processes.[26]

## III. The FRP Process for Ecuadorians

As in all other FRP processes, the FRP process for Ecuadorians will allow U.S.C. and LPR petitioners who have been invited to file a request and initiate this process for certain eligible family members to receive advance authorization to travel to the United States to seek parole at an interior POE (*i.e.,* an airport). Individuals who are eligible to be considered for parole under this process include nationals of Ecuador who are principal beneficiaries of approved Form I–130 family-based immigrant petitions, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. This process requires that the Form I–130 petitioner first receive an invitation to be able to initiate the process on behalf of the Form I–130 principal beneficiary and their immediate family members. As in other FRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If U.S. Customs and Border Protection (CBP) issues an advance authorization to travel to a beneficiary, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the other FRP processes. If paroled into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an

immigrant visa becomes available to them. As with all parole requests, under this FRP process for Ecuadorians, parole will be authorized only on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process—Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''

The case-by-case parole of noncitizens who are beneficiaries of approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives; (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### A. Promoting Family Unity

The case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite in the United States with their

family members from Ecuador. Currently, nationals of Ecuador with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[27] While they wait for an immigrant visa to be issued, security concerns and uncertainty in their home country, combined with a desire to reunify with family in the United States, could cause many to choose irregular migration in the absence of an alternative, near-term path to come to the United States for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the expeditious reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

---

[26] *See* Implementation of Changes to the Cuban Family Reunification Parole Process, 88 FR 54639 (Aug. 11, 2023); Implementation of Changes to the Haitian Family Reunification Parole Process, 88 FR 54635 (Aug. 11, 2023).

[27] For example, under the October 2023 Department of State Visa Bulletin, an Ecuadorian unmarried son or daughter of a U.S.C.—F1 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 8 years ago. *See* DOS, Visa Bulletin for October 2023, Number 82, Volume X (Oct. 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2024/visa-bulletin-for-october-2023.html.* However, these dates are not predictive. Due to increases in volume of Form I–130 filings, an Ecuadorian unmarried son or daughter of a U.S.C. for whom a Form I–130 is filed today will likely have an even longer wait before an immigrant visa becomes available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[28] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[29] establishing SMOs in key locations throughout the Western Hemisphere,[30] joining Mexico to announce and develop a humanitarian plan on migration,[31] issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America,[32] and, most recently, announcing full support for an initiative that the Government of Mexico plans to start in southern Mexico to offer new refugee and labor pathways.[33] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways

for migration. Many countries have cooperated extensively, at great financial, staffing, and domestic political costs, to: (1) create and expand access to lawful pathways in their respective countries, (2) increase enforcement measures along the migratory routes, and (3) introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela. Implementation of this FRP process is one response to such requests and, thereby, will build goodwill with regional partners and secure cooperation and strengthen bilateral relations in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger foreign policy objectives of this Administration and fits within a framework of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[34] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[35] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[36] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in Spring 2023 as the date on which the CDC Title

42 public health Order[37] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[38] For instance, on April 11, 2023, consistent with the spirit of the L.A. Declaration, in anticipation of the end of the Title 42 public health Order, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[39] Implementing this process fulfills one of the commitments the United States made with its regional partners to, among all these governments, "[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration." [40]

The United States also continues to encourage regional governments to continue to expand lawful pathways for migrants, including providing legal status to migrants residing in their countries, as well as to establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[41] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.

---

[28] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*.

[29] *Trilateral Joint Statement*, April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement*.

[30] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/*; United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*; The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/*; United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*.

[31] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[32] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america*.

[33] *See* The White House, Statement from National Security Advisor Jake Sullivan on Legal Pathways Initiative with Mexico, July 28, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/07/28/statement-from-national-security-advisor-jake-sullivan-on-legal-pathways-initiative-with-mexico/*.

[34] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*.

[35] *Id.*

[36] *Id.*

[37] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Order, which ''suspend[] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19'').

[38] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing ''concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order''); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html*.

[39] *Trilateral Joint Statement*, Apr. 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement*.

[40] *See id.*

[41] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—U.S. Department of State (''Blinken-Mayorkas Joint Press Availability''), Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/*.

Brazil's "Operation Welcome" helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43]

Expanding cooperation with Ecuador can help achieve migration goals within Ecuador, regionally, and around the globe.[44] Ecuador is committed to diminishing the flow of irregular migrants from Ecuador northward by imposing additional visa requirements for certain nationalities,[45] providing life-saving assistance to Venezuelan and Colombian refugees and migrants in its borders, and strengthening its border security and controls.[46] Ecuador, along with Costa Rica, Belize, and Peru, is undertaking efforts to regularize migrants from Venezuela and Nicaragua.[47] Ecuador's program for Venezuelans in the country has provided an opportunity for stability and integration for more than 500,000 displaced Venezuelans.[48] Furthermore, establishing an FRP process for certain nationals of Ecuador furthers the USG's efforts to set up SMOs in Ecuador. As part of ongoing negotiations over the establishment of SMOs in Ecuador, the Government of Ecuador has repeatedly emphasized the critical importance of lawful pathways to the United States for nationals of Ecuador, including labor and family reunification pathways.[49]

After months of negotiations, on October 19, the USG and the Government of Ecuador announced the establishment of SMOs in Ecuador to guide migrants and refugees towards lawful migration pathways.[50]

*C. Lawful Alternative to Irregular Migration*

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In Fiscal Year 2023 (FY23), CBP encounters with Ecuadorians totaled 117,487 as compared to 24,936 encounters in FY22, a 371% increase.[51] In FY21, CBP encountered a total of 97,074 Ecuadorian nationals, and in all of FY20, CBP encountered 12,892 Ecuadorian nationals.[52] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from Ecuador to the United States.[53]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[54]

While beneficiaries of this FRP process will still need to wait to apply to become an LPR, it will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Ecuador and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration.

*D. Reducing Strain on Limited U.S. Resources*

Increases in irregular migration from Ecuador have strained DHS's reception and processing capacity at the SWB. From FY20 to FY23, encounters of Ecuadorians at the SWB totaled approximately 252,389.[55] By establishing a lawful pathway for some nationals of Ecuador and their immediate family members, on a case-by-case basis, to be paroled into the United States before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB. This would thereby provide a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of noncitizens to interior POEs.

Paroling noncitizens through this process will be significantly less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, preserving space and resources for managing irregular migration.

Furthermore, by establishing a meaningful, near-term lawful pathway that certain noncitizens, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to

[42] *See id.*

[43] *See id.*

[44] U.S. Department of State, Integrated Country Strategies—Ecuador, Apr. 20, 2023, *https://www.state.gov/wp-content/uploads/2022/07/ICS_WHA_Ecuador_Public-1.pdf.*

[45] Ministry of Foreign Affairs of Ecuador, LISTA DE PAÍSES QUE DEBEN PRESENTAR VISA AL INGRESAR AL ECUADOR, *https://www.cancilleria.gob.ec/2020/06/30/lista-de-paises-que-deben-presentar-visa-al-ingresar-al-ecuador/* (last visited Sept. 21, 2023). Ecuador passed new legislation imposing additional visa requirements on nationals arriving from Chad, Guinea-Bissau, Kyrgyzstan, Mauritania, Sierra Leone, Sudan, and South Sudan. The new law went into effect on August 3, 2023, and since then, all new travelers must have visas prior to arrival in Ecuador. These additional nationalities follow Ecuador's late 2022 decision to add visa requirements for nationals arriving from Albania, Tajikistan, and Uzbekistan.

[46] *Id.*

[47] *See supra* note 41.

[48] The White House, Readout of Los Angeles Declaration Implementation Launch, Sept. 27, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/09/27/readout-of-los-angeles-declaration-implementation-launch/.*

[49] *See, e.g.,* The Department of State, Quito PRM Regional Refugee Coordinator Report, 23 QUITO 648, July 21, 2023. Gustavo Manrique: "Dialogamos con EE.UU. para que los migrantes puedan tener una reunificación familiar" (Gustavo Manrique: "We are in dialogue with the U.S. so that migrants can have family reunification"), July 10, 2023, *https://www.ecuavisa.com/noticias/politica/*

gustavo-manrique-dialogamos-con-ee-uu-para-que-los-migrantes-puedan-tener-una-reunificacion-familiar-YK5509735.

[50] The Department of State, Announcement of Safe Mobility Office in Ecuador, Oct. 19, 2023, *https://www.state.gov/announcement-of-safe-mobility-office-in-ecuador/.*

[51] CBP, Nationwide Encounters, *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited Nov. 2, 2023).

[52] *Id.*

[53] Genevieve Glatsky and José María León Cabrera, *Security is the Main Worry as Ecuador Votes on Sunday. Here's What to Know,* New York Times, Aug. 20, 2023, *https://www.nytimes.com/2023/08/20/world/americas/ecuador-election-assassination-explainer.html;* Genevieve Glatsky and José María León Cabrera, *How Narco Traffickers Unleashed Violence and Chaos in Ecuador,* New York Times, Aug 17, 2023, *https://www.nytimes.com/2023/08/17/world/americas/ecuador-drug-trafficking-election.html?searchResultPosition=16;* Gonzalo Solano and Michael Weissenstein, *More Ecuadorians move to US, spared many others' hurdles,* Associated Press, Apr. 2, 2023, *https://apnews.com/article/ecuador-migrants-migration-us-immigration-policy-86a8009efa8d357e7cb4dc0cff40fb52;* Vincent Ricci, *More Ecuadorians leaving for US amid 'burst in migration,'* Aljazeera, Sep. 23, 2021, *https://www.aljazeera.com/news/2021/9/23/more-ecuadorians-leaving-for-us-amid-burst-in-migration;* Adriana Pérez and Alfredo Corchado, *A heartbreaking exodus: More people from Ecuador feel forced to migrate to the U.S.,* The Dallas Morning News, Aug. 13, 2021, *https://www.dallasnews.com/news/immigration/2021/08/13/a-heartbreaking-exodus-more-people-from-ecuador-feel-forced-to-migrate-to-the-us/.*

[54] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145;* DOS, Visa Bulletin for

October 2023, Number 82, Volume X (Oct. 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2024-visa-bulletin-for-october-2023.html.*

[55] CBP, Nationwide Encounters, *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited Nov. 2, 2023).

enter the United States irregularly, the process could redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the Northern Central America region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated with irregular migration.[56] TCOs exploit irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[57] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[58] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

DHS anticipates that this process will help minimize the burden on communities, state and local governments, and non-governmental organizations along the SWB. Beneficiaries will be required to fly at their own expense to an interior POE, rather than arriving at the SWB and transiting through border communities. Beneficiaries will only be authorized to come to the United States if they have a U.S.-based supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries will also be immediately eligible to apply for employment authorization, enabling them to support themselves.

### E. Addressing Root Causes of Migration Through Remittances

The case-by-case parole into the United States of noncitizens under this FRP process will also serve a significant

public benefit by aiding U.S. efforts to address economic insecurity in Ecuador, which is a key factor that drives out-migration.[59] Unlike many noncitizens who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that, if granted, they may maintain throughout the duration of their parole period, allowing them to support themselves and to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[60] Noncitizens with employment authorization also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[61]

Additional remittances sent back to Ecuador, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns, may promote economic development and address some of the root causes of migration.[62]

---

[59] U.S. Department of State, Integrated Country Strategies—Ecuador, Apr. 20, 2023, *https://www.state.gov/wp-content/uploads/2022/07/ICS_WHA_Ecuador_Public-1.pdf;* Gonzalo Solano and Michael Weissenstein, *More Ecuadorians move to US, spared many others' hurdles,* Associated Press, Apr. 2, 2023, *https://apnews.com/article/ecuador-migrants-migration-us-immigration-policy-86a8009efa8d357e7cb4dc0cff40fb52;* Vincent Ricci, *More Ecuadorians leaving for US amid 'burst in migration,'* Aljazeera, Sept. 23, 2021, *https://www.aljazeera.com/news/2021/9/23/more-ecuadorians-leaving-for-us-amid-burst-in-migration;* Adriana Pérez and Alfredo Corchado, *A heartbreaking exodus: More people from Ecuador feel forced to migrate to the U.S.,* The Dallas Morning News, Aug. 13, 2021, *https://www.dallasnews.com/news/immigration/2021/08/13/a-heartbreaking-exodus-more-people-from-ecuador-feel-forced-to-migrate-to-the-us/.*

[60] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[61] George I. Borjas, "The Earnings of Undocumented Immigrants," National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[62] Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018), *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes*

In total, remittances sent to Ecuador amounted to $603.97 million in 2021, a significant contribution to development in communities in Ecuador.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Ecuador, impacting individual decisions on whether to leave the country. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, noncitizens are more likely to turn to irregular migration in the short-term.

## V. Eligibility

### A. Petitioners

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of an Ecuadorian principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved [64] Form I–130 filed on behalf of an Ecuadorian principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf

---

*of Migration in Central America* (July 2021)) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[63] Statista, Personal remittances paid in Ecuador from 1999 to 2021, *https://www.statista.com/statistics/1390805/personal-remittances-paid-ecuador/#:~:text=The%20personal%20remittances%20paid%20in,have%20been%20subject%20to%20fluctuation* (last visited July 6, 2023). *See also* The World Bank, Data, GDP (current US$)—Ecuador, *https://data.worldbank.org/indicator/NY.GDP.MKTP.CD?end=2021&locations=EC&start=2019* (last visited July 31, 2023), which indicates that the 2021 GDP for Ecuador was 106.17 billion US dollars.

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

---

[56] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019), *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022), *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[57] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[58] *Id.*

of an Ecuadorian principal beneficiary of an approved Form I–130, and separate requests for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of their parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationships between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of Ecuador (or their immediate family member of any nationality) who is outside the United States and who may be considered for a discretionary grant of parole under this FRP process. To be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE under this process, a beneficiary must:

• Be outside the United States;
• Be the principal beneficiary (or a derivative beneficiary spouse or child)[65] of an approved Form I–130, Petition for Alien Relative;
• Be a national of Ecuador or be a non-Ecuadorian derivative beneficiary spouse or child[66] of an Ecuadorian principal beneficiary;
• Have a petitioning relative in the United States who received an invitation to initiate this FRP process on the beneficiary's behalf by filing a Form I–134A;
• Have a U.S.-based petitioning relative who filed a Form I–134A on the beneficiary's behalf that USCIS has vetted and confirmed;

65 *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age"). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. Such "add-on derivatives" are included within the term "derivative" in this notice.

66 Certain non-Ecuadorans may use this process if they are a derivative beneficiary of an Ecuadorian principal beneficiary and traveling with that Ecuadorian beneficiary.

• Have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and
• Have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting by CBP prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting and collection of additional biometrics at the POE by CBP upon inspection, as described in the section of this Notice that details the processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary approvals of advance authorization to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary has:

• Crossed irregularly into the United States, between POEs, after November 16, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);
• Been interdicted at sea[67] after November 16, 2023; or
• Been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[68]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on urgent humanitarian reasons or significant public benefit, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant

67 For purposes of this notice, "interdicted at sea" refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

68 *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Ecuador. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[69]

A potential beneficiary of this process who enters the United States between POEs after November 16, 2023, rather than being considered for parole under this process, will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs may become ineligible for adjustment of status[72] or for an immigrant visa[73] as a result of

69 *See* 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").

70 INA secs. 275 and 276, 8 U.S.C. 1325 and 1326 (for illegal entry and reentry, respectively).

71 INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

72 INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c)(2), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

73 INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for immigrant visas ineligible).

entering without inspection and not having been admitted or paroled.[74]

*C. Processing Steps*

This FRP process will be implemented in light of lessons learned from the original CFRP and HFRP programs and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP. All steps of the process, except certain medical requirements, and the ultimate parole determination made in person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner be permitted to file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they

wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134a Online To Initiate This Process

After receiving an invitation, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries may submit a Form I–134A for each beneficiary with USCIS through the USCIS online system to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, then the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, then the beneficiary named on the Form I–134A will receive an email from USCIS with instructions to create a USCIS online account and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their USCIS online account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in their USCIS online account and completing required eligibility attestations, the beneficiary will receive instructions through USCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric

information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their USCIS online account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion.

A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole under this process and will be processed consistent with established policy and procedure. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate

---

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis in the exercise of discretion for urgent humanitarian reasons or significant public benefit, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions of parole or other derogatory information emerges during the parole period.

*D. Termination and No Private Rights*

As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This process is being implemented as a matter of the Secretary's discretion, and the Secretary retains the sole discretion to terminate this FRP process at any point. It is not intended to, shall not be construed to, may not be relied upon to, and does not create any rights, privileges, benefits, substantive or procedural, enforceable by any party in any matter, civil or criminal, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

**VI. Considerations in the Establishment of This FRP Process**

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes or forms such as parole-related employment authorization applications. Beneficiaries who are paroled into the

United States under this FRP process may have to wait before being authorized to work in the United States, depending on the amount of time it takes USCIS to process beneficiaries' requests for employment authorization.[77] However, the impact of that waiting period is to some extent mitigated by the requirements of this process. Beneficiaries may not be paroled under this process unless their Form I–130 petitioner has filed on their behalf to initiate the FRP process, requesting to be a supporter and declaring their ability to financially support the beneficiary. As noted above, the petitioner must provide evidence to demonstrate their ability to support the beneficiary or must include similar evidence establishing that with the help of a co-supporter, they have the financial means to support the beneficiary.

Although personnel and resources may be diverted from other similar processes and programs or for the adjudication of forms such as parole-related employment authorization applications, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure as resource limitations require. Therefore, for the processing of employment authorization applications, for example, the adjudication burden on USCIS can be controlled and limited as needed under this FRP process. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. As explained in detail above, DHS has determined that there are significant public benefits of the case-by-case parole of noncitizens under this process. DHS also recognizes there are costs that may be incurred, such as for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant

visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants). Ultimately, DHS has determined that the significant public benefits of the case-by-case parole of noncitizens under this FRP process to the United States, and to other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, justify the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence.[78]

Alternatively, as discussed below, a decision to forego establishing this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation from foreign partners with respect to removals and ensure continued collaboration on migration management. In addition, certain nationals of Ecuador still waiting for their immigrant visas to become available would remain separated from their family members for an extended period of time and could resort to irregular migration without this process. For any such Ecuadorian nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of noncitizens living in the United States without authorization, unable to legally seek employment. The states in which they settle may be less likely to benefit from additional tax revenues and other positive economic contributions these noncitizens would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

**VII. Regulatory Requirements**

*A. Administrative Procedure Act*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

---

[76] 8 CFR 274a.12(c)(11).

[77] USCIS, Check Case Processing Times, *https://egov.uscis.gov/processing-times/* (last visited Oct. 25, 2023). This website provides the approximate processing time a parolee can expect when filing Form I–765, Application for Employment Authorization.

[78] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

First, DHS is merely adopting a general statement of policy,[79] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [80] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions.

Second, even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[81] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [82] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[83]

This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure our partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary worker visas.[84] Since the April 27, 2023 announcement,[85] the

United States has engaged in ongoing negotiations to implement the announced initiatives in close coordination with regional partners including establishing SMOs in Colombia, Guatemala, and Costa Rica as part of its strategy to manage migration collaboratively in the Western Hemisphere.

As with the four recently implemented FRP processes and the modernization of the CFRP and HFRP processes, delaying issuance and implementation of this process to undertake rulemaking would complicate broader discussions and ongoing negotiations with key foreign partners about migration management. Ongoing negotiations with regional partners involve the implementation of a range of new measures, including establishing SMOs in key locations throughout the Western Hemisphere to manage and reduce irregular migration and improve qualified noncitizens' access to accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB are therefore connected to the United States expanding access to lawful pathways, including FRP processes that will benefit nationals in countries identified to host SMOs.

Ecuador is committed to diminishing the flow of irregular migrants from Ecuador northward by imposing additional visa requirements for certain nationalities. To that end, Ecuador unilaterally has taken two very critical actions to prevent certain nationalities from abusing Ecuador's visa regime to irregularly travel to the Western Hemisphere. Ecuador passed new legislation imposing additional visa requirements on nationals arriving from Chad, Guinea-Bissau, Kyrgyzstan, Mauritania, Sierra Leone, Sudan, and South Sudan.[86] The new law went into effect on August 3, 2023, and since then, all new travelers from the seven countries must have visas prior to arrival in Ecuador. These additional nationalities follow Ecuador's late 2022 decision to add visa requirements for

nationals arriving from Albania, Tajikistan, and Uzbekistan.[87] While Ecuador is taking this action unilaterally, representatives of the Government of Ecuador have emphasized the critical importance of availability of lawful pathways for Ecuadorian nationals, including labor pathways and processes for nationals of Ecuador to reunify with their family members in the United States.[88] Similarly, Foreign Minister Gustavo Manrique shared with local press that Ecuador is negotiating with the United States on hosting SMOs and noted their position on family reunification and labor pathways for Ecuadorians.[89] After months of negotiations, on October 19, the USG and the Government of Ecuador announced the establishment of SMOs in Ecuador.[90] In DHS's judgment, the delay associated with a public rulemaking process involving notice and comment and a delayed effective date would negatively impact ongoing efforts to operationalize SMOs in Ecuador to channel migrants to lawful pathways.

Such a delay would also be inconsistent with the dispatch with which DHS has appropriately implemented other FRP processes. Such processes support a series of efforts that the United States has been pursuing in the hemisphere to increase the availability of lawful pathways for migration and involve additional countries with destination pathways and as host countries for certain processing initiatives. The ability to implement such processes rapidly is critical for supporting the Administration's overall goals as part of these efforts, which include multi-faceted negotiations with a range of regional partners.

For instance, on May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that

---

[79] 5 U.S.C. 553(b)(A).

[80] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[81] 5 U.S.C. 553(a)(1).

[82] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[83] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https:// www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[85] *Id.*

[86] Ministry of Foreign Affairs of Ecuador, LISTA DE PAISES QUE DEBEN PRESENTAR VISA AL INGRESAR AL ECUADOR, *https:// www.cancilleria.gob.ec/2020/06/30/lista-de-paises-que-deben-presentar-visa-al-ingresar-al-ecuador/* (last visited Sept. 21, 2023).

[87] *Id.*

[88] The Department of State, Quito PRM Regional Refugee Coordinator Report, 23 QUITO 648, July 21, 2023.

[89] Gustavo Manrique: "Dialogamos con EE.UU. para que los migrantes puedan tener una reunificación familiar" (Gustavo Manrique: "We are in dialogue with the US so that migrants can have family reunification"), July 10, 2023, *https:// www.ecuavisa.com/noticias/politica/gustavo-manrique-dialogamos-con-ee-uu-para-que-los-migrantes-puedan-tener-una-reunificacion-familiar-YK5509735.*

[90] The Department of State, Announcement of Safe Mobility Office in Ecuador, Oct. 19, 2023, *https://www.state.gov/announcement-of-safe-mobility-office-in-ecuador/.*

consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, which will continue to remain a central topic of bilateral relations.[91] Specifically, the United States stated its intention to welcome as many as 100,000 noncitizens from El Salvador, Guatemala, and Honduras under the FRP processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success.[92] Mexico concurrently agreed to continue to implement the joint initiative whereby the United States provides a lawful pathway through parole for nationals of Cuba, Haiti, Nicaragua, and Venezuela, while Mexico would accept the return of certain third-country migrants on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.[93]

Similarly, on July 28, 2023, building on a series of successful lawful pathway initiatives the United States and the Government of Mexico agreed to launch last year,[94] the United States announced additional steps to expand access to safe, orderly, and lawful pathways for migration.[95] On July 28, the United States noted its full support to the Government of Mexico of efforts to establish international multipurpose space in Mexico to offer protection and labor pathways, including accepting refugee resettlement referrals to the U.S. Refugee Admissions Program from qualified noncitizens from Cuba, Haiti, Nicaragua, and Venezuela.[96] The United States and the Government of Mexico are working to implement this new commitment to expand access to lawful pathways. As stated in the **Federal Register** Notices implementing family reunification processes for certain

nationals of Colombia,[97] El Salvador,[98] Guatemala,[99] and Honduras,[100] a delay in implementation of the U.S. commitment to family reunification pathways risks undermining Mexico's commitments, which are critical to the U.S. foreign policy approach to migration management in the Western Hemisphere.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the L.A. Declaration.[101] As the first step of a comprehensive program to manage irregular migration, both countries are implementing a six-month pilot phase of SMOs.[102] These offices began accepting appointments on the website movilidadsegura.org on June 12, 2023.[103] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[104]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[105] The Safe Mobility initiative launched in Colombia on June 28, 2023, with SMOs

currently operational in three cities throughout the country. SMOs in Colombia serve to facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian pathways.[106] The U.S. government also reaffirmed its commitment to expand lawful pathways for Colombians with temporary work visas and expanded family reunification.[107]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, launched an exploratory six-month implementation of SMOs.[108] SMOs in Costa Rica serve to facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian pathways.[109] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[110]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate ongoing negotiations with the Government of Ecuador, specifically, and overall U.S. efforts to manage migration together with foreign partners. Because this FRP process is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining partner countries' multilateral and unilateral efforts, and in the case of Ecuador, putting at risk multiple efforts, including the United States' ability to continue SMO operations in Ecuador and Ecuador's willingness to unilaterally impose certain visa restrictions, which are critical to the U.S. foreign policy approach to migration management in the Western Hemisphere.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would

---

[91] *See* Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[92] *Id.*

[93] *Id.*

[94] *See* The White House, Remarks by President Biden and President López Obrador of Mexico Before Bilateral Meeting, July 12, 2022, *https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/07/12/remarks-by-president-biden-and-president-lopez-obrador-of-mexico-before-bilateral-meeting-2/*.

[95] *See* The White House, Statement from National Security Advisor Jake Sullivan on Legal Pathways Initiative with Mexico, July 28, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/07/28/statement-from-national-security-advisor-jake-sullivan-on-legal-pathways-initiative-with-mexico/*.

[96] *Id.*

[97] *See* Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023).

[98] *See* Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023).

[99] *See* Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023).

[100] *See* Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023).

[101] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/*.

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*. *See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/*.

[106] *Id.*

[107] *Id.*

[108] *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*.

[109] *Id.*

[110] *Id.*

adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals. In diplomatic engagements, regional partner countries have repeatedly requested additional lawful pathways in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. As encounters of Ecuadorians along the SWB have remained high compared to the same months last year, maintaining and expanding their cooperation on removals is necessary to effectively manage irregular migration. Demographics and dynamics are evolving and difficult to predict, requiring flexibility in the responses of all governments involved. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption here is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[111] DHS similarly invoked the foreign affairs exemption more recently in connection with the CHNV parole processes [112] and family reunification parole processes for certain nationals of Colombia, El Salvador, Guatemala, and Honduras announced on July 10, 2023.[113]

[111] *See* Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[112] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[113] *See* DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras, July 17, 2023, *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala;* Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR

## B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Ecuadorians and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143); the revision to the ATA collection will add Ecuador to the list of countries authorized to utilize ATA. USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization for OMB approval of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. USCIS and CBP will issue respective **Federal Register** notices seeking comment on these changes.[114]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–25313 Filed 11–15–23; 8:45 am]
**BILLING CODE 9111–97–P; 9111–14–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–7075–N–14]**

## 60-Day Notice of Proposed Information Collection: Evaluation of Cohort 1 of the Moving to Work Demonstration Program Expansion OMB Control No.: 2528–0328

**AGENCY:** Office of Policy Development and Research, HUD.
**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice

43611 (July 10, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023); and Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023).

[114] Per the normal clearance procedures at 5 CFR 1320.10(e).

is to allow for 60 days of public comment.

**DATES:** *Comments Due Date:* January 16, 2024.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal.

Written comments and recommendations for the proposed information collection can be submitted within 60 days of publication of this notice to *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting, ''Currently under 60-day Review—Open for Public Comments'' or by using the search function. Interested persons are also invited to submit comments regarding this proposal by name and/or OMB Control Number and can be sent to: Anna Guido, Reports Management Officer, REE, Department of Housing and Urban Development, 451 7th Street SW, Room 8210, Washington, DC 20410–5000 or email at *PaperworkReductionActOffice@ hud.gov.*

**FOR FURTHER INFORMATION CONTACT:** Anna Guido, Reports Management Officer, Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410; email; *Anna.P.Guido@hud.gov;* telephone (202) 402–5535 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.*

Copies of available documents submitted to OMB may be obtained from Ms. Guido.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

## A. Overview of Information Collection

*Title of Information Collection:* Evaluation of Cohort 1 of the Moving to Work Demonstration Program Expansion.

*OMB Approval Number:* 2528–0328.
*Type of Request:* Extension of currently approved collection.
*Form Number:* N/A.
*Description of the need for the information and proposed use:* The Office of Policy Development and Research (PD&R), at the U.S. Department of Housing and Urban Development (HUD), is proposing this collection of information for the

changes to their current operations and will remain in effect through July 31, 2024.

CDC has further determined that good cause exists for a one-year extension of the temporary suspension through July 31, 2024, to address public health concerns regarding importation of dogs infected with rabies. Moreover, in parallel to this notice announcing the extension of the temporary suspension, CDC is proposing a rule revising entry requirements to address these concerns regarding importation of rabid dogs and fraudulent vaccination documentation. The proposed rule outlines a framework and set of operations that would mitigate the need for further extensions of the temporary suspension, should these procedures be adopted. In consideration of both the anticipated needs for global rabies vaccine campaigns to return to pre-pandemic levels and to avoid disruption to importers' and the travel industry's operations, CDC has determined that a one-year extension of the temporary suspension through July 31, 2024, is required to protect the public's health and is therefore in the public's interest. In the absence of further extension of the temporary suspension, dog importation requirements would return to procedures that proved inadequate to prevent the import of rabid dogs into the United States. A one-year extension provides time for CDC to continue to build a robust dog importation system while global rabies vaccination efforts continue to rebound. It will also avoid potential public confusion regarding changing dog importation requirements and better address the needs of importers, the animal care and transport industry, and Federal partners who have indicated they would need time to adequately prepare for any changes to their current operations. The proposed rule published in parallel with this extension provides an opportunity for public comment and input on any new procedures.

This temporary suspension will enter into effect on August 1, 2023, and remain in effect through July 31, 2024, unless modified or rescinded by the CDC Director based on public health or other considerations.

**Kathryn Wolff,**
*Chief of Staff, Centers for Disease Control and Prevention.*

[FR Doc. 2023–14342 Filed 7–6–23; 4:15 pm]

**BILLING CODE 4163–18–P**

---

# DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2751–23; DHS Docket No. USCIS–2023–0008]**

**RIN 1615–ZC01**

## Implementation of a Family Reunification Parole Process for Guatemalans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Guatemalans.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Guatemalans. Under this process, certain Guatemalan principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Guatemala to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

This notice describes the implementation of a new parole process for certain Guatemalan nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Guatemalans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America*.[4] This strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration

---

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[10] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January

2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program;[15] and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG

efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

---

[5] See NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] See id.

[11] Id.

[12] See Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] See id. at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. See Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] See DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to

them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries. See The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/;* See United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/;* See The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. See Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. Id. DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. See Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

**II. Parole Authority**

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [18] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

**III. The FRP Process for Guatemalans**

As in the CFRP and HFRP processes, this FRP process for Guatemalans will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of Guatemala who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Guatemalan principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Guatemalans, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

**IV. Justification for the Process— Significant Public Benefit**

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives, (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

*A. Promoting Family Unity*

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family members from Guatemala in the United States. Currently, nationals of Guatemala with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[26]

---

DOL reserved a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole'').

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as ''reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States,'' and stating that whether to parole a particular alien ''remains, however, a case-by-case, discretionary determination.'').

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) (''By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.'').

[26] For example, under the May 2023 Department of State Visa Bulletin, a Guatemalan married child of a U.S. citizen—F3 Preference Relative category— will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for
Continued

While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29]

joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration

acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process

May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.* However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Guatemalan married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[28] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June

4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://*

*www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing "concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order'''); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

[37] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, "[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration." [38]

The USG also continues to continue to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services. [39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua. [40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization. [41] Brazil's "Operation Welcome" helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity. [42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis. [43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

### C. Lawful Alternative to Irregular Migration

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In the past several years, out-migration from the countries of Northern Central America (NCA), including El Salvador, Guatemala, and Honduras, has accounted for a significant proportion of individuals seeking to irregularly migrate to the United States. In Fiscal Year (FY) 2021, CBP encounters with Guatemalans at the SWB increased by about 112 percent as compared to FY18,

and 4.8 percent as compared to FY19, with encounters totaling approximately 283,000 in FY21 as compared to 133,200 and 270,100 in FY18 and FY19, respectively. [44] Encounters with Guatemalans dropped in FY22, but still remained high with 231,500 encounters. [45] For FY21 through April 2023 of FY23, migrants from the NCA accounted for more than 27 percent of all encounters at the SWB, with Guatemalans accounting for approximately 11.3 percent of all encounters. [46] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from NCA countries, including Guatemala, to the United States. [47]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available. [48] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Guatemala and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular

migration for which they may choose to wait.

### D. Reducing Strain on Limited U.S. Resources

Substantial irregular migration, including from Guatemala, has strained DHS's reception and processing capacity at the SWB. [49] By establishing a lawful pathway for some of these migrants from Guatemala, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB, [50] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration. [51]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the NCA region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated with irregular migration. [52] TCOs exploit

---

[38] *See id.*

[39] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.*

[40] *See id.*

[41] *See id.*

[42] *See id.*

[43] *See id.*

[44] Data as of May 4, 2023. OIS analysis of CBP data.

[45] *Id.*

[46] *Id.*

[47] *See* Migration Policy Institute, Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration (Nov. 2021) *https://www.migrationpolicy.org/research/motivations-costs-central-american-migration; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[48] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145;* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.*

[49] *See* Migration Policy Institute, Record-Breaking Migrant Encounters at the U.S.-Mexico Border Overlook the Bigger Story, (Oct. 2022) *https://www.migrationpolicy.org/news/2022-record-migrant-encounters-us-mexico-border.*

[50] As of late May 2023, there are currently an estimated 12,800 Guatemalan nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Guatemalan nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[51] *See, e.g.,* INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

[52] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019) *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022)

Continued

irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[53] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[54] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

*E. Addressing Root Causes of Migration Through Remittances*

This FRP process will also aid U.S. efforts in addressing economic insecurity in Guatemala, which is a key factor that drives out-migration.[55] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[56] Noncitizens with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[57]

Additional remittances sent back to Guatemala, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns may promote economic development and address some of the root causes of migration.[58] Remittances from migrants from NCA countries including Guatemala already play a crucial role in their economies.[59] In 2018, remittances from migrants living abroad were equivalent to 12 percent of Gross Domestic Product (GDP) in Guatemala.[60] Remittances remained stable in 2019, at 13.8 percent.[61] Following the onset of the COVID–19 pandemic in 2020, remittances to the NCA countries increased dramatically as a percentage of GDP in 2021. In Guatemala specifically, remittances were equivalent to 18 percent of the country's 2021 GDP.[62] For the first eight months of 2022, remittances to El Salvador, Guatemala, and Honduras increased 16.5 percent.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Guatemala, impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and

the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

**V. Eligibility**

*A. Petitioners*

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Guatemalan principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved[64] Form I–130 filed on behalf of a Guatemalan principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Guatemalan principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of Guatemala (or their immediate family member of any nationality) who is outside the United States and who may

---

https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.

[53] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[54] *Id.*

[55] U.S. Department of State, Integrated Country Strategies—Guatemala, Apr. 29, 2022, *https://www.state.gov/wp-content/uploads/2022/08/ICS_WHA_Guatemala_Public.pdf.*

[56] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[57] George J. Borjas, ''The Earnings of Undocumented Immigrants,'' National Bureau of Economic Research (Mar. 2017), *https://*

*www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[58] Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018) *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf; see also* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[59] *See* Atlas of Sustainable Development Goals, Remittances: a lifeline for many economies, The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/; see also* Council on Foreign Relations, *Central America's Turbulent Northern Triangle* (July 1, 2021) *https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle.*

[60] Congressional Research Service, U.S. Strategy for Engagement in Central America: Policy Issues for Congress (Nov. 12, 2019) *https://fas.org/sgp/crs/row/R44812.pdf.*

[61] The World Bank, Personal Remittances, received (% of GDP)—Guatemala (last visited June 9, 2023) *https://data.worldbank.org/indicator/BX.TRF.PWKR.DT.GD.ZS?locations=GT.*

[62] Bloomberg Línea, Remittances to Central America on Track to Break Records (Nov. 1, 2022) *https://www.bloomberglinea.com/english/remittances-to-central-america-on-track-to-breaking-records/.*

[63] *Id.*

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or USC), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, a beneficiary must:

• be outside the United States;

• be the principal beneficiary (or a derivative beneficiary spouse or child) [65] of an approved Form I–130, Petition for Alien Relative;

• be a national of Guatemala or be a non-Guatemalan derivative beneficiary spouse or child [66] of a Guatemalan principal beneficiary;

• have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;

• have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and

• have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making

these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

• has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);

• has been interdicted at sea [67] after July 10, 2023; or

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[68]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Guatemala. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.*, international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[69]

A potential beneficiary of this process who enters the United States between

POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status [72] or for an immigrant visa [73] as a result of entering without inspection and not having been admitted or paroled.[74]

## C. Processing Steps

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP. All steps of the process,

---

[65] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age"). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. Such "add-on derivatives" are included within the term "derivative" in this notice.

[66] Certain non-Guatemalans may use this process if they are a derivative beneficiary of a Guatemalan principal beneficiary and traveling with that Guatemalan beneficiary.

[67] For purposes of this notice, "interdicted at sea" refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[68] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[69] *See* 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").

[70] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[71] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[72] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[73] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation, the USC or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a "live" facial photograph—into CBP One.

Step 5: Approval To Travel to United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the individual is a discretionary, case-by-case determination made by

CBP at the time the individual arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

*D. Termination and No Private Rights*

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights,

---

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[76] 8 CFR 274a.12(c)(11).

substantive or procedural, enforceable by any party in any matter, civil or criminal.

## VI. Other Considerations in the Establishment of This FRP Process

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case-by-case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon

thereafter would, in general, have been admitted as immigrants).[77]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of Guatemala still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without this process. For any such Guatemalan nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

## VII. Regulatory Requirements

### A. Administrative Procedure Act (APA)

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* DHS is merely adopting a general statement of policy,[78] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[79] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions.

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment

rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[80] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function."[81] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[82] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs.[83]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[84] These measures are being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to

---

[77] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

[78] 5 U.S.C. 553(b)(A).

[79] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[80] 5 U.S.C. 553(a)(1).

[81] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[82] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[83] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

**43590** **Federal Register** / Vol. 88, No. 130 / Monday, July 10, 2023 / Notices

accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, including in Central America, which will continue to remain a central topic of bilateral relations.[85] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the LA. Declaration.[86] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[87] These offices began accepting appointments on the website *movilidadsegura.org* on June 12, 2023.[88] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[89]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[90] The goal is to prevent irregular migration to the United States or other places in the Hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[91] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[92]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an exploratory six-month implementation of SMOs.[93] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian and labor pathways.[94] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[95]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and

---

[85] See Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[86] See The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/*.

[87] Id

[88] Id.

[89] Id.

[90] See United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*. See The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/*.

[91] Id.

[92] Id.

[93] See United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*.

[94] Id.

[95] Id.

enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Guatemalans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register**

notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*
[FR Doc. 2023–14473 Filed 7–7–23; 8:45 am]
BILLING CODE 9111–97–P; 9111–14–P

# DEPARTMENT OF HOMELAND SECURITY

[CIS No. 2749–23; DHS Docket No. USCIS–2023–0006]

RIN 1615–ZB99

## Implementation of a Family Reunification Parole Process for Colombians

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Colombians.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Colombians. Under this process, certain Colombian principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Colombia to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial

Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

This notice describes the implementation of a new parole process for certain Colombian nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Colombians and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.[4]* This

---

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States Sates or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021)
Continued

entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[93] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[94]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Colombians and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register**

notices seeking comment on these changes.[95]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*
[FR Doc. 2023–14472 Filed 7–7–23; 8:45 am]
BILLING CODE 9111–97–P; 9111–14–P

## DEPARTMENT OF HOMELAND SECURITY

[CIS No. 2752–23; DHS Docket No. USCIS–2023–0009]

RIN 1615–ZC02

## Implementation of a Family Reunification Parole Process for Hondurans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Implementation of a Family Reunification Parole Process for Hondurans.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Hondurans. Under this process, certain Honduran principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Honduras to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial

Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

This notice describes the implementation of a new parole process for certain Honduran nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Hondurans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This

---

[93] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[94] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[95] Per the normal clearance procedures at 5 CFR 1320.10(e).

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options, where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States, as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[10] Implementation of the

parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program;[15]

and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

---

[5] See NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/ wp-content/uploads/2021/07/Collaborative- %20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https:// www.whitehouse.gov/briefing-room/statements- releases/2022/06/10/los-angeles-declaration-on- migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] *See id.*

---

[11] *Id.*

[12] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] *See id.* at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and

---

Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https:// www.dhs.gov/news/2023/04/27/fact-sheet-us- government-announces-sweeping-new-actions- manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the MovilidadSegura.org website and the announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/ statements-releases/2023/06/01/joint-statement- from-the-united-states-and-guatemala-on- migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint- commitment-to-address-the-hemispheric-challenge- of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/ statements-releases/2023/06/11/readout-of- principal-deputy-national-security-advisor-jon- finers-meeting-with-colombian-foreign-minister- alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa- rica-joint-commitment-to-address-the-hemispheric- challenge-of-irregular-migration/.*

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H– 2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation

**Federal Register** / Vol. 88, No. 130 / Monday, July 10, 2023 / Notices    **43603**

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [18] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

## III. The FRP Process for Hondurans

As in the CFRP and HFRP processes, this FRP process for Hondurans will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of Honduras who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Honduran principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Hondurans, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process—Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives; (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### A. Promoting Family Unity

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family members from Honduras in the United States. Currently, nationals of Honduras with approved family-based petitions often wait many years before their immigrant visas can be issued and they

for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole'').

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as ''reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States,'' and stating that whether to parole a particular alien ''remains, however, a case-by-case, discretionary determination.'').

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) (''By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.'').

can travel to the United States to apply for admission as immigrants.[26] While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29] joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased

---

[26] For example, under the May 2023 Department of State Visa Bulletin, a Honduran married child of a U.S. citizen—F3 Preference Relative category— will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.* However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Honduran married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[28] *Trilateral Joint Statement*, April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing "concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order"); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, "[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration."[38]

The USG also continues to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua.[40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.[41] Brazil's "Operation Welcome" helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

*C. Lawful Alternative to Irregular Migration*

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In the past several years, out-migration from the

countries of Northern Central America (NCA), including El Salvador, Guatemala, and Honduras, has accounted for a significant proportion of individuals seeking to irregularly migrate to the United States. In Fiscal Year (FY) 2021, CBP encounters with Hondurans at the SWB were 262 percent of the FY18 level and over 22 percent as compared to FY19, with encounters totaling approximately 319,200 in FY21 as compared to approximately 88,100 and 261,000 in FY18 and FY19, respectively.[44] Encounters of Hondurans dropped in FY22, but still remained high with about 212,900 encounters.[45] For FY21 through April 2023 of FY23, migrants from the NCA accounted for more than 27 percent of all encounters at the SWB, with Hondurans accounting for approximately 11.4 percent of all encounters.[46] Economic insecurity and high levels of poverty, food insecurity, gang violence, corruption, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from NCA countries, including Honduras, to the United States.[47]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[48] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Honduras and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available.

The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration for which they may choose to wait.

*D. Reducing Strain on Limited U.S. Resources*

Substantial irregular migration, including from Honduras, has strained DHS's reception and processing capacity at the SWB. Between FY20 and May 2023, encounters of Hondurans at the SWB exceeded half a million.[49] By establishing a lawful pathway for some of these migrants from Honduras, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB,[50] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration.[51]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the NCA region to the United States earn hundreds of

---

[37] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[38] *See id.*

[39] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.*

[40] *See id.*

[41] *See id.*

[42] *See id.*

[43] *See id.*

[44] Data as of May 4, 2023. OIS analysis of CBP data.

[45] *Id.*

[46] *Id.*

[47] *See* Migration Policy Institute, Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration (Nov. 2021) *https://www.migrationpolicy.org/research/motivations-costs-central-american-migration; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[48] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145;* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.*

[49] CBP, Nationwide Encounters (last visited June 9, 2023); *https://www.cbp.gov/newsroom/stats/nationwide-encounters.* Total SWB encounters between FY20 and May 2023 sum to 662,470 as of date accessed.

[50] As of late May 2023, there are currently an estimated 10,700 Honduran nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Honduran nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[51] *See, e.g.,* INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

millions to billions of dollars each year from smuggling activities associated with irregular migration.[52] TCOs exploit irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[53] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[54] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

*E. Addressing Root Causes of Migration Through Remittances*

This FRP process will also aid U.S. efforts in addressing economic insecurity in Honduras, which is a key factor that drives out-migration.[55] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[56] Noncitizens

with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[57]

Additional remittances sent back to Honduras, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns, may promote economic development and address some of the root causes of migration.[58] Remittances from migrants from NCA countries including Honduras already play a crucial role in their economies.[59] In 2018, remittances from migrants living abroad were equivalent to 20 percent of Gross Domestic Product (GDP) in Honduras.[60] Remittances remained stable in 2019, at 21 percent.[61] Following the onset of the COVID–19 pandemic in 2020, remittances to the NCA countries increased dramatically as a percentage of GDP in 2021. In Honduras specifically, remittances were equivalent to 26 percent of the country's 2021 GDP.[62] For the first eight months of 2022, remittances to El Salvador, Guatemala, and Honduras increased

16.5 percent.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Honduras, impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

**V. Eligibility**

*A. Petitioners*

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Honduran principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved[64] Form I–130 filed on behalf of a Honduran principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Honduran principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass

[52] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019) *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022) *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[53] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[54] *Id.*

[55] U.S. Department of State, Integrated Country Strategies—Honduras, April 4, 2022, *https://www.state.gov/wp-content/uploads/2022/06/ICS_WHA_Honduras_Public.pdf.*

[56] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[57] George J. Borjas, ''The Earnings of Undocumented Immigrants,'' National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[58] Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018) *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf; see also* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[59] *See* Atlas of Sustainable Development Goals, Remittances: a lifeline for many economies, The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/; see also* Council on Foreign Relations, *Central America's Turbulent Northern Triangle* (July 1, 2021) *https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle.*

[60] Congressional Research Service, *U.S. Strategy for Engagement in Central America: Policy Issues for Congress* (Nov. 12, 2019) *https://fas.org/sgp/crs/row/R44812.pdf.*

[61] USAID, Economic Analysis of the Honduras Remittances Ecosystem: An Assessment of the Role Remittances have on Financial Inclusion and Development Outcomes (2022) *https://pdf.usaid.gov/pdf_docs/PA00Z69J.pdf.*

[62] Bloomberg Línea, Remittances to Central America on Track to Break Records (Nov. 1, 2022) *https://www.bloomberglinea.com/english/remittances-to-central-america-on-track-to-breaking-records/.*

[63] *Id.*

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of Honduras (or their immediate family member of any nationality) who is outside the United States and who may be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, a beneficiary must:

• be outside the United States;

• be the principal beneficiary (or a derivative beneficiary spouse or child)[65] of an approved Form I–130, Petition for Alien Relative;

• be a national of Honduras or be a non-Honduran derivative beneficiary spouse or child[66] of a Honduran principal beneficiary;

• have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;

• have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and

• have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the processing steps for this FRP process.

CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

• has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);

• has been interdicted at sea[67] after July 10, 2023; or

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[68] DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Honduras. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to

ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[69]

A potential beneficiary of this process who enters the United States between POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status[72] or for an immigrant visa[73] as a result of entering without inspection and not having been admitted or paroled.[74]

---

[65] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age"). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. The term "add-on derivatives" are included within the term "derivative" in this notice.

[66] Certain non-Hondurans may use this process if they are a derivative beneficiary of a Honduran principal beneficiary and traveling with that Honduran beneficiary.

[67] For purposes of this notice, "interdicted at sea" refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[68] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[69] *See* 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").

[70] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[71] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[72] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[73] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within periods of time thereafter is inadmissible and *Continued*

**43608**    **Federal Register** / Vol. 88, No. 130 / Monday, July 10, 2023 / Notices

## C. Processing Steps

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP. All steps of the process, except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

### Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

### Step 2: Petitioner Files Form I–134A Online

After receiving an invitation, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

### Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

### Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a "live" facial photograph—into CBP One.

### Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination, made by CBP at the time the beneficiary arrives at the interior POE.

### Step 6: Beneficiary Seeks Parole at the POE

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

### Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or

---

therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

---

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[76] 8 CFR 274a.12(c)(11).

detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

### D. Termination and No Private Rights

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

### VI. Other Considerations in the Establishment of This FRP Process

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case by

case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants).[77]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of Honduras still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without this process. For any such Honduran nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

### VII. Regulatory Requirements

#### A. Administrative Procedure Act (APA)

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* DHS is merely adopting a general statement of policy,[78] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [79] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole

decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions.

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[80] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [81] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[82] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities including the timely establishment of SMOs.[83]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[84] These measures are

---

[77] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

[78] 5 U.S.C. 553(b)(A).

[79] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[80] 5 U.S.C. 553(a)(1).

[81] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[82] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[83] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

**43610** **Federal Register** / Vol. 88, No. 130 / Monday, July 10, 2023 / Notices

being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, including in Central America, which will continue to remain a central topic of bilateral relations.[85] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the

United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the LA. Declaration.[86] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[87] These offices began accepting appointments on the website movilidadsegura.org on June 12, 2023.[88] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[89]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[90] The goal is to prevent irregular migration to the United States or other places in the Hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[91] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[92]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an

exploratory six-month implementation of SMOs.[93] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian and labor pathways.[94] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[95]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their

---

[85] See Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[86] See The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/*.

[87] Id.

[88] Id.

[89] Id.

[90] See United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration*. See The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/*.

[91] Id.

[92] Id.

[93] See United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*.

[94] Id.

[95] Id.

efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Hondurans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes

(under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14474 Filed 7–7–23; 8:45 am]

**BILLING CODE P**

---

**DEPARTMENT OF HOMELAND SECURITY**

[CIS No. 2750–23; DHS Docket No. USCIS–2023–0007]

**RIN 1615–ZC00**

**Implementation of a Family Reunification Parole Process for Salvadorans**

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Implementation of a Family Reunification Parole Process for Salvadorans.

---

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Salvadorans. Under this process, certain Salvadoran principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from El Salvador to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Renã Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

This notice describes the implementation of a new parole process for certain Salvadoran nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Salvadorans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes*

---

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

---

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf*; *see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf*.

[3] *See* E.O. 14010 at secs. 2–4.

efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Hondurans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes

(under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14474 Filed 7–7–23; 8:45 am]

**BILLING CODE P**

---

**DEPARTMENT OF HOMELAND SECURITY**

[CIS No. 2750–23; DHS Docket No. USCIS–2023–0007]

RIN 1615–ZC00

**Implementation of a Family Reunification Parole Process for Salvadorans**

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Implementation of a Family Reunification Parole Process for Salvadorans.

---

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Salvadorans. Under this process, certain Salvadoran principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from El Salvador to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

This notice describes the implementation of a new parole process for certain Salvadoran nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Salvadorans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes*

---

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf*; *see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

*of Migration in Central America.*[4] This strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options, where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[10] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program;[15] and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

---

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] *See id.*

[11] *Id.*

[12] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] *See id.* at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022)

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." [18] Parole is not an admission of the individual to the United States, and a parolee remains an "applicant for admission" during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

## III. The FRP Process for Salvadorans

As in the CFRP and HFRP processes, this FRP process for Salvadorans will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of El Salvador who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Salvadoran principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Salvadorans, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process— Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives, (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### A. Promoting Family Unity

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family

---

(authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole").

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as "reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States," and stating that whether to parole a particular alien "remains, however, a case-by-case, discretionary determination.").

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) ("By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.").

members from El Salvador in the United States. Currently, nationals of El Salvador with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[26] While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

### B. Furthering Important Foreign Policy Objectives

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29] joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-

[26] For example, under the May 2023 Department of State Visa Bulletin, a Salvadoran married child of a U.S. citizen—F3 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html*. However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Salvadoran married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*.

[28] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/*; *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*; *See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/*; *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*.

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*.

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing "concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order"); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, "[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration." [38]

The USG also continues to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua.[40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.[41] Brazil's "Operation Welcome" helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

## C. Lawful Alternative to Irregular Migration

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In the past several years, out-migration from the countries of Northern Central America (NCA), including El Salvador, Guatemala, and Honduras, has accounted for a significant proportion of individuals seeking to irregularly migrate to the United States. In Fiscal Year (FY) 2021, CBP encounters with Salvadorans at the SWB increased by about 168 percent as compared to FY18, and about 7.0 percent as compared to FY19, with encounters totaling approximately 98,600 in FY21 as compared to 36,800 and 92,200 in FY18 and FY19, respectively.[44] In FY22, the encounters remained at the high levels of the previous fiscal year, with 97,000 encounters.[45] For FY21 through April 2023 of FY23, migrants from the NCA accounted for more than 27 percent of all encounters at the SWB, with Salvadorans accounting for approximately 4.3 percent of all encounters.[46] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from NCA countries, including El Salvador, to the United States.[47]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[48] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of El Salvador and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration for which they may choose to wait.

## D. Reducing Strain on Limited U.S. Resources

Substantial irregular migration, including from El Salvador, has strained DHS's reception and processing capacity at the SWB. Between FY20 and April 2023, encounters of Salvadorans at the SWB totaled approximately a quarter million.[49] By establishing a lawful pathway for some of these migrants from El Salvador, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB,[50] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration.[51]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling

---

[37] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[38] *See id.*

[39] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.*

[40] *See id.*

[41] *See id.*

[42] *See id.*

[43] *See id.*

[44] Data as of May 4, 2023. OIS analysis of CBP data.

[45] *Id.*

[46] *Id.*

[47] *See* Migration Policy Institute, Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration (Nov. 2021) *https://www.migrationpolicy.org/research/motivations-costs-central-american-migration;* see also NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[48] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145;* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.*

[49] CBP, Nationwide Encounters (last visited June 9, 2023) *https://www.cbp.gov/newsroom/stats/nationwide-encounters.*

[50] As of late May 2023, there are currently an estimated 32,600 Salvadoran nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Salvadoran nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[51] *See, e.g.,* INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

along the route from the NCA region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated with irregular migration.[52] TCOs exploit irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[53] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[54] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

### E. Addressing Root Causes of Migration Through Remittances

This FRP process will also aid U.S. efforts in addressing economic insecurity in El Salvador, which is a key factor that drives out-migration.[55] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[56] Noncitizens

with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[57]

Additional remittances sent back to El Salvador, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns may promote economic development and address some of the root causes of migration.[58] Remittances from migrants from NCA countries including El Salvador already play a crucial role in their economies.[59] In 2018, remittances from migrants living abroad were equivalent to nearly 21 percent of Gross Domestic Product (GDP) in El Salvador.[60] Remittances remained stable in 2019, at 21 percent.[61] Following the onset of the COVID–19 pandemic in 2020, remittances to the NCA countries increased dramatically as a percentage of GDP in 2021. In El Salvador specifically, remittances were equivalent to 26 percent of the country's 2021 GDP.[62] For the first eight months of 2022, remittances to El Salvador, Guatemala, and Honduras increased

16.5 percent.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in El Salvador, impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

## V. Eligibility

### A. Petitioners

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Salvadoran principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved[64] Form I–130 filed on behalf of a Salvadoran principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Salvadoran principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review

---

[52] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019) *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022) *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[53] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[54] *Id.*

[55] U.S. Department of State, Integrated Country Strategies—El Salvador, Apr. 21, 2023, *https://www.state.gov/wp-content/uploads/2023/04/ICS_WHA_El-Salvador_Public.pdf.*

[56] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized

Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[57] George J. Borjas, ''The Earnings of Undocumented Immigrants,'' National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[58] Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018) *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf; see also* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[59] *See* Atlas of Sustainable Development Goals, Remittances: a lifeline for many economies, The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/; see also* Council on Foreign Relations, *Central America's Turbulent Northern Triangle* (July 1, 2021) *https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle.*

[60] Congressional Research Service, *U.S. Strategy for Engagement in Central America: Policy Issues for Congress* (Nov. 12, 2019) *https://fas.org/sgp/crs/row/R44812.pdf.*

[61] The World Bank, Personal Remittances, received (% of GDP)—El Salvador (last visited June 9, 2023) *https://data.worldbank.org/indicator/BX.TRF.PWKR.DT.GD.ZS?locations=SV.*

[62] *Id.; also see* Bloomberg Línea, *Remittances to Central America on Track to Break Records* (Nov. 1, 2022) *https://www.bloomberglinea.com/english/remittances-to-central-america-on-track-to-breaking-records.*

[63] *Id.*

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

### B. Beneficiaries

A beneficiary is a national of El Salvador (or their immediate family member of any nationality) who is outside the United States and who may be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, a beneficiary must:

• be outside the United States;

• be the principal beneficiary (or a derivative beneficiary spouse or child) [65] of an approved Form I–130, Petition for Alien Relative;

• be a national of El Salvador or be a non-Salvadoran derivative beneficiary spouse or child [66] of a Salvadoran principal beneficiary;

• have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;

• have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and

• have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the

processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

• has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);

• has been interdicted at sea [67] after July 10, 2023; or

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[68]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in El Salvador. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (e.g., international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in

coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[69]

A potential beneficiary of this process who enters the United States between POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status [72] or for an immigrant visa [73] as a result of entering without inspection and not having been admitted or paroled.[74]

---

[65] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age"). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. The term "add-on derivatives" are included within the term "derivative" in this notice.

[66] Certain non-Salvadorans may use this process if they are a derivative beneficiary of a Salvadoran principal beneficiary and traveling with that Salvadoran beneficiary.

[67] For purposes of this notice, "interdicted at sea" refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[68] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[69] *See* 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").

[70] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[71] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[72] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[73] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain

Continued

*C. Processing Steps*

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP.All steps of the process, except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and

assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a "live" facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel

via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the Poe

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[76] 8 CFR 274a.12(c)(11).

detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

### D. Termination and No Private Rights

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

### VI. Other Considerations in the Establishment of This FRP Process

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case-

by-case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants).[77]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of El Salvador still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without thus, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

### VII. Regulatory Requirements

#### A. Administrative Procedure Act (APA)

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* DHS is merely adopting a general statement of policy,[78] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[79] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole

decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions.

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[80] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function."[81] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[82] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs.[83]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[84] These measures are

---

[77] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/ the-economic-and-fiscal-consequences-of-immigration.*

[78] 5 U.S.C. 553(b)(A).

[79] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[80] 5 U.S.C. 553(a)(1).

[81] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[82] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[83] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https:// www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https:// www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, including in Central America, which will continue to remain a central topic of bilateral relations.[85] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the LA. Declaration.[86] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[87] These offices began accepting appointments on the website movilidadsegura.org on June 12, 2023.[88] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[89]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[90] The goal is to prevent irregular migration to the United States or other places in the Hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[91] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[92]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an exploratory six-month implementation of SMOs.[93] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian and labor pathways.[94] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[95]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their

---

[85] See Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.

[86] See The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/.

[87] Id.

[88] Id.

[89] Id.

[90] See United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/. See The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/.

[91] Id.

[92] Id.

[93] See United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.

[94] Id.

[95] Id.

efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Salvadorans and is being revised in connection with this notice by increasing the burden estimate. This

process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14475 Filed 7–7–23; 8:45 am]

**BILLING CODE 9111–97–P; 9111–14–P**

---

# DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

**[Docket No. FWS–R7–ES–2023–0008; FF07CAMM00–FX–ES111607MRG01]**

## Marine Mammals; Letters of Authorization To Take Pacific Walruses and Polar Bears in the Beaufort Sea, Alaska, in 2022

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of issuance.

**SUMMARY:** In accordance with the Marine Mammal Protection Act of 1972, as amended, the U.S. Fish and Wildlife Service issued letters of authorization (LOA) for the nonlethal take of polar bears and Pacific walruses incidental to oil and gas industry exploration, development, and production activities in the Beaufort Sea and the adjacent northern coast of Alaska in 2022. This notice announces the LOAs issued in calendar year 2022. The LOAs stipulate conditions and methods that minimize impacts to polar bears and Pacific walruses from these activities.

**ADDRESSES:** *Document availability:* You may view the letters of authorization at *https://www.regulations.gov* under Docket No. FWS–R7–ES–2023–0008, or you may request them from the contact in **FOR FURTHER INFORMATION CONTACT.**

**FOR FURTHER INFORMATION CONTACT:** Charles Hamilton, via U.S. mail at

Marine Mammals Management, U.S. Fish and Wildlife Service, MS 341, 1011 East Tudor Road, Anchorage, AK 99503; by email at *R7mmmRegulatory@fws.gov,* or by telephone at 1–800–362–5148. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** On August 5, 2021, the U.S. Fish and Wildlife Service (Service) published in the **Federal Register** a final rule (86 FR 42982) establishing regulations that allow us to authorize the nonlethal, incidental, unintentional take of small numbers of polar bears (*Ursus maritimus*) and Pacific walruses (*Odobenus rosmarus divergens*) during year-round oil and gas industry exploration, development, and production activities in the Beaufort Sea and adjacent northern coast of Alaska. These incidental take regulations are located in subpart J in part 18 of title 50 of the Code of Federal Regulations (CFR) and are effective through August 5, 2026. The rule prescribed a process under which we issue letters of authorization (LOA) to applicants conducting activities as described under the provisions of the regulations.

Each LOA stipulates conditions and methods that are specific to the activity and location. Holders of the LOAs must use methods and conduct activities in a manner that minimizes to the greatest extent practicable adverse impacts on Pacific walruses and polar bears and their habitat, and on the availability of these marine mammals for subsistence purposes. No intentional take or lethal incidental take is authorized under these regulations.

In accordance with section 101(a)(5)(A) of the Marine Mammal Protection Act (16 U.S.C. 1361 *et seq.*) and our regulations at 50 CFR part 18, subpart J, in 2022, we issued LOAs to the companies in the Beaufort Sea and adjacent northern coast of Alaska shown in the table. The Service includes in the table all LOAs issued in 2022.

---

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

procedural updates announced in this notice.

## III. Regulatory Requirements

### A. Administrative Procedure Act

The changes to the HFRP process announced in this notice are exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and are therefore amenable to immediate issuance and implementation.

*First,* the HFRP process, and these updates to that process, constitute a general statement of policy,[22] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [23] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions. The updates to the process do not change the nature of the policy and fall under the exception for general statements of policy. Additionally, this falls under the separate exception for rules of agency organization, procedure, or practice [24] because it sets forth updates to how agencies will implement the HFRP process.

*Second,* even if the updates to this process were considered to be a legislative rule that will normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the updates are exempt from such requirements because they involve a foreign affairs function of the United States.[25] As discussed in the July 10, 2023 notices announcing four new family reunification processes,[26] the United States continues to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration.[27] Improving the

efficiency and accessibility of HFRP is necessary to ensure our foreign partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the implementation of the initial phases of Safe Mobility Offices (SMOs) in Guatemala, Costa Rica, and Colombia.[28] Also, as with the four new processes, delays in implementing these procedural changes would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management. As such, foreign partners have requested that the United States ensure that functional, efficient lawful pathways exist for Haitian nationals.

### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The updates to the HFRP process announced by this notice require changes to the collection of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), and the collection of information on Form I–131, Application for Travel Document (OMB control number 1615–0013), which will be used for this HFRP process and are being revised in connection with this notice by adjusting the burden estimate. The updates to this process also require changes to the collection of information for Advance Travel Authorization (ATA) (OMB

Control Number 1651–0143). USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A, Form I–131, and ATA for a period of six (6) months. USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes on or before August 25, 2023.[29]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*
[FR Doc. 2023–17344 Filed 8–10–23; 8:45 am]
**BILLING CODE 9111–97–P ; 9111–14–P**

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2753–23; DHS Docket No. USCIS–2007–0043]**

**RIN 1615–ZC04**

## Implementation of Changes to the Cuban Family Reunification Parole Process

**AGENCY:** Department of Homeland Security (DHS).

**ACTION:** Notice of changes to Cuban Family Reunification Parole.

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to modernize Cuban Family Reunification Parole (CFRP). CFRP provides a lawful, safe, and orderly pathway for certain Cubans to seek parole into the United States, allowing them to reunite with family as they wait for their immigrant visas to become available so they may apply to adjust status to lawful permanent resident (LPR). The Secretary has authorized these updates to CFRP in light of technological advancements and process efficiencies created since the CFRP's inception in 2007. Every step of the updated process will be completed online with the exception of a medical exam by a panel physician and the parole determination made upon arrival at an interior U.S. port of entry (POE).

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on August 11, 2023.

**FOR FURTHER INFORMATION CONTACT:** Renā Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs,

---

[22] 5 U.S.C. 553(b)(A).

[23] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[24] 5 U.S.C. 553(b)(A).

[25] 5 U.S.C. 553(a)(1).

[26] *See* footnotes 8, 9, 10, and 11; *see also* DHS press release "DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras" (July 7, 2023), *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala.*

[27] *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* United States Department of State, U.S.-Colombia Joint

Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; see* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[28] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration (April 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries.

[29] Per the normal clearance procedures at 5 CFR 1320.10(e).

**54640** **Federal Register** / Vol. 88, No. 154 / Friday, August 11, 2023 / Notices

MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

In 2007, U.S. Citizenship and Immigration Services (USCIS) launched CFRP in furtherance of the United States' commitment under the U.S.-Cuba Migration Accords [1] to direct Cuban migration into lawful, safe, and orderly channels and to continue regular review of the migration situation and proper implementation of the Accords.[2] Under CFRP, the U.S. Government (USG) invites certain eligible United States citizen (U.S.C.) and LPR petitioners to file a request and initiate consideration for parole for certain family members in Cuba who are the beneficiaries of an approved Form I–130, Petition for Alien Relative.[3]

If travel is authorized for the beneficiaries, these family members are allowed to travel to the United States before their immigrant visas become available and seek parole on a case-by-case basis upon arrival at a port of entry (POE) in the United States.[4] If granted parole into the United States, CFRP parolees may apply for employment authorization while they wait to apply to adjust to LPR status.[5] Unlike parolees under similar family reunification parole (FRP) processes, CFRP beneficiaries may apply for adjustment one year after their parole into the United States under the Cuban Adjustment Act.[6] They do not need to wait for their immigrant visas to become available to apply for adjustment.[7]

Beneficiaries must have a petitioner who filed a Form I–130 on behalf of a principal beneficiary and has been invited to participate in the CFRP process after the Form I–130 was approved. The principal beneficiary of that petitioner's Form I–130 must be a Cuban national. Consistent with a **Federal Register** notice updating the CFRP process in 2014, beginning February 17, 2015, USCIS required invited petitioners to file a completed Form I–131, Application for Travel Document, and submit the required fee(s) or fee waiver request for consideration of parole for each beneficiary.[8] Also consistent with that notice, USCIS required that USCIS officers or U.S. Department of State (State) consular officers interview beneficiaries in Havana, Cuba, to verify their eligibility for the program.[9] If USCIS issued a travel document to a given beneficiary, that individual could then travel to the United States to seek parole.

In May 2022, the United States announced the resumption of CFRP operations following suspension of CFRP interviews in September 2017 [10] and closure of the USCIS Havana Field Office on December 10, 2018.[11] In August 2022, USCIS began mailing CFRP interview notices to petitioners with instructions for the beneficiary interview. On August 18, 2022, USCIS restarted interviews at the U.S. Embassy in Cuba. However, USCIS has had limited capacity to conduct interviews due to operational constraints in Cuba. Specifically, while both State and USCIS are working to fully resume operations in Havana, these efforts are taking time to fully realize, which is one reason DHS is implementing these operational changes. Furthermore, the economic and political crisis in Cuba, which has been marked by food shortages, rolling blackouts, and countrywide internet outages,[12] impacts the USG capacity to process parole requests in Cuba for Cuban nationals and their immediate family members [13] under CFRP.

In short, interview capacity limitations in Cuba, resource constraints within DHS and State, and the pending application caseload have made the process inefficient and inaccessible to many beneficiaries in Cuba. Many applications are pending, and no new invitations to access CFRP have been sent since August 23, 2016.

In the meantime, technology has evolved since the launch of the CFRP process in 2007. DHS is now able to electronically collect biographic information and evidentiary documents to facilitate identity verification, national security checks, and public safety vetting. DHS has expanded capacity to intake forms through online processes and allow individuals to upload supporting documentation directly online as part of the application process. The updated process for CFRP utilizes these technological developments to make the advance travel authorization and parole process more efficient and accessible while maintaining national security and public safety vetting measures as well as other measures for case-by-case adjudication.

In addition, DHS has recently implemented parole processes that are similar to CFRP but that follow different procedures that utilize these recent technological developments. These include the filing of a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, the use of a fully electronic request for advance travel authorization (as opposed to the petitioner's use of the Form I–131 under the 2014 CFRP procedures), and processing without a requirement for an in-person interview abroad. Most recently, on July 10, 2023, DHS implemented FRP processes for certain Colombians,[14] Guatemalans,[15]

---

[1] See generally U.S. Department of State archived website on Cuban migration, https://1997-2001.state.gov/regions/wha/cuba/migration.html. Under the Accords, the United States committed itself to total legal migration to the United States from Cuba of a minimum of 20,000 Cubans each year, not including immediate relatives of U.S. citizens (USCs). See Joint Communiqué on Migration, U.S.-Cuba (Sept. 9, 1994) (known together with the Joint Statement With the Republic of Cuba on Normalization of Migration (May 2, 1995) as the U.S.-Cuba Migration Accords).

[2] Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 15, 2007). Note that, consistent with other processes described in this notice, DHS now refers to CFRP as a process rather than a program.

[3] Id.; see also USCIS, The Cuban Family Reunification Parole Program (Sept. 1, 2022), https://www.uscis.gov/humanitarian/humanitarian-parole/the-cuban-family-reunification-parole-program.

[4] Id.

[5] See 8 CFR 274a.12(c)(11).

[6] See Public Law 89–732, 80 Stat. 1161 (Nov. 2, 1966), as amended (Immigration and Nationality Act (INA), sec. 245, Note 1, 8 U.S.C. 1255, Note 1).

[7] Id.

[8] Notice of Changes to Application Procedures for the Cuban Family Reunification Parole Program, 79 FR 75579 (Dec. 18, 2014).

[9] 79 FR 75581.

[10] See U.S. Department of State, Biden Administration Measures to Support the Cuban People (May 16, 2022), https://www.state.gov/biden-administration-measures-to-support-the-cuban-people/. See also U.S. Embassy in Cuba, USCIS Resumes Cuban Family Reunification Parole Program Operations (September 1, 2022), https://cu.usembassy.gov/uscis-resumes-cuban-family-reunification-parole-program-operations/#:~:text=CFRP%20processing%20was%20suspended%20due, office%20in%20Havana%20in%202018.

[11] See USCIS, USCIS Closes Havana Field Office on December 10, 2018 (December 10, 2018), https://www.uscis.gov/archive/uscis-closes-havana-field-office-on-dec-10-2018.

[12] New York Times, 'Cuba Is Depopulating': Largest Exodus Yet Threatens Country's Future, Dec. 10, 2022, https://www.nytimes.com/2022/12/10/world/americas/cuba-us-migration.html; Dave Sherwood, Reuters, Oct. 1, 2022, Banging pots, Cubans stage rare protests over Hurricane Ian

blackouts. https://www.reuters.com/world/americas/cubans-havana-bang-pots-protest-days-long-blackout-after-ian-2022-09-30/; The Economist, Cuba is Facing Its Worst Shortage of Food Since the 1990s (July 1, 2021), https://www.economist.com/the-americas/2021/07/01/cuba-is-facing-its-worst-shortage-of-food-since-the-1990s.

[13] Within this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. See INA sec. 203(d), 8 U.S.C. 1153(d); see also INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child", in general, as meaning "an unmarried person under twenty-one years of age").

[14] See Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43581 (July 10, 2023).

[15] See Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023).

**Federal Register** / Vol. 88, No. 154 / Friday, August 11, 2023 / Notices    **54641**

Hondurans,[16] and Salvadorans [17] along these lines. DHS is now conforming the CFRP process to these recently announced processes.

## II. Modernized Process

### A. Petitioners

As done under the 2007 process and the revised process in 2014, invitations to participate in the CFRP process will issue to certain petitioners who have an approved Form I–130 filed on behalf of a Cuban principal beneficiary. Invitations will continue to issue at the USG's discretion, based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the foreign policy aims of this process.

Petitioners who have an approved [18] Form I–130 filed on behalf of a Cuban principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request to be a supporter with USCIS to initiate this process on behalf of a Cuban principal beneficiary of an approved Form I–130, and how to file separate requests for any immediate family members of the principal beneficiary.

As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the period of parole. Petitioners will also be required to provide evidence to verify the familial relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request to be a supporter under this process. As part of the review process, the petitioner must also pass security and background vetting, including for public safety,

national security, human trafficking, and exploitation concerns.

### B. Beneficiaries

The threshold eligibility criteria for participation in the CFRP continue to apply. Principal beneficiaries must be Cuban nationals who have a petitioner who has been invited to participate. However, DHS is implementing an update for the petitioner to initiate this process so the beneficiary can be considered for issuance of advance authorization to travel to the United States where the beneficiary can seek a discretionary grant of parole at an interior POE.

To be eligible to be considered under this process, a beneficiary must not have been issued an immigrant visa at the time the invitation issues to the petitioner and, if authorized to travel, must now travel by commercial air with sufficient documentation (e.g., international passport) to an interior POE.

In addition, as with the 2007 process and the revised 2014 process, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. Under this updated process, U.S. Customs and Border Protection (CBP) will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of national security and public safety vetting when determining a beneficiary's eligibility to be issued advance authorization to travel to the United States. CBP will determine, on a case-by-case basis, whether to exercise discretion to grant parole to the beneficiary at an interior POE upon their arrival. CBP also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Upon arrival at an interior POE, each beneficiary must demonstrate to CBP that a grant of parole is warranted based on a significant public benefit or for urgent humanitarian reasons and that the beneficiary merits a favorable exercise of discretion. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines, prior to traveling to the United States. For consistency with other FRP processes, parole will generally be granted for a period of up to three years, rather than the two years under the previous CFRP process.

Participation in this process is not limited to beneficiaries currently living

in Cuba.[19] However, as noted above, beneficiaries must be outside the United States to participate in the process, and the principal beneficiaries must be Cuban nationals.

A beneficiary of this process who enters the United States between POEs rather than being considered for parole under this process will be processed under Title 8 of the U.S. Code and face appropriate consequences. For example, they may be subject to potential criminal prosecution,[20] expedited removal proceedings,[21] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, beneficiaries who enter the United States between POEs rather than being considered for parole under this process may already be or may become ineligible for adjustment of status [22] or for an immigrant visa [23] as a result of entering without inspection and not having been admitted or paroled.[24]

---

[19] DHS recognizes that permitting Cubans to be processed under the CFRP process when not physically present in Cuba means that not all Cubans who are paroled under the CFRP process would count towards the U.S. Government's annual obligation under the U.S.-Cuba Migration Accords.

[20] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[21] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[22] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for adjustment of status ineligible).

[23] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[24] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. See INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. See INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. See INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

---

[16] See Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023).

[17] See Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023).

[18] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (e.g., the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice of the revocation of the approved Form I–130.

*C. Description of Updated Process for CFRP*

DHS announces these updates to the CFRP process in light of lessons learned, technological advancements made, and efficiencies created in parole processes developed and implemented since CFRP's inception in 2007. Except for the medical exam by a panel physician and the ultimate parole determination made in person, on a case-by-case basis, by CBP at an interior POE, all steps of the updated CFRP process will generally be completed online. As a result, the process will no longer require an in-country interview for each beneficiary.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the principal beneficiary and any derivative beneficiaries listed on the Form I–130. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice.

Only after receiving an invitation may the petitioner file a Form I–134A request to initiate consideration under this CFRP process. Participation in the process will continue to be voluntary. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A filing. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation to initiate this process, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the USCIS online web portal. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner will not be required to pay a fee to file Form I–134A. The Form I–134A identifies and collects information on both the petitioner and the beneficiary.

The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries.

USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create a USCIS online account and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their USCIS online account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in their USCIS online account and completing required eligibility attestations, the beneficiary will receive instructions through their USCIS online account for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information— including a ''live'' facial photograph— into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization from CBP to travel to the United States. This will facilitate their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE.

The beneficiary will receive a notice in their USCIS online account confirming whether CBP has, in its discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE inside a U.S. airport.[25]

Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination, made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

To use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[26]

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years. Upon arrival at an interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion.

A beneficiary who is determined to pose a national security or public safety threat will be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and

---

[25] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[26] *See* 6 U.S.C. 279(g)(2) (defining ''unaccompanied alien child'').

Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[27]

Parole may be terminated upon notice at DHS's discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period. A noncitizen paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

*D. Termination, No Private Rights, and Severability*

The Secretary retains the sole discretion to terminate this CFRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal. The 2007 decision to implement this process remains unchanged and is severable from the procedural updates announced in this notice.

### III. Regulatory Requirements

*A. Administrative Procedure Act*

The changes to the CFRP process announced in this notice are exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and are therefore amenable to immediate issuance and implementation.

*First,* the CFRP process, and these updates to that process, constitute a general statement of policy,[28] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [29] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions. The updates to the process do not change the nature of the policy and fall under the exception for general statements of policy. Additionally, this falls under the separate exception for rules of agency organization, procedure, or practice [30] because it sets forth updates to how agencies will implement the CFRP process.

*Second,* even if the updates to this process were considered to be a legislative rule that will normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the updates are exempt from such requirements because they involve a foreign affairs function of the United States.[31] As discussed in the July 10, 2023 notices announcing four new family reunification processes,[32] the United States continues to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration.[33] Improving the efficiency and accessibility of CFRP is necessary to ensure our foreign partners' continued collaboration on migration issues, including the ability of the United States to meet other

immigration-management priorities such as the implementation of the initial phases of Safe Mobility Offices (SMOs) in Guatemala, Costa Rica, and Colombia.[34] Also, as with the four new processes, delays in implementing these procedural changes would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management. As such, foreign partners have requested that the United States ensure that functional, efficient lawful pathways exist for Cuban nationals.

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The updates to the CFRP process announced by this notice require changes to the collection of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), and the collection of information on Form I–131, Application for Travel Document (OMB control number 1615–0013), which will be used for this CFRP process and are being revised in connection with this notice by adjusting the burden estimate. The updates to this process also require changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A, Form I–131, and ATA for a period of six (6) months. USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes on or before August 25, 2023.[35]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–17376 Filed 8–10–23; 8:45 am]

**BILLING CODE 9111–97–P; 9111–14–P**

[27] 8 CFR 274a.12(c)(11).

[28] 5 U.S.C. 553(b)(A).

[29] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[30] 5 U.S.C. 553(b)(A).

[31] 5 U.S.C. 553(a)(1).

[32] *See* footnotes 14, 15, 16, and 17; *see also* DHS press release "DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras" (July 7, 2023), *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala.*

[33] *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; see* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[34] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration (April 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the MovilidadSegura.org website and the announcements with hosting countries.

[35] Per the normal clearance procedures at 5 CFR 1320.10(e).

Specialist, Marketing & Outreach, Federal Insurance, Federal Insurance and Mitigation Administration, 202–322–6215, *joshua.heath@fema.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** E.O. 12862 directs Federal Agencies to provide service to the public that matches or exceeds the best service available. Section 1(b) of E.O. 12862 requires government agencies to "survey customers to determine the kind and quality of services they want." In addition, the Foundations for Evidence-Based Policymaking Act of 2018 ("Evidence Act") enables agencies to collect and analyze data to use as evidence in policymaking, as well as assess the effectiveness and efficiency of current programs. To work continuously to ensure that our programs are effective and meet our customers' needs, FEMA seeks to obtain the Office of Management and Budget's (OMB) approval of a generic clearance to collect information through mixed methods (quantitative and qualitative) to improve marketing, outreach, and other promotional activities of services, programs, and opportunities offered by FEMA.

This proposed information collection previously published in the **Federal Register** on May 5, 2023, at 88 FR 29143 with a 60-day public comment period. No comments were received. The purpose of this notice is to notify the public that FEMA will submit the information collection abstracted below to the Office of Management and Budget for review and clearance.

**Collection of Information**

*Title:* Generic Clearance for the Multi-Modal Mixed Methods Collection of Information to Inform Agency Marketing and Outreach.

*Type of Information Collection:* New information collection.

*OMB Number:* 1660–NW131.

*FEMA Forms:* Not applicable.

*Abstract:* In accordance with the Evidence Act, the collected information will equip FEMA with vital feedback from the general public and stakeholders that will allow for evidence-based improvements to FEMA's programs and services. FEMA will collect, analyze, and interpret information to identify strengths and weaknesses of programs based on current stakeholder experience and make improvements in the marketing and other promotional activities based on feedback.

*Affected Public:* Individuals and households, business or other for-profit, Federal Government, State, local or Tribal government, non-profit institutions.

*Estimated Number of Respondents:* 45,600.

*Estimated Number of Responses:* 45,600.

*Estimated Total Annual Burden Hours:* 7,861.

*Estimated Total Annual Respondent Cost:* $374,020.

*Estimated Respondents' Operation and Maintenance Costs:* $0.

*Estimated Respondents' Capital and Start-Up Costs:* $0.

*Estimated Total Annual Cost to the Federal Government:* $748,830.

**Comments**

Comments may be submitted as indicated in the **ADDRESSES** caption above. Comments are solicited to (a) evaluate whether the proposed data collection is necessary for the proper performance of the Agency, including whether the information shall have practical utility; (b) evaluate the accuracy of the Agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (c) enhance the quality, utility, and clarity of the information to be collected; and (d) minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

**Millicent Brown Wilson,**

*Records Management Branch Chief, Office of the Chief Administrative Officer, Mission Support, Federal Emergency Management Agency, Department of Homeland Security.*

[FR Doc. 2023–17281 Filed 8–10–23; 8:45 am]

**BILLING CODE 9111–52–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**[CIS No. 2754–23; DHS Docket No. USCIS–2014–0013]**

**RIN 1615–ZC03**

**Implementation of Changes to the Haitian Family Reunification Parole Process**

**AGENCY:** Department of Homeland Security (DHS).

**ACTION:** Notice of changes to Haitian Family Reunification Parole.

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to modernize Haitian Family Reunification Parole (HFRP). HFRP provides a lawful,

safe, and orderly pathway for certain Haitians to seek parole into the United States, allowing them to reunite with family as they wait for their immigrant visas to become available so they may apply to adjust status to lawful permanent resident (LPR). The Secretary has authorized these updates to HFRP in light of technological advancements and process efficiencies created since the HFRP's inception in 2014. Every step of the updated process will be completed online with the exception of a medical exam by a panel physician and the parole determination made upon arrival at an interior U.S. port of entry (POE).

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on August 11, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

In 2014, U.S. Citizenship and Immigration Services (USCIS) launched HFRP to expedite family reunification through lawful, safe, and orderly channels of migration to the United States, increase existing avenues for lawful migration from Haiti, and help Haiti in its recovery from the long-term impacts of the January 12, 2010 earthquake that devastated the country.[1] Under HFRP, the U.S. Government (USG) invites certain eligible United States citizen (U.S.C.) and LPR petitioners to file a request and initiate consideration for parole for certain family members in Haiti who are the beneficiaries of an approved Form I–130, Petition for Alien Relative. Since it was established in 2014, HFRP has allowed certain beneficiaries of family-based immigrant petitions that were approved on or before December 18, 2014 to request a discretionary grant of parole to enter the United States up to approximately two years before their immigrant visas become available,

---

[1] *Implementation of Haitian Family Reunification Parole Program,* 79 FR 75581 (Dec. 18, 2014). Note that, consistent with other processes described in this notice, DHS now refers to HFRP as a process rather than a program.

rather than remain in Haiti awaiting availability of their immigrant visas.[2]

If travel is authorized for the beneficiaries, these family members are allowed to travel to the United States before their immigrant visas become available and seek parole on a case-by-case basis upon arrival at a port of entry (POE) in the United States.[3] If granted parole into the United States, HFRP parolees may apply for employment authorization while they wait for their immigrant visas to become available so they may apply to adjust to LPR status.[4]

As launched in 2014, USCIS required invited petitioners to file a completed Form I–131, Application for Travel Document, and submit the required fee(s) or fee waiver request for consideration of parole for each beneficiary. USCIS also required that USCIS officers interview beneficiaries in Port-au-Prince, Haiti, to verify their eligibility for HFRP. The National Visa Center (NVC) at the U.S. Department of State (State) first issued invitations to eligible petitioners to apply for HFRP in March 2015. Due to several factors, including anticipated policy changes,[5] a change in Administrations, the permanent closure of USCIS's field office in Port-au-Prince, Haiti, on December 20, 2019, extremely limited visa processing due to COVID–19,[6] and severe insecurity in the country,[7] new

invitations to the HFRP process have not issued since June 2016 and interviews have not taken place since December 2019.

In the meantime, technology has evolved since the launch of HFRP in 2014. DHS is now able to electronically collect biographic information and evidentiary documents to facilitate identity verification, national security checks, and public safety vetting. DHS has expanded access to intake forms through online processes and allow individuals to upload supporting documentation directly online as part of the application process. The updated process for HFRP utilizes these technological developments to make the advance travel authorization and parole process more efficient and accessible while maintaining national security and public safety vetting measures as well as other measures for case-by-case adjudication.

In addition, DHS has recently implemented parole processes that are similar to HFRP but that follow different procedures, which utilize these recent technological developments. These include the filing of a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, the use of a fully electronic request for advance travel authorization (as opposed to the petitioner's use of the Form I–131 under the 2014 HFRP procedures), and processing without a requirement for an in-person interview abroad. Most recently, on July 10, 2023, DHS implemented family reunification parole (FRP) processes for certain Colombians,[8] Guatemalans,[9]

Hondurans,[10] and Salvadorans[11] along these lines. DHS is now conforming the HFRP process to these recently announced processes.

## II. Modernized Process

### A. Petitioners

Invitations to participate in the HFRP process will continue to issue to certain petitioners who have an approved Form I–130 filed on behalf of a Haitian principal beneficiary. Invitations will continue to issue at the USG's discretion, based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available and in a manner calibrated to best achieve the foreign policy aims of this process.

Petitioners who have an approved[12] Form I–130 filed on behalf of a Haitian principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's NVC as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request to be a supporter with USCIS to initiate this process on behalf of a Haitian principal beneficiary of an approved Form I–130 and how to file separate requests for any immediate family members[13] of the principal beneficiary.

As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the period of parole. Petitioners will also be required to provide evidence to verify the familial relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request to be a supporter under this process. As

---

[2] *Id.; see also* USCIS, The Haitian Family Reunification Parole Program (June 22, 2022), *https://www.uscis.gov/humanitarian/humanitarian-parole/the-haitian-family-reunification-parole-hfrp-program.* To participate in HFRP, beneficiaries must have a petitioner who filed a Form I–130, Petition for Alien Relative, on behalf of a principal beneficiary, and was invited to participate in the HFRP process after the Form I–130 was approved. The principal beneficiary of that petitioner's approved Form I–130 must be a Haitian national.

[3] *See Implementation of Haitian Family Reunification Parole Program,* 79 FR 75581 (Dec. 18, 2014). *See also* USCIS, The Haitian Family Reunification Parole Program (June 22, 2022), *https://www.uscis.gov/humanitarian/humanitarian-parole/the-haitian-family-reunification-parole-hfrp-program.*

[4] 8 CFR 274a.12(c)(11).

[5] In August 2019, USCIS announced an intention to terminate HFRP, although USCIS never formally terminated the process. *See* USCIS to End Certain Categorical Parole Programs (Aug. 2, 2019), *https://www.uscis.gov/archive/uscis-to-end-certain-categorical-parole-programs.* In June 2022, USCIS reversed its 2019 announcement. *See also* The Haitian Family Reunification Parole (HFRP) Program: Alert (June 22, 2022), *https://www.uscis.gov/humanitarian/humanitarian-parole/the-haitian-family-reunification-parole-hfrp-program.*

[6] On March 19, 2020, the U.S. Embassy Port-au-Prince, Haiti, issued a Health Alert and suspended all non-emergency consular services. *See* Health Alert—U.S. Embassy Port-au-Prince, Haiti (March 19, 2020), *https://ht.usembassy.gov/security-alert-u-s-embassy-port-au-prince-haiti-january-8-2020-4-3-2-2-3-2-2-2-3-3-2-2-2-2-2-2-3-2-2-4-3-2-2-2-2-5-2-2-2/.*

[7] The assassination of Haiti's late President Jovenel Moïse exacerbated political and economic

instability in Haiti, undermining state institutions and generating a power vacuum that has since been occupied by gangs. *See Implementation of a Parole Process for Haitians,* 88 FR 1243, 1246–47 (Jan. 9, 2023) (discussing conditions in Haiti). Due to the lawlessness in the country, the U.S. Embassy in Haiti temporarily suspended visa processing and continues to operate at a limited capacity. *See* Security Alert: U.S. Embassy Port-au-Prince, Haiti (Feb. 5, 2023), *https://ht.usembassy.gov/security-alert-u-s-embassy-port-au-prince-haiti-80.* To further complicate matters, on August 14, 2021, a 7.2 magnitude earthquake hit Haiti, killing more than 2,200 people, injuring over 12,000 more, destroying tens of thousands of homes, and crippling Haiti's already fragile infrastructure. *See* UNICEF, Massive earthquake leaves devastation in Haiti: UNICEF and partners are on the ground providing emergency assistance for children and their families (Oct. 4, 2021), *https://www.unicef.org/emergencies/massive-earthquake-devastation-haiti.*

[8] *See Implementation of a Family Reunification Parole Process for Colombians,* 88 FR 43591 (July 10, 2023).

[9] *See Implementation of a Family Reunification Parole Process for Guatemalans,* 88 FR 43581 (July 10, 2023).

[10] *See Implementation of a Family Reunification Parole Process for Hondurans,* 88 FR 43601 (July 10, 2023).

[11] *See Implementation of a Family Reunification Parole Process for Salvadorans,* 88 FR 43611 (July 10, 2023).

[12] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice of the revocation of the approved Form I–130.

[13] Throughout this notice "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* the Immigration and Nationality Act (INA), sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child" in general, as meaning "an unmarried person under twenty-one years of age").

part of the review process, the petitioner must also pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

### B. Beneficiaries

Previously, the HFRP process limited eligibility to Haitian principal beneficiaries of Forms I–130 and their immediate family members that were approved by USCIS on or before December 18, 2014 and for whom an immigrant visa was not currently available. The volume of invitations issued was limited based on operational capacity and other factors, as described above. The revised process is open to all Haitian principal beneficiaries of an approved Form I–130 and their immediate family members who have not yet received an immigrant visa regardless of the date on which USCIS approved the Form I–130. However, as mentioned above, the process will still be available on an invitation-only basis.

In addition, individuals whose immigrant visas were not available but were expected to become available within a specific time range were previously sent invitations to participate in the HFRP process. USCIS will no longer apply a time limit for expected immigrant visa availability. However, USCIS will consider when a beneficiary's immigrant visa is expected to become available when determining which petitioners will receive invitations to initiate this process on behalf of the beneficiary of their approved Form I–130.

To be eligible to be considered under this process, a beneficiary must not have been issued an immigrant visa at the time the invitation issues to the petitioner and, if authorized to travel, must now travel by commercial air with sufficient documentation (e.g., international passport) to an interior POE.

In addition, as with the 2014 HFRP process, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. Under this updated process, U.S. Customs and Border Protection (CBP) will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of national security and public safety vetting when determining a beneficiary's eligibility to be issued advance authorization to travel to the United States. CBP will determine, on a case-by-case basis, whether to exercise discretion to grant parole to the beneficiary at an interior POE upon their arrival. CBP also will consider

other factors in making discretionary determinations consistent with longstanding policy and practice.

Upon arrival at an interior POE, each beneficiary must demonstrate to CBP that a grant of parole is warranted based on a significant public benefit or for urgent humanitarian reasons and that the beneficiary merits a favorable exercise of discretion. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines, prior to traveling to the United States.

Participation in this process is not limited to beneficiaries currently living in Haiti. However, as noted above, beneficiaries must be outside the United States to participate in the process, and the principal beneficiaries must be Haitian nationals.

A beneficiary of this process who enters the United States between POEs rather than being considered for parole under this process will be processed under Title 8 of the U.S. Code and face appropriate consequences. For example, they may be subject to potential criminal prosecution,[14] expedited removal proceedings,[15] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, beneficiaries who enter the United States between POEs rather than being considered for parole under this process may already be, or may become, ineligible for adjustment of status[16] or for an immigrant visa[17] as a result of entering without inspection and not having been admitted or paroled.[18]

---

[14] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[15] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[16] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for adjustment of status ineligible).

[17] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for immigrant visas ineligible).

[18] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. See INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180

### C. Description of Updated Process for HFRP

DHS announces these updates to the HFRP process in light of lessons learned, technological advancements made, and efficiencies created in parole processes developed and implemented since HFRP's inception in 2014. Except for the medical exam by a panel physician and the ultimate parole determination made in person, on a case-by-case basis, by CBP at an interior POE, all steps of the updated HFRP process will generally be completed online. As a result, the process will no longer require an in-country interview for each beneficiary.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the principal beneficiary and any derivative beneficiaries listed on the Form I–130. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this notice.

Only after receiving an invitation may the petitioner file a Form I–134A request to initiate consideration under this HFRP process. Participation in the process will continue to be voluntary. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A filing. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation to initiate this process, the U.S. citizen

---

days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. See INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. See INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

(U.S.C.) or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the USCIS online web portal. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner will not be required to pay a fee to file Form I–134A. The Form I–134A identifies and collects information on both the petitioner and the beneficiary.

The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries.

USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create a USCIS online account and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their USCIS online account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in their USCIS online account and completing required eligibility attestations, the beneficiary will receive instructions through their USCIS online account for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a "live" facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization from CBP to travel to the United States. This will facilitate their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE.

The beneficiary will receive a notice in their USCIS online account confirming whether CBP has, in its discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE inside a U.S. airport.[19]

Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

To use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.*, international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[20]

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years. Upon arrival at an interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric

information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion.

A beneficiary who is determined to pose a national security or public safety threat will be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[21]

Parole may be terminated upon notice at DHS's discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period. A noncitizen paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and make the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

*D. Termination, No Private Rights, and Severability*

The Secretary retains the sole discretion to terminate this HFRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal. The 2014 decision to implement this process remains unchanged and is severable from the

---

[19] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[20] *See* 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").

[21] 8 CFR 274a.12(c)(11).

procedural updates announced in this notice.

## III. Regulatory Requirements

### A. Administrative Procedure Act

The changes to the HFRP process announced in this notice are exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and are therefore amenable to immediate issuance and implementation.

*First,* the HFRP process, and these updates to that process, constitute a general statement of policy,[22] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [23] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions. The updates to the process do not change the nature of the policy and fall under the exception for general statements of policy. Additionally, this falls under the separate exception for rules of agency organization, procedure, or practice [24] because it sets forth updates to how agencies will implement the HFRP process.

*Second,* even if the updates to this process were considered to be a legislative rule that will normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the updates are exempt from such requirements because they involve a foreign affairs function of the United States.[25] As discussed in the July 10, 2023 notices announcing four new family reunification processes,[26] the United States continues to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration.[27] Improving the

efficiency and accessibility of HFRP is necessary to ensure our foreign partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the implementation of the initial phases of Safe Mobility Offices (SMOs) in Guatemala, Costa Rica, and Colombia.[28] Also, as with the four new processes, delays in implementing these procedural changes would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management. As such, foreign partners have requested that the United States ensure that functional, efficient lawful pathways exist for Haitian nationals.

### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The updates to the HFRP process announced by this notice require changes to the collection of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), and the collection of information on Form I–131, Application for Travel Document (OMB control number 1615–0013), which will be used for this HFRP process and are being revised in connection with this notice by adjusting the burden estimate. The updates to this process also require changes to the collection of information for Advance Travel Authorization (ATA) (OMB

Control Number 1651–0143). USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A, Form I–131, and ATA for a period of six (6) months. USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes on or before August 25, 2023.[29]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–17344 Filed 8–10–23; 8:45 am]

**BILLING CODE 9111–97–P ; 9111–14–P**

---

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2753–23; DHS Docket No. USCIS–2007–0043]**

**RIN 1615–ZC04**

### Implementation of Changes to the Cuban Family Reunification Parole Process

**AGENCY:** Department of Homeland Security (DHS).

**ACTION:** Notice of changes to Cuban Family Reunification Parole.

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to modernize Cuban Family Reunification Parole (CFRP). CFRP provides a lawful, safe, and orderly pathway for certain Cubans to seek parole into the United States, allowing them to reunite with family as they wait for their immigrant visas to become available so they may apply to adjust status to lawful permanent resident (LPR). The Secretary has authorized these updates to CFRP in light of technological advancements and process efficiencies created since the CFRP's inception in 2007. Every step of the updated process will be completed online with the exception of a medical exam by a panel physician and the parole determination made upon arrival at an interior U.S. port of entry (POE).

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on August 11, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs,

---

[22] 5 U.S.C. 553(b)(A).

[23] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[24] 5 U.S.C. 553(b)(A).

[25] 5 U.S.C. 553(a)(1).

[26] *See* footnotes 8, 9, 10, and 11; *see also* DHS press release "DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras" (July 7, 2023), *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala.*

[27] *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* United States Department of State, U.S.-Colombia Joint

Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; see* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[28] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration (April 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries.

[29] Per the normal clearance procedures at 5 CFR 1320.10(e).

and file the Form I–131 in effect at the time of filing—and follow any additional instructions included in the program eligibility notice they receive from either USCIS or the NVC in submitting their application. A completed Form I–131 and fee or fee waiver request must be filed for each individual on whose behalf parole is being requested.

## III. Participation in the CFRP Program and Application Process

USCIS offers participation in the CFRP Program to Cuban nationals who reside in Cuba and who are the beneficiaries—including any eligible spouse and child accompanying or following-to-join the principal beneficiaries (*see* INA sec. 203(d), 8 U.S.C. 1153(d))—of an approved Form I–130, Petition for Alien Relative, but for whom an immigrant visa is not immediately available. Participation in the CFRP Program is voluntary.

Prior to the date of this notice, the NVC mailed written notice to eligible U.S.-based U.S.C. and LPR petitioners with approved Forms I–130 indicating their beneficiaries' eligibility to participate in the CFRP Program. The notice invited an interested petitioner to submit to the NVC a copy of their approved Form I–130 and other supporting documents to opt in to the CFRP Program and begin the process of requesting parole. No formal application form or fee was required to apply. As of the date of this notice, the NVC will no longer issue CFRP Program eligibility notices that do not require a form and fee to apply. Petitioners with CFRP Program eligibility notices dated prior to December 18, 2014 must submit to the NVC the complete required documentation to opt in to the CFRP Program prior to February 17, 2015 in order to be grandfathered and considered for processing without a form and fee.

On or after February 17, 2015, participation in the CFRP Program will be predicated on submission of a Form I–131 and the requisite fee(s) or request for fee waiver that has been approved by USCIS. A U.S.C. or LPR petitioner in the United States with an approved Form I–130 that was filed on behalf of a beneficiary relative residing in Cuba, for whom a visa is not anticipated to be available during the CFRP processing time, will receive a written invitation from the NVC regarding the beneficiary's eligibility to participate in the CFRP Program and the procedures for requesting parole, if desired. The notice will instruct the recipient on how to file a completed Form I–131 and submit the required fee(s) or fee waiver

request to apply for the program. USCIS will reject a request for parole under the CFRP Program submitted without the required form and fee(s) or a request for a fee waiver.

USCIS officers or Department of State consular officers will interview qualified beneficiaries in Havana to verify their eligibility for the program. Beneficiaries may also have their biometrics collected. If USCIS exercises its discretion to authorize parole under the CFRP Program, USCIS or the Department of State will issue the necessary travel documents to the beneficiary in Cuba. These travel documents will enable the beneficiary to travel safely to the United States and seek parole by U.S. Customs and Border Protection (CBP) at a U.S. port-of-entry to join his or her family member. A beneficiary who is paroled into the United States would then be eligible to apply to adjust status to that of lawful permanent resident after he or she has been physically present in the United States for one year as provided by the Cuban Adjustment Act, Pub. L. 89–732, 80 Stat. 1161 (8 U.S.C. 1255 note), or once the beneficiary's visa becomes available, whichever comes first.

Participation in the CFRP Program is not available to aliens who qualify as "immediate relatives" under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i). Such aliens may seek immigrant visas for travel to the United States immediately upon the approval of the immigrant visa petitions filed on their behalf.

For eligible beneficiaries who are not "immediate relatives," if an immigrant visa becomes available while the Form I–131 is pending, the beneficiary will be able to proceed with the parole process to completion, if desired. Alternatively, the beneficiary can choose to pursue immigrant visa processing, which will require payment of associated fees but will enable the individual to apply for admission to the United States as an immigrant, if found eligible by the Department of State for the visa and admissible by CBP at the port of entry.

## IV. Paperwork Reduction Act (PRA)

Under the PRA, 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB) for review and approval, any new reporting requirements they impose. The Application for Travel Document, Form I–131, has been approved by OMB and assigned OMB control number 1615–0013. USCIS is making no changes to the Form in connection with the CFRP Program and this notice; however, USCIS estimates that this notice will result in an annual

average of 13,000–15,000 Form I–131 filings per year. The current OMB-approved estimate of the number of annual respondents filing a Form I–131 is 940,671. USCIS has overestimated the number of individuals who will use this form to apply for immigration benefits to the degree that additional respondents who will use it to file for the CFRP Program will be covered within the 940,671 estimated. USCIS is not changing the collection instrument or increasing its burden estimates in connection with this notice. Therefore, USCIS is not publishing a notice under the PRA or making revisions to the currently approved burden for OMB control number 1615–0013.

Additional information about the CFRP Program and the application process will be posted on the USCIS Web site at *www.uscis.gov*.

Dated: December 11, 2014.

**León Rodríguez**
*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. 2014–29486 Filed 12–17–14; 8:45 am]

**BILLING CODE 9111–97–P**

## DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2548–14; DHS Docket No. USCIS–2014–0013]

## Implementation of Haitian Family Reunification Parole Program

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

**SUMMARY:** This notice announces the implementation of U.S. Citizenship and Immigration Services' (USCIS) Haitian Family Reunification Parole (HFRP) Program. Under this program, USCIS offers certain Haitian beneficiaries of family-based immigrant petitions approved on or before December 18, 2014 an opportunity to receive a discretionary grant of parole to enter the United States up to approximately two years before their immigrant visas become available, rather than remain in Haiti awaiting availability of their immigrant visas. The program is intended to expedite family reunification through safe, legal, and orderly channels of migration to the United States, increase existing avenues for legal migration from Haiti, and help Haiti continue to recover from the devastation and damage suffered in the January 12, 2010 earthquake.

**DATES:**

• The HFRP Program will only be available to Haitian beneficiaries of family-based immigrant petitions approved on or before December 18, 2014.

• On or after February 2, 2015, the Department of State's National Visa Center (NVC) will begin sending to eligible petitioners written invitations to apply to the HFRP Program.

**FOR FURTHER INFORMATION CONTACT:**
Maura Nicholson, Deputy Chief, International Operations Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Suite 3300, Washington, DC 20529, Telephone (202) 272–1892.

**SUPPLEMENTARY INFORMATION:**

**I. Background of the HFRP Program**

The rebuilding and development of a safe and economically strong Haiti is a priority for the United States. While progress has been made since the 2010 earthquake that devastated parts of the country, Haiti continues to face significant development challenges. Reconstruction and development in Haiti will continue for many years.[1]

With the exception of "immediate relatives" of U.S. citizens (USCs) (i.e., parent, spouse and unmarried child(ren) under 21 years of age), see Immigration and Nationality Act (INA) sec. 201(b)(2)(A)(i), 8 U.S.C. 1151(b)(2)(A)(i), the number of family-based immigrant visas that are available in any given year is limited by statute. See INA secs. 201(c), 202(a) & 203, 8 U.S.C. 1151(c), 1152(a) & 1153. These statutory limits have resulted in long waiting periods before family members remaining in Haiti may join the U.S.C. and lawful permanent resident (LPR) family members in the United States who petitioned for them.

Under the HFRP Program, USCIS will exercise its discretionary parole authority[2] to permit certain eligible Haitians in Haiti to join their family members in the United States up to approximately two years before their immigrant visas become available, thereby promoting family unity. By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States.

Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development. Once paroled into the United States, HFRP Program beneficiaries will be eligible to apply for employment authorization, and those who are able to work may contribute to Haiti's post-earthquake reconstruction and development through remittances. Whether to parole a particular alien remains, however, a case-by-case, discretionary determination.

**II. Participation in the HFRP Program and Application Process**

USCIS offers participation in the HFRP Program to eligible Haitians: (1) In Haiti; (2) who are the beneficiaries (including any accompanying or following-to-join spouse and children[3]) of Forms I–130, Petition for Alien Relative, that were approved on or before the date of publication of this notice; (3) whose immigrant visas are not available, but are expected to become available within approximately 18 to 30 months; and (4) whose petitioning relatives in the United States have received a written invitation to apply for the HFRP Program on their behalf from the Department of State's National Visa Center (NVC).

The NVC will issue a written invitation to petitioners of approved Forms I–130 based upon the date when the immigrant visas for their beneficiary relatives are expected to become available. Each year the NVC will identify approved Forms I–130 whose filing dates (priority dates) are expected to become current in approximately the next 18 to 30 months, meaning that the immigrant visas for those cases are expected to become available within that timeframe. The NVC will prioritize the issuance of invitations to petitioners within that group, beginning with the oldest Form I–130 filing date and working forward to the most recent filing date. The number of HFRP Program invitations may be limited annually based on U.S. Government operational capacity in Haiti and the availability of U.S. Government resources to aid program beneficiaries. Initially, the U.S. Government will seek to interview approximately 5,000 HFRP Program beneficiaries in Haiti per year. Petitioners will be given a deadline by which they must apply to have their beneficiary relatives considered for parole under the program. Participation in the HFRP Program is voluntary.

On or after February 2, 2015, eligible U.S.-based U.S.C. and LPR petitioners with approved Forms I–130 filed on behalf of a beneficiary relative in Haiti

for whom a visa is not available but expected to become available within approximately 18 to 30 months, will receive a written notice from the NVC regarding the beneficiary's eligibility to participate in the HFRP Program and the procedures for requesting parole, if desired. The notice will instruct the recipient on how to file a completed Form I–131, Application for Travel Document, and submit the required fee(s) or fee waiver request to apply for parole under the HFRP Program on behalf of each beneficiary. USCIS will reject a request for parole under the HFRP Program that is not submitted as instructed, without the required completed form, or without the fee(s) or a request for a fee waiver.

USCIS or Department of State consular officers will interview qualified beneficiaries in Port au Prince, Haiti, to verify their eligibility for the program. Beneficiaries may also have their biometrics collected. If USCIS exercises its discretion to grant parole under the HFRP Program, USCIS or the Department of State will issue the necessary travel documents to the beneficiary in Haiti. These travel documents will enable the beneficiary to travel to the United States and seek parole from U.S. Customs and Border Protection (CBP) at a U.S. port-of-entry to join his or her family. A beneficiary who is paroled into the United States would then be eligible to apply to adjust status to that of lawful permanent resident once the beneficiary's immigrant visa becomes available.

Participation in the HFRP Program is not available to aliens who qualify as "immediate relatives" under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i). Such aliens may seek immigrant visas for travel to the United States immediately upon the approval of immigrant visa petitions filed on their behalf. If, however, an immigrant visa becomes available for a beneficiary who is not an "immediate relative" while the Form I–131 is pending, the beneficiary will still be able to complete the parole process, if desired. Alternatively, the beneficiary can choose to pursue immigrant visa processing, which will require payment of associated fees, but will enable the individual to apply for admission to the United States as an immigrant, if found eligible by the Department of State for the visa and admissible by CBP at the port of entry.

**III. Paperwork Reduction Act (PRA)**

Under the PRA, 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB) for review and approval, any new reporting requirements they

---

[1] http://www.state.gov/s/hsc/factsheets/2014/219539.htm.

[2] See INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (permitting parole of certain aliens into the United States, as a matter of discretion and on a case-by-case basis, for urgent humanitarian reasons or significant public benefit); see also 8 CFR 212.5(c) & (d) (discretionary authority for establishing conditions of parole and for terminating parole).

[3] See INA sec. 203(d), 8 U.S.C. 1153(d).

impose. The USCIS, Application for Travel Document, (Form I–131), has been approved by OMB and assigned OMB control number 1615–0013. USCIS is making no changes to this form in connection with the implementation of the HFRP Program and this notice. USCIS estimates that the HFRP Program will result in an average of 5,000 Form I–131 filings per year. The current OMB-approved estimated number of annual respondents filing Form I–131 is 940,671. USCIS believes it has overestimated the number of individuals who will use this form to apply for immigration benefits to the degree that additional respondents who will use it to file a HFRP Program-related request will be covered within the 940,671 estimated. Because USCIS is not changing the collection instrument or increasing its burden estimates in connection with this notice, it is publishing no notice under the PRA and making no revisions to the currently approved burden for OMB control number 1615–0013.

Additional information about the HFRP program and the application process will be posted on the USCIS Web site at *www.uscis.gov.*

Dated: December 11, 2014.

**León Rodríguez,**

*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. 2014–29533 Filed 12–17–14; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF THE INTERIOR

[Docket No. ONRR–2014–0002; DS63610000 DR2PS0000.CH7000 145D0102R2]

**Office of Natural Resources Revenue; Agency Information Collection Activities: Proposed Collection–United States Extractive Industries Transparency Initiative (USEITI) Revenue Information Collection, Comment Request**

**AGENCY:** Office of Natural Resources Revenue (ONRR), Interior.

**ACTION:** Notice of a new information collection.

---

**SUMMARY:** To comply with the Paperwork Reduction Act of 1995 (PRA), we are inviting comments on an information request that we will submit to the Office of Management and Budget (OMB) for review and approval. This Information Collection Request (ICR) covers the voluntary paperwork requirements for participation in the United States' implementation of the Extractive Industries Transparency Initiative (EITI). It encompasses

upcoming requests that certain companies voluntarily provide information on the amount of revenue which they have paid to the Federal government for extracting Federally-owned natural resources.

**DATES:** Submit written comments on or before February 17, 2015.

**ADDRESSES:** You may submit comments on this ICR to ONRR by using one of the following three methods (please use ONRR 2014–0002 as an identifier in your comment):

1. Electronically, go to *http://www.regulations.gov.* In the entry titled "Enter Keyword or ID," enter ONRR–2014–0002 and then click "Search." Follow the instructions to submit public comments. ONRR will post all comments.

2. Mail comments to Mr. Luis Aguilar, Regulatory Specialist, ONRR, P.O. Box 25165, MS 61030A, Denver, Colorado 80225–0165.

3. Hand-carry or mail comments, using an overnight courier service, to ONRR. Our courier address is Building 85, Room A–614, Denver Federal Center, West 6th Ave. and Kipling St., Denver, Colorado 80225.

**FOR FURTHER INFORMATION CONTACT:** For questions on technical issues, contact Mr. Jon Swedin, Program Analyst, at (303) 231–3028, or email *Jonathan.Swedin@onrr.gov.* For other questions, contact Mr. Luis Aguilar, telephone (303) 231–3418, or email *Luis.Aguilar@onrr.gov.* You may also contact Mr. Aguilar to obtain copies, at no cost, of (1) the ICR, (2) any associated form, and (3) the regulations that require us to collect the information.

**SUPPLEMENTARY INFORMATION:**

*Title:* United States Extractive Industries Transparency Initiative (USEITI) Revenue Information Collection.

*OMB Control Number:* 1012—0NEW.

*Bureau Form Number:* United States Extractive Industries Transparency Initiative (USEITI) Company Payment Reporting Template.

*Abstract:* The Secretary of the U.S. Department of the Interior is responsible for mineral resource development on Federal and Indian lands and the Outer Continental Shelf (OCS). Under various laws, the Secretary's responsibility is to manage mineral resources production on Federal and Indian lands and the OCS, collect the royalties and other mineral revenues due, and distribute the funds collected under those laws. ONRR performs the royalty management functions and assists the Secretary in carrying out the Department's responsibility. We have posted those laws pertaining to mineral leases on

Federal and Indian lands and the OCS at *http://www.onrr.gov/Laws_R_D/PubLaws/default.htm.*

In September 2011, President Obama announced the U.S. commitment to domestic implementation of EITI, a key element of the President's Open Government Partnership commitments. President Obama appointed the Secretary of the Interior as the senior U.S. official to lead USEITI implementation. EITI is a voluntary global effort designed to strengthen transparency, accountability, and public trust for the revenues paid and received for a country's oil, gas, and mineral resources. The Administration renewed its commitment to implement EITI in the December 2013 U.S. Open Government National Action Plan. By signing onto the global EITI standard, the U.S. Government will help ensure that American taxpayers are receiving every dollar due for the extraction of these valuable public resources. The EITI Standard contains the set of requirements that countries need to meet in order to be recognized first as an EITI Candidate and, ultimately, an EITI-Compliant Country. In March 2014, the U.S. became the first G7 country to achieve Candidate Country status. When fully implemented, EITI will ensure more transparency in how the country's natural resources are governed and also will provide full disclosure of government revenues from its extractive sector.

The following laws and executive initiative are applicable to USEITI, including the Secretary's and ONRR's management of mineral resource production, revenue, and information disclosure obligations:

- U.S. Open Government National Action Plan
- Freedom of Information Act, as amended (5 U.S.C. 552)
- Outer Continental Shelf Lands Act, as amended (43 U.S.C. 1331–56b), including provisions of the Energy Policy Act of 2005 (42 U.S.C. 15801 *et seq.*)
- Federal Oil and Gas Royalty Management Act of 1982 as amended by the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996 (30 U.S.C. 1701–1759).
- Geothermal Steam Act of 1970 (30 U.S.C. 1001–28)
- Mineral Leasing Act (30 U.S.C. 181–287)
- Mineral Leasing Act for Acquired Lands (30 U.S.C. 351–60)

**General Information**

International EITI requirements direct participating governments to publish annual reports to help citizens

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Immigration and Customs Enforcement

**[OMB Control Number 1653–0022]**

## Agency Information Collection Activities; Extension, Without Change, of a Currently Approved Collection: Form No. I–352; Immigration Bond

**AGENCY:** U.S. Immigration and Customs Enforcement, Department of Homeland Security.

**ACTION:** 30-Day notice.

**SUMMARY:** In accordance with the Paperwork Reduction Act (PRA) of 1995 the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE) will submit the following Information Collection Request (ICR) to the Office of Management and Budget (OMB) for review and clearance. This information collection was previously published in the **Federal Register** on September 3, 2025, allowing for a 60-day comment period. ICE received no comments. The purpose of this notice is to allow an additional 30 days for public comments.

**DATES:** Comments are encouraged and will be accepted until December 22, 2025.

**ADDRESSES:** Written comments and recommendations for the proposed information collection should be sent within 30 days of the publication of this notice to *www.reginfo.gov/public/do/PRAMain.* Find this information collection by selecting ''Currently under 30-day Review—Open for Public Comments'' or by using the search function.

**FOR FURTHER INFORMATION CONTACT:** If you have questions related to this collection, call or email Carl Albritton, ERO Bond Management Unit, (202) 732–5918, *carl.a.albritton@ice.dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

### Comments

Written comments and suggestions from the public and affected agencies concerning the proposed collection of information should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information,

including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

### Overview of This Information Collection

(1) *Type of Information Collection:* Extension, Without Change, of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Immigration Bond.

(3) *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* I–352; U.S. Immigration and Customs Enforcement.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individual or Households; Business or other for-profit. The data collected on this collection instrument is used by ICE to ensure that the person or company posting the bond is aware of the duties and responsibilities associated with the bond. The collection instrument serves the purpose of instruction in the completion of the form, together with an explanation of the terms and conditions of the bond. Sureties have the capability of accessing, completing, and submitting delivery, voluntary departure, and order of supervision bonds electronically through ICE's eBonds system which encompasses the I–352, while individuals are still required to complete the bond form manually and sureties will be required to submit maintenance of status and departure bonds manually.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* 16,505 responses at 30 minutes (.50 hours) per response.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden is 8,253 hours.

Dated: November 18, 2025.

**Scott Elmore,**

*PRA Clearance Officer.*

[FR Doc. 2025–20481 Filed 11–20–25; 8:45 am]

**BILLING CODE 9111–28–P**

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

**[CIS No. 2838–25]**

## Inflation Adjustment to HR–1 Immigration Fees

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice of inflationary fee adjustment.

**SUMMARY:** U.S. Citizenship and Immigration Services (USCIS), a component of the Department of Homeland Security (DHS), is announcing inflationary adjustments to immigration-related fees administered by USCIS under the One Big Beautiful Bill Act (HR–1) for Fiscal Year (FY) 2026. HR–1 mandates that USCIS adjust the HR–1 fees. This notice outlines the adjusted fees and their effective date.

**DATES:** The fees announced in this notice are effective on or after January 1, 2026. Any immigration benefit request postmarked on or after January 1, 2026 without the proper filing fee will be rejected.

**FOR FURTHER INFORMATION CONTACT:** Office of Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746; telephone 240–721–3000 (this is not a toll-free number). Individuals with hearing or speech impairments may access the telephone number above via TTY by calling the toll-free Federal Information Relay Service at 1–877–889–5627 (TTY/TDD).

**SUPPLEMENTARY INFORMATION:**

### Table of Abbreviations

BLS—U.S. Bureau of Labor Statistics
CPI–U—Consumer Price Index for All Urban Consumers
DHS—Department of Homeland Security
EAD—Employment Authorization Document
FY—Fiscal Year
HR–1—One Big Beautiful Bill Act
INA—Immigration and Nationality Act
TPS—Temporary Protected Status
USCIS—U.S. Citizenship and Immigration Services

### I. Background and Authority

*H.R.1—One Big Beautiful Bill Act*

On July 4, 2025, the President signed into law H.R.1—One Big Beautiful Bill Act, Public Law 119–21, 139 Stat. 72 (HR–1), a comprehensive legislative package that amended various laws, including the Immigration and Nationality Act (INA). Among its changes, HR–1 introduced new

immigration fees as minimum amounts for Fiscal Year (FY) 2025, authorized agencies to adjust them through rulemaking, and mandated annual updates based on the Consumer Price Index for All Urban Consumers (CPI–U). *See* HR–1, Title X, Subtitle A, Part I, Sections 100001 through 100018.

On July 22, 2025, USCIS published a **Federal Register** Notice announcing the implementation of these fees. *See* 90 FR 34511 (July 22, 2025).

• $100 fee for any alien who files an application for asylum under section 208 (8 U.S.C. 1158) at the time such application is filed. Sec. 100002.

• $550 fee for individuals filing an initial application for employment authorization based on a pending asylum application under section 208(d)(2) (8 U.S.C. 1158(d)(2)). Sec. 10003(a).

• $275 fee for renewals and extensions of employment authorization for asylum applicants. Sec. 100011.

• $550 fee for any alien paroled into the United States for any initial application for employment authorization at the time such initial application is filed. Sec. 100003(b).

• $275 fee for renewals and extensions of employment authorization based on a grant of parole. Sec. 100010.

• $550 fee for an alien who files an initial employment authorization application under Temporary Protected Status (TPS). Sec. 100003(c).

• $275 fee for renewals and extensions of employment authorization for aliens granted TPS. Sec. 100012.

• $500 fee for first-time applicants filing Form I–821, Application for Temporary Protected Status, not including the $30 biometric services fee. Sec. 100006.

• $250 fee for any alien who files Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant for Special Immigrant Juvenile (SIJ) status under section 101(a)(27)(J), 8 U.S.C. 1101(a)(27)(J). Sec. 100005.

• $100 annual fee for all aliens with a pending asylum application for each calendar year the application remains pending. Sec. 100009.[1]

HR–1 requires that DHS, beginning in FY 2026 and continuing for each subsequent fiscal year, adjust the immigration-related fees for inflation. HR–1 prescribes that DHS use the percentage change to the CPI–U for the month of July in the current year compared to the preceding calendar year, and round each fee to the next lowest multiple of $10 or down to the nearest dollar as authorized by HR–1. *See e.g.* Sec. 100002(c) or Sec. 100007(a)(3).

**II. Basis for Adjustment**

In accordance with the provisions outlined in HR–1, most fees established for various immigration-related applications and benefit requests are subject to annual inflation adjustments. USCIS calculated these adjustments using the percentage change in the CPI–U from July 2024 to July 2025, with most fees "rounded to the next lowest multiple of $10" as required by HR–1. *See e.g.,* sec 100002(c). Section 100009 specifies that the Annual Asylum Fee is adjusted for inflation and rounded down to the nearest "dollar." *See* sec 100009(b)(2)(B). This approach aligns with HR–1 requirements to use the percentage change in CPI–U from the "month of July preceding the date on which such adjustment takes effect . . . for the same month of the preceding calendar year." *Id.* In July 2024, the CPI–U was 314.540 and in July 2025 it was 323.048.[2] Therefore, between July 2024 and July 2025, the CPI–U increased by approximately 2.70 percent.[3] When this percentage increase is applied to the current (FY 2025) HR–1 fees and rounded to the next lowest $10 increment, some fees increase by $5, $10, or $20. Some fees will not change because the inflation adjusted amount is equal to the current fee when rounded to the next lowest $10 increment. Table 1 summarizes the HR–1 fees for FY 2026 which USCIS collects.

TABLE 1—HR–1 INFLATION ADJUSTMENTS FOR FY 2026

| Immigration fee type | Current fee | CPI–U change (%) | Inflation adjustment | Fee plus inflation | Round down to $10 | Round down to nearest dollar | Fee increase | FY 2026 fee |
|---|---|---|---|---|---|---|---|---|
| I–589 Asylum Fee (Initial fee for aliens filing an application for asylum). | $100 | 2.70 | $2.70 | $102.70 | $100 | N/A | $0 ........................ | $100 |
| I–589 Annual Pending Asylum Application Fee ........................... | 100 | 2.70 | 2.70 | 102.70 | N/A | 102 | $2 ........................ | 102 |
| I–765 Initial Asylum Applicant Employment Authorization Document (EAD). | 550 | 2.70 | 14.88 | 564.88 | 560 | N/A | $10 ..................... | 560 |
| I–765 Renewal or Extension of Asylum Applicant EAD ............. | 275 | N/A | N/A | N/A | N/A | N/A | HR–1 does not provide for adjustment[4]. | 275 |
| I–765 Initial Parole EAD—Valid for 1 year ................................ | 550 | 2.70 | 14.88 | 564.88 | 560 | N/A | $10 ..................... | 560 |
| I–765 Renewal or Extension of Parole EAD—Valid for 1 year ... | 275 | 2.70 | 7.44 | 282.44 | 280 | N/A | $5 ........................ | 280 |
| I–765 Initial Temporary Protected Status (TPS) EAD—Valid for 1 year or the duration of the TPS designation whichever is shorter. | 550 | 2.70 | 14.88 | 564.88 | 560 | N/A | $10 ..................... | 560 |
| I–765 Renewal or Extension of TPS EAD—Valid for 1 year ...... | 275 | 2.70 | 7.44 | 282.44 | 280 | N/A | $5 ........................ | 280 |
| I–131 EAD upon new period of Parole (Re-parole) ................... | 275 | 2.70 | 7.44 | 282.44 | 280 | N/A | $5 ........................ | 280 |
| I–821 TPS Fee ............................................................................. | 500 | 2.70 | 13.52 | 513.52 | 510 | N/A | $10 ..................... | 510 |
| I–360 Special Immigrant Juvenile (SIJ) Fee ............................... | 250 | 2.70 | 6.76 | 256.76 | 250 | N/A | $0 ........................ | 250 |

---

[1] On October 30, 2025, as required by an order issued in in *Asylum Seeker Advocacy Project* v. *United States Citizenship and Immigration Services, et al.,* SAG–25–03299 (D. Md.), USCIS paused the implementation of the July 22, 2025 notice as it relates to annual asylum fee notices. Any applicant who has received a notice from USCIS may disregard that notice pending updated instructions. That order does not affect the adjustment of the amount of the AAF as required by the law and announced in this notice.

[2] *See* U.S. Bureau of Labor Statistics (BLS), CPI–U Series Id CUUR0000SA0, *https://data.bls.gov/timeseries/CUUR0000SA0* (last visited Sep. 24, 2025).

[3] DHS calculated this by subtracting the July 2024 CPI–U (314.540) from the July 2025 CPI–U

(323.048), then dividing the result (8.508) by the July 2024 CPI–U (314.540). Calculation: (323.048 − 314.540)/314.540 = 0.0270 × 100 = 2.705 percent.

[4] Public Law 119–21 section 100011, which governs fees for Renewal or Extension of Employment Authorization for Asylum Applicants, does not provide for inflationary adjustments.

For the fees outlined in this notice, the statute clearly states that agencies should round inflation adjustments down to the nearest dollar or, in most cases, to the "next lowest multiple of $10." Consistent with the statute, when applicable, USCIS is rounding down to the next lowest multiple of $10 increment rather than rounding to the nearest $10 increment.

The methodology USCIS used ensures that fees keep pace with inflation as enacted by Congress in HR–1.[5]

### III. Effective Date and Implementation

USCIS will require the filing fees for FY 2026 established in this notice for any immigration benefit requests postmarked on or after January 1, 2026. Because of the time needed by DHS and USCIS to issue guidance on and operationalize the change in the required fees, and for the public to adapt their immigration benefit requests that are in process to the changes, requests postmarked on or after January 1, 2026 without the proper filing fee will be rejected. DHS has determined that the policy required by this Notice is the most equitable path forward to effectuate collection of HR–1 fees for FY 2026 as expeditiously as practicable for the fees administered by USCIS.[6] The initial HR–1 fees and subsequent inflation adjustments are required by law, but for additional clarity, DHS may codify the fees covered by this notice and annual adjustments in 8 CFR part 106 in a future rule.

**Joseph B. Edlow,**

*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. 2025–20622 Filed 11–20–25; 8:45 am]

**BILLING CODE 9111–97–P**

---

### INTERNATIONAL TRADE COMMISSION

**[Investigation Nos. 731–TA–1435–1436 and 1438–1440 (Review)]**

### Acetone From Belgium, Singapore, South Africa, South Korea, and Spain; Revised Schedule for the Subject Proceeding

**AGENCY:** United States International Trade Commission.

---

[5] *See e.g.,* sec 100002(c).

[6] The fee required by section 100004 of HR–1 from any alien who is paroled into the United States, and by section 100008 from any alien who submits an application for a Form I–94 Arrival/Departure Record, will be adjusted for inflation as required by the law in a subsequent notice in the **Federal Register**. DHS or the relevant component of DHS will explain the effective dates for implementation of the changes that are announced in each notice, rule, or guidance document.

**ACTION:** Notice.

**DATES:** November 18, 2025.

**FOR FURTHER INFORMATION CONTACT:** Stamen Borisson (202–205–3125), Office of Investigations, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436. Hearing-impaired persons can obtain information on this matter by contacting the Commission's TDD terminal on 202–205–1810. Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at 202–205–2000. General information concerning the Commission may also be obtained by accessing its internet server (*https://www.usitc.gov*). The public record for this proceeding may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov.*

**SUPPLEMENTARY INFORMATION:** Effective May 20, 2025, the Commission established a schedule for the conduct of the subject proceeding (90 FR 22323, May 27, 2025). Due to the lapse in appropriations and ensuing cessation of Commission operations, the Commission is revising its schedule as follows: the deadline for filing posthearing briefs and for written statements from any person who has not entered an appearance as a party is December 3, 2025; the Commission will make its final release of information on December 22, 2025; and final party comments are due on December 30, 2025.

On September 30, 2025, counsel for the Coalition for Acetone Fair Trade filed a request to appear at the hearing. No other parties submitted a request to appear at the hearing. On November 17, 2025, counsel for the Coalition for Acetone Fair Trade withdrew its request to appear at the hearing, filed a request that the Commission cancel the scheduled hearing for this proceeding and indicated a willingness to respond to any Commission questions in lieu of an actual hearing. Consequently, the public hearing in connection with this proceeding, originally scheduled to begin at 9:30 a.m. on October 7, 2025, is cancelled. Parties to this proceeding should respond to any written questions posed by the Commission in their posthearing briefs.

For further information concerning this proceeding, see the Commission's notice cited above and the Commission's Rules of Practice and Procedure, part 201, subparts A and B (19 CFR part 201), and part 207, subparts A, D, E, and F (19 CFR part 207).

*Authority:* This proceeding is being conducted under authority of title VII of the Tariff Act of 1930; this notice is published pursuant to section 207.62 of the Commission's rules.

By order of the Commission.

Issued: November 18, 2025.

**Sharon Bellamy,**

*Supervisory Hearings and Information Officer.*

[FR Doc. 2025–20518 Filed 11–20–25; 8:45 am]

**BILLING CODE 7020–02–P**

---

### INTERNATIONAL TRADE COMMISSION

### Notice of Receipt of Complaint; Solicitation of Comments Relating to the Public Interest

**AGENCY:** U.S. International Trade Commission.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that the U.S. International Trade Commission has received a complaint entitled *Certain Low-Profile Microwave-Hood Combination Products, DN 3857;* the Commission is soliciting comments on any public interest issues raised by the complaint or complainant's filing pursuant to the Commission's Rules of Practice and Procedure.

**FOR FURTHER INFORMATION CONTACT:** Lisa R. Barton, Secretary to the Commission, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436, telephone (202) 205–2000. The public version of the complaint can be accessed on the Commission's Electronic Document Information System (EDIS) at *https://edis.usitc.gov.* For help accessing EDIS, please email *EDIS3Help@usitc.gov.*

General information concerning the Commission may also be obtained by accessing its internet server at United States International Trade Commission (USITC) at *https://www.usitc.gov.* The public record for this investigation may be viewed on the Commission's Electronic Document Information System (EDIS) at *https://edis.usitc.gov.* Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on (202) 205–1810.

**SUPPLEMENTARY INFORMATION:** The Commission has received a complaint and a submission pursuant to § 210.8(b) of the Commission's Rules of Practice and Procedure filed on behalf of Whirlpool Corporation on November 18, 2025. The complaint alleges violations of section 337 of the Tariff Act of 1930

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[OMB Control Number 1615–0017]

**Agency Information Collection Activities: Application for Advance Permission To Enter as Nonimmigrant [Pursuant to Section 212(d)(3)(A)(ii) of the INA, Section 212(d)(13) of the INA, or Section 212(d)(14) of the INA, Form I–192; Revision of a Currently Approved Collection**

**ACTION:** 60-Day notice.

**SUMMARY:** The Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS) invites the general public and other Federal agencies to comment upon this proposed revision of a currently approved collection of information. In accordance with the Paperwork Reduction Act (PRA) of 1995, the information collection notice is published in the **Federal Register** to obtain comments regarding the nature of the information collection, the categories of respondents, the estimated burden (*i.e.*, the time, effort, and resources used by the respondents to respond), the estimated cost to the respondent, and the actual information collection instruments.

**DATES:** Comments are encouraged and will be accepted for 60 days until February 17, 2015.

**ADDRESSES:** All submissions received must include the OMB Control Number 1615–0017 in the subject box, the agency name and Docket ID USCIS–2008–0009. To avoid duplicate submissions, please use only one of the following methods to submit comments:

(1) *Online.* Submit comments via the Federal eRulemaking Portal Web site at *www.regulations.gov* under e-Docket ID number USCIS–2008–0009;

(2) *Email.* Submit comments to *USCISFRComment@uscis.dhs.gov*;

(3) *Mail.* Submit written comments to DHS, USCIS, Office of Policy and Strategy, Chief, Regulatory Coordination Division, 20 Massachusetts Avenue NW., Washington, DC 20529–2140.

**SUPPLEMENTARY INFORMATION:**

**Comments**

Regardless of the method used for submitting comments or material, all submissions will be posted, without change, to the Federal eRulemaking Portal at *http://www.regulations.gov*, and will include any personal information you provide. Therefore,

submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary submission you make to DHS. DHS may withhold information provided in comments from public viewing that it determines may impact the privacy of an individual or is offensive. For additional information, please read the Privacy Act notice that is available via the link in the footer of *http://www.regulations.gov*.

**Note:** The address listed in this notice should only be used to submit comments concerning this information collection. Please do not submit requests for individual case status inquiries to this address. If you are seeking information about the status of your individual case, please check "My Case Status" online at: *https://egov.uscis.gov/cris/Dashboard.do*, or call the USCIS National Customer Service Center at 1–800–375–5283.

Written comments and suggestions from the public and affected agencies should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.*, permitting electronic submission of responses.

**Overview of This Information Collection**

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Advance Permission to Enter as Nonimmigrant [Pursuant to Section 212(d)(3)(A)(ii) of the INA, Section 212(d)(13) of the INA, or Section 212(d)(14) of the INA.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–192; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. This form is provided by

the U.S. Citizenship and Immigration Services (USCIS) as a means for certain inadmissible nonimmigrant aliens to apply for permission to enter the United States.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–192 is 10,448 and the estimated hour burden per response is .5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 5,224 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* There is no estimated annual cost burden associated with this collection of information.

If you need a copy of the information collection instrument with instructions, or additional information, please visit the Federal eRulemaking Portal site at: *http://www.regulations.gov*. We may also be contacted at: USCIS, Office of Policy and Strategy, Regulatory Coordination Division, 20 Massachusetts Avenue NW., Washington, DC 20529–2140, Telephone number 202–272–8377.

Dated: December 12, 2014.

**Laura Dawkins,**
*Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. 2014–29588 Filed 12–17–14; 8:45 am]

**BILLING CODE 9111–97–P**

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2547–14; DHS Docket No. USCIS–2007–0043]

**Notice of Changes to Application Procedures for the Cuban Family Reunification Parole Program**

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

**SUMMARY:** U.S. Citizenship and Immigration Services (USCIS) announces that as of February 17, 2015, USCIS will begin requiring the filing of an Application for Travel Document (Form I–131) and payment of its associated fee or approval of a fee waiver request from individuals who are applying for the Cuban Family

**75580**    **Federal Register** / Vol. 79, No. 243 / Thursday, December 18, 2014 / Notices

Reunification Parole (CFRP) Program on behalf of a beneficiary in Cuba. No form or fee is currently required for the CFRP Program. Under the CFRP Program, USCIS offers certain beneficiaries of approved family-based immigrant petitions the opportunity to be paroled into the United States to apply for lawful permanent resident status, rather than remain in Cuba waiting for their immigrant visas to become available. The purpose of the program is to expedite family reunification through safe, legal, and orderly channels of migration to the United States and to discourage irregular and inherently dangerous maritime migration. This notice is intended to: Make the CFRP Program application and adjudication processes consistent with those for most other requests for parole filed on behalf of individuals outside the United States; facilitate centralized filing and more standardized processing of parole applications; and, recover costs incurred by USCIS to adjudicate and provide CFRP Program travel documents. This notice will affect only those individuals who receive a written invitation to apply to the CFRP Program from the Department of State's National Visa Center (NVC) which is dated on or after February 17, 2015. This notice will not affect existing CFRP Program beneficiaries or individuals who received a notice of program eligibility from the NVC predating the publication of this notice and who submitted to the NVC the complete documentation required to apply for the program prior to February 17, 2015 (referred to as 'grandfathered' cases). Grandfathered cases will continue to be processed without form or fee.

**DATES:**

• As of December 18, 2014, the NVC will no longer issue CFRP Program eligibility notices inviting eligible petitioners to opt in to the program without the required form and fee.

• On or after February 17, 2015, the NVC will begin sending to eligible petitioners a written invitation to apply to the CFRP Program using the required form and fee or request for fee waiver.

• A petitioner who received a CFRP Program eligibility notice dated prior to December 18, 2014 must submit to the NVC the complete required documentation to apply for the CFRP Program before February 17, 2015 to be grandfathered and eligible for processing without a form and fee.

• A petitioner who received a CFRP Program eligibility notice before December 18, 2014 who fails to submit to the NVC the complete required documentation to apply for the CFRP

Program before February 17, 2015 cannot apply for the program until the petitioner receives a written invitation to apply to the CFRP Program using a required form and fee.

• Any person who applies for the CFRP Program after February 17, 2015 must submit a form and fee as prescribed in this notice and after receipt of a written invitation to apply from the NVC.

**FOR FURTHER INFORMATION CONTACT:** Pilar Peralta Mihalko, Chief, International Adjudications Support Branch, International Operations Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 1585 S. Manchester Avenue, Anaheim, CA 92802, Telephone (714) 808–8133.

**SUPPLEMENTARY INFORMATION:**

**I. Background on CFRP Program**

The CFRP Program was announced on November 15, 2007, via **Federal Register** notice (72 FR 65588). The notice explained that, in accordance with the U.S.-Cuba Migration Accords, the United States committed to ensuring that total legal migration to the United States from Cuba would be a minimum of 20,000 Cubans each year, not including immediate relatives of U.S. citizens (USC). *See* Joint Communiqué on Migration, U.S.-Cuba (Sept. 9, 1994) (known together with the May 2, 1995 Joint Statement as the U.S.-Cuba Migration Accords (hereinafter ''Migration Accords'')). Through the CFRP the United States offers a safe, legal, and orderly means of migrating to the United States.

The CFRP Program addressed two constraints posed by the array of migration programs that existed at the time of the program's creation, which had limited the ability of the United States to effectively promote safe, legal, and orderly migration as an alternative to inherently dangerous maritime crossings. First, with the exception of immediate relatives of USCs (*i.e.,* spouse, unmarried child(ren) under 21 years of age, and parents), *see* Immigration and Nationality Act (INA) sec. 201(b)(2)(A)(i), 8 U.S.C. 1151(b)(2)(A)(i), the number of family-based immigrant visas that are available in any given year is limited by statute, *see* INA secs. 201(c), 202(a), 203, 8 U.S.C. 1151(c), 1152(a), 1153. These statutory limits have resulted in long waiting periods before family members remaining in Cuba may join the USC and lawful permanent resident (LPR) family members who petitioned for them. Since 1998, the Cuban Government has not permitted a new registration for the Special Program for

Cuban Migration, the parole lottery initiated by the United States in support of the Migration Accords. Without this pool of individuals, there was a deficiency in the number of Cubans potentially eligible for travel to the United States.

Under the CFRP Program, USCIS exercises its discretionary parole authority to permit eligible Cuban nationals to come to the United States to join their family members.[1] Granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords. It also lessens the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States. Whether to parole a particular alien remains, however, a case-by-case, discretionary determination.

**II. Background on Requiring a Form and a Fee**

USCIS has not previously required a form or collected a fee for parole requests under the CFRP Program. As a result, USCIS has not used a standardized USCIS form, and has not required family members or beneficiaries to cover any of the costs associated with the benefit provided to them under the CFRP Program. The INA provides that USCIS may collect fees at a level that will ensure recovery of the full costs of adjudication and naturalization services, including services provided without charge to asylum applicants and certain other immigration applicants. INA sec. 286(m), 8 U.S.C. 1356(m). Operating expenses for the CFRP Program have been fully funded through use of fee revenue from other immigration benefit applicants. To bring CFRP Program parole requests in line with the majority of other parole requests filed on behalf of individuals outside of the United States, USCIS will now require the submission of a completed Form I–131, Application for Travel Document, and the fee required by USCIS fee regulations at 8 CFR 103.7(b)(1)(i)(M) for any CFRP Program application filed on or after February 17, 2015. Applicants for the CFRP Program must complete

---

[1] *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (permitting parole of certain aliens into the United States, as a matter of discretion and on a case-by-case basis, for urgent humanitarian reasons or significant public benefit); *see also* 8 CFR 212.5(c) & (d) (discretionary authority for establishing conditions of parole and for terminating parole).

and file the Form I–131 in effect at the time of filing—and follow any additional instructions included in the program eligibility notice they receive from either USCIS or the NVC in submitting their application. A completed Form I–131 and fee or fee waiver request must be filed for each individual on whose behalf parole is being requested.

## III. Participation in the CFRP Program and Application Process

USCIS offers participation in the CFRP Program to Cuban nationals who reside in Cuba and who are the beneficiaries—including any eligible spouse and child accompanying or following-to-join the principal beneficiaries (*see* INA sec. 203(d), 8 U.S.C. 1153(d))—of an approved Form I–130, Petition for Alien Relative, but for whom an immigrant visa is not immediately available. Participation in the CFRP Program is voluntary.

Prior to the date of this notice, the NVC mailed written notice to eligible U.S.-based U.S.C. and LPR petitioners with approved Forms I–130 indicating their beneficiaries' eligibility to participate in the CFRP Program. The notice invited an interested petitioner to submit to the NVC a copy of their approved Form I–130 and other supporting documents to opt in to the CFRP Program and begin the process of requesting parole. No formal application form or fee was required to apply. As of the date of this notice, the NVC will no longer issue CFRP Program eligibility notices that do not require a form and fee to apply. Petitioners with CFRP Program eligibility notices dated prior to December 18, 2014 must submit to the NVC the complete required documentation to opt in to the CFRP Program prior to February 17, 2015 in order to be grandfathered and considered for processing without a form and fee.

On or after February 17, 2015, participation in the CFRP Program will be predicated on submission of a Form I–131 and the requisite fee(s) or request for fee waiver that has been approved by USCIS. A U.S.C. or LPR petitioner in the United States with an approved Form I–130 that was filed on behalf of a beneficiary relative residing in Cuba, for whom a visa is not anticipated to be available during the CFRP processing time, will receive a written invitation from the NVC regarding the beneficiary's eligibility to participate in the CFRP Program and the procedures for requesting parole, if desired. The notice will instruct the recipient on how to file a completed Form I–131 and submit the required fee(s) or fee waiver

request to apply for the program. USCIS will reject a request for parole under the CFRP Program submitted without the required form and fee(s) or a request for a fee waiver.

USCIS officers or Department of State consular officers will interview qualified beneficiaries in Havana to verify their eligibility for the program. Beneficiaries may also have their biometrics collected. If USCIS exercises its discretion to authorize parole under the CFRP Program, USCIS or the Department of State will issue the necessary travel documents to the beneficiary in Cuba. These travel documents will enable the beneficiary to travel safely to the United States and seek parole by U.S. Customs and Border Protection (CBP) at a U.S. port-of-entry to join his or her family member. A beneficiary who is paroled into the United States would then be eligible to apply to adjust status to that of lawful permanent resident after he or she has been physically present in the United States for one year as provided by the Cuban Adjustment Act, Pub. L. 89–732, 80 Stat. 1161 (8 U.S.C. 1255 note), or once the beneficiary's visa becomes available, whichever comes first.

Participation in the CFRP Program is not available to aliens who qualify as "immediate relatives" under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i). Such aliens may seek immigrant visas for travel to the United States immediately upon the approval of the immigrant visa petitions filed on their behalf.

For eligible beneficiaries who are not "immediate relatives," if an immigrant visa becomes available while the Form I–131 is pending, the beneficiary will be able to proceed with the parole process to completion, if desired. Alternatively, the beneficiary can choose to pursue immigrant visa processing, which will require payment of associated fees but will enable the individual to apply for admission to the United States as an immigrant, if found eligible by the Department of State for the visa and admissible by CBP at the port of entry.

## IV. Paperwork Reduction Act (PRA)

Under the PRA, 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB) for review and approval, any new reporting requirements they impose. The Application for Travel Document, Form I–131, has been approved by OMB and assigned OMB control number 1615–0013. USCIS is making no changes to the Form in connection with the CFRP Program and this notice; however, USCIS estimates that this notice will result in an annual

average of 13,000–15,000 Form I–131 filings per year. The current OMB-approved estimate of the number of annual respondents filing a Form I–131 is 940,671. USCIS has overestimated the number of individuals who will use this form to apply for immigration benefits to the degree that additional respondents who will use it to file for the CFRP Program will be covered within the 940,671 estimated. USCIS is not changing the collection instrument or increasing its burden estimates in connection with this notice. Therefore, USCIS is not publishing a notice under the PRA or making revisions to the currently approved burden for OMB control number 1615–0013.

Additional information about the CFRP Program and the application process will be posted on the USCIS Web site at *www.uscis.gov*.

Dated: December 11, 2014.

**León Rodríguez**

*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. 2014–29486 Filed 12–17–14; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

**[CIS No. 2548–14; DHS Docket No. USCIS–2014–0013]**

## Implementation of Haitian Family Reunification Parole Program

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

**SUMMARY:** This notice announces the implementation of U.S. Citizenship and Immigration Services' (USCIS) Haitian Family Reunification Parole (HFRP) Program. Under this program, USCIS offers certain Haitian beneficiaries of family-based immigrant petitions approved on or before December 18, 2014 an opportunity to receive a discretionary grant of parole to enter the United States up to approximately two years before their immigrant visas become available, rather than remain in Haiti awaiting availability of their immigrant visas. The program is intended to expedite family reunification through safe, legal, and orderly channels of migration to the United States, increase existing avenues for legal migration from Haiti, and help Haiti continue to recover from the devastation and damage suffered in the January 12, 2010 earthquake.

**DATES:**

Federal Register

Vol. 89, No. 111

Friday, June 7, 2024

# Presidential Documents

Proclamation 10773 of June 3, 2024

## Securing the Border

**By the President of the United States of America**

**A Proclamation**

There are more people around the world who are displaced from their homes today than at any point in time since World War II. Many factors have contributed to this problem. Failing regimes and dire economic conditions afflict many countries, including several in the Western Hemisphere. Violence linked to transnational criminal organizations has displaced substantial numbers of people in Latin America. The global COVID–19 pandemic upended societies around the globe. Natural disasters have forced people from their homes.

As a result of these global conditions, we have been experiencing substantial levels of migration throughout the Western Hemisphere, including at our southwest land border. In 2019, encounters nearly doubled from their 2018 level to almost 1 million. In 2020, the global COVID–19 pandemic led countries throughout the world to shut their borders and suspend international travel; however, once the pandemic began to recede, international travel resumed, and we again experienced elevated levels of migration throughout the Western Hemisphere, including at our southwest land border.

On May 11, 2023, as part of my Administration's work to prepare for the end of the Centers for Disease Control and Prevention's public health order under title 42, United States Code, and to return to processing all noncitizens under immigration authorities under title 8, United States Code (title 8), the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a final rule, entitled Circumvention of Lawful Pathways (Lawful Pathways rule), encouraging the use of lawful pathways and imposing a rebuttable presumption of asylum ineligibility on those who do not use them.

The Lawful Pathways rule was designed to address the high levels of migration throughout the Western Hemisphere and further discourage irregular migration by encouraging migrants to use lawful, safe, and orderly processes for entering the United States or to seek protection in other partner nations; imposing a presumptive condition on asylum eligibility for those who fail to do so; and supporting the swift return of those who do not have valid protection claims.

As a complement to the Lawful Pathways rule and associated enforcement efforts, the Department of State and DHS have taken significant steps to expand safe and orderly pathways for migrants to enter the United States lawfully. Those steps include establishing Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala to facilitate access to lawful pathways; expanding country-specific and other available processes to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit; expanding access to visa programs for seasonal employment; establishing a mechanism for noncitizens to schedule a time and place to present at ports of entry in a safe, orderly, and lawful manner through the CBP One mobile application; and expanding refugee admissions from the Western Hemisphere from 5,000 in Fiscal Year 2021 to up to 50,000 in Fiscal Year 2024.

The Lawful Pathways rule and these complementary measures have made a substantial impact. On May 12, 2023, DHS returned to processing all noncitizens under title 8 immigration authorities and is processing noncitizens at record scale and efficiency. Since then, my Administration has maximized the use of expedited removal to the greatest extent possible given limited resources, placing more than 970 individuals encountered at and between ports of entry at the southwest land border into the process each day on average and conducting more than 152,000 credible fear interviews, both of which are record highs. As a result, from May 12, 2023, to May 1, 2024, my Administration removed or returned more than 720,000 noncitizens who did not have a lawful basis to remain in the United States, the vast majority of whom crossed the southwest land border. Total removals and returns in the 12 months following May 12, 2023, exceeded removals and returns in every full Fiscal Year since 2010. The majority of all individuals encountered at the southwest land border from Fiscal Year 2021 to Fiscal Year 2023 were removed, returned, or expelled.

Despite these efforts, and after months of reduced encounter levels following the changes put in place after May 12, 2023, encounter levels increased toward the end of 2023, and December 2023 saw the highest level of encounters between ports of entry in history, as increasing numbers of people migrated through the Western Hemisphere. The challenges presented by this surge in migration, which would have been even worse had the Lawful Pathways rule and other measures not been in place, were compounded by the fact that the surge was focused increasingly on western areas of the border in California and Arizona that are geographically remote, challenging to address, and without sufficient pre-existing infrastructure or resources to respond to the surge. From January to March 2024, encounters decreased from and have remained below levels experienced in November and December 2023, including as a result of increased enforcement by the United States and partner countries. However, the factors that are driving the unprecedented movement of people in our hemisphere remain, and there is still a substantial and elevated level of migration that continues to pose significant operational challenges.

The current situation is also the direct result of the Congress's failure to update an immigration and asylum system that is simply broken—and not equipped to meet current needs. While my Administration has vigorously enforced the law within the constraints imposed by the existing system, the statutory framework put in place by the Congress is outdated. For the vast majority of people in immigration proceedings, the current laws make it impossible to quickly grant protection to those who require it and to quickly remove those who do not establish a legal basis to remain in the United States. This reality is compounded by the fact that the Congress has chronically underfunded our border security and immigration system and has failed to provide the resources or reforms it needs to be able to deliver timely consequences to most individuals who cross unlawfully and cannot establish a legal basis to remain in the United States.

Despite the strengthened consequences in place at our border through the Lawful Pathways rule and the related measures that have led to record returns and removals, encounter levels are exceeding our capacity to deliver those consequences in a timely manner due to the outdated laws and limited resources we have available.

My Administration has repeatedly asked the Congress to update the outdated and inadequate immigration statutes, to create a legal framework that is functional and addresses current realities, and to provide additional resources so that we can more effectively deliver consequences at the border. In August 2023, I requested more than $4 billion in additional funding for border security and related migration issues, including more than $2 billion for urgent DHS border management requirements. The Congress failed to act. In October 2023, I requested $13.6 billion for border enforcement and migration management. This request included more than $5 billion for DHS

to manage conditions on the southern border, as well as funding for critical capacity enhancements to keep the southern border secure. The Congress once again failed to provide our border and immigration system with the resources it needs to deliver timely consequences to those who cross unlawfully.

In early February 2024, a bipartisan group of Senators introduced legislation (bipartisan legislative proposal) containing the toughest and fairest reforms of our asylum laws in decades that would have provided new authorities to significantly streamline and speed up immigration enforcement proceedings for individuals encountered at the border, including those who are seeking protection. Critically, the bipartisan legislative proposal included nearly $20 billion in additional resources for DHS and other departments to implement those new authorities, such as:

(a) over 1,500 new U.S. Customs and Border Protection (CBP) personnel, including Border Patrol agents and CBP officers;

(b) over 4,300 new asylum officers and additional U.S. Citizenship and Immigration Services staff to facilitate timely and fair decisions;

(c) 100 new immigration judge teams to help reduce the asylum caseload backlog and adjudicate cases more quickly;

(d) shelter and critical services for newcomers in our cities and States; and

(e) 1,200 new U.S. Immigration and Customs Enforcement personnel for functions including enforcement and deportations.

While the bipartisan legislative proposal did not include everything we wanted, senior officials from my Administration worked closely with the bipartisan group of Senators to ensure that the reforms would adequately address the challenges that we have been facing at our southern border for more than a decade. However, the Congress failed to move forward with this bipartisan legislative proposal.

The Further Consolidated Appropriations Act, 2024 (Public Law 118–47) increased funding for DHS over Fiscal Year 2023, but it did not address the needs identified in various related supplemental requests, nor did it equip the Federal Government with the new authorities from the bipartisan legislative proposal. In May 2024, when the Senate again considered the bipartisan legislative proposal, the Senate failed to advance the measure.

Our broken immigration system is directly contributing to the historic migration we are seeing throughout the Western Hemisphere, exacerbated by poor economic conditions, natural disasters, and general insecurity, and this fact, combined with inadequate resources to keep pace, has once again severely strained our capacity at the border. The result is a vicious cycle in which our United States Border Patrol facilities constantly risk overcrowding, our detention system has regularly been at capacity, and our asylum system remains backlogged and cannot deliver timely decisions, all of which spurs more people to make the dangerous journey north to the United States.

The Congress's failure to deliver meaningful policy reforms and adequate funding, despite repeated requests that they do so, is a core cause of this problem. Under current law, whenever a noncitizen in expedited removal indicates an intention to apply for asylum or a fear of persecution, they are referred for an interview with an asylum officer and cannot be removed through expedited removal if there is a significant possibility that they could establish eligibility for asylum. This screening standard is a requirement imposed by the Congress, but it has not functioned well in predicting ultimate success in asylum proceedings. From 2014 to 2019, 83 percent of individuals referred for an interview with an asylum officer passed the screening stage, meaning that they were not removed pursuant to expedited removal, but less than 25 percent of cases ultimately resulted in a grant of asylum or other protection, often after waiting years to reach a final

decision. By imposing a rebuttable presumption of asylum ineligibility on those who cross the border unlawfully, the Lawful Pathways rule has made a meaningful impact in reducing this disparity. The screen-in rate from May 12, 2023, to March 31, 2024, dropped to 52 percent for individuals who are subject to the rebuttable presumption of asylum ineligibility. However, the Lawful Pathways rule alone is inadequate during times of record encounter levels and cannot change the underlying statutory limitations.

Data confirm that the system has been badly strained for many years and is not functioning to provide timely relief for those who warrant it or timely consequences for those without viable protection claims. Due to an outdated and inefficient system and insufficient resources that do not allow for prompt adjudication of claims, too many people have had to be processed by the Border Patrol and released with a notice to appear in removal proceedings before an immigration judge since May 2023. The U.S. Citizenship and Immigration Service affirmative asylum backlog is now over 1 million cases and growing, with over 300,000 applications filed prior to 2021 still pending. At the end of Fiscal Year 2023, there were over 2.4 million cases pending in the immigration courts. Pending cases more than doubled from the end of Fiscal Year 2016 to the end of Fiscal Year 2020 and doubled again between that time and the end of Fiscal Year 2023. Between Fiscal Year 2006 and the end of Fiscal Year 2023, in tandem with historic increases in filings to initiate immigration court proceedings, the immigration courts' pending caseload increased from approximately 170,000 to approximately 2.46 million. During Fiscal Year 2023, immigration judges completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts than were completed.

The status quo system—the result of outdated laws and inadequate resources—has become a driver for unlawful migration throughout the region and an increasingly lucrative source of income for dangerous transnational criminal organizations and other criminal smuggling organizations that, without countermeasures, will continue to grow in strength and pose significant threats to the safety and security of United States communities and migrants, as well as countries throughout the region.

Considering these trends and the decades-long failure of the Congress to address the problem through systemic reform and adequate funding, and following the Congress's failure to pass the bipartisan legislative proposal, I must exercise my executive authorities to meet the moment. This proclamation answers the call by suspending entry of noncitizens across the southern border during this time of high border crossings. Appropriate exceptions are provided, such as for those who are particularly vulnerable or present pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for safe and orderly processing into the United States. That process will continue to allow for individuals to seek entry to this country each day in a safe and orderly manner, and following their arrival, to seek protection through the appropriate process. This proclamation, in conjunction with steps to be taken by DOJ and DHS, is needed to enhance our ability to address the historic levels of migration and more efficiently process migrants arriving at the southern border given current resource levels.

These actions do not change or fully compensate for the fact that our immigration system is under-resourced and broken, nor do they change the fact that there are significant limits to what can be achieved without the Congress fulfilling its responsibility to help solve the unprecedented challenge that we are facing. No executive action can deliver the significant policy reforms and additional resources that were in the bipartisan legislative proposal. But I will continue to take actions, within these constraints, to address the situation at our southern border.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States, by the authority vested in me by the Constitution and the laws of the

*Federal Register* / Vol. 89, No. 111 / Friday, June 7, 2024 / Presidential Documents **48491**

United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the entry into the United States of persons described in section 1 of this proclamation under circumstances described in section 2 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1.** *Suspension and Limitation on Entry.* The entry of any noncitizen into the United States across the southern border is hereby suspended and limited, subject to section 3 of this proclamation. This suspension and limitation on entry shall be effective at 12:01 a.m. eastern daylight time on June 5, 2024. The suspension and limitation directed in this proclamation shall be discontinued pursuant to subsection 2(a) of this proclamation, subject to subsection 2(b) of this proclamation.

**Sec. 2.** *Applicability of Suspension and Limitation on Entry.* (a) The Secretary of Homeland Security shall monitor the number of daily encounters and, subject to subsection (b) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall be discontinued at 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, not including encounters described in subsection 4(a)(iii) of this proclamation.

(b) Notwithstanding a factual determination made under subsection (a) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall apply at 12:01 a.m. eastern time on the calendar day immediately after the Secretary has made a factual determination that there has been a 7-consecutive-calendar-day average of 2,500 encounters or more, not including encounters described in subsection 4(a)(iii) of this proclamation, until such suspension and limitation on entry is discontinued pursuant to subsection (a) of this section.

(c) For purposes of subsection (a) and subsection (b) of this section, unaccompanied children (as defined in section 279(g)(2) of title 6, United States Code) from non-contiguous countries shall not be included in calculating the number of encounters.

**Sec. 3.** *Scope and Implementation of Suspension and Limitation on Entry.* (a) The suspension and limitation on entry pursuant to section 1 of this proclamation shall apply across the southern border to noncitizens, other than those described in subsection (b) of this section, during such times that the suspension and limitation on entry is in effect.

(b) The suspension and limitation on entry pursuant to section 1 of this proclamation shall not apply to:

(i) any noncitizen national of the United States;

(ii) any lawful permanent resident of the United States;

(iii) any unaccompanied child as defined in section 279(g)(2) of title 6, United States Code;

(iv) any noncitizen who is determined to be a victim of a severe form of trafficking in persons, as defined in section 7102(16) of title 22, United States Code;

(v) any noncitizen who has a valid visa or other lawful permission to seek entry or admission into the United States, or presents at a port of entry pursuant to a pre-scheduled time and place, including:

(A) members of the United States Armed Forces and associated personnel, United States Government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household;

(B) noncitizens who hold a valid visa or who have all necessary documents required for admission consistent with the requirements of section 1182(a)(7) of title 8, United States Code, upon arrival at a port of entry;

(C) noncitizens traveling pursuant to the visa waiver program as described in section 1187 of title 8, United States Code; and

(D) noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for the safe and orderly entry of noncitizens into the United States;

(vi) any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter; and

(vii) any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, due to operational considerations at the time of the entry or encounter that warranted permitting the noncitizen to enter.

(c) An exception under subsection (b) of this section from the suspension and limitation on entry pursuant to section 1 of this proclamation does not affect a noncitizen's inadmissibility under the Immigration and Nationality Act for a reason other than the applicability of this proclamation.

(d) The Secretary of Homeland Security and the Attorney General are authorized to issue any instructions, orders, or regulations as may be necessary to implement this proclamation, including the determination of the exceptions in subsection (b) of this section, and shall promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted.

(e) Nothing in this proclamation shall limit the statutory processes afforded to unaccompanied children upon entering the United States under section 279 of title 6, United States Code, and section 1232 of title 8, United States Code.

**Sec. 4.** *Definitions.* (a) The term ''encounter'' refers to a noncitizen who:

(i) is physically apprehended by CBP immigration officers within 100 miles of the United States southwest land border during the 14-day period immediately after entry between ports of entry;

(ii) is physically apprehended by DHS personnel at the southern coastal borders during the 14-day period immediately after entry between ports of entry; or

(iii) is determined to be inadmissible at a southwest land border port of entry.

(b) The term ''southern coastal borders'' means all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the southwest land border, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico.

(c) The term ''southwest land border'' means the entirety of the United States land border with Mexico.

(d) The term ''southern border'' means the southwest land border and the southern coastal borders.

**Sec. 5.** *Severability.* It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States. Accordingly, if any provision of this proclamation, or the application of any provision to any person or circumstance, is held

to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 6.** *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this third day of June, in the year of our Lord two thousand twenty-four, and of the Independence of the United States of America the two hundred and forty-eighth.

[FR Doc. 2024–12647
Filed 6–6–24; 8:45 am]
Billing code 3395–F4–P

# Presidential Documents

Proclamation 10817 of September 27, 2024

## Amending Proclamation 10773

**By the President of the United States of America**

**A Proclamation**

On June 3, 2024, I signed Proclamation 10773 (Securing the Border). That proclamation suspended and limited the entry of certain noncitizens into the United States across the southern border during times of high border crossings, and directed the Secretary of Homeland Security and the Attorney General to promptly consider issuing any instructions, orders, or regulations as might be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determined were warranted. Following that direction, the Secretary of Homeland Security and the Attorney General issued an interim final rule (IFR) that established a limitation on asylum eligibility for certain noncitizens who enter the United States across the southern border during times when Proclamation 10773 and the IFR are designed to be in effect, and revised certain procedures applicable to the expedited removal process to more swiftly apply consequences for irregular migration during those times for noncitizens who do not establish a lawful basis to remain.

Those actions have already produced significant results. Since Proclamation 10773 and the IFR went into effect, and as of the end of the last calendar month, the average number of encounters by the United States Border Patrol at our southwest border between ports of entry has decreased by 59 percent compared to the period after the Circumvention of Lawful Pathways rule began to apply on May 12, 2023, and before Proclamation 10773 and the IFR went into effect. July and August 2024 were the lowest 2 months of encounters between ports of entry since September 2020. While Proclamation 10773 and the IFR have been in effect, and for individuals encountered between southern border ports of entry as of the end of the last calendar month, the Department of Homeland Security has removed or returned 70 percent of single adults and family members, including more than 119,000 individuals to more than 140 countries; has more than tripled the percentage of noncitizens processed through expedited removal; and has decreased the percentage of noncitizens encountered at the southwest border who are released by United States Border Patrol pending their removal proceedings by 52 percent.

Following the issuance of the IFR, the Department of Homeland Security and the Department of Justice (Departments) received and reviewed more than 1,000 comments. Based on their review of those comments and their experience in implementing Proclamation 10773 and the IFR, the Departments have identified two issues related to the thresholds for determining when to apply the suspension and limitation on entry in Proclamation 10773 and the measures described in the IFR.

First, having closely monitored the 7-consecutive-calendar-day average of encounters following the issuance of Proclamation 10773 and the IFR, the Departments have assessed that the current threshold for discontinuing the suspension and limitation on entry in Proclamation 10773 and the measures described in the IFR could be reached following a short-term decrease in the number of encounters at the southern border that does not reflect a sustained decrease in the number of such encounters or an end to the

border circumstances in which Proclamation 10773 and the IFR are designed to apply. The Departments are currently considering regulatory action to address this issue as it relates to the measures described in the IFR. With respect to Proclamation 10773, to ensure that the threshold to discontinue the suspension and limitation on entry reflects a sustained decrease in encounters, I have now determined that the suspension and limitation on entry in that proclamation should be discontinued only after the Secretary of Homeland Security has made a factual determination that there have been 28 consecutive calendar days in which the 7-consecutive-calendar-day average of encounters is less than 1,500.

Second, while Proclamation 10773 and the IFR excluded encounters of unaccompanied children from non-contiguous countries from the calculation of encounters, the Departments have assessed, based on their experience implementing Proclamation 10773 and the IFR, that this exclusion is unwarranted because processing such noncitizens is particularly resource-intensive for our frontline personnel at the southern border. This experience indicates that excluding these noncitizens from the calculation yields inaccurate estimates of system capacity. Again, the Departments are currently considering regulatory action to address this issue as it relates to the measures described in the IFR. I have now concluded that in order to better achieve Proclamation 10773's goal of enhancing our ability to address historic levels of migration and more efficiently process migrants arriving at the southern border, that proclamation should include unaccompanied children from both non-contiguous and contiguous countries in the calculation of encounters. Consistent with section 3(b)(iii) of Proclamation 10773, any unaccompanied children will remain excepted from the suspension and limitation on entry pursuant to section 1 of Proclamation 10773.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in Proclamation 10773, as amended by this proclamation, the entry into the United States of persons described in section 1 of Proclamation 10773 under circumstances described in section 2 of Proclamation 10773, as amended by this proclamation, would be detrimental to the interests of the United States, and that the entry of such persons should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1**. *Amendment to Section 2(a) of Proclamation 10773*. Section 2(a) of Proclamation 10773 is amended to read as follows:

"The Secretary of Homeland Security shall monitor the number of daily encounters and, subject to subsection (b) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall be discontinued at 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there have been 28 consecutive calendar days of a 7-consecutive-calendar-day average of less than 1,500 encounters, not including encounters described in subsection 4(a)(iii) of this proclamation."

**Sec. 2**. *Revocation of Section 2(c) of Proclamation 10773*. Section 2(c) of Proclamation 10773 is revoked.

**Sec. 3**. *Severability*. It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States. Accordingly, if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 4**. *Effectiveness*. The amendments described in sections 1 and 2 of this proclamation shall be effective if and when there is in effect a final

rule promulgated by the Secretary of Homeland Security and the Attorney General that amends the IFR entitled Securing the Border, 89 FR 48,710 (June 7, 2024), consistent with the amendments described in sections 1 and 2 of this proclamation. If, due to court order, the final rule described in the prior sentence cannot be enforced insofar as it makes changes consistent with the amendment described in section 1 of this proclamation, then the amendment described in section 1 of this proclamation will no longer be in effect and section 2(a) of Proclamation 10773 shall continue to apply by its terms. If, due to court order, the final rule described in the first sentence of this section cannot be enforced insofar as it makes changes consistent with the amendment described in section 2 of this proclamation, then the amendment described in section 2 of this proclamation will no longer be in effect and section 2(c) of Proclamation 10773 shall continue to apply by its terms.

**Sec. 5**. *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-seventh day of September, in the year of our Lord two thousand twenty-four, and of the Independence of the United States of America the two hundred and forty-ninth.

[FR Doc. 2024–22942
Filed 10–1–24; 11:15 am]
Billing code 3395–F4–P

**48710**    **Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 208 and 235**

[USCIS Docket No. USCIS–2024–0006]

RIN 1615–AC92

## DEPARTMENT OF JUSTICE

## Executive Office for Immigration Review

**8 CFR Part 1208**

[A.G. Order No. 5943–2024]

RIN 1125–AB32

## Securing the Border

**AGENCY:** U.S. Citizenship and Immigration Services ("USCIS"), Department of Homeland Security ("DHS"); Executive Office for Immigration Review ("EOIR"), Department of Justice ("DOJ").

**ACTION:** Interim final rule ("IFR") with request for comments.

**SUMMARY:** On June 3, 2024, the President signed a Proclamation under sections 212(f) and 215(a) of the Immigration and Nationality Act ("INA"), finding that the entry into the United States of certain noncitizens during emergency border circumstances would be detrimental to the interests of the United States, and suspending and limiting the entry of those noncitizens. The Proclamation directed DHS and DOJ to promptly consider issuing regulations addressing the circumstances at the southern border, including any warranted limitations and conditions on asylum eligibility. The Departments are now issuing this IFR.

**DATES:**

*Effective date:* This IFR is effective at 12:01 a.m. eastern daylight time on June 5, 2024.

*Submission of public comments:* Comments must be submitted on or before July 8, 2024.

The electronic Federal Docket Management System will accept comments prior to midnight eastern time at the end of that day.

**ADDRESSES:** You may submit comments on this IFR, identified by USCIS Docket No. USCIS–2024–0006, through the Federal eRulemaking Portal: *https:// www.regulations.gov*. Follow the website instructions for submitting comments.

Comments submitted in a manner other than the one listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the IFR and

may not receive a response from the Departments. Please note that the Departments cannot accept any comments that are hand-delivered or couriered. In addition, the Departments cannot accept comments contained on any form of digital media storage devices, such as CDs/DVDs and USB drives. The Departments are not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov,* please contact the Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (240) 721–3000 for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**

*For DHS:* Daniel Delgado, Acting Deputy Assistant Secretary for Immigration Policy, Office of Strategy, Policy, and Plans, U.S. Department of Homeland Security; telephone (202) 447–3459 (not a toll-free call).

*For the Executive Office for Immigration Review:* Lauren Alder Reid, Assistant Director, Office of Policy, EOIR, Department of Justice, 5107 Leesburg Pike, Falls Church, VA 22041; telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Public Participation
II. Executive Summary
　A. Background and Purpose
　B. Legal Authority
　C. Summary of Provisions of the IFR
III. Discussion of the IFR
　A. Current Framework
　1. Asylum, Statutory Withholding of Removal, and CAT Protection
　2. Expedited Removal and Screenings in the Credible Fear Process
　3. Lawful Pathways Condition on Asylum Eligibility
　B. Justification
　1. Global Migration at Record Levels
　2. Need for These Measures
　3. Description of the Rule and Explanation of Regulatory Changes
　C. Section-by-Section Description of Amendments
　1. 8 CFR 208.13 and 1208.13
　2. 8 CFR 208.35
　3. 8 CFR 1208.35
　4. 8 CFR 235.15
IV. Statutory and Regulatory Requirements
　A. Administrative Procedure Act
　1. Foreign Affairs
　2. Good Cause
　B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)
　C. Regulatory Flexibility Act
　D. Unfunded Mandates Reform Act of 1995
　E. Congressional Review Act
　F. Executive Order 13132 (Federalism)
　G. Executive Order 12988 (Civil Justice Reform)
　H. Family Assessment
　I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)
　J. National Environmental Policy Act
　K. Paperwork Reduction Act

## List of Abbreviations

AO    Asylum Officer
APA    Administrative Procedure Act
BIA    Board of Immigration Appeals (DOJ, EOIR)
CAT    Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment
CBP    U.S. Customs and Border Protection
CBP    One app CBP One mobile application
CDC    Centers for Disease Control and Prevention
CHNV    Cuba, Haiti, Nicaragua, and Venezuela
DHS    Department of Homeland Security
DOD    Department of Defense
DOJ    Department of Justice
EOIR    Executive Office for Immigration Review
FARRA    Foreign Affairs Reform and Restructuring Act of 1998
FRP    Family Reunification Parole
FY    Fiscal Year
HSA    Homeland Security Act of 2002
ICE    U.S. Immigration and Customs Enforcement
IFR    Interim Final Rule
IIRIRA    Illegal Immigration Reform and Immigrant Responsibility Act of 1996
IJ    Immigration Judge
INA    or the Act Immigration and Nationality Act
INS    Immigration and Naturalization Service
MPP    Migrant Protection Protocols
NGO    Non-Governmental Organization
NEPA    National Environmental Policy Act
NTA    Notice to Appear
OHSS    Office of Homeland Security Statistics
OIS    Office of Immigration Statistics
OMB    Office of Management and Budget
POE    Port of Entry
RFA    Regulatory Flexibility Act
SWB    Southwest Land Border
TCO    Transnational Criminal Organization
UC    Unaccompanied Child, having the same meaning as Unaccompanied Alien Child as defined at 6 U.S.C. 279(g)(2)
UIP    U.S. Customs and Border Protection Unified Immigration Portal
UMRA    Unfunded Mandates Reform Act of 1995
UNHCR    United Nations High Commissioner for Refugees
USBP    U.S. Border Patrol
USCIS    U.S. Citizenship and Immigration Services

## I. Public Participation

The Departments invite all interested parties to participate in this rulemaking by submitting written data, views, comments, and arguments on all aspects of this IFR by the deadline stated above. The Departments also invite comments

that relate to the economic, environmental, or federalism effects that might result from this IFR. Comments that will provide the most assistance to the Departments in implementing these changes will reference a specific portion of the IFR, explain the reason for any recommended change, and include data, information, or authority that supports such recommended change. Comments must be submitted in English, or an English translation must be provided. Comments submitted in a manner other than pursuant to the instructions, including emails or letters sent to the Departments' officials, will not be considered comments on the IFR and may not receive a response from the Departments.

*Instructions:* If you submit a comment, you must include the USCIS Docket No. USCIS–2024–0006 for this rulemaking. All submissions may be posted, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to the Departments. The Departments may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy and Security Notice available at *https://www.regulations.gov.*

*Docket:* For access to the docket and to read background documents or comments received, go to *https://www.regulations.gov,* referencing USCIS Docket No. USCIS–2024–0006. You may also sign up for email alerts on the online docket to be notified when comments are posted, or a final rule is published.

## II. Executive Summary

### A. Background and Purpose

On June 3, 2024, the President signed a Proclamation under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), finding that because the border security and immigration systems of the United States are unduly strained at this time, the entry into the United States of certain categories of noncitizens [1] is detrimental to the interests of the United States, and

suspending and limiting the entry of such noncitizens. The Proclamation explicitly excepts from its terms certain persons who are not subject to the suspension and limitation. This rule is necessary to respond to the emergency border circumstances discussed in the Proclamation.

The Departments use the term "emergency border circumstances" in this preamble to generally refer to situations in which high levels of encounters at the southern border exceed DHS's capacity to deliver timely consequences to most individuals who cross irregularly into the United States and cannot establish a legal basis to remain in the United States. As the preamble elsewhere explains, the periods during which the Proclamation is intended to be in effect, when encounters exceed certain thresholds, identify such situations. Hence, the Departments in this preamble use the term "emergency border circumstances" to refer more specifically to the period of time after the date that the Proclamation's suspension and limitation on entry would commence (as described in section 1 of the Proclamation) until the discontinuation date referenced in section 2(a) of the Proclamation or the date the President revokes the Proclamation (whichever comes first), as well as any subsequent period during which the Proclamation's suspension and limitation on entry would apply as described in section 2(b) of the Proclamation.[2] As the Proclamation and this preamble explain, these circumstances exist despite the Departments' efforts to address substantial levels of migration, and such circumstances are a direct result of Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems.

The Proclamation explains that since 2021, as a result of political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere,[3] including record levels at the southwest land border ("SWB").[4] In

250,000 Colombians, 210,000 Haitians, and 210,000 Salvadorans, among others. By comparison, prior to 2018 there were never more than 1 million displaced persons in the hemisphere, and prior to 2007 there were never more than 300,000. Nearly 1 in every 100 people in the Western Hemisphere was displaced in 2022, compared to less than 1 in 1,000 displaced in the region each year prior to 2018. *See* UNHCR, *Refugee Data Finder, unhcr.org/refugee-statistics/download/?url=PhV1Xc* (last visited May 27, 2024); *see also* UNHCR, *Global Trends: Forced Displacement in 2022,* at 2, 8, 9, 12 (June 14, 2023), *https://www.unhcr.org/global-trends-report-2022* (showing rapid global increases in forcibly displaced persons and other persons in need of international protection in 2021 and 2022, and projecting significant future increases); UNHCR, *Venezuela Situation, https://www.unhcr.org/emergencies/venezuela-situation* (last updated Aug. 2023).

[4] United States Government sources refer to the U.S. border with Mexico by various terms, including "SWB" and "the southern border." In some instances, these differences can be substantive, referring only to portions of the border, while in others they simply reflect different word choices. As defined in section 4(d) of the Proclamation, the term "southern border" includes both the southwest land border ("SWB") and the southern coastal borders. As defined in section 4(c) of the Proclamation, the term "southwest land border" means the entirety of the United States land border with Mexico. And as defined in section 4(b) of the Proclamation, the term "southern coastal borders" means all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the SWB, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico. The Departments believe that the factual circumstances described herein support applying this IFR to both the SWB and the southern coastal borders, although they recognize that occasionally different variations of this terminology may be used. The Departments further note there are sound reasons for the Proclamation and rule to include maritime borders of the United States Virgin Islands and Puerto Rico; this aspect of the Proclamation and rule help avoid any incentive for maritime migration to such locations. The dangers of such migration, and the operational challenges associated with responding to such maritime migration, are well documented. *See Securing America's Maritime Border: Challenges and Solutions for U.S. National Security: Hearing Before the Subcomm. on Transp. & Mar. Sec. of the H. Comm. on Homeland Sec.,* 108th Cong. 10–11 (prepared statement of Rear Admiral Jo-Ann F. Burdian, Assistant Commandant for Response Policy, U.S. Coast Guard) (describing an increasingly challenging operational environment and noting that most "Cuban and Haitian migrants use transit routes into Florida, either directly or via the Bahamas. Alternatively, Dominican and some Haitian migrants use shorter transit routes across the Mona Passage to Puerto Rico and the U.S. Virgin Islands. Common conveyances used in this region range from fishing vessels, coastal freighters, sail freighters, go-fast type vessels, and 'rusticas.' "); PBS, *More Than 100 Migrants Stranded Near Puerto Rico Await Help During Human Smuggling Operation* (Oct. 18, 2022), *https://www.pbs.org/newshour/world/more-than-100-migrants-stranded-near-puerto-rico-await-help-during-human-smuggling-operation* ("Mona Island is located in the treacherous waters between Dominican Republic and Puerto Rico and has long been a dropping off point for human smugglers promising to ferry Haitian and Dominican migrants to the U.S. territory aboard rickety boats. Dozens of them have died in recent months in an attempt to flee their countries amid a spike in poverty and

Continued

---

[1] For purposes of this preamble, the Departments use the term "noncitizen" to be synonymous with the term "alien" as it is used in the INA. *See* INA 101(a)(3), 8 U.S.C. 1101(a)(3); *Barton* v. *Barr,* 590 U.S. 222, 226 n.2 (2020).

[2] The Departments have sought to avoid describing "emergency border circumstances" as the time period during which the Proclamation is in effect, because the Departments intend for certain provisions of this rule to remain in effect in the event a court enjoins or otherwise renders inoperable the Proclamation or this rule's limitation on asylum eligibility.

[3] According to OHSS analysis of the United Nations High Commissioner for Refugees ("UNHCR") data from 1969 to 2022, there were more than 8.5 million displaced persons in the Western Hemisphere in 2022, including approximately 6.6 million Venezuelans, 300,000 Nicaraguans, 260,000 Hondurans, 250,000 Cubans,

response to record levels of encounters at the SWB,[5] the United States

Government has taken a series of significant steps to strengthen consequences for unlawful or unauthorized entry at the border, while at the same time overseeing the largest expansion of lawful, safe, and orderly pathways and processes for individuals to come to the United States for protection in decades.[6] These steps include:

• Promulgating and implementing the rule titled Circumvention of Lawful Pathways, 88 FR 31314 (May 16, 2023) ("Circumvention of Lawful Pathways rule");

• Deploying more than 500 additional DHS personnel at a time to the SWB to support U.S. Customs and Border Protection ("CBP") operations and refocusing a significant portion of DHS's SWB workforce to prioritize migration management above other border security missions;[7]

• Deploying over 1,000 additional Department of Defense ("DOD") personnel on top of the 2,500 steady state presence to the SWB in May 2023 to further enhance border security;[8]

• Processing record numbers of individuals through expedited removal;[9]

• Implementing a historic expansion of lawful pathways and processes to come to the United States, including: the Cuba, Haiti, Nicaragua, and Venezuela ("CHNV") parole processes, which allow individuals with U.S.-based supporters to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit; the Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala, which provide access to expedited refugee processing for eligible individuals; and the expansion of country-specific family reunification parole processes for individuals in the region who have U.S. citizen relatives in the United States;[10]

• Expanding opportunities to enter the United States for seasonal employment;[11]

• Establishing a mechanism for over 1,400 migrants per day to schedule a time and place to arrive in a safe, orderly, and lawful manner at ports of entry ("POEs") through the CBP One mobile application ("CBP One app");[12]

• Increasing proposed refugee admissions from the Western Hemisphere from 5,000 in Fiscal Year ("FY") 2021 to up to 50,000 in FY 2024;[13]

violence."); United States Coast Guard, *Coast Guard Repatriates 38 Migrants to Dominican Republic Following 2 Interdictions Near Puerto Rico* (Apr. 25, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3755880/coast-guard-repatriates-38-migrants-to-dominican-republic-following-2-interdict/*; United States Coast Guard, *Coast Guard Repatriates 101 Migrants to Dominican Republic Following 3 Interdictions Near Puerto Rico* (Apr. 9, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3734747/coast-guard-repatriates-101-migrants-to-dominican-republic-following-3-interdic/*; United States Coast Guard, *Federal, Local Interagency Responders Search for Possible Survivors of Capsized Migrant Vessel in Camuy, Puerto Rico* (Feb. 1, 2024), *https://www.uscg.mil/Press-Releases/Article/3663106/coast-guard-federal-local-interagency-responders-search-for-possible-survivors/*; United States Coast Guard, *Coast Guard Repatriates 28 Migrants to Dominican Republic, Following Interdiction of Unlawful Migration Voyage in the Mona Passage* (Jan. 31, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3661517/coast-guard-repatriates-28-migrants-to-dominican-republic-following-interdictio/*. There were 35,100 encounters of Dominicans between POEs at the SWB in Fiscal Year ("FY") 2023 and 14,100 in the first six months of FY 2024 (on pace for 28,200), up from an average of 400 such encounters per year in FY 2014 through FY 2019—roughly a 90-fold increase. Office of Homeland Security Statistics ("OHSS") analysis of March 2024 OHSS Persist Dataset.

[5] At the SWB, U.S. Customs and Border Protection ("CBP") completed approximately 1.7 million encounters at and between POEs in FY 2021, 2.4 million in FY 2022, and 2.5 million in FY 2023, with each year exceeding the previous record high of 1.68 million in FY 2000. *Compare* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (total apprehensions and Title 42 expulsions from 1925 to 2022), *and id.* at 94–96 tbl. 35 (apprehensions from FY 2013 to FY 2022), *with* OHSS, *2013 Yearbook of Immigration Statistics* 96 tbl. 35 (July 2013), *https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2012.pdf* (apprehensions from FY 2003 to FY 2012), *and* OHSS, *2002 Yearbook of Immigration Statistics* 184 tbl. 40 (Oct. 2003), *https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2002.pdf* (apprehensions from FY 1996 to FY 2002). In December 2023, CBP also completed a single-month record of approximately 302,000 encounters at and between POEs, almost one and a half times as many as the highest monthly number recorded prior to 2021 (approximately 209,000 in March 2000) based on records available in the OHSS Persist Dataset from FY 2000 to the present. Although some of the increase in encounters is explained by higher-than-normal numbers of repeat encounters of the same individuals during the period in which noncitizens were expelled pursuant to the Centers for Disease Control and Prevention's ("CDC's") Title 42 public health Order, OHSS analysis of the March 2024 OHSS Persist Dataset indicates that unique encounters were also at record high levels. *See* OHSS analysis of March 2024 OHSS Persist Dataset.

DHS data in this IFR are current through March 31, 2024, the most recent month for which DHS has data that have gone through its full validation process. DHS primarily relies on two separate datasets for most of the data in this IFR. Most DHS data are pulled from OHSS's official statistical system of record data, known as the OHSS Persist Dataset, which is typically released by OHSS on a 90-day delay. Other data in this IFR are pulled from OHSS's Enforcement Lifecycle dataset, which combines 23 separate DHS and DOJ datasets to report on the end-to-end immigration enforcement process. Due to this greater complexity, Lifecycle data generally become available for reporting 90 to 120 days after the end of each quarter.

CBP also publishes preliminary data pulled from its operational systems more quickly as part of its regular Monthly Operational Updates. The data in these updates reflect operational realities but change over time as transactional records in the systems of record are cleaned and validated; they are best viewed as initial estimates rather than as final historical records. CBP released an operational update on May 15, 2024, that includes the Component's official reporting for encounters through the end of April. Based on these data, SWB encounters between POEs fell slightly by six percent between March and April. OHSS analysis of data obtained from CBP, *Southwest Land Border Encounters*, *https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last accessed May 24, 2024). The preliminary April data are best understood to reflect a continuation of the general pattern described elsewhere in this IFR. Excluding March through April 2020, which was an unusual case because of the onset of the COVID–19 pandemic, the average month-over-month change between March and April for 2013 through 2024 is a 2.3 percent increase, with 4 out of those 11 years experiencing decreases in April and 7 years experiencing increases.

[6] *See* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), *https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.*

[7] DHS, *Fact Sheet: The Biden-Harris Administration Takes New Actions to Increase Border Enforcement and Accelerate Processing for Work Authorizations, While Continuing to Call on Congress to Act* (Sept. 20, 2023), *https://www.dhs.gov/news/2023/09/20/fact-sheet-biden-harris-administration-takes-new-actions-increase-border.*

[8] *Id.*; *see also* DOD, *Austin Approves Homeland Security Request for Troops at Border* (May 2, 2023), *https://www.defense.gov/News/News-Stories/Article/Article/3382272/austin-approves-homeland-security-request-for-troops-at-border/.*

[9] In the months between May 12, 2023, and March 31, 2024, CBP processed roughly 316,000 noncitizens encountered at and between SWB POEs for expedited removal, more than in any prior full fiscal year. OHSS analysis of data pulled from CBP Unified Immigration Portal ("UIP") on April 2, 2024.

[10] DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[11] DHS, *DHS to Supplement H–2B Cap with Nearly 65,000 Additional Visas for FY 2024, Department of Homeland Security* (Nov. 3, 2023), *https://www.dhs.gov/news/2023/11/03/dhs-supplement-h-2b-cap-nearly-65000-additional-visas-fiscal-year-2024.*

[12] DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration*; CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.*

[13] U.S. State Dep't, *Report to Congress on Proposed Refugee Admissions for Fiscal Year 2024* (Nov. 3, 2023), *https://www.state.gov/report-to-congress-on-proposed-refugee-admissions-for-fiscal-year-2024/.*

**Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations **48713**

• Completing approximately 89 percent more immigration court cases in FY 2023 as compared to FY 2019; [14] and

• Increasing the immigration judge ("IJ") corps by 66 percent from FY 2019 to FY 2023, including maximizing the congressionally authorized number in FY 2023 for a total corps of 734.[15]

The Proclamation further states that although these efforts and other complementary measures are having their intended effect—DHS is processing noncitizens for removal in record numbers and with record efficiency [16]— the border security and immigration systems have not been able to keep pace with the number of individuals arriving at the southern border.[17] Simply put, the Departments do not have adequate resources and tools to deliver timely

decisions and consequences to individuals who cross unlawfully and cannot establish a legal basis to remain in the United States, or to provide timely protection to those ultimately found eligible for protection when individuals are arriving at such elevated, historic volumes.[18]

This became even more clear in the months following the lifting of the Title 42 public health Order.[19] As the Departments resumed widespread processing under title 8 authorities, the insufficiency of both the available statutorily authorized tools and the

resources provided to implement them came into stark focus. Despite the expanded ability to impose consequences at the SWB through the Circumvention of Lawful Pathways rule and complementary measures, which led to the highest numbers of returns and removals in more than a decade,[20] encounter levels have remained elevated well above historical levels, with December 2023 logging the highest monthly total on record.[21] While encounter levels in calendar year 2024 have decreased from these record numbers, there is still a substantial and elevated level of migration, and historically high percentages of migrants are claiming fear and are challenging to remove, as discussed in more detail in Section III.B.1 of this preamble.[22] This

---

[14] See EOIR, *Adjudication Statistics: New Cases and Total Completions—Historical* 1–2 (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2022/09/01/3_new_cases_and_total_completions_-_historical.pdf*.

[15] See EOIR, *Adjudication Statistics: Immigration Judge (IJ) Hiring* 1 (Jan. 2024), *https://www.justice.gov/eoir/media/1344911/dl?inline* (showing 734 total IJs on board in FY 2023); Executive Office for Immigration Review ("EOIR") Strategic Plan 2024, Current Operating Environment, *https://www.justice.gov/eoir/strategic-plan/strategic-context/current-operating-enviroment* (last visited May 27, 2024) ("The agency's streamlining efforts also enabled EOIR, by the close of FY 2023, to fill all 734 appropriated IJ positions, thus creating the largest judge corps in the agency's history.").

[16] See supra note 9. Since May 12, 2023, the median time to refer noncitizens encountered by CBP at the SWB who claim a fear for credible fear interviews decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative credible fear determinations, the median time from encounter to removal, over the same time frames, decreased 85 percent from 73 days to 11 days. Pre-May 12, 2023, data from OHSS Lifecycle Dataset as of December 31, 2023; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

DHS removed or returned over 662,000 noncitizens between May 12, 2023, and March 31, 2024, or an average of over 61,300 per month (excluding crew members detained on board their vessels and other administrative returns); this represents the highest average monthly count of removals and returns since FY 2010. Post-May 12, 2023, repatriations from OHSS analysis of data downloaded from UIP on April 2, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on repatriations); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (noncitizen removals, returns, and expulsions for FY 1892 to FY 2022).

[17] See Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, Office of Management and Budget ("OMB") (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf*.

[18] *Id.; see also* Ariel G. Ruiz-Soto et al., Migration Pol'y Inst., *Shifting Realities at the U.S.-Mexico Border: Immigration Enforcement and Control in a Fast-Evolving Landscape* 20 (Jan. 2024), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-contemporary-border-policy-2024_final.pdf* ("Across the border, interviewed agents expressed frustration with low staffing levels and resource allocations compared to the challenge of managing the border."). DHS acknowledges that the enacted FY 2024 DHS budget does appropriate funding sufficient to pay for approximately 2,000 additional Border Patrol agents, bringing the total level indicated by Congress up to 22,000 agents, compared with 19,855 agents for FY 2023. 170 Cong Rec. H1809–10 (daily ed. Mar. 22, 2024) (Explanatory Statement Regarding H.R. 2882, Further Consolidated Appropriations Act) ("The agreement includes . . . [funding] to hire 22,000 Border Patrol Agents."); 168 Cong Rec. S8557 (daily ed. Dec. 20, 2022) (Explanatory Statement Regarding H.R. 2617, Consolidated Appropriations Act, 2023) ("The agreement provides funding for 19,855 Border Patrol agents."). However, the FY 2024 appropriations do not fully fund CBP's existing operational and staffing requirements. Additionally, CBP estimates that it will likely be unable to implement a hiring surge to meaningfully grow its overall staffing levels towards the staffing levels funded by the FY 2024 budget before the end of the current fiscal year. The hiring process requires time and resources to bring additional agents on board. For example, it generally takes more than six months for an applicant to complete the hiring process and report to the U.S. Border Patrol ("USBP") Academy to receive necessary training. *See* DHS, *Statement from Secretary Mayorkas on the President's Fiscal Year 2025 Budget for the U.S. Department of Homeland Security* (Mar. 11, 2024), *https://www.dhs.gov/news/2024/03/11/statement-secretary-mayorkas-presidents-fiscal-year-2025-budget-us-department* ("However, DHS's border security and immigration enforcement efforts along the Southwest border desperately require the additional funds requested by the Administration and included in the Senate's bipartisan border security legislation, which would provide DHS with approximately $19 billion to fund additional personnel, facilities, repatriation capabilities, and other enforcement resources.").

[19] *See* Public Health Determination and Order Regarding Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ed] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19"). Although the CDC indicated its intention to lift the order on May 23, 2022, ongoing litigation prevented the order from being lifted until it ultimately expired on May 11, 2023. *See* 88 FR at 31319.

[20] In the ten and a half months between May 12, 2023, and March 31, 2024, DHS completed over 662,000 removals and enforcement returns, more than in any full fiscal year since FY 2011, and the highest monthly average of enforcement repatriations since FY 2010. Post-May 12, 2023, repatriations from OHSS analysis of data downloaded from UIP on April 2, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on repatriations); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (noncitizen removals, returns, and expulsions for FY 1892 to FY 2022).

[21] There were nearly 302,000 CBP encounters at and between POEs along the SWB in December 2023, higher than any previous month on record. OHSS analysis of March 2024 OHSS Persist Dataset and historic CBP data for encounters prior to FY 2000; *see also* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023) (total apprehensions and Title 42 expulsions from 1925 to 2022), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf; id.* at 94–96 tbl. 35 (apprehensions from FY 2013 to FY 2022); OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (SWB encounters from FY 2014 through December 2023).

[22] After peaking at nearly 302,000 in December 2023, encounters at and between POEs along the SWB fell to approximately 176,000 in January 2024, 190,000 in February 2024, and 189,000 in March 2024. At an average of 185,000 for the first three months of 2024, monthly encounters levels were almost 4 times higher than the pre-pandemic (FY 2014 through 2019) average of 48,000 encounters at and between POEs per month and—with the exceptions of FY 2022 and FY 2023—represented the highest second quarter count of encounters in any year since FY 2001. March 2024 OHSS Persist Dataset; *see also* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (total apprehensions and title 42 expulsions from 1925 to 2022); *id.* at 94–96 tbl. 35 (apprehensions from FY 2013 to FY 2022); OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-*

Continued

substantial migration throughout the hemisphere, combined with inadequate resources and tools to keep pace, limits DHS's ability to impose timely consequences through expedited removal, the main consequence available at the border under title 8 authorities.

The sustained, high encounter rates the Departments have experienced over the past year have outstripped the Departments' abilities—based on available resources—to process noncitizens through expedited removal in significant numbers. Due to its funding shortfall, DHS simply lacks sufficient resources, such as sufficient USCIS asylum officers ("AOs") to conduct fear screenings and sufficient temporary processing facilities, often called "soft-sides," which limits DHS's ability to conduct credible fear interviews for individuals in CBP custody and to process and hold individuals in U.S. Immigration and Customs Enforcement ("ICE") custody during the expedited removal process.[23] This mismatch in available resources and encounters creates stress on the border and immigration systems and forces DHS to rely on processing pathways outside of expedited removal—limiting the Departments' ability to deliver timely consequences to individuals who do not have a legal basis to remain in the United States.[24] Individuals who are subject to but cannot be processed under expedited removal due to resource constraints are instead released pending removal proceedings under section 240 of the

INA, 8 U.S.C. 1229a ("section 240 removal proceedings"). After an IJ, a process that can take several years to conclude.[25] These immigration court proceedings can be less resource intensive for processing upon initial encounter, because individuals can be released from custody fairly quickly, but are also far less likely to result in swift decisions and swift consequences, and generally require more IJ and ICE attorney time to resolve. *Compare* INA 235(b)(1), 8 U.S.C. 1225(b)(1), *with* INA 240, 8 U.S.C. 1229a. Notably, in FY 2023, when the immigration courts had a historic high number of case completions, the number of new cases far outnumbered those completions and led to a larger backlog—likely extending the length of time it will take individuals encountered and referred into section 240 removal proceedings to finish their immigration court process.[26]

Said another way, at the current levels of encounters and with current resources, the Departments cannot predictably and swiftly deliver consequences to most noncitizens who cross the border without a lawful basis to remain. This inability to predictably deliver timely decisions and consequences further compounds incentives for migrants to make the dangerous journey to the SWB, regardless of any individual noncitizen's ultimate likelihood of success on an asylum or protection application.[27] Smugglers and transnational criminal organizations ("TCOs") have exploited this mismatch, further fueling migration by actively advertising to migrants that they are likely to be able to remain in the United States.[28]

The Departments' ability to refer and process noncitizens through expedited removal thus continues to be overwhelmed, creating a vicious cycle in which the border security and immigration systems cannot deliver timely decisions and consequences to all the people who are encountered at the SWB and lack a lawful basis to remain in the United States. This, in turn, forces DHS to release individuals into the backlogged immigration court system; for the many cases in that system initiated just prior to or during the COVID–19 pandemic, the process can take several years to result in a final decision or consequence,[29] which then incentivizes more people to make the dangerous journey north to take their chances at the SWB.[30] The status quo of the broken immigration and asylum system has become a driver for unlawful migration throughout the region and an increasingly lucrative source of income for dangerous TCOs.[31] Without countermeasures, those TCOs will continue to grow in strength, likely resulting in even more smuggling operations and undermining democratic governance in the countries where they operate.[32] All of these factors, taken together, pose significant threats to the

---

*monthly-tables* (last updated May 10, 2024) (SWB encounters from FY 2014 through December 2023).

[23] "Because ICE has very limited detention capacity and appropriated bedspace has remained relatively static, the agency must carefully prioritize whom it detains. Similar to FY 2022, during FY 2023, Enforcement and Removal Operations' limited detention capacity was primarily used to house two populations: noncitizens CBP arrested at the Southwest Border and noncitizens with criminal histories [Enforcement and Removal Operations] arrested in the interior." Fiscal Year 2023 ICE Annual Report 18 (Dec. 29, 2023), *https://www.ice.gov/doclib/eoy/iceAnnualReportFY2023.pdf.* In FY 2024, ICE was appropriated $5,082,218,000.00 "for enforcement, detention and removal operations." Consolidated Appropriations Act, 2024, Public Law 118–47, 138 Stat. 460, 598 (2024). The joint explanatory statement states that the bill provides "$5,082,218,000 for Enforcement and Removal Operations (ERO)" and "$355,700,000 for 41,500 beds for the full fiscal year and inflationary adjustments to support current detention facility operations." 170 Cong. Rec. H1807, 1812 (daily ed. Mar. 22, 2024).

[24] *See* CBP, *Custody and Transfer Statistics, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics* (last updated Apr. 12, 2024) (table showing that, under current constraints, the number of individuals processed for expedited removal makes up only a fraction of total processing dispositions, including section 240 proceedings).

[25] EOIR decisions completed in December 2023 were, on average, initiated in December 2020, during the significant operational disruptions caused by the COVID–19 pandemic (with encounters several months earlier than that), but 50 percent of EOIR cases initiated during that time were still pending as of December 2023, so the final mean processing time (once all such cases are complete) will be longer. OHSS analysis of EOIR data as of February 12, 2024; EOIR Strategic Plan 2024, Current Operating Environment, *https://www.justice.gov/eoir/strategic-plan/strategic-context/current-operating-enviroment* (last visited May 26, 2024) ("EOIR [ ] suffered operational setbacks during the COVID–19 pandemic years of FY 2020 through FY 2022, including declining case completions due to health closures and scheduling complications and delays in agency efforts to transition to electronic records and the efficiencies they represent. While the challenges of the pandemic were overcome by adaptive measures taken during those years, the pandemic's impact on the pending caseload is still being felt."). While EOIR does not report statistics on pending median completion times for removal proceedings in general, it does report median completion times for certain types of cases, such as detained cases and cases involving UCs. *See, e.g.,* EOIR, *Median Unaccompanied Noncitizen Child (UAC) Case Completion and Case Pending Time* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344951/dl?inline* (median completion time of 1,346 days); EOIR, *Median Completion Times for Detained Cases* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344866/dl?inline* (median completion time of 47 days in the first quarter of 2024 for removal, deportation, exclusion, asylum-only, and withholding-only cases); EOIR, *Percentage of DHS-Detained Cases Completed within Six Months* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344886/dl?inline* (reporting seven percent of detained cases not completed within six months).

[26] EOIR completed more than 520,000 cases in FY 2023 (a record number), but also had almost 1.2 million case receipts, resulting in a net increase of nearly 700,000 cases in its backlog. *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* 1 (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2020/01/31/1_pending_new_receipts_and_total_completions.pdf*; EOIR, *Adjudication Statistics: New Cases and Total Completions—Historical* (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2022/09/01/3_new_cases_and_total_completions_-_historical.pdf*. OHSS estimates that

1.1 million of the nearly 1.2 million case receipts (95 percent) resulted from SWB encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

[27] Miriam Jordan, *One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay,* N.Y. Times (Jan. 31, 2024), *https://www.nytimes.com/2024/01/31/us/us-immigration-asylum-border.html.*

[28] *See* Parker Asmann & Steven Dudley, *How US Policy Foments Organized Crime on US-Mexico Border,* Insight Crime (June 28, 2023), *https://insightcrime.org/investigations/how-us-policy-foments-organized-crime-us-mexico-border/.*

[29] *See supra* note 25.

[30] *See, e.g.,* Jordan, *supra* note 27.

[31] *See* Asmann & Dudley, *supra* note 28.

[32] *See* Jordan, *supra* note 27.

**Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations **48715**

safety and security of migrants exploited into making the dangerous journey to the SWB and the U.S. communities through which many such migrants transit.

In the absence of congressional action to appropriately resource DHS and EOIR and to reform the outdated statutory framework, the Proclamation and the changes made by this rule are intended to substantially improve the Departments' ability to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain. By suspending and limiting entries until 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, as defined by the Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE, and by imposing a limitation on asylum eligibility and making other policy changes, the Proclamation and IFR will realign incentives at the southern border.[33] The Proclamation and IFR will do this by improving DHS's ability to place into expedited removal the majority of noncitizens who are amenable to such processing; to avoid large-scale releases of such individuals pending section 240 removal proceedings; and to allow for swift resolution of their cases and, where appropriate, removal.

The Proclamation imposes a suspension and limitation on entry upon certain classes of noncitizens who are encountered while the suspension and limitation is in effect. The Proclamation provides that the suspension and limitation on entry applies beginning at 12:01 a.m. eastern daylight time on June 5, 2024. The suspension and limitation on entry will be discontinued 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, as defined by the

Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE. Unaccompanied children ("UCs")[34] from non-contiguous countries are not included in calculating the number of encounters. If at any time after such a factual determination the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of 2,500 encounters or more, the suspension and limitation on entry will apply at 12:01 a.m. eastern time on the next calendar day (or will continue to apply, if the 14-calendar-day period has yet to elapse) until 14 days after the Secretary makes another factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters or the President revokes the Proclamation, at which time its application will be discontinued once again.

The Proclamation does not apply to the following persons:

(i) any noncitizen national of the United States;

(ii) any lawful permanent resident of the United States;

(iii) any unaccompanied child as defined in section 279(g)(2) of title 6, United States Code;

(iv) any noncitizen who is determined to be a victim of a severe form of trafficking in persons, as defined in section 7102(16) of title 22, United States Code;

(v) any noncitizen who has a valid visa or other lawful permission to seek entry or admission into the United States, or presents at a port of entry pursuant to a pre-scheduled time and place, including:

(A) members of the United States Armed Forces and associated personnel, United States Government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household;

(B) noncitizens who hold a valid visa or who have all necessary documents required for admission consistent with the requirements of section 1182(a)(7) of title 8, United States Code, upon arrival at a port of entry;

(C) noncitizens traveling pursuant to the visa waiver program as described in section 217 of the INA, 8 U.S.C. 1187; and

(D) noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for

the safe and orderly entry of noncitizens into the United States;

(vi) any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a U.S. Customs and Border Protection immigration officer, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter; and

(vii) any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a U.S. Customs and Border Protection immigration officer, due to operational considerations at the time of the entry or encounter that warranted permitting the noncitizen to enter.

The President authorized the Secretary of Homeland Security and the Attorney General to issue any instructions, orders, or regulations as may be necessary to implement the Proclamation, including the determination of the exceptions in section 3(b), and directed them to promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted.

Consistent with the President's direction, the Departments have determined that this IFR is necessary to address the situation at the southern border. This IFR aligns the Departments' border operations and applicable authorities with the Proclamation's policy and objectives. Specifically, this IFR establishes a limitation on asylum eligibility that applies to certain individuals who enter during emergency border circumstances and revises certain procedures applicable to the expedited removal process to more swiftly apply consequences for irregular migration[35] and remove noncitizens who do not have a legal basis to remain in the United States. Although the Departments are adopting these measures to respond to the emergency situation at the southern border, they are not a substitute for congressional action—which remains the only long-term solution to the challenges the Departments have confronted on the border for more than a decade.

---

[33] Under the Proclamation, the term "encounter" refers to a noncitizen who (i) is physically apprehended by CBP immigration officers within 100 miles of the United States SWB during the 14-day period immediately after entry between POEs; (ii) is physically apprehended by DHS personnel at the southern coastal borders during the 14-day period immediately after entry between POEs; or (iii) is determined to be inadmissible at a SWB POE. But the 1,500 and 2,500 encounter thresholds in the Proclamation and this rule exclude the third category of encounters—individuals determined to be inadmissible at a SWB POE. When describing historical data in this preamble, the Departments have generally sought to distinguish between encounters between POEs (also referred to as "USBP encounters") and encounters at and between the POEs (also referred to as "total CBP encounters" or "encounters," depending on the context).

[34] In this rulemaking, as in the Proclamation, the term "unaccompanied children" or "UCs" has the same meaning as the term "unaccompanied alien child[ren]" under 6 U.S.C. 279(g)(2).

[35] In this preamble, "irregular migration" refers to the movement of people into another country without authorization.

*B. Legal Authority*

The Secretary and the Attorney General jointly issue this rule pursuant to their shared and respective authorities concerning consideration of claims for asylum, statutory withholding of removal, and protection under regulations implemented pursuant to U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").[36] The Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to the Secretary of Homeland Security many functions related to the administration and enforcement of Federal immigration law while maintaining some functions and authorities with the Attorney General, including some shared concurrently with the Secretary.

The INA, as amended by the HSA, charges the Secretary "with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens," except insofar as those laws assign functions to other agencies. INA 103(a)(1), 8 U.S.C. 1103(a)(1). The INA also grants the Secretary the authority to establish regulations and take other actions "necessary for carrying out" the Secretary's authority under the immigration laws, INA 103(a)(3), 8 U.S.C. 1103(a)(3); *see also* 6 U.S.C. 202.

The HSA provides the Attorney General with "such authorities and functions under [the INA] and all other laws relating to the immigration and naturalization of aliens as were [previously] exercised by [EOIR], or by the Attorney General with respect to [EOIR]." INA 103(g)(1), 8 U.S.C. 1103(g)(1); *see also* 6 U.S.C. 521. In addition, under the HSA, the Attorney General retains authority to "establish such regulations, . . . issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out" the Attorney General's authorities under the INA. INA 103(g)(2), 8 U.S.C. 1103(g)(2).

Under the HSA, the Attorney General retains authority over the conduct of removal proceedings under section 240 of the INA, 8 U.S.C. 1229a ("section 240 removal proceedings"). These adjudications are conducted by IJs within DOJ's EOIR. *See* 6 U.S.C. 521; INA 103(g)(1), 8 U.S.C. 1103(g)(1). With limited exceptions, IJs adjudicate asylum, statutory withholding of removal, and CAT protection applications filed by noncitizens during the pendency of section 240 removal proceedings, including asylum applications referred by USCIS to the immigration court. INA 101(b)(4), 8 U.S.C. 1101(b)(4); INA 240(a)(1), 8 U.S.C. 1229a(a)(1); INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 1208.2(b), 1240.1(a); *see also Dhakal* v. *Sessions*, 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals ("BIA"), also within DOJ's EOIR, in turn hears appeals from IJ decisions. *See* 8 CFR 1003.1(a)(1), (b)(3); *see also Garland* v. *Ming Dai*, 593 U.S. 357, 366–67 (2021) (describing appeals from IJs to the BIA). And the INA provides that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." INA 103(a)(1), 8 U.S.C. 1103(a)(1).

In addition to the separate authorities discussed above, the Attorney General and the Secretary share some authorities.[37] Section 208 of the INA, 8 U.S.C. 1158, authorizes the "Secretary of Homeland Security or the Attorney General" to "grant asylum" to a noncitizen "who has applied for asylum in accordance with the requirements and procedures established by" the Secretary or the Attorney General under section 208 if the Secretary or the Attorney General determines that the noncitizen is a "refugee" within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A). INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A). Section 208 thereby authorizes the Secretary and the Attorney General to "establish[]" "requirements and procedures" to govern asylum applications. *Id.* The statute further authorizes them to "establish," "by regulation," "additional limitations and conditions, consistent with" section 208, under which a noncitizen "shall be ineligible for asylum." INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see also* INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B) (authorizing the Secretary and the

Attorney General to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with [the INA]").[38] The INA also provides the Secretary and Attorney General authority to publish regulatory amendments governing their respective roles regarding apprehension, inspection and admission, detention and removal, withholding of removal, deferral of removal, and release of noncitizens encountered in the interior of the United States or at or between POEs. *See* INA 235, 236, 241, 8 U.S.C. 1225, 1226, 1231.

The HSA granted DHS the authority to adjudicate asylum applications and to conduct credible fear interviews, make credible fear determinations in the context of expedited removal, and establish procedures for further consideration of asylum applications after an individual is found to have a credible fear. INA 103(a)(3), 8 U.S.C. 1103(a)(3); INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); *see also* 6 U.S.C. 271(b) (providing for the transfer of adjudication of asylum and refugee applications from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services, now USCIS). Within DHS, the Secretary has delegated some of those authorities to the Director of USCIS, and AOs conduct credible fear interviews, make credible fear determinations, and determine whether a noncitizen's asylum application should be granted. *See* DHS, No. 0150.1, Delegation to the Bureau of Citizenship and Immigration Services (June 5, 2003); 8 CFR 208.2(a), 208.9, 208.30.

The United States is a party to the 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 ("Refugee Protocol"), which incorporates Articles 2 through 34 of the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 ("Refugee Convention"). Article 33 of the Refugee Convention generally prohibits parties to the Convention from expelling or returning ("refouler") "a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Refugee Convention, *supra*, 19 U.S.T. at 6276, 189 U.N.T.S. at 176.

---

[36] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85, 114; *see also* 8 U.S.C. 1231 note (United States Policy With Respect to Involuntary Return of Persons in Danger of Subjection to Torture); 8 CFR 208.16(c)–208.18, 1208.16(c)–1208.18.

[37] The HSA further provides, "Nothing in this Act, any amendment made by this Act, or in section 103 of the [INA], as amended . . . , shall be construed to limit judicial deference to regulations, adjudications, interpretations, orders, decisions, judgments, or any other actions of the Secretary of Homeland Security or the Attorney General." Public Law 107–296, 116 Stat. 2135, 2274 (codified at 6 U.S.C. 522).

[38] Under the HSA, the references to the "Attorney General" in the INA also encompass the Secretary with respect to statutory authorities vested in the Secretary by the HSA or subsequent legislation, including in relation to immigration proceedings before DHS. 6 U.S.C. 251, 271(b)(3), (5), 557.

*Federal Register* / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations

**48717**

Congress implemented these obligations through the Refugee Act of 1980, Public Law 96–212, 94 Stat. 102 ("Refugee Act"), creating the precursor to what is now known as statutory withholding of removal. The Supreme Court has long recognized that the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3) ("statutory withholding of removal"), which provides that a noncitizen may not be removed to a country where their life or freedom would be threatened on account of one of the protected grounds listed in Article 33 of the Refugee Convention.[39] *See* INA 241(b)(3), 8 U.S.C. 1231(b)(3); *see also* 8 CFR 208.16, 1208.16. The INA also authorizes the Secretary and the Attorney General to implement statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* INA 103(a)(1), (3), (g)(1)–(2), 8 U.S.C. 1103(a)(1), (3), (g)(1)–(2).

The Departments also have authority to implement Article 3 of the CAT. The Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") provides the Departments with the authority to "prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." Public Law 105–277, div. G, sec. 2242(b), 112 Stat. 2681, 2681–822 (codified at 8 U.S.C. 1231 note). DHS and DOJ have implemented the obligations of the United States under Article 3 of the CAT in the Code of Federal Regulations, consistent with FARRA. *See, e.g.,* 8 CFR 208.16(c)–208.18, 1208.16(c)–1208.18; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999), *amended by* 64 FR 13881 (Mar. 23, 1999).

This rule is necessary because, while the Proclamation recognizes that the asylum system has contributed to the border emergency, the Proclamation itself does not and cannot affect noncitizens' right to apply for asylum, eligibility for asylum, or asylum procedures. That has been the Executive Branch's consistent position for four decades.[40] That longstanding understanding follows from the text and structure of the governing statutes. Section 212(f) provides that under certain circumstances, the President may "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." INA 212(f), 8 U.S.C. 1182(f). Although this provision—first enacted in 1952—"grants the President broad discretion," it "operate[s]" only in its "sphere[ ]." *Trump* v. *Hawaii*, 585 U.S. 667, 683–84, 695 (2018). Section 212 of the INA, 8 U.S.C. 1182 (entitled "Inadmissible aliens"), generally "defines the universe of aliens who are admissible" and "sets the boundaries of admissibility into the United States." *Id.* at 695. Hence, when section 212(f) authorizes the President to suspend "entry," it "enabl[es] the President to supplement the other grounds of inadmissibility in the INA," *id.* at 684 (citing *Abourezk* v. *Reagan,* 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986)), and to bar individuals from entry into the United States.

This authority, though broad, does not authorize the President to override the asylum statute.[41] The asylum statute, first enacted in the Refugee Act of 1980, today provides that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum." INA 208(a)(1), 8 U.S.C. 1158(a)(1). The right to apply for asylum thus turns on whether a noncitizen is "physically present" or has "arrive[d] in the United States," *id.,* as those terms are properly understood, and exists regardless of whether a noncitizen is inadmissible.[42] As a result, the power under section 212(f) to suspend "entry" does not authorize the President to override the asylum rights of noncitizens who have already physically entered the United States and who are entitled to an adjudication of eligibility under the applicable statutory and regulatory rules and standards.[43]

---

[39] *See INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 426–27 (1999); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 440–41 (1987) (distinguishing between Article 33's non-refoulement prohibition, which aligns with what was then called withholding of deportation, and Article 34's call to "facilitate the assimilation and naturalization of refugees," which the Court found aligned with the discretionary provisions in section 208 of the INA, 8 U.S.C. 1158). The Refugee Convention and Protocol are not self-executing. *E.g., Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.").

[40] In 1984, then-Assistant Attorney General of the Office of Legal Counsel Theodore B. Olson advised that section 212(f) did not permit the President to eliminate the asylum rights of noncitizens who had hijacked a plane and, as a condition of the plane's release, been flown to the United States. And in 2018, the Departments reaffirmed that "[a]n alien whose entry is suspended or restricted under . . . a [section 212(f)] proclamation, but who nonetheless reaches U.S. soil contrary to the President's determination that the alien should not be in the United States, would remain subject to various procedures under immigration laws," including "expedited-removal proceedings" where they could "raise any claim for protection." *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims,* 83 FR 55934, 55940 (Nov. 9, 2018). Although Presidents have invoked section 212(f) at least 90 times since 1981, to the Departments' knowledge, none of those proclamations was understood to affect the right of noncitizens on U.S. soil to apply for, or noncitizens' statutory eligibility to receive, asylum. *See* Kelsey Y. Santamaria et al., Cong. Rsch. Serv., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. 1182(f)* (Feb. 21, 2024). At the same time, nothing in the proclamations or the INA have precluded the Departments from considering as an adverse *discretionary* criterion that a noncitizen is described in a section 212(f) proclamation.

[41] The Supreme Court, though it has never squarely addressed this issue, has also never indicated that section 212(f) confers power to affect asylum rights of those present in the United States.

[42] Section 212(f) contrasts with 42 U.S.C. 265, which authorizes the CDC to temporarily suspend "the right to introduce . . . persons and property" into the United States if such suspension "is required in the interest of the public health." During the COVID–19 pandemic and to prevent the "serious danger of the introduction of [the] disease into the United States," 42 U.S.C. 265, the CDC issued an order invoking section 265 to expel certain noncitizens without allowing asylum applications. As the final rule implementing section 265 explained, the provision is part of a "broad public health statute" that "operates separately and independently of the immigration powers" and authorizes the CDC "to temporarily suspend the effect of any law . . . by which a person would otherwise have the right to be introduced . . . into the U.S.," *Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right To Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes,* 85 FR 56424, 56426, 56442 (Sept. 11, 2020), including the immigration laws, *id.* at 56426 (noting that legislative history indicates that section 265 was intended to suspend immigration if public health required it). The drafting history of section 265 also confirms that Congress conferred authority to prohibit "the introduction of persons" in order to broaden this provision and that this provision subsumed but was not limited to the authority to "suspend immigration." Br. for Appellants at 41–43, *Huisha-Huisha* v. *Mayorkas,* 27 F.4th 718 (D.C. Cir. 2022) (No. 21–5200); *see Huisha-Huisha,* 27 F.4th at 730–31 (determining plaintiffs not likely to succeed on their challenge to the CDC order on the ground that it improperly suspended migrants' right to apply for asylum). Section 265 is a public health authority under the Public Health Service Act. Its grant of authority to allow the CDC to temporarily suspend immigration laws in case of a public health emergency has no relevance to the interpretation of section 212(f), which is in title 8.

[43] For similar reasons, section 215(a) of the INA, 8 U.S.C. 1185(a), which the Proclamation also

Continued

This rule, as discussed elsewhere, is authorized because Congress has conferred upon the Secretary and the Attorney General express rulemaking power to create new conditions and limitations on asylum eligibility and create certain procedures for adjudicating asylum claims. INA 103(a)(1), (a)(3), (g), 208(b)(1)(A), (b)(2)(C), (d)(5)(B), 8 U.S.C. 1103(a)(1), (a)(3), (g), 1158(b)(1)(A), (b)(2)(C), (d)(5)(B); INA 235(b)(1)(B)(iii)(III), (iv), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (iv).

*C. Summary of Provisions of the IFR*

This IFR adds provisions at 8 CFR 208.13(g), 208.35, 235.15, 1208.13(g), and 1208.35 that effectuate three key changes to the process for those seeking asylum, statutory withholding of removal, or protection under the CAT during emergency border circumstances giving rise to the suspension and limitation on entry under the Presidential Proclamation of June 3, 2024, Securing the Border ("Presidential Proclamation of June 3"):

• During emergency border circumstances, persons who enter across the southern border and who are not described in section 3(b) of the Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family as described in 8 CFR 208.30(c) with whom they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11.

• During emergency border circumstances, rather than asking

invokes, does not authorize the President to impose the condition and limitation on asylum eligibility created by this rule. *Cf. United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 540–47 (1950) (holding that under the precursor to section 215(a)(1) of the INA and the presidential proclamation and regulations issued pursuant to that provision, which during times of national emergency made it unlawful for "any alien to . . . enter or attempt to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President shall prescribe," the Attorney General could issue regulations governing entry during such an emergency to "deny [certain noncitizens] a hearing . . . in special cases" notwithstanding the ordinary exclusion hearing provisions governing entry). This does not mean, however, that the President could not invoke section 215(a) as authority to impose reasonable rules, regulations, and orders on asylum applicants and asylees, such as travel document requirements for re-entry and departure controls.

specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, for those who enter across the southern border and are not described in section 3(b) of the Proclamation, DHS will provide general notice regarding the process for seeking asylum, statutory withholding of removal, or protection under the CAT and will refer a noncitizen for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to his or her country or the country of removal.

• The limitation on asylum eligibility will be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation will receive a negative credible fear determination with respect to their asylum claim unless there is a significant possibility the noncitizen could demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist. Such noncitizens will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, a higher standard than that applied to noncitizens in a similar posture under the Circumvention of Lawful Pathways rule. The "reasonable probability" standard is defined to mean substantially more than a "reasonable possibility" but somewhat less than more likely than not.

As discussed throughout this IFR, these changes are designed to implement the policies and objectives of the Proclamation by enhancing the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances.

## III. Discussion of the IFR

*A. Current Framework*

1. Asylum, Statutory Withholding of Removal, and CAT Protection

Asylum is a discretionary benefit that can be granted by the Secretary or the Attorney General if a noncitizen establishes, among other things, that they have experienced past persecution or have a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. INA 208(b)(1)–(2), 8 U.S.C. 1158(b)(1)–(2)

(providing that, unless subject to a mandatory bar, the Secretary or Attorney General "may" grant asylum to refugees); INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A) (defining "refugee"). As long as they retain their asylee status, noncitizens who are granted asylum (1) cannot be removed or returned to their country of nationality or, if they have no nationality, their last habitual residence, (2) receive employment authorization incident to their status, (3) may be permitted to travel outside of the United States and return with prior consent, and (4) may seek derivative benefits for their spouses or children. INA 208(c)(1), 8 U.S.C. 1158(c)(1); *see Johnson* v. *Guzman Chavez,* 594 U.S. 523, 536 (2021) ("[A] grant of asylum permits an alien to remain in the United States and to apply for permanent residency after one year[.]" (emphasis omitted) (internal quotation marks and citation omitted)); 8 CFR 274a.12(a)(5) (employment authorization incident to asylum status); 8 CFR 223.1(b) (allowing for return to the United States after travel with a requisite travel document for a "person who holds . . . asylum status pursuant to section 208 of the Act"); *see also* 6 U.S.C. 271(b)(3) (transferring asylum functions to DHS); 6 U.S.C. 557 (providing that references to any other officer shall be deemed to refer to the "Secretary" with respect to any transferred function); INA 208(b)(3), 8 U.S.C. 1158(b)(3) (derivative asylum status).

Asylum applications are generally classified as "affirmative" or "defensive" applications, depending on the agency with which they are filed. If a noncitizen is physically present in the United States, not detained, and not in section 240 removal proceedings, the noncitizen may file an asylum application with USCIS. These applications are "affirmative" filings. Generally, if the noncitizen is in section 240 removal proceedings before an IJ, the noncitizen may apply for asylum before the IJ as a defense to removal.[44] These applications are "defensive" filings.

Noncitizens are eligible for asylum if they have been persecuted or have a well-founded fear of future persecution in their country of nationality or, if they have no nationality, their last habitual residence, on account of one of five protected grounds and are not subject to a bar to eligibility. *See generally* INA 208, 8 U.S.C. 1158; INA 101(a)(42), 8 U.S.C. 1101(a)(42). To be granted

[44] The only exception is that USCIS has initial jurisdiction over asylum applications filed by a UC even where the applicant is in section 240 removal proceedings. INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C).

asylum, eligible noncitizens must also establish that they merit asylum in the exercise of discretion. *Id.* Noncitizens who are ineligible for a grant of asylum, or who are denied asylum based on the Attorney General's or the Secretary's discretion, may qualify for other forms of protection. An application for asylum submitted by a noncitizen in section 240 removal proceedings is also considered an application for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* 8 CFR 1208.3(b), 1208.13(c)(1). An IJ also may consider a noncitizen's eligibility for statutory withholding of removal and CAT protection under regulations issued pursuant to the implementing legislation regarding the obligations of the United States under Article 3 of the CAT. FARRA sec. 2242(b) (codified at 8 U.S.C. 1231 note); 8 CFR 1208.3(b), 1208.13(c)(1); *see also* 8 CFR 1208.16(c), 1208.17.

Statutory withholding of removal and CAT protection preclude removing a noncitizen to any country where the noncitizen would ''more likely than not'' face persecution or torture, meaning that the noncitizen's life or freedom would be threatened because of a protected ground or that the noncitizen would be tortured. 8 CFR 1208.16(b)(2), (c)(2). Thus, if a noncitizen establishes that it is more likely than not that their life or freedom would be threatened because of a protected ground, but is denied asylum for some other reason, the noncitizen nonetheless may be entitled to statutory withholding of removal if not otherwise barred from that form of protection. INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A); 8 CFR 208.16, 1208.16. Likewise, a noncitizen who establishes that they more likely than not will face torture in their country of removal will qualify for CAT protection. *See* 8 CFR 208.16(c), 208.17(a), 1208.16(c), 1208.17(a).

In contrast to the more generous benefits available by attaining asylum, statutory withholding of removal and CAT protection do not: (1) prohibit the Government from removing the noncitizen to a third country where the noncitizen would not face the requisite likelihood of persecution or torture (even in the absence of an agreement with that third country); (2) create a path to lawful permanent resident status; or (3) afford the same ancillary benefits, such as derivative protection for family members. *See, e.g., Guzman Chavez,* 594 U.S. at 536 (''distinguish[ing] withholding-only relief from asylum'' on the ground that withholding does not preclude the Government from removing the noncitizen to a third country and does

not provide the noncitizen any permanent right to remain in the United States); *Matter of A–K–,* 24 I&N Dec. 275, 279 (BIA 2007) (stating that ''the Act does not permit derivative withholding of removal under any circumstances''); INA 208(b)(3)(A), 8 U.S.C. 1158(b)(3)(A) (statutory provision allowing asylum status to be granted to accompanying or following-to-join spouse or children of a noncitizen granted asylum; no equivalent statutory or regulatory provision for individuals granted withholding or deferral of removal).

2. Expedited Removal and Screenings in the Credible Fear Process

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (''IIRIRA''), Public Law 104–28, div. C, 110 Stat. 3009, 3009–546, Congress established the expedited removal process. The process is applicable to certain noncitizens present or arriving in the United States (and, in the discretion of the Secretary, certain other designated classes of noncitizens) who are found to be inadmissible under either section 212(a)(6)(C) of the INA, 8 U.S.C. 1182(a)(6)(C), which renders inadmissible noncitizens who make certain material misrepresentations, or section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7), which renders inadmissible noncitizens who lack documentation requirements for admission. INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). Upon being subject to expedited removal, such noncitizens may be ''removed from the United States without further hearing or review unless the [noncitizen] indicates either an intention to apply for asylum . . . or a fear of persecution.'' *Id.*

Congress created a screening process, known as ''credible fear'' screening, to identify potentially valid claims for asylum by noncitizens in expedited removal proceedings. The Departments have used the same screening process to identify potentially valid claims for statutory withholding of removal and CAT protection. If a noncitizen indicates a fear of persecution or torture, a fear of return, or an intention to apply for asylum during the course of the expedited removal process, DHS refers the noncitizen to a USCIS AO to determine whether the noncitizen has a credible fear of persecution or torture in the country of citizenship or removal. INA 235(b)(1)(A)(ii), (B), 8 U.S.C. 1225(b)(1)(A)(ii), (B); *see also* 8 CFR 235.3(b)(4). A noncitizen has a ''credible fear of persecution'' if ''there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the

alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum.'' INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). If the AO determines that the noncitizen does not have a credible fear of persecution or torture, the noncitizen may request that an IJ review that determination. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 208.33(b)(2)(v), 1208.30(g).

If the AO (or an IJ reviewing the AO's decision) determines that a noncitizen has a credible fear of persecution or torture, USCIS can refer the noncitizen to an immigration court for adjudication of the noncitizen's claims in section 240 removal proceedings, 8 CFR 208.30(f), 8 CFR 1208.30(g)(2)(iv)(B), and the noncitizen may subsequently file a defensive asylum application with the court during those proceedings, *see* 8 CFR 1240.1(a)(1)(ii). Alternatively, USCIS can retain jurisdiction over the application for asylum for further consideration in an asylum merits interview. *See* 8 CFR 208.30(f). During an asylum merits interview, a positive credible fear determination is treated as the asylum application, and strict timelines thereafter govern the applicant's case before both USCIS and EOIR. *See* 8 CFR 208.2(a)(1)(ii), 208.3(a)(2), 208.4(b)(2), 208.9(a)(1), (e)(1)–(2), (g)(2), (i), 1240.17. The AO may grant asylum, subject to review within USCIS, where the noncitizen is eligible and warrants a grant as a matter of discretion. 8 CFR 208.14(b). If the noncitizen is not eligible or does not warrant a grant of asylum as a matter of discretion, the AO refers the application to EOIR. 8 CFR 208.14(c)(1). Where USCIS does not grant asylum, the AO's decision will also include a determination on eligibility for statutory withholding of removal and CAT protection based on the record before USCIS. 8 CFR 208.16(a), (c)(4).

For cases referred to EOIR following an asylum merits interview, the written record of the positive credible fear determination serves as the asylum application, 8 CFR 1240.17(e), and the record the AO developed during the asylum merits interview, as supplemented by the parties, serves as the record before the IJ, 8 CFR 1240.17(c), (f)(2)(i)(A)(1), (f)(2)(ii)(B). The IJ reviews applications for asylum de novo and also reviews applications for statutory withholding of removal and CAT protection de novo where USCIS found the noncitizen ineligible for such protection. 8 CFR 1240.17(i)(1). However, where USCIS found the noncitizen eligible for statutory withholding of removal or CAT

protection, IJs must give effect to USCIS's eligibility determination unless DHS demonstrates, through evidence or other testimony that specifically pertains to the noncitizen and was not in the record of proceedings for the asylum merits interview, that the noncitizen is not eligible for such protection. 8 CFR 1240.17(i)(2). With a limited exception, DHS may not appeal the grant of any protection for which the AO determined the noncitizen eligible. *Id.*

### 3. Lawful Pathways Condition on Asylum Eligibility

On March 20, 2020, the Director of the Centers for Disease Control and Prevention (''CDC'') issued an order under 42 U.S.C. 265 and 268 suspending the introduction of certain noncitizens from foreign countries or places where the existence of a communicable disease creates a serious danger of the introduction of such disease into the United States and the danger is so increased by the introduction of persons from the foreign country or place that a temporary suspension of such introduction is necessary to protect the public health.[45] The CDC's Title 42 public health Order was extended multiple times.[46] While the Title 42 public health Order was in effect, noncitizens who did not have proper travel documents were generally not processed into the United States; they were instead expelled to Mexico or to their home countries under the Order's authority without being processed under the authorities set forth in title 8 of the United States Code, which includes the INA. Circumvention of Lawful Pathways, 88 FR 11704, 11705 (Feb. 23, 2023) (''Circumvention of Lawful Pathways NPRM''). In early 2023, the President announced that the Administration expected to end the public health emergency on May 11, 2023, which would cause the then-operative Title 42 public health Order to end. *See id.* at 11708.

As the Departments stated in the Circumvention of Lawful Pathways rule, absent further action, the end of the Title 42 public health Order was expected to cause encounters with noncitizens seeking to enter the United States at the SWB to rise to or remain at all-time highs—as high as 11,000 migrants daily. 88 FR at 31331, 31315. And many of these individuals would be entitled to remain in the United States pending resolution of their asylum and protection claims. *See* INA 235(b)(1)(B)(ii), 8, U.S.C. 1225(b)(1)(B)(ii) (not allowing for removal of those found to have a credible fear pending further consideration of the asylum claim); *see also* 88 FR at 31363 (noting that ''most non-Mexicans processed for expedited removal under Title 8 would likely establish credible fear and remain in the United States for the foreseeable future''). The Departments thus faced a looming urgent situation: absent policy change, the end of the Title 42 public health Order was expected to result in many more migrants crossing the border and asserting claims of fear or seeking protection, which would in turn exceed the border security and immigration systems' capacity to process migrants in a safe, expeditious, and orderly way. *See* 88 FR at 31363. To address this expected increase in the number of migrants at the SWB and adjacent coastal borders seeking to enter the United States without authorization, the Departments promulgated the Circumvention of Lawful Pathways rule. *See* 88 FR 31314.

The Circumvention of Lawful Pathways rule, which became effective on its public inspection date, May 11, 2023, *id.,* and applies to those who enter during a two-year period, imposes a rebuttable presumption of asylum ineligibility on certain noncitizens who fail to pursue safe, orderly, and lawful processes for entry into the United States or seek protection in another qualifying country through which they traveled. 8 CFR 208.33(a), 1208.33(a). The rebuttable presumption applies to noncitizens who enter the United States from Mexico at the SWB or adjacent coastal borders without documents sufficient for lawful admission where the entry is: (1) between May 11, 2023, and May 11, 2025; (2) subsequent to the end of implementation of the Title 42 public health Order issued on August 2, 2021, and related prior orders issued pursuant to the authorities in 42 U.S.C. 265 and 268 and the implementing regulation at 42 CFR 71.40; and (3) after the noncitizen traveled through a country other than their country of citizenship, nationality, or, if stateless,

last habitual residence, that is a party to the Refugee Convention or Refugee Protocol. 8 CFR 208.33(a)(1), 1208.33(a)(1).

The presumption does not apply to UCs or to noncitizens who availed themselves of or were traveling with a family member who availed themselves of certain safe, orderly, and lawful pathways—specifically those who (1) received appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process; (2) presented at a POE pursuant to a pre-scheduled time and place or presented at a POE without a pre-scheduled time and place but who can demonstrate by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or (3) sought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application. 8 CFR 208.33(a)(2), 1208.33(a)(2). Noncitizens may also overcome the presumption by demonstrating by a preponderance of the evidence that ''exceptionally compelling circumstances exist.'' 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). Such circumstances necessarily exist where, at the time of entry, the noncitizen or a family member with whom the noncitizen is traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) was a victim of a severe form of trafficking in persons under 8 CFR 214.11(a). 8 CFR 208.33(a)(3)(i)(A)–(C), (ii), 1208.33(a)(3)(i)(A)–(C), (ii). A noncitizen presumed ineligible for asylum under the rule may still apply for statutory withholding of removal or CAT protection and thus may not be removed to a country where it is more likely than not that they will be persecuted because of a protected ground or tortured.

The condition on asylum eligibility in the Circumvention of Lawful Pathways rule (''Lawful Pathways condition'') applies to asylum applications before USCIS and EOIR. 8 CFR 208.13(f), 1208.13(f). It also applies during credible fear screenings. 8 CFR 208.33(b), 1208.33(b). Noncitizens subject to expedited removal who indicate a fear of persecution or an intention to apply for asylum are currently first screened to assess whether the rebuttable presumption applies and, if so, whether the noncitizen is able to rebut the presumption. 8 CFR 208.33(b). If the AO

---

[45] CDC, Order Under Sections 362 & 365 of the Public Health Services Act (42 U.S.C. 265, 268): Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists (Mar. 20, 2020), *https://www.cdc.gov/quarantine/pdf/CDC-Order-Prohibiting-Introduction-of-Persons_Final_3-20-20_3-p.pdf.*

[46] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which ''suspend[ed] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19'').

determines that the rebuttable presumption does not apply or the noncitizen has rebutted the presumption, the general procedures governing the credible fear process then apply. *See* 8 CFR 208.33(b)(1)(ii). On the other hand, if the AO determines that the noncitizen is covered by the rebuttable presumption and no rebuttal ground applies, the AO will consider whether the noncitizen has established a reasonable possibility of persecution or torture with respect to the identified country or countries of removal. *See* 8 CFR 208.33(b)(1)(i), (b)(2). The Circumvention of Lawful Pathways rule currently provides that, if a noncitizen has established a reasonable possibility of persecution or torture, then DHS will issue a notice to appear ("NTA") to commence section 240 removal proceedings and may not refer the case to the asylum merits interview process. 8 CFR 208.33(b)(2)(ii).

Where a noncitizen requests review by an IJ, the IJ reviews the negative credible fear finding de novo. *See* 8 CFR 1208.33(b). If the IJ determines that the noncitizen has made a sufficient showing that the rebuttable presumption does not apply to them or that they can rebut the presumption, and that the noncitizen has established a significant possibility of eligibility for asylum, statutory withholding of removal, or CAT protection, the IJ issues a positive credible fear finding and the case proceeds under existing procedures. *See* 8 CFR 208.33(b)(2)(v)(A), 1208.33(b)(2)(i). If the IJ determines that the noncitizen is covered by the rebuttable presumption and it has not been rebutted, but the noncitizen has established a reasonable possibility of persecution or torture, the IJ issues a positive credible fear finding and DHS will issue an NTA to commence section 240 removal proceedings. 8 CFR 208.33(b)(2)(v)(B), 1208.33(b)(2)(ii). And finally, if the IJ issues a negative credible fear determination, the case is returned to DHS for removal of the noncitizen. *See* 8 CFR 208.33(b)(2)(v)(C), 1208.33(b)(2)(ii). In such a circumstance, the noncitizen may not appeal the IJ's decision or request that USCIS reconsider the AO's negative determination, although USCIS may, in its sole discretion, reconsider a negative determination. *See* 8 CFR 208.33(b)(2)(v)(C).

A noncitizen who has not established during expedited removal proceedings a significant possibility of eligibility for asylum because of the Lawful Pathways condition may, if placed in section 240 removal proceedings, apply for asylum, statutory withholding of removal, or CAT protection, or any other form of relief or protection for which the noncitizen is eligible. *See* 8 CFR 1208.33(b)(4). Where a principal asylum applicant in section 240 removal proceedings is eligible for statutory withholding of removal or withholding of removal under the CAT and would be granted asylum but for the rebuttable presumption, and where either an accompanying spouse or child does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant, the presumption shall be deemed rebutted as an exceptionally compelling circumstance. 8 CFR 1208.33(c).

*B. Justification*

1. Global Migration at Record Levels

Border encounters in the 1980s, 1990s, and 2000s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[47] Beginning in the 2010s, a growing share of migrants were from northern Central America[48] and, since the late 2010s, from countries throughout the Americas.[49] Since 2010,

the makeup of border crossers has significantly changed, expanding from Mexican single adults to single adults and families from the northern Central American countries, and now to single adults and families from throughout the hemisphere (and beyond). Those encountered also have been more likely to seek asylum and other forms of relief or protection, straining the Departments' capacity to process individuals through expedited removal.[50]

In the early 2010s, U.S. Border Patrol ("USBP") encounters along the SWB reached modern lows, averaging fewer than 400,000 per year from 2011 to 2018. *See* 88 FR at 11708. This followed decades during which annual USBP encounters routinely numbered in the millions; however, the overall share of those who were processed for expedited removal and claimed a fear never exceeded 2 percent until 2011. *Id.* at 11708, 11716. Despite these historically low encounter numbers, the Departments faced significant challenges in 2014 due to an unprecedented surge in migration by UCs and in 2016 due to a surge in family units at the border— demographics that present unique challenges due to their vulnerability.[51]

From FY 2017 to FY 2019, however, encounters between the POEs along the SWB more than doubled, to more than 850,000, and—following a significant drop during the beginning of the COVID–19 pandemic—continued to increase in FY 2021 and FY 2022.[52] In FY 2021, USBP encounters between POEs along the SWB reached a level not seen since the early 2000s—over 1.6 million.[53] In FY 2022, encounters at the

---

[47] *See* 88 FR at 11708. According to OHSS Persist data and historic Office of Immigration Statistics ("OIS") Yearbooks of Immigration Statistics, Mexican nationals accounted for 87 to over 99 percent of apprehensions between POEs of persons entering without inspection between 1981 and 2010. *See* March 2024 OHSS Persist Dataset; *see, e.g.,* INS, *1981 Statistical Yearbook of the Immigration and Naturalization Service* 119 tbl. 53 (1981); INS, *1999 Statistical Yearbook of the Immigration and Naturalization Service* 208–11 tbl. 56 (Mar. 2002), *https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_1999.pdf*. For more information about Mexican migrants' demographics and economic motivations during some of that time period, see Jorge Durand et al., *The New Era of Mexican Migration to the United States,* 86 J. Am. Hist. 518, 522–27, 530–31, 535–36 (1999).

[48] Northern Central America refers to El Salvador, Guatemala, and Honduras. 88 FR at 11708 n.35.

[49] According to OHSS Persist data, Mexican nationals continued to account for 89 percent of total CBP SWB encounters in FY 2010, with northern Central Americans accounting for 8 percent and all other nationalities accounting for 3 percent. March 2024 OHSS Persist Dataset. Northern Central Americans' share of total CBP SWB encounters increased to 21 percent by FY 2012 and averaged 48 percent from FY 2014 to FY 2019, the last full year before the start of the COVID–19 pandemic. *Id.* Nationals from all other countries except Mexico and the northern Central American countries accounted for an average of 5 percent of total CBP SWB encounters from FY 2010 to FY 2013, and for 10 percent of total encounters from FY 2014 to FY 2019. *Id.* This transition has accelerated since the start of FY 2021, as Mexican nationals accounted for approximately 32 percent of total CBP SWB encounters in FY 2021 through March 2024, including roughly 29 percent in the first six months of FY 2024; northern Central Americans accounted for roughly 25 percent from FY 2021 through March 2024 (20 percent in FY 2024 through March); and all other countries

accounted for roughly 42 percent from FY 2021 through March 2024, including roughly 51 percent of FY 2024 encounters through March 2024. *Id.*

[50] For noncitizens encountered at the SWB from FY 2014 to FY 2019 who were placed in expedited removal proceedings, roughly 6 percent of Mexican nationals made fear claims that were referred to USCIS for determination compared to roughly 57 percent of people from northern Central America and 90 percent of all other nationalities. OHSS analysis of Enforcement Lifecycle data as of December 31, 2023; *see also* 88 FR at 11709 n.37.

[51] Decl. of Blas Nuñez-Neto ¶ 6, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[52] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters).

[53] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters).

**48722** **Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations

SWB reached a new high-water mark, with total USBP encounters exceeding 2.2 million.[54] FY 2023 saw a slight drop, but USBP encounters remained high—over 2.0 million.[55] By early 2023, while the Title 42 public health Order was in place, total encounters at the SWB—referring to the number of times U.S. officials encountered noncitizens attempting to cross the SWB without authorization to do so either between or at POEs—had reached all-time highs.[56] This dramatic increase in encounters has coincided with a substantial and—setting aside the period of time when the Title 42 public health Order was in effect—persistent increase in the number of noncitizens making fear claims in recent years. *See* 88 FR at 11716.[57] In 2019—prior to the implementation of the Title 42 public health Order—44 percent of noncitizens encountered at the SWB placed in expedited removal proceedings claimed fear, resulting in 98,000 credible fear screenings. *Id.* The number of fear

claims returned to these historically high levels after the Title 42 public health Order ended. From May 2023 through March 2024, approximately 54 percent of noncitizens encountered at and between SWB POEs who were subject to expedited removal claimed fear (approximately 169,000 fear claims out of 315,000 noncitizens processed for expedited removal, excluding cases processed for expedited removal but reprocessed into other dispositions by ICE).[58] These high numbers of both encounters and fear claims combine to further compound the significant stress on the immigration system.

Much of this growth in encounters was driven by nationalities that DHS had never before encountered in large numbers at the border—including nationals of countries such as Brazil, Colombia, Cuba, Ecuador, Haiti, Nicaragua, Peru, and Venezuela, as well as migrants from Eastern Hemisphere countries.[59] Because of this, DHS has had to undertake a focused diplomatic effort, working closely with the Department of State, to enter into commitments with countries to facilitate the return of their nationals. However, despite this concerted effort, it remains difficult for DHS to repatriate citizens of some of these countries who do not establish a legal basis to remain in the United States, including those from the Eastern Hemisphere—substantially limiting DHS's ability to impose consequences on those nationals.[60]

Overall, countries other than Mexico and the northern Central American countries of El Salvador, Guatemala, and Honduras accounted for 43 percent of total SWB encounters from January 2021 to March 2024—including 51 percent of total SWB encounters in FY 2023 and in the first two quarters of FY 2024—up from 10 percent from FY 2014

to December 2020.[61] Encounters of Mexican nationals have fallen to 29 percent of total SWB encounters during this time frame—an enormous change from historical trends that has sweeping ramifications for the border and immigration system, which are detailed below.[62]

The increase in migration at the SWB is consistent with global and regional trends. Over the past three years, migration around the world has reached levels not seen since World War II.[63] The Western Hemisphere is no exception and has been facing historic levels of migration that have severely strained the immigration systems of countries throughout the region.[64] There is a growing consensus within the region that this shared challenge cannot be solved without collective action—a consensus reflected by the 22 countries that have supported the Los Angeles Declaration on Migration and Protection, which proposes a comprehensive approach to managing migration throughout the region.[65]

---

[54] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters).

[55] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters).

[56] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters). During the initial seven months of FY 2023, while the Title 42 public health Order was still in effect, total CBP encounters surged to an all-time high of 1.4 million—an 11 percent increase over the same period in FY 2022 and nearly double the encounters recorded in FY 2021 for the same time period.

[57] The percentage of noncitizens encountered at and between SWB POEs processed for expedited removal who made fear claims steadily rose from 16 percent in FY 2013 to 44 percent in FY 2019, experienced a temporary dip in FY 2020 at the start of the Title 42 public health Order, and then resumed an upward trajectory, reaching a peak of 59 percent in FY 2023, marking the highest level of fear claims as a share of the SWB expedited removal population ever recorded. *See* OHSS Enforcement Lifecycle as of December 31, 2023; March 2024 OHSS Persist Dataset. Data on the exact number of noncitizens encountered at the SWB processed for expedited removal who made fear claims is not available for years prior to FY 2013, but OHSS estimates that about 84 percent of all fear claims made in prior years were made by noncitizens encountered at and between SWB POEs. Even if 100 percent of fear claims made before FY 2013 were made by noncitizens encountered at the SWB, the level of fear claims as a share of SWB encounters at and between POEs processed for expedited removal in 2023 would be the highest ever.

[58] OHSS analysis of data downloaded from CBP UIP on April 2, 2024.

[59] Nationals from all countries other than Mexico and the northern Central American countries accounted for less than 5 percent of total CBP SWB encounters each year between FY 1981 and FY 2010, an average of 5 percent of SWB encounters from FY 2010 to FY 2013, and 10 percent of total SWB encounters from FY 2014 to FY 2019. The increase in encounters from these new countries of origin has accelerated since the start of FY 2021, as non-Mexican, non-northern Central American countries accounted for 42 percent of encounters from the start of FY 2021 through the second quarter of FY 2024, including 51 percent of FY 2024 encounters through March 2024. OHSS analysis of historic OIS *Yearbooks of Immigration Statistics* and March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Citizenship").

[60] *See* 88 FR at 11708–11.

[61] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Selected Citizenship").

The application of title 42 authorities at the SWB also altered migratory patterns, in part by incentivizing individuals who were expelled—without being issued a removal order, which, unlike a title 42 expulsion, carries immigration consequences—to try to re-enter, often multiple times. *See* 88 FR at 11709. The majority of repeat encounters were of Mexican and northern Central American nationals, who were much more likely than others to be expelled to the Mexico side of the U.S.-Mexico border—between FY 2020 and FY 2023, 72 percent of Mexican and 50 percent of northern Central American encounters at and between SWB POEs resulted in title 42 expulsion, contrasting sharply with 8 percent of non-Mexican and non-northern Central American encounters experiencing similar outcomes. March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters Book-Outs by Selected Citizenship").

Even accounting for increased repeat encounters, unique encounters at and between SWB POEs also hit all-time highs in each year from FY 2021 to FY 2023. Nationals of countries other than Mexico and the northern Central America countries account for an even larger share of the growth in unique encounters, comprising 51 percent of unique encounters from January 2021 to March 2024, up from 9 percent in FY 2014 to December 2020. March 2024 OHSS Persist Dataset.

[62] March 2024 OHSS Persist Dataset.

[63] Decl. of Blas Nuñez-Neto ¶ 2, *M.A. v. Mayorkas*, No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[64] *See* 88 FR at 11710–11.

[65] *See* The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

As it prepared for the return to title 8 processing of all noncitizens, DHS led a comprehensive, all-of-government planning and preparation effort that lasted more than 18 months.[66] This included record deployments of personnel, infrastructure, and resources to support DHS's frontline personnel at a substantial cost to other DHS operations.[67] This effort also included the development and implementation of policy measures, including the joint DHS and DOJ Circumvention of Lawful Pathways rule and complementary measures, which were critically important components of DHS preparations to manage the anticipated significant influx of migrants associated with the end of the Title 42 public health Order's application at the border.[68] And the United States Government's efforts were complemented by a range of measures taken by foreign partners in the region, such as Mexico's independent decision to continue to accept the return of certain non-Mexican migrants after May 11, 2023,[69] and campaigns by Colombia and Panama to attack smuggling networks operating in the Darién Gap.[70]

The Circumvention of Lawful Pathways rule has strengthened the consequences in place for those who cross the border irregularly and is a critical component of the Government's regional strategy. DHS has also put in place complementary measures to streamline expedited removal processing to more quickly apply consequences to those who fail to use lawful pathways. These measures include holding noncitizens processed for expedited removal for the pendency of their credible fear interviews in CBP facilities to maximize the use of expedited removal and limit noncitizens absconding;[71] changing the consultation period such that credible fear interviews take place no earlier than 24 hours after the noncitizen's acknowledgment of receipt of information explaining the credible fear process;[72] returning certain third-country nationals to Mexico, consistent with established processes under the INA;[73] permitting certain non-Mexican citizens to withdraw their application for admission and voluntarily return to Mexico;[74] and increasing USCIS's capacity to train and prepare additional staff temporarily detailed as AOs to conduct credible fear interviews.[75] These measures, combined with existing processes and resources and work with regional and international partners to disrupt irregular migration and smuggling networks, seek to form a comprehensive framework for managing migratory flows to the border—one that seeks to disincentivize noncitizens from putting their lives in the hands of callous smugglers by crossing the SWB between POEs and to incentivize noncitizens to use lawful, safe, and orderly pathways and processes instead.

Without the Circumvention of Lawful Pathways rule and complementary measures, DHS assesses that irregular migration at the border would be substantially higher today. DHS saw evidence of very high levels of irregular migration in the days leading up to the end of the Title 42 public health Order on May 11, 2023.[76] A historic surge in migration culminated with what were then the highest recorded encounter levels in U.S. history over the days immediately preceding May 11, which placed a significant strain on DHS's operational capacity at the border.[77] Encounters between POEs almost doubled from an average of approximately 4,900 per day the week ending April 11, 2023, to an average of approximately 9,500 per day the week ending May 11, 2023, including an average of approximately 10,000 encounters immediately preceding the termination of the Title 42 public health Order (from May 8 to May 11).[78] The

sharp increase in encounters between POEs during the 30 days preceding May 11 represented the largest month-over-month increase in almost two decades—since January 2004.[79]

As a consequence of the elevated flows USBP experienced in the days leading up to the end of the Title 42 public health Order, USBP saw a steady increase in the numbers of noncitizens in custody, leading to significant operational challenges.[80] From May 8 to 11, 2023, USBP's daily in-custody average was approximately 27,000 noncitizens, with a single-day peak of approximately 28,500 on May 10—well above its holding capacity at that time of approximately 18,500.[81] During this same time frame, eight out of nine SWB sectors were over their holding capacity—with four sectors (El Centro, El Paso, Rio Grande Valley, and Yuma) at more than 50 percent over their holding capacity and one sector (Tucson) at more than two-and-a-half times over its holding capacity.[82]

This record number of encounters between POEs severely strained DHS operations and resources, as well as the resources of other Federal Government agencies, local communities, and non-governmental organizations ("NGOs").[83] CBP redirected limited resources from other mission needs—in particular, legitimate travel and trade operations, the volume of which by that time had surpassed pre-pandemic levels—to focus on processing apprehended noncitizens.[84] Overcrowding in CBP facilities increased the potential for health and safety risks to noncitizens, Government personnel, and contract support staff. Such risks were exacerbated by an increase in the average time in custody, which generally occurs when there are large numbers of noncitizens in custody who must be processed.[85] To manage these conditions, USBP sectors redirected personnel from the field to perform tasks for noncitizens in custody, including processing, transporting, and escorting noncitizens.[86] This, in turn, decreased USBP's ability to respond to noncitizens avoiding detection, other agency calls for assistance, and noncitizens in distress.[87]

The surge in encounters between POEs immediately preceding the end of the Title 42 public health Order also led

[66] Decl. of Blas Nuñez-Neto ¶ 8, *E. Bay Sanctuary Covenant* v. *Biden*, No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[67] *Id.*

[68] *Id.*

[69] The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[70] Decl. of Blas Nuñez-Neto ¶ 40, *M.A.* v. *Mayorkas*, No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[71] *Id.* ¶ 5.

[72] *Id.*

[73] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (noting the United States and Mexico's commitment to increase joint actions to counter human smugglers and traffickers, address root causes of migration, and continue to combine expanded lawful pathways with consequences for irregular migration, and noting that Mexico will continue to accept back migrants on humanitarian grounds).

[74] Decl. of Blas Nuñez-Neto ¶ 5, *M.A.* v. *Mayorkas*, No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[75] *Id.*

[76] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden*, No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2); Decl. of Matthew J. Hudak ¶ 11, *Florida* v. *Mayorkas*, No. 22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[77] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden*, No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[78] *Id.*

[79] *Id.*

[80] *Id.* ¶ 10.

[81] *Id.*

[82] *Id.*

[83] *Id.* ¶ 11.

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Id.*

to significant challenges for local border communities.[88] For example, in the days leading up to May 11, 2023, local community resources in El Paso, Texas, were quickly overwhelmed as the number of noncitizens arriving in the United States surpassed the city's capacity.[89] In anticipation of an influx of noncitizens arriving to the city—an influx that ultimately materialized—the city declared a state of emergency, as more than 1,000 noncitizens were sleeping on the sidewalks and left without shelter.[90] Similarly, the cities of Brownsville and Laredo, Texas, declared states of emergency to allow them to seek additional resources to bolster their capacities.[91] The surge in encounters also placed strain on interior cities. In May 2023, for instance, New York's Governor declared a State Disaster Emergency.[92]

Since their implementation in May 2023, the Circumvention of Lawful Pathways rule and complementary measures have helped DHS to better manage migratory flows. Between May 12, 2023, and March 31, 2024, CBP placed into expedited removal more than 970 individuals encountered at and between POEs each day on average, and USCIS conducted a record number of credible fear interviews (more than 152,000) resulting from such cases. This is more interviews from SWB encounters at and between POEs during the span of ten and a half months than in any full fiscal year prior to 2023, and more than twice as many as the annual average from FY 2010 to FY 2019.[93] On average, since May 12, 2023, USCIS has completed approximately 3,300 cases each week, more than double its average weekly completed cases from FY 2014 to FY 2019.[94] In addition, in FY 2023, IJs conducted over 38,000 credible fear and reasonable fear reviews, the highest figure on record since at least 2000.[95]

These efforts have significantly reduced the median time to process credible fear cases. Since May 12, 2023, the median time to refer noncitizens claiming a fear for credible fear interviews decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative fear determinations, the median time from encounter to removal, in the same time frames, decreased by 85 percent from 73 days to 11 days.[96]

The increase in referrals into expedited removal proceedings, combined with the streamlining of the process, has had tangible results. From May 12, 2023, to March 31, 2024, DHS removed more than 662,000 individuals—more removals than in any full fiscal year since 2013 and an indication that the increased efficiencies gained through these measures have enabled DHS to swiftly impose immigration consequences when individuals do not establish a legal basis to remain in the United States.[97] Over the first six months immediately following May 12, 2023, DHS saw a significant decrease in border encounters between POEs. After peaking at 9,700 per day in the seven days just before the end of the Title 42 public health Order, daily SWB encounters between POEs decreased by 45 percent to an average of 5,200 per day for the period from May 12, 2023, to November 30, 2023.[98] While this months-long trend included variability over shorter periods, border encounters between POEs remained below the levels projected to occur in the absence of the

Circumvention of Lawful Pathways rule and complementary measures.[99]

While the Circumvention of Lawful Pathways rule and complementary measures have yielded demonstrable results, the resources provided to the Departments still have not kept pace with irregular migration.

After months of relatively lower encounter levels between POEs following the changes put in place after May 11, 2023, encounter levels increased through the fall of 2023,[100] and December 2023 saw the highest levels of encounters between POEs in history, including a surge in which border encounters between POEs exceeded 10,000 for three consecutive days and averaged more than 8,000 a day for the month.[101] That surge in migration was focused increasingly on western areas of the border—California and Arizona—that had not been the focal point of migration over the prior two years, and in areas that are geographically remote and challenging to respond to. For instance, the Tucson sector's average full-year encounter total for the pre-pandemic period (FY 2014 to FY 2019) was approximately 62,000; by contrast, in November and December of 2023, the sector recorded approximately 64,000 and 80,000 encounters, respectively.[102] And while the number of encounters between POEs since December 2023 has decreased, consistent with seasonal migration flows and as a result of increased enforcement, they still remain at historically high levels—USBP encounters from January 2024 to March 2024 are just 5 percent below the levels

[88] *Id.* ¶ 12.

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] *See* N.Y. Exec. Order No. 28, Declaring a Disaster Emergency in the State of New York (May 9, 2023), *https://www.governor.ny.gov/executive-order/no-28-declaring-disaster-emergency-state-new-york; see also* Mayor of Chicago Emergency Exec. Order No. 2023–2 (May 9, 2023).

[93] Pre-May 12, 2023, data from OHSS Lifecycle Dataset; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

[94] Completed cases are those with credible fear interviews that have been adjudicated or that have been closed. Pre-May 12, 2023, data from OHSS Lifecycle Dataset; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

[95] EOIR, *Adjudication Statistics: Credible Fear and Reasonable Fear Review Decisions* (Apr. 27, 2023), *https://www.justice.gov/eoir/media/1344816/dl?inline.*

[96] Historic processing times are based on OHSS Enforcement Lifecycle data as of December 31, 2023; post-May 12 estimates are based on OHSS analysis of operational CBP, ICE, USCIS, and DOJ/EOIR data downloaded from UIP on April 2, 2024. Encounter-to-removal cases include noncitizens removed after being placed in expedited removal proceedings, claiming fear, and receiving a negative fear determination or an administrative closure that is not referred to EOIR. Comparisons to the pandemic period are not relevant because many noncitizens who normally would have been referred for expedited removal processing were instead expelled under title 42 authority.

[97] OHSS analysis of data downloaded from UIP on April 2, 2024; *see* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (noncitizen removals, returns, and expulsions for FY 1892 to FY 2022).

[98] Pre-May 12, 2023, data from March 2024 OHSS Persist Dataset; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on December 12, 2023.

[99] Decl. of Blas Nuñez-Neto ¶ 4, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2) (noting that in the absence of the rule, DHS planning models suggest that irregular migration could meet or exceed the levels that DHS recently experienced in the days leading up to the end of the Title 42 public health Order).

[100] *See* CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last visited May 27, 2024) (providing monthly figures for 2021 to 2024).

[101] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2024-02/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf;* Priscilla Alvarez, *Authorities Encountering Record Number of Migrants at the Border Each Day Amid Unprecedented Surge,* CNN (Dec. 22, 2023), *https://www.cnn.com/2023/12/22/politics/border-border-surge-record-amounts/index.html.*

[102] *See* March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Sector").

reached during the same months in 2023,[103] while some USBP sectors, such as Tucson and San Diego, have seen increases of 83 percent and 62 percent, respectively, from the second quarter of FY 2023, and Tucson is on pace for an all-time high number of annual encounters.[104]

Since the lifting of the Title 42 public health Order, then, it has become increasingly clear that DHS's ability to process individuals encountered at the SWB under applicable title 8 authorities—including, critically, to deliver timely consequences to a meaningful proportion of those who do not establish a legal basis to remain in the United States—is significantly limited by the lack of resources and tools available to the Departments. In response to the record high levels of encounters between POEs in December 2023, DHS had to take extraordinary steps to shift personnel and resources to the affected sectors: CBP curtailed or suspended operations at a number of POEs, and, just before December 25, 2023, CBP reassigned 246 officers to support USBP operations. As part of these extraordinary measures: vehicular traffic through the Eagle Pass, Texas, POE was suspended on November 27, 2023; the POE in Lukeville, Arizona, was closed on December 4, 2023; rail operations at POEs in El Paso and Eagle Pass, Texas, were suspended on December 18, 2023;[105] the Morley Gate POE in Nogales, Arizona, which was closed due to construction and slated to be reopened in November 2023, delayed its reopening;[106] and operations at Pedestrian West, part of the San Ysidro POE in San Diego, California, were suspended on December 9, 2023.[107] On

January 4, 2024, once the volume of migrants had diminished and CBP officers were able to return to normal duties, port operations in these locations resumed.[108]

The decision to close POEs was not one taken lightly. The United States Government fully understands the impacts of such closures on local communities on both sides of the border, both socially and economically.[109] Closing international POEs is a measure of last resort, and one that DHS was compelled to take in order to reassign its resources to support frontline agents in a challenging moment.

In addition to concerted efforts to strengthen and maximize consequences, including through new regulations, the United States Government has engaged intensively with the Government of Mexico to identify coordinated measures both countries could take, as partners, to address irregular migration. During the period before and after the December surge, the United States Government and the Government of Mexico held numerous talks at the highest levels of government to address migration. For example, President Biden and President of Mexico Andrés Manuel López Obrador spoke on December 21, 2023, and February 3, 2024.[110] During their conversation on December 21, the presidents agreed that additional enforcement actions were urgently needed so that the POEs that were temporarily closed could reopen.[111] In

subsequent high-level meetings, both countries committed to expanding efforts to increase enforcement measures to deter irregular migration, expanding safe and lawful pathways, and strengthening cooperation.[112] The Government of Mexico expressed its concern about the economic impact of the POE closures and committed to increasing enforcement on key transit routes north.[113] On January 22, 2024, after a series of follow-up meetings between United States and Mexican Cabinet members in Washington, DC, Mexico's Foreign Secretary enumerated a series of steps that the United States and Mexico committed to taking to continue to address migration, including combating human smuggling and trafficking organizations.[114]

DHS assesses that the surge in late 2023 was likely the result of a number of factors, including the growing understanding by smugglers and migrants that DHS's capacity to impose consequences at the border is limited by the lack of resources and tools that Congress has made available and the Government of Mexico's operational constraints at the end of its fiscal year, which limited its ability to enforce its own immigration laws.[115] The

---

[103] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Sector").

[104] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Sector").

[105] *See* CBP, *Statement from CBP on Operations in Eagle Pass, Texas and Lukeville, Arizona* (Nov. 27, 2023), *https://www.cbp.gov/newsroom/national-media-release/statement-cbp-operations-eagle-pass-texas-and-lukeville-arizona.*

[106] *See* CBP, *Statement on Operational Changes and Resumption of Rail Operations in Eagle Pass and El Paso* (Dec. 22, 2023), *https://www.cbp.gov/newsroom/national-media-release/statement-cbp-operational-changes-and-resumption-rail-operations.*

[107] *See* CBP, *Statement from CBP on Operations in San Diego, California* (Dec. 7, 2023), *https://www.cbp.gov/newsroom/national-media-release/statement-cbp-operations-san-diego-california.*

[108] *See* CBP, *Statement from CBP on Resumption of Operations in Arizona, California, and Texas* (Jan. 2, 2024), *https://www.cbp.gov/newsroom/national-media-release/statement-cbp-resumption-field-operations-arizona-california-and/.*

[109] *See, e.g.,* Russel Contreras, *U.S.-Mexico Border Closures Could Cost Billions,* Axios (Dec. 22, 2023), *https://www.axios.com/2023/12/22/us-mexico-border-closures-could-cost-billions* (discussing evidence of the "devastating consequences" that follow from partial border closings); *cf.* Bryan Roberts et al., *The Impact on the U.S. Economy of Changes in Wait Times at Ports of Entry: Report to U.S. Customs and Border Protection* 5 (Apr. 2013), *https://ebir.info/wp-content/uploads/2014/07/U.S.C.-Create-CBP-Final-Report.pdf* (discussing the benefits of adding staffing to land border POEs).

[110] *See* The White House, *Readout of President Joe Biden's Call with President Andrés Manuel López Obrador of Mexico* (Dec. 21, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/12/21/readout-of-president-joe-bidens-call-with-president-andres-manuel-lopez-obrador-of-mexico-2/;* The White House, *Readout of President Joe Biden's Call with President Andrés Manuel López Obrador of Mexico* (Feb. 3, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/03/readout-of-president-joe-bidens-call-with-president-andres-manuel-lopez-obrador-of-mexico-3/.*

[111] The White House, *Readout of President Joe Biden's Call with President Andrés Manuel López Obrador of Mexico* (Dec. 21, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/12/21/readout-of-president-joe-bidens-call-with-president-andres-manuel-lopez-obrador-of-mexico-2/.*

[112] The White House, *Readout of Homeland Security Advisor Dr. Liz Sherwood-Randall's Trip to Mexico* (Feb. 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/07/readout-of-homeland-security-advisor-dr-liz-sherwood-randalls-trip-to-mexico/.*

[113] *Id.; see also, e.g.,* Amna Nawaz, *Mexico's Foreign Secretary Discusses What Her Country Is Doing to Ease Border Crisis,* PBS News Hour (Jan. 25, 2024), *https://www.pbs.org/newshour/show/mexicos-foreign-secretary-discusses-what-her-country-is-doing-to-ease-border-crisis; US, Mexico Agree to Strengthen Efforts to Curb Record Migration,* Reuters (Dec. 28, 2023), *https://www.reuters.com/world/us-mexico-keep-border-crossings-open-lopez-obrador-says-2023-12-28/.*

[114] *See, e.g.,* Valentine Hilaire & Cassandra Garrison, *Mexico, US Pitch Measures to Ease Pressure on Border, Plan Guatemala Talks,* Reuters (Jan. 22, 2024), *https://www.reuters.com/world/americas/mexico-us-guatemala-officials-meet-migration-talks-2024-01-22/;* Amna Nawaz, *Mexico's Foreign Secretary Discusses What Her Country Is Doing to Ease Border Crisis,* PBS News Hour (Jan. 25, 2024), *https://www.pbs.org/newshour/show/mexicos-foreign-secretary-discusses-what-her-country-is-doing-to-ease-border-crisis* (quoting Mexico's Foreign Affairs Secretary as saying that "we have done much more law enforcement to bring down the pressure in the border in the north").

[115] *See* María Verza, *Mexico Halts Deportations and Migrant Transfers Citing Lack of Funds,* AP News (Dec. 4, 2023), *https://apnews.com/article/mexico-immigration-migrants-venezuela-17615ace23d0677bb44d8386e254fbc; Smugglers Are Bringing Migrants To a Remote Arizona Crossing, Overwhelming Agents,* NPR (Dec. 10, 2023), *https://www.npr.org/2023/12/10/1218428530/smugglers-are-bringing-migrants-to-a-remote-arizona-crossing-overwhelming-agents;*

Continued

Departments cannot address all of these factors in one rule, but assess that this rule will significantly increase the ability to deliver timely decisions and timely consequences at the border within current resources, combating perceptions and messaging to the contrary.

Encounters between POEs in January 2024 were substantially lower than December 2023 encounters, consistent with historic seasonal trends, and encounters in January 2022 and January 2023.[116] In February and March 2024, encounter levels increased from the levels in January but remained significantly lower than in December 2023.[117] Overall, from January 1 to March 31, 2024, encounters between POEs were 5 percent lower than during the same months in 2023 and 22 percent lower than those in 2022.[118] However, despite the overall decrease in encounters since December 2023, specific areas of the border—in particular USBP's San Diego and Tucson Sectors—have experienced localized increases in encounters that have, at times, strained DHS's holding capacity, adversely impacted local operations, and limited DHS's ability to swiftly impose consequences on individuals who do not establish a legal basis to remain in the United States. During the last week of April 2024, USBP's San Diego Sector encountered an average of more than 1,400 migrants each day, including many migrants from countries outside the Western Hemisphere who are more difficult to process.[119] The USBP Tucson Sector is experiencing similar, unprecedented migratory flows and consequent challenges. This high concentration of encounters, including comparatively large numbers of migrants who are hard to remove, in a focused geographic area places particular strain on the immigration enforcement system. This is particularly true in areas of the border—such as San Diego—where infrastructure-related capacity constraints limit DHS's ability to swiftly

impose consequences at the border. These factors resulted in USBP's main processing facility in San Diego reaching over 200 percent capacity in April 2024, despite a recent expansion of this facility.

Since January 2024, the United States and Mexico have continued to hold regular, high-level conversations, as partners, to continue to deepen their collaboration, identify emerging trends, and coordinate additional steps by both countries to address changing flows. These meetings have informed operational deployments by both governments, including the coordinated response to the shift in migratory flows to the San Diego and Tucson sectors. This extensive ongoing collaboration was reflected by another bilateral engagement between President Biden and President López-Obrador on April 28, 2024, after which the presidents released a joint statement in which they "ordered their national security teams to work together to immediately implement concrete measures to significantly reduce irregular border crossings while protecting human rights."[120]

Since then, the United States and the Government of Mexico have worked together, cooperatively, to increase enforcement.[121] But these efforts—while significant—are likely to be less effective over time. Smuggling networks are adaptable, responding to changes put in place. Despite their immediate effectiveness, such changes are not enough—and will almost certainly have diminished effect over time. The reality is that the scale of irregular migration over the past two years has strained the

funding, personnel, and infrastructure of both countries' immigration enforcement systems in ways that have, at times, contributed to high encounters between POEs.

2. Need for These Measures

DHS projects that, absent the policy changes being promulgated here, irregular migration will once again increase, and that any disruption in Mexican enforcement will only exacerbate that trend. Without the Proclamation and this rule, the anticipated increase in migration will, in turn, worsen significant strains on resources already experienced by the Departments and communities across the United States.

Current trends and historical data indicate that migration and displacement in the Western Hemisphere will continue to increase as a result of violence, persecution, poverty, human rights abuses, the impacts of climate change, and other factors. The case of migration through the Darién jungle between Colombia and Panama is illustrative. For example, between January and April, 2024, the United Nations High Commissioner for Refugees ("UNHCR") tracked 139,000 irregular entries, up from 128,000 for the same months in 2023 and a seven-fold increase over migration levels during that period in 2022.[122] The number of migrants crossing the Darién will only further increase the pressure on Mexico at its southern border and on the United States at the SWB.

Past unprecedented migration surges bolster the Departments' views and the need for this rulemaking. As described in detail in Section III.B.1 of this preamble, migration trends have been steadily increasing in scope and complexity, featuring increasingly varied nationalities and demographic groups. This has been true even as DHS has experienced sustained levels of historically high encounter levels. Over the past two years, an increasing proportion of total CBP encounters at the SWB has been composed of families and UCs, and DHS has seen record flows of migrants from countries outside of northern Central America.[123] These

Adam Isaacson, *Weekly U.S.-Mexico Border Update: Senate Negotiations, Migration Trends*, Washington Office of Latin America (Dec. 15, 2023), *https://www.wola.org/2023/12/weekly-u-s-mexico-border-update-senate-negotiations-migration-trends/*; Jordan, *supra* note 27.

[116] OHSS analysis of March 2024 OHSS Persist Dataset.

[117] OHSS analysis of March 2024 OHSS Persist Dataset.

[118] OHSS analysis of March 2024 OHSS Persist Dataset.

[119] *See* Elliot Spagat, *The Latest Hot Spot for Illegal Border Crossings is San Diego. But Routes Change Quickly*, AP News (May 17, 2024), *https://apnews.com/article/san-diego-border-asylum-biden-mexico-da1e7b7c81e4e58912deff6d36dbdb9e*.

[120] *See* The White House, *Joint Statement by the President of the United States Joe Biden and the President of Mexico Andrés Manuel López Obrador* (Apr. 29, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/29/joint-statement-by-the-president-of-the-united-states-joe-biden-and-the-president-of-mexico-andres-manuel-lopez-obrador*.

[121] *See* Valerie Gonzalez & Elliot Spagat, *The US Sees a Drop in Illegal Border Crossings After Mexico Increases Enforcement*, AP News (Jan. 7, 2024), *https://apnews.com/article/mexico-immigration-enforcement-crossings-drop-b67022cf0853dca95a8e0799bb99b68a*; Luke Barr, *US Customs And Border Protection Reopening 4 Ports of Entry After Migrant Surge Subsides*, ABC News (Jan. 2, 2024), *https://abcnews.go.com/US/us-customs-border-protection-reopening-4-ports-entry/story?id=106062555*; Seung Min Kim, *US and Mexico Will Boost Deportation Flights and Enforcement to Crack Down on Illegal Immigration*, AP News (Apr. 30, 2024), *https://apnews.com/article/joe-biden-andres-manuel-lopez-obrador-mexico-immigration-border-c7e694f7f104ee0b87b80ee859fa2b9b*; Julia Ainsley & Chloe Atkins, *Mexico Is Stopping Nearly Three Times as Many Migrants Now, Helping Keep U.S. Border Crossings Down*, NBC News (May 15, 2024), *https://www.nbcnews.com/politics/immigration/mexico-stopping-three-times-as-many-migrants-as-last-year-rcna146821*.

[122] The UNHCR tracked 20,000 irregular entries in the Darién gap in 2022. OHSS analysis of downloaded from UNHCR Operational Data Portal, *Darien Panama: Mixed Movements Protection Monitoring—January–December 2023*, *https://data.unhcr.org/en/documents/details/105569* (last visited May 31, 2024); *Darien Panama: Mixed Movements Protection Monitoring—April 2024*, *https://data.unhcr.org/en/documents/details/108399* (last visited May 31, 2024).

[123] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, *https://www.dhs.gov/*

international migration trends are the result of exceedingly complex factors and are shaped by, among other things, family and community networks, labor markets, environmental and security-related push factors, and rapidly evolving criminal smuggling networks.[124] The United States Government is working to address these root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[125] including through working closely with partner countries across the Western Hemisphere.[126] But these efforts will take time to have significant impacts and will not alleviate the stress that the border security and immigration systems are currently experiencing, as described in the Proclamation.

The Departments' views and the need for this rulemaking are further supported by projections developed from ongoing work by DHS's Office of Homeland Security Statistics ("OHSS"), which leads an interagency working group that produces encounter projections used for operational planning, policy development, and short-term budget planning. OHSS uses a mixed-method approach that combines a statistical predictive model with subject matter expertise intended to provide informed estimates of future migration flow and trends. The mixed-methods approach blends multiple types of models through an ensemble approach of model averaging.[127] The

model includes encounter data disaggregated by country and demographic characteristics, data on apprehensions of third-country nationals by Mexican enforcement agencies, and economic data. DHS uses the encounter projection to generate a range of planning models, which can include "low" planning models that are based on the lower bound of the 95 percent forecast interval, "moderate" planning models that are based on the upper bound of the 68 percent forecast interval, and "high" planning models based on the upper bound of the 95 percent forecast interval. These planning models account for changes in effectiveness of current enforcement and lawful migration processes.[128]

Because of the significant time and operational cost it takes to redeploy resources, DHS is generally conservative in its enforcement planning. 88 FR at 31328. As a result, it focuses on its higher planning models as it projects future resource deployments to avoid using more optimistic scenarios that could leave enforcement efforts badly under-resourced. *Id.* The current internal projections, based on this robust modeling methodology, suggest that encounters may once again reach extremely elevated levels in the weeks to come, averaging in the three months from July to September, 2024, in the range of approximately 3,900 to approximately 6,700 encounters at and between POEs per day, not including an additional 1,450 noncitizens per day who are expected to be encountered at POEs after making appointments though the CBP One app.[129] The Departments believe the policies in this rule are

justified in light of high levels of migration that have ultimately proved persistent even in the face of new policies that have resulted in processing migrants with record efficiency, as evidenced by the migration patterns witnessed in December 2023. Current sustained, high encounter rates exceed the border security and immigration systems' capacity to effectively and safely process, detain, and remove, as appropriate, all migrants who are encountered.[130] This is generally true when considering total encounters across the entire SWB, and even more the case when specific sectors along the border are targeted by smuggling organizations with focused localized surges in encounters—as has been happening since the late fall in Tucson, Arizona, which accounted for 35 percent of SWB encounters between POEs in the second quarter of FY 2024, up from 18 percent in FY 2023 and 13 percent in FY 2022.[131]

Despite the fact that the average of 4,400 daily encounters between POEs in the second quarter of FY 2024 is below the highs experienced in the days immediately preceding the end of the Title 42 public health Order and in December 2023,[132] daily encounter numbers remain sufficiently high—especially in the locations where encounters have been extremely elevated, such as California and Arizona—that the numbers significantly impact the operational flexibility required to process individuals in a timely and consequential manner.[133]

---

*ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SWB Encounters by Agency and Family Status" and "SWB Encounters by Citizenship and Family Status").

[124] *See* 88 FR at 31327–28 & n.59.

[125] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (committing to addressing root causes of migration).

[126] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration On Migration and Protection in Guatemala* (May 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala.*

[127] Blending multiple models and basing predictions on prior data has been understood to improve modeling accuracy. *See, e.g.,* Spyros Makridakis et al., *Forecasting in Social Settings: The State of the Art,* 36 Int'l J. Forecasting 15, 16 (2020) (noting that it has "stood the test of time . . . that combining forecasts improves the [forecast] accuracy"); The Forecasting Collaborative, *Insights into the Accuracy of Social Scientists' Forecasts of Societal Change,* 7 Nat. Hum. Behaviour 484 (2023), *https://doi.org/10.1038/s41562-022-01517-1* (comparing forecasting methods and suggesting that forecasting teams may materially improve accuracy by, for instance, basing predictions on prior data and including scientific experts and

multidisciplinary team members). DHS notes that the complexity of international migration limits DHS's ability to precisely project border encounters under the best of circumstances. The current period is characterized by greater than usual uncertainty due to ongoing changes in the major migration source countries (*i.e.,* the shift in demographics of those noncitizens encountered by DHS), the growing impact of climate change on migration, political instability in several source countries, the evolving recovery from the COVID–19 pandemic, and uncertainty generated by border-related litigation, among other factors. *See* 88 FR at 31316 n.14.

[128] OHSS Southwest Border Encounter Projection, April 2024.

[129] OHSS Encounter Projections, April 2024. Note that the OHSS encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (*i.e.,* encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023, based on OHSS analysis of March 2024 OHSS Persist Dataset. *See also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.*

[130] *See, e.g.,* Decl. of Blas Nuñez-Neto ¶ 8, *M.A.* v. *Mayorkas,* No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[131] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables—October 2023, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Sector").

[132] March 2024 OHSS Persist Dataset. As noted *supra* note 5, preliminary April data show SWB encounters between POEs fell slightly, by 6 percent, between March and April. OHSS analysis of data obtained from CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last accessed May 24, 2024). The preliminary April data are best understood to reflect a continuation of the general pattern described elsewhere in this rule.

[133] The Tucson Sector accounted for 35 percent of USBP encounters in the second quarter of FY 2024, up from 18 percent in FY 2023 and 13 percent in FY 2022. OHSS analysis of March 2024 OHSS Persist Dataset; *see also* CBP, *Southwest Land Border Encounters (By Component), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters-by-component* (last modified May 15, 2024). Border encounters typically fall around the New Year and often remain lower than other months in January. *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/*

Continued

When capacity is strained like this in specific locations along the border, it becomes even more difficult for the Departments to deliver timely decisions and timely consequences. At increased levels of encounters and without a change in policy, most non-Mexicans processed for expedited removal under title 8 would likely establish a credible fear and remain in the United States for the foreseeable future despite the fact that most of them will not ultimately be granted asylum, assuming results are similar to historic rates,[134] a scenario that would likely continue to incentivize an increasing number of migrants to journey to the United States and further increase the likelihood of sustained high encounter rates.

Even in times with sustained lower encounter volumes, such as between 2011 and 2017, the Departments experienced challenging situations, including the first surge in UCs in 2014, that severely strained the United States Government's capacity.[135] Surges in encounters at the southern border—both at and between POEs—are now occurring more frequently and at higher magnitudes, and featuring more diverse demographics and nationalities than ever before.[136] These surges affect more

CBP sectors along the border, disrupt operations more quickly, and affect readiness in other critical areas as DHS diverts resources, including front-line agents, from other urgent tasks and geographic areas.[137] These actions, in turn, impact other critical mission sets, including processing lawful trade and travel at POEs.[138]

DHS continues to lack the necessary funding and resources to deliver timely consequences to the majority of noncitizens encountered given the increased level of encounters it is experiencing at the SWB.[139] On August 10, 2023, the Administration submitted to Congress a request for $2.2 billion in supplemental funding for border operations, including $1.4 billion for CBP and $714 million for ICE for border management and enforcement and an additional $416 million for counter-fentanyl efforts.[140]

On October 20, 2023, the Administration submitted to Congress a second request for supplemental funding for DHS, which would provide funding to enhance enforcement and processing, procure and operationalize needed technologies, and hire additional personnel.[141] This funding

would further support critical border enforcement efforts, including:

• An additional 1,300 Border Patrol Agents to work alongside the 20,200 agents proposed in the President's FY 2024 budget request, as well as 300 Border Patrol Processing Coordinators and support staff;[142]

• An additional 1,600 AOs and associated support staff to process migrant claims, which would provide USCIS with the critical resources needed to expand its current credible fear interview capacity to support timely processing of those placed in expedited removal;[143] and

• An expansion of detention beds and ICE removal flight funding to sustain the current significantly increased use of expedited removal, provide necessary surge capacity, and allow DHS to process more expeditiously noncitizens who cross the SWB unlawfully and swiftly remove those without a legal basis to remain in the United States.[144]

On January 31, 2024, DHS published a new USCIS fee schedule, effective April 1, 2024, that adjusted the fees to fully recover costs and maintain adequate service. *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 89 FR 6194, 6194 (Jan. 31, 2024); U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; Correction, 89 FR 20101 (Mar. 21, 2024) (making corrections). Because there is

---

enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("Nationwide CBP Encounters by Encounter Type and Region"). Thus, while CBP's apprehension of 402,000 noncitizens between POEs in the second quarter of FY 2024 is slightly lower than the 424,000 observed in FY 2023 and 518,000 in FY 2022, it is almost four times as high as the pre-pandemic second-quarter average for FY 2014 through FY 2019, and with the exceptions of FY 2022 and FY 2023 the highest second-quarter count recorded since FY 2001. Even with the downturn between January and March, 2024, the high volume of encounters and challenging demographic mix still meant that most noncitizens processed by USBP were released from custody into the United States (including noncitizens enrolled in an ICE Alternatives to Detention program and those paroled by the Office of Field Operations). OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables,* https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters Book-Outs by Agency").

[134] Since May 12, 2023, 60 percent of non-Mexican noncitizen SWB encounters (at and between POEs) processed for expedited removal who have made fear claims have been referred to EOIR for immigration proceedings. OHSS analysis of data downloaded from UIP on April 2, 2024. But based on historic (pre-pandemic) data, only 18 percent of non-Mexican noncitizens processed for expedited removal that are referred to EOIR result in an individual being granted relief or protection from removal once the case is completed. OHSS Enforcement Lifecycle December 31, 2023.

[135] OHSS, *Immigration Enforcement and Legal Processes Monthly Tables,* https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Family Status").

[136] OHSS, *Immigration Enforcement and Legal Processes Monthly Tables,* https://www.dhs.gov/

ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Family Status" and "CBP SW Border Encounters by Agency and Selected Citizenship"); *The Unaccompanied Children Crisis: Does the Administration Have a Plan to Stop the Border Surge and Adequately Monitor the Children?: Hearing Before the S. Comm. On the Judiciary,* 114th Cong. (2016) (statement of Ronald Vitiello, Acting Chief of USBP), *https://www.judiciary.senate.gov/imo/media/doc/02-23-16%20Vitiello%20Testimony.pdf*; Memorandum on the Response to the Influx of Unaccompanied Alien Children Across the Southwest Border, 1 Pub. Papers of Pres. Barack Obama 635, 635 (June 2, 2014).

[137] *See, e.g.,* Decl. of Raul L. Ortiz ¶¶ 11–12, *Florida* v. *Mayorkas,* No. 23–11644 (11th Cir. May 19, 2023) (Dkt. 3–2).

[138] *See, e.g.,* Decl. of Raul L. Ortiz ¶¶ 11–12, *Florida* v. *Mayorkas,* No. 23–11644 (11th Cir. May 19, 2023) (Dkt. 3–2); Decl. of Blas Nuñez-Neto ¶ 32, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[139] Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, OMB, at 2–3 (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf*; The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.*

[140] *See* Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, OMB, at 2–3, attach. at 45–50 (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf.*

[141] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical*

National Security Priorities (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.*

[142] *See* DHS, *Fact Sheet: Biden-Harris Administration Supplemental Funding Request* (Oct. 20, 2023), *https://www.dhs.gov/news/2023/10/20/fact-sheet-biden-harris-administration-supplemental-funding-request;* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.*

[143] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.*

[144] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/;* DHS, *Fact Sheet: Biden-Harris Administration Supplemental Funding Request* (Oct. 20, 2023), *https://www.dhs.gov/news/2023/10/20/fact-sheet-biden-harris-administration-supplemental-funding-request.*

no fee required to file an asylum application or for protection screenings, 8 CFR 106.2(a)(28), and because Congress has not provided other funds to pay for the operating expenses of the Asylum Division,[145] fees generated from other immigration applications and petitions must be used to pay for these expenses. *See* INA 286(m), 8 U.S.C. 1356(m). While the new fee rule does provide for increased funding for the Refugee, Asylum, and International Operations Directorate,[146] keeping pace with USCIS's protection screening and affirmative asylum workloads requires additional funding, as reflected in the President's FY 2025 Budget.[147] Raising fees on other applications and petitions to cover the $755 million that would be required to hire and support the additional 1,600 AOs called for in the President's 2025 FY Budget [148] would impose a burden on other filers.

In early February 2024, a bipartisan group of Senators proposed reforms of the country's asylum laws that would have provided new authorities to significantly streamline and speed up immigration enforcement proceedings and immigration adjudications for individuals encountered at the border, including those who are seeking protection, while preserving principles of fairness and humane treatment.[149] Critically, the proposal included nearly $20 billion in additional resources for DHS, DOJ, and other departments to implement those new authorities,[150] including resources for:

• Over 1,500 new CBP personnel, including Border Patrol Agents and CBP Officers;
• Over 4,300 new AOs, as well as USCIS staff to facilitate timely and fair decisions;
• 100 additional IJ teams to help reduce the asylum caseload backlog and adjudicate cases more quickly;
• Shelter and critical services for newcomers in U.S. cities and States; and
• 1,200 new ICE personnel for functions including enforcement and removals.[151]

However, Congress failed to move forward with this bipartisan legislative proposal.[152] It also failed to pass the emergency supplemental funding requests that the Administration submitted. Although Congress did ultimately enact an FY 2024 appropriations bill for DHS, the funding falls significantly short of what DHS requires to deliver timely consequences and avoid large-scale releases pending section 240 removal proceedings. For example, the bill does not provide the resources necessary for DHS to refer the majority of noncitizens encountered by USBP who are amenable to expedited removal into such processing, resulting in large-scale releases pending section 240 removal proceedings based on current encounter numbers. Such releases, in turn, have significant impacts on communities and contribute to further migration by incentivizing potential migrants to travel to the United States with the belief that, even if initially detained, they will ultimately be released to live and work in the United States for long periods of time. Absent the Proclamation and this rule, these harmful results are especially likely given the circumstances described in the Proclamation.

The FY 2024 appropriations provided some additional funding for DHS above its request, including for additional Border Patrol Agents and a higher level of ICE detention beds than was previously appropriated.[153] Although

this increase is helpful, there are a number of ways in which the FY 2024 budget falls well short of what DHS needs to respond to the current elevated levels of migration. For example, the FY 2024 appropriations failed to fund the salary increase set across the Federal Government by the Office of Management and Budget ("OMB"), effectively reducing salary funding for the entirety of the appropriations-funded DHS workforce.[154] This reduction will limit the availability of overtime to respond to surges in irregular migration and may require difficult operational decisions during the closing months of the fiscal year, which is historically a busier period for such migration. The appropriations also did not provide sufficient funding to maintain the temporary processing facilities needed to hold migrants in custody. Further, the funds for hiring additional personnel were restricted to the current fiscal year rather than being provided as multi-year funds as requested; given the length of the hiring process, DHS will not be able to realize the increases in personnel envisioned by the legislation before the funding expires.

All of these factors, taken together, mean that under the current appropriations law, DHS will, at best, be able only to sustain most of its current operations, resulting in an operating capacity that already experiences strain during times of high migration levels; this will, in turn, reduce DHS's ability to maximize the delivery of timely consequences for those without a lawful basis to remain. Additionally, DHS will not be able to expand capacity along the border or increase its ability to deliver consequences through referrals into expedited removal. Instead, DHS may actually need to reduce capacity in some key areas, including by closing critical temporary processing facilities and pulling USBP agents away from the frontline to undertake processing and tasks related to custody. Thus, while DHS has made significant progress toward a migration strategy focused on enforcement, deterrence, encouragement of the use of lawful pathways, and diplomacy, a lack of needed resources and tools hampers DHS's current ability to manage the unprecedented flow of hemispheric migration, and the

---

[145] *See* DHS, *U.S. Citizenship and Immigration Services, Budget Overview, Fiscal Year 2025 Congressional Justification* CIS—IEFA—22 (Mar. 8, 2024), *https://www.dhs.gov/sites/default/files/2024-03/2024_0308_us_citizenship_and_immigration_services.pdf* (showing AOs are funded by Immigration Examinations Fee Account); *id.* at CIS—O&S—30 (showing that appropriated funds from the Refugee, Asylum, and International Operations Directorate of USCIS support Refugee Officers).

[146] DHS, *Immigration Examinations Fee Account: Fee Review Supporting Documentation with Addendum* 53 (Nov. 2023), *https://www.regulations.gov/document/USCIS-2021-0010-8176.*

[147] *See* The White House, *Fact Sheet: The President's Budget Secures Our Border, Combats Fentanyl Trafficking, and Calls on Congress to Enact Critical Immigration Reform* (Mar. 11, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/11/fact-sheet-the-presidents-budget-secures-our-border-combats-fentanyl-trafficking-and-calls-on-congress-to-enact-critical-immigration-reform/.*

[148] *Id.*

[149] The White House, *Fact Sheet: Biden-Harris Administration Calls on Congress to Immediately Pass the Bipartisan National Security Agreement* (Feb. 4, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/04/fact-sheet-biden-harris-administration-calls-on-congress-to-immediately-pass-the-bipartisan-national-security-agreement/.*

[150] Deirdre Walsh & Claudia Grisales, *Negotiators release $118 billion border bill as GOP leaders call*

*it dead in the House,* NPR (Feb. 4, 2024), *https://www.npr.org/2024/02/04/1226427234/senate-border-deal-reached.*

[151] The White House, *Fact Sheet: Biden-Harris Administration Calls on Congress to Immediately Pass the Bipartisan National Security Agreement* (Feb. 4, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/04/fact-sheet-biden-harris-administration-calls-on-congress-to-immediately-pass-the-bipartisan-national-security-agreement/.*

[152] Associated Press, *Border Bill Fails Senate Test Vote as Democrats Seek to Underscore Republican Resistance* (May 23, 2024), *https://apnews.com/article/border-immigration-senate-vote-924f48912eecf1dc544dc648d757c3fe.*

[153] *See* House of Representatives, *Explanatory Statement: Division C, Department of Homeland Security Appropriations Act, 2024,* at 14, 25 (Mar.

18, 2024), *https://docs.house.gov/billsthisweek/20240318/Division%20C%20Homeland.pdf.*

[154] *See id.* at 14, 22 (explaining that for CBP, "[t]he agreement includes $346,498,000 below the request, including the following: $182,772,000 for the 2024 pay raise," and for ICE, "[t]he agreement provides $9,501,542,000 for Operations and Support, including a decrease below the request of $74,153,000 for the 2024 pay raise").

situation will only worsen with expected seasonal and other increases.

Immigration-related resource challenges are not unique to front-line border officials. The immigration removal continuum—from apprehension, processing, and inspection to protection interviews and removal—is hampered by a lack of sufficient funding, resources, and tools at every stage.[155] EOIR is underfunded, without sufficient resources to address the backlog of over 2.78 million cases that were pending in the immigration courts at the end of the first quarter of FY 2024.[156] This under-resourcing has contributed to the growth of this backlog; in FY 2023, IJs completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts as were completed.[157] The FY 2024 budget

creates even greater strains on EOIR. EOIR received $844 million this fiscal year,[158] a cut of $16 million from FY 2023.[159] EOIR's budget was also cut $94.3 million from its inflation-adjusted funding requirements (referred to as "Current Services").[160] As a result of the significant budgetary gap, EOIR will necessarily be required to reduce the Federal and contract labor force that has been supporting its immigration courts nationwide and cut spending to technological initiatives. Specifically, EOIR has identified a need to cut 200 of its authorized Federal positions and is identifying areas in which it can make cuts to contracts, including those supporting the Office of Information Technology, with the least amount of impact on operations.

Similarly, the USCIS backlog of affirmative asylum cases stands at over 1.16 million and is growing.[161] USCIS does not have enough AOs to keep pace with the number of individuals who could be referred for credible fear interviews at the border, much less keep pace with new affirmative asylum receipts or even marginally reduce the affirmative asylum backlog. In sum, the border security and immigration systems are badly strained and not functioning to provide timely relief or protection for those who warrant it or timely consequences for those without a legal basis to remain, including those without viable asylum or protection claims.

The TCOs operating in the region, and the migrants they prey upon who intend to make the dangerous journey north, have taken notice of this situation. They understand that when the capacity of DHS to quickly process individuals at the border is strained, DHS is limited in its ability to deliver timely consequences. Because of these resource limitations, individuals are more likely

than not to be released to pursue a years-long immigration court process during which, beginning 180 days after applying for asylum, they may be authorized to work.[162] These smuggling organizations have built a multi-billion-dollar industry, featuring online marketing campaigns to spread misinformation and sophisticated logistics networks designed to quickly funnel migrants to the parts of the border where DHS capacity is lower.[163]

While the emergency measures instituted by the Proclamation are in effect, the Departments will put in place extraordinary procedures to more quickly process individuals encountered at the southern border, reducing the time noncitizens spend in DHS facilities. The specific measures introduced by this rule are designed to further streamline DHS processes at the border so that DHS can more quickly deliver meaningful consequences to more individuals who cross unlawfully or without authorization within the resource and operational constraints that have limited DHS capacity to date.

Under this rule, while emergency border circumstances persist, the way noncitizens are processed, their eligibility for asylum, and the way in which their eligibility for protection is assessed, will change in three ways. First, during emergency border circumstances, those who enter the United States across the southern border and who are not described in section 3(b) of the Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist. As discussed in Section III.B.3.a of this preamble, the Departments expect that applying the limitation on asylum eligibility will encourage noncitizens to make an appointment to present at the SWB, take advantage of other lawful migration

---

[155] See DHS, *Statement from Secretary Mayorkas on the President's Fiscal Year 2025 Budget for the U.S. Department of Homeland Security* (Mar. 11, 2024), *https://www.dhs.gov/news/2024/03/11/statement-secretary-mayorkas-presidents-fiscal-year-2025-budget-us-department* ("DHS reiterates previously submitted funding requests that are critical to secure the border, build immigration enforcement capacity, combat fentanyl and address domestic needs like natural disaster response, which Congress has failed to act on. Among them, the October funding request, which includes $8.7 billion for border, immigration, and counter fentanyl requirements and $9.2 billion for FEMA's Disaster Relief Fund and Nonprofit Security Grant Program. Notably, the Administration's border supplemental request includes funding to build capacity in the areas of border security, immigration enforcement, and countering fentanyl. DHS strongly supports the additional $19 billion in funding proposals included in the Senate's bipartisan border legislation that would, among other things, enable DHS to hire more CBP agents and officers, ICE enforcement and investigative personnel, and USCIS asylum officers and provide new tools to bolster the Department's efforts to secure and manage the border."); *see also* Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, OMB, at 2–3 (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf*; The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/*; DHS, *Fact Sheet: Biden-Harris Administration Supplemental Funding Request* (Oct. 20, 2023), *https://www.dhs.gov/news/2023/10/20/fact-sheet-biden-harris-administration-supplemental-funding-request*.

[156] See EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Jan. 18, 2024), *https://www.justice.gov/eoir/workload-and-adjudication-statistics*.

[157] See EOIR, *Adjudication Statistics: New Cases and Total Completions* (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2018/05/08/2_new_cases_and_total_completions.pdf*; EOIR, *Adjudication Statistics: New Cases and Total Completions—Historical* 1 (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2022/09/01/3_new_cases_and_total_completions_-_historical.pdf*.

[158] Consolidated Appropriations Act, 2024, Public Law 118–42, 138 Stat. 25, 133 ("[f]or expenses necessary for the administration of immigration-related activities of the Executive Office for Immigration Review, $844,000,000").

[159] Consolidated Appropriations Act, 2023, Public Law 117–328, 136 Stat. 4459, 4522 (2022) ("[f]or expenses necessary for the administration of immigration-related activities of the Executive Office for Immigration Review, $860,000,000"); EOIR, *FY 2024 Budget Request at a Glance, https://www.justice.gov/d9/2023-03/eoir_fy_24_budsum_ii_omb_cleared_03.08.23.pdf* (showing FY 2023 enacted budget providing EOIR $860 million).

[160] EOIR, *FY 2024 Budget Request at a Glance, https://www.justice.gov/d9/2023-03/eoir_fy_24_budsum_ii_omb_cleared_03.08.23.pdf* (providing the Current Services Adjustment as an increase of $78.3 million, bringing the inflation-adjusted amount to $938.3 million).

[161] OHSS analysis of USCIS Global Affirmative Data as of April 25, 2024 (noting that "[d]ata is limited to filings between FY2000 and March 31, 2024").

[162] See 8 CFR 208.7, 274a.12(c)(8). Sixty-seven percent of individuals encountered by CBP at and between POEs at the SWB between May 2023 and March 2024 were released, including 66 percent of such individuals in the second quarter of FY 2024. These individuals include noncitizens enrolled in an ICE Alternatives to Detention program. March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters Book-Out Outcomes by Agency").

[163] See, e.g., Priscilla Alvarez, *Human smugglers peddle misinformation to US-bound migrants on Facebook, watchdog says,* CNN (July 27, 2022), *https://www.cnn.com/2022/07/27/politics/human-smuggling-misinformation/index.html*; Bernd Debusmann Jr, *TikTok and Title 42 rumours fuel human smuggling at the US border,* BBC (July 8, 2023), *https://www.bbc.com/news/world-us-canada-65848683*.

pathways, or not undertake the dangerous journey north to begin with.

Second, this rule will reduce the time it takes to process individuals placed in expedited removal at the border by changing the way CBP immigration officers identify and refer noncitizens for credible fear interviews. Under current title 8 procedures, noncitizens encountered at the border and processed for expedited removal are provided lengthy advisals regarding the credible fear and asylum process and are asked questions to ascertain whether they may potentially have a fear of persecution or torture.[164] During emergency border circumstances, DHS will move to a ''manifestation of fear'' process at the border, detailed below in Section III.B.3.b of this preamble, that will involve general (rather than individual) advisals and require individuals who have a fear of persecution or torture to manifest that fear, verbally, non-verbally, or physically, in order for DHS personnel to refer them for a credible fear interview.

Third, the limitation on asylum eligibility will be considered during credible fear interviews and reviews, and those who are subject to the limitation and are unable to establish a significant possibility of showing exceptionally compelling circumstances will be screened for eligibility for statutory withholding of removal and CAT protection under a heightened ''reasonable probability of persecution or torture'' standard—a higher standard than the ''reasonable possibility'' standard under the Circumvention of Lawful Pathways rule.

As the Departments described more fully in the Circumvention of Lawful Pathways rule, the current asylum system—in which a high number of migrants are initially determined to be eligible to pursue their claims, even though most ultimately are not granted asylum or protection at the merits stage—has contributed to the growing backlog of cases awaiting review by IJs.[165] The practical result is that those with meritorious claims may have to wait years for their claims to be granted, while individuals who are ultimately denied protection may spend years in the United States before being issued a final order of removal.[166] As the demographics of border encounters have shifted in recent years to include Mexicans claiming fear at a higher rate, and large numbers of non-Mexicans—who have historically been far more likely to assert fear claims—and as the

time required to process and remove noncitizens ineligible for protection has grown (during which individuals may become eligible to apply for employment authorization), the deterrent effect of apprehending noncitizens at the SWB has become more limited.[167]

The provisions in this rule are intended to be emergency measures that impact the expedited removal process and eligibility for relief or protection only for those who enter the United States across the southern border during emergency border circumstances. Unfortunately, the significant efforts the Departments have made to address such circumstances to date have not been as effective as they could have been had

[167] According to OHSS Persist data, Mexican nationals continued to account for 89 percent of total CBP SWB encounters in FY 2010, with northern Central Americans accounting for 8 percent and all other nationalities accounting for 3 percent. March 2024 OHSS Persist Dataset. Northern Central Americans' share of total CBP SWB encounters increased to 21 percent by FY 2012 and averaged 48 percent from FY 2014 to FY 2019, the last full year before the start of the COVID–19 pandemic. *Id.* Nationals from all other countries except Mexico and the northern Central American countries accounted for an average of 5 percent of total CBP SWB encounters from FY 2010 to FY 2013, and for 10 percent of total encounters from FY 2014 to FY 2019. *Id.* This transition has accelerated since the start of FY 2021, as Mexican nationals accounted for approximately 32 percent of total CBP SWB encounters in FY 2021 through March 2024, including roughly 29 percent in the first six months of FY 2024; northern Central Americans accounted for roughly 25 percent from FY 2021 through March 2024 (20 percent in FY 2024 through March 2024); and all other countries accounted for roughly 42 percent from FY 2021 through March 2024, including roughly 51 percent of FY 2024 encounters through March 2024. *Id.*

For noncitizens encountered at and between SWB POEs from FY 2014 through FY 2019 who were placed in expedited removal, nearly 6 percent of Mexican nationals made fear claims that were referred to USCIS for determination. OHSS analysis of Enforcement Lifecycle data as of December 31, 2023. In contrast, as discussed in Section III.B.3.a.iv of this preamble, from May 12, 2023 to March 31, 2024, 29 percent of all Mexican nationals processed for expedited removal at the SWB made fear claims, including 39 percent in February 2024. OHSS analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

For noncitizens encountered at and between SWB POEs from FY 2014 through FY 2019, nearly 57 percent of people from northern Central America (*i.e.,* El Salvador, Guatemala, and Honduras), and close to 90 percent of all other nationalities made fear claims that were referred to USCIS for determination. OHSS analysis of Enforcement Lifecycle data as of December 31, 2023. Of note, according to OHSS analysis of historic EOIR and CBP data, there is a clear correlation since FY 2000 between the increasing time it takes to complete immigration proceedings, which results in a lower share of noncitizens being removed, and the growth in non-Mexican encounters at and between SWB POEs. Both trends accelerated in the 2010s, as non-Mexicans became the majority of such encounters, and they have accelerated further since FY 2020, as people from countries other than Mexico and northern Central America now account for the largest numbers of such encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

Congress provided the personnel, infrastructure, technology, and broader reforms that the Departments have requested. Communities all over the United States are being adversely impacted as a result. The goal of these measures is to quickly reduce unlawful and unauthorized entries at the border and to quickly impose decisions and consequences on those who cross our border unlawfully and lack a legal basis to remain.

3. Description of the Rule and Explanation of Regulatory Changes

This rule amends the Departments' regulations to further the purpose of the Presidential Proclamation of June 3, 2024, which suspends and limits entry along the southern border to address the emergency border circumstances outlined in that Proclamation. The rule does so by amending 8 CFR 208.13 and 1208.13 and adding regulatory provisions at 8 CFR 208.35, 235.15, and 1208.35 that (1) limit asylum eligibility for those who enter the United States across the southern border during emergency border circumstances described in the Proclamation and this rule, are not described in section 3(b) of the Proclamation, and do not establish the existence of exceptionally compelling circumstances; (2) alter the process for advising noncitizens of their rights to seek asylum and for identifying which noncitizens to refer to an AO for credible fear screening during emergency border circumstances; and (3) alter the standard for screening for statutory withholding of removal and CAT protection while such circumstances exist.[168] Below is an explanation of the limitation and each change to the expedited removal and fear screening process. The specific content of each provision and amendment is set forth in detail in Section III.C of this preamble.

a. Limitation on Asylum Eligibility

As discussed above in Sections III.B.1 and 2 of this preamble, irregular migration is continuing to strain the Departments' ability to process, detain, and remove, as appropriate, and

[168] The Departments understand that the President has directed the agencies to promptly consider issuing ''any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border.'' Such actions may include other measures that are not addressed in this rule, and the Departments have considered and are continuing to consider such other actions. The Departments believe that the changes made in this rule are the most appropriate means to begin addressing the concerns identified in the Proclamation, and the Departments will assess the effectiveness of this rule as they continue to consider other actions to respond to the President's direction.

---

[164] 8 CFR 235.3(b)(2).

[165] 88 FR at 31315.

[166] *See supra* note 25.

thus to swiftly deliver timely decisions and timely consequences to noncitizens at the southern border. This challenge is exacerbated by the sheer number of migrants who invoke credible fear procedures at a POE or when they are encountered between POEs without following the lawful, safe, and orderly processes that DHS has made available. The Departments have implemented the Circumvention of Lawful Pathways rule and complementary measures, but Congress has not provided the resources necessary to timely and effectively process and interview all those who invoke credible fear procedures through the expedited removal process at the southern border, particularly during times in which the country's border faces an emergency of the magnitude described in the Proclamation. The record numbers of migrants invoking the credible fear procedures at the southern border exacerbate the risk of severe overcrowding in USBP facilities and POEs, and it creates a situation in which large numbers of migrants—only a small proportion of whom are likely to be granted asylum—are not able to be expeditiously removed but are instead referred to backlogged immigration courts. This situation is self-reinforcing: the expectation of a lengthy stay in the United States and the lack of timely consequences for irregular migration encourage more migrants without potentially meritorious claims for asylum to make the dangerous journey to the southern border to invoke credible fear procedures at the southern border and take their chances on being allowed to remain in the country for a lengthy period.

For these reasons, pursuant to section 208(b)(1)(A), (b)(2)(C), (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(1)(A), (b)(2)(C), (d)(5)(B), the Departments are adopting a limitation on asylum eligibility for noncitizens who (1) enter the United States across the southern border during emergency border circumstances; (2) are not described in section 3(b) of the Proclamation; and (3) do not establish exceptionally compelling circumstances. *See* 8 CFR 208.13(g), 208.35(a), 1208.13(g), 1208.35(a). Section 3(b) of the Proclamation lists classes of individuals to whom the Proclamation's suspension and limitation on entry and this limitation on asylum eligibility does not apply; those classes are discussed in Section II.A of this preamble. The exceptionally compelling circumstances exception to this rule's limitation on asylum eligibility is discussed below in Sections III.B.3.a and III.C.2 of this preamble.

The limitation on asylum eligibility is needed to address the emergency border circumstances outlined in the Proclamation and this rule and responds to the President's direction to the Secretary of Homeland Security and the Attorney General to promptly consider issuing such instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted. Under the circumstances described in the Proclamation, the Departments assess that the limitation on asylum is necessary to help streamline the Departments' processing of noncitizens, thereby conserving limited resources during the emergency border circumstances described in the Proclamation and this rule and allowing for enough resources to continue to process lawful cross-border trade and travel and noncitizens who present in a safe and orderly manner at a POE.[169]

The Departments have further made the determination to apply the limitation on asylum eligibility to those who enter the United States across the southern border during emergency border circumstances irrespective of whether the noncitizen is encountered during such emergency border circumstances. This will permit a consistent application of the rule to all those who enter across the southern border during such circumstances and

are subject to this limitation on asylum eligibility, including those who evade detection at the southern border and are later placed in section 240 removal proceedings, as well as those who affirmatively apply for asylum. The Departments have considered applying the rule's asylum limitation only to those who enter and are encountered at the southern border during emergency border circumstances. The Departments believe, however, that the rule's asylum limitation should avoid creating an incentive for noncitizens to take risky measures to evade detection, which would further strain resources dedicated to apprehension at the border.[170]

Additionally, the approach adopted in this rule is consistent with the Circumvention of Lawful Pathways rule, which, with narrow exceptions, applies to all those who enter during the two-year period currently specified in that rule, regardless of whether they are apprehended at or near the border during the 14-day period immediately after entry or within 100 miles of the border. *See* 8 CFR 208.33(c), 1208.33(d). Moreover, the Departments note that the provisions of §§ 208.35(b) and 235.15 would be applicable only to those who have entered the United States during the emergency border circumstances described in the Proclamation and this rule and are processed for expedited removal. Thus, those provisions would not apply to those who have long since entered the United States. Accordingly, the Departments have determined that it is reasonable to apply this rule's limitation on asylum eligibility consistent with the Circumvention of Lawful Pathways rule, without regard to the date of encounter or commencement of proceedings.

Even if a noncitizen entered the United States across the southern border during emergency border circumstances and is not described in section 3(b) of the Proclamation, they may avoid application of the limitation on asylum eligibility if they establish by a preponderance of the evidence that exceptionally compelling circumstances exist.[171] Such circumstances necessarily

---

[169] When it comes to determining the applicability of the Proclamation, CBP immigration officers, who first encounter noncitizens when they enter or attempt to enter, must determine whether a noncitizen is subject to the Proclamation under section 3(a), including whether the noncitizen is excluded from the suspension and limitation on entry under section 3(b). *See* 8 CFR 208.35(a), 1208.35(a). The Departments anticipate that, when determining whether the limitation on asylum eligibility applies, AOs and IJs will rarely have grounds to reach a different result from the CBP immigration officers. *See* 8 CFR 208.35(b), 1208.35(b). In part, the Proclamation's application turns on straightforward questions of status—*e.g.*, whether someone was a noncitizen, Proclamation sec. 3(a)(i); was a noncitizen national, *id.* sec. 3(b)(ii); was a lawful permanent resident, *id.* sec. 3(b)(ii); was a UC, *id.* sec. 3(b)(iii); or had a valid visa or other lawful permission to seek entry or admission into the United States or presented at a POE pursuant to a pre-scheduled time and place, *id.* sec. 3(b)(v). The Proclamation's application also turns on questions of historical fact, including whether the suspension and limitation on entry was in place at the relevant time, *id.* sec. 3(a), and whether someone was ''permitted to enter by . . . a CBP immigration officer'' based on two sets of specified considerations ''at the time of the entry or encounter that warranted permitting the noncitizen to enter,'' *id.* Sec. 3(b)(vi)–(vii). These two exceptions allow CBP immigration officers to permit the entry of noncitizens who present at the encounter with—for example—medical issues requiring immediate attention. *See id.* sec. 3(b)(vi).

[170] The Departments note that adjudicators already make determinations regarding the noncitizen's date of arrival when determining whether the noncitizen is barred from filing an asylum application (unless meeting an exception) within one year of arrival. *See* INA 208(a)(2)(B) and (D), 8 U.S.C. 1158(a)(2)(B) and (D).

[171] The Departments decline to adopt an exception mirroring the exception from the Circumvention of Lawful Pathways rule for those who present at a POE without a pre-scheduled time and place but show that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. *See*

exist where the noncitizen demonstrates that, at the time of entry, the noncitizen or a member of the noncitizen's family as described in 8 CFR 208.30(c) with whom the noncitizen was traveling faced an acute medical emergency; faced an imminent and extreme threat to their life or safety; or was a "victim of a severe form of trafficking in persons" as defined in 8 CFR 214.11.[172] 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). Acute medical emergencies would include, but would not be limited to, situations in which someone faces a life-threatening medical emergency or faces acute and grave medical needs that cannot be

---

8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). This rule, unlike the Circumvention of Lawful Pathways rule, applies only in the emergency circumstances described in the Proclamation and the rule, where encounters strain the border security and immigration systems' capacity. And although the Circumvention of Lawful Pathways rule was also aimed at reducing irregular migration, it was focused on encouraging the use of lawful pathways, rather than the number of daily entrants. In these emergency border circumstances, this rule's exception for "exceptionally compelling circumstances" captures individuals with a time-sensitive imperative; such individuals may also be permitted to enter under one of the exceptions in section 3(b) of the Proclamation. And in these emergency border circumstances, the Departments have determined that individuals who do not qualify for this exception should wait for a CBP One appointment. Moreover, under the Circumvention of Lawful Pathways rule, this exception requires additional questioning of any noncitizen who entered at a POE and is subject to the rule—time that, in the aggregate, could diminish the Departments' ability to deploy resources to address the emergency circumstances that support application of this rule.

In addition, the Departments did not include an exception for a noncitizen who sought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application. *See* 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). This rule serves a different purpose than 8 CFR 208.33(a)(2)(ii)(C) and 1208.33(a)(2)(ii)(C); specifically, this rule is aimed at deterring irregular migration and speeding up the border process during a period of high encounters, rather than encouraging noncitizens to seek protection in other countries. During the emergency border circumstances described in the Proclamation and this rule, narrowing the exceptions to those who are unable to wait for an appointment is key. Those who sought and were denied protection in another country will still be eligible for asylum if they enter pursuant to an appointment, meet another exception to the Proclamation, or establish exceptionally compelling circumstances, such as that at the time of entry they faced an acute medical emergency or an imminent and extreme threat to life or safety.

[172] The Departments note that noncitizens who are a "victim of a severe form of trafficking in persons" are already excepted from the Proclamation's suspension and limitation on entry as provided in section 3(b) of the Proclamation and are therefore also not subject to the rule's limitation on asylum eligibility. Nonetheless, the Departments have opted to retain "victims of severe form of trafficking in persons" as an exceptional circumstance to avoid any confusion and to ensure that the exceptions in this rule mirror the rebuttal circumstances the Departments adopted in the Circumvention of Lawful Pathways rule.

---

adequately addressed outside of the United States. Examples of imminent and extreme threats would include imminent threats of rape, kidnapping, torture, or murder that the noncitizen faced at the time the noncitizen crossed the southern border, such that they cannot wait for an appointment at a pre-scheduled time and place or until this IFR's limitation on asylum eligibility is not in effect for an opportunity to present at a POE without putting their life or well-being at extreme risk; it would not include generalized threats of violence.

The "exceptionally compelling circumstances" exception mirrors the rebuttal circumstance the Departments adopted in the Circumvention of Lawful Pathways rule. *See* 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). That exception is adopted here for the reasons articulated for adopting it in the Circumvention of Lawful Pathways NPRM and rule and the exception is intended to apply to the same circumstances identified in that NPRM and rule. *See, e.g.,* 88 FR at 11723; 88 FR at 31318, 31338, 31348, 31351, 31380, 31390, 31391–93.

Like the Circumvention of Lawful Pathways rule, this rule recognizes an additional exception that avoids the separation of families. *See* 8 CFR 208.35(c), 1208.35(c). Those noncitizens who are subject to the limitation on asylum eligibility and who do not establish exceptionally compelling circumstances under 8 CFR 208.35(a)(2)(i) or 1208.35(a)(2)(i) would be able to continue to apply for statutory withholding of removal and protection under the CAT, forms of protection to which the limitation does not apply if placed in section 240 removal proceedings. Unlike asylum, spouses and minor children are not eligible for derivative grants of statutory withholding of removal or CAT protection. *Compare* INA 208(b)(3)(A), 8 U.S.C. 1158(b)(3)(A) ("[a] spouse or child . . . of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien"), *with* INA 241(b)(3), 8 U.S.C. 1231(b)(3) (not providing for derivative statutory withholding of removal), *and* 8 CFR 1208.16(c) (not providing for derivative CAT protection); *see also Sumolang* v. *Holder,* 723 F.3d 1080, 1083 (9th Cir. 2013) (recognizing that the asylum statute allows for derivative beneficiaries of the principal applicant for asylum, but that the withholding of removal statute makes no such allowance). Again, mirroring EOIR's

---

family unity provision in the Circumvention of Lawful Pathways rule, *see* 8 CFR 1208.33(c), where a principal asylum applicant is eligible for statutory withholding of removal or CAT protection and would be granted asylum but for the limitation on eligibility established in this rule, and where an accompanying spouse or child as defined in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), the noncitizen shall be excepted from the limitation on eligibility by the IJ if placed in section 240 removal proceedings. 8 CFR 1208.35(c). The Departments have determined that the possibility of separating the family should be avoided. *See* E.O. 14011, Establishment of Interagency Task Force on the Reunification of Families, 86 FR 8273, 8273 (Feb. 2, 2021) ("It is the policy of my Administration to respect and value the integrity of families seeking to enter the United States.").

In the Circumvention of Lawful Pathways rule, the Departments included a family unity provision in EOIR's regulations but not DHS's. The Departments did so because they decided at that time that those who an AO concludes are subject to the Lawful Pathways presumption and who are not able to establish an exception or rebut the presumption during a credible fear screening may not be placed into the asylum merits interview process and may instead only be issued an NTA and placed into section 240 removal proceedings. *See* 88 FR at 11725–26; 88 FR at 31336–37. For purposes of this rule, the Departments have allowed for an asylum merits interview process at the discretion of USCIS that includes USCIS discretion to apply a parallel family unity provision. *See* 8 CFR 208.35(c). This provision is discretionary to allow USCIS flexibility as it implements the new process. The Departments request comment on whether to adopt a non-discretionary family unity provision for the asylum merits interview process in a final rule.

i. Authority To Impose Additional Limitations on Asylum Eligibility

The Secretary and the Attorney General have authority to adopt this additional limitation on asylum eligibility. Both have long exercised discretion, now expressly authorized by Congress, to create new rules governing the granting of asylum. When section

208 of the INA was first enacted as part of the Refugee Act of 1980, it simply provided that the Attorney General "shall establish a procedure" for a noncitizen "to apply for asylum," and that the noncitizen "may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such [noncitizen] is a refugee within the meaning of section 1101(a)(42)(A)." 8 U.S.C. 1158(a) (1982). In 1980, the Attorney General, in the exercise of that broad statutory discretion, established several mandatory bars to the granting of asylum. *See* 8 CFR 208.8(f)(1) (1980); Aliens and Nationality; Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980). In 1990, the Attorney General substantially amended the asylum regulations, but exercised his discretion to retain the mandatory bars to asylum eligibility related to persecution of others on account of a protected ground, conviction of a particularly serious crime in the United States, firm resettlement in another country, and the existence of reasonable grounds to regard the noncitizen as a danger to the security of the United States. *See* Aliens and Nationality; Asylum and Withholding of Deportation Procedures, 55 FR 30674, 30678, 30683 (July 27, 1990); *see also Yang* v. *INS,* 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding firm-resettlement bar); *Komarenko* v. *INS,* 35 F.3d 432, 436 (9th Cir. 1994) (upholding particularly-serious-crime bar), *abrogated on other grounds by Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009) (en banc).

In that 1990 rule, the Attorney General also codified another limitation that was first discussed in *Matter of Chen,* 20 I&N Dec. 16 (BIA 1989). 55 FR at 30678. Specifically, although the statute defines a "refugee" and thus allows asylum for a noncitizen based on a showing of past "persecution or a well-founded fear of persecution," INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A), by regulation, a showing of past persecution only gives rise to a presumption of a well-founded fear of future persecution, which can be rebutted by showing that circumstances have changed such that the noncitizen no longer has a well-founded fear of future persecution or that the noncitizen can relocate to avoid persecution and under all the circumstances it is reasonable to expect the noncitizen to do so.[173] 8 CFR 208.13(b)(1), 1208.13(b)(1). Where the presumption is rebutted, the adjudicator, "in the

exercise of his or her discretion, shall deny the asylum application." [174] 8 CFR 208.13(b)(1)(i), 1208.13(b)(1)(i). In 1990, Congress added a mandatory statutory bar for those with aggravated felony convictions. Immigration Act of 1990, Public Law 101–649, sec. 515, 104 Stat. 4978, 5053.

With the passage of IIRIRA, Congress added three categorical statutory bars to the ability to apply for asylum for (1) noncitizens who can be removed, pursuant to a bilateral or multilateral agreement, to a third country where they would not be persecuted on account of a specified ground; (2) noncitizens who failed to apply for asylum within one year of arriving in the United States; and (3) noncitizens who have previously applied for asylum and had the application denied. Public Law 104–208, div. C, sec. 604, 110 Stat. 3009, 3009–690 to –691. Congress also adopted six mandatory bars to asylum eligibility that largely reflected the pre-existing, discretionary bars that had been set forth in the Attorney General's asylum regulations. These bars cover (1) noncitizens who "ordered, incited, assisted, or otherwise participated" in the persecution of others; (2) noncitizens who, having been convicted of a "particularly serious crime," constitute a danger to the United States; (3) noncitizens for whom there are serious reasons to believe committed a "serious nonpolitical crime outside the United States" before arriving in the United States; (4) noncitizens for whom there are reasonable grounds to regard as a "danger to the security of the United States"; (5) noncitizens who are removable under a set of specified grounds relating to terrorist activity; and (6) noncitizens who were "firmly resettled" in another country prior to arriving in the United States. *Id.* at 3009–691 (codified at INA 208(b)(2)(A), 8 U.S.C. 1158(b)(2)(A)). Congress further added that aggravated felonies, defined in section 101(a)(43) of the INA, 8 U.S.C. 1101(a)(43), would be considered "particularly serious crime[s]." *Id.* at 3009–692 (codified at INA 208(b)(2)(B)(i), 8 U.S.C. 1158(b)(2)(B)(i)).

In IIRIRA, Congress also made clear that the Executive Branch may continue to exercise its broad discretion in determining whether to grant asylum by creating additional limitations and

conditions on the granting of asylum. The INA provides that the Attorney General and Secretary "may by regulation establish additional limitations and conditions, consistent with [section 208], under which an alien shall be ineligible for asylum." INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see* 6 U.S.C. 552(d); INA 103(a)(1), 8 U.S.C. 1103(a)(1). In addition, while section 208(d)(5) of the INA, 8 U.S.C. 1158(d)(5), establishes certain procedures for consideration of asylum applications, Congress specified that the Attorney General and Secretary "may provide by regulation for any other conditions or limitations on the consideration of an application for asylum" so long as those conditions or limitations are "not inconsistent with this chapter," INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B). In sum, the current statutory framework retains the broad discretion of the Attorney General (and, after the HSA, also the Secretary) to adopt additional limitations on the granting of asylum and procedures for implementing those limitations.

Previous Attorneys General and Secretaries have since invoked their authorities under section 208 of the INA, 8 U.S.C. 1158, to establish eligibility bars beyond those required by the statute itself. *See, e.g.,* Asylum Procedures, 65 FR 76121, 76126 (Dec. 6, 2000) (requiring consideration of the applicant's ability to relocate safely in his or her home country in assessing asylum eligibility); Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934 (Nov. 9, 2018) ("Proclamation Bar IFR") (limit on eligibility for applicants subject to certain presidential proclamations);[175] Asylum Eligibility and Procedural Modifications, 85 FR 82260 (Dec. 17, 2020) ("TCT Bar final rule") (limit on eligibility for certain noncitizens who failed to apply for protection while in a third country through which they transited en route to the United States);[176] Procedures for Asylum and Bars to Asylum Eligibility, 85 FR 67202 (Oct. 21, 2020) (limits on eligibility for noncitizens convicted of certain criminal offenses);[177] Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of

---

[173] As noted below, the internal relocation provision was added in 2000 by Asylum Procedures, 65 FR 76121, 76126 (Dec. 6, 2000).

[174] There is a narrow exception to this mandatory discretionary ground for denial, called "humanitarian asylum," where the noncitizen establishes "compelling reasons for being unwilling or unable to return to the [noncitizen's] country arising out of the severity of . . . past persecution" or "that there is a reasonable possibility that [the non-citizen] may suffer other serious harm upon removal to the [noncitizen's] country." 8 CFR 208.13(b)(1)(iii), 1208.13(b)(1)(iii).

[175] *See O.A.* v. *Trump,* 404 F. Supp. 3d 109 (D.D.C. 2019) (vacating Proclamation Bar IFR).

[176] *See E. Bay Sanctuary Covenant* v. *Barr,* 519 F. Supp. 3d 663 (N.D. Cal. 2021) (preliminarily enjoining the TCT Bar final rule).

[177] *See Pangea Legal Servs.* v. *U.S. Dep't of Homeland Sec.,* 501 F. Supp. 3d 792, 827 (N.D. Cal. 2020) (granting temporary restraining order against operation of the rule and ordering defendants to show cause why the rule should not be preliminarily enjoined).

Removal Proceedings; Asylum Procedures, 62 FR 10312, 10342 (Mar. 6, 1997) (IFR codifying mandatory bars and adding provision allowing for discretionary denials of asylum where "the alien can be removed to a third country which has offered resettlement and in which the alien would not face harm or persecution"); *see also Yang,* 79 F.3d at 936–39 (upholding firm-resettlement bar); *Komarenko,* 35 F.3d at 436 (upholding particularly-serious-crime bar). Consistent with this historical practice, the Secretary and Attorney General exercised this authority when adopting the Lawful Pathways presumption of asylum ineligibility. *See* Circumvention of Lawful Pathways rule, 88 FR 31314.[178]

### ii. Litigation Over the Proclamation Bar IFR

This rule places a limitation on asylum eligibility for those noncitizens who are described in the Proclamation subject to certain exceptions. The Departments acknowledge prior judicial decisions addressing a different limit on asylum eligibility adopted pursuant to section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), relating to suspensions and limitations on entry by presidential proclamation under section 212(f) of the INA, 8 U.S.C. 1182(f). In *East Bay Sanctuary Covenant* v. *Biden,* 993 F.3d 640 (9th Cir. 2021) ("*East Bay III*"), the Ninth Circuit affirmed a preliminary injunction against the Proclamation Bar IFR, which categorically rendered certain noncitizens ineligible for asylum if they entered the United States in violation of a presidential proclamation or other presidential order suspending or limiting the entry of noncitizens along the southern border. The relevant presidential proclamation in that case suspended entry of all migrants along the southern border except those who entered at a POE. *See id.* at 659. The court held that the Proclamation Bar IFR was inconsistent with section 208(a) of the INA, 8 U.S.C. 1158(a), which provides that any migrant "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum." *Id.* at 670.[179]

The Departments regard this rule as substantially different than the rule the Ninth Circuit deemed invalid in *East Bay III.* The Proclamation and limitation on asylum eligibility at issue here differ significantly from the prior categorical bar on "manner of entry" because they do not treat the manner of entry as dispositive in determining eligibility. Rather, the limitation at issue here turns on whether—during emergency border circumstances described in the Proclamation and this rule—an individual has followed the lawful, safe, and orderly pathways that the United States Government has established during these emergency situations when it is essential that noncitizens use such pathways to ensure the United States Government's ability to manage the border. And even during these situations, AOs and IJs have the ability to except noncitizens from the rule's asylum limitation where the noncitizens establish that an exceptionally compelling circumstance exists. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). For example, a noncitizen may be excepted from the limitation on asylum eligibility if they experienced an acute medical emergency at the time of entry regardless of where that entry occurred. Other exceptionally compelling circumstances include, but are not limited to, if the noncitizen demonstrates that, at the time of entry, the noncitizen or a member of their family as described in 8 CFR 208.30(c) with whom the noncitizen was traveling faced an imminent and extreme threat to their life or safety or was a "victim of a severe form of trafficking in persons" as defined in 8 CFR 214.11. 8 CFR 208.35(a)(2)(i)(B)–(C), 1208.33(a)(2)(i)(B)–(C). Indeed, the rule's exceptionally compelling circumstances exception is identical to the grounds that would rebut the presumption of asylum ineligibility under the Circumvention of Lawful Pathways rule, which has been allowed to continue in effect despite litigation challenging its validity. *See E. Bay Sanctuary Covenant* v. *Biden,* No. 23–16032, 2023 WL 11662094, at *1 (9th Cir. Aug. 3, 2023) (staying order vacating Circumvention of Lawful Pathways rule pending appeal). Furthermore, this rule does not implicate the same concerns as the prior categorical bar based on "manner of entry" because it applies only to individuals who enter during emergency border circumstances and would not treat solely the manner of entry as dispositive in determining eligibility even during such circumstances, given that the rule applies both at and between POEs and in light of the exceptions available under section 3(b) of the Proclamation and for exceptionally compelling circumstances under 8 CFR 208.35(a)(2) and 1208.35(a)(2).

Moreover, the Departments disagree with important aspects of the reasoning that the district court and Ninth Circuit relied upon in *East Bay III.* The Departments argued in *East Bay III* that section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), by its plain terms requires only that a noncitizen be permitted to "apply" for asylum, regardless of their manner of entry. It does not require that a noncitizen be eligible to be granted asylum, regardless of their manner of entry. Indeed, the BIA has long taken account of a noncitizen's manner of entry in determining whether to grant asylum. *See Matter of Pula,* 19 I&N Dec. 467, 473 (BIA 1987) (holding that "manner of entry . . . is a proper and relevant discretionary factor to consider in adjudicating asylum applications"). The court in *East Bay III* rejected this argument, stating that "[e]xplicitly authorizing a refugee to file an asylum application because he arrived between ports of entry and then summarily denying the application for the same reason borders on absurdity," 993 F.3d at 670 (emphasis omitted), but the statute draws a clear distinction between the two. Section 208(a) of the INA, 8 U.S.C. 1158(a), governs who may "apply for asylum" and includes several categorical bars, such as the bar for applications for noncitizens present in the country for more than one year. INA 208(a)(1), (2)(B), 8 U.S.C. 1158(a)(1), (2)(B); *see* INA 241(a)(5), 8 U.S.C. 1231(a)(5). Section 208(b) of the INA, 8 U.S.C. 1158(b), in turn, governs who is eligible to be granted asylum. Specifically, section 208(b)(1)(A) of the INA, 8 U.S.C. 1158(b)(1)(A), provides that the Attorney General or the Secretary "may grant asylum to an alien who has applied," INA 208(b)(2), 8 U.S.C. 1158(b)(2), then specifies six categories of noncitizens to whom "[p]aragraph (1)" (*i.e.,* the discretionary authority to grant asylum to an applicant) "shall not apply." Any noncitizen falling within one of those categories may apply for asylum under section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), but is categorically ineligible

---

[178] The Circumvention of Lawful Pathways rule was vacated by *East Bay Sanctuary Covenant* v. *Biden,* 683 F. Supp. 3d 1025 (N.D. Cal. 2023). But the Ninth Circuit has stayed that vacatur pending appeal, *see E. Bay Sanctuary Covenant* v. *Biden,* No. 23–16032 (9th Cir. Aug. 3, 2023), and thus the rule and its presumption remain in effect. On February 21, 2024, the Ninth Circuit placed the case in abeyance pending settlement discussions. *E. Bay Sanctuary Covenant* v. *Biden,* 93 F.4th 1130 (9th Cir. 2024).

[179] The court also held that the Proclamation Bar IFR likely did not properly fall under the good cause or foreign affairs exceptions to notice-and-comment rulemaking under 5 U.S.C. 553(a)(1) and (b)(B). *See East Bay III,* 993 F.3d at 676–77.

to receive it under section 208(b) of the INA, 8 U.S.C. 1158(b).

The broad preemptive sweep that the Ninth Circuit attributed to section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), also fails to account for the discretionary nature of asylum. No noncitizen ever has a right to be granted asylum. The ultimate "decision whether asylum should be granted to an eligible alien is committed to the Attorney General's [and the Secretary's] discretion." *INS* v. *Aguirre-Aguirre*, 526 U.S. 415, 420 (1999). The *East Bay III* court did not dispute that manner of entry is a permissible consideration in determining whether to exercise that discretion to grant asylum in individual cases. 99 F.3d at 671; *see also Matter of Pula*, 19 I&N Dec. at 473; *Fook Hong Mak* v. *INS*, 435 F.2d 728, 730 (2d Cir. 1970) (Friendly, J.) (upholding the INS's authority to "determine[ ] certain conduct to be so inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration").

The *East Bay III* court also suggested that a regulation categorically barring asylum based on manner of entry is inconsistent with the United States' commitments under the Refugee Protocol, in which the United States adhered to specified provisions of the Refugee Convention. *See* 993 F.3d at 972–75. Even accepting *East Bay III*'s reasoning on this point, that reasoning is limited to a categorical eligibility bar premised on manner of entry; this IFR does not implicate the same concerns as the prior categorical bar on "manner of entry" for the reasons detailed above. In any event, the *East Bay III* court's conclusion was incorrect. The United States' non-refoulement obligation under Article 33 of the Refugee Convention is implemented by statute through the provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3)(A), for mandatory withholding of removal. This rule specifically preserves the availability of that protection from removal. The INA's provision in section 208 of the INA, 8 U.S.C. 1158, for the discretionary granting of asylum instead aligns with Article 34 of the Refugee Convention, which is precatory and does not require any signatory to actually grant asylum to all those who are eligible. *See, e.g., INS* v. *Cardoza-Fonseca*, 480 U.S. 421, 440–41 (1987). The *East Bay III* court also misread Article 31(1) of the Refugee Convention, which pertains only to "penalties" imposed "on account of . . . illegal entry or presence" on refugees who, among other criteria, are "coming directly from a territory where" they face persecution. *See, e.g.,*

*Singh* v. *Nelson*, 623 F. Supp. 545, 560–61 & n.14 (S.D.N.Y. 1985) (quoting the Refugee Convention). And a bar to the granting of the discretionary relief of asylum is not a penalty under Article 31(1), especially given that the noncitizen remains eligible to apply for statutory withholding of removal, which implements U.S. non-refoulement obligations under the Refugee Protocol. *See Mejia* v. *Sessions*, 866 F.3d 573, 588 (4th Cir. 2017); *Cazun* v. *U.S. Att'y Gen.*, 856 F.3d 249, 257 n.16 (3d Cir. 2017).

### iii. Litigation Over Other Limitations

The Departments also acknowledge other prior precedent concerning the scope of the Departments' statutory rulemaking authority under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). Specifically, when reviewing the TCT Bar final rule, the Ninth Circuit in *East Bay Sanctuary Covenant* v. *Garland*, 994 F.3d 962 (9th Cir. 2020) ("*East Bay I*"), held that a new condition on asylum eligibility under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), must "further[ ] the purpose" of another provision in section 208 to be "consistent with" it. 994 F.3d at 977, 977–80. The Departments disagree. A requirement that additional asylum limitations can only "further[ ] the purpose" of the existing exceptions by either targeting threats to the nation or promoting the purposes the Ninth Circuit identified in the safe-third-country or firm-resettlement bars, *id.* at 977, is irreconcilable with the statute's meaning and conflicts with its history. Not only has Congress adopted asylum bars that do not further the purpose the Ninth Circuit identified—*e.g.,* the one-year filing deadline and the bar on successive applications—it has granted to the Departments the broad discretion to add more such bars. The Ninth Circuit's approach is also inconsistent with *Trump* v. *Hawaii*, 585 U.S. 667, 690–91 (2018) (INA's express provisions governing entry "did not implicitly foreclose the Executive from imposing tighter restrictions," even if restrictions addressed a subject that is "similar" to one that Congress "already touch[ed] on"). The statutory asylum bars likewise do not foreclose imposing further conditions, even if those conditions address subjects similar to those already in the asylum statute. *See, e.g.,* INA 241(a)(5), 8 U.S.C. 1231(a)(5) (barring from asylum those whose orders of removal have been reinstated regardless whether they have asylum claims stemming from events that occurred after the original order of removal); *see R–S–C* v. *Sessions*, 869 F.3d 1176, 1184 (10th Cir. 2017) (reconciling the reinstatement provision's bar on asylum

with section 208's allowing noncitizens to apply for asylum regardless of manner of entry).

Regardless, this rule is consistent with section 208 of the INA, 8 U.S.C. 1158, as a limitation on asylum eligibility.[180] The President has determined that, under certain emergency border circumstances, entries must be suspended and limited because in such circumstances the border security and immigration systems lack capacity to deliver timely decisions and timely consequences, which threatens to incentivize further migration. And in light of such circumstances and their pernicious effects, the Departments have determined that special procedures must be used to quickly process the influx of noncitizens, including those seeking asylum. Those determinations do not conflict with the text or structure of section 208 of the INA, 8 U.S.C. 1158, and are consistent with (and an appropriate exercise of the Departments' authority under) that provision. Nothing more is required for the rule to constitute a valid exercise of authority under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C).

Moreover, this rule's propriety is reinforced by the statutory bars on asylum Congress has enacted. Just as Congress has chosen to promote systemic efficiency by prohibiting asylum applications filed more than one year after entry and by generally prohibiting noncitizens from pursuing successive asylum applications, INA 208(a)(2)(B)–(C), 8 U.S.C. 1158(a)(2)(B)–(C), this rule furthers systemic efficiency by limiting asylum in certain situations where the strains on the immigration system are at their peak. Congress did

---

[180] The Departments' interpretation of the phrase "consistent with" is supported by judicial interpretation of the term in other contexts. The D.C. Circuit, for example, has cautioned against construing "consistent with" too narrowly in a Clean Air Act case. *Envtl. Def. Fund, Inc.* v. *EPA*, 82 F.3d 451, 457 (D.C. Cir. 1996) (per curiam), *amended by* 92 F.3d 1209 (D.C. Cir. 1996). The court emphasized that this "flexible statutory language" does not require "exact correspondence . . . but only congruity or compatibility" and underscored that the phrase's ambiguity warranted deference to the agency's policy. *Id.* Other courts have adopted the same understanding of "consistent with." *See, e.g., Jimenez-Rodriguez* v. *Garland*, 996 F.3d 190, 198 (4th Cir. 2021) ("The phrase 'consistent with' does not require 'exact correspondence . . . but only congruity or compatibility.'" (quoting *Nuclear Energy Inst., Inc.* v. *EPA*, 373 F.3d 1251, 1269 (D.C. Cir. 2004))); *Nat'l Wildlife Fed'n* v. *Sec'y of U.S. Dep't of Transp.*, 960 F.3d 872, 878 (6th Cir. 2020) ("'[T]he phrase 'consistent with' cannot bear the weight that the Federation places on it. Response plans are 'consistent' with the contingency plans if they 'show no noteworthy opposing, conflicting, inharmonious, or contradictory qualities'—in other words, if the documents put together are 'not self-contradictory. Consistency does *not* mean exact, point-by-point correspondence.'" (cleaned up)).

not foreclose the Departments from likewise taking systemic considerations into account when exercising their discretion to add conditions or limitations on eligibility. Indeed, the ultimate consideration when determining whether someone warrants a grant of relief as a matter of discretion is whether granting relief "appears in the best interests of th[e] country," *Matter of Marin,* 16 I&N Dec. 581, 584 (BIA 1978), a point Congress was aware of when it amended the INA in 1996, *see id.* (best interests standard preceded 1996 amendments by nearly two decades). The Departments find that the rule's limitation on asylum eligibility furthers the efficiency aims of the asylum statute and is in the best interests of the United States because it allows the Departments to deliver timely decisions and timely consequences in order to address the emergency border circumstances discussed in the Proclamation and this rule.

Consistent with the best-interest standard, the BIA has long held a noncitizen's "circumvention of orderly refugee procedures" to be relevant to whether a favorable exercise of discretion is warranted. *Matter of Pula,* 19 I&N Dec. at 473. And the BIA has specifically considered as relevant factors the noncitizen's "manner of entry or attempted entry." *Id.* Although the rule places greater weight on these factors under certain emergency circumstances, this decades-old precedent establishes that the Departments can permissibly take into account manner of entry. And exactly how much weight to place on those factors, and whether to do so in weighing asylum eligibility, falls well within the broad discretion conferred on the Departments by section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). *Cf. Lopez* v. *Davis,* 531 U.S. 230, 244 (2001); *Reno* v. *Flores,* 507 U.S. 292, 313 (1993); *Yang,* 79 F.3d at 936–37.

The Departments acknowledge that *Matter of Pula* did not consider a noncitizen's arrival at a POE to weigh against a discretionary grant of asylum. *See* 19 I&N Dec. at 473. But *Matter of Pula* also did not involve circumstances in which the country's border faced an emergency of a magnitude comparable to the emergency border circumstances described by the Proclamation and this rule, where even arrivals at POEs significantly contribute to the Departments' inability to process migrants and deliver timely decisions and timely consequences to those without a lawful basis to remain. Given the emergency border circumstances described by the Proclamation and the

President's direction in section 3(d) of the Proclamation to promptly consider issuing any instructions, orders, or regulations as may be necessary to address the situation at the southern border; and given the strain on operations and resources that high volumes of new arrivals create, such that consequences cannot be appropriately delivered; the Departments believe that the rule's limitation on asylum eligibility should apply to noncitizens who enter the United States across the southern border, including at a POE during the emergency border circumstances described in the Proclamation and this rule, unless an exception applies.

In *Matter of Pula,* the BIA explained that a noncitizen's "circumvention of orderly refugee procedures," including their "manner of entry or attempted entry," is a relevant factor for asylum, 19 I&N Dec. at 473–74, and this rule merely takes such circumvention into account. Because the Proclamation contains an exception for arrivals at a pre-scheduled time and place under a process approved by the Secretary, this rule's limitation on asylum will also not apply to such arrivals. One of the mechanisms by which a noncitizen may arrive at a POE with a pre-scheduled time to appear is through the CBP One app. Use of the CBP One app creates efficiencies that enable CBP to safely and humanely expand its ability to process noncitizens at POEs, including those who may be seeking asylum. *See* 88 FR at 11719. Indeed, without CBP One, noncitizens could have longer wait times for processing at the POE depending on daily operational constraints and circumstances. *See* 88 FR at 31342. During emergency border circumstances, use of the CBP One app is especially critical because it allows DHS to maximize the use of its limited resources. *See, e.g., id.* at 31317–18 (explaining the benefits of having noncitizens pre-schedule appointments using the CBP One app). The CBP One app and other lawful pathways that the United States Government has made available to those seeking to enter the United States, including to seek asylum or protection, are intended to allow for orderly processing. Therefore, those who "circumvent orderly refugee procedures," consistent with *Matter of Pula,* 19 I&N Dec. at 474, during emergency border circumstances without meeting one of the recognized exceptions to asylum will be ineligible for asylum.[181]

iv. This Limitation on Asylum Eligibility

For the reasons discussed above, the *East Bay* cases dealt with different limitations on asylum and involved different factual circumstances, and hence are distinguishable from this rule.[182] Moreover, the Departments respectfully disagree with some of the substantive holdings of the Ninth Circuit and the district court as described above. The Secretary and the Attorney General permissibly may determine that, during emergency border circumstances, it is in the "best interests of th[e] country," *Matter of Marin,* 16 I&N Dec. at 584, to limit asylum eligibility for those who enter in violation of the Proclamation, which, in turn, will allow the Departments to allocate their limited resources to prioritize processing noncitizens who do not enter in violation of it. Nothing in section 208 of the INA, 8 U.S.C. 1158, forecloses that view, and securing the best interests of the country is a reasonable policy goal under section 208 and thus "consistent with" it. INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see Yang,* 79 F.3d at 939 (observing that "it is precisely to cope with the unexpected that Congress deferred to the experience and expertise of the Attorney General in fashioning section 208"); *see also id.* at 935 ("We must reject the argument that [the] regulation [establishing a categorical discretionary bar to asylum eligibility] exceeds the authority of the Attorney General if we find that the regulation has a 'reasonable foundation . . .' that is, if it rationally pursues a purpose that it is lawful for the

[181] As the BIA further explained with respect to the asylum statute as it existed at the time, "[a] careful reading of the language of [section 208(a)(1)]

reveals that the phrase 'irrespective of such alien's status' modifies only the word 'alien.'" *Matter of Pula,* 19 I&N Dec. at 473. "The function of that phrase is to ensure that the procedure established by the Attorney General for asylum applications includes provisions for adjudicating applications from *any* alien present in the United States or at a land or port of entry, irrespective of such alien's status.'" *Id.* (collecting cases). Congress accordingly made clear that noncitizens like stowaways, who, at the time the Refugee Act was passed, could not avail themselves of our immigration laws, would be eligible at least to apply for asylum "irrespective of [their] status." *Id.* "Thus, while section 208(a) provides that an asylum application be accepted from an alien 'irrespective of such alien's status,' no language in that section precludes the consideration of the alien's status in granting or denying the application in the exercise of discretion." *Id.*

[182] The Departments have considered the July 25, 2023 district court decision vacating the Circumvention of Lawful Pathways rule. *See E. Bay Sanctuary Covenant* v. *Biden,* 683 F. Supp. 3d 1025 (N.D. Cal. 2023). That decision applied the holdings of the other *East Bay* decisions generally, and the Departments do not see a need to address it separately except to note that as of publication the court's vacatur remains stayed pending appeal in the Ninth Circuit, and thus the rule is in effect. *See E. Bay Sanctuary Covenant* v. *Biden,* No. 23–16032, 2023 WL 11662094, at *1 (9th Cir. Aug. 3, 2023).

**48738** **Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations

[immigration agencies] to seek.' '' (quoting *Reno,* 507 U.S. at 309)).

Beyond the clear statutory text, settled principles of administrative law dictate that the Departments may adopt generally applicable eligibility requirements. Those principles establish that it is permissible for agencies to establish general rules or guidelines in lieu of case-by-case assessments, so long as those rules or guidelines are not inconsistent with the statute, and that principle is especially salient here as asylum is inherently discretionary in nature. *See Lopez,* 531 U.S. at 243–44 (rejecting the argument that the Bureau of Prisons was required to make ''case-by-case assessments'' of eligibility for sentence reductions and explaining that an agency ''is not required continually to revisit 'issues that may be established fairly and efficiently in a single rulemaking' '' (quoting *Heckler* v. *Campbell,* 461 U.S.458, 467 (1983))); *Reno,* 507 U.S. at 313–14 (holding that a statute requiring ''individualized determination[s]'' does not prevent immigration authorities from using ''reasonable presumptions and generic rules'' (quotation marks omitted)); *Fook Hong Mak,* 435 F.2d at 730 (upholding INS's authority to ''determine[ ] certain conduct to be so inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration'' and observing that there is no legal principle forbidding an agency that is ''vested with discretionary power'' from determining that it will not use that power ''in favor of a particular class on a case-by-case basis''); *see also Singh,* 623 F. Supp. at 556 (''attempting to discourage people from entering the United States without permission . . . provides a rational basis for distinguishing among categories of illegal aliens''); *Matter of Salim,* 18 I&N Dec. 311, 315–16 (BIA 1982) (before *Pula,* explaining that a certain form of entry can be considered an ''extremely adverse factor which can only be overcome with the most unusual showing of countervailing equities''); *cf. Peulic* v. *Garland,* 22 F.4th 340, 346–48 (1st Cir. 2022) (rejecting challenge to *Matter of Jean,* 23 I&N Dec. 373 (A.G. 2002), which established strong presumption against a favorable exercise of discretion for certain categories of applicants for asylee and refugee adjustment of status under section 209(c) of the INA, 8 U.S.C. 1159(c) (citing cases)); *Cisneros* v. *Lynch,* 834 F.3d 857, 863–64 (7th Cir. 2016) (rejecting challenge to 8 CFR 1212.7(d), which established strong presumption against a favorable exercise of discretion

for waivers under section 212(h) of the INA, 8 U.S.C. 1182(h), for certain classes of noncitizens, even if a few could meet the heightened discretionary standard (citing cases)).

The Departments recognize that in the Circumvention of Lawful Pathways rule they declined to adopt on a permanent basis the Proclamation Bar IFR because it conflicted with the tailored approach in that rule and because barring all noncitizens who enter between POEs along the SWB was not the proper approach under the circumstances the Departments then faced. *See* 88 FR at 31432. The Departments continue to believe that the approach taken in the Proclamation Bar IFR conflicts with the tailored approach of the Circumvention of Lawful Pathways rule as well as the tailored approach in this rule, which borrows heavily from the Circumvention of Lawful Pathways rule. The Proclamation Bar IFR contained no exceptions and was open-ended, allowing for implementation of any future proclamations or orders regardless of their terms. *See* 83 FR at 55952. In contrast, like the Circumvention of Lawful Pathways rule, this rule is narrowly tailored to address the emergency border circumstances described in the Proclamation and the rule and includes exceptions to account for circumstances in which waiting for an end to the suspension and limitation on entry and the limitation on asylum eligibility is not possible. And by relating the rule to a specific proclamation and the circumstances described therein, the Departments have been able to tailor its provisions to the terms of the Proclamation and the circumstances under which it is applied.

Finally, the Departments acknowledge that, unlike the Circumvention of Lawful Pathways rule, neither the Proclamation nor this rule excepts Mexican nationals. *See* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii) (providing that the Lawful Pathways rebuttable presumption of asylum ineligibility applies only to those who enter the United States along the SWB after transiting through a third country). Traveling through a third country is a key part of the Circumvention of Lawful Pathways rule because one lawful pathway for obtaining protection is applying for protection in a third country. *See* 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). The Departments recognize that some Mexican nationals seek asylum and protection in the United States. Indeed, since 2021, DHS has seen a sharp increase in total SWB encounters of Mexican nationals, from a pre-pandemic (FY 2014 through FY

2019) average of approximately 239,000 to more than 717,000 in FY 2023.[183] Of note, this increase in encounters has been accompanied by a sharp increase in referrals for credible fear interviews of Mexican nationals in expedited removal. The percentage of Mexican nationals processed for expedited removal who claimed a fear of return averaged 6 percent in the pre-pandemic period (FY 2014 through FY 2019), and never exceeded 7 percent for any fiscal year.[184] But 29 percent of all Mexican nationals processed for expedited removal at the SWB from May 12, 2023, to March 31, 2024, made fear claims, including 39 percent in February 2024.[185] Because of this sharp increase from the historical average, the Departments believe that applying this rule to Mexican nationals will result in faster processing of a significant number of Mexican noncitizens and thereby significantly advance this rule's overarching goal of alleviating the strain on the border security and immigration systems while entry is suspended and limited under the Proclamation. At the same time, the Departments continue to believe that, if encounters decrease to levels under which the systems do not experience the substantial strains they currently experience while the Circumvention of Lawful Pathways rule remains in effect, the application of that rule only to those noncitizens who travel through a third country en route to the United States appropriately accounts for the goals of encouraging migrants to seek protection in other countries or to use safe, orderly, and lawful pathways to enter the United States, ensuring the border security and immigration systems can efficiently process noncitizens, and affording asylum and other protection to those seeking it who establish their eligibility.

Under this rule, Mexican nationals will still be eligible for asylum in some circumstances—they may present at a POE pursuant to a pre-scheduled appointment, or, if they are unable to wait in Mexico while scheduling an appointment, they may be able to establish an exception to the Proclamation or exceptionally compelling circumstances under the rule. Even if they are not able to do so, the rule does not preclude eligibility for

---

[183] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables,* https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) (''CBP SW Border Encounters by Agency and Selected Citizenship'').

[184] OHSS Enforcement Lifecycle December 31, 2023.

[185] OHSS analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

statutory withholding of removal and CAT protection, and they will be able to seek such protection. In the absence of an exception, however, Mexican nationals should be ineligible for asylum under the rule because, during the emergency border circumstances described in the Proclamation and this rule, it is important to deter irregular entry by all noncitizens regardless of country of origin. And the above data make clear that additional incentives are necessary to encourage Mexican nationals to pursue the available lawful, safe, and orderly pathways, rather than entering the country unlawfully.

v. Application During Credible Fear Screenings and Reviews

The limitation on asylum eligibility adopted here applies during merits adjudications, *see* 8 CFR 208.13(g), 1208.13(g), but will most frequently be relevant for noncitizens who are subject to expedited removal under section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1). Noncitizens in expedited removal are subject to removal "without further hearing or review" unless they indicate an intention to apply for asylum or fear of persecution. INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). Noncitizens in expedited removal who indicate an intention to apply for asylum or fear of persecution are referred to an AO for an interview to determine if they have a credible fear of persecution and should accordingly remain in proceedings for further consideration of the application. INA 235(b)(1)(A)(ii), (b)(1)(B)(i), (ii), 8 U.S.C. 1225(b)(1)(A)(ii), (b)(1)(B)(i), (ii). In addition, AOs consider whether a noncitizen in expedited removal may be eligible for statutory withholding of removal or for CAT protection. *See* 8 CFR 208.30(e)(2), (3).

This rule instructs AOs and IJs to apply the limitation it adopts during credible fear screenings and reviews. 8 CFR 208.35(b), 1208.35(b). Under the rule, when screening for asylum eligibility, the AO and IJ must determine whether there is a significant possibility that the noncitizen would be able to establish by a preponderance of the evidence that they were not subject to the rule's limitation on asylum eligibility or that they will be able to establish by a preponderance of the evidence exceptionally compelling circumstances. For the reasons noted in the Circumvention of Lawful Pathways rule, the Departments expect that noncitizens rarely would be found excepted from the limitation on asylum for credible fear purposes and subsequently be found not to be excepted at the merits stage. *See* 88 FR at 31380–81.

The Departments recognize that in the recent past they changed course regarding whether to apply bars and conditions and limitations on asylum eligibility during credible fear screenings by rescinding provisions that would have applied the mandatory asylum bars during credible fear screenings. *See* 87 FR at 18135. In the Circumvention of Lawful Pathways NPRM, the Departments explained their reasoning for nevertheless applying that condition on asylum eligibility during credible fear screenings, stating that the rebuttable presumption would be less difficult to apply than other bars, limitations, or conditions because the facts regarding the presumption's applicability, exceptions, and rebuttal circumstances would generally be straightforward to apply. 88 FR at 11744–45. Indeed, the Departments have applied the presumption effectively in credible fear screenings for the time in which the Circumvention of Lawful Pathways rule has been in effect.[186]

The limitation adopted here is in many ways parallel to the Lawful Pathways rebuttable presumption— specifically, it borrows from the Circumvention of Lawful Pathways rule's rebuttal circumstances—although it is more straightforward because it does not include the Lawful Pathways rebuttable presumption's exceptions for those who applied and were denied asylum or other protection in a third country and those who were unable to schedule an appointment through the CBP One app for certain reasons. *See* 8 CFR 208.33(a)(2)(ii)(B)–(C), 1208.33(a)(2)(ii)(B)–(C). Given the Departments' experience with implementing the Circumvention of Lawful Pathways rule, the Departments are confident that the limitation and

---

[186] In the post-May 12, 2023, period, the median time to refer noncitizens encountered by CBP at the SWB who claim a fear for credible fear interviews has decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative fear determinations or administrative closures that are not referred to EOIR, the median time from encounter to removal, in the same time frames, decreased 85 percent from 73 days to 11 days. Pre-pandemic medians based on OHSS analysis of OHSS Enforcement Lifecycle December 31, 2023; post-May 12 estimates based on OHSS analysis of operational CBP, ICE, USCIS, and DOJ/EOIR data downloaded from UIP on April 2, 2024. The Departments note that DHS recently published a notice of proposed rulemaking proposing that certain mandatory bars be considered at the screening stage under a reasonable possibility standard. Application of Certain Mandatory Bars in Fear Screenings, 89 FR 41347 (May 13, 2024). If DHS were to finalize that rule as drafted, this rule's "reasonable probability" standard would still apply when the noncitizen is subject to this rule's limitation on asylum eligibility.

exceptions established here will be just as straightforward to apply as the similar provisions are for the Circumvention of Lawful Pathways rule.

b. Manifestation of Fear

This rule also alters certain aspects of the expedited removal process for individuals who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation. When an immigration officer inspects a noncitizen at a POE or between POEs and determines that the noncitizen is inadmissible and will be subject to expedited removal, current regulations require the immigration officer to take certain steps before ordering the noncitizen removed from the United States. *See* 8 CFR 235.3(b). This process takes approximately two hours per individual in USBP custody. In particular, the immigration officer conducts an inspection, including taking biometrics; running background checks; collecting biographic information, citizenship, and place and manner of entry; and advising the noncitizen of the charges against them. 8 CFR 235.3(b)(2)(i). The noncitizen has an opportunity to provide a response. *Id.* The officer must also read (or have read through an interpreter, if appropriate) the information contained in the Form I–867A, Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act, which advises the noncitizen of their ability to seek protection in the United States. *Id.* The examining immigration officer must also read the noncitizen the questions on the Form I–867B, Jurat for Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act, which asks, among other things, whether the noncitizen has any fear of return or would be harmed if returned. *Id.* After the noncitizen has provided answers to the questions on Form I–867B, the immigration officer records the answers, and the noncitizen then reads the statement (or has the statement read to them) and signs the statement. *Id.* On average, USBP agents spend about 20 to 30 minutes of the inspection period completing both the Form I–867A and the Form I–867B. Finally, a noncitizen who indicates a fear of return or an intention to seek asylum is served with and acknowledges receipt of a Form M–444, which includes more detailed information about the credible fear process. 8 CFR 235.3(b)(4)(i).

Instead of this current process, DHS is adding a new provision at 8 CFR 235.15(b)(4) to modify the process for determining whether a noncitizen who enters across the southern border and is

not described in section 3(b) of the Proclamation during the emergency circumstances giving rise to the Proclamation's suspension and limitation on entry should be referred to an AO for a credible fear interview. These procedures apply during emergency border circumstances. *See* 8 CFR 235.15(a). Under the new rule, immigration officers will conduct an immigration inspection and, where the noncitizen will be subject to expedited removal, will advise the noncitizen of the removal charges against them and provide an opportunity to respond, consistent with existing practice and regulations outlined above. 8 CFR 235.3(b)(2)(i). However, the immigration officer will not complete either the Form I–867A or Form I–867B or a sworn statement. Moreover, the officer will not be required to provide individualized advisals on asylum or ask the noncitizen questions related to whether they have a fear. *See* 8 CFR 235.15(b)(4). Under the rule, the immigration officer will instead refer the noncitizen to an AO for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to the noncitizen's country or country of removal. *See id.* This manifestation can occur at any time in the process and can be expressed verbally, non-verbally, or physically.[187] In such situations, the immigration officer will not proceed further with the removal and will comply with the existing regulations, policies, and procedures, including as outlined in 8 CFR 235.3(b)(4), regarding processing and referring noncitizens for credible fear interviews. At the time that a noncitizen is referred for a credible fear interview, they will receive additional information about the credible fear process that has the same substantive information as in the current process, but without the requirement that such information be provided on a particular form.

DHS is making these changes to address the emergency circumstances at the southern border discussed in the

Proclamation and the rule in a manner consistent with its legal obligations. DHS has broad authority to change the procedures that immigration officers apply to determine whether a noncitizen subject to expedited removal will be referred for a credible fear interview by an AO so long as those procedures are consistent with the INA. *See* INA 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3) (granting the Secretary the authority to establish regulations and take other actions "necessary for carrying out" the Secretary's authority under the immigration laws); *see also* 6 U.S.C. 202; *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983) (emphasizing that agencies "must be given ample latitude to adapt their rules and policies to the demands of changing circumstances" (quotation marks omitted)).

DHS believes that the above-described changes are fully consistent with the statutory procedures governing expedited removal under section 235(b)(1)(A) of the INA, 8 U.S.C. 1225(b)(1)(A). Section 235(b)(1)(A) of the INA, 8 U.S.C. 1225(b)(1)(A), does not specify the relevant aspects of the procedures that immigration officers must follow to determine whether a noncitizen who is subject to expedited removal can be ordered removed or whether the noncitizen must be referred to an AO for a credible fear interview. Instead, the statute provides that the immigration officer may order removed any noncitizen who, subject to certain exceptions, is arriving in the United States, or who is within a class of noncitizens subject to expedited removal as designated by the Secretary, and who is inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the INA, 8 U.S.C. 1182(a)(6)(C) or 1182(a)(7). The statute further provides that only those noncitizens who "indicate[] either an intention to apply for asylum . . . or a fear of persecution," INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i), must be referred to an AO for a credible fear interview, INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). But the statute does not require immigration officers to affirmatively ask every noncitizen subject to expedited removal if they have a fear of persecution or torture. Moreover, Congress has not provided a particular definition of the phrase "indicates . . . an intention." The statute's text thus gives DHS discretion to employ the procedures it reasonably concludes are appropriate to implement

section 235(b)(1)(A)(ii) of the INA, 8 U.S.C. 1225(b)(1)(A)(ii).[188]

Interpreting the statute in this manner is also consistent with the United States' international law obligations. As described in Section II.B of this preamble, the United States is a party to the Refugee Protocol, which incorporates Articles 2 through 34 of the Refugee Convention. Article 33 of the Refugee Convention generally prohibits parties to the Convention from expelling or returning "a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Refugee Convention, *supra,* 19 U.S.T. at 6276, 189 U.N.T.S. at 176.[189] Neither the Refugee Convention nor the Protocol prescribes minimum screening procedures that must be implemented.[190] Rather, each state party has the authority "to establish the procedure that it considers most appropriate, having regard to its particular constitutional and administrative structure," as long as such procedures are consistent with the purposes of the Convention.[191] The United States has also ratified the CAT, which includes a non-refoulement provision at Article 3 that prohibits the return of a person from the United States to a country where there are "substantial grounds for believing" the person would be tortured. *See Pierre* v. *Gonzales,* 502 F.3d 109, 114 (2d Cir. 2007); *see id.* at 115 (" '[T]he United States understands the phrase, 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in

---

[187] By these terms, DHS intends to include a wide range of human communication and behavior, such that "non-verbally" could include things like noises or sounds without any words, while physical manifestations could include behaviors, with or without sound, such as shaking, crying, or signs of abuse. *See* U.S. State Dep't, Bureau of Population, Refugees, and Migration, *Fact Sheet: U.S. Commemorations Pledges, Fact Sheet, Bureau of Population, Refugees, and Migration* (June 24, 2013), *https://2009-2017.state.gov/j/prm/releases/factsheets/2013/211074.htm.* A noncitizen could thus manifest a fear of returning to a previous location without using actual words to state that they are specifically afraid of return to their home country or country of removal.

[188] *See Vermont Yankee Nuclear Power Corp.* v. *Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 543 (1978) ("Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." (quotation marks omitted)); *United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 543 (1950) (" '[T]he decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General."); *Las Americas Immigrant Advoc. Ctr.* v. *Wolf,* 507 F. Supp. 3d 1, 18 (D.D.C. 2020).

[189] *See INS* v. *Stevic,* 467 U.S. 407, 428 & n.22 (1984); *Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.").

[190] UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status* ¶ 189 (Jan. 1992 ed., reissued Feb. 2019), *https://www.unhcr.org/media/handbook-procedures-and-criteria-determining-refugee-status-under-1951-convention-and-1967.*

[191] *Id.*

Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.' '' (quoting the Senate resolution of ratification)). The CAT similarly does not prescribe screening requirements. As such, the United States has broad discretion in what procedures are appropriate to implement, through domestic law, to satisfy its non-refoulement obligations.[192]

The United States implements its obligations under the Refugee Protocol and the CAT through the INA and related rulemaking, and it provides specified procedures—including in the expedited removal process, as described above—for seeking asylum or other protection in the United States. The process outlined in this rule temporarily affords immigration officers the ability to refer noncitizens to an AO for a credible fear interview if the noncitizen manifests a fear of return, expresses an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to the noncitizen's country or country of removal. The Departments have concluded that the manifestation standard is consistent with their obligations (1) not to return noncitizens to countries where they would be persecuted; and (2) not to return noncitizens to countries where it is more likely than not that they would be tortured.[193]

In addition to changing to a ''manifestation'' standard, CBP is implementing operational changes to generally inform noncitizens subject to expedited removal that, if they have a fear of return, they should inform an immigration officer, and they will be referred to an AO for consideration of their fear claim. DHS believes that these operational changes and notice provisions, as implemented, are consistent with the notice provision in section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv).[194] Moreover, CBP will provide immigration officers with information on how to apply the manifestation standard, including that manifestation may occur verbally, non-verbally, or physically.

Upon implementation of this rule, signs will be posted in areas of CBP facilities where individuals are most likely to see these signs. The signs will provide clear direction to individuals that, in addition to being able to inform the inspecting immigration officers of urgent medical or other concerns, they should inform the inspecting immigration officer if they have a fear of return, and that, if they do, they will be referred for a screening. These signs will be in the languages spoken by the most common nationalities encountered by CBP and thus will likely be understood by those described in the Proclamation and likely subject to the provisions of this rule.[195]

Moreover, in CBP's large capacity facilities—where the vast majority of individuals subject to expedited removal undergo processing—a short video explaining the importance of raising urgent medical concerns, a need for food or water, or fear of return will be shown on a loop in the processing areas and will also be available in those languages most commonly spoken by those noncitizens encountered by CBP who may be described in the Proclamation and likely subject to the provisions of this rule.[196]

The video will also explain to noncitizens that, if they inform an immigration officer that they have a fear, an AO will conduct an interview to ask questions about their fear. Consistent with CBP's Language Access Plan, CBP provides language assistance services for those who may not speak one of those languages.[197] CBP immigration officers have extensive experience and training in identifying whether an individual requires a translator or interpreter or is unable to understand a particular language. In addition, CBP facilities have ''I Speak'' signs, which are signs that assist literate individuals to identify a preferred language from one of over 60 possible languages.[198] Furthermore, individuals who are unable to read the signs or communicate effectively in one of the languages in which the sign and video will be presented will be read the contents of the sign and video in a language they understand.[199]

---

[192] Although neither the Refugee Convention nor the Refugee Protocol nor the CAT includes specific screening requirements, the United States is bound not to return noncitizens from the United States to countries where they would be tortured, or, with limited exceptions, to countries where they would be persecuted on account of a protected ground. As discussed in detail above in Section III.A.1 of this preamble, the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), not through the asylum provisions at section 208 of the INA, 8 U.S.C. 1158. And the United States implements its obligations under the CAT through regulations. *See* FARRA, Pub. L. 105–277, sec. 2242(b), 112 Stat. 2681, 2631–822 (8 U.S.C. 1231 note); 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, 1208.18.

[193] 136 Cong. Rec. 36198 (1990) (recording the Senate's advice and consent to the ratification of the CAT, subject to certain reservations, understandings, and declarations, including that the phrase in Article 3 of the CAT, '' 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' '' is understood to mean '' 'if it is more likely than not that he would be tortured' ''); *see also Pierre,* 502 F.3d at 115.

[194] DHS acknowledges that an argument could be made that the requirement in section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), which states that DHS ''shall provide information concerning the asylum interview . . . to aliens who may be eligible,'' is not limited only to noncitizens who are eligible for a credible fear interview, but instead applies to noncitizens who are suspected of qualifying for expedited removal and ''may'' be eligible for an interview. In all events, DHS is providing information to noncitizens who are being processed for expedited removal about their right to seek asylum and protection in the United States. As explained below, DHS is posting signs on display for all noncitizens in CBP custody and including information in a video that will be on display for the vast majority of noncitizens in CBP custody, informing them that if they have a fear of return, they should inform an immigration officer and, if they do, an AO will conduct an interview and ask the noncitizens questions about any fear they may have. Noncitizens who indicate a fear of return will be given a more detailed written explanation of the credible fear interview process prior to being referred for the interview. That explanation will be translated into certain common languages or will be read to the noncitizen if required.

[195] Currently, these languages are English, Spanish, Mandarin, and Hindi.

[196] These large capacity facilities currently hold the vast majority of individuals in CBP custody. Although the videos will not be shown at smaller facilities, including small POEs and Border Patrol stations, these facilities house very few noncitizens who are subject to the asylum limitation. These small facilities will still post the relevant signs in the processing areas. And at these small facilities, resources are such that immigration officers will be able to devote a great deal of attention to observing individuals, including for any manifestations of fear or any indication that an individual requires assistance from a translator or reading assistance to understand the information provided at the facility, including the information provided on the signs. Immigration officers at these facilities are trained to provide such assistance as needed and will continue to do so under this rule.

[197] *See* CBP, *Language Access Plan* (Nov. 18, 2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf;* CBP, *Supplementary Language Access Plan* (Oct. 30, 2023), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf.*

[198] *See* CBP, *Language Access Plan* 7 (Nov. 18, 2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf; see also* DHS, *DHS Language Access Resources, https://www.dhs.gov/publication/dhs-language-access-materials* (last updated July 17, 2023); DHS, *I Speak . . . Language Identification Guide, https://www.dhs.gov/sites/default/files/publications/crcl-i-speak-poster-2021.pdf* (last updated Mar. 10, 2021).

[199] These videos and signs will be presented in a manner that is consistent with how CBP provides other important notifications to individuals in its facilities. CBP utilizes posters for other critical information, such as ensuring that individuals are on the lookout for those who may commit suicide, advising all children in CBP custody of the amenities available to them (*e.g.,* food, water, medical care, blankets, and hygiene products), communicating its zero tolerance regarding sexual assault, and conveying critical information about oversight entities such as the Office of the Inspector General. CBP also has a video targeted towards UCs explaining the process that they will go through. These signs and videos are similarly posted in the
Continued

DHS's experience, based on the nature of CBP facilities and the utility of the existing signs, is that short, concise, and simple notifications are effective. This is because CBP holds individuals only for as long as it takes to complete inspection and processing, including conducting any basic medical screenings and making arrangements for transfer out of CBP custody. Particularly for those who are apprehended by USBP between POEs, noncitizens will go through a number of steps during their time in a CBP facility, including completion of processing paperwork, fingerprinting, and being interviewed by an inspecting immigration officer. In many USBP facilities, these steps occur at the same time as the facility provides showers and hygiene products, medical evaluations, and food and water. Given that noncitizens may move through other areas of the facility and do not remain in custody for a long period of time, DHS regularly places important signs in both the processing areas and the detention areas of its facilities, which are the locations where noncitizens spend time while being inspected or while in CBP custody; DHS is confident that noncitizens see these existing signs and that the new signs added as part of this rule are also likely to be seen. DHS has determined that more complicated videos and signs are less effective for conveying important information.

DHS acknowledges that these procedures represent a departure from the justification that the former Immigration and Naturalization Service (''INS'') provided, in 1997, when it adopted the current procedures in 8 CFR 235.3(b)(2)(i). At the time, INS explained that adopting these procedures would ''ensure that bona fide asylum claimants are given every opportunity to assert their claim[s],'' and that it was including the requirement that immigration officers must provide advisals about the credible fear process and ask questions about fear as ''safeguards'' to ''protect potential asylum claimants.'' *See* 62 FR at 10318–19. INS further explained that these procedures would ''not unnecessarily burden[] the inspections process or encourag[e] spurious asylum claims.'' *Id.* at 10318. While such procedures have remained in place since 1997, this fact alone is not an indication that they are required by the statute, and DHS maintains discretion to update the procedures in a manner consistent with the statute. *See FCC* v. *Fox Television Stations, Inc.,* 556 U.S.

502, 515 (2009) (holding that an agency changing an established rule need not justify the change with a more detailed justification than that supporting the original so long as it can show ''good reasons'' for the new policy). Given the extraordinary circumstances currently facing the Departments, DHS has determined it is reasonable to change the procedures here.

When the existing regulations were adopted in 1997, the situation at the border was different. In 1998 (the first full year that statistics concerning the expedited removal process were available), approximately 80,000 noncitizens were processed for expedited removal.[200] In that same year, AOs conducted fewer than 3,000 credible fear interviews [201] and IJ reviews numbered around 100.[202] Additionally, at that time, expedited removal was applied only to ''arriving aliens,'' noncitizens processed at a POE, not noncitizens encountered between POEs.[203] Expedited removal was not extended to certain noncitizens encountered after entering between POEs until 2004. *See* Designating Aliens for Expedited Removal, 69 FR 48877 (Aug. 11, 2004) (extending expedited removal to noncitizens encountered within 100 air miles of the border and within 14 days of entry). At that time, USBP apprehended approximately 1.1 million noncitizens between POEs annually.[204] The numbers have changed significantly since that time. In FY 2023, USBP apprehended more than 2 million noncitizens between POEs along the SWB.[205] In February 2024, USBP processed more than 33,000 individuals for expedited removal,[206] and USBP

processed more than 28,000 in March 2024.[207] Since May 2023, USCIS has completed about 3,300 credible fear interviews per week of individuals encountered at and between SWB POEs,[208] and in FY 2023, IJs reviewed over 34,000 credible fear decisions.[209] These high levels of encounters and credible fear referrals impose a significant burden on the expedited removal process and have strained DHS and EOIR resources, substantially impairing the Departments' ability to deliver timely decisions and timely consequences. At a processing time of approximately 2 hours per person, USBP agents spent approximately 56,000 hours—the equivalent of approximately 2,333 calendar days— processing the approximately 28,000 expedited removal cases in March 2024 under the current process. High numbers, such as those giving rise to the Proclamation and this rule, increase the likelihood that USBP facilities will become quickly overcrowded.[210] This type of crowding in USBP facilities creates health and safety concerns for noncitizens and Government personnel.[211]

Additionally, compared to 1997, today's high levels of migration impose a severe strain on the credible fear process. AOs and IJs must devote substantial resources to credible fear interviews and reviews.[212] Despite the strengthened consequences in place at the SWB through the Circumvention of Lawful Pathways rule and the complementary measures that have led to record returns and removals, encounter levels and credible fear referrals are exceeding the capacity of

---

[200] *See* INS, *1998 Statistical Yearbook of the Immigration and Naturalization Service* 203 (Nov. 1998), *https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_1998.pdf.*

[201] *See id.* at 91.

[202] EOIR, *Statistical Yearbook 2000,* at D1 (Jan. 2001), *https://www.justice.gov/sites/default/files/eoir/legacy/2001/05/09/SYB2000Final.pdf* (reporting that EOIR received 90 credible fear reviews in FY 1998).

[203] *See* 62 FR at 10318–19; *compare* INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i) (applying expedited removal to noncitizens arriving at ports of entry), *with* INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii) (permitting the application to designated noncitizens).

[204] CBP, *United States Border Patrol Nationwide Encounters Fiscal Year 1925–2020, https://www.cbp.gov/sites/default/files/assets/documents/2021-Aug/U.S.%20Border%20Patrol%20Total%20Apprehensions%20%28FY%201925%20-%20FY%202020%29%20%28508%29.pdf* (last accessed May 27, 2024).

[205] CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last modified May 15, 2024).

[206] OHSS analysis of data downloaded from UIP on April 2, 2024.

[207] OHSS analysis of data downloaded from UIP on April 2, 2024.

[208] OHSS analysis of data downloaded from UIP on April 2, 2024.

[209] *See* EOIR, *Adjudication Statistics: Credible Fear and Reasonable Fear Review Decisions* (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2018/10/26/7_credible_fear_review_and_reasonable_fear_review_decisions.pdf.*

[210] *See* Decl. of Matthew J. Hudak ¶¶ 11, 17, *Florida* v. *Mayorkas,* Case No. 3:22 cv 9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[211] *Id.*

[212] USCIS closed or adjudicated an estimated 135,000 credible fear interviews resulting from SWB encounters in FY 2023, up from an average of 52,000 from 2010 to 2019 and an average of 5,400 from 2005 to 2009. OHSS analysis of March 2024 OHSS Persist Dataset and Enforcement Lifecycle December 31, 2023. *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (reflecting ever increasing numbers of credible fear interview screenings at the ''SW Border Credible Fear Screenings Referred to USCIS by citizenship'' tab); *see also* 88 FR at 31314, 31326, 31381.

areas of CBP facilities where DHS is confident they are likely to be seen by noncitizens being processed.

the expedited removal process.[213] Therefore, DHS has determined that a different approach is needed here. The manifestation standard in the new rule is designed to reasonably help meet these challenges during emergency border circumstances. It is intended to help immigration officers process noncitizens more expeditiously, while still affording opportunities for those seeking protection to do so.

DHS acknowledges that, by implementing a manifestation standard in the circumstances outlined in this rule, it is temporarily eliminating the requirement to provide individualized advisals and ask affirmative questions via Forms I–867A and B. DHS has determined that, in light of the circumstances giving rise to the Proclamation and this rule, it is critical to have a system in place that more effectively and efficiently identifies those who may have a fear of return or indicate an intention to seek asylum. DHS is making the decision to use the manifestation standard consistent with the statute, as described above, and for the reasons detailed below. At bottom, based on DHS's long experience inspecting and interviewing individuals, DHS has determined that a manifestation approach is the most appropriate way to address emergency border circumstances while still sufficiently affording the ability to seek protection. Specifically, DHS makes this determination based on its significant experience relating to the inspection of individuals seeking entry and admission into the United States. DHS immigration officers have expertise observing and inspecting individuals, as they consistently encounter and inspect large numbers of people every day. In FY 2019, prior to COVID–19, for example, the approximately 28,000 officers of CBP's Office of Field Operations [214] processed more than 1.1 million people at POEs every day.[215] USBP's 20,000 agents [216] encountered more than 2

million people on the SWB in FY 2023.[217]

In addition, DHS, including through its predecessor agencies, has been implementing the expedited removal provisions since 1997. It therefore has nearly 30 years of experience completing the Form I–867A advisals and asking the questions on Form I–867B.[218] Based on this experience, it is DHS's determination that, when individuals are asked affirmative questions, such as those on Form I–867B, individuals are more likely to respond in the affirmative, even if they do not in fact have a fear of return or intention of seeking asylum. Moreover, based on this experience, DHS concludes that providing noncitizens with specific advisals on fear claims—particularly given the emergency context of this rule and because few if any other advisals are provided—would be suggestive and prompt many individuals to respond in the affirmative even if they do not have any actual fear or intention to seek asylum. For this reason, as well, DHS has made the determination, based on its experience and expertise inspecting noncitizens, to temporarily adjust its approach to individualized advisals and questions about fear.

As part of this approach, DHS is temporarily forgoing asking the fear questions on Form I–867B with respect to noncitizens who (1) are described in § 208.13(g), (2) are not described in section 3(b) of the Proclamation, and (3) are processed for expedited removal. DHS anticipates that this approach will likely lead to a higher proportion of those referred having colorable claims for protection. Based on the expertise of DHS in administering Form I–867B, it has determined that affirmative questions are suggestive and account for part of the high rates of referrals and screen-ins that do not ultimately result in a grant of asylum or protection.[219] DHS believes that those noncitizens who indicate a fear of return on their own, in the absence of suggestive questions, are more likely to be urgently seeking protection. Indeed, it is DHS's experience and assessment that asking questions is likely to lead individuals to answer yes, even if they do not actually

have a fear of persecution or torture.[220] DHS acknowledges that there are mixed opinions on this point and that this may not be the case for all individuals, such that questioning may be helpful in order for some individuals to feel comfortable articulating a fear.[221] DHS recognizes

[213] See Decl. of Blas Nuñez-Neto ¶¶ 9–10, E. Bay Sanctuary Covenant v. Biden, No. 18 cv 6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2); Decl. of Matthew J. Hudak ¶¶ 10–12, Florida v. Mayorkas, No. 3:22 cv 9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1); Decl. of Enrique M. Lucero ¶ 7, Innovation Law Lab v. Wolf, No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–3).

[214] See CBP, About CBP: Leadership & Organization, Executive Assistant Commissioners' Offices, https://www.cbp.gov/about/leadership-organization/executive-assistant-commissioners-offices (last updated Jan. 30, 2024).

[215] See CBP, On a Typical Day in 2019, CBP . . . , https://www.cbp.gov/newsroom/stats/typical-day-fy2019 (last modified May 11, 2022).

[216] See CBP, About CBP: Leadership & Organization, Executive Assistant Commissioners' Offices, https://www.cbp.gov/about/leadership-organization/executive-assistant-commissioners-offices (last updated Apr. 19, 2024).

[217] See CBP, Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last modified May 15, 2024).

[218] See 62 FR at 10312, 10318–19.

[219] From 2014 through 2019, of total SWB encounters with positive fear determinations, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief. OHSS Enforcement Lifecycle December 31, 2023.

[220] This is also reflected in the behavioral science concept of ''acquiescence,'' in which individuals tend to ''consistently agree to questionnaire items, irrespective of item directionality.'' Shane Costello & John Roodenburg, Acquiescence Response Bias—Yeasaying and Higher Education, 32 Australian Ed. & Dev. Pysch. 105, 105 (2015). Studies have shown that this bias is higher amongst those with lower education levels and from countries that score higher on scales of corruption or collectivism. See, e.g., Beatrice Rammstedt, Daniel Danner & Michael Bosnjak, Acquiescence Response Styles: A Multilevel Model Explaining Individual-Level and Country-Level Differences, 107 Personality & Individual Differences 190 (2017); Seth J. Hill & Margaret E. Roberts, Acquiescence Bias Inflates Estimates of Conspiratorial Beliefs and Political Misperceptions, 31 Pol. Analysis 575 (2023).

[221] DHS acknowledges that some studies of the expedited removal process concluded that the Form I–867A information and the Form I–867B questions are important protections, and that failure to read the advisals led to lower referrals for credible fear interviews. See, e.g., Allen Keller et al., Study on Asylum Seekers in Expedited Removal as Authorized by Section 605 of the International Religious Freedom Act of 1998: Evaluation of Credible Fear Referral in Expedited Removal at Ports of Entry in the United States 16–18 (2005), https://www.uscirf.gov/sites/default/files/resources/stories/pdf/asylum_seekers/evalCredibleFear.pdf (''USCIRF Report'') (finding that noncitizens who are read the information in Form I–867A are seven times more likely to be referred for a credible fear interview and ''the likelihood of referral for a Credible Fear interview was roughly doubled for each fear question asked''); see also U.S. Gov't Accountability Off., Opportunities Exist to Improve the Expedited Removal Process, No. GAO/GGD–00–176 (Sept. 2000). DHS acknowledges that one study concluded that there was ''little evidence'' that the advisals and fear questions prompted noncitizens to make fear claims, but rather most of the noncitizens whose cases were studied ''spontaneously expressed fear of returning to their home country.'' See USCIRF Report at 21. The same study noted that three quarters of those had been read the advisals on Form I–867A. See id. Given the small sample size (n=73) and the report's uncertain conclusion, this report does not alleviate CBP's long held ''concerns that [noncitizens] may be 'prompted' to express fears to officers by the I–867B fear questions.'' Id. As in 2005, at the time of the report, DHS continues to have such concerns, and DHS further believes that the individualized advisals on Form I–867A raise similar ''prompting'' concerns. And, even to the extent that the study concluded otherwise, DHS notes that, under the manifestation standard outlined in the rule, noncitizens continue to have the ability to affirmatively manifest a fear. Thus, considering the current situation at the border that gives rise to the Proclamation and this rule and the need to allocate limited resources to those urgently seeking protection, DHS believes that, notwithstanding the study's finding, the approach taken in this rule provides an appropriate standard for the emergency border circumstances at issue. As noted, CBP will be providing signs and videos advising, in a general matter, that individuals may express a fear of return. Accordingly, DHS has fully considered and weighed the contrary evidence and has concluded that the rule adopts the appropriate approach to help meet the challenge when emergency border circumstances are present.

that the manifestation standard, as with any other screening standard, could result in some noncitizens with meritorious claims not being referred to a credible fear interview. However, in light of the emergency border circumstances facing the Departments and addressed by the Proclamation and this rule, DHS believes the standard is appropriate and necessary. During emergency border circumstances, it is critical for the Departments to devote their processing and screening resources to those urgently seeking protection while quickly removing those who are not. DHS believes that the manifestation standard, rather than affirmative questioning, better achieves this balance in emergency border circumstances.

Additionally, DHS is eliminating the requirement that officers and agents read the individualized advisals on Form I–867A. DHS plans to replace these advisals with a generalized notice—for all individuals in CBP facilities—of the ability to raise a claim of fear of persecution or torture. DHS is making this change based on its experience suggesting that, like with the Form I–867B advisals, individualized Form I–867A advisals would be suggestive and would likely lead many individuals to claim a fear of return when they otherwise would not, particularly given the emergency context of this rule and because there are few if any other advisals provided. Based on its experience, DHS determines that removing these advisals on their own is also suggestive.[222] Thus, in the context of inspecting individuals who (1) are described in § 208.13(g), (2) are not described in section 3(b) of the Proclamation, and (3) are processed for expedited removal, DHS has determined not to require the provision of such suggestive advisals. DHS acknowledges that, like with the Form I–867B questions, there are studies that show that such advisals make it more likely that a noncitizen will indicate a fear of return.[223] However, based on DHS's

experience, the nature of the emergency border circumstances facing the Departments, and the statutory requirements, DHS has determined that the approach taken here—eliminating the requirement to provide individualized advisals but providing signage and videos—is appropriate.[224]

Indeed, DHS notes that the manifestation standard has been used in other urgent and challenging situations to identify noncitizens with fear claims. This standard has long been used by the United States Coast Guard, a DHS component, to determine whether an at-sea protection screening interview is required for migrants interdicted at sea.[225] This standard was also adopted by the United States Government to screen family units during the pendency of the Title 42 public health Order, when the Government was similarly dealing with urgent, exigent circumstances—the global pandemic— while still allowing noncitizens an opportunity to seek protection.[226]

DHS believes that the manifestation standard is reasonably designed to identify meritorious claims even if a noncitizen does not expressly articulate a fear of return. Manifestations may be verbal, non-verbal, or physical.[227] A manifestation of fear may present with non-verbal or physical cues, through behaviors such as shaking, crying, fleeing, or changes in tone of voice, or through physical injuries consistent with abuse.[228] An individual who may

not be comfortable answering a question about whether they have a fear of return may nevertheless manifest that fear through an unconscious behavior, which can be observed by the inspecting immigration officer, and the individual may then be referred for a fear screening. DHS acknowledges that, in some cases, these behaviors may reflect circumstances other than a fear of return—for instance, a noncitizen who has just arrived at the border may be physically tired, cold, hungry, and disoriented, which may present similarly to manifestation of fear. In such cases, DHS immigration officers will use their expertise and training to determine whether the noncitizen is manifesting a fear. If there is any doubt, however, immigration officers will be instructed to err on the side of caution and refer the noncitizen to an AO for a credible fear interview.

Moreover, DHS will provide immigration officers with information on how to apply the standard, which will build on their existing training and experience. Indeed, as noted above, CBP immigration officers (both USBP agents and CBP officers) have extensive experience interviewing and observing individuals. As a result of their experience and training, they have skills and expertise in interacting with individuals and observing human behavior and in determining appropriate follow up steps with regards to any behaviors or indicators of concern. For instance, upon encountering a group of individuals who purport to be a family, USBP agents will observe the individuals to determine whether they evidence typical familial behavior or whether there are any concerns about the validity of the asserted familial relationship or the safety of any children in the group. Agents and officers are also trained on identifying potential trafficking victims or victims of crimes and are trained on appropriate follow up action. Additionally, agents and officers frequently encounter individuals who may be vulnerable, including those in physical or medical distress or in need of humanitarian care, as well as those who may be seeking protection in the United States. Agents and officers can similarly use such skills and experiences to identify any manifestations of fear. Agents and officers will also receive information on how to apply the manifestation standard, including that manifestation may occur verbally, non-verbally, or physically. DHS believes that this experience, coupled with guidance, will help agents and officers effectively

---

[222] This determination is based, in part, on CBP's experience that the language in specific, individualized advisals often serves as a prompt for noncitizens to express a fear while in CBP custody. This is, in part, because CBP understands that TCOs coach noncitizens and advise them to listen for certain words in the language of particular advisals as a prompt to express a fear. While it is possible that TCOs will provide noncitizens information about how to manifest fear, even in the absence of affirmative advisals, CBP believes that, at least at the outset of the process, individuals without such a fear or intent to seek asylum are less likely to remember the information a TCO provided in the absence of individualized advisals. Additionally, CBP believes that individuals who do have a fear of return or intend to seek asylum will generally make such a claim even in the absence of such advisals.

[223] See, e.g., USCIRF Report at 16–18.

[224] DHS considered whether to provide a short, individualized advisal to inform noncitizens of their ability to seek asylum, in addition to these signs and videos. But DHS determined that such a short, individualized advisal would be unlikely to convey information more effectively than the signs and videos that CBP already intends to use as a general notification, and that even a short advisal would take undue time to administer. Moreover, CBP assesses that the signs and videos providing general notification of the ability to seek asylum are less suggestive than short, individualized advisals would be.

[225] U.S. State Dep't, Bureau of Population, Refugees, and Migration, *Fact Sheet: U.S. Commemorations Pledges* (June 24, 2013), *https:// 2009-2017.state.gov/j/prm/releases/factsheets/2013/ 211074.htm* (notifying the public that U.S. Coast Guard personnel were provided updated training ''on identifying manifestations of fear by interdicted migrants'').

[226] See *Huisha-Huisha v. Mayorkas,* 27 F.4th 718, 732–33 (D.C. Cir. 2022); CBP, Office of Field Operations, *Processing of Noncitizens Manifesting Fear of Expulsion Under Title 42* (May 21, 2022); USBP, *Guidance Regarding Family Units Moving Forward Under Title 42* (May 21, 2022).

[227] See U.S. State Dep't, Bureau of Population, Refugees, and Migration, *Fact Sheet: U.S. Commemorations Pledges* (June 24, 2013), *https:// 2009-2017.state.gov/j/prm/releases/factsheets/2013/ 211074.htm* (noting implementation of training that ''demonstrates different ways a migrant might express a verbal or non-verbal manifestation of fear'').

[228] *Id.*

identify noncitizens with potential fear or asylum claims under a manifestation approach. Therefore, DHS believes that this rule remains consistent with the need to "safeguard[]" the rights of asylum seekers. *See* 62 FR at 10319. Because an immigration officer's observation of whether a noncitizen manifests a fear—rather than a noncitizen's answers to affirmative questions regarding asylum—will lead to a referral to an AO for a fear screening, this standard may result in a greater proportion of those referred to an AO being individuals with meritorious claims.

Additionally, the manifestation standard in the rule will enable DHS to streamline the process, allowing it to process noncitizens in a more expeditious manner during the emergency border circumstances identified in the Proclamation and this rule. In particular, DHS anticipates that omitting the requirement to complete Form I–867A and I–867B will save about 20 to 30 minutes per noncitizen, providing DHS with—based on the number of cases in March 2024— approximately 14,000 extra personnel hours per month.[229] This increased efficiency is critical for processing noncitizens in an expeditious way, and thus will better ensure that, given the immense challenges of irregular migration at the southern border, DHS's limited resources are used most effectively while still affording opportunities for noncitizens to seek asylum or protection. Indeed, this is particularly critical in the emergency border circumstances described in the Proclamation and the rule. As discussed above, given the number of noncitizens and the time it takes to process them during periods of heightened encounters, expediting the process is critical for avoiding overcrowding and ensuring safe conditions for those in custody.[230]

For all of these reasons, DHS believes that the "manifestation of fear" standard, as explained in the rule, will enable immigration officers to effectively identify noncitizens who require credible fear interviews while streamlining the process. During the emergency circumstances described in the Proclamation and the rule, it is important for immigration officers to

expeditiously process and swiftly apply consequences to noncitizens while still affording access to protection. Here, the Departments are currently facing such emergency circumstances, as explained above in Sections III.B.1 and 2 of this preamble. DHS believes that the approach taken in the rule is the most appropriate one in light of the situation at the southern border, as explained in this rule and as discussed in the Proclamation, balancing the need to protect those who may wish to seek protection in the United States against an urgent need to use DHS resources effectively.

c. Raising the Standard for Protection Screening

Under this rule, if the AO determines that, in light of the limitation on asylum eligibility under 8 CFR 208.35(a), there is not a significant possibility that the noncitizen could establish eligibility for asylum, *see* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), the AO will enter a negative credible fear determination with respect to the noncitizen's asylum claim. *See* 8 CFR 208.35(b)(1)(i). The AO will then assess whether the noncitizen has established a reasonable probability of persecution (meaning a reasonable probability of being persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion) or torture, with respect to the designated country or countries of removal identified pursuant to section 241(b)(2) of the INA, 8 U.S.C. 1231(b)(2).[231] *See* 8 CFR 208.35(b)(2)(i). Likewise, when reviewing a negative credible fear determination, where the IJ concludes that there is not a significant possibility that the noncitizen could establish eligibility for asylum in light of the limitation on asylum eligibility, the IJ will assess whether the noncitizen has established a reasonable probability of persecution because of a protected ground or torture. *See* 8 CFR 1208.35(b)(2)(ii).

The Departments have some discretion to articulate the screening standard for claims for statutory withholding of removal and protection under the CAT. As the Departments observed previously, "Congress clearly expressed its intent that the 'significant possibility' standard be used to screen for asylum eligibility but did not express any clear intent as to other

applications." 88 FR at 11742. In addition, "the legislative history regarding the credible fear screening process references only asylum." *Id.* at 11743. By contrast, section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and FARRA section 2242 are silent as to what screening procedures are to be employed, while the INA elsewhere confers broad discretionary authority to establish rules and procedures for implementing those provisions, *see, e.g.,* INA 103(a)(3), (g)(2), 8 U.S.C. 1103(a)(3), (g)(2).

Moreover, in past rules applying a "reasonable possibility" screening standard to claims for statutory withholding of removal or CAT protection, the Departments have noted that such a screening standard is used "in other contexts where noncitizens would also be ineligible for asylum." 88 FR at 11743 (citing 8 CFR 208.31(c), (e)); *see also, e.g.,* Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 36264, 36270 (June 15, 2020) (referencing "the established framework for considering whether to grant statutory withholding of removal or CAT protection in the reasonable fear context"). Under the Circumvention of Lawful Pathways rule, "[i]f a noncitizen is subject to the lawful pathways condition on eligibility for asylum and not excepted and cannot rebut the presumption of the condition's applicability, there would not be a significant possibility that the noncitizen could establish eligibility for asylum." 88 FR at 11742. For those noncitizens, the Departments implemented a "reasonable possibility of persecution or torture" screening standard for statutory withholding of removal and protection under the CAT. *See* 8 CFR 208.33(b)(2)(ii), 1208.33(b)(2)(ii). The Departments similarly believe that those who enter across the southern border during the emergency border circumstances identified in the Proclamation and this rule and who are not described in section 3(b) of the Proclamation, do not establish an enumerated exception, and are unable to establish a significant possibility of eligibility for asylum should be screened for protection under a higher screening standard.

The Departments' experience with the Circumvention of Lawful Pathways rule has validated the Departments' choice to use an elevated screening standard to narrowly focus limited resources on those who are likely to be persecuted or tortured and to remove those who are unlikely to establish eligibility for statutory withholding of removal or CAT protection. Under that rule, which

---

[229] At a time savings of 30 minutes per noncitizen, multiplied by 28,466 noncitizens processed for expedited removal in March 2024, *see* OHSS analysis of data downloaded from UIP on April 2, 2024, DHS would save approximately 14,000 hours per month.

[230] *See* Decl. of Matthew J. Hudak ¶¶ 7, 17–22, *Florida* v. *Mayorkas*, No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[231] As noted above, DHS is also concurrently soliciting comment on the Application of Certain Mandatory Bars Notice of Proposed Rulemaking, which proposes that certain mandatory bars be considered at the screening stage under a reasonable possibility standard.

uses a "reasonable possibility of persecution or torture" screening standard for statutory withholding of removal and CAT protection claims, the Departments have processed record numbers of noncitizens through expedited removal and have seen a significant decrease in the rate at which noncitizens receive positive credible fear determinations, showing greater operational efficiencies.[232] Between May 12, 2023, and March 31, 2024, USCIS completed more than 152,000 credible fear interviews resulting from SWB expedited removal cases—this is more than twice as many interviews during the span of ten and a half months than the 75,000 interviews resulting from SWB encounters that USCIS averaged each year from FY 2014 to FY 2019.[233] Between May 12, 2023, and March 31, 2024, 52 percent (approximately 57,000) of those who were subject to the rule's presumption were able to establish a credible fear of persecution or torture under the "reasonable possibility" standard,[234] compared to an 83 percent credible fear screen-in rate in the pre-pandemic period of 2014 to 2019.[235] From 2014 through 2019, of SWB expedited removal cases with positive fear determinations, less than 25 percent of EOIR case completions ultimately

resulted in a grant of protection or relief.[236]

Screening under the "reasonable possibility" standard has allowed the Departments to screen out and swiftly remove additional noncitizens whose claims are unlikely to succeed at the merits stage. Although fewer noncitizens are screened in under the "reasonable possibility" standard applied in the context of the Circumvention of Lawful Pathways rule, that screen-in rate remains significantly higher than the grant rate for ultimate merits adjudication for SWB expedited removal cases that existed prior to the rule.[237] Under the emergency border circumstances described in the Proclamation and this rule, the Departments' limited resources must be focused on processing those who are most likely to be persecuted or tortured if removed, and overall border security and immigration systems efficiencies outweigh any challenges related to training on a new screening standard and a possible marginal increase in interview length resulting from the application of a new standard in screening interviews. Likewise, the benefits of this rule, which is consistent with all statutory and regulatory requirements and the United States' international law obligations, outweigh any potential marginal increase in the likelihood that a meritorious case would fail under the raised screening standard. Swiftly removing noncitizens without meritorious claims is critical to deterring noncitizens from seeking entry under the belief that they will be released and able to remain in the United States for a significant period. *See, e.g.,* 88 FR at 31324 (discussing the success of the CHNV parole processes as being in part due to imposing consequences for failing to use a lawful pathway, namely swift removal); 88 FR at 11713 (noting that in the 60 days immediately following DHS's resumption of routine repatriation flights to Guatemala and Honduras, average daily encounters fell by 38 percent for Guatemala and 42 percent for Honduras).[238]

To allow for swift removals in the case of those noncitizens who the Departments are confident are unlikely to meet their ultimate burden to establish eligibility for statutory withholding of removal or protection under the CAT, the Departments have decided to raise the screening standard to "reasonable probability of persecution or torture" during the emergency border circumstances described in the Proclamation and this rule. The Departments define this "reasonable probability" standard as "substantially more than a reasonable possibility, but somewhat less than more likely than not." 8 CFR 208.35(b)(2)(i), 1208.35(b)(2)(ii). Under this standard, a noncitizen would be screened in if they provide credible testimony[239] and set forth a credible claim with sufficient specificity for an AO or IJ to be persuaded that there is a reasonable probability that the noncitizen would be persecuted or tortured so as to qualify for statutory withholding of removal or CAT protection in an ultimate merits adjudication.

The Departments view the difference between the "reasonable possibility" standard and the new "reasonable probability" standard as being that the new standard requires a greater specificity of the claim in the noncitizen's testimony before the AO or the IJ. In particular, although claims based on general fears of return may at times be found to meet the "reasonable possibility" standard where evidence in the record of country conditions

---

[232] Decl. of Blas Nuñez-Neto ¶ 7, *M.A.* v. *Mayorkas,* No. 1:23–cv–01843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1). The screen-in rate refers to the percentage of cases with a positive fear determination calculated by dividing the number of cases that receive a positive fear determination by the total number of determinations made (*i.e.,* positive and negative fear determinations). *See id.* ¶ 7 n.2.

[233] Pre-May 12, 2023, data from OHSS Enforcement Lifecycle Dataset December 31, 2023; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

[234] OHSS analysis of data downloaded from UIP on April 2, 2024. At this time, data on EOIR's grant rate under the Circumvention of Lawful Pathways rule is not available because only a small number of cases processed under that rule have been completed. From May 12 through November 30, 2023 (the most recent date for which fully linked records are available), a total of 61,000 SWB expedited removal cases have been referred to EOIR for section 240 removal proceedings, including 1,400 with case completions (2.2 percent). In addition, cases that are already completed are a biased sample of all future completions because in years since FY 2014, the median processing time for cases resulting in relief or other protection from removal has been, on average, about six times longer than the median processing time for cases resulting in removal orders, so reporting on the small data set of already completed cases would yield a relief rate that is artificially low. OHSS analysis of OHSS Enforcement Lifecycle Dataset December 31, 2023 and OHSS analysis of EOIR data as of January 31, 2024.

[235] OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

[236] OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

[237] DHS OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

[238] *See also, e.g.,* Muzaffar Chishti et al., *At The Breaking Point: Rethinking the U.S. Immigration Court System,* Migration Pol'y Inst., at 11 (2023), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-courts-report-2023_final.pdf* ("In the case of noncitizens crossing or arriving at the U.S.-Mexico border without authorization to enter, years-long delays create incentives to file frivolous asylum claims that further perpetuate delays for those eligible for protection, undermining the integrity of the asylum system and border

enforcement."); Doris Meissner, Faye Hipsman, & T. Alexander Aleinikoff, *The U.S. Asylum System in Crisis: Charting a Way Forward,* Migration Pol'y Inst., at 9 (2018), *https://www.migrationpolicy.org/sites/default/files/publications/MPI-AsylumSystemInCrisis-Final.pdf* ("Incentives to misuse the asylum system may also be reemerging. For example, over the past five years, the number of employment authorization documents (EADs) approved for individuals with pending asylum cases that have passed the 180-day mark increased from 55,000 in FY 2012 to 270,000 in FY 2016, and further to 278,000 in just the first six months of FY 2017. This high and growing level of EAD grants may suggest that, as processing times have grown, so too have incentives to file claims as a means of obtaining work authorization and protection from deportation, without a sound underlying claim to humanitarian protection.").

[239] Credible testimony alone is sufficient in a credible fear screening, and AOs are trained to ask questions to elicit testimony to assist the noncitizen in meeting their burden with testimony alone. Although testimony alone could certainly meet the burden, it is not required that the burden be met solely through testimony. And even though corroborating evidence is not required, AOs will consider any additional evidence the noncitizen presents. Additionally, AOs are trained to conduct interviews of individuals with persecution or non-persecution-related injuries, traumas, or conditions that may impact their ability to provide testimony for themselves.

indicates instances of persecution or torture within the country, such claims are less likely to be sufficient under the "reasonable probability" standard when the noncitizen cannot provide greater detail in their statements and information as to the basis for their individual claim.

The Departments frequently see such general claims of fear that lack specificity at both the screening and merits stage. However, generalized fear of persecution is ultimately not sufficient to establish a claim. *See Sharma* v. *Garland,* 9 F.4th 1052, 1060 (9th Cir. 2023) ("[A]dverse country conditions are not sufficient evidence of past persecution, for the obvious reason that '[t]o establish past persecution, an applicant must show that he as individually targeted on account of a protected ground rather than simply the victim of generalized violence.'" (quoting *Hussain* v. *Rosen,* 985 F.3d 634, 646 (9th Cir. 2012)); *Prasad* v. *INS,* 101 F.3d 614, 617 (9th Cir. 1996) (stating that to establish past persecution, "[i]t is not sufficient to show [the applicant] was merely subject to the general dangers attending a civil war or domestic unrest"); *Al Fara* v. *Gonzales,* 404 F.3d 733, 740 (3d Cir. 2005) ("[G]enerally harsh conditions shared by many other persons do not amount to persecution. . . . [H]arm resulting from country-wide civil strife is not persecution on account of an enumerated statutory factor." (quotation marks omitted)); *see also Debab* v. *INS,* 163 F.3d 21, 27 (1st Cir. 1998) (citing cases).

Moreover, to establish ultimate eligibility for CAT protection, the noncitizen must demonstrate an individualized risk of torture—not a general possibility of it. *See Escobar-Hernandez* v. *Barr,* 940 F.3d 1358, 1362 (10th Cir. 2019) ("[P]ervasive violence in an applicant's country generally is insufficient to demonstrate the applicant is more likely than not to be tortured upon returning there."); *Bernard* v. *Sessions,* 881 F.3d 1042, 1047 (7th Cir. 2018) ("Evidence of generalized violence is not enough; the IJ must conclude that there is a substantial risk that the petitioner will be targeted specifically."); *Lorzano-Zuniga* v. *Lynch,* 832 F.3d 822, 830–31 (7th Cir. 2016) ("[G]eneralized violence or danger within a country is not sufficient to make a claim that it is more likely than not that a petitioner would be tortured upon return to his home country."); *Alvizures-Gomes* v. *Lynch,* 830 F.3d 49, 55 (1st Cir. 2016) (country reports demonstrating overall corruption and ineffectiveness of Guatemalan authorities "do not relieve

[the applicant] of the obligation to point to specific evidence indicating that he, personally, faces a risk of torture because of these alleged shortcomings"); *Delgado-Ortiz* v. *Holder,* 600 F.3d 1148, 1152 (9th Cir. 2010) ("Petitioners' generalized evidence of violence and crime in Mexico is not particular to Petitioners and is insufficient to meet th[e] standard [for eligibility for CAT protection].").

Under the "reasonable possibility" standard, a noncitizen presenting a claim based on general civil strife is sometimes found to pass the screening stage even where they provide only general testimony about their fear of harm. For example, a noncitizen may meet the "reasonable possibility" standard where he expresses a fear of being killed by the government upon his return to his native country, United States Government reports indicate the country may engage in human rights abuses, and the noncitizen has been involved in anti-government political activism for years, even absent specific information as to an individualized threat against the noncitizen or any other individuals who have been threatened or harmed. But to meet the "reasonable probability" standard, the noncitizen would either need to explain with some specificity why he thinks he, in particular, is likely to be harmed, or the record would have to reflect some specific information regarding the treatment of anti-government political activists similarly situated to the applicant. Such claims are assessed on a case-by-case basis. As an example, however, were the noncitizen to credibly state that he knew, and to provide details about, people who are similarly situated to him who have been killed, harmed, or credibly threatened, that testimony may be sufficient to meet the "reasonable probability" standard because it provides more specificity as to why the noncitizen believes he would be harmed. The Departments believe that the "reasonable probability" standard, by requiring additional specificity, will better identify claims that are likely to be meritorious in a full adjudication while screening out those whose claims are not likely to prevail.[240]

The Departments are confident that AOs and IJs can apply this heightened standard effectively to identify those who are likely to have viable claims on the merits while mitigating the possibility that those with a viable claim would be screened out. The level of specificity and certainty that the "reasonable probability" standard requires remains lower than the ultimate merits standard, and AOs and IJs have the training and experience necessary to elicit the information required to determine whether a case is sufficiently specific to meet the "reasonable probability" standard.[241] This is particularly the case because, in implementing such training, USCIS expects to adapt existing training, including on the ultimate merits standard, to prepare AOs on the "reasonable probability" screening standard, since the way evidence is evaluated remains the same, save for the degree of specificity required. AOs especially have significant training in non-adversarial interview techniques and are required to elicit testimony from the noncitizen—in effect, to help the noncitizen meet their burden through testimony alone.[242] If upon such questioning a noncitizen is unable to provide specific facts that lead the AO or IJ to believe that the noncitizen would be able to meet their burden with more opportunity to prepare, such claims are unlikely to prevail at the merits stage.

Moreover, this heightened screening standard targets information—specificity based on the noncitizen's own knowledge—that should generally be available at the screening stage. A noncitizen at the screening stage generally would have information regarding their fear of harm, such as whom they are afraid of and why, and an AO will elicit information regarding the claim that either is sufficiently specific to satisfy the heightened screening standard or is not. Credible

---

[240] Although the Departments believe the standard will better identify claims that are likely to be meritorious, for now the Departments do not seek to apply the "reasonable probability" standard outside the context of this rule—that is, to those who do not establish a significant possibility of eligibility for asylum because of the limitation on asylum eligibility or, if the limitation is rendered inoperative by court order, to those who are ineligible for asylum under the *Circumvention of Lawful Pathways* rule, *see* 8 CFR 208.35(b)(2)(i) and (3), 1208.35(b)(2)(iii) and (4)—because in this rule

the Departments are addressing emergency border circumstances rather than regulating to change the status quo. The Departments may consider such changes in future rulemaking.

[241] USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* (Dec. 20, 2019); EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline.*

[242] USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* (Dec. 20, 2019). As described in a previous rule, AOs have experience in "country conditions and legal issues, as well as nonadversarial interviewing techniques," and they have "ready access to country conditions experts." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 FR 46906, 46918 (Aug. 20, 2021).

**48748**    **Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations

testimony alone can satisfy the noncitizen's burden and is sometimes the only available evidence of persecution or torture. *See, e.g., Matter of Mogharrabi,* 19 I&N Dec. 439, 443 (BIA 1987). In most cases, noncitizens would have such information at the screening stage, and the Departments expect—and logic suggests—that such information could be shared through testimony. Instances of past harm or those that inform a future fear of return that caused a noncitizen to seek protection generally occur before entry and would not be expected to develop after the fact of entry or after the screening stage. Hence, the Departments believe that this standard will screen out claims that are likely to fail at the merits stage and poses only a minimal risk of screening out claims that could ultimately succeed. For example, if a noncitizen does not know who harmed or would harm them or why, in the Departments' experience, AOs and IJs will often be able to determine—depending on the facts of the case—that it is unlikely that the noncitizen will be able to provide answers to those critical questions at the merits stage.

In addition, AOs and IJs also receive training in, and have substantial experience weighing, country conditions, which will further help them assess whether and under what circumstances the lack of specificity in a noncitizen's testimony indicates that they have little prospect of meeting their ultimate burden.[243] For example, it may

be the case that where a noncitizen expresses only generalized fear of harm based on their ethnicity, but country conditions confirm serious, ongoing harm in the form of widespread, systematic persecutory acts by government institutions targeting individuals who are similarly situated to the noncitizen, adjudicators will rely on that information to deem the "reasonable probability" standard satisfied.

AOs, supervisory AOs, and IJs receive training and have experience applying asylum, statutory withholding of removal, and CAT protection screening standards and in applying and reviewing decisions related to the ultimate asylum (for USCIS and EOIR) and statutory withholding of removal and CAT protection (for EOIR) merits standards, so they are well-suited to be able to identify in a screening whether the information the noncitizen has provided is sufficiently specific to lead them to believe that the noncitizen may be able to establish eligibility at the merits stage.[244] Moreover, all credible fear determinations must be concurred upon by a supervisory AO before they become final to ensure quality and consistency and will be subject to de novo IJ review if requested by the noncitizen. *See* 8 CFR 235.3(b)(7), 235.15(b)(2)(i)(B), 1208.35(b).

Although AOs, supervisory AOs, and IJs will have to be trained on applying the new "reasonable probability of persecution or torture" standard, the standard as explained above is not a

significant departure from the types of analyses AOs, supervisory AOs, and IJs conduct on a daily basis. Rather, it is a matter of degree—to meet the "reasonable probability of persecution or torture" standard, the noncitizen must present more specificity than is required to meet the "reasonable possibility of persecution or torture" standard, but not so much as to establish ultimate eligibility for protection. Indeed, to meet the ultimate standard, noncitizens may still be required to provide more evidence—whether testimonial or documentary.

The Departments do not believe that applying the "reasonable probability of persecution or torture" standard will increase the time required for credible fear interviews by any great margin. AOs generally ask similar questions to elicit information from noncitizens during screening interviews regardless of the standard they will apply to the information elicited. The difference will be whether the information provided as a result of those questions reaches the required level of specificity. That said, there may be cases where an AO believes that the noncitizen may be able to meet the "reasonable probability of persecution or torture" standard after answering a few additional questions. But even if there is a marginal increase in the length of some interviews, the Departments believe that the interest in swift removal of those unlikely to establish eligibility for protection during emergency border circumstances outweighs the risk of some interviews taking longer.[245] This is because a higher standard will be more likely to create a deterrent: Those less likely to establish eligibility for statutory withholding of removal or CAT protection will be swiftly removed rather than being released and waiting years for a hearing, or in some cases, absconding and remaining in the United States unlawfully. And this deterrent effect could lead to lower encounter levels as noncitizens and smugglers realize that the process is functioning

---

[243] USCIS, *RAIO Directorate—Officer Training: Decision Making* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing— Eliciting Testimony* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing— Introduction to the Non-Adversarial Interview* (Dec. 20, 2019); 86 FR at 46918. IJs "receive extensive training upon entry on duty, annual training, and periodic training on specialized topics as necessary." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078, 18170 (Mar. 29, 2022); *see also* EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), *https://www.justice.gov/eoir/page/file/ 1513996/dl?inline.* Moreover, IJs are required to maintain professional competence in the law, U.S. Dep't of Justice, Ethics and Professionalism Guide for Immigration Judges § IV (Jan. 26, 2011), *https:// www.justice.gov/sites/default/files/eoir/legacy/ 2013/05/23/ EthicsandProfessionalismGuideforIJs.pdf,* which necessarily includes the elements required to establish eligibility for relief or entitlement to protection from removal, *id.* Consistent with their role in adjudicating asylum and related protection applications, IJs have long been able to take administrative notice of commonly known facts, including country conditions evidence. *See* 8 CFR 208.12 (1997) (stating that the adjudicator may rely on information from a variety of sources ranging from the Department of State to credible international organizations or academic institutions); 8 CFR 208.1(a) (1997) (stating this part shall apply to all applicants for asylum whether before an AO or an IJ). Federal Government country

conditions reports, such as the U.S. Department of State country conditions reports, are longstanding, credible sources of information to which IJs often look. *See, e.g., Sowe v. Mukasey,* 538 F.3d 1281, 1285 (9th Cir. 2008) ("U.S. Department of State country reports are the most appropriate and perhaps the best resource for information on political situations in foreign nations." (quotation marks omitted)); *Xiao Ji Chen v. U.S. Dep't of Justice,* 471 F.3d 315, 341 (2d Cir. 2006) (Department of State country reports are "usually the best available source of information on country conditions" (quotation marks omitted)).

[244] *See* USCIS, *RAIO Directorate—Officer Training: Note Taking* (Feb. 12, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing— Survivors of Torture and Other Severe Trauma* (Nov. 2, 2023); USCIS, *RAIO Directorate—Officer Training: Children's Claims* (Dec. 20, 2020); USCIS, *RAIO Directorate—Officer Training: Interviewing— Introduction to the Non-Adversarial Interview* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Cross-Cultural Communication and Other Factors That May Impede Communication at an Interview* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Detecting Possible Victims of Trafficking* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing— Working With an Interpreter* (Dec. 20, 2019); EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), *https://www.justice.gov/eoir/page/file/1513996/ dl?inline.*

[245] In Section III.B.3.b of this preamble, the Departments conclude that there is a need to streamline immigration officers' processing of noncitizens through expedited removal while the Proclamation's suspension and limitation on entry is in effect. That reasoning is not inconsistent with the reasoning here. Because AOs interview only a subset of noncitizens processed through expedited removal, the Departments believe at most a portion of those noncitizens' credible fear interviews may be longer, and, as noted, any marginal increase in the time it takes to conduct some interviews is outweighed by improving deterrence and avoiding erroneous screen-ins, which result in noncitizens being added to the backlog of immigration cases and being released into and remaining in the United States for a significant period of time.

more effectively.[246] Screening out those unlikely to establish eligibility for protection has the added benefit of saving United States Government resources overall because fewer noncitizens who are unlikely to establish eligibility for protection will be placed into section 240 removal proceedings before EOIR, which as of the end of December 2023 had a backlog of more than 2.7 million cases.[247]

In developing this rule, the Departments considered the possibility that the application of different screening standards to "the same or a closely related set of facts" might result in inefficiencies. *See* 87 FR at 18091; *see also* 88 FR at 11746. The Departments note, however, that under this rule, that is unlikely to be the case. The facts relevant to whether a noncitizen is subject to the rule's limitation on asylum eligibility will only rarely be relevant to the inquiry into whether the noncitizen has a fear of persecution or torture. For example, whether the noncitizen faced an acute medical emergency that excepts them from the rule under 8 CFR 208.35(a)(2)(i)(A) or 1208.35(a)(2)(i)(A) will not likely be relevant to whether the noncitizen has a fear of persecution or torture in their designated country of removal and so only the "reasonable probability" standard will be applied to the facts relevant to their persecution or torture claim. And where a noncitizen meets such an exception, they will continue to be eligible to pursue asylum in addition to any claim of persecution or torture,

and those claims will all be considered only under the "significant possibility" standard. Similarly, whether a noncitizen faced an imminent and extreme threat to life and safety that excepts them from the rule under 8 CFR 208.35(a)(2)(i)(B) or 1208.35(a)(2)(i)(B) will involve an evaluation of the discrete set of circumstances at the time of the noncitizen's arrival at the border, and will not likely be relevant to whether the noncitizen has a fear of persecution or torture in their designated country of removal. The question of an imminent threat relates to the situation immediately prior to the noncitizen's entry into the United States, rather than necessarily any fear of persecution or torture. Thus, the Departments do not believe there will generally be a need to apply multiple standards to the same set of facts.

### d. The Scope of This Rule

The Departments have decided to tie the application of this IFR, including the limitation on asylum eligibility, to emergency border circumstances. The suspension and limitation on entry applies beginning at 12:01 a.m. eastern time on June 5, 2024. The suspension and limitation on entry will be discontinued 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, as defined by the Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE. If encounters increase again (including during the 14-calendar-day period), the suspension and limitation will apply again (or continue to apply, as applicable) after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of more than 2,500 encounters, as defined by the Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE. These thresholds are consistent with those set forth in sections 2(a) and (b) of the Proclamation.[248] In order to maximize

the consequences for those who cross unlawfully or without authorization, DHS endeavors to deliver consequences swiftly to the highest proportion of individuals who fail to establish a legal basis to remain the United States. This includes, subject to available resources, referring the maximum number of eligible individuals possible into expedited removal to quickly adjudicate their claims. However, as described below, DHS has been limited in its ability to do so as a result of capacity and resource constraints. The number of people who can be processed for expedited removal is dependent on the Departments' resources and can be impacted by several factors, including limited detention beds and holding capacity;[249] the presence or absence of sufficient AOs to conduct credible fear interviews for all those who claim a fear or indicate an intent to apply for asylum; the availability of IJs to review negative fear findings; and the ability to repatriate individuals ordered removed in a timely manner—an option that is not always available because, among other things, it relies on independent decisions made by foreign governments.

Sustained high encounter rates threaten to overwhelm the Departments' ability to effectively process, detain, and remove the migrants encountered, as appropriate, in a timely manner. *See* 88 FR at 31316. The President has determined that the suspension and limitation on entry is necessary to manage encounter levels. The Departments have determined that emergency border circumstances described in the Proclamation and this rule necessitate this rule's limitation on asylum eligibility and changes to the referral process and screening standard because, in such circumstances, DHS lacks the capacity to deliver timely consequences, and absent this rule, must resort to large-scale releases of noncitizens pending section 240 removal proceedings, which leads to significant harms and threatens to incentivize further migration by individuals who recognize the

---

[246] *See* Muzaffar Chishti et al., *At the Breaking Point: Rethinking the U.S. Immigration Court System,* Migration Pol'y Inst., at 11 (2023), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-courts-report-2023_final.pdf* ("In the case of noncitizens crossing or arriving at the U.S.-Mexico border without authorization to enter, years-long delays create incentives to file frivolous asylum claims that further perpetuate delays for those eligible for protection, undermining the integrity of the asylum system and border enforcement."); Doris Meissner, Faye Hipsman, & T. Alexander Aleinikoff, *The U.S. Asylum System in Crisis: Charting a Way Forward,* Migration Pol'y Inst., at 9 (2018), *https://www.migrationpolicy.org/sites/default/files/publications/MPI-AsylumSystemInCrisis-Final.pdf* ("Incentives to misuse the asylum system may also be reemerging. For example, over the past five years, the number of employment authorization documents (EADs) approved for individuals with pending asylum cases that have passed the 180-day mark increased from 55,000 in FY 2012 to 270,000 in FY 2016, and further to 278,000 in just the first six months of FY 2017. This high and growing level of EAD grants may suggest that, as processing times have grown, so too have incentives to file claims as a means of obtaining work authorization and protection from deportation, without a sound underlying claim to humanitarian protection.").

[247] *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline.*

[248] The 14-day waiting period prior to a discontinuation provides time for the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in encounters is sustained. The absence of a similar waiting period prior to a reactivation reflects the operational exigencies in a circumstance in which there has been a 7-consecutive-calendar-day average of more than 2,500 encounters and is necessary to avoid a surge to the border in advance of a reactivation. As the Departments have explained, the preliminary data pulled from DHS's operational systems have not undergone a full validation process. *See supra* note 5. But a rapid policy and operational response to emergency border circumstances requires relying on this more recent data when making factual determinations consistent with sections 2(a) and

2(b) of the Proclamation. Hence, the data used to make these factual determinations may differ somewhat from the more definitive numbers that ultimately emerge from DHS's full validation process.

[249] *See, e.g.,* Consolidated Appropriations Act, 2024, Public Law 118–47, 138 Stat. 460, 598 (2024). The joint explanatory statement states that the bill provides "$5,082,218,000 for Enforcement and Removal Operations (ERO)" and "$355,700,000 for 41,500 beds for the full fiscal year and inflationary adjustments to support current detention facility operations." 170 Cong. Rec. H1807, H1812 (daily ed. Mar. 22, 2024).

limitations on the ability to deliver timely consequences.[250]

DHS simply lacks sufficient resources to detain and conduct credible fear interviews for the number of noncitizens arriving each day who claim a fear of return when processed through expedited removal. This mismatch in available resources and encounters creates stress on the border and immigration systems and forces DHS to rely on processing pathways outside of expedited removal—limiting DHS's ability to swiftly deliver consequences on individuals who do not have a legal basis to remain in the United States.[251] The Departments have determined that the 1,500-encounter threshold is a reasonable proxy for when the border security and immigration system is no longer over capacity and the measures adopted in this rule are not necessary to deal with such circumstances.

At the outset, it is important to put the threshold in context. From FY 2000 through FY 2008, USBP encounters between POEs averaged approximately 3,000 per day, routinely including monthly averages over 3,500 for a few months most springs.[252] The vast majority (94 percent) of individuals encountered by USBP during this period were Mexican nationals, and very few of those who were processed for expedited removal claimed a fear of return or an intent to seek asylum during that process—fewer than one percent of all CBP SWB encounters.[253] As a result, DHS and its predecessor agency were able to swiftly remove or voluntarily return the vast majority of those

encountered at the SWB using comparatively few resources. *See* 88 FR at 11708, 11716.

From FY 2009 through FY 2020, USBP encounters between POEs declined substantially from these historical highs, averaging approximately 1,200 per day, and daily USBP encounters between the POEs averaged less than 3,500 per day in all but one month of that 12-year period—May 2019 when USBP encounters peaked at 4,300 during that year's surge.[254] Within that 12-year stretch, there were only four months (from March through June 2019) with average encounters between the POEs even above 2,500 per day.[255] In fact, for the 15 years prior to March 2021, DHS did not experience a single month with more than 5,000 total average daily encounters.[256] However, during that time, the demographics of these encounters changed significantly, with nationals from the northern Central American countries steadily increasing as a proportion of encounters, becoming a majority of individuals encountered between POEs for the first time in history in 2017—a trend that continued until 2020. Starting in 2014, families and UCs increased as a proportion of USBP encounters as well, reaching a high of 65 percent of encounters in 2019.[257] Finally, and as described in

greater detail in Section III.B.1 of this preamble, from 2021 to 2023, there was a historic surge in migration from other countries in the Western Hemisphere and from Eastern Hemisphere countries, which, for the first time ever, accounted for more than half of the encounters at the border in 2023—with Mexican nationals accounting for just 29 percent of encounters, an all-time low.[258]

The change in the nationalities and demographics being encountered at the border has coincided with a dramatic increase in the number of individuals who claim fear when they are processed at the border. Between 2005 and 2015, the proportion of noncitizens encountered by CBP and processed for expedited removal who claimed fear ranged from 5 percent at the low end to 26 percent at the high end.[259] Driven by the changing demographics at the border, both the percentage of those processed for expedited removal as well as the percentage of those processed for expedited removal who claimed a fear of return or an intent to seek asylum generally increased during this time frame.[260] This, in turn, has resulted in a steep increase in the number of credible fear interviews that USCIS is required to conduct.[261]

In 2023, a record 59 percent of encounters at and between POEs on the SWB that were processed for expedited removal resulted in fear claims. From 2016 to 2023, the percentage of SWB encounters processed for expedited removal who claimed a fear dipped below 41 percent just once, in FY 2020, the first year of the COVID–19

---

[250] See Section III.B.2 of this preamble. The Departments acknowledge that, despite the protections preserved by the rule and the available exceptions, the provisions adopted by this rule will result in the denial of some asylum claims that otherwise may have been granted and, as with all screening mechanisms, there is some risk that a case that might otherwise warrant protection might not proceed to a merits adjudication. However, in light of the emergency circumstances facing the Departments and addressed in the Proclamation and this rule, the Departments believe these measures are appropriate and necessary. And given the Departments' experience with asylum and protection screenings and adjudications, the Departments believe the rule's provisions will produce accurate outcomes, although the Departments believe the rule continues to be justified even if that expectation turns out to be misplaced in close cases.

[251] See CBP, *Custody and Transfer Statistics* (May 15, 2024), *https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics* (detailing the number of individuals processed for expedited removal compared to another processing disposition, including section 240 proceedings).

[252] OHSS analysis of March 2024 OHSS Persist Dataset. Total CBP encounters (at and between POEs) also averaged approximately 3,000 per day from FY 2004 to FY 2008; data on encounters at POEs are not available prior to FY 2004.

[253] OHSS analysis of March 2024 OHSS Persist Dataset.

[254] OHSS analysis of March 2024 OHSS Persist Dataset. Total CBP encounters (at and between POEs) averaged approximately 1,500 per day during this period. For most of this period (from FY 2009 through FY 2018), the share of encounters processed for expedited removal and the share of those processed through expedited removal making fear claims generally increased, so that during FY 2018, 41 percent of SWB encounters were processed for expedited removal and 45 percent of those processed for expedited removal made fear claims, yielding an all-time high of 18 percent of all encounters making fear claims. OHSS analysis of March 2024 OHSS Persist Dataset. Data on the exact number of SWB encounters processed for expedited removal who made fear claims is not available for years prior to FY 2013, but OHSS estimates that the vast majority (84 percent) of all fear claims made in prior years were made by SWB encounters. Even if 100 percent of fear claims made before FY 2013 were made by SWB encounters, FY 2018 would represent the all-time highest percentage of all encounters making fear claims.

[255] OHSS analysis of March 2024 OHSS Persist Dataset. Total CBP encounters (at and between POEs) also averaged approximately 2,700 per day and 2,600 per day in February and July 2019, respectively.

[256] OHSS analysis of March 2024 OHSS Persist Dataset.

[257] OHSS analysis of March 2024 OHSS Persist Dataset. Northern Central Americans accounted for 54 percent of encounters between POEs in 2017. Northern Central Americans' proportion of encounters between POEs continued to increase until it reached 71 percent of USBP encounters in 2019 but dropped at the onset of the pandemic, in 2020, to less than 26 percent. *See also* OHSS, *Immigration and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/*

*immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship").

[258] OHSS analysis of OIS Yearbook of Immigration Statistics 1980–1999 and OHSS analysis of March 2024 OHSS Persist Dataset. *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship"). Nationality breakouts of border encounters are not available prior to 1980, but Mexicans accounted for 97 percent of encounters for all of 1980 through 1999 and never accounted for less than 96 percent in any fiscal year during that period.

[259] OHSS analysis of March 2024 OHSS Persist Dataset.

[260] The percentage of those processed via expedited removal fell again in 2019 due to resource constraints. OHSS analysis of March 2024 OHSS Persist Dataset.

[261] The share of noncitizens encountered by CBP at and between POEs who were processed through expedited removal increased from 6 percent in FY 2005 to between 39 and 47 percent each year from FY 2012 to FY 2018, but then dropped in FY 2019 because DHS was unable to scale up expedited removal processing in proportion to the substantial increase in USBP encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

pandemic.[262] The global COVID–19 pandemic briefly interrupted this trend, which has continued after the lifting of the Title 42 public health Order in May 2023. Between May 12, 2023, and the end of March 2024, DHS processed a record number of individuals through expedited removal as it sought to maximize the consequences at the border, and 54 percent of noncitizens processed for expedited removal indicated a fear of persecution or intent to seek asylum.[263] As part of DHS's comprehensive effort to impose strengthened consequences at the border after the lifting of the Title 42 public health Order, USCIS reassigned a significant number of AOs to conduct credible fear interviews, which resulted in USCIS completing a record number of such interviews. In fact, USCIS conducted more interviews from SWB encounters during the span of ten and a half months after the lifting of the Title 42 public health Order than in any full fiscal year prior to 2023, and twice as many as the annual average from FY 2010 to FY 2019.[264]

As DHS transitioned from the enforcement of the Title 42 public health Order at the border to full use of its title 8 authorities after May 11, 2023, DHS's capacity constraints—and the impact of those constraints on DHS's ability to impose consequences on noncitizens who cross unlawfully or without authorization—have come increasingly into focus. Given these real resource constraints, DHS has had to make hard choices about whom it can prioritize for detention or refer into expedited removal.[265] As a result of a lack of sufficient holding spaces, detention beds, and AOs, DHS has only been able to refer certain noncitizens into expedited removal—which, as detailed above, is the most efficient tool available under title 8 authorities to impose swift consequences for irregular migration. This means that DHS cannot impose consequences swiftly or predictably on most people encountered at the border, feeding the narrative pushed by smugglers that irregular

migrants will be able to stay in the United States.[266]

The expedited removal process requires the outlay of significant Government resources. When a noncitizen in expedited removal indicates an intention to seek asylum or a fear of persecution, rather than being swiftly removed, they are referred to an AO for a credible fear interview and may seek review of any negative screening by an IJ—all of which takes time and Government resources. As described in further detail above, DHS has made significant process enhancements to reduce the overall time it takes for individuals to proceed through this process. However, the availability of sufficient numbers of AOs to conduct credible fear interviews is critical to DHS's ability to quickly adjudicate fear claims and deliver consequences to those who do not have a credible fear of persecution or torture.

As described above, Congress has failed to provide the additional resources requested for USCIS that would have increased the number of AOs that are available to conduct credible fear interviews for SWB cases. This reality, combined with increases in encounters at the border, and increases in the proportion of noncitizens processed for expedited removal who claim fear of return, means that DHS cannot impose consequences swiftly or predictably on most people whom DHS encounters. Due to its resource constraints, the majority of individuals USBP encountered since May 11, 2023, were ultimately placed in section 240 removal proceedings,[267] undercutting the effectiveness of the previous measures that have been implemented. This reality contributes to the vicious cycle described above in which increasing numbers of releases lead to increased migration, fueled by the narrative, pushed by smugglers, that migrants who are encountered at the border will be allowed to remain and work in the United States for long periods of time.

As a result of the changes to the nationalities and demographics being encountered at the border, and the associated increase in the rate of claiming fear by individuals encountered, the amount of resources required to deliver consequences quickly through referrals into expedited removal for the vast majority of individuals who claimed a fear in 2000 (when DHS's predecessor agency averaged 3,000 to 7,000 daily

encounters between POEs) or in 2010 (when DHS averaged 1,000 to 2,000 daily encounters between POEs) was far lower than the amount of resources required to manage the same number of encounters today.[268]

Of course, as noted above, DHS has been experiencing much higher encounter levels,[269] and simply does not have the resources it would need to place into expedited removal the majority of those encountered by USBP who are amenable to such processing. Similarly, DHS has never had the resources to detain every individual encountered at the border through the pendency of their immigration removal proceedings—even during FY 2009 through FY 2020, when average encounters between POEs on the SWB were 1,200 a day. Encounters between POEs on the SWB are now more than triple that level, resulting in overcrowded USBP facilities, an immigration detention system that has regularly been at capacity, and an asylum system that has been crippled by enormous backlogs and cannot deliver timely decisions.[270] When DHS does not

---

[262] OHSS analysis of March 2024 OHSS Persist Dataset.

[263] OHSS analysis of data downloaded from CBP UIP on April 2, 2024.

[264] OHSS analysis of data downloaded from CBP UIP on April 2, 2024. Data on the exact number of SWB encounters processed for expedited removal who made fear claims is only available since FY 2013; for the years prior to FY 2013 there was no full fiscal year in which the total number of USCIS fear claims was equal to the number of fear claims completed for SWB encounters processed for expedited removal between May 12, 2023, and March 31, 2024.

[265] ICE, *Fiscal Year 2023 ICE Annual Report* 17–18 (Dec. 29, 2023), *https://www.ice.gov/doclib/eoy/iceAnnualReportFY2023.pdf.*

[266] March 2024 OHSS Persist Dataset.

[267] OHSS analysis of March 2024 OHSS Persist Dataset.

[268] March 2024 OHSS Persist Dataset. The most notable change has been the rising share of non-Mexican nationals as a share of encounters, with Mexican nationals accounting for 98 percent of USBP encounters in FY 2000 and 89 percent in 2010. OHSS Persist Database March 31, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship" and "CBP SW Border Encounters by Family Status").

[269] Even as compared to the 2,000 to 7,000 daily encounters between POEs in 2000, the corresponding numbers in the recent past have been higher. In FY 2023, there were 3,300 to 7,300 such daily encounters, and from October 2023 through March 2024, the corresponding numbers are 4,000 to 8,300. March 2024 OHSS Persist Dataset.

[270] *See* OHSS analysis of data downloaded from UIP on April 2, 2024. CBP completed approximately 1.7 million total encounters at the SWB in FY 2021, 2.4 million in FY 2022, and 2.5 million in FY 2023, with each year exceeding the previous record high of 1.6 million in FY 2000. *See* OHSS analysis of March 2024 OHSS Persist Dataset. In December 2023, CBP also completed a single-month record of 302,000 encounters, almost one and a half times as many as the highest monthly number recorded prior to 2021 (209,000 in March 2000) based on records available in the OHSS Persist Dataset for FY 2000 to the present. Although some of the increase in encounters is explained by higher-than-normal numbers of repeat encounters of the same individual during the period in which noncitizens were expelled pursuant to the CDC's Title 42 public health Order, OHSS analysis of the March 2024 OHSS Persist Dataset indicates that unique encounters were also at record high levels. *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship" and "CBP SW Border Encounters by Family Status").

Continued

**48752** Federal Register / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations

have the capacity to process individuals through expedited removal or detain noncitizens to await their proceedings, releasing individuals into the interior of the United States is generally the only option that is left.[271] The need to release individuals at the border has increased over time and peaked during surges.

By contrast, when encounters (excluding UCs from non-contiguous countries and noncitizens determined to be inadmissible at a SWB POE) are below 1,500 per day, DHS will be able to refer most individuals it encounters into expedited removal and deliver a swift consequence to the majority of individuals it encounters who do not establish a legal basis to remain in the United States—in the form of a return or removal. Given limited congressional appropriations and agency funding levels, DHS has a finite capacity to deliver such consequences at the border, which is reflected in the number of individuals that can be processed through expedited removal on any given day. As detailed above, DHS over the past year has significantly streamlined the expedited removal process and has set records in terms of individuals placed in expedited removal by CBP at the SWB and credible fear interviews conducted by AOs. Given current resources, however, and in the absence of congressional action, there is a limit

on how many people can be put through the process—and that limit directly informs the 1,500 threshold.

From May 12, 2023, through March 2024, USBP has referred a daily average of over 900 individuals encountered at the SWB into the expedited removal process.[272] During the same period, about 17 percent of individuals encountered between POEs voluntarily returned to Mexico, had their removal orders reinstated at the border, or were subject to administrative removal pursuant to INA 238(b), 8 U.S.C. 1228(b).[273] This means that, at the 1,500-encounter level and assuming a similar level of voluntary repatriations and reinstatements, DHS would be able to refer for expedited removal more than 70 percent of the individuals who are not quickly repatriated.[274] As discussed previously, of those individuals encountered by USBP and placed into expedited removal from May 12, 2023 to March 31, 2024, 65 percent have been quickly removable—either because they do not claim a fear, or because they are found not to have a credible fear and are ordered removed.[275] This means that, at 1,500 daily encounters between POEs, and assuming similar fear claim rates, DHS would be able to quickly remove the majority of the people it processes at the border on any given day who have no legal basis to remain in the United States.[276]

Simply put, at 1,500 daily encounters, DHS would be able to swiftly deliver a consequence to enough individuals to meaningfully impact migratory decisions and deter unlawful entries. DHS would also be able to minimize releases of those who are amenable to expedited removal or transfer them to ICE custody pending immigration proceedings. By contrast, above 2,500 encounters—the level at which the Proclamation and the rule would again apply—DHS's ability to impose such consequences is significantly lower and decreases rapidly as encounters increase beyond that level. At the 2,500-encounter level and assuming a similar level of voluntary repatriations and reinstatements described above, DHS would be able to place just 43 percent of the individuals who are not quickly repatriated into expedited removal—significantly less than the 70 percent under the 1,500-encounter threshold.[277] This would, in turn, lead to a significant degradation of DHS's ability to impose consequences at the border for individuals who do not establish a legal basis to remain in the United States, with DHS only able to quickly remove or return substantially less than half of the individuals it encounters.[278] Moreover, the percentage of people who can be referred to expedited removal and ultimately be quickly removed if they do not establish a legal basis to remain decreases rapidly as encounters increase beyond 2,500 given the baseline constraints outlined above.

This difficulty in imposing swift consequences on individuals without a legal basis to remain in the United States during periods of elevated

---

CBP held an average of 21,863 noncitizens in custody each day during December 2023, averaging 104 percent of CBP's daily custody capacity (21,042) roughly each day for the entire month. OHSS analysis of data downloaded from UIP on February 14, 2024.

EOIR had a backlog of over 2.7 million cases that were pending in the immigration courts at the end of the first quarter of FY 2024. *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline; see also* Ariel G. Ruiz-Soto et al., *Shifting Realities at the U.S.-Mexico Border: Immigration Enforcement and Control in a Fast-Evolving Landscape,* Migration Pol'y Inst., at 1 (Jan. 2024), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-contemporary-border-policy-2024_final.pdf* ("Insufficiently equipped to respond effectively to these and likely future changes, U.S. immigration agencies must perpetually react and shift operations according to their strained capacity and daily changes in migrant arrivals."); UNHCR, *Global Trends: Forced Displacement in 2022,* at 2, 8–9, 12 (June 14, 2023), *https://www.unhcr.org/global-trends-report-2022* (showing rapid global increases in forcibly displaced persons and other persons in need of international protection in 2021 and 2022, and projecting significant future increases).

[271] Consistent with the Departments' conclusion in the Circumvention of Lawful Pathways rule, the Departments believe the emergency border circumstances described in the Proclamation and this rule cannot be addressed by relying on the programmatic use of its contiguous territory return authority at section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C), due to resource constraints and foreign affairs considerations. *See* 88 FR at 31370; 88 FR at 11731.

[272] OHSS analysis of data downloaded from UIP on April 2, 2024.

[273] Based on comprehensive CBP processing dispositions for single adults, family units, and UCs from contiguous countries encountered May 12, 2023 to March 31, 2024; data downloaded from UIP on April 2, 2024.

[274] At 1,500 single adult, family unit, and UC from contiguous countries encounters between POEs per day and with 17 percent of such encounters voluntarily returning to Mexico or subject to reinstatement of a removal order or administrative removal, 1,250 encounters would not be subject to rapid repatriation, including 1,240 who would potentially be amenable to expedited removal. Further, assuming that CBP could process 900 people for expedited removal, the agency would have the ability to place 72 percent of people not subject to rapid repatriation and 73 percent of potentially amenable single adults and family units into expedited removal. OHSS analysis of data downloaded from UIP on April 2, 2024. Applying the rule even more broadly based on a lower threshold would also raise countervailing considerations, *see supra* note 250, and so the Departments have struck the balance reflected in the rule.

[275] OHSS analysis of data downloaded from UIP on April 2, 2024.

[276] At 1,500 encounters of single adults, family units, and UCs from contiguous countries per day and assuming similar shares of encounters accept voluntary return or are subject to reinstatement of removal or administrative removal, about 250 people would be repatriated with one of these dispositions. Further, assuming 900 encounters would be processed for expedited removal, and that 65 percent of expedited removal encounters would be quickly removable, about 590 would be

repatriated pursuant to an expedited removal order or withdrawal, yielding a total of about 830 repatriations (sums do not add due to rounding), or 56 percent of encounters.

[277] At 2,500 single adult, family unit, and UC from contiguous countries encounters between POEs per day and with 17 percent of such encounters voluntarily returning to Mexico or subject to reinstatement of a removal order or administrative removal, 2,080 encounters would not be subject to rapid repatriation. Further, assuming that CBP could process 900 people for expedited removal, the agency would have the ability to place 43 percent of people not subject to rapid repatriation into expedited removal. OHSS analysis of data downloaded from UIP on April 2, 2024.

[278] At 2,500 encounters of single adults, family units, and UCs from contiguous countries per day and assuming similar shares of encounters accept voluntary return or are subject to reinstatement of removal or administrative removal, about 420 people would be repatriated with one of these dispositions. Further, assuming 900 encounters would be processed for expedited removal, and that 65 percent of expedited removal encounters would be quickly removable, about 590 would be repatriated pursuant to an expedited removal order or withdrawal, yielding a total of about 1,010 repatriations (sums do not add due to rounding), or 40 percent of encounters.

encounters is borne out by both recent experience, which is detailed in Sections III.B.1 and 2 of this preamble, and by historical data. DHS historical data also clearly show the dichotomy between the outcomes for individuals processed at the border at the 1,500- and 2,500-encounter levels. DHS data show that releases from CBP custody as a share of encounters have generally been highest during periods of sustained high-encounter levels, and lowest when encounters have been at 1,500 or below. For example, from FY 2013 through FY 2019, months with average daily USBP encounters of fewer than 1,500 per day resulted in a minimal level of releases due to capacity constraints at the border.[279] During the 2013 to 2019 pre-pandemic period, USBP encounters only exceeded 1,500 per day for a sustained period from October 2018 to August 2019. During that 7-year stretch, months in which daily encounters were between 1,500 and 2,500 resulted in an average of 210 individuals released each day, while months in which daily encounters exceeded 2,500 resulted in approximately 1,300 releases each day with CBP releasing as many as 46 percent of the individuals it processed pending section 240 removal proceedings.[280]

It is important to note, however, the demographics and nationalities encountered at the border significantly impact DHS's ability to impose timely consequences and the number of people who are ultimately released by CBP pending section 240 removal proceedings. This is especially true for periods when CBP has encountered more UCs, family units, or individuals from countries to which it is difficult to effectuate removals. During the 2013 to 2019 time frame—which forms the basis for the analysis in the preceding paragraph—the vast majority of encounters at the border were from Mexico, El Salvador, Guatemala, and Honduras—countries that are comparatively easy to return people to.[281] Today, a much higher proportion of SWB encounters are from other countries that are comparatively much more difficult to return people to, including record numbers from the Eastern Hemisphere.[282] At the same time, the proportion of encounters

involving family units and UCs, although still high, is lower today than it was during periods of high numbers of encounters and releases in FY 2019.[283] Although shifting demographics affect the Departments' capacity to deliver timely decisions and timely consequences at varying levels of encounters, it remains clear that with the challenging demographics being encountered today, DHS would have the ability to deliver a timely consequence to the majority of people it processes at the border when encounters are below 1,500—supporting the decision to suspend the application of the rule when DHS reaches that level of encounters over a 7-day average. Likewise, as discussed above, the Departments have concluded that it is reasonable to apply the rule when encounter levels rise above a 7-day average of 2,500 due to the sharp decrease in their ability to swiftly impose meaningful consequences at the border once encounters exceed that level.

Lastly, it is important to note that using a single threshold—for example, 1,500 encounters—to activate or deactivate the measures in this rule would pose significant challenges and not be operationally viable. Having a single threshold would likely lead to scenarios where the rule would be regularly activated and deactivated as the 7-day average rose above and below 1,500, which would have significant operational impacts for CBP, ICE, and USCIS, and be confusing for government personnel, migrants, and other key stakeholders. For example, the Departments will need to notify and provide guidance to their personnel to apply the provisions of this rule in connection with each activation and deactivation. These actions represent a burden on staff time and resources that would have negative operational impacts if activation or deactivation happened regularly. CBP and ICE will also face scenarios in which they would have many people in their custody some of whom would be subject to and others of whom would not be subject to the provisions of this rule, and CBP and ICE will need to keep track of which individuals needed to be processed under which procedures—something that could become extraordinarily complex and unwieldy if the rule were to be activated and deactivated regularly. Legal service providers and migrants would similarly face a great

deal of confusion about when the provisions of this rule were in effect based upon a single threshold of 1,500 encounters to activate or deactivate the measures in this rule. The burden of tracking, identifying, and applying different standards that change back and forth over a matter of days is significantly more complex for USCIS personnel as they consider protection claims.

For all of these reasons, it is important to ensure that there is a clear division between the levels at which the rule is deactivated and when it is activated. And to ensure that stakeholders are aware of when the rule is deactivated and activated, DHS will notify the public about Secretarial determinations of the encounter levels described in sections 2(a) and 2(b) of the Proclamation. As noted above, the 2,500-encounter level is a good proxy for when DHS's ability to quickly impose consequences at the border for individuals who do not establish a legal basis to remain is becoming so degraded that it is likely to further incentivize additional unlawful crossings. It also has the benefit of increasing the time that would elapse between deactivations and activations, allowing DHS to ensure that its personnel are not having to constantly switch back and forth between different procedures.[284]

The exclusion of those determined to be inadmissible at a SWB POE from the 1,500- and 2,500-encounter thresholds is also reasonable in light of recent policy decisions, processing experience, and operational needs. Since May 12, 2023, SWB daily POE encounters have averaged 1,650—largely because DHS has been incentivizing individuals to present at POEs in a safe, orderly manner.[285] This number has stayed relatively constant compared to the number of encounters between POEs, which have varied widely, from a low of 2,554 on May 21, 2023, to a high of 10,822 on December 18, 2023.[286] The predictability in the number of POE encounters, paired with the processing efficiencies gained by the widespread use of the CBP One app, improves CBP's

[279] For FY 2013 to FY 2019, in months with fewer than 1,500 encounters between POEs, USBP released an average of 11 encounters per day. OHSS analysis of March 2024 OHSS Persist Dataset.

[280] OHSS analysis of March 2024 OHSS Persist Dataset.

[281] OHSS analysis of March 2024 OHSS Persist Dataset.

[282] OHSS analysis of March 2024 OHSS Persist Dataset.

[283] UCs and family units accounted for 65 percent of USBP encounters in FY 2019, compared to 45 percent in FY 2024 through March. OHSS analysis of March 2024 OHSS Persist Dataset.

[284] The Departments recognize that, due to the rule's approach, at a given encounter level between 1,500 and 2,500 encounters per day—such as 2,000 encounters a day—whether the rule applies will be path dependent. If encounters have been above 2,500, the rule will apply. If encounters have been below 1,500, the rule will not apply. This is a necessary consequence of providing the clear division that the Departments have deemed necessary, and the Departments assess that adopting this approach best balances the relevant considerations.

[285] OHSS analysis of March 2024 OHSS Persist Dataset.

[286] OHSS analysis of March 2024 OHSS Persist Dataset.

**48754** **Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations

ability to manage encounters at POEs. The vast majority of noncitizens who present at a SWB POE have done so after having registered with the CBP One app.[287] Because such individuals have registered with the CBP One app, CBP can process these individuals more efficiently and in a more orderly way than individuals encountered between POEs.[288] This is a critical element of our strategy to encourage the use of safe, orderly, and lawful pathways, as described above, to incentivize noncitizens to seek out lawful pathways instead of attempting to cross into the United States irregularly. CBP officers will determine the most appropriate processing disposition on a case-by-case basis, although DHS expects to generally issue such individuals an NTA for removal proceedings under section 240 of the INA.

In short, DHS has assessed that the emergency border circumstances that are described by the Proclamation and this rule—and that the President has concluded warrant the step of suspending and limiting entry— reasonably capture the capacity of the border security and immigration systems to deliver consequences in a timely manner to individuals who cross unlawfully or without authorization. Thus, the Departments have determined to tie the application of the rule's provisions to the date that the Proclamation takes effect, and to include a mechanism to temporarily halt the application of the rule's provisions when encounters between POEs reach 1,500 and to restart the application of its provisions if they once again rise above 2,500. Because the Departments intend for certain provisions of this rule to remain in effect in the event a court enjoins or otherwise renders inoperable the Proclamation, the Departments intend for the Secretary of Homeland Security to continue to make the factual determinations regarding the 1,500 and 2,500 thresholds described in this rule and in sections 2(a) and 2(b) of the Proclamation, even if the Proclamation is enjoined, in order to provide continuity during emergency border circumstances. Lastly, the Proclamation may be revoked by the President upon a determination that it is no longer needed.[289]

## C. Section-by-Section Description of Amendments

### 1. 8 CFR 208.13 and 1208.13

DHS and DOJ are adding a paragraph (g) to the end of 8 CFR 208.13 and 1208.13, respectively, *Establishing asylum eligibility,* to explain when a noncitizen is potentially subject to this IFR's limitation on asylum eligibility and credible fear screening procedures and how this limitation and its associated procedures interact with the Lawful Pathways condition referenced in paragraph (f) of 8 CFR 208.13 and 1208.13. Paragraph (g) refers the reader to the new regulatory provisions at 8 CFR 208.35 and 1208.35 that establish the limitation on eligibility for asylum where a noncitizen entered the United States across the southern border during emergency border circumstances.

### 2. 8 CFR 208.35

DHS is adding to 8 CFR part 208, *Procedures for Asylum and Withholding of Removal,* a new subpart D, *Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances.* Within subpart D, DHS is adding a new § 208.35, *Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.* This section sets forth a new limitation on asylum eligibility and screening procedures related to the application of such limitation in expedited removal proceedings and the conduct of credible fear screenings during the emergency border circumstances. This provision applies notwithstanding any contrary provision of part 208.

Section 208.35 consists of the following provisions:

Paragraph (a) sets forth the limitation on asylum eligibility. Under the rule, a noncitizen is ineligible for asylum if the noncitizen is described in § 208.13(g) and not described in section 3(b) of the Proclamation. This approach is consistent with the general policy of the Proclamation and rule and provides important exceptions that continue to incentivize the use of safe, orderly, and lawful pathways, such as for those who arrive in the United States at a southwest land border POE pursuant to a process approved by the Secretary of Homeland Security.[290]

Paragraph (a)(2) contains provisions regarding an exception to the limitation on asylum eligibility that aligns with the means for rebutting the presumption of asylum ineligibility in the Circumvention of Lawful Pathways rule. *See* 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). The exception applies if the noncitizen, or the noncitizen's family member as described in § 208.30(c) with whom the noncitizen is traveling, demonstrates by a preponderance of the evidence exceptionally compelling circumstances, including that, at the time of entry, the noncitizen or a member of the noncitizen's family as described in § 208.30(c) with whom the noncitizen is traveling:

• Faced an acute medical emergency;
• Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or
• Satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11.

Paragraph (a)(2)(ii) makes clear that where a noncitizen establishes one of the above, they shall necessarily have established exceptionally compelling circumstances. This exception for exceptionally compelling circumstances limits the potential adverse effects of the limitation on asylum eligibility on certain particularly vulnerable populations, and family members with whom they are traveling, without undermining the key policy imperative to disincentivize irregular migration during a time when encounters are above certain benchmarks.[291] Paragraph (a)(2)(iii) deems those who have established exceptionally compelling circumstances for purposes of this asylum limitation or who are described in the provisions of the Proclamation as being excepted from its suspension and limitation on entry as having established exceptionally compelling circumstances for purposes of the Lawful Pathways condition. This provision is intended to simplify administration of this asylum limitation while it and the Circumvention of

---

[287] OHSS analysis of March 2024 OHSS Persist Dataset.

[288] *See, e.g.,* 88 FR at 11719.

[289] The Departments have not sought to apply the rule even after any revocation of the Proclamation by the President, because the Departments expect that any such revocation would only follow consultation with the Departments regarding the policy and operational implications of such an

action. Moreover, a decision by the President would reflect important changed circumstances, and the Departments would want to take into account those changed circumstances in assessing the appropriate policy as to the issues covered by this rule.

[290] *See* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures To Humanely*

---

*Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), *https:// www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.*

[291] *See, e.g.,* 88 FR at 31325 ("These exceptions and opportunities for rebuttal are meant to ensure that migrants who are particularly vulnerable, who are in imminent danger, or who could not access the lawful pathways provided are not made ineligible for asylum by operation of the rebuttable presumption. Those who are not excepted from and are unable to rebut the presumption of ineligibility may still pursue statutory withholding of removal and protection under the CAT.").

Lawful Pathways rule are both operative.

Paragraph (b) prescribes procedures for considering the limitation on asylum eligibility during the credible fear screening process and for applying the ''reasonable probability'' standard in the event the Proclamation or the limitation on asylum eligibility are rendered inoperable by court order. Under paragraph (b)(1), the AO will first determine whether there is a significant possibility that the noncitizen is eligible for asylum in light of the limitation on asylum eligibility in paragraph (a). The paragraph sets forth three possible procedural scenarios depending on the AO's findings. First, where the AO determines that the noncitizen is subject to the limitation on asylum eligibility under paragraph (a)—including that there is not a significant possibility, *see* INA 235(b)(1)(B)(iii), 8 U.S.C. 1225(b)(1)(B)(iii),[292] that the noncitizen could establish an exception under section 3(b) of the Proclamation—and that there is not a significant possibility that the noncitizen could establish an exception to the limitation under paragraph (a)(2), the AO will enter a negative credible fear determination with respect to the noncitizen's asylum claim and continue to consider the noncitizen for potential eligibility for statutory withholding of removal and CAT protection under the procedures in paragraph (b)(2), as described below. *See* 8 CFR 208.35(b)(1)(i). Second, where the AO determines that the noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish that they are not described in § 208.13(g), the AO will follow the procedures for credible fear interviews relating to the Lawful Pathways condition in § 208.33(b). *See id.* 208.35(b)(1)(ii). This provides that those noncitizens who are not subject to the Proclamation because they did not enter during emergency border circumstances are processed under the provisions governing the Lawful Pathways condition—and under § 208.33(b)(1)(ii), if the noncitizen is not subject to that condition, they will be screened for a significant possibility of

eligibility for statutory withholding of removal or CAT protection consistent with § 208.30.[293] Third, where the AO determines that the noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish either that they are described in section 3(b) of the Proclamation or exceptionally compelling circumstances exist under paragraph (a)(2), the AO will conduct the screening consistent with 8 CFR 208.30. *See id.* 208.35(b)(1)(iii).

If the AO determines that the noncitizen is subject to paragraph (a) and cannot establish a significant possibility that they will be able to establish exceptionally compelling circumstances by a preponderance of the evidence per paragraph (a)(2), the AO will then assess whether the noncitizen has established a reasonable probability of persecution (meaning a reasonable probability of being persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion) or torture, with respect to the designated country or countries of removal identified pursuant to section 241(b) of the INA, 8 U.S.C. 1231(b). *See* 8 CFR 208.35(b)(2)(i). As noted above, for purposes of this section, reasonable probability means substantially more than a reasonable possibility, but somewhat less than more likely than not, that the noncitizen would be persecuted because of his or her race, religion, nationality, membership in a particular social group, or political opinion, or tortured, with respect to the designated country or countries of removal. *See id.*

If the noncitizen establishes a reasonable probability of persecution or torture with respect to the designated country or countries of removal, DHS will issue a positive credible fear determination and follow the procedures in § 208.30(f). *See id.* 208.35(b)(2)(ii). Under § 208.30(f), USCIS may issue an NTA for removal proceedings under section 240 of the INA, or, in its discretion, retain the application for an asylum merits interview pursuant to § 208.2(a)(1)(ii). Under the regulations governing the asylum merits interview process, where USCIS exercises its discretion to retain jurisdiction over an application for asylum of a noncitizen found to have a credible fear of persecution or torture

pursuant to § 208.30(f), the written record of the positive credible fear determination is treated as the asylum application. 8 CFR 208.3(a)(2). Under this IFR, however, noncitizens who are subject to the limitation on asylum eligibility under 8 CFR 208.35(a), and fail to show a significant possibility of being able to establish an exception by a preponderance of the evidence at the credible fear interview, will receive a negative credible fear determination with respect to their application for asylum, pursuant to § 208.35(b)(1)(i), but could go on to receive a positive credible fear determination with respect to a potential claim for statutory withholding of removal or protection under the CAT at the reasonable probability of persecution or torture standard. *See id.* 208.35(b)(2).

In the event that USCIS were to exercise its discretion to place such a case into the asylum merits interview process, the credible fear record in that case would have found the applicant unable to establish eligibility for asylum under § 208.35(a) and the positive determination would be based only on a potential statutory withholding of removal or protection under the CAT claim. USCIS may thus need supplementary information to constitute an application for asylum, as the asylum claim may not have been fully explored in the credible fear record given that the AO determined the applicant would have been ineligible for asylum based on the rule's limitation on asylum eligibility. Therefore, § 208.35(b)(2)(ii) allows USCIS to require a noncitizen who received a negative credible fear determination with respect to their application for asylum pursuant to § 208.35(b)(1)(i), but whose application is nonetheless retained by USCIS for asylum merits interview proceedings, to submit an asylum application to USCIS within 30 days of service of the positive credible fear determination, to ensure that there is a record of their potential asylum claim to serve as a substantive asylum application. For purposes of the filing and receipt date, the date of service of the positive credible fear determination will continue to serve as the date of filing pursuant to § 208.3(a)(2); however, if USCIS requires the submission of an asylum application, the timelines laid out in § 208.9(a)(1) and § 208.9(e)(2) may be delayed up to 15 days, considering the need to allow extra time for the submission of an asylum application to USCIS following service of the positive credible fear determination. *See id.* 208.35(b)(2)(ii). Under this IFR, if the applicant does not submit the

---

[292] In the Circumvention of Lawful Pathways rule, the Departments described how AOs would apply the limitation on asylum eligibility at issue there consistent with the statutory ''significant possibility'' standard. *See* 88 FR at 31380. That discussion in the Circumvention of Lawful Pathways rule also applies to AOs' application of the limitation on asylum eligibility created by this IFR. As explained above in Section III.B.3.a of this preamble, AOs will rarely have grounds to reach a different result from the CBP immigration officers as to the application of the Proclamation or its exceptions.

[293] In such cases, consistent with the Circumvention of Lawful Pathways rule, DHS would also have discretion to refer the noncitizen to EOIR for section 240 removal proceedings. *See Matter of E–R–M– & L–R–M–*, 25 I&N Dec. 520 (BIA 2011); *see also* 88 FR at 31348.

application within the time period required, USCIS will refer the noncitizen to section 240 removal proceedings before an IJ. USCIS does not foresee that it would be a prudent use of resources to place such cases into the asylum merits interview process, considering that USCIS has a finite number of AOs, and it is more efficient at present to assign work in a manner that maximizes the number of credible fear interviews USCIS can conduct at the border. Nevertheless, the IFR preserves the flexibility for USCIS to exercise its discretion to potentially place such cases into the asylum merits interview process (albeit with the potential addition of a supplementary application for asylum) should available resources and circumstances ever be such that it would be prudent to place such cases into the asylum merits interview process.

If the noncitizen fails to establish a reasonable probability of persecution or torture with respect to all designated countries of removal, the AO will provide the noncitizen with a written notice of decision and inquire whether the noncitizen wishes to have an IJ review the negative credible fear determination. *See id.* 208.35(b)(2)(iii). If the noncitizen indicates on the Record of Negative Fear that they request IJ review of the adverse finding, *see id.* 208.35(b)(2)(iv), the AO will serve the noncitizen with a Notice of Referral to Immigration Judge, *see id.* 208.35(b)(2)(v). *See* 88 FR at 11747; 88 FR at 31423. The record of determination, including copies of the Notice of Referral to Immigration Judge, the AO's notes, the summary of the material facts, and other materials upon which the AO based their determination regarding the applicability of the condition on asylum eligibility (which, in cases where the limitation on asylum eligibility created by this IFR applies, includes materials showing the relevant known entry date), will be provided to the IJ with the negative determination. *See* 8 CFR 208.35(b)(2)(v). The IJ would then review the case consistent with § 1208.35, described below.

If, following IJ review, the IJ makes a positive credible fear determination under § 1208.35(b)(2)(iii) or § 1208.35(b)(4), the case will proceed under § 1208.30(g)(2)(iv)(B). *See id.* 208.35(b)(2)(v)(A). The IJ may vacate the Notice and Order of Expedited Removal and refer the case back to DHS for further proceedings consistent with 8 CFR 1208.2(a)(1)(ii). *See id.* 1208.30(g)(2)(iv)(B). Alternatively, DHS may commence section 240 removal proceedings, during which time the noncitizen may file an application for asylum, statutory withholding of removal, and CAT protection in accordance with § 1208.4(b)(3)(i). *See id.* 1208.30(g)(2)(iv)(B).

If the IJ makes a negative credible fear determination, however, the case will be returned to DHS for removal of the noncitizen. *See id.* 208.35(b)(2)(v)(B). Consistent with the purpose of the expedited removal process and this IFR, there would be no appeal from the IJ's decision and DHS would not accept requests for reconsideration. *See id.* USCIS may, however, in its sole discretion, reconsider a negative determination. *See id.;* 88 FR at 11747; 88 FR at 31418–19.

Paragraph (b)(3) applies in the event that the limitation on asylum eligibility in paragraph (a) is rendered inoperative by court order. In such circumstance, those who enter during emergency border circumstances and who are found not to have a significant possibility of eligibility for asylum because of the Lawful Pathways condition will be screened for eligibility for statutory withholding of removal and CAT protection under the "reasonable probability" screening standard. This will ensure continued applicability of that standard during emergency border circumstances, even absent the rule's limitation on asylum eligibility. The Departments acknowledge that under this approach, not all who would have been subject to the higher screening standard if the limitation remained in force would be subject to it in the event of an injunction—*i.e.,* those who do not travel through a country other than their country of citizenship, nationality, or, if stateless, last habitual residence; those excepted from the Lawful Pathways condition under the exceptions at 8 CFR 208.33(a)(2)(ii)(A) and (C); those excepted from the Lawful Pathways condition because they present at a POE without a pre-scheduled time and place and demonstrate that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; and those who enter across the maritime borders covered by the Proclamation that are not covered by the Lawful Pathways condition. The Departments have adopted a somewhat narrower scope for the standard to avoid a circumstance where AOs and IJs would be required to analyze both the applicability of the Lawful Pathways condition and then also whether the noncitizen would otherwise be subject to the rule's limitation—which could complicate and increase the time required to conduct credible fear screenings. The Departments believe the approach adopted strikes the right balance between the interest in applying the screening standard to those to whom it would otherwise apply and administrability in the event the limitation on asylum eligibility is rendered inoperative by court order. The Departments request comment on whether to expressly expand this provision to also apply to those who are found not to have a significant possibility of eligibility for asylum because they are barred from asylum due to a mandatory bar to asylum eligibility if the rule Application of Certain Mandatory Bars in Fear Screenings, 89 FR 41347 (May 13, 2024), is finalized.

Paragraph (c) contains a family unity provision that parallels and serves the same purposes as the DOJ family unity provision in the Circumvention of Lawful Pathways rule. *See* 8 CFR 1208.33(c). The paragraph specifies that a noncitizen who would be eligible for asylum but for the limitation on eligibility set forth in the IFR, the condition set forth in the Circumvention of Lawful Pathways rule, or both, may meet the family unity provision where the other requirements are met. The expressly permissive, discretionary nature of this provision, which owes in part to the considerations described earlier in this section with respect to asylum merits interviews, distinguishes it from the parallel DOJ provision in the Circumvention of Lawful Pathways rule and the parallel DOJ provision described in the next section of this preamble.

Paragraph (d) mirrors 8 CFR 208.33(c) and 1208.33(d) and specifies the ongoing applicability of the limitation on asylum eligibility by providing that it shall apply to "any asylum application" that is filed by a covered noncitizen "regardless of when the application is filed and adjudicated." *Id.* 208.35(d)(1). The Departments have excepted from this ongoing application of the limitation on asylum eligibility certain noncitizens who enter the United States during emergency border circumstances while under the age of 18 and who later seek asylum as principal applicants so long as the asylum application is filed after the period of time described in § 208.13(g) during which the noncitizen entered. *See id.* 208.35(d)(2). Commenters on the Circumvention of Lawful Pathways rule raised concerns about the impact of that rule on children who arrive as part of a family unit and who are thus subject to the decision-making of their parents. 88 FR at 31320. The Departments decided to adopt a provision excepting

such children from that rule in certain circumstances after the two-year period ends. *See* 8 CFR 208.33(c)(2), 1208.33(d)(2). The Departments recognized that children who enter with their families are generally traveling due to their parents' decision-making. 88 FR at 31320. The Departments believe that these considerations are also relevant to this rule and have decided to adopt a similar approach as that adopted in the Circumvention of Lawful Pathways rule.

The Departments considered whether to except family units, or children who are part of family units, from the limitation on asylum eligibility entirely. The Departments decline to adopt such an approach. Excepting all family units that include minor children could incentivize families who otherwise would not make the dangerous journey and cross unlawfully to do so. And excepting only the child could inadvertently lead to the separation of a family in many cases because every child would have to be treated separately from their family during the credible fear screening, as they would not be subject to the limitation but their parents could be. Although accompanied children remain subject to the limitation on asylum eligibility generally, the Departments have determined that the limitation should not apply to them in any application for asylum they file after the relevant period, but only if they apply as a principal (as opposed to a derivative) applicant.

The Departments also considered applying a specific calendar date to this provision, similar to the approach taken by the Departments in the Circumvention of Lawful Pathways rule.[294] The Departments determined that such a provision would be challenging to implement because the Departments have not identified a date certain upon which emergency border circumstances are expected to discontinue. The Departments believe that the key purpose of an asylum application waiting period—protecting against any perceived incentive for family units to migrate irregularly—is adequately served by a requirement that the applicable period of emergency border circumstances is no longer in place at the time of application. For that same reason, the Departments do not believe it is necessary to make this exception unavailable during any period of emergency border circumstances; instead, this exception will be available

after the end of the emergency border circumstance during which the applicant entered. Because noncitizens will not know in advance when the emergency border circumstance will end, and when another emergency border circumstance might occur, the approach adopted in the rule addresses noncitizens' incentives without restricting this exception more than is necessary.

The Departments believe this approach balances the interest in ensuring the limitation has an impact on behavior, while at the same time recognizing the special circumstance of children who enter in a manner that triggers the limitation, likely without intending to do so or being able to form an understanding of the consequences. Specifically, if the Departments were to extend this exception to children who filed as a derivative, the Departments would risk incentivizing families to seek to prolong their proceedings to file their asylum applications after the end of the circumstances leading to the suspension and limitation on entry, undermining the Departments' interest in efficient adjudications. In addition, any family that did so would be able to avoid the applicability of the limitation entirely, by virtue of the rule's family unity provision. The Departments have decided not to include such a broad exception, in light of the urgent need to gain efficiencies in the expedited removal process and dissuade entry during the circumstances described in the Proclamation and this rule.

Finally, DHS is including a severability clause in this provision. *See* 8 CFR 208.35(e). If any provision of this section, § 235.15, or the Proclamation is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, DHS intends that the provision be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding is that the provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances. Indeed, in this rule, the Departments have sought to avoid describing "emergency border circumstances" as the time period during which the Proclamation is in effect, because the Departments intend for certain provisions of this rule to remain in effect in the event a court enjoins or otherwise renders inoperable the Proclamation or this rule's limitation on asylum eligibility. This

approach is consistent with the nature of the rule as an emergency measure and reflects DHS's determination that the limitation on asylum eligibility will improve the border security and immigration systems' capacity to safely process migrants during the circumstances described in the Proclamation and this rule. For example, even in the absence of the limitation on asylum eligibility, as expressly set forth in paragraph (b)(3), the Department intends that the "reasonable probability" standard be used for screening for eligibility for statutory withholding of removal and CAT protection for those who would have been subject to the limitation on asylum if they are otherwise unable to establish a credible fear of persecution for asylum purposes, including but not limited to because they are subject to the Lawful Pathways rebuttable presumption. Similarly, even in the absence of the new provision at 8 CFR 235.15 discussed below, the changes made in § 208.35 are expected to prove helpful in the emergency circumstances described by the Proclamation and the rule. *See id.* 208.35(e).

### 3. 8 CFR 1208.35

Like DHS's addition to 8 CFR part 208, DOJ is adding to 8 CFR part 1208, *Procedures for Asylum and Withholding of Removal,* a new subpart D, *Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances.* Within subpart D, DOJ is adding a new § 1208.35, *Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.* This section sets forth a new limitation on asylum eligibility and procedures related to IJ review of credible fear determinations in expedited removal proceedings during emergency border circumstances. This provision applies notwithstanding any contrary provision in EOIR's regulations. Section 1208.35 consists of the following provisions:

Paragraph (a) mirrors new § 208.35(a), discussed above.

Paragraph (b) provides procedures for credible fear determinations. Under these procedures, when a noncitizen has requested IJ review of an AO's negative credible fear determination, the IJ will evaluate the case de novo, taking into account the credibility of the statements made by the noncitizen in support of the noncitizen's claim and such other facts as are known to the IJ. *See* 8 CFR 1208.35(b)(1). The paragraph sets forth three possible procedural scenarios depending on the IJ's determinations. First, where the IJ determines that the

---

[294] Under this rule, the Lawful Pathways condition does not apply to certain asylum applications filed after May 11, 2025—two years after that rule's initial issuance. 8 CFR 208.33(c)(2), 1208.33(d)(2); 88 FR at 31449.

**48758** **Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations

noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish that they are not described in § 1208.13(g), the IJ will follow the procedures for credible fear interviews relating to the Lawful Pathways condition in § 1208.33(b). *See id.* 1208.35(b)(2)(i).[295] This provides that those noncitizens who did not enter during emergency border circumstances are processed under the provisions governing the Lawful Pathways condition—and under § 1208.33(b)(2)(i), if the noncitizen is not subject to that condition they will be screened for a significant possibility of eligibility for statutory withholding of removal or CAT protection consistent with § 208.30. Second, where the IJ determines that the noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish either that they are described in section 3(b) of the Proclamation or exceptionally compelling circumstances exist under paragraph (a)(2), the IJ will follow the procedures in 8 CFR 1208.30. *See id.* 1208.35(b)(2)(ii). Third, where the IJ determines that the IFR's limitation on asylum eligibility applies—including that there is not a significant possibility that the noncitizen could establish an exception under section 3(b) of the Proclamation—and that there is not a significant possibility that the noncitizen could establish an exception under paragraph (a)(2) of the limitation, the IJ will apply the Circumvention of Lawful Pathways rule's procedures set forth in § 1208.33(b)(2)(ii), except that the IJ will apply a "reasonable probability" standard to parallel the standard adopted by DHS. *See id.* 1208.35(b)(2)(iii).

Paragraph (b)(4), mirrors new § 208.35(b)(3), discussed above.

Paragraph (c) contains a family unity provision that parallels and serves the same purposes as the family unity provision in the Circumvention of Lawful Pathways rule. *See id.* 1208.33(c), 1208.35(c). The paragraph specifies that a noncitizen who would be eligible for asylum but for the limitation on eligibility set forth in the

IFR, the condition set forth in the Circumvention of Lawful Pathways rule, or both, may meet the family unity exception where the other requirements are met.

Paragraph (d) mirrors new § 208.35(d), discussed above.

Paragraph (e) contains a severability provision that serves a similar purpose to the provision in § 208.35(e) described above. If any provision of this section or the Proclamation is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, DOJ intends that the provision be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding is that the provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances. This approach is consistent with the nature of the rule as an emergency measure and reflects DOJ's determination that the limitation on asylum eligibility will improve the border security and immigration systems' capacity to safely process migrants during the circumstances described in the Proclamation and this rule. For example, as set forth explicitly in paragraph (b)(4), even in the absence of the limitation on asylum eligibility, the Department intends that the "reasonable probability" standard be used for screening for eligibility for statutory withholding of removal and CAT protection for those who would have been subject to the limitation on asylum if they are otherwise unable to establish a credible fear of persecution for asylum purposes, including but not limited to because they are subject to the Lawful Pathways rebuttable presumption. *See id.* 1208.35(e).

### 4. 8 CFR 235.15

DHS is adding to 8 CFR part 235, *Inspection of Persons Applying for Admission,* a new § 235.15, *Inadmissible aliens and expedited removal during emergency border circumstances.* New 8 CFR 235.15 will further streamline aspects of the expedited removal process by effectively replacing paragraphs (b)(2)(i) and (b)(4)(i) of 8 CFR 235.3 for those individuals described in § 235.3(b)(1)(i) or (ii) and who are described in § 208.13(g) but not described in section 3(b) of the Proclamation. *See* 8 CFR 235.15. The changes would not affect implementation of 8 CFR 235.3(b)(4)(ii)

or any other portion of 8 CFR 235.3. *See id.* The changes are as follows.

First, under 8 CFR 235.3(b)(2)(i), the record of proceeding includes a sworn statement using Form I–867AB, *Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act.* Under the existing regulations, the examining immigration officer reads (or has read) to the noncitizen all information contained on Form I–867A. Following questioning and recording of the noncitizen's statement regarding identity, alienage, and inadmissibility, the examining immigration officer records the noncitizen's response to the questions contained on Form I–867B, and has the noncitizen read (or has read to the noncitizen) the statement, and the noncitizen signs and initials each page of the statement and each correction, if any.

DHS is adding a new 8 CFR 235.15(b)(2)(i) to apply to certain noncitizens instead of this current process during emergency border circumstances. Under this procedure, Forms I–867A and I–867B will no longer be mandated in such circumstances. Instead, the immigration officer shall advise the individual of the charges against them on the Form I–860 and give him or her an opportunity to respond to those charges. *See* 8 CFR 235.15(b)(2)(i)(B). This provision does not require that the response be done through a sworn statement. *See id.* Consistent with current regulations, however, the inspecting officer must obtain supervisory concurrence of an expedited removal order in accordance with § 235.3(b)(7). *Id.* Moreover, consistent with current regulations, the examining immigration official shall serve the noncitizen with Form I–860, and the noncitizen shall be required to sign the form acknowledging receipt. *Id.* The new 8 CFR 235.15(b)(2)(i) no longer mandates that the signature occur on the reverse, but preserves the requirement that the noncitizen be required to sign, allowing greater flexibility for location of signature blocks on the document. *See id.* 235.3(b)(2)(i). The new provision maintains the requirement that interpretative assistance shall be used if necessary to communicate with the noncitizen. *Id.* 235.3(b)(2)(i)(B). The new 8 CFR 235.15(b)(2)(i) also allows for greater flexibility regarding how DHS records the information that supports the finding that the noncitizen is inadmissible and subject to expedited removal. This operational flexibility is consistent with the President's determination that emergency border circumstances are present such that the suspension and limitation on entry is warranted.

---

[295] As explained above regarding AOs, the discussion in the Circumvention of Lawful Pathways rule regarding how AOs would apply the limitation on asylum eligibility at issue there consistent with the statutory "significant possibility" standard, *see* 88 FR at 31380, is equally applicable to IJs' application of the limitation on asylum eligibility created by this IFR. As explained above in Section III.B.3.a of this preamble, IJs will rarely have grounds to reach a different result from the CBP immigration officers as to the application of the Proclamation or its exceptions.

Second, under 8 CFR 235.3(b)(4), if a noncitizen subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer does not proceed further with removal of the noncitizen until the noncitizen has been referred for an interview by an AO in accordance with 8 CFR 208.30.

Instead of this current process, DHS is adding a new 8 CFR 235.3(b)(4), applicable to those who (1) are described in § 208.13(g), (2) are not described in section 3(b) of the Proclamation, and (3) are processed for expedited removal. Under this provision the immigration officer would refer the noncitizen to an AO if the noncitizen manifests a fear of return or affirmatively expresses an intention to apply for asylum, or affirmatively expresses a fear of persecution or torture, or a fear of return to his or her country or the country of removal.

Third, under 8 CFR 235.3(b)(4)(i), the referring officer provides the noncitizen with a written disclosure on Form M–444, *Information About Credible Fear Interview,* describing (1) the purpose of the referral and description of the credible fear interview process; (2) the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; (3) the right to request a review by an IJ of the AO's credible fear determination; and (4) the consequences of failure to establish a credible fear of persecution or torture. New 8 CFR 235.15(b)(4) will simply require that an immigration officer provide "a written disclosure describing the purpose of the referral and the credible fear interview process; the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; the right to request a review by an IJ of the AO's credible fear determination; and the consequences of failure to establish a credible fear of persecution or torture." 8 CFR 235.15(b)(4)(i)(B). Thus, while maintaining the substance of the information that must be provided to the noncitizen, the regulation removes the requirement that it be on a particular form, allowing for greater flexibility in how the information is distributed.

Finally, DHS is including a severability clause in this provision. *See id.* 235.15(g). DHS believes that each of these changes can function sensibly without the others, given that each change is independently seeking to provide greater flexibility during a time when the suspension and limitation on entry is in effect, while still protecting

the important ability of individuals to seek protection from removal. DHS further believes that even if a court order enjoins or vacates the Proclamation or provisions other than § 235.15 of this rule, the provisions in § 235.15 can continue to apply to those described in § 208.13(g) and not described in section 3(b) of the Proclamation, even if they cannot be subject to those provisions by operation of such court order.

## IV. Statutory and Regulatory Requirements

### A. Administrative Procedure Act

Under the Administrative Procedure Act ("APA"), agencies must generally provide "notice of proposed rule making" in the **Federal Register** and, after such notice, "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. 553(b) and (c). The APA further provides that the required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except in certain circumstances. *Id.* 553(d). Consistent with the APA, the Departments have not invoked these procedures because (1) this rule involves a foreign affairs function of the United States and thus is excepted from such requirements, *id.* 553(a)(1), and (2) the Departments have found good cause to proceed with an immediately effective interim final rule, *id.* 553(b)(B), 553(d)(3), for the reasons explained below. At the same time, the Departments seek and welcome post-promulgation comments on this IFR.

#### 1. Foreign Affairs

This rule is excepted from the APA's notice-and-comment and delayed-effective-date requirements because it involves a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1). Courts have held that this exception applies when the rule in question "is clearly and directly involved in a foreign affairs function." [296] In addition, although the text of the APA does not require an agency invoking this exception to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing. *Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d

Cir. 2008) (quotation marks omitted).[297] This rule satisfies both standards.

The United States' border management strategy is predicated on the belief that migration is a shared responsibility among all countries in the region—a fact reflected in the intensive and concerted diplomatic outreach on migration issues that DHS and the Department of State have made with partners throughout the Western Hemisphere. This strategy includes the Los Angeles Declaration on Migration and Protection, which was joined by leaders during the Summit of the Americas on June 10, 2022, and has been endorsed by 22 countries.[298] Under the umbrella of this framework, the United States has been working closely with its foreign partners to manage the unprecedented levels of migration that countries throughout the region have recently been experiencing, including on efforts to: expand access to, and increase, lawful pathways, such as the Safe Mobility Office initiative;[299] conduct joint enforcement efforts, such as the Darién Campaign with Colombia and Panama and the mirrored patrols[300] with the Government of Mexico along

---

[296] *E.B.* v. *U.S. Dep't of State,* 583 F. Supp. 3d 58, 63 (D.D.C. 2022) (cleaned up); *see Mast Indus., Inc.* v. *Regan,* 596 F. Supp. 1567, 1582 (Ct. Int'l Trade 1984); *see also Am. Ass'n of Exps. & Imps.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (holding that the exception applies where a rule is "linked intimately with the Government's overall political agenda concerning relations with another country").

[297] *See, e.g., Rajah,* 544 F.3d at 437 ("There are at least three definitely undesirable international consequences that would follow from notice and comment rulemaking. First, sensitive foreign intelligence might be revealed in the course of explaining why some of a particular nation's citizens are regarded as a threat. Second, relations with other countries might be impaired if the government were to conduct and resolve a public debate over why some citizens of particular countries were a potential danger to our security. Third, the process would be slow and cumbersome, diminishing our ability to collect intelligence regarding, and enhance defenses in anticipation of, a potential attack by foreign terrorists."); *see also Yassini* v. *Crosland,* 618 F.2d 1356, 1360 n.4 (9th Cir. 1980) ("For the [foreign affairs] exception to apply, the public rulemaking provisions should provoke definitely undesirable international consequences."). *But see E.B.,* 583 F. Supp. 3d at 64–66 (rejecting the "provoke definitely undesirable international consequences" standard).

[298] *See* Los Angeles Declaration on Migration and Protection, *Endorsing Countries, https://losangelesdeclaration.com/endorsing-countries* (last visited May 27, 2024).

[299] *See* U.S. Dep't of State, *Safe Mobility Initiative, https://www.state.gov/refugee-admissions/safe-mobility-initiative* (last visited May 27, 2024).

[300] *See* CBP, *Readout: U.S.-Mexico meeting on joint actions to further enhance border security* (Sept. 24, 2023), *https://www.cbp.gov/newsroom/national-media-release/readout-us-mexico-meeting-joint-actions-further-enhance-border* (noting that CBP encouraged mirrored patrols); U.S. Dep't of State, *Third Meeting of the U.S.-Mexico High-Level Security Dialogue—Fact Sheet* (Oct. 13, 2023), *https://www.state.gov/third-meeting-of-the-us-mexico-high-level-security-dialogue/* (noting that "CBP and INM regularly coordinate enforcement efforts at the border through mirrored patrols," which suggests that those patrols were occurring).

our shared border; [301] and share information, technical assistance, and best practices.[302] The United States and endorsing countries continue to progress and expand upon our shared commitments made under this framework.[303]

This international coordination has yielded important results. A number of foreign partners, including Mexico, Panama, and Colombia, announced significantly enhanced efforts to enforce their borders in the days leading up to the end of the Title 42 public health Order.[304] These governments recognized that the United States was taking measures to strengthen border enforcement, specifically through application of the Circumvention of Lawful Pathways rule along with other complementary measures, and committed to taking their own actions to address irregular migratory flows in the region.[305] Additionally, immediately prior to the transition from DHS processing under the Title 42 public health Order to processing under title 8 authorities, the Government of Mexico announced that it had independently decided to accept the return into Mexico of nationals from CHNV countries under title 8 processes.[306] However, in the

intervening months, Mexico and other partners' resources have been significantly strained by sustained high encounter levels, and at different times enforcement by our partners has been disrupted, leading to surges at our own border.[307]

In public messaging, the Government of Mexico linked its decision to accept return into Mexico of CHNV nationals to the success of the CHNV parole processes framework under the Title 42 public health Order,[308] which combined expansion of lawful pathways and processes for nationals of these countries with a meaningful consequence framework, and which reduced irregular border crossings.[309] Sustaining and, as appropriate, ramping

up efforts to improve border security and stem arrivals to the southern border is a critical element of the United States' ongoing diplomatic approach to migration management with partners in the region. This has been a key component of our diplomacy, as regional partner countries have regularly encouraged DHS to take steps to address migratory flows, including by channeling intending migrants into expanded lawful pathways and processes. For example, following the development of the parole process for Venezuelans announced in October 2022—an approach that was subsequently expanded to include processes for Cuban, Haitian, and Nicaraguan nationals in January 2023—regional partners urged the United States to continue building on this approach, which imposed consequences for irregular migration alongside the availability of a lawful, safe, and orderly process for migrants to travel directly to the United States.[310] Following the announcement of the Venezuela parole process in October 2022 and the subsequent announcement of the Cuba, Haiti, and Nicaragua parole processes in January 2023, migration flows through the region and at the U.S.-Mexico border slowed. *See* 88 FR at 31317 ("DHS estimates that the drop in CHNV encounters in January through March was almost four times as large as the number of people permitted entry under the parole processes.").

The United States has continued to build on this historic expansion of lawful pathways and processes, which include the humanitarian parole processes for CHNV nationals; [311] efforts to expand labor pathways and dedicate a set number of visas to nationals of countries in the hemisphere; [312] the implementation of new Family Reunification Parole ("FRP") processes for certain nationals of Colombia, Ecuador, El Salvador, Guatemala, and Honduras; and the modernization of FRP processes for certain nationals of Cuba and Haiti.[313]

---

[301] *See* DHS, *Trilateral Statement* (Apr. 11, 2023), *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[302] *See, e.g., Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border,* Exec. Order 14010, 86 FR 8267, 8270 (Feb. 2, 2021); The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/;* The White House, *Fact Sheet: U.S.-Mexico High-Level Security Dialogue* (Oct. 8, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/08/fact-sheet-u-s-mexico-high-level-security-dialogue/;* U.S. Dep't of State, *Fact Sheet: Third Meeting of the U.S.-Mexico High-Level Security Dialogue* (Oct. 13, 2023), *https://www.state.gov/third-meeting-of-the-u-s-mexico-high-level-security-dialogue/.*

[303] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration On Migration and Protection in Guatemala* (May 7, 2024),

[304] Kathia Martínez, *US, Panama and Colombia Aim to Stop Darien Gap Migration,* AP News (Apr. 11, 2023), *https://apnews.com/article/darien-gap-panama-colombia-us-migrants-cf0cd1e0de2119208c9af186e53e09b7;* Camilo Montoya-Galvez, *Mexico Will Increase Efforts To Stop U.S.-Bound Migrants as Title 42 Ends, U.S. Officials Say,* CBS News (May 10, 2023), *https://www.cbsnews.com/news/title-42-end-border-mexico-efforts-us-bound-migrants/.*

[305] 88 FR at 31444.

[306] *See* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/;*

[307] *See* Charles G. Ripley III, *Crisis Prompts Record Emigration from Nicaragua, Surpassing Cold War Era,* Migration Pol'y Inst. (Mar. 7, 2023), *https://www.migrationpolicy.org/article/record-emigration-nicaragua-crisis;* James Fredrick, *Mexico Feels Pressure of Relentless Migration from South America,* N.Y. Times (Sept. 21, 2023) ("Similar scenes are playing out across the country as Mexico's immigration system strains under a tide of people desperately trying to go north. The relentless surge has led to a hodgepodge response in Mexico ranging from shutting down railways heading north to the busing of people to areas with fewer migrants."); Megan Janetsky & Javier Córdoba, *Central America scrambles as the international community fails to find solution to record migration,* AP News (Oct. 26, 2023), *https://apnews.com/article/costa-rica-migration-darien-gap-biden-420e2d1219d403d7fecc6463a6e9cdae* (noting the resources pull migration flows place on certain Central American countries); María Verza, *Mexico halts deportations and migrant transfers citing lack of funds,* AP News (Dec. 4, 2023), *https://apnews.com/article/mexico-immigration-migrants-venezuela-17615ace23d0677bb443d8386e254fbc* (observing that the "head of Mexico's immigration agency . . . ordered the suspension of migrant deportations and transfers due to a lack of funds"); Valerie Gonzalez & Elliot Spagat, *The US sees a drop in illegal border crossings after Mexico increases enforcement,* AP News (Jan. 7, 2024), *https://apnews.com/article/mexico-immigration-enforcement-crossings-drop-b67022cf0853dca95a8e0799bb99b68a* (noting the disruption in enforcement that resulted from Mexico's lack of funding and quoting Andrew Selee, President of the Migration Policy Institute, as saying that "[t]he U.S. is able to lean on Mexico for a short-term enforcement effect at the border, but the long-term effects are not always clear").

[308] *See* Gobierno de México, *México y Estados Unidos fortalecen Plan Humanitario Conjunto sobre Migración* (May 2, 2023), *https://www.gob.mx/presidencia/prensa/mexico-y-estados-unidos-fortalecen-plan-humanitario-conjunto-sobre-migracion?state=published* (characterizing the effort of the Government of Mexico as a successful joint initiative and expressing the Government's commitment to continue to accept migrants back into Mexico on humanitarian grounds).

[309] *See id.* (describing a significant reduction in irregular migration following the implementation of CHNV parole processes, which pair an expansion of lawful pathways with consequences for irregular migration).

[310] *See* 88 FR at 31444; The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[311] *See* USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (Sept. 20, 2023), *https://www.uscis.gov/CHNV.*

[312] *See* DHS & U.S. Dep't of Labor, *Temporary Rule—Exercise of Time-Limited Authority To Increase the Numerical Limitation for FY 2024 and for the H-2B Temporary Nonagricultural Worker Program and Portability Flexibility for H-2B Workers Seeking To Change Employers,* 88 FR 80394 (Nov. 17, 2023).

[313] DHS, *DHS Modernizes Cuban and Haitian Family Reunification Parole Processes* (Aug. 10,

**Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations **48761**

Concurrently, the Governments of Colombia and Panama have made significant efforts to combat smuggling networks operating on both sides of the Darién Gap.[314] The Government of Mexico has likewise increased enforcement along its southern border and the transit routes north.[315] These enforcement campaigns have been implemented at substantial cost for those governments and, as with United States Government actions, reflect our shared regional responsibility to manage migration.[316]

Given the particular challenges facing the United States and its regional partners at this moment, the Departments assess that it is critical that the United States continue to lead the way in responding to ever-changing and increasing migratory flows, and that this regulatory effort and the Presidential Proclamation—and the strong consequences they will impose at the border—will send an important message to the region that the United States is prepared to put in place appropriate measures to prepare for and, if necessary, respond to ongoing migratory challenges.

In addition to this IFR's clear and direct involvement in foreign affairs, the Departments believe that conducting a notice-and-comment process and providing a delayed effective date on this rule likely would lead to a surge to the border before the Departments could finalize the rule, which would adversely impact the United States' foreign policy priorities. Prior to the end of the Title 42 public health Order, regional partners expressed great concern about the misperception that the end of the Order would mean an open U.S. border and result in a surge of irregular migration flowing through their countries as migrants sought to enter the United States. *See* 88 FR at 31444. One foreign partner, for example, expressed the strong concern that the formation of caravans during the spring of 2022 was spurred by rumors—and the subsequent official announcement—of the anticipated end of the Title 42 public health Order. *See id.* This view is consistent with the views of other regional partner countries that have repeatedly emphasized the ways in which U.S. policy announcements have a direct and immediate impact on migratory flows through their countries. *See id.* Such effects are precisely the kind of ''definitely undesirable international consequences'' that the Departments seek to avoid.

The surge about which many foreign leaders were concerned happened sooner than expected. In the weeks leading up to the lifting of the Title 42 public health Order, hemispheric migration spiked. Entries into the Darién jungle by migrants staged in Colombia began increasing in the months leading up to May 12, 2023, from a little more than 24,600 in January 2023, to more than 40,000 in April 2023 immediately before the Order lifted.[317] And as described more fully above, total CBP encounters at the SWB increased to then-record levels in the days immediately preceding May 12, 2023, a situation that was fueled by noncitizens seeking to enter the United States before new policies were put into effect, as well as by smuggling organizations that disseminated misinformation.[318] The scale of regional migration in those weeks strained the immigration processes of all the affected countries, including those of the United States.

As noted above, the United States saw a similar scale of migration at the end of 2023. The surge in December 2023 led the United States Government and the Government of Mexico to hold a series of engagements at the highest levels—including between the countries' Presidents and Cabinet Members—to address the shared challenge of migration confronting both countries.[319] These conversations included commitments by both governments to continue to expand efforts to coordinate enforcement actions on both sides of the border.[320] January, February, and March are typically slower months, but since these engagements, and the joint operational actions that resulted, there has been a decrease in USBP encounters at the border, as discussed in Section III.B.1 of this preamble.

The record-breaking hemispheric migration throughout the region has deeply affected governments from South America all the way to the U.S.-Mexico border. Panama has been encountering record numbers of migrants transiting one of the most dangerous smuggling corridors on the planet, the Darién Jungle.[321] Colombia, Peru, and Ecuador have hosted around 3 million,[322] over 1.5 million,[323] and more than 475,000 Venezuelans,[324] respectively, while Costa Rica has recently hosted hundreds of thousands of Nicaraguans.[325] Mexico has received record-breaking numbers of

---

2023), *https://www.dhs.gov/news/2023/08/10/dhs-modernizes-cuban-and-haitian-family-reunification-parole-processes.*

[314] See Kathia Martinez, *US, Panama, and Colombia aim to stop Darien Gap migration,* AP News (Apr. 11, 2023), *https://apnews.com/article/darien-gap-panama-colombia-us-migrants-cf0cd1e9de2119208c9af186e53e09b7;* Juan Zamorano & Christopher Sherman, *Explainer: Panama launches operation against smugglers in Darien Gap,* AP News (June 3, 2023), *https://apnews.com/article/panama-colombia-darien-gap-migrants-d0ec93c4d4ddc91f34e31c704b4cf8ae.*

[315] See, e.g., Associated Press, *U.S. Border Arrests Decline Amid Increased Enforcement in Mexico,* NPR (Apr. 13, 2024), *https://www.npr.org/2024/04/13/1244590706/mexico-border-arrests-fall-march* (''Mexico detained migrants 240,000 times in the first two months of the year, more than triple from the same period of 2023, sending many deeper south into the country to discourage them from coming to the United States. While Mexico hasn't released figures for March, U.S. officials have said Mexican enforcement is largely responsible for recent declines.'').

[316] See, e.g., The White House, Press Release, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[317] See Servicio Nacional de Migración Panamá, *Estadísticas, Tránsito Irregular por Darién 2023, https://www.migracion.gob.pa/inicio/estadisticas.*

[318] See Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires,* AP News (May 11, 2023), *https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257c0220413b8e9cf9* (noting that ''[m]any migrants were acutely aware of looming policy changes as they searched Thursday for an opportunity to turn themselves over to U.S. immigration authorities before the 11:59 EDT deadline . . . [and] [e]ven as migrants were racing to reach U.S. soil before the rules expire, Mexican President Andrés Manuel López Obrador said smugglers were sending a different message . . . [and] offering to take migrants to the United States and telling them the border was open starting Thursday'').

[319] See supra Section III.B.1 of this preamble.

[320] See, e.g., White House, *Readout of Homeland Security Advisor Dr. Liz Sherwood-Randall's Trip to Mexico* (Feb. 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/07/readout-of-homeland-security-advisor-dr-liz-sherwood-randalls-trip-to-mexico/;* Amna Nawaz, *Mexico's foreign secretary discusses what her country is doing to ease border crisis,* PBS News Hour (Jan. 25, 2024), *https://www.pbs.org/newshour/show/mexicos-foreign-secretary-discusses-what-her-country-is-doing-to-ease-border-crisis* (quoting Foreign Secretary Bárcena as describing ''much more law enforcement to bring down the pressure in the border'' by Mexico in the preceding weeks).

[321] See Nick Paton Walsh et al., *On one of the world's most dangerous migrant routes, a cartel makes millions off the American dream,* CNN (Apr. 17, 2023), *https://www.cnn.com/2023/04/15/americas/darien-gap-migrants-colombia-panama-whole-story-cmd-intl/index.html;* Diana Roy, *Crossing the Darién Gap: Migrants Risk Death on the Journey to the U.S.,* Council on Foreign Rels. (Feb. 1, 2024), *https://www.cfr.org/article/crossing-darien-gap-migrants-risk-death-journey-us;* Mallory Moench, *Volume of Migrants Crossing the Dangerous Darién Gap Hit Record High in 2023,* Time (Dec. 22, 2023), *https://time.com/6547992/migrants-crossing-darien-gap-2023.*

[322] See UNHCR, *Colombia Country Operations* (2024), *https://reporting.unhcr.org/operational/operations/colombia.*

[323] See UNHCR, *Peru Country Operations* (2024), *https://reporting.unhcr.org/operational/operations/peru.*

[324] See UNHCR, *Ecuador Country Operations* (2024), *https://reporting.unhcr.org/operational/operations/ecuador.*

[325] See UNHCR, *Costa Rica Country Operations* (2024), *https://reporting.unhcr.org/operational/operations/costa-rica.*

**48762** Federal Register / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations

asylum applications in addition to the enforcement efforts it is undertaking.[326]

As described more fully above, DHS's internal projections suggest that SWB encounters may once again reach extremely elevated levels in the weeks to come, averaging in the range of approximately 3,900 to approximately 6,700 encounters at and between POEs per day from July to September, not including an additional 1,450 noncitizens per day who are expected to be encountered at POEs after making appointments though the CBP One app.[327] Regional migration trends support these projections. For example, between January and April 2024, UNHCR tracked 139,000 irregular entries, up from 128,000 for the same months in 2023 and a seven-fold increase over that period in 2022.[328] Moreover, as noted above, the Government of Mexico has been receiving record-breaking numbers of asylum applications—reflecting the large number of migrants currently in Mexico.

The weeks leading up to May 12, 2023, demonstrated that when migrants anticipate major changes in border policy, there is the potential to ignite a rush to the border to arrive before the changes take effect.[329] Any delay between announcement of this rule and its implementation through notice and comment would almost certainly trigger a surge in migration that would undermine the principal goal of this entire effort: to reduce migratory flows to our border, and throughout the region.

The Departments believe that the emergency measures being taken here are needed to help address this regional challenge, and that any decrease in migration that results will help relieve the strain not just on the U.S.-Mexico border but on countries throughout the hemisphere. The actions the United States is taking in this regulation demonstrate a commitment to addressing irregular migration in the region, even as foreign partners have been taking actions themselves that are aligned with a shared interest in reducing migration. The IFR changes key procedures to significantly streamline and strengthen the consequences delivered for unlawful or unauthorized entry at the southern border. The actions the Departments are taking are directly responsive to the shared challenge the United States and its regional partners are confronting and, equally important, it is critical to implement these actions without a lengthy period of advance notice before the actions go into effect.

### 2. Good Cause

The Departments have also found good cause to forego the APA's notice-and-comment and delayed-effective-date procedures. *See* 5 U.S.C. 553(b)(B), (d)(3). Such procedures are impracticable because the delays associated with such procedures would unduly postpone implementation of a policy that is urgently needed to avert significant public harm. Such procedures are likewise contrary to the public interest because an advance announcement of this rule would seriously undermine a key goal of the policy: It would incentivize even more irregular migration by those seeking to enter the United States before the rule would take effect.

First, the "impracticable" prong of the good cause exception "excuses notice and comment in emergency situations . . . or where delay could result in serious harm."[330] Findings of impracticability are "inevitably fact- or context-dependent,"[331] and when reviewing such findings, courts generally consider, among other factors, the harms that might have resulted while the agency completed standard rulemaking procedures[332] and the agency's diligence in addressing the problem it seeks to address.[333]

The critical need to immediately implement more effective border management measures is described at length in the Presidential Proclamation of June 3, 2024, Securing the Border, and in Section III.B of this preamble. Despite the strengthened consequences in place at the SWB, including the Circumvention of Lawful Pathways rule and other measures, the United States Government continues to contend with exceptionally high levels of irregular migration along the southern border, including record-high total USBP encounter levels on the SWB as recently as December 2023.[334] DHS's ability to manage this increase in encounters has been significantly challenged by the substantial number of noncitizens processed for expedited removal and expressing a fear of return or an intent to seek asylum; rather than being swiftly removed, these noncitizens are referred to an AO for a credible fear interview and can seek IJ review of an AO's negative credible fear determination, which requires additional time and resources.

---

[326] *See* UNHCR, *Operational Update: Mexico* (Dec. 2023), *https://reporting.unhcr.org/mexico-operational-update-6421;* UNHCR, *Fact Sheet, Mexico* (Nov. 2023), *https://data.unhcr.org/en/documents/download/105202* ("From January to October 2023, Mexico received over 127,796 asylum applications, the highest ever number of asylum claims received in this time frame."); Daina Beth Solomon & Lizbeth Diaz, *Mexico seeks to curb 'abuse' of asylum system by migrants who do not plan to stay,* Reuters (Feb. 13, 2023), *https://www.reuters.com/world/americas/mexico-seeks-curb-abuse-asylum-system-by-migrants-who-do-not-plan-stay-2023-02-13/* ("Mexico has the world's third highest number of asylum applications after the United States and Germany, reflecting growing numbers of refugee seekers that have strained resources at the Mexican Commission for Refugee Assistance.").

[327] OHSS Southwest Border Encounter Projection, April 2024. Note that the OHSS encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (*i.e.,* encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023. *See also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.*

[328] *See supra* note 122.

[329] Decl. of Blas Nuñez-Neto ¶¶ 9–10, *E. Bay Sanctuary Covenant* v. *Biden,* No. 4:18–cv–06810–JST (N.D. Cal. June 16, 2023) (Dkt. 176–2); Decl. of Matthew J. Hudak ¶ 11, *Florida* v. *Mayorkas,* No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[330] *Jifry* v. *FAA,* 370 F.3d 1174, 1179 (D.C. Cir. 2004); *see, e.g., id.* (upholding a claim of good cause to address "a possible imminent hazard to aircraft, persons, and property within the United States" (quotation marks omitted)); *Haw. Helicopter Operators Ass'n* v. *FAA,* 51 F.3d 212, 214 (9th Cir. 1995) (upholding a claim of good cause to address 20 air tour accidents over a four-year period, including recent incidents indicating that voluntary measures were insufficient to address the threat to public safety).

[331] *Mid-Tex Elec. Co-op, Inc.* v. *FERC,* 822 F.2d 1123, 1132 (D.C. Cir. 1987); *see Petry* v. *Block,* 737 F.2d 1193, 1203 (D.C. Cir. 1984) (when evaluating agency "good cause" arguments, "it is clear beyond cavil that we are duty bound to analyze the entire set of circumstances"). Courts have explained that notice-and-comment rulemaking may be impracticable, for instance, where air travel security agencies would be unable to address threats, *Jifry,* 370 F.3d at 1179, if "a safety investigation shows that a new safety rule must be put in place immediately," *Util. Solid Waste Activities Grp.* v. *EPA,* 236 F.3d 749, 754 (D.C. Cir. 2001) (ultimately finding that not to be the case and rejecting the agency's argument), or if a rule was of "life-saving importance" to mine workers in the event of a mine explosion, *Council of S. Mountains, Inc.* v. *Donovan,* 653 F.2d 573, 581 (D.C. Cir. 1981).

[332] *See Util. Solid Waste Activities Grp.,* 236 F.3d at 754–55 (explaining that "a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required in § 553, as when a safety investigation shows that a new safety rule must be put in place immediately" (cleaned up)).

[333] *See, e.g., Tri-Cty. Tel. Ass'n, Inc.* v. *FCC,* 999 F.3d 714, 720 (D.C. Cir. 2021) ("[T]his is not a case of unjustified agency delay. The Commission *did* act earlier, . . . [and t]he agency needed to act again . . . .").

[334] According to March 2024 OHSS Persist Dataset and OHSS analysis of historic CBP data for encounters prior to FY 2000, USBP completed 250,000 encounters along the SWB in December 2023, higher than any previous month on record. *See also* OHSS, *2022 Yearbook of Immigration Statistics,* tbls. 33 & 35, *https://www.dhs.gov/ohss/topics/immigration/yearbook.*

Without adequate resources and tools to keep pace, the Departments cannot deliver timely decisions and timely consequences to all noncitizens encountered at the SWB who do not establish a lawful basis to remain. Instead, DHS is forced to place many of these individuals into the backlogged immigration court system, a process that can take several years to result in a decision or consequence.[335] Even then, it can take weeks, months, or years to execute a removal order depending upon the facts of the individual case.[336]

Quite simply, these historic levels of encounters and fear claims, combined with limited resources and tools to manage them, create a vicious cycle: The expectation of a lengthy stay in the United States and the inability to impose consequences for irregular migration close in time to entry inspires more people to make the dangerous journey north to take their chances at the border.[337] The USCIS affirmative asylum backlog has reached almost 1.2 million cases and is growing.[338] At the end of the first quarter of FY 2024, there were over 2.7 million cases pending in the immigration courts.[339] During FY 2023, IJs completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts as were completed.[340]

Absent changes promulgated in this rule, recent encounter trends both in the region and at our southern border indicate a risk of further exceeding the Departments' capacity to effectively process, detain, and remove, as appropriate, the noncitizens encountered, and exacerbating perceived incentives to migrate now. As noted above, DHS's current internal projections suggest that total encounters will average in the range of 3,900 to approximately 6,700 encounters at and between POEs per day from July to September, not including an additional 1,450 noncitizens per day who are

expected to be encountered at POEs after making appointments though the CBP One app.[341] Even at the low end of such projections, such a volume of encounters would likely result in thousands of migrants per day being referred to section 240 removal proceedings; their cases would further exacerbate the immigration court backlog and perceived incentives to migrate irregularly, and would take many years to complete. Such harms would be mitigated by the additional measures put in place by this rule. If implementation of the rule is delayed, by contrast, the harms of such an increase would be immediate and substantial, even if such an increase would only last for the months needed to complete a very rapid notice-and-comment rulemaking. Thus, it is impracticable to delay the measures in this rule for even a few months to allow for notice and an opportunity to comment and a delayed effective date. In the interim, the heightened levels of migration and forced displacement that have resulted in the President's determination to apply the suspension and limitation on entry and the Departments adopting the provisions in this rule would further strain resources, risk overcrowding in USBP stations and border POEs in ways that pose significant health and safety concerns, and create a situation in which large numbers of migrants[342]—only a small proportion of whom are likely to be granted asylum or other protection—would be encouraged to put their lives in the hands of dangerous organizations to make the hazardous journey north based on a perceived lack of immediate consequences. The Departments must immediately safeguard their ability to enforce our Nation's immigration laws in a timely way and at the scale necessary with respect to those who seek to enter without complying with our laws. This rule does just that.

Furthermore, current trends in migration, including through the Darién jungle between Colombia and Panama, indicate that a significant increase in encounters may be imminent. Between

January and April 2024, UNHCR tracked 139,000 irregular entries, up from 128,000 for the same months in 2023 and a seven-fold increase over that period in 2022.[343] And the Departments believe that most of those migrants are on their way to seek entry into the United States.[344] Based on historical trends, the Departments expect that many of these migrants may already be proximate to the SWB, giving the Departments insufficient time to seek public comment and delay the effective date of this rule without immediate and substantial harm to U.S. interests. Indeed, as of May 2024, CBP estimates that there are more than 40,000 non-Mexican migrants in northern Mexico, proximate to the SWB, in addition to more than 100,000 such migrants in central and southern Mexico. These

---

[335] *See supra* note 25.

[336] OHSS analysis of March 2024 OHSS Persist Dataset.

[337] *See, e.g.,* Jordan, *supra* note 27.

[338] OHSS analysis of USCIS Global Affirmative Data as of March 31, 2024. Almost all of this backlog is the result of cases filed since FY 2015. From FY 2015 through FY 2023, an average of 156,000 affirmative asylum cases were filed per year, versus an average of 49,000 cases completed. In FY 2024 through March 31, 2024, 191,000 cases have been filed versus 78,000 cases completed. OHSS analysis of USCIS Global Affirmative Data as of March 31, 2024.

[339] *See* EOIR, *Caseload: Pending Cases* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline*.

[340] *See id.*; EOIR, *New Cases and Total Completions-Historical, https://www.justice.gov/eoir/media/1344801/dl?inline* (Jan. 18, 2024).

[341] OHSS Encounter Projections, April 2024. Note that the OHSS encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (*i.e.,* encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023. *See also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day* (last modified July 14, 2023).

[342] Decl. of Matthew J. Hudak, *Florida* v. *Mayorkas,* No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[343] *See supra* note 122.

[344] *See* Sergio Martínez-Beltrán, *Despite a Fortified Border, Migrants Will Keep Coming, Analysts Agree. Here's Why.,* NPR, (Apr. 22, 2024), *https://www.npr.org/2024/04/22/1244381584/immigrants-border-mexico-asylum-illegal-immigration* ("[Analysts] keep a close eye on the Darién Gap in Panama and the borders between Central American countries, two key points to gauge the number of people venturing up north. 'In most countries (outward) migration has increased . . . particularly in Venezuela, and that's not really reflected yet in the U.S. numbers,' said [one analyst]. . . . Despite Mexico's cracking down on migrants, [the analyst] said people are still making their way up north, even if they need to pause for months at different points during their journey. 'There must be a huge number of people from Venezuela bottled up in Mexico right now,' he said."); Diana Roy, *Crossing the Darién Gap: Migrants Risk Death on the Journey to the U.S.,* Council on Foreign Rels. (Feb. 1, 2024), *https://www.cfr.org/article/crossing-darien-gap-migrants-risk-death-journey-us* ("The surge across the Darién Gap is reflected in an influx at the southern U.S. border, where U.S. border authorities reported that they apprehended close to 2.5 million people during fiscal year 2023, a record high, while northern cities such as New York are also struggling to manage the arrivals."); Mallory Moench, *Volume of Migrants Crossing the Dangerous Darién Gap Hit Record High in 2023,* Time (Dec. 22, 2023), *https://time.com/6547992/migrants-crossing-darien-gap-2023/* ("Laurent Duvillier, UNICEF's spokesperson for Latin America and the Caribbean based in Panama, tells TIME that many—driven to leave their homes by poverty, crime, or discrimination—aim to seek asylum in the U.S. or Canada, though they may never get there. This analysis is supported by refugee protection organization HIAS, with a spokesperson telling TIME that, by the group's estimations, between 90 to 95% of those crossing the Darién Gap aim to reach the U.S."); Ariel G. Ruiz Soto, *Record-Breaking Migrant Encounters at the U.S.-Mexico Border Overlook the Bigger Story,* Migration Pol'y Inst. (Oct. 2022), *https://www.migrationpolicy.org/news/2022-record-migrant-encounters-us-mexico-border* ("Record flows of extracontinental migrants through the Darien Gap jungle that connects Colombia to Panama foreshadow increases in migration through Central America and Mexico. The 28,000 Venezuelan migrants who trekked through the deadly jungle in August were mostly en route to the United States; with more than 34,000 Venezuelans recorded at the Darien Gap in September, it is very likely that many of them will be reaching the U.S.-Mexico border soon.").

numbers show that a very large number of migrants would likely have the ability and the incentive to travel to the U.S. border, and the Departments assess that announcing this rule in advance would likely yield the type of surges described in connection with prior changes in significant border policies affecting the availability of asylum for large numbers of migrants. For these reasons, consistent with the President's judgment, and given the emergency circumstances facing the Departments, the Departments assess that it would be impracticable to delay the policies set forth in this rule to allow time to complete notice-and-comment rulemaking or delay the rule's effective date.

Second, under the "contrary to the public interest" prong of the good cause exception, it has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment process.[345] If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[346] A number of cases follow this logic in the context of economic regulation.[347] The same logic

applies here, where the Departments are responding to exceedingly serious challenges at the border, and advance announcement of this response—which will increase the Departments' ability to swiftly process and remove, as appropriate, more noncitizens who enter the United States irregularly—would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. For the same reasons, "the [need] for immediate implementation" outweighs the "principles" underlying the requirement for a 30-day delay in the effective date, justifying the Departments' finding of good cause to forego it.[348] The Departments' experience has been that in some circumstances when official public announcements have been made regarding significant upcoming changes in immigration laws and procedures that would impact how individuals are processed at the border, such as changes that restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States—including, most recently, in the days preceding the lifting of the Title 42 public health Order in May 2023.[349] This is not only because, generally, would-be migrants respond to real and perceived incentives created by border management and immigration policies, such that many choose to seek entry under a border processing regime they think is preferable, prior to the implementation of a new system, including increasing the speed of their transit north in an effort to arrive before the implementation of any such measure. Additionally, smugglers routinely prey on migrants by spreading rumors, misrepresenting facts, or creating a sense of urgency to induce migrants to make the journey by overemphasizing the significance of recent or upcoming policy developments, among other tactics, and do so particularly when there is a change announced in U.S. policy, as highlighted by the many examples described below.[350]

The acuteness of such concerns is borne out by the facts. An influx of migrants occurred in the days following the November 15, 2022, court decision that, had it not been stayed on December 19, 2022, would have resulted in the lifting of the Title 42 public health Order effective December 21, 2022.[351] Leading up to the Order's expected termination date, migrants gathered in various parts of Mexico, including along the SWB, waiting to cross the border once the Title 42 public health Order was lifted.[352] According to internal Government sources, smugglers were also expanding their messaging and recruitment efforts, using the expected lifting of the Title 42 public health Order to claim that the border was open, thereby seeking to persuade would-be migrants to participate in expensive and dangerous human smuggling schemes. 88 FR at 31315. In that one-month period following the court decision, total CBP encounter rates jumped from an average of 7,800 per week (in mid-November) to over 9,100 per week (in mid-December), a change not predicted by normal seasonal effects.[353]

Similarly, on February 28, 2020, the Ninth Circuit lifted a stay of a

---

[345] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 95 (D.C. Cir. 2012) (noting that the "contrary to the public interest" prong of the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent . . . [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1974) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline.").

[346] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase." (quotation marks omitted)).

[347] *See, e.g., Chamber of Com. of U.S.* v. *S.E.C.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ['good cause'] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . , this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can

be expected to precipitate activity by affected parties that would harm the public welfare.").

[348] *Omnipoint Corp.* v. *FCC,* 78 F.3d 620, 630 (D.C. Cir. 1996) (cleaned up).

[349] *See supra* Sections III.B.1 and III.B.2 of this preamble.

[350] *See* Nick Miroff & Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America,* Wash. Post (Oct. 24, 2018), *https://www.washingtonpost.com/world/*

*national-security/theres-still-one-way-into-america/ 2018/10/24/d9b68842-aafb-11e8-8fdb-aee063e14538_story.html;* Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires,* AP News (May 11, 2023), *https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257c0220413b8e9cf9* ("Even as migrants were racing to reach U.S. soil before the rules expire, Mexican President Andrés Manuel López Obrador said smugglers were sending a different message. He noted an uptick in smugglers at his country's southern border offering to take migrants to the United States and telling them the border was open starting Thursday.").

The Departments recognize that there has been reporting on the possibility of the policies set forth in the Proclamation and this IFR since February with no apparent month-over-month increase in encounters. *See, e.g.,* Myah Ward, *Biden considering major new executive actions for migrant crisis,* Politico (Feb. 21, 2024), *https:// www.politico.com/news/2024/02/21/biden-considering-major-new-executive-actions-for-southern-border-00142524.* But such reporting about vague, possible plans differs significantly from officially proposed policy changes with timelines provided for implementation, such as those mentioned below.

[351] *See Huisha-Huisha* v. *Mayorkas,* 642 F. Supp. 3d 1 (D.D.C. 2022), *stay granted, Arizona* v. *Mayorkas,* ___ S. Ct. ___, 2022 WL 17750015 (U.S. Dec. 19, 2022); DHS, *Statement by Secretary Mayorkas on Planning for End of Title 42* (Dec. 13, 2022), *https://www.dhs.gov/news/2022/12/13/statement-secretary-mayorkas-planning-end-title-42.*

[352] *See, e.g.,* Leila Miller, *Asylum Seekers Are Gathering at the U.S.-Mexico Border. This Is Why,* L.A. Times (Dec. 23, 2022), *https:// www.latimes.com/world-nation/story/2022-12-23/ la-fg-mexico-title-42-confusion.*

[353] OHSS analysis of March 2024 OHSS Persist Dataset. Month-over-month change from November to December for all of FY 2013 to FY 2022 averaged negative two percent.

nationwide injunction of the Migrant Protection Protocols ("MPP"), a program implementing the Secretary's contiguous return authority under section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C).[354] Almost immediately, hundreds of migrants began massing at POEs across the southern border and attempting to immediately enter the United States, creating a severe safety hazard that forced CBP to temporarily close POEs in whole or in part.[355] Many others requested immediate entry into the country through their counsel, while others attempted to illegally cross the southern border between the POEs.[356] Absent immediate and resource-intensive action taken by CBP, the number of migrants gathered at the border, whether at or between the POEs, could have increased dramatically, especially considering there were approximately 25,000 noncitizens who were in removal proceedings pursuant to MPP without scheduled court appearances, as well as others in Mexico who could have become aware of CBP's operational limitations and sought to exploit them.[357] And while CBP officers took action to resolve the sudden influx of migrants at multiple POEs and prevent further deterioration of the situation at the border, in doing so they were diverted away from other critical responsibilities of protecting national security, detecting and confiscating illicit materials, and guarding efficient trade and travel.[358]

This same phenomenon occurred in the days leading up to the end of the Title 42 public health Order on May 12, 2023, when DHS saw a historic surge in migration as smugglers falsely advertised that those arriving before the Order ended and the Circumvention of Lawful Pathways rule took effect would be allowed to remain in the United States.[359] This surge culminated with

what were then the highest recorded USBP encounter levels in U.S. history over the days immediately preceding May 12, which placed significant strain on DHS's operational capacity at the border.[360] Encounters between POEs (which excludes arrival of inadmissible individuals scheduled through the CBP One app, who appear at POEs almost doubled from an average of approximately 4,900 per day the week ending April 11, 2023, to an average of approximately 9,500 per day the week ending May 11, 2023, including an average of approximately 10,000 daily encounters immediately preceding the termination of the public health Order (from May 8 to May 11).[361] The sharp increase in USBP encounters during the 30 days preceding May 12 represented the largest month-over-month increase in almost two decades—since January 2004.[362]

Meanwhile, the current backlogs and inefficiencies in our border security and immigration systems render DHS unable to effect removals and apply consequences at a sufficient scale to deter migration by those whose claims may not ultimately succeed.[363] This, too, serves as an incentive for migrants to take a chance. And sudden influxes, which result in part from smugglers' deliberate actions, overload scarce United States Government resources dedicated to border security that, as reflected above, are already stretched extremely thin.[364] This rule is specifically designed to allow the United States Government to deliver consequences more swiftly, and with a reduced resource burden, during such an influx.

In a more manageable steady-state environment, when encounters surge in specific sectors, DHS manages its detention capacity using the other tools at its disposal, such as lateral decompression flights and similar efforts.[365] But the increase in SWB encounters preceding the end of the Title 42 public health Order and the increase in border encounters that occurred in December 2023 were far-reaching across multiple sectors of the SWB and significantly greater than what

DHS resources and operations are designed to handle. They raised detention capacity concerns anew. At that point, DHS faced an urgent situation, including a significant risk of overcrowding in its facilities. Given the nature of its facilities, increased numbers and times in custody increase the likelihood that USBP facilities will become quickly overcrowded.[366] Crowding, particularly given the way that USBP facilities are necessarily designed, increases the potential risk of health and safety concerns for noncitizens and Government personnel.[367]

The Departments assess that there would be a significant risk of such an urgent situation occurring if they undertook notice-and-comment procedures for this rule or delayed its effective date. As demonstrated by the Departments' experience with the end of the Title 42 public health Order and MPP, significant shifts in U.S. border policies lead to an increase in migrants coming to the SWB that risks overwhelming the Departments' resources and operations. This rule is likewise a significant shift in U.S. border policy that affects the vast majority of noncitizens arriving at the southern border who do not have documents sufficient for lawful admission—a shift that may be viewed as similar to the end of the Title 42 public health Order and MPP. In addition, unlike the Lawful Pathways rebuttable presumption, the limitation on asylum eligibility in this rule would affect Mexican migrants, which may provide an additional perceived incentive for such migrants—who constitute a large and geographically proximate potential population [368]—to rush to the border during a notice-and-comment period. Finally, such a surge in migration would come at a time when our border security and immigration systems' resources are already stretched thin and severely backlogged.[369]

[354] *See Innovation Law Lab* v. *Wolf,* 951 F.3d 1073, 1077, 1095 (9th Cir. 2020), *vacated as moot sub nom. Innovation Law Lab* v. *Mayorkas,* 5 F.4th 1099 (9th Cir. 2021).

[355] *See* Decl. of Robert E. Perez ¶¶ 4–15, *Innovation Law Lab,* No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–2).

[356] *Id.* ¶¶ 4, 8.

[357] *Id.* ¶ 14.

[358] *Id.* ¶ 15.

[359] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden,* No. 4:18–cv–06810–JST (N.D. Cal. June 16, 2023) (Dkt. 176–2). Conversely, as noted above, smugglers also message that the border would be open starting on May 12. *See* Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires,* AP News (May 11, 2023), *https://apnews.com/article/ immigration-border-title-42-mexico-asylum-8c239766c2cb6e257c0220413b8e9cf9.* This conflicting messaging underscores smuggling organizations' tendency to deceptively message on changes in border policy to lure vulnerable migrants to pay for their services.

[360] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden,* No. 4:18–cv–6810–JST (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[361] *Id.*

[362] *Id.*

[363] *See* EOIR, *Adjudication Statistics: Pending Cases* (Jan. 18, 2024), *https://www.justice.gov/eoir/ media/1344791/dl?inline.*

[364] Decl. of Enrique Lucero ¶¶ 6–8, *Innovation Law Lab* v. *Wolf,* No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–3); Decl. of Robert E. Perez ¶ 15, *Innovation Law Lab,* No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–2).

[365] *See* 88 FR at 11715.

[366] Decl. of Matthew J. Hudak ¶¶ 6, 14, 17, *Florida* v. *Mayorkas,* No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[367] *Id.* ¶ 17.

[368] U.S. Census Bureau, *Mexico, https:// www.census.gov/popclock/world/mx* (last visited May 27, 2024).

[369] *See, e.g.,* Ariel G. Ruiz-Soto et al., *Shifting Realities at the U.S.-Mexico Border: Immigration Enforcement and Control in a Fast-Evolving Landscape,* Migration Pol'y Inst., at 1 (rev. Jan. 2024), *https://www.migrationpolicy.org/sites/ default/files/publications/mpi-contemporary-border-policy-2024_final.pdf* ("Insufficiently equipped to respond effectively to these and likely future changes, U.S. immigration agencies must perpetually react and shift operations according to their strained capacity and daily changes in migrant arrivals."); The White House, *Fact Sheet: White*
Continued

Therefore, the Departments believe that a gap between when this rule is made public and when it becomes effective would create the same incentive for migrants to come to the United States before the rule takes effect.

The Departments' determination here is consistent with past practice. For example, in the Circumvention of Lawful Pathways rule, the Departments undertook a notice-and-comment rulemaking while the Title 42 public health Order remained in effect,[370] but invoked the good cause exception (as well as the foreign affairs exception) to bypass a delayed effective date that would have resulted in a gap between the end of the Title 42 public health Order and the implementation of the rule. *See* 88 FR at 31445–47. The Departments noted that such a gap "would likely result in a significant further increase in irregular migration," and that such an increase, "exacerbated by an influx of migrants from countries such as Venezuela, Nicaragua, and Cuba, with limited removal options, and coupled with DHS's limited options for processing, detaining, or quickly removing such migrants, would unduly impede DHS's ability to fulfill its critical and varied missions." *Id.* at 31445.

Similarly, when implementing the parole process for Venezuelans, DHS implemented the process without prior public procedures,[371] and witnessed a drastic reduction in irregular migration by Venezuelans.[372] The process by which eligible Venezuelans could receive advance travel authorization to present at a POE was accompanied by a policy that those who entered the United States outside this process or who entered Mexico illegally after the

date of announcement would be ineligible for parole under this process, and was conditioned on Mexico continuing to accept the expulsion or removal of Venezuelan nationals seeking to irregularly enter the United States between POEs. *See* 87 FR at 63508. Thus, had the parole process been announced prior to a lengthy notice-and-comment period, it likely would have resulted in thousands of Venezuelan nationals attempting to cross the United States and Mexican borders before the ineligibility criteria went into effect, and before the United States was able to return Venezuelan nationals to Mexico in large numbers.

DHS also concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "[p]re-promulgation notice and comment would . . . endanger[] human life and hav[e] a potential destabilizing effect in the region."[373] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule."[374] DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities," "could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations," and "could result in significant loss of human life."[375]

Given the urgent circumstances facing the Departments, the delays associated with requiring a notice-and-comment process for this rule would be contrary to the public interest because an advance announcement of the rule would incentivize even more irregular migration by those seeking to enter the United States before the IFR would take effect.

## B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)

Executive Order 12866 ("Regulatory Planning and Review"), as amended by Executive Order 14094 ("Modernizing Regulatory Review"), and Executive Order 13563 ("Improving Regulation and Regulatory Review"), directs agencies to assess the costs, benefits, and transfers of available alternatives, and, if regulation is necessary, to select regulatory approaches that maximize net benefits, including potential economic, environmental, public health and safety effects, distributive impacts, and equity. Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

The Office of Information and Regulatory Affairs ("OIRA") of OMB reviewed this IFR as a significant regulatory action under Executive Order 12866, as amended by Executive Order 14094. The estimated effects of the rule are described and summarized qualitatively below. Consistent with OMB Circular A–4, the Departments assessed the impacts of this rule against a baseline. The baseline used for this analysis is the "no action" baseline, or what the world would be like absent the rule. For purposes of this analysis, the Departments assumed that the no-action baseline involved continued application of the Circumvention of Lawful Pathways rule.

The expected effect of this rule, as discussed above, is primarily to reduce incentives for irregular migration and illegal smuggling activity. As a result, the primary effects of this rule will be felt by noncitizens outside of the United States. In addition, for those who are present in the United States and described in the Proclamation, the rule will likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are ineligible for asylum and who lack a reasonable probability of establishing eligibility for protection from persecution or torture would remain in the United States. Noncitizens, however, can avoid the limitation on asylum under this rule if they meet an exception to the rule's limitation or to the Proclamation, including by presenting at a POE pursuant to a pre-scheduled time and place or by showing exceptionally compelling circumstances. Moreover, noncitizens who in credible fear screenings establish

---

*House Calls on Congress To Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/;* Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, Office and Management Budget (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf.*

[370] The Departments noted, however, that the Circumvention of Lawful Pathways rule was exempt from notice-and-comment requirements pursuant to the good cause exception at 5 U.S.C. 553(b)(B) for the same reasons that the rule was exempt from delayed effective date requirements under 5 U.S.C. 553(d). *See* 88 FR at 31445 n.377.

[371] *See* DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[372] *See* 88 FR at 31317 ("A week before the announcement of the Venezuela parole process on October 12, 2022, Venezuelan encounters between POEs at the SWB averaged over 1,100 a day from October 5–11. About two weeks after the announcement, Venezuelan encounters averaged under 200 per day between October 18 and 24.").

[373] DHS, Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[374] *Id.*

[375] *Id.; accord* U.S. Dep't of State, Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of short-run incentive concerns).

a reasonable probability of persecution or torture would still be able to seek statutory withholding or CAT protection in proceedings before IJs.

The benefits of the rule are expected to include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and a reduction in the role of exploitative TCOs and smugglers. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the severe strain that further surges in irregular migration would impose on the Departments.

The direct costs of the rule are borne by noncitizens and the Departments. To the extent that any noncitizens are made ineligible for asylum by virtue of the rule but would have received asylum in the absence of this rule, such an outcome would entail the denial of asylum and its attendant benefits, although such persons may continue to be eligible for statutory withholding of removal and withholding under the CAT. Unlike asylees, noncitizens granted these more limited forms of protection do not have a path to citizenship and cannot petition for certain family members to join them in the United States. Such noncitizens may also be required to apply for work authorization more frequently than an asylee would. As discussed in this preamble, the rule's manifestation of fear and reasonable probability standards may also engender a risk that some noncitizens with meritorious claims may not be referred for credible fear interviews or to removal proceedings to seek protection. In these cases, there may be costs to noncitizens that result from their removal.

The rule may also require additional time for AOs and IJs, during credible fear screenings and reviews, respectively, to inquire into the applicability of the rule and the noncitizen's fear claim. Similarly, the rule will require additional time for IJs during section 240 removal proceedings. However, as discussed throughout this preamble, the rule is expected to result in significantly reduced irregular migration. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rule to be mitigated by a comparatively smaller number of credible fear cases than AOs and IJs would otherwise have been required to handle in the absence of the rule.

Other entities may also incur some indirect, downstream costs as a result of the rule. The nature and scale of such effects will vary by entity and should be considered relative to the baseline condition that would exist in the absence of this rule, which as noted above is the continued application of the Circumvention of Lawful Pathways rule. As compared to the baseline condition, this rule is expected to reduce irregular migration. The Departments welcome comments on the effects described above to inform analysis in a final rule.

## C. Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA"), as amended by the Small Business Regulatory Enforcement and Fairness Act of 1996, requires an agency to prepare and make available to the public a final regulatory flexibility analysis that describes the effect of a rule on small entities (*i.e.,* small businesses, small organizations, and small governmental jurisdictions) when the agency was required "to publish a general notice of proposed rulemaking" prior to issuing the final rule. *See* 5 U.S.C. 604(a). Because this IFR is being issued without a prior proposal, on the grounds set forth above, a regulatory flexibility analysis is not required under the RFA.

## D. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 ("UMRA") is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. Title II of the UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule, that includes any Federal mandate that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and Tribal governments, in the aggregate, or by the private sector. The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 658(6), 1502(1). A "Federal intergovernmental mandate," in turn, is a provision that would impose an enforceable duty upon State, local, or Tribal governments (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(5). And the term "Federal private sector mandate" refers to a provision that would impose an enforceable duty upon

the private sector (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(7).

This IFR is not subject to the UMRA because the Departments did not publish a proposed rule prior to this action. In addition, this rule does not contain a Federal mandate, because it does not impose any enforceable duty upon any other level of government or private sector entity. Any downstream effects on such entities would arise solely due to an entity's voluntary choices, and the voluntary choices of others, and would not be a consequence of an enforceable duty imposed by this rule. Similarly, any costs or transfer effects on State and local governments would not result from a Federal mandate as that term is defined under UMRA. The requirements of Title II of the UMRA, therefore, do not apply, and the Departments have not prepared a statement under the UMRA.

## E. Congressional Review Act

OMB has determined that this rule does not meet the criteria set forth in 5 U.S.C. 804(2). The rule will be submitted to Congress and the Government Accountability Office consistent with the Congressional Review Act's requirements no later than its effective date.

## F. Executive Order 13132 (Federalism)

This rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

## G. Executive Order 12988 (Civil Justice Reform)

This IFR meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

## H. Family Assessment

The Departments have reviewed this rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999, enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999. The Departments have reviewed the criteria specified in section 654(c)(1), by evaluating whether this regulatory action (1) impacts the

stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local governments or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines a regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

The Departments have determined that the implementation of this rule will not impose a negative impact on family well-being or the autonomy or integrity of the family as an institution.

*I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)*

This rule would not have Tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

*J. National Environmental Policy Act*

DHS and its components analyze actions to determine whether the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. 4321 *et seq.,* applies to these actions and, if so, what level of NEPA review is required. 42 U.S.C. 4336. DHS's Directive 023–01, Revision 01 [376] and Instruction Manual 023–01–001–01, Revision 01 ("Instruction Manual 023–01") [377] establish the procedures that DHS uses to comply with NEPA and the Council on Environmental Quality ("CEQ")

regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

Federal agencies may establish categorical exclusions for categories of actions they determine normally do not significantly affect the quality of the human environment and, therefore, do not require the preparation of an Environmental Assessment or Environmental Impact Statement. 42 U.S.C. 4336e(1); 40 CFR 1501.4, 1507.3(e)(2)(ii), 1508.1(d). DHS has established categorical exclusions, which are listed in Appendix A of its Instruction Manual 023–01. Under DHS's NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.[378]

The IFR effectuates the following three changes to the process for those seeking asylum, withholding of removal, or protection under the CAT during emergency border circumstances:

• For those who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation, rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, DHS will provide general notice regarding the processes for seeking asylum, withholding of removal, and protection under the CAT, and will only refer a noncitizen for credible fear screenings if the noncitizen manifests a fear of return, or expresses an intention to apply for asylum or protection, expresses a fear of persecution or torture, or expresses a fear of return to his or her country or the country of removal.

• During emergency border circumstances, persons who enter the United States across the southern border and who are not described in paragraph 3(b) of the Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family as described in 8 CFR 208.30(c) with whom they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and

extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11.

• The limitation on asylum eligibility will be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and who are not described in section 3(b) of the Proclamation and do not establish exceptionally compelling circumstances will receive a negative credible fear determination with respect to asylum and will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, a higher standard than that applied to noncitizens in a similar posture under the Circumvention of Lawful Pathways rule.

Given the nature of the IFR, it is categorically excluded from DHS's NEPA implementing procedures, as it satisfies all three relevant conditions. First, the Departments have determined that the IFR fits clearly within categorical exclusions A3(a) and (d) of DHS's Instruction Manual 023–01, Appendix A, for the promulgation of rules of a "strictly administrative or procedural nature" and rules that "interpret or amend an existing regulation without changing its environmental effect," respectively. The IFR changes certain administrative procedures relating to the processing of certain noncitizens during emergency border circumstances, and does not result in a change in environmental effect. Second, this IFR is a standalone rule and is not part of any larger action. Third, the Departments are not aware of any extraordinary circumstances that would cause a significant environmental impact. Therefore, this IFR is categorically excluded, and no further NEPA analysis or documentation is required. DOJ is adopting the DHS determination that this IFR is categorically excluded under A3(a) and A3(d) of DHS's Instruction Manual 023–01, Appendix A, because the IFR's asylum limitation and the reasonable probability standard will be applied by EOIR in substantially the same manner as it will be applied by DHS. *See* 40 CFR 1506.3(d) (setting forth the ability of an agency to adopt another agency's categorical exclusion determination).

*K. Paperwork Reduction Act*

This IFR does not adopt new, or revisions to existing, "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163,

---

[376] DHS, *Implementation of the National Environmental Policy Act, Directive 023–01, Revision 01* (Oct. 31, 2014), *https://www.dhs.gov/sites/default/files/publications/DHS_Directive%2023-01%20Rev%2001_508compliantversion.pdf.*

[377] DHS, *Implementation of the National Environmental Policy Act (NEPA), Instruction Manual 023–01–001–01, Revision 01* (Nov. 6, 2014), *https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-01-001-01%20Rev%2001_508%20Admin%20Rev.pdf.*

[378] Instruction Manual 023–01 at V.B(2)(a) through (c).

44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

### List of Subjects

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 235*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

## DEPARTMENT OF HOMELAND SECURITY

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security amends 8 CFR parts 208 and 235 as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; 8 CFR part 2; Pub. L. 115–218.

■ 2. In § 208.13, add paragraph (g) to read as follows:

### § 208.13    Establishing asylum eligibility.

\*    \*    \*    \*    \*

(g) *Entry during emergency border circumstances.* For an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, Securing the Border) between the dates described in section 1 of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 208.35.

■ 3. Add subpart D, consisting of § 208.35, to read as follows:

## Subpart D—Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances

### § 208.35    Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.

Notwithstanding any contrary section of this part, including §§ 208.2, 208.13, 208.30, and 208.33—

(a) *Limitation on eligibility.* (1) *Applicability.* An alien who is described in § 208.13(g) and who is not described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border, is ineligible for asylum.

(2) *Exceptions.* (i) This limitation on eligibility does not apply if the alien demonstrates by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the alien, or the alien's family member as described in § 208.30(c) with whom the alien is traveling, demonstrates by a preponderance of the evidence that, at the time of entry, the alien or a member of the alien's family as described in § 208.30(c) with whom the alien is traveling:

(A) Faced an acute medical emergency;

(B) Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or

(C) Satisfied the definition of "victim of a severe form of trafficking in persons" provided in § 214.11 of this chapter.

(ii) An alien who demonstrates by a preponderance of the evidence any of the circumstances in paragraph (a)(2)(i) of this section shall necessarily establish exceptionally compelling circumstances.

(iii) An alien described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border, or who establishes exceptionally compelling circumstances under paragraph (a)(2)(i) of this section has established exceptionally compelling circumstances under § 208.33(a)(3).

(b) *Application in credible fear determinations.* (1) *Initial determination.* The asylum officer shall first determine whether the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section.

(i) Where the asylum officer determines that the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section, then the asylum officer shall enter a negative credible fear determination with respect to the alien's asylum claim and continue

to consider the alien's claim under paragraph (b)(2) of this section.

(ii) Where the asylum officer determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is not described in § 208.13(g), the asylum officer shall follow the procedures in § 208.33(b).

(iii) Where the asylum officer determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is described in section 3(b) of the Proclamation or is excepted from the limitation on asylum eligibility under paragraph (a)(2) of this section, the asylum officer shall follow the procedures in § 208.30.

(2) *Protection eligibility screening.* (i) In cases in which the asylum officer enters a negative credible fear determination under paragraph (b)(1)(i) or (b)(3) of this section, the asylum officer will assess the alien under the procedures set forth in § 208.33(b)(2)(i) except that the asylum officer will apply a reasonable probability standard. For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not, that the alien would be persecuted because of his or her race, religion, nationality, membership in a particular social group or political opinion, or tortured, with respect to the designated country or countries of removal.

(ii) In cases described in paragraph (b)(2)(i) or (b)(3) of this section, if the alien establishes a reasonable probability of persecution or torture with respect to the designated country or countries of removal, the Department will issue a positive credible fear determination and follow the procedures in § 208.30(f). For any case in which USCIS retains jurisdiction over the application for asylum pursuant to § 208.2(a)(1)(ii) for further consideration in an interview pursuant to § 208.9, USCIS may require aliens who received a negative credible fear determination with respect to their asylum claim under paragraph (b)(1)(i) of this section to submit a Form I–589, Application for Asylum and for Withholding of Removal, together with any additional supporting evidence in accordance with the instructions on the form, to USCIS within 30 days from the date of service of the positive credible fear determination. The date of service of the positive credible fear determination remains the date of filing and receipt of the asylum application under § 208.3(a)(2); however, for any case in which USCIS requires the alien to submit a Form I–589, it may extend the

timelines in § 208.9(a)(1) and (e)(2) by up to 15 days. If USCIS requires the alien to submit a Form I–589 and the alien fails to do so within the applicable timeline, USCIS shall issue a Form I–862, Notice to Appear.

(iii) In cases described in paragraph (b)(2)(i) or (b)(3) of this section, if the alien fails to establish a reasonable probability of persecution or torture with respect to all designated countries of removal, the asylum officer will provide the alien with a written notice of decision and inquire whether the alien wishes to have an immigration judge review the negative credible fear determinations.

(iv) The alien must indicate whether he or she desires such review on a Record of Negative Fear Finding and Request for Review by Immigration Judge.

(v) Only if the alien requests such review by so indicating on the Record of Negative Fear shall the asylum officer serve the alien with a Notice of Referral to Immigration Judge. The record of determination, including copies of the Notice of Referral to Immigration Judge, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination. Immigration judges will evaluate the case as provided in 8 CFR 1208.35(b). The case shall then proceed as set forth in paragraphs (b)(2)(v)(A) and (B) of this section.

(A) Where the immigration judge issues a positive credible fear determination under 8 CFR 1208.35(b)(2)(iii) or (b)(4), the case shall proceed under 8 CFR 1208.30(g)(2)(iv)(B).

(B) Where the immigration judge issues a negative credible fear determination, the case shall be returned to the Department for removal of the alien. No appeal shall lie from the immigration judge's decision and no request for reconsideration may be submitted to USCIS. Nevertheless, USCIS may, in its sole discretion, reconsider a negative determination.

(3) *Procedures in the absence of the limitation on asylum eligibility.* If the limitation on asylum eligibility in paragraph (a) of this section is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, then during the period(s) described in § 208.13(g), the asylum officer shall, as applicable, apply a reasonable probability screening standard for any protection screening under § 208.33(b)(2).

(c) *Family unity in the asylum merits process.* In cases where the Department retains jurisdiction over the application for asylum pursuant to § 208.2(a)(1)(ii), where a principal asylum applicant is found eligible for withholding of removal under section 241(b)(3) of the Act or withholding of removal under § 208.16(c)(2) and would be granted asylum but for the limitation on asylum in paragraph (a)(1) of this section or § 208.33(a), or both, and where an accompanying spouse or child as defined in section 208(b)(3)(A) of the Act does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the Act, the asylum officer may deem the principal applicant to have established exceptionally compelling circumstances under paragraph (a)(2)(i) of this section and § 208.33(a)(3)(i).

(d) *Continuing applicability of limitation on eligibility.* (1) Subject to paragraph (d)(2) of this section, the limitation on asylum eligibility in paragraph (a) of this section shall apply to any asylum application filed by an alien who entered the United States during the time and in the manner described in § 208.13(g) and who is not covered by an exception in paragraph (d)(2) of this section, regardless of when the application is filed and adjudicated.

(2) The limitation on asylum eligibility in paragraph (a) of this section shall not apply to an alien who was under the age of 18 at the time of the alien's entry, if—

(i) The alien is applying for asylum as a principal applicant; and

(ii) The asylum application is filed after the period of time in 208.13(g) during which the alien entered.

(e) *Severability.* The Department intends that in the event that any provision of this section, § 235.15, or the Presidential Proclamation of June 3, 2024, Securing the Border, is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, the provisions of this section and § 235.15 should be construed so as to continue to give the maximum effect to those provisions permitted by law, unless such holding is that a provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 4. The authority citation for part 235 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2003 Comp., p. 278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1365b, 1379, 1731–32; 48 U.S.C. 1806 and notes, 1807, and 1808 (Title VII, Pub. L. 110–229, 122 Stat. 754); 8 U.S.C. 1185 note (sec. 7209, Pub. L. 108–458, 118 Stat. 3638, and Pub. L. 112–54, 125 Stat. 550).

■ 5. Add § 235.15 to read as follows:

### § 235.15 Inadmissible aliens and expedited removal during emergency border circumstances.

(a) *Applicability.* Notwithstanding §§ 235.3(b)(2)(i) and 235.3(b)(4)(i) (but not § 235.3(b)(4)(ii)), the provisions of this section apply to any alien described in § 235.3(b)(1)(i) through (ii) if the alien is described in § 208.13(g) and is not described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border.

(b) *Expedited removal.* (1) [Reserved]

(2) *Determination of inadmissibility—*(i) *Record of proceeding.* (A) A noncitizen who is arriving in the United States, or other alien as designated pursuant to § 235.3(b)(1)(ii), who is determined to be inadmissible under section 212(a)(6)(C) or 212(a)(7) of the Act (except an alien for whom documentary requirements are waived under § 211.1(b)(3) or § 212.1 of this chapter) shall be ordered removed from the United States in accordance with section 235(b)(1) of the Act. In every case in which the expedited removal provisions will be applied and before removing an alien from the United States pursuant to this section, the examining immigration officer shall create a record of the facts of the case and statements made by the alien.

(B) The examining immigration officer shall advise the alien of the charges against him or her on Form I–860, Notice and Order of Expedited Removal, and the alien shall be given an opportunity to respond to those charges. After obtaining supervisory concurrence in accordance with § 235.3(b)(7), the examining immigration official shall serve the alien with Form I–860 and the alien shall sign the form acknowledging receipt. Interpretative assistance shall be used if necessary to communicate with the alien.

(ii) [Reserved]

(iii) [Reserved]

(3) [Reserved]

(4) *Claim of asylum or fear of persecution or torture.* (i) If an alien subject to the expedited removal

provisions manifests a fear of return, or expresses an intention to apply for asylum or protection, expresses a fear of persecution or torture, or expresses a fear of return to his or her country or the country of removal, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with part 208 of this chapter.

(A) The inspecting immigration officer shall document whether the alien has manifested or affirmatively expressed such intention, fear, or concern.

(B) The referring officer shall provide the alien with a written disclosure describing the purpose of the referral and the credible fear interview process; the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; the right to request a review by an immigration judge of the asylum officer's credible fear determination; and the consequences of failure to establish a credible fear of persecution or torture.

(ii) [Reserved]
(c)–(f) [Reserved]

(g) *Severability.* The Department intends that in the event that any provision of paragraphs (a), (b)(2)(i), and (b)(4) of this section, § 208.35, or the Presidential Proclamation of June 3, 2024, Securing the Border, is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, the provisions of this section and § 208.35 should be construed so as to continue to give the maximum effect to those provisions permitted by law, unless such holding is that a provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

### DEPARTMENT OF JUSTICE

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR part 1208 as follows:

### PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 6. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; Pub. L. 115–218.

■ 7. In § 1208.13, add paragraph (g) to read as follows:

### § 1208.13   Establishing asylum eligibility.

\*     \*     \*     \*     \*

(g) *Entry during emergency border circumstances.* For an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, Securing the Border) between the dates described in section 1 of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier) refer to the provisions on asylum eligibility described in § 1208.35.

■ 8. Add subpart D, consisting of § 1208.35, to read as follows:

### Subpart D—Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances

### § 1208.35   Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.

Notwithstanding any contrary section of this chapter, including §§ 1003.42, 1208.2, 1208.13, 1208.30, and 1208.33—

(a) *Limitation on eligibility.* (1) *Applicability.* An alien who is described in § 1208.13(g) and who is not described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border, is ineligible for asylum.

(2) *Exceptions.* (i) This limitation on eligibility does not apply if the alien demonstrates by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the alien, or the alien's family member as described in 8 CFR 208.30(c) with whom the alien is traveling, demonstrates by a preponderance of the evidence that, at the time of entry, the alien or a member of the alien's family as described in § 208.30(c) with whom the alien is traveling:

(A) Faced an acute medical emergency;

(B) Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or

(C) Satisfied the definition of "victim of a severe form of trafficking in persons" provided in § 214.11 of this title.

(ii) An alien who demonstrates by a preponderance of the evidence any of the circumstances in paragraph (a)(2)(i) of this section shall necessarily establish exceptionally compelling circumstances.

(iii) An alien described in section 3(b) of the Presidential Proclamation of June

3, 2024, Securing the Border, or who establishes exceptionally compelling circumstances under paragraph (a)(2)(i) of this section has established exceptionally compelling circumstances under § 1208.33(a)(3).

(b) *Application in credible fear determinations.* (1) Where an asylum officer has issued a negative credible fear determination pursuant to 8 CFR 208.35(b), and the alien has requested immigration judge review of that credible fear determination, the immigration judge shall evaluate the case de novo, as specified in paragraph (b)(2) of this section. In doing so, the immigration judge shall take into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the immigration judge.

(2) The immigration judge shall first determine whether the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section.

(i) Where the immigration judge determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is not described in § 1208.13(g), the immigration judge shall follow the procedures in § 1208.33(b).

(ii) Where the immigration judge determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is described in section 3(b) of the Proclamation or is excepted from the limitation on asylum eligibility under paragraph (a)(2) of this section, the immigration judge shall follow the procedures in § 1208.30.

(iii) Where the immigration judge determines that the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section, the immigration judge shall assess the alien under the procedures set forth in § 1208.33(b)(2)(ii) except that the immigration judge shall apply a reasonable probability standard. For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not, that the alien would be persecuted because of his or her race, religion, nationality, membership in a particular social group or political opinion, or tortured, with respect to the designated country or countries of removal.

(3) Following the immigration judge's determination, the case will proceed as indicated in 8 CFR 208.35(b)(2)(v)(A) and (B).

(4) If the limitation on asylum eligibility in paragraph (a) of this section is held to be invalid or

**48772**    Federal Register / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations

unenforceable by its terms, or as applied to any person or circumstance, then during the period(s) described in § 1208.13(g), the immigration judge shall, as applicable, apply a reasonable probability screening standard for any protection screening under § 1208.33(b)(2)(ii).

(c) *Family unity and removal proceedings.* In removal proceedings under section 240 of the Act, where a principal asylum applicant is found eligible for withholding of removal under section 241(b)(3) of the Act or withholding of removal under § 1208.16(c)(2) and would be granted asylum but for the limitation on asylum eligibility in paragraph (a)(1) of this section or § 1208.33(a), or both, and where an accompanying spouse or child as defined in section 208(b)(3)(A) of the Act does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the

Act, the alien shall be deemed to have established exceptionally compelling circumstances under paragraph (a)(2)(i) of this section and § 1208.33(a)(3)(i).

(d) *Continuing applicability of limitation on eligibility.* (1) Subject to paragraph (d)(2) of this section, the limitation on asylum eligibility in paragraph (a) of this section shall apply to any asylum application filed by an alien who entered the United States during the time and in the manner described in § 1208.13(g) and who is not covered by an exception in paragraph (d)(2) of this section, regardless of when the application is filed and adjudicated.

(2) The limitation on asylum eligibility in paragraph (a) of this section shall not apply to an alien who was under the age of 18 at the time of the alien's entry, if—

(i) The alien is applying for asylum as a principal applicant; and

(ii) The asylum application is filed after the period of time in 1208.13(g) during which the alien entered.

(e) *Severability.* The Department intends that in the event that any

provision of this section or the Presidential Proclamation of June 3, 2024, Securing the Border, is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, the provisions of this section should be construed so as to continue to give the maximum effect to those provisions permitted by law, unless such holding is that a provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

**Merrick B. Garland,**
*Attorney General, U.S. Department of Justice.*

[FR Doc. 2024–12435 Filed 6–4–24; 4:15 pm]
**BILLING CODE 4410–30–P; 9111–97–P**

**81156** **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Parts 208 and 235**

[CIS No. 2778–24; Docket No: USCIS–2024–0006]

**RIN 1615–AC92**

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Part 1208**

[A.G. Order No. 6053–2024]

**RIN 1125–AB32**

**Securing the Border**

**AGENCY:** U.S. Citizenship and Immigration Services (''USCIS''), Department of Homeland Security (''DHS''); Executive Office for Immigration Review (''EOIR''), Department of Justice (''DOJ'').

**ACTION:** Final rule; request for comments.

**SUMMARY:** On June 3, 2024, the President signed a Proclamation under sections 212(f) and 215(a) of the Immigration and Nationality Act (''INA'') suspending and limiting the entry of certain noncitizens into the United States during emergency border circumstances. DHS and DOJ (''the Departments'') issued a complementary interim final rule (''IFR'') shortly thereafter. This final rule responds to public comments received on the IFR, makes certain revisions to the regulatory text, and seeks comment on potential changes to the Circumvention of Lawful Pathways rule as well as changes that parallel modifications made by the subsequent Proclamation.

**DATES:**

*Effective date:* This rule is effective at 12:01 a.m. eastern daylight time on October 1, 2024.

*Comment period for solicited comments:* Comments on the extended and expanded applicability of the Circumvention of Lawful Pathways rebuttable presumption in Section IV of this preamble and changes that parallel modifications made by the subsequent Proclamation described in Section II.C.1 of this preamble must be submitted on or before November 6, 2024.

The electronic Federal Docket Management System will accept comments prior to midnight eastern time at the end of that day.

**ADDRESSES:**

*Docket:* To view comments on the IFR that preceded this rule, search for docket number USCIS–2024–0006 on the Federal eRulemaking Portal at *https://www.regulations.gov.*

*Comment period for solicited additional comments:* You may submit comments on the specific issues identified in Sections II.C.1 and IV of this preamble via the electronic Federal Docket Management System at *https://www.regulations.gov,* to DHS Docket Number USCIS–2024–0006. Follow the website instructions for submitting comments. Comments submitted in a manner other than the one listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the rulemaking and may not receive a response from the Departments. Please note that the Departments cannot accept any comments that are hand-delivered or couriered. In addition, the Departments cannot accept comments contained on any form of digital media storage device, such as CDs/DVDs and USB drives. The Departments are not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov,* please contact the Regulatory Coordination Division, Office of Policy and Strategy, USCIS, DHS, by telephone at (240) 721–3000 for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**

*For DHS:* Daniel Delgado, Acting Deputy Assistant Secretary for Immigration Policy, Office of Strategy, Policy, and Plans, DHS; telephone (202) 447–3459 (not a toll-free call).

*For EOIR:* Lauren Alder Reid, Assistant Director, Office of Policy, EOIR, DOJ, 5107 Leesburg Pike, Falls Church, VA 22041; telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Public Participation
II. Executive Summary
   A. Background and Purpose
   1. Basis for the IFR
   2. The Departments' Experience With the IFR
   B. Legal Authority
   C. Changes From the IFR to Final Rule
   1. Changes to the IFR's Thresholds
   2. Clarifying Changes to Regulatory Text
   3. Other Technical Changes
   D. Rule Provisions
   E. Severability
III. Public Comments and Responses
   A. Legal Authority and Background
   1. Legality Concerns
   a. General Comments on Domestic Law
   b. Statutory Conditions and Limitations on Asylum Eligibility
   c. Expedited Removal
   d. General Comments on International Law
   e. UNHCR Guidelines on International Protection
   f. 2000 Protocol To Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children
   2. Justification and Statements on Need for the Rule
   a. Rule Is Unjustified, Unsubstantiated, or Arbitrary
   b. Lack of Resources Does Not Justify the Rule
   c. Rule Does Not Acknowledge Factors Contributing to Migration
   d. Other Comments Related to the Departments' Justification
   B. General Feedback on the IFR
   1. General Support
   2. General Opposition
   a. Negative Impacts on Noncitizens and Others
   i. Conflicts With Humanitarian Values
   ii. Procedural and Due Process Concerns
   (1) General Concerns
   (2) Access to Counsel, Unrepresented Applicants, and the Ability or Time To Prepare
   (3) Noncitizens' Ability to Have Their Claims Heard
   (4) Issues With Asylum Officers, Detention Conditions, and Quality of Credible Fear Determinations
   (5) Fairness or Risks Associated With Process
   iii. Impacts on Specific Vulnerable Populations, Discrimination Concerns
   iv. Impacts on Criminal Enforcement
   v. Negative Impacts on Other Affected Entities
   b. Negative or Minimal Impacts on Immigration System and Government Operations
   i. Undermines the Administration's Promises and Goals
   ii. Similarity to Actions of Past Administration
   iii. Would Be Ineffective or Not Achieve Its Intended Outcomes
   c. Negative Impacts on the U.S. Economy, Workforce, Citizenry, Public Health, and Safety
   d. Other General Opposition
   C. Provisions of the Rule
   1. Limitation on Asylum Eligibility
   a. Proclamation Exceptions—Section 3(b) of Proclamation
   i. Legal Concerns Related to CBP One and the Lack of Exceptions
   ii. Wait Times for CBP One Appointments
   iii. Availability of and Access to CBP One Appointments and Concerns about Discrimination
   b. Regulatory Exception—Exceptionally Compelling Circumstances
   c. Implementation by CBP Officers
   d. Application of the Limitation on Asylum Eligibility in Proceedings Before EOIR
   e. Family Unity Provisions
   2. Manifestation of Fear Standard
   a. Legality Concerns
   b. Concerns About the Efficiency and Complexity of the Manifestation Standard
   c. Implementation Guidance and Accuracy of Manifestation To Identify Fear of Return
   d. Trauma Impacting Manifestation and Vulnerable Populations

e. A Manifestation of Fear Does Not Sufficiently Align With a Valid Claim for Asylum
f. Noncitizens May Not Understand Their Legal Right to Seek Asylum
3. ''Reasonable Probability'' Screening Standard for Statutory Withholding of Removal and CAT Protection
4. Other Comments on the Regulatory Provisions
a. Application to Mexican Nationals
b. Adequacy of Statutory Withholding of Removal and CAT Protection
c. Requests for Reconsideration
D. Other Issues Relating to the Rule
1. Scope of the Rule and Implementation
a. Concerns That the Encounter Thresholds Are Too Low or Arbitrary
b. Concerns Regarding Exceptions From the Encounter Thresholds
c. Other Concerns About the Encounter Thresholds
2. Other Comments on Issues Relating to the Rule
E. Statutory and Regulatory Requirements
1. Administrative Procedure Act
a. Foreign Affairs Exception
b. Good Cause Exception
c. Length and Sufficiency of Comment Period
2. Impacts, Costs, and Benefits (E.O. 12866 and E.O. 13563)
3. Alternatives
a. Address Root Causes of Migration
b. Prioritize Funding and Other Resources
c. Further Expand Refugee Processing or Other Lawful Pathways
d. Expand Asylum Merits Process
e. Other Congressional Action
f. Additional Suggested Measures or Revisions
F. Out of Scope
IV. Requests for Comments
A. Aligning the Geographic Reach of the Circumvention of Lawful Pathways Rule With That of the Proclamation and This Rule
B. Extending the Applicability of the Circumvention of Lawful Pathways Rebuttable Presumption
V. Regulatory Requirements
A. Administrative Procedure Act
B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)
1. Effects Under a Without-IFR Baseline
2. Effects Under a With-IFR Baseline
3. Discontinuation Analysis Under a Without-IFR Baseline
4. Effects of Expansion and Extension of Circumvention of Lawful Pathways Rebuttable Presumption
C. Regulatory Flexibility Act
D. Unfunded Mandates Reform Act of 1995
E. Congressional Review Act
F. Executive Order 13132 (Federalism)
G. Executive Order 12988 (Civil Justice Reform)
H. Family Assessment
I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)
J. National Environmental Policy Act
K. Paperwork Reduction Act

## List of Abbreviations

AO   Asylum Officer
AMI   Asylum Merits Interview
APA   Administrative Procedure Act
BIA   Board of Immigration Appeals (DOJ, EOIR)
CAT   Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment
CBP   U.S. Customs and Border Protection
CBP One app   CBP One mobile application
CDC   Centers for Disease Control and Prevention
CHNV   Cuba, Haiti, Nicaragua, and Venezuela
DHS   Department of Homeland Security
DOJ   Department of Justice
EOIR   Executive Office for Immigration Review
ERO   Enforcement and Removal Operations
FARRA   Foreign Affairs Reform and Restructuring Act of 1998
FERM   Family Expedited Removal Management
FY   Fiscal Year
HSA   Homeland Security Act of 2002
ICE   U.S. Immigration and Customs Enforcement
IFR   Interim Final Rule
IIRIRA   Illegal Immigration Reform and Immigrant Responsibility Act of 1996
IJ   Immigration Judge
INA   or the Act Immigration and Nationality Act
LGBTQI+   Lesbian, Gay, Bisexual, Transgender, Queer/Questioning, and Intersex
MPP   Migrant Protection Protocols
NGO   Non-Governmental Organization
NEPA   National Environmental Policy Act of 1969
NTA   Notice to Appear
OFO   Office of Field Operations
OHSS   Office of Homeland Security Statistics
POE   Port of Entry
RFA   Regulatory Flexibility Act
SWB   Southwest Land Border
TCO   Transnational Criminal Organization
TVPA   Trafficking Victims Protection Act of 2000
UC   Unaccompanied Child, having the same meaning as Unaccompanied Alien Child as defined at 6 U.S.C. 279(g)(2)
UDHR   Universal Declaration of Human Rights
UIP   U.S. Customs and Border Protection Unified Immigration Portal
UMRA   Unfunded Mandates Reform Act of 1995
UNHCR   United Nations High Commissioner for Refugees
USBP   U.S. Border Patrol
USCIS   U.S. Citizenship and Immigration Services
USCG   U.S. Coast Guard

## I. Public Participation

Interested persons are invited to submit comments on the specific issues identified in Sections II.C.1 and IV of this preamble by submitting relevant written data, views, comments, and arguments by the deadline stated above. To provide the most assistance to the Departments, comments should explain the reason for any recommendation and include data, information, or authority that supports the recommended course of action. Comments must be submitted in English, or an English translation must be provided. Comments submitted in a manner other than pursuant to the instructions, including emails or letters sent to the Departments' officials, will not be considered comments on the rule and may not receive a response from the Departments.

*Instructions:* If you submit a comment, you must include the USCIS Docket No. USCIS–2024–0006 for this rulemaking. All submissions may be posted, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to the Departments. The Departments may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy and Security Notice available at *https://www.regulations.gov.*

*Docket:* For access to the docket and to read background documents or comments received, go to *https://www.regulations.gov,* referencing USCIS Docket No. USCIS–2024–0006. You may also sign up for email alerts on the online docket to be notified when comments are posted, or a final rule is published.

## II. Executive Summary

### A. Background and Purpose

#### 1. Basis for the IFR

On June 3, 2024, the President signed Proclamation 10773 (''June 3 Proclamation'') [1] under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), finding that because the border security and immigration systems of the United States were unduly strained, the entry into the United States of certain categories of noncitizens was detrimental to the interests of the United States, and

---

[1] As discussed in Section II.C.1 of this preamble, the President has since issued a proclamation amending portions of the June 3 Proclamation. That amending proclamation is referred to as the ''September 27 Proclamation'' in this preamble. Where the preamble refers to ''the Proclamation'' without specifying a date, it is referring to Proclamation 10773 as amended by the September 27 Proclamation.

**81158** **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

suspending and limiting the entry of such noncitizens. 89 FR 48487, 48487–91 (June 7, 2024). The June 3 Proclamation directed DHS and DOJ to promptly consider issuing regulations addressing the circumstances at the southern border of the United States, including any warranted limitations and conditions on asylum eligibility. *Id.* at 48492. The Departments subsequently promulgated an IFR, effective June 5, 2024, "designed to implement the policies and objectives of the Proclamation by enhancing the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances." [2] Securing the Border, 89 FR 48710, 48718 (June 7, 2024) ("the IFR").

The June 3 Proclamation and the IFR explain that, since 2021, as a result of political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere, including at the southwest land border ("SWB"). 89 FR at 48487; *id.* at 48711 & n.3. In December 2023, migration levels at the SWB surged to the highest monthly total on record.[3] *Id.* at 48712 n.5. DHS assessed that the surge in late 2023 was likely the result of a number of factors, including the growing understanding by smugglers and migrants that DHS's capacity to impose consequences at the border is limited by the lack of resources and tools made available by Congress and the Government of Mexico's operational constraints caused by a lack of funding at the end of the 2023 calendar year, which limited its ability to enforce its own immigration laws. *Id.* at 48725 & n.115.

These sustained high encounter rates outstripped the Departments' abilities—based on available resources—to deliver

timely decisions and consequences in significant numbers for those without a legal basis to remain in the United States. 89 FR at 48714. Due to its funding shortfall, DHS lacked adequate resources such as sufficient USCIS asylum officers ("AOs") to conduct fear screenings and sufficient temporary processing facilities, often called "soft-sides." *Id.* These factors limited DHS's ability to conduct credible fear interviews for individuals in U.S. Customs and Border Protection ("CBP") custody and to process and hold individuals in U.S. Immigration and Customs Enforcement ("ICE") custody during the expedited removal process. *Id.* The substantial migration throughout the hemisphere, combined with inadequate resources and tools to keep pace, limited DHS's ability to impose timely consequences through expedited removal, the main consequence Congress has made available at the border under title 8 authorities. 89 FR at 48713–14. Consistent with past practice prior to the Title 42 public health Order, individuals who are subject to but cannot be processed under expedited removal due to resource constraints are instead generally released, after screening and vetting, pending removal proceedings under section 240 of the INA, 8 U.S.C. 1229a ("section 240 removal proceedings"), before an immigration judge ("IJ").

These higher encounter rates also place significant strain on the immigration courts. Recently, despite significant increases in the total number of IJs and case completions since Fiscal Year ("FY") 2021, newly initiated cases have far outpaced such completions.[4] Placing more noncitizens in section 240 removal proceedings before an IJ—rather than processing eligible noncitizens through the expedited removal process—only further contributes to the immigration court backlog, and those cases can take several years to conclude.[5] This strain is

also particularly acute in light of EOIR's current underfunding. Rather than increase funding to support IJ team hiring, EOIR's FY 2024 budget was $16 million less than in FY 2023 and was $94.3 million less than its inflation-adjusted funding requirements (referred to as "Current Services").[6]

The Departments reasoned that their capacity to predictably deliver timely decisions and consequences is jeopardized by emergency border circumstances, which, left unmitigated, further add to the incentives and motivations for migrants to make the dangerous journey to the SWB, regardless of their ultimate likelihood of success on an asylum or protection application, and that the current immigration and asylum systems had become a driver for irregular migration [7] throughout the region and an increasingly lucrative source of income for dangerous transnational criminal organizations ("TCOs"). 89 FR at 48714. Despite the Departments' efforts to address these substantial levels of migration, strengthen the consequences in place at the border, and enhance the overall functioning of the immigration system, including through the

---

[2] The Departments use the term "emergency border circumstances" in this preamble to generally refer to situations in which high levels of encounters at the southern border exceed the Department of Homeland Security's ("DHS's") capacity to deliver timely consequences to most individuals who cross irregularly into the United States and cannot establish a legal basis to remain in the United States. *See* 89 FR at 48711 & n.2.

[3] There were nearly 302,000 U.S. Customs and Border Protection ("CBP") encounters at and between ports of entry ("POEs") along the southwest land border ("SWB") in December 2023, higher than any previous month on record. Office of Homeland Security Statistics ("OHSS") analysis of July 2024 OHSS Persist Dataset [Encounters Fiscal Year ("FY") 2000–2024]; 89 FR at 48714 n.21; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables* (last updated Sept. 6, 2024), *https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (SWB encounters from FY 2014 through December 2023). OHSS figures are generally rounded throughout this preamble.

[4] *See* Executive Office of Immigration Review ("EOIR"), *Adjudication Statistics: New Cases and Total Completions* (July 2024), *https://www.justice.gov/eoir/media/1344796/dl?inline*; EOIR, *Adjudication Statistics: Immigration Judge (IJ) Hiring* (July 2024), *https://www.justice.gov/eoir/media/1344911/dl?inline.*

[5] EOIR decisions completed in July 2024 were, on average, initiated in February 2022, during the significant operational disruptions caused by the COVID–19 pandemic (with encounters several months earlier than that), but 60 percent of EOIR cases initiated during that time were still pending as of July 2024, so the final mean processing time (once all such cases are complete) will be longer. OHSS analysis of EOIR data as of July 2024 (Mean EOIR Filed Dates tab); EOIR, *EOIR Strategic Plan 2024, EOIR's Strategic Context, Current Operating Environment, https://www.justice.gov/eoir/*

*strategic-plan/strategic-context/current-operating-enviroment* (last visited Sept. 20, 2024) ("EOIR . . . suffered operational setbacks during the COVID-19 pandemic years of FY 2020 through FY 2022, including declining case completions due to health closures and scheduling complications and delays in agency efforts to transition to electronic records and the efficiencies they represent. While the challenges of the pandemic were overcome by adaptive measures taken during those years, the pandemic's impact on the pending caseload is still being felt."). Although EOIR does not report statistics on pending median completion times for removal proceedings in general, it does report median completion times for certain types of cases, such as detained cases and cases involving unaccompanied children ("UCs"). *See, e.g.,* EOIR, *Median Unaccompanied Noncitizen Child (UAC) Case Completion and Case Pending Time* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344951/dl?inline* (median completion time of 1,254 days); EOIR, *Median Completion Times for Detained Cases* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344866/dl?inline* (median completion time of 46 days in the second quarter of 2024 for removal, deportation, exclusion, asylum-only, and withholding-only cases); EOIR, *Percentage of DHS-Detained Cases Completed within Six Months* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344886/dl?inline* (reporting seven percent of detained cases not completed within six months).

[6] *See* Consolidated Appropriations Act, 2024, Public Law 118–42, 138 Stat. 25, 133; EOIR, *FY 2024 Budget Request at a Glance, https://www.justice.gov/d9/2023-03/eoir_fy_24_budsum_ii_omb_cleared_03.08.23.pdf.*

[7] As used in this preamble, "irregular migration" refers to the movement of people into another country unlawfully or without authorization. With respect to the United States' borders, the term "irregular" is used in this preamble to refer to physically entering between POEs or otherwise entering without documents sufficient for lawful admission, unless entering with advance authorization to travel or at a pre-scheduled time and place to present at a POE.

Circumvention of Lawful Pathways rule, 88 FR 31314 (May 16, 2023), these circumstances still existed as a direct result of Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems. 89 FR at 48711–13, 48715.

In the absence of congressional action, and consistent with the President's direction in the June 3 Proclamation to consider issuing regulations, the Departments adopted the provisions in the IFR, which were intended to address the emergency border circumstances and to substantially improve the Departments' ability to deliver timely decisions and consequences during such circumstances. *See* 89 FR at 48710. The IFR established a limitation on asylum eligibility that applies to certain individuals who enter irregularly across the southern border during emergency border circumstances and revised certain procedures applicable to the expedited removal process during such periods to reduce the time required to apply consequences to those individuals and remove noncitizens who do not have a legal basis to remain in the United States. *Id.* at 48715. The IFR was expected to achieve several benefits: reduce strains on limited Federal Government immigration processing and enforcement resources; preserve the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; protect against overcrowding in border facilities; and reduce the ability of exploitative TCOs and smugglers to operate. *Id.* at 48745, 48767.

## 2. The Departments' Experience With the IFR

The IFR's limitation on asylum eligibility and revised procedures are working as intended, though as discussed below, the Departments have determined that modest adjustments to the threshold calculations are warranted. As explained in the paragraphs that follow, in the weeks since June 5, 2024, U.S. Border Patrol ("USBP") encounters between the ports of entry ("POEs") have dropped markedly. Although the Departments believe that this has occurred for a range of reasons, one important reason is that the rule itself has significantly shifted incentives at the southern border. As explained further below, and consistent with the explanation provided in the IFR, the rule has, at least in part, significantly improved DHS's ability to place into expedited removal a majority of single adults and individuals in family units encountered by USBP; to

avoid large-scale releases of such individuals into the United States pending section 240 removal proceedings; and to allow for swift resolution of such individuals' cases and, where appropriate, their removal. *See id.* At the same time, the Departments have continued to implement the largest expansion of lawful, safe, and orderly pathways and processes [8] for individuals to come to the United States and to uphold the United States' non-refoulement obligations under international law.

In the period between June 5, 2024, and August 31, 2024, average daily total encounters between POEs at the SWB under the Proclamation and IFR have fallen 59 percent from the level of average daily encounters during the immediate post-pandemic period, *i.e.,* the period after the Circumvention of Lawful Pathways rule began to apply on May 12, 2023,[9] and before the IFR entered into effect on June 5, 2024.[10] This dramatic decrease in encounters has spanned multiple demographic categories. For instance, DHS has observed a drop in encounters of family units, a demographic category that presents particular operational challenges. During the immediate post-pandemic period, DHS experienced an average of about 2,000 daily encounters of individuals in family units.[11] Since the Departments issued the IFR, that daily average has dropped 70 percent to

about 600 individuals in family units encountered daily.[12] Other significant drops in encounter numbers occurred with single adults and unaccompanied children ("UCs").[13]

In contrast to processing before the IFR, DHS is now placing the majority of single adults and individuals in family units encountered by USBP at the SWB into expedited removal. Between June 5, 2024, and August 31, 2024, DHS placed 59 percent of these noncitizens into expedited removal proceedings, compared to 18 percent of such noncitizens during the immediate post-pandemic period following the end of the Title 42 public health Order.[14] In the pre-pandemic period,[15] DHS placed 41 percent of such noncitizens into expedited removal proceedings.[16] The decrease in the number of encounters at the SWB directly enabled DHS's increased placement rate of noncitizens into expedited removal proceedings. Because encounter levels have decreased, DHS is able to use its operational resources to refer a higher percentage of noncitizens into expedited removal proceedings and deliver timely consequences in a greater proportion of cases.[17] The IFR is remedying the

---

[8] The terms "lawful pathways," "lawful, safe, and orderly pathways," "lawful pathways and processes," and "lawful, safe, and orderly pathways and processes," as used in this preamble, refer to the range of pathways and processes by which migrants are able to enter the United States or other countries in a lawful, safe, and orderly manner, including to seek asylum and other forms of protection or other immigration benefits for which they may be eligible.

[9] While the rule's effective date was May 11, 2023, 88 FR at 31314, the rule only applies to noncitizens who enter the United States "[s]ubsequent to the end of implementation of the Title 42 public health Order[,]" 8 CFR 208.33(a)(1)(ii), which expired at 11:59 p.m. on May 11, 2023, *see* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Security Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), *https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.* Therefore, the Circumvention of Lawful Pathways rule began to apply on May 12, 2023.

[10] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from the U.S. Customs and Border Protection Unified Immigration Portal ("UIP") on September 3, 2024 (Summary Statistics tab). There was an average of about 2,100 total encounters per day (including all demographic groups) between POEs at the SWB from June 5, 2024, to August 31, 2024, compared to around 5,100 per day during the immediate post-pandemic period, defined as May 12, 2023, through June 4, 2024. *Id.*

[11] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[12] OHSS analysis data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[13] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[14] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[15] Throughout this preamble the "pre-pandemic period" refers to FY 2014 to FY 2019.

[16] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab). DHS reinstated removal orders for a larger share of single adults and individuals in family units during the pre-pandemic period (26 percent during the pre-pandemic period compared to 14 percent under the interim final rule ("IFR")), which is unsurprising given that the Departments are seeing fewer repeat encounters as a result of the higher proportion of non-Mexicans/non-northern Central Americans—with more limited migration histories—as a share of total encounters. *Id.;* 89 FR at 48721 n.49. Notably, the sum of reinstatements and expedited removals is still higher during the IFR (a combined 73 percent) than it was during the pre-pandemic period (67 percent). OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[17] The most effective way to deliver timely consequences to noncitizens who enter irregularly is through the expedited removal system, but DHS's capacity to use that system on a large scale is subject to resource constraints. One such constraint is space to hold noncitizens in DHS custody during the expedited removal process. Because noncitizens in expedited removal are subject to detention, including during the pendency of their credible fear proceedings, the use of expedited removal may lead to an increase in the time that an individual spends in CBP custody. This is particularly the case when the individual is receiving their credible fear interview while in CBP custody. When there are high numbers of individuals placed in expedited removal, the number of individuals who remain in CBP custody for a lengthier period can increase rapidly, leading to overcrowded conditions. In
Continued

negative effects of the previously sustained high encounter numbers described in the IFR and in this rule. *See, e.g.,* 89 FR at 48749 ("In order to maximize the consequences for those who cross unlawfully or without authorization, DHS endeavors to deliver consequences swiftly to the highest proportion of individuals who fail to establish a legal basis to remain in the United States. This includes, subject to available resources, referring the maximum number of eligible individuals possible into expedited removal to quickly adjudicate their claims.").

Relatedly, the IFR has also significantly reduced the percentage of noncitizens encountered between POEs at the SWB who are released into the United States pending completion of their section 240 removal proceedings. For instance, from June 5, 2024, through August 31, 2024, USBP placed 25 percent of noncitizens encountered at the SWB into section 240 removal proceedings.[18] This is down 41 percentage points from the immediate post-pandemic period, when USBP placed 66 percent of such noncitizens into section 240 removal proceedings, translating to a reduction of over 60 percent.[19] Similarly, between June 5, 2024, and August 31, 2024, 33 percent of all noncitizens encountered at the SWB were sent to Enforcement and Removal Operations ("ERO"); this figure is up from 19 percent during the immediate post-pandemic period.[20]

The IFR's change to how DHS immigration officers identify and refer noncitizens for credible fear interviews has resulted in a reduction of such referrals. Under the IFR, during emergency border circumstances, instead of asking specific questions about fear or providing lengthy advisals, DHS refers a noncitizen for such an interview if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to the noncitizen's country or the country of removal. From June 5, 2024, through August 31, 2024, 27 percent of noncitizens encountered between POEs at the SWB and processed for expedited removal indicated an intention to apply for asylum or a fear of persecution or torture, compared with a 37 percent fear-claim rate during the pre-pandemic period and 57 percent during the immediate post-pandemic period.[21] In the IFR, DHS explained that based on its extensive experience administering the expedited removal process, it concluded that the affirmative questions asked under steady state operations are suggestive and account for part of the high rates of referrals and screen-ins that do not ultimately result in a grant of asylum or protection. 89 FR at 48743.[22] The shift to a manifestation standard has, as intended, reduced the gap between high rates of referrals and screen-ins and historic ultimate grant rates as well as increased processing efficiency for DHS, and noncitizens who manifest or claim a fear, or who indicate an intention to apply for asylum, still have their claims adjudicated as required by the INA.

The shift to a "reasonable probability" standard for screening for statutory withholding of removal and protection under the regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465

U.N.T.S 85,[23] has further reduced the difference between high screen-in rates and historically low ultimate grant rates of protection or relief. Overall, of those USBP has referred for credible fear interviews, the comprehensive screen-in rate has dropped to 57 percent, compared to 83 percent during the pre-pandemic period and 62 percent during the immediate post-pandemic period.[24] Of USBP encounters screened by USCIS under the rule's "reasonable probability" standard, the screen-in rate has decreased to approximately 48 percent[25] compared to 76 percent[26] under the "significant possibility" standard during the pre-pandemic period, and approximately 51 percent[27] for those screened under the Circumvention of Lawful Pathway rule's lower "reasonable possibility" standard.[28] The Departments believe the lower screen-in rate under the IFR better

---

addition, given the nature of CBP facilities—which are designed for short-term temporary holding—CBP endeavors to move all individuals out of custody in an expeditious manner and to avoid overcrowding.

Thus, if high encounter levels result in a significant number of individuals in CBP custody, or if those individuals have been in custody for a significant period of time, CBP may lose optionality: having lost the capacity to place additional noncitizens into the expedited removal process, CBP generally must take steps to release some individuals from custody to ensure safe and sanitary conditions and appropriate time in custody. In cases when release is appropriate or warranted, CBP generally issues an individual a Notice to Appear ("NTA") before an immigration judge ("IJ") prior to their release from custody. Although in some circumstances transfer of such noncitizens to U.S. Immigration and Customs Enforcement ("ICE") for detention for the duration of the credible fear process is possible, the ability to do so is dependent on the availability of space in ICE's already significantly strained detention network. Therefore, when ICE detention space is unavailable, noncitizens must then be processed by CBP through non-expedited removal pathways.

[18] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[19] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[20] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[21] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[22] From FY 2014 through 2019, of total SWB encounters processed for expedited removal and then referred to section 240 proceedings, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief. 89 FR at 48743 n.219; OHSS analysis of June 2024 Enforcement Lifecycle dataset (Historic ERCF Results tab). During that same period, 37 percent of SWB encounters processed for expedited removal claimed fear, and 76 percent of those who claimed fear were screened in and referred to section 240 removal proceedings. OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[23] In this preamble, consistent with the IFR, the Departments generally refer to protection under the regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") as "CAT protection." *See, e.g.,* 89 FR at 48716.

[24] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab). Data for immediate post-pandemic and IFR periods are limited to SWB encounters between POEs. The comprehensive screen-in rate includes positive determinations issued by U.S. Citizenship and Immigration Services ("USCIS"), cases where an IJ vacated USCIS's negative determination, and cases administratively closed by USCIS in which a discretionary NTA was issued. For cases processed under either the Circumvention of Lawful Pathways rule or the IFR, the comprehensive screen-in rate encompasses cases where USCIS or an IJ determined that the noncitizen was found not subject to the Circumvention of Lawful Pathways rule's rebuttable presumption or the IFR's limitation on asylum eligibility under the significant possibility standard, in addition to cases screened-in under the "reasonable possibility" or "reasonable probability" standards, as applicable.

[25] OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening—STB tab, Line 9 divided by Line 8). Data are limited to SWB encounters between POEs.

[26] OHSS analysis of June 2024 Enforcement Lifecycle dataset (Historic ERCF Results tab). Data are limited to SWB encounters between POEs.

[27] OHSS analysis of July 2024 Persist Dataset (Fear Screening—CLP tab, Line 13 divided by Line 12). Data are limited to SWB encounters between POEs.

[28] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab). Although in the preamble to the IFR, DHS anticipated that the manifestation approach "will likely lead to a higher proportion of those referred having colorable claims for protection[,]" *see* 89 FR at 48743, USCIS screen-in rates have dropped slightly, as noted above, *see* OHSS analysis of June 2024 Enforcement Lifecycle dataset, July 2024 Persist Dataset, and data downloaded from UIP on September 3, 2024 (Historic ERCF Results, Fear Screening—STB, and Fear Screening—CLP tabs). There could be multiple reasons for this development, including the effects of the "manifestation" and "reasonable probability" provisions, which are difficult to disentangle.

aligns with the percentage of noncitizens who have historically been granted protection or relief. That is to say, noncitizens screened under the higher "reasonable probability" standard that receive positive findings are more likely to have meritorious claims in ultimate adjudications.

As a result of the IFR, DHS is able to more quickly remove a greater percentage of those who do not have a legal basis to remain in the United States. In the pre-pandemic period, the median processing time for a noncitizen encountered by USBP with a negative fear determination in expedited removal was 75 days from encounter to removal.[29] During the immediate post-pandemic period, this metric dropped to 44 days.[30] From June 5, 2024, through August 31, 2024, the metric dropped again to 32 days.[31] Similarly, the processing time from when a noncitizen is referred for a credible fear interview to when the noncitizen receives a fear determination is down 58 percent compared to the immediate post-pandemic period and down 71 percent compared to the pandemic period.[32] The Departments attribute the decreased processing time to key provisions of the IFR. For instance, the manifestation of fear provision has resulted in streamlined processing and a lower percentage of individuals indicating fear, thereby shortening the average processing time as those who do not indicate fear do not receive a screening by an AO or review by an IJ prior to removal. Then, for those who indicate fear, following a minimum consultation period that DHS reduced through separate guidance,[33] AOs, supervisory AOs, and IJs have been applying the IFR's reasonable probability screening standard. In addition, between June 5, 2024, and August 31, 2024, 32 percent of all noncitizens encountered at the SWB were removed or returned to their home country or to Mexico directly from USBP custody.[34] This is double the rate of repatriations from USBP custody (16 percent) that occurred during the immediate post-pandemic period.[35] Overall, from June 5, 2024, through August 31, 2024, DHS has removed or returned 70 percent of single adults and individuals in family units encountered by USBP.[36] This contrasts with a 28-percent rate during the immediate post-pandemic period.[37] Viewed in terms of daily averages, under the IFR through August 31, 2024, there have been about 1,880 daily encounters of single adults and individuals in family units.[38] And DHS has averaged about 1,320 total daily repatriations and 580 releases from CBP custody pending immigration proceedings over that time frame.[39]

Faster repatriations free up DHS resources and capacity for processing new arrivals, allowing for further increases in the use of expedited removal and fewer releases pending completion of section 240 removal proceedings. These successes disrupt the "vicious cycle" the Departments sought to counteract in issuing the IFR. 89 FR at 48714; *see id.* at 48751 ("This reality contributes to the vicious cycle . . . in which increasing numbers of releases lead to increased migration, fueled by the narrative, pushed by smugglers, that migrants who are encountered at the border will be allowed to remain and work in the United States for long periods of time.").

Meanwhile, noncitizens have continued to use lawful, safe, and orderly pathways and processes to seek entry to the United States. For example, the use of the CBP One mobile application ("CBP One app") to schedule an appointment at a SWB POE is an available tool that permits noncitizens to present themselves at the border in a lawful, safe, and orderly manner. From June 5, 2024, through August 31, 2024, approximately 123,500 noncitizens with CBP One appointments presented at SWB POEs and were accordingly processed outside of the procedures set forth in the IFR.[40] *See* 8 CFR 208.35(a)(1), 1208.35(a)(1); section 3(b)(v)(D) of the Proclamation. During the pre-pandemic period, approximately 300 encounters were processed at SWB POEs per day.[41] Since the launch of the CBP One app in January 2023, approximately 1,500 encounters have been processed at SWB POEs each day (with and without CBP One appointments).[42] And from the start of FY 2024 through August 31, 2024, that average increased to approximately 1,700 per day.[43] Other lawful pathways that continue to be available include expanded parole processes for specific populations and demographics such as nationals of Cuba, Haiti, Nicaragua, and Venezuela ("CHNV"), which allow certain individuals with U.S.-based supporters to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit;[44] the Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala, which provide, among other services, access to information and referrals for humanitarian and family parole processes, labor pathways, expedited refugee processing, and other lawful, safe, and orderly pathways for eligible

---

[29] OHSS analysis of June 2024 Enforcement Lifecycle dataset (Summary Statistics tab).

[30] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[31] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[32] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[33] The Immigration and Nationality Act ("INA") requires that the noncitizen be given information about the credible fear interview and provides the right for noncitizens in the credible fear process to consult with a person or persons of their choosing prior to the interview, so long as the consultation is conducted "according to [duly prescribed] regulations." INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); *see* INA 103(a), 8 U.S.C. 1103(a); 6 U.S.C. 557. Under those regulations, including during circumstances in which the measures in the IFR apply, consultation shall be at no expense to the Government, and consultations "shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained, . . . and shall not unreasonably delay the process." 8 CFR 235.3(b)(4)(ii), 235.15(a). The regulations do not require that the noncitizen be allowed a particular amount of time to consult with the person or persons of their choosing. *Id.* On June 4, 2024, to support implementation of the Proclamation and IFR, as a matter of internal policy, USCIS reduced the minimum consultation period for noncitizens subject to the rule's provisions from at least 24 hours to at least 4 hours beginning at the time ICE or CBP provides the noncitizen with the opportunity to consult and continuing only during the hours of 7 a.m. and 7 p.m. local time. *See* Memorandum for Jennifer B. Higgins, Deputy Dir., USCIS, from Ted Kim, Assoc. Dir., Refugee, Asylum, and Int'l Operations Directorate, USCIS, *Re: Scheduling of Credible Fear Interviews While the Measures in the Securing the Border Interim Final Rule Apply* (June 4, 2024).

[34] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[35] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[36] DHS encountered 165,000 single adults and individuals in family units between June 4, 2024, and August 31, 2024, and had repatriated 119,000 of them as of September 3, 2024. OHSS analysis of data downloaded from UIP on Sept. 3, 2024 (IFR Details tab).

[37] During that time period, there were 1.87 million such encounters with noncitizens other than UCs, of which 511,000 noncitizens were repatriated. OHSS analysis of July 2024 OHSS Persist Dataset (Immediate Post-Pandemic Details tab).

[38] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR Details tab).

[39] *Id.*

[40] *Id.*

[41] OHSS analysis of July 2024 Persist Dataset (OFO Encounters tab).

[42] *Id.* On June 30, 2023, CBP announced the expansion of available appointments for noncitizens through the CBP One mobile application ("CBP One app") to 1,450 per day, up from 1,250. Cumulatively, the expansion to 1,450 appointments represented a nearly 50 percent increase from May 12, 2023, when CBP processed 1,000 appointments per day. *See* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.*

[43] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (OFO Encounters tab).

[44] USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last reviewed/updated Aug. 29, 2024), *https://www.uscis.gov/CHNV.*

**81162**    **Federal Register**/Vol. 89, No. 194/Monday, October 7, 2024/Rules and Regulations

individuals to the United States and other countries; [45] country-specific family reunification parole processes for certain nationals of Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras who have qualifying U.S. citizen relatives in the United States; [46] and temporary nonimmigrant worker visas, which provide employment opportunities for eligible individuals.[47]

Thus, the provisions of the IFR and other measures taken to assist in the IFR's implementation are effective tools in managing levels of irregular migration that, absent key policy interventions like this rule, severely strain the Departments' abilities to safely, effectively, and humanely enforce and administer U.S. immigration laws. The historically high level of encounters that DHS experienced in the months before the IFR's implementation has decreased markedly, and DHS's ability to expeditiously process noncitizens and deliver swift consequences to those who do not establish a legal basis to remain in the United States has therefore improved significantly.

*B. Legal Authority*

The Secretary and the Attorney General jointly issue this rule pursuant to their shared and respective authorities concerning consideration of claims for asylum, statutory withholding of removal, and protection under regulations implemented pursuant to U.S. obligations under Article 3 of the CAT. The Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to the Secretary of Homeland Security many functions related to the administration and enforcement of Federal immigration law while maintaining some functions and authorities with the Attorney General, including some shared concurrently with the Secretary.[48]

The INA, as amended by the HSA, charges the Secretary "with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens," except insofar as those laws assign functions to certain other officers. INA 103(a)(1), 8 U.S.C. 1103(a)(1). The INA grants the Secretary the authority to establish regulations and take other actions that the Secretary deems "necessary for carrying out" the Secretary's authority under the immigration laws. INA 103(a)(3), 8 U.S.C. 1103(a)(3); *see also* 6 U.S.C. 202.

The HSA provides the Attorney General with "such authorities and functions under [the INA] and all other laws relating to the immigration and naturalization of aliens as were [previously] exercised by [EOIR], or by the Attorney General with respect to [EOIR]." INA 103(g)(1), 8 U.S.C. 1103(g)(1); *see also* 6 U.S.C. 521(a). In addition, under the HSA, the Attorney General retains authority to "establish such regulations, . . . issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out" the Attorney General's authorities under the immigration laws. INA 103(g)(2), 8 U.S.C. 1103(g)(2).

Under the HSA, the Attorney General retains authority over the conduct of section 240 removal proceedings. These adjudications are conducted by IJs within DOJ's EOIR. *See* 6 U.S.C. 521(a); INA 103(g)(1), 8 U.S.C. 1103(g)(1); 8 CFR 1240.1. With limited exceptions, IJs adjudicate asylum, statutory withholding of removal, and CAT protection applications filed by noncitizens during the pendency of section 240 removal proceedings, including asylum applications referred by USCIS to the immigration court. INA 101(b)(4), 8 U.S.C. 1101(b)(4); INA 240(a)(1), 8 U.S.C. 1229a(a)(1); INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 1208.2(b), 1240.1(a); *see also Dhakal* v. *Sessions,* 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals ("BIA"), also within DOJ's EOIR, in turn hears appeals from IJ decisions. *See* 8 CFR 1003.1(a)(1), (b)(3); *see also Garland* v. *Ming Dai,* 593 U.S. 357, 366–67 (2021) (describing appeals from IJs to the BIA). And the INA provides that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." INA 103(a)(1), 8 U.S.C. 1103(a)(1).

In addition to the separate authorities discussed above, the Attorney General and the Secretary share some authorities. Section 208 of the INA, 8 U.S.C. 1158, authorizes the "Secretary of Homeland Security or the Attorney General" to "grant asylum" to a noncitizen "who has applied for asylum in accordance with the requirements and procedures established by" the Secretary or the Attorney General under section 208 if the Secretary or the Attorney General determines that the noncitizen is a "refugee" within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A). INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A). Section 208 thereby authorizes the Secretary and the Attorney General to "establish[ ]" "requirements and procedures" to govern asylum applications. *Id.* The statute further authorizes them to "establish," "by regulation," "additional limitations and conditions, consistent with" section 208, under which a noncitizen "shall be ineligible for asylum." INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see also* INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B) (authorizing the Secretary and the Attorney General to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with [the INA]").[49] The INA also provides the Secretary and the Attorney General authority to publish regulations governing their respective roles regarding apprehension, inspection and admission, detention and removal, withholding of removal, deferral of removal, and release of noncitizens encountered in the interior of the United States or at or between POEs. *See* INA 103(a)(3), (g)(2), 8 U.S.C. 1103(a)(3), (g)(2); *see also, e.g.,* INA 235(b)(1)(B)(iii)(III), (B)(iv), (C), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (B)(iv), (C).

The INA and HSA grant DHS the authority to adjudicate asylum applications and to conduct credible fear interviews, make credible fear determinations in expedited removal proceedings, and establish procedures for further consideration of asylum applications after an individual is found to have a credible fear. INA 103(a)(1), (a)(3), 8 U.S.C. 1103(a)(1), (a)(3); INA 208(b)(1)(A), (d)(1), (d)(5)(B), 8 U.S.C. 1158(b)(1)(A), (d)(1), (d)(5)(B); INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); *see also* 6 U.S.C. 271(b)(3) (providing for the transfer of adjudication of asylum and

---

[45] U.S. Dep't of State, *Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas, https://www.state.gov/ safe-mobility-initiative/* (last visited Aug. 23, 2024).

[46] *See* USCIS, *Family Reunification Parole Processes* (last reviewed/updated Sept. 10, 2024), *https://www.uscis.gov/FRP.*

[47] *See* USCIS, *Temporary (Nonimmigrant) Workers* (last reviewed/updated July 24, 2024), *https://www.uscis.gov/working-in-the-united-states/ temporary-nonimmigrant-workers.*

[48] The Homeland Security Act of 2002 ("HSA") further provides, "Nothing in this Act, any amendment made by this Act, or in section 103 of the [INA], as amended . . . , shall be construed to limit judicial deference to regulations, adjudications, interpretations, orders, decisions, judgments, or any other actions of the Secretary of Homeland Security or the Attorney General." 116 Stat. at 2274 (codified at 6 U.S.C. 522).

[49] Under the HSA, the references to the "Attorney General" in the INA also encompass the Secretary with respect to statutory authorities vested in the Secretary by the HSA or subsequent legislation, including in relation to immigration proceedings before DHS. 6 U.S.C. 251, 271(b)(3), (5), 557.

refugee applications from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services, now USCIS); 6 U.S.C. 557 (providing that references to any officer from whom functions are transferred under the HSA are to be understood as referring to the Secretary of Homeland Security). Within DHS, AOs conduct credible fear interviews, make credible fear determinations, and determine whether a noncitizen's asylum application should be granted, all of which are subject to review by a supervisory AO. *See* 8 CFR 208.2(a), 208.9, 208.14(b), 208.30(b), (e)(6)(i), (e)(8). The INA grants IJs the authority to review AO negative credible fear determinations. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III).

The United States is a party to the 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 (''Refugee Protocol''), which incorporates Articles 2 through 34 of the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 (''Refugee Convention''). Article 33.1 of the Refugee Convention generally prohibits parties to the Convention from expelling or returning (''refouling'') ''a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.'' Refugee Convention, 19 U.S.T. at 6276, 189 U.N.T.S. at 176.

Because the Refugee Protocol is not self-executing,[50] Congress implemented these non-refoulement obligations through the INA, as amended by the Refugee Act of 1980, Public Law 96–212, 94 Stat. 102 (''Refugee Act''). *See* 8 U.S.C. 1253(h) (1952); *Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 174–77 (1993) (describing the history of the statutory withholding provision and the Refugee Act amendments). The Supreme Court has long recognized that the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3) (''statutory withholding of removal''), which provides that a noncitizen may not be removed to a country where their life or freedom would be threatened on account of one

of the protected grounds listed in Article 33 of the Refugee Convention.[51] *See* INA 241(b)(3), 8 U.S.C. 1231(b)(3); *see also* 8 CFR 208.16, 1208.16. The INA also authorizes the Secretary and the Attorney General to implement statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* INA 103(a)(1), (3), (g)(1)–(2), 8 U.S.C. 1103(a)(1), (3), (g)(1)–(2).

The Departments also have authority to implement Article 3 of the CAT, which is likewise not self-executing.[52] The Foreign Affairs Reform and Restructuring Act of 1998 (''FARRA'') delegates to the Departments the authority to ''prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention.'' Public Law 105–277, div. G, sec. 2242(b), 112 Stat. 2681, 2681 (codified at 8 U.S.C. 1231 note). Consistent with FARRA, DHS and DOJ have implemented in the Code of Federal Regulations the United States' obligations under Article 3 of the CAT. *See, e.g.,* 8 CFR 208.16(c)–208.18, 1208.16(c)–1208.18; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999), amended by 64 FR 13881 (Mar. 23, 1999).

This rule is necessary because, although the Proclamation recognizes that the asylum system has contributed to the border emergency, the Proclamation itself does not and cannot affect noncitizens' right to apply for asylum, their eligibility for asylum, or asylum procedures. This recognition that section 212(f) does not affect the right to pursue a claim for asylum has been the Executive Branch's consistent position for four decades.[53] That

longstanding understanding follows from the text and structure of the governing statutes. Section 212(f) provides that under certain circumstances, the President may ''suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.'' INA 212(f), 8 U.S.C. 1182(f). Although this provision—first enacted in 1952—''grants the President broad discretion,'' it ''operate[s]'' only within its ''sphere.'' *Trump* v. *Hawaii,* 585 U.S. 667, 683–84, 695 (2018). Section 212 of the INA, 8 U.S.C. 1182 (entitled ''Inadmissible aliens''), generally ''defines the universe of aliens who are admissible'' and ''sets the boundaries of admissibility into the United States.'' *Id.* at 695. Hence, when section 212(f) authorizes the President to suspend ''entry,'' it ''enabl[es] the President to supplement the other grounds of inadmissibility in the INA,'' *id.* at 684 (citing *Abourezk* v. *Reagan,* 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986)), and to bar individuals from entry into the United States.

This authority, though broad, does not authorize the President to override the asylum statute.[54] First enacted in the Refugee Act, the asylum statute today provides that ''[a]ny alien who is physically present in the United States or who arrives in the United States[,]

---

[50] *E.g., Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) (''The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.'' (citations omitted)).

[51] *See INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 426–27 (1999); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 440–41 (1987) (distinguishing between Article 33's non-refoulement prohibition, which aligns with what was then called withholding of deportation, and Article 34's call to ''facilitate the assimilation and naturalization of refugees[,]'' which the Court found aligned with the discretionary provision in section 208 of the INA, 8 U.S.C. 1158).

[52] *Omar* v. *McHugh,* 646 F.3d 13, 17 (D.C. Cir. 2011) (''This multilateral treaty is non-self-executing and thus does not itself create any rights enforceable in U.S. courts.'' (citation omitted)).

[53] In 1984, then-Assistant Attorney General for the Office of Legal Counsel Theodore B. Olson advised that section 212(f) did not permit the President to eliminate the asylum rights of noncitizens who had hijacked a plane and, as a condition of the plane's release, been flown to the United States. And in 2018, the Departments reaffirmed that ''[a]n alien whose entry is suspended or restricted under . . . a [section 212(f)]

proclamation, but who nonetheless reaches U.S. soil contrary to the President's determination that the alien should not be in the United States, would remain subject to various procedures under immigration laws[,]'' including ''expedited-removal proceedings'' where they could ''raise any claims for protection[.]'' *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims,* 83 FR 55934, 55940 (Nov. 9, 2018). Although Presidents have invoked section 212(f) at least 90 times since 1981, to the Departments' knowledge, none of those proclamations were understood to affect the right of noncitizens on U.S. soil to apply for, or noncitizens' statutory eligibility to receive, asylum. Kelsey Y. Santamaria et al., Cong. Rsch. Serv., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. 1182(f)* (updated Feb. 21, 2024). At the same time, nothing in the proclamations or the INA has precluded the Departments from considering as an adverse discretionary criterion that a noncitizen is described in a section 212(f) proclamation.

[54] The Supreme Court, though it has never squarely addressed this issue, has also never indicated that section 212(f) confers power to affect asylum rights of those present in the United States. *Cf., e.g., Sale,* 509 U.S. at 164 n.13, 174–77, 187–88 (upholding a Coast Guard program of intercepting migrant vessels and returning migrants to their home country, authorized in part by section 212(f), on the basis that statutory rights under the withholding of removal statute did not have ''extraterritorial application'' to migrants who were not physically present); *Hawaii,* 585 U.S. at 689, 695 (assuming, without deciding, that section 212(f) ''does not allow the President to expressly override particular provisions of the INA[,]'' while emphasizing the particular ''sphere[ ]'' in which it operates).

**81164** **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

. . . irrespective of such alien's status, may apply for asylum.'' INA 208(a)(1), 8 U.S.C. 1158(a)(1). The right to apply for asylum thus turns on whether a noncitizen is ''physically present'' or has ''arrive[d] in the United States.'' [55] *Id.* As a result, the power under section 212(f) to suspend ''entry'' does not authorize the President to override the asylum rights of noncitizens who have already physically entered the United States and who are entitled to an adjudication of eligibility under the applicable statutory and regulatory rules and standards.[56]

[55] Section 212(f) of the INA, 8 U.S.C. 1182(f), contrasts with 42 U.S.C. 265, which authorizes the Centers for Disease Control and Prevention (''CDC'') to temporarily suspend ''the right to introduce . . . persons and property'' into the United States if such suspension ''is required in the interest of the public health.'' During the COVID–19 pandemic and to prevent the ''serious danger of the introduction of [the] disease into the United States,'' 42 U.S.C. 265, the CDC issued a public health Order invoking section 265 to expel certain noncitizens generally without title 8 protections, including asylum applications. As the final rule implementing section 265 explained, that provision originates in a ''broad public health statute'' that Congress intended to ''operate[ ] separately and independently of the immigration power'' and authorizes the CDC ''to temporarily suspend the effect of any law[ ] . . . by which a person would otherwise have the right to be introduced . . . into the U.S.,'' *Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right To Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes,* 85 FR 56424, 56426, 56442 (Sept. 11, 2020), including the immigration laws, *id.* at 56426 (noting that legislative history indicates that section 265's predecessor was intended to suspend immigration if public health required it). The drafting history of section 265 also confirms that Congress conferred authority to prohibit ''the introduction of persons'' in order to broaden this provision and that this provision subsumed but was not limited to the authority to ''suspend immigration[.]'' Br. for Appellants at 41–43, *Huisha-Huisha* v. *Mayorkas,* 27 F.4th 718 (D.C. Cir. 2022) (No. 21–5200); *see Huisha-Huisha,* 27 F.4th at 730–31 (determining plaintiffs not likely to succeed on their challenge to the CDC Order on the ground that it improperly suspended migrants' right to apply for asylum). Section 265 is a public-health authority under the Public Health Service Act. Its grant of authority to allow the CDC to temporarily suspend immigration laws in case of a public health emergency has no relevance to the interpretation of section 212(f), which is in title 8.

[56] For similar reasons, section 215(a) of the INA, 8 U.S.C. 1185(a), which the Proclamation also invokes, does not authorize the President to impose the condition and limitation on asylum eligibility created by this rule. *Cf. United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 540–47 (1950) (holding that under the precursor to section 215(a)(1) of the INA and the presidential proclamation and regulations issued pursuant to that provision, which during times of national emergency made it unlawful for ''any alien to . . . enter or attempt to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President shall prescribe[,]'' the Attorney General could issue regulations governing entry during such an emergency to ''deny [certain noncitizens] a hearing . . . in special cases'' notwithstanding the ordinary exclusion hearing

This rule, as discussed in the IFR and this preamble, is authorized because Congress has conferred upon the Secretary and the Attorney General express rulemaking power to create new conditions and limitations on asylum eligibility and create certain procedures for adjudicating asylum claims. INA 103(a)(1), (a)(3), (g), 8 U.S.C. 1103(a)(1), (a)(3), (g); INA 208(b)(1)(A), (b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(1)(A), (b)(2)(C), (d)(5)(B); INA 235(b)(1)(B)(iii)(III), (iv), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (iv).

### C. Changes From the IFR to Final Rule

The Departments issued the IFR, effective June 5, 2024, adopting provisions at 8 CFR 208.13(g), 208.35, 235.15, 1208.13(g), and 1208.35 that effectuated three key changes to eligibility for asylum and the expedited removal process for noncitizens who are encountered at the southern border during the emergency border circumstances giving rise to the suspension and limitation on entry under the June 3 Proclamation: (1) adding a limitation on asylum eligibility, subject to an exception for exceptionally compelling circumstances, that is considered during credible fear screenings in addition to its application during adjudications on the merits; (2) rather than asking specific questions of every noncitizen encountered and processed for expedited removal, providing general notice regarding the process for seeking asylum, statutory withholding of removal, or CAT protection and referring a noncitizen for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to his or her country or the country of removal; and (3) for those found not to have a credible fear of persecution for asylum purposes because they could not establish a significant possibility that they are not subject to or are exempt from the limitation on asylum eligibility, screening for potential eligibility for statutory withholding of removal and CAT protection under a ''reasonable probability'' standard.

Following careful consideration of public comments received and the Departments' experiences implementing the IFR's provisions since early June 2024, the Departments have made

provisions governing entry). This does not mean, however, that the President is prohibited from invoking section 215(a) as authority to impose reasonable rules, regulations, and orders on asylum applicants and asylees, such as travel document requirements for re-entry and departure controls.

modifications to the regulatory text adopted in the IFR, as described below. The rationale for the provisions adopted in the IFR and the reasoning provided in the IFR's preamble remain valid, except as distinguished in this regulatory preamble.

#### 1. Changes to the IFR's Thresholds

On September 27, 2024, the President issued a proclamation amending the June 3 Proclamation. *See* Presidential Proclamation of September 27, 2024, *Amending Proclamation 10773* (''September 27 Proclamation''). Following the issuance of the IFR, the Departments have closely monitored its implementation and results across the southern border. The Departments recommended to the President adjustments to the Proclamation based on their experiences implementing the Proclamation and IFR. Following those recommendations, the President issued the September 27 Proclamation, which amended section 2 of the June 3 Proclamation in two ways. First, section 2(a) of the June 3 Proclamation provided that the suspension and limitation on entry would be discontinued at 12:01 a.m. eastern time on the date that is 14-calendar-days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of fewer than 1,500 encounters between POEs. As amended by the September 27 Proclamation, the 7-consecutive-calendar-day average must remain below 1,500 encounters between POEs for 28-consecutive-calendar-days before the 14-calendar-day waiting period is triggered.[57] Second, the September 27 Proclamation deleted section 2(c) of the June 3 Proclamation, which provided that UCs [58] from non-contiguous countries shall not be included in calculating the number of encounters for purposes of section 2(a) and 2(b) of the June 3 Proclamation.

The Departments are implementing changes in this final rule that parallel those made in the September 27 Proclamation. Specifically, the Departments are revising §§ 208.13(g) and 1208.13(g) to refer to ''the Presidential Proclamation of June 3, 2024, as defined in paragraph (h) of this section.'' Paragraph (h) of each section now defines ''Presidential Proclamation of June 3, 2024'' as referring to

[57] As an illustration, for any given day, DHS will calculate the average number of encounters for that day and the prior 6 calendar days *i.e.,* the 7-consecutive-calendar-day average. If that average remains below 1,500 for 28 consecutive calendar days, the 14-day waiting period will begin.

[58] In this preamble, as in the Proclamation, the terms ''unaccompanied children'' or ''UCs'' have the same meaning as the term ''unaccompanied alien child[ren]'' under 6 U.S.C. 279(g)(2).

''Proclamation 10773 of June 3, 2024, as amended by the Presidential Proclamation of September 27, 2024[ ]'' for the purpose of §§ 208.13(g), 208.35, and 235.15 (in the case of § 208.13(h)) and §§ 1208.13(g) and 1208.35 (in the case of § 1208.13(h)). The Departments are also making conforming changes in §§ 208.35, 235.15, and 1208.35. To ensure that the rule can function even if the September 27 Proclamation were rendered inoperative by court order, and consistent with the September 27 Proclamation, the Departments have also included a severability clause in both §§ 208.13(h) and 1208.13(h).

The Departments believe that shifting to the 28-consecutive-calendar-day requirement for this rule, in parallel with the changes made in the September 27 Proclamation, is necessary to ensure that the rule's measures discontinue only once there has been a durable and sustained decrease in encounters at the southern border such that the emergency border circumstances have in fact abated. Premature and frequent discontinuations of the rule's measures, as discussed below, would increase the risk of sizeable and disruptive surges and could undermine the message the Departments intend the rule to send, which is to discourage noncitizens from utilizing irregular migration and the services of smugglers and TCOs to enter the United States. In the IFR, the Departments explained that at 1,500 daily encounters between POEs, ''DHS would be able to swiftly deliver a consequence to enough individuals to meaningfully impact migratory decisions and deter unlawful entries.'' 89 FR at 48752. The Departments further explained that ''[t]he 14-day waiting period prior to a discontinuation provides time for the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in encounters is sustained.'' 89 FR at 48749 n.248. The changes made here further both purposes.

Requiring the 7-consecutive-calendar-day average to remain below 1,500 encounters for 28 consecutive calendar days instead of one calendar day will guard against a circumstance in which the threshold for discontinuation is met solely due to a short-term, erratic decrease (such as a short-term holiday downturn [59] or a decrease due to an

extreme weather event) that does not signal a meaningful reduction in overall migration pressures. Such short-term decreases could force the provisions of the rule to trigger on and off more frequently, causing operational strain while also signaling to migrants that emergency border circumstances are so temporal and episodic that the rule's measures can be avoided by waiting in Mexico for a short period of time—which could lead to a cycle of surges that significantly disrupt border processing. Moreover, if the Departments had opted for a substantially smaller number of consecutive days, there is a significant risk that the rule would deactivate due to a transient drop due to holidays, weather, or another cause, which can lead to several weeks of uncharacteristically low encounters. At the same time, a 28-day period is still a short enough period to ensure a timely response when an actual, sustained downturn occurs. The Departments have therefore decided that 28 days strikes an appropriate balance.

The Departments' experience since the IFR's implementation has informed their view that the limited changes made by this rule are necessary to provide greater assurance that a decrease is likely to be sustained and to guard against costly toggling of the rule when a brief decrease proves not to be sustained. For one thing, this experience highlights the risk that under an approach that looks only to a 7-consecutive-calendar-day average, the rule might discontinue even though a reduction is unlikely to be sustained. Comparing the week ending June 4, 2024, to the week ending August 31, 2024, the Departments observed (as expected) a significant decrease in encounters at the southern border, but Mexico's government reported a much smaller decrease in encounters within Mexico.[60] This trend suggests that even

though the IFR has affected incentives for migrants to try to cross the U.S. border, migrants continue to travel towards the U.S. border in large numbers, and that even if the 7-consecutive-calendar-day average dropped below 1,500 encounters, that drop likely would not be sustained given the large and growing population of migrants in Mexico who could relatively quickly reach the U.S. border. Moreover, if the IFR's provisions did deactivate, that large and growing population in Mexico would be a ready target for smugglers and TCOs, increasing the risk of a surge following a discontinuation that does not reflect a truly sustained decrease in migration flows.

Adding this rule's 28-consecutive-day requirement reduces those concerns by providing for greater stability. With that change, the rule's provisions will not be discontinued unless there has been a 7-consecutive-calendar-day average of less than 1,500 encounters that is sustained over a period of 28 days. The Departments expect that this change, coupled with the IFR's 14-day waiting period after the Secretary makes the factual determination necessary to discontinue the suspension and limitation on asylum eligibility, will reduce any perceived incentive to remain close to the U.S.-Mexico border in anticipation of a rapid change in policy. Although the Departments recognize that this change does not eliminate the risk of the rule discontinuing even when regional migration flows remain high, they assess that this rule's approach better balances this risk against this rule's purpose as an exceptional measure to address emergency border circumstances that should not apply when encounters have fallen for a sustained period. The Departments further discuss later in this subsection why the rule's approach appropriately balances those considerations.

The Departments' concern is also consistent with some of the public comments received on the IFR. For instance, one commenter remarked that some migrants had concluded that they should congregate near the border in preparation for the Proclamation and IFR's measures to discontinue. Other commenters expressed concern regarding potential misunderstandings about the threshold for discontinuation. Given the reality that a surge remains possible, the Departments seek to avoid a situation where the emergency

---

[59] Short-term decreases that are not associated with changes in the fundamental drivers of migration have been especially notable during the end-of-year holiday season. From FY 2013 through FY 2024, SWB encounters fell by an average of 42 percent in the two weeks between December 23 and January 5, only to be followed by an average

increase of 41 percent in the two weeks between January 5 and January 18. *See* OHSS analysis of July 2024 Persist Dataset (USBP Encounters—Holiday Dip tab). Although the January rebound was less dramatic in 2023 and 2024, this historic pattern suggests that if average encounters heading into the holidays are even as low as the mid-2000s—well above the intended threshold for discontinuation of emergency circumstances—a short-term decrease could push the 7-day average number of encounters below 1,500 even though the fundamental drivers of high levels of migration have not changed. A metric based on a 7-day average would trigger a discontinuation of emergency circumstances in this scenario, but the likely January rebound means a 28-day metric would not.

[60] *See* OHSS analysis of data downloaded from UIP on September 3, 2024, and data provided by the Government of Mexico as of August 31, 2024 (Mexican Enforcement tab) (showing that comparing the week ending June 4, 2024, to the week ending August 31, 2024, total Mexican

enforcement apprehensions dropped 19 percent, while total U.S. Border Patrol (''USBP'') encounters dropped 48 percent).

**81166**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

measures in this rule are discontinued prematurely.

The Departments note that the existing 14-day waiting period before discontinuation once this threshold is reached will continue to help the Departments complete processing of noncitizens encountered during emergency border circumstances and to confirm that a sustained downward trend in encounters has been achieved. *See* 89 FR at 48749 n.248. At the same time, under the prior standard for discontinuation, a rapid shift between discontinuing and reactivating the rule's provisions would remain possible.[61] Such a shift would pose significant operational challenges.

Experience with the IFR suggests that rapidly switching between the rule's provisions discontinuing and reactivating would result in harmful operational burdens. For instance, upon implementation of the Proclamation and IFR, the Departments had to prioritize processing of individuals encountered prior to June 5. Therefore, USBP was unable to immediately maximize processing of the desired number of noncitizens through expedited removals.[62] USBP took 6 days to ramp up processing for expedited removal under the IFR, from about 60 encounters processed under the rule on June 5 to about 1,500 on June 10, which was the first day that a majority of encounters were processed for expedited removal under the rule.[63] Similarly, USBP released an average of about 930 post-June 4 encounters per day between June 5 and June 17, including 8 days of over 1,000 releases, before releases fell to an average of about 510 per day between June 18 and August 31, including an average of about 410 per day in August.[64] And although ICE repatriated approximately 38,500 single adults and members of family units from June 5 through July 31, 2024, only around

15,400 (40 percent) of them were encountered by USBP after June 4, 2024.[65] The rest were pre-June 5th USBP SWB encounters and pre- and post-June 5th Office of Field Operations ("OFO") encounters (39 percent) or non-SWB encounters and interior enforcement (21 percent).[66] USCIS did not complete its first credible fear interview under the IFR until June 9, 2024, and completed an average of about 20 interviews per day for the first two weeks after June 4, compared to an average of roughly 330 per day in the month of August.[67] EOIR did not conduct its first review of an adverse credible fear determination under the IFR until June 11, 2024, and averaged approximately 9 reviews per day in the first 3 weeks after June 4 compared to an average of about 90 per day in August.[68] The lag between the rule's activation and the Departments' ability to fully avail themselves of the rule's efficiencies means that when the provisions of the rule discontinue and then reactivate, the Departments' abilities to deliver timely decisions and consequences consistent with the rule's purpose may be unnecessarily impaired.

In addition, although the Departments continue to believe that the burden of shifting between applying this rule and the Circumvention of Lawful Pathways rule is warranted when there has been a sustained reduction in irregular migration, such a burden is much harder to justify in the context of a short-lived reduction in encounters followed by very high levels of encounters. For instance, USCIS required time to provide training, procedures, and guidance to the field before its staff could process credible fear referrals under the IFR. Additionally, EOIR required time to ensure IJs have sufficient docket capacity for any increase in credible fear reviews in response to any increased number of expedited removal cases. EOIR also required time to provide training to IJs who conduct credible fear reviews or who adjudicate cases involving individuals who enter the United States while the Proclamation and rule are in effect. To be sure, subsequent reactivation of the rule's measures will be easier given that the Departments' personnel will have become familiar with the rule's provisions. Nonetheless, reactivation will always require resources and

coordination within the workforce necessitating the need to ensure that discontinuations and reactivations do not occur with undue frequency.[69]

The Departments have also determined that it is appropriate and necessary to include UCs from non-contiguous countries in the encounter calculations relevant to discontinuing and continuing or reactivating the provisions of this rule, in parallel with the changes made in the September 27 Proclamation. Under the June 3 Proclamation and the IFR, the thresholds for such discontinuation and continuation or reactivation did not include encounters of such UCs. But as some commenters on the IFR correctly noted, excluding such encounters results in an unrealistic assessment of the Departments' resources and capabilities. All UCs (regardless of whether they came from a contiguous country or a non-contiguous country) require a greater proportion of resources to process and hold safely in CBP facilities and merit inclusion in the threshold calculations to accurately reflect this reality. For example, UCs in CBP custody generally must be referred to the Department of Health and Human Services' Office of Refugee Resettlement and transferred to its care within 72 hours after determining that the noncitizen is a UC, absent exceptional circumstances. 8 U.S.C. 1232(b)(3); *see also* 6 U.S.C. 279. Because of this, UCs are generally prioritized for processing in CBP facilities. The processing and treatment of UCs also include a number of other unique legal and policy requirements, such as conducting a thorough screening for trafficking and any claims of fear of return.[70] During their time in custody, UCs receive medical screenings and child-appropriate activities and humanitarian supplies. They also must generally be held separately from unrelated adults, impacting CBP's holding capacity. This means that DHS must expend resources to quickly process, refer, and transfer UCs to the Office of Refugee Resettlement's care. This time-consuming and resource-intensive process must always be followed for

---

[61] From FY 2013 through FY 2019, there were 2,014 days where the 7-consecutive-calendar-day average of USBP encounters (including encounters of UCs from non-contiguous countries) was below 1,500. OHSS analysis of July 2024 Persist Dataset (Trigger Analysis tab). Of those 2,014 days, 1,813 days (90 percent of the total) were also part of a period of time when the 7-consecutive-calendar-day average had remained below 1,500 for 28 consecutive days. *Id.* Thus, considering hypothetical lower-bound thresholds for the period FY 2013 through FY 2019, switching from the IFR's approach to this rule's approach would have reduced the number of below-threshold days by only 10 percent. *Id.* While it is too early in the post-IFR period to know the precise reduction in volatility it has brought about, requiring the 7-day average to remain below 1,500 encounters for 28 consecutive days may have a broadly similar effect.

[62] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR Ramp Up tab).

[63] *Id.*

[64] *Id.*

[65] OHSS analysis of July 2024 Persist Dataset (IFR Ramp Up tab).

[66] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR Ramp Up tab).

[67] *Id.*

[68] *Id.*

[69] The Departments acknowledge that they have not made a similar change to require 28 consecutive days of a 7-day average of encounters above 2,500 for the rule's provisions to be reactivated. The absence of a similar requirement prior to reactivation reflects the operational exigencies in a circumstance where there has been a 7-consecutive-calendar-day average of more than 2,500 encounters. *See* 89 FR at 48749 n.248. The Departments have determined that those operational exigencies require the rule's provisions to be reactivated and outweigh the resources and coordination that reactivation requires.

[70] *See* 8 U.S.C. 1232(a)(2)(A)(ii).

UCs encountered at the southern border, regardless of whether emergency border circumstances are present.

In addition, UCs who are nationals or habitual residents of a contiguous country may, in certain circumstances, be permitted to withdraw their applications for admission and voluntarily return to their respective countries of nationality or habitual residence. *See* 8 U.S.C. 1232(a)(2). To determine whether such an outcome is permissible, such UCs are screened for indicators of trafficking or credible evidence that they are at risk of being trafficked upon return, whether they are able to make an independent decision to withdraw their applications, and whether they have any fear of return owing to a credible fear of persecution. *See* 8 U.S.C. 1232(a)(2)(A), (a)(4). However, as a matter of longstanding policy, CBP screens all UCs—even those from non-contiguous countries—in this manner.

Because one of the primary purposes of the rule is to alleviate undue strain on the limited resources of the border security and immigration systems, the Departments found that they must consider the operational burden that results from all UC encounters at the border. That is why UC encounters from all countries, not just from contiguous countries, should be considered by the Secretary when making a factual determination that average daily encounters at the southern border have exceeded or fallen below the requisite thresholds contained in the rule and the Proclamation.

Also informing the Departments' decision to reconsider the IFR's approach is that in recent months, encounters of UCs from non-contiguous countries have grown relative to other encounters. That growth, which adds operational burdens separate from those inherent in the processing of individuals for expedited removal, increases the distorting effects of excluding these UCs. Specifically, the Departments had observed from June 2023 through May 2024 that rates of encounters of UCs from non-contiguous countries had generally accounted for about 6.5 percent of total encounters of all non-contiguous nationalities, and comprised about 15 percent of encounters of nationals of El Salvador, Guatemala, and Honduras.[71] However, while encounters of UCs from non-contiguous countries have decreased in absolute terms since June 2024, such

encounters have not decreased in proportion with the decreases seen among single adults and individuals in family units. Rather, the UCs' share of total non-contiguous encounters has increased to 8.9 percent, including 24 percent of all encounters of nationals of El Salvador, Guatemala, and Honduras.[72] As a result, the share of total encounters attributable to UCs from non-contiguous countries increased from 4.6 percent from June 2023 to May 2024 to 6.4 percent from June 2024 to August 2024, and the share of all UCs increased from 6.2 percent to 9.4 percent.[73]

With the two changes just described, the rule will continue to serve the purposes that the IFR pursued from the start. First, the rule continues to target emergency border circumstances exceeding the Departments' capacity to effectively process, detain, and remove, as appropriate, the noncitizens encountered; Section III.D.1 of this preamble describes why the rule's thresholds continue to reflect those circumstances, accounting for the inclusion of UCs from non-contiguous countries.

Second, the rule will continue to deactivate when a decrease in encounters means that those emergency border circumstances no longer exist. Although the change to require that the 7-consecutive-calendar-day average must remain below 1,500 encounters for 28 consecutive days appropriately ensures that the rule does not deactivate prematurely, the rule will continue to deactivate where a decrease is likely to be genuinely sustained. Encounter levels are driven by a variety of factors, many of which are external to the United States and difficult to predict, such as natural disasters, economic changes, and political instability. However, the Departments believe, based on past experience, that the Departments may experience an average daily encounter rate below 1,500 for 28 consecutive days. In fact, from FY 2013 through FY 2019, the 7-consecutive-calendar-day USBP encounter average was below 1,500 encounters for 28 consecutive days 71 percent of the

time.[74] Even since the IFR was promulgated, encounters have dropped to levels indicating that the threshold in section 2(a) of the Proclamation will be met if migration dynamics change for a sustained period. If, consistent with the June 3 Proclamation, one excludes UCs from non-contiguous countries, the Departments have observed 40 separate days between June 5, 2024, and August 31, 2024, with encounters within 15 percent of 1,500 (*i.e.*, below 1,725).[75] And if, consistent with the September 27 Proclamation, one includes such UCs, the Departments have observed 15 such days.[76] These single-day figures suggest that the threshold for discontinuation, as revised, will be met if migration dynamics change for a sustained period.

2. Clarifying Changes to Regulatory Text

This final rule also makes clarifying changes to the regulatory text. In §§ 208.35(b)(2) and 1208.35(b)(2)(iii), the Departments removed from the definition of "reasonable probability" the clause: "that the alien would be persecuted because of his or her race, religion, nationality, membership in a particular social group or political opinion, or tortured, with respect to the designated country or countries of removal." The Departments believe that the remaining definition of "reasonable probability"—"substantially more than a reasonable possibility, but somewhat less than more likely than not"—accurately defines the reasonable probability standard. The deleted clause describes what the AO or IJ is assessing for rather than what the standard means, so it need not be part of the standard's definition.

3. Other Technical Changes

The final rule also implements two technical changes. First, the rule replaces the term "alien" with "noncitizen" where it appears in 8 CFR 1208.35. *See* 8 CFR 1001.1(gg). Second, the rule amends 8 CFR 208.35(a)(2)(i)(C) and 1208.35(a)(2)(i)(C) as well as the provisions of the Circumvention of Lawful Pathways rule at 8 CFR 208.33(a)(3)(i)(C) and 1208.33(a)(3)(i)(C) to update the cross-references to the definition of "victim of a severe form of trafficking in persons." Specifically, the rule replaces the cross-references to 8

---

[71] *See* OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (USBP Encounters by Fam Status tab).

[72] *See* OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (USBP Encounters by Fam Status tab). While the monthly average single adult encounters fell 53 percent between June 2023–May 2024 and June 2024–August 2024, and the monthly average number of encounters of individuals in family units fell 69 percent, encounters of non-contiguous UCs fell just 42 percent, and encounters of UCs overall fell just 37 percent. *Id.*

[73] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (USBP Encounters by Fam status tab).

[74] *See* OHSS analysis of July 2024 OHSS Persist Dataset (Trigger Analysis tab). The Departments rely on data from FY 2013 through FY 2019 and not data from the pandemic period given the unique circumstances dictating migratory trends during the latter time.

[75] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Section 2c Encounters tab).

[76] *See id.*

**81168** **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

CFR 214.11 with cross-references to 8 CFR 214.201. This change recognizes that on August 28, 2024, after the Departments published the IFR, DHS's rule Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status, 89 FR 34864 (Apr. 30, 2024),[77] became effective, which moved the definition of "victim of a severe form of trafficking in persons" from § 214.11 to § 214.201. *See id.* at 34931–32.

*D. Rule Provisions*

The rule contains the following key provisions:

• The rule applies to certain individuals who seek asylum, statutory withholding of removal, or CAT protection during emergency border circumstances giving rise to this rule and to the suspension and limitation on entry under the June 3 Proclamation, as amended by the September 27 Proclamation. *See* 8 CFR 208.13(g), 208.35, 235.15, 1208.13(g), 1208.35.

• The rule establishes that those who enter across the southern border during emergency border circumstances and who are not described in section 3(b) of the June 3 Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family as described in 8 CFR 208.30(c) with whom they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.201. *See* 8 CFR 208.13(g), 208.35(a), 1208.13(g), 1208.35(a). Exceptionally compelling circumstances may also be established for noncitizens in section 240 removal proceedings or the asylum merits interview ("AMI") process under specified conditions to ensure family unity. *See* 8 CFR 208.35(c), 1208.35(c).

• The rule also establishes that, during emergency border circumstances, rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, for those who enter across the southern border and are not described in section 3(b) of the June 3 Proclamation, DHS will provide general notice regarding the process for seeking

asylum, statutory withholding of removal, and protection under the CAT and will refer a noncitizen for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to their country or the country of removal. *See* 8 CFR 235.15.

• The limitation on asylum eligibility will be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the June 3 Proclamation will receive a negative credible fear determination with respect to their asylum claim unless there is a significant possibility that the noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation does not apply or that they meet an exception. Such noncitizens will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, a higher standard than that applied to noncitizens in a similar posture under the Circumvention of Lawful Pathways rule. The "reasonable probability" standard is defined to mean substantially more than a "reasonable possibility" but somewhat less than more likely than not. 8 CFR 208.35(b), 1208.35(b).

*E. Severability*

As stated in 8 CFR 208.13(h), 208.35(b)(3), 208.35(e), 235.15(g), 1208.13(h), 1208.35(b)(4), and 1208.35(e), the Departments intend for the provisions of the rule to be severable from each other and to be given effect to the maximum extent possible, such that if a court holds that any provision is invalid or unenforceable as to a particular person or circumstance, the other provisions will remain in effect as to any other person or circumstance.[78] *See* 89 FR at 48757–59. During emergency border circumstances, the Departments' abilities to refer and safely process noncitizens through expedited removal is overwhelmed and prevents the border security and immigration systems from delivering timely decisions and consequences to noncitizens arriving at the southern border. *See* 89 FR at 48714. Consequently, each provision of the rule

is designed to function sensibly without the others, and the Departments intend for them to be severable so that each can operate independently.

For example, the Departments intend for the "reasonable probability" screening standard to be used—even in the absence of a limitation on asylum eligibility, the manifestation of fear procedures, or the Proclamation—to screen for statutory withholding of removal and CAT protection claims if a noncitizen was otherwise unable to establish a credible fear of persecution for asylum purposes due to the Lawful Pathways rebuttable presumption. 8 CFR 208.35(b)(3), 1208.35(b)(4); *see* 8 CFR 208.35(b)(2), (e), 1208.35(b)(2), (e), 235.15(g); 89 FR at 48757. That approach ensures that, during emergency border circumstances, the Departments will continue to be able to benefit from the higher screening standard, even without the limitation on asylum eligibility this rule adopts.

To maintain operational flexibility, DHS similarly intends for manifestation of fear procedures under 8 CFR 235.15 to remain in effect, even without a limitation on asylum eligibility, the reasonable probability standard, or the Proclamation. *See* 8 CFR 235.15(g). As with the reasonable probability standard, allowing for the continued use of the manifestation of fear provisions absent the other portions of the rule or Proclamation ensures that such a tool remains available to the Departments during emergency border circumstances.

Finally, the Departments intend for the limitation on asylum eligibility to be severable from the manifestation of fear procedures, the reasonable probability standard, and the Proclamation because the limitation on asylum eligibility operates independently of those provisions and the Proclamation, and in the absence of those tools would likewise continue to be an important tool for addressing emergency border circumstances at the southern border. *See* 8 CFR 208.35(e), 1208.35(e).

**III. Public Comments and Responses**

The Departments received 1,067 comments on the IFR, the majority of which expressed opposition. A range of governmental and non-governmental entities, public officials, and private persons submitted comments. The Departments summarize and respond to the public comments below.

*A. Legal Authority and Background*

1. Legality Concerns

a. General Comments on Domestic Law

*Comment:* Commenters asserted that the rule violates domestic law and

---

[77] *See also* 89 FR 68081 (Aug. 23, 2024) (making corrections).

[78] Courts have uniformly held that the Administrative Procedure Act ("APA"), 5 U.S.C. 706(2), authorizes courts to sever and set aside "only the offending parts of the rule." *Carlson* v. *Postal Regulatory Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019); *see, e.g., K Mart Corp.* v. *Cartier, Inc.,* 486 U.S. 281, 294 (1988).

emphasized that U.S. law allows noncitizens to apply for asylum regardless of where they entered the United States. Some commenters described a fundamental right to apply for asylum for anyone inside the United States and stated that analysis of an asylum application should focus on the applicant's reasonable fear of persecution rather than manner of entry, criticizing what a commenter characterized as a categorical exclusion of those "apprehended between ports of entry from asylum eligibility, barring narrow exceptions." Commenters asserted that entering the United States either through a POE or across the southern border between POEs and asking for asylum constitutes a "lawful pathway." Other commenters stated that the Departments should not and cannot categorically deny asylum for reasons unrelated to the merits of the claim itself. One commenter claimed that the rule effectively closes the border and asserted that closing the border is unconstitutional.

Although some commenters agreed that the rule is within the scope of the Departments' authority and is consistent with the INA, other commenters claimed that the rule would violate the Refugee Act of 1980 and the INA, specifically section 208 of the INA, 8 U.S.C. 1158. Commenters claimed that the rule conflicts with the plain language of these provisions, which permit a noncitizen "physically present in the United States" to apply for asylum. Refugee Act of 1980, 94 Stat. at 105; INA 208(a)(1), 8 U.S.C. 1158(a)(1). Commenters asserted that the INA does not require those seeking protection to apply before entering or at a POE or to schedule an appointment through a website or app in order to make an application, but instead allows applications from anywhere along the border. Commenters also stated that, although Congress gave the Attorney General and the Secretary authority to impose additional limitations on asylum eligibility, such limitations must be consistent with legislation and congressional intent. Along the same lines, a commenter stated that the IFR undermines the separation of powers between Congress and the Executive Branch because it is Congress, not the Executive Branch, that enacts laws, and the IFR rewrites the INA.

*Response:* The Departments disagree that this rule is inconsistent with U.S. law or congressional intent. The rule does not effectively close the border, require the Departments to turn away migrants at the southern border, or categorically deny all asylum applications filed by noncitizens who

enter the United States across the southern border. Nor does the rule prohibit any noncitizen from seeking protection solely because of the manner or location of their entry into the United States. Rather, the rule is a limitation on asylum eligibility, as authorized by sections 208(b)(2)(C) and (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C) and (d)(5)(B), and the Departments' other discretionary authorities, *e.g.,* sections 103(a)(3), (g)(2), and 208(b)(1)(A) of the INA, 8 U.S.C. 1103(a)(3), (g)(2), and 1158(b)(1)(A). Given these authorities for the Departments to act, the Departments disagree that the IFR (or the final rule) violates the principle of separation of powers.

The rule's limitation on asylum eligibility does not prevent anyone from pursuing a claim for asylum, nor does it categorically foreclose eligibility for asylum. The Departments have authority to impose limitations on asylum eligibility. As explained above, the INA authorizes the Secretary and the Attorney General to establish, by regulation, "additional limitations and conditions, consistent with" section 208, under which a noncitizen "shall be ineligible for asylum." INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see also* INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B) (authorizing the Secretary and the Attorney General to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with [the INA]"). And section 208(b)(1)(A) of the INA, 8 U.S.C. 1158(b)(1)(A), authorizes the Secretary or the Attorney General to grant asylum in their discretion. The INA also provides the Secretary and the Attorney General authority to publish regulations governing their respective roles regarding apprehension, inspection and admission, detention and removal, withholding of removal, deferral of removal, and release of noncitizens encountered in the interior of the United States or at or between POEs. *See* INA 103(a)(3), (g)(2), 235(b)(1)(B)(iii)(III), (B)(iv), (C), 241(a)(3), (d)(2)(B), 8 U.S.C. 1103(a)(3), (g)(2), 1225(b)(1)(B)(iii)(III), (B)(iv), (C), 1231(a)(3), (d)(2)(B); *see also* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A).

Consistent with these authorities, the Departments have promulgated other limitations or conditions on asylum eligibility, including some provisions that Congress later adopted and codified in the INA. *See* Aliens and Nationality; Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980) (imposing firm resettlement bar); Aliens and Nationality; Asylum and Withholding of Deportation Procedures, 55 FR 30674,

30678, 30683 (July 27, 1990) (promulgating 8 CFR 208.14(c) (1990), which provided for mandatory regulatory bars to asylum for those convicted in the United States of a particularly serious crime or those who constitute a danger to the security of the United States while retaining a prior regulatory bar to asylum for noncitizens who were firmly resettled in a third country prior to entering in the United States); Asylum Procedures, 65 FR 76121, 76124 (Dec. 6, 2000) (providing that an applicant does not have a well-founded fear of persecution if they could avoid persecution by internally relocating); *see also, e.g., Afriyie* v. *Holder,* 613 F.3d 924, 934–36 (9th Cir. 2010) (discussing internal relocation), *overruled on other grounds by Bringas-Rodriguez* v. *Sessions,* 850 F.3d 1051 (9th Cir. 2017) (en banc); *Yang* v. *INS,* 79 F.3d 932, 935–36 (9th Cir. 1996) (holding that the regulatory firm resettlement limitation was a permissible exercise of the Attorney General's authority under the asylum statute). Restraining the Departments' authority to promulgate additional limitations and conditions on the ability to establish eligibility for asylum consistent with section 208 of the INA, 8 U.S.C. 1158, would be contrary to Congress' intent that the Departments' only constraint be that additional limitations and conditions are consistent with section 208, 8 U.S.C. 1158, and "this chapter." INA 208(b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(2)(C), (d)(5)(B); *see also DHS* v. *Thuraissigiam,* 591 U.S. 103, 112 (2020) (recognizing that the "theme" of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") "was to protect the Executive's discretion from undue interference by the courts" (alteration and internal quotation marks omitted)); *R–S–C* v. *Sessions,* 869 F.3d 1176, 1187 (10th Cir. 2017) (reasoning that the "delegation of authority" in section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), "means that Congress was prepared to accept administrative dilution" of section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1)); *INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 444–45 (1987); Circumvention of Lawful Pathways, 88 FR 11704, 11740 (Feb. 23, 2023).

The rule is within the scope of the Departments' authority and does not conflict with the statutory requirement that noncitizens "physically present in the United States" be permitted to apply for asylum because it adds a limitation on asylum eligibility as permitted under section 208(b)(2)(C) and (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C) and

**81170**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

(d)(5)(B). The limitation is not a sweeping categorical bar that would preclude a grant of asylum solely based on manner of entry, which some courts have found to conflict with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1). *E.g., East Bay Sanctuary Covenant* v. *Biden (East Bay III),* 993 F.3d 640, 669–70 (9th Cir. 2021) (concluding that a prior regulation that enacted a bar on asylum eligibility for those who entered the United States between designated POEs was "effectively a categorical ban" on migrants based on their method of entering the United States, in conflict with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1)).

Under this rule—and contrary to commenter assertions—manner of entry alone is never dispositive. Rather, the rule's limitation on asylum eligibility does not apply if a noncitizen establishes that exceptionally compelling circumstances exist. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). The rule provides that such exceptionally compelling circumstances include where the noncitizen, or a family member with whom they are traveling, faced an acute medical emergency; faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or was a victim of a severe form of trafficking in persons. 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

Specifically, the limitation at issue here turns on whether—during the emergency border circumstances described in the Proclamation and this rule—an individual has followed the lawful, safe, and orderly pathways that the United States Government has established, or shown exceptionally compelling circumstances, when it is essential that noncitizens use such pathways to ensure the Government's ability to manage the border.

Limitations and conditions on asylum eligibility do not need to directly relate to whether a noncitizen satisfies the definition of a "refugee" within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A), but instead can embrace policy considerations that justify a finding of ineligibility. *See, e.g., Zheng* v. *Mukasey,* 509 F.3d 869, 871 (8th Cir. 2007) (noting that IIRIRA included several provisions, including the one-year bar, "intended to reduce delays and curb perceived abuses in removal proceedings"); *Ali* v. *Reno,* 237 F.3d 591, 594 (6th Cir. 2001) (recognizing that asylum law "was never intended to open the United States to refugees who had found shelter in another nation and had begun to build new lives" (internal quotation marks and citation omitted));

*Matter of Negusie,* 28 I&N Dec. 120, 125 (A.G. 2020) (discussing the persecutor bar, and noting that Congress intended to make "certain forms of immigration relief," including asylum, "unavailable to persecutors"), *stayed by Matter of Negusie,* 28 I&N Dec. 399, 399 (A.G. 2021); *Singh* v. *Nelson,* 623 F. Supp. 545, 556 (S.D.N.Y. 1985) ("[A]ttempting to discourage people from entering the United States without permission . . . provides a rational basis for distinguishing among categories" of noncitizens who are not lawfully present.).

In sum, as with other conditions and limitations imposed by section 208(b)(2) of the INA, 8 U.S.C. 1158(b)(2), this rule is grounded in important policy objectives, including providing those with meritorious asylum claims an opportunity to have their claims heard in a timely fashion, preventing an increased flow of migrants arriving at the southern border that will overwhelm the Departments' ability to provide safe and orderly processing, and reducing the role of exploitative TCOs and smugglers. In seeking to enhance the overall functioning of the immigration system and to improve processing of asylum applications, the Departments are, in the exercise of their authority to promulgate limitations on asylum eligibility and in recognition of the limited resources provided by Congress, electing to implement a limitation on asylum eligibility that places greater weight on manner of entry. This limitation on asylum eligibility is expected to disincentivize irregular migration by those unlikely to establish exceptionally compelling circumstances during times when encounters exceed certain benchmarks and therefore challenge the Departments' ability to swiftly process single adults and individuals in family units encountered by USBP at the SWB through expedited removal. See Section II.A.2 of this preamble for further discussion of the Departments' experience with the IFR.

*Comment:* Commenters claim that the rule violates the principles of non-refoulement and nondiscrimination in the Refugee Act and other U.S. laws. Some commenters claimed the rule conflicts with congressional intent to create a uniform procedure for noncitizens applying for asylum regardless of manner of entry.

*Response:* The Departments disagree that the rule conflicts with U.S. law or congressional intent. The rule does not violate the principles of non-refoulement and nondiscrimination. And the rule does not conflict with what commenters describe as a congressional intent to create a uniform

procedure for noncitizens applying for asylum. *See Cazun* v. *Att'y Gen. U.S.,* 856 F.3d 249, 258 (3d Cir. 2017). The Departments may create additional substantive limitations and conditions on asylum eligibility—as Congress itself has done, and as Congress expressly authorized the Departments to do. INA 208(b)(2)(A), (b)(2)(C), 8 U.S.C. 1158(b)(2)(A), (b)(2)(C). Moreover, all noncitizens to whom the rule applies are subject to the same procedures for adjudicating their asylum claims as those who are not subject to the rule. The United States has implemented its non-refoulement obligations through section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3) (which is referred to as statutory withholding of removal) and the regulations implementing U.S. obligations under Article 3 of the CAT at 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, and 1208.18. The INA's provision in section 208, 8 U.S.C. 1158, for the discretionary granting of asylum instead aligns with Article 34 of the Refugee Convention, which is precatory and does not require any signatory to actually grant asylum to all those who are eligible. *See, e.g., Cardoza-Fonseca,* 480 U.S. at 441.

*Comment:* Commenters asserted that, under *Matter of Pula,* 19 I&N Dec. 467 (BIA 1987), manner of entry may not be the dispositive factor in deciding whether a noncitizen is eligible for asylum. Similarly, commenters argued that *Matter of Pula* is binding precedent and precludes consideration of manner of entry over all other factors. A commenter claimed that manner of entry can only be considered in determining whether a noncitizen merits asylum as a matter of discretion and not in determining whether the noncitizen is eligible for asylum.

*Response:* The rule is consistent with historical consideration of manner of entry as a relevant factor in considering whether to grant asylum as a matter of discretion. In *Matter of Pula,* the BIA identified—as relevant factors as to whether a noncitizen warrants the favorable exercise of discretion in granting asylum—the noncitizen's "circumvention of orderly refugee procedures," including their "manner of entry or attempted entry"; whether they "passed through any other countries or arrived in the United States directly"; "whether orderly refugee procedures were in fact available to help" in any transit countries; and whether they "made any attempts to seek asylum before coming to the United States." 19 I&N Dec. at 473–74. The BIA explained that section 208(a) of the INA, 8 U.S.C. 1158(a), required the Attorney General to establish procedures for adjudicating

applications filed by any noncitizen, "irrespective of such alien's status," but the BIA did not preclude consideration of the manner of entry in assessing whether to grant asylum. *Id.* at 473. The BIA also stated that while the manner of entry could "be a serious adverse factor, . . . it should not be considered in such a way that the practical effect is to deny relief in virtually all cases." *Id.* at 473. The BIA cautioned against placing "too much emphasis on the circumvention of orderly refugee procedures" as "the danger of persecution should generally outweigh all but the most egregious of adverse factors." *Id.* at 473–74.

While the Departments acknowledge that the rule places greater weight on manner of entry under certain emergency circumstances, this decades-old precedent establishes that the Departments can permissibly take into account manner of entry. Both how much weight to place on that factor and whether to do so in weighing asylum eligibility fall well within the broad discretion conferred on the Departments by section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). *Cf. Lopez* v. *Davis,* 531 U.S. 230, 243–44 (2001) (government can rely on rulemaking to "resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority" (quoting *Am. Hosp. Ass'n* v. *NLRB,* 499 U.S. 606, 612 (1991)); *Reno* v. *Flores,* 507 U.S. 292, 313 (1993) (noting that INS need not "forswear use of reasonable presumptions and generic rules" even where the statute "requires some level of individualized determination" (citations and quotation marks omitted)).

Under this rule, manner of entry, standing alone, is never dispositive. Rather, the limitation at issue here turns on whether—during the emergency border circumstances described in the Proclamation and this rule—an individual has followed the lawful, safe, and orderly pathways that the United States has established when it is essential that noncitizens use such pathways to ensure the United States' ability to manage the border. And even during these situations, the rule's limitation on asylum eligibility does not apply if a noncitizen establishes that exceptionally compelling circumstances exist. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). The rule provides that such exceptionally compelling circumstances include where the noncitizen, or a family member with whom they are traveling, faced an acute medical emergency; faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or was

a victim of a severe form of trafficking in persons. 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

In line with *Matter of Pula,* then, the rule considers factors other than manner of entry. And, like *Matter of Pula,* this rule provides for consideration of manner of entry in assessing eligibility for some asylum seekers in "a way that the practical effect is" not "to deny relief in virtually all cases." 19 I&N Dec. at 473. Rather, the manner of entry reduces the availability of relief only in limited circumstances—during emergency border circumstances described in the Proclamation and this rule—and only for those unable to establish exceptionally compelling circumstances.

The Departments also recognize that the specific analysis discussed in *Matter of Pula* (considering manner of entry in the discretionary decision of whether to grant asylum) is distinct from how this rule considers manner of entry (as part of provisions governing asylum eligibility). *See* 19 I&N Dec. at 472. The Departments, in exercising their broad discretion to issue regulations adopting additional limitations on asylum eligibility, are not bound to consider manner of entry only as a factor contributing to whether a particular noncitizen warrants a favorable exercise of discretion. While *Matter of Pula* allows manner of entry to be one factor in the consideration of whether a noncitizen merits a grant of asylum as a matter of discretion, it does not purport to restrict the Departments from considering a noncitizen's manner of entry in assessing eligibility. *Id.* at 473–74.

Moreover, while *Matter of Pula* considered manner of entry for purposes of a discretionary grant whereas the rule considers manner of entry as a limitation on asylum eligibility, adjudicators are not precluded from considering the same facts when evaluating both eligibility and discretion. Indeed, it is possible for a single fact to be relevant to both determinations. *See Kankamalage* v. *INS,* 335 F.3d 858, 864 (9th Cir. 2003) (concluding that a conviction did not render a noncitizen ineligible for asylum, but stating that the Board was "not prohibited from taking into account Kankamalage's robbery conviction when it decides whether or not to grant asylum as a matter of discretion"); *Matter of Jean,* 23 I&N Dec. 373, 385 (A.G. 2002) (concluding that even a noncitizen who "qualifies as a 'refugee'" and whose criminal conviction did "not preclude her eligibility" for asylum could

nevertheless be "manifestly unfit for a *discretionary* grant of relief").

The Departments conclude that this rule does not conflict with *Matter of Pula,* which remains the applicable standard for discretionary determinations in the absence of a regulation that otherwise governs the discretionary determination. *See, e.g., Thamotar* v. *U.S. Att'y Gen.,* 1 F.4th 958, 970–71 (11th Cir. 2021) (observing that discretionary asylum determinations continue to be governed by *Matter of Pula*); *Hussam F.* v. *Sessions,* 897 F.3d 707, 718 (6th Cir. 2018) (stating that "circumvention [of proper immigration procedures] may be taken into account as a 'serious adverse factor'" (quoting *Matter of Pula,* 19 I&N Dec. at 473)); *see also Andriasian* v. *INS,* 180 F.3d 1033, 1043–44 (9th Cir. 1999) (finding that reliance on certain *Matter of Pula* factors was inappropriate once regulations controlling discretionary denials of asylum on the basis of a petitioner's stay or opportunity to stay in a third country had been promulgated). And the Departments view *Matter of Pula* as providing support for the proposition that it is lawful to consider manner of entry for asylum applicants.

b. Statutory Conditions and Limitations on Asylum Eligibility

*Comment:* Commenters stated that the rule would be inconsistent with or would otherwise render superfluous the statutory firm-resettlement bar and safe-third-country bar. *See* INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi); INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A).

*Response:* This rule is within the Departments' broad authority to create new limitations on asylum eligibility, and the Departments disagree that the rule conflicts with any of the exceptions to a noncitizen's ability to apply for asylum or limitations on a noncitizen's eligibility for a grant of asylum under section 208(a)(2) or (b)(2) of the INA, 8 U.S.C. 1158(a)(2) or (b)(2).

The INA's firm-resettlement provision precludes a noncitizen who "was firmly resettled in another country prior to arriving in the United States" from demonstrating eligibility for asylum. INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi); *see also* 8 CFR 208.15, 1208.15 (2020).[79] The INA's safe-third-

---

[79] These regulations were amended by *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review,* 85 FR 80274 (Dec. 11, 2020), but the amendments were preliminarily enjoined. *See Pangea Legal Servs.* v. *U.S. Dep't of Homeland Sec.,* 512 F. Supp. 3d 966, 969 (N.D. Cal. 2021). This order remains in effect,

Continued

country provision prohibits a noncitizen from applying for asylum if the noncitizen "may be removed, pursuant to a bilateral or multilateral agreement" to a safe third country in which the noncitizen would not be subject to persecution and "would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A).

The rule does not conflict with or otherwise render the firm-resettlement bar or safe-third-country bar superfluous; instead, this rule and the statutory bars apply independently.

First, this rule has a different scope. In contrast to those statutory bars, this limitation on asylum eligibility only applies to those who enter the United States during emergency border circumstances. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1). Additionally, unlike those who are subject to the firm-resettlement or safe-third-country bars, those who are subject to this limitation on asylum eligibility are not categorically barred from applying for asylum or from being eligible for asylum, as application of the rule's limitation on asylum eligibility will be considered on a case-by-case basis, including to determine if exceptional circumstances apply to overcome this limitation.

The rule also serves a different purpose than those statutory bars. The INA's firm resettlement and safe-third-country provisions limit asylum eligibility and applications, respectively, for noncitizens who have available sustained protection in another country, and they help protect against forum shopping. *See Rosenberg* v. *Yee Chien Woo,* 402 U.S. 49, 55–56 (1971) (noting that the concept of firm resettlement is historically rooted in the notion of providing "a haven for the world's homeless people" while encouraging "other nations to do likewise"); *see also Maharaj* v. *Gonzales,* 450 F.3d 961, 988–89 (9th Cir. 2006) (en banc) (O'Scannlain, J., concurring in part and dissenting in part) (recognizing that the firm-resettlement provision protects against forum shopping, an issue "that our immigration laws have long sought to avoid"). The limitation on asylum eligibility adopted in this rule, by contrast, seeks to streamline the Departments' processing of noncitizens while upholding all screening and protection requirements, thereby conserving limited resources during the emergency border circumstances

and thus the 2020 version of these provisions—the version immediately preceding the enjoined amendment—is currently effective.

described in the Proclamation and this rule and allowing for enough resources to continue to process lawful cross-border trade and travel and noncitizens who present in a safe and orderly manner at a POE. The rule is also designed to encourage noncitizens to use lawful, safe, and orderly pathways to the United States during emergency border circumstances or to wait until such circumstances have abated, to the extent possible. Thus, the limitation has a different object and purpose, and it is consistent with those statutory provisions.

Moreover, the INA permits the Attorney General and the Secretary to create new eligibility limitations and does not limit this authority from overlapping with existing statutory conditions. *See R–S–C,* 869 F.3d at 1187 (noting that Congress's delegation of authority in section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), "means that Congress was prepared to accept administrative dilution" of the right to seek asylum); *cf. Hawaii,* 585 U.S. at 690–91 (recognizing that the existence of the Visa Waiver Program "did not implicitly foreclose the Executive from imposing tighter restrictions" in "similar" areas).

Indeed, section 208(b)(2)(C) and (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C) and (d)(5)(B), provide no subject-matter limit other than requiring any regulation be "consistent with" section 208 of the INA, 8 U.S.C. 1158, and the INA generally. *See R–S–C,* 869 F.3d at 1187 n.9. The limitation on asylum eligibility established by this rule is consistent with section 208 of the INA, 8 U.S.C. 1158, as a whole, and the INA generally, and it is consistent with the firm-resettlement and safe-third-country bars in particular.

### c. Expedited Removal

*Comment:* Several commenters claimed that the rule conflicts with the expedited removal process created by Congress in IIRIRA. Commenters noted that the statutory framework provides for preliminary screening of noncitizens in credible fear interviews, where noncitizens may apply for asylum after demonstrating a "significant possibility" that the noncitizen could establish eligibility for asylum. In this regard, one commenter asserted that Congress had intended the "significant possibility" standard to be a "low screening standard," but that the IFR "would convert the preliminary screening into a full adjudication" of whether the IFR applied and would eliminate the "significant possibility" standard "entirely for all asylum seekers covered[,] . . . forc[ing] them to meet an

even higher 'reasonable probability' standard." Commenters asserted that the rule's requirement that noncitizens instead show a "reasonable probability" of persecution or torture is in conflict with this statutory framework. Commenters further asserted that the rule effectively creates a new legal framework by which to evaluate asylum claims in conflict with the statutory process. One commenter claimed that the rule unlawfully shuts down the U.S. asylum system.

*Response:* The Departments disagree that the rule conflicts with the expedited removal process created by Congress. The expedited removal process is applicable to certain noncitizens arriving in the United States (and, in the discretion of the Secretary, certain other designated classes of noncitizens) who are found to be inadmissible under either section 212(a)(6)(C) of the INA, 8 U.S.C. 1182(a)(6)(C), which renders inadmissible noncitizens who make certain material misrepresentations, or section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7), which renders inadmissible noncitizens who lack documentation required for admission. INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). Upon being subject to expedited removal, such noncitizens may be "removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." *Id.*

Congress created a screening process, known as "credible fear" screening, to identify potentially valid claims for asylum by noncitizens in expedited removal proceedings. *See* INA 235(b)(1)(A)(ii), (B), 8 U.S.C. 1225(b)(1)(A)(ii), (B). But Congress has not provided for such a screening for statutory withholding of removal or CAT protection. In the absence of a statutory process for screening for potential eligibility for statutory withholding of removal and CAT protection, the Departments have also used the credible fear screening process to identify potentially valid claims for such protection. *See generally* 8 CFR 208.30, 1003.42, 1208.30 (providing for screenings for potential eligibility for statutory withholding of removal and CAT protection alongside screening for potential asylum eligibility). If a noncitizen indicates a fear of persecution or torture, a fear of return, or an intention to apply for asylum during the course of the expedited removal process, DHS refers the noncitizen to an AO to determine whether the noncitizen has a credible fear of persecution or torture in the

country of nationality or removal. INA 235(b)(1)(A)(ii), (B), 8 U.S.C. 1225(b)(1)(A)(ii), (B); *see also* 8 CFR 208.30(e)(2), 235.3(b)(4); *id.* 208.13(b)(1)–(2), 1208.13(b)(1)–(2) (defining the grounds for asylum eligibility); *id.* 208.16(b)–(c), 1208.16(b)–(c) (defining the grounds for statutory withholding of removal and CAT protection). A noncitizen has a "credible fear of persecution" if "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v).

Just as the statute is silent on the availability of screening procedures for statutory withholding of removal and CAT protection, it is also silent on the standard applied during such screenings. By regulation, the Departments have applied the "significant possibility" standard to also screen for potential eligibility for statutory withholding of removal and CAT protection, *see* 8 CFR 208.30(e)(2)– (3), 1003.42(d): AOs must determine whether "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien can establish eligibility . . . for withholding of removal under section 241(b)(3) of the Act," 8 CFR 208.30(e)(2), and whether the noncitizen "shows that there is a significant possibility that the alien is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to § 208.16 or § 208.17," 8 CFR 208.30(e)(3). If the AO determines that the noncitizen does not have a credible fear of persecution or torture in the proposed country of removal, the noncitizen may request that an IJ review that determination. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.16(b)– (c), 208.30(g), 208.33(b)(2)(v), 1208.16(b)–(c), 1208.30(g).

To the extent commenters allege that the Departments are not applying the "significant possibility" standard to screen for asylum eligibility—such as for application of the limitation on asylum eligibility—the commenters are mistaken. Under this rule, the AO or IJ determines whether there is a significant possibility that the noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation does not apply or that they meet the exception

for exceptionally compelling circumstances. The "significant possibility" standard applies by statute, section 235(b)(1)(B)(v) of the INA, 8 U.S.C. 1225(b)(1)(B)(v), and the regulation does not in any way displace that standard, by its terms or otherwise. The Departments did not explicitly include this language in the regulation itself. This is because the provisions regarding credible fear screenings at 8 CFR 208.35(b) and 1208.35(b)(2) generally explain the order of operations—instructing the AO or IJ to consider the limitation first before considering the rest of the asylum claim. In other rules adopting conditions and limitations on asylum eligibility, the Departments have consistently used the regulatory text to explain the order of operations for consideration of the limitations during credible fear screenings without explicitly restating the applicable statutory standard,[80] while at the same time explaining that the "significant possibility" standard applies in the preamble.[81] Deviating from the Departments' practice here could wrongly imply that, in other regulations pertaining to the credible fear process, the default standard of proof for AO and IJ determinations is something other than the "significant

possibility" standard. To avoid that unwanted implication, the Department declines to modify the text of §§ 208.35 and 1208.35 as well. The "reasonable probability" standard does not affect or change the "significant possibility" standard used to screen for asylum eligibility, which, as discussed above, is set by statute and remains in effect for asylum claims in the credible fear process. Accordingly, the Departments disagree with the claim that the use of the "reasonable probability" standard for the purposes of screening for potential eligibility for statutory withholding of removal and CAT protection would eliminate, or in any way affect, the "significant possibility" standard as it applies to screening for asylum eligibility.

The Departments also disagree that the rule's application of the "reasonable probability" standard to screen for potential eligibility for statutory withholding of removal or CAT protection is inconsistent with the "significant possibility" standard under the expedited removal statute. As the Departments observed previously, "Congress clearly expressed its intent that the 'significant possibility' standard be used to screen for asylum eligibility but did not express any clear intent as to which standard should apply to other applications." 88 FR at 11742. Section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and FARRA section 2242 are silent as to what screening standards and procedures are to be employed in determining potential eligibility for statutory withholding of removal or CAT protection, and the INA elsewhere confers broad discretionary authority to establish rules and procedures for implementing those provisions. *See, e.g.,* INA 103(a)(3), (g)(2), 8 U.S.C. 1103(a)(3), (g)(2). Accordingly, the Departments have some discretion to articulate the screening standard for claims for statutory withholding of removal and CAT protection. As further discussed in Section III.C.3 of this preamble, the Departments continue to believe that during the emergency border circumstances described in the IFR and this rule, the "reasonable probability" screening standard is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection and better captures the population of noncitizens with potentially valid claims for such protection. *See* 89 FR at 48745–47.

Thus, despite the claims of some commentators, the rule does not effectively shut down the U.S. asylum system or deviate from applicable statutory standards. Noncitizens still

---

[80] For example, under the Circumvention of Lawful Pathways rule, "[t]he asylum officer shall first determine whether the alien is covered by the presumption . . . and, if so, whether the alien has rebutted the presumption[.]" 8 CFR 208.33(b)(1); *see also* 8 CFR 1208.33(b)(2) ("The immigration judge shall first determine whether the alien is covered by the presumption at 8 CFR 208.33(a)(1) and 1208.33(a)(1) and, if so, whether the alien has rebutted the presumption in accordance with 8 CFR 208.33(a)(3) and 1208.33(a)(3)."); *Asylum Eligibility and Procedural Modifications,* 84 FR 33829, 33843– 45 (July 16, 2019) (interim final rule amending and adding provisions at 8 CFR 208.13(c)(4)(i) through(iii), 1003.42(d)(2) and(3), and 1208.30(g)(1)(i) through (ii), providing the order of operations for applying two now-rescinded bars to asylum eligibility); 88 FR at 31319; *id.* at 31449 (adding amendatory instructions to remove regulatory provisions added to implement the bars to asylum eligibility adopted in two prior rules).

[81] *See, e.g.,* 89 FR at 48755 (explaining that, during the credible fear interview, "the AO will first determine whether there is a significant possibility that the noncitizen is eligible for asylum in light of the [rule's] limitation on asylum eligibility"); *id.* at 48757–58 (discussing the application of the "significant possibility" standard under the rule during IJ review of a negative credible fear determination); 84 FR at 33837 ("If there is a significant possibility that the alien is not subject to the eligibility bar [and the alien otherwise demonstrates that there is a significant possibility that he or she can establish eligibility for asylum], then the alien will have established a credible fear."); *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims,* 83 FR 55934, 55943 (Nov. 9, 2018) ("If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates sufficient facts pertaining to asylum eligibility), then the alien will have established a credible fear.").

may seek asylum and protection in the United States.

d. General Comments on International Law

*Comment:* Commenters generally asserted that the rule violates international law. A commenter wrote that seeking asylum is a human right guaranteed by international law and the rule unjustly denies people this right. In this regard, a commenter asserted that the use of emergency border circumstances as a justification for promulgating the rule is insufficient to justify violating international law and that the lack of a time frame or sunset provision denies access to migrants seeking asylum and places them at risk of refoulement. Commenters claimed that the rule imposes prohibited penalties on asylum seekers, bars refugees from a path to citizenship, and impermissibly discriminates based on manner of entry, race, and nationality. A commenter stated that regulations that deny access to asylum based on arbitrary factors that do not relate to a person's status as a refugee are inconsistent with the Refugee Convention and that the United States has an obligation under the Convention to provide a "fair and efficient refugee status determination procedure" to individuals in the U.S. asylum process.

Commenters were concerned that the rule violates the United States's non-refoulement obligations under the Refugee Convention (through the Refugee Protocol) and Article 3 of the CAT. For example, commenters predicted many noncitizens would not be able to satisfy the comparatively higher standards of proof for statutory withholding of removal and CAT protection claims and that, in turn, would lead to the refoulement of persons who, if not for the rule's limitation on asylum eligibility, would have been granted asylum. Several of these commenters also asserted that statutory withholding of removal and CAT protection are insufficient to satisfy the United States's non-refoulement obligations because they afford lesser protection than asylum. Commenters expressed apprehension that the rule would result in the turning away of migrants who seek refuge at the southern border.

Another commenter wrote that the rule is consistent with U.S. commitments under the Refugee Protocol and the CAT, reasoning that neither is self-executing and therefore the United States is bound only by its own law implementing these treaties. The commenter acknowledged that the United States implements its non-

refoulement obligations through the withholding of removal statute at section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). Another commenter, however, asserted that the argument that asylum is discretionary under U.S. law and therefore the rule does not violate the Refugee Protocol is incorrect as a matter of international law, even if true under domestic law, because parties to the Refugee Convention must provide asylum and protection from refoulement to those who meet the definition of "refugee."

*Response:* This rule is consistent with the United States' international treaty obligations. Three primary documents govern the rights of refugees and corresponding obligations of states in international law: the Refugee Convention; the Refugee Protocol, which incorporates Articles 2 through 34 of the Refugee Convention; and the CAT. 88 FR at 31384. Together, these documents provide a framework for states to provide protection to noncitizens fleeing persecution or torture and establish the principle of non-refoulement, which prohibits states from returning refugees to territories in specific circumstances. *Id.*

These treaties, however, do not prescribe or impose any particular minimum procedures for implementation of non-refoulement obligations. Although the United States is a party to the 1967 Refugee Protocol [82] and the CAT, these treaties are not directly enforceable in U.S. law. *See INS* v. *Stevic,* 467 U.S. 407, 428 & n.22 (1984); *Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation."); *Omar* v. *McHugh,* 646 F.3d 13, 17 (D.C. Cir. 2011) (explaining that the CAT "is non-self-executing and thus does not itself create any rights enforceable in U.S. courts"). Instead, the United States has implemented its obligations through domestic legislation and implementing regulations. The Refugee Convention's non-refoulement obligation is contained in Article 33.1, which prohibits contracting states from returning a refugee to a territory "where his life or freedom would be threatened" on account of an enumerated ground. 19 U.S.T. at 6276,

189 U.N.T.S. at 176. The United States has implemented the non-refoulement provisions of Article 33.1 of the Refugee Convention through the withholding of removal provisions at section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), rather than through the asylum provisions at section 208 of the INA, 8 U.S.C. 1158. *See Cardoza-Fonseca,* 480 U.S. at 429, 440–41. The CAT's non-refoulement provision is in Article 3, which prohibits the return of a person to a country where there are "substantial grounds for believing" the person will be tortured. S. Treaty Doc. No. 100–20 at 20, 1465 U.N.T.S. 85, 114. The United States has implemented its obligations under Article 3 of the CAT through regulations. *See* FARRA, Public Law 105–277, sec. 2242(b), 112 Stat. 2681–761, 2681–822 (codified at 8 U.S.C. 1231 note); *see also, e.g.,* 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, 1208.18. The rule does not change or limit ultimate eligibility for statutory withholding of removal or CAT protection. Instead, applicants subject to the rule's limitation on asylum eligibility will be screened for potential eligibility for statutory withholding of removal and CAT protection under a "reasonable probability" standard, which is lower than the ultimate statutory or regulatory standard of proof for those forms of protection.

The rule will limit asylum eligibility for some noncitizens. But, as the Supreme Court has explained, asylum "does not correspond to Article 33 of the Convention, but instead corresponds to Article 34[,]" which provides that contracting countries "shall as far as possible facilitate the assimilation and naturalization of refugees." *Cardoza-Fonseca,* 480 U.S. at 441 (quoting Refugee Convention art. 34, 19 U.S.T. at 6276, 189 U.N.T.S. at 176); *see also* United Nations High Commissioner for Refugees ("UNHCR"), *Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* 16 para. 25 (2019 ed.) ("[T]he granting of asylum is not dealt with in the 1951 Convention or the 1967 Protocol"). Article 34 "is precatory; it does not require the implementing authority actually to grant asylum to all those who are eligible." *Cardoza-Fonseca,* 480 U.S. at 441. Because the limitation on asylum eligibility does not affect ultimate eligibility for statutory withholding of removal or protection under the CAT regulations, the rule is consistent with U.S. non-refoulement obligations under the Refugee Protocol (incorporating,

---

[82] *See Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 169 n.19 (1993) ("Although the United States is not a signatory to the [1951 Refugee] Convention itself, in 1968 it acceded to the United Nations Protocol Relating to the Status of Refugees, which bound the parties to comply with Articles 2 through 34 of the Convention as to persons who had become refugees because of events taking place after January 1, 1951." (citation omitted)).

among other things, Article 33 of the Refugee Convention and the CAT. *See R–S–C,* 869 F.3d at 1188 n.11 (explaining that ''the Refugee Convention's nonrefoulement principle—which prohibits the deportation of aliens to countries where the alien will experience persecution—is given full effect by the Attorney General's withholding-only rule''); *Cazun* v. *Att'y Gen. U.S.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017); *Ramirez-Mejia* v. *Lynch,* 813 F.3d 240, 241 (5th Cir. 2016).

The Departments agree that asylum is an important form of protection and acknowledge that the right to seek asylum has been recognized under the Universal Declaration of Human Rights (''UDHR''), art. 14, G.A. Res. 217A (III), U.N. Doc. A/810 (1948). The UDHR is a nonbinding human rights resolution of the UN General Assembly, and thus it does not impose legal obligations on the United States. *See Sosa* v. *Alvarez-Machain,* 542 U.S. 692, 734–35 (2004) (''[T]he [UDHR] does not of its own force impose obligations as a matter of international law.'').

Moreover, although the rule creates a limitation on eligibility for asylum, the rule does not bar those seeking asylum from taking part in procedures that protect them from refoulement. Under the rule, all noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are referred for a credible fear interview. Even in those cases where the AO determines that the noncitizen has not established a significant possibility that they could ultimately demonstrate by a preponderance of the evidence that they are not subject to the limitation on asylum eligibility or are excepted from it, the noncitizen may still demonstrate credible fear by showing a reasonable probability of persecution or torture. Similarly, even if found ineligible for asylum by an IJ due to the application of the limitation on asylum eligibility, a noncitizen may still demonstrate eligibility for statutory withholding of removal or CAT protection.

The rule is also consistent with the Refugee Convention and the corresponding obligations under international law, including the specific provisions cited by commenters. The rule does not violate the nondiscrimination requirement in Article 3 of the Refugee Convention. Article 3 prohibits discrimination on the basis of ''race, religion or country of origin.'' 19 U.S.T. at 6264, 189 U.N.T.S.

at 156. The rule does not discriminate on the basis of any of the protected characteristics described in Article 3. This rule is limited to the southern border because that is the U.S. border where emergency circumstances exist. The Departments acknowledge that this limitation will affect those noncitizens with easier access to the southern border and not those with easier access to other borders of the United States. However, the rule does not treat such noncitizens differently on that basis; the rule applies equally based on the actions of a noncitizen during emergency border circumstances. Specifically, the application of this rule is limited to those who enter the United States across the southern border during emergency border circumstances described in the Proclamation and this rule, are not described in section 3(b) of the Proclamation, and do not establish the existence of exceptionally compelling circumstances. For the same reason, the rule does not violate other antidiscrimination principles described in other international human rights treaties, including the International Convention on the Elimination of All Forms of Racial Discrimination, arts. 2–5, Dec. 21, 1965, T.I.A.S. No. 94–1120, 660 U.N.T.S. 195, and the International Covenant on Civil and Political Rights, arts. 2–3, Dec. 16, 1966, T.I.A.S. No. 92–908, 999 U.N.T.S. 171.

Similarly, the rule is consistent with Article 31.1 of the Refugee Convention, which prohibits states from ''impos[ing] penalties'' on refugees based on ''illegal entry or presence'' if such refugees are ''coming directly from a territory where their life or freedom was threatened'' and ''present themselves without delay to the authorities and show good cause for their illegal entry or presence.'' 19 U.S.T. at 6275, 189 U.N.T.S. at 174. As the commentary to the Refugee Convention explains, the term ''penalties'' in Article 31.1 refers ''to administrative or judicial convictions on account of illegal entry or presence, not to expulsion.'' UNHCR, *The Refugee Convention, 1951: The Travaux Préparatoires Analyzed with a Commentary by Dr. Paul Weis* 219, *https://www.unhcr.org/us/media/refugee-convention-1951-travaux-preparatoires-analysed-commentary-dr-paul-weis; see Cazun,* 856 F.3d at 257 & n.16 (rejecting argument that the reinstatement bar on asylum was a ''penalty'' within the meaning of Article 31.1). The rule does not change any rules or policies relating to detention or convictions for unlawful entry or presence. The Departments acknowledge that the Ninth Circuit

concluded in *East Bay III,* 993 F.3d at 674, that the bar to asylum at issue in that case violated Article 31.1 of the Refugee Convention because it imposed a ''penalty.'' As described in the IFR, the rule here does not create a categorical bar to asylum, but instead a limitation on asylum eligibility, and *East Bay III* accordingly does not address the lawfulness of this rule. 89 FR at 48735. Moreover, the Ninth Circuit's conclusion was erroneous because the denial of discretionary relief is not a penalty within the meaning of Article 31.1. *Id.* at 48736.

*Comment:* One commenter asserted that the IFR conflicts with the United States Supreme Court's decisions in *Murray* v. *Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64, 118 (1804), which generally states that ambiguous U.S. statutes should be interpreted to avoid conflicts with international law where possible, and *INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 436–37 (1987), which explained that ''one of Congress' primary purposes'' when passing the Refugee Act of 1980 ''was to bring United States refugee law into conformance with the 1967 [Refugee Protocol].''

*Response:* The Departments disagree with the commenter that the IFR conflicts with *Charming Betsy* or *Cardoza-Fonseca.*[83] As explained above, the rule is consistent with the United States' obligations under international law, specifically the Refugee Convention, the Refugee Protocol, and the CAT. The rule does not change the ultimate eligibility requirements for statutory withholding of removal or CAT protection and is consistent with the United States' non-refoulement obligations. Moreover, the rule does not prohibit any person from seeking asylum or, more importantly for purposes of U.S. non-refoulement obligations, from seeking or obtaining statutory withholding of removal or CAT protection. All noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are entitled to a credible fear interview. Even in cases in which the AO determines that the noncitizen is subject to the limitation on eligibility for asylum, the noncitizen may still receive a positive credible fear determination by

---

[83] For purposes of this response, the Departments assume *arguendo* that the *Charming Betsy* canon applies with respect to non-self-executing treaties. *See, e.g., Saleh* v. *Bush,* 848 F.3d 880, 891 n.9 (9th Cir. 2017) (noting that the question remains unsettled).

showing a reasonable probability of persecution or torture. Similarly, after applying for asylum before an IJ, a noncitizen may still demonstrate eligibility for statutory withholding of removal or CAT protection.

e. UNHCR Guidelines on International Protection

*Comment:* Commenters stated that the rule violates UNHCR statements and guidelines and the right to seek asylum guaranteed by Article 14 of the UDHR. Commenters also claimed that the pre-screening procedures in expedited removal proceedings are contrary to UNHCR guidelines and that adjudicators must instead provide full and individualized assessments of each asylum case.

*Response:* The Departments agree that asylum is an important protection in international law and acknowledge that the right to seek asylum has been recognized under article 14 of the UDHR. However, the UDHR is a nonbinding human rights resolution of the UN General Assembly and does not impose legal obligations on the United States. *See Sosa,* 542 U.S. at 734–35 ("[T]he [UDHR] does not of its own force impose obligations as a matter of international law."). Moreover, UNHCR's interpretations of, or recommendations regarding, the Refugee Convention and Refugee Protocol are "not binding on the Attorney General, the BIA, or United States courts." *INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 427 (1999). UNHCR's Handbook on Procedures and Criteria for Determining Refugee Status "itself disclaims such force, explaining that 'the determination of refugee status under the 1951 Convention and the 1967 Protocol . . . is incumbent upon the Contracting State in whose territory the refugee finds himself.'" *Id.* at 427–28 (quoting *Cardoza-Fonseca,* 480 U.S. at 439 n.22). Such guidance "may be a useful interpretative aid," *id.* at 427, but it does not impose obligations on the United States.

*Comment:* Commenters stated that the rule violates the Refugee Convention because the exclusion grounds in Article 1(F) of the Refugee Convention are exhaustive, yet the rule creates an exclusion ground not found in Article 1(F). The commenters acknowledged that the rule's limitation on asylum eligibility contains an exception but asserted that the exception is insufficient to comply with the Refugee Convention. Along the same lines, a commenter asserted that such exclusionary grounds should only be considered after an assessment of whether the noncitizen is a "refugee"

and be balanced against the need for protection itself, as is the order of procedures in a full merits hearing.

*Response:* The Departments disagree with the commenters' characterization of the limitation on asylum eligibility in this rule as a ground of exclusion like those in Article 1(F) of the Refugee Convention. Article 1(F) of the Refugee Convention provides that the provisions of the Convention "shall not apply to any person with respect to whom there are serious reasons for considering that" they have: (1) "committed a crime against peace, a war crime, or a crime against humanity"; (2) "committed a serious non-political crime outside the country of refuge prior to [their] admission to that country as a refugee"; or (3) "been guilty of acts contrary to the purposes and principles of the United Nations." As explained above, the United States has implemented the non-refoulement provisions of Article 33.1 of the Refugee Convention through the withholding of removal provisions at section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), rather than through the asylum provisions at section 208 of the INA, 8 U.S.C. 1158. This rule's limitation on asylum eligibility does not extend to statutory withholding of removal and therefore does not implicate the application of the Convention's exclusion grounds to the mandatory non-refoulement obligation of Article 33. *See R–S–C,* 869 F.3d at 1188 n.11 (explaining that "the Refugee Convention's nonrefoulement principle—which prohibits the deportation of aliens to countries where the alien will experience persecution—is given *full effect* by the Attorney General's withholding-only rule" (emphasis added)). Nor does the rule restrict who qualifies as a refugee. *Cf.* INA 101(a)(42), 8 U.S.C. 1101(a)(42) (excluding those who "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of" a protected ground from the "refugee" definition); UNHCR, *UNHCR Statement on Article 1F of the 1951 Convention* at 1 (July 2009), *https:// www.unhcr.org/us/media/unhcr-statement-article-1f-1951-convention* (providing that the exclusion grounds "exclude a person from being a refugee where there are serious reasons for considering that she/he has committed certain heinous acts").

In any event, the exclusion clauses of Article 1(F) of the Refugee Convention do not limit the United States from adopting additional or different limitations on asylum eligibility. Congress has implemented Article 1(F) in establishing mandatory bars to eligibility for statutory withholding of

removal. *See* INA 241(b)(3)(B), 8 U.S.C. 1231(b)(3)(B). Congress adopted certain parallel bars to asylum eligibility, *see, e.g.,* INA 208(b)(2)(A), 8 U.S.C. 1158(b)(2)(A), but also authorized the Departments to establish additional limitations on asylum eligibility, *see* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). As discussed earlier in this preamble, the asylum statute implements the precatory provision in Article 34 of the Convention, but neither the mandatory nor the precatory provisions of the Convention and Protocol are directly enforceable in U.S. law. *See Stevic,* 467 U.S. at 428 & n.22; *Al-Fara,* 404 F.3d at 743 ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation." (citations omitted)). Instead, the United States has implemented its obligations through domestic legislation and implementing regulations, and the Protocol "serves only as a useful guide in determining congressional intent in enacting the Refugee Act." *Barapind* v. *Reno,* 225 F.3d 1100, 1107 (9th Cir. 2000) (citations omitted). Thus, the Refugee Protocol does not circumscribe the United States' prerogative to establish limitations on asylum eligibility that extend beyond the exclusion grounds described in Article 1(F).

f. 2000 Protocol To Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children

*Comment:* A commenter stated that the rule conflicts with the United States' obligations under the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime, Nov. 15, 2000, 2237 U.N.T.S. 319 ("Trafficking Protocol"), and the Trafficking Victims Protection Act of 2000 ("TVPA"), 22 U.S.C. 7101 *et seq.,* because the rule will not prevent human trafficking and will instead drive trafficking networks further underground and make people more vulnerable to exploitation. The commenter stated that the reality of human movement and escape from harm will drive people to take other routes and reported that they had handled cases involving individuals who were mistreated after being forced to take on large debts to pay smuggling networks to seek safety in the United States. The commenter also claimed the rule will exacerbate violent crime, which increases asylum seekers' vulnerabilities to trafficking.

*Response:* The Departments disagree that the rule conflicts with U.S.

obligations under the Trafficking Protocol or the TVPA. At the outset, the Departments note that the Trafficking Protocol is separate from the Refugee Convention and Refugee Protocol; the Trafficking Protocol explicitly disclaims any impact upon those agreements or on the non-refoulement principle they contain. *See* Trafficking Protocol art. 14(1) (''Nothing in this Protocol shall affect the rights, obligations and responsibilities of States and individuals under international law, including . . . , in particular, where applicable, the 1951 Convention and the 1967 Protocol relating to the Status of Refugees and the principle of non-refoulement as contained therein.'').

In addition, the rule is consistent with the Trafficking Protocol and TVPA. Nothing in the IFR or the rule is implicated by or conflicts with the provisions of the Trafficking Protocol, none of which relate to limitations on asylum eligibility. Moreover, the IFR and this rule remain in line with the purpose of the Trafficking Protocol in protecting and assisting the victims of human trafficking,[84] as they specify that any person who can demonstrate by a preponderance of the evidence that they are a ''victim of a severe form of trafficking in persons'' as defined in 8 CFR 214.201 will thereby show exceptionally compelling circumstances, and will therefore not be subject to the rule's limitation on asylum eligibility. Similarly, the IFR and this rule are entirely consistent with the TVPA, which provides immigration relief to certain victims of a severe form of trafficking in persons who assist law enforcement (or meet certain exceptions), Public Law 106–386, sec. 107(e), 114 Stat. 1464, 1477, but does not otherwise implicate immigration authorities under title 8.

Regarding the commenter's concerns about smuggling and trafficking, the Departments believe the most helpful approach to prevent migrants from falling victim to smugglers and traffickers is to both discourage attempts to enter the United States irregularly and, ultimately, to increase the availability of lawful pathways for migration.

This rule is expected to continue to reduce irregular migration, which benefits human smuggling and trafficking organizations. The rule is also expected to reduce human trafficking and smuggling by reducing overall flows of migrants, thereby allowing the Departments to better manage their limited resources while

delivering consequences more swiftly through expedited removal for those without a legal basis to remain. *Id.* at 48762, 48766–67.

Moreover, CBP immigration officers (both USBP agents and CBP officers) have extensive experience interviewing and observing individuals. *Id.* at 48744. They are trained to identify potential trafficking victims or victims of crimes and to take appropriate follow up action. *Id.* The commenter's prediction that the rule may increase asylum seekers' vulnerabilities to trafficking is speculative and ignores CBP immigration officers' training and experience in combating and preventing human trafficking. Additionally, without this rule, incentives for irregular migration would likely increase, which would likely exacerbate the very vulnerabilities about which the commenter expressed concern, including by driving more migrants into the hands of human traffickers promising a pathway to the United States. *See id.* at 48714–15.

Regarding the commenter's concerns about the safety of noncitizens attempting to enter the United States, one cause of recent surges in irregular migration is smugglers and migrants' growing understanding that DHS's capacity to impose consequences at the border is limited by the lack of resources and tools that Congress has made available. *Id.* at 48714. The Departments assess that the IFR has significantly increased the ability to deliver timely decisions and consequences, combating contrary messaging and perceptions. *See* Section II.A.2 of this preamble; *see also* 89 FR at 48746. Additional discussion of the rule's incentive effects is found at Sections III.A.2 and III.B.2 of this preamble.

### 2. Justification and Statements on Need for the Rule

#### a. Rule Is Unjustified, Unsubstantiated, or Arbitrary

*Comment:* Several commenters argued that the Departments' reliance on the success of the Circumvention of Lawful Pathways rule to justify the IFR is erroneous because the evidence regarding the high levels of encounters at the border does not support implementing such ''extreme'' measures as those contained in the IFR. One commenter stated that the Departments cannot argue that the Circumvention of Lawful Pathways rule has been successful at alleviating the stress on the border and immigration systems while at the same time arguing that the measures in the IFR are needed to

address the surge in high levels of migration at the southern border. Another commenter argued that (1) the increase in encounters prior to the end of the Title 42 public health Order does not necessarily mean that encounters would have remained high after the Title 42 public health Order ended, and (2) it is implausible that the Circumvention of Lawful Pathways rule led to higher encounters prior to its implementation and lower encounters after its implementation, as most migrants did not know what the Circumvention of Lawful Pathways rule was before it was implemented. Thus, the commenter claimed, it is more likely that the end of the Title 42 public health Order was the reason for higher encounters prior to its end and lower encounters after its end. The commenter concluded that, as there is insufficient evidence to support the asserted success of the Circumvention of Lawful Pathways rule, a fundamental justification of the IFR, it is not justifiable to institute more stringent processes under the IFR.

Another commenter similarly took issue with the effectiveness of the Circumvention of Lawful Pathways rule, stating that it is well understood that the Title 42 public health Order drove border crossings to record highs, and the end of the Title 42 public health Order would therefore have led to a substantial decrease in border crossings without further policy changes. However, the commenter said the Departments claimed, without any evidence, that crossing levels under the Title 42 public health Order were somehow predictive of crossing levels after the Title 42 public health Order ended; the commenter said this assertion is contrary to the record.

*Response:* The Departments disagree with commenters' claim that there is not enough evidence demonstrating the Circumvention of Lawful Pathways rule's impact on encounters at the SWB. In the first month following the implementation of the Circumvention of Lawful Pathways rule, encounters between POEs along the SWB decreased by 69 percent compared to their peak just before the end of the Title 42 public health Order.[85] The Departments believe that overall encounters would not have decreased after the end of the Title 42 public health Order absent their implementation of policy changes, including the Circumvention of Lawful Pathways rule, to address the level of irregular migration. The Departments

---

[84] Trafficking Protocol art. 2.b, 2237 U.N.T.S. at 344.

[85] *See* Decl. of Blas Nuñez-Neto ¶ 13, *E. Bay Sanctuary Covenant* v. *Biden*, No. 18-cv-6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

agree with commenters that the Title 42 public health Order increased repeat crossing attempts, but as noted in the Circumvention of Lawful Pathways rule, repeat crossings were a contributing factor, but not the only reason, for the increase in overall encounters: for example, unique encounters with nationals of countries outside of Mexico and Northern Central America were also rising also increased in each of FYs 2022–2024, as compared with the pre-pandemic period.[86] In addition to the overall increase in encounters and unique encounters, several other factors caused the Departments to project a spike in average daily encounters in the run-up to the end of the Title 42 public health Order, including: (1) the prospect that DHS would no longer have a means to promptly expel migrants without a legal basis to stay in the United States following the termination of the Title 42 public health Order; (2) the presence of several large diaspora populations in Mexico and elsewhere in the hemisphere; (3) the unprecedented recent growth in migration from countries of origin not previously typically encountered; (4) the already large number of migrants in proximity to the SWB; and (5) the general uncertainty surrounding the expected impact of the termination of the Title 42 public health Order. *See* 89 FR at 48723; *see also* 88 FR at 31316. Consistent with their projections, the Departments planned for, and briefly observed, a very significant spike in average daily encounters. *See* 89 FR at 48723. Had these levels of migration persisted without the incentives put in place by the Circumvention of Lawful Pathways rule, encounters may have exceeded even the very high levels of irregular migration that the Departments observed under that rule. *See id.* at 48723–24. The Departments believe the Circumvention of Lawful Pathways rule mitigated the overall impact on the border security and immigration systems that would have been caused by an expected surge following the end of processing under the Title 42 public health Order. This is evidenced by the sharp initial drop CBP saw in overall encounters at the SWB in the weeks following the expiration of the Title 42 public health Order and when the Circumvention of Lawful Pathways rule

went into effect.[87] Instead of seeing a surge of migrants arriving at the border following the end of the Title 42 public health Order, there was a precipitous drop that lasted through June 2023.[88] At about the same time DHS assessed, and public reporting confirmed, that DHS messaging about the Circumvention of Lawful Pathways rule and associated measures were effective in dissuading potential migrants from attempting to cross the U.S. border due to the disincentives created by that rule.[89]

The Departments recognize that while the Circumvention of Lawful Pathways rule is a valuable tool available to the Departments to reduce irregular migration, it is not, by itself, able to mitigate all the factors influencing migration trends. Despite the success of the Circumvention of Lawful Pathways rule and complementary measures, for much of the immediate post-pandemic period until issuance of the IFR, border encounters remained higher than the Departments' abilities to consistently deliver timely decisions and consequences.[90] Therefore, even if the

evidence supporting the Circumvention of Lawful Pathways rule's success was inconclusive (which the Departments do not believe), the Departments would have adopted the IFR in response to the high number of migrants subsequently arriving at the southern border, overwhelming the Departments' resources and preventing them from delivering timely decisions and consequences to those who lack a lawful basis to remain.

The rule is a tailored approach designed to substantially improve the Departments' abilities to process noncitizens more expeditiously and deliver timely decisions and consequences to most noncitizens who cross between POEs into the United States during emergency border circumstances. As discussed in Section II.A.2 of this preamble, the IFR is working as intended. DHS is placing into expedited removal the majority of single adults and individuals in family units encountered by USBP at the SWB, the rule has reduced the percentage of noncitizens encountered at the SWB who are released, and DHS is more quickly removing a greater percentage of those without a legal basis to remain in the United States than during the immediate post-pandemic period, which in turn discourages additional crossings.[91] Since promulgating the IFR,

---

[86] Unique USBP SWB encounters of nationals of countries other than Mexico and Northern Central America were more than 30 times higher in each of FY 2022–FY 2024 (through May 2024) than in the pre-pandemic period. OHSS analysis of July 2024 Persist Dataset (USBP Encounters by Citizenship tab).

[87] Average daily CBP SWB encounters fell 68 percent from their May 12, 2023, level in the first 11 days after the CLP rule went into effect and remained at similar low levels throughout May and June 2024. OHSS analysis of July 2024 OHSS Persist Dataset (Encounters FY2000–2024 tab).

[88] *Id.* In July 2023, total monthly CBP SWB encounters remained below 200,000. While total encounters increased from August 2023 through December 2023, the same increase occurred between August 2022 and December 2022 while the Title 42 public health Order was still in place, suggesting that these surges are more consistent with seasonal migration trends that changes in U.S. immigration policy cannot unilaterally mitigate. *Id.*

[89] *See* Mary Beth Sheridan, Maria Sacchetti & Nick Miroff, *End of Title 42 Pandemic Border Policy Brings Reset, But No Sudden Rush,* Wash. Post (May 12, 2023), *https://www.washingtonpost.com/nation/2023/05/12/title-42-pandemic-ends-border-migrants/; see also* Valerie Gonzalez, *Migrants Rush Across U.S. Border in Final Hours Before Title 42 Asylum Restrictions are Lifted,* PBS (May 11, 2023), *https://www.pbs.org/newshour/politics/migrants-rush-across-u-s-border-in-final-hours-before-title-42-asylum-restrictions-are-lifted;* Decl. of Blas Nuñez-Neto ¶ 22, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18-cv-6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2); *Testimony of Blas Nuñez-Neto Before U.S. House of Representatives Committee on Homeland Security Subcommittee on Border Security and Enforcement on "Examining DHS' Failure to Prepare for the Termination of Title 42"* (June 6, 2023), *https://www.congress.gov/118/meeting/house/115908/witnesses/HHRG-118-HM11-Wstate-Nuez-NetoB-20230606.pdf.*

[90] Total daily SWB encounters averaged about 5,700/day in April and May 2024 and USBP SWB encounters averaged about 4,100/day, compared to averages of 1,600 and 1,300/day, respectively, in the pre-Pandemic period (OHSS analysis of July 2024 Persist Dataset (Encounters FY2000–2024 tab). In late 2023, while the Title 42 public health Order was in place, total encounters at the SWB reached all-time highs. OHSS's analysis of July 2024 Persist Dataset (Encounters FY2000–2024 tab) shows that total SWB encounters reached over 242,000 in November 2023 and over 301,000 in December

2023. Total SWB encounters for the month of May 2023 were approximately 207,000. This was the month the Title 42 public health Order ended and when the Circumvention of Lawful Pathways rule went into effect. Total SWB encounters for the following month (June 2023) dropped precipitously to 145,000 encounters, but total SWB encounters climbed back to 233,000 in August 2023 and remained at highly elevated levels through December 2023.

[91] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP August 6, 2024, for encounters since May 1, 2024 (Summary Statistics tab). For encounters under the IFR through July 31, 2024, 34 percent of bookouts of single adults and individuals in family unit were releases, compared to 64 percent in the immediate post-pandemic period. Thirty percent of bookouts from CBP custody were repatriations, up from 16 percent during the immediate post-pandemic period. Overall, DHS repatriated an average of approximately 1,370 noncitizens encountered at the SWB per day during the first two months of enforcement under the IFR, up from approximately 1,360 in the immediate post-pandemic period. *Id.* This marginal increase understates the actual impact of the IFR, however, given the sharp drop in encounters: repatriations of noncitizens encountered at the SWB as a share of SWB encounters were equivalent to 26 percent in the immediate post-pandemic period compared to 62 percent under the IFR—a rate that is also slightly higher than the pandemic period (58 percent, only 5 percent of which were title 8 repatriations) and the pre-pandemic period (61 percent, at a time of much lower encounters and when Mexicans and Northern Central Americans accounted for over 90 percent of USBP encounters). *Id.* For public reporting suggesting that migrants are aware of the IFR and that it has discouraged attempts to cross

USBP has placed 59 percent of noncitizen single adults and individuals in family units encountered at the SWB into expedited removal proceedings, compared to 18 percent of such noncitizens during the immediate post-pandemic period following the end of the Title 42 public health Order,[92] and 41 percent in the pre-pandemic period.[93]

While more noncitizens without a legal basis to remain in the United States were removed under the Circumvention of Lawful Pathways rule than in the pre-pandemic period, the Departments recognize that the volume of noncitizens arriving at the SWB remained beyond the Departments' capacity to timely process given the resources provided by Congress.[94] As explained in the IFR's preamble, once the Departments resumed widespread processing under their title 8 authorities, it became clear that, even with the Circumvention of Lawful Pathways rule's expanded measures to impose consequences along the SWB, substantial migration throughout the hemisphere, combined with inadequate resources and tools to keep pace, limited DHS's ability to meaningfully address the historic levels of encounters at the southern border. *See* 89 FR at 48713.

The Departments did not and have not represented that the Circumvention of Lawful Pathways Rule would singlehandedly resolve migratory pressures in the region; the Departments

into the United States irregularly, see Mariana Martínez Barbra & Caterina Morbiato, *US Border Policy Spurred Migrant Camps Hundreds of Miles Away in Mexico's Capital,* Associated Press, Sept. 1, 2024, *https://apnews.com/article/mexico-migrants-asylum-cbp-app-camps-22b49fabf6e4d7d25d2873d0637544fe.*

[92] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024. (Summary Statistics tab).

[93] *Id.*

[94] OHSS analysis of July 2024 OHSS Persist Dataset (Immediate Post-Pandemic Details tab). Although sustained high encounter rates outstripped the Departments' abilities—based on available resources—to process noncitizens through expedited removal in significant numbers in the immediate post-pandemic period, between May 12, 2023, and June 4, 2024, CBP placed into expedited removal an average of about 920 individuals encountered between POEs each day on average, and USCIS conducted more than 206,000 credible fear interviews, a record number. *Id.* Between May 12, 2023, and June 4, 2024, DHS removed or returned more than 796,000 noncitizens who did not have a legal basis to remain in the United States, the vast majority of whom crossed the SWB. *Id.* USBP encounters at the SWB decreased by 16 percent compared to the previous 12 months, to an average of 5,100 per day for the period from May 12, 2023, to June 4, 2024, *id.,* and border encounters remained below the levels projected to occur in the absence of the Circumvention of Lawful Pathways rule and complementary measures. April 2023 OHSS Encounter Projection.

only represent that it would reduce the number of daily encounters at the SWB that, absent intervention, were predicted to materialize in a post-Title 42 public health Order surge. The pre-IFR status quo of the broken immigration and asylum systems had become a driver for irregular migration throughout the region and an increasingly lucrative source of income for dangerous TCOs. *See* 89 FR at 48714. Without adequate countermeasures, those TCOs will continue to grow in strength, likely resulting in even more smuggling operations and undermining democratic governance in the countries where they operate. *See id.* All of these factors, taken together, pose significant threats to the safety and security of migrants exploited into making the dangerous journey to the SWB and the U.S. communities through which many such migrants transit. *See id.* at 48715.

Moreover, the Departments do not expect the Circumvention of Lawful Pathways rule or this rule to solve every migration problem in the region. Its provisions cannot account for every factor impacting the unprecedented level of migration occurring in the Western Hemisphere, which is why the Departments have instituted complementary measures such as creating lawful, safe, and orderly pathways. Thus far, as discussed in Section II.A of this preamble, this rule has demonstrated that it helps meet its goal of allowing the Departments to deliver timely decisions and consequences during emergency border circumstances.

*Comment:* Several commenters argued that the rule's characterization of the situation at the border as an "emergency" is arbitrary. Commenters took issue with the rule's use of the daily encounter thresholds to identify the existence of emergency border circumstances. One commenter argued that the circumstances that give rise to "emergency border circumstances" and so trigger the provisions of the rule have been met for quite some time and are not a uniquely emergent circumstance but a reflection of an increase in migration globally. Another claimed that rather than starting with an assessment of need, looking at the number of asylum seekers and the capacities of other countries in the region, the Departments began with the current level and allocation of resources in the United States and "work[ed] backwards from there."

Commenters also argued that the rule is arbitrary because it invokes emergency authority while simultaneously asserting that border crossings are down. One commenter

argued that the existence of this emergency is undercut by an almost 50 percent drop in unauthorized border crossings since December 2023, a period during which the Departments' threshold has nonetheless been met. Citing to a statement in Section III.B.2 of the IFR's preamble, a commenter stated the Departments "concede" that the rule was based on a fear of a future emergency rather than a current one.

Finally, one commenter wrote that if a unilateral declaration of an emergency is all that is required for a Federal agency to violate statutes and court decisions, then the Executive Branch could call everything an "emergency." The commenter claimed that the IFR's limitation on asylum eligibility violates section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), and is indistinguishable from prior regulations that imposed limitations on asylum eligibility that some courts have held unlawful. The commenter also claimed that the rule violates section 235 of the INA, 8 U.S.C. 1225, because it conditions a noncitizen's access to a credible fear interview on the ability to obtain a CBP One appointment. The commenter argued that labeling the situation at the southern border an emergency does not allow the Departments to disregard these statutes and court decisions.

*Response:* The Departments disagree that the numerical encounter thresholds are arbitrary and do not reflect the existence of "emergency" circumstances at the southern border. As explained in the IFR, emergency border circumstances exist when "encounters at the southern border exceed DHS's capacity to deliver timely consequences to most individuals who cross irregularly into the United States and cannot establish a legal basis to remain in the United States." 89 FR at 48711. Thus, an emergency border circumstance is a function of high levels of encounters combined with resource constraints that substantially limit DHS's ability to place eligible noncitizens into expedited removal, the primary consequence-delivery mechanism Congress has made available to the Departments for managing border encounters under title 8. *Id.* at 48714. When southern border encounters exceed DHS's ability to process noncitizens for expedited removal, DHS generally must release those noncitizens pending section 240 removal proceedings, a process that can take several years to conclude. *Id.* The comparatively abbreviated timeline of the expedited removal process serves as a powerful disincentive against the irregular migration of noncitizens without strong claims for asylum, and

**81180** **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

this disincentive is diminished when noncitizens are placed into section 240 removal proceedings, which may take several years to conclude.

Given the resources made available by Congress, the Departments determined that the daily encounter thresholds described in the June 3 Proclamation and this rule are a reasonable proxy for when such emergency border circumstances exist. *See* 89 FR at 48749–54. Specifically, when daily encounters average less than 1,500 for a sustained period, DHS anticipates that it "would be able to swiftly deliver a consequence to enough individuals to meaningfully impact migratory decisions and deter unlawful entries." *Id.* at 48752. In contrast, when daily encounters exceed 2,500, "DHS's ability to impose such consequences is significantly lower and decreases rapidly as encounters increase beyond that level." *Id.* For example, as noted in the IFR, during the FY 2013 to FY 2019 pre-pandemic period, USBP encounters only exceeded 1,500 per day for a sustained period from October 2018 to August 2019. *Id.* at 48753. During that 7-year period, an average of 210 individuals were released each day in months in which daily encounters were between 1,500 and 2,500, while approximately 1,300 individuals were released each day in months in which daily encounters exceeded 2,500, with CBP releasing as many as 46 percent of the individuals it processed pending section 240 removal proceedings. *Id.* (footnote omitted). And as discussed below in Section III.D.1 of this preamble, the Departments' demonstrated capacity during the immediate post-pandemic period confirms that these thresholds reflect current operational capacity. If Congress provides significant additional resources, the Departments may then reevaluate whether the current thresholds still serve as a reasonable proxy for when such emergency border circumstances exist.

Relatedly, the Departments disagree with commenters' suggestion that it was arbitrary to rely on the United States' own processing capacity and challenges as a justification for the rule without any consideration of the capacities of other countries in the region to address heightened migration. The Departments acknowledge that since 2021, due to political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere, which have severely strained the capacities of immigration systems in countries throughout the region. *See* 89 FR at 48722. The United States Government

has been working to address the root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[95] including by working closely with partner countries across the Western Hemisphere.[96] The Departments do not believe it would be appropriate to defer this rulemaking until foreign partners have developed enough capacity to absorb all irregular migrants, or to measure whether an emergency exists at the southern border by reference to whether such migrants have what commenters would view as sufficient opportunities to resettle elsewhere. Instead, the rule is part of the United States' efforts to act as a regional leader in responding to increased migratory flows. *See* Section III.E.1.a of this preamble. Moreover, the rule is structured to complement those regional efforts, as success in reducing push factors and in promoting alternatives to migration to the United States would contribute to decreasing encounter levels and alleviating emergency border circumstances. The rule permissibly responds to existing challenges at our southern border by providing effective safeguards that improve the Departments' ability to enforce the United States' immigration laws during periods of heightened migration by creating an incentive for noncitizens to use the lawful, safe, and orderly pathways that the Departments have put in place while simultaneously imposing swift consequences on those who do not have a legal basis to remain in the United States. *See* Section II.A.2 of this preamble. And this ability to impose consequences quickly, combined with a historic expansion of lawful pathways, is a critical element of the United States' ongoing diplomatic approach to migration management with partners in the region. *See id.* at 48759–60.

The Departments further note that the United States Government is working with regional partners in a concerted and historic effort via the groundbreaking Los Angeles Declaration on Migration and Protection to address the shared challenge of irregular migration that has strained the resources

of countries throughout the region.[97] The United States has taken steps to address migratory flows throughout the region by encouraging foreign partners to increase their enforcement efforts, integrate migrants residing in their territories, expand lawful pathways and processes, and channel intending migrants into those pathways.[98] The United States is also working to address the root causes of migration, such as a lack of opportunity, poor government and corruption, crime, and violence in countries across the region and the world.[99] However, these measures will take time to have significant impacts and have not been in effect long enough to alleviate the stress that high encounters impose on the United States border security and immigration systems. *See id.* at 48727. In the face of these challenges to the United States' own border and immigration systems, however, the Departments believe that it is appropriate to act at the southern border while pursuing efforts to address the root causes of migration more broadly.

Second, the Departments disagree that, prior to implementation of the IFR, there had not been emergency circumstances at the southern border. During the immediate post-pandemic period, average daily encounters were at levels that significantly exceeded the Departments' capacity to impose consequences on most noncitizens who crossed irregularly at the southern border.[100] As the June 3 Proclamation explains, the border security and immigration systems are badly strained and have been for many years. 89 FR at 48490. DHS processing facilities frequently become overcrowded, forcing DHS to release into the United States noncitizens who could otherwise be

---

[95] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https:// www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (committing to addressing root causes of migration).

[96] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration on Migration and Protection in Guatemala* (May 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala.*

[97] *See* The White House, *Press Release: Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[98] *Id.*

[99] *See* Marcela X. Escobari, *FPC Briefing: Migration Policy and the Biden-Harris Administration's Root Cause Strategy* (June 22, 2023), *https://www.state.gov/briefings-foreign-press-centers/migration-policy-and-the-biden-harris-admins-root-causes-strategy; see also* The White House, *Fact Sheet: Strategy to Address the Root Causes of Migration in Central America* (July 29, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/29/fact-sheet-strategy-to-address-the-root-causes-of-migration-in-central-america/.*

[100] OHSS analysis of July 2024 OHSS Persist Dataset (Summary Statistics tab) (reflecting that average daily encounters were over 5,100 per day during the immediate post-pandemic period). From May 12, 2023 through June 4, 2024, USBP referred a daily average of about 860 individuals encountered at the SWB into the expedited removal process. *See id.* (Imm Post-Pandemic ERCF tab).

processed for expedited removal, and place them into section 240 removal proceedings, the resolution of which can take years given the pre-existing backlog. By the end of the first half of FY 2024, despite EOIR being on pace to complete a record number of cases during FY 2024 and DHS maximizing expedited removal as much as resources allow, EOIR had received over 1 million initial receipts, some of which could have been processed for expedited removal had there been sufficient resources to do so, increasing the pending caseload before EOIR to over 3.1 million cases.[101] The Departments believe that releasing individuals who may otherwise be referred for expedited removal may inadvertently incentivize increased irregular migration and the exploitation of the asylum system, especially by human smugglers who encourage migrants to claim fear once they are encountered by USBP as it will allow them to remain in the United States for years pending resolution of their case and, where appropriate, removal. 88 FR at 31326. Moreover, maximizing credible fear screening capacity pulls resources away from USCIS processing cases in the affirmative asylum backlog, which had reached over 1.25 million cases as of the third quarter of FY 2024.[102] This vicious cycle is exactly the circumstance to which the rule is responding.[103] The decrease in encounter levels after December 2023 was not an indication that emergency border circumstances had abated or the IFR was not warranted, because encounters remained well above the daily encounter thresholds that, as described above, the Departments determined reflect the existence of emergency

border circumstances.[104] *See* 89 FR at 48752. That DHS had anticipated an increase in migration absent the IFR was not a concession that the rule was unnecessary. Rather, that projection reflected the urgent need to take immediate action, without which encounters would have increased, and the emergency border circumstances that existed at the time that the IFR was issued would have continued to worsen. *See* 89 FR at 48726. Given that daily encounters persistently remain above 1,500—and could rise above 1,500 again, even if they decline for a time—the IFR is currently and will remain an important policy tool.

Finally, the Departments disagree with one commenter's suggestion that the Departments are characterizing the situation at the southern border as an emergency to avoid complying with their legal obligations under the INA and certain court decisions. The commenter is incorrect because the rule is fully compliant with relevant provisions of the INA and applicable judicial decisions. For the reasons discussed in Section III.A.1 of this preamble, the rule is fully consistent with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1). Moreover, for the reasons discussed in Section III.C.1.a.i. of this preamble, the Departments also disagree that the rule conditions noncitizens' access to the credible fear process on the ability to obtain CBP One appointments in violation of section 235 of the INA, 8 U.S.C. 1225. Finally, for the reasons discussed in the IFR, *see* 89 FR at 48735–39, and Section III.A of this preamble, the Departments disagree with commenters' comparison between this rule and prior regulatory actions imposing a limitation on asylum eligibility that some courts have ruled unlawful.

*Comment:* Several commenters argued that the Departments justified the rule using mischaracterizations of asylum grant rates resulting from positive credible fear determinations. Commenters took issue with the Departments' reference to a "small proportion" of noncitizens in the credible fear process who are likely to

be granted asylum, stating that the Departments artificially deflated the grant rate by including cases where there was no decision on the merits—such as cases where the asylum application was withdrawn or not adjudicated, or the case was administratively closed—in calculating the proportion of cases where asylum was granted. Commenters argued that "'the majority of people who establish a credible fear of persecution are granted asylum' when their asylum claim is adjudicated," quoting a statistic claiming that 55 percent of noncitizens whose cases were decided on the basis of their asylum claim after a positive credible fear determination were ultimately granted asylum in FY 2022 and 2023.

Commenters said that the EOIR denial rate in cases originating from a credible fear claim is an unreliable indicator of meritless asylum claims because a denial could result from factors that have nothing to do with the underlying merits of the case, including: noncitizens' lack of timely access to counsel, translation issues, noncitizens' lack of familiarity with the statutory 1-year bar to filling an asylum application after entering the United States, and the significant discretion provided to IJs by law.

One commenter took issue with the Departments' claim that an increase in positive credible fear determinations was evidence that meritorious asylum claims were still making it through the initial screening process, saying that those subject to the Circumvention of Lawful Pathways rule's presumption of ineligibility for asylum are three times more likely to receive negative credible fear determinations than individuals not subject to the presumption. The commenter said it has documented examples of individuals subjected to the Circumvention of Lawful Pathways rule in expedited removal who were wrongfully ordered removed or refouled, outcomes that the commenter stated will only become more frequent under the IFR. The commenter concluded that the available evidence makes clear that many, if not most, people subject to the IFR will have plausible, or even grantable, claims for humanitarian relief.

A commenter alleged that the Departments' focus on the gap between historical credible fear interview screen-in rates and asylum grant rates is "willfully blind to reality." The commenter stated that the Departments "simply ignore the fact that," even before the IFR, such screen-in rates had declined dramatically, and that historical asylum grant rates were for a

---

[101] *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline.* Initial receipts equal removal, deportation, exclusions, asylum-only, and withholding only cases.

[102] USCIS, *Asylum Division Monthly Statistics Report: Fiscal Year 2024* (July 23, 2024), *https://www.uscis.gov/sites/default/files/document/reports/asylumfiscalyear2024todatestats_240630.xlsx.*

[103] 89 FR at 48489 ("Our broken immigration system is directly contributing to the historic migration we are seeing throughout the Western Hemisphere, exacerbated by poor economic conditions, natural disasters, and general insecurity, and this fact, combined with inadequate resources to keep pace, has once again severely strained our capacity at the border. The result is a vicious cycle in which our United States Border Patrol facilities constantly risk overcrowding, our detention system has regularly been at capacity, and our asylum system remains backlogged and cannot deliver timely decisions, all of which spurs more people to make the dangerous journey north to the United States.").

[104] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024. (Encounters FY2000–2024 tab). With the exception of the pandemic period (March 2020–May 2023), total SWB encounters for January 2024 and for FY 2024Q2 were the highest for the month of January and for Quarter 2 of the fiscal year since FY 2000, including over 4,000 average daily USBP encounters in January and nearly 5,000 in February (CBP SWB Encounter FY 2000–24 tab and Encounters FY2000–2024 tab). *See also* OHSS analysis of July 2024 OHSS Persist Dataset (USBP Encounters—Holiday Dip tab) (showing that encounters tend to dip immediately after each New Year before increasing again by the end of January).

population of people seeking asylum that, by the IFR's own admission, looked very different—and included many more single Mexican men seeking to work—than the current population of people seeking asylum. The commenter further objected that the Departments' focus on the gap between screen-in rates and merits rates ignores the fact that credible fear interviews are intended to be evaluated at a lower standard; according to the commenter, a screening interview is not, and cannot be, a merits adjudication.

*Response:* The Departments disagree that they have mischaracterized the data related to the percentage of EOIR asylum grants in cases originating from the credible fear process. The data consistently show that only a small percentage of cases referred for section 240 removal proceedings before EOIR after a credible fear determination ultimately result in a grant of asylum.[105]

In the IFR, the Departments noted that from FY 2014 through FY 2019, of the total SWB encounters with positive credible fear determinations, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief. 89 FR at 48743 n. 219. The Departments included the underlying data in the IFR docket.[106] The Departments acknowledge that the denominator includes cases where there was no decision on the merits of the asylum claim, such as, for example, applications that were withdrawn or not adjudicated, or where the case was administratively closed, terminated, or dismissed.[107] The Departments disagree, however, that this approach is misleading. The cited statistic demonstrates that the number of noncitizens who are placed in section 240 removal proceedings after the expedited removal process greatly exceeds the number of noncitizens who are ultimately granted relief or protection. Even if one excludes cases involving termination, dismissal, or administrative closure as well as in absentia removal orders, DHS and EOIR data show that from 2014 through 2019, of the total SWB encounters referred to EOIR after being processed for expedited removal, only 33 percent of

EOIR case completions ultimately resulted in a grant of relief on the merits.[108] The rate increases slightly to 36 percent if the "relief rate" is defined as all EOIR findings of non-removability and grants of asylum, statutory withholding of removal, CAT protection, cancellation of removal, and adjustment of status, divided by the sum of those grants and removal orders not issued in absentia.[109] Whether one uses the 18 percent, 33 percent, or 36 percent figure, the data demonstrate that historically there is a significant disparity between positive credible fear findings and ultimate grants of relief in section 240 removal proceedings.[110]

The Departments disagree with the statistical approach presented by at least one commenter who claimed that the majority of people (55 percent in FY 2023 and 2024) who establish a credible fear are ultimately granted asylum when their asylum claim is adjudicated. The commenter seems to have arrived at this statistic by dividing the number of asylum grants by the total number of grants and denials from a chart provided on EOIR's website.[111] But the EOIR chart also demonstrates that a large percentage of completed cases resulting from a positive credible fear determination involve noncitizens who never filed asylum applications once placed in section 240 removal proceedings or who abandoned or withdrew their applications.[112] The Departments believe that it is inaccurate to exclude these cases in assessing the disparity between positive credible fear findings and ultimate relief because the noncitizens in these cases did not actually pursue an asylum claim during section 240 removal proceedings even though the opportunity to pursue such a claim was the sole reason they were placed in section 240 removal proceedings rather than being removed on an expedited removal order. Instead,

relying on the most recent version of the EOIR chart cited by the commenter, if one includes these cases, which are numerous, in the denominator (and excludes cases where the asylum application was not adjudicated or the case was administratively closed), the ultimate grant rates for cases reflect a much smaller percentage than commenter's representation of the ultimate asylum grant rate. As EOIR's adjudication statistics reflect, the asylum grant rates of cases completed by EOIR in FYs 2022 and 2023 that originated with a credible fear claim were just 23 percent and 18 percent, respectively.[113]

The Departments cited these data to demonstrate the general point that there is a significant disparity between positive credible fear determinations and ultimate relief in section 240 removal proceedings, which can take years to resolve. *See* 89 FR at 48743 n.219 (noting that from FY 2014 through FY 2019, of the total SWB encounters with positive fear determinations, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief). That reality, as well as the length of time it can take before a removal takes place after a removal order is final, creates a strong incentive for some number of migrants without potentially meritorious claims to make the dangerous journey to the southern border to claim fear in order to take their chances on being allowed to remain in the United States for a lengthy period. And that risk is magnified by Congress's failure to provide the resources necessary to timely and effectively process and interview all those who invoke credible fear procedures through the expedited removal process at the southern border, particularly during periods of high encounters. The rule's limitation on asylum eligibility is intended in part to reduce this incentive and encourage migrants with meritorious asylum claims to use the lawful, safe, and orderly pathways that the United States Government has provided. *See* 89 FR at 48732.

Regarding commenters' concerns that the data cited include noncitizens whose asylum applications may have been denied for reasons unrelated to the meritoriousness of their underlying claim—such as noncitizens' lack of access to counsel, translation issues, noncitizens' lack of knowledge about the one-year bar, and IJ discretion—the Departments disagree that these potential issues would undermine the Departments' reliance on DHS and EOIR

---

[105] *See, e.g.,* EOIR, Adjudication Statistics: Asylum Decisions in Cases Originating with a Credible Fear Claim (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344831/dl?inline; see also* OHSS analysis of June 2024 Enforcement Lifecycle data (Historic ERCF Results Tab)

[106] *See* OHSS Data Spreadsheet Data for Securing the Border IFR, tab 219 (June 2024), *https://www.regulations.gov/document/USCIS-2024-0006-0003.*

[107] *See id.; see also* OHSS analysis of June 2024 Enforcement Lifecycle data (Historic ERCF Results tab).

[108] Relief on merits rate is defined as EOIR grants of asylum, conditional grants of asylum, or adjustment of status under statutory provisions divided by the sum of those grants of relief plus removal orders not issued in absentia. OHSS analysis of June 2024 Enforcement Lifecycle data (Historic ERCF Results tab).

[109] *See id.*

[110] *See id.*

[111] *See* Human Rights First, Correcting the Record: The Reality of U.S. Asylum Process and Outcomes (Nov. 2023) *https://humanrightsfirst.org/wp-content/uploads/2023/11/US-Asylum-process-and-outcomes-Fact-Sheet_Nov-2023.pdf* [citing EOIR, *Adjudication Statistics: Asylum Decisions and Filing Rates in Cases Originating with a Credible Fear Claim* (Oct. 12, 2023), *https://www.justice.gov/eoir/page/file/1062976/download*).

[112] *See, e.g.,* EOIR, *Adjudication Statistics: Asylum Decisions in Cases Originating with a Credible Fear Claim* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344831/dl?inline* (last visited Sept. 2, 2024).

[113] *See id.*

data to demonstrate the disparity between positive credible fear determinations and ultimate relief in section 240 removal proceedings. The factors cited by commenters exist in the absence of the rule and are not impacted by the rule. Furthermore, the Departments' procedures aimed at mitigating these concerns remain unchanged and are expected to continue mitigating those concerns. For example, all AOs are trained to elicit testimony and, even with this rule's changes to the credible fear screening process, the type of information sought to be elicited during a credible fear interview and IJ review is generally well within a noncitizen's knowledge, such that having an attorney is not necessary to secure a positive outcome. *See* Section III.B.2.a.ii of this preamble. USCIS also has language access policies in place to ensure that noncitizens have an interpreter for a language they understand during credible fear interviews and procedures to address interpretation and rare language issues. *See* 8 CFR 208.30(d)(5). Additionally, EOIR provides interpreters for noncitizens in section 240 removal proceedings.[114] Those long existing procedures remain in place under this rule. Nor have any of the procedural requirements for filing an asylum application changed, including the requirement that noncitizens must generally file their application within one year of their arrival in the United States, *see* section 208(a)(2)(B) of the INA, 8 U.S.C. 1158(a)(2)(B), and must show that they should be granted relief in the exercise of discretion. *See Delgado* v. *Mukasey,* 508 F.3d 702, 705 (2d Cir. 2007) ("Asylum is a discretionary form of relief . . . Once an applicant has established eligibility . . . it remains within the Attorney General's discretion to deny asylum.").

The Departments agree that credible fear screenings are not meant to mirror ultimate merits adjudications and that, by design, these screenings will result in some noncitizens being screened in who ultimately are not granted asylum or protection. However, the number of noncitizens who are granted asylum or other protection following a screening necessarily reflects the effectiveness of those screenings; the gap between the screen-in rate and the rate of those granted asylum or other protection matters. With a screening standard that is more likely to identify meritorious claims, the Departments expect to see a

higher share of screened in noncitizens ultimately granted relief or protection. While a credible fear screening in the expedited removal process takes place shortly after entry into the United States, the ultimate adjudication of an asylum (or other protection) claim may be months or years later. The outcome of the screening compared with the outcome of the asylum application's ultimate adjudication on the merits is an important measure of the credible fear interview's effectiveness at ensuring that meritorious asylum claims proceed in the application process because only cases that could be viable should continue on in the process.

Finally, the Departments acknowledge that, as with all screening mechanisms, there is some risk under the rule that a meritorious case might not proceed to a credible fear screening or a merits adjudication. The Departments believe that during emergency border circumstances, the rule's provisions strike an appropriate balance, and that the rule's benefits outweigh any potential marginal increase in the likelihood that a meritorious case would be missed or would fail under the rule's procedures, as discussed in more detail in Section III.C.3 of this preamble. The Departments reiterate that nothing in this rule prevents a noncitizen from raising a fear claim. All noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are referred for a credible fear interview. For the reasons discussed in Section III.C.2 of this preamble, DHS believes that the manifestation standard will continue to provide noncitizens with an adequate opportunity to seek relief and protection in the United States. Moreover, under the rule, those referred for a credible fear screening will continue to have an opportunity to have their claims assessed by an AO in a non-adversarial interview and will be able to seek IJ review of the AO's decision. Although many noncitizens may be subject to the limitation on asylum eligibility under this rule, during the credible fear interview and IJ review (if elected), they will still be screened for potential eligibility for statutory withholding of removal and CAT protection. In sum, as explained in the IFR, the Departments expect that these provisions will continue to produce accurate outcomes, although the Departments believe that the rule continues to be necessary and appropriate to address emergency

border circumstances even if this expectation turns out to be misplaced in close cases. 89 FR at 48750 n.250.

Indeed, as discussed in Section II.A.2 of this preamble, the Departments believe that the IFR is working to reduce the gap between high rates of referrals and screen-ins and the historically low percentage of those who are ultimately granted protection or relief, while still providing noncitizens with opportunities to raise and have their claims considered. The Departments believe that the difference between the positive credible fear rate during the pre-pandemic period and the rate under the IFR is attributable to the rule's limitation on asylum eligibility and the higher "reasonable probability" screening standard for statutory withholding of removal and CAT claims, which, as the Departments explained in the IFR, is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection, better captures the population of noncitizens with potentially valid claims for such protection, and will assist the Departments in addressing the emergency border circumstances described in the IFR. *See* 89 FR at 48745–46.

*Comment:* At least one commenter argued that the IFR is arbitrary and capricious because the Departments impermissibly use the availability of pathways not related to asylum or humanitarian relief as justification for reducing asylum access. The commenter stated that the availability of lawful pathways is not a factor that Congress intended the agencies to consider as a basis for limiting asylum.

*Response:* The Departments disagree with the assertion that the rule impermissibly relies on the availability of lawful, safe, and orderly pathways to reduce access to asylum. As an initial matter, the Departments note that the primary purpose of the rule's temporary limitation on asylum eligibility is to reduce the daily number of entrants by discouraging irregular migration during periods when the border security and immigration systems are over capacity and unable to effectively process noncitizens through expedited removal. *See* 89 FR at 48731–32. Because section 3(b)(v)(D) of the Proclamation contains an exception for arrivals at the SWB under a process approved by the Secretary, and because this rule's limitation on asylum eligibility excepts those who are described in section 3(b) of the Proclamation, the limitation will also not apply to such arrivals. *See id.* at 48754. In this way, the Proclamation

---

[114] *See* EOIR, *Director's Memorandum 23–02, Language Access in Immigration Court* 1–2 (June 6, 2023), *https://www.justice.gov/eoir/book/file/1586686/dl.*

and the rule continue to maintain incentives for noncitizens seeking protection to use the safe, lawful, and orderly process that the United States has provided. *See id.* at 48730–31 (stating that "applying the limitation on asylum eligibility will encourage noncitizens to make an appointment to present at the SWB, take advantage of other lawful migration pathways, or not undertake the dangerous journey north to begin with"); *see also id.* at 48754 (explaining that the rule "provides important exceptions that continue to incentivize the use of safe, orderly, and lawful pathways"). Indeed, the use of such pathways and tools to access those pathways, like the CBP One app, is critical for promoting efficient border processing especially during emergency border circumstances. *See id.* at 48737 ("During emergency border circumstances [the] use of the CBP One app is especially critical because it allows DHS to maximize the use of its limited resources." (citations omitted)); *see also* 88 FR at 31317–18 (explaining the benefits of having noncitizens pre-schedule appointments using the CBP One app). However, contrary to the commenter's claim, the rule does not impose a limitation on asylum eligibility based solely on the availability of such pathways. Rather, the rule's limitation applies to noncitizens who enter the United States across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation. *See* 8 CFR 208.13(g), 208.35(a), 1208.13(g), 1208.35(a). And even during these situations, the rule provides an exception for noncitizens (including those who do not use the lawful, safe, and orderly pathways) who demonstrate exceptionally compelling circumstances. *See* 8 CFR 208.35(a)(2), 1208.35(a)(2).

In any event, Congress did not preclude the Departments from considering a noncitizen's use of lawful pathways and processes as a factor when establishing conditions and limitations on asylum. As described in Section III.A.1.a of this preamble, in *Matter of Pula,* the BIA explained that a noncitizen's "circumvention of orderly refugee procedures," including their "manner of entry or attempted entry," is a relevant factor for discretionary asylum determinations, 19 I&N Dec. at 472–73, and this rule merely takes such circumvention into account to determine eligibility. And exactly how much weight to put on that factor and whether to do so in weighing asylum eligibility falls well within the broad discretion conferred by section

208 of the INA, 8 U.S.C. 1158, including section 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). For the reasons discussed in Section III.A.1 of this preamble and in the IFR, *see* 89 FR at 48733–38, this rule's limitation on asylum eligibility is consistent with the statute, a proper exercise of the Departments' authority, and distinguishable from the prior regulations that some courts have found invalid.

*Comment:* One commenter disagreed with the Departments' assertion that the IFR will undermine TCOs' ability to incentivize migrants to utilize irregular migration methods. The commenter argued that the IFR will instead have the opposite effect of forcing many migrants to use irregular routes, thus strengthening the organized smuggling operations and TCOs the agencies seek to combat. The commenter also argued that the IFR makes the "bizarre assertion that *new* measures punishing vulnerable people are necessary because" smuggling operations have ways to avoid existing asylum restrictions.

*Response:* The Departments disagree that the IFR will incentivize irregular migration and thereby strengthen organized smuggling operations and TCOs. The IFR has enhanced the disincentives to crossing irregularly, reducing the overall number of encounters between POEs. Through August 31, 2024, average daily total encounters between POEs at the SWB under the Proclamation and the IFR have fallen 59 percent from the level of average daily encounters during the "immediate post-pandemic period," *i.e.,* the period after the Circumvention of Lawful Pathways rule began to apply on May 12, 2023, and before the IFR entered into effect on June 5, 2024.[115] This rule addresses the reality of unprecedented migratory flows, the systemic costs those flows impose, and the ways in which increasingly sophisticated smuggling networks cruelly exploit the system for financial gain. The procedures in place before the publication of the IFR resulted in the release of a high proportion of migrants into the United States to await section 240 removal proceedings, creating a vicious cycle in which exploitative smuggling networks could effectively advertise that border crossers were likely to remain in the United States

upon arrival, encouraging higher encounter numbers, which in turn led to more releases. *See* 89 FR at 48714–15. This created a situation in which large numbers of migrants—regardless of their ultimate likelihood of success on an asylum or protection application—were subject to exploitation and risks to their lives by the networks that drove their movements north. *See id.* In contrast, the Departments believe that the reduction in migration resulting from this rule will, over time, weaken the TCOs that prey on migrants for profit by starving such TCOs of funding.

The IFR does not "punish[ ] vulnerable people," as the commenter alleges. The Departments explained that although heightened enforcement efforts by the United States and Mexico helped to mitigate very high levels of irregular migration, "[s]muggling networks are adaptable, responding to changes put in place. Despite their immediate effectiveness, such changes [in enforcement efforts] are not enough—and will almost certainly have diminished effect over time. The reality is that the scale of irregular migration over the past two years has strained the funding, personnel, and infrastructure of both countries' immigration enforcement systems in ways that have, at times, contributed to high encounters between POEs." 89 FR at 48726. The Departments further stated that "[w]ithout the Proclamation and this rule, the anticipated increase in migration will, in turn, worsen significant strains on resources already experienced by the Departments and communities across the United States." *Id.*

The rule is consistent with concern for vulnerable people and the Departments' operational capacity to administer and enforce the immigration laws. As a means of preventing migrants from falling prey to smuggling and other criminal organizations, the Departments have discouraged attempts to enter the United States without inspection while increasing the availability of lawful pathways. The limitation on asylum eligibility contained in the rule undercuts claims made to migrants by TCOs and smugglers that simply arriving at the border will result in them being released into the United States. Additionally, the Departments believe that increasing the availability of lawful pathways for migration helps discourage attempts to enter the United States without inspection by providing individuals with options that do not involve putting their lives in the hands of smugglers. The Departments believe that this balanced approach—expanded lawful pathways to enter the United

---

[115] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024. (Summary Statistics tab). There were, on average, 2,077 encounters per day (including all demographic groups) between POEs at the SWB from June 5 through August 31, 2024, compared to 5,119 per day during the immediate post-pandemic period, defined as May 12, 2023, through June 4, 2024. *Id.*

States, coupled with conditions on asylum eligibility for those who fail to exercise those pathways and the swift imposition of legal consequences when individuals do not establish a legal basis to remain in the United States—will continue to decrease attempts to irregularly enter the United States, and thereby reduce reliance on smugglers and human traffickers.

*Comment:* A commenter argued that the IFR fails to account for the effect of existing and contemporaneously promulgated policies, such as EOIR's "recent arrivals docket."

*Response:* The IFR is one of several tools that the Departments employ to encourage the use of safe, orderly, and lawful processes for accessing the border and to maintain a manageable operational capacity to adequately deliver timely decisions and consequences to noncitizens encountered at the southern border who do not establish a legal basis to remain. The Departments are not aware of any evidence that the recent arrivals docket or any other recent procedural changes in case processing could have, on their own, addressed the record high levels of migration that the Departments have contended with in recent years. Such changes offer important efficiency benefits but by themselves do not adequately address problems such as the large number of non-meritorious claims for asylum and related protection.

For example, as the Departments announced on May 16, 2024, the recent arrivals docket applies to certain noncitizen single adults.[116] For cases on the recent arrivals docket, IJs will generally aim to render a final decision within 180 days, which is substantially longer than the expedited removal process.[117] The recent arrivals docket

provides efficient case processing procedures for removal proceedings, which are, as a general matter, designed to be more comprehensive proceedings for the full adjudication of claims,[118] as compared with expedited removal, which is designed to quickly screen out those who cannot demonstrate a sufficient likelihood of ultimate success on the merits. Thus, the recent arrivals docket is not as efficient as either expedited removal proceedings generally or expedited removal proceedings undertaken pursuant to this rule. Accordingly, the recent arrivals docket is best considered as a complementary measure to this rule for those who are not subject to or cannot be processed under expedited removal despite the resource-saving measures laid out in this rule. Similarly, while the Departments are constantly making efforts to maximize the efficiency of their procedures, all such changes are inadequate, on their own, to accommodate the high volumes of encounters that make this rule necessary.

*Comment:* Citing 89 FR at 48724 nn.99–100 as an example, a commenter objected that the Departments' reliance on an undisclosed data analysis with unknown assumptions as a basis for projecting future trends is arbitrary.

*Response:* The Departments included in the rulemaking docket extensive data supporting the IFR, including an explanation of assumptions underlying certain projections.[119] As DHS explained in the IFR, the complexity of international migration limits DHS's ability to precisely project border encounters under the best of circumstances. *See* 89 FR at 48727 n.127. The period leading up to the IFR

was characterized by greater than usual uncertainty due to ongoing changes in the major migration source countries (*i.e.,* the shift in demographics of those noncitizens encountered by DHS), the growing impact of climate change on migration, political instability in several source countries, the evolving recovery from the COVID–19 pandemic, and uncertainty generated by border-related litigation, among other factors. *Id.* Nonetheless, the Departments included ample basis for their assessment that the IFR was needed and did not rely exclusively on internal projections as a basis for the rule. *See, e.g.,* 89 FR at 48726 (explaining that "between January and April, 2024, [UNCHR] tracked 139,000 irregular entries [through the Darién jungle], up from 128,000 for the same months in 2023 and a seven-fold increase over migration levels during that period in 2022," and that "[p]ast unprecedented migration surges [described in the IFR] bolster . . . the need for this rulemaking"). Further, the Departments note that they are including in the docket extensive data supporting this final rule, including data related to the impact of the IFR, the changes made in this final rule, and the request for comment discussed in Section IV of this preamble, as well as detailed explanations of certain projections.

### b. Lack of Resources Does Not Justify the Rule

*Comment:* Some commenters stated that the Departments' justification of the IFR based on the lack of resources and congressional funding needed to effectively and efficiently meet process demands for migrants and those in the U.S. asylum process is not a valid basis for the Departments' purportedly disregarding their legal obligations to migrants when managing asylum claims and upending the asylum system. A commenter similarly stated that resource constraints should have no relationship to the treatment of newly arriving migrants whose right to remain has not yet been assessed.

Another commenter said that the IFR is arbitrary and capricious because, while the agencies argue that the IFR is required because of a lack of funding, they provided no analysis to justify that conclusion. The commenter stated that the primary reason USCIS lacks enough AOs is that USCIS faces challenges with hiring and retention. The commenter stated that the agency underpays officers, forces them to work 60-hour weeks, and routinely requires them to apply new and illegal requirements in credible fear interviews, all while ignoring their primary duty of

---

[116] Press Release, *DHS, DHS and DOJ Announce "Recent Arrivals" Docket Process for More Efficient Immigration Hearings* (May 16, 2024), *https://www.dhs.gov/news/2024/05/16/dhs-and-doj-announce-recent-arrivals-docket-process-more-efficient-immigration* ("Recent Arrivals Docket Announcement").

[117] Credible fear interviews generally take place close in time to when a noncitizen arrives in the United States. *See* INA 235(b)(1)(B)(i), 8 U.S.C. 1225(b)(1)(B)(i) (providing that AOs "shall conduct interviews" of noncitizens who indicate either an intention to apply for asylum or a fear of persecution "at a port of entry or at such other place designated by the Attorney General"). If the noncitizen is not found to have a credible fear, the noncitizen may request review by an IJ, but such review must take place "in no case later than 7 days after the date" of the AO's determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). DHS data show a median processing time from credible fear referral to result of 8 days in the pre-pandemic period; 17 days during the pandemic period; 12 days during the immediate post-

pandemic period; and 5 days during the IFR period. *See* OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[118] Parties in section 240 removal proceedings have a wide range of well-established rights, including the following: the rights to representation at no expense to the Government, to a reasonable opportunity to examine and present evidence, and to cross-examine witnesses, INA 240(b)(4)(A)–(B), 8 U.S.C. 1229a(b)(4)(A)–(B); the right to seek various forms of relief, 8 CFR 1240.1(a)(1)(ii)-(iii); the right to file a motion to continue, 8 CFR 1003.29; and the right to appeal specified decisions to the Board of Immigration Appeals ("BIA"), 8 CFR 1003.3(a), 1003.38(a), and to later file a petition for review of certain decisions in the appropriate U.S. Court of Appeals, *see generally* INA 242, 8 U.S.C. 1252. For these reasons, the completion goals for cases on the recent arrivals docket remain subject to case-specific circumstances and procedural protections, including allowing time for noncitizens to seek representation where needed. *See* Recent Arrivals Docket Announcement.

[119] *See* OHSS Data Spreadsheet, *Data for Securing the Border IFR* (June 2024), *https://www.regulations.gov/document/USCIS-2024-0006-0003.*

conducting asylum adjudications. The commenter stated that CBP has the ability under current resources to greatly expand its capacity at POEs, but that CBP and DHS simply refuse to take that step. Another commenter similarly said that the IFR repeatedly invokes resource constraints as the reason to deny access to asylum, yet CBP is the nation's largest Federal law enforcement agency, and it has "seriously understated" its processing capacity in the past. A few commenters said that real solutions to alleviate conditions at the southern border include operational efficiency, better resource allocation, and increasing resources to meet demand and fairly process applications.

One commenter said the rule is motivated by the Departments' concern that too many people are seeking asylum, rather than whether individuals are eligible. Further, this commenter wrote that, without any monitoring of the consequences of removal, it is unclear if the IFR's supposed efficiency is in the best interests of the United States, which include a commitment to upholding human rights and providing humanitarian aid.

*Response:* With respect to the claim that the rule's reliance on resource and funding constraints and efficiency concerns are impermissible bases to disregard legal obligations to migrants seeking asylum and protection, the Departments first reiterate that the rule does not violate any legal obligations to migrants, as explained in Section III.A.1 of this preamble and in the IFR. *See* 89 FR at 48733–39. This rule is consistent with U.S. domestic law and with the United States's treaty obligations. The United States implements its non-refoulement obligations through statutory withholding of removal and CAT protection. Even when the threshold for emergency border circumstances has been reached, these forms of protection remain available. From June 5, 2024, through August 31, 2024, 27 percent of those encountered between ports of entry at the SWB and placed into expedited removal were referred for a credible fear interview, and over half of individuals referred for credible fear interviews under the IFR have ultimately been screened in.[120] Those who have not received such determinations have either been determined to have not manifested a fear of removal or have been determined to have not shown a significant possibility that they could ultimately demonstrate by a preponderance of the

evidence eligibility for asylum in light of the rule's limitation on asylum eligibility or a reasonable probability of persecution or torture.

In addition, the Departments disagree with commenters' assertion that it is impermissible to consider resource constraints and lack of funding as supporting the need for the IFR and this rule. Congress provided the Departments with broad discretionary authority under section 208 of the INA, 8 U.S.C. 1158, including expressly conferring discretion to impose limitations on asylum eligibility. INA 208(b)(1)(A), (b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(1)(A), (b)(2)(C), (d)(5)(B). Nothing in the INA explicitly or implicitly forecloses the Departments from considering the impact of resource constraints when exercising their discretionary authorities. For this reason, as explained in Section II.A.1 of this preamble and in the IFR, *see* 89 FR at 48731–49, the rule's changes to certain expedited removal procedures and the credible fear process are a lawful exercise of the Departments' authorities and are consistent with the INA.

Indeed, resources and funding cannot be separated from the safe, effective, and humane enforcement and administration of our immigration laws. The Departments can only function with the resources provided to them by Congress. While the Departments carefully utilize the resources that they are given, they are inadequate in the face of substantial and unprecedented global migration. As explained in the IFR, these constraints prevent the border and immigration systems from properly functioning to provide timely relief for those who warrant it and timely consequences for those without a legal basis to remain when encounters reach the thresholds identified in the rule. *See* 89 FR at 48730 (discussing the impact of resource limitations); *see also id.* at 48752 (explaining that "[g]iven current resources[ ] . . . there is a limit on how many people can be put through the process—and that limit directly informs the 1,500 threshold").

The rule is carefully tailored to address these challenges and is therefore a reasonable exercise of the Departments' discretionary authorities. By shifting to a manifestation standard for fear claims, and heightening the screening standard for withholding and CAT protection, DHS will be able to devote more of its limited resources to more effectively and quickly processing migrants, and the Departments will be able to focus on those claims that are more likely to have merit. *See id.* at 48744–45. The limitation on asylum

eligibility disincentivizes attempts at entry, thereby easing stress on DHS resources, while also providing an efficient way to address claims of fear raised by individuals who do not fall within the exception to the limitation. *See* 89 FR at 48731–33. At the same time, the rule does not foreclose asylum eligibility for noncitizens who are in circumstances that require immediate action: It includes an exception for exceptionally compelling circumstances, including for noncitizens (or members of their families with whom they are traveling) who experience an acute medical emergency, face an imminent and extreme threat to life or safety, or are a "victim of a severe form of trafficking in persons." *See* 89 FR at 48732–33. And those referred to the credible fear process will continue to be screened for potential eligibility for statutory withholding of removal and protection under the CAT. Thus, the rule allows the Departments to use their limited resources more effectively to administer and enforce the nation's immigration laws, while also reducing incentives for migrants to make the dangerous journey to the southern border in the hope that the overwhelmed and under-resourced immigration system will not be able to expeditiously process them for removal. In sum, the rule is needed to support the effective "operation of the immigration system" during emergency border circumstances. *Judulang* v. *Holder,* 565 U.S. 42, 55 (2011).

Contrary to commenters' claim, the IFR fully explains the funding shortfall facing the Departments and how it has severely hampered their abilities to effectively and efficiently process noncitizens at the southern border and deliver timely decisions and consequences to those without a legal basis to remain. *See* 89 FR at 48728–30. Under current appropriations, DHS will, at best, be able only to sustain most of its current operations and will not be able to expand capacity along the southern border or increase its ability to deliver consequences through referrals into expedited removal. *See id.* at 48729. Because of the funding shortfall, in the circumstances in which the measures enacted by this rule apply, DHS simply lacks sufficient personnel and facility resources to safely detain a majority of border crossers for the time needed to complete the expedited removal process, which forces DHS to release noncitizens pending prolonged processing pathways outside of expedited removal. *See id.* at 48752. This renders DHS unable to swiftly process migrants and impose

---

[120] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab and IFR ERCF tab).

consequences on those who fail to establish a legal basis to remain in the United States, which in turn leads to higher recourse rates. *See id.*

These resource constraints are not unique to front-line officials. In recent years, EOIR adjudicators have completed a record number of cases.[121] However, the drastic increase in the number of newly initiated cases— composed in large part of cases that could have been processed through expedited removal if DHS resources allowed, *id.* at 48751 (''Due to its resource constraints, the majority of individuals USBP encountered since May 11, 2023, were ultimately placed in section 240 removal proceedings[.]'')— has significantly outpaced even these record numbers of case completions, thus increasing the pending caseload before EOIR.[122]

Similarly, USCIS has experienced a dramatic increase in credible fear referrals. USCIS received an estimated 137,000 credible fear referrals resulting from SWB encounters in FY 2023, up from an average of about 52,000 from 2010 to 2019 and an average of about 5,700 from 2005 to 2009.[123] However, as the Departments explained in the IFR, USCIS does not have enough AOs to keep pace with the number of noncitizens who could be referred for credible fear interviews, much less keep pace with new affirmative asylum receipts or the existing affirmative backlog. 89 FR at 48730. The USCIS affirmative asylum application backlog has reached over 1.25 million cases.[124] Despite its growing affirmative asylum backlog, USCIS must continue to assign AOs to certain caseloads (some of which are included in the affirmative asylum backlog and some of which are not) that must be staffed to meet processing time frames established by statute, regulation, settlement agreement, court order, or litigation need, including: reasonable fear screenings; Operation Allies Welcome affirmative asylum cases; affirmative asylum cases subject to litigation; and Safe Third Country Agreement screenings. With a focus on

credible fear screenings and while having to address the required caseloads mentioned above, AOs are unavailable to fully support efforts to reduce the affirmative asylum backlog. If there is a surge in credible fear referrals, USCIS would be forced to detail and train additional staff from other parts of the agency, further affecting the overall immigration system.

USCIS has filled 850 out of 1,011 available AO positions as of August 15, 2024. USCIS is working diligently to avoid a gap between the number of AOs on board and the number of available positions, but some gap in these numbers persists, in part due to the time it takes to hire and receive security clearances for individuals to come on board as AOs. As of August 15, 2024, USCIS has a total of approximately 702 permanent AOs fully trained and certified to complete its workloads, including credible fear screening, reasonable fear screening, and affirmative asylum adjudication. Given that the ebb and flow of hiring and the number of credible fear referrals prior to the implementation of the IFR required far more officers to maintain pace, USCIS has trained staff members from across the agency to serve temporarily on detail as AOs and conduct credible fear interviews consistent with the statute. INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E). As of August 15, 2024, USCIS had a total of 807 credible fear trained AOs (702 permanent staff and 105 detailees, who are trained to conduct credible fear screenings only). Given the need to address the Departments' various required workloads mentioned above, 511 AOs are currently assigned to work exclusively on credible fear cases. With this number of available AOs and accounting for some fluctuation, USCIS can generally complete credible fear determinations for an average of 650 individuals daily Monday through Friday and an average of 200 individuals daily on Saturday and Sunday. Workload priorities related to border enforcement, statutory requirements, and litigation obligations, along with insufficient resourcing allocations from Congress, continue to affect USCIS's ability to staff at appropriate levels. Accordingly, these funding shortfalls, combined with high encounter levels at the southern border, necessitate this rule's limitation on asylum eligibility and its changes to the credible fear referral process and screening standard for statutory withholding of removal and CAT protection to ensure the Departments are able to deliver timely decisions and

consequences using the resources provided. *See* 89 FR at 48729–31.

DHS disagrees with the claim that USCIS's resource challenges are due to hiring and staff retention problems caused by working conditions and underpay, rather than Congress's failure to provide the agency with sufficient resources. Resource challenges at USCIS are not a novel issue. Nearly 96 percent of USCIS's funding is from filing fees, not from congressional appropriations. Fees for adjudication and naturalization services are set at a level to ''ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants.'' INA 286(m), 8 U.S.C. 1356(m). On April 1, 2024, DHS implemented a new fee schedule for USCIS-processed immigration benefits, which will generate approximately an additional $1 billion annually; the schedule includes a new asylum program surcharge for employment-based petitioners. 89 FR 6194, 6205, 6391 (Jan. 31, 2024). While the new fee rule does provide for increased funding for the Refugee, Asylum, and International Operations Directorate,[125] keeping pace with USCIS's protection screening and affirmative asylum workloads requires additional funding, as reflected in the President's FY 2025 Budget.[126] As DHS explained in proposing the new fee schedule, the new fee schedule was created based on historical data and the additional funding provided by the new fee schedule may not be sufficient to cover the increased costs of the asylum program, including credible fear processing, if encounters exceed historic rates. 88 FR 402, 432–38 (Jan. 4, 2023). Even with the very limited appropriations provided by Congress to USCIS, the President's budget requests demonstrate the need to supplement USCIS's ability to address credible fear screenings. The President's FY 2024 budget request to Congress sought funds necessary to complete up to 150,000

[121] *See* EOIR, *Adjudication Statistics: New Cases and Total Completions* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344796/dl?inline; see also* 89 FR at 48751 (noting that due to its resource constraints, ''the majority of individuals USBP encountered since May 11, 2023, were ultimately placed in section 240 removal proceedings[]'' (footnote omitted)).

[122] *Id.*

[123] *See* OHSS analysis of Asylum Pre-Screening Officer (''APSO'') Global and OHSS Persist Datasets current as of June 30, 2024 (Historic CFIs tab).

[124] USCIS, *Asylum Division Monthly Statistics Report. Fiscal Year 2024. June 2024* (July 23, 2024), *https://www.uscis.gov/sites/default/files/document/reports/asylumfiscalyear2024todatestats_240630.xlsx.*

[125] DHS, *Immigration Examinations Fee Account: Fee Review Supporting Documentation with Addendum* 53 (Nov. 2023), *https://www.regulations.gov/document/USCIS-2021-0010-8176.*

[126] *See* The White House, *Fact Sheet: The President's Budget Secures Our Border, Combats Fentanyl Trafficking, and Calls on Congress to Enact Critical Immigration Reform* (Mar. 11, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/11/fact-sheet-the-presidents-budget-secures-our-border-combats-fentanyl-trafficking-and-calls-on-congress-to-enact-critical-immigration-reform/.*

**81188** **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

credible fear determinations.[127] A supplemental request in October 2023 sought congressional funding for 1,600 AOs.[128] Congress failed to provide resources to address credible fear screenings with respect to these appropriation requests. Raising fees on other applications and petitions to cover the $755 million that would be required to hire and support the additional 1,600 AOs called for in the President's 2025 FY Budget [129] would impose a burden on other filers. *See* 89 FR at 48729. USCIS takes workforce retention seriously, but any concern about pay, hours, or workload does not obviate the systemic obstacles in running an underfunded program with limited resources.

With regard to the specific comments regarding CBP's ability and capacity to process noncitizens at POEs on the SWB, DHS disagrees that it has the resources to meaningfully expand that capacity under current conditions. CBP has finite resources available at POEs, all of which must be distributed both to processing of noncitizens and to implementing CBP's other priority missions, including facilitating lawful trade and travel and protecting national security interests.[130] That said, CBP has taken steps to increase the number of noncitizens processed at POEs, including through tools such as the CBP One app, which has helped CBP to maximize its limited resources as it permits noncitizens to pre-schedule appointments and mitigates long waiting times at POEs.[131] The

Departments welcome additional resources from Congress, but must respond to emergency border circumstances with the resources currently available.[132]

Finally, the Departments disagree that this rule is motivated by a concern that too many people are seeking asylum. The rule is intended to address the very high levels of irregular migration that the Departments have recently observed, without discouraging those with valid claims from applying for asylum or other protection. By managing flows more effectively, the rule will help ensure the continued effective, humane, and efficient processing of migrants who arrive at the southern border during emergency border circumstances.

Moreover, the Departments disagree with the suggestion that the rule is not in the best interests of the United States. On June 3, 2024, the President signed a Proclamation under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), finding that because the border security and immigration systems of the United States were unduly strained, the entry into the United States of certain categories of noncitizens was detrimental to the interests of the United States, and suspending and limiting the entry of such noncitizens. 89 FR at 48490–91. The Departments determined that the IFR was necessary to respond to the emergency border circumstances discussed in the Proclamation. *Id.* at 48715. Exercising their authorities, including under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), the Secretary and the Attorney General determined that during emergency border circumstances, it is in the "best interests of the country . . . to limit asylum eligibility for those who enter in violation of the Proclamation, which, in turn, will allow the Departments to allocate their limited resources to prioritize processing of noncitizens who do not enter in violation of it." *Id.* at 48737 (alteration, citation, and internal quotation marks omitted). At this time, the Secretary and

the Attorney General continue to believe that this rule's limitation on asylum eligibility is in the best interests of the United States and that it should continue to apply, while encounter levels remain above the thresholds in the rule (*i.e.,* during emergency border circumstances), to noncitizens who enter across the southern border and who are not described in section 3(b) of the Proclamation, unless such noncitizens demonstrate that exceptionally compelling circumstances exist.

The Departments further disagree with the assertion of commenters that, without monitoring the consequences of removal, it is unclear if the IFR's improvement to systemic efficiency is in the best interests of the United States. The Departments believe that the present rulemaking strikes the appropriate balance between facilitating efficiency during times when emergency border circumstances are present and upholding the commitment of the United States to protecting human rights and honoring its non-refoulement obligations. Indeed, the credible fear screening process itself is designed to make a case-by-case determination related to the consequences of removal and whether those potential consequences warrant allowing a noncitizen to remain in the United States to pursue an asylum or related protection claim. While it is not feasible for the United States to monitor the exact consequences of removal in every individual case, AOs and IJs routinely use country conditions information, including Department of State Country Reports on Human Rights Practices, to inform their evaluation of potential consequences of removal as part of the credible fear determination, as part of their statutory obligation to consider "such other facts as are known" to them in the credible fear of persecution determination (INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v)); likewise, they are required by regulation to consider "evidence of gross, flagrant or mass violations of human rights within the country of removal" and "any other relevant information regarding conditions in the country of removal" in any evaluation of protection under the CAT, 8 CFR 208.16(c)(3)(iii)–(iv).[133] The

---

[127] *See* DHS, *FY 2024 Budget-in-Brief* 74 (2024), *https://www.dhs.gov/publication/fy-2024-budget-brief* (last visited Sep. 3, 2024).

[128] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/*.

[129] *See* The White House, *Fact Sheet: The President's Budget Secures Our Border, Combats Fentanyl Trafficking, and Calls on Congress to Enact Critical Immigration Reform* (Mar. 11, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/11/fact-sheet-the-presidents-budget-secures-our-border-combats-fentanyl-trafficking-and-calls-on-congress-to-enact-critical-immigration-reform/*.

[130] *See, e.g.,* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, CBP, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/document/guidance/guidance-management-and-processing-undocumented-non-citizens-southwest-border-land*.

[131] *Id.* During the pre-pandemic period, CBP's Office of Field Operations ("OFO") processed around 330 people per day. From January 2023 (when CBP opened CBP One for direct scheduling) through August 31, 2024, OFO has processed approximately four-and-a-half times that number of

people daily. *See* OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (OFO Encounters tab).

[132] *See* Letter for the Hon. Patrick McHenry, Speaker Pro Tempore of the U.S. House of Representatives, from Shalanda D. Young, Dir., Off. of Mgmt. & Budget, *Re: Critical National Security Funding Needs for FY 2024* (Oct. 20, 2023), *https://www.whitehouse.gov/omb/briefing-room/2023/10/20/letter-regarding-critical-national-security-funding-needs-for-fy-2024/* ("This request includes resources for an additional 1,300 border patrol agents to work alongside the 20,200 agents already funded in the FY2024 Budget; 375 immigration judge teams to strengthen the immigration court system—the largest incremental request ever; [and] 1,600 asylum officers to speed up processing of asylum claims[.]").

[133] USCIS RAIO Directorate, *Officer Training: Credible Fear of Persecution and Torture Determinations* 19–20 (May 9, 2024) ("Additionally, pursuant to the statutory definition of 'credible fear of persecution,' the asylum officer must take account of 'such other facts as are known to the officer.' Such 'other facts' include relevant country conditions information. Similarly, country conditions information should be considered when evaluating a credible fear of torture. The Convention Against Torture and implementing

present rulemaking does not change the types of evidence AOs and IJs rely on, such as human rights monitoring reports relating to the potential consequences of removal to a particular country, in making credible fear determinations at the higher "reasonable probability" of persecution or torture standard.

### c. Rule Does Not Acknowledge Factors Contributing to Migration

*Comment:* Some commenters argued that the Departments failed to analyze to what extent migration patterns are shaped by U.S. immigration enforcement system incentive structures relative to other factors, such as the many reasons people are forced to flee their homes.

These commenters disagreed with what they characterized as the Departments' decision to impose further consequences on individuals seeking protection. Some commenters argued that many factors contribute to the number of border encounters, including dire conditions in migrants' countries of origin and their personal circumstances, and that while the IFR acknowledges that various push factors such as violence, persecution, poverty, human rights abuses, climate change, and others contribute to current migratory patterns, it does not fully engage with them and instead "assumes, without foundation, that the perceived incentives, responsive to U.S. enforcement measures, single-handedly shape migration patterns," despite ample United States Government and academic analyses that demonstrate that U.S. enforcement measures are only one of several factors informing patterns of migration.

Similarly, another commenter stated that, although the IFR asserts that insufficient enforcement leads to high encounter levels, it is more plausible that the world is experiencing high levels of displacement and international migration and that the United States is a desirable destination for migrants. The commenter added that such global pressures would be more productively met with policies that directly address the desire, ability, and opportunities for people to migrate, rather than imposing harsher enforcement.

*Response:* The Departments agree that many factors that are outside the U.S. Government's control influence migration patterns, including push factors. The Departments have never

asserted that U.S. enforcement measures singlehandedly shape migration patterns. Economic and political instability around the world is fueling the highest levels of migration since World War II, including in the Western Hemisphere. 88 FR at 11704. However, the effects of these factors and U.S. immigration enforcement are complementary to each other. They can both simultaneously and separately influence migrants' decisions regarding when, how, and where to migrate. The Departments believe that ensuring the timely enforcement of consequences for noncitizens who enter the United States irregularly without a legal basis to remain in the United States is a powerful tool for addressing the situation at the southern border, particularly when combined with the expanded availability of lawful pathways. This view is supported by the success of the IFR in reducing levels of irregular migration as further discussed in Section II.A.2 of this preamble. Timely enforcement of consequences is but one approach to respond to the specific issue of incentivizing the use of lawful, safe, and orderly pathways and disincentivizing migrants from utilizing dangerous, irregular migration routes along the southern border. This rule was designed to address encounters on our SWB, not to singlehandedly reshape migration patterns throughout the region.

### d. Other Comments Related to the Departments' Justification

*Comment:* Commenters suggested that high encounter levels are due to the Biden Administration's border security and immigration regulatory and policy efforts. One commenter disagreed with the Departments' assigning blame for the border crisis to Congress's failure to appropriate additional funding to the Departments, instead stating that it is the Administration's consistent "abdication of border security and immigration enforcement[]" that has resulted in the sustained high rate of encounters since 2021. The commenter said DHS must implement additional deterrence policies to discourage "illegal immigration" across the SWB.

*Response:* The Departments disagree that the Administration's regulatory and policy efforts have led to the emergency border circumstances. Rather, the Departments believe that the COVID–19 global pandemic upended travel throughout the world, forcing many noncitizens to delay their journeys to the United States. This was further exacerbated by the implementation of the Title 42 public health Order, which quickly expelled noncitizens who were

crossing the border back into Mexico without applying an immigration consequence. *See* 88 FR at 31335 (discussing lack of immigration consequences associated with expulsions under the Title 42 public health Order). These factors contributed greatly to the significant surge in migration immediately following the end of the COVID–19 pandemic period. Since 2021, the United States Government has taken a series of significant steps to strengthen consequences for irregular entry at the southern border in response to record levels of encounters there. The Circumvention of Lawful Pathways rule created disincentives for irregular border crossings and is a critical component of the Government's regional strategy. DHS also put in place complementary measures to streamline expedited removal processing to more quickly apply consequences to those who fail to use lawful, safe, and orderly pathways. These measures include holding noncitizens processed for expedited removal for the pendency of their credible fear interviews in CBP facilities to maximize the use of expedited removal.[134] In the immediate post-pandemic period, DHS maximized the use of expedited removal given its limited resources, placing an average of 900 individuals encountered between POEs at the SWB into the process each day between May 12, 2023, and June 4, 2024, and conducting an average of 490 credible fear interviews daily, both of which are record highs.[135] Between May 12, 2023, and June 4, 2024, DHS removed or returned more than 794,000 noncitizens who did not have a legal basis to remain in the United States, the majority of whom crossed the SWB.[136] Average daily removals and returns during the immediate post-pandemic period exceeded daily rates for every FY since 2010.[137] The majority of all individuals encountered at the SWB from FY 2021 to FY 2023 were removed, returned, or expelled.[138]

Unfortunately, despite maximizing the usage of resources available to the Departments, these efforts have not been as effective as they could have been had Congress provided the tools and resources needed to address substantial

---

regulations require consideration of '[e]vidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and [o]ther relevant information regarding conditions in the country of removal.' " (quoting 8 CFR 208.16(c)(3)(iii)–(iv)]).

[134] *See* Decl. of Blas Nuñez-Neto ¶ 20, *M.A.* v. *Mayorkas,* No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[135] OHSS analysis of June 2024 Enforcement Lifecycle data (Immediate Post-Pandemic ERCF tab); OHSS analysis of APSO Global and OHSS Persist Datasets (Historic CFIs tab).

[136] *Id.*

[137] OHSS 2022 Yearbook of Immigration Statistics (OHSS YB Table 39 tab) (listing past repatriations).

[138] OHSS analysis of June 2024 Enforcement Lifecycle data (Enforcement Lifecycle 6.2024 tab).

**81190**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

levels of migration impacting the southern border. Encounter levels increased toward the end of 2023,[139] and December 2023 saw the highest level of encounters between POEs in history,[140] as increasing numbers of people migrated through the Western Hemisphere. 89 FR at 48713. The Departments' inability, given a lack of sufficient resources, to deliver timely decisions and consequences through expedited removal for those without a legal basis to remain creates incentives for further irregular migration and creates further strain on the border security and immigration systems. *See id.* at 48713–14. The IFR was needed to respond to this emergency situation, and it is having its intended effect as discussed in Section II.A.2 of this preamble. However, only Congress can provide the resources and authorities that the Departments need to ensure durable solutions to heightened levels of global migration and the impact it has on the border security and immigration systems.

*B. General Feedback on the IFR*

1. General Support

*Comment:* Some commenters approved of the rule's limitation on asylum eligibility, reasoning that the U.S. asylum system is being ''abused'' and ''exploit[ed].'' A commenter stated that the Federal Government should stop permitting undocumented immigrants to stay in the country while their asylum claims are processed, as many exploit the system to remain for years, and that daily border crossings pose national security risks. That commenter also stated that the United States has housing and job shortages, so allowing immigrants to take housing and jobs is hurting America. Another commenter thanked the Departments for implementing this rule and asked that all enforcement mechanisms be deployed to uphold it.

*Response:* The Departments agree that maintaining border security is critical and that the rule will have benefits for the U.S. border security and immigration systems. Specifically, the United States Government has better ensured timely decisions and consequences for irregular entry at the border, while at the same time overseeing the largest expansion of lawful, safe, and orderly pathways and processes for individuals to come to the United States in decades. *See, e.g.,* 89 FR at 48712–13; *id.* at 48721–26

(discussing the increase in migration at the SWB, consistent with global trends and regional United States Government efforts); 88 FR at 11716–18 (discussing United States Government measures to offer alternative pathways to address the root causes of migration, improve the asylum system, and address the pernicious role of smugglers). This approach has allowed DHS to process noncitizens arriving at the southern border for removal in record numbers and with record efficiency. 89 FR at 48713, 48727.

This rule has improved DHS's ability to place into expedited removal the majority of single adults and individuals in family units encountered by USBP at the SWB and to swiftly issue decisions and impose consequences that have proven effective to disincentivize noncitizens who do not have a strong claim for asylum or other protection from entering the United States to pursue such claims. *See* Section II.A.2 of this preamble; *see also* 89 FR at 48746. This rule is also designed to identify more effectively those with a fear of return, and, for noncitizens who have manifested or expressed a fear of return, to screen out and swiftly remove those whose claims have a low likelihood of succeeding on the merits. *See* 89 FR at 48743–46. As a result, the Departments believe that this rule will also improve the overall functioning and efficiency of the immigration system by reducing strains on EOIR and USCIS resources and allowing DHS to remove more noncitizens through expedited removal, rather than adding them to the backlogged immigration courts.

2. General Opposition

a. Negative Impacts on Noncitizens and Others

i. Conflicts with Humanitarian Values

*Comment:* Several commenters expressed opposition to the IFR based on general humanitarian and moral concerns, with some commenters urging the Departments to reconsider or rescind the rule. Commenters addressed the general right to seek asylum and the United States' obligations to protect those seeking asylum. For example, commenters emphasized that people have the right to migrate and seek asylum, which commenters described as a human right. Commenters stated the Administration should provide rights to those in the U.S. asylum process. Commenters also stated that people have a right to work and live in a safe environment with their families so that they can enjoy a better life. Several commenters stated that the IFR denies

the right to seek asylum or that it harms those with the right to asylum. Commenters stated that the United States has a responsibility or moral obligation to welcome noncitizens who might make claims of asylum, that the United States should provide protection to those who seek it, and that turning them away is unconscionable. Some commenters suggested that the United States should welcome all people, regardless of their origin or when or how they arrive. Commenters stated that the United States has contributed to the conditions or push factors that promote migration and that it should share the responsibility for the geopolitical and climatic conditions it has created, especially since the response of the United States may shape how other countries react to humanitarian crises.

*Response:* The Departments agree that the United States has certain legal obligations to protect those present in the United States who fear persecution or torture in their home countries or countries of removal and recognize the importance of offering migrants the opportunity to seek protection from removal. *See* 89 FR at 48759. But as explained more fully in Section III.A.1 of this preamble, this rule does not run afoul of those obligations or otherwise undermine the commitment of the United States to adhering to international law principles concerning non-refoulement. *See also id.* at 48716–17, 48735–36. The Departments have instead exercised their authority to adopt a limitation on asylum eligibility and an exception to that limitation in certain circumstances. *See id.* at 48718. As discussed more fully in Section III.A.1 of this preamble, this framework comports with section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), which permits limitations and conditions on asylum as long as they are consistent with the INA.

Any noncitizen who is physically present in the United States may apply for asylum, but there is no right for a noncitizen to enter the United States or to be processed in a particular manner. *See United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 542 (1950) (''At the outset we wish to point out that an alien who seeks admission to this country may not do so under any claim of right. Admission of aliens to the United States is a privilege granted by the sovereign United States Government.''). No individual present in the United States will be denied the opportunity to seek asylum or protection in the United States under this rule.

In particular, this rule does not preclude noncitizens who cross the

[139] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP August 6, 2024, for July 2024 (Encounters FY 2000–2024 tab).
[140] *Id.*

southern border from seeking asylum. Indeed, all noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are entitled to a credible fear interview, as appropriate. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); 8 CFR 235.15(b)(4). Also, noncitizens in section 240 removal proceedings have the opportunity to present information asserting fear of or concern about potential removal. *See* INA 240(c)(4), 8 U.S.C. 1229a(c)(4). Although many individuals may be ineligible for asylum under this rule, they may seek to establish that they are subject to the rule's exception for exceptionally compelling circumstances, and they may also still seek statutory withholding of removal and CAT protection in the United States.

The purpose of this rule is to enhance the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances. 89 FR at 48718. Consistent with that purpose, the rule limits eligibility for asylum during such circumstances and ensures that the process is not overwhelmed by those with nonviable claims in the expedited removal process who will add to an already-large backlog. Those referred to an IJ will become part of the backlog of pending immigration cases before EOIR, which at the end of the third quarter of FY 2024 was over 3.46 million cases.[141] Continuing to process non-viable claims will also exacerbate USCIS's asylum backlog, which, based on case filings through August 31, 2024, was over 1.3 million cases.[142]

*Comment:* Commenters wrote that the IFR contradicts U.S. values and history. Commenters stated that the United States is a nation of immigrants and is built on a history of welcoming migrants. Some commenters described the IFR's limitations on asylum as contrary to U.S. values and democracy and termed it "un-American." Commenters stated that the IFR does not treat noncitizens with dignity and respect. Many commenters emphasized the desire for any process to be "welcoming, transparent, humanitarian,

and fair;" one commenter specifically expressed concern for "the dignity, safety, and human rights of asylum seekers;" and another expressed concern for those people "seeking safety and the American dream." Another commenter emphasized that immigrants "are human beings and deserve to be treated as such." Many commenters generally desired policies that "welcome immigrants." Other commenters provided additional remarks on the contributions of immigrants to the United States, stating that noncitizens provide value to U.S. communities and that immigrants have enriched the United States. Commenters emphasized their own status as descendants of immigrants and expressed a desire for fairness in welcoming noncitizens at all borders. Commenters argued that the IFR undermines the historic commitment of the United States to protecting those who seek refuge. At least one commenter described the IFR as "authoritarian."

Commenters also addressed moral concerns related to the IFR or the immigration system overall. One commenter stated that immigrants are not "a problem;" rather it is "our immigration system that is the problem." Some described the IFR, or denying asylum, as "immoral," "inhumane," "cruel," "unjust" or "unfair," or "xenophobi[c]." Commenters asserted that the United States should have an accessible, diverse, safe, welcoming, dignified, fair, and balanced immigration system. Commenters stated that the United States should not make it harder for those fleeing danger to seek protections. Commenters stated that the United States should treat immigrants and refugees with respect, dignity, and compassion while defending human life. Commenters stated that Mexico and Latin America are neighbors of the United States and should be treated with goodwill. One commenter stated that asylum seekers from Mexico should be given the full rights of citizens. One commenter stated that there is no real border security or immigration crisis, but rather the concept has been created to distract Americans from certain political agendas, and that the "real crisis" is climate change.

*Response:* The United States is both a nation of immigrants and a nation of laws. The Departments are charged with administering and enforcing those laws and endeavor to do so humanely. The Departments agree that the historical openness of the United States to immigration has enriched our culture, expanded economic opportunities, and

enhanced our influence around the world. However, the Departments reject the contention that the IFR's limitation on asylum eligibility and other provisions are inconsistent with American values, fairness, and showing respect for immigrants.

The United States has a long tradition of accepting and welcoming refugees. For decades, U.S. law has protected vulnerable populations from return to a country where they would be persecuted or tortured. *See, e.g., Stevic,* 467 U.S. at 409 ("For over 30 years the Attorney General has possessed statutory authority to withhold the deportation of an alien upon a finding that the alien would be subject to persecution in the country to which he would be deported."). Under this rule, the United States will continue to offer such protection. The rule is designed to implement the Proclamation's policies and objectives by enhancing the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances. *See* 89 FR at 48718. The rule enhances the Departments' ability to manage high levels of irregular migration to the United States during emergency border circumstances and allows the Departments to quickly deliver decisions and consequences to those who cross the southern border irregularly and are unable to establish a legal basis to remain, while upholding domestic and international protection obligations. *Id.* at 48731.

Without a policy in place to ensure lawful, safe, and orderly processing of migrants entering the United States, the number of migrants would exceed DHS's already limited resources and facilities. Over the past several years, the border security and immigration systems have experienced extreme strain, with a dramatic increase in the number of noncitizens attempting to cross the SWB between POEs. 89 FR at 48722. Despite the meaningful impact of the Circumvention of Lawful Pathways rule and related measures, encounter levels continued to exceed DHS's capacity to, as appropriate, effectively and safely process, detain, and remove noncitizens. *Id.* at 48727. As explained in the IFR, the Departments believed that, without meaningful policy change, encounters between POEs would continue to rise and surpass DHS's capacity and abilities based on available resources. *Id.* at 48726. The Departments disagree with the sentiment that the rule is unnecessary, as it responds to this urgent situation. The Departments reiterate that the goal

---

[141] *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (July 19, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline.* Initial receipts equals removal, deportation, exclusions, asylum-only, and withholding-only cases.

[142] *See* OHSS analysis of USCIS Global data as of September 10, 2024.

**81192** **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

of the rule is not to discourage migrants with valid claims from applying for asylum or other protection, but rather to discourage the unprecedented level of irregular migration while at the same time maintaining access to lawful, safe, and orderly pathways to enter the United States. The Departments have determined that the benefits to the overall functioning and efficiency of the immigration system at our southern border justify the rule; applying the rule is necessary to ensure the Departments' continued ability to safely, humanely, and effectively enforce and administer U.S. immigration laws and to reduce the role of exploitative and dangerous smuggling and human trafficking networks.

The rule does not render noncitizens to whom it applies categorically ineligible for asylum, nor does it alter their ultimate eligibility for withholding or CAT protection. To ensure that particularly vulnerable migrants are not unduly burdened by the rule, the Departments have included an exception to the limitation on asylum eligibility that will allow some migrants to remain eligible for asylum. 8 CFR 208.35(a)(2), 1208.35(a)(2). And even those ineligible for asylum may continue to seek statutory withholding of removal and CAT protection. A noncitizen who seeks to maintain eligibility for asylum can also utilize one of several lawful, safe, and orderly pathways to the United States, including use of the CBP One app, or, for some noncitizens, refugee resettlement, parole processes, family reunification, and labor pathways. Indeed, as noted above, the CBP One app has permitted the United States Government to process nearly five times more individuals at land border POEs each day than it did on an average day in the six years preceding the pandemic—providing an important avenue for individuals who may wish to access protection in the United States to so in a safe and orderly manner.[143] The Safe Mobility Initiative, which includes Safe Mobility Offices in several countries in the Western Hemisphere, processes and educates migrants about the aforementioned pathways.[144] By reducing migration flows to a reasonable rate, the rule will reduce strains on limited Federal Government immigration processing and enforcement resources; preserve the

Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and reduce the role of exploitative TCOs and smugglers. 89 FR at 48767. Finally, as explained in Section III.A.1 of this preamble, the rule is fully consistent with the Departments' authority and obligations under section 208 of the INA, 8 U.S.C. 1158.

ii. Procedural and Due Process Concerns

(1) General Concerns

*Comment:* A commenter stated that the IFR does not violate noncitizens' due process rights because asylum is a discretionary benefit to which noncitizens have no inherent due process interest; instead, they have only the procedural rights guaranteed by statute. Because the IFR preserves all procedural statutory protections, the commenter stated, the IFR complies with due process. The commenter further stated that regulatory bars to asylum do not alter the basic procedural protections, such as the opportunity to be heard, for noncitizens who make credible fear claims.

Other commenters urged the Departments to rescind the IFR entirely. Some commenters expressed general concern that the IFR would violate or undermine due process protections. One commenter said that U.S. immigration law is already confusing, citing research that it said showed that 55.9 percent of noncitizen respondents did not understand the requirements and processes for accessing United States territory. The commenter further stated that noncitizens arriving at the southern border will not be able to understand the procedures for seeking asylum or protection given the IFR's complexity.

Commenters discussed the importance of due process in the asylum system, as required by international human rights law, and said that the United States has a duty to ensure that noncitizens receive a fair trial and fully understand their rights. Similarly, one commenter stated that noncitizens who express the desire to seek asylum have a due process right to information about their rights and obligations, including deadlines and appeals, the interview process, and their right to legal representation. Such safeguards, the commenter wrote, would ensure that noncitizens receive the necessary guidance for pursuing their asylum claims.

Commenters wrote that fair and efficient asylum procedures are even more important for noncitizens with particular vulnerabilities, such as UCs. Commenters stated that the IFR would

hamper consistent application of the law and result in arbitrary application of the law, thus severely restricting access to asylum and humanitarian protections.

*Response:* The Departments disagree that the rule violates the Due Process Clause of the Fifth Amendment or impermissibly restricts access to asylum. Noncitizens who are encountered in close vicinity to and immediately after crossing the border and are placed in expedited removal proceedings, including those in the credible fear screening process, have "only those rights regarding admission that Congress has provided by statute."[145] *Thuraissigiam,* 591 U.S. at 140; *see also Mendoza-Linares* v. *Garland,* 51 F.4th 1146, 1148 (9th Cir. 2022) (concluding that "an arriving immigrant caught at the border . . . 'has no constitutional rights regarding his application' for asylum" (quoting *Thuraissigiam,* 591 U.S. at 139)). As discussed above in Section III.A.1 of this preamble, the changes in this rule are consistent with the INA. They thus comply with the Due Process Clause with respect to noncitizens in expedited removal proceedings.[146]

Contrary to commenters' assertions, the rule ensures that noncitizens receive

---

[143] OHSS analysis of July 2024 OHSS Persist Dataset (OFO Encounters tab).

[144] *See* U.S. Dep't of State, *Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas, https:// www.state.gov/safe-mobility-initiative/* (last visited Sept. 24, 2024).

[145] Courts also have held that noncitizens do not have an underlying property or liberty interest in a grant of asylum to which the protections of the Due Process Clause attach. *See, e.g., Jin* v. *Mukasey,* 538 F.3d 143, 157 (2d Cir. 2008) (holding that "an alien who has already filed one asylum application, been adjudicated removable and ordered deported, and who has nevertheless remained in the country illegally for several years, does not have a liberty or property interest in a discretionary grant of asylum"); *Ticoulu* v. *Gonzales,* 472 F.3d 8, 11 (1st Cir. 2006) ("Due process rights do not accrue to discretionary forms of relief, and asylum is a discretionary form of relief." (citation and internal quotation omitted)); *Mudric* v. *Att'y Gen.,* 469 F.3d 94, 99 (3d Cir. 2006) (holding that an 8-year delay in processing the petitioner's asylum application was not a constitutional violation because the petitioner "had no due process entitlement to the wholly discretionary benefits of which he and his mother were allegedly deprived"); *cf. Munoz* v. *Ashcroft,* 339 F.3d 950, 954 (9th Cir. 2003) ("Since discretionary relief is a privilege created by Congress, denial of such relief cannot violate a substantive interest protected by the Due Process clause."). Notably, UCs are excepted from expedited removal and have other rights under the nation's immigration laws. *See generally* 8 U.S.C. 1232. Procedural concerns related to UCs are addressed later in this section.

[146] Although this rule's limitation on asylum eligibility also applies in section 240 removal proceedings, even if noncitizens in those proceedings had an interest protected by the Due Process Clause, the application of the limitation would not violate the Due Process Clause because, as noted below, noncitizens in such proceedings are entitled to all the procedural protections such proceedings normally entail. *See Pouhova* v. *Holder,* 726 F.3d 1007, 1011 (7th Cir. 2013) (citing section 240(b)(4) of the INA, 8 U.S.C. 1229a(b)(4), and explaining that "[a]ny proceeding that meets the requirements of the statute also satisfies constitutional due process").

a fair process. Indeed, although the rule changes some procedures, as discussed throughout this preamble, it leaves much of the process unaltered. Specific comments concerning the rule's manifestation of fear standard and related changes to the process for determining whether a noncitizen should be referred to an AO for a credible fear interview are addressed in Section III.C.2 of this preamble. The Departments address commenters' concerns about the rule's consistency with international obligations in Section III.A.1 of this preamble.

First, with respect to one commenter's claim that noncitizens do not understand the requirements for accessing United States territory because U.S. immigration law is confusing, the Departments are aware of no statutory requirement that notice regarding any of the INA's provisions be provided to individuals outside the United States, including those who may be subject to expedited removal provisions or this rule's limitation on asylum eligibility upon arrival. In addition, to the extent the commenter's objection is to the complexity of the INA, that concern is a matter for Congress to address.

Second, under the rule, DHS is continuing to provide noncitizens who are subject to expedited removal with notice of their ability to raise a claim of fear of persecution or torture. DHS is using signs and videos that are reasonably designed to ensure that noncitizens in its custody are aware of their right to request asylum or protection. As discussed further in Section III.C.2 of this preamble, these signs and videos are provided in languages that are common to the large majority of noncitizens encountered by CBP at the southern border. ICE likewise provides information in a number of languages to detainees being processed under the rule.[147] And the signs provide a simple instruction to noncitizens that, if they fear persecution or torture if they are removed from the United States, they should tell an immigration officer and an AO will conduct an interview and ask the noncitizens questions about

any fear they may have. Individuals who do not speak one of the languages are provided with language access services consistent with CBP's existing language assistance policies. These procedures are consistent with DHS's obligations under section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv).

Moreover, to the extent that commenters have expressed due process concerns about the manifestation standard, the Departments reiterate that the expedited removal statute does not require immigration officers to affirmatively ask every noncitizen subject to expedited removal if the noncitizen has a fear of persecution or torture. *See* 89 FR at 48740. Instead, the statute provides that only those noncitizens who ''indicate[] either an intention to apply for asylum . . . or a fear of persecution,'' INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i), must be referred to an AO for a credible fear interview, INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). As discussed in detail in Section III.C.2 of this preamble, the statute does not place any affirmative obligation on the Government to question noncitizens about intent to seek relief or fear in their home countries, nor does it define what circumstances constitute the requisite indication of intent or fear; to the contrary, the onus under the statute is on the noncitizen to ''indicate[]'' either of the circumstances warranting referral. Because the Departments' procedures comply with the statute, they comport with due process. *See Thuraissigiam,* 591 U.S. at 139–40.

Third, noncitizens who manifest or express a fear and who are referred for a credible fear interview will receive additional information about the credible fear process that has the same types of procedural and substantive information as that provided in the Form M–444, which is used for those not subject to the rule's expedited removal procedures and during times when this rule's provisions do not apply. 89 FR at 48739–40. The new ''Information About Credible Fear Interview Sheet'' informs the noncitizen that the noncitizen may consult with another person, including a legal service provider, and is provided to the noncitizen along with an EOIR-maintained list of pro bono legal service providers. It gives the noncitizen information about the credible fear interview itself, including that an interpreter will be provided, if needed or requested. It explains that the noncitizen may request a male or female interpreter or AO and may speak to the AO separately from the noncitizen's

family. It highlights the importance of telling the AO about the noncitizen's fear of harm and that this may be the only opportunity to do so. The information sheet notifies the noncitizen of the right to have an IJ review a negative fear determination and gives details about the steps following a positive determination.

Individuals in the credible fear process maintain the right to consult with an attorney or other person or persons of their choosing before their interview, and such persons may be present for the interview itself. 8 CFR 235.15(b)(4)(i)(B). Asylum seekers also may present evidence relevant to their claim during their interviews. 89 FR at 48746 & n.239. Additionally, USCIS provides interpreter services at the agency's expense to noncitizens who cannot proceed effectively in English. 8 CFR 208.30(d)(5). And noncitizens may request review of a negative fear determination before an IJ. *Compare* 8 CFR 208.30(g)(1) (providing the standard process for requesting IJ review in credible fear proceedings), *with* 8 CFR 208.35(b)(2)(iii)–(v) (explaining the process for requesting IJ review for those subject to the rule and unable to show that the exception to the limitation on asylum eligibility applies). The rule requires noncitizens to respond affirmatively when asked whether the noncitizen would like to request such review, rather than providing review if the noncitizen does not respond, but IJ review remains available in all cases with a negative credible fear determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.35(b)(2), 1208.35(b)(1). The rule is thus fully consistent with the Departments' legal authority and obligations.

In addition, the rule provides several procedural protections to ensure that asylum applicants receive a full and fair hearing before an IJ and that the limitation on asylum eligibility applies only to noncitizens properly within the scope of 8 CFR 208.35(a) and 1208.35(a). During the credible fear review, an IJ will evaluate de novo whether there is a significant possibility that the noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that the noncitizen meets the exception. 8 CFR 208.35(b)(2)(v), 1208.35(b). Even where an IJ determines that the noncitizen has not met that burden, if the noncitizen demonstrates a reasonable probability of persecution or torture in the country or countries of removal, the noncitizen will have an opportunity to apply for statutory withholding of removal,

[147] *See* Memorandum for Daniel A. Bible, Exec. Assoc. Dir., Enforcement and Removal Operations, ICE, from Patrick J. Lechleitner, Deputy Dir. and Senior Off. Performing the Duties of the Dir., ICE, *Re: Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024,* Securing the Border, *and Interim Final Rule,* Securing the Border 5 (June 4, 2024) (''These signs must be posted in English and Spanish. [Enforcement and Removal Operations ('ERO')] will have additional translations available in facility law libraries in the following languages . . . .''); ICE, *National Detainee Handbook* 7, 15, 25 (2024), *https://www.ice.gov/doclib/detention/ndHandbook/ndhEnglish.pdf.*

**81194** **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

protection under the CAT regulations, or any other form of relief or protection for which the noncitizen is eligible in section 240 removal proceedings, including asylum. 8 CFR 1208.33(b)(2)(ii), 1208.35(b)(2)(iii). These standards help to ensure the outcome of the process delineated in the rule is not predetermined and that noncitizens potentially subject to the limitation on asylum eligibility receive sufficient opportunity for consideration and review of threshold eligibility determinations to satisfy any putative due process rights they may have. See *Mathews* v. *Eldridge,* 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (internal quotation marks omitted)).

Nor does the rule violate any procedural due process rights noncitizens may have in section 240 removal proceedings. For those placed in section 240 removal proceedings, the rule's limitation on asylum eligibility will be litigated in those proceedings before an IJ with all the procedural rights that apply in such proceedings. *See Pouhova,* 726 F.3d at 1011; *see also Rehman* v. *Gonzales,* 441 F.3d 506, 508 (7th Cir. 2006) ("Any proceeding that meets [the requirements of section 240 of the INA, 8 U.S.C. 1229a, and the INA's implementing regulations,] satisfies the Constitution as well.").

Additionally, the Departments disagree with comments characterizing the IFR as resulting in unfair procedures that are especially harmful to those with particular vulnerabilities, such as UCs, individuals with mental health issues or intellectual capacity challenges, and victims of violence, torture, or other traumatic experiences. Nothing in the IFR changes the longstanding framework establishing that UCs are not subject to expedited removal. *See* 8 U.S.C. 1232(a)(5)(D). UCs are also specifically excepted from the Proclamation's suspension and limitation on entry under section 3(b) of the Proclamation and, accordingly, the IFR's limitation on asylum eligibility. 89 FR at 48487; 8 CFR 208.35(a)(1), 1208.35(a)(1). Moreover, the process outlined in the IFR does not prohibit USCIS from exercising its discretion to issue notices to appear ("NTAs") and place noncitizens, including those who are unable to testify or who speak a rare language, in section 240 removal proceedings, where they can request asylum. *See* 8 CFR 208.30(b); *see also Matter of E–R–M– & L–R–M–,* 25 I&N Dec. 520, 523 (BIA 2011) (finding that the INA provides DHS with "discretion to put aliens in section 240 removal

proceedings even though they may also be subject to expedited removal"). Additionally, EOIR has established a specialized juvenile docket at each immigration court with an established caseload of children's cases; has issued guidance to its adjudicators regarding special considerations and procedures for cases involving children, including UCs; and has provided training to IJs on cases involving children, including UCs.[148]

Noncitizens in section 240 removal proceedings have a wide range of well-established statutory and regulatory rights, including the following: the right to representation at no expense to the Government, INA 240(b)(4)(A), 8 U.S.C. 1229a(b)(4)(A); a reasonable opportunity to examine evidence, present evidence, and cross-examine witnesses, INA 240(b)(4)(B), 8 U.S.C. 1229a(b)(4)(B); the right to seek various forms of relief, 8 CFR 1240.1(a)(1)(ii)–(iii); the right to file a motion to continue, 8 CFR 1003.29; and the right to appeal specified decisions to the BIA, 8 CFR 1003.3(a), 1003.38(a), and to later file a petition for review of a final removal order in the appropriate U.S. Court of Appeals, INA 242, 8 U.S.C. 1252. Additionally, EOIR provides interpreters for noncitizens in section 240 removal proceedings.[149] And safeguards are provided to those who are not competent to participate in their proceedings, *see Matter of Matter of M–A–M–,* 25 I&N Dec. 474, 481–82 (BIA 2011), which may include termination of the proceedings where "[f]undamentally fair proceedings are not possible because the noncitizen is mentally incompetent and adequate safeguards are unavailable," 8 CFR 1003.1(m)(1)(i)(B), 1003.18(d)(1)(i)(B).

The Departments also disagree with commenters' assertion that the IFR would lead to disparate or arbitrary application of the law. USCIS AOs and supervisory AOs have received the same training and materials related to applying the IFR across offices and jurisdictions. Asylum staff nationwide use Global, a cloud-based case management system,[150] which includes interview guides, forms, and instructions—including specific interview guides, forms, and instructions to implement the IFR—to

ensure consistency in procedures and substantive guidelines. Moreover, the IFR does not change the fact that all credible fear determinations issued by USCIS are reviewed by a supervisory AO prior to being served on a noncitizen, 8 CFR 208.30(e)(8), another important safeguard to ensure quality and consistency within and between offices.

Additionally, IJs are career employees who are selected through a competitive process.[151] The Director of EOIR has authority to order "comprehensive, continuing training and support" directed at "promot[ing] the quality and consistency of adjudications." 8 CFR 1003.0(b)(1)(vii). And the Chief IJ has the authority to "[p]rovide for appropriate training of the immigration judges and other [Office of the Chief Immigration Judge] staff on the conduct of their powers and duties." 8 CFR 1003.9(b)(2). Regulations also require IJs to "resolve the questions before them in a timely and impartial manner consistent with the [INA] and regulations." 8 CFR 1003.10(b). To that end, all IJs receive ongoing training to facilitate the implementation of new policies and procedures, such as the IFR.[152] EOIR's Legal Education and Research Services Division also offers nationwide legal training for IJs and "regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations."[153]

## (2) Access to Counsel, Unrepresented Applicants, and the Ability or Time To Prepare

*Comment:* Commenters stated that access to counsel is a due process right. Commenters also discussed statutory and regulatory requirements that provide noncitizens eligible for a credible fear interview the right to consult with legal counsel and said that the recent change to a minimum 4-hour consultation period prior to a credible fear interview—which DHS made via guidance—would effectively deny noncitizens that right.

One commenter additionally stated that less than 3 percent of migrants in

---

[148] *See* EOIR, *Director's Memorandum 24–01, Children's Cases in Immigration Court* (Dec. 21, 2023), *https://www.justice.gov/d9/2023-12/dm-24-01_1.pdf.*

[149] *See* EOIR, *Director's Memorandum 23–02, Language Access in Immigration Court* 1–2 (June 6, 2023), *https://www.justice.gov/eoir/book/file/1586686/dl.*

[150] USCIS, *Privacy Impact Assessment Update for the USCIS Asylum Division,* at 4 (2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-asylum-september2018.pdf.*

[151] EOIR, *Make a Difference—Apply for an Immigration Judge Position* (last updated Sept. 17, 2024), *https://www.justice.gov/eoir/Adjudicators* (describing application process and core position requirements for IJ position).

[152] *See, e.g.,* EOIR, *Fact Sheet: Executive Office for Immigration Review Immigration Judge Training* 2 (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline.*

[153] EOIR, *Legal Education and Research Services Division* (last updated Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division.*

expedited removal were able to obtain legal representation. Other commenters said that less than 1 percent were able to find representation in the credible fear process. A commenter stated that in 2023, 35 percent of represented individuals had their negative fear determinations vacated, compared to just 15 percent of unrepresented noncitizens. Commenters emphasized that any immigration solution should include procedures for asylum seekers to access legal representation.

Another commenter said that a 2010 study found that 54 percent of noncitizens with representation were granted asylum, compared to 11 percent of noncitizens without representation. Another commenter said that noncitizens with representation were twice as likely to receive a grant of asylum as their unrepresented counterparts. The commenter said that such data indicate that, as a result of the IFR and reduced access to counsel, applicants with meritorious claims who would have otherwise been referred to full hearings will be denied.

Commenters stated that many noncitizens do not understand the function and purpose of a credible fear interview without speaking with an attorney, particularly those who speak languages not included on orienting signs. Commenters explained that a majority of noncitizens do not have legal representation and thus may struggle to effectively present their cases, particularly if they do not speak English. Commenters also stated that, without legal counsel, many noncitizens will not understand the process nor the legal grounds for their asylum claims. Commenters stated that access to counsel significantly affects asylum outcomes and that less access to counsel is particularly troubling considering that noncitizens must now meet a new, higher standard for protection screenings. One commenter stated that the rule will worsen the issues that already exist in expedited removal proceedings, adding that children and adults are routinely denied access to legal advice if they get referred for fear screenings. Commenters who provide legal services also claimed that they have been excluded from credible fear interviews and subsequent credible fear review hearings before IJs.

Another commenter stated that the availability of legal information and representation at the outset of the asylum process increases efficiency, discourages frivolous claims, reduces the number of appeals and repeat claims, and shortens the time required to determine a claim.

Several commenters stated that noncitizens face significant barriers to obtaining legal representation during the credible fear process. A commenter stated that noncitizens in custody already face insurmountable hurdles to access legal counsel, such as knowing how to contact a lawyer, knowing where they are being detained, having access to a phone, and being given enough information to understand the credible fear process. Another commenter stated that having only 4 hours would make it impossible for providers to meet with clients before credible fear interviews, stating that legal representatives often face barriers to accessing clients within 48 hours, much less 4. The commenter discussed such barriers, stating that legal representatives frequently wait 24 to 48 hours for their interviews with their clients to be scheduled and may be barred from including translators or interpreters in those interviews. Some commenters stated that immigration advocates and attorneys face numerous issues in trying to provide legal consultations, such as being unable to physically access detention facilities or obtain the requisite signatures from their clients. Another commenter added that advocates lack access to private meeting rooms and experience long waits to meet with clients, malfunctioning technology, and unsafe or uncomfortable environments.

Several commenters stated that the rule would effectively eliminate access to legal representation because noncitizens would have only 4 hours to find and consult with a lawyer before an initial hearing. Commenters emphasized that they viewed a 4-hour window as troubling in light of the newly increased standards noncitizens must meet. Commenters stated that it takes more than 4 hours to adequately prepare a noncitizen for the credible fear process. Commenters stated that noncitizens will not have the time or resources to contest arguments and present evidence before the credible fear screenings. Commenters believed that the 4-hour window will lead to greater rates of refoulement. Commenters stated that the 4-hour window may fall on a weekend or after business hours, when legal service providers and aid organizations are closed. Commenters asserted that noncitizens will lose access to legal counsel because the United States does not provide free counsel for noncitizens, and 4 hours is not enough time for individuals to retain counsel. Commenters stated that the rule's restrictions are arbitrary and impermissible, not supported by evidence, and will lead to the denial of

otherwise meritorious asylum claims. Commenters stated that counsel would not be able to access their clients physically or telephonically in a 4-hour window.

Commenters stated that, by reducing noncitizens' ability to secure counsel and connect with communities, the IFR will prevent individuals from becoming aware of other protections from which they could potentially benefit.

*Response:* The rule does not deprive noncitizens of access to counsel in violation of the Fifth Amendment's Due Process Clause. The Supreme Court has held that the rights of individuals seeking asylum at the border are limited to "only those rights regarding admission that Congress has provided by statute." *Thuraissigiam,* 591 U.S. at 140. The INA provides that a noncitizen "may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General," provided that "[s]uch consultation shall be at no expense to the Government and shall not unreasonably delay the process." INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). This statutory right to consult does not attach until a noncitizen becomes eligible for a credible fear interview, and it does not guarantee an absolute right to retain counsel. *See* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). The regulations implementing expedited removal elaborate that "[s]uch consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained." 8 CFR 235.3(b)(4)(ii).

Moreover, because this rule does not alter procedures governing consultation or representation, commenters' concerns regarding those issues—including that the minimum 4-hour consultation period violates section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), or is unreasonable—are outside the scope of this rulemaking. Procedures regarding consultation and representation are governed by other DHS regulations, guidance, and policies.

Nevertheless, insofar as commenters' concerns relate to the Departments' decision to adopt the changes made by the IFR and this rule, DHS's changes to the consultation period do not undermine the Departments' decision to promulgate this rule. Those changes aim to address the same emergency border circumstances as this rule—specifically, DHS determined that shortening the minimum consultation period would reduce the risk that DHS's processing capacity would become overwhelmed by increasing DHS's ability to impose

consequences swiftly, which in turn lowers incentives for additional irregular migration. DHS's 4-hour minimum consultation period, moreover, continues to allow sufficient time for individuals to make multiple phone calls and have in-depth conversations. DHS is not aware of any data supporting the assertion that this approach has decreased the effective availability of consultation. Finally, even if this approach had some adverse effect on noncitizens' ability to consult, the Departments would still find it necessary and appropriate to adopt this rule's changes, including the two changes to the portions of the removal process that follow consultation—the asylum limitation and the reasonable probability standard.

The Departments start by explaining how the consultation process works. Once a noncitizen is referred to USCIS for a credible fear interview pursuant to 8 CFR 235.15(b)(4), the rule ensures that the noncitizen receives information about that interview and the right to consult with a person or persons of the noncitizen's choosing. Specifically, all those referred for a credible fear interview receive a written "Information About Credible Fear Interview Sheet" describing the purpose of the referral and the credible fear interview process; the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; the right to request a review by an IJ of any negative fear determination an AO enters; and the consequences of a failure to establish a credible fear of persecution or torture. 8 CFR 235.15(b)(4)(i)(B). This written disclosure is available in English, Spanish, Haitian Creole, and Portuguese, and the noncitizen is also provided with a list of pro bono legal service providers. If the noncitizen does not speak one of these languages, then language access services are provided to orally communicate the written material in a language understood by the noncitizen.[154] As stated in the "Information About Credible Fear

Interview Sheet," the minimum 4-hour consultation period begins at the time a noncitizen who has been referred to USCIS for a credible fear interview has access to a phone or another opportunity to consult with an individual of the noncitizen's choosing, and the minimum 4-hour period runs only between the hours of 7 a.m. and 7 p.m. This period is calculated in local time. Procedurally, a noncitizen is scheduled for a credible fear interview only after the minimum consultation period has elapsed, regardless of whether the noncitizen used the phone or consulted with anyone during that period.

The "Information About Credible Fear Interview Sheet" further explains that the noncitizen may have a consultant of the noncitizen's choice participate in the interview with USCIS by telephone, and an EOIR-maintained list of pro bono legal service providers who may be able to speak with the noncitizen is also provided. The information sheet instructs noncitizens to ask a DHS officer for assistance if they want to call someone. Individuals who manifest fear in CBP custody and go through the credible fear process in CBP custody are provided access to a phone in order to telephonically consult with any individual of their choosing, including legal counsel, and do not need to ask CBP employees to do so. After manifesting a fear, when a phone becomes available, such noncitizens are brought to the phone and given at least 4 hours in which to use it. If a noncitizen requests use of a phone after the end of the noncitizen's consultation period, but before the noncitizen's interview occurs, the noncitizen is afforded the opportunity to access a phone unless it is not operationally feasible to provide such access (such as because of a lack of available personnel to escort the noncitizen to the consultation area). The phone booths in which such consultations occur are private, closed, confidential booths and include an EOIR-maintained list of pro bono legal service providers.[155]

Those detained noncitizens who go through the credible fear process in ICE custody generally have direct access to phones (without having to interact with facility staff to request access, for instance) and have access to a free call platform that includes telephone numbers of legal service providers who are listed on the EOIR-maintained list of pro bono legal service providers, in accordance with ICE detention

standards.[156] Beyond telephone access, visits between a legal representative and a detained noncitizen are confidential and not subject to auditory supervision.[157] Private consultation rooms may be available for these meetings.[158] To facilitate improved access to legal resources and representation, ICE has also expanded its Virtual Attorney Visitation program, which facilitates confidential attorney-client conversations through virtual technology.[159]

Commenters' arguments concerning the minimum 4-hour consultation period, first, miss that Congress did not provide an unqualified right to consultation or representation during the credible fear process. Rather, noncitizens may consult "according to regulations prescribed by" the Secretary, and "[such consultation . . . shall not unreasonably delay the process." *See* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). And those regulations specify that "consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained." 8 CFR 235.3(b)(4)(ii). "Read together, the text of these provisions provides noncitizens with a right to consultation while they are detained pending expedited removal, but also plainly establish that the consultation right is subordinate to the expedition that this removal process is designed to facilitate, and that the scope of the right to consult is determined by the facility in which these noncitizens are detained." *Las Americas Immigr. Advoc. Ctr.* v. *Wolf*, 507 F. Supp. 3d 1, 25 (D.D.C. 2020); *cf.* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III) (providing that IJ review of an AO's negative credible fear determination "shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination").

DHS, moreover, moved to the 4-hour minimum consultation period for credible fear referrals for noncitizens

---

[154] *See, e.g.,* ICE, *2019 National Detention Standards for Non-Dedicated Facilities,* Foreword (2019), *https://www.ice.gov/detain/detention-management/2019* ("Generally, all written materials provided to detainees must be translated into Spanish and other frequently encountered languages. Oral interpretation or other language assistance must be provided to any detainee who speaks a language in which written material has not been translated or who is illiterate."); ICE, *2011 Operations Manual ICE Performance-Based National Detention Standards,* Standard 2.13 (2011), *https://www.ice.gov/detain/detention-management/2011* ("Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.").

[155] *See* USBP, *6.4.24 USBP Field Guidance,* at 4.

[156] ICE, *Attorney Information and Resources: Communicating with Your Client or Prospective Client* (last updated Aug. 9, 2024), *https://www.ice.gov/detain/attorney-information-resources.* Telephone access and use may be limited in the event of emergencies (for instance, escapes, escape attempts, disturbances, fires, power outages) or other events that disrupt orderly facility operations. If such disturbances occur, officers are responsible for ensuring that the minimum 4-hour consultation period is afforded.

[157] *Id.*

[158] *Id.*

[159] ICE, *Virtual Attorney Visitation Program* (last updated Aug. 16, 2024), *https://www.ice.gov/detain/detention-facilities/vav.*

covered by the IFR to address the emergency border circumstances described in the President's June 3 Proclamation based on a determination that operational imperatives necessitated this change in order to avoid unreasonable delays to the process in the context of these emergency border circumstances— exactly the type of determination that Congress authorized DHS to make. Under DHS's guidance that applies outside of the context of emergency border circumstances, noncitizens are not interviewed until at least 24 hours after the noncitizen's acknowledgement of receipt of the Form M–444,[160] unless the noncitizen, at the noncitizen's request, voluntarily waives the consultation period. Even if a noncitizen consults at the start of that 24-hour period, the noncitizen's credible fear interview is not conducted until after that period ends.

The 4-hour approach allows a swifter cadence of scheduling noncitizens for credible fear interviews. This minimum 4-hour consultation period thus enables credible fear screenings to take place in a more efficient manner and reduces the time noncitizens remain in custody; in turn, those improvements mitigate overcapacity issues in DHS facilities, free up detention space to allow for greater expedited-removal processing capacity over time, and help to avoid situations in which DHS must issue NTAs to individuals otherwise eligible for expedited removal and release them pending section 240 removal proceedings—in turn delaying the imposition of consequences for those without a legal basis to remain in the United States and creating incentives for additional arrivals at the border. Conversely, a longer minimum consultation period would delay credible fear screenings, increase the amount of time noncitizens remain in immigration detention, and contribute to a situation where DHS's capacity could quickly become overwhelmed, including potentially requiring the release of individuals into section 240 removal proceedings instead of processing such individuals under expedited removal due to resource constraints—thus delaying the imposition of consequences for those without a legal basis to remain and creating incentives for more irregular migration.

The Departments disagree with the conclusion drawn by certain

commenters that a shortened minimum consultation period effectively eliminates access to counsel or that the hours during which the consultation period runs make it practically impossible for noncitizens to reach attorneys or consultants. To the contrary, the minimum 4-hour period that DHS has adopted allows sufficient time for individuals to make multiple phone calls and have in-depth conversations prior to the credible fear interview. *Cf. Las Americas Immigr. Advoc. Ctr.,* 507 F. Supp. 3d at 12–14, 30.

The difference between DHS's 24-hour approach and its approach during these emergency border circumstances is also less significant in practice than certain commenters suggested. For example, the consultation period during emergency border circumstances begins to run only when the individual is provided access to a phone and confers access during at least that 4-hour period; the 24-hour period, by contrast, begins when a noncitizen acknowledges receipt of the Form M–444, and the noncitizen does not necessarily have access to a phone immediately at that point. For those who express a fear in CBP custody, under either approach, CBP generally takes a noncitizen to a phone booth once during the noncitizen's time in custody for consultation, and CBP generally will accommodate requests for additional phone access when operationally feasible. In addition, a significant share of the 24-hour period occurs overnight, when fewer people are likely be available to take calls. Under the 4-hour approach, by contrast, the clock runs only during daytime hours.

The 4-hour period is also a minimum, and noncitizens may receive greater time. For example, for noncitizens in CBP custody, if a noncitizen requests access to a phone booth after the consultation, but the interview has not yet occurred, the agent or officer would in the normal course facilitate another call, to the extent operationally feasible. For noncitizens in ICE custody, noncitizens are generally housed in areas with phones that they may use at any time. Hence, noncitizens have phone access even during times when the 4-hour consultation period is tolled, as well as in circumstances in which the noncitizen's credible-fear interview is delayed for a longer time than the 4-hour minimum. The result is that noncitizens in ICE custody will often have more than 4 hours of phone access. Requests to reschedule the credible fear interview may be accommodated for reasons that constitute extraordinary circumstances, such as serious illness of the noncitizen's consultant or serious

facility issues that prevented the noncitizen from contacting a consultant.

The Departments acknowledge that the period includes Saturdays, Sundays, holidays, and periods outside of traditional business hours (7 a.m. to 9 a.m. and 5 p.m. to 7 p.m.). And while the Departments recognize that it may be more difficult for detained noncitizens to connect with the person or persons with whom they wish to consult during these times, this concern again does not undermine the Departments' decision to adopt the changes in the IFR and this rule. DHS's 24-hour approach also includes Saturdays, Sundays, and holidays.[161] Although DHS's 4-hour approach uses a shorter window during those periods than its 24-hour approach, the Departments have already explained why that change makes less of a practical difference than some commenters suggest. Moreover, although DHS's approach during emergency border circumstances may sometimes result in some or all of the 4-hour period falling outside of traditional business hours, noncitizens may reach out to individuals in different time zones during these periods. For those who manifest fear in CBP custody, CBP provides noncitizens with a list of legal service providers operating in multiple time zones.[162] For those who manifest fear in ICE custody, ICE provides noncitizens with a list of legal service providers who service the area in which the noncitizen is detained and ICE will, upon request, provide the noncitizen a list of providers in additional States identified by the noncitizen. In addition, DHS's 24-hour approach also does not guarantee that noncitizens would have access to phones during traditional business hours (for example, when the period falls over a weekend or holiday).[163] Excluding weekends, holidays, and periods outside of traditional business hours would thus mark a significant

---

[160] *See* Memorandum for Andrew Davidson, Acting Deputy Dir., USCIS, from John L. Lafferty, Chief, Asylum Div., USCIS, *Re: Scheduling of Credible Fear Interviews* (May 10, 2023).

[161] *See* DHS, *M–444 Information About Credible Fear Interview* (May 10, 2023) (noting that the interview will occur no earlier than 24 hours after receipt of the form without mention of any tolling or stoppage).

[162] *See, e.g., EOIR, List of Pro Bono Legal Service Providers (Noncitizens in U.S. Customs and Border Protection Custody)* (July 2024), *https://www.justice.gov/eoir/page/file/1582586/dl.*

[163] The consultation period also was not tolled for weekends, holidays, or periods outside of normal business hours under the 48-hour approach that predated the 24-hour approach. *See* Memorandum for Andrew Davidson, Acting Deputy Dir., USCIS, from John L. Lafferty, Chief, Asylum Div., USCIS, *Re: Scheduling of Credible Fear Interviews* (May 10, 2023) ("Under the current policy, credible fear interviews have generally taken place at least 48 hours after the time of the noncitizen's arrival at the detention facility, unless the noncitizen specifically requests to be interviewed more quickly.").

change in DHS's practice that could lead to unreasonable delays. And because CBP continues to encounter individuals and to take them into custody 24 hours a day and 7 days a week, that change would be inconsistent with the imperative to facilitate the prompt operation of the expedited removal process, especially during the emergency border circumstances when this rule applies.

In addition, when a noncitizen receives a negative credible fear determination, the noncitizen also has an additional opportunity to consult before review of that determination by an IJ (if requested). INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). Noncitizens can obtain counsel or consult with other individuals of their choosing and seek to introduce new evidence before IJs, allowing for additional consultation beyond the initial 4 hours. INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); 8 CFR 1003.42(c). That additional consultation opportunity further reinforces the Departments' view that the minimum 4-hour consultation period prior to the credible fear interview does not undermine their decision to adopt the changes made by the IFR and this rule.

In response to comments alleging that legal representatives have been excluded from credible fear interviews, the Departments again note that neither this rule nor the consultation period policy changes the procedures and regulations governing attorney participation during credible fear interviews. Under existing regulations, all noncitizens are afforded the opportunity to have a person or persons of their choosing present, including by phone, during their credible fear interview. 8 CFR 208.30(d)(4). In any case where USCIS has received a properly executed G–28, Notice of Entry of Appearance as Attorney or Accredited Representative, prior to the credible fear interview, asylum office staff notify the attorney or accredited representative of the scheduled interview date and time, and the AO must call the attorney or representative before beginning the interview so the attorney or representative may be present. If the AO is unable to reach the attorney or accredited representative, the AO documents this in the interview notes and asks the noncitizen if the noncitizen would like to proceed without the attorney or accredited representative present. Guidance instructs that, where a properly executed Form G–28 is on file, asylum office staff will attempt to ensure that the attorney or accredited representative is present at the interview if the

noncitizen desires such a person's presence. Further, as long as it does not unreasonably delay the process, the asylum office has discretion to reschedule interviews on a case-by-case basis to ensure that an attorney or accredited representative may attend. At the beginning of the credible fear interview, if it has not already been established through a Form G–28, the AO asks the noncitizen if the noncitizen has an attorney or consultant and verifies whether the noncitizen received a list of free or low-cost legal service providers. If the noncitizen does not have an attorney or consultant present, the AO reminds the noncitizen that the noncitizen may have an attorney or consultant present during the interview and asks the noncitizen if the noncitizen wants to continue with the interview without an attorney or consultant present. In addition, as noted above, if a noncitizen requests to reschedule the interview for reasons that constitute extraordinary circumstances, such as illness of the noncitizen's consultant or technical issues that prevented the noncitizen from contacting a consultant, such requests may be accommodated. If there are individual instances where commenters believe legal representatives have been excluded from a credible fear interview contrary to the wishes of a noncitizen, commenters should lodge those complaints through the proper channels,[164] but the Departments emphasize that the present rule does not change the regulatory provisions that govern who may be present during the credible fear interview or impact how asylum office staff ensure those provisions are enforced.

As for the credible fear interview itself, as discussed more fully below in Section III.C.3 of this preamble, even with the heightened screening standard for those found not to have a significant possibility of demonstrating eligibility for asylum under this rule's limitation on asylum eligibility, the type of information sought to be elicited during a credible fear interview is well within a noncitizen's knowledge, such that having an attorney is not necessary to secure a positive outcome. 89 FR at 48747–48. Indeed, even after implementation of the IFR, the experience of DHS has been that noncitizens who do not have an attorney or consultant present during

the credible fear interview are often able to successfully satisfy the "reasonable probability" screening standard.[165] Additionally, under the IFR and this rule, a noncitizen may request IJ review of an AO's negative credible fear determination, which provides an additional layer of protection, including for those noncitizens who are unable to consult with an attorney.

With respect to commenters' reliance on data that purport to show that few noncitizens are able to secure the assistance of counsel during the credible fear process and that those who do receive better outcomes, the Departments note that such data fail to take into account any screening that may occur by legal service providers to determine the perceived validity of the claim before agreeing to provide representation to a noncitizen. Even assuming some instances of improved results for those with counsel, due process "does not mandate that all governmental decisionmaking comply with standards that assure perfect, error-free determinations." *Mackey* v. *Montrym,* 443 U.S. 1, 13 (1979). Moreover, as discussed in Section II.A.2 of this preamble, 51 percent of SWB encounters between POEs referred to the credible fear process under the rule—including many who did not have an attorney or consultant present during the credible fear interview—have received a positive result.[166]

With regard to commenter concerns about lack of privacy during credible fear interviews, DHS notes that these interviews are conducted "separate and apart from the general public." 8 CFR 208.30(d). The Departments are mindful of their duties under 8 CFR 208.6 and 1208.6 to prevent unauthorized disclosure of records pertaining to any credible fear determination, and AOs are required to explain these confidentiality requirements to noncitizens prior to credible fear interviews.[167] For those going through the consultation and credible fear process in CBP custody, noncitizens consulting with an attorney or other individual before a credible fear interview do so in a private phone booth. USCIS contract interpreters

---

[164] *See* USCIS, *Report USCIS Employee Misconduct* (last reviewed/updated Mar. 15, 2024), *https://www.uscis.gov/scams-fraud-and-misconduct/report-uscis-employee-misconduct; see also* DHS, *Make a Civil Rights Complaint* (last updated Aug. 20, 2024), *https://www.dhs.gov/file-civil-rights-complaint.*

[165] *See* OHSS analysis of data pulled from CBP UIP on September 3, 2024, and data pulled from Global on September 11, 2024 (Fear by Atty or Cons Present tab).

[166] *See* OHSS analysis of data pulled from CBP UIP on September 3, 2024, and data pulled from Global on September 11, 2024 (Fear by Atty or Cons Present tab).

[167] *See* USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* 19–20 (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing—Working With An Interpreter* 14, 30 (Apr. 24, 2024).

conducting telephonic interpretation are bound by the confidentiality requirements protecting all credible fear determinations pursuant to 8 CFR 208.6 [168] and must pass all required DHS background checks applicable to contractors.[169] All AOs receive training on working with interpreters, which includes explaining confidentiality, assessing competency, and recognizing other factors that may affect the accuracy of interpretation.[170] AOs are trained to elicit all relevant testimony during credible fear interviews [171] and will not preemptively issue negative credible fear determinations due to phone connectivity issues. And all AOs receive training on interviewing survivors of torture and other severe trauma.[172]

The Departments therefore decline to amend in this rule existing practices with respect to credible fear proceedings based on commenters' concerns about noncitizens' ability to obtain and consult with counsel. Nothing in the rule alters noncitizens' existing ability to consult with persons of their choosing prior to the credible fear interview, *see* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv), or prior to IJ review of a negative credible fear determination, *see* 8 CFR 1003.42(c). The Departments believe that any minimal adverse impact on the ability to retain counsel resulting from the rule and changes in DHS's practices are outweighed by the significant benefits to efficiency that the rule and DHS's changed practices promote. In addition, the Departments do not believe that the limitation on asylum eligibility or the heightened ''reasonable probability'' standard applied to those who do not establish a credible fear of persecution for asylum purposes due to the

limitation require significant development prior to the credible fear interview. At the screening stage, the information pertinent to the limitation—including the existence of exceptionally compelling circumstances—and the reasons for the noncitizen's fear of persecution or torture are reasonably expected to be within the noncitizen's personal knowledge at the time of the credible fear interview. *See* 89 FR at 48747–48. And as explained in the IFR, AOs and IJs are trained on and have extensive experience eliciting such information from noncitizens. *Id.* at 48747–48 & nn.241–44. The Departments do not seek to diminish the importance of being able to consult with a person or persons of the noncitizen's choosing during the screening process as provided by statute, *see* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv), but the Departments also do not believe that the information required for the screening process under the IFR and this rule is such that the screening interviews must be significantly delayed to allow for greater consultation time. Doing so in the context of emergency border circumstances would ''unreasonably delay the process.'' INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv).

As to commenters' arguments that ensuring legal representation increases efficiency, discourages frivolous claims, shortens the time required to determine a claim, and reduces the number of appeals and repeat claims, the Departments note that even assuming those claims are true, ensuring legal representation for all noncitizens would impose extraordinary burdens on DHS and would undermine the speed that Congress sought to achieve in the expedited removal system. Moreover, because Congress refrained from creating an unqualified right to legal representation, the approach adopted in this rule accords with the statute and is a reasonable exercise of the Departments' discretion. *See* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv) (providing the noncitizen only an opportunity to ''consult'' with a person prior to a credible fear interview).

(3) Noncitizens' Ability To Have Their Claims Heard

*Comment:* Commenters stated that a quota system would deny vulnerable individuals and families the opportunity to have their claims fairly considered, in contravention of U.S. and international law. Similarly, a commenter stated that, by imposing a cap on daily asylum claims and automatically denying asylum to those

who exceed the limit, the IFR ''nullifies fundamental rights that the United States is obligated to uphold.'' The commenter wrote that this ''blanket denial'' would deviate from due process principles under U.S. and international law that mandate non-refoulement and the individualized assessment of asylum claims. Commenters also stated that the IFR strips away the humane aspects of the asylum system.

*Response:* The Departments do not believe that the rule affords noncitizens an insufficient opportunity to have their asylum or protection claims heard, and the rule's limitation on eligibility includes no automatic ''blanket denials'' based on quotas or caps. Instead, during the emergency border circumstances described in the Proclamation, in the IFR, and in this rule—which relate to encounter levels as described in Section III.D.1 of this preamble—the rule's provisions (which are consistent with U.S. domestic and international law, as discussed in Section III.A.1 of this preamble) impose a limitation on asylum eligibility (with an appropriate exception) and changes to the expedited removal and credible fear process aimed at providing the Departments a greater ability to deliver timely decisions and consequences to noncitizens encountered along the southern border. The rule does so while ensuring that those in expedited removal proceedings who fear removal continue to have their fear claims heard.

First, all noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are referred for a credible fear interview, as appropriate. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); 8 CFR 235.15(b)(4). Such referrals occur irrespective of how many noncitizens have presented at the border or sought protection on a given day.

Second, this rule does not change the longstanding procedural protections that are provided to noncitizens during these credible fear interviews. Credible fear interviews are conducted in a non-adversarial manner,[173] and all AOs are

---

[168] *See* USCIS, *RAIO Directorate—Officer Training: Interviewing—Working With An Interpreter* 14, 30 (Apr. 24, 2024); *see also* USCIS, *Credible Fear Procedures Manual* sec. III.E.3.d (May 10, 2023), *https://www.uscis.gov/sites/default/files/document/guides/CredibleFearProceduresManual.pdf.*

[169] *See* DHS, *Fact Sheet: Contractor Fitness at DHS, https://www.dhs.gov/sites/default/files/publications/personnel_security_contractor_fitness_fact_sheet_new.pdf* (last visited Sept. 20, 2024).

[170] USCIS, *RAIO Directorate—Officer Training: Interviewing—Working with an Interpreter* 14, 17–22, 24, 30, 43–44 (Apr. 24, 2024).

[171] USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* 11 (Apr. 24, 2024) (''In cases requiring an interview, although the burden is on the applicant to establish eligibility, equally important is your obligation to elicit all pertinent information.''); *id.* at 12 (''It is your duty to fully and fairly develop the record by eliciting information from the interviewee, probing for additional information, and following up on the interviewee's statements.'').

[172] USCIS, *RAIO Directorate—Officer Training: Interviewing Survivors of Torture and Other Severe Trauma* (Apr. 24, 2024).

[173] USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* 13–15 (Apr. 24, 2024). As described in a previous rule, AOs have experience in ''country conditions and legal issues, as well as nonadversarial interviewing techniques,'' and they have ''ready access to country conditions experts.'' Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 FR 46906, 46918 (Aug. 20, 2021).

**81200** **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

trained in non-adversarial interview techniques to facilitate their duty to elicit relevant and useful information— in effect, to help the noncitizen meet their burden through testimony alone.[174] 8 CFR 208.1(b). AOs are also trained to consult country conditions information, which often provides context to a noncitizen's claim. *Id.* In evaluating whether a noncitizen has shown a credible fear, AOs are instructed by statute to take into account the credibility of the statements made by the noncitizen and such other facts as are known to the AO. INA 235(b)(1)(B)(ii)–(iii), 8 U.S.C. 1158(b)(1)(B)(ii)–(iii). Just as a noncitizen's testimony alone without corroboration may be sufficient to establish the noncitizen meets the definition of a refugee where it is credible, persuasive, and refers to specific facts, INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii), a noncitizen's testimony alone, in the credible fear context, may meet the burden to demonstrate a credible fear of persecution or torture.[175] Accordingly, insofar as it is part of a credible fear determination, credible testimony and evidence available to the AO alone may be sufficient to demonstrate a significant possibility that the noncitizen could show that the noncitizen is eligible for the "exceptionally compelling circumstances" exception to this rule's limitation on asylum eligibility. The procedures outlined above do not depend on how many noncitizens have presented at the border or have sought protection on a given day.

Third, all negative credible fear determinations are reviewed by a supervisory AO prior to becoming final, *see* 8 CFR 208.30(e)(8), and, consistent with the sole statutorily provided mechanism for review of negative credible fear determinations, *see* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III), noncitizens may request review of a negative credible fear determination before an IJ, *see* 8 CFR 208.35(b)(2)(iii)–(v) (explaining the process for requesting IJ review for those described in the Proclamation and unable to show that the rule's exception to the limitation on asylum eligibility applies).

Unlike the process that applies to negative credible fear determinations under 8 CFR 208.30(g)(1)(i), during which a noncitizen's refusal or failure to request or decline IJ review is treated as a request for IJ review, noncitizens under the present rule must indicate whether they desire IJ review when asked, *see* 8 CFR 208.35(b)(2)(iv). When serving the negative credible fear determination, USCIS staff read the contents of the Form I–869SBIFR, Record of Negative Credible Fear and Reasonable Probability Finding and Request for Review by Immigration Judge for Noncitizens Subject to the Limitation on Asylum Eligibility Pursuant to 8 CFR 208.35(a), to the noncitizen in a language the noncitizen understands, using an interpreter if needed.[176] The Form I–869SBIFR includes a statement that the noncitizen may request that an IJ review the negative determination and that, if the noncitizen does not request IJ review, the noncitizen will not receive review by an IJ and may be removed from the United States immediately. The noncitizen then must check one of two boxes on the I–869SBIFR indicating either that the noncitizen requests IJ review or does not request IJ review. The noncitizen will be referred to an IJ for review of a negative determination only where the noncitizen requests such review. 8 CFR 208.35(b)(2)(iv)–(v). Under the IFR and this rule, IJ review remains available in all cases with a negative credible fear determination, and such review includes an opportunity for the noncitizen to be heard and questioned by the IJ. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.35(b)(2), 1208.35(b)(1) and (2). Additionally, while it is not equivalent to another level of review, USCIS retains the sole discretion to reconsider its own negative credible fear determination following IJ concurrence. 8 CFR 208.35(b)(2)(v)(B). Thus, the rule maintains review of any negative credible fear determination by a supervisory AO prior to service and, following service of a negative credible fear determination, the opportunity to have an IJ review the finding de novo. *See* 8 CFR 1208.35(b)(1).

As discussed above in this section of the preamble, the Departments believe these processes are adequate in light of the high levels of training received by adjudicators and the high volume of cases before the Departments.

**(4) Issues With Asylum Officers, Detention Conditions, and Quality of Credible Fear Determinations**

*Comment:* Several commenters expressed concern with the conduct of AOs during credible fear interviews and suggested that AOs are ill-equipped to conduct the analysis the rule requires, including applying the "exceptionally compelling circumstances" exception to the limitation and screening fear claims at a higher evidentiary standard. Some commenters stated that they are aware of instances where AOs have failed to comply with established guidelines during credible fear interviews and that translation issues, such as Indigenous language speakers being interviewed in Spanish, exist in some cases. One commenter recounted examples of noncitizens who, the commenter believes, were wrongly issued negative credible fear determinations; the commenter said that noncitizens' statements were incorrectly translated by interpreters and that noncitizens were not adequately asked about their experiences or were interrupted by AOs during screenings. Other commenters discussed alleged violations of the credible fear interview procedures experienced by noncitizens, such as alleged failures to address language barriers, that prevent noncitizens from adequately telling their stories, resulting in refoulement.

An organizational commenter discussed its experience with clients who it contends were wrongfully deported and returned to violence, stating that the rule will only increase the frequency with which USCIS errs in conducting credible fear screenings and IJs err in reviewing credible fear determinations. Commenters emphasized that hearings take place shortly after noncitizens have endured lengthy and traumatic journeys to reach the United States and asserted that they take place while noncitizens are in detention facilities with deplorable conditions. Commenters stated that the harm caused by the IFR will be exacerbated by expedited removal policies such as conducting credible fear interviews while noncitizens are in CBP custody. A commenter stated that courts have questioned the reliability of credible fear interviews because of the expedited and stressful nature of the process.

*Response:* The Departments take any allegations of misconduct by AOs or other government officials seriously, and there are existing channels available to report any such alleged

---

[174] *See, e.g.,* USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* 11–12 (Apr. 24, 2024).

[175] *See* USCIS, *RAIO Directorate—Officer Training: Credible Fear of Persecution and Torture Determinations* 19 (May 9, 2024); *see also Kiakombua* v. *Wolf,* 498 F. Supp. 3d 1, 46–47 (D.D.C. 2020) (asylum officer ("AO") cannot require an applicant to provide corroborating evidence at the credible fear stage where the applicant's testimony is otherwise found credible).

[176] Following issuance of this rule, the form will be designated I–869SB instead of I–869SBIFR.

misconduct.[177] To the extent that commenters suggested that examples where they believe AOs failed to follow existing guidance related to credible fear screenings or failed to conduct a fair credible fear interview are representative of AOs generally and are grounds for reasoning that AOs are ill-equipped to perform credible fear screenings under the current rule, the Departments disagree with these assertions and find them unpersuasive. Instances where commenters believe AOs failed to conduct credible fear interviews fairly should be reported through the proper channels and will be addressed on a case-by-case basis, but these anecdotal complaints do not dissuade the Departments from concluding that AOs are capable of performing their duties under this rule. These complaints about AO conduct in specific credible fear interviews do not undermine the statutorily prescribed role of AOs to conduct credible fear interviews and make credible fear determinations, and the Departments are confident, for the reasons explained above, that AOs have the necessary training and expertise to fulfill that role.

As discussed in Section III.A.1.c of this preamble, the rule operates within the expedited removal and credible fear screening process established by section 235 of the INA, 8 U.S.C. 1225, and comports with all statutory requirements. Under the credible fear statutory framework, AOs conduct credible fear screening interviews. INA 235(b)(1)(B)(i), 8 U.S.C. 1225(b)(1)(B)(i). By definition, AOs are individuals who have had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of asylum applications under section 208 of the INA, 8 U.S.C. 1158. INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E). They are supervised by officers who meet the same training requirements and have had substantial experience adjudicating asylum applications. INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E). AOs conducting credible fear interviews do so in a non-adversarial manner, beginning with ensuring the noncitizen understands the purpose of the interview, that the noncitizen has a right to have a legal representative or other person of the noncitizen's choosing present during the interview, and that the noncitizen understands the

interpreter, where applicable. 8 CFR 208.30(d). USCIS has language access policies in place to ensure that noncitizens have an interpreter for a language they understand during credible fear interviews and procedures in place that all AOs must follow to address instances where rare language interpreters may not be available, including issuing a discretionary NTA in certain circumstances. After the noncitizen has received an NTA, the noncitizen's language barrier can be addressed in proceedings before an IJ. At the beginning of a credible fear interview, AOs explain to noncitizens the confidentiality provisions governing credible fear interviews pursuant to 8 CFR 208.6, including that the AO and interpreter will keep the noncitizen's information and testimony confidential. The AO verifies that the noncitizen is comfortable proceeding with the interpreter and the AO of the given gender. AOs also ask noncitizens if there are any issues that could affect their ability to testify, such as a language barrier or health issue, and deal with any such issue according to established procedures. All credible fear determinations, including those in which the IFR limitation on asylum eligibility applies, are reviewed by supervisory AOs before becoming final and being served on the noncitizen, and this will remain true under the final rule. 8 CFR 208.30(e)(8). Supervisory review includes ensuring that AOs follow all applicable procedures and guidelines related to language access and other issues that could impede the noncitizen's ability to effectively communicate during a credible fear interview.

As already explained, AOs are specifically trained on eliciting testimony, working with interpreters, engaging in cross-cultural communication, detecting possible victims of trafficking, and interviewing vulnerable populations, including survivors of torture and other severe trauma. In addition to receiving specialized training on interviewing and eliciting testimony, AOs are trained on and well-versed in applying substantive asylum law in both full asylum adjudications and in screening determinations. As explained in the IFR, AOs and supervisory AOs have the training and experience necessary to identify in a screening whether the information the noncitizen has provided is sufficiently specific to lead them to believe that the noncitizen may be able to establish eligibility at the merits stage. 89 FR at 48748. AOs frequently assess physical and psychological harm

when adjudicating asylum applications and are trained to do so in a sensitive manner.[178] AOs may also evaluate harm resulting from the unavailability of necessary medical care or specific medications when assessing ''other serious harm'' under 8 CFR 208.13(b)(1)(iii)(B) in full asylum adjudications.[179] When conducting a credible fear interview where the IFR's limitation on asylum eligibility applies, AOs' questioning will necessarily include information related to whether there is a significant possibility that the noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that the noncitizen satisfies the rule's exception, regardless of whether the noncitizen affirmatively raises the issue. Since May 11, 2023, when the Circumvention of Lawful Pathways rule went into effect, AOs and supervisory AOs have evaluated the exceptionally compelling circumstances grounds for rebutting the presumption of asylum ineligibility under that rule, including the enumerated examples of an acute medical emergency, imminent and extreme threat to life or safety, and satisfying the definition of a victim of a severe form of trafficking in persons. 8 CFR 208.33(a)(3). The enumerated examples mirror the enumerated examples of exceptionally compelling circumstances that except noncitizens from the limitation on asylum eligibility under the IFR and this rule, see 8 CFR 208.35(a)(2), so not only have AOs and supervisory AOs been implementing this approach since the IFR was implemented, but they also already had considerable experience in eliciting testimony related to the ''exceptionally compelling circumstances'' exception and determining whether that exception applied in the context of the Circumvention of Lawful Pathways rule. Likewise, IJs have extensive experience and training in applying such concepts to individual cases under the Circumvention of Lawful Pathways rule and the IFR.[180] Accordingly, the

---

[177] See USCIS, Report USCIS Employee Misconduct (last reviewed/updated Mar. 15, 2024), https://www.uscis.gov/scams-fraud-and-misconduct/report-uscis-employee-misconduct; see also DHS, Make a Civil Rights Complaint (last updated Aug. 20, 2024), https://www.dhs.gov/file-civil-rights-complaint.

[178] For example, AOs adjudicate cases involving forms of persecution like female genital mutilation, forced abortion, and forced sterilization. See Matter of Kasinga, 21 I&N Dec. 357 (BIA 1996); INA 101(a)(42)(B), 8 U.S.C. 1101(a)(42)(B); see also USCIS, RAIO Directorate—Officer Training: Gender-Related Claims 23–27 (Apr. 24, 2024).

[179] See USCIS, RAIO Directorate—Officer Training: Definition of Persecution and Eligibility Based on Past Persecution 56–57 (Apr. 24, 2024).

[180] See 8 CFR 1003.0(b)(1)(vii) (EOIR Director's authority to ''[p]rovide for comprehensive, continuing training and support'' for IJs); 8 CFR 1003.9(b)(1)–(2) (Chief IJ's authority to issue ''procedural instructions regarding the implementation of new statutory or regulatory
Continued

**81202** **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

Departments believe that IJs and AOs will continue to fairly and competently examine the facts and circumstances of each individual's case to determine whether the individual has established a significant possibility that the individual would ultimately be able to demonstrate by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that the individual satisfies the rule's exception.

The Departments consider the commenters' concerns about the quality of determinations unfounded. USCIS AOs and supervisory AOs have received the same thorough training and materials related to applying the IFR across offices and jurisdictions. Asylum staff nationwide use the Global case management system,[181] which includes updated interview guides, forms, and instructions for processing cases under the IFR to ensure consistency in procedures and substantive guidelines. All credible fear determinations, as noted above, are subject to review by a supervisory AO, 8 CFR 208.30(e)(8), and IJ (if requested), INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III), and determinations made in section 240 removal proceedings are subject to administrative appeal and judicial review.

Regarding concerns about noncitizens going through the credible fear process while in CBP custody, the Departments disagree with the contention that such a process causes or exacerbates harm. Noncitizens who are going through the credible fear process in CBP custody are given at least 4 hours between 7 a.m. and 7 p.m. to telephonically consult with an individual of their choosing, including legal counsel, before their credible fear interview. Additionally, the noncitizens are afforded privacy for these consultations, which occur in a private phone booth. These phones and phone booths are also used to conduct the credible fear interview.

Additionally, to the extent that commenters have generalized concerns about conditions in CBP custody, such comments are outside the scope of this rule. DHS notes, however, that it is committed to providing safe, sanitary, and humane conditions to all individuals in custody, and that it is committed to transferring individuals out of CBP custody in an expeditious manner. The Departments further note that one anticipated effect of this rule is to reduce the risk of overcrowding in DHS detention facilities. *See* 89 FR at 48742 (noting that "[h]igh [encounter] numbers, such as those giving rise to the Proclamation and this rule, increase the likelihood that USBP facilities will become quickly overcrowded . . . [which] creates health and safety concerns for noncitizens and Government personnel").

(5) Fairness or Risks Associated With Process

*Comment:* Commenters stated that the rule would undermine the commitment of the United States to providing refuge for those fleeing persecution and violence and exacerbate the humanitarian crisis at the southern border. Other commenters stated that the rule would increase refoulement and that the Departments did not adequately consider this consequence. Commenters asserted that the rule could cause arbitrary denials of asylum, thus placing noncitizens back into harm's way and resulting in life-threatening outcomes. A commenter asserted that the IFR ignores the realities of initial fear screenings (including that individuals have often experienced a long and difficult journey, undergo screenings within days of arrival, and may face barriers to accessing counsel and language services) and establishes an even higher screening standard that may prevent noncitizens from factually presenting claims before an AO. A commenter stated that a decline in positive credible fear determinations under the Circumvention of Lawful Pathways rule is a result of an orchestrated effort to reduce the screen-in rate by erecting barriers to eligibility and attorney consultation and eroding due process protections, not the result of the appropriate screening out of claims that would in fact be non-meritorious, as suggested by the Departments in the IFR.

Some commenters discussed the existing difficulties that noncitizens in CBP custody have in obtaining what they need, such as a pen and paper to write down essential information, access to counsel, and access to private phone services. Some commenters

stated that they have witnessed failures by USCIS and EOIR to notify attorneys of their clients' interviews and immigration court reviews.

*Response:* The present rule complies with all statutory and regulatory requirements related to access to counsel, including the right of a noncitizen to access counsel at no cost to the Government, the right to consult with a person of the noncitizen's choosing prior to the credible fear interview, and the right to have a person of the noncitizen's choosing (including a legal representative) present during the interview, provided it will not cause unreasonable delay. INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); 8 CFR 208.30(d)(4). Moreover, in addition to protecting the procedural safeguards guaranteed by statute, the rule also ensures the United States honors its non-refoulement obligations under international law by screening for statutory withholding and protection under regulations implementing the CAT, even where a noncitizen is subject to the rule's limitation on asylum eligibility and cannot establish that the rule's exception applies under the significant possibility standard. 8 CFR 208.35(b)(2). Contrary to commenters' assertions that noncitizens may be prevented from presenting factual claims to an AO where they are subject to the IFR's limitation on asylum eligibility, AOs elicit testimony, and noncitizens have the opportunity to present testimony and other evidence relevant to a potential persecution or torture claim, even where the limitation applies and no exception is established during the credible fear interview; this allows the AO to effectively screen the noncitizen for a reasonable probability of persecution or torture. 8 CFR 208.35(b)(2)(i). Indeed, the experience of USCIS with the IFR since its implementation illustrates that noncitizens are still able to meet the higher reasonable probability standard in approximately 48 percent of cases where the IFR's limitation on asylum eligibility applies and no exception is established during the credible fear interview.[182]

Further, while a commenter suggested that the drop in the overall screen-in rate under the Circumvention of Lawful Pathways rule resulted from barriers to eligibility or to counsel and the erosion of due process rights, as opposed to screening out more potentially non-meritorious cases under the higher "reasonable possibility" standard in the

---

[181] USCIS, *Privacy Impact Assessment Update for the USCIS Asylum Division*, at 4 (2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-asylum-september2018.pdf*.

authorities" and "[p]rovide for appropriate training of the [IJs] . . . on the conduct of their powers and duties"); EOIR, *Legal Education and Research Services Division* (last updated Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division* ("The Legal Education and Research Services Division (LERS) develops and coordinates headquarters and nationwide substantive legal training and professional development for new and experienced judges, attorneys, and others within EOIR who are directly involved in EOIR's adjudicative functions. LERS regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations.").

[182] OHSS analysis of data pulled from CBP UIP on September 3, 2024 (Fear Screening—STB tab).

IFR, *see* 89 FR at 48746, a more granular examination of the various screen-in rates undermines the commenter's assertion. In fact, SWB encounter credible fear screen-in rates for screenings conducted by USCIS under the significant possibility standard remain consistent or increase when comparing (1) interviews that took place in the pre-pandemic period (76 percent positive); (2) interviews that took place under the Circumvention of Lawful Pathways rule where the presumption of asylum ineligibility applied but an exception was established (79 percent positive) or the presumption was rebutted (86 percent positive); and (3) interviews that took place under the IFR where the IFR's limitation on asylum eligibility applied but the IFR's exception was applicable (81 percent positive).[183] If anything, then, the screen-in rate at the significant possibility standard is higher under the Circumvention of Lawful Pathways rule and under the IFR, notwithstanding commenters' claims that factors such as difficulty in accessing counsel necessarily reduce screen-in rates. Rather, USCIS screen-in rates for USBP encounters effectively drop only when AOs apply the higher substantive standards, dropping (1) to approximately 51 percent for cases screened at the reasonable possibility standard where the Circumvention of Lawful Pathways presumption of asylum eligibility applies and no exception or rebuttal is established; and (2) to approximately 48 percent for cases screened at the reasonable probability standard where the IFR's limitation on asylum eligibility applies and no exception is established.[184] Accordingly, the analysis provided by the Departments in the IFR concluding that the drop in screen-in rates under the higher ''reasonable possibility'' standard relates to the merits of the potential claim, *see* 89 FR at 48746, remains supported and is only further bolstered by the experience of the Departments in implementing the IFR.

The IFR acknowledges that the rule's manifestation of fear and reasonable probability standards may increase the risk that some noncitizens with meritorious claims may not be referred for credible fear interviews or may not receive a positive credible fear

determination. 89 FR at 48767. It also explains that there may be costs to noncitizens that result from their removal—indeed, such costs are likely. *Id.* Thus, the Departments did consider these risks, and they have continued to consider these risks in finalizing this rule.

The Departments weighed the fact that, despite the protections preserved by the rule, the available exception, and the training and expertise of DHS personnel, the changes to the credible fear process adopted may result in the denial of asylum where such an asylum claim otherwise may have been granted. *Id.* at 48750 n.250. As with all screening mechanisms, there is some risk that a case that might otherwise lead to a grant of asylum might not proceed to a merits adjudication, *id.,* but as discussed in Sections III.C.2.c and III.B.2.a.ii of this preamble, DHS personnel have significant experience and training in recognizing and interviewing noncitizens with protection claims, which the Departments believe will minimize the frequency of such cases. Regardless, in light of the emergency border circumstances facing the Departments and addressed in the Proclamation and this rule, the Departments believe these measures are appropriate, necessary, and legally permissible. *Id.* And given the emergency border circumstances facing the Departments and the gap between high rates of referrals and screen-ins during the immediate post-pandemic period and historic ultimate grant rates, as described in Section II.A.2 of this preamble, the Departments believe the rule's provisions are appropriate and justified even if certain close cases result in imperfect outcomes. *Id.* As with other conditions and limitations imposed under section 208(b)(2) of the INA, 8 U.S.C. 1158(b)(2), this rule is grounded in important policy objectives, including providing those with valid asylum claims an opportunity to have their claims heard in a timely fashion, preventing an increased flow of migrants arriving at the southern border that would overwhelm DHS's ability to provide safe and orderly processing, and reducing the role of exploitative TCOs and smugglers. The Departments have determined that these important policies outweigh whatever marginal impact on meritorious claims the rule might have.

DHS serves noncitizens with all the necessary documents related to their credible fear determination, 8 CFR 208.30(f)–(g), which for noncitizens in detention may be served through a telephone call by USCIS, during which

information on the noncitizen's determination is relayed in a language that the noncitizen understands, while CBP or ICE personnel physically provide the documents to a noncitizen. While any person may consult with a noncitizen in the credible fear process, DHS provides copies of documents only to legal representatives who have completed a fully executed Form G– 28.[185] Although commenters expressed concern about the burden of obtaining consent and a signature from a detained noncitizen, the Departments must balance the sensitive nature of credible fear interviews and the importance of confidentiality pursuant to the nondisclosure provisions in 8 CFR 208.6.

With regard to the comment about noncitizens in CBP custody having difficulties obtaining items such as pen and paper, or having access to counsel or to private phone booths, the Departments disagree with the commenters' characterizations. Noncitizens who are going through the credible fear process in CBP custody are provided with pen and paper, and they are afforded a period of time to consult with an individual of their choosing, which occurs in a private phone booth, as discussed in this section.[186] These phones and phone booths are also used to conduct the credible fear interview.

### iii. Impacts on Specific Vulnerable Populations, Discrimination Concerns

*Comment:* Many commenters expressed concern that the rule would disproportionately harm vulnerable groups, including Black individuals, Indigenous individuals, and People of Color (''BIPOC''), those who are HIV positive, and people with disabilities. For example, a commenter remarked that the Departments did not analyze the effect the rule has on particularly vulnerable populations such as Black migrants. A commenter voiced concern about the impact the rule could have on predominantly BIPOC communities, remarking that the rule perpetuates harmful political rhetoric about these communities and the border that can lead to long-term detrimental effects and violence. While sharing specific examples of the way the IFR has impacted members of BIPOC communities, another commenter raised

---

[183] OHSS analysis of June 2024 Enforcement Lifecycle data, July 2024 Persist Dataset, and data downloaded from UIP on September 3, 2024 (Summary Statistics tab; Fear Screening—CLP tab; Fear Screening—STB tab).

[184] OHSS analysis of June 2024 Enforcement Lifecycle data, July 2024 Persist Dataset, and data downloaded from UIP on September 3, 2024 (Fear Screening—CLP tab and Fear Screening—STB tab).

[185] DHS, *Instructions for Notice of Entry of Appearance as Attorney or Accredited Representative* 1, 4 (Sep. 17, 2018), *https:// www.uscis.gov/sites/default/files/document/forms/ g-28instr.pdf.*

[186] To the extent that commenters have concerns regarding compliance with this policy, DHS notes that such complaints about noncompliance can be addressed under the process described in Section III.C.2.c of this preamble.

**81204**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

concern for the discrimination these populations may face under the rule while seeking asylum and waiting for an appointment. A commenter stated that the rule would prevent fair and equal access to lifesaving protections and lead to the unnecessary deaths of individuals who are denied entry and returned to dangerous and unsafe countries. Therefore, the commenter urged, the rule should be rescinded in its entirety.

*Response:* The Departments are committed to the equal treatment of all persons, and this rule does not distinguish between individuals based on race, nationality, ethnicity, or any other protected characteristic. The Departments also acknowledge that certain populations, including members of BIPOC communities, may have unique vulnerabilities or face unique issues in their country of origin or countries of transit, and agree that the United States has certain legal obligations to protect noncitizens present in the United States who fear harm in their home countries. But as explained more fully in Section III.A.1 of this preamble, the rule ensures that noncitizens may continue to seek asylum or other protection in the United States. The Departments note that the rule and its exception apply equally to noncitizens who enter during the times when emergency border circumstances are present, regardless of nationality, race, ethnicity, or other demographics of concern identified by the commenters. Further, as explained in this section, adjudicators receive training to help them identify members of vulnerable communities and account for the harms such individuals may face. And, to the extent that members of certain communities may face greater risks because of their membership in those communities, the Departments believe that the "exceptionally compelling circumstances" exception will afford a means to seek asylum or protection when those risks manifest as specific threats to the individuals in question.

*Comment:* Several commenters expressed concern regarding the separation of families and the treatment of trafficking victims. A commenter generally supported allowing united families to escape persecution and cross the border together. Other commenters raised concern that the IFR and associated policy changes routinely separate families and often complicate or prevent family reunification. Another commenter wrote that the rule is likely to impose negative impacts on family wellbeing and result in family separations, as the commenter reasoned the changes in policy would incentivize an increase in the arrival of UCs because

families are unable to seek or receive protection by crossing the border together. One commenter also expressed concern that the rule puts children at risk to migrate alone. Another commenter elaborated that family unity and reunification is fundamental to our Nation's immigration policies and the foundational principles of a Catholic social teaching. The commenter voiced concern that the effects of this rule would be similar to the effects of the Migrant Protection Protocols ("MPP") and the Title 42 public health Order, which, the commenter stated, "led families to 'self-separate' at the border" because either the adults decided the conditions in Mexico were too dangerous to wait with them or the adults were injured or had disappeared. The commenter urged the Departments to rescind the rule entirely, arguing that the policy changes undermine families' ability to seek humanitarian protection.

Additionally, a commenter stated that the rule's exemption for survivors of trafficking is inadequate. The commenter wrote that survivors could be returned to trafficking situations when the new heightened credible fear standard fails to trigger safeguards codified in the TVPA.

*Response:* The Departments have designed the rule with a goal of keeping families together. As described in Section III.C.1.e of this preamble, the Departments have adopted family unity provisions that apply during both AMIs and section 240 removal proceedings. *See* 8 CFR 208.35(c), 1208.35(c). Additionally, if one member of a family unit traveling together is excepted from the limitation on asylum eligibility based on exceptionally compelling circumstances, then the entire family unit is excepted. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). Accordingly, commenters are incorrect that the rule disallows families from obtaining relief or protection together.

Additionally, the Departments believe that the safeguards in place for victims of human trafficking are sufficient. A noncitizen who is a victim of a severe form of trafficking in persons as defined in 8 CFR 214.201 is excepted from the suspension and limitation on entry under section 3(b) of the Proclamation and is also separately excepted from the provisions of this rule. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1) (excepting from the limitation on asylum eligibility noncitizens described in section 3(b) of the Proclamation); 8 CFR 235.15(a) (excepting from the manifestation provision noncitizens described in section 3(b) of the Proclamation). Noncitizens who meet that definition

are also excepted from the limitation on asylum eligibility as having established exceptionally compelling circumstances. *See* 8 CFR 208.35(a)(2)(i)(C), 1208.35(a)(2)(i)(C). In practice, these two provisions provide two significant safeguards and work alongside section 3(b) of the Proclamation and 8 CFR 235.15(a) to ensure that noncitizens are not subject to the suspension and limitation on entry or any of the rule's provisions if they meet the definition of a victim of a severe form of trafficking.

*Comment:* A commenter raised concern for non-Mexicans under the rule being removed and left stranded in Mexico without migration documents or resources. The commenter explained that undocumented individuals removed to Mexico are vulnerable to arrest, detention, and potential deportation by Mexican immigration authorities. The commenter stated that this process has been a dangerous and unsafe practice that results in human rights violations and that government officials in Mexico have confirmed this practice will continue and potentially expand under the rule.

*Response:* This rule does not change the statutory and regulatory process for designating the country to which a noncitizen may be removed. To the extent that a greater number of noncitizens may be removed through the operation of this rule—some of whom may be removed to Mexico rather than their home countries, consistent with country of removal designation authorities—the Departments note that noncitizens may assert claims of fear of harm in Mexico and that the rule explicitly provides that noncitizens are screened for fear of harm in their "designated country or countries of removal." 8 CFR 208.35(b)(2)(ii); *see also* 8 CFR 208.35(b)(2)(iii).

The Departments acknowledge that noncitizens other than Mexicans who are removed to Mexico may be subject to Mexican immigration law. However, the Departments disagree that being returned to Mexico is necessarily unsafe, whether because of actions by the Government of Mexico or otherwise. Over the last several years, the Government of Mexico has made exceptional strides to improve conditions for asylum seekers, migrants, and refugees within its borders. For instance, Mexico's Federal Public Defender's office provides legal counseling and support to asylum seekers and migrants who file claims with Mexico's Commission for Refugee Assistance, and the office has expanded its specialized staff and increased its visits to migration stations. 88 FR at

31411. Further, not only is Mexico a party to the 1951 Convention [187] relating to the Status of Refugees and its 1967 Refugee Protocol,[188] but also Mexico's Constitution includes a right to seek and receive asylum from political persecution. *See* Mex. Const. art. 11. In fact, the available grounds to qualify for asylum are broader in Mexico than in the United States. *See* 88 FR at 31411 (explaining that Mexico has joined the Cartagena Declaration on Refugees, which expands the definition of ''refugee,'' ''thus providing some who may apply for protection, such as asylum, with more grounds on which to make their claim than they would have in the United States''). And applicants who do not qualify for asylum in Mexico are automatically considered for complementary protection if they possess a fear of harm in their country of origin, or if there is reason to believe that they will be subjected to torture or to cruel, inhuman, or degrading treatment, but do not meet the ''refugee'' definition; those granted complimentary protection are able to regularize their status.[189]

*Comment:* Multiple commenters expressed concerns for the health and safety of women and noncitizens from Lesbian, Gay, Bisexual, Transgender, Queer/Questioning, and Intersex (''LGBTQI+'') communities. For example, one commenter voiced concern for the asserted lack of equal opportunity and the Departments' asserted lack of analysis of the effect of the rule on particularly vulnerable populations, such as LGBTQI+ migrants. Another commenter wrote that the rule erroneously separates the imminent threat the noncitizen suffer at the border from their future threat of persecution upon return, especially for those noncitizens fleeing from Mexico who identify as LGBTQI+. The commenter wrote that violence towards members of the LGBTQI+ community can happen randomly and unexpectedly, and hence that noncitizens would be unable to predict or articulate the violent risks

they may face when seeking refuge in the United States. In addition, the commenter voiced concern for the disproportionate impacts of the rule on LGBTQI+ community members from Mexico and the ''Northen Triangle'' countries of Guatemala, Honduras, and El Salvador because, the commenter asserted, these countries have long and documented histories of severe violence against the LGBTQI+ population. Citing research, the commenter wrote that 4,385 claims of fear were related to LGBTQI+ status and 98.4 percent of the interviews resulted in positive determinations for fear of persecution. In conclusion, the commenter urged that it is imperative for the United States to remain a haven for all people fleeing danger and violence, especially LGBTQI+ migrants and therefore requested that the IFR be immediately rescinded. This commenter further expressed concern that the IFR was contrary to President Biden's February 2021 memorandum on advancing the human rights of LBGTQI+ persons around the world, which included an explicit instruction to the Departments of State and Homeland Security to ''enhance their ongoing efforts to ensure that LGBTQI+ refugees and asylum seekers have equal access to protection and assistance, particularly in countries of first asylum.''

Citing experts on gender-based violence in Mexico, a commenter stated that violence against asylum seekers who are women or members of LGBTQI+ communities is endemic in many parts of the country. While sharing specific examples involving both LGBTQI+ community members and women, a commenter raised concern about the violence these populations may face under the rule while seeking asylum. For example, the commenter shared that migrant girls, adolescents, and women have either witnessed or been victims of exploitation, sexual violence, kidnapping, and human trafficking both in transit and while waiting in Mexico. The commenter also remarked that the rule adds new barriers that further endanger LGBTQI+ individuals, such as lack of access to safe housing, employment, and medical care.

Another commenter asserted that the rule arbitrarily and unlawfully prevents women, children, families, and LGBTQI+ community members from seeking safety in the form of asylum based on border encounter numbers that are unrelated to the individuals' need for protection. The commenter wrote that the result would be to severely harm the health and safety of those who would otherwise merit protection.

*Response:* The Departments agree that the United States has certain legal obligations to protect those who fear harm in their home countries and recognize the importance of offering noncitizens the opportunity to seek protection from removal from the United States based on a likelihood of future persecution or torture. 89 FR at 48759. But as explained more fully in Section III.A.1 of this preamble and in the IFR, this rule complies with all such obligations and does not deny anyone the ability to apply for asylum or other protection in the United States. *See id.* at 48716–17, 48735–36.

The rule does not prevent noncitizens with valid claims from seeking asylum or other protection. To the extent that, as commenters asserted, women and members of the LGBTQI+ community do in fact face a greater risk of violence, those individuals would necessarily have a greater ability to establish that exceptionally compelling circumstances exist that would except them from the rule's limitation on asylum eligibility. To be clear, generalized risks of violence would not be sufficient to establish such circumstances, but insofar as such generalized risks manifest as specific threats to women and members of the LGBTQI+ community, the rule affords an avenue for those individuals to remain eligible for asylum. 8 CFR 208.35(a)(2), 1208.35(a)(2). And the rule does not change the ultimate eligibility requirements for statutory withholding of removal or CAT protection. A noncitizen who seeks to apply for asylum can also schedule arrival at a POE under a process approved by the Secretary, including by using the CBP One app, and avoid application of the rule. 8 CFR 208.35(a)(1), 1208.35(a)(1); Proclamation sec. 3(b)(v); 89 FR at 48737.

This rule does not preclude noncitizens who cross the southern border from seeking asylum or protection. Indeed, all noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are referred for a credible fear interview, as appropriate. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); 8 CFR 235.15(b)(4). AOs receive mandatory, specific training on screening and adjudicating gender-related claims.[190] This training includes information about violence against women (including domestic

[187] *See* United Nations Treaty Collection, *Chapter V: Refugees and Stateless Persons: Convention Relating to the Status of Refugees, https://treaties. un.org/doc/Publication/MTDSG/Volume%20I/ Chapter%20V-V-2.en.pdf* (last visited Sept. 24, 2024).

[188] *See* United Nations Treaty Collection, *Chapter V: Refugees and Stateless Persons: Protocol Relating to the Status of Refugees, https://treaties.un.org/ doc/Publication/MTDSG/Volume%20I/ Chapter%20V-V-5.en.pdf* (last visited Sept. 24, 2024).

[189] 88 FR at 11721 & n.144 (citing Government of Mexico, *Ley sobre Refugiados, Protección Complementaria y Asilo Político* (Jan. 27, 2011), *https://www.gob.mx/cms/uploads/attachment/file/ 211049/08_Ley_sobre_Refugiados__Protecci_n_ Complementaria_y_Asilo_Pol_tico.pdf*).

[190] USCIS, *RAIO Directorate—Officer Training: Gender-Related Claims* (Apr. 24, 2024).

violence), and guidance on interview considerations specific to gender-based claims.[191] AOs also receive training on screening and adjudicating claims relating to LGBTQI+ noncitizens.[192] This training includes information about types of harm that may be directed at LGBTQI+ individuals, as well as guidance on interview considerations specific to LGBTQI+ claims.[193] AOs are trained to recognize the sensitive nature of these claims and to pursue appropriate lines of inquiry.[194] AOs also receive training on country of origin information specific to LGBTQI+ issues, while recognizing that LGBTQI+ country-of-origin information may sometimes be difficult to find.[195]

Additionally, the Departments recognize the sensitive nature of credible fear interviews, especially for vulnerable populations, including LGBTQI+ noncitizens. For example, for those going through the credible fear process in CBP custody, CBP has taken steps to protect the privacy of noncitizens during their interviews. These interviews occur in confidential and private phone booths intended for use both for consultation and for the credible fear interview. Additionally, ICE provides similar reasonable access to legal counsel for those who are detained in ICE custody during the credible fear process.[196]

*Comment:* Commenters stated that many immigrants today are Punjabi-speaking Sikhs seeking protection due to the worsening human rights conditions under India's current administration. The commenters stated that these immigrants may face hardships such as language barriers and difficulty accessing employment opportunities and resources upon arrival. Commenters stated that the rule would exacerbate language-barrier issues. Specifically, a commenter stated that the requirement to express a fear of persecution explicitly and proactively in order to be referred for a credible fear screening, and the limited time to seek legal advice from a language-accessible attorney, would prevent many Sikh noncitizens from understanding their legal rights or the need to express their credible fear. The commenters wrote

that it is critical for the Sikh community and many other populations fleeing persecution to have the opportunity to seek asylum and requested clarification on how the Government intends to address the concerns of religious minorities who would be impacted by the rule.

*Response:* The Departments disagree that the rule will exacerbate language-barrier issues. For those who are going through the credible fear process in CBP custody, CBP provides language assistance services for those who do not speak English, consistent with CBP's Language Access Plan.[197] CBP immigration officers have extensive experience and training in identifying whether an individual requires a translator or interpreter or is unable to understand a particular language. *See* 89 FR at 48741. In addition, CBP facilities have ''I Speak'' signs, which are signs that assist literate individuals to identify a preferred language from one of over 60 possible languages, including Punjabi.[198] With respect to the signs and videos in CBP facilities that provide general information about the ability to express a fear, individuals who are unable to read those signs or communicate effectively in one of the languages in which the sign and video are presented are read the contents of the sign and video in a language they understand. *See* 89 FR at 48741.

The Departments agree that the United States has certain legal obligations to protect those who fear harm in their home countries, including those who are fleeing for religious reasons, and recognize the importance of offering noncitizens the opportunity to seek protection from removal. But as explained more fully in Section III.A.1 of the preamble, this rule does not deny anyone the ability to seek asylum or other protection in the United States and meets all such legal obligations. *See also id.* at 48716–17, 48735–36. Further, although commenters asserted generally

that religious minorities would be harmed by the IFR and DHS's policy changes, the commenters provided no specific reason to believe that the IFR and policy changes would disproportionately impact any particular religious groups other than the Punjabi-speaking Sikhs discussed above.

*Comment:* Commenters discussed the rule's impact on noncitizens with fewer financial resources and means. For example, a commenter wrote that the rule would further disadvantage those noncitizens with fewer financial resources because they are less likely to pursue alternative routes to safety. A few commenters expressed concern for noncitizens with physical and mental health disabilities. And a commenter remarked that individuals with cognitive issues, disabilities, and language barriers are less likely to effectively articulate fears to border officials.

*Response:* The Departments agree that the United States has certain legal obligations to protect from removal those who fear specific types of harm upon removal and recognize the importance of offering noncitizens the opportunity to seek protection from removal, including noncitizens with fewer financial resources, noncitizens with physical and mental health disabilities, and noncitizens with cognitive issues, disabilities, and language barriers. But as explained more fully in Section III.A.1 of this preamble, this rule does not deny anyone the ability to seek asylum or other protection in the United States. *See also id.* at 48716–17, 48735–36. Further, there is no fee to download or use the CBP One app to schedule an appointment and thereby avoid the IFR's limitation on asylum eligibility,[199] and DHS has designed the CBP One app to be accessible to people with disabilities. Additionally, the Departments note that, depending on individual circumstances, AOs and IJs may find that certain especially vulnerable individuals meet the ''exceptionally compelling circumstances'' standard, or, as discussed previously, AOs may exercise their discretion to issue an NTA to place such noncitizens into section 240 removal proceedings as appropriate, where additional procedural safeguards are available to noncitizens. For

---

[191] *E.g., id.* at 15–20, 42.

[192] USCIS, *RAIO Directorate—Officer Training: Guidance for Adjudicating Lesbian, Gay, Bisexual, Transgender, and Intersex (LGBTI) Refugee and Asylum Claims* (Apr. 24, 2024).

[193] *E.g., id.* at 18–19, 27–34.

[194] *Id.* at 28–30, 37–38, 49.

[195] *Id.* at 43–44, 50.

[196] ICE, *Access to Due Process: Fiscal Year 2023 Report to Congress* 2–3 (Feb. 20,2024), *https:// www.dhs.gov/sites/default/files/2024-04/2024_ 0220_ice_access_to_due_process.pdf.*

[197] *See* CBP, *Language Access Plan* (Nov. 18, 2016), *https://www.dhs.gov/sites/default/files/ publication/final-cbp-language-access-plan.pdf;* CBP, *Supplementary Language Access Plan* (Feb. 7, 2020), *https://www.dhs.gov/sites/default/files/ publications/cbp-updated-language-access-plan-2020.pdf.*

[198] *See* CBP, *Language Access Plan* 7 (Nov. 18, 2016), *https://www.dhs.gov/sites/default/files/ publications/final-cbp-language-access-plan.pdf;* DHS, *I Speak . . . Language Identification Guide, https://www.dhs.gov/sites/default/files/ publications/crcl-i-speak-poster-2021.pdf* (last visited Sept. 24, 2024); DHS, *I Speak . . . Indigenous Language Identification Poster, https:// www.dhs.gov/sites/default/files/publications/ Habla%20Poster_12-9-16.pdf* (last visited Sept. 24, 2024); *see also* DHS, *DHS Language Access Resources* (last updated July 17, 2023), *https:// www.dhs.gov/publication/dhs-language-access-materials.*

[199] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/ about/mobile-apps-directory/cbpone* (explaining in response to frequently asked questions that ''the CBP One™ mobile application is FREE and available to everyone who has access to a mobile device'').

example, during section 240 removal proceedings, IJs may more fully consider whether a noncitizen demonstrates indicia of mental incompetency and, if so, what procedural safeguards are appropriate. *See Matter of M–A–M–,* 25 I&N Dec. at 481–83. Additionally, CBP officers may determine that such noncitizens are excepted from the suspension and limitation on entry (and thus that the provisions of this rule do not apply) under Section 3(b)(vi) or (vii) of the Proclamation.

iv. Impacts on Criminal Enforcement

*Comment:* Commenters stated that they are concerned that noncitizens would face criminal charges if they attempted to return to the United States following removal under the rule. One commenter stated that an increased number of expedited removal orders would inevitably lead more noncitizens to attempt to reenter the United States after their removal, potentially subjecting them to felony charges and two years of imprisonment, and that noncitizens should not be deemed criminals and incarcerated for seeking asylum in the United States. Another commenter stated that charging noncitizens criminally would decrease their access to humanitarian relief and increase the risk that criminal organizations would target those noncitizens.

*Response:* The Departments are committed to the fair, evenhanded enforcement of the law as Congress has enacted it. The Departments agree that, in appropriate cases, noncitizens who have been removed pursuant to an expedited removal order may be subject to criminal charges if they attempt to unlawfully reenter the United States. *See* INA 276(a), 8 U.S.C. 1326(a). Because the rule will allow the Departments to predictably and swiftly impose consequences on noncitizens who enter the United States without a legal basis to remain, the Departments believe noncitizens will be disincentivized from attempting to enter without a legal basis to remain or to reenter after being removed. Nevertheless, for the relatively few who choose nevertheless to reenter unlawfully, congressionally enacted criminal penalties remain an important tool to enforce the law.[200]

v. Negative Impacts on Other Affected Entities

*Comment:* Commenters stated that the rule would impose more burdens on nonprofit organizations, legal-service providers, and communities near the border. One commenter believed that the increase in negative fear determinations would cause legal-service providers to dedicate significant resources to preparing clients for and representing them in hearings before IJs and potential requests for reconsideration to USCIS. The commenter also alleged that the Departments have failed to consider reliance interests such as those of legal-service providers that prepare informational material, employ internal protocols, and deliver client services predicated on access to asylum and on access to clients in custody; the commenter stated that their organization would need to understand the changes effected by the rule, train staff and pro bono volunteers on those changes, and rewrite published legal information in multiple languages. Another commenter stated that its presentations would become longer and more complex to explain the effect of the rule's limitation on asylum eligibility, the exceptionally compelling circumstances needed to overcome it, and the new, heightened "reasonable probability" standard in credible fear interviews. The commenter asserted that the rule would also affect its staff's ability to provide services to callers of its hotline and its clients' ability to understand the legal issues involved.

*Response:* The Departments decline to modify the rule in response to the commenters' concerns. The concerns raised are not unique to immigration. Any change to any law or policy regulating the public requires providers who practice in the relevant area to adapt—they must learn the new law and advise clients accordingly. To facilitate the transition to the new provisions, since the Proclamation and IFR came into force, DHS personnel have regularly made themselves available to answer questions about these policies and the Departments' implementation activities, made information about these policies public on the Departments' websites,[201] and proactively engaged a variety of stakeholder groups to promote understanding of the rule. The Departments believe that any purported costs that nonprofit organizations and legal-service providers assert they will bear in adapting to the changes effected by the rule are outweighed by the interest in reducing the current levels of encounters and allowing the Departments to invest more of their limited resources into predictably and swiftly delivering consequences to noncitizens who cross the border without a lawful basis to remain in the United States. *See* 89 FR at 48714. Although returning to the status quo before the IFR may eliminate some of the asserted burdens to which the commenters object, that status quo would perpetuate the vicious cycle in which the border security and immigration systems cannot deliver timely decisions and consequences to those encountered at the southern border who lack a lawful basis to remain in the United States, ultimately incentivizing more noncitizens to attempt to cross the border. *See id.* Conversely, a decrease in encounters at the southern border could be expected to allow organizations like the commenters to allocate more resources to each of their individual clients, allowing them to serve their clients more effectively.

The Departments also disagree that the rule will burden communities near the border. To the contrary, the rule will free resources to allow DHS to more effectively patrol the border and interdict smugglers and TCOs.[202] Moreover, the rule enables the delivery of predictable, swift consequences to noncitizens who cross the border without a legal basis to remain in the United States. That will disincentivize such noncitizens from attempting to cross the border, depriving smugglers and TCOs of opportunities to perpetuate their illegal operations. *See* 89 FR at 48730. In these ways, this rule is expected to reduce smuggler and TCO activity in border communities, ultimately reducing the harms that those activities bring to those communities. Additionally, the same incentives are expected to ultimately lower the number of noncitizens present in border communities, further reducing the burdens on those communities.

---

[200] Even so, although convictions for certain "particularly serious crimes" may render noncitizens ineligible for asylum or withholding of removal, unlawful reentry alone is not necessarily a particularly serious crime. *See* INA 208(b)(2)(A)(ii), 8 U.S.C. 1158(b)(2)(A)(ii); INA 241(b)(3)(B)(ii), 8 U.S.C. 1231(b)(3)(B)(ii); *Matter of N–A–M–,* 24 I&N Dec. 336, 342 (BIA 2007) ("Where,

as in the instant case, a conviction is not for an aggravated felony for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years, we examine the nature of the conviction, the type of sentence imposed, and the circumstances and underlying facts of the conviction.").

[201] *See, e.g.,* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[202] *See* 89 FR at 48729–30.

b. Negative or Minimal Impacts on Immigration System and Government Operations

i. Undermines the Administration's Promises and Goals

*Comment:* Some commenters urged the Administration to keep its promises, stating that "[w]e are all immigrant[s]." Specifically, one commenter stated that the Administration "has not upheld its promise to safeguard the legal right to asylum and protect individuals from persecution, violations of due process, and family separation." Other commenters asserted that the Administration issued the Proclamation for political reasons, including using it as a political tool and for reelection purposes, while another commenter stated that the rule will not be effective in achieving the Administration's perceived political messaging or in "sway[ing]" right-wing individuals. And a third commenter argued that the Democratic Party supported discriminatory ideas like those found in the rule despite claiming to disagree with such policies.

Along the same lines, commenters stated that the rule is inconsistent with the Administration's goal of creating a just immigration system and goes against the Administration's promise to not deny asylum for noncitizens fleeing persecution and violence. One commenter claimed that the Administration had "previously pledged to restore the United States' 'moral standing in the world and our historic role as a haven for refugees and asylum seekers, and those fleeing violence and persecution,'" but that the rule "is misaligned with the values promised by this administration, including promises to end Trump-era restrictions on asylum seekers." Other commenters asserted that the Departments sought to curtail the rights of noncitizens arriving at the border by shutting them out of the asylum process based "solely" on how they arrived in the United States, even though the Administration had previously called on agencies to review expedited removal procedures to make them fairer. Another commenter expressed concern regarding what they alleged was a shift in the Administration's "rhetoric" and support for "fear-based restrictions" on asylum, instead of proposing measures to overhaul and ameliorate the asylum process, which they said was "sadly a very different stance" from the Administration's position a few years ago. A few commenters urged the Administration to expand the asylum system and to not close the southern border.

*Response:* The Departments agree that the United States has a long tradition of accepting and welcoming refugees and note that in the past few years, the United States Government has taken steps to significantly expand refugee admissions worldwide,[203] including for refugees from Latin America and the Caribbean. *See* 89 FR at 48712; 88 FR at 31333, 31341. However, without a policy in place to ensure lawful, safe, and orderly processing of noncitizens entering the United States during emergency border circumstances, the number of noncitizens in such circumstances would exceed DHS's already limited resources and facilities. *See* 89 FR at 48711–15. As explained in the IFR and under this rule, noncitizens seeking protection in the United States will still be able to do so, either before USCIS or in removal proceedings before EOIR, subject to the rule's provisions.

The Departments have determined that the changes effected by the IFR and the rule during emergency border circumstances will allow for better management of the limited resources Congress has provided to the Departments. Specifically, noncitizens intending to seek asylum are encouraged to do so using lawful pathways and processes, which facilitate the orderly processing of claims. In addition, the changes in the IFR and this rule permit the Departments to swiftly screen noncitizens not likely to establish eligibility for relief or protection, as well as to efficiently identify and process valid claims. The combined effect of the changes has reduced the percentage of noncitizens placed in section 240 removal proceedings,[204] where cases may take years to resolve.[205] In addition to reducing the impact on EOIR operations, reducing the number of noncitizens in removal proceedings reduces ancillary benefit requests to USCIS, *see* 8 CFR 208.7 (employment authorization for pending asylum applicants), and alleviates the burden on ICE of removing non-detained noncitizens who receive final orders of removal at the conclusion of section 240 removal proceedings but who do not comply with their orders, *see, e.g.,* 8 CFR 241.4(f)(7) (in considering whether to recommend further detention or

release of a noncitizen, an adjudicator must consider "[t]he likelihood that the alien is a significant flight risk or may abscond to avoid removal").

The Departments reiterate that a noncitizen may avoid application of the limitation on asylum eligibility if the noncitizen establishes by a preponderance of the evidence that exceptionally compelling circumstances exist. *See* 8 CFR 208.35(a)(2), 1208.35(a)(2). The Departments recognize that some noncitizens who would otherwise be granted asylum may not be eligible due to this rule. However, because such noncitizens remain able to seek statutory withholding of removal and CAT protection, the Departments believe that this rule strikes the appropriate balance between the need to protect those who wish to seek protection in the United States and the need to use resources effectively during emergency border circumstances.

Moreover, the Departments have determined that responding to emergency border circumstances is necessary to ensure the Departments' continued ability to safely, humanely, and effectively enforce and administer U.S. immigration laws, as well as to reduce the role of exploitative and dangerous smuggling and human trafficking networks. *See* 89 FR at 48714, 48723, 48726, 48767. One cause of recent surges in irregular migration is smugglers' and noncitizens' growing understanding that DHS's capacity to impose consequences at the border is limited by the lack of resources and tools that Congress has made available. Indeed, this rule follows congressional inaction limiting DHS's capacity to impose such consequences despite the Departments' repeated attempts to obtain the legislative framework and resources required to address unprecedented levels of irregular migration. In early February 2024, a bipartisan group of Senators proposed reforms of the country's asylum laws that would have provided new authorities to significantly streamline and speed up immigration enforcement proceedings and immigration adjudications for individuals encountered at the border, including those who are seeking protection, while preserving principles of fairness and humane treatment.[206] 89 FR at 48729.

---

[203] U.S. Dep't of State, *Report to Congress on Proposed Refugee Admissions for Fiscal Year 2024,* at 6 (2023), *https://www.state.gov/wp-content/uploads/2023/11/FY-2024-USRAP-Report-to-Congress_FINAL-Accessible-11.02.2023.pdf.*

[204] OHSS analysis of June 2024 Enforcement Lifecycle data and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[205] *See* OHSS analysis of EOIR data as of July 2024 (Mean EOIR Filed Dates tab).

[206] The White House, *Fact Sheet: Biden-Harris Administration Calls on Congress to Immediately Pass the Bipartisan National Security Agreement* (Feb. 4, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/04/fact-sheet-biden-harris-administration-calls-on-congress-to-immediately-pass-the-bipartisan-national-security-agreement/.*

Critically, the proposal included more than $20 billion in additional resources for DHS, DOJ, and other departments to implement those new authorities.[207] *Id.* However, Congress failed to move forward with this bipartisan legislative proposal.[208] *Id.* It also failed to pass the emergency supplemental funding requests that the Administration submitted. *Id.* Although Congress did ultimately enact an FY 2024 appropriations bill for DHS, the funding falls significantly short of what DHS requires to deliver timely consequences and avoid large-scale releases pending section 240 removal proceedings. *Id.*

In light of congressional inaction, this rule is designed to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances with the resources and tools Congress did make available. As discussed in Section II.A.2 of this preamble, the Departments assess that this rule significantly increases their ability to deliver timely decisions and consequences. Accordingly, the Departments reject commenters' claim that the Departments' basis for promulgating the rule is political. Rather, the Departments believe that the rule will continue to reduce irregular migration by allowing the Departments to better manage their limited resources while delivering consequences more swiftly through expedited removal for those without a legal basis to remain in the United States.

ii. Similarity to Actions of Past Administration

*Comment:* Some commenters stated that the rule was akin to the asylum-related rulemaking and policies of the prior Administration, which, the commenters said, denied noncitizens their "legal right to request asylum in the United States" and were "struck down" by Federal courts. Specifically, one commenter stated that the prior Administration "provided [a] similar rationale" for its policies: "to alleviate the mass illegal immigration crises along the Southern border by discouraging the submission of fraudulent or otherwise meritless asylum claims." And another commenter asserted that the rule was

similar to the prior Administration's interim final rule entitled Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934 (Nov. 9, 2018) ("Proclamation Bar IFR"), in that it is "again barring people crossing between ports from accessing asylum protections for no legitimate reason beyond false optics of border 'control' that unlawfully penalize and seek to deter those who need access to protection." A number of commenters criticized the rule as an insufficient break from prior immigration policies that the commenters described as "inhumane," "cruel[]," and "punishing." Some commenters claimed that the Administration was "walking back promises to protect fair asylum processes" since revoking Title 42. And another commenter stated that the Administration's echoing of "reactionary measures" of the prior Administration "during a looming election season" was a "cynical approach" that would foster "division and xenophobia," fail to address the root causes of immigration issues, and "alienat[e] an electorate that values fairness and justice for immigrants."

*Response:* The Departments disagree that the rule is indistinguishable from or too similar to the asylum-related rulemakings and policies commenters cited. The Proclamation Bar IFR, for instance, imposed a categorical eligibility bar for noncitizens crossing the southern border outside a POE. *See* 83 FR at 55935; *cf. East Bay III,* 993 F.3d at 669–70. By contrast, this rule does not operate as a categorical bar on asylum eligibility based on manner of entry. Instead, the rule provides a limitation on asylum eligibility for certain noncitizens who (1) enter the United States across the southern border during emergency border circumstances; (2) are not described in section 3(b) of the Proclamation; and (3) do not establish exceptionally compelling circumstances. *See* 8 CFR 208.13(g), 208.35(a), 1208.13(g), 1208.35(a). Importantly, then, noncitizens may avoid application of the limitation on asylum eligibility if they establish by a preponderance of the evidence that exceptionally compelling circumstances exist. *See* 8 CFR 208.35(a)(2), 1208.35(a)(2). Such circumstances necessarily exist where the noncitizen demonstrates that, at the time of entry, the noncitizen or a member of the noncitizen's family as described in 8 CFR 208.30(c) with whom the noncitizen was traveling faced an acute medical emergency; faced an imminent and extreme threat to their life or safety;

or was a "victim of a severe form of trafficking in persons" as defined in 8 CFR 214.201. 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). Noncitizens may also be excepted from the limitation if, during section 240 removal proceedings or the asylum merits process, they meet the family unity exception. *See* 8 CFR 208.35(c), 1208.35(c). As discussed in further detail in Section III.C.1.e of this preamble, under the family unity provision, the following noncitizens may be treated as having established exceptionally compelling circumstances sufficient to avoid application of the limitation on asylum eligibility: those who (1) are found eligible for statutory withholding of removal or CAT withholding; (2) would be eligible for asylum but for the limitation on asylum eligibility set forth in the rule, the condition set forth in the Circumvention of Lawful Pathways rule, or both; and (3) have a qualifying spouse or child. *See id.* The Departments believe that the distinctions between this rule and the Proclamation Bar IFR are of legal significance, and those distinctions are discussed at length in the IFR. *See* 89 FR at 48735–36.

In addition, the rule is designed to implement policies distinct from those motivating the Proclamation Bar IFR. This rule seeks to enhance the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances. 89 FR at 48718, 48726–31. The rule is intended to better manage already strained resources, thereby protecting against overcrowding in border facilities and helping to ensure that the processing of migrants seeking protection in the United States is done in an effective, humane, and efficient manner. *See* 89 FR at 48767. In that vein, the Proclamation Bar IFR differed in important respects from this rule. *See* 89 FR at 48734–36, 48738 (explaining that this rule does not treat the manner of entry as dispositive in determining asylum eligibility, contains an exception that accounts for varied circumstances, and is narrowly tailored to address the emergency border circumstances described in the Proclamation and this rule and thus does not allow for implementation of future proclamations or orders).

Moreover, this rule is a response to emergency border circumstances that did not exist when the Proclamation Bar IFR was promulgated. 89 FR at 48726–28. Current trends and historical data indicate that migration and displacement in the Western Hemisphere will continue to increase as a result of violence, persecution,

---

[207] Deirdre Walsh & Claudia Grisales, *Negotiators Release $118 Billion Border Bill as GOP Leaders Call It Dead in the House,* NPR (Feb. 4, 2024), *https://www.npr.org/2024/02/04/1226427234/senate-border-deal-reached.*

[208] Stephen Groves, Rebecca Santana & Mary Clane Jalonick, *Border Bill Fails Senate Test Vote as Democrats Seek to Underscore Republican Resistance,* AP News (May 23, 2024), *https://apnews.com/article/border-immigration-senate-vote-924f48912eecf1dc544dc648d757c3fe.*

poverty, human rights abuses, the impacts of climate change, and other factors. *Id.* at 48726. The United States Government is working to address these root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[209] including by working closely with partner countries across the Western Hemisphere.[210] *Id.* at 48727. But these efforts will take time to have significant impacts and will not alleviate the stress that the border security and immigration systems are currently experiencing, as described in the Proclamation, the IFR, and this rule. *Id.*

iii. Would Be Ineffective or Not Achieve Its Intended Outcomes

*Comment:* Commenters expressed opposition to the rule, claiming that the rule would decrease, not increase, the efficiency of USCIS management of asylum cases and could lead to further backlogs and inefficiencies for AOs and immigration courts, complicating the asylum process. One commenter believed that the rule would ''exacerbate efficiency issues by requiring operational changes to compensate for elimination of the preliminary screening to notify noncitizens of the expedited removal process and the need to affirmatively express their fear of persecution or torture.'' Some commenters asserted that the Departments have created an ''unworkable, convoluted, and unfair'' system at the border, which CBP officers and AOs will not be prepared to adapt to. Commenters claimed that the rule would create additional administrative burdens by requiring officers, applicants, stakeholders, and judges to apply multiple tests in one proceeding. Further, commenters stated that having to track, identify, and apply different standards would be more complex for all those involved.

Other commenters stated that the rule would exacerbate conditions at the southern border and would increase the number of migrants who enter between POEs, further straining resources and escalating the current humanitarian crisis. A commenter stated that the rule may cause migrants to be turned away if they walked up to a POE, and thus, it would ''inadvertently encourage desperate individuals to resort to dangerous methods to reach safety.'' One commenter voiced concern that the rule would have an adverse effect on the asylum process because the rule would cause a foundational shift in the U.S. asylum system, causing access to asylum to be the exception rather than the norm. Another commenter claimed that decades of deterrence policies have ''proven that punitive policies do not reduce irregular migration—they only increase chaos, confusion, and human suffering.'' (Emphasis omitted.)

Other commenters claimed that the rule would be ineffective at achieving its intended goals for managing the border. One commenter stated that people were coming to the United States because they had no choice, so securing the border would not solve the problem. Similarly, a commenter stated that the rule would be like playing ''whack-a-mole, except with real live people, most of whom would not undertake such a dangerous, difficult journey to the border if they felt they could stay where they were.'' Furthermore, a commenter stated that, without additional resources, the Government will have no way of fully implementing its own policy. Commenters cited an article stating that ''it is hard to say with confidence whether this regulation will work as the administration intends.'' [211] One commenter stated that the Proclamation did not address the actual needs of asylum seekers, nor did it address the problem that has led the U.S. immigration system to be ''broken.'' This commenter described a ''broken legal system that takes years to process cases, leading individuals to live in limbo and without important legal rights.'' Along the same lines, another commenter stated that turning away noncitizens is evidence of a faulty immigration system and, thus, there are better solutions than turning away those asking for help.

Other commenters asserted that the rule had not substantiated its aim of incentivizing a sustained drop in the number of encounters at the southern border. While citing a study, one commenter stated that any change in border policy triggers a short-term drop in encounters, regardless of the intent of the policy change. The commenter also stated that the rule has not provided an adequate explanation for the assumption that it would achieve its objective of reducing the number of encounters at the border. And while referencing another study, another commenter elaborated that policies that limit access to POEs increase irregular crossings by noncitizens who cannot wait in Mexico, which they stated was also confirmed by DHS's Office of Inspector General. Conversely, another commenter remarked that, while there has been a temporary drop in encounters immediately after the issuance of the IFR, the IFR would be ineffective in deterring migrants in the long term because of the rule's exceptions and loopholes. Lastly, another commenter expressed concern that ''[a]s written, the [IFR] simply continues the status quo by encouraging mass illegal immigration and abuse of our asylum system.''

*Response:* The Departments disagree that the rule decreases the efficiency of management of asylum claims. The Departments recognize that the rule may require additional time for AOs and IJs during credible fear screenings and reviews, respectively, to inquire into the applicability of the rule and noncitizens' fear claims. Similarly, where its provisions apply to a given case, applying the rule will require additional time during asylum adjudications before USCIS and before IJs during section 240 removal proceedings. On the other hand, in the absence of this rule's provisions, AOs and IJs would have to make other inquiries into potential fear claims under steady-state regulations and into asylum eligibility under the Circumvention of Lawful Pathways rule. In addition, as discussed throughout this preamble, the IFR has resulted in significantly reduced irregular migration and has allowed the Departments to filter out a greater portion of cases that are unlikely to ultimately be successful on the merits. *See* Section II.A.2 of this preamble. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rule to be accompanied by a comparatively smaller number of credible fear cases and full adjudications on the merits than AOs and IJs would otherwise have been required to handle in the absence of the rule. And as discussed in Section III.C.3 of this preamble, AOs and IJs are specifically trained to apply multiple tests in the same proceedings; any claim that these trained and skilled professionals would be burdened by multiple tests is unfounded. Moreover, any burdens imposed by the rule on

[209] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (describing the commitment of the United States and Mexico to addressing root causes of migration).

[210] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration on Migration and Protection in Guatemala* (May 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala.*

[211] Am. Immigr. Council, *Analysis of the President's 212(f) Proclamation & Interim Final Rule Restricting Asylum* 2 (2024), *https://www.americanimmigrationcouncil.org/research/american-immigration-council-analysis-presidents-212f-proclamation-and-interim-final-rule.*

CBP officers and agents have been accompanied by a substantial reduction in other resource burdens due to a substantial reduction in encounters at the southern border caused by this rule.

The Departments agree with commenters that the immigration system is badly in need of additional resources and efficiencies. This rule is not a substitute for congressional action, which remains the only long-term solution to the challenges the Departments have confronted on the border for more than a decade. However, the Departments disagree that these fundamental challenges mean this rule will be ineffective in achieving its aims. Given the absence of reforms by Congress, the Departments are working within the legal framework and with the resources provided by Congress to ensure the functioning of the border security and immigration systems during emergency border circumstances. After the implementation of the Proclamation and IFR, the Departments saw a significant decrease in encounters along the southern border, which has allowed the Departments to more efficiently process noncitizens through expedited removal, delivering timely decisions and consequences and discouraging irregular migration. In other words, commenters are incorrect that the rule would lead to an increase in encounters between POEs and decreased efficiencies in the process.

Notably, in addition to the decrease in encounters, operations at POEs have remained largely steady over this time. For example, vehicle wait times at POEs on the SWB have not shown changes from typical monthly fluctuations. The numbers of vehicle occupants and pedestrians entering the United States with lawful status have remained aligned with normal entry data. In particular, between August 2023 and May 2024—the last month before implementation of the IFR—the average wait time across all SWB POEs (passenger vehicle, pedestrian, and truck cargo) was 32 minutes for vehicles, 15 minutes for cargo trucks, and 9 minutes for pedestrians. From June 2024 through July 2024, the average wait times were 34 minutes for vehicle traffic, 9 minutes for truck cargo, and 7 minutes for pedestrians.

With respect to the suggestion that the rule would inadvertently encourage desperate individuals to resort to dangerous methods to reach safety (such as crossing between POEs), the Departments note that the rule creates no such incentive; experience shows that the IFR has improved DHS's capacity to swiftly deliver consequences to those who cross between POEs and

do not have a lawful basis to remain, including through the use of expedited removal. *See* Section II.A.2 of this preamble. Notably, the comparatively abbreviated timeline of the expedited removal process serves as a powerful disincentive against irregular migration of noncitizens who cross between POEs without viable claims for asylum. In addition, the rule, by adopting the exceptions contained in section 3(b) of the Proclamation, complements and incentivizes the use of lawful, safe, and orderly pathways and processes for individuals to come to the United States.

With respect to the claim that this rule will yield at most a short-term reduction in encounters as noncitizens decide that they cannot wait in Mexico, the Departments note that thus far, encounters have not increased to the levels that were seen in the years leading up to the IFR. *See* Section II.A.2 of this preamble. Moreover, in the Departments' experience, migrants are sensitive to the incentives created by national policy,[212] and the Departments see an imperative to act in the face of the challenging problem of very high levels of irregular migration. Even if the rule's effects did not last indefinitely, moreover, that would not be a reason to depart from the rule's approach now—when its approach is having its intended effect.

The Departments do assess that ensuring that the reduction in border encounters is sustained will require not just the rule itself but work on the confluence of factors that also contribute to high levels of irregular migration. And in parallel with this rule, the Administration is working to address those factors.[213] For instance, the United States Government is working to address the root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[214] including through working

closely with partner countries across the Western Hemisphere.[215] 89 FR at 48727; *see* Section II.A.2 of this preamble. Additionally, increased access to lawful, safe, and orderly pathways will continue to complement one of the rule's goals of discouraging irregular migration where appropriate.[216] While these and other parallel measures are necessary complements to the rule, they cannot substitute for the rule: These efforts will take time to have significant impacts and will not alleviate the stress that the border security and immigration systems are currently experiencing, as described in the Proclamation, the IFR, and this rule. 89 FR at 48727.

c. Negative Impacts on the U.S. Economy, Workforce, Citizenry, Public Health, and Safety

*Comment:* Commenters expressed general concern that the IFR would negatively impact the U.S. workforce and economy, stating that the United States needs immigrants to bolster the workforce and address labor shortages, that the United States was built on the labor of immigrants, and that reliance on immigrant labor continues today. They argued that restricting immigration into the United States exacerbates population shortages, and that closing borders to immigrants negatively impacts the food supply chain because a significant portion of agricultural workers and food processing employees are immigrants. One commenter specified that migrants are currently needed because "the reproductive birthrate here has declined" and "replacement" of economic contributors is "essential to avoid complete replacement by 'artificial intelligence.'"

*Response:* The Departments do not dispute the importance and contributions of immigrants to the economy. As noted in Section V.B. of this preamble (in which the Departments describe the estimated

[212] *See, e.g.,* Miriam Jordan, One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay, N.Y. Times (Jan. 31, 2024), *https://www.nytimes.com/2024/01/31/us/us-immigration-asylum-border.html.*

[213] *See* DHS, *Fact Sheet: DHS Continues to Strengthen Border Security, Reduce Irregular Migration, and Mobilize International Partnerships* (June 4, 2024), *https://www.dhs.gov/news/2024/06/04/fact-sheet-dhs-continues-strengthen-border-security-reduce-irregular-migration-and;* U.S. Agency for Int'l Dev., *U.S. Strategy to Address the Roots Causes of Migration in Central America—FY 2022 USAID Results, https://www.usaid.gov/central-america-and-mexico-regional-program/fy-2022-root-causes-strategy-results* (last visited Sept. 15, 2024).

[214] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-*

*strengthen-joint-humanitarian-plan-on-migration/* (describing the commitment of the United States and Mexico to addressing root causes of migration).

[215] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration on Migration and Protection in Guatemala* (May 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala.*

[216] *See, e.g.,* Ezra Klein, *The Real 'Border Czar' Defends the Biden-Harris Record,* N.Y. Times (Sept. 13, 2024), *https://www.nytimes.com/2024/09/13/opinion/ezra-klein-podcast-alejandro-mayorkas.html* (interview response of Secretary of Homeland Security Alejandro Mayorkas explaining that one "leg[] of the stool" for decreasing encounters is presenting migrants with "alternative means of accessing humanitarian relief in the United States," including "the lawful pathways that we have built").

effects of the rule pursuant to Executive Order 12866), the expected effect of this rule is primarily to reduce incentives for irregular migration and illegal smuggling activity. This rule does not inhibit or prevent regular migration into the United States. In particular, the Departments have been clear that the IFR does not apply to any noncitizen who has a valid visa or other lawful permission to seek entry or admission into the United States or presents at a POE pursuant to a pre-scheduled time and place. 89 FR at 48715; *see also* 8 CFR 208.35(a), 1208.35(a) (excepting from the limitation on asylum eligibility noncitizens who are excepted from the Proclamation's suspension and limitation on entry under section 3(b) of the Proclamation). Additionally, this rule does not change or place any restrictions on those who may be eligible for employment authorization within the United States. The Departments recognize that there may be an impact on some people who attempt to enter the United States irregularly and who are removed after their entry, but the Departments find that the limitation on asylum eligibility is, on balance, an appropriate response to surges in irregular migration during emergency border circumstances. For those whom this rule renders ineligible for asylum but who ultimately receive statutory withholding of removal or CAT protection, another effect would be the increased frequency with which those subject to this rule who are present in the United States are required to renew their employment authorization and a reduced ability for their family to immigrate to the United States.

Additionally, as noted in the IFR, 89 FR at 48712 & nn.10–13, over the past several years the United States Government has implemented a historic expansion of lawful pathways and processes to come to the United States, including:

• The CHNV parole processes, which allow individuals with U.S.-based supporters to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit;

• The Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala, which provide, among other things, information and referrals to humanitarian or family reunification parole processes, labor pathways, and expedited refugee processing for eligible individuals;[217]

• The expansion of country-specific family reunification parole processes for individuals in the region who have U.S. citizen relatives in the United States;

• Increasing proposed refugee admissions from the Western Hemisphere from 5,000 in FY 2021 to up to 50,000 in FY 2024; and

• Expanding access to labor pathways.

More specifically, recognizing the significant contributions noncitizens make to the U.S. economy, the United States Government significantly expanded access to labor pathways to maintain strong economic growth and meet labor demand in the United States. Our efforts to expand access to labor pathways have yielded results. In FY 2023, the United States issued 442,000 H–2A and H–2B nonimmigrant worker visas globally.[218] Similarly, in FY 2023, the United States issued 265,777 H–1B specialty occupation visas,[219] the highest number of visas issued or otherwise utilized in decades.[220] Furthermore, the United States also issued more than 192,000 employment-based immigrant visas in 2023—far above the pre-pandemic number—and ensured that no employment-based visas went unused for the second year running.[221]

The Departments believe that these new or expanded lawful pathways, and particularly employment-based pathways, are effective ways to address labor shortages and encourage lawful migration. The Departments also believe that, by reducing migrants' incentives to use human smugglers and traffickers to enter the United States, this rule will reduce the likelihood that newly arrived migrants will be subjected to labor

trafficking. The Departments further reiterate that noncitizens who avail themselves of any of the lawful, safe, and orderly pathways recognized in this rule will not be subject to the limitation on asylum eligibility or the other provisions of the rule.

*Comment:* Other commenters provided additional remarks on the contributions of immigrants to the United States, stating that noncitizens provide value to U.S. communities and that immigrants have enriched the United States. While citing a 2024 article, a commenter stated that the IFR would subject noncitizens who cross the border irregularly to expedited removal and further criminalization through criminal prosecution, costing taxpayers over $7 billion to incarcerate migrants charged or convicted with unauthorized entry or reentry crimes.

*Response:* The Departments emphasize that neither the IFR nor this rule requires DHS to refer noncitizens it encounters at the border for prosecution for unauthorized entry or other immigration-related offenses. It is incorrect to cite expedited removal as the vehicle leading to mass incarceration and criminal prosecution of migrants. To the contrary, expedited removal is a process that allows DHS officials to quickly remove certain noncitizens encountered at the border. While it is true that noncitizens will spend some time in custody pending completion of the expedited removal process (and for a credible fear determination where referred), such custody is not for purposes of criminal prosecution. Although the Departments recognize commenters' concerns regarding the amount of taxpayer funds used to incarcerate migrants who are charged and convicted with unauthorized entry or reentry crimes, that is not at issue here. And in any event, as discussed in Section V.B of this preamble, the Departments expect that the rule will result in significantly reduced irregular migration. Accordingly, the Departments expect AOs and IJs to conduct a smaller number of credible fear cases than AOs and IJs would otherwise be required to handle in the absence of this rule, with the possibility of attendant savings of Government resources.

### d. Other General Opposition

*Comment:* Several comments urged the Departments not to close the SWB.

*Response:* The rule does not close the SWB. It adds a limitation on asylum eligibility and alters the process for those individuals described in section 3(a) of the Proclamation who are not described in section 3(b) of the

---

[217] U.S. Dep't of State, *Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas, https://www.state.gov/ safe-mobility-initiative/* (last visited Sep. 20, 2024);

The White House, *Fact Sheet: Biden-Harris Administration on World Refugee Day Celebrates a Rebuilt U.S. Refugee Admissions Program* (June 20, 2024), *https://www.whitehouse.gov/briefing-room/ statements-releases/2024/06/20/fact-sheet-biden- harris-administration-on-world-refugee-day- celebrates-a-rebuilt-u-s-refugee-admissions- program/*.

[218] U.S. Dep't of State, *Worldwide Visa Operations: Update, https://travel.state.gov/ content/travel/en/News/visas-news/worldwide-visa- operations-update.html* (last updated Jan. 2, 2024).

[219] U.S. Dep't of State, *Nonimmigrant Visa Statistics, https://travel.state.gov/content/travel/en/ legal/visa-law0/visa-statistics/nonimmigrant-visa- statistics.html* (last visited Aug. 27, 2024) (see the "FY2019–2023 Detail Table (PDF)" under "Nonimmigrant Visas by Individual Class of Admission (*e.g.* A1, A2, etc.)").

[220] *Id.* (see the "FY1997–2023 NIV Detail Table (Excel spreadsheet)" under "Nonimmigrant Visa Issuances by Visa Class and by Nationality" showing issuance totals of H–1B specialty occupation visas).

[221] USCIS, *Completing an Unprecedented 10 Million Immigration Cases in Fiscal Year 2023, USCIS Reduced Its Backlog for the First Time in Over a Decade* (Feb. 9, 2024), *https:// www.uscis.gov/EOY2023*.

Proclamation, but it does not "close" the border.

Additionally, the rule does not impose any changes to asylum eligibility or processing of noncitizens who use lawful, safe, and orderly pathways to seek entry to the United States. Noncitizens who use the CBP One app to pre-schedule an appointment at a SWB POE to present themselves at the border in a safe, orderly, and lawful manner are excepted from the suspension and limitation on entry under section 3(b) of the Proclamation and so are excepted from the limitation on asylum eligibility and changes to expedited removal processing. This exception is significant. From June 5, 2024, through August 31, 2024, 123,600 noncitizens with CBP One appointments presented at POEs and were accordingly processed outside of the IFR's provisions and will be excepted from the limitation on asylum eligibility if they choose to apply for asylum.[222] *See* 8 CFR 208.35(a)(1), 1208.35(a)(1); June 3 Proclamation sec. 3(b)(v)(D). During the pre-pandemic period, approximately 330 encounters were processed at SWB POEs per day.[223] Since January 2023 through August 2024, approximately 1,500 encounters have been processed at SWB POEs per day.[224] And since the start of FY 2024 through August 2024, that average has increased to approximately 1,700 per day.[225]

## C. Provisions of the Rule

### 1. Limitation on Asylum Eligibility

a. Proclamation Exceptions—Section 3(b) of Proclamation

*Comment:* Commenters raised a number of concerns regarding the exceptions to the Proclamation's suspension and limitation on entry, including the exceptions for UCs; those permitted to enter based on the totality of the circumstances; and those permitted to enter based on operational considerations.

As an initial matter, a majority of commenters supported the Proclamation's exclusion of UCs from the suspension and limitation on entry or from provisions of the rule. However, some commenters stated that excepting UCs from the Proclamation's suspension and limitation on entry, without also providing an exception for family units,

would lead families traveling together to choose to "self-separate" at the border and send the children across unaccompanied because conditions in Mexico are too dangerous for children to wait with their parents until the family can cross together. Similarly, commenters stated that excepting UCs from the Proclamation's suspension and limitation on entry would encourage the trafficking and exploitation of children. Commenters stated that the rule, without an additional family-unit exception, would therefore result in the separation of families.

Another commenter opposed the Proclamation's exception for UCs. This commenter stated that noncitizens, including those who pose security risks, would attempt to pose as UCs to evade the Proclamation's suspension and limitation on entry.

Additionally, some commenters opposed the exceptions in sections 3(b)(vi) and 3(b)(vii) of the June 3 Proclamation, which provide that the suspension and limitation on entry will not apply to a noncitizen if a CBP immigration officer determines that the noncitizen is permitted to enter either based on the totality of the circumstances or based on operational considerations. Commenters expressed concern that these exceptions are vague and subjective and should not be left to the discretion of CBP immigration officers.

Specifically, commenters asserted that the Proclamation does not provide any standards or make clear how CBP officers will determine when someone is excepted based on the totality of the circumstances or operational considerations. Commenters also stated that CBP immigration officers may not be properly equipped to apply the Proclamation's exceptions, which would result in arbitrary decision-making and removals in violation of non-refoulement principles.

Other commenters stated that the Proclamation's exceptions were overly broad and would authorize CBP immigration officers to use them as a "loophole" to permit large populations of noncitizens to enter the country based on the "totality of the circumstances" or due to "operational considerations." These commenters stated that, as a result, overbroad use of these exceptions will result in fewer noncitizens being removed and will not change the status quo of large numbers of noncitizens crossing the border.

Lastly, commenters expressed concern that noncitizens excepted under section 3(b)(vi) or 3(b)(vii) of the June 3 Proclamation based on the totality of the circumstances or for

operational considerations and who are subsequently placed into immigration court proceedings will be unable to demonstrate that they are not subject to the rule's provisions in immigration court.

*Response:* Any comments opposing provisions of the Proclamation, as opposed to the parallel provisions of the rule, are outside of the scope of this rule. President Biden issued the Proclamation by the authority vested in the President by the INA. *See* INA 212(f), 8 U.S.C. 1182(f); INA 215(a), 8 U.S.C. 1185(a); 89 FR 48487. Under section 3(d) of the Proclamation, the President directed the Secretary and Attorney General to promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions to such asylum eligibility limitations and conditions that they determine are warranted. The Departments lack authority to amend the exceptions to the Proclamation's suspension and limitation on entry, as set forth in section 3(b) of the Proclamation, and any proposal to do so would be outside the scope of this rule. At the same time, the Departments may depart from the Proclamation's section 3(b) exceptions in determining which exceptions to this rule's limitation on asylum eligibility are warranted to the extent they are adopted in this rule, and the Departments have responded to comments suggesting such exceptions below.

To the extent that commenters suggest excepting family units from the rule's limitation on asylum eligibility, the Departments reiterate that excepting all family units could incentivize families to bring their children on the often-perilous journey to the United States. *See* 89 FR at 48757. Such a broad exception would also be at odds with the Proclamation and rule's goals in addressing emergency border circumstances. *See id.* at 48726–31 ("Need for These Measures").

Further, the Departments do not believe that the rule will meaningfully incentivize the "self-separation" of families. Because UCs are already excluded from expedited removal by statute, *see* 8 U.S.C. 1232(a)(5)(D), the Departments do not expect based on their experience implementing border enforcement and asylum that excepting UCs, but not family units, from the limitation on asylum eligibility would lead to increased incentives to "self-separate." Rather, in the time since the

---

[222] OHSS analysis data downloaded from UIP on September 3, 2024 (IFR Details tab).

[223] OHSS analysis of July 2024 Persist Dataset (OFO Encounters tab).

[224] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (OFO Encounters tab).

[225] *Id.*

IFR took effect, average daily encounters of UCs at the SWB have actually decreased by 37 percent.[226]

Moreover, on balance, the Departments believe that the important interests of protecting the statutorily recognized vulnerabilities of UCs, while maintaining the fundamental goals of the rule in addressing emergency border circumstances, outweigh any consequences of claimed incentives for noncitizens to "self-separate" at the border. Notably, the Departments emphasized the importance of maintaining family unity in the IFR and crafted a number of exceptions to the limitation to preserve family unity and avoid family self-separations. *See* 8 CFR 208.35(a)(2), 208.35(c), 1208.35(a)(2), 1208.35(c); *see also* 89 FR at 48733 (explaining that the rule contains exceptions that "avoid[] the separation of families"). For instance, if any member of a noncitizen's family—as described in 8 CFR 208.30(c)—with whom the noncitizen is traveling demonstrates exceptionally compelling circumstances for entering the United States during emergency border circumstances, then all of the members of that family unit traveling together will be excepted from the rule's limitation on asylum eligibility. 8 CFR 208.35(a)(2), 1208.35(a)(2); *see also* 89 FR at 48754. The rule also contains an explicit family unity provision in the AMI process before USCIS and in removal proceedings before EOIR; this provision allows a principal asylum applicant to be excepted from the rule's limitation on asylum eligibility if the applicant can establish that the applicant meets the statutory requirements for statutory withholding of removal or CAT protection, among other requirements. *See* 8 CFR 208.35(c), 1208.35(c); *see also* 89 FR at 48733 (explaining family unity provision requirements).

The Departments recognize commenters' concerns about the vulnerability of UCs. The Departments encourage all those who seek to travel to the United States, including UCs, to take advantage of available lawful, safe, and orderly pathways and processes rather than rely on smugglers or criminal organizations to facilitate a potentially dangerous journey. 89 FR at 48723; 88 FR at 31346. However, the Departments note that UCs are particularly vulnerable and entitled to special protections under the law. *See* 88 FR at 31346 (citing INA 208(a)(2), 8 U.S.C. 1158(a)(2) (providing that safe-third-country bar does not apply to UCs); INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C) (stating that an AO has initial jurisdiction over the asylum claims of UCs)); *see generally* 8 U.S.C. 1232. Given that UCs have long had special rules and protections applicable to them in immigration proceedings, the Departments disagree with commenters that this rule's adoption of the exception for UCs at section 3(b)(iii) of the Proclamation would create any meaningful new incentive for noncitizens who may be a security risk to attempt to pose as UCs in order to circumvent the rule's provisions. Further, immigration officers have training, knowledge, skills, and experience in identifying fraudulent behavior. *See* 89 FR at 48744 (explaining that CBP immigration officials "have skills and expertise in interacting with individuals and observing human behavior and in determining appropriate follow ups steps with regards to any behaviors or indicators of concern").

Furthermore, with respect to commenters' concerns regarding the discretionary nature of the exceptions at sections 3(b)(vi) and 3(b)(vii) of the Proclamation based on the totality of the circumstances and operational considerations, the Departments reiterate that comments on the Proclamation itself are outside the scope of this rulemaking. And insofar as these comments relate to this rule, the Departments disagree that these exceptions will essentially swallow the rule, as commenters suggest, or that CBP immigration officers will be unable to apply these exceptions fairly or consistently. Section 3(b)(vi) of the Proclamation permits entry based on the totality of the circumstances, and then delineates examples such as "consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter." Thus, this "totality of the circumstances" exception provides numerous examples that would allow the CBP immigration officer to determine whether such circumstances were present such that a noncitizen would not be subject to the Proclamation's suspension and limitation on entry. The discretionary nature of the "operational considerations" exception provides flexibility for CBP immigration officers to better manage migratory flows during emergency border circumstances, which is a driving purpose of this rule. 89 FR at 48723, 48726–31 (explaining, in detail, the need for the rule). Moreover, CBP officers have experience considering various factors and factual scenarios when exercising their discretion as immigration officers, including determining appropriate processing pathways, and such experience is also relied upon in making these decisions.

Finally, as to commenters' concerns about whether noncitizens who were excepted from the Proclamation's suspension and limitation on entry under subsections 3(b)(vi) and (vii) of the Proclamation would nonetheless be subject to the rule's limitation on asylum eligibility in immigration court, those concerns are misplaced. By their terms, subsections 3(b)(vi) and (vii) apply to "any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer," based on certain considerations. Whether a noncitizen was excepted from the Proclamation and permitted to enter the United States is a question of historical fact, documented by CBP in the appropriate electronic processing system(s),[227] and does not require a separate assessment by an AO or IJ. *See* 89 FR at 48732 n.169. Thus, any noncitizen who is described in subsections 3(b)(vi) and (vii) of the Proclamation will not be subject to the limitation on asylum eligibility contained in the rule. *Id.*

i. Legal Concerns Related to CBP One and the Lack of Exceptions

*Comment:* Commenters raised a number of concerns regarding the rule's exception to the limitation on asylum eligibility for noncitizens who use the CBP One app to present at a POE pursuant to a pre-scheduled time and place. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1); June 3 Proclamation sec. 3(b)(v)(D).

Commenters expressed concern that use of CBP One is unlawful. Some commenters voiced concern that "barring" those who enter the United States along the SWB without a pre-

---

[226] *See* OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab). Consistent with the discussion in Section II.C.1 of this preamble, encounters of individuals in family units and single adults have fallen more sharply than encounters of UCs, which has caused UCs' share of total encounters to increase, notwithstanding the overall drop in UC encounters in absolute numbers. The relative stability of UC flows compared to family unit flows is consistent with the fact that most policy changes in recent years (including the current rule) have not had a direct impact on UCs.

[227] Memorandum for Exec. Dirs., Headquarters & Dirs., Field Operations, OFO, from Ray Provencio, Acting Exec. Dir., Admissibility and Passenger Programs, OFO, *Re: Implementation of Presidential Proclamation and Interim Final Rule, Securing the Border* attach. 5 (June 4, 2024) (Muster).

**Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations    **81215**

scheduled CBP One appointment would violate U.S. and international law and "effectively eliminate[] asylum" for every noncitizen who crosses into the United States at the southern border without an appointment. Commenters further stated that, while the Departments seek to distinguish the IFR from the vacated Proclamation Bar IFR by explaining that it is being implemented during an emergency and some lawful pathways remain available to migrants, most who cannot wait for a CBP One app appointment would be barred from asylum under the IFR. Similarly, commenters stated that the INA requires DHS to provide every noncitizen who arrives in the United States with the opportunity to establish a credible fear of persecution—not just those with the resources to own a smartphone and the ability to schedule an appointment. Other commenters stated that the CBP One app codifies a form of electronic metering and essentially replaces a program that relied on metering to limit the number of noncitizens who could approach POEs, a practice that, the commenters argued, was held unlawful by the Federal courts.

One commenter expressed concern with the use of the CBP One app, stating that the app has been used to release record numbers of undocumented noncitizens into the United States. The commenter warned that the Biden Administration could continue to utilize and expand upon the CBP One app without any limits under the IFR. The commenter also raised concerns that the number of appointments available through the CBP One app can be expanded without limit, such that a large population of noncitizens could be excepted from the Proclamation's suspension and limitation on entry.

Several commenters expressed concern that the IFR, unlike the Circumvention of Lawful Pathways rule, does not provide an exception for those who are unable to access or use the CBP One application. Other commenters asserted that the IFR does not provide a justification for deviating from the Circumvention of Lawful Pathways rule's scheduling issues exception and expressed concern that while the Circumvention of Lawful Pathways rule's exception has not been properly applied, the lack of such an exception in the IFR would expose migrants who are unable to access or use the CBP One app to the risk of refoulement.

*Response:* The Departments believe the exception for noncitizens who present at a POE pursuant to a pre-scheduled time and place, such as through the CBP One app, is consistent

with the INA and the purpose of the Proclamation and this rule.

As an initial matter, the Departments note that migrants do not apply for asylum with CBP at a POE. At POEs, CBP is responsible for the inspection and processing of all applicants for admission, including individuals who may intend to seek asylum in the United States. 8 CFR 235.1(a) (concerning all applicants for admission at POEs); *id.* 235.3(b)(4) (concerning individuals processed for expedited removal and claiming fear of persecution or torture). While the CBP One app is one key way that CBP is streamlining and increasing its capacity to process undocumented noncitizens, the app is not a method of seeking asylum in the United States, and CBP officers do not determine the validity of any claims for protection.

The Departments disagree that the use of the CBP One app to manage the flow of migration and intake into POEs and to encourage the use of safe, orderly, and lawful pathways constitutes a form of "digital metering," unlawfully withholds or bars access to the asylum process, or conflicts with the agency's duties under 8 U.S.C. 1225(a)(3). Any noncitizen who is processed for expedited removal upon arrival at a POE and who indicates an intention to apply for asylum or a fear of return, whether or not the noncitizen uses the CBP One app, will be referred for a credible fear interview. Further, as noted in Sections II.B and III.A of this preamble, the United States implements its non-refoulement obligations under the 1967 Refugee Protocol through the provisions governing withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), rather than through section 208 of the INA, 8 U.S.C. 1158, which governs asylum. Noncitizens who are ineligible for asylum under the rule, such as those who enter the United States without pre-scheduling an appointment through the CBP One app, and are unable to establish that exceptionally compelling circumstances exist remain eligible to seek statutory withholding of removal and CAT protection consistent with these obligations.

The Departments also disagree with commenter concerns regarding unlimited expansion of CBP One or the use of CBP One to release individuals. The CBP One app is intended to allow for the orderly processing of noncitizens and, under the Proclamation and this rule, use of the app is especially critical during emergency border circumstances because it allows DHS to maximize the use of its limited resources. 89 FR at 48737; *see also* 88 FR at 31317–18 (explaining that the CBP One app

"enables the POEs to manage the flows in a safe and efficient manner, consistent with [each POE's] footprint and operational capacity, which vary substantially across the SWB"). Thus, because the CBP One app allows each POE to manage the daily number of appointments that the POE has the capacity to handle, commenter concerns that the use of CBP One appointments will be vastly expanded beyond CBP's capacity to process them are unfounded, especially during the emergency border circumstances that the Proclamation and this rule are designed to address. In addition, with regard to concerns regarding the number of noncitizens released following the use of the CBP One app to schedule an appointment, use of the CBP One app does not guarantee a particular processing disposition, and all such determinations are made on a case-by-case basis.[228]

Regarding commenters' concerns that the IFR does not provide an exception for those who present at a POE but are unable to access or use the CBP One app, here, and as noted in the IFR, the Departments choose not to include an exception to the rule's limitation on asylum eligibility for those who present at a POE but have an inability to access the CBP One app due to significant technical failure or other ongoing and serious obstacle. 89 FR at 48732 n.171. The IFR explained that the Departments made this decision in part because of the different purposes of this rule and the Circumvention of Lawful Pathways rule. This rule, unlike the Circumvention of Lawful Pathways rule, applies only during emergency border circumstances as described in the Proclamation and the rule, when encounters strain the border security and immigration systems' capacity. In contrast, the primary aim of the Circumvention of Lawful Pathways rule was to encourage the use of lawful, safe, and orderly pathways. Therefore, the Departments determined that the heightened need to address these emergency border circumstances necessitated limiting the scheduling issues exception in this rule.

Moreover, experience applying the Circumvention of Lawful Pathways rule in credible fear screenings indicates that

---

[228] *See* Memorandum for Exec. Dirs., Headquarters & Dirs., Field Operations, OFO, from Ray Provencio, Acting Exec. Dir., Admissibility and Passenger Programs, OFO, *Re: Implementation of Presidential Proclamation and Interim Final Rule, Securing the Border* attach. 5–6 (June 4, 2024) (Muster); CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone* ("Upon arriving at a POE, CBP officers inspect and evaluate all individuals to determine the appropriate processing disposition.").

the exception for presenting at a POE and being unable to access or use the CBP One app rarely applied.[229] The Circumvention of Lawful Pathways rule excepted, in addition to UCs, three categories of noncitizens: (1) individuals provided authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process; (2) individuals who presented at a POE with a CBP One appointment or who presented at a POE and demonstrated "it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle"; and (3) individuals who sought asylum or other protection in a country through which the alien traveled and received a final decision denying that application. 8 CFR 208.33(a)(2)(ii), 1208.33(a)(2)(ii). Leaving aside UCs, as UCs are not subject to expedited removal, 8 U.S.C. 1232(a)(5)(D), noncitizens could establish at least one of these three exceptions in only approximately 4.7 percent of total credible fear screenings conducted by USCIS under the Circumvention of Lawful Pathways rule (*i.e.,* including referrals from USBP and OFO).[230] While DHS data do not differentiate among the types of exceptions, available data show that the exception for presenting at a POE and being unable to utilize the CBP One app applied in less than 5 percent of all credible fear determinations made by USCIS when considering whether the presumption of asylum ineligibility applied.[231]

The data showing the limited application of the exception for presenting at a POE and being unable to use CBP One reinforce the Departments' judgment not to adopt a similar exception in the emergency border circumstances in which this rule applies. Consistent with AOs' obligation under 8 CFR 208.30(d) to elicit testimony on all potentially relevant information, USCIS guidance instructs AOs to elicit testimony related to all exceptions to the presumption of asylum ineligibility where they may apply and evaluate their applicability, which for the exception under the Circumvention of Lawful Pathways rule (8 CFR 208.33(a)(2)(ii)(B)) would be any case where the presumption of asylum ineligibility applied and the noncitizen presented at a POE. At a time where emergency border circumstances are present that trigger a suspension and limitation on entry and necessitate the

limitation on asylum eligibility in the current rule, the Departments do not believe it would be appropriate to expend the resources it would take to elicit testimony about possible ways a noncitizen was unable to access the CBP One app and analyze that information in every credible fear interview where the noncitizen presented at a POE without an appointment in order to apply an exception to the limitation on asylum eligibility similar to the one present at 8 CFR 208.33(a)(2)(ii)(B), particularly where recent experience shows that such an exception is rarely applicable in credible fear determinations.

In addition to these exceptions, the Circumvention of Lawful Pathways Rule also contains a "[r]ebuttal" ground for "exceptionally compelling circumstances." 8 CFR 208.33(a)(3), 1208.33(a)(3). The Departments determined that this rule should also contain an exception for exceptionally compelling circumstances to ensure that noncitizens with a time-sensitive imperative for entering the United States without authorization may avoid application of this rule's limitation on asylum eligibility. Notably, under the Circumvention of Lawful Pathways rule, across the set of all expedited removal cases that resulted in credible fear interviews (*i.e.,* from encounters at and between POEs), USCIS found that an "exceptionally compelling circumstances" rebuttal ground applied in over 10 percent of those cases where the rule's presumption of asylum ineligibility was analyzed as part of the credible fear determination.[232] Under the present rule, the "exceptionally compelling circumstances" exception to the rule's limitation on asylum eligibility was found to apply in approximately 11 percent of all encounters with credible fear determinations issued by USCIS where the limitation on asylum eligibility was considered.[233] Under this rule, noncitizens may also be permitted to enter under one of the exceptions in section 3(b) of the Proclamation. For those who are unable to meet such an exception, the Departments believe that, in the emergency border circumstances in which this rule applies, such noncitizens should wait for a CBP One appointment. *See* 89 FR at 48732 n.171.

For those individuals seeking a CBP One appointment, CBP continues to take steps to make the process of seeking appointments more equitable and accessible. For instance, individuals have the chance to request an

appointment within a 12-hour period each day, with appointments allocated to the requesting group the following day.[234] In addition, noncitizens are not required to use the same mobile phone or device to request an appointment each day, as appointment requests are allocated based on the requesting registration. In other words, if a noncitizen has a registration, they can request an appointment each day from any mobile device. Individuals are not required to utilize a single device for each step of the process, and they may use a shared or borrowed device to request and schedule an appointment.

If a noncitizen receives an appointment, they are notified by an email notification, a push notification to the device that made the appointment, an in-app message, and a change to their registration status in the app.[235] The push notification that is sent to the device provides a notification to check the app, alerting a user to log into the app to review and confirm their appointment. This ensures that the notification is provided in multiple ways, such that those without continuous access to the same mobile device can still learn of their appointment status by logging into the app. If selected for an appointment, the individual then has 23 hours to complete the geolocation and liveness check and schedule the appointment.[236] Individuals may also request an automatic 24-hour extension to complete the process, if needed. Again, this can be done via any mobile device.

Individuals who do not have a smartphone or have other phone-related problems can seek assistance from trusted partners, if needed. Individuals are also permitted to seek assistance from others to complete the registration, request, and appointment confirmation process.

ii. Wait Times for CBP One Appointments

*Comment:* Commenters expressed concerns with long wait times for those using the CBP One app to schedule an

---

[229] OHSS analysis of June 2024 Enforcement Lifecycle data (Fear Screening—CLP tab).

[230] *Id.*

[231] *Id.*

[232] *See id.*

[233] *See* OHSS analysis of June 2024 Enforcement Lifecycle data (Fear Screening—STB tab).

[234] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/ about/mobile-apps-directory/cbpone.*

[235] *See* DHS, DHS/CBP/PIA–076(a), *Privacy Impact Assessment Update for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border: Post Title 42,* at 4 (2023), *https://www.dhs.gov/sites/default/files/ 2023-12/23_1019_priv_ia-cbp-076%28a%29- advance-collection-appendix-update.pdf.*

[236] *See* DHS, DHS/CBP/PIA–076(a), *Privacy Impact Assessment Update for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border: Post Title 42,* at 4 (2023), *https://www.dhs.gov/sites/default/files/ 2023-12/23_1019_priv_ia-cbp-076%28a%29- advance-collection-appendix-update.pdf.*

appointment, with one organizational commenter stating that waiting times routinely reach half a year due to the "enforced scarcity of appointments." Several commenters expressed concern that capping CBP One appointments at 1,450 per day is insufficient to address the number of arrivals at the border. For example, a commenter stated that, while 1,450 CBP One appointments are assigned each day, the "average number of appointment requests made per month between January 2023 and February 2024 was just under 5 million." A commenter stated that appointments are limited to less than 20 percent of the POEs at the SWB, while others noted that CBP One appointments are offered at only eight POEs along the almost 2,000 miles of the SWB.

Commenters further stated that the IFR would likely increase wait times by incentivizing more people to use the CBP One app—including Mexican nationals subject to the IFR—thereby exacerbating the significant backlog for securing an appointment.

Several commenters expressed additional concern that long wait times heighten the risk of danger for migrants in Mexico who intend to seek asylum in the United States. Specifically, multiple commenters warned that long wait times place migrants at severe risk of rape, assault, torture, kidnapping, and death, while leaving Mexican nationals to wait in the same country from which they are fleeing, and that those waiting for a CBP One appointment are vulnerable to being targeted by "criminal actors and detained or mistreated by Mexican government officials." Other commenters expressed concern about the hot weather, insufficient housing, and lack of access to essential resources. Additionally, commenters remarked that violence, coercion, and apprehensions by Mexican authorities prevent migrants waiting in Mexico from attending their pre-scheduled appointments. Commenters further expressed that particularly vulnerable populations who are waiting in Mexico, including Black migrants and women, are particularly susceptible to discrimination, violence, and heightened barriers to report crimes and access support services.

A few commenters further addressed health concerns for noncitizens required to wait in Mexico for their CBP One appointment. A commenter observed that the wait times for an appointment are "neither predictable nor reliable," which compounds stress and difficulties for noncitizens. The commenter further stated that health problems among certain noncitizens make it more

untenable for them to wait in Mexico. The commenter wrote that living conditions in Mexico exacerbate preexisting conditions such as asthma, cancer, and mental health concerns related to trauma, and that migrants have limited access to adequate medical care and life-saving medicine in Mexico. Likewise, another commenter observed that noncitizens living with HIV—both Mexican and non-Mexican—experience barriers to accessing treatment and medication while waiting in Mexico. Another commenter expressed concern over documented outbreaks of chicken pox in informal migrant encampments in Mexico City due to the high number of asylum seekers waiting for an appointment.

A commenter remarked that noncitizens may be granted appointments at a POE far from where they are physically located, despite the app's purported use of geolocation technology, forcing individuals to risk travel within Mexico. The commenter stated that Mexican authorities do not issue and renew temporary humanitarian visas to a majority of migrants, despite the fact that these visas are required to access bus and airline travel. The commenter additionally wrote that Mexican authorities have set up checkpoints targeted at preventing individuals from accessing public transportation required to make it to their scheduled CBP One appointments.

*Response:* Regarding concerns about long wait times to schedule a CBP One appointment, and the uncertainty this may cause, in large part due to high levels of migration in the region, the Departments note that CBP One is a tool that facilitates safe and orderly processing of noncitizens at POEs, and has aided CBP's efforts to increase processing at POEs.[237] CBP currently allocates a certain number of appointments per day to those registrations that have been pending for the longest period of time, based on the date on which a registration was created. CBP also regularly monitors wait times to be able to address any issues. While average wait times have generally increased since June 2023 due to demand for appointments, as of August 25, 2024, CBP has not seen evidence that average wait times have

increased at a greater rate following the implementation of the Proclamation and IFR. Indeed, CBP One represents a significant expansion of CBP's capacity to process noncitizens at SWB POEs: During the pre-pandemic period, CBP's OFO processed around 330 people per day.[238] From January 2023 (when CBP opened CBP One for direct scheduling) through August 31, 2024, OFO has processed four-and-a-half times that number daily.[239] Although demand for appointments currently outpaces supply, there are now more CBP One appointments available daily (1,450) than average daily encounters at and between POEs between FYs 2011 and 2018 (1,300).[240]

With regard to concerns about the number of available CBP One appointments, DHS acknowledges that there are more noncitizens seeking appointments than there are available appointments. For example, in July 2024, CBP received an average of 282,824 CBP One appointment requests per day. The total appointment requests over multiple day periods include a significant number of repeat requests because individuals are encouraged to submit an appointment request each day until gaining an appointment, and thus monthly totals do not reflect an accurate count of unique individuals seeking appointments. However, this high level of demand reflects the high levels of migration throughout the region, which CBP has responded to by increasing capacity to process noncitizens at POEs. CBP has increased the number of available appointments since January 2023 but notes that POEs can safely and securely process only a finite number of migrants,[241] and that the current number of appointments reflects that capacity. The Departments disagree that there is "enforced scarcity" of appointments or that the number of appointments is set in an arbitrary manner. The number of appointments is determined by a port's capability and capacity to process noncitizens. CBP's ability to process undocumented noncitizens in a timely manner at land border POEs is dependent on CBP

---

[237] *See, e.g.,* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, OFO, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf;* 89 FR at 48737.

[238] *See* OHSS analysis of July 2024 Persist Dataset (OFO Encounters tab).

[239] *See id.*

[240] *See* OHSS analysis of July 2024 Persist Dataset (Encounters FY 2000–2024 tab).

[241] *See, e.g.,* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, OFO, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* 1–2 (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

resources, including infrastructure and personnel.[242]

With regard to the number of POEs at which appointments are available and the locations of such ports, OFO must evaluate each POE's unique capabilities, both with respect to processing and staffing. There are also important variances between POEs due to geography, infrastructure, and workload. These considerations are evaluated continuously as OFO determines the number of appointments to schedule and at which ports to schedule them. OFO has limited use of CBP One to certain POEs that have the space and infrastructure to process elevated numbers of inadmissible noncitizens and has assigned staff to those POEs to conduct this processing. Adding additional POEs would require reallocation of that staffing, exchanging capacity in one location for another. Additionally, OFO has sought to utilize POEs that are located in or near urban areas with sufficient resources for migrants who may be released from OFO custody.

The Departments acknowledge that there may be humanitarian and health concerns for noncitizens in Mexico, including but not limited to individuals seeking a CBP One appointment, particularly for those with preexisting or underlying health conditions. The Departments also acknowledge that the congregation of groups of individuals can lead to increased transmission of communicable diseases. Similarly, the Departments acknowledge that some noncitizens seeking an appointment—including Mexican nationals—may be required to travel through Mexico to reach their appointment, and to wait in Mexico for their appointment, which may present safety concerns. The Departments also recognize that such concerns may be exacerbated by uncertainty about how long a migrant may have to wait to be processed at a POE, which may make it harder to schedule medical care or travel within Mexico.

Such circumstances, however, have been a reality that existed for migrants seeking to present at POEs prior to the introduction of CBP One. Indeed, before CBP One's introduction, migrants faced greater unpredictability given the high levels of migration in the region, which predate the introduction of CBP One,[243]

and the fact that before CBP One's introduction, migrants did not have the ability to wait anywhere in the expanded geographic boundaries now available to migrants using CBP One. In another respect, too, migrants would face worse conditions without this rule: As explained elsewhere in this preamble, the Departments assess that, when levels of encounters by USBP are elevated, such that DHS does not have the capacity to process most noncitizens through expedited removal and therefore must release a significant number of noncitizens pending section 240 removal proceedings, this dynamic serves to incentivize more migrants to travel through Mexico. This dynamic both exacerbates dangerous conditions along that route and exposes more migrants to dangerous conditions along the way. While CBP has continued to take steps to increase processing at POEs in an effort to provide a safe and orderly mechanism to enter the United States, it continues to be operationally impossible for CBP to immediately process all noncitizens seeking to enter the United States.

With regard to the location of scheduled appointments, the CBP One app does not arbitrarily designate the location for appointments. The location is selected by the user, and the location can be changed by the user every time the user requests an appointment. The Departments continue to believe that the use of CBP One to schedule appointments facilitates the safe and orderly entry of noncitizens at POEs, including migrants who are already waiting in Mexico to enter the United States. In particular, the use of the app enables migrants to schedule their arrival at a pre-determined date and time, providing migrants with certainty about the date of their entry. Migrants may then wait in whatever location they deem best before approaching the border for their appointment. To this end, as of August 23, 2024, the CBP One app allows non-Mexican nationals to request and schedule an appointment from the southern Mexican states of Tabasco and Chiapas in addition to their existing ability to request and schedule appointments from Northern and Central Mexico.[244] Mexican nationals may request and schedule an appointment from anywhere in Mexico.[245] CBP continues to encourage

migrants to make appointments at POEs close to where they may be geographically located in Mexico or seek to enter the United States.

With regard to claims regarding the actions of government authorities in Mexico, the Departments note that they do not control the actions or decisions of the Mexican government or Mexico's implementation of its own laws.

### iii. Availability of and Access to CBP One Appointments and Concerns About Discrimination

*Comment:* Several commenters raised concerns about unequal access to POEs and asylum resulting from barriers to using the CBP One app, such as language, disability, resource, and other access issues that disparately impact and discriminate against migrants. A commenter acknowledged that CBP One may allow for certain positive gains in receiving and processing migrants, and also expressed concern that the application is wielded to penalize those with possible protection needs who cannot access it or obtain an appointment. One commenter called the CBP One app "inherently discriminatory," and another commenter articulated that the CBP One app has "pervasive" accessibility issues. A commenter cited a 2024 Amnesty International report,[246] where that organization called on the United States to "stop the mandatory use of the CBP One application" due to concerns over language access, technological barriers, and privacy and surveillance.

In the same vein, numerous commenters raised concerns related to the accessibility of the app for those lacking the required technology. Specifically, commenters expressed concern that scheduling an appointment via CBP One is not a viable option for those who lack access to reliable internet, electricity, or a smartphone. Some commenters provided examples that migrants have reported that their phones have been stolen by Mexican authorities or cartels, or lost or damaged during their travels. A commenter stated that in encampments with limited access to electricity, migrants are charged high prices for access to an outlet to charge their phones. Another commenter expressed that the IFR places people who do not have access to technology in the prejudicial position of having to meet a higher standard of proof to receive a positive credible fear

---

[242] *See, e.g., id.*

[243] *See, e.g.,* Perla Trevizo, *Dozens of Families, Many from Guatemala, Arrive in Nogales Seeking US Asylum,* Ariz. Daily Star (Aug. 2, 2018), *https://tucson.com/news/local/dozens-of-families-many-from-guatemala-arrive-in-nogales-seeking/article_4dd45e2f-0b19-5b7b-880e-74a82e3515ea.html;* Ariel G. Ruiz Soto, *Record-Breaking Migrant*

*Encounters at the U.S.-Mexico Border Overlook the Bigger Story,* Migration Pol'y Inst. (Oct. 2022), *https://www.migrationpolicy.org/news/2022-record-migrant-encounters-us-mexico-border.*

[244] *See CBP, CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[245] *See id.*

[246] Amnesty Int'l, *CBP One Mobile Application Violates the Rights of People Seeking Asylum in the United States* (May 9, 2024), *https://www.amnesty.org/en/latest/news/2024/05/cbp-one-mobile-application-violates-the-rights-of-people-seeking-asylum-in-the-united-states/.*

determination, in violation of U.S. asylum law. A commenter remarked that in perpetuating the ''division'' between ''classes of people seeking asylum''—''those who have a smartphone and access to the internet and are technologically literate'' and ''those who do not have these required items, skills or abilities''—the IFR fails to apply protections equally under U.S. and international law.

Many commenters also discussed limited language accessibility for the CBP One app, stating that the app is only available in Spanish, English, and Haitian Creole, and expressed that conditioning access to asylum on the use of a smartphone app that is only available in three languages denies equal access to asylum to those in need of protection who are unable to use the app. Commenters expressed concerns about the fact that different stages for securing a CBP One appointment are available in different sets of languages (*e.g., Login.gov*, the initial app registration page, and app form responses), as this results in noncitizens, even those who are literate in Spanish and Haitian Creole, requiring assistance with completing the CBP One app form. The commenter further remarked that the system is particularly difficult for vulnerable populations to navigate as a result of challenges with finding adequate translation services, reasoning, for example, that it can take up to a week to find interpretation for Indigenous languages.

Several commenters additionally raised concerns about access to the app among those who are illiterate, have disabilities, or have limited language and digital literacy. In particular, commenters expressed that the IFR assumes technological literacy in the use of smartphone apps, such as the ability to access an email account, check the account on an ongoing basis, upload a video, and enable Global Positioning System/geolocators with many people requiring assistance to undertake these steps. A commenter provided an account of their experiences with individuals in Ciudad Juarez who struggle to navigate the app despite knowing how to read in Spanish and Haitian Creole, and the inability of legal service providers to provide logistical support to all the individuals with potential asylum claims who lack the

digital literacy to navigate the mobile app.

Commenters further remarked on technological issues surrounding the app. Commenters expressed concerns that CBP One remains inaccessible to many due to facial recognition technology errors, which commenters stated are frequent for migrants with darker skin tones. Commenters stated that the app cannot read the faces of Black, Brown, Asian, and Indigenous people seeking asylum, and Haitians and Africans are particularly likely to experience ''algorithm bias'' while using the CBP One app which would prevent large classes of individuals from using the app to secure an appointment, and, therefore, from seeking asylum, perpetuating racism in the U.S. immigration system.

Commenters also noted additional technology concerns, such as issues with error messages, account access, and deactivated accounts. One commenter listed various reported issues with the CBP One app, such as difficulty uploading files, error messages only provided in English, saturated bandwidth resulting in delays, appointments being rejected if GPS is not activated, and phones unable to take video or photos of sufficient quality to be recognized by the app. Another commenter provided various anecdotal examples of individuals who were unable to access the CBP One app under the Circumvention of Lawful Pathways rule, and who the commenter said would similarly be harmed under the IFR, while another commenter added that complications with the app forced nongovernmental organizations to spend resources helping people use the app rather than assisting noncitizens with credible fear interviews, reviews of negative determinations, and representation in immigration court. A commenter also stated that ''[t]here is a thriving black market for appointments available only to the wealthiest refugees.''

Separately, while some commenters expressed support for the ''expansion of mechanisms for [CBP One] appointments,'' commenters also stated that these expansions are insufficient to counteract noncitizens' unawareness of the CBP One application and the inability to obtain appointments.

Lastly, a commenter asserted that the use of CBP One results in family separation due to different appointment dates. Furthermore, a commenter expressed additional concern that families with a CBP One appointment are not always guaranteed the ability to cross the border, citing examples of families who were turned away despite arriving on time for a valid appointment.

*Response:* The Departments disagree that the CBP One app is a barrier to asylum. Rather, it is a tool that DHS has established to process the flow of noncitizens seeking to enter the United States in a more orderly and efficient fashion. CBP One is a free app, and noncitizens are not required to pay to register or schedule an appointment.

The Departments acknowledge that not all migrants may have access to a smartphone or be able to easily use the CBP One app, and that lack of or limited smartphone access or ability to use a smartphone (due to lack of digital literacy, disability, or other reasons) may limit a migrant's ability to use the CBP One app to schedule an appointment. However, individuals who do not have a smartphone or who have other phone-related issues can seek assistance, including sharing phones, or translation or technical assistance, from trusted partners, if needed. In addition, as noted above, individuals may utilize shared or borrowed devices to register for the CBP One app and to schedule an appointment. CBP conducts extensive engagement with non-governmental organizations (''NGOs'') and stakeholders, and has received feedback and information about the challenges associated with the use of the CBP One app. Throughout these engagements, access to smartphones has been raised, although not as a significant concern for most individuals. CBP is aware that NGOs have discussed providing assistance with completing individuals' CBP One registrations and offering continued assistance with requesting appointments. CBP also notes that individuals seeking to create a CBP One registration can do so from anywhere. To create a registration, users are not required to enable location services, although they are required to enable location services in order to request and schedule an appointment.

With regard to internet access, the Departments acknowledge there can be connectivity gaps, electrical outages, and unreliable wireless internet access in northern Mexico. However, CBP made significant updates to the appointment scheduling process in 2023, including transitioning CBP One scheduling to a daily appointment allocation process to allow noncitizens additional time to complete the process. Under this system, users must "ask for an appointment" each day, by selecting the relevant registration and submitting a request for that registration.[247] If a noncitizen receives an appointment that day, they are notified in multiple ways, and have up to 23 hours to confirm that appointment.[248] If a noncitizen does not receive an appointment, they must "request an appointment" the following day, again by selecting the relevant registration and requesting that registration. Individuals are not required to use the same mobile phone or device to request an appointment each day, and, as noted above, may use a shared or borrowed device to request and schedule the appointment. In addition, in July 2024, CBP updated the appointment allocator to increase the percentage of appointments allocated to users who had been waiting for longer periods of time, based on the date on which their registration was created.

CBP also continually takes steps to provide access to the app for individuals in different languages. The app was originally available in Spanish and English. Haitian Creole was added in February 2023 in response to feedback from stakeholders. Additionally, after the user makes a language preference, error messages are available in the selected language (English, Spanish, or Haitian Creole). While the app remains available in Spanish, English, and Haitian Creole, quick reference guides are now available in many languages (including Russian, French, Portuguese, Arabic, Dari, Pashto, Punjabi, and Chinese). According to the UNHCR, of the top 5 nationalities of displaced individuals in Mexico, all are from Spanish-speaking countries and Haiti.[249] Between May 11,

2023 (when the Title 42 public health Order terminated) and September 11, 2024, USBP data show that over 88 percent of noncitizens apprehended between POEs on the SWB were recorded as speaking Spanish or English. The next most common languages were Mandarin, representing just over 2 percent of apprehensions, followed by Portuguese and French, which each represent less than 2 percent of noncitizens apprehended.[250] Finally, a CBP analysis conducted in September 2024 showed that, of all of the CBP One appointment requests during the first week of September 2024, approximately 90 percent were made by individuals from Spanish-speaking countries, with the next highest percentage, 5 percent, made by Haitians, and the remainder by other nationalities. The fact that Haitian nationals represent a relatively large proportion of the displaced persons in Mexico generally, are more likely to be encountered at POEs, and use the CBP One app further supports the prioritization of Haitian Creole and Spanish translations in the app. In addition, based on NGO feedback, CBP will be adding a French translation to the app. CBP has also been made aware of concerns with regard to the accuracy of the app's Haitian Creole translation and is currently taking steps to improve its accuracy.

CBP acknowledges that individuals who do not speak Spanish, English, or Haitian Creole, including those who speak Portuguese or Mandarin, may have more difficulty accessing the app, but has determined that it is appropriate to prioritize translation services in the app to those languages spoken by the vast majority of users of the app and noncitizens in the region. And CBP believes that its efforts to make the app accessible in other ways, such as through the quick reference guides, are working. CBP has seen a significant number of individuals who do not speak Spanish, English, or Haitian Creole requesting appointments, suggesting that the quick reference guides, as well as other information about CBP One

available on CBP's website,[251] are working to provide accessibility to the app even for those who do not speak one of those languages. With regard to concerns about different stages of the CBP One appointment process being in different languages, CBP does not exercise control over Login.gov, which is used to register for an appointment, as it is operated by the General Services Administration.[252] Login.gov is available in several languages, including English, Spanish, and French. And while Login.gov is not available in Haitian Creole, CBP analysis showed that, as noted above, Haitian nationals continue to be the second-highest population of noncitizens requesting CBP One appointments, indicating that Login.gov's languages are not posing a substantial limitation for those users. Moreover, the CBP One quick reference guides include a description of the Login.gov steps in the process. The Departments also appreciate the concerns related to the information required to access or use the CBP One app. The Departments note that users of the app are not required to upload any documents in order to use the app. Users are required to submit a photograph, and may, although are not required to, upload document information, such as scanning their passport information. With regard to concerns raised by commenters relating to facial recognition and access to the app by individuals with darker skin tones, CBP and the third party responsible for liveness detection took steps in 2023 to improve the liveness capability of the application and increase bandwidth. Since that time, CBP has data showing that the app successfully matches liveness in 80–90 percent of attempts, with the difference in performance across ethnicities on the order of tenths of a percent. If an individual initially is not able to successfully match to their live photo, they are not prohibited from trying again, and they may seek an extension to continue to try to complete liveness. Individuals who continue to fail liveness are able to reach out to CBP either directly or, if appropriate, through an NGO or other external entity. CBP notes that it does not collect data on race or skin complexion.

CBP engages frequently with stakeholders to determine further updates and changes in the app that improve the users' experience and

---

[247] See CBP, CBP One™ Mobile Application, Frequently Asked Questions—English (last modified Sept. 19, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[248] See CBP, CBP One™ Application Update Announcement—English (Mar. 1, 2024), *https://www.cbp.gov/document/guidance/cbp-one-application-update-announcement-english.*

[249] See United Nations High Commissioner for Refugees ("UNHCR"), *Country Operations: Mexico, Population by Origin, https://reporting.unhcr.org/operational/operations/mexico#* (last visited Sept. 19, 2024). For purposes of this analysis, the Departments are excluding the nationalities

grouped as "various," given a lack of information on what such category includes.

[250] Due to the way that CBP's OFO records and documents language services, data for languages used by those encountered at POEs are not readily available. Although there is a high volume of displaced Haitian nationals in Mexico, CBP's experience is that, particularly in recent years, Haitian nationals have been much more likely to be encountered at POEs than between POEs. For instance, in FY 2023, more than 75,000 Haitian nationals were encountered at SWB POEs, compared with just over 1,000 between POEs. *See* OHSS analysis of July 2024 Persist Dataset (Haitian Encounters tab).

[251] See CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[252] See U.S. General Servs. Admin., *Login.gov, https://login.gov/* (last visited Aug. 10, 2024).

enhance access to its features. For example, because of NGO feedback, height and weight were made optional fields and additional response options were added such as "I don't have one" for a foreign address and "Unknown" for parental information. CBP also acknowledges that reading comprehension and disability may present challenges for some users among this user population. CBP has improved the app's text for users with low literacy and will continue to make improvements to the app for this population. The app has also undergone a compliance review pursuant to section 508 of the Rehabilitation Act regarding its accessibility to people with disabilities, with a final certification expected by the end of November 2024.

Regarding concerns raised by NGOs regarding the resources expended to address questions from migrants about the app and its impacts, the Departments are not able to comment on how such entities determine the use of their own resources. With regard to concerns regarding a "black market" for appointments, CBP has advised noncitizens and the general public that appointments that purport to be "for sale" are fraudulent, and migrants should not pay for such appointments.[253]

With regard to the commenters' concerns related to whether noncitizens have sufficient awareness of the availability of the CBP One app and this rule, the Departments believe that they have provided sufficient notice to the public. The Departments note the use of, and benefits of, the CBP One app have been broadly publicized. Indeed, the CBP One app is widely used, as evidenced by the number of requests CBP receives each day for appointments. For example, in July 2024, CBP received an average of 282,824 CBP One appointment requests per day. Demand for CBP One appointments has outpaced supply, which has resulted in average wait times increasing since June 2023. CBP continues to regularly announce updates and improvements made to the app to the public. In particular, CBP regularly announces changes and updates to the app on its public website at *https://www.cbp.gov/about/mobile-apps-directory/cbpone*. This website also contains a number of detailed questions and answers regarding the use of the app. Additionally, DHS has

published a Privacy Impact Analysis (PIA) for CBP One, and subsequent updates to the original CBP One PIA to address privacy risks in the deployment and use of the CBP One app.[254] Moreover, the Departments' publication of the Circumvention of Lawful Pathways rule, the IFR, and this rule have provided (and in the case of this rule, will provide) further notice to the public and to noncitizens of the pathways available to them and the potential consequences of not availing themselves of such pathways. The Departments believe that such efforts provide sufficient information for noncitizens seeking to travel to the United States.

With respect to comments suggesting that families are processed separately or have been turned away, the Departments note that all individuals—including members of families—are processed pursuant to existing CBP policies and practices. Family members who register together on CBP One using a single registration number to schedule an appointment for their whole family are given the same appointment date and time. So long as they arrive as a family for their appointment at that date and time, they will be processed at that appointment time.

**b. Regulatory Exception—Exceptionally Compelling Circumstances**

*Comment:* Commenters raised concerns regarding the preponderance of the evidence standard for establishing exceptionally compelling circumstances under the IFR. Commenters argued that applying a limitation on asylum eligibility during credible fear interviews, and then requiring noncitizens to demonstrate exceptionally compelling circumstances by a preponderance of the evidence in order to overcome the limitation on asylum eligibility, is inconsistent with

the INA and congressional intent. Rather, commenters stated that Congress enacted a "significant possibility" standard for the credible fear interview in order to safeguard a noncitizen's opportunity to present potentially viable asylum claims in full proceedings and to prevent noncitizens from being returned to persecution or torture.

Relatedly, commenters stated that noncitizens should not have to demonstrate exceptionally compelling circumstances unrelated to their asylum claim by a preponderance of the evidence in order to have their asylum claims adjudicated. Some commenters believed that the preponderance of the evidence standard was too onerous for noncitizens to meet during the credible fear interview, even if the noncitizen had experienced a situation or event prior to entry that should otherwise qualify as an exceptionally compelling circumstance.

Lastly, at least one commenter implied that AOs conducting credible fear interviews did not have adequate training and were not equipped to conduct the analyses required by the IFR, including applying the preponderance of the evidence standard to determine whether a noncitizen is subject to the limitation on asylum eligibility.

*Response:* Many of commenters' concerns are based on an incorrect premise. The Departments recognize that the "significant possibility" standard is established by statute, *see* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), and the Departments lack the authority to—and have not sought to—alter this statutory standard through rulemaking. By statute, to determine whether a noncitizen has a "credible fear," an AO must assess whether there is a "significant possibility . . . that the alien could establish eligibility for asylum." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Thus, during credible fear proceedings, the overall standard of proof for establishing exceptionally compelling circumstances to overcome the limitation on asylum eligibility remains the "significant possibility" standard, which must be applied in conjunction with the standard of proof required for the ultimate determination (*i.e.,* preponderance of the evidence that the exception applies). *See* 89 FR at 48739. Accordingly, at the credible fear interview, the AOs assess whether there is a "significant possibility" that the noncitizen would be able to show at a future merits adjudication by a preponderance of the evidence that the limitation does not apply or that the noncitizen satisfies the rule's exception.

---

[253] *See* CBP, *CBP One™ Mobile Application, Frequently Asked Questions—English, CBP One™ Mobile Application, "What if someone asks me to pay for an appointment?"* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[254] *See* DHS, DHS/CBP/PIA–068, *Privacy Impact Assessment for CBP One™ Mobile Application* (2021 and subsequent updates), *https://www.dhs.gov/sites/default/files/2023-05/privacy-pia-cbp068-cbpmobileapplication-may2023.pdf;* DHS, DHS/CBP/PIA–068(a), *Privacy Impact Assessment [Update] for CBP One™ Mobile Application* (2024), *https://www.dhs.gov/sites/default/files/2024-07/24_0725_priv_pia-cbp-068%28a%29-cbpone-update.pdf; see also* DHS, DHS/CBP/PIA–076, *Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* (2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf;* DHS, DHS/CBP/PIA–076(a), *Privacy Impact Assessment Update for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border: Post Title 42* (2023), *https://www.dhs.gov/sites/default/files/2023-12/23_1019_priv_pia-cbp-076%28a%29-advance-collection-appendix-update.pdf.*

Likewise, during credible fear reviews, IJs will apply the ''significant possibility'' standard to determine whether a noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that the noncitizen satisfies the rule's exception.

To the extent commenters voiced general opposition to requiring a noncitizen to demonstrate exceptionally compelling circumstances by a preponderance of the evidence so as not to be subject to the rule's limitation on asylum eligibility, the Departments note that this standard is the general standard noncitizens must meet to determine that a ground of ineligibility does not apply in a merits adjudication. *See* 8 CFR 1240.8(d) (''If the evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.''). Additionally, this burden for establishing exceptionally compelling circumstances was codified by the Circumvention of Lawful Pathways rule, which has been in effect since May 11, 2023. 88 FR at 31450–51 (codified at 8 CFR 208.33(a)(3), 1208.33(a)(3)). The Departments believe that maintaining consistency in the preponderance of the evidence standard between these two related rules promotes consistent adjudications when adjudicators must determine whether a noncitizen has demonstrated exceptionally compelling circumstances. In fact, to promote such consistency, the rule provides that if a noncitizen demonstrates an exceptionally compelling circumstance for purposes of this rule, then the noncitizen has necessarily demonstrated an exceptionally compelling circumstance for purposes of the Circumvention of Lawful Pathways rule, and vice versa, further underscoring the importance of maintaining a consistent analytical framework between the two rules. *See* 89 FR at 48754–55 (explaining that the IFR's exception to the limitation on asylum eligibility mirrors the Circumvention of Lawful Pathways rule's rebuttal grounds to simplify administration of each while both rules are in effect).

Further, contrary to commenter concerns, the preponderance of the evidence standard is not onerous or unduly burdensome such that a noncitizen would be unable to demonstrate exceptionally compelling circumstances. To the extent that commenters expressed concern with the preponderance of the evidence standard

during credible fear proceedings, the Departments again clarify that the applicable standard during credible fear proceedings is the ''significant possibility'' standard, INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), and AOs will assess whether there is a significant possibility that the noncitizen would be able to show at a future merits adjudication by a preponderance of the evidence that the limitation does not apply or that the noncitizen meets the ''exceptionally compelling circumstances'' exception. Similar to the Circumvention of Lawful Pathways rule's rebuttal grounds, *see* 88 FR at 31380, the Departments believe that there should generally be sufficient evidence available at the time of the credible fear interview for an AO to evaluate whether there is a significant possibility that the noncitizen would be able to establish exceptionally compelling circumstances by a preponderance of the evidence. Notably, the credible fear screening process involves eliciting testimony from noncitizens seeking protection, and the rule does not require noncitizens to provide any specific form of evidence, such as written statements or other documentation. *See* 89 FR at 48746 & n.239.

Indeed, DHS data show that the standard is not unduly challenging to meet at the credible fear stage. Since the IFR went into effect through August 31, 2024, USCIS determined that the limitation on asylum eligibility did not apply in over 2,200 cases (approximately 11 percent of credible fear interviews completed under the IFR during that period) because the noncitizen was able to demonstrate exceptionally compelling circumstances under the credible fear screening standard.[255] The Departments believe that these data show that the exception is both meaningful and appropriately tailored to ensure that, during emergency border circumstances, only those with a time-sensitive imperative are able to avoid the rule's limitation on asylum eligibility.

Regarding the preponderance of the evidence standard during a full merits adjudication, the Departments similarly do not believe that it imposes an onerous or unduly burdensome evidentiary standard. The INA explicitly provides that during full merits adjudication of an asylum claim ''testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration'' in

[255] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening—STB tab).

certain circumstances. INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii). Thus, as the Departments have explained, the preponderance of the evidence standard may be met through credible testimony alone. *See* 88 FR at 31395. For example, if a noncitizen or a member of the noncitizen's family as described in 8 CFR 208.30(c) with whom they were traveling faced an acute medical emergency, an imminent and extreme threat to life or safety, or satisfied the definition of a victim of a severe form of trafficking in persons, or faced other exceptionally compelling circumstances, then the noncitizen could present testimony of those facts and circumstances.

Lastly, to the extent commenters expressed skepticism about an AO or IJ's ability to properly apply the screening standard during a credible fear interview, the Departments note that both AOs and IJs receive extensive training in substantive law and procedure, *see* 88 FR at 31395 & nn.211–213, and the Departments are confident that AOs and IJs have the requisite knowledge, skills, and experience to properly apply the framework of this rule, as they have been doing for months.

*Comment:* Some commenters recommended that the Departments rescind the ''exceptionally compelling circumstances'' exception to the limitation on asylum eligibility, stating that the exception codifies ''loopholes'' that are easy for noncitizens to exploit and undermines the Departments' goal of discouraging irregular migration across the SWB.

*Response:* The Departments decline to rescind the ''exceptionally compelling circumstances'' exceptions at 8 CFR 208.35(a)(2)(i) and 1208.35(a)(2)(i). As the Departments explained in the IFR, maintaining an exception to the limitation on asylum eligibility for exceptionally compelling circumstances is intended to mitigate potential adverse impacts of the rule on certain particularly vulnerable individuals and family members as described in 8 CFR 208.30(c) with whom they are traveling, without undermining the Departments' stated policy objectives of disincentivizing irregular migration during emergency border circumstances. 89 FR at 48754. The Departments believe the nature of the exceptionally compelling circumstances—such as facing an acute medical emergency, facing an imminent and extreme threat to life or safety, or meeting the definition of a victim of a severe form of trafficking in persons—appropriately balances the Departments' stated policy

objectives and does not create a "loophole" as commenters suggest.

The Departments are also confident that AOs and IJs will appropriately assess a noncitizen's testimony and any evidence presented to determine whether a noncitizen has established that the rule's exception to the limitation on asylum eligibility applies. Indeed, DHS and EOIR personnel have the training and experience necessary to determine whether the exception applies, including several months of experience from implementing the IFR and other rules. For example, AOs were provided specific training for the implementation of the Circumvention of Lawful Pathways rule to elicit and analyze testimony related to whether a noncitizen can establish an exception or rebut the presumption of asylum ineligibility. *See* 88 FR at 33330. Additionally, before any AO can interview a noncitizen where the IFR's limitation on asylum eligibility applies, or any supervisory AO can review such a case, they must receive specific training on the IFR, including on applying the IFR's limitation on asylum eligibility and the "exceptionally compelling circumstances" exception.

*Comment:* Commenters stated that the enumerated per se exceptionally compelling circumstances in 8 CFR 208.35(a)(2) and 1208.35(a)(2) are, on the whole, too limited in number and narrow in scope, and are framed in a restrictive manner with a high burden of proof that commenters asserted many noncitizens will be unable to meet. According to commenters, because the exception is so difficult to establish, the vast majority of noncitizens who enter between POEs will be ineligible for asylum. Commenters also alleged that noncitizens may not have access to or be aware of what information or evidence is necessary to sufficiently demonstrate exceptionally compelling circumstances, particularly as they may not be aware of the rule and its evidentiary requirements until they are placed in proceedings. Similarly, commenters expressed concern about the evidentiary burden noncitizens would face in trying to establish that exceptionally compelling circumstances existed at the time of entry when their case may not be adjudicated until years after the date of entry due to existing backlogs, and when evidence and witnesses may be lost over time. Commenters offered, as an example, the difficulty that noncitizens would face in demonstrating that they or a family member with whom they traveled experienced an acute medical emergency, in the absence of concurrently issued medical documents.

Commenters stated that it will be difficult for AOs to evaluate whether a noncitizen satisfies an exception at the credible fear stage because it is a fact-intensive inquiry and will require significant development of the record. Commenters also stated that there is insufficient guidance about how, in practice, AOs are supposed to make a finding regarding exceptionally compelling circumstances. Further, commenters expressed concern that AOs are not required to elicit potentially relevant facts about the rule's exceptions to ensure that noncitizens are not improperly subject to the IFR's limitation on asylum eligibility and recommended that the Departments adopt a screening framework in which AOs have a shared burden to elicit all information relevant to asylum eligibility, preferably in a non-adversarial manner.

*Response:* The Departments believe that the rule's exception to the limitation on asylum eligibility for exceptionally compelling circumstances, including the enumerated per se circumstances, are appropriate in scope and detail, and as such, the Departments decline to modify those provisions. Indeed, during emergency border circumstances, limiting the "exceptionally compelling circumstances" exception to those who are unable to wait for an appointment due to an acute medical emergency or an imminent and extreme threat to life or safety is important to deter irregular migration and provide for efficient border processing during a period of high encounters.[256] *See* 89 FR at 48732 n.171. As discussed above in this section of the preamble, the data reflect that the "exceptionally compelling circumstances" exception is achieving this balance; USCIS determined that the exception had been met in approximately 11 percent of credible fear interviews completed between the IFR's effective date and August 31, 2024.[257]

The Departments stress, however, that exceptionally compelling circumstances are not limited to the enumerated examples. Rather, similar to the rebuttal grounds adopted in the Circumvention

of Lawful Pathways rule, the examples are a non-exhaustive list intended to preserve AO and IJ flexibility and permit consideration of all facts giving rise to potential exceptionally compelling circumstances. 89 FR at 48733; 88 FR at 31394. Additionally, the Departments continue to prioritize family unity by extending these exceptions to qualifying family members with whom the noncitizen is traveling. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

Regarding concerns that establishing exceptionally compelling circumstances is a fact-intensive inquiry that will require significant development of the record, and that noncitizens will not have access to information and evidence of exceptionally compelling circumstances at the time of screening, the Departments note that relevant evidence of such circumstances generally relates to the situation immediately prior to the noncitizen's entry into the United States, and focuses on relevant personal facts and circumstances within the noncitizen's knowledge. Accordingly, the Departments expect that any evidence necessary for a noncitizen to demonstrate that they have a significant possibility of ultimately showing exceptionally compelling circumstances should generally be readily available—whether from the noncitizen in the form of credible testimony or other evidence or from government records relating to the noncitizen's circumstances at the time of entry—at the time of the credible fear screening. With respect to cases where the existence of exceptionally compelling circumstances at the time of entry may be evaluated later in time, the Departments similarly note that the rule does not impose any requirement for the type of evidence necessary to establish exceptionally compelling circumstances, and a noncitizen's testimony alone "may be sufficient to sustain [their] burden without corroboration" in a full merits hearing in certain circumstances. INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii). Regarding commenter concerns that noncitizens would have difficulty demonstrating that they faced an acute medical emergency at the time of entry without medical documents, the Departments expect that credible testimony about the medical emergency would generally be sufficient at the credible fear stage, and the rule does not require any specific type of evidence related to the acute medical emergency. *See* 89 FR at 48746 & n.239 (explaining that credible testimony is sufficient in a credible fear screening and that

---

[256] Separately, noncitizens facing an urgent humanitarian situation may not be subject to the limitation at all if, under the Proclamation, a noncitizen is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, based on the totality of the circumstances, including consideration of urgent humanitarian interests at the time of the entry or encounter. *See* 8 CFR 208.4(a)(1), 1208.35(a)(1); Section 3(b) of the Proclamation.

[257] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening—STB tab).

**81224**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

corroborating evidence is not required); *see also* 88 FR at 31392 (discussing the analogous acute medical emergency rebuttal ground under the Circumvention of Lawful Pathways rule).

Additionally, when conducting credible fear interviews, AOs have an obligation to elicit testimony relevant to a noncitizen's claim, which will necessarily include any information related to exceptionally compelling circumstances.[258] Moreover, during credible fear reviews before IJs, noncitizens have an opportunity to be heard and to be questioned by the IJ. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). During section 240 removal proceedings, IJs also must develop the record, which will, as relevant, necessarily include facts and testimony pertaining to exceptionally compelling circumstances. *See* INA 240(b)(1), 8 U.S.C. 1229a(b)(1) ("[IJs] shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the [noncitizen] and any witnesses."); 8 CFR 1003.10(b) (same); *see also Quintero* v. *Garland,* 998 F.3d 612, 626 (4th Cir. 2021).

Finally, the Departments disagree with the assertion that there is insufficient guidance regarding making a finding related to exceptionally compelling circumstances. The rule clearly sets forth both the standard for the "exceptionally compelling circumstances" exception and the process for evaluating the limitation on asylum eligibility during credible fear determinations. *See* 8 CFR 208.35(a), (b), 1208.35(a), (b). Additionally, AOs must receive training on application of the limitation on asylum eligibility and the "exceptionally compelling circumstances" exception before any AO can interview a noncitizen where the limitation on asylum eligibility applies, or any supervisory AO can review such a case. Further, the Departments have experience in applying the "exceptionally compelling circumstances" standard in the context of the Circumvention of Lawful Pathways rule. *See* 89 FR at 48733 (explaining that the exception mirrors the rebuttal circumstances adopted in the Circumvention of Lawful Pathways rule and is intended to apply to the same circumstances); *see also* 88 FR at 31380, 31390–93 (explaining the standard for establishing and procedure for evaluating analogous rebuttal

grounds under the Circumvention of Lawful Pathways rule). The Departments also now have several months of experience implementing the IFR, and implementation itself yields valuable information on continued operation of its provisions. *See supra* Section II.A.2.

*Comment:* Commenters raised concerns that the "exceptionally compelling circumstances" exception does not provide adequate protection for vulnerable groups. Specifically, commenters alleged that the exceptions are insufficient to protect vulnerable groups who face a disproportionate risk of harm in Mexico, including LGBTQI+ noncitizens, Black and Indigenous noncitizens, women, and children, among others. Commenters observed that some such noncitizens, and particularly those without access to legal representation, may not understand the intricacies of the IFR or the requirements to establish an exception. Further, commenters stated that the complicated exceptions will contribute to confusion among and disparate treatment of such noncitizens, making them vulnerable to smugglers and undermining the Departments' goal of orderly processing at the SWB.

*Response:* For general discussion regarding concerns related to specific vulnerable populations, please see Section III.B.2.a.iii of this preamble.

With regard to the "exceptionally compelling circumstances" exception and vulnerable populations specifically, the Departments believe that the exception provides sufficient protection for such populations. The exception focuses on relevant personal facts and circumstances within the noncitizen's knowledge relating to potential harm they faced immediately preceding their entry into the United States. *See* 89 FR at 48747–48. To determine whether the exception applies, the AO questions the noncitizen regarding the circumstances of their entry into the United States, which does not require any particular legal knowledge by the noncitizen.

Further, the Departments disagree that the "exceptionally compelling circumstances" provision will make noncitizens more vulnerable to smugglers due to confusion about the rule. As the Departments explained in the IFR, 89 FR at 48733, the exception for exceptionally compelling circumstances was drafted to mirror the rebuttal grounds in the Circumvention of Lawful Pathways rule, which the Departments believe will help reduce any confusion among noncitizens or adjudicators. Moreover, the Departments believe that, overall, this rule is a key measure to combat illegal

smuggling activity by drastically reducing incentives for noncitizens without a lawful basis to remain in the United States to rely on smugglers for entry into the United States. *See* 89 FR at 48714–15 (explaining how the rule is necessary to combat illegal smuggling activity), *id.* at 48766. The "exceptionally compelling circumstances" exception is an important provision of this rule because it appropriately balances the essential need to use resources effectively during emergency border circumstances with consideration of whether a noncitizen or family member with whom they are traveling is specifically vulnerable to immediate harm and has entered the United States during emergency border circumstances due to serious and urgent needs to do so. *See* 89 FR at 48754.

*Comment:* Commenters stated that the exception to the IFR was subjective, highly discretionary, and insufficient to ensure individuals were not refouled. Commenters also expressed concern that the enumerated per se exceptionally compelling circumstances require a subjective assessment of the degree and temporal nature of the needs and threats faced by noncitizens at the time of entry, which commenters allege is inconsistent with the right to seek asylum and the principle of non-refoulement.

*Response:* The Departments disagree that the "exceptionally compelling circumstances" exception is overly subjective or affords too much discretion to AOs and IJs, as the Departments are confident in AOs' and IJs' ability to fairly and accurately apply the exception. AOs and IJs have significant training and experience in eliciting testimony and applying legal standards in immigration proceedings. *See, e.g.,* 89 FR at 48747 (noting that AOs and IJs have the training and experience necessary to elicit information required to determine whether a case meets the necessary requirements); 8 CFR 1003.10(b) (requiring IJs to "seek to resolve the questions before them in a timely and impartial manner consistent with the [INA] and regulations").

Further, to the extent a noncitizen has concerns with an AO's determination, all credible fear determinations undergo supervisory review to ensure consistency. 8 CFR 208.30(e)(8). Noncitizens may also request IJ review of negative credible fear determinations. 8 CFR 208.35(b)(2)(v). Moreover, if the limitation on asylum eligibility is applied to a noncitizen in section 240 removal proceedings, IJ determinations are subject to review by the BIA. 8 CFR 1003.1(b)(3).

---

[258] *See, e.g.,* USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* 11 (Apr. 24, 2024) ("In cases requiring an interview, although the burden is on the applicant to establish eligibility, equally important is your obligation to elicit all pertinent information.").

With regard to concerns about potential refoulement, the Departments note that, even in those cases where a noncitizen is unable to establish exceptionally compelling circumstances and is subject to the limitation on asylum eligibility, the noncitizen remains eligible to pursue statutory withholding of removal and CAT protection, which implement the United States' non-refoulement obligations. *See* 8 CFR 208.35(b)(2); 8 CFR 1208.35(b)(2)(iii). For additional discussion regarding the United States' non-refoulement obligations, please see Sections III.A.1.a and III.A.1.d of this preamble.

*Comment:* Commenters noted that the per se exceptionally compelling circumstances mirror the rebuttal grounds established in the Circumvention of Lawful Pathways rule; some commenters incorporated their previous objections to that rule, concerning the per se exceptionally compelling circumstances, into comments submitted in response to this IFR.

*Response:* Commenters correctly assert that the per se exceptionally compelling circumstances mirror the rebuttal grounds in the Circumvention of Lawful Pathways rule. *See* 89 FR at 48733. To the extent that commenters stated that they were incorporating their previous comments submitted in response to the Circumvention of Lawful Pathways NPRM, the Departments responded to those comments as part of the Circumvention of Lawful Pathways rulemaking, and commenters are encouraged to refer to that rule for the Departments' responses. *See, e.g.,* 88 FR at 31390–95 (responding to commenter concerns related to the grounds for rebutting the presumption of asylum ineligibility under the Circumvention of Lawful Pathways rule).

*Comment:* Commenters alleged that the ''imminent and extreme threat to life and safety'' exception is inadequate and illusory, claiming that CBP officers would, in practice, turn away noncitizens who could otherwise establish such threats. For example, commenters provided anecdotal reports of women being turned away from POEs after CBP officers determined that their accounts of being sexually assaulted and raped in Mexico did not fall within an exception.

Commenters also stated that the exception incentivizes noncitizens to wait in Mexico until they are subject to harm or violence before seeking protection. Further, commenters were concerned that the IFR included a per se exception for forward-looking threats,

but not for being a survivor of ''recent and severe forms of violence.'' Commenters stated that such survivors have a significant need for protection to mitigate past harm and to prevent further harm.

Commenters also noted that, in responding to comments about the analogous rebuttal ground in the Circumvention of Lawful Pathways rule, the Departments explicitly stated that generalized threats of violence, membership in a particularly vulnerable group, and dangerous country conditions will not rise to the level of an ''imminent and extreme threat to life and safety,'' which commenters believed was overly limiting.

Commenters further recommended broadening the per se exceptionally compelling circumstances, so that ''acute medical emergencies'' includes non-medical and non-life-threatening medical needs; and ''imminent and extreme threats to life or safety'' includes threats to life or safety that may not necessarily be ''imminent'' or ''extreme.'' Commenters further stated that the grounds for rebutting the presumption of asylum ineligibility contained within the Circumvention of Lawful Pathways rule have been interpreted narrowly, resulting in noncitizens wrongfully being unable to rebut the presumption, not receiving a full adjudication of their claims, and ultimately being ordered removed. Commenters also urged the Departments to ensure that these per se exceptionally compelling circumstances encompass the medical risks and harms reported by asylum seekers while waiting in Mexico.

*Response:* The Departments decline to amend the list of per se exceptionally compelling circumstances established in the rule. The per se circumstances contained in the rule—acute medical emergencies, imminent and extreme threats to life or safety, or being a victim of severe trafficking in persons—are intended to capture noncitizens with a time-sensitive imperative for entering the United States to avoid immediate, serious harm. *See* 89 FR at 48732 n.171. Broadening these per se circumstances further would undermine the goal of this rule: to address the significant strain on the United States' immigration system during emergency border circumstances. *See* 89 FR at 48726–31 (''Need for These Measures'').

Likewise, requiring a situation-specific analysis of potential harm to the noncitizen is necessary to limit the ''exceptionally compelling circumstances'' exception to only those noncitizens who truly require entry to the United States to avoid putting their

life or well-being at extreme risk. Allowing, for example, concern about generalized violence to establish an imminent and extreme threat to life or safety would be purely speculative as to an individual noncitizen, and further undermine the objectives of the rule. However, in requiring specific evidence of potential harm, the Departments note that more generalized evidence, such as membership in a particularly vulnerable group, ''may be a relevant factor in assessing the extremity and immediacy of the threats faced at the time of entry.'' 88 FR at 31393.

Additionally, the Departments disagree that the parallel rebuttal grounds in the Circumvention of Lawful Pathways rule have been interpreted too narrowly, and therefore, that the per se exceptions should be expanded in this rule. Departmental data show that, during the immediate post-pandemic period, over 10 percent of noncitizens subject to the Circumvention of Lawful Pathways rule's rebuttable presumption of asylum ineligibility were able to rebut the presumption during USCIS credible fear interviews.[259] This indicates that those rebuttal grounds were meaningfully available to noncitizens, and the Departments note that Departmental data show that the parallel exceptions in this rule are being similarly applied. Since the IFR went into effect through August 31, 2024, USCIS determined that there was a significant possibility the noncitizen could demonstrate an ''exceptionally compelling circumstances'' exception to the limitation on asylum eligibility in over 2,200 cases—approximately 11 percent of credible fear interviews completed by USCIS that were subject to the IFR during that period.[260]

With regard to consideration of past harm, the Departments note that, to the extent a noncitizen suffered harm immediately preceding their entry into the United States, such harm can be relevant to whether the noncitizen faces further imminent and extreme harm or threats to their life or safety, and adjudicators could consider such immediate, past harm as relevant to making an ''exceptionally compelling circumstances'' determination.

The Departments also disagree with commenters' assertions that the imminent and extreme threat to life or safety exception incentivizes noncitizens to wait in another country until they are harmed to then seek an

---

[259] *See* OHSS analysis of June 2024 Enforcement Lifecycle data (Fear Screening—CLP tab).
[260] *See* OHSS analysis of fear data downloaded from UIP on September 3, 2024 (Fear Screening—STB tab).

exception under the rule. To the extent that waiting in another country could increase the risk of potential harm, the Departments note that noncitizens need not have actually been harmed or show that the feared harm was certain to occur to demonstrate exceptionally compelling circumstances. Rather, the rule states that those who demonstrate that they or a member of their family as defined in 8 CFR 208.30(c) with whom they are traveling ''[f]aced an imminent and extreme threat to life and safety, such as an imminent threat of rape, kidnapping, torture, or murder'' shall have demonstrated exceptionally compelling circumstances. 8 CFR 208.35(a)(2)(i)(B), (ii), 1208.35(a)(2)(i)(B), (ii). Therefore, this exception is intended to balance the emergency border circumstances necessitating implementation of the rule's limitation on asylum eligibility with recognition that there may be noncitizens with a specific, time-sensitive safety imperative for entering the United States during times where DHS's resource capacity to process noncitizens at the border is overwhelmed.

Finally, more generally, the Departments also clarify that CBP officers do not apply this rule's ''exceptionally compelling circumstances'' exception during initial border encounters, although they do implement the Proclamation's suspension and limitation on entry. Rather, the exception—and this rule's limitation on asylum eligibility more broadly—is applied during credible fear screenings before USCIS, once a noncitizen has manifested a fear of return or expressed an intention to apply for asylum or other protection and is placed in the expedited removal process. *See* 8 CFR 208.35(b) (''Application in credible fear determinations.'').

*Comment:* Commenters stated that the enumerated ''exceptionally compelling circumstances'' exception for victims of a severe form of trafficking in persons is inadequate and that this rule imposes an impossible evidentiary hurdle on trafficking survivors. For example, commenters said that not all victims of a severe form of trafficking have proof of such crimes and, during initial fear screenings, AOs do not ask specific questions about trafficking history. Commenters also stated that the trafficking exception should be expanded to encompass both noncitizens who may be at risk of trafficking and noncitizens at risk of or who have experienced trafficking, regardless of the degree of severity of the trafficking.

*Response:* The Departments disagree that the existing ''exceptionally compelling circumstances'' exception for trafficking victims should be further amended. First, pursuant to section 3(b)(iv) of the Proclamation, noncitizens who are determined to be ''a victim of a severe form of trafficking in persons'' as defined in 22 U.S.C. 7102(16) are excepted from the Proclamation's suspension and limitation on entry and, therefore, are not subject to the IFR's limitation on asylum eligibility. 8 CFR 208.35(a)(1), 1208.35(a)(1) (providing that the limitation on asylum eligibility only applies to a noncitizen described in 8 CFR 1208.13(g) ''and who is not described in section 3(b) of the Presidential Proclamation of June 3, 2024''); 89 FR at 48733 n.172.

Nonetheless, as explained by the Departments in the IFR, the Departments have retained the per se ''exceptionally compelling circumstances'' exception for human trafficking victims to avoid confusion and to ensure that the exceptions in this rule continue to mirror the rebuttal grounds adopted by the Departments in the Circumvention of Lawful Pathways rule. 89 FR at 48733 n.172. Under the rule's exception for victims of human trafficking, both a noncitizen and any family members as defined in 8 CFR 208.30(c) with whom the noncitizen is traveling are excepted from the limitation on asylum eligibility if, at the time of entry, the noncitizen or family member satisfied the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.201. 8 CFR 208.35(a)(2)(i)(C), 1208.35(a)(2)(i)(C); 89 FR at 48733.

The Departments disagree that this rule creates an insurmountable evidentiary burden for trafficking survivors. While the Departments recognize that victims of trafficking often do not possess written or documentary evidence of their trafficking, the rule does not impose any requirements about the type of evidence a noncitizen must submit to establish exceptionally compelling circumstances. Indeed, during the credible fear screening process, AOs or IJs elicit testimony from noncitizens, and written statements or other documentation are not required. *See* 89 FR at 48746 n.239.

Regarding concerns that noncitizens will not be asked specific questions about any history involving trafficking, the Departments note that those concerns are unfounded because interview guides specifically designed for credible fear interviews pursuant to the Circumvention of Lawful Pathways rule and the IFR instruct AOs to ask questions related to trafficking where they are relevant to the credible fear determination, including where either the Circumvention of Lawful Pathways rule's presumption of asylum ineligibility or the IFR's limitation on asylum eligibility applies. In such cases, AOs are instructed to elicit testimony related to potential ''exceptionally compelling circumstances'' rebuttal grounds (in the case of the Circumvention of Lawful Pathways rule) or the ''exceptionally compelling circumstances'' exception (in the case of the IFR), including the exceptionally compelling circumstance of the noncitizen or an accompanying family member satisfying the definition of a victim of severe form of trafficking in persons pursuant to 8 CFR 208.33(a)(3)(i)(C) and 208.35(a)(2)(i)(C). *See* 8 CFR 208.30(d). AOs receive extensive training in not only substantive law and procedure but in identifying and interviewing vulnerable noncitizens, including victims of trafficking.[261] Further, for merits adjudications, AOs and IJs receive training[262] and have experience in evaluating credibility and evidence, even in the absence of other documentation, and a noncitizen's testimony alone ''may be sufficient to sustain [their] burden without corroboration'' in certain circumstances. INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii). The Departments are therefore confident in AOs' and IJs' ability to elicit relevant information from victims of trafficking and appropriately evaluate whether the noncitizen established exceptionally compelling circumstances.

Finally, the Departments believe that, as drafted, both section 3(b)(iv) of the June 3 Proclamation and the rule itself, which provides that being a victim of a

---

[261] *See* USCIS, *RAIO Directorate—Officer Training: Detecting Possible Victims of Trafficking* (Apr. 24, 2024)

[262] *See* USCIS, *RAIO Directorate—Officer Training: Decision Making* (Apr. 24, 2024); 8 CFR 1003.0(b)(1)(vii) (EOIR Director's authority to ''[p]rovide for comprehensive, continuing training and support'' for IJs); 8 CFR 1003.9(b)(1) and (2) (Chief IJ's authority to issue ''procedural instructions regarding the implementation of new statutory or regulatory authorities'' and ''[p]rovide for appropriate training of the [IJs] . . . on the conduct of their powers and duties''); EOIR, *Legal Education and Research Services Division* (Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division* (''LERS develops and coordinates headquarters and nationwide substantive legal training and professional development for new and experienced judges, attorneys, and others within EOIR who are directly involved in EOIR's adjudicative functions. LERS regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations.'').

severe form of trafficking in persons is a per se exceptionally compelling circumstance, provide sufficient protections for victims of trafficking. The Departments decline to expand this exceptionally compelling circumstance to trafficking victims who do not rise to the level of being victims of "severe forms of trafficking in persons." This is a statutorily defined term [263] which includes "sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age" and "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery." 22 U.S.C. 7102(11). The Departments find that this statutory definition sufficiently encompasses noncitizens who have experienced exceptionally compelling circumstances that should except them from the limitation on asylum eligibility. This definition has long been employed in the immigration context, *see, e.g.,* INA 101(a)(15)(T)(i)(I), 8 U.S.C. 1101(a)(15)(T)(i)(I) (T nonimmigrant status for victims of severe forms of trafficking in persons); INA 212(a)(2)(H), 8 U.S.C. 1182(a)(2)(H) (ground of inadmissibility for those who engage in severe forms of trafficking), with which AOs and IJs are familiar, and commenters have not offered a persuasive reason for deviating from this well-established definition. Exceptionally compelling circumstances are intended to be narrow and preserved only for those who would generally be subject to the limitation, but present with the most urgent and immediate need to enter without a CBP One appointment or between POEs during times when the border system is overwhelmed. That said, noncitizens who do not satisfy the existing exception for trafficking victims (or other exceptionally compelling circumstances enumerated in the rule) may still seek to establish exceptionally compelling circumstances for another reason, and officers will evaluate every case based on its individual facts and circumstances.

*Comment:* Commenters asserted that the IFR did not provide sufficient clarity about the procedures for noncitizens to

seek an exception to the IFR's limitation on asylum eligibility.

First, commenters stated that access to the IFR's exceptions requires physical access to U.S. immigration authorities at POEs but alleged that there are many factors that impede such physical access, including security agents on the Mexican side of the border restricting access to POEs. Commenters asserted that such impediments to physically accessing U.S. immigration authorities undermine the IFR's exceptions and prevent noncitizens who may satisfy an exception from accessing protection. Commenters also stated that it is unclear how the rule and Proclamation together impact access to POEs. Accordingly, commenters requested that the Departments establish clear, transparent procedures to guarantee that noncitizens seeking to establish an exception from the limitation on asylum eligibility can physically access U.S. immigration officials.

*Response:* The Departments believe that the IFR adequately explains the exception to the limitation on asylum eligibility for noncitizens who establish exceptionally compelling circumstances, including the process by which AOs and IJs will evaluate whether a noncitizen has satisfied the exception. *See* 89 FR at 48732–33. Regarding commenters' concerns related to noncitizens' ability to physically access U.S. immigration authorities, the Departments note that nothing in the IFR physically impedes a noncitizen from accessing U.S. immigration authorities and that insofar as these comments concern CBP's implementation of the Proclamation, they are outside the scope of this rulemaking, as are concerns about conduct by individuals outside of the United States who are not U.S. immigration authorities—for example, on the Mexican side of the border. *Cf.* 89 FR at 48732 n.169 (explaining that "[w]hen it comes to determining the applicability of the Proclamation, CBP immigration officers, who first encounter noncitizens when they enter or attempt to enter, must determine whether a noncitizen is subject to the Proclamation under section 3(a), including whether the noncitizen is excluded from the suspension and limitation on entry under section 3(b)").

*Comment:* Commenters recommended that the Departments exclude noncitizens who present at a POE from the IFR's limitation on asylum eligibility, and instead limit application of any restrictions to those who cross irregularly, in order to guarantee access to border processing for noncitizens who present at a POE.

*Response:* The Departments decline to adopt an exception to the limitation on asylum eligibility for all noncitizens who present at a POE. As the Departments explained in the IFR, in the absence of congressional action, the changes made by this rule are intended to improve the Departments' ability to deliver timely decisions and consequences to noncitizens who do not have a legal basis to remain in the United States, and the Departments expect that the limitation on asylum eligibility will encourage noncitizens to present at a POE pursuant to an appointment, pursue another lawful pathway, or decline to journey to the United States at all. *See* 89 FR at 48715; *id.* at 48730–31. The Departments have determined that excepting all noncitizens who present at a POE would undermine these objectives and undermine processes designed to manage border inflows at POEs. *See, e.g.,* 88 FR at 31318 (noting that the "ability to schedule a time and place to arrive at POEs and the availability of other orderly and lawful pathways" are designed to, among other things, "protect against an unmanageable flow of migrants arriving at the SWB").

*Comment:* Commenters questioned why the IFR's exceptions do not fully align with the exceptions available under the Circumvention of Lawful Pathways rule. In particular, commenters stated that the IFR does not provide an exception for technological failure of the CBP One app or for noncitizens who are unable to use the CBP One app due to illiteracy, a language barrier, a disability, or an inability to afford a smartphone or data plan. Noting ongoing technical and accessibility issues with the CBP One app, commenters urged the Departments to adopt an exception to the limitation on asylum eligibility for all noncitizens—whether they present at a POE or cross between POEs—who: (1) are unable to use the CBP One app due to accessibility issues with the app itself; (2) are unable to use the CBP One app due to illiteracy, disabilities, not speaking a language in which the CBP One app is provided, lack of knowledge about the existence of the CBP One app, or a lack of resources or other difficulties; or (3) fail to secure appointments after multiple attempts.

Additionally, commenters noted that the IFR does not contain an exception for being denied asylum in a country through which the noncitizen transited. Commenters stated that the Departments failed to provide a justification or explanation for eliminating such exceptions under the IFR and alleged that it is arbitrary for the Departments

---

[263] The provisions at 8 CFR 208.35(a)(2)(i)(C) and 1208.35(a)(2)(i)(C) reference the definition of "victim of a severe form of trafficking in persons" in 8 CFR 214.201, and that regulatory provision references relevant statutory definitions, including definitions found at 22 U.S.C. 7102. *See* 8 CFR 214.201.

**81228**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

to include such exceptions under the Circumvention of Lawful Pathways rule but not under the IFR.

Commenters also asserted that the inconsistencies between the exceptions available under the IFR and the Circumvention of Lawful Pathways rule will create confusion for all parties, as it is unclear which rule will apply when emergency border circumstances are in effect.

*Response:* The Departments decline to add any additional exceptions to the limitation on asylum eligibility and disagree with commenters' assertions that the Departments did not provide adequate justifications for why the rule does not contain exceptions for an inability to access or use the CBP One app or being denied asylum in a transit country.

The Departments explained in the IFR that they were not adopting these exceptions from the Circumvention of Lawful Pathways rule because, unlike that rule, this rule only applies during emergency border circumstances, when the number of encounters strains the capacity of immigration and border security systems. 89 FR at 48732 n.171. Because of this rule's focus on emergency border circumstances, the Departments have determined that the rule's exceptions should be limited to noncitizens "with a time-sensitive imperative" to enter the United States. *Id.* For example, the rule focuses its exception for exceptionally compelling circumstances on noncitizens who require immediate entry into the United States, due to medical emergencies or imminent and extreme threats to life or safety, among other reasons. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). The Departments have explained above why they have not included in the IFR and this rule the exception for difficulty using the CBP One app and refer readers to that discussion.

Similarly, and as explained in the IFR, the Departments did not include and are not adding an exception for noncitizens who received a final decision denying asylum in a country through which they transited because this rule serves a different purpose than the Circumvention of Lawful Pathways rule. 89 FR at 48732 n.171. While the Circumvention of Lawful Pathways rule sought to encourage noncitizens to seek protection in other countries, this rule is focused on deterring irregular migration and speeding up the border process during emergency border circumstances, when the immigration system is experiencing extreme and enduring strains. *Id.* Accordingly, the Departments believe that limiting exceptions to those noncitizens who

have the most immediate and urgent need to present at or cross the U.S. border is imperative. *See id.* Importantly, however, noncitizens who were denied protection in another country remain eligible to apply for asylum if they "enter pursuant to an appointment, meet another exception to the Proclamation, or establish exceptionally compelling circumstances" under this rule. *Id.*

The Departments also disagree that omission of these exceptions will create confusion. The Departments clarify that both this rule and the Circumvention of Lawful Pathways rule are applied during credible fear screenings when emergency border circumstances are in effect. If it is determined that this rule does not apply, AOs and IJs will then consider the noncitizen's claim through the now familiar Circumvention of Lawful Pathways rule, which has been in effect for over a year. Given the Departments' experience in implementing the Circumvention of Lawful Pathways rule, the Departments are confident in adjudicators' ability to implement this rule, which is similar in structure to the Circumvention of Lawful Pathways rule, and to apply this rule's "exceptionally compelling circumstances" exception, which mirrors the rebuttal grounds in the Circumvention of Lawful Pathways rule. *See* 89 FR at 48739. If the noncitizen establishes exceptionally compelling circumstances under this rule pursuant to 8 CFR 208.35(a)(2)(i) or 8 CFR 1208.35(a)(2)(i), they will also have established exceptionally compelling circumstances under the Circumvention of Lawful Pathways rule. 8 CFR 208.35(a)(2)(iii), 1208.35(a)(2)(iii). However, adjudication of the additional exceptions in Circumvention of Lawful Pathways are unlikely to be dispositive in cases where both this rule and the Circumvention of Lawful Pathways rule apply, because if the noncitizen does not meet the exception to this rule, this rule's limitation on asylum eligibility will apply.

#### c. Implementation by CBP Officers

*Comment:* A few commenters expressed concern that, unlike the Circumvention of Lawful Pathways rule, in which AOs and IJs solely adjudicate the application of its presumption of asylum ineligibility and exceptions, the application of the Proclamation and the IFR are first adjudicated by CBP officers at the limit line, resulting in at-risk individuals and survivors of violence being denied entry. Relatedly, commenters stated that although the IFR allows CBP officials at POEs to assess whether a noncitizen qualifies for an

exception, it is unclear what guidance or training has been provided to those officials to ensure fair determinations or whether there is a mechanism for noncitizens to be screened for application of the bar when they approach a POE. A commenter noted that it is difficult to understand from the IFR how CBP will determine whether noncitizens are subject to the rule and how the rule and Proclamation would impact access to POEs and CBP conduct. Another commenter similarly stated that it is unclear whether the Departments would equip CBP officers or noncitizens to navigate the changes under the Proclamation and IFR, including in circumstances where the applicable legal standards could change within short windows of time, depending on whether crossing thresholds are being met.

*Response:* Comments relating to the implementation of the Proclamation itself are outside the scope of this rule, which applies a separate limitation on asylum eligibility. Additionally, to the extent that commenters expressed concern about CBP officials assessing whether a noncitizen qualifies for a regulatory exception to the limitation on asylum eligibility, commenters misunderstand the operation of the IFR. CBP officials may determine whether an exception to the June 3 Proclamation applies to a particular noncitizen, but do not apply the rule's limitation on asylum eligibility and its exception. Rather, it is AOs and IJs, during credible fear screenings and reviews, who must determine "whether there is a significant possibility that the noncitizen would be able to establish by a preponderance of the evidence that they were not subject to the rule's limitation on asylum eligibility or that they will be able to establish by a preponderance of the evidence exceptionally compelling circumstances." 89 FR at 48739; *see also* 8 CFR 208.35(b), 1208.35(b). AOs and IJs—not CBP officials—will thus be evaluating whether the limitation on asylum eligibility applies and whether a noncitizen has established a regulatory exception. *See* 8 CFR 208.35(b)(1); 8 CFR 1208.35(a), (b).

#### d. Application of the Limitation on Asylum Eligibility in Proceedings Before EOIR

*Comment:* Commenters stated broad concerns with the credible fear review process in general, including concerns over whether there are adequate opportunities to present supplementary evidence and testimony, questions over whether IJ review is truly de novo, concerns that IJs do not appropriately

weigh evidence in the record, and concerns that the outcome of credible fear reviews is dependent upon the IJ considering the case, rather than the strength of the claim.

Commenters also objected to the IFR's provision that would require noncitizens to affirmatively request IJ review of a negative credible fear determination. Commenters stated that this affirmative request requirement removes an important safeguard intended to minimize the risk of refoulement, with particular harm to the most vulnerable noncitizens. Commenters explained that, given the frequency of IJs reversing negative credible fear findings, IJ review is a necessary procedural protection for the integrity of the asylum screening process, especially since the IFR's changes may lead to erroneous decisions by AOs. Moreover, commenters stated that requiring noncitizens to affirmatively request review is especially problematic when combined with the other changes in the IFR, namely the limited opportunity to access counsel and the heightened standards of proof for pre-screening interviews. Commenters stated that there must be an opportunity for IJ review of negative fear determinations to be considered an effective remedy under international law.

Commenters also stated there are a multitude of reasons why a noncitizen may fail to request IJ review. For example, a noncitizen may fail to request IJ review due to mental health conditions, language barriers, trauma, or because they are not adequately informed of the procedure for requesting review. Similarly, one commenter stated that requiring noncitizens to affirmatively request review mirrors the Global Asylum Final Rule, 85 FR 80274, which the Departments later reversed in a subsequent rulemaking, *see* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022) ("Asylum Processing IFR"), citing fairness concerns and noting that treating a failure to elect review as a request for review better accounts for the range of explanations for a noncitizen's failure to seek review.

Commenters supported the IFR's requirement that DHS inform noncitizens of the procedure to request review and recommended that such information be provided both verbally and in writing in a language that the noncitizen understands. However, commenters said that noncitizens may find the concept of an IJ review hearing

confusing, and requiring noncitizens to request review may unfairly punish noncitizens for their confusion.

*Response:* To the extent that commenters raise concerns about the credible fear review process in general, such concerns are outside the scope of this rulemaking, which is focused only on the credible fear review process for noncitizens who are subject to this rule.

As to concerns about credible fear review under this rule, the Departments emphasize that, although the rule requires noncitizens to affirmatively request review of a negative credible fear determination, the statutory right to IJ review remains available. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 1208.30(g)(2). The Departments will continue to seek to ensure noncitizens are aware of the right to IJ review and the consequences of failure to affirmatively request such review. *See, e.g.,* 88 FR at 11747. Specifically, if an AO enters a negative credible fear determination, the AO will provide the noncitizen with a written notice of decision and inquire whether the noncitizen wishes to have an IJ review the negative credible fear determination. 8 CFR 208.35(b)(1)(i), (2)(iii). Thus, contrary to commenters' concerns, this safeguard remains in place and the Departments believe that such notice sufficiently ensures that noncitizens who desire IJ review of negative credible fear determinations can elect it under this rule.

As explained in the analogous provision introduced in the Circumvention of Lawful Pathways rule, to ensure that the noncitizens referenced by commenters—including noncitizens with mental health conditions, those who have suffered trauma, or those who are unable to read or speak English—understand what review is available to them, DHS provides explanations to noncitizens "to make clear to noncitizens that the failure to affirmatively request review will be deemed a waiver of the right to seek such review." 88 FR at 11747. These explanations are provided by trained asylum office staff through an interpreter in a language understood by the noncitizen. As a result, the Departments believe it is reasonable to conclude that noncitizens who do not request IJ review after receiving sufficient notice, see *id.,* and the enhanced explanations described above, can be fairly processed as if they have declined to seek additional IJ review. See 88 FR at 11747.

Moreover, the Departments previously acknowledged in the Circumvention of Lawful Pathways rule that "the

procedure for IJ review of negative credible fear determinations . . . differ[ed] from the credible fear review procedures implemented by the Asylum Processing IFR." 88 FR at 31423 (citing 88 FR at 11744). There, the Departments explained that "'the need for expedition under the current and anticipated exigent circumstances' weigh[ed] in favor of requiring noncitizens to affirmatively request IJ review of a negative credible fear determination." *Id.*

Following this reasoning, the Departments believe that this requirement that noncitizens affirmatively request IJ review of negative credible fear determinations continues to be necessary during times of emergency border circumstances, despite other measures to address the exceptionally high levels of irregular migration along the southern border, including the Circumvention of Lawful Pathways rule. *See* 89 FR at 48712–13 (listing measures). This rule has been adopted to address emergency border circumstances, times where the Departments' limited resources are under maximum strain to the point where border security and immigration systems are experiencing serious operative impacts and further fueling more lasting effects of a backlogged system. Accordingly, the Departments believe requiring noncitizens to affirmatively request IJ review of credible fear determinations will help ensure that such reviews take place only for those who desire such review. The alternatives suggested by commenters risk extending such review to those not actually interested in IJ review, thereby unnecessarily expending valuable adjudicatory capacity during a time when such resources are not available.

As to requests to provide information about review procedures verbally and in writing in a language that the noncitizen understands, noncitizens receive that information in writing (via a written English document), and noncitizens who do not speak English receive that information verbally through a real-time translation of the written document as well. This approach satisfies the Departments' statutory obligations, *see* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv), and in DHS's judgment, provides adequate notice of the ability to seek review. It is neither required nor feasible to, in addition, provide that information in written form in all languages that may be spoken.

*Comment:* Commenters stated that the same complexity concerns about the IFR raised by commenters in the credible fear context will apply to removal proceedings before IJs. For example,

**81230**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

commenters stated that determinations as to the timing and applicability of emergency border circumstances, including determining whether emergency circumstances were in effect on the noncitizen's dates of entry, whether to apply this rule versus the Circumvention of Lawful Pathways rule, and whether exceptionally compelling circumstances apply, would only lead to longer, more complex removal proceedings, and an inefficient focus on inquiries having no bearing on the merits of the protection claim in an already backlogged immigration court system. Commenters said that proceedings could be prolonged due to a potential rise in the numbers of motions to reopen or reconsider and appeals to the BIA or Federal courts challenging application of the rule, among other reasons.

Commenters stated that these determinations will be especially complex for noncitizens who enter without inspection ("EWI"). Commenters explained that it is unclear how the Departments will accurately determine whether this rule applies, especially when few people who EWI remember the exact date they crossed the border and, regardless, will likely not have evidence of the time of such crossing. Therefore, commenters stated that the rule will result in arbitrary IJ decisions, because IJs will not be able to determine whether the rule applies. As a result, commenters suggest creating a specific policy for noncitizens who EWI.

*Response:* The Departments disagree with commenters' concerns about the complexity in applying this rule in EOIR proceedings. To the contrary, given the IJ's role as the fact finder in removal proceedings, IJs are well-equipped to make fact-based determinations, such as dates of entry and whether emergency border circumstances were in effect on a specific date. *See, e.g.,* INA 240(b)(1), 8 U.S.C. 1229a(b)(1) ("Authority of immigration judge"). For example, regarding commenters' concerns about noncitizens who EWI, the Departments note that IJs routinely make similar entry timing determinations, such as determining application of the one-year filing deadline for asylum and continuous physical presence for cancellation of removal for certain nonpermanent residents. INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B) (one-year time limit); INA 240A(b)(1)(A), 8 U.S.C. 1229b(b)(1)(A) (cancellation of removal for certain nonpermanent residents). Moreover, IJs have been applying the Circumvention of Lawful Pathways rule since its effective date, which similarly requires determining a

noncitizen's entry date. *See* 8 CFR 1208.33(a)(1)(i) (requiring determination as to whether a noncitizen entered the United States "[b]etween May 11, 2023, and May 11, 2025").

Additionally, one change made by this rule—requiring the 7-consecutive-calendar-day average to remain below 1,500 encounters between POEs for 28 consecutive calendar days before the 14-day waiting period is triggered—will further reduce complexity concerns by reducing the probability that emergency border circumstances will be discontinued and then continued or reactivated soon thereafter. This requirement not only better ensures that emergency border circumstances have abated, but also mitigates potential confusion in determining whether emergency border circumstances were in effect on a noncitizen's date of entry. Contrary to commenters' concerns, this rule's provisions will not consistently "turn off" one day and "turn on" the next day. Rather, when triggered, this rule will be in effect for a more sustained period of time, making it easier for noncitizens and adjudicators to determine the timing and applicability of emergency border circumstances. Lastly of note, at all times since issuance of the June 3 Proclamation and publication of the IFR, DHS has maintained a publicly available record of the dates that a suspension and limitation on entry is in effect.[264] This DHS-maintained record will be available into the future, and the Departments believe that it will serve as an essential aid for IJs in determining whether the provisions of the rule should be applied based on a noncitizen's date of entry.

e. Family Unity Provisions

*Comment:* Commenters expressed general support for the family unity provisions in the IFR, stating that family unity is a key principle in both international and U.S. immigration law. However, commenters also raised concerns that the provisions were not sufficient, and that family unity would be better preserved by eliminating the rule's limitation on asylum eligibility altogether. For example, commenters stated that the family unity provisions are overly limiting, as they only benefit noncitizens who are able to meet the higher burden of proof for statutory withholding of removal.

Commenters were also concerned that the family unity provisions would create unnecessary procedural hurdles

for families. For example, commenters raised concerns that the family unity provisions only apply to qualifying family members who cannot independently establish other protection from removal. In doing so, commenters also questioned what forms of protection would qualify as "other protection from removal" sufficient to disqualify spouses or children from the family unity provisions.

Commenters stated that this requirement would result in ethical dilemmas where families would need to ensure that qualifying family members do not independently qualify for statutory withholding of removal so that the family members can receive derivative asylum relief under the family unity provisions. Commenters also claimed that this requirement would require family members to obtain separate counsel and sever proceedings, which will cause unnecessary financial hardship to the family and undue burdens to the Government. Rather, commenters recommended removing altogether the requirement that qualifying spouses or children not independently qualify for relief.

Commenters also raised procedural questions about how the family unity provisions function where a noncitizen is belatedly eligible for asylum under the family unity provisions, but after their spouse or child have undergone their own immigration adjudications.

*Response:* The Departments agree with commenters that keeping families unified and avoiding family separation is an important goal. Emergency border circumstances necessitated implementation of the IFR's limitation on asylum eligibility to better manage border operations and substantially improve the Departments' ability to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain in the United States. *See* 89 FR at 48715.

Nevertheless, recognizing the importance of family unity, the Departments included a number of provisions in the IFR to eliminate the risk of family separation. For example, the "exceptionally compelling circumstances" exception applies to all qualifying family members of the noncitizen's traveling party if the noncitizen, or the noncitizen's qualifying family member with whom the noncitizen is traveling, meets the exception. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

Similarly, the IFR made no changes to the family unity provision, which establishes an "exceptionally compelling circumstances" exception for noncitizens who can, among other

---

[264] *See* DHS, *Securing the Border: Presidential Proclamation and Rule* (Aug. 6, 2024), *https://www.dhs.gov/immigration laws.*

requirements, establish eligibility for statutory withholding of removal or CAT protection and could have, but for either the IFR's limitation or Circumvention of Lawful Pathways presumption, established eligibility for asylum. *See* 8 CFR 208.35(c), 1208.35(c); *see also* 88 FR at 11723–24 (explaining that the parallel Circumvention of Lawful Pathways family unity provision is intended to treat "the possibility of separating the family" as "an exceptionally compelling circumstance" when the provision's requirements are met). This provision allows qualifying noncitizens to pursue asylum, and its allowance for derivative beneficiaries, instead of statutory withholding of removal and CAT protection, with their comparatively fewer benefits. *See* INA 208(b)(3), 8 U.S.C. 1158(b)(3) (derivative asylum status).

Importantly, these provisions are not intended to serve as wholesale "family" exceptions to the IFR's limitation on asylum eligibility, which would significantly reduce the effectiveness of the limitation on asylum eligibility and incentivize families to engage in dangerous irregular migration to the United States. *See* 89 FR at 48757 (explaining that "[e]xcepting all family units that include minor children could incentivize families who otherwise would not make the dangerous journey and cross unlawfully to do so"). Rather, the exceptionally compelling circumstances family unity exceptions help ensure that noncitizens who qualify for the rule's exception are not separated from their qualifying spouses or children while pursuing relief or protection in the United States, including, for example, through derivate asylee status if granted relief, or through removal of the family unit if denied.

With regard to commenter concerns about qualifying spouses or children obtaining their own independent relief or protection, which would in turn make the IFR's family unity provisions inapplicable, the Departments clarify that the IFR's family unity provisions are intended as limited exceptions solely to prevent potential family separation due to the IFR's limitation on asylum eligibility. If qualifying spouses or children obtain independent relief or protection that allows them to remain in the United States, then they will have necessarily avoided the family separation concerns underlying the IFR's family unity provisions. *See, e.g.,* 88 FR at 11724 (explaining that the parallel Circumvention of Lawful Pathways family unity provision is intended to avoid family separation where "at least one other family member would not qualify for asylum or

other protection from removal on their own"). The Departments further note that asylum "or other protection" under this family unity provision refers to statutory withholding of removal and CAT protection. *See, e.g.,* Implementation of the 2022 Additional Protocol to the 2002 U.S.-Canada Agreement for Cooperation in the Examination of Refugee Status Claims From Nationals of Third Countries, 88 FR 18227 (Mar. 28, 2023) (noting that "asylum or other protection" refers to claims "relating to a fear of persecution or torture").

Additionally, to the extent that commenters raised concerns over qualifying spouses or children independently receiving statutory withholding of removal, with comparatively fewer benefits than asylum, the Departments note that statutory withholding of removal protects the qualifying spouse or child from removal to a country where they more likely than not would be persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion. *See* INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A); *INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 419 (1999); *Stevic,* 467 U.S. at 429–30; *see also* 8 CFR 208.16, 1208.16. Moreover, if noncitizen families wish to pursue asylum relief specifically, the IFR and the Circumvention of Lawful Pathways rule are designed to encourage noncitizens to make an appointment to present at the SWB or take advantage of other lawful migration pathways. *See* 89 FR at 48730–31.

Relatedly, the Departments do not share commenters' concerns about potential ethical dilemmas faced by representatives related to pursuing independent relief for family members due to the family unity provisions. Representatives must be truthful to the court in presenting the record facts and will either be able to zealously advocate on behalf of all of their clients where the family members' interests present no conflict, or counsel can withdraw from such representation if they believe they cannot advocate for each client's interests equally. *See* 8 CFR 1003.102 (acknowledging that practitioners who appear before EOIR have a duty to zealously represent their clients "within the bounds of the law"); *see also* 8 CFR 1003.102(c) (setting forth that a practitioner may face disciplinary sanctions for "[k]nowingly or with reckless disregard" making a false statement of material fact or law).

Further, this rule does not impact EOIR's existing procedures for consolidating or severing cases, which

has always involved parties making assessments and strategic decisions on how best to proceed with their cases. *See* Immigration Court Practice Manual ch 4.21 (setting forth procedures for combining and severing cases). Prior to this rule, family units have been able to seek asylum and related forms of protection in consolidated proceedings, and family units are always permitted to sever their proceedings if they so choose, including for strategic reasons based on their own assessment about the strength of their individual claims. *Id.* Thus, the Departments disagree that the rule will meaningfully impact noncitizens choosing to sever their cases from those of their families in the way that commenters claim, especially given the family unity provisions included in the IFR and maintained in this final rule.

Lastly, with regard to procedural timing concerns in applying the family unity provisions, the Departments clarify that the family unity provisions only apply to qualifying family members who are accompanying the principal applicant or who are eligible to follow to join that applicant. *See* 8 CFR 208.35(c), 1208.35(c). Therefore, principal applicants and accompanying family members who are traveling together will generally have their claims adjudicated together in removal proceedings. *See, e.g.,* Immigration Court Practice Manual ch. 4.21(a) (Oct. 25, 2023) (explaining that immigration courts may consolidate cases together that involve immediate family members into a single adjudication). As a result, there are unlikely to be significant timing gaps between determinations on any individual relief or protection claims within a family unit.

*Comment:* Commenters supported the inclusion of a family unity provision in the AMI process, wherein DHS retains jurisdiction over an asylum application for further adjudication after a positive credible fear determination. Commenters stated that it is logical and efficient for AOs to apply the same family unity provision as IJs when adjudicating the merits of an asylum application. However, commenters also expressed concern that the family unity provision in the AMI process is discretionary for AOs, and urged the Departments to make the provision mandatory, similar to the family unity provision for IJs in the IFR. Commenters also recommended amending the Circumvention of Lawful Pathways rule to allow DHS to apply the same family unity exception under that rule to avoid confusion that the disparity would allegedly cause for applicants, counsel,

and AOs, particularly where the two rules are both in effect and overlapping.

*Response:* In the IFR, the Departments included a family unity provision in the AMI process before USCIS, but made it discretionary to provide USCIS with flexibility while implementing the new AMI process. *See* 89 FR at 48733. After further consideration, the Departments are retaining the discretionary nature of the family unity provision in the AMI process before USCIS.

USCIS maintains complete discretion to place a case with a positive credible fear determination into the AMI process or to issue an NTA. 8 CFR 208.30(f). In exercising this discretion, USCIS does not foresee that it would be a prudent use of resources to place cases into the AMI process where, at the credible fear stage, the IFR's limitation on asylum eligibility applied and there was not a significant possibility the noncitizen could establish an exception to the limitation. USCIS has a finite number of AOs, and it is more efficient at present to assign work in a manner that maximizes the number of credible fear interviews USCIS can conduct at the southern border. *See* 89 FR at 48756. Accordingly, it is unlikely that USCIS would adjudicate a case where the 8 CFR 208.35(c) family unity provision could apply in the foreseeable future.

With that understanding, were such a case ever to be placed into the AMI process, USCIS has the discretion to apply the 8 CFR 208.35(c) family unity provision, depending on the circumstances of the individual case. Importantly, if USCIS exercises its discretion not to apply the family unity provision, the noncitizen will not be prejudiced because, if USCIS does not grant asylum in such a case, the asylum application will be reviewed de novo by an IJ, 8 CFR 1240.17(i), who is required to apply the family unity provision in removal proceedings pursuant to 8 CFR 1208.35(c).

Additionally, the discretionary nature of the family unity provision before USCIS in 8 CFR 208.35(c) is necessary in order for USCIS to comply with the AMI regulatory timeline laid out in 8 CFR 208.9. This timeline requires USCIS to conduct the AMI interview no later than 45 days of the applicant being served with a positive credible fear determination, absent exigent circumstances, 8 CFR 208.9(a)(1), and prohibits extensions on the submission of additional evidence that would prevent the AMI decision from being issued within 60 days of service of the positive credible fear determination, 8 CFR 208.9(e)(2). While the IFR allows for USCIS to extend both of those timelines up to 15 days in the event

USCIS requires the noncitizen to submit a Form I–589, 8 CFR 208.35(b)(2)(ii), even with a 15-day extension, these are still accelerated time frames that would not accommodate applying the family unity provision in every AMI case where it could potentially apply before USCIS.

In some cases, USCIS may be able to apply the family unity provision without running afoul of the regulatory time frames, such as where the accompanying family members are also dependents on the AMI case, and the principal applicant is found eligible at the AMI for statutory withholding of removal with respect to their country of nationality based on the record before USCIS. In such a case, the AO could likely apply the family unity provision within the regulatory timelines, as there would likely be no need to request additional evidence verifying the qualifying family relationships. Additionally, if the principal applicant was already found eligible for statutory withholding of removal with respect to their country of nationality based on the record before USCIS, it is likely that they also would be found eligible for asylum if the limitation on asylum eligibility is not applied. In such a circumstance, USCIS could likely exercise discretion to apply the 8 CFR 208.35(c) family unity provision in a logical and efficient manner and complete the case within the regulatory time frame without issue.

In other cases, however, applying the family unity provision in an AMI case could prove excessively cumbersome within the regulatory time frame. For example, if the qualifying family relationship relates to a family member outside of the United States for which additional proof is needed to establish the relationship, it may be impossible for an AO to extend the timeline to accommodate the production of such evidence and still meet the processing timeline for an AMI under 8 CFR 208.9(e)(2). In a case where the AO finds the noncitizen is not eligible for asylum due to the IFR's limitation on asylum eligibility, and is not eligible for statutory withholding of removal, but would be eligible for withholding of removal under 8 CFR 208.16(c)(2) (withholding of removal under the CAT) based on the record before USCIS, requiring the AO to apply the 8 CFR 208.35(c) family unity provision would entail the AO conducting a cumbersome analysis, including revisiting the noncitizen's asylum eligibility, absent application of the IFR's limitation on eligibility, only to possibly still find the applicant ineligible for asylum on the merits and refer the case to the IJ, who

would then review the asylum application de novo. *See* 8CFR 1240.17(i).

Indeed, if USCIS were required to apply the 8 CFR 208.35(c) family unity provision in all AMI cases, significant extra resources would likely have to be expended in any case where the provision might apply (including additional interview time, extending the evidentiary submission timeline, and additional time writing up the case) even where it would not result in a grant of asylum. If asylum is not granted by USCIS, asylum eligibility would still be reviewed de novo by an IJ. *See* 8 CFR 1240.17(i). Keeping the provision discretionary, in contrast, allows USCIS to apply the provision where it can do so in a logical and efficient manner without thwarting the regulatory timelines for AMI processing.

While logic and efficiency support keeping the 8 CFR 208.35(c) family unity provision discretionary for AMI cases before USCIS, it is also logical for the 8 CFR 1208.35(c) family unity provision to apply in all removal proceedings (whether they originated as AMI cases or not) before EOIR. Removal proceedings before the IJ are potentially the last opportunity the noncitizen will have to be granted asylum. In contrast, the AMI process before USCIS cannot result in a denial of asylum, only a referral to the IJ for a de novo review of the asylum application. 8 CFR 208.14(c)(1), 1240.17(i). Additionally, while removal proceedings for AMI cases operate on a streamlined time frame, there is still substantially more time allotted for removal proceedings before EOIR than for the initial AMI adjudication before USCIS, 8 CFR 208.9(a)(1), (e)(2), *id.* at 1240.17(f), so there is more flexibility in the time frame for the IJ to apply the family unity provision at the final adjudication stage than there would be for an AO to apply the provision in the AMI process before USCIS.

Separately, the Departments note that any comments regarding family unity amendments to the separate Circumvention of Lawful Pathways rule are outside the scope of this rulemaking.

### 2. Manifestation of Fear Standard

#### a. Legality Concerns

*Comment:* Commenters expressed concerns that implementing a manifestation of fear requirement would ultimately lead to noncitizens with valid claims being removed without proper evaluation, which would violate U.S. international non-refoulement obligations and "circumvent U.S. asylum law." One advocacy group

called the manifestation requirement a "deeply deficient" means of screening applicants for fear that will cause "credible fear pass rates to plummet and lead to refoulement." Another commenter described the change as "morally and legally troubling," while a third commenter stated that it would create significant hurdles for noncitizens seeking statutory withholding of removal and CAT protection.

Commenters further asserted that the manifestation requirement violates specific international refugee laws or principles. Citing amicus briefs, the UNHCR handbook, and other UNHCR publications, one commenter stated that the United States has an "affirmative obligation" under international law "to elicit information that might reveal potential refugee status" and "conduct an individualized assessment to evaluate whether the individual is entitled to protection as a refugee," which the manifestation requirement violates. In that same vein, another commenter observed that international refugee organizations have "long emphasized that to fully carry out . . . obligations under the Refugee Convention" the parties should implement procedures that "affirmatively identify" possible applicants and provide guidance to them on how to apply for relief and protection, and the IFR's "reliance on manifestation of fear is inadequate to fulfill these basic requirements."

Commenters stated that the manifestation requirement violated proper implementation of the credible fear process outlined in the INA. One commenter characterized the IFR's manifestation requirement as an attempt to expand the reach of expedited removal by creating additional barriers to credible fear interviews, in violation of Federal law. Another commenter stated the manifestation requirement did not align with "Congressional intent" to "ensure that asylum was available to all those with legitimate claims." Other commenters echoed the sentiment that the manifestation requirement was implemented without regard for the risk of refoulement and purely as a means to efficiently remove noncitizens without a hearing.

Commenters also stated that eliminating the requirement that immigration officers affirmatively document and inquire about a noncitizen's fear of persecution during initial encounters at the border is a "sharp break from prior practice by the Departments" that would ultimately lead to higher numbers of noncitizens being refouled. One commenter

described the change to using manifestation as "a dangerous reversal of a procedural safeguard" designed to ensure legal compliance, expressing concern that other safeguards are already being removed. Other commenters recommended that the Departments end the manifestation of fear approach and reinstate the previous policy of using preliminary questions to identify whom to refer for credible fear screenings.

Some commenters opposed the manifestation requirement due to concerns that it violated DHS's obligations under section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), and pointed to what they purport was the Government's acknowledgment (*see* 89 FR at 48741 n.194) that an argument could be made that the IFR conflicts with the INA. Specifically, commenters argued that the INA requires DHS to provide information concerning credible fear interviews to noncitizens who may be eligible and eliminating use of the forms in lieu of a manifestation requirement was a violation of that statutory obligation. Commenters were specifically concerned that the alternatives outlined in the IFR—such as providing signs and videos in facilities—would not be "sufficient to put noncitizens on notice of how they may assert a claim for protection."

Commenters pointed to different parts of the IFR where they believe the Government explicitly acknowledged that the manifestation requirement will result in refoulement and stated that these purported acknowledgements are problematic. One commenter stated that the IFR was creating a standard that "knowingly accepts" a probability of violating non-refoulement and fails to satisfy the statutory requirement to provide information about credible fear interviews to noncitizens who may be eligible for such interviews. Another commenter highlighted part of the IFR that they said conceded that the manifestation requirement would result in the removal of noncitizens with valid claims. Similarly, commenters discussed the IFR's purported admission that asylum seekers who are asked affirmative questions about whether they have a fear of returning to their home country are seven times more likely to assert a claim.

*Response:* The Departments disagree that the manifestation standard violates any international obligations or that it is inconsistent with Federal law.

As to concerns related to international law, commenters did not specify any binding international law source that creates such obligations and instead

cited publications and amicus briefs, which do not have the force of law and are not international treaties to which the United States is a party. As described in Section II.B of this preamble, the United States' non-refoulement obligations are implemented through domestic law, and neither the 1967 Protocol nor the CAT are self-executing. Regardless, as outlined in the IFR, 89 FR at 48740–41, the applicable international laws do not specifically prescribe the minimum screening requirements that must be implemented to determine whether a noncitizen should be referred for a credible fear interview.[265] Instead, it is up to each participating state "to establish the procedure that it considers most appropriate, having regard to its particular constitutional and administrative structure."[266] Thus, it is within the Departments' discretion to revisit the screening process the United States implements during emergency border circumstances.

Moreover, the United States continues to uphold its non-refoulement obligations during emergency border circumstances.[267] Under applicable international law, the United States has an obligation (1) not to return noncitizens to countries where they would be persecuted; and (2) not to return noncitizens to countries where it is more likely than not that they would be tortured. *See* Refugee Convention, 19 U.S.T. at 6276, 189 U.N.T.S. at 176 (outlining standard under the Refugee Convention); *Pierre* v. *Gonzales,* 502 F.3d 109, 114 (2d Cir. 2007) (outlining standard under the CAT). During the emergency circumstances at the southern border, the manifestation standard temporarily affords immigration officers the ability to refrain from affirmatively asking noncitizens about fear, and instead refer noncitizens to an AO for a credible fear interview if the noncitizen manifests a

---

[265] *See* UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* ¶ 189 (Jan. 1992 ed., reissued Feb. 2019), *https://www.unhcr.org/media/handbook-procedures-and-criteria-determining-refugee-status-under-1951-convention-and-1967* (highlighting that the process for identifying refugees is not "specifically regulated").

[266] *Id.*

[267] The United States' non-refoulement obligation under Article 33 of the Refugee Convention is implemented by statute through section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), for mandatory withholding of removal. And the United States implements its obligations under Article 3 of the CAT through regulations. *See* Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, sec. 2242(b), 112 Stat. 2681, 2681–822 (8 U.S.C. 1231 note); *see also, e.g.,* 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, 1208.18.

fear of return, expresses an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to the noncitizen's country or country of removal. 89 FR at 48739–40. This rule does not, in any way, prevent noncitizens from manifesting or expressing such fears; rather, the rule ensures that noncitizens who manifest or express such fears are properly screened consistent with United States' non-refoulement obligations. *See* 8 CFR 235.15(b)(4). As explained in the IFR and this rule, the Departments believe that this requirement represents the best way to remain consistent with U.S. international obligations while simultaneously addressing the emergency circumstances at the southern border.

The Departments also do not believe the manifestation standard violates the INA or any other Federal law. As addressed in the IFR, 89 FR at 48739–40, DHS has broad authority to change the procedures that immigration officers apply to determine whether a noncitizen subject to expedited removal will be referred for a credible fear interview by an AO, so long as those procedures are consistent with the INA.[268] In using this authority, the Departments are confident the manifestation standard is fully consistent with the statutory procedures governing expedited removal under section 235(b)(1)(A) of the INA, 8 U.S.C. 1225(b)(1)(A). That statutory section provides that only those noncitizens who "indicate[] either an intention to apply for asylum . . . or a fear of persecution," INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i), must be referred to an AO for a credible fear interview, INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). As such—and contrary to commenters' assertions—the INA does not require immigration officers to affirmatively ask every noncitizen subject to expedited removal if they have a fear of persecution or torture, nor does it define what circumstances constitute the requisite indication of intent or fear. To the contrary, the onus under the statute is on the noncitizen to indicate either of the circumstances warranting referral, which the IFR provides a noncitizen can do at any time during the process. *See* 89 FR at 48740.[269] Thus, as discussed in Section III.B.2 of this preamble, the rule's approach accords with section 235(b)(1)(A)(ii) of the INA, 8 U.S.C. 1225(b)(1)(A)(ii).[270]

Separately, regarding commenters' concerns about departing from the longstanding practice of providing individualized advisals and asking affirmative questions, the Departments disagree that there are insufficient procedural protections for individuals subject to the rule. As the IFR acknowledged, the practice of providing individualized advisals and asking affirmative questions was originally adopted to "ensure that bona fide asylum claimants [were] given every opportunity to assert their claim[s]." 89 FR at 48742 (quoting 62 FR at 10318–19). However, importantly, the legacy INS further explained that enacting these procedures was intended to "not unnecessarily burden[] the inspections process or encourage[] spurious asylum claims." *Id.* (quoting 62 FR at 10318). While such procedures have remained in place in the expedited removal context since 1997, this fact alone does not indicate that they are required by the INA, and DHS maintains discretion to update the procedures in a manner consistent with the INA. *See FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) (holding that an agency changing an established rule must show that there are good reasons for the new policy but need not necessarily "provide a more detailed justification than what would suffice for a new policy created on a blank slate"). And indeed, when emergency circumstances are present on the southern border, the procedures adopted in 1997 are unduly suggestive and, thus, unnecessarily burden the inspections process, which necessitates revisiting screening referral processes to more effectively and efficiently identify those noncitizens who may have a fear of return to their native country or country of removal or indicate an intention to seek fear-based relief or protection. Given the extraordinary circumstances facing the Departments during times of emergency border circumstances, DHS has determined it is reasonable to implement the manifestation standard.

The Departments similarly disagree that discontinuing use of the Form I–867A and Form I–867B during emergency border circumstances violates DHS's obligations under section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), which states that DHS "shall provide information concerning the asylum interview . . . to aliens who may be eligible." DHS continues to provide information concerning credible fear interviews to noncitizens in CBP custody subject to expedited removal who may be eligible to receive such an interview via signs and videos in multiple languages, satisfying DHS's statutory duty under the INA. This is precisely what footnote 194 of the IFR explains. Rather than any purported acknowledgment of conflict with the INA, that footnote was simply included to clarify the points above and illustrate that the IFR does, in fact, satisfy this statutory obligation. Moreover, as the IFR explains, 89 FR at 48741–42, noncitizens who manifest a fear of return (and, thus, who are in fact eligible for a credible fear interview) are given a more detailed written explanation of the credible fear interview process prior to being referred for the interview.[271] Additionally, noncitizens who manifest a fear in CBP custody are shown a video prior to their credible fear interview, which also explains the credible fear process in more detail.

The Departments also recognize commenters' concern regarding the IFR's explicit acknowledgment that the manifestation standard may result in some noncitizens with meritorious claims not being referred to a credible fear interview. *See, e.g.,* 89 FR at 48743–44. The Departments included these statements to demonstrate their

---

[268] *See* INA 103(a)(1), (3), & 8 U.S.C. 1103(a)(1), (3) (granting the Secretary the authority to establish regulations and take other actions "necessary for carrying out" the Secretary's authority under the immigration laws); *see also* 6 U.S.C. 202; *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983) (emphasizing that agencies "must be given ample latitude to adapt their rules and policies to the demands of changing circumstances" (quotation marks omitted)).

[269] *Accord Indicate,* Merriam-Webster's Collegiate Dictionary 592 (10th ed. 1996) ("to point out or point to," "to be a sign, symptom, or index of," "to demonstrate or suggest the necessity or advisability of," or "to state or express briefly"); *Indicate,* New International Webster's Comprehensive Dictionary of the English Language 644 (1996) ("To be or give a sign of; betoken," "To point out; direct attention to," or "To express or make known, especially briefly or indirectly"); *Indicate,* The American Heritage Dictionary of the English Language 918–19 (3d ed. 1996) ("To show the way to or the direction of; point out," "To serve as a sign, symptom, or token of; signify," "To suggest or demonstrate the necessity, expedience, or advisability of," or "To state or express briefly"); *Indicate,* Webster's II New Riverside University Dictionary 622–23 (1994) ("To show or point out," "To serve as a sign, symptom, or token of; signify," "To suggest or demonstrate the need, expedience, or advisability of," or "To express briefly").

[270] *See Vermont Yankee Nuclear Power Corp.* v. *Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 543 (1978) ("Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." (quotation marks omitted)); *Knauff,* 338 U.S. at 543 ("[T]he decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General."); *Las Americas Immigr. Advoc. Ctr.,* 507 F. Supp. at 18.

[271] That explanation will be translated into certain common languages or will be read to the noncitizen if required. 89 FR at 48741 n.194.

thorough consideration of all possible issues that might arise from the implementation of a manifestation standard at the southern border during emergency circumstances. In that vein, the Departments emphasize that the manifestation standard is a temporary solution to emergency border circumstances. In light of those circumstances, it is critical to have a system in place that more effectively and efficiently identifies those who may have a fear of return or indicate an intention to seek fear-based relief or protection. Unfortunately, any screening mechanism—even affirmative questioning—could result in some noncitizens with potentially meritorious claims not being referred for a credible fear interview. But given the emergency border circumstances facing the Departments and discussed in the June 3 Proclamation, the IFR, and this rule, the Departments believe the manifestation standard is appropriate and necessary.

b. Concerns About the Efficiency and Complexity of the Manifestation Standard

*Comment:* Several commenters expressed doubts about the Departments' claims that the change to the manifestation approach would increase efficiency, while others observed that the change would make the system more complex and create further inefficiencies. Relatedly, multiple commenters questioned the stated purpose of efficiency for eliminating the credible fear questions by CBP officers, writing that it instead appears to be a desire to reduce referrals of noncitizens for fear interviews and described the assertion by DHS in the preamble that the questions are suggestive and do not result in grants of asylum as unfounded.

One commenter questioned whether the Departments are sacrificing legitimate claims in the name of speed. Commenters wrote that the three questions and explanation previously required by the Form I–867A and Form I–867B take only a few minutes to read and criticized the Departments for alleging efficiency gains of 20 to 30 minutes by eliminating critical questions that could prevent refoulement. The commenters further stated that investing in adequate training and enforcing compliance with the "standard" screening process would be more efficient than providing additional guidance and requiring CBP officers to complete additional training. Another commenter described the scenario of CBP officers directing noncitizens to interpreters, who will

refer to the informative signs and videos the IFR's preamble described in CBP waiting rooms, and questioned whether this process would be shorter.

*Response:* Regarding commenters' concerns regarding complexity and efficiencies, the Departments continue to believe that the manifestation standard outlined in the IFR meets the purposes for which it was implemented—to increase processing efficiency and avoid suggestive advisals and questioning, while still ensuring that noncitizens are able to seek protection in the United States.

As outlined in the preamble to the IFR, DHS determined that, in times of emergency border circumstances, it was appropriate to temporarily eliminate the use of affirmative advisals and questions on the Forms I–867A and I–867B, based on DHS's determinations that such advisals and questioning can be suggestive. *See* 89 FR at 48743–45. The Departments disagree with the assertion that this determination was "unfounded." It was based on CBP's experience that, when noncitizens are asked affirmative questions like those on the Form I–867B, noncitizens are more likely to respond in the affirmative. The affirmative questions thus can serve as a prompt for noncitizens in custody to respond in the affirmative, even if they do not actually have a fear of persecution or torture. As outlined in the IFR, the Departments' determination is also consistent with the behavioral science concept of "acquiescence," or the tendency of respondents to "consistently agree to questionnaire items, irrespective of item directionality." *See* 89 FR at 48743 n.220. Regarding concerns that such studies are less probative of noncitizens' experiences in CBP custody, DHS notes that it did not rely, and is not relying, on these studies as the sole basis for its determination that the advisals and affirmative questions are suggestive, nor is it asserting that these studies provide the only justification for the implementation of the manifestation standard in this rule. Rather, the implementation of the standard was, as noted above, based in part on CBP's experience in the years implementing the expedited removal process that providing affirmative advisals and asking affirmative questions was suggestive. As noted in the IFR, these studies provide illustrative support for this learned experience. *See* 89 FR at 48743.

DHS continues to believe that the concept of acquiescence supports its determination, based on its decades of experience in the processing of noncitizens who enter the United States,

that the affirmative advisals on the Form I–867A and the questions on the Form I–867B are suggestive. This determination is informed, in part, by information that agency personnel regularly receive about the activities of TCOs in the region, including information that TCOs guide or coach many noncitizens on what to say in order to remain in the United States. It is DHS's experience that, upon encounter and inspection, the questions on the Form I–867B can prompt noncitizens to follow this guidance, thus leading them to claim a fear even if they would not have done so on their own. While DHS acknowledges that noncitizens could similarly be prompted to manifest a fear under the approach of the IFR and this rule, DHS continues to believe that this approach will at minimum mitigate this problem by removing suggestive questions. Moreover, DHS continues to believe that it is likely that noncitizens with a fear of return or an intent to seek asylum will manifest a fear absent the affirmative advisals and questions on the Form I–867B. This is supported by the fact that DHS is referring on average more than 300 individuals in DHS custody for credible fear interviews each day.[272]

DHS's determination that it was appropriate to eliminate the use of affirmative advisals and questions on the Form I–867B was also based in part on its assessment that such action would make the process more efficient. In particular, the Departments anticipated that the implementation of the manifestation standard would save approximately 20–30 minutes of processing time, contributing to increased efficiencies in processing and across the immigration process. *See* 89 FR at 48745. This assessment was based on the experience of CBP officers and agents with extensive experience reading and completing these forms, and DHS thus disagrees with commenters' contention that the completion of these forms only takes a few minutes. This is, in part, due to the fact that, when completing a sworn statement, such as the Form I–867A, officers and agents ask a number of questions of the noncitizen, each of which may need to be translated; the noncitizens' answers may need to be translated; and the officers and agents must record the answers to each question in the processing system. The noncitizen also must sign the sworn statement, which requires additional explanation that may require

---

[272] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR ERCF tab).

**81236** **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

translation. This question-and-answer process is in addition to the potential need to provide translation services to noncitizens, if needed, when reading noncitizens the contents of the Form I–867A. While it is difficult to provide the exact time saved as a result of these changes in processes (because USBP systems do not automatically track processing time, standing alone), it is CBP's experience in the time since the Proclamation and IFR were implemented that the elimination of these questions and processes (including not reading the contents of the Form M–444) has, as anticipated, saved approximately 20–30 minutes per person, and led to more efficient and expedited processing overall.

With regard to concerns questioning the stated purpose behind the changes, the Departments disagree that the true purpose of the changes was to reduce the number of individuals referred for credible fear screenings. As explained in the IFR, the shift to a manifestation standard is intended to address suggestive questions and, in so doing, reduce the gap between high rates of referrals and screen-ins with historic ultimate grant rates as well as increase processing efficiency for DHS. *See* 89 FR at 48742–44 & n.220. As explained above in this section, there are multiple reasons why the referral rate observed under a direct questioning approach is very likely greater than the true rate of noncitizens who fear removal or intend to seek asylum—including coaching by TCOs and the possibility that the advisals and questions lead to an unduly high rate of false positives. *See id.* at 48743 & n.220. Seeking to address this problem is not the same as seeking to decrease the number of referrals for that purpose alone, as commenters suggest. Moreover, noncitizens who manifest or express a fear still have their claims adjudicated as required by the INA.

The Departments appreciate commenters' suggestion that, rather than implementing a manifestation standard, resources should be devoted to providing additional training to CBP officers and agents on the non-IFR process, but decline to eliminate or change the manifestation standard at this time. As noted in the IFR and in this section, the Departments believe that, in the emergency border circumstances outlined in this rule, the manifestation standard is appropriate. In addition, CBP notes that its officers and agents have had experience implementing the statutory and regulatory requirements of expedited removal since they became effective and were implemented by legacy INS in

1997, including experience identifying indicators of fear.[273] Guidance authored at that time explained that inspectors were required to refer a noncitizen to an AO if that noncitizen indicated an intention to apply for asylum or a fear of harm or concern about returning home.[274] The guidance stated that immigration inspectors should consider verbal as well as non-verbal cues given by the noncitizen; and it provided that, when determining whether to refer the noncitizen, ''inspectors should not make eligibility determinations or weigh the strength of the claims, nor should they make credibility determinations concerning the alien's statements.''[275] The guidance also highlighted that ''[t]he inspector should err on the side of caution and apply the criteria generously, referring to the asylum officer any questionable cases, including cases which might raise a question about whether the alien faces persecution.''[276] CBP also notes that, like legacy INS, under the IFR procedures and consistent with agency policy, agents and officers are instructed to err on the side of caution and refer any questions to supervisory officers.[277]

The Departments also disagree with comments indicating that the manifestation standard creates complexities. They maintain that the manifestation standard, in fact, decreases the complexity of the process, given the more streamlined approach taken in the rule and disuse of the Form I–867A and the Form I–867B. In addition, as outlined in the preamble to the IFR and throughout this rule, the rule also allows DHS to effectively and efficiently remove inadmissible noncitizens who are subject to expedited removal orders while quickly identifying inadmissible noncitizens who require a credible fear screening by USCIS AOs. *See* 89 FR at 48742–43.

[273] *See* Memorandum for Mgmt. Team, Reg'l Dirs., et al., from Off. of the Dep. Comm'r, Immigr. & Naturalization Serv., DOJ, *Re:* Implementation of Expedited Removal (Mar. 31, 1997).

[274] *See id.* at 3.

[275] *Id.*

[276] *Id.*

[277] *See* CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance;* CBP, Off. of Field Operations, *Muster, Documenting Noncitizen Asylum of Fear Claims or Fear Manifestations* (July 18, 2024); Memorandum for Dirs., Field Operations, & Dir., Preclearance Operations, Off. of Field Operations, from Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Processing Expedited Removal Cases & attach. (Muster); Memorandum Mgmt. Team, Reg'l Dirs., et al., from Off. of the Dep. Comm'r, Immigr. and & Naturalization Serv., DOJ, *Re:* Implementation of Expedited Removal at 3 (Mar. 31, 1997).

**c. Implementation Guidance and Accuracy of Manifestation to Identify Fear of Return**

*Comment:* Several commenters described the manifestation approach presented by the IFR as an unclear method of assessing fear of return and critiqued the rule as confusing or lacking clear guidance on implementation. A commenter expressed concern that the criteria requiring referral for a credible fear interview are overly broad, including a ''mere belief'' that a noncitizen may have a fear of return. Similarly, another expressed concern that the IFR lacks guidance around what degree of manifestation is required, whether immigration officers will consistently implement the manifestation requirement, and whether noncitizens will be provided information ''if and when the Departments begin to figure out what is sufficient under this test,'' while another commenter added that the existing U.S. asylum infrastructure is inadequate to administer the multiple layered and broad-ranging changes of the IFR, including the change to use manifestation.

Many commenters wrote that it is difficult and inappropriate for immigration officers to use manifestation of fear to assess fear of return. Commenters expressed concern that the IFR creates a confusing, non-transparent, and unfair situation for CBP officers to consider. A commenter described the manifestation standard as ''deficient'' in refugee protection and far from an equitable standard. The commenter wrote that requiring officers to simultaneously interrogate people at the border while also determining if their behaviors indicate fear is ''nonsensical.'' Similarly, another commenter remarked that Border Patrol agents and CBP officers focus on border security and the identification and prevention of criminal activity at the border, often placing them in an adversarial role with noncitizens that would leave these workers ill-equipped to make careful and considered asylum determinations. The commenter also described the contrasting extensive trauma-informed training given to AOs to learn interviewing techniques designed for vulnerable populations, adding that research shows that many noncitizens who qualify for asylum relief have difficulty expressing their claims without the support of such trained techniques.

A commenter referenced a statement in the IFR noting that although the video explaining the importance of expressing a fear of return will not be

played at small facilities, immigration officers at such facilities have resources to be able to "devote a great deal of attention to observing individuals" to see if they manifest fear or need a translator or reading assistance. *See* 89 FR at 48741 n.196. The commenter stated that this suggests that the opposite is true at the larger facilities, *i.e.*, that officers at larger facilities will not have the time or wherewithal to scrutinize noncitizens for nonverbal signs of fear, and, in fact, expect the videos and signs to do a great deal of work for them.

Multiple commenters critiqued the IFR's directive for immigration officers to assess non-verbal shaking, crying, or fleeing behaviors as "unworkable." Commenters further expressed concern that the officers would not be able to discern whether newly arrived noncitizens were cold, hungry, tired, or exhibiting other unconscious behaviors as opposed to a fear of return. Commenters described this directive in the IFR as "absurd and disingenuous," writing that it would be more effective and accurate for CBP officers to directly ask simple questions regarding fear than trying to be "mind readers." Another commenter referenced studies and stated that nonverbal cues of fear would likely go unheard, reasoning that express manifestations of fear are being ignored.

Several commenters recommended requiring CBP officers to ask, in a language understood by the noncitizen, one question regarding whether they have a fear of return.

Many commenters cited research—including a 2022 study by the Center for Gender & Refugee Studies that interviewed 97 families expelled during a previous use of a manifestation approach while the Title 42 public health Order was in effect—that requiring manifestation lowers the rate of noncitizens receiving fear screenings. Commenters stated that human rights monitors have documented that using the manifestation approach has resulted in "CBP failing to refer people who expressed a fear of return to the required fear screening interviews," and that the "shout" test under the Title 42 public health Order resulted in the erroneous return of many people, including women and children, to situations of danger. Another commenter observed lower statistics of credible fear interviews granted to Haitian nationals when given the "shout test" at sea by the U.S. Coast Guard ("USCG") compared to the historical rate of credible fear interviews granted to migrants encountered by immigration officials at land borders, when the shout

test was not used. Lastly, commenters stated that the IFR is already leading to failures in properly referring noncitizens for fear interviews.

In addition, several commenters referenced research[278] and expressed strong concern that CBP officers have a pattern of ignoring signs of fear in migrants. They critiqued the Departments' discussion and statistics of the likelihood of migrants responding affirmatively to asylum questions regardless of a valid fear of return, stating that the IFR's preamble does not cite any statistics about noncitizens failing to present legitimate fear claims in their interview or account for greater numbers of people seeking fear interviews if they are told they are available. A commenter stated that the statistics cited by the Departments have been directly contradicted by other research findings.

Similarly, a couple of commenters cited research[279] that some families have been ignored or chastised for requesting asylum, voiced concern that CBP officers were hostile and mistreated noncitizens at the southern border, and further expressed concerns that under "the Shout Test" immigration officers have prevented migrants from speaking or verbally abused them.

*Response:* The Departments disagree that the manifestation standard is an unclear, confusing, or inaccurate method of assessing fear of return and are confident that the manifestation process in the IFR—including the use of signage and a video to provide generalized notice of the right to seek asylum and protection and the way to raise such a claim—is sufficient to provide individuals with an opportunity to seek asylum and protection, while also maintaining the efficiency gains discussed above. During the time that the manifestation process has been in place under the IFR, there have been higher rates of manifestation than when the standard was recorded and tracked for family units under the Title 42 public health Order, and DHS is referring on average more than 300 individuals in DHS custody for credible fear interviews each day.[280]

The Departments acknowledge that immigration officers have historically provided advisals regarding the credible fear process and ascertained a

noncitizen's fear through affirmative questioning, through use of the Form I–867A and Form I–867B, and that removing these questions is a significant change. Thus, the Departments acknowledge that the manifestation process is, in the context of expedited removal, a new process both for officers and agents and for noncitizens. However, the Departments disagree that USBP agents and CBP officers are not equipped or trained to properly identify individuals who are vulnerable or who indicate or manifest fear. When implementing this process, agents and officers draw on their longstanding experience and practice observing and interacting with individuals, including observing any indications or behaviors of concern. Immigration officers have implemented the regulatory and statutory standards governing expedited removal since it was implemented in 1997, and, as noted above, they have had guidance regarding the treatment of noncitizens processed under these provisions since that time.

Additionally, CBP provided guidance to its frontline workforce implementing the IFR delineating how fear can be manifested by a noncitizen in many different ways, including verbally, non-verbally, or physically; CBP also provided examples and indicators. Such indicators include statements of fear; statements that the noncitizen was previously harmed in their home country or country of removal; evidence of physical injury consistent with abuse (*e.g.*, bruises, scars); evidence of self-harm; or non-verbal actions that may indicate fear such as hysteria, trembling, shaking, unusual behavior, changes in tone of voice, incoherent speech patterns, panic attacks, or an unusual level of silence.

Furthermore, the recent guidance on IFR implementation provides that, if officers or agents are in doubt, or if ambiguity exists as to whether a noncitizen's statement, actions, or behavior constitute a manifestation of fear, expression of fear, or expression of an intent to seek asylum or related protection, then officers and agents should refer the matter to a supervisor.[281] And, as noted above, existing guidance and CBP practice is to err on the side of caution and on the side of referring an individual to USCIS.[282]

---

[278] *See, e.g.,* Ctr. for Gender & Refugee Studies, *"Manifesting" Fear at the Border: Lessons from Title 42 Expulsions,* Jan. 30, 2024, *https://cgrs. uclawsf.edu/our-work/publications/ %E2%80%9Cmanifesting%E2%80%9D-fear-border-lessons-title-42-expulsions.*

[279] *See, e.g., id.*

[280] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR ERCF tab).

[281] *See id.; see also* CBP, Off. of Field Operations, *Muster, Documenting Noncitizen Asylum or Fear Claims or Fear Manifestations* (July 18, 2024).

[282] *See* Memorandum for Dirs., Field Operations, & Dir., Preclearance Operations, Off. of Field Operations, from Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP,
Continued

The Departments also disagree with the commenters' concerns that the manifestation of fear standard is difficult and inappropriate, confusing, or unfair for agents and officers to apply, or that agents and officers are ill-equipped to determine the nature of an individual's fear claim. Indeed, USBP agents and CBP officers, as immigration officers, are intimately familiar with the processing of individuals, including vulnerable populations or populations requiring additional care, safety, security, or medical assistance, and with recognizing the needs of such individuals. As a result of their experience and training, CBP immigration officers (both USBP agents and CBP officers) have skills and expertise in interacting with individuals and observing human behavior and in determining appropriate follow-up steps with regards to any behaviors or indicators of concern. *See* 89 FR at 48744. For instance, upon encountering a group of individuals who purport to be a family, USBP agents will observe the individuals to determine whether they evidence typical familial behavior or whether there are any concerns about the validity of the asserted familial relationship or the safety of any children in the group. *Id.* Additionally, agents and officers frequently encounter individuals who may be vulnerable, including those in physical or medical distress or in need of humanitarian care, as well as those who may be seeking protection in the United States. *Id.* Agents and officers can similarly use such skills and experiences to identify any manifestations of fear. *Id.* DHS believes that this experience, coupled with guidance, helps agents and officers effectively identify noncitizens with potential fear or asylum claims under a manifestation approach. *Id.*

The Departments acknowledge that interactions between agents and officers and noncitizens occur in the context of an immigration inspection and interview and in a custodial environment, but disagree with commenters' suggestion that the interview is ''adversarial'' in such a manner that noncitizens would be unlikely to manifest fear or officers would have difficulty recognizing manifestations of fear. Such immigration inspections and interviews are conducted for the sole purpose of

determining an individual's admissibility under the immigration laws of the United States and ensuring that they are processed accordingly.[283] In addition, the Departments note that, when in use, the Form I–867A and Form I–867B are also completed in this same context. During such an immigration inspection, officers and agents have face-to-face interactions with the noncitizen and thus have a chance to closely observe the individual who is being inspected, to identify those who may have a fear of return or indicate an intention to seek fear-based relief or protection.[284] The Departments reiterate that agents and officers do not assess the merits of an individual's claim of fear. The Departments acknowledge that fear can be manifested in many different ways, including verbally, non-verbally, or physically, and that when doubt or ambiguity exists, officers and agents should involve supervisors or managers to ensure appropriate decisions are made. The Departments also reiterate that USBP agents and CBP officers do not determine whether a noncitizen is excepted from the rule's limitation on asylum eligibility. Such decisions are made by a USCIS AO or, for those processed with an NTA, by an IJ. *See* 8 CFR 208.35(b)(1); 8 CFR 1208.35(a). Agents and officers are responsible for identifying whether an individual has manifested or expressed a fear and, if so, referring them for further consideration by an AO.

Additionally, the Departments note that, under the manifestation standard, a noncitizen is not required to verbally express or state that they have a fear. Contrary to commenters' concerns, the IFR does not impose a ''shout test.'' As outlined in the IFR, manifestations of fear may be verbal, non-verbal, or physical. 89 FR at 48739–45. Thus, a migrant can manifest a fear through an unconscious behavior. *Id.* at 48744. The Departments acknowledge and appreciate that some noncitizens may have difficulty volunteering a fear of return to agents and officers during processing. However, certain migrants may also have difficulty volunteering their fear in response to the previous questions on the Form I–867B, given that the questions are asked by immigration officers in the context of the immigration process. Additionally, for noncitizens who may be hesitant to answer questions or to affirmatively express a fear, the manifestation

standard and CBP officer and agent training and experience, as well as observations from the inspection itself, take into account physical and non-verbal manifestations, some of which may be unconscious by the noncitizen.

The Departments acknowledge a two-page document cited by commenters regarding the prior use of a manifestation standard under the Title 42 public health Order.[285] The document asserts that from June through October 2022, advocates interviewed at least 97 families expelled to cities along the SWB, of whom over half reported that they had verbally expressed a fear of return and nearly three-quarters reported having non-verbally expressed a fear. According to the document, multiple migrants sought to raise fear claims with ''CBP officers'' but such officers did not allow them to speak and ultimately expelled them to Mexico. The Departments lack a basis to independently evaluate the advocates' methodology (which is largely undescribed) or the accuracy of migrants' claims as described in the document. At the same time, the Departments note that most of the specific allegations in the document involve behavior—officers not allowing noncitizens to speak—that would be a violation of CBP policy under the Title 42 public health Order, under this rule,[286] and under the Form I–867A/B approach that applies when emergency border circumstances are not in place.[287] For this reason, and due to the distinctions between processing under the IFR and during the implementation of the Title 42 public health Order described below, DHS does not regard this study as providing persuasive evidence that the manifestation approach of the IFR and this rule has not been and will not be effective.

The Departments disagree with commenters' implicit suggestion that the implementation of the IFR is substantially similar to the

*Re:* Processing Expedited Removal Cases & attach. (Muster); Memorandum for Chief Patrol Agents, Tucson & Laredo Sectors, from David V. Aguilar, Chief, USBP, *Re:* Expedited Removal Policy (Aug. 11, 2004); Memorandum for Mgmt. Team, Reg'l Dirs., et al., from Off. of the Dep. Comm'r, Immigr. & Naturalization Serv., DOJ, *Re:* Implementation of Expedited Removal (Mar. 31, 1997).

[283] *See, e.g.,* INA 235(a)(3), 8 U.S.C. 1225(a)(3); 8 CFR 235.1; 8 CFR 235.3(a).

[284] *See* CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance.*

[285] *See* Ctr. for Gender & Refugee Studies, ''*Manifesting*'' *Fear at the Border: Lessons from Title 42 Expulsions* (Jan. 30, 2024), *https://cgrs. uclawsf.edu/our-work/publications/ %E2%80%9Cmanifesting%E2%80%9D-fear-border-lessons-title-42-expulsions.*

[286] *See, e.g.,* CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance* (requiring officers and agents to refer any noncitizen who manifests a fear for a credible fear interview with USCIS).

[287] *See* Memorandum for Dirs., Field Operations, & Dir., Preclearance Operations, Off. of Field Operations, from Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Processing Expedited Removal Cases & attach. at 1 (Muster); Memorandum for Chief Patrol Agents, Tucson & Laredo Sectors, from David V. Aguilar, Chief, USBP, *Re: Expedited Removal Policy* at 7–8 (Aug. 11, 2004).

implementation of the manifestation standard used during the Title 42 public health Order, such that experience under Title 42, including in the study mentioned above, demonstrates that the manifestation standard is inherently unreliable. As an initial matter, the manifestation under the IFR occurs in the context of immigration processing under title 8, rather than in the context of processing and expulsion under Title 42. Immigration processing is, as a general matter, a more complex process than the processing that occurred under Title 42, with noncitizens generally interacting with immigration officers during processing for a longer period of time than occurred during processing for expulsion. For example, the processing of an individual for expulsion under Title 42 took, on average, less than 30 minutes, as compared to, under the current processes under the IFR, approximately 1.5 hours. Therefore, noncitizens have a longer period of time to interact with the processing agents or officers, and potentially manifest a fear. In addition, noncitizens processed under title 8 procedures under the IFR provisions are generally in CBP custody for longer than under Title 42, and can manifest a fear at any time in DHS custody.

Additionally, based on best practices and lessons learned during the implementation of the Title 42 public health Order, the Departments have implemented several operational advancements and information sharing developments. Under the IFR and this rule, noncitizens have access to signage explaining that they may manifest fear during their time in DHS custody. Noncitizens in large-capacity facilities can also view videos explaining the manifestation standard and the general process they are receiving. 89 FR at 48741–42. As noted above, during implementation of the public health Order under Title 42, the DHS process was more expedited. This resulted in a narrower window of opportunity for a noncitizen to manifest a fear in DHS custody. This difference can be seen through the higher number of noncitizens manifesting fear under the IFR. Since the implementation of the IFR, 27 percent of noncitizens encountered between POEs at the SWB have manifested fear while in DHS custody.[288] Between June 3, 2022, and May 11, 2023, when the use of the manifestation standard for noncitizens encountered and subject to the Title 42 public health Order was tracked, less than 7 percent of individuals in family

units processed under the Title 42 public health Order nationwide were recorded as having manifested a fear in USBP custody and were, in general, excepted from the Title 42 public health Order. As evidenced by the significantly higher manifestation rate under the IFR as compared to what had been recorded during implementation of the Title 42 public health Order, the two circumstances are not comparable. Noncitizens encountered along the SWB under the IFR have manifested a fear and been referred to an AO for a credible fear interview on a much more frequent basis. At the same time, as discussed in Section II.A.2 of this preamble, fear-claim rates remain well below the very high rates following the ending of the Title 42 public health Order and prior to the IFR. During emergency border circumstances, it is critical for the Departments to devote their processing and screening resources to those urgently seeking protection while quickly removing those who are not. DHS believes that the manifestation standard, rather than affirmative questioning, better achieves this balance in emergency border circumstances. *See* 89 FR at 48744.

With regards to commenters' concerns that, particularly at large-capacity facilities, officers and agents may not be able to "scrutinize" noncitizens for nonverbal signs of manifestation of fear, the Departments disagree. As acknowledged in the preamble to the IFR, CBP has placed signs in its facilities along the SWB advising noncitizens of their ability to express or manifest a fear, and has placed videos in its larger facilities. 89 FR at 48741–42. DHS explained that, at smaller facilities, such videos are not played, but officers and agents have had sufficient resources to devote to observing individuals to determine if they manifested a fear. *Id.* at 48741 n.196. This statement was intended to explain why a video was not necessary at such facilities, but is not intended to convey any lack of attention to such claims at large-capacity facilities. Indeed, as noted above, agents and officers interview and observe noncitizens during their immigration inspection and interviews, which occur one-on-one. CBP operations at any CBP facilities with noncitizens in custody are staffed and operate 24 hours a day. Every CBP officer and agent receives annual training on CBP National Standards on Transport, Escort, Detention, and Search (TEDS)—which provide standards for the custodial conditions in CBP facilities—that ensures every noncitizen in CBP

custody is monitored for care and safety, including a provision requiring officers and agents to "physically check" areas where noncitizens are held "on a regular and frequent manner," providing noncitizens with an opportunity to raise any concerns or needs directly with CBP personnel conducting the checks.[289] Noncitizens in custody at CBP facilities are generally under continuous and direct supervision by multiple personnel and may seek assistance or ask questions of any of those individuals supervising their holding areas at any time. *See* 89 FR at 48744. DHS is confident that, during this time, even in large-capacity facilities, agents and officers have sufficient experience and expertise to identify manifestations or expressions of fear. Likewise, noncitizens in custody at ICE facilities may seek assistance or ask questions and are supervised such that officers, who have experience and expertise in these interactions, can identify manifestations or expressions of fear. It is important to note that a noncitizen does not have a finite or limited number of opportunities to manifest fear, but rather may manifest fear at any point while in DHS custody.

Further, regarding comments that express concerns and reference reports concluding that the manifestation standard has resulted in failures to refer noncitizens for a required fear interview, and comments recommending that, given this, officers and agents should ask, at a minimum, a question about fear in the noncitizen's native language, the Departments are aware of these studies and their conclusions. The Departments acknowledge that, under the manifestation approach outlined in this rule, there may be some noncitizens who have a fear of persecution or a fear of return, but who are not referred for a credible fear interview. However, the Departments do not believe that such a possibility is unique to the manifestation standard, and, in any event, DHS has taken steps, including posting signs and videos and providing guidance to its personnel, to help mitigate this possibility. Having considered the reports commenters cite, as well as the mitigating steps DHS has taken and the lessons learned from DHS's experiences during processing under the Title 42 public health Order, the Departments continue to believe that the manifestation standard is

---

[288] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[289] CBP, *National Standards on Transport, Escort, Detention, and Search (TEDS) 4.6,* at 16 (Oct. 2015), *https://www.cbp.gov/document/directives/cbp-national-standards-transport-escort-detention-and-search.*

appropriate in the circumstances outlined in the IFR and this rule. Moreover, as explained earlier in this response, the Departments' implementation of the IFR has resulted in a fear-claim rate substantially higher than the rate observed under the Title 42 public health Order, further suggesting that the circumstances from other operational contexts, including those studied in earlier research, may be inapposite.[290] DHS acknowledges that asking a single question about fear would be an alternative to the approach adopted in this IFR. However, DHS declines to implement such an option, as it would be subject to the same concerns that DHS outlined in the preamble to the IFR with regards to a short, individualized advisal. As noted in that preamble, DHS has determined that, during times of emergency border circumstances, a short, individualized advisal would be unlikely to convey information more effectively than signs and videos. *See* 89 FR at 48744. In particular, the Departments assessed that if an advisal could be developed that was short enough to avoid unduly lengthening processing times in the current emergency situation, such an advisal would be unlikely to convey information more effectively than the existing signs and videos, and such an advisal would still have the suggestiveness problems of the current system. The Departments assess that asking a single question—particularly in the context of the expedited removal process under the IFR where there are no individualized advisals provided—would likely present the suggestiveness problems of the current system. DHS thus declines to implement this change.[291]

To the extent that there are allegations that an agent or officer ignored expressions or manifestations of fear by a noncitizen, such conduct is contrary to DHS policies and practices, and would be treated as such. The Departments again note that, to the extent it exists, such employee misconduct would not be unique to the implementation of this rule. Nor do such claims provide a persuasive reason to depart from the approach this rule adopts to address emergency border circumstances. As already explained, DHS has provided guidance to CBP and ICE agents and officers on how to identify manifestations of fear; that guidance directs them to refer individuals who manifest fear for a credible fear screening, including instructing them to err on the side of referral. 89 FR at 48744. If agents or officers disregard those instructions— which could occur with or without this rule—DHS has procedures in place for reporting misconduct.[292] DHS relies on

these procedures generally to ensure that personnel are following applicable law and guidance, and DHS assesses that these procedures are generally effective. If allegations of misconduct are found to be substantiated and misconduct is found, such findings may lead to, for instance, disciplinary action against involved personnel and referral for criminal charges if a determination is made that any laws were violated. In addition, regardless of whether any such findings are substantiated, DHS may impose additional training and policy measures consistent with the rule's provisions.

Concerns about misconduct by individual employees are further mitigated by the reality that, as explained above, noncitizens do not have just one chance to manifest fear while in CBP or ICE custody: Noncitizens will typically interact with multiple agents and officials, and they can manifest fear to any of them. Noncitizens will have these opportunities, moreover, after being exposed to signs and videos explaining that they can manifest fear. From June 5, 2024, through August 31, 2024, the median processing time from encounter through repatriation for a case with no fear claims was 6 days.[293]

Moreover, commenters have provided no evidence that there is a widespread problem of CBP officers and agents ignoring fear claims under the IFR. As described above, there are a number of mechanisms within the Department for such complaints and concerns to be raised, and CBP is not aware of any substantiated allegations of misconduct raised through these channels. And the data showing a manifestation rate of 27 percent under the IFR—though not alone proving a negative or showing that no fear claims are being missed— indicate that officers and agents are following their guidance and reporting manifestations of fear in a large number of cases. For all these reasons, DHS does not believe the commenters' arguments provide a reason to depart from the rule's approach.

*Comment:* A few commenters reasoned that because the manifestation of fear approach does not require documentation, unlike affirmative questioning, the IFR removes appropriate accountability. One commenter described the change to using manifestation as "a dangerous reversal of a procedural safeguard that

---

[290] As noted in the IFR, the manifestation standard is used by the USCG, a DHS component, to determine whether an at-sea protection screening interview is required for migrants interdicted at sea. *See* 89 FR at 48744. Although the Departments believe these other uses support the view that a manifestation standard can be effective, having implemented the IFR's manifestation standard and observed the results of that standard, the Departments now believe that the difference between the operational contexts limits the usefulness of the direct comparison as suggested by some commenters.

[291] As noted in the preamble to the IFR, the Departments acknowledge that there are some studies articulating that the Form I–867A and Form I–867B provide important protections. As explained in the IFR, DHS disagrees with these studies to the extent that they conclude that individualized advisals and affirmative questions are not suggestive, based on DHS's longstanding experience with this process. Indeed, such studies are now nearly two decades old and were done at a time when, as described above, the ER process was very different from what it is now. Additionally, given that the studies do not account for the signs, videos, and other means of providing information under the IFR's approach, DHS does not believe they are

particularly probative as a means of assessing the effectiveness of this approach.

[292] CBP takes allegations of employee misconduct very seriously, and allegations of serious misconduct are investigated by CBP's Office of Professional Responsibility (OPR). CBP, *Office of Professional Responsibility, https://www.cbp.gov/about/leadership-organization/professional-responsibility* (last modified Mar. 29, 2024). Allegations of misconduct by a CBP employee or contractor can be sent to CBP OPR's Intake Center via email: *JointIntake@cbp.dhs.gov*, or via phone: 1–877–2INTAKE (246–8253), Option 5. Similarly, ICE's Office of Professional Responsibility ("OPR") takes employee misconduct very seriously and manages and investigates allegations of employee misconduct and oversees a variety of other integrity programs that protect the public trust and preserve the highest standards of integrity and accountability across the agency. ICE, *Office of Professional Responsibility, https://www.ice.gov/about-ice/opr* (last updated May 15, 2024). To promote integrity, mitigate risk, and uphold the agency's professional standards, the OPR-led Integrity Coordination Center receives and assesses information and refers any allegations of employee misconduct to appropriate offices for investigation, if necessary. ICE, *Office of Professional Responsibility, https://www.ice.gov/about-ice/opr* (last updated May 15, 2024). This process ensures that allegations of criminal or administrative misconduct against ICE personnel are properly assessed and thoroughly investigated. ICE, *Office of Professional Responsibility, https://www.ice.gov/about-ice/opr* (last updated May 15, 2024). Allegations of misconduct by an ICE employee or contractor can be sent to ICE OPR's Integrity Coordination Center via email: *ICEOPRIntake@ice.dhs.gov*, via phone: 1–833–4ICE–OPR (833–442–3677), or via the "File a Complaint" web link. ICE, *Integrity Coordination Center—Intake Form, https://www.ice.gov/webform/opr-contact-form* (last updated Jan. 9, 2024).

Additionally, the DHS Office of Inspector General and the DHS Office for Civil Rights and Civil Liberties are also available for the public, including previously removed noncitizens, to provide feedback and make complaints involving DHS employees, including officers and agents, or programs; to submit allegations of civil rights and civil liberties violations; and to submit other types of grievances. *See, e.g.,* DHS, Off. of Inspector Gen.,

*Hotline, https://www.oig.dhs.gov/hotline* (last visited Sept. 21, 2024); UDHS, *Office for Rights and Civil Liberties, https://www.dhs.gov/office-civil-rights-and-civil-liberties* (last visited Sept. 21, 2024).

[293] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

has been implemented to ensure the United States' compliance with its international obligations,'' expressing concern that other safeguards are already being removed. A commenter expressed concern that the Departments have eliminated the Form I–867A and Form I–867B without replacing them with any other documentation, which they wrote could make it impossible to have any record of missed viable claims for asylum or the total extent of any such errors. Another commenter asserted that the previous system of requiring immigration officials to complete and sign two forms incentivized officials to be honest and critiqued the manifestation approach as leaving no paper trail. Another commenter stated that the manifestation standard would worsen already problematic interactions between CBP officers and noncitizens. The commenter referenced a report[294] finding that CBP officers had an "alarming" rate of irregularities and non-conforming practices when assessing fear of return, including failing to read the required script for the Form I–867A, failing to record answers correctly, and using questionable interpretation practices. Another commenter discussed reports finding that many interviews conducted by CBP and ICE were marked by inaccuracies, mistranslations, and fabricated information, as well as research showing that in most situations when migrants stated that CBP agents did not ask about their fear of return, the immigration records showed instead that this question had been asked and answered.

*Response:* The Departments disagree that the manifestation of fear standard removes accountability or eliminates official documentation of a fear claim. As an initial matter, while CBP officers and agents are not required to provide noncitizens with an M–444 and do not complete a Form I–867A or Form I–867B when the IFR's provisions are in effect, fear claims are documented in the relevant electronic systems. Guidance issued to both USBP and the OFO requires that, when a noncitizen subject to the Proclamation and the IFR is being processed for expedited removal, and manifests a fear, that noncitizen is to be processed under a particular disposition code in the electronic processing

system.[295] This code is unique to those who are processed for expedited removal and who manifest a fear. Additionally, while noncitizens processed for expedited removal under the IFR procedures are not required to be provided the Form M–444, they continue to be provided information about the credible fear process, through a tear sheet called *Information about Credible Fear Interview* and by video, and they are provided the opportunity to consult with an individual of their choosing.[296] CBP facilities also have signage and, in some cases, videos, providing notice to all noncitizens in custody that, if they have a fear of return, they should inform an agent or officer. 89 FR at 48741. This manifestation may occur at any point during a noncitizen's time in CBP custody, and if such a claim is made, it must be documented in the relevant electronic system at that time.

ICE maintains an electronic system to record case management actions for noncitizens, including referrals to an AO and the disposition of a noncitizen's credible fear determination.[297] If a noncitizen manifests or expresses a fear after their initial encounter with CBP, while in ICE custody, ICE guidance requires officers to refer the case to USCIS for a credible fear interview, including having an opportunity to

consult with an individual of their choosing prior to their credible fear interview.[298]

Per applicable guidance, ICE documents any manifestation or expression of fear on the Form G–166C, which also verifies that the noncitizen has been provided information on the credible fear interview process and the specific language in which it was provided.[299] ICE guidance requires that all documentation, including the claim of credible fear and USCIS fear referral package, are captured in an electronic system of records.[300]

ICE and CBP utilize the same electronic database system for case management of noncitizens and have electronic access to these records.[301] ICE tracks noncitizens transferred from CBP to ICE custody who have manifested fear through the same system.[302] This system ensures that information relating to a noncitizen's case, including fear manifestation, is properly referred to USCIS.[303]

---

[294] *See* U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal*, at 19 (Aug. 2, 2016), *https://www.uscirf.gov/publications/barriers-protection-treatment-asylum-seekers-expedited-removal.*

[295] *See* Memorandum for All Chief Patrol Agents & All Exec. Directorates, from Jason D. Owens, Chief, USBP, *Re: Processing Guidelines for Noncitizens Described in Presidential Proclamation, Securing the Border* and Interim Final Rule, *Securing the Border* at 4–5 (June 4, 2024); Memorandum for Exec. Dirs., Headquarters, & Dirs., Field Operations, Off. of Field Operations, from Ray Provencio, Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Implementation of Presidential Proclamation and Interim Final Rule, *Securing the Border* attach. at 3–5 (June 4, 2024) (Muster).

[296] *See* Memorandum for All Chief Patrol Agents & All Exec. Directorates, from Jason D. Owens, Chief, USBP, *Re:* Processing Guidelines for Noncitizens Described in Presidential Proclamation, *Securing the Border* and Interim Final Rule, *Securing the Border* 4–5 (June 4, 2024); 6.4.24 USBP Field Guidance ER IFR 1; Memorandum for Exec. Dirs., Headquarters, & Dirs., Field Operations, Off. of Field Operations, from Ray Provencio, Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Implementation of Presidential Proclamation and Interim Final Rule, *Securing the Border* attach. at 4 (June 4, 2024) (Muster).

[297] ICE, Broadcast message for Field Office Directors and Deputy Field Office Directors, from Asst. Dir. for Field Operations, *Re:* Procedures for Processing Noncitizens that Fall Under the Presidential Proclamation and Interim Final Rule (June 7, 2024) (ICE officers are instructed "to document the Claim Credible Fear, Fear Referral package submitted, and all subsequent CF related actions in [the electronic system's] Actions and Decisions Tab"); DHS, *Privacy Impact Assessment for the Enforcement Integrated Database (EID)*, at 2, 4 (Dec. 3, 2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-eid-december2018.pdf.*

[298] ICE, *Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024*, Securing the Border, *and Interim Final Rule*, Securing the Border, at 4 (June 4, 2024) ("If ERO determines that a noncitizen subject to expedited removal manifests a fear of return or expresses an intention to apply for asylum or related protection, or expresses a fear of persecution or torture, or expresses a fear of return to his or her country or designated country of removal, the officer will provide the noncitizen with the Information About Credible Fear Interview Sheet and refer the noncitizen to USCIS for a credible fear interview.").

[299] ICE, Broadcast message for Field Office Directors and Deputy Field Office Directors, from Asst. Dir. for Field Operations, *Re:* Procedures for Processing Noncitizens that Fall Under the Presidential Proclamation and Interim Final Rule (June 7, 2024).

[300] *Id.*

[301] DHS, *Privacy Impact Assessment for the Enforcement Integrated Database (EID)*, at 2, 4 (Dec. 3, 2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-eid-december2018.pdf.*

[302] ICE, Broadcast message for Field Office Directors and Deputy Field Office Directors, from Asst. Dir. for Field Operations, *Re:* Procedures for Processing Noncitizens that Fall Under the Presidential Proclamation and Interim Final Rule (June 7, 2024) ("The new processing dispositions [by CBP] can be tracked in the ICE [system's] Dashboard . . . by selecting these new processing dispositions . . . ."); DHS, *Privacy Impact Assessment for the Enforcement Integrated Database (EID)*, at 2, 4 (Dec. 3, 2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-eid-december2018.pdf.*

[303] ICE, Broadcast message for Field Office Directors and Deputy Field Office Directors, from Asst. Dir. for Field Operations, *Re:* Procedures for Processing Noncitizens that Fall Under the Presidential Proclamation and Interim Final Rule (June 7, 2024) (for cases transferred to ICE from CBP after a noncitizen has manifested fear, "[t]he existing automated referral solution using the 'Refer Credible Fear to USCIS button' in [the electronic system] will be available for use . . . [and the automated] functionality will function as designed."); DHS, *Privacy Impact Assessment for the Enforcement Integrated Database (EID)*, at 2, 4 Continued

**81242**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

With regard to a commenter's concern that the absence of affirmative questioning will result in irregularities and non-conforming practices when assessing fear of return, the Departments disagree. The Departments acknowledge that, under the standard outlined in this rule, official documentation will indicate if a noncitizen expressed or manifested a fear, but will *not* contain an express similar record of a lack of such manifestation. DHS acknowledges that this is a change from non-IFR practices, in which a noncitizen's case file will reflect that the individual was provided with the Form I–867A advisals and will contain the noncitizen's response to the questions in the Form I–867B. DHS disagrees that the lack of such documentation under the manifestation of fear standard removes accountability from CBP officers and agents, incentivizes any falsification of records, or undermines the validity of the manifestation process. During immigration processing, CBP officers and agents ask a noncitizen a number of questions, including about their biographic information, nationality, and purpose of travel to the United States. The processing officer or agent records the noncitizen's answers to these questions in the electronic processing system.[304] In addition, as noted above, any individual who is processed for expedited removal and manifests or expresses a fear is processed using a unique code in the electronic system.[305] Officers and agents have an obligation, as law enforcement officers and Federal employees, to ensure that the record of a particular individual's case file is accurate and complete,[306] which

includes any manifestations or expressions of fear. Thus, the lack of such a code indicates that the individual did not manifest a fear. However, to the extent that an officer or agent failed to accurately record a manifestation of fear, the lack of the unique code in the noncitizen's file itself would provide a record of that failure—just as an inaccurate "no" answer to a question on a Form I–867B would if a noncitizen actually answered "yes" to the question. To the extent that commenters are concerned about potential misconduct by officers and agents, CBP and ICE take allegations of misconduct very seriously and have mechanisms in place to investigate and respond to such allegations as discussed above.

*Comment:* Multiple commenters expressed concern that the IFR and "shout test" approach avoids the provision of necessary interpretation by immigration officers and thwarts appropriate language access for migrants, often adding that immigration officers are not likely to understand expressions of fear in languages other than English or Spanish. Commenters further stated that the IFR might disproportionately impact speakers of Indigenous languages, who may be able to communicate regarding basic information in Spanish but may be unable to discuss the complicated matter of a fear-based claim in anything other than their native language. Similarly, a commenter observed that noncitizens are held in facilities for only a limited time and that during that time language needs might be overlooked. In the same vein, another commenter expressed concern that the IFR and the preamble are not clear regarding how noncitizens who speak languages other than English or Spanish are expected to manifest fear, when they may be able to communicate only basic identification in English or Spanish and Border Patrol agents are not incentivized to seek an interpreter in the noncitizen's language.

*Response:* The Departments disagree with commenters expressing a belief that immigration officers are not likely to understand expressions of fear in languages other than English or Spanish and that they are not incentivized to seek an interpreter. As noted, noncitizens are not required to verbally express or state a fear. A fear can also be manifested non-verbally or physically. In addition, CBP has legal and policy obligations to provide language access services and translation and has long recognized the importance of effective and accurate communication between CBP personnel and the public. Ensuring effective communication with

all persons, including limited English proficiency ("LEP") persons, facilitates CBP's mission.

It is the policy of CBP to take reasonable steps to provide LEP persons with meaningful access, free of charge, to its operations, services, and other conducted activities and programs without unduly burdening the Agency's fundamental mission.[307] This policy applies to all methods of communication—*e.g.*, verbal (including telephone); correspondence (including emails); websites; newsletters; community engagement activities; and flyers, posters, pamphlets, and other documents explaining CBP programs.[308] This policy also applies to interactions with the public, including law enforcement encounters (*e.g.*, questioning, processing, etc.).[309] As a result of and related to these policy obligations, CBP agents and officers have extensive experience and training in identifying whether an individual requires a translator or interpreter or is unable to understand a particular language. In addition, CBP facilities have "I Speak" signs, which are signs that assist literate individuals to identify a preferred language from one of over 60 possible languages.[310] Upon implementation of the IFR, signs were posted in areas of CBP facilities where individuals are most likely to see those signs, instructing individuals that, in addition to being able to inform the inspecting immigration officers of

(Dec. 3, 2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-eid-december2018.pdf*.

[304] *See* DHS, *Privacy Impact Assessment for the CBP Portal (E3) to ENFORCE/IDENT, DHS/CBP/PIA–012*, at 1, 3 (July 25, 2012), *https://www.dhs.gov/publication/cbp-portal-e3-enforceident* (discussing the type of information collected from noncitizens and how it is recorded in the electronic system).

[305] *See* Memorandum for All Chief Patrol Agents & All Exec. Directorates, from Jason D. Owens, Chief, USBP, *Re:* Processing Guidelines for Noncitizens Described in Presidential Proclamation, *Securing the Border* and Interim Final Rule, *Securing the Border* at 4 (June 4, 2024); Memorandum for Exec. Dirs., Headquarters, & Dirs., Field Operations, Off. of Field Operations, from Ray Provencio, Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Implementation of Presidential Proclamation and Interim Final Rule, *Securing the Border* attach. at 3–5 (June 4, 2024) (Muster).

[306] *See, e.g.*, 44 U.S.C. 3101 (providing that federal agencies "make and preserve records containing adequate and proper documentation of the [official activities] of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons affected by the agency's activities").

[307] *See, e.g.*, CBP Directive 2130–031, *Roles and Responsibilities of U.S. Customs and Border Protection Offices and Personnel Regarding Provision of Language Access* (Dec. 4, 2018); CBP, *Supplementary Language Access Plan* (2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf*.

[308] *See, e.g.*, CBP Directive 2130–031, *Roles and Responsibilities of U.S. Customs and Border Protection Offices and Personnel Regarding Provision of Language Access* (Dec. 4, 2018); CBP, *Supplementary Language Access Plan* (2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf*.

[309] *See, e.g.*, CBP Directive 2130–031, *Roles and Responsibilities of U.S. Customs and Border Protection Offices and Personnel Regarding Provision of Language Access* (Dec. 4, 2018); CBP, *Supplementary Language Access Plan* (2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf*.

[310] *See* CBP, *Language Access Plan* 7 (2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf*; DHS, *I Speak . . . Language Identification Guide, https://www.dhs.gov/sites/default/files/publications/crcl-i-speak-poster-2021.pdf* (last visited Sept. 3, 2024); DHS, *I Speak . . . Indigenous Language Identification Poster, https://www.dhs.gov/sites/default/files/publications/Habla%20Poster_12-9-16.pdf* (last visited Sept. 3, 2024); *see also* DHS, *DHS Language Access Resources* (July 17, 2023), *https://www.dhs.gov/publication/dhs-language-access-materials*.

urgent medical or other concerns, they should inform the inspecting immigration officer if they have a fear of return, and that, if they do, they will be referred for a screening. 89 FR at 48741. Moreover, in CBP's large-capacity facilities—where the vast majority of individuals subject to expedited removal undergo processing—a short video explaining the importance of raising urgent medical concerns, a need for food or water, or fear of return is shown on a loop in the processing areas and will also be available in commonly-spoken languages. To the extent that noncitizens do not speak one of these languages, CBP provides language assistance services consistent with CBP's Language Access Plan.[311] Furthermore, individuals who are unable to read the signs or communicate effectively in one of the languages in which the signs and videos are presented will be read the contents of the signs and videos in a language they understand.

*Comment:* One commenter expressed concern that, as a result of the signs and videos in CBP facilities advising migrants of their ability to manifest or express a fear, noncitizens are "in essence . . . coached" by DHS with regard to manifesting fear.

*Response:* With regard to this concern that the existence of signs and videos amount to DHS "coaching" migrants with regards to manifesting or expressing a fear, the Departments are cognizant that, for some individuals, such messaging may result in migrants expressing or manifesting a fear when they otherwise would not. However, as explained in the preamble to the IFR, DHS adopted the approach outlined in this rule—a manifestation standard, coupled with a general notice of the right to express or manifest a fear—in an effort to mitigate this potential, compared with the existing practice of asking affirmative questions. *See* 89 FR at 48743–44. DHS believes that the approach taken in this rule appropriately reflects and accounts for DHS operational needs while protecting noncitizens' ability to seek protection in the United States.

d. Trauma Impacting Manifestation and Vulnerable Populations

*Comment:* Many commenters expressed concern that noncitizens have endured significant trauma en route to the United States or are under stress after escaping harm and "might not be able to explicitly state their fears" and, thus, would fail the manifestation requirement. One commenter pointed out that trauma does not always present with the physical cues identified in the IFR, such as "shaking, crying, or signs of physical injury." The commenter stated that the relevant USCIS Training Module "explains that survivors of severe trauma may appear emotionally detached"; the commenter wrote that removing an affirmative individualized explanation of the process makes it even harder for survivors to pursue protection for which they are entitled to apply. Other commenters similarly observed that people who have suffered trauma "often have great difficulty raising their fears of return in non-confidential group settings" and might be hesitant to disclose their fear to armed, uniformed officials. One commenter expressed concern that many migrants have fled violence at the hands of government officials and would have difficulty volunteering their fear of return to uniformed CBP agents who are not asking questions about their fear but about other aspects of their situation, while another commenter observed that "all people [seeking] asylum remain traumatized, and very few are able or prepared to tell their full story even if they understand the consequences of the [credible fear interview] process." Commenters also asserted that noncitizens may not understand the importance of their first encounter with a government official or may believe they will have an opportunity to raise their claim later in the process.

*Response:* The Departments acknowledge that many noncitizens arriving in CBP custody may have experienced trauma of some kind and that being taken into immigration custody may exacerbate some of this trauma. The Departments also acknowledge that it may be difficult for some noncitizens to articulate details of their fear claim to CBP officers and agents during processing, and may, in general, have negative reactions to law enforcement officials in uniform. On this point, however, the Departments note that, during CBP processing, the relevant factor determining whether a noncitizen is referred to USCIS is whether the noncitizen manifests a fear. They are not required to, nor expected to, articulate the full scope of their fear or the rationale behind it. Indeed, CBP agents and officers do not determine the validity of any fear claim. Additionally, to the extent that an individual may react negatively to a CBP officer or agent in uniform, such concerns are not limited to the process under the IFR and would ostensibly apply to any screening process implemented by the Departments. CBP has taken steps over the past several years to integrate trauma-informed care for all persons in custody, with a particular focus on UCs.[312] In particular, in CBP holding facilities, the agency has taken steps to ensure that processing procedures are informed by the potential for trauma experienced by individuals in custody, with a particular emphasis on providing a sense of safety and security, providing caregivers for children in custody and increased custodial oversight, increasing medical standards for individuals in CBP custody, providing regular orientation and assistance, and providing activities and recreation for children.[313] In addition, CBP has taken steps specific to the credible fear process, for those going through the process in CBP custody, to protect the privacy of noncitizens during their interviews, where noncitizens may discuss traumatic situations. These interviews occur in confidential and private phone booths intended for use both for consultation and for the credible fear interview. While DHS has taken steps to mitigate the impact of such trauma on the effectiveness of the screening process, including through its signage and videos, it is not possible to develop a screening process that completely eliminates the potential effects of past trauma.

*Comment:* Many commenters expressed specific concerns that certain vulnerable populations of noncitizens would be at a particular disadvantage when seeking protection due to the manifestation requirement. Some commenters highlighted survivors of sexual violence, political dissidents, and LGBTQI+ populations as particularly disadvantaged, in that they may not easily manifest fear in asylum settings due to their specific history of oppression. For example, one commenter wrote that political dissidents may have a fear and mistrust of government officials and be unlikely to reveal their stories to immigration officials. They also discussed the significant harm that they believe the manifestation requirement will have on members of the LGBTQI+ community who are fleeing persecution and thus are

---

[311] *See* CBP, *Language Access Plan* (2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf;* CBP, *Supplementary Language Access Plan* (2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf.*

[312] *See* Memorandum for Exec. Assistant Comm'rs, et al., from Chris Magnus, Comm'r, U.S. Customs and Border Protection, *Re:* Directive for U.S. Customs and Border Protection Approach to Trauma-Informed Care for Persons in Custody at 1 (Apr. 29, 2022).

[313] *Id.* at 2–4.

likely afraid to reveal intimate details of their lives in immigration facility spaces that lack privacy and confidentiality.

*Response:* Regarding concerns that certain populations, including LGBTQI+ individuals, survivors of sexual violence, and political dissidents, may not be comfortable expressing the details of their fear claim to CBP officers and agents, the Departments reiterate that, at the time of CBP processing, agents and officers do not inquire about or ask questions about the nature of an individual's fear claim, nor do they evaluate the validity of that claim. Thus, such migrants are not required to—and are not expected to—provide the details of any fear claim, or even the basis for their claim, during CBP processing. In addition, the Departments note that concerns regarding the ability of these populations to articulate their fear claims are not limited to the process under the IFR, and would seemingly apply to any screening process implemented by the Departments, including the process utilizing the Form I–867A and Form I–867B.

e. A Manifestation of Fear Does Not Sufficiently Align With a Valid Claim for Asylum

*Comment:* Several commenters critiqued the assertion in the IFR that a manifestation of fear aligns with a valid claim for asylum. One commenter articulated that the Departments provided no rationale to think that the new manifestation of fear approach would only affect people with "frivolous claims" to asylum and wrote that this conclusion was contrary to common sense. A commenter wrote that requests for relief or visibly detectable signs of fear are not proxies for a strong claim and that other factors, such as coaching by a smuggler, might determine whether or not a migrant manifests fear.

*Response:* Contrary to the contention contained in the comments, the IFR did not state that the manifestation standard will only impact those with "frivolous" claims. The Departments noted in the preamble to the IFR that they believed that the manifestation standard "is reasonably designed to identify meritorious claims even if a noncitizen does not expressly articulate a fear of return." 89 FR at 48744. This decision was informed by the Department's experience that providing the affirmative advisals on the Form I–867A and asking the affirmative questions on the Form I–867B is, in some cases, suggestive, and by the Departments' belief and experience that those with meritorious claims will make their fear or desire to request asylum known when

given the opportunity to do so. However, the Departments also acknowledge that any screening mechanism may result in some noncitizens with valid claims not being referred for a credible fear interview. *Id.* at 48743–44. Nonetheless, the Departments believe that the manifestation standard will allow DHS to identify claims that may be meritorious in an efficient and effective manner, and that this change remains appropriate and necessary in light of the emergency border circumstances in which this rule is implemented. *Id.* at 48744.

f. Noncitizens May Not Understand Their Legal Right To Seek Asylum

*Comment:* Multiple commenters wrote that some noncitizens may not know that they legally can raise their fears of harm. Other commenters wrote that many immigrants would be unable to meet the requirement to express their fear of return equitably, due to lack of access to legal counsel or unfamiliarity with the legal requirements. A commenter remarked that noncitizens may not understand that the experiences they suffered based on gender, racism, or homophobia or transphobia in their countries of origin might be grounds for asylum in the United States.

Some commenters described the signs and videos discussed in the IFR as insufficient for communicating the complex concepts of manifestation of fear and credible fear screenings. A commenter criticized the content and design of the signs as insufficient to inform the reader that they forfeit their right to seek asylum if they do not manifest a fear of their return. Another commenter noted that the videos would not necessarily even be played at smaller facilities.

Some commenters stated that signs or videos are an inadequate systematic approach to reaching a broad pool of noncitizens with valid asylum claims, particularly given the limited number of languages used. One commenter criticized the "arbitrary" limitation on the number of languages used for the signs and videos and stated that the IFR at footnote 195 (89 FR at 48741 n.195) suggests the signs and videos in CBP facilities will be posted in English, Spanish, Mandarin, and Hindi, but the ICE Implementation Guidance says only that the signs must be posted in English and Spanish without mentioning additional languages to be used on the signs themselves.[314] The comment

stated that limiting language access to these four languages will clearly leave many without any way to understand the procedure they must follow to have their claims heard. The commenter stated that neither the Implementation Guidance nor the Rule explain how someone who cannot understand one of these four languages would know to seek out translations in the law library, as indicated in the rule, or if all facilities even have a law library.

*Response:* The Departments disagree with the commenters' assertions that the signs and videos are not sufficient to notify noncitizens that they can manifest a fear. CBP has posted signs in areas of its facilities where individuals are most likely to see those signs. In addition, CBP has developed a video that is shown on a loop in the processing areas of its large-capacity facilities. Commenters are correct that these videos are not shown in smaller facilities. However, as outlined in the IFR, in such smaller facilities, the signs are posted, and officers and agents are generally able to devote significant attention to noncitizens in custody and identify either fear manifestations or language needs. *See* 89 FR at 48741 n.196. Contrary to commenters' assertion that the list of languages in which these signs and videos are provided is arbitrary, they are provided in the languages spoken by the most common nationalities encountered by CBP and thus will likely be understood by most of the individuals in CBP custody who are subject to the rule. And if a noncitizen does not speak one of these languages, CBP provides language assistance services in accordance with CBP's Language Access Plan.[315]

These signs and videos have also been provided in short, concise language, rather than explaining the complex details of the credible fear process or the standards for addressing a claim for asylum or other protection. This is based on DHS' experience that short, concise, and simple notifications are most effective for noncitizens in custody at CBP facilities, given the nature of CBP facilities and CBP operations.[316] In

---

[314] ICE, *Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3,*

*2024, Securing the Border, and Interim Final Rule*, Securing the Border, at 5 (June 4, 2024) ("These signs must be posted in English and Spanish. ERO will have additional translations available in facility law libraries in the following languages. . . .").

[315] *See* CBP, *Supplementary Language Access Plan: Fiscal Years 2020–2021*, at 6 (Feb. 7, 2020), *https://www.cbp.gov/about/language-access.*

[316] *See* CBP, *Directive 2130–031: Roles and Responsibilities of U.S. Customs and Border Protection Offices and Personnel Regarding Provision of Language Access*, at 1, 4–5 (Dec. 4, 2018), *https://www.cbp.gov/document/directives/2013-031-roles-and-responsibilities-us-customs-and-border-protection-offices?language=pt.*

particular, CBP's role in the credible fear screening process is to identify those who may be seeking protection in the United States, in order to ensure that such individuals are referred to a USCIS AO. This role thus requires officers and agents to identify claims of fear, and, at this initial stage, err on the side of caution.[317] In addition, noncitizens in CBP custody go through a number of steps and may move between various locations in a single facility while completing processing and awaiting transfer out of CBP custody. Therefore, it is CBP's experience that short, simple signs, which can be noticed and read quickly, are more effective for communicating with noncitizens than signs with more complex language. Such claims of fear are, under non-IFR procedures, identified in part through the questions on the Form I–867B. Under this rule, such claims may be manifested or expressed to an officer or agent at the time of processing. However, this rule does not change the role of either the noncitizen or CBP immigration officers in the process—a noncitizen may express or manifest a fear, and, once that fear is expressed, CBP refers the individual to a AO. Additionally, those noncitizens who are referred and who undergo their credible fear interviews in CBP custody are provided additional information about the credible fear process, through the *Information about Credible Fear* tear sheet and the USBP video explaining the credible fear process.

Additionally, for those transferred to ICE custody, commenters are correct that initial ICE guidance called for ICE to provide signage in English and Spanish,[318] but ICE subsequently directed the relevant facilities to post signage in the same four languages as CBP. In addition, as noted by the commenter, ICE has translations available in facility law libraries in the following languages: Arabic, Bengali, French, Haitian Creole, Hindi, K'iche' (Quiché)/Kxlantzij, Portuguese, Punjabi, Romanian, Russian, Simplified Chinese, Turkish, and Vietnamese.[319]

Noncitizens in ICE detention facilities have access to law libraries for at least five hours per week.[320] Furthermore, ICE has access to an ICE-wide 24/7 language services contract for interpretation and translation, and guidance and best practices materials for identifying LEP individuals and their primary language to secure the necessary interpretation and translation services for them.[321] ICE detention standards provide that oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.[322] Each detained noncitizen in an ICE detention facility is provided an ICE National Detainee Handbook,[323] which is currently available in 16 languages (English, Spanish, Arabic, Bengali, French, Haitian Creole, Hindi, K'iche' (Quiché)/Kxlantzij, Portuguese, Pulaar, Punjabi, Romanian, Russian, Simplified Chinese, Turkish, and Vietnamese).[324] The Handbook describes the noncitizen's ability to ask for relief from removal, including by seeking asylum, and also provides information regarding the law library and additional resources available to noncitizens.[325] All ICE detainees have the right to use the facility's law library to access approved legal materials.[326]

With regard to concerns that migrants may not know that their experience in their home country or on their journey to the United States may be grounds for asylum, the Departments note that this has always been the case, even under non-IFR credible fear processes. In any event, the Departments note that the current signs and videos use general language to advise noncitizens that they should tell an officer if they "[f]ear persecution or torture if removed from the United States." This open-ended language does not require a noncitizen to fully understand the legal nuances or complexities of their claim at the time it is manifested. CBP therefore believes that the existing signs and videos are sufficient.

3. "Reasonable Probability" Screening Standard for Statutory Withholding of Removal and CAT Protection

Commenters largely opposed the heightened "reasonable probability" screening standard for statutory withholding of removal and CAT protection for noncitizens subject to this rule. By contrast, one commenter supported the "reasonable probability" standard for this rulemaking and recommended more broadly applying it to all withholding of removal credible fear screenings.

*Comment:* Commenters stated the "reasonable probability" standard was too high and would lead to refoulement. Some commenters stated that the "reasonable probability" standard is inconsistent with the statutory "significant possibility" standard for asylum in credible fear screenings, and that any attempt to change the "significant possibility" standard was ultra vires. Commenters also explained that the higher standard would cause credible fear passage rates to drop dramatically and result in the removal of noncitizens with valid asylum claims. Commenters stated that Congress intended, as evidenced by the plain language of the statute, for the threshold credible fear screening standards to be low so as not to exclude legitimate asylum seekers, and not to ensure the quick imposition of consequences for irregular entry as described in the IFR.

Similarly, commenters believed the "reasonable probability" standard was set too close to the ultimate burdens of proof for statutory withholding of removal and CAT protection and would require excessively specific evidence, particularly as the credible fear process is designed to move quickly. Rather, commenters suggested that only claims that were "manifestly unfounded" should be screened out at the credible fear stage and that, as much as possible,

---

[317] *See* CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance,* at 1 ("If doubt or ambiguity exists as to whether a noncitizen's statement, actions, or behavior constitute a manifestation of fear, expression of fear, or expression of an intent to seek asylum or related protection, then CBP officers and agents should refer the matter to a supervisor.").

[318] Memorandum for Enforcement and Removal Operations Exec. Assoc. Dir. Daniel A. Bible, from ICE Deputy Dir. and Senior Off. Performing the Duties of the Dir. Patrick J. Lechleitner, *Re:* Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024, *Securing the Border,* and Interim Final Rule, *Securing the Border* at 5 (June 4, 2024).

[319] *Id.*

[320] ICE, *Attorney Information and Resources: Other Legal Resources Available to Noncitizens in ICE Custody* (Aug. 9, 2024), *https://www.ice.gov/detain/attorney-information-resources.*

[321] ICE, *Language Access Information and Resources* (May 7, 2024), *https://www.ice.gov/detain/language-access* (describing current language access policies); ICE, *ICE Language Access Plan, Supplemental Update Covering Fiscal Years 2019 and 2020,* at 3–5 (July 21, 2020), *https://www.ice.gov/doclib/about/offices/ero/pdf/iceLanguageAccessPlanSupplemental2020.pdf;* ICE, *Language Access Plan,* at 7, 10, 13 (June 14, 2015), *https://www.ice.gov/sites/default/files/documents/Document/2015/LanguageAccessPlan.pdf.*

[322] *See, e.g., ICE, 6.3 Law Libraries and Legal Material,* at 422 (revised Dec. 2016), *https://www.ice.gov/doclib/detention-standards/2011/6-3.pdf.*

[323] ICE, *Detention Management, National Detainee Handbook* (Sept. 4, 2024), *https://www.ice.gov/detain/detention-management/national-detainee-handbook.*

[324] *Id.*

[325] ICE, *National Detainee Handbook,* at 9, 16 (2024), *https://www.ice.gov/doclib/detention/ndHandbook/ndhEnglish.pdf* ("You have the right to ask for relief from removal based on various legal grounds if you believe you qualify. These might include cancellation of removal, adjustment of status, asylum, withholding of removal, or relief under the Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. For example, you have the right to ask for asylum to stay in the U.S. if you were (or are afraid that you will be) persecuted in your native country or a country where you last lived because of your race, religion, nationality, political opinion, or membership in a particular social group.").

[326] *Id.* at 16.

asylum, statutory withholding of removal, and CAT protection claims should be adjudicated in full removal proceedings before an IJ, as such claims are complex and require robust processes with more procedural safeguards. Commenters noted a number of issues that would make it difficult for noncitizens to provide the specific evidence required to establish a reasonable probability under this rule, including the inability to obtain counsel during the credible fear process; being interviewed shortly after arriving in the United States; difficulties sharing information due to trauma, exhaustion, or translation availability; additional stress placed on vulnerable populations; detention status; challenges surrounding placement into the non-detained Family Expedited Removal Management ("FERM") process, such as challenges involving children attending credible fear interviews and difficulty obtaining Indigenous language interpreters; and difficulties procuring documentary evidence, expert opinions, or witnesses.

*Response:* The Departments disagree with commenters that the rule's reasonable probability screening standard for statutory withholding of removal and CAT claims is too high and decline to make changes to the standard. The Departments believe the reasonable probability screening standard is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection, better captures the population of noncitizens with potentially valid claims for such protection, and will assist the Departments in addressing the emergency border circumstances described in the IFR. *See* 89 FR at 48745–46.

To start, and as discussed in Section III.A.1 of this preamble, the Departments note that the "reasonable probability" standard neither affects nor changes the "significant possibility" standard used to screen for asylum eligibility, which is set by statute and remains in effect for asylum claims in the credible fear process. *See* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v) (a credible fear of persecution "means that there is a significant possibility" that a noncitizen could establish eligibility for asylum). Commenter concerns about changes to the statutory "significant possibility" standard are therefore misplaced.

While Congress clearly expressed its intent that the "significant possibility" standard be used to screen asylum claims, section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and FARRA section 2242 are silent as to what screening

procedures are to be employed with respect to statutory withholding of removal and CAT protection. The Departments therefore have some discretion to articulate the screening standard for such claims. And in the context of the emergency border circumstances described in the IFR and this rule, the Departments believe the "reasonable probability" screening standard better captures the population of noncitizens with potentially valid claims and is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection.

As explained in the IFR and the June 3 Proclamation, resource limitations, outdated laws, and significantly elevated encounter levels at the southern border have made it difficult for the Departments to quickly grant relief or protection to those who require it and to quickly remove those who do not establish a legal basis to remain in the United States. In light of the emergency border circumstances outlined in the June 3 Proclamation, the IFR, and this rule, the goal of this rule is to reduce irregular entries at the southern border and to quickly issue decisions and impose consequences on those who cross our border irregularly and lack a legal basis to remain. *See* 89 FR at 48731. The Departments believe that imposing a "reasonable probability" screening standard for statutory withholding of removal and CAT protection is needed to further this goal and is consistent with all statutory and regulatory requirements and the United States' international law obligations.

Specifically, the elevated "reasonable probability" screening standard will better allow the Departments to screen out claims that are unlikely to be meritorious, as the higher screening standard is more proportional to the ultimate burdens of proof for statutory withholding of removal and CAT protection, which are each higher than that for asylum. *See, e.g.,* 89 FR at 48747 (noting that the higher screening standard will help better predict the likelihood of success on the ultimate application for relief or protection); *see also* Regulations Governing the Convention Against Torture, 64 FR at 8485 (applying a higher screening standard for statutory withholding of removal and CAT protection in the reasonable fear context "[b]ecause the standard for showing entitlement to these forms of protection (a probability of persecution or torture) is significantly higher than the standard for asylum (a well-founded fear of persecution)"). Identifying non-meritorious claims early

in the process is an important deterrent to disincentivize noncitizens from making the perilous journey to the United States under the belief that they will be released and able to remain in the United States for a significant period, or indefinitely. Instead, under this rule, those who do not establish eligibility for statutory withholding of removal or CAT protection under the "reasonable probability" standard will be swiftly removed rather than being released into the United States to potentially wait years for a hearing. This will also allow the Departments to focus limited resources on processing of those who are most likely to be persecuted or tortured if removed, and to more quickly provide stability and benefits to noncitizens whose asylum claims are granted. *See, e.g.,* INA 209, 8 U.S.C. 1159 ("Adjustment of status of refugees").

The Departments made a similar determination in the Circumvention of Lawful Pathways rule in implementing the "reasonable possibility" standard for statutory withholding of removal and CAT protection for noncitizens subject to that rule. *See* 88 FR at 31336 (noting that the heightened standard would help in "reducing the strain on the immigration courts by screening out and removing those with non-meritorious claims more quickly"). That determination has been subsequently validated, as the elevated standard for statutory withholding of removal and CAT protection in credible fear screenings under the Circumvention of Lawful Pathways rule resulted in an approximately 30 percent decrease in positive credible fear findings. *See* 89 FR at 48745–46 (providing Circumvention of Lawful Pathways data).

The Departments recognize that, as identified by commenters, noncitizens may face difficulties in their journeys to the United States and in presenting their claims during credible fear screenings. However, the statutory expedited removal process is predicated on the requirement that noncitizens must explain their fear during a credible fear screening. *See* INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B) (implementing credible fear "[a]sylum interviews," to include "material facts as stated by the applicant"). As part of this threshold screening, the "reasonable probability" standard is not intended to be an insurmountable hurdle; rather, it requires noncitizens to provide greater specificity in their testimony related to their claim than that which might be sufficient to meet the "reasonable possibility" or "significant possibility" screening standards. *See* 89 FR at

48746–48 (explaining that "the new standard requires a greater specificity of the claim in the noncitizen's testimony"). This greater specificity is intended to be straightforward for noncitizens to provide, as it entails answering standard credible fear screening questions, such as variations of the following questions: Why do you fear return to the country of removal? Who do you believe would harm you if you were removed from the United States? Have you been previously harmed in the country of removal? If so, why were you harmed? Having the noncitizen answer these types of questions with greater specificity is not intended to require legal expertise and instead seeks to have communicated relevant personal facts and circumstances within the noncitizen's knowledge. Moreover, such evidence is generally provided through testimony at the credible fear screening stage, and credible testimony alone can satisfy the noncitizen's burden. *See, e.g.,* 89 FR at 48746.

Furthermore, to the extent that commenters expressed concerns about the compounding effects of trauma resulting in difficulty expressing fear, less time for consultation, and the need to meet a "reasonable probability" standard at the screening stage, the Departments note that AOs have significant training and experience in engaging in non-adversarial interview techniques, working with interpreters, cross-cultural communication, and eliciting information from trauma survivors and other vulnerable populations.[327] As discussed at greater length at section III.B.2.a.ii(2) of this preamble, while the length of the consultation period is outside the scope of this rulemaking, this rule ensures that noncitizens are provided with all of the rights due to them under the statutory expedited removal and credible fear processes, including the right to consult with a legal representative or other individual of their choosing prior to the credible fear interview and to have such an individual present during their credible fear interview, provided it will not unreasonably delay the process. *See* INA 235(b)(1)(B)(iv), 8 U.S.C.

1225(b)(1)(B)(iv); 8 CFR 208.30(d)(4). AOs apply the same training and draw from the same breadth of experience in eliciting testimony and conducting non-adversarial interviews described above regardless of the screening standard that is being applied. Noncitizens are not expected to have legal knowledge or to be familiar with specific standards or elements related to a persecution or torture screening; rather, they are only expected to truthfully testify about their claim and testimony alone can be sufficient to support a positive fear determination.

The Departments take seriously concerns raised by commenters related specifically to difficulties faced by families in the non-detained FERM process, including children attending credible fear interviews and challenges obtaining Indigenous language interpreters. Where issues arise in non-detained credible fear interviews in the FERM process, just as when issues arise in any interview, AOs and supervisory AOs tap into their extensive training and experience and follow existing procedures to address the issue.[328] USCIS has established procedures in place in order to obtain interpreters of rare languages for credible fear interviews and ensure appropriate steps are taken where an interpreter is not available, including issuing a discretionary NTA where warranted. And while there are inherent challenges in conducting non-detained interviews with families, including attending to children during an interview, these issues are not unique to the FERM process. They are issues dealt with during interviews where children may be present in various situations, including affirmative asylum interviews; and AOs, supervisory AOs, and asylum office staff handle these issues as they arise in various circumstances. Whether the credible fear interview is taking place in a detained setting or is taking place in a non-detained setting as part of the FERM process, AOs apply their extensive training related to non-adversarial interviewing, combined with their substantive legal training, to make a determination as to whether a noncitizen meets the given screening standard. Additionally, all credible fear determinations must be reviewed by a supervisory AO before they become final. 8 CFR 208.30(e)(8).

Moreover, as provided by statute and as the IFR makes clear, noncitizens have a right to request review by an IJ of the AO's credible fear determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.35(b)(2)(iii)–(v), 1208.35(b)(1); 89 FR at 48748. Where it is requested, the IJ conducts a de novo review of the negative credible fear determination, including the application of the rule's limitation on asylum eligibility and possible exceptions to that limitation. 8 CFR 1208.35(b). Importantly, noncitizens will have additional time to consult with other persons prior to this review. 8 CFR 235.15(b)(4) (requiring written disclosure of a noncitizen's right to consult with other persons prior to an interview or any review thereof). During such review, noncitizens will have the opportunity to make statements in support of their claims, and IJs may also consider other such facts as are known to the IJ. *See* 8 CFR 1003.42(c)–(d); *see also* Immigration Court Practice Manual ch. 7.4(d)(4)(E), *https://www.justice.gov/eoir/reference-materials/ic/chapter-7/4* (noting that "[e]ither the noncitizen or DHS may introduce oral or written statements" during a credible fear review). IJs have significant training and experience in eliciting testimony from individuals who have experienced trauma and developing the record accordingly.[329] As further explained in the IFR, AOs, supervisory AOs, and IJs receive training and have experience applying asylum, statutory withholding of removal, and CAT protection screening standards and in applying and reviewing decisions related to the ultimate asylum (for USCIS and EOIR) and statutory withholding of removal and CAT protection (for EOIR) merits standards. As such, they are well-suited to be able to identify in a screening whether the information the noncitizen has provided is sufficiently specific to lead them to believe that the noncitizen may be able to establish eligibility at the

---

[327] *See* USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing—Working with an Interpreter* (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Cross-Cultural Communication and Other Factors That May Impede Communication at an Interview* (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing Survivors of Torture and Other Severe Trauma* (Apr. 24, 2024).

[328] *See, e.g.,* USCIS, *RAIO Directorate—Officer Training: Interviewing—Working with an Interpreter* (Apr. 24, 2024); USCIS, *RAIO Directorate—Cross-Cultural Communication and Other Factors That May Impede Communication at an Interview* (Apr. 24, 2024).

[329] *See* 8 CFR 1003.0(b)(1)(vii) (authorizing the provision of comprehensive training and support to IJs); 8 CFR 1003.9(b)(2) (authorizing the Chief IJ to provide "appropriate training . . . on the conduct of their powers and duties"); *Fact Sheet: Executive Office for Immigration Review Immigration Judge Training* 2 (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline;* DOJ EOIR, *Legal Education and Research Services Division* (Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division* ("The Legal Education and Research Services Division (LERS) develops and coordinates headquarters and nationwide substantive legal training and professional development for new and experienced judges, attorneys, and others within EOIR who are directly involved in EOIR's adjudicative functions. LERS regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations.").

merits stage. *See* 89 FR at 48747. In sum, the Departments believe the procedural safeguards in place that comport with all statutory requirements and the extensive training and experience of AOs, supervisory AOs, and IJs in conducting screening interviews and making and reviewing fear determinations will ensure that noncitizens in the credible fear process, including those experiencing the effects of trauma and other vulnerable populations, will be screened for potential claims in a sensitive and fair manner at the applicable fear standard.

*Comment:* Commenters stated that the rule's "reasonable probability" definition—which requires "substantially more than a 'reasonable possibility,' but somewhat less than more likely than not"—is vague and amorphous; overly subjective; and lacks interpretive guidance or similar usage in other comparative contexts. Commenters stated that the definition would result in inconsistent application due to a lack of meaningful instruction for AOs and IJs, who would instead rely on their own discretion.

*Response:* The Departments believe that the "reasonable probability" definition set forth in the IFR, which comparatively references the "reasonable possibility" and "more likely than not" legal standards, provides adequate guidance for AOs and IJs and noncitizens to understand the level of evidentiary proof needed to satisfy the threshold credible fear screening process. Both "reasonable possibility" and "more likely than not" are longstanding legal standards familiar to AOs and IJs and representatives, so implementing a new "reasonable probability" standard that falls between those two existing standards provides a stable benchmark for determining whether the new standard has been satisfied. *See, e.g.,* 8 CFR 208.13(b)(1)(iii)(B), 1208.13(b)(1)(iii)(B) ("reasonable possibility" standard); 8 CFR 208.16(b)(2), 1208.16(b)(2) ("more likely than not" standard). AOs and IJs also receive training on the applicable legal screening standards.[330]

Moreover, as explained in the IFR, evaluating evidence under both the "reasonable probability" standard and the "reasonable possibility" standard remains the same, "save for the degree of specificity required." 89 FR at 48747; *see also id.* at 48746 (explaining the difference between the two standards "as being that the new standard requires

a greater specificity of the claim in the noncitizen's testimony"). Indeed, USCIS AOs and supervisory AOs have applied this new standard in a manner that is consistent with expectations, resulting in a somewhat, but not drastically, lower screen-in rate for USBP credible fear cases screened by USCIS under the IFR (51 percent for all fear screening cases subject to the rule, including 48 percent of those screened under the "reasonable probability" standard)[331] than USBP credible fear cases screened by USCIS under the Circumvention of Lawful Pathways rule (54 percent overall, including 51 percent of those screened under the: reasonable possibility" standard).[332] In addition, during credible fear reviews overall, IJs have vacated negative credible fear determinations under the IFR at a much lower rate than under the Circumventing Legal Pathways rule.[333]

*Comment:* Commenters stated that an additional "reasonable probability" screening standard in the credible fear process will lead to confusion amongst adjudicators. Commenters explained that there are now three different legal standards in credible fear screenings—significant possibility, reasonable possibility, and reasonable probability—all of which could be applicable in some cases. Moreover, commenters noted that the governing standards might change depending on whether emergency border circumstances are in effect under this rule. Commenters were concerned that multiple standards would lead to AOs and IJs applying the wrong standard, or conflating the requirements of each standard, which could result in potential refoulement because there will be few mechanisms for accountability if a mistake occurs.

Commenters also stated that adding another screening standard is inefficient, as AOs and IJs will need to

determine which standard applies to each aspect of a case. Commenters also noted that this will require more resources from legal organizations to gather necessary evidence.

*Response:* The Departments disagree with commenters' claims that the "reasonable probability" screening standard for statutory withholding of removal and CAT protection will result in confusion or adjudication errors or would otherwise be inefficient. AOs and IJs regularly work with various standards, and determine which standards apply, in the course of their adjudications, such as the "extraordinary circumstances" standard to determine whether an asylum applicant qualifies for an exception to the one-year filing deadline, *see* INA 208(a)(2)(D), 8 U.S.C. 1158(a)(2)(D), and the discretionary "compelling reasons" standard to determine whether an applicant who has suffered past persecution but lacks a well-founded fear of future persecution should be granted asylum in the exercise of discretion, *see* 8 CFR 208.13(b)(1)(iii)(A), 1208.13(b)(1)(iii)(A). Indeed, deciding which legal standard applies is a critical aspect of the role of AOs and IJs. *See* 8 CFR 1003.10(b).

Further, AOs and IJs have significant training and experience in eliciting testimony and applying evidentiary standards in immigration proceedings. *See, e.g.,* 89 FR at 48747. The Departments are similarly confident that AOs and IJs will efficiently apply the "reasonable probability" standard, which is similar to the "significant possibility" and "reasonable possibility" standards. *See id.* at 48748 (explaining that the reasonable probability standard "is not a significant departure from the types of analyses AOs, supervisory AOs, and IJs conduct on a daily basis" but is rather "a matter of degree"). Further, credible fear determinations are reviewed by a supervisory AO before they become final to ensure consistency and quality and are subject to de novo review by an IJ if a noncitizen requests such review. *See* 8 CFR 208.30(e)(8), 1208.35(b); 89 FR at 48748. Additionally, to avoid confusion, any changes regarding the applicability of emergency border circumstances are communicated to AOs, IJs, and the public, and have been made publicly available since the June 3 Proclamation and publication of the IFR.[334]

For comparison, under the Circumvention of Lawful Pathways rule,

---

[330] *See, e.g.,* USCIS, *RAIO Directorate—Officer Training: Evidence* 20–26 (Apr. 24, 2024); EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline.*

[331] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening—STB tab). Data are limited to SWB encounters between POEs. The total rate excludes cases referred for fear screening but determined by USCIS not to be subject to the IFR.

[332] *See* OHSS analysis of June 2024 Enforcement Lifecycle data (Fear Screening—CLP tab). The overall rate includes Mexican nationals (even though they are not technically covered by the rule) and excludes cases referred for fear screening but determined by USCIS not to be subject to the Circumvention of Lawful Pathways rule. Data are limited to SWB encounters between POEs.

[333] *See* OHSS analysis of June 2024 Enforcement Lifecycle data and data downloaded from UIP on September 3, 2024 (IFR ERCF tab and Imm Post-Pandemic ERCF tab). During the immediate post-pandemic period, OHSS estimates that IJs vacated 16 percent of negative fear credible fear interviews resulting from USBP ER cases, and 6 percent of all credible fear interviews; under the IFR the corresponding rates for USBP ER cases through July 31, 2024, were 9 percent and 4 percent.

[334] *See* DHS, *Securing the Border: Presidential Proclamation and Rule* (Aug. 6, 2024), *https://www.dhs.gov/immigrationlaws.*

AOs and IJs have successfully applied the "significant possibility" screening standard to asylum claims and the "reasonable possibility" screening standard to statutory withholding of removal and CAT protection claims since its implementation. *See* 8 CFR 208.33(b)(2)(ii), 1208.33(b)(2)(ii). And for several months, AOs and IJs have successfully applied the "reasonable probability" standard in screenings under the IFR. Therefore, the Departments believe that AOs and IJs can continue to apply the "reasonable probability" standard implemented in this rule.

With regard to concerns from legal service organizations about gathering additional evidence under the "reasonable probability" standard, the Departments again reiterate that the relevant evidence largely remains the same, and simply requires more specificity. *See* 89 FR at 48746–47. Much of this specificity is likely to come through the noncitizen's testimony, which will require the noncitizen to describe why they, in particular, are likely to be harmed or threatened with harm. This testimony focuses on relevant personal facts and circumstances within the noncitizen's knowledge, which should not significantly increase the burden of production on the noncitizen or legal service providers.

*Comment:* Commenters raised concerns with the IFR's justifications for implementing the "reasonable probability" standard.

Commenters argued that the ultimate asylum grant rate should not be the sole justification for implementing the "reasonable probability" standard. Commenters noted that the disparity between positive credible fear determinations and ultimate asylum grant rates itself was not a reason to raise the credible fear screening standard. Commenters explained that the credible fear screening threshold was intended to be low to avoid refoulement and, therefore, the credible fear screening passage rate should necessarily be higher than the ultimate asylum grant rate.

Commenters also believed the IFR relied on misleading statistics in claiming that the screening standard should be raised because the credible fear screening passage rate was significantly higher than the ultimate asylum grant rate in removal proceedings. Commenters explained that the ultimate asylum grant rate statistic in removal proceedings includes all disposition types—not just grants and denials—and also includes factors such as a lack of counsel, poor translation, and variable IJ grant rates, which does not necessarily mean that the asylum claim itself was insufficient. Moreover, commenters pointed to additional EOIR statistics, which they stated showed that the ultimate asylum grant rates were higher than portrayed in the IFR.

Commenters also stated that the Departments did not adequately explain why they imposed a higher screening standard in this rule while, in the previous Asylum Processing IFR (87 FR 18078), the Departments argued that the "significant possibility" standard was preferable for screening statutory withholding of removal and CAT protection claims. Separately, commenters argued that the "reasonable probability" standard would not meet the IFR's stated goals of deterring irregular migration, asserting that the Circumvention of Lawful Pathways rule's increased screening standard did not "significantly lower" the credible fear passage rate. Lastly, commenters stated that the Departments did not consider that deterrence-based policies, such as a heightened standard, only result in temporary reductions in border crossings.

*Response:* The Departments disagree with objections to the IFR's justifications supporting the "reasonable probability" standard.

First, the Departments disagree that the disparity between the credible fear screening passage rate and ultimate asylum grant rate is irrelevant or should not be relied upon. This disparity is a clear indication of how many positive credible fear determinations ultimately translate into grants of asylum relief. The Departments understand that the credible fear screening process is only a threshold determination and will, by design, result in asylum claims that meet the initial screening standard but fail during the ultimate merits adjudication. However, for purposes of the IFR, the Departments cited to this disparity to explain that such a wide disparity ultimately indicates a screening process that is excessively overinclusive, resulting in a large number of non-meritorious asylum claims increasing adjudicatory backlogs. *See* 89 FR at 48746 (explaining that, under the Circumvention of Lawful Pathways rule, the "screen-in rate remains significantly higher than the grant rate for ultimate merits adjudication for SWB expedited removal cases that existed prior to the rule" and that, under the IFR, the existence of emergency border circumstances necessitates focusing limited resources on "processing those who are most likely to be persecuted or tortured if removed").

The Departments also disagree that any cited statistics in the IFR regarding asylum grant rates in section 240 removal proceedings are misleading. While commenters are correct that section 240 removal proceedings may be completed without an ultimate adjudication on an asylum application (such as through dismissal or termination of proceedings), EOIR data are consistent that, for completed cases, only a small percentage of asylum claims referred from the credible fear process are ultimately granted in section 240 removal proceedings, which was a relevant concern underlying the IFR's justification for the heightened "reasonable probability" standard.[335] For example, in 2023, only 18 percent of referred asylum claims ultimately resulted in an asylum grant at the completion of section 240 removal proceedings, even when excluding cases that were administratively closed or did not have the asylum claim adjudicated.[336] Moreover, the Departments note that the data also demonstrate that a large percentage of completed cases without an ultimate asylum adjudication of grant or denial involve noncitizens who never filed an asylum application once placed in section 240 removal proceedings.[337] Additionally, to the extent that section 240 removal proceedings are terminated before an asylum application is adjudicated, the termination does not necessarily have any bearing on the ultimate strength or weakness of the asylum claim.

In response to commenters' concerns regarding the Departments' decision in the 2022 Asylum Processing IFR to maintain the "significant possibility" screening standard for statutory withholding of removal and CAT protection, the Departments note that they addressed these concerns in the Circumvention of Lawful Pathways rule. *See* 88 FR at 31336. In response to similar comments on that rule, the Departments explained that "the current and impending situation on the ground along the SWB warrants departing in some respects from the approach generally applied in credible fear screenings" and that the "Asylum Processing IFR was designed for non-exigent circumstances." *Id.* Similarly, as explained in the IFR and this rule, prior to implementation of the IFR, migration

---

[335] *See, e.g.,* EOIR, *Adjudication Statistics: Asylum Decisions in Cases Originating with a Credible Fear Claim* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344831/dl?inline.*

[336] *See id.*

[337] *See id.*

patterns and other factors resulting in emergency border circumstances had only intensified, thereby necessitating a further change to the relevant credible fear screening standard for statutory withholding of removal and CAT protection. *See* 89 FR at 48724 ("While the Circumvention of Lawful Pathways rule and complementary measures have yielded demonstrable results, the resources provided to the Departments still have not kept pace with irregular migration."); *see also supra* Section II.A.1 ("Basis for the IFR").

Lastly, the Departments disagree with commenters regarding the overall efficacy of this rule and of the "reasonable probability" standard in particular. Contrary to commenters' claims, the Departments have seen a significant decrease in the credible fear screen-in rate since the Circumvention of Lawful Pathways rule's implementation of the "reasonable possibility" standard, and a further decrease since the IFR's implementation of the "reasonable probability" standard. *See* 89 FR at 48745–46 (showing a 31 percent decrease in the screen-in rate under the Circumvention of Lawful Pathways rule); *see also* Section II.A.2 of this preamble (providing statistics on the IFR's efficacy to date). The Departments also disagree that deterrence-based policies have only temporary or limited effects, but they do note that deterrence is only one part of an overall border and migration strategy that can help to better manage migratory flows. *See* 89 FR at 48729–30 (explaining that DHS's migration strategy focuses on "enforcement, deterrence, encouragement of the use of lawful pathways, and diplomacy").

Overall, the Departments believe that the screening standard changes made in this rule will help better manage an overwhelmed immigration system, while also noting that, as explained in IFR, this rule is only a piece of broader efforts that will likely require further congressional action. *See* 89 FR at 48715 ("Although the Departments are adopting these measures to respond to the emergency situation at the southern border, they are not a substitute for congressional action—which remains the only long-term solution to the challenges the Departments have confronted on the border for more than a decade.").

*Comment:* Commenters noted that the "reasonable probability" standard could also apply in the context of the consideration of mandatory asylum bars as proposed in a separate DHS rulemaking, Application of Certain Mandatory Bars in Fear Screenings, 89 FR 41347 (May 13, 2024) ("Mandatory Bars NPRM"). Commenters stated that the Departments should not apply the "reasonable probability" standard to noncitizens found to be barred from asylum due to a mandatory bar, noting the Mandatory Bars NPRM.

*Response:* The Departments agree with commenters that the "reasonable probability" standard may apply in the context of consideration of mandatory bars if DHS finalizes the DHS Mandatory Bars NPRM as proposed, as the Departments noted in the IFR. *See* 89 FR at 48739 n.186 (explaining that, if the DHS Mandatory Bars NPRM is finalized, the "reasonable probability" standard would still apply when a noncitizen is subject to this rule's limitation on asylum eligibility).

The Departments decline to amend the "reasonable probability" standard so that it would not apply to considerations of mandatory bars. First, as stated above in this section, the Departments have determined that a higher "reasonable probability" standard is needed in light of the emergency border circumstances. Accordingly, the Departments decline to make edits to reduce the standard's applicability. If DHS ultimately decides to consider the mandatory bars as part of fear screenings under the steady-state regulations and the Circumvention of Lawful Pathways rule, it would be appropriate for DHS to consider those bars under this rule as well, also under a "reasonable probability" standard. *See* 8 CFR 208.35(b)(2)(i). This would be consistent with the overall purpose of the DHS Mandatory Bars NPRM. *See* 89 FR at 41351 (explaining that the proposed rule "is consistent with the Administration's demonstrated record of providing operators maximum flexibility and tools to apply consequences, including by more expeditiously removing those without a lawful basis to remain in the United States, while providing immigration relief or protection to those who merit it at the earliest point possible" and that the proposed rule would "allow DHS to quickly screen out certain non-meritorious protection claims and to swiftly remove those noncitizens who present a national security or public safety concern").

4. Other Comments on the Regulatory Provisions

a. Application to Mexican Nationals

*Comment:* Commenters raised several concerns regarding the applicability of the IFR's limitation on asylum eligibility to Mexican nationals. Generally, commenters argued that Mexican asylum seekers should be exempt from the rule's limitation on asylum eligibility and should not be forced to wait in Mexico, the country where they fear persecution or torture, during emergency border circumstances. Commenters stated that requiring Mexican asylum seekers to wait in the country where they claim to face persecution is tantamount to refoulement in violation of international law and would further expose them to the threat of future harm. Similarly, commenters stated that Mexican nationals cannot be expected to apply for asylum in Mexico—the country where they are claiming harm—which commenters explained was a "common-sense principle" that the Departments abandoned in the IFR.

Relatedly, commenters stated that the Departments' available pathways to pursue asylum, including the CBP One app, are too limited for Mexican nationals, who would be exposed to an increased risk of persecution if forced to wait in Mexico for the ability to pursue asylum. Commenters expressed further concerns about the rule's lack of exceptions, including that, if the IFR's exceptions are intended to "mirror" the Circumvention of Lawful Pathways rule, it is "unfair and dangerous" for the IFR to apply to Mexican nationals, and that the IFR's requirements would "trap" Mexican nationals in the country of alleged persecution in violation of international law and non-refoulement obligations.

*Response:* The Departments decline to change the rule's applicability to Mexican nationals, as excepting Mexican nationals from the rule would undermine the rule's foundational purpose to alleviate strain on border security and immigration systems while entry is suspended and limited under the Proclamation. *See* 89 FR at 48738–39. The strains that resulted in emergency border circumstances and necessitated implementation of the IFR were driven in part by a recent sharp increase in Mexican nationals processed for expedited removal and referred for credible fear interviews. *Id.* The Departments believe that these emergency border circumstances weigh heavily in favor of applying the rule to Mexican nationals in order to better process increased inflows of Mexican nationals and return border processing to more manageable levels.

Moreover, the rule's applicability to Mexican nationals does not violate non-refoulement obligations because the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory

withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). All noncitizens, including Mexican nationals, maintain the opportunity to make a threshold showing for statutory withholding of removal and CAT protections during the credible fear screening process, as the rule's limitation on asylum eligibility does not extend to those forms of protection. *See* 8 CFR 208.35(b)(2), 1208.35(b)(2).

The Departments also disagree that Mexican nationals do not have sufficient paths for seeking relief or protection in the United States. First, Mexican nationals may avail themselves of lawful, safe, and orderly pathways to the United States, such as making an appointment through the CBP One app. *See, e.g.,* 8 CFR 208.33(a)(2)(ii)(B); *see also* 89 FR at 48754 (explaining that CBP One appointments create an efficient and orderly process at POEs). To the extent a Mexican national cannot wait in Mexico for a CBP One appointment due to urgent safety concerns, the rule contains an exception for exceptionally compelling circumstances, including for imminent and extreme threats to life or safety. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). This exception maintains the rule's efficacy by ensuring that Mexican nationals with specific, urgent safety needs to enter the United States can do so, while otherwise allowing the rule to apply to those Mexican nationals who, for example, are able to safely wait in another part of Mexico for their appointment. Furthermore, as of August 23, 2024, the Departments note that Mexican nationals are able to request and schedule a CBP One appointment from anywhere within Mexico.[338] This new adjustment to the CBP One app will enable Mexican nationals facing imminent danger in a specific area of Mexico to internally relocate while waiting for their CBP One appointment.[339]

Second, this rule ensures that noncitizens are able to avoid refoulement through the availability of statutory withholding of removal, in addition to CAT protection. *See* 8 CFR 208.35(b)(2), 1208.35(b)(2). Third, the rule contains a number of provisions that may apply to Mexican nationals. For example, the limitation on asylum eligibility does not apply to groups that are excepted from the suspension and limitation on entry under section 3(b) of

the Proclamation, including UCs. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1). The rule also provides an exception for noncitizens who can establish the aforementioned exceptionally compelling circumstances. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). Additionally, the rule includes a provision to ensure family unity and avoid potential family separation for certain noncitizens who can establish eligibility for statutory withholding of removal or CAT protection. *See* 8 CFR 208.35(c), 1208.35(c). Taken together, these provisions help ensure that, while some Mexican nationals may not be granted asylum after entering the United States during emergency border circumstances, sufficient options exist for Mexican nationals to pursue available protection and avoid immediate harm.

*Comment:* Commenters stated that the rule's exceptions are inadequate for Mexican nationals. Commenters stated that, for Mexican nationals, the facts underlying their asylum claim would be conflated with the rule's exception for an ''imminent and extreme threat to life or safety.'' According to commenters, in practice, this would result in Mexican nationals having to essentially present their full asylum claim to establish the exception.

*Response:* If a Mexican national is unable to remain in Mexico while awaiting a CBP One appointment due to an imminent and extreme threat of harm, the rule provides an exception for exceptionally compelling circumstances, in order to provide a potential avenue for the Mexican national to avoid application of the rule's limitation on asylum eligibility. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). The Departments disagree that this exception for noncitizens who demonstrate exceptionally compelling circumstances is inadequate for Mexican nationals.

The Departments clarify that the analysis to determine whether any noncitizen—including a Mexican national—has demonstrated exceptionally compelling circumstances based on an ''imminent and extreme threat to life or safety'' at the time of entry is separate from the ultimate determination regarding the merits of a noncitizen's asylum claim, even if, in certain circumstances, some of the same facts underlying a Mexican national's asylum claim may also be relevant to a determination on the rule's exception. For purposes of the ''imminent and extreme threat to life or safety'' exception, noncitizens need only provide evidence focused on threats that the noncitizen faced at the time they

crossed the SWB, such that the noncitizen could not wait for an opportunity to present at a POE. *See, e.g.,* 88 FR at 11723 (explaining operation of similar ground for rebutting presumption of ineligibility for asylum under the Circumvention of Lawful Pathways rule). In contrast, for the asylum claim itself, the noncitizen must demonstrate that they otherwise have a credible fear of persecution or torture during credible fear proceedings and, during a full merits adjudication, that they satisfy the eligibility requirements for asylum. *See* 8 CFR 208.35(b)(1)(iii), 1208.35(b)(2)(ii) (directing AOs and IJs to proceed under 8 CFR 208.30 and 1208.30, respectively, in credible fear proceedings where a noncitizen has established the exception to the limitation on asylum eligibility based on exceptionally compelling circumstances); *see generally* 8 CFR 208.13, 1208.13 (describing asylum eligibility requirements).

Relatedly, the Departments also clarify that the ''exceptionally compelling circumstances'' exception is applied during the credible fear process, and not during any initial border encounter with CBP. *See* 8 CFR 208.35(b) (''Application in credible fear determinations.'').

*Comment:* Commenters stated that the rule discriminates against Mexican nationals, both in intent and effect. Commenters stated that, by comparison, the rule is more restrictive than prior Departmental policies, including the Circumvention of Lawful Pathways rule and the now-defunct MPP, which specifically exempted Mexican nationals. Thus, commenters stated, this rule was issued to limit the entry of Mexican nationals and would result in more drastic consequences for Mexican nationals than those other rules and policies. Furthermore, commenters argued that, because the Circumvention of Lawful Pathways rule does not apply to Mexican nationals, there will be significant confusion in applying these rules together during the credible fear process.

*Response:* The Departments disagree with commenters' assertions that this rule discriminates against Mexican nationals. Commenters stated that the discriminatory intent and purpose is evidenced by the Circumvention of Lawful Pathways rule's comparative inapplicability to Mexican nationals. However, the Departments emphasize that this rule and the Circumvention of Lawful Pathways rule serve different objectives. For example, unlike with respect to this rule, traveling through a third country is a key requirement of the Circumvention of Lawful Pathways rule

---

[338] *See* CBP, *CBP One™ Mobile Application: Recent Updates* (last modified Sept. 23, 2024), https://www.cbp.gov/about/mobile-apps-directory/cbpone.

[339] *See id.*

because requiring that noncitizens apply for protection in a third country is one means for providing protection in the United States where necessary while also sharing the responsibility of providing necessary protections with the United States' regional partners. *See* 8 CFR 208.33(a)(1)(iii); 1208.33(a)(1)(iii); 88 FR at 31316. Thus, the Circumvention of Lawful Pathways rule generally does not apply to Mexican nationals residing in Mexico, who would not need to travel through another country to reach the United States. To the contrary, this rule applies uniformly to all noncitizens who enter the United States at the southern border during emergency border circumstances and are not excepted under the June 3 Proclamation or able to establish exceptionally compelling circumstances, without consideration of the path of transit to the southern border. *See* 8 CFR 208.13(g), 1208.13(g).

Additionally, since the implementation of the Circumvention of Lawful Pathways rule, emergency border circumstances dictate applying the rule broadly in order to reduce irregular entries at the southern border and to quickly issue decisions and impose consequences on those who cross the southern border irregularly and lack a legal basis to remain. *See* 89 FR at 48731. As relevant here, the United States saw a sharp increase in the number of encounters of Mexican nationals at the SWB during the COVID–19 pandemic prior to implementation of the Circumvention of Lawful Pathways rule, which continued into the immediate post-pandemic period.[340] During the same period, the United States saw a corresponding increase in credible fear referrals, which necessitates applying the rule to Mexican nationals. *See id.* at 48738.

Moreover, the Departments do not believe that the rule's broad applicability will cause confusion, as the rule maintains a straightforward application to noncitizens who enter the United States at the southern border during periods of emergency border circumstances and are not excepted under the Proclamation or able to establish exceptionally compelling circumstances.

*Comment:* Commenters stated that the rule's expediency justification for subjecting Mexican nationals to the limitation on asylum eligibility is insufficient. Commenters argued that the statistics provided in the IFR cannot justify extending the limitation on asylum eligibility to Mexican nationals,

noting that statistics evincing recent increases in Mexican nationals making fear claims indicate increasingly dangerous conditions in Mexico and an increased need for protection. Another commenter claimed that applying the rule to Mexican nationals is contrary to the record before the agency because, according to the commenter's characterization of that record, encounters of Mexican nationals have actually declined significantly. Similarly, a commenter objected that the IFR subjects Mexican nationals fleeing persecution to extensive stays in Mexico if they wish to seek asylum in the United States, but fails to consider the impact on Mexican nationals or provide any rationale for that result.

*Response:* The Departments have considered the commenters' concerns and reaffirm the justifications for applying the IFR's limitation on asylum eligibility to Mexican nationals. The foundational basis of the June 3 Proclamation and the IFR is to address substantial migration levels at the southern border, including a "sharp increase" in SWB encounters of Mexican nationals. *See, e.g.,* 89 FR at 48726–27; *id.* at 48738. Addressing these migration levels, and their significant impact on border processing and the United States' immigration system more broadly, thereby necessitates applying the rule's limitation on asylum eligibility to all noncitizens, with limited exception, who enter the United States across the southern border during emergency border circumstances, including Mexican nationals.

The Departments believe the cited data fully support the rule's application to Mexican nationals. Departmental data show that excluding Mexican nationals would undermine the rule's deterrent effect, as Mexican nationals comprise the largest portion of recent (post-IFR) SWB encounters between POEs, at approximately 41 percent.[341] And, contrary to one commenter's claim, the data in the IFR did not show a decline in encounters of Mexican nationals. Rather, the Departments explained that, since 2010, the makeup of border crossers has significantly changed, expanding from Mexican single adults to single adults and families from northern Central American countries, and then to single adults and families from throughout the hemisphere (and beyond), many of whom are more likely to seek asylum and other forms of protection. *See* 89 FR at 48721. The Departments further explained that, as the demographics of border encounters

have shifted in recent years to include a higher rate of Mexican nationals claiming fear, in addition to larger encounter numbers of other nationalities with high historical rates of asserting fear claims, the deterrent effect of apprehending noncitizens at the SWB has become more limited. *See id.* at 48731 n.167 (explaining that for noncitizens encountered at and between SWB POEs from FY 2014 through FY 2019 who were placed in expedited removal, nearly 6 percent of Mexican nationals made fear claims that were referred to USCIS for a determination, whereas from May 12, 2023 to March 31, 2024, 29 percent of all Mexican nationals processed for expedited removal at the SWB made fear claims, including 39 percent in February 2024). Given this demonstrated increase in encounters of, and fear claims made by, Mexican nationals, the Departments believe that applying this rule to Mexican nationals will result in faster processing of a significant number of Mexican noncitizens and thereby significantly advance this rule's overarching goal of alleviating the strain on the border security and immigration systems during emergency border circumstances. Without broad application, the practical result would be that those with meritorious claims would wait years for their claims to be granted, while noncitizens who are ultimately denied protection potentially would spend years in the United States before being issued a final order of removal.

*Comment:* Commenters stated that not creating an exception for Mexican nationals is especially concerning for vulnerable Mexican nationals, including people fleeing gang and cartel violence or other severe forms of violence, women, members of the LGBTQI+ community, those escaping sexual and gender-based violence, children, families, Indigenous people, journalists, and activists, among others. Commenters explained that violence against these vulnerable populations is endemic in Mexico and has been recognized by the Departments, including through individual asylum adjudications. Therefore, the commenters stated that it is concerning that the IFR does not except these vulnerable populations despite the clear need to prevent further harm and mitigate past harms suffered.

*Response:* Regarding concerns about specific vulnerable populations of Mexican nationals, the Departments emphasize that agents and officers frequently encounter noncitizens who may be vulnerable and are trained on appropriate action. *See* 89 FR at 48744–

---

[340] *See* OHSS analysis of July 2024 Persist Dataset (USPB Encounters by Citizenship tab).

[341] *See id.*

45. Moreover, the rule contains an explicit exception for exceptionally compelling circumstances that is intended to limit potential adverse effects of the rule's limitation on asylum eligibility, including on uniquely vulnerable populations. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). For example, a noncitizen may qualify for the exception if the noncitizen faces an imminent and extreme threat to the noncitizen's life or safety immediately prior to entry into the United States. *See id.*

b. Adequacy of Statutory Withholding of Removal and CAT Protection

*Comment:* Commenters stated that statutory withholding of removal and CAT protection are insufficient alternative forms of protection for noncitizens who would be ineligible for asylum under the rule, asserting that these forms of protection are more difficult to obtain and provide fewer benefits than asylum.

First, commenters explained that statutory withholding of removal and CAT protection require noncitizens to meet a higher burden of proof than asylum and that, ultimately, these higher burdens will result in more noncitizens being denied protection under the rule.

Second, commenters stated that, even if noncitizens were able to meet the higher burden of proof for statutory withholding of removal or CAT protection, the noncitizen would not be accorded the same benefits as asylees. For example, commenters stated that recipients of statutory withholding of removal and CAT protection are subject to the continued risk of removal; cannot petition for derivative beneficiaries; are unable to apply for permanent residency or citizenship; are unable to travel abroad; and must apply annually for work authorization, which commenters claimed is subject to frequent adjudicatory delays. As a result, commenters argued that recipients of statutory withholding of removal and CAT protection are left in an uncertain status incongruent with the United States' obligations to protect refugees; that such status would lead to community instability in the United States, as it prevents noncitizens from investing in their communities and fully recovering from harm; and that such status would fail to ensure family unity—and even promote family separation—due to an inability to petition for derivative beneficiaries.

Further, commenters argued that the Departments cannot meet their non-refoulement obligations with statutory withholding of removal or CAT

protections alone, stating that neither statutory withholding of removal nor CAT protections are equivalent to asylum because those protections do not convey rights guaranteed by the Refugee Protocol or meet the goals of the Refugee Convention. Those commenters said that the United States must comply with the Refugee Convention in its entirety, not only with Article 33. For example, commenters said that the United States is obligated to comply with Article 34 of the Refugee Convention and facilitate the integration and naturalization of refugees.

Lastly, commenters claimed that noncitizens who attempt to pursue statutory withholding of removal or CAT protection under the rule would increase confusion in their interactions with DHS, particularly due to the rule's interactions with other rulemakings.

*Response:* As an initial matter, the Departments reiterate that this rule fully complies with the United States' non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol), which the United States implements through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* Section III.A.1.d of this preamble. This rule's limitation on asylum eligibility does not affect a noncitizen's ultimate eligibility for statutory withholding of removal. *See* 8 CFR 208.35(b)(2)(i), 1208.35(b)(2)(i) (requiring an AO to assess a noncitizen's eligibility for statutory withholding of removal and CAT protection when applicable). Similarly, this rule's implementation of the "reasonable probability" screening standard is well within the Departments' broad discretion to determine which screening standard should apply in implementing the United States' non-refoulement obligations. *See* 89 FR at 48740–41.

The rule is similarly compliant with Article 34 of the Refugee Convention, which is precatory and encourages the assimilation and naturalization of refugees. Importantly, although the rule limits asylum eligibility for noncitizens who enter the United States during emergency border circumstances, Article 34 "does not require the implementing authority actually to grant asylum to all those who are eligible." *INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 441 (1987). Indeed, under U.S. law, asylum is a discretionary form of relief. *Id.; see also* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A); 8 CFR 1208.14(a)–(b). Consistent with that authority, the Departments have determined that this rule's limitation on asylum eligibility is necessary to address the emergency border circumstances described in the

IFR. *See* 89 FR at 48726–31. Further, the rule does not preclude the availability of asylum for those to whom the rule does not apply or who demonstrate that exceptionally compelling circumstances exist. For example, noncitizens may utilize the CBP One app to schedule an appointment to present themselves at a POE. *See* June 3 Proclamation Sec. 3(b)(v)(D) (excepting "noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for the safe and orderly entry of noncitizens into the United States"); 89 FR at 48737 ("One of the mechanisms by which a noncitizen may arrive at a POE with a pre-scheduled time to appear is through the CBP One app. Use of the CBP One app creates efficiencies that enable CBP to safely and humanely expand its ability to process noncitizens at POEs, including those who may be seeking asylum."). Additionally, noncitizens may overcome the limitation on asylum eligibility if they, or a family member as described in 8 CFR 208.30(c) with whom they are traveling, are able to demonstrate exceptionally compelling circumstances by a preponderance of the evidence, such as if they face an acute medical emergency or an imminent and extreme threat to life or safety, among other circumstances. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

Next, the Departments recognize that the burdens of proof for statutory withholding of removal and CAT protection are higher than that for asylum, as they require a demonstration that it is more likely than not that noncitizens will be persecuted or tortured in another country, while asylum requires that noncitizens demonstrate a lesser burden of proof: a well-founded fear of persecution. *See Cardoza-Fonseca,* 480 U.S. at 423. These higher burdens of proof for those to whom the limitation applies align with the overall purpose of the rule: to disincentivize irregular migration during periods of emergency border circumstances, so as to mitigate the risk that border enforcement operations and the larger immigration system become overwhelmed and unable to issue timely decisions or consequences. *See* 89 FR at 48718 (explaining that the rule is intended to "address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances"). These differences in burdens of proof also correspond with the distinct, but related, objectives of the Circumvention of Lawful Pathways

**81254** **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

rule: to encourage noncitizens to avail themselves of lawful, safe, and orderly pathways, where possible, as well as to discourage irregular migration, promote orderly processing at POEs, and ensure that protection is still available for those who satisfy the applicable standards for statutory withholding of removal or CAT protection. *See* 88 FR at 31428. Therefore, if a noncitizen is subject to the rule's limitation on asylum eligibility, being required to meet comparatively higher existing standards for statutory withholding of removal or CAT protection is intended to further disincentivize irregular migration when encounters are above a certain benchmark and to "substantially improve the Departments' ability to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain." 89 FR at 48715; *see also id.* at 48754.

Separately, and as explained in response to similar comments on the Circumvention of Lawful Pathways rule, the Departments also recognize the comparatively fewer benefits of statutory withholding of removal and CAT protection as compared to asylum, including: (1) no permanent right to remain in the United States; (2) the inability to adjust status to become a lawful permanent resident and, relatedly, later naturalize as a U.S. citizen; (3) the inability to travel abroad; and (4) the need to affirmatively apply for, and annually renew, employment authorization documents. *See* 88 FR at 31428. However, the Departments again emphasize that the rule's limitation on asylum eligibility, along with the comparatively fewer benefits of statutory withholding of removal and CAT protection, align with the overall purposes of the June 3 Proclamation and this rule: to address historic levels of migration at the southern border and efficiently process migrants arriving at the southern border during emergency border circumstances. *See* 89 FR at 48718; *id.* at 48726–31.

Moreover, with regard to concerns about the inability of statutory withholding of removal or CAT protection recipients to petition for beneficiary derivatives,[342] this rule contains a family unity provision to help prevent family separation for noncitizens who can establish eligibility for statutory withholding of removal or CAT withholding. *See* 8 CFR 208.35(c), 1208.35(c). As discussed in further detail in Section III.C.1.e of this preamble, the family unity provision treats the following noncitizens as having established exceptionally compelling circumstances sufficient to avoid application of the limitation on asylum eligibility: those (1) who are found eligible for statutory withholding of removal or CAT withholding; (2) who would be eligible for asylum, but for the limitation on asylum eligibility set forth in the rule, the condition set forth in the Circumvention of Lawful Pathways rule, or both; and (3) who have a qualifying spouse or child. *See id.*

Lastly, the Departments do not believe that the ability of a noncitizen to apply for statutory withholding of removal or CAT protection when subject to the rule's limitation on asylum eligibility will cause confusion. Noncitizens have long maintained the ability to pursue such protection, and DHS and EOIR personnel are well-trained in screening for, and adjudicating, such forms of protection. *See* 89 FR at 48748 (explaining that "AOs, supervisory AOs, and IJs receive training and have experience applying asylum, statutory withholding of removal, and CAT protection screening standards and in applying and reviewing decisions related to the ultimate asylum (for USCIS and EOIR) and statutory withholding of removal and CAT protection (for EOIR) merits standards").

#### c. Requests for Reconsideration

*Comment:* Several commenters opposed eliminating noncitizens' ability to request reconsideration of a negative credible fear determination by USCIS. Commenters stated that the opportunity to request reconsideration of a negative credible fear determination after IJ concurrence is an important safeguard against non-refoulement. One commenter noted that in the Asylum Processing IFR, the Departments counted at least 569 negative credible fear determinations that were changed to positive credible fear determinations after a request for reconsideration between FY 2019 and 2021. Commenters stated that USCIS should continue the practice of allowing requests for reconsideration, as it may be the only opportunity for noncitizens to present additional evidence that was not presented during the credible fear interview or to correct procedural defects in the credible fear interview, alleging that the IJ review process generally does not provide meaningful review and routinely affirms erroneous negative credible fear determinations. A commenter also claimed that even with the regulatory language acknowledging that USCIS maintains the discretion to reconsider its own negative credible fear determinations following IJ concurrence, it is unclear under the rule when or how USCIS would exercise its *sua sponte* authority to reconsider a negative credible fear finding.

*Response:* The Departments disagree with comments urging USCIS to allow noncitizens to request reconsideration of negative credible fear determinations under the present rule. This rule does not eliminate the discretionary authority of USCIS to reconsider negative credible fear determinations concurred upon by an IJ, but instead only prohibits noncitizens from submitting a request to reconsider a negative credible fear determination in cases subject to the rule. 8 CFR 208.35(b)(2)(v)(B). The Departments deem it appropriate to include this prohibition against requests for reconsideration in the rule to further its purpose of effectuating efficient yet fair credible fear case processing where emergency border circumstances are present. As noted in prior rulemakings, allowing requests for reconsideration of negative credible fear determinations diverts limited USCIS resources away from initial screenings, and relatively few such requests ultimately result in a reversal of the determination.[343]

The Departments acknowledge that they previously provided information in the Asylum Processing IFR that USCIS counted at least 569 negative credible fear determinations that were reversed after a request for reconsideration was submitted between FY 2019 through FY 2021. The Departments note, however, that that number was out of a total of at least 5,408 requests for reconsideration that were submitted during those years. *See* 87 FR at 18132. Under the present rule, where emergency border circumstances are present and a credible fear determination is made pursuant to the rule's limitation on asylum eligibility, the Departments assess that, in light of the safeguards in place, efficiency interests outweigh the interest in providing an opportunity to request reconsideration.

To the extent commenters argue that this provision of the rule implicates statutory or due process rights of noncitizens, the Departments note that noncitizens have no statutory right to request reconsideration of a negative credible fear determination. The Supreme Court has held that the due process rights of noncitizens applying

---

[342] The Departments note that, although there is no derivative protection under statutory withholding of removal or CAT protection, certain U.S.-based qualifying parents or legal guardians, including those granted withholding of removal, may petition for qualifying children and eligible family members to be considered for refugee status and possible resettlement in the United States. *See* USCIS, *Central American Minors (CAM) Program, https://www.uscis.gov/CAM* (last updated Mar. 7, 2024).

[343] *See* Asylum Processing IFR, 87 FR at 18132; *see also* 88 FR at 31419.

for admission at the border are limited to "only those rights regarding admission that Congress has provided by statute." *Thuraissigiam,* 591 U.S. at 140. In establishing the streamlined procedures governing credible fear screening, Congress explicitly mandated that review of any negative credible fear determination made by an AO be conducted by an IJ and provided no mechanism for noncitizens to request reconsideration of the IJ's determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III).

With respect to commenters' concerns about fairness, the Departments note that all credible fear determinations, including determinations made under the processes set forth in this rule, will continue to be reviewed by a supervisory AO. *See* 8 CFR 208.30(e)(8); *see also* 89 FR at 48748. And the rule does not impact a noncitizen's right to request IJ review of a negative credible fear determination. Where requested, the IJ will evaluate the case de novo, including making a de novo determination as to whether there is a significant possibility the noncitizen could demonstrate they are not subject to the rule's limitation on asylum eligibility or are eligible for the exception. 8 CFR 208.35(b)(2)(iii)–(v), 1208.35(b). Accordingly, this rule ensures IJ review of the entirety of the negative credible fear determination, including application of the rule's limitation on asylum eligibility. To the extent commenters raise general concerns about IJ review of negative credible fear determinations, those concerns are outside the scope of this rulemaking.

In response to the comment noting that it is unclear when USCIS would exercise its discretion to reconsider a negative credible fear determination *sua sponte,* the Departments note that the regulatory framework makes clear that USCIS possesses the inherent discretion to reconsider its own negative credible fear determination that has been concurred upon by an IJ, and that such discretion may be exercised on a case-by-case basis dependent on the facts and circumstances in an individual case. *See, e.g.,* 8 CFR 1208.30(g)(2)(iv)(A) (2018) (noting that "[t]he Service, however, may reconsider a negative credible fear finding that has been concurred upon by an immigration judge"); 208.35(b)(2)(v)(B). As noted above, the Departments contend that the existing safeguards under the present rule comport with all statutory requirements and believe that these safeguards sufficiently address any concerns related to adequate review of

negative credible fear determinations under the present rule.

*D. Other Issues Relating to the Rule*

1. Scope of the Rule and Implementation

a. Concerns That the Encounter Thresholds Are Too Low or Arbitrary

*Comment:* Some commenters expressed concern with the 2,500-encounter threshold that would trigger the limitation on asylum eligibility for certain individuals who enter during emergency border circumstances. Some commenters characterized the threshold as "arbitrary." Another commenter claimed that encounter rates have historically never fallen below the 2,500-encounter threshold due to the urgent humanitarian need and expressed concern that, contrary to the realities of forced displacement, the IFR limiting entries to 2,500 encounters effectively serves as a policy to close the border and end access to asylum.

Several commenters remarked that the low threshold required for the limitation on asylum eligibility to be discontinued is unrealistic and would virtually guarantee the limitation would always be in place. One commenter expressed concern that 1,500 daily encounters is well below historical averages. Another commenter stated that in the past 6 FYs, monthly average border apprehensions consistently surpassed 1,500 individuals. Similarly, another commenter stated that the "emergency border circumstances" would apply during 58 percent of all months this century. Another commenter stated that the 1,500-encounter threshold is unreasonable given the number of encounters at the SWB in 2024, which, according to the commenter, has lately hovered between 170,000 to 190,000 per month, or around 6,000 people per day on average.

While referencing the thresholds, a commenter remarked that the preamble acknowledges that the Departments cannot swiftly change from one means of processing to another. Citing high levels of border crossings since May 2023 (after the implementation of the Circumvention of Lawful Pathways rule), the commenter stated that the Departments' intent is to keep this rule in place indefinitely, punishing migrants in an attempt to deter them from seeking protection in the United States. A commenter warned that "the mechanism for lifting the restrictions in the IFR is insufficient to meet the humanitarian needs at the U.S. border, jeopardizing the asylum system for many years to come."

*Response:* The Departments disagree that the numerical thresholds are arbitrary or too low. As explained in the IFR, the emergency border circumstances described in the June 3 Proclamation and this rule necessitate this rule's limitation on asylum eligibility and changes to the referral process and screening standard for statutory withholding of removal and CAT protection. *See* 89 FR at 48726–31. This is because, in such circumstances, DHS lacks the capacity to deliver timely consequences and must resort to large-scale releases of noncitizens pending section 240 removal proceedings. *Id.* at 48749. Such large-scale releases in the absence of this rule would lead to significant harms and incentivize human smuggling organizations to recruit more potential migrants based on the limitations on the Departments' ability to deliver timely decisions and consequences. *Id.* at 48749–50. The 1,500-encounter threshold, as adopted in this rule, is a reasonable proxy for when the border security and immigration systems, as currently resourced, are no longer over capacity and the measures adopted in this rule are not necessary. *Id.* at 48750. And the 2,500-encounter threshold, as adopted in this rule, is a reasonable proxy for when there has been a significant degradation of DHS's ability to impose consequences at the border for individuals who do not establish a legal basis to remain in the United States. *Id.* at 48752. Were the resourcing of border security and immigration systems to change, this change (if sufficiently substantial) could trigger reassessment of these thresholds, in order to ensure that they reflect the Departments' ability to deliver timely decisions and consequences.

In the IFR, the Departments demonstrated the reasonableness of the thresholds in two ways. First, the Departments explained that during the FY 2013 to FY 2019 pre-pandemic period, USBP total encounters (including all UCs) only exceeded 1,500 per day for a sustained period from October 2018 to August 2019. *Id.* at 48753. During that 7-year period, months in which daily encounters were between 1,500 and 2,500 resulted in an average of 210 noncitizens released each day,[344] while months in which daily

---

[344] Although the demographic composition of current encounters (*e.g.,* a higher percentage of noncitizens encountered who assert fear claims) means that such a low release rate is likely unachievable in the near term, releases remain much lower when daily encounters are below the 2,500-encounter threshold. *See* 89 FR at 48731; *see also* OHSS analysis of July 2024 Persist Dataset and

*Continued*

encounters exceeded 2,500 resulted in approximately 1,300 noncitizens released each day with CBP releasing as many as 46 percent of the individuals it processed pending section 240 removal proceedings. *Id.*

Second, the Departments demonstrated that at the 1,500-encounter level and assuming a similar level of voluntary returns and reinstatements to those seen during implementation of the Circumvention of Lawful Pathways rule, DHS would be able to refer for expedited removal more than 70 percent of the single adults and family unit individuals who are not quickly repatriated (through voluntary return or reinstatement), and would be able to repatriate a total of about 830 noncitizens (*i.e.,* 56 percent of the 1,500 encounters counted towards the threshold). *Id.* at 48752 & nn.274, 276. By contrast, at above 2,500 encounters—the level at which the June 3 Proclamation and the IFR would again apply—DHS's ability to impose such consequences is significantly lower and decreases rapidly as encounters increase beyond that level; for instance, at that level DHS would be able to refer for expedited removal 43 percent of the single adults and family unit individuals who are not quickly repatriated, and would be able to repatriate a total of about 1,010 noncitizens (*i.e.,* 40 percent of the 2,500 encounters counted towards the threshold). *Id.* at 48752 nn.277–278.

In this second analysis as presented in the IFR, consistent with the June 3 Proclamation, DHS excluded encounters of UCs from non-contiguous countries from the threshold counts. But as noted in the IFR, "the demographics and nationalities encountered at the border significantly impact DHS's ability to impose timely consequences and the number of people who are ultimately released by CBP pending section 240 removal proceedings. This is especially true for periods when CBP has encountered more UCs, family units, or individuals from countries to which it is difficult to effectuate removals." *Id.* at 48753. Consistent with this reality, the September 27 Proclamation and this rule include, in both thresholds, consideration of encounters of all UCs, including those from non-contiguous countries. As discussed in Section II.C.1 of this preamble and later in this Section III.D.1, most UCs are from non-contiguous countries, and the processing of all UCs requires the use of significant CBP resources.

Including non-contiguous UCs in the 7-consecutive-calendar-day average calculation recognizes this impact. Depending on the levels of such UCs encountered at any given time, failing to include such UCs in the 1,500 and 2,500 encounter limits may result in an overestimate of resources available to the Departments to efficiently process noncitizens encountered at the SWB while delivering timely decisions and consequences to noncitizens who enter without a lawful basis to remain. This is because the number of UCs from non-contiguous countries encountered by USBP can fluctuate—something that models that assume stable demographics cannot fully account for. And if encounters of such UCs rise but are not included in the rule's thresholds, then those thresholds become much less useful predictors of overall capacity. Although encounters of UCs from non-contiguous countries have generally declined since the IFR took effect,[345] their proportion of USBP encounters has increased,[346] and the population of UCs from non-contiguous countries at the border has surged on several occasions in the past.[347]

As part of this final rule, DHS updated the second analysis discussed above to reflect more recent data and to demonstrate the impact on that analysis of counting all UCs—at current encounter levels—towards the encounter thresholds. The Office of Homeland Security Statistics ("OHSS") updated the IFR's methodology by (1) applying fear claim rates for the entirety of the immediate post-pandemic period (*i.e.,* not ending in April 2024, as the prior analysis did), (2) assuming a demographic makeup (including with respect to UCs) similar to that observed between June 5, 2024, and July 30, 2024 for that entire period, and (3) including all UCs in the 1,500 and 2,500 encounter figures.[348]

Under these parameters, at 1,500 encounters between the POEs (including all UCs) and assuming USBP is able to process 900 cases for expedited removal per day (as was approximately the case during the immediate post-pandemic period between May 12, 2023 and June 4, 2024), DHS would be able to refer for expedited removal 77 percent of the noncitizen single adults and individuals in family units who are not quickly repatriated, and would be able to repatriate a total of about 880 noncitizens per day (*i.e.,* under 60 percent of the 1,500 encounters counted towards the threshold).[349]

Similarly, at 2,500 encounters between the POEs (including all UCs) and assuming USBP can process 900 people for expedited removal per day, DHS would be able to refer for expedited removal 46 percent of the single adults and individuals in family units who are not quickly repatriated, and would be able to repatriate a total of about 1,040 noncitizens per day (*i.e.,* over 40 percent of the 2,500 encounters counted towards the threshold).[350]

The Departments caution that this type of analysis depends on a range of assumptions regarding capacity, fear claim rates, screen-in rates, and geographic and demographic distribution of encounters, among other variables. A change in these variables—for instance, a spike in UC encounters—could place a strain on custody resources that would further reduce the Departments' overall capacity to deliver timely decisions and consequences, such as by processing noncitizens for expedited removal. The analysis does show, however, that the change to the thresholds to include counting of all UCs is incremental in nature and consistent with the rule's overall purpose.

Finally, with respect to claims that either threshold effectively serves as a policy to "close the border" and end access to asylum, the Departments

---

data downloaded from UIP on September 3, 2024 (Summary Statistics tab, see cells L27 and M27).

[345] *See* OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (USBP Encounters by Fam Status tab).

[346] *See id.*

[347] *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https:// www.dhs.gov/ohss/topics/immigration/ enforcement-and-legal-processes-monthly-tables* (last updated Sept. 10, 2024) (SWB encounters by family status from FY 2014 through May 2024).

[348] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab). The figures presented in the IFR were based on fear claim rates, demographics, and average expedited removal capacity under the Circumvention of Lawful Pathways rule; these rates were pulled in early April 2024. *See* 89 FR at 48752 nn.274, 276. For instance, based on data pulled in early April 2024, the figures in the IFR assumed that CBP could process approximately 900 USBP encounters for expedited removal per day and that 17 percent of encounters would result in rapid returns via

voluntary return to Mexico, reinstatement of a removal order, or administrative removal. *Id.* Accounting for all of the immediate post-pandemic period (*i.e.,* also, including April, May, and early June 2024), USBP averaged about 860 people processed for expedited removal per day during that time period. OHSS analysis of July 2024 Persist Dataset (Imm Pos Pandemic ERCF tab). CBP processed for expedited removal about 920 people on average during that time. *Id.* From June 5, 2024 through August 31, 2024, CBP processed over 1,100 people for expedited removal per day and about 16 percent of encounters resulted in such rapid returns. OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR Details tab, IFR ERCF tab, and CLP v pre-CLP Projection Tool tab).

[349] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab).

[350] *Id.*

disagree. The Departments also disagree with commenters' specific claims about historical encounter rates and numbers. Commenters are incorrect that daily encounters rates have never fallen below 2,500.[351] Commenters are also wrong that an average of 1,500 daily encounters is far below historical averages. From FY 2013 through FY 2019, the 7-consecutive-calendar-day average of encounters was below 1,500 nearly 80 percent of the time, and above 2,500 approximately 5 percent of the time.[352] And for over 70 percent of days during that time frame, the 7-consecutive-calendar-day average had been below 1,500 encounters for 28 consecutive days.[353] Over a longer time period, from FY 2009 through FY 2020, there were a total of only four months (all during the spring 2019 family unit surge) that encounters averaged more than 2,500 per day.[354] One commenter argued that in the past six fiscal years, monthly average apprehensions have consistently surpassed 1,500 noncitizens. But this only shows that the past six fiscal years have generally been times of historically high migrations, and the Departments established the 1,500-encounter daily threshold not by selecting an arbitrary figure but by estimating capacity to deliver timely consequences at current resource levels.

Even since the IFR took effect, encounters have dropped to levels indicating that it is possible the 1,500-encounter threshold will be met in the future. If, consistent with the June 3 Proclamation and IFR, one excludes UCs from non-contiguous countries, the 7-consecutive-calendar-day average has been below 2,000 encounters since June 27.[355] And if, consistent with the September 27 Proclamation and this rule, one includes such UCs, the 7-consecutive-calendar-day average has been below 2,000 encounters since June 29.[356]

### b. Concerns Regarding Exceptions From the Encounter Thresholds

*Comment:* A commenter remarked that there are too many exceptions to the types of encounters that are counted daily. The commenter stated that it is "hard to count up to 1,500" when there are so many exceptions. The commenter used the exception for non-contiguous country UCs, who are not counted under the June 3 Proclamation, as an example. The commenter stated that this exception encourages the trafficking of children and prevents reporting these as encounters. The commenter also objected to the exception for noncitizens who are determined to be inadmissible at a SWB POE, which the commenter asserted significantly limits the number of encounters considered.

Another commenter expressed similar concerns regarding the exclusion of UCs from the 2,500-encounter threshold. The commenter stated that the current UC policies, influenced by the Flores Settlement Agreement and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, are susceptible to exploitation. The commenter further noted that during the current Administration, UC encounters have exponentially increased, with more than 480,000 UCs encountered at the southern border between POEs. The commenter cautioned that without counting all UC encounters towards the 1,500-encounter threshold, existing policies may be further abused by criminal elements, leading to increased risks for UCs, such as human trafficking and other forms of exploitation. The commenter maintained that in addition to excluding non-contiguous country UCs, the encounter thresholds in the IFR also exclude 1,650 encounters every day at POEs, plus 30,000 noncitizens processed every month through the CHNV parole processes.

*Response:* Regarding UCs from non-contiguous countries, as discussed in Section II.C.1 of this preamble, the September 27 Proclamation amends the June 3 Proclamation to remove section 2(c), which provided that UCs from non-contiguous countries shall not be included in calculating the number of encounters, and this rule makes a parallel change. As discussed in Section II.C.1 of this preamble, the Departments' experience implementing the IFR has shown that excluding encounters of UCs from non-contiguous countries results in an incomplete assessment of the

Departments' resources and capabilities. UCs, regardless of their country of origin or nationality, require considerable resources to process and safely hold in CBP facilities and the Departments have in the past experienced surges of encounters of such UCs.[357] One of the primary purposes of this rule is to alleviate undue strain on the limited resources of border security and immigration systems, and through their experience with the IFR the Departments have recognized the need to consider the full operational burden that results from all UC encounters at the southern border. The resource burden posed by UCs from non-contiguous countries, along with recent increases in the proportion of such UCs relative to types of encounters, support the Departments' determination that UCs from all countries, not just from contiguous countries, are relevant to the thresholds contained in the rule.

The Departments disagree that the encounter thresholds should include daily encounters at the SWB POEs or CHNV parolees. The IFR applies only when encounters strain the border security and immigration systems' capacity. To date, this strain has been caused primarily by increased encounters between POEs. CBP can more efficiently process those at SWB POEs, particularly those who have used the CBP One app to make an appointment. In the past several years, processing capacity at POEs has been significantly expanded, enabling CBP to manage processing of noncitizens in a safe and efficient manner. However, despite the efforts to increase capacity within the limits of available resources and funding, processing between POEs continues to tax DHS resources and remains very resource intensive.

The CHNV processes do not adversely affect the Departments' resources at the southern border because noncitizens arriving under the CHNV processes travel by air to an interior POE.[358] The Departments do not believe it necessary or appropriate to include noncitizens who use the CHNV processes as part of encounter calculations under this rule for that reason.

---

[351] Average daily encounters averaged 1,310 between FYs 2011 and 2018. In FY 2009, average daily encounters were approximately 1,200. *See* OHSS analysis of July 2024 Persist Dataset (Daily Encounters FY2000–2024 tab).

[352] Consistent with the September 27 Proclamation, this calculation includes encounters of UCs from non-contiguous countries. If, consistent with the June 3 Proclamation, one excludes such UCs from non-contiguous countries, the 7-consecutive-calendar-day average was below 1,500 nearly 85 percent of the time and above 2,500 only 4 percent of the time. *See* OHSS analysis of July 2024 Persist Dataset (Trigger Analysis tab).

[353] Consistent with the September 27 Proclamation, this calculation includes encounters of UCs from non-contiguous countries. If, consistent with the June 3 Proclamation, one excludes such UCs from non-contiguous countries, the resulting figure is just below 80 percent. *See* OHSS analysis of July 2024 Persist Dataset (Trigger Analysis tab).

[354] OHSS analysis of July 2024 Persist Dataset (Encounters FY 2000–2024 tab).

[355] OHSS analysis of data downloaded from UIP on September 3, 2024 (Section 2c Encounters Tab).

[356] *Id.*

[357] *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated Sept. 10, 2024) (SWB encounters by family status from FY 2014 through May 2024).

[358] *See, e.g.,* Implementation of a Parole Process for Nicaraguans, 88 FR 1255, 1256, 1263 (Jan. 9, 2023); USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last updated Aug. 29, 2024), *https://www.uscis.gov/CHNV.*

**81258** **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

c. Other Concerns About the Encounter Thresholds

*Comment:* A commenter wrote that it is reasonable to assume the threshold for suspending the rule will not be met in the foreseeable future, because even if the number of encounters dropped to the level where the 1,500-encounter threshold might be met, the Departments could issue a new IFR to keep the procedure in place. A commenter stated that the IFR provides no end dates and the Departments do not provide an explanation as to why the IFR should be in place indefinitely.

*Response:* The Departments disagree with the suggestion that they would perpetually take actions to lower the threshold for discontinuation solely to keep these emergency measures in place. If the Departments intended to permanently have these measures in place, they could have made the IFR apply indefinitely without using encounter thresholds. The two changes to the threshold made in this rule and the September 27 Proclamation are incremental in nature and consistent with the underlying purpose of the June 3 Proclamation. The Secretary will monitor encounter levels and make relevant determinations consistent with the September 27 Proclamation. Should further policy changes prove necessary—whether in response to comments submitted in response to this final rule's request or in another context—the Departments may take appropriate action to implement such changes. Additionally, the rule does not contain specific end dates because its measures are designed to be responsive to patterns in daily encounters. The IFR does not contain an overall expiration date because, due to the unpredictable nature of migration trends and for so long as Congress fails to increase the Departments' resources and modernize the current U.S. immigration system, such measures will be necessary when the Departments' operational capacity, as measured by daily encounter thresholds, is greatly overwhelmed.

*Comment:* A commenter stated that it would be challenging for noncitizens to know when thresholds have been met. The commenter stated that they had surveyed migrants in Mexico and over half of respondents in the first half of 2024 affirmed that they do not understand the requirements and processes for accessing U.S. territory, and that nearly half of respondents in certain areas confirmed that the main channel through which they receive information on policy changes is word of mouth, while around a third receive this information through social media.

The commenter said noncitizens would not be able to discern the application of the IFR without access to official information, particularly given that, according to the commenter, the United States Government does not currently publish statistics on encounters. The commenter wrote that even when some noncitizens might be aware of the dynamics of irregular movements, this awareness is likely to be limited to the specific region of the SWB where they are located and would very likely not cover the overall number of encounters.

The commenter stated that, given the swiftness with which the limitations established under the IFR can be invoked and applied, they are not likely to influence the ability of noncitizens in different parts of the transit route to adapt their decisions to increase their chances of receiving the protection that they need. The commenter stated that those who are already at or around Mexico's northern border when the rule's provision apply cannot meaningfully consider any potential alternative pathways. The commenter further stated that a significant proportion of people of concern present in Mexico could be ineligible for certain alternatives. For example, 97.9 percent of respondents to the commenter's protection monitoring activities during the first semester of 2024 reported having entered Mexico irregularly, which could render them ineligible for certain parole processes. The commenter stated that as a result, persons of concern are unlikely to become aware of when the additional limitations on asylum eligibility would apply with sufficient lead time to be able to adapt their decisions. This will thus undermine their ability to make decisions that increase their chances of receiving the protection that they need.

The commenter further stated that confusion around changing policies and practices governing access to U.S. territory has fueled the widespread belief that there are certain moments when the U.S. border is "open" and others when it is "closed," and that access to U.S. territory requires individuals to remain close to the border and attentive to any information suggesting that the border is "open." The commenter stated that the IFR has already contributed to this dynamic, with migrants along the U.S.-Mexico border expressing their understanding that the new limitations effectively "close off" access to U.S. territory. According to the commenter, this has led to desperation and fostered the likelihood that the population resorts to imprecise and misleading information provided by human traffickers or on social media.

*Response:* DHS posts statistics on SWB encounters on CBP's website.[359] The website includes data extracted from CBP systems and data sources regarding encounters with single adults, individuals in family units, and UCs. Information about the status of the suspension and limitation on entry, and the related provisions in this rule, is available in English and Spanish at: *https://www.dhs.gov/immigrationlaws.* In addition, regardless of whether the threshold for discontinuing or continuing or reactivating the suspension and limitation on entry under the Proclamation or the limitation on asylum eligibility under this rule has been met, migrants may, for instance, arrive in the United States at a SWB POE pursuant to a process the Secretary determines is appropriate to allow for the safe and orderly entry of noncitizens into the United States.

For similar reasons, the Departments do not believe that it is necessary to adjust the rule to ensure that the potentially "abrupt" nature of its provisions allows sufficient time for those already in Mexico to adjust their behavior in order to access protection. The IFR was not the first time that the Departments encouraged migrants to use lawful, safe, and orderly pathways to come to the United States. The Circumvention of Lawful Pathways rule also incentivized the use of such pathways, *see generally* 8 CFR 208.33, 1208.33, and since their inception, the CHNV parole processes have included an ineligibility for those who crossed into Mexico irregularly, *see, e.g.,* Implementation of a Parole Process for Nicaraguans, 88 FR at 1263; Implementation of a Parole Process for Venezuelans, 87 FR 63507, 63515 (Oct. 19, 2022). And the CBP One app remains available to noncitizens in Mexico.[360] The rule also provides an exception for those who are able to demonstrate exceptionally compelling circumstances, *see* 8 CFR 208.35(a)(2)(i)

[359] CBP, *Southwest Land Border Encounters* (last modified Sept. 16, 2024), *https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.*

[360] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.* On August 23, 2024, CBP expanded the areas from which noncitizens can request appointments through the CBP One app. With this expansion, Mexican nationals will be able to request an appointment from anywhere within Mexico. Additionally, non-Mexican nationals will be able to request and schedule appointments from the Southern Mexico states of Tabasco and Chiapas, in addition to their existing ability to request and schedule an appointment from Northern and Central Mexico—enabling them to make appointments without having to travel all the way north to do so. *See id.*

and (ii), 1208.35(a)(2)(i) and (ii), and the rule's limitation on asylum eligibility does not apply those who are excepted under the Proclamation, *see* 8 CFR 208.35(a)(1), 1208.35(a)(1). And the rule preserves access to statutory withholding of removal, as well as CAT protection. *See* 8 CFR 208.35(b)(2), 1208.35(b). Thus, migrants already in Mexico have the ability under the rule to access available protection.

The Departments acknowledge the potential that some migrants would perceive the possibility of abrupt changes in procedures at the southern border as a reason to remain close to the border and attentive to any information suggesting that the border is or soon will be "open." In the IFR, the Departments explained that "[t]he 14-day waiting period prior to a discontinuation provides time for the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in encounters is sustained." 89 FR at 48749 n.248. This rule makes an additional change that addresses this concern: The rule's provisions will not be discontinued unless there has been a 7 consecutive-calendar-day average of less than 1,500 encounters that is sustained over a period of 28 days. The Departments expect that this change, coupled with the 14-day waiting period after the Secretary makes a factual determination to discontinue the suspension and limitation on asylum eligibility, will reduce any perceived incentive to remain close to the U.S.-Mexico border in anticipation of a rapid change in policy.

*Comment:* A commenter wrote that while DHS has created a website that states whether the border is currently open or closed, it is unlikely that noncitizens in desperate conditions in Mexico would review the website before deciding to cross the border. Further, the commenter stated that, if the border were to reopen under the rule, it seems inevitable that smugglers would charge higher fees to move noncitizens across the border, and that if noncitizens understand the rule at all, they will flood the border when the suspension and limitation discontinues—leading again to its immediate closure. The commenter stated that the burden of tracking, identifying, and applying different standards over a matter of days is significantly more complex for USCIS personnel as they consider protection claims. The commenter expressed concern that the preamble to the IFR did not consider that this complexity would affect and complicate merits adjudications and lead to longer, more

complex hearings in an already overwhelmed, backlogged system.

*Response:* As noted in Section II.A.2 of this preamble, encounters between POEs have dropped substantially since implementation of the IFR, suggesting that many migrants have not responded as the commenter predicted. But in any event, if a migrant were to disregard the existence of the rule and other restrictions on crossing between POEs, or if a migrant who is unaware of the existence of the rule were to cross between the POEs, the rule would allow the Departments to swiftly deliver decisions and consequences, while allowing noncitizens who are able to demonstrate the existence of exceptionally compelling circumstances to avoid application of the rule's limitation on asylum eligibility and preserving access to statutory withholding of removal and CAT protection, as discussed in the preceding response.

With respect to the commenter's suggestion that noncitizens could respond to the discontinuation of the rule's provisions by "flood[ing] the border" and "leading again to its immediate closure," to the extent there is a prospect of such actions, this highlights the need for this rule, the overall effect of which will be to combat such actions by alleviating stresses on the border security and immigration systems at the southern border; it is not a reason to withdraw the rule. Moreover, the historical encounter data discussed in Section II.C of this preamble suggest that when regional migration decreases, encounter numbers often remain below 2,500 for very long periods. Those data militate against the commenter's view that encounters will inevitably rise quickly above 2,500.

Further, as discussed in Section II.C of this preamble, the September 27 Proclamation and this rule revise the timeline for the 1,500-encounter threshold to reduce the probability that an ephemeral drop in encounters would result in rapid shifts in applicable policy. With respect to the commenter's concern about complexity for Government personnel, the use of a 7-consecutive-calendar-day average, combined with the new requirement for the average to be below 1,500 encounters for each of 28 consecutive calendar days, also reduces the prospect of undue complexity. Although some section 240 removal proceedings and credible fear interviews may become more complex by virtue of this rule's provisions, many such proceedings may be avoided entirely. *See, e.g.,* 89 FR at 48767 ("[T]he Departments expect the additional time spent by AOs and IJs on

implementation of the rule to be mitigated by a comparatively smaller number of credible fear cases than AOs and IJs would otherwise have been required to handle in the absence of the rule.").

### 2. Other Comments on Issues Relating to the Rule

*Comment:* Commenters asked how USCIS' implementation of the IFR would be funded, remarking that the funds to execute the IFR as written have not been allocated.

*Response:* USCIS applies the IFR's provisions as part of the credible fear determination or the full asylum adjudication. It is not a discrete or separate adjudication that would require its own funding stream separate from that which is used for credible fear determinations or asylum adjudications.

*Comment:* Commenters expressed concern about their ability to comment on the proposals in DHS's recent Mandatory Bars NPRM, the comment period for which ended four days after the IFR published. For example, a commenter noted that, in the IFR, the Departments expressly asked for comment on the interaction between the two rules, including whether to explicitly apply the heightened "reasonable probability" standard to those who are subject to a mandatory bar but not subject to the Circumvention of Lawful Pathways rule, but the commenter asserted that they could not provide comment on those issues without knowing how and whether DHS plans to finalize the DHS Mandatory Bars NPRM. Commenters also stated that DHS failed to analyze the interaction between the two rulemakings, which they stated will create additional hurdles for noncitizens seeking asylum and will lead to inconsistencies and potential challenges in processing. Commenters expressed the need for a comprehensive examination of how the policies overlap to avoid uncertainty.

*Response:* The Departments disagree that commenters did not have adequate opportunity to comment on the potential interaction between the DHS Mandatory Bars NPRM and the IFR. Indeed, as the commenters note, the Departments requested comment in the IFR on whether to expand 8 CFR 208.35(b)(3) (directing asylum officers to apply a reasonable probability screening standard in protection screenings in the event that 8 CFR 208.35(a) is held to be invalid or unenforceable) to cover "those who are found not to have a significant possibility of eligibility for asylum because they are barred from asylum due to a mandatory bar to

asylum eligibility if the [DHS Mandatory Bars NPRM] is finalized.'' 89 FR at 48756. The DHS Mandatory Bars NPRM provides ample notice of the proposed mandatory bars policy, and the commenters do not explain with any specificity why they must review any final rule associated with the DHS Mandatory Bars NPRM in order to provide relevant comments about its potential impact on the IFR.

Moreover, the Departments have considered the interaction between the two rulemakings and do not believe any corresponding changes to this rule are necessary. While both rules address DHS screening procedures, the DHS Mandatory Bars NPRM relates to a different issue than the issues raised in this rulemaking. The DHS Mandatory Bars NPRM proposes to allow AOs to consider the applicability of certain statutory bars to asylum, statutory withholding of removal, and withholding of removal under the CAT regulations during credible fear screenings, but it does not propose changes to the substantive screening standards by which AOs make their credible fear determinations. *See generally* 89 FR at 41347–61. On the other hand, the IFR established a new ''reasonable probability'' standard for the statutory withholding and CAT screening of noncitizens determined to be subject to the IFR's limitation on asylum eligibility. 8 CFR 208.35(b)(2)(i), 1208.35(b)(2)(iii). Except for this changed screening standard, the AO and IJ would otherwise follow the pre-existing standards at 8 CFR 208.30, 208.33, 1208.30, or 1208.33, as applicable. *Id.* Accordingly, as stated in the IFR, if DHS finalizes the DHS Mandatory Bars NPRM as drafted, the ''reasonable probability'' standard would still apply to determinations involving a noncitizen who is subject to this rule's limitation on asylum eligibility. 89 FR at 48739 n.186.

*Comment:* A commenter added that the Departments failed to explain how the IFR will interact with the Circumvention of Lawful Pathways rule.

*Response:* In the IFR, the Departments explained how the IFR will interact with another recent rule, the Circumvention of Lawful Pathways rule. 89 FR at 48754. The Departments explained that they were adding to 8 CFR 208.13 and 1208.13 a paragraph (g), entitled ''Entry during emergency border circumstances,'' which ''explain[s] when a noncitizen is potentially subject to th[e] IFR's limitation on asylum eligibility and credible fear screening procedures and how this limitation and its associated procedures interact with the Lawful

Pathways condition referenced in paragraph (f) of 8 CFR 208.13 and 1208.13.'' *Id.* These new paragraphs added to 8 CFR 208.13 and 1208.13 provide that, ''[f]or an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, Securing the Border) between the dates described in section 1 of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 208.35.'' 8 CFR 208.13(g), 1208.13(g).

In short, during emergency border circumstances, those who enter across the southern border are subject to this rule, ''[n]otwithstanding'' the Circumvention of Lawful Pathways rule or any other regulatory provision. *See* 8 CFR 208.35, 1208.35. A noncitizen who establishes exceptionally compelling circumstances under this rule has established exceptionally compelling circumstances under the Circumvention of Lawful Pathways rule. *See* 8 CFR 208.35(a)(2)(iii), 1208.35(a)(2)(iii). And the credible fear process under this rule uses the same framework as the Circumvention of Lawful Pathways rule, except for the use of a ''reasonable probability'' screening standard. *See* 8 CFR 208.35(b)(1)(ii), (b)(2)(i), (c), 1208.35(b)(2)(i), (b)(2)(iii), (c). The Departments described the provisions of the regulatory text in detail in the IFR's preamble. 89 FR at 48754–48759; *id.* at 48762–66.

*Comment:* A commenter asserted that recent rulemakings have complicated the asylum system and that the Departments have not provided reliable information about those changes to affected noncitizens.

*Response:* The Departments acknowledge that recent rulemakings have modified the credible fear screening process to better enable the Departments to deliver timely decisions and consequences to noncitizens entering across the southern border who do not have a basis to remain in the United States. Specifically, in the past two and a half years, the Departments have issued the Asylum Processing IFR, the Circumvention of Lawful Pathways rule, and the IFR discussed here. DHS has also issued a proposed rule—the DHS Mandatory Bars NPRM. Each rule has been accompanied by detailed preamble discussion and regulatory text. In addition to the public-facing

materials, although not required to by law, the Departments have executed robust communications plans to notify and inform the public about the consequences of irregular migration while noting the expansion of lawful pathways and the tools that can be used to access those lawful pathways.[361] The public engagement plans have both domestic and international dimensions.[362] Domestically, these plans have included engagement with NGOs, international organizations, legal services organizations, and others.[363] Internationally, the Departments have also executed communications campaigns throughout the Western Hemisphere in coordination with interagency partners and partner governments to educate migrants and would-be migrants about lawful pathways and consequences for not using them.[364] This includes media engagements with in-country reporters, graphics and explainer videos, and press releases highlighting removal flights as a direct consequence of

---

[361] *See* U.S. Department of State, *U.S. Government Response to Migration in the Americas* (Nov. 17, 2023), *https://www.state.gov/briefings-foreign-press-centers/us-government-response-to-migration-in-the-americas;* USCG, Press Release: *Task Force continues to prevent irregular, unlawful maritime migration to United States* (April 12, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3739500/task-force-continues-to-prevent-irregular-unlawful-maritime-migration-to-united/.*

[362] *See* U.S. Department of State, *U.S. Government Response to Migration in the Americas* (Nov. 17, 2023), *https://www.state.gov/briefings-foreign-press-centers/us-government-response-to-migration-in-the-americas;* USCG, Press Release: *Task Force continues to prevent irregular, unlawful maritime migration to United States* (Apr. 12, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3739500/task-force-continues-to-prevent-irregular-unlawful-maritime-migration-to-united/;* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), *https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.*

[363] *See* U.S. Department of State, *Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas Opening Remarks at the Ministerial Conference on Migration and Protection Reception* (Apr. 19, 2022), *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-opening-remarks-at-the-ministerial-conference-on-migration-and-protection-reception/.*

[364] *See* U.S. Department of State, *U.S. Government Response to Migration in the Americas* (Nov. 17, 2023), *https://www.state.gov/briefings-foreign-press-centers/us-government-response-to-migration-in-the-americas; see also* USCG, Press Release: *Task Force continues to prevent irregular, unlawful maritime migration to United States* (April 12, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3739500/task-force-continues-to-prevent-irregular-unlawful-maritime-migration-to-united/.*

coming to the United States irregularly.[365]

The Departments understand concerns about changes to southern border processing. However, as discussed throughout the June 3 Proclamation, the IFR, and this rule, the circumstances at the southern border have changed, and U.S. policy has had to change with them to ensure the effective functioning of the immigration and border management systems. The Departments have consistently encouraged noncitizens seeking to enter the United States to pursue lawful, safe, and orderly pathways to do so, and they continue to provide that encouragement now.

*Comment:* One commenter expressed concern that the Departments failed to analyze how the IFR interacts with the DHS Policy and Guidelines for the Use of Classified Information in Immigration Proceedings (May 9, 2024).[366]

*Response:* The Departments acknowledge that the IFR did not discuss DHS guidelines governing the use of classified or confidential information, but the IFR does not contain any provisions calling for or governing the use of classified information. Regardless, the rule and DHS's policy on the use of classified information in immigration proceedings are harmonious. The INA permits the use of classified information in certain immigration proceedings, and noncitizens have no right to examine classified national security information that DHS may consider or proffer in opposition to the noncitizen's admission to the United States or application for relief from removal. INA 235(c), 8 U.S.C. 1225(c); INA 240(b)(4)(B), 8 U.S.C. 1229a(b)(4)(B); 8 CFR 235.8(b)(3), 1240.33(c)(4). That was the case before DHS issued its updated policy and guidance on the use of classified information in immigration proceedings on May 9, 2024. The updated guidance does not alter those fundamental principles or the type of information that may be used in the immigration proceedings governed by

the IFR,[367] and so there was no need for the Departments to address the interaction between the IFR and the new classified information policy.

*E. Statutory and Regulatory Requirements*

1. Administrative Procedure Act

*Comment:* Commenters expressed concerns with the Departments' decision to issue an IFR instead of an NPRM, and the Departments' invocation of the "foreign affairs" and "good cause" exceptions. Commenters stated that the Departments have not proved that either exception applies and, therefore, argued the IFR did not comply with the APA.

*Response:* Under the APA, agencies must generally provide "notice of proposed rule making" in the **Federal Register** and, after such notice, "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. 553(b) and (c). The APA further provides that the required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except in certain circumstances. *Id.* 553(d). However, consistent with the APA, the Departments did not employ these procedures before issuing the IFR because (1) the IFR involved a foreign affairs function of the United States and thus is excepted from such requirements, *id.* 553(a)(1), and (2) the Departments found good cause to proceed with an immediately effective interim final rule, *id.* 553(b)(B), 553(d)(3). *See also* 89 FR at 48759–66 (explaining use of these APA exceptions). Because the Departments have now issued this final rule after soliciting comments, those concerns are moot—but regardless, the Departments address commenters' concerns below.

a. Foreign Affairs Exception

*Comment:* A commenter suggested that the Departments' invocation of the foreign affairs exception is inappropriate because this exception has been "selective[ly] appli[ed]," pointing to other rules concerning processing of noncitizens at the border (the Circumvention of Lawful Pathways rule and the DHS Mandatory Bars NPRM) for which the Departments did not invoke this exception. Another commenter remarked that the foreign affairs exception cannot apply because the IFR is a "unilateral action" by the United States, seemingly without any formal agreements with Mexico or other affected countries, and the rule's effects might exacerbate undesirable international consequences. A third commenter stated that the foreign affairs exception does not apply to rulemakings concerning the U.S. border, stating that these are matters of domestic policy. Similarly, another commenter noted that Federal courts have previously informed agencies that these exceptions to the APA's notice-and-comment requirement "do not apply to regulations that alter domestic law around asylum eligibility." A fifth commenter expressing opposition to the Departments' invocation of the foreign affairs exception remarked that the exception's interpretation is "overly broad."

*Response:* The IFR is excepted from the APA's notice-and-comment and delayed-effective-date requirements because it involves a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1). Courts have held that this exception applies when the rule in question is "clearly and directly involve[d]" in "a foreign affairs function." *E.B.* v. *U.S. Dep't of State,* 583 F. Supp. 3d 58, 63 (D.D.C. 2022) (cleaned up). In addition, although the text of the APA does not require an agency invoking this exception to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing. *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008) (quotation marks omitted). This rule satisfies both standards. Nevertheless, the Departments provided an opportunity for public comment after issuing the IFR and in this final rule are responding to those comments.

With respect to comments asserting this rule represents "unilateral action" by the United States, the United States' border management strategy, as further developed in this rule, is predicated on the belief that migration is a shared responsibility among all countries in the

---

[365] *See* Ecuador Envivo, *La tragedia detrás de la migración irregular, una desgarradora realidad (The tragedy behind irregular migration, a heartbreaking reality)* (July 31, 2024), *https://ecuadorenvivo.com/blog/2024/07/31/la-tragedia-humana-detras-de-la-migracion-expertos-analizan-crisis-de-migracion-irregular/; see also* ICE, *ICE conducts single adult, family unit removal flights Aug. 9* (Aug. 9, 2024), *https://www.ice.gov/news/releases/ice-conducts-single-adult-family-unit-removal-flights-aug-9-0.*

[366] DHS, *DHS Policy and Guidelines for the Use of Classified Information in Immigration Proceedings* (May 9, 2024), *https://www.dhs.gov/publication/dhs-policy-and-guidelines-use-classified-information-immigration-proceedings.*

[367] The previous policy and guidelines permitted the use of classified national security information in an individual's immigration proceedings only as a matter of last resort. *See* DHS, *DHS Guidelines for the Use of Classified Information in Immigration Proceedings* (Oct. 4, 2004), *https://www.dhs.gov/publication/dhs-policy-and-guidelines-use-classified-information-immigration-proceedings-october.* The new policy and guidelines now permit the use of classified national security information as the Department deems necessary to protect our national security and public safety interests, subject to procedures outlined in the new guidance. *See* DHS, *DHS Policy and Guidelines for the Use of Classified Information in Immigration Proceedings* (May 9, 2024), *https://www.dhs.gov/publication/dhs-policy-and-guidelines-use-classified-information-immigration-proceedings.* Neither the new or old policies and guidelines provide the individual who is subject to the immigration proceedings any entitlement to review classified national security information. Such classified information would be reviewed either *ex parte* or *in camera.*

**81262**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

region—a fact reflected in the intensive and concerted diplomatic outreach on migration issues that DHS and the Department of State have made with partners throughout the Western Hemisphere.[368] This strategy takes particular inspiration from the Los Angeles Declaration on Migration and Protection ("L.A. Declaration"), which was joined by world leaders during the Summit of the Americas on June 10, 2022, and has been endorsed by 22 countries.[369]

Under the umbrella of this framework, the United States has been working closely with its foreign partners to manage the unprecedented levels of migration that countries throughout the region have recently been experiencing. This work includes efforts to expand access to and increase the number of lawful, safe, and orderly pathways, such as the Safe Mobility Initiative;[370] conduct joint enforcement efforts, such as the Darién Campaign with Colombia and Panama and the mirrored patrols with the Government of Mexico along our shared border; and share information, technical assistance, and best practices. *See* 89 FR at 48759–60 & nn.300–02. These also include the commitment by the United States and Mexico to strengthen their joint humanitarian plan on migration. *See id.* at 48760 & n.310. The United States and endorsing countries continue to progress and expand upon our shared commitments made under this framework.

Given the particular challenges facing the United States and its regional partners at this moment, the Departments appropriately assessed that it was critical that the United States continue to lead the way in responding to ever-changing and increasing migratory flows, and that the IFR and the Proclamation—and the strong consequences they were intended to impose at the border—would send an important message to the region that the

United States is prepared to put in place appropriate measures to prepare for and, if necessary, respond to ongoing migratory challenges.[371] *See* 89 FR at 48761.

In response to the comments that the Departments' invocation of the foreign affairs exception is overly broad and that because the IFR impacts asylum and issues at the southern border of the United States, it implicates only domestic policy and law and thus does not qualify for the foreign affairs exception, the Departments point out that the IFR stems from international cooperation and directly addresses international challenges. As one commenter noted, at least one court has determined that a rule imposing a limitation on asylum eligibility is not subject to the foreign affairs exception when that rule has only an indirect impact on foreign affairs. *See Capital Area Immigrants' Rights Coalition* v. *Trump,* 471 F. Supp. 3d 25, 56 (D.D.C. 2020). But recently Mexico and the United States have worked together on a joint humanitarian plan on migration intended "to address the humanitarian situation caused by unprecedented migration flows at our shared border and in the region." [372] In a joint statement following a meeting between President Biden and President López-Obrador on April 28, 2024, the presidents "ordered their national security teams to work together to immediately implement concrete measures to significantly reduce

irregular border crossings while protecting human rights." [373] The IFR and this rule further this international mission by limiting heightened levels of migration. This contrasts with the "indirect international effects," including potential "downstream effects in other countries or on international negotiations," that the court discussed in *Capital Area Immigrants' Rights Coalition. Capital Area Immigrants' Rights Coalition,* 471 F. Supp. 3d at 55. Given the IFR's direct and clear involvement in foreign affairs, the foreign affairs exception applies.

In addition to the IFR's clear and direct involvement in foreign affairs, the Departments believed that conducting a notice-and-comment process and providing a delayed effective date likely would have led to a surge to the southern border before the Departments could finalize the rule, as occurred in anticipation of the end of the Title 42 public health Order.[374] Regional partner countries have repeatedly emphasized the ways in which U.S. policy announcements have a direct and immediate impact on migratory flows through their countries. *See* 88 FR at 31444. For example, one foreign partner opined that the formation of caravans in the spring of 2022 were spurred by rumors of the United States Government terminating the Title 42 public health Order and then the officially announced plans to do so. *Id.* Such effects are precisely the kind of "definitely undesirable international consequences" that the Departments seek to avoid. The Departments appropriately concluded that the emergency measures taken in the IFR would help address this regional challenge, rather than exacerbate it as one commenter suggested, and that any decrease in migration that results would help relieve the strain not just on the U.S.-Mexico border, but also on

---

[368] *See* The White House, *Joint Statement by the President of the United States Joe Biden and the President of Mexico Andrés Manuel López Obrador* (Apr. 29, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/29/joint-statement-by-the-president-of-the-united-states-joe-biden-and-the-president-of-mexico-andres-manuel-lopez-obrador; see also* Kathia Martínez, *US, Panama, and Colombia aim to stop Darien Gap migration,* AP News (Apr. 11, 2023), *https://apnews.com/article/darien-gap-panama-colombia-us-migrants-cf0cd1e9de2119208c9af186e53e09b7.*

[369] *See* Los Angeles Declaration on Migration and Protection, *Endorsing Countries, https://losangelesdeclaration.com/endorsing-countries* (last visited Aug. 2, 2024).

[370] *See* U.S. Dep't of State, *Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas, https://www.state.gov/safe-mobility-initiative/* (last visited Sept. 21, 2024).

[371] *See* Muzaffar Chishti et al., *At the Breaking Point: Rethinking the U.S. Immigration Court System,* Migration Pol'y Inst., at 11 (2023), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-courts-report-2023_final.pdf* ("In the case of noncitizens crossing or arriving at the U.S.-Mexico border without authorization to enter, years-long delays create incentives to file frivolous asylum claims that further perpetuate delays for those eligible for protection, undermining the integrity of the asylum system and border enforcement."); Doris Meissner, Faye Hipsman, & T. Alexander Aleinikoff, *The U.S. Asylum System in Crisis: Charting a Way Forward,* Migration Pol'y Inst., at 9 (2018), *https://www.migrationpolicy.org/sites/default/files/publications/MPI-AsylumSystemInCrisis-Final.pdf* ("Incentives to misuse the asylum system may also be reemerging. For example, over the past five years, the number of employment authorization documents (EADs) approved for individuals with pending asylum cases that have passed the 180-day mark increased from 55,000 in FY 2012 to 270,000 in FY 2016, and further to 278,000 in just the first six months of FY 2017. This high and growing level of EAD grants may suggest that, as processing times have grown, so too have incentives to file claims as a means of obtaining work authorization and protection from deportation, without a sound underlying claim to humanitarian protection.").

[372] The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[373] The White House, *Joint Statement by the President of the United States Joe Biden and the President of Mexico Andrés Manuel López Obrador* (Apr. 29, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/29/joint-statement-by-the-president-of-the-united-states-joe-biden-and-the-president-of-mexico-andres-manuel-lopez-obrador.*

[374] *See* 89 FR at 48761–62. Note that the encounter projections included in the IFR excluded encounters of people who had registered with the CBP One app along with administrative encounters at POEs, but included non-CBP One enforcement encounters at POEs, which at the time averaged about 190 per day since May 2023, based on OHSS analysis of March 2024 OHSS Persist Dataset; *see also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day;* Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden,* No. 4:18–cv–06810–JST (N.D. Cal. June 16, 2023) (Dkt. 176–2).

countries throughout the hemisphere.[375] The actions the United States took in the IFR thus affected conditions beyond the southern border and demonstrated a commitment to addressing irregular migration in the region, even as foreign partners have been taking actions themselves that are aligned with a shared interest in reducing migration.[376] Thus, regardless of whether the foreign affairs exception has been invoked for other rulemakings involving border issues, that exception is applicable here. *See* 5 U.S.C. 553(a)(1). The Departments note, however, that the Circumvention of Lawful Pathways rule did invoke the foreign affairs exception to the APA's delayed-effective-date requirement on similar grounds to the IFR. *See* 88 FR at 31444–45.

b. Good Cause Exception

*Comment:* Commenters stated that the good cause exception did not apply to the IFR because the Departments' claim that proceeding via NPRM would yield a surge in border encounters was misguided, not supported by evidence, and an insufficient reason to invoke the good cause exception. Similarly, commenters stated that the IFR acknowledged that border encounters were lower in 2024 than the year prior, belying the claim of a border emergency. Commenters expressed concern that there is no indication of a new emergency sufficient for the Departments to immediately change their rules without allowing the public an opportunity to engage with or be warned about the coming changes. Commenters further claimed that evidence shows that migration rates rise independently of U.S. efforts to enact consequences, that any change in policy leads to a short-term decrease in encounters and, thus, that the IFR should not have been excepted from the APA. Commenters noted that the increase in encounters in December 2023 was not tied to any policy change. Commenters also criticized the Departments' discounting of the lack of a surge after the Circumvention of Lawful Pathways NPRM, stating that although at that time the Title 42 public health Order remained in effect, "it is disingenuous to compare the current IFR with the lifting of Title 42, which,

as the agencies report, led to increased border entries." Commenters expressed opposition to the Departments' invocation of the good cause exception, remarking that the assumption that "not seeking safety in the United States protects the welfare of people who otherwise would undertake that dangerous journey is unsubstantiated and false."

Commenters compared the IFR to the Circumvention of Lawful Pathways NPRM, which according to the commenters did not invoke the good cause exception. Commenters wrote that the good cause exception should not have applied to the IFR because providing notice would have been both "practicable and in the public interest." Commenters stated that the Departments' good cause exception claim of an emergency is based on "long standing structural challenges," such as backlogged immigration case processing and limited resources.

*Response:* The Departments' decision to invoke the good cause exceptions to the APA's notice-and-comment and delayed-effective-date procedures at 5 U.S.C. 553(b)(B) and (d)(3) was reasonable and appropriate. Notwithstanding that the Departments had ample basis to forgo advance notice and comment, the Departments nevertheless provided an opportunity for public comment and in this final rule are responding to these comments.

An agency may forgo notice and comment when it is "impracticable, unnecessary, or contrary to the public interest." *Id.* 553(b)(B). Here, the notice-and-comment procedures were impracticable and contrary to the public interest because the delays associated with such procedures would have unduly postponed implementation of a policy that was urgently needed to avert significant public harm. While courts have "narrowly construed" this exception, it can "excuse[ ] notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." *Am. Pub. Gas Ass'n* v. *U.S. DOE,* 72 F.4th 1324, 1339–40 (D.C. Cir. 2023) (internal citations omitted). An advance announcement of the IFR would have seriously undermined a key goal of the policy in disincentivizing substantial levels of irregular migration, *see, e.g.,* 89 FR at 48754, and instead would have incentivized noncitizens to irregularly enter the United States before the IFR took effect.

First, the "impracticable" prong of the good cause exception "excuses notice

and comment in emergency situations . . . or where delay could result in serious harm." [377] Findings of impracticability are "inevitably fact- or context-dependent," [378] and when reviewing such findings, courts generally consider, among other factors, the harms that might have resulted while the agency completed standard rulemaking procedures [379] and the agency's diligence in addressing the problem it seeks to address.[380]

The critical need to immediately implement more effective border management measures is described at length in the June 3 Proclamation, the IFR, and Section II.A of this preamble. Despite the strengthened consequences in place at the SWB and adjacent coastal borders, including the Circumvention of Lawful Pathways rule and other measures (which led to the highest numbers of returns and removals in more than a decade, 89 FR at 48713), when the IFR was published, the U.S. Government continued to contend with exceptionally high levels of irregular migration along the southern border, including record-high total USBP encounter levels on the SWB as recently as December 2023.[381] While encounter

---

[375] *See* 88 FR at 11713 (noting that in the 60 days immediately following DHS's resumption of routine repatriation flights to Guatemala and Honduras in 2021, average daily encounters fell by 38 percent for Guatemala and 42 percent for Honduras).

[376] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[377] *Jifry* v. *FAA,* 370 F.3d 1174, 1179 (D.C. Cir. 2004); *see, e.g., id.* (upholding a claim of good cause to address "a possible imminent hazard to aircraft, persons, and property within the United States" (quotation marks omitted)); *Haw. Helicopter Operators Ass'n* v. *FAA,* 51 F.3d 212, 214 (9th Cir. 1995) (upholding a claim of good cause to address 20 air tour accidents over a four-year period, including recent incidents indicating that voluntary measures were insufficient to address the threat to public safety).

[378] *Mid-Tex Elec. Co-op, Inc.* v. *FERC,* 822 F.2d 1123, 1132 (D.C. Cir. 1987); *see Petry* v. *Block,* 737 F.2d 1193, 1203 (D.C. Cir. 1984) (when evaluating agency "good cause" arguments, "it is clear beyond cavil that we are duty bound to analyze the entire set of circumstances"). Courts have explained that notice-and-comment rulemaking may be impracticable, for instance, where air travel security agencies would be unable to address threats, *Jifry,* 370 F.3d at 1179, if "a safety investigation shows that a new safety rule must be put in place immediately," *Util. Solid Waste Activities Grp.* v. *EPA,* 236 F.3d 749, 754 (D.C. Cir. 2001) (ultimately finding that not to be the case and rejecting the agency's argument), or if a rule was of "life-saving importance" to mine workers in the event of a mine explosion, *Council of S. Mountains, Inc.* v. *Donovan,* 653 F.2d 573, 581 (D.C. Cir. 1981).

[379] *See Util. Solid Waste Activities Grp.,* 236 F.3d at 754–55 (explaining that "a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required in § 553, as when a safety investigation shows that a new safety rule must be put in place immediately" (cleaned up)).

[380] *See, e.g., Tri-Cty. Tel. Ass'n, Inc.* v. *FCC,* 999 F.3d 714, 720 (D.C. Cir. 2021) ("[T]his is not a case of unjustified agency delay. The Commission *did* act earlier, . . . [and t]he agency needed to act again . . . .").

[381] There were approximately 250,000 USBP encounters along the SWB in December 2023, higher than any previous month on record, *see*

Continued

levels in calendar year 2024 prior to issuance of the IFR had decreased from these record numbers, there was still a substantial and elevated level of migration. Historically high percentages of migrants were claiming fear. 89 FR at 48713.

DHS was forced to place many of these individuals into the backlogged immigration court system, a process that can take several years to result in a decision or consequence.[382] Even then, it can take a substantial period to effectuate the removal of these individuals.[383] This difficulty in predictably delivering timely decisions

and consequences further compounded incentives for migrants to make the dangerous journey to the SWB, regardless of any individual noncitizen's ultimate likelihood of success on an asylum or protection application. 89 FR at 48714. The emergency border circumstances were not, however, due solely to longstanding structural challenges such as case backlogs in immigration court and the lack of government resources, as one commenter suggested; rather, the heightened level of encounters at the southern border occurred despite recent increases in the number of immigration court judges, immigration court cases completed, individuals processed through expedited removal, and expanded opportunities to use lawful, safe, and orderly processes. *Id.* at 48712–13. The Departments reasonably determined that the heightened levels of migration and forced displacement that resulted in the President's determination to apply the suspension and limitation on entry and the Departments' determination to adopt the IFR would further strain resources, risk overcrowding in USBP stations and border POEs in ways that pose significant health and safety concerns, and create a situation in which large numbers of migrants—only a small proportion of whom are likely to be granted asylum or other protection— would be encouraged to put their lives in the hands of dangerous organizations to make the hazardous journey north based on a perceived lack of immediate consequences. *See id.* at 48763. The Departments acted immediately to safeguard their ability to enforce our Nation's immigration laws in a timely way and at the scale necessary with respect to those who seek to enter without complying with our laws. *See id.*

Second, under the "contrary to the public interest" prong of the good cause exception, it has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, when significant public harm would result from the notice-and-comment process.[384] If, for

example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[385] A number of cases follow this logic in the context of economic regulation.[386]

With respect to comments stating that migration rates can rise independently of policy changes, commenters are correct that there are increases in migration rates that do not appear to be a result of changes in U.S. policies, such as the increase in encounters in December 2023. But that does not diminish the impact of even short-term surges after announcements of policy changes, which the Departments have experienced time and again, as detailed in the IFR. *See* 89 FR at 48764–66.

The Departments reasonably assessed that announcing this rule in advance would have likely yielded a surge. As explained in the IFR, the Departments were responding to emergency border circumstances, and advance announcement of the response—a significant change in border policy that increased the Departments' ability to swiftly process and remove, as appropriate, more noncitizens who enter the United States irregularly— would have significantly incentivized migrants to engage in actions likely to compound those very challenges.[387]

---

OHSS analysis of July 2024 Persist Dataset (Encounters FY 2000–2024 tab).

[382] EOIR decisions completed in July 2024 were, on average, initiated in February 2022, during the significant operational disruptions caused by the COVID–19 pandemic (with encounters several months earlier than that), but 60 percent of EOIR cases initiated in February 2022 were still pending as of July 2024, so the final mean processing time (once all such cases are complete) will be longer. OHSS analysis of EOIR data as of July 2024 (Mean EOIR Filed Dates tab); EOIR, *EOIR Strategic Plan 2024, Current Operating Environment, https:// www.justice.gov/eoir/strategic-plan/strategic- context/current-operating-enviroment* (last visited Aug. 2, 2024) ("EOIR [] suffered operational setbacks during the COVID–19 pandemic years of FY 2020 through FY 2022, including declining case completions due to health closures and scheduling complications and delays in agency efforts to transition to electronic records and the efficiencies they represent. While the challenges of the pandemic were overcome by adaptive measures taken during those years, the pandemic's impact on the pending caseload is still being felt."). While EOIR does not report statistics on pending median completion times for removal proceedings in general, it does report median completion times for certain types of cases, such as detained cases and cases involving UCs. *See, e.g.,* EOIR, *Median Unaccompanied Noncitizen Child (UAC) Case Completion and Case Pending Time* (July 19, 2024), *https://www.justice.gov/eoir/media/1344951/ dl?inline* (median completion time of 1,241 days); EOIR, *Median Completion Times for Detained Cases* (July 19, 2024), *https://www.justice.gov/eoir/media/ 1344866/dl?inline* (median completion time of 46 days in the third quarter of 2024 for removal, deportation, exclusion, asylum-only, and withholding-only cases); EOIR, *Percentage of DHS- Detained Cases Completed within Six Months* (July 19, 2024), *https://www.justice.gov/eoir/media/ 1344886/dl?inline* (reporting seven percent of detained cases not completed within six months); *see also* 89 FR at 48749–54 (discussing the limits in the Departments' ability to quickly repatriate noncitizens when encounters are elevated, which results in the release of many of these noncitizens into the United States); Section III.D.1 of this preamble (describing how the rule's thresholds target emergency border circumstances exceeding the Departments' capacity to effectively process, detain, and remove, as appropriate, the noncitizens encountered).

[383] Miriam Jordan, *One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay,* N.Y. Times (Jan. 31, 2024), *https:// www.nytimes.com/2024/01/31/us/us-immigration- asylum-border.html* ("Most asylum claims are ultimately rejected. But even when that happens, years down the road, applicants are highly unlikely to be [removed]. . . ."); OHSS analysis of July 2024 Persist Dataset (Removal Orders tab); *see also* 88 FR at 31326, 31381.

[384] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 95 (D.C. Cir. 2012) (noting that the "contrary to the public interest" prong of the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent . . . [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1974) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was

'impracticable, unnecessary, or contrary to the public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and contract 'actual transactions'—or avoid them—before the freeze deadline.").

[385] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase." (quotation marks omitted)).

[386] *See, e.g., Chamber of Com. of U.S.* v. *S.E.C.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ['good cause'] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . , this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.").

[387] *See* Decl. of Robert E. Perez ¶¶ 4–15, *Innovation Law Lab,* No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–2) (noting that on February 28, 2020, the Ninth Circuit lifted a stay of a nationwide injunction of the Migrant Protection Protocols, a program implementing the Secretary's contiguous return authority under section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C), and almost immediately, hundreds of migrants began massing at POEs across the southern border and attempting

These incentives are exacerbated by smugglers, who routinely emphasize the significance of recent or upcoming policy developments, among other tactics, and do so particularly when there is a change announced in U.S. policy.[388] For the same reasons, "the [need] for immediate implementation" outweighed the "principles" underlying the requirement for a 30-day delay in the effective date, justifying the Departments' finding of good cause to forgo it.[389] The stark drop in encounters following implementation of the Proclamation and IFR, as discussed in Section II.A.2 of this preamble, is strong evidence that announcements of such changes in policy can have significant effects on migration patterns; by making the IFR immediately effective, the Departments avoided triggering a surge in migration that might otherwise have occurred during a notice-and-comment period or pending a delayed effective date.

The increase in SWB encounters preceding the end of the Title 42 public health Order and the increase in border encounters that occurred in December 2023 were far-reaching across multiple sectors of the SWB and significantly greater than what DHS resources and operations are designed to handle. Increasing encounters raised detention capacity concerns anew, and, at that point, DHS faced an urgent situation, including a significant risk of overcrowding in its facilities.[390] Given the nature of its facilities, increased numbers and custody duration increase the likelihood that USBP facilities will become quickly overcrowded.[391] In response to the comment noting skepticism over the Departments' assumption that deterring irregular migration will protect migrants' welfare, the Departments disagree: crowding, particularly given how USBP facilities are necessarily designed, increases the potential risk of health and safety concerns for noncitizens and Government personnel.[392] The Departments thus assessed that there

would be a significant risk of such an urgent situation occurring if they undertook notice-and-comment procedures for the IFR or delayed its effective date.

The Departments' determination in the IFR was also consistent with the United States' past practice. For example, and in response to the comment that the Departments did not invoke the good cause exception in promulgating the Circumvention of Lawful Pathways rule, the Departments provided notice and an opportunity to comment on that rule while the Title 42 public health Order remained in effect[393] but invoked the good cause exception (as well as the foreign affairs exception) to bypass a delayed effective date that would have resulted in a gap between the end of the Title 42 public health Order and the implementation of the rule. See 88 FR at 31445–47. Contrary to the comment asserting that it was disingenuous for the Departments to compare the potential surge of migrants between the end of Title 42 and the effective date of the Circumvention of Lawful Pathways rule with the potential surge associated with the delayed implementation of this rule, the Departments merely refer to the Title 42 surge to illustrate that a surge would be likely given the significance of the border policy change made by the IFR, not that the surge would have been of precisely the same degree. See 89 FR at 48761–62.

Similarly, when implementing the parole process for Venezuelans, DHS implemented the process without prior public procedures, and witnessed a drastic reduction in irregular migration by Venezuelans.[394] Had the parole process been announced before a lengthy notice-and-comment period, thousands of Venezuelan nationals would have likely attempted to cross the United States and Mexican borders before the ineligibility criteria went into effect and before the United States could return Venezuelan nationals to Mexico. See 89 FR at 48766.

DHS similarly concluded in January 2017 that it was imperative to give immediate effect to a rule designating

Cuban nationals arriving by air as eligible for expedited removal because "[p]re-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region.' '[395] The "publication of the rule as a proposed rule . . . would [have] signal[ed] a significant change in policy while permitting continuation of the exception for Cuban nationals, [and] could [have led] to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule.' '[396] A surge of this kind "would [have] threaten[ed] national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities" and "could also have [had] a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations," and "could [have] result[ed] in significant loss of human life.' '[397]

Given the emergency border circumstances facing the Departments, the delays associated with requiring a notice-and-comment process for the IFR would have been contrary to the public interest because an advance announcement of the rule would have incentivized even more irregular migration by those seeking to enter the United States before the IFR took effect.

c. Length and Sufficiency of Comment Period

Comment: Commenters remarked that the 30-day post-promulgation comment period was not long enough to allow for "meaningful[ ] comment" on the IFR, including from experts. Multiple commenters recommended that the Departments either rescind the IFR, reissue it with a longer comment period, or both, and suggested the new comment period be at least 60 days or 90 days. A few commenters expressed concern with the IFR's publication four days before the end of the 30-day comment period for the DHS Mandatory Bars NPRM, stating that the Departments did not give the public an adequate opportunity to analyze or comment on them separately or in conjunction.

to immediately enter the United States, creating a severe safety hazard that forced CBP to temporarily close POEs in whole or in part).

[388] See Nick Miroff & Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America,* Wash. Post (Oct. 24, 2018), *https://www.washingtonpost.com/world/national-security/theres-still-one-way-into-america/2018/10/24/d9b68842-aafb-11e8-8f4b-aee063e14538_story.html.*

[389] *Omnipoint Corp.* v. *FCC,* 78 F.3d 620, 630 (D.C. Cir. 1996) (cleaned up).

[390] See Decl. of Matthew J. Hudak ¶¶ 11, 17, *Florida* v. *Mayorkas,* Case No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[391] *Id.* ¶¶ 6, 14, 17.

[392] *Id.* ¶ 17.

[393] The Departments noted, however, that the Circumvention of Lawful Pathways rule was exempt from notice-and-comment requirements pursuant to the good cause exception at 5 U.S.C. 553(b)(B) for the same reasons that the rule was exempt from delayed effective date requirements under 5 U.S.C. 553(d). *See* 88 FR at 31445 n.377.

[394] *See* 88 FR at 31317 ("A week before the announcement of the Venezuela parole process on October 12, 2022, Venezuelan encounters between POEs at the SWB averaged over 1,100 a day from October 5–11. About two weeks after the announcement, Venezuelan encounters averaged under 200 per day between October 18 and 24.").

[395] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[396] *Id.*

[397] *Id.;* accord U.S. Dep't of State, Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of short-run incentive concerns).

*Response:* As explained earlier in this Section III.E of this preamble, the Departments did not provide notice and an opportunity to comment or provide for a delayed effective date because the foreign affairs and good cause exceptions to those procedures applied. *See* 5 U.S.C. 553(a)(1), (b)(B). Thus, the IFR became effective on June 5, 2024, after the Proclamation was issued and the IFR was placed in public inspection. *See* 89 FR at 48710. The Departments invited the public to provide post-promulgation comments on the ''rulemaking by submitting written data, views, comments, and arguments on all aspects of this IFR by'' July 8, 2024. *Id.* It bears noting that the APA does not impose any requirements governing the process for submitting public comments when an agency voluntarily chooses to receive them following the promulgation of a rule that is exempt from notice-and-comment procedures; much less does it establish any set number of days for which the Departments would have to leave such a comment period open.

This post-promulgation comment period spanned 30 days from the date of publication (from June 7, 2024, through July 8, 2024) and 34 days from the date the IFR was filed for public inspection (the afternoon of June 4, 2024). *See* 89 FR at 48710; *id.* at 48772. The Departments believe this comment period was sufficient to allow for meaningful public input, as evidenced by the 1,067 public comments received, including numerous detailed comments from interested organizations.[398]

Even where notice and comment is required, the APA does not require that the comment period be any particular length. *See* 5 U.S.C. 553(b), (c). And although Executive Orders 12866 and 13563 generally recommend a comment period of at least 60 days, they do not impose any binding requirement that a 60-day period be utilized in every case. In fact, courts have found 30 days to be a reasonable comment period length, finding that such a period is generally ''sufficient for interested persons to meaningfully review a proposed rule and provide informed comment,'' even when ''substantial rule changes are proposed.'' *Nat'l Lifeline Ass'n* v. *FCC,* 921 F.3d 1102, 1117 (D.C. Cir. 2019) (citing *Petry* v. *Block,* 737 F.2d 1193, 1201 (D.C. Cir. 1984)); *see also Connecticut Light & Power Co.* v. *Nuclear Regul. Comm'n,* 673 F.2d 525, 534 (D.C. Cir. 1982) (noting that a 30-day comment period was not

unreasonable despite complexity of proposed rule). Comment periods shorter than 30 days, often in the face of exigent circumstances, have also been deemed adequate. *See, e.g., Omnipoint Corp.,* 78 F.3d at 629–30 (concluding 15 days for comments was sufficient); *NW Airlines, Inc.* v. *Goldschmidt,* 645 F.2d 1309, 1321 (8th Cir. 1981) (finding 7-day comment period sufficient).

Regarding commenters' concerns about the comment period in light of the DHS Mandatory Bars NPRM, the Departments first emphasize that the two rules regard separate aspects of DHS screening procedures, as discussed above in Section III.D.2 of this preamble. Nevertheless, the Departments explained the relationship between the two rules in the IFR by noting that, ''[i]f DHS were to finalize that rule as drafted, [the IFR]'s 'reasonable probability' standard would still apply when the noncitizen is subject to this rule's limitation on asylum eligibility.'' 89 FR at 48739 n.186; *see id.* at 48756. In addition, because the DHS Mandatory Bars NPRM was published prior to the IFR, commenters were able to use that NPRM to inform their comments on the IFR. Accordingly, the Departments disagree that commenters were provided an inadequate opportunity to comment on the interaction of these two rules.

Here, the 30-day comment period allowed for significant, meaningful public participation. Commenters have provided numerous and detailed comments regarding the IFR, and the Departments appreciate their effort to provide thorough commentary for the Departments' consideration during the preparation of this final rule. The 30-day comment period also allowed the Departments to swiftly finalize a critical border measure needed to address the emergency border circumstances posed by the Departments' lack of resources for delivering timely consequences to the heightened number of migrants attempting to enter the southern border without a viable legal basis for doing so. *See* 89 FR at 48749–54.

2. Impacts, Costs, and Benefits (E.O. 12866 and E.O. 13563)

*Comments:* One commenter reasoned that the effects of removal on noncitizens should not be disregarded because the costs are not low. The commenter stated that the costs resulting from removal would ''encourage refoulement for individuals attempting to reach safety.'' The commenter stated that correctly identifying meritorious claims of fear is an invaluable process that should not be categorized as costs in ''additional time

and resources.'' The commenter further stated that the Departments cannot simply dismiss the task of identifying meritorious claims or characterize their failure to do as purported cost savings, as the commenter alleges is done in the IFR.

*Response:* The commenter misrepresents the IFR's discussion of costs and impacts, *see* 89 FR at 48766– 67, which acknowledged that a noncitizen who would have received asylum in the absence of the rule would incur costs from the denial of that benefit. The IFR also acknowledged that noncitizens may incur further costs upon removal. The Departments have described these potential costs qualitatively not as a means of dismissing the importance of such costs, but in order to assess the costs and benefits of the rule in accordance with certain executive orders addressing the regulatory process. *See id.*

Furthermore, the Departments disagree with the commenter's suggestion that the rule does not result in cost savings. The rule does not cause a reduction in overall resources dedicated to immigration processing and enforcement. Rather, it prevents those resources from being spread so thin. As the IFR's analysis explains, given ongoing strains on limited Federal Government immigration processing and enforcement resources, any reduction in new asylum claims would necessarily increase the availability of those resources and allow for more timely adjudications of existing claims. The benefits of the rule include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the nation's immigration laws; and a reduction in the role of exploitative TCOs and smugglers. *Id.* at 48767. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the severe strain that further surges in irregular migration would impose on the Departments. *Id.*

3. Alternatives

a. Address Root Causes of Migration

*Comment:* A few commenters specifically urged the United States Government to address ''root causes'' of migration. Many commenters blamed United States foreign policy generally for creating conditions in foreign countries that have caused irregular migration. For example, one commenter stated that the United States must

---

[398] Document Comments, Securing the Border, *https://www.regulations.gov/document/USCIS-2024-0006-0002/comment.*

amend its foreign policies ''which contribute to poverty and injustice in the countries migrants are trying to escape.'' Another commenter called immigration ''payback'' for the United States's foreign policies. Some commenters specified foreign policies they would like to see changed, such as those regarding weapons sales, fossil fuels, the environment, humanitarian aid, and sanctions on foreign governments. Other commenters criticized the Government and corporations for contributing to destabilization in other countries leading to immigration. Commenters suggested that the Government should disrupt corporate greed causing destabilization in other countries.

*Response:* As a preliminary matter, these comments are outside the scope of this rulemaking. Regardless, the Departments disagree with the suggestion that addressing the root causes of migration obviates the necessity of the rule. Rather, the United States's ongoing efforts, along with those of partner nations, to address the root causes of migration and abate adverse effects from unprecedented levels of global irregular migration will not immediately resolve the urgent border security and immigration systems' situations. Efforts to address the root causes of irregular migration will take significant time to create impact, and in the meantime the more targeted policies set forth in the IFR and this rule are necessary to alleviate the current acute stress on the border security and immigration systems.

The Departments nonetheless agree with commenters that addressing root causes is a necessary element of regional migration management. For example, the *U.S. Strategy for Addressing the Root Causes of Migration in Central America,* directed by the President in Executive Order 14010, 86 FR 8267 (Feb. 5, 2021), focuses on a coordinated, place-based approach to improve the underlying causes that push Central Americans to migrate, and it takes into account, as appropriate, the views of bilateral, multilateral, and private sector partners, as well as civil society.[399] The strategy includes addressing economic, governance, and security challenges through five pillars: (1) addressing economic insecurity and inequality; (2) combating corruption and strengthening democratic governance; (3) promoting human rights and labor rights; (4) countering and preventing violence; and

(5) combating sexual and gender-based violence.[400] In March 2024, the White House announced that the Administration is on track to meet its commitment in the root causes strategy to provide $4 billion to the region over four years.[401]

The United States has also worked closely with its regional partners to prioritize and implement a strategy that advances safe, orderly, legal, and humane migration, including taking measures to address the root causes of migration, expand access to lawful pathways, improve the U.S. asylum system, and address the pernicious role of smugglers. The IFR provided a detailed account of the United States' efforts throughout the region to implement such strategies. *See* 89 FR at 48759–62. For instance, the United States, along with 21 other countries in the Western Hemisphere, has endorsed the L.A. Declaration, which proposes a comprehensive approach to managing migration throughout the Western Hemisphere. *See id.* at 48759. Under the L.A. Declaration's framework, the United States has been working closely with foreign partners to manage the unprecedented levels of migration that countries throughout the region have been experiencing, including efforts to expand access to and increase lawful pathways; conduct joint enforcement efforts; and share information, technical assistance, and best practices. *Id.* at 48759–60.

Additionally, the Government has developed and implemented a number of policy measures, including the Circumvention of Lawful Pathways rule and other measures, which are complemented by a range of actions taken by foreign partners in the region, such as campaigns by Colombia and Panama to counter smuggling networks in the Darién Gap. The Government believes that migration is a shared responsibility among all countries in the region, which is reflected in the intensive and concerted diplomatic outreach on migration issues that DHS and the Department of State have made with partners throughout the Western Hemisphere.

Consistent with these efforts, this rule will further incentivize noncitizens to avoid irregular migration and instead avail themselves of other lawful, safe, and orderly means for seeking

protection in the United States or elsewhere. The Departments agree with commenters that recent surges in irregular migration have been caused by multiple factors, including the growing understanding by smugglers and migrants that DHS's capacity to impose timely consequences at the border is limited by the lack of resources and tools available and by partner nations' operational constraints.

Although this rule does not purport to—and a single rule cannot—address all of the root causes and factors driving migration, the Departments assess that this rule has significantly increased their ability to deliver timely decisions and consequences at the southern border with currently available resources, combating perceptions and messaging to the contrary. Given the challenges facing the United States and its regional partners, this regulatory effort—and the strong consequences it imposes at the southern border—have sent and will continue to send an important message throughout the region that the United States has put in place appropriate measures to prepare for and, if necessary, respond to ongoing migratory challenges.

In short, the Departments acknowledge that international migration trends are the product of exceedingly complex factors and are shaped by, among other things, family and community networks, labor markets, environmental and security-related push factors, and rapidly evolving criminal smuggling networks. *See* 88 FR at 31327–28 & n.59. The United States Government is working to address these root causes of migration, including by cooperating closely with partner countries, and to abate adverse effects from unprecedented levels of irregular migration.

b. Prioritize Funding and Other Resources

*Comment:* Many commenters urged the United States Government to prioritize funding, other resources, or alternative policies to make border processing and asylum adjudications more effective and efficient. Commenters suggested various priorities for funding, including hiring more personnel and staff, such as immigration officers, IJs, and court personnel; allocating more funding to already existing personnel and staff; allocating more funding and other resources to local governments and organizations that assist immigrants; increasing access to legal representation and mental health services; and devoting more resources to asylum processing and adjudications at POEs and the interior.

---

[399] Nat'l Sec. Council, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* at 4 (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[400] The White House, *Fact Sheet: Update on the U.S. Strategy for Addressing the Root Causes of Migration in Central America* (Mar. 25, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/25/fact-sheet-update-on-the-u-s-strategy-for-addressing-the-root-causes-of-migration-in-central-america-3/.*

[401] *Id.*

Other commenters suggested more generally that the Government devote more resources to recent arrivals and the asylum system. A few commenters specified that the Government should provide additional funding for the Shelter and Services Program and the Case Management Pilot Program. One commenter suggested that the Government create a system to require asylum seekers to have their applications vetted in their home countries as a way to reduce costs and migration. Another commenter suggested sending noncitizen arrivals with family members in the United States to their families. One commenter stated that the Government should expand capacity at the border, while another commenter questioned DHS's ability to increase capacity at POEs.

*Response:* The Departments acknowledge commenters' suggestions for increasing resources, both financial and otherwise, to account for the increased arrivals at the southern border, but those suggestions are outside the scope of this rulemaking, and they would require congressional action. As discussed in the IFR, the circumstances that the Departments faced in June 2024 existed despite the Departments' efforts to address substantial levels of migration and were a direct result of Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems. *See* 89 FR at 48712–15. The Administration has repeatedly requested additional resources from Congress, only some of which have been provided. *See id.* at 48728. USCIS also implemented a new fee schedule, effective April 1, 2024, that adjusted the fees to fully recover costs and maintain adequate service.[402] While the new fee rule does provide for increased funding for the Refugee, Asylum, and International Operations Directorate, keeping pace with USCIS' protection screening and affirmative asylum workloads requires additional funding, as reflected in the President's FY 2025 Budget. 89 FR at 48729.

Additional financial support would require additional congressional actions, including significant additional appropriations, which are outside the scope of this rulemaking. The Departments agree with the commenters

that additional resources would provide substantial benefits for managing the border and immigration systems but decline to wait to act pending receipt of additional funding from Congress. DHS notes that despite this lack of additional funding it has taken steps to increase processing at SWB POEs, including through use of the CBP One app.[403]

Additionally, the Departments note that they are leading ongoing Federal Government efforts to support NGOs, local and state governments, and other migrant support organizations as they work to respond to the unprecedented migration impacting communities across the United States. As noted in the Circumvention of Lawful Pathways rule, FEMA spent $260 million in FYs 2021 and 2022 on grants to non-governmental and state and local entities through the EFSP–H to assist migrants arriving at the SWB with shelter and transportation. *See* 88 FR at 31327 (citing 88 FR at 11704–05). In December 2022, $75 million was awarded through the program.[404] In addition, the Bipartisan Year-End Omnibus, which was enacted on December 29, 2022, directed CBP to transfer $800 million in funding to FEMA to support sheltering and related activities for noncitizens encountered by DHS. The Omnibus authorized FEMA to utilize this funding to establish a new Shelter and Services Program and to use a portion of the funding for the existing EFSP–H, until the Shelter and Services Program is established.[405] For FY 2023, there were $363.8 million in available funds to enable non-federal entities to provide humanitarian services to noncitizen migrants following their release from DHS.[406] In FY 2024, that figure increased to nearly $650 million.[407]

The Departments do not agree with commenter's suggestions that alternative policies, including vetting migrants in

their home countries and sending those who arrive the United States who have family members in the United States to those family members, should be pursued in place of this rule. In addition to being far outside the scope of the rule, such policies would lack the demonstrably effective incentive structure of this rule. The Departments nonetheless agree that the United States must consistently engage with partners throughout the Western Hemisphere to address the hardships that cause people to leave their homes and come to our southern border. During the emergency border circumstances underlying the rule, the Departments' limited resources must be focused on processing those who are most likely to be persecuted or tortured if removed and overall border security and immigration systems efficiencies. Swift removal of noncitizens without meritorious claims is critical to deterring noncitizens from seeking entry under the belief that they will be released and able to remain in the United States for a significant period.

*Comment:* Some commenters stated that the Government "should focus on educating the public about the complexities of immigration" and "provide information to the American people" regarding contributions of immigrants to society.

*Response:* The Departments maintain publicly accessible information regarding the border security and immigration systems and routinely publicize law enforcement action and efforts against human trafficking, smuggling, and TCOs that profit from irregular migration.[408] The Departments will continue to make such information publicly available through routine publication. To the extent commenters suggest that the Departments should inform the American public about the contributions migrants have made to the United States, the Departments respectfully note that such action is outside the scope of this rulemaking as it is unrelated to and would have no immediate effect on encounters at the southern border.

### c. Further Expand Refugee Processing or Other Lawful Pathways

*Comment:* Several commenters suggested increasing access to asylum and humanitarian protections. Commenters expressed concern that the United States' annual rates of refugee admissions have not kept pace with

---

[402] *See U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements,* 89 FR 6194, 6194 (Jan. 31, 2024); *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; Correction,* 89 FR 20101 (Mar. 21, 2024) (making corrections).

[403] *See* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

[404] *See* FEMA, Release No. HQ–22–232, *Emergency Food and Shelter Program National Board Allocates $75 Million for Humanitarian Assistance* (Dec. 23, 2022), *https://www.fema.gov/press-release/20230103/emergency-food-and-shelter-program-national-board-allocates-75-million.*

[405] Public Law 117–328, Division F, Title II, Security, Enforcement, and Investigations, U.S. Customs and Border Protection, Operations and Support, 131 Stat. 4459, 4730 (2022).

[406] FEMA, Shelter and Services Program (June 14, 2024), *https://www.fema.gov/grants/shelter-services-program.*

[407] *Id.*

[408] *See* DHS, Securing the Border (last updated Aug. 6, 2024), *https://www.dhs.gov/immigrationlaws;* DHS, Border Security (last updated Nov. 7, 2023), *https://www.dhs.gov/topics/border-security.*

worldwide demand for refugee protections, driving migrants to seek alternative, and oftentimes irregular, migration routes. While many commenters focused on noncitizens arriving at the border, at least one commenter suggested expanding protections for "those who have long called the United States home." Many commenters stated that the Government "should be creating accessible pathways to citizenship." Many commenters emphasized the need for expanded lawful pathways and speeding up processing times. One commenter requested that the Government "invest in expanding pathways to lawful status." Several commenters implored the Government to focus "on a solutions strategy."

*Response:* The United States has made and will continue to make extensive efforts to expand refugee processing and lawful pathways generally.[409] As explained in detail in the IFR, in recent years, the Government has overseen the largest expansion of lawful, safe, and orderly pathways and processes for noncitizens to come to the United States in decades. 89 FR at 48760. Such steps include promulgating the Circumvention of Lawful Pathways rule, refocusing a significant portion of DHS's southern border workforce to prioritize migration management above other border security missions, implementing the CHNV parole processes, implementing the Safe Mobility Initiative in several countries, expanding country-specific family reunification parole processes, expanding opportunities to enter the United States for seasonal employment, establishing a mechanism for over 1,400 migrants per day to schedule a time and place to arrive at POEs through the CBP One app, increasing proposed refugee admissions from the Western Hemisphere from 5,000 in FY 2021 to up to 50,000 in FY 2024, completing approximately 89 percent more immigration court cases in FY 2023 compared to FY 2019, and increasing the IJ corps by 66 percent from FY 2019 to FY 2023. 89 FR at 48712–13.

---

[409] *See* DHS, *Fact Sheet: DHS Continues to Strengthen Border Security, Reduce Irregular Migration, and Mobilize International Partnerships* (June 4, 2024), *https://www.dhs.gov/news/2024/06/04/fact-sheet-dhs-continues-strengthen-border-security-reduce-irregular-migration-and* (citing continued efforts to expand lawful pathways and processes, including establishing country-specific parole processes for certain nationals, working with interagency partners and the private sector to increase access to H–2 nonimmigration visa programs, expanding capacity at POEs to increase CBP One app processing capabilities, and implementing new family reunification parole processes among other efforts).

Despite these and other efforts to expand lawful pathways and provide border security, and while DHS is processing noncitizens in record numbers and with record efficiency, the border security and immigration systems have not been able to keep pace with the number of noncitizens arriving at the southern border. Simply put, the Departments do not have adequate resources and tools to deliver timely decisions and consequences to individuals who cross irregularly and cannot establish a legal basis to remain in the United States, or to provide timely protection to those ultimately found eligible for protection, when noncitizens are arriving at such elevated volumes.

Further, existing levels of migration make clear that the efforts described above, on their own, are insufficient to change the incentives of migrants, reduce the risks associated with current levels of irregular migration and the current surges of migrants to the border, and protect migrants from human smugglers that profit from their vulnerability. The Departments note that, while they continue to explore the possibility of providing additional lawful pathways, this rule does not create, expand, or otherwise constitute the basis for any lawful pathway. The Departments further note that requests that the United States create a path to citizenship is outside the scope of this rulemaking.

### d. Expand Asylum Merits Process

*Comment:* One commenter stated that instead of finalizing the IFR, the Departments should consider expanding the use of the AMI process outlined in the Asylum Processing IFR. The commenter stated that the rule has the same stated purpose of increasing efficiency and fairness of asylum adjudications for those in expedited removal, but that DHS had reduced its use of the AMI process in the last quarter of 2022 and has not explained why finalizing the IFR is preferable.

*Response:* The Departments do not view the present rulemaking and the Asylum Processing IFR as mutually exclusive. Rather, the Departments view these rulemakings as complementary efforts. The AMI process promulgated in the Asylum Processing IFR is predicated on a noncitizen receiving a positive credible fear determination and seeks to make the process following a positive credible fear determination more efficient and streamlined, while maintaining fairness; meanwhile, the present rulemaking establishes a limitation on asylum eligibility and addresses the credible fear process

itself. While both rulemakings seek to increase efficiency and maintain fairness, they do so by focusing on separate parts of the process—one primarily prior to and during a credible fear determination (the present rulemaking) and one following service of a positive credible fear determination (the Asylum Processing IFR). Additionally, the Asylum Processing IFR was written with the express intent of being implemented in a discretionary manner. As the Departments explained, the discretion of USCIS to place an individual with a positive credible fear determination into the AMI process under the rule or to issue an NTA for removal proceedings under section 240 of the INA was a necessary part of the rule in order for it to function, as the rule would have to be implemented in a reality in which USCIS did not have all of the resources necessary to place every case with a positive credible fear determination into the AMI process. *See* 87 FR at 18185. Accordingly, the Asylum Processing IFR provided USCIS complete discretion to place a case with a positive credible fear determination into the AMI process or to issue an NTA. 8 CFR 208.30(f).

As explained in the preamble to the IFR, there are simply not enough AOs available to conduct fear screenings to keep pace with current sustained high encounter rates. *See* 89 FR at 48714. USCIS has a finite number of AOs to conduct all of its casework, including fear screenings, and does not plan on placing cases into the AMI process in circumstances in which the noncitizen did not establish a significant possibility that they would ultimately be able to establish by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that they qualify for the exception; such an approach would not be a prudent use of resources given current operational realities. *See* 89 FR at 48756. The Departments nonetheless formulated the present rulemaking in a manner that preserves the ability of USCIS to exercise its discretion to place cases with positive credible fear determinations in the AMI process should USCIS have the resources available to do so in the future. *See id.; see also* 8 CFR 208.35(b)(2)(ii). The Departments will continue to implement the Asylum Processing IFR in a manner consistent with the way the rule was envisioned to function, enrolling new cases in the process at the discretion of USCIS, in accordance with available resources.

**81270**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

e. Other Congressional Action

*Comment:* Many commenters stated that the Administration should work with Congress on comprehensive legislative reforms. Commenters emphasized the need for meaningful legislative reform of the U.S. immigration system. Several commenters demanded that Congress address ''the issue of immigration.'' Commenters pointed to a variety of reforms that they believed Congress should implement. However, one commenter disagreed with any suggestion that the border crisis was the result of any failure of Congress and felt it was the Administration's consistent ''abdication'' of border security and immigration enforcement that has resulted in the sustained, high rate of encounters since 2021.

*Response:* These are suggestions for Congress and are outside the scope of this rulemaking. Nevertheless, the Departments acknowledge the commenters' expressed frustration with Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems. The Departments observe that this failure, combined with unprecedented levels of irregular migration along the southern border, makes up the causal background of the June 3 Proclamation and this rule, and they therefore disagree with one commenter's suggestion that the current border circumstances can be ascribed to the Administration's alleged ''abdication'' of border security, and in no part to any congressional inaction. As explained in the June 3 Proclamation and the IFR, in the absence of congressional action to provide appropriate resources to DHS and EOIR and to reform the outdated statutory framework, the rule implements new policies to substantially improve the Departments' ability within that framework to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain. *See* 89 FR at 48715. Although the Departments are adopting these measures to respond to the emergency situation at the southern border, they are not a substitute for congressional action, which remains the only long-term solution to the challenges the Departments have confronted on the border.

f. Additional Suggested Measures or Revisions

*Comment:* One commenter suggested that the Departments ''engage in meaningful dialogue with legal experts and humanitarian groups to develop compassionate and effective approaches to migration.''

*Response:* The Departments appreciate the commenter's suggestion and welcome the views of legal experts and humanitarian groups. Indeed, the Departments have sought comment on their rules relating to border management—such as the Asylum Processing IFR, Circumvention of Lawful Pathways rule, DHS Mandatory Bars NPRM, and the IFR here—and have either considered and responded to those comments, or, in the case of the DHS Mandatory Bars NPRM, are in the process of doing so. Additionally, such experts and organizations are able to petition the Departments for rulemaking, through which process they may present their proposals for consideration by the Departments. The Departments appreciate the thoughtful comments and feedback they have received from the public, including legal experts and humanitarian groups, and hope that the public's interest in aiding the Departments in their efforts to manage the border continues. Further, since the June 3 Proclamation and the IFR came into force, DHS has continually engaged advocacy, non-governmental, and international organization partners to seek their feedback and perspectives.

*Comment:* One commenter made several suggestions for additional, stricter measures instead of or in addition to this rule. Such suggested measures included strictly limiting parole into the United States, reinstating MPP and requiring noncitizens to wait in Mexico pending removal proceedings, rescinding enforcement priorities and enforcing immigration law in the interior of the United States, expanding expedited removal, terminating policies the commenter viewed as hindering immigration enforcement, requiring AOs to apply all mandatory bars to asylum and statutory withholding of removal in credible fear screenings, raising the standard for withholding of removal and deferral of removal to the ''reasonable probability'' standard for all credible fear proceedings, and terminating USCIS's policy of accepting requests for reconsideration after an IJ has concurred with an AO's negative credible fear determination. The commenter, addressing the instant rule, requested that the Departments eliminate ''overbroad and easy to exploit loopholes,'' specifically stating that the Departments should ''strike'' the exception for those who establish exceptionally compelling circumstances. One commenter stated that the rule should also apply to the northern border.

*Response:* The Departments acknowledge the commenters' varying viewpoints and concerns but believe that even if some of the alternatives proposed by the commenters are suitable to pursue, they would not obviate the need for this rule. Proposals to broadly limit lawful pathways to enter the United States, such as parole processes, are outside the scope of this rulemaking, as are other comments advocating for immigration policy changes or reforms unrelated to the IFR.

The Departments nonetheless note that this rule does not provide for, prohibit, or otherwise set any policy regarding DHS's discretionary authority to make parole determinations. Even so, in the Departments' experience, the various parole processes work in tandem with other lawful pathways in a complementary manner to address surges in migration. Examples of the success of DHS's discretionary parole processes include the CHNV parole processes and family reunification parole processes resulting in use of lawful pathways for entry into the United States. Importantly, the parole processes themselves are lawful pathways for qualifying individuals seeking to come to the United States, and this rule does not discourage their use. The parole processes are lawful, safe, and orderly pathways that the Departments wish to encourage in light of the urgent circumstances.

The Departments disagree with commenters' suggestion to reinstate MPP for the reasons stated in the IFR and the Circumvention of Lawful Pathways rule. *See* 89 FR at 48752 n.271; 88 FR at 31370.

Regarding commenters' request for expansion of expedited removal, the Departments observe that, among the series of steps the Government has taken to strengthen consequences for irregular entry at the border, DHS has processed record numbers of individuals through expedited removal. For example, in the months between May 12, 2023, and June 4, 2024, CBP processed more than 359,000 noncitizens encountered at and between POEs along the SWB for expedited removal [410]—almost twice as many as any prior full FY.[411] Indeed, under the IFR, from June 5 through August 31, 2024:

---

[410] OHSS analysis of July 2024 Persist Dataset (Imm Post Pandemic ERCF tab).

[411] OHSS analysis of June 2024 Enforcement Lifecycle and July 2024 OHSS Persist Dataset. Prior to FY 2024, the single-year FY record for Southwest Border cases processed for expedited removal was 202,000 in FY 2013 (Historic CFIs tab).

• DHS removed or returned more than 119,000 individuals encountered at the SWB [412] to more than 140 countries, including by operating more than 400 international repatriation flights; [413]

• DHS has doubled the percentage of noncitizens encountered at the SWB who are removed or returned directly from CBP custody compared to the immediate post-pandemic period (32 percent compared to 16 percent); [414]

• DHS has more than tripled the percentage of noncitizens encountered by USBP at the SWB who are processed through expedited removal (up from 18 percent to 59 percent; expedited removal processing was already at record levels, as noted above); [415] and

• DHS has decreased the percentage of noncitizens encountered at the SWB who are released by USBP pending their section 240 removal proceedings by more than half (from 64 percent to 31 percent). [416]

However, as explained at length in the IFR, DHS's ability to apply expedited removal is subject to resource constraints. *See, e.g.,* 89 FR at 48752. At high levels of encounters, DHS simply lacks sufficient resources, such as AOs to conduct fear screenings and temporary processing facilities, to refer noncitizens for expedited removal processing. The mismatch in resources and encounters has created stress on the border security and immigration systems, forcing DHS to rely on processing pathways outside of expedited removal.

With respect to the suggestion that mandatory bars be considered at the screening stage under a reasonable possibility standard, DHS is considering that issue in a separate rulemaking. *See* Mandatory Bars NPRM.

The Departments decline to apply the ''reasonable probability'' standard to screen all statutory withholding of removal and CAT protection claims during all credible fear interviews at this time. Although the Departments acknowledge the commenters' concerns, the Departments emphasize that the primary focus of this rule is to substantially improve the Departments' ability, during periods of high encounters, to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain. Application of the a ''reasonable

probability'' standard under emergency border circumstances as defined in the rule satisfies these goals.

The suggestion to generally disallow USCIS from accepting requests for reconsideration of negative credible fear determinations exceeds the scope of this rulemaking, which regards the procedures applied during emergency border circumstances. The Departments note that during such circumstances, if it was determined at the credible fear interview that there is not a significant possibility a noncitizen could ultimately demonstrate by a preponderance of the evidence that they are not subject to the IFR's limitation on asylum eligibility or are eligible for the exception to the limitation, the noncitizen would not be permitted to submit requests for reconsideration with USCIS. *See* 8 CFR 208.35(b)(2)(v)(B). In such circumstances, USCIS may, in its sole discretion, reconsider a negative determination. *See id.; see also* 89 FR at 48756.

The Departments disagree with the concern one commenter raised about what it characterized as ''loopholes.'' The exceptions to the limitation on eligibility for asylum are necessary to prevent undue hardship. The Departments have limited the means of avoiding the limitation on asylum eligibility to those identified in the June 3 Proclamation and to exceptionally compelling circumstances in an effort to maximize the rule's applicability.

With respect to a commenter's suggestion that the rule apply to the northern border, the Departments do not currently assess that application of the rule is necessary at the U.S.-Canada land border. Instead, the United States is implementing other measures to address irregular migration at that border, such as the Additional Protocol of 2022 to the Safe Third Country Agreement between the United States and Canada, which expands the Agreement to apply to noncitizens who claim asylum or other protection within 14 days of crossing the U.S.-Canada land border between POEs, including certain mutually designated bodies of water. *See* Implementation of the 2022 Additional Protocol to the 2002 U.S.-Canada Agreement for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries, 88 FR 18227 (Mar. 28, 2023). Under the Safe Third Country Agreement, with limited exceptions, noncitizens who cross from Canada to the United States cannot pursue an asylum or other protection claim in the United States and are instead returned to Canada to pursue their claim.

*Comment:* A commenter suggested exempting persons who manifest a credible fear from penalties arising from expedited removal, including restrictions on subsequent admission to the United States, and conditioning the implementation of restrictions on eligibility for protection at the border ''on the actual availability of an alternative pathway[ ].''

*Response:* The Departments acknowledge the commenters' suggestions but do not believe the alternatives proposed by the commenters are suitable to address operational concerns or meet the Departments' policy objectives.

With regard to comments recommending that all noncitizens who manifest a fear be exempted from facing ''penalties'' arising from expedited removal, including restrictions on future admission to the United States, the Departments note that such a change would require a change to the INA, and thus is not within the Department's authority. *See* INA 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A) (providing that noncitizens removed pursuant to an order of expedited removal are inadmissible for a period of five or ten years following the date of such removal).

With regard to the commenter's suggestion to condition the limitation on asylum eligibility on whether each individual had a lawful, safe, and orderly pathway available to them, the Departments note that the current framework already effectively does so. Any noncitizen without documents sufficient for lawful admission to the United States may pre-schedule a time and place to present at a POE through the CBP One app. [417] Those who cannot wait for such an appointment may present at a POE and seek an exception to the Proclamation's suspension and limitation on entry or establish exceptionally compelling circumstances before an AO or IJ, both of which except them from the limitation on asylum eligibility. *See* 8 CFR 208.35(a), 1208.35(a). To the extent commenters think these mechanisms are insufficient, the Departments have considered those arguments but believe that the rule strikes an appropriate balance between managing emergency border circumstances and protecting noncitizens' access to asylum, as discussed in Section III.C.1.b of this preamble.

---

[412] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR details tab).

[413] OHSS analysis of data downloaded from UIP on September 3, 2024 (Flights and Removals tab).

[414] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[415] *Id.*

[416] *Id.*

[417] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/ about/mobile-apps-directory/cbpone.*

## F. Out of Scope

*Comment:* In addition to the comments discussed above, commenters also discussed a range of topics that are outside the scope of this rule. For example, some commenters shared a general concern relating to overpopulation; a recommendation that the United States accept a certain number of noncitizens each year to compensate for labor shortages; a suggestion that the Government provide legal counsel at no expense to noncitizens or otherwise fund court-appointed counsel; a suggestion to issue "general rules or guidelines in lieu of case by case assessments that would allow asylum officers to quickly approve certain cases"; a suggested amendment to the DHS Mandatory Bars NPRM to require AOs to apply all mandatory bars to asylum and statutory withholding of removal at the credible fear stage; a recommendation to preclude USCIS from considering requests for reconsideration of negative credible fear or reasonable fear determinations that have been reviewed by an IJ; concern with and strong opposition to the United States' military support for Israel; a request for open borders; a request for the Government to focus its efforts on providing asylum seekers access to mental health services; requests related to custody and detention of noncitizens and asylum seekers, such as investing in "non-custodial processing centers"; concerns about family separation and reunification policies; a recommendation to provide "relief for undocumented caregivers by modernizing existing rules"; suggestions relating to work authorization for migrants and asylum seekers; sentiments that the Government should provide funding to support migrant communities with public services and respite; a recommendation that the Government grow "federal support for case management support"; claims that the President does not have authority under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), for the policies and objectives of the Proclamation; a claim that the President's use of his authority under section 212(f) of the INA, 8 U.S.C. 1182(f), to issue the Proclamation is a departure from how other presidents have used the authority in the past, relying on statements from the Ninth Circuit's decision in *Hawaii* v. *Trump,* 878 F.3d 662, 689 (9th Cir. 2017), *rev'd and remanded,* 585 U.S. 667 (2018); challenges to DHS's parole authority and use of parole; and a recommendation to give second chances

to noncitizens involved in unlawful activities and to shut down operations such as the Western Hemisphere Institute for Security Cooperation because they further perpetuate drug-related violence.

*Response:* These comments address matters beyond the scope of the rule and do not require further response. To the extent that commenters' concerns raised in relation to actions taken under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f), 1185(a), apply also to the legality of actions taken by the Departments, and not only to the President's June 3 Proclamation or DHS's implementation of it, those concerns are addressed in Section III.A.1 of this preamble.

## IV. Requests for Comments

### A. Aligning the Geographic Reach of the Circumvention of Lawful Pathways Rule With That of the Proclamation and This Rule

The Departments request comment on whether to expand the geographic reach of the Circumvention of Lawful Pathways rebuttable presumption to include those who enter at southern coastal borders, irrespective of whether they traveled through a third country. *See* 8 CFR 208.33(a)(1), 1208.33(a)(1). The Circumvention of Lawful Pathways rule's rebuttable presumption of asylum ineligibility applies to a noncitizen who "enters the United States from Mexico at the southwest land border or adjacent coastal borders." *See* 8 CFR 208.33(a)(1), 1208.33(a)(1). In addition, among other requirements, the rebuttable presumption only applies if the noncitizen traveled through a country other than the noncitizen's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the Refugee Convention or the Refugee Protocol. *See* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii).

The Departments specifically welcome comment on two proposals: first, whether, in 8 CFR 208.33(a)(1) and 1208.33(a)(1), the Departments should remove the words "from Mexico at the southwest land border or adjacent coastal borders" and replace them with the words "across the southern border (as that term is described in section 4(d) of Presidential Proclamation 10773)." Second, the Departments welcome comment on whether to add to the beginning of 8 CFR 208.33(a)(1)(iii) and 1208.33(a)(1)(iii) a clause that reads, "After the alien entered the United States by sea, or"—so that paragraph (a)(1)(iii) would state in full, "After the alien entered the United States by sea, or after the alien traveled through a

country other than the alien's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of Refugees." In a future final rule, the Departments may adopt the first proposal, the second proposal, or both.

Although this request for comment is similar to the Departments' request for comment in the Circumvention of Lawful Pathways rule, *see* 88 FR at 31440–44, the Departments are now seeking comments on the geographic scope in the broader context of this Securing the Border [418] rulemaking. Given the intervening Securing the Border rulemaking, the comments that will be most useful are those that are informed by the full range of actions taken to address migration since the end of the Title 42 public health Order. Accordingly, although the Departments intend to incorporate any comments received on the 2023 Circumvention of Lawful Pathways rule's request for comment into the docket for this request for comment, those who submitted comments in response to that request for comment are encouraged to update their comments in light of the intervening Securing the Border rulemaking and resubmit their comments here.

Unlike the Circumvention of Lawful Pathways rule, the Proclamation and the Securing the Border rule apply to certain noncitizens entering the United States across the "southern border," which includes "southern coastal borders." 89 FR at 48491; *see also* 8 CFR 208.13(g), 1208.13(g). Section 4(b) of the Proclamation defines "southern coastal borders" to mean "all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the southwest land border, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico." 89 FR at 48491. The term "southern border" adopted by the Proclamation and the Securing the Border rule is categorically broader than the term "adjacent coastal borders" adopted in the Circumvention of Lawful Pathways rule, which the Departments defined as "any coastal border at or near the U.S.-Mexico border." 88 FR at 31320. In contrast to this definition, the term "southern coastal borders" encompasses certain specified coastlines that are not at or

---

[418] Although the Departments have not referred to the present rule as the "Securing the Border rule" throughout this preamble, the Departments do so in this request for comment to distinguish the present rule from the Circumvention of Lawful Pathways rule in an effort to avoid confusion.

near the U.S.-Mexico border, such as the maritime borders of Puerto Rico and the United States Virgin Islands. 89 FR at 48711 n.4.

The Departments believe it is best to align the geographic reach of the Circumvention of Lawful Pathways rule to that in the Proclamation, which was adopted by the Securing the Border rule, for three reasons: (1) to make clear to noncitizens intending to migrate to the United States that timely consequences will result if they resort to crossing irregularly no matter where along the southern border they cross; (2) to deter smugglers and noncitizens from using dangerous maritime migration to avoid the rebuttable presumption of asylum ineligibility if the noncitizen did not travel through a country other than the noncitizen's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of Refugees, *see* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii); and (3) to ensure consistency in implementation. This modification to the geographic reach of the Circumvention of Lawful Pathways rule would encourage noncitizens to avoid dangerous maritime migration and further persuade them to utilize lawful, safe, and orderly pathways. As discussed in more detail below, maritime migration results in life-threatening risks for both migrants and DHS personnel.

When the Departments initially proposed the Circumvention of Lawful Pathways rule, the rule would have covered migrants who entered the United States from Mexico "at the southwest land border"—that is, "along the entirety of the U.S. land border with Mexico." 88 FR at 11704 n.1; *see also id.* at 11750, 11751. However, the Departments received comment from the public expressing concern that limiting the rebuttable presumption to only those who entered the United States from Mexico by land would incentivize noncitizens without documents sufficient for lawful admission to circumvent the land border by making the hazardous attempt to reach the United States by sea. 88 FR at 31320. Concurring with this concern, the Departments modified the geographic reach of the rebuttable presumption to include "adjacent coastal borders" so that it applied to noncitizens who crossed into the United States from Mexico via adjacent coastal borders. Further, this definition mirrored the geographic reach of the Centers for Disease Control and Prevention's ("CDC") Title 42 public

health Order and, as implemented by CBP, the Amended CDC Order issued in May 2020. *Id.* Because CBP had been interpreting the term in this way for three years before the Circumvention of Lawful Pathways rule's finalization, the Departments believed this consistency with the Title 42 public health Order in geographic application would help prevent smugglers from exploiting what could be perceived as a loophole by persuading migrants to take the perilous journey of trying to reach the United States by sea upon the termination of the Order. *Id.*

The Departments now believe that further expanding the geographic scope of the Circumvention of Lawful Pathways rule beyond "adjacent coastal borders," and, with respect to those who arrive by sea, removing the restriction that the rule only applies to noncitizens who enter the United States from Mexico, could be supported by the same justification for the Securing the Border rule's inclusion of southern coastal borders: these changes would "help avoid any incentive for maritime migration to such locations" that are currently covered by the Securing the Border rule but not by the Circumvention of Lawful Pathways rule. 89 FR at 48711 n.4. For example, expanding the scope of the Circumvention of Lawful Pathways rule in this manner would mean that a noncitizen who enters the United States at a border via the Gulf of Mexico would be subject to the Circumvention of Lawful Pathways rule regardless of whether they transited through Mexico. Further, as an operational matter, this would ensure consistency in processing. Aligning the geographic scope of the Circumvention of Law Pathways rule with that of the Securing the Border rule would eliminate one operational switch that DHS personnel would have to make when the provisions of the Securing the Border rule discontinue in the absence of emergency border circumstances. This would allow DHS personnel to operate consistently with respect to noncitizens encountered utilizing maritime migration to cross the southern coastal borders, all of whom would be presumptively ineligible for asylum.

Maritime migration poses unique hazards to life and safety to both migrants and DHS personnel.[419] Human smugglers and noncitizens migrating to the United States continue to use unseaworthy, overly crowded vessels,

piloted by inexperienced mariners, without any safety equipment—including, but not limited to, personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons.[420] The USCG regularly interdicts noncitizens employing maritime migration in the Gulf of Mexico and Atlantic Ocean in makeshift, overcrowded vessels.[421] In FY 2022, over 12,500 noncitizens were interdicted by the USCG and in FY 2023, that figure was nearly 13,500.[422] This is a dramatic increase from previous years. For example, between FY 2017 and FY 2020, annual maritime interdictions never exceeded 3,600.[423] Between October 1, 2023 and April 30, 2024, the USCG carried out 35 maritime migration interdictions in the Mona Passage and waters near Puerto Rico, with nearly 1,200 noncitizens interdicted at sea from various countries such as the Dominican Republic, Haiti, and Venezuela.[424] Between October 1, 2022 and August 5, 2023, the USCG interdicted over 6,900 migrants from Cuba alone.[425] In August 2024, the

---

[419] The Departments also reiterate the explanation of the dangers of maritime migration in the Circumvention of Lawful Pathways rule. *See* 88 FR at 31441–42.

[420] *See* David C. Adams, James Wagner, *At Least 40 Migrants Die in Boat Fire Off Haitian Coast, U.N. says,* N.Y. Times (July 19, 2024), *https://nytimes.com/2024/07/19/world/americas/boat-fire-haiti-migrants.html;* Samantha Schmidt, Paulina Villegas, Hannah Dormido, *Dreams and Deadly Seas: Bahamas Human Smuggling by Boat,* The Wash. Post (July 27, 2023), *https://www.washingtonpost.com/nation/interactive/2023/bahamas-human-smuggling-by-boat/* ("The United States . . . Coast Guard cutters have been rescuing migrants from foundering or overcrowded boats every few days."); Adriana Gomez Licon, *Situation 'dire' as Coast Guard seeks 38 missing off Florida,* Associated Press (Jan. 26, 2022), *https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe06430474b0c3a3019;* Gina Martinez, *Coast Guard rescues more than 180 people from overloaded sailboat in Florida Keys,* CBS News, CW44 Tampa (Nov. 22, 2022), *https://www.cbsnews.com/news/coast-guard-rescues-more-than-180-people-overloaded-sailboat-florida-keys/.*

[421] USCG, *Press Release: Coast Guard repatriates 136 migrants to Dominican Republic, following 3 separate interdictions near Puerto Rico* (May 28, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3789058/coast-guard-repatriates-136-migrants-to-dominican-republic-following-3-separate; see also* USCG, *Press Release: Coast Guard repatriates 119 migrants to Dominican Republic following 2 interdictions near Puerto Rico* (Apr. 29, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3758973/coast-guard-repatriates-119-migrants-to-dominican-republic-following-2-interdic/.*

[422] OHSS analysis of July 2024 Persist Dataset (Maritime Interdictions tab).

[423] *Id.*

[424] USCG, *Press Release: Coast Guard repatriates 136 migrants to Dominican Republic, following 3 separate interdictions near Puerto Rico* (May 28, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3789058/coast-guard-repatriates-136-migrants-to-dominican-republic-following-3-separate.*

[425] USCG, *Press Release: Coast Guard repatriates 27 people to Cuba* (Aug. 5, 2023), *https://www.news.uscg.mil/Press-Releases/Article/*

Continued

USCG interdicted a disabled migrant vessel and repatriated 182 migrants back to Haiti.[426] In May 2024, the USCG located and intercepted a 30-foot makeshift vessel with over 60 migrants crammed into it traveling nearly 63 miles north of Punta Cana, Dominican Republic.[427] During a second interdiction occurring on May 20, 2024, CBP's Air and Marine Operations interdicted a "grossly overloaded makeshift vessel" carrying 68 migrants located two miles from Puerto Rico's coastline.[428]

In FY 2023, the USCG recorded 112 noncitizen deaths, including those presumed dead, as a result of irregular maritime migration. IOM's Missing Migrants Project found that from 2014 to 2024, in the Americas, the maritime route from the Caribbean to the United States resulted in the second-highest number of dead and missing migrants, after the U.S.-Mexico border crossing.[429] The intention behind the Circumvention of Lawful Pathways rule is to discourage individuals from resorting to irregular migration, including markedly more dangerous maritime migration, and to instead incentivize noncitizens to utilize lawful, safe, and orderly pathways and processes to come to the United States. Expanding the geographic scope of the Circumvention of Lawful Pathways rule's rebuttable presumption would expand that incentive structure to cover the entire southern border, rather than just a portion of it.

The United States has taken significant steps to expand safe and orderly options for migrants, including migrants from the Caribbean region, to lawfully enter the United States.[430] The United States has increased and will continue to increase refugee processing in the Western Hemisphere; country-specific and other available processes for individuals seeking parole for urgent humanitarian reasons or significant public benefit, including the Cuba and Haiti parole processes; and opportunities to lawfully enter the United States for the purpose of seasonal employment.[431] In addition, the United States has resumed the Cuban Family Reunification Program and resumed and increased participation in the Haitian Family Reunification Program.[432] The availability of these pathways serves as important background for the proposal to expand the geographic reach of the Circumvention of Lawful Pathways rebuttable presumption to include those who enter at southern coastal borders, irrespective of whether they traveled through a third country. Such pathways for migrants from this region provide meaningful opportunities for these individuals to use a lawful, safe, and orderly pathway to enter the United States, even if they did not first travel through a third country where they could request such protection. Accordingly, the Departments are considering and seeking comment on applying the Circumvention of Lawful Pathways rebuttable presumption to those who enter the United States via the southern coastal border, irrespective of whether they traveled through a third country, to discourage noncitizens from using dangerous maritime migration routes.

*B. Extending the Applicability of the Circumvention of Lawful Pathways Rebuttable Presumption*

Currently, the Circumvention of Lawful Pathways rule applies to a noncitizen who, *inter alia*, entered the United States from Mexico "between May 11, 2023 and May 11, 2025" and "[s]ubsequent to the end of implementation of the Title 42 public health Order." 8 CFR 208.33(a)(1)(i)–(ii),

1208.33(a)(1)(i)–(ii). When issuing that rule, the Departments acknowledged that "aspects of the present situation at the border are likely to continue for some time and are unlikely to be significantly changed in a short period," but the Departments opted for a two-year "entry period" to, *inter alia*, address the surge in migration that, in the absence of the Circumvention of Lawful Pathways rule, was anticipated to follow the lifting of the Title 42 public health Order and to provide sufficient time to implement and assess the effects of the policy contained in that rule. *See* 88 FR at 11727; 88 FR at 31421. The Departments are now considering, and request comment on, whether to extend the entry period indefinitely so that the rebuttable presumption will apply to noncitizens who entered the United States without documents sufficient for lawful admission any time on or after May 11, 2023, and, if the applicability is extended, other appropriate changes. *See* 8 CFR 208.33(a)(1)(i), 1208.33(a)(1)(i); *see also, e.g., id.* 208.33(c), 1208.33(d) (providing the ongoing applicability of the Circumvention of Lawful Pathways rebuttable presumption to any future asylum applications filed by noncitizens who enter during the entry period regardless of when the application was filed, except in the case of certain children who entered as part of a family unit if they later apply for asylum as principal applicants).

In the Circumvention of Lawful Pathways NPRM, the Departments specifically welcomed comment on whether the proposed two-year duration of the rule's applicability "should be modified, including whether it should be shorter, longer, or of indefinite duration." *See* 88 FR at 11708. In response to comments received on the NPRM, the Departments maintained the proposed two-year period in the Circumvention of Lawful Pathways final rule because that rule's focus was to respond to the anticipated surge in migration upon the termination of the Title 42 public health Order. *See* 8 CFR 208.33(a)(1)(i), 1208.33(a)(1)(i); 88 FR at 31421–22. The Departments stated that a 24-month period would provide "sufficient time to implement and assess the effects of the policy contained in this rule" and that "a 24-month period is sufficiently long to impact the decision-making process for noncitizens who might otherwise pursue irregular migration and make the dangerous journey to the United States, while a shorter duration, or one based on specified conditions, would likely not

---

3484466/coast-guard-repatriates-27-people-to-cuba/.

[426] USCG, *Press Release: Coast Guard repatriates 182 migrants to Haiti* (Aug. 21, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3878831/coast-guard-repatriates-182-migrants-to-haiti/*.

[427] USCG, *Press Release: Coast Guard repatriates 136 migrants to Dominican Republic, following 3 separate interdictions near Puerto Rico* (May 28, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3789058/coast-guard-repatriates-136-migrants-to-dominican-republic-following-3-separate/*.

[428] *Id.*

[429] IOM, *Missing Migrants Project: Migration Within the Americas, https://missingmigrants.iom.int/region/americas* (last visited Aug. 15, 2024). IOM cautions that "[c]ollecting information about migrants who die or disappear on maritime routes while attempting to migrate by boat in the Caribbean is also very challenging. The remote nature of maritime routes, the secrecy in which boats set out, and the lack of information on trajectories means that many shipwrecks carrying migrants are never recorded. It is rarely known exactly how many people were on board boats that ran into trouble at sea, making it difficult to verify how many people went missing, or to know any information about their identities." *Id.*

[430] *See* DHS, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), *https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and*.

[431] *See* DHS, *Fact Sheet: DHS Continues to Strengthen Border Security, Reduce Irregular Migration, and Mobilize International Partnerships* (June 4, 2024), *https://www.dhs.gov/news/2024/06/04/fact-sheet-dhs-continues-strengthen-border-security-reduce-irregular-migration-and*.

[432] *See* DHS, *DHS Modernizes Cuban and Haitian Family Reunification Parole Processes* (Aug. 10, 2023), *https://www.dhs.gov/news/2023/08/10/dhs-modernizes-cuban-and-haitian-family-reunification-parole-processes*.

have such an effect.'' 88 FR at 31421. The Departments further stated that the United States would continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region, and implement other measures as appropriate, including continued efforts to increase immigration enforcement capacity and streamline processing of asylum seekers and other migrants. *Id.*

The Departments recognized, however, ''that there is not a specific event or demarcation that would occur at the 24-month mark,'' and stated that they would ''closely monitor conditions during this period in order to review and make a decision, consistent with the requirements of the APA, whether additional rulemaking is appropriate to modify, terminate, or extend the rebuttable presumption and the other provisions of th[e] rule.'' *Id.* The Departments explained that such review and decision would consider all relevant factors, such as resource limitations and the Departments' capacity to safely, humanely, and efficiently administer the immigration system; the availability of lawful pathways to seek protection in the United States and partner nations; and foreign policy considerations. *Id.* The Departments also expected to consider their experience under the Circumvention of Lawful Pathways rule at the 24-month mark, including the effects of the rebuttable presumption on those pursuing asylum claims. *Id.* In addition, the Departments expected to consider changes in policy views and imperatives, including foreign policy objectives, in making any decision regarding the future of the rule. *Id.* The Departments did not identify specific metrics for extending the rule *ex ante*, given the dynamic nature of the circumstances at the SWB and the multifaceted domestic and foreign policy challenges facing the Departments. *Id.*

The Departments have considered these factors and propose and seek comment on an indefinite extension of the applicability of the Circumvention of Lawful Pathways rule's rebuttable presumption and credible fear provisions. The Departments also seek comment on whether other changes to the Circumvention of Lawful Pathways rule's provisions would be appropriate if its applicability becomes indefinite. First, as detailed in the IFR, although the Circumvention of Lawful Pathways rule did not fully mitigate the very high levels of irregular migration during the

immediate post-pandemic period, it yielded tangible results that ameliorated a situation that otherwise would have been more challenging. *See* 89 FR at 48723–31.[433] Extending the entry period for the Circumvention of Lawful Pathways rule would ensure that DHS can continue to deliver timely consequences, where appropriate, to more noncitizens encountered, even at levels of migration below the threshold at which the suspension and limitation on entry under this rule would be active. As the Departments explained in the IFR, ''at 1,500 daily encounters between POEs . . . DHS would be able to quickly remove the majority of the people it processes at the border on any given day who have no legal basis to remain in the United States.'' *Id.* at 48752. This estimate was expressly based on the Departments' demonstrated performance under the Circumvention of Lawful Pathways rule, *see id.,* and therefore accounted for the effects of that policy as well as the most recent data on capacity limitations, demographics, fear claim rates, and other variables. *See id.* Even with the Proclamation and Securing the Border rule in place, the absence of the Circumvention of Lawful Pathways rebuttable presumption would mean that when encounters between POEs begin to exceed 1,500 encounters and the threshold for continuing or reactivating the measures in this rule is not yet met, the Departments' ability to deliver timely decisions and consequences would likely be impaired.[434]

Second, the Departments continue to be subject to significant resource

limitations, *see* 89 FR at 48728–31, such that—as explained earlier in this section—even at levels of encounters below the 2,500-encounter threshold contained in section 2(b) of the Proclamation, DHS would not be able to quickly remove the majority of those encountered who do not have a basis to remain.[435] In such circumstances, DHS will need policy interventions like the Circumvention of Lawful Pathways rule to continue delivering timely consequences. Although there were months during the FY 2013–FY 2019 period ''in which daily encounters . . . between 1,500 and 2,500 resulted in an average of 210 individuals released each day,'' *see* 89 FR at 48753, such a low release rate would be unrealistic given today's demographic mix of encounters, even at 1,500 daily encounters, particularly in the absence of policy interventions such as the Circumvention of Lawful Pathways rule. For instance, even under the Circumvention of Lawful Pathways rule, assuming that USBP processes 900 noncitizens per day for expedited removal at 1,500 daily encounters between POEs, and assuming a similar level of voluntary returns and reinstatements as observed during the immediate pre-pandemic period, DHS would be able to refer into expedited removal 77 percent of single adults and individuals in family units to expedited removal, and would likely release over 530 single adults and individuals in family units.[436] This is due to current resource limits for expedited removal, current demographics, and fear-claim and screen-in rates under the Circumvention of Lawful Pathways rule.[437] If one adjusts the calculation to use the fear-claim and comprehensive screen-in rates that existed during the pre-pandemic period, over 700 single adults and family members would be released.[438] In short, unless the Departments extend the entry period of the Circumvention of Lawful Pathways rule, DHS's ability to deliver timely consequences would be further degraded because releases pending

[433] Between May 12, 2023, and June 4, 2024, CBP placed into expedited removal approximately 920 individuals encountered at and between POEs each day on average. OHSS analysis of July 2024 Persist Dataset (Imm Post Pandemic ERCF tab). While encounters at the SWB and in coastal sectors averaged over 5,000 per day for the period from May 12, 2023, to June 4, 2024, border encounters remained below the levels projected to occur in the absence of the Circumvention of Lawful Pathways rule. *Id.;* 89 FR at 48724 & n.99.

[434] Assuming similar processing capacity as during the immediate post-pandemic period and the same mix of encounter demographics as observed during the first two months of enforcement under the IFR, OHSS estimates that at 1,500 encounters (including all UCs) approximately 58 percent of single adult and family unit encounters would be quickly repatriated (including voluntary returns, reinstatements, and expedited removals) with the rebuttable presumption in effect, versus 46 percent in the absence of the rebuttable presumption. OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab). At 2,500 encounters per day, OHSS estimates that 41 percent of single adult and family unit encounters would be quickly repatriated with the rebuttable presumption in effect, versus 34 percent in the absence of the rebuttable presumption. *Id.*

[435] After the conditions for discontinuing the suspension and limitation on entry under section 2(a) of the Proclamation are met, the suspension and limitation on entry in this rule will continue or reactivate when the 2,500-encounter threshold in section 2(b) of the Proclamation is reached. This numerical gap between discontinuation and continuation or reactivation is important for operational reasons, *see* 89 FR at 48753, but also potentially results in periods of relatively high encounter numbers that the Circumvention of Lawful Pathways rule is needed to manage.

[436] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab).

[437] *Id.*

[438] *Id.*

**81276** **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

section 240 removal proceeding would be significantly higher. If the demographics were to shift such that the Circumvention of Lawful Pathways rule was no longer necessary to manage steady-state levels of migration, the Departments could at that time revise policy as appropriate.

Third, even as the United States has continued to coordinate extensively with its regional partners to expand the availability of lawful, safe, and orderly pathways, the Departments have found that these efforts are strengthened by the imposition of appropriate measures to prepare for and respond to ongoing migration challenges as needed. A key component of the Departments' engagement with foreign counterparts has been their ability to demonstrate a willingness to impose, and as appropriate expand, meaningful policy and operational measures in direct response to the pressures caused by migratory flows. *See* 89 FR at 48759. The Departments believe that ''leading by example'' has been an important part of our overall regional engagement and helped encourage regional partners to continue to adopt new and creative policy and operational migration responses. *Id.* By extending the applicability of the Circumvention of Lawful Pathways rule, the Departments believe it would not only demonstrate to our regional partners that we are committed to disincentivizing irregular migration, but it would also encourage our international partners to maintain their mutual efforts to address the unprecedented migration of people in the Western Hemisphere.

Fourth, with respect to the effects of the rule in general and on those who migrate irregularly in particular, experience has proven that the ability to deliver swift consequences for those who do not use lawful, safe, and orderly pathways or processes for entering the United States is critical; the expiration of the Circumvention of Lawful Pathways rule would limit the Departments' abilities to deliver consequences where appropriate, likely changing the perception and decision-making calculus of would-be migrants and thus could be a pull-factor and serve to increase border encounters. Extending the entry period indefinitely would avoid creating the impression among those contemplating crossing irregularly that no timely consequences will apply to them if they wait until the suspension and limitation on asylum eligibility provided for in the Securing the Border rule is lifted and then cross irregularly.

The indefinite applicability of the entry period would also ensure that the

Circumvention of Lawful Pathways rule's incentive for migrants to utilize lawful, safe, and orderly pathways will continue should the enhanced measures in the Securing the Border rule not be in effect in the future. Although initially designed as a temporary measure, the Circumvention of Lawful Pathways rule is also a critical component of DHS's broader efforts to incentivize migrants to use the lawful, safe, and orderly pathways and processes that the United States Government has made available to them, thereby reducing irregular migration and allowing more efficient and timely processing at the southern border. *See* 88 FR at 31318. Since 2021, the Departments have steadily expanded such pathways, including by increasing refugee processing in the Western Hemisphere; providing country-specific and other available processes for individuals seeking parole for urgent humanitarian reasons or significant public benefit; and expanding the availability of the CBP One app to allow noncitizens to schedule appointments to present at a POE rather than risking their lives by crossing the border unlawfully.[439] To encourage noncitizens to continue to pursue such pathways, rather than putting their lives in the hands of dangerous smugglers and resorting to irregular migration that strains the border security and immigration system, the Departments are considering extending the Circumvention of Lawful Pathways rule indefinitely.

Fifth, there are a variety of factors outside of DHS's control that an indefinite extension could help mitigate. Political unrest abroad, natural disasters and climate change, perceptions about U.S. elections or changes in domestic policy, implications of elections in the region, large-scale economic fluctuations, and the migration management practices of regional partners (*e.g.,* their enforcement practices or visa policies)—all have the potential to serve as push or pull factors and dramatically impact encounters at the southern border. *See* 88 FR 31327. An indefinite extension would ensure consistency in U.S. border management practices and maintain a basic tool necessary to address potential migration surges.

Sixth, the Departments believe this approach would complement recent policy initiatives, including this Securing the Border rule, by allowing

DHS to continue to deliver timely consequences to more noncitizens encountered who do not have a legal basis to remain, even at levels of migration below the threshold at which the suspension and limitation on entry would be continued or reactivated.

Finally, extending the applicability of the rebuttable presumption would guard against a circumstance where an adverse litigation outcome against any aspect of this rule or its limitation on asylum eligibility would leave the Departments without sufficient tools in place to address high volumes of migration. Litigation against the IFR remains ongoing,[440] as does litigation against the Circumvention of Lawful Pathways Rule.[441] Maintaining the rebuttable presumption as a fallback measure is a commonsense way to address the possibility of a judicial decision that temporarily or permanently impairs the Departments' ability to implement this rule.

In considering whether to extend the temporal applicability of the Circumvention of Lawful Pathways rule's rebuttable presumption and credible fear provisions and, if so, how to implement such a change, the Departments expect to consider other changes to the rule's provisions warranted by an extension, and as necessary to achieve the goals of the rule. The Departments request comment regarding any such changes and particularly welcome comments addressing whether and how extending the Circumvention of Lawful Pathways rule's temporal applicability—especially an indefinite extension—would warrant:

• Amendments to the continuing applicability provisions at 8 CFR 208.33(c)(1) and 1208.33(d)(1) regarding future applicability of the rebuttable presumption of asylum ineligibility to those who enter and are subject to the Circumvention of Lawful Pathways rule's provisions;

• Amendments to the exception to continuing applicability at 8 CFR 208.33(c)(2) and 1208.33(d)(2) for certain asylum applications filed after May 11, 2025, by noncitizens who entered as children in a family unit and who later apply for asylum as principal applicants;

---

[439] *See* DHS, *Fact Sheet: DHS Continues to Strengthen Border Security, Reduce Irregular Migration, and Mobilize International Partnerships* (June 4, 2024), *https://www.dhs.gov/news/2024/06/04/fact-sheet-dhs-continues-strengthen-border-security-reduce-irregular-migration-and.*

[440] *See Las Americas Immigrant Advocacy Ctr.* v. *DHS,* No. 1:24–cv–1702–RC (D.D.C. filed June 12, 2024).

[441] *See East Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–06810, 2023 WL 4729278 (N.D. Cal. July 25, 2023), vacatur stayed pending appeal *East Bay Sanctuary Covenant* v. *Biden,* No. 23–16032 (9th Cir. Aug. 3, 2023); *M.A.* v. *Mayorkas,* No. 23–cv–01843 (D.D.C. June 6, 2023); *Texas* v. *Mayorkas,* No. 23–cv–00024 (W.D. Tex. May 23, 2023); and *Indiana* v. *Mayorkas,* 23–cv–00106 (D.N.D. May 31, 2023).

• Amendments to the grounds for necessarily rebutting the rebuttable presumption;

• Amendments to the exceptions to the rebuttable presumption; and

• The addition or amendment of any other specific regulatory provisions related to the Circumvention of Lawful Pathways rule in light of the proposal to extend the temporal application of the rebuttable presumption and related credible fear provisions.

## V. Regulatory Requirements

### A. Administrative Procedure Act

The Departments have forgone the Administrative Procedure Act's ("APA") delayed-effective-date procedure in implementing this rule because the Departments have found good cause to do so and because this rule relates to a foreign affairs function of the United States. *See* 5 U.S.C. 553(d)(3), (a)(1).[442] This rule generally adopts the provisions of the IFR with a few technical amendments and changes to the calculation of thresholds to ensure those provisions can remain in force until there has been a sustained decrease in daily encounters. None of the amendments, crucially, implicate the justifications for the 30-day waiting period. The purpose of the waiting period is "to give affected parties time to adjust their behavior before the final rule takes effect." *Riverbend Farms, Inc.* v. *Madigan*, 958 F.2d 1479, 1485 (9th Cir. 1992). Here, however, that purpose would not be served by delaying the effective date of the rule: The IFR has been in effect since June 5, and the limited changes adopted in this rule do not require anyone other than the Departments themselves to change their conduct or to take any particular steps in advance of the effective date. *See United States* v. *Gavrilovic*, 551 F.2d 1099, 1104 (8th Cir. 1977) (noting that the "legislative history of the APA" indicates that the waiting period "was not intended to unduly hamper agencies from making a rule effective immediately," but intended "to 'afford persons affected a reasonable time to prepare for the effective date of a rule . . . or to take other action which the issuance may prompt' " (citing S. Rep.

No. 752, 79th Cong., 1st Sess. 15 (1946); H.R. Rep. No. 1980, 79th Cong., 2d Sess. 25 (1946))). Instead, the changes made by this rule address the encounter thresholds that the Departments will use to determine the applicability of the rule's suspension and limitation on entry and better ensure that the measures devised to deal with emergency border circumstances will remain in place until there has been a sustained easing of those circumstances.

In finding good cause to bypass the 30-day waiting period, the Departments have taken care to "balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable [amount of] time to prepare for the effective date of [the] rul[e]." *Gavrilovic*, 551 F.2d at 1105. Here, that balance tips considerably in favor of immediate implementation, where the limited changes introduced by this rule preserve the status quo and do not interfere with the operative provisions of the IFR. At most, the amendments in this rule are designed to buttress the IFR's effectiveness in dealing with the emergency border circumstances by better ensuring that its limitation on asylum eligibility and other measures will stay in place until there has been a sustained improvement in encounter patterns across the southern border. For instance, the September 27 Proclamation and this rule provide that UCs from non-contiguous countries should be included in calculating the number of encounters to determine whether the suspension and limitation on entry remain in effect or are discontinued. They additionally provide that the suspension and limitation on entry are not to be discontinued unless there has been a 7-consecutive-calendar-day average of less than 1,500 encounters that is sustained over a period of 28 days. The changes to the threshold represent an incremental improvement upon the prior thresholds. These changes fine-tune the statistical parameters for tracking daily encounters so as to immunize the emergency measures from transitory blips in the data, but do not disturb or add to requirements imposed by the IFR.

Even in the narrow circumstances where the changes made in this final rule might have an effect on whether the rule's provisions apply, a waiting period would provide little benefit. The amendments do not impose new requirements or obligations on migrants contemplating a border crossing, nor on other entities that might claim an interest in the rulemaking, such as legal service organizations looking to help

noncitizens navigate the immigration system (or, to the extent such interests should be considered, smugglers and TCOs angling to learn about legal developments ahead of time so as to exploit perceived gaps in the border processing regime). All of those parties have long been on notice of the substantive provisions of the June 3 Proclamation and the IFR, none of which this rule purports to invalidate. The Proclamation and the IFR went into effect months ago and have since been the subject of regular public updates from DHS, as well as detailed coverage from the national news press.[443]

To the extent the threshold adjustments might have any effect in the next 30 days—*i.e.*, by preventing the IFR's emergency measures from being discontinued, when they otherwise would have turned off under the old parameters—this would only heighten the impetus for human smugglers and other criminals to inflate or distort the significance of the policy development to manufacture a sense of urgency among migrants and induce them to attempt to enter the country without delay.[444] As the Departments explained in the IFR, individuals contemplating entry into the United States may respond to both real and perceived incentives that stem from changes to border management and immigration

---

[442] There is also good cause to forgo notice and comment on the rule's updates to the cross-reference to the definition of "victim of a severe form of trafficking in persons" in 8 CFR 208.33(a)(3)(i)(C) and 1208.33(a)(3)(i)(C) from "§ 214.11" to "§ 214.201." Notice and an opportunity to comment on that technical change to the cross-reference is unnecessary as it does not change the substance of the provision and merely updates a cross-reference that has been rendered imprecise by a subsequent rulemaking. *See* 89 FR at 34931–32 (moving the definitions from 8 CFR 214.11 to the newly created 8 CFR 214.201).

[443] *See* DHS, *Fact Sheet: President Biden's Presidential Proclamation and Joint DHS–DOJ Interim Final Rule Cut Encounters at Southwest Border by 55 Percent* (July 24, 2024), *https://www.dhs.gov/news/2024/07/24/fact-sheet-president-bidens-presidential-proclamation-and-joint-dhs-doj-interim;* CBP, *Statistics Show Lowest Southwest Border Encounters in Nearly Four Years* (Aug. 16, 2024), *https://www.cbp.gov/newsroom/national-media-release/cbp-releases-july-2024-monthly-update;* Miriam Jordan & J. David Goodman, *Amid Talk of Border Chaos, Crossings Have Sharply Declined,* N.Y. Times (July 20, 2024), *https://www.nytimes.com/2024/07/20/us/border-immigration-current-situation.html;* Rebecca Santana & Elliot Spagat, *Border arrests fall more than 40% after Biden's halt to asylum processing, Homeland Security says,* AP News (June 26, 2024), *https://apnews.com/article/border-arrests-biden-asylum-mexico-immigration-6e302f06f567b96d88cc1333aa6d10fe.*

[444] *See* Nick Miroff & Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America,* Wash. Post (Oct. 24, 2018), *https://www.washingtonpost.com/world/national-security/theres-still-one-way-into-america/2018/10/24/db968842-aafb-11e8-8f4b-aee063e14538_story.html;* Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires,* AP News (May 11, 2023), *https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257c0220413b8e9cf9* ("Even as migrants were racing to reach U.S. soil before the rules expire, Mexican President Andrés Manuel López Obrador said smugglers were sending a different message. He noted an uptick in smugglers at his country's southern border offering to take migrants to the United States and telling them the border was open starting Thursday.").

policies. 89 FR at 48764. In such circumstances, it may be easier for smugglers to ''prey on migrants by spreading rumors, misrepresenting facts, or creating a sense of urgency to induce migrants to make the journey by overemphasizing the significance of recent or upcoming policy developments, among other tactics, and do so particularly when there is a change announced in U.S. policy.'' *Id.*

Immediate implementation is warranted not only in the absence of any benefit that advance notice would provide, but also to avoid the significant costs that would accrue to the Department if they had to toggle between applying and discontinuing the emergency border measures while waiting for this rule to go into effect. That is especially true for the amendment expanding the timeline over which a decline in encounters must be observed before the agencies will lift the suspension and limitation on entry consistent with the June 3 Proclamation. Prior to this rule, a one-day drop in the 7-consecutive-day average to a number below 1,500 encounters would have triggered the process by which the agencies must discontinue the emergency border measures—even if that drop turned out to be a mere one-off event amidst a longer pattern of daily encounters far exceeding 1,500. The amendments contained in this rule guard against such situations where the agencies' ability to consistently apply the rule's important measures might be disrupted by short-lived and intermittent fluctuations in the longitudinal tracking data.[445] That rationale extends to the decision to bypass the 30-day waiting period for this rule. Unless the amendments are implemented immediately, the agencies could face a predicament where they would have to abruptly suspend the emergency measures if the 7-consecutive-calendar-day-average dipped below 1,500 for a single day, only to then reverse course and reimpose the same measures as soon as encounters rose again to an average of 2,500 or more. Such sudden shifts in the

implementation of the June 3 Proclamation and IFR would be operationally burdensome to the agencies and would require the development and issuance of starkly differing instructions and internal guidance based on whether the measures had been discontinued, continued, or reactivated. The possibility of such shifts is arguably an inevitable consequence of the decision to limit the applicability of the rule's provisions to the existence of a temporary circumstance; at the same time, the Departments have sought to temper the frequency and severity of such shifts through two means: (1) in the IFR, providing for a gap between the 1,500-encounter threshold and the 2,500-encounter threshold, *see* 89 FR at 48753; and (2) in this rule, making modest changes to the provisions governing encounter calculations and discontinuation mechanics.

Finally, for similar reasons, immediate implementation is justified in light of the United States' foreign policy priorities. Because this rule involves a foreign affairs function of the United States, it is exempt from the APA's delayed-effective-date requirement. *See* 5 U.S.C. 553(a)(1); *see also* 89 FR at 48759–62. It is conceivable that had a 30-day waiting period been imposed, a very substantial one-day drop in the encounters average would have led to a discontinuation of the emergency provisions of the Proclamation and IFR. That in turn could have had a direct and immediate impact on migratory flows through other countries in the region, as those countries have articulated before. *See* 89 FR at 48761. Past experience has shown that even a *perceived* policy development can touch off a surge in irregular migration throughout the region. One regional partner, for example, concluded that the formation of caravans in the spring of 2022 was attributable to rumors of the termination of the Title 42 public health Order, which were followed by an official announcement. *Id.* Such effects are precisely the kind of ''definitely undesirable international consequences'' that the Departments seek to avoid by forgoing a waiting period. *Rajah,* 544 F.3d at 437 (quotation marks omitted). Immediate implementation also allows the United States to demonstrate its continued and shared commitment to addressing

irregular migration in the region, an objective that directly involves a foreign affairs function of the United States. *See* 89 FR at 48761–62.

In sum, the amendments introduced in this final rule do not fundamentally change the way in which the IFR addresses the emergency circumstances at the border and instead ensure that the system created in response to those circumstances remains in force until a decrease in encounters proves to be sustained. As a result, the purpose of the delayed-effective-date-requirement—providing affected parties time to adjust to changes in the status quo—would not be served by delaying effectiveness here, where the changes preserve the status quo. Moreover, even in the narrow circumstances in which this rule's changes to the thresholds would have an effect (by avoiding a discontinuation of the rule's emergency procedures due to a short-term change in encounter numbers), the Departments are unable to identify sufficient particular hardships to affected persons that would contravene fairness and potentially outweigh the Departments' considered assessment of the need for immediate implementation, including the need to avoid disruptive changes to the continuation of the rule's emergency provisions. There is good cause to forgo the 30-day waiting period for this rule and to instead implement it without delay.

*B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)*

Executive Orders 12866 (''Regulatory Planning and Review''), as amended by Executive Order 14094 (''Modernizing Regulatory Review''), and 13563 (''Improving Regulation and Regulatory Review'') direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

---

[445] For similar reasons, the June 3 Proclamation provides that the suspension and limitation on entry remain in place for 14 days after the agencies have determined there has been an average of less than 1,500 encounters. This allows ''the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in encounters is sustained.'' 89 FR at 48749.

The Office of Management and Budget has designated this rule a "significant regulatory action" as defined under section 3(f)(1) of Executive Order 12866, as amended by Executive Order 14094. Accordingly, the Office of Management and Budget has reviewed this rule.

1. Effects Under a Without-IFR Baseline

The primary effect of the final rule, as compared to a without-IFR baseline,[446] is to reduce incentives for irregular migration and illegal smuggling activity. As a result, the primary effects of this rule will be felt by noncitizens outside of the United States. In addition, for those who are present in the United States and described in the Proclamation, the rule will likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are determined to be ineligible for asylum and who are determined to lack a reasonable probability of establishing eligibility for protection from persecution or torture would remain in the United States. Noncitizens, however, can avoid the limitation on asylum eligibility under this rule if they meet an exception to the rule's limitation or to the Proclamation, including by presenting at a POE pursuant to a pre-scheduled time and place or by showing exceptionally compelling circumstances. Moreover, noncitizens who in credible fear screenings establish a reasonable probability of persecution or torture would still be able to seek statutory withholding of removal or CAT protection in proceedings before IJs.

The benefits of the rule are expected to include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and a reduction in the role of exploitative TCOs and smugglers. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the severe strain that further surges in irregular migration would impose on the Departments.

The direct costs of the rule are borne by noncitizens and the Departments. To the extent that any noncitizens are denied or do not seek asylum by virtue of the rule but would have received asylum in the absence of this rule, such an outcome would entail not only the loss of asylum but also its attendant benefits, although such persons may be granted statutory withholding of removal and withholding or deferral of removal under the CAT. Unlike asylees, noncitizens granted these more limited forms of protection do not have a path to citizenship and cannot petition for certain family members to join them in the United States. Such noncitizens may also be required to apply for employment authorization more frequently than an asylee would. As discussed in this preamble, the rule's manifestation of fear and reasonable probability standards may also engender a risk that some noncitizens with meritorious claims may not be referred for credible fear interviews or to removal proceedings to seek asylum and protection. In these cases, there would likely be costs to noncitizens that result from their removal.

The rule may also require additional time for AOs and IJs, during credible fear screenings and reviews, respectively, to inquire into the applicability of the rule and the noncitizen's fear claim. Similarly, where its provisions apply to a given case, applying the rule will require additional time during asylum adjudications before USCIS and before IJs during section 240 removal proceedings. On the other hand, in the absence of this rule's provisions, AOs and IJs would have to make other inquiries into potential fear claims under steady-state regulations and into asylum eligibility under the Circumvention of Lawful Pathways rule. In addition, as discussed throughout this preamble, the rule is expected to result in significantly reduced irregular migration and to filter out a greater portion of cases that are unlikely to ultimately be successful on the merits. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rule to be mitigated by a comparatively smaller number of credible fear cases and full adjudications on the merits than AOs and IJs would otherwise have been required to handle in the absence of the rule.

Other entities may also incur some indirect, downstream costs as a result of the rule. The effects should be considered relative to the baseline condition that would exist in the absence of this rule, which as noted above is the continued application of the Circumvention of Lawful Pathways rule. As compared to the baseline condition, this rule is expected to reduce irregular migration. DHS has recently described the impact of noncitizens on the U.S. labor market. *See, e.g.,* 89 FR 67459, 67486–88.

2. Effects Under a With-IFR Baseline

The only expected effects of this rule relative to a with-IFR baseline would involve the changes to the thresholds discussed above. As explained in Section II.C.1 of this preamble, the amendments marginally reduce the probability that the suspension and limitation on entry will be discontinued prematurely or remain discontinued during periods in which high levels of migration place significant strain on the Departments' resources and capabilities. The amendments do so by (1) requiring the 7-consecutive-calendar-day average below 1,500 encounters to persist for 28 consecutive calendar days before the 14-day waiting period is triggered, and by (2) including encounters of UCs from non-contiguous countries when calculating encounters for the purpose of the thresholds under sections 2(a) and 2(b) of the Proclamation.

It is challenging to predict with certainty the effects of the Departments' decision to adopt these changes. Although in some circumstances the Departments' decision could reduce the likelihood that the rule's limitation on asylum eligibility and changes to the credible fear process would be discontinued or remain discontinued, the Departments have not assigned a specific probability to such circumstances occurring. Encounter levels are driven by a variety of factors, many of which are external to the United States and difficult to predict, such as family and community networks, labor markets, environmental and security-related push factors, and rapidly evolving criminal smuggling networks. *See* 88 FR at 31327–28 & n.59.

If the changes to the thresholds were to result in this rule's emergency provisions remaining activated for a longer period of time than they would have been under the IFR, those changes would amplify this rule's effects relative to a with-IFR baseline. In such a circumstance, the same analysis presented with respect to the without-IFR baseline above would apply here as well, but the marginal impacts of this final rule (compared to the with-IFR baseline) are expected to be smaller than the marginal impacts of the IFR (compared to the without-IFR baseline). For instance, the primary effects of this

---

[446] The benefits and costs of a regulation under Executive Order 12866 are generally measured against a no-action baseline: an analytically reasonable forecast of the way the world would look absent the regulatory action being assessed, including any expected changes to current conditions over time. *See* OMB Circular No. A–4 11 (Nov. 9, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/11/CircularA-4.pdf.* For purposes of this analysis, the Departments use the without-IFR baseline as the primary baseline, and a with-IFR baseline as a secondary baseline. The primary baseline also serves as the baseline for the significance determination under section 3(f)(1) of Executive Order 12866.

**81280**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

rule would still be felt by noncitizens outside of the United States. And for those who are present in the United States, the rule would still likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are ineligible for asylum and who lack a reasonable probability of persecution or torture would remain in the United States. The changes made in this rule may decrease the administrative burdens associated with discontinuing and continuing or reactivating the measures contained in the rule.

3. Discontinuation Analysis Under a Without-IFR Baseline

For purposes of this assessment, the Departments have also analyzed the potential effects of the 7-consecutive-calendar-day average of encounters falling below 1,500. If that average remains below 1,500 encounters for 28 consecutive calendar days, and the 2,500-encounter threshold is not reached during the 14-day waiting period, the rule's provisions will be discontinued 14 days after the Secretary's determination and remain so until one day after the Secretary determines that the 7-consecutive-calendar-day average of encounters has reached 2,500.

The effects of discontinuation would depend on a wide range of factors that are difficult to predict and may involve factors arising from events occurring outside the United States, or entirely outside the Departments' control. Some such factors would include:
• Whether the Circumvention of Lawful Pathways rule would apply at the time of the discontinuation; [447]
• Whether metrics such as fear-claim rates and screen-in rates during the discontinuation period would resemble rates previously observed under the Circumvention of Lawful Pathways rule; [448]

• Whether, in the absence of a discontinuation, such rates would continue to resemble those observed from June 5, 2024, through August 31, 2024;
• Encounter levels and related demographics during the discontinuation period, which, in turn, are influenced by factors such as family and community networks, economic conditions, environmental and security-related push factors, responses to policy changes such as the discontinuation itself, and rapidly evolving criminal smuggling networks;
• Available processing resources;
• Tactical changes by smugglers and migrants;
• Misinformation, disinformation, or malinformation generated by smugglers and circulating online among migrant communities; and
• Whether and how soon the 2,500-encounter threshold for continuing or reactivating the rule's provisions would be reached.

Assuming the Circumvention of Lawful Pathways rule remains in effect at the time of a discontinuation, in the immediate aftermath of a discontinuation, the Departments would begin the processing of noncitizens under the Circumvention of Lawful Pathways rule's provisions: the Departments would apply the rebuttable presumption of asylum ineligibility during covered credible fear screenings and section 240 removal proceedings and employ a ''reasonable possibility of persecution or torture'' standard to screen for potential eligibility for statutory withholding of removal and CAT protection for those noncitizens who are unable to establish a significant possibility that the rebuttable presumption does not apply or that they can rebut it. Although it is impossible to reliably address these uncertainties quantitatively, the Departments offer a number of observations about the potential outcomes of a discontinuation while the Circumvention of Lawful Pathways rule applies.

Although the Circumvention of Lawful Pathways rule meaningfully improved the Departments' capacity to deliver timely decisions and consequences and is a critical tool for the Departments to incentivize the use of lawful, safe, and orderly pathways, see Section IV of this preamble, it did not yield efficiency benefits comparable to those delivered by the IFR. [449] Under

the Circumvention of Lawful Pathways rule, the average processing time for USBP encounters, from encounter to removal, was 44 days—down from 75 days in the pre-pandemic period; under the IFR, the average processing time decreased more than 25 percent as compared to the time period under the Circumvention of Lawful Pathways rule, to 32 days. [450] A comparison of the number of expedited removals processed per day is also instructive. Under the Circumvention of Lawful Pathways rule, USBP referred, on average, about 860 people for expedited removal per day, [451] while under the IFR, USBP referrals for expedited removal increased approximately 28 percent, to an average of nearly 1,100 persons per day. [452]

In particular, the elimination of lengthy and suggestive advisals and the shift to a manifestation standard under the Securing the Border rule contributes to a substantially lower proportion of noncitizens encountered between POEs at the SWB being referred for credible fear interviews. Fear-claim rates dropped from 57 percent under the Circumvention of Lawful Pathways rule to a 27 percent fear-claim rate under the IFR. [453]

The reduction in fear-claim rates allows USCIS to focus its resources more effectively and efficiently on those noncitizens who may have a fear of return to their native country or their country of removal or indicate an intention to seek fear-based relief or protection and enables DHS to more swiftly process and remove those who do not manifest a fear or express an intent to apply for asylum. [454] Congress has not provided the resources necessary to timely and effectively process and interview all those who

---

[447] In Section IV.B of this preamble, the Departments seek comment on whether to extend the applicability of that rule to certain noncitizens who enter the United States after May 11, 2025.

[448] As noted in Section II.A.2 of this preamble, under this rule, from June 5, 2024, through August 31, 2024, 27 percent of those encounters between POEs at the SWB and processed for expedited removal claimed fear, compared to a 57 percent fear-claim rate under the Circumvention of Lawful Pathways rule and a 37 percent fear-claim rate during the pre-pandemic period. OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab). Similarly, with this rule's ''reasonable probability'' standard in place, the comprehensive screen-in rate for those USBP encounters manifesting fear has decreased to approximately 57 percent, compared to approximately 62 percent for those screened under the Circumvention of Lawful Pathway rule with its lower ''reasonable possibility'' standard in place, and 83 percent in the pre-pandemic period.

OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[449] As discussed elsewhere in this preamble and in the Circumvention of Lawful Pathways rule, high

encounter rates at the southern border, combined with inadequate resources and tools to keep pace, have limited DHS's ability to impose timely consequences through expedited removal, the main consequence available at the border under title 8 authorities. See 89 FR at 48714. This mismatch between the resources made available by Congress and large numbers of encounters creates significant stress on the border and immigration systems that forces DHS to rely on slower processing pathways—limiting the Departments' ability to more quickly deliver consequences to individuals who do not have a legal basis to remain in the United States.

[450] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[451] OHSS analysis of July 2024 Persist Dataset (Imm Post Pandemic ERCF tab).

[452] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR ERCF tab).

[453] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[454] Id. (showing both reduced rates of fear claims/fear manifestation and reduced time from encounter to negative fear removals).

invoke credible fear procedures through the expedited removal process at the southern border, including under the Circumvention of Lawful Pathways rule. *See* 89 FR at 48732. When the Departments' ability to timely process, detain, and remove, as appropriate, noncitizens who do not establish a legal basis to remain in the United States is limited, it exacerbates the risk of severe overcrowding in USBP facilities and POEs and creates a situation in which large numbers of migrants—only a small proportion of whom are likely to be granted asylum—are not able to be expeditiously removed but are instead referred to backlogged immigration courts. *Id.* This situation is self-reinforcing: the expectation of a lengthy stay in the United States and the lack of timely consequences for irregular migration encourage more migrants to make the dangerous journey to the southern border to invoke credible fear procedures and take their chances on being allowed to remain in the country for a lengthy period. *Id.*

The Securing the Border rule expressly guards against the resource strains posed by very high levels of encounters; the day after the Secretary makes a factual determination that there have been 2,500 daily encounters, the Departments will again implement the Securing the Border rule, thereby reestablishing stronger incentives against irregular migration. But as discussed in Section II.C.1 of this preamble, the Departments may not be able to fully realize the benefits of the Securing the Border rule in the first few days of reactivation, because encounters made prior to reactivation must still be processed under the Circumvention of Lawful Pathways rule. Unnecessary discontinuations and reactivations also impose unnecessary costs on the Departments. And frequent discontinuations—which the changes made in this rule seek to avoid—risk signaling to migrants that emergency border circumstances are so temporal and episodic that the rule's measures can be avoided entirely by simply waiting in Mexico for a short period of time—which could lead to a cycle of surges that significantly disrupt border processing.

Finally, there are of course other differences between the two frameworks as well. For instance, the Circumvention of Lawful Pathways rule affects the asylum eligibility of a smaller number of migrants, because that rule generally does not affect the asylum eligibility of Mexican nationals. For such persons, the application of the Circumvention of Lawful Pathways rule instead of the Securing the Border rule could result in

greater access to asylum and its attendant benefits, and even those determined to be subject to the Circumvention of Lawful Pathways rule's rebuttable presumption of asylum ineligibility will be screened for statutory withholding of removal and CAT protection at the ''reasonable possibility'' standard, rather than the ''reasonable probability'' standard applied during statutory withholding of removal and CAT protection screenings under the Securing the Border rule.

4. Effects of Expansion and Extension of Circumvention of Lawful Pathways Rebuttable Presumption

In Section IV of this preamble, the Departments also propose to extend and expand the applicability of the Circumvention of Lawful Pathways rebuttable presumption. First, in Section IV.A of this preamble, the Departments request comment on whether to expand the rebuttable presumption (which currently applies to noncitizens who ''enter[ ] the United States from Mexico at the southwest land border or adjacent coastal borders'' after traveling through certain third countries) such that the rebuttable presumption would also apply to noncitizens who enter across southern coastal borders by sea and irrespective of whether such noncitizens traveled through a third country before entry across the southern coastal borders. This would expand the geographic reach of the rebuttable presumption. Second, in Section IV.B of this preamble, the Departments request comment on whether to indefinitely extend the entry period (currently scheduled to end on May 12, 2025) so that the rebuttable presumption will apply to noncitizens who enter the United States without documents sufficient for lawful admission any time on or after May 11, 2023. *See* 8 CFR 208.33(a)(1)(i), 1208.33(a)(1)(i).

The potential effects of such an expansion and extension are described in Section IV of this preamble. The expansion would (1) make clear to noncitizens intending to migrate to the United States that timely consequences will result if they resort to irregular migration no matter where along the southern border they cross; (2) deter smugglers and noncitizens from using dangerous maritime migration to avoid the rebuttable presumption of asylum ineligibility if the noncitizen did not travel through a country other than the noncitizen's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of

Refugees, *see* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii); and (3) ensure consistency in implementation between the Circumvention of Lawful Pathways rule's rebuttable presumption and the provisions in the Securing the Border rule.

The proposed extension of the Circumvention of Lawful Pathways rule's entry period would better preserve the Departments' ability to deliver timely decisions and consequences. Even with the Proclamation and Securing the Border rule in place, the absence of the Circumvention of Lawful Pathways rebuttable presumption after May 11, 2025 would mean that when the following three conditions are satisfied—(1) the threshold for discontinuing the Securing the Border rule's provisions has been met, (2) encounters between POEs begin to exceed 1,500 encounters, and (3) the threshold for continuing or reactivating the measures in this rule is not yet met—without the ability to apply the Circumvention of Lawful Pathways rebuttable presumption, the Departments' ability to deliver timely decisions and consequences would likely be impaired. For example, assuming similar processing capacity as during the immediate post-pandemic period and the same mix of encounter demographics as observed during the first two months of enforcement under the IFR, OHSS estimates that at 1,500 encounters (including all UCs), approximately 58 percent of single adult and family unit encounters would be quickly repatriated (including voluntary returns, reinstatements, and expedited removals) with the rebuttable presumption in effect, versus 46 percent in the absence of the rebuttable presumption.[455] At 2,500 encounters per day, OHSS estimates that 41 percent of single adult and family unit encounters would be quickly repatriated with the rebuttable presumption in effect, versus 34 percent in the absence of the rebuttable presumption.[456] These differences are driven by differences in fear-claim and screen-in rates.[457]

The primary effect of the Departments' proposed expansion and extension of the Circumvention of Lawful Pathways rebuttable presumption would be to reduce incentives for irregular migration and illegal smuggling activity during periods when the threshold for discontinuing

---

[455] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab).

[456] *Id.*

[457] *Id.*

the measures in the Securing the Border rule has been met or where that rule is otherwise not in effect due to an adverse litigation outcome against its asylum limitation or any aspect of that rule. The primary effects of such an expansion and extension would be felt by noncitizens outside of the United States. In addition, for those who are present in the United States and subject to the rebuttable presumption, such an action would likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are determined to be ineligible for asylum and who are determined to lack a reasonable possibility of establishing eligibility for protection from persecution or torture would remain in the United States. Noncitizens, however, can avoid the rebuttable presumption if they meet certain exceptions, including by presenting at a POE pursuant to a pre-scheduled time and place or by showing exceptionally compelling circumstances. Moreover, noncitizens who in credible fear screenings establish a reasonable possibility of persecution or torture would still be able to seek statutory withholding of removal or CAT protection in proceedings before IJs.

The benefits of such an expansion or extension would include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and a reduction in the role of exploitative TCOs and smugglers. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the strain that further surges in irregular migration would impose on the Departments.

The direct costs of the expansion or extension would be borne by noncitizens and the Departments. To the extent that any noncitizens are made ineligible for asylum by virtue of the rebuttable presumption but would otherwise have received asylum, such an outcome would entail the denial of asylum and its attendant benefits, although such persons may continue to be eligible for statutory withholding of removal and withholding or deferral of removal under the CAT. Unlike asylees, noncitizens granted these more limited forms of protection do not have a path to citizenship and cannot petition for certain family members to join them in the United States—although such noncitizens may in the end be granted asylum despite the rebuttable presumption by operation of the family

unity provision that applies in section 240 removal proceedings. Such noncitizens may also be required to apply for employment authorization more frequently than an asylee would.

The expansion and extension of the rebuttable presumption may also require additional time for AOs and IJs, during credible fear screenings and reviews, respectively, to inquire into the applicability of the rebuttable presumption to the noncitizen's fear claim. Similarly, where its provisions apply to a given case, applying the rebuttable presumption would require additional time during asylum adjudications before USCIS and before IJs during section 240 removal proceedings. However, such an expansion or extension may reduce perceived incentives for irregular migration. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rebuttable presumption to be mitigated by a comparatively smaller number of credible fear cases than AOs and IJs would otherwise have been required to handle in the absence of the rebuttable presumption.

Other entities may also incur some indirect, downstream costs as a result of an expansion or extension. The nature and scale of such effects will vary by entity and should be considered relative to the baseline condition that would exist in the absence of such an action, which would be the application of steady-state regulations that have not been the primary mode of the processing of noncitizens at the southern border since before the Title 42 public health Order. As compared to the baseline condition, an expansion and extension would be expected to reduce irregular migration. DHS has recently described the impact of noncitizens on the U.S. labor market. *See* 89 FR at 67486–88.

### C. Regulatory Flexibility Act

Under the Regulatory Flexibility Act ("RFA"), "[w]henever an agency is required by section 553 of [the APA], or any other law, to publish general notice of proposed rulemaking for any proposed rule, . . . the agency shall prepare and make available for public comment an initial regulatory flexibility analysis." 5 U.S.C. 603(a); *see also id.* 604(a) (final regulatory flexibility analysis). Such analysis requires agencies to consider the direct impact of the proposed rule on "small entities." *Id.* 603(a); *see also id.* 604(a) (final regulatory flexibility analysis). This rule does not directly regulate small entities and is not expected to have a direct effect on small entities. It does not

mandate any actions or requirements for small entities. Rather, this rule regulates individuals, and individuals are not defined as "small entities" by the RFA. *See* 5 U.S.C. 601(6). Based on the evidence presented in this analysis and throughout this preamble, the Departments certify that this final rule would not have a significant economic impact on a substantial number of small entities. And for the same reason, the Departments certify that the Circumvention of Lawful Pathways rule, if extended or expanded, would not have a significant economic impact on a substantial number of small entities.

### D. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 ("UMRA") is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may directly result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and Tribal governments, in the aggregate, or by the private sector. 2 U.S.C. 1532(a). The inflation-adjusted value of $100 million in 1995 is approximately $200 million in 2023 based on the Consumer Price Index for All Urban Consumers (CPI–U).[458]

The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 1502(1), 658(6). A "Federal intergovernmental mandate," in turn, is a provision that would impose an enforceable duty upon State, local, or Tribal governments (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(5). And the term "Federal private sector mandate" refers to a provision that would impose an enforceable duty upon the private sector (except as a condition

---

[458] *See* BLS, Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, by month, *https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202406.pdf* (last visited Sept. 21, 2024). Steps in calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the current year (2023); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2023 − Average monthly CPI–U for 1995) ÷ (Average monthly CPI–U for 1995)] × 100 = [(304.702 − 152.383) ÷ 152.383] = (152.319/152.383) = 0.99958001 × 100 = 99.96 percent = 100 percent (rounded). Calculation of inflation-adjusted value: $100 million in 1995 dollars × 2.00 = $200 million in 2023 dollars.

of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(7).

This rule does not constitute a Federal mandate because it does not impose any enforceable duty upon any other level of government or private sector entity. Any downstream effects on such entities would arise solely due to the entity's voluntary choices, and the voluntary choices of others, and would not be a consequence of an enforceable duty imposed by this proposed rule. Similarly, any costs or transfer effects on State and local governments would not result from a Federal mandate as that term is defined under UMRA. The requirements of title II of UMRA, therefore, do not apply, and the Departments have not prepared a statement under UMRA.

### E. Congressional Review Act

The Administrator of the Office of Information and Regulatory Affairs has determined that this rule does not meet the criteria set forth in 5 U.S.C. 804(2). When compared to the with-IFR baseline, the changes made in this final rule[459] have not resulted in, and are not likely to result in, an annual effect on the economy of $100,000,000 or more; a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets. The rule will be submitted to Congress and the Government Accountability Office consistent with the Congressional Review Act's requirements no later than its effective date.

### F. Executive Order 13132 (Federalism)

This rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

---

[459] The Administrator of the Office of Information and Regulatory Affairs has measured the effects of this final rule with a with-IFR baseline. *See* 5 U.S.C. 804(2); *compare* Section V.B of this preamble.

### G. Executive Order 12988 (Civil Justice Reform)

This rule meets the applicable standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988, Civil Justice Reform.

### H. Family Assessment

The Departments have reviewed this rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999, enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999. The Departments have reviewed the criteria specified in section 654(c)(1), by evaluating whether this regulatory action (1) impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local governments or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines a regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

The Departments have determined that the implementation of this rule will not impose a negative impact on family well-being or the autonomy or integrity of the family as an institution.

### I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)

This rule would not have Tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

### J. National Environmental Policy Act

DHS and its components analyze actions to determine whether the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. 4321 *et seq.*, applies to these actions and, if so, what level of NEPA review is required. 42 U.S.C. 4336. DHS's Directive 023–01, Revision 01 and Instruction Manual

023–01–001–01, Revision 01 ("Instruction Manual 023–01–001–01") establish the procedures that DHS uses to comply with NEPA and the Council on Environmental Quality ("CEQ") regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

Federal agencies may establish categorical exclusions for categories of actions they determine normally do not significantly affect the quality of the human environment and, therefore, do not require the preparation of an Environmental Assessment or Environmental Impact Statement. 42 U.S.C. 4336e(1); 40 CFR 1501.4, 1507.3(c)(8), 1508.1(e). DHS has established categorical exclusions, which are listed in Appendix A of its Instruction Manual 023–01–001–01. Under DHS's NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.

The rule adopts as final the following three changes to the process for those seeking asylum, statutory withholding of removal, or CAT protection during emergency border circumstances:

• For those who enter the United States across the southern border during emergency border circumstances and are not described in section 3(b) of the June 3 Proclamation, rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, DHS will continue to provide general notice regarding the processes for seeking asylum, statutory withholding of removal, and CAT protection, and will only refer a noncitizen for credible fear screenings if the noncitizen manifests a fear of return, or expresses an intention to apply for asylum or protection, expresses a fear of persecution or torture, or expresses a fear of return to their country or the country of removal.

• During emergency border circumstances, those who enter the United States across the southern border and who are not described in paragraph 3(b) of the June 3 Proclamation will continue to be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of

**81284** **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

their family as described in 8 CFR 208.30(c) when they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.201.

• The limitation on asylum eligibility will continue to be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and who are not described in section 3(b) of the June 3 Proclamation and do not establish exceptionally compelling circumstances under the credible fear screening standard will receive a negative credible fear determination with respect to asylum and will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, under a higher standard than that applied to noncitizens in a similar posture under the Circumvention of Lawful Pathways rule.

This rule also makes a small number of changes consistent with the overall purpose and structure of the IFR, as discussed in Section II.C of this preamble, and requests comment on the potential expansion and extension of the applicability of the Circumvention of Lawful Pathways rebuttable presumption.

Given the nature of the final rule with request for comment, DHS has determined that it is categorically excluded under its NEPA implementing procedures, as it satisfies all three relevant conditions. First, the final rule with request for comment clearly fits within categorical exclusions A3(a) and A3(d) of DHS's Instruction Manual 023–01–001–01, Appendix A, for the promulgation of rules of a "strictly administrative or procedural nature" and rules that "interpret or amend an existing regulation without changing its environmental effect," respectively. The IFR changed certain procedures relating to the processing of certain noncitizens during emergency border circumstances, and does not result in a change in environmental effect. This final rule makes only modest changes to the IFR and seeks comment on the expansion and extension of the Circumvention of Lawful Pathways rebuttable presumption. Second, this final rule with request for comment is a standalone rule and is not part of any larger action.[460] Third, in accordance

---

[460] *See* Instruction Manual 023–01–001–01, at V–5.

with its NEPA implementing procedures, DHS has determined no extraordinary circumstances exist that would cause a significant environmental impact. Therefore, this final rule is categorically excluded, and no further NEPA analysis or documentation is required. DOJ is adopting the DHS determination that this final rule is categorically excluded under A3(a) and A3(d) of DHS's Instruction Manual 023–01–001–01, Appendix A, because the final rule's limitation on asylum eligibility and the "reasonable probability" standard will be applied by EOIR in substantially the same manner as it will be applied by DHS and DOJ is not aware of any extraordinary circumstances that would require the preparation of an environmental assessment or environmental impact statement. *See* 40 CFR 1506.3(d) (setting forth the ability of an agency to adopt another agency's categorical exclusion determination).

### *K. Paperwork Reduction Act*

This rule does not adopt new, or revisions to existing, "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

### List of Subjects

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 235*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### Department of Homeland Security

Accordingly, the interim final rule amending 8 CFR parts 208 and 235, which was published at 89 FR 48710 on June 7, 2024, is adopted as final with the following changes:

### PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; 8 CFR part 2; Pub. L. 115–218.

■ 2. Amend § 208.13 by revising paragraph (g) and adding paragraph (h) to read as follows:

### § 208.13   Establishing asylum eligibility.

\*      \*      \*      \*      \*

(g) *Entry during emergency border circumstances.* For an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, as defined in paragraph (h) of this section) between the dates described in section 1 and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 208.35.

(h) *References to the Presidential Proclamation of June 3, 2024.* For purposes of paragraph (g) of this section and this chapter, the Presidential Proclamation of June 3, 2024, refers to Proclamation 10773 of June 3, 2024, as amended by the Presidential Proclamation of September 27, 2024. The Department intends that in the event the Presidential Proclamation of September 27, 2024, or the portions of this chapter referring to it are rendered inoperative by court order, this chapter shall continue to operate as if the references to that Proclamation have been stricken.

### § 208.33   [Amended]

■ 3. Amend § 208.33 by removing the reference to "§ 214.11(a)" in paragraph (a)(3)(i)(C) and adding in its place "§ 214.201.

■ 4. Amend § 208.35 by:
■ a. Removing the reference to "§ 214.11" in paragraph (a)(2)(i)(C) and adding in its place "§ 214.201";
■ b. Revising paragraph (b)(2)(i); and
■ c. Removing the words "Presidential Proclamation of June 3, 2024, Securing the Border," and "Proclamation" wherever they appear and adding, in their place, the words "Presidential Proclamation of June 3, 2024, as defined in 8 CFR 208.13(h),".

The revision reads as follows:

### § 208.35   Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.

\*      \*      \*      \*      \*

(b) \*  \*  \*

(2) \*  \*  \*

(i) In cases in which the asylum officer enters a negative credible fear determination under paragraph (b)(1)(i) or (b)(3) of this section, the asylum officer will assess the alien under the procedures set forth in § 208.33(b)(2)(i) except that the asylum officer will apply a reasonable probability standard. For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not.

*    *    *    *    *

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 5. The authority citation for part 235 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2003 Comp., p. 278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1365b, 1379, 1731–32; 48 U.S.C. 1806, 1807, and 1808 and 48 U.S.C. 1806 notes (title VII, Pub. L. 110–229, 122 Stat. 754); 8 U.S.C. 1185 note (sec. 7209, Pub. L. 108–458, 118 Stat. 3638, and Pub. L. 112–54, 125 Stat. 550).

### § 235.15   [Amended]

■ 6. Amend § 235.15 by removing the words ''Presidential Proclamation of June 3, 2024, Securing the Border,'' wherever they appear and adding, in their place, the words ''Presidential Proclamation of June 3, 2024, as defined in 8 CFR 208.13(h),''.

### Department of Justice

Accordingly, the interim final rule amending 8 CFR part 1208, which was published at 89 FR 48710, on June 7, 2024, is adopted as final with the following changes:

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 7. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; Pub. L. 115–218.

■ 8. Amend § 1208.13 by revising paragraph (g) and adding paragraph (h) to read as follows:

### § 1208.13   Establishing asylum eligibility.

*    *    *    *    *

(g) *Entry during emergency border circumstances.* For a noncitizen who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, as defined in paragraph (h) of this section) between the dates described in section 1 and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 1208.35.

(h) *References to the Presidential Proclamation of June 3, 2024.* For purposes of paragraph (g) of this section and § 1208.35, the Presidential Proclamation of June 3, 2024, refers to Proclamation 10773 of June 3, 2024, as amended by the Presidential Proclamation of September 27, 2024. The Department intends that in the event the Presidential Proclamation of September 27, 2024, or the portions of this chapter referring to it are rendered inoperative by court order, this chapter shall continue to operate as if the references to that Proclamation have been stricken.

### § 1208.33   [Amended]

■ 9. Amend § 1208.33 by removing the reference to ''8 CFR 214.11'' in paragraph (a)(3)(i)(C) and adding in its place ''8 CFR 214.201''.

■ 10. Amend § 1208.35 by:

■ a. Removing the reference to ''§ 214.11(a)'' in paragraph (a)(2)(i)(C) and adding in its place ''§ 214.201'';

■ b. Revising paragraph (b)(2)(iii);

■ c. Removing the words ''An alien'' and adding in their place the words ''A noncitizen'', wherever they appear;

■ d. Removing the words ''the alien'' and adding in their place the words ''the noncitizen'', wherever they appear;

■ e. Removing the words ''the alien's'' and adding in their place the words ''the noncitizen's'', wherever they appear;

■ f. Removing the words ''an alien'' and adding in their place the words ''a noncitizen'', wherever they appear;

■ g. Removing the words ''The alien'' and adding in their place the words ''The noncitizen'', wherever they appear; and

■ h. Removing the words ''Presidential Proclamation of June 3, 2024, Securing the Border,'' and ''Proclamation'' wherever they appear and adding, in their place, the words ''Presidential Proclamation of June 3, 2024, as defined in 8 CFR 1208.13(h).

The revision reads as follows:

### § 1208.35   Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.

*    *    *    *    *

(b) *    *    *

(2) *    *    *

(iii) Where the immigration judge determines that the noncitizen is subject to the limitation on asylum eligibility under paragraph (a) of this section, the immigration judge shall assess the noncitizen under the procedures set forth in § 1208.33(b)(2)(ii) except that the immigration judge shall apply a reasonable probability standard. For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not.

*    *    *    *    *

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

Dated: September 27, 2024.

**Merrick B. Garland,**

*Attorney General, U.S. Department of Justice.*

[FR Doc. 2024–22602 Filed 9–30–24; 1:00 pm]

**BILLING CODE 4410–30–P; 9111–97–P**

below in advance of the meeting. The open session will be videocast and can be accessed from the NIH Videocasting website (*http://videocast.nih.gov/*).

The meeting will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5 U.S.C., as amended. The grant applications and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the grant applications, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* Council of Councils.
*Date:* April 21, 2025.
*Open:* April 21, 2025, 10:00 a.m. to 12:15 p.m.
*Agenda:* Welcome and Opening Remarks; Announcements, and NIH Program Updates; Presentations; and Other Business of the Committee.
*Place:* National Institutes of Health Building 1, 1 Center Drive, Bethesda, MD 20892 (Virtual Meeting).
*Closed:* April 21, 2025, 12:15 p.m. to 01:15 p.m.
*Agenda:* Review of Grant Applications.
*Place:* National Institutes of Health Building 1, 1 Center Drive, Bethesda, MD 20892 (Virtual Meeting).
*Open:* April 21, 2025, 01:15 p.m. to 04:35 p.m.
*Agenda:* NIH Program Updates; Presentations; and Other Business of the Committee.
*Place:* National Institutes of Health Building 1, 1 Center Drive, Bethesda, MD 20892 (Virtual Meeting).
*Contact Person:* Franziska Grieder, D.V.M., Ph.D., Executive Secretary, Council of Councils, Director, Office of Research Infrastructure Programs, Division of Program Coordination, Planning, and Strategic Initiatives, Office of the Director, NIH, 6701 Democracy Boulevard, Room 948, Bethesda, MD 20892, *GriederF@mail.nih.gov*, 301–435–0744.

Any interested person may file written comments with the committee by forwarding the statement to the Contact Person listed on this notice. The statement should include the name, address, telephone number and when applicable, the business or professional affiliation of the interested person.

Information is also available on the Council of Council's home page at *http://dpcpsi.nih.gov/council/* where an agenda and any additional information for the meeting will be posted when available.

(Catalogue of Federal Domestic Assistance Program Nos. 93.14, Intramural Research Training Award; 93.22, Clinical Research Loan Repayment Program for Individuals from Disadvantaged Backgrounds; 93.232, Loan Repayment Program for Research Generally; 93.39, Academic Research Enhancement Award; 93.936, NIH Acquired Immunodeficiency Syndrome Research Loan Repayment Program; 93.187, Undergraduate Scholarship Program for Individuals from Disadvantaged Backgrounds, National Institutes of Health, HHS)

Dated: March 20, 2025.

**Bruce A. George,**
*Program Analyst, Office of Federal Advisory Committee Policy.*

[FR Doc. 2025–05010 Filed 3–24–25; 8:45 am]

**BILLING CODE 4140–01–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans

**ACTION:** Notice.

**SUMMARY:** The Department of Homeland Security ("DHS") is terminating the categorical parole programs for inadmissible aliens from Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members (hereinafter referred to as "CHNV parole programs") that DHS announced in 2022 and 2023. This **Federal Register** notice is intended to provide context and guidance to the public regarding the termination of the CHNV parole programs and related employment authorization.

**DATES:** DHS is terminating the CHNV parole programs as of March 25, 2025. The temporary parole period of aliens in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary. Parolees without a lawful basis to remain in the United States following this termination of the CHNV parole programs must depart the United States before their parole termination date.

**FOR FURTHER INFORMATION CONTACT:** Ihsan Gunduz, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background

Over the previous two years, DHS has implemented programs through which inadmissible aliens who are citizens or nationals of designated countries, and their immediate family members, could request authorization to travel to the United States in order to be considered for parole into the country.[1] Under these

---

[1] Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a

---

categorical parole programs, potentially eligible beneficiaries were adjudicated on a case-by-case basis, for advance authorization to travel to a U.S. port of entry ("POE") in the interior of the country to seek a discretionary grant of parole.

On January 20, 2025, President Trump issued Executive Order 14165, "Securing Our Borders."[2] Section 2 of the Order establishes a policy of the United States to take all appropriate action to secure the borders of our Nation through a range of means, including deterring and preventing the entry of illegal aliens into the United States, and removing promptly all aliens who enter or remain in violation of Federal law. Section 7 of the Order directs the Secretary of Homeland Security to, consistent with applicable law, take all appropriate action to "[t]erminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders, including the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.'"

Consistent with the President's direction, and for the independent reasons stated in this notice, this notice terminates the CHNV parole programs. Although DHS established the categorical programs for each country through a separate notice in the **Federal Register**, the justification for the establishment of each of the four categorical programs was very similar,[3] and the rationale for termination is largely consistent for all four parole programs. Thus, DHS is announcing the termination of all four parole programs by publishing this single notice in the **Federal Register**.

## II. DHS Parole Authority

The Immigration and Nationality Act ("INA") confers upon the Secretary of Homeland Security ("Secretary") the narrow discretionary authority to parole inadmissible aliens into the United States "temporarily under such conditions as [DHS] may prescribe only on a case-by-case basis for urgent

---

Change to the Parole Process for Cubans, 88 FR 26329 (Apr. 28, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Change to the Parole Process for Haitians, 88 FR 26337 (Apr. 28, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[2] *See* Executive Order 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025).

[3] *Compare, e.g.,* 88 FR at 1260–63, *with* 88 FR at 1248–52 (setting out the justifications for the parole programs for Nicaragua and Haiti, respectively).

humanitarian reasons or significant public benefit.'' *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 8 CFR 212.5(a) and (c) through (e) (discretionary authority for establishing conditions of parole and for terminating parole). Additionally, upon a finding by DHS that the purpose of the temporary, discretionary parole has been served, the alien is required to depart the United States ''or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.'' INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

A review of the history of the parole authority supports the contention that discretionary parole determinations were intended by Congress to be narrowly tailored to specific instances and not based on a set of broadly applicable eligibility criteria.[4] Under the law, the determination to parole an alien into the country should only be made on a case-by-case basis, taking into account each alien's unique circumstances. The ultimate determination whether to parole an alien into the United States upon the alien's arrival at a POE is made by U.S. Customs and Border Protection (''CBP'') officers. *See* 8 CFR 212.5(a).

Parole is inherently temporary, and parole alone is not an underlying basis

for obtaining any immigration status, nor does it constitute an admission to the United States. *See* INA 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A). Once an alien is paroled into the United States, the parole allows the alien to stay temporarily in the United States for the duration of the parole period unless and until the parole expires or is otherwise terminated. *See* 8 CFR 212.5(e).

Paroled aliens, including those paroled under the CHNV parole programs, may apply for any immigration benefit or status for which they may be eligible, including discretionary employment authorization under the (c)(11) employment eligibility category. *See* 8 CFR 274a.12(c)(11). In the absence of any subsequent application conferring an immigration benefit or status, and upon termination of parole, such alien will remain an arriving alien. *See* 8 CFR 1.2; *see also* INA 101(a)(13)(B), 8 U.S.C. 1101(a)(13)(B).

## III. Rationale for Initial Implementation

When DHS established the CHNV parole programs, DHS provided several justifications for their promulgation. *See, e.g.,* 88 FR at 1248–51 (Implementation of a Parole Process for Haitians). Overall, DHS stated that the programs would provide a significant public benefit for the United States and address the urgent humanitarian reasons underlying the high levels of migration from those countries.

With respect to the significant public benefit, DHS wrote that the CHNV parole programs would: (i) enhance border security by reducing illegal immigration between the POEs, (ii) minimize the domestic impact of high levels of illegal immigration by CHNV nationals, particularly in border communities; (iii) improve vetting for national security and public safety; (iv) reduce the strain on DHS personnel and resources; (v) disincentivize a dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

For the reasons discussed below, DHS has determined that it is now appropriate and necessary to terminate the CHNV parole programs. These programs do not serve a significant public benefit, are not necessary to reduce levels of illegal immigration, did not sufficiently mitigate the domestic effects of illegal immigration, are not serving their intended purposes, and are inconsistent with the Administration's

foreign policy goals.[5] Regarding previous arguments or determinations that these programs were consistent with the requirement of ''urgent humanitarian reasons'' for granting parole, DHS believes that consideration of any urgent humanitarian reasons for granting parole is best addressed on a case-by-case basis consistent with the statute, and taking into consideration each alien's specific circumstances. These reasons, independently and cumulatively, support termination of the CHNV parole programs.

Accordingly, the Secretary, in her discretion, is terminating the CHNV parole programs. Consistent with her statutory authority, the Secretary retains discretion to continue to extend parole to any alien paroled under CHNV— temporarily under such conditions as she may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit. *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). The decision to do so, or not do so, is committed to the Secretary's sole discretion.

*1. The CHNV Parole Programs Are Unnecessary To Achieve Border Security Goals*

From the announcement of the parole program for Venezuelans and their immediate family members on October 12, 2022, through the subsequent addition of the programs for Cubans, Haitians, Nicaraguans, and their immediate family members in January 2023, and until January 22, 2025, approximately 532,000 inadmissible aliens were granted advance authorization to travel to the United States and receive consideration for parole into the United States.[6]

One justification for these 532,000 discretionary paroles was to ''enhance border security'' at the southwest border of the United States.[7] DHS reasoned that by ''incentivizing individuals to seek a lawful, orderly means of traveling to the United States, while imposing

---

[4] Parole was codified into immigration law in the Immigration and Nationality Act of 1952. As envisioned then, the 1952 Act authorized the Attorney General to parole aliens temporarily under such conditions as he may prescribe for emergent reasons or reasons deemed strictly in the public interest. As expressed then, ''the parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted.'' *See Leng May Ma* v. *Barber,* 357 U.S. 185, 190 (1958). However, the parole authority, whether intended to be narrow or broad, has in fact been used in an increasingly broad manner since its inception, often earning the criticism of Congress, which in 1996 wrote, ''[i]n recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.'' *See* H.R. Rep. 104–469, pt. 1, at 140 (1996). Furthermore, the Illegal Immigration Reform and Immigration Responsibility Act of 1996 (''IIRIRA'') struck from INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), the phrase, ''for emergent reasons or for reasons deemed strictly in the public interest'' as grounds for granting parole into the United States and inserted ''only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' *See* Public Law 104–208, div. C, § 602(a). ''The legislative history indicates that this change was animated by concern that parole under 8 U.S.C. 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy.'' *Cruz-Miguel* v. *Holder,* 650 F.3d 189, 199 n.15 (2d Cir. 2011).

[5] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (''. . . when the purposes of such parole shall, in the opinion the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled.'').

[6] Office of Homeland Security Statistics (''OHSS'') analysis of advanced travel authorizations data provided by CBP Passenger Systems Program Directorate and valid as of January 22, 2025. Beneficiary travel authorizations excluded expired applications. The Venezuelan program started on October 18, 2022, and the Cuba, Haiti, Nicaragua parole programs started January 6, 2023.

[7] *See, e.g.,* 88 FR at 1255 (''The [Nicaraguan] parole process is intended to enhance border security by reducing the record levels of Nicaraguan nationals entering the United States between POEs.'').

consequences to irregular migration, . . . the new parole process will mitigate anticipated future surges'' of illegal immigration. *See, e.g.,* 88 FR at 1249 (Implementation of a Parole Process for Haitians). DHS pointed to past experience with rapidly increasing ''encounters of Guatemalan and Honduran nationals from January 2021 until August 2021'' along the southwest border, explaining that the resumption of repatriation flights to Guatemala and Honduras helped reduce the amount of illegal immigration but was insufficient to address the sheer numbers.[8] Accordingly, the CHNV parole programs contemplated enhancing border security by combining ''a consequence for [nationals seeking] to enter the United States [in an unlawful manner between POEs (*i.e.,* removal or return to a third country, such as Mexico), while introducing] an incentive to use [a] lawful process to request authorization to travel by air to and enter the United States, without making the dangerous journey to the border.''[9]

Upon review, DHS concludes that this ''deterrent'' and ''incentive'' approach did not result in a sufficient and sustained improvement in border security, and has exacerbated challenges associated with interior enforcement of the immigration laws. Encounters of CHNV nationals, particularly at POEs, remained unacceptably high while the CHNV parole programs were in effect, and overall migration of CHNV nationals to the United States increased between October 12, 2022 and January 22, 2025. In addition, the CHNV parole programs have at best traded an unmanageable population of unlawful migration along the southwest border for the additional complication of a substantial population of aliens in the interior of the United States without a clear path to a durable status.

As an initial matter, DHS acknowledges that in establishing the CHNV parole programs, and in subsequent DHS evaluations of these programs, DHS focused, in part, on a goal of reducing encounters of CHNV nationals between POEs.[10] And it is true that there was a reduction in encounters

of CHNV nationals between POEs from FY 2022 through FY 2024—from around 600,000 encounters in FY 2022 to 416,000 in FY 2023 and 183,000 in FY 2024.[11] But in implementing the CHNV parole programs, DHS also focused on the importance of reducing pressures at the southwest border generally. It was for this reason that the CHNV parole programs required, for instance, that CHNV nationals ''fly at their own expense to an interior [POE] rather than entering at a land POE''[12] and rendered ineligible those CHNV nationals who irregularly entered the United States, Mexico, or Panama after the programs' announcement.[13]

Consistent with that focus and in light of the reality that DHS's border security mission involves activities at southwest border POEs as well, DHS has concluded that the present assessment of the efficacy of the CHNV parole programs should include encounters at such land POEs. If one includes encounters of CHNV nationals at POEs, the actual reduction in southwest border encounters of CHNV nationals is much more muted: encounters of CHNV nationals at and between southwest border POEs dropped from approximately 626,000 in FY 2022 only to 584,000 in FY 2023 and 535,000 in FY 2024.[14] This is due to a significant increase in encounters of such aliens at southwest border POEs over that time period: from 26,250 in FY 2022 to 168,010 in FY 2023 and 352,790 in FY 2024.[15] The increase can be attributed to the use of the CBP One mobile application (''CBP One app'' or ''CBP One'') to schedule appointments at southwest border POEs,[16] which resulted in very high numbers of CHNV nationals placed into removal proceedings pursuant to section 240 of the INA, 8 U.S.C. 1229a, (''section 240 removal proceedings'') and released into

U.S. border communities,[17] exacerbating the immigration court backlog and the poor incentives that the backlog creates.[18] Finally, it is important to emphasize that in addition to these southwest border encounters, DHS must also consider the 532,000 parolees who entered the United States under the CHNV parole programs.

The decision to terminate the discretionary and temporary parole programs is further informed by the actions of the prior administration, which found the CHNV parole programs, even when paired with the Circumvention of Lawful Pathways rule, to be insufficient to address very high levels of illegal immigration.[19] For example, DHS and the Department of Justice (DOJ) promulgated the Securing the Border framework[20] as an emergency measure to address ongoing high levels of unlawful immigration between southwest border POEs.[21] The Departments explained that ''at the current levels of encounters and with current resources, [DHS] cannot predictably and swiftly deliver consequences to most noncitizens who cross the border without a lawful basis to remain . . . [DHS's] ability to refer and process noncitizens through expedited removal thus continues to be overwhelmed, creating a vicious cycle.''[22] This conclusion—that DHS's ability to swiftly impose consequences for illegal immigration ''continue[d] to be overwhelmed''[23]—followed nearly two years of the CHNV parole programs, whose chief justification had been facilitating operational control of the

---

[8] *See, e.g.,* 87 FR at 63509.

[9] *See, e.g.,* 87 FR at 63510.

[10] *See, e.g.,* 87 FR at 63507 (''The parole process is intended to enhance border security by reducing the record levels of Venezuelan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.''); *see also* Circumvention of Lawful Pathways 88 FR 31314, 31317 (May 16, 2023) (noting that in the first weeks following implementation of the CHNV parole programs, encounters of CHNV nationals between POEs dropped significantly).

[11] OHSS analysis of January 2025 OHSS Persist Dataset.

[12] *See, e.g.,* 87 FR at 63507; *see also id.* at 63512 (explaining that by ''diverting flows of Venezuelan nationals to interior POEs through a safe and orderly process,'' DHS could relieve pressure on border communities).

[13] *See, e.g.,* 87 FR at 63515.

[14] OHSS analysis of January 2025 OHSS Persist Dataset.

[15] OHSS analysis of January 2025 OHSS Persist Dataset.

[16] Section 7 of Executive Order 14165 also directed the Secretary to, consistent with applicable law, take all appropriate action to cease using the CBP One app. as a method of paroling or facilitating the entry of otherwise inadmissible aliens into the United States. DHS has ceased the use of the CBP One app for this purpose. *See* CBP, Press Release, CBP Removes Scheduling Functionality in CBP One™ App (Jan. 21, 2025), *https://www.cbp.gov/ newsroom/national-media-release/cbp-removes-scheduling-functionality-cbp-one-app* (last updated Jan. 22, 2025).

[17] A total of 582,800 CHNV nationals with CBP One registration numbers were encountered at southwest border POEs from Jan. 1, 2023–Jan. 31, 2025, including 576,900 (99 percent) that were issued NTAs. OHSS analysis of January 2025 OHSS Persist Dataset.

[18] *See, e.g.,* Securing the Border, 89 FR 81156, 81181 (Oct. 7, 2024) (explaining that particularly in light of the immigration court backlog, ''releasing individuals who may otherwise be referred for expedited removal may inadvertently incentivize increased irregular migration and the exploitation of the asylum system, especially by human smugglers who encourage migrants to claim fear once they are encountered by USBP as it will allow them to remain in the United States for years pending resolution of their case and, where appropriate, removal.'').

[19] 88 FR 31314 (May 16, 2023).

[20] *See* 89 FR 48710 (June 7, 2024) (interim final rule); 89 FR 81156 (Oct. 7, 2024) (final rule).

[21] ''On June 3, 2024, the President signed Proclamation 10773 under sections 212(f) and 215(a) of the INA, finding that because border security and immigration systems of the United States were unduly strained, the entry into the United States of certain categories of [aliens] was detrimental to the interests of the United States, and suspending and limiting the entry of such [aliens].'' *See* 89 FR at 48157–58.

[22] 89 FR at 48714.

[23] 89 FR at 48715.

southwest border of the United States. Promulgation of the Securing the Border interim final rule in June 2024 reflected the reality that the CHNV parole programs and Circumvention of Lawful Pathways rule did not sufficiently enhance border security.[24]

Finally, to whatever extent the CHNV parole programs could be characterized as reducing encounters of CHNV nationals at the southwest border from the very high levels that existed in late 2022, DHS does not believe that the programs are necessary to achieve such reductions at this time. In December 2022—the last full month prior to implementation of all four programs—the U.S. Border Patrol (USBP) encountered around 84,000 CHNV nationals at the southwest border.[25] That figure has been below 12,000 every month since January 2024, and below 6,000 every month since June 2024, when DHS and DOJ issued the Securing the Border rule.[26] In January 2025, even with the CHNV parole programs paused, USBP encountered around 3,400 CHNV nationals at the southwest border.[27] Whatever the need for these programs may have been in late 2022, the situation at the southwest border now, and the set of tools implemented by DHS to deter illegal immigration, are quite different.

Moreover, with the implementation of President Trump's policies beginning on January 20, 2025, border encounters generally have continued to drop notwithstanding the ongoing pause on these programs. Southwest border encounters between POEs fell from an average of about 1,180 aliens per day in the two-week period ending on January 20, 2025, to an average of about 640 per day in the two-week period from January 21 to February 3, 2025, and fell further to an average just under 260 per day in the two-week period from February 12, 2025 to February 25, 2025.[28] Over those same three time periods, southwest border releases from USBP custody fell from an average of about 240 per day to an average of about 50 per day and then an average of fewer than 5 per day.[29]

The need to break the "vicious cycle" of unlawful immigration supports this DHS action to terminate the CHNV parole programs in favor of new presidential directives that address the demand for enhanced border security beyond the 2024 Securing the Border framework.[30] Executive Order 14165, "Securing Our Borders," [31] and Executive Order 14159, "Protecting the American People Against Invasion," [32] exemplify more reasoned and realistic initiatives to control unlawful immigration at the southwest border of the United States.

## 2. The Domestic Effects of Illegal Immigration Continued To Be Felt Throughout Implementation of the CHNV Parole Programs

Although one goal of the CHNV parole programs was to "help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of arriving migrants at the SWB," the programs did not have this effect. As discussed in the preceding section, overall levels of CHNV migration at and between southwest border POEs did not fall dramatically year-over-year in FY 2023 and FY 2024. In addition, if one takes into account the 532,000 parolees who entered the United States at an interior POE, CHNV migration may have increased over the relevant time period. Recent policy interventions have proven more effective than the CHNV parole programs in addressing very high levels of illegal immigration.

Over the past few years, there has been extensive public discussion of the effects of high levels of illegal immigration and inadmissible aliens arriving in local communities. Although public accounts of these effects do not always distinguish between aliens strictly on the basis of how they entered the country or their status (e.g., CHNV parolees; aliens whom DHS encountered at a southwest border POE placed in section 240 removal proceedings; and aliens present without admission or parole), localities nationwide have experienced the effects of very high levels of migration.[33] CHNV parolees and other recent arrivals have competed for limited resources such as housing, food, transportation, education, legal services, and public benefits.[34] Some localities experienced surges of CHNV parolees in particular.[35]

The domestic impact of the CHNV parole program was also felt at the Federal level in at least three ways. First, the CHNV parole programs resulted in expanded eligibility for Federal public benefits. This is because, for instance, an alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year is considered a "qualified alien." See 8 U.S.C. 1641(b)(4). Because DHS generally issued two-year periods of parole from the outset, CHNV parolees generally were considered qualified aliens. Although qualified aliens are generally subject to a five-year waiting period before becoming eligible for certain Federal public benefits, see, e.g., 8 U.S.C. 1613(a) (five-year waiting period for Federal means-tested public benefits); 8 U.S.C. 1612(a)(2)(L) (general five-year waiting period before a qualified alien can receive supplemental nutrition assistance program (SNAP) benefits), such waiting periods do not apply to all CHNV parolees with respect to all public benefit programs. For instance, a parolee under the age of 18 may be eligible for SNAP benefits, see

---

[24] DHS notes that on October 4, 2024, the prior administration announced that there would be no "re-parole" beyond the initial two-year period for the parolees who entered the United States under the CHNV parole programs. The decision of the prior administration to decline renewal or extension of the CHNV related parole coincided in large part with other actions of DHS to promulgate policies to reduce illegal immigration.

[25] OHSS analysis of January 2025 OHSS Persist Dataset.

[26] OHSS analysis of January 2025 OHSS Persist Dataset.

[27] OHSS analysis of January 2025 OHSS Persist Dataset.

[28] OHSS analysis of data downloaded from UIP February 25, 2025.

[29] OHSS analysis of data downloaded from UIP Feb. 25, 2025. DHS also notes that to whatever extent the incentives created by the parole programs for Cubans and Haitians deterred illegal immigration by sea—a particularly dangerous form of migration—the parole programs are not necessary for such deterrence and raise other issues, some of which are outlined in sections III.2–4 of this notice. DHS has adopted a more robust enforcement posture in general, and will monitor trends in maritime migration and respond as appropriate. Through early February 2025, DHS has yet to see a return to the very high levels of maritime migration observed in 2022.

[30] The streamlined procedures offered by the Securing the Border framework and complementary actions permitted DHS to more than triple the percentage of aliens processed for expedited removal under INA 235(b)(1), 8 U.S.C. 1225(b)(1), and decrease the number of aliens released by USBP pending immigration court proceedings by 89 percent, a number that has only improved further with the end of "catch and release." Encounters and releases based on OHSS analysis of January 2025 OHSS Persist Dataset. Processed for ER based on OHSS analysis of September 2024 OHSS enforcement Lifecycle and CBP data downloaded from UIP ER Daily Report Data Dashboard as of February 4, 2025.

[31] 90 FR 8611 (Jan. 20, 2025).

[32] 90 FR 8443 (Jan. 20, 2025).

[33] See, e.g., Adam Shaw, Fox News, Biden Admin Faces Mounting Pressure to Dismantle Migrant Parole Program Amid 'Stress' on Small Towns (Oct. 31, 2024), https://www.foxnews.com/politics/biden-admin-faces-mounting-pressure-dismantle-migrant-parole-program-stress-small-towns; Muzaffar Chishti & Colleen Putzel-Kavanaugh, After Crisis of Unprecedented Migrant Arrivals, U.S. Cities Settle into New Normal, Migration Policy Institute (Aug. 1, 2024), https://www.migrationpolicy.org/article/us-cities-innovations-integrate-arrivals.

[34] See Muzaffar Chishti & Colleen Putzel-Kavanaugh, After Crisis of Unprecedented Migrant Arrivals, U.S. Cities Settle into New Normal, Migration Policy Institute (Aug. 1, 2024), https://www.migrationpolicy.org/article/us-cities-innovations-integrate-arrivals.

[35] Nick Mordowanec, Map Shows Hotspots for Migrants Flying Into U.S., Newsweek (May 1, 2024), https://www.newsweek.com/migrants-dhs-flying-border-illegal-1896239.

7 CFR 273.4(a)(6)(ii)(J), as might ''a Cuban or Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980),'' *see* 7 CFR 273.4(a)(6)(ii)(E). Similarly, some states have extended Medicaid and Children's Health Insurance Program benefits without a five-year waiting period to ''lawfully residing'' children and pregnant women, which includes an alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year.[36]

Second, the CHNV parole programs have exacerbated backlogs, or risked exacerbating backlogs, for the immigration system writ large. For example, the population of aliens paroled into the United States and who have filed an application for asylum contributes to an already taxed immigration system with historically high backlogs before USCIS and the Executive Office for Immigration Review (''EOIR'').[37] Many such parolees may not otherwise have come to the United States and have exacerbated such backlogs or are likely to eventually do so. U.S. Citizenship and Immigration Services (''USCIS'') recently reported that as of the end of December 2024, the USCIS asylum backlog had increased to over 1.4 million cases.[38] CHNV parolees account for approximately 75,000 affirmative asylum applications.[39] In addition, when a CHNV parolee's two-year parole period ends, if the CHNV parolee has no lawful basis to remain in the United States, DHS may place the alien in section 240 removal proceedings. But, due in part to the overwhelmed expedited removal system, EOIR's immigration court backlog has already been growing rapidly, and will be further strained by the initiation of additional removal proceedings for the CHNV parolee population once their parole period ends. The immigration court backlog increased by approximately 44 percent between the end of FY 2023 (2.5 million cases) and FY 2024 (3.6 million cases).[40]

Third, the CHNV parole programs had a disruptive impact for CBP operations at interior air POEs. A progressive increase in beneficiaries of the CHNV parole programs arriving at POEs with advance travel authorizations ''(ATAs)'') were ultimately not granted parole due to CBP's determination that the alien did not warrant a discretionary grant of parole, for instance due to evidence of fraud or confirmation that the alien was a citizen or resident of a non-CHNV country. As a result, CBP processed these aliens for another appropriate disposition under Title 8, including detention or referral into expedited removal proceedings or section 240 removal proceedings, as appropriate. This caused further processing delays and coordination with air carriers for return flights when appropriate, and further contributed to the immigration court backlog.

The overwhelmed immigration systems in particular may incentivize aliens to enter the United States, without regard to the strength of any potential claims for immigration status, as aliens who are subject to expedited removal may nevertheless be placed in section 240 removal proceedings when the system is strained beyond its processing capacity. As a result, many remain in the United States until their immigration benefit requests are adjudicated or their section 240 removal proceedings conclude and any resultant removal order is executed. Any further strain to the immigration systems resulting from aliens pursuing the CHNV parole programs exacerbates these detrimental incentives.

In short, the domestic impact of the CHNV parole programs do not warrant continuing to operate these programs. Implementation of these programs coincided with an overall increase in CHNV migration, significant pressures on localities throughout the country, an expansion of public benefits eligibility, and a further exacerbation of USCIS and immigration court backlogs.

### 3. The CHNV Parole Programs Are Inconsistent With the Administration's Foreign Policy Goals

One of the stated goals of the CHNV parole programs was to promote the foreign policy objectives of the prior administration. Indeed, DHS explained repeatedly in its notices promulgating the CHNV parole programs that their implementation would advance the foreign policy objectives of the then-current administration.[41] The foreign

policy objectives underlying the CHNV parole programs, however, are not consistent with those of the current Administration.

Executive Order 14150, ''America First Policy Directive to the Secretary of State'' (Jan. 20, 2025) clearly sets out the President's vision that ''the foreign policy of the United States shall champion core American interests and always put America and American citizens first.'' [42] Executive Order 14159, ''Protecting the American People Against Invasion'' (Jan. 20, 2025) states that it is the policy of the United States to ''faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people.'' Further, it is the policy of the United States to achieve the ''total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.'' [43]

Whereas implementation of the CHNV parole programs was contingent upon the Government of Mexico (''GOM'') making an independent decision to accept the return or removal of CHNV nationals who migrated illegally, the U.S. Government is pursuing a range of other policy initiatives that would allow DHS to return, remove, or deter the illegal migration of CHNV nationals and other aliens. Section 13 of that Executive Order 14159 specifically addresses repatriation, and directs the Secretaries of State and Homeland Security to take all appropriate action to cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), and ensure that diplomatic efforts and negotiations with foreign states include the foreign states' acceptance of their nationals who are subject to removal from the United States. Section 13 further directs the Secretaries to eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. The Order provides that any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out section 243(d) sanctions and shall also be considered regarding the issuance of

---

[36] *See* 42 U.S.C. 1396b(v)(4) (Medicaid); 42 U.S.C. 1397gg(e)(1)(O) (CHIP).

[37] *See* Holly Straut-Eppsteiner, Cong. Rsch. Serv. IN12492, FY2024 EOIR Immigration Court Data: Caseloads and the Pending Cases Backlog (2025); *see also* Elizabeth Jacobs, *Affirmative Asylum Backlog Exceeds One Million for the First Time* (Center for Immigration Studies) (July 26, 2024), *https://cis.org/Jacobs/Affirmative-Asylum-Backlog-Exceeds-One-Million-First-Time.*

[38] USCIS, Performance Data, Asylum Division Monthly Statistics Report (Dec. 2024), *https://www.uscis.gov/sites/default/files/document/data/asylumfiscalyear2025todatestats_241231.xlsx* (last visited Feb. 25, 2025).

[39] USCIS Office of Performance & Quality.

[40] EOIR, Executive Office for Immigration Review Adjudication Statistics (Jan. 16, 2025), *https://www.justice.gov/eoir/media/1344791/dl?inline.*

[41] *See e.g.,* 87 FR at 63516 (''the implementation of [the Venezuela process] will advance the Administration's foreign policy goals''); 88 FR at

1253 (''[the Haiti process] is fully aligned with larger and important foreign policy objectives of this Administration'').

[42] See Executive Order 14150, America First Policy Directive to the Secretary of State, 90 FR 8337 (Jan. 20, 2025) (published Jan. 29, 2025).

[43] *See* Executive Order 14159, Protecting the American People Against Invasion, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025).

any other sanctions that may be available to the United States.

Further, as noted above, Executive Order 14165, "Securing Our Borders" states that DHS shall "terminate all categorical parole programs that are contrary to the policies of the United States established in [the President's] Executive Orders, including the program known as the 'Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.'" [44] In the same Order, the President directed that as soon as practicable, the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to resume the Migrant Protection Protocols in all sectors along the southern border of the United States and ensure that, pending section 240 removal proceedings, aliens described in section 235(b)(2)(C) of the INA (8 U.S.C. 1225(b)(2)(C)) are returned to the territory from which they came.

The President has pursued the cooperation of foreign partners in other ways as well. For instance:

• On January 23, 2025, President Trump in his call with Salvadoran President Nayib Bukele discussed working together to stop illegal immigration and crack down on transnational gangs like Tren de Aragua.[45]

• On January 26, 2025, the Government of Colombia agreed to the unrestricted acceptance of all illegal aliens from Colombia returned from the United States, including on U.S. military aircraft, without limitation or delay.[46]

• On January 27, 2025, President Trump had a productive conversation with Indian Prime Minister Narendra Modi, who agreed to "do what's right" in regard to illegal migration.[47]

• Beginning on February 1, 2025, President Trump has issued a number of tariff-related executive orders in connection with the situation at the southern border.[48]

• On February 16, 2025, Panama received a first U.S. military plane transporting 119 deportees of various nationalities, who will then be repatriated to their own respective countries. Panamanian President Jose Raul Mulino has offered his country as a stopover for aliens expelled from the United States.[49]

Multiple agencies of the U.S. Government are actively pursuing the President's foreign policy goals. For instance, the Department of State has announced multiple discussions with neighboring countries regarding DHS's ability to remove or return illegal aliens,[50] consistent with Secretary of State Rubio's January 22, 2025 announcement that a key priority of the Department of State is to curb mass migration and secure our borders.[51] In that announcement, the Department of State made clear that it "will no longer undertake any activities that facilitate or encourage mass migration" and that "[o]ur diplomatic relations with other countries, particularly in the Western Hemisphere, will prioritize securing America's borders, stopping illegal and destabilizing migration, and negotiating the repatriation of illegal immigrants." [52] Additionally, pursuant to his authority under section 219 of the INA, 8 U.S.C. 1189,[53] Secretary of State

Rubio designated the Venezuelan gang, Tren de Aragua, along with other cartels and gangs, as Foreign Terrorist Organizations.[54]

In other words, in addition to directly fulfilling the President's directive to terminate the CHNV parole programs, this action complements and underscores the Administration's pivot to a foreign policy that prioritizes the United States' interests in a secure border. Regardless of whether the prior Administration saw the CHNV parole programs as a component of a regional migration management strategy, the current Administration is not pursuing that strategy. Rather, as described above, the current Administration has focused its foreign policy attention on other measures to deter and prevent the entry of illegal aliens into the United States and obtain complete operational control of our borders.

These measures will allow DHS to better "achieve the total and efficient enforcement" of U.S. immigration law and, as such, champion a core American interest in accordance with the President's vision for American foreign policy.[55] In short, the continued implementation of the CHNV parole programs no longer accords with the President's stated priorities and foreign policy objectives.

### 4. Other Factors Do Not Counsel in Favor of Maintaining the Programs

The other factors cited by DHS in promulgating the CHNV parole programs also do not counsel in favor of maintaining the programs. For instance:

• DHS predicted that by allowing DHS to vet aliens before they travel to the United States, the programs would enhance national security as compared to high levels of illegal immigration. But as discussed above, these programs are unnecessary to counter high levels of illegal immigration. In addition, and critically, such vetting is inherently limited and, as has been reported publicly, there were significant gaps in the vetting process. In response to these problems, the CHNV parole programs were paused briefly in July 2024 to evaluate the program vulnerabilities.[56]

---

[44] *See* Executive Order 14165, Securing Our Borders, 90 FR 8467 (Jan. 20, 2025) (published Jan. 30, 2025).

[45] The White House, "Readout of President Donald J. Trump's Call with President Nayib Bukele" (Jan. 23, 2025), *https://www.whitehouse.gov/briefings-statements/2025/01/readout-of-president-donald-j-trumps-call-with-president-bukele/*.

[46] The White House, "Statement From the Press Secretary" (Jan. 26, 2025), *https://www.whitehouse.gov/briefings-statements/2025/01/statement-from-the-press-secretary/*.

[47] Meryl Sebastian, *Trump Says India 'Will Do What's Right' on Illegal Immigration* BBC News (Jan. 27, 2025), *https://www.bbc.com/news/articles/cj91z842wlmo*.

[48] *See, e.g.,* Executive Order 14194, Imposing Duties to Address the Situation at Our Southern

Border, 90 FR 9117 (Feb. 1, 2025) (published Feb. 7, 2025); Executive Order 14198, Progress on the Situation at Our Southern Border, 90 FR 9185 (Feb. 3, 2025) (published Feb. 10, 2025); Executive Order 14227, Amendment to Duties to Address the Situation at Our Southern Border, 90 FR 11371 (Mar. 2, 2025) (published Mar. 6, 2025).

[49] *Panama Receives First U.S. Deportation Flight Under Trump Administration,* The Tico Times (Feb. 16, 2025), *https://ticotimes.net/2025/02/16/panama-receives-first-us-deportation-flight-under-trump-administration.*

[50] *See, e.g.,* U.S. Department of State, Readout, Secretary Rubio's Meeting with Salvadoran President Nayib Bukele (Feb. 3, 2025) ("President Bukele agreed to take back all Salvadoran MS–13 gang members who are in the United States unlawfully. He also promised to accept and incarcerate violent illegal immigrants, including members of the Venezuelan Tren de Aragua gang, but also criminal illegal migrants from any country."), *https://www.state.gov/secretary-rubios-meeting-with-salvadoran-president-nayib-bukele/;* U.S. Department of State, Readout, Secretary Rubio's Meeting with Panamanian President Mulino (Feb. 2, 2025) ("Secretary Rubio also emphasized the importance of collaborative efforts to end the hemisphere's illegal migration crisis and thanked President Mulino for his support of a joint repatriation program, which has reduced illegal migration through the Darien Gap."), *https://www.state.gov/secretary-rubios-meeting-with-panamanian-president-mulino/.*

[51] U.S. Department of State, Press Statement, Priorities and Mission of the Second Trump Administration's Department of State (Jan. 22, 2025).

[52] *Id.*

[53] *See* Executive Order 14157, Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global

Terrorists, 90 FR 8439 (Jan. 20, 2025) (published Jan. 29, 2025).

[54] Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jallisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana, 90 FR 10030 (Feb. 20, 2025).

[55] *See* Executive Order 14159, Protecting the American People Against Invasion, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025).

[56] Stephen Dinan, *'Parole' program put on hold amid massive fraud; Homeland Security promises to set up safeguards,* Wash. Times (Aug. 2, 2024),

• DHS also initially reasoned that the CHNV parole programs would disincentivize a dangerous journey that puts aliens' lives and safety at risk and enriches smuggling networks. As noted above, however, although these programs were accompanied by a significant decrease in CHNV encounters between southwest border POEs, they were also accompanied by a significant increase in CHNV encounters at southwest land border POEs. This indicates that CHNV nationals continued to engage in dangerous migration to the southwest border, even if the overall level of migration to the southwest border dropped somewhat and CHNV aliens did not cross between POEs with the same frequency. And, as also noted above, the U.S. Government has implemented other policies that have more effectively deterred illegal immigration.

• Another stated goal of the CHNV parole programs was to reduce the burden on DHS personnel and resources that would otherwise be required for detention, monitoring, processing, and removal. However, as noted above, significant resource burdens persisted even after the programs' implementation, including with respect to encounters at and between POEs. Program implementation itself occupied significant resources. For instance, there have been approximately 2,970,000 Forms I–134 and I–134A filed with USCIS since October 2022,[57] which includes 2,140,000 pending review, 642,410 confirmed by USCIS, and 181,820 non-confirmed by USCIS.[58] Further, DHS needed additional resources to counter the fraud, national

security concerns, and public safety concerns discussed above. In addition, due to the originating location of beneficiaries of the CHNV parole programs and available travel routes via commercial airlines, over 80 percent of the aliens who were issued an ATA under the CHNV parole programs flew to Florida POEs. The unexpected increase in approximately 25,000 inadmissible aliens per month resulted in CBP experiencing a decrease in enforcement operations and an increase in wait times, overtime expenditures, and other needs at Florida POEs. Processing an alien requesting parole under the CHNV parole programs requires secondary processing and enrollment of biometrics, resulting in a more extensive and prolonged time in CBP facilities.

## IV. Reliance Interests of Prospective Supporters and Parolees

In deciding whether and how to terminate the CHNV parole programs, DHS has considered potential reliance interests of a range of potential supporters and beneficiaries of these programs. At the outset, however, DHS observes that the temporary and discretionary nature of the programs indicate that reliance on the continued existence of the CHNV parole programs would be unwarranted. The notices establishing the CHNV parole programs expressly advise the public that, "[t]he Secretary retains the sole discretion to terminate the [Parole Program] . . . at any point" [59] and that "DHS may terminate parole in its discretion at any time." [60] The CHNV parole programs were "being implemented as a matter of the Secretary's discretion. [They are] not intended to and [do] not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal." [61]

In addition, DHS observes that on October 4, 2024, the prior administration announced that there was no re-parole process under CHNV, informing participants that, "if you have not sought a lawful status or period of authorized stay, you will need to leave the United States before your authorized parole period expires, or you may be placed in removal proceedings after your period of parole expires." [62] Finally, as noted above, Executive Order 14165 directs the Secretary to terminate

the CHNV parole programs consistent with law.

Notwithstanding that DHS made very clear that reliance on these programs would be inappropriate, that DHS made clear months ago that there would be no "re-parole" process under the CHNV parole programs, and the additional notice provided in Executive Order 14165, DHS has analyzed the effects of this action on any potential reliance interests in an abundance of caution.[63]

### 1. Reliance Interests of Potential Supporters and Beneficiaries

DHS first considered the potential reliance interests of those U.S.-based supporters who had intended to file or have filed a Form I–134A in support of a potential parolee. In general, the costs associated with such filings are minimal. The potential supporter may have incurred the opportunity cost of completing Form I–134A, estimated at 2.60 hours per response, and a few potential supporters who submitted Form I–134A may have submitted their biometrics (photograph and fingerprints) at a USCIS Application Support Center for biometric screening and vetting by USCIS as part of the review of their Form I–134A.[64]

At this early stage in the process, the costs incurred by a potential beneficiary are also minimal. Once a supporter is confirmed, the potential beneficiary receives instructions to create a USCIS online account, confirm their biographic information in their online account, and attest to meeting the eligibility requirements, including public health requirements, and certain vaccination requirements. It is also possible that a beneficiary who has received instructions to create an online account may have obtained vaccinations in anticipation of the required attestation. After confirming their biographic information, the beneficiary received instructions to access the CBP One mobile application to enter biographic information and submit a live photo. CBP One was used to collect the beneficiary's biographic information and photo and was an additional step in the process prior to the alien being authorized to travel to the United States to seek parole. The estimated time to complete the CBP One part of the

https://www.washingtontimes.com/news/2024/aug/2/dhs-suspends-parole-program-amid-rampant-fraud/.

[57] Under the parole program for Venezuelans, a U.S.-based supporter would initiate consideration for parole under the program by filing Form I–134, *Declaration of Financial Support* (Online), along with supporting evidence. 87 FR at 63515. In January 2023, when DHS expanded the programs to cover Cubans, Haitians, and Nicaraguans and their immediate family members as well, DHS announced that it would instead begin accepting the Form I–134A *Online Request to be a Supporter and Declaration of Financial Support*, along with supporting evidence, to initiate consideration for parole under all four programs. *See, e.g.,* 88 FR at 1279. Neither form could be filed on paper by mail and neither form required the payment of a fee.

[58] OHSS analysis of USCIS Form I–134/Form I–134A data as of January 22, 2025. The Venezuelan parole program started on October 18, 2022, and the Cuba, Haiti, Nicaragua parole programs started January 6, 2023. "Confirmed" in this context meant that that USCIS had determined that the supporter was eligible to be a supporter and that they demonstrated the ability to financially support the beneficiary, while "non-confirmed" meant that USCIS had determined that the potential supporter had been determined to be ineligible to be a supporter or failed to demonstrate ability to financially support the beneficiary.

[59] *E.g.,* 88 FR at 1268 (Cuba).
[60] *E.g.,* 88 FR at 1272 (Cuba).
[61] *E.g.,* 88 FR at 1277 (Cuba).
[62] Camilo Montoya-Galvez, *U.S. Won't Extend Legal Status For 530,000 Migrants Who Arrived Under Biden Program,* CBS News (Oct. 4, 2024), https://www.cbsnews.com/news/venezuelans-legal-status-chnv-program/.

[63] *See* USCIS, *Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (Oct. 4, 2024), available at *https://web.archive.org/web/20250104043158/https://www.uscis.gov/humanitarian/frequently-asked-questions-about-the-processes-for-cubans-haitians-nicaraguans-and-venezuelans.*

[64] Biometrics submission is estimated to require 1.17 hours per respondent. 89 FR 104557 (Dec. 23, 2024).

ATA process was 10 minutes. *See* 88 FR 62810, 62812 (Sept. 13, 2023).

In general, these costs are not significant and pale in comparison to the U.S. Government's sovereign interest in determining who is paroled into the United States. DHS intends to issue a notice of non-confirmation for all remaining pending Forms I–134A. DHS will also rescind the confirmation of all Form I–134A that were previously confirmed and issue updated notices of non-confirmation for any potential beneficiaries who have not yet traveled to a POE to seek parole. Potential beneficiaries will no longer be able to execute any attestations or seek ATA through a USCIS online account based on a previously confirmed Form I–134A.

### 2. Reliance Interests of Potential Beneficiaries With Approved ATAs and Their Supporters

A beneficiary with an approved ATA may travel to the United States to seek a discretionary grant of parole. Authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel, at no cost to the U.S. government, via commercial air to the United States.[65] DHS intends to cancel all pending applications for advance authorizations to travel to the United States to seek a discretionary grant of parole under the CHNV parole programs. There are no currently approved ATAs upon which an alien may travel under the CHNV parole programs.[66]

A beneficiary whose application for an ATA is cancelled may have, for example, provided notice to their landlord, sold property, and/or resigned from employment. In addition, a confirmed Form I–134A supporter may have incurred expenses, for example, to secure living quarters or furniture for the beneficiary in anticipation of their process being completed through parole into the United States.

DHS recognizes that the potential costs incurred by supporters and potential beneficiaries at this point could be viewed as significant. Nevertheless, as explained above, supporters and potential beneficiaries were apprised that DHS could terminate the programs at any point. Moreover, the notices for each parole program made it clear that the approval of an

ATA or grant of parole at a POE was entirely discretionary. *See, e.g.,* 88 FR 1243, 1252 (noting that a potential beneficiary may be ''ineligible for advance authorization to travel to the United States as well as parole under this process'' for a range of reasons, including if the alien ''fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion''); 88 FR at 1253 (''Approval of advance authorization to travel does not guarantee parole into the United States. Whether to parole the [aliens] is a discretionary determination made by CBP at the POE at the time the [alien] arrives at the interior POE''); 88 FR at 1253 (''[Aliens] who . . . otherwise do not warrant parole pursuant to [section 212(d)(5)(A) of the INA], and as a matter of discretion upon inspection, . . . may be referred to ICE for detention.''). While the termination of the CHNV parole programs as provided in this notice may result in costs incurred by both the supporter and potential beneficiary who have prepared to travel to the United States, those parties chose to incur such expenses knowing that completion of the process was never guaranteed by the terms of the program, and the termination of the programs was possible at any time. DHS has concluded that any such reliance interests are outweighed by other interests and policy concerns as explained in this notice.[67]

### V. Effect of Termination on Current Parolees Under the CHNV Parole Programs and Corresponding Reliance Interests

The notices establishing the CHNV parole programs explain that parole is not an admission of the alien to the United States, and a parolee remains an applicant for admission during the period of parole in the United States. *See also* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS may set the duration of the parole based on the purpose for

granting the parole request and may impose reasonable conditions on parole. *Id.* Aliens may be granted advance authorization to travel to the United States to seek parole. *See* 8 CFR 212.5(f). The Secretary may terminate parole in her discretion at any time when, in her opinion, neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of the alien in the United States, and parole shall be terminated when the purpose for which it was authorized has been accomplished. *See* 8 CFR 212.5(e). And, finally, aliens who are paroled into the United States, including those paroled through the CHNV parole programs, may generally apply for and be granted employment authorization under the (c)(11) employment eligibility category. *See* 8 CFR 274a.12(c)(11).

As noted above, between October 19, 2022, and January 22, 2025, approximately 532,000 inadmissible aliens received parole into the United States pursuant to the CHNV parole programs. DHS has determined that as one aspect of the termination of the CHNV parole programs, consistent with the Secretary's statutory and regulatory authority,[68] the parole of aliens who have been paroled into the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary.

Following this termination, and consistent with the direction in Executive Order 14165, DHS generally intends to remove promptly aliens who entered the United States under the CHNV parole programs who do not depart the United States before their parole termination date and do not have any lawful basis to remain in the United States. DHS retains its discretion to commence enforcement action against any alien at any time, including during the 30-day waiting period created by this notice. Parolees without a lawful basis to remain in the United States following the termination of the CHNV programs must depart the United States

---

[65] Authorization to travel does not guarantee parole. Parole of the individual is a discretionary determination made by CBP when the individual arrives at the viewed POE. *See, e.g.,* 88 FR 1255, 1264 (Jan. 9, 2023).

[66] OHSS analysis of advance travel authorization data provided by CBP PSPD and valid as of February 27, 2025.

[67] DHS has considered the alternative of allowing any approved ATAs to remain in place until they were used or expired by their terms. Even if there were currently approved ATAs, DHS would not pursue this route, because DHS would not wish to incentivize aliens flying to the United States to seek parole under policies that DHS no longer supports or appear to encourage them to incur additional expenses based on a belief that they will be paroled upon arrival at the POE. Such an approach would risk exacerbating the problems created by the CHNV parole programs. As is always the case, however, CBP may consider a request for parole under DHS's existing parole authority, on a case-by-case basis for urgent humanitarian reasons or significant public benefit. If parole is not granted, the alien may be returned to their home country at U.S. Government expense or processed for another appropriate disposition under the INA.

[68] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (''when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States''); 8 CFR 212.5(e)(2)(i) (''[U]pon accomplishment of the purpose for which parole was authorized or when, in the opinion of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, *parole shall be terminated upon written notice to the alien. . . .*'' (emphasis added)).

before their parole termination date. Aliens departing the United States via land border POEs should report their departure once outside the United States via the CBP Home mobile app. Aliens should visit *https://i94.cbp.dhs.gov/home* for more information about voluntarily reporting their departure.

In implementing this approach, DHS intends to prioritize for removal those who (1) have not, prior to the publication of this notice, properly filed an immigration benefit request, with appropriate fee (or fee waiver request, if available) to obtain a lawful basis to remain in the United States (*e.g.,* adjustment of status, asylum, Temporary Protected Status, or T or U nonimmigrant status) and (2) are not the beneficiary of an immigration benefit request properly filed by someone else on their behalf (*e.g.,* petition for alien relative, fiancé petition, petition for immigrant employee), with appropriate fee (or fee waiver request, if available). Aliens who have since obtained a lawful immigration status or other basis that permits them to remain in the United States are not required to depart the United States pursuant to this notice.

Parole-based employment authorization under 8 CFR 274a.12(c)(11) automatically terminates upon (1) the expiration date specified on the employment authorization document, (2) DHS's institution of removal proceedings against the alien, or (3) a grant of voluntary departure. *See* 8 CFR 274a.14(a). Such employment authorization may also be revoked on notice consistent with the procedures in 8 CFR 274a.14(b). DHS has determined that, after termination of the parole, the condition upon which the employment authorization was granted no longer exists and thus DHS intends to revoke parole-based employment authorization consistent with those revocation on notice procedures. 8 CFR 274a.14(b).

DHS has considered the impacts on parolees who are affected by this discretionary decision to terminate their parole prior to the expiration of the parole period. DHS recognizes the costs incurred by some aliens who have been granted parole and traveled to the United States.[69] Parolees will have departed their native country; traveled

to the United States; obtained housing, employment authorization, and means of transportation; and perhaps commenced the process of building connections to the community where they reside.

However, any assessment of the reliance interests of CHNV parolees must account for CHNV parolees' knowledge at the outset that (1) the Secretary retained the discretion to terminate the parole programs at any point in time, and to terminate any grants of parole at any time when, in her opinion, the purposes of such parole have been served[70]; and that (2) the initial term of parole would be limited to a maximum of two years. These clear, limiting conditions of the parole programs served to attenuate any long-term expectations and interests amongst CHNV parolees. Accordingly, DHS has taken these limiting conditions, along with CHNV parolees' knowledge of them, into consideration when weighing their reliance interests.[71]

DHS has concluded that the potential reliance interests among aliens paroled into the United States under the CHNV parole programs do not outweigh the U.S. government's strong interest in promptly removing parolees when the basis for the underlying program no longer exists. To effectuate their prompt removal, the U.S. government may in its discretion initiate expedited removal proceedings where appropriate. Expedited removal is available only when an alien has not been continuously present in the United States for at least the two years preceding the date of the inadmissibility determination. INA 235(b)(1)(iii)(II), 8 U.S.C. 1225(b)(1)(iii)(II); 8 CFR 235.3.[72] If DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in section 240 removal proceedings to effectuate their removal, further straining the already over-burdened immigration court system discussed in Section III.1.

To the extent that current parolees have obtained housing and employment authorization, or created new ties

within the community while in the United States, DHS notes these interests are qualitatively less than any reliance interests that might be attributed to the Deferred Action for Childhood Arrival (DACA) recipient population consistent with the discussion in *DHS* v. *Regents of the Univ. of Cal.*[73] In *Regents,* the Supreme Court reviewed whether DHS had appropriately considered the reliance interests of DACA recipients when rescinding DACA.[74] The reliance interests of DACA recipients, all of whom had been present in the United States for far longer than two years, included their enrollment in degree programs, the beginning of their careers, the starting of businesses, and the purchase of homes.[75] As the Court noted, these interests, though noteworthy, were not "necessarily dispositive," and "DHS may determine, in the particular context before it, that other interests and policy concerns [in rescinding DACA] outweigh any reliance interests."[76] For the purposes of the actions announced in this notice, DHS notes the reliance interests of those paroled under the CHNV parole programs are far less than the population in *Regents.* Further, as stated above, the reliance interests under the CHNV parole programs must take into account the express, discretionary terms of the parole program. Accordingly, the reliance interests are outweighed by the U.S. government's strong interest in promptly returning parolees when the basis for the underlying parole no longer exists.

Third parties, including employers, landlords, and others, may also have indirect reliance interests in the availability of individual CHNV parolees, but even if DHS had allowed the grants of parole to expire at the end of their designated terms, such third parties would have experienced the effects of such expiration. By providing 30 days' notice, DHS balances the benefits of a wind-down period for aliens and third parties with the exigency of promptly enforcing the law against those aliens lacking a lawful basis to remain in the United States. For the same reasons set forth above, DHS finds the U.S. government's interest in terminating these grants of parole outweigh any reliance interest of third parties.

DHS has considered the alternative of permitting CHNV participants' parole to remain in effect until the natural expiration of the parole, as DHS has in

---

[69] *See Encino Motorcars, LLC* v. *Navarro,* 579 U.S. 211, 221–22 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change. . . . But the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy. In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." (cleaned up)).

[70] As explained throughout this notice, the Secretary has determined that the purposes of parole under the CHNV programs have been served because, *inter alia,* the CHNV parole programs are unnecessary to achieve border security goals; the domestic impact of the CHNV parole programs was too great; and the programs are inconsistent with this Administration's foreign policy goals.

[71] *See DHS* v. *Regents of the Univ. of Cal.,* 591 U.S. 1, 32 (2020) (noting that DHS could conclude that reliance is "unjustified in light of the express limitations" in relevant immigration policy).

[72] *See* Designating Aliens for Expedited Removal, 90 FR 8139 (Jan. 24, 2025).

[73] 591 U.S. 1 (2020).

[74] *Id.* at 31.

[75] *Id.*

[76] *Id.*

**13620**    **Federal Register** / Vol. 90, No. 56 / Tuesday, March 25, 2025 / Notices

the past done with some parole terminations. *See, e.g.,* 82 FR 38926, 38927 (Aug. 16, 2017). However, DHS has opted to not pursue this route. As explained above, this would essentially foreclose DHS's ability to expeditiously remove those CHNV parolees with no lawful basis to remain in the United States. Under this alternative, CHNV parolees may begin to accrue more than two years of continuous presence in the United States, such that DHS would have to initiate section 240 removal proceedings to effectuate their removal. *See* INA 235(b)(1)(iii)(II), 8 U.S.C. 1235(b)(1)(iii)(II). As a result, the already overburdened immigration court system would be further taxed with adjudicating the section 240 removal proceedings for the pertinent CHNV beneficiary population, a result DHS finds unacceptable.

DHS has also considered the alternative of a longer than 30-day wind-down period. After due consideration, DHS has also decided not to pursue this option. As discussed above, DHS has a strong interest in preserving the ability to initiate expedited removal proceedings to the maximum extent possible for the appropriate CHNV population to prevent further straining of the over-burdened immigration court system. Any lengthening of the wind-down period will increase the likelihood that additional CHNV parolees are no longer subject to expedited removal.[77] DHS has determined that a 30-day wind-down period provides affected parties sufficient notice while also preserving DHS's ability to enforce the law promptly against those CHNV parolees lacking a lawful basis to remain in the United States. Accordingly, DHS is opting not to increase the wind-down period to more than 30 days.

## VI. Federal Register Notice as Constructive Notice

This **Federal Register** notice serves as notice of the termination of the CHNV parole programs and satisfies the requirement that DHS provide written notice upon the termination of parole. *See* 8 CFR 212.5(e)(2)(i) (". . . Upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, *parole shall*

*be terminated upon written notice to the alien. . . .*" (emphasis added)). For the reasons set forth above, the Secretary has concluded that neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of aliens paroled under the CHNV programs and the purposes of such parole therefore have been served. This notice accordingly serves as written notice to CHNV parolees.

DHS has determined that publication of this notice in the **Federal Register** is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance. *See* 44 U.S.C. 1507; *Friends of Sierra R.R., Inc.* v. *I.C.C.,* 881 F.2d 663, 667–68 (9th Cir. 1989); *see also Fed. Crop Ins. Corp.* v. *Merrill,* 332 U.S. 380, 385 (1947) ("Congress has provided that the appearance of rules and regulations in the **Federal Register** gives legal notice of their contents.").

DHS finds **Federal Register** publication of the decision to terminate existing grants of parole to be the most practicable approach in light of the size of the affected population and potential noncompliance with change-of-address reporting requirements. *See* 8 U.S.C. 1305; 8 CFR 265.1. Because all CHNV parolees should have a USCIS online account and all processing under these parole programs took place electronically, DHS will also provide individual notice to each parolee through their USCIS online account. *Cf., e.g.,* 8 CFR 103.2(b)(19)(iii)(B) ("For applications or petitions filed electronically, USCIS will notify both the applicant or petitioner and the authorized attorney or accredited representative electronically of any notices or decisions. . . ."). This notice, and the individual notice through the USCIS online account, each independently constitute "written notice to the alien" under 8 CFR 212.5(e)(2)(i).

## VII. Administrative Procedure Act

This notice is exempt from notice-and-comment rulemaking requirements because DHS is merely adopting a general statement of policy, 5 U.S.C. 553(b)(A). *i.e.,* a "statement [ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)). By terminating the CHNV parole programs—which themselves constituted general statements of policy, *see, e.g.,* 88 FR at 1277—DHS is explaining how it will implement the Secretary's broad

discretion for exercising her narrow parole authority. Accordingly, this notice of termination constitutes a general statement of policy and is exempt from the notice-and-comment rulemaking requirements under the Administrative Procedure Act (APA).[78]

When an agency merely explains how it will enforce a statute or regulation by describing how it will exercise its broad enforcement discretion, as was the case with the CHNV parole programs, it is a general statement of policy. *See Lincoln,* 508 U.S. at 197. Section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A) provides the Secretary broad discretion in exercising the parole authority, with parole decisions made by the Secretary of Homeland Security "in [her] discretion." The CHNV parole programs therefore were general statements of policy.

Because the CHNV parole programs constitute general statements of policy and were exempt from notice-and-comment rulemaking requirements under the APA, their termination likewise is a mere general statement of policy exempt from the notice and comment rulemaking requirements. Through the termination of the CHNV parole programs and for the reasons given, DHS is merely making a change to a previous policy statement on the exercise of its discretionary parole authority.[79] Accordingly, there is no requirement to publish notice prior to the termination's effective date, and it is therefore amenable to immediate issuance and implementation.[80]

Even if the changes were considered to be a legislative rule that would normally be subject to notice and comment rulemaking and a delayed effective date, these changes—like the implementation of the parole programs themselves[81]—pertain to a foreign affairs function of the United States, and are exempt from such procedural requirements on that basis.[82] Consistent

---

[77] According to OHSS analysis of data provided by USCIS, for each month from March 2025 through September 2026, there are thousands of CHNV parolees who will become ineligible for expedited removal upon the natural expiration of their two-year parole.

[78] *Cf. Perez* v. *Mortg. Bankers Ass'n,* 575 U.S. 92, 101 ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.").

[79] *See Encino Motorcars,* 579 U.S. at 221 ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.").

[80] *See* 5 U.S.C. 553(d)(2).

[81] *See* 5 U.S.C. 553(a)(1); 88 FR at 1277; 88 FR at 1253; 88 FR at 1264; 87 FR at 63516 (as modified by 88 FR 1279).

[82] *See Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (noting that foreign affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country"); *Yassini* v. *Crosland,* 618 F.2d 1356, 1361 (9th Cir.

with the Secretary of State's February 21, 2025 determination that "all efforts, conducted by any agency of the federal government, to control the status, entry, and exit of people, and the transfer of goods, services, data, technology, and other items across the borders of the United States, constitute a foreign affairs function of the United States[,]" DHS finds that these changes are connected to the entry and exit of people and thereby constitute a foreign affairs function.[83]

Moreover, although the APA does not require the agency to show that such procedures may result in "definitely undesirable international consequences" to invoke the foreign affairs exemption to notice-and-comment rulemaking, some courts have required such a showing,[84] and DHS can make one here. Delaying rescission of the CHNV parole programs to undertake rulemaking would undermine the U.S. Government's ability to conduct foreign policy, including the ability to shift governmental policies and engage in delicate and time-sensitive negotiations following a change in Administration. It is the view of the United States that the termination of these parole programs will fulfill important foreign policy goals that the President has repeatedly articulated and urged DHS to implement swiftly; any delay in achieving such goals is definitely undesirable.

As explained in Section III.3 of this notice, the CHNV parole programs were implemented as an integral part of negotiations with regional neighbors, including Mexico, to address unlawful migratory flows challenging immigration systems throughout the region. For instance, in announcing the Venezuela parole program, DHS explained that even if the program were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the program would be exempt from such requirements because it involves a foreign affairs function of the United

States.[85] DHS cautioned that it "will not implement the new parole process without the ability to return Venezuelan nationals who enter [unlawfully] to Mexico, and the United States' ability to execute this process thus requires the GOM's willingness to accept into Mexico those who bypass this new process and enter the United States [unlawfully] between POEs." DHS explained that "initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to this unilateral U.S. action and ongoing, sensitive diplomatic engagements."[86] DHS noted that the program was "not only responsive to the interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—[but] also fully aligned with larger and important foreign policy objectives of [the prior] Administration and fits within a web of carefully negotiated actions by multiple governments."[87] When implementing the Cuba, Haiti, and Nicaragua parole programs, DHS invoked the foreign affairs exemption on similar grounds.[88]

Yet, as also discussed in Section III.3 of this notice, U.S. foreign policy has changed in critical respects, and DHS must expeditiously align its policies to that change. Whereas implementation of the CHNV parole programs was contingent upon the GOM making an independent decision to accept the return or removal of CHNV nationals who migrated illegally, the U.S. Government is pursuing a range of other policy initiatives that would allow DHS to return or remove CHNV nationals, including re-implementation of the Migrant Protection Protocols and improved cooperation and coordination with other countries regarding return or removal of their or third country nationals.

In the context of these complex and time-sensitive diplomatic negotiations, it would be counterproductive to retain vestiges of a foreign policy approach that the United States is no longer pursuing, even temporarily, to allow for a period of public comment about matters that implicate our foreign affairs and are ultimately within the Executive's discretion. Continuing to administer the CHNV parole programs pending notice-and-comment would adversely affect the United States' ability to pivot rapidly to a more effective approach in these negotiations

and may result in an even greater number of CHNV nationals requiring removal or return. Further delay in pursuing these more effective approaches would be particularly pernicious in the context of ongoing negotiations, as discussed in section III.3 of this notice, with countries to accept the removal of illegal aliens, including inadmissible CHNV nationals.

Finally, and for the same reasons that a delay in implementing this action would result in undesirable international consequences, even if notice-and-comment and a delayed effective date were required, DHS has determined that the good cause exemptions to notice-and-comment rulemaking and the 30-day effective date apply and that the delay associated with implementing these changes through notice-and-comment rulemaking or delaying the effective date would be impracticable and contrary to the public interest. Any delay for such procedures would harm the U.S. Government's ability to timely implement the current Administration's foreign policy approach and exacerbate the challenges associated with the CHNV parole programs, as explained throughout this notice, contrary to the President's direction to protect the American people against invasion and to secure the border. Such an outcome would also be inconsistent with the fundamentally discretionary nature of DHS's parole authority.[89]

## VIII. Severability

DHS intends for the decisions announced in this notice to be severable from each other and to be given effect to the maximum extent possible, such that if a court holds that any provision is invalid or unenforceable—whether in their entirety or as to a particular person or circumstance—the other provisions will remain in effect as to any other person or circumstance.[90] The various decisions in this notice are designed to function sensibly without the others, and DHS intends for them to be severable so that each can operate independently.

---

1980) (because an immigration directive "was implementing the President's foreign policy," the action "fell within the foreign affairs function and good cause exceptions to the notice and comment requirements of the APA'").

[83] U.S. Secretary of State, *Determination: Foreign Affairs Functions of the United States,* 90 FR 12200 (Feb. 21, 2025) (published Mar. 14, 2025). The Secretary of State's determination references and implements numerous Presidential actions reflecting the President's top foreign policy priorities, including Executive Order 14165. As noted above, Executive Order 14165 specifically directs the Secretary of Homeland Security to, consistent with applicable law, take all appropriate action to terminate the CHNV parole programs.

[84] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[85] *See* 87 FR at 63516.

[86] *Id.*

[87] *Id.*

[88] *See* 88 FR at 1277 (Cuba), 88 FR at 1253–54 (Haiti), 88 FR at 1265 (Nicaragua).

[89] *See* 5 U.S.C. 553(b)(B), 553(d)(3); *see Util. Solid Waste Activities Grp.* v. *EPA,* 236 F.3d 749, 754– 55 (D.C. Cir. 2001) ("a situation is 'impracticable' when an agency finds that else and timely execution of its functions would be impeded by the notice otherwise required"); *see also* Executive Order 14159, 90 FR 8443 (Jan. 20, 2025) (published Jan. 29, 2025).

[90] Courts have uniformly held that the APA, 5 U.S.C. 706(2), authorizes courts to sever and set aside "only the offending parts of the rule." *Carlson* v. *Postal Regulatory Comm'n,* 938 F.3d 337, 351 (D.C. Cir. 2019); *see, e.g., K Mart Corp.* v. *Cartier, Inc.,* 486 U.S. 281, 294 (1988).

**13622**    **Federal Register** / Vol. 90, No. 56 / Tuesday, March 25, 2025 / Notices

For example, DHS would intend that the termination of the CHNV parole programs be implemented immediately, even if the termination of ATAs or existing grants of parole were to be enjoined in whole or in part. This approach ensures that DHS is able to implement its policy choices, and the President's direction in Executive Order 14165, to the maximum extent possible.

## IX. Paperwork Reduction Act (PRA)

This rule does not promulgate new or revise existing ''collection[s] of information'' as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

**Kristi Noem,**
*Secretary of Homeland Security.*
[FR Doc. 2025–05128 Filed 3–21–25; 4:15 pm]
**BILLING CODE 9110–9M–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Finding of Mass Influx of Aliens

On January 23, 2025, the Acting Secretary of Homeland Security issued a Finding of Mass Influx of Aliens. This finding went into effect immediately (on January 23, 2025) and remained in effect for 60 days (until March 23, 2025). The Acting Secretary's finding published in the **Federal Register** on January 23, 2025. *See* 90 FR 8,399. Upon review of the current situation at the border, I am extending that finding.

The Immigration and Nationality Act (INA), at 8 U.S.C. 1103(a), provides an expansive grant of authority, stating that in the event of a mass influx of aliens off the coast of the United States or a land border, the Secretary may authorize a State or local law enforcement officer, with the consent of the officer's superiors, to perform duties of immigration officers under the INA. In turn, section 65.83 of Title 28 of the Code of Federal Regulations allows the Secretary [1] to ''request assistance from a

State or local government in the administration of the immigration laws of the United States'' under certain specified circumstances. Among those circumstances are when ''[t]he [Secretary] determines that there exist circumstances involving the administration of the immigration laws of the United States that endanger the lives, property, safety, or welfare of the residents of a State or locality.'' 28 CFR 65.83(b).

In making such a determination, the Secretary may also determine that there is an ''immigration emergency.'' The regulations define an immigration emergency as ''an actual or imminent mass influx of aliens which either is of such magnitude or exhibits such other characteristics that effective administration of the immigration laws of the United States is beyond the existing capabilities of [the Department of Homeland Security (DHS)] in the affected area or areas.'' 28 CFR 65.83(d)(1) (using identical language as 8 U.S.C. 1103(a)(10)).

Such a determination is based on ''the factors set forth in the definitions contained in'' 28 CFR 65.81. Characteristics of an influx of aliens, other than magnitude, which may be considered in determining whether an immigration emergency exists include: the likelihood of continued growth in the magnitude of the influx; an apparent connection between the influx and increases in criminal activity; the actual or imminent imposition of unusual and overwhelming demands on law enforcement agencies; and other similar characteristics.

Upon review of the current data, I have determined that there continues to exist circumstances involving the administration of the immigration laws of the United States that endanger the lives, property, safety, or welfare of the residents of all 50 States and that an actual or imminent mass influx of aliens is arriving at the southern border of the United States and presents urgent circumstances requiring a continued federal response. I make this finding for the reasons discussed below.

First, over the last four years, our southern border has been overrun. As noted in Proclamation 10,888, *Guaranteeing the States Protection Against Invasion,* ''[o]ver the last 4 years, at least 8 million illegal aliens were encountered along the southern border of the United States, and countless millions more evaded detection and illegally entered the United States.'').

Second, as of March 12, 2025, DHS estimates that there are likely approximately 20,000 aliens across the

Southwest border waiting to illegally enter. While encounters along the southwest border declined in February 2025, historical trends over the past four years strongly indicate that without this finding, aliens are likely to resume crossing the border, and border crossing numbers are likely to rise again before DHS can gain operational control. It is precisely measures, such as this one, that have kept the numbers under control.

Third, as stated in the January 23, 2025 notice, when border crossing numbers are high, much detention capacity is required of U.S. Immigration and Customs Enforcement (ICE). Mandatory detention of aliens apprehended at the border serves important public safety and national security purposes. Aliens who have not completed this process have not been effectively vetted for criminality or national security threats. Current databases do not allow for comprehensive and rapid searching for foreign convictions or other public safety and national security risks. As a result, the fact that the numbers at the border are effectively forcing DHS to engage in catch-and-release practices is eliminating or thwarting legally mandated screenings and it is threatening public safety and national security. This does not account for so-called gotaways, of which there have been millions over the last four years, who are not screened in any manner. Without controls in place at the border to stem the influx, DHS loses its capacity to hold all aliens as required by the INA. 8 U.S.C. 1225(b). As of March 13, 2025, ICE has a detention population of 47,372, with a maximum capacity of 54,500. ICE's facilities are currently at nearly at 87% occupancy, and ICE's priority for detention space is removing aliens with criminal records, public safety risks, and national security risks. Should this finding not be extended, ICE would be hampered in this critical effort.

Fourth, an influx of aliens presents significant concerns with respect to increased criminal activity. Between FY 2017 and 2019, ICE removed 485,930 aliens with criminal convictions or pending criminal charges. However, between FY 2021 and FY 2023, ICE removed 158,931 aliens with criminal convictions or pending criminal charges. Assuming that the crime rate of foreign nationals has remained unchanged over the year, this 67% decrease (in removals) suggests that tens of thousands of criminal aliens remain in the United States. Where there is an increase in criminal aliens, there is

---

[1] Although the regulations reference the ''Attorney General,'' Congress has, since the publication of these regulations, transferred the authority and responsibility for administering and enforcing the immigration laws to the Secretary of Homeland Security. See Homeland Security Act of 2002 471, 6 U.S.C. 291 (abolishing the former Immigration and Naturalization Service); id. S 441, 6 U.S.C. 251 (transferring immigration enforcement functions from the Department of Justice to the Department of Homeland Security); Immigration and Nationality Act 103(a)(1), 8 U.S.C. 1103(a)(1) (''the Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens.'')

during the import process, the record is routed for manual examination, investigation, and resolution to determine whether it is truly a duplicate record.

2. DHS/FEMA—SBA Duplication of Benefits Automated Match Process:

a. Both DHS/FEMA and SBA will act as the recipient (*i.e.,* matching) agency. SBA will extract and provide to DHS/FEMA data from its Disaster Loans Case Files system of records, accessed via the Disaster Lending System. DHS/FEMA will match the data SBA provides to records in its Disaster Recovery Assistance Files system of records, accessed through the Individual Assistance System, via the DHS/FEMA Registration Identification number. SBA will issue a data call to DHS/FEMA requesting that DHS/FEMA return any records for which the Individual Assistance System found a match. For each match found, DHS/FEMA sends all applicant information that DHS/FEMA collects during the registration process to SBA so that SBA may match these records with its registrant data in the Disaster Lending System. SBA's Disaster Lending System manual process triggers an automated interface to query the Individual Assistance System, using the DHS/FEMA Registration Identification number as the unique identifier.

b. DHS/FEMA will return the following fields for the matching DHS/FEMA record, if any: DHS/FEMA Disaster number; DHS/Registration Identification number; applicant and if applicable, co-applicant name; damaged dwelling address, phone number, Social Security number, damaged property data, insurance policy information, contact address (if different from damaged dwelling address), flood zone and flood insurance data, DHS/FEMA Housing Assistance and Other Needs Assistance data, program, award level, eligibility, inspection data, verification of ownership and occupancy, and approval or rejection data. DHS/FEMA will return no result when the DHS/FEMA Registration Identification number is not matched.

c. For each matching record received from DHS/FEMA, SBA determines whether DHS/FEMA assistance duplicates SBA loan assistance. If SBA loan officers determine that there is a duplication of benefits, the duplicated amount is deducted from the eligible SBA loan amount.

3. DHS/FEMA—SBA Status Update Automated Match Process:

a. DHS/FEMA will act as the recipient (*i.e.,* matching) agency. DHS/FEMA will match records from its Disaster Recovery Assistance Files system of records to the records extracted and

provided by SBA from its Disaster Loans Case Files system of records. The purpose of this process is to update DHS/FEMA applicant information with the status of SBA loan determinations. The records provided by SBA will be automatically imported into DHS/FEMA's Individual Assistance System to update the status of existing applicant records. Controls on the SBA export of data are in place to ensure that DHS/FEMA only receives unique and valid referral records.

b. In response to Presidential Individual Assistance Declarations with a DHS/FEMA Disaster number, the SBA will provide to DHS/FEMA information and data, including but not limited to the following: personal information about SBA applicants, including name, damaged dwelling address, and Social Security number; application data; loss to personal property data; loss mitigation data; SBA loan data; and SBA event data. DHS/FEMA will conduct the match using DHS/FEMA Disaster number and DHS/FEMA Registration Identification number.

c. Loan data for matched records will be recorded and displayed in the Individual Assistance System.

### Systems of Records

DHS/FEMA—008 Disaster Recovery Assistance Files (89 FR 73104, September 9, 2024) covers records from DHS/FEMA's Disaster Recovery Assistance Files system of records. These records are matched against the records that SBA provides from its SBA–20 Disaster Loans Case Files, 86 FR 64979 (November 19, 2021) system of records.

SBA–20 Disaster Loans Case Files (86 FR 64979, November 19, 2021). SBA uses its Disaster Lending System to access records from its Disaster Loan Case Files system of records and match them to the records that DHS/FEMA provides from its Disaster Recovery Assistance Files system of records.

**Roman Jankowski,**

*Chief Privacy Officer, U.S. Department of Homeland Security.*

[FR Doc. 2025–13709 Filed 7–18–25; 4:15 pm]

**BILLING CODE 9110–9L–P**

---

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2829–25]**

### USCIS Immigration Fees Required by HR–1 Reconciliation Bill

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice of immigration fees.

**SUMMARY:** U.S. Citizenship and Immigration Services (USCIS) is announcing a series of fees to be collected by USCIS. Recently enacted legislation that provided for reconciliation pursuant to Title II of House Concurrent Resolution 14, titled HR–1, establishes specific fees for various immigration-related forms, benefits, statuses, petitions, applications, and requests administered by multiple government agencies. This notice announces the new fees that are administered by USCIS, a component of the U.S. Department of Homeland Security (DHS), to whom those fees apply, when the new fees take effect, instructions on their payment, when and if the fees may be waived, and consequences of the failure to pay. This notice is intended to provide the information needed for the public to comply with the new law.

**DATES:** Unless specified otherwise in this notice, the fees announced in this notice must be submitted for any immigration benefit requests postmarked on or after July 22, 2025. Any form postmarked on or after August 21, 2025 without the proper filing fee will be rejected.

**FOR FURTHER INFORMATION CONTACT:** Office of Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746, telephone (240) 721–3000 (this is not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### Table of Abbreviations

AAF—Annual Asylum Fee
CPI–U—Consumer Price Index for All Urban Consumers
DHS—Department of Homeland Security
EAD—Employment Authorization Document
FY—Fiscal Year
HR–1—One Big Beautiful Bill Act
IMMVI—Immigrant Military Members and Veterans Initiative
INA—Immigration and Nationality Act
PIP—Parole in Place
SIJ—Special Immigrant Juvenile
TPS—Temporary Protected Status
USCIS—U.S. Citizenship and Immigration Services

### I. Background and Authority

*A. H.R.1—One Big Beautiful Bill Act*

On July 4, 2025, the President signed into law H.R.1—One Big Beautiful Bill Act, Public Law 119–21, 139 Stat. 72 (''HR–1''). HR–1 was a comprehensive legislative package that changed many laws and added new laws that touch many areas of the United States government. Among those changes, the

law established several new provisions and fees to the Immigration and Nationality Act (INA). *See* HR–1, Title X, Subtitle A, Part I, Sections 100001 through 1000018.

The new fees are provided as minimum amounts for Fiscal Year (FY) 2025, authorize the relevant agency to adjust them as determined necessary using rulemaking, and are required to be adjusted annually based on the Consumer Price Index for All Urban Consumers (CPI–U). In most cases, fee waivers or reductions are prohibited for the additional fees under HR–1. The funds collected from these fees are allocated to relevant agencies or the U.S. Treasury. USCIS will reject or deny any immigration benefit requests that are submitted without all of the fees required, including the new fees announced in this notice, as provided in 8 CFR 103.2(a)(7)(ii)(D).

*B. DHS Fee Setting Authority, USCIS Fees, and HR–1 Fees*

INA sec. 286(m), 8 U.S.C. 1356(m), authorizes the Secretary of Homeland Security to set fees for adjudication by regulation "at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants" and "that will recover any additional costs associated with the administration of the fees collected." DHS codified new fees and related

regulations as authorized by INA sec. 286(m) on January 31, 2024, effective April 1, 2024. *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements,* Final Rule, 89 FR 6194 (Jan. 31, 2024) (USCIS Fee Rule).

Unless otherwise described in this notice regarding a specific fee, the new fees in HR–1 are required in addition to any other fee authorized by law and by the heads of relevant departments.[1] That means that the fees in HR–1 do not supersede or replace those promulgated by the USCIS Fee Rule, rather they will be charged "in addition" to current fees.[2] USCIS fees are generally codified in 8 CFR part 106 and any other fees authorized by law as referred to in this notice refers to part 106 unless otherwise noted.

USCIS acknowledges that the portion of the HR–1 fees that USCIS retains will be in addition to the revenue it receives from the fees that DHS determined in the USCIS Fee Rule were needed to recover the full costs of operating USCIS. Regardless, the HR–1 text "in addition to any other fee authorized by law" is clear. Furthermore, to interpret HR–1 as providing for replacement of the USCIS fees DHS codified in 8 CFR part 106 would result in USCIS being unable to fund its operations. If HR–1 fees replaced the fees that USCIS retains to recover its operating costs with new

fees that must partly or wholly go to the Treasury, USCIS would be required to maintain our current production and service levels with a large reduction in revenue. USCIS will soon conduct a total cost recovery fee study consistent with the CFO Act, 31 U.S.C. 901–03 (requiring each agency's Chief Financial Officer (CFO) to review, on a biennial basis, the fees imposed by the agency for services it provides, and to recommend changes to the agency's fees). However, USCIS has no basis to believe that Congress intended HR–1 to result in USCIS not being fully funded until promulgation of the next USCIS fee rule.

**II. New Immigration Fees**

This notice announces certain new fees promulgated by HR–1, when collection of the fees will begin and, when necessary, how the fees are to be paid.[3]

The new immigration fees imposed by HR–1 are in addition to any other fees already authorized by law and regulations, as shown in Table 1.

The DHS fee and HR–1 fees must be submitted separately. If the requestor is eligible for a fee waiver for the DHS fee, he or she may submit Form I–912, Request for Fee Waiver, or a written fee waiver request, along with HR–1 fees as listed in Table 1.[4] The annual pending asylum application fee must be submitted online.

*A. Summary of New Fees*

TABLE 1—USCIS IMMIGRATION BENEFIT REQUEST WITH ADDITIONAL FEES FROM HR–1

| Benefit category | Form | Current filing fee [5] | Immigration fee type | HR–1 FY 2025 fee | Combined fees |
|---|---|---|---|---|---|
| Asylum | I–589 [6] | $0 | Asylum Fee (Initial fee for aliens filing an application for asylum). | $100 ........................................ No Fee Waiver Available. | $100 |
| | I–589 (Pending) | N/A | Annual Pending Asylum Application Fee. | $100 (annual for every calendar year that the asylum application is pending); payable online only. No Fee Waiver Available. | 100 |
| EADs | I–765 [7]—Initial for (c)(8) Asylum Applicant. | $0 | Initial Asylum Applicant EAD | $550 ........................................ No Fee Waiver Available. | 550 |
| | I–765—Initial (c)(8) Applying under Special *American Baptist Churches* v. *Thornburgh* [8] (ABC) Procedures. | Paper Filing: $520 Fee Waiver Available. | Initial Asylum Applicant EAD | $550 ........................................ No Fee waiver Available. | 1,070 |
| | | Online Filing: $470 Fee Waiver Available. | Initial Asylum Applicant EAD. | $550 ........................................ No Fee waiver Available. | 1,020 |

---

[1] *See* Sec. 100002(a) ("In addition to any other fee authorized by law, the Secretary of Homeland Security or the Attorney General, as applicable, shall require the payment of a fee, equal to the amount specified in this section, by any alien who files an application for asylum under section 208 (8 U.S.C. 1158) at the time such application is filed."); *see also* Sec. 100003(a)(1) (initial application for employment authorization under section 208(d)(2)); Sec. 100003(b)(1) (initial application for employment authorization filed by any alien paroled into the United States); Sec. 100003(c)(1) (initial application for employment authorization under section 244(a)(1)(B)); Sec. 100005(a) (any alien, parent, or legal guardian of an

alien applying for special immigrant juvenile status under section 101(a)(27)(J)); Sec. 100009(a) (for each calendar year that an alien's asylum application remains pending); Sec. 100010(a) (any alien who seeks a renewal or extension of employment authorization based on a grant of parole); Sec. 100011(a) (any alien who has applied for asylum for each renewal or extension of employment authorization); Sec. 100012(a) (renewal or extension of employment authorization based on a grant of temporary protected status).

[2] One exception is at section 100006 of Title X governing the Temporary Protected Status application fee. This provision replaces the $50 registration fee amount specified at INA sec.

244(c)(1)(B), 8 U.S.C. 1254a(c)(1)(B) with the new registration fee amount of $500. See 8 CFR 106.2(a)(50)(i).

[3] As explained later in this notice, USCIS does not list all the new fees required by HR–1 in this notice because (1) the law contains restrictions on collection of the fees that require additional study and planning before they can be implemented, or (2) the fee is administered by another DHS component or federal agency.

[4] For information on how to submit fees, see USCIS, Filing Fees, *https://www.uscis.gov/forms/filing-fees* (Last Reviewed/Updated: May 28, 2025). USCIS will update the I–912 as appropriate to account for the changes in HR–1.

**Federal Register** / Vol. 90, No. 138 / Tuesday, July 22, 2025 / Notices

34513

TABLE 1—USCIS IMMIGRATION BENEFIT REQUEST WITH ADDITIONAL FEES FROM HR–1—Continued

| Benefit category | Form | Current filing fee [5] | Immigration fee type | HR–1 FY 2025 fee | Combined fees |
|---|---|---|---|---|---|
| | I–765—Renewal for (c)(8) Asylum Applicant. | Paper Filing: $520 .................. Fee Waiver Available. | Renewal or Extension of Asylum Applicant EAD. | $275 ......................................... No Fee Waiver Available. | 795 |
| | | Online Filing: $470 ................. Fee Waiver Available. | Renewal or Extension of Asylum Applicant EAD. | $275 ......................................... No Fee Waiver Available. | 745 |
| | I–765—Initial for (a)(4) Paroled Refugee. | $0 ............................................. | Initial Parole EAD—Valid for 1 year. | $550 ......................................... No Fee Waiver Available. | 550 |
| | I–765—Initial (c)(11) for 212(d)(5)(A) Parole. | Paper Filing: $520 .................. Fee Waiver Available. | Initial Parole EAD—Valid for 1 year. | $550 ......................................... No Fee Waiver Available. | 1,070 |
| | | Online Filing: $470 ................. Fee Waiver Available. | Initial Parole EAD—Valid for 1 year. | $550 ......................................... No Fee Waiver Available. | 1,020 |
| | | IMMVI current or former service members, special processes for paroled Ukrainians: $0. | Initial Parole EAD—Valid for 1 year. | $550 ......................................... No Fee Waiver Available. | 550 |
| | I–765—Initial (c)(34) Paroled Spouse of (b)(37) Entrepreneur. | Paper Filing: $520 .................. Fee Waiver Available. | Initial Parole EAD—Valid for 1 year. | $550 ......................................... No Fee Waiver Available. | 1,070 |
| | I–765—Renewal (a)(4) Paroled Refugee. | $0 ............................................. | Initial Parole EAD—Valid for 1 year. | $275 ......................................... No Fee Waiver Available. | 275 |
| | I–765—(c)(11) Renewal for 212(d)(5)(A) Parole. | Paper Filing: $520 .................. Fee Waiver Available. | Renewal or Extension of Parole EAD—Valid for 1 year. | $275 ......................................... No Fee Waiver Available. | 795 |
| | | Online Filing: $470 ................. Fee Waiver Available. | Renewal or Extension of Parole EAD—Valid for 1 year. | $275 ......................................... No Fee Waiver Available. | 745 |
| | | IMMVI [9] current or former U.S. armed forces: $0. | Renewal or Extension of Parole EAD—Valid for 1 year. | $275 ......................................... No Fee Waiver Available. | 275 |
| | I–765—Renewal (c)(34) Paroled spouse of (b)(37) Entrepreneur. | Paper Filing: $520 .................. Fee Waiver Available. | Renewal or Extension of Parole EAD—Valid for 1 year. | $275 ......................................... No Fee Waiver Available. | 795 |
| | I–765—Initial (a)(12) or (c)(19) TPS. | Paper Filing: $520 .................. Fee Waiver Available. | Initial TPS EAD—Valid for 1 year or the duration of the TPS designation whichever is shorter. | $550 ......................................... No Fee Waiver Available. | 1,070 |
| | | Online Filing: $470 ................. Fee Waiver Available. | Initial TPS EAD—Valid for 1 year or the duration of the TPS designation whichever is shorter. | $550 ......................................... No Fee Waiver Available. | 1,020 |
| | I–765—Renewal (a)(12) or (c)(19) TPS. | Paper Filing: $520 .................. Fee Waiver Available. | Renewal or Extension of TPS EAD—Valid for 1 year. | $275 ......................................... No Fee Waiver Available. | 795 |
| | | Online Filing: $470 ................. Fee Waiver Available. | Renewal or Extension of TPS EAD—Valid for 1 year. | $275 ......................................... No Fee Waiver Available. | 745 |
| | I–131 [10]—Employment Authorization Upon Issuance of New Period of Parole. | Paper Filing: $1,150 ............... Fee Waiver Available. | EAD upon new period of Parole (Re-parole). | $275 [11] ......................................... No Fee Waiver Available. | 1,425 |
| | | Online Filing: $1,050 ............. Fee Waiver Available. | EAD upon new period of Parole (Re-parole). | $275 ......................................... No Fee Waiver Available. | 1,325 |
| | | Military PIP [12] for family of service members: $520. Fee Waiver Available. | EAD upon new period of Parole (Re-parole). | $275 ......................................... No Fee Waiver Available. | 795 |
| | | IMMVI, FRTF, [13] Military PIP for current or former service members: $0. | EAD upon new period of Parole (Re-parole). | $275 ......................................... No Fee Waiver Available. | 275 |
| TPS .................. | I–821 [14]—Initial TPS Registration. | $50 + $30 (biometrics fee) ..... Fee Waivable.[15] | TPS Fee ................................ | $500 ......................................... No Fee Waiver Available. | 530 |
| SIJs .................. | I–360 [16] | $0 ............................................. | Special Immigrant Juvenile Fee. | $250 ......................................... No Fee Waiver Available.[17] | 250 |

*B. Description of the New Fees*

1. Asylum Fee

HR–1 created a new fee for any alien who files an application for asylum

under section 208 (8 U.S.C. 1158) at the time such application is filed. Sec. 100002(a). The asylum fee cannot be

---

[5] For additional information on fees, including fee waivers, see Form G–1055, Fee Schedule, *https://www.uscis.gov/g-1055*.

[6] Form I–589, Application for Asylum and for Withholding of Removal.

[7] Form I–765, Application for Employment Authorization.

[8] *See American Baptist Churches* v. *Thornburgh*, 760 F. Supp. 796 (N.D. Cal. 1991). *See also, USCIS, American Baptist Churches* v. *Thornburgh (ABC) Settlement Agreement, https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/american-baptist-churches-v-thornburgh-abc-settlement-agreement* (last visited July 9, 2025).

[9] Parole for Immigrant Military Members and Veterans Initiative (IMMVI).

[10] Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records. Part 9 of Form I–131 currently permits certain aliens to request an EAD upon approval of a new period of parole (re-parole).

[11] As explained below, USCIS will temporarily charge the $275 for requests for initial EADs and renewal or extension EADs.

[12] Military Parole in Place (Military PIP).

[13] Parole for members of the Family Reunification Task Force (FRFT) settlement agreement.

[14] Form I–821, Application for Temporary Protected Status.

[15] HR–1 increased the base application fee for an initial Form I–821 from $50 to $500, which is no longer eligible for a fee waiver. See Sec. 100006. However, the $30 biometrics fee remains eligible for fee waiver. See 8 CFR 106.2(a)(50)(iii), 8 CFR 106.3(a)(3)(i)(E).

[16] Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant.

[17] Section II.D. of this notice contains an explanation of fee waivers as they apply to HR–1 fees. Sec. 100005 establishing the SIJ fee does not include an explicit "no fee waiver" provision. However, USCIS' general authority to grant waivers is based on the discretionary language of INA 286(m), 8 U.S.C. 1356(m), which states that "fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." In contrast, the language of Sec. 100005(a) is mandatory ("the Secretary of Homeland Security shall require the payment of a fee"). Therefore, no fee waiver is available.

waived or reduced. Id.(e). The initial asylum fee amount is set at $100 for FY 2025. Id. Because Sec. 100002 imposes this asylum application fee "at the time such application is filed," the fee applies to asylum applications filed on or after the date of publication of this Notice. Any Form I–589, Application for Asylum and for Withholding of Removal, submitted to USCIS must include the new fee or it will be rejected as provided in the **DATES** section of this notice.

2. Employment Authorization Document Fees

HR–1 created new EAD fees in addition to other existing fees for EADs. Sec. 100003. The fees apply to specific groups of applicants and vary by initial, renewal, or extension for those groups.

a. Asylum EAD

HR–1 created a fee for individuals filing an initial application for employment authorization based on a pending asylum application under section 208(d)(2) (8 U.S.C. 1158(d)(2)), which is $550 for FY 2025. Sec. 100003(a). The fee is due when the initial employment authorization application is filed. Id. The asylum EAD fee cannot be waived or reduced. Id. (a)(5).

In addition to the initial EAD application fee, HR–1 created an additional fee for renewals and extensions of employment authorization for asylum applicants. Sec. 100011. The fee is $275 for FY 2025. HR–1 renewal or extension fee cannot be waived or reduced, though USCIS may waive the pre-existing regulatory fee. See 8 CFR 106.2(a)(44) and 8 CFR 106.3(a)(3)(ii)(F).

b. Parolee EAD Fees

HR–1 requires a fee "by any alien paroled into the United States for any initial application for employment authorization at the time such initial application is filed." Sec. 100003(b)(1). This additional fee is $550 for FY 2025. Each initial employment authorization shall be valid for a period of 1 year or for the duration of the individual's parole, whichever is shorter. Id. The fee is due when the initial employment authorization application is filed. Id. The HR–1 parole EAD fee cannot be waived or reduced. Sec. 100003(b)(5). However, USCIS may waive the pre-existing regulatory fee. See 8 CFR 106.2(a)(44) and 8 CFR 106.3(a)(3)(ii)(F).

In addition to the initial EAD application fee, HR–1 created an additional fee for renewals and extensions of employment authorization "based on a grant of parole." Sec. 100010(a). The fee that is effective for FY 2025 is $275. The HR–1 fee cannot be waived or reduced, though USCIS may waive the pre-existing regulatory fee. See 8 CFR 106.2(a)(44) and 8 CFR 106.3(a)(3)(ii)(F).

Sec. 100003(b)(1) states that these fees apply to "any alien paroled" into the United States. This language, on its face, would seem to encompass all those who were paroled into the United States at any point in time, regardless of the category under which they are seeking to qualify for employment authorization, rather than only those who are applying for employment authorization based on being "an alien paroled into the United States . . . pursuant to section 212(d)(5) of the Act". See 8 CFR 274a.12(c)(11). Such a reading does not align with the remainder of the statutory text which sets a validity period for the employment authorization of 1 year or the "duration of the alien's parole, whichever is shorter", sec. 100003(b)(1), and which states that the renewal or extension is "based on a grant of parole", sec. 100010(a). In addition, applying this fee to any alien who was paroled into the United States rather than only those seeking to qualify for employment authorization on that basis would create the perverse effect of applying the fee to asylum applicants who were initially paroled into the United States, even though asylum applicants already have a $550 initial employment authorization application fee designated in the prior paragraph, sec. 100003(a)(1), and even if they were not granted parole for any significant duration. In order to give effect to the parolee employment authorization provisions in the context of the whole statutory text, the fees in sections 100003(b) and 100010 must be read to apply to those paroled into the United States pursuant to INA 212(d)(5)(A) and who are seeking authorization for employment on that basis under category (c)(11).

If an alien requests an EAD under category (c)(11), based upon approval of a new period of parole (re-parole) by filing Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records, USCIS will initially impose the lower $275 HR–1 fee. USCIS recognizes that a parolee may have been granted parole, opted to not request an EAD for that initial period of parole, and is now requesting an initial EAD for an additional period of parole being requested. However, the current Form I–131 and Form I–765 do not distinguish initial EAD requests from renewal or extension EAD requests. USCIS will presume that an EAD requested for re-parole, renewal, or extension of parole will be for a renewal EAD regardless of whether the alien has no current or previous EAD and we will only require a $275 fee under HR–1.

c. Temporary Protected Status (TPS) EAD Fees

The additional fee for an alien who files an initial EAD application under TPS is $550. Sec. 100003(c). Each initial employment authorization for TPS registrants who are subject to this fee will be valid for a period of 1 year or for the duration of the alien's TPS, whichever is shorter. Id. The HR–1 TPS EAD fee cannot be waived or reduced. Sec. 100003(c)(5). However, USCIS may continue to waive the preexisting regulatory TPS EAD fee. See 8 CFR 106.2(a)(44) and 8 CFR 106.3(a)(3)(ii)(F).

In addition to the initial EAD application fee, HR–1 created an additional fee for renewals and extensions of employment authorization for aliens granted TPS. Sec. 100012. The renewal or extension period for employment authorization shall be approved for a period of no more than 1 year, or for the duration of the designation of TPS, whichever is shorter. Sec. 100012(a). The FY 2025 fee is $275. The HR–1 renewal or extension fee cannot be waived or reduced. Sec. 100012(d). However, USCIS may continue to waive the preexisting regulatory TPS EAD fee. See 8 CFR 106.2(a)(44) and 8 CFR 106.3(a)(3)(ii)(F).

3. Temporary Protected Status Fee

HR–1 amended Section 244(c)(1)(B) of the INA (8 U.S.C. 1254a(c)(1)(B)) to raise the maximum cost to register for temporary protected status using Form I–821, Application for Temporary Protected Status, from $50 to $500. Sec. 100006. Because DHS has set the fee for first-time Form I–821 applicants as "$50 or the maximum permitted by section 244(c)(1)(B) of the Act" in 8 CFR 106.2(a)(50)(i),[18] the resulting fee is $500, not including the $30 biometric services fee. See 8 CFR 106.2(a)(50)(iii). The HR–1 TPS fee cannot be waived or reduced. Sec. 100006. Aliens filing Form I–821 may continue to request a waiver of the biometrics fee. See 8 CFR 106.2(a)(50)(iii), 8 CFR 106.3(a)(3)(i)(E).

4. Special Immigrant Juvenile Fee

HR–1 created a new fee for any alien who files a Form I–360, Petition for Amerasian, Widow(er) or Special Immigrant for Special Immigrant Juvenile (SIJ) status under section

---

[18] By regulation at 8 CFR 106.2(a)(50)(i), DHS has exercised its discretionary authority to impose the maximum fee permitted by section 244(c)(1)(B).

101(a)(27)(J), 8 U.S.C. 1101(a)(27)(J). Sec. 100005. The FY 2025 HR–1 fee is $250. The language of HR–1 prohibits fee waivers or exemptions for this fee.[19] There is no separate authority permitting fee waivers for Form I–360. Cf. 8 CFR 106.3(a)(3).

### 5. Annual Asylum Fee (AAF)

HR–1 requires all aliens with a pending asylum application to pay an annual fee for each calendar year that the alien's application remains pending, in addition to any other fee. Sec. 100009. The first AAF is $100 for FY 2025. Sec. 100009(b). DHS interprets the term ''remains pending'' to mean any application filed with USCIS or DOJ and that remains pending with any federal government agency, court, or entity with jurisdiction over asylum claims as intended by Sec. 100009(b) of HR–1. This notice provides notice and information about how USCIS will administer the fee required from asylum applicants with applications pending more than one year with USCIS.

To effectuate the FY 2025 fee, DHS will require that any alien who filed a Form I–589, Application for Asylum and for Withholding of Removal, with USCIS before or on the beginning of fiscal year 2025, October 1, 2024, and whose application is still pending with USCIS at the end of fiscal year 2025, on September 30, 2025, must pay the FY 2025 amount specified by statute.[20] Such aliens must also pay the AAF as of September 30 in each subsequent year that the application remains pending with USCIS. For applications pending for more than a year prior to October 1, 2024, DHS has determined that HR–1 does not require any additional AAF for years that the application was pending prior to FY 2025. Any alien who filed or files a Form I–589 after October 1, 2024, that remains pending with USCIS for 365 days must pay the AAF as of the one-year anniversary of his or her filing date and each year thereafter that the application remains pending on such day of the calendar year.

DHS determined that the fee applies to a Form I–589 pending as of October 1, 2024 or submitted thereafter because language in HR–1 is clear and

unambiguous that the AAF applies during fiscal year 2025, which runs from October 1, 2024 through September 30, 2025, and to each fiscal year thereafter. Subsection (b)(1) of section 100009(b) provides for an initial amount that ''shall'' be applied for fiscal year (FY) 2025. Subsection (a) applies a fee for ''each calendar year that an alien's application for asylum remains pending.'' Because HR–1 states that the AAF will be applicable in FY 2025, it necessarily applies the provision to the start of FY 2025. To apply the law only to applications filed after the date of enactment in July 2025 or later would result in no fee collections in FY 2025 because no such application would be pending for a calendar year (i.e. twelve months) during that time frame. Therefore, section 100009(b) requires applying the fee to applications pending with USCIS before enactment of HR–1. As such, Section 100009 contains a clear expression of intent to apply the AAF to applications filed on or before October 1, 2024 that remain pending for the entirety of fiscal year 2025. DHS is not retroactively applying the AAF to applications pending for one-year periods during fiscal years prior to 2025. *Landgraf* v. *USI Film Prods.*, 511 U.S. 244, 264 (1994). Requiring the 2025 AAF with respect to pending asylum applications filed as of October 1, 2024, the first day of FY 2025, is not impermissibly retroactive because it merely applies changes in procedural rules required by statute. Id. at 275; see also INA 208(d)(3) (2024) (listing ''fees'' under the ''asylum procedure'' subsection and providing that the government may impose fees for the consideration of an application for asylum).

For the first time the AAF is due under this notice, asylum applicants need not monitor the time their application has been pending and if the AAF applies to them. USCIS will provide personal, individual notice to each asylum applicant with an application pending with USCIS from whom the AAF is required, the amount of the fee, when the fee must be paid, how the fee must be paid, and the consequences of failure to pay. USCIS will require that AAF be paid using an online fee payment process. USCIS will provide guidance for future years' AAF payments in subsequent issuances.

### C. Consumer Price Index for All Urban Consumers (CPI–U) Updates

In FY 2026 and each subsequent fiscal year, DHS will adjust the fee by inflation by using the Consumer Price Index for all Urban Consumers (CPI–U) for the month of July. See secs.

100002(c), 10003(a)(3), 100003(b)(3) 100003(c)(3), 100004(d), 100005(c), 10006, 10009(b)(2), 100010(b)(2), 100012(b)(2). The Department of Homeland Security (DHS) will round the adjusted fee to the next lowest multiple of $10, secs. 100002(c), 100003(a)(3), 100003(b)(3) 100003(c)(3), 100004(d), 100005(c), 100006, 100010(b)(2), 100012(b)(2), or the nearest dollar. Sec. 100009(b)(2). USCIS will deposit and retain a portion of the revenue from some of these fees in the Immigration Examinations Fee Account (IEFA).[21] The remaining revenue will be deposited with the general fund of the Treasury.[22]

### D. Fee Waivers and Exemptions

Fees, fee exemptions, and fee waivers[23] in 8 CFR part 106 have not changed. Fees imposed by HR–1 cannot be waived or reduced.[24] Therefore the fees required by HR–1 for an immigration benefit request must be paid with each request submitted. However, a request may be submitted for one of the benefits covered by HR–1 and if the benefit is eligible for a DHS fee waiver, may still be accompanied by a USCIS Form I–912, Request for a Fee Waiver, under 8 CFR 106.3(a) in lieu of the fee required by 8 CFR 106.2(a). If the fee waiver is approved, the application will be accepted without the USCIS regulatory fee. However, even if a waiver under 8 CFR 106.3(a) of the fee required by 8 CFR 106.2(a) is requested, and even if the applicant is eligible and approved for the waiver, the fee required by HR–1 and announced in this notice must be paid for each request.

In addition, INA section 245(l)(7), 8 U.S.C. 1255(l)(7),[25] requires DHS to

---

[19] Sec. 100005 states that ''the Secretary of Homeland Security shall require the payment of a fee, equal to the amount specified in this section . . . .'' USCIS authority to waive fees in its fee schedule rests in the language of 8 U.S.C. 1356(m), which grants the Secretary of Homeland Security discretion in setting fees. The new SIJ fee, however, is mandatory.

[20] USCIS collects certain fees on behalf of EOIR. Administrative processes such as whether USCIS will collect the AAF or any other HR–1 fees on behalf of EOIR are beyond the scope of this notice.

[21] Secs. 100002 (50% to USCIS), 100003 (25% to USCIS), 100010 (25% to USCIS), 100011 (25% to USCIS), 100012 (25% to USCIS).

[22] Secs. 100002 (50% to the Treasury), 100003 (75% to Treasury), 100010 (75% to Treasury), 100011(75% to Treasury), 100012 (75% to Treasury); Secs. 100004–06, 100009 (100% to Treasury).

[23] See Form G–1055, Fee Schedule, *https://www.uscis.gov/g-1055* (last reviewed/updated July 11, 2025).

[24] See Sec. 100002(e) (asylum fee); Sec. 100003 (initial employment authorization document fees); Sec. 100006 (temporary protected status fee); Sec. 100009(d) (annual asylum fee); Sec. 100010(d) (fees for renewal and extension of employment authorization for parolees); Sec. 100011(d) (fees for renewal or extension of employment authorization for asylum applicants); Sec. 100012(d) (fees for renewal and extension of employment authorization for temporary protected status).

[25] ''The Secretary of Homeland Security shall permit aliens to apply for a waiver of any fees associated with filing an application for relief through final adjudication of the adjustment of status for a VAWA self-petitioner and for relief under sections 1101(a)(15)(T), 1101(a)(15)(U),

Continued

allow a request for waiver of the fees required for certain immigration benefit requests. However, where the new specific language in HR–1 states that the fees ''shall not be waived or reduced'' DHS interprets HR–1 as superseding section 245(l)(7), 1255(l)(7), for purposes of the new fees imposed by HR–1. Although a waiver of the USCIS fee under 8 CFR 106.3(a)(3)(iii) of the fee required by 8 CFR 106.2(a) may be requested, USCIS will not waive such a fee required by HR–1 and a request for such may not be submitted.

*E. HR–1 Fees Not in the Notice*

This notice does not announce all of the fees required or authorized by HR–1. DHS will announce the collection of any fees not covered in this notice in a future action. USCIS is not announcing certain fees required by HR–1 in this notice as follows:

• The IMMIGRATION PAROLE FEE required by section 100004 (parole fee) of HR–1. HR–1 contains multiple exceptions to the requirement for the parole fee and DHS must interpret how the exceptions should be applied. DHS will announce the parole fee in a future publication.

• The VISA INTEGRITY FEE required by section 100007 of HR–1 for any alien issued a nonimmigrant visa at the time of such issuance. The VISA INTEGRITY FEE requires cross-agency coordination before implementing; the fee will be implemented in a future publication.

• The FORM I–94 FEE required by section 100008 of HR–1 is required from any alien who submits an application for a Form I–94 Arrival/Departure Record. DHS will be issuing guidance on the Form I–94 fee requirements in a future publication.

• The ELECTRONIC SYSTEM FOR TRAVEL AUTHORIZATION (ESTA) FEE required by section 100014 of HR–1. These are not USCIS administered fees.

• The ELECTRONIC VISA UPDATE SYSTEM FEE required by section 100015 (Visa update fee) and the FEE FOR ALIENS ORDERED REMOVED IN ABSENTIA (in absentia fee) required by section 100016 are not USCIS administered fees.

DHS will continue to work toward implementation of the remaining fees applicable to USCIS, specifically: (1) fees related to Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records, and (2) Form I–102, Application for Replacement/Initial Nonimmigrant Arrival-Departure Document.

1105a, 1229b(b)(2), and 1254a(a)(3) of this title (as in effect on March 31, 1997).''

## III. Effective Date and Implementation

DHS recognizes that HR–1 became effective upon Presidential signature on July 4, 2025, and we are working to implement the statutory mandates as soon as practicable. This notice explains how we will collect the required fees. While that work is ongoing, and in an effort to implement the plain terms of HR–1 as quickly as possible, USCIS will begin collecting the filing fees for fiscal year 2025 for any immigration benefit requests postmarked on or after July 22, 2025. In addition, DHS has balanced the impact on the public of imposing HR–1 fees and the timeliness of complying with the statutory mandates. Because of the time needed by DHS and USCIS to issue guidance on and operationalize the required fees, and for the public to adapt their immigration benefit requests that are in process to the changes, requests postmarked on or after August 21, 2025 without the proper filing fee will be rejected. DHS has determined that the policy required by this Notice is the most equitable path forward in order to effectuate HR–1 as expeditiously as practicable. The HR–1 fees are required by law, but for additional clarity, DHS may codify these fees in 8 CFR part 106 in a future rule.

## IV. Paperwork Reduction Act

This notice is not subject to the Paperwork Reduction Act, 44 U.S.C. 3501–3521 (PRA). The PRA does not preclude the imposition of a penalty on an entity for failing to comply with a collection of information that is imposed on the entity by statute. See 5 CFR 1320.6(e).

**Angelica Alfonso-Royals,**
*Acting Director, United States Citizenship and Immigration Services.*
[FR Doc. 2025–13738 Filed 7–18–25; 4:15 pm]
**BILLING CODE 9111–97–P**

## DEPARTMENT OF THE INTERIOR

### Bureau of Reclamation

**[RR040U2000, XXXR4081G3, RX.05940913.FY19400]**

### Public Meeting of the Glen Canyon Dam Adaptive Management Work Group

**AGENCY:** Bureau of Reclamation, Interior.

**ACTION:** Notice of public meeting.

**SUMMARY:** In accordance with the Federal Advisory Committee Act of 1972, the Bureau of Reclamation (Reclamation) is publishing this notice to announce that a Federal Advisory

Committee meeting of the Glen Canyon Dam Adaptive Management Work Group (AMWG) will take place. The meeting is open to the public.

**DATES:** The meeting will be held on Wednesday, August 20, 2025, beginning at 9:30 a.m. to approximately 4:30 p.m. PDT (Arizona); and Thursday, August 21, 2025, from 8:30 a.m. to approximately 3:30 p.m. PDT (Arizona).

**ADDRESSES:** The meeting will be held in person at Little America, 2515 E Butler Ave., Flagstaff, AZ 86004. The meeting can also be accessed virtually on Wednesday, August 20, 2025, at *https://events.gcc.teams.microsoft.com/event/9b12f616-e09b-487c-962b-30b3d0d2877f@0693b5ba-4b18-4d7b-9341-f32f400a5494;* and on Thursday, August 21, 2025, at *https://events.gcc.teams.microsoft.com/event/c0b7de6e-2ffa-4cee-a063-29ed2ce5d8e3@0693b5ba-4b18-4d7b-9341-f32f400a5494.*

**FOR FURTHER INFORMATION CONTACT:** Mr. William Stewart, Bureau of Reclamation, telephone (385) 622–2179, email at *wstewart@usbr.gov.* Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** The Glen Canyon Dam Adaptive Management Program (GCDAMP) was implemented as a result of the Record of Decision on the Operation of Glen Canyon Dam Final Environmental Impact Statement to comply with consultation requirements of the Grand Canyon Protection Act (Pub. L. 102–575) of 1992. The AMWG makes recommendations to the Secretary of the Interior concerning Glen Canyon Dam operations and other management actions to protect resources downstream of Glen Canyon Dam, consistent with the Grand Canyon Protection Act. The AMWG meets two to three times a year.

*Agenda:* The AMWG will meet to receive updates on: (1) current basin hydrology and water year 2025 operations; (2) experiments considered for implementation in 2026; (3) the status of threatened and endangered species; (4) long-term funding considerations; (5) recommendations for the 2026 Triennial Work Plan and Budget. The AMWG will also discuss other administrative and resource issues pertaining to the GCDAMP. To view a copy of the agenda and documents

U.S. Customs and Border Protection

U.S. Customs and
Border Protection

**Archived Content**

In an effort to keep CBP.gov current, the archive contains content from a previous administration or is otherwise outdated.

# CBP Releases December 2024 Monthly Update

**Release Date:** Tue, 01/14/2025

**WASHINGTON** – U.S. Customs and Border Protection (CBP) released operational statistics today for December 2024. CBP monthly reporting can be viewed on CBP's Stats and Summaries webpage.

"The men and women of CBP are continuing their diligent enforcement efforts – and they are having an impact on community safety and national security," said **Pete Flores, Senior Official Performing the Duties of the Commissioner.** "In the last six months of 2024, Border Patrol apprehensions along the southwest border have decreased more than **70%** from the same period in 2023. We will stay vigilant as we enhance border security, interdict dangerous drugs, ensure economic security and vitality, protect our nation's agricultural system, and uphold our other critical missions."

## CBP Southwest Border Enforcement Numbers for December 2024

Since the Biden-Harris Administration took executive action in June, there has been a significant and sustained decrease in unlawful border crossings – including a **60%** decrease in encounters between ports of entry along the southwest border from May to December. November and December encounters between ports of entry are now at their lowest level since August 2020 and lower than the monthly average for 2019.

These actions have also led to an increase in the percentage of migrants removed from the United States and a meaningful decrease in the number of people released pending their removal proceedings. Since the Proclamation took effect on June 5, DHS has tripled

FRP-FRN-00485

the percentage of noncitizens processed for Expedited Removal, and the number of individuals released by the U.S. Border Patrol pending immigration court proceedings is down **89%**.

From June 5 through the end of December, DHS removed or returned more than **271,000** individuals to more than **160** countries, not including CBP repatriations of noncitizens encountered at airports or the northern border. U.S. Immigration and Customs Enforcement – Enforcement and Removal Operations (ICE-ERO) has operated more than **860** international repatriation flights from June 5 through the end of December.

In fiscal year (FY) 2024, DHS completed roughly **700,000** removals and returns, more than any prior fiscal year since 2010. That includes more removals to countries other than Mexico than in any prior fiscal year. DHS has also reduced the time it takes to remove individuals with final orders of removal who do not establish a legal basis to remain in the United States by more than half from its historical average. Additionally, the estimated number of migrant "gotaways" – people who crossed the border without encountering CBP – decreased approximately **60%** from FY 2023 to FY 2024.

On the northern border, CBP's expanded enforcement efforts in response to changing migration trends has yielded a reduction in encounters between ports of entry of more than **85%** from June to December. Specifically in the Swanton Sector, encounters dropped **89%** from June to December.

*Below are key operational statistics for CBP's primary mission areas in December 2024. View all CBP statistics online.*

## Strengthening Border Security and Managing Migration

CBP, ICE, and U.S. Citizenship and Immigration Services (USCIS) continue to expeditiously process, remove, and apply strengthened consequences for individuals who cross the nation's borders irregularly.

In December, the U.S. Border Patrol recorded approximately **47,330** encounters between ports of entry along the southwest border. The U.S. Border Patrol's encounters in December were **81%** lower than in December 2023, maintaining the downward trend in encounter numbers since June. Total southwest border irregular encounters in December, including encounters at ports of entry of noncitizens without a CBP One appointment, were **52,082** compared to the **51,191** recorded in November.

The Presidential Proclamation and Final Rule have enhanced DHS's ability to deliver swift consequences to individuals who pose a threat to national security or public safety, such as gang members attempting to enter the country unlawfully DHS has also returned more U.S. Border Patrol agents to the field to undertake front line border security operations, enhancing DHS efforts to interdict

FRP-FRN-00486

individuals who pose a threat to public safety or national security. These efforts continue to expand and maximize DHS enforcement against individuals who pose a threat to our communities.

The U.S. Border Patrol has undertaken significant efforts in recent years to expand capacity to aid and rescue individuals in distress. To prevent the loss of life, CBP initiated a Missing Migrant Program in 2017 that locates noncitizens reported missing, rescues individuals in distress, and reunifies decedents' remains with their families in the border region. In December, the U.S. Border Patrol conducted **402** rescues. The U.S. Border Patrol has recorded **1,175** rescues in fiscal year 2025 through December.

*View more migration statistics and rescues statistics.*

## CBP One™ App

The CBP One™ mobile application is a key scheduling tool and part of DHS's efforts to incentivize noncitizens to use lawful, safe, humane, and orderly pathways and processes. Noncitizens who cross between the ports of entry or who present themselves at a port of entry without making a CBP One™ appointment are generally subject to the Securing the Border Final Rule that limits asylum eligibility. DHS encourages migrants to use lawful processes, rather than taking the dangerous journey to cross unlawfully between the ports of entry, which also carries significant consequences under the United States immigration laws.

Use of the CBP One™ app to schedule appointments at ports of entry has significantly increased CBP's capacity to process migrants in a more efficient and orderly manner while cutting out unscrupulous smugglers who endanger and profit from vulnerable migrants. The suspension and limitation on entry and Final Rule does not apply to noncitizens who use the CBP One™ mobile app to enter the United States at a port of entry in a safe and orderly manner to avail themselves to lawful processes.

In December, CBP processed almost **44,000** individuals at ports of entry with information submitted in advance through CBP One™. Since the appointment scheduling function in CBP One™ was introduced in January 2023 through the end of December 2024, more than **936,500** individuals have successfully scheduled appointments to present at ports of entry instead of risking their lives in the hands of smugglers. The top nationalities processed with appointments through CBP One™ are Venezuelan, Cuban, and Mexican.

## CHNV Parole Processes

DHS continues to process new Advance Travel Authorizations (ATAs) in the parole processes for certain nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). As part of an internal review, DHS has implemented additional safeguards to the CHNV processes,

incorporating rigorous enhanced vetting of US-based supporters, including biographic and biometric screening.

All CHNV beneficiaries continue to be thoroughly screened and vetted by CBP prior to their arrival to the United States and must meet other eligibility criteria for advanced authorization to travel to the United States in a safe, orderly, and lawful way. Noncitizens with advanced authorization to travel purchase their own commercial airline tickets to come to the United States.

Through the end of December, about **531,690** Cubans, Haitians, Nicaraguans, and Venezuelans arrived lawfully and were granted parole under the parole processes. Specifically, **110,970** Cubans, **213,150** Haitians, **96,270** Nicaraguans, and **120,760** Venezuelans were vetted and authorized for travel; and **110,240** Cubans, **211,040** Haitians, **93,070** Nicaraguans, and **117,330** Venezuelans arrived and were granted parole.

Since DHS has implemented these safe, orderly and lawful processes, encounters of CHNV nationals in between ports of entry are down **91%**.

## Safeguarding Communities by Interdicting Narcotics and Dangerous Drugs

As the largest law enforcement agency in the United States, CBP is uniquely positioned to detect, identify, and seize illicit drugs like fentanyl before they enter our communities. CBP's combination of interdiction and intelligence capabilities, complemented by its border search authorities, scientific services, non-intrusive inspection equipment, and canine detection teams, places it at the forefront of the U.S. government's efforts to combat illicit fentanyl and other dangerous drugs.

CBP surged its enforcement efforts this year to further increase efforts to disrupt and dismantle the transnational criminal organizations that smuggle fentanyl, dangerous drugs, and other contraband with no regard for human life. There have been significant results from these operations. In the last two fiscal years, CBP seized record amounts of fentanyl – nearly **50,000 pounds** – enough to produce more than **2 billion** lethal doses.

In December 2024, CBP seized **1,148** pounds of fentanyl. Nationwide in December, CBP seizures of cocaine, methamphetamine, heroin, fentanyl, and marijuana (combined, by weight) increased **2.7%** from November. December seizures of cocaine increased by **296%** and heroin increased **341%** compared to November.

*Additional CBP drug seizure statistics can be found on the Drug Seizure Statistics webpage.*

FRP-FRN-00488

## Facilitating Lawful Trade and Travel

CBP encourages travelers to utilize mobile applications with technological enhancements to help speed up the travel process when entering the United States via air, land, or sea. Global Entry, for example, launched a new mobile app last year that allows members to complete their entry processing on their phones before even leaving the plane. The app can be downloaded from the Apple App store and Google Play, and is currently available for use at **47** airports, with more locations coming soon. International travelers who are not Global Entry members can take advantage of the Mobile Passport Control (MPC) app, which allows travelers to submit their passport and travel information in advance with a mobile device, resulting in less congestion and more efficient processing.

These innovative improvements reflect CBP's commitment to facilitating lawful trade and travel and contributing to the country's economic growth. The number of pedestrians arriving by land at ports of entry increased **2.6%** from December 2023 to December 2024. The number of travelers arriving by air into the United States increased **6.9%** over the same period. Passenger vehicles processed at ports of entry increased **5.2%** and commercial trucks processed at ports of entry increased **3.6%**.

CBP works diligently with the trade community and port operators to ensure that merchandise is cleared as efficiently as possible and to strengthen international supply chains and improve border security. In December 2024, CBP processed more than **2.8 million** entry summaries valued at more than **$290 billion**, identifying estimated duties of nearly **$7.4 billion** to be collected by the U.S. government. In December, trade via the ocean environment accounted for **40%** of the total import value, followed by air, truck, and rail.

*View more travel statistics, and trade statistics.*

## Protecting Consumers and Eradicating Forced Labor from Supply Chains

CBP continues to lead U.S. government efforts to eliminate goods from the supply chain made with forced labor from the Xinjiang Uyghur Autonomous Region of China. In December, CBP stopped **1,404** shipments valued at more than **$18.7 million** for further examination based on the suspected use of forced labor, and which may be subject to a Withhold Release order, Forced Labor Finding, or the Uyghur Forced Labor Prevention Act's rebuttable presumption, and prohibited importation into the United States under 19 U.S.C. § 1307.

In December, CBP issued a Finding against a Chinese-owned entity in the Dominican Republic based on information indicating the use of forced labor in the production of aluminum extrusion and profile products used to build transportation and construction

FRP-FRN-00489

products, furniture, electronics, and more. With this Finding issuance, CBP currently oversees and enforces **51** withhold release orders and Findings under 19 U.S.C. § 1307.

CBP also seizes millions of counterfeit products every year worth billions of dollars had they been genuine. In December, CBP seized **1,687** shipments that contained counterfeit goods valued at more than **$110 million**. Consumers are encouraged to be alert to the dangers of counterfeit goods especially when shopping online as they support criminal activity, hurt American businesses, and often have materials or ingredients that can pose serious health and safety risks.

Criminal groups are exploiting the explosive growth of e-commerce to sell illicit products and drugs, including fentanyl, through online platforms. CBP is working with DHS to move the 21st Century Customs Framework statutory package through an interagency review process in order to improve CBP's ability to interdict these illicit products. At the same time, CBP is working with Department of Treasury to ensure the de minimis regulatory package enters interagency review.

CBP completed **48** audits in December that identified **$8 million** in duties and fees owed to the U.S. government, stemming from goods that had been improperly declared in accordance with U.S. trade laws and customs regulations. CBP collected over **$519 million** of this identified revenue and from previous fiscal years' assignments. View more UFLPA enforcement statistics, and intellectual property rights enforcement statistics.

## Agriculture Stats/Seizures – Securing American Agriculture

In December 2024, CBP agriculture specialists helped protect America's agriculture, natural resources, and economic prosperity.

CBP issued **6,580** emergency action notifications for restricted and prohibited plant and animal products entering the United States.

- CBP conducted **98,420** positive passenger inspections and issued **631** civil penalties and/or violations to the traveling public for failing to declare prohibited agriculture items.

*U.S. Customs and Border Protection (CBP) is America's frontline: the nation's largest law enforcement organization and the world's first unified border management agency. The 65,000+ men and women of CBP protect America on the ground, in the air, and on the seas. We facilitate safe, lawful travel and trade and ensure our country's economic prosperity. We enhance the nation's security through innovation, intelligence, collaboration, and trust.*

FRP-FRN-00490

FRP-FRN-00491

4/30/25, 9:33 PM

CBP Releases December 2024 Monthly Update | U.S. Customs and Border Protection

**Last Modified: Jan 27, 2025**

**Media Contacts**

## Office of Public Affairs

📞 (202) 344-1780

✉ CBPMEDIARELATIONS

## CBP Information Center (for non-media inquiries)

📞 (202) 325 8000

FRP-FRN-00492

FRP-FRN-00493

CBP Releases December 2024 Monthly Update | U.S. Customs and Border Protection



## Social Media Directory

View a complete list of local and regional CBP social media accounts.

**View the Directory**

 U.S. Customs and
Border Protection

U.S. Customs and Border Protection

Home  »  Newsroom  »  Stats and Summaries  »  Nationwide Encounters

# Nationwide Encounters

Encounter data includes U.S. Border Patrol (USBP) Title 8 Apprehensions, Office of Field Operations (OFO) Title 8 Inadmissibles, and Title 42 Expulsions. Data is available for the Northern Land Border, Southwest Land Border, and Nationwide (i.e., air, land, and sea modes of transportation) encounters.

Title 8 Enforcement Actions refers to apprehensions or inadmissibles processed under CBP's immigration authority. Inadmissibles refers to individuals encountered at ports of entry (POEs) by OFO who are seeking lawful admission into the United States (U.S.) but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe. Apprehensions refers to the physical control or temporary detainment of a person by USBP between POEs who is not lawfully in the U.S. which may or may not result in an arrest.

Title 42 Expulsions refers to individuals encountered by USBP and OFO and expelled to the country of last transit or home country in the interest of public health under Title 42 U.S.C. 265 from March 21, 2020 to May 11, 2023.

Demographics for USBP and OFO include:

- Accompanied Minors (AM)

- Individuals in a Family Unit (FMUA)

- Single Adults

- Unaccompanied Alien Children (UAC) / Single Minors

To access the data used to build these dashboards, please visit the CBP Data Portal.

Data is extracted from live CBP systems and data sources. Statistical information is subject to change due to corrections, systems changes, change in data definition, additional information, or encounters pending final review. Final statistics are available at the conclusion of each fiscal year.

FRP-FRN-00494

*Fiscal Year 2026 runs from October 1, 2025 to September 30, 2026.*

# U.S. Border Patrol At Large and U.S. Border Patrol at Entry Apprehensions

| Monthly Totals | Oct-25 | Nov-25 | Dec-25 | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Ju 2 |
|---|---|---|---|---|---|---|---|---|---|
| **Nationwide Total Apprehensions** | 9,846 | - | - | - | - | - | - | - | - |
| *At Large* | 3,177 | - | - | - | - | - | - | - | - |
| *At Entry* | 6,669 | - | - | - | - | - | - | - | - |
| **Southwest Border Total Apprehensions** | 7,989 | - | - | - | - | - | - | - | - |
| *At Large* | 1,400 | - | - | - | - | - | - | - | - |
| *At Entry* | 6,589 | - | - | - | - | - | - | - | - |
| **Northern Border Total Apprehensions** | 645 | - | - | - | - | - | - | - | - |
| *At Large* | 570 | - | - | - | - | - | - | - | - |
| *At Entry* | 75 | - | - | - | - | - | - | - | - |

**At Entry:** Refers to an alien who has entered the United States without admission and has not yet reached his/her destination, regardless of the amount of time since entry.

**At Large:** Refers to an alien who has illegally entered the United States, has already reached their destination, and is encountered or who was legally admitted and has since overstayed their permitted time, illegally remaining in the U.S.

# U.S. Border Patrol and Office of Field Operations Encounters by Area of Responsibility and Component

**Note:** *Internet Explorer has problems displaying the following charts. Please use another browser (Chrome, Safari, Firefox, Edge) to view. When using a mobile device, the charts are best displayed in landscape mode.*



and Northern Land Border Encounters by Fiscal Year (FY)

**FY Southwest Land Border Encounters by Month**

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2026 (FYTD) | 9 | | | | | | | | | | | | 9 |
| 2025 | 3,835 | 2,597 | 2,356 | 1,329 | 10 | 3 | 6 | 4 | 15 | 7 | 11 | 19 | 10,192 |
| 2024 | 4,680 | 5,603 | 9,058 | 10,718 | 11,440 | 9,487 | 8,607 | 8,139 | 6,263 | 5,677 | 4,921 | 4,080 | 88,673 |
| 2023 | 6,716 | 5,469 | 5,138 | 3,174 | 7,427 | 4,421 | 7,276 | 5,173 | 7,360 | 10,684 | 8,687 | 4,605 | 76,130 |

**FY Comparison by Demographic**

**Source:** USBP and OFO official year end reporting for FY23-FY25; USBP and OFO month end reporting for FY26 to date. Data is current as of 11/5/2025.

# U.S. Border Patrol and Office of Field Operations Encounters by State

*Note:* Nationwide encounters are the sum of CBP encounters across all areas of responsibility including Northern Land Border, Southwest Land Border, OFO non-land border ports of entry (e.g., airports, seaports), and USBP sectors that do not share a land border with Canada or Mexico (e.g., Miami Sector). This data is available for further review and download on the Nationwide Encounters Public Data Portal page.



and Northern Land Border Encounters by Fiscal Year (FY)

**Source:** USBP and OFO official year end reporting for FY23-FY25; USBP and OFO month end reporting for FY26 to date. Data is current as of 11/5/2025.

# U.S. Border Patrol and Office of Field Operations Encounters

FRP-FRN-00500



**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide Encounters for Fiscal Year (FY) 2026 to Date

U.S. Customs and
Border Protection

| Choose Region | Demographic | Citizenship ▽ ▼ | |
|---|---|---|---|
| Southwest Land Border ▼ | (All) ▼ | (All) ▼ | **Reset Filters** |

| | OFO | USBP | All CBP |
|---|---|---|---|
| **SEP FY2025** | 3,261 | 8,386 | 11,647 |
| **OCT FY2026** | 3,721 | 7,989 | 11,710 |
| **Percent Change** | ▲14.1% | ▼-4.7% | ▲.5% |

| FYTD Nationwide Demographic by Month | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|

| | Office of Field Operations | | | | | U.S. Border Patrol | | | | FYTD Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Single Adults | FMUA | Accompanied Minors | UAC | *Total* | Single Adults | FMUA | UAC | *Total* | |
| OCT | 3,173 | 459 | 53 | 36 | *3,721* | 6,522 | 636 | 831 | *7,989* | **11,710** |
| Total | 3,173 | 459 | 53 | 36 | 3,721 | 6,522 | 636 | 831 | 7,989 | 11,710 |

**Source:** USBP and OFO official year end reporting for FY23-FY25; USBP and OFO month end reporting for FY26 to date. Data is current as of 11/5/2025.

To ensure that law enforcement sensitive statistics are not publicly released, modifications to data filters have been made that may alter the format of data previously obtained from this dashboard.

For additional years of Southwest Land Border encounter data, visit the Southwest Land Border Encounters webpage.

# Related Resources

↙ Close all    ↗ Open all

| Previous Year Statistics | — |
| --- | --- |

FY 2025

FY 2024

**Last Modified: Nov 14, 2025**

FRP-FRN-00502

U.S. Customs and Border Protection

Home  »  Newsroom  »  Stats and Summaries  »  Nationwide Encounters

# Nationwide Encounters

Encounter data includes U.S. Border Patrol (USBP) Title 8 Apprehensions, Office of Field Operations (OFO) Title 8 Inadmissibles, and Title 42 Expulsions. Data is available for the Northern Land Border, Southwest Land Border, and Nationwide (i.e., air, land, and sea modes of transportation) encounters.

Title 8 Enforcement Actions refers to apprehensions or inadmissibles processed under CBP's immigration authority. Inadmissibles refers to individuals encountered at ports of entry (POEs) by OFO who are seeking lawful admission into the United States (U.S.) but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe. Apprehensions refers to the physical control or temporary detainment of a person by USBP between POEs who is not lawfully in the U.S. which may or may not result in an arrest.

Title 42 Expulsions refers to individuals encountered by USBP and OFO and expelled to the country of last transit or home country in the interest of public health under Title 42 U.S.C. 265 from March 21, 2020 to May 11, 2023.

Demographics for USBP and OFO include:

- Accompanied Minors (AM)

- Individuals in a Family Unit (FMUA)

- Single Adults

- Unaccompanied Alien Children (UAC) / Single Minors

To access the data used to build these dashboards, please visit the CBP Data Portal.

Data is extracted from live CBP systems and data sources. Statistical information is subject to change due to corrections, systems changes, change in data definition, additional information, or encounters pending final review. Final statistics are available at the conclusion of each fiscal year.

*Fiscal Year 2026 runs from October 1, 2025 to September 30, 2026.*

# U.S. Border Patrol At Large and U.S. Border Patrol at Entry Apprehensions

| Monthly Totals | Oct-25 | Nov-25 | Dec-25 | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Ju... |
|---|---|---|---|---|---|---|---|---|---|
| **Nationwide Total Apprehensions** | 9,846 | - | - | - | - | - | - | - | - |
| *At Large* | 3,177 | - | - | - | - | - | - | - | - |
| *At Entry* | 6,669 | - | - | - | - | - | - | - | - |
| **Southwest Border Total Apprehensions** | 7,989 | - | - | - | - | - | - | - | - |
| *At Large* | 1,400 | - | - | - | - | - | - | - | - |
| *At Entry* | 6,589 | - | - | - | - | - | - | - | - |
| **Northern Border Total Apprehensions** | 645 | - | - | - | - | - | - | - | - |
| *At Large* | 570 | - | - | - | - | - | - | - | - |
| *At Entry* | 75 | - | - | - | - | - | - | - | - |

**At Entry:** Refers to an alien who has entered the United States without admission and has not yet reached his/her destination, regardless of the amount of time since entry.

**At Large:** Refers to an alien who has illegally entered the United States, has already reached their destination, and is encountered or who was legally admitted and has since overstayed their permitted time, illegally remaining in the U.S.

# U.S. Border Patrol and Office of Field Operations Encounters by Area of Responsibility and Component

***Note:*** *Internet Explorer has problems displaying the following charts. Please use another browser (Chrome, Safari, Firefox, Edge) to view. When using a mobile device, the charts are best displayed in landscape mode.*

and Northern Land Border Encounters by Fiscal Year (FY)



| Choose Region | Fiscal Year | Component | Area of Responsibility |
|---|---|---|---|
| Southwest Land Border | (All) | (All) | (All) |

| Demographic | Citizenship | Title of Authority | |
|---|---|---|---|
| (All) | ECUADOR | (All) | Reset Filters |

FY    ■ 2023    ■ 2024    ■ 2025    ■ 2026 (FYTD)

## FY Southwest Land Border Encounters by Month

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2026 (FYTD) | 120 | | | | | | | | | | | | 120 |
| 2025 | 2,697 | 2,662 | 3,178 | 1,921 | 226 | 105 | 87 | 91 | 69 | 72 | 76 | 95 | 11,279 |
| 2024 | 12,157 | 13,482 | 17,235 | 7,838 | 11,725 | 15,829 | 15,922 | 10,496 | 6,779 | 4,307 | 3,598 | 2,704 | 122,072 |
| 2023 | 7,030 | 11,999 | 16,206 | 9,416 | 7,372 | 7,143 | 6,396 | 6,474 | 5,105 | 9,912 | 13,631 | 15,545 | 116,229 |

## FY Comparison by Demographic

**Single Adults:** 2023: 48,369 | 2024: 71,657 | 2025: 5,994 | 2026 (FYTD): 103

**FMUA:** 2023: 63,957 | 2024: 47,394 | 2025: 4,857 | 2026 (FYTD): 14

**UAC:** 2023: 3,887 | 2024: 3,010 | 2025: 427 | 2026 (FYTD): 3

**Accompanied Minors:** 2023: 16 | 2024: 11 | 2025: 1

**Source:** USBP and OFO official year end reporting for FY23-FY25; USBP and OFO month end reporting for FY26 to date. Data is current as of 11/5/2025.

FRP-FRN-00506

# U.S. Border Patrol and Office of Field Operations Encounters by State

**Note:** Nationwide encounters are the sum of CBP encounters across all areas of responsibility including Northern Land Border, Southwest Land Border, OFO non-land border ports of entry (e.g., airports, seaports), and USBP sectors that do not share a land border with Canada or Mexico (e.g., Miami Sector). This data is available for further review and download on the Nationwide Encounters Public Data Portal page.



and Northern Land Border Encounters by Fiscal Year (FY)

# U.S. Border Patrol and Office of Field Operations Encounters



**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide Encounters for Fiscal Year (FY) 2026 to Date

U.S. Customs and Border Protection

Choose Region
Southwest Land Border ▼

Demographic
(All) ▼

Citizenship
(All) ▼

**Reset Filters**

|  | OFO | USBP | All CBP |
|---|---|---|---|
| **SEP FY2025** | 3,261 | 8,386 | 11,647 |
| **OCT FY2026** | 3,721 | 7,989 | 11,710 |
| **Percent Change** | ▲14.1% | ▼-4.7% | ▲.5% |

### FYTD Nationwide Demographic by Month

|  | Office of Field Operations | | | | | U.S. Border Patrol | | | | FYTD Total |
|---|---|---|---|---|---|---|---|---|---|---|
|  | Single Adults | FMUA | Accompanied Minors | UAC | Total | Single Adults | FMUA | UAC | Total |  |
| OCT | 3,173 | 459 | 53 | 36 | 3,721 | 6,522 | 636 | 831 | 7,989 | 11,710 |
| Total | 3,173 | 459 | 53 | 36 | 3,721 | 6,522 | 636 | 831 | 7,989 | 11,710 |

**Source:** USBP and OFO official year end reporting for FY23-FY25; USBP and OFO month end reporting for FY26 to date. Data is current as of 11/5/2025.

To ensure that law enforcement sensitive statistics are not publicly released, modifications to data filters have been made that may alter the format of data previously obtained from this dashboard.

For additional years of Southwest Land Border encounter data, visit the Southwest Land Border Encounters webpage.

## Related Resources

↙ Close all     ↗ Open all

| Previous Year Statistics | — |
| --- | --- |

FY 2025

FY 2024

**Last Modified: Nov 14, 2025**

Case 1:25-cv-10495-IT    Document 246-1    Filed 01/13/26    Page 518 of 1448

U.S. Customs and Border Protection

# Nationwide Encounters

Encounter data includes U.S. Border Patrol (USBP) Title 8 Apprehensions, Office of Field Operations (OFO) Title 8 Inadmissibles, and Title 42 Expulsions. Data is available for the Northern Land Border, Southwest Land Border, and Nationwide (i.e., air, land, and sea modes of transportation) encounters.

Title 8 Enforcement Actions refers to apprehensions or inadmissibles processed under CBP's immigration authority. Inadmissibles refers to individuals encountered at ports of entry (POEs) by OFO who are seeking lawful admission into the United States (U.S.) but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe.

Apprehensions refers to the physical control or temporary detainment of a person by USBP between POEs who is not lawfully in the U.S. which may or may not result in an arrest.

Title 42 Expulsions refers to individuals encountered by USBP and OFO and expelled to the country of last transit or home country in the interest of public health under Title 42 U.S.C. 265 from March 21, 2020 to May 11, 2023.

Demographics for USBP and OFO include:

- Accompanied Minors (AM)
- Individuals in a Family Unit (FMUA)
- Single Adults
- Unaccompanied Alien Children (UAC) / Single Minors

To access the data used to build these dashboards, please visit the CBP Data Portal.

FRP-FRN-00512

FRP-FRN-00513

4/30/25, 9:31 PM

Nationwide Encounters | U.S. Customs and Border Protection

Data is extracted from live CBP systems and data sources. Statistical information is subject to change due to corrections, systems changes, change in data definition, additional information, or encounters pending final review. Final statistics are available at the conclusion of each fiscal year.

# U.S. Border Patrol and Office of Field Operations Encounters by Area of Responsibility and Component

**Note:** *Internet Explorer has problems displaying the following charts. Please use another browser (Chrome, Safari, Firefox, Edge) to view. When using a mobile device, the charts are best displayed in landscape mode.*

4/30/25, 9:31 PM

Nationwide Encounters | U.S. Customs and Border Protection



**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

U.S. Customs and
Border Protection

| Choose Region | Fiscal Year | Component | Area of Responsibility |
|---|---|---|---|
| Southwest Land Border ▾ | 2024 ▾ | (All) ▾ | (All) ▾ |

| Demographic | Citizenship | Title of Authority | |
|---|---|---|---|
| (All) ▾ | (Multiple values) ▾ | Title 8 ▾ | **Reset Filters** |

FY  ■ 2024

**FY Southwest Land Border Encounters by Month**

Encounter Count

100K

50K

0K

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2024 | 96,012 | 101,156 | 125,243 | 73,507 | 87,711 | 80,683 | 73,803 | 69,961 | 56,880 | 44,236 | 41,248 | 37,583 | 888,023 |

**FY Comparison by Demographic**

FRP-FRN-00514

3/8

4/30/25, 9:31 PM



Nationwide Encounters | U.S. Customs and Border Protection

# U.S. Border Patrol and Office of Field Operations Encounters by State

**Note:** *Nationwide encounters are the sum of CBP encounters across all areas of responsibility including Northern Land Border, Southwest Land Border, OFO non-land border ports of entry (e.g., airports, seaports), and USBP sectors that do not share a land border with Canada or Mexico (e.g., Miami Sector). This data is available for further review and download on the Nationwide Encounters Public Data Portal page.*

FRP-FRN-00515

https://www.cbp.gov/newsroom/stats/nationwide-encounters

FRP-FRN-00516

Nationwide Encounters | U.S. Customs and Border Protection



| Choose Region | Fiscal Year | State | Title of Authority |
|---|---|---|---|
| Nationwide ▾ | (All) ▾ | (All) ▾ | (All) ▾ |

| Demographic | Citizenship |
|---|---|
| (All) ▾ | (All) ▾ |

**Reset Filters**

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2025 (FYTD) | 142,754 | 124,980 | 124,507 | 81,499 | 28,635 | 29,065 | | | | | | | 531,440 |
| 2024 | 309,024 | 308,605 | 370,883 | 242,530 | 256,071 | 246,505 | 247,929 | 240,924 | 204,932 | 170,180 | 158,893 | 144,666 | 2,901,142 |
| 2023 | 278,317 | 284,624 | 302,392 | 209,151 | 213,911 | 259,471 | 276,036 | 275,166 | 211,457 | 245,154 | 304,073 | 341,392 | 3,201,144 |
| 2022 | 187,136 | 198,553 | 205,691 | 186,808 | 190,578 | 250,404 | 262,109 | 274,992 | 247,523 | 238,929 | 251,521 | 272,338 | 2,766,582 |

**FY Comparison by Demographic**

6/8

FRP-FRN-00517



Nationwide Encounters | U.S. Customs and Border Protection

**U.S. Border Patrol and Office of Field Operations Encounters**

Nationwide Encounters | U.S. Customs and Border Protection

FRP-FRN-00518

Choose Region: Nationwide ▾   Demographic: (All) ▾   Citizenship: (All) ▾   **Reset Filters**

| | OFO | USBP | All CBP |
|---|---|---|---|
| **FEB FY2025** | 19,398 | 9,237 | 28,635 |
| **MAR FY2025** | 20,872 | 8,193 | 29,065 |
| **Percent Change** | ▲7.6% | ▼-11.3% | ▲1.5% |

| | Office of Field Operations | | | | | U.S. Border Patrol | | | | FYTD Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Single Adults | FMUA | Accompanied Minors | UAC | Total | Single Adults | FMUA | UAC | Total | |
| OCT | 56,549 | 27,096 | 245 | 744 | 84,634 | 36,752 | 15,470 | 5,898 | 58,120 | 142,754 |
| NOV | 52,186 | 24,382 | 162 | 710 | 77,440 | 29,336 | 12,427 | 5,777 | 47,540 | 124,980 |
| DEC | 50,795 | 24,621 | 220 | 731 | 76,367 | 27,635 | 14,373 | 6,132 | 48,140 | 124,507 |
| JAN | 35,132 | 15,570 | 168 | 502 | 51,372 | 20,191 | 7,176 | 2,760 | 30,127 | 81,499 |
| FEB | 18,048 | 1,185 | 74 | 91 | 19,398 | 7,655 | 837 | 745 | 9,237 | 28,635 |
| MAR | 19,635 | 1,063 | 118 | 56 | 20,872 | 7,070 | 477 | 646 | 8,193 | 29,065 |
| Total | 232,345 | 93,917 | 987 | 2,834 | 330,083 | 128,639 | 50,760 | 21,958 | 201,357 | 531,440 |

Nationwide Encounters | U.S. Customs and Border Protection

To ensure that law enforcement sensitive statistics are not publicly released, modifications to data filters have been made that may alter the format of data previously obtained from this dashboard.

For additional years of Southwest Land Border encounter data, visit the Southwest Land Border Encounters webpage.

**Last Modified: Apr 14, 2025**

FRP-FRN-00519

U.S. Customs and Border Protection

# Nationwide Encounters

Encounter data includes U.S. Border Patrol (USBP) Title 8 Apprehensions, Office of Field Operations (OFO) Title 8 Inadmissibles, and Title 42 Expulsions. Data is available for the Northern Land Border, Southwest Land Border, and Nationwide (i.e., air, land, and sea modes of transportation) encounters.

Title 8 Enforcement Actions refers to apprehensions or inadmissibles processed under CBP's immigration authority. Inadmissibles refers to individuals encountered at ports of entry (POEs) by OFO who are seeking lawful admission into the United States (U.S.) but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe.

Apprehensions refers to the physical control or temporary detainment of a person by USBP between POEs who is not lawfully in the U.S. which may or may not result in an arrest.

Title 42 Expulsions refers to individuals encountered by USBP and OFO and expelled to the country of last transit or home country in the interest of public health under Title 42 U.S.C. 265 from March 21, 2020 to May 11, 2023.

Demographics for USBP and OFO include:

- Accompanied Minors (AM)

- Individuals in a Family Unit (FMUA)

- Single Adults

- Unaccompanied Alien Children (UAC) / Single Minors

To access the data used to build these dashboards, please visit the CBP Data Portal.

FRP-FRN-00520

Data is extracted from live CBP systems and data sources. Statistical information is subject to change due to corrections, systems changes, change in data definition, additional information, or encounters pending final review. Final statistics are available at the conclusion of each fiscal year.

# U.S. Border Patrol and Office of Field Operations Encounters by Area of Responsibility and Component

**Note:** *Internet Explorer has problems displaying the following charts. Please use another browser (Chrome, Safari, Firefox, Edge) to view. When using a mobile device, the charts are best displayed in landscape mode.*

Nationwide Encounters | U.S. Customs and Border Protection





FRP-FRN-00522

U.S. Customs and
Border Protection

U.S. Customs and Border Protection

Home  »  Newsroom  »  Stats and Summaries  »  Nationwide Encounters

# Nationwide Encounters

Encounter data includes U.S. Border Patrol (USBP) Title 8 Apprehensions, Office of Field Operations (OFO) Title 8 Inadmissibles, and Title 42 Expulsions. Data is available for the Northern Land Border, Southwest Land Border, and Nationwide (i.e., air, land, and sea modes of transportation) encounters.

Title 8 Enforcement Actions refers to apprehensions or inadmissibles processed under CBP's immigration authority. Inadmissibles refers to individuals encountered at ports of entry (POEs) by OFO who are seeking lawful admission into the United States (U.S.) but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe. Apprehensions refers to the physical control or temporary detainment of a person by USBP between POEs who is not lawfully in the U.S. which may or may not result in an arrest.

Title 42 Expulsions refers to individuals encountered by USBP and OFO and expelled to the country of last transit or home country in the interest of public health under Title 42 U.S.C. 265 from March 21, 2020 to May 11, 2023.

Demographics for USBP and OFO include:

- Accompanied Minors (AM)

- Individuals in a Family Unit (FMUA)

- Single Adults

- Unaccompanied Alien Children (UAC) / Single Minors

To access the data used to build these dashboards, please visit the CBP Data Portal.

Data is extracted from live CBP systems and data sources. Statistical information is subject to change due to corrections, systems changes, change in data definition, additional information, or encounters pending final review. Final statistics are available at the conclusion of each fiscal year.

*Fiscal Year 2026 runs from October 1, 2025 to September 30, 2026.*

# U.S. Border Patrol At Large and U.S. Border Patrol at Entry Apprehensions

| Monthly Totals | Oct-25 | Nov-25 | Dec-25 | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Ju 2 |
|---|---|---|---|---|---|---|---|---|---|
| **Nationwide Total Apprehensions** | 9,846 | - | - | - | - | - | - | - | - |
| *At Large* | 3,177 | - | - | - | - | - | - | - | - |
| *At Entry* | 6,669 | - | - | - | - | - | - | - | - |
| **Southwest Border Total Apprehensions** | 7,989 | - | - | - | - | - | - | - | - |
| *At Large* | 1,400 | - | - | - | - | - | - | - | - |
| *At Entry* | 6,589 | - | - | - | - | - | - | - | - |
| **Northern Border Total Apprehensions** | 645 | - | - | - | - | - | - | - | - |
| *At Large* | 570 | - | - | - | - | - | - | - | - |
| *At Entry* | 75 | - | - | - | - | - | - | - | - |

**At Entry:** Refers to an alien who has entered the United States without admission and has not yet reached his/her destination, regardless of the amount of time since entry.

**At Large:** Refers to an alien who has illegally entered the United States, has already reached their destination, and is encountered or who was legally admitted and has since overstayed their permitted time, illegally remaining in the U.S.

# U.S. Border Patrol and Office of Field Operations Encounters by Area of Responsibility and Component

**Note:** *Internet Explorer has problems displaying the following charts. Please use another browser (Chrome, Safari, Firefox, Edge) to view. When using a mobile device, the charts are best displayed in landscape mode.*



and Northern Land Border Encounters by Fiscal Year (FY)

**Source:** USBP and OFO official year end reporting for FY23-FY25; USBP and OFO month end reporting for FY26 to date. Data is current as of 11/5/2025.

# U.S. Border Patrol and Office of Field Operations Encounters by State

**Note:** Nationwide encounters are the sum of CBP encounters across all areas of responsibility including Northern Land Border, Southwest Land Border, OFO non-land border ports of entry (e.g., airports, seaports), and USBP sectors that do not share a land border with Canada or Mexico (e.g., Miami Sector). This data is available for further review and download on the Nationwide Encounters Public Data Portal page.



**U.S. Customs and Border Protection (CBP) Encounters by State**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

Choose Region: Nationwide
Fiscal Year: (All)
State: (All)
Title of Authority: (All)

Demographic: (All)
Citizenship: (All)

Reset Filters

FY    2023    2024    2025    2026 (FYTD)

## FY Nationwide Encounters by Month

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2026 (FYTD) | 30,573 | | | | | | | | | | | | 30,573 |
| 2025 | 142,742 | 124,972 | 124,482 | 81,479 | 28,613 | 29,013 | 29,197 | 29,470 | 25,185 | 24,589 | 26,162 | 26,002 | 691,906 |
| 2024 | 309,024 | 308,605 | 370,883 | 242,530 | 256,071 | 246,505 | 247,929 | 240,924 | 204,932 | 170,180 | 158,893 | 144,666 | 2,901,142 |
| 2023 | 278,317 | 284,624 | 302,392 | 209,151 | 213,911 | 259,471 | 276,036 | 275,166 | 211,457 | 245,154 | 304,073 | 341,392 | 3,201,144 |

## FY Comparison by Demographic

| Single Adults | | | | FMUA | | | | UAC | | | | Accompanied Minors | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2,061,723 | 1,788,490 | 503,088 | 27,512 | 993,947 | 996,074 | 157,572 | 2,029 | 137,992 | 110,672 | 29,584 | 930 | 7,482 | 5,906 | 1,662 | 102 |
| 2023 | 2024 | 2025 | 2026 (FYTD) | 2023 | 2024 | 2025 | 2026 (FYTD) | 2023 | 2024 | 2025 | 2026 (FYTD) | 2023 | 2024 | 2025 | 2026 (FYTD) |

# U.S. Border Patrol and Office of Field Operations Encounters

| Choose Region | Demographic | Citizenship | |
|---|---|---|---|
| Nationwide ▼ | (All) ▼ | (All) ▼ | **Reset Filters** |

| | OFO | USBP | All CBP |
|---|---|---|---|
| **SEP FY2025** | **15,799** | **10,203** | **26,002** |
| **OCT FY2026** | **20,727** | **9,846** | **30,573** |
| **Percent Change** | ▲31.2% | ▼-3.5% | ▲17.6% |

| | Office of Field Operations | | | | | U.S. Border Patrol | | | | FYTD Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Single Adults | FMUA | Accompanied Minors | UAC | *Total* | Single Adults | FMUA | UAC | *Total* | **FYTD Total** |
| OCT | 19,173 | 1,367 | 102 | 85 | *20,727* | 8,339 | 662 | 845 | *9,846* | **30,573** |
| **Total** | **19,173** | **1,367** | **102** | **85** | **20,727** | **8,339** | **662** | **845** | **9,846** | **30,573** |

To ensure that law enforcement sensitive statistics are not publicly released, modifications to data filters have been made that may alter the format of data previously obtained from this dashboard.

For additional years of Southwest Land Border encounter data, visit the Southwest Land Border Encounters webpage.

# Related Resources

↙ Close all    ↗ Open all

| Previous Year Statistics | — |
| --- | --- |

FY 2025

FY 2024

**Last Modified: Nov 14, 2025**



U.S. Department of Homeland Security

# DHS/CBP/PIA–021 TECS System: Platform

The Department of Homeland Security, U.S. Customs and Border Protection owns and operates the TECS (not an acronym) system. The TECS Platform facilitates information sharing among federal, state, local, and tribal government agencies, as well as with international governments and commercial organizations. CBP's mission includes the enforcement of the customs, immigration, and agriculture laws and regulations of the United States and the enforcement at the border of hundreds of laws on behalf of numerous federal agencies. Through the TECS Platform, users are able to input, access, or maintain law enforcement, inspection, intelligence-gathering, and operational records. CBP is publishing this Privacy Impact Assessment as a complement to the previously published DHS/CBP/PIA-009, CBP Primary and Secondary Processing PIA from 2010, to provide notice to the public and to assess the privacy risks and mitigations associated with the TECS Platform.

**August 2016**

## Associated SORN

- [DHS/CBP-011 - U.S. Customs and Border Protection TEC](/system-records-notices-sorns) (/system-records-notices-sorns)

| Attachment | Ext. | Size | Date |
|---|---|---|---|
| **[DHS/CBP/PIA-021 TECS System: Platform - August 2016 - Appendix Update - April 2022](https://www.dhs.gov/sites/default/files/2022-05/privacy-pia-cbp-tecs%20platform-april2022.pdf)** (https://www.dhs.gov/sites/default/files/2022-05/privacy-pia-cbp-tecs%20platform-april2022.pdf) | PDF | 714.99 KB | 08/12/2016 |

### Collections

[PRIVACY IMPACT ASSESSMENTS (PIA)](/collections/privacy-impact-assessments-pia) (/COLLECTIONS/PRIVACY-IMPACT-ASSESSMENTS-PIA)

### Keywords

[PRIVACY](/keywords/privacy) (/KEYWORDS/PRIVACY)     [PRIVACY IMPACT ASSESSMENT (PIA)](/keywords/privacy-impact-assessment-pia) (/KEYWORDS/PRIVACY-IMPACT-ASSESSMENT-PIA)

### Topics

[PRIVACY](/topics/privacy) (/TOPICS/PRIVACY)

Last Updated: 04/10/2025



U.S. Department of Homeland Security

# DHS Announces Historic Travel Assistance and Stipend for Voluntary Self-Deportation

**Release Date:** May 5, 2025

*The First Illegal Alien to Utilize Travel Assistance has Already Returned to Honduras*

WASHINGTON, D.C.—Today, the Department of Homeland Security (DHS) announced a historic opportunity for illegal aliens to receive both financial and travel assistance to facilitate travel back to their home country through the CBP Home App. Any illegal alien who uses the CBP Home App to self-deport will also receive a stipend of $1,000 dollars, paid after their return to their home country has been confirmed through the app.

Self-deportation is a dignified way to leave the U.S. and will allow illegal aliens to avoid being encountered by U.S. Immigration and Customs Enforcement (ICE). Even with the cost of the stipend, it is projected that the use of CBP Home will decrease the costs of a deportation by around 70 percent. Currently the average cost to arrest, detain, and remove an illegal alien is $17,121.

The first use of travel assistance has already proven successful. An illegal alien that the Biden Administration allowed into our country recently utilized the program to receive a ticket for a flight from Chicago to Honduras. Additional tickets have already been booked for this week and the following week.

"*If you are here illegally, self-deportation is the best, safest and most cost-effective way to leave the United States to avoid arrest. DHS is now offering illegal aliens financial travel assistance and a stipend to return to their home country through the CBP Home App*," said Secretary Kristi Noem. "*This is the safest option for our law enforcement, aliens and is a 70% savings for US taxpayers. Download the CBP Home App TODAY and self-deport.*"

Illegal aliens submitting their intent to voluntarily self-deport in CBP Home will also be deprioritized for detention and removal ahead of their departure as long as they demonstrate they are making meaningful strides in completing that departure. Participation in CBP Home Self-Deportation may help preserve the option for an illegal alien to re-enter the United States legally in the future.

Qualifying aliens need to submit their "Intent to Depart" via the CBP Home app. For further information, visit DHS.gov/CBPhome (/cbphome).

## Topics

BORDER SECURITY (/TOPICS/BORDER-SECURITY)    HOMELAND SECURITY ENTERPRISE (/TOPICS/HOMELAND-SECURITY-ENTERPRISE)
IMMIGRATION AND CUSTOMS ENFORCEMENT (/TOPICS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT)

## Keywords

CUSTOMS AND BORDER PROTECTION (CBP) (/KEYWORDS/CUSTOMS-AND-BORDER-PROTECTION-CBP)
IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)
SECRETARY KRISTI NOEM (/KEYWORDS/SECRETARY-KRISTI-NOEM)    DEPORTATION (/KEYWORDS/DEPORTATION)

Last Updated: 05/05/2025



Privacy Impact Assessment
for the

# TECS System: Platform

## DHS/CBP/PIA-021

## August 12, 2016

**Contact Point**
**John Maulella**
**Office of Field Operations**
**Customs and Border Protection**
**(202) 344-2605**

**Reviewing Official**
**Jonathan R. Cantor**
**Acting Chief Privacy Officer**
**Department of Homeland Security**
**(202) 343-1717**

FRP-FRN-00534



## Abstract

The Department of Homeland Security, U.S. Customs and Border Protection owns and operates the TECS (not an acronym) system. The TECS Platform facilitates information sharing among federal, state, local, and tribal government agencies, as well as with international governments and commercial organizations. CBP's mission includes the enforcement of the customs, immigration, and agriculture laws and regulations of the United States and the enforcement at the border of hundreds of laws on behalf of numerous federal agencies. Through the TECS Platform, users are able to input, access, or maintain law enforcement, inspection, intelligence-gathering, and operational records. CBP is publishing this Privacy Impact Assessment as a complement to the previously published DHS/CBP/PIA-009, CBP Primary and Secondary Processing PIA from 2010, to provide notice to the public and to assess the privacy risks and mitigations associated with the TECS Platform.

## Overview

DHS is charged with ensuring compliance with federal laws at the border, including those preventing contraband, other illegal goods, and inadmissible persons from entering or exiting the United States.[1] DHS' border authorities permit the inspection, examination, and search of vehicles, persons, baggage, and merchandise to ensure compliance with any law or regulation enforced or administered by DHS and its components, and to determine if the merchandise is subject to duty or being introduced into the United States contrary to law. DHS/CBP's mission includes the enforcement of the customs, immigration, and agriculture laws and regulations of the United States and the enforcement at the border of hundreds of laws on behalf of numerous federal agencies.

Accordingly, all travelers entering the United States must undergo DHS customs and immigration inspection to ensure that they are legally eligible to enter (as a U.S. citizen or otherwise) and that their belongings are not being introduced into the United States contrary to law. It is not until those processes are complete that a traveler, with or without his/her belongings, is permitted to enter the United States.

Depending on the method of conveyance used to travel to the United States (*e.g.*, air, sea, or land (pedestrian and vehicle)), CBP collects certain information from, and about, the traveling public at various stages of the international trip. As part of the inspection and admissibility process, CBP performs law enforcement queries on the traveling public prior to and/or at the time of performing an inspection, including making admissibility determinations that may permit entry into the United States. Generally, CBP collects information:

---

[1] *See* authorities listed in Section 1.0.

1) Prior to arrival in the United States (*e.g.*, Advance Passenger Information System[2]),

2) At the time of arrival (*e.g.*, Nonimmigrant Inspection System,[3] Border Crossing Information system[4]), and

3) As appropriate, throughout its inspection of the international traveling public to detail certain enforcement related circumstances (*e.g.*, TECS,[5] Seized Assets and Case Tracking System (SEACATS)[6]).

These different types of information collections are physically located within the information technology (IT) architecture of TECS with discrete System of Records Notices (SORN) in place, recognizing each system's discrete purpose, distinct authority, differing populations, access rules, and retention periods. The inclusion of these systems within the TECS IT architecture, often described as residing upon the "TECS Platform," facilitates the collection and cross-referencing of these data sets as a traveler crosses the border.

<u>TECS System</u>

The TECS (not an acronym) System is the updated and modified version of the former Treasury Enforcement Communications System. TECS is owned and managed by CBP. TECS is both an information-sharing platform, "TECS Platform," which allows users to access different databases that may be maintained on the platform or accessed through the platform, and the name of a law enforcement system, "TECS,[7]" that includes temporary and permanent enforcement, inspection, and operational records relevant to the antiterrorism and law enforcement mission of CBP and numerous other federal agencies that it supports.

TECS not only provides a platform for interaction between these different types of information (*e.g.* APIS, BCI, TECS, and SEACATS) and defined TECS users, but also serves as a data repository to support law enforcement "lookouts," border screening, and reporting for CBP's primary and secondary inspection processes, which are generally referenced as TECS Records or Subject Records. For the purposes of this PIA, "Subject Records" is a generic term that will be used to describe the enforcement or inspection records located in the TECS module of the TECS Platform pertaining to individuals. Such records include, but are not limited to, those records related to a violation of law discovered by CBP or another authorized user agency or a CBP officer narrative concerning an interaction between CBP and a person. Subject Records encompass not only violations of laws enforced by CBP, but may also include information on violations of other federal and state laws.

---

[2] DHS/CBP-005 Advance Passenger Information System (APIS), March 13, 2015, 80 FR 13407.
[3] DHS/CBP-016 Nonimmigrant Information System, March 13, 2015, 80 FR 13398.
[4] DHS/CBP-007 Border Crossing Information (BCI), January 25, 2016, 81 FR 404.
[5] DHS/CBP-011 U.S. Customs and Border Protection TECS, December 19, 2008, 73 FR 77778.
[6] DHS/CBP-013 Seized Assets and Case Tracking System, December 19, 2008, 73 FR 77764.
[7] DHS/CBP-011 U.S. Customs and Border Protection TECS, December 19, 2008, 73 FR 77778.

**Homeland Security**

*TECS Compliance Framework*

In order to provide more transparency as it relates to the functions and data in TECS, CBP published separate Privacy Impact Assessments (PIA) and Privacy Act System of Records Notices (SORN) for the CBP sub-systems based on the purpose and use of the information. CBP also maintains other federal agency data on TECS to stage the information for use by CBP at the time an individual presents himself/herself to CBP. This allows TECS to work more efficiently and reduces the performance impact on the originating systems.

TECS privacy compliance documentation is divided into three categories:

1. TECS Primary and Secondary Inspections Process – CBP conducted a PIA in 2010 to describe CBP's use and modernization of TECS as it relates to the primary and secondary inspection processes (including information collected in advance of arrival, during inspections at the United States port of entry (POE), and retention of information and reports following interactions during U.S. border crossing activities) to ensure compliance with the numerous laws enforced by CBP, including determining the admissibility of persons attempting to enter the United States. The information collected pertaining to an individual's travel forms the operational basis for much of the TECS system and is discussed in more detail in the CBP Primary and Secondary Processing PIA,[8] as well as in section 1.2 of this PIA.

2. TECS Platform – This PIA describes TECS Platform, which includes the information access and system linkages facilitated for CBP, DHS, and other federal agency systems that link to TECS and share data within the TECS user community. The TECS Platform, which houses many of these records and provides a portal to several other systems and services to facilitate screening, vetting, and analysis activities for CBP and external agency users.

3. TECS source systems – Covered by their own individual PIAs and SORNs, as noted in the Appendices to this PIA.

## TECS Platform

The TECS Platform is the underlying infrastructure designed to facilitate the maintenance and sharing of law enforcement, inspection, intelligence-gathering, and operational records among the TECS user community. TECS is also used by other agencies, known as Partner Government Agencies (PGA), which are provided with access to TECS (for a full list of current PGAs with access to TECS, please see Appendix 4). The TECS Platform serves as a mechanism to query the databases of other law enforcement agencies, and serves as a centralized platform to

---

[8] DHS/CBP/PIA-009, CBP Primary and Secondary Processing, and DHS/CBP/PIA-009(a), TECS System: CBP Primary and Secondary Processing (TECS) National SAR Initiative, *available at* http://www.dhs.gov/privacy



**Privacy Impact Assessment**
DHS/CBP/PIA-021 TECS Platform
Page 4

access CBP and other PGA records. TECS maintains records that are owned by CBP, and records that are owned by external agencies. External partner agencies that input records into TECS, without a Lookout record, are maintained by the external partner agency for purposes of the Privacy Act of 1974.[9] Records maintained within TECS that are owned and maintained by CBP include information about individuals who have violated, or are suspected of violating, a law or regulation that is enforced or administered by CBP (to include Lookout records uploaded by other agencies); to provide a record of inspections conducted at the border; to determine admissibility into the United States; and to record information regarding individuals, vehicles, cargo, firms, and organizations to whom the Department of Homeland Security (DHS)/CBP has issued detentions and warnings. TECS also retains records on individuals who have been given access to the system for authorized purposes. TECS information is maintained in multiple databases that have been integrated into a single information technology architecture – known as the "TECS Platform" – in order to facilitate timely collection and comprehensive cross-referencing of datasets.

This Privacy Impact Assessments (PIA) reviews the framework in which TECS Platform data is maintained, describes the data security and auditing mechanisms by which this data is secured, and evaluates the methods by which data is shared or restricted among DHS/CBP and the other international, national, federal, state, local, and tribal agencies and commercial organizations. CBP has previously published separate PIAs to address the use of TECS as it relates to the primary and secondary inspection processes[10] at ports of entry, as well as procedures for processing travel documents at the border.[11]

*TECS Platform Access*

The TECS Platform functions as a data repository through which users are able to access different databases and perform functions and services according to their defined permissions. Users access information via their online access profile, which is defined according to each individual TECS user's particular job roles and responsibilities, known as a "TECS Profile"; the management of TECS profiles is discussed in detail in section 8.3. Accordingly, a "TECS user" is someone from CBP (or other DHS component) or another law enforcement entity at the federal or state level who has access to TECS. CBP and (when appropriate) the PGA assess access according to the user's responsibilities to enable the TECS user to access only information within the scope of his or her professional responsibilities. TECS users must generally be U.S. nationals. However, there is a limited exception for Foreign Service nationals who support missions overseas, including those who support CBP attachés, U.S. Immigration and Customs

---

[9] 5 U.S.C. § 552a.
[10] DHS/CBP/PIA-009, CBP Primary and Secondary Processing, and DHS/CBP/PIA-009(a), TECS System: CBP Primary and Secondary Processing (TECS) National SAR Initiative, *available at* http://www.dhs.gov/privacy
[11] DHS/CBP/PIA-004(e), Western Hemisphere Travel Initiative (WHTI) and DHS/CBP/PIA-007, Electronic System of Travel Authorization (ESTA), *available at* http://www.dhs.gov/privacy

Enforcement (ICE) foreign offices, or the U.S. Department of State (DOS). ICE provides access to TECS data for local and tribal law enforcement agencies.[12]

The TECS Platform contains datasets that, while being physically located within the TECS IT architecture, are covered by different SORNs and PIAs, as mentioned above. A list of the applicable PIAs and SORNs for each of these TECS subsystems, as well as an outline of their functions is provided in Appendix 1.

The TECS Platform is also a mechanism for querying the databases of other law enforcement agencies, and for hosting Lookout records input by other agencies for CBP to take action at Primary or Secondary Inspection (see previously published 2010 PIA[13] for more information on this process). For example, authorized users can use the TECS Platform to query records maintained within the Federal Bureau of Investigation (FBI) Criminal Justice Information Service's (CJIS) National Crime Information Center (NCIC); Interstate Identification Index (III); the International Justice & Public Safety Network (Nlets); and the Nlets interface to Canadian Police Information Centre (CPIC).[14] A full list of the systems external to CBP that TECS users may query is available in Appendix 2.

### 1. Types of TECS Access Levels

With more than 90,000 users, TECS requires a sophisticated and configurable access control process. CBP grants access to TECS based on four different access levels:

- Access Level 1: Data that is available to all TECS users with an appropriate type of background investigation.

- Access Level 2: Data that is available only to employees of the agency that entered the data. This level is no longer in use.

- Access Level 3: Data that is available to classes of users based on the owning agency, specifying that the information be made available to a set of users.

- Access Level 4: Data that is restricted to specific individuals as specified, or the individual creating the record (reserved for Grand Jury data).

For basic, Level 1 access, CBP requires that all TECS users must have a completed and favorably adjudicated background investigation of one of the types listed below. Background investigations must be periodically updated. The frequency at which reinvestigation is required

---

[12] *See* DHS/ICE/PIA-004(a) - ICE Pattern Analysis and Information Collection (ICEPIC) Update (October 26, 2011), *available at* http://www.dhs.gov/privacy.

[13] DHS/CBP/PIA-009, CBP Primary and Secondary Processing, and DHS/CBP/PIA-009(a), TECS System: CBP Primary and Secondary Processing (TECS) National SAR Initiative, *available at* http://www.dhs.gov/privacy

[14] Information on the NCIC is available at https://www.fbi.gov/about-us/cjis/ncic. Information on Nlets is available at http://www.nlets.org. The Privacy Impact Assessment for the Canadian Police Information Centre is available at http://www.rcmp-grc.gc.ca/en/privacy-impact-assessment-canadian-police-information-centre.

depends on the level of the initial investigation. Access to TECS functions and data will be limited depending on the type of background investigation that has been completed. The initial background investigation for all TECS users must be one of the following:

- Type 1: Access National Agency Check with Inquiries (ANACI), as defined by Office of Personnel Management (OPM).[15] Users with this type of background investigation may have access to any of the functions authorized for the user's agency, and access to data from TECS agencies when specifically granted this access by the owning agency.

- Type 2: Background Investigation (BI), as defined by OPM. Users with this type of background investigation may be given access to any of the functions and data authorized for use by the agency.

External TECS user agencies are responsible for ensuring that none of their personnel will serve as a TECS user without one of these types of completed background investigations. Full TECS access requires a BI. All external TECS user agencies must conduct an annual review of their TECS users to ensure that each user has a properly completed and active background investigation.

### 2. User Functionality

All TECS users have the option of designating the data they enter into TECS as access Level 1, 3, or 4, and specifying which TECS users may access this data. All TECS users, as part of training and on-boarding agreements, understand and agree that any data designated as Level 1 will be accessible to **all** TECS users. Level 1 may be disseminated to other TECS agencies, without prior notification to CBP.

All external TECS users must sign a Memoranda of Agreement (MOA) with CBP that outlines their access levels and roles and responsibilities as a TECS user. A typical TECS agreement includes the following provisions:

a) Data Access: External TECS users are typically granted access to the following types of records:

1. TECS Level 1 records.

2. TECS Level 3 and 4 records owned by the external TECS agency itself, and entered into TECS at the option of the external agency.

3. TECS Level 3 and 4 records owned by another TECS User Agency, with that other owning agency's authorization. This authorization will be documented

---

[15] Per Office of Personnel Management and DHS/CBP Security Policy, reinvestigation is required every ten (10) years for the ANACI and every five (5) years for the BI.



by a memorandum from the owning agency to the CBP TECS Custodian of Records, explicitly stating the class of records and access to be granted.

4. Primary Query History (PQH) records. These are records of the primary queries made at ports of entry that can be used to identify individuals or vehicles entering the country, and may include queries in support of Border Patrol activities at checkpoints.

5. Images associated with accessible records.

6. Inspection Results Records: These records are the results of CBP secondary inspections at ports of entry. They provide the disposition (*e.g.*, admitted at B2 or adverse action) and short comments on the inspection.

7. I-94 Records: These records include the entry and exit information from I-94, I-94W, and I-95 forms for most travelers other than U.S. citizens or lawful permanent residents.

b) Access to Functions: TECS users are typically granted access to the following sets of functions:

1. User Profile Record (UPR) Functions: These functions allow TECS users to create, modify, retrieve, and display records describing users of the system.

2. Subject Record Creation and Update: These functions allow TECS users to create, modify, and/or delete records on person, business, vehicle, vessel, and aircraft subjects. All records created by external agencies that are *not* considered Lookout records, are owned and maintained by the creating external agency. DHS/CBP does not assert ownership, accuracy, or Privacy Act coverage to these non-DHS and non-Lookout records.

3. Subject Query Functions: These functions allow TECS users to retrieve and display records on person, business, vehicle, vessel, and aircraft subjects based on query parameters. These functions also allow access to primary query history (crossing information), inspection results, and I-94 data.

4. Record Linking: This function retrieves and displays records that are related to records found during a subject query.

5. Management Information (MI) Reports: These functions allow TECS users to request formatted reports for display or printing.

6. Printing: This function allows TECS users to print records or groups of records retrieved through query functions or reports obtained through the MI function.

7. Primary Query History: This function provides on-line query and display, or off-line reports, of historical information on primary queries performed at ports of entry.

8. Batch Access for vetting purposes. External users are provided with access to the TECS CBP-vetting web capability that allows for the submission of data files to TECS for screening of persons of interest to the external agency. The response data from this query will also be provided in a batch file format.

9. System Support: This function includes help, an on-line user guide, access to edit tables, and a variety of other general functions.

10. Reference Library (RL) Function: This function includes an on-line user guide for available TECS systems.

TECS is the repository for data from many separate agency sources. This data includes sensitive law enforcement information. Each agency supplying data is considered to be the owner of that data and is responsible for its content and validity.

# Section 1.0 Authorities and Other Requirements

## 1.1 What specific legal authorities and/or agreements permit and define the collection of information by the project in question?

While the authority for each specific database is described in the appropriate SORNs and PIAs listed in Appendix 1, the data collected in TECS is generally authorized by CBP's general statutory authority, including the following statutes and regulations:

- Homeland Security Act of 2002;[16]

- Tariff Act of 1930, as amended;[17]

- Aviation and Transportation Security Act of 2001;[18]

- Enhanced Border Security and Visa Reform Act of 2002;[19]

- Section 103(a)(1) of the Immigration and Nationality Act (INA) of 1952, as amended;[20]

---

[16] Pub. L. 107-296, 116 Stat. 2135.
[17] 19 U.S.C. §§ 66, 1433, 1459, 1485, 1624, 2071.
[18] Pub. L. 107-71, 115 Stat. 597.
[19] Pub. L. 107-173, 116 Stat. 543.
[20] 8 U.S.C. § 1103(a)(1), to enforce and administer the immigration laws (as defined in section 101(a)(17) of the INA) with respect to matters within the jurisdiction of CBP.



- Title 8 of the United States Code, Aliens and Nationality;[21]

- 18 U.S.C. Chapter 27 (customs crimes);[22]

- Title 19 of the United States Code, Customs Duties;[23]

- Illegal Exportation of War Materials;[24]

- Search and Forfeiture of Monetary Instruments;[25]

- Passenger Manifests;[26] and

- CBP regulations promulgated pursuant to Titles 8, Aliens and Nationality, and 19, Customs Duties, of the Code of Federal Regulations.[27]

## 1.2 What Privacy Act System of Records Notice(s) (SORN(s)) apply to the information?

Data from the following CBP systems of records is maintained in the TECS Platform IT architecture:

- *DHS/CBP-005 Advance Passenger Information System (APIS)*: This SORN covers the required advanced submission of passenger and crew information for certain air and sea carriers and any other forms of passenger transportation, including rail, that is (or may subsequently be) mandated or provided on a voluntary basis.

- *DHS/CBP-007 Border Crossing Information (BCI)*: This system collects and reviews border crossing information regarding persons entering and (if applicable) exiting the United States.

- *DHS/CBP-008 Non-Federal Entity Data Systems (NEDS):* This system supports the use and collection of certain travel documents, such as Enhanced Driver's Licenses, issued by other government authorities, such as states, Canadian provinces, or Canadian territories.

---

[21] 8 U.S.C. §§ 1185, Travel control of citizens and aliens; 1221, Lists of aliens and citizen passengers arriving and departing; 1225, Inspection by immigration officers; and 1357, Powers of immigration officers and employees.
[22] Available at https://www.law.cornell.edu/uscode/text/18/part-I/chapter-27
[23] 19 U.S.C. §§ 482, Search of vehicles and persons; 507, Officers to make character known; assistance for officers; 1431, Manifests; 1461, Inspection of merchandise and baggage; Examination of baggage; 1499, Examination of merchandise; 1581, Boarding vessels; 1582, Search of persons and baggage; regulations; 1595a, Forfeitures and other penalties; and 1644a, Ports of Entry.
[24] 22 U.S.C. § 401.
[25] 31 U.S.C. § 5317.
[26] 49 U.S.C. § 44909.
[27] Available at https://www.gpo.gov/fdsys/pkg/CFR-2012-title8-vol1/pdf/CFR-2012-title8-vol1.pdf and https://www.law.cornell.edu/cfr/text/19/chapter-I



- *DHS/CBP-009 Electronic System for Travel Authorization (ESTA)*: This web-based application and screening system is used to determine whether certain aliens are eligible to travel to the United States under the Visa Waiver Program.

- *DHS/CBP-011 U.S. Customs and Border Protection TECS*: This system of records consists of the enforcement, inspection, and intelligence records relevant to the anti-terrorism and law enforcement mission of CBP and other federal agencies that use TECS. The purpose of this system is to track individuals who have violated or are suspected of violating a law or regulation that is enforced or administered by CBP, to provide a record of any inspections conducted at the border by CBP, to determine admissibility into the United States, and to record information regarding individuals, firms, and organizations to whom DHS/CBP has issued detentions and warnings.

- *DHS/CBP-013 Seized Assets and Case Tracking System*: This system collects and maintains seizure data and information about current, former, and suspected violators of customs, immigration, agriculture, or other laws and regulations enforced and administered by DHS/CBP.

- *DHS/CBP-016 Nonimmigrant Information System (NIIS)*: This system maintains arrival and departure information collected from foreign nationals entering and departing the United States. on such forms as the I-94, I-94W, or through interviews with CBP officers.

The information contained in TECS Platform datasets or sub-systems is detailed in separate PIAs and SORNs. A comprehensive list of the systems that reside on, interface with, and are accessed through the TECS Platform are listed in Appendices 2, 3, and 4.

### 1.3    Has a system security plan been completed for the information system(s) supporting the project?

Yes. A system security plan has been completed for the TECS application as part of the Certification and Accreditation (C&A) process in accordance with the requirements defined under the Federal Information Security Management Act (FISMA). The most recent C&A for TECS was completed in December 2014. Additionally, the TECS Modernization effort, a multi-year upgrade to the TECS system and functionality, received its initial C&A in December 2009, with a new Authority to Operate (ATO) issued in December 2014. Both TECS and TECS Modernization are included in the current Security Authorization Package.

## 1.4 Does a records retention schedule approved by the National Archives and Records Administration (NARA) exist?

The TECS Platform retains each subset of data according to the specific retention schedule described in each subset's SORN. As of the date of publication of this PIA, CBP is in the process of obtaining approval from NARA for the current retention schedules that conform to the associated SORNs.

## 1.5 If the information is covered by the Paperwork Reduction Act (PRA), provide the OMB Control number and the agency number for the collection. If there are multiple forms, include a list in an appendix.

Most of the information maintained within the TECS Platform is covered by the Paperwork Reduction Act, if it is not law enforcement-related. Information collections approved by OMB are described in the subsystem SORNs and PIAs. Specific information collections relevant to passenger information collections include:

1. OMB 1651-0088 – Passenger and Crew Manifest for Passenger Flights

2. OMB 1651-0103 – Passenger List/Crew List

3. OMB 1651-0107 – Application for Waiver of Passport or Visa

4. OMB 1651-0111 – Arrival and Departure Record

# Section 2.0 Characterization of the Information

*The following questions are intended to define the scope of the information requested and/or collected, as well as reasons for its collection.*

## 2.1 Identify the information the project collects, uses, disseminates, or maintains.

The TECS Platform collects, uses, and disseminates information from CBP and PGA systems as outlined in the Appendices to this PIA. The TECS Platform is comprised of several modules designed to collect and maintain Lookout, Screening, Travel Document, Encounter, User Profile, and Audit data from the source databases and subsystems, as described in the Overview and covered in the PIAs and SORNs listed in Appendix 1. Generally, CBP collects information on individuals prior to arrival (*e.g.*., APIS), at the time of crossing (*e.g.*., NIIS, BCI), and throughout the inspection process of the international traveling public to document enforcement encounters, actions, and observations (*e.g.*., when a traveler is referred to Secondary Inspection (TECS: if law enforcement action is taken, SEACATS: if a seizure occurs)). The collection of this information is described in detail in the TECS Primary and Secondary



Processing PIA.[28] PGAs provide data, either for ingestion into TECS or through a query of the source system, when the information is relevant to CBP's missions. For example, Department of State passport information is ingested into TECS so that a CBP Officer can quickly verify a person's identity and passport information.

### *Lookout Records Services*

TECS Lookout Records Services provide access to create, maintain, or query Lookout record information. A TECS Lookout record may be created by CBP, or other TECS partner agencies. Lookout records are created based on law enforcement, anti-terrorism, travel document fraud, or other interests (for example, if a traveler to a medical outbreak area posed a public health threat). Such interests are based on previous violations of law, suspicion of violations, or a business or occupation in which the law enforcement community has an interest. Lookout records created by external agencies are considered under the control of CBP, with a nexus to border security, because they are used by CBP Officers at primary and secondary inspection processing at the ports of entry.

TECS Lookout Records Services provides authorized users with the ability to create a Lookout Record and indicate whether the system should notify the record owner if the record is queried by another user or displayed as part of an encounter. The notification provides the record owner with the date, time, and location of query or encounter. A Lookout Record is limited to providing only enough identifying information to correspond to a particular individual or conveyance when queried, as well as an explanation of the reason for the Lookout. Authorized users may further place the Lookout Record "on Primary," which informs CBP officers at Ports of Entry of what action (if any) is required to be taken when the subject of a Lookout Record is encountered crossing the border. For example, the Lookout may indicate that a subject is armed and dangerous, requires visa verification, or should be referred to secondary inspection for further customs, immigration, or agriculture inspection by CBP Officers.

### *Screening Services*

TECS Screening Services supports a number of system interfaces that enable authorized users to query TECS Lookout Records, NCIC and Nlets, and encounter data (including crossing, arrival, departure, secondary inspection, and air manifest information); users access this information in support of screening, intelligence, and vetting activities. CBP's collection of this information is discussed in detail in the TECS System: CBP Primary and Secondary Processing PIA.[29] In conjunction with Lookout Records Screening, the TECS Platform maintains external interfaces with the DHS Watchlist Service (WLS), NCIC/Nlets, and customized vetting services.

---

[28] DHS/CBP-013, Seized Assets and Case Tracking System, *available at* http://www.dhs.gov/privacy
[29] DHS/CBP/PIA-009, CBP Primary and Secondary Processing, and DHS/CBP/PIA-009(a), TECS System: CBP Primary and Secondary Processing (TECS) National SAR Initiative, *available at* http://www.dhs.gov/privacy



Examples of vetting services include queries of border crossing history, Non-Immigrant Information System (NIIS) information, etc. DHS WLS data is provided by the Terrorist Screening Center (TSC) and shared with DHS and its components on a need-to-know basis, as documented in the DHS/ALL/-027(b) DHS Watchlist Service PIA Update.[30] Additionally, NCIC/Nlets service provides a real-time interface to the FBI CJIS, NCIC, NCIC III, Nlets, and Nlets interface to CPIC.

### Travel Document Services

CBP holds a repository of travel document records and associated border crossing histories as part of the TECS Platform. Travel document records stored within the repository are non-CBP travel-related records such as Department of State passports (including ePassports), immigrant visas (IV), and non-immigrant visas (NIV); and U.S. Citizenship and Immigration Services (USCIS) Lawful Permanent Resident (LPR) cards and other travel documents. Additionally, the Travel Document Services provides access to Enhanced Tribal Cards (ETC) and Enhanced Drivers Licenses (EDL) that are queried by CBP at primary, but are not shared with other agencies through the TECS Platform. This information is collected through system-to-system interfaces, which are listed in Appendices 2 and 3. The specific data elements of these travel documents are enumerated in the relevant Department of State, USCIS, and CBP SORNs.[31]

### Encounter Data Services

Encounter data services provide access to information collected during a traveler's encounter with CBP while entering or exiting the United States. The TECS Primary and Secondary Processing PIA[32] references "subject records" to describe information collection as part of a traveler or vehicle encounter with CBP at either a port of entry or checkpoint. Encounter Data includes Currency and Monetary Instruments Report (CMIR) data, border crossing history, NIIS data, Memorandum of Information Received (MOIR) reports[33] and Secondary Inspection reports.[34]

---

[30] DHS/ALL/PIA-027(b), DHS Watchlist (WLS) Update, *available at* http://www.dhs.gov/privacy

[31] *See* Overseas Citizens Services Records-STATE-05 (May 02, 2008), Passport Records – STATE-26 (March 24, 2015), and Visa Records – STATE-39 (October 25, 2012), *available at* https://foia.state.gov/Learn/SORN.aspx. *See* CBP/DHS-005, Advance Passenger Information System (APIS), DHS/CBP-016, Non-immigrant Information System (NIIS), DHS/ICE-001, Student and Exchange Visitor Information System (SEVIS), DHS/USVISIT-001 Arrival and Departure Information System (ADIS), DHS/USCIS/ICE/CBP-001, Alien File, Index, and National File Tracking System, *all available at* http://www.dhs.gov/privacy

[32] DHS/CBP/PIA-009, CBP Primary and Secondary Processing, and DHS/CBP/PIA-009(a), TECS System: CBP Primary and Secondary Processing (TECS) National SAR Initiative, *available at* http://www.dhs.gov/privacy

[33] CBP officers and agents may use a free-form text field in TECS to document observations or interactions with an individual at the border; these reports are known as Memoranda of Information Received (MOIRs).

[34] DHS/CBP-007, Border Crossing Information (BCI) System of Records Notice, *available at* http://www.dhs.gov/privacy

*TECS Security Services*

TECS Security Services consists of three components: Internal Affairs and Background Investigation Support; User Access Management; and Auditing. These components provide built-in checks to ensure data residing on the Platform is accessed by only those who have a need-to-know (a job function requiring access to the information) and designated authority to receive the data accessed. The components also monitor TECS to ensure that users are not inappropriately accessing or using their data.

*User Profile and Maintenance Data*

The TECS Platform maintains information specifically about TECS users and the actions users take in the system. CBP collects information about the user as part of the application process to obtain TECS access, including complete name (last name, first name, and middle name or initial), Foreign Service National indicator, Social Security number,[35] badge number, work and home addresses, telephone numbers, occupation, supervisor's names, background investigation status, security clearance level, and certifications (i.e., NCIC and TECS Privacy Awareness certified). CBP maintains historical background investigation data on the TECS Platform to verify user access. However, the current system of records for background investigation information is the Integrated Security Management System (ISMS).[36] TECS access rights are verified through ISMS to determine whether CBP employees and contractors have the appropriate background investigation required for access to the TECS system. CBP shares user profile data on the TECS Platform on a limited basis with auditors, internal affairs personnel, and other individuals who have a need-to-know to perform their job functions.

*Audit Data*

Audit logging captures the activity of a user accessing TECS including user identifier, date, time, and location of the access, as well as the type of activity performed. The system captures all query requests and results, including search attempts for which the user is denied access to the results. Logs are also maintained related to the creation of TECS records, including TECS Lookout Records.

## 2.2    What are the sources of the information and how is the information collected for the project?

The TECS Platform is a repository of data collected directly by CBP, datasets collected by other DHS components, and data sourced from other federal, state, and international government agency systems of records that resides on, or is accessed through, the TECS

---

[35] CBP is transitioning away from the SSN-generated HashID for CBP users on modernized TECS. CBP is looking into an alternate Federal ID for non-CBP users but for the time being, SSN is still used for authentication.

[36] DHS/ALL/PIA-038 Integrated Security Management System, *available at* http://www.dhs.gov/privacy.

**Homeland Security**

Platform. *See* Appendices 2 and 3 for a list of TECS interfaces. TECS also maintains limited information on individuals who have been granted access to the system, as explained above.

### DHS-collected Data

Traveler information in TECS is collected directly and indirectly from travelers while entering and exiting the United States. Data collected directly from travelers includes border crossing information obtained during CBP primary inspections,[37] documentation of a physical inspection of a traveler or their baggage in an "incident log" as a part of secondary inspection or as a result of a CBP enforcement action, such as a seizure of merchandise. Some of this information consists of notes on information collected from electronic devices pursuant to a border search.[38] CBP obtains travel document information in advance of a traveler's arrival or departure through APIS from air, land, and sea carriers. CBP also obtains travel document information through Trusted Traveler programs.[39] Separately, as explained above in the Encounter Data section, CBP Officers may record an interaction with a member of the public when it is anticipated that information pertaining to that encounter may be of future value. This is typically done in situations when a violation of the law is discovered in order to provide context, and/or to establish or supplement a Lookout record. The CBP Office of Professional Responsibility also uses the TECS Platform to track background information garnered from background investigations. Since the development of DHS's ISMS, the TECS Internal Affairs background investigation feature is used by internal affairs for historical purposes and by Office of Information Technology (OIT) to verify whether a user has the appropriate background investigation required for systems access. TECS interfaces with other DHS systems, such as the U.S. Citizenship and Immigration Services (USCIS) Person Centric Query Service and Central Index System.[40]

TECS user information is collected directly from the user. Historical information in TECS related to users' background investigations were collected through CBP Office of Professional Responsibility; the background information was gathered both directly from the subject, as well as persons interviewed in the course of the background investigation. Training and audit records are collected as part of an automated process on the TECS Platform.

### Other Government Agency Data

The TECS Platform is not only a repository of enforcement, inspection, operational, and

---

[37] As described in the BCI SORN, CBP maintains information for each instance of an individual's entry into the United States at official ports of entry including airports, land border crossings, or sea ports. Border crossing information includes biographic and biometric information, photographs, information provided by commercial carriers, and the time of the location of the border crossing.

[38] DHS/CBP/PIA-008, Border Searches of Electronic Devices, *available at* http://www.dhs.gov/privacy.

[39] DHS/CBP-002, Global Enrollment System, *available at* http://www.dhs.gov/privacy.

[40] DHS/USCIS/PIA-010, Person Centric Query Service and DHS/USCIS/PIA-009, Central Index System, *available at* http://www.dhs.gov/privacy.

security records, but also an information-sharing platform through which the TECS user community facilitates the processing of international travelers and checks for possible links to terrorism or law enforcement violations. CBP enforces many different agencies' laws at the border. Thus, CBP affords other agencies access to TECS to view and enter data on the TECS Platform consistent with each respective law enforcement agency's legal authority to do so, and in conformance with memoranda of understanding/agreement executed between CBP (or the legacy U.S. Customs Service) and the PGA. Accordingly, the TECS Platform includes data from other federal, state, local, tribal, and foreign law enforcement entities. This data is provided to TECS via system-to-system interfaces and/or through online user input. Information collected by CBP and other DHS components can be shared by, and supplemented with, other local, state, national, foreign, and international law enforcement entities' systems via system-to-system interfaces. TECS also allows direct access to other major law enforcement systems, so that authorized TECS users may query CJIS, NCIC, Nlets, and CPIC, and others in order to obtain law enforcement information regarding persons of interest, including Lookouts.

### 2.3  Does the project use information from commercial sources or publicly available data? If so, explain why and how this information is used.

The TECS Platform receives advance passenger information from commercial carriers pursuant to its statutory mandate.[41] TECS does not receive direct feeds of information from commercial data aggregators, and it does not collect direct feeds from public news sources. TECS users may incorporate publicly available information into narrative reports contained in TECS (such as MOIRs) if the user determines that the information is relevant to the analysis or action being performed. Such incorporation is the result of an action taken by a TECS user and is not the result of an automated collection.

### 2.4  Discuss how accuracy of the data is ensured.

TECS users routinely compare newly collected data to existing records to ensure that the information is accurate. For example, CBP Officers verify information received through APIS or entered into a Lookout by comparing it to identification cards and answers to questions provided by an individual at the border. CBP relies on the originating systems to have appropriate processes in place to ensure the accuracy of the data being shared through TECS. When discrepancies are discovered, CBP works with the source system owner to determine the accurate version of the information and resolve any discrepancies.

---

[41] The Aviation and Transportation Security Act of 2001, Pub. L. 107-71, 115 Stat. 597, and the Enhanced Border Security and Visa Entry Reform Act of 2002, Pub. L. 107-173, 116 Stat. 543, provide specific authority for the mandatory collection of certain information on all passenger and crewmembers that arrive in, transit through, or depart from the United States via private aircraft, commercial air, or vessel carrier (and in the case of air carrier crew, overfly the United States).



## 2.5   <u>Privacy Impact Analysis</u>: Related to Characterization of the Information

In addition to the risks and mitigation described in previous TECS PIAs, the following potential risks related to TECS Platform's collection of data have been identified:

**Privacy Risk:** TECS aggregates data from many systems, including those belonging to federal, state, local, tribal, and foreign law enforcement agencies, which may exceed the minimal amount of data necessary to satisfy CBP mission responsibilities.

**Mitigation:** CBP maintains a large the amount of information in TECS from a variety of agencies, and while this information is necessary to CBP's mission at the border, this risk is mitigated through the employ of access controls to ensure that users can only access information relevant to their specific role. Different types of information from these agencies are required to enforce the wide spectrum of laws enforced at the border. For example, federal and state criminal violations may affect the admissibility of an alien or alert a CBP Officer to smuggling or other customs violations. Passport, visa, ETC, and EDL information assists CBP Officers in confirming the identity of the person seeking admission to the United States. Notes in narrative reports from previous inspections or MOIRs help CBP identify past violations or, conversely, rule out otherwise suspicious behavior. Moreover, access to the information in TECS is controlled by both the mission responsibilities and the role of each TECS user. Information provided to, or accessible by, PGAs is limited to those data sets that fall within their authorized missions and are delineated in a TECS MOU/MOA.

Additionally, CBP is mitigating this risk by identifying datasets that should no longer be maintained on the TECS Platform through TECS Modernization. Certain datasets currently maintained on the TECS Platform as a result of legacy operations under the U.S. Customs Service (including some ICE case management records; Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) records; and Internal Revenue Service (IRS) investigative records that are inaccessible to CBP), are being migrated out of the TECS Platform to the owning agencies. CBP is migrating these records off of the TECS Platform to ensure CBP only maintains the minimal amount of information necessary to achieve its missions.

**Privacy Risk:** Because TECS contains a substantial amount and variety of Personally Identifiable Information (PII) collected by multiple organizations and maintained across multiple systems, there is a risk that users have access to more PII than is required to perform their specific function.

**Mitigation:** This risk is partially mitigated through CBP's securing of the data and the provision of user access according to a set of permissions based on need-to-know and job function. CBP has imposed strict controls to minimize the risk of compromising the information that is being stored. CBP protects the data through uninterrupted monitoring in conformance to

National Institute of Standards and Technology (NIST) standards, to include encryption, electronic firewalls, and physical location within secured facilities. CBP restricts access to these areas to authorized users who have appropriate clearances and permissions, in the performance of their official duties.

# Section 3.0 Uses of the Information

*The following questions require a clear description of the project's use of information.*

### 3.1    Describe how and why the project uses the information.

CBP's mission includes the enforcement of the customs, immigration, and agriculture laws and regulations of the United States and the enforcement at the border of hundreds of laws on behalf of numerous federal agencies. TECS users collect, maintain, and share information through the TECS Platform to facilitate counterterrorism, law enforcement, border security, and inspection activities. CBP uses this data to assess the risk or threat posed by persons, goods, or conveyances entering or exiting the country.

#### *Law Enforcement and Counterterrorism*

TECS users create records on the TECS Platform to document any customs, immigration, or other law enforcement actions taken with respect to a subject, including goods and conveyances, and to document encounters otherwise deemed to be of law enforcement or counterterrorism interest. Certain authorized PGA TECS users create Lookout records to assist CBP's law enforcement and counterterrorism missions at the border by providing information about known or suspected violators or terrorists. For example, certain users from the U.S. Marshals Service enter Lookouts for fugitives into TECS so that a CBP Officer can apprehend the individual at the border.

Authorized PGA TECS users also query individuals and review responsive records in support of their mission. For example, certain authorized users from the FBI access TECS Lookout records to identify individuals suspected of, or involved in, a violation of federal law.

#### *Information-gathering and Assessment*

In connection with the counterterrorism DHS Suspicious Activity Reporting Initiative, MOIRs may be reviewed by the CBP Office of Intelligence and the Office of Field Operations. Those MOIRs that meet the necessary criteria for nomination into a Suspicious Activity Report (SAR) are sent to the DHS Information Sharing Environment – Suspicious Activity Report (ISE-SAR) server and further incorporated by DHS as National Security Information (NSI). A detailed description of SARs is discussed in the TECS National SAR Initiative PIA.[42]

---

[42] DHS/CBP/PIA-009(a) TECS System: CBP Primary and Secondary Processing (TECS) National SAR Initiative, *available at* www.dhs.gov/privacy.

### Benefits Determination

The TECS Platform assists CBP users in making admissibility determinations. Queries are also performed by DHS and partner agencies to evaluate eligibility for their own benefits determination (*e.g.*., USCIS benefit requests, Department of State visa issuance).

### Audit Function

CBP uses audit logs to evaluate internal threats posed by trusted users of the TECS community. CBP records and monitors TECS system use and there is no expectation of privacy on the part of any user for any action taken in TECS. The CBP Office of Professional Responsibility (OPR) uses audit logs during the internal investigative process to research claims that TECS users have misused the system. Examples of misuse could include actions such as browsing the system for personal use, or providing operational details to those who might seek unauthorized access to the system or to do harm to CBP or the U.S. Government.

### Employee Background Investigations

CBP/OPR queries the TECS Platform for law enforcement data as part of the background investigation process for all applicants and current employees. OPR also uses the TECS platform to suspend mainframe access for current CBP employees who are not in compliance with the reinvestigation requirements. The Office of Information and Technology uses historical background investigation data on the TECS Platform to verify that individuals requesting access to CBP systems have a favorably adjudicated background investigation.

## 3.2 Does the project use technology to conduct electronic searches, queries, or analyses in an electronic database to discover or locate a predictive pattern or an anomaly? If so, state how DHS plans to use such results.

No. The TECS Platform does not discover predictive patterns or anomalies. TECS only conducts queries for responsive records.

## 3.3 Are there other DHS components with assigned roles and responsibilities within the system?

Yes. Consistent with DHS regulations and the One DHS policy,[43] CBP shares the information collected in TECS with personnel within all DHS components that have a need-to-know the information, a job function requiring access to the information, and will access data that is consistent with the component's mission.

---

[43] One DHS Policy, available at, http://www.dhs.gov/xlibrary/assets/dhs_information_sharing_strategy.pdf.

The objectives of sharing TECS data within the DHS community are: 1) to provide the DHS enforcement community with a common repository of information related to suspected or known violators of the law; 2) to provide the ability for timely communication of information related to known or suspected criminals to CBP officers and other DHS employees, such as Immigration and Customs Enforcement agents; and, 3) to provide a common repository for the routine recording of law enforcement activity, including inspection results and assets seized from criminals as a result of law enforcement activities. In addition, TECS provides a repository against which other DHS components can perform queries in support of their specific missions.

CBP and other DHS components are able to access TECS information to perform job functions in conjunction with a need-to-know. A current list of DHS components with access to TECS includes:

- DHS Office of the Chief Security Officer (OCSO)

- DHS Office of the Inspector General (OIG)

- DHS Office of Intelligence and Analysis (I&A)

- DHS Office of Operations Coordination

- National Protection and Programs Directorate (NPPD)

- Transportation Security Administration (TSA), including the Federal Air Marshal Service (FAM)

- U.S. Citizenship and Immigration Services (USCIS)

- U.S. Coast Guard (USCG)

- U.S. Immigration and Customs Enforcement (ICE)

- U.S. Secret Service (USSS)

A complete list of the TECS user community can be found in Appendices 2 and 4.

## 3.4    **Privacy Impact Analysis**: Related to the Uses of Information

**Privacy Risk**: Approximately 90,000 authorized users, including personnel from government agencies outside of CBP and DHS access the TECS Platform for data entry, communication, and data query. There is a risk that TECS could be accessed for unapproved or inappropriate purposes such as searching for, or creating records or Lookouts for friends, relatives, neighbors, the users themselves, or other members of the public.

**Mitigation**: This risk is mitigated through CBP's employment of several layers of training, review, and access controls. All prospective CBP employees and contractors are required to undergo a background investigation before receiving access to TECS; a TECS



account cannot be activated without a properly adjudicated background investigation or change in background investigation status. Additionally, all users must pass an annual TECS Security and Privacy Awareness course in order to establish and retain TECS access. Moreover, TECS users are required to comply with TECS security requirements, including having a supervisor approve a Lookout in order for it to remain on Primary ("on Primary" indicates that immediate action is required by CBP officers if the travelers is encountered crossing the border) in TECS.

CBP OPR continuously monitors the use of TECS, including reviews of the extensive audit logs that TECS maintains, which identifies the users that have accessed records, and what changes or deletions (if any) were made to the records. DHS employees and contractors have no privacy expectations associated with the use of any DHS network, system, or application and this policy is also enforced for TECS. All use of the TECS Platform results in the creation of audit trails designed to document an individual's activity. These audit trails are reviewed in an effort to identify inappropriate uses of the system and misuses of TECS information. All users acknowledge their understanding that their activities within TECS will be monitored, and provide consent to such monitoring each time they log onto the system.

# Section 4.0 Notice

*The following questions seek information about the project's notice to the individual about the information collected, the right to consent to uses of said information, and the right to decline to provide information.*

### 4.1    How does the project provide individuals notice prior to the collection of information? If notice is not provided, explain why not.

Some information in TECS is collected directly from individuals as they complete primary (and secondary, if applicable) inspection at a port of entry. These individuals have direct notice of the information they provide to the CBP Officers during the admissibility determination process. Some of the information in TECS is collected directly from a suspect after a criminal or administrative arrest. In such cases, the individual is advised in writing and orally of their right to refuse to provide information pursuant to the Fifth Amendment.

With respect to information obtained from suspects or other individuals through Government forms, such as immigration benefit applications, Privacy Act statements on those forms provide notice to the individual that their information may be shared with law enforcement entities.

With respect to Lookout records, or records created during the course of a law enforcement investigation, it is not feasible to provide individuals who are interviewed as suspects, witnesses, or victims with any form of written notice regarding the collection of



information, nor is such written notice required by the Privacy Act or other federal laws or policies. With the exception of authorized undercover operations, however, these individuals are aware that they are being interviewed by a law enforcement officer and that their information is being collected for use in an investigation.

More generally, CBP provides notice through the publication of this PIA, and TECS source system PIAs, SORNs, and implementing regulations associated with individual programs and subsystems that information collected may be shared with other programs and government agencies. CBP also posts signage and video notices at the border explaining what information will be required at Ports of Entry, and publishes this information online at www.cbp.gov.

## 4.2 What opportunities are available for individuals to consent to uses, decline to provide information, or opt out of the project?

Generally, the decision of whether to travel to or from the United States is within the discretion of the individual traveler. Pursuant to CBP's authorities, any individual seeking to enter the United States must demonstrate to the satisfaction of the CBP officer that the traveler is a U.S. citizen, lawful permanent resident, or is otherwise eligible for admission to the United States. When applicable, a traveler must also prove he or she is not attempting to import or export any merchandise in violation of U.S. laws. Those unwilling to provide information supporting these requirements can choose not to travel to the United States.

For Lookout or law enforcement records, due to the DHS law enforcement or immigration purposes for which the information is collected, opportunities to decline may be limited or nonexistent. Users may enter data during the course of a law enforcement activity or in support of other DHS proceedings, and it is the nature of the proceeding and the individual rights afforded to the subject by law that will determine the ability of a person to exercise the right to decline to provide information.

There is no opportunity for individuals to decline to provide information that the TECS Platform receives from PGAs via system-to-system interface. However, external agency programs that initially collected the information from individuals may provide them with opportunities to decline to provide their information to that specific program. Opportunities to decline to provide information are enumerated in the program-specific PIA. However, once it has been collected, the data may be shared with TECS as outlined in the collecting system's SORN.

## 4.3 Privacy Impact Analysis: Related to Notice

**Privacy Risk:** There is a risk that an individual may not know that his or her information is being maintained on the TECS Platform.

**Mitigation:** This risk is mitigated to the extent possible through the publication of this PIA, as well as the publishing of PIAs and SORNs addressing the collection, notification, and



individual control aspects of each subsystem on the TECS Platform. Each PIA describes the data residing on the TECS Platform. With regard to CBP personnel and TECS users, notification that their data resides on the TECS platform is provided on an annual basis when they take the privacy awareness course.

There is a countervailing risk that arises when an individual is notified that information is being collected about them by DHS for a law enforcement or intelligence purpose. The notification may cause the individual to flee or destroy or conceal evidence required by DHS, compromising the ability of DHS agencies to perform their missions, and could put DHS personnel and resources at risk of injury, death, loss, or destruction. In such cases, DHS will intentionally withhold notification to the individual until he or she is arrested or indicted.

**Privacy Risk:** There is a risk that individuals are not afforded notice or an opportunity to consent to provide information for inclusion in a Lookout or law enforcement record.

**Mitigation:** This risk can only be partially mitigated. Because the data stored in TECS is used in support of systems in which law enforcement or intelligence contexts apply, notice or the opportunity to consent to use would compromise the ability of the agencies to perform their missions and could put DHS and other law enforcement personnel at risk. Thus, notice of collection and consent to specific uses are limited or not available in most cases for data stored in the TECS However, the methods of providing direct notice as appropriate to an individual are described in Section 6.1 above. There is a potential risk that an individual may not understand the notice. When necessary, the notice to an arrested person is provided in his or her native language through an interpreter or through written translation. There is a potential risk that false or misleading information about an individual may be provided by a source with malicious intent. This risk is mitigated by user training and standard operating procedures that emphasize the importance of verifying information prior to recording and using it.

## Section 5.0 Data Retention by the project

*The following questions are intended to delineate clearly the use of information and the accuracy of the data being used.*

### 5.1    Explain how long and for what reason the information is retained.

TECS records are retained for the purposes and durations set out in the SORNs for the various subsystem datasets that reside on the TECS Platform. For example, TECS Lookout records are retained for 75 years from the date of the last collection of data; TECS user information and training records are similarly retained for 75 years, while audit logs are



maintained for 25 years.[44] Lookout records not collected by CBP but residing on the TECS Platform are governed by the owning agency's respective retention policy.

CBP also published SORNs for data collected by the agency that resides on the TECS Platform, including APIS,[45] BCI,[46] NIIS,[47] and SEACATS.[48] Data on these platforms is retained according to the records schedules published in the SORNs.

Datasets not collected by CBP but residing on the TECS Platform include the Non-Federal Entity Data System (NEDS)[49] and the Department of State (DOS) American Citizen Records Query (ACRQ) System.[50] Watchlist records received from the TSC that are included within TECS as a match or possible match to TECS records are maintained for 75 years.

CBP and NARA are reviewing the record retention and disposition schedule for the TECS databases and will update the appropriate SORNs upon completion.

## 5.2    **Privacy Impact Analysis**: Related to Retention

**Privacy Risk:** There is a risk that information may be retained on the TECS Platform longer than is necessary.

**Mitigation:** This risk is mitigated through CBP's application of data retention policies for the TECS Platform that are consistent with CBP's law enforcement and antiterrorism

---

[44] DHS/CBP-011, U.S. Customs and Border Protection TECS System of Records Notice, *available at* http://www.dhs.gov/privacy

[45] Information collected in APIS is maintained for a maximum period of twelve months from the date of collection, but may be used to create records in BCI, NIIS, or other systems with differing retention periods.

[46] For U.S. citizens and lawful permanent residents (LPR), BCI will maintain travelers' border crossing information for fifteen years from the date that the traveler was admitted or paroled into the United States. For non-immigrant aliens, to ensure that any information related to a particular border crossing is available for providing any applicable benefits related to immigration or for other law enforcement purposes, the information will be maintained for seventy-five (75) years from the date of admission/parole into the United States. However, for all travelers, BCI records that are linked to active law enforcement activities, and/or investigations will remain accessible beyond the limitations stated above for the life of that activity. *See* BCI SORN.

[47] NIIS data is collected and maintained for seventy five (75) years from the date obtained for purposes of entry screening, admissibility, and benefits determinations. *See* NIIS SORN.

[48] Records related to a law enforcement action; that are linked to an alleged violation of law or regulation, or are matches or suspected matches to enforcement activities, investigations, or cases (i.e., administrative penalty actions or criminal prosecutions), will remain accessible until the conclusion of the law enforcement matter and any other enforcement matters or related investigative, administrative, or judicial action to which it becomes associated plus five years. Records associated with a law enforcement matter, when all applicable statutes of limitation have expired prior to the conclusion of the matter, will be retained for two years following the expiration of the applicable statute of limitations. *See* SEACATS SORN.

[49] NEDS is retained for the duration of the validity of the travel document; that is, until the date of expiration on the document or to the extent more restrictive, in accordance with the terms of any Memorandum of Understanding/Agreement between DHS/CBP and the issuing authority. *See* Non-Federal Entity Data System.

[50] Retention of records maintained in the DOS ACRQ will vary depending upon when the passport application was received; these documents will be retired or destroyed in accordance with published NARA and DOS record schedules (presently 100 years for electronic records). *See* ACRQ, 73 Fed. Reg. 1660 (Jan. 9, 2008).



missions. Additionally, retention plans are tailored in each subsystem to the particular program needs. TECS provides a systematic evaluation of Lookout Records on Primary to notify the record owner that the "on Primary" designation is about to expire. If the record is not recertified, the record no longer appears "on Primary."

DHS has determined it needs to maintain TECS audit records for a period of 25 years to support internal investigations of TECS misuse and internal threats.

## Section 6.0 Information Sharing

*The following questions are intended to describe the scope of the project information sharing external to the Department. External sharing encompasses sharing with other federal, state and local governments, and private sector entities.*

### 6.1 Is information shared outside of DHS as part of the normal agency operations? If so, identify the organization(s) and how the information is accessed and how it is to be used.

Yes. CBP provides access to TECS information for agencies that have the authority to receive TECS data and have demonstrated a justifiable need for this information. The TECS program manager (in concurrence with all necessary DHS/CBP offices) provides authorization for a non-DHS agency's access to TECS via a Memorandum of Agreement (MOA), or other Information Sharing Access Agreement (ISAA), between DHS/CBP and the outside entity. The MOA specifies the general terms and conditions that govern the use of the functionality or data, including privacy-related limitations on use and re-dissemination, and the types of information in TECS to which the agency is being granted access. An Interconnection Security Agreement (ISA) governs any interface implemented between DHS/CBP and that outside entity. For log-in access to TECS, third party agencies must not only identify their authority to receive this information, but also specifically identify and certify an individual(s) that meets TECS employee criteria. Appendices 2, 3, and 4 identify the entities with which CBP shares TECS data, describe what type of TECS data is shared, and how it is shared. CBP has also published PIAs and SORNs which describe the type of data residing on the TECS Platform. *See* Appendix 1.

In the absence of an MOA, TECS data may still be shared with federal, state, local, tribal, and foreign law enforcement, counterterrorism, and border security agencies on a case-by-case basis. In such instances, the requesting or receiving agency must provide a written explanation of (or DHS/CBP must have reason to know) what information the receiving agency needs, how it intends to use that information, and its authority to receive that data. Prior to disclosure, DHS/CBP determines that the proposed use is consistent with a routine use published in the most recent SORN or is otherwise subject to a condition of disclosure under the Privacy Act.

Access to TECS information is governed by need-to-know criteria, which demands that



the receiving entity demonstrate a mission-related need for the data before access is granted. The reason for the access, the scope of its use, and the purpose for which it will be employed are the primary privacy-related concerns that are included in the MOA negotiated between DHS/CBP and an agency seeking access to TECS.

Pursuant to the terms of the MOA, authorized PGAs access TECS Platform information through system-to-system connections or as direct users of TECS. Alternatively, if the agency seeking TECS information does not have an electronic interface with TECS, appropriate TECS records may be transmitted pursuant to the terms of an MOA between CBP and the agency or on a case-by-case basis, as discussed above.

Various PGAs and foreign governments connect to TECS for the purposes of law enforcement, screening, and consideration of benefit. Appendix 2 identifies the PGAs and foreign governments that presently have access to TECS and describes the type of data that is being shared.

## 6.2 Describe how the external sharing noted in 6.1 is compatible with the SORN noted in 1.2.

CBP shares data from the TECS Platform with entities external to DHS in accordance with the Privacy Act exemptions and routine uses identified in the SORNs for the applicable TECS Platform data systems listed in section 1.2. Those routine uses are compatible with the purposes for which those records were collected.

## 6.3 Does the project place limitations on re-dissemination?

Yes. The use of TECS data outside of DHS is governed by the MOA, which places express limitations on use of CBP data and conditions on re-dissemination, or authorized for narrowly-tailored purposes on a case-by-case basis, as described in Section 6.1. Generally information cannot be re-disseminated without the prior written authorization of CBP. Additionally, agencies accessing information stored on the TECS Platform agree that information not owned by that agency cannot be disclosed by that agency without the specific approval of the agency or entity that owns the records.

## 6.4 Describe how the project maintains a record of any disclosures outside of the Department.

The TECS Platform automatically generates a DHS Form 191, *Privacy Act Disclosure Record* whenever a user views TECS Person Subject Records. Case-by-case disclosures are recorded manually on the DHS Form 191 by the CBP or DHS employee making the disclosure. The DHS Form 191 lists: the type of inquiry (written or oral); the name of the subject of the record(s) being sought; the name of the individual, and the associated agency, seeking the



record(s); the address of the requestor; the name of the individual retrieving and providing the records to the requestor; the purpose for the disclosure; the name of the System of Records from which these records are retrieved; a description, in general terms, of the nature of the records provided; and the date of the disclosure. The individual/component maintains a copy of the DHS Form 191 and provides the records to the requestor as well as by the CBP Privacy Office.

### 6.5    <u>Privacy Impact Analysis</u>: Related to Information Sharing

<u>**Privacy Risk**</u>: There is a risk that information may be shared under inappropriate circumstances.

<u>**Mitigation**</u>: This risk is mitigated through CBP's governance of access to datasets on the TECS Platform by need-to-know criteria that demand the receiving entity demonstrate a mission-related purpose for the data before access is granted. Access and use are limited by the initial and ongoing authorization to receive the data, including the negotiation of MOAs between DHS/CBP and the requesting agency. Additionally, to retain TECS access, all TECS users must comply with the TECS security requirements, including successful completion of the TECS Security and Privacy Awareness course on an annual basis. CBP requires PGAs to sign interconnection security agreements before connecting to the TECS Platform to assists in guarding against errant transmissions and misuse.

For all information sharing requests, DHS/CBP reviews the requests for individual records, new user access, and bulk sharing. In the absence of an MOA, TECS data may still be shared with federal, state, local, tribal, and foreign law enforcement, counterterrorism, and border security agencies on a case-by-case basis, as approved by DHS/CBP. In such instances, the requesting or receiving agency must provide a written explanation of (or DHS/CBP must have reason to know) what information the receiving agency needs, how it intends to use that information, and its authority to receive that data. Prior to disclosure, DHS/CBP determines that the proposed use is consistent with a routine use published in the most recent SORN or is otherwise subject to a condition of disclosure under the Privacy Act.

## Section 7.0 Redress

*The following questions seek information about processes in place for individuals who wish to seek redress (access to records about them, accuracy of the information collected about them, and/or filing complaints).*

### 7.1    What are the procedures that allow individuals to access their information?

DHS has exempted the TECS system of records from access requirements pursuant to 5 U.S.C. § 552a(j) and (k). This is because access to the TECS records could inform a subject of an actual or potential criminal, civil, or regulatory violation investigation or reveal investigative interest on the part of DHS or another agency. This could enable the individual who is the



subject of a record to impede the investigation, to tamper with witnesses, destroy or conceal evidence, and flee to avoid detection or apprehension.

However, the SORNs for each subsystem governs the access to data in that system – therefore, individuals may be able to access, correct, and amend records from APIS, BCI, or other external agency information. Regardless of exemption, CBP will consider individual requests to determine if information may be released. Individuals seeking notification of, and access to, any record contained in TECS, or seeking to contest its content, may gain access to certain information in TECS about them by filing a Freedom of Information Act (FOIA) or Privacy Act request with CBP at https://foia.cbp.gov/palMain.aspx, or by mailing a request to the CBP FOIA Headquarters Office, U.S. Customs and Border Protection, FOIA Division, 90 K Street NE, 9th Floor, Washington, D.C. 20229. Fax Number: (202) 325-0230.

## 7.2    What procedures are in place to allow the subject individual to correct inaccurate or erroneous information?

A person who believes that CBP actions are the result of incorrect or inaccurate information may request information about their records pursuant to procedures provided by the Freedom of Information Act and the access provisions of the Privacy Act of 1974 by writing to:

U.S. Customs and Border Protection
Freedom of Information Act Division
90 K Street NE, 9th Floor
Washington, D.C. 20229

Travelers may also contact the DHS Traveler Redress Inquiry Program (TRIP) at 601 South 12th Street, TSA-901, Arlington, VA, 22202-4220 or online at www.dhs.gov/trip. Individuals making inquiries should provide as much identifying information as possible to identify the record(s) at issue.

## 7.3    How does the project notify individuals about the procedures for correcting their information?

The TECS Platform does not provide individual notification of procedures for correcting records from each system on the Platform. Instead, notification is set out in those systems' individual SORNs and PIAs. For TECS records that are investigatory in nature, no individual notification is currently provided.

Additionally, CBP Officers provide a Fact Sheet to individuals at ports of entry that outlines the process for correcting data upon request. This fact sheet describes the details in Section 7.2 of this PIA for individuals who believe mistakes in TECS may exist and desire redress. Additionally, DHS Privacy Office published guidance specifically on identifying,

processing, tracking, and reporting on requests for amendments to records submitted to DHS under the Privacy Act.[51]

### 7.4    Privacy Impact Analysis: Related to Redress

**Privacy Risk:** There is a risk that individuals may not know how to request redress related to accessing their records, or with regard to an issue they may have experienced during the customs and immigration inspection process.

**Mitigation:** To mitigate this risk, CBP has described redress procedures in this PIA as well as the relevant system SORNs. CBP and DHS provide notice to the public of their redress rights on their websites. In addition, as described above, CBP Officers provide a fact sheet to individuals to provide additional information on the process for accessing and correcting records.

**Privacy Risk:** Due to the law enforcement nature of much of the information in TECS, there is a risk that individuals will be unable to access, correct, or amend their records.

**Mitigation:** CBP determines all request for redress on a case-by-case basis. If an individual is not satisfied with the response, he or she can appeal his or her case to the appropriate authority provided for in the Privacy Act. There may also be specific legal remedies available to the individual in the context of any criminal or immigration proceedings in which the individual is involved.

## Section 8.0 Auditing and Accountability

*The following questions are intended to describe technical and policy based safeguards and security measures.*

### 8.1    How does the project ensure that the information is used in accordance with stated practices in this PIA?

The TECS Platform employs a layered approach of checks and balances to ensure information is used in accordance with intended uses stated in this PIA. First, to gain and maintain access to information that resides on the TECS Platform, a user must have the appropriate background investigation and have successfully passed the annual TECS Security and Privacy Awareness course, as well as have a need to know and job-related requirement for TECS information. An agency representative (CBP supervisor or agency National System Control Officer) submits requests to CBP indicating an individual has a need-to-know for official purposes. CBP verifies that background investigations, as well as security and privacy trainings are complete, and issues a new user account upon an affirmative determination.

---

[51] Privacy Policy Guidance Memorandum 2011-01, *available at* http://www.dhs.gov/privacy-policy-guidance.



The ability to view information within TECS is dependent on both the User Profile assigned to the TECS user, and the access control placed on the information in the database. TECS users consist of CBP/PGA government employees and contractor personnel who are granted only the privileges necessary for them to complete the tasks required as part of their assigned duties. TECS users are generally required to be U.S. citizens who have successfully completed, at a minimum, the appropriate background investigation and have successfully passed the annual TECS Security and Privacy Awareness course, as well as have a need to know TECS information. There are some limited instances where a non-U.S. citizen with a successfully completed and adjudicated background investigation may be granted limited TECS access, following DHS guidelines.

### 8.2    Describe what privacy training is provided to users either generally or specifically relevant to the project.

A new TECS user must complete the TECS Security and Privacy Awareness course and pass the associated test before CBP grants initial TECS access. The course presents Privacy Act responsibilities and Agency policy regarding security, sharing, and safeguarding of official information and PII on the TECS Platform. The course also provides a number of sharing and access scenarios to test the prospective user's understanding of appropriate controls put in place to protect privacy. This training is regularly updated and TECS users are required to take the course annually.

TECS users are educated about the consequences of misuse of TECS records. Inappropriate access to (or use of) TECS can subject a user to criminal and civil penalties, as well as disciplinary actions in accordance with the CBP Code of Conduct to include being removed from one's position.

### 8.3    What procedures are in place to determine which users may access the information and how does the project determine who has access?

TECS users are classified into the following categories: general system users; supervisors; system control officers; systems maintenance personnel; and security administrators. General system users are those CBP and PGA users requiring access to the data stored in TECS. Supervisors are individuals who are responsible for approving records that are added to the system. System Control Officers are responsible for creating and maintaining user provisioning lists. Systems maintenance personnel perform patch management, functionality changes, and testing. Security Administrators are responsible for performing audit reviews.

Every new and existing user of TECS is assigned a system control officer. The system control officer is responsible for the user's profile record and assigns the role(s) (i.e., a CBP



Officer) and the accessible service functions (i.e., Secondary Inspection) within that role. CBP manages the assignment of system control officers so that the system control officer may assign only functions that the system control officer has authority to use, as well as authority to assign. User accounts are reviewed periodically and certified annually to ensure that these standards are maintained. TECS actively prevents access to information for which a user lacks authorization, as defined by the user's role in the system, location of duty station, and/or job position. Multiple attempts to access information without proper authorization will cause TECS to suspend access automatically.

The TECS platform automatically generates audit logs that capture all users' activity. Audit logs are captured at the time of logon and throughout the user's session. The audit logs consist of a journal of the user's data requests or queries into the TECS datasets, and contain the user ID, date and time, and the location and activity performed, such as the query terms. These audit logs allow system administrators to respond to "user activity" requests from the CBP Office of Professional Responsibility to investigate abuse of the TECS Platform.

Users are required to have and maintain, at minimum, a background investigation status and successfully complete the TECS Security and Privacy Awareness training annually to gain and retain access and certification to information on the TECS Platform. Additionally, TECS users with access to NCIC, Nlets, and the Nlets interface to the CPIC transaction via TECS must be NCIC-certified by successfully completing NCIC testing and certification every two years. The lack of a current certification trumps all other access and is not granted until recertification is complete. Functions required to perform job duties are reinstated after a user completes the recertification.

TECS users can also be assigned a specific transaction on an as-needed basis. A transaction is a collection of capabilities that update, read, or report on data. TECS users must possess both the authority to run the transaction and the authority to read or update the particular record that transaction attempts to access. Typically, transactions are used for temporary assignments and after the temporary assignment is completed, the user profile is reset in order to remove any transaction that is no longer needed. Access through transactions is further limited according to the specific authorization of each user. For example, two users may run the same transaction specifying the same parameters and get two different results if their access permissions differ. Additionally, a user's ability to add a TECS record is limited entirely by the user's role.

### 8.4 How does the project review and approve information sharing agreements, MOUs, new uses of the information, new access to the system by organizations within DHS and outside?

Long-standing procedures govern access to, or sharing of, information from the TECS Platform. Information sharing agreements/arrangements are drafted by the CBP operational stakeholders (Office of Field Operations, Office of Border Patrol, etc.) in consultation with the Office of Information Technology program managers. Arrangements that involve PII are sent to the CBP Privacy Officer for review and to DHS for final approval in accordance with procedures developed by the DHS Information Sharing Governance Board.

## Responsible Officials

Valerie Isbell
Executive Director, Passenger Systems Program Directorate
Office of Information and Technology
U.S. Customs and Border Protection
(571) 468-3100

John Maulella, Director,
Traveler Entry Programs,
Office of Field Operations,
U.S. Customs and Border Protection
(202) 344-2605

Debra L. Danisek
Acting CBP Privacy Officer
U.S. Customs and Border Protection
(202) 344-1610

## Approval Signature

Original signed copy of file with the DHS Privacy Office.
_____
Jonathan R. Cantor
Acting Chief Privacy Officer
Department of Homeland Security

## Appendix 1. TECS Data and Associated PIAs and SORNs

| Sub-system or Interface | Privacy Act – System of Records Notice – Federal Register | Most Recent Published PIA, available at: www.dhs.gov/privacy | General Comments |
|---|---|---|---|
| **Sub-systems – Data that resides on the TECS Platform and is collected by CBP** | | | |
| Advance Passenger Information System (APIS) | 73 Fed. Reg. 68435 (Nov. 18, 2008) | DHS/CBP/PIA-001(f) - Advanced Passenger Information System (APIS) Update National Counterterrorism Center (NCTC) | |
| Border Crossing Information (BCI) | 78 Fed. Reg. 31958 (May 28, 2013) | DHS/CBP/PIA-004(h) - Beyond the Border Entry/Exit Program Phase III | |
| Non-immigrant Information System (NIIS) - I-94 & I-94W data/query | 73 Fed. Reg. 77739 (Dec. 19, 2009) | DHS/CBP/PIA-016 - U.S. Customs and Border Protection Form I-94 Automation. | |
| Seized Asset and Case Tracking System (SEACATS) | 73 Fed. Reg. 77764 (Dec. 19, 2008) | DHS/CBP/PIA-009 TECS System: CBP Primary and Secondary Processing | |
| **Data that resides on TECS but is not collected by CBP** | | | |
| Interface with U.S. Department of State: American Citizens Record Query System (ACRQ) | 73 Fed. Reg 1660 (Jan. 8, 2008) | See Passport Information Electronic Records System PIA (March 1, 2010), *available at* https://foia.state.gov/_docs/PIA/PassportInfoElecRecordsSystems_PIERS.pdf | Passport and related information provided for border patrol, screening, law enforcement, counterterrorism, and fraud prevention activities.<br><br>ACRQ was formerly the Passport Information Electronic Records System |



| Sub-system or Interface | Privacy Act – System of Records Notice – Federal Register | Most Recent Published PIA, available at: www.dhs.gov/privacy | General Comments |
|---|---|---|---|
| Interface with Non-Federal Entity Data System (NEDS) | 73 Fed. Reg. 43462 (July 25, 2008) | DHS/CBP/PIA-004(e) Procedures for Processing Travel Documents at the Border | Certain States, Native American Tribes, Canadian Provinces and Territories, and other non-Federal Governmental Authorities provide Enhanced Drivers Licenses, Enhanced Tribal Cards, and other identification documents acceptable for travel. |
| Interface with the DHS Watchlist Service to the FBI Terrorist Screening Center (TSC) Terrorist Screening Database | 76 Fed. Reg. 39408 (July 6, 2011) | DHS/ALL/PIA-027(b) Watchlist Service (WLS) Update | In accordance with the Watchlist Service PIA (July 14, 2010), Watchlist information for CBP is maintained in TECS |
| **Data that is accessible through TECS but does not reside on TECS** | | | |
| Nlets (formerly known as the National Law Enforcement Telecommunications System) | NO | DHS/CBP/PIA-009 TECS System: CBP Primary and Secondary Processing | No SORN because this data is owned by the states of the United States, not subject to Privacy Act |
| California Law Enforcement Telecommunications System (CLETS) | NO | DHS/CBP/PIA-009 TECS System: CBP Primary and Secondary Processing | See above |
| Canadian Police Information Center (CPIC) | NO | DHS/CBP/PIA-009 TECS System: CBP Primary and Secondary Processing | No SORN because foreign agencies are not subject to Privacy Act |

**Privacy Impact Assessment**
DHS/CBP/PIA-021 TECS Platform
Page 35

## Appendix 2. TECS Interfaces with Entities External to CBP

| Government Agency or Commercial Organization | Remote System Name or Use | TECS Data Type |
|---|---|---|
| **TECS System-to-System Interfaces with Non-CBP Systems (Inbound)** | | |
| **Commercial** | | |
| ARINC | Carrier APIS determinations | APIS |
| SITA | Carrier APIS determinations | APIS |
| Air Carriers | Carrier APIS determinations | APIS |
| **Department of Defense (DoD)** | | |
| DoD Personnel Research Center (PERSEREC) | Background checks | Encounter data |
| **Department of Homeland Security (DHS)** | | |
| U.S. Immigration and Customs Enforcement (ICE) | Global Enterprise Manager (GEMS), Enforcement Alien Removal Module (EARM), ICE Case Management Modernization Program; Student and Exchange Visitor Information System (SEVIS) | Screening, Lookout |
| U.S. Secret Service | N/A | Screening, Lookout |
| Transportation Security Administration (TSA) | Secure Flight, Terrorist Threat Assessment and Credentialing (TTAC), Crew Vetting Program (CVP); used by Office of Investigations (OI) | Lookout |
| United States Coast Guard (USCG) | APIS determinations | APIS |
| U.S. Citizenship and Immigration Services (USCIS) | Central Index System (CIS), e-Verify, Alien Documentation, Identification, and Telecommunications System (ADIT), Person-Centric Query System (PCQS) | Travel Documents, Lookout, TECS Screening, Certificates of Eligibility |



| Government Agency or Commercial Organization | Remote System Name or Use | TECS Data Type |
|---|---|---|
| **Department of Justice (DoJ)** | | |
| Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) | Used for firearms & firearm purchase, Lookout creation | TECS Screening, Lookout |
| Drug Enforcement Administration (DEA) | Narcotics and Dangerous Drugs Information System (NADDIS) | Lookout |
| Federal Bureau of Investigation (FBI) | International Criminal Police Organization (INTERPOL), National Crime Information Center (NCIC) (person & vehicle), NCIC Interstate Identification Index (III), Terrorist Screening Center (TSC) | APIS, Encounter, TECS Screening, Lookout |
| Department of Labor | Used for Labor Management Standards | Lookout |
| **Department of State (DoS)** | | |
| DoS (Visas) | Immigrant visa transmission from DoS | Travel Documents |
| DoS (Passport Office) | U.S. passport feed from DoS | Travel Documents |
| Bureau of Consular Affairs and Office of Diplomatic Security | Consular Lookout and Support System (CLASS) | Lookout |
| **Department of Treasury** | | |
| Financial Crimes Enforcement Network (FinCEN) | Case Management Information System (CMIS) | Encounter |
| **State & Local** | | |
| International Justice and Public Safety Network (Nlets) | Enhanced Driver's License (EDL) for Michigan, Nlets | Encounter, TECS Screening, Travel Documents, Lookout |
| California Law Enforcement Telecommunications System (CLETS) | CLETS | TECS Screening |
| Washington | EDL for Washington | Travel Documents |



**Privacy Impact Assessment**
DHS/CBP/PIA-021 TECS Platform
Page 37

| Government Agency or Commercial Organization | Remote System Name or Use | TECS Data Type |
|---|---|---|
| New York | EDL for New York | Travel Documents |
| Vermont | EDL for Vermont | Travel Documents |
| Minnesota | EDL for Minnesota | Travel Documents |
| Pascua Yaqui Tribe | Enhanced Tribal Card | Travel Documents |
| Kootenai of Idaho | Enhanced Tribal Card | Travel Documents |
| Seneca Nation | Enhanced Tribal Card | Travel Documents |
| **TECS System-to-System Interfaces with Non-CBP Systems (Outbound)** | | |
| **Commercial** | | |
| ARINC | Carrier APIS determinations | APIS |
| SITA | Carrier APIS determinations | APIS |
| Air Carriers | Carrier APIS determinations | APIS |
| National Insurance Crime Bureau (NICB) | Receipt of vehicle crossing | Encounter (vehicle crossing) |
| **Department of Commerce (DoC)** | | |
| Office of Tourism Information (OTI) | Not Provided | Encounter |
| **Department of Defense (DoD)** | | |
| DoD PERSEREC | Background checks | Encounter |
| **Department of Homeland Security (DHS)** | | |
| DHS Office of Immigration Statistics (OIS) | Not Provided | Encounter |
| ICE | Student and Exchange Visitor Information System (SEVIS), GEMS, ICE Case Management Modernization | Travel Document, Screening |

**Homeland Security**

| Government Agency or Commercial Organization | Remote System Name or Use | TECS Data Type |
|---|---|---|
| National Protection and Programs Directorate (NPPD)-Office of Biometric Identity Management | Automated Biometric Identification System (IDENT) | APIS, Primary, Secondary, Encounter, Travel Document |
| TSA | Secure Flight, TTAC, CVP, OI | APIS, Lookout |
| USCIS | e-Verify, Systematic Alien Verification for Entitlement (SAVE), Computer Linked Application Information Management System (CLAIMS), ADIT, PCQS | Travel Documents (A-Numbers), Encounter, TECS Screening |
| **Department of Justice (DoJ)** | | |
| ATF | Support for firearm purchase | TECS Screening |
| DEA | Use of license plate data | Primary |
| FBI | Used by Foreign Terrorist Tracking Task Force (FTTTF), INTERPOL, NCIC (person & vehicle), III, & TSC | Encounter, TECS Screening, APIS, Primary, Secondary, Lookout |
| **Department of State (DoS)** | | |
| DoS (Passport Office) | U.S. passport feed | Travel documents |
| Bureau of Consular Affairs and Office of Diplomatic Security | CLASS | Lookout |
| **Department of Treasury** | | |
| FinCEN | Supports receipt of Currency & Monetary Instrument Reporting (CMIR) data | Encounter |
| **Other Government Agencies** | | |
| Selective Service | not provided | Encounter |
| **State & Local** | | |
| Nlets | EDL for Michigan, Nlets | Primary, Secondary, TECS Screening, Travel Documents, Lookout |

**Privacy Impact Assessment**
DHS/CBP/PIA-021 TECS Platform
Page 39

| Government Agency or Commercial Organization | Remote System Name or Use | TECS Data Type |
|---|---|---|
| California | CLETS | TECS Screening |
| New York | EDL | Travel Documents |



## Appendix 3. TECS Interfaces with CBP Systems

| Remote System | TECS Data Type |
|---|---|
| **TECS Interfaces with CBP Systems (Inbound)** | |
| ATS-P | APIS |
| ATS-P: Lookout Record Creation (Person) | TECS Screening |
| ATS-P,TF: Immigration Advisory Program (IAP) | Secondary |
| ATS- P,TF: Integrated Search Service (ISS) | TECS Screening |
| ATS-TF: Intelligence & Operations Framework System (IOFS) | TECS Screening |
| ATS-TF: Secured Integrated Government Mainframe Access (SIGMA) | Secondary |
| ATS-L (Vehicle and Person) | Primary, Secondary, Nlets |
| Automated Commercial Environment (ACE) | Lookout |
| **TECS Interfaces with CBP Systems (Outbound)** | |
| **Office of Field Operations** | |
| Office of Field Operations Management Reporting | APIS, Primary, Secondary |
| ATS-P | APIS |
| ATS-P,TF: ISS | TECS Screening |
| ATS-TF: IOFS | TECS Screening |
| ATS-TF: SIGMA | Secondary |
| ATS-L (Vehicle & Person) | Primary, Secondary, Nlets |
| Enterprise Data Warehouse (EDW) | Encounter |
| ACE | Lookout |

**Homeland Security**

### Appendix 4. Partner Government Agencies with Access to TECS

*Last Updated: July 20, 2017*

| Agency | Sub-Agency |
|---|---|
| Federal Reserve Board | N/A |
| Office of the Director of National Intelligence | National Counterterrorism Center |
| Department of Agriculture | Animal and Plant Health Inspection Service |
| Department of Commerce | Bureau of Industry and Security |
| Department of Defense | DOD Office of Inspector General |
| | Special Inspector General for Afghanistan Reconstruction |
| | U.S. Army Criminal Investigation Command (CID)/Major Procurement Fraud Unit (MPFU) |
| Department of Health and Human Services | Food and Drug Administration |
| Department of Justice | Alcohol, Tobacco and Firearms |
| | Drug Enforcement Administration |
| | DEA El Paso Intelligence Center |
| | Interpol |
| | Federal Bureau of Investigation |
| | FBI Information Technology Centers |
| | Office of Human Rights and Special Prosecutions Section |
| | U.S. Marshals Service |
| Department of Labor | Office of Labor Management Standards |
| Department of State | Bureau of Consular Affairs |
| | Office of Diplomatic Security |
| Department of Treasury | Internal Revenue Service (IRS) |
| | Financial Crime Enforcement Network (FinCEN) |
| | IRS Treasury Inspector General for Tax Administration |
| | Bureau of Engraving and Printing |
| | Office of Foreign Assets Control |
| | Office of Intelligence and Analysis |



| Agency | Sub-Agency |
|---|---|
| | Special Inspector General for Troubled Asset Relief Program |
| | IRS Criminal Investigations Division |
| | Office of Inspector General |
| | Alcohol and Tobacco Tax and Trade Bureau (TTB) |
| Social Security Administration | Office of Inspector General |
| U.S. Consumer Product Safety Commission | N/A |
| Department of the Interior | U.S. Fish and Wildlife Service |
| Export-Import Bank of the United States | N/A |

**Homeland Security**

**Appendix 5 - TECS Subsystems and Associated PIAs and SORNs**

*Last Updated: March 7, 2022*

| Subsystem Name | System Description | PIA and SORN Coverage |
|---|---|---|
| Currency and Monetary Instruments Report (CMIR) | The CMIR subsystem is responsible for the collection of all information related to the Department of the Treasury (Treasury) Financial Crimes Enforcement Network (FinCEN) Form 105.<br><br>FinCEN requires persons who physically transport, mail, or ship currency or other monetary instruments in an aggregate amount exceeding $10,000 at one time to or from the United States to complete FinCEN Form 105. FinCEN Form 105 is a Treasury form that travelers transporting currency or other monetary instruments who are subject to the reporting requirement must complete and submit to CBP Officers (CBPOs) upon their arrival in or prior to their departure from the United States. CBP inputs the FinCEN Form 105 into CMIR. CBP personnel as well as enforcement personnel at other agencies, use the system to develop currency-related investigations and to conduct other financial analysis. | **PIA:**<br>• DHS/CBP/PIA-009 TECS System: CBP Primary and Secondary Processing<br>**SORN:**<br>• DHS/CBP-011 TECS, December 19, 2008, 73 FR 77778 |
| Advance Passenger Information System (APIS) | Commercial air, vessel carriers, and private aircraft pilots are required to provide CBP with advance passenger information (to include crew members) traveling by air or sea and arriving in and/or departing from (and, in the case of aircraft crew, overflying) the United States.[52]<br><br>In addition to the mandatory collection from air and commercial vessel carriers, bus, train, ferry, and bridge operators may voluntarily submit this information to CBP.<br><br>This advance passenger information is submitted to CBP via various systems and tools (e.g., the Electronic Advance Passenger Information System (eAPIS) and the U.S. Coast Guard's National Vessel Movement Center's Notice of Arrival and Departure System (NOAD)) that have a direct connection to CBP's APIS. In turn, CBP vets passengers and crew arriving in, transiting through, and departing from (and in the case of crew, overflying) the United States to identify whether the passenger or crewmember poses a risk to border, aviation, vessel, rail, bus, or public security, may be a terrorist or suspected terrorist or affiliated with or | **PIA:**<br>• DHS/CBP/PIA-001 APIS<br>**SORN:**<br>• DHS/CBP-005 APIS, March 13, 2015, 80 FR 13407 |

---

[52] CBP's APIS regulations include 19 CFR 4.7b, 4.64, 122.22, 122.49a, 122.49b, 122.49c, 122.75a, and 122.75b



| | | |
|---|---|---|
| | suspected of being affiliated with terrorists, may be inadmissible, may be a person of interest, or may otherwise be engaged in activity in violation of U.S. law, or the subject of wants or warrants. | |
| Pleasure Boat Reporting System (PBRS) | Pursuant to 19 CFR 4.2, operators of small pleasure vessels, arriving in the United States from a foreign port or place to include any vessel which has visited a hovering vessel or received merchandise outside the territorial sea, are required to report their arrival to CBP immediately. PBRS is a reporting system that allows CBPOs to collect and report on information related to the arrival of pleasure boats and associated travelers into the United States, record vessel enforcement stops, and provide cruising licenses for the boating public. | **PIAs:**<br>• DHS/CBP/PIA-009 TECS System: CBP Primary and Secondary Processing<br>• DHS/CBP/PIA-021 TECS System: Platform<br>• DHS/CBP/PIA-002(b) Global Enrollment System (GES)<br>**SORNs:**<br>• DHS/CBP-007 Border Crossing Information (BCI), December 13, 2016, 81 FR 89957<br>• DHS/CBP-011 TECS, December 19, 2008, 73 FR 77778<br>• DHS/ALL-004 General Information Technology Access Account Records System (GITAARS), November 27, 2012, 77 FR 70792<br>• DHS/CBP-002 GES, January 16, 2013, 78 FR 3441 |
| Private Aircraft Enforcement System (PAES) | PAES is an enforcement tool that is used by CBPOs to track and record aircraft inspection results for general aviation aircraft arriving from and departing for foreign locations. In TECS Modernization, PAES is available through the General Aviation Processing (GAP) module. | **PIAs:**<br>• DHS/CBP/PIA-009 TECS System<br>• DHS/CBP/PIA-001 APIS<br>**SORN:**<br>• SORN not required |
| U.S. Passport Interface | The Travel Document and Encounter Database (TDED) receives U.S. passport information directly from the Department of State (DoS) Passport Office any time a new passport is issued or an existing passport is modified or revoked. The passport information in the TDED is updated in real time by DoS via a feed from the Consular Consolidated Database (CCD).<br><br>CBP uses the passport information to verify the accuracy of | **PIA:**<br>• DHS/CBP/PIA-021 TECS System: Platform<br>**SORNs:**<br>• DHS/CBP-011 TECS, December 19, 2008, 73 FR 77778<br>• DHS/CBP-007 BCI, December 13, 2016, 81 |



**Privacy Impact Assessment**
DHS/CBP/PIA-021 TECS Platform
Page 45

| | | |
|---|---|---|
| | the passport presented by a person seeking entry into the United States, and for identification, targeting, and enforcement activities as authorized by the Memorandum of Understanding between the DoS and CBP. | FR 89957<br>• STATE-26 Passport Records, March 24, 2015, 80 FR 15653[53]<br>• STATE-39, Visa Records, June 15, 2018, 83 FR 28062[54] |
| Traveler Primary Arrival Client (TPAC) | CBPOs use the TPAC application during the primary inspection process at air and sea ports of entry (POEs). TPAC integrates several primary inspection systems so that CBPOs can query, capture, and display biographic and biometric information through one single sign on application. | **PIAs:**<br>• DHS/CBP/PIA-009 TECS System: CBP Primary and Secondary Processing<br>• DHS/CBP/PIA-056 Traveler Verification Service (TVS)<br>**SORNs:**<br>• DHS/CBP-007 BCI, December 13, 2016, 81 FR 89957<br>• DHS/CBP-011 TECS, December 19, 2008, 73 FR 77778<br>• DHS/ALL-004 GITAARS, November 27, 2012, 77 FR 70792 |
| APIS Quick Query (AQQ) | APIS Quick Query (AQQ) is an interactive electronic transmission message syntax that is used by certain air carriers to transmit interactive passenger APIS manifest data to CBP. AQQ messages are typically sent when a passenger checks in for a flight. AQQ messages are sent by air carriers to the DHS Router, described below. | **PIA:**<br>• DHS/CBP/PIA-001 APIS<br>**SORN:**<br>• SORN not required |
| DHS Router | The DHS Router provides air carriers with a single window to transmit required traveler manifest data to DHS to meet both CBP and TSA requirements. The DHS Router sends the data to the Pre-Departures Service (PD) described below, the Automated Targeting System, and to TSA Secure Flight. The HDS router will also send a consolidated message back to the carrier with boarding pass issuance information, based on the results of system checks and vetting conducted CBP and TSA. | **PIA:**<br>• DHS/CBP/PIA-001 APIS<br>**SORN:**<br>• DHS/CBP-005 APIS, March 13, 2015, 80 FR 13407 |
| Portable Automated | PALS serves as a backup and provides redundancy for | **PIAs:** |

[53] https://www.state.gov/wp-content/uploads/2019/05/Passport-Records-STATE-26.pdf
[54] https://www.state.gov/wp-content/uploads/2019/05/Visa-Records-STATE-39.pdf

| Lookout System (PALS) | critical CBP records so that operations may continue even in the event of loss of network connectivity or power outage. | • DHS/CBP/PIA-009 TECS System: CBP Primary and Secondary Processing<br>• DHS/CBP/PIA-040 Seized Assets and Case Tracking System (SEACATS)<br>**SORNs:**<br>• DHS/CBP-011 TECS, December 19, 2008, 73 FR 77778<br>• DHS/CBP-013 SEACATS, December 19, 2008, 73 FR 77764 |
|---|---|---|
| Look Out Records Data and Screening Services (LRDS) | LRDS allows TECS users to create and modify Lookout Records (LRs). Lookout records contain information about people, vehicles, vessels, aircraft, organizations, and other things that may pose a threat, should be subjected to additional scrutiny, or require special processing when presented for inspection or who are encountered between the POEs. LRs are used to vet travelers and alert CBPOs and other agencies when a person of interest crosses or attempts to cross the border. LRs are also used to vet travelers prior to departure. | **PIAs:**<br>• DHS/CBP/PIA-009 TECS System: CBP Primary and Secondary Processing<br>• DHS/CBP/PIA-021 TECS System: Platform<br>**SORN:**<br>• DHS/CBP-011 TECS, December 19, 2008, 73 FR 77778 |
| Primary Lookout Override (PLOR) | The PLOR process is designed to prevent a person who is not the target of a lookout record, but has a similar name or other similar information, from being repeatedly referred for secondary inspection based on that unrelated record.  After a secondary inspection officer determines that the person referred is not the target of a lookout record, he or she can create a PLOR record in TECS, Unified Secondary and ATS UPAX by inputting the passport information for that traveler. At subsequent encounters, the specific lookout record will no longer create a secondary referral for that specific traveler for the TECS record hit. | **PIAs:**<br>• DHS/CBP/PIA-009 TECS System: CBP Primary and Secondary Processing<br>• DHS/CBP/PIA-021 TECS System: Platform<br>**SORN:**<br>• DHS/CBP-011 TECS, December 19, 2008, 73 FR 77778 |
| Integrated Advance Passenger Information System (iAPIS) | CBP uses iAPIS to report on data collected and processed in APIS regarding international air, sea, and rail travelers on entry into and departure from the United States. CBP personnel use create daily iAPIS reports to the APIS community (CBP Office of Field Operations, APIS National Account Managers, and representatives from airlines and the shipping/vessel industry responsible for ensuring APIS | **PIA:**<br>• DHS/CBP/PIA-001 APIS<br>**SORN:**<br>• DHS/CBP-005 APIS, March 13, 2015, 80 FR 13407 |



| | compliance). These reports inform CBP officers of passengers who are missing data, such as date of birth, in their manifest records. iAPIS also compiles reports on the changes made to APIS information by officers or the system itself. Reports are shared with airlines and other vessels to inform them that they are providing incomplete manifests and warn them of penalties. | |
|---|---|---|
| DHS Watch List Service (WLS) | The DHS WLS stores and receives the Terrorist Screening Database (TSDB) from the Terrorist Screening Center (TSC) and disseminates it to various DHS systems. WLS is a system-to-system connection with no direct user interface, and CBP does not manipulate any WLS data.<br><br>CBP maintains a copy of WLS in TECS. WLS records in TECS are accessible and visible to all authorized users. When a TECS user searches for information on a person for whom there is a WLS record, that record is returned along with any other responsive border crossing, encounter, lookout, or enforcement related records. In addition, traveler manifests submitted via APIS are queried against WLS records, and users of the CBP primary inspection clients (e.g., TPAC) are able to view WLS information in TECS. | **PIAs:**<br>• DHS/ALL/PIA-027 DHS Watchlist Service<br>• DHS/CBP/PIA-021 TECS System: Platform<br>**SORNs:**<br>• DHS/CBP-011 TECS, December 19, 2008, 73 FR 77778<br>• DHS/ALL-030 Use of the Terrorist Screening Database System of Records, April 6, 2016, 81 FR 19988 |
| Consolidated Secondary Inspection Service (CSIS) | CSIS is a back-end system that stores records of secondary inspections conducted at POEs. Biographic information gathered during primary inspection, as well as the reason(s) for referral, are forwarded to Unified Secondary from the relevant primary system (including Simplified Arrival, TPAC, U.S. Pedestrian, U.S. Arrival, and the Border Patrol Primary Client) for use by CBP officers. As part of secondary inspections, the CBP officers record what occurred as part of the inspection, such as the type of inspection that was conducted, any issues that were discovered, and the outcome of the inspection. If an officer finds something improper, the officer notes that in Unified Secondary, as the front facing system, and takes appropriate action. As the back-end system, CSIS stores a record of inspection, narrative, and other information entered by CBPOs over the course of processing a secondary inspection. | **PIA:**<br>• DHS/CBP/PIA-009 TECS System: CBP Primary and Secondary Processing<br>**SORN:**<br>• DHS/CBP-011 TECS, December 19, 2008, 73 FR 77778 |
| High Performance Primary Query (HPPQ) | HPPQ is a backend service, used mainly by primary applications (e.g., TPAC) to (1) conduct lookout searches to determine if travelers who present themselves for inspection are subjects of lookout records and, (2) create border crossing records. | **PIAs:**<br>• DHS/CBP/PIA-021 TECS System: Platform<br>• DHS/CBP/PIA-009 TECS System: CBP Primary and Secondary |

**Privacy Impact Assessment**
DHS/CBP/PIA-021 TECS Platform
Page 48

| | | |
|---|---|---|
| | In order to conduct these checks, the primary applications send biographic information on the individual to HPPQ, which searches lookout records and returns any hits. Officers use these results, along with other information gathered during the inspection, to permit a traveler to enter the United States or refer them to secondary inspection. HPPQ also creates border crossing records for all travelers who present themselves at a port of entry. | Processing<br><br>**SORN:**<br>• SORN not required |
| NCIC/Nlets Service (NNSV) | NNSV provides user interface screens via the TECS Portal to perform queries of the following external systems:<br>• FBI National Crime Information Center (NCIC), an index of criminal justice information (i.e., criminal record history information, fugitives, stolen properties, missing persons).<br>• Interstate Identification Index (Triple I (III)), a Federal/State exchange of criminal history record information.<br>• International Justice and Public Safety Network (Nlets), permits law enforcement and criminal justice agencies to access a wide range of information, from standard driver's license and vehicle queries to criminal history and Interpol information. State vehicle registration data from Nlets is ingested into NNSV to assist TECS users in identifying and researching travelers.<br><br>NNSV also provides backend services for system-to-system consumers to request NCIC, Nlets, and III queries. | **PIA:**<br>• DHS/CBP/PIA-021 TECS Platform<br>**SORN:**<br>• DHS/CBP-011 TECS, December 19, 2008, 73 FR 77778 |
| Travel Documents and Encounter Data (TDED) | TDED, which consists of two separate systems, allows CBP to query and/or validate travel documents and encounter data for travelers and conveyances. TDED also provides a modernized Web-based User Interface to support both CBP and external partners in their mission functions.<br><br>The Travel Document database stores all available information on travel documents (e.g., DoS passports and visas, Enhanced Driver's Licenses and Tribal cards). CBP uses the information in the Travel Document database to verify the travel documents presented by travelers.<br><br>When a CBPO encounters a traveler with a non-U.S. issued travel document, the information from that document is transferred into the Travel Document database when the officer inputs it into one of the TECS primary processing applications or confirms the validity of the document information received from other systems (e.g., APIS) at inspection. | **PIA:**<br>• DHS/CBP/PIA-021 TECS System: Platform<br><br>**SORNs:**<br>• DHS/CBP-011 TECS, December 19, 2008, 73 FR 77778<br>• DHS/CBP-007 BCI, December 13, 2016, 81 FR 89957 |



| | | |
|---|---|---|
| | The Encounter Data database collects information on person and vehicle encounters as they cross through POEs and is populated by applications used by CBPOs for travel processing (e.g., person, vehicle, and CMIR records). Information in the Encounter Data database is primarily used by TECS users to view travel history. | |
| CBP Vetting | CBP Vetting is a web portal used by a variety of DHS and other government users to bulk query records located in TECS. For example, a user can search CBP Vetting for a list of license plates they believe are involved in illicit activities. CBP Vetting will return any hits on those records found throughout TECS subsystems, and other DHS and external agency systems connected to TECS, including the CBP Seized Assets and Cases Tracking System (SEACATS), FBI NCIC, FBI Identification Index, Nlets, and INTERPOL. Users are then able to download those records to their workstations for analysis. | **PIAs:**<br>• DHS/CBP/PIA-009(a) TECS System: CBP Primary and Secondary Processing<br>• DHS/CBP/PIA-021 TECS System: Platform<br><br>**SORNs:**<br>• DHS/CBP-007 BCI, December 13, 2016, 81 FR 89957<br>• DHS/CBP-011 U.S. CBP TECS December 19, 2008, 73 FR 77778 |
| Enterprise Reporting System (ERS) | ERS allows users to produce reports based on requests from internal TECS users. These reports pull information stored in TECS, the Electronic System for Travel Authorization (ESTA), Electronic Visa Update System (EVUS), Arrival and Departure Information Systems (ADIS), Global Entry (GE), and Traveler Verification System (TVS) and may include any of the biographic information contained in these data sets. ERS enables CBP officers to monitor activities across POEs and allow officers to track and analyze compliance rates, monitor activity, and enforce regulatory processes. | **PIAs:**<br>• Source system PIAs (e.g., TECS, ESTA, and EVUS)<br>**SORNs:**<br>• Source system SORNs (e.g., TECS, ESTA, and EVUS) |
| Pre-Departure Service (PDS) | The DHS Router sends traveler information to PDS for travel document validation. PDS queries passenger names against the ESTA, EVUS, Visa Verify, and various TECS functions (Primary Query Service, VISA, and Travel Document and Encounter Data (TDED)) in order to verify passenger information submitted through APIS, ensure that they have valid documents, and the proper authorization to travel to the United States. The results of the checks are sent back to DHS Router, which sends the message to TSA who conduct watchlist matching and adds the results to the message which is sent back to the DHS Router and then to the air carrier for them to determine if a boarding pass can | **PIA:**<br>• DHS/CBP/PIA-001 APIS<br>**SORN:**<br>• DHS/CBP-005 APIS, March 13, 2015, 80 FR 13407 |



| | be issued. | |
|---|---|---|
| Automated Passport Control (APC) Services | APC Services enables authorized devices to collect biographic and inspection-related information from travelers. APC Services validates this data and securely transmits it to other federal systems to query for derogatory information. CBP APC Services support two programs: Mobile Passport Control (MPC) and the APC Kiosk System.<br>• With MPC, eligible participants may use an approved mobile application loaded onto their personal smartphone or tablet to expedite the entry process into the United States.<br>• The Kiosk System is: (1) equipment in the form of a kiosk or other CBP approved device that allows a traveler to input data and (2) a server(s) that allows the kiosk to interface with CBP's APC Service for traveler processing. | **PIA:**<br>• DHS/CBP/PIA-051 APC and MPC<br>**SORNs:**<br>• DHS/CBP-011 TECS, December 19, 2008, 73 FR 77778<br>• DHS/CBP-007 BCI, January 25, 2016, 81 FR 4040 |
| Automated License Plate Reader (ALPR) | ALPR allows vehicles and its occupants to pass through POEs quickly and efficiently using automated cameras and RFID travel document readers that provide information to primary inspection applications. Currently, ALPR is implemented at all vehicle inbound lanes at land POEs. Non-RFID capable ALPR systems are located at southern border vehicle outbound lanes and all Border Patrol Checkpoints. | **PIAs:**<br>• DHS/CBP/PIA-009 TECS System: CBP Primary and Secondary Processing<br>• DHS/CBP/PIA-049 CBP License Plate Reader Technology (LPRT)<br>**SORNs:**<br>• DHS/CBP-006 ATS, May 22, 2012, 77 FR 30297<br>• DHS/CBP-007 BCI, December 13, 2016, 81 FR 89957 |
| Land Border Mobile Client (LMC) | LMC is used at checkpoints by Border Patrol Agents and for outbound inspections by CBPOs. LMC has the ability to read (via Optical Character Recognition or via manual data entry) and query vehicle license plates and scan Vehicle Identification Numbers (VIN). LMC can also read passenger travel documents with a Machine Readable Zone (MRZ) and scan a driver's license bar code.<br><br>CBPOs/Agents use the LMC to conduct queries via the | **PIAs:**<br>• DHS/CBP/PIA-009 TECS System: CBP Primary and Secondary Processing<br>• DHS/CBP/PIA-006 Automated Targeting System (ATS)<br>**SORNs:** |

| | Vehicle Primary Application and Integration Services (VPAIS)[55] or the Land Primary Application and Integration Service (LPAIS)[56] depending on the mode of operation. | • DHS/CBP-011 TECS, December 19, 2008, 73 FR 77778<br>• DHS/CBP-007 BCI, December 13, 2016, 81 FR 89957 |
|---|---|---|
| Border Patrol Client (BPC) | BPC is a desktop application that Border Patrol Agents use to process travelers at Border Patrol checkpoints using the information collected from travel documents through RFID scans, swipes of the MRZ on travel documents, or manual entry by Agents. Information collected from travel documents is queried through the LPAIS. | **PIAs:**<br>• DHS/CBP/PIA-009 TECS System: CBP Primary and Secondary Processing<br>• DHS/CBP/PIA-006 ATS<br>**SORN:**<br>• DHS/CBP-011 TECS, December 19, 2008, 73 FR 77778 |
| Vehicle Primary Client (VPC) | VPC is used by CBPOs at land POEs to inspect vehicles and occupants entering the United States. At vehicle primary, the CBPO obtains information from the driver and any passengers within the vehicle via RFID enabled travel documents, a manual swipe of the MRZ of passports, or manual entry and enters it into VPC. This information is then sent through the VPAIS for vetting. VPC creates a Vehicle Package that consists of biographic information on the vehicle, the driver, and any passengers, as well as any license plate reader pictures taken during the crossing. | **PIAs:**<br>• DHS/CBP/PIA-009 TECS System: CBP Primary and Secondary Processing<br>• DHS/CBP/PIA-006 ATS<br>• DHS/CBP/PIA-049 CBP LPRT<br>**SORNs:**<br>• DHS/CBP-011 TECS, December 19, 2008, 73 FR 77778<br>• DHS/CBP-007 BCI, December 13, 2016, 81 FR 89957 |
| License Plate Image Archive (LPIA) | LPIA is a tool that provides CBPOs at land POEs with statistical data for monitoring primary operations. LPIA/ Land Border Web Reporting System (LBWRS) helps ensure the integrity and validity of all license plate data captured by the ALPR system. ALPR captures images from vehicles exiting and entering the United States. These images include license plate, surroundings, driver, and passenger images. | **PIAs:**<br>• DHS/CBP/PIA-009 TECS System: CBP Primary and Secondary Processing<br>• DHS/CBP/PIA-049 CBP LPRT |

---

[55] VPAIS is a service that receives information from the various primary vehicle applications, like VPC, and runs that information through various databases for vetting (e.g., TECS, NCIC, Nlets, and ATS).

[56] LPAIS is a service that receives information from the various primary land applications, like BPC, and runs that information through various databases for vetting. LPAIS queries information from various systems (e.g., TECS, NCIC, Nlets, and ATS). Any hits are returned to the BPC, through LPAIS, for Agent action.





| | | |
|---|---|---|
| | CBP uses the LPIA photographs for quality control checks to ensure that the readers are accurately capturing and transcribing license plate information. LPIA also contains information associated with the crossing, such as driver and passenger biographic information. This information is automatically sent to LPIA from the VPC, Outbound Primary Client (OPC), and the BPC. LPIA provides a variety of reports and statistical data, including lane status, average inspection and response times, and RFID read counts to CBPOs and managers. | **SORN:**<br>• DHS/CBP-007 BCI, December 13, 2016, 81 FR 89957 |
| U.S. Pedestrian (PED) | PED is used by CBPOs to process pedestrians seeking entry into the United States at land border POEs. During the primary inspection, the CBPO enters the traveler's information into PED, which then queries other information stored in TECS. Any hits are returned to the PED for CBPO action. CBPOs will either refer travelers for secondary processing or allow them to enter the United States. If a traveler is referred to secondary inspection, the CBPO uses PED to note why the referral is occurring and the traveler's information is ported over to the CSIS for review by a secondary inspection officer | **PIA:**<br>• DHS/CBP/PIA-009 TECS System: Primary and Secondary Processing<br>**SORNs:**<br>• DHS/CBP-011 TECS, December 19, 2008, 73 FR 77778<br>• DHS/CBP-007 BCI, December 13, 2016, 81 FR 89957 |
| U.S. Arrival (ARR) | ARR is an application that allows travelers crossing at land ports of entry to obtain an I-94 or I-94W (with approved ESTA) if they are not in possession of one. ARR allows CBPOs to perform a document validation and take the required biometrics for the issuance of the I-94. Officers create an I-94 by inputting biographic data, either manually keyed from the travel document or scanning the MRZ of the document, photograph and fingerprints into ARR. Information input in ARR is vetted through TECS (e.g., NCIC and Nlets), ESTA, EVUS, and the Automated Biometric Identification System (IDENT). If no derogatory information is returned, then a final I-94 is created for the traveler. If the vetting finds derogatory information, then hits are returned to ARR and the traveler is referred for further secondary inspection. In addition to creating an I-94, ARR also creates a border crossing record for the traveler. | **PIA:**<br>• DHS/CBP/PIA-009 TECS System: CBP Primary and Secondary Processing (TECS)<br>**SORNs:**<br>• DHS/CBP-016 Nonimmigrant Information System March 13, 2015, 80 FR 13398<br>• DHS/CBP-021 Arrival and Departure Information System (ADIS) November 18, 2015, 80 FR 72081 |
| Enhanced Driver's License (EDL) and Enhanced Tribal Cards (ETCs) | EDLs allow individuals from issuing states and some Canadian Provinces to use RFID-enabled travel documents for expedited land and sea border crossing. ETCs are issued to recognized Native American Indian tribes and nations for the same purpose. EDLs and ETCs are federally-recognized documentation that provide proof of U.S. citizenship and proof of identity. | **PIA:**<br>• DHS/CBP/PIA-004(e) CBP Procedures for Processing Travel Documents at the Border<br>**SORN:**<br>• DHS/CBP-008 Non- |



| | | |
|---|---|---|
| | When a traveler's EDL or ETC is scanned by a CBP RFID reader at a POE, the information is sent to the TDED database to verify authenticity of the EDL or ETC presented, and to run law enforcement checks through TECS and ATS to see if there are any hits which would require further inspection. | Federal Entity Data Systems (NEDS), July 25, 2008, 73 FR 43462 |
| Simplified Arrival (SA) | In 2017, CBP introduced a technical demonstration to reengineer the primary air entry process through the incorporation of advanced facial recognition biometric technologies. The new primary entry solution uses biometrics to initiate a transaction, using facial recognition as the primary biometric verification modality. Historically, travel documents such as passports or visas have been used to verify a traveler's identity, travel history, and any enforcement concerns that may require attention, prior to admission to the United States. This shift from a biographically, document-based system to biometrically-initiated transactions means that the majority of travelers will provide facial biometrics for identity verification purposes. | **PIAs:**<br>• DHS/CBP/PIA-009 TECS System: CBP Primary and Secondary Processing<br>• DHS/CBP/PIA-030 TVS<br>**SORNs:**<br>• DHS/CBP-007 BCI, December 13, 2016, 81 FR 89957<br>• DHS/CBP-006 ATS, May 22, 2012, 77 FR 30297 |



U.S. Department of Homeland Security

# DHS Reinstates Migrant Protection Protocols, Allowing Officials to Return Applicants to Neighboring Countries

**Release Date:** January 21, 2025

WASHINGTON – The Department of Homeland Security (DHS) made the following announcement regarding restarting the Migrant Protection Protocols (MPP) immediately.

On January 25, 2019, Department of Homeland Security (DHS) Secretary Kirstjen Nielsen issued Policy Guidance for Implementation of the Migrant Protection Protocols (the MPP Policy). The MPP Policy is an exercise of the authority granted to DHS pursuant to Section 235(b)(2)(c) of the Immigration and Nationality Act (INA). That authority permits the Secretary of DHS to return certain applicants for admission to the adjoining country from which they are arriving pending the completion of removal proceedings pursuant to Section 240 of the INA.

Between Jan. 20, 2021, and Oct. 29, 2021, Acting Secretary David Pekoske, and later Secretary Alejandro Mayorkas, repeatedly attempted to suspend or terminate the MPP Policy. Following a series of legal actions, Secretary Mayorkas's final attempt to terminate the MPP Policy was stayed by a federal court. *See* Order Granting Stay, *Texas v. Biden*, 2:21-cv-67 (N.D. Tex. Dec. 15, 2022). The Department of Justice, seven months after that stay was entered, voluntarily dismissed the federal government's appeal, acquiescing to keeping the MPP Policy in effect for the foreseeable future. *See Texas v. Biden*, No. 23-10143 (5th Cir. Jul. 17, 2023).

According to representations made by the federal government in court, DHS at all times complied with that court order, but the facts on the ground "render[ed] restarting MPP impossible." Defendants' Supplemental Response Brief at 10, *Texas v. Biden*, 2:21-cv-67 (N.D. Tex. Oct. 6, 2023). The situation at the border has changed and the facts on the ground are favorable to resuming implementation of the 2019 MPP Policy.

## Topics

BORDER SECURITY (/TOPICS/BORDER-SECURITY)

## Keywords

BORDER SECURITY (/KEYWORDS/BORDER-SECURITY)     CUSTOMS AND BORDER PROTECTION (CBP) (/KEYWORDS/CUSTOMS-AND-BORDER-PROTECTION-CBP)
IMMIGRATION ENFORCEMENT (/KEYWORDS/IMMIGRATION-ENFORCEMENT)
MIGRANT PROTECTION PROTOCOLS (MPP) (/KEYWORDS/MIGRANT-PROTECTION-PROTOCOLS-MPP)

Last Updated: 03/21/2025

 **Homeland Security**    Environmental Planning and Historic Preservation Decision Support System

## Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans - Project Approved

## Status

- In Preparation (11/25/2025)
- Environmental Review (11/25/2025)
- Legal Review (11/25/2025)
- Senior Environmental Review (11/25/2025)
- Proponent Review (11/25/2025)
- Project Approved (11/25/2025)

## Project Information

### General

**Name:** Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans

**DSS ID:** DSS-USCIS-2025-24077

**Security:** Unclassified

**Description:** Consistent with the Executive Order 14165, "Securing Our Borders," and for the independent reasons stated in the Federal Register notice, DHS, through this Proposed Action, is terminating the categorical parole programs for aliens from Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras, and their immediate family members, under the Family Reunification Parole (FRP) processes (modernized programs). DHS is also terminating the residual processing of legacy cases under the Cuban Family Reunification Parole program and the Haitian Family Reunification Parole program first implemented by USCIS in 2007 and 2014, respectively (legacy programs). DHS is informing the public of the termination of all nine programs, termination of individual grants of parole under these programs, and revocation of employment authorization.

Upon publication of a notice in the Federal Register, DHS will terminate the FRP programs. Individual grants of parole will terminate 30 days after the date of publication except under the following conditions: (1) the alien filed a Form I-485, Application to Register Permanent Residence or Adjust Status, prior to publication of the notice and remains pending adjudication; or (2) the Secretary of Homeland Security determines otherwise on a case-by-case basis. Aliens without a lawful basis to remain in the United States following termination of parole must depart the United States before the parole termination date.

For the modernized programs, DHS will provide individual notice to each parolee through their myUSCIS account. For legacy program parolees, USCIS will provide individual notice by mail if

Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalan... (Unclassified)

the parolee does not have a myUSCIS account.

DHS is not aware of any significant impact on the environment, or any change in environmental effect that would result from the Proposed Action. DHS finds the Proposed Action clearly fits within categorical exclusion A3 established in the Department's NEPA implementing procedures.

**Funded through IRA?:** No

**Funded through the IIJA?:** No

**Critical Infrastructure?:** No

**Adopting Another Agency CATEX, or CATEX Determination?:** No

**Project Types:**

· Administrative & Regulatory Activities - Promulgation of rules, issuance of rulings or interpretations, and the development and publication of policies, orders, directives, notices, procedures, manuals, advisory circulars, and other guidance documents. (CATEX A3)

· Administrative & Regulatory Activities - Other, Use "Other" to trigger full review

**Mitigation Required?:** No

**Tiering - PEA/PEIS?:** No

**Adopting EA/EIS?:** No

**Requires EA/EIS?:** No

**Project Priority:** Normal

**Federal Assistance:** No

**Estimated Project Cost:** (not entered)

## Component

**Component:** USCIS - U.S. Citizenship and Immigration Services

**Tracking Number:** 2806-25

## Dates

**FY Funding:** 2026

**Proposed Project Start:** 12/29/2025

**Proposed Project End:** On-going

**Review Start:** 11/25/2025

## Project Location

- Nationwide

## Team

- Document Preparer, Bryan Williamson, bryan.j.williamson@uscis.dhs.gov
- Collaborator-Document Preparation, Faisal Akhter, faisal.k.akhter@uscis.dhs.gov
- Environmental Reviewer, Sarah Larkin, sarah.larkin@hq.dhs.gov
- Legal Reviewer, Thomas Rollins, thomas.j.rollins@uscis.dhs.gov
- Senior Environmental Reviewer, Jennifer Hass, jennifer.hass@hq.dhs.gov

Printed 11/30/2025 2:26 PM

FRP-FRN-00590

• Proponent, Mirna Smith, mirna.smith@uscis.dhs.gov

## Categorical Exclusions

• A3 - Promulgation of rules, issuance of rulings or interpretations, and the development and publication of policies, orders, directives, notices, procedures, manuals, advisory circulars, and other guidance documents of the following nature:

(a) Those of a strictly administrative or procedural nature;

(b) Those that implement, without substantive change, statutory or regulatory requirements;

(c) Those that implement, without substantive change, procedures, manuals, and other guidance documents;

(d) Those that interpret or amend an existing regulation without changing its environmental effect;

(e) Technical guidance on safety and security matters; or,

(f) Guidance for the preparation of security plans.

## Required Conditions

1. Any change to the Proposed Action that may cause a physical interaction with the human environment will require re-evaluation for compliance with NEPA and other EP&HP requirements before the action can proceed.

2. This review addresses NEPA and other EP&HP requirements as described in DHS Directive 023-01. This review may identify the need for additional federal, state, and/or local permits, approvals, etc. required for the Proposed Action. However, this review may not satisfy those requirements and the Proponent is responsible for ensuring that all other appropriate federal, state, and/or local permits, approvals, etc. have been obtained.

## Decision Documents

• Memorandum For Record (MFR), 6.13kB

## Attachments

• There are no attachments.

## Comments

• Bryan Williamson, The Proposed Action is a stand-alone administrative or procedural action with no construction or ground disturbing activities. (11/25/2025 11:47:19)

• Bryan Williamson, The Proposed Action is a stand-alone administrative or procedural action with no construction or ground disturbing activities. (11/25/2025 11:46:47)

FRP-FRN-00591

- Bryan Williamson, The Proposed Action is strictly administrative or procedural in nature and limited to DHS. (11/25/2025 11:46:25)
- Bryan Williamson, The Proposed Action is administrative or procedural in nature and is not anticipated to have any associated construction or ground disturbing activities. The Federal action has no potential to impact Native American graves or objects of cultural patrimony. (11/25/2025 11:46:12)
- Bryan Williamson, Although the Proposed Action is related to President Trump's directive to terminate all categorical parole programs, consistent with applicable law, the Proposed Action is an independent action that falls within the Department's statutory authority to administer the nation's immigration system. The Proposed Action is independent in nature and is consistent with other Department actions related to the enforcement of the nation's immigration laws. The Proposed Action, nor any other related parole termination, has individually insignificant but cumulatively significant impacts. (11/25/2025 11:43:19)
- Bryan Williamson, The Proposed Action is not anticipated to have any direct or indirect impacts that would result in the significant degradation of existing poor environmental conditions. The Proposed Action will not initiate a potentially significant environmentally degrading influence, activity, or effect in areas not already significantly modified from their natural condition.  (11/25/2025 11:42:40)
- Bryan Williamson, The Proposed Action is not significantly greater in scope or size than normally experienced for this category of action. (11/25/2025 11:42:25)
- Bryan Williamson, Although the Proposed Action is related to President Trump's directive to terminate all categorical parole programs, consistent with applicable law, the Proposed Action is an independent action that will not establish precedent for future action with significant effects. Additionally, future DHS major federal actions will be evaluated in accordance with Directive 023-01 rev 01 and Instruction 023-01-001-01 rev 01 for compliance with the National Environmental Policy Act. (11/25/2025 11:42:12)
- Bryan Williamson, The Proposed Action is administrative or procedural in nature and does not involve any new or unproven technology. (11/25/2025 11:41:46)
- Bryan Williamson, The Proposed Action is not anticipated to affect the quality of the human environment in any way that is likely to be highly controversial in terms of scientific validity, be highly uncertain, or involve unique or unknown environmental risks. (11/25/2025 11:41:29)
- Bryan Williamson, The Proposed Action is not anticipated to result in a violation of Federal, state, or local law or requirement imposed to protect the environment. The Proposed Action is administrative or procedural in nature with no construction or ground disturbing activities. (11/25/2025 11:41:13)
- Bryan Williamson, The Proposed Action is a stand-alone administrative or procedural action with no construction or ground disturbing activities. The Proposed Action is not anticipated to have potentially significant effects on environmentally sensitive areas such as prime or unique agricultural lands, coastal zones, designated wilderness study areas, wild and scenic rivers, 100-year floodplains, wetlands, sole source aquifers, Marine Sanctuaries, National Wildlife Refuges, National Parks,

FRP-FRN-00592

National Monuments, or other protected lands. No significant direct or indirect impacts to environmentally sensitive areas are anticipated as a result of the Proposed Action. (11/25/2025 11:37:34)

- Bryan Williamson, No effect on the resources covered by the Magnuson-Stevens Fishery Conservation and Management Act (essential fish habitat) is anticipated as a result of the Proposed Action. (11/25/2025 11:33:09)

- Bryan Williamson, The Proposed Action is an administrative or procedural action and is not anticipated to have a potentially significant effect on species or habitats protected under ESA, MMPA, MBTA, BGEPA, or MSFCMA. The Proposed Action has no anticipated direct effects to protected species or their habitat.

  DHS has no reason to believe that the termination of the FRP programs will violate the ESA, MMPA, MBTA, BGEPA, or MSFCMA.
  (11/25/2025 11:32:35)

## EPHP Review

### Environmental Resources

- Is the Proposed Action a piece of a larger action or connected to another action? -- No
  Please explain how you came to this determination. : The Proposed Action is a stand-alone administrative or procedural action to terminate all nine FRP programs, terminate parole for aliens under these programs, and revoke any related employment authorization.

  While this Proposed Action complements other USCIS policy efforts, it is not dependent on any other action, nor does it trigger any subsequent action.

- Will the Proposed Action have a potentially significant effect on public health or safety? Areas to consider include, but are not limited to: air quality; noise impacts; hazardous wastes and/or contamination; wastewater; potable water; and changes in modes or safety of transportation. -- No
  Explain how the proposed action would not have a potentially significant effect on public health or safety. : There are no anticipated potentially significant direct or indirect environmental effects to public health or safety associated with the Proposed Action. The Proposed Action does not include any construction or ground disturbing activities. The Proposed Action is not anticipated to have any significant effects on air quality, noise levels, hazardous wastes and/or contamination, wastewater, potable water, or changes in modes or safety of transportation.

- Will the Proposed Action have a potentially significant effect on species or habitats protected by the Endangered Species Act, Marine Mammal Protection Act, Migratory Bird Treaty Act, Bald and Golden Eagle Protection Act, or Magnuson-Stevens Fishery Conservation and Management Act? -- No

Attachments:  FWS, NMFS, or Wildlife Agency Consultation:  (No files uploaded yet.)
Comments:

Bryan Williamson, The Proposed Action is an administrative or procedural action and is not anticipated to have a potentially significant effect on species or habitats protected under ESA, MMPA, MBTA, BGEPA, or MSFCMA. The Proposed Action has no anticipated direct effects to protected species or their habitat.

DHS has no reason to believe that the termination of the FRP programs will violate the ESA, MMPA, MBTA, BGEPA, or MSFCMA.
(11/25/2025 11:32:35)

- What is your Endangered Species Act (ESA) finding and determination? -- No effect
  Explain how the determination was made (e.g., are species present in the area but your proposed action will have no effect? why?). Although not required, recommend attaching any consultation or correspondence conducted.: The Proposed Action is an administrative action and is not anticipated to have potential impacts on species or habitats protected under the Endangered Species Act (ESA). There are no anticipated direct or indirect effects to species protected under the ESA or their habitat as a result of the Proposed Action. As the Proposed Action is administrative or procedural in nature, it is not anticipated to have impacts on ESA listed species or habitat, DHS has determined a "no effect" finding is appropriate for this action.
  Attachments:  ESA consultation:  (No files uploaded yet.)

- What is your Marine Mammal Protection Act (MMPA) finding and determination? -- No effect or negligible effect
  Explain how the determination was made (e.g., are species present in the area but your proposed action will have no effect or negligible effects? why?). Although not required, recommend attaching any consultation or correspondence conducted.: The Proposed Action is an administrative or procedural action, and it is not anticipated to have potential impacts on species or habitats protected under the Marine Mammal Protection Act (MMPA). There are no anticipated direct or indirect effects to species protected under the MMPA or their habitat as a result of the Proposed Action. As the Proposed Action is administrative or procedural in nature, it is not anticipated to have impacts on MMPA protected species or habitat, DHS has determined a "no effect or negligible effect" finding is appropriate for this action.
  Attachments:  MMPA consultation:  (No files uploaded yet.)

- Would the proposed action adversely affect a species protected under the Bald and Golden Eagle Protection Act or Migratory Bird Treaty Act or habitat for such species?  -- No
  Explain how the determination was made (e.g., are species present in the area but your proposed action will have no adverse effect or no significant effect? why?). Although not required, recommend attaching any consultation or correspondence conducted.: The Proposed Action is an administrative or procedural action and is not anticipated to adversely impact species or habitats

FRP-FRN-00594

protected under the Bald and Golden Eagle Protection Act (BGEPA) or Migratory Bird Treaty Act (MBTA). There are no anticipated direct or indirect adverse effects to species protected under the BGEPA or MBTA or their habitat as a result of the Proposed Action.

Attachments:  BGEPA MBTA consultation:  (No files uploaded yet.)

- What is your Magnuson-Stevens Fishery Conservation and Management Act (essential fish habitat) finding and determination? -- No effect

Attachments:  EFH consultation:  (No files uploaded yet.)

Comments:

Bryan Williamson, No effect on the resources covered by the Magnuson-Stevens Fishery Conservation and Management Act (essential fish habitat) is anticipated as a result of the Proposed Action. (11/25/2025 11:33:09)

- Will the Proposed Action have a potentially significant effect on an environmentally sensitive area? Examples include, but are not limited to: areas having special designation or recognition such as prime or unique agricultural lands, coastal zones, designated wilderness study areas, wild and scenic rivers, 100-year floodplains, wetlands, sole source aquifers, Marine Sanctuaries, National Wildlife Refuges, National Parks, National Monuments, etc.  -- No resources present

Comments:

Bryan Williamson, The Proposed Action is a stand-alone administrative or procedural action with no construction or ground disturbing activities. The Proposed Action is not anticipated to have potentially significant effects on environmentally sensitive areas such as prime or unique agricultural lands, coastal zones, designated wilderness study areas, wild and scenic rivers, 100-year floodplains, wetlands, sole source aquifers, Marine Sanctuaries, National Wildlife Refuges, National Parks, National Monuments, or other protected lands. No significant direct or indirect impacts to environmentally sensitive areas are anticipated as a result of the Proposed Action. (11/25/2025 11:37:34)

- Will the Proposed Action result in the potential violation of a Federal, State, or local law or requirement imposed to protect the environment? -- No

Comments:

Bryan Williamson, The Proposed Action is not anticipated to result in a violation of Federal, state, or local law or requirement imposed to protect the environment. The Proposed Action is administrative or procedural in nature with no construction or ground disturbing activities. (11/25/2025 11:41:13)

- Will the Proposed Action have an effect on the quality of the human environment that is likely to be highly controversial in terms of scientific validity, likely to be highly uncertain, or likely to involve unique or unknown environmental risks?  -- No

Comments:

Bryan Williamson, The Proposed Action is not anticipated to affect the quality of the human environment in any way that is likely to be highly controversial in terms of scientific validity, be highly uncertain, or involve unique or unknown environmental risks. (11/25/2025 11:41:29)

- Will the Proposed Action employ new or unproven technology that is likely to involve unique or unknown environmental risks, where the effect on the human environment is likely to be highly uncertain, or where the effect on the human environment is likely to be highly controversial in terms of scientific validity?  -- No
Comments:
Bryan Williamson, The Proposed Action is administrative or procedural in nature and does not involve any new or unproven technology. (11/25/2025 11:41:46)

- Will the Proposed Action establish a precedent for future actions that have significant effects? -- No
Comments:
Bryan Williamson, Although the Proposed Action is related to President Trump's directive to terminate all categorical parole programs, consistent with applicable law, the Proposed Action is an independent action that will not establish precedent for future action with significant effects. Additionally, future DHS major federal actions will be evaluated in accordance with Directive 023-01 rev 01 and Instruction 023-01-001-01 rev 01 for compliance with the National Environmental Policy Act. (11/25/2025 11:42:12)

- Is the Proposed Action significantly greater in scope or size than normally experienced for its particular category of action? -- No
Comments:
Bryan Williamson, The Proposed Action is not significantly greater in scope or size than normally experienced for this category of action. (11/25/2025 11:42:25)

- Will the Proposed Action have the potential to result in the significant degradation of existing poor environmental conditions? Will the Proposed Action initiate a potentially significant environmentally degrading influence, activity, or effect in areas not already significantly modified from their natural condition? -- No
Comments:
Bryan Williamson, The Proposed Action is not anticipated to have any direct or indirect impacts that would result in the significant degradation of existing poor environmental conditions. The Proposed Action will not initiate a potentially significant environmentally degrading influence, activity, or effect in areas not already significantly modified from their natural condition.  (11/25/2025 11:42:40)

- Is the Proposed Action related to other actions with individually insignificant but cumulatively significant impacts?  -- No
Comments:
Bryan Williamson, Although the Proposed Action is related to President Trump's directive to terminate all categorical parole programs, consistent with applicable law, the Proposed Action is an independent action that falls within the Department's statutory authority to administer the nation's immigration system. The Proposed Action is independent in nature and is consistent with other Department actions related to the enforcement of the nation's immigration laws. The Proposed

FRP-FRN-00596

Action, nor any other related parole termination, has individually insignificant but cumulatively significant impacts. (11/25/2025 11:43:19)

- Are there any other requirements for the protection of the environment that need to be considered for this proposed action?  -- No

## Historic Preservation & Cultural Resources

- Will the proposed action have a potentially significant effect on a district, highway, structure, or object that is listed, or eligible for listing, on the National Register of Historic Places, a historic or cultural resource, traditional or sacred site, or result in the destruction of a significant scientific, cultural, or historic resource? -- No

  Please explain how you came to this determination.: The Proposed Action is not anticipated to have a potentially significant effect on a district, highway, structure, or object that is listed, or eligible for listing, on the National Register of Historic Places, a historic or cultural resource, traditional or sacred site, or result in the destruction of a significant scientific, cultural, or historic resource.

- Have you consulted with the appropriate federally-recognized tribe(s), including Native Alaskan Communities, and Native Hawaiian Organizations?  -- No

  Please explain why Tribal consultation was not initiated/held. : The Proposed Action is administrative or procedural in nature and is not anticipated to have any associated construction or ground disturbing activities. The Federal action is not anticipated to have any potential to affect federally-recognized tribe(s), including Native Alaskan Communities, and Native Hawaiian Organizations.

  ** This question should be carefully checked by the Environmental Reviewer.

- Does the proposed action limit access to, and/or ceremonial use of, Indian sacred sites on federal lands by Indian religious practitioners, and/or adversely affect the physical integrity of such sites?  -- No

  Please explain how you came to this determination.: The Proposed Action will not limit access to, and ceremonial use of, Indian sacred sites on federal lands, by Indian religious practitioners, and/or adversely affect the physical integrity of such sites.

- Does the proposed undertaking have the potential to impact Native American graves or objects of cultural patrimony?  -- No

  Comments:

  Bryan Williamson, The Proposed Action is administrative or procedural in nature and is not anticipated to have any associated construction or ground disturbing activities. The Federal action has no potential to impact Native American graves or objects of cultural patrimony. (11/25/2025 11:46:12)

- Will the proposed undertaking occur on non-DHS federal lands or within/on a non-DHS federally owned facility?  -- No

  Comments:

  Bryan Williamson, The Proposed Action is strictly administrative or procedural in nature and limited

FRP-FRN-00597

to DHS. (11/25/2025 11:46:25)

- Does the proposed undertaking require any ground disturbing activities?  -- No
  Comments:
  Bryan Williamson, The Proposed Action is a stand-alone administrative or procedural action with no construction or ground disturbing activities. (11/25/2025 11:46:47)
- Will the proposed undertaking take place entirely within or on an existing building or structure?  -- Yes
  Comments:
  Bryan Williamson, The Proposed Action is a stand-alone administrative or procedural action with no construction or ground disturbing activities. (11/25/2025 11:47:19)
- Are there any historic properties eligible for or listed on the National Register of Historic Places (NRHP) present within the Area of Potential Effect (APE)?  -- No
  Please explain why no historic properties are located within the APE (i.e., survey was conducted but there were no historic-age resources, survey was conducted but all resources were ineligible, no survey was conducted, etc.).: The Proposed Action is strictly administrative or procedural in nature with no construction or ground disturbing activities within the Area of Potential Effect.
- What is the DHS effects determination of the proposed undertaking on historic property(ies)?  -- No Potential to Effect
  This determination is not used often, and typically means the undertaking is a type of activity that does not have the potential to cause effects to historic properties, assuming such historic properties were present.: The Proposed Action is strictly administrative or procedural in nature with no associated construction or ground disturbing activities. The Federal action has no potential to affect historic properties listed or eligible for listing under the National Historic Preservation Act. No survey was conducted as the Proposed Action does not have any associated construction or ground disturbing activities. The Federal action has no potential to affect historic properties listed or eligible for listing under the National Historic Preservation Act.
  ** This question should be carefully checked by the Environmental Reviewer.
- Has the State Historic Preservation Office (SHPO)/Tribal Historic Preservation Office (THPO) concurred with the DHS Section 106 effect determination?  -- SHPO/THPO concurrence has not been requested
  Please explain why SHPO/THPO concurrence was not requested and how you complied with Section 106.: The Proposed Action is strictly administrative or procedural in nature with no associated construction or ground disturbing activities. The Federal action has no potential to affect historic properties listed or eligible for listing under the National Historic Preservation Act.
  ** This question should be carefully checked by the Environmental Reviewer.
- Have any other consulting parties provided comments on this undertaking?  -- No
- Is there a Section 106 agreement document associated with this undertaking?  -- No

FRP-FRN-00598

## Tribal Consultations

**Tribal Consultation Initiated:** No

**Tribal Consultation not initiated explanation:** The Proposed Action is a stand-alone administrative or procedural action to terminate all nine FRP programs, terminate parole for aliens under these programs, and revoke any related employment authorization.

The Proposed Action is strictly administrative or procedural in nature and does not have any associated construction or ground disturbing activities. The Federal action has no potential to substantially, directly affect tribal equities per DHS Tribal policy.

# DHS Record of Environmental Consideration (REC)
# for Categorically Excluded Actions under NEPA

| INTRODUCTION |
|---|
| The purpose of this Record of Environmental Consideration (REC) is to provide a record that the potential for impacts to the quality of the human environment has been considered in the decision to implement the Proposed Action described below, in accordance with the National Environmental Policy Act of 1969 (NEPA) and DHS Directive 023-01 and Instruction Manual 023-01-001-01 on implementation of NEPA.  DHS integrates the NEPA process with review and compliance requirements under other Federal laws, regulations, Executive Orders, and other requirements for the stewardship and protection of the human environment, as reflected in Section II (8) of this REC.  Signature of the DHS Proponent on this REC demonstrates that they have considered the potential for impacts to the human environment in their decision to implement the Proposed Action as required by NEPA, and are committing to any conditions listed in Section IV of this REC that may be required for implementation of the project. When completed, the form is to be signed by the Preparer, the Environmental Approver, and the Action Proponent. The completed REC becomes a part of the administrative record for the Proposed Action. |

| SECTION I - Description of Proposed Action |
|---|
| 1.  Name of Component Authorizing the Proposed Action:<br><br>U.S. Citizenship and Immigration Services |
| 2.  Title of Proposed Action:<br><br>Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans |
| 3.  Identifying Number of Proposed Action:<br><br>DSS-USCIS-2025-24077 |
| 4.  Estimated Start Date and Useful Life of Proposed Action:<br><br>Start Date: 12/29/2025 - End Date: On-Going |
| 5.  Location of Proposed Action:<br><br>Nationwide |

FRP-FRN-00600

6. Description of Proposed Action:

Consistent with the Executive Order 14165, "Securing Our Borders," and for the independent reasons stated in the Federal Register notice, DHS, through this Proposed Action, is terminating the categorical parole programs for aliens from Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras, and their immediate family members, under the Family Reunification Parole (FRP) processes (modernized programs). DHS is also terminating the residual processing of legacy cases under the Cuban Family Reunification Parole program and the Haitian Family Reunification Parole program first implemented by USCIS in 2007 and 2014, respectively (legacy programs). DHS is informing the public of the termination of all nine programs, termination of individual grants of parole under these programs, and revocation of employment authorization.

Upon publication of a notice in the Federal Register, DHS will terminate the FRP programs. Individual grants of parole will terminate 30 days after the date of publication except under the following conditions: (1) the alien filed a Form I-485, Application to Register Permanent Residence or Adjust Status, prior to publication of the notice and remains pending adjudication; or (2) the Secretary of Homeland Security determines otherwise on a case-by-case basis. Aliens without a lawful basis to remain in the United States following termination of parole must depart the United States before the parole termination date.

For the modernized programs, DHS will provide individual notice to each parolee through their myUSCIS account. For legacy program parolees, USCIS will provide individual notice by mail if the parolee does not have a myUSCIS account.

DHS is not aware of any significant impact on the environment, or any change in environmental effect that would result from the Proposed Action. DHS finds the Proposed Action clearly fits within categorical exclusion A3 established in the Department's NEPA implementing procedures.

## SECTION II - Analysis of Extraordinary Circumstances

7. ☒ Proposed Action is not a piece of a larger action

☐ Proposed Action is a piece of a larger action

Remarks:

## 8. For A through K, check the appropriate box and provide an explanation when appropriate. Include a summary of any coordination or consultation that occurred with a resource or regulatory agency, if relevant.

| ☐ ☒<br>Yes No | A. Will the Proposed Action have a potentially significant effect on public health or safety? |
|---|---|
| | Remarks: |

| ☐ ☒<br>Yes No | B. Will the Proposed Action have a potentially significant effect on species or habitats protected by the Endangered Species Act, Marine Mammal Protection Act, Migratory Bird Treaty Act, Bald and Golden Eagle Protection Act, or Magnuson-Stevens Fishery Conservation and Management Act? |
|---|---|
| | Remarks: |

| ☐ ☒<br>Yes No | C. Will the Proposed Action have a potentially significant effect on a district, highway, structure, or object that is listed or eligible for listing on the National Register of Historic Places (NRHP)? Will the Proposed Action have a potentially significant effect on a historic or cultural resource, traditional or sacred site, or result in the destruction of a significant scientific, cultural, or historic resource? |
|---|---|
| | Remarks: |

| ☐ ☒<br>Yes No | D. Will the Proposed Action have a potentially significant effect on an environmentally sensitive area? |
|---|---|
| | Remarks: |

| ☐ ☒<br>Yes No | E. Will the Proposed Action result in the potential violation of a Federal, State, or local law or requirement imposed to protect the environment? |
|---|---|
| | Remarks: |

FRP-FRN-00601

| | | |
|---|---|---|
| ☐ Yes | ☒ No | F. Will the Proposed Action have an effect on the quality of the human environment that is likely to be highly controversial in terms of scientific validity, likely to be highly uncertain, or likely to involve unique or unknown environmental risks? |

Remarks:

| | | |
|---|---|---|
| ☐ Yes | ☒ No | G. Will the Proposed Action employ new or unproven technology that is likely to involve unique or unknown environmental risks, where the effect on the human environment is likely to be highly uncertain, or where the effect on the human environment is likely to be highly controversial in terms of scientific validity? |

Remarks:

| | | |
|---|---|---|
| ☐ Yes | ☒ No | H. Will the Proposed Action establish a precedent for future actions that have significant effects? |

Remarks:

| | | |
|---|---|---|
| ☐ Yes | ☒ No | I. Is the Proposed Action significantly greater in scope or size than normally experienced for its particular category of action? |

Remarks:

| | | |
|---|---|---|
| ☐ Yes | ☒ No | J. Does the Proposed Action have the potential to result in significant degradation of existing poor environmental conditions? Will the Proposed Action initiate a potentially significant environmentally degrading influence, activity, or effect in areas not significantly modified from their natural condition? |

Remarks:

| | | |
|---|---|---|
| ☐ Yes | ☒ No | K. Is the Proposed Action related to other actions with individually insignificant but cumulatively significant impacts? |

Remarks:

## SECTION III - Categorical Exclusion (CATEX) Determination

9. This action is not expected to result in any significant adverse environmental impacts as described in the National Environmental Policy Act of 1969 (NEPA). The proposed action has been thoroughly reviewed by the U.S. Citizenship and Immigration Services and it has been determined, by the undersigned, that this action is categorically excluded under current DHS CATEX **A3;** from further environmental documentation, in accordance with Section 3 of DHS Directive 023-01, Environmental Planning Program since implementation of this action:

   I.  Clearly fits within one or more of the categories of excludable actions listed in Appendix A of DHS Instruction 023-01-001-01;
   II. Is not a piece of a larger action which has been segmented into smaller parts in order to avoid a more extensive evaluation of the potential for significant environmental impacts;
   III. Does not involve any extraordinary circumstances, as defined in DHS Instruction 023-01-001-01, Section V(B)(2), that would create the potential for a normally excluded action to have a significant environmental effect.

## SECTION IV - Conditions

10. The following conditions are required to implement the Proposed Action:

☒ Any change to the Proposed Action that may cause a physical interaction with the human environment will require re-evaluation for compliance with NEPA and other EP&HP requirements before the action can proceed.

☒ This review addresses NEPA and other EP&HP requirements as described in DHS Directive 023-01. This review may identify the need for additional federal, state, and/or local permits, approvals, etc. required for the Proposed Action. However, this review may not satisfy those requirements and the Proponent is responsible for ensuring that all other appropriate federal, state, and/or local permits, approvals, etc. have been obtained.

DHS is aware of the November 12, 2024 decision in Marin Audubon Society v. Federal Aviation Administration, No. 23-1067 (D.C. Cir. Nov. 12, 2024). To the extent that a court may conclude that the Council on Environmental Quality (CEQ) regulations implementing NEPA are not judicially enforceable or binding on this agency action, DHS has nonetheless elected to follow those regulations at 40 C.F.R. Parts 1500–1508, in addition to the Department's procedures/regulations implementing NEPA in Instruction 023-01-001, rev. 01, "Implementation of NEPA" to meet the agency's obligations under NEPA, 42 U.S.C. §§ 4321 et seq.

## SECTION V - Signatures

### 11a. Preparer of this REC

| Name:<br><br>Bryan Williamson | Digitally signed by Bryan Williamson at 11/25/2025 11:48 AM<br><br>*Bryan Williamson* | Date:<br><br>11/25/2025 |
|---|---|---|

### 11b. Environmental Approver of this REC

| Name:<br><br>Jennifer Hass | Digitally signed by Jennifer Hass at 11/25/2025 1:25 PM<br><br>*Jennifer Hass* | Date:<br><br>11/25/2025 |
|---|---|---|

### 11c. Action Proponent

| Name:<br><br>Mirna Smith | Digitally signed by Mirna Smith at 11/25/2025 1:26 PM<br><br>*Mirna Smith* | Date:<br><br>11/25/2025 |
|---|---|---|

Case 1:25-cv-10495-IT    Document 246-1    Filed 01/13/26    Page 610 of 1448

Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans,

## Preview of Attachments

The following pages will display this project's attachments that are of these file types:

- .jpg /.jpeg
- .png
- .gif
- .txt
- .pdf

The attachments of compatible file types from this project are:

**Note:**

All project attachments can be downloaded at the 'File Upload/Manage Attachments' page.

FRP-FRN-00604



U.S. Department of Homeland Security

# System of Records Notices (SORNs)

A system of records is a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifier assigned to the individual. The Privacy Act requires each agency to publish notice of its systems of records in the Federal Register. This notice is generally referred to as a System of Records Notice or SORN.

All DHS SORNs are listed here, based on the source or DHS Component.

⤢ Close all    ⤢ Open all

## Government Wide

- EEOC/GOVT-1 Equal Employment Opportunity in the Federal Government Complaint and Appeal Records (https://www.gpo.gov/fdsys/pkg/FR-2002-07-30/html/02-18895.htm), July 30, 2002, 67 FR 49338
- DHS/FEMA/GOVT-001 National Defense Executive Reserve System of Records (https://www.federalregister.gov/documents/2013/11/21/2013-27894/privacy-act-of-1974-department-of-homeland-security-federal-emergency-management-agency-federal), (https://www.dhs.gov/now-leaving?external_url=https%3A%2F%2FFederal%20Register%20%3A%3A%20Privacy%20Act%20of%201974%3B%20Department%20of%20Homeland%20Security%2C%20Federal%20... 001%20National%20Defense%20Executive%20Reserve%20System%20of%20Records%2C%20November%2021%2C%202013%2C%2078%2069861&back_url=https%3A%2F%2F... records-notices-soms) November 21, 2013, 78 69861
- GSA/GOVT-2 Employment Under Commercial Activities Contracts, (https://tile.loc.gov/storage-services/service/ll/fedreg/fr048/fr048029/fr048029.pdf) February 10, 1983, 48 FR 6176
- GSA/GOVT-3 Travel Charge Card Program, (http://www.gpo.gov/fdsys/pkg/FR-2013-04-03/html/2013-07669.htm) April 3, 2013, 78 FR 20108
- GSA/GOVT-4 Contracted Travel Services Program (http://www.gpo.gov/fdsys/pkg/FR-2009-06-03/html/E9-12951.htm), June 3, 2009, 74 FR 26700
- GSA/GOVT-5 Access Certificates for Electronic Services (ACES) (http://www.gpo.gov/fdsys/pkg/FR-1999-05-28/html/99-13636.htm) - Access Certificates for Electronic Services (ACES) May 28, 1999, 64 FR 29032, as modified by 73 FR 22380 (https://www.federalregister.gov/documents/2008/04/25/E8-8886/privacy-act-of-1974-notice-of-updated-systems-of-records) (April 25, 2008)
- GSA/GOVT-6 GSA SmartPay Purchase Charge Card Program (https://www.gpo.gov/fdsys/pkg/FR-2006-11-03/html/E6-18600.htm), November 3, 2006 71 FR 64707, as modified by 73 FR 22376 (https://www.federalregister.gov/documents/2008/04/25/E8-8883/privacy-act-of-1974-notice-of-updated-systems-of-records) (April 25, 2008)
- GSA/GOVT-7 Personal Identity Verification Identity Management System (PIV IDMS), (http://www.gpo.gov/fdsys/pkg/FR-2006-09-28/html/E6-15901.htm) September 28, 2006, 71 FR 56983, as modified by 80 FR 64416 (https://www.federalregister.gov/documents/2015/10/23/2015-26940/privacy-act-of-1974-notice-of-an-updated-system-of-records) (October 23, 2015)
- GSA/GOVT-9 System for Award Management (SAM) (https://www.federalregister.gov/documents/2013/02/19/2013-03743/privacy-act-of-1974-notice-of-new-system-of-records), February 19, 2013, 78 FR 11648
- DOL/GOVT-1 Office of Worker's Compensation Programs, Federal Employees' Compensation Act File (https://www.gpo.gov/fdsys/pkg/FR-2012-01-11/html/2012-345.htm) January 11, 2012, 77 FR 1738, as modified by 81 FR 25776 (https://www.federalregister.gov/documents/2016/04/29/2016-09510/privacy-act-of-1974-publication-in-full-of-all-notices-of-systems-of-records-including-several-new) (April 29, 2016)
- DOL/GOVT-2 Job Corps Student Records (https://www.gpo.gov/fdsys/pkg/PAI-2005-LABOR/html/PAI-2005-LABOR.html), April 8, 2002, 67 FR 16815
- DOT/ALL-8 Employee Transportation Facilitation (http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=2000_register&docid=00-8505-filed), April 11, 2000, 65 FR 19475, as modified by 80 FR 64493 (https://www.federalregister.gov/documents/2015/10/23/2015-26974/privacy-act-of-1974-department-of-transportationall-8-parking-and-transit-benefit-system) (October 23, 2015)
- MSPB/GOVT-1 Appeals and Case Records, (https://www.federalregister.gov/documents/2012/10/25/2012-26241/privacy-act-of-1974-amendment-of-privacy-act-system-of-records) October 25, 2012 77 FR 65206
- OGE/GOVT-1 - Executive Branch Personnel Public Financial Disclosure Reports and Other Name-Retrieved Ethics Program Records
  - Original SORN: 68 FR 3098, January 22, 2003 (https://www.federalregister.gov/articles/2003/01/22/03-1101/privacy-act-of-1974-systems-of-records)
  - Correction #1: 68 FR 24744, May 8, 2003 (https://www.federalregister.gov/articles/2003/05/08/03-11416/privacy-act-of-1974-systems-of-records-notice-correction)
  - Correction #2: 77 FR 45353, July 31, 2012 (https://www.federalregister.gov/articles/2012/07/31/2012-18658/privacy-act-of-1974-amendment-to-system-of-records)

- Correction #3: 78 FR 73863, December 9, 2013 (https://www.federalregister.gov/articles/2013/12/09/2013-29342/privacy-act-of-1974-amendment-to-system-of-records)
- OGE/GOVT-2 Executive Branch Confidential Financial Disclosure Reports, (https://www.gpo.gov/fdsys/pkg/FR-2003-01-22/html/03-1101.htm) January 22, 2003, 68 FR 3097 [correction published May 8, 2003, 68 FR 24722]
- OPM/GOVT-1 General Personnel Records (http://www.gpo.gov/fdsys/pkg/FR-2012-12-11/html/2012-29777.htm) , December 11, 2012, 77 FR 73694, as modified by 80 FR 74815 (https://www.federalregister.gov/documents/2015/11/30/2015-30309/privacy-act-of-1974-routine-use-implementation-system-of-records) (November 30, 2015)
- OPM/GOVT-2 Employee Performance File System Records (http://www.gpo.gov/fdsys/pkg/FR-2006-06-19/html/06-5459.htm) , June 19, 2006, 71 FR 35342, 35347, as modified by 80 FR 74815 (https://www.federalregister.gov/documents/2015/11/30/2015-30309/privacy-act-of-1974-routine-use-implementation-system-of-records) (November 30, 2015)
- OPM/GOVT-3 Records of Adverse Actions, Performance Based Reduction in Grade and Removal Actions, and Termination of Probationers, (http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=2000_register&docid=00-10088-filed) April 27, 2000, 65 FR 24732, as modified by 80 FR 74815 (https://www.federalregister.gov/documents/2015/11/30/2015-30309/privacy-act-of-1974-routine-use-implementation-system-of-records) (November 30, 2015)
- OPM/GOVT-5 Recruiting, Examining, and Placement Records, (https://www.gpo.gov/fdsys/pkg/FR-2014-03-26/html/2014-06593.htm) March 26, 2014, 79 FR 16834, as modified by 80 FR 74815 (https://www.federalregister.gov/documents/2015/11/30/2015-30309/privacy-act-of-1974-routine-use-implementation-system-of-records) (November 30, 2015)
- OPM/GOVT-6 Personnel Research and Test Validation Records (https://www.gpo.gov/fdsys/pkg/FR-2006-06-19/html/06-5459.htm) , June 19, 2006, 71 FR 35354, as modified by 80 FR 74815 (https://www.federalregister.gov/documents/2015/11/30/2015-30309/privacy-act-of-1974-routine-use-implementation-system-of-records) (November 30, 2015)
- OPM/GOVT-7 Applicant Race, Sex, National Origin and Disability Status Records (http://www.gpo.gov/fdsys/pkg/FR-2006-06-19/html/06-5459.htm) , June 19, 2006, 71 FR 35356, as modified by 80 FR 74815 (https://www.federalregister.gov/documents/2015/11/30/2015-30309/privacy-act-of-1974-routine-use-implementation-system-of-records) (November 30, 2015)
- OPM/GOVT-9 File on Position Classification Appeals, Job Grading Appeals, Retained Grade or Pay Appeals, Fair Labor Standard Act (FLSA) Claims and Complaints, Federal Civilian Employee Compensation and Leave Claims, and Settlement of Accounts for Deceased Civilian Officers and Employees (https://www.govinfo.gov/content/pkg/FR-2013-10-01/pdf/2013-23839.pdf) , October 1, 2013, 78 FR 60331, as modified by 80 FR 74815 (https://www.federalregister.gov/documents/2015/11/30/2015-30309/privacy-act-of-1974-routine-use-implementation-system-of-records) (November 30, 2015)
- OPM/GOVT-10 Employee Medical File System Records (http://www.gpo.gov/fdsys/pkg/FR-2010-06-21/html/2010-14838.htm) , June 21, 2010, 75 FR 35099, as modified by 80 FR 74815 (https://www.federalregister.gov/documents/2015/11/30/2015-30309/privacy-act-of-1974-routine-use-implementation-system-of-records) (November 30, 2015)
- EPA/GOVT-2 Federal Docket Management System (FDMS), (http://www.gpo.gov/fdsys/pkg/FR-2005-03-24/html/05-5823.htm) March 24, 2005, 70 FR 15086
- OSC/GOVT-1 OSC Complaint, Litigation, Political Activity, and Disclosure Files (https://www.federalregister.gov/documents/2017/09/27/2017-20596/privacy-act-of-1974-system-of-records) , September 27, 2017, 82 FR 45076, a modified by 77 FR 24242 (https://www.federalregister.gov/documents/2012/04/23/2012-9605/privacy-act-of-1974-system-of-records) (April 23, 2012)

# Department Wide

- DHS/ALL-001 Department of Homeland Security (DHS) Freedom of Information Act (FOIA) and Privacy Act (PA) Record System (https://www.gpo.gov/fdsys/pkg/FR-2014-02-04/html/2014-02206.htm) , February 4, 2014, 79 FR 6609
  - DHS/ALL-001 Final Rule for Privacy Act Exemptions, (https://www.gpo.gov/fdsys/pkg/FR-2010-08-18/html/2010-20477.htm) August 18, 2010, 75 FR 50846
- DHS/ALL-002 Department of Homeland Security (DHS) Mailing and Other Lists System (http://www.gpo.gov/fdsys/pkg/FR-2008-11-25/html/E8-28053.htm) , November 25, 2008, 73 FR 71659
- DHS/ALL-003 Department of Homeland Security General Training Records, (http://www.gpo.gov/fdsys/pkg/FR-2008-11-25/html/E8-28037.htm) November 25, 2008, 73 FR 71656
  - DHS/ALL-003 Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2008/11/25/E8-28039/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-security-general-training/) , November 25, 2008, 73 FR 71521
- DHS/ALL-004 General Information Technology Access Account Records System (GITAARS) (http://www.gpo.gov/fdsys/pkg/FR-2012-11-27/html/2012-28675.htm) , November 27, 2012, 77 FR 70792
- DHS/ALL-005 Department of Homeland Security Redress and Response Records System, (https://www.gpo.gov/fdsys/pkg/FR-2007-01-18/html/07-190.htm) January 18, 2007, 72 FR 2294
  - DHS/ALL-005 Final Rule for Privacy Act Exemptions, (https://www.gpo.gov/fdsys/pkg/FR-2007-07-16/html/E7-13576.htm) July 16, 2007, 72 FR 38750

- DHS/ALL-006 Department of Homeland Security Accident Records, (https://www.gpo.gov/fdsys/pkg/FR-2008-11-25/html/E8-28057.htm) November 25, 2008, 73 FR 71661
  - DHS/ALL-006 Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2009-08-24/html/E9-20151.htm), August 24, 2009, 74 FR 42577
- DHS/ALL-007 Accounts Payable System of Records (https://www.federalregister.gov/documents/2018/12/21/2018-27606/privacy-act-of-1974-system-of-records), December 21, 2018, 83 FR 65705
- DHS/ALL-008 Accounts Receivable System of Records (https://www.federalregister.gov/documents/2018/12/19/2018-27390/privacy-act-of-1974-system-of-records), December 19, 2018, 83 FR 65176
- DHS/ALL-009 Department of Homeland Security Advisory Committees (https://www.gpo.gov/fdsys/pkg/FR-2008-10-03/html/E8-23304.htm), October 3, 2008, 73 FR 57639
- DHS/ALL-010 Asset Management Records System of Records, (http://www.gpo.gov/fdsys/pkg/FR-2015-09-28/html/2015-24583.htm) September 28, 2015, 80 FR 58280
- DHS/ALL-011 Biographies and Awards System of Records (https://www.federalregister.gov/documents/2018/04/05/2018-06986/privacy-act-of-1974-system-of-records), April 5, 2018, 83 FR 14652
- DHS/ALL-012 Department of Homeland Security Childcare System of Records, (https://www.gpo.gov/fdsys/pkg/FR-2008-10-03/html/E8-23306.htm) October 3, 2008, 73 FR 57642
- DHS/ALL-013 Department of Homeland Security Claims Records (https://www.gpo.gov/fdsys/pkg/FR-2008-10-28/html/E8-25612.htm), October 28, 2008, 73 FR 63987
  - DHS/ALL-013 Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2009-08-24/html/E9-20155.htm), August 24, 2009 74 FR 42579
- DHS/ALL-014 Department of Homeland Security Personnel Contact Information (https://www.federalregister.gov/documents/2018/03/16/2018-05403/privacy-act-of-1974-system-of-records), March 16, 2018, 83 FR 11780
- DHS/ALL-015 Department of Homeland Security Employee Assistance Program (https://www.gpo.gov/fdsys/pkg/FR-2008-10-31/html/E8-25969.htm), October 31, 2008, 73 FR 64971
- DHS/ALL-016 Correspondence Records (https://www.federalregister.gov/documents/2018/09/26/2018-20876/privacy-act-of-1974-system-of-records), September 26, 2018, 83 FR 48645
- DHS/ALL-017 Department of Homeland Security General Legal Records, (http://www.gpo.gov/fdsys/pkg/FR-2011-11-23/html/2011-30175.htm) November 23, 2011, 76 FR 72428
  - DHS/ALL-017 Final Rule for Privacy Act Exemptions, (https://www.govinfo.gov/content/pkg/FR-2009-10-01/html/E9-23514.htm) October 1, 2009, 74 FR 50903
- DHS/ALL-018 Administrative Grievance Records, (https://www.federalregister.gov/documents/2019/04/29/2019-08595/privacy-act-of-1974-system-of-records) April 29, 2019, 84 FR 18070
  - DHS/ALL-018 Final Rule for Privacy Act Exemptions, (https://www.federalregister.gov/documents/2019/04/29/2019-08596/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-securityall-018) April 29, 2019, 84 FR 17941
- DHS/ALL-019 Payroll, Personnel, and Time and Attendance Records System of Records, (http://www.gpo.gov/fdsys/pkg/FR-2015-09-28/html/2015-24589.htm) September 28, 2015, 80 FR 58283
- DHS/ALL-020 Department of Homeland Security Internal Affairs (http://www.gpo.gov/fdsys/pkg/FR-2014-04-28/html/2014-09471.htm), April 28, 2014, 79 FR 23361
  - DHS/ALL-020 Final Rule for Privacy Act Exemptions, (https://www.gpo.gov/fdsys/articles/2009/08/24/E9-20159/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-securityall-020-internal) August 24, 2009, 74 FR 42575
- DHS/ALL-021 Department of Homeland Security Contractors and Consultants, (http://www.gpo.gov/fdsys/pkg/FR-2008-10-23/html/E8-25205.htm) October 23, 2008, 73 FR 63179
- DHS/ALL-022 Department of Homeland Security Drug Free Workplace (https://www.gpo.gov/fdsys/pkg/FR-2008-10-31/html/E8-25971.htm), October 31, 2008, 73 FR 64974
- DHS/ALL-023 Department of Homeland Security Personnel Security Management (http://www.federalregister.gov/documents/2020/10/13/2020-22536/privacy-act-of-1974-system-of-records), October 13, 2020, 85 FR 64511
  - DHS/ALL-023 Final Rule for Privacy Act Exemptions, (https://www.gpo.gov/fdsys/pkg/FR-2009-10-01/html/E9-23524.htm) October 1, 2009, 74 FR 50904
- DHS/ALL-024 Department of Homeland Security Facility and Perimeter Access Control and Visitor Management (http://www.gpo.gov/fdsys/pkg/FR-2010-02-03/html/2010-2206.htm), February 3, 2010, 75 FR 5609
  - DHS/ALL-024 Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2009/08/24/E9-20155/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-securityall-024-facility-and), August 24, 2009, 74 FR 42578
- DHS/ALL-025 Law Enforcement Authority in Support of the Protection of Property Owned, Occupied, or Secured by the Department of Homeland Security System of Records (https://www.federalregister.gov/documents/2017/06/14/2017-12262/privacy-act-of-1974-system-of-records), June 14, 2017, 82 FR 27274

- Notice of Proposed Rulemaking for Privacy Act Exemptions (https://www.federalregister.gov/documents/2017/06/14/2017-12253/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-securityall-025-law) , June 14, 2017, 82 FR 27218
- DHS/ALL-026 Department of Homeland Security Personal Identity Verification Management System (https://www.gpo.gov/fdsys/pkg/FR-2009-06-25/html/E9-14905.htm) , June 25, 2009, 74 FR 30301
- DHS/ALL-027 The History of the Department of Homeland Security (https://www.gpo.gov/fdsys/pkg/FR-2010-02-23/html/2010-3402.htm) , February 23, 2010, 75 FR 8092
  - DHS/ALL-027 Final Rule for Privacy Act Exemptions, (https://www.gpo.gov/fdsys/pkg/FR-2010-08-18/html/2010-20477.htm) August 18, 2010, 75 FR 50845
- DHS/ALL-028 Department of Homeland Security Complaint Tracking System, (https://www.gpo.gov/fdsys/pkg/FR-2009-07-21/html/E9-17320.htm) July 21, 2009, 74 FR 35877
- DHS/ALL-029 Civil Rights and Civil Liberties Records, (https://www.gpo.gov/fdsys/pkg/FR-2010-07-08/html/2010-16569.htm) July 8, 2010, 75 FR 39266
  - DHS/ALL-029 Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/articles/2011/07/26/2011-18832/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-securityall-029-civil-rights) , July 26, 2011, 76 FR 44451
- DHS/ALL-030 Use of the Terrorist Screening Database System of Records (https://www.federalregister.gov/documents/2016/04/06/2016-07895/privacy-act-of-1974-department-of-homeland-securityall-030-use-of-the-terrorist-screening-database) , April 6, 2016, 81 FR 19988
  - DHS/ALL-030 Final Rule for Privacy Act Exemptions, (https://www.federalregister.gov/documents/2016/04/06/2016-07896/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-securityall-030-use-of-the) April 6, 2016, 81 FR 19857
- DHS/ALL-031 Information Sharing Environment Suspicious Activity Reporting Initiative, (https://www.gpo.gov/fdsys/pkg/FR-2010-09-10/html/2010-22636.htm) September 10, 2010, 75 FR 55335
  - DHS/ALL-031 Final Rule for Privacy Act Exemptions, (https://www.federalregister.gov/documents/2010/12/21/2010-32000/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-securityall-031-information) December 21, 2010, 75 FR 79947
- DHS/ALL-032 Official Passport Application and Maintenance Records, (https://www.gpo.gov/fdsys/pkg/FR-2011-02-15/html/2011-3450.htm) February 15, 2011, 76 FR 8755
- DHS/ALL-033 Reasonable Accommodations Records System of Records (https://www.federalregister.gov/documents/2022/04/01/2022-06894/privacy-act-of-1974-system-of-records) , April 1, 2022, 87 FR 19111
- DHS/ALL-034 Emergency Care Medical Records System of Records Notice, (http://www.gpo.gov/fdsys/pkg/FR-2011-08-30/html/2011-22169.htm) August 30, 2011, 76 FR 53921
- DHS/ALL-035 Common Entity Index Prototype System of Records Notice (http://www.gpo.gov/fdsys/pkg/FR-2013-08-23/html/2013-20635.htm) , August 23, 2013, 78 FR 52553
- DHS/ALL-036 Board for Correction of Military Records System of Records Notice (http://www.gpo.gov/fdsys/pkg/FR-2013-10-02/html/2013-23991.htm) , October 2, 2013, 78 FR 60888
- DHS/ALL-037 E-Authentication Records System of Records (http://www.gpo.gov/fdsys/pkg/FR-2014-08-11/html/2014-18703.htm) , August 11, 2014, 79 FR 46857
- DHS/ALL-038 Insider Threat Program System of Records (https://www.federalregister.gov/documents/2020/03/10/2020-04795/privacy-act-of-1974-system-of-records) , March 10, 2020, 85 FR 13914
  - DHS/ALL-038 Final Rule for Privacy Act Exemptions, (https://www.federalregister.gov/documents/2020/10/06/2020-18857/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-securityall-038-insider) October 6, 2020, 85 FR 62933
- DHS/ALL-039 Foreign Access Management System of Records (https://www.federalregister.gov/documents/2018/05/01/2018-09196/privacy-act-of-1974-system-of-records) , May 1, 2018, 83 FR 19078
  - DHS/ALL-039 Final Rule for Privacy Act Exemptions, (https://www.federalregister.gov/documents/2018/07/27/2018-16024/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-securityall-039-foreign) July 27, 2018, 83 FR 35537
- DHS/ALL-040 DHS Personnel Recovery Information System of Records (https://www.federalregister.gov/documents/2017/10/25/2017-23203/privacy-act-of-1974-system-of-records) , October 25, 2017, 82 FR 49407
- DHS/ALL-041 External Biometric Records (EBR) System of Records (https://www.federalregister.gov/documents/2018/04/24/2018-08453/privacy-act-of-1974-system-of-records) , April 24, 2018, 83 FR 17829
  - Notice of Proposed Rulemaking for Privacy Act Exemptions (https://www.federalregister.gov/documents/2018/04/24/2018-08454/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-securityall-041-external) , April 24, 2018, 83 FR 17766
- DHS/ALL-042 Personnel Networking and Collaboration System of Records (https://www.federalregister.gov/documents/2018/02/28/2018-04001/privacy-act-of-1974-system-of-records) , February 28, 2018, 83 FR 8685
- DHS/ALL-043 Enterprise Biometric Administrative Records (EBAR) System of Records (https://www.federalregister.gov/documents/2020/03/16/2020-04979/privacy-act-of-1974-system-of-records) , March 16, 2020, 85 FR 14955
  - Notice of Proposed Rulemaking for Privacy Act Exemptions (https://www.federalregister.gov/documents/2020/03/16/2020-04985/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-securityall-043-enterprise) , March 16, 2020, 85 FR 14805
- DHS/ALL-044 DHS eRulemaking System of Records (https://www.federalregister.gov/documents/2020/03/11/2020-04983/privacy-act-of-1974-system-of-records) , March 11, 2020, 85 FR 14226

- DHS/ALL-045 Statistical Immigration Data Production and Reporting System of Records (https://www.federalregister.gov/documents/2020/03/11/2020-04978/privacy-act-of-1974-system-of-records), March 11, 2020, 85 FR 14223
  - DHS/ALL-045 Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2020/07/31/2020-15513/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-securityall-045-statistical), July 31, 2020, 85 FR 45967
- DHS/ALL-046 Counterintelligence Program System of Records (https://www.federalregister.gov/documents/2020/12/14/2020-27315/privacy-act-of-1974-system-of-records), December 14, 2020, 85 FR 80800
  - DHS/ALL-046 Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2021/08/13/2021-17004/privacy-act-of-1974-implementation-of-exemptions-us-department-of-homeland-securityall-046), August 13,2021, 86 FR 44574
- DHS/ALL-047 Records Related to DHS Personnel, Long-Term Trainees, Contractors, Mission Support Individuals, and Visitors During a Declared Public Health Emergency System of Records (https://www.federalregister.gov/documents/2020/12/11/2020-27204/privacy-act-of-1974-system-of-records), December 11, 2020, 85 FR 80127

## Customs and Border Protection (CBP)

- See DHS/USCIS/ICE/CBP-001 below under USCIS for the Alien File System of Records
- DHS/CBP-001 Import Information System (https://www.regulations.gov/document?D=DHS-2016-0048-0001), (http://www.gpo.gov/fdsys/pkg/FR-2015-08-17/html/2015-19731.htm) July 26, 2016, 81 FR 48826
  - Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/articles/2016/03/17/2016-05962/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-securityus-customs-and), March 17, 2016, 81 FR 14369
- DHS/CBP-002 Trusted and Registered Traveler Programs (https://www.federalregister.gov/documents/2020/03/11/2020-04980/privacy-act-of-1974-system-of-records), March 11, 2020, 85 FR 14214
  - Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2021/09/10/2021-19472/privacy-act-of-1974-implementation-of-exemptions-us-department-of-homeland-security-us-customs-and), September 10, 2021, 86 FR 50603
- DHS/CBP-003 Credit/Debit Card Data System, (http://www.gpo.gov/fdsys/pkg/FR-2011-11-02/html/2011-28406.htm) November 2, 2011, 76 FR 67755
  - Notice of Proposed Rulemaking for Privacy Act Exemptions (http://www.gpo.gov/fdsys/pkg/FR-2011-11-02/html/2011-28400.htm), November 2, 2011, 76 FR 67621
- DHS/CBP-004 Intellectual Property Rights e-Recordation and Search Systems, (http://www.gpo.gov/fdsys/pkg/FR-2013-01-15/html/2013-00603.htm) January 15, 2013, 78 FR 3015
  - Notice of Proposed Rulemaking for Privacy Act Exemptions (http://www.gpo.gov/fdsys/pkg/FR-2013-01-22/html/2013-01049.htm), January 22, 2013, 78 FR 4347
- DHS/CBP-005 Advance Passenger Information System (APIS) (https://www.gpo.gov/fdsys/pkg/FR-2015-03-13/html/2015-05798.htm), March 13, 2015, 80 FR 13407
  - Final Rule for Privacy Act Exemptions, (https://www.gpo.gov/fdsys/pkg/FR-2008-11-18/html/E8-27206.htm) November 18, 2008, 73 FR 68291
- DHS/CBP-006 Automated Targeting System, (http://www.gpo.gov/fdsys/pkg/FR-2012-05-22/html/2012-12396.htm) May 22, 2012, 77 FR 30297
  - Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2010-02-03/html/2010-2201.htm), February 3, 2010, 75 FR 5487
- DHS/CBP-007 Border Crossing Information (https://www.federalregister.gov/documents/2016/12/13/2016-29898/privacy-act-of-1974-department-of-homeland-securityus-customs-and-border-protection-007-border) (BCI), December 13, 2016, 81 FR 89957
  - Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2016/03/21/2016-06233/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-securityus-customs-and), March 21, 2016, 81 FR 14947
- DHS/CBP-008 Non-Federal Entity Data Systems (NEDS) (https://www.gpo.gov/fdsys/pkg/FR-2008-07-25/html/E8-17126.htm), July 25, 2008, 73 FR 43462
- DHS/CBP-009 Electronic System for Travel Authorization (ESTA) (https://www.federalregister.gov/documents/2022/07/12/2022-14789/privacy-act-of-1974-system-of-records-dhscbp-009-electronic-system-for-travel-authorization-esta), July 12, 2022, 87 FR 41338
  - DHS/CBP-009 Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2020/03/16/2020-04987/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-securityus-customs-and), (https://www.gpo.gov/fdsys/pkg/FR-2009-08-31/html/E9-20744.htm) March 16, 2020, 85 FR 14733
- DHS/CBP-010 Persons Engaged in International Trade in Customs and Border Protection Licensed/Regulated Activities, (https://www.federalregister.gov/documents/2008/12/19/E8-29799/privacy-act-of-1974-us-customs-and-border-protection-010-persons-engaged-in-international-trade-in) December 19, 2008 73 FR 77753
  - DHS/CBP-010 Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2009/08/31/E9-20745/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-security-us-customs-and), August 31, 2009 74 FR 45070
- DHS/CBP-011 U.S. Customs and Border Protection TECS, (https://www.gpo.gov/fdsys/pkg/FR-2008-12-19/html/E8-29807.htm) December 19, 2008, 73 FR 77778
  - DHS/CBP-011 Final Rule for Privacy Act Exemptions, (https://www.gpo.gov/fdsys/pkg/FR-2009-08-31/html/E9-20765.htm) August 31, 2009, 74 FR 45072
- DHS/CBP-012 Closed Circuit Television System (https://www.gpo.gov/fdsys/pkg/FR-2008-12-19/html/E8-29838.htm), December 19, 2008, 73 FR 77799

- DHS/CBP-012 Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2009-08-31/html/E9-20765.htm), August 31, 2009, 74 FR 45073
- DHS/CBP-013 Seized Assets and Case Tracking System (http://www.gpo.gov/fdsys/pkg/FR-2008-12-19/html/E8-29802.htm), December 19, 2008, 73 FR 77764
  - DHS/CBP-013 Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2009/08/31/E9-20754/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-security-us-customs-and), August 31, 2009, 74 FR 45074
- DHS/CBP-014 Regulatory Audit Archive System (RAAS) (https://www.federalregister.gov/documents/2016/04/06/2016-07893/privacy-act-of-1974-department-of-homeland-security-us-customs-and-border-protection-dhscbp-014), April 6, 2016, 81 FR 19985
  - DHS/CBP-014 Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2022/02/04/2022-02004/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-security-us-customs-and), February 4, 2022, 87 FR 6403
- DHS/CBP-016 Nonimmigrant Information System, (https://www.federalregister.gov/documents/2015/03/13/2015-05804/privacy-act-of-1974-department-of-homeland-securityunited-states-customs-and-border-protection-016) March 13, 2015, 80 FR 13398
  - DHS/CBP-016 Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2009/08/31/E9-20778/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-security-us-customs-and), August 31, 2019, 74 FR 45077
- DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records (http://www.gpo.gov/fdsys/pkg/FR-2013-11-21/html/2013-27895.htm), November 21, 2013, 78 FR 69864
  - DHS/USCIS/ICE/CBP-001 Final Rule for Privacy Act Exemptions (http://www.gpo.gov/fdsys/pkg/FR-2013-11-22/html/2013-27896.htm), November 22, 2013, 78 FR 69983
- DHS/CBP-018 Customs Trade Partnership Against Terrorism (CTPAT) (https://www.federalregister.gov/documents/2021/03/22/2021-05647/privacy-act-of-1974-system-of-records), March 22, 2021, 86 FR 15241
  - DHS/CBP-018 Final Rule Privacy Act Exemptions (http://www.federalregister.gov/documents/2021/10/06/2021-21138/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-security), October 6, 2021, 86 FR 55475
- DHS/CBP-019 AMOSS System of Records Notice (https://www.federalregister.gov/documents/2013/09/18/2013-22690/privacy-act-of-1974-department-of-homeland-securityus-customs-and-border-protection-019-air-and), September 18, 2013, 78 FR 57402
  - DHS/CBP-019 Notice of Proposed Rulemaking (https://www.govinfo.gov/content/pkg/FR-2013-09-23/html/2013-22691.htm), September 23, 2013, 78 FR 58254
- DHS/CBP-020 Export Information System (EIS) System of Records (https://www.federalregister.gov/documents/2015/09/02/2015-21675/privacy-act-of-1974-department-of-homeland-security-us-customs-and-border-protection-dhscbp-020), January 02, 2015, 80 FR 53181
  - DHS/CBP-020 Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2023/01/18/2023-00580/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-security-us-customs-and), , (http://www.gpo.gov/fdsys/pkg/FR-2015-09-02/html/2015-21675.htm) January 18, 2023, 88 FR 2797
- DHS/CBP-021 Arrival and Departure Information System (ADIS), (http://www.gpo.gov/fdsys/pkg/FR-2015-11-18/html/2015-29445.htm) November 18, 2015, 80 FR 72081
  - DHS/CBP-021 Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2009/12/04/E9-28910/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-securitynational-protections), December 4, 2009, 74 FR 63943
- DHS/CBP-022 Electronic Visa Update System (EVUS) System of Records (https://www.federalregister.gov/documents/2023/06/27/2023-13540/privacy-act-of-1974-system-of-records), June 27, 2023, 88 FR 41648
  - DHS/CBP-022 Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2020/03/16/2020-04991/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-securityus-customs-and), March 16, 2020, 85 FR 14734
- DHS/CBP-023 Border Patrol Enforcement Records (BPER) (https://www.regulations.gov/document?D=DHS-2016-0067-0001), October 20, 2016, 81 FR 72601
  - DHS/CBP-023 Final Rule for Privacy Act Exemptions, 81 FR 92549 (http://www.federalregister.gov/documents/2016/12/20/2016-30457/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-dhsus-customs-and), December 20, 2016
- DHS/CBP-024 Intelligence Records System (CIRS) System of Records (https://www.federalregister.gov/documents/2020/12/14/2020-27446/privacy-act-of-1974-system-of-records), December 14, 2020, 85 FR 80806
  - DHS/CBP-024 Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2018/12/27/2018-27944/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-dhsus-customs-and), December 27, 2018, 83 FR 66557
- DHS/CBP-025 CBP Recruitment and Hiring System of Records (http://www.federalregister.gov/documents/2022/01/10/2022-00183/privacy-act-of-1974-system-of-records), January 10, 2022, 87 FR 1175
- DHS/CBP-026 Explorer Program System of Records (https://www.federalregister.gov/documents/2020/03/11/2020-04981/privacy-act-of-1974-system-of-records), March 11, 2020, 85 FR 14219
- DHS/CBP-027 Customs Broker Management (CBM) (https://www.federalregister.gov/documents/2022/07/22/2022-15711/privacy-act-of-1974-system-of-records), July 22, 2022, 87 FR 43880
  - DHS/CBP-027 Final Rule for Privacy Act Exemptions, (https://www.federalregister.gov/documents/2023/03/31/2023-06714/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-security-dhsus-customs-and) March 31, 2023, 88 FR 19213

## Cybersecurity and Infrastructure Security Agency (CISA)

- DHS/NPPD-001 National Infrastructure Coordinating Center (NICC) Records System (http://www.gpo.gov/fdsys/pkg/FR-2011-09-08/html/2011-22903.htm) , September 8, 2011, 76 FR 55693
  - DHS/NPPD-001 Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2011-07-26/html/2011-18828.htm) , July 26, 2011, 76 FR 44452
- DHS/NPPD-002 Chemical Facility Anti-Terrorism Standards Personnel Surety Program System of Records (http://www.gpo.gov/fdsys/pkg/FR-2014-05-19/html/2014-11431.htm) , May 19, 2014, 79 FR 28752
  - DHS/NPPD-002 Final Rule for Privacy Act Exemptions (http://www.gpo.gov/fdsys/pkg/FR-2014-05-21/html/2014-11433.htm) , May 21, 2014, 79 FR 29072
- DHS/USVISIT-003 Technical Reconciliation Analysis Classification System (TRACS) (https://www.gpo.gov/fdsys/pkg/FR-2008-06-16/html/E8-13383.htm) , June 16, 2008, 73 FR 34028
  - DHS/NPPD/USVISIT-003 Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2009-12-04/html/E9-28913.htm) , December 4, 2009, 74 FR 63946
- DHS/USVISIT-004 DHS Automated Biometric Identification System (IDENT) (http://www.gpo.gov/fdsys/pkg/FR-2007-06-05/html/07-2781.htm) , June 5, 2007, 72 FR 31080
  - DHS/USVISIT-004 Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2007-07-16/html/E7-13576.htm) , July 16, 2007, 72 FR 38749
- DHS/CISA-005 Administrative Subpoenas for Cybersecurity Vulnerability Identification and Notification System of Records (https://www.federalregister.gov/documents/2021/04/05/2021-06874/privacy-act-of-1974-system-of-records) , April 5, 2021, 86 FR 17616

## Federal Emergency Management Agency (FEMA)

- DHS/FEMA/GOVT-001 National Defense Executive Reserve (https://www.gpo.gov/fdsys/pkg/FR-2013-11-21/html/2013-27894.htm) , November 21, 2013, 78 FR 69861
- DHS/FEMA-001 National Emergency Family Registry and Locator System, (https://www.gpo.gov/fdsys/pkg/FR-2013-11-21/html/2013-27897.htm) November 21, 2013, 78 FR 69858
- DHS/FEMA-002 Quality Assurance Recording System of Records (https://www.federalregister.gov/documents/2017/07/14/2017-14839/privacy-act-of-1974-system-of-records) , July 17, 2017, 82 FR 32564
- DHS/FEMA-003 National Flood Insurance Program Files, (https://www.gpo.gov/fdsys/pkg/FR-2014-05-19/html/2014-11386.htm) May 19, 2014, 79 FR 28747
- DHS/FEMA-004 Non-Disaster Grant Management Information Files (https://www.federalregister.gov/documents/2022/07/11/2022-14673/privacy-act-of-1974-system-of-records) , July 11, 2022, 87 FR 41141
- DHS/FEMA-006 Individual and Community Preparedness Division System of Records (https://www.regulations.gov/document/DHS-2022-0032-0002) , November 18, 2022, 87 FR 69284
- DHS/FEMA-008 Disaster Recovery Assistance Files (https://www.federalregister.gov/documents/2024/09/09/2024-20155/privacy-act-of-1974-system-of-records) , September 9, 2024, 89 FR 73104
- DHS/FEMA-009 Hazard Mitigation Disaster Public Assistance and Disaster Loan Programs (https://www.gpo.gov/fdsys/pkg/FR-2014-03-24/html/2014-06361.htm) , March 24, 2014, 79 FR 16015
- DHS/FEMA-011 Training and Exercise Program Records (https://www.federalregister.gov/documents/2022/10/17/2022-22450/privacy-act-of-1974-system-of-records) , October 17, 2022, 87 FR 62872
- DHS/FEMA-012 Suspicious Activity Reporting System of Records (https://www.federalregister.gov/documents/2023/03/31/2023-06745/privacy-act-of-1974-system-of-records) , March 31, 2023, 88 FR 19317
- DHS/FEMA-013 Operational Use of Publicly Available Social Media Internet Sources for Situational Awareness (https://www.gpo.gov/fdsys/pkg/FR-2016-04-21/html/2016-09191.htm) , April 21, 2016, 81 FR 23503
- DHS/FEMA-014 Hazard Mitigation Planning and Flood Mapping Products and Services Records System of Records (https://www.federalregister.gov/documents/2021/01/11/2021-00307/privacy-act-of-1974-system-of-records) , January 11, 2021, 86 FR 1988
- DHS/FEMA-015 Fraud Investigations System of Records (https://www.federalregister.gov/documents/2021/03/22/2021-05645/privacy-act-of-1974-system-of-records) , March 22, 2021, 86 FR 15237
  - DHS/FEMA-015 Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2024/11/19/2024-26836/privacy-act-of-1974-implementation-of-exemptions) , November 19, 2024, 89 FR 91247

- DHS/FEMA-016 Disaster Case Management (DCM) Files System of Records (http://www.federalregister.gov/documents/2022/01/10/2022-00182/privacy-act-of-1974-system-of-records), January 10, 2022, 87 FR 1171

## Intelligence and Analysis (I&A)

- DHS/IA-001 Enterprise Records System (ERS), (https://www.gpo.gov/fdsys/pkg/FR-2008-05-15/html/E8-10888.htm) May 15, 2008, 73 FR 28128
  - DHS/IA-001 Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2008-09-30/html/E8-22603.htm), September 30, 2008, 73 FR 56922

## Immigration and Customs Enforcement (ICE)

- See USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System under USCIS below
- DHS/ICE 001 - Student and Exchange Visitor Information System (https://www.federalregister.gov/documents/2021/12/08/2021-26477/privacy-act-of-1974-system-of-records), December 8, 2021, 86 FR 69663
  - DHS/ICE-001 Notice of Proposed Rulemaking for Privacy Act Exemptions (https://www.federalregister.gov/documents/2021/12/08/2021-26478/privacy-act-of-1974-implementation-of-exemptions-us-department-of-homeland-security-us-immigrations), December 8, 2021, 86 FR 69587
- DHS/ICE-002 ICE Pattern and Analysis and Information Collection (ICEPIC), (https://www.gpo.gov/fdsys/pkg/FR-2008-08-18/html/E8-19031.htm) August 18, 2008, 73 FR 48226
  - DHS/ICE-002 Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2008-08-18/html/E8-19033.htm), August 18, 2008, 73 FR 48117
- DHS/ICE-003 General Counsel Electronic Management System (GEMS), (http://www.gpo.gov/fdsys/pkg/FR-2009-08-19/html/E9-19818.htm) August 19, 2009, 74 FR 41919
  - DHS/ICE-003 Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2008-10-23/html/E8-24996.htm), October 23, 2008, 73 FR 63058
- DHS/ICE-004 Bond Management Information System (BMIS) (https://www.federalregister.gov/documents/2020/10/13/2020-22535/privacy-act-of-1974-system-of-records), October 13, 2020, 85 FR 64515
- DHS/ICE-006 ICE Intelligence Records System (IIRS) (https://www.federalregister.gov/documents/2025/07/21/2025-13613/privacy-act-of-1974-system-of-records), July 21, 2025, 90 FR 34282
  - DHS/ICE-006 Final Rule for Privacy Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2010-03-16/html/2010-5618.htm), March 16, 2010, 75 FR 12437
- DHS/ICE-007 Criminal History and Immigration Verification (CHIVe) System of Records (https://www.federalregister.gov/documents/2018/05/08/2018-09902/privacy-act-of-1974-system-of-records), May 8, 2018, 83 FR 20844
  - DHS/ICE-007 Final Rule for Privacy Exemptions (https://www.federalregister.gov/documents/2019/05/09/2019-09598/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-security-us-immigration-and), May 9, 2019, 84 FR 20240
- DHS/ICE-008 Search, Arrest, and Seizure Records (SAS) (https://www.federalregister.gov/documents/2025/07/21/2025-13609/privacy-act-of-1974-system-of-records), July 21, 2025, 90 FR 34288
  - DHS/ICE-008 Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2009-08-31/html/E9-20761.htm), August 31, 2009, 74 FR 45080
- DHS/ICE-009 External Investigations, (https://www.federalregister.gov/documents/2020/11/20/2020-25619/privacy-act-of-1974-system-of-records) November 20, 2020, 85 FR 74362
  - DHS/ICE-009 Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2009-08-31/html/E9-20762.htm), August 31, 2009, 74 FR 45081
- DHS/ICE-010 Confidential and Other Sources of Information (http://www.gpo.gov/fdsys/pkg/FR-2013-02-04/html/2013-02343.htm), February 4, 2013, 78 FR 7798
  - DHS/ICE-010 Final Rule for Privacy Act Exemptions, (https://www.gpo.gov/fdsys/pkg/FR-2009-08-31/html/E9-20750.htm) August 31, 2009, 74 FR 45083
- DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER) System of Records, (https://www.federalregister.gov/documents/2024/07/05/2024-14768/privacy-act-of-1974-system-of-records) July 5, 2024, 89 FR 55638
  - DHS/ICE-011 Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2010-03-09/html/2010-4900.htm), March 9, 2010, 75 FR 10633
- DHS/ICE-012 Visa Security Program (VSP), (https://www.gpo.gov/fdsys/pkg/FR-2009-09-30/html/E9-23522.htm) September 30, 2009, 74 FR 50228
  - DHS/ICE-012 Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2010-03-01/html/2010-4160.htm), March 1, 2010, 75 FR 9085

- DHS/ICE-013 Alien Health Records System (https://www.federalregister.gov/documents/2018/03/19/2018-05542/privacy-act-of-1974-system-of-records), March 19, 2018, 83 FR 12015

- DHS/ICE-014 Homeland Security Investigations Forensic Laboratory (https://www.federalregister.gov/documents/2016/07/14/2016-16587/privacy-act-of-1974-department-of-homeland-securityus-immigration-and-customs-enforcement-014), July 14, 2016, 81 FR 45523

  - DHS/ICE-014 Final Rule for Privacy Act Exemptions (http://www.gpo.gov/fdsys/pkg/FR-2014-04-02/html/2014-07386.htm), April 2, 2014, 79 FR 18441

- DHS/ICE-015 LeadTrac System of Records (https://www.regulations.gov/document?D=DHS-2016-0053-0001), August 9, 2016, 81 FR 52700

  - DHS/ICE-015 Final Rule for Privacy Act Exemptions (https://www.regulations.gov/document?D=DHS-2016-0087-0001), November 25, 2016, 81 FR 85106

- DHS/ICE-017 Angel Watch Program System of Records (https://www.federalregister.gov/documents/2019/02/01/2019-00770/privacy-act-of-1974-system-of-records), March 4, 2019, 84 FR 118

- DHS/ICE-018 Analytical Records (https://www.federalregister.gov/documents/2021/03/22/2021-05651/privacy-act-of-1974-system-of-records), March 22, 2021, 86 FR 15246

  - DHS/ICE-018 Final Rule For Privacy Act Exemption (https://www.federalregister.gov/documents/2021/11/08/2021-24328/privacy-act-of-1974-implementation-of-exemptions-us-department-of-homeland-securityus-immigration), November 8, 2021, 86 FR 61665

- DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, (http://www.gpo.gov/fdsys/pkg/FR-2011-06-13/html/2011-14489.htm) June 13, 2011, 76 FR 34233

  - DHS/USCIS/ICE/CBP-001 Notice of Proposed Rulemaking for Privacy Act Exemptions (http://www.gpo.gov/fdsys/pkg/FR-2011-06-13/html/2011-14486.htm), June 13, 2011, 76 FR 34177

## Office of the Citizenship and Immigration Services Ombudsman (CISOMB)

- DHS/CISOMB-001 Case Assistance Analytics and Data Integration (CAADI) System (https://www.federalregister.gov/documents/2021/10/27/2021-23342/privacy-act-of-1974-system-of-records), October 27, 2021, 86 FR 59408

## Office of Health Affairs (OHA)

- DHS/OHA-001 Contractor Occupational Health and Immunization Records, (https://www.gpo.gov/fdsys/pkg/FR-2011-04-18/html/2011-9331.htm) April 18, 2011, 76 FR 21768-21772

## Office of the Immigration Detention Ombudsman (OIDO)

- DHS/OIDO-001 Office of the Immigration Detention Ombudsman System of Records (https://www.federalregister.gov/documents/2021/09/03/2021-18798/privacy-act-of-1974-system-of-records), September 3, 2021, 86 FR 49553

  - DHS/OIDO-001 Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2021/12/09/2021-26618/privacy-act-of-1974-implementation-of-exemptions-us-department-of-homeland-securityoffice-of-the), December 9, 2021, 86 FR 69977

## Office of Inspector General (OIG)

- DHS/OIG-002 Investigative Records System (http://www.federalregister.gov/documents/2021/10/21/2021-22836/privacy-act-of-1974-system-of-records), October 21, 2021, 86 FR 58292

  - DHS/OIG-002 Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2022/01/27/2022-01559/privacy-act-of-1974-implementation-of-exemptions-us-department-of-homeland-securityoffice-of), January 27, 2022, 87 FR 4125

## Operations

- DHS/OPS-001 Homeland Security Operations Center Database, (https://www.gpo.gov/fdsys/pkg/FR-2005-04-18/html/05-7704.htm) April 18, 2005, 70 FR 20156
    - DHS/OPS-001 Notice of Proposed Rulemaking for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2005-04-18/html/05-7705.htm), April 18, 2005, 70 FR 20061
- DHS/OPS-002 National Operations Center Tracker and Senior Watch Officer Logs, (https://www.gpo.gov/fdsys/pkg/FR-2011-03-08/html/2011-5100.htm) March 8, 2011, 76 FR 12745
    - DHS/OPS-002 Final Rule for Privacy Act Exemptions, (http://www.gpo.gov/fdsys/pkg/FR-2011-07-18/html/2011-17939.htm) July 18, 2011, 76 FR 42005
- DHS/OPS-003 Operations Collection, Planning, Coordination, Reporting, Analysis, and Fusion (https://www.gpo.gov/fdsys/pkg/FR-2010-11-15/html/2010-28566.htm), November 15, 2010, 75 FR 69689
    - DHS/OPS-003 Final Rule for Privacy Act Exemptions, (http://www.gpo.gov/fdsys/pkg/FR-2012-06-07/html/2012-13778.htm) June 6, 2012, 77 FR 33605
- DHS/OPS-004 Publicly Available Social Media Monitoring and Situational Awareness Initiative System of Records (http://www.gpo.gov/fdsys/pkg/FR-2015-05-27/html/2015-12692.htm), May 27, 2015, 80 FR 30259

## Science and Technology (S&T)

- DHS/S&T-001 Research, Development, Test, and Evaluation Records (http://www.federalregister.gov/documents/2021/10/20/2021-22849/privacy-act-of-1974-system-of-records), October 20, 2021, 86 FR 58084
- DHS/S&T-002 Personnel Radiation Exposure Records (https://www.gpo.gov/fdsys/pkg/FR-2008-12-11/html/E8-29398.htm), December 11, 2008, 73 FR 75461
- DHS/S&T-003 National Bioforensic Analysis Center Laboratory Elimination Database System of Records (https://www.federalregister.gov/documents/2021/05/11/2021-09937/privacy-act-of-1974-system-of-records), May 11, 2021, 86 FR 25877

## Transportation Security Administration (TSA)

- DHS/TSA-001 Transportation Security Enforcement Record System (https://www.federalregister.gov/documents/2018/08/28/2018-18558/privacy-act-of-1974-system-of-records), August 28, 2018, 83 FR 43888
    - DHS/TSA-001 Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2006-08-04/html/06-6670.htm), August 4, 2006, 71 FR 44223
- DHS/TSA-002 Transportation Security Threat Assessment System, (https://www.gpo.gov/fdsys/pkg/FR-2014-08-11/html/2014-18699.htm) August 11, 2014, 79 FR 46862
    - DHS/TSA-002 Final Rule for Privacy Act Exemptions, (https://www.gpo.gov/fdsys/pkg/FR-2004-06-25/html/04-14502.htm) June 25, 2004, 69 FR 35536
- DHS/TSA-003 Employee Transportation Facilitation Records (https://www.federalregister.gov/documents/2004/12/10/04-27096/privacy-act-of-1974-systems-of-records), December 10, 2004, 69 FR 71828
    - DHS/TSA-003 Final Rule for Privacy Act Exemptions, (https://www.federalregister.gov/documents/2004/06/25/04-14502/privacy-act-of-1974-implementation-of-exemption) June 25, 2004, 69 FR 35536
- DHS/TSA 004 Personnel Background Investigation File System (https://www.gpo.gov/fdsys/pkg/FR-2004-12-10/html/04-27096.htm), December 10, 2004, 69 FR 71828
    - DHS/TSA-004 Final Rule for Privacy Act Exemptions, (https://www.gpo.gov/fdsys/pkg/FR-2004-06-25/html/04-14502.htm) June 25, 2004, 69 FR 35536
- DHS/TSA-005 Internal Investigation Record System *has been replaced by DHS/ALL-020 above.*
- DHS/TSA-006 Correspondence and Matters Tracking Records, (https://www.gpo.gov/fdsys/pkg/FR-2010-04-13/html/2010-8316.htm) April 13, 2010, 75 FR 18863
    - DHS/TSA-006 Final Rule for Privacy Act Exemptions, (https://www.gpo.gov/fdsys/pkg/FR-2004-06-25/html/04-14502.htm) June 25, 2004, 69 FR 35536
- DHS/TSA-008 Notification Contact Lists (https://www.gpo.gov/fdsys/pkg/FR-2004-12-10/html/04-27096.htm), December 10, 2004, 69 FR 71828
- DHS/TSA-011 Transportation Security Intelligence Service Files (http://www.gpo.gov/fdsys/pkg/FR-2010-04-13/html/2010-8315.htm), April 13, 2010, 75 FR 18867

- DHS/TSA-011 Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2006-08-04/html/06-6670.htm), August 4, 2006, 71 FR 44223
- DHS/TSA-013 Federal Flight Deck Officer Record System, (https://www.gpo.gov/fdsys/pkg/FR-2010-04-13/html/2010-8317.htm) April 13, 2010, 75 FR 18860
  - DHS/TSA-013 Final Rule for Privacy Act Exemptions, (https://www.gpo.gov/fdsys/pkg/FR-2004-06-25/html/04-14502.htm) June 25, 2004, 69 FR 35536
- DHS/TSA-014 Telecommunications Usage Detail Records, (https://www.gpo.gov/fdsys/pkg/FR-2004-06-01/html/04-12452.htm) June 1, 2004, 69 FR 30948
- DHS/TSA-016 Security Technology Testing System, (https://www.gpo.gov/fdsys/pkg/FR-2004-07-01/html/04-14876.htm) July 1, 2004, 69 FR 39947
- DHS/TSA-019 Secure Flight Records, (https://www.gpo.gov/fdsys/pkg/FR-2015-01-05/html/2014-30856.htm) January 5, 2015, 80 FR 233
  - DHS/TSA-019 Final Rule for Privacy Act Exemptions, (https://www.gpo.gov/fdsys/pkg/FR-2007-11-09/html/E7-21907.htm) November 9, 2007, 72 FR 63706
- DHS/TSA-020 Safety Information System (http://www.gpo.gov/fdsys/pkg/FR-2005-07-27/html/05-14819.htm), July 27, 2005, 70 FR 43442
- DHS/TSA-021 TSA Pre✓™ Applications Program (https://www.gpo.gov/fdsys/pkg/FR-2013-09-10/html/2013-21979.htm), September 10, 2013, 78 FR 55274
  - DHS/TSA-021 Final Rule for Privacy Act Exemptions (http://www.gpo.gov/fdsys/pkg/FR-2014-01-02/html/2013-31183.htm), January 2, 2014, 79 FR 2
- DHS/TSA-022 National Finance Center Payroll Personnel System, (https://www.gpo.gov/fdsys/pkg/FR-2006-07-17/html/E6-11235.htm) July 17, 2006, 71 FR 40530
- DHS/TSA-023 Workplace Violence Prevention Program, (https://www.gpo.gov/fdsys/pkg/FR-2010-02-23/html/2010-3401.htm) February 23, 2010, 75 FR 8096
  - DHS/TSA-023 Final Rule for Privacy Act Exemptions, (http://www.gpo.gov/fdsys/pkg/FR-2011-07-18/html/2011-17938.htm) July 18, 2011, 76 FR 42003

## US Citizenship and Immigration Services (USCIS)

- DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records (https://www.federalregister.gov/documents/2017/09/18/2017-19365/privacy-act-of-1974-system-of-records), September 18, 2017, 82 FR 43556
  - Final Rule for Privacy Act Exemptions (http://www.gpo.gov/fdsys/pkg/FR-2013-11-22/html/2013-27896.htm), November 22, 2013, 78 FR 69983
- DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program System of Records (https://gcc02.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.federalregister.gov%2Fdocuments%2F2025%2F10%2F31%2F2025-19735%2Fprivacy-act-of-1974-system-of-records&data=05%7C02%7CAUDREY.DIMITREW%40hq.dhs.gov%7Cfad8931b752f4c9570dc08de188a1942%7C3ccde76c946d4a12bb7afc9d0842354a%7C0%7C0%7C638975179000000000%7C), October 31, 2025, 90 FR 48948
- DHS/USCIS-005 Inter-Country Adoptions Security (https://www.regulations.gov/document?D=DHS-2016-0071-0001), November 8, 2016, 81 FR 78614
- DHS/USCIS-006 Fraud Detection and National Security Records (FDNS) (http://www.gpo.gov/fdsys/pkg/FR-2012-08-08/html/2012-19337.htm), August 8, 2012, 77 FR 47411
  - Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2009-08-31/html/E9-20760.htm), August 31, 2009, 74 FR 45084
- DHS/USCIS-007 Benefits Information System (https://www.federalregister.gov/documents/2019/10/10/2019-22156/privacy-act-of-1974-system-of-records), October 10, 2019, 84 FR 54622
- DHS/USCIS-008 Refugee Access Verification Unit (http://www.gpo.gov/fdsys/pkg/FR-2013-11-25/html/2013-28247.htm), November 25, 2013, 78 FR 70313
- DHS/USCIS-009 Compliance Tracking and Monitoring System, (https://www.gpo.gov/fdsys/pkg/FR-2009-05-22/html/E9-11967.htm) May 22, 2009, 74 FR 24022
  - Final Rule for Privacy Act Exemptions, (https://www.gpo.gov/fdsys/pkg/FR-2010-08-23/html/2010-20856.htm) August 23, 2010, 75 FR 51619
- DHS/USCIS-010 Asylum Information and Pre-Screening System of Records, (http://www.gpo.gov/fdsys/pkg/FR-2015-11-30/html/2015-30270.htm) November 30, 2015, 80 FR 74781
- DHS/USCIS-011 E-Verify Program (https://www.federalregister.gov/documents/2019/06/18/2019-12789/privacy-act-of-1974-system-of-records), June 18, 2019, 84 FR 28326
- DHS/USCIS-012 Citizenship and Immigration Data Repository (CIDR) (https://www.federalregister.gov/documents/2018/05/01/2018-09235/privacy-act-of-1974-system-of-records), May 1, 2018, 83 FR 19082
  - Final Rule for Privacy Act Exemptions, (https://www.gpo.gov/fdsys/pkg/FR-2010-12-28/html/2010-32540.htm) December 28, 2010, 75 FR 81371
- DHS/USCIS-017 Refugee Case Processing and Security Screening Information System of Records (https://www.federalregister.gov/documents/2016/10/19/2016-25195/privacy-act-of-1974-department-of-homeland-securityunited-states-citizenship-and-immigration), October 19, 2016, 81 FR 72075

- DHS/USCIS-018 Immigration Biometric and Background Check (IBBC) System of Records (https://www.regulations.gov/document?D=DHS-2018-0003-0001), July 31, 2018, 83 FR 36950
  - NPRM for Privacy Act Exemptions (https://www.regulations.gov/document?D=DHS-2018-0002-0001), July 31, 2018, 83 FR 36792

## US Coast Guard (USCG)

- DHS/USCG-002 Employee Assistance Program Records (http://www.gpo.gov/fdsys/pkg/FR-2014-12-16/html/2014-29379.htm), December 16, 2014, 79 FR 74736
- DHS/USCG-006 Great Lakes Registered Pilot and Applicant Pilot Eligibility (http://www.gpo.gov/fdsys/pkg/FR-2014-12-16/html/2014-29380.htm), December 16, 2014, 79 FR 74744
- DHS/USCG-007 Special Needs Program System of Records, (https://www.gpo.gov/fdsys/pkg/FR-2011-05-03/html/2011-10756.htm) May 3, 2011, 76 FR 24905
- DHS/USCG-008 Courts-Martial and Military Justice Case Files System of Records (https://www.federalregister.gov/documents/2019/05/09/2019-09597/privacy-act-of-1974-system-of-records), May 9, 2019, 84 FR 20383
  - DHS/USCG-008 Final Rule for Courts-Martial and Military Justice Case Files, (http://www.gpo.gov/fdsys/pkg/FR-2011-05-13/html/2011-11689.htm) May 13, 2011, 76 FR 27847
- DHS/USCG-010 Physical Disability Evaluation System Files, (http://www.gpo.gov/fdsys/pkg/FR-2014-10-31/html/2014-25909.htm) October 31, 2014, 79 FR 64809
- DHS/USCG-011 Military Personnel Health Records (https://www.gpo.gov/fdsys/pkg/FR-2008-12-19/html/E8-29805.htm), December 19, 2008, 73 FR 77773
- DHS/USCG-012 Request for Remission of Indebtedness, (http://www.gpo.gov/fdsys/pkg/FR-2014-10-31/html/2014-25913.htm) October 31, 2014, 79 FR 64823
- DHS/USCG-013 Marine Information for Safety and Law Enforcement (MISLE) (http://edocket.access.gpo.gov/2009/E9-14906.htm), June 25, 2009, 74 FR 30305
  - DHS/USCG-013 Final Rule for Privacy Act Exemptions, (https://www.gpo.gov/fdsys/pkg/FR-2009-12-04/html/E9-28911.htm) December 4, 2009, 74 FR 63948
- DHS/USCG-014 Military Pay and Personnel (http://www.gpo.gov/fdsys/pkg/FR-2011-10-28/html/2011-27881.htm), October 28, 2011, 76 FR 66933
- DHS/USCG-015 Legal Assistance Case Files (https://www.regulations.gov/document?D=DHS-2016-0038-0001), July 14, 2016, 81 FR 45520
- DHS/USCG-016 Adjudication and Settlement of Claims (http://www.gpo.gov/fdsys/pkg/FR-2014-12-16/html/2014-29381.htm), December 16, 2014, 79 FR 74739
- DHS/USCG-017 Federal Medical Care Recovery Act (http://www.gpo.gov/fdsys/pkg/FR-2014-12-16/html/2014-29349.htm), December 16, 2014, 79 FR 74742
- DHS/USCG-018 Exchange System and Morale Well-Being and Recreation System Files (http://www.gpo.gov/fdsys/pkg/FR-2014-10-31/html/2014-25907.htm), October 31, 2014, 79 FR 64820
- DHS/USCG-019 Non-Federal Invoice Processing (https://www.gpo.gov/fdsys/pkg/FR-2008-12-19/html/E8-29811.htm), December 19, 2008, 73 FR 77790
- DHS/USCG-020 Substance Abuse Prevention and Treatment Program (http://www.gpo.gov/fdsys/pkg/FR-2011-08-10/html/2011-20229.htm), August 10, 2011, 76 FR 49500
- DHS/USCG-021 Appointment of Trustee or Guardian for Mentally Incompetent Personnel Files, (http://www.gpo.gov/fdsys/pkg/FR-2014-10-31/html/2014-25906.htm) October 31, 2014, 79 FR 64818
- DHS/USCG-024 Auxiliary Database, (https://www.gpo.gov/fdsys/pkg/FR-2014-04-25/html/2014-09476.htm) April 25, 2014, 79 FR 23001
- DHS/USCG-027 Recruiting Files (http://www.gpo.gov/fdsys/pkg/FR-2011-08-10/html/2011-20225.htm), August 10, 2011, 76 FR 49494
- DHS/USCG-028 Family Advocacy Case Records, (https://www.gpo.gov/fdsys/pkg/FR-2008-12-19/html/E8-29808.htm) December 19, 2008, 73 FR 77782
  - DHS/USCG-028 Final Rule for Privacy Act Exemptions, (https://www.gpo.gov/fdsys/pkg/FR-2009-08-31/html/E9-20759.htm) August 31, 2009, 74 FR 45085
- DHS/USCG-029 Notice of Arrival and Departure System of Records (https://www.federalregister.gov/documents/2017/07/17/2017-14841/privacy-act-of-1974-system-of-records), July 17, 2017, 82 FR 32715
  - DHS/USCG-029 Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2017/07/17/2017-14845/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-securityunited-states-coast), July 17, 2017, 82 FR 32613
- DHS/USCG-030 Merchant Seamen's Records (https://www.gpo.gov/fdsys/pkg/FR-2009-06-25/html/E9-14911.htm), June 25, 2009, 74 FR 30308
  - DHS/USCG-030 Final Rule for Privacy Act Exemptions, (https://www.gpo.gov/fdsys/pkg/FR-2009-12-04/html/E9-28912.htm) December 4, 2009 74 FR 63949
- DHS/USCG-031 USCG Law Enforcement (ULE) System of Records (https://www.regulations.gov/document?D=DHS-2016-0074-0001), December 8, 2016, 81 FR 88697

- DHS/USCG-031 Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2017/03/31/2017-06327/privacy-act-of-1974-implementation-of-exemptions-department-of-homeland-securityunited-states-coast), March 31, 2017, 82 FR 15981
  - DHS/USCG-032 Asset Logistics Management Information System (ALMIS) System of Records (https://www.federalregister.gov/documents/2018/05/01/2018-09231/privacy-act-of-1974-system-of-records), May 1, 2018, 83 FR 19087
  - DHS/USCG-060 Homeport (http://www.gpo.gov/fdsys/pkg/FR-2014-12-16/html/2014-29354.htm), December 16, 2014, 79 FR 74747
  - DHS/USCG-061 Maritime Analytic Support System (MASS), (https://www.federalregister.gov/documents/2020/11/23/2020-25540/privacy-act-of-1974-system-of-records) November 23, 2020, 85 FR 74742
    - DHS/USCG-061 Final Rule for Privacy Act Exemptions (https://www.federalregister.gov/documents/2021/03/25/2021-05941/privacy-act-of-1974-implementation-of-exemptions-us-department-of-homeland-security-united-states), March 25, 2021, 86 FR 15779
  - DHS/USCG-062 Law Enforcement Information Database (LEIDB)/Pathfinder, (https://www.gpo.gov/fdsys/pkg/FR-2008-09-30/html/E8-22612.htm) September 30, 2008, 73 FR 56930
    - DHS/USCG-062 Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2008-09-30/html/E8-22613.htm), September 30, 2008, 73 FR 56927

## US Secret Service (USSS)

- DHS/USSS-001 Criminal Investigation Information (https://www.federalregister.gov/documents/2020/10/13/2020-22533/privacy-act-of-1974-system-of-records) October 13, 2020, 85 FR 64523
  - DHS/USSS-001 Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2009-08-31/html/E9-20757.htm) August 31, 2009, 74 FR 45087
- DHS/USSS-003 Non-Criminal Investigation Information System (http://www.gpo.gov/fdsys/pkg/FR-2011-10-28/html/2011-27882.htm) October 28, 2011 76 FR 66937
  - DHS/USSS-003 Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2009-08-31/html/E9-20756.htm) August 31, 2009, 74 FR 45088
- DHS/USSS-004 Protection Information System (https://www.federalregister.gov/documents/2020/10/13/2020-22534/privacy-act-of-1974-system-of-records) October 13, 2020, 85 FR 64519
  - DHS/USSS-004 Final Rule for Privacy Act Exemptions (https://www.gpo.gov/fdsys/pkg/FR-2009-08-31/html/E9-20755.htm) August 31, 2009, 74 FR 45090

## Retired and Removed Notices

These System of Records Notices have been retired or removed.

- DHS/FEMA-017 Individuals and Households Program Equity Analysis Records System of Records (https://www.federalregister.gov/documents/2022/08/03/2022-16587/privacy-act-of-1974-system-of-records), August 3, 2022, 87 FR 47493
  - Rescindment - DHS/FEMA-017 Individuals and Households Program Equity Analysis Records System of Records, (https://www.federalregister.gov/documents/2025/03/26/2025-05074/privacy-act-of-1974-system-of-records) March 26, 2025, 90 FR 13772

## Topics

PRIVACY (/TOPICS/PRIVACY)

## Keywords

PRIVACY (/KEYWORDS/PRIVACY)

Last Updated: 10/31/2025

23 January 2025

# Lawful Pathways and Processes Report

23 JANUARY 2025

**Office of Homeland Security Statistics**
LRP-FRN-00018
U.S. Department of Homeland Security

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

**Table of Contents**

2.  Lawful Pathways and Processes Summary
3.  CBP One
4.  CHNV - Process for Cubans
5.  CHNV - Process for Haitians
6.  CHNV - Process for Nicaraguans
7.  CHNV - Process for Venezuelans
8.  FRP - Colombia
9.  FRP – Cuba
10. FRP - Ecuador
11. FRP - El Salvador
12. FRP - Guatemala
13. FRP - Haiti
14. FRP - Honduras

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

# Lawful Pathways and Processes Summary

23 January 2025

## CBP ONE ARRIVALS AT SWB POES

### NTAs with Parole By Top 10 Citizenships
SINCE JANUARY 12, 2023



**167,528,762**
Total Appointments Requested
+1,059,866 since previous week
+6,839,116 since previous month

**926,193**
Total Individuals with NTAs Released on Parole
+6,328 since previous week
+34,942 since previous month

## CUBA, HAITI, NICARAGUA, AND VENEZUELA PROCESSES

### Beneficiary Arrivals by Process
SINCE OCTOBER 18, 2022



**642,412**
Total Supporter Applications Confirmed
-5 since previous week
-39 since previous month

**531,686**
Total Beneficiary Arrivals at POEs
+0 since previous week
+5 since previous month

*Only includes individuals applying/arriving for CHP, HHP, NHP, and VHP processes.

## FAMILY REUNIFICATION PAROLE

### Beneficiary Arrivals by Process
SINCE JULY 31, 2023



**73,465**
Cumulative qualifying beneficiaries
+0 since previous week
+0 since previous month

**19,497**
Total Supporter Applications Confirmed
+54 since previous week
+228 since previous month

**14,069**
Total Beneficiary Arrivals at POEs
+126 since previous week
+413 since previous month

Note: The previous month is defined as the 28 days before the report date. All figures are based on preliminary data pulled from live systems, and are subject to change as data  mature. CBP One NTAs with Parole include noncitizens arriving at a POE with a CBP One appointment who request the opportunity to apply for asylum and who are issued an NTA and DT Parole (and exclude noncitizens with CBP One appointments who are not granted parole). Noncitizens arriving for CBP One and who are located within Northern Mexico are eligible to request an appointment up to once per day by accessing their registration. CHNV and FRP supporter applications confirmed describe  persons in the US who have filed an application to support a CHNV parolee. CHNV and FRP beneficiary arrivals at POEs are those individuals who arrive at a POE under their respective parole processes; these  individuals may not necessarily be paroled in. FRP qualifying beneficiaries are those whose sponsors were invited to apply on their behalf for the FRP process. Data are current as of report date; future reporting may include updates to previous reports' data.

2

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

# CBP One

### SINCE JANUARY 12TH, 2023

23 January 2025



**APPOINTMENTS REQUESTED**

**167,528,762**

**Cumulative Appointments Requested**
+1,059,866 since previous week

**APPOINTMENTS SCHEDULED**

**977,913**

**Cumulative Appointments**
+3,948 since previous week

**ARRIVALS**

**961,418**

**Cumulative Arrivals**
+7,854 since previous week

**NTAS WITH PAROLE BY NATIONALITY**

**926,193**

**Individuals with NTAs Released on Parole**
+6,328 since previous week

**NTAS WITH PAROLE BY FAMILY STATUS**

UC — 19
FM — 425,494
SA — 500,133
AM — 547

**NTAS WITH PAROLE BY SEX**

Male — 510,689
Female — 415,493
Unknown — 11

Notes: While CBP One Registrations can be done from anywhere, appointments can only be requested and scheduled by individuals within the select geofenced zone. Once a registration is complete, noncitizens located within Northern Mexico are eligible to request an appointment up to once per day by accessing their registration. Parolees include individuals issued an NTA and granted parole (for OFO ports after a CBP One appointment as a POE (and exclude noncitizens with CBP One appointments who are not granted parole). All figures are based on preliminary data pulled from live system and subject to change as data mature.

Source: OHSS analysis of appointments requested and scheduled data provided by CBP PSPD and valid as of 01/23/2025 5:47 AM; OHSS analysis of parolees data downloaded from UIP and valid as of 01/23/2025 5:10 AM. Data are current as of report date; future reporting may include updates to previous reports' data.

UNCLASSIFIED//FOR OFFICIAL USE ONLY//NOT FOR FURTHER DISSEMINATION

23 January 2025

# CHNV: Process for Cubans

SINCE JANUARY 6TH, 2023



SUPPORTER APPLICATIONS CONFIRMED

**130,947**

Cumulative confirmed applications

+0 since previous week

BENEFICIARY MATERIALS COMPLETED

**118,348**

Cumulative submissions completed

+1 since previous week

BENEFICIARY TRAVEL AUTHORIZATIONS

**109,620**

Cumulative approvals

+0 since previous week

BENEFICIARY ARRIVALS AT POES
BY TOP 3 COUNTRIES OF EMBARKATION

**110,243**

Cumulative arrivals

+0 since previous week

ARRIVALS BY AGE AND SEX

BENEFICIARY LOCATIONS
BY TOP 5 COUNTRIES

SUPPORTER LOCATIONS
BY TOP 5 STATES OF RESIDENCE

APPLICATIONS & ARRIVALS

Notes: Report data are person-level (i.e., exclude duplicate entry records). Beneficiary Travel Authorizations exclude expired applications. All figures are based on preliminary data pulled from live systems and are subject to change in the future.
Source: OHSS analysis of confirmed applications, supporter locations, and beneficiary locations data provided by USCIS and valid as of 01/22/2025 1:58 PM OHSS analysis of submissions completed, approvals, and parolees data provided by CBP PSPD and valid as of 01/22/2025 7:13 AM. Data are current as of report date; future reporting may include updates to previous reports' data.

UNCLASSIFIED//FOR OFFICIAL USE ONLY//NOT FOR FURTHER DISSEMINATION

# CHNV: Process for Haitians

23 January 2025

SINCE JANUARY 6TH, 2023



Form I-134A Data Transmitted From USCIS to CBP

Approval/Denial Status Sent to USCIS

Approved Beneficiaries Schedule Travel

Travel Authorization Status Confirmed

**SUPPORTER APPLICATIONS CONFIRMED**

238,587

Cumulative confirmed applications
-5 since previous week

- Confirmations: 238,587
- Non-Confirmations: 92,067

**BENEFICIARY MATERIALS COMPLETED**

229,173

Cumulative submissions completed
+2 since previous week

- 229,173

**BENEFICIARY TRAVEL AUTHORIZATIONS**

208,319

Cumulative approvals
+0 since previous week

- Approved: 208,319
- Denied: 10,967
- Pending: 8,174

**BENEFICIARY ARRIVALS AT POE**
BY TOP 3 COUNTRIES OF EMBARKATION

211,039

Cumulative arrivals
+0 since previous week

- Haiti: 190,895
- Dom. Rep.: 11,756
- Mexico: 2,123
- Other: 6,265

**ARRIVALS BY AGE AND SEX**

- Female: 108,612
- Male: 102,427
- 0-17: 6,396
- 18-30: 102,946
- 31-61: 70,26(
- 61+: 31,4(

**SUPPORTER LOCATIONS**
BY TOP 5 STATES OF RESIDENCE

- Florida: 102,701
- New York: 37,993
- Massachusetts: 25,321
- New Jersey: 17,550
- Pennsylvania: 7,554

**BENEFICIARY LOCATIONS**
BY TOP 5 COUNTRIES

- Haiti: 121,768
- Dom. Rep.: 3,767
- Chile: 958
- Mexico: 653
- Bahamas: 343

APPLICATIONS & ARRIVALS

Notes: Report data are person-level (i.e., exclude duplicate entry records). Beneficiary Travel Authorizations exclude expired applications. All figures are based on preliminary data pulled from live systems and are subject to change in the future.
Source: OHSS analysis of confirmed applications, supporter locations, and beneficiary locations data provided by USCIS and valid as of 01/22/2025 1:58 PM OHSS analysis of submissions completed, approvals, and parolees data provided by CBP PSPD and valid as of 01/22/2025 7:13 AM. Data are current as of report date; future reporting may include updates to previous reports' data.

23 January 2025

# CHNV: Process for Nicaraguans   SINCE JANUARY 6TH, 2023

UNCLASSIFIED//FOR OFFICIAL USE ONLY//NOT FOR FURTHER DISSEMINATION

Form I-134A Data Transmitted From USCIS to CBP

Approval/Denial Status Sent to USCIS

Approved Beneficiaries Schedule Travel

Travel Authorization Status Confirmed

## SUPPORTER APPLICATIONS CONFIRMED

**114,736**

**Cumulative confirmed applications**

+0 since previous week

Confirmations: 114,736
Non-Confirmations: 18,318

## BENEFICIARY MATERIALS COMPLETED

**104,623**

**Cumulative submissions completed**

+3 since previous week

104,623

## BENEFICIARY TRAVEL AUTHORIZATIONS

**93,799**

**Cumulative approvals**

+0 since previous week

Approved: 93,799
Denied: 6,152
Pending: 3,469

## BENEFICIARY ARRIVALS AT POES
BY TOP 3 COUNTRIES OF EMBARKATION

**93,076**

**Cumulative arrivals**

+0 since previous week

Nicaragua: 89,312
Costa Rica: 814
United States: 1,083
Other: 1,867

## ARRIVALS BY AGE AND SEX

Female: 49,679
Male: 43,397

Female: 43,397
Male: 49,679

0-17: 2,287
18-30: 42,555
31-61: 32,071
61+: 16,155

## APPLICATIONS & ARRIVALS

400,000
360,000
320,000
280,000
240,000
200,000
160,000
120,000
80,000
40,000
0

## SUPPORTER LOCATIONS
BY TOP 5 STATES OF RESIDENCE

Florida: 41,916
California: 20,919
Texas: 9,439
Maryland: 3,383
New York: 3,202

400,000
360,000
320,000
280,000
240,000
200,000
160,000
120,000
80,000
40,000
0

## BENEFICIARY LOCATIONS
BY TOP 5 COUNTRIES

Nicaragua: 100,233
Mexico: 2,274
Costa Rica: 600
Spain: 523
Unknown: 423

Notes: Report data are person-level (i.e., exclude duplicate entry records). Beneficiary Travel Authorizations exclude expired applications. All figures are based on preliminary data pulled from live systems and are subject to change in the future. Source: OHSS analysis of confirmed applications, supporter locations, and beneficiary locations data provided by USCIS and valid as of 01/22/2025 1:58 PM OHSS analysis of submissions completed, approvals, and parolees data provided by CBP PSPD and valid as of 01/22/2025 7:13 AM. Data are current as of report date; future reporting may include updates to previous reports' data.



# CHNV: Process for Venezuelans SINCE OCTOBER 18, 2022

23 January 2025

UNCLASSIFIED//FOR OFFICIAL USE ONLY//NOT-FOR-FURTHER DISSEMINATION

**SUPPORTER APPLICATIONS CONFIRMED**

158,142

Cumulative confirmed applications

+0 since previous week

158,142 Confirmations
38,282 Non-Confirmations

**BENEFICIARY MATERIALS COMPLETED**

135,448

Cumulative submissions completed

+12 since previous week

135,448

**BENEFICIARY TRAVEL AUTHORIZATIONS**

117,584

Cumulative approvals

+0 since previous week

117,584 Approved
7,973 Denied
8,573 Pending

**BENEFICIARY ARRIVALS AT POES** BY TOP 3 COUNTRIES OF EMBARKATION

117,328

Cumulative arrivals

+0 since previous week

38,055 Colombia
31,619 Venezuela
26,114 Dom. Rep.
21,540 Other

**ARRIVALS BY AGE AND SEX**

Female 54,482
Male 62,845
Unknown 1

0-17 12,946
18-30 50,440
31-61 
61+ 29,569
24,31

**SUPPORTER LOCATIONS** BY TOP 5 STATES OF RESIDENCE

65,133 Florida
24,212 Texas
8,138 Georgia
6,133 Utah
5,352 New York

**BENEFICIARY LOCATIONS** BY TOP 5 COUNTRIES

70,742 Venezuela
28,957 Mexico
5,813 Chile
5,473 Unknown
4,467 Colombia

APPLICATIONS & ARRIVALS

Notes: Report data are person-level (i.e., exclude duplicate entry records). Beneficiary Travel Authorizations exclude expired applications. All figures are based on preliminary data pulled from live systems and are subject to change in the future.
Source: OHSS analysis of confirmed applications, supporter locations, and beneficiary locations data provided by USCIS and valid as of 01/22/2025 1:58 PM OHSS analysis of submissions completed, approvals, and parolees data provided by CBP PSPD and valid as of 01/22/2025 7:13 AM. Data are current as of report date; future reporting may include updates to previous reports' data.

UNCLASSIFIED//FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

23 January 2025

# Family Reunification Parole for Colombians



Form I-134A Data Transmitted From USCIS to CBP Approval/Denial Status Sent to USCIS    Approved Beneficiaries Schedule Travel    Travel Authorization Status Confirmed

**INVITATIONS ISSUED**
7,932
Cumulative qualifying beneficiaries
+0 since previous week

**SUPPORTER APPLICATIONS CONFIRMED**
1,796
Cumulative confirmed applications
+6 since previous week

**HEALTH SCREENINGS CLEARED**
1,469
Health screenings cleared
+11 since previous week

**BENEFICIARY MATERIALS COMPLETED**
1,417
Cumulative submissions completed
+5 since previous week

**BENEFICIARY TRAVEL AUTHORIZATIONS**
1,126
Cumulative travel authorizations
-60 since previous week

**ARRIVALS**

ARRIVALS BY AGE

ARRIVALS BY SEX

BENEFICIARY ARRIVALS AT POES BY TOP 3 PORTS OF ENTRY

BENEFICIARY ARRIVALS AT POES BY TOP 3 COUNTRIES OF EMBARKATION

1,116
Cumulative Paroles
+20 since previous week

Notes: Beneficiary count includes both principal and derivative beneficiaries. The number of invitations sent may be less than the number of beneficiaries, as multiple beneficiaries may qualify based on one invitation. Beneficiary Travel Authorizations exclude expired applications. All figures are based on preliminary data pulled from live systems, and are subject to change as data matures.

Source: OHSS analysis of beneficiaries invited, supporter applications confirmed, and health screenings data provided by USCIS and valid as of 01/23/2025 10:00 AM OHSS analysis of beneficiary materials completed, travel authorizations, and parolees data provided by CBP PSPD and valid as of 01/23/2025 7:36 AM. Data are current as of report date; future reporting may include updates to previous reports' data.

UNCLASSIFIED//FOR OFFICIAL USE ONLY//NOT FOR FURTHER DISSEMINATION

23 January 2025

# Family Reunification Parole for Cubans



**Notes:** Beneficiary count includes both principal and derivative beneficiaries. The number of invitations sent may be less than the number of beneficiaries, as multiple beneficiaries may qualify based on one invitation. Beneficiary Travel Authorizations exclude expired applications. All figures are based on preliminary data pulled from live systems, and are subject to change as data mature. FRP-FRN-00626

**Source:** OHSS analysis of beneficiaries invited, supporter applications confirmed, and health screenings data provided by USCIS and valid as of 01/23/2025 10:00 AM OHSS analysis of beneficiary materials completed, travel authorizations, and parolees data provided by CBP PSPD and valid as of 01/23/2025 7:36 AM. Data are current as of report date; future reporting may include updates to previous reports' data.

UNCLASSIFIED//FOR OFFICIAL USE ONLY//NOT FOR FURTHER DISSEMINATION

23 January 2025

# Family Reunification Parole for Ecuadorans



INVITATIONS ISSUED — Form I-134A Data Transmitted From USCIS to CBP

**6,436**
Cumulative qualifying beneficiaries
+0 since previous week

SUPPORTER APPLICATIONS CONFIRMED — Approval/Denial Status Sent to USCIS

**1,295**
Cumulative confirmed applications
+1 since previous week

HEALTH SCREENINGS CLEARED — Approved Beneficiaries Schedule Travel

**1,060**
Health screenings cleared
+3 since previous week

BENEFICIARY MATERIALS COMPLETED

**978**
Cumulative submissions completed
+6 since previous week

BENEFICIARY TRAVEL AUTHORIZATIONS — Travel Authorization Status Confirmed

**659**
Cumulative travel authorizations
-4 since previous week

ARRIVALS BY AGE

ARRIVALS BY SEX — 333 Female, 317 Male

BENEFICIARY ARRIVALS AT POES BY TOP 3 PORTS OF ENTRY

BENEFICIARY ARRIVALS AT POES BY TOP 3 COUNTRIES OF EMBARKATION

**640**
Cumulative Parolees
+0 since previous week

Notes: Beneficiary count includes both principal and derivative beneficiaries. The number of invitations sent may be less than the number of beneficiaries, as multiple beneficiaries may qualify based on one invitation. Beneficiary Travel Authorizations exclude expired applications. All figures are based on preliminary data pulled from live systems, and are subject to change as data matures.

Source: OHSS analysis of beneficiaries invited, supporter applications confirmed, and health screenings data provided by USCIS and valid as of 01/23/2025 10:00 AM OHSS analysis of beneficiary materials completed, travel authorizations, and parolees data provided by CBP PSPD and valid as of 01/23/2025 7:36 AM. Data are current as of report date; future reporting may include updates to previous reports' data.

FRP-FRN-00627



# Family Reunification Parole for Salvadorans

23 January 2025

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

Form I-134A Data Transmitted From USCIS to CBP Approval/Denial Status Sent to USCIS    Approved Beneficiaries Schedule Travel    Travel Authorization Status Confirmed

**INVITATIONS ISSUED**
16,187
Cumulative qualifying beneficiaries
+0 since previous week

**SUPPORTER APPLICATIONS CONFIRMED**
3,086
Cumulative confirmed applications
+15 since previous week

**HEALTH SCREENINGS CLEARED**
2,336
Health screenings cleared
+14 since previous week

**BENEFICIARY MATERIALS COMPLETED**
2,259
Cumulative submissions completed
+11 since previous week

**BENEFICIARY TRAVEL AUTHORIZATIONS**
1,794
Cumulative travel authorizations
-158 since previous week

Invitations issued by Round:
1: 7/23 — 2,580
2: 8/23 — 10,696
3: 8/23 — 0
4: 11/23 — 0
5: 6/24 — 2,911
(0, 0)

Supporter Applications: Confirmations 3,086; Non-Confirmations 1,304; Pending Confirmations 46

Health Screenings: Cleared 2,336; Not Cleared 58; Pending 40

Beneficiary Materials Completed: 2,259

Travel Authorizations: Approved 1,794; Denied 246; Pending 219

**ARRIVALS**

**ARRIVALS BY AGE**
0-17: 501
18-30: 335
31-61: 936
61+: 45

**ARRIVALS BY SEX**
Female: 987
Male: 830

**BENEFICIARY ARRIVALS AT POES BY TOP 3 PORTS OF ENTRY**
WAS – WASHINGTON, DC: 370
LOS – LOS ANGELES, CA: 369
HOU – HOUSTON, TX: 313
Other: 765

**BENEFICIARY ARRIVALS AT POES BY TOP 3 COUNTRIES OF EMBARKATION**
1,817
Cumulative Parolees
+42 since previous week

El Salvador: 1,766
United States: 34
Guatemala: 7
Other

Notes: Beneficiary count includes both principal and derivative beneficiaries. The number of invitations sent may be less than the number of beneficiaries, as multiple beneficiaries may qualify based on one invitation. Beneficiary Travel Authorizations exclude expired applications. All figures are based on preliminary data pulled from live systems, and are subject to change as data matures. RP-FRN-00628

Source: OHSS analysis of beneficiaries invited, supporter applications confirmed, and health screenings data provided by USCIS and valid as of 01/23/2025 10:00 AM OHSS analysis of beneficiary materials completed, travel authorizations, and parolees data provided by CBP PSPD and valid as of 01/23/2025 7:36 AM. Data are current as of report date; future reporting may include updates to previous reports' data.

11

UNCLASSIFIED//FOR OFFICIAL USE ONLY//NOT FOR FURTHER DISSEMINATION

23 January 2025

# Family Reunification Parole for Guatemalans



**Notes:** Beneficiary count includes both principal and derivative beneficiaries. The number of invitations sent may be less than the number of beneficiaries, as multiple beneficiaries may qualify based on one invitation. Beneficiary Travel Authorizations exclude expired applications. All figures are based on preliminary data pulled from live systems, and are subject to change as data mature. ERP-FRN-00629

**Source:** OHSS analysis of beneficiaries invited, supporter applications confirmed, and health screenings data provided by USCIS and valid as of 01/23/2025 10:00 AM OHSS analysis of beneficiary materials completed, travel authorizations, and parolees data provided by CBP PSPD and valid as of 01/23/2025 7:36 AM. Data are current as of report date; future reporting may include updates to previous reports' data.

12

UNCLASSIFIED//FOR OFFICIAL USE ONLY//NOT FOR FURTHER DISSEMINATION

23 January 2025

# Family Reunification Parole for Haitians



Notes: Beneficiary count includes both principal and derivative beneficiaries. The number of invitations sent may be less than the number of beneficiaries, as multiple beneficiaries may qualify based on one invitation. Beneficiary Travel Authorizations exclude expired applications. All figures are based on preliminary data pulled from live systems, and are subject to change as data mature.

Source: OHSS analysis of beneficiaries invited, supporter applications confirmed, and health screenings data provided by USCIS and valid as of 01/23/2025 10:00 AM OHSS analysis of beneficiary materials completed, travel authorizations, and parolees data provided by CBP PSPD and valid as of 01/23/2025 7:36 AM. Data are current as of report date; future reporting may include updates to previous reports' data.

ERP-FRN-00630

13

UNCLASSIFIED//FOR OFFICIAL USE ONLY//NOT FOR FURTHER DISSEMINATION

23 January 2025

# Family Reunification Parole for Hondurans



Form I-134A Data Transmitted From USCIS to CBP Approval/Denial Status Sent to USCIS   Approved Beneficiaries Schedule Travel   Travel Authorization Status Confirmed

**INVITATIONS ISSUED** 5,531
Cumulative qualifying beneficiaries
+0 since previous week

ARRIVALS

| Round | |
|---|---|
| 1: 7/23 | 764 |
| 2: 8/23 | 3,575 |
| 3: 8/23 | 0 |
| 4: 11/23 | 0 |
| 5: 6/24 | 1,192 |

**SUPPORTER APPLICATIONS CONFIRMED** 966
Cumulative confirmed applications
+18 since previous week

| Confirmations | Non-Confirmations | Pending |
|---|---|---|
| 966 | 669 | 42 |

**HEALTH SCREENINGS CLEARED** 774
Health screenings cleared
+6 since previous week

| Cleared | Not Cleared | Pending |
|---|---|---|
| 774 | 7 | 15 |

**BENEFICIARY MATERIALS COMPLETED** 709
Cumulative submissions completed
+0 since previous week

709

**BENEFICIARY TRAVEL AUTHORIZATIONS** 572
Cumulative travel authorizations
-31 since previous week

| Approved | Denied | Pending |
|---|---|---|
| 572 | 47 | 90 |

ARRIVALS BY AGE

| 0-17 | 18-30 | 31-61 | 61+ |
|---|---|---|---|
| 174 | 98 | 305 | 4 |

ARRIVALS BY SEX

Female
Male
311
269

BENEFICIARY ARRIVALS AT POES BY TOP 3 PORTS OF ENTRY

| MIA - MIAMI, FL | FTL - FT. LAUDERDALE, FL | HOU - HOUSTON, TX | Other |
|---|---|---|---|
| 190 | 90 | 77 | 224 |

BENEFICIARY ARRIVALS AT POES BY TOP 3 COUNTRIES OF EMBARKATION

Cumulative Parolees 581
+11 since previous week

| Honduras | El Salvador | United States | Other |
|---|---|---|---|
| 563 | 7 | 6 | 5 |

Notes: Beneficiary count includes both principal and derivative beneficiaries. The number of invitations sent may be less than the number of beneficiaries, as multiple beneficiaries may qualify based on one invitation. Beneficiary Travel Authorizations exclude expired applications. All figures are based on preliminary data pulled from live systems, and are subject to change as data matures.

Source: OHSS analysis of beneficiaries invited, supporter applications confirmed, and health screenings data provided by USCIS and valid as of 01/23/2025 10:00 AM OHSS analysis of beneficiary materials completed, travel authorizations, and parolees data provided by CBP PSPD and valid as of 01/23/2025 7:36 AM. Data are current as of report date; future reporting may include updates to previous reports' data.

ERP-FRN-00631

14



**From:** Higgins, Jennifer B ████████████████████████
**Sent:** Thursday, January 23, 2025 4:55 PM
**To:** Meckley, Tammy M ████████████████ DeNayer, Larry C
████████████████ Nolan, Connie L ████████████████ Valverde, Michael
████████████████ Lotspeich, Katherine J ████████████████; Kim, Ted H
████████████ Maxwell, Rebecca M (Becca) ████████████████ Knafla,
Susan J ████████████
**Cc:** Scott, Kika M ████████████████ Calkins, Aaron L ████████████
Deshommes, Samantha L ████████████████; Miles, John D
████████████ Selby, Cara M (Carrie) ████████████ Lotspeich, Katherine
J ████████████ Puchek, Elizabeth A (Beth) ████████████
**Subject:** Securing Our Borders EO and Parole Processing

Colleagues,

Pursuant to the Executive Order issued Jan. 20. 2025 titled *Securing Our Borders*, and in accordance with Acting Secretary Huffman's memorandum dated Jan. 20, 2025, which directs ICE, CBP, and USCIS to conduct a review of DHS policies and practices governing parole, **please ensure effective immediately that your staff do not make any final decisions** (approval, denial, closure) or issue a travel document or I-94 for any initial parole or re-parole application, petition, motion, or other request, for the following parole programs, processes, or types:

- Uniting for Ukraine (U4U),

- Re-parole of Afghan nationals paroled under Operations Allies Welcome (OAW),

- Family Reunification Parole (FRP) Processes, including legacy Cuban Family Reunification Parole Program (CFRP) cases,

- Central American Minors (CAM),

- Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV),

- International Entrepreneur Parole,

- Parole of Western Hemisphere nationals interviewed for refugee status in Safe Mobility Offices (WHP), and

- Certain former members of the Mojahedin-e-Khalq (MeK) reparole,

This instruction does not include requests for advance parole, non-categorical Form I-131 Humanitarian Parole requests, or government referrals for parole filed and adjudicated on a case-by-case basis for urgent humanitarian reasons or significant public benefit.


We will provide additional information when available.

Thank you,

Jennifer

**SUPPORTING STATEMENT FOR**
**Online Request to be a Supporter and Declaration of Financial Support**
**OMB Control No.: 1615-0157**
**COLLECTION INSTRUMENT(S): Form I-134A**

## A. Justification

1. **Explain the circumstances that make the collection of information necessary. Identify any legal or administrative requirements that necessitate the collection. Attach a copy of the appropriate section of each statute and regulation mandating or authorizing the collection of information.**

   Section 212(d)(5) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(d)(5)) provides the Secretary of Homeland Security with the discretionary authority to parole noncitizens into the United States temporarily, under such reasonable conditions that the Secretary may prescribe, only on a case-by-case basis for "urgent humanitarian reasons or significant public benefit." *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); see also 6 U.S.C. 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules…governing…parole").

   U.S. Department of Homeland Security (DHS) uses this collection to obtain information from individuals who want to initiate consideration for certain parole processes on behalf of nationals of certain countries and their immediate family members. Under these parole processes, potential U.S.-based supporters may submit this online form on behalf of a beneficiary to demonstrate that the potential supporter has sufficient financial resources and access to those funds to support the beneficiary for the duration of the beneficiary's temporary stay in the United States.

   The potential supporter will also indicate why they believe the beneficiary warrants a discretionary grant of parole based on urgent humanitarian reasons or significant public benefit. The supporter's response may be used by U.S. Citizenship and Immigration Services (USCIS) to prioritize the request or by U.S. Customs and Border Protection (CBP) later in consideration of the parole determination.

   USCIS will review the information submitted on the Form I-134A to determine if the potential supporter has demonstrated sufficient financial resources to support the beneficiary for the duration of the beneficiary's temporary stay in the United States and to conduct security and background checks on the potential supporter. If the potential supporter's eligibility is confirmed, DHS thoroughly vets the beneficiary and may ultimately issue the beneficiary advance travel authorization to travel to the United States to seek parole.

1

Any individual or co-supporter filing an I-134A, or individual filing an I-134A on behalf of an organization, may be required to submit biometric information. DHS will collect and store the biometric information submitted by an individual for present or future use, by electronic or other means. DHS may use this biometric information to conduct background and security checks, adjudicate immigration and naturalization benefits, and perform other functions related to administering and enforcing the immigration and naturalization laws. See 8 CFR 103.16; 8 U.S.C. 1103(a).

**This Emergency Revision:**
In this emergency request, USCIS is amending the Form I-134A for potential supporters and co-supporters under the Uniting for Ukraine (U4U) process and the processes for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV) to: (1) require potential supporters and co-supporters to submit biometrics, (2) require a $30.00 biometric services fee, (3) require potential co-supporters to also submit a Form I-134A, and (4) require all potential supporters to submit a copy of a government-issued photo identity document for themselves and a copy of the beneficiary's passport biographic data page.

USCIS has also made updates to identification elements for organizations by requesting information about the organization's name, phone number, email address, tax identification number, finances, and confirmation of the organization's support of the beneficiary. The Form I-134A instructions are being updated with the associated information. The addition of information related to the submission of biometrics and the associated fee is necessary to ensure that the information submitted by the potential supporters is accurate, that DHS can verify supporter identity, and that DHS can run security and background checks on potential supporters, particularly for the identification of any public safety, national security, human trafficking, or exploitation concerns.

USCIS is revising the Form I-134A instructions to make clear that a supporter who is submitting the request on behalf of an organization may be required by USCIS at its discretion biometrics, pay a biometrics services fee, and undergo additional background vetting using biometrics. USCIS is generally authorized to require biometrics submission from petition signatories by 8 CFR 103.2(b)(9) on a per case basis at the discretion of USCIS when circumstances require additional vetting, and authorized to require biometrics from certain populations through form instructions by 8 CFR 103.16, and to charge a fee as provided in 8 CFR 103.17. The new instructions will put organizational representatives on clear notice that they may be required to undergo biometrics based background vetting to receive confirmation of their or their organization's Form I-134A as a supporter.

The revisions under this request will apply to potential supporters and co-supporters under the U4U process and the CHNV processes, but not to potential supporters for family reunification parole (FRP) processes available by invitation only to certain petitioners who filed an approved Form I-130, Petition for Alien Relative, on behalf of a

2

principal beneficiary who is a national of Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, or Honduras, and their immediate family members. Those processes differ from U4U and CHNV because the supporter must be an approved close relative petitioner.

**2.    Indicate how, by whom, and for what purpose the information is to be used. Except for a new collection, indicate the actual use the agency has made of the information received from the current collection.**

USCIS uses Form I-134A to determine whether certain U.S.-based individuals have sufficient financial resources and access to those funds to support the beneficiary named on the Form I-134A for the duration of their temporary stay in the United States, as well as to obtain information concerning whether the beneficiary merits a favorable exercise of discretion under the statutory parole standard. Currently, Form I-134A is used for the U4U process; CHNV processes; and the Cuban, Colombian, Ecuadorian, Guatemalan, Haitian, Honduran, and Salvadoran family reunification parole (FRP) processes.

Form I-134A is filed by a U.S.-based individual (the potential supporter) to request to be a supporter, agree to provide financial support to the beneficiary named on the form during the beneficiary's period of stay in the United States, and to provide information concerning why the beneficiary warrants a discretionary grant of parole. Form I-134A is filed online.

Under the U4U and the CHNV processes, multiple U.S.-based supporters may join together to support a beneficiary, and organizations, businesses, and other entities can provide some or all of the necessary support to the beneficiaries applying. In those instances, an individual is required to file and sign the Form I-134A and should submit evidence demonstrating the identity of, and resources to be provided by, the co-supporters, or entity, and attach a statement explaining the intent to share responsibility to support the beneficiary among individuals or an entity's commitment to support the beneficiary. Each additional individual co-supporter must also file their own I-134A, to ensure that the information submitted by the potential co-supporter is accurate, DHS can verify co-supporter identity, and DHS can run security and background checks on potential co-supporters, particularly for the identification of any public safety, national security, human trafficking, or exploitation concerns. However, under the FRP processes applicable to Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, Ecuador, and Honduras, only a close relative, the petitioner of the approved Form I-130, Petition for Alien Relative, may file Form I-134A on the behalf of a beneficiary.

The additional information related to submitting biometrics and payment of the biometrics services fee are necessary to ensure that the information submitted by the prospective supporters is accurate, that DHS can verify supporter identity, and DHS can run security and background checks on prospective supporters, particularly for the

3

identification of any public safety, national security, human trafficking, or exploitation concerns. Information about the beneficiary provided on Form I-134A will be used for security screening and advance travel authorization from DHS (OMB Control Number 1651-0143) for eligible nationals. Prior to the transmission of this information from USCIS to CBP for this purpose, the beneficiary will be requested to electronically confirm the accuracy of the information provided on their behalf by the supporter. Collecting a copy of the beneficiary's biographic information page from their passport at the time the Form I-134A is filed will also allow USCIS to correct minor spelling and input errors during the review of the Form I-134A and improve the accuracy and efficiency of beneficiary information that USCIS transmits to CBP.

USCIS will require the submission of biometrics from all potential supporters and co-supporters filing the Form I-134A, to verify the potential supporter's identity, obtain new or updated background checks, and produce any necessary documentation related to the supporter's support of the beneficiary.

3.    **Describe whether, and to what extent, the collection of information involves the use of automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of responses, and the basis for the decision for adopting this means of collection. Also describe any consideration of using information technology to reduce burden.**

This information collection provides the most efficient and accurate means for gathering and processing information about whether U.S.-based individuals, and, where applicable to the specific parole process, multiple supporters or organizations have sufficient financial resources to support the named beneficiary for their period of temporary stay in the United States.  The form also collects information about the beneficiary to be used for security screening and advance travel authorization from DHS (OMB Control Number 1651-0143) for eligible nationals, and information concerning why the beneficiary warrants a discretionary grant of parole.  Form I-134A is filed online only by certain U.S.-based individuals on behalf of noncitizens seeking parole into the United States for urgent humanitarian reasons or significant public benefit under the designated parole processes.

Those individuals who are agreeing to support a beneficiary who is not seeking consideration under one of the designated parole processes associated with this information collection (Form I-134A) will use the paper-version of USCIS Form I-134 (OMB Control Number: 1615-0014), available as a fillable PDF on the USCIS website at uscis.gov/i-134.  Once completed, the fillable PDF can be printed, signed, and submitted to USCIS by mail.  Form I-134 can also be filed with the Department of State (DOS). See www.travel.state.gov for more information on filing.

USCIS uses various tools to collect feedback from end users of USCIS information

4

collections. These tools include surveys or focus groups designed to collect general information, as well as public feedback submitted to USCIS either in response to an official solicitation of public comments from Federal Register publications or submitted proactively through USCIS' robust external outreach activities with stakeholders (see, e.g. www.uscis.dhs.gov/outreach). USCIS also performed usability testing on USCIS Forms I-765, N-400, and I-485 (the three highest-filing forms) with the goal of studying cross-cutting issues that impact the responding public across the entirety of the USCIS collections of information USCIS.

In addition to feedback from external stakeholders, our analysis considers consultation with internal agency stakeholders regarding such activities including, but not limited to, document submission, evidentiary requirements, and like activities. USCIS extensively engages with various program, policy, and intake teams for feedback on the information collections. USCIS analyzes the results of all of these efforts to identify necessary modifications to the collection tools approved for use under the Paperwork Reduction Act. Such modifications could include clarifying edits, potential question removal, and instructional updates, all intended to further support the respondent's experience in complying with a collection of information. The collection of information proposed in this current submission is the cumulative result of all of this analysis and studies conducted.

The original creation of Form I-134A was done as an emergency submission in support of DHS's efforts to curb a surge in migrants crossing the Southwest Border without authorization and immediately expand the avenues for lawful migration into the United States. USCIS monitored the submission process, analyzed feedback from respondents, as well as input from internal assessment of user experience and is submitting these changes as a result. These changes will allow USCIS to more fully screen and vet all parties involved in the parole process, to include U.S.-based supporters. USCIS has provided a synopsis of the edits associated with the processes to the information collection within the Copy Deck Table of Changes (TOC) for the Form I-134A.

4.    **Describe efforts to identify duplication. Show specifically why any similar information already available cannot be used or modified for use for the purposes described in Item 2 above.**

A search of DHS systems revealed no duplication and no similar data collected. The requirement that certain family-based immigrants and employment-based immigrants must show they have adequate means of financial support and are not inadmissible under the public charge ground, which is documented on USCIS Form I-864, Affidavit of Support Under Section 213A of the INA, is inapplicable to parole in general and to these parole processes specifically.

5.    **If the collection of information impacts small businesses or other small entities (Item**

5

**5 of OMB Form 83-I), describe any methods used to minimize burden.**

An individual may request to be a supporter with funding from organizations that may be small businesses or other small entities; however, the supporter must be an individual who commits to the support obligations. Thus, DHS is providing no distinct Form I-134A submission process for cases in which a small business may be providing financial assistance to the individual supporter.

6.   **Describe the consequence to Federal program or policy activities if the collection is not conducted or is conducted less frequently, as well as any technical or legal obstacles to reducing burden.**

If the information is not collected, USCIS would not be able to determine whether certain U.S.-based supporters have sufficient financial support to cover the expenses for noncitizens seeking to come to the United States temporarily for the duration of their stay in the United States. Collecting this information will allow DHS to verify the accuracy of the information and supporter identity as well as run security and background checks on potential supporters, particularly for the identification of any public safety or national security concerns and to safeguard against human trafficking or exploitation of beneficiaries.  Collection of the information will also enhance USCIS and CBP's case-by-case determination as to whether the beneficiary warrants a discretionary grant of parole.

7.   **Explain any special circumstances that would cause an information collection to be conducted in a manner:**

- **Requiring respondents to report information to the agency more often than quarterly;**

- **Requiring respondents to prepare a written response to a collection of information in fewer than 30 days after receipt of it;**

- **Requiring respondents to submit more than an original and two copies of any document;**

- **Requiring respondents to retain records, other than health, medical, government contract, grant-in-aid, or tax records for more than three years;**

- **In connection with a statistical survey, that is not designed to produce valid and reliable results that can be generalized to the universe of study;**

- **Requiring the use of a statistical data classification that has not been reviewed and approved by OMB;**

6

- **That includes a pledge of confidentiality that is not supported by authority established in statute or regulation, that is not supported by disclosure and data security policies that are consistent with the pledge, or which unnecessarily impedes sharing of data with other agencies for compatible confidential use; or**

- **Requiring respondents to submit proprietary trade secret, or other confidential information unless the agency can demonstrate that it has instituted procedures to protect the information's confidentiality to the extent permitted by law.**

This information collection is conducted in a manner consistent with the guidelines in 5 CFR 1320.5(d)(2).

8.  **If applicable, provide a copy and identify the data and page number of publication in the Federal Register of the agency's notice, required by 5 CFR 1320.8(d), soliciting comments on the information collection prior to submission to OMB. Summarize public comments received in response to that notice and describe actions taken by the agency in response to these comments. Specifically address comments received on cost and hour burden.**

    **Describe efforts to consult with persons outside the agency to obtain their views on the availability of data, frequency of collection, the clarity of instructions and recordkeeping, disclosure, or reporting format (if any), and on the data elements to be recorded, disclosed, or reported.**

    **Consultation with representatives of those from whom information is to be obtained or those who must compile records should occur at least once every 3 years - even if the collection of information activity is the same as in prior periods. There may be circumstances that may preclude consultation in a specific situation. These circumstances should be explained.**

    USCIS is seeking emergency approval under 5 CFR 1320.13, and DHS published a notice in the *Federal Register* on September 03, 2024, to notify the public of additional requirements for prospective supporters that will be used to determine whether these U.S.-based individuals have sufficient financial resources and access to those funds to support the beneficiary named on the form for the duration of the beneficiary's temporary stay in the United States.

    Public comments will be solicited, and this information collection request will go through a normal Paperwork Reduction Act (PRA) approval process, including a response to all comments received from the public, no later than six months after the approval of this emergency request.

7

9.    **Explain any decision to provide any payment or gift to respondents, other than remuneration of contractors or grantees.**

USCIS does not provide any payment for the benefit sought.

10.    **Describe any assurance of confidentiality provided to respondents and the basis for the assurance in statute, regulation or agency policy.**

There is no assurance of confidentiality.

This collection is covered under the following Privacy Impact Assessments:

- DHS/USCIS/PIA-051 - Case and Activity Management for International Operations (CAMINO);
- DHS/USCIS/PIA-003 - Integrated Digitization Document Management Program (IDDMP);
- DHS/CBP/PIA-024 - Arrival and Departure Information System;
- DHS/CBP/PIA-068 - CBP One Mobile Application;
- DHS/CBP/PIA-073 – Advance Travel Authorization;
- DHS/USCIS/PIA-056(a) - USCIS Electronic Information System (USCIS ELIS); and,
- DHS/USCIS/PIA-071 - myUSCIS Account Experience.

The collection is covered under the following System of Records Notices:

- DHS/USCIS/ICE/CBP-001 - Alien File, Index, and National File Tracking System of Records November 22, 2013, 78 FR 69983;
- DHS/USCIS-007 - Benefits Information System October 10, 2019, 84 FR 54622;
- DHS/USCIS-018 - Immigration Biometric and Background Check July 31, 2018, 83 FR 36950; and,
- DHS/CBP-024 - Intelligence Records System (CIRS) System of Records, December 14, 2020, 85 FR 80806.

11.    **Provide additional justification for any questions of a sensitive nature, such as sexual behavior and attitudes, religious beliefs, and other matters that are commonly considered private. This justification should include the reasons why the agency considers the questions necessary, the specific uses to be made of the information, the explanation to be given to persons from whom the information is requested, and any steps to be taken to obtain their consent.**

This information collection contains questions that are of a sensitive nature. Potential supporters must provide information and records about personal income and financial

8

resources. The potential supporter will also indicate why they believe the potential parolee warrants a discretionary grant of parole based on urgent humanitarian reasons or significant public benefit. This information is necessary to establish that the U.S.-based individual named on Form I-134A has sufficient financial resources to cover the expenses of the beneficiary(ies) during their temporary stay in the United States, as well as why the beneficiary should warrant a favorable exercise of discretion for parole.

To facilitate and expedite confirmation of the sufficiency of the Form I-134A, USCIS will require the potential supporter who is a U.S. citizen (USC) to provide a U.S. social security number (SSN) or state that they choose not to provide their SSN. Potential supporters who are not a UCS must provide one of either their SSN, A-number; or I-94 number. USCIS personnel conduct background and security checks on U.S.-based individuals seeking to support foreign nationals who may be eligible for one of the designated special parole processes. The information is collected to determine whether the potential supporter has demonstrated that they have sufficient financial resources to support the beneficiary(ies) during their temporary stay in the United States. The SSN number would be used to establish and corroborate the U.S.-based individual's declared identity, as not all potential supporters who file Form I-134A have a passport or A-number. Additionally, some of the U.S.-based individuals seeking to be a supporter may create multiple separate USCIS online accounts to file online Forms I-134A on behalf of different beneficiaries, and there is not a unique identifier to link these accounts. In addition, in this limited circumstance the SSN is critical to linking USCIS online accounts to help determine whether the potential supporter has sufficient resources to support each beneficiary on whose behalf the potential supporter has submitted a Form I-134A. Collecting the potential supporter's SSN is a critical tool for making accurate sufficiency decisions.

This collection requests the sex/gender of the potential supporter and the proposed beneficiary to evaluate and determine if the U.S.-based individual seeking to be a supporter poses a public safety or national security risk or poses such a risk to the proposed beneficiary. This information will also help DHS verify the identities of the potential supporter and proposed beneficiary. USCIS will use this biographic identifier to query the holdings of interagency and intelligence community partners, and as needed, to query state, local, or international agencies. Name, date of birth (DOB), and sex are the three most important identifiers for biographic searches or queries. Sex will be used to verify identity and to confirm the submitted information relates to the individual when records are found. This is applicable to nearly all required and as needed (ad hoc) system checks. DHS also searches public and private sector databases that use sex as an identifier.

 The sex data element is critical in our efforts to make sure the parole processes that require the Form I-134A are not used to facilitate human trafficking or exploitation of the beneficiary. Inclusion of this data element will allow DHS to quickly identify, through

9

systematic checks, trends, and other indicators in the filings of Form I-134A supporters and proposed beneficiaries, patterns commonly associated with human trafficking and transnational criminal activity. This will provide DHS additional tools to identity potential cases that require further investigation prior to confirmation of a Form I-134A or for which DHS may initiate an interview with a potential supporter to ascertain the basis for their agreement to financially support certain individuals. Finally, the capture of the sex data element is also consistent with the U.S. recognition policy for certain passports and identity documents issued by those foreign countries that allow an individual to indicate a non-binary assignment or gender-neutral option.

**12.** **Provide estimates of the hour burden of the collection of information. The statement should:**

- **Indicate the number of respondents, frequency of response, annual hour burden, and an explanation of how the burden was estimated. Unless directed to do so, agencies should not conduct special surveys to obtain information on which to base hour burden estimates. Consultation with a sample (fewer than 10) of potential respondents is desirable. If the hour burden on respondents is expected to vary widely because of differences in activity, size, or complexity, show the range of estimated hour burden, and explain the reasons for the variance. Generally, estimates should not include burden hours for customary and usual business practices.**

- **If this request for approval covers more than one form, provide separate hour burden estimates for each form and aggregate the hour burdens in Item 13 of OMB Form 83-I.**

- **Provide estimates of annualized cost to respondents for the hour burdens for collections of information, identifying and using appropriate wage rate categories. The cost of contracting out or paying outside parties for information collection activities should not be included here. Instead, this cost should be included in Item 14.**

| Type of Respondent | Form Name / Form Number | A<br>#. of Respondents**** | B<br>#. of Responses per Respondent | C (=AxB)<br># of Responses | D<br>Avg. Burden per Response (in hours) | E (=CxD)<br>Total Annual Burden (in hours) | F<br>Avg. Hourly Wage Rate* | (=ExF)<br>Total Annual Respondent Cost |
|---|---|---|---|---|---|---|---|---|
| Individuals and Households | Form I-134A *** | 1,373,600 | 1 | 1,373,600 | 2.6 | 3,571,360 | $43.45 | $155,175,592 |

10

| Individuals and Households | Biometric Service Appointment | 1,288,000 | 1 | 1,288,000 | 1.17 | 1,506,960 | $43.45 | $68,491,332 |
|---|---|---|---|---|---|---|---|---|
| **Total** | | | | **2,661,600** | | **5,078,320** | | **$223,666,924** |

*      *The above Average Hourly Wage Rate is the [May 2022 Bureau of Labor Statistics](#) average wage for All Occupations of $29.76 times the wage rate benefit multiplier of 1.46 (to account for benefits provided) equaling $43.45. The selection of "All Occupations" was chosen because respondents to this collection could be expected from any occupation.*

**      *The estimated number of respondents includes receipts of Form I-134A by both USCIS and Department of State.*

***      *The beneficiary named on the Form I-134A will be asked to confirm electronically that the biographic information provided on the Form I-134A by the respondent/supporter is accurate. USCIS does not anticipate that this will pose more than a negligible burden on the beneficiary but will seek comment on this assumption.*

****      *DHS estimates that 1,120,000 respondents or prospective supporters will submit Form I-134A for parolees as part of Uniting for Ukraine, and the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans over the next 12-month period. These respondents will be required to attend a Biometric service Appointment and pay the fee.*

     *DHS estimates that up to 85,600 respondents or prospective supporters will submit Form I-134A for parolees annually under the new and updated FRP processes for Cuba, Colombia, El Salvador, Ecuador, Guatemala, Haiti, and Honduras. This likely represents a maximum and the number of respondents in later years may be lower, depending on the number of approved Forms I-130, Petition for Alien Relative, and factors such as visa availability and foreign policy priorities.*

13. **Provide an estimate of the total annual cost burden to respondents or record keepers resulting from the collection of information. (Do not include the cost of any hour burden shown in Items 12 and 14).**

- **The cost estimate should be split into two components:  (a) a total capital and start-up cost component (annualized over its expected useful life); and (b) a total operation and maintenance and purchase of services component. The estimates should consider costs associated with generating, maintaining, and disclosing or providing the information. Include descriptions of methods used to estimate major cost factors including system and technology acquisition, expected useful life of capital equipment, the discount rate(s), and the time period over which costs will be incurred. Capital and start-up costs include, among other items, preparations for collecting information such as purchasing computers and software; monitoring, sampling, drilling and testing equipment; and record storage facilities.**

- **If cost estimates are expected to vary widely, agencies should present ranges of cost burdens and explain the reasons for the variance. The cost of purchasing or contracting out information collection services should be a part of this cost burden estimate. In developing cost burden estimates, agencies may consult with**

11

> a sample of respondents (fewer than 10), utilize the 60-day pre-OMB submission public comment process and use existing economic or regulatory impact analysis associated with the rulemaking containing the information collection, as appropriate.

- Generally, estimates should not include purchases of equipment or services, or portions thereof, made: (1) prior to October 1, 1995; (2) to achieve regulatory compliance with requirements not associated with the information collection; (3) for reasons other than to provide information or keep records for the government; or (4) as part of customary and usual business or private practices.

There are no capital, start-up, operational or maintenance costs associated with this collection of information. For informational purposes only, there is no filing fee for Form I-134A. The biometric services fee is $30.00.  USCIS estimates that respondents will not incur any out-of-pocket costs associated with the electronic filing of this information.

14.  **Provide estimates of annualized cost to the Federal government. Also, provide a description of the method used to estimate cost, which should include quantification of hours, operational expenses (such as equipment, overhead, printing, and support staff), and any other expense that would not have been incurred without this collection of information. Agencies also may aggregate cost estimates from Items 12, 13, and 14 in a single table.**

The estimated cost to the Government is $127,443,240**.** This figure is calculated by multiplying the estimated number of respondents for all processes (1,373,600) by the time required to adjudicate the form (1 hour), which is multiplied by the average hourly rate of USCIS adjudicators ($64.65) for a total of $88,803,240 plus the estimated number of respondents who are estimated to need biometrics (1,288,000) multiplied by the biometric services fee ($30.00) for a total of $38,640,000.

15.  **Explain the reasons for any program changes or adjustments reporting in Items 13 or 14 of the OMB Form 83-I.**

DHS published a notice in the *Federal Register* on September 03, 2024, to notify the public that USCIS is amending the Form I-134A for prospective supporters under the U4U process and the CHNV to: (1) require potential supporters and co-supporters to submit biometrics, (2) require a $30.00 biometric services fee, (3) require potential co-supporters to also submit a Form I-134A, and (4) require all potential supporters to submit a copy of a government-issued photo identity document for themselves and a copy of the beneficiary's passport biographic data  page.

USCIS has also made updates to identification elements for organizations by requesting information about the organization's name, phone number, email address, tax

12

identification number, finances, and confirmation of the organization's support of the beneficiary.

| Data collection Activity/Instrument (in hours) | A<br>Program Change (hours currently on OMB Inventory) | B<br>Program Change (New) | C = B-A<br>Difference | D<br>Adjustment (hours currently on OMB Inventory) | E<br>Adjustment (New) | F = E-D<br>Difference |
|---|---|---|---|---|---|---|
| Form I-134A | 2,543,816 | 3,571,360 | 1,027,544 | | | |
| Biometric Service Appointment | 0 | 1,506,960 | 1,506,960 | | | |
| **Total(s)** | **2,543,816** | **5,078,320** | **2,534,504** | | | |

The increase in the total estimated annual time burden is a result of programmatic change expanding the requirements for potential supporters.

There is no change to the total estimated annual cost burden to respondents.

16. **For collections of information whose results will be published, outline plans for tabulation, and publication. Address any complex analytical techniques that will be used. Provide the time schedule for the entire project, including beginning and ending dates of the collection of information, completion of report, publication dates, and other actions.**

This information collection will not be published for statistical purposes.

17. **If seeking approval to not display the expiration date for OMB approval of the information collection, explain the reasons that display would be inappropriate.**

USCIS will display the expiration date for OMB approval of this information collection.

18. **Explain each exception to the certification statement identified in Item 19, "Certification for Paperwork Reduction Act Submission," of OMB 83-I.**

USCIS does not request an exception to the certification of this information collection.

## B. Collections of Information Employing Statistical Methods.

There is no statistical methodology involved with this collection.

13


**U.S. Citizenship and Immigration Services**

MENU

Home > Humanitarian > Humanitarian or Significant Public Benefit Parole for Aliens Outside the United States > The Cuban Family Reunification Parole Program

# The Cuban Family Reunification Parole Program

**ⓘ ALERT: DHS Implements Modernized Family Reunification Parole Process for Cubans**

**See less ⌃**

On Aug. 11, 2023, DHS implemented the modernized Cuban Family Reunification Parole (CFRP) process so certain parts of the process can be completed online. Petitioners with an approved Form I-130, Petition for Alien Relative, who receive an invitation may submit Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, on behalf of each eligible beneficiary. For more information about the updated process, please see our Family Reunification Parole Processes page.

We will continue to process previously submitted Form I-131, Application for Travel Document, CFRP applications. We will no longer accept Form I-131 CFRP applications for initial CFRP filings.

**ⓘ ALERT: For Petitioners of a Pending CFRP Form I-131 Application**

**See less ⌃**

USCIS sent a letter to petitioners of a pending CFRP Form I-131 application whose family members have not yet been scheduled for an interview in Havana. The letter explains how to participate in the modernized CFRP process. If you (the petitioner) choose the modernized process (Form I-134A online process), we will administratively close your pending CFRP Form I-131. When you file Form I-134A, include supporting documentation for each beneficiary who meets the eligibility requirements. As the Form I-131 petitioner, **only you** may file and sign the Form I-134A, even if you submitted evidence of a co-supporter. If you do not want to opt into the modernized Form I-134A CFRP process, you do not need to do anything; your beneficiaries will continue processing in Havana under the current Form I-131 process.


Need Help? Chat with Emma™

ℹ **ALERT**: Adding Additional Derivative Beneficiaries to a Previously Filed Form I-131 under the Legacy CFRP Program

**See less** ⌃

If you are a petitioner of a CFRP Form I-131 application pending an interview in Havana, and you choose to continue with Form I-131 processing instead of opting into the Form I-134A process, you may file a Form I-131 on behalf of qualified add-on derivative beneficiaries. If the principal beneficiary now has a spouse or unmarried child under age 21 who is not listed on the Form I-130 but who is eligible to immigrate based on their relationship to the principal beneficiary, they may qualify as an add-on derivative. If you want to add family members to the case, please complete and file a paper Form I-131 at the correct filing address. You will need to complete one Form I-131 for each family member you want to add. When filling Form I-131 for an add-on derivative beneficiary, type or write "CFRP ADD-ON" at the top of the Form I-131. Effective Dec. 13, 2023, petitioners who file a Form I-131 for an add-on derivative beneficiary are exempt from paying the Form I-131 filling fee. NOTE: An add-on derivative beneficiary is the Form I-130 principal beneficiary's spouse or unmarried child under the age of 21, who is not listed on the Form I-130 but who may be eligible to immigrate based on their relationship to the principal beneficiary. See the definition of add-on derivative beneficiary in the "Eligibility Under the Form I-131 CFRP Process" section below for more information.

Created in 2007, the CFRP Program allows certain eligible U.S. citizens and lawful permanent residents to apply for parole for their family members in Cuba. If granted parole, these family members may come to the United States without waiting for their immigrant visas to become available. After they are in the United States, CFRP Program beneficiaries may apply for work authorization while they wait to apply for lawful permanent resident status.

On Aug. 11, 2023, DHS implemented the modernized CFRP process that uses the Form I-134A, Online Request to be a Supporter and Declaration of Financial Support. For more information about the updated process, please see our Family Reunification Parole Processes page.

As of Aug. 11, 2023, we will no longer accept Form I-131 for initial CFRP applications. However, if you previously filed a Form I-131 under CFRP and your application is currently pending, we will accept Form I-131 filings for your add-on derivative beneficiaries. When filing Form I-131 for an add-on derivative beneficiary, select 6.e in Part 1 as the Application Type and type or write "CFRP ADD-ON" as the specific program or process in the appropriate field next to question 6.e in Part 1.

The information on this webpage is only relevant to individuals who:

- Have a CFRP application pending with USCIS based on a Form I-131 filed before Aug. 11, 2023; or

- Have already been paroled into the United States under CFRP.

↗ Close All    ↗ Open All

## Eligibility Under the Form I-131 CFRP Process    ⌃

**Note: The below applies only to CFRP applications that were filed on Form I-131 before Aug. 11, 2023, and applications for add-on derivative beneficiaries. For more information about the updated process, please see our Family Reunification Parole Processes page.**

We use the following terms with CFRP:

| Term | Definition |
|---|---|
| Petitioner | The U.S. citizen or Green Card holder in the United States who filed Form I-130, Petition for Alien Relative, on behalf of a relative living in Cuba, which USCIS approved. Only qualified petitioners can file applications for parole under the CFRP Program. (See the Who Is Eligible to Apply section below for more information on who is a qualified petitioner.) |
| Beneficiaries | Family members in Cuba who may benefit from the Form I-130 filed and approved on their behalf and who may be paroled into the United States if we approve them under the CFRP program.<br><br>Beneficiaries include the principal beneficiary, derivative beneficiaries listed on the petitioner's Form I-130. Additional add-on derivative beneficiaries that were not listed on the petitioner's Form I-130 but have since joined the family (that is, a spouse or minor children) may be added and included as beneficiaries under this process. |
| Principal beneficiary | The Cuban family member for whom a petitioner filed Form I-130. For example, the principal beneficiary could be a lawful permanent resident's spouse or unmarried child, or a U.S. citizen's adult son, daughter, or sibling.<br><br>Projected visa eligibility dates are based on the legal category under which we approved the petition. The principal beneficiary must remain eligible for an immigrant visa category. For example, if we approved a beneficiary as the unmarried son or daughter of a lawful permanent resident (F2B category), marriage of the principal beneficiary would result in ineligibility for the immigrant visa, along with any potential derivative beneficiaries. If a beneficiary was approved as the unmarried son or daughter of a U.S. citizen, marriage of the principal beneficiary changes their immigrant visa classification. |

| Term | Definition |
|------|-----------|
| Derivative beneficiaries | The principal beneficiary's spouse and unmarried children under age 21. They may also be listed on the approved Form I-130.<br><br>These beneficiaries may be eligible for parole based on their relationship to the principal beneficiary. If we do not approve the principal beneficiary for parole, we will not approve the derivative beneficiaries. |
| Add-on derivative beneficiary | If a principal beneficiary married or had a child after we approved the underlying Form I-130, that spouse or unmarried child under 21 may in some circumstances become an add-on derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. |

**Who Is Eligible**

You (the petitioner) may request parole for your qualifying relatives in Cuba if you meet the following requirements:

- You are a U.S. citizen or a lawful permanent resident (have a Green Card);
- You filed Form I-130, Petition for Alien Relative, for a Cuban family member and USCIS approved it;
- An immigrant visa is not yet available for your relative; and
- You received an invitation from the Department of State's National Visa Center (NVC) to participate in the CFRP Program.

**If you do not meet all the above requirements, when we adjudicate your Form I-131 for CFRP benefits, we will deny your application.**

**A qualified petitioner will only be able to apply on behalf of a family member (beneficiary) who is:**

- A Cuban national (only applies to the principal beneficiary); and
- The beneficiary of a Form I-130 that we approved (including any accompanying or "following to join" spouse or child). For more information, see section 203(d) of the Immigration and Nationality Act (INA).

**In addition, we will generally authorize parole only to beneficiaries who meet the following criteria:**

- Meet all eligibility requirements for an immigrant visa (except for the requirement that the immigrant visa number be available);
- Pass background checks;
- Pass a medical examination;
- Are admissible to the United States; and
- Warrant a favorable exercise of discretion.

FRP-FRN-00649

**Please Note:**

If an immigrant visa becomes available while someone is being processed for parole under CFRP, that person may choose to continue with the parole process. Alternatively, the person may choose to be processed by the Department of State for an immigrant visa, in which case, they will be required to pay any fees associated with that process.

**Who Is Not Eligible**

The following people are not eligible to participate in CFRP:

- Individuals who qualify as immediate relatives, as defined at INA 201(b)(2)(A)(i), at the time of the application for parole under CFRP. Parole will not be available to these individuals because they may immediately seek immigrant visas for travel to the United States when we approve their Form I-130. They do not have to wait for an immigrant visa to become available. (If a Green Card petitioner becomes a U.S. citizen after filing the parole application, any beneficiaries who become immediate relatives as a result are not necessarily disqualified from obtaining parole. See the Circumstances That Could Affect Eligibility section below.) Immediate relatives are:

- Spouses of U.S. citizens;

- Unmarried children under 21 years of age of U.S. citizens; and

- Parents of U.S. citizens over 21 years of age.

- Individuals who are not able to attend an in-person interview in Cuba; and

- Beneficiaries of an approved Form I-130 whose petitioning relatives in the United States have not received an invitation from the NVC indicating that they are eligible to apply for CFRP.

We will not authorize parole for beneficiaries who have committed serious crimes or who fail to pass background checks.

If you are the beneficiary of an approved Form I-130 living in Cuba, you cannot apply for CFRP for yourself or your family members. Your U.S. petitioner must have filed the Form I-131 on your behalf.

**Spouses and Unmarried Children under Age 21 of the Principal Beneficiary (Derivative Beneficiaries)**

If the principal beneficiary's spouse and unmarried children under age 21 (known as derivative beneficiaries) are named on the approved Form I-130, they may be eligible for parole under CFRP. You must file any parole request on their behalf at the same time you file a parole request for the principal beneficiary. They will only be eligible for parole if we approve the principal beneficiary for parole.

If you did not file a Form I-131 CFRP application for the principal beneficiary, or if we determine that the principal beneficiary is not eligible for the CFRP Program, their spouse and children will not be eligible for parole under CFRP.

**Requesting to Add a Spouse or Child to an Approved Form I-130 (Add-on Derivative Beneficiaries)**

If a principal beneficiary married or had a child after we approved the underlying Form I-130, you may file a Form I-131 CFRP application on behalf of that principal beneficiary's spouse or child under 21 (often referred to as "add-on" derivatives). When filing Form I-131 for an add-on derivative beneficiary,

type or write "CFRP ADD-ON" in the appropriate field next to Application Type 6.e. in Part 1 . For a complete list of all USCIS fees, including fee exemptions and fee waivers, see our Fee Schedule. Petitioners must mail the Form I-131 to the correct address. See the Direct Filing Addresses for Form I-131 page for more information.

Add-on derivatives will not be listed on the NVC's invitation letter. As a qualified petitioner, you may still file a Form I-131 CFRP application on their behalf if you provide the necessary evidence to establish the qualifying relationship of the add-on derivative relative.

**Age Limit for Beneficiaries**

There is no age limit for principal beneficiaries of Forms I-130. However, any derivative children must be under the age of 21 on the date that we receive your properly filed application for parole under the CFRP Program using Form I-131. The invitation letter instructs you not to file Forms I-131 CFRP Program applications for derivative children who will be 21 years of age or older when you file your application.

We will deny any Form I-131 submitted for derivative children who are 21 years of age or older on the date we receive the properly filed application.

We will continue to process the applications for any other beneficiaries, including the principal beneficiary and their spouse and unmarried children under 21.

**Circumstances That Could Affect Eligibility**

The table below lists circumstances that could affect eligibility for the Form I-131 process under the CFRP Program.

| | |
|---|---|
| Cubans living outside Cuba | The CFRP Program is intended for Cubans in Cuba, but Cubans living outside of Cuba may still be eligible. If the beneficiary is in the United States or another country, they must travel to Cuba for an CFRP Program interview to be considered for parole. Beneficiaries in the United States who decide to travel to Cuba for their interview should first obtain advance parole from USCIS. Without advance parole, they may not be able to return to the United States if we deny their CFRP Program application. If the principal beneficiary is in the United States or another country and will not return to Cuba for interview under the CFRP Program, you should not file for the principal beneficiary's derivative relatives in Cuba because we will deny these applications. We can only approve derivative family members for parole if we approve the principal beneficiary for parole under the CFRP program. |
| A Petitioner Becoming a U.S. citizen | If you have a Green Card and become a U.S. citizen **after** you have properly filed your CFRP Program application with USCIS, beneficiaries of your immigrant visa petition might become immediate relatives as a result and have an immigrant visa immediately available to them. You may, however, choose to have your immediate relatives continue to be processed for parole. Alternatively, you may choose to have them processed for immigrant visas after payment of all applicable immigrant visa fees. If you become a U.S. citizen **before** you apply for the CFRP Program, we will deny any applications filed on behalf of your immediate relatives. (See the Who is Not Eligible section above.) |

| | |
|---|---|
| Marriage | A change in the marital status of a Form I-130 beneficiary relative could affect their eligibility for an immigrant visa, and so for the CFRP Program. Married relatives who are not eligible for the CFRP Program include:<br><br>• **A married beneficiary who is the child under age 21 or the adult son or daughter of a petitioner who holds a Green Card.** If your child under 21 or adult son or daughter married after we approved their Form I-130, they are no longer eligible for an immigrant visa. (Section 101(b)(1) of the INA defines a child as "an unmarried person under 21 years of age.") The law only allows Green Card holders to petition for their spouses and unmarried children under age 21 and adult sons and daughters to immigrate to the United States; and<br><br>• **A child of the principal beneficiary who marries after approval of the Form I-130.** If the child of the principal beneficiary (otherwise known as a derivative child) marries after we approve the Form I-130, they are no longer a child under the INA, even if they are under 21 years of age, and may not derive status from the principal beneficiary. |

## Process Steps

**Note: The below applies only to CFRP applications that were filed on Form I-131 before Aug. 11, 2023, and add-on derivative beneficiaries. For more information about the updated process, please see our [Family Reunification Parole Processes](#) page.**

The key steps in the Form I-131 CFRP process after a case has been forwarded to the U.S. Embassy in Cuba include:

**Step 1: Appointment Notice sent to petitioner.**

• After a conditional approval of the Form(s) I-131, we will mail the petitioner an appointment notice for the principal and derivative beneficiaries whose Forms I-131 were conditionally approved.

• The appointment notice will include instructions for the beneficiaries, including what documents to bring to the interview and the medical exam requirement. If the petitioner wishes to file a Form I-131 CFRP application for any add-on derivative beneficiaries, we strongly encourage them to file the Form I-131 as soon as possible before the scheduled appointment date. See the [Direct Filing Addresses for Form I-131](#) page for more information. If they do not do this, it may take longer to process their application. When filing Form I-131 for an add-on derivative beneficiary, type or write "CFRP ADD-ON" in the appropriate field next to Application Type 6.e. in Part 1. For a complete list of all USCIS fees, including fee exemptions and fee waivers, see our [Fee Schedule](#).

**Step 2: Beneficiary completes medical examination.**

- Beneficiary follows instructions in appointment notice and completes medical exam with a panel physician.

**Step 3: Beneficiary appears at USCIS appointment.**

- Beneficiary must bring documents as instructed in appointment notice.

- All CFRP beneficiaries listed on the USCIS appointment notice and any other add-on derivative beneficiaries must appear at the USCIS appointment. If not, we may reschedule the appointment for all derivatives.

- If the principal beneficiary is not present at the appointment, we may reschedule the appointment or issue a notice of failure to appear.

**Step 4: USCIS issues a decision notice.**

- We use our discretion to authorize parole on a case-by-case basis.

- If approved, we issue a Parole Approval Notice to the petitioner.

- If denied, we issue a Notice of Ineligibility to Travel to the petitioner.

- We may issue a Request for Evidence to the petitioner if we need additional information to finalize a decision.

**Step 5: USCIS issues travel document to beneficiary (for approvals only).**

- The principal beneficiary will pick up a Form I-512L Authorization to Transport for Parole, at the U.S. Embassy in Cuba.

- In general, the authorization is valid for 90 days.

- Children under age 18 must travel to the United States with and in the care and custody of a parent or legal guardian and be able to provide documentation to confirm the relationship.

- Principal beneficiaries must travel to the United States with or before any derivative beneficiary. Derivative beneficiaries may not be paroled into the United States until the principal beneficiary is paroled into the United States.

- Issuance of a Form I-512L does not guarantee parole, but it allows the beneficiary to proceed to Step 6.

**Step 6: Beneficiary seeks parole at the port of entry.**

- Beneficiary will present the Form I-512L Authorization to Transport for Parole to CBP.

- CBP will inspect each beneficiary arriving at a port of entry under this process and consider everyone, on a case-by-case basis, for a grant of discretionary parole.

**Step 7: Beneficiary is paroled into the United States.**

- A beneficiary granted parole under these processes will generally be paroled into the United States for a period of up to 3 years, subject to applicable health and vetting requirements.

- A beneficiary granted parole may apply for an Employment Authorization Document (EAD) by filing Form I-765, Application for Employment Authorization, either online or via mail.

## What to Expect When Your Form I-131 Is Pending with USCIS in Cuba ⌄

**Note: The below applies only to CFRP applications that were filed on Form I-131 before Aug. 11, 2023, and add-on derivative beneficiaries. For more information about the updated process, please see our Family Reunification Parole Processes page.**

CFRP Form I-131 processing times will vary depending on the issues raised and whether we need additional evidence.

**Beneficiary Appointment**

Do not try to schedule an appointment directly with the U.S. Embassy in Cuba.

We will send the petitioner a Notice of Interview for all beneficiaries with additional instructions. If you have not filed a Form I-131 for an add-on derivative beneficiary, we strongly encourage you to do so before the date of the scheduled appointment (see Requesting to Add a Spouse or Child (Add-on Derivative Beneficiaries) Section). On the date of appointment, the principal beneficiary and derivative beneficiaries must appear in person together to verify their identities and confirm their eligibility for parole under the CFRP Program.

**Preparing for the Interview**

On the date of their interview, beneficiaries should bring the following documents to present to the officer:

- A government-issued form of identification;

- Their valid unexpired passport;

- Original civil documents supporting their eligibility for the program, in addition to certified English translations of these documents, including but not limited to:

  - Birth certificate;

  - Current marriage certificate (if applicable);

  - Divorce certificates from any previous marriage (if applicable);

  - If widowed, death certificate from previous spouse;

  - Documents that establish the relationship between the CFRP beneficiary and the petitioner. In the case of a brother or sister, the beneficiary will need to provide their birth certificate and that of the petitioner; and

  - Police certificates or court records (for applicants 16 years of age or older) issued within 6 months of the visa interview date;

- Medical examination results. Applicants must follow instructions on the interview appointment notice to have their medical examination; and

- A copy of their interview schedule appointment notice.

The INA gives us the authority to use our discretion to authorize parole for urgent humanitarian reasons or significant public benefit.

**After the Appointment**

Beneficiaries should not take any permanent actions such as selling or buying property, terminating employment, or withdrawing from school until they have their CFRP parole travel document in their hands.

**If travel is approved:**

- We will issue the Form I-512L to the beneficiary in Cuba. These travel documents will enable the beneficiary to travel to the United States and request parole from a U.S. Customs and Border Protection officer at a port of entry;

- Beneficiaries traveling to the United States under the CFRP Program must arrange and pay for their own travel.

- After they enter the United States, we expect beneficiaries to apply for a Green Card after being present in the United States for 1 year under the 1966 Cuban Adjustment Act or as soon as their immigrant visa becomes available. See the After the Beneficiary Is Paroled into the United States section for more information.

**If travel is not approved:**

We will send the petitioner a written notification listing the beneficiaries who are not approved for travel to the United States.

**If we deny parole:**

- Our decision to deny parole is final, and there is no right of appeal.

- If we deny parole for the beneficiary, they may still be eligible for immigrant visa processing based on the approved Form I-130 filed on their behalf. If the beneficiary is still eligible to apply for an immigrant visa, they may do so when their immigrant visa becomes available; and

- In certain circumstances, the reason we denied parole may also cause us to revoke the approval of the beneficiary's underlying Form I-130. If we revoke Form I-130 approval, the beneficiary will no longer be eligible for an immigrant visa. We will make these determinations on a case-by-case basis, and we will provide a written notice.

## After the Beneficiary Is Paroled into the United States    ⌃

Parole is **not** an immigrant visa, and it is **not** the same as having lawful permanent resident status (a Green Card). Parole is temporary and allows you (the beneficiary) to be lawfully present in the United States during your parole period.

FRP-FRN-00655

**Applying for Work Authorization**

After you (the beneficiary) are paroled into the United States under the CFRP Program, you are eligible to apply for discretionary employment authorization from USCIS.

To apply for discretionary employment authorization, you must submit Form I-765, Application for Employment Authorization. You can find the filing fee for Form I-765 by visiting our Fee Schedule page.

If you ever worked without authorization in the United States, you may be barred from applying for a Green Card in the United States. In this case, you will need to apply and be processed overseas for an immigrant visa instead of applying for a Green Card in the United States.

**Obtaining a Social Security Number and Card**

We encourage you (the beneficiary) to apply for a Social Security number (SSN) using Form I-765, Application for Employment Authorization, and following the form instructions. If you request an SSN in Part 2 (Items 13.a-17.b) of your Form I-765, and we approve your Form I-765, we will send that data to the Social Security Administration (SSA), and SSA will assign you an SSN and issue you a Social Security card. SSA will mail your Social Security card directly to the address you provide on Form I-765. SSNs generally are assigned to people who are authorized to work in the United States. SSNs are used to report your wages to the government and to determine your eligibility for Social Security benefits.

If you do not request an SSN on your Form I-765, you can apply for an SSN after you receive your EAD from USCIS using the instructions on SSA's Social Security Number and Card webpage.

**Eligibility for Certain Benefits**

After you (the beneficiary) are paroled into the United States under the CFRP, you meet the definition of a Cuban/Haitian entrant and may be eligible to receive certain public benefits. For more information, see section 501(e)(1) of the Refugee Education and Assistance Act (REAA) of 1980.

You will be eligible to apply for benefits and services from the date you first enter Cuban/Haitian entrant status. This is the date you enter the United States with parole.

**Address Updates**

If you (the beneficiary) are residing in the United States longer than 30 days, you must report your physical address in the United States as a condition of your parole. If your address changes after you enter the United States, you must notify us within 10 days of the change, by either:

- Using our online change of address form; or

- Through your existing USCIS online account (if you have an account). For more information on how to create an online account, visit the How to Create a USCIS Online Account webpage.

Changing your address online will update the address on file with USCIS for each pending application, petition, or request for which you provide a receipt number when filling out the Online Change of Address form. It is important to include the receipt number for any cases pending with USCIS in your address change request, so that we can update the address associated with those cases. We will mail secure documents to the address on file. You can find the receipt number on the receipt notice (Form I-

797C, Notice of Action) that we issued after you filed your application, petition, or request. We send receipt notices to the address listed on the application, petition, or request.

**Terminating Your Parole**

If you (the beneficiary) have already been paroled into the United States, your parole may automatically terminate if:

- You depart the United States; or
- Your parole period expires.

The Department of Homeland Security (DHS) may also decide to terminate your parole for other grounds, such as violating any laws of the United States.

**Leaving the United States**

If CBP grants you (the beneficiary) advance authorization to travel, you may present it only once for travel to the United States to seek parole at the U.S. port of entry. After you are paroled into the United States, if you want to leave the United States and then return as a parolee, you must request an advance parole document by filing Form I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records, before traveling outside the United States. If you leave the United States without getting an advance parole document, you may not be able to return and seek parole back into the United States. For information on how to apply for an advance parole document while you are in the United States, please see the Form I-131 page.

**Applying for Lawful Permanent Resident Status (a Green Card)**

Parole itself does not give any legal immigration status in the United States.

We expect individuals paroled under the CFRP to apply for a Green Card after being present in the United States for 1 year under the 1966 Cuban Adjustment Act or as soon as their immigrant visa is available. It is your responsibility to keep track of when your immigrant visa becomes available. We do not send you a notice to alert you when your immigrant visa is available, nor do we track if any derivative beneficiaries have "aged out" of their eligibility for a Green Card and may need a new petition filed on their behalf. (See our Child Status Protection Act (CSPA) page for more information.)

Please see the information on how to check if your immigrant visa is available in English or Spanish.

| If... | Then... |
|-------|---------|
| <ul><li>You have been present in the United States for 1 year or your immigrant visa is available;</li><li>Your parole period has not expired; and</li><li>You wish to remain in the United States permanently</li></ul> | You should apply for a Green Card by filing Form I-485, Application to Register Permanent Residence or Adjust Status, along with filing any required forms and initial evidence, including but not limited to:<br><br><ul><li>Form I-864, Affidavit of Support under Section 213A of the INA; and</li><li>Form I-693, Report of Medical Examination and Vaccination Record</li></ul><br>For more information on required initial evidence, please visit the Form I-485 webpage.<br><br>You should consider requesting re-parole if your immigrant visa processing may not be complete by the time your parole period expires. If your parole period expires before you obtain an immigration status, and you have not requested or obtained re-parole, then you will generally not be eligible to adjust your status to become a permanent resident, even if your immigrant visa is available. You may also accrue unlawful presence. (See the Unlawful Presence section below for more details.) |
| You filed Form I-485 and it is *pending* | You should consider requesting re-parole before your current parole period expires. If we reject or deny your Form I-485, you may accrue unlawful presence if your parole period has expired and you have not obtained re-parole and are not otherwise in a period of authorized stay. (See the Unlawful Presence section below for more details.) |
| You filed Form I-485 and we **rejected** or **denied** it | You may be in an unauthorized period of stay and you may be accruing unlawful presence if your parole period has expired and you have not obtained re-parole. You should consider requesting re-parole. (See the Unlawful Presence section below for more details.) |

**Unlawful Presence**

Unlawful presence in the United States can have serious immigration consequences:

- You may not be able to adjust your status if you have been in the United States unlawfully at any time since you arrived as a parolee. This means you would have to leave the United States to apply for an immigrant visa to return to the United States as a lawful permanent resident; and

- If you have been in the United States unlawfully for more than 180 days, you may be subject to an unlawful presence bar, depending on your age. This means you may not be allowed to return to the

United States for either 3 or 10 years, depending on the length of your unlawful presence, unless you receive a waiver. For more information, visit our [Unlawful Presence and Inadmissibility](#) page.

If you are subject to an unlawful presence bar, you may apply for a waiver by filing [Form I-601A, Provisional Unlawful Presence Waiver](#), before you leave the United States to appear at a U.S. embassy or U.S. consulate for an immigrant visa interview. For more information about applying for a waiver after departing the United States, go to our [Form I-601, Application for Waiver of Grounds of Inadmissibility](#), page.

You may also seek [legal counsel](#) or consult with an authorized immigration service provider regarding your situation.

## Requesting Re-Parole 

If you have been paroled into the United States under CFRP, you can apply for re-parole if your initial parole period is nearing expiration, unless you are subject to grounds for termination under DHS regulations at 8 CFR section 212.5(e). You can see when your parole period expires on [your electronic Form I-94, Arrival/Departure Record](#).

To request a new parole period (re-parole), you must:

- File a new [Form I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records](#). You can find the filing fee for Form I-131 by visiting our [Fee Schedule](#) page;

- Check Box 10.A. in Part 1 of the form;

- Complete Item 12 in Part 1 indicating the Admit Until Date or Parole Until Date listed on the initial I-94;

- Complete Item 12 in Part 2 indicating your Class of Admission (COA) and Item 26 in Part 2 indicating the COA of the person you are applying for, if applicable; and

- Mail your request to the address listed in the "Re-Parole" section on the [Direct Filing Address for Form I-131](#) webpage.

| If... | Then... |
| --- | --- |
| Your parole period is about to **expire** and you have not requested or obtained re-parole or are otherwise in an authorized period of stay | You must request re-parole to remain lawfully in the United States. We will consider re-parole requests on a case-by-case basis under the same terms as the initial parole under the CFRP Program. You should submit your request **at least 90 days before** your parole expiration date to allow time for processing. |

| If... | Then... |
|-------|---------|
| Your parole period has *already expired*, but you have not requested re-parole or a Green Card and are not otherwise in an authorized period of stay | You may not be in an authorized period of stay; however, you may still request re-parole. You should submit a complete request for re-parole as soon as possible. If we approve your request, you may be eligible to apply for a Green Card when your immigrant visa is available. However, if we deny your request, you may not be in an authorized period of stay and you may be accruing unlawful presence. |

## Background 

The 1994 and 1995 U.S.-Cuba migration accords commit the United States to ensuring that total legal migration to the United States from Cuba will be a minimum of 20,000 Cubans each year, not including immediate relatives of U.S. citizens. In 2007, USCIS launched the CFRP program to help the United States meet its annual obligations under the accords.

## Protect Yourself from Immigration Scams 

**Avoid immigration scams.** We do not want you to become the victim of an immigration scam. If you need legal advice on immigration matters, make sure the person helping you is authorized to give legal advice. Only an attorney or accredited representative working for a [Department of Justice recognized organization](#) can give you legal advice. Visit the [Avoid Scams](#) page for information and resources.

## Related Links 

**More Information**

- [Memorandum of Agreement between CBP, ICE and USCIS regarding Parole Authority (PDF)](#)

- [G-1055, Fee Schedule](#)

- [Additional Information on Filing a Fee Waiver](#)

- [U.S. Embassy in Cuba, Cuban Family Reunification Parole (CFRP) Program](#)

- [Cuban Medical Professional Parole (CMPP) Program](#)

- [DHS Announcement on Changes to Parole and Expedited Removal Policies Affecting Cuban Nationals (Jan. 12, 2017)](#)

**Forms**

- [I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records](#)

- [I-912, Request for Fee Waiver](#)

- [I-134, Declaration of Financial Support](#)

- [I-134A, Online Request to be a Supporter and Declaration of Financial Support](#)

- [I-485, Application to Register Permanent Residence or Adjust Status](#)

- [I-765, Application for Employment Authorization](#)

⤢ Close All    ⤢ Open All

Last Reviewed/Updated: 10/11/2024





# FY2024 EOIR Immigration Court Data: Caseloads and the Pending Cases Backlog

January 24, 2025

U.S. immigration courts within the Department of Justice's Executive Office for Immigration Review (EOIR) preside over immigration hearings; most commonly, removal proceedings for foreign nationals who have been charged by the Department of Homeland Security (DHS) with immigration violations. Immigration courts have experienced growing backlogs for several years. In recent years, a large volume of enforcement encounters at the Southwest border contributed to EOIR's caseload. During each of the last three years, EOIR's new annual case receipts have reached record levels.

In FY2024, EOIR received nearly 1.8 million new cases. Even as EOIR has hired more immigration judges (IJs), the backlog has continued to grow, reaching 3.6 million cases at the end of FY2024. Many of those in removal proceedings have filed applications for asylum as a defense against removal. Defensive asylum applications are adjudicated by IJs during removal proceedings. EOIR received 850,720 defensive asylum applications at the end of FY2024, with 1.5 million applications pending in the courts.

This CRS Insight provides an overview of FY2024 EOIR data, including numbers of new cases received, asylum applications filed, IJ staffing, case completions, and pending cases.

## Overview: Removal Proceedings in Immigration Courts

Immigration court hearings include removal proceedings, which represent nearly all of EOIR's pending caseload. Foreign nationals who are present in the United States, seeking admission at a U.S. port of entry without authorization, or cross into the U.S. between ports of entry may be subject to removal (deportation) from the country. DHS may charge any non-U.S. citizen (alien) with grounds of deportability and inadmissibility and place them in formal removal proceedings in immigration court.

Certain arriving or recently arrived migrants may be subject to expedited removal and may be removed without a formal hearing. However, the law provides individuals in expedited removal an opportunity to seek asylum in immigration court if they claim an intent to apply for asylum or a fear of persecution or torture if removed and they demonstrate a credible fear of persecution in a screening with a U.S. Citizenship and Immigration Services (USCIS) asylum officer. In other cases, migrants may be placed directly into formal removal at DHS's discretion. Immigration courts have jurisdiction over a case once DHS issues an individual a Notice to Appear (NTA) charging document and files it with EOIR.

**Congressional Research Service**

https://crsreports.congress.gov

IN12492

# New Case Receipts: FY1983-FY2024

Since EOIR was established in 1983, immigration courts' caseloads have generally increased. However, annual case receipts have increased more significantly since FY2019, with the exception of FY2020 and FY2021 during the COVID-19 pandemic (**Figure 1**). The level of annual case receipts during the last three years, including nearly 1.8 million NTAs filed by DHS in FY2024, are unprecedented in EOIR's 41-year history, reflecting record-high levels of enforcement encounters at the Southwest border.

Notably, case receipts declined in the last two quarters of FY2024, likely reflecting policy changes under a rule that limits asylum eligibility for migrants encountered at the Southwest border. That rule has resulted in a larger proportion of encountered migrants being processed for expedited removal.

**Figure 1. Immigration Courts Annual Case Receipts, FY1983-FY2024**



**Source:** EOIR, "New Cases and Total Completions – Historical," Adjudication Statistics, October 10, 2024.

**Notes:** Includes removal, deportation, exclusions, asylum-only, and withholding-only cases. For more information on hearing types, see CRS Report R47077, *U.S. Immigration Courts and the Pending Cases Backlog*, Table 1.

# Asylum Applications in Immigration Courts

Individuals may apply for asylum as a form of relief from removal during their proceedings in immigration court (*defensive asylum*). Annual defensive asylum applications have increased every year since FY2018, with the exception of FY2021 during the COVID-19 pandemic (**Figure 2**). Defensive asylum applications have more than doubled each year since FY2022 (238,594) and reached 850,720 in FY2024.

Foreign nationals who are physically present in the United States and are not in removal proceedings may apply for *affirmative asylum* with USCIS regardless of their immigration status. If a USCIS asylum officer determines that an applicant is ineligible for asylum and appears to be inadmissible or deportable, they will refer the application to EOIR. Therefore, EOIR's asylum caseload includes both defensive asylum applications filed in immigration court and affirmative referrals.

In total, 1,478,623 asylum applications were pending in immigration courts at the end of FY2024.

**Figure 2. Asylum Applications Filed and Pending with EOIR, FY2015-FY2024**



**Source:** EOIR, "Total Asylum Applications," October 10, 2024.

# Immigration Judges and Courtrooms

EOIR prioritized IJ hiring and courtroom expansion in recent years as measures to address its large backlog of pending cases. During the last five fiscal years, EOIR hired 437 new judges. The number of IJs on staff has nearly tripled over the last decade, from 254 at the end of FY2015 to 735 at the end of FY2024 (**Figure 3**). The agency has indicated that this is the maximum number of IJs supported under current funding levels. The number of EOIR's courtrooms increased from 336 at the end of CY2015 to 642 in FY2024.

Figure 3. Immigration Judges (IJs) Hired and on Board, FY2015-FY2024



Source: EOIR, "Immigration Judge (IJ) Hiring," Adjudication Statistics, October 2024.

# Case Completions and the Pending Cases Backlog

Despite increased staffing, IJs were unable to complete enough cases to counter the growth in new cases EOIR received in FY2024 (**Figure 4**). In FY2024, IJs completed 701,749 cases, the largest number in the agency's history, with an average of 58,479 cases completed per month (by comparison, EOIR received an average of 148,663 new cases per month during this same time). EOIR's case completions data include both initial case completions (IJs' first dispositive decisions) and subsequent case completions (e.g., a respondent files a motion to reconsider or reopen a case after the initial completion). At the end of FY2024, EOIR had 3,558,995 pending cases.

**Figure 4. Case Completions and Cases Pending, FY2009-FY2023**



Source: EOIR, "Pending Cases, New Cases, and Total Completions," Adjudication Statistics, October 10, 2024.

# Author Information

Holly Straut-Eppsteiner
Analyst in Immigration Policy

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.


| 104TH CONGRESS<br>2d Session | HOUSE OF REPRESENTATIVES | REPT. 104–469<br>Part 1 |
| --- | --- | --- |

# IMMIGRATION IN THE NATIONAL INTEREST ACT OF 1995

———————

# R E P O R T

OF THE

## COMMITTEE ON THE JUDICIARY HOUSE OF REPRESENTATIVES

ON

## H.R. 2202

together with

## ADDITIONAL AND DISSENTING VIEWS

[Including cost estimate of the Congressional Budget Office]



MARCH 4, 1996.—Ordered to be printed

IMMIGRATION IN THE NATIONAL INTEREST ACT OF 1995

FRP-FRN-00668

| 104TH CONGRESS<br>*2d Session* | HOUSE OF REPRESENTATIVES | REPT. 104–469<br>Part 1 |

# IMMIGRATION IN THE NATIONAL INTEREST ACT OF 1995

———————

# R E P O R T

OF THE

## COMMITTEE ON THE JUDICIARY
## HOUSE OF REPRESENTATIVES

ON

## H.R. 2202

together with

## ADDITIONAL AND DISSENTING VIEWS

[Including cost estimate of the Congressional Budget Office]



MARCH 4, 1996.—Ordered to be printed

———————

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1996

22–948

FRP-FRN-00670

# CONTENTS

| | Page |
|---|---|
| The Amendment ......................................................................... | 1 |
| Explanation of Amendment ....................................................... | 106 |
| Purpose and Summary ............................................................... | 106 |
| Background and Need for Legislation ...................................... | 110 |
| Hearings ...................................................................................... | 182 |
| Committee Consideration .......................................................... | 182 |
| Vote of the Committee ............................................................... | 182 |
| Committee Oversight Findings ................................................. | 205 |
| Committee on Government Reform and Oversight Findings ............ | 205 |
| New Budget Authority and Tax Expenditures ......................... | 205 |
| Congressional Budget Office Cost Estimate ............................ | 205 |
| Inflationary Impact Statement ................................................ | 218 |
| Section-by-Section Analysis and Discussion .......................... | 219 |
| Agency Views ............................................................................. | 278 |
| Changes in Existing Law Made by the Bill, as Reported ....................... | 282 |
| Additional/Minority Views ....................................................... | 512 |

FRP-FRN-00671

104TH CONGRESS } HOUSE OF REPRESENTATIVES { REPT. 104–469
2d Session                                    Part 1

IMMIGRATION IN THE NATIONAL INTEREST ACT OF 1995

———————

MARCH 4, 1996.—Ordered to be printed

———————

Mr. HYDE, from the Committee on the Judiciary,
submitted the following

R E P O R T

together with

ADDITIONAL AND DISSENTING VIEWS

[To accompany H.R. 2202]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill
(H.R. 2202) to amend the Immigration and Nationality Act to im-
prove deterrence of illegal immigration to the United States by in-
creasing border patrol and investigative personnel, by increasing
penalties for alien smuggling and for document fraud, by reforming
exclusion and deportation law and procedures, by improving the
verification system for eligibility for employment, and through
other measures, to reform the legal immigration system and facili-
tate legal entries into the United States, and for other purposes,
having considered the same, report favorably thereon with an
amendment and recommend that the bill as amended do pass.
    The amendment is as follows:
    Strike out all after the enacting clause and insert in lieu thereof
the following:

**SECTION 1. SHORT TITLE; AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT; TABLE OF
    CONTENTS.**

    (a) SHORT TITLE.—This Act may be cited as the "Immigration in the National In-
terest Act of 1995".
    (b) AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT.—Except as otherwise
specifically provided—
        (1) whenever in this Act an amendment or repeal is expressed as the amend-
    ment or repeal of a section or other provision, the reference shall be considered

FRP-FRN-00672

2

to be made to that section or provision in the Immigration and Nationality Act, and

(2) amendments to a section or other provision are to such section or other provision as in effect on the date of the enactment of this Act and before any amendment made to such section or other provision elsewhere in this Act.

(c) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title; amendments to Immigration and Nationality Act; table of contents.

**TITLE I—DETERRENCE OF ILLEGAL IMMIGRATION THROUGH IMPROVED BORDER ENFORCEMENT, PILOT PROGRAMS, AND INTERIOR ENFORCEMENT**

**Subtitle A—Improved Enforcement at Border**

Sec. 101. Border patrol agents and support personnel.
Sec. 102. Improvement of barriers at border.
Sec. 103. Improved border equipment and technology.
Sec. 104. Improvement in border crossing identification card.
Sec. 105. Civil penalties for illegal entry.
Sec. 106. Prosecution of aliens repeatedly reentering the United States unlawfully.
Sec. 107. Inservice training for the border patrol.

**Subtitle B—Pilot Programs**

Sec. 111. Pilot program on interior repatriation.
Sec. 112. Pilot program on use of closed military bases for the detention of inadmissible or deportable aliens.
Sec. 113. Pilot program to collect records of departing passengers.

**Subtitle C—Interior Enforcement**

Sec. 121. Increase in personnel for interior enforcement.

**TITLE II—ENHANCED ENFORCEMENT AND PENALTIES AGAINST ALIEN SMUGGLING; DOCUMENT FRAUD**

**Subtitle A—Enhanced Enforcement and Penalties Against Alien Smuggling**

Sec. 201. Wiretap authority for alien smuggling investigations.
Sec. 202. Racketeering offenses relating to alien smuggling.
Sec. 203. Increased criminal penalties for alien smuggling.
Sec. 204. Increased number of Assistant United States Attorneys.
Sec. 205. Undercover investigation authority.

**Subtitle B—Deterrence of Document Fraud**

Sec. 211. Increased criminal penalties for fraudulent use of government-issued documents.
Sec. 212. New civil penalties for document fraud.
Sec. 213. New civil penalty for failure to present documents and for preparing immigration documents without authorization.
Sec. 214. New criminal penalties for failure to disclose role as preparer of false application for asylum and for preparing certain post-conviction applications.
Sec. 215. Criminal penalty for knowingly presenting document which fails to contain reasonable basis in law or fact.
Sec. 216. Criminal penalties for false claim to citizenship.

**Subtitle C—Asset Forfeiture for Passport and Visa Offenses**

Sec. 221. Criminal forfeiture for passport and visa related offenses.
Sec. 222. Subpoenas for bank records.
Sec. 223. Effective date.

**TITLE III—INSPECTION, APPREHENSION, DETENTION, ADJUDICATION, AND REMOVAL OF INADMISSIBLE AND DEPORTABLE ALIENS**

**Subtitle A—Revision of Procedures for Removal of Aliens**

Sec. 300. Overview of changes in removal procedures.
Sec. 301. Treating persons present in the United States without authorization as not admitted.
Sec. 302. Inspection of aliens; expedited removal of inadmissible arriving aliens; referral for hearing (revised section 235).
Sec. 303. Apprehension and detention of aliens not lawfully in the United States (revised section 236).
Sec. 304. Removal proceedings; cancellation of removal and adjustment of status; voluntary departure (revised and new sections 239 to 240C).
Sec. 305. Detention and removal of aliens ordered removed (new section 241).
Sec. 306. Appeals from orders of removal (new section 242).
Sec. 307. Penalties relating to removal (revised section 243).
Sec. 308. Redesignation and reorganization of other provisions; additional conforming amendments.
Sec. 309. Effective dates; transition.

**Subtitle B—Removal of Alien Terrorists**

PART 1—REMOVAL PROCEDURES FOR ALIEN TERRORISTS

Sec. 321. Removal procedures for alien terrorists.

**"TITLE V—SPECIAL REMOVAL PROCEDURES FOR ALIEN TERRORISTS**

"Sec. 501. Definitions.
"Sec. 502. Establishment of special removal court; panel of attorneys to assist with classified information.
"Sec. 503. Application for initiation of special removal proceeding.
"Sec. 504. Consideration of application.
"Sec. 505. Special removal hearings.

3

"Sec. 506. Consideration of classified information.
"Sec. 507. Appeals.
"Sec. 508. Detention and custody.
Sec. 322. Funding for detention and removal of alien terrorists.

PART 2—INADMISSIBILITY AND DENIAL OF RELIEF FOR ALIEN TERRORISTS

Sec. 331. Membership in terrorist organization as ground of inadmissibility.
Sec. 332. Denial of relief for alien terrorists.

### Subtitle C—Deterring Transportation of Unlawful Aliens to the United States

Sec. 341. Definition of stowaway.
Sec. 342. List of alien and citizen passengers arriving.

### Subtitle D—Additional Provisions

Sec. 351. Definition of conviction.
Sec. 352. Immigration judges and compensation.
Sec. 353. Rescission of lawful permanent resident status.
Sec. 354. Civil penalties for failure to depart.
Sec. 355. Clarification of district court jurisdiction.
Sec. 356. Use of retired Federal employees for institutional hearing program.
Sec. 357. Enhanced penalties for failure to depart, illegal reentry, and passport and visa fraud.
Sec. 358. Authorization of additional funds for removal of aliens.
Sec. 359. Application of additional civil penalties to enforcement.
Sec. 360. Prisoner transfer treaties.
Sec. 361. Criminal alien identification system.
Sec. 362. Waiver of exclusion and deportation ground for certain section 274C violators.
Sec. 363. Authorizing registration of aliens on criminal probation or criminal parole.
Sec. 364. Confidentiality provision for certain alien battered spouses and children.

### TITLE IV—ENFORCEMENT OF RESTRICTIONS AGAINST EMPLOYMENT

Sec. 401. Strengthened enforcement of the employer sanctions provisions.
Sec. 402. Strengthened enforcement of wage and hour laws.
Sec. 403. Changes in the employer sanctions program.
Sec. 404. Reports on earnings of aliens not authorized to work.
Sec. 405. Authorizing maintenance of certain information on aliens.
Sec. 406. Limiting liability for certain technical violations of paperwork requirements.
Sec. 407. Unfair immigration-related employment practices.

### TITLE V—REFORM OF LEGAL IMMIGRATION SYSTEM

Sec. 500. Overview of new legal immigration system.

### Subtitle A—Worldwide Numerical Limits

Sec. 501. Worldwide numerical limitation on family-sponsored immigrants.
Sec. 502. Worldwide numerical limitation on employment-based immigrants.
Sec. 503. Worldwide numerical limitation on diversity immigrants.
Sec. 504. Establishment of numerical limitation on humanitarian immigrants.
Sec. 505. Requiring congressional review and reauthorization of worldwide levels every 5 years.

### Subtitle B—Changes in Preference System

Sec. 511. Limitation of immediate relatives to spouses and children.
Sec. 512. Change in family-sponsored classification.
Sec. 513. Change in employment-based classification.
Sec. 514. Changes in diversity immigrant program.
Sec. 515. Authorization to require periodic confirmation of classification petitions.
Sec. 516. Changes in special immigrant status.
Sec. 517. Requirements for removal of conditional status of entrepreneurs.
Sec. 518. Adult disabled children.
Sec. 519. Miscellaneous conforming amendments.

### Subtitle C—Refugees, Parole, and Humanitarian Admissions

Sec. 521. Changes in refugee annual admissions.
Sec. 522. Persecution for resistance to coercive population control methods.
Sec. 523. Parole available only on a case-by-case basis for humanitarian reasons or significant public benefit.
Sec. 524. Admission of humanitarian immigrants.

### Subtitle D—Asylum Reform

Sec. 531. Asylum reform.
Sec. 532. Fixing numerical adjustments for asylees at 10,000 each year.
Sec. 533. Increased resources for reducing asylum application backlogs.

### Subtitle E—General Effective Date; Transition Provisions

Sec. 551. General effective date.
Sec. 552. General transition for current classification petitions.
Sec. 553. Special transition for certain backlogged spouses and children of lawful permanent resident aliens.
Sec. 554. Special treatment of certain disadvantaged family first preference immigrants.
Sec. 555. Authorization of reimbursement of petitioners for eliminated family-sponsored categories.

### TITLE VI—RESTRICTIONS ON BENEFITS FOR ALIENS

Sec. 600. Statements of national policy concerning welfare and immigration.

### Subtitle A—Eligibility of Illegal Aliens for Public Benefits

PART 1—PUBLIC BENEFITS GENERALLY

Sec. 601. Making illegal aliens ineligible for public assistance, contracts, and licenses.

4

Sec. 602. Making unauthorized aliens ineligible for unemployment benefits.
Sec. 603. General exceptions.
Sec. 604. Treatment of expenses subject to emergency medical services exception.
Sec. 605. Report on disqualification of illegal aliens from housing assistance programs.
Sec. 606. Verification of student eligibility for postsecondary Federal student financial assistance.
Sec. 607. Payment of public assistance benefits.
Sec. 608. Definitions.
Sec. 609. Regulations and effective dates.

Part 2—Earned Income Tax Credit

Sec. 611. Earned income tax credit denied to individuals not authorized to be employed in the United States.

Subtitle B—Expansion of Disqualification From Immigration Benefits on the Basis of Public Charge

Sec. 621. Ground for inadmissibility.
Sec. 622. Ground for deportability.

Subtitle C—Attribution of Income and Affidavits of Support

Sec. 631. Attribution of sponsor's income and resources to family-sponsored immigrants.
Sec. 632. Requirements for sponsor's affidavit of support.

TITLE VII—FACILITATION OF LEGAL ENTRY

Sec. 701. Additional land border inspectors; infrastructure improvements.
Sec. 702. Commuter lane pilot programs.
Sec. 703. Preinspection at foreign airports.
Sec. 704. Training of airline personnel in detection of fraudulent documents.

TITLE VIII—MISCELLANEOUS PROVISIONS

Subtitle A—Amendments to the Immigration and Nationality Act

Sec. 801. Nonimmigrant status for spouses and children of members of the Armed Services.
Sec. 802. Amended definition of aggravated felony.
Sec. 803. Authority to determine visa processing procedures.
Sec. 804. Waiver authority concerning notice of denial of application for visas.
Sec. 805. Treatment of Canadian landed immigrants.
Sec. 806. Changes relating to H–1B nonimmigrants.
Sec. 807. Validity of period of visa.
Sec. 808. Limitation on adjustment of status of individuals not lawfully present in the United States.
Sec. 809. Limited access to certain confidential INS files.
Sec. 810. Change of nonimmigrant classification.

Subtitle B—Other Provisions

Sec. 831. Commission report on fraud associated with birth certificates.
Sec. 832. Uniform vital statistics.
Sec. 833. Communication between State and local government agencies, and the Immigration and Naturalization Service.
Sec. 834. Criminal alien reimbursement costs.
Sec. 835. Female genital mutilation.
Sec. 836. Designation of Portugal as a visa waiver pilot program country with probationary status.

Subtitle C—Technical Corrections

Sec. 851. Miscellaneous technical corrections.

# TITLE I—DETERRENCE OF ILLEGAL IMMIGRATION THROUGH IMPROVED BORDER ENFORCEMENT, PILOT PROGRAMS, AND INTERIOR ENFORCEMENT

## Subtitle A—Improved Enforcement at Border

### SEC. 101. BORDER PATROL AGENTS AND SUPPORT PERSONNEL.

(a) INCREASED NUMBER OF BORDER PATROL POSITIONS.—The number of border patrol agents shall be increased, for each fiscal year beginning with the fiscal year 1996 and ending with the fiscal year 2000, by 1,000 full-time equivalent positions above the number of equivalent positions as of September 30, 1994.

(b) INCREASE IN SUPPORT PERSONNEL.—The number of full-time support positions for personnel in support of border enforcement, investigation, detention and deportation, intelligence, information and records, legal proceedings, and management and administration in the Immigration and Naturalization Service shall be increased, beginning with fiscal year 1996, by 800 positions above the number of equivalent positions as of September 30, 1994.

(c) DEPLOYMENT OF NEW BORDER PATROL AGENTS.—The Attorney General shall, to the maximum extent practicable, ensure that the border patrol agents hired pursuant to subsection (a) shall—

5

(1) be deployed among the various Immigration and Naturalization Service sectors in proportion to the level of illegal crossing of the borders of the United States measured in each sector during the preceding fiscal year and reasonably anticipated in the next fiscal year, and

(2) be actively engaged in law enforcement activities related to such illegal crossings.

**SEC. 102. IMPROVEMENT OF BARRIERS AT BORDER.**

(a) IN GENERAL.—The Attorney General, in consultation with the Commissioner of the Immigration and Naturalization Service, shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.

(b) CONSTRUCTION OF FENCING AND ROAD IMPROVEMENTS IN THE BORDER AREA NEAR SAN DIEGO, CALIFORNIA.—

(1) IN GENERAL.—In carrying out subsection (a), the Attorney General shall provide for the construction along the 14 miles of the international land border of the United States, starting at the Pacific Ocean and extending eastward, of second and third fences, in addition to the existing reinforced fence, and for roads between the fences.

(2) PROMPT ACQUISITION OF NECESSARY EASEMENTS.—The Attorney General shall promptly acquire such easements as may be necessary to carry out this subsection and shall commence construction of fences immediately following such acquisition (or conclusion of portions thereof).

(3) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this subsection not to exceed $12,000,000. Amounts appropriated under this paragraph are authorized to remain available until expended.

(c) WAIVER.—The provisions of the Endangered Species Act of 1973 are waived to the extent the Attorney General determines necessary to assure expeditious construction of the barriers and roads under this section.

(d) FORWARD DEPLOYMENT.—

(1) IN GENERAL.—The Attorney General shall forward deploy existing border patrol agents in those areas of the border identified as areas of high illegal entry into the United States in order to provide a uniform and visible deterrent to illegal entry on a continuing basis.

(2) REPORT.—By not later than 6 months after the date of the enactment of this Act, the Attorney General shall submit to the appropriate committees of Congress a report on the progress and effectiveness of such forward deployments.

**SEC. 103. IMPROVED BORDER EQUIPMENT AND TECHNOLOGY.**

The Attorney General is authorized to acquire and utilize, for the purpose of detection, interdiction, and reduction of illegal immigration into the United States, any Federal equipment (including fixed wing aircraft, helicopters, four-wheel drive vehicles, sedans, night vision goggles, night vision scopes, and sensor units) determined available for transfer by any other agency of the Federal Government upon request of the Attorney General.

**SEC. 104. IMPROVEMENT IN BORDER CROSSING IDENTIFICATION CARD.**

(a) IN GENERAL.—Section 101(a)(6) (8 U.S.C. 1101(a)(6)) is amended by adding at the end the following: "Such regulations shall provide that (A) each such document include a biometric identifier (such as the fingerprint or handprint of the alien) that is machine readable and (B) an alien presenting a border crossing identification card is not permitted to cross over the border into the United States unless the biometric identifier contained on the card matches the appropriate biometric characteristic of the alien.".

(b) EFFECTIVE DATES.—

(1) Clause (A) of the sentence added by the amendment made by subsection (a) shall apply to documents issued on or after 6 months after the date of the enactment of this Act.

(2) Clause (B) of such sentence shall apply to cards presented on or after 3 years after the date of the enactment of this Act.

(c) REPORT.—Not later than one year after the implementation of clause (A) of the sentence added by the amendment made by subsection (a) the Attorney General shall submit to Congress a report on the impact of such clause on border crossing activities.

6

**SEC. 105. CIVIL PENALTIES FOR ILLEGAL ENTRY.**

(a) IN GENERAL.—Section 275 (8 U.S.C. 1325) is amended—

(1) by redesignating subsections (b) and (c) as subsections (c) and (d), respectively, and

(2) by inserting after subsection (a) the following new subsection:

"(b) Any alien who is apprehended while entering (or attempting to enter) the United States at a time or place other than as designated by immigration officers shall be subject to a civil penalty of—

"(1) at least $50 and not more than $250 for each such entry (or attempted entry), or

"(2) twice the amount specified in paragraph (1) in the case of an alien who has been previously subject to a civil penalty under this subsection.

Civil penalties under this subsection are in addition to, and not in lieu of, any criminal or other civil penalties that may be imposed.".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to illegal entries or attempts to enter occurring on or after the first day of the sixth month beginning after the date of the enactment of this Act.

**SEC. 106. PROSECUTION OF ALIENS REPEATEDLY REENTERING THE UNITED STATES UNLAW-FULLY.**

(a) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to the Attorney General such sums as may be necessary to provide for detention and prosecution of each alien who commits an act that constitutes a violation of section 275(a) of the Immigration and Nationality Act if the alien has committed such an act on two previous occasions. Funds appropriated pursuant to this subsection are authorized to remain available until expended.

(b) SENSE OF CONGRESS.—It is the sense of Congress that the Attorney General should use available resources to assure detention and prosecution of aliens in the cases described in subsection (a).

**SEC. 107. INSERVICE TRAINING FOR THE BORDER PATROL.**

(a) REQUIREMENT.—Section 103 (8 U.S.C. 1103) is amended by adding at the end the following new subsection:

"(e)(1) The Attorney General shall continue to provide for such programs (including intensive language training programs) of inservice training for full-time and part-time personnel of the Border Patrol in contact with the public as will familiarize the personnel with the rights and varied cultural backgrounds of aliens and citizens in order to ensure and safeguard the constitutional and civil rights, personal safety, and human dignity of all individuals, aliens as well as citizens, within the jurisdiction of the United States with whom such personnel have contact in their work.

"(2) The Attorney General shall provide that the annual report of the Service include a description of steps taken to carry out paragraph (1).".

(b) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to the Attorney General such sums as may be necessary for fiscal year 1996 to carry out the inservice training described in section 103(e)(1) of the Immigration and Nationality Act. The funds appropriated pursuant to this subsection are authorized to remain available until expended.

# Subtitle B—Pilot Programs

**SEC. 111. PILOT PROGRAM ON INTERIOR REPATRIATION.**

(a) ESTABLISHMENT.—Not later than 120 days after the date of the enactment of this Act, the Attorney General, after consultation with the Secretary of State, shall establish a pilot program for up to 2 years which provides for methods to deter multiple illegal entries by aliens into the United States. The pilot program may include the development and use of interior repatriation, third country repatriation, and other disincentives for multiple illegal entries into the United States.

(b) REPORT.—Not later than 30 months after the date of the enactment of this Act, the Attorney General, together with the Secretary of State, shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate on the operation of the pilot program under this section and whether the pilot program or any part thereof should be extended or made permanent.

**SEC. 112. PILOT PROGRAM ON USE OF CLOSED MILITARY BASES FOR THE DETENTION OF IN-ADMISSIBLE OR DEPORTABLE ALIENS.**

(a) ESTABLISHMENT.—The Attorney General and the Secretary of Defense shall establish one or more pilot programs for up to 2 years each to determine the feasibility

7

of the use of military bases available because of actions under a base closure law as detention centers by the Immigration and Naturalization Service.

(b) REPORT.—Not later than 30 months after the date of the enactment of this Act, the Attorney General, together with the Secretary of State, shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate, and the Committees on Armed Services of the House of Representatives and of the Senate, on the feasibility of using military bases closed under a base closure law as detention centers by the Immigration and Naturalization Service.

(c) DEFINITION.—For purposes of this section, the term "base closure law" means each of the following:

(1) The Defense Base Closure and Realignment Act of 1990 (part A of title XXIX of Public Law 101–510; 10 U.S.C. 2687 note).

(2) Title II of the Defense Authorization Amendments and Base Closure and Realignment Act (Public Law 100–526; 10 U.S.C. 2687 note).

(3) Section 2687 of title 10, United States Code.

(4) Any other similar law enacted after the date of the enactment of this Act.

**SEC. 113. PILOT PROGRAM TO COLLECT RECORDS OF DEPARTING PASSENGERS.**

(a) ESTABLISHMENT.—The Commissioner of the Immigration and Naturalization Service shall, within 180 days after the date of the enactment of this Act, establish a pilot program in which officers of the Service collect a record of departure for every alien departing the United States and match the records of departure with the record of the alien's arrival in the United States. The program shall be operated in as many air ports of entry as is deemed appropriate, but at no less than 3 of the 5 air ports of entry with the heaviest volume of incoming traffic from foreign territories.

(b) REPORT.—

(1) DEADLINE.—The Commissioner shall submit a report to Congress not later than 2 years after the date the pilot program is implemented under subsection (a).

(2) INFORMATION.—The report shall include the following information for each participating port of entry:

(A) The number of departure records collected, with an accounting by country of nationality of the departing alien.

(B) The number of departure records that were successfully matched to records of the alien's prior arrival in the United States, with an accounting by the alien's country of nationality and by the alien's classification as an immigrant or nonimmigrant.

(C) The number of aliens who arrived at the port of entry as nonimmigrants, or as a visitor under the visa waiver program under section 217 of the Immigration and Nationality Act, for whom no matching departure record has been obtained through the pilot program or through other means, with an accounting by the alien's country of nationality and date of arrival in the United States.

(D) The estimated cost of establishing a national system to verify the departure from the United States of aliens admitted temporarily as nonimmigrants.

(3) RECOMMENDATIONS.—The report also shall include specific recommendations for implementation of the pilot program on a permanent basis.

(c) USE OF INFORMATION ON VISA OVERSTAYS.—Information on instances of visa overstay identified through the pilot program shall be integrated into appropriate data bases of the Immigration and Naturalization Service and the Department of State, including those used at ports of entry and at consular offices.

# Subtitle C—Interior Enforcement

**SEC. 121. INCREASE IN PERSONNEL FOR INTERIOR ENFORCEMENT.**

Subject to the availability of appropriations, the Attorney General shall provide for an increase in the number of investigators and enforcement personnel of the Immigration and Naturalization Service who are deployed in the interior so that the number of such personnel is adequate properly to investigate violations of, and to enforce, immigration laws.

8

# TITLE II—ENHANCED ENFORCEMENT AND PENALTIES AGAINST ALIEN SMUGGLING; DOCUMENT FRAUD

## Subtitle A—Enhanced Enforcement and Penalties Against Alien Smuggling

**SEC. 201. WIRETAP AUTHORITY FOR ALIEN SMUGGLING INVESTIGATIONS.**

Section 2516(1) of title 18, United States Code, is amended—

(1) by striking "and" at the end of paragraph (n),

(2) by redesignating paragraph (o) as paragraph (p), and

(3) by inserting after paragraph (n) the following new paragraph:

"(o)(1) a felony violation of section 1028 (relating to production of false identification documentation), section 1541 (relating to passport issuance without authority), section 1542 (relating to false statements in passport applications), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud or misuse of visas, permits, or other documents) of this title; or

"(2) a violation of section 274, 277, or 278 of the Immigration and Nationality Act (relating to the smuggling of aliens); or".

**SEC. 202. RACKETEERING OFFENSES RELATING TO ALIEN SMUGGLING.**

Section 1961(1) of title 18, United States Code, is amended—

(1) by inserting "section 1028 (relating to fraud and related activity in connection with identification documents)," before "section 1029";

(2) by inserting "section 1542 (relating to false statement in application and use of passport), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud and misuse of visas, permits, and other documents), sections 1581–1588 (relating to peonage and slavery)," after "section 1513 (relating to retaliating against a witness, victim, or an informant),";

(3) by striking "or" before "(E)"; and

(4) by inserting before the period at the end the following: ", or (F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose)".

**SEC. 203. INCREASED CRIMINAL PENALTIES FOR ALIEN SMUGGLING.**

(a) IN GENERAL.—Section 274(a)(1) (8 U.S.C. 1324(a)(1)) is amended—

(1) in subparagraph (B)(i), by inserting "or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain" after "subparagraph (A)(i)", and

(2) by adding at the end the following new subparagraph:

"(C) Any person who engages in any conspiracy to commit, or aids or abets the commission of, any of the acts described in—

"(i) subparagraph (A)(i) shall be fined under title 18, United States Code, imprisoned not more than 10 years, or both; or

"(ii) clause (ii), (iii), or (iv) of subparagraph (A) shall be fined under title 18, United States Code, imprisoned not more than 5 years, or both.".

(b) SMUGGLING OF ALIENS WHO WILL COMMIT CRIMES.—Section 274(a)(2) (8 U.S.C. 1324(a)(2)) is amended—

(1) in subparagraph (B)—

(A) by striking "or" at the end of clause (ii),

(B) by adding "or" at the end of clause (iii), and

(C) by inserting after clause (iii) the following:

"(iv) an offense committed with the intent or with reason to believe that the alien unlawfully brought into the United States will commit an offense against the United States or any State punishable by imprisonment for more than 1 year,"; and

(2) by striking "be fined" and all that follows through the final period at the end and inserting the following: "be fined under title 18, United States Code, and shall be imprisoned not less than 3 years nor more than 10 years.".

(c) APPLYING CERTAIN PENALTIES ON A PER ALIEN BASIS.—Section 274(a)(2) (8 U.S.C. 1324(a)(2)) is amended by striking "for each transaction constituting a viola-

9

tion of this paragraph, regardless of the number of aliens involved" and inserting "for each alien in respect to whom a violation of this paragraph occurs".

**SEC. 204. INCREASED NUMBER OF ASSISTANT UNITED STATES ATTORNEYS.**

(a) IN GENERAL.—The number of Assistant United States Attorneys employed by the Department of Justice for the fiscal year 1996 shall be increased by 25 above the number of Assistant United States Attorneys that were authorized to be employed as of September 30, 1994.

(b) ASSIGNMENT.—Individuals employed to fill the additional positions described in subsection (a) shall be specially trained to be used for the prosecution of persons who bring into the United States or harbor illegal aliens, fraud, and other criminal statutes involving illegal aliens.

**SEC. 205. UNDERCOVER INVESTIGATION AUTHORITY.**

(a) IN GENERAL.—Title II is amended by adding at the end the following new section:

"UNDERCOVER INVESTIGATION AUTHORITY

"SEC. 294. (a) IN GENERAL.—With respect to any undercover investigative operation of the Service which is necessary for the detection and prosecution of crimes against the United States—

"(1) sums appropriated for the Service may be used for leasing space within the United States and the territories and possessions of the United States without regard to the following provisions of law:

"(A) section 3679(a) of the Revised Statutes (31 U.S.C. 1341),

"(B) section 3732(a) of the Revised Statutes (41 U.S.C. 11(a)),

"(C) section 305 of the Act of June 30, 1949 (63 Stat. 396; 41 U.S.C. 255),

"(D) the third undesignated paragraph under the heading 'Miscellaneous' of the Act of March 3, 1877 (19 Stat. 370; 40 U.S.C. 34),

"(E) section 3648 of the Revised Statutes (31 U.S.C. 3324),

"(F) section 3741 of the Revised Statutes (41 U.S.C. 22), and

"(G) subsections (a) and (c) of section 304 of the Federal Property and Administrative Services Act of 1949 (63 Stat. 395; 41 U.S.C. 254 (a) and (c));

"(2) sums appropriated for the Service may be used to establish or to acquire proprietary corporations or business entities as part of an undercover operation, and to operate such corporations or business entities on a commercial basis, without regard to the provisions of section 304 of the Government Corporation Control Act (31 U.S.C. 9102);

"(3) sums appropriated for the Service, and the proceeds from the undercover operation, may be deposited in banks or other financial institutions without regard to the provisions of section 648 of title 18, United States Code, and of section 3639 of the Revised Statutes (31 U.S.C. 3302); and

"(4) the proceeds from the undercover operation may be used to offset necessary and reasonable expenses incurred in such operation without regard to the provisions of section 3617 of the Revised Statutes (31 U.S.C. 3302).

The authority set forth in this subsection may be exercised only upon written certification of the Commissioner, in consultation with the Deputy Attorney General, that any action authorized by paragraph (1), (2), (3), or (4) is necessary for the conduct of the undercover operation.

"(b) DISPOSITION OF PROCEEDS NO LONGER REQUIRED.—As soon as practicable after the proceeds from an undercover investigative operation, carried out under paragraphs (3) and (4) of subsection (a), are no longer necessary for the conduct of the operation, the proceeds or the balance of the proceeds remaining at the time shall be deposited into the Treasury of the United States as miscellaneous receipts.

"(c) DISPOSITION OF CERTAIN CORPORATIONS AND BUSINESS ENTITIES.—If a corporation or business entity established or acquired as part of an undercover operation under paragraph (2) of subsection (a) with a net value of over $50,000 is to be liquidated, sold, or otherwise disposed of, the Service, as much in advance as the Commissioner or Commissioner's designee determines practicable, shall report the circumstances to the Attorney General, the Director of the Office of Management and Budget, and the Comptroller General. The proceeds of the liquidation, sale, or other disposition, after obligations are met, shall be deposited in the Treasury of the United States as miscellaneous receipts.

"(d) FINANCIAL AUDITS.—The Service shall conduct detailed financial audits of closed undercover operations on a quarterly basis and shall report the results of the audits in writing to the Deputy Attorney General.".

10

(b) Clerical Amendment.—The table of contents is amended by inserting after the item relating to section 293 the following:

"Sec. 294. Undercover investigation authority.".

# Subtitle B—Deterrence of Document Fraud

**SEC. 211. INCREASED CRIMINAL PENALTIES FOR FRAUDULENT USE OF GOVERNMENT-ISSUED DOCUMENTS.**

(a) Fraud and Misuse of Government-Issued Identification Documents.—Section 1028(b) of title 18, United States Code, is amended—

(1) in paragraph (1), by inserting "except as provided in paragraphs (3) and (4)," after "(1)" and by striking "five years" and inserting "15 years";

(2) in paragraph (2), by inserting "except as provided in paragraphs (3) and (4)," after "(2)" and by striking "and" at the end;

(3) by redesignating paragraph (3) as paragraph (5); and

(4) by inserting after paragraph (2) the following new paragraphs:

"(3) a fine under this title or imprisonment for not more than 20 years, or both, if the offense is committed to facilitate a drug trafficking crime (as defined in section 929(a)(2) of this title);

"(4) a fine under this title or imprisonment for not more than 25 years, or both, if the offense is committed to facilitate an act of international terrorism (as defined in section 2331(1) of this title); and".

(b) Changes to the Sentencing Levels.—Pursuant to section 944 of title 28, United States Code, and section 21 of the Sentencing Act of 1987, the United States Sentencing Commission shall promulgate guidelines, or amend existing guidelines, relating to defendants convicted of violating, or conspiring to violate, sections 1546(a) and 1028(a) of title 18, United States Code. The basic offense level under section 2L2.1 of the United States Sentencing Guidelines shall be increased to—

(1) not less than offense level 15 if the offense involves 100 or more documents;

(2) not less than offense level 20 if the offense involves 1,000 or more documents, or if the documents were used to facilitate any other criminal activity described in section 212(a)(2)(A)(i)(II) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(A)(i)(II)) or in section 101(a)(43) of such Act; and

(3) not less than offense level 25 if the offense involves—

(A) the provision of documents to a person known or suspected of engaging in a terrorist activity (as such terms are defined in section 212(a)(3)(B) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B));

(B) the provision of documents to facilitate a terrorist activity or to assist a person to engage in terrorist activity (as such terms are defined in section 212(a)(3)(B) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)); or

(C) the provision of documents to persons involved in racketeering enterprises (described in section 1952(a) of title 18, United States Code).

**SEC. 212. NEW CIVIL PENALTIES FOR DOCUMENT FRAUD.**

(a) Activities Prohibited.—Section 274C(a) (8 U.S.C. 1324c(a)) is amended—

(1) by striking "or" at the end of paragraph (3);

(2) by striking the period at the end of paragraph (4) and inserting ", or"; and

(3) by adding at the end the following:

"(5) in reckless disregard of the fact that the information is false or does not relate to the applicant, to prepare, to file, or to assist another in preparing or filing, documents which are falsely made for the purpose of satisfying a requirement of this Act.

For purposes of this section, the term 'falsely made' includes, with respect to a document or application, the preparation or provision of the document or application with knowledge or in reckless disregard of the fact that such document contains a false, fictitious, or fraudulent statement or material representation, or has no basis in law or fact, or otherwise fails to state a material fact pertaining to the document or application.".

(b) Conforming Amendments for Civil Penalties.—Section 274C(d)(3) (8 U.S.C. 1324c(d)(3)) is amended by striking "each document used, accepted, or created and each instance of use, acceptance, or creation" both places it appears and inserting "each instance of a violation under subsection (a)".

11

(c) EFFECTIVE DATES.—(1) The amendments made by subsection (a) shall apply to the preparation or filing of documents, and assistance in such preparation or filing, occurring on or after the date of the enactment of this Act.

(2) The amendment made by subsection (b) shall apply to violations occurring on or after the date of the enactment of this Act.

**SEC. 213. NEW CIVIL PENALTY FOR FAILURE TO PRESENT DOCUMENTS AND FOR PREPARING IMMIGRATION DOCUMENTS WITHOUT AUTHORIZATION.**

(a) IN GENERAL.—Section 274C(a) (8 U.S.C. 1324c(a)), as amended by section 212(a), is further amended—

(1) by striking "or" at the end of paragraph (4);

(2) by striking the period at the end of paragraph (5) and inserting a comma; and

(3) by inserting after paragraph (5) the following new paragraphs:

"(6) to present before boarding a common carrier for the purpose of coming to the United States a document which relates to the alien's eligibility to enter the United States and to fail to present such document to an immigration officer upon arrival at a United States port of entry, or

"(7) to prepare or assist in the preparation and submission of immigration forms, petitions, and applications if the person or entity is not authorized to represent aliens, or to prepare or assist in the preparation and submission of such forms, petitions, and applications pursuant to regulations promulgated by the Attorney General."; and

(4) by adding at the end the following:

"The Attorney General may, in the discretion of the Attorney General, waive the penalties of this section with respect to an alien who knowingly violates paragraph (6) if the alien is granted asylum under section 208 or withholding of deportation under section 243(h).".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to individuals who board a common carrier on or after 30 days after the date of the enactment of this Act.

**SEC. 214. NEW CRIMINAL PENALTIES FOR FAILURE TO DISCLOSE ROLE AS PREPARER OF FALSE APPLICATION FOR ASYLUM AND FOR PREPARING CERTAIN POST-CONVICTION APPLICATIONS.**

Section 274C (8 U.S.C. 1324c) is amended by adding at the end the following new subsection:

"(e) CRIMINAL PENALTIES FOR FAILURE TO DISCLOSE ROLE AS DOCUMENT PREPARER.—

"(1) If a person is required by law or regulation to disclose the fact that the person, on behalf of another person and for a fee or other remuneration, has prepared or assisted in preparing an application for asylum pursuant to section 208, or the regulations promulgated thereunder, and the person knowingly and willfully fails to disclose, conceals, or covers up such fact, and the application was falsely made, the person shall—

"(A) be imprisoned for not less than 2 nor more than 5 years, fined in accordance with title 18, United States Code, or both, and

"(B) be prohibited from preparing or assisting in preparing, regardless of whether for a fee or other remuneration, any other such application for a period of at least 5 years and not more than 15 years.

"(2) Whoever, having been convicted of a violation of paragraph (1), knowingly and willfully prepares or assists in preparing an application for asylum pursuant to section 208, or the regulations promulgated thereunder, regardless of whether for a fee or other remuneration, in violation of paragraph (1)(B) shall be imprisoned for not less than 5 years or more than 15 years, fined in accordance with title 18, United States Code, or both, and prohibited from preparing or assisting in preparing any other such application.".

**SEC. 215. CRIMINAL PENALTY FOR KNOWINGLY PRESENTING DOCUMENT WHICH FAILS TO CONTAIN REASONABLE BASIS IN LAW OR FACT.**

The fourth paragraph of section 1546(a) of title 18, United States Code, is amended by striking "containing any such false statement" and inserting "which contains any such false statement or which fails to contain any reasonable basis in law or fact".

**SEC. 216. CRIMINAL PENALTIES FOR FALSE CLAIM TO CITIZENSHIP.**

Section 1015 of title 18, United States Code, is amended—

(1) by striking the dash at the end of paragraph (d) and inserting "; or", and

(2) by inserting after paragraph (d) the following:

12

"(e) Whoever knowingly makes any false statement or claim that he is, or at any time has been, a citizen or national of the United States, with the intent to obtain on behalf of himself, or any other person, any Federal benefit or service, or to engage unlawfully in employment in the United States; or

"(f) Whoever knowingly makes any false statement or claim that he is a citizen of the United States in order to register to vote or to vote in any Federal, State, or local election (including an initiative, recall, or referendum)—".

## Subtitle C—Asset Forfeiture for Passport and Visa Offenses

### SEC. 221. CRIMINAL FORFEITURE FOR PASSPORT AND VISA RELATED OFFENSES.

Section 982 of title 18, United States Code, is amended—

(1) in subsection (a), by inserting after paragraph (5) the following new paragraph:

"(6) The court, in imposing sentence on a person convicted of a violation of, or conspiracy to violate, section 1541, 1542, 1543, 1544, or 1546 of this title, or a violation of, or conspiracy to violate, section 1028 of this title if committed in connection with passport or visa issuance or use, shall order that the person forfeit to the United States any property, real or personal, which the person used, or intended to be used, in committing, or facilitating the commission of, the violation, and any property constituting, or derived from, or traceable to, any proceeds the person obtained, directly or indirectly, as a result of such violation.", and

(2) in subsection (b)(1)(B), by inserting "or (a)(6)" after "(a)(2)".

### SEC. 222. SUBPOENAS FOR BANK RECORDS.

Section 986(a) of title 18, United States Code, is amended by inserting "1028, 1541, 1542, 1543, 1544, 1546," before "1956".

### SEC. 223. EFFECTIVE DATE.

The amendments made by this subtitle shall take effect on the first day of the first month that begins more than 90 days after the date of the enactment of this Act.

# TITLE III—INSPECTION, APPREHENSION, DETENTION, ADJUDICATION, AND REMOVAL OF INADMISSIBLE AND DEPORTABLE ALIENS

## Subtitle A—Revision of Procedures for Removal of Aliens

### SEC. 300. OVERVIEW OF CHANGES IN REMOVAL PROCEDURES.

This subtitle amends the provisions of the Immigration and Nationality Act relating to procedures for inspection, exclusion, and deportation of aliens so as to provide for the following:

(1) EXPEDITED REMOVAL FOR UNDOCUMENTED ALIENS.—Aliens arriving without valid documents are subject to an expedited removal process, without an evidentiary hearing and subject to strictly limited judicial review.

(2) NO REWARD FOR ILLEGAL ENTRANTS OR VISA OVERSTAYERS.—Aliens who enter illegally or who overstay the period of authorized admission will have a greater burden of proof in removal proceedings and will face tougher standards for most discretionary immigration benefits, such as suspension of removal and work authorization.

(3) STRICTER STANDARDS TO ASSURE DETENTION OF ALIENS.—There are more stringent standards for the release of aliens (particularly aliens convicted of aggravated felonies) during and after removal proceedings.

(4) SIMPLIFIED, SINGLE REMOVAL PROCEEDING (IN PLACE OF SEPARATE EXCLUSION AND DEPORTATION PROCEEDINGS).—The procedures for exclusion and deportation are consolidated into a simpler, single procedure for removal of inadmissible and deportable aliens.

(5) STREAMLINED JUDICIAL REVIEW.—Judicial review is streamlined through removing a layer of review in exclusion cases, shortening the time period to file

13

for review, and permitting the removal of inadmissible aliens pending the review.

(6) INCREASED PENALTIES TO ASSURE REMOVAL AND PREVENT FURTHER REENTRY.—Aliens who are ordered removed are subject to civil money penalties for failure to depart on time and if they seek reentry they are subject to immediate removal under the prior order.

(7) PROTECTION OF APPLICANTS FOR ASYLUM.—Throughout the process, the procedures protect those aliens who present credible claims for asylum by giving them an opportunity for a full hearing on their claims.

(8) REORGANIZATION.—The provisions of the Act are reorganized to provide a more logical progression from arrival and inspection through proceedings and removal.

**SEC. 301. TREATING PERSONS PRESENT IN THE UNITED STATES WITHOUT AUTHORIZATION AS NOT ADMITTED.**

(a) "ADMISSION" DEFINED.—Paragraph (13) of section 101(a) (8 U.S.C. 1101(a)) is amended to read as follows:

"(13)(A) The terms 'admission' and 'admitted' mean, with respect to an alien, the entry of the alien into the United States after inspection and authorization by an immigration officer.

"(B) An alien who is paroled under section 212(d)(5) or permitted to land temporarily as an alien crewman shall not be considered to have been admitted.

"(C) An alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien—

"(i) has abandoned or relinquished that status,

"(ii) has engaged in illegal activity after having departed the United States,

"(iii) has departed from the United States while under legal process seeking removal of the alien from the United States, including removal proceedings under this Act and extradition proceedings,

"(iv) has been convicted of an aggravated felony, unless since such conviction the alien has been granted relief under section 240A(a), or

"(v) is attempting to enter at a time or place other than as designated by immigration officers or has not been admitted to the United States after inspection and authorization by an immigration officer.".

(b) INADMISSIBILITY OF ALIENS PRESENT WITHOUT ADMISSION OR PAROLE.—

(1) IN GENERAL.—Section 212(a) (8 U.S.C. 1182(a)) is amended by redesignating paragraph (9) as paragraph (10) and by inserting after paragraph (8) the following new paragraph:

"(9) PRESENT WITHOUT ADMISSION OR PAROLE.—

"(A) IN GENERAL.—An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.

"(B) EXCEPTION FOR CERTAIN BATTERED WOMEN AND CHILDREN.—Subparagraph (A) shall not apply to an alien who can demonstrate that—

"(i) the alien qualifies for immigrant status under subparagraphs (A)(iii), (A)(iv), (B)(ii), or (B)(iii) of section 204(a)(1),

"(ii)(I) the alien has been battered or subject to extreme cruelty by a spouse or parent, or by a member of the spouse's or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, or (II) the alien's child has been battered or subject to extreme cruelty by a spouse or parent of the alien (without the active participation of the alien in the battery or extreme cruelty) or by a member of the spouse's or parent's family residing in the same household as the alien when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty, and

"(iii) there was a substantial connection between the battery or cruelty described in subclause (I) or (II) and the alien's unlawful entry into the United States.".

(2) TRANSITION FOR BATTERED SPOUSE OR CHILD PROVISION.—The requirements of clauses (ii) and (iii) of section 212(a)(9)(B) of the Immigration and Nationality Act, as inserted by paragraph (1), shall not apply to an alien who demonstrates that the alien first arrived in the United States before the title III–A effective date (described in section 309(a)).

(c) REVISION TO GROUND OF INADMISSIBILITY FOR ILLEGAL ENTRANTS AND IMMIGRATION VIOLATORS.—Subparagraphs (A) and (B) of section 212(a)(6) (8 U.S.C. 1182(a)(6)) are amended to read as follows:

14

"(A) ALIENS PREVIOUSLY REMOVED.—

"(i) ARRIVING ALIENS.—Any alien who has been ordered removed under section 235(b)(1) or at the end of proceedings under section 240 initiated upon the alien's arrival in the United States and who again seeks admission within 5 years of the date of such removal is inadmissible.

"(ii) OTHER ALIENS.—Any alien not described in clause (i) who has been ordered removed under section 240 or any other provision of law and who again seeks admission within 10 years of the date of such removal (or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.

"(iii) EXCEPTION.—Clauses (i) and (ii) shall not apply to an alien seeking admission within a period if, prior to the alien's reembarkation at a place outside the United States or attempt to be admitted from foreign contiguous territory, the Attorney General has consented to the alien's reapplying for admission.

"(B) ALIENS PRESENT UNLAWFULLY FOR MORE THAN 1 YEAR.—

"(i) IN GENERAL.—Any alien who was unlawfully present in the United States for an aggregate period totaling 1 year is inadmissible unless the alien has remained outside the United States for a period of 10 years.

"(ii) EXCEPTIONS.—

"(I) MINORS.—No period of time in which an alien is under 18 years of age shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

"(II) ASYLEES.—No period of time in which an alien has a bona fide application for asylum pending under section 208 shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

"(III) ALIENS WITH WORK AUTHORIZATION.—No period of time in which an alien is provided authorization to engage in employment in the United States (including such an authorization under section 244A(a)(1)(B)), or in which the alien is the spouse of such an alien, shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

"(IV) FAMILY UNITY.—No period of time in which the alien is a beneficiary of family unity protection pursuant to section 301 of the Immigration Act of 1990 shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

"(V) BATTERED WOMEN AND CHILDREN.—Clause (i) shall not apply to an alien described in paragraph (9)(B).

"(iii) EXTENSION.—The Attorney General may extend the period of 1 year under clause (i) to a period of 15 months in the case of an alien who applies to the Attorney General (before the alien has been present unlawfully in the United States for a period totaling 1 year) and establishes to the satisfaction of the Attorney General that—

"(I) the alien is not inadmissible under clause (i) at the time of the application, and

"(II) the failure to extend such period would constitute an extreme hardship for the alien.

"(iv) WAIVER.—In the case of an alien who is the spouse, parent, or child of a United States citizen or the spouse or child of a permanent resident alien, the Attorney General may waive clause (i) for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.

"(v) NATIONAL INTEREST WAIVER.—The Attorney General may waive clause (i) if the Attorney General determines that such a waiver is necessary to substantially benefit—

"(I) the national security, national defense, or Federal, State, or local law enforcement;

"(II) health care, housing, or educational opportunities for an indigent or low-income population or in an underserved geographical area;

"(III) economic or employment opportunities for a specific industry or specific geographical area;

"(IV) the development of new technologies; or

15

"(V) environmental protection or the productive use of natural resources; and

the alien will engage in a specific undertaking to advance one or more of the interests identified in subclauses (I) through (V).".

(d) WAIVER OF MISREPRESENTATION GROUND OF INADMISSIBILITY FOR CERTAIN ALIENS.—Subsection (i) of section 212 is amended to read as follows:

"(i) The Attorney General may, in the discretion of the Attorney General, waive the application of clause (i) of subsection (a)(6)(C)—

"(1) in the case of an immigrant who is the spouse, son, or daughter of a United States citizen; or

"(2) in the case of an immigrant who is the spouse or son or daughter of an alien lawfully admitted for permanent residence, if it is established to the satisfaction of the Attorney General that the refusal of admission to the United States of such immigrant alien would result in extreme hardship to the lawfully resident spouse or parent of such an alien.".

(e) PROHIBITION ON ISSUANCE OF VISAS FOR FORMER CITIZENS WHO RENOUNCED CITIZENSHIP TO AVOID UNITED STATES TAXATION.—Section 212(a)(10) (8 U.S.C. 1182(a)(10)), as redesignated by subsection (b)(1), is amended by adding at the end the following:

"(D) FORMER CITIZENS WHO RENOUNCED CITIZENSHIP TO AVOID TAXATION.—Any alien who is a former citizen of the United States who officially renounced United States citizenship and who is determined by the Attorney General to have renounced United States citizenship for the purpose of avoiding taxation by the United States is excludable.".

(f) PROOF OF VACCINATION REQUIREMENT FOR IMMIGRANTS.—

(1) IN GENERAL.—Section 212(a)(1)(A) (8 U.S.C. 1182(a)(1)(A)) is amended—

(A) by redesignating clauses (ii) and (iii) as clauses (iii) and (iv), respectively, and

(B) by inserting after clause (i) the following new clause:

"(ii) who seeks admission as an immigrant, or who seeks adjustment of status to the status of an alien lawfully admitted for permanent residence, and who has failed to present documentation of having received vaccination against vaccine-preventable diseases, which shall include at least the following diseases: mumps, measles, rubella, polio, tetanus and diphtheria toxoids, pertussis, influenza type B and hepatitis B, and any other vaccinations against vaccine-preventable diseases recommended by the Advisory Committee for Immunization Practices,".

(2) WAIVER.—Section 212(g) (8 U.S.C. 1182(g) is amended by striking ", or" at the end of paragraph (1) and all that follows and inserting a semicolon and the following:

"in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe;

"(2) subsection (a)(1)(A)(ii) in the case of any alien—

"(A) who receives vaccination against the vaccine-preventable disease or diseases for which the alien has failed to present documentation of previous vaccination, or

"(B) for whom a civil surgeon, medical officer, or panel physician (as those terms are defined by 42 C.F.R. 34.2) certifies, according to such regulations as the Secretary of Health and Human Services may prescribe, that such vaccination would not be medically appropriate; or

"(3) subsection (a)(1)(A)(iii) in the case of any alien, in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe.".

(3) EFFECTIVE DATE.—The amendments made by this subsection shall apply with respect to applications for immigrant visas or for adjustment of status filed after September 30, 1996.

(g) ADJUSTMENT IN GROUNDS FOR DEPORTATION.—Section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2), is amended—

(1) in the matter before paragraph (1) of subsection (a), by striking "in the United States" and inserting "in and admitted to the United States";

(2) in subsection (a)(1), by striking "EXCLUDABLE" each place it appears and inserting "INADMISSIBLE";

(3) in subsection (a)(1)(A), by striking "excludable" and inserting "inadmissible"; and

(4) by amending subparagraph (B) of subsection (a)(1) to read as follows:

16

"(B) PRESENT IN VIOLATION OF LAW.—Any alien who is present in the United States in violation of this Act or any other law of the United States is deportable.".

SEC. 302. INSPECTION OF ALIENS; EXPEDITED REMOVAL OF INADMISSIBLE ARRIVING ALIENS; REFERRAL FOR HEARING (REVISED SECTION 235).

Section 235 (8 U.S.C. 1225) is amended to read as follows:

"INSPECTION BY IMMIGRATION OFFICERS; EXPEDITED REMOVAL OF INADMISSIBLE ARRIVING ALIENS; REFERRAL FOR HEARING

"SEC. 235. (a) INSPECTION.—

"(1) ALIENS TREATED AS APPLICANTS FOR ADMISSION.—An alien present in the United States who has not been admitted, who arrives in the United States (whether or not at a designated port of arrival), or who is brought to the United States after having been interdicted in international or United States waters shall be deemed for purposes of this Act an applicant for admission.

"(2) STOWAWAYS.—An arriving alien who is a stowaway is not eligible to apply for admission or to be admitted and shall be ordered removed upon inspection by an immigration officer. Upon such inspection if the alien indicates an intention to apply for asylum under section 208 or a fear of persecution, the officer shall refer the alien for an interview under subsection (b)(1)(B). A stowaway may apply for asylum only if the stowaway is found to have a credible fear of persecution under subsection (b)(1)(B). In no case may a stowaway be considered an applicant for admission or eligible for a hearing under section 240.

"(3) INSPECTION.—All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers.

"(4) WITHDRAWAL OF APPLICATION FOR ADMISSION.—An alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States.

"(5) STATEMENTS.—An applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States, including the applicant's intended length of stay and whether the applicant intends to remain permanently or become a United States citizen, and whether the applicant is inadmissible.

"(b) INSPECTION OF APPLICANTS FOR ADMISSION.—

"(1) INSPECTION OF ALIENS ARRIVING IN THE UNITED STATES.—

"(A) SCREENING.—If the examining immigration officer determines that an alien arriving in the United States (whether or not at a port of entry) is inadmissible under section 212(a)(6)(C) or 212(a)(7) and the alien—

"(i) does not indicate either an intention to apply for asylum under section 208 or a fear of persecution, the officer shall order the alien removed from the United States without further hearing or review; or

"(ii) indicates an intention to apply for asylum under section 208 or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

"(B) ASYLUM INTERVIEWS.—

"(i) CONDUCT BY ASYLUM OFFICERS.—An asylum officer shall promptly conduct interviews of aliens referred under subparagraph (A)(ii).

"(ii) REFERRAL OF CERTAIN ALIENS.—If the officer determines at the time of the interview that an alien has a credible fear of persecution (within the meaning of clause (v)), the alien shall be detained for further consideration of the application for asylum.

"(iii) REMOVAL WITHOUT FURTHER REVIEW IF NO CREDIBLE FEAR OF PERSECUTION.—

"(I) IN GENERAL.—Subject to subclause (II), if the officer determines that an alien does not have a credible fear of persecution, the officer shall order the alien removed from the United States without further hearing or review.

"(II) REVIEW OF DETERMINATION BY SUPERVISORY OFFICER.—The Attorney General shall promulgate regulations to provide for the immediate review by a supervisory asylum officer at the port of entry of a determination under subclause (I).

"(iv) INFORMATION ABOUT INTERVIEWS.—The Attorney General shall provide information concerning the asylum interview described in this subparagraph to aliens who may be eligible. An alien who is eligible

17

for such interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General. Such consultation shall be at no expense to the Government and shall not delay the process.

"(v) CREDIBLE FEAR OF PERSECUTION DEFINED.—For purposes of this subparagraph, the term 'credible fear of persecution' means (I) that it is more probable than not that the statements made by the alien in support of the alien's claim are true, and (II) that there is a significant possibility, in light of such statements and of such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 208.

"(C) LIMITATION ON ADMINISTRATIVE REVIEW.—A removal order entered in accordance with subparagraph (A)(i) or (B)(iii)(I) is not subject to administrative appeal, except that the Attorney General shall provide by regulation for prompt review of such an order under subparagraph (A)(i) against an alien who claims under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, after having been warned of the penalties for falsely making such claim under such conditions, to have been lawfully admitted for permanent residence.

"(D) LIMIT ON COLLATERAL ATTACKS.—In any action brought against an alien under section 275(a) or section 276, the court shall not have jurisdiction to hear any claim attacking the validity of an order of removal entered under subparagraph (A)(i) or (B)(iii)(I).

"(E) ASYLUM OFFICER DEFINED.—As used in this paragraph, the term 'asylum officer' means an immigration officer who—

"(i) has had professional training in country conditions, asylum law, and interview techniques, and

"(ii) is supervised by an officer who meets the condition described in clause (i).

"(2) INSPECTION OF OTHER ALIENS.—

"(A) IN GENERAL.—Subject to subparagraph (B), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a hearing under section 240.

"(B) EXCEPTION.—Subparagraph (A) shall not apply to an alien—

"(i) who is a crewman,

"(ii) to whom paragraph (1) applies, or

"(iii) who is a stowaway.

"(3) CHALLENGE OF DECISION.—The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien whose privilege to be admitted is so challenged, before an immigration judge for a hearing under section 240.

"(c) REMOVAL OF ALIENS INADMISSIBLE ON SECURITY AND RELATED GROUNDS.—

"(1) REMOVAL WITHOUT FURTHER HEARING.—If an immigration officer or an immigration judge suspects that an arriving alien may be inadmissible under subparagraph (A) (other than clause (ii)), (B), or (C) of section 212(a)(3), the officer or judge shall—

"(A) order the alien removed, subject to review under paragraph (2);

"(B) report the order of removal to the Attorney General; and

"(C) not conduct any further inquiry or hearing until ordered by the Attorney General.

"(2) REVIEW OF ORDER.—(A) The Attorney General shall review orders issued under paragraph (1).

"(B) If the Attorney General—

"(i) is satisfied on the basis of confidential information that the alien is inadmissible under subparagraph (A) (other than clause (ii)), (B), or (C) of section 212(a)(3), and

"(ii) after consulting with appropriate security agencies of the United States Government, concludes that disclosure of the information would be prejudicial to the public interest, safety, or security,

the Attorney General may order the alien removed without further inquiry or hearing by an immigration judge.

"(C) If the Attorney General does not order the removal of the alien under subparagraph (B), the Attorney General shall specify the further inquiry or hearing that shall be conducted in the case.

18

"(3) SUBMISSION OF STATEMENT AND INFORMATION.—The alien or the alien's representative may submit a written statement and additional information for consideration by the Attorney General.

"(d) AUTHORITY RELATING TO INSPECTIONS.—

"(1) AUTHORITY TO SEARCH CONVEYANCES.—Immigration officers are authorized to board and search any vessel, aircraft, railway car, or other conveyance or vehicle in which they believe aliens are being brought into the United States.

"(2) AUTHORITY TO ORDER DETENTION AND DELIVERY OF ARRIVING ALIENS.—Immigration officers are authorized to order an owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft bringing an alien (except an alien crewmember) to the United States—

"(A) to detain the alien on the vessel or at the airport of arrival, and

"(B) to deliver the alien to an immigration officer for inspection or to a medical officer for examination.

"(3) ADMINISTRATION OF OATH AND CONSIDERATION OF EVIDENCE.—The Attorney General and any immigration officer shall have power to administer oaths and to take and consider evidence of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, transit through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service.

"(4) SUBPOENA AUTHORITY.—(A) The Attorney General and any immigration officer shall have power to require by subpoena the attendance and testimony of witnesses before immigration officers and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service, and to that end may invoke the aid of any court of the United States.

"(B) Any United States district court within the jurisdiction of which investigations or inquiries are being conducted by an immigration officer may, in the event of neglect or refusal to respond to a subpoena issued under this paragraph or refusal to testify before an immigration officer, issue an order requiring such persons to appear before an immigration officer, produce books, papers, and documents if demanded, and testify, and any failure to obey such order of the court may be punished by the court as a contempt thereof.".

**SEC. 303. APPREHENSION AND DETENTION OF ALIENS NOT LAWFULLY IN THE UNITED STATES (REVISED SECTION 236).**

(a) IN GENERAL.—Section 236 (8 U.S.C. 1226) is amended to read as follows:

"APPREHENSION AND DETENTION OF ALIENS NOT LAWFULLY IN THE UNITED STATES

"SEC. 236. (a) ARREST, DETENTION, AND RELEASE.—On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General—

"(1) may continue to detain the arrested alien; and

"(2) may release the alien on—

"(A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

"(B) conditional parole; but

"(3) may not provide the alien with work authorization (including an 'employment authorized' endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

"(b) REVOCATION OF BOND OR PAROLE.—The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien.

"(c) ALIENS CONVICTED OF AGGRAVATED FELONIES.—

"(1) CUSTODY.—The Attorney General shall take into custody any alien convicted of an aggravated felony when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

"(2) RELEASE.—The Attorney General may release the alien only if—

"(A) the alien was lawfully admitted to the United States and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding;

19

"(B) the alien was not lawfully admitted to the United States, cannot be removed because the designated country of removal will not accept the alien, and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding; or

"(C) the Attorney General decides pursuant to section 3521 of title 18, United States Code, that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation.

A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

"(d) IDENTIFICATION OF ALIENS CONVICTED OF AGGRAVATED FELONIES.—(1) The Attorney General shall devise and implement a system—

"(A) to make available, daily (on a 24-hour basis), to Federal, State, and local authorities the investigative resources of the Service to determine whether individuals arrested by such authorities for aggravated felonies are aliens;

"(B) to designate and train officers and employees of the Service to serve as a liaison to Federal, State, and local law enforcement and correctional agencies and courts with respect to the arrest, conviction, and release of any alien charged with an aggravated felony; and

"(C) which uses computer resources to maintain a current record of aliens who have been convicted of an aggravated felony and who have been removed.

"(2) The record under paragraph (1)(C) shall be made available—

"(A) to inspectors at ports of entry and to border patrol agents at sector headquarters for purposes of immediate identification of any such previously removed alien seeking to reenter the United States, and

"(B) to officials of the Department of State for use in its automated visa lookout system.".

(b) INCREASE IN INS DETENTION FACILITIES.—Subject to the availability of appropriations, the Attorney General shall provide for an increase in the detention facilities of the Immigration and Naturalization Service to at least 9,000 beds by fiscal year 1997.

**SEC. 304. REMOVAL PROCEEDINGS; CANCELLATION OF REMOVAL AND ADJUSTMENT OF STATUS; VOLUNTARY DEPARTURE (REVISED AND NEW SECTIONS 239 TO 240C).**

(a) IN GENERAL.—Chapter 4 of title II is amended—

(1) by redesignating section 239 as section 234 and by moving such section to immediately follow section 233;

(2) by redesignating section 240 (8 U.S.C. 1230) as section 240C; and

(3) by inserting after section 238 the following new sections:

"INITIATION OF REMOVAL PROCEEDINGS

"SEC. 239. (a) NOTICE TO APPEAR.—

"(1) IN GENERAL.—In removal proceedings under section 240, written notice (in this section referred to as a 'notice to appear') shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any) specifying the following:

"(A) The nature of the proceedings against the alien.

"(B) The legal authority under which the proceedings are conducted.

"(C) The acts or conduct alleged to be in violation of law.

"(D) The charges against the alien and the statutory provisions alleged to have been violated.

"(E) The alien may be represented by counsel and the alien will be provided (i) a period of time to secure counsel under subsection (b)(1) and (ii) a current list of counsel prepared under subsection (b)(2).

"(F)(i) The requirement that the alien must immediately provide (or have provided) the Attorney General with a written record of an address and telephone number (if any) at which the alien may be contacted respecting proceedings under section 240.

"(ii) The requirement that the alien must provide the Attorney General immediately with a written record of any change of the alien's address or telephone number.

"(iii) The consequences under section 240(b)(5) of failure to provide address and telephone information pursuant to this subparagraph.

"(G)(i) The time and place at which the proceedings will be held.

20

"(ii) The consequences under section 240(b)(5) of the failure, except under exceptional circumstances, to appear at such proceedings.

"(2) NOTICE OF CHANGE IN TIME OR PLACE OF PROCEEDINGS.—

"(A) IN GENERAL.—In removal proceedings under section 240, in the case of any change or postponement in the time and place of such proceedings, subject to subparagraph (B) a written notice shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any) specifying—

"(i) the new time or place of the proceedings, and

"(ii) the consequences under section 240(b)(5) of failing, except under exceptional circumstances, to attend such proceedings.

"(B) EXCEPTION.—In the case of an alien not in detention, a written notice shall not be required under this paragraph if the alien has failed to provide the address required under paragraph (1)(F).

"(3) CENTRAL ADDRESS FILES.—The Attorney General shall create a system to record and preserve on a timely basis notices of addresses and telephone numbers (and changes) provided under paragraph (1)(F).

"(b) SECURING OF COUNSEL.—

"(1) IN GENERAL.—In order that an alien be permitted the opportunity to secure counsel before the first hearing date in proceedings under section 240, the hearing date shall not be scheduled earlier than 10 days after the service of the notice to appear, unless the alien requests in writing an earlier hearing date.

"(2) CURRENT LISTS OF COUNSEL.—The Attorney General shall provide for lists (updated not less often than quarterly) of persons who have indicated their availability to represent pro bono aliens in proceedings under section 240. Such lists shall be provided under subsection (a)(1)(E) and otherwise made generally available.

"(c) SERVICE BY MAIL.—Service by mail under this section shall be sufficient if there is proof of attempted delivery to the last address provided by the alien in accordance with subsection (a)(1)(F).

"(d) PROMPT INITIATION OF REMOVAL.—(1) In the case of an alien who is convicted of an offense which makes the alien deportable, the Attorney General shall begin any removal proceeding as expeditiously as possible after the date of the conviction.

"(2) Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.

"REMOVAL PROCEEDINGS

"SEC. 240. (a) PROCEEDING.—

"(1) IN GENERAL.—An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien.

"(2) CHARGES.—An alien placed in proceedings under this section may be charged with any applicable ground of inadmissibility under section 212(a) or any applicable ground of deportability under section 237(a).

"(3) EXCLUSIVE PROCEDURES.—Unless otherwise specified in this Act, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States. Nothing in this section shall affect proceedings conducted pursuant to section 238.

"(b) CONDUCT OF PROCEEDING.—

"(1) AUTHORITY OF IMMIGRATION JUDGE.—The immigration judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses. The immigration judge may issue subpoenas for the attendance of witnesses and presentation of evidence. The immigration judge shall have authority (under regulations prescribed by the Attorney General) to sanction by civil money penalty any action (or inaction) in contempt of the judge's proper exercise of authority under this Act.

"(2) FORM OF PROCEEDING.—

"(A) IN GENERAL.—The proceeding may take place—

"(i) in person,

"(ii) through video conference, or

"(iii) subject to subparagraph (B), through telephone conference.

"(B) CONSENT REQUIRED IN CERTAIN CASES.—An evidentiary hearing on the merits may only be conducted through a telephone conference with the consent of the alien involved after the alien has been advised of the right to proceed in person or through video conference.

21

"(3) PRESENCE OF ALIEN.—If it is impracticable by reason of an alien's mental incompetency for the alien to be present at the proceeding, the Attorney General shall prescribe safeguards to protect the rights and privileges of the alien.

"(4) ALIENS RIGHTS IN PROCEEDING.—In proceedings under this section, under regulations of the Attorney General—

"(A) the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings,

"(B) the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government, and

"(C) a complete record shall be kept of all testimony and evidence produced at the proceeding.

"(5) CONSEQUENCES OF FAILURE TO APPEAR.—

"(A) IN GENERAL.—Any alien who, after written notice required under paragraph (1) or (2) of section 239(a) has been provided to the alien or the alien's counsel of record, does not attend a proceeding under this section, shall be ordered removed in absentia if the Service establishes by clear, unequivocal, and convincing evidence that the written notice was so provided and that the alien is removable (as defined in subsection (e)(2)). The written notice by the Attorney General shall be considered sufficient for purposes of this subparagraph if provided at the most recent address provided under section 239(a)(1)(F).

"(B) NO NOTICE IF FAILURE TO PROVIDE ADDRESS INFORMATION.—No written notice shall be required under subparagraph (A) if the alien has failed to provide the address required under section 239(a)(1)(F).

"(C) RESCISSION OF ORDER.—Such an order may be rescinded only—

"(i) upon a motion to reopen filed within 180 days after the date of the order of removal if the alien demonstrates that the failure to appear was because of exceptional circumstances (as defined in subsection (e)(1)), or

"(ii) upon a motion to reopen filed at any time if the alien demonstrates that the alien did not receive notice in accordance with paragraph (1) or (2) of section 239(a) or the alien demonstrates that the alien was in Federal or State custody and did not appear through no fault of the alien.

The filing of the motion to reopen described in clause (i) or (ii) shall stay the removal of the alien pending disposition of the motion.

"(D) EFFECT ON JUDICIAL REVIEW.—Any petition for review under section 242 of an order entered in absentia under this paragraph shall (except in cases described in section 242(b)(5)) be confined to (i) the validity of the notice provided to the alien, (ii) the reasons for the alien's not attending the proceeding, and (iii) whether or not the alien is removable.

"(6) TREATMENT OF FRIVOLOUS BEHAVIOR.—The Attorney General shall, by regulation—

"(A) define in a proceeding before an immigration judge or before an appellate administrative body under this title, frivolous behavior for which attorneys may be sanctioned,

"(B) specify the circumstances under which an administrative appeal of a decision or ruling will be considered frivolous and will be summarily dismissed, and

"(C) impose appropriate sanctions (which may include suspension and disbarment) in the case of frivolous behavior.

Nothing in this paragraph shall be construed as limiting the authority of the Attorney General to take actions with respect to inappropriate behavior.

"(7) LIMITATION ON DISCRETIONARY RELIEF FOR FAILURE TO APPEAR.—Any alien against whom a final order of removal is entered in absentia under this subsection and who, at the time of the notice described in paragraph (1) or (2) of section 239(a), was provided oral notice, either in the alien's native language or in another language the alien understands, of the time and place of the proceedings and of the consequences under this paragraph of failing, other than because of exceptional circumstances (as defined in subsection (e)(1)) to attend a proceeding under this section, shall not be eligible for relief under section 240A, 240B, 245, 248, or 249 for a period of 10 years after the date of the entry of the final order of removal.

"(c) DECISION AND BURDEN OF PROOF.—

"(1) DECISION.—

22

"(A) IN GENERAL.—At the conclusion of the proceeding the immigration judge shall decide whether an alien is removable from the United States. The determination of the immigration judge shall be based only on the evidence produced at the hearing.

"(B) CERTAIN MEDICAL DECISIONS.—If a medical officer or civil surgeon or board of medical officers has certified under section 232(b) that an alien has a disease, illness, or addiction which would make the alien inadmissible under paragraph (1) of section 212(a), the decision of the immigration judge shall be based solely upon such certification.

"(2) BURDEN ON ALIEN.—In the proceeding the alien has the burden of establishing—

"(A) if the alien is an applicant for admission, that the alien is clearly and beyond doubt entitled to be admitted and is not inadmissible under section 212; or

"(B) by clear and convincing evidence, that the alien is lawfully present in the United States pursuant to a prior admission.

In meeting the burden of proof under subparagraph (B), the alien shall have access to the alien's visa or other entry document, if any, and any other records and documents, not considered by the Attorney General to be confidential, pertaining to the alien's admission or presence in the United States.

"(3) BURDEN ON SERVICE IN CASES OF DEPORTABLE ALIENS.—In the proceeding the Service has the burden of establishing by clear and convincing evidence that, in the case of an alien who has been admitted to the United States, the alien is deportable. No decision on deportability shall be valid unless it is based upon reasonable, substantial, and probative evidence.

"(4) NOTICE.—If the immigration judge decides that the alien is removable and orders the alien to be removed, the judge shall inform the alien of the right to appeal that decision and of the consequences for failure to depart under the order of removal, including civil and criminal penalties.

"(5) MOTIONS TO RECONSIDER.—

"(A) IN GENERAL.—The alien may file one motion to reconsider a decision that the alien is removable from the United States.

"(B) DEADLINE.—The motion must be filed within 30 days of the date of entry of a final administrative order of removal.

"(C) CONTENTS.—The motion shall specify the errors of law or fact in the previous order and shall be supported by pertinent authority.

"(6) MOTIONS TO REOPEN.—

"(A) IN GENERAL.—An alien may file one motion to reopen proceedings under this section.

"(B) CONTENTS.—The motion to reopen shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material.

"(C) DEADLINE.—

"(i) IN GENERAL.—Except as provided in this subparagraph, the motion to reopen shall be filed within 90 days of the date of entry of a final administrative order of removal.

"(ii) ASYLUM.—There is no time limit on the filing of a motion to reopen if the basis of the motion is to apply for relief under sections 208 or 241(b)(3) and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding.

"(iii) FAILURE TO APPEAR.—A motion to reopen may be filed within 180 days after the date of the final order of removal if the order has been entered pursuant to subsection (b)(5) due to the alien's failure to appear for proceedings under this section and the alien establishes that the alien's failure to appear was because of exceptional circumstances beyond the control of the alien or because the alien did not receive the notice required under section 239(a)(2).

"(d) STIPULATED REMOVAL.—The Attorney General shall provide by regulation for the entry by an immigration judge of an order of removal stipulated to by the alien (or the alien's representative) and the Service. A stipulated order shall constitute a conclusive determination of the alien's removability from the United States.

"(e) DEFINITIONS.—In this section and section 240A:

"(1) EXCEPTIONAL CIRCUMSTANCES.—The term 'exceptional circumstances' refers to exceptional circumstances (such as serious illness of the alien or serious illness or death of the spouse, child, or parent of the alien, but not including less compelling circumstances) beyond the control of the alien.

23

"(2) REMOVABLE.—The term 'removable' means—

"(A) in the case of an alien not admitted to the United States, that the alien is inadmissible under section 212, or

"(B) in the case of an alien admitted to the United States, that the alien is deportable under section 237.

"CANCELLATION OF REMOVAL; ADJUSTMENT OF STATUS

"SEC. 240A. (a) CANCELLATION OF REMOVAL FOR CERTAIN PERMANENT RESIDENTS.—The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—

"(1) has been an alien lawfully admitted for permanent residence for not less than 5 years,

"(2) has resided in the United States continuously for 7 years after having been admitted in any status, and

"(3) has not been convicted of an aggravated felony or felonies for which the alien has been sentenced, in the aggregate, to a term of imprisonment of at least 5 years.

"(b) CANCELLATION OF REMOVAL AND ADJUSTMENT OF STATUS FOR CERTAIN NONPERMANENT RESIDENTS.—

"(1) IN GENERAL.—The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—

"(A) has been physically present in the United States for a continuous period of not less than 7 years immediately preceding the date of such application;

"(B) has been a person of good moral character during such period;

"(C) has not been convicted of an aggravated felony; and

"(D) establishes that removal would result in extreme hardship to the alien or to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.

"(2) SPECIAL RULE FOR BATTERED SPOUSE OR CHILD.—The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—

"(A) has been battered or subjected to extreme cruelty in the United States by a spouse or parent who is a United States citizen or lawful permanent resident (or is the parent of a child of a United States citizen or lawful permanent resident and the child has been battered or subjected to extreme cruelty in the United States by such citizen or permanent resident parent);

"(B) has been physically present in the United States for a continuous period of not less than 3 years immediately preceding the date of such application;

"(C) has been a person of good moral character during such period;

"(D) is not inadmissible under paragraph (2) or (3) of section 212(a), is not deportable under paragraph (1)(G) or (2) through (4) of section 237(a), and has not been convicted of an aggravated felony; and

"(E) establishes that removal would result in extreme hardship to the alien, the alien's child, or (in the case of an alien who is a child) to the alien's parent.

In acting on applications under this paragraph, the Attorney General shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General.

"(3) ADJUSTMENT OF STATUS.—The Attorney General may adjust to the status of an alien lawfully admitted for permanent residence any alien who the Attorney General determines meets the requirements of paragraph (1) or (2). The number of adjustments under this paragraph shall not exceed 4,000 for any fiscal year. The Attorney General shall record the alien's lawful admission for permanent residence as of the date the Attorney General's cancellation of removal under paragraph (1) or (2) or determination under this paragraph.

"(c) ALIENS INELIGIBLE FOR RELIEF.—The provisions of subsections (a) and (b)(1) shall not apply to any of the following aliens:

"(1) An alien who entered the United States as a crewman subsequent to June 30, 1964.

"(2) An alien who was admitted to the United States as a nonimmigrant exchange alien as defined in section 101(a)(15)(J), or has acquired the status of such a nonimmigrant exchange alien after admission, in order to receive graduate medical education or training, regardless of whether or not the alien is

FRP-FRN-00694

24

subject to or has fulfilled the two-year foreign residence requirement of section 212(e).

"(3) An alien who—

"(A) was admitted to the United States as a nonimmigrant exchange alien as defined in section 101(a)(15)(J) or has acquired the status of such a nonimmigrant exchange alien after admission other than to receive graduate medical education or training,

"(B) is subject to the two-year foreign residence requirement of section 212(e), and

"(C) has not fulfilled that requirement or received a waiver thereof.

"(4) An alien who is inadmissible under section 212(a)(3) or deportable under subparagraph (B) or (D) of section 237(a)(4).

"(d) Special Rules Relating to Continuous Residence or Physical Presence.—

"(1) Termination of continuous period.—For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear under section 239(a).

"(2) Treatment of certain breaks in presence.—An alien shall be considered to have failed to maintain continuous physical presence in the United States under subsections (b)(1) and (b)(2) if the alien has departed from the United States for any periods in the aggregate exceeding 180 days, unless the Attorney General finds that return could not be accomplished within that time period due to emergent reasons.

"(3) Continuity not required because of honorable service in armed forces and presence upon entry into service.—The requirements of continuous residence or continuous physical presence in the United States under subsections (a) and (b) shall not apply to an alien who—

"(A) has served for a minimum period of 24 months in an active-duty status in the Armed Forces of the United States and, if separated from such service, was separated under honorable conditions, and

"(B) at the time of the alien's enlistment or induction was in the United States.

"VOLUNTARY DEPARTURE

"Sec. 240B. (a) Certain Conditions.—

"(1) In general.—The Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense under this subsection, in lieu of being subject to proceedings under section 240 or prior to the completion of such proceedings, if the alien is not deportable under section 237(a)(2)(A)(iii) or section 237(a)(4)(B).

"(2) Period.—Permission to depart voluntarily under this subsection shall not be valid for a period exceeding 120 days.

"(3) Bond.—The Attorney General may require an alien permitted to depart voluntarily under this subsection to post a voluntary departure bond, to be surrendered upon proof that the alien has departed the United States within the time specified.

"(4) Treatment of aliens arriving in the united states.—In the case of an alien who is arriving in the United States and with respect to whom proceedings under section 240 are (or would otherwise be) initiated at the time of such alien's arrival, paragraph (1) shall not apply. Nothing in this paragraph shall be construed as preventing such an alien from withdrawing the application for admission in accordance with section 235(a)(4).

"(b) At Conclusion of Proceedings.—

"(1) In general.—The Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense if, at the conclusion of a proceeding under section 240, the immigration judge enters an order granting voluntary departure in lieu of removal and finds that—

"(A) the alien has been physically present in the United States for a period of at least one year immediately preceding the date the notice to appear was served under section 239(a);

"(B) the alien is, and has been, a person of good moral character for at least 5 years immediately preceding the alien's application for voluntary departure;

"(C) the alien is not deportable under section 237(a)(2)(A)(iii) or section 237(a)(4); and

25

"(D) the alien has established by clear and convincing evidence that the alien has the means to depart the United States and intends to do so.

"(2) PERIOD.—Permission to depart voluntarily under this subsection shall not be valid for a period exceeding 60 days.

"(3) BOND.—An alien permitted to depart voluntarily under this subsection shall be required to post a voluntary departure bond, in an amount necessary to ensure that the alien will depart, to be surrendered upon proof that the alien has departed the United States within the time specified.

"(c) ALIENS NOT ELIGIBLE.—The Attorney General shall not permit an alien to depart voluntarily under this section if the alien was previously permitted to so depart after having been found inadmissible under section 212(a)(9).

"(d) CIVIL PENALTY FOR FAILURE TO DEPART.—If an alien is permitted to depart voluntarily under this section and fails voluntarily to depart the United States within the time period specified, the alien shall be subject to a civil penalty of not less than $1,000 and not more than $5,000, and be ineligible for a period of 10 years for any further relief under this section and sections 240A, 245, 248, and 249.

"(e) ADDITIONAL CONDITIONS.—The Attorney General may by regulation limit eligibility for voluntary departure under this section for any class or classes of aliens.

"(f) APPEALS OF DENIALS.—An alien may appeal from denial of a request for an order of voluntary departure under subsection (b) in accordance with the procedures in section 242. Notwithstanding the pendency of such appeal, the alien shall be removable from the United States 60 days after entry of the order of removal. The alien's removal from the United States shall not moot the appeal.".

(b) REPEAL OF SECTION 212(c).—Section 212(c) (8 U.S.C. 1182(c)) is repealed.

**SEC. 305. DETENTION AND REMOVAL OF ALIENS ORDERED REMOVED (NEW SECTION 241).**

(a) IN GENERAL.—Title II is further amended—

(1) by striking section 237 (8 U.S.C. 1227),

(2) by redesignating section 241 as section 237 and by moving such section to immediately follow section 236, and

(3) by inserting after section 240C (as redesignated by section 304(a)(2)) the following new section:

"DETENTION AND REMOVAL OF ALIENS ORDERED REMOVED

"SEC. 241. (a) DETENTION, RELEASE, AND REMOVAL OF ALIENS ORDERED REMOVED.—

"(1) REMOVAL PERIOD.—

"(A) IN GENERAL.—Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the 'removal period').

"(B) BEGINNING OF PERIOD.—The removal period begins on the latest of the following:

"(i) The date the order of removal becomes administratively final.

"(ii) If the removal order is judicially reviewed and such review serves to stay the removal of the alien, the date of the court's final order.

"(iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

"(C) SUSPENSION OF PERIOD.—The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien willfully fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

"(2) DETENTION AND RELEASE BY THE ATTORNEY GENERAL.—During the removal period, the Attorney General shall detain the alien. If there is insufficient detention space to detain the alien, the Attorney General shall make a specific finding to this effect and may release the alien on a bond containing such conditions as the Attorney General may prescribe.

"(3) SUPERVISION AFTER 90-DAY PERIOD.—If the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General. The regulations shall include provisions requiring the alien—

"(A) to appear before an immigration officer periodically for identification;

"(B) to submit, if necessary, to a medical and psychiatric examination at the expense of the United States Government;

26

"(C) to give information under oath about the alien's nationality, circumstances, habits, associations, and activities, and other information the Attorney General considers appropriate; and

"(D) to obey reasonable written restrictions on the alien's conduct or activities that the Attorney General prescribes for the alien.

"(4) ALIENS IMPRISONED, ARRESTED, OR ON PAROLE, SUPERVISED RELEASE, OR PROBATION.—Except as provided in section 343(a) of the Public Health Service Act (42 U.S.C. 259(a)), the Attorney General may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment. Parole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal.

"(5) REINSTATEMENT OF REMOVAL ORDERS AGAINST ALIENS ILLEGALLY REENTERING.—If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, and the alien shall be removed under the prior order at any time after the reentry.

"(6) INADMISSIBLE ALIENS.—An alien ordered removed who is inadmissible under section 212 may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

"(7) EMPLOYMENT AUTHORIZATION.—No alien ordered removed shall be eligible to receive authorization to be employed in the United States unless the Attorney General makes a specific finding that—

"(A) the alien cannot be removed due to the refusal of all countries designated by the alien or under this section to receive the alien, or

"(B) the removal of the alien is otherwise impracticable or contrary to the public interest.

"(b) COUNTRIES TO WHICH ALIENS MAY BE REMOVED.—

"(1) ALIENS ARRIVING AT THE UNITED STATES.—Subject to paragraph (3)—

"(A) IN GENERAL.—Except as provided by subparagraphs (B) and (C), an alien who arrives at the United States and with respect to whom proceedings under section 240 were initiated at the time of such alien's arrival shall be removed to the country in which the alien boarded the vessel or aircraft on which the alien arrived in the United States.

"(B) TRAVEL FROM CONTIGUOUS TERRITORY.—If the alien boarded the vessel or aircraft on which the alien arrived in the United States in a foreign territory contiguous to the United States, an island adjacent to the United States, or an island adjacent to a foreign territory contiguous to the United States, and the alien is not a native, citizen, subject, or national of, or does not reside in, the territory or island, removal shall be to the country in which the alien boarded the vessel that transported the alien to the territory or island.

"(C) ALTERNATIVE COUNTRIES.—If the government of the country designated in subparagraph (A) or (B) is unwilling to accept the alien into that country's territory, removal shall be to any of the following countries, as directed by the Attorney General:

"(i) The country of which the alien is a citizen, subject, or national.

"(ii) The country in which the alien was born.

"(iii) The country in which the alien has a residence.

"(iv) A country with a government that will accept the alien into the country's territory if removal to each country described in a previous clause of this subparagraph is impracticable, inadvisable, or impossible.

"(2) OTHER ALIENS.—Subject to paragraph (3)—

"(A) SELECTION OF COUNTRY BY ALIEN.—Except as otherwise provided in this paragraph—

"(i) any alien not described in paragraph (1) who has been ordered removed may designate one country to which the alien wants to be removed, and

"(ii) the Attorney General shall remove the alien to the country the alien so designates.

"(B) LIMITATION ON DESIGNATION.—An alien may designate under subparagraph (A)(i) a foreign territory contiguous to the United States, an adjacent island, or an island adjacent to a foreign territory contiguous to the United States as the place to which the alien is to be removed only if the alien is a native, citizen, subject, or national of, or has resided in, that designated territory or island.

"(C) DISREGARDING DESIGNATION.—The Attorney General may disregard a designation under subparagraph (A)(i) if—

27

"(i) the alien fails to designate a country promptly;

"(ii) the government of the country does not inform the Attorney General finally, within 30 days after the date the Attorney General first inquires, whether the government will accept the alien into the country;

"(iii) the government of the country is not willing to accept the alien into the country; or

"(iv) the Attorney General decides that removing the alien to the country is prejudicial to the United States.

"(D) ALTERNATIVE COUNTRY.—If an alien is not removed to a country designated under subparagraph (A)(i), the Attorney General shall remove the alien to a country of which the alien is a subject, national, or citizen unless the government of the country—

"(i) does not inform the Attorney General or the alien finally, within 30 days after the date the Attorney General first inquires or within another period of time the Attorney General decides is reasonable, whether the government will accept the alien into the country; or

"(ii) is not willing to accept the alien into the country.

"(E) ADDITIONAL REMOVAL COUNTRIES.—If an alien is not removed to a country under the previous subparagraphs of this paragraph, the Attorney General shall remove the alien to any of the following countries:

"(i) The country from which the alien was admitted to the United States.

"(ii) The country in which is located the foreign port from which the alien left for the United States or for a foreign territory contiguous to the United States.

"(iii) A country in which the alien resided before the alien entered the country from which the alien entered the United States.

"(iv) The country in which the alien was born.

"(v) The country that had sovereignty over the alien's birthplace when the alien was born.

"(vi) The country in which the alien's birthplace is located when the alien is ordered removed.

"(vii) If impracticable, inadvisable, or impossible to remove the alien to each country described in a previous clause of this subparagraph, another country whose government will accept the alien into that country.

"(F) REMOVAL COUNTRY WHEN UNITED STATES IS AT WAR.—When the United States is at war and the Attorney General decides that it is impracticable, inadvisable, inconvenient, or impossible to remove an alien under this subsection because of the war, the Attorney General may remove the alien—

"(i) to the country that is host to a government in exile of the country of which the alien is a citizen or subject if the government of the host country will permit the alien's entry; or

"(ii) if the recognized government of the country of which the alien is a citizen or subject is not in exile, to a country, or a political or territorial subdivision of a country, that is very near the country of which the alien is a citizen or subject, or, with the consent of the government of the country of which the alien is a citizen or subject, to another country.

"(c) REMOVAL OF ALIENS ARRIVING AT PORT OF ENTRY.—

"(1) VESSELS AND AIRCRAFT.—An alien arriving at a port of entry of the United States who is ordered removed either without a hearing under section 235(a)(1) or 235(c) or pursuant to proceedings under section 240 initiated at the time of such alien's arrival shall be removed immediately on a vessel or aircraft owned by the owner of the vessel or aircraft on which the alien arrived in the United States, unless—

"(A) it is impracticable to remove the alien on one of those vessels or aircraft within a reasonable time, or

"(B) the alien is a stowaway—

"(i) who has been ordered removed in accordance with section 235(a)(1),

"(ii) who has requested asylum, and

"(iii) whose application has not been adjudicated or whose asylum application has been denied but who has not exhausted all appeal rights.

"(2) STAY OF REMOVAL.—

"(A) IN GENERAL.—The Attorney General may stay the removal of an alien under this subsection if the Attorney General decides that—

28

"(i) immediate removal is not practicable or proper; or

"(ii) the alien is needed to testify in the prosecution of a person for a violation of a law of the United States or of any State.

"(B) PAYMENT OF DETENTION COSTS.—During the period an alien is detained because of a stay of removal under subparagraph (A)(ii), the Attorney General may pay from the appropriation 'Immigration and Naturalization Service—Salaries and Expenses'—

"(i) the cost of maintenance of the alien; and

"(ii) a witness fee of $1 a day.

"(C) RELEASE DURING STAY.—The Attorney General may release an alien whose removal is stayed under subparagraph (A)(ii) on—

"(i) the alien's filing a bond of at least $500 with security approved by the Attorney General;

"(ii) condition that the alien appear when required as a witness and for removal; and

"(iii) other conditions the Attorney General may prescribe.

"(3) COSTS OF DETENTION AND MAINTENANCE PENDING REMOVAL.—

"(A) IN GENERAL.—Except as provided in subparagraph (B) and subsection (d), an owner of a vessel or aircraft bringing an alien to the United States shall pay the costs of detaining and maintaining the alien—

"(i) while the alien is detained under subsection (d)(1), and

"(ii) in the case of an alien who is a stowaway, while the alien is being detained pursuant to—

"(I) subsection (d)(2)(A) or (d)(2)(B)(i),

"(II) subsection (d)(2)(B)(ii) or (iii) for the period of time reasonably necessary for the owner to arrange for repatriation or removal of the stowaway, including obtaining necessary travel documents, but not to extend beyond the date on which it is ascertained that such travel documents cannot be obtained from the country to which the stowaway is to be returned, or

"(III) section 235(b)(1)(B)(ii), for a period not to exceed 15 days (excluding Saturdays, Sundays, and holidays) commencing on the first such day which begins on the earlier of 72 hours after the time of the initial presentation of the stowaway for inspection or at the time the stowaway is determined to have a credible fear of persecution.

"(B) NONAPPLICATION.—Subparagraph (A) shall not apply if—

"(i) the alien is a crewmember;

"(ii) the alien has an immigrant visa;

"(iii) the alien has a nonimmigrant visa or other documentation authorizing the alien to apply for temporary admission to the United States and applies for admission not later than 120 days after the date the visa or documentation was issued;

"(iv) the alien has a reentry permit and applies for admission not later than 120 days after the date of the alien's last inspection and admission;

"(v)(I) the alien has a nonimmigrant visa or other documentation authorizing the alien to apply for temporary admission to the United States or a reentry permit;

"(II) the alien applies for admission more than 120 days after the date the visa or documentation was issued or after the date of the last inspection and admission under the reentry permit; and

"(III) the owner of the vessel or aircraft satisfies the Attorney General that the existence of the condition relating to inadmissibility could not have been discovered by exercising reasonable care before the alien boarded the vessel or aircraft; or

"(vi) the individual claims to be a national of the United States and has a United States passport.

"(d) REQUIREMENTS OF PERSONS PROVIDING TRANSPORTATION.—

"(1) REMOVAL AT TIME OF ARRIVAL.—An owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft bringing an alien (except an alien crewmember) to the United States shall—

"(A) receive an alien back on the vessel or aircraft or another vessel or aircraft owned or operated by the same interests if the alien is ordered removed under this part; and

"(B) take the alien to the foreign country to which the alien is ordered removed.

29

"(2) ALIEN STOWAWAYS.—An owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft arriving in the United States with an alien stowaway—

"(A) shall detain the alien on board the vessel or aircraft, or at such place as the Attorney General shall designate, until completion of the inspection of the alien by an immigration officer;

"(B) may not permit the stowaway to land in the United States, except pursuant to regulations of the Attorney General temporarily—

"(i) for medical treatment,

"(ii) for detention of the stowaway by the Attorney General, or

"(iii) for departure or removal of the stowaway; and

"(C) if ordered by an immigration officer, shall remove the stowaway on the vessel or aircraft or on another vessel or aircraft.

The Attorney General shall grant a timely request to remove the stowaway under subparagraph (C) on a vessel or aircraft other than that on which the stowaway arrived if any travel documents necessary for departure or repatriation of the stowaway have been obtained and removal of the stowaway will not be unreasonably delayed.

"(3) REMOVAL UPON ORDER.—An owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel, aircraft, or other transportation line shall comply with an order of the Attorney General to take on board, guard safely, and transport to the destination specified any alien ordered to be removed under this Act.

"(e) PAYMENT OF EXPENSES OF REMOVAL.—

"(1) COSTS OF REMOVAL AT TIME OF ARRIVAL.—In the case of an alien who is a stowaway or who is ordered removed either without a hearing under section 235(a)(1) or 235(c) or pursuant to proceedings under section 240 initiated at the time of such alien's arrival, the owner of the vessel or aircraft (if any) on which the alien arrived in the United States shall pay the transportation cost of removing the alien. If removal is on a vessel or aircraft not owned by the owner of the vessel or aircraft on which the alien arrived in the United States, the Attorney General may—

"(A) pay the cost from the appropriation 'Immigration and Naturalization Service—Salaries and Expenses'; and

"(B) recover the amount of the cost in a civil action from the owner, agent, or consignee of the vessel or aircraft (if any) on which the alien arrived in the United States.

"(2) COSTS OF REMOVAL TO PORT OF REMOVAL FOR ALIENS ADMITTED OR PERMITTED TO LAND.—In the case of an alien who has been admitted or permitted to land and is ordered removed, the cost (if any) of removal of the alien to the port of removal shall be at the expense of the appropriation for the enforcement of this Act.

"(3) COSTS OF REMOVAL FROM PORT OF REMOVAL FOR ALIENS ADMITTED OR PERMITTED TO LAND.—

"(A) THROUGH APPROPRIATION.—Except as provided in subparagraph (B), in the case of an alien who has been admitted or permitted to land and is ordered removed, the cost (if any) of removal of the alien from the port of removal shall be at the expense of the appropriation for the enforcement of this Act.

"(B) THROUGH OWNER.—

"(i) IN GENERAL.—In the case of an alien described in clause (ii), the cost of removal of the alien from the port of removal may be charged to any owner of the vessel, aircraft, or other transportation line by which the alien came to the United States.

"(ii) ALIENS DESCRIBED.—An alien described in this clause is an alien who—

"(I) is admitted to the United States (other than lawfully admitted for permanent residence) and is ordered removed within 5 years of the date of admission based on a ground that existed before or at the time of admission, or

"(II) is an alien crewman permitted to land temporarily under section 252 and is ordered removed within 5 years of the date of landing.

"(C) COSTS OF REMOVAL OF CERTAIN ALIENS GRANTED VOLUNTARY DEPARTURE.—In the case of an alien who has been granted voluntary departure under section 240B and who is financially unable to depart at the alien's own expense and whose removal the Attorney General deems to be in the

30

best interest of the United States, the expense of such removal may be paid from the appropriation for the enforcement of this Act.

"(f) ALIENS REQUIRING PERSONAL CARE DURING REMOVAL.—

"(1) IN GENERAL.—If the Attorney General believes that an alien being removed requires personal care because of the alien's mental or physical condition, the Attorney General may employ a suitable person for that purpose who shall accompany and care for the alien until the alien arrives at the final destination.

"(2) COSTS.—The costs of providing the service described in paragraph (1) shall be defrayed in the same manner as the expense of removing the accompanied alien is defrayed under this section.

"(g) PLACES OF DETENTION.—

"(1) IN GENERAL.—The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal. When United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the Attorney General may expend from the appropriation 'Immigration and Naturalization Service—Salaries and Expenses', without regard to section 3709 of the Revised Statutes (41 U.S.C. 5), amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available) necessary for detention.

"(2) DETENTION FACILITIES OF THE IMMIGRATION AND NATURALIZATION SERVICE.—Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.

"(h) STATUTORY CONSTRUCTION.—Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.".

(b) MODIFICATION OF AUTHORITY.—

(1) Section 241(i), as redesignated by section 306(a)(1), is amended—

(A) in paragraph (3)(A) by striking "felony and sentenced to a term of imprisonment" and inserting "felony or two or more misdemeanors", and

(B) by adding at the end the following new paragraph:

"(6) In this subsection, the term 'incarceration' includes imprisonment in a State or local prison or jail the time of which is counted towards completion of a sentence or the detention of an alien previously convicted of a felony or misdemeanor who has been arrested and is being held pending judicial action on new charges or pending transfer to Federal custody.".

(2) The amendments made by paragraph (1) shall apply beginning with fiscal year 1996.

(c) MISCELLANEOUS CONFORMING AMENDMENT.—Section 212(a)(4) (8 U.S.C. 1182(a)(4)), as amended by section 621(a), is amended by striking "241(a)(5)(B)" each place it appears and inserting "237(a)(5)(B)".

**SEC. 306. APPEALS FROM ORDERS OF REMOVAL (NEW SECTION 242).**

(a) IN GENERAL.—Section 242 (8 U.S.C. 1252) is amended—

(1) by redesignating subsection (j) as subsection (i) and by moving such subsection and adding it at the end of section 241, as inserted by section 305(a)(3); and

(2) by amending the remainder of section 242 to read as follows:

"JUDICIAL REVIEW OF ORDERS OF REMOVAL

"SEC. 242. (a) APPLICABLE PROVISIONS.—

"(1) GENERAL ORDERS OF REMOVAL.—Judicial review of a final order of removal (other than an order of removal without a hearing pursuant to section 235(b)(1)) is governed only by chapter 158 of title 28 of the United States Code, except as provided in subsection (b) and except that the court may not order the taking of additional evidence under section 2347(c) of such title.

"(2) LIMITATIONS ON REVIEW RELATING TO SECTION 235(b)(1).—Notwithstanding any other provision of law, no court shall have jurisdiction to review—

"(A) except as provided in subsection (f), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 235(b)(1),

"(B) a decision by the Attorney General to invoke the provisions of such section,

"(C) the application of such section to individual aliens, including the determination made under section 235(b)(1)(B), or

31

"(D) procedures and policies adopted by the Attorney General to implement the provisions of section 235(b)(1).

"(3) TREATMENT OF CERTAIN DECISIONS.—No alien shall have a right to appeal from a decision of an immigration judge which is based solely on a certification described in section 240(c)(1)(B).

"(b) REQUIREMENTS FOR ORDERS OF REMOVAL.—With respect to review of an order of removal under subsection (a)(1), the following requirements apply:

"(1) DEADLINE.—The petition for review must be filed not later than 30 days after the date of the final order of removal.

"(2) VENUE AND FORMS.—The petition for review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings. The record and briefs do not have to be printed. The court of appeals shall review the proceeding on a typewritten record and on typewritten briefs.

"(3) SERVICE.—

"(A) IN GENERAL.—The respondent is the Attorney General. The petition shall be served on the Attorney General and on the officer or employee of the Service in charge of the Service district in which the initial proceedings under section 240 were conducted.

"(B) STAY OF ORDER.—

"(i) IN GENERAL.—Except as provided in clause (ii), service of the petition on the officer or employee stays the removal of an alien pending the court's decision on the petition, unless the court orders otherwise.

"(ii) EXCEPTION.—If the alien has been convicted of an aggravated felony, or the alien has been ordered removed pursuant to a finding that the alien is inadmissible under section 212, service of the petition does not stay the removal unless the court orders otherwise.

"(4) DECISION.—Except as provided in paragraph (5)(B)—

"(A) the court of appeals shall decide the petition only on the administrative record on which the order of removal is based,

"(B) the administrative findings of fact are conclusive if supported by reasonable, substantial, and probative evidence on the record considered as a whole, and

"(C) a decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law.

"(5) TREATMENT OF NATIONALITY CLAIMS.—

"(A) COURT DETERMINATION IF NO ISSUE OF FACT.—If the petitioner claims to be a national of the United States and the court of appeals finds from the pleadings and affidavits that no genuine issue of material fact about the petitioner's nationality is presented, the court shall decide the nationality claim.

"(B) TRANSFER IF ISSUE OF FACT.—If the petitioner claims to be a national of the United States and the court of appeals finds that a genuine issue of material fact about the petitioner's nationality is presented, the court shall transfer the proceeding to the district court of the United States for the judicial district in which the petitioner resides for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of title 28, United States Code.

"(C) LIMITATION ON DETERMINATION.—The petitioner may have such nationality claim decided only as provided in this paragraph.

"(6) CONSOLIDATION WITH REVIEW OF MOTIONS TO REOPEN OR RECONSIDER.—When a petitioner seeks review of an order under this section, any review sought of a motion to reopen or reconsider the order shall be consolidated with the review of the order.

"(7) CHALLENGE TO VALIDITY OF ORDERS IN CERTAIN CRIMINAL PROCEEDINGS.—

"(A) IN GENERAL.—If the validity of an order of removal has not been judicially decided, a defendant in a criminal proceeding charged with violating section 243(a) may challenge the validity of the order in the criminal proceeding only by filing a separate motion before trial. The district court, without a jury, shall decide the motion before trial.

"(B) CLAIMS OF UNITED STATES NATIONALITY.—If the defendant claims in the motion to be a national of the United States and the district court finds that—

"(i) no genuine issue of material fact about the defendant's nationality is presented, the court shall decide the motion only on the administrative record on which the removal order is based and the administra-

32

tive findings of fact are conclusive if supported by reasonable, substantial, and probative evidence on the record considered as a whole; or

"(ii) a genuine issue of material fact about the defendant's nationality is presented, the court shall hold a new hearing on the nationality claim and decide that claim as if an action had been brought under section 2201 of title 28, United States Code.

The defendant may have such nationality claim decided only as provided in this subparagraph.

"(C) CONSEQUENCE OF INVALIDATION.—If the district court rules that the removal order is invalid, the court shall dismiss the indictment for violation of section 243(a). The United States Government may appeal the dismissal to the court of appeals for the appropriate circuit within 30 days after the date of the dismissal.

"(D) LIMITATION ON FILING PETITIONS FOR REVIEW.—The defendant in a criminal proceeding under section 243(a) may not file a petition for review under subsection (a) during the criminal proceeding.

"(8) CONSTRUCTION.—This subsection—

"(A) does not prevent the Attorney General, after a final order of removal has been issued, from detaining the alien under section 241(a);

"(B) does not relieve the alien from complying with section 241(a)(4) and section 243(g); and

"(C) except as provided in paragraph (3), does not require the Attorney General to defer removal of the alien.

"(c) REQUIREMENTS FOR PETITION.—A petition for review or for habeas corpus of an order of removal shall state whether a court has upheld the validity of the order, and, if so, shall state the name of the court, the date of the court's ruling, and the kind of proceeding.

"(d) REVIEW OF FINAL ORDERS.—A court may review a final order of removal only if—

"(1) the alien has exhausted all administrative remedies available to the alien as of right, and

"(2) another court has not decided the validity of the order, unless the reviewing court finds that the petition presents grounds that could not have been presented in the prior judicial proceeding or that the remedy provided by the prior proceeding was inadequate or ineffective to test the validity of the order.

"(e) LIMITED REVIEW FOR NON-PERMANENT RESIDENTS CONVICTED OF AGGRAVATED FELONIES.—

"(1) IN GENERAL.—A petition for review filed by an alien against whom a final order of removal has been issued under section 238 may challenge only whether—

"(A) the alien is the alien described in the order,

"(B) the alien is an alien described in section 238(b)(2) and has been convicted after entry into the United States of an aggravated felony, and

"(C) proceedings against the alien complied with section 238(b)(4).

"(2) LIMITED JURISDICTION.—A court reviewing the petition has jurisdiction only to review the issues described in paragraph (1).

"(f) JUDICIAL REVIEW OF ORDERS UNDER SECTION 235(b)(1).—

"(1) APPLICATION.—The provisions of this subsection apply with respect to judicial review of orders of removal effected under section 235(b)(1).

"(2) LIMITATIONS ON RELIEF.—Regardless of the nature of the action or claim and regardless of the identity of the party or parties bringing the action, no court shall have jurisdiction or authority to enter declaratory, injunctive, or other equitable relief not specifically authorized in this subsection, or to certify a class under Rule 23 of the Federal Rules of Civil Procedure.

"(3) LIMITATION TO HABEAS CORPUS.—Judicial review of any matter, cause, claim, or individual determination made or arising under or pertaining to section 235(b)(1) shall only be available in habeas corpus proceedings, and shall be limited to determinations of—

"(A) whether the petitioner is an alien,

"(B) whether the petitioner was ordered removed under such section, and

"(C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence and is entitled to such further inquiry as prescribed by the Attorney General pursuant to section 235(b)(1)(C).

"(4) DECISION.—In any case where the court determines that the petitioner—

"(A) is an alien who was not ordered removed under section 235(b)(1), or

"(B) has demonstrated by a preponderance of the evidence that the alien is a lawful permanent resident,

33

the court may order no remedy or relief other than to require that the petitioner be provided a hearing in accordance with section 240. Any alien who is provided a hearing under section 240 pursuant to this paragraph may thereafter obtain judicial review of any resulting final order of removal pursuant to subsection (a)(1).

"(5) SCOPE OF INQUIRY.—In determining whether an alien has been ordered removed under section 235(b)(1), the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.

"(g) LIMIT ON INJUNCTIVE RELIEF.—Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of chapter 4 of title II, as amended by the Immigration in the National Interest Act of 1995, other than with respect to the application of such provisions to an individual alien against whom proceedings under such chapter have been initiated.".

(b) REPEAL OF SECTION 106.—Section 106 (8 U.S.C. 1105a) is repealed.

**SEC. 307. PENALTIES RELATING TO REMOVAL (REVISED SECTION 243).**

(a) IN GENERAL.—Section 243 (8 U.S.C. 1253) is amended to read as follows:

"PENALTIES RELATED TO REMOVAL

"SEC. 243. (a) PENALTY FOR FAILURE TO DEPART.—

"(1) IN GENERAL.—Any alien against whom a final order of removal is outstanding by reason of being a member of any of the classes described in section 237(a), who—

"(A) willfully fails or refuses to depart from the United States within a period of 90 days from the date of the final order of removal under administrative processes, or if judicial review is had, then from the date of the final order of the court,

"(B) willfully fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure,

"(C) connives or conspires, or takes any other action, designed to prevent or hamper or with the purpose of preventing or hampering the alien's departure pursuant to such, or

"(D) willfully fails or refuses to present himself or herself for removal at the time and place required by the Attorney General pursuant to such order,

shall be fined under title 18, United States Code, or imprisoned not more than four years (or 10 years if the alien is a member of any of the classes described in paragraph (1)(E), (2), (3), or (4) of section 237(a)), or both.

"(2) EXCEPTION.—It is not a violation of paragraph (1) to take any proper steps for the purpose of securing cancellation of or exemption from such order of removal or for the purpose of securing the alien's release from incarceration or custody.

"(3) SUSPENSION.—The court may for good cause suspend the sentence of an alien under this subsection and order the alien's release under such conditions as the court may prescribe. In determining whether good cause has been shown to justify releasing the alien, the court shall take into account such factors as—

"(A) the age, health, and period of detention of the alien;

"(B) the effect of the alien's release upon the national security and public peace or safety;

"(C) the likelihood of the alien's resuming or following a course of conduct which made or would make the alien deportable;

"(D) the character of the efforts made by such alien himself and by representatives of the country or countries to which the alien's removal is directed to expedite the alien's departure from the United States;

"(E) the reason for the inability of the Government of the United States to secure passports, other travel documents, or removal facilities from the country or countries to which the alien has been ordered removed; and

"(F) the eligibility of the alien for discretionary relief under the immigration laws.

"(b) WILLFUL FAILURE TO COMPLY WITH TERMS OF RELEASE UNDER SUPERVISION.—An alien who shall willfully fail to comply with regulations or requirements issued pursuant to section 241(a)(3) or knowingly give false information in response to an inquiry under such section shall be fined not more than $1,000 or imprisoned for not more than one year, or both.

34

"(c) PENALTIES RELATING TO VESSELS AND AIRCRAFT.—
    "(1) CIVIL PENALTIES.—
        "(A) FAILURE TO CARRY OUT CERTAIN ORDERS.—If the Attorney General is satisfied that a person has violated subsection (d) or (e) of section 241, the person shall pay to the Commissioner the sum of $2,000 for each violation.
        "(B) FAILURE TO REMOVE ALIEN STOWAWAYS.—If the Attorney General is satisfied that a person has failed to remove an alien stowaway as required under section 241(d)(2), the person shall pay to the Commissioner the sum of $5,000 for each alien stowaway not removed.
        "(C) NO COMPROMISE.—The Attorney General may not compromise the amount of such penalty under this paragraph.
    "(2) CLEARING VESSELS AND AIRCRAFT.—
        "(A) CLEARANCE BEFORE DECISION ON LIABILITY.—A vessel or aircraft may be granted clearance before a decision on liability is made under paragraph (1) only if a bond approved by the Attorney General or an amount sufficient to pay the civil penalty is deposited with the Commissioner.
        "(B) PROHIBITION ON CLEARANCE WHILE PENALTY UNPAID.—A vessel or aircraft may not be granted clearance if a civil penalty imposed under paragraph (1) is not paid.
"(d) DISCONTINUING GRANTING VISAS TO NATIONALS OF COUNTRY DENYING OR DELAYING ACCEPTING ALIEN.—On being notified by the Attorney General that the government of a foreign country denies or unreasonably delays accepting an alien who is a citizen, subject, national, or resident of that country after the Attorney General asks whether the government will accept the alien under this section, the Secretary of State shall order consular officers in that foreign country to discontinue granting immigrant visas or nonimmigrant visas, or both, to citizens, subjects, nationals, and residents of that country until the Attorney General notifies the Secretary that the country has accepted the alien.".

**SEC. 308. REDESIGNATION AND REORGANIZATION OF OTHER PROVISIONS; ADDITIONAL CONFORMING AMENDMENTS.**

    (a) CONFORMING AMENDMENT TO TABLE OF CONTENTS; OVERVIEW OF REORGANIZED CHAPTERS.—The table of contents, as amended by section 851(d)(1), is amended—
        (1) by striking the item relating to section 106, and
        (2) by striking the item relating to chapter 4 of title II and all that follows through the item relating to section 244A and inserting the following:

"CHAPTER 4—INSPECTION, APPREHENSION, EXAMINATION, EXCLUSION, AND REMOVAL

"Sec. 231.  Lists of alien and citizen passengers arriving or departing; record of resident aliens and citizens leaving permanently for foreign country.
"Sec. 232.  Detention of aliens for physical and mental examination.
"Sec. 233.  Entry through or from foreign contiguous territory and adjacent islands; landing stations.
"Sec. 234.  Designation of ports of entry for aliens arriving by civil aircraft.
"Sec. 235.  Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing.
"Sec. 236.  Apprehension and detention of aliens not lawfully in the United States.
"Sec. 237.  General classes of deportable aliens.
"Sec. 238.  Expedited removal of aliens convicted of committing aggravated felonies.
"Sec. 239.  Initiation of removal proceedings.
"Sec. 240.  Removal proceedings.
"Sec. 240A.  Cancellation of removal; adjustment of status.
"Sec. 240B.  Voluntary departure.
"Sec. 240C.  Records of admission.
"Sec. 241.  Detention and removal of aliens ordered removed.
"Sec. 242.  Judicial review of orders of removal.
"Sec. 243.  Penalties relating to removal.
"Sec. 244.  Temporary protected status.

"CHAPTER 5—ADJUSTMENT AND CHANGE OF STATUS"

    (b) REORGANIZATION OF OTHER PROVISIONS.—Chapters 4 and 5 of title II are amended as follows:
        (1) AMENDING CHAPTER HEADING.—Amend the heading for chapter 4 of title II to read as follows:

"CHAPTER 4—INSPECTION, APPREHENSION, EXAMINATION, EXCLUSION, AND REMOVAL"

        (2) REDESIGNATING SECTION 232 AS SECTION 232(a).—Amend section 232 (8 U.S.C. 1222)—
            (A) by inserting "(a) DETENTION OF ALIENS.—" after "SEC. 232.", and
            (B) by amending the section heading to read as follows:

"DETENTION OF ALIENS FOR PHYSICAL AND MENTAL EXAMINATION".

        (3) REDESIGNATING SECTION 234 AS SECTION 232(b).—Amend section 234 (8 U.S.C. 1224)—

35

(A) by striking the heading,

(B) by striking "SEC. 234." and inserting the following: "(b) PHYSICAL AND MENTAL EXAMINATION.—", and

(C) by moving such provision to the end of section 232.

(4) REDESIGNATING SECTION 238 AS SECTION 233.—Redesignate section 238 (8 U.S.C. 1228) as section 233 and move the section to immediately follow section 232.

(5) REDESIGNATING SECTION 242A AS SECTION 238.—Redesignate section 242A as section 238, strike "DEPORTATION" in its heading and insert "REMOVAL", and move the section to immediately follow section 237 (as redesignated by section 305(a)(2)).

(6) STRIKING SECTION 242B.—Strike section 242B (8 U.S.C. 1252b).

(7) STRIKING SECTION 244 AND REDESIGNATING SECTION 244A AS SECTION 244.— Strike section 244 and redesignate section 244A as section 244.

(8) AMENDING CHAPTER HEADING.—Amend the heading for chapter 5 of title II to read as follows:

"CHAPTER 5—ADJUSTMENT AND CHANGE OF STATUS".

(c) ADDITIONAL CONFORMING AMENDMENTS.—

(1) EXPEDITED PROCEDURES FOR AGGRAVATED FELONS (FORMER SECTION 242A).—Section 238 (which, previous to redesignation under section 308(b)(5), was section 242A) is amended—

(A) in subsection (a)(1), by striking "section 242" and inserting "section 240";

(B) in subsection (a)(2), by striking "section 242(a)(2)" and inserting "section 236(c)"; and

(C) in subsection (b)(1), by striking "section 241(a)(2)(A)(iii)" and inserting "section 237(a)(2)(A)(iii)".

(2) TREATMENT OF CERTAIN HELPLESS ALIENS.—

(A) CERTIFICATION OF HELPLESS ALIENS.—Section 232, as amended by section 308(b)(2), is further amended by adding at the end the following new subsection:

"(c) CERTIFICATION OF CERTAIN HELPLESS ALIENS.—If an examining medical officer determines that an alien arriving in the United States is inadmissible, is helpless from sickness, mental or physical disability, or infancy, and is accompanied by another alien whose protection or guardianship may be required, the officer may certify such fact for purposes of applying section 212(a)(10)(B) with respect to the other alien.".

(B) GROUND OF INADMISSIBILITY FOR PROTECTION AND GUARDIANSHIP OF ALIENS DENIED ADMISSION FOR HEALTH OR INFANCY.—Subparagraph (B) of section 212(a)(10) (8 U.S.C. 1182(a)(10)), as redesignated by section 301(a)(1), is amended to read as follows:

"(B) GUARDIAN REQUIRED TO ACCOMPANY HELPLESS ALIEN.—Any alien—

"(i) who is accompanying another alien who is inadmissible and who is certified to be helpless from sickness, mental or physical disability, or infancy pursuant to section 232(c), and

"(ii) whose protection or guardianship is determined to be required by the alien described in clause (i),

is inadmissible.".

(3) CONTINGENT CONSIDERATION IN RELATION TO REMOVAL OF ALIENS.—Section 273(a) (8 U.S.C. 1323(a)) is amended—

(A) by inserting "(1)" after "(a)", and

(B) by adding at the end the following new paragraph:

"(2) It is unlawful for an owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft who is bringing an alien (except an alien crewmember) to the United States to take any consideration to be kept or returned contingent on whether an alien is admitted to, or ordered removed from, the United States.".

(4) CLARIFICATION.—(A) Section 238(a)(1), which, previous to redesignation under section 308(b)(5), was section 242A(a)(1), is amended by adding at the end the following: "Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.".

(B) Section 225 of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416), as amended by section 851(b)(15), is amended by striking "and nothing in" and all that follows up to "shall".

36

(d) ADDITIONAL CONFORMING AMENDMENTS RELATING TO EXCLUSION AND INADMIS-SIBILITY.—

(1) SECTION 212.—Section 212 (8 U.S.C. 1182(a)) is amended—

(A) in the heading, by striking "EXCLUDED FROM" and inserting "INELI-GIBLE FOR";

(B) in the matter in subsection (a) before paragraph (1), by striking all that follows "(a)" and inserting the following: "CLASSES OF ALIENS INELI-GIBLE FOR VISAS OR ADMISSION.—Except as otherwise provided in this Act, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States:";

(C) in subsection (a), by striking "is excludable" and inserting "is inadmis-sible" each place it appears;

(D) in subsections (a)(5)(C), (d)(1), (k), by striking "exclusion" and insert-ing "inadmissibility";

(E) in subsections (b), (d)(3), (h)(1)(A)(i), and (k), by striking "excludable" each place it appears and inserting "inadmissible";

(F) in subsection (b)(2), by striking "or ineligible for entry";

(G) in subsection (d)(7), by striking "excluded from" and inserting "de-nied"; and

(H) in subsection (h)(1)(B), by striking "exclusion" and inserting "denial of admission".

(2) SECTION 241.—Section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2), is amended—

(A) in subsection (a)(1)(H), by striking "excludable" and inserting "inad-missible";

(B) in subsection (a)(4)(C)(ii), by striking "excludability" and inserting "in-admissibility"; and

(C) in subsection (c), by striking "exclusion" and inserting "inadmissibil-ity".

(3) OTHER GENERAL REFERENCES.—The following provisions are amended by striking "excludability" and "excludable" each place each appears and inserting "inadmissibility" and "inadmissible", respectively:

(A) Sections 101(f)(3), 213, 234 (before redesignation by section 308(b)), 241(a)(1) (before redesignation by section 305(a)(2)), 272(a), 277, 286(h)(2)(A)(v), and 286(h)(2)(A)(vi).

(B) Section 601(c) of the Immigration Act of 1990.

(C) Section 128 of the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993 (Public Law 102–138).

(D) Section 1073 of the National Defense Authorization Act for Fiscal Year 1995 (Public Law 103–337).

(E) Section 221 of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416).

(4) RELATED TERMS.—

(A) Section 101(a)(17) (8 U.S.C. 1101(a)(17)) is amended by striking "or expulsion" and inserting "expulsion, or removal".

(B) Section 102 (8 U.S.C. 1102) is amended by striking "exclusion or de-portation" and inserting "removal".

(C) Section 103(c)(2) (8 U.S.C. 1103(c)(2)) is amended by striking "been excluded or deported" and inserting "not been admitted or have been re-moved".

(D) Section 206 (8 U.S.C. 1156) is amended by striking "excluded from admission to the United States and deported" and inserting "denied admis-sion to the United States and removed".

(E) Section 216(f) (8 U.S.C. 1186a) is amended by striking "exclusion" and inserting "inadmissibility".

(F) Section 217 (8 U.S.C. 1187) is amended by striking "excluded from ad-mission" and inserting "denied admission at the time of arrival" each place it appears.

(G) Section 221(f) (8 U.S.C. 1201) is amended by striking "exclude" and inserting "deny admission to".

(H) Section 232(a) (8 U.S.C. 1222(a)), as redesignated by subsection (b)(2), is amended by striking "excluded by" and "the excluded classes" and insert-ing "inadmissible under" and "inadmissible classes", respectively.

(I(i)) Section 272 (8 U.S.C. 1322) is amended—

(I) by striking "EXCLUSION" in the heading and inserting "DENIAL OF ADMISSION",

(II) in subsection (a), by striking "excluding condition" and inserting "condition causing inadmissibility", and

37

(III) in subsection (c), by striking "excluding".

(ii) The item in the table of contents relating to such section is amended by striking "exclusion" and inserting "denial of admission".

(J) Section 276(a) (8 U.S.C. 1326) is amended—

(i) in paragraph (1), by striking "deported or excluded and deported" and inserting "denied admission or removed", and

(ii) in paragraph (2)(B), by striking "excluded and deported" and inserting "denied admission and removed".

(K) Section 286(h)(2)(A)(vi) (8 U.S.C. 1356(h)(2)(A)(vi)) is amended by striking "exclusion" each place it appears and inserting "removal".

(L) Section 287 (8 U.S.C. 1357) is amended—

(i) in subsection (a), by striking "or expulsion" each place it appears and inserting "expulsion, or removal", and

(ii) in subsection (c), by striking "exclusion from" and inserting "denial of admission to".

(M) Section 290(a) (8 U.S.C. 1360(a)) is amended by striking "admitted to the United States, or excluded therefrom" each place it appears and inserting "admitted or denied admission to the United States".

(N) Section 291 (8 U.S.C. 1361) is amended by striking "subject to exclusion" and inserting "inadmissible" each place it appears.

(O) Section 292 (8 U.S.C. 1362) is amended by striking "exclusion or deportation" each place it appears and inserting "removal".

(P) Section 360 (8 U.S.C. 1503) is amended—

(i) in subsection (a), by striking "exclusion" each place it appears and inserting "removal", and

(ii) in subsection (c), by striking "excluded from" and inserting "denied".

(Q) Section 301(a)(1) of the Immigration Act of 1990 is amended by striking "exclusion" and inserting "inadmissibility".

(R) Section 401(c) of the Refugee Act of 1980 is amended by striking "deportation or exclusion" and inserting "removal".

(S) Section 501(e)(2) of the Refugee Education Assistance Act of 1980 (Public Law 96–422) is amended—

(i) by striking "exclusion or deportation" each place it appears and inserting "removal", and

(ii) by striking "deportation or exclusion" each place it appears and inserting "removal".

(T) Section 4113(c) of title 18, United States Code, is amended by striking "exclusion and deportation" and inserting "removal".

(e) REVISION OF TERMINOLOGY RELATING TO DEPORTATION.—

(1) Each of the following is amended by striking "deportation" each place it appears and inserting "removal":

(A) Subparagraphs (A)(iii)(II), (A)(iv)(II), and (B)(iii)(II) of section 204(a)(1) (8 U.S.C. 1154(a)(1)).

(B) Section 212(d)(1) (8 U.S.C. 1182(d)(1)).

(C) Section 212(d)(11) (8 U.S.C. 1182(d)(11)).

(D) Section 214(k)(4)(C) (8 U.S.C. 1184(k)(4)(C)), as redesignated by section 851(a)(3)(A).

(E) Section 241(a)(1)(H) (8 U.S.C. 1251(a)(1)(H)), before redesignation as section 237 by section 305(a)(2).

(F) Section 242A (8 U.S.C. 1252a, before redesignation as section 238 by subsection (b)(5).

(G) Subsections (a)(3) and (b)(5)(B) of section 244A (8 U.S.C. 1254a), before redesignation as section 244 by subsection (b)(7).

(H) Section 246(a) (8 U.S.C. 1256(a)).

(I) Section 254 (8 U.S.C. 1284).

(J) Section 263(a)(4) (8 U.S.C. 1303(a)(4)).

(K) Section 276(b) (8 U.S.C. 1326(b)).

(L) Section 286(h)(2)(A)(v) (8 U.S.C. 1356(h)(2)(A)(v)).

(M) Section 291 (8 U.S.C. 1361).

(N) Section 318 (8 U.S.C. 1429).

(O) Section 130005(a) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322).

(P) Section 4113(b) of title 18, United States Code.

(2) Each of the following is amended by striking "deported" each place it appears and inserting "removed":

(A) Section 212(d)(7) (8 U.S.C. 1182(d)(7)).

(B) Section 214(d) (8 U.S.C. 1184(d)).

38

(C) Section 241(a) (8 U.S.C. 1251(a)), before redesignation as section 237 by section 305(a)(2).

(D) Section 242A(c)(2)(D)(iv) (8 U.S.C. 1252a(c)(2)(D)(iv)), as amended by section 851(b)(14) but before redesignation as section 238 by subsection (b)(5).

(E) Section 252(b) (8 U.S.C. 1282(b)).

(F) Section 254 (8 U.S.C. 1284).

(G) Subsections (b) and (c) of section 266 (8 U.S.C. 1306).

(H) Section 301(a)(1) of the Immigration Act of 1990.

(I) Section 4113 of title 18, United States Code.

(3) Section 101(g) (8 U.S.C. 1101(g)) is amended by inserting "or removed" after "deported" each place it appears.

(4) Section 103(c)(2) (8 U.S.C. 1103(c)(2)) is amended by striking "suspension of deportation" and inserting "cancellation of removal".

(5) Section 201(b)(1)(D) (8 U.S.C. 1151(b)(1)(D)) is amended by striking "deportation is suspended" and inserting "removal is canceled".

(6) Section 212(l)(2)(B) (8 U.S.C. 1182(l)(2)(B)) is amended by striking "deportation against" and inserting "removal of".

(7) Subsections (b)(2), (c)(2)(B), (c)(3)(D), (c)(4)(A), and (d)(2)(C) of section 216 (8 U.S.C. 1186a) are each amended by striking "DEPORTATION", "deportation", "deport", and "deported" each place each appears and inserting "REMOVAL", "removal", "remove", and "removed", respectively.

(8) Subsections (b)(2), (c)(2)(B), (c)(3)(D), and (d)(2)(C) of section 216A (8 U.S.C. 1186b) are each amended by striking "DEPORTATION", "deportation", "deport", and "deported" and inserting "REMOVAL", "removal", "remove", and "removed", respectively.

(9) Section 217(b)(2) (8 U.S.C. 1187(b)(2)) is amended by striking "deportation against" and inserting "removal of".

(10) Section 242A (8 U.S.C. 1252a), before redesignation as section 238 by subsection (b)(6), is amended, in the headings to various subdivisions, by striking "DEPORTATION" and "DEPORTATION" and inserting "REMOVAL" and "REMOVAL", respectively.

(11) Section 244A(a)(1)(A) (8 U.S.C. 1254a(a)(1)(A)), before redesignation as section 244 by subsection (b)(8), is amended—

(A) in subsection (a)(1)(A), by striking "deport" and inserting "remove", and

(B) in subsection (e), by striking "SUSPENSION OF DEPORTATION" and inserting "CANCELLATION OF REMOVAL".

(12) Section 254 (8 U.S.C. 1284) is amended by striking "deport" each place it appears and inserting "remove".

(13) Section 273(d) (8 U.S.C. 1323(d)) is repealed.

(14)(A) Section 276 (8 U.S.C. 1326) is amended by striking "DEPORTED" and inserting "REMOVED".

(B) The item in the table of contents relating to such section is amended by striking "deported" and inserting "removed".

(15) Section 318 (8 U.S.C. 1429) is amended by striking "suspending" and inserting "canceling".

(16) Section 301(a) of the Immigration Act of 1990 is amended by striking "DEPORTATION" and inserting "REMOVAL".

(17) The heading of section 130005 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322) is amended by striking "deportation" and inserting "removal".

(18) Section 9 of the Peace Corps Act (22 U.S.C. 2508) is amended by striking "deported" and all that follows through "Deportation" and inserting "removed pursuant to chapter 4 of title II of the Immigration and Nationality Act".

(19) Section 8(c) of the Foreign Agents Registration Act (22 U.S.C. 618(c)) is amended by striking "deportation" and all that follows and inserting "removal pursuant to chapter 4 of title II of the Immigration and Nationality Act.".

(f) REVISION OF REFERENCES TO ENTRY.—

(1) The following provisions are amended by striking "entry" and inserting "admission" each place it appears:

(A) Section 101(a)(15)(K) (8 U.S.C. 1101(a)(15)(K)).

(B) Section 101(a)(30) (8 U.S.C. 1101(a)(30)).

(C) Section 212(a)(2)(D) (8 U.S.C. 1182(a)(2)(D)).

(D) Section 212(a)(6)(C)(i) (8 U.S.C. 1182(a)(6)(C)(i)).

(E) Section 212(h)(1)(A)(i) (8 U.S.C. 1182(h)(1)(A)(i)).

(F) Section 212(j)(1)(D) (8 U.S.C. 1182(j)(1)(D)).

(G) Section 214(c)(2)(A) (8 U.S.C. 1184(c)(2)(A)).

39

(H) Section 214(d) (8 U.S.C. 1184(d)).

(I) Section 216(b)(1)(A)(i) (8 U.S.C. 1186a(b)(1)(A)(i)).

(J) Section 216(d)(1)(A)(i)(III) (8 U.S.C. 1186a(d)(1)(A)(i)(III)).

(K) Subsection (b) of section 240 (8 U.S.C. 1230), before redesignation as section 240C by section 304(a)(2).

(L) Subsection (a)(1)(G) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2).

(M) Subsection (a)(1)(H) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2), other than the last time it appears.

(N) Paragraphs (2) and (4) of subsection (a) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2).

(O) Section 245(e)(3) (8 U.S.C. 1255(e)(3)).

(P) Section 247(a) (8 U.S.C. 1257(a)).

(Q) Section 601(c)(2) of the Immigration Act of 1990.

(2) The following provisions are amended by striking "enter" and inserting "be admitted":

(A) Section 204(e) (8 U.S.C. 1154(e)).

(B) Section 221(h) (8 U.S.C. 1201(h)).

(C) Section 245(e)(2) (8 U.S.C. 1255(e)(2)).

(3) The following provisions are amended by striking "enters" and inserting "is admitted to":

(A) Section 212(j)(1)(D)(ii) (8 U.S.C. 1154(e)).

(B) Section 214(c)(5)(B) (8 U.S.C. 1184(c)(5)(B)).

(4) Section (a) of section 238 (8 U.S.C. 1228), before redesignation as section 233 by section 308(b)(4), is amended by striking "entry and inspection" and inserting "inspection and admission".

(5) Subsection (a)(1)(H)(ii) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2), is amended by striking "at entry".

(6) Section 7 of the Central Intelligence Agency Act of 1949 (50 U.S.C. 403h) is amended by striking "that the entry", "given entry into", and "entering" and inserting "that the admission", "admitted to", and "admitted to".

(7) Section 4 of the Atomic Weapons and Special Nuclear Materials Rewards Act (50 U.S.C. 47c) is amended by striking "entry" and inserting "admission".

(g) CONFORMING REFERENCES TO REORGANIZED SECTIONS.—

(1) REFERENCES TO SECTIONS 232, 234, 238, 239, 240, 241, 242A, AND 244A.—Any reference in law in effect on the day before the date of the enactment of this Act to section 232, 234, 238, 239, 240, 241, 242A, or 244A of the Immigration and Nationality Act (or a subdivision of such section) is deemed, as of the title III–A effective date, to refer to section 232(a), 232(b), 233, 234, 234A, 237, 238, or 244 of such Act (or the corresponding subdivision of such section), as redesignated by this subtitle. Any reference in law to section 241 (or a subdivision of such section) of the Immigration and Nationality Act in an amendment made by a subsequent subtitle of this title is deemed a reference (as of the title III–A effective date) to section 237 (or the corresponding subdivision of such section), as redesignated by this subtitle.

(2) REFERENCES TO SECTION 106.—

(A) Sections 242A(b)(3) and 242A(c)(3)(A)(ii) (8 U.S.C. 1252a(b)(3), 1252a(c)(3)(A)(ii)), as amended by section 851(b)(14) but before redesignation as section 238 by subsection (b)(5), are each amended by striking "106" and inserting "242".

(B) Sections 210(e)(3)(A) and 245A(f)(4)(A) (8 U.S.C. 1160(e)(3)(A), 1255a(f)(4)(A)) are amended by inserting "(as in effect before October 1, 1996)" after "106".

(C) Section 242A(c)(3)(A)(iii) (8 U.S.C. 1252a(c)(3)(A)(iii)), as amended by section 851(b)(14) but before redesignation as section 238 by subsection (b)(5), is amended by striking "106(a)(1)" and inserting "242(b)(1)".

(3) REFERENCES TO SECTION 236.—

(A) Sections 205 and 209(a)(1) (8 U.S.C. 1155, 1159(a)(1)) are each amended by striking "236" and inserting "240".

(B) Section 4113(c) of title 18, United States Code, is amended by striking "1226 of title 8, United States Code" and inserting "240 of the Immigration and Nationality Act".

(4) REFERENCES TO SECTION 237.—

(A) Section 209(a)(1) (8 U.S.C. 1159(a)(1)) is amended by striking "237" and inserting "241".

(B) Section 212(d)(7) (8 U.S.C. 1182(d)(7)) is amended by striking "237(a)" and inserting "241(c)".

40

(C) Section 280(a) (8 U.S.C. 1330(a)) is amended by striking "237, 239, 243" and inserting "234, 243(c)(2)".

(5) REFERENCES TO SECTION 242.—

(A)(i) Sections 214(d), 252(b), and 287(f)(1) (8 U.S.C. 1184(d), 1282(b), 1357(f)(1)) are each amended by striking "242" and inserting "240".

(ii) Subsection (c)(4) of section 242A (8 U.S.C. 1252a), as amended by section 851(b)(14) but before redesignation as section 238 by subsection (b)(5), are each amended by striking "242" and inserting "240".

(iii) Section 245A(a)(1)(B) (8 U.S.C. 1255a(a)(1)(B)) is amended by inserting "(as in effect before October 1, 1996)" after "242".

(iv) Section 4113 of title 18, United States Code, is amended—

(I) in subsection (a), by striking "section 1252(b) or section 1254(e) of title 8, United States Code," and inserting "section 240B of the Immigration and Nationality Act"; and

(II) in subsection (b), by striking "section 1252 of title 8, United States Code," and inserting "section 240 of the Immigration and Nationality Act".

(B) Section 130002(a) of Public Law 103–322, as amended by section 361(a), is amended by striking "242(a)(3)(A)" and inserting "236(d)".

(C) Section 242A(b)(1) (8 U.S.C. 1252a(b)(1)), before redesignation as section 238 by section 308(b)(5), is amended by striking "242(b)" and inserting "240".

(D) Section 242A(c)(2)(D)(ii) (8 U.S.C. 1252a(c)(2)(D)(ii)), as amended by section 851(b)(14) but before redesignation as section 238 by subsection (b)(5), is amended by striking "242(b)" and inserting "240".

(E) Section 1821(e) of title 28, United States Code, is amended by striking "242(b)" and inserting "240".

(F) Section 130007(a) of Public Law 103–322 is amended by striking "242(i)" and inserting "239(d)".

(G) Section 20301(c) of Public Law 103–322 is amended by striking "242(j)(5)" and "242(j)" and inserting "241(h)(5)" and "241(h)", respectively.

(6) REFERENCES TO SECTION 242B.—

(A) Section 303(d)(2) of the Immigration Act of 1990 is amended by striking "242B" and inserting "240(b)(5)".

(B) Section 545(g)(1)(B) of the Immigration Act of 1990 is amended by striking "242B(a)(4)" and inserting "239(a)(4)".

(7) REFERENCES TO SECTION 243.—

(A) Section 214(d) (8 U.S.C. 1184(d)) is amended by striking "243" and inserting "241".

(B)(i) Section 315(c) of the Immigration Reform and Control Act of 1986 is amended by striking "243(g)" and "1253(g)"and inserting "243(d)" and "1253(d)" respectively.

(ii) Section 702(b) of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1988 is amended by striking "243(g)" and inserting "243(d)".

(iii) Section 903(b) of Public Law 100–204 is amended by striking "243(g)" and inserting "243(d)".

(C)(i) Section 6(f)(2)(F) of the Food Stamp Act of 1977 (7 U.S.C. 2015(f)(2)(F)) is amended by striking "243(h)" and inserting "241(b)(3)".

(ii) Section 214(a)(5) of the Housing and Community Development Act of 1980 (42 U.S.C. 1436a(a)(5)) is amended by striking "243(h)" and inserting "241(b)(3)".

(D)(i) Subsection (c)(2)(B)(ii) of section 244A (8 U.S.C. 1254a), before redesignated as section 244 by section 308(b)(7), is amended by striking "243(h)(2)" and inserting "208(b)(2)(A)".

(ii) Section 301(e)(2) of the Immigration Act of 1990 is amended by striking "243(h)(2)" and inserting "208(b)(2)(A)".

(E) Section 316(f) (8 U.S.C. 1427(f)) is amended by striking "subparagraphs (A) through (D) of paragraph 243(h)(2)" and inserting "clauses (i) through (v) of section 208(b)(2)(A)".

(8) REFERENCES TO SECTION 244.—

(A)(i) Section 201(b)(1)(D) (8 U.S.C. 1151(b)(1)(D)) and subsection (e) of section 244A (8 U.S.C. 1254a), before redesignation as section 244 by section 308(b)(7), are each amended by striking "244(a)" and inserting "240A(a)".

(ii) Section 304(c)(1)(B) of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 (Public Law 102–232) is amended by striking "244(a)" and inserting "240A(a)".

41

(B) Section 304(c)(1)(B) of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 (Public Law 102–232) is amended by striking "244(b)(2)" and inserting "240A(b)(2)".

(C) Section 364(a)(2) of this Act is amended by striking "244(a)(3)" and inserting "240A(a)(3)".

(9) REFERENCES TO CHAPTER 5.—

(A) Sections 266(b), 266(c), and 291 (8 U.S.C. 1306(b), 1306(c), 1361) are each amended by striking "chapter 5" and inserting "chapter 4".

(B) Section 6(b) of the Act of August 1, 1956 (50 U.S.C. 855(b)) is amended by striking "chapter 5, title II, of the Immigration and Nationality Act (66 Stat. 163)" and inserting "chapter 4 of title II of the Immigration and Nationality Act".

(10) MISCELLANEOUS CROSS-REFERENCE CORRECTIONS FOR NEWLY ADDED PROVISIONS.—

(A) Section 245(c)(6), as amended by section 332(d), is amended by striking "241(a)(4)(B)" and inserting "237(a)(4)(B)".

(B) Section 249(d), as amended by section 332(e), is amended by striking "241(a)(4)(B)" and inserting "237(a)(4)(B)".

(C) Section 276(b)(3), as inserted by section 321(b), is amended by striking "excluded" and "excludable" and inserting "removed" and "inadmissible", respectively.

(D) Section 505(c)(7), as added by section 321(a)(1), is amended by amending subparagraphs (B) through (D) to read as follows:

"(B) Withholding of removal under section 241(b)(3).

"(C) Cancellation of removal under section 240A.

"(D) Voluntary departure under section 240B.".

(E) Section 506(b)(2)(B), as added by section 321(a)(1), is amended by striking "deportation" and inserting "removal".

(F) Section 508(c)(2)(D), as added by section 321(a)(1), is amended by striking "exclusion because such alien is excludable" and inserting "removal because such alien is inadmissible".

(G) Section 130007(a) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322), as amended by section 851(a)(6), is amended by striking "242A(a)(3)" and inserting "238(a)(3)".

**SEC. 309. EFFECTIVE DATES; TRANSITION.**

(a) IN GENERAL.—Except as provided in this section and section 301(f), this subtitle and the amendments made by this subtitle shall take effect on the first day of the first month beginning more than 180 days after the date of the enactment of this Act (in this title referred to as the "title III–A effective date").

(b) PROMULGATION OF REGULATIONS.—The Attorney General shall first promulgate regulations to carry out this subtitle by not later than 30 days before the title III–A effective date.

(c) TRANSITION FOR ALIENS IN PROCEEDINGS.—

(1) GENERAL RULE THAT NEW RULES DO NOT APPLY.—Subject to the succeeding provisions of this subsection, in the case of an alien who is in exclusion or deportation proceedings as of the title III–A effective date—

(A) the amendments made by this subtitle shall not apply, and

(B) the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments.

(2) ATTORNEY GENERAL OPTION TO ELECT TO APPLY NEW PROCEDURES.—In a case described in paragraph (1) in which an evidentiary hearing under section 236 or 242 and 242B of the Immigration and Nationality Act has not commenced as of the title III–A effective date, the Attorney General may elect to proceed under chapter 4 of title II of such Act (as amended by this subtitle). The Attorney General shall provide notice of such election to the alien involved not later than 30 days before the date any evidentiary hearing is commenced. If the Attorney General makes such election, the notice of hearing provided to the alien under section 235 or 242(a) of such Act shall be valid as if provided under section 239 of such Act (as amended by this subtitle) to confer jurisdiction on the immigration judge.

(3) ATTORNEY GENERAL OPTION TO TERMINATE AND REINITIATE PROCEEDINGS.—In the case described in paragraph (1), the Attorney General may elect to terminate proceedings in which there has not been a final administrative decision and to reinitiate proceedings under chapter 4 of title II the Immigration and Nationality Act (as amended by this subtitle). Any determination in the terminated proceeding shall not be binding in the reinitiated proceeding.

42

(4) TRANSITIONAL CHANGES IN JUDICIAL REVIEW.—In the case described in paragraph (1) in which a final order of exclusion or deportation is entered more than 30 days after the date of the enactment of this Act, notwithstanding any provision of section 106 of the Immigration and Nationality Act (as in effect as of the date of the enactment of this Act) to the contrary—

(A) in the case of judicial review of a final order of exclusion, subsection (b) of such section shall not apply and the action for judicial review shall be governed by the provisions of subsections (a) and (c) of such in the same manner as they apply to judicial review of orders of deportation;

(B) a court may not order the taking of additional evidence under section 2347(c) of title 28, United States Code;

(C) the petition for judicial review must be filed not later than 30 days after the date of the final order of exclusion or deportation; and

(D) the petition for review shall be filed with the court of appeals for the judicial circuit in which the administrative proceedings before the special inquiry officer or immigration judge were completed.

(5) TRANSITIONAL RULE WITH REGARD TO SUSPENSION OF DEPORTATION.—Paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to notices to appear issued after the date of the enactment of this Act.

(6) TRANSITION FOR CERTAIN FAMILY UNITY ALIENS.—The Attorney General may waive the application of section 212(a)(9) of the Immigration and Nationality Act, as inserted by section 301(b)(1), in the case of an alien who is provided benefits under the provisions of section 301 of the Immigration Act of 1990 (relating to family unity).

(d) TRANSITIONAL REFERENCES.—For purposes of carrying out the Immigration and Nationality Act, as amended by this subtitle—

(1) any reference in section 212(a)(1)(A) of such Act to the term "inadmissible" is deemed to include a reference to the term "excludable", and

(2) any reference in law to an order of removal shall be deemed to include a reference to an order of exclusion and deportation or an order of deportation.

(e) TRANSITION.—No period of time before the date of the enactment of this Act shall be included in the period of 1 year described in section 212(a)(6)(B)(i) of the Immigration and Nationality Act (as amended by section 301(c)).

# Subtitle B—Removal of Alien Terrorists

## PART 1—REMOVAL PROCEDURES FOR ALIEN TERRORISTS

**SEC. 321. REMOVAL PROCEDURES FOR ALIEN TERRORISTS.**

(a) IN GENERAL.—The Immigration and Nationality Act is amended—

(1) by adding at the end of the table of contents the following:

"TITLE V—SPECIAL REMOVAL PROCEDURES FOR ALIEN TERRORISTS

"Sec. 501. Definitions.
"Sec. 502. Establishment of special removal court; panel of attorneys to assist with classified information.
"Sec. 503. Application for initiation of special removal proceeding.
"Sec. 504. Consideration of application.
"Sec. 505. Special removal hearings.
"Sec. 506. Consideration of classified information.
"Sec. 507. Appeals.
"Sec. 508. Detention and custody.",

and

(2) by adding at the end the following new title:

"TITLE V—SPECIAL REMOVAL PROCEDURES FOR ALIEN TERRORISTS

"DEFINITIONS

"SEC. 501. In this title:

"(1) The term 'alien terrorist' means an alien described in section 241(a)(4)(B).

"(2) The term 'classified information' has the meaning given such term in section 1(a) of the Classified Information Procedures Act (18 U.S.C. App.).

"(3) The term 'national security' has the meaning given such term in section 1(b) of the Classified Information Procedures Act (18 U.S.C. App.).

"(4) The term 'special attorney' means an attorney who is on the panel established under section 502(e).

43

"(5) The term 'special removal court' means the court established under section 502(a).

"(6) The term 'special removal hearing' means a hearing under section 505.

"(7) The term 'special removal proceeding' means a proceeding under this title.

"ESTABLISHMENT OF SPECIAL REMOVAL COURT; PANEL OF ATTORNEYS TO ASSIST WITH CLASSIFIED INFORMATION

"SEC. 502. (a) IN GENERAL.—The Chief Justice of the United States shall publicly designate 5 district court judges from 5 of the United States judicial circuits who shall constitute a court which shall have jurisdiction to conduct all special removal proceedings.

"(b) TERMS.—Each judge designated under subsection (a) shall serve for a term of 5 years and shall be eligible for redesignation, except that the four associate judges first so designated shall be designated for terms of one, two, three, and four years so that the term of one judge shall expire each year.

"(c) CHIEF JUDGE.—The Chief Justice shall publicly designate one of the judges of the special removal court to be the chief judge of the court. The chief judge shall promulgate rules to facilitate the functioning of the court and shall be responsible for assigning the consideration of cases to the various judges.

"(d) EXPEDITIOUS AND CONFIDENTIAL NATURE OF PROCEEDINGS.—The provisions of section 103(c) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1803(c)) shall apply to proceedings under this title in the same manner as they apply to proceedings under such Act.

"(e) ESTABLISHMENT OF PANEL OF SPECIAL ATTORNEYS.—The special removal court shall provide for the designation of a panel of attorneys each of whom—

"(1) has a security clearance which affords the attorney access to classified information, and

"(2) has agreed to represent permanent resident aliens with respect to classified information under section 506 in accordance with (and subject to the penalties under) this title.

"APPLICATION FOR INITIATION OF SPECIAL REMOVAL PROCEEDING

"SEC. 503. (a) IN GENERAL.—Whenever the Attorney General has classified information that an alien is an alien terrorist, the Attorney General, in the Attorney General's discretion, may seek removal of the alien under this title through the filing of a written application described in subsection (b) with the special removal court seeking an order authorizing a special removal proceeding under this title. The application shall be submitted in camera and ex parte and shall be filed under seal with the court.

"(b) CONTENTS OF APPLICATION.—Each application for a special removal proceeding shall include all of the following:

"(1) The identity of the Department of Justice attorney making the application.

"(2) The approval of the Attorney General or the Deputy Attorney General for the filing of the application based upon a finding by that individual that the application satisfies the criteria and requirements of this title.

"(3) The identity of the alien for whom authorization for the special removal proceedings is sought.

"(4) A statement of the facts and circumstances relied on by the Department of Justice to establish that—

"(A) the alien is an alien terrorist and is physically present in the United States, and

"(B) with respect to such alien, adherence to the provisions of title II regarding the removal of aliens would pose a risk to the national security of the United States.

"(5) An oath or affirmation respecting each of the facts and statements described in the previous paragraphs.

"(c) RIGHT TO DISMISS.—The Department of Justice retains the right to dismiss a removal action under this title at any stage of the proceeding.

"CONSIDERATION OF APPLICATION

"SEC. 504. (a) IN GENERAL.—In the case of an application under section 503 to the special removal court, a single judge of the court shall be assigned to consider the application. The judge, in accordance with the rules of the court, shall consider the application and may consider other information, including classified information, presented under oath or affirmation. The judge shall consider the application (and

44

any hearing thereof) in camera and ex parte. A verbatim record shall be maintained of any such hearing.

"(b) APPROVAL OF ORDER.—The judge shall enter ex parte the order requested in the application if the judge finds, on the basis of such application and such other information (if any), that there is probable cause to believe that—

"(1) the alien who is the subject of the application has been correctly identified and is an alien terrorist, and

"(2) adherence to the provisions of title II regarding the removal of the identified alien would pose a risk to the national security of the United States.

"(c) DENIAL OF ORDER.—If the judge denies the order requested in the application, the judge shall prepare a written statement of the judge's reasons for the denial.

"(d) EXCLUSIVE PROVISIONS.—Whenever an order is issued under this section with respect to an alien—

"(1) the alien's rights regarding removal and expulsion shall be governed solely by the provisions of this title, and

"(2) except as they are specifically referenced, no other provisions of this Act shall be applicable.

"SPECIAL REMOVAL HEARINGS

"SEC. 505. (a) IN GENERAL.—In any case in which the application for the order is approved under section 504, a special removal hearing shall be conducted under this section for the purpose of determining whether the alien to whom the order pertains should be removed from the United States on the grounds that the alien is an alien terrorist. Consistent with section 506, the alien shall be given reasonable notice of the nature of the charges against the alien and a general account of the basis for the charges. The alien shall be given notice, reasonable under all the circumstances, of the time and place at which the hearing will be held. The hearing shall be held as expeditiously as possible.

"(b) USE OF SAME JUDGE.—The special removal hearing shall be held before the same judge who granted the order pursuant to section 504 unless that judge is deemed unavailable due to illness or disability by the chief judge of the special removal court, or has died, in which case the chief judge shall assign another judge to conduct the special removal hearing. A decision by the chief judge pursuant to the preceding sentence shall not be subject to review by either the alien or the Department of Justice.

"(c) RIGHTS IN HEARING.—

"(1) PUBLIC HEARING.—The special removal hearing shall be open to the public.

"(2) RIGHT OF COUNSEL.—The alien shall have a right to be present at such hearing and to be represented by counsel. Any alien financially unable to obtain counsel shall be entitled to have counsel assigned to represent the alien. Such counsel shall be appointed by the judge pursuant to the plan for furnishing representation for any person financially unable to obtain adequate representation for the district in which the hearing is conducted, as provided for in section 3006A of title 18, United States Code. All provisions of that section shall apply and, for purposes of determining the maximum amount of compensation, the matter shall be treated as if a felony was charged.

"(3) INTRODUCTION OF EVIDENCE.—The alien shall have a right to introduce evidence on the alien's own behalf.

"(4) EXAMINATION OF WITNESSES.—Except as provided in section 506, the alien shall have a reasonable opportunity to examine the evidence against the alien and to cross-examine any witness.

"(5) RECORD.—A verbatim record of the proceedings and of all testimony and evidence offered or produced at such a hearing shall be kept.

"(6) DECISION BASED ON EVIDENCE AT HEARING.—The decision of the judge in the hearing shall be based only on the evidence introduced at the hearing, including evidence introduced under subsection (e).

"(7) NO RIGHT TO ANCILLARY RELIEF.—In the hearing, the judge is not authorized to consider or provide for relief from removal based on any of the following:

"(A) Asylum under section 208.

"(B) Withholding of deportation under section 243(h).

"(C) Suspension of deportation under section 244(a).

"(D) Voluntary departure under section 244(e).

"(E) Adjustment of status under section 245.

"(F) Registry under section 249.

"(d) SUBPOENAS.—

45

"(1) REQUEST.—At any time prior to the conclusion of the special removal hearing, either the alien or the Department of Justice may request the judge to issue a subpoena for the presence of a named witness (which subpoena may also command the person to whom it is directed to produce books, papers, documents, or other objects designated therein) upon a satisfactory showing that the presence of the witness is necessary for the determination of any material matter. Such a request may be made ex parte except that the judge shall inform the Department of Justice of any request for a subpoena by the alien for a witness or material if compliance with such a subpoena would reveal evidence or the source of evidence which has been introduced, or which the Department of Justice has received permission to introduce, in camera and ex parte pursuant to subsection (e) and section 506, and the Department of Justice shall be given a reasonable opportunity to oppose the issuance of such a subpoena.

"(2) PAYMENT FOR ATTENDANCE.—If an application for a subpoena by the alien also makes a showing that the alien is financially unable to pay for the attendance of a witness so requested, the court may order the costs incurred by the process and the fees of the witness so subpoenaed to be paid from funds appropriated for the enforcement of title II.

"(3) NATIONWIDE SERVICE.—A subpoena under this subsection may be served anywhere in the United States.

"(4) WITNESS FEES.—A witness subpoenaed under this subsection shall receive the same fees and expenses as a witness subpoenaed in connection with a civil proceeding in a court of the United States.

"(5) NO ACCESS TO CLASSIFIED INFORMATION.—Nothing in this subsection is intended to allow an alien to have access to classified information.

"(e) INTRODUCTION OF CLASSIFIED INFORMATION.—

"(1) IN GENERAL.—When classified information has been summarized pursuant to section 506(b) or where a finding has been made under section 506(b)(5) that no summary is possible, classified information shall be introduced (either in writing or through testimony) in camera and ex parte and neither the alien nor the public shall be informed of such evidence or its sources other than through reference to the summary provided pursuant to such section. Notwithstanding the previous sentence, the Department of Justice may, in its discretion and, in the case of classified information, after coordination with the originating agency, elect to introduce such evidence in open session.

"(2) TREATMENT OF ELECTRONIC SURVEILLANCE INFORMATION.—

"(A) USE OF ELECTRONIC SURVEILLANCE.—The Government is authorized to use in a special removal proceedings the fruits of electronic surveillance and unconsented physical searches authorized under the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.) without regard to subsections (c), (e), (f), (g), and (h) of section 106 of that Act.

"(B) NO DISCOVERY OF ELECTRONIC SURVEILLANCE INFORMATION.—An alien subject to removal under this title shall have no right of discovery of information derived from electronic surveillance authorized under the Foreign Intelligence Surveillance Act of 1978 or otherwise for national security purposes. Nor shall such alien have the right to seek suppression of evidence.

"(C) CERTAIN PROCEDURES NOT APPLICABLE.—The provisions and requirements of section 3504 of title 18, United States Code, shall not apply to procedures under this title.

"(3) RIGHTS OF UNITED STATES.—Nothing in this section shall prevent the United States from seeking protective orders and from asserting privileges ordinarily available to the United States to protect against the disclosure of classified information, including the invocation of the military and state secrets privileges.

"(f) INCLUSION OF CERTAIN EVIDENCE.—The Federal Rules of Evidence shall not apply to hearings under this section. Evidence introduced at the special removal hearing, either in open session or in camera and ex parte, may, in the discretion of the Department of Justice, include all or part of the information presented under section 504 used to obtain the order for the hearing under this section.

"(g) ARGUMENTS.—Following the receipt of evidence, the attorneys for the Department of Justice and for the alien shall be given fair opportunity to present argument as to whether the evidence is sufficient to justify the removal of the alien. The attorney for the Department of Justice shall open the argument. The attorney for the alien shall be permitted to reply. The attorney for the Department of Justice shall then be permitted to reply in rebuttal. The judge may allow any part of the argument that refers to evidence received in camera and ex parte to be heard in camera and ex parte.

46

"(h) BURDEN OF PROOF.—In the hearing the Department of Justice has the burden of showing by clear and convincing evidence that the alien is subject to removal because the alien is an alien terrorist. If the judge finds that the Department of Justice has met this burden, the judge shall order the alien removed and detained pending removal from the United States. If the alien was released pending the special removal hearing, the judge shall order the Attorney General to take the alien into custody.

"(i) WRITTEN ORDER.—At the time of rendering a decision as to whether the alien shall be removed, the judge shall prepare a written order containing a statement of facts found and conclusions of law. Any portion of the order that would reveal the substance or source of information received in camera and ex parte pursuant to subsection (e) shall not be made available to the alien or the public.

"CONSIDERATION OF CLASSIFIED INFORMATION

"SEC. 506. (a) CONSIDERATION IN CAMERA AND EX PARTE.—In any case in which the application for the order authorizing the special procedures of this title is approved, the judge who granted the order shall consider each item of classified information the Department of Justice proposes to introduce in camera and ex parte at the special removal hearing and shall order the introduction of such information pursuant to section 505(e) if the judge determines the information to be relevant.

"(b) PREPARATION AND PROVISION OF WRITTEN SUMMARY.—

"(1) PREPARATION.—The Department of Justice shall prepare a written summary of such classified information which does not pose a risk to national security.

"(2) CONDITIONS FOR APPROVAL BY JUDGE AND PROVISION TO ALIEN.—The judge shall approve the summary so long as the judge finds that the summary is sufficient—

"(A) to inform the alien of the general nature of the evidence that the alien is an alien terrorist, and

"(B) to permit the alien to prepare a defense against deportation.

The Department of Justice shall cause to be delivered to the alien a copy of the summary.

"(3) OPPORTUNITY FOR CORRECTION AND RESUBMITTAL.—If the judge does not approve the summary, the judge shall provide the Department a reasonable opportunity to correct the deficiencies identified by the court and to submit a revised summary.

"(4) CONDITIONS FOR TERMINATION OF PROCEEDINGS IF SUMMARY NOT APPROVED.—

"(A) IN GENERAL.—If, subsequent to the opportunity described in paragraph (3), the judge does not approve the summary, the judge shall terminate the special removal hearing unless the judge makes the findings described in subparagraph (B).

"(B) FINDINGS.—The findings described in this subparagraph are, with respect to an alien, that—

"(i) the continued presence of the alien in the United States would likely cause serious and irreparable harm to the national security or death or serious bodily injury to any person, and

"(ii) the provision of the required summary would likely cause serious and irreparable harm to the national security or death or serious bodily injury to any person.

"(5) CONTINUATION OF HEARING WITHOUT SUMMARY.—If a judge makes the findings described in paragraph (4)(B)—

"(A) if the alien involved is an alien lawfully admitted for permanent residence, the procedures described in subsection (c) shall apply; and

"(B) in all cases the special removal hearing shall continue, the Department of Justice shall cause to be delivered to the alien a statement that no summary is possible, and the classified information submitted in camera and ex parte may be used pursuant to section 505(e).

"(c) SPECIAL PROCEDURES FOR ACCESS AND CHALLENGES TO CLASSIFIED INFORMATION BY SPECIAL ATTORNEYS IN CASE OF LAWFUL PERMANENT ALIENS.—

"(1) IN GENERAL.—The procedures described in this subsection are that the judge (under rules of the special removal court) shall designate a special attorney to assist the alien—

"(A) by reviewing in camera the classified information on behalf of the alien, and

"(B) by challenging through an in camera proceeding the veracity of the evidence contained in the classified information.

47

"(2) RESTRICTIONS ON DISCLOSURE.—A special attorney receiving classified information under paragraph (1)—

"(A) shall not disclose the information to the alien or to any other attorney representing the alien, and

"(B) who discloses such information in violation of subparagraph (A) shall be subject to a fine under title 18, United States Code, imprisoned for not less than 10 years nor more than 25 years, or both.

"APPEALS

"SEC. 507. (a) APPEALS OF DENIALS OF APPLICATIONS FOR ORDERS.—The Department of Justice may seek a review of the denial of an order sought in an application by the United States Court of Appeals for the District of Columbia Circuit by notice of appeal which must be filed within 20 days after the date of such denial. In such a case the entire record of the proceeding shall be transmitted to the Court of Appeals under seal and the Court of Appeals shall hear the matter ex parte. In such a case the Court of Appeals shall review questions of law de novo, but a prior finding on any question of fact shall not be set aside unless such finding was clearly erroneous.

"(b) APPEALS OF DETERMINATIONS ABOUT SUMMARIES OF CLASSIFIED INFORMATION.—Either party may take an interlocutory appeal to the United States Court of Appeals for the District of Columbia Circuit of—

"(1) any determination by the judge pursuant to section 506(a)—

"(A) concerning whether an item of evidence may be introduced in camera and ex parte, or

"(B) concerning the contents of any summary of evidence to be introduced in camera and ex parte prepared pursuant to section 506(b); or

"(2) the refusal of the court to make the findings permitted by section 506(b)(4)(B).

In any interlocutory appeal taken pursuant to this subsection, the entire record, including any proposed order of the judge or summary of evidence, shall be transmitted to the Court of Appeals under seal and the matter shall be heard ex parte.

"(c) APPEALS OF DECISION IN HEARING.—

"(1) IN GENERAL.—Subject to paragraph (2), the decision of the judge after a special removal hearing may be appealed by either the alien or the Department of Justice to the United States Court of Appeals for the District of Columbia Circuit by notice of appeal.

"(2) AUTOMATIC APPEALS IN CASES OF PERMANENT RESIDENT ALIENS IN WHICH NO SUMMARY PROVIDED.—

"(A) IN GENERAL.—Unless the alien waives the right to a review under this paragraph, in any case involving an alien lawfully admitted for permanent residence who is denied a written summary of classified information under section 506(b)(4) and with respect to which the procedures described in section 506(c) apply, any order issued by the judge shall be reviewed by the Court of Appeals for the District of Columbia Circuit.

"(B) USE OF SPECIAL ATTORNEY.—With respect to any issue relating to classified information that arises in such review, the alien shall be represented only by the special attorney designated under section 506(c)(1) on behalf of the alien.

"(d) GENERAL PROVISIONS RELATING TO APPEALS.—

"(1) NOTICE.—A notice of appeal pursuant to subsection (b) or (c) (other than under subsection (c)(2)) must be filed within 20 days after the date of the order with respect to which the appeal is sought, during which time the order shall not be executed.

"(2) TRANSMITTAL OF RECORD.—In an appeal or review to the Court of Appeals pursuant to subsection (b) or (c)—

"(A) the entire record shall be transmitted to the Court of Appeals, and

"(B) information received pursuant to section 505(e), and any portion of the judge's order that would reveal the substance or source of such information, shall be transmitted under seal.

"(3) EXPEDITED APPELLATE PROCEEDING.—In an appeal or review to the Court of Appeals pursuant to subsection (b) or (c):

"(A) REVIEW.—The appeal or review shall be heard as expeditiously as practicable and the Court may dispense with full briefing and hear the matter solely on the record of the judge of the special removal court and on such briefs or motions as the Court may require to be filed by the parties.

"(B) DISPOSITION.—The Court shall uphold or reverse the judge's order within 60 days after the date of the issuance of the judge's final order.

48

"(4) STANDARD FOR REVIEW.—In an appeal or review to the Court of Appeals pursuant to subsection (b) or (c):

"(A) QUESTIONS OF LAW.—The Court of Appeals shall review all questions of law de novo.

"(B) QUESTIONS OF FACT.—(i) Subject to clause (ii), a prior finding on any question of fact shall not be set aside unless such finding was clearly erroneous.

"(ii) In the case of a review under subsection (c)(2) in which an alien lawfully admitted for permanent residence was denied a written summary of classified information under section 506(b)(4), the Court of Appeals shall review questions of fact de novo.

"(e) CERTIORARI.—Following a decision by the Court of Appeals pursuant to subsection (b) or (c), either the alien or the Department of Justice may petition the Supreme Court for a writ of certiorari. In any such case, any information transmitted to the Court of Appeals under seal shall, if such information is also submitted to the Supreme Court, be transmitted under seal. Any order of removal shall not be stayed pending disposition of a writ of certiorari except as provided by the Court of Appeals or a Justice of the Supreme Court.

"(f) APPEALS OF DETENTION ORDERS.—

"(1) IN GENERAL.—The provisions of sections 3145 through 3148 of title 18, United States Code, pertaining to review and appeal of a release or detention order, penalties for failure to appear, penalties for an offense committed while on release, and sanctions for violation of a release condition shall apply to an alien to whom section 508(b)(1) applies. In applying the previous sentence—

"(A) for purposes of section 3145 of such title an appeal shall be taken to the United States Court of Appeals for the District of Columbia Circuit, and

"(B) for purposes of section 3146 of such title the alien shall be considered released in connection with a charge of an offense punishable by life imprisonment.

"(2) NO REVIEW OF CONTINUED DETENTION.—The determinations and actions of the Attorney General pursuant to section 508(c)(2)(C) shall not be subject to judicial review, including application for a writ of habeas corpus, except for a claim by the alien that continued detention violates the alien's rights under the Constitution. Jurisdiction over any such challenge shall lie exclusively in the United States Court of Appeals for the District of Columbia Circuit.

"DETENTION AND CUSTODY

"SEC. 508. (a) INITIAL CUSTODY.—

"(1) UPON FILING APPLICATION.—Subject to paragraph (2), the Attorney General may take into custody any alien with respect to whom an application under section 503 has been filed and, notwithstanding any other provision of law, may retain such an alien in custody in accordance with the procedures authorized by this title.

"(2) SPECIAL RULES FOR PERMANENT RESIDENT ALIENS.—An alien lawfully admitted for permanent residence shall be entitled to a release hearing before the judge assigned to hear the special removal hearing. Such an alien shall be detained pending the special removal hearing, unless the alien demonstrates to the court that—

"(A) the alien, if released upon such terms and conditions as the court may prescribe (including the posting of any monetary amount), is not likely to flee, and

"(B) the alien's release will not endanger national security or the safety of any person or the community.

The judge may consider classified information submitted in camera and ex parte in making a determination under this paragraph.

"(3) RELEASE IF ORDER DENIED AND NO REVIEW SOUGHT.—

"(A) IN GENERAL.—Subject to subparagraph (B), if a judge of the special removal court denies the order sought in an application with respect to an alien and the Department of Justice does not seek review of such denial, the alien shall be released from custody.

"(B) APPLICATION OF REGULAR PROCEDURES.—Subparagraph (A) shall not prevent the arrest and detention of the alien pursuant to title II.

"(b) CONDITIONAL RELEASE IF ORDER DENIED AND REVIEW SOUGHT.—

"(1) IN GENERAL.—If a judge of the special removal court denies the order sought in an application with respect to an alien and the Department of Justice seeks review of such denial, the judge shall release the alien from custody sub-

49

ject to the least restrictive condition or combination of conditions of release described in section 3142(b) and clauses (i) through (xiv) of section 3142(c)(1)(B) of title 18, United States Code, that will reasonably assure the appearance of the alien at any future proceeding pursuant to this title and will not endanger the safety of any other person or the community.

"(2) NO RELEASE FOR CERTAIN ALIENS.—If the judge finds no such condition or combination of conditions, the alien shall remain in custody until the completion of any appeal authorized by this title.

"(c) CUSTODY AND RELEASE AFTER HEARING.—

"(1) RELEASE.—

"(A) IN GENERAL.—Subject to subparagraph (B), if the judge decides pursuant to section 505(i) that an alien should not be removed, the alien shall be released from custody.

"(B) CUSTODY PENDING APPEAL.—If the Attorney General takes an appeal from such decision, the alien shall remain in custody, subject to the provisions of section 3142 of title 18, United States Code.

"(2) CUSTODY AND REMOVAL.—

"(A) CUSTODY.—If the judge decides pursuant to section 505(i) that an alien shall be removed, the alien shall be detained pending the outcome of any appeal. After the conclusion of any judicial review thereof which affirms the removal order, the Attorney General shall retain the alien in custody and remove the alien to a country specified under subparagraph (B).

"(B) REMOVAL.—

"(i) IN GENERAL.—The removal of an alien shall be to any country which the alien shall designate if such designation does not, in the judgment of the Attorney General, in consultation with the Secretary of State, impair the obligation of the United States under any treaty (including a treaty pertaining to extradition) or otherwise adversely affect the foreign policy of the United States.

"(ii) ALTERNATE COUNTRIES.—If the alien refuses to designate a country to which the alien wishes to be removed or if the Attorney General, in consultation with the Secretary of State, determines that removal of the alien to the country so designated would impair a treaty obligation or adversely affect United States foreign policy, the Attorney General shall cause the alien to be removed to any country willing to receive such alien.

"(C) CONTINUED DETENTION.—If no country is willing to receive such an alien, the Attorney General may, notwithstanding any other provision of law, retain the alien in custody. The Attorney General, in coordination with the Secretary of State, shall make periodic efforts to reach agreement with other countries to accept such an alien and at least every 6 months shall provide to the attorney representing the alien at the special removal hearing a written report on the Attorney General's efforts. Any alien in custody pursuant to this subparagraph shall be released from custody solely at the discretion of the Attorney General and subject to such conditions as the Attorney General shall deem appropriate.

"(D) FINGERPRINTING.—Before an alien is transported out of the United States pursuant to this subsection, or pursuant to an order of exclusion because such alien is excludable under section 212(a)(3)(B), the alien shall be photographed and fingerprinted, and shall be advised of the provisions of subsection 276(b).

"(d) CONTINUED DETENTION PENDING TRIAL.—

"(1) DELAY IN REMOVAL.—Notwithstanding the provisions of subsection (c)(2), the Attorney General may hold in abeyance the removal of an alien who has been ordered removed pursuant to this title to allow the trial of such alien on any Federal or State criminal charge and the service of any sentence of confinement resulting from such a trial.

"(2) MAINTENANCE OF CUSTODY.—Pending the commencement of any service of a sentence of confinement by an alien described in paragraph (1), such an alien shall remain in the custody of the Attorney General, unless the Attorney General determines that temporary release of the alien to the custody of State authorities for confinement in a State facility is appropriate and would not endanger national security or public safety.

"(3) SUBSEQUENT REMOVAL.—Following the completion of a sentence of confinement by an alien described in paragraph (1) or following the completion of State criminal proceedings which do not result in a sentence of confinement of an alien released to the custody of State authorities pursuant to paragraph (2), such an alien shall be returned to the custody of the Attorney General who

50

shall proceed to carry out the provisions of subsection (c)(2) concerning removal of the alien.

"(e) APPLICATION OF CERTAIN PROVISIONS RELATING TO ESCAPE OF PRISONERS.— For purposes of sections 751 and 752 of title 18, United States Code, an alien in the custody of the Attorney General pursuant to this title shall be subject to the penalties provided by those sections in relation to a person committed to the custody of the Attorney General by virtue of an arrest on a charge of a felony.

"(f) RIGHTS OF ALIENS IN CUSTODY.—

"(1) FAMILY AND ATTORNEY VISITS.—An alien in the custody of the Attorney General pursuant to this title shall be given reasonable opportunity to communicate with and receive visits from members of the alien's family, and to contact, retain, and communicate with an attorney.

"(2) DIPLOMATIC CONTACT.—An alien in the custody of the Attorney General pursuant to this title shall have the right to contact an appropriate diplomatic or consular official of the alien's country of citizenship or nationality or of any country providing representation services therefore. The Attorney General shall notify the appropriate embassy, mission, or consular office of the alien's detention.".

(b) CRIMINAL PENALTY FOR REENTRY OF ALIEN TERRORISTS.—Section 276(b) (8 U.S.C. 1326(b)) is amended—

(1) by striking "or" at the end of paragraph (1),

(2) by striking the period at the end of paragraph (2) and inserting "; or", and

(3) by inserting after paragraph (2) the following new paragraph:

"(3) who has been excluded from the United States pursuant to subsection 235(c) because the alien was excludable under subsection 212(a)(3)(B) or who has been removed from the United States pursuant to the provisions of title V, and who thereafter, without the permission of the Attorney General, enters the United States or attempts to do so shall be fined under title 18, United States Code, and imprisoned for a period of 10 years, which sentence shall not run concurrently with any other sentence.".

(c) ELIMINATION OF CUSTODY REVIEW BY HABEAS CORPUS.—Section 106(a) (8 U.S.C. 1105a(a)) is amended—

(1) by adding "and" at the end of paragraph (8),

(2) by striking "; and" at the end of paragraph (9) and inserting a period, and

(3) by striking paragraph (10).

(d) EFFECTIVE DATE.—The amendments made by this section shall take effect on the date of the enactment of this Act and shall apply to all aliens without regard to the date of entry or attempted entry into the United States.

**SEC. 322. FUNDING FOR DETENTION AND REMOVAL OF ALIEN TERRORISTS.**

In addition to amounts otherwise appropriated, there are authorized to be appropriated for each fiscal year (beginning with fiscal year 1996) $5,000,000 to the Immigration and Naturalization Service for the purpose of detaining and removing alien terrorists.

## PART 2—INADMISSIBILITY AND DENIAL OF RELIEF FOR ALIEN TERRORISTS

**SEC. 331. MEMBERSHIP IN TERRORIST ORGANIZATION AS GROUND OF INADMISSIBILITY.**

(a) IN GENERAL.—Section 212(a)(3)(B) (8 U.S.C. 1182(a)(3)(B)) is amended—

(1) in clause (i)—

(A) by striking "or" at the end of subclause (I),

(B) in subclause (II), by inserting "engaged in or" after "believe,", and

(C) by inserting after subclause (II) the following:

"(III) is a representative of a terrorist organization, or

"(IV) is a member of a terrorist organization which the alien knows or should have known is a terrorist organization,"; and

(2) by adding at the end the following:

"(iv) TERRORIST ORGANIZATION DEFINED.—

"(I) DESIGNATION.—For purposes of this Act, the term 'terrorist organization' means a foreign organization designated in the Federal Register as a terrorist organization by the Secretary of State, in consultation with the Attorney General, based upon a finding that the organization engages in, or has engaged in, terrorist activity that threatens the national security of the United States.

"(II) PROCESS.—At least 3 days before designating an organization as a terrorist organization through publication in the Federal

51

Register, the Secretary of State, in consultation with the Attorney General, shall notify the Committees on the Judiciary of the House of Representatives and the Senate of the intent to make such designation and the findings and basis for designation. The Secretary of State, in consultation with the Attorney General, shall create an administrative record and may use classified information in making such a designation. Such information is not subject to disclosure so long as it remains classified, except that it may be disclosed to a court ex parte and in camera under subclause (III) for purposes of judicial review of such a designation. The Secretary of State, in consultation with the Attorney General, shall provide notice and an opportunity for public comment prior to the creation of the administrative record under this subclause.

"(III) JUDICIAL REVIEW.—Any organization designated as a terrorist organization under the preceding provisions of this clause may, not later than 30 days after the date of the designation, seek judicial review thereof in the United States Court of Appeals for the District of Columbia Circuit. Such review shall be based solely upon the administrative record, except that the Government may submit, for ex parte and in camera review, classified information considered in making the designation. The court shall hold unlawful and set aside the designation if the court finds the designation to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, lacking substantial support in the administrative record taken as a whole or in classified information submitted to the court under the previous sentence, contrary to constitutional right, power, privilege, or immunity, or not in accord with the procedures required by law.

"(IV) CONGRESSIONAL REMOVAL AUTHORITY.—The Congress reserves the authority to remove, by law, the designation of an organization as a terrorist organization for purposes of this Act.

"(V) SUNSET.—Subject to subclause (IV), the designation under this clause of an organization as a terrorist organization shall be effective for a period of 2 years from the date of the initial publication of the terrorist organization designation by the Secretary of State. At the end of such period (but no sooner than 60 days prior to the termination of the 2-year-designation period), the Secretary of State, in consultation with the Attorney General, may redesignate the organization in conformity with the requirements of this clause for designation of the organization.

"(VI) REMOVAL AUTHORITY.—The Secretary of State, in consultation with the Attorney General, may remove the terrorist organization designation from any organization previously designated as such an organization, at any time, so long as the Secretary publishes notice of the removal in the Federal Register. The Secretary is not required to report to Congress prior to so removing such designation.

"(v) REPRESENTATIVE DEFINED.—

"(I) IN GENERAL.—In this subparagraph, the term 'representative' includes an officer, official, or spokesman of the organization and any person who directs, counsels, commands or induces the organization or its members to engage in terrorist activity.

"(II) JUDICIAL REVIEW.—The determination under this subparagraph that an alien is a representative of a terrorist organization shall be subject to judicial review under section 706 of title 5, United States Code.".

(b) EFFECTIVE DATE.—The amendments made by this section shall take effect on the date of the enactment of this Act.

**SEC. 332. DENIAL OF RELIEF FOR ALIEN TERRORISTS.**

(a) WITHHOLDING OF DEPORTATION.—Subsection (h)(2) of section 243 (8 U.S.C. 1253), before amendment by section 307(a), is amended by adding at the end the following new sentence: "For purposes of subparagraph (D), an alien who is described in section 241(a)(4)(B) shall be considered to be an alien for whom there are reasonable grounds for regarding as a danger to the security of the United States.".

(b) SUSPENSION OF DEPORTATION.—Section 244(a) (8 U.S.C. 1254(a)), before amendment by section 308(b), is amended by striking "section 241(a)(4)(D)" and inserting "subparagraph (B) or (D) of section 241(a)(4)".

52

(c) VOLUNTARY DEPARTURE.—Section 244(e)(2) (8 U.S.C. 1254(e)(2)), before amendment by section 308(b), is amended by inserting "under section 241(a)(4)(B) or" after "who is deportable".

(d) ADJUSTMENT OF STATUS.—Section 245(c) (8 U.S.C. 1255(c)) is amended—

(1) by striking "or" before "(5)", and

(2) by inserting before the period at the end the following: ", or (6) an alien who is deportable under section 241(a)(4)(B)".

(e) REGISTRY.—Section 249(d) (8 U.S.C. 1259(d)) is amended by inserting "and is not deportable under section 241(a)(4)(B)" after "ineligible to citizenship".

(f) EFFECTIVE DATE.—(1) The amendments made by this section shall take effect on the date of the enactment of this Act and shall apply to applications filed before, on, or after such date if final action has not been taken on them before such date.

(2) The amendments made by subsections (a) through (c) are subsequently superseded by the amendments made by subtitle A.

## Subtitle C—Deterring Transportation of Unlawful Aliens to the United States

### SEC. 341. DEFINITION OF STOWAWAY.

(a) STOWAWAY DEFINED.—Section 101(a) (8 U.S.C. 1101(a)) is amended by adding the following new paragraph:

"(47) The term 'stowaway' means any alien who obtains transportation without the consent of the owner, charterer, master or person in command of any vessel or aircraft through concealment aboard such vessel or aircraft. A passenger who boards with a valid ticket is not to be considered a stowaway.".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on the date of the enactment of this Act.

### SEC. 342. LIST OF ALIEN AND CITIZEN PASSENGERS ARRIVING.

(a) IN GENERAL.—Section 231(a) (8 U.S.C. 1221(a)) is amended—

(1) by amending the first sentence to read as follows: "In connection with the arrival of any person by water or by air at any port within the United States from any place outside the United States, it shall be the duty of the master or commanding officer, or authorized agent, owner, or consignee of the vessel or aircraft, having such person on board to deliver to the immigration officers at the port of arrival, or other place designated by the Attorney General, electronic, typewritten, or printed lists or manifests of the persons on board such vessel or aircraft.";

(2) in the second sentence, by striking "shall be prepared" and inserting "shall be prepared and submitted"; and

(3) by inserting after the second sentence the following sentence: "Such lists or manifests shall contain, but not be limited to, for each person transported, the person's full name, date of birth, gender, citizenship, travel document number (if applicable) and arriving flight number.".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to vessels or aircraft arriving at ports of entry on or after such date (not later than 60 days after the date of the enactment of this Act) as the Attorney General shall specify.

## Subtitle D—Additional Provisions

### SEC. 351. DEFINITION OF CONVICTION.

(a) IN GENERAL.—Section 101(a) (8 U.S.C. 1101(a)), as amended by section 341(a), is amended by adding at the end the following new paragraph:

"(48) The term 'conviction' means a formal judgment of guilt entered by a court or, if adjudication of guilt has been withheld, where all of the following elements are present:

"(A) A judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt.

"(B) The judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

"(C) A judgment or adjudication of guilt may be entered if the alien violates the terms of the probation or fails to comply with the requirements

FRP-FRN-00723

53

of the court's order, without availability of further proceedings regarding the alien's guilt or innocence of the original charge.".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to convictions entered before, on, or after the date of the enactment of this Act.

**SEC. 352. IMMIGRATION JUDGES AND COMPENSATION.**

(a) DEFINITION OF TERM.—Paragraph (4) of section 101(b) (8 U.S.C. 1101(b)) is amended to read as follows:

"(4) The term 'immigration judge' means an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under section 240. An immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe, but shall not be employed by the Immigration and Naturalization Service.".

(b) SUBSTITUTION FOR TERM "SPECIAL INQUIRY OFFICER".—The Immigration and Nationality Act is amended by striking "a special inquiry officer", "special inquiry officer", and "special inquiry officers" and inserting "an immigration judge", "immigration judge", and "immigration judges", respectively, each place it appears in the following sections:

(1) Section 106(a)(2) (8 U.S.C. 1105a(a)(2)).

(2) Section 209(a)(2) (8 U.S.C. 1159(a)(2)).

(3) Section 234 (8 U.S.C. 1224), before redesignation by section 308(b).

(4) Section 235 (8 U.S.C. 1225), before redesignation by section 308(b).

(5) Section 236 (8 U.S.C. 1226), before amendment by section 303.

(6) Section 242(b) (8 U.S.C. 1252(b)), before amendment by section 306(a)(2).

(7) Section 242(d)(1) (8 U.S.C. 1252(d)(1)), before amendment by section 306(a)(2).

(8) Section 292 (8 U.S.C. 1362).

(c) COMPENSATION FOR IMMIGRATION JUDGES.—

(1) IN GENERAL.—There shall be four levels of pay for immigration judges, under the Immigration Judge Schedule (designated as IJ–1, 2, 3, and 4, respectively), and each such judge shall be paid at one of those levels, in accordance with the provisions of this subsection.

(2) RATES OF PAY.—

(A) The rates of basic pay for the levels established under paragraph (1) shall be as follows:

| | |
|---|---|
| IJ–1 ............................................................ | 70% of the next to highest rate of basic pay for the Senior Executive Service |
| IJ–2 ............................................................ | 80% of the next to highest rate of basic pay for the Senior Executive Service |
| IJ–3 ............................................................ | 90% of the next to highest rate of basic pay for the Senior Executive Service |
| IJ–4 ............................................................ | 92% of the next to highest rate of basic pay for the Senior Executive Service. |

(B) Locality pay, where applicable, shall be calculated into the basic pay for immigration judges.

(3) APPOINTMENT.—

(A) Upon appointment, an immigration judge shall be paid at IJ–1, and shall be advanced to IJ–2 upon completion of 104 weeks of service, to IJ–3 upon completion of 104 weeks of service in the next lower rate, and to IJ–4 upon completion of 52 weeks of service in the next lower rate.

(B) The Attorney General may provide for appointment of an immigration judge at an advanced rate under such circumstances as the Attorney General may determine appropriate.

(4) TRANSITION.—Judges serving on the Immigration Court as of the effective date shall be paid at the rate that corresponds to the amount of time, as provided under paragraph (3)(A), that they have served as an immigration judge.

(d) EFFECTIVE DATES.—

(1) Subsections (a) and (b) shall take effect on the date of the enactment of this Act.

(2) Subsection (c) shall take effect 90 days after the date of the enactment of this Act.

**SEC. 353. RESCISSION OF LAWFUL PERMANENT RESIDENT STATUS.**

(a) IN GENERAL.—Section 246(a) (8 U.S.C. 1256(a)) is amended by adding at the end the following sentence: "Nothing in this subsection shall require the Attorney General to rescind the alien's status prior to commencement of procedures to remove the alien under section 240, and an order of removal issued by an immigration judge shall be sufficient to rescind the alien's status.".

54

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on the title III–A effective date (as defined in section 309(a)).

**SEC. 354. CIVIL PENALTIES FOR FAILURE TO DEPART.**

(a) IN GENERAL.—The Immigration and Nationality Act is amended by inserting after section 274C the following new section:

"CIVIL PENALTIES FOR FAILURE TO DEPART

"SEC. 274D. (a) IN GENERAL.—Any alien subject to a final order of removal who—
     "(1) willfully fails or refuses to—
          "(A) depart from the United States pursuant to the order,
          "(B) make timely application in good faith for travel or other documents necessary for departure, or
          "(C) present for removal at the time and place required by the Attorney General; or
     "(2) conspires to or takes any action designed to prevent or hamper the alien's departure pursuant to the order,
shall pay a civil penalty of not more than $500 to the Commissioner for each day the alien is in violation of this section.

"(b) CONSTRUCTION.—Nothing in this section shall be construed to diminish or qualify any penalties to which an alien may be subject for activities proscribed by section 243(a) or any other section of this Act.".

(b) CLERICAL AMENDMENT.—The table of contents is amended by inserting after the item relating to section 274C the following new item:

"Sec. 274D.  Civil penalties for failure to depart.".

(c) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to actions occurring on or after the title III–A effective date (as defined in section 309(a)).

**SEC. 355. CLARIFICATION OF DISTRICT COURT JURISDICTION.**

(a) IN GENERAL.—Section 279 (8 U.S.C. 1329) is amended—
     (1) by amending the first sentence to read as follows: "The district courts of the United States shall have jurisdiction of all causes, civil and criminal, brought by the United States that arise under the provisions of this title.", and
     (2) by adding at the end the following new sentence: "Nothing in this section shall be construed as providing jurisdiction for suits against the United States or its agencies or officers.".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to actions filed after the date of the enactment of this Act.

**SEC. 356. USE OF RETIRED FEDERAL EMPLOYEES FOR INSTITUTIONAL HEARING PROGRAM.**

(a) AUTHORIZATION OF TEMPORARY EMPLOYMENT OF CERTAIN ANNUITANTS AND RETIREES.—For the purpose of performing duties in connection with supporting the enhanced Institutional Hearing Program, the Attorney General may employ for a period not to exceed 24 months (beginning 3 months after the date of the enactment of this Act) not more than 300 individuals (at any one time) who, by reason of separation from service on or before January 1, 1995, are receiving—
     (1) annuities under the provisions of subchapter III of chapter 83 of title 5, United States Code, or chapter 84 of such title;
     (2) annuities under any other retirement system for employees of the Federal Government; or
     (3) retired or retainer pay as retired officers of regular components of the uniformed services.

(b) NO REDUCTION IN ANNUITY OR RETIREMENT PAY OR REDETERMINATION OF PAY DURING TEMPORARY EMPLOYMENT.—
     (1) RETIREES UNDER CIVIL SERVICE RETIREMENT SYSTEM AND FEDERAL EMPLOYEES' RETIREMENT SYSTEM.—In the case of an individual employed under subsection (a) who is receiving an annuity described in subsection (a)(1)—
          (A) such individual's annuity shall continue during the employment under subsection (a) and shall not be increased as a result of service performed during that employment;
          (B) retirement deductions shall not be withheld from such individual's pay; and
          (C) such individual's pay shall not be subject to any deduction based on the portion of such individual's annuity which is allocable to the period of employment.
     (2) OTHER FEDERAL RETIREES.—The President shall apply the provisions of paragraph (1) to individuals who are receiving an annuity described in subsection (a)(2) and who are employed under subsection (a) in the same manner

55

and to the same extent as such provisions apply to individuals who are receiving an annuity described in subsection (a)(1) and who are employed under subsection (a).

(3) RETIRED OFFICERS OF THE UNIFORM SERVICES.—The retired or retainer pay of a retired officer of a regular component of a uniformed service shall not be reduced under section 5532 of title 5, United States Code, by reason of temporary employment authorized under subsection (a).

**SEC. 357. ENHANCED PENALTIES FOR FAILURE TO DEPART, ILLEGAL REENTRY, AND PASSPORT AND VISA FRAUD.**

(a) FAILING TO DEPART.—The United States Sentencing Commission shall promptly promulgate, pursuant to section 994 of title 28, United States Code, amendments to the sentencing guidelines to make appropriate increases in the base offense level for offenses under section 242(e) and 276(b) of the Immigration and Nationality Act (8 U.S.C. 1252(e) and 1326(b)) to reflect the amendments made by section 130001 of the Violent Crime Control and Law Enforcement Act of 1994.

(b) PASSPORT AND VISA OFFENSES.—The United States Sentencing Commission shall promptly promulgate, pursuant to section 994 of title 28, United States Code, amendments to the sentencing guidelines to make appropriate increases in the base offense level for offenses under chapter 75 of title 18, United States Code to reflect the amendments made by section 130009 of the Violent Crime Control and Law Enforcement Act of 1994.

**SEC. 358. AUTHORIZATION OF ADDITIONAL FUNDS FOR REMOVAL OF ALIENS.**

In addition to the amounts otherwise authorized to be appropriated for each fiscal year beginning with fiscal year 1996, there are authorized to be appropriated to the Attorney General $150,000,000 for costs associated with the removal of inadmissible or deportable aliens, including costs of detention of such aliens pending their removal, the hiring of more investigators, and the hiring of more detention and deportation officers.

**SEC. 359. APPLICATION OF ADDITIONAL CIVIL PENALTIES TO ENFORCEMENT.**

(a) IN GENERAL.—Subsection (b) of section 280 (8 U.S.C. 1330(b)) is amended to read as follows:

"(b)(1) There is established in the general fund of the Treasury a separate account which shall be known as the 'Immigration Enforcement Account'. Notwithstanding any other section of this title, there shall be deposited as offsetting receipts into the Immigration Enforcement Account amounts described in paragraph (2) to remain available until expended.

"(2) The amounts described in this paragraph are the following:

"(A) The increase in penalties collected resulting from the amendments made by sections 203(b) and 543(a) of the Immigration Act of 1990.

"(B) Civil penalties collected under sections 240B(d), 274C, 274D, and 275(b).

"(3)(A) The Secretary of the Treasury shall refund out of the Immigration Enforcement Account to any appropriation the amount paid out of such appropriation for expenses incurred by the Attorney General for activities that enhance enforcement of provisions of this title, including—

"(i) the identification, investigation, apprehension, detention, and removal of criminal aliens;

"(ii) the maintenance and updating of a system to identify and track criminal aliens, deportable aliens, inadmissible aliens, and aliens illegally entering the United States; and

"(iii) for the repair, maintenance, or construction on the United States border, in areas experiencing high levels of apprehensions of illegal aliens, of structures to deter illegal entry into the United States.

"(B) The amounts which are required to be refunded under subparagraph (A) shall be refunded at least quarterly on the basis of estimates made by the Attorney General of the expenses referred to in subparagraph (A). Proper adjustments shall be made in the amounts subsequently refunded under subparagraph (A) to the extent prior estimates were in excess of, or less than, the amount required to be refunded under subparagraph (A).".

(b) IMMIGRATION USER FEE ACCOUNT.—Section 286(h)(1)(B) (8 U.S.C. 1356(h)(1)(B)) is amended by striking "271" and inserting "243(c), 271,".

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to fines and penalties collected on or after the date of the enactment of this Act.

56

**SEC. 360. PRISONER TRANSFER TREATIES.**

(a) NEGOTIATION.—Congress advises the President to begin to negotiate and re-negotiate, not later than 90 days after the date of the enactment of this Act, bilateral prisoner transfer treaties. The focus of such negotiations shall be—

(1) to expedite the transfer of aliens unlawfully in the United States who are (or are about to be) incarcerated in United States prisons,

(2) to ensure that a transferred prisoner serves the balance of the sentence imposed by the United States courts,

(3) to eliminate any requirement of prisoner consent to such a transfer, and

(4) to allow the Federal Government or the States to keep their original prison sentences in force so that transferred prisoners who return to the United States prior to the completion of their original United States sentences can be returned to custody for the balance of their prison sentences.

In entering into such negotiations, the President may consider providing for appropriate compensation in cases where the United States is able to independently verify the adequacy of the sites where aliens will be imprisoned and the length of time the alien is actually incarcerated in the foreign country under such a treaty.

(b) CERTIFICATION.—The President shall submit to the Congress, annually, a certification as to whether each prisoner transfer treaty in force is effective in returning aliens unlawfully in the United States who have committed offenses for which they are incarcerated in the United States to their country of nationality for further incarceration.

**SEC. 361. CRIMINAL ALIEN IDENTIFICATION SYSTEM.**

(a) OPERATION AND PURPOSE.—Subsection (a) of section 130002 of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322) is amended to read as follows:

"(a) OPERATION AND PURPOSE.—The Commissioner of Immigration and Naturalization shall, under the authority of section 242(a)(3)(A) of the Immigration and Nationality Act (8 U.S.C. 1252(a)(3)(A)), operate a criminal alien identification system. The criminal alien identification system shall be used to assist Federal, State, and local law enforcement agencies in identifying and locating aliens who may be subject to removal by reason of their conviction of aggravated felonies, subject to prosecution under section 275 of such Act, not lawfully present in the United States, or otherwise removable. Such system shall include providing for recording of fingerprint records of aliens who have been previously arrested and removed into appropriate automated fingerprint identification systems.".

(b) IDENTIFICATION OF CRIMINAL ALIENS UNLAWFULLY PRESENT IN THE UNITED STATES.—Upon the request of the governor or chief executive officer of any State, the Immigration and Naturalization Service shall provide assistance to State courts in the identification of aliens unlawfully present in the United States pending criminal prosecution.

**SEC. 362. WAIVER OF EXCLUSION AND DEPORTATION GROUND FOR CERTAIN SECTION 274C VIOLATORS.**

(a) EXCLUSION GROUNDS.—Section 212 (8 U.S.C. 1182) is amended—

(1) by amending subparagraph (F) of subsection (a)(6) to read as follows:

"(F) SUBJECT OF CIVIL PENALTY.—

"(i) IN GENERAL.—An alien who is the subject of a final order for violation of section 274C is inadmissible.

"(ii) WAIVER AUTHORIZED.—For provision authorizing waiver of clause (i), see subsection (d)(12)."; and

(2) by adding at the end of subsection (d) the following new paragraph:

"(12) The Attorney General may, in the discretion of the Attorney General for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest, waive application of clause (i) of subsection (a)(6)(F)—

"(A) in the case of an alien lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation and who is otherwise admissible to the United States as a returning resident under section 211(b), and

"(B) in the case of an alien seeking admission or adjustment of status under section 201(b)(2)(A) or under section 203(a),

if the violation under section 274C was committed solely to assist, aid, or support the alien's spouse, parent, son, or daughter (and not another individual).".

(b) GROUND OF DEPORTATION.—Subparagraph (C) of section 241(a)(3) (8 U.S.C. 1251(a)(3)), before redesignation by section 305(a)(2), is amended to read as follows:

"(C) DOCUMENT FRAUD.—

"(i) IN GENERAL.—An alien who is the subject of a final order for violation of section 274C is deportable.

57

"(ii) WAIVER AUTHORIZED.—The Attorney General may waive clause (i) in the case of an alien lawfully admitted for permanent residence if the alien's civil money penalty under section 274C was incurred solely to assist, aid, or support the alien's spouse, parent, son, or daughter (and no other individual).".

**SEC. 363. AUTHORIZING REGISTRATION OF ALIENS ON CRIMINAL PROBATION OR CRIMINAL PAROLE.**

Section 263(a) (8 U.S.C. 1303(a)) is amended by striking "and (5)" and inserting "(5) aliens who are or have been on criminal probation or criminal parole within the United States, and (6)".

**SEC. 364. CONFIDENTIALITY PROVISION FOR CERTAIN ALIEN BATTERED SPOUSES AND CHILDREN.**

(a) IN GENERAL.—Except as provided in subsection (b), in no case may the Attorney General, or any other official or employee of the Department of Justice (including any bureau or agency of such Department)—

(1) make an adverse determination of admissibility or deportability of an alien under the Immigration and Nationality Act using information furnished solely by—

(A) a spouse or parent who has battered the alien or subjected the alien to extreme cruelty,

(B) a member of the spouse's or parent's family residing in the same household as the alien who has battered the alien or subjected the alien to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty,

(C) a spouse or parent who has battered the alien's child or subjected the alien's child to extreme cruelty (without the active participation of the alien in the battery or extreme cruelty), or

(D) a member of the spouse's or parent's family residing in the same household as the alien who has battered the alien's child or subjected the alien's child to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty,

unless the alien has been convicted of a crime or crimes listed in section 241(a)(2) of the Immigration and Nationality Act; or

(2) permit use by or disclosure to anyone (other than a sworn officer or employee of the Department, or bureau or agency thereof, for legitimate Department, bureau, or agency purposes) of any information which relates to an alien who is the beneficiary of an application for relief under clause (iii) or (iv) of section 204(a)(1)(A), clause (ii) or (iii) of section 204(a)(1)(B), section 216(c)(4)(C), or section 244(a)(3) of such Act as an alien (or the parent of a child) who has been battered or subjected to extreme cruelty.

The limitation under paragraph (2) ends when the application for relief is denied and all opportunities for appeal of the denial have been exhausted.

(b) EXCEPTIONS.—

(1) The Attorney General may provide, in the Attorney General's discretion, for the disclosure of information in the same manner and circumstances as census information may be disclosed by the Secretary of Commerce under section 8 of title 13, United States Code.

(2) The Attorney General may provide in the discretion of the Attorney General for the disclosure of information to law enforcement officials to be used solely for a legitimate law enforcement purpose.

(3) Subsection (a) shall not be construed as preventing disclosure of information in connection with judicial review of a determination in a manner that protects the confidentiality of such information.

(4) Subsection (a)(2) shall not apply if all the battered individuals in the case are adults and they have all waived the restrictions of such subsection.

(c) PENALTIES FOR VIOLATIONS.—Anyone who uses, publishes, or permits information to be disclosed in violation of this section shall be fined in accordance with title 18, United States Code, or imprisoned not more than 5 years, or both.

58

# TITLE IV—ENFORCEMENT OF RESTRICTIONS AGAINST EMPLOYMENT

**SEC. 401. STRENGTHENED ENFORCEMENT OF THE EMPLOYER SANCTIONS PROVISIONS.**

(a) IN GENERAL.—The number of full-time equivalent positions in the Investigations Division within the Immigration and Naturalization Service of the Department of Justice beginning in fiscal year 1996 shall be increased by 350 positions above the number of full-time equivalent positions available to such Division as of September 30, 1994.

(b) ASSIGNMENT.—Individuals employed to fill the additional positions described in subsection (a) shall be assigned to investigate violations of the employer sanctions provisions contained in section 274A of the Immigration and Nationality Act, including investigating reports of violations received from officers of the Employment Standards Administration of the Department of Labor.

**SEC. 402. STRENGTHENED ENFORCEMENT OF WAGE AND HOUR LAWS.**

(a) IN GENERAL.—The number of full-time equivalent positions in the Wage and Hour Division with the Employment Standards Administration of the Department of Labor beginning in fiscal year 1996 shall be increased by 150 positions above the number of full-time equivalent positions available to the Wage and Hour Division as of September 30, 1994.

(b) ASSIGNMENT.—Individuals employed to fill the additional positions described in subsection (a) shall be assigned to investigate violations of wage and hour laws in areas where the Attorney General has notified the Secretary of Labor that there are high concentrations of undocumented aliens.

**SEC. 403. CHANGES IN THE EMPLOYER SANCTIONS PROGRAM.**

(a) REDUCING THE NUMBER OF DOCUMENTS ACCEPTED FOR EMPLOYMENT VERIFICATION.—Section 274A(b) (8 U.S.C. 1324a(b)) is amended—

(1) in paragraph (1)(B)—

(A) by adding "or" at the end of clause (i),

(B) by striking clauses (ii) through (iv), and

(C) in clause (v), by striking "or other alien registration card, if the card" and inserting ", alien registration card, or other document designated by regulation by the Attorney General, if the document" and redesignating such clause as clause (ii);

(2) by amending subparagraph (C) of paragraph (1) to read as follows:

"(C) SOCIAL SECURITY ACCOUNT NUMBER CARD AS EVIDENCE OF EMPLOYMENT AUTHORIZATION.—A document described in this subparagraph is an individual's social security account number card (other than such a card which specifies on the face that the issuance of the card does not authorize employment in the United States)."; and

(3) by amending paragraph (2) to read as follows:

"(2) INDIVIDUAL ATTESTATION OF EMPLOYMENT AUTHORIZATION AND PROVISION OF SOCIAL SECURITY ACCOUNT NUMBER.—The individual must—

"(A) attest, under penalty of perjury on the form designated or established for purposes of paragraph (1), that the individual is a citizen or national of the United States, an alien lawfully admitted for permanent residence, or an alien who is authorized under this Act or by the Attorney General to be hired, recruited, or referred for such employment; and

"(B) provide on such form the individual's social security account number.".

(b) EMPLOYMENT ELIGIBILITY CONFIRMATION PROCESS.—Section 274A (8 U.S.C. 1324a) is amended—

(1) in subsection (a)(3), by inserting "(A)" after "DEFENSE.—", and by adding at the end the following:

"(B) FAILURE TO SEEK AND OBTAIN CONFIRMATION.—Subject to subsection (b)(7), in the case of a hiring of an individual for employment in the United States by a person or entity that employs more than 3 employees, the following rules apply:

"(i) FAILURE TO SEEK CONFIRMATION.—

"(I) IN GENERAL.—If the person or entity has not made an inquiry, under the mechanism established under subsection (b)(6), seeking confirmation of the identity, social security number, and work eligibility of the individual, by not later than the end of 3 working days (as specified by the Attorney General) after the date of the hiring, the defense under subparagraph (A) shall not be considered to apply with respect to any

59

employment after such 3 working days, except as provided in subclause (II).

"(II) SPECIAL RULE FOR FAILURE OF CONFIRMATION MECHANISM.—If such a person or entity in good faith attempts to make an inquiry during such 3 working days in order to qualify for the defense under subparagraph (A) and the confirmation mechanism has registered that not all inquiries were responded to during such time, the person or entity can make an inquiry in the first subsequent working day in which the confirmation mechanism registers no nonresponses and qualify for the defense.

"(ii) FAILURE TO OBTAIN CONFIRMATION.—If the person or entity has made the inquiry described in clause (i)(I) but has not received an appropriate confirmation of such identity, number, and work eligibility under such mechanism within the time period specified under subsection (b)(6)(D)(iii) after the time the confirmation inquiry was received, the defense under subparagraph (A) shall not be considered to apply with respect to any employment after the end of such time period.";

(2) by amending paragraph (3) of subsection (b) to read as follows:

"(3) RETENTION OF VERIFICATION FORM AND CONFIRMATION.—After completion of such form in accordance with paragraphs (1) and (2), the person or entity must—

"(A) retain the form and make it available for inspection by officers of the Service, the Special Counsel for Immigration-Related Unfair Employment Practices, or the Department of Labor during a period beginning on the date of the hiring, recruiting, or referral of the individual and ending—

"(i) in the case of the recruiting or referral for a fee (without hiring) of an individual, three years after the date of the recruiting or referral, and

"(iii) in the case of the hiring of an individual—

"(I) three years after the date of such hiring, or

"(II) one year after the date the individual's employment is terminated,

whichever is later; and

"(B) subject to paragraph (7), if the person employs more than 3 employees, seek to have (within 3 working days of the date of hiring) and have (within the time period specified under paragraph (6)(D)(iii)) the identity, social security number, and work eligibility of the individual confirmed in accordance with the procedures established under paragraph (6), except that if the person or entity in good faith attempts to make an inquiry in accordance with the procedures established under paragraph (6) during such 3 working days in order to fulfill the requirements under this subparagraph, and the confirmation mechanism has registered that not all inquiries were responded to during such time, the person or entity shall make an inquiry in the first subsequent working day in which the confirmation mechanism registers no nonresponses."; and

(3) by adding at the end of subsection (b) the following new paragraphs:

"(6) EMPLOYMENT ELIGIBILITY CONFIRMATION PROCESS.—

"(A) IN GENERAL.—Subject to paragraph (7), the Attorney General shall establish a confirmation mechanism through which the Attorney General (or a designee of the Attorney General which may include a nongovernmental entity)—

"(i) responds to inquiries by employers, made through a toll-free telephone line or other electronic media in the form of an appropriate confirmation code or otherwise, on whether an individual is authorized to be employed by that employer, and

"(ii) maintains a record that such an inquiry was made and the confirmation provided (or not provided).

"(B) EXPEDITED PROCEDURE IN CASE OF NO CONFIRMATION.—In connection with subparagraph (A), the Attorney General shall establish, in consultation with the Commissioner of Social Security and the Commissioner of the Service, expedited procedures that shall be used to confirm the validity of information used under the confirmation mechanism in cases in which the confirmation is sought but is not provided through the confirmation mechanism.

"(C) DESIGN AND OPERATION OF MECHANISM.—The confirmation mechanism shall be designed and operated—

"(i) to maximize the reliability of the confirmation process, and the ease of use by employers, recruiters, and referrers, consistent with in-

60

sulating and protecting the privacy and security of the underlying information, and

"(ii) to respond to all inquiries made by employers on whether individuals are authorized to be employed by those employers, recruiters, or referrers registering all times when such response is not possible.

"(D) CONFIRMATION PROCESS.—(i) As part of the confirmation mechanism, the Commissioner of Social Security shall establish a reliable, secure method, which within the time period specified under clause (iii), compares the name and social security account number provided against such information maintained by the Commissioner in order to confirm (or not confirm) the validity of the information provided and whether the individual has presented a social security account number that is not valid for employment. The Commissioner shall not disclose or release social security information.

"(ii) As part of the confirmation mechanism, the Commissioner of the Service shall establish a reliable, secure method, which, within the time period specified under clause (iii), compares the name and alien identification number (if any) provided against such information maintained by the Commissioner in order to confirm (or not confirm) the validity of the information provided and whether the alien is authorized to be employed in the United States.

"(iii) For purposes of this section, the Attorney General (or a designee of the Attorney General) shall provide through the confirmation mechanism confirmation or a tentative nonconfirmation of an individual's employment eligibility within 3 working days of the initial inquiry. In cases of tentative nonconfirmation, the Attorney General shall specify, in consultation with the Commissioner of Social Security and the Commissioner of the Service, an expedited time period not to exceed 10 working days within which final confirmation or denial must be provided through the confirmation mechanism in accordance with the procedures under subparagraph (B).

"(iv) The Commissioners shall update their information in a manner that promotes the maximum accuracy and shall provide a process for the prompt correction of erroneous information.

"(E) PROTECTIONS.—(i) In no case shall an individual be denied employment because of inaccurate or inaccessible data under the confirmation mechanism.

"(ii) The Attorney General shall assure that there is a timely and accessible process to challenge nonconfirmations made through the mechanism.

"(iii) If an individual would not have been dismissed from a job but for an error of the confirmation mechanism, the individual will be entitled to compensation through the mechanism of the Federal Tort Claims Act.

"(F) TESTER PROGRAM.—As part of the confirmation mechanism, the Attorney General shall implement a program of testers and investigative activities (similar to testing and other investigative activities assisted under the fair housing initiatives program under section 561 of the Housing and Community Development Act of 1987 to enforce rights under the Fair Housing Act) in order to monitor and prevent unlawful discrimination under the mechanism.

"(G) PROTECTION FROM LIABILITY FOR ACTIONS TAKEN ON THE BASIS OF INFORMATION PROVIDED BY THE EMPLOYMENT ELIGIBILITY CONFIRMATION MECHANISM.—No person shall be civilly or criminally liable for any action taken in good faith reliance on information provided through the employment eligibility confirmation mechanism established under this paragraph (including any pilot program established under paragraph (7)).

"(7) APPLICATION OF CONFIRMATION MECHANISM THROUGH PILOT PROJECTS.—

"(A) IN GENERAL.—Subsection (a)(3)(B) and paragraph (3) shall only apply to individuals hired if they are covered under a pilot project established under this paragraph.

"(B) UNDERTAKING PILOT PROJECTS.—For purposes of this paragraph, the Attorney General shall undertake pilot projects for all employers in at least 5 of the 7 States with the highest estimated population of unauthorized aliens, in order to test and assure that the confirmation mechanism described in paragraph (6) is reliable and easy to use. Such projects shall be initiated not later than 6 months after the date of the enactment of this paragraph. The Attorney General, however, shall not establish such mechanism in other States unless Congress so provides by law. The pilot projects shall terminate on such dates, not later than October 1, 1999, as the Attor-

61

ney General determines. At least one such pilot project shall be carried out through a nongovernmental entity as the confirmation mechanism.

"(C) REPORT.—The Attorney General shall submit to the Congress annual reports in 1997, 1998, and 1999 on the development and implementation of the confirmation mechanism under this paragraph. Such reports may include an analysis of whether the mechanism implemented—

"(i) is reliable and easy to use;

"(ii) limits job losses due to inaccurate or unavailable data to less than 1 percent;

"(iii) increases or decreases discrimination;

"(iv) protects individual privacy with appropriate policy and technological mechanisms; and

"(v) burdens individual employers with costs or additional administrative requirements.".

(c) REDUCTION OF PAPERWORK FOR CERTAIN EMPLOYEES.—Section 274A(a) (8 U.S.C. 1324a(a)) is amended by adding at the end the following new paragraph:

"(6) TREATMENT OF DOCUMENTATION FOR CERTAIN EMPLOYEES.—

"(A) IN GENERAL.—For purposes of paragraphs (1)(B) and (3), if—

"(i) an individual is a member of a collective-bargaining unit and is employed, under a collective bargaining agreement entered into between one or more employee organizations and an association of two or more employers, by an employer that is a member of such association, and

"(ii) within the period specified in subparagraph (B), another employer that is a member of the association (or an agent of such association on behalf of the employer) has complied with the requirements of subsection (b) with respect to the employment of the individual,

the subsequent employer shall be deemed to have complied with the requirements of subsection (b) with respect to the hiring of the employee and shall not be liable for civil penalties described in subsection (e)(5).

"(B) PERIOD.—The period described in this subparagraph is—

"(i) up to 5 years in the case of an individual who has presented documentation identifying the individual as a national of the United States or as an alien lawfully admitted for permanent residence; or

"(ii) up to 3 years (or, if less, the period of time that the individual is authorized to be employed in the United States) in the case of another individual.

"(C) LIABILITY.—

"(i) IN GENERAL.—If any employer that is a member of an association hires for employment in the United States an individual and relies upon the provisions of subparagraph (A) to comply with the requirements of subsection (b) and the individual is an unauthorized alien, then for the purposes of paragraph (1)(A), subject to clause (ii), the employer shall be presumed to have known at the time of hiring or afterward that the individual was an unauthorized alien.

"(ii) REBUTTAL OF PRESUMPTION.—The presumption established by clause (i) may be rebutted by the employer only through the presentation of clear and convincing evidence that the employer did not know (and could not reasonably have known) that the individual at the time of hiring or afterward was an unauthorized alien.".

(d) ELIMINATION OF DATED PROVISIONS.—Section 274A (8 U.S.C. 1324a) is amended by striking subsections (i) through (n).

(e) EFFECTIVE DATES.—

(1) Except as provided in this subsection, the amendments made by this section shall apply with respect to hiring (or recruiting or referring) occurring on or after such date (not later than 180 days after the date of the enactment of this Act) as the Attorney General shall designate.

(2) The amendments made by subsections (a)(1) and (a)(2) shall apply with respect to the hiring (or recruiting or referring) occurring on or after such date (not later than 18 months after the date of the enactment of this Act) as the Attorney General shall designate.

(3) The amendment made by subsection (c) shall apply to individuals hired on or after 60 days after the date of the enactment of this Act.

(4) The amendment made by subsection (d) shall take effect on the date of the enactment of this Act.

(5) Not later than 180 days after the date of the enactment of this Act, the Attorney General shall issue regulations which shall provide for the electronic

62

storage of forms I-9, in satisfaction of the requirements of section 274A(b)(3) of the Immigration and Nationality Act as amended by this Act.

**SEC. 404. REPORTS ON EARNINGS OF ALIENS NOT AUTHORIZED TO WORK.**

Subsection (c) of section 290 (8 U.S.C. 1360) is amended to read as follows:

"(c)(1) Not later than 3 months after the end of each fiscal year (beginning with fiscal year 1995), the Commissioner of Social Security shall report to the Committees on the Judiciary of the House of Representatives and the Senate on the aggregate number of social security account numbers issued to aliens not authorized to be employed to which earnings were reported to the Social Security Administration in such fiscal year.

"(2) If earnings are reported on or after January 1, 1996, to the Social Security Administration on a social security account number issued to an alien not authorized to work in the United States, the Commissioner of Social Security shall provide the Attorney General with information regarding the name and address of the alien, the name and address of the person reporting the earnings, and the amount of the earnings. The information shall be provided in an electronic form agreed upon by the Commissioner and the Attorney General.".

**SEC. 405. AUTHORIZING MAINTENANCE OF CERTAIN INFORMATION ON ALIENS.**

Section 264 (8 U.S.C. 1304) is amended by adding at the end the following new subsection:

"(f) Notwithstanding any other provision of law, the Attorney General is authorized to require any alien to provide the alien's social security account number for purposes of inclusion in any record of the alien maintained by the Attorney General or the Service.".

**SEC. 406. LIMITING LIABILITY FOR CERTAIN TECHNICAL VIOLATIONS OF PAPERWORK REQUIREMENTS.**

(a) IN GENERAL.—Section 274A(e)(1) (8 U.S.C. 1324a(e)(1)) is amended—

(1) by striking "and" at the end of subparagraph (C),

(2) by striking the period at the end of subparagraph (D) and inserting ", and", and

(3) by adding at the end the following new subparagraph:

"(E) under which a person or entity shall not be considered to have failed to comply with the requirements of subsection (b) based upon a technical or procedural failure to meet a requirement of such subsection in which there was a good faith attempt to comply with the requirement unless (i) the Service (or another enforcement agency) has explained to the person or entity the basis for the failure, (ii) the person or entity has been provided a period of not less than 10 business days (beginning after the date of the explanation) within which to correct the failure, and (iii) the person or entity has not corrected the failure voluntarily within such period, except that this subparagraph shall not apply with respect to the engaging by any person or entity of a pattern or practice of violations of subsection (a)(1)(A) or (a)(2).".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to failures occurring on or after the date of the enactment of this Act.

**SEC. 407. UNFAIR IMMIGRATION-RELATED EMPLOYMENT PRACTICES.**

(a) REQUIRING CERTAIN REMEDIES IN UNFAIR IMMIGRATION-RELATED DISCRIMINATION ORDERS.—Section 274B(g)(2) (8 U.S.C. 1324b(g)(2)) is amended—

(1) in subparagraph (A), by adding at the end the following: "Such order also shall require the person or entity to comply with the requirements of clauses (ii) and (vi) of subparagraph (B).";

(2) in subparagraph (B), by striking "Such an order" and inserting "Subject to the second sentence of subparagraph (A), such an order"; and

(3) in subparagraph (B)(vi), by inserting before the semicolon at the end the following: "and to certify the fact of such education".

(b) TREATMENT OF CERTAIN DOCUMENTARY PRACTICE AS EMPLOYMENT PRACTICES.—Section 274B(a)(6) (8 U.S.C. 1324b(a)(6)) is amended—

(1) by striking "For" and inserting "(A) Subject to subparagraph (B), for", and

(2) by adding at the end the following new subparagraph:

"(B) A person or other entity—

"(i) may request a document proving a renewal of employment authorization when an individual has previously submitted a time-limited document to satisfy the requirements of section 274A(b)(1); or

"(ii) if possessing reason to believe that an individual presenting a document which reasonably appears on its face to be genuine is nonetheless an

63

unauthorized alien, may (I) inform the individual of the question about the document's validity, and of such person or other entity's intention to verify the validity of such document, and (II) upon receiving confirmation that the individual is unauthorized to work, may dismiss the individual with no benefits or rights accruing on the basis of the period employed.

Nothing in this provision prohibits an individual from offering alternative documents that satisfy the requirements of section 274A(b)(1).".

(c) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to orders issued on or after the first day of the first month beginning at least 90 days after the date of the enactment of this Act.

# TITLE V—REFORM OF LEGAL IMMIGRATION SYSTEM

**SEC. 500. OVERVIEW OF NEW LEGAL IMMIGRATION SYSTEM.**

This title amends the legal immigration provisions of the Immigration and Nationality Act so as to provide for the following (beginning with fiscal year 1997):

(1) DIVISION OF IMMIGRATION AMONG 3 CATEGORIES.—There will be a worldwide level of immigration of approximately 562,000, divided among—

(A) family-sponsored immigrants, with a worldwide annual numerical limitation (after a transition) of approximately 330,000,

(B) employment-based immigrants, with a worldwide annual numerical limitation of 135,000,

(C) diversity immigrants, with a worldwide annual numerical limitation of 27,000, and

(D) humanitarian immigrants, with a worldwide annual numerical limitation (after a transition) of approximately 70,000.

Congress is required to reevaluate and reauthorize these numbers every 5 years.

(2) FAMILY-SPONSORED IMMIGRANTS.—

(A) CATEGORIES.—Family-sponsored immigrants are (i) spouses and children of citizens, (ii) spouses and children of permanent resident aliens, (iii) parents of adult United States citizens if the parents meet certain insurance requirements, and (iv) sons or daughters of United States citizens or sons or daughters of permanent resident aliens who have never been married, are childless, but for the residence requirements would qualify as dependents for Federal income tax purposes, and are at least 21 but not more than 25 years of age.

(B) NUMERICAL LIMITATIONS.—

(i) There will be no direct numerical limit on admission of spouses and children of United States citizens.

(ii) The annual numerical limit on admission of spouses and children of permanent residents will not be below 85,000.

(iii) The annual numerical limit on admission of parents of United States citizens will not be below 25,000.

(3) EMPLOYMENT-BASED IMMIGRANTS.—Employment-based immigrants will fall within the following categories and numerical limitations:

(A) EXTRAORDINARY IMMIGRANTS.—First, aliens with extraordinary ability, up to 15,000 each year.

(B) OUTSTANDING PROFESSORS AND RESEARCHERS AND MULTINATIONAL EXECUTIVES.—Second, aliens who are outstanding professors and researchers or multinational executives or managers, up to 30,000 each year, plus any left from the previous category.

(C) PROFESSIONALS WITH ADVANCED DEGREES OR EXCEPTIONAL ABILITY ALIENS.—Third, aliens who are members of the professions holding advanced degrees or who have exceptional ability, up to 30,000 each year, plus any left from the previous categories.

(D) OTHER PROFESSIONALS AND SKILLED WORKERS.—Fourth, aliens who are skilled workers with at least 4 years of training and work experience or are professionals with a baccalaureate degree and at least 2 years' experience, up to 45,000 each year, plus any left from the previous categories.

(E) INVESTORS.—Fifth, aliens who are investing at least $1,000,000 in enterprises in the United States that will employ at least 10 workers, up to 10,000 each year (with a 2-year pilot program for those investing at least $500,000 in enterprises employing at least 5 workers).

64

(F) CERTAIN SPECIAL IMMIGRANTS.—Lastly, aliens who fall within certain classes of special immigrants (such as religious ministers, aliens who have worked for the Government abroad, certain long-term alien employees of international organizations, certain dependent juveniles, and certain long-term alien members of the Armed Forces), up to 5,000 each year.

(4) DIVERSITY IMMIGRANTS.—Diversity immigrants are chosen from the 10 countries in each region with the highest demand for diversity visas by random selection.

(5) HUMANITARIAN IMMIGRANTS.—Humanitarian immigrants will fall within the following categories and numerical limitations:

(A) REFUGEES.—Refugees, subject to a numerical limitation (after a transition and excluding emergency refugees) of 50,000 or such higher number as the Congress may provide by law.

(B) ASYLEES.—Aliens seeking asylum, subject to no numerical limitation in any year. As under current law, asylees may adjust to permanent residence status at a rate of up to 10,000 each year.

(C) OTHER HUMANITARIAN IMMIGRANTS.—Other immigrants who are of special humanitarian concern to the United States, up to 10,000 each year.

(6) TRANSITION.—

(A) ADDITIONAL VISA NUMBERS FOR SPOUSES AND MINOR, UNMARRIED CHILDREN OF PERMANENT RESIDENT ALIENS.—In order to reduce the current backlog for spouses and minor, unmarried children of lawful permanent residents, there will be at least an additional 50,000 immigrant visa numbers made available for these aliens for each of 5 fiscal years, with priority for spouses and children of aliens who did not participate in a legalization program.

(B) PHASE-DOWN IN NORMAL FLOW REFUGEE NUMERICAL LIMITATION.—The annual numerical limitation on non-emergency refugees (without specific approval of Congress) will be phased down to 75,000 in fiscal year 1997 and 50,000 in fiscal year 1998 and thereafter.

## Subtitle A—Worldwide Numerical Limits

### SEC. 501. WORLDWIDE NUMERICAL LIMITATION ON FAMILY-SPONSORED IMMIGRANTS.

(a) OVERVIEW.—

(1) The amendment made by subsection (b) provides for a worldwide level of family-sponsored immigrants of 330,000 less the number of spouses and children of citizens admitted in the previous year.

(2) However, there will be no limit on spouses and children of citizens, nor would the number of visas available to spouses and children of lawful permanent residents go below 85,000, nor would the number of visas available to parents of citizens go below 25,000.

(3) Any excess in family immigration above 330,000 would come from other unused visas and, if necessary, from future visa numbers.

(4) If there are any remaining family visas, these visas would be added to the visas made available to spouses and children of lawful permanent resident aliens.

(b) AMENDMENT.—Subsection (c) of section 201 (8 U.S.C. 1151) is amended to read as follows:

"(c) WORLDWIDE LEVEL OF FAMILY-SPONSORED IMMIGRANTS.—

"(1) IN GENERAL.—Subject to the succeeding provisions of this subsection, the worldwide level of family-sponsored immigrants under this subsection (in this subsection referred to as the 'worldwide family level') for a fiscal year is 330,000.

"(2) REDUCTION FOR SPOUSES AND CHILDREN OF UNITED STATES CITIZENS AND CERTAIN OTHER FAMILY-RELATED IMMIGRANTS.—The worldwide family level for a fiscal year shall be reduced (but not below a number sufficient to provide for the minimum visa numbers described in paragraph 4)) by the number of aliens described in subsection (b)(2) who were issued immigrant visas or who otherwise acquired the status of aliens lawfully admitted to the United States for permanent residence in the previous fiscal year.

"(3) FURTHER REDUCTION FOR ANY PREVIOUS EXCESS FAMILY IMMIGRATION.—

"(A) IN GENERAL.—If there are excess family admissions in a particular fiscal year (as determined under subparagraph (B)) beginning with fiscal year 1997, then for the following fiscal year the worldwide family level shall be reduced (but not below a number sufficient to provide for the minimum

65

visa numbers described in paragraph (4)) by the net number of excess admissions in that particular fiscal year (as defined in subparagraph (C)).

"(B) DETERMINATION OF EXCESS FAMILY ADMISSIONS.—For purposes of subparagraph (A), there are excess family admissions in a fiscal year if—

"(i) the number of aliens who are issued immigrant visas or who otherwise acquire the status of aliens lawfully admitted to the United States for permanent residence under section 203(a) or subsection (b)(2) in a fiscal year, exceeds

"(ii) 330,000, less the carryforward number of excess admissions for the previous fiscal year (as defined in subparagraph (D)).

For purposes of this subparagraph, immigrant visa numbers issued under section 553 of the Immigration in the National Interest Act of 1995 (relating to certain transition immigrants) shall not be counted under clause (i).

"(C) NET NUMBER OF EXCESS ADMISSIONS.—For purposes of subparagraph (A), the 'net number of excess admissions' for a fiscal year is—

"(i) the excess described in subparagraph (B) for the fiscal year, reduced (but not below zero) by

"(ii) the number (if any) by which the worldwide level under subsection (d) for the previous fiscal year exceeds the number of immigrants who are issued immigrant visas or who otherwise acquire the status of aliens lawfully admitted to the United States for permanent residence under section 203(b) in that previous fiscal year.

"(D) CARRYFORWARD NUMBER OF EXCESS ADMISSIONS.—For purposes of subparagraph (B)(ii), the carryforward number of excess admissions for a particular fiscal year is the net number of excess admissions for the previous fiscal year (as defined in subparagraph (C)), reduced by the reductions effected under subparagraph (A) and paragraph (5) in visa numbers for the particular fiscal year.

"(4) NO REDUCTION IN NUMBER OF SPOUSES AND CHILDREN OF LAWFUL PERMANENT RESIDENTS OR PARENTS OF UNITED STATES CITIZENS.—

"(A) SPOUSES AND CHILDREN OF LAWFUL PERMANENT RESIDENTS.—Any reductions in the worldwide family level for a fiscal year under paragraph (2) or (3) shall not reduce the number of visas available to spouses and children of lawful permanent residents below 85,000.

"(B) PARENTS OF UNITED STATES CITIZENS.—Any reductions in the worldwide family level for a fiscal year under paragraph (2) or (3) shall not reduce the number of visas available to parents of United States citizens below 25,000.

"(5) ADJUSTMENT IN CERTAIN EMPLOYMENT-BASED VISA NUMBERS IN CASE OF REMAINING EXCESS FAMILY ADMISSIONS.—

"(A) IN GENERAL.—If there is a remaining excess number of family admissions (as described in subparagraph (B)) in a fiscal year (beginning with fiscal year 1997) that is greater than zero, then for the following fiscal year there shall be reductions in immigrant visa numbers made available under subsection (d) and section 203(b)(4) by the lesser of—

"(i) the remaining excess number of family admissions (described in subparagraph (B)), or

"(ii) ½ of the maximum number of visa numbers that could (but for this paragraph) otherwise be made available under section 203(b)(5) in such following fiscal year.

"(B) REMAINING EXCESS NUMBER OF FAMILY ADMISSIONS DESCRIBED.—For purposes of subparagraph (A), the 'remaining excess number of family admissions' in a fiscal year is the net number of excess admissions for the fiscal year (as defined in paragraph (3)(C)), reduced by the reduction (if any) effected under paragraph (3) in visa numbers for the succeeding fiscal year.".

**SEC. 502. WORLDWIDE NUMERICAL LIMITATION ON EMPLOYMENT-BASED IMMIGRANTS.**

Subsection (d) of section 201 (8 U.S.C. 1151) is amended to read as follows:

"(d) WORLDWIDE LEVEL OF EMPLOYMENT-BASED IMMIGRANTS.—The worldwide level of employment-based immigrants under this subsection for a fiscal year is—

"(1) 135,000, minus

"(2) beginning with fiscal year 1998, the total of the reductions (if any) in visa numbers under section 203(a)(3)(C) made for the fiscal year pursuant to subsection (c)(5) and in visa numbers under this subsection for the fiscal year pursuant to section 203(a)(3)(B)(ii)(II).".

**SEC. 503. WORLDWIDE NUMERICAL LIMITATION ON DIVERSITY IMMIGRANTS.**

Subsection (e) of section 201 (8 U.S.C. 1151) is amended to read as follows:

66

"(e) Worldwide Level of Diversity Immigrants.—The worldwide level of diversity immigrants is equal to 27,000 for each fiscal year.".

SEC. 504. ESTABLISHMENT OF NUMERICAL LIMITATION ON HUMANITARIAN IMMIGRANTS.

(a) In General.—Section 201 (8 U.S.C. 1151) is amended—

(1) in subsection (a)—

(A) by striking "and" at the end of paragraph (2),

(B) by striking the period at the end of paragraph (3) and inserting "; and", and

(C) by adding at the end the following new paragraph:

"(4) for fiscal years beginning with fiscal year 1997, humanitarian immigrants described in section 203(e) (or who are admitted under section 211(a) on the basis of a prior issuance of a visa to their accompanying parent under section 203(e)) in a number not to exceed in any fiscal year the number specified in subsection (f) for that year, and not to exceed in any of the first 3 quarters of any fiscal year 27 percent of the worldwide level under such subsection for all of such fiscal year."; and

(2) by adding at the end the following new subsection:

"(f) Worldwide Level of Humanitarian Immigrants.—

"(1) In general.—Subject to the succeeding provisions of this subsection, the worldwide level of humanitarian immigrants (in this subsection referred to as the 'worldwide humanitarian level') under this subsection for a fiscal year is equal to 70,000.

"(2) Reduction for humanitarian immigrants who are refugees or asylees.—The worldwide humanitarian level for a fiscal year shall be reduced by the sum of—

"(A) 50,000, or, if less, the number of aliens who were admitted as refugees under section 207 in the previous fiscal year, and

"(B) the number of aliens who had been granted asylum whose status was adjusted in the previous fiscal year under section 209(b).

"(3) Reduction for prior year cancellation of removal and registry.—The worldwide humanitarian level for a fiscal year shall be further reduced by the sum of—

"(A) the number of aliens whose removal was canceled and who were provided lawful permanent resident status in the previous fiscal year under section 240A, and

"(B) the number of aliens who were provided permanent resident status in the previous fiscal year under section 249.

"(4) Limitation.—In no case shall the worldwide humanitarian level for a fiscal year (taking into account any reductions under paragraphs (2) and (3)) exceed 10,000.".

(b) Transition.—In determining the worldwide humanitarian level under section 201(f) of the Immigration and Nationality Act for fiscal year 1997, the reference in paragraph (3)(A) of such section to 'section 240A' is deemed a reference to 'section 244(a)'.

SEC. 505. REQUIRING CONGRESSIONAL REVIEW AND REAUTHORIZATION OF WORLDWIDE LEVELS EVERY 5 YEARS.

Section 201 (8 U.S.C. 1151) is further amended by adding at the end the following new subsection:

"(g) Requirement for Periodic Review and Reauthorization of Worldwide Levels.—

"(1) Congressional review.—The Committees on the Judiciary of the House of Representatives and of the Senate shall undertake during fiscal year 2004 (and each fifth fiscal year thereafter) a thorough review of the appropriate worldwide levels of immigration to be provided under this section during the 5-fiscal-year period beginning with the second subsequent fiscal year.

"(2) Congressional reauthorization.—The Congress, after consideration of the reviews under paragraph (1) and by amendment to this section, shall specify the appropriate worldwide levels of immigration to be provided under this section during the 5-fiscal-year period beginning with the second subsequent fiscal year.

"(3) Sunset in absence of reauthorization.—The worldwide levels specified under the previous provisions of this section are applicable only to fiscal years 1997 through 2005. Immigrant visa numbers for fiscal years after fiscal year 2005 that are subject to such levels are only authorized to the extent provided by amendment under paragraph (2) made to this section.".

67

# Subtitle B—Changes in Preference System

**SEC. 511. LIMITATION OF IMMEDIATE RELATIVES TO SPOUSES AND CHILDREN.**

(a) RECLASSIFICATION.—Section 201(b)(2)(A) (8 U.S.C. 1151(b)(2)(A)) is amended—

(1) in clause (i)—

(A) by striking "IMMEDIATE RELATIVES.—" and all that follows through the end of the first sentence and inserting "An alien who is a spouse or child of a citizen of the United States.", and

(B) in the second sentence, by striking "an immediate relative" and inserting "a spouse of a citizen of the United States"; and

(2) in clause (ii), by striking "such an immediate relative" and inserting "a spouse of a citizen of the United States".

(b) PROTECTION OF CERTAIN CHILDREN FROM AGING OUT OF PREFERENCE STATUS.—

(1) IN GENERAL.—Section 204 (8 U.S.C. 1154) is amended by adding at the end the following new subsection:

"(i) For purposes of applying section 101(b)(1) in the case of issuance of an immigrant visa to, or admission or adjustment of status of, an alien under section 201(b)(2)(A), section 203(a)(1), or 203(e) as a child of a citizen of the United States or a permanent resident alien, the age of the alien shall be determined as of the date of the filing of the classification petition under section 204(a)(1) as such a child of a citizen of the United States or a permanent resident alien.".

(2) EFFECTIVE DATE.—The amendment made by paragraph (1) shall apply to immigrant visas issued on or after October 1, 1996.

**SEC. 512. CHANGE IN FAMILY-SPONSORED CLASSIFICATION.**

(a) IN GENERAL.—Section 203(a) (8 U.S.C. 1153(a)) is amended by striking paragraphs (1) through (4) and inserting the following:

"(1) SPOUSES AND CHILDREN OF LAWFUL PERMANENT RESIDENT ALIENS.—Immigrants who are the spouses and children of an alien lawfully admitted for permanent residence shall be allocated visas in a number not to exceed 85,000, plus any immigrant visas not used under paragraphs (2) and (3).

"(2) PARENTS OF UNITED STATES CITIZENS.—

"(A) IN GENERAL.—Immigrants who are the parents of an individual who is at least 21 years of age and a citizen of the United States shall be allocated visas in a number, which is not less than 25,000 and does not exceed the lesser of—

"(i) 45,000, or

"(ii) the number by which the worldwide level exceeds 85,000.

"(B) REFERENCE TO INSURANCE REQUIREMENT.—For requirement relating to insurance for parents, see section 212(a)(4)(D).

"(3) ADULT SONS AND DAUGHTERS.—

"(A) IN GENERAL.—Immigrants who are the qualifying adult sons or daughters (as defined in subparagraph (C)) of an individual who is (i) at least 21 years of age and (ii) either a citizen of the United States or an alien lawfully admitted for permanent residence shall be allocated visas according to the levels established in subparagraph (B).

"(B) ALLOCATION OF VISAS TO ADULT SONS AND DAUGHTERS OF UNITED STATES CITIZENS AND PERMANENT RESIDENT ALIENS.—

"(i) IN GENERAL.—Subject to clause (ii), any remaining visas shall be allocated under this paragraph in a number not to exceed the lesser of—

"(I) 5,000, or

"(II) the number by which the worldwide level exceeds the sum of 85,000 and the number of immigrant visas used under paragraph (2).

"(ii) ALLOCATION OF ADDITIONAL VISA NUMBERS.—

"(I) IN GENERAL.—If the demand for visa numbers under this paragraph exceeds the number (if any) available under clause (i) in any fiscal year, an additional number of visas shall be made available under this paragraph, but not to exceed 5,000 additional visas numbers in any fiscal year.

"(II) OFFSETTING REDUCTION IN THE LEVELS OF EMPLOYMENT-BASED VISAS.—If an additional number of visa numbers are made available under subclause (I) in a fiscal year, the number of visas made available under section 201(a)(2) and paragraphs (1) through (6) of subsection (b) in the fiscal year shall be reduced by a number

68

equal to such additional number reduced by the amount (if any) by which 110,000 exceeds the number of immigrant visas used under paragraphs (1) and (2) of this subsection in the fiscal year. The reduction under each such paragraph of subsection (b) shall be in the same proportion to the total reduction as the ratio of the numerical limitation under each such paragraph specified under such subsection to the worldwide level of employment-based immigrants (as specified in section 201(d)).

"(C) QUALIFICATIONS.—For purposes of this paragraph, the term 'qualifying adult son or daughter' means an immigrant who, as of the date of approval of the classification petition under section 204(a)(1)—

"(i) is at least 21, but not more than 25 years of age,

"(ii) has never been married,

"(iii) is childless, and

"(iv) would qualify as a dependent of the petitioning individual for Federal income tax purposes, except that the immigrant does not meet the residence requirements.

"(D) THREE-YEAR CONDITIONAL REQUIREMENT.—

"(i) CONDITIONAL BASIS FOR STATUS.—Notwithstanding any other provision of this Act, an alien provided lawful permanent residence status on the basis of being a qualifying adult son or daughter shall be considered, at the time of obtaining the status of an alien lawfully admitted for permanent residence, to have obtained such status on a conditional basis subject to the provisions of this subparagraph.

"(ii) REQUIREMENTS OF NOTICE AND PETITIONING FOR REMOVAL OF CONDITIONAL STATUS.—The Attorney General shall establish, by regulation, procedures which incorporate the requirements of notice and petitioning for removal of conditional status similar to the requirements for removal of conditional status under section 216A.

"(iii) TERMINATION OF STATUS.—In the case of an alien with permanent resident status on a conditional basis under clause (i), the alien must demonstrate that the alien met the qualifications set forth in subparagraph (C) as of the date of approval of the classification petition under section 204(a). In the absence of such a demonstration by the alien, the alien's status shall be terminated.

"(iv) SPECIAL RULE.—In applying section 216A under this subparagraph, any reference to the 'second' anniversary in such section is deemed a reference to the 'third' anniversary.".

(b) INSURANCE REQUIREMENT.—Section 212(a)(4) (8 U.S.C. 1182(a)(4)), as amended by section 621(a), is amended by adding at the end the following new subparagraph:

"(D) INSURANCE REQUIREMENTS FOR PARENTS.—

"(i) IN GENERAL.—Any alien who seeks admission as a parent under section 203(a)(2) is inadmissible unless the alien demonstrates at the time of issuance of the visa (and at the time of admission) to the satisfaction of the consular officer and the Attorney General that the alien—

"(I) will have coverage under an adequate health insurance policy (at least comparable to coverage provided under the medicare program under title XVIII of the Social Security Act), and

"(II) will have coverage with respect to long-term health needs (at least comparable to such coverage provided under the medicaid program under title XIX of such Act for the State in which either the alien intends to reside or in which the petitioner, on behalf of the alien under section 204(a)(1), resides),

throughout the period the individual is residing in the United States.

"(ii) FACTORS TO BE TAKEN INTO ACCOUNT.—In making a determination under clause (i), the Attorney General shall take into account the age of the parent and the likelihood of the parent securing health insurance coverage through employment.".

**SEC. 513. CHANGE IN EMPLOYMENT-BASED CLASSIFICATION.**

(a) IN GENERAL.—Section 203(b) (8 U.S.C. 1153(b)) is amended—

(1) by redesignating paragraph (6) as paragraph (7);

(2) by striking paragraphs (1) through (5) and inserting the following:

"(1) ALIENS WITH EXTRAORDINARY ABILITY.—Visas shall first be made available in a number not to exceed 15,000 of such worldwide level to immigrants—

"(A) who have extraordinary ability in the sciences, arts, education, business, or athletics which has been demonstrated by sustained national or

international acclaim and whose achievements have been recognized in the field through sufficient documentation,

"(B) who seek to be admitted into the United States to continue work in the area of extraordinary ability, and

"(C) whose admission into the United States will substantially benefit prospectively the United States.

"(2) ALIENS WHO ARE OUTSTANDING PROFESSORS AND RESEARCHERS OR MULTINATIONAL EXECUTIVES AND MANAGERS.—

"(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 30,000 of such worldwide level, plus any visas not required for the class specified in paragraph (1), to immigrants who are aliens described in subparagraph (B) or (C).

"(B) OUTSTANDING PROFESSORS AND RESEARCHERS.—An alien is described in this subparagraph if—

"(i) the alien is recognized internationally as outstanding in a specific academic area,

"(ii) the alien has at least 3 years of experience in teaching or research in the academic area, and

"(iii) the alien seeks to enter the United States—

"(I) for a tenured position (or tenure-track position) within a university or institution of higher education to teach in the academic area,

"(II) for a comparable position with a university or institution of higher education to conduct research in the area, or

"(III) for a comparable position to conduct research in the area with a department, division, or institute of a private employer, if the department, division, or institute employs at least 3 persons full-time in research activities and has achieved documented accomplishments in an academic field.

"(C) CERTAIN MULTINATIONAL EXECUTIVES AND MANAGERS.—An alien is described in this subparagraph if the alien, in the 3 years preceding the time of the alien's application for classification and admission into the United States under this subparagraph, has been employed for at least 1 year by a firm or corporation or other legal entity or an affiliate or subsidiary thereof and the alien seeks to enter the United States in order to continue to render services to the same employer or to a subsidiary or affiliate thereof in a capacity that is managerial or executive.

"(3) ALIENS WHO ARE MEMBERS OF THE PROFESSIONS HOLDING ADVANCED DEGREES OR ALIENS OF EXCEPTIONAL ABILITY.—

"(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 30,000 of such worldwide level, plus any visas not required for the classes specified in paragraphs (1) and (2), to immigrants who are aliens described in subparagraph (B).

"(B) ALIENS WHO ARE MEMBERS OF THE PROFESSIONS HOLDING ADVANCED DEGREES OR ALIENS OF EXCEPTIONAL ABILITY.—

"(i) IN GENERAL.—An alien is described in this subparagraph if the alien is a member of a profession holding an advanced degree or its equivalent or who because of exceptional ability in the sciences, arts, or business will substantially benefit prospectively the national economy, cultural or educational interests, or welfare of the United States, and whose services in the sciences, arts, professions, or business are sought by an employer in the United States.

"(ii) DETERMINATION OF EXCEPTIONAL ABILITY.—In determining under clause (i) whether an immigrant has exceptional ability, the possession of a degree, diploma, certificate, or similar award from a college, university, school, or other institution of learning or a license to practice or certification for a particular profession or occupation shall not by itself be considered sufficient evidence of such exceptional ability.

"(iii) LABOR CERTIFICATION REQUIRED.—An immigrant visa may not be issued to an immigrant under this subparagraph until the consular officer is in receipt of a determination made by the Secretary of Labor pursuant to the provisions of section 212(a)(5)(A).

"(iv) NATIONAL INTEREST WAIVER.—The Attorney General may waive the requirement under clause (iii) and the requirement under clause (i) that an alien's services be sought by an employer in the United States only if—

"(I) such a waiver is necessary to substantially benefit—

"(aa) the national security, national defense, or Federal, State, or local law enforcement;

"(bb) health care, housing, or educational opportunities for an indigent or low-income population or in an underserved geographical area;

"(cc) economic or employment opportunities for a specific industry or a specific geographical area;

"(dd) the development of new technologies; or

"(ee) environmental protection or the productive use of natural resources, and

"(II) the alien will engage in a specific undertaking to advance one or more of the interests under subclause (I).

"(4) SKILLED WORKERS AND PROFESSIONALS.—

"(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 45,000 of such worldwide level, plus any visas not required for the classes specified in paragraphs (1) through (3) to immigrants who are described in subparagraph (B) or (C).

"(B) SKILLED WORKERS.—An alien described in this subparagraph is an immigrant who is capable, at the time a petition is filed, of performing skilled labor (requiring at least 2 years of training or experience), not of a temporary or seasonal nature, for which qualified workers are not available in the United States, and who has a total of 4 years of training or experience (or both) with respect to such labor.

"(C) PROFESSIONALS.—

"(i) IN GENERAL.—An alien described in this subparagraph is an immigrant who holds a baccalaureate degree and is a member of the professions and, subject to clause (ii), has at least 2 years of experience in the profession after the receipt of the degree.

"(ii) SPECIAL RULE FOR LANGUAGE TEACHERS.—An alien who is a teacher and has (within the previous 5 years) at least 2 years of experience teaching a language (other than English) full-time at an accredited elementary or middle school may be classified and admitted as a professional under this subparagraph if the alien is seeking admission to teach such language full-time in an accredited elementary or middle school.

"(D) LABOR CERTIFICATION REQUIRED.—An immigrant visa may not be issued to an immigrant under this paragraph until the consular officer is in receipt of a determination made by the Secretary of Labor pursuant to the provisions of section 212(a)(5)(A).

"(E) EXPERIENCE REQUIREMENT.—Any period of experience acquired as a nonimmigrant under section 101(a)(15)(E), 101(a)(15)(H)(i), or 101(a)(15)(L) may be used to fulfill a requirement for experience under this paragraph.

"(5) INVESTORS IN JOB CREATION.—

"(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 10,000 of such worldwide level less the reduction in visa numbers under this paragraph required to be effected under section 201(c)(5)(A) for the fiscal year involved, to immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise—

"(i) which the alien has established,

"(ii) in which the alien has invested (after the date of the enactment of the Immigration Act of 1990), or is actively in the process of investing, capital in an amount not less $1,000,000, and

"(iii) which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens or aliens lawfully admitted for permanent residence or other immigrants lawfully authorized to be employed in the United States (other than the immigrant and the immigrant's spouse, sons, or daughters).

"(B) PILOT PROGRAM.—For each of fiscal years 1997 and 1998, up to 2,000 visas otherwise made available under this paragraph shall be made available to immigrants who would be described in subparagraph (A) if '$500,000' were substituted for '$1,000,000' in subparagraph (A)(ii) and if 'for not fewer than 5' were substituted for 'for not fewer than 10' in subparagraph (A)(iii). By not later than April 1, 1998, the Attorney General shall submit to Congress a report on the operation of this subparagraph and shall include in the report information describing the immigrants admitted under this paragraph and the enterprises they invest in and a recommendation on whether the pilot program under this subparagraph should be continued or modified.

71

"(6) CERTAIN SPECIAL IMMIGRANTS.—Visas shall be made available, in a number not to exceed 5,000 of such worldwide level, to qualified special immigrants described in section 101(a)(27) (other than those described in subparagraph (A) thereof), of which not more than 4,000 may be made available in any fiscal year to special immigrants described in subclause (II) or (III) of section 101(a)(27)(C)(ii)."; and

(3) by adding at the end the following new paragraph:

"(8) NOT COUNTING WORK EXPERIENCE AS AN UNAUTHORIZED ALIEN.—For purposes of this subsection, work experience obtained in employment in the United States with respect to which the alien was an unauthorized alien (as defined in section 274A(h)(3)) shall not be taken into account.".

(b) CONDITIONAL STATUS FOR CERTAIN FOREIGN LANGUAGE TEACHERS.—

(1) IN GENERAL.—Title II is amended by inserting after section 216A the following new section:

"CONDITIONAL PERMANENT RESIDENT STATUS FOR CERTAIN FOREIGN LANGUAGE TEACHERS

"SEC. 216B. (a) IN GENERAL.—Subject to the succeeding provisions of this section, section 216A shall apply to an alien foreign language teacher (as defined in subsection (d)(1)) and to an alien spouse or alien child (as defined in subsection (d)(2)) in the same manner as such section applies to an alien entrepreneur and an alien spouse or alien child.

"(b) TIMING FOR PETITION.—

"(1) IN GENERAL.—In applying section 216A under subsection (a), any reference to a 'second anniversary of an alien's lawful admission for permanent residence' is deemed a reference to the end of the time period described in paragraph (2).

"(2) TIME PERIOD FOR DETERMINATION.—The time period described in this paragraph is 5 years less the period of experience, during the 5-year period ending on the date the alien foreign language teacher obtains permanent resident status, of teaching a language (other than English) full-time at an accredited elementary or middle school.

"(c) REQUIREMENT FOR TOTAL OF 5 YEARS' TEACHING EXPERIENCE.—In applying section 216A under subsection (a), the determination of the Attorney General under section 216A(b)(1) shall be whether (and the facts and information under section 216A(d)(1) shall demonstrate that) the alien has been employed on a substantially full-time basis as a foreign language teacher at an accredited elementary or middle school in the United States during the period since obtaining permanent residence status (instead of the determinations described in section 216A(b)(1) and of the facts and information described in section 216A(d)(1)).

"(d) DEFINITIONS.—In this section:

"(1) The term 'alien foreign language teacher' means an alien who obtains the status of an alien lawfully admitted for permanent residence (whether on a conditional basis or otherwise) under section 203(b)(4)(C)(ii) on the basis of less than 5 years' teaching experience.

"(2) The term 'alien spouse' and the term 'alien child' mean an alien who obtains the status of an alien lawfully admitted for permanent residence (whether on a conditional basis or otherwise) by virtue of being the spouse or child, respectively, of an alien foreign language teacher.".

(2) CLERICAL AMENDMENT.—The table of contents is amended by inserting after the item relating to section 216A the following:

"Sec. 216B. Conditional permanent resident status for certain foreign language teachers.".

**SEC. 514. CHANGES IN DIVERSITY IMMIGRANT PROGRAM.**

(a) APPLICATION ONLY TO 10 COUNTRIES WITH HIGHEST REGISTRANTS.—Section 203(c) (8 U.S.C. 1153(c)) is amended—

(1) in paragraph (1)(B)(ii), by striking "and" at the end of subclause (I), by striking the period at the end of subclause (II) and inserting ", and", and by adding at the end the following new subclause:

"(III) within each region, the 10 foreign states which had the highest number of registrants for the diversity immigrant program under this subsection for the period beginning October 1, 1994, and ending September 30, 1996, and which are not high-admission states."; and

(2) by adding at the end of paragraph (1)(E) the following new clause:

72

"(vi) TEN STATES ELIGIBLE IN EACH REGION.—Only natives of the 10 states identified for each region in subparagraph (B)(ii)(III) are eligible for diversity visas.".

(b) CHANGE IN DEFINITION OF REGION.—Section 203(c)(1)(F) (8 U.S.C. 1153(c)(1)(F)) is amended—

(1) by striking "Northern Ireland shall be treated as a separate foreign state,",

(2) by striking the comma after "foreign state",

(3) in clause (iv), by striking "(other than Mexico)",

(4) in clause (vi), by striking "Mexico,".

(c) ESTABLISHING JOB OFFER REQUIREMENT.—Paragraph (2) of section 203(c) (8 U.S.C. 1153(c)) is amended to read as follows:

"(2) REQUIREMENT OF JOB OFFER AND EDUCATION OR SKILLED WORKER.—An alien is not eligible for a visa under this subsection unless the alien—

"(A) has a job offer in the United States which has been verified;

"(B) has at least a high school education or its equivalent; and

"(C) has at least 2 years of work experience in an occupation which requires at least 2 years of training.".

(d) ADDITIONAL PROVISIONS.—Section 203(c) (8 U.S.C. 1153) is further amended by adding at the end the following new paragraphs:

"(4) FEES.—Fees for the furnishing and verification of applications for visas under this subsection and for the issuance of visas under this subsection may be prescribed by the Secretary of State in such amounts as are adequate to compensate the Department of State for the costs of administering the diversity immigrant program. Any such fees collected may be deposited as an offsetting collection to the appropriate Department of State appropriation to recover the costs of such program and shall remain available for obligation until expended.

"(5) INELIGIBILITY OF ALIENS UNLAWFULLY PRESENT IN THE UNITED STATES.— An alien who is unlawfully present in the United States at the time of filing of an application, within 5 years prior to the filing of such application, or at any time subsequent to the filing of the application is ineligible for a visa under this subsection.".

**SEC. 515. AUTHORIZATION TO REQUIRE PERIODIC CONFIRMATION OF CLASSIFICATION PETITIONS.**

(a) IN GENERAL.—Section 204(b) (8 U.S.C. 1154(b)) is amended by inserting "(1)" after "(b)" and by adding at the end the following new paragraph:

"(2)(A) The Attorney General may provide that a petition approved with respect to an alien (and the priority date established with respect to the petition) shall expire after a period (specified by the Attorney General and of not less than 2 years) following the date of approval of the petition, unless the petitioner files with the Attorney General a form described in subparagraph (B).

"(B) The Attorney General shall specify the form to be used under this paragraph. Such form shall be designed—

"(i) to reconfirm the continued intention of the petitioner to seek admission of the alien based on the classification involved, and

"(ii) as may be provided by the Attorney General, to update the contents of the original classification petition.

"(C) The Attorney General may apply subparagraph (A) to one or more classes of classification petitions and for different periods of time for different classes of such petitions, as specified by the Attorney General.".

(b) EFFECTIVE DATE.—(1) Except as provided in paragraph (2), the amendments made by subsection (a) shall not apply to classification petitions filed before October 1, 1996.

(2) The Attorney General may apply such amendments to such classification petitions, but only in a manner so that no such petition expires under such amendments before October 1, 2000.

**SEC. 516. CHANGES IN SPECIAL IMMIGRANT STATUS.**

(a) REPEALING CERTAIN OBSOLETE PROVISIONS.—Section 101(a)(27) (8 U.S.C. 1101(a)(27)) is amended by striking subparagraphs (B), (E), (F), (G), and (H).

(b) SPECIAL IMMIGRANT STATUS FOR CERTAIN NATO CIVILIAN EMPLOYEES.—Section 101(a)(27) (8 U.S.C. 1101(a)(27)) is further amended—

(1) by striking "or" at the end of subparagraph (J),

(2) by striking the period at the end of subparagraph (K) and inserting "; or", and

(3) by adding at the end the following new subparagraph:

"(L) an immigrant who would be described in clause (i), (ii), (iii), or (iv) of subparagraph (I) if any reference in such a clause—

73

"(i) to an international organization described in paragraph (15)(G)(i) were treated as a reference to the North American Treaty Organization (NATO);

"(ii) to a nonimmigrant under paragraph (15)(G)(iv) were treated as a reference to a nonimmigrant classifiable under NATO–6 (as a member of a civilian component accompanying a force entering in accordance with the provisions of the NATO Status-of-Forces Agreement, a member of a civilian component attached to or employed by an Allied Headquarters under the 'Protocol on the Status of International Military Headquarters' set up pursuant to the North Atlantic Treaty, or as a dependent); and

"(iii) to the Immigration Technical Corrections Act of 1988 or to the Immigration and Nationality Technical Corrections Act of 1994 were a reference to the Immigration in the National Interest Act of 1995.".

(c) CONFORMING NONIMMIGRANT STATUS FOR CERTAIN PARENTS OF SPECIAL IMMIGRANT CHILDREN.—Section 101(a)(15)(N) (8 U.S.C. 1101(a)(15)(N)) is amended—

(1) by inserting "(or under analogous authority under paragraph (27)(L))" after "(27)(I)(i)", and

(2) by inserting "(or under analogous authority under paragraph (27)(L))" after "(27)(I)".

(d) EXTENSION OF SUNSET FOR RELIGIOUS WORKERS.—Section 101(a)(27)(C)(ii) (8 U.S.C. 1101(a)(27)(C)(ii)) is amended by striking "1997" and inserting "2005" each place it appears.

(e) ADDITIONAL CONFORMING AMENDMENTS.—

(1) Section 201(b)(1)(A) (8 U.S.C. 1151(b)(1)(A)) is amended by striking "or (B)".

(2) Section 203(b)(4) (8 U.S.C. 1153(b)(4)) is amended by striking "or (B)".

(3) Section 214(l)(3) (8 U.S.C. 1184(l)(3)), as redesignated by section 851(a)(3)(A), is amended by striking ", who has not otherwise been accorded status under section 101(a)(27)(H),".

(4) Section 245(c)(2) (8 U.S.C. 1255(c)(2)) is amended by striking "101(a)(27)(H), (I)," and inserting "101(a)(27)(I),".

(f) EFFECTIVE DATES.—(1) Except as provided in this section, the amendments made by this section shall take effect on the date of the enactment of this Act.

(2) The amendments made by subsection (a) shall not apply to any alien with respect to whom an application for special immigrant status under a subparagraph repealed by such amendments has been filed by not later than September 30, 1996.

**SEC. 517. REQUIREMENTS FOR REMOVAL OF CONDITIONAL STATUS OF ENTREPRENEURS.**

(a) IN GENERAL.—Section 216A(b) (8 U.S.C. 1186b(b)) is amended—

(1) by amending clause (ii) of paragraph (1)(B) to read as follows:

"(ii) subject to paragraph (3), the alien did not invest (and maintain investment of) the requisite capital, or did not employ the requisite number of employees, throughout substantially the entire period since the alien's admission; or", and

(2) by adding at the end the following new paragraph:

"(3) EXCEPTIONS.—

"(A) GOOD FAITH EXCEPTION.—Paragraph (1)(B)(ii) shall not apply to an alien to the extent that the alien continues to attempt in good faith throughout the period since admission to invest (and maintain investment of) the requisite capital, and to employ the requisite number of employees, but was unable to do so due to circumstances for which the alien should not justly be held responsible.

"(B) EXTENSION.—In the case of an alien to whom the exception under subparagraph (A) applies, the application period under subsection (d)(2) (and period for termination under paragraph (1)) shall be extended (for up to 3 additional years) by such additional period as may be necessary to enable the alien to have had the requisite capital and number of employees throughout a 2-year period. Such extension shall terminate at any time at which the Attorney General finds that the alien has not continued to attempt in good faith to invest such capital and employ such employees.".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall apply to aliens admitted on or after the date of the enactment of this Act.

**SEC. 518. ADULT DISABLED CHILDREN.**

Section 101(b)(1) (8 U.S.C. 1101(b)(1)) is amended—

(1) in subparagraph (E) by striking "or" at the end,

(2) in subparagraph (F) by striking the period at the end and inserting "; or", and

(3) by adding at the end the following new subparagraph:

74

"(G) a child of a citizen or national of the United States or lawful permanent resident alien, regardless of age, who has never been married, and who has a severe mental or physical impairment, or combination of mental or physical impairments, which—

"(i) is likely to continue indefinitely; and

"(ii) causes substantially total inability to perform functions necessary for independent living, including but not necessarily limited to 3 or more of the following areas of major life activity—

"(I) self-care,

"(II) interpersonal communication,

"(III) learning,

"(IV) mobility, and

"(V) self-direction:

*Provided,* That no child may be considered to be a child within the meaning of this subparagraph on the basis, in whole or in part, of any physical or mental impairment that is not being ameliorated through medical treatment to the maximum extent reasonably possible given the ability and resources of such child and the citizen, national, or lawful permanent resident alien who is the child's parent.".

**SEC. 519. MISCELLANEOUS CONFORMING AMENDMENTS.**

(a) CONFORMING AMENDMENTS RELATING TO IMMEDIATE RELATIVES.—

(1) Section 101(b)(1)(F) (8 U.S.C. 1101(b)(1)(F)) is amended by striking "as an immediate relative under section 201(b)" and inserting "as a child of a citizen of the United States".

(2) Section 204 (8 U.S.C. 1154) is amended—

(A) in subsection (a)(1)(A)(i), by striking "to an immediate relative status" and inserting "to status as the spouse or child of a citizen of the United States";

(B) in subsection (a)(1)(A)(iii), by striking "as an immediate relative" and inserting "as the spouse of a citizen of the United States";

(C) in subsection (a)(1)(iv), by striking "as an immediate relative" and inserting "as a child of a citizen of the United States";

(D) in subsection (b), by striking "an immediate relative specified in section 201(b)" and inserting "a spouse or child of a citizen of the United States under section 201(b)";

(E) in subsection (c), by striking "an immediate relative or preference" and inserting "a preferential";

(F) in subsection (e)—

(i) by striking "an immediate relative" and inserting "a spouse or child of a citizen of the United States", and

(ii) by striking "his" and "he" and inserting "the alien's" and "the alien", respectively; and

(G) in subsection (g), by striking "immediate relative status" and inserting "status as a spouse or child of a citizen of the United States or other".

(3) Section 212(a)(6)(E)(ii) (8 U.S.C. 1182(a)(6)(E)(ii)) is amended by striking "an immediate relative" and inserting "a spouse, child, or parent of a citizen of the United States".

(4) Section 212(d)(11) (8 U.S.C. 1182(d)(11)) is amended by striking "an immediate relative" and inserting "a spouse or child of a citizen of the United States".

(5) Section 216(g)(1)(A) (8 U.S.C. 1186a(g)(1)(A)) is amended by striking "an immediate relative (described in section 201(b)) as the spouse of a citizen of the United States" and inserting "the spouse of a citizen of the United States (described in section 201(b))".

(6) Section 221(a) (8 U.S.C. 1201(a)) is amended by striking ", immediate relative,".

(7)(A) Section 224 (8 U.S.C. 1204) is amended—

(i) by amending the heading to read as follows:

"VISAS FOR SPOUSES AND CHILDREN OF CITIZENS AND SPECIAL IMMIGRANTS",

(ii) by striking "immediate relative" the first place it appears and inserting "a spouse or child of a citizen of the United States", and

(iii) by striking "immediate relative status" and inserting "status or status as a spouse or child of a citizen of the United States".

(B) The item in the table of contents relating to section 224 is amended to read as follows:

"Sec. 224.   Visas for spouses and children of citizens and special immigrants.".

75

(8) Subsection (a)(1)(E)(ii) of section 241 (8 U.S.C. 1251), before redesignation as section 237 by section 305(a)(2), is amended by striking "an immediate relative" and inserting "a spouse, child, or parent of a citizen of the United States under section 201(b) or 203(a)(2)".

(9) Section 245(c) (8 U.S.C. 1255(c)) is amended by striking "an immediate relative as defined in section 201(b)" and inserting "a spouse or child of a citizen of the United States under section 201(b) or a parent of a citizen under section 203(a)(2)" each place it appears.

(10) Section 291 (8 U.S.C. 1361) is amended by striking "immigrant, special immigrant, immediate relative" and inserting "immigrant status, special immigrant status, status as a spouse or child of a citizen of the United States".

(11) Section 401 of the Immigration Reform and Control Act of 1986 is amended by striking "immediate relatives" and inserting "spouses and children of citizens".

(b) CONFORMING AMENDMENTS FOR OTHER FAMILY-SPONSORED IMMIGRANTS.—

(1) PETITIONING REQUIREMENTS.—Section 204 (8 U.S.C. 1154) is amended—

(A) in subsection (a)(1)(A)(i), by striking "paragraph (1), (3), or (4)" and inserting "paragraph (2) or (3)";

(B) in subsection (a)(1)(B)(i), by striking "section 203(a)(2)" and inserting "paragraph (1) or (3) of section 203(a)(1)";

(C) in clauses (ii) and (iii) of subsection (a)(1)(B), by striking "203(a)(2)(A)" and inserting "203(a)(1)"; and

(D) in subsection (f)(1), by striking ", 203(a)(1), or 203(a)(3)" and inserting "or 203(a)(2)".

(2) APPLICATION OF PER COUNTRY LEVELS.—Section 202 (8 U.S.C. 1152) is amended—

(A) by amending paragraph (4) of subsection (a) to read as follows:

"(4) SPECIAL RULES FOR SPOUSES AND CHILDREN OF LAWFUL PERMANENT RESIDENT ALIENS.—

"(A) 75 PERCENT OF 1ST PREFERENCE NOT SUBJECT TO PER COUNTRY LIMITATION.—Of the visa numbers made available under section 203(a) to immigrants described in paragraph (1) of that section in any fiscal year, 63,750 shall be issued without regard to the numerical limitation under paragraph (2).

"(B) LIMITING PASS DOWN FOR CERTAIN COUNTRIES SUBJECT TO SUBSECTION (e).—In the case of a foreign state or dependent area to which subsection (e) applies, if the total number of visas issued under section 203(a)(1) exceeds the maximum number of visas that may be made available to immigrants of the state or area under such section consistent with subsection (e) (determined without regard to this paragraph), in applying paragraph (2) of section 203(a) under subsection (e)(2) all visas shall be deemed to have been required for the classes specified in paragraph (1) of such section."; and

(B) in subsection (e)—

(i) in paragraph (1), by inserting before the semicolon the following: "(determined without regard to subsections (c)(4) and (d)(2) of section 201)";

(ii) in paragraph (2), by striking "paragraphs (1) through (4)" and inserting "paragraphs (1) and (2), and

(iii) in the last sentence, by striking "203(a)(2)(A)" and inserting "203(a)(1)".

(3) ADDITIONAL CONFORMING AMENDMENTS.—

(A) Subsection (d) of section 203 (8 U.S.C. 1153), before redesignation by section 524(a)(1), is amended by striking "(a)" and inserting "(a)(2)".

(B) Section 212(a)(6)(E)(ii) (8 U.S.C. 1182(a)(6)(E)(ii)) and subsection (a)(1)(E)(ii) of section 241 (8 U.S.C. 1251), before redesignation as section 237 under section 305(a)(2), are each amended by striking "203(a)(2)" and inserting "203(a)(1)".

(C) Section 212(d)(11) (8 U.S.C. 1182(d)(11)) is amended by striking "immigrant under section 203(a) (other than paragraph (4) thereof)" and inserting "an immigrant under section 203(a)".

(D) Section 216(g)(1)(C) (8 U.S.C. 1186a(g)(1)(C)) is amended by striking "203(a)(2)" and inserting "203(a)(1)".

(E) Section 2(c) of the Virgin Islands Nonimmigrant Alien Adjustment Act of 1982 (Public Law 97–271) is amended—

(i) in paragraph (2), by inserting "or first or third family preference petitions" after "second preference petitions";

(ii) in paragraph (3)(A), by striking "or" at the end;

76

(iii) in paragraph (3)(B), by striking the period at the end and inserting "; or";

(iv) by adding at the end of paragraph (3) the following new subparagraph:

"(C) by virtue of a first or third family preference petition filed by an individual who was admitted to the United States as an immigrant by virtue of a second family preference petition filed by the son or daughter of the individual, if that son or daughter had his or her status adjusted under this section."; and

(v) in paragraph (4), by striking "on or after such date." and inserting the following: "on or after such date and before October 1, 1996). For purposes of this subsection, the terms 'first family preference petition', 'second family preference petition', and 'third family preference petition' mean, in the case of an alien, a petition filed under section 204(a) of the Act to grant preference status to the alien by reason of the relationship described in section 203(a)(1), 203(a)(2), or 203(a)(3), respectively (as in effect on and after October 1, 1996).".

(c) CONFORMING AMENDMENTS RELATING TO EMPLOYMENT-BASED IMMIGRANTS.—

(1) TREATMENT OF SPECIAL K IMMIGRANTS.—Subparagraph (B) of section 203(b)(7) (8 U.S.C. 1153(b)(7)), as redesignated by section 513(a)(1), is amended—

(A) in clause (i), by striking "and (3) shall each be reduced by ⅓" and inserting "(3), and (4) shall each be reduced by the same proportion, as the proportion (of the visa numbers made available under all such paragraphs) that were made available under each respective paragraph,", and

(B) in clause (ii), by striking "(3) of this subsection in the fiscal year shall be reduced by ⅓" and inserting "(4) in the fiscal year reduced by the same proportion, as the proportion (of the visa numbers made available under all such paragraphs to natives of the foreign state) that were made available under each respective paragraph to such natives,".

(2) CONFORMING AMENDMENTS RELATING TO PETITIONING RIGHTS.—Section 204(a)(1) (8 U.S.C. 1154(a)(1)) is amended—

(A) in subparagraph (C), by striking "203(b)(1)(A)" and inserting "203(b)(1)";

(B) in subparagraph (D), by striking "section 203(b)(1)(B), 203(b)(1)(C), 203(b)(2), or 203(b)(3)" and inserting "section 203(b)(2), 203(b)(3), or 203(b)(4)";

(C) in subparagraph (E)(i), by striking "203(b)(4)" and inserting "203(b)(6)"; and

(D) by redesignating subparagraphs (E) and (F) as subparagraphs (F) and (E), respectively, and by moving subparagraph (E) (as so redesignated) to precede subparagraph (F) (as so redesignated).

(3) GROUND FOR INADMISSIBILITY.—Section 212(a)(5)(C) (8 U.S.C. 1182(a)(5)(C)) is amended by striking "(2) or (3)" and inserting "(3) or (4)".

(4) OTHER CONFORMING AMENDMENTS.—

(A) Section 202(e)(3) (8 U.S.C. 1152(e)(3)) is amended by striking "through (5)" and inserting "through (6)".

(B) Section 245(j)(3) (8 U.S.C. 1255(j)(3)), as added by section 130003(c)(1) Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322) and as redesignated by section 851(a)(3)(A) of this Act, is amended by striking "203(b)(4)" and inserting "203(b)(6)".

(C) Section 154(b)(1)(B)(i) of the Immigration Act of 1990 is amended by striking "1991" and inserting "1991, and before October 1, 1996) or under section 203(a), 203(b)(1), or 203(b)(2) (as in effect on and after October 1, 1996".

(D) Section 206(a) of the Immigration Act of 1990 is amended by striking "203(b)(1)(C)" and inserting "203(b)(2)(C)".

(E) Section 2(d)(2)(A) of the Chinese Student Protection Act of 1992 (Public Law 102–404) is amended by striking "203(b)(3)(A)(i)" and inserting "203(b)(4)(B)".

(F) The Soviet Scientists Immigration Act of 1992 (Public Law 102–509) is amended—

(i) in sections 3 and 4(a), by striking "203(b)(2)(A) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(2)(A))" and inserting "203(b)(3)(B)(i) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(3)(B)(i))", and

(ii) in section 4(c), by striking "203(b)(2)(A) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(2)(A))" and inserting "203(b)(3) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(2))".

(d) REPEAL OF CERTAIN OUTDATED PROVISIONS.—The following provisions of law are repealed:

(1) Section 9 of Public Law 94–571 (90 Stat. 2707).

(2) Section 19 of Public Law 97-116 (95 Stat. 1621).

# Subtitle C—Refugees, Parole, and Humanitarian Admissions

### SEC. 521. CHANGES IN REFUGEE ANNUAL ADMISSIONS.

(a) IN GENERAL.—Paragraphs (1) and (2) of section 207(a) (8 U.S.C. 1157(a)) are amended to read as follows:

"(1) Except as provided in paragraph (2) and subsection (b), the number of refugees who may be admitted under this section in any fiscal year shall be such number as the President determines, before the beginning of the fiscal year and after appropriate consultation, is justified by humanitarian concerns or is otherwise in the national interest.

"(2)(A) Except as provided in subparagraph (B), the number determined under paragraph (1) for a fiscal year may not exceed—

"(i) 75,000 in the case of fiscal year 1997, or

"(ii) 50,000 in the case of any succeeding fiscal year.

"(B) The number determined under paragraph (1) for a fiscal year may exceed the limit specified under subparagraph (A) if Congress enacts a law providing for a higher number.".

(b) ADMISSIONS IN EMERGENCY REFUGEE SITUATIONS AND TIMING OF THE REFUGEE CONSULTATION PROCESS.—

(1) Section 207(b) (8 U.S.C. 1157(b)) and section 207(d)(3)(B) (8 U.S.C. 1157(d)(3)(B)) are amended by striking "unforeseen".

(2) Section 207(d)(1) (8 U.S.C. 1157(d)(1)) is amended by striking "Before the start of each fiscal year" and inserting "Before June 1 of the preceding fiscal year".

(3) Section 207(e) (8 U.S.C. 1157(e)) is amended by adding at the end the following:

"Such discussions shall occur before July 1 of the fiscal year preceding the fiscal year of admissions, except that discussions relating to an emergency refugee situation shall occur not more than 30 days after the President proposes admissions in response to the emergency.".

(c) EFFECTIVE DATE.—The amendments made by subsections (a) and (b) shall apply beginning with fiscal year 1997.

### SEC. 522. PERSECUTION FOR RESISTANCE TO COERCIVE POPULATION CONTROL METHODS.

(a) DEFINITION OF REFUGEE.—Section 101(a)(42) (8 U.S.C. 1101(a)(42)) is amended by adding at the end the following: "For purposes of determinations under this Act, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.".

(b) NUMERICAL LIMITATION.—Section 207(a) (8 U.S.C. 1157(a)), as amended by section 532(b), is amended by adding at the end the following new paragraph:

"(4) For any fiscal year, not more than a total of 1,000 refugees may be admitted under this subsection or granted asylum under section 208 pursuant to a determination under the last sentence of section 101(a)(42) (relating to persecution for resistance to coercive population control methods).".

### SEC. 523. PAROLE AVAILABLE ONLY ON A CASE-BY-CASE BASIS FOR HUMANITARIAN REASONS OR SIGNIFICANT PUBLIC BENEFIT.

(a) IN GENERAL.—Paragraph (5) of section 212(d) (8 U.S.C. 1182(d)) is amended to read as follows:

"(5)(A) Subject to the provisions of this paragraph and section 214(f)(2), the Attorney General, in the sole discretion of the Attorney General, may on a case-by-case basis parole an alien into the United States temporarily, under such conditions as the Attorney General may prescribe, only—

"(i) for an urgent humanitarian reason (as described under subparagraph (B)); or

78

"(ii) for a reason deemed strictly in the public interest (as described under subparagraph (C)).

"(B) The Attorney General may parole an alien based on an urgent humanitarian reason described in this subparagraph only if—

"(i) the alien has a medical emergency and the alien cannot obtain necessary treatment in the foreign state in which the alien is residing or the medical emergency is life-threatening and there is insufficient time for the alien to be admitted through the normal visa process;

"(ii) the alien is needed in the United States in order to donate an organ or other tissue for transplant into a close family member; or

"(iii) the alien has a close family member in the United States whose death is imminent and the alien could not arrive in the United States in time to see such family member alive if the alien were to be admitted through the normal visa process.

"(C) The Attorney General may parole an alien based on a reason deemed strictly in the public interest described in this subparagraph only if—

"(i) the alien has assisted the United States Government in a matter, such as a criminal investigation, espionage, or other similar law enforcement activity, and either the alien's presence in the United States is required by the Government or the alien's life would be threatened if the alien were not permitted to come to the United States; or

"(ii) the alien is to be prosecuted in the United States for a crime.

"(D) The Attorney General may not use the parole authority under this paragraph to permit to come to the United States aliens who have applied for and have been found to be ineligible for refugee status or any alien to whom the provisions of this paragraph do not apply.

"(E) Parole of an alien under this paragraph shall not be considered an admission of the alien into the United states. When the purposes of the parole of an alien have been served, as determined by the Attorney General, the alien shall immediately return or be returned to the custody from which the alien was paroled and the alien shall be considered for admission to the United States on the same basis as other similarly situated applicants for admission.

"(F) Not later than 90 days after the end of each fiscal year, the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and the Senate describing the number and categories of aliens paroled into the United States under this paragraph. Each such report shall contain information and data concerning the number and categories of aliens paroled, the duration of parole, and the current status of aliens paroled during the preceding fiscal year.".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to individuals paroled into the United States on or after the first day of the first month beginning more than 60 days after the date of the enactment of this Act.

**SEC. 524. ADMISSION OF HUMANITARIAN IMMIGRANTS.**

(a) IN GENERAL.—Section 203 (8 U.S.C. 1153) is amended—

(1) by redesignating subsections (d) through (g) as subsections (e) through (h), respectively, and

(2) by inserting after subsection (c) the following new subsection:

"(d) HUMANITARIAN IMMIGRANTS.—

"(1) IN GENERAL.—Aliens subject to the worldwide humanitarian level specified in section 201(e) shall be allotted visas only if the aliens have been selected by the Attorney General under paragraph (2) as of special humanitarian concern to the United States.

"(2) SELECTION OF IMMIGRANTS.—

"(A) IN GENERAL.—The Attorney General shall, on a case-by-case basis and based on humanitarian concerns and the public interest, select aliens for purposes of this subsection.

"(B) RESTRICTION.—The Attorney General may not select an alien under this paragraph if the alien is a refugee (within the meaning of section 101(a)(42)) unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be admitted into the United States as a humanitarian immigrant under this subsection rather than as a refugee under section 207.

"(3) ANNUAL REPORT.—Not later than 90 days after the end of each fiscal year, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report describing the number of immigrant visas issued under this subsection and the individuals to whom the visas were issued.".

79

(b) PETITIONING.—Section 204(a)(1) (8 U.S.C. 1154(a)(1)) is amended by adding at the end the following new subparagraph:

"(I) Any alien desiring to be provided an immigrant visa under section 203(d) may file a petition with the Attorney General for such classification, but only if the Attorney General has identified the alien as possibly qualifying for such a visa.".

(c) ORDER OF CONSIDERATION.—Subsection (f) of section 203 (8 U.S.C. 1153), as redesignated by subsection (a)(1), is amended by redesignating paragraph (3) as paragraph (4) and by inserting after paragraph (2) the following new paragraph:

"(3) Immigrant visa numbers made available under subsection (d) (relating to humanitarian immigrants) shall be issued to eligible immigrants in an order specified by the Attorney General.".

(d) APPLICATION OF PER COUNTRY NUMERICAL LIMITATIONS.—Section 202(a) (8 U.S.C. 1152(a)) is amended by adding at the end the following new paragraph:

"(5) PER COUNTRY LEVELS FOR HUMANITARIAN IMMIGRANTS.—The total number of immigrant visas made available to natives of any single foreign state or dependent area under section 203(d) in any fiscal year may not exceed 50 percent (in the case of a single foreign state) or 15 percent (in the case of a dependent area) of the total number of such visas made available under such subsection in that fiscal year.".

(e) WAIVER OF CERTAIN GROUNDS OF INADMISSIBILITY.—Section 212(a) (8 U.S.C. 1182(a)) is amended—

(1) in paragraph (4), as amended by sections 621(a) and 512(b), by adding at the end the following new subparagraph:

"(E) WAIVER AUTHORIZED FOR HUMANITARIAN IMMIGRANTS.—The Attorney General, in the discretion of the Attorney General, may waive the ground of inadmissibility under subparagraph (A) in the case of an alien seeking admission as a humanitarian immigrant under section 203(d).";

(2) in paragraph (5)(C), by inserting before the period at the end the following: ", and shall not apply to immigrants seeking admissions as humanitarian immigrants under section 203(d)"; and

(3) in paragraph (7)(A), by redesignating clause (ii) as clause (iii) and by inserting after clause (i) the following new clause:

"(ii) WAIVER AUTHORIZED FOR HUMANITARIAN IMMIGRANTS.—The Attorney General, in the discretion of the Attorney General, may waive the ground of inadmissibility under clause (i) in the case of an alien seeking admission as a humanitarian immigrant under section 203(d).".

(f) CONFORMING AMENDMENT.—Section 216(g)(1) (8 U.S.C. 1186a(g)(1)) is amended by striking "203(d)" and inserting "203(e)".

# Subtitle D—Asylum Reform

**SEC. 531. ASYLUM REFORM.**

(a) ASYLUM REFORM.—Section 208 (8 U.S.C. 1158) is amended to read as follows:

"ASYLUM

"SEC. 208. (a) AUTHORITY TO APPLY FOR ASYLUM.—

"(1) IN GENERAL.—Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival), irrespective of such alien's status, may apply for asylum in accordance with this section.

"(2) EXCEPTIONS.—

"(A) SAFE THIRD COUNTRY.—Paragraph (1) shall not apply to an alien if the Attorney General determines that the alien may be removed, including pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States.

"(B) TIME LIMIT.—Paragraph (1) shall not apply to an alien unless the alien demonstrates by clear and convincing evidence that the application has been filed within 30 days after the alien's arrival in the United States.

80

"(C) PREVIOUS ASYLUM APPLICATIONS.—Paragraph (1) shall not apply to an alien if the alien has previously applied for asylum and had such application denied.

"(D) CHANGED CONDITIONS.—An application for asylum of an alien may be considered, notwithstanding subparagraphs (B) and (C), if the alien demonstrates to the satisfaction of the Attorney General the existence of fundamentally changed circumstances which affect the applicant's eligibility for asylum.

"(3) LIMITATION ON JUDICIAL REVIEW.—No court shall have jurisdiction to review a determination of the Attorney General under paragraph (2).

"(b) CONDITIONS FOR GRANTING ASYLUM.—

"(1) IN GENERAL.—The Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Attorney General under this section if the Attorney General determines that such alien is a refugee within the meaning of section 101(a)(42)(A).

"(2) EXCEPTIONS.—

"(A) IN GENERAL.—Paragraph (1) shall not apply to an alien if the Attorney General determines that—

"(i) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

"(ii) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

"(iii) there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States;

"(iv) there are reasonable grounds for regarding the alien as a danger to the security of the United States;

"(v) the alien is inadmissible under subclause (I), (II), (III), or (IV) of section 212(a)(3)(B)(i) or removable under section 237(a)(4)(B) (relating to terrorist activity), unless, in the case only of an alien inadmissible under subclause (IV) of section 212(a)(3)(B)(i), the Attorney General determines, in the Attorney General's discretion, that there are not reasonable grounds for regarding the alien as a danger to the security of the United States; or

"(vi) the alien was firmly resettled in another country prior to arriving in the United States.

"(B) SPECIAL RULES.—

"(i) CONVICTION OF AGGRAVATED FELONY.—For purposes of clause (ii) of subparagraph (A), an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime.

"(ii) OFFENSES.—The Attorney General may designate by regulation offenses that will be considered to be a crime described in clause (ii) or (iii) of subparagraph (A).

"(C) ADDITIONAL LIMITATIONS.—The Attorney General may by regulation establish additional limitations and conditions under which an alien shall be ineligible for asylum under paragraph (1).

"(D) NO JUDICIAL REVIEW.—There shall be no judicial review of a determination of the Attorney General under subparagraph (A)(v).

"(3) TREATMENT OF SPOUSE AND CHILDREN.—A spouse or child (as defined in section 101(b)(1)(A), (B), (C), (D), or (E)) of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien.

"(c) ASYLUM STATUS.—

"(1) IN GENERAL.—In the case of an alien granted asylum under subsection (b), the Attorney General—

"(A) shall not remove or return the alien to the alien's country of nationality or, in the case of a person having no nationality, the country of the alien's last habitual residence;

"(B) shall authorize the alien to engage in employment in the United States and provide the alien with appropriate endorsement of that authorization; and

"(C) may allow the alien to travel abroad with the prior consent of the Attorney General.

81

"(2) Termination of asylum.—Asylum granted under subsection (b) does not convey a right to remain permanently in the United States, and may be terminated if the Attorney General determines that—

"(A) the alien no longer meets the conditions described in subsection (b)(1) owing to a fundamental change in circumstances;

"(B) the alien meets a condition described in subsection (b)(2);

"(C) the alien may be removed, including pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien cannot establish that it is more likely than not that the alien's life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien is eligible to receive asylum or equivalent temporary protection;

"(D) the alien has voluntarily availed himself or herself of the protection of the alien's country of nationality or, in the case of an alien having no nationality, the alien's country of last habitual residence, by returning to such country with permanent resident status or the reasonable possibility of obtaining such status with the same rights and obligations pertaining to other permanent residents of that country; or

"(E) the alien has acquired a new nationality and enjoys the protection of the country of his new nationality.

"(3) Removal when asylum is terminated.—An alien described in paragraph (2) is subject to any applicable grounds of inadmissibility or deportability under section 212(a) and 237(a), and the alien's removal or return shall be directed by the Attorney General in accordance with sections 240 and 241.

"(4) Limitation on judicial review.—No court shall have jurisdiction to review a determination of the Attorney General under paragraph (2).

"(d) Asylum Procedure.—

"(1) Applications.—The Attorney General shall establish a procedure for the consideration of asylum applications filed under subsection (a). An application for asylum shall not be considered unless the alien submits fingerprints and a photograph in a manner to be determined by regulation by the Attorney General.

"(2) Employment.—An applicant for asylum is not entitled to employment authorization, but such authorization may be provided under regulation by the Attorney General. An applicant who is not otherwise eligible for employment authorization shall not be granted such authorization prior to 180 days after the date of filing of the application for asylum.

"(3) Fees.—The Attorney General may impose fees for the consideration of an application for asylum, for employment authorization under this section, and for adjustment of status under section 209(b). The Attorney General may provide for the assessment and payment of such fees over a period of time or by installments. Nothing in this paragraph shall be construed to require the Attorney General to charge fees for adjudication services provided to asylum applicants, or to limit the authority of the Attorney General to set adjudication and naturalization fees in accordance with section 286(m).

"(4) Notice of privilege of counsel and consequences of frivolous application.—At the time of filing an application for asylum, the Attorney General shall—

"(A) advise the alien of the privilege of being represented by counsel and of the consequences, under paragraph (6), of knowingly filing a frivolous application for asylum; and

"(B) provide the alien a list of persons (updated not less often than quarterly) who have indicated their availability to represent aliens in asylum proceedings on a pro bono basis.

"(5) Consideration of asylum applications.—

"(A) Procedures.—The procedure established under paragraph (1) shall provide that—

"(i) asylum cannot be granted until the identity of the applicant has been checked against all appropriate records or databases maintained by the Attorney General and by the Secretary of State, including the Automated Visa Lookout System, to determine any grounds on which the alien may be inadmissible to or deportable from the United States, or ineligible to apply for or be granted asylum;

"(ii) in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed;

82

"(iii) in the absence of exceptional circumstances, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed;

"(iv) any administrative appeal shall be filed within 30 days of a decision granting or denying asylum, or within 30 days of the completion of removal proceedings before an immigration judge under section 240, whichever is later; and

"(v) in the case of an applicant for asylum who fails without prior authorization or in the absence of exceptional circumstances to appear for an interview or hearing, including a hearing under section 240, the application may be dismissed or the applicant may be otherwise sanctioned for such failure.

"(B) ADDITIONAL REGULATORY CONDITIONS.—The Attorney General may provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this Act.

"(6) FRIVOLOUS APPLICATIONS.—

"(A) IN GENERAL.—If the Attorney General determines that an alien has knowingly made a frivolous application for asylum and the alien has received the notice under paragraph (4)(A), the alien shall be permanently ineligible for any benefits under this Act, effective as of the date of a final determination on such application.

"(B) MATERIAL MISREPRESENTATIONS.—An application shall be considered to be frivolous if the Attorney General determines that the application contains a willful misrepresentation or concealment of a material fact.

"(7) NO PRIVATE RIGHT OF ACTION.—Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.".

(b) CONFORMING AND CLERICAL AMENDMENTS.—

(1) The item in the table of contents relating to section 208 is amended to read as follows:

"Sec. 208. Asylum.".

(2) Section 104(d)(1)(A) of the Immigration Act of 1990 (Public Law 101–649) is amended by striking "208(b)" and inserting "208".

(c) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to applications for asylum filed on or after the first day of the first month beginning more than 180 days after the date of the enactment of this Act.

**SEC. 532. FIXING NUMERICAL ADJUSTMENTS FOR ASYLEES AT 10,000 EACH YEAR.**

(a) IN GENERAL.—Section 209(b) (8 U.S.C. 1159(b)) is amended by striking "Not more than" and all that follows through "adjust" and inserting the following: "The Attorney General, in the Attorney General's discretion and under such regulations as the Attorney General may prescribe, and in a number not to exceed 10,000 aliens in any fiscal year, may adjust".

(b) CONFORMING AMENDMENT.—Section 207(a) (8 U.S.C. 1157(a)) is amended by striking paragraph (4).

(c) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on October 1, 1996.

**SEC. 533. INCREASED RESOURCES FOR REDUCING ASYLUM APPLICATION BACKLOGS.**

(a) AUTHORIZATION OF TEMPORARY EMPLOYMENT OF CERTAIN ANNUITANTS AND RETIREES.—

(1) IN GENERAL.—For the purpose of performing duties in connection with adjudicating applications for asylum pending as of the date of the enactment of this Act, the Attorney General may employ for a period not to exceed 24 months (beginning 3 months after the date of the enactment of this Act) not more than 300 individuals (at any one time) who, by reason of separation from service on or before January 1, 1995, are receiving—

(A) annuities under the provisions of subchapter III of chapter 83 of title 5, United States Code, or chapter 84 of such title;

(B) annuities under any other retirement system for employees of the Federal Government; or

(C) retired or retainer pay as retired officers of regular components of the uniformed services.

(2) NO REDUCTION IN ANNUITY OR RETIREMENT PAY OR REDETERMINATION OF PAY DURING TEMPORARY EMPLOYMENT.—

83

(A) RETIREES UNDER CIVIL SERVICE RETIREMENT SYSTEM AND FEDERAL EM-PLOYEES' RETIREMENT SYSTEM.—In the case of an individual employed under paragraph (1) who is receiving an annuity described in paragraph (1)(A)—

(i) such individual's annuity shall continue during the employment under paragraph (1) and shall not be increased as a result of service performed during that employment;

(ii) retirement deductions shall not be withheld from such individual's pay; and

(iii) such individual's pay shall not be subject to any deduction based on the portion of such individual's annuity which is allocable to the period of employment.

(B) OTHER FEDERAL RETIREES.—The President shall apply the provisions of subparagraph (A) to individuals who are receiving an annuity described in paragraph (1)(B) and who are employed under paragraph (1) in the same manner and to the same extent as such provisions apply to individuals who are receiving an annuity described in paragraph (1)(A) and who are employed under paragraph (1).

(C) RETIRED OFFICERS OF THE UNIFORM SERVICES.—The retired or retainer pay of a retired officer of a regular component of a uniformed service shall not be reduced under section 5532 of title 5, United States Code, by reason of temporary employment authorized under paragraph (1).

(b) PROCEDURES FOR PROPERTY ACQUISITION ON LEASING.—Notwithstanding the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 471 et seq.), the Attorney General is authorized to expend out of funds made available to the Department of Justice for the administration of the Immigration and Nationality Act such amounts as may be necessary for the leasing or acquisition of property to carry out the purpose described in subsection (a)(1).

(c) INCREASE IN ASYLUM OFFICERS.—Subject to the availability of appropriations, the Attorney General shall provide for an increase in the number of asylum officers to at least 600 asylum officers by fiscal year 1997.

# Subtitle E—General Effective Date; Transition Provisions

**SEC. 551. GENERAL EFFECTIVE DATE.**

(a) IN GENERAL.—Except as otherwise provided in subsection (b) or in this title, this title and the amendments made by this title shall take effect on October 1, 1996, and shall apply beginning with fiscal year 1997.

(b) PROVISIONS TAKING EFFECT UPON ENACTMENT.—Sections 523 and 554 shall take effect on the date of the enactment of this Act.

**SEC. 552. GENERAL TRANSITION FOR CURRENT CLASSIFICATION PETITIONS.**

(a) FAMILY-SPONSORED IMMIGRANTS.—

(1) IMMEDIATE RELATIVES.—Any petition filed under section 204(a) of the Immigration and Nationality Act before October 1, 1996, for immediate relative status under section 201(b)(2)(A) of such Act (as in effect before such date) as a spouse or child of a United States citizen or as a parent of a United States citizen shall be deemed, as of such date, to be a petition filed under such section for status under section 201(b)(2)(A) (as such a spouse or child) or under section 203(a)(2), respectively, of such Act (as amended by this title).

(2) SPOUSES AND CHILDREN OF PERMANENT RESIDENTS.—Any petition filed under section 204(a) of the Immigration and Nationality Act before October 1, 1996, for preference status under section 203(a)(2) of such Act as a spouse or child of an alien lawfully admitted for permanent residence shall be deemed, as of such date, to be a petition filed under such section for preference status under section 203(a)(1) of such Act (as amended by this title).

(b) EMPLOYMENT-BASED IMMIGRANTS.—

(1) IN GENERAL.—Subject to paragraph (2), any petition filed before October 1, 1996, and approved on any date, to accord status under section 203(b)(1)(A), 203(b)(1)(B), 203(b)(1)(C), 203(b)(2), 203(b)(3)(A)(i), 203(b)(3)(A)(ii), 203(b)(4), 203(b)(5) of the Immigration and Nationality Act (as in effect before such date) shall be deemed, on and after October 1, 1996 (or, if later, the date of such approval), to be a petition approved to accord status under section 203(b)(1), 203(b)(2)(B), 203(b)(2)(C), 203(b)(3), 203(b)(4)(B), 203(b)(4)(C), 203(b)(6), or 203(b)(5), respectively, of such Act (as in effect on and after such date). Nothing

84

in this paragraph shall be construed as exempting the beneficiaries of such petitions from the numerical limitations under section 203(b) (as amended by section 513).

(2) TIME LIMITATION.—Paragraph (1) shall not apply more than two years after the date the priority date for issuance of a visa on the basis of such a petition has been reached.

(c) ADMISSIBILITY STANDARDS.—When an immigrant, in possession of an unexpired immigrant visa issued before October 1, 1996, makes application for admission, the immigrant's admissibility under paragraph (7)(A) of section 212(a) of the Immigration and Nationality Act shall be determined under the provisions of law in effect on the date of the issuance of such visa.

(d) CONSTRUCTION.—Nothing in this title shall be construed as affecting the provisions of section 19 of Public Law 97–116, section 2(c)(1) of Public Law 97–271, or section 202(e) of Public Law 99–603.

**SEC. 553. SPECIAL TRANSITION FOR CERTAIN BACKLOGGED SPOUSES AND CHILDREN OF LAWFUL PERMANENT RESIDENT ALIENS.**

(a) IN GENERAL.—(1) In addition to any immigrant visa numbers otherwise available, immigrant visa numbers in a number not to exceed 50,000 (or, if greater, ⅕ of the number of aliens described in paragraph (2)) immigrant visa numbers shall be made available in each of fiscal years 1997 through 2001 for aliens who have petitions approved for classification under section 203(a)(1) of the Immigration and Nationality Act (as amended by this title) for the fiscal year.

(2) Aliens described in this paragraph are aliens, for whom petitions are pending as of the beginning of the fiscal year involved, with respect to whom the petitioning alien became an alien admitted for lawful permanent residence through the operation of section 210 or 245A of the Immigration and Nationality Act.

(b) ORDER.—(1) Subject to paragraph (2), visa numbers under this section shall be made available in the order in which a petition, in behalf of each such immigrant for classification under section 203(a)(1) of the Immigration and Nationality Act, is filed with the Attorney General under section 204 of such Act.

(2) Visa numbers shall first be made available to aliens for whom the petitioning alien did not become an alien lawfully admitted for permanent residence thorough the operation of section 210 or 245A of the Immigration and Nationality Act.

(3) The per country numerical limitations of section 202 of such Act shall not apply with respect to visa numbers made available under this section, and visa numbers made available under this section shall not be counted in determining whether there are excess family admissions in a fiscal year under section 201(c)(3)(B) of the Immigration and Nationality Act (as amended by section 501(b)).

(c) REPORT.—The Attorney General shall submit to Congress, by April 1, 2001, a report on the operation of this section and the extent to which this section will, by October 1, 2001, have resulted in visa numbers being available to immigrants described in paragraphs (1) and (2) of subsection (b) being available on a current basis.

**SEC. 554. SPECIAL TREATMENT OF CERTAIN DISADVANTAGED FAMILY FIRST PREFERENCE IMMIGRANTS.**

(a) DISREGARD OF PER COUNTRY LIMITS FOR LAST HALF OF FISCAL YEAR 1996.—The per country numerical limitations specified in section 202(a) of the Immigration and Nationality Act shall not apply to immigrant numbers made available under section 203(a)(1) of such Act (as in effect before the date of the enactment of this Act) on or after April 1, 1996, but only to the extent necessary to assure that the priority date for aliens classified under such section who are nationals of a country is not earlier than the priority date for aliens classified under section 203(a)(2)(B) of such Act for aliens who are nationals of that country.

(b) ADDITIONAL VISA NUMBERS POTENTIALLY AVAILABLE TO ASSURE EQUITABLE TREATMENT FOR UNMARRIED SONS AND DAUGHTERS OF UNITED STATES CITIZENS.—

(1) IN GENERAL.—In addition to any immigrant visa otherwise available, immigrant visa numbers shall be made available during fiscal year 1997 for disadvantaged family first preference aliens (as defined in paragraph (2)) and for spouses and children of such aliens who would otherwise be eligible to immigrant status under section 203(e) of the Immigration and Nationality Act in relation to such aliens if the aliens remained entitled to immigrant status under section 203(a) of such Act.

(2) DISADVANTAGED FAMILY FIRST PREFERENCE ALIEN DEFINED.—In this subsection, the term "disadvantaged family first preference alien" means an alien—

(A) with respect to whom a petition for classification under section 203(a)(1) of the Immigration and Nationality Act (as in effect on the date of the enactment of this Act) was approved as of September 30, 1996, and

85

(B) whose priority date, as of September 30, 1996, under such classification was earlier than the priority date as of such date for aliens of the same nationality with respect to whom a petition for classification under section 203(a)(2)(B) of such Act (as in effect on such date) had been approved.

(3) DISREGARD OF PER COUNTRY NUMERICAL LIMITATIONS.—Additional visa numbers made available under this subsection shall not be taken into account for purposes of applying any numerical limitation applicable to the country under section 202 of such Act, and visa numbers made available under this subsection shall not be counted in determining whether there are excess family admissions in a fiscal year under section 201(c)(3)(B) of the Immigration and Nationality Act (as amended by section 501(b) of this Act).

**SEC. 555. AUTHORIZATION OF REIMBURSEMENT OF PETITIONERS FOR ELIMINATED FAMILY-SPONSORED CATEGORIES.**

(a) IN GENERAL.—Subject to the availability of appropriations, after the effective date of this title, the Attorney General shall establish a process to provide for the reimbursement to each petitioner of all fees paid to the United States, and which were required to be paid under the Immigration and Nationality Act, for a petition, which was not disapproved as of such date and for which a visa has not been issued, for a family-sponsored immigrant category which is eliminated by this title or the amendments made by this title. Any such process shall provide that such a petitioner shall present any required documentation or other proof of such claim, in person, to the Immigration and Naturalization Service.

(b) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as are necessary to carry out this section.

# TITLE VI—RESTRICTIONS ON BENEFITS FOR ALIENS

**SEC. 600. STATEMENTS OF NATIONAL POLICY CONCERNING WELFARE AND IMMIGRATION.**

The Congress makes the following statements concerning national policy with respect to welfare and immigration:

(1) Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes.

(2) It continues to be the immigration policy of the United States that—

(A) aliens within the nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations, and

(B) the availability of public benefits not constitute an incentive for immigration to the United States.

(3) Despite the principle of self-sufficiency, aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates.

(4) Current eligibility rules for public assistance and unenforceable financial support agreements have proved wholly incapable of assuring that individual aliens not burden the public benefits system.

(5) It is a compelling government interest to enact new rules for eligibility and sponsorship agreements in order to assure that aliens be self-reliant in accordance with national immigration policy.

(6) It is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits.

(7) Where States are authorized to follow Federal eligibility rules for public assistance programs, the Congress strongly encourages the States to adopt the Federal eligibility rules.

86

# Subtitle A—Eligibility of Illegal Aliens for Public Benefits

## PART 1—PUBLIC BENEFITS GENERALLY

### SEC. 601. MAKING ILLEGAL ALIENS INELIGIBLE FOR PUBLIC ASSISTANCE, CONTRACTS, AND LICENSES.

(a) FEDERAL PROGRAMS.—Notwithstanding any other provision of law, except as provided in section 603, any alien who is not lawfully present in the United States shall not be eligible for any of the following:

(1) FEDERAL ASSISTANCE PROGRAMS.—To receive any benefits under any program of assistance provided or funded, in whole or in part, by the Federal Government for which eligibility (or the amount of assistance) is based on financial need.

(2) FEDERAL CONTRACTS OR LICENSES.—To receive any grant, to enter into any contract or loan agreement, or to be issued (or have renewed) any professional or commercial license, if the grant, contract, loan, or license is provided or funded by any Federal agency.

(b) STATE PROGRAMS.—Notwithstanding any other provision of law, except as provided in section 603, any alien who is not lawfully present in the United States shall not be eligible for any of the following:

(1) STATE ASSISTANCE PROGRAMS.—To receive any benefits under any program of assistance (not described in subsection (a)(1)) provided or funded, in whole or in part, by a State or political subdivision of a State for which eligibility (or the amount of assistance) is based on financial need.

(2) STATE CONTRACTS OR LICENSES.—To receive any grant, to enter into any contract or loan agreement, or to be issued (or have renewed) any professional or commercial license, if the grant, contract, loan, or license is provided or funded by any State agency.

(c) REQUIRING PROOF OF IDENTITY FOR FEDERAL CONTRACTS, GRANTS, LOANS, LICENSES, AND PUBLIC ASSISTANCE.—

(1) IN GENERAL.—In considering an application for a Federal contract, grant, loan, or license, or for public assistance under a program described in paragraph (2), a Federal agency shall require the applicant to provide proof of identity under paragraph (3) to be considered for such Federal contract, grant, loan, license, or public assistance.

(2) PUBLIC ASSISTANCE PROGRAMS COVERED.—The requirement of proof of identity under paragraph (1) shall apply to the following Federal public assistance programs:

(A) SSI.—The supplemental security income program under title XVI of the Social Security Act, including State supplementary benefits programs referred to in such title.

(B) AFDC.—The program of aid to families with dependent children under part A or E of title IV of the Social Security Act.

(C) SOCIAL SERVICES BLOCK GRANT.—The program of block grants to States for social services under title XX of the Social Security Act.

(D) MEDICAID.—The program of medical assistance under title XIX of the Social Security Act.

(E) FOOD STAMPS.—The program under the Food Stamp Act of 1977.

(F) HOUSING ASSISTANCE.—Financial assistance as defined in section 214(b) of the Housing and Community Development Act of 1980.

(3) DOCUMENTS THAT SHOW PROOF OF IDENTITY.—

(A) IN GENERAL.—Any one of the documents described in subparagraph (B) may be used as proof of identity under this subsection if the document is current and valid. No other document or documents shall be sufficient to prove identity.

(B) DOCUMENTS DESCRIBED.—The documents described in this subparagraph are the following:

(i) A United States passport (either current or expired if issued both within the previous 20 years and after the individual attained 18 years of age).

(ii) A resident alien card.

(iii) A State driver's license, if presented with the individual's social security account number card.

(iv) A State identity card, if presented with the individual's social security account number card.

87

(d) AUTHORIZATION FOR STATES TO REQUIRE PROOF OF ELIGIBILITY FOR STATE PROGRAMS.—In considering an application for contracts, grants, loans, licenses, or public assistance under any State program, a State is authorized to require the applicant to provide proof of eligibility to be considered for such State contracts, grants, loans, licenses, or public assistance.

(e) EXCEPTION FOR BATTERED ALIENS.—

(1) EXCEPTION.—The limitations on eligibility for benefits under subsection (a) or (b) shall not apply to an alien if—

(A)(i) the alien has been battered or subject to extreme cruelty in the United States by a spouse or parent, or by a member of the spouse or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, or

(ii) the alien's child has been battered or subject to extreme cruelty in the United States by a spouse or parent of the alien (without the active participation of the alien in the battery or extreme cruelty) or by a member of the spouse or parent's family residing in the same household as the alien when the spouse or parent consented or acquiesced to, and the alien did not actively participate in, such battery or cruelty; and

(B)(i) the alien has petitioned (or petitions within 45 days after the first application for assistance subject to the limitations under subsection (a) or (b)) for—

(I) status as a spouse or child of a United States citizen pursuant to clause (ii), (iii), or (iv) of section 204(a)(1)(A) of the Immigration and Nationality Act,

(II) classification pursuant to clauses (ii) or (iii) of section 204(a)(1)(B) of such Act, or

(III) cancellation of removal and adjustment of status pursuant to section 240A(b)(2) of such Act ; or

(ii) the alien is the beneficiary of a petition filed for status as a spouse or child of a United States citizen pursuant to clause (i) of section 204(a)(1)(A) of the Immigration and Nationality Act, or of a petition filed for classification pursuant to clause (i) of section 204(a)(1)(B) of such Act.

(2) TERMINATION OF EXCEPTION.—The exception under paragraph (1) shall terminate if no complete petition which sets forth a prima facie case is filed pursuant to the requirement of paragraph (1)(B) or (1)(C) or when an petition is denied.

## SEC. 602. MAKING UNAUTHORIZED ALIENS INELIGIBLE FOR UNEMPLOYMENT BENEFITS.

(a) IN GENERAL.—Notwithstanding any other provision of law, no unemployment benefits shall be payable (in whole or in part) out of Federal funds to the extent the benefits are attributable to any employment of the alien in the United States for which the alien was not granted employment authorization pursuant to Federal law.

(b) PROCEDURES.—Entities responsible for providing unemployment benefits subject to the restrictions of this section shall make such inquiries as may be necessary to assure that recipients of such benefits are eligible consistent with this section.

## SEC. 603. GENERAL EXCEPTIONS.

Sections 601 and 602 shall not apply to the following:

(1) EMERGENCY MEDICAL SERVICES.—The provision of emergency medical services (as defined by the Attorney General in consultation with the Secretary of Health and Human Services).

(2) PUBLIC HEALTH IMMUNIZATIONS.—Public health assistance for immunizations with respect to immunizable diseases and for testing and treatment for communicable diseases.

(3) SHORT-TERM EMERGENCY RELIEF.—The provision of non-cash, in-kind, short-term emergency relief.

(4) FAMILY VIOLENCE SERVICES.—The provision of any services directly related to assisting the victims of domestic violence or child abuse.

(5) SCHOOL LUNCH ACT.—Programs carried out under the National School Lunch Act.

(6) CHILD NUTRITION ACT.—Programs of assistance under the Child Nutrition Act of 1966.

## SEC. 604. TREATMENT OF EXPENSES SUBJECT TO EMERGENCY MEDICAL SERVICES EXCEPTION.

(a) IN GENERAL.—Subject to such amounts as are provided in advance in appropriation Acts, each State or local government that provides emergency medical services (as defined for purposes of section 603(1)) through a public hospital or other

88

public facility (including a nonprofit hospital that is eligible for an additional payment adjustment under section 1886 of the Social Security Act) or through contract with another hospital or facility to an individual who is an alien not lawfully present in the United States is entitled to receive payment from the Federal Government of its costs of providing such services, but only to the extent that such costs are not otherwise reimbursed through any other Federal program and cannot be recovered from the alien or another person.

(b) CONFIRMATION OF IMMIGRATION STATUS REQUIRED.—No payment shall be made under this section with respect to services furnished to an individual unless the identity and immigration status of the individual has been verified with the Immigration and Naturalization Service in accordance with procedures established by the Attorney General.

(c) ADMINISTRATION.—This section shall be administered by the Attorney General, in consultation with the Secretary of Health and Human Services.

(d) EFFECTIVE DATE.—Subsection (a) shall not apply to emergency medical services furnished before October 1, 1995.

**SEC. 605. REPORT ON DISQUALIFICATION OF ILLEGAL ALIENS FROM HOUSING ASSISTANCE PROGRAMS.**

Not later than 90 days after the date of the enactment of this Act, the Secretary of Housing and Urban Development shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate, the Committee on Banking of the House of Representatives, and the Committee on Banking, Housing, and Urban Affairs of the Senate, describing the manner in which the Secretary is enforcing section 214 of the Housing and Community Development Act of 1980. The report shall contain statistics with respect to the number of aliens denied financial assistance under such section.

**SEC. 606. VERIFICATION OF STUDENT ELIGIBILITY FOR POSTSECONDARY FEDERAL STUDENT FINANCIAL ASSISTANCE.**

No student shall be eligible for postsecondary Federal student financial assistance unless the student has certified that the student is a citizen or national of the United States or an alien lawfully admitted for permanent residence and the Secretary of Education has verified such certification through an appropriate procedure determined by the Attorney General.

**SEC. 607. PAYMENT OF PUBLIC ASSISTANCE BENEFITS.**

In carrying out this part, the payment or provision of benefits (other than those described in section 603 under a program of assistance described in section 601(a)(1)) shall be made only through an individual or person who is not ineligible to receive such benefits under such program on the basis of immigration status pursuant to the requirements and limitations of this part.

**SEC. 608. DEFINITIONS.**

For purposes of this part:

(1) LAWFUL PRESENCE.—The determination of whether an alien is lawfully present in the United States shall be made in accordance with regulations of the Attorney General. An alien shall not be considered to be lawfully present in the United States for purposes of this title merely because the alien may be considered to be permanently residing in the United States under color of law for purposes of any particular program.

(2) STATE.—The term "State" includes the District of Columbia, Puerto Rico, the Virgin Islands, Guam, the Northern Mariana Islands, and American Samoa.

**SEC. 609. REGULATIONS AND EFFECTIVE DATES.**

(a) REGULATIONS.—The Attorney General shall first issue regulations to carry out this part (other than section 605) by not later than 60 days after the date of the enactment of this Act. Such regulations shall take effect on an interim basis, pending change after opportunity for public comment.

(b) EFFECTIVE DATE FOR RESTRICTIONS ON ELIGIBILITY FOR PUBLIC BENEFITS.—(1) Except as provided in this subsection, section 601 shall apply to benefits provided, contracts or loan agreements entered into, and professional and commercial licenses issued (or renewed) on or after such date as the Attorney General specifies in regulations under subsection (a). Such date shall be at least 30 days, and not more than 60 days, after the date the Attorney General first issues such regulations.

(2) The Attorney General, in carrying out section 601(a)(2), may permit such section to be waived in the case of individuals for whom an application for the grant, contract, loan, or license is pending (or approved) as of a date that is on or before the effective date specified under paragraph (1).

89

(c) EFFECTIVE DATE FOR RESTRICTIONS ON ELIGIBILITY FOR UNEMPLOYMENT BENE-FITS.—(1) Except as provided in this subsection, section 602 shall apply to unemployment benefits provided on or after such date as the Attorney General specifies in regulations under subsection (a). Such date shall be at least 30 days, and not more than 60 days, after the date the Attorney General first issues such regulations.

(2) The Attorney General, in carrying out section 602, may permit such section to be waived in the case of an individual during a continuous period of unemployment for whom an application for unemployment benefits is pending as of a date that is on or before the effective date specified under paragraph (1).

(d) BROAD DISSEMINATION OF INFORMATION.—Before the effective dates specified in subsections (b) and (c), the Attorney General shall broadly disseminate information regarding the restrictions on eligibility established under this part.

## PART 2—EARNED INCOME TAX CREDIT

### SEC. 611. EARNED INCOME TAX CREDIT DENIED TO INDIVIDUALS NOT AUTHORIZED TO BE EMPLOYED IN THE UNITED STATES.

(a) IN GENERAL.—Section 32(c)(1) of the Internal Revenue Code of 1986 (relating to individuals eligible to claim the earned income tax credit) is amended by adding at the end the following new subparagraph:

"(F) IDENTIFICATION NUMBER REQUIREMENT.—The term 'eligible individual' does not include any individual who does not include on the return of tax for the taxable year—

"(i) such individual's taxpayer identification number, and

"(ii) if the individual is married (within the meaning of section 7703), the taxpayer identification number of such individual's spouse."

(b) SPECIAL IDENTIFICATION NUMBER.—Section 32 of the Internal Revenue Code of 1986 (relating to earned income) is amended by adding at the end the following new subsection:

"(k) IDENTIFICATION NUMBERS.—For purposes of subsections (c)(1)(F) and (c)(3)(D), a taxpayer identification number means a social security number issued to an individual by the Social Security Administration (other than a social security number issued pursuant to clause (II) (or that portion of clause (III) that relates to clause (II)) of section 205(c)(2)(B)(i) of the Social Security Act)."

(c) EXTENSION OF PROCEDURES APPLICABLE TO MATHEMATICAL OR CLERICAL ER-RORS.—Section 6213(g)(2) of the Internal Revenue Code of 1986 (relating to the definition of mathematical or clerical errors) is amended by striking "and" at the end of subparagraph (D), by striking the period at the end of subparagraph (E) and inserting ", and", and by inserting after subparagraph (E) the following new subparagraph:

"(F) an omission of a correct taxpayer identification number required under section 23 (relating to credit for families with younger children) or section 32 (relating to the earned income tax credit) to be included on a return.".

(d) EFFECTIVE DATE.—The amendments made by this section shall apply to taxable years beginning after December 31, 1995.

## Subtitle B—Expansion of Disqualification From Immigration Benefits on the Basis of Public Charge

### SEC. 621. GROUND FOR INADMISSIBILITY.

(a) IN GENERAL.—Paragraph (4) of section 212(a) (8 U.S.C. 1182(a)) is amended to read as follows:

"(4) PUBLIC CHARGE.—

"(A) FAMILY-SPONSORED IMMIGRANTS.—Any alien who seeks admission or adjustment of status under a visa number issued under section 203(a), who cannot demonstrate to the consular officer at the time of application for a visa, or to the Attorney General at the time of application for admission or adjustment of status, that the alien's age, health, family status, assets, resources, financial status, education, skills, or a combination thereof, or an affidavit of support described in section 213A, or both, make it unlikely that the alien will become a public charge (as determined under section 241(a)(5)(B)) is inadmissible.

90

"(B) NONIMMIGRANTS.—Any alien who seeks admission under a visa number issued under section 214, who cannot demonstrate to the consular officer at the time of application for the visa that the alien's age, health, family status, assets, resources, financial status, education, skills or a combination thereof, or an affidavit of support described in section 213A, or both, make it unlikely that the alien will become a public charge (as determined under section 241(a)(5)(B)) is inadmissible.

"(C) EMPLOYMENT-BASED IMMIGRANTS.—

"(i) IN GENERAL.—Any alien who seeks admission or adjustment of status under a visa number issued under paragraph (2) or (3) of section 203(b) who cannot demonstrate to the consular officer at the time of application for a visa, or to the Attorney General at the time of application for admission or adjustment of status, that the immigrant has a valid offer of employment is inadmissible.

"(ii) CERTAIN EMPLOYMENT-BASED IMMIGRANTS.—Any alien who seeks admission or adjustment of status under a visa number issued under section 203(b) by virtue of a classification petition filed by a relative of the alien (or by an entity in which such relative has a significant ownership interest) is inadmissible unless such relative has executed an affidavit of support described in section 213A with respect to such alien.".

(b) EFFECTIVE DATE.—(1) Subject to paragraph (2), the amendment made by subsection (a) shall apply to applications submitted on or after such date, not earlier than 30 days and not later than 60 days after the date the Attorney General promulgates under section 632(f) a standard form for an affidavit of support, as the Attorney General shall specify.

(2) Section 212(a)(4)(C)(i) of the Immigration and Nationality Act, as amended by subsection (a), shall apply only to aliens seeking admission or adjustment of status under a visa number issued on or after October 1, 1996.

**SEC. 622. GROUND FOR DEPORTABILITY.**

(a) IN GENERAL.—Paragraph (5) of subsection (a) of section 241 (8 U.S.C. 1251(a)), before redesignation as section 237 by section 305(a)(2), is amended to read as follows:

"(5) PUBLIC CHARGE.—

"(A) IN GENERAL.—Any alien who, within 7 years after the date of entry or admission, becomes a public charge is deportable.

"(B) EXCEPTIONS.—(i) Subparagraph (A) shall not apply if the alien establishes that the alien has become a public charge from causes that arose after entry or admission. A condition that the alien knew (or had reason to know) existed at the time of entry or admission shall be deemed to be a cause that arose before entry or admission.

"(ii) The Attorney General, in the discretion of the Attorney General, may waive the application of subparagraph (A) in the case of an alien who is admitted as a refugee under section 207 or granted asylum under section 208.

"(C) INDIVIDUALS TREATED AS PUBLIC CHARGE.—

"(i) IN GENERAL.—For purposes of this title, an alien is deemed to be a 'public charge' if the alien receives benefits (other than benefits described in subparagraph (E)) under one or more of the public assistance programs described in subparagraph (D) for an aggregate period, except as provided in clauses (ii) and (iii), of at least 12 months within 7 years after the date of entry. The previous sentence shall not be construed as excluding any other bases for considering an alien to be a public charge, including bases in effect on the day before the date of the enactment of the Immigration in the National Interest Act of 1995. The Attorney General, in consultation with the Secretary of Health and Human Services, shall establish rules regarding the counting of health benefits described in subparagraph (D)(iv) for purposes of this subparagraph.

"(ii) DETERMINATION WITH RESPECT TO BATTERED WOMEN AND CHILDREN.—For purposes of a determination under clause (i) and except as provided in clause (iii), the aggregate period shall be 48 months within 7 years after the date of entry if the alien can demonstrate that (I) the alien has been battered or subject to extreme cruelty in the United States by a spouse or parent, or by a member of the spouse or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, or (II) the alien's child has been battered or subject to extreme cruelty in the

91

United States by a spouse or parent of the alien (without the active participation of the alien in the battery or extreme cruelty), or by a member of the spouse or parent's family residing in the same household as the alien when the spouse or parent consented or acquiesced to and the alien did not actively participate in such battery or cruelty, and the need for the public benefits received has a substantial connection to the battery or cruelty described in subclause (I) or (II).

"(iii) SPECIAL RULE FOR ONGOING BATTERY OR CRUELTY.—For purposes of a determination under clause (i), the aggregate period may exceed 48 months within 7 years after the date of entry if the alien can demonstrate that any battery or cruelty under clause (ii) is ongoing, has led to the issuance of an order of a judge or an administrative law judge or a prior determination of the Service, and that the need for the benefits received has a substantial connection to such battery or cruelty.

"(D) PUBLIC ASSISTANCE PROGRAMS.—For purposes of subparagraph (B), the public assistance programs described in this subparagraph are the following (and include any successor to such a program as identified by the Attorney General in consultation with other appropriate officials):

"(i) SSI.—The supplemental security income program under title XVI of the Social Security Act, including State supplementary benefits programs referred to in such title.

"(ii) AFDC.—The program of aid to families with dependent children under part A or E of title IV of the Social Security Act.

"(iii) MEDICAID.—The program of medical assistance under title XIX of the Social Security Act.

"(iv) FOOD STAMPS.—The program under the Food Stamp Act of 1977.

"(v) STATE GENERAL CASH ASSISTANCE.—A program of general cash assistance of any State or political subdivision of a State.

"(vi) HOUSING ASSISTANCE.—Financial assistance as defined in section 214(b) of the Housing and Community Development Act of 1980.

"(E) CERTAIN ASSISTANCE EXCEPTED.—For purposes of subparagraph (B), an alien shall not be considered to be a public charge on the basis of receipt of any of the following benefits:

"(i) EMERGENCY MEDICAL SERVICES.—The provision of emergency medical services (as defined by the Attorney General in consultation with the Secretary of Health and Human Services).

"(ii) PUBLIC HEALTH IMMUNIZATIONS.—Public health assistance for immunizations with respect to immunizable diseases and for testing and treatment for communicable diseases.

"(iii) SHORT-TERM EMERGENCY RELIEF.—The provision of non-cash, in-kind, short-term emergency relief.".

(b) EFFECTIVE DATE.—(1) The amendment made by subsection (a) shall take effect as of the first day of the first month beginning at least 30 days after the date of the enactment of this Act.

(2) In applying section 241(a)(5)(C) of the Immigration and Nationality Act (which is subsequently redesignated as section 237(a)(5)(C) of such Act), as amended by subsection (a), no receipt of benefits under a public assistance program before the effective date described in paragraph (1) shall be taken into account.

## Subtitle C—Attribution of Income and Affidavits of Support

### SEC. 631. ATTRIBUTION OF SPONSOR'S INCOME AND RESOURCES TO FAMILY-SPONSORED IMMIGRANTS.

(a) FEDERAL PROGRAMS.—Notwithstanding any other provision of law, in determining the eligibility and the amount of benefits of an alien for any Federal means-tested public benefits program (as defined in subsection (d)) the income and resources of the alien shall be deemed to include—

(1) the income and resources of any individual who executed an affidavit of support pursuant to section 213A of the Immigration and Nationality Act (as inserted by section 632(a)) in behalf of such alien, and

(2) the income and resources of the spouse (if any) of the individual.

(b) PERIOD OF ATTRIBUTION.—

(1) PARENTS OF UNITED STATES CITIZENS.—Subsection (a) shall apply with respect to an alien who is admitted to the United States as the parent of a United

92

States citizen under section 203(a)(2) of the Immigration and Nationality Act, as amended by section 512(a), until the alien is naturalized as a citizen of the United States.

(2) SPOUSES OF UNITED STATES CITIZENS AND LAWFUL PERMANENT RESIDENTS.—Subsection (a) shall apply with respect to an alien who is admitted to the United States as the spouse of a United States citizen or lawful permanent resident under section 201(b)(2) of 203(a)(1) of the Immigration and Nationality Act until—

(A) 7 years after the date the alien is lawfully admitted to the United States for permanent residence, or

(B) the alien is naturalized as a citizen of the United States, whichever occurs first.

(3) MINOR CHILDREN OF UNITED STATES CITIZENS AND LAWFUL PERMANENT RESIDENTS.—Subsection (a) shall apply with respect to an alien who is admitted to the United States as the minor child of a United States citizen or lawful permanent resident under section 201(b)(2) of 203(a)(1) of the Immigration and Nationality Act until the child attains the age of 21 years or, if earlier, the date the child is naturalized as a citizen of the United States.

(4) ATTRIBUTION OF SPONSOR'S INCOME AND RESOURCES ENDED IF SPONSORED ALIEN BECOMES ELIGIBLE FOR OLD-AGE BENEFITS UNDER TITLE II OF THE SOCIAL SECURITY ACT.—

(A) Notwithstanding any other provision of this section, subsection (a) shall not apply and the period of attribution of a sponsor's income and resources under this subsection shall terminate if the alien is employed for a period sufficient to qualify for old age benefits under title II of the Social Security Act and the alien is able to prove to the satisfaction of the Attorney General that the alien so qualifies.

(B) The Attorney General shall ensure that appropriate information pursuant to subparagraph (A) is provided to the System for Alien Verification of Eligibility (SAVE).

(5) BATTERED WOMEN AND CHILDREN.—Notwithstanding any other provision of this section, subsections (a) and (c) shall not apply and the period of attribution of the income and resources of any individual under paragraphs (1) or (2) of subsection (a) or paragraph (1) shall not apply—

(A) for up to 48 months if the alien can demonstrate that (i) the alien has been battered or subject to extreme cruelty in the United States by a spouse or parent, or by a member of the spouse or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, or (ii) the alien's child has been battered or subject to extreme cruelty in the United States by a spouse or parent of the alien (without the active participation of the alien in the battery or extreme cruelty), or by a member of the spouse or parent's family residing in the same household as the alien when the spouse or parent consented or acquiesced to and the alien did not actively participate in such battery or cruelty, and need for the public benefits applied for has a substantial connection to the battery or cruelty described in clause (i) or (ii); and

(B) for more than 48 months if the alien can demonstrate that any battery or cruelty under subparagraph (A) is ongoing, has led to the issuance of an order of a judge or an administrative law judge or a prior determination of the Service, and that need for such benefits has a substantial connection to such battery or cruelty.

(c) OPTIONAL APPLICATION TO STATE PROGRAMS.—

(1) AUTHORITY.—Notwithstanding any other provision of law, in determining the eligibility and the amount of benefits of an alien for any State means-tested public benefits program, the State or political subdivision that offers the program is authorized to provide that the income and resources of the alien shall be deemed to include—

(A) the income and resources of any individual who executed an affidavit of support pursuant to section 213A of the Immigration and Nationality Act (as inserted by section 632(a)) in behalf of such alien, and

(B) the income and resources of the spouse (if any) of the individual.

(2) PERIOD OF ATTRIBUTION.—The period of attribution of a sponsor's income and resources in determining the eligibility and amount of benefits for an alien under any State means-tested public benefits program pursuant to paragraph (1) may not exceed the Federal period of attribution with respect to the alien.

(d) MEANS-TESTED PROGRAM DEFINED.—In this section:

93

(1) The term "means-tested public benefits program" means a program of public benefits (including cash, medical, housing, and food assistance and social services) of the Federal Government or of a State or political subdivision of a State in which the eligibility of an individual, household, or family eligibility unit for benefits under the program, or the amount of such benefits, or both are determined on the basis of income, resources, or financial need of the individual, household, or unit.

(2) The term "Federal means-tested public benefits program" means a means-tested public benefits program of (or contributed to by) the Federal Government.

(3) The term "State means-tested public benefits program" means a means-tested public benefits program that is not a Federal means-tested program.

**SEC. 632. REQUIREMENTS FOR SPONSOR'S AFFIDAVIT OF SUPPORT.**

(a) IN GENERAL.—Title II is amended by inserting after section 213 the following new section:

"REQUIREMENTS FOR SPONSOR'S AFFIDAVIT OF SUPPORT"

"SEC. 213A. (a) ENFORCEABILITY.—(1) No affidavit of support may be accepted by the Attorney General or by any consular officer to establish that an alien is not inadmissible as a public charge under section 212(a)(4) unless such affidavit is executed by a sponsor of the alien as a contract—

"(A) that is legally enforceable against the sponsor by the Federal Government and by any State (or any political subdivision of such State) that provides any means-tested public benefits program, subject to subsection (b)(4); and

"(B) in which the sponsor agrees to submit to the jurisdiction of any Federal or State court for the purpose of actions brought under subsection (b)(2).

"(2)(A) An affidavit of support shall be enforceable with respect to benefits provided under any means-tested public benefits program for an alien who is admitted to the United States as the parent of a United States citizen under section 203(a)(2) until the alien is naturalized as a citizen of the United States.

"(B) An affidavit of support shall be enforceable with respect to benefits provided under any means-tested public benefits program for an alien who is admitted to the United States as the spouse of a United States citizen under section 201(b)(2) or 203(a)(2) until—

"(i) 7 years after the date the alien is lawfully admitted to the United States for permanent residence, or

"(ii) such time as the alien is naturalized as a citizen of the United States, whichever occurs first.

"(C) An affidavit of support shall be enforceable with respect to benefits provided under any means-tested public benefits program for an alien who is admitted to the United States as the minor child of a United States citizen or lawful permanent resident under section 201(b)(2) or section 203(a)(2) until the child attains the age of 21 years.

"(D)(i) Notwithstanding any other provision of this subparagraph, a sponsor shall be relieved of any liability under an affidavit of support if the sponsored alien is employed for a period sufficient to qualify for old age benefits under title II of the Social Security Act and the sponsor or alien is able to prove to the satisfaction of the Attorney General that the alien so qualifies.

"(ii) The Attorney General shall ensure that appropriate information pursuant to clause (i) is provided to the System for Alien Verification of Eligibility (SAVE).

"(b) REIMBURSEMENT OF GOVERNMENT EXPENSES.—(1)(A) Upon notification that a sponsored alien has received any benefit under any means-tested public benefits program, the appropriate Federal, State, or local official shall request reimbursement by the sponsor in the amount of such assistance.

"(B) The Attorney General, in consultation with the Secretary of Health and Human Services, shall prescribe such regulations as may be necessary to carry out subparagraph (A).

"(2) If within 45 days after requesting reimbursement, the appropriate Federal, State, or local agency has not received a response from the sponsor indicating a willingness to commence payments, an action may be brought against the sponsor pursuant to the affidavit of support.

"(3) If the sponsor fails to abide by the repayment terms established by such agency, the agency may, within 60 days of such failure, bring an action against the sponsor pursuant to the affidavit of support.

"(4) No cause of action may be brought under this subsection later than 10 years after the alien last received any benefit under any means-tested public benefits program.

94

"(5) If, pursuant to the terms of this subsection, a Federal, State, or local agency requests reimbursement from the sponsor in the amount of assistance provided, or brings an action against the sponsor pursuant to the affidavit of support, the appropriate agency may appoint or hire an individual or other person to act on behalf of such agency acting under the authority of law for purposes of collecting any moneys owed. Nothing in this subsection shall preclude any appropriate Federal, State, or local agency from directly requesting reimbursement from a sponsor for the amount of assistance provided, or from bringing an action against a sponsor pursuant to an affidavit of support.

"(c) REMEDIES.—Remedies available to enforce an affidavit of support under this section include any or all of the remedies described in section 3201, 3203, 3204, or 3205 of title 28, United States Code, as well as an order for specific performance and payment of legal fees and other costs of collection, and include corresponding remedies available under State law. A Federal agency may seek to collect amounts owed under this section in accordance with the provisions of subchapter II of chapter 37 of title 31, United States Code.

"(d) NOTIFICATION OF CHANGE OF ADDRESS.—(1) The sponsor of an alien shall notify the Federal Government and the State in which the sponsored alien is currently residing within 30 days of any change of address of the sponsor during the period specified in subsection (a)(1).

"(2) Any person subject to the requirement of paragraph (1) who fails to satisfy such requirement shall be subject to a civil penalty of—

"(A) not less than $250 or more than $2,000, or

"(B) if such failure occurs with knowledge that the sponsored alien has received any benefit under any means-tested public benefits program, not less than $2,000 or more than $5,000.

"(e) DEFINITIONS.—For the purposes of this section—

"(1) SPONSOR.—The term 'sponsor' means, with respect to an alien, an individual who—

"(A) is a citizen or national of the United States or an alien who is lawfully admitted to the United States for permanent residence;

"(B) is 18 years of age or over;

"(C) is domiciled in any State;

"(D) demonstrates, through presentation of a certified copy of a tax return or otherwise, (i) the means to maintain an annual income equal to at least 200 percent of the poverty level for the individual and the individual's family (including the alien and any other aliens with respect to whom the individual is a sponsor), or (ii) for an individual who is on active duty (other than active duty for training) in the Armed Forces of the United States, the means to maintain an annual income equal to at least 100 percent of the poverty level for the individual and the individual's family including the alien and any other aliens with respect to whom the individual is a sponsor); and

"(E) is petitioning for the admission of the alien under section 204 (or is an individual who accepts joint and several liability with the petitioner).

"(2) FEDERAL POVERTY LINE.—The term 'Federal poverty line' means the income official poverty line (as defined in section 673(2) of the Community Services Block Grant Act) that is applicable to a family of the size involved.

"(3) MEANS-TESTED PUBLIC BENEFITS PROGRAM.—The term 'means-tested public benefits program' means a program of public benefits (including cash, medical, housing, and food assistance and social services) of the Federal Government or of a State or political subdivision of a State in which the eligibility of an individual, household, or family eligibility unit for benefits under the program, or the amount of such benefits, or both are determined on the basis of income, resources, or financial need of the individual, household, or unit.".

(b) REQUIREMENT OF AFFIDAVIT OF SUPPORT FROM EMPLOYMENT SPONSORS.—For requirement for affidavit of support from individuals who file classification petitions for a relative as an employment-based immigrant, see the amendment made by section 621(a).

(c) SETTLEMENT OF CLAIMS PRIOR TO NATURALIZATION.—Section 316 (8 U.S.C. 1427) is amended—

(1) in subsection (a), by striking "and" before "(3)", and by inserting before the period at the end the following: ", and (4) in the case of an applicant that has received assistance under a means-tested public benefits program (as defined in subsection (f)(3) of section 213A) administered by a Federal, State, or local agency and with respect to which amounts may be owing under an affidavit of support executed under such section, provides satisfactory evidence that there are no outstanding amounts that may be owed to any such Federal, State, or

local agency pursuant to such affidavit by the sponsor who executed such affidavit, except as provided in subsection (g)''; and

(2) by adding at the end the following new subsection:

"(g) Clause (4) of subsection (a) shall not apply to an applicant where the applicant can demonstrate that—

"(A) either—

"(i) the applicant has been battered or subject to extreme cruelty in the United States by a spouse or parent or by a member of the spouse or parent's family residing in the same household as the applicant and the spouse or parent consented or acquiesced to such battery or cruelty, or

"(ii) the applicant's child has been battered or subject to extreme cruelty in the United States by the applicant's spouse or parent (without the active participation of the applicant in the battery or extreme cruelty), or by a member of the spouse or parent's family residing in the same household as the applicant when the spouse or parent consented or acquiesced to and the applicant did not actively participate in such battery or cruelty;

"(B) such battery or cruelty has led to the issuance of an order of a judge or an administrative law judge or a prior determination of the Service; and

"(C) the need for the public benefits received as to which amounts are owing had a substantial connection to the battery or cruelty described in subparagraph (A).".

(d) CLERICAL AMENDMENT.—The table of contents is amended by inserting after the item relating to section 213 the following:

"Sec. 213A.    Requirements for sponsor's affidavit of support.".

(e) EFFECTIVE DATE.—Subsection (a) of section 213A of the Immigration and Nationality Act, as inserted by subsection (a) of this section, shall apply to affidavits of support executed on or after a date specified by the Attorney General, which date shall be not earlier than 60 days (and not later than 90 days) after the date the Attorney General formulates the form for such affidavits under subsection (f) of this section.

(f) PROMULGATION OF FORM.—Not later than 90 days after the date of the enactment of this Act, the Attorney General, in consultation with the Secretary of State and the Secretary of Health and Human Services, shall promulgate a standard form for an affidavit of support consistent with the provisions of section 213A of the Immigration and Nationality Act.

# TITLE VII—FACILITATION OF LEGAL ENTRY

**SEC. 701. ADDITIONAL LAND BORDER INSPECTORS; INFRASTRUCTURE IMPROVEMENTS.**

(a) INCREASED PERSONNEL.—

(1) IN GENERAL.—In order to eliminate undue delay in the thorough inspection of persons and vehicles lawfully attempting to enter the United States, the Attorney General and Secretary of the Treasury shall increase, by approximately equal numbers in each of the fiscal years 1996 and 1997, the number of full-time land border inspectors assigned to active duty by the Immigration and Naturalization Service and the United States Customs Service to a level adequate to assure full staffing during peak crossing hours of all border crossing lanes now in use, under construction, or construction of which has been authorized by Congress.

(2) DEPLOYMENT OF PERSONNEL.—The Attorney General and the Secretary of the Treasury shall, to the maximum extent practicable, ensure that the personnel hired pursuant to this subsection shall be deployed among the various Immigration and Naturalization Service sectors in proportion to the number of land border crossings measured in each such sector during the preceding fiscal year.

(b) IMPROVED INFRASTRUCTURE.—

(1) IN GENERAL.—The Attorney General may, from time to time, in consultation with the Secretary of the Treasury, identify those physical improvements to the infrastructure of the international land borders of the United States necessary to expedite the inspection of persons and vehicles attempting to lawfully enter the United States in accordance with existing policies and procedures of the Immigration and Naturalization Service, the United States Customs Service, and the Drug Enforcement Agency.

(2) PRIORITIES.—Such improvements to the infrastructure of the land border of the United States shall be substantially completed and fully funded in those portions of the United States where the Attorney General, in consultation with

96

the Committees on the Judiciary of the House of Representatives and the Senate, objectively determines the need to be greatest or most immediate before the Attorney General may obligate funds for construction of any improvement otherwise located.

**SEC. 702. COMMUTER LANE PILOT PROGRAMS.**

(a) MAKING LAND BORDER INSPECTION FEE PERMANENT.—Section 286(q) (8 U.S.C. 1356(q)) is amended—

    (1) in paragraph (1), by striking "a project" and inserting "projects";

    (2) in paragraph (1), by striking "Such project" and inserting "Such projects"; and

    (3) by striking paragraph (5).

(b) CONFORMING AMENDMENT.—The Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriation Act, 1994 (Public Law 103–121, 107 Stat. 1161) is amended by striking the fourth proviso under the heading "Immigration and Naturalization Service, Salaries and Expenses".

**SEC. 703. PREINSPECTION AT FOREIGN AIRPORTS.**

(a) IN GENERAL.—The Immigration and Nationality Act is amended by inserting after section 235 the following new section:

"PREINSPECTION AT FOREIGN AIRPORTS

"SEC. 235A. (a) ESTABLISHMENT OF PREINSPECTION STATIONS.—(1) Subject to paragraph (4), not later than 2 years after the date of the enactment of this section, the Attorney General, in consultation with the Secretary of State, shall establish and maintain preinspection stations in at least 5 of the foreign airports that are among the 10 foreign airports which the Attorney General identifies as serving as last points of departure for the greatest numbers of passengers who arrive from abroad by air at ports of entry within the United States. Such preinspection stations shall be in addition to any preinspection stations established prior to the date of the enactment of this section.

"(2) Not later than November 1, 1995, and each subsequent November 1, the Attorney General shall compile data identifying—

    "(A) the foreign airports which served as last points of departure for aliens who arrived by air at United States ports of entry without valid documentation during the preceding fiscal years,

    "(B) the number and nationality of such aliens arriving from each such foreign airport, and

    "(C) the primary routes such aliens followed from their country of origin to the United States.

"(3) Subject to paragraph (4), not later than 4 years after the date of enactment of this section, the Attorney General, in consultation with the Secretary of State, shall establish preinspection stations in at least 5 additional foreign airports which the Attorney General, in consultation with the Secretary of State, determines based on the data compiled under paragraph (2) and such other information as may be available would most effectively reduce the number of aliens who arrive from abroad by air at points of entry within the United States without valid documentation. Such preinspection stations shall be in addition to those established prior to or pursuant to paragraph (1).

"(4) Prior to the establishment of a preinspection station the Attorney General, in consultation with the Secretary of State, shall ensure that—

    "(A) employees of the United States stationed at the preinspection station and their accompanying family members will receive appropriate protection,

    "(B) such employees and their families will not be subject to unreasonable risks to their welfare and safety, and

    "(C) the country in which the preinspection station is to be established maintains practices and procedures with respect to asylum seekers and refugees in accordance with the Convention Relating to the Status of Refugees (done at Geneva, July 28, 1951), or the Protocol Relating to the Status of Refugees (done at New York, January 31, 1967).

"(b) ESTABLISHMENT OF CARRIER CONSULTANT PROGRAM.—The Attorney General shall assign additional immigration officers to assist air carriers in the detection of fraudulent documents at foreign airports which, based on the records maintained pursuant to subsection (a)(2), served as a point of departure for a significant number of arrivals at United States ports of entry without valid documentation, but where no preinspection station exists.".

97

(c) Clerical Amendment.—The table of contents, as amended by section 308(a)(2), is further amended by inserting after the item relating to section 235 the following new item:

"Sec. 235A.   Preinspection at foreign airports.".

**SEC. 704. TRAINING OF AIRLINE PERSONNEL IN DETECTION OF FRAUDULENT DOCUMENTS.**

(a) Use of Funds.—Section 286(h)(2)(A) (8 U.S.C. 1356(h)(2)(A)) is amended—

(1) in clause (iv), by inserting ", including training of, and technical assistance to, commercial airline personnel regarding such detection" after "United States", and

(2) by adding at the end the following:

"The Attorney General shall provide for expenditures for training and assistance described in clause (iv) in an amount, for any fiscal year, not less than 5 percent of the total of the expenses incurred that are described in the previous sentence.".

(b) Compliance With Detection Regulations.—Section 212(f) (8 U.S.C. 1182(f)) is amended by adding at the end the following: "Whenever the Attorney General finds that a commercial airline has failed to comply with regulations of the Attorney General relating to requirements of airlines for the detection of fraudulent documents used by passengers traveling to the United States (including the training of personnel in such detection), the Attorney General may suspend the entry of some or all aliens transported to the United States by such airline.".

(c) Effective Dates.—

(1) The amendments made by subsection (a) shall apply to expenses incurred during or after fiscal year 1996.

(2) The Attorney General shall first issue, in proposed form, regulations referred to in the second sentence of section 212(f) of the Immigration and Nationality Act, as added by the amendment made by subsection (b), by not later than 90 days after the date of the enactment of this Act.

# TITLE VIII—MISCELLANEOUS PROVISIONS

## Subtitle A—Amendments to the Immigration and Nationality Act

**SEC. 801. NONIMMIGRANT STATUS FOR SPOUSES AND CHILDREN OF MEMBERS OF THE ARMED SERVICES.**

Section 101(a)(15) (8 U.S.C. 1101(a)(15)) is amended—

(1) by striking "or" at the end of subparagraph (R),

(2) by striking the period at the end of subparagraph (S) and inserting "; or", and

(3) by inserting after subparagraph (S) the following new subparagraph:

"(T) an alien who is the spouse or child of a another alien who is serving on active duty in the Armed Forces of the United States during the period in which the other alien is stationed in the United States.".

**SEC. 802. AMENDED DEFINITION OF AGGRAVATED FELONY.**

(a) In General.—Section 101(a)(43) (8 U.S.C. 1101(a)(43)), as amended by section 222 of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416), is amended—

(1) in subparagraph (N), by striking "of title 18, United States Code" and inserting "of this Act", and

(2) in subparagraph (O), by striking "which constitutes" and all that follows up to the semicolon at the end and inserting ", for the purpose of commercial advantage".

(b) Effective Date of Conviction.—Section 101(a)(43) (8 U.S.C. 1101(a)(43)), as amended by section 222(a) of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416), is amended by adding at the end the following sentence: "Notwithstanding any other provision of law, the term applies for all purposes to convictions entered before, on, or after the date of enactment of the Immigration and Nationality Technical Corrections Act of 1994.".

(c) Effective Date.—The amendments made by this section shall be effective as if included in the enactment of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416).

98

### SEC. 803. AUTHORITY TO DETERMINE VISA PROCESSING PROCEDURES.

(a) IN GENERAL.—Section 202(a) (8 U.S.C. 1152(a)), as amended by section 524(d), is amended—

(1) in paragraph (1), by striking "paragraph (2)" and inserting "paragraphs (2) and (6)", and

(2) by adding at the end the following new paragraph:

"(6) CONSTRUCTION.—Nothing in paragraph (1) shall be construed to limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications or the locations where such applications will be processed.".

(b) ELIMINATION OF CONSULATE SHOPPING FOR VISA OVERSTAYS.—Section 222 (8 U.S.C. 1202) is amended by adding at the end the following new subsection:

"(g) In the case of an alien who has entered and remained in the United States beyond the authorized period of stay, the alien is not eligible to be admitted to the United States as a nonimmigrant on the basis of a visa issued other than in a consular office located in the country of the alien's nationality (or, if there is no office in such country, at such other consular office as the Secretary of State shall specify).".

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to visas issued before, on, or after the date of the enactment of this Act.

### SEC. 804. WAIVER AUTHORITY CONCERNING NOTICE OF DENIAL OF APPLICATION FOR VISAS.

Section 212(b) (8 U.S.C. 1182(b)) is amended—

(1) by redesignating paragraphs (1) and (2) as subparagraphs (A) and (B);

(2) by striking "If" and inserting "(1) Subject to paragraph (2), if"; and

(3) by inserting at the end the following paragraph:

"(2) With respect to applications for visas, the Secretary of State may waive the application of paragraph (1) in the case of a particular alien or any class or classes of aliens inadmissible under subsection (a)(2) or (a)(3).".

### SEC. 805. TREATMENT OF CANADIAN LANDED IMMIGRANTS.

Section 212(d)(4)(B) (8 U.S.C. 1182(d)(4)(B)) is amended—

(1) by striking "and residents" and inserting ", residents", and

(2) by striking "nationals," and inserting "nationals, and aliens who are granted permanent residence by the government of the foreign contiguous territory and who are residing in that territory".

### SEC. 806. CHANGES RELATING TO H-1B NONIMMIGRANTS.

(a) PROVISIONS RELATING TO WAGE DETERMINATIONS.—Section 212(n) (8 U.S.C. 1182(n)) is amended by adding at the end the following new paragraphs:

"(3) For purposes of determining the actual wage level paid under paragraph (1)(A)(i)(I), an employer shall not be required to have and document an objective system to determine the wages of workers.

"(4) For purposes of determining the actual wage level paid under paragraph (1)(A)(i)(I), a non-H-1B-dependent employer of more than 1,000 full-time equivalent employees in the United States may demonstrate that in determining the wages of H-1B nonimmigrants, it utilizes a compensation and benefits system that has been previously certified by the Secretary of Labor (and recertified at such intervals the Secretary of Labor may designate) to satisfy all of the following conditions:

"(A) The employer has a company-wide compensation policy for its full-time equivalent employees which ensures salary equity among employees similarly employed.

"(B) The employer has a company-wide benefits policy under which all full-time equivalent employees similarly employed are eligible for substantially the same benefits or under which some employees may accept higher pay, at least equal in value to the benefits, in lieu of benefits.

"(C) The compensation and benefits policy is communicated to all employees.

"(D) The employer has a human resources or compensation function that administers its compensation system.

"(E) The employer has established documentation for the job categories in question.

An employer's payment of wages consistent with a system which meets the conditions of subparagraphs (A) through (E) of this paragraph which has been certified by the Secretary of Labor pursuant to this paragraph shall be deemed to satisfy the requirements of paragraph (1)(A)(i)(I).

"(5) For purposes of determining the prevailing wage level paid under paragraph (1)(A)(i)(II), employers may provide a published survey, a State Employment Security Agency determination, a determination by an accepted private source, or any other legitimate source. The Secretary of Labor shall, not later than 180 days from

99

the date of enactment of this paragraph, provide for acceptance of prevailing wage determinations not made by a State Employment Security Agency. The Secretary of Labor or the Secretary's designate must either accept such a non-State Employment Security Agency wage determination or issue a written decision rejecting the determination and detailing the legitimate reasons that the determination is not acceptable. If a detailed rejection is not issued within 45 days of the date of the Secretary's receipt of such determination, the determination will be deemed accepted. An employer's payment of wages consistent with a prevailing wage determination not rejected by the Secretary of Labor under this paragraph shall be deemed to satisfy the requirements of paragraph (1)(A)(i)(II).".

(b) INAPPLICABILITY OF CERTAIN REGULATIONS TO NON-H–1B-DEPENDENT EMPLOYERS.—

(1) DEFINITION OF H–1B-DEPENDENT EMPLOYER.—Section 212(n)(2) (8 U.S.C. 1182(n)(2)) is amended by inserting after subparagraph (D) the following new subparagraphs:

"(E) In this subsection, the term 'H–1B-dependent employer' means an employer that—

"(i)(I) has fewer than 21 full-time equivalent employees who are employed in the United States, and (II) employs 4 or more H–1B nonimmigrants; or

"(ii)(I) has at least 21 but not more than 150 full-time equivalent employees who are employed in the United States, and (II) employs H–1B nonimmigrants in a number that is equal to at least 20 percent of the number of such full-time equivalent employees; or

"(iii)(I) has at least 151 full-time equivalent employees who are employed in the United States, and (II) employs H–1B nonimmigrants in a number that is equal to at least 15 percent of the number of such full-time equivalent employees.

In applying this subparagraph, any group treated as a single employer under subsection (b), (c), (m), or (o) of section 414 of the Internal Revenue Code of 1986 shall be treated as a single employer. Aliens employed under a petition for H–1B nonimmigrants shall be treated as employees, and counted as nonimmigrants under section 101(a)(15)(H)(i)(b) under this subparagraph. In this subsection, the term 'non-H–1B-dependent employer' means an employer that is not an H–1B-dependent employer.

"(F)(i) An employer who is an H–1B-dependent employer as defined in subparagraph (E) can nevertheless be treated as a non-H–1B-dependent employer for five years on a probationary status if—

"(I) the employer has demonstrated to the satisfaction of the Secretary of Labor that it has developed a reasonable plan for reducing its use of H–1B nonimmigrants over a five-year period to the level of a non-H–1B-dependent employer, and

"(II) annual reviews of that plan by the Secretary of Labor indicate successful implementation of that plan.

If the employer has not met the requirements established in this clause, the probationary status ends and the employer shall be treated as an H–1B-dependent employer until such time as the employer can prove to the Secretary of Labor that it no longer is an H–1B-dependent employer as defined in subparagraph (E).

"(ii) The probationary program set out in clause (i) shall be effective for no longer than five years after the date of the enactment of this subparagraph.".

(2) LIMITING APPLICATION OF CERTAIN REQUIREMENTS FOR NON-H–1B-DEPENDENT EMPLOYERS.—Section 212(n) (8 U.S.C. 1182(n)), as amended by subsection (a), is further amended by adding at the end the following new paragraph:

"(6) In carrying out this subsection in the case of an employer that is a non-H–1B-dependent employer—

"(A) the employer is not required to post a notice at a worksite that was not listed on the application under paragraph (1) if the worksite is within the area of intended employment listed on such application for such nonimmigrant; and

"(B) if the employer has filed and had certified an application under paragraph (1) with respect to one or more H–1B nonimmigrants for one or more areas of employment—

"(i) the employer is not required to file and have certified an additional application under paragraph (1) with respect to such a nonimmigrant for an area of employment not listed in the previous application because the employer has placed one or more such nonimmigrants in such a nonlisted area so long as either (I) each such nonimmigrant is not placed in such nonlisted areas for a period exceeding 45 workdays in any 12-month period and not to exceed 90 workdays in any 36-month period, or (II) each such

100

nonimmigrant's principal place of employment has not changed to a nonlisted area, and

"(ii) the employer is not required to pay per diem and transportation costs at any specified rates for work performed in such a nonlisted area.".

(3) LIMITATION ON AUTHORITY TO INITIATE COMPLAINTS AND CONDUCT INVESTIGATIONS FOR NON-H-1B-DEPENDENT EMPLOYERS.—Section 212(n)(2)(A) (8 U.S.C. 1182(n)(2)(A)) is amended—

(A) in the second sentence, by inserting before the period at the end the following: ", except that the Secretary may only file such a complaint in the case of an H–1B-dependent employer (as defined in subparagraph (E)) or when conducting an annual review of a plan pursuant to subparagraph (F)(i) if there appears to be a violation of an attestation or a misrepresentation of a material fact in an application", and

(B) by inserting after the second sentence the following new sentence: "No investigation or hearing shall be conducted with respect to a non-H–1B-dependent employer except in response to a complaint filed under the previous sentence.".

(c) No DISPLACEMENT OF AMERICAN WORKERS PERMITTED.—(1) Section 212(n)(1) (8 U.S.C. 1182(n)(1)) is amended by inserting after subparagraph (D) the following new subparagraph:

"(E)(i) If the employer, within the period beginning 6 months before and ending 90 days of the date of filing of the application or during the 90 days immediately preceding and following the date of filing of any visa petition supported by the application, has laid off or lays off any protected individual with substantially equivalent qualifications and experience in the specific employment as to which the nonimmigrant is sought or is employed, the employer will pay a wage to the nonimmigrant that is at least 110 percent of the arithmetic mean of the last wage earned by all such laid off individuals (or, if greater, at least 110 percent of the arithmetic mean of the highest wage earned by all such laid off individuals within the most recent year if the employer reduced the wage of any such laid off individual during such year other than in accordance with a general company-wide reduction of wages for substantially all employees).

"(ii) Except as provided in clause (iii), in the case of an H–1B-dependent employer which employs an H–1B nonimmigrant, the employer shall not place the nonimmigrant with another employer where—

"(I) the nonimmigrant performs his or her duties in whole or in part at one or more worksites owned, operated, or controlled by such other employer, and

"(II) there are indicia of an employment relationship between the nonimmigrant and such other employer.

"(iii) Clause (ii) shall not apply to an employer's placement of an H–1B nonimmigrant with another employer if—

"(I) the other employer has executed an attestation that it, within the period beginning 6 months before and ending 90 days following the date of filing of the application or during the 90 days immediately preceding and following the date of filing of any visa petition supported by the application, has not laid off and will not lay off any protected individual with substantially equivalent qualifications and experience in the specific employment as to which the H–1B nonimmigrant is being sought or is employed, or

"(II) the employer pays a wage to the nonimmigrant that is at least 110 percent of the arithmetic mean of the last wage earned by all such laid off individuals (or, if greater, at least 110 percent of the arithmetic mean of the highest wage earned by all such laid off individuals within the most recent year if the other employer reduced the wage of any such laid off individual during such year other than in accordance with a general company-wide reduction of wages for substantially all employees).

"(iv) For purposes of this subparagraph, the term 'laid off', with respect to an individual—

"(I) refers to the individual's loss of employment, other than a discharge for inadequate performance, cause, voluntary departure, or retirement, and

"(II) does not include any situation in which the individual involved is offered, as an alternative to such loss of employment, a similar job opportunity with the same employer (or with the H–1B-dependent employer described in clause (ii)) carrying equivalent or higher compensation and benefits as the position from which the employee was laid off, regardless of whether or not the employee accepts the offer.

101

"(v) For purposes of this subparagraph, the term 'protected individual' means an individual who—

"(I) is a citizen or national of the United States, or

"(II) is an alien who is lawfully admitted for permanent residence, is granted the status of an alien lawfully admitted for temporary residence under section 210(a), 210A(a), or 245(a)(1), is admitted as a refugee under section 207, or is granted asylum under section 208.".

(2) Section 212(n)(2) (8 U.S.C. 1182(n)(2)), as amended by subsection (b)(1), is amended by adding at the end the following new subparagraph:

"(G) Under regulations of the Secretary, the previous provisions of this paragraph shall apply to complaints respecting a failure of an other employer to comply with an attestation described in paragraph (1)(E)(iii)(I) in the same manner that they apply to complaints with respect to a failure to comply with a condition described in paragraph (1)(E)(i).".

(3) Section 212(n)(2)(C) (8 U.S.C. 1182(n)(2)(C)) is amended by inserting "or (1)(E)" after "(1)(B)".

(d) INCREASED PENALTIES.—Section 212(n)(2) is amended—

(1) in subparagraph (C)(i), by striking "$1,000" and inserting "$5,000";

(2) by amending subparagraph (C)(ii) to read as follows:

"(ii) the Attorney General shall not approve petitions filed with respect to that employer (or any employer who is a successor in interest) under section 204 or 214(c) for aliens to be employed by the employer—

"(I) during a period of at least 1 year in the case of the first determination of a violation or any subsequent determination of a violation occurring within 1 year of that first violation or any subsequent determination of a nonwillful violation occurring more than 1 year after the first violation;

"(II) during a period of at least 5 years in the case of a determination of a willful violation occurring more than 1 year after the first violation; and

"(III) at any time in the case of a determination of a willful violation occurring more than 5 years after a violation described in subclause (II)."; and

(3) in subparagraph (D), by adding at the end the following: "If a penalty under subparagraph (C) has been imposed in the case of a willful violation, the Secretary shall impose on the employer a civil monetary penalty in an amount equalling twice the amount of backpay.".

(e) COMPUTATION OF PREVAILING WAGE LEVEL.—Section 212(n) (8 U.S.C. 1182(n)), as amended by subsections (a) and (b)(2), is further amended by adding at the end the following new paragraph:

"(7) In computing the prevailing wage level for an occupational classification in an area of employment for purposes of paragraph (1)(A)(i)(II) and subsection (a)(5)(A) in the case of an employee of (A) an institution of higher education (as defined in section 1201(a) of the Higher Education Act of 1965), or a related or affiliated nonprofit entity, or (B) a nonprofit scientific research organization, the prevailing wage level shall only take into account employees at such institutions and entities in the area of employment.".

(f) CONFORMING AMENDMENTS.—Section 212(n) (8 U.S.C. 1182(n)) is further amended—

(1) in the matter in paragraph (1) before subparagraph (A), by inserting "(in this subsection referred to as an 'H–1B nonimmigrant')" after "101(a)(15)(H)(i)(b)"; and

(2) in paragraph (1)(A), by striking "nonimmigrant described in section 101(a)(15)(H)(i)(b)" and inserting "H–1B nonimmigrant".

(g) EFFECTIVE DATES.—

(1) Except as otherwise provided in this subsection, the amendments made by this section shall take effect on the date of the enactment of this Act and shall apply to applications filed with the Secretary of Labor on or after 30 days after the date of the enactment of this Act.

(2) The amendments made by subsection (b)(3) shall apply to complaints filed, and to investigations or hearings initiated, on or after January 19, 1995.

**SEC. 807. VALIDITY OF PERIOD OF VISAS.**

(a) EXTENSION OF VALIDITY OF IMMIGRANT VISAS TO 6 MONTHS.—Section 221(c) (8 U.S.C. 1201(c)) is amended by striking "four months" and inserting "six months".

(b) AUTHORIZING APPLICATION OF RECIPROCITY RULE FOR NONIMMIGRANT VISA IN CASE OF REFUGEES AND PERMANENT RESIDENTS.—Such section is further amended by inserting before the period at the end of the third sentence the following: "; except that in the case of aliens who are nationals of a foreign country and who either are granted refugee status and firmly resettled in another foreign country or are

102

granted permanent residence and residing in another foreign country, the Secretary of State may prescribe the period of validity of such a visa based upon the treatment granted by that other foreign country to alien refugees and permanent residents, respectively, in the United States".

**SEC. 808. LIMITATION ON ADJUSTMENT OF STATUS OF INDIVIDUALS NOT LAWFULLY PRESENT IN THE UNITED STATES.**

(a) IN GENERAL.—Section 245(i)(1) (8 U.S.C. 1255), as added by section 506(b) of the Department of State and Related Agencies Appropriations Act, 1995 (Public Law 103–317, 108 Stat. 1765), is amended by striking all that follows "equalling" through "application," and inserting "$2,500".

(b) ELIMINATION OF LIMITATION.—Section 212 (8 U.S.C. 1182) is amended by striking subsection (o).

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to applications for adjustment of status filed after September 30, 1996.

**SEC. 809. LIMITED ACCESS TO CERTAIN CONFIDENTIAL INS FILES.**

(a) LEGALIZATION PROGRAM.—Section 245A(c)(5) (8 U.S.C. 1255a(c)(5)) is amended—

(1) by redesignating subparagraphs (A) through (C) as clauses (i) through (iii), respectively;

(2) by striking "Neither" and inserting "(A) Except as provided in this paragraph, neither";

(3) by redesignating the last sentence as subparagraph (D);

(4) by striking the semicolon and inserting a period;

(5) by striking "except that the" and inserting the following:

"(B) The";

(6) by inserting after subparagraph (B), as created by the amendment made by paragraph (5), the following:

"(C) The Attorney General may authorize an application to a Federal court of competent jurisdiction for, and a judge of such court may grant, an order authorizing disclosure of information contained in the application of the alien under this section to be used—

"(i) for identification of the alien when there is reason to believe that the alien has been killed or severely incapacitated; or

"(ii) for criminal law enforcement purposes against the alien whose application is to be disclosed if the alleged criminal activity occurred after the legalization application was filed and such activity involves terrorist activity or poses either an immediate risk to life or to national security, or would be prosecutable as an aggravated felony, but without regard to the length of sentence that could be imposed on the applicant."; and

(7) by adding at the end the following new subparagraph:

"(E) Nothing in this paragraph shall preclude the release for immigration enforcement purposes of the following information contained in files or records of the Service pertaining to the application:

"(i) The immigration status of the applicant on any given date after the date of filing the application (including whether the applicant was authorized to work) but only for purposes of a determination of whether the applicant is eligible for relief from deportation or removal and not otherwise.

"(ii) The date of the applicant's adjustment (if any) to the status of an alien lawfully admitted for permanent residence.

"(iii) Information concerning whether the applicant has been convicted of a crime occurring after the date of filing the application.

"(iv) The date or disposition of the application.".

(b) SPECIAL AGRICULTURAL WORKER PROGRAM.—Section 210(b) of such Act (8 U.S.C. 1160(b)) is amended—

(1) in paragraph (5), by inserting ", except as permitted under paragraph (6)(B)" after "consent of the alien"; and

(2) in paragraph (6)—

(A) in subparagraph (A), by striking the period at the end and inserting a comma,

(B) by redesignating subparagraphs (A) through (C) as clauses (i) through (iii), respectively,

(C) by striking "Neither" and inserting "(A) Except as provided in subparagraph (B), neither",

(D) by striking "Anyone" and inserting the following:

"(C) Anyone",

(E) by inserting after the first sentence the following:

103

"(B) The Attorney General may authorize an application to a Federal court of competent jurisdiction for, and a judge of such court may grant, an order authorizing disclosure of information contained in the application of the alien to be used—

"(i) for identification of the alien when there is reason to believe that the alien has been killed or severely incapacitated, or

"(ii) for criminal law enforcement purposes against the alien whose application is to be disclosed if the alleged criminal activity occurred after the special agricultural worker application was filed and such activity involves terrorist activity or poses either an immediate risk to life or to national security, or would be prosecutable as an aggravated felony, but without regard to the length of sentence that could be imposed on the applicant.", and

"(F) by adding at the end the following new subparagraph:

"(D) Nothing in this paragraph shall preclude the release for immigration enforcement purposes of the following information contained in files or records of the Service pertaining to the application:

"(i) The immigration status of the applicant on any given date after the date of filing the application (including whether the applicant was authorized to work).

"(ii) The date of the applicant's adjustment (if any) to the status of an alien lawfully admitted for permanent residence.

"(iii) Information concerning whether the applicant has been convicted of a crime occurring after the date of filing the application.

"(iv) The date or disposition of the application.".

**SEC. 810. CHANGE OF NONIMMIGRANT CLASSIFICATION.**

Section 248 (8 U.S.C. 1258) is amended by inserting at the end the following: "Any alien whose status is changed under this section may apply to the Secretary of State for a visa without having to leave the United States and apply at the visa office.".

# Subtitle B—Other Provisions

**SEC. 831. COMMISSION REPORT ON FRAUD ASSOCIATED WITH BIRTH CERTIFICATES.**

Section 141 of the Immigration Act of 1990 is amended—

(1) in subsection (b)—

(A) by striking "and" at the end of paragraph (1),

(B) by striking the period at the end of paragraph (2) and inserting "; and", and

(C) by adding at the end the following new paragraph:

"(3) transmit to Congress, not later than January 1, 1997, a report containing recommendations (consistent with subsection (c)(3)) of methods of reducing or eliminating the fraudulent use of birth certificates for the purpose of obtaining other identity documents that may be used in securing immigration, employment, or other benefits."; and

(2) by adding at the end of subsection (c), the following new paragraph:

"(3) FOR REPORT ON REDUCING BIRTH CERTIFICATE FRAUD.—In the report described in subsection (b)(3), the Commission shall consider and analyze the feasibility of—

"(A) establishing national standards for counterfeit-resistant birth certificates, and

"(B) limiting the issuance of official copies of a birth certificate of an individual to anyone other than the individual or others acting on behalf of the individual.".

**SEC. 832. UNIFORM VITAL STATISTICS.**

(a) PILOT PROGRAM.—The Secretary of Health and Human Services shall consult with the State agency responsible for registration and certification of births and deaths and, within 2 years of the date of enactment of this Act, shall establish a pilot program for 3 of the 5 States with the largest number of undocumented aliens of an electronic network linking the vital statistics records of such States. The network shall provide, where practical, for the matching of deaths with births and shall enable the confirmation of births and deaths of citizens of such States, or of aliens within such States, by any Federal or State agency or official in the performance of official duties. The Secretary and participating State agencies shall institute measures to achieve uniform and accurate reporting of vital statistics into the pilot program network, to protect the integrity of the registration and certification proc-

104

ess, and to prevent fraud against the Government and other persons through the use of false birth or death certificates.

(b) REPORT.—Not later than 180 days after the establishment of the pilot program under subsection (a), the Secretary shall issue a written report to Congress with recommendations on how the pilot program could effectively be instituted as a national network for the United States.

(c) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated for fiscal year 1996 and for subsequent fiscal years such sums as may be necessary to carry out this section.

**SEC. 833. COMMUNICATION BETWEEN STATE AND LOCAL GOVERNMENT AGENCIES, AND THE IMMIGRATION AND NATURALIZATION SERVICE.**

Notwithstanding any other provision of Federal, State, or local law, no State or local government entity shall prohibit, or in any way restrict, any government entity or any official within its jurisdiction from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States. Notwithstanding any other provision of Federal, State, or local law (and excepting the attorney-client privilege), no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

**SEC. 834. CRIMINAL ALIEN REIMBURSEMENT COSTS.**

Amounts appropriated to carry out section 501 of the Immigration and Reform Act of 1986 for fiscal year 1995 shall be available to carry out section 242(j) of the Immigration and Nationality Act in that fiscal year with respect to undocumented criminal aliens incarcerated under the authority of political subdivisions of a State.

**SEC. 835. FEMALE GENITAL MUTILATION.**

(a) INFORMATION REGARDING FEMALE GENITAL MUTILATION.—The Immigration and Naturalization Service (in cooperation with the Department of State) shall make available for all aliens who are issued immigrant or nonimmigrant visas, prior to or at the time of entry into the United States, the following information:

(1) Information on the severe harm to physical and psychological health caused by female genital mutilation which is compiled and presented in a manner which is limited to the practice itself and respectful to the cultural values of the societies in which such practice takes place.

(2) Information concerning potential legal consequences in the United States for (A) performing female genital mutilation, or (B) allowing a child under his or her care to be subjected to female genital mutilation, under criminal or child protection statutes or as a form of child abuse.

(b) LIMITATION.—In consultation with the Secretary of State, the Commissioner of Immigration and Naturalization shall identify those countries in which female genital mutilation is commonly practiced and, to the extent practicable, limit the provision of information under subsection (a) to aliens from such countries.

(c) DEFINITION.— For purposes of this section, the term "female genital mutilation" means the removal or infibulation (or both) of the whole or part of the clitoris, the labia minora, or labia majora.

**SEC. 836. DESIGNATION OF PORTUGAL AS A VISA WAIVER PILOT PROGRAM COUNTRY WITH PROBATIONARY STATUS.**

Notwithstanding any other provision of law, Portugal is designated as a visa waiver pilot program country with probationary status under section 217(g) of the Immigration and Nationality Act for each of the fiscal years 1996, 1997, and 1998.

# Subtitle C—Technical Corrections

**SEC. 851. MISCELLANEOUS TECHNICAL CORRECTIONS.**

(a) AMENDMENTS RELATING TO PUBLIC LAW 103–322 (VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1994).—

(1) Section 60024(1)(F) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322) (in this subsection referred to as "VCCLEA") is amended by inserting "United States Code," after "title 18,".

(2) Section 130003(b)(3) of VCCLEA is amended by striking "Naturalization" and inserting "Nationality".

(3)(A) Section 214 (8 U.S.C. 1184) is amended by redesignating the subsection (j), added by section 130003(b)(2) of VCCLEA (108 Stat. 2025), and the sub-

105

section (k), added by section 220(b) of the Immigration and Nationality Technical Amendments Act of 1994 (Public Law 103–416, 108 Stat. 4319), as subsections (k) and (l), respectively.

(B) Section 101(a)(15)(S) (8 U.S.C. 1101(a)(15)(S)) is amended by striking "214(j)" and inserting "214(k)".

(4)(A) Section 245 (8 U.S.C. 1255) is amended by redesignating the subsection (i) added by section 130003(c)(1) of VCCLEA as subsection (j).

(B) Section 241(a)(2)(A)(i)(I) (8 U.S.C. 1251(a)(2)(A)(i)(I)), as amended by section 130003(d) of VCCLEA and before redesignation by section 305(a)(2), is amended by striking "245(i)" and inserting "245(j)".

(5) Section 245(j)(3), as added by section 130003(c)(1) of VCCLEA and as redesignated by paragraph (4)(A), is amended by striking "paragraphs (1) or (2)" and inserting "paragraph (1) or (2)".

(6) Section 130007(a) of VCCLEA is amended by striking "242A(d)" and inserting "242A(a)(3)".

(7) The amendments made by this subsection shall be effective as if included in the enactment of the VCCLEA.

(b) AMENDMENTS RELATING TO IMMIGRATION AND NATIONALITY TECHNICAL CORRECTIONS ACT OF 1994.—

(1) Section 101(d) of the Immigration and Nationality Technical Corrections Act of 1994 (Public Law 103–416) (in this subsection referred to as "INTCA") is amended—

(A) by striking "APPLICATION" and all that follows through "This" and inserting "APPLICABILITY OF TRANSMISSION REQUIREMENTS.—This";

(B) by striking "any residency or other retention requirements for" and inserting "the application of any provision of law relating to residence or physical presence in the United States for purposes of transmitting United States"; and

(C) by striking "as in effect" and all that follows through the end and inserting "to any person whose claim is based on the amendment made by subsection (a) or through whom such a claim is derived.".

(2) Section 102 of INTCA is amended by adding at the end the following new subsection:

"(e) TRANSITION.—In applying the amendment made by subsection (a) to children born before November 14, 1986, any reference in the matter inserted by such amendment to 'five years, at least two of which' is deemed a reference to '10 years, at least 5 of which'.".

(3) Section 351(a) (8 U.S.C. 1483(a)), as amended by section 105(a)(2)(A) of INTCA, is amended by striking the comma after "nationality".

(4) Section 207(2) of INTCA is amended by inserting a comma after "specified".

(5) Section 101(a)(43) (8 U.S.C. 1101(a)(43)) is amended—

(A) in subparagraph (K)(ii), by striking the comma after "1588", and

(B) in subparagraph (O), by striking "suspicion" and inserting "suspension".

(6) Section 273(b) (8 U.S.C. 1323(b)), as amended by section 209(a) of INTCA, is amended by striking "remain" and inserting "remains".

(7) Section 209(a)(1) of INTCA is amended by striking "$3000" and inserting "$3,000".

(8) Section 209(b) of INTCA is amended by striking "subsection" and inserting "section".

(9) Section 217(f) (8 U.S.C. 1187(f)), as amended by section 210 of INTCA, is amended by adding a period at the end.

(10) Section 219(cc) of INTCA is amended by striking " 'year 1993 the first place it appears' " and inserting " 'year 1993' the first place it appears".

(11) Section 219(ee) of INTCA is amended by adding at the end the following new paragraph:

"(3) The amendments made by this subsection shall take effect on the date of the enactment of this Act.".

(12) Paragraphs (4) and (6) of section 286(r) (8 U.S.C. 1356(r)) are amended by inserting "the" before "Fund" each place it appears.

(13) Section 221 of INTCA is amended—

(A) by striking each semicolon and inserting a comma,

(B) by striking "disasters." and inserting "disasters,", and

(C) by striking "The official" and inserting "the official".

(14) Section 242A (8 U.S.C. 1252a), as added by section 224(a) of INTCA and before redesignation as section 238 by section 308(b)(5), is amended by redesignating subsection (d) as subsection (c).

FRP-FRN-00776

106

(15) Section 225 of INTCA is amended—

(A) by striking "section 242(i)" and inserting "sections 242(i) and 242A", and

(B) by inserting ", 1252a" after "1252(i)".

(16) Except as otherwise provided in this subsection, the amendments made by this subsection shall take effect as if included in the enactment of INTCA.

(c) STRIKING REFERENCES TO SECTION 210A.—

(1)(A) Section 201(b)(1)(C) (8 U.S.C. 1151(b)(1)(C)) and section 274B(a)(3)(B) (8 U.S.C. 1324b(a)(3)(B)) are each amended by striking ", 210A,".

(B) Section 241(a)(1) (8 U.S.C. 1251(a)(1)), before redesignation by section 305(a)(2), is amended by striking subparagraph (F).

(2) Sections 204(c)(1)(D)(i) and 204(j)(4) of Immigration Reform and Control Act of 1986 are each amended by striking ", 210A,".

(d) MISCELLANEOUS CHANGES IN THE IMMIGRATION AND NATIONALITY ACT.—

(1) Before being amended by section 308(a), the item in the table of contents relating to section 242A is amended to read as follows:

"Sec. 242A. Expedited deportation of aliens convicted of committing aggravated felonies.".

(2) Section 101(c)(1) (8 U.S.C. 1101(c)(1)) is amended by striking ", 321, and 322" and inserting "and 321".

(3) Pursuant to section 6(b) of Public Law 103–272 (108 Stat. 1378)—

(A) section 214(f)(1) (8 U.S.C. 1184(f)(1)) is amended by striking "section 101(3) of the Federal Aviation Act of 1958" and inserting "section 40102(a)(2) of title 49, United States Code"; and

(B) section 258(b)(2) (8 U.S.C. 1288(b)(2)) is amended by striking "section 105 or 106 of the Hazardous Materials Transportation Act (49 U.S.C. App. 1804, 1805)" and inserting "section 5103(b), 5104, 5106, 5107, or 5110 of title 49, United States Code".

(4) Section 286(h)(1)(A) (8 U.S.C. 1356(h)(1)(A)) is amended by inserting a period after "expended".

(5) Section 286(h)(2)(A) (8 U.S.C. 1356(h)(2)(A)) is amended—

(A) by striking "and" at the end of clause (iv),

(B) by moving clauses (v) and (vi) 2 ems to the left,

(C) by striking "; and" in clauses (v) and (vi) and inserting "and for",

(D) by striking the colons in clauses (v) and (vi), and

(E) by striking the period at the end of clause (v) and inserting "; and".

(6) Section 412(b) (8 U.S.C. 1522(b)) is amended by striking the comma after "is authorized" in paragraph (3) and after "The Secretary" in paragraph (4).

(e) MISCELLANEOUS CHANGE IN THE IMMIGRATION ACT OF 1990.—Section 161(c)(3) of the Immigration Act of 1990 is amended by striking "an an" and inserting "of an".

(f) MISCELLANEOUS CHANGES IN OTHER ACTS.—

(1) Section 506(a) of the Intelligence Authorization Act, Fiscal Year 1990 (Public Law 101–193) is amended by striking "this section" and inserting "such section".

(2) Section 140 of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, as amended by section 505(2) of Public Law 103–317, is amended—

(A) by moving the indentation of subsections (f) and (g) 2 ems to the left, and

(B) in subsection (g), by striking "(g)" and all that follows through "shall" and inserting "(g) Subsections (d) and (e) shall".

## EXPLANATION OF AMENDMENT

Because H.R. 2202 was ordered reported with a single amendment in the nature of a substitute, the contents of this report constitute an explanation of that amendment.

## PURPOSE AND SUMMARY

### TITLE I—BORDER ENFORCEMENT

The first step in asserting our national sovereignty and controlling illegal immigration is to secure our nation's land borders. This fundamental mission has been undermined in recent decades by a lack of clear policy, inadequate resources, and a defeatist attitude.

107

The result is a crisis at the land border, allowing hundreds of thousands of illegal aliens to cross each year, and contributing more than half of the 300,000 to 400,000 annual growth in the illegal alien population. The problem is not limited to illegal immigration from this hemisphere: alien smugglers from around the globe have set routes through Latin America and Canada to smuggle people into the United States.

More border patrol agents, enhanced training, and improved border technology are all critical to regaining control over our nation's borders. H.R. 2202 includes all of these reforms, including a 1,000 annual increase in Border Patrol agents from now until the end of the century. But H.R. 2202 does something more—it requires a focus on prevention and deterrence of illegal immigration, modeled after the successful "Operation Hold-the-Line" in El Paso, Texas. H.R. 2202 also improves the security of Border Crossing Identification Cards, so that such cards will only be used by those who have been granted the privilege of carrying them.

Finally, illegal immigration control is not simply a matter of securing the land border. Close to half of illegal immigrants enter on temporary visas and overstay. H.R. 2202 authorizes new resources for the prosecution of aliens with multiple illegal entries, and establishes pilot programs: (1) to deter multiple illegal entries into the United States through strategies such as interior repatriation or third country repatriation; (2) to use closed military facilities for detention of illegal aliens; and (3) to create a system for tracking the departures of temporary visitors.

TITLE II—ENFORCEMENT AGAINST ALIEN SMUGGLING AND DOCUMENT FRAUD

Illegal immigration is facilitated through criminal activity: alien smuggling, often carried out by organized criminal elements, and document fraud, including visa and passport fraud. Federal law enforcement should have the same tools to combat immigration crimes it does to combat other serious crimes that threaten public safety and national security. Thus, H.R. 2202 extends current wiretap and undercover investigation authority to the investigation of alien smuggling, document fraud, and other immigration-related crimes. It increases criminal penalties for alien smuggling and document fraud, establishes new civil penalties for document fraud, and extends coverage of the federal anti-racketeering statute (RICO) to organized criminal enterprises engaging in such activity.

TITLE III—REFORMING PROCEDURES FOR REMOVAL OF ILLEGAL ALIENS

Existing procedures to deny entry to and to remove illegal aliens from the United States are cumbersome and duplicative. Removal of aliens who enter the United States illegally, even those who are ordered deported after a full due process hearing, is an all-too-rare event. The asylum system has been abused by those who seek to use it as a means of "backdoor" immigration.

H.R. 2202 streamlines rules and procedures for removing illegal aliens, and establishes special procedures for removing alien terrorists. Aliens who arrive in the United States with no valid documents will be removed on an expedited basis; arriving aliens with

108

credible asylum claims will be allowed to pursue those claims. For illegal aliens already present in the U.S., there will be a single form of removal proceeding, with a streamlined appeal and removal process. To avoid removal, aliens must establish in such proceedings that they are entitled to be admitted or to remain in the United States. Relief from deportation will be more strictly limited. Aliens ordered removed who do not depart on time will be subject to civil penalties and excluded from certain immigration benefits.

### TITLE IV—PREVENTING EMPLOYMENT OF ILLEGAL ALIENS

The magnet of jobs is a driving force behind illegal immigration. Despite federal laws prohibiting the hiring of illegal aliens, and requiring the verification of eligibility for all employees, an underground market in fraudulent documents permits illegal aliens to gain employment. Recent INS crackdowns demonstrate that illegal aliens work in a variety of industries and take jobs that could otherwise be filled by American workers. Enforcement, however, is hampered by a system that is difficult to implement and invites document fraud.

H.R. 2202 cuts from 29 to 6 the number of acceptable documents to establish eligibility to work. It also establishes pilot projects, to be operated in States with high levels of illegal immigration, for employers to verify through a simple phone call or computer message an employee's authorization to work. The system will work through existing databases, and not require creation of any new government database. The system also will assure employers that the employment eligibility information provided to them by employees is genuine. The system could not be established on a national basis without prior approval by Congress. H.R. 2202 also establishes pilot projects to improve the security of birth certificates and birth/death registries, all of which have been subject to fraudulent use by illegal immigrants for gaining work, public benefits, and even, in some cases, voting privileges.

### TITLE V—LEGAL IMMIGRATION REFORM

Congress has the task to set legal immigration policy that serves the national interest. As a result of the immigration bills passed in 1965, 1986, and 1990, there has been a dramatic increase in the overall levels of legal immigration. In addition, the percentage of immigrants admitted without regard to their level of education or skills now exceeds 80 percent. Since 1981, we have admitted a total of 12.5 million legal immigrants. During this period, we have admitted at least 500,000 immigrants each year, and during the past 5 years, an average of close to 1 million per year.

Such sustained, uninterrupted growth in immigration is without precedent in American history. So is the underlying rationale of many that immigration is a right, not a privilege. The entitlement theory, which seeks to fit immigration policy to the demands of those who would like to immigrate to the United States, has made it increasingly difficult to establish a policy that selects immigrants according to their ability to advance our national interests.

A central failure of the current system is the admissions backlog for spouses and minor children of lawful permanent residents, which now numbers 1.1 million. This means that nuclear family

109

members can be kept separated for years. Even larger backlogs exist in categories for adult, "extended family" immigrants. These backlogs undermine the credibility of the system by forcing people who are technically eligible to immigrate to wait for years, sometimes decades, before they can legally come to the U.S. The existence of these categories thus creates expectations that cannot possibly be met within the capacity of the current system. These failed expectations encourage many waiting in line to immigrate illegally to the U.S.

The key to legal immigration reform is stating clear priorities that reflect the national interest. H.R. 2202 will better match the attributes of immigrants with the needs of the American economy, by increasing the number of visas available for highly-skilled and educated immigrants and by decreasing the proportion of immigrants admitted without regard to their level of skill and education. The bill also will put nuclear families first by giving priority to the admission of spouses and children of United States citizens, and for 5 years, doubling the number of visas for nuclear family members of legal permanent residents. The bill also preserves America's traditional role of leadership in refugee and other humanitarian immigration. While reforming legal immigration to end the "entitlement" attitude, H.R. 2202 maintains levels of legal immigration that are generous by historic standards: approximately 3.5 million immigrants would be admitted during the first 5 years.

### TITLE VI—IMMIGRANTS AND PUBLIC BENEFITS

Immigrants should be self-sufficient. Yet, the most reliable studies show that immigrants receive $25 billion more in direct public benefits than they contribute in taxes—$16 billion for direct cash benefits and $9 billion for non-cash benefits such as Food Stamps and Medicaid. In addition, immigrant participation in Supplemental Security Income (SSI) has risen 580 percent during the past dozen years. H.R. 2202 reinforces prohibitions against receipt of public benefits by illegal immigrants, makes enforceable the grounds for denying entry or removing aliens who are or are likely to become a public charge, and makes those who agree to sponsor immigrants legally responsible to support them.

### TITLE VII—FACILITATION OF LEGAL ENTRY

To facilitate legal entry and deter fraud, H.R. 2202 will increase the number of INS and Customs Service inspectors at border ports of entry, expand preinspection services at overseas airports, and require more training of airline personnel in detecting fraudulent documents.

### TITLE VIII—TEMPORARY SKILLED WORKERS AND MISCELLANEOUS PROVISIONS

To remain competitive in world markets, American business needs access to skilled foreign workers. The nonimmigrant H-1B visa permits such persons to work in the United States for up to six years. However, American workers need protection against abuse of the H-1B program by those employers who seek to replace native workers with lower-paid foreign workers. H.R. 2202 strikes

FRP-FRN-00780

110

a balance between these interests, removing excessive regulatory burdens from businesses who are not dependent on H–1B workers and who do not abuse the program, while prohibiting the use of the program to replace laid-off American workers.

### Background and Need for the Legislation

As a nation of immigrants, the United States has a singular interest that its immigration laws encourage the admission of persons who will enrich our society. President Ronald Reagan aptly observed that our nation is "an island of freedom," political and economic, toward which the world has looked as both protector and exemplar. Unlimited immigration, however, is a moral and practical impossibility. We live in an age where the nations of the world are called upon to resolve the root causes—political, economic, and humanitarian—of migration pressures. In this context, the United States must exercise its national sovereignty to control its borders and pursue an immigration policy that serves the fundamental needs of the nation. In the words of the 1981 report of the Select Commission on Immigration and Refugee Policy ("Select Commission"), "[o]ur policy—while providing opportunity for a portion of the world's population—must be guided by the basic interests of the United States."[1]

During the ensuing 15 years, that basic message has been lost. Serious immigration reform has been frustrated by our failure to define the national interests that must be served by U.S. immigration policy. A pervasive sense exists among the public that the Federal Government lacks the will and the means to enforce existing immigration laws.

The symptoms of this failure are manifest: four million illegal aliens residing in the United States, with an annual increase in illegal immigration of more than 300,000; tens of thousands of overseas visitors each year who overstay their visas and remain in the United States illegally; a deportation process that removes only a small fraction of illegal aliens; an asylum adjudications backlog of over 400,000; a program of employer sanctions that is confusing for employers, riddled with document fraud, and ineffective in deterring both the hiring of illegal aliens and the illegal entry of aliens seeking employment; and a legal immigration system that fails to unite nuclear families promptly, encourages the "chain migration" of extended families, and admits a vast majority of immigrants without any regard to levels of education or job skills.

H.R. 2202 seeks a fundamental re-orientation of immigration policy in the direction of the national interest. The Act will curb illegal immigration and establish a legal immigration system that is generous by historic standards and serves fundamental family, economic, and humanitarian needs. The bill is comprehensive because the crisis is so deep and the challenges presented by legal and illegal immigration so closely intertwined. All aspects of immigration law must be reformed to provide clear direction and purpose to those responsible for their enforcement, and to eliminate to the

---

[1] "Select Commission on Immigration and Refugee Policy, U.S. Immigration Policy and the National Interest," Joint Committee Print No. 8, Committees on the Judiciary of the House of Representatives and the United States Senate, 97th Cong., 1st Sess. 3 (1981) (referred to hereinafter as 1991 Select Commission Report).

111

greatest possible extent special provisions and exceptions that detract from these fundamental purposes. In short, our immigration laws should enable the prompt admission of those who are entitled to be admitted, the prompt exclusion or removal of those who are not so entitled, and the clear distinction between these categories.

To place H.R. 2202 in its proper context, a more detailed assessment of current immigration problems and past efforts and proposals for reform is appropriate.

### I. ILLEGAL IMMIGRATION

The challenge of combatting illegal immigration is but one facet of the vast overall demand on the United States immigration system. As explained by the U.S. Commission on Immigration Reform in its 1994 report to Congress:

> Each year U.S. land and air borders face inspection of approximately *500 million people seeking entry.* In 1993, approximately 409 million people were inspected at U.S. land ports of entry, 55 million at airports, and 9 million at seaports. This number does not include illegal entrants or individuals apprehended while attempting to enter illegally. The Immigration and Naturalization Service (INS) estimated in 1992 that there were 3.4 million "permanent" illegal aliens in the U.S. Of this population, *roughly one-half entered legally by air and overstayed their visas and the other one-half entered without inspection by land or sea.*[2]

The INS estimates that there is a net annual increase of 300,000 in the illegal alien population. Thus, the number of "permanent" illegal aliens exceeds 4 million. To halt this increase and make actual cuts in the size of the illegal immigrant population, immigration policy must address both illegal border crossings and the phenomenon of "visa overstays."

*Illegal border-crossing*

Perhaps the most visible illustration of the failures of immigration enforcement is the continued high level of illegal migration across the land borders of the United States, particularly in the Southwest. Precise measurement of this migration flow is elusive. The INS traditionally has relied upon apprehension statistics for this task, but such statistics are a flawed measure of both the rate of illegal migration and the success of enforcement. As the U.S. Commission on Immigration Reform has stated, "[t]he most effective border control strategy would produce an apprehension rate of zero. So, too, would a complete failure of border control."[3] Despite these shortcomings, apprehension statistics show the growing extent of the problem.

| Years | Apprehensions |
|---|---|
| 1931–1940 | 147,457 |
| 1941–1950 | 1,377,210 |
| 1951–1960 | 3,598,949 |

[2] U.S. Commission on Immigration Reform, U.S. Immigration Policy: Restoring Credibility 47 (1994) (emphasis supplied) (referred to hereinafter as 1994 Commission Report).
[3] 1994 Commission Report at 57.

112

| Years | Apprehensions |
|---|---|
| 1961–1970 | 1,608,356 |
| 1971–1980 | 8,321,498 |
| 1981–1990 | 11,883,328 |
| 1991–1994 | 4,778,333 |

For virtually all of this period, apprehension of aliens shortly after they have crossed the border, or at destinations further in the interior, has been the backbone of INS and Border Patrol enforcement strategy. Deterrent-based strategies had not been attempted, despite the 1981 observation of the Select Commission that "[i]t is both more humane and cost effective to deter people from entering the United States than it is to locate and remove them from the interior." [4] The choice of strategy was dictated in part by a lack of resources: the Select Commission noted that "[a]t any given hour no more than 450 Border Patrol agents are directly engaged in activities to stop persons attempting to enter the United States without inspection." [5]

Another symbol of America's past failure to take seriously the problem of illegal immigration has been the reluctance to use secure fences to prevent illegal border crossings. In general, physical barriers can assist the Border Patrol to deter illegal crossings, channel aliens to locations where they can be most easily apprehended, and reduce crime and violence at the border.

In recent years, the approach to border enforcement has changed. Chain-link fences have been replaced in certain high-traffic areas by more resistant structures. Section 542 of the Immigration Act of 1990 authorized the appropriation of funds for the "repair, maintenance, or construction on the United States border, in areas experiencing high levels of apprehensions of illegal aliens, of structures to deter illegal entry to the United States." Just as visible has been the deployment of border patrol agents directly on or in close vicinity to the border, to create a visible deterrent to potential illegal immigrants. This approach was initiated by Chief Silvestre Reyes of the El Paso Border Patrol Sector in September 1993, when he ordered 400 of his 650 agents to be deployed on a 24-hour basis directly on the border, stationed in their vehicles at distances ranging from 50 yards to a quarter mile. Regular helicopter patrols were established. The border fence, which has numerous holes and was breachable in 125 locations, was repaired and maintained. Originally conceived as a two-week pilot program called "Operation Blockade," Chief Reyes' strategy has become a standing initiative, "Operation Hold-the-Line."

Operation Hold-the-Line represented a fundamental change in strategy for control of the border. As in other areas, illegal crossings into El Paso had been largely tolerated and enforcement efforts were directed at apprehending aliens who attempted to remain in the United States for extended periods of time. Only about 15 percent of the estimated 8,000 to 10,000 persons who crossed the border illegally each day in the El Paso Sector were apprehended. Under Operation Hold-the-Line, illegal crossings have been substantially deterred, with apprehensions of illegal aliens within El Paso dropping by as much as 75 percent. Petty street crime and

---
[4] 1981 Select Commission Report at 47.
[5] 1981 Select Commission Report at 48.

113

property crime has been reduced, as has the occurrence of more se-
rious property and violent crimes. The Operation also has led to
the seizure of more illegal drugs and other contraband. The Oper-
ation has had overwhelming public support in El Paso, including
in the Mexican American community. Complaints against the Bor-
der Patrol have been reduced because there are fewer apprehen-
sions and pursuits of aliens. The change has been particularly no-
ticed in schools lying close to the border, which are now considered
safer for students.[6]

The success of Operation Hold-the-Line has led both the Commis-
sion on Immigration Reform and the General Accounting Office to
urge adoption of similar deterrence strategies as the prevalent form
of enforcement along the southern border.[7] The Commission rec-
ommended a comprehensive approach to deal with the changing
crossing patterns that resulted from stepped-up enforcement in the
El Paso area. The GAO concluded that the national border patrol
strategy adopted by the INS shows promise for success in reducing
illegal immigration and is consistent with previous recommenda-
tions for securing the border.

The INS also has recently adopted a deterrence strategy in the
heavily-travelled San Diego sector. This initiative, called "Oper-
ation Gatekeeper," entails assignment of additional Border Patrol
agents in the sector, deployment of agents in close proximity to the
border, although not directly on the border as in El Paso, comple-
tion of new fences and roads along the border (an initiative started
and substantially completed during the Bush Administration), and
installation of additional lighting. The INS now also fingerprints
all aliens apprehended in the sector in order to identify aliens with
criminal records, track aliens who repeatedly try to cross the bor-
der illegally, and measure the effectiveness of the new border con-
trol measures.

The impact of Operation Gatekeeper has been favorable, but not
as dramatic as Operation Hold-the-Line. Border Patrol agents have
been concentrated in the western end of the sector, and construc-
tion of a steel fence extending into the Pacific Ocean and to a point
14 miles inland from the coast, is nearly complete. As a result, ap-
prehensions of illegal aliens have fallen most markedly in the Im-
perial Beach area, adjacent to the Pacific Ocean, but illegal alien
traffic has greatly increased in the eastern portion of the San Diego
sector, and overall apprehensions in the sector have actually in-
creased. The fingerprinting process has identified large numbers of
repeat border-crossers, some of whom are being prosecuted.

Despite these initial successes, the challenge of securing the bor-
der over the long term will prove to be difficult. One seemingly in-
tractable problem is repeat border-crossings. Many of these aliens
eventually escape apprehension and thus add to the illegal alien

---

[6] Bean, et al., Illegal Mexican Migration and the United States/Mexico Border: The Effects of
Operation Hold-the-Line on El Paso/Juarez (July 1994) (Report prepared for the U.S. Commis-
sion on Immigration Reform by the Population Research Center at the University of Texas at
Austin); General Accounting Office, Border Control: Revised Strategy is Showing Some Positive
Results (December 1994) (Report to the Subcommittee on Information, Justice, Transportation
and Agriculture of the House Committee on Government Operations).

[7] 1994 Commission Report at 49; Border Control: Revised Strategy Is Showing Some Results,
supra note 6. See also "Border Security: Hearing Before the Subcomm. on Immigration and
Claims of the House Comm. on the Judiciary," 104th Cong., 1st Sess. 102-110 (March 10, 1995)
(Statement of Laurie E. Ekstrand, General Accounting Office).

114

population. All of them add to the enforcement burdens of the INS. The INS has previously attempted efforts at interior repatriation of such aliens, returning them to places hundreds of miles from the border rather than directly across the border where they are free immediately to attempt another illegal entry. This program was dropped, but should be reinstituted as part of the broader deterrence strategy. In addition, stronger bilateral efforts with the Mexican Government should be undertaken, especially in the area of cross-border crimes and alien smuggling. These are genuine issues of national security and public safety exacerbated by the U.S. government's failure to control the border.

Based on the experience in El Paso and San Diego, Congress should establish as a fundamental strategy for immigration enforcement the deterrence of illegal migration across the land borders of the United States. Such a strategy is preferable to one based on interior apprehension of illegal aliens because of the costs associated with apprehending and deporting an alien from the interior. The INS should be given the resources to carry out a deterrence strategy at all appropriate locations along the borders, as well as the necessary direction from Congress to use the resources in this fashion. A pilot program for interior repatriation should be reinstituted, along with technological measures to combat illegal border crossing.

An additional problem in border enforcement has been abuse of the Border Crossing Identification Card, used primarily by citizens of Mexico in lieu of visas for visits to the United States within 25 miles of the border for up to 72 hours. (Canadian citizens and landed immigrants from Commonwealth nations are not required to have a visa to enter the United States, and thus generally do not require a border crossing card.) Approximately 200,000 cards are issued annually. The Commission on Immigration Reform and the INS have both identified a troubling instance of fraud associated with these cards. In 1993, 24,236 cards were intercepted after issuance for counterfeiting, alteration, use by impostors, or violations of the conditions of usage, such as engaging in employment. These problems should come as little surprise. Despite the high incidence of illegal immigration across the land border with Mexico, the cards have heretofore been issued without security features. Until recently, in fact, border crossing cards were issued on a permanent basis, meaning that aliens could hold a card for years or even decades without renewal. The high demand for the cards has resulted both in backlogs of individuals waiting to receive cards and hasty adjudication of applications. In some recent cases, individuals with criminal records have been issued border crossing cards.

The INS has recently taken some steps to improve the security of these cards and to ensure that only aliens entitled to the privilege are issued cards. H.R. 2202 requires specific improvements to be made in all new and existing cards within 3 years.

*Visa overstays*

A "visa overstay" is an alien who has been admitted to the United States as a nonimmigrant visitor (often as a student, tourist, or businessperson) but who stays in the United States beyond the ex-

115

piration of the visa and lives here as an illegal alien.[8] Despite the magnitude of this problem, it has only recently been recognized as a leading component of the illegal alien population in the U.S. Moreover, no one is certain of how many people overstay their visas, how long they do so, and how they support themselves. Methods of calculating if and when persons with temporary visas leave the U.S. are haphazard.[9]

Without a reliable system, the INS has no means to determine exactly how many people who arrive in the United States as visitors actually depart, and who they are. Currently, all foreign visitors complete an I–94 arrival/departure form prior to arrival in the United States. The arrival portion of the I–94 is turned over to the INS inspector at the port of entry. However, because the departure portion of the form is collected by the air carrier when the alien departs, and the collection process by carriers is uneven, the data is not reliable.

The INS can estimate "apparent overstays" by simply counting the number of arrival forms without matching departure forms. However, the INS has concluded that the majority of "apparent overstays" are actually the result of incomplete collection of the departure forms. After correcting for this high rate of system error, the INS calculated that the number of visa overstays in 1992 was 305,000, and the visa overstay rate is 1.5 percent. The number of overstays has increased since the mid-1980s, while the rate has decreased, owing to the overall growth in the number of visas issued to foreign visitors. The INS estimates that more than 80 percent of nonimmigrant overstays have received a B–2 (tourist) visa. Most of the remaining percentage entered on a B–1 (business visitor) visa.

Visa overstay rates vary among regions of the world. Overstay percentages from Europe are always well below the average percentage for other countries, but nevertheless account for 15–20 percent of the aggregate total. Leading countries are Italy, Poland, and, recently, the former Soviet Union. Overstay rates from Asia run slightly below the average percentage for other countries, and account for numbers roughly equal to those of Europe. The leading country from the region by far is the Philippines, with India, China, and Hong Kong also contributing significant numbers. North America (including Central America) produces both the highest rate and highest percentage of visa overstays. This is chiefly attributable to Mexico, where the estimated number of overstays rose from 25,000 in 1985 to 60,000 in 1992. The Bahamas (13,000 in 1992), Jamaica (9,000), Haiti (9,000) and Central America (22,000) also produce significant numbers, especially given their limited populations. Overstay rates from Africa are relatively high, but the

---

[8] Although they are "legally" admitted, nonimmigrant visa holders who intend to come to the United States and stay permanently are technically "illegal" immigrants from the time of their arrival in the United States. A person who obtains a nonimmigrant visa intending to remain in the U.S. indefinitely has committed visa fraud and is excludable under INA §212(a)(6)(C)(i). Most aliens who intend to overstay their visas are not apprehended upon entry, and still others make the decision to overstay after they have arrived. Such aliens are subject to deportation under section 241(a)(1)(C).

[9] See generally, "Foreign Visitors Who Violate the Terms of the Their Visas by Remaining in the United States Indefinitely: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary," 104th Cong., 1st Sess. (Feb. 24, 1995) (cited hereinafter as Hearing: Foreign Visitors Who Overstay).

overall numbers are relatively low. This may be due in part to the limited number of nonimmigrant visas issued in some African nations. Both the overstay rate and overstay numbers from South America are modest.

The phenomenon of visa overstays presents specific problems for immigration enforcement. First, visa overstayers spread the illegal immigration problem to regions outside of the border states, and due to their diverse character (many visa overstayers have more advanced education and skills than typical illegal land border entrants), to various sectors of the economy. Second, visa overstayers account for a substantial portion of those waiting in the "asylum backlog"—the estimated 400,000 persons who are waiting for adjudication by the INS of their asylum claims. While some of these people have legitimate claims, many have filed the asylum claim as a means of remaining in the United States indefinitely. Third, obstacles to enforcement against this phenomenon are likely to remain (or increase) with the further globalization of the economy and rise in the number of legitimate visitors to the United States. A more lengthy or intrusive inspections process at ports of entry might identify more aliens who intend to overstay, but at the price of convenience for the vast majority of legitimate visitors. Another alternative would be more extensive processing by consular officers of requests for nonimmigrant visas. This would require a greater commitment of resources to the consular bureau within the Department of State.

Perhaps as a result of these difficulties, there have been fewer specific recommendations regarding enforcement measures against visa overstays. The Commission on Immigration Reform indicated that the solution lies in improved interior enforcement, chiefly by preventing employment of illegal aliens. (This topic is treated at greater length below.) The State Department now processes a vast majority of visas through an automated system that allows for quicker background checks, and most newly-issued visas are machine-readable, an additional security feature.[10] Stricter standards for issuing visas have been suggested. However, in many countries with a high visa overstay rate, State Department consular officers already deny a substantial percentage of visa applications.[11]

*Alien smuggling*

Alien smuggling contributes greatly to the overall problem of illegal immigration. Whether carried out by so-called coyotes (smugglers) along the Southwest border, or through sophisticated organized crime rings that smuggle aliens into the United States by land, sea, and air, alien smuggling both adds to the overall numbers of illegal aliens in the United States and increases the financial and other incentives for such trafficking to continue. Alien smuggling is often linked to other crimes, such as drug smuggling and trafficking, prostitution, racketeering, and severe labor law violations. Due to the inhumane living and working conditions they

---

[10] Hearing: Foreign Visitors Who Overstay, supra note 9, at 20 (Statement of Diane Dillard, Deputy Assistant Secretary for Visa Services, Bureau of Consular Affairs, Department of State).
[11] Id. at 32–33.

117

face, many smuggled aliens are victims, more than beneficiaries, of this criminal activity.[12]

Smuggling by boat is perhaps the most visible recent manifestation of alien smuggling carried out by organized crime syndicates. The arrival of the *Golden Venture* in New York City in June 1993 brought this problem to national attention: the vessel foundered on a sand bar, and hundreds of Chinese nationals struggled to reach the shore and escape, several of them drowning in the process. The remainder were apprehended and detained for exclusion proceedings, in which most claimed political asylum. Due to procedural delays inherent in the immigration hearing process, and the difficulty of arranging return travel to the People's Republic of China, most of these aliens remained in the United States more than 2 years after their arrival.

Other smuggling boats have landed or been apprehended in United States waters, while still others have been interdicted in international waters. However, due to greater enforcement efforts, the organized smuggling by sea from Asia has decreased somewhat since the arrival of the *Golden Venture.* (Illegal immigration by sea has long been prevalent from countries in the Caribbean, and this continues to be the case.)

Notwithstanding the public visibility of alien smuggling by boat, the vast majority of smuggled aliens arrive by more conventional means. Some travel directly to the United States, using fraudulent passports and visas, and attempt entry at international airports. Many such aliens have presented passports and visas prior to embarking overseas, but destroy the documents en route or surrender them to confederates. Probably the greatest number travel through more circuitous routes, travelling to other countries in the Western Hemisphere and then arranging onward travel to the United States either by air or through surreptitious crossing of the land border.

Whether they arrive by boat, directly by air, or through more complex routes, smuggled aliens (often with the assistance of smugglers) abuse immigration procedures to extend their stay in the United States. Thousands of smuggled aliens arrive in the United States each year with no valid entry documents and declare asylum immediately upon arrival. Due to lack of detention space and overcrowded immigration court dockets, many have been released into the general population. Not surprisingly, a majority of such aliens do not return for their hearings. In recent years, however, the number of aliens arriving at airports with no valid documents has decreased in districts, particularly in New York and Los Angeles, where detention capacity has increased and most mala fide aliens can be detained. The threat of expedited exclusion, which has been considered by Congress since 1993, may also have had a deterrent effect.

Finally, many aliens successfully smuggled into the United States have filed asylum claims as a means not only to extend their stay, but, under regulations in effect until January 1995, to obtain work authorization. Due to the huge backlog in asylum cases, and the inability of the INS to detain failed asylum applicants who are

---

[12] See generally, "Alien Smuggling: Hearing Before the Subcomm. on International Law, Immigration, and Refugees of the House Comm. on the Judiciary," 103rd Cong., 1st Sess. (June 30, 1993).

118

deportable from the United States, these aliens could reasonably expect that the filing of an asylum application would allow them to remain indefinitely in the United States. Under regulations effective in January 1995, asylum applicants no longer are entitled to receive work authorization. This has led to a substantial reduction in filing of new asylum applications. (The new asylum regulations are discussed below in more detail.)

<div align="center">II. INSPECTION, APPREHENSION, AND REMOVAL OF CRIMINAL AND ILLEGAL ALIENS</div>

<div align="center">A. Populations of Criminal and Illegal Aliens</div>

*Criminal aliens*

The number of criminal aliens incarcerated in Federal and State prisons has grown dramatically in recent years, and is now estimated as 100,000.[13] The "foreign-born"[14] population in institutions operated by the Bureau of Prisons (BOP) is 27,938, or 29 percent of all inmates (95,997). An estimated 75 percent are subject to deportation.[15] Compared to FY 1980, this is an increase from approximately 1,000, or less than 4 percent of all BOP inmates (27,825). According to the BOP, the increase in the Federal alien prisoner population is due largely to drug convictions; 75 percent of alien inmates are incarcerated for such offenses, compared to 61 percent of all Federal inmates. Foreign-born prisoners serve an average of 7.7 years. More than 85 percent are from Mexico, Central America, South America, and the Caribbean. The leading individual countries of origin are, in order, Mexico, Colombia, Cuba, the Dominican Republic, Jamaica, and Nigeria.

The INS reports that there are an estimated 69,926 foreign-born inmates in State prisons, and that 80 percent of these, or 55,640, are deportable.[16] (The remainder are not deportable because they are either naturalized citizens or lawful permanent residents with protection from deportation.) More than 81 percent (56,391) of the overall foreign-born state prison population are in seven high immigration states: California, Texas, Florida, New York, Illinois, New Jersey, and Arizona.[17] The INS believes that the number of criminal aliens in Federal or State prisons who are subject to final orders of deportation is small. The INS and the Executive Office for Immigration Review (EOIR) complete deportation proceedings

---

[13] See "Removal of Criminal and Illegal Aliens: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary," 104th Cong., 1st Sess. 4 (Statement of T. Alexander Aleinikoff, General Counsel, Immigration and Naturalization Service) (Hearing: Criminal and Illegal Aliens).

[14] "Foreign-born" prisoners may include naturalized citizens and certainly includes both legal permanent residents and people who are in violation of their immigration status (including visa overstays) or who entered the U.S. without permission. See "Criminal Aliens: Hearing Before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary," February 23, 1994, at 188–189 (Testimony of INS Deputy Commissioner Chris Sale). The Director of the BOP has testified that "[a]s of January 29, 1994, our inmate data base reflects that there were 22,326 inmates in BOP custody who were non-United States citizens (24.8 percent of the population). Id. at 166–167 (Statement of Kathleen M. Hawk). The BOP confirmed to the Committee by telephone in November 1995 that the non-citizen population remains at approximately 24 percent.

[15] Id.; "Management Practices of the Immigration and Naturalization Service: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary," 104th Cong., 1st Sess. 41 (February 8, 1995) (Hearing: Management Practices).

[16] Hearing: Criminal and Illegal Aliens, supra note 13, at 8 (Statement of T. Alexander Aleinikoff).

[17] Id.

119

against incarcerated criminal aliens through the Institutional Hearing Program (IHP); most IHP proceedings are completed close to the alien's scheduled release from prison.

*Illegal aliens*

The overall population of illegal aliens in the United States is now estimated at 4,000,000 or more, with an annual increase of 300,000 to 400,000. Only a fraction face immigration enforcement proceedings. In FY 1995, deportation proceedings resulted in orders of deportation against 82,915 aliens. An additional 22,815 aliens were ordered deported by immigration judges after being found excludable from the U.S. Finally, 19,040 aliens were granted voluntary departure after being found deportable. These deportation and exclusion figures represent substantial increases from the same figures for FY 1994, when 67,352 were ordered deported, 16,730 were found excludable, and 13,416 were granted voluntary departure. The principal reason is additional resources that have permitted the hiring of new immigration judges and INS trial counsel. The direct referral of unsuccessful asylum applicants to deportation proceedings under the new asylum regulations will lead to further increases in the number of deportation proceedings.

In FY 1995, a total of 17,464 aliens filed appeals to the Board of Immigration Appeals; the BIA affirms the vast majority of deportation and exclusion orders. A smaller number—approximately 1200 in recent years—appeal their cases to the Federal courts.

The number of aliens ordered deported, moreover, greatly exceeds the number who actually are removed from the U.S. In 1995, the INS removed 49,311 illegal aliens, 41,451 of which had received deportation hearings, and 7,860 of which had been processed through exclusion hearings. Approximately 32,000 (29,255 from deportation cases, and 2,738 from exclusion cases) of these aliens were criminals. Thus, an important subset of the annual growth in the number of illegal aliens—as many as 50,000 or more—consists of those who have been ordered deported, but are not actually removed.

A critical question, for which there is no precise answer, is how many of the aliens ordered deported but not removed are criminals. The INS claims that this figure is very low, because criminal aliens who are in INS custody and have received final orders of deportation are kept in custody and deported. However, the INS admits that some convicted criminal aliens with final orders of deportation are released. The INS explains that these are generally lawful permanent residents who are deemed unlikely to abscond. The INS also admits that some criminal aliens are released from custody prior to having their deportation proceedings completed. This is often done because of a lack of detention space. These aliens are generally released on bond; however, some of them do not appear for their deportation hearings and thus disappear into the general population of illegal aliens.[18]

---

[18] See generally Hearing: Criminal and Illegal Aliens, supra note 13 at 45–48; Hearing: Management Practices, supra note 15, at 49–50.

120

## Summary

The number of aliens incarcerated in Federal and State prisons has risen dramatically in the past 15 years to close to 100,000. Approximately 45,000 criminal aliens are placed in deportation proceedings each year, and in the last fiscal year, 29,000 were removed from the country. A certain number of criminal aliens, including a small number with final orders of deportation, are released from INS detention each year.

The overall population of illegal aliens is growing much more rapidly (300,000–400,000 per year) than the number of aliens that the INS seeks to remove through deportation proceedings. More than 100,000 aliens are ordered deported or excluded each year, but only about 50,000 (32,000 of which are criminals) are actually removed from the United States. Thus, in addition to the general illegal immigrant population, there are growing numbers of aliens remaining in the United States who are not only illegally present, but who have ignored final orders of deportation to leave the U.S. (These figures do not include aliens granted voluntary departure who do not, in fact, depart from the U.S.)

### B. Legal Issues Pertaining to Removal of Aliens

The vast majority of illegal aliens apprehended in the United States are those who have crossed the Mexican border and are allowed to return voluntarily without being placed in formal deportation proceedings. Other aliens may be placed in deportation proceedings under section 242 of the Immigration and Nationality Act (INA), 8 U.S.C. 1252, through issuance of an "Order to Show Cause." (OSC) [19] An OSC requires an alien to appear for hearing before an immigration judge within the Executive Office for Immigration Review.

An alien is entitled to be represented by counsel, at no expense to the Government, and to examine evidence and cross-examine witnesses at the deportation proceeding. At most hearings, the issue of deportability is conceded: the alien essentially admits that he or she is here illegally, but seeks relief from deportation under one of the provisions of the INA. The following are the most common forms of relief:

### Voluntary departure

Under section 244(e) of the INA, a deportable alien may be granted the option to voluntarily depart the United States, in lieu of deportation. This option is attractive because it allows the alien to leave without bearing the consequences of having been deported, which include restrictions on subsequent legal entries to the United States. An alien may be granted voluntary departure if the alien has been a person of good moral character for the previous five years. The grant of voluntary departure gives the alien a specific amount of time to leave the U.S., after which the alien becomes subject automatically to an order of deportation.

---

[19] See INA § 242B.

121

*Asylum*

The alien may state a "defensive" claim for asylum (as opposed to an "affirmative" claim presented in the first instance to an INS asylum officer). The immigration judge rules on the asylum claim in accordance with section 208 of the INA, which permits the granting of asylum to any alien present in the U.S. who meets the definition of a "refugee" under section 101(a)(42) of the INA.[20]

Under new INS regulations effective in January 1995,[21] failed applicants in the "affirmative" asylum system will be directly referred to an immigration judge for deportation hearing and be able to renew their asylum claim in that proceeding. This is expected to ensure that failed asylum seekers remain under INS docket control and are ordered to leave the country.

Aggravated felons are barred from seeking asylum and are ineligible for withholding of deportation.

*Suspension of deportation*

Under section 244 of the INA, aliens who have been present in the United States for seven years or longer may qualify for suspension of deportation if deportation would result in extreme hardship to the alien, or to a family member who is a citizen or a lawful permanent resident. Aliens convicted of crimes (but not aggravated felons) are eligible for suspension of deportation only if they have shown 10 years of good moral character since the conviction and can show extreme and unusual hardship. A person granted suspension of deportation is permitted to become a lawful permanent resident of the United States.

Aggravated felons are ineligible for suspension of deportation.

*"Section 212(c)" relief*

Section 212(c) of the INA provides that a lawful permanent resident returning to an "unrelinquished domicile" in the United States of at least seven years standing may be admitted to the United States even if he or she is excludable for having committed a crime. This provision has been interpreted to apply to deportation proceedings as well, on the ground that it is unconstitutional to limit the relief to a lawful permanent resident who has departed the U.S.[22] In these cases, the immigration judge decides whether the lawful permanent resident has established sufficient "equities" (including rehabilitation and non-recidivism) to outweigh the crime committed. A person granted this relief retains lawful permanent resident status.

Aggravated felons are ineligible for this form of relief if they have been convicted of crimes for which they have served, in the aggregate, five years in prison.

---

[20] An asylum claim also is considered a claim for withholding of deportation under section 243(h) of the INA; but very few aliens are granted withholding of deportation because if they are eligible for that form of relief, they are probably eligible for the more permanent relief of asylum. Withholding of deportation, which conveys no right to remain in the United States permanently, must be granted when the immigration judge finds that the alien's life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. (An asylee, by contrast, need only show a "well-founded fear" of persecution on account of one of these five grounds.)

[21] 59 Fed. Reg. 62284 (Dec. 5, 1994).

[22] *Francis* v. *INS*, 532 F.2d 268 (2d Cir. 1976); Matter of Silva, 16 I&N Dec. 26 (BIA 1976).

122

Each of these forms of relief may be exploited by illegal aliens to extend their stay in the United States. Voluntary departure is subject to abuse because there is very little assurance that aliens actually leave the United States, and very little incentive for them to do so. In addition, the Government often gets nothing in return for granting this form of relief. Voluntary departure could be used to "settle" deportation cases expeditiously and ensure that people actually leave the United States, but this is not frequently done under the current system.

Asylum is often claimed by persons who have not suffered persecution, but who know that delays in adjudication (particularly in the affirmative asylum system) will allow them to remain in the United States indefinitely, meanwhile accruing time so that they will be eligible for suspension of deportation if they are ever placed in deportation proceedings.

Suspension of deportation is often abused by aliens seeking to delay proceedings until 7 years have accrued. This includes aliens who failed to appear for their deportation proceedings and were ordered deported in absentia, and then seek to re-open proceedings once the requisite time has passed. Such tactics are possible because some Federal courts permit aliens to continue to accrue time toward the seven year threshold even after they have been placed in deportation proceedings. Similar delay strategies are adopted by aliens in section 212(c) cases, where persons who have been in the United States for a number of years, but have only been lawful permanent residents for a short period of time, seek and obtain this form of relief.

C. Procedural Issues Pertaining to Removal of Illegal Aliens

Illegal aliens also may frustrate removal through taking advantage of certain procedural loopholes in the current removal process.

First, aliens may request and obtain multiple continuances, in order to change the venue of their hearing, obtain an attorney, or prepare an application for relief. Due to the crowded dockets in the immigration courts, delays can stretch out over weeks and months.

Second, many aliens simply fail to appear for their deportation hearing. A 1989 study by the General Accounting Office estimated that 27 percent of deportation proceedings are closed because aliens fail to appear for their hearings. The "no-show" rate can exceed 50 percent in venues such as New York, Los Angeles, and Miami. Bonds apparently do not have a strong deterrent effect against no-shows.

Third, lapses (perceived or genuine) in the procedures for notifying aliens of deportation proceedings lead some immigration judges to decline to exercise their authority to order an alien deported in absentia. These problems are exacerbated by the fact that aliens may request a change of venue of their proceeding. Often, an alien who has changed venue will not inform the INS of a changed address (or of subsequent address changes) despite the legal obligation to do so.

Fourth, there are few consequences (other than forfeiture of bond) for aliens who fail to appear for their hearings. Failure to appear for earlier proceedings is rarely if ever cited as an example of misconduct in future hearings if the alien is applying for relief such

123

as suspension of deportation. Furthermore, aliens expect that the INS is unlikely to mount any serious effort to apprehend them if they fail to appear.

Fifth, although only a small percentage of aliens appeal their deportation orders to the Board of Immigration Appeals or to the Federal courts, those who do can count on significant delays in the disposition of their appeal.

Sixth, illegal aliens apprehended at worksites have, as a result of being placed in deportation proceedings, acquired the right to obtain work authorization pending the completion of their hearings. This leads to the anomalous situation in which an alien who was illegally working for an employer one week may be legally re-hired the following week after being apprehended by INS. Cases like this should be rare in the future, however, since the INS in January 1995 repealed the regulatory provision that granted work authorization to all aliens in deportation proceedings.[23] Aliens seeking certain forms of relief from deportation (though not asylum) continue to be eligible for work authorization.

### D. Detention Issues Pertaining to Removal of Criminal and Illegal Aliens

A chief reason why many deportable aliens are not removed from the United States is the inability of the INS to detain such aliens through the course of their deportation proceedings. The INS plans to increase its detention space to about 8,500 beds in FY 1996, an increase of close to 50 percent.[24] This enables the INS to detain approximately 100,000 aliens per year, with an average stay of 28 days.[25] Detained cases are given priority in the immigration system, both by immigration judges and the BIA. However, relatively few deportable aliens, outside of criminals, are detained at all. In order to manage its limited resources, the INS has adopted the following detention priorities:

1. Aliens convicted of crimes or identified as alien smugglers;

2. Excludable aliens, with priority to those with criminal or terrorist histories or those attempting to enter the United States with fraudulent documents;

3. Deportable aliens who have committed fraud against the INS, such as those who have entered with fraudulent visas;

4. Deportable aliens who have failed to appear for their hearings or who have been previously ordered deported;

5. Deportable aliens apprehended while trying to enter illegally;

6. Other deportable aliens, including those working illegally;

These priorities lead to disparities of treatment among aliens who might be considered as having committed similar immigration violations. For example, an alien who is caught at a port of entry with a fraudulent document is more likely to be detained than an alien who has entered the United States on a nonimmigrant visa,

[23] 59 Fed. Reg. 62284 (Dec. 5, 1994).
[24] Hearing: Removal of Criminal and Illegal Aliens, supra note 13, at 35.
[25] The INS reported to the Committee in December 1995 that approximately 83,400 aliens were detained in 6,418 funded detention beds in FY 1995, with an average stay of 28.3 days. Increasing the available beds to 8,500 actually will enable the detention of more than 100,000 aliens, based on the same average length of stay.

124

overstayed, and been apprehended while working illegally. A criminal alien is likely to be detained for at least some period of time; an alien who has actually been ordered deported is unlikely to be detained at all. In fact, at the conclusion of a deportation proceeding, it is exceedingly rare that an alien is taken into custody after being ordered deported, unless the alien is already in INS detention.

Another issue related to the release of deportable aliens is the use of bonds. The INA provides that bonds can be required for those released pending their hearings. Bond amounts in immigration cases are often "absolute"—bonding companies are reluctant to underwrite the high risk of aliens failing to appear, and thus, aliens must put up the full amount of the bond. In addition, the INS is sometimes reluctant to set bonds too high because if the alien is not able to pay, the alien cannot be released, and a needed bed space is lost. In essence, in deciding to release a deportable alien, the INS is making a decision that the alien cannot be detained given its limited resources. A bond requirement under such circumstances is an empty threat. In addition, an alien may contest the amount of bond before an immigration judge.[26]

### E. Recent Strategies to Expedite Removal of Criminal Aliens

*The Institutional Hearing Program*

The Institutional Hearing Program (IHP) is a joint effort between the INS, the Executive Office for Immigration Review (EOIR), and State and Federal correctional officials to ensure that alien inmates receive orders of deportation prior to the end of their criminal sentences. The goal is to conclude exclusion and deportation hearings against criminal aliens before they complete their prison terms, making them amenable to deportation upon release.[27] The hearings are similar in procedure to other deportation hearings.

The program began in 1986 after the passage of the Immigration Reform and Control Act. It has since expanded so that hearings can be held in a number of Federal facilities, and in every State, D.C., and Puerto Rico. The IHP expedites hearings in Federal prisons by centralizing the alien inmate populations in six facilities. In the States, IHP hearings have been expedited through similar patterns of centralizing inmates at particular facilities.

In FY 1995, a total of 9,557 criminal aliens were removed from the U.S. based on completion of IHP proceedings in federal, state, and county facilities. A larger number were interviewed and processed for a final removal order. In FY 1995, the INS and EOIR have moved to expand the IHP in 5 states with the largest criminal alien populations: California, Florida, Illinois, New York, and Texas. The expansion includes the permanent assignment of immigration judges and INS trial attorneys to IHP hearing sites. In these 5 states in FY 1995, approximately 24,000 foreign-born inmates were interviewed and approximately 15,000 removal proceedings were commenced.

---

[26] The procedures for setting and redetermining the amounts of bonds is one of the most complex procedural aspects of the deportation and removal process.

[27] Hearing: Removal of Criminal and Illegal Aliens, supra note 13, at 183 (Statement of Gerald S. Hurwitz, Counsel to the Director, Executive Office for Immigration Review).

125

*Expedited administrative deportation*

Section 130004 of the Violent Crime Control and Law Enforcement Act of 1994 (Pub. L. 103–322, Sept. 13, 1994) amended section 242A of the INA to provide for expedited deportation procedures for aliens convicted of aggravated felonies who are not lawfully admitted for permanent residence to the United States and are not eligible for any relief from deportation. Under these procedures, an INS District Director will be able to issue an order of deportation without the need for a hearing before an immigration judge. The alien shall be provided notice of the grounds for deportation and of his right to contest the deportation, and shall have the opportunity to inspect the evidence. The alien may not be deported for a period of 30 days, in order to have time to contest the order or seek judicial review. However, judicial review is limited to whether the alien: (1) has been correctly identified; (2) has been convicted of an aggravated felony; and (3) has been afforded the limited procedural rights under this new provision.[28]

*Judicial deportation*

Section 224 of the Immigration and Nationality Technical Corrections Act of 1994 (enacted October 25, 1994) amended section 242A of the INA to provide that Federal judges may, at the time of sentencing of a criminal alien, order the alien to be deported. This obviates the need for a separate deportation proceeding. A United States Attorney must file a notice upon the defendant and the INS stating his or her intention to seek judicial deportation; the INS must concur with the United States Attorney's intention to seek an order of deportation. The alien must be provided notice of the grounds for deportation and the opportunity to examine the evidence and rebut the charges.

### F. Alien Terrorists

The removal of alien terrorists from the U.S., and the prevention of alien terrorists from entering the U.S. in the first place, present among the most intractable problems of immigration enforcement. The stakes in such cases are compelling: protecting the very lives and safety of U.S. residents, and preserving the national security. Yet, alien terrorists, while deportable under section 241(a)(4)(D) of the INA, are able to exploit many of the substantive and procedural provisions available to all deportable aliens in order to delay their removal from the U.S. In addition, alien terrorists, including representatives and members of terrorist organizations, often are able to enter the U.S. under a legitimate guise, despite the fact that their entry is inimical to the national interests of the U.S. In several noteworthy cases, the Department of Justice has consumed years of time and hundreds of thousands (if not millions) of dollars seeking to secure the removal of such aliens from the U.S.

Starting in the first Administration of President Reagan, the Department of Justice has sought reform of immigration law and procedures to better enable this country to protect itself against the threat of alien terrorists. The chief target of these reforms are the

---

[28] Final regulations to implement the administrative deportation process were issued in August 1995. 60 Fed. Reg. 43954 (Aug. 24, 1995).

126

statutory and administrative protections given to such aliens, many of which are not required by the due process clause of the Fifth or Fourteenth Amendment or any other provision of law, that enable alien terrorists to delay their removal from the U.S.

The need for special procedures to adjudicate deportation charges against alien terrorists is manifest. Terrorist organizations have developed sophisticated international networks that allow their members great freedom of movement and opportunity to strike, including within the United States. Several terrorist groups have established footholds within immigrant communities in the U.S.

The nature of these groups tend to shield the participants from effective counterterrorism efforts—including the most basic measure of removing them from our soil. The U.S. relies heavily upon close and continued cooperation of friendly nations who provide information on the identity of such terrorists. Such information will only be forthcoming if its sources continue to be protected. Thus, it is essential to the national security of the U.S. that procedures be established to permit the use of classified information in appropriate cases to establish the deportability of an alien terrorist.

Such procedures also must be crafted to meet constitutional requirements. The government's efforts to safeguard lives and property and to protect the national security may be contested on the grounds that they conflict with the procedural rights of aliens. The interests of the government must therefore be balanced against the legitimate rights of those privileged to be present within the United States.[29]

### III. EMPLOYER SANCTIONS AND VERIFICATION

The availability of jobs in the U.S. economy is a primary magnet for illegal immigration. The employment of illegal aliens, in turn, causes deleterious effects for U.S. workers.

First, illegal immigrants by and large are attracted to America by the lure of jobs. As Vernon M. Briggs, Jr., professor of labor economics at Cornell University, stated in testimony before the Subcommittee on Immigration and Claims on April 5, 1995, "It has long been conceded that the driving force behind illegal immigration is access to the U.S. labor market."[30] The U.S. Commission on Immigration Reform stated:

> Employment opportunity is commonly viewed as the principal magnet which draws illegal aliens to the United States. Since the beginning of U.S. history, foreigners have come to the United States in search of a better life. Whatever initially motivated them to come here, they often ended up seeking and finding employment. For years, U.S. policy tacitly accepted illegal immigration, as it was

---

[29] *Fiallo* v. *Levi*, 406 F. Supp. 162 (S.D.N.Y.), aff'd, 430 U.S. 787 (1975); *Jean* v. *Nelson*, 472 U.S. 846, aff'g, 727 F.2d 957 (11th Cir. 1984); *Kleindienst* v. *Mandel*, 408 U.S. 753 (1972) (alien's presence in U.S. is privilege extended by Congress and not fundamental right.) See also *Alvarez* v. *INS*, 539 F.2d 1220 (9th Cir.), cert. denied, 430 U.S. 918 (1976) (applying rational basis test to equal protection claim for impermissible classification of aliens).
[30] "Impact of Illegal Immigration on Public Benefit Programs and the American Labor Force: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary," 104th Cong., 1st Sess. (1995) (Statement of Vernon M. Briggs, Jr.).

127

viewed by some to be in the interests of certain employers and the American public to do so.[31]

This "tacit acceptance" of illegal immigration was reflected in the fact that, until the last decade, no law prohibited the employment of illegal aliens. The Select Commission on Immigration and Refugee Policy (1981) stated that "[a]s long as the possibility of employment exists, men and women seeking economic opportunities will continue to take great risks to come to the United States, and curbing illegal immigration will be extremely difficult."[32] The Select Commission concluded that economic deterrents—specifically, a law prohibiting the hiring of undocumented or illegal aliens—were necessary to curb illegal immigration.

Second, employment of illegal aliens is having a detrimental effect on low skilled American workers. Professor Briggs testified further that:

> Every study of illegal immigration of which I am aware has concluded that it is the low skilled sector of the U.S. labor force that bears the brunt of the economic burden. For illegal immigrants are overwhelmingly found in the secondary labor market of the U.S. economy. This segment of the labor market is characterized by jobs that require little in the way of skill to do them and the workers have little in the way of human capital to offer. The concentration of illegals in the secondary labor market occurs because most of the illegal immigrants themselves are unskilled, poorly educated, and non-English speaking which restricts the range of jobs . . . they can seek. . . . Although occupational definitions vary, it can be crudely estimated that about one quarter to one-third of the U.S. labor force are employed in jobs that are predominately concentrated in the secondary labor market. This high percentage certainly belies the claim that U.S. citizens and resident aliens will not work in these low skilled occupations.[33]

Dean Frank Morris of Morgan State University concluded at the same hearing that "it is time that the labor market effects, especially the labor market effects of illegal immigration on African Americans and other low income workers be addressed as a top priority."[34] More recently, a paper from the Bureau of Labor Statistics reported that immigration accounts for as much as 50 percent of the decline in real wages of high school dropouts, and for approximately 25 percent of the increase in the wage gap between low- and high-skilled workers.[35]

---

[31] 1994 Commission Report at 88 (1994).
[32] 1981 Select Commission Report, supra note 1, at 59.
[33] See Briggs testimony, supra note 30.
[34] "Impact of Illegal Immigration on Public Benefit Programs and the American Labor Force: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary," 104th Cong., 1st Sess. (1995) (Statement of Frank Morris).
[35] David A. Jaeger, "Skill Differences and the Effect of Immigrants on the Wages of Natives," U.S. Dep't of Labor, Bureau of Labor Statistics, Office of Employment Research and Program Development, Working Paper 273 (Dec. 1995).

FRP-FRN-00798

128

*The Immigration Reform and Control Act*

Laws against the employment of illegal aliens ("employer sanctions") were considered by Congress as early as the 1952 Immigration and Nationality Act. The endorsement by the Select Commission in 1981 provided a strong impetus for the passage of such measures, and employer sanctions became a part of the Simpson-Mazzoli immigration reform bill, eventually enacted as the Immigration Reform and Control Act of 1986 (IRCA).

IRCA's employer sanctions and verification provisions prohibit employers from knowingly hiring aliens who are not authorized to work in the United States.[36] IRCA also requires that employers verify the employment eligibility and identity of all new employees by examining documents provided by new employees, and by completing the Employment Eligibility Verification Form (INS Form I-9). IRCA also prohibited discrimination in employment based on national origin or citizenship status, except with respect to persons not authorized to work in the United States.[37] Enforcement of the IRCA provisions, however, has been hampered by rampant use of fraudulent documents, confusion on the part of employers, and continued access by illegal aliens to jobs and public benefits.[38]

*Work eligibility documents and document fraud*

The 29 documents that may be used to establish identification and eligibility to work are divided by statute and regulation into three categories:

So-called "A List" documents establish both work eligibility and identification. An employee producing one of these 12 documents does not need to produce any other document.[39]

"B List" documents establish identity only. The most common document produced from this list is the driver's license.[40]

---

[36] Title I of Pub.L. 99-603, Nov. 6, 1986, as amended, enacting section 274A of the Immigration and Nationality Act (INA). The penalties include fines from $100 to $1000 per individual for "paperwork" violations (failure to properly complete the Form I-9); fines of $250 to $10,000 for knowingly hiring, continuing to employ, recruiting, or referring an unauthorized alien to work; and criminal penalties for engaging in a pattern or practice of violating the employer sanctions provisions.

Generally, those unauthorized to work are illegal aliens and holders of certain nonimmigrant visas that do not permit employment. However, one may be a "legal alien" (for example someone who is present legally in the United States pursuant to a type of nonimmigrant visa that does not authorize employment) but not be authorized to work. Similarly, one can be an illegal alien, but be authorized to work. (This latter category would include certain asylum applicants and aliens awaiting completion of deportation proceedings.) Lawful permanent residents are always authorized to work.

[37] Section 102 of IRCA, adding section 274B of the INA. Section 274B provides for creation within the Department of Justice of a Special Counsel for Immigration-Related Unfair Employment Practices ("Special Counsel" or "OSC"). The Special Counsel employs approximately 14 attorneys and 3 investigators to investigate charges of discrimination received from the public. The Immigration Act of 1990 increased the fines that may be imposed for discrimination violations to levels equivalent to those imposed for employer sanctions violations.

[38] See generally "Verification of Eligibility for Employment and Benefits: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary," 104th Cong., 1st Sess. (March 30, 1995).

[39] These include a U.S. passport, certificate of citizenship, certificate of naturalization, Alien Registration Receipt Card (I–151) or Resident Alien Card (I–551—"Green Card"), unexpired foreign passport stamped by the INS to indicate employment authorization, Temporary Resident Card (INS Form 688), Employment Authorization Card (Form I–688A), reentry permit (Form I–327), Refugee Travel document (Form I–571), employment authorization document issued by INS bearing a photograph. See 8 C.F.R. 274a.2(b)(1)(v)(A).

[40] There are 10 such documents, including a state driver's license or identification card with a photograph or identifying information, a school ID card with photograph, a voter registration card, and a U.S. military or dependent's ID card. See 8 CFR 274a.2(b)(v)(B).

129

"C List" documents establish employment eligibility only. The most common documents produced from this list are birth certificates and the social security card.[41]

The employer's responsibility is limited to determining whether or not the documents "appear" to be genuine; they are allowed a good faith defense and are not liable for verifying the validity of the documents. However, employers are the initial enforcers of the employment eligibility restrictions.

The number of permissible documents has long been subject to criticism. The INS published a proposed regulation in 1993 (with a supplement published on June 22, 1995) to reduce the number of documents from 29 to 16. This proposal, however, does not reflect the consensus of opinion that documents should be reduced even further, and that documents that are easily counterfeited should be eliminated entirely.

The problem of document fraud is pervasive. Social security cards, birth certificates, and the alien registration cards ("green cards") are the most commonly used employment eligibility documents. They are also the ones most prone to counterfeit, the incidence of which has increased sharply since the passage of IRCA. Birth certificates, even if issued by lawful authority, may be fraudulent in that they do not belong to the person who has requested that one be issued. This problem is exacerbated by the large number of authorities—numbering in the thousands—that issue birth certificates.

*Enforcement issues*

A majority of employers comply with both the employment restriction and verification requirements of IRCA. Nevertheless, enforcement of employer sanctions has been beset by difficulty from the start. Among the chief problems have been:

The fact that workers may present any of a large number of documents, some of which may be obscure or unfamiliar, in order to establish the worker's identification and eligibility to be employed;

A proliferation of fraudulent documents, particularly birth certificates, social security cards, drivers' licenses, and INS work authorization cards, that are used to establish identity and eligibility to be employed;

Employer confusion regarding the requirements for verification of work eligibility;

Allegations that fear of liability for hiring unauthorized workers has led some employers to discriminate against job applicants who appear to be foreign-born;

Tepid enforcement efforts by the INS on the hiring of unauthorized workers and an overemphasis on paperwork violations (failure to fully or correctly complete the I–9 form).

Employers also report feeling trapped between the work verification and anti-discrimination provisions of IRCA. "As a result of inconsistent and confused government regulations, policies or pro-

---

[41] There are 7 such documents, including the social security card, a certificate of birth abroad issued by the Department of State, an original or certified copy of a birth certificate, or an employment authorization card issued by the INS, but not included in List A. See 8 CFR 274a.2(b)(v)(C).

130

nouncements, compliance with one of these precepts sometimes inevitably means violation of the other." [42] As a result, some businesses take a less aggressive posture in identifying fraudulent documents, and thus hire (even if unknowingly) aliens not authorized to work.

### IV. LEGAL IMMIGRATION

### A. Sources of Current Immigration Policy

Legal immigration to the United States has steadily increased from the end of the Second World War (during which virtually no immigration took place) to the current decade, in which an average of nearly 1,000,000 persons have legally immigrated (or been granted permanent resident status) each year. During that time, the composition of the immigration population also has changed. Between 1941 and 1960, the top five countries sending immigrants to the United States were Germany, Canada, Cuba, the Philippines, and the United Kingdom. From 1981 to 1993, the top five were Mexico, the Philippines, China, Korea, and Vietnam.

These changes in immigration are due in large part to three major legislative enactments.

*The Immigration Act of 1965*

The Immigration Act of 1965, Pub. L. 89-236, abolished the national origins quota system established by the Immigration Act of May 26, 1924. The 1924 law prohibited virtually all immigration from Asian countries and imposed quotas on non-Western Hemisphere countries. These measures were intended to preserve the ethnic balance existing in the country at the time of the 1890 census. As a result, Southern and Eastern Europeans, who had comprised the majority of immigration during the period 1901-1920, were largely excluded under the quota system. Immigration from the Western Hemisphere, however, was virtually unrestricted.

In place of the national origins quota system, the 1965 Act established a system based on overall ceilings and preference categories. There was an annual ceiling of 170,000 on Eastern Hemisphere immigration with a 20,000 per country limit. Within these restrictions, immigrant visas were distributed according to a seven-category preference system placing priority, in order, on family reunification, needed skills, and refugees. The 1965 law also provided that Western Hemisphere immigration would be limited by an annual ceiling of 120,000, without per-country limits or a preference system. Congressional amendments in 1976 extended the per-country limits and preference system to the Western Hemisphere, and in 1978 established a single worldwide immigrant ceiling of 270,000, exclusive of refugees.

The principal effects of the 1965 law and these amendments were to make family unification the dominant principle of United States immigration law, and to change the ethnic composition of immigration. By the mid-1980s, nearly 75 percent of all legal immigrant admissions were admitted as immediate or extended family members.

---

[42] Hearing before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary, 103rd Cong., 2d Sess. 83-84 (Oct. 3, 1994) (statement of Daryl Buffenstein, President-Elect of the American Immigration Lawyers Association).

131

In addition, 85 percent of immigrants now come from Asia, Latin America (including Mexico), Oceania, and Africa; 15 percent came from Europe and Canada.

*The Refugee Act of 1980*

The next major change in immigration law was the Refugee Act of 1980 (Pub. L. 96-212). The law removed refugee admissions from the preference system and established a system whereby the President, after "appropriate consultations," establishes the number of refugees to be admitted in a given year. The law also enacted section 208 of the INA, requiring the Attorney General to establish a procedure for granting asylum to persons present in the United States or at our borders who meet the definition of refugee.

During the past 15 years, the number of refugees admitted from overseas has increased. A record 354,000 refugees arrived in the United States in 1980, which included approximately 150,000 Cuban marielitos and large numbers of Southeast Asian refugees. A record 155,000 refugees adjusted to permanent resident status in 1982. A yearly average of 110,000 refugees, and an additional 11,000 asylees, adjusted to permanent resident status in 1990 through 1994. The Administration has projected that there will be 90,000 refugee admissions in FY 1996, with a gradual decrease to 50,000 per year later in the decade.[43]

The number of asylum applications has increased more dramatically, from approximately 30,000 in the early 1980s to 150,000 per year by the early 1990s. Most of these were meritless applications filed by illegal aliens in order to prolong their stay in the U.S. and to receive work authorization. Thus, abuse of the asylum system has had a profound effect on illegal immigration. On the other hand, legitimate use of the asylum system has not dramatically increased the amount of legal immigration: the number of persons granted asylum each year has been 15,000–20,000 or less. The asylum reform regulations effective in January 1995 were intended to discourage the filing of nonmeritorious asylum applications by illegal immigrants and to expedite the removal of applicants who are denied. The number of asylum applications has significantly declined since these regulations went into effect.

*The Immigration Reform and Control Act of 1986*

The Immigration Reform and Control Act of 1986 (IRCA) included a program for legalization of long-term resident illegal aliens that will affect the flow of legal immigration for years to come. IRCA's legalization program included aliens who had resided continuously in the United States in an unlawful status since before January 1, 1982. In addition, the Special Agricultural Workers program provided for the legalization of certain agricultural workers (SAWs) present in the United States during 1985 and 1986. Approximately 2.7 million persons received lawful permanent resident status through the legalization program in 1989 through 1993: about 1.6 million as long-term illegal resident aliens and 1.1 million as SAWs. While these numbers do not represent new admis-

---

[43] U.S. Commission on Immigration Reform, Legal Immigration: Setting Priorities 136 (1995) (Hereinafter referred to as 1995 Commission Report).

132

sions to the United States, the beneficiaries of legalization gain the ability to petition for relatives under the family preference system.

*The Immigration Act of 1990*

The Immigration Act of 1990 included the first comprehensive reform of the legal immigration system since the Immigration Act of 1965. Major changes included a separation of family preference and employment-based preference categories, an increase in total immigration under an overall pierceable cap, an increase in employment-based immigration from 54,000 to 140,000, and a provision for the admission of "diversity immigrants" from countries that have been underrepresented in United States immigration since 1965.

Serious consideration of changes in the system established in 1965 began with the report of the Select Commission in 1981. Legislation was introduced in the Senate after the passage of IRCA that would have lessened the dominance of family-based immigration and provided more opportunity for "traditional immigrants"— those without family ties in the United States.

As a result of the 1990 Act, there is now a worldwide annual level of at least 675,000 immigrants, not including refugees and several other categories. Of this total, 480,000 are family-related immigrants, 140,000 are employment-based immigrants, and 55,000 are diversity immigrants. In the family-related category, there is no limit on the number of immediate relatives (spouses, unmarried minor children, and parents) of United States citizens who can be admitted in a given year. The number of admissions for immediate relatives of citizens counts against the total of 480,000 to a "floor" of 226,000; that is, at least 226,000 immigrant visas are reserved for other family preference categories, including unmarried (adult) sons and daughters of citizens (allocation=23,400), spouses and children of permanent resident aliens (114,200), married sons and daughters of citizens (23,400), and brothers and sisters of adult citizens (65,000).

The 1986 amnesty provisions and the increases in the 1990 act have resulted in high levels of admissions in recent years. The highest admissions level, including amnestied aliens adjusting to lawful status, occurred in 1991: 1,827,167. The highest admissions figure not counting amnestied aliens occurred in 1993: 880,014.

## B. The Need for Legal Immigration Reform

Congress has the Constitutional task to set immigration policy in the national interest. As a result of legislation enacted in 1965, 1986, and 1990, the United States has dramatically increased overall levels of legal immigration. During the past 15 years, we have admitted or legalized almost 12 million immigrants: an average of 733,000 each year legal immigrants were admitted or legalized from 1981–1990, and a whopping 1.13 million per year from 1991–1994. These numbers include the amnesty granted to 2.7 million illegal aliens under the 1986 Immigration Reform and Control Act. There is no comparable sustained period of immigration growth in American history.

Such large increases in immigration create problems as well as opportunities for the American society and economy. The Commis-

133

sion on Immigration Reform noted that "immigrants often are a bright spot in today's all too often bleak urban environment," and that in areas where they concentrate, immigrants "frequently establish new businesses and other employment-generating activities that promote the renewal of city neighborhoods and commercial districts."[44] On the other hand, immigration has costs as well, many related to the fact that such a preponderance of immigrants (close to 9 million since 1980) are admitted without reference to their level of education or skills. The current cohort of immigrants is far more likely to have less than a high-school education than native-born Americans. This can have the effect of flooding the labor market for unskilled work, as well as creating pockets of impoverished immigrants who will be less likely to assimilate into the broader American society.[45] The rise of immigrant-based organized crime groups suggests that screening of potential immigrants is not as rigorous as it ought to be. These negative impacts are most keenly felt in the handful of States in which a vast majority of immigrants choose to live,[46] and, ironically, cause most direct harm to recent immigrants.[47] Legal immigration policy must strike a proper balance so that these problems do not overwhelm the opportunities that immigration brings to the nation, and result in job loss and displacement for American workers.

There also are legitimate concerns that the Government's and society's capacity for admitting, assimilating, and naturalizing immigrants have been strained by current levels of legal immigration. Again, these problems are heightened in high-immigration States. Our education system, for example, is burdened by the needs of immigrants who either are not proficient in English or illiterate in their own language or both. In Los Angeles county, education is provided in over 70 languages at a larger "per student" cost to the taxpayer. While we should expect a great deal of diversity in immigration, the U.S.'s capacity to absorb immigrants is not unlimited.

*Reform of family-based immigration*

Family-based immigration is the dominant category of immigration growth. Demand in these categories has grown dramatically due to the beneficiaries of legalization under IRCA obtaining permanent resident status, and in some cases citizenship, thus allowing them to petition for relatives abroad. In FY 1994, for example, 497,000 family-sponsored immigrants were admitted, as opposed to 123,000 employment-based immigrants. Many of these employment-based immigrants were the spouses and children of the principal immigrants admitted for employment purposes. In addition, a significant portion of refugee admissions and asylum adjustments (121,000 in 1994) consist of the relatives of principal refugee applicants. The primary beneficiaries of family-sponsored immigration are the families of recently-arrived immigrants, not of native-born U.S. citizens. This, combined with the share of family-sponsored

---

[44] 1995 Commission Report at 20.
[45] 1995 Commission Report at 25.
[46] Seventy percent of legal immigrants intend to live in the six states of California (25.8 percent); New York (18.0); Texas (7.3); Florida (6.9); New Jersey (5.5), and Illinois (5.3). 1995 Commission Report at 15–16.
[47] 1995 Commission Report at 27.

134

immigration, means that most immigrants are admitted solely on the basis of their relationship to another immigrant.

Supporters of family unification as an objective in immigration policy state that this pattern of immigration, in addition to serving the humanitarian interest in keeping families intact, helps immigrants to establish networks and put down roots that make them more productive members of society. However, because current family unification policy also permits the creation of migration "chains"—immigrants petitioning for their parents and brothers and sisters, who may in turn petition for their children and other relatives—family immigration has become a form of entitlement that may crowd out other types of immigration that would be equally or more beneficial to American society. In addition, "chain migration" allows the demand for family immigration to grow exponentially.

The availability of "chain migration" not only distorts the selection criteria for legal immigrants, but may add additional incentive for people to attempt illegal immigration to the U.S. There is growing evidence that some families overseas pool their resources to pay the smuggling fee for one family member to illegally enter the U.S., in the hope that this family member will eventually gain legal status, and be able to petition for other family members.[48]

There are other compelling signs that this aspect of the legal immigration system is broken and in need of repair. Since 1965, family unification has been a primary goal of our immigration policy. Currently, however, there is a backlog of 1.1 million spouses and minor children of lawful permanent residents waiting for admission or for legal status. This means that many legal resident aliens are physically separated from their husbands, wives, and children for up to four years, and those applying today may wait up to 10 years. Even if the spouses and minor children are present in the U.S., their immigration status is uncertain.

The basic failure of the current system, therefore, is that while it sets preferences, it fails to set priorities. For example, with a finite number of immigrant admissions, numbers allocated to brothers and sisters and other categories mean fewer numbers are allocated to the spouses and minor children of lawful permanent residents. The number of visas now used to admit brothers and sisters and adult children should be used instead to reduce the backlog for nuclear family members.

The preservation of the nuclear family, therefore, should continue to be a cornerstone of U.S. immigration policy. The same priority cannot be given, and should not be given, to the admission of brothers and sisters and adult sons and daughters, solely on the basis of their family relationship to an immigrant. When an adult leaves his native land to emigrate to America, he or she makes a decision to be separated from brothers and sisters, parents, and adult children. We realize that this is a difficult decision in many cases, but ultimately, it is a decision that the immigrant has made. Immigration policy cannot and should not attempt to soften the blow by holding out the hope that these adult family members will

---

[48] See, e.g., William Branigin, "A Cottage Industry of Counterfeit People and Papers," Wash. Post, Nov. 25, 1995, A1, A12.

135

be eligible to immigrate to the U.S. Clear evidence of this fact are the enormous backlogs that now exist in virtually all extended family categories. As of January 1994, the State Department estimates the following number of persons waiting for admission to the U.S.: (1) unmarried adult sons and daughters of U.S. citizens: 63,499 (current law allows 23,400 annual admissions); (2) unmarried adult sons and daughters of permanent resident aliens: 450,579 (36,266 annual admissions); (3) married adult sons and daughters of U.S. citizens: 257,110 (23,400 annual admissions); and (4) brothers and sisters of U.S. citizens: 1,643,463 (65,000 annual admissions). To clear out these backlogs, immigration law would have to provide up to an additional 2.4 million visas: a dramatic increase in legal immigration at a time when stabilization of immigrant numbers is called for. To compound the problem, these 2.4 million immigrants could petition for admission of their relatives, thus raising demand on the legal immigration system to an unprecedented level and creating new, exponentially larger backlogs.

Excessive backlogs in these admission categories undermine the credibility and integrity of U.S. immigration policy because they hold out a promise of opportunity to immigrate that cannot be met in the foreseeable future. For most, the opportunity to immigrate to the U.S. as the adult relative of a citizen or lawful permanent resident is theoretical at best: a newly-arriving immigrant or newly-naturalized citizen can expect to wait 10 years, or longer in many cases, from the time an immigrant visa petition is filed for his or her relative to the time a visa for that relative becomes available. Thus, these categories often do not create an opportunity to immigrate, but an opportunity to wait in line. Some do not wait their turn, but instead immigrate illegally to the U.S., hoping (and in many cases succeeding) to wait here until their visa number becomes available. Thus, the unrealistic expectations created by the failure to set firm priorities in the system of legal immigration causes further incentive for illegal immigration.

Finally, the permanent excessive demand on the immigration system represented by these backlogs makes it difficult if not impossible to alter course and give greater priority to immigration categories that are more closely tied to the national interest. We can sympathize with people who have been waiting in line and may no longer be eligible for admission. But immigration is a privilege, not a right, and not all those eligible at one time for a visa can be guaranteed to receive one. Otherwise, immigration policy would be forever "locked in" to decisions and priorities of the past.

*Reform of employment-based immigration*

A reformed legal immigration system should make generous provision for the admission of highly-skilled and educated workers who will bring needed expertise to the American economy. For the most part, business immigration serves important economic and social objectives. It gives employers access to the increasingly global labor market and enables pursuit of international business opportunities, expansion in international markets, and overall enhancement of competitiveness. Business immigration can also expand job opportunities for U.S. workers by admitting top-flight talent which helps maintain U.S. leadership in developing technologies.

136

At the same time, business immigration policies must protect U.S. workers from displacement or adverse effects on wages and working conditions. The labor certification process is the primary means to meet this objective. However, it should be recognized that a large influx of workers in and of itself may have some negative economic impacts. The admission of less-skilled workers, for example, may hurt the domestic labor force by increasing competition for scarce jobs at the lower end of the economic ladder.[49] Thus, the current system ill-serves the American economy by allowing for the admission of 10,000 unskilled workers per year. This is particularly true since large numbers of unskilled workers are admitted through the family-based and humanitarian categories each year.

In addition, the business immigration categories should more clearly define those immigrants who, for the sake of protecting the American work force, can only be admitted after their sponsoring employer completes the labor certification process.[50] Under current law, aliens with advanced degrees or exceptional ability must have a job offer and are subject to the labor certification process. However, these requirements can be waived when admission of the alien is deemed by the INS to be "in the national interest." The problem is that the statute fails to define what constitutes the national interest, which has led to absurd results: among the aliens admitted on the national interest waiver in recent years are a golf course designer, a deer farmer, a children's musician, and numerous corporate employees whose only claim to "national interest" is improving the profitability of their own companies. All of these persons were presumably eligible for admission to the U.S., but it appears doubtful that waiver of the labor certification process was required by any national interest.

*Reform of refugee admissions*

The current level of refugee admissions, which has exceeded 100,000 per year for the past decade, is set by the President and reviewed by Congress through the consultation process established in the Refugee Act of 1980. A prime difficulty with this process is that Congress has virtually no influence in setting the refugee admissions numbers or allocations for any given fiscal year. The required consultations often take place weeks, if not days, before the start of the fiscal year, thus rendering moot the opportunity for meaningful input.

The Refugee Act of 1980[51] was intended to establish a comprehensive yet flexible procedure for the admission and resettlement of refugees in the United States.[52] To this end, Congress delegated authority for setting the number and allocation of refugee ad-

---

[49] One recent government study found that immigration accounted for roughly half of the decline in real wages among workers with less than a high school education. See David Jaeger, "Skill Differences and the Effect of Immigrants on the Wages of Natives," U.S. Department of Labor, Bureau of Labor Statistics, Working Paper 273 (Dec. 1995).

[50] See INA § 212(a)(5)(A)(i).

[51] Pub. L. No. 96–212, 94 Stat. 102, in part adding INA §§ 101(a)(42), 207–209, 411–414, 8 U.S.C. §§ 1101(a)(42), 1157–1159, 1521–1524.

[52] See, e.g., H.R. Rep. No. 96–608, 96th Cong., 1st Sess. 1 (1979) [hereinafter House Report 96–608].

137

missions to the President.[53] At the same time, Congress retained for itself a broad consultative role in the process.[54]

Under section 207(d) of the INA, the President must consult with certain members of the House and Senate Judiciary Committees prior to making any of the following determinations: setting the number of refugee admissions for the upcoming fiscal year; allocating refugee admissions within this overall number; that there exists an unforeseen refugee emergency situation justifying the admission of additional refugees over the limit for the current fiscal year; and allocating emergency refugee admissions.

In addition to these consultation provisions, section 207(d)(1) requires the President to report annually to the Judiciary Committees on anticipated allocations and to provide for periodic consultation between the President's representatives and members of those committees on the possible need for adjustments in the current allocation. Neither the allocation provision nor the report and discussion provision expressly confers authority to reallocate admissions or sets forth the procedures to be followed in effectuating a reallocation.

The Refugee Act of 1980 intended to provide Congress with a meaningful role in the process of determining refugee admissions. In the words of former Representative Elizabeth Holtzman, then Chair of the House Subcommittee on Immigration, Refugees and International Law, "Importantly, for the first time, the bill requires that Congress be consulted before refugees are admitted, and spells out in detail the elements of that consultation."[55] Additionally, the Report of the House Committee on the Judiciary regarding the Refugee Act of 1980 stated the following:

> The Committee has made every effort to assure that Congress has a proper and substantial role in all decisions on refugee admissions. In the past, the Attorney General's consultation with this committee regarding admissions has been merely a matter of courtesy or custom. * * * The Committee cannot overemphasize the importance it attaches to consultation. The Congress is charged under the Constitution with the responsibility for the regulation of immigration, and this responsibility continues with respect to refugee admissions.[56]

In the past several years, the refugee consultation process has devolved into a single meeting between the Executive Branch and the House and Senate Judiciary Committees near the end of the fiscal year—the very type of process which the 1980 Act expressly rejected. As an example, the refugee consultation for fiscal year 1996 occurred in the middle of September 1995—two weeks prior to the beginning of fiscal year 1996. The failure of the Administration to consult with Congress on the number and allocation of refugee admissions until just prior to the beginning of the fiscal year meant that the series of discussions between the President and

---

[53] INA § 207(a), (b), 8 U.S.C. §§ 1157(a), (b).
[54] Id.
[55] 125 Cong. Rec. H11966, H1167 (daily ed. Dec. 13, 1979) (statement of Rep. Holtzman).
[56] House Report 96–608 at 12–14 (1979).

FRP-FRN-00808

138

Congress called for in section 207(d)(1) of the INA did not take place.

The current process of determining refugee admissions does not provide Congress with a meaningful role in this process, as intended in the Refugee Act of 1980. The number of refugee admissions for a particular fiscal year should not be set unilaterally by the President. As former Chairwoman Holtzman stated: "* * * there is no substitute for public scrutiny, public disclosure, public debate on an issue of such importance as the admission of refugees to the United States."[57] The only way to have an adequate public debate on the issue of refugees is to give Congress a more meaningful role in determining number and allocation of refugee admissions.

Some may argue that Congress exercises adequate control over the numbers of refugees admitted through its power over the appropriations process. However, it is virtually impossible for Congress to reduce the number of refugees admitted by failing to fund programs for persons often already in this country or whom the President has already promised to admit. In the past, attempts by Congress to exercise control over refugee admissions through the appropriations process have only resulted in shifting a majority of the costs for resettling refugees to the State and local levels. Reducing federal funding for refugee resettlement has had no effect on the number of refugee admissions.

Congress also should re-assess the appropriate level of refugee resettlement in the United States. The United Nations High Commissioner for Refugees has estimated that the total population of refugees requiring resettlement may be under 50,000 per year. Even if the U.S. took half or more of this number, it would be much less than our current refugee admissions, which have averaged over 100,000 in recent years.

In addition, the U.S. admits large numbers of persons, particularly from the former Soviet Union, who would not be considered "refugees" by the UNHCR. In fact, the vast majority of refugees admitted to the U.S. in recent years have been admitted under a program which establishes a threshold for determining refugee status that is lower and thus significantly more generous than that contained in the INA or in international law.[58] Without this program, U.S. refugee admissions would be significantly below the 50,000 target originally established in the Refugee Act of 1980. The U.S. refugee programs in the former Soviet Union and Vietnam are expected to phase out during the next few years, leading the State

---

[57] 125 Cong. Rec. H37203 (daily ed. Dec. 20, 1979).

[58] The so-called Lautenberg Amendment—named after its author, Sen. Frank Lautenberg (D–N.J.)—allows certain residents of the former Soviet Union and Southeast Asia to be deemed refugees by merely asserting, not establishing, a fear of persecution. See §§599D, 599E, Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990 (Pub. L. 101–167, Nov. 21, 1989), as amended by §598 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990, (Pub. L. 101–513, Nov. 5, 1990), the Miscellaneous Technical Immigration and Naturalization Amendments of 1991, (Pub. L. 102–232, Dec. 12, 1991), §582 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1993 (Pub. L. 102–391, Oct. 6, 1992), §905 of the FREEDOM Support Act (Pub. L. 102–511, Oct. 24, 1992), §512 of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995 (Pub. L. 103–236, April 30, 1994), and §219(bb) of the Immigration and Nationality Technical Corrections Act of 1994 (Pub. L. 103–416, 108 Stat., Oct. 25, 1994)); 8 U.S.C. 1157 note. The standard applied to all other applicants is whether the applicant has demonstrated a well-founded fear of persecution. See INA §101(a)(42). See also Article I of the Protocol Relating to the Status of Refugees, 19 UST 6223, TIAS 6577 (1968).

139

Department to project that the Administration's refugee target will be 50,000 by FY 1998. Thus, under the State Department's plans, there would be no need for additional legislation authorizing higher refugee admissions should the provisions of this bill be enacted.

*Reform of asylum*

The asylum system established in the 1980 Refugee Act has provided protection to thousands of legitimate claimants, but has been subject to abuse by tens of thousands more who filed non-legitimate claims simply in order to extend their stay in the U.S. and to receive work authorization. Recently, as many as 140,000 "affirmative" asylum applications have been filed per year with the INS. This is in addition to the thousands of "defensive" asylum applications filed by aliens in exclusion and deportation proceedings. The INS has been able to resolve only one-third of these new filings in recent years, meaning that a huge backlog of claims, over 400,000, had developed by the end of FY 1994.

The Administration has taken significant steps to resolve these problems, principally through regulations effective in January 1995. Under these new rules, asylum applicants no longer will be eligible for work authorization unless they are granted asylum or there are unusual delays in completing adjudication of their claims. Asylum claims are scheduled for interview within 45 days of the application. The asylum officer will either grant the claim, or refer the case without decision to an immigration judge. (The vast majority of asylum applicants are not lawfully present in the U.S., and under the administrative reforms, the final decision on referred cases will be made by the immigration judge in the context of a deportation proceeding.) The entire system is streamlined, with the objective of completing proceedings before the immigration judge within 180 days of the original application.

These reforms are a strong step in the right direction, and have apparently resulted in a 50 percent or greater reduction in the filing of new asylum claims. However, the regulations do not address several significant issues. First, aliens remain able to file an asylum application regardless of how long they have resided in the United States, and many applications are filed by aliens who have been here for years. International law anticipates that aliens who have illegally entered a country in order to flee persecution should present themselves "without delay" to the authorities.[59] This is the exception, rather than the rule, under the U.S. asylum system.

Second, the U.S. system includes no meaningful provision for the return or removal of aliens to countries (including countries through which they have travelled prior to reaching the U.S.), in which they would not be persecuted and in which they would have access to proper asylum procedures. Refugees fleeing persecution should ordinarily seek protection in the first safe country to which they travel. Many people seeking asylum in the U.S. have travelled

---

[59] Article 31 of the United Nations Convention Relating to the Status of Refugees (1951) states in part:

　　The Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened * * * enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence.

140

through one or more countries in which comparable asylum procedures and protection are available.

Third, despite greater efficiency in the process, there are no firm targets for completion of asylum cases. The problem with delay in the asylum system has been so pervasive that nothing short of firm, legislated deadlines will be sufficient to ensure that this problem does not persist into the future.

Fourth, legislation is required to ensure that illegal aliens denied asylum are actually removed from the U.S. The reforms in Title III of this bill address this concern.

Finally, asylum legislation should codify the best features of the administrative reforms of the asylum process, including the new rules on employment authorization. This will clarify the firm Congressional support for asylum reform and prevent court challenges to the administrative reforms on the grounds that they have not been authorized by Congress.

*Reform of parole*

Section 212(d)(5) of the INA grants the Attorney General broad discretion to "temporarily" parole aliens applying for admission to the United States into the country for "emergent reasons or reasons deemed strictly in the public interest." Under this section, parole is not to be regarded as an admission of the alien. Once the purposes for such parole are served, the alien must be returned to the custody from which he or she was paroled.

The text of section 212(d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, and not as a supplement to Congressionally-established immigration policy. In recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.

Additionally, the Attorney General has not kept accurate records in the past of the way in which parole authority is used. Consequently, Congress has no way to effectively exercise its oversight authority over the use of parole. Without an effective control mechanism, the Attorney General can continue to use the parole authority to implement immigration policy without Congressional knowledge or approval.

An example of a recent abuse of the parole authority stems from the September 1994 migration agreement negotiated by the Clinton Administration with Cuba. To implement this agreement, the Administration is using the parole authority to admit up to 20,000 Cuban nationals annually. The paroled Cubans will eventually be entitled to adjust to permanent resident status.[60]

---

[60] Under the provisions of the Cuban Adjustment Act of 1966, natives or citizens of Cuba who are admitted or paroled into the United States after Jan. 1, 1959 are eligible to adjust to permanent resident status without leaving the U.S. after residing in the country for a period of one year. See Act of Nov. 2, 1966, 80 Stat. 1161, H.R. Rep. No. 89–178, 89th Cong., 2d Sess. 3 (1966).

141

In this case, the use of parole to fulfill the terms of the Cuban migration agreement is a misuse and intentionally admits, on a permanent basis, aliens who are not otherwise eligible for immigrant visas. According to the Supreme Court, Congress has plenary power over immigration policy: a power that is largely immune from interference.[61] Such use of the parole authority has not been authorized by Congress. Indeed, the Clinton Administration did not even attempt to consult with Congress in negotiating the Cuban migration agreement.

Parole should only be given on a case-by-case basis for specified urgent humanitarian reasons, such as life-threatening humanitarian medical emergencies, or for specified public interest reasons, such as assisting the government in a law-enforcement-related activity. It should not be used to circumvent Congressionally-established immigration policy or to admit aliens who do not qualify for admission under established legal immigration categories.

*The need for humanitarian admissions*

The United States has traditionally admitted immigrants who are of special humanitarian concern to our nation. While provisions exist in the law to admit refugees and aliens granted asylum, there are aliens of humanitarian concern to the U.S. that do not meet the definition of a refugee. The lack of a single, transparent category for the admission of such aliens has also contributed to the improper use of parole authority by the Attorney General, as in the case of the implementation of the Cuban migration agreement. If a category existed in the law to provide for a limited number of humanitarian visas each year at the discretion of the Attorney General, migration agreements such as the recent agreement with Cuba could be negotiated without violating other existing provisions in immigration law.

C. Reform Proposals

*Commission on immigration reform*

The Commission on Immigration Reform has recommended a significant redefinition of priorities and a reallocation of existing admission numbers to ensure that immigration continues to serve our national interests. The Commission defined several principles that should guide immigration policy: the establishment of clear goals and priorities; the enforcement of immigration limits; regular periodic review; clarity and efficiency; enforcement of the financial responsibility of sponsors to prevent immigrants from becoming dependent on public benefits; protection of American workers; coherence; and "Americanization"—the assimilation of immigrants to become effective citizens.

The Commission recommended that there be three major categories of legal immigration—family-based, skills-based, and refugees. The current category for diversity admissions would be eliminated.

Within the family category, the spouses and minor children of U.S. citizens would be admitted on an unlimited basis, as under

---

[61] Harisiades v. Shaughnessy, 342 U.S. 580 (1952); Fiallo v. Bell, 430 U.S. 787 (1977); Plyler v. Doe, 457 U.S. 202 (1982).

142

current law. The parents of citizens could also be admitted, but with stricter sponsorship requirements than currently exist. Third priority would be given to the spouses and minor children of lawful permanent residents. The proposed 400,000 cap for family admissions would accommodate current demand in these categories and allow for growth in the unlimited category of spouses and children of citizens. In addition, the Commission would make available 150,000 additional visas during each of the first 5 years to clear the backlog of spouses and children ("nuclear family") of lawful permanent residents.

The Commission also proposed the elimination of the following family categories: adult unmarried sons and daughters of U.S. citizens; adult unmarried sons and daughters of lawful permanent residents; adult married sons and daughters of citizens; and brothers and sisters of adult U.S. citizens. This was done for several reasons: to focus priority on the admission of nuclear family members; to reduce the waiting time for nuclear family members of lawful permanent residents without raising overall immigration numbers; and to eliminate the extraordinary backlogs in these categories that undermine credibility of the immigration system. Most importantly, the Commission believes that "[u]nless there is a compelling national interest to do otherwise, immigrants should be chosen on the basis of the skills they contribute to the U.S. economy." Admission of nuclear family members and refugees present such a compelling interest, but admission of more extended family members solely on the basis of their family relationship is not as compelling.[62]

The Commission recommended that up to 100,000 skills-based immigrants be admitted each year in two basic categories: those exempt from labor market testing, and those subject to labor testing. The exempt category would include aliens with extraordinary ability, multinational executives and managers, entrepreneurs, and ministers and religious workers. Others that would be subject to labor market testing include professionals with advanced degrees and baccalaureate degrees, and skilled workers with 5 years specialized experience. The category for unskilled workers would be eliminated. In place of the current labor certification process, those immigrants subject to labor market testing could only be admitted if their prospective employer paid a substantial fee and demonstrated appropriate attempts to find qualified U.S. workers. The fee would be used to support private sector initiatives for the education and training of U.S. workers. In addition, such immigrants would be admitted on a conditional basis that would convert to permanent status after 2 years if the immigrant was still employed by the same employer at the attested original wage or higher.

The Commission recommended that 50,000 admission numbers be allocated each year to refugees, not including the adjustment to permanent resident status of aliens already present in the U.S. who are granted asylum. Refugee admissions could exceed 50,000 in the case of an emergency, or through approval by Congress.

---

[62] 1995 Commission Report at 72.

143

*Administration*

The Clinton Administration has not formally submitted to Congress recommended legislation on legal immigration reform. However, in testimony before the Senate Subcommittee on Immigration in September 1995, the Commissioner of the INS outlined the Administration's proposal on this subject.[63] The proposal would call for a flexible annual admissions ceiling of approximately 500,000, including family and employment-based admissions, but not refugees. The diversity category would be eliminated.

The Administration would maintain the current unlimited admissions for spouses, minor children, and parents of U.S. citizens, and also preserve categories for the adult children of U.S. citizens and lawful permanent residents. The category for brothers and sisters of citizens would be eliminated. The plan makes no specific provision for backlog clearance for nuclear family members of lawful permanent residents. However, the Administration believes that recent increases in applications for naturalization, combined with a new "Naturalization 2000" program being implemented by the INS, will result in naturalization of most of the sponsoring aliens who are currently lawful permanent residents. This will "move" the backlog into the unlimited category for admission of spouses and minor children of U.S. citizens. The Administration has estimated that this may increase the number of admissions in this unlimited category by as much as 60,000 per year, which would cause a concomitant increase in the overall annual admissions figure. The Administration would admit 100,000 employment-based immigrants and eliminate the current category for unskilled workers.

On refugees, the Administration would retain current law, which permits the ceiling to be set by the President on an annual basis after consultation with Congress. The State Department has projected that refugee admissions, which are to be 90,000 in FY 1996, will decrease to 70,000 in FY 1997 and 50,000 thereafter.[64]

### V. PUBLIC BENEFITS

As a matter of national policy regarding immigration and welfare, self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes. It continues to be the immigration policy of the United States that aliens within the nation's borders not depend on taxpayer-funded public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations. The availability of taxpayer-funded public benefits should not constitute an incentive for immigration to the United States.

Since 1882, aliens have been excludable from admission to the U.S. if found likely to become "public charges."[65] Since 1917, aliens have been subject to deportation from the U.S. for becoming public charges after entry from causes arising before entry. By regulation and administrative practice, the State Department and the INS

---

[63] "Legal Immigration Reform: Hearing Before the Subcommittee on Immigration of the Senate Judiciary Committee", 104th Cong., 1st Sess. (September 13, 1995) (Statement of Doris Meissner, Commissioner, Immigration and Naturalization Service).
[64] 1995 Commission Report at 136.
[65] INA § 212(a)(4), 8 U.S.C. § 1182(a)(4).

FRP-FRN-00814

144

permit those immigrants who would otherwise be excluded as pub-
lic charges to overcome exclusion through an affidavit of support,
which is executed by a person who agrees to provide financial sup-
port for the alien (the alien's "sponsor").

Despite the long-standing principle of self-sufficiency, aliens have
been applying for and receiving public benefits from Federal, State
and local governments at increasing rates. Only a negligible num-
ber of aliens are deported on public charge grounds. Further, var-
ious State court decisions and decisions by immigration courts have
held that the affidavits of support, as currently constituted, do not
impose a binding obligation on sponsors to reimburse welfare agen-
cies that provide public benefits to sponsored aliens. As a result,
these provisions have been wholly incapable of assuring that indi-
vidual aliens not burden the public benefits system and, con-
sequently, the taxpayer.

Many studies at the national, State, and local levels have exam-
ined the use of public benefits by non-citizens. One of the better of
these studies was recently conducted by Professor George J. Borjas,
formerly of the University of California at San Diego and presently
at Harvard University. Professor Borjas, a Cuban immigrant to the
U.S. who specializes in economics, concluded in his study "Immi-
gration and Welfare, 1970–1990" that immigrants use public bene-
fits to a greater degree than citizens, and estimated that the an-
nual cost to the American taxpayer of providing means-tested pub-
lic assistance to immigrants, deducting the amount they pay in
taxes, is $16 billion.[66] Professor Borjas cites that 9.1 percent of im-
migrant households received cash welfare assistance in 1990, com-
pared with 7.4 percent of native households.[67] The average amount
of cash assistance received by an immigrant household was $5,400
annually, compared with $4,000 for a native household.[68] Further,
from 1970–1990 the total amount of cash assistance received by im-
migrant households was 56 percent higher than would have been
the case if immigrants used the welfare system to the same extent
as natives.[69] In a more recent study, Professor Borjas has found
that 26 percent of immigrant households receive some form of pub-
lic benefits. In the Supplemental Security Income program alone,
immigrant applications increased 580 percent from 1982–1994,
compared to a 49 percent increase for natives.[70]

Allowing immigrants to become dependent on public assistance
undermines America's historic immigration policy that those who
come to the country be and remain self-sufficient. Welfare destroys
the recipient's work incentives, encourages the breakdown of the
family unit, and transmits dependency across generations. Further,
it keeps immigrants from becoming productive participants in
American society.

The Committee believes that it is a compelling government inter-
est to enact new rules for eligibility and sponsorship agreements in
order to assure that aliens be self-reliant in accordance with the
longstanding tenets of national immigration policy. It is also a com-

---

[66] George J. Borjas, Immigration and Welfare, 1970–1990 23 (Nat'l Bur. Econ. Res. Working
Paper No. 4872, Sept. 1994).
[67] Id. at 4–5.
[68] Id. at 9.
[69] Id. at 20.
[70] Social Security Administration.

pelling government interest to remove the incentive for illegal immigration provided by the easy availability of public benefits. Finally, with respect to the State authority to make determinations concerning alien eligibility for public benefits in this legislation, a State that chooses to follow the Federal classification in determining the eligibility of aliens for public benefits shall be deemed by any Federal or State court to have chosen the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy.

<div align="center">VI. SKILLED NONIMMIGRANTS (H VISAS)</div>

<div align="center">The H–1B Program</div>

*Background*

Up to 65,000 "H–1B" visas [71] are granted each year for foreign workers coming to perform work in specialty occupations (requiring at least a baccalaureate degree or its equivalent) or as fashion models. Since the visas are good for up to 6 years, a total of 390,000 H–1B aliens can be working in the United States at any one time. Typical occupations are computer programmers, engineers, physical therapists and university professors and researchers.

In order to enable H–1B aliens to be brought on board promptly, employers are not required to engage in a lengthy labor certification process (such as that used for employment-based immigrants) prior to the arrival of the alien in the United States. Protection of American workers from unfair competition in the H–1B program is accomplished by requiring employers to file a "labor condition application" ("LCA") making certain basic attestations. The Secretary of Labor is empowered to investigate complaints alleging noncompliance with these attestations.[72]

The attestations include:

(1) the employer will pay the H–1B alien wages which will be the higher of the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question or the prevailing wage level for the occupational classification in the area of employment, and the employer will provide working conditions for the H–1B that will not adversely affect those of workers similarly employed;

(2) there is no strike or lockout in the course of a labor dispute in the occupational classification at the place of employment;

(3) the employer has provided notice of the filing of the application to the bargaining representative of the employer's employees in the occupational classification and area for which the H–1Bs are sought, or if there is no such bargaining representative, has posted notice in conspicuous locations at the place of employment; and

---

[71] See INA §§ 101(a)(15)(H)(i)(b) and 214(g)–(i).
[72] See INA § 212(n).

146

(4) the LCA will identify the number of workers sought, the occupational classification in which the workers will be employed, and the wage rate and conditions under which they will be employed. Department of Labor regulations require that the employer also identify the place of intended employment and the specific source relied upon to determine the prevailing wage.[73]

The Secretary of Labor must accept the LCA within 7 days unless it is incomplete or obviously inaccurate. Departmental investigations as to whether the employer has failed to fulfill its attestations or has misrepresented material facts in its LCA are triggered by complaints filed by aggrieved persons or organizations. The employer can be subject to penalties including civil monetary fines of up to $1,000 per violation and an inability to have petitions approved for alien workers (both immigrant and nonimmigrant) for at least 1 year. In addition, if wages were not paid at the required wage level, back pay can be awarded to an H–1B alien.

*The current controversy*

The H–1B program has recently become embroiled in controversy. Certain employers appear to be using H–1B aliens in ways contrary to the intent of the program. They are building workforces almost entirely composed of H–1Bs instead of using the aliens to ameliorate temporary skills shortages in the American labor force, and are often serving as "job contractors," leasing out these pooled H–1Bs to other firms. Since the job contractor, not the business where the H–1B employee will actually work, is considered the employer, it is the contractor's responsibility to make and fulfill the required attestations. This can have the effect of defeating the H–1B program's safeguards. Finally, in many instances American employees are being fired and replaced with H–1Bs at lower wages. Secretary of Labor Robert Reich recently expressed worry over these practices:

Our experience with the practical operation of the H–1B program has raised serious concerns * * * that what was conceived as a means to meet temporary business needs for unique, highly skilled professionals from abroad is, in fact, being used by some employers to bring in relatively large numbers of foreign workers who may well be displacing U.S. workers and eroding employers' commitment to the domestic workforce. Some employers * * * seek the admission of scores, even hundreds of [H–1Bs], especially for work in relatively low-level computer-related and health care occupations. These employers include "job contractors," some of which have a workforce composed predominantly or even entirely of H–1B workers, which then lease these employees to other U.S. companies or use them to provide services previously provided by laid-off U.S. workers.[74]

---

[73] See 59 Fed. Reg. 65646, 65662 (Dec. 20, 1994); 20 CFR 655.730 (1995).
[74] "Nonimmigrant Visas: Hearings Before the Subcomm. on Immigration of the Senate Comm. on the Judiciary," 104th Cong., 1st Sess. (Sept. 28, 1995) (Statement of Robert Reich, Secretary of Labor).

147

*The Department of Labor response*

Responding to such concerns, the Department of Labor promulgated a set of final rules which went into effect on January 19, 1995.[75] Instead of targeting job contractors or companies relying to an inordinate degree on H–1B aliens, the regulations imposed new requirements on all employers of H–1B aliens. The Committee believes that four of the regulations and a section of the appendix to the regulations are unduly burdensome to legitimate users of H–1Bs.

The first of the regulations requires that "[w]here the employer places any H–1B nonimmigrant(s) at one or more worksites not contemplated at the time of filing the application, but which are within the area of intended employment listed on the [application],[76] the employer is required to post notice(s) at such worksite(s) * * * ."[77]

This regulation has a defensible purpose. If an employer is a job contractor and places H–1Bs at other firms, a posting at the contractor's headquarters will not necessarily provide adequate notice to the employees of the other firms, who are the ones who might be negatively impacted and who must file complaints for the enforcement program to work. A regulation requiring additional postings in such circumstances makes sense, and was in fact once proposed by the Department.[78] But the regulation does not stop there. It requires that all employers employing H–1Bs must ensure that notice is posted at whatever worksites an H–1B alien ventures to in the course of his or her employment. Thus, if an H–1B goes to a client of his or her employer to service equipment or make a sales pitch, notice has to be posted at the client's location. If an H–1B goes to a potential client to prospect for business, to a law firm to give a deposition, to a university for training, or to a convention, notice has to be posted at the respective locations. In all these instances, the employer must obtain the consent from the owners of the subject property to post notice (including the wages of the H–1B) on their property. This mandate requires more than customary and reasonable business norms would allow.

The second of the problematic regulations requires an employer to file a new LCA if any H–1B or combination of H–1Bs is placed in an area of employment not listed in their original LCA(s) for a cumulative period of more than 90 workdays within a 3-year period. A "workday" means any day on which any H–1B performs any work in a non-listed area of employment.[79] Thus, if New York City is not listed on the employer's LCA(s), the employer may not permit any H–1B to work in that area (without filing a new LCA listing New York City) if, in the previous 3 years, any H–1B(s) em-

---

[75] See 59 Fed. Reg. 65646 (Dec. 20, 1994).
[76] The area of intended employment is defined as the area "within normal commuting distance of the place (address) of employment." 20 CFR 655.715 (1995).
[77] 20 CFR 655.734(a)(1)(ii)(D) (1995).
[78] See 58 Fed. Reg. 52152, 52161 (Oct. 6, 1993)(§———.735). The proposed regulation defined a job contractor as "an employer whose employees perform their duties in whole or in part at worksites that are owned, operated, and controlled not by the job contractor, but by an entity with which the job contractor has a contractual relationship and which displays indicia of an employment relationship with the job contractor's employees (e.g., assignment of tasks; day to day supervision of performance; evaluation of performance)." Id. at §———.715.
[79] 20 CFR 655.735(a), (b)(4) (1995).

148

ployed by that employer have worked in New York City for a cumulative total of 90 days.

This regulation also has a defensible purpose, to ensure that the notice and prevailing wage requirements of an attestation apply to the location where an H–1B alien actually works. For example, if an H–1B is brought to the country by a job contractor in Baltimore and placed at a firm in San Francisco, the notice attestation in the original LCA will only require notice in Baltimore and the wage requirement will require the payment of the wage prevailing in Baltimore. Requiring a new LCA with San Francisco listed as the area of employment will result in notice to co-workers in San Francisco and the payment of the San Francisco prevailing wage. For the same reasons, an additional application also makes some sense when a company sends an H–1B to work permanently at its San Francisco branch, where the initial LCA stated that he or she would work in its Baltimore headquarters.

Again, however, the regulation covers all instances in which an H–1B is sent out of the office. In business today, success in many occupations requires frequent travel around the country and the Committee recognizes two undue burdens with the application of this regulation to all employers of H–1B nonimmigrants. First is requiring an employer to file a new LCA whenever it sends H–1Bs on legitimate business trips exceeding some arbitrary period of time to cities not listed on their LCAs. Second is the administrative burden of having to track every city in the country to which it sends H–1Bs (on whose LCAs the city is not listed) to ensure that no city receives any combination of such H–1Bs for a total of more than 90 days every three years.

The third provision of concern to the Committee requires employers who send H–1Bs to a non-listed area of employment to pay the H–1B per diem and transportation expenses (for both work and non-work days) at rates no lower than those prescribed for Federal Government employees on travel or temporary assignment.[80] This provision appears designed to ensure that the salaries of H–1Bs are not indirectly lowered by forcing them to pay their own travel expenses, and to ensure that "travelling" employees are, in fact, on temporary assignment. However, to require that such expenses be reimbursed at Government rates is unacceptable micromanagement of corporate travel policy for companies that are not prone to abusing the H–1B program: non-H–1B dependent employers.

The fourth area of concern involves investigations by the Department of Labor. Section 212(n)(2)(A) of the INA states that "complaints may be filed by any aggrieved person or organization (including bargaining representatives)." Congress clearly intended to implement a complaint-driven system in which co-workers, unions, and competitors would be the parties authorized to complain and thus set into motion Department of Labor investigations. However, the regulations now define aggrieved party to include "[a] government agency which has a program that is impacted by the employer's alleged non-compliance with the labor condition application"[81]—i.e., the Department of Labor. Then, the regulations state

---

[80] 20 CFR 655.735(b)(3) (1995).
[81] 20 CFR 655.715 (1995).

149

that the Secretary shall investigate misrepresentation or failure of an employer to meet an attestation "either pursuant to a complaint or otherwise".[82] This action by the Department of Labor contravenes the legislative intent of the Immigration Act of 1990.

Lastly, the appendix to the regulations states that in determining the actual wage level paid by the employer to workers similarly employed as an H–1B, "[t]he employer must have and document an objective system used to determine the wages of non-H–1B workers, and apply that system to H–1B nonimmigrants as well."[83] Whether the intent of this requirement was just to make it easier for the Department to determine the actual wage paid in various instances or whether broader policy goals were in mind, the move was unwarranted. It was clearly never the intent of Congress to use the H–1B program as a way of mandating how employers pay their non-H–1B employees. As long as an employer pays its H–1Bs the actual wage (assuming it is higher than the appropriate prevailing wage), the employer should be free to determine its wage scale, constrained by factors such as market forces, contractual agreements, collective bargaining, and the minimum wage.

In summary, the newly promulgated regulations are somewhat successful in dealing with abusive employers and with the problems that the job contractor phenomenon and the existence of firms with multiple worksites pose to the H–1B enforcement scheme. However, they do so at a cost which may be too high for the legitimate employer hiring a relatively small number of H–1B aliens. Further, they do not address the specter of employers laying off American workers and replacing them with lower-cost H–1Bs or treat the heavy user of H–1Bs any more severely than they do the employer who only uses the aliens to fill temporary skills gaps.

### The H–1A Program

The special pilot program created by the Immigration Nursing Relief Act of 1989 ("INRA", Pub. L. 101–238) to permit foreign nurses to come to work temporarily in the United State expired on August 31, 1995. Prior to the creation of this special program, nurses had been admitted under what is now the H–1B temporary non-immigrant program. The Committee expects that eligible foreign non-immigrant nurses will again be admitted under the H–1B program.

The valuable screening and competency requirements contained in the pilot program should be retained. The authentication of applications and supporting documents for foreign health care workers is of vital importance to consumers, and can serve as an important mechanism to reduce illegal immigration as well. For example, prior to the enactment of the Immigration Nursing Relief Act of 1989 (INRA), the Department of Health, Education, and Welfare reported that more than 80 percent of all foreign-licensed nurses were unable to pass the U.S. Registered Nurse examination of the first try.[84] Foreign nurses who were unable to pass the exam were more likely to remain illegally in the U.S. Following the imposition

---

[82] 20 CFR 655.710 (1995).
[83] 20 CFR Appendix A to Subpart H to Part 655 (1995).
[84] Survey of Foreign Nurse Graduates, DHEW Publication No. HRA 76–13 (1976).

150

of a requirement that applicants' credentials be authenticated, the number of foreign nurses who failed the U.S. nursing exam fell to 20 percent.[85] Pursuant to the pilot program, the successful authentication process was conducted by a non-governmental body, the Commission on Graduates of Foreign Nursing Schools, and funded by a fee paid by the applicant and at no cost to the U.S. government. Additionally, the Commission's work saved valuable governmental resources by also substantially reducing the burden on consular officers to authenticate credentials.

The Department of State has statutory authority under Section 222 of the INS (8 U.S. C. Section 1202) to require authentication of applications for both immigrant and non-immigrant visas. Again, because the protection of the public health and safety must be paramount, the Committee believes that the Department of State should revise its visa application procedures under Section 222 to require health care workers to authenticate their visa application and supporting documents in the same manner as under INRA. The health care workers covered by this requirement should include nurses, physical therapists, and occupational therapists, as well as both licensed and unlicensed health occupations in which the practitioner diagnoses, delivers care, or supports the delivery of care such that incompetent practitioners in those occupations might jeopardize public health.

Similarly, the Committee expects, therefore, that the INS, in consultation with the DOL, will promulgate separate H–1B standards for nurses which will require that foreign nurses admitted non-immigrants under the H–1B category meet requirements identical to those now imposed on foreign nurses seeking admission as immigrants, including the successful completion of the examination recognized by the DOL in 20 CFR § 656.10 (a)(2)(I).

The Committee recommends that the Departments of State and Labor use an independent credentialing organization with sufficient experience and resources on health care-related foreign educational institutions, ministries of health and licensing jurisdictions. The organization should have a proven record of consistent and accurate credentialing. One such organization is the Commission on Graduates of Foreign Nursing Schools which has both the experience and resources to provide this service.

PREVIOUS CONSIDERATION AND HEARINGS

On February 8, 1995, the Subcommittee on Immigration and Claims held an oversight hearing on the Management Practices of the Immigration and Naturalization Service. Witnesses were Laurie Ekstrand, Associate Director, Administration of Justice Issues, General Government Division, accompanied by James Blume, Assistant Director, Administration of Justice Issues, General Government Division, General Accounting Office; and Chris Sale, Deputy Commissioner, Immigration and Naturalization Service.

On February 24, 1995, the Subcommittee on Immigration and Claims held an oversight hearing on Foreign Visitors Who Violate

---

[85] Barbara S. Jacobsen and Theresa M. Kowalski, "Validity Study: CGFNS Qualifying Examinations as Predictors of Success on United States Registered Nurse Licensing Examination," Commission on Graduates of Foreign Nursing Schools (1994).

151

the Terms of Their Visas by Remaining in the United States indefinitely. Witnesses were Honorable Barbara Jordan, Chair, accompanied by Robert Hill, Commissioner, and Susan Martin, Executive Director, Commission on Immigration Reform; Diane Dillard, Deputy Assistant Secretary for Consular Affairs, Department of State; James Puleo, Executive Associate Commissioner, Programs, Immigration and Naturalization Service; and Robert Warren, Director, Statistics Branch, Immigration and Naturalization Service.

On March 3, 1995, the Subcommittee on Immigration and Claims held an oversight hearing on Work Site Enforcement of Employer Sanctions. Witnesses were James Puleo, Executive Associate Commissioner, Programs, U.S. Immigration and Naturalization Service, accompanied by Brian J. Vaillancourt, Director Civil Matters, Investigations Division, U.S. Immigration and Naturalization Service; Maria Echeveste, Administrator, Wage and Hour Division, U.S. Department of Labor; Shirley S. Chater, Commissioner, Social Security Administration, U.S. Department of Health and Human Services; Robert Rasor, Special Agent, Secret Service, U.S. Department of the Treasury; Robert Charles Hill, Member, U.S. Commission on Immigration Reform, accompanied by Susan Forbes Martin, Executive Director, U.S. Commission on Immigration Reform; Wade Avondoglio, Owner, Perona Farms Restaurant, Member, National Restaurant Association; Richard Holcomb, Commissioner, Virginia Department of Motor Vehicles; W. Marshall Rickert, Motor Vehicle Administrator, Maryland Motor Vehicle Administration; A. Torrey McLean, State Registrar, North Carolina Department of Vital Records.

On March 10, 1995, the Subcommittee on Immigration and Claims held an oversight hearing on Border Security. The Members of Congress testifying were Honorable Duncan Hunter, Honorable Brian Bilbray, and Honorable Ronald Coleman. Other witnesses were Mary Ryan, Assistant Secretary of State for Consular Affairs, Department of State, accompanied by Frank Moss, Special Assistant for Border Security, Bureau for Consular Affairs; Honorable Doris Meissner, Commissioner, Immigration and Naturalization Service, accompanied by Silvestre Reyes, Sector Chief, U.S. Border Patrol, El Paso Sector, and Gus de la Vina, Regional Director, Western Region, Immigration and Naturalization Service; Laurie Ekstrand, Associate Director, Administration of Justice Issues, General Government Division, General Accounting Office; Brigadier General Edmund Zysk, Deputy Commander, California National Guard, accompanied by Lieutenant Colonel Bill Hipsley, Training Officer, California National Guard.

On March 23, 1995, the Subcommittee on Immigration and Claims held an oversight hearing on Removal of Criminal and Illegal Aliens. Witnesses were T. Alexander Aleinikoff, General Counsel, Immigration and Naturalization Service, accompanied by James Puleo, Executive Associate Commissioner, Programs, and Joan Higgins, Assistant Commissioner, Detention and Deportation; Anthony C. Moscato, Director, Executive Office for Immigration Review, accompanied by Paul Schmidt, Chairman, Board of Immigration Appeals, and Michael J. Creppy, Chief Immigration Judge.

On March 30, 1995 the Subcommittee on Immigration and Claims held an oversight hearing on Verification of Eligibility for

152

Employment and Benefits. Witnesses were Honorable Barbara Jordan, Chair, Commission on Immigration Reform, accompanied by Susan Martin, Ph.D., Executive Director; Robert L. Bach, Ph.D., Executive Associate Commissioner, Policy and Planning, U.S. Immigration and Naturalization Service, accompanied by John E. Nahan, Director, Systematic Alien Verification for Entitlements (SAVE) Program; William Ludwig, Administrator, Food and Consumer Service, U.S. Department of Agriculture; Wendell E. Primus, Deputy Assistant Secretary for Human Services Policy, U.S. Department of Health and Human Services, accompanied by Sandy Crank, Associate Commissioner, Social Security Administration, and Mack Storrs, Division Director for AFDC Policy; Nelson Diaz, General Counsel, U.S. Department of Housing and Urban Development; Richard W. Velde, Esq.; Austin T. Fragomen, Jr., Chairman, American Council on International Personnel; Joseph A. Antolin, Deputy Director of Field Operations, Illinois Department of Public Aid; Esperita Johnson-Bullard, Eligibility Supervisor, Division of Social Services, Department of Human Services, City of Alexandria, Virginia.

On April 5, 1995, the Subcommittee on Immigration and Claims held an oversight hearing on the Impact of Illegal Immigration on Public Benefit Programs and the American Labor Force. Witnesses were Michael Fix, Esq., The Urban Institute, accompanied by Jeffrey Passel; Dr. Donald Huddle, Rice University; Dr. Georges Vernez, RAND; Dr. George Borjas, University of California at San Diego; Dr. Joseph Altonji, Northwestern University; Dr. B. Lindsay Lowell; Dr. Vernon Briggs, Jr., Cornell University; Dr. Frank Morris, Morgan State University; Dr. Norman Matloff, University of California at Davis; Dr. Peter Skerry, Woodrow Wilson International Center for Scholars.

On May 17, 1995, the Subcommittee on Immigration and Claims held an oversight hearing on Legal Immigration Reform Proposals. Witnesses were Susan Martin, Ph.D., Executive Director, Commission on Immigration Reform; Peter Brimelow, Author, "Alien Nation"; Peter Skerry, Wilson Center, Philip Martin, Professor of Agricultural Economics, University of California at Davis; Harris Miller, President, Information Technology Association of America; Markley Roberts, Assistant Director, Economic Research Department, AFL–CIO; Demetrios Papademetriou, Carnegie Endowment for International Peace; Mark Krikorian, Executive Director, Center for Immigration Studies; Professor John Guendelsberger, Pettit College of Law, Ohio Northern University; Michael Lempres, Esq., Akin, Gump, Strauss, Hauer, & Feld.

On April 24, 1995, the Subcommittee on Immigration and Claims held a Members' Forum on Immigration. The following Members testified. Hon. Ronald Packard; Hon. Zoe Lofgren; Hon. Brian Bilbray; Hon. Dana Rohrabacher; Hon. William Martini; Hon. Mark Foley; Hon. Porter Goss; Hon. Jay Kim; Hon. Owen Pickett; Hon. Robert Underwood; Hon. Susan Molinari; Hon. Patsy Mink; Hon. Anthony Beilenson; Hon. Andrea Seastrand; Hon. Esteban Edward Torres; Hon. Bob Filner; Hon. Tim Hutchinson; Hon. Ronald Coleman.

On June 28, 1995, the Subcommittee on Immigration and Claims held a joint hearing with the Senate Subcommittee on Immigration

153

to receive testimony from the Commission on Immigration Reform regarding the Commission's interim recommendations on legal immigration reform. Testifying was the Honorable Barbara Jordan, Chair, accompanied by Michael Teitelbaum, Vice Chair; Bruce Morrison, Commissioner; Robert Charles Hill, Commissioner; and Susan Martin, Executive Director.

On June 29, 1995, the Subcommittee on Immigration and Claims held a hearing on H.R. 1915, the Immigration in the National Interest Act of 1995. Witnesses were T. Alexander Aleinikoff, Executive Associate Commissioner for Programs, Immigration and Naturalization Service; Anthony C. Moscato, Director, Executive Office for Immigration Review; Diane Dillard, Acting Assistant Secretary for Consular Affairs, Department of State; John R. Fraser, Deputy Administrator, Wage and Hour Division, Department of Labor; Dr. Lawrence H. Thompson, Principal Deputy Commissioner, Social Security Administration; Robert Rector, Senior Policy Analyst, The Heritage Foundation; Dr. Vernon Briggs, Jr., School of Industrial Relations, Cornell University; Austin T. Fragomen, Jr., Chairman, American Council on International Personnel; Daryl R. Buffenstein, President, American Immigration Lawyers Association; David Simcox, Research Director, Negative Population Growth; Dr. Frank Morris, Dean, Morgan State University; Carl Hampe, Esq., Paul, Weiss, Rifkind, Wharton & Garrison; John Swenson, Executive Director, Migration and Refugee Services, U.S. Catholic Conference; Raul Yzaguirre, President, National Council of La Raza; Dr. Michael Teitelbaum, Program Officer, Alfred P. Sloan Foundation; David North, Independent Immigration Researcher; Bill Frelick, Senior Policy Analyst, U.S. Committee for Refugees; Karen K. Narasaki, Executive Director, National Asian Pacific American Legal Consortium; Dan Stein, Executive Director, The Federation for American Immigration Reform.

### PROVISIONS OF H.R. 2202

The goal of H.R. 2202 is to curb illegal immigration and reform legal immigration in the national interest. H.R. 2202 mandates specific enforcement measures against illegal immigration, including the hiring of new Border Patrol agents as well as interior enforcement personnel, authorizes the acquisition of additional resources for immigration enforcement and control, and overhauls procedures to allow the prompt identification, apprehension, and removal of illegal aliens from the United States. On the legal immigration front, H.R. 2202 reorients current admission priorities to directly advance U.S. interests in the preservation of the nuclear family, the admission of highly-skilled individuals, the protection of U.S. workers from unfair competition, and the safety of refugees.

### TITLE I—BORDER CONTROL

Immigration control is a fundamental aspect of national sovereignty, and protection of that sovereignty begins with securing its borders. Title I of H.R. 2202 authorizes the addition of 1,000 border patrol agents each year through FY 2000, the hiring of support personnel for border enforcement, and the procurement of advanced technologies to prevent illegal border crossings.

154

Section 101 increases the number of Border Patrol agents by 1000 per year from 1996 through 2000, raises by 800 the number of support personnel for border enforcement, and requires that new personnel be deployed in sectors along the border in proportion to the level of illegal immigration through those sectors. Section 130006 of the Violent Crime Control and Law Enforcement Act of 1994 (Pub. L. 103–322, Sept. 13, 1994), authorized the appropriation of increased resources for INS enforcement efforts, and specified that funds be allocated to increase the Border Patrol by 1,000 agents per year from FY 1995 through FY 1998. This section requires that such agents be hired and that the 1,000 per year increase continue through FY 2000. In addition, by requiring deployment on the border, this section states a clear policy that Border Patrol resources should be used primarily at the border to deter illegal crossings and to apprehend those illegal aliens who do cross at the earliest possible juncture. This does not mean, however, that efforts at interior enforcement should be reduced. Section 358, in fact, authorizes the expenditure of $150 million to hire new personnel for interior enforcement, including investigators and detention and deportation officers.

Section 102 requires the Attorney General to install additional fences and roads to deter illegal immigration. In the San Diego sector, it calls for extension of the new fencing to a point 14 miles east of the Pacific Ocean, and the construction of second and third fences, with roads between the fences, to provide an additional deterrent. This adopts the recommendations of the Sandia Laboratories in New Mexico, in a January 1993 report, that a series of fences, with interspersed roads, be constructed in areas with the highest concentration of illegal immigration.

This section also provides for a limited waiver of the Endangered Species Act. This is necessary because the Committee has learned that roads and fences have not been built in certain areas along the border because of concern that animal habitats might be affected. Without these roads and fences, Border Patrol agents are unable to properly patrol these areas. Furthermore, the national interest requires that the Border Patrol be able to deter entry at any feasible point of entry along the land border. The International Boundary and Water Commission already provides guidance to the INS and other agencies regarding the construction of barriers, and potential environmental impacts may be discussed and resolved in that context.

Section 102 also requires the forward deployment of Border Patrol agents to provide a visible deterrent to illegal immigration. The Committee is concerned that notwithstanding the success of Operation Hold-the-Line in El Paso, the INS has been reluctant to adopt similar forward deployment of agents in other border sectors. At the same time, the Committee recognizes that forward deployment may work better in certain sectors than in others due to factors such as topography and established migration patterns. Accordingly, section 102(d) requires the Attorney General to report to Congress on the success of forward deployment. This report will enable Congress to better exercise its oversight authority in this critical area of immigration enforcement and make appropriate adjustments in policy and available resources.

155

Section 104 requires improvement in the Border Crossing Identification Card. Amendments adopted by the Committee at the request of the INS will give the INS a longer time period to implement these new improvements. However, the Committee intends that the INS move as rapidly as possible to: (1) ensure that all newly-issued border crossing cards include additional security features; (2) replace existing cards with new secure cards; and (3) require verification of the identity of the holder of the border crossing card each time it is used to seek admission into the U.S. Although not specifically addressed in this legislation, the Committee also believes that it would be appropriate to impose a fee for the new secure card. The Committee understands that pursuant to an existing exchange of letters between the United States and Mexico, no fee may be charged for issuance of the border crossing card. Issuance of a more secure border crossing card is in the interests of both nations, since it will deter illegal migration and facilitate legitimate border traffic. The cost per card should be modest, but it is most appropriately borne by those who benefit from use of the card. The Attorney General and the Secretary of State should cooperate in discussions with the Government of Mexico to remove any existing restrictions on the collection of a fee for the border crossing card.

A number of provisions address the problem of the "revolving door" at the southern land border. Apprehended illegal aliens who agree to voluntarily return to Mexico in lieu of being placed in removal proceedings often make repeated attempts to cross the border, with no consequences attached. While prompt removal of illegal aliens should be the goal of immigration enforcement, the ability to cross into the United States over and over with no consequences undermines the credibility of our efforts to secure the border.

Section 105 sets a civil penalty for attempted illegal entry into the U.S. Under this provision, illegal aliens would be liable for a significant fine each time they attempt to cross. This provision is not intended to require that indigent aliens be detained in the United States until they are able to obtain sufficient funds to pay the fine. Prosecutorial discretion should be exercised in favor of rapid removal of illegal aliens from the United States. However, the civil penalty is intended to act as a deterrent to those who are otherwise determined to make repeated attempts to cross illegally into the United States.

Section 106 authorizes the appropriation of funds necessary to detain and prosecute any alien who has attempted illegal entry into the U.S. on more than two occasions.

Section 111 requires establishment of a pilot program to repatriate illegal aliens to the interior of their home countries. Release of aliens at the border, from where they can easily and immediately attempt re-entry, is particularly inappropriate in the case of aliens who have been ordered deported after proceedings before an immigration judge, and especially in the case of aliens involved in criminal activity. Releasing such deported aliens to a situation where they can immediately attempt re-entry undermines immigration enforcement, weakens border security, and increases the risk of crime.

156

The Committee believes that the INS, in cooperation with other law enforcement agencies, should implement a number of approaches to make deportation more effective by reducing the likelihood that aliens physically removed from the United States will attempt re-entry. Primary effort should be given to programs for repatriating illegal aliens to the interior of the countries to which they are deported, thus making it more difficult for them to attempt illegal reentry. Repatriation to third countries, where the alien is removed to a country other than that from which the alien has arrived directly to the United States, also should be considered. For example, if a national of a third country crosses into the United States from Canada and is apprehended at the border, procedures should exist for removing that alien expeditiously to the alien's country of nationality. The Committee believes that the reforms of the removal process adopted in Title III of this bill would facilitate such efforts by the INS, and that pilot projects with a required report to Congress offer the best opportunity to identify sound approaches to this problem.

Title I also addresses interior enforcement issues which relate directly to the problem of visa overstays and criminal aliens. Section 112 requires a pilot program to determine the feasibility of using closed military bases as INS detention centers. Lack of detention space is frequently cited as a reason why the INS is able to remove only a small fraction of deportable aliens. This problem is particularly acute when the INS is unable to detain criminal aliens. Use of converted military facilities may help bridge the gap between the need for detention space and available capacity. The INS already has planned to use one closed military facility as a site for training of new immigration officers and Border Patrol agents. Other uses of such facilities to aid in immigration enforcement should be pursued.

Section 113 seeks to improve tracking of visa overstays by requiring pilot projects at 3 major international airports under which the INS would directly collect records of departure from every departing alien passenger. As previously discussed, the INS lacks the ability to accurately track whether aliens with permission to enter the United States temporarily leave within the time limit set for their departure. This makes it more difficult for the INS to assess the extent of the overstay problem, and more importantly, to determine if individual aliens are violating, or have violated, their nonimmigrant status. The United States should test the feasibility of a system of uniform departure controls for all aliens. Initial pilot projects should focus on airports with the highest volume of international travel. A pilot program should first be implemented in order to test the cost and effectiveness of a comprehensive departure control system before a decision is made to make such a program permanent. The pilot program, however, should be seen as a first step toward eventual implementation of a system that will enable INS to readily identify all aliens who violate their nonimmigrant status by overstaying.

Section 121 authorizes the appropriation of funds to increase the number of investigators and other enforcement personnel deployed in the interior of the United States.

157

TITLE II—ENHANCED ENFORCEMENT AND PENALTIES AGAINST ALIEN
SMUGGLING AND DOCUMENT FRAUD

Sections 201 through 205 permit the INS to seek wiretap authorization under 18 U.S.C. 2516(1) in investigations of alien smuggling and document fraud; make document fraud and alien smuggling crimes indictable as racketeering offenses under the Racketeer Influenced and Corrupt Organizations Act (RICO); increase criminal penalties for alien smuggling, particularly where the smuggling is done for financial gain, involves criminal aliens, or multiple illegal entries; increase the number of U.S. attorneys available for the prosecution of immigration crimes; and expand the undercover investigations authority of the INS.

Section 211 through 216 increase civil and criminal penalties for document fraud, and establish new penalties for knowing preparation or presentation of fraudulent documents, and for making false claims to citizenship. Section 221 extends asset forfeiture authority under 18 U.S.C. 982(a) in the case of aliens convicted of passport or visa fraud, and section 222 permits the issuance of subpoenas for bank records in investigating such crimes.

TITLE III—APPREHENSION AND REMOVAL OF ILLEGAL ALIENS

## Subtitle A—Reform of Removal Procedures

Subtitle A of Title III (sections 301 through 309) streamlines rules and procedures in the Immigration and Nationality Act to make it easier to deny admission to inadmissible aliens and easier to remove deportable aliens from the United States. (Due to complexity of these provisions, detailed analysis and comment of some provisions is reserved to the section-by-section analysis.)

Section 301 provides that aliens who have entered the United States without being legally admitted are now classified as "inadmissible" and, if apprehended, bear the same burden of proof as an alien seeking to be admitted at a port of entry: to establish clearly and beyond doubt that they are entitled to be legally admitted. Aliens who have been legally admitted, but who overstay their visas or otherwise violate their immigration status (such as by committing crimes), must establish by clear and convincing evidence that they are lawfully present. Aliens who have been illegally present in the U.S. for an aggregate of 12 months will, with certain exceptions, not be eligible for permanent residence or other immigration benefits for 10 years.

Section 301(e) makes inadmissible to the United States any former U.S. citizen who officially renounces United States citizenship for the purpose of avoiding taxation by the United States. The Committee intends that this section shall apply solely to those individuals who officially renounce their U.S. citizenship after the date on which this section becomes effective.

Section 302 provides that an arriving alien can be denied entry into the U.S. by an immigration officer because of misrepresentation, use of fraudulent documents, or lack of any documents. The alien may be ordered removed without a hearing before an immigration judge, and without administrative or judicial review. This provision is based upon legislation approved by the Subcommittee

158

on International Law, Immigration, and Refugees during the 103rd Congress.

This provision is necessary because thousands of aliens arrive in the U.S. at airports each year without valid documents and attempt to illegally enter the U.S. Unless such aliens claim to be U.S. nationals, or state a fear of persecution, there is no requirement under the Constitution or international treaty to do anything other than return them, as promptly as possible, to where they boarded the plane to come here. Neither international law nor the Due Process Clause of the Fifth Amendment require that such aliens be given a hearing before an immigration judge or a right to appeal.

Section 302 also requires that an alien subject to expedited removal who claims persecution or otherwise indicates a desire to apply for asylum be interviewed by an asylum officer to determine if the alien has a "credible fear" of persecution. A "credible fear" is established if the alien is more likely than not telling the truth, and if there is a reasonable probability that the alien will meet the definition of refugee and otherwise qualify for asylum. This standard, therefore, is lower than the "well-founded fear" standard needed to ultimately be granted asylum in the U.S.—the arriving alien need only show a probability that he will meet the well-founded fear standard. The credible fear standard is designed to weed out non-meritorious cases so that only applicants with a likelihood of success will proceed to the regular asylum process. If the alien meets this threshold, the alien is permitted to remain in the U.S. to receive a full adjudication of the asylum claim—the same as any other alien in the U.S.

Under this system, there should be no danger that an alien with a genuine asylum claim will be returned to persecution. The initial screening, which should take place in the form of a confidential interview, will focus on two questions: is the alien telling the truth; and does the alien have some characteristic that would qualify the alien as a refugee. As in other cases, the asylum officer should attempt to elicit all facts relevant to the applicant's claim. It is not unreasonable to expect the applicant to be truthful in such an interview. Nor is it unreasonable to expect that, in the case of a person genuinely fleeing persecution, that the interview will yield sufficient facts to determine that the alien has a reasonable likelihood of being successful in the full asylum process.

Section 302 permits the interview itself to be carried out by a full-time INS asylum officer, or by an INS inspector or other official who has received the complete training provided to full-time asylum officers and has reasonable access to country condition reports and other resources that are used by asylum officers to assess the credibility and foundation of asylum claims.

Section 304 provides that there will be a single, streamlined "removal proceeding" before an immigration judge for all inadmissible and deportable aliens. This will replace the current exclusion proceedings under section 236 of the INA, and deportation proceedings under section 242. The consolidation will end procedural disputes contesting the type of proceeding an alien should be subject to, disputes that often turn on the elusive question of whether an illegal alien has been apprehended immediately upon entry, or evaded government control for a period of time. Instead, the focus will be

159

upon whether the alien has or has not been lawfully admitted to the U.S.

Section 304 also will simplify procedures for initiating removal proceedings against an alien. There will be a single form of notice, stating the nature and legal authority for the proceedings, the charges against the alien, the fact that the alien may be represented by counsel at no expense to the government, and, importantly, the specific requirement that the alien immediately provide the Attorney General with an address and phone number at which the alien may be contacted, as well as any change in that address or phone number. The Committee is particularly concerned with two problems regarding lack of accurate information on alien's addresses. First, many aliens do not leave forwarding addresses, thus making delivery of notice impossible. Second, there often are protracted disputes concerning whether an alien has been provided proper notice of a proceeding. This impairs the ability of the government to secure in absentia deportation orders in cases where aliens fail to appear for their hearings; in many such cases, aliens will petition to reopen their hearings on the grounds that they never received proper notice.

Section 304 addresses these problems with a number of new requirements. First, it requires the INS to establish a central address file to accurately record address information, including changes, provided by aliens. Second, it provides that service by mail of the required notice of hearing is sufficient if there is proof of delivery to the most recent address provided by the alien. Third, it authorizes the immigration judge to enter an in absentia order if the alien fails to appear provided that there is proof of attempted delivery at this address. Fourth, it allows an alien to rescind an in absentia order only in the case of specified exceptional circumstances or if the alien demonstrates that notice was not received notwithstanding the alien's compliance with the notice of address requirements.

At the time of the service of notice of hearing, or at any time thereafter, an alien must be provided oral notice, in a language the alien understands, of the time and place of the proceedings, and the consequences of failing to appear for the hearing. An alien who has been provided such notice and who nevertheless fails to appear also shall be ineligible for various immigration benefits, including voluntary departure, cancellation of removal, adjustment of status, and registry, for a period of 10 years.

The burden of proof shall be on the alien at the hearing either to establish by clear and convincing evidence that he or she is lawfully present pursuant to a prior lawful admission or, in the case of an alien who has never been lawfully admitted, to establish beyond a doubt that he or she is entitled to be admitted. If the alien establishes that he or she has been lawfully admitted, the burden of proof shifts to the INS to establish by clear and convincing evidence that the alien is deportable. Aliens are limited to a single motion to reconsider and a single motion to reopen removal proceedings.

Section 304 also removes the requirement that the written notice of hearing be provided in Spanish as well as English. The increased administrative burdens on the INS imposed by this requirement are not justified, especially in light of the fact that many immi-

160

grants served such notices do not speak Spanish. Section 304 also authorizes an immigration judge to enter an order of removal stipulated to by the alien (or representative) and the INS.

Section 304 also redefines the relief available to aliens in removal proceedings. New limitations are placed on the practice of "voluntary departure," to ensure that aliens granted this form of relief actually and timely depart the United States. An alien who is removable may apply for cancellation of removal if he or she has been a lawful permanent resident for not less than 5 years and has not been sentenced for 5 years due to commission of an aggravated felony; if he or she is a battered spouse or child of a citizen or lawful permanent resident and has been physically present for 3 years; or if the alien has been physically present for and has been a person of good moral character for 7 years preceding the application. The time period for continuous physical presence terminates on the date a person is served a notice to appear for a removal proceeding or if the alien is absent from the United States for an aggregate period in excess of 180 days. There is an annual cap of 4,000 on cancellations of removal, to be effective immediately, and to include the cases of persons who are eligible for suspension of deportation because they were served a notice of hearing prior to the enactment of this bill.

Section 305 seeks to ensure that aliens with a final order of removal under the streamlined procedures established in section 304 are removed from the U.S. within a target period of 90 days from the entry of such order and, during that time, are either detained or released on conditions that ensure they will appear for removal.

These mandates represent a significant departure from current law and practice, which often permit aliens who have final orders of deportation to remain in the U.S. indefinitely. Numerous factors are cited for this failure to deport: insufficient detention space, lack of resources to apprehend aliens for deportation, and archaic procedures which provide advance notice to aliens of when they must report for deportation—a practice charitably characterized as a "run letter." H.R. 2202 specifically addresses all of these factors, by increasing detention space (including the use of closed military facilities on a pilot basis), increasing the number of interior enforcement personnel, including specifically detention and deportation officers, and, in this section, establishing procedures that will ensure that an order of removal is no longer a dead letter, but results in an actual physical removal of the alien.

Yet, perhaps the most critical factor in lax enforcement of deportation orders is what happens—or, more precisely, does not happen—when an immigration judge enters an order of deportation. Unless the alien is currently under detention (which is the exception, not the rule), the alien walks out of court scot-free: the immigration judge imposes no bond requirement, establishes no firm date for departure, and obtains no assurance that the alien will be prepared to depart when the INS is ready to remove him. With such lax procedures, it should come as no surprise that a high percentage of aliens abscond. As a result, the resources expended to identify, apprehend, and provide a hearing to a deportable alien are all too often wasted.

161

Under section 305, an alien must be detained during the 90-day "removal period," which commences when an order of deportation is final. Since most aliens ordered deported do not file appeals, this detention can ordinarily begin when the order is entered. (Such detention, of course, would not prevent the alien from filing an appeal, in which case the alien could be released on bond.) If detention space is not available, the alien may be released on bond and under conditions prescribed by the Attorney General in order to ensure that the alien appears for deportation. The Committee strongly recommends that the INS and immigration judges be charged with the requirement to impose conditions that will ensure the alien is available for deportation when all proceedings are complete and travel documents have been obtained. An alien under an order of deportation, moreover, may not be granted work authorization unless the alien cannot be removed because there is no country willing to accept the alien or if the Attorney General determines that deportation is contrary to the public interest.

The objective of section 305 is that the entry of an order of removal be accompanied by specific requirements to ensure that the alien will depart the U.S. No set of reforms in this legislation is more important to establishing credibility in enforcement against illegal immigration.

Section 306 preserves the right to appeal from a final administrative order of removal (first issued by an immigration judge, then reviewed by the Board of Immigration Appeals) to one of the Federal circuit courts of appeals. The bill limits rights in cases where the alien's right to relief is limited by statute: arriving aliens who clearly have no right to enter the U.S.; illegal aliens who also have committed aggravated felonies; and aliens who have failed to appear for their immigration hearings. Judicial review in such cases is limited to whether the alien has been correctly identified as being subject to expedited procedures for removal, and whether the appropriate procedures have been followed.

Section 306 also limits the authority of Federal courts other than the Supreme Court to enjoin the operation of the new removal procedures established in this legislation. These limitations do not preclude challenges to the new procedures, but the procedures will remain in force while such lawsuits are pending. In addition, courts may issue injunctive relief pertaining to the case of an individual alien, and thus protect against any immediate violation of rights. However, single district courts or courts of appeal do not have authority to enjoin procedures established by Congress to reform the process of removing illegal aliens from the U.S.

Section 307 provides that aliens who are ordered removed or granted voluntary departure and do not depart the U.S. on time are subject to civil penalties and excludes them from most immigration benefits. Members of terrorist organizations are deemed inadmissible to the U.S., and alien terrorists are ineligible for asylum or withholding of deportation. Arriving aliens who are inadmissible on terrorist grounds are subjected to an expedited removal procedure under the jurisdiction of the Attorney General.

162

### Subtitle B—Removal and Inadmissibility of Alien Terrorists

Subtitle B of Title III (sections 321 through 332) provides that in cases where the use of normal removal proceedings would risk national security, the deportation charges against suspected alien terrorists may be adjudicated in special procedures conducted before one of five Federal district court judges specially appointed to serve in such cases by the Chief Justice of the Supreme Court. The special hearings will be open to the public but conducted to ensure the confidentiality of classified national security information. Aliens have the right to court-appointed attorneys, to confront adverse evidence, and to present evidence. The judges may consider classified evidence in camera, and provide a summary of such evidence to the alien, unless providing the summary would cause harm to the national security or to any person. Aliens may be detained in most cases throughout the proceeding and expeditiously removed after entry of an order of removal.

These special procedures are intended to address the rare circumstance when the government is not able to establish the deportability of an alien under section 241(a)(4)(D) of the INA without recourse to evidence the disclosure of which would pose a risk to the national security of the United States. They are exclusively to be used in cases where the alien is deportable under section 241(a)(4)(D). The Committee expects that these procedures will be used infrequently, and requests that the government will exercise utmost discretion in seeking to initiate proceedings under Subtitle B. Moreover, with the enactment of the provisions of Title I and Title II directed at securing the nation's borders and preventing immigration-related crimes, and the remaining provisions of Title III which streamline the administrative removal process, the numbers of cases in which these special deportation procedures must be used hopefully will be further diminished.

These special procedures are designed to protect the "fundamental requirement of due process[:] . . . the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"[86] The Supreme Court has acknowledged that "'due process is flexible and calls for such procedural protections as the particular situation demands.'"[87] The Court's decisions indicate that three factors must be weighed in determining if the procedures to which one is subjected meets the constitutional threshold.

> [T]he private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the * * * burdens that the additional or substitute procedural requirement would entail.[88]

These factors have been taken into full account in drafting section 321.

---

[86] *Mathews* v. *Eldridge,* 424 U.S. 319, 333 (1976) (citing *Armstrong* v. *Manzo,* 380 U.S. 545, 552 (1965); *Grannis* v. *Ordean,* 234 U.S. 385, 394 (1914)).
[87] *Mathews,* 424 U.S. at 334 (quoting *Morrissey* v. *Brewer,* 408 U.S. 471, 481 (1972)).
[88] *Mathews,* 424 U.S. at 335, 347.

163

First, section 321 recognizes that an alien present in the U.S. has a constitutional liberty interest to remain in the U.S., and that this liberty interest is most significant in the case of a lawful permanent resident alien.

> [I]t is clear that, in defining an alien's right to due process, the Supreme Court is concerned with whether he is a permanent resident. * * * A permanent resident alien [has] a stake in the United States substantial enough to command a higher level of protection under the due process clause before he may be deported. The result of such an action after all, may be to separate him from family, friends, property, and career, and to remit him to starting a new life in a new land. * * * [E]ven a manifest national security interest of the United States cannot support an argument that [a permanent resident alien] is not entitled, as a threshold matter, to protection under the due process clause. Once across that threshold, the calculus of just how much process is due involves a consideration of the Government's interests in dispensing with procedural safeguards.[89]

No alien, in particular a permanent resident alien, would be subject to deportation without an opportunity to contest that deportation. Even in the case where confidential information may be used without disclosure to the alien, section 321 provides protections adequate under the due process clause of the Fifth and Fourteenth Amendment, by permitting, in the case of a lawful permanent resident, a special attorney representing the alien to review and contest the information.

Second, the risk of an erroneous deprivation of the liberty interest is remote. The government's burden of proof, as in regular deportation proceedings, is to establish by clear and convincing evidence that the alien is deportable. This determination, moreover, is to be made in the first instance by a judge serving pursuant to Article III of the Constitution, which enhances the due process provided to an alien terrorist above that provided in regular deportation proceedings, in which the presiding immigration judge is an employee of the Department of Justice. Furthermore, the alien is entitled to be represented by counsel at government expense, a privilege that is not extended to aliens under Title II of the INA, which stipulates that the alien's representation is to be at no expense to the government. Finally, the determination is subject to appellate review. As discussed in greater detail below, the risk of error arising from in camera and ex parte consideration of classified evidence is minimized through the procedural safeguards limiting reliance on such evidence without any disclosure to the alien.

Third, there can be no gainsaying the compelling nature of the government's interest in the prompt removal of alien terrorists from U.S. soil, or in protecting the ability of the government to collect and rely upon confidential information regarding alien terror-

---

[89] *Rafeedie* v. *INS*, 880 F.2d 506, 522 (D.C. Cir. 1989). See also *Landon* v. *Plasencia*, 459 U.S. 21, 32 (1982) ("[O]nce an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly."); *Mathews*, 424 U.S. at 333.

164

ists who may be present in the U.S. Piercing this provision's limited veil of secrecy over classified evidence will clearly make it more difficult to gather evidence against suspected terrorists and to convince international sources that such information will be secure in the hands of our government, and ultimately lead to alien terrorists being able to remain in the U.S. to harm our citizens and lawful residents, while the Government waits, hoping that another ground for deportation is made available.

The most salient distinction between the procedures constructed in section 321 and those normally available under Title II of the INA is the provision for use of classified information. All of the procedures and procedural protections in section 321 flow from this fundamental policy decision: that reliable and relevant classified information should be available to be used to establish the deportability of an alien terrorist. This policy in itself causes no constitutional difficulty, and the protections against abuse of that policy by the government are more than adequate to protect the constitutional interests at stake.

The Supreme Court and lower federal courts have upheld the authority of the INS to use classified information in the cases of aliens who seek discretionary relief from deportation, without disclosing such information to the applicant.[90] Thus, the use of nondisclosed classified information to inform a court's decision whether or not to order deportation has precedent and is not unconstitutional on its face.

Furthermore, the clear intent of section 321 is that all information used to support the charge of deportability will be disclosed to the applicant. This intent is most clearly seen by considering the substantive and procedural hurdles the government must satisfy before confidential information may be considered in camera as part of the record. First, in order to even convene a special deportation proceeding, the government must present a petition personally approved by the Attorney General or the Deputy Attorney General to one of the federal district court judges serving on the special deportation court. Placing these proceedings before an Article III judge provides such aliens an enhanced measure of due process that is not accorded to other deportable aliens, whose cases are heard by administrative judges under the direction of the Attorney General.

Second, the proceeding cannot commence unless the judge finds probable cause to believe that the alien has been correctly identified, is a terrorist, and that the use of normal deportation procedures under Title II of the INA would pose a risk to national security.

Third, the Department of Justice has the burden to prove by clear and convincing evidence that the alien is deportable. Classified information may be presented in camera and ex parte. However, a summary of such evidence sufficient to inform the alien of the nature of the evidence and to permit the alien to prepare a defense must be approved by the judge and provided to the alien. If the judge does not believe the summary to be adequate, and the

---

[90] *Jay* v. *Boyd*, 351 U.S. 345, 358-60 (1956); *Suciu* v. *INS*, 755 F.2d 127, 128 (8th Cir. 1985)(per curiam). See also *Naji* v. *Nelson*, 113 F.R.D. 548, 551-552 (N.D. Ill. 1986).

165

government cannot correct the deficiencies, the proceedings will be terminated.

Fourth, the only circumstance in which the consideration of classified information in camera can proceed without providing a summary to the alien is if the judge finds that the continued presence of the alien in the U.S., or the provision of the summary, would cause serious and irreparable harm to the national security or death or serious bodily injury to any person. This is, intentionally, a strict standard, designed to emphasize the clear policy of this legislation that the alien have appropriate notice of the evidence against him and an opportunity to prepare and present a defense.

Fifth, as an additional protection, section 321 provides, in the case of an alien lawfully admitted for permanent residence, that confidential information may be disclosed to a special attorney appointed for this purpose by the judge. The attorney may not disclose such information to the alien or any other party under pain of fine and imprisonment, but may present all relevant arguments against the admissibility, relevance, credibility, or probative value of the evidence.

As noted previously, the Constitution does not forbid the use of classified information in rendering decisions on the right of an alien to remain in the United States. The procedures established in section 321 permit use of classified information in deportation proceedings, while protecting to the maximum extent possible consistent with the classified nature of such information the ability of the alien to examine, confront, and cross-examine such evidence. Any further protection of the alien's rights in this regard would eviscerate the ability of the government to rely upon such information and protect its classified nature, an objective that is grounded on national interests of the most compelling nature.

Subtitle B also makes representatives and members of organizations designated by the Secretary of State as terrorist organizations inadmissible to the U.S. and ineligible for asylum, withholding of deportation, suspension of deportation (cancellation of removal), voluntary departure, and registry.

The objective of preventing terrorist aliens from entering the U.S. is equally important to the national interest as the removal of alien terrorists. On this question, the demands of due process are negligible, and Congress is free to set criteria for admission and screening procedures that it deems to be in the national interest. "Aliens seeking admission to the United States cannot demand that their application for entry be determined in a particular manner or by use of a particular type of proceeding. For those aliens, the procedure fixed by Congress is deemed to be due process of law." [91] The Supreme Court observed in *Knauff* v. *Shaughnessy* "that an initial entrant has no liberty (or any other) interest in entering the United States, and thus has no constitutional right to any process in that context; whatever Congress by statute provides is obviously sufficient, so far as the Constitution goes." [92] "Our starting point, therefore, is that an applicant for initial entry has no constitu-

---

[91] *Rafeedie* v. *INS*, 880 F.2d 506, 513 (D.C. Cir. 1989) (citing *Knauff* v. *Shaughnessy*, 338 U.S. 537 (1950)) (emphasis in original).
[92] *Rafeedie*, 880 F.2d at 520.

166

tionally cognizable liberty interest in being permitted to enter the United States." [93]

Under these provisions, an alien will be inadmissible if the alien is a representative of a terrorist organization or a member of an organization that the alien knew or should have known was a terrorist organization. This distinction is intended to ensure that aliens who are most active as directors, officers, commanders, or spokespersons for terrorist organizations are strictly barred from entering the U.S. An alien who is merely a member of a terrorist organization will be considered under a slightly less strict standard that incorporates a scienter requirement that the alien knew or should have known that the organization is terrorist in nature. Thus, an alien innocent of involvement with or knowledge of terrorist activity on the part of an organization of which he or she was merely a member would not necessarily be inadmissible to the U.S.

An organization will be considered "terrorist" for purposes of these provisions only if it has been designated as such by the Secretary of State after consultation with the Attorney General, and after consultation with the Committees on the Judiciary of the House of Representatives and the Senate. Only foreign organizations and subsidiary foreign groups that have engaged in, or are engaging in, terrorist activity (as that term is currently defined in the INA) and whose acts pose a threat to the national security of the United States, can be so designated. The Secretary of State, in consultation with the Attorney General, may remove any such designation once made. The designation is subject to judicial review upon its being made public and, by law, may be removed by Congress.

## Subtitles C and D—Miscellaneous

The remainder of title III contains a number of miscellaneous provisions, including a definition of "stowaway;" a clarification of the definition of "conviction" for immigration law purposes; a definition of "immigration judge" together with a salary schedule for the position; the establishment of an "Immigration Enforcement Account" for the deposit of civil penalties; an authorization for use of retired Federal employees in the Institutional Hearing Program; the setting of conditions for prisoner transfer treaties with foreign states; amendments to the criminal alien identification system; and provisions to protect the confidentiality of battered women and children.

### TITLE IV—EMPLOYER SANCTIONS AND VERIFICATION

H.R. 2202 recognizes that the solution to the problems in employer sanctions is twofold. First, the number of employment eligibility documents employers are required to review must be reduced. Currently, employees can submit one or more of 29 different documents. Title IV reduces this to six: a passport or alien registration card or resident alien card, or a social security card in combination with a driver's license or state ID card.

More importantly, there must be an authoritative check of the veracity of the documents provided by new employees. Such a ver-

---

[93] Id.

167

ification mechanism will be instituted on a pilot basis, using existing databases of the SSA and the INS. Every person in America authorized to work receives a social security number. Aliens legally in this country (and many illegal aliens) have alien identification numbers issued by the INS. If a verification mechanism could compare the social security (and, for a noncitizen, alien number) provided by new employees against the existing databases, individuals presenting fictitious numbers and counterfeit documents, or who are not authorized to be employed, would be identified. A verification system could "prevent use of never-issued numbers, numbers restricted to nonwork purposes, and numbers belonging to deceased people."[94]

Title IV will institute pilot projects testing this verification mechanism in at least five of the seven states with the highest estimated populations of illegal aliens. All employers in such states having 4 or more employees will be involved. The pilots will terminate no later than October 1, 1999. The mechanism cannot be expanded nationwide without authorization by Congress.

The verification mechanism would work as follows: As under current law, once an applicant has accepted a job offer, he or she will present certain documents to the employer. The employer, within three days of the hire, must examine the document(s) to determine whether they reasonably appear on their face(s) to be genuine and complete an I–9 form attesting to this examination.

The employer will also have three days from the date of hire (which can be before the date the new employee actually reports to work) to make an inquiry by phone or other electronic means to the confirmation office established to run the mechanism. Additional time will be provided in the event the confirmation office cannot respond to all inquiries. If the new hire claims to be a citizen, the employer will transmit his or her name and social security number. The confirmation office will compare the name and social security number provided against information contained in the Social Security Administration database. If the new hire claims to be a noncitizen, the employer will transmit his or her name, social security number and alien identification number. The alien number is needed despite the fact that all work authorized aliens have social security numbers because (1) in some instances a social security number will not have been issued by the time of the verification attempt and (2) the SSA database does not provide information on changes in work eligibility status occurring after the number is issued. The confirmation office will compare the name and social security number provided against information contained in the SSA database and will compare the name and alien number provided against information contained in the INS database.

When the confirmation office ascertains that the new hire is eligible to work, the operator will within three days so inform the employer and provide a confirmation number. If the confirmation office cannot confirm the work eligibility of the new hire, it will within three days so inform the employer of a tentative nonconfirmation and provide a tentative nonconfirmation number.

---

[94] Social Security Administration, Department of Health and Human Services, A Social Security Number Validation System: Feasibility, Costs, and Privacy Considerations 2 (1988) (hereinafter cited as Social Security Number Validation System).

168

If the new hire wishes to contest this finding, "secondary verification" will be undertaken. Secondary verification is an expedited procedure set up to confirm the validity of information contained in the government databases and provided by the new hire. Under this process, the new hire will typically contact or visit the SSA and/or INS to see why the government records disagree with the information he or she has provided. If the new hire requests secondary verification, he or she cannot be fired on the basis of the tentative nonconfirmation. The employee has 10 days to reconcile the discrepancy. If the discrepancy is reconciled, then confirmation of work eligibility and a confirmation number is given to the employer by the end of this period. If the discrepancy is not reconciled or the employee does not attempt to reconcile the information, then final denial of confirmation and a final nonconfirmation number will be given by the end of this period; the employer must then dismiss the new hire as being ineligible to work in the United States.[95]

Title IV provides protection to both employers and employees. Employers will be shielded from liability for actions they take in good faith reliance on information provided by the confirmation mechanism. Employees who would not have been dismissed from their jobs but for errors contained in the databases or made by the verification mechanism will be entitled to compensation through the Federal Tort Claims Act.

Title IV's verification mechanism will most likely reduce any temptation to engage in employment discrimination based on considerations of national origin. Currently, employers might be tempted not to hire job applicants who look or sound "foreign" in order to protect themselves from being penalized for hiring illegal aliens. After the verification mechanism is implemented, employers will receive independent confirmation that their new hires are work-authorized. The temptation to worry—and to discriminate—will be greatly reduced. As to any burden secondary verification may place on employers, it must be remembered that verification can only take place after an employee is offered a job. Thus, if an employer were to revoke a job offer because secondary verification were required, the employee would immediately know that illegal verification-related discrimination had taken place and could file a complaint with the Justice Department's Office of Special Counsel.

The verification mechanism also does not present civil liberties concerns. The system requires no new document, let alone anything approaching a "national ID" card. It requires no modification of existing identification documents. It requires no new federal government database and entails the collection by the federal government of no new data. It relies on information that the SSA and the INS have been recording for years. Employees' privacy is protected since the information contained in the existing government databases cannot be disseminated, under penalty of law to employers or anyone else. Employers will merely be told yes (information provided by an employee matches information contained in the databases and the person is eligible to work), or that secondary verification

---

[95] The process under which discrepancies are investigated and either reconciled or not reconciled is called "secondary verification." See notes 100–103 and accompanying text.

169

is required (the information indicates that the employee is not au-
thorized to work or that there is a discrepancy) and later, whether
secondary verification was or was not successful in confirming the
identity and work eligibility of the employee.

Verification mechanisms like that proposed by Title IV have in
fact been tested in recent years. In the late 1980's, the Social Secu-
rity Administration tested a system in which about 1,500 volunteer
employers received confirmation of work authorization of prospec-
tive employees and new hires by telephoning Social Security and
transmitting social security numbers.[96] Upon evaluation of the
pilot, it was determined that "given sufficient leadtime and re-
sources, a [social security number] validation system using public
telephone lines could be developed."[97] Since 1992, the INS has
been testing a "telephone verification system" with first nine and
now 223 volunteer employers who check the eligibility to work of
new hires identifying themselves as aliens by contacting the system
through telephones and "point-of-sale" devices and transmitting
alien numbers.[98]

Employers who took part in the first phase of the INS' pilot pro-
gram: (1) unanimously recommended that it be implemented as a
permanent program; (2) unanimously indicated that they would be
willing to pay for the service; (3) indicated in 100 percent of the
monthly survey responses that overall procedures were beneficial;
(4) indicated in 100 percent of the monthly survey responses that
primary verification was easy to use; (5) indicated in 99 percent of
the monthly survey responses that primary verification was useful;
and (6) indicated in 99 percent of the monthly survey responses
that secondary verification response was satisfactory.[99]

Questions have been raised about the accuracy of data in the
SSA and INS databases, based on the apparently high rates of sec-
ondary verification required in both the SAVE program (Systematic
Alien Verification for Entitlements) and the INS and Social Secu-
rity pilot projects testing verification.[100] The concern is misplaced.
Secondary verification is ordered whenever an employee or benefits
applicant provided information that does not match that in the
database. It typically involves a review of the files by the applicable
government agency and can take from a few days to a few weeks.
Secondary verification does not necessarily mean database error; it
is often the fault of the employee or the applicant for mistakenly

---

[96] See Social Security Number Validation System.
[97] Id. at 7.
[98] Office of Information Resources Management, Records Systems Division, SAVE Program
Branch, Immigration and Naturalization Service, Telephone Verification System (TVS) Pilot: Re-
port on the Demonstration Pilot-Phase 1 (1993) (hereinafter cited as Telephone Verification Sys-
tem).
[99] Id. at 9–10, 16.
[100] The SAVE program, established by section 121 of IRCA, requires state social service agen-
cies to check alien eligibility for federal benefits through an INS database. See Verification of
Eligibility for Employment and Benefits: Hearing Before the Subcomm. on Immigration and
Claims of the House Comm. on the Judiciary, 104th Cong., 1st Sess. 36–37 (March 30, 1995)
(Statement of Robert L. Bach, Executive Associate Commissioner, Policy and Planning, Immi-
gration and Naturalization Service).
In FY 1994, the SAVE system secondary verification rate was 17 percent. See 1994 Commis-
sion Report at 74. The INS pilot project registered a 28 percent secondary verification rate from
April to December 1993. See Telephone Verification System at 11. The Social Security Adminis-
tration pilot project conducted from January 1987 to October 1988) registered a 17 percent sec-
ondary verification rate. See Social Security Number Validation System at 6.

170

providing erroneous information or deliberately providing fictitious information.[101]

In cases where the alien has assumed a fictitious identity or is legally present but not authorized to work, secondary verification will reveal that the system worked properly in declining to provide employment eligibility confirmation. In cases where the alien is eligible to work but provided incorrect information or there was an error in the INS database, secondary verification should result in confirmation of employment eligibility. In the Social Security Administration pilot, only 12 percent of individuals initially denied confirmation bothered to contact the Administration,[102] indicating the other 88 percent were probably not eligible to work to begin with. In the first phase of the INS pilot, secondary verification confirmed noneligibility to work 43 percent of the time.[103]

The Principal Deputy Commissioner of the Social Security Administration testified before the Subcommittee on Immigration and Claims on June 29, 1995, that "[o]ur information on name, social security number, and so forth, so far as we know is absolutely accurate." Asked whether he "perceive[d] any problem being able to identify whether there's an individual with a particular social security number", he responded in the negative.[104] The Executive Associate Commissioner for Policy and Planning of the INS testified before the Subcommittee on March 30, 1995, that the INS is pursuing initiatives to "reduce[] error and creat[e] a capacity for resolving any errors which might now exist. The goal of these improvements is to enable INS to provide timely and accurate responses to verification requests."[105]

TITLE V—LEGAL IMMIGRATION REFORM

Title V reforms the legal immigration system of the United States. Any alien who seeks to immigrate to the U.S. must be admitted under one of these four categories: (1) family-sponsored immigrants; employment-based immigrants; humanitarian immigrants; and diversity immigrants. (Due to the complexity of these provisions, detailed analysis and comment on some provisions is reserved to the section-by-section analysis.)

Sections 501 through 504 establish worldwide levels for family-sponsored (330,000), employment-based (135,000), diversity (27,000) and humanitarian (70,000) immigrants. Section 505 specifies that these worldwide levels are effective only through FY 2005, by which time Congress must review and reauthorize new legal im-

---

[101] For example, an inquiry to INS could require secondary verification for any of the following reasons: (1) the INS database correctly indicates the alien is not eligible to work; (2) the INS database has no information on the alien because the alien has provided a false alien number; (3) the alien gave the employer a different spelling of his name from that in the INS database; (4) the INS has been tardy in entering the immigrant's alien number into its database; or (5) the INS database is in error. As part of the pilot program, the INS must review and update its data in order to "promote[] . . . maximum accuracy and shall provide a process for the prompt correction of erroneous information." Additionally, computer programs can be designed to allow for common alternative spellings of names.
[102] See A Social Security Number Validation System at appendix C.
[103] Telephone Verification System at 12.
[104] H.R. 1915, the Immigration in the National Interest Act of 1995: Hearing Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary, 104th Cong., 1st Sess. (1995) (statement of Lawrence H. Thompson).
[105] Hearing: Verification of Eligibility for Employment and Benefits, supra note 100, at 36 (statement of Robert L. Bach).

171

migration levels. Furthermore, the review and reauthorization process is to take place every five years thereafter.

Under sections 511 and 512, family-sponsored immigrants are: (1) spouses and unmarried children under 21 of U.S. citizens; (2) spouses and unmarried children under 21 of lawful permanent residents; (3) parents of U.S. citizens; and (4) dependent adult sons and daughters of U.S. citizens and lawful permanent residents, who are under age 26, never-married, and childless. Section 518 provides for the admission of disabled adult sons and daughters as "children." Section 501 sets an approximate annual ceiling for family-sponsored immigrants at 330,000, allocated as follows: for nuclear family of U.S. citizens, no annual limitation; for nuclear family of lawful permanent residents, 85,000; for parents of U.S. citizens, 50,000; and for dependent adult sons and daughters, 10,000. Section 553 provides that the current backlog of spouses and children of permanent resident aliens is to be reduced by an average of 110,000 per year (based on current estimates of the backlog) over a five-year period.

These provisions will give highest priority in the immigration system to unification of the nuclear family, and shift the emphasis from chain migration of extended families to preservation of the nuclear family, which should be a cornerstone of our immigration policy. The spouses and minor children of U.S. citizens will be admitted without any numerical limits. The spouses and children of lawful permanent residents will be the first family-preference category, and the special backlog reduction provisions in section 553 will ensure that the backlog in this category is eliminated. The category should then be sufficient to meet current demand.

Section 512 also requires that the parents of citizens being sponsored as immigrants must have insurance to cover their health care costs and potential long-term care needs. This requirement is imposed because of substantial evidence that many immigrant parents come to the U.S. to take advantage of welfare benefits for which they have not contributed. The number of immigrants receiving Supplemental Security Income (SSI) has risen 580 percent during the past twelve years. Impoverished immigrant parents also become eligible for Medicaid, which provides health care virtually without cost. In many cases, sponsoring children abandon financial responsibility for their parents just so that they can be eligible for these benefits.

Requiring the purchase of health insurance and long-term care insurance will ensure that the children who sponsor their parents do not incur obligations that they cannot meet, and protect American taxpayers from footing the bill for the health care costs of immigrants who have not contributed to the system.

Under section 513, employment-based immigrants are: (1) aliens with extraordinary ability (visas not to exceed 15,000); (2) aliens who are outstanding professors and researchers, or who are multinational executives and managers (visas not to exceed 30,000, plus unused visas from category (1)); (3) aliens who are professionals with advanced degrees, and aliens of exceptional ability (30,000, plus unused visas from previous categories); (4) professionals and skilled immigrants, who are either professionals with a baccalaureate degree and experience or skilled workers with training

172

and work experience (45,000 visas, plus unused visas from previous categories); (5) investor immigrants (10,000 visas), who invest at least $1 million in a U.S. company that employs at least 10 workers (with a pilot program through 1998 allowing for a $500,000 investment and the hiring of 5 workers); and (6) special immigrants (5,000 visas). Section 502 sets the annual limit for employment-based immigrants at 135,000.

Experience requirements are increased for immigrants in category (4): skilled workers are required to have 4 years experience, and professionals with baccalaureate degrees, 2 years. (These new requirements refer to the background of the alien as of the time the immigrant petition is filed, and not to the requirements of the job, which must, as under current law, require at least 2 years of training or experience for a skilled worker and a baccalaureate degree for a professional position.) This experience (in the relevant profession or field) can be obtained with the petitioning employer, including (but not necessarily) during a period of lawful admission as a nonimmigrant worker, such as an H–1B, but cannot be obtained during a period of illegal residence in the U.S. The "national interest" waiver for immigrants in category (3) is also reformed, to prevent current abuses in the granting of such waivers. The labor certification requirement can be waived for category (3) if the alien's particular skills or education are uniquely necessary and substantially benefit the national interest in several specifically-defined areas, including national security, national defense, the provision of health care or other services to low income Americans, and the development of new technologies.

Section 514 reforms the diversity immigrant program established in the Immigration Act of 1990. The revised program will allow admission of 27,000 immigrants each year from a maximum of 10 countries designated as "low admission states" within each of six regions. To be eligible for a diversity visa, the alien must have a verified job offer in the U.S., a high school education or its equivalent, and a minimum of two years experience in an occupation that requires at least two years of training. No alien who at the time of application or at any time during the previous five years has been illegally present in the U.S. is eligible to receive a diversity visa.

Sections 521 and 524 establish categories for refugees and other humanitarian immigrants. The annual level for such immigrants is 70,000 (95,000 in 1997), consisting of: refugees, 50,000 (75,000 in 1997), unless Congress sets a higher number by law, or the President declares an emergency; and other humanitarian immigrants, 10,000. Section 521 also reforms the refugee consultation process by requiring that the annual consultations take place by July 1. The refugee provisions in section 521 accomplish several important goals. First, they ensure the availability of a minimum number of visas sufficient to meet the State Department's anticipated demand for refugee resettlement. Second, they will involve Congress more directly in decisions to set refugee policy, by setting a reasonable deadline for the consultation process and requiring legislation to raise the refugee target except in emergency situations. Third, they preserve flexibility by permitting the President to admit additional refugees in the case of an emergency (not merely an "unforeseen"

173

emergency, as under current law.) Section 521 provides that the number of annual refugee admissions designated by the President may not exceed 75,000 in fiscal year 1997 or 50,000 in any succeeding fiscal year thereafter. These levels may be exceeded only if: (1) Congress provides by law for a higher number; or (2) the President declares the existence of an emergency which requires additional refugee admissions. The current requirement that an emergency be "unforeseen" for the purpose of admitting refugees outside of the set limits for a particular fiscal year is deleted.

By deleting the "unforeseen" requirement, the President will have more flexibility in increasing the refugee numbers when circumstances indicate that a true emergency has created an immediate need to process and resettle additional refugees. This change does not obviate the need for consultation between the President and the House and Senate Committees on the Judiciary.

Additionally, this section amends section 207(d)(1) of the INA to require the President to report to the House and Senate Judiciary Committees by June 1 of the preceding fiscal year on the number and allocation of refugee admissions for the subsequent fiscal year, and requires the series of discussions on this report under subsection (e) to occur by July 1.

The category for humanitarian visas in section 524 is designed to meet the need for a flexible, transparent category that will be available for any specific situation in which admission of an alien is of special humanitarian concern to the United States. This category is specifically intended to replace the need for special admission categories tailored to special interests, and particularly to end the practice of admitting aliens on a permanent basis through grants of parole under section 212(d)(5).

The Attorney General may use this discretionary category, for example, to admit specific individuals of humanitarian concern to the U.S. who has assisted the government in past legitimate military operations. In many cases, these individuals do not qualify as refugees and can only come to the country if the Attorney General chooses to grant parole on a long-term basis. As noted earlier, however, parole was intended to be and should be temporary and is not designed to admit aliens who do not otherwise qualify for admission to the U.S. The humanitarian visa category ensures, therefore, that aliens in these types of situations, and others can be admitted to the U.S. on a case-by-case basis without improper use of her statutorily-prescribed parole authority.

Section 522 amends the definition of "refugee" to extend protection to aliens who have been subjected (or have a well-founded fear of being subjected) to coercive abortion or sterilization under a government-sanctioned program of coercive family planning, or has been persecuted (or has a well-founded fear of being persecuted) for refusal or resistance to such a program. There is much confusion about this provision, and this should be clarified. The primary intent of section 522 is to overturn several decisions of the Board of Immigration Appeals, principally *Matter of Chang* and *Matter of G–*.[106] These decisions, which are binding on all immigration judges

---

[106] Matter of Chang, Int. Dec. 3107 (BIA, 1989); Matter of G–, Int. Dec. 3215 (1993). See also *Zheng* v. *INS*, 44 F.3d 379 (5th Cir. 1995); Chen v. Carroll, 1995 WL 88164 (4th Cir. 1995).

174

and INS asylum and refugee officers, hold that a person who has been compelled to undergo an abortion or sterilization, or has been severely punished for refusal to submit to such a procedure, cannot be eligible on that basis for refugee or asylee status unless the alien was singled out for such treatment on account of factors such as religious belief or political opinion.

The Committee believes that the BIA's rationale for these opinions—that policies of coercive family planning are "laws of general application" motivated by concerns over population growth, and thus are not "persecutory"—is unduly restrictive. The BIA opinion effectively precludes from protection persons who have been submitted to undeniable and grotesque violations of fundamental human rights. As stated by First Lady Hilary Clinton in her September 1995 address to the U.N. Conference on Women in Beijing, policies of coercive family planning violate human rights and must be resisted. However, the Administration, which has the authority to overrule the BIA decisions through regulation or through decision of the Attorney General, has not done so. Nor has it offered adequate relief to persons who have undergone such coercion.

In the People's Republic of China, some women with "unauthorized" second or third pregnancies are subjected to involuntary abortions, often late in their pregnancies. Both men and women who have met their "quota" for children may be forcibly sterilized. Couples with unauthorized children are subjected to excessive fines, and sometimes their homes and possessions are destroyed. These measures are carried out by government agents, at the regional or local level.

The United States should not deny protection to persons subjected to such treatment. Nor, however, should the U.S. grant protection to anyone who presents such a claim. Nothing in section 522 is intended to lower the evidentiary burden of proof for any alien, no matter how serious the nature of the claim. The Committee emphasizes that the burden of proof remains on the applicant, as in every other case, to establish by credible evidence that he or she has been subject to persecution—in this case, to coercive abortion or sterilization—or has a well-founded fear of such treatment. The Committee is aware that asylum claims based on coercive family planning are often made by entire groups of smuggled aliens, thus suggesting that at least some of the claims, if not the majority, have been "coached." Section 522 is not intended to protect persons who have not actually been subjected to coercive measures or specifically threatened with such measures, but merely speculate that they will be so mistreated at some point in the future.

Determining the credibility of the applicant and whether the actual or threatened harm rises to the level of persecution is a difficult and complex task, but no more so in the case of claims based on coercive family planning than in cases based on other factual situations. Asylum officers and immigration judges are capable of making such judgments.

Finally, section 522 limits the number of refugee admissions and asylum grants on the basis of coercive family planning claims to 1,000 in any given fiscal year.

Section 523 restricts the use of parole authority to allow aliens to enter the U.S. to specific reasons that are strictly in the public

175

interest or are matters of urgent humanitarian concern, such as for the prosecution of an alien, to obtain an alien's testimony in a criminal proceeding, or to permit an alien to visit a dying relative. This section is intended to end the use of parole authority to create an ad hoc immigration policy or to supplement current immigration categories without Congressional approval. Section 524, establishing a category for humanitarian immigrants, is intended to allow the admission of immigrants that may currently be admitted through improper application of the parole authority, but to place such admissions within the overall immigration ceilings established by Congress.

Section 531 reforms the asylum process, requiring that applications be filed within 30 days of arrival in the U.S., unless circumstances in the alien's home country or in the alien's personal circumstances that relate to the alien's eligibility for asylum have fundamentally changed. This section also provides that an application not be accepted if the alien may be removed to a safe third country in which the alien would have access to a fair asylum process, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States, and that asylum applications be adjudicated on a specific timetable that will result in completion of most cases within 6 months of filing.

This report has previously discussed the need for such measures to supplement the administrative reforms of the asylum process that were effective in January 1995. This section is intended to build upon the success of such provisions in streamlining the asylum process, while ensuring that no alien will be returned to persecution.

There has been some question whether the imposition of a time deadline for filing an asylum application will close off from protection those aliens who miss the deadline. Section 531 includes an exception from the deadline in cases where there are fundamentally changed circumstances affecting eligibility for asylum. In cases where this exception does not apply, and the alien would be subject to persecution if returned to his or her home country, the Committee recognizes that some provision for protection must be made.

Even in its present form, however, H.R. 2202 does not require the deportation of an alien to a place where he would face persecution. The alien may designate any country for deportation, and deportation to such country is contingent upon acceptance of the alien by that country. Otherwise-qualified applicants who have missed the deadline may be eligible for a humanitarian visa, as established in section 524. This, the Committee believes, could be applied by the Attorney General to satisfy any international obligations of the U.S. regarding the protection of those who would be subject to persecution if returned to their homelands.

Finally, the Committee believes that the interest in filing a timely application supersedes the interest in filing a comprehensive application. The Committee is aware that current INS regulations require a relatively long and detailed application for asylum. While it may be important for an applicant to be able to commit the details of his or her case to writing prior to an interview with an asylum officer, it is more important that the case be commenced as

176

soon as possible after the alien's arrival in the U.S. Thus, the Committee encourages the INS to adopt a simpler form of application for asylum, with generous allowance for amendment. Furthermore, the INS should take affirmative steps to notify the public of the 30-day filing requirement.

TITLE VI—ELIGIBILITY FOR BENEFITS AND SPONSORSHIP

This title is designed to continue the long-standing principle in U.S. immigration policy that immigrants be self-reliant and not depend on the American taxpayer for financial support. Current eligibility rules, unenforceable financial support agreements, and poorly-defined public charge provisions have undermined the tradition of self-sufficiency among the immigrant community. As a result, the cost to the American taxpayer of providing public benefits to immigrants has been in the tens of billions of dollars every year. Title VI specifies that illegal aliens are not eligible for most public benefits, makes enforceable the grounds for denying entry or removing aliens who are or are likely to become public charges, and makes those who agree to sponsor immigrants legally responsible to support them.

Section 601 makes illegal aliens ineligible for means-tested public benefits and government contracts. Federal agencies must require that applicants show one of six documents to prove eligibility to receive benefits, and State agencies are authorized to require documentation of eligibility to receive benefits. This section also requires verification of citizenship or legal resident status for the receipt of any Federal student financial assistance.

Section 621 strengthens the grounds for inadmissibility as a public charge by stating that a family-sponsored immigrant or a non-immigrant is inadmissible if the alien cannot demonstrate that the alien's age, health, family status, education, skills, affidavit of support, or a combination thereof make it unlikely that the alien will become a public charge. An employment-based immigrant, other than an immigrant of extraordinary ability, is inadmissible unless the immigrant has employment at the time of immigration. An employment-sponsored immigrant working in a business owned by a member of his family must obtain a affidavit of support.

Section 622 strengthens the grounds for removal as a public charge by extending the time period within which such removal may occur to seven years from the date of admission, provided the alien's public charge status stems from causes arising before admission. An alien is considered to be a public charge if the alien receives benefits under Supplemental Security Income, Aid to Families with Dependent Children, Medicaid, Food Stamps, State general assistance or Federal Housing Assistance for an aggregate of twelve months within the seven-year period. More flexible standards are established for battered spouses and children.

Section 631 specifies that a sponsor's income and resources are available to the sponsored alien for the purpose of qualifying for public benefits. A legally binding affidavit of support is created for those who wish to sponsor immigrants into the U.S. The length of time for deeming income and for which the sponsorship contract is enforceable is as follows: for parents of U.S. citizens, through the time the parent becomes a citizen; for spouses of U.S. citizens and

177

lawful permanent residents, until the earlier of seven years after the date the spouse becomes a permanent resident or the date the spouse becomes a citizen; and for minor children, until the child reaches 21 years of age. The deeming period may end earlier if the alien works long enough to qualify for social security retirement income.

Section 632 requires that a sponsor must be the individual who is petitioning for the alien's admission (or an individual who accepts joint and several liability with the petitioner under the affidavit of sponsorship); be a U.S. citizen or permanent resident; be at least 18 years old; live in the U.S.; and demonstrate the means to maintain an annual income equal to at least 200 percent of the poverty level (unless the sponsor is on active-duty status in the U.S. military, in which case the requirement is 100 percent) for the individual and the sponsored alien. Certain provisions also were modified to provide greater flexibility to grant benefits to battered spouses and children.

TITLE VII—FACILITATION OF LEGAL ENTRY

Immigration reform not only must address the challenges of illegal and legal immigration, but also must ensure that U.S. ports of entry are capable of receiving the hundreds of millions of foreign visitors who seek legitimate entry into our country each year. Enhancing our enforcement capability at land, air, and sea ports must go hand in hand with improving the service functions at such ports. This is important first because of the economic benefits brought to this country by international commerce and travel, and second because smooth functioning of our ports will enable enforcement resources to be strategically deployed in order to maximize the prevention of unauthorized entries into the U.S. In addition, curbing the number of people who attempt to enter on fraudulent documents should enable further streamlining of procedures for legitimate travellers.

Section 701 requires an increase in both INS and Customs Service inspectors at land borders sufficient to ensure full staffing at peak crossing hours in all travel lanes, and that inspectors be deployed to areas with the greatest need. Section 702 authorizes further expansion of the commuter lane pilot programs now being operated successfully at several land border crossing points. These programs permit frequent crossers who meet eligibility criteria to travel through express lanes that verify identity through scanners and other advanced technology. Special care must be taken to thoroughly screen applicants for special programs (such as commuter lane pilot programs and border crossing cards) allowing, ultimately, freer border crossings. Once an alien is granted this special treatment, further monitoring for abuse of the special benefits is difficult.

Section 703 adds to the INA a new section 235A, mandating the operation of pre-inspection stations at 5 of the 10 foreign airports having the greatest number of departures for the U.S. The Committee believes that pre-inspection services should, to the greatest extent possible, result in the clearance of all passengers permitted to board to be admitted to the U.S. The converse, of course, is that passengers refused permission to board, on the ground that they do

178

not have valid documents to be admitted or are otherwise inadmissible, will be prevented from even reaching a U.S. port of entry, thus reducing the burden on INS inspection facilities and the likelihood that unauthorized aliens will enter the U.S. The Committee encourages the INS to work closely with the Customs Service and the Department of State in the planning and operation of such preinspection stations, particularly in seeing to it that the stations have access to all relevant information in government databases regarding persons applying for admission to the U.S.

Section 704, which requires the INS to expend funds from the Immigration User Fee Account to train airline personnel in the detection of fraudulent documents, and imposes sanctions upon airlines for failure to comply with regulations regarding the detection of such documents, is intended to provide air carriers with the means and the incentive to cooperate with the U.S. government in ensuring that only persons with legitimate admission documents are permitted to board aircraft bound for the U.S.

The Committee is concerned that disputes between air carriers and the INS regarding the treatment of certain small classes of illegal aliens may have led to a less than cooperative approach on the urgent goal of preventing the boarding of international passengers with no right to be admitted to the U.S. Communications from the INS and the air carriers during the course of the Committee's considerations of this bill confirm this impression. The mandates contained in this section are equitable, requiring the government and the carriers to fully bear their respective responsibilities on this issue. The Committee believes that optimum implementation of these mandates will occur only through a spirit of cooperation greater than that displayed in recent years. These mandates are clear: the INS must issue regulations within 90 days of enactment of this legislation, and must provide substantial funds for the training of personnel. The carriers must in turn comply with these regulations, at the risk of losing their right to transport aliens to the U.S.

### TITLE VIII—SKILLED NONIMMIGRANTS (H–1B)

Section 806 is designed to end the abuses which have recently plagued the H–1B program while providing regulatory relief for employers who do not abuse the program. Section 806 requires an employer to attest that it will not fire and replace an American worker with an H–1B alien unless the company is willing to pay the H–1B 110 percent of what the fired American was making. The time period in which an employer is subject to this requirement is consistent with the United States' international obligations under the General Agreement on Trade in Services. This provision is intended to curtail any possible incentive which may exist currently for employers to lay off Americans because of the lure of cheap foreign labor. If an employer is willing to pay an H–1B a premium wage, then this is evidence that the H–1B is being recruited for reasons of superior skills.

In addition, penalties for violations of the H–1B provisions will be enhanced to provide an additional disincentive to abuse. Among the changes, maximum civil fines are increased fivefold and the pe-

179

riod in which a company cannot get visa petitions approved for foreign workers can be extended to a permanent ban.

The employers most prone to abuse are "H–1B dependent employers"—a significant percentage of whose work forces are composed of H–1Bs. The H–1B program is designed to ameliorate temporary shortages of specialized skills in the American work force. While it is conceivable that a company would need to stock its workforce predominantly with H–1Bs because of such shortages, this is unlikely. In many cases, the fact that firms are H–1B dependent cannot be attributed to any domestic skills shortage. It is evident that large pools of H–1Bs are being created to do precisely the work of—and often to replace—widely available American workers, presumably for cost-saving reasons. American workers can be replaced through direct hiring of H–1Bs, through utilization of a job contractor that is itself largely composed of H–1Bs, or through subcontracting work to a firm largely composed of H–1Bs.

There is nothing inherently wrong with a firm relying on subcontracting or outsourcing, i.e., having another company produce a product or provide a service which it used to produce or provide on its own. Such reliance can generate great efficiencies. However, this practice is suspect when it is accomplished through the utilization of an H–1B dependent firm. Extensive reliance on foreign labor for cost savings alone (and not to provide needed, hard-to-find skills) is not in the nation's best interests.

Neither is job contracting inherently wrong. There exist many job contractors which perform valuable services for the economy and do not rely inordinately on H–1B aliens. However, H–1B dependent job contractors are suspect. The service they provide is often access to a pool of cut rate foreign labor. In addition, the employer-job contractor relationship is one which can defeat the protection of the H–1B attestation system. As discussed earlier, the complaint-driven system relies on notice to impacted employees. When a job contractor places workers at another firm, it is imperative that the workers at the other firm are given notice.

Section 806 provides regulatory relief to firms which are non-H–1B dependent, while maintaining strict regulatory standards for H–1B dependent employers. Certain of the January 1995 Department of Labor regulations, described in an earlier section of this report, do have beneficial effects. However, the Committee believes that the good which the regulations do is outweighed by the burden they place on non-H–1B dependent employers. Therefore, the regulations are kept effective only as to H–1B dependent employers.

Except for the smallest employers, the bill sets the percentage test for H–1B dependence at 15 or 20 percent (depending on the size of the firm), which ensures that mainstream, legitimate users of H–1Bs are classified as non-dependent. About ten percent of the instructional faculties of major universities are composed of H–1Bs. About one percent of the workforces at major computer corporations are so composed.

The bill recognizes, however, that certain employers have become dependent on H–1B aliens not out of an abusive intent, but because they had legitimate business reasons and there never was any prohibition or penalty for doing such. Therefore, the bill provides employers which are H–1B dependent a transition period

180

(lasting until five years after enactment) during which they will be accorded probationary status as non-H–1B dependent employers if they utilize a pre-approved plan and systematically reduce, to the satisfaction of the Secretary of Labor, their reliance on H–1B aliens.

The regulatory relief provided to non-H–1B dependent employers is as follows:

(1) A non-H–1B dependent employer does not have to post notice at worksites visited by an H–1B alien which are in the area of employment listed on the labor condition application (LCA) but not themselves listed. As discussed previously, the regulation has an important goal, especially in the context of job contractors. But the Committee believes that only with those employers where the potential for abuse is greatest—H–1B dependent employers—is the burden justified.

(2) A non-H–1B dependent employer is not required to file additional LCAs when sending H–1B aliens to areas of employment not listed in their initial LCAs, so long as the H–1Bs' principal places of employment have not changed to non-listed areas. Again, this regulation has an important purpose, but because of its burden, it is best reserved for H–1B dependent employers, where the potential for abuse is greatest.

(3) A non-H–1B dependent employer does not have to pay per diem and transportation costs at any specified rates when sending H–1Bs to areas of employment not listed in their labor condition applications.

(4) The Secretary of Labor can conduct an investigation of a non-H–1B dependent employer only after receiving a complaint filed by an aggrieved party outside of the Department of Labor. Self-directed investigations will prove to be a better use of limited investigatory resources when focused on those employers where the potential for abuse is highest.

Additionally, no employer shall be required to pay its non-H–1B workers according to an objective wage scale.

The bill requires that when an H–1B dependent "job contractor" (meaning an employer who places an employee with another employer where the employee performs duties at worksites owned, operated, or controlled by the other employer and there are indicia of an employment relationship between the employee and the other employer) places an H–1B alien at another firm, it attest that either the other firm has executed an attestation stating that the other firm has not and will not lay off an American employee and replace him or her with an H–1B alien for the time periods specified in the General Agreement on Trade in Services, or the job contractor will pay the H–1B at 110 percent of the level of the laid off employee. The other employer will be subject to the section 212(n)(2) penalties for violating its attestation. This provision is designed to make sure that employers do not evade the no-layoff provision by simply firing American workers and replacing them with H–1Bs who are technically employees of job contractors. Some businesses may likely refuse to sign such an attestation with potentially severe legal consequences for noncompliance just for the privilege of doing business with a job contractor. It is for this reason that the additional attestation is only required with an H–1B

181

dependent job contractor, where the provision, in this limited form, is necessary to prevent wholesale abuse.

Under current regulations, a safe harbor (i.e., protection from liability) exists for prevailing wage determinations made by a State Employment Security Agency:

> In all situations where the employer obtains the prevailing wage determination from the SESA, the Department will accept that prevailing wage determination as correct and will not question its validity where the employer has maintained a copy of the SESA prevailing wage determination. A complaint alleging inaccuracy of a SESA prevailing wage determination, in such cases, will not be investigated.[107]

If a complaint is filed and the employer has relied upon a non-SESA source to determine the prevailing wage, the Labor Department may find that an incorrect determination was made and that penalties and back wages may be assessed against the employer.[108] Given the long delays sometimes associated with obtaining SESA determinations and the high quality of many alternative sources of prevailing wage data, the Committee finds it appropriate to enlarge the current safe harbor. Section 806 provides that if the Secretary of Labor does not issue a written rejection of an alternate source prevailing wage determination submitted by an employer within 45 days, then that wage shall be deemed to satisfy the requirement of section 212(n)(1)(A)(i)(II) of the Immigration and Nationality Act. The safe harbor will have an effect identical to that of the quoted language above.

Similarly, the bill provides protection from liability for employers in determining the actual wage paid to workers similarly employed as the H–1B alien. Certain large employers who have regularized compensation systems certified by the Secretary of Labor will be presumed to be paying the actual wage (assuming it is higher than the prevailing wage) to H–1Bs if they pay the H–1Bs in accordance with such systems. This provision allows employers with sophisticated pay systems relief from constructing artificial "actual" wages to the Secretary of Labor's satisfaction for the sake of compliance with the H–1B regulations.

Last, section 806 partially overturns the Department of Labor Board of Alien Labor Certification Appeals' decision in *Hathaway Children's Services.*[109] In *Hathaway,* BALCA ruled that in determining whether a non-profit organization or other entity having "special circumstances" was offering the prevailing wage to a prospective employment-based immigrant (and presumably for H–1Bs), the Department of Labor must look to the wage levels for jobs in the overall job market. *Hathaway* itself reversed BALCA's ruling in *Tuskegee University,*[110] which stated that "it is not only the job titles, but the nature of the business or institution where the jobs are located—for example, public or private, secular or religious, profit or non-profit, multi-national corporation or individual propri-

---

[107] 70 CFR 655.731(a)(2)(iii)(A)(3) (1995).
[108] 20 CFR 655.731(d) (1995).
[109] 91–INA–388 (1994).
[110] 5 Bender's Immigr. L. and Proc. Rep. B3–172 (87–INA–561, 1988).

182

etorship—which must be evaluated in determining whether the jobs are 'substantially comparable'" [111] for purposes of determining the prevailing wage.

Were *Hathaway* to stand, the Committee believes it would have a severely detrimental impact on our research universities and institutions, which must obtain H–1B visas for temporary workers or labor certification for permanent immigrants to place foreign researchers and post-doctoral students in their research labs. University researchers, foreign or American, typically work for much less than industry scale. If universities were required to pay industry-standard wages for these individuals, they would in effect be prevented from utilizing foreign scientific talent. *Hathaway* fails to recognize the intangible benefits that one receives from working at a university rather than in industry. This benefit often makes salary a secondary factor in an employee's decision whether to work in academia. Thus, the bill provides that jobs at universities and scientific research institutions be only compared with jobs at similar entities when determining the prevailing wage.

## Hearings

The Committee's Subcommittee on Immigration and Claims held one day of hearings on H.R. 1915 on June 29, 1995. Testimony was received from 19 witnesses, representing 19 organizations, with additional material submitted by 5 individuals and organizations.

## Committee Consideration

On July 20, 1995, the Subcommittee on Immigration and Claims met in open session and ordered reported the bill H.R. 1915, as amended and as a clean bill, by a voice vote, a quorum being present. The clean bill was introduced on August 4, 1995, as H.R. 2202. On October 24, 1995, the Committee met in open session and ordered reported the bill H.R. 2202 with an amendment by a recorded vote of 23 to 10, a quorum being present.

## Vote of the Committee

*Voice votes*

Sixty-four amendments were adopted by a voice vote. These were: (1) An amendment by Mr. Smith of Texas to extend the effective date for new border crossing card requirements; (2) an amendment by Mr. Canady to provide specific penalties for making false claims of citizenship when registering to vote or voting; (3A) an amendment by Mr. Goodlatte to strike section 212(i) of the Immigration and Nationality Act, thus eliminating waivers of exclusion for aliens who have previously committed misrepresentations to immigration officials; (3B) an amendment by Mr. Berman to restore a modified version of the waiver under section 212(i) of the INA; (4) an amendment by Mr. Berman to provide an exception for aliens with work authorization and an exception for aliens under family unity protection to the 10 year bar on admission for aliens residing illegally in the United States for greater than 1 year; (5) an amendment by Mr. Smith of Texas to extend expedited removal

---

[111] Id. at B3–176.

183

procedures to aliens interdicted at sea and brought to the United States; (6) an amendment by Mr. Smith of Texas to preclude any private right of action arising out of mandates imposed on government officials under section 305; (7) an amendment by Mr. Smith of Texas to specify procedures for the detention and removal of stowaways; (8) an amendment by Mr. Smith of Texas to provide that a stowaway's application for asylum shall be considered under procedures for expedited removal; (9) an amendment by Mr. Bryant of Tennessee to the definition of a stowaway; (10) an amendment by Mr. Bryant of Tennessee to strike increased penalties on airlines; (11) an amendment by Mr. McCollum to the definition of immigration judge and to specify compensation for immigration judges; (12) an amendment by Mr. Gallegly to strike amended requirements regarding transit without visa aliens; (13) an amendment by Mr. Gallegly to extend federal reimbursement of state expenses for incarceration to cases involving aliens with two or more misdemeanor convictions, and to include certain pre-trial detention; (14) an amendment by Mr. Smith of Texas to exempt alien women and children who have been battered or subject to extreme cruelty from being inadmissible to the United States on the ground that they are present without being lawfully admitted; (15) an amendment by Mrs. Schroeder to protect the confidentiality of claims for relief by a person who has been battered or subject to extreme cruelty, and to prevent the use of information provided solely by an abusive spouse or family member to make a determination of admissibility or deportability; (16) an amendment by Mr. Goodlatte to state that a returning lawful permanent resident shall be regarded as applying for admission if the alien attempts to enter the United States at a time or place other than as designated by an immigration officer or has not been admitted after inspection and authorization by an immigration officer; (17) an amendment by Mr. Goodlatte to state that, for purposes of the 10-year exclusion for aliens who have been unlawfully present for more than one year, no time in which an alien is under the age of 18 (original text specified age 21) shall be taken into account in determining the period of unlawful presence; (18) an amendment by Mr. Gallegly to provide that prisoner transfer treaties shall allow the Federal Government and States to keep original prison sentences in force in the event that transferred prisoners return to the United States prior to the completion of their prison terms; to provide that independent verification shall include the length of time a transferred alien is actually incarcerated in the foreign country; and to require that upon the request of a governor, the INS shall assist State courts in identifying aliens unlawfully present in the United States pending criminal prosecution; (19) an amendment by Mr. Frank to provide for judicial review of a determination that an alien is a representative of a terrorist organization; (20) an amendment by Mr. Berman to strike the requirement that an alien have been lawfully admitted to the United States to be eligible for cancellation of removal; to provide, for purposes of meeting the seven-year continuous physical presence requirement for cancellation of removal, that an alien who has departed the United States for 180 days shall not be considered to have broken continuous physical presence if the Attorney General finds that return could not be accomplished due

184

to emergent reasons; to provide that the provisions regarding calculation of continuous physical presence shall apply only to notices to appear for a deportation or removal proceeding filed after the date of enactment; and to limit to 4,000 in each year the number of aliens granted cancellation of removal; (21) an amendment by Mr. Hyde to provide that the amendments reducing the number of documents that may be presented by employees to establish identity and eligibility for employment shall take effect on a date designated by the Attorney General not later than 18 months after the date of enactment; (22) an amendment offered by Mr. Goodlatte to exempt from civil or criminal liability the action of any person taken in good faith reliance on information provided through the employment eligibility confirmation mechanism; (23) an amendment by Mr. Barr, with a perfecting amendment by Mr. Goodlatte, to state that the confirmation mechanism shall confirm whether an individual has presented a social security account number or an alien identification number that is not valid for employment; (24) an amendment by Mr. Goodlatte to change from 2 days to 3 days after date of employment the period within which an employer must make an inquiry into the confirmation mechanism; (25) an en bloc amendment by Mr. Goodlatte to make a conforming change to require that the employer inquire into the confirmation mechanism within 3 days of employment; to provide that operation of the confirmation mechanism may be carried out by a nongovernmental entity designated by the Attorney General; to require that the confirmation mechanism be designed to maximize reliability and ease of use, to respond to all inquiries and to register when such response is not possible; to provide that if an employer attempts to make an inquiry within the required 3 days of employment and the confirmation mechanism has registered that not all inquiries were responded to during that time, the employer can meet requirements for making such inquiries and qualify for the defense from liability extended to those who use the confirmation mechanism, if the employer makes the inquiry on the first subsequent working day in which the confirmation mechanism registers no nonresponses; to provide that the confirmation mechanism shall provide a confirmation or tentative nonconfirmation of an individual's employment eligibility within 3 days of the initial inquiry and that in the case of a tentative nonconfirmation, the Attorney General, in consultation with the Commissioner of Social Security and the Commissioner of the INS, shall provide an expedited time period, not more than 10 days, within which final confirmation or nonconfirmation must be provided; to require that within 180 days of enactment, the Attorney General shall issue regulations providing for the electronic storage of I–9 forms; to conform to current law the bill's references to "hiring" and "employment" by adding references to recruitment and referral for employment; (26) an amendment by Mr. Hoke, with an amendment by Mr. Becerra and a perfecting amendment by Mr. Hyde, to implement the confirmation mechanism as a series of pilot projects in 5 of the 7 States with the highest estimated population of unauthorized aliens, to terminate not later than October 1, 1999, and to require the Attorney General to submit annual reports on the pilot projects which may include analysis of whether the mechanism is reliable and

185

easy to use, limits job losses due to inaccurate data, increases or decreases discrimination, protects individual privacy, and burdens employers; (27) an amendment by Mr. Goodlatte to state that an employer's request for more or different documents than are required under section 274A(b) of the INA shall constitute an unfair immigration-related employment practice if done for the purpose of discriminating; (28) an amendment by Mr. Hyde to create a new second employment-based immigration preference for outstanding professors and researchers and multinational executives and managers; (29) an amendment by Mr. Hyde to provide a waiver from the requirement for labor certification for certain aliens who are members of the professions holding advanced degrees or aliens of exceptional ability if such waiver is necessary to advance the national interest in one of several specific areas; (30) an amendment by Mr. Hyde to strike the requirement that at least 50 percent of an immigrant's sons and daughters are lawful permanent residents or citizens residing in the United States in order for the immigrant to be admitted as the parent of a United States citizen; (31) an amendment by Mr. Gekas, with an amendment by Mr. Smith of Texas which was adopted on a roll call vote, to create a category for the admission as immigrants of the adult sons and daughters of United States citizens and lawful permanent residents if such immigrants are under age 26, never-married, childless, and considered as dependents for Federal income tax purposes, and to set numerical limits for the admission of such immigrants; (32) an amendment by Mr. Gekas, with an amendment by Mr. Smith of Texas which was adopted on a roll call vote, to change the experience requirements for immigrants admitted as professionals and skilled workers; an amendment by Ms. Lofgren to provide a waiver of the 10-year exclusion for aliens unlawfully present if the Attorney General determined that such waiver is necessary to substantially benefit the national interest in one of several specified areas; (33) an amendment by Mr. Gallegly to provide that work experience obtained while an alien is unauthorized to work in the United States shall not count to meet the experience requirements for immigrants admitted as professionals and skilled workers; (34) an amendment by Mr. Smith of Texas to provide for the admission as immigrants of certain adult disabled children of United States nationals and lawful permanent residents; (35) an amendment by Mr. Hyde to extend refugee protection to aliens who have resisted implementation of coercive population control measures; (36) an amendment by Mr. Smith of Texas to establish that not less than 25,000 immigrant visas will be available for the parents of United States citizens; (37) an amendment by Mr. McCollum to strike provisions for the adjustment of visa numbers for professionals and skilled workers to offset excess family admissions; (38) an amendment by Mr. McCollum to change deadlines for the filing of asylum applications, and to make other reforms to the asylum process, with an amendment by Mr. Frank adopted by a roll call vote to the provision for return of an alien to a safe third country; (39) an amendment by Mr. Schiff, with a substitute amendment by Mr. Hyde, to establish deadlines for the refugee consultation process; (40) an amendment by Mr. Bryant of Tennessee to permit the use of parole authority for the prosecution of aliens in U.S. courts; (41)

186

an en bloc amendment by Mr. Smith of Texas to exempt family vio-
lence services from the prohibition on receipt of public benefits by
illegal aliens and to, in the case of an alien battered or subject to
extreme cruelty by a spouse or parent (or, under certain conditions,
another family member residing in the household); exempt the
alien from the prohibition on receipt of public benefits if the alien
has applied for a change in immigration status within 45 days of
the first application for such public benefits; lengthen to 48 months
the period of receipt of public benefits which would render the alien
deportable as a public charge; modify the rules for attribution of a
sponsor's income to the alien; exempt the alien from the require-
ment that public benefits paid to the alien be reimbursed prior to
naturalization of the alien in the event that the battery or cruelty
resulted in issuance of a judicial or administrative order and the
need for the public benefits had a substantial nexus to the battery
or cruelty; (42) an amendment by Mr. Smith of Texas to exempt
school lunch and child nutrition benefits from the prohibition on re-
ceipt of public benefits by illegal aliens; (43) an amendment by Mr.
Smith of Texas to provide that active-duty military personnel, in
order to qualify as sponsors, must maintain an income at 100 per-
cent of the poverty level; (44) an amendment by Mr. Smith of Texas
to remove social services block grants from the list of public bene-
fits receipt of which can be used to establish that an alien is a pub-
lic charge; (45) an en bloc amendment by Mr. Smith of Texas to
provisions regarding the protection of American workers from dis-
placement through the H–1B nonimmigrant program, and other
conforming changes; (46) an amendment by Mrs. Schroeder to re-
quire notification to arriving aliens from certain countries regard-
ing female genital mutilation; (47) an amendment by Mr. McCol-
lum offered to require immigrants to submit proof of vaccination
against specified diseases; (48) an amendment by Mr. Gallegly to
provide that reimbursement to hospitals for emergency medical
services may be made for such services provided through a contract
with another hospital or facility; (49) an amendment by Mr.
Gallegly to require that the pilot project for linking vital statistics
records in certain States be implemented within two years of the
date of enactment; (50) an amendment by Mr. Gallegly to require
verification of student eligibility for post-secondary federal student
financial assistance; (51) an amendment by Mr. Gallegly, with an
amendment by Mr. Hyde, regarding communication between State
and local government agencies and the INS; (52) an amendment by
Mr. Smith of Texas to exempt from limitations on adjustment of
status an alien who has reasonable grounds to fear that he or she
will be subject to battery or extreme cruelty if he or she departs
from the United States; (53) an amendment by Mr. Reed to require
that prior to the construction of new detention facilities for aliens,
that the Commissioner of the INS consider the availability for pur-
chase or lease of existing facilities; (54) an amendment by Ms.
Lofgren to provide that an alien whose status is changed under sec-
tion 248 of the INA may obtain a visa without departing from the
United States; (55) an amendment by Mr. Nadler to provide that
an illegal alien may receive emergency relief not limited to disaster
relief; (56) an amendment by Mr. Reed to designate Portugal as a
country eligible for the visa waiver pilot program; (57) an amend-

187

ment by Mr. Berman to strike the limitation on adjustment of status under section 245(i) of the INA and increase the charge for adjustment of status to $2,500; (58) an amendment by Mr. Becerra, with an amendment by Mr. Smith of Texas adopted by a voice vote, to provide reimbursement, subject to available appropriations, of fees paid by petitioners for eliminated family-sponsored categories; (59) an amendment by Mr. Berman regarding the confidentiality of the files of legalization applicants; (60) an en bloc amendment by Mr. Goodlatte to amend requirements on the hiring of H–1B nonimmigrants by removing the expanded 30-day period to approve a labor condition application for an H–1B-dependent employer; increasing the penalties for not fulfilling H–1B attestations; clarifying that firing an employee for poor performance does not violate the no-layoff provisions; establishing criteria for the determination of prevailing wages; and making other changes; (61) an amendment by Mr. Berman to extend civil penalties for document fraud to unauthorized preparers of forms, petitions, or applications; (62) an amendment by Mr. Frank to allow relief under the Federal Tort Claims Act for persons wrongly denied employment through operation of the employment eligibility verification mechanism; (63) an amendment by Mr. Berman to permit execution of an affidavit of support for an immigrant by an individual who will accept joint and several liability with the petitioner for the immigrant; (64) an amendment by Mr. Frank to establish criteria under which an employer may request additional employment eligibility documents from an employee.

*Recorded votes*

There were forty recorded votes (thirty-nine on amendments and one on final passage) during the Committee's consideration of H.R. 2202, as follows:

1. Amendment offered by Mr. Watt to strike the provisions regarding construction of fencing in the border area near San Diego. Defeated 11–17.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mrs. Schroeder | Mr. Moorhead |
| Mr. Berman | Mr. Sensenbrenner |
| Mr. Reed | Mr. Coble |
| Mr. Nadler | Mr. Smith (TX) |
| Mr. Scott | Mr. Schiff |
| Mr. Watt | Mr. Gallegly |
| Mr. Becerra | Mr. Canady |
| Mr. Serrano | Mr. Inglis |
| Ms. Lofgren | Mr. Goodlatte |
| Ms. Jackson Lee | Mr. Hoke |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Barr |
| | Mr. Bryant (TX) |

2. Amendment offered by Mr. Becerra to strike the 10-year re-admission bar for aliens who have been present unlawfully in the U.S. for more than one year. Defeated 13–19.

| AYES | NAYS |
|------|------|
| Mr. Conyers | Mr. Hyde |
| Mrs. Schroeder | Mr. Moorhead |
| Mr. Berman | Mr. Sensenbrenner |
| Mr. Boucher | Mr. McCollum |
| Mr. Bryant (TX) | Mr. Coble |
| Mr. Reed | Mr. Smith (TX) |
| Mr. Nadler | Mr. Schiff |
| Mr. Scott | Mr. Gallegly |
| Mr. Watt | Mr. Canady |
| Mr. Becerra | Mr. Inglis |
| Mr. Serrano | Mr. Goodlatte |
| Ms. Lofgren | Mr. Buyer |
| Ms. Jackson Lee | Mr. Hoke |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |

3. Amendment offered by Mr. Goodlatte to permanently exclude aliens from readmission into the U.S. if convicted of an aggravated felony. Adopted 14–8.[112]

| AYES | NAYS |
|------|------|
| Mr. Hyde | Mr. Bono |
| Mr. Moorhead | Mr. Conyers |
| Mr. Sensenbrenner | Mrs. Schroeder |
| Mr. McCollum | Mr. Frank |
| Mr. Coble | Mr. Berman |
| Mr. Smith (TX) | Mr. Nadler |
| Mr. Schiff | Mr. Scott |
| Mr. Gallegly | Mr. Watt |
| Mr. Canady | |
| Mr. Goodlatte | |
| Mr. Heineman | |
| Mr. Bryant (TN) | |
| Mr. Chabot | |
| Mr. Reed | |

4. Amendment offered by Mr. Watt to strike the provisions regarding the introduction of electronic surveillance information in special proceedings to remove an alien terrorist from the U.S. Defeated 10–16.[113]

| AYES | NAYS |
|------|------|
| Mr. Bono | Mr. Hyde |
| Mr. Conyers | Mr. Sensenbrenner |

---

[112] Ms. Jackson Lee stated for record that, had she been present, she would have voted "nay" on this amendment.

[113] Ms. Jackson Lee stated for record that, had she been present, she would have voted "aye" on this amendment.

FRP-FRN-00859

189

| | |
|---|---|
| Mrs. Schroeder | Mr. McCollum |
| Mr. Frank | Mr. Gekas |
| Mr. Berman | Mr. Coble |
| Mr. Nadler | Mr. Smith (TX) |
| Mr. Scott | Mr. Schiff |
| Mr. Watt | Mr. Gallegly |
| Mr. Serrano | Mr. Canady |
| Ms. Lofgren | Mr. Inglis |
| | Mr. Goodlatte |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Boucher |
| | Mr. Reed |

5. Amendment offered by Mr. Nadler to limit the introduction of classified information in special proceedings for the removal of alien terrorists. Defeated 11–18.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mr. Frank | Mr. Moorhead |
| Mr. Berman | Mr. McCollum |
| Mr. Reed | Mr. Coble |
| Mr. Nadler | Mr. Smith (TX) |
| Mr. Scott | Mr. Gallegly |
| Mr. Watt | Mr. Canady |
| Mr. Becerra | Mr. Inglis |
| Mr. Serrano | Mr. Buyer |
| Ms. Lofgren | Mr. Hoke |
| Ms. Jackson Lee | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |
| | Mrs. Schroeder |
| | Mr. Schumer |

6. Amendment offered by Mr. Watt to require judicial review of an order to exclude an alien under procedures for expedited removal, including review of an asylum officer's determination that an inadmissible alien does not have a credible fear of persecution. Defeated 9–15.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mr. Frank | Mr. McCollum |
| Mr. Berman | Mr. Coble |
| Mr. Reed | Mr. Smith (TX) |
| Mr. Scott | Mr. Gallegly |
| Mr. Watt | Mr. Inglis |
| Mr. Becerra | Mr. Buyer |
| Ms. Lofgren | Mr. Hoke |
| Ms. Jackson Lee | Mr. Bono |
| | Mr. Heineman |

190

Mr. Chabot
Mr. Flanagan
Mr. Barr
Mr. Schumer
Mr. Bryant (TX)

7. Amendment offered by Mr. Chabot to strike provisions for an employment eligibility verification system. Defeated 15–17.[114]

| AYES | NAYS |
|---|---|
| Mr. Sensenbrenner | Mr. Hyde |
| Mr. Inglis | Mr. Moorhead |
| Mr. Buyer | Mr. McCollum |
| Mr. Hoke | Mr. Gekas |
| Mr. Heineman | Mr. Coble |
| Mr. Chabot | Mr. Smith (TX) |
| Mr. Flanagan | Mr. Schiff |
| Mr. Conyers | Mr. Gallegly |
| Mrs. Schroeder | Mr. Canady |
| Mr. Reed | Mr. Goodlatte |
| Mr. Nadler | Mr. Bono |
| Mr. Watt | Mr. Bryant (TN) |
| Mr. Becerra | Mr. Barr |
| Mr. Serrano | Mr. Frank |
| Ms. Lofgren | Mr. Schumer |
| | Mr. Berman |
| | Mr. Bryant (TX) |

8. Amendment offered by Mr. Berman to expand enforcement authority and penalties against labor standards violations. Defeated 13–18.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mrs. Schroeder | Mr. Moorhead |
| Mr. Frank | Mr. Sensenbrenner |
| Mr. Berman | Mr. McCollum |
| Mr. Boucher | Mr. Gekas |
| Mr. Bryant (TX) | Mr. Smith (TX) |
| Mr. Reed | Mr. Schiff |
| Mr. Nadler | Mr. Gallegly |
| Mr. Watt | Mr. Canady |
| Mr. Becerra | Mr. Inglis |
| Mr. Serrano | Mr. Goodlatte |
| Ms. Lofgren | Mr. Hoke |
| Ms. Jackson Lee | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |

9. Amendment offered by Mr. Barr to exempt employers of three or less employees from the requirement to verify employment eligi-

---

[114] Ms. Jackson Lee stated for record that, had she been present, she would have voted "aye" on this amendment.

191

bility through the electronic verification mechanism. Adopted 16–13.[115]

| AYES | NAYS |
|---|---|
| Mr. Moorhead | Mr. Hyde |
| Mr. Gekas | Mr. Sensenbrenner |
| Mr. Smith (TX) | Mr. McCollum |
| Mr. Gallegly | Mr. Schiff |
| Mr. Canady | Mr. Goodlatte |
| Mr. Inglis | Mr. Hoke |
| Mr. Bono | Mr. Bryant (TN) |
| Mr. Heineman | Mr. Frank |
| Mr. Flanagan | Mr. Schumer |
| Mr. Barr | Mr. Berman |
| Mr. Conyers | Mr. Watt |
| Mrs. Schroeder | Mr. Becerra |
| Mr. Boucher | Mr. Serrano |
| Mr. Reed | |
| Mr. Nadler | |
| Ms. Jackson Lee | |

10. A perfecting amendment offered by Mr. Berman to remove from the substitute amendment offered by Mr. Smith of Texas to the amendment offered by Mr. Gekas the requirement that, in order to be eligible for an immigrant visa, the adult unmarried sons and daughters be claimed as dependents for Federal Income Tax purposes. Defeated 11–17.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mrs. Schroeder | Mr. Sensenbrenner |
| Mr. Frank | Mr. McCollum |
| Mr. Berman | Mr. Gekas |
| Mr. Nadler | Mr. Coble |
| Mr. Scott | Mr. Smith (TX) |
| Mr. Watt | Mr. Schiff |
| Mr. Becerra | Mr. Gallegly |
| Mr. Serrano | Mr. Canady |
| Ms. Lofgren | Mr. Goodlatte |
| Ms. Jackson Lee | Mr. Buyer |
| | Mr. Hoke |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |

11. A perfecting amendment offered by Mr. Becerra to remove from the substitute amendment offered by Mr. Smith of Texas to the amendment offered by Mr. Gekas the requirement that, in order to be eligible for an immigrant visa, a son or daughter be "never married" and to insert a requirement that the son or daughter be "unmarried." Defeated 11–19.

---

[115] Ms. Lofgren voted "present".

192

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mrs. Schroeder | Mr. Sensenbrenner |
| Mr. Frank | Mr. McCollum |
| Mr. Berman | Mr. Gekas |
| Mr. Nadler | Mr. Coble |
| Mr. Scott | Mr. Smith (TX) |
| Mr. Watt | Mr. Schiff |
| Mr. Becerra | Mr. Gallegly |
| Mr. Serrano | Mr. Canady |
| Ms. Lofgren | Mr. Inglis |
| Ms. Jackson Lee | Mr. Goodlatte |
| | Mr. Buyer |
| | Mr. Hoke |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |
| | Mr. Boucher |

12. A substitute amendment offered by Mr. Smith of Texas to the amendment offered by Mr. Gekas to create a category for the admission of certain adult sons and daughters of citizens and permanent resident aliens. Adopted 17–12.

| AYES | NAYS |
|---|---|
| Mr. Sensenbrenner | Mr. Hyde |
| Mr. McCollum | Mr. Conyers |
| Mr. Gekas | Mrs. Schroeder |
| Mr. Coble | Mr. Frank |
| Mr. Smith (TX) | Mr. Berman |
| Mr. Schiff | Mr. Boucher |
| Mr. Gallegly | Mr. Scott |
| Mr. Canady | Mr. Watt |
| Mr. Inglis | Mr. Becerra |
| Mr. Goodlatte | Mr. Serrano |
| Mr. Buyer | Ms. Lofgren |
| Mr. Hoke | Ms. Jackson Lee |
| Mr. Bono | |
| Mr. Heineman | |
| Mr. Chabot | |
| Mr. Flanagan | |
| Mr. Barr | |

13. A substitute amendment offered by Mr. Smith of Texas to an amendment offered by Mr. Gekas to change the work experience requirements for aliens admitted as professionals or skilled workers. Adopted 17–9.

| AYES | NAYS |
|---|---|
| Mr. Moorhead | Mr. Hyde |
| Mr. McCollum | Mr. Gekas |
| Mr. Coble | Mr. Inglis |
| Mr. Smith (TX) | Mr. Bono |
| Mr. Schiff | Mr. Chabot |

193

| | |
|---|---|
| Mr. Gallegly | Mr. Flanagan |
| Mr. Buyer | Mr. Barr |
| Mr. Hoke | Mr. Frank |
| Mr. Heineman | Ms. Lofgren |
| Mr. Conyers | Mrs. Schroeder |
| Mr. Schumer | |
| Mr. Berman | |
| Mr. Bryant (TX) | |
| Mr. Reed | |
| Mr. Watt | |
| Ms. Jackson Lee | |

14. Amendment offered by Mr. Watt to eliminate the investor visa program. Defeated 8–20.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mr. Frank | Mr. Moorhead |
| Mr. Bryant (TX) | Mr. McCollum |
| Mr. Reed | Mr. Gekas |
| Mr. Scott | Mr. Coble |
| Mr. Watt | Mr. Smith (TX) |
| Mr. Becerra | Mr. Schiff |
| Mr. Serrano | Mr. Gallegly |
| | Mr. Canady |
| | Mr. Inglis |
| | Mr. Goodlatte |
| | Mr. Buyer |
| | Mr. Hoke |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |
| | Mr. Berman |
| | Ms. Lofgren |

15. Amendment offered by Mr. Watt to limit to 2,000 the numbers of visas available for investors. Defeated 10–18.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mr. Frank | Mr. Moorhead |
| Mr. Bryant (TX) | Mr. McCollum |
| Mr. Reed | Mr. Coble |
| Mr. Nadler | Mr. Smith (TX) |
| Mr. Scott | Mr. Schiff |
| Mr. Watt | Mr. Gallegly |
| Mr. Becerra | Mr. Canady |
| Mr. Serrano | Mr. Inglis |
| Ms. Jackson Lee | Mr. Goodlatte |
| | Mr. Buyer |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Chabot |
| | Mr. Flanagan |

194

Mr. Barr
Mr. Berman
Mr. Boucher

16. Amendment offered by Ms. Jackson Lee to extend the asylum filing deadline from 60 to 180 days. Defeated: 9–14.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mrs. Schroeder | Mr. McCollum |
| Mr. Frank | Mr. Gekas |
| Mr. Berman | Mr. Smith (TX) |
| Mr. Boucher | Mr. Gallegly |
| Mr. Nadler | Mr. Canady |
| Mr. Serrano | Mr. Goodlatte |
| Ms. Lofgren | Mr. Buyer |
| Ms. Jackson Lee | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |

17. Amendment offered by Mr. Berman to strike the provisions reforming the legal immigration system (sections 500 through 517). Defeated 14–20.

| AYES | NAYS |
|---|---|
| Mr. Chabot | Mr. Hyde |
| Mr. Conyers | Mr. Moorhead |
| Mrs. Schroeder | Mr. Sensenbrenner |
| Mr. Frank | Mr. McCollum |
| Mr. Schumer | Mr. Gekas |
| Mr. Berman | Mr. Coble |
| Mr. Reed | Mr. Smith (TX) |
| Mr. Nadler | Mr. Gallegly |
| Mr. Scott | Mr. Canady |
| Mr. Watt | Mr. Inglis |
| Mr. Becerra | Mr. Goodlatte |
| Mr. Serrano | Mr. Buyer |
| Ms. Lofgren | Mr. Hoke |
| Ms. Jackson Lee | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Flanagan |
| | Mr. Barr |
| | Mr. Boucher |
| | Mr. Bryant (TX) |

18. Amendment offered by Mr. Frank to the amendment offered by McCollum to section 526 [now section 531] regarding the eligibility of aliens to apply for asylum. Adopted 18–11.

| AYES | NAYS |
|---|---|
| Mr. Hyde | Mr. Sensenbrenner |
| Mr. Moorhead | Mr. McCollum |
| Mr. Schiff | Mr. Coble |

195

| | |
|---|---|
| Mr. Canady | Mr. Smith (TX) |
| Mr. Bono | Mr. Gallegly |
| Mr. Flanagan | Mr. Inglis |
| Mr. Conyers | Mr. Goodlatte |
| Mrs. Schroeder | Mr. Buyer |
| Mr. Frank | Mr. Heineman |
| Mr. Schumer | Mr. Bryant (TN) |
| Mr. Berman | Mr. Chabot |
| Mr. Boucher | |
| Mr. Reed | |
| Mr. Scott | |
| Mr. Watt | |
| Mr. Serrano | |
| Ms. Lofgren | |
| Ms. Jackson Lee | |

19. Perfecting amendment offered by Mr. Schiff to the substitute amendment offered by Mr. Hyde to the amendment offered by Mr. Schiff concerning the refugee consultation process, to permit the establishment of a higher refugee ceiling through the consultation process. Defeated 15–16.[116]

| AYES | NAYS |
|---|---|
| Mr. Schiff | Mr. Hyde |
| Mr. Hoke | Mr. Moorhead |
| Mr. Chabot | Mr. Sensenbrenner |
| Mr. Flanagan | Mr. McCollum |
| Mr. Conyers | Mr. Smith (TX) |
| Mrs. Schroeder | Mr. Gallegly |
| Mr. Frank | Mr. Canady |
| Mr. Schumer | Mr. Inglis |
| Mr. Berman | Mr. Goodlatte |
| Mr. Reed | Mr. Buyer |
| Mr. Nadler | Mr. Bono |
| Mr. Scott | Mr. Heineman |
| Mr. Watt | Mr. Bryant (TN) |
| Mr. Becerra | Mr. Barr |
| Ms. Lofgren | Mr. Boucher |
| | Mr. Bryant (TX) |

21. Amendment offered by Ms. Jackson Lee eliminating the cap on immediate relatives, restoring parents of citizens to the category of immediate relatives, and eliminating borrowing from employment based visas for family admissions. Defeated 16–16.

| AYES | NAYS |
|---|---|
| Mr. Chabot | Mr. Hyde |
| Mr. Flanagan | Mr. Moorhead |
| Mr. Conyers | Mr. Sensenbrenner |
| Mrs. Schroeder | Mr. McCollum |
| Mr. Frank | Mr. Coble |
| Mr. Schumer | Mr. Smith (TX) |
| Mr. Berman | Mr. Schiff |
| Mr. Boucher | Mr. Canady |

---

[116] Ms. Jackson Lee stated for the record that, had she been present, she would have voted "aye" on this amendment.

196

| | |
|---|---|
| Mr. Reed | Mr. Inglis |
| Mr. Nadler | Mr. Goodlatte |
| Mr. Scott | Mr. Buyer |
| Mr. Watt | Mr. Hoke |
| Mr. Becerra | Mr. Bono |
| Mr. Serrano | Mr. Heineman |
| Ms. Lofgren | Mr. Bryant (TN) |
| Ms. Jackson Lee | Mr. Bryant TX) |

20. Amendment offered by Mr. Berman regarding the admission of the spouses and children of aliens admitted as employment-based immigrants. Defeated 13–18.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mrs. Schroeder | Mr. Moorhead |
| Mr. Frank | Mr. Sensenbrenner |
| Mr. Berman | Mr. McCollum |
| Mr. Boucher | Mr. Smith (TX) |
| Mr. Bryant (TX) | Mr. Schiff |
| Mr. Reed | Mr. Canady |
| Mr. Nadler | Mr. Inglis |
| Mr. Scott | Mr. Goodlatte |
| Mr. Watt | Mr. Buyer |
| Mr. Becerra | Mr. Hoke |
| Mr. Serrano | Mr. Bono |
| Ms. Jackson Lee | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |
| | Ms. Lofgren |

21. Amendment offered by Ms. Jackson Lee eliminating the cap on immediate relatives, restoring parents of citizens to the category of immediate relatives, and eliminating borrowing from employment based visas for family admissions. Defeated 16–16.

| AYES | NAYS |
|---|---|
| Mr. Chabot | Mr. Hyde |
| Mr. Flanagan | Mr. Moorhead |
| Mr. Conyers | Mr. Sensenbrenner |
| Mrs. Schroeder | Mr. McCollum |
| Mr. Frank | Mr. Coble |
| Mr. Schumer | Mr. Smith (TX) |
| Mr. Berman | Mr. Schiff |
| Mr. Boucher | Mr. Canady |
| Mr. Reed | Mr. Inglis |
| Mr. Nadler | Mr. Goodlatte |
| Mr. Scott | Mr. Buyer |
| Mr. Watt | Mr. Hoke |
| Mr. Becerra | Mr. Bono |
| Mr. Serrano | Mr. Heineman |
| Ms. Lofgren | Mr. Bryant (TN) |
| Ms. Jackson Lee | Mr. Bryant (TX) |

197

22. Amendment offered by Mr. Schiff to permit an increase in the limit on refugee admissions through the refugee consultation process. Defeated 14–16.[117]

| AYES | NAYS |
|------|------|
| Mr. Schiff | Mr. Hyde |
| Mr. Hoke | Mr. Moorhead |
| Mr. Chabot | Mr. Sensenbrenner |
| Mrs. Schroeder | Mr. McCollum |
| Mr. Frank | Mr. Gekas |
| Mr. Schumer | Mr. Smith (TX) |
| Mr. Berman | Mr. Gallegly |
| Mr. Boucher | Mr. Canady |
| Mr. Reed | Mr. Inglis |
| Mr. Nadler | Mr. Goodlatte |
| Mr. Scott | Mr. Buyer |
| Mr. Watt | Mr. Bono |
| Mr. Serrano | Mr. Heineman |
| Ms. Lofgren | Mr. Bryant (TN) |
| | Mr. Barr |
| | Mr. Bryant (TX) |

23. Amendment offered by Mr. Nadler providing that the "public charge" ground for deportability would not apply in the case of a refugee or asylee. Defeated 7–14.[118]

| AYES | NAYS |
|------|------|
| Mr. Conyers | Mr. Hyde |
| Mr. Berman | Mr. Moorhead |
| Mr. Nadler | Mr. Sensenbrenner |
| Mr. Scott | Mr. Smith (TX) |
| Mr. Watt | Mr. Canady |
| Mr. Becerra | Mr. Goodlatte |
| Ms. Lofgren | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |
| | Mr. Bryant (TX) |
| | Mr. Reed |

24. Amendment offered by Mr. Bryant of TN requiring hospitals to provide that hospitals seeking federal reimbursement for the emergency treatment of illegal aliens shall promptly provide the INS with identifying information regarding the illegal alien. Defeated 11–15.[119]

| AYES | NAYS |
|------|------|
| Mr. McCollum | Mr. Hyde |
| Mr. Smith (TX) | Mr. Moorhead |
| Mr. Inglis | Mr. Sensenbrenner |

[117]Ms. Jackson Lee stated for the record that, had she been present, she would have voted "aye" on this amendment.
[118]Ms. Jackson Lee stated for the record that, had she been present, she would have voted "aye" on this amendment.
[119]Ms. Jackson Lee stated for the record that, had she been present, she would have voted "nay" on this amendment.

198

| | |
|---|---|
| Mr. Buyer | Mr. Goodlatte |
| Mr. Hoke | Mr. Conyers |
| Mr. Bono | Mrs. Schroeder |
| Mr. Heineman | Mr. Schumer |
| Mr. Bryant (TN) | Mr. Berman |
| Mr. Chabot | Mr. Boucher |
| Mr. Flanagan | Mr. Bryant (TX) |
| Mr. Barr | Mr. Reed |
| | Mr. Nadler |
| | Mr. Watt |
| | Mr. Becerra |
| | Ms. Lofgren |

25. Amendment offered by Mr. Moorhead providing that for purposes of computing prevailing wages in the H–1B program for non-profit independent research organizations, the calculation shall take into account only employees at similar institutions and entities. Adopted 21–10.

| AYES | NAYS |
|---|---|
| Mr. Hyde | Mr. Conyers |
| Mr. Moorhead | Mr. Frank |
| Mr. Sensenbrenner | Mr. Schumer |
| Mr. McCollum | Mr. Berman |
| Mr. Coble | Mr. Boucher |
| Mr. Smith (TX) | Mr. Bryant (TX) |
| Mr. Schiff | Mr. Reed |
| Mr. Gallegly | Mr. Nadler |
| Mr. Canady | Mr. Becerra |
| Mr. Inglis | Ms. Jackson Lee |
| Mr. Goodlatte | |
| Mr. Buyer | |
| Mr. Hoke | |
| Mr. Bono | |
| Mr. Heineman | |
| Mr. Bryant (TN) | |
| Mr. Chabot | |
| Mr. Flanagan | |
| Mr. Barr | |
| Mrs. Schroeder | |
| Ms. Lofgren | |

26. Amendment offered by Mr. Schumer limiting to 20 percent the number of H–1B immigrants that may be employed in any single employer's workforce. Defeated 8–18–1.[120]

| AYES | NAYS |
|---|---|
| Mrs. Schroeder | Mr. Hyde |
| Mr. Frank | Mr. Moorhead |
| Mr. Schumer | Mr. Sensenbrenner |
| Mr. Berman | Mr. Smith (TX) |
| Mr. Bryant (TX) | Mr. Gallegly |
| Mr. Reed | Mr. Canady |
| Mr. Nadler | Mr. Inglis |

---

[120] Mr. Becerra voted "present".

199

Mr. Watt

Mr. Goodlatte
Mr. Buyer
Mr. Hoke
Mr. Bono
Mr. Heineman
Mr. Bryant (TN)
Mr. Chabot
Mr. Flanagan
Mr. Barr
Mr. Serrano
Ms. Lofgren

27. An en bloc amendment offered by Ms. Lofgren to change the limitations in section 212(e) on the ability of participants in the Exchange Visitor Visa Program to apply for an immigrant visa. Defeated 10–15.

| AYES | NAYS |
|---|---|
| Mr. Goodlatte | Mr. Hyde |
| Mr. Conyers | Mr. Moorhead |
| Mr. Frank | Mr. McCollum |
| Mr. Berman | Mr. Gekas |
| Mr. Bryant (TX) | Mr. Coble |
| Mr. Reed | Mr. Smith (TX) |
| Mr. Watt | Mr. Gallegly |
| Mr. Becerra | Mr. Canady |
| Ms. Lofgren | Mr. Inglis |
| Ms. Jackson Lee | Mr. Hoke |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Chabot |
| | Mr. Flanagan |
| | Mr. Barr |

28. Amendment offered by Mr. Goodlatte to the amendment offered by Mr. Schumer to restore the diversity immigrant program, to limit the foreign states whose nationals would be eligible for the program. Defeated 14–15.

| AYES | NAYS |
|---|---|
| Mr. Moorhead | Mr. Hyde |
| Mr. Sensenbrenner | Mr. McCollum |
| Mr. Smith (TX) | Mr. Hoke |
| Mr. Canady | Mr. Bono |
| Mr. Inglis | Mr. Chabot |
| Mr. Goodlatte | Mr. Flanagan |
| Mr. Buyer | Mr. Conyers |
| Mr. Heineman | Mrs. Schroeder |
| Mr. Bryant (TN) | Mr. Frank |
| Mr. Barr | Mr. Schumer |
| Mr. Bryant (TX) | Mr. Berman |
| Mr. Watt | Mr. Boucher |
| Mr. Becerra | Mr. Reed |
| Ms. Lofgren | Mr. Nadler |
| | Ms. Jackson Lee |

200

29. Amendment offered by Mr. Schumer, as amended by an amendment offered by Mr. Becerra and adopted by unanimous consent, to establish a diversity immigration program. Adopted 18–11.

| AYES | NAYS |
|------|------|
| Mr. Hyde | Mr. Moorhead |
| Mr. McCollum | Mr. Sensenbrenner |
| Mr. Hoke | Mr. Gekas |
| Mr. Bono | Mr. Smith (TX) |
| Mr. Bryant (TN) | Mr. Gallegly |
| Mr. Flanagan | Mr. Canady |
| Mr. Barr | Mr. Inglis |
| Mr. Conyers | Mr. Goodlatte |
| Mr. Frank | Mr. Buyer |
| Mr. Schumer | Mr. Heineman |
| Mr. Berman | Mr. Bryant (TX) |
| Mr. Boucher | |
| Mr. Reed | |
| Mr. Nadler | |
| Mr. Watt | |
| Mr. Becerra | |
| Ms. Lofgren | |
| Ms. Jackson Lee | |

30. Amendment offered by Mr. Becerra to limit actions that may be taken by an employer pending completion of the secondary verification process. Defeated 12–18.

| AYES | NAYS |
|------|------|
| Mr. Conyers | Mr. Hyde |
| Mrs. Schroeder | Mr. Moorhead |
| Mr. Frank | Mr. Sensenbrenner |
| Mr. Berman | Mr. McCollum |
| Mr. Boucher | Mr. Gekas |
| Mr. Bryant (TX) | Mr. Coble |
| Mr. Reed | Mr. Smith (TX) |
| Mr. Nadler | Mr. Schiff |
| Mr. Watt | Mr. Gallegly |
| Mr. Becerra | Mr. Canady |
| Ms. Lofgren | Mr. Inglis |
| Ms. Jackson Lee | Mr. Goodlatte |
| | Mr. Buyer |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Barr |

31. Amendment offered by Mr. Goodlatte to change the percentage threshold for H–1B dependent employers and to provide a transitional program for certain H–1B dependent employers to become H–1B non-dependent employers. Adopted 22–11.

| AYES | NAYS |
|------|------|
| Mr. Hyde | Mr. Conyers |
| Mr. Moorhead | Mr. Frank |

201

| | |
|---|---|
| Mr. Sensenbrenner | Mr. Schumer |
| Mr. McCollum | Mr. Berman |
| Mr. Gekas | Mr. Boucher |
| Mr. Coble | Mr. Bryant (TX) |
| Mr. Smith (TX) | Mr. Reed |
| Mr. Schiff | Mr. Nadler |
| Mr. Gallegly | Mr. Watt |
| Mr. Canady | Mr. Becerra |
| Mr. Inglis | Ms. Jackson Lee |
| Mr. Goodlatte | |
| Mr. Buyer | |
| Mr. Hoke | |
| Mr. Bono | |
| Mr. Heineman | |
| Mr. Bryant (TN) | |
| Mr. Chabot | |
| Mr. Flanagan | |
| Mr. Barr | |
| Mrs. Schroeder | |
| Ms. Lofgren | |

32. A perfecting amendment offered by Mr. Smith of Texas to an amendment offered by Mr. Becerra Amendment regarding reimbursement of fees to petitioners for immigrants in the eliminated family-sponsored categories. Adopted 18–13.

| AYES | NAYS |
|---|---|
| Mr. Hyde | Mr. Heineman |
| Mr. Moorhead | Mr. Flanagan |
| Mr. Sensenbrenner | Mr. Conyers |
| Mr. McCollum | Mrs. Schroeder |
| Mr. Gekas | Mr. Schumer |
| Mr. Coble | Mr. Berman |
| Mr. Smith (TX) | Mr. Boucher |
| Mr. Gallegly | Mr. Reed |
| Mr. Canady | Mr. Nadler |
| Mr. Inglis | Mr. Watt |
| Mr. Goodlatte | Mr. Becerra |
| Mr. Buyer | Ms. Lofgren |
| Mr. Hoke | Ms. Jackson Lee |
| Mr. Bono | |
| Mr. Bryant (TN) | |
| Mr. Chabot | |
| Mr. Barr | |
| Mr. Bryant (TX) | |

33. Amendment offered by Mr. Reed excluding from entry persons who renounce U.S. citizenship to avoid paying taxes. Adopted 25–5.

| AYES | NAYS |
|---|---|
| Mr. Hyde | Mr. Moorhead |
| Mr. Sensenbrenner | Mr. McCollum |
| Mr. Schiff | Mr. Gekas |
| Mr. Gallegly | Mr. Coble |
| Mr. Canady | Mr. Smith (TX) |

202

Mr. Inglis
Mr. Goodlatte
Mr. Buyer
Mr. Bono
Mr. Heineman
Mr. Bryant (TN)
Mr. Chabot
Mr. Flanagan
Mr. Barr
Mr. Conyers
Mrs. Schroeder
Mr. Schumer
Mr. Berman
Mr. Bryant (TX)
Mr. Reed
Mr. Nadler
Mr. Watt
Mr. Becerra
Ms. Lofgren
Ms. Jackson Lee

34. Amendment offered by Mr. Gallegly providing that payments of public assistance benefits only be made to individuals who are personally eligible to receive such benefits. Adopted 16–11.

| AYES | NAYS |
|---|---|
| Mr. Hyde | Mr. Moorhead |
| Mr. Gekas | Mr. Conyers |
| Mr. Coble | Mrs. Schroeder |
| Mr. Smith (TX) | Mr. Berman |
| Mr. Schiff | Mr. Bryant (TX) |
| Mr. Gallegly | Mr. Nadler |
| Mr. Canady | Mr. Scott |
| Mr. Inglis | Mr. Watt |
| Mr. Goodlatte | Mr. Becerra |
| Mr. Buyer | Ms. Lofgren |
| Mr. Bono | Ms. Jackson Lee |
| Mr. Heineman | |
| Mr. Bryant (TN) | |
| Mr. Chabot | |
| Mr. Flanagan | |
| Mr. Barr | |

35. Amendment offered by Mr. Becerra to provide for a study to examine the cost to small businesses for participation in the employment eligibility verification system. Defeated 11–19.

| AYES | NAYS |
|---|---|
| Mr. Inglis | Mr. Hyde |
| Mr. Chabot | Mr. Moorhead |
| Mr. Flanagan | Mr. Sensenbrenner |
| Mr. Conyers | Mr. Gekas |
| Mr. Reed | Mr. Coble |
| Mr. Nadler | Mr. Smith (TX) |
| Mr. Scott | Mr. Schiff |
| Mr. Watt | Mr. Gallegly |

203

| | |
|---|---|
| Mr. Becerra | Mr. Canady |
| Ms. Lofgren | Mr. Goodlatte |
| Ms. Jackson Lee | Mr. Buyer |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Barr |
| | Mr. Schumer |
| | Mr. Berman |
| | Mr. Boucher |
| | Mr. Bryant (TX) |

36. Amendment offered by Mr. Berman regarding employer responsibility in case of H–1B employees. Defeated 11–17.

| AYES | NAYS |
|---|---|
| Mrs. Schroeder | Mr. Hyde |
| Mr. Frank | Mr. Moorhead |
| Mr. Berman | Mr. Sensenbrenner |
| Mr. Boucher | Mr. McCollum |
| Mr. Bryant (TX) | Mr. Coble |
| Mr. Reed | Mr. Smith (TX) |
| Mr. Nadler | Mr. Schiff |
| Mr. Scott | Mr. Gallegly |
| Mr. Watt | Mr. Canady |
| Mr. Becerra | Mr. Inglis |
| Ms. Jackson Lee | Mr. Goodlatte |
| | Mr. Buyer |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Chabot |
| | Mr. Flanagan |

37. An amendment offered by Ms. Jackson Lee providing for an exemption from expedited removal for persons fleeing a country where there is civil strife, or other, temporary unsafe conditions, or where the Secretary of State has not certified that human rights violations do not occur. Defeated 10–22.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mrs. Schroeder | Mr. Moorhead |
| Mr. Frank | Mr. Sensenbrenner |
| Mr. Berman | Mr. McCollum |
| Mr. Nadler | Mr. Coble |
| Mr. Scott | Mr. Smith (TX) |
| Mr. Watt | Mr. Schiff |
| Mr. Becerra | Mr. Gallegly |
| Ms. Lofgren | Mr. Canady |
| Ms. Jackson Lee | Mr. Inglis |
| | Mr. Goodlatte |
| | Mr. Buyer |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |

204

Mr. Chabot
Mr. Flanagan
Mr. Barr
Mr. Schumer
Mr. Boucher
Mr. Bryant (TX)
Mr. Reed

38. An amendment offered by Mr. Berman to provide visas for eliminated family preference categories whose priority date falls within 2 years of the bill's effective date. Defeated 15–18.

| AYES | NAYS |
|---|---|
| Mr. Schiff | Mr. Hyde |
| Mr. Chabot | Mr. Moorhead |
| Mr. Flanagan | Mr. Sensenbrenner |
| Mr. Conyers | Mr. McCollum |
| Mrs. Schroeder | Mr. Gekas |
| Mr. Frank | Mr. Coble |
| Mr. Schumer | Mr. Smith (TX) |
| Mr. Berman | Mr. Gallegly |
| Mr. Reed | Mr. Canady |
| Mr. Nadler | Mr. Inglis |
| Mr. Scott | Mr. Goodlatte |
| Mr. Watt | Mr. Buyer |
| Mr. Becerra | Mr. Bono |
| Ms. Lofgren | Mr. Heineman |
| Ms. Jackson Lee | Mr. Bryant (TN) |
| | Mr. Barr |
| | Mr. Boucher |
| | Mr. Bryant (TX) |

39. An amendment offered by Mr. Becerra to decrease the level of annual income required by a sponsor from 200 percent to 150 percent of the poverty level. Defeated 6–14.

| AYES | NAYS |
|---|---|
| Mr. Conyers | Mr. Hyde |
| Mr. Frank | Mr. Moorhead |
| Mr. Berman | Mr. Sensenbrenner |
| Mr. Watt | Mr. Gekas |
| Mr. Becerra | Mr. Coble |
| Ms. Lofgren | Mr. Smith (TX) |
| | Mr. Schiff |
| | Mr. Inglis |
| | Mr. Buyer |
| | Mr. Hoke |
| | Mr. Bono |
| | Mr. Heineman |
| | Mr. Bryant (TN) |
| | Mr. Boucher |

40. Vote on Final Passage: Adopted 23–10.

| AYES | NAYS |
|---|---|
| Mr. Hyde | Mr. Conyers |
| Mr. Moorhead | Mrs. Schroeder |

205

| | |
|---|---|
| Mr. Sensenbrenner | Mr. Frank |
| Mr. McCollum | Mr. Schumer |
| Mr. Gekas | Mr. Berman |
| Mr. Coble | Mr. Nadler |
| Mr. Smith (TX) | Mr. Scott |
| Mr. Schiff | Mr. Watt |
| Mr. Gallegly | Mr. Becerra |
| Mr. Canady | Ms. Lofgren |
| Mr. Inglis | |
| Mr. Goodlatte | |
| Mr. Buyer | |
| Mr. Hoke | |
| Mr. Bono | |
| Mr. Heineman | |
| Mr. Bryant (TN) | |
| Mr. Chabot | |
| Mr. Flanagan | |
| Mr. Barr | |
| Mr. Boucher | |
| Mr. Bryant (TX) | |
| Mr. Reed | |

### COMMITTEE OVERSIGHT FINDINGS

In compliance with clause 2(l)(3)(A) of rule XI of the Rules of the House of Representatives, the Committee reports that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this report.

### COMMITTEE ON GOVERNMENT REFORM AND OVERSIGHT FINDINGS

No findings or recommendations of the Committee on Government Reform and Oversight were received as referred to in clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives.

### NEW BUDGET AUTHORITY AND TAX EXPENDITURES

Clause 2(l)(3)(B) of House Rule XI is inapplicable because this legislation does not provide new budgetary authority or increased tax expenditures.

### CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

In compliance with clause 2(l)(3)(C) of rule XI of the Rules of the House of Representatives, the Committee sets forth, with respect to the bill, H.R. 2202, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 403 of the Congressional Budget Act of 1974:

206

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, March 4, 1996.*

Hon. HENRY J. HYDE,
*Chairman, Committee on the Judiciary,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has prepared the enclosed cost estimate for H.R. 2202, the Immigration and the National Interest Act of 1995. Because enactment of the bill would affect direct spending, pay-as-you-go procedures would apply.

If you wish further details on this estimate, we will be pleased to provide them.

Sincerely,

JUNE E. O'NEILL, *Director.*

Enclosure.

CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

1. Bill number: H.R. 2202.
2. Bill Title: Immigration in the National Interest Act of 1995.
3. Bill status: As ordered reported by the House Committee on the Judiciary on October 24, 1995.
4. Bill purpose: H.R. 2202 would make many changes and additions to federal laws relating to immigration. Provisions having a potentially significant budgetary impact are highlighted below.

Title I would:

specify that the number of Immigration and Naturalization (INS) border patrol agents would be increased by 1,000 in each of the fiscal years 1996 through 2000 relative to the number as of September 30, 1995; in addition, the number of full-time support positions for border patrol agents would be increased by 800;

authorize appropriations of $12 million for improvements in barriers along the U.S.-Mexico border;

require that border crossing identification cards include a biometric identifier (such as a fingerprint) that is machine-readable;

direct the Attorney General to train border patrol personnel on the rights and various cultural backgrounds of aliens and U.S. citizens;

establish several pilot programs relating to inadmissible or deportable aliens; and

direct the Attorney General to deploy enough INS investigators and enforcement personnel in the interior of the United States to properly investigate and enforce immigration laws.

Title II would:

increase by 25 the number of Assistant United States Attorneys that may be employed by the Department of Justice for fiscal year 1996; and

provide for new and increased penalties for a number of crimes related to immigration.

Title III would:

207

permit the Attorney General to reemploy up to 300 federal retirees for as long as two years to support the Institutional Hearing Program;

direct the Attorney General to increase the detention facilities of the INS to at least 9,000 beds by fiscal year 1997;

authorize appropriations of $5 million annually for the INS and $150 million annually for the Attorney General, beginning in fiscal year 1996, for costs related to detention and removal of aliens;

provide for an increase in pay for immigration judges;

establish in the general fund of the Treasury an Immigration Enforcement Account, and

provide for new and increased penalties for a number of crimes related to immigration.

Title IV would:

direct the INS to increase the number of positions in the Investigations Division by 350 above the number of such positions available as of September 30, 1994;

direct the Department of Labor (DOL) to increase the number of full-time equivalent positions in the Wage and Hour Division of the Employment Standards Administration by 150 above the number of such positions available as of September 30, 1994; and

direct the Attorney General to devise a system, such as a toll-free telephone line or other electronic media, by which employers could confirm the eligibility of prospective employees. This system would be implemented via pilot projects in five states through the end of fiscal year 1999; continuation of the projects would be subject to Congressional action.

Title V would:

reduce the number of legal immigrants allowed to enter the United States each year;

set a statutory cap on the number of refugees admitted into the United States;

permit the Attorney General to reemploy up to 300 federal retirees for as long as two years to reduce the backlog in asylum applications;

direct the Attorney General to increase the number of INS asylum officers to at least 600 by fiscal year 1997; and

require the Attorney General, subject to the availability of appropriations, to reimburse visa application fees paid by petitioners for family-sponsored immigrant categories that are eliminated by this bill before the petitioner receives the visa.

Title VI would affect various benefit programs. It would:

curtail the eligibility of non-legal aliens, including those permanently residing under color of law (PRUCOL), in the narrow instances where they are now eligible for federal benefits;

put sponsors of future immigrants on notice that they are expected to support them for a longer period than current law provides, by extending the period in which a sponsor's income is presumed or deemed to be available to the alien and by making affidavits of support legally enforceable;

deny the earned income tax credit to individuals not authorized to be employed in the United States; and

208

change federal coverage of emergency Medicaid services for illegal aliens.

Title VII would:

direct the Attorney General and the Secretary of the Treasury to increase the number of land border inspectors in fiscal years 1996 and 1997 to assure full staffing during peak border crossing hours; and

direct the Attorney General, within two years of enactment of this bill, to establish preinspection stations in at least five of the foreign airports that serve as departure points for the greatest number of air passengers traveling to the U.S. In addition, this title would direct the Attorney General, within four years of enactment, to establish preinspection stations in at least five foreign airports that would most effectively reduce the number of aliens who arrive by air without valid documentation.

5. Estimated cost to the Federal Government: Assuring appropriation of the entire amounts authorized, enacting H.R. 2202 would increase discretionary spending over fiscal years 1996 through 2002 by a total of about $5 billion. Several provisions of H.R. 2202, mainly those in Title VI affecting benefit programs, would result in changes to mandatory spending and federal revenues. CBO estimates that the changes in mandatory spending would reduce outlays by about $6 billion over the 1996–2002 period, and that revenues would increase by about $80 million over the same period. The estimated budgetary effects of the legislation are summarized in Table 1. Table 2 shows projected outlays for direct spending programs under current law, the changes that would stem from the bill, and the projected outlays for each program if the bill were enacted.

TABLE 1.—ESTIMATED BUDGETARY EFFECTS OF H.R. 2202

[By fiscal years, in millions of dollars]

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|
| SPENDING SUBJECT TO APPROPRIATIONS ACTION | | | | | | | |
| Authorizations: | | | | | | | |
| Estimated authorization level ................ | 129 | 699 | 774 | 856 | 960 | 978 | 996 |
| Estimated outlays ..................................... | 0 | 532 | 637 | 940 | 994 | 956 | 976 |
| MANDATORY SPENDING AND RECEIPTS | | | | | | | |
| Direct Spending: | | | | | | | |
| Estimated budget authority .................... | 0 | −230 | −428 | −684 | −1,020 | −1,397 | −2,057 |
| Estimated outlays ..................................... | 0 | −230 | −428 | −684 | −1,020 | −1,397 | −2,057 |
| Estimated Revenues ............................... | 0 | 14 | 13 | 12 | 13 | 13 | 13 |

The costs of this bill fall within budget functions 550, 600, 750, and 950.

209

TABLE 2.—ESTIMATED EFFECTS OF H.R. 2202 ON DIRECT SPENDING PROGRAMS

[By fiscal years, in millions of dollars]

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|---|
| PROJECTED SPENDING UNDER CURRENT LAW | | | | | | | | |
| Supplemental Security Income [1] | 24,509 | 24,497 | 29,894 | 32,967 | 36,058 | 42,612 | 39,287 | 46,511 |
| Food Stamps [1] | 25,554 | 26,935 | 28,620 | 30,164 | 31,706 | 33,406 | 35,035 | 36,603 |
| Family Support Payments [2] | 18,086 | 18,544 | 19,048 | 19,534 | 20,132 | 20,793 | 21,477 | 22,184 |
| Medicaid | 89,070 | 99,292 | 110,021 | 122,060 | 134,827 | 148,110 | 162,590 | 177,786 |
| Earned Income Tax Credit (outlay portion) | 15,244 | 20,392 | 22,904 | 23,880 | 24,938 | 25,982 | 26,794 | 27,546 |
| Receipts of Employer Contributions | −27,960 | −27,365 | −28,081 | −28,907 | −29,621 | −30,938 | −32,428 | −33,910 |
| Total | 144,503 | 162,295 | 182,406 | 199,698 | 218,040 | 239,965 | 252,755 | 216,720 |
| PROPOSED CHANGES | | | | | | | | |
| Supplemental Security Income [1] | | 0 | −10 | −80 | −160 | −260 | −370 | −670 |
| Food Stamps [1] | | 0 | 0 | −15 | −45 | −100 | −170 | −250 |
| Family Support Payments [2] | | 0 | −1 | −13 | −23 | −48 | −63 | −78 |
| Medicaid | | 0 | −5 | −110 | −240 | −390 | −570 | −830 |
| Earned Income Tax Credit (outlay portion) | | 0 | −216 | −214 | −218 | −222 | −224 | −229 |
| Receipts of Employer Contributions | | 0 | 2 | 4 | 2 | 0 | 0 | 0 |
| Total | | 0 | −230 | −428 | −684 | −1,020 | −1,397 | −2,057 |
| PROJECTED SPENDING UNDER H.R. 2202 | | | | | | | | |
| Supplemental Security Income [1] | 24,509 | 24,497 | 29,884 | 32,887 | 35,898 | 42,352 | 38,917 | 45,841 |
| Food Stamps [1] | 22,554 | 26,935 | 28,620 | 30,149 | 31,661 | 33,306 | 34,865 | 36,353 |
| Family Support Payments [2] | 18,086 | 18,544 | 19,047 | 19,521 | 20,109 | 20,745 | 21,414 | 22,106 |
| Medicaid | 89,070 | 99,292 | 110,016 | 121,950 | 134,587 | 147,720 | 162,020 | 176,956 |
| Earned Income Tax Credit (outlay portion) | 15,244 | 20,392 | 22,688 | 23,666 | 24,720 | 25,760 | 26,570 | 27,317 |
| Receipts of Employer Contributions | −27,960 | −27,365 | −28,079 | −28,903 | −29,619 | −30,938 | −32,428 | −33,910 |
| Total | 144,503 | 162,295 | 182,176 | 199,270 | 217,356 | 238,945 | 251,358 | 274,663 |
| Changes to revenues | | | 14 | 13 | 12 | 13 | 13 | 13 |
| Net deficit effect | | 0 | −244 | −441 | −696 | −1,033 | −1,410 | −2,070 |

[1] Food Stamps includes Nutrition Assistance for Puerto Rico. Spending under current law includes the provisions of the fiscal year 1996 Agriculture appropriations.

[2] Family Support Payments includes spending on Aid to Families with Dependent Children (AFDC), AFDC-related child care, administrative costs for child support enforcement, net federal savings from child support collections, and the Job Opportunities and Basic Skills Training program (JOBS).

Notes.—Assumes enactment date of August 1, 1996. Estimates will change with later effective date. Details may not add to totals because of rounding.

210

6. Basis of Estimate: For purposes of this estimate, CBO assumes that H.R. 2202 will be enacted by August 1, 1996.

*Spending subject to appropriations*

The following estimates assume that all specific amounts authorized by the bill would be appropriated for each fiscal year. For programs in the bill for which authorizations are not specified, or for programs whose specific authorizations do not provide sufficient funding, CBO estimated the cost based on information from the agencies involved. We assumed that few of the bill's programs would be implemented until fiscal year 1997. (Hence, we estimate that outlays in 1996 would not be affected by enactment.) Estimated outlays, beginning in 1997, are based on historical rates for these or similar activities.

The provisions in this bill that affect discretionary spending would increase costs to the federal government by the amounts shown in Table 3, assuming appropriation of the necessary funds. In many cases, the bill authorizes funding for programs already authorized in the violent Crime Control and Law Enforcement Act of 1994 (1994 crime bill) or already funded by fiscal year 1996 appropriations action. For example, the additional border patrol agents and support personnel in Title I already were authorized in the 1994 crime bill through fiscal year 1998. For such provisions, the amounts shown in Table 3 reflect only the cost above funding authorized in current law.

In the most recent continuing resolution enacted for fiscal year 1996, appropriations for the Department of Justice total about $14 billion, of which about $1.7 billion is for the INS.

TABLE 3.—SPENDING SUBJECT TO APPROPRIATIONS ACTION

[By fiscal years, in millions of dollars]

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|
| Estimated authorization levels: | | | | | | | |
| Title I: | | | | | | | |
| Additional border patrol agents | 0 | ......... | ......... | 116 | 119 | 123 | 127 |
| Barrier improvements | 0 | 20 | ......... | ......... | ......... | ......... | ......... |
| Improved identification cards | 0 | 34 | 34 | 34 | ......... | ......... | ......... |
| Border patrol training | ......... | 0 | 3 | ......... | ......... | ......... | ......... |
| Pilot programs | 0 | 1 | ......... | ......... | ......... | ......... | ......... |
| Increased interior enforcement | 0 | 130 | 260 | 390 | 520 | 530 | 540 |
| Title II: | | | | | | | |
| Additional U.S. Attorneys | 0 | 8 | 8 | 8 | 8 | 8 | 8 |
| Title III: | | | | | | | |
| Increased detention facilities | 0 | 199 | 220 | 50 | 52 | 53 | 55 |
| Detention and removal of aliens [1] | 129 | 155 | 155 | 155 | 155 | 155 | 155 |
| Pay raise for immigration judges | 0 | 1 | 1 | 1 | 1 | 1 | 1 |
| Title IV: | | | | | | | |
| Additional INS investigators | 0 | 11 | 11 | 11 | 12 | 12 | 12 |
| Additional DOL employees | 0 | 12 | 12 | 13 | 13 | 14 | 14 |
| Work eligibility pilot program | 0 | ([2]) | ([2]) | ([2]) | ......... | ......... | ......... |
| Title V: | | | | | | | |
| Additional asylum officers | 0 | 34 | 34 | 35 | 36 | 37 | 38 |
| Visa reimbursement | 0 | 55 | ......... | ......... | ......... | ......... | ......... |
| Title VII: | | | | | | | |
| Additional land border inspectors | 0 | 36 | 39 | 43 | 44 | 45 | 46 |
| Total | 129 | 699 | 774 | 856 | 960 | 978 | 996 |

211

TABLE 3.—SPENDING SUBJECT TO APPROPRIATIONS ACTION—Continued

[By fiscal years, in millions of dollars]

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|
| Estimated outlays ......................................... | 0 | 532 | 637 | 940 | 994 | 956 | 976 |

[1] Amounts for this provision are specified in the bill. The amount authorized for fiscal year 1996 was reduced to reflect $26 million in ap-propriations already provided.

[2] Less than $500,000.

### Revenues and direct spending

Table 4 details estimated changes in revenues and direct spending. The most significant changes in direct spending would result from provisions contained in Title VI of the bill, in particular, from the provisions changing benefits conferred through the Supplemental Security Income program, Medicaid, and the Earned Income Tax Credit.

TABLE 4.—CHANGES IN REVENUES AND DIRECT SPENDING

[By fiscal years, in millions of dollars]

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|
| Revenues: | | | | | | | |
| New Criminal Fines and Forfeiture ......... | 0 | (1) | (1) | (1) | (1) | (1) | (1) |
| Earned Income Tax Credit ....................... | 0 | 14 | 13 | 12 | 13 | 13 | 13 |
| Total Revenus ........................................... | 0 | 14 | 13 | 12 | 13 | 13 | 13 |
| Direct Spending: | | | | | | | |
| New Criminal Fines and Forfeiture ......... | 0 | (1) | (1) | (1) | (1) | (1) | (1) |
| Immigration Enforcement Account .......... | 0 | (1) | (1) | (1) | (1) | (1) | (1) |
| Supplemental Security Income ............... | 0 | −10 | −80 | −160 | −260 | −370 | −670 |
| Food Stamps ............................................ | 0 | 0 | −15 | −45 | −100 | −170 | −250 |
| Family Support ......................................... | 0 | −1 | −13 | −23 | −48 | −63 | −78 |
| Medicaid ................................................... | 0 | −5 | −110 | −240 | −390 | −570 | −830 |
| Earned Income Tax Credit ....................... | 0 | −216 | −214 | −218 | −222 | −224 | −229 |
| Federal Employee Retirement ................. | 0 | 2 | 4 | 2 | 0 | 0 | 0 |
| Total Direct SApending ............................ | 0 | −230 | −428 | −684 | −1,020 | −1,397 | −2,057 |

[1] Less than $500,000.

*Fines.*—The imposition of new and enhanced civil and criminal fines in H.R. 2202 could cause governmental receipts to increase, but CBO estimates that any such increase would be less than $500,000 annually, civil fines would be deposited into the general fund of the Treasury. Criminal fines would be deposited in the Crime Victims Fund and would be spent in the following year. Thus, direct spending from the fund would match the increase in revenues with a one-year lag.

*Forfeiture.*—A new forfeiture provision in H.R. 2202 could lead to more assets seized and forfeited to the United States, but CBO estimates that any such increase would be less than $500,000 annually in value. Proceeds from the sale of any such assets would be deposited as revenues into the Assets Forfeiture Fund of the Department of Justice and spent out of that fund in the same year. Thus, direct spending from the Assets Forfeiture fund would match any increase in revenues.

*Immigration enforcement account.*—The creation of an immigration enforcement account in Title III would affect both direct spending and receipts. Currently, civil fines collected from viola-

212

tions of certain immigration laws are classified as revenues for budgetary purposes and deposited into the general fund of the Treasury. H.R. 2202 would deposit these collections as offsetting receipts into the immigration enforcement account and would spend them out of that fund. Thus, direct spending would increase, but this increase would be less than $500,000 annually.

*Legal immigration reform.*—H.R. 2202 would reduce legal immigration levels by roughly 100,000 entries annually. By law, the costs incurred by INS to oversee legal immigration are covered by fees it charges, so there is no net impact on the federal budget. Reducing legal immigration would decrease the fees collected by INS, so the agency would have to reduce its costs accordingly, mainly by cutting personnel. INS would attempt to maintain a balance between fee collections and costs, as it does now. Over time, any imbalance would be corrected to achieve a net budgetary impact of zero.

*Preinspection stations.*—Based on information from INS, CBO estimates that the costs to establish and maintain the first five preinspection stations would reach about $40 million annually, with similar costs for the second five stations. However, as required by law, costs of this sort would be covered by increased INS user fees charged to passengers entering the United States. Such fees would be recorded as offsetting receipts, and additional spending by the INS would be considered direct spending. Thus, there would be no net budgetary impact from any additional preinspection stations.

*Supplemental security income.*—The SSI program pays benefits to low-income people with few assets who are aged 65 or older or disabled. According to tabulations by the Congressional Research Service (CRS), the SSI program for the aged is the major benefit program with the sharpest contrast in participation between noncitizens and citizens. The CRS reported that nearly one-quarter of aliens over the age of 65 receive SSI, versus about 4 percent of citizens. The Social Security Administration states that about 700,000 legal aliens collect SSI (although some unknown fraction of those "aliens" are really naturalized citizens, whose change in status is not reflected in program records). About three-quarters of alien SSI recipients are immigrants legally admitted for permanent residence, who must serve out a waiting period during which their sponsor's income is "deemed" to them before they can go on the program. That waiting period was temporarily lengthened to 5 years in 1994 but is slated to return to 3 years in October 1996. The other one-quarter of alien recipients of SSI are refugees, asylees, and PRUCOLs.

H.R. 2202 would have little effect on the eligibility for SSI or other benefits of legal immigrants who are already in the U.S., because the bill would not direct the agencies administering these programs to make any changes in the way they treat aliens who were legally admitted for permanent residence before the bill's enactment. Any effect on such aliens would be indirect. The bill would amend the "public charge" section of the Immigration and Nationality Act to state that anyone who collected certain benefits within 7 years of arrival could be deported, and names the programs in which participation would brand the alien a public

213

charge. No benefits received before the date of enactment would count against the 7-year ban. Nor would benefits paid for certain reasons arising after entry—such as the death or disability of a breadwinner—count. A public charge ban (for 5, not 7 years after the alien's entry) is already on the books, but is hardly ever enforced through deportation. The ban apparently has not acted as a major deterrent to many aliens' participation in public assistance programs. CBO does not rule out that the proposed "public charge" language might make some aliens who are already here fearful of collecting benefits, but views such psychological effects as a tenuous basis for budget estimates.

For future entrants, though, the bill has real teeth. The bill's principal effect on the SSI program would be the proposed lengthening of the deeming period for future entrants. H.R. 2202 would require the government to draft a new affidavit of support explicitly telling sponsors that they are liable for any public assistance benefits provided to the alien. Furthermore, for immigrants covered by such affidavits, the deeming period would last until naturalization (if the immigrant was admitted as a parent of a citizen or legal resident) or for at least 7 years (if admitted in another category). CBO assumes that the new forms would be in place by early 1997 and that significant savings would begin in 2000—when that first group of entrants would otherwise have graduated from the 3-year deeming period under current law. Small savings would occur before 2000, because the bill would make two other changes in the way deeming now operates in the SSI program—specifically, by requiring that all income of the sponsor and spouse be deemed, instead of only a portion of it, and by repealing the exemption from deeming for aliens who become disabled after their arrival.

Because the stiffer deeming rules would make little difference in the near term, they account for just half of the estimated savings of $1.6 billion in SSI over the entire 1996–2000 period; nevertheless, they contribute two-thirds of the estimated savings in fiscal year 2002. H.R. 2202 also proposes to shave the number of overall immigrant admissions, and would explicitly limit the number of parents of citizens or legal residents who may enter the country. Since deeming has proven to be a quite powerful tool in the SSI program, the proposed cutback in admissions is largely immaterial to CBO's estimate; from a dollar standpoint, it matters little whether immigrants can get into the country but are then barred from SSI, or whether they cannot get into the country in the first place.

Two other provisions of the bill would generate the remaining savings in SSI. First, H.R. 2202 would eliminate eligibility for SSI benefits of aliens permanently residing under color of law. That label covers such disparate groups as parolees, aliens who are granted a stay of deportation, and others with various legal statuses. PRUCOLs currently make up about 5 percent of aliens on the SSI rolls. CBO assumes that some would successfully seek to have their classification changed to another category (such as refugee or asylee) that would protect their SSI benefits. The remainder, though, would be barred from the program, generating savings of about $0.5 billion over 7 years.

214

The second provision would set a statutory ceiling on a number of refugee admissions, removing that prerogative from the President. The bill would limit refugee admissions to 75,000 in 1997 and 50,000 a year thereafter. It is impossible to say how many refugees would be admitted if current policy remained unchanged, since the ceiling is announced by the President annually and is affected by geopolitical conditions. For this estimate, CBO assumed that, under current policy, refugee admissions would drop from 90,000 in fiscal year 1996 (the ceiling announced by the President) to 75,000 in 1997 and beyond. Compared with that path, H.R. 2202 would require a reduction of 25,000 refugee admissions a year after 1997. Refugees often arrive with little or no money, poor English, and limited prospects for employment, so it is not surprising that they tend to rely on welfare at first. Tabulations by the Office of Refugee Resettlement in the Department of Health and Human Services indicate that, of refugees who arrived in the past 5 years, about 7 percent are on SSI, 24 percent on Aid to Families with Dependent Children (AFDC), and 60 percent on food stamps. Based on that pattern, CBO estimates that the limits on refugee admissions in H.R. 2202 would lead to savings in the SSI program of $0.1 billion over the 1998–2002 period.

*Food stamps.*—The estimated savings in the Food Stamp program—$0.6 billion over 7 years—are considerably smaller than those in SSI but have essentially the same explanations. The Food Stamp program imposes a 3-year deeming period. Therefore, lengthening the deeming period (to at least 7 years for most future entrants and even longer for some) would save money in food stamps beginning in 2000. Restrictions on the number of legal entrants and particularly of refugees admitted into the country account for the rest of the savings. The Food Stamp program already denies benefits to most PRUCOLs, so no additional savings are estimated from that source.

Statistics compiled by CRS suggest that about 16 percent of noncitizens live in households that receive food stamps, not so sharply different from the 12 percent participation rate of citizens. Other data on them, though, are sketchier than data on aliens in the SSI program. For example, CBO lacks information on how long aliens (other than refugees) are in the country before going on food stamps, why they file for benefits, and how many of them have financial sponsors—information that would have helped greatly in estimating the effects of H.R. 2202.

*Family support.*—H.R. 2202 would lead to small savings in the AFDC program—again, from essentially the same provisions that would generate savings in SSI and food stamps. CRS tabulations show that noncitizens are only slightly more likely than citizens to participate in the AFDC program (6 percent of noncitizens, versus 5 percent of citizens). Often, the household consists of a noncitizen parent and a citizen child or children—in which case H.R. 2202 would directly affect only the parent's eligibility. As for food stamps, information on sponsorship, length of time in the country, and reason for participation by aliens in AFDC is scanty.

The AFDC program already deems income from sponsors to aliens for three years after the alien's arrival. H.R. 2202 would lengthen that period to 7 years in most cases. The $0.2 billion in

215

total savings over the 1997–2002 period would stem from lengthening the deeming period, restricting the number of admissions of immigrants and refugees, and ending the eligibility of PRUCOLs for AFDC benefits.

*Medicaid.*—H.R. 2202 would erect several barriers to Medicaid eligibility for future entrants into this country. In most cases, AFDC or SSI eligibility carries Medicaid eligibility along with it. By restricting aliens' access to those two cash programs, H.R. 2202 would generate savings in Medicaid. Medicaid now has no deeming requirement at all; that is, program administrators do not consider a sponsor's income when they gauge the alien's eligibility for benefits. Therefore, it is possible for a sponsored alien to qualify for Medicaid even before he or she has satisfied the SSI waiting period. H.R. 2202 would change that by requiring that every means-tested program weigh the income of a sponsor who signed one of the new, legally enforceable affidavits of support. Under current law, PRUCOLs are specifically eligible for Medicaid; H.R. 2202 would make them ineligible.

Finally, H.R. 2202 would bar immigration by parents of citizens and legal residents unless a sponsor could document that the parent would be covered by a private insurance policy that provides coverage similar to Medicare plus long-term care protection equivalent to Medicaid. Such coverage would be extremely expensive if it even exists. That requirement was not critical to CBO's estimate of Medicaid savings in H.R. 2202, because CBO judged that the other SSI provisions and the deeming requirements would effectively bar most elderly entrants from the Medicaid program over the 1997–2002 period. The estimate assumes that the new, legally enforceable affidavits will be in place by early 1997. If that assumed timetable were to slip, perhaps because of the sheer difficulty of crafting acceptable criteria for insurance coverage, estimates of savings in other programs that also hinge on the new affidavits could also slip. If enforced stringently, the insurance requirement could effectively forbid immigration of all except the wealthiest parents of U.S. residents.

CBO estimated the savings in Medicaid by first estimating the number of aliens who would be barred from the SSI and AFDC programs by other provisions of H.R. 2202. CBO then added another group—dubbed "noncash beneficiaries" in Medicaid parlance because they participate in neither of the two cash programs. CBO assumed that the noncash participants who would be affected by H.R. 2202 essentially fall into two groups. One is the group of elderly (and less importantly, disabled) aliens who enter in 1997 and beyond and who could, under current law, seek Medicaid even before they satisfied the 3-year wait for SSI, the second is poor children and pregnant women who could, under current law, qualify for Medicaid even if they do not get AFDC. CBO then multiplied the assumed number of aliens affected times an average Medicaid cost appropriate for their group. That average cost is significantly higher for an aged or disabled person than for a younger mother or child. In selecting an average cost, CBO took into account the fact that relatively few aged or disabled aliens receive expensive long-term care in Medicaid-covered institutions, but that on the other hand few are eligible for Medicare as their primary payer.

216

The resulting estimate of Medicaid savings was then trimmed by 25 percent to reflect the fact that—if the aliens in question were barred from regular Medicaid—the federal government would likely end up paying more in reimbursements for emergency care and for uncompensated care. The resulting savings in Medicaid would be negligible at first but would reach an estimated $0.8 billion by 2002, totaling $2.1 billion over the 1997–2002 period.

One of the few benefits for which illegal aliens now qualify is emergency Medicaid under section 1903(v) of the Social Security Act. H.R. 2202 contains a provision that is apparently intended to make the federal government responsible for the entire cost of emergency Medicaid services, instead of splitting the cost with states as under the current matching requirements. However, the drafting of the provision leaves several legal and practical issues dangling. H.R. 2202 would not repeal the current provision in section 1903(v). It also orders the Immigration and Naturalization Service to verify the identity of recipients in order for the states to qualify for the proposed reimbursement. Emergency patients often show up with no insurance and little other identification; therefore, if the INS drafted stringent rule for verification, it is possible that hardly any providers could collect under this section. On the other hand, if the INS required only minimal identification, providers would have an incentive to classify as many patients as possible in this category because that would maximize their federal reimbursement. Also unclear is whether any reimbursement would be subject to the usual limits on allowable charges in Medicaid, or whether providers could seek reimbursement for their entire cost.

*Earned income tax credit.*—H.R. 2202 would deny eligibility for the Earned Income Tax Credit (EITC) to workers who are not authorized to be employed in the U.S. In practice, that provision would work by requiring valid Social Security numbers to be filed for the primary and secondary taxpayers on returns that claim the EITC. A similar provision was contained in President Clinton's 1996 budget proposal and in last fall's reconciliation bill. The Joint Committee on Taxation estimates that the provision would reduce the deficit by approximately $0.2 billion a year. Most of this reduction would appear as lower outlays for the refundable portion of the credit, but there would also be a small increase in revenues.

*Federal employee retirement.*—H.R. 2202 would have a small effect on the net outlays of federal retirement programs. Section 533 and 356 of the bill would permit certain civilian and military retirees to collect their full pensions in addition to their salary if they are reemployed by the Department of Justice to help tackle a backlog of asylum applications or support the Institutional Hearing Program. Under current law, an employing agency must deduct the annuity amount from the paycheck of a reemployed civil service annuitant and remit that amount to the retirement trust fund. The retirement fund, in effect, makes no net annuity payments for the period of the annuitant's reemployment. (Rules governing the reemployment of military retirees are slightly more liberal, but still require forfeiture of part of the annuity.) Under the bill, the salary reduction requirement would be waived for up to 24 months of reemployment. CBO estimates that about 200 annuitants would be

217

affected, and that net outlays would increase by $2 million to $4 million a year in 1997 through 1999.

*Other programs.*—Entitlement or direct spending programs, other than those already listed, are estimated to incur negligible costs or savings over the 1997–2002 period as a consequence of H.R. 2202. The child nutrition program would be specifically exempt from H.R. 2202's ban on benefits to illegal aliens. It is possible that child nutrition would fall under the requirement that all means-tested programs develop sponsor-to-alien deeming provisions for future entrants; however, the applicability of that section is ambiguous, and it would take time to craft deeming rules and implement them in school systems nationwide in any case. The foster care program does not appear by name on any specific list of exemptions in H.R. 2202, but CBO assumes that it would be exempt under provisions protecting battered children. CBO estimates that the bill would not lead to any significant savings in the student loan program. The Title XX social services program, an entitlement program for the states, is funded at a fixed dollar amount set by the Congress; the eligibility or ineligibility of aliens for services would not have any direct effect on those dollar amounts.

7. Pay-as-you-go considerations: Section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985 sets up pay-as-you-go procedures for legislation affecting direct spending or receipts through 1998. Because several sections of this bill would affect receipts and direct spending, pay-as-you-go procedures would apply. These effects are summarized in the following table.

[By fiscal year, in millions of dollars]

|  | 1996 | 1997 | 1998 |
|---|---|---|---|
| Change in outlays | 0 | −230 | −428 |
| Change in receipts | 0 | 14 | 13 |

8. Estimated impact on state, local, and tribal governments: CBO has not completed its review of possible mandates in H.R. 2202. This section represents a preliminary analysis of the mandates contained in the bill and their likely impacts on the budgets of state, local, and tribal governments. A comprehensive mandate cost statement will be provided when CBO's analysis is completed.

H.R. 2202 contains a number of mandates on state and local governments. The major mandates would require that state and local governments:

Deny non-legal aliens, including those permanently residing under color of law, eligibility for all means-tested state and local benefit programs except emergency Medicaid, immunizations, disaster relief, and family violence services;

Distribute means-tested benefits only through individuals who are themselves eligible for the program, at least on the basis of their immigration status; and

Impose no restrictions on the exchange of information between governmental entities or officials and the Immigration and Naturalization Service regarding the immigration status of individuals.

In addition, H.R. 2202 would require employers, including state and local government personnel offices, in at least five states to

218

confirm through a toll-free telephone number (or other electronic media), the identity, Social Security number, and work eligibility of all employees within three days of hiring.

CBO's preliminary conclusion is that the total net costs of the bill's mandates on state and local governments would not exceed the $50 million annual threshold established in the Unfunded Mandates Reform Act.

9. Estimated impact on the private sector: H.R. 2202 contains several private sector mandates. Although CBO has not completed its analysis of impacts on the private sector, our preliminary analysis indicates that the expected direct costs of private sector mandates contained in H.R. 2202 would exceed $100 million a year.

Generally, speaking, the private sector mandates in H.R. 2202 lie in four areas: (1) provisions that affect aliens within the borders of the United States, (2) provisions that affect individuals who sponsor aliens and execute affidavits of support, (3) provisions that affect the transportation industry, and (4) provisions that affect employers of aliens. In addition, a few provisions would reduce existing mandates on employers and offset marginally some of the costs imposed by new mandates.

Specifially, we expect that the direct costs imposed on sponsors of aliens who execute affidavits of support to exceed $100 million a year within the first five years that the mandate is in effect. Those are costs now borne by the federal government and state and local governments for the provision of benefits under public assistance programs. We also expect that some direct costs would be imposed on aliens within U.S. borders, the transportation industry, and the employers of aliens but that those costs would not be significant.

10. Previous CBO estimate: In 1995 CBO prepared many estimates of the effects of restricting aliens' eligibility for public assistance in the context of the debate over welfare reform. Examples include CBO's estimates of H.R. 4 (the welfare reform bill) and of H.R. 2491 (the reconciliation bill), both of which were eventually vetoed. In general, however, those proposals did not draw a sharp distinction between aliens already in the country and future entrants. CBO has not previously estimated the effects of restrictions on public assistance like those in H.R. 2202 that are essentially targeted at future entrants.

11. Estimate prepared by: Federal Cost Estimate: Mark Grabowicz, Wayne Boyington, Sheila Dacey, Dorothy Rosenbaum, Robin Rudowitz, Kathy Ruffing, and Stephanie Weiner.

State and Local Government Estimate: Karen McVey and Leo Lex.

Private Sector Mandate Estimate: Matthew Eyles.

12. Estimate approved by: Paul N. Van de Water, Assistant Director, for Budget Analysis.

INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(l)(4) of rule XI of the Rules of the House of Representatives, the Committee estimates that H.R. 2202 will have no significant inflationary impact on prices and costs in the national economy.

219

SECTION BY SECTION ANALYSIS

TITLE I—DETERRENCE OF ILLEGAL IMMIGRATION THROUGH IMPROVED BORDER ENFORCEMENT, PILOT PROGRAMS, AND INTERIOR ENFORCEMENT

## Subtitle A—Improved Enforcement at Border

*Sec. 101.—Border patrol agents and support personnel*

Subsection (a) provides that the number of border patrol agents shall be increased by 1000 per year from 1996 through 2000. Subsection (b) provides that the number of support personnel for border enforcement, investigations, detention and deportation, intelligence, information and records, legal proceedings, and management and administration shall be increased beginning in fiscal year 1996 by 800 positions above the number existing as of September 30, 1994. Subsection (c) requires the deployment of new border patrol agents to border sectors in proportion to the level of illegal entries in the sectors.

*Sec. 102.—Improvement of barriers at border*

Subsection (a) provides that the Attorney General and the Commissioner of the Immigration and Naturalization Service (INS) shall install additional physical barriers and roads to deter illegal crossings into the U.S. in areas of high illegal entry.

Subsection (b) provides that in carrying out subsection (a) in the San Diego sector, the Attorney General shall provide for multiple fencing, separated by roads, for the 14 miles eastward of the Pacific Ocean. The Attorney General shall promptly acquire necessary easements for the fencing and roads. There are authorized to be appropriated $12,000,000 for these fences and roads.

Subsection (c) provides for a waiver of the Endangered Species Act to the extent necessary to expeditiously complete construction of the roads and fences under this section.

Subsection (d) requires the Attorney General to forward deploy existing border patrol agents in those border areas with high levels of illegal entry and to submit a report within 6 months of the date of enactment regarding the progress and effectiveness of such forward deployments.

*Sec. 103.—Improved border equipment and technology*

This section authorizes the Attorney General to acquire Federal equipment, including aircraft, helicopters, vehicles, and night vision equipment, to improve the deterrence of illegal immigration into the U.S. Some of this material may be acquired from the Department of Defense. Where necessary for the proper utilization of such equipment, the Committee believes that it would be appropriate for military personnel to provide training to Border Patrol agents and other immigration officers. Responsibility for operation of material acquired by the Attorney General would remain in the hands of employees of the Department of Justice.

220

*Sec. 104.—Improvement in border crossing identification card*

This section amends the definition in section 101(a)(6) of the Immigration and Nationality Act [121] of the "border crossing identification card." The amendment requires that within 6 months of the date of enactment, all new border crossing ID cards (which are issued only to aliens) include a biometric identifier, such as a handprint or fingerprint of the alien. The amendment also requires that within 36 months, an alien cannot be admitted to the United States on the basis of such a card unless the biometric identifier on the card matches the appropriate biometric characteristic of the alien. The amendment requires that within a year after implementing the requirement for new ID cards, the Attorney General shall report to Congress on the impact of issuing the new cards on border crossing activities.

*Sec. 105.—Civil penalties for illegal entry*

This section amends section 275 by redesignating subsections (b) and (c) and inserting a new subsection (b). The new subsection provides that an alien apprehended while entering or attempting to enter the U.S. illegally shall be subject to a civil penalty of not less than $50 nor more than $250. The penalties shall be doubled in the case of an alien previously subject to such penalties.

*Sec. 106.—Prosecution of aliens repeatedly re-entering the united states unlawfully*

This section authorizes the appropriations of such sums as may be necessary to provide for detention and prosecution of any alien who has illegally reentered the U.S. if the alien has illegally reentered the U.S. on two previous occasions. This section also states the sense of Congress that the Attorney General use available resources to detain and prosecute such aliens.

*Sec. 107.—Inservice training for the border patrol*

This section amends section 103 of the INA by adding a new subparagraph (e), to provide for programs that would train Border Patrol agents to ensure and safeguard the constitutional and civil rights, personal safety, and human dignity of aliens and citizens with whom they come into contact. The annual report of the INS shall include a description of the steps taken to carry out this provision.

SUBTITLE B—PILOT PROGRAMS.

*Sec. 111.—Pilot program on interior repatriation*

This section requires the Attorney General, after consultation with the Secretary of State, to establish a pilot program for up to 2 years to deter multiple illegal entries into the U.S., which may include interior repatriation, third country repatriation, and other disincentives to multiple unlawful entries. Not later than 30 months after the date of enactment, the Attorney General and Sec-

---

[121] Unless otherwise specified, all references to existing statutes are to sections of the Immigration and Nationality Act.

221

retary of State shall report on the pilot program, including whether the program or any part should be extended or made permanent.

*Sec. 112.—Pilot program on use of closed military bases for the detention of inadmissible or deportable aliens*

This section requires the Attorney General and the Secretary of Defense to establish a pilot program for up to 2 years to determine the feasibility of using military bases closed because of a base closure law as detention centers for the Immigration and Naturalization Service. The Attorney General and the Secretary of State are to submit a report not later than 30 months after the date of enactment to the Committees on the Judiciary and the Committees on Armed Services of the House of Representatives and the Senate.

*Sec. 113.—Pilot program to collect records of departing passengers*

This section requires the Commissioner of the INS, within 180 days after the date of enactment, to establish a pilot program in which INS officers would collect a record of departure for every alien departing the U.S. and match the record of departure with the record of the alien's arrival in the U.S. The program shall be operated in not less than 3 of the 5 air ports of entry with the heaviest volume of arriving international air traffic. Instances of visa overstay identified through the pilot program shall be included in INS and Department of State databases. Not later than 2 years after the pilot program is implemented, the Commissioner shall submit a report on the number of departure records collected and other statistics, the estimated cost of establishing a national system to verify the departure from the U.S. of aliens admitted as nonimmigrants, and specific recommendations for the establishment of such a system.

### Subtitle C—Interior Enforcement

*Sec. 121.—Increase in personnel for interior enforcement*

This section authorizes the appropriation of funds to increase the number of investigators and other enforcement personnel deployed in the interior of the United States to a level adequate to properly investigate violations of and enforce immigration law. It is the intent of this section to include among interior enforcement personnel inspectors at United States airports, as well as INS investigators and detention and deportation officers.

### TITLE II—ENHANCED ENFORCEMENT AND PENALTIES AGAINST ALIEN SMUGGLING; DOCUMENT FRAUD

### Subtitle A—Enhanced Enforcement and Penalties Against Alien Smuggling

This subtitle includes provisions in several immigration reform bills introduced in the 103rd Congress and the 104th Congress, and in the immigration reform legislation submitted by the Clinton Administration in May 1995.

222

*Sec. 201—Wiretap authority for alien smuggling investigations*

This section amends 18 U.S.C. 2516(1) to give INS the authority under that section to use wiretaps in investigations of alien smuggling and document fraud violations under section 1028 (production of false identification documents), 1541 (unauthorized issuance of passports), 1542 (false statements in passport applications), 1546 (fraud and misuse of visas, permits, and other documents) of title 18, or sections 274, 277, or 278 of the INA (smuggling of aliens).

*Sec. 202—Racketeering offenses relating to alien smuggling*

This section amends 18 U.S.C. 1961(1) to include as racketeering offenses acts indictable under: section 1028 (fraud and related activity in connection with identification documents), section 1542 (false statement in application and use of passport), 1543 (forgery and false use of passport), 1544 (misuse of passport), 1546 (fraud and misuse of visas, permits, and other documents), and 1581-1588 (peonage and slavery), and sections 274, 277, and 278 of the INA (alien smuggling and related offenses).

*Sec. 203—Increased criminal penalties for alien smuggling*

Subsection (a) amends section 274(a)(1)(B)(i) to provide that any person who violates the prohibitions in 274(a)(1)(A)(ii)-(iv) against transporting, harboring, or inducing an illegal alien to come to the U.S. may be imprisoned for up to 10 years if the offense was committed for purposes of commercial advantage or private financial gain.

Subsection (a) also adds a new subparagraph (C) to section 274(a)(1), providing that a person who engages in a conspiracy to commit or aids and abets in the commission of offenses under section 274(a)(1)(A) shall be fined and imprisoned for up to 10 years (alien smuggling) or up to 5 years (transportation, harboring, inducement).

Subsection (b) amends section 274(a)(2)(B) (bringing into the U.S. an alien not authorized to enter) by adding a new clause (iv) to make it an aggravating factor if the offense is committed with the intent or reason to believe that the alien will commit a crime punishable by imprisonment for more than one year. This subsection also amends this subparagraph to provide that if any of the aggravating factors are present, the violator shall be fined under title 18 and imprisoned for not less than 3 years nor more than 10 years.

Subsection (c) amends section 274(a)(2) to provide that the punishments for unlawfully bringing an alien to the U.S. shall apply to each alien with respect to whom a violation occurs, replacing the current provision that the punishments shall apply to "each transaction," regardless of the number of aliens involved.

*Sec. 204—Increased number of assistant United States Attorneys*

This section provides that the number of Assistant U.S. Attorneys shall be increased in fiscal years 1996 by 25, and that such new Assistant U.S. Attorneys shall prosecute persons involved in smuggling or harboring of illegal aliens, or other crimes involving illegal aliens.

223

*Sec. 205—Undercover investigation authority*

This section amends title II of the INA to add a new section 294, providing authority for the INS to use appropriated funds for the establishment and operation of undercover proprietary corporations or business entities.

Subtitle B—Deterrence of Document Fraud

*Sec. 211—Increased criminal penalties for fraudulent use of Government-issued documents*

Subsection (a) amends 18 U.S.C. 1028(b)(1), relating to fraud and misuse of government-issued identification documents, to increase the maximum term of imprisonment from 5 to 15 years. The sentence is increased 20 years if the offense is committed to facilitate a drug-trafficking crime, and to 25 years if committed to facilitate an act of international terrorism.

Subsection (b) directs the Sentencing Commission promptly to increase the basic offense levels for document fraud offenses under sections 1028(a) and 1546(a) of title 18: offense level 15 if the offense involved 100 or more documents; level 20 if the offense involved 1,000 or more documents or was done to facilitate a drug offense or aggravated felony, and level 25 if done to provide documents to persons engaged in terrorist activity or racketeering enterprises.

*Sec. 212.—New civil penalties for document fraud*

Subsection (a) amends section 274C(a) by adding a new paragraph (5) to make it unlawful for any person knowingly or in reckless disregard of the fact that the information is false or does not relate to the applicant, to prepare, file, or assist another person in preparing or filing, documents which are falsely made for the purpose of satisfying a requirement of the INA. "Falsely made" shall include a document submitted with knowledge or reckless disregard of the fact that the document contains a false, fictitious, fraudulent statement or material misrepresentation, has no basis in law or fact, or fails to state a material fact.

Subsection (b) makes conforming amendments to section 274C(d)(3).

Subsection (c) provides that the amendment shall apply to assistance, preparation, or submission of documents or applications occurring on or after the date of enactment.

*Sec. 213.—New civil penalty for failure to present documents and for preparing immigration documents without authorization*

Subsection (a) amends section 274C(a) by adding a new paragraph (6) to apply civil penalties against an alien who presents upon boarding a common carrier a document relating to the alien's eligibility to be admitted to the United States and then fails to present the document upon arrival. The Attorney General may waive these penalties if the alien is subsequently granted asylum. Subsection (a) also adds a new paragraph (7) to apply civil penalties against any person who prepares or assists in preparing immigration forms, petitions, and applications who is not authorized

224

to represent aliens or to assist in the preparation and submission of such forms.

Subsection (b) provides that these amendments shall apply to individuals who board a common carrier on or after 30 days after enactment.

*Sec. 214. New criminal penalties for failure to disclose role as preparer of false application for asylum and for preparing certain post-conviction applications*

This section amends section 274C of the INA by adding a new subsection (e), providing that a person who fails to disclose or conceals his role in preparing, for fee or other remuneration, a false application for asylum shall be imprisoned for not less than 2 years nor more than 5 years and also shall be prohibited from preparing, whether or not for fee or other remuneration, any other such application for at least 5 years and not more that 15 years. A person convicted under this section who later prepares or assists in preparing an application for asylum, regardless of whether for a fee or other remuneration, is subject to imprisonment of not less than 5 nor more than 15 years and is prohibited from preparing any other such application.

*Sec. 215.—Criminal penalty for knowingly presenting document which fails to contain reasonable basis in law or fact*

This section amends 18 U.S.C. 1546(a) to provide that the penalty for knowingly presenting a document which contains a false statement also extends to a document which fails to contain any reasonable basis in law or fact.

*Sec. 216.—Criminal penalties for false claim to citizenship*

This section amends 18 U.S.C. 1015 by adding new subparagraphs (e) and (f). New subparagraph (e) provides for criminal penalties against any person who makes a false claim to United States citizenship or nationality for the purpose of obtaining, for himself or any other person, any Federal benefit or service or employment in the United States. New subsection (f) provides for criminal penalties against any person who makes a false claim to United States citizenship in order to vote or register to vote in any Federal, State, or local election, including an initiative, recall, or referendum.

Subtitle C—Asset Forfeiture for Passport and Visa Offenses

*Sec. 221.—Criminal forfeiture for passport and visa related offenses*

This section amends 18 U.S.C. 982(a) by adding a new paragraph (6), providing that a person who is convicted of a violation of or of a conspiracy to violate sections 1541, 1542, 1543, 1544, or 1546 of title 18, or section 1028 of title 18 if committed in connection with passport or visa issuance or use, shall forfeit any property, real or personal, which was used or intended to be used in facilitating the violation, and any property constituting, derived from, or traceable to the proceeds of the violation.

225

*Sec. 222.—Subpoenas for bank records*

This section amends section 986(a) of title 18 to permit the issuance of subpoenas for bank records in investigations of offenses under sections 1028, 1541, 1542, 1543, 1544, and 1546 of title 18.

*Sec. 223. Effective date*

This provides that the amendments made by this subtitle take effect on the first day of the first month that begins more than 90 days after the date of enactment.

TITLE III—INSPECTION, APPREHENSION, DETENTION, ADJUDICATION, AND REMOVAL OF INADMISSIBLE AND DEPORTABLE ALIENS

Subtitle A—Revision of Procedures for Removal of Aliens

*Sec. 300.—Overview of changes in removal procedures*

This section provides an overview of changes made in the procedures for inspection, exclusion, apprehension, and deportation of aliens under the Immigration and Nationality Act.

*Sec. 301.—Treating persons present in the United States without authorization as not admitted*

Subsection (a) of this section amends section 101(a)(13) of the INA by replacing the definition of "entry" with a definition for "admission" and "admitted": the entry of an alien into the United States after inspection and authorization by an immigration officer. An alien who is paroled under section 212(d)(5) shall not be considered to have been admitted. With certain exceptions (specified below) a returning lawful permanent resident alien (LPR) is not considered to be seeking admission.

*Comment.*—This subsection is intended to replace certain aspects of the current "entry doctrine," under which illegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry. Hence, the pivotal factor in determining an alien's status will be whether or not the alien has been lawfully admitted. Parolees under INA section 212(d)(5), who are not considered to have made an "entry" under current law,[122] will likewise not be considered to have been admitted under this new definition. Finally, this section preserves a portion of the *Fleuti* doctrine [123] by stating that a returning lawful permanent resident shall not be regarded as seeking admission unless the alien has relinquished lawful permanent resident status; has engaged in criminal activity after having left the U.S.; has departed the U.S. while under removal or extradition proceedings; or has been convicted of an aggravated felony, unless since such conviction the alien has been granted relief under new section 240A(a) (cancellation of removal for certain aliens lawfully admitted for permanent residence). However, this section intends

---

[122] See *Leng May Ma* v. *Barber*, 357 U.S. 185 (1958); INA §212(d)(5), 8 U.S.C. §1182(d)(5).
[123] See *Rosenberg* v. *Fleuti*, 374 U.S. 449 (1963) (lawful permanent resident returning from abroad not considered to have made a new "entry" if trip was "innocent, casual, and brief").

226

to overturn certain interpretations of *Fleuti*[124] by stating that a returning lawful permanent resident alien is seeking admission if the alien is attempting to enter or has entered the United States without inspection and authorization by an immigration officer.

Subsection (b) adds a new paragraph (9) to subsection 212(a) (grounds of inadmissibility). The new paragraph states in subparagraph (A) that an alien who is present in the U.S. without being admitted or paroled, or who has arrived in the U.S. at any time or place other than as designated by the Attorney General, is inadmissible. Subparagraph (B) provides that the grounds of inadmissibility shall not apply if: (I) the alien qualifies for immigrant status as the spouse or child of a United States citizen or lawful permanent resident; (II) the alien or the alien's child has been battered or subject to extreme cruelty; and (III) there was a substantial connection between the cruelty or battery and the alien's unlawful entry into the United States. As a matter of transition, the requirements under (II) and (III) shall not apply if the alien establishes that he or she first entered the United States prior to the effective date of Title III of this legislation, as set forth in section 309(a).

*Comment.*—This subsection will conform the grounds of inadmissibility under section 212(a) with the new doctrine of "admission" established in section 301(a) of the bill. Currently, aliens who have entered without inspection are deportable under section 241(a)(1)(B). Under the new "admission" doctrine, such aliens will not be considered to have been admitted, and thus, must be subject to a ground of inadmissibility, rather than a ground of deportation, based on their presence without admission. (Deportation grounds will be reserved for aliens who have been admitted to the United States.)

The exception in subparagraph (B) will ensure that this new ground of inadmissibility does not apply to certain battered or abused alien spouses and children, where the alien's illegal entry is substantially connected to the battery or abuse. The exception will apply to alien spouses and children who, due to the amendments to section 204(a)(1)(A) made by section 40701 of the Violent Crime Control and Law Enforcement Act of 1994, are eligible to petition for immigrant visas because they have been battered or subject to extreme cruelty as defined in that section, and who have been battered or subject to extreme cruelty as defined in subparagraph (B) if the alien's unlawful entry was substantially connected to such battery or cruelty.

The transition provision will ensure that aliens who were granted self-petition rights under section 40701 of VCCLEA and who were first present in the U.S. prior to the effective date of this title need meet no other criteria in order to be exempted from this new ground of inadmissibility.

Subsection (c) revises paragraph (6) of section 212(a) (inadmissibility for aliens previously removed from the United States). Current paragraph (6)(A) imposes a 1-year bar to admission for an alien ordered excluded and deported from the United States, and current paragraph (6)(B) imposes a 5-year bar to admission for an

---

[124] See, e.g., Matter of Romero, (BIA, Dec. 19, 1990).

227

alien deported from the United States, except in the case of an alien convicted of an aggravated felony, in which case the bar is for 20 years. Revised paragraph (6)(A)(i) provides that an alien ordered removed under revised section 235(b)(1), or at the end of proceedings under new section 240 that were initiated upon the alien's arrival in the United States, is inadmissible for a period of 5 years. Revised paragraph (6)(A)(ii) provides that an alien otherwise ordered removed from the United States shall be barred from admission for 10 years (or permanently in the case of an alien convicted of an aggravated felony). These bars to readmission can be waived (as in current law) if the Attorney General has given prior consent to the alien's reapplying for admission.

Revised paragraph (6)(B) provides that an alien unlawfully present in the United States for an aggregate period totalling 1 year is inadmissible unless the alien has remained outside of the United States for 10 years. No period of time in which the alien was present in the United States as a minor under the age of 18, as a bona fide applicant for asylum under section 208, as an alien authorized to be employed in the United States, or as a beneficiary of family unity protection, shall count towards the aggregate 1-year period. This bar shall not apply to an alien described in new section 212(a)(9)(B) (battered spouse or child). An alien may be granted a 3-month extension if the alien applies for such extension prior to the expiration of the 1-year period and the failure to extend the period would constitute extreme hardship to the alien. The Attorney General may waive this ground of inadmissibility if the Attorney General determines that admission of the alien would substantially benefit a specifically defined national interest or, in the case of an alien who is the spouse, parent, or child of a United States citizen of lawful permanent resident, for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.

Subsection (d) revises section 212(i) to provide that the ground of inadmissibility under section 212(a)(6)(C) (fraud and misrepresentation) may be waived in the case of a spouse, son, or daughter of a United States citizen or, in the case of a spouse, son, or daughter of a lawful permanent resident, if the refusal of admission would result in extreme hardship to the lawfully resident spouse or parent.

*Comment.*—The intent of this amendment is to strengthen penalties against immigration fraud by making waiver of this ground of inadmissibility available only to members of nuclear families, and to apply an extreme hardship requirement in the case of family members of lawful permanent residents.

Subsection (e) amends redesignated section 212(a)(10) by adding a new subparagraph (D), making inadmissible any alien who had previously renounced United States citizenship for the purpose of avoiding taxation.

Subsection (f)(1) amends section 212(a)(1)(A) by adding a new clause (ii), making inadmissible any alien who seeks immigration as an immigrant who does not present evidence of vaccination against mumps, measles, rubella, polio, tetanus and diphtheria toxoids, pertussis, influenza type B and hepatitis B, and any other vaccinations recommended by the Advisory Committee for Immunization Practices.

228

Subsection (f)(2) amends section 212(g) to make conforming amendments and to add a new paragraph (3), providing that the new exclusion ground related to vaccinations may be waived if the alien receives the required vaccination or if a civil surgeon or similar official designated in 42 CFR 34.2 certifies that the vaccination would not be medically appropriate.

The foregoing amendments shall apply to applicants for immigrant visas or adjustment of status filed after September 30, 1996. The Committee anticipates that the INS and the State Department will provide notification to persons seeking admission to the U.S. of the need to obtain the required vaccinations.

Subsection (g) conforms references in section 241(a) (grounds of deportability) to reflect the change in nomenclature in section 212(a) from "excludable" to "inadmissible." Subparagraph (B) of paragraph 241(a)(1) (entry without inspection) will be amended to state that an alien present in the United States in violation of law is deportable. The current category of persons who are deportable because they have made an entry without inspection will, under subsection (c) of this section, be considered inadmissible under new paragraph (9) of subsection 212(a).

*Sec. 302.—Inspection of aliens; expedited removal of inadmissible arriving aliens; referral for hearing (revised section 235)*

This section will amend section 235 of the INA, regarding the inspection of aliens arriving in the U.S.

*Applicants for admission.*—New section 235(a) provides that an alien present in the United States who has not been admitted to the U.S. (see Section 301(a) of this bill), who arrives at the United States, whether or not at a designated port of arrival, or who is brought to the United States after having been interdicted in international or United States waters, shall be deemed an applicant for admission.

An arriving alien who is a stowaway is not eligible to apply for admission or to be admitted and shall be ordered removed upon inspection by an immigration officer. A stowaway shall not be eligible to apply for asylum in the United States unless the stowaway establishes a credible fear of persecution pursuant to the expedited review process in section 235(b)(1).

Aliens seeking admission, readmission, or transit through the United States shall be inspected by an immigration officer, who shall have the same authority to take statements and receive evidence as under current section 235 of the INA. An alien applying for admission may, at the discretion of the Attorney General, be permitted to withdraw the application for admission and depart immediately from the United States.

New section 235(b) establishes new procedures for the inspection and in some cases removal of aliens arriving in the United States.

*Expedited removal of arriving aliens.*—New paragraph (b)(1) provides that if an examining immigration officer determines that an alien is inadmissible under section 212(a)(6)(C) (fraud or misrepresentation) or 212(a)(7) (lack of valid documents), the officer may order the alien removed without further hearing or review, unless the alien states a fear of persecution or a desire to apply for asylum.

229

An alien who states a fear of persecution or a wish to apply for asylum shall be referred for interview by an asylum officer, who is an immigration officer who has had professional training in asylum law, country conditions, and interview techniques. If the officer finds that the alien has a credible fear of persecution, the alien shall be detained for further consideration of the application for asylum. If the alien does not meet this standard, and the officer's decision is upheld by a supervisory asylum officer, the alien will be ordered removed. An alien may consult with a person of his or her choosing before the interview, at no expense to the Government and without delaying the interview. A "credible fear of persecution" means that it is more probable than not that the alien is telling the truth and the alien has a reasonable possibility of establishing eligibility for asylum.

There is no administrative review of a removal order entered into under this paragraph, but an alien claiming under penalty of perjury to be lawfully admitted for permanent residence shall be entitled to administrative review of such an order. An alien ordered removed under this paragraph may not make a collateral attack against the order in a prosecution under section 275(a) (illegal entry) or 276 (illegal reentry).

*Inspection of other arriving aliens.*—New paragraph (b)(2) provides that an alien determined to be inadmissible by an immigration officer (other than an alien subject to removal under paragraph (b)(1), or an alien crewman or stowaway) shall be referred for a hearing before an immigration judge under new section 240.

*Aliens inadmissible on national security grounds.*—Subsection (c) restates the provisions of current section 235(c) regarding the removal of aliens arriving in the United States who are inadmissible on national security grounds. This subsection is not intended to apply in the case of aliens who are inadmissible under new section 212(a)(9) because they are already present in the United States. Such aliens could be subject to the special removal procedures provided in Subtitle B of this Title.

*Authority of officers.*—New subsection (d) restates provisions currently in section 235(a) authorizing immigration officers to search conveyances, administer oaths, and receive evidence, and to issue subpoenas enforceable in a United States district court.

*Sec. 303—Apprehension and detention of aliens not lawfully in the United States (revised section 236)*

Subsection (a) of this section will amend section 236 of the INA to include provisions currently contained in sections 236 and 242. Subsection (b) authorizes an increase in INS detention facilities to 9,000 beds by FY 1997.

*Section 236.*—Section 236(a) restates the current provisions in section 242(a)(1) regarding the authority of the Attorney General to arrest, detain, and release on bond an alien who is not lawfully in the United States. (The current authority in section 242(a) for a court in habeas corpus proceedings to review the conditions of detention or release pending the determination of the alien's inadmissibility or deportability is not retained.) The minimum bond for an alien released pending removal proceedings is raised from $500 to $1500.

230

New section 236(b) restates the current provisions in section 242(a)(1) that the Attorney General may at any time revoke an alien's bond or parole.

New section 236(c) restates the current provisions in section 236(e) and 242(a)(2) regarding the detention of an alien convicted of an aggravated felony, and adds an additional provision enabling the release of such an alien if the Attorney General decides in accordance with 18 U.S.C. 3521 that release is necessary to provide protection to a witness, potential witness, a person cooperating with an investigation into major criminal activity, or a family member or close associate of such a witness or cooperator.

New section 236(d) restates the current provisions in section 242(a)(3) regarding the identification of aliens convicted of aggravated felonies and amends those provisions to require that information be provided to the Department of State for inclusion in its automated visa lookout system.

*Sec. 304—Removal proceedings; cancellation of removal and adjustment of status; Voluntary departure (revised and new sec. 239 to 240C)*

Subsection (a) of this section redesignates current section 239 (designation of ports of entry for aliens arriving by civil aircraft) as section 234, redesignates section 240 (records of admission) as section 240C, and inserts new sections 239, 240, 240A, and 240B. Subsection (b) of this section repeals section 212(c) of the INA.

*Section 239.*—New section 239 ("*Initiation of removal proceedings*") restates the provisions of current subsections (a) and (b) of section 242B regarding the provision of notice ("Notice to Appear") to aliens placed in removal proceedings. These provisions are conformed to the establishment of a single removal hearing to replace the proceedings under current section 236 (exclusion) and 242 (deportation). The requirement that the Notice to Appear (formerly "Order to Show Cause") be provided in Spanish as well as English is not retained. The mandatory period between notice and date of hearing is reduced to 10 days. Service is sufficient if there is proof of mailing to the last address provided by the alien.

*Section 240.*—New section 240 ("Removal Proceedings") restates provisions in current section 236 (exclusion proceedings) and 242 and 242B (deportation proceedings).

Section 240(a) provides that there shall be a single proceeding for deciding whether an alien is inadmissible under section 212(a) or deportable under section 237 (formerly section 241(a)). This subsection shall not affect proceedings under new section 235(c) (aliens inadmissible on national security grounds), new section 238 (currently section 242A) (aliens convicted of aggravated felonies), or new section 235(b)(1) (arriving aliens inadmissible for fraud or lack of documents).

Section 240(b) provides that the removal proceeding under this section shall be conducted by an immigration judge in largely the same manner as currently provided in sections 242 and 242B. Under paragraph (b)(2), the proceeding may take place in person, through video conference, or, with the consent of the alien in hearings on the merits, through telephone conference. Under paragraph (b)(5), an alien who fails to appear for a hearing may be ordered

231

removed if the Service establishes by clear, unequivocal, and convincing evidence that notice under section 239 was provided and the alien is inadmissible or deportable. There is no requirement to provide written notice if the alien has failed to provide the address required under section 239(a)(1)(F). An in absentia order can only be rescinded through a motion to reopen filed within 180 days if the alien demonstrates that the failure to appear was due to exceptional circumstances (as defined in section 240(e)), or a motion to reopen filed at any other time if the alien demonstrates that the alien either did not receive notice of the hearing or was in Federal or State custody and could not appear. An alien who fails to appear shall be ineligible for any relief under new sections 240A (voluntary departure) and 240B (cancellation of removal), and sections 245, 248, and 249.

Section 240(c) provides that the immigration judge shall make a decision on removability based only upon the evidence at the hearing. An alien applicant for admission shall have the burden to establish that he or she is beyond doubt entitled to be admitted. An alien who is not an applicant for admission shall have the burden to establish by clear and convincing evidence that he or she is lawfully present in the U.S. pursuant to a prior lawful admission. In the case of an alien who has been admitted to the U.S., the Service has the burden to establish by clear and convincing evidence that the alien is deportable.

An alien is limited to one motion to reconsider the decision of the immigration judge. Such motion shall be filed within 30 days of the final administrative order of removal and shall specify the errors of law or fact in the order. An alien is limited to one motion to reopen proceedings. Such motion shall be filed within 90 days of the final administrative order of removal and shall state the new facts to be proven at a hearing if the motion is granted. The deadline for a motion to reopen may be extended in the case of an application for asylum or withholding of removal that is based on new evidence of changed country conditions that was not available at the time of the initial hearing. The deadline also may be extended in the case of an in absentia order of removal if filed within 180 days and establishing that the alien's failure to appear was because of exceptional circumstances beyond the control of the alien (as defined in section 240(e)) or because the alien did not receive the notice required under section 239(a).

Section 240(d) provides that the Attorney General shall provide by regulation for the entry by an immigration judge of an order of removal stipulated to by the alien and the INS. Such an order shall be a conclusive determination of the alien's removability from the U.S.

Section 240(e) defines as "exceptional circumstances" the serious illness of the alien or the serious illness or death of the spouse, parent, or child of the alien, but not including less compelling circumstances. The subsection defines "removable" to mean that an alien who has not been admitted is inadmissible under section 212 and that an alien who has been admitted is deportable under section 237.

*Section 240A.*—New section 240A ("*Cancellation of removal; adjustment of status*") establishes revised rules for the type of relief

232

that is currently available to excludable and deportable aliens under section 212(c) and 244(a)–(d).

Section 240A(a) provides that the Attorney General may cancel removal in the case of an alien lawfully admitted for permanent residence for not less than 5 years if the alien has resided in the United States continuously for 7 years since being lawfully admitted in any status and has not been convicted of an aggravated felony or felonies the aggregate sentence for which is at least 5 years. This provision is intended to replace and modify the form of relief now granted under section 212(c) of the INA.

Section 240A(b)(1) provides that the Attorney General may cancel removal in the case of an alien who has been physically present in the United States for a continuous period of at least 7 years immediately preceding the date of applying for such relief, has been a person of good moral character, has not been convicted of an aggravated felony, and establishes that removal would result in extreme hardship to the alien or to the alien's spouse, parent, or child who is a citizen of the United States or an alien lawfully admitted for permanent residence. This provision is intended to replace and modify the relief of suspension of deportation now granted under section 244(a).

Section 240A(b)(2) restates the provisions in current section 244(a)(3), enacted in section 40703(a)(3) of the Violent Crime Control and Law Enforcement Act of 1994. It provides that the Attorney General may cancel removal if the inadmissible or deportable alien has been subjected to extreme cruelty in the United States by a spouse or parent who is a United States citizen or lawful permanent resident, has been physically present in the United States for a continuous period of at least 3 years, has been a person of good moral character during such period, is not deportable or inadmissible on grounds related to criminal activity, national security, or marriage fraud, and establishes that removal would result in severe hardship.

Section 240A(b)(3) states that the Attorney General may adjust to the status of an alien lawfully admitted for permanent residence an alien who meets the requirements for cancellation of removal. The number of such adjustments shall not exceed 4,000 in any fiscal year.

Subsection 240A(c) provides that the following categories of aliens shall not be eligible for cancellation of removal under subsections (a) and (b)(1): an alien who entered as a crewman after June 30, 1964; an alien who was admitted as a nonimmigrant exchange alien under 101(a)(15)(J); an alien who was admitted as a nonimmigrant exchange alien under section 101(a)(15)(J), is subject to the two-year foreign residence requirement of section 212(e), and has not fulfilled that requirement or received a waiver; or an alien who is inadmissible under section 212(a)(3) or deportable under section 237(a)(4)(D) (national security and related grounds).

Subsection 240A(d) provides that the period of continuous residence or physical presence ends when an alien is served a notice to appear under section 239(a) (for the commencement of removal proceedings under section 240). A period of continuous physical presence is broken if the alien has departed from the United States for any periods in the aggregate exceeding 180 days, unless for

emergent reasons the return could not be accomplished in that time. The continuous physical presence requirement does not apply to an alien who has served 24 months in active-duty status in the United States armed forces, was in the United States at the time of enlistment or induction, and was honorably discharged.

*Section 240B.*—New section 240B ("*Voluntary departure*") establishes new conditions for the granting of voluntary departure, currently governed by section 242(b) and 244(e) of the INA.

Section 240B(a) provides that the Attorney General may permit an alien voluntarily to depart the United States at the alien's expense in lieu of being subject to removal proceedings under section 240 or prior to the completion of such proceedings, if the alien is not deportable because of conviction for an aggravated felony or on national security and related grounds. Permission to depart voluntarily under this subsection shall not be valid for a period exceeding 120 days and an alien may be required to post a voluntary departure bond, to be surrendered upon proof that the alien has departed the U.S. within the time specified. No alien arriving in the United States for whom removal proceedings under section 240 are instituted at the time of arrival is eligible for voluntary departure under this section. Such an alien may withdraw his or her application for admission to the United States in accordance with section 235(a)(4).

Section 240B(b) provides that the Attorney General may permit an alien voluntarily to depart the United States at the conclusion of proceedings under section 240 if the alien has been physically present for at least one year in the United States, the alien has been a person of good moral character for the preceding 5 years, the alien is not deportable because of conviction for an aggravated felony or on national security and related grounds, and the alien has established by clear and convincing evidence that the alien has the means to depart the United States and intends to do so. The period for voluntary departure cannot exceed 60 days and a voluntary departure bond is required.

Section 240B(c) provides that an alien is not eligible for voluntary departure if the alien was previously granted voluntary departure after having been found inadmissible under section 212(a)(9) (present without admission).

Section 240B(d) provides that if an alien is permitted to depart voluntarily and fails to do so, the alien shall be subject to a civil penalty of not less than $1,000 nor more than $5,000 and shall not be eligible for any further relief under this section or sections 240A, 245, 248, or 249 for a period of 10 years.

Section 240B(e) provides that the Attorney General may by regulation limit eligibility for voluntary departure for any class or classes of aliens.

Section 240B(f) provides that an alien may appeal from a denial of an order of voluntary departure but shall be removable from the U.S. 60 days after the entry of the order of removal and may prosecute the appeal from abroad.

234

*Sec. 305—Detention and removal of aliens ordered removed (new section 241)*

Subsection (a) of this section strikes section 237, redesignates section 241 as section 237, and inserts a new section 241.

*Section 241*—New section 241 ("*Detention and removal of aliens ordered removed*") restates and revises provisions in current sections 237, 242, and 243 regarding the detention and removal of aliens.

Section 241(a) provides that the Attorney General shall remove an alien within 90 days of the alien being ordered removed. This removal period shall begin when the alien's order is administratively final, when the alien is released from non-immigration related detention or confinement, or, if the alien has appealed his order to a court and removal has been stayed, the date of the court's final order. The removal period is extended beyond 90 days if the alien wilfully refuses to apply for travel documents or takes other steps (other than appeals) to prevent removal.

The alien shall be detained during the removal period. If space is not available, the Attorney General may release the alien on bond and under any conditions that the Attorney General may prescribe. If the alien is not removed within 90 days, the alien shall be subject to supervision under conditions similar to those currently in section 242(d). An inadmissible alien who has been ordered removed may be detained beyond the 90-day period. The Attorney General may not remove an alien who is sentenced to imprisonment until the alien is released, but parole, supervised release, probation, or the possibility of arrest are not grounds to defer removal.

If an alien reenters the United States illegally after having been removed or departed voluntarily under an order of removal, the prior order of removal is reinstated and the alien shall be removed under the prior order, which shall not be subject to review.

An alien who is subject to an order of removal may not be granted authorization to work in the United States unless there is no country willing to accept the alien, or the alien cannot be removed for reasons deemed strictly in the public interest.

Section 241(b) establishes the countries to which an alien may be removed. Subsection (b)(1) restates the provisions in current section 237(a); subsection (b)(2) restates the provisions in current sections 243 (a) and (b).

Section 241(c) provides that an alien arriving in the United States who is ordered removed shall be removed immediately by the vessel or aircraft that brought the alien, unless it is impracticable to do so or the alien is a stowaway who has been ordered removed by operation of section 235(b)(1) but has a pending application for asylum. This subsection also restates and revises the provisions in section 237(d) regarding stay of removal, and the provisions in section 237(a) regarding cost of detention and maintenance pending removal. These provisions make it clear that actual physical detention of an alien who has been permitted to land in the United States shall be the sole responsibility of the Attorney General and shall take place in INS facilities or contract facilities, even in cases where the liability for cost of detention is assigned to a private entity such as a carrier. The Committee further believes the

235

rate of reimbursement charged to the carrier to other entity made responsible for the cost of detention of an alien shall be at the same per diem rate charged to the government for the cost of detention.

In the case of an alien stowaway, the carrier shall be liable for the cost of detention incurred by the Attorney General. If the stowaway does not claim asylum, the only issue is to arrange for the stowaway's departure from the United States. This could occur directly on the vessel of arrival, particularly in the case of aircraft. However, the Committee understands that, due to commercial requirements, safety concerns, and other factors, it is often not practicable for the stowaway to be removed on the vessel of arrival, particularly in the case of commercial maritime vessels. For this reason, section 241(d)(2)(B) provides that an alien stowaway may be allowed to land in the United States for detention by the Attorney General or departure or removal of the stowaway. In such a case, the carrier shall be responsible, under section 241(c)(3)(A)(ii)(II), for the cost of detention by the Attorney General for the time reasonably necessary to arrange for repatriation or removal of the alien, including obtaining necessary travel documents. The carrier's liability shall not extend beyond the date on which it is ascertained that such travel documents cannot be obtained. The Committee expects that the carrier and the INS will work cooperatively in order to obtain such travel documents in an expeditious manner, but understands that there are circumstances in which foreign governments do not cooperate in issuing such documents. Since circumstances in such cases vary, the Committee has not designated a time period beyond which the financial responsibility for continued detention shifts from the carrier to the INS. The Committee expects that the INS, through regulations or internal policy guidance, will set a reasonable timeline and other criteria that will be applied uniformly in all INS districts. Such guidelines should include an obligation on the part of the carrier to continue efforts to obtain travel documents and make other arrangements for the departure of the stowaway from the U.S.

In the case of a stowaway who has claimed asylum and is being detained to pursue an application for asylum, the carrier shall be liable, under section 241(c)(3)(A)(ii)(III), for a period not to exceed 15 business days, excluding Saturdays, Sundays, and holidays. The 15-day period shall begin when the alien is determined, under section 235(b)(1), to have a credible fear of persecution and thus be eligible to apply for asylum, but not later than 72 hours after the actual arrival of the stowaway in the U.S. The 72-hour period is intended to provide adequate time for the Attorney General to determine if the stowaway has a credible fear of persecution and thus may be detained by the INS to pursue an asylum application. Under no circumstances shall the carrier be required to reimburse the INS for a period of detention greater than 15 business days, plus the portion of the initial 72-hour period required to determine if the stowaway is eligible to apply for asylum. The Committee believes that the obligation of the carrier to pay for detention costs shall not be extended to require the carrier to pay for the cost of translators, legal counsel, or other assistance in preparing and presenting the stowaway's claim for asylum. The Committee expects that the INS will adopt, through regulations consistent with the

236

provisions of this legislation, clear policy guidance regarding the conduct of interviews to determine if a stowaway has a credible fear of persecution.

Section 241(d) restates the provisions in current section 237(b) requiring the owner of the vessel or aircraft bringing an alien to the United States to comply with orders of an immigration officer regarding the detention or removal of the alien. This subsection also restates the provisions in section 243(e) that any carrier (not limited to the carrier who has brought an alien) comply with an order of the Attorney General to remove to a specific destination an alien who has been ordered removed.

Section 241(d) also revises and restates the requirements in section 273(d) regarding permission for a stowaway to land in the U.S. A carrier who has brought a stowaway shall, pending completion of the inspection of the stowaway, detain the stowaway on board the vessel or at another place designated by the INS. The carrier may not permit the stowaway to land except temporarily for medical treatment, for detention of the stowaway by the Attorney General, or for departure and removal of the stowaway. However, a carrier shall not be required to detain a stowaway who has been permitted to remain in the U.S. to pursue an application for asylum, who shall be detained by the Attorney General subject to the reimbursement requirements set forth in section 241(c). Furthermore, the Attorney General shall grant a timely request by a carrier to remove the stowaway on a vessel other than that on which the alien has arrived in the U.S., provided that the carrier pays the cost of removal and obtains all necessary travel documents. In this way, the stowaway can be rapidly repatriated to the country of origin, instead of being forced to remain on the vessel while it makes other ports of call.

Section 241(e) restates the provisions in current sections 237(c) and 243(c) regarding the payment of expenses for removal of aliens who have been ordered removed.

Section 241(f) restates the provisions in section 243(f) regarding the employment of persons to assist in the removal of aliens requiring personal care during removal.

Section 241(g) amends and restates the authority in current section 242(c) for construction and operation of detention facilities. The amendment states that before the construction of new facilities, the Commissioner of the INS shall consider the availability for purchase or lease of existing facilities.

Section 241(h) provides that nothing in section 241 shall be construed to create any substantive or procedural right or benefit that is legally enforceable against the United States, its agencies or officers, or any other person. This provision is intended, among other things, to prohibit the litigation of claims by aliens who have been ordered removed from the U.S. that they be removed at a particular time or to a particular place.

Subsection (b) of section 305 amends redesignated section 241(h) (reimbursement to States for incarceration of undocumented criminal alien felons—currently section 242(j)). The amendment provides that "incarceration" shall include imprisonment in a State or local facility that is counted towards completion of a sentence and also the imprisonment of a previously convicted felon or misdemeanant

237

who has been rearrested on new charges. The amendment also will permit reimbursement in the case of an alien convicted of two or more misdemeanors.

*Sec. 306—Appeals from orders of removal (new section 242)*

This section amends section 242 to revise and restate the provisions in current section 106, which is repealed.

Section 242(a) provides that a final order of removal, other than an order or removal under section 235(b)(1), is governed by chapter 158 of title 28. This is consistent with current section 106(a). This subsection also provides that no court shall have jurisdiction to review a decision by the Attorney General to invoke section 235(b)(1), the application of such section to individual aliens (including the determination under section 235(b)(1)(B) regarding credible fear of persecution), or procedures and policies to implement section 235(b)(1). Individual determinations under section 235(b)(1) may only be reviewed under new subsection 242(f).

Section 242(b)(1) provides that a petition for review must be filed within 30 days after the final order of removal in the federal court of appeals for the circuit in which the immigration judge completed proceedings. Subsection (b)(3)(B) provides that the filing of a petition stays the removal of the alien unless the alien has been convicted of an aggravated felony or has been ordered removed because alien is inadmissible under section 212, in which case removal is stayed only if specifically ordered by the court.

The remaining paragraphs of subsection (b) revise and restate the provisions in subsections (3) through (8) of current section 106 regarding form, service, decision, treatment of a petitioner's claim that he or she is a national of the United States, consolidation of motions to reopen and reconsider, challenge of validity of orders of removal, and detention and removal of alien petitioners.

Section 242(c) restates the provisions in the second sentence of subsection (c) of current section 106 that a petition for review must state whether a court has upheld the validity of an order of removal, and if so, identifying the court and date and type of proceeding.

Section 242(d) restates the provisions in the first and third sentences of subsection (c) of current section 106 requiring that a petitioner have exhausted administrative remedies and precluding a court from reviewing an order of removal that has been reviewed by another court absent a showing that the prior review was inadequate to address the issues presented in the petition, or that the petition presents new grounds that could not have been presented in the prior proceeding.

Section 242(e) provides that a petition for review from an order of removal under section 238 (expedited procedures for non-resident aliens convicted of an aggravated felony) may address only whether the alien has been correctly identified, has been convicted of an aggravated felony, and has been given the procedures described in section 238(b)(4).

Section 242(f) provides rules for judicial review of orders of removal under section 235(b)(1). No court shall have jurisdiction or authority to enter declaratory, injunctive, or other equitable relief against the operation of section 235(b)(1) (other than that specifi-

238

cally authorized in this subsection), or to certify a class under Rule 23 of the Federal Rules of Civil Procedure. Judicial review is only available in habeas corpus and is limited to whether the petitioner is an alien, whether the petitioner was ordered removed under section 235(b)(1), and whether the petitioner can prove by a preponderance of the evidence that he or she is an alien lawfully admitted for permanent residence. If the court determines that the petitioner was not ordered excluded or is an alien lawfully admitted for permanent residence, the court may order no relief other than to require that the alien be provided a hearing under section 240. The habeas corpus proceeding shall not address whether the alien actually is admissible or entitled to any relief from removal.

Section 242(g) provides that no court other than the Supreme Court shall have jurisdiction or authority to enjoin or restrain the operation of the provisions in chapter 4 of Title II of the INA, as amended by this legislation, other than with respect to the application of the provisions to an individual alien against whom removal proceedings have been initiated.

*Sec. 307. Penalties relating to removal (revised section 243)*

Subsection (a) restates the provisions in current section 242(e) regarding penalties for failure to depart within 90 days of the order of removal.

Subsection (b) restates the provisions in the third and final sentence of current section 242(d) regarding penalties for failure to comply with the terms of release under supervision pursuant to section 241(a)(3) (currently the first two sentences of section 242(d)).

Subsection (c) restates the provisions in the second and third sentences of current section 237(d) and the final clause of current section 243(e) regarding penalties for failure to comply with an order to remove an alien from the U.S., including civil money penalties and limitations on the clearance of vessels.

Subsection (d) revises and restates the provisions in current section 243(g) regarding sanctions against a country that refuses to accept an alien who is a citizen, subject, national, or resident of that country. Under the amendment, the Secretary of State shall order that the issuance of both immigrant and nonimmigrant visas to citizens, nationals, subjects, or nationals of that country be suspended until the country has accepted the alien.

*Sec. 308. Redesignation and reorganization of other provisions; additional conforming amendments*

This section makes a series of redesignations and conforming amendments in addition to those made in other sections.

Current section 232 is redesignated as section 232(a).

Current section 234 is redesignated as section 232(b).

Current section 238 is redesignated as section 233.

Current section 240 is redesignated as section 234A.

Current section 242A is redesignated as section 238, with conforming amendments.

Current section 242B is stricken.

Current section 244A is redesignated as section 244.

239

The provisions in current section 237(e) regarding the removal of an arriving alien who is helpless from sickness or mental or physical disorder are restated as a new section 232(c). Section 212(a)(10)(B), the redesignated ground of inadmissibility for an alien who is ordered to accompany such a helpless alien during removal, also is amended to conform to the amendments in new section 232(c).

Section 273(a) is amended by adding a new paragraph (2) to restate the provisions in current section 237(b)(5) prohibiting a carrier from taking any consideration contingent on whether an alien is admitted to or order removed from the U.S.

Section 273(d) is repealed.

*Sec. 309—Effective dates; transition*

Subsection (a) provides that the changes made in this subtitle shall take effect on the first day of the first month beginning more than 180 days after the date of enactment.

Subsection (b) provides that the Attorney General shall promulgate regulations to carry out this subtitle at least 1 month before the effective date in subsection (a).

Subsection (c) provides for the transition to new procedures in the case of an alien already in exclusion or deportation proceedings on the effective date. In general, the amendments made by this subtitle shall not apply and the proceedings (including judicial review) shall continue to be conducted without regard to such amendments.

The Attorney General may elect to apply the new procedures in a case in which an evidentiary hearing under current section 236 (exclusion) or sections 242 and 242B (deportation) has not been commenced as of the effective date. The Attorney General shall provide notice of such election to the alien, but the prior notice of hearing and order to show cause served upon the alien shall be effective to retain jurisdiction over the alien.

The Attorney General also may elect, in a case in which there has been no final administrative decision, to terminate proceedings without prejudice to the Attorney General's ability to initiate new proceedings under the amendments made by this subtitle. Determinations in the terminated proceeding shall not be binding in the new proceeding.

This subsection also provides that in the case where a final order of exclusion or deportation is entered on or after the date of enactment and for which a petition for review or for habeas corpus under section 106 has not been filed as of such date, new rules shall apply to subsequent petitions for judicial review. All judicial review, both of exclusion and deportation decisions, shall be by petition for review to the court of appeals for the judicial circuit in which the administrative proceedings before the special inquiry officer (immigration judge) were completed. The petition for review also must be filed not later than 30 days after the final order of exclusion or deportation.

The rules under new section 240A(d)(1) and (2) regarding continuous physical presence in the United States as a criterion for eligibility for cancellation of removal shall apply to any notice to appear

240

(including an Order to Show Cause under current section 242A) issued after the date of enactment of this Act.

### Subtitle B—Removal of Alien Terrorists

#### Part 1—Removal Procedures for Alien Terrorists

*Sec. 321—Removal procedures for alien terrorists*

This section amends the INA by adding a new title V, entitled SPECIAL REMOVAL PROCEDURES FOR ALIEN TERRORISTS.

Section 501 provides definitions to apply to title V. An "alien terrorist" is an alien deportable under current section 241(a)(4)(B).

Section 502 ("*Establishment of special removal court; panel of attorneys to assist with classified information*")

Sections 502(a) through (c) require the Chief Justice of the Supreme Court to publicly designate 5 district court judges from 5 of the U.S. judicial circuits who shall constitute a special court with jurisdiction to conduct special removal proceedings. The terms of the judges first appointed shall be so staggered that the term of one judge expires each year. The Chief Justice shall designate a chief judge, who shall serve a full five-year term.

Section 502(d) provides that the proceedings shall be conducted in conformance with section 103(c) of the Foreign Intelligence Surveillance Act of 1978.

Section 502(e) provides that the special court shall designate a panel of attorneys each of whom has a security clearance permitting access to classified information and has agreed to represent aliens lawfully admitted for permanent residence with respect to certain classified information used in special removal proceedings under the provisions of section 506(c).

Section 503 ("*Application for initiation of special removal proceeding*") provides that when the Attorney General has classified information that an alien is an alien terrorist, the Attorney General may seek removal through the filing under seal, ex parte and in camera, of a written application with the special court. The application, made under oath or affirmation, shall identify the attorney making the application; indicate the approval of the Attorney General or Deputy Attorney General to the filing of the application based on a finding that the alien is removable under this title; identify the alien for whom special removal proceedings are sought; and a statement of facts to establish that the alien is an alien terrorist, is physically present in the U.S., and that the use of removal procedures under title II would pose a risk to the national security of the U.S. The Attorney General may dismiss a removal action under this title at any time.

Section 504 ("*Consideration of application*") provides that a single judge on the removal court shall consider, ex parte and in camera, the application and other information, including classified information, presented under oath or affirmation. A verbatim record shall be kept of any hearing on the application. The judge shall enter ex parte an order approving the application if there is probable cause to believe that the alien has been correctly identified and is a terrorist, and that adherence to the provisions of title II regarding the removal of aliens would pose a risk to national secu-

rity. The judge, in the case of denial, shall prepare a written statement of the reasons therefor.

If an order is issued under this section, the alien's rights regarding removal and expulsion shall be governed exclusively by this title. No other provisions of the Act shall apply, unless otherwise specified in this title.

Section 505 ("*Special removal hearings*") provides that an alien shall be given reasonable of the nature of the charges and of the time and place of the hearing, and a general account of the basis for the charges. The hearing shall be held expeditiously and by the same judge who granted the application for the special removal proceeding under section 504. The hearing shall be open to the public and the alien shall have the right to be represented by counsel. An alien unable to afford counsel shall have counsel assigned, in accordance with section 3006A of title 18. The alien may introduce evidence and, subject to section 506, may examine the evidence and cross-examine any witnesses. A verbatim record shall be kept and the decision shall be based only on the evidence at the hearing.

An alien subject to proceedings under this section shall not be eligible for relief under section 208 (asylum), 243(h) (withholding of deportation), 244(a) (suspension of deportation), 244(e) (voluntary departure), 245 (adjustment of status), and 249 (registry).

The Department of Justice or the alien may request the judge to compel by subpoena the attendance of witnesses and the production of books, papers, documents, or other objects. Such requests may be made ex parte, but the judge may reveal an alien's request to the Department of Justice if the witness or material requested by the alien would reveal evidence or the source of evidence which the Department of Justice has received permission to introduce in camera and ex parte under section 505(e) or section 506.

Section 505(e) provides that classified information shall be introduced in camera and ex parte and that neither the alien nor the public shall be informed of such evidence or its sources other than by reference to a summary of the evidence prepared in accordance with section 506(b). Electronic surveillance information obtained through the Foreign Intelligence Surveillance Act of 1978 shall not be disclosed to the alien. The United States shall retain the right to seek protective orders and assert privileges ordinarily available to the U.S. to protect against the disclosure of classified information, including the military and state secrets privileges. The Federal Rules of Evidence shall not apply to hearings under this title.

At the end of the evidence, argument shall proceed with the Department of Justice opening and having final reply. Argument concerning evidence presented in camera and ex parte shall be heard under like circumstances. The Department has the burden to prove by clear and convincing evidence that the alien is an alien terrorist and thus subject to removal. If this burden is met, the judge shall order the alien detained pending removal and taken into custody if the alien had been released pending the hearing. The judge shall prepare a written order of findings of fact and conclusions of law, but shall not disclose to the public or the alien the source or substance of information received in camera and ex parte.

242

Section 506 ("*Consideration of classified information*") provides that the judge shall consider each item of classified information in camera and ex parte. The Department shall prepare a written summary of such classified information which summary does not pose a risk to the national security. The judge shall approve the summary if the judge finds that the summary is sufficient to inform the alien of the nature of the evidence and to permit the alien to prepare a defense; if the judge finds the summary insufficient, the Department shall have a reasonable opportunity to correct it.

If the summary remains insufficient, the judge shall terminate the proceedings unless the judge finds that the continued presence of the alien or the provision of the summary would cause serious and irreparable harm to the national security or death or serious bodily injury to any person. If the judge makes these findings, the special removal proceeding shall continue, the alien shall be informed that no summary is possible, and the classified information submitted in camera and ex parte may be used pursuant to section 505(e).

Section 506(c) provides special procedures for cases involving an alien lawfully admitted for permanent residence in which the judge determines that no summary of classified evidence may be provided to the alien. In such cases, the judge shall appoint a special attorney (see section 502(e)) to whom the classified information may be disclosed for purposes of representing the alien in an in camera proceeding on the evidence. The special attorney may not disclose the classified information to the alien or to any other attorney representing the alien, and is subject to a prison term of not less than 10 nor more than 25 years in prison for violating these restrictions.

Section 507 ("*Appeals*") provides that the Department may seek review of a denial of an order to initiate a special removal hearing by filing an appeal within 20 days of the denial with the U.S. Court of Appeals for the D.C. Circuit. Either party may take an interlocutory appeal to the D.C. Circuit concerning evidentiary issues, including issues concerning the preparation and submission of a summary of classified information.

The decision of the judge after the special removal hearing may be appealed by either the alien or the Department to the D.C. Circuit. In the case of an alien lawfully admitted for permanent residence who is denied a written summary of classified information under section 506(b)(4) and to whom the procedures under section 506(c) have been applied, there shall be an automatic appeal, unless waived by the alien. To the extent such an appeal concerns classified information, the special attorney appointed for the alien shall represent the alien.

Appeals shall be filed within 20 days. The Court of Appeals shall hear the appeal as expeditiously as possible, and shall issue a decision within 60 days of the judge's final order. After the Court of Appeals decision, a petition for certiorari may be filed by either party to the Supreme Court. An appeal of an order of detention also shall be taken to the D.C. Circuit and shall be adjudicated in accordance with the provisions of sections 3145 through 3148 of title 18 regarding the review and appeal of a release or detention order, penalties for failure to appear or for committing a crime, and sanctions for violation of a release condition.

243

Section 508 ("*Detention and custody*") provides that the Attorney General may take into custody any alien against whom an application under section 503 has been filed to initiate special removal proceedings under this title. An alien lawfully admitted for permanent residence is entitled to a release hearing and may be released if the alien demonstrates that he is not likely to flee and that the release will not endanger national security or the safety of any person. An alien in detention under this title shall be entitled to reasonable opportunity to communicate with members of the alien's family or the alien's attorney, and to have contact with diplomatic officers of the alien's country of nationality.

If the special removal judge denies the order sought for in an application under section 503, the alien shall be released from custody. If the Department seeks review of the denial, the judge shall impose the least restrictive conditions that will reasonable assure the appearance of the alien and that the release will not endanger the safety of any person or the community. If no such conditions exist, the alien shall continue to be detained.

If after the hearing the judge decides that the alien should not be removed, the alien shall be released, unless the Attorney General takes an appeal, in which case the alien shall be detained subject to the conditions in section 3142 of title 18. If after the hearing the judge decides that the alien is to be removed, the alien shall be detained pending judicial review.

An alien ordered removed shall be removed to any country the alien shall designate. If the alien refuses to designate a country, or if removal to the designated country would impair an international obligation or adversely affect U.S. foreign policy, the removal shall be to any country willing to receive the alien. If no country is willing to receive the alien, the alien shall be detained. The Attorney General shall report to the alien's attorney every 6 months regarding efforts to find a country willing to accept the alien. An alien in this situation may be released by the Attorney General under such conditions as the Attorney General may prescribe. The removal of an alien ordered removed under this title may be delayed pending a criminal trial against the alien and the service of any sentence.

This section also amends section 276(b) to provide that an alien terrorist removed under the provisions of this title or under subsection 235(c) who enters or attempts to enter the U.S. without the permission of the Attorney General shall be fined and imprisoned for 10 years.

*Sec. 322—Funding for detention and removal of alien terrorists*

This section authorizes to be appropriated, in addition to amounts already appropriated, $5,000,000 for the purpose of detaining and deporting alien terrorists.

*Part 2—Exclusion and Denial of Asylum for Alien Terrorists*

*Sec. 331—Membership in a terrorist organization as ground of inadmissibility*

This section amends section 212(a)(3)(B) of the INA to provide that an alien who is a representative or member of an organization

244

that engages in or actively supports or advocates terrorist activity is excludable from the U.S.

This section also amends section 212(a)(3)(B) by adding a new clause (iv), defining "terrorist organization" to mean a foreign organization designated in the Federal Register by the Secretary of State, in consultation with the Attorney General, based on a finding that the organization engages in or has engaged in terrorist activity that threatens the national security. Congress shall be notified at least 3 days prior to the published designation and has the authority to remove, by law, any such designation. The designation shall be effective for 2 years and may be renewed not earlier than 60 days prior to its expiration. The Secretary of State, in consultation with the Attorney General, may remove a designation at any time. The designation is subject to judicial review.

This section also adds a new clause (v) to section 212(a)(3)(B), defining "representative" to include an officer, official, or spokesman of the organization and any person who directs, counsels, commands, or induces the organization to engage in terrorist activity. The determination of the Secretary of State or Attorney General that an alien is a representative of a terrorist organization is subject to judicial review.

*Sec. 332—Denial of relief for alien terrorists*

This section amends sections 243(h)(2) (withholding of deportation), 244(a) (suspension of deportation), 244(e)(2) (voluntary departure), 245(c) (adjustment of status), and 249(d) (registry) to provide that an alien who is deportable under section 241(a)(4)(B) is not eligible for these forms of relief.

Subtitle C—Deterring Transportation of Unlawful Aliens to the United States

*Sec. 341—Definition of stowaway*

This section amends section 101 of the INA to add a new paragraph (47), defining "stowaway" to mean any alien who obtains transportation without consent including through concealment. A passenger who boards with a valid ticket is not to be considered a stowaway.

*Comment:*—"Stowaway" is a term that has not previously been defined in the INA. Some passengers who board with valid tickets but destroy those tickets and other travel documents en route have been categorized as stowaways in the past. Current administrative practice limits the "stowaway" designation to passengers who have obtained passage without the consent of the carrier. Ordinarily, this will involve concealment on board the vessel, although it may on rare occasions result from failure to observe secure boarding procedures and allowing an illicit passenger who is plainly visible to obtain transport. This amendment is intended to codify the current administrative practice.

The definition clarifies that the term "stowaway" does not apply to a passenger boarding with a ticket. The Committee is aware of the trend in the airline industry toward so-called "ticketless" travel and does intend that the term "ticket" apply to any boarding pass

or other authorization to travel validly obtained through such a "ticketless" system.

*Sec. 342—List of alien and citizen passengers arriving*

This section amends section 231(a) to provide that carriers shall provide electronic manifests of persons arriving in the U.S., and that such lists include for each person transported the person's name, date of birth, gender, citizenship, and travel document number (if applicable). This provision shall be effective not later than 60 days after enactment.

Subtitle D—Additional Provisions.

*Sec. 351—Definition of conviction*

This section amends section 101(a) of the INA to add a new paragraph (47), defining conviction to mean a formal judgment of guilt entered by a court. If adjudication of guilt has been withheld, a judgment is nevertheless considered a conviction if (1) the judge or jury has found the alien guilty or the alien has pleaded guilty or nolo contendere; (2) the judge has imposed some form of punishment or restraint on liberty; and (3) a judgment of guilt may be imposed without further proceedings on guilt or innocence of the original charge if the alien violates the term of probation or otherwise fails to comply with the court's order.

*Sec. 352—Immigration judges and compensation*

Subsection (a) amends paragraph (4) of section 101(b) to replace the definition of "special inquiry officer" with a definition of "immigration judge:" an attorney designated by the Attorney General as an administrative judge within the Executive Order for Immigration Review to conduct proceedings, including proceedings under section 240.

Subsection (b) substitutes the term "immigration judge" for "special inquiry officer" wherever it appears in the INA.

Subsection (c) establishes a four-level pay scale for immigration judges, beginning at 70 percent and reaching 92 percent of the next to highest rate of basic pay for the Senior Executive Service.

*Sec. 353—Rescission of lawful permanent resident status*

This section amends section 246(a) of the INA to clarify that the Attorney General is not required to rescind the lawful permanent resident status of a deportable alien separate and apart from the removal proceeding under section 240.

*Sec. 354—Civil penalties for failure to depart*

This section adds a new section 274D to the INA, providing that aliens under an order of removal who willfully fail to depart or to take actions necessary to permit departure (e.g., apply for travel documents) to a $500 penalty for each day in violation. This section would not diminish the criminal penalties at section 243(a) (for failure to depart) or at any other section of the INA.

246

*Sec. 355—Clarification of district court jurisdiction*

This section clarifies that the grant of jurisdiction under section 279 of the INA is to permit the Government to institute lawsuits for enforcement of provisions of the INA, not for private parties to sue the Government. This has no effect on other statutory or constitutional grounds for private suits against the Government.

*Sec. 356—Use of retired Federal employees for Institutional Hearing Program*

This section permits the hiring of retired military or Federal civilian employees, with no reduction in retirement pay or annuity, for not longer than 24 months to perform duties in connection with the Institutional Hearing Program for removal of criminal aliens from the United States.

*Sec. 357—Enhanced penalties for failure to depart, illegal reentry, and passport and visa fraud*

This section instructs the Sentencing Commission to promptly promulgate amendments to the sentencing guidelines to reflect the amendments made in section 130001 and 130009 of the Violent Crime Control and Law Enforcement Act of 1994.

*Sec. 358—Authorization of additional funds for removal of aliens*

This section authorizes to be appropriated beginning in fiscal year 1996 the sum of $150,000,000 for costs associated with the removal of inadmissible or deportable aliens, including costs of detention of such aliens pending their removal. This section is intended to authorize sufficient funds in fiscal year 1996 for the hiring of 475 detention and deportation officers and support personnel and 475 investigators and support personnel.

*Sec. 359—Application of additional civil penalties to enforcement*

This section amends section 280(b) to provide for establishment of the "Immigration Enforcement Account," into which shall be deposited the civil penalties collected under sections 240B(d), 274C, 274D, and 275(b), as amended by this bill. The collected funds shall be used for specified immigration enforcement purposes.

*Sec. 360—Prisoner transfer treaties*

This section advises the President to negotiate and renegotiate bilateral prisoner transfer treaties to expedite the transfer to their countries of nationality of aliens unlawfully in the United States who are subject to incarceration. The negotiations are to ensure that a transferred prisoner serves the balance of the sentence imposed by the United States, and to eliminate any requirement of prisoner consent to such transfer. The President shall submit an annual certification to Congress on whether each prisoner transfer treaty in force is effective in returning criminal aliens to their countries of nationality.

*Sec. 361—Criminal alien identification system*

Subsection (a) amends section 130002(a) of the Violent Crimes Control and Law Enforcement Act of 1994 to require that the criminal alien identification system be used to assist Federal,

247

State, and local law enforcement agencies in identifying and locating aliens who may be removable on account of criminal or other grounds. The system shall provide for recording of fingerprints of aliens previously arrested and removed.

Subsection (b) provides that at the request of a governor of a State, the INS shall provide assistance in the identification of aliens unlawfully present in the United States.

*Sec. 362—Waiver of exclusion and deportation ground for certain section 274C violations*

Subsection (a) of this section amends subparagraph 212(a)(6)(F) and adds a new paragraph 212(d)(12), to provide that an alien who is inadmissible for having been in violation of section 274C (civil document fraud) may have the ground of inadmissibility waived if the alien is a lawful permanent resident or an alien seeking admission and a family-sponsored or employment-based immigrant, and the violation was committed solely to assist the alien's spouse, parent, son, or daughter (and not another individual).

Subsection (b) amends subparagraph 241(a)(3)(C) (prior to redesignation as section 237(a)(3)(C)) to provide a similar waiver for an alien who is deportable due to a section 274C violation.

*Sec. 363—Authorizing registration of aliens on criminal probation or criminal parole*

This section amends section 263(a) to authorize the registration by the Attorney General of aliens who are or who have been on criminal probation or criminal parole within the U.S.

*Sec. 364—Confidentiality provision for certain alien battered spouses and children*

This section provides that the Attorney General shall not make an adverse determination of admissibility or deportability against an alien or an alien's child using information furnished solely by certain individuals who have battered or subjected to extreme cruelty that alien or that alien's child, unless the alien has been convicted of a crime identified in redesignated section 237(a)(2). Neither shall the Attorney General permit use by, or disclosure to (other than to an officer of the Department of Justice for official and certain other designated purposes) any information that relates to an alien who is the beneficiary of an application for relief (which has not been denied) under section 204(a)(1)(B) (self-petition for immigrant visa by alien who has been battered or subject to extreme cruelty), section 216(c)(4)(C) (hardship waiver allowing removal of conditional permanent resident status based on qualifying marriage because alien spouse or child has been subject to battery or extreme cruelty), or section 244(a)(3) (suspension of deportation for alien spouse or child who has been subject to battery or extreme cruelty). (This prohibition also should extend to applications for cancellation of removal under new section 240A(b)(2)). Penalties are established for violations.

248

TITLE IV—ENFORCEMENT OF RESTRICTIONS AGAINST EMPLOYMENT

*Sec. 401—Strengthened enforcement of the employer sanctions provisions*

This section requires that the number of full-time INS Investigators be increased by 350 and that the new agents be assigned to investigate violations of the employer sanctions provisions of the INA.

*Sec. 402—Strengthened enforcement of wage and hour laws*

This section requires that the number of full-time Department of Labor Wage and Hour Division employees to be increased by 150 and that the new agents be assigned to investigate violations in areas where there are high concentrations of undocumented aliens.

*Sec. 403—Changes in the employer sanctions program*

Subsection (a) amends section 274A(b)(1)(B) of the INA to strike clauses (ii) through (iv). This eliminates three categories of documents that now can be used to establish both employment authorization and identity: certificate of citizenship, certificate of naturalization, and unexpired foreign passport stamped by Attorney General with employment authorization. After this amendment, only a United States passport, alien registration card, or other employment authorization document issued by Attorney General would be acceptable to establish both identity and work authorization.

Subsection (a) also amends section 274A(b)(1)(C) of the INA to eliminate a birth certificate as a document that can be used to establish work authorization. Only a social security card would be acceptable for this purpose. Subsection (a) also amends section 274A(b)(2) to require that an individual being hired provide his or her social security number on the employment verification attestation form.

Subsection (b) ("Employment Eligibility Confirmation Process") amends subsections (a) and (b) of section 274A to require the development and use, on a pilot basis, of an employment eligibility confirmation mechanism.

Section 274A(a)(3) currently provides a defense against liability for hiring an unauthorized alien if the employer has complied in good faith with the document-based employment verification system in section 274A(b). Under this subsection, section 274A(a)(3) is amended to state that if an employer who (1) employs more than 3 employees and (2) is subject to the pilot program in 274A(b)(7) does not obtain appropriate confirmation through the new mechanism of the identity, social security number, and work eligibility of an individual through this process, this defense does not apply. To preserve the defense, an employer must make an inquiry through the mechanism within 3 working days after the date of hiring, unless the confirmation mechanism has registered that not all inquiries were responded to during that time, in which case the inquiry can be made on the first subsequent working day in which the confirmation mechanism is responding to all inquiries. The employer also must receive a confirmation within a time to be specified in

249

regulations by the Attorney General (but not to exceed 10 working days), in order to preserve the defense.

Section 274A(b)(3) currently provides that the employer must retain for a period of 3 years the verification form completed by the employee. This subsection amends section 274A(b)(3) to incorporate the requirements in amended section 274A(a)(3) regarding use of the confirmation mechanism to verify the accuracy of information provided on the form, and to require that the employer retain both the verification form as well as the receipt of confirmation for at least 3 years after the date of hiring, recruiting, or referral of the employee. It will be unlawful for an employer with more than 3 employees to hire an individual without complying with the new confirmation mechanism set out in section 274A(b)(3).

Section 274A(b)(6) is amended to require the Attorney General (or a designee that may include a private entity) to respond to inquiries by employers, through a toll-free telephone line or other electronic media, in the form of a confirmation code signifying whether or not an individual is authorized to be employed. The Attorney General shall establish expedited procedures to confirm the validity of information used under the confirmation mechanism in cases in which confirmation is sought but not provided by the mechanism. The confirmation mechanism shall be designed to maximize the reliability and ease of use of the confirmation process consistent with protecting the privacy and security of the underlying information, and to register all times when the system is not able to respond to all inquiries on whether individuals are authorized to be employed. The mechanism shall compare the name and social security account number and, in certain instances, the alien identification number, supplied by the new employee against records of the Social Security Administration and the INS to determine the validity of the information provided and whether or not the individual has presented a social security number or an alien number that is not valid for employment. The Attorney General shall provide a confirmation or tentative nonconfirmation within 3 working days of the initial inquiry. The Attorney General, in consultation with the Commissioner of Social Security and the Commissioner of INS, shall designate an expedited time period (not to exceed 10 days) within which final confirmation or denial must be provided through the confirmation mechanism. No social security information may be disclosed or released.

No individual shall be denied employment because of inaccurate or inaccessible data in the confirmation mechanism, and the Attorney General shall provide a timely and accessible process for challenging failures to confirm eligibility for employment. If an individual would not have been dismissed from a job but for an error of the confirmation mechanism, the individual is entitled to compensation through the mechanism of the Federal Tort Claims Act. The Attorney General also shall implement a program of testers and investigative activities to monitor and prevent unlawful discrimination through use of the mechanism. No person shall be civilly or criminally liable for any action taken in good faith reliance on information provided through the confirmation mechanism.

A new section 274A(b)(7) is added to require that the new requirements for employers added in subsection (b) shall only be im-

250

plemented (and tested for reliability and ease of use) through pilot projects in at least 5 of the 7 States with the highest estimated population of unauthorized aliens. The pilot projects shall be started within 6 months of the date of enactment, and shall terminate by no later than October 1, 1999. The confirmation mechanism shall not be established in other States unless Congress so provides by law. The Attorney General shall issue annual reports, beginning in 1997, on the development and implementation of the mechanism in the pilot states. The reports may include information on whether the mechanism: is reliable and easy to use; limits to less than 1 percent job loss due to inaccurate information; increases or decreases discrimination; protects individual privacy; and burdens employers with costs or administrative requirements.

Subsection (c) amends section 274A(a) by adding a new paragraph (6), to reduce paperwork requirements for the subsequent employers of certain employees whose eligibility to work has been confirmed by a prior employer. This provision applies in the case of an individual who is employed under a collective bargaining agreement entered into with an association of two or more employers, whose prior employer has complied with the employment verification process, and whose subsequent employer is a member of the same multi-employer association. The period during which this deeming can take place is up to 5 years in the case of a United States national or an alien lawfully admitted for permanent residence, and 3 years in the case of any other individual.

If an employer who has taken advantage of this provision is found to have hired an unauthorized alien, that hiring shall be presumed to be a knowing hire in violation of section 274A(a). The employer may rebut the presumption by presentation of clear and convincing evidence.

Subsection (d) strikes subsection (i) through (n) of section 274A, which are dated provisions.

Subsection (e) sets forth effective dates for the amendments made by this section. In general, the amendments shall be effective not later than 180 days after the date of enactment. The amendments made in subsections (a)(1) and (a)(2) (regarding reductions in the number of documents that may be presented by new employees) shall be effective not later than 18 months after enactment. The amendments made in subsection (c) (paperwork reduction) shall apply to all individuals hired on or after 60 days after enactment.

In addition, the Attorney General shall within 180 days of enactment issue regulations which provide for electronic storage of the I-9 form, in satisfaction of the record retention requirements in section 274A(b)(3).

### Sec. 404—Reports on earnings of aliens not authorized to work

This section revises section 290(c) of the INA to require that the Social Security Administration (SSA) report to Congress on the number of social security numbers issued to aliens not authorized to be employed in the United States for which earnings were reported to the SSA. After January 1, 1996, if earnings are reported to the SSA for any such social security account number, the SSA shall report to the Attorney General the name and address of the

251

person for whom the earnings were reported and the name and address of the person (employer) reporting the earnings.

*Sec. 405—Authorizing maintenance of certain information on aliens*

This section amends section 264 of the INA to clarify that the Attorney General may require any alien to provide his or her social security number to include in any record of the alien.

*Sec. 406—Limiting liability for certain technical violations of paperwork requirements*

This section amends section 274A(e)(1) to provide that an employer shall not be considered to have been in violation of the verification requirements based upon a technical or procedural failure to meet a requirement unless the INS has explained the basis for the failure and given the employer 10 business days to correct it, and the employer has not corrected the failure during that period.

*Sec. 407—Unfair immigration-related employment practices*

Subsection (a) amends section 274B(g)(2) to require that employers subject to a final order for an immigration-related unfair employment practice be ordered to retain records for each person applying for employment for a period up to 3 years and be fined not less than $250 nor more than $2000 for each individual discriminated against.

Subsection (b) amends section 274B(a)(6) by providing that in the case of an employee who has presented a time-limited work authorization document to satisfy section 274A(b)(1), an employer may request a document proving that employment authorization has been renewed. The amendment also provides that if the employer has reason to believe that an alien who has presented a document valid on its face is nevertheless an unauthorized alien, the employer may inform the employee of the questions regarding the document's validity and the employer's intention to verify its validity. If the verification confirms that the employee is unauthorized to work, the employee may be discharged with no benefits or rights accruing on the basis of the period employed.

TITLE V—REFORM OF LEGAL IMMIGRATION SYSTEM

*Sec. 500—Overview of new legal immigration system*

This section provides an overview of the legal immigration system that will be in effect beginning with fiscal year 1997.

Subtitle A—Worldwide Numerical Limits

*Sec. 501—Worldwide numerical limitation on family-sponsored immigrants*

This section amends section 201(c) to provide for a worldwide level for family-sponsored immigrants of 330,000. This level is to be reduced (but not below 110,000) for each fiscal year by the number of spouses and children of citizens admitted as immigrants in the previous fiscal year. There will be no limit on admission of spouses and children of citizens. The number of visas available to spouses and children of lawful permanent residents would not go below 85,000, and the number for parents of United States citizens

252

would not go below 25,000. Any excess in family immigration above 330,000 would come from other unused immigrant visas.

Reductions for excess family-based admissions would be computed in the following manner. The number of excess family admissions is the extent to which the number of family-based immigrant visas exceeded 330,000 in a given fiscal year. This excess would first be offset by the number of unused immigrant visas in that year in the employment-based categories. If any excess remained ("net excess"), the worldwide family level for the following fiscal year would be reduced by the amount of the net excess (but not below 110,000: 85,000 for the spouses and children of lawful permanent residents, and 25,000 for the parents of citizens). If any excess still remained ("remaining excess"), there would be reductions during the following fiscal year of up to half of the otherwise available visas in the category for investors (total available = 10,000). Any remaining excess ("carryforward excess") would be carried over into the calculations for subsequent fiscal years and would be drawn down by similar borrowing in following fiscal years from the investor category.

*Sec. 502—Worldwide numerical limitation on employment-based immigrants*

This section amends section 201(d) to provide that the worldwide level for employment-based immigrants is 135,000. This number may be reduced by the number of investor visas (not to exceed 5,000) used to offset excess family admissions (see section 501), and also by the number of visas (not to exceed 5,000) made available under section 512 to meet excess demand in the category for adult sons and daughters.

*Sec. 503—Worldwide numerical limitation on diversity immigrants*

This section amends section 201(e) to provide that the worldwide level of diversity immigrants is 27,000 for each fiscal year.

*Sec. 504—Establishment of numerical limitations on humanitarian immigrants*

This section amends subsections (a)(4) and (f) of section 201 to provide a worldwide level of humanitarian immigrants equal to 70,000 for each fiscal year (95,000 for FY 1997). The worldwide level shall be reduced by the number of aliens (not to exceed 50,000, or 75,000 in FY 1997, unless the number is increased by Congress) who were admitted as non-emergency refugees under section 207 in the previous year, by the number of aliens granted asylum who adjusted status under section 209(b) in the previous year, and by the number of aliens who were granted relief under suspension of deportation (current section 244(a)), section 240A (cancellation of removal) and 249 (registry) in the prior fiscal year.

*Sec. 505—Requiring congressional review and reauthorization of worldwide levels every 5 Years*

This section amends section 201 by adding a new subsection (g), providing that each fifth fiscal year starting in 2004, the Congress, after thorough review of appropriate immigration levels by the Committees on the Judiciary of the House and the Senate, shall

253

authorize by law the worldwide levels to apply beginning with the second subsequent fiscal year (i.e., FY 2006). The worldwide levels specified previously in section 201 are applicable only for the period of such authorization.

### Subtitle B—Changes in Preference System

*Sec. 511—Limitation of immediate relatives to spouses and children*

This section amends section 201(b)(2)(A) to substitute the phrase "spouses and children of a citizen of the United States" in place of "immediate relatives."

This section also adds a new subsection (i) to section 204, to provide that the age of an alien child being issued an immigrant visa as a nuclear family member shall be determined as of the date of the filing of a classification petition under section 204(a)(1). This is to prevent such children from "aging out" of eligibility to immigrate if they turn 21 while waiting for a visa to become available.

*Sec. 512—Change in family-sponsored classification*

Subsection (a) amends section 203(a) by striking paragraphs (1) through (4) (the current family-sponsored preference categories) and inserting new paragraphs (1), (2), and (3).

Section 203(a)(1) defines as the first family-sponsored preference category the spouses and children of aliens lawfully admitted for permanent residence. The number for this category is not to exceed 85,000, plus any unused visas in the second category.

Section 203(a)(2) defines the second family-sponsored preference category as the parents of U.S. citizens. The number of visas assigned to this category is the lesser of 45,000 or the number by which the worldwide level calculated under amended section 201(c) exceeds 85,000, but shall not be less than 25,000. Such aliens may only be admitted if they meet certain insurance requirements in new section 212(a)(4)(D).

Section 203(a)(3) defines the third family-sponsored preference category as the adult sons and daughters of either a citizen of the United States or of a lawful permanent resident, provided that the son or daughter is less than 26 years of age, never-married, childless, and eligible, but for the residence requirements, to be declared as a dependent for Federal income tax purposes. The number of visas available for this category shall be the lesser of 5,000 or the number by which the worldwide family level exceeds the sum of 85,000 plus the number of visas used for parents of U.S. citizens under section 203(a)(2). If the demand for such visas exceeds 5,000 (or the lesser number referred to in the previous sentence), up to 5,000 additional visas may be made available by reducing the number of visas in the employment-based categories in proportion to the visa numbers allocated for each of those categories. A son or daughter admitted under this category shall be admitted on a conditional basis. The Attorney General shall issue regulations for the removal of conditional status similar to those set forth in section 216A. An alien in such status must demonstrate that he or she met the requirements for admission in this category on the date of approval of the alien's classification petition.

254

Subsection (b) amends section 212(a)(4) (the public charge ground for inadmissibility, as amended by section 621 of H.R. 2202) by adding a new subparagraph (D). This provision requires that an alien who seeks admission as a parent must demonstrate to the satisfaction of the Attorney General and the consular officer that the alien will have adequate health insurance comparable to that provided under the Medicare program (title XVIII) of the Social Security Act), and long-term health coverage comparable to that provided under the Medicaid program (title XIX). In making this determination, the Attorney General shall take into account the age of the parent and the likelihood of the parent securing health insurance through employment.

*Sec. 513—Change in employment-based classification*

Subsection (a) amends section 203(b) by striking paragraphs (1) through (5) (the current employment-based preference categories) and inserting new paragraphs (1) through (6).

Paragraph (1) defines as the first employment-based preference category aliens with extraordinary ability, and assigns to this category visas not to exceed 15,000. This category includes aliens currently defined in section 203(b)(1)(A).

Paragraph (2) defines as the second employment-based preference category aliens who are outstanding professors and researchers or multinational executives and managers, and assigns to this category visas not to exceed 30,000, plus any visas not required under paragraph (1). This category includes aliens currently defined in section 203(b)(1)(B) and (C).

Paragraph (3) defines as the third employment-based preference category aliens who are members of the professions holding advanced degrees or aliens of exceptional ability, and assigns to this category visas not to exceed 30,000, plus any unused visas from the previous categories. This category includes aliens currently defined in section 203(b)(2) as members of the professions holding advanced degrees or aliens of exceptional ability.

Aliens admitted under paragraph (3) are subject to the labor certification requirement under section 212(a)(5)(A). This requirement may be waived in the national interest if such action is necessary to substantially benefit the national defense, national security, or law enforcement; health care, housing, or educational opportunities in a low-income population or in an underserved area; economic or employment opportunities for a specific industry or geographic area; the development of new technologies; or environmental protection or the productive use of natural resources. An alien admitted on such a waiver must engage in a specific undertaking to advance one or more of these interests.

Paragraph (4) defines as the fourth employment-based preference category skilled workers and professionals, and assigns to this category visas not to exceed 45,000, plus any unused visas from the previous categories. Under subparagraph (B), an alien is a skilled worker if the alien is capable of performing skilled labor requiring at least 2 years training or experience, not of a temporary or seasonal nature, for which qualified workers are not available in the United States, and who has a total of 4 years of training or experience (or both) with respect to such labor. Under subparagraph

255

(C)(i), an alien is a professional if the alien holds a baccalaureate degree and has at least 2 years experience in the profession after such degree. Under subparagraph (C)(ii), an alien who is a teacher and has within the previous 5 years at least 2 years of experience teaching a language other than English full-time also may be admitted as a professional if the alien is seeking admission to teach such language at an accredited elementary or middle school. A labor certification under section 212(a)(5)(A) also is required for immigrants under this paragraph.

Paragraph (5) defines as the fifth employment-based preference category investors seeking admission for the purpose of engaging in a new commercial enterprise in which the alien has invested $1 million and will employ full-time not less than 10 U.S. citizens or lawful permanent residents. Visas assigned are not to exceed 10,000, less the reduction provided in section 201(c)(5)(A) for excess family-based admissions. This section also provides for establishment of a pilot program to permit in fiscal years 1997 and 1998 the issuance of 2,000 of these investor visas to immigrants willing to invest $500,000 in an enterprise that will employ 5 full-time employees. The Attorney General shall submit a report to Congress in 1998 on the operation of this pilot program, with recommendations.

Paragraph (6) defines as the sixth employment-based preference category qualified special immigrants defined in section 101(a)(27), with 5,000 assigned visas, not more than 4,000 of which may be issued to special religious workers under section 101(a)(27)(C)(ii)(II) or (III).

Paragraph (7) is the new designation for current paragraph (6), dealing with special K immigrants.

Paragraph (8) provides that work experience as an unauthorized alien shall not be taken into account in calculating the experience required under this subsection.

Subsection (b) adds a new section 216B to the INA, under which the provisions of section 216A regarding conditional permanent resident status shall apply to foreign language teachers admitted under section 203(b)(3)(C)(ii). Such teachers shall remain in conditional status for a period of five years, less the number of years the teacher spent teaching a language other than English full-time at the elementary or middle school level during the 5 years immediately prior to obtaining conditional permanent resident status.

*Sec. 514—Changes in diversity immigrant program*

Subsection (a) amends section 203(c)(1)(B)(ii) to provide that the Attorney General shall identify, within each region, the 10 states which had the highest number of registrants for the diversity immigrant program between October 1, 1994 and September 30, 1996, and which are not high-admission states. This subsection also amends section 203(c)(1)(E) to provide that only natives of these 10 states in each region are eligible for diversity visas.

Subsection (b) amends section 203(c)(1)(F) to strike the designation of Northern Ireland as a separate foreign state and by treating Mexico as part of North America.

Subsection (c) amends section 203(c)(2) to provide that an alien is not eligible for a diversity visa unless the alien has a verified job offer in the United States; at least a high school education or its

256

equivalent; and at least two years experience in an occupation which requires 2 years of training.

Subsection (d) amends section 203(c) by adding a new paragraph (4), providing that the Secretary of State may set fees for processing applications and issuing visas under the diversity program, and adding a new paragraph (5), providing that no alien who is unlawfully present in the United States at the time of filing an application, or has been unlawfully present within the previous 5 years or at any time subsequent to the application, is eligible for a diversity visa.

*Sec. 515—Authorization to require periodic confirmation of classification petitions*

Subsection (a) amends section 204(b) to add a new paragraph (2) providing that the Attorney General may provide that an approved classification petition shall expire not less than two years after the date of approval unless the petitioner files a prescribed form to reconfirm the continued intention of the petitioner to seek admission of the alien and to update the contents of the petition.

Subsection (b) provides that, with exceptions to ensure that no previously-filed petition expires before October 1, 2000, the amendments made by subsection (a) shall not apply to classification petitions filed before October 1, 1996.

*Sec. 516—Changes in special immigrant status*

Subsection (a) repeals certain obsolete special immigrant provisions.

Subsection (b) amends section 101(a)(27) to provide special immigrant status for certain NATO civilian employees.

Subsection (c) adopts a conforming amendment to section 101(a)(15)(N) regarding nonimmigrant status for certain parents of special immigrant children.

Subsection (d) amends section 101(a)(27)(C)(ii) to extend the sunset date for the religious worker special immigrant category to FY 2005.

Subsection (e) makes additional conforming amendments.

Subsection (f) provides that, unless otherwise specified, the amendments made by this section shall be effective on the date of enactment.

*Sec. 517—Requirements for removal of conditional status of entrepreneurs*

Subsection (a) revises section 216A(b)(1)(B)(ii) to provide that the conditional permanent resident status of an alien entrepreneur may be terminated if it is determined that the alien did not invest the requisite capital and employ the requisite number of employees throughout substantially the entire period [up to 2 years] since the alien's admission. A good faith exception is provided for an alien who attempts to meet the capital investment and employment requirements but is unable to do so due to circumstances beyond the alien's control. For such an alien, the period for applying for removal of conditional status and for terminating such status shall be extended for up to 3 years to enable to alien to meet the capital and employment requirements for a period of 2 years.

257

Subsection (b) provides that the amendments in this section shall apply to aliens admitted on or after the date of enactment.

*Sec. 518—Adult disabled children*

This section amends the definition of "child" in section 101(b)(1) to include the child of a citizen or lawful permanent resident, regardless of age, who has never been married, and who has a severe mental or physical impairment which is likely to continue indefinitely and causes substantially total inability to perform functions necessary for independent living. A child may not be considered disabled unless the physical or mental impairment is being ameliorated to the maximum extent reasonably possible given the resources of the child and the parent.

*Sec. 519—Miscellaneous conforming amendments*

Subsection (a) makes various conforming amendments relating to the striking of the term "immediate relative" to describe an immigrant visa category.

Subsection (b) makes a number of conforming amendments for family-sponsored immigrants. This subsection also revises paragraph (4) of section 202(a) to provide that 75 percent of the visas available to family-sponsored immigrants in the new first preference category (spouses and children of aliens lawfully admitted for permanent residence) shall not be subject to the per-country levels in paragraph of section 202(a)(2). If, for a particular foreign state or dependent area, the number of aliens admitted in the first preference category exceeds the per country level, then for purposes of the operation of section 202(e), all visas shall be deemed to have been required for the first preference category. No visas then would be available for the second preference category (parents).

Subsection (c) makes a number of conforming amendments relating to employment-based immigrants, including special K immigrants.

### Subtitle C—Refugees, Parole, and Humanitarian Admissions

*Sec. 521—Changes in refugee annual admissions*

Subsection (a) amends paragraphs (1) and (2) of section 207(a) to provide that the number of annual refugee admissions designated by the President may not exceed 75,000 in fiscal year 1997 or 50,000 in any succeeding fiscal year. The number may exceed these limits if Congress by law provides for a higher number.

Subsection (b) amends section 207(b) and section 207(d)(3)(B) to strike the modifier "unforeseen" before the word "emergency." The effect of this change is to enable the President to exercise the authority to admit refugees on an emergency basis regardless of whether the specific emergency was foreseen or unforeseen.

Subsection (b) also amends section 207(d)(1) to require that the President shall report before June 1 of the preceding fiscal year to the Judiciary Committees of the House and Senate on the foreseeable number of refugees requiring resettlement. It also amends section 207(e) to require that the consultation with respect to the admission of refugees shall occur before July 1 of the preceding fiscal

258

year and in the case of emergency refugee admissions, not later than 30 days after the President proposes such admissions.

The Committee intends that the President's determination of the annual number of refugee admissions as described in subsection (a)(1) occur after the consultation process prescribed in section 207(d)(1). Only in this way will the consultation process serve its intended purpose of giving Congress a meaningful role in establishing refugee policy. In the absence of an emergency, the President's determination shall not exceed the target established in section 207(a), although the President can request that Congress raise that target level be raised.

*Sec. 522—Persecution for resistance to coercive population control methods*

Subsection (a) amends the definition of refugee at section 101(a)(42) to provide that a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear of being compelled to undergo such a procedure or being subject to such persecution shall be deemed to have a well founded fear of persecution on account of political opinion.

Subsection (b) amends section 207(a) to provide that not more than 1,000 refugees shall be admitted on the basis of persecution under coercive population control policies.

Further explanation of this provision is set forth in the preceding discussion of the provisions of H.R. 2202.

*Sec. 523—Parole available only on a case-by-case basis for humanitarian reasons or significant public benefit*

Subsection (a) amends section 212(d)(5) to provide that the Attorney General may on a case-by-case basis parole an alien into the United States temporarily only for an urgent humanitarian reason (limited to medical emergencies or the imminent death of a family member) or for a reason deemed strictly in the public interest (limited to cases where the alien's presence is required as a witness or the alien has assisted the United States Government and the alien's life would be threatened if not permitted to be in the United States; or to cases where the alien is to be prosecuted in the United States for a crime). The Attorney General shall submit a report not later than 90 days after the end of each fiscal year reporting on the number and status of aliens paroled.

Subsection (b) makes these changes effective to individuals paroled into the U.S. on the first month beginning more than 60 days after the date of enactment.

*Sec. 524—Admission of humanitarian immigrants*

This section amends section 203(c) to provide for the admission, subject to the worldwide level specified in section 201(e) (as amended by section 503 of this bill), of qualified immigrants of special humanitarian concern to the U.S. Such immigrants shall be selected on a case-by-case basis after having been identified for potential

259

eligibility by the Attorney General. One acceptable use of this visa might be in a particularly egregious case of battery, where the battered alien may not otherwise qualify for relief under the INA. It is contemplated that the Attorney General will have the discretion to defer adverse action against a candidate for a humanitarian visa (who is otherwise deportable) for a short period of time until a humanitarian visa becomes available.

An alien who is a refugee is not entitled to admission as a humanitarian immigrant unless there are compelling reasons in the public interest to admit the alien under this provision rather than under section 207.

This section also limits issuance of humanitarian visas to 50 percent of a single foreign state's (or 15 percent of a dependent area's) allotted level of immigrant visas. The Attorney General may waive the public charge ground of inadmissibility in the case of a humanitarian immigrant.

Subtitle D—Asylum Reform

*Sec. 531—Asylum reform*

This section will amend section 208 of the Immigration and Nationality Act.

Section 208(a) provides that any alien who is physically present in the United States or at the border of the United States, regardless of status, is eligible to apply for asylum. However, an alien is not eligible to apply if the Attorney General determines that the alien can be returned to a country (other than the alien's country of nationality or last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection. The Attorney General may, however, permit such an alien to apply if it is in the public interest for the alien to be granted asylum in the United States. An alien also is not eligible to apply if the alien has not filed an application within 30 days of arriving in the United States, or if the alien has previously applied for and been denied asylum; these bars do not apply if the alien demonstrates the existence of fundamentally changed circumstances which affect the applicant's eligibility for asylum. A determination by the Attorney General that an alien is ineligible to apply for asylum due to one of these enumerated reasons is not subject to judicial review.

In applying the time deadline in section 208(a), the Committee expects that the Attorney General will promulgate a form of application for asylum in which the applicant will be required to present only a brief statement of his or her claim, and which can be completed by the applicant in a brief period of time, with minimal assistance. Further presentation of the details of the applicant's claim would be presented prior to or at the time of the interview by the asylum officer.

Subsection (b) provides that asylum may be granted to an alien who meets the definition of a refugee under section 101(a)(42) of the INA. Asylum may not be granted to an alien who has engaged

260

in persecution of others, has been convicted of a particularly seri-
ous crime (including an aggravated felony), has committed a seri-
ous non-political crime outside of the U.S., is regarded on reason-
able grounds as a danger to national security, is inadmissible on
national security or terrorist grounds, or has been firmly resettled
in another country. The Attorney General may designate by regula-
tion additional limitations and conditions on eligibility for asylum.
A spouse or child of an alien granted asylum, if accompanying or
following to join such alien, may be given the same status.

Subsection (c) provides that an alien granted asylum shall not be
removed to his country of nationality or last habitual residence,
shall be granted authorization to work, and may be allowed to trav-
el abroad with prior consent of the Attorney General. This sub-
section also provides that asylum may be terminated if the alien:
is no longer a refugee under section 101(a)(42); is ineligible for asy-
lum under subsection (b); may be returned to a third country where
the alien would receive asylum or other temporary protection; has
voluntarily returned to his country of nationality or last habitual
residence with lawful permanent resident or equivalent status; or
has acquired a new nationality which confers protection on the
alien. A determination that asylum should be terminated is not
subject to judicial review. An alien whose asylum is terminated is
subject to any applicable ground of inadmissibility or deportation.

Subsection (d) provides that the Attorney General shall establish
procedures for considering applications for asylum. The applicant
must submit fingerprints and a photograph. An applicant is not en-
titled to be employed and, unless otherwise authorized to be em-
ployed, cannot be granted permission to work until at least 180
days after the filing of the asylum application. The Attorney Gen-
eral may charge a fee for asylum applications, and may provide for
payment over time or in installments. The alien shall be provided
at the time of application a notice of the consequences of knowingly
filing an application for asylum that is frivolous (including an ap-
plication that contains a willful misrepresentation of a material
fact), as well as a current list of attorneys willing to represent asy-
lum applicants on a pro bono basis.

Subsection (d) also provides that the asylum procedures shall in-
clude the following: that asylum cannot be granted until the iden-
tity of the applicant is checked against all appropriate records
maintained by the Attorney General and the Secretary of State, in-
cluding the Automated Visa Lookout System, to determine if the
alien is inadmissible or deportable from the U.S.; that in the ab-
sence of exceptional circumstances the initial interview on the asy-
lum application shall take place within 45 days of the application
and the administrative adjudication (not counting administrative
appeal) concluded within 180 days; that administrative appeals are
to be filed within 30 days of initial decision; and that an applica-
tion may be dismissed if the alien fails to appear for a scheduled
hearing or interview without advance notice or in the case of excep-
tional circumstances. Nothing in subsection (d) shall be construed
to create any substantive or procedural right or benefit that is en-
forceable by any party against the United States.

Subsection (b) makes conforming and clerical amendments. Sub-
section (c) provides that the amendments made by this section

261

shall take effect on the first day of the first month beginning more than 180 days after the date of enactment.

*Sec. 532—Fixing numerical adjustments for asylees at 10,000 each year*

This section amends section 209(b) to provide that not more than 10,000 persons who have been granted asylum may in any one year adjust to the status of an alien lawfully admitted for permanent residence.

*Sec. 533—Increased resources for reducing asylum application backlogs*

This section authorizes the temporary employment, without reduction in retired pay, retainer pay, or annuity, of former members of the Armed Forces or retired employees of the Federal Government to adjudicate applications for asylum pending as of the date of enactment. This section also authorizes, subject to the availability of appropriations, an increase to 600 in the number of asylum officers by FY 1997.

Subtitle E—General Effective Dates; Transition Provisions

*Sec. 551—General effective date*

The amendments made by this title, unless otherwise specified, shall take effect October 1, 1996, and apply beginning with fiscal year 1997.

*Sec. 552—General transition for current classification petitions*

This section provides for transition of current classification petitions to the amendments made by this title. Under subsection (a), any petition filed before October 1, 1996, for immediate relative status under section 201(b)(2)(A) (as in effect before October 1, 1996), shall be deemed to be an application for status under amended section 201(b)(2)(A) (spouse or child) or under amended 203(a)(2) (parent). A petition filed for preference status under existing section 203(a)(2) (spouse or child of a lawful permanent resident) shall be deemed on October 1, 1996, to be a petition under amended section 203(a)(1).

Under subsection (b), similar transition is made for petitions for employment-based visas filed prior to October 1, 1996.

Under subsection (c), when an immigrant holding an unexpired immigrant visa issued before October 1, 1996, makes application for admission, the immigrant's admissibility under section 212(a)(7)(A) shall be determined as of the date the visa was issued.

Subsection (d) provides that nothing in this title shall be construed to affect the following provisions: section 2(c)(1) of the Virgin Islands Nonimmigrant Alien Adjustment Act of 1982 (Pub. L. 97-271) (waiving application of numerical limitations to aliens who adjust immigration status under that Act); section 202(e) of the Immigration Reform and Control Act of 1986 (Pub. L. 99-603) (Cuban-Haitian adjustments); and section 19 of the Immigration and Nationality Act Amendments of 1981 (Pub. L. 97-116).

*Sec. 553—Special transition for certain backlogged spouses and children of lawful permanent resident aliens*

This section provides that in addition to immigrant visas otherwise available, a number of immigrant visas shall be available in each year from 1997 to 2001 for aliens who have petitions approved for classification as spouses or minor children of lawful permanent residents. The number of such additional visas shall be the greater of 50,000, or 20 percent of the number of aliens for whom petitions are pending at the beginning of the fiscal year, and with respect to whom the petitioning alien became a lawful permanent resident under section 210 (Special Agricultural Worker legalization) or 245A (legalization).

The additional visas shall be available in the order in which the petition for classification of the alien has been filed with the Attorney General, and shall first be available to the spouses and children of lawful permanent residents who did not gain that status under the legalization (section 245A) or special agricultural worker (section 210) programs. The per country numerical limitations of section 202 shall not apply with respect to the additional visa numbers made available under this section. The Attorney General shall submit a report to Congress by April 1, 2001, on the operation of this section and whether it will result in visas being made available on a current basis by October 1, 2001.

*Sec. 554—Special treatment of certain disadvantaged family first preference immigrants*

This section provides that the per country numerical limitations in section 202(a) shall not apply in the last half of fiscal year 1996 to the extent necessary to ensure that the priority date for an alien classified as an unmarried son or daughter of a citizen is not earlier than the priority date for aliens classified as unmarried sons and daughters of aliens lawfully admitted for permanent residence.

This section also provides that additional visa numbers shall be available in fiscal year 1997 without regard to per country numerical limitations for alien sons and daughters of citizens for whom a preference petition was approved as of September 30, 1996, and whose priority date was earlier than the priority date for alien sons and daughters of lawful permanent resident aliens of the same nationality for whom a petition had been approved on that date.

*Sec. 555—Authorization of reimbursement of petitioners for eliminated family-sponsored categories*

Subsection (a) provides that there shall be a procedure to reimburse, subject to appropriations, all fees required to be paid under the INA by a petitioner for a family-sponsored visa in a category eliminated by this bill, provided that the visa has not been issued and the petition has not been disapproved.

Subsection (b) authorizes the appropriation of funds necessary to carry out this section.

263

TITLE VI—RESTRICTIONS ON BENEFITS FOR ILLEGAL ALIENS

*Sec. 600—Statements on national policy concerning welfare and immigration*

This section states national policy with respect to welfare and immigration.

### Subtitle A—Eligibility of Illegal Aliens for Public Benefits

#### Part 1—Public Benefits Generally

*Sec. 601—Making illegal aliens ineligible for public assistance, contracts, and licenses*

Subsections (a) and (b) provide that aliens not lawfully present in the United States are ineligible to receive benefits under any means-tested program provided or funded, in whole or in part, by the Federal or State Governments and also are ineligible to receive any grant, to enter into any contract or loan agreement, or to be issued or have renewed any professional or commercial license, provided or funded by the Federal or State Governments.

Subsection (c) provides that Federal agencies must require applicants to provide sufficient proof of identity to receive a Federal contract, grant, loan, or license, or the following types of public assistance: supplemental security income (SSI); Aid to Families with Dependent Children (AFDC); social services block grants; Medicaid; Food Stamps; or housing assistance. Proof of identity is limited to showing the following documents: a United States passport (either current or expired if issued within the previous 20 years and after the individual has reached the age of 18); a resident alien card; or a State driver's license or identity card, if presented with the individual's social security card.

Subsection (d) authorizes State agencies to require proof of eligibility to receive State assistance.

Subsection (e) provides exceptions to the limitations in subsections (a) and (b) in the case of an alien who (or whose child) has been battered or subject to extreme cruelty. The alien must have applied (or apply within 45 days of the initial application for benefits) for family-sponsored immigration status or classification, or cancellation of removal and adjustment of status, or the alien must be the beneficiary of a petition for family-sponsored immigration or classification. The exception terminates if no application setting forth a prima facie case for such immigration benefits has been filed or when an application is denied.

The rationale behind this provision is straightforward: aliens who are in the U.S. illegally should not be entitled to receive any of the privileges or benefits of membership in American society. It is unfair to citizens and legal residents to allow illegal aliens to access public benefits.

No aspect of illegal immigration angers the American people more than illegal aliens using taxpayer-funded public benefits. Poll after poll shows that the American people are tired of footing the bill for those who are in the country illegally. The passage of Proposition 187 in California, and other similar movements in Florida and Arizona are evidence of this. While the availability of public

264

benefits may not be the chief magnet that draws illegal aliens to the U.S., it is certainly one of the most powerful. As a matter of national immigration policy, Congress must remove all of the possible incentives that may lure illegal aliens to either come to or stay in the U.S. The Committee believes that, to thoroughly combat illegal immigration, illegal aliens must not be given taxpayer-funded public benefits at any level—Federal, State or local.

The prohibition on Federal, State and local contracts, grants, loans, licenses, and welfare assistance as contained in this section is not intended to address the issue of alien eligibility for a basic public education as determined by the U.S. Supreme Court in *Plyler* v. *Doe*.[125]

*Sec. 602—Making unauthorized aliens ineligible for unemployment benefits*

This section provides that aliens are ineligible for unemployment benefits payable in whole or in part out of Federal funds to the extent such benefits are attributable to any employment for which the alien had not had authorization. Benefits providers must make such inquiries as may be necessary to assure that applicants are eligible.

*Sec. 603—General exceptions*

This section provides that sections 601 and 602 shall not apply to the provision of emergency medical services, public health immunizations, short-term emergency relief, school lunch programs, child nutrition programs, and family violence services.

The allowance for treatment of communicable diseases is very narrow. The Committee intends that it only apply where absolutely necessary to prevent the spread of such diseases. This is only a short term measure until the deportation of an alien who is unlawfully present in the U.S. It is not intended to provide authority for continued long-term treatment of such diseases as a means for illegal aliens to delay their removal from the country. However, it is the Committee's intent to give public health providers the ability, within the scope of their professional judgment, to treat individuals who might have, or require immunization against, communicable diseases. So long as that judgment was made in good faith it is intended to fall within the exception for immunizations, testing, and treatment for communicable diseases. Furthermore, this exception is also intended to permit health care providers to examine patients sufficient to determine whether testing, treatment, or immunization is appropriate.

The allowance for emergency medical services under Medicaid is very narrow. The Committee intends that it only apply to medical care that is strictly of an emergency nature, such as medical treatment administered in an emergency room, critical care unit, or intensive care unit. The Committee does not intend that emergency medical services include pre-natal or delivery care assistance that is not strictly of an emergency nature as specified herein. The Committee intends that any provision of services under this exception for mental health disorders be limited to circumstances in which

---

[125] *Plyler* v. *Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).

265

the alien's condition is such that he is a danger to himself or to others and has therefore been judged incompetent by a court of appropriate jurisdiction.

*Sec. 604—Treatment of expenses subject to emergency medical services exception*

Subsection (a) provides that, subject to advance appropriations, a State or local government that provides emergency medical services through a public hospital (including through a contract with another hospital or facility) to an illegal alien is entitled to receive payment from the Federal Government for the costs of the services, but only to the extent that such costs are not reimbursed through any other Federal program and cannot be recovered from the alien or another person. Reimbursement also may be made to a hospital eligible for additional payment adjustment under section 1886(d)(5) of the Social Security Act.

Subsection (b) provides that no payment shall be made unless the identity and immigration status of the alien has been verified with the INS. Subsection (c) provides that the program shall be administered by the Attorney General in consultation with the Secretary of Health and Human Services. Subsection (d) provides that subsection (a) shall not apply to emergency medical services furnished before October 1, 1995.

*Sec. 605—Report on disqualification of illegal aliens from housing assistance programs*

This section provides that the Secretary of Housing and Urban Development shall submit a report within 90 days to certain committees of Congress describing the manner in which the Secretary is enforcing section 214 of the Housing and Community Development Act of 1980.

*Sec. 606—Verification of student eligibility for postsecondary federal student financial assistance*

This section provides that no student shall be eligible for postsecondary Federal student financial assistance unless the student has certified that he or she is a citizen or national of the United States, or an alien lawfully admitted for permanent residence, and the Secretary of Education has verified such status through a procedure determined by the Attorney General.

*Sec. 607—Payment of public assistance benefits*

This section provides that in carrying out the provisions of this part, payment of means-tested benefits identified in section 601 (other than those exempted by section 603) shall be made only through an individual or person who is not ineligible to receive such benefits under section 601.

*Sec. 608—Definitions*

This section provides that for purposes of this title, an alien shall not be considered lawfully present in the U.S. merely because the alien may be considered to be permanently residing in the United States under color of law for purposes of any particular program.

266

*Sec. 609—Regulations and effective dates*

This section requires that the Attorney General issue regulations carrying out this subpart (other than section 605) within 60 days of enactment. The Attorney General shall apply section 601 to assistance provided, contracts or loan agreements entered into, and professional and commercial licenses issued or renewed at least 30 and not more than 60 days after the date the regulations are first issued, but may waive this section in the case of applications which are pending or approved on or before this date. The Attorney General shall apply section 602 to unemployment benefits provided on or after a date at least 30 and not more than 60 days after the date the regulations are first issued, but may waive this section in the case of applications for benefits pending as of this date. The Attorney General must broadly disseminate information regarding these restrictions on eligibility before the effective dates.

### Part 2—Earned Income Tax Credit

*Sec. 611—Earned income tax credit denied to individuals not authorized to be employed in the United States*

This section amends section 32(c)(1) of the Internal Revenue Code of 1986 by adding a new subparagraph (F), providing that an individual is not eligible for the earned income tax credit if the individual does not include a taxpayer identification number on the tax return. This section also amends section 32 of the Internal Revenue Code to add a new subsection (k), providing that a taxpayer identification number means a social security account number other than one that has been issued to an individual not authorized to work in the U.S.

### Subtitle B—Expansion of Disqualification from Immigration Benefits on the Basis of Public Charge

*Sec. 621—Ground for inadmissibility*

This section amends paragraph (4) of section 212(a) (public charge exclusion ground) to provide that a family-sponsored immigrant or nonimmigrant is inadmissible if the alien cannot demonstrate that the alien's age, health, family status, education, skills, or a combination thereof, or an affidavit of support, or both, make it unlikely that the alien will become a public charge. An employment-based immigrant is inadmissible, other than an immigrant of extraordinary ability, unless the immigrant has a valid job offer at the time of immigration. An employment-based immigrant who receives a visa by virtue of a job offer from a business owned by a relative, or from a business in which a relative has a significant ownership interest, is inadmissible (inadmissible) unless the relative has executed an affidavit of support.

*Sec. 622—Ground for deportability*

This section amends paragraph (5) of redesignated section 237(a) (public charge deportation ground) to provide that an alien is deportable if the alien becomes a public charge within 7 years of admission from causes arising before entry or admission. The ground may be waived in the case of an alien who is admitted as a refugee

267

or granted asylum. An alien is considered a public charge if he or she receives benefits under (1) Supplemental Security Income, (2) Aid to Families with Dependent Children, (3) Medicaid, (4) Food Stamps, (5) State General Assistance or (6) certain Federal housing assistance, for an aggregate period of at least 12 months within 7 years of admission. An alien shall not be considered to be a public charge on the basis of receipt of emergency medical services, public health immunizations and short-term emergency relief. In the case of an alien who (or whose child) has been battered or subject to extreme cruelty, the aggregate period for receipt of benefits shall be 48 months within 7 years, if the need for such benefits has a substantial connection to the abuse, and may exceed 48 months if the alien can demonstrate that the abuse is ongoing and has led to an issuance of an administrative or judicial order, or there has been a prior determination of abuse by the INS.

Subtitle C—Attribution of Income and Affidavits of Support

*Sec. 631—Attribution of sponsor's income and resources to family-sponsored immigrants*

This section provides that in determining the eligibility and the amount of benefits of an alien for any Federal means-tested public benefits program, the income and resources of the alien shall be deemed to include those of the person who executed an affidavit of support on behalf of such alien, and that person's spouse. States may act similarly in determining the eligibility and the amount of benefits of an alien for any State means-tested public benefits program. Such deeming shall end for parents of United States citizens at the time the parent becomes a citizen; for spouses of citizens and lawful permanent residents at the earlier of 7 years after the date the spouse becomes an alien lawfully admitted for permanent residence or the date the spouse becomes a citizen; and for minor children at the time the child reaches 21 years of age or, if earlier, the date the child becomes a citizen. The deeming period may end earlier than specified above if the alien is employed long enough to qualify for social security retirement income.

In the case of an alien who (or whose child) has been battered or subject to extreme cruelty, the deeming requirements shall not apply for 48 months if the need for such benefits has a substantial connection to the abuse, or for more than 48 months if the alien can demonstrate that the abuse is ongoing and has led to an issuance of an administrative or judicial order or there has been a prior determination of abuse by the INS.

For States that choose to follow the Federal model of deeming that a sponsor's income and resources is available to the sponsored immigrant for the purpose of qualifying for State or local means-tested public benefits, those States shall be deemed by any Federal or State court to have chosen the least restrictive means available for achieving the compelling government interest of assuring that aliens be self-reliant in accordance with national immigration policy.

268

*Sec. 632—Requirements for sponsor's affidavit of support*

Subsection (a) of this section amends title II of the INA by adding a new section 213A.

Section 213A(a) provides that an affidavit of support may only be accepted as establishing that an alien is not inadmissible as a public charge if it is executed as a contract legally enforceable against the sponsor in any Federal or State court by the Federal Government, and by any State which provided any means-tested public benefits, for a period 10 years after the alien last received any benefit. Such contract shall be enforceable with respect to benefits provided for parents of United States citizens until the time the parent becomes a citizen; for spouses of United States citizens and lawful permanent residents at the earlier of 7 years after the date the spouse becomes an alien lawfully admitted for permanent residence or the date the spouse becomes a citizen; and for minor children at the time the child reaches 21 years of age. The sponsorship period may end earlier than specified above if the alien is employed long enough to qualify for social security retirement income.

Section 213A(b) provides that upon notification that a sponsored alien has received a benefit, the appropriate official shall request reimbursement from the sponsor. If the sponsor does not indicate a willingness to reimburse, or fails to abide by repayment terms, an action may be brought. The appropriate agency may appoint or hire a person to act on its behalf in collecting moneys owed. Section 213A(c) provides that available remedies include those described in sections 3201, 3203, 3204, and 3205 of title 28, U.S. Code, as well as specific performance, reimbursement of legal fees and collection costs, and corresponding State law remedies. Section 213A(d) provides that subject to civil penalties, a sponsor shall notify the federal government and the sponsored alien's State of residence of any change of address of the sponsor.

Section 213A(e) limits eligibility to sponsor an alien into the United States to individuals only (not institutions). Sponsors also must be: the United States citizen or lawful permanent resident who is petitioning for the alien's admission, or an individual who will accept joint and several liability with the petitioner; at least 18 years old; and domiciled in a State. Finally, sponsors must demonstrate, through a certified copy of a tax return, the means to maintain an annual income equal to at least 200 percent of the poverty level for the individual, the individual's family, and the sponsored alien and the alien's nuclear family, if any, who arrive with the alien at the time of the alien's admission. In the case of an individual who is on active duty in the Armed Forces, the income requirement is 100 percent of the poverty level.

Subsection (b) refers to the requirement for an affidavit of support from individuals who file petitions for a relative as an employment-based immigrant.

Subsection (c) amends section 316(a) of the INA by adding a new clause to provide that no person shall be naturalized who has received assistance under a federal or State means-tested public benefit program with respect to which amounts may be owing under an affidavit of support unless he or she provides satisfactory evidence that there are no outstanding amounts owed pursuant to such affidavit. This subsection also amends section 316 by adding

FRP-FRN-00939

269

a new subsection (g), providing that the amendment made in section 316(a)(4) shall not apply to a battered alien spouse or child under specified conditions.

Subsection (d) makes a clerical amendment. Subsections (e) and (f) provide that the Attorney General shall promulgate within 90 days of enactment a new standard form for the affidavit of support that complies with new section 213A(a), and that the new section 213A(a) shall apply to affidavits of support executed on a specified date not less than 60 days nor more than 90 days after promulgation of the new form.

TITLE VII—FACILITATION OF LEGAL ENTRY

*Sec. 701—Additional land border inspectors; infrastructure improvements*

This section requires the Attorney General and the Secretary of the Treasury to increase the number of full-time land border inspectors in the INS and the Customs Service to a level adequate to assure full staffing during peak crossing hours of all border crossing lanes, and that personnel be deployed in proportion to the number of land border crossings in the border sectors.

This section also requires that in completing infrastructure improvements to expedite the inspection of persons and vehicles seeking lawful admission at land borders, the Attorney General give priority to those areas where the need for such improvements is greatest.

*Sec. 702—Commuter lane pilot programs*

This section amends section 286(q) of the INA and the 1994 Justice appropriations act to permit the expansion of commuter lane pilot programs at land borders.

*Sec. 703—Preinspection at foreign airports*

This section amends the INA to create a new section 235A, providing for the establishment within 2 years of preinspection stations at 5 of the 10 foreign airports having the greatest number of departures for the U.S., and to establish an additional 5 preinspection stations within 4 years.

*Sec. 704—Training of airline personnel in detection of fraudulent documents*

Subsection (a) amends section 286(h)(2)(A)(iv) to provide that funds may expended from the Immigration User Fee Account for the training of commercial airline personnel in the detection of fraudulent documents, and that not less than 5 percent of the expenses incurred out of the Account in a given fiscal year shall be expended for this purpose.

Subsection (b) amends section 212(f) to provide that if a commercial airline has failed to comply with regulations of the Attorney General relating to the detection of fraudulent documents, including the training of personnel, the Attorney General may suspend the entry of aliens transported to the U.S. by the airline.

Subsection (c) provides that the Attorney General shall issue the regulations called for in subsection (b) within 90 days of enactment.

270

TITLE VIII—MISCELLANEOUS PROVISIONS

Subtitle A—Amendments to the Immigration and Nationality Act

*Sec. 801—Nonimmigrant status for spouses and children of members of the armed services*

This section amends section 101(a)(15) by adding a new subparagraph (T), creating a nonimmigrant category for an alien who is the spouse or child of another alien who is serving on active duty in the Armed Forces and is stationed in the U.S.

*Sec. 802—Amended definition of aggravated felony*

This section amends the definition of aggravated felony in section 101(a)(43) of the INA, as amended by section 222 of the Immigration and Nationality Technical Corrections Act of 1994, to make certain technical corrections and to make the definition effective to all convictions entered at any time before, on, or after the date of enactment.

*Sec. 803—Authority to determine visa processing procedures*

Subsection (a) amends section 202(a)(1) of the INA to clarify that the Secretary of State has non-reviewable authority to establish procedures for the processing of immigrant visa applications and the locations where visas will be processed.

Subsection (b) amends section 222 by adding a new subsection (g), providing that an alien who has remained in the U.S. beyond the authorized period of stay is not eligible to be admitted to the U.S. as a nonimmigrant unless the alien has received a visa in a consular office located in the country of the alien's nationality (or, if there is no such office, at a consular office designated by the Secretary of State).

*Sec. 804—Waiver authority concerning notice of denial of applications for visas*

This section amends section 212(b) of the INA to permit the Secretary of State to waive, in the case of an alien denied a visa by a consular officer on the basis of the exclusion grounds in section 212(a)(2) (criminal activity) or 212(a)(3) (national security and terrorist), the requirement that the alien be provided notice of the reason for denial. Currently, all foreign nationals who are denied a visa are entitled to notice of the basis for the denial. This creates a difficult situation in those instances where an alien is denied entry on the basis, for example, of being a drug trafficker or a terrorist. Clearly, the information that U.S. government officials are aware of such drug trafficking or terrorist activity would be highly valued by the alien and may hamper further investigation and prosecution of the alien and his or her confederates.

An alien has no constitutional right to enter the U.S. and no right to be advised of the basis for the denial of such a privilege. Thus, there is no impediment to the limitation on disclosure in this section.

271

*Sec. 805—Treatment of Canadian landed immigrants*

This section amends section 212(d)(4)(B) to provide that the Attorney General may waive the requirements of section 212(a)(7)(b)(i) regarding presentation of documents in the case of aliens who are granted permanent residence by the government of a foreign contiguous territory and who are residing in that territory.

*Sec. 806—Changes relating to H–1B nonimmigrants*

This section amends section 212(n) to provide for changes in the statutory and regulatory requirements for visas issued to nonimmigrants under section 101(a)(15)(H)(i)(B) ("H–1B visas").

Subsection (a) provides that no employer shall be required to have and document an objective system to determine the wages of workers.

For purposes of determining the actual wage level an employer pays to individuals with similar experience and qualifications in the specific employment of an H–1B worker, a non-H–1B dependent employer (see below for definition) of more than 1,000 full-time equivalent employees in the United States may demonstrate that in determining the wages of its H–1B workers, it utilizes a compensation and benefits system that has been previously certified by the Secretary of Labor (and recertified at such intervals the Secretary may designate) to satisfy the five following conditions: (1) The employer has a company-wide compensation policy for its full-time equivalent employees which ensures salary equity among employees similarly employed, (2) the employer has a company-wide benefits policy under which all full-time equivalent employees similarly employed are eligible for substantially the same benefits or under which some employees may accept higher pay, at least equal in value to the benefits, in lieu of benefits, (3) the compensation and benefits policy is communicated to all employees, (4) the employer has a human resources or compensation function that administers its compensation system, and (5) the employer has established documentation for the job categories in question. An employer's payment of wages to an H–1B worker consistent with a system which meets these conditions and which has been certified by the Secretary of Labor shall be deemed to satisfy the actual wage requirement of section 212(n)(1)(A)(i)(I).

For purposes of determining and enforcing the prevailing wage level for the occupational classification in the area of employment of an H–1B worker, employers may provide a published survey, a State Employment Security Agency determination, a determination by an accepted private source or any other legitimate source. The Secretary of Labor shall, no later than 180 days from the date of enactment of this Act, provide for acceptance of prevailing wage determinations not made by a State Employment Security Agency. The Secretary must either accept such a wage determination or issue a written decision rejecting the determination and detailing the legitimate reasons that the determination is not acceptable. If a detailed rejection is not issued within 45 days of receipt by the Secretary of Labor, the determination will be deemed accepted. An employer's payment of wages consistent with a prevailing wage de-

272

termination not rejected by the Secretary shall be deemed to satisfy the prevailing wage requirement of section 212(n)(1)(A)(i)(II).

Subsection (b) provides that employers which are non-H–1B dependent employers do not have to abide by certain regulations promulgated by the Department of Labor which went into effect on January 19, 1995. An H–1B dependent employer is defined as an employer which (1) has fewer than 21 full-time equivalent employees who are employed in the United States, 4 or more of whom are H–1B workers, (2) has at least 21 but not more than 150 full-time equivalent employees who are employed in the United States, 20% or more of whom are H–1B workers, or (3) has at least 151 full-time equivalent employees who are employed in the United States, 15 percent or more of whom are H–1B workers. An alien employed under an H–1B petition shall be treated as an employee of the employer for purposes of this subsection.

An employer which is H–1B dependent can nevertheless be treated as non-H–1B dependent for up to five years on a probationary status if (1) the employer has demonstrated to the satisfaction of the Secretary of Labor that it has developed a reasonable plan for reducing its use of H–1B workers over a five year period to the level of a non-H–1B dependent employer, and (2) annual reviews of the plan by the Secretary indicate successful implementation of the plan. If the Secretary determines that the employer has not met the requirements of (1) or (2), the probationary status ends and the employer shall be treated as H–1B dependent until such time as the employer can prove to the Secretary of Labor that it is no longer H–1B dependent, as defined previously. All opportunities for probationary status end five years after the date of enactment.

The regulatory relief provided to non-H–1B dependent employers includes:

(1) A non-H–1B dependent employer does not have to post a notice at a worksite visited by an H–1B worker that is within the area of intended employment listed on that worker's labor condition application but is not itself listed on the application.

(2) A non-H–1B dependent employer is not required to file and have certified an additional labor condition application (LCA) with respect to an H–1B worker for an area of employment not listed in the worker's initial LCA because the employer has placed that or other H–1B workers (who did not have that area of employment listed in their LCAs) in that area for any period of time, except that such employer can only place an H–1B worker in areas of employment not listed in the worker's LCA for a period exceeding 45 workdays in any 12-month period and 90 workdays in any 3 year period if (1) the employer files and has certified an additional LCA for the H–1B worker listing such areas of employment visited after the 45/90 limit is reached, or (2) the H–1B worker's principal place of employment has not changed to a non-listed area.

(3) A non-H–1B dependent employer is not required to pay per diem and transportation costs at any specified rate when sending H–1Bs to areas of employment not listed in their LCAs.

(4) The Secretary of Labor can file a complaint respecting an employer's failure to meet a condition specified on an LCA or misrepresentation of a material fact on an LCA only in the case of an

273

H–1B dependent employer (including an H–1B dependent employer which is on probationary status as a non-H–1B dependent employer when the Secretary is conducting an annual review of the employer's plan and the review indicates that there appears to be a violation of an attestation or a misrepresentation of a material fact). No investigation or hearing shall be conducted with respect to a non-H–1B dependent employer except in response to a complaint.

Subsection (c) provides that when filing an LCA, an employer must attest that within the period beginning six months before and ending 90 days following the filing of the application and during the 90 days immediately preceding and following the filing of any visa petition supported by the application, the employer has not laid off and will not lay off protected individuals with substantially equivalent qualifications and experience in the specific employment as to which the H–1B worker is sought or employed, unless the employer will pay a wage to the H–1B worker that is at least 110 percent of the mean of the last wage earned by all such laid off individuals (or, if greater, at least 110 percent of the mean of the highest wage earned by all such laid off individuals within the most recent year if the employer reduced the wage of any such laid off individual during such year other than in accordance with a general company-wide reduction of wages for substantially all employees).

For purposes of the "no layoff" provisions in section 806 restricting the ability of an employer to lay off a domestic worker in the specific employment as to which an H–1B alien is sought or is employed, the term "specific employment" can be coterminous with a concept such as occupational category ("engineer"), or it can be narrower in scope. It can also be coterminous with a broad subcategory of occupational category ("chemical engineer"), or it can be narrower in scope. Specific employment means a specific job with specific responsibilities. For example, in a small company this may be a job of great breadth—the accountant who does all the books or the programmer who designs all the software. Conversely, in a large company this may be very specialized—the engineer whose job it is to design the gyroscope for a new rocket or the programmer whose job it is to design a new spreadsheet program. The question to ask is: "In the context of a specific employer, is it reasonable to conclude that a domestic worker is being replaced by an H–1B alien?" In any case, merely minor changes in a job description are not sufficient to change the specific employment. And an employer cannot shift a domestic employee from his or her specific employment—in which an H–1B alien is sought or is employed—to a different job preparatory to laying him or her off merely as a ruse to avoid the "no layoff" provisions. In such a case, the domestic worker's specific employment should be considered his or her initial job.

In the case of an H–1B dependent employer, the employer shall not place an H–1B worker with another employer where (1) the H–1B performs his or her duties in whole or in part at worksite(s) owned, operated, or controlled by the other employer, and (2) there are indicia of an employment relationship between the alien and the other employer. This prohibition will not apply if either (1) the other employer has executed an attestation that within the period

274

beginning six months before and ending 90 days following the filing of the LCA and during the 90 days immediately preceding and following the filing of any visa petition supported by the LCA the other employer has not laid off and will not lay off protected individuals with substantially equivalent qualifications and experience in the specific employment as to which the H–1B worker is sought or employed, or (2) the employer pays a wage to the H–1B worker that is at least 110 percent of the mean of the last wage earned by all such laid off individuals (or, if greater, at least 110 percent of the mean of the highest wage earned by all such laid off individuals within the most recent year if the other employer reduced the wage of any such laid off individual during such year other than in accordance with a general company-wide reduction of wages for substantially all employees).

The term "laid off" refers to the individual's loss of employment, other than a discharge for inadequate performance, cause, voluntary departure, or retirement, and does not include any situation in which the employee is offered a similar job opportunity with the same employer (or the other employer with which an H–1B worker is placed by an H–1B dependent employer referenced in the preceding paragraph) carrying equivalent or higher compensation and benefits, regardless of whether or not the employee accepts the offer.

The term "protected individual" refers to an individual who is a citizen or national of the United States or is an alien who is lawfully admitted for permanent residence, is granted the status of an alien lawfully admitted for temporary residence under section 210(a), 210A(a), or 245(a)(1), is admitted as a refugee under section 207, or is granted asylum under section 208.

The provisions of section 212(n)(2), including the process for the receipt, investigation, and disposition of complaints, the imposition of administrative remedies and back pay, and the prohibition of the Attorney General from approving an employer's petitions for alien workers, shall apply to failures of an employer to comply with the new attestation required of it under this Act and to complaints respecting a failure of another employer with which an H–1B worker is placed by an H–1B dependent employer to comply with the new attestation required of it under this Act.

Subsection (d) provides for enhanced penalties for violations of an attestation or misrepresentation of a material fact in an LCA. Maximum civil penalties are increased to $5,000 per violation. The Attorney General is prohibited from approving petitions for aliens to be employed by an employer for a period of at least 1 year in the case of the first determination of a violation or any subsequent determination of a non-willful violation occurring within 1 year of that first violation or any subsequent determination of a non-wilful violation occurring more than 1 year after the first violation; for a period of at least 5 years in the case of a determination of a willful violation occurring more than one year after the first violation; and at any time in the case of a determination of a willful violation occurring more than 5 years after a violation resulting in a bar of at least five years. If a penalty has been imposed in the case of a willful violation, an additional punishment consisting of a civil mone-

tary penalty will be imposed on the employer in an amount equal-ling twice the amount of back pay awarded.

When computing the prevailing wage level in the case of an em-ployee of an institution of higher education or a related or affiliated nonprofit entity, or a nonprofit scientific research organization, the level shall only take into account employees at such institutions and entities in the area of employment.

In general, the changes to the H–1B program contained in the Act will take effect on the date of enactment and shall apply to ap-plications filed with the Secretary of Labor on or after 30 days after the date of enactment. The changes to the complaint and in-vestigation process shall apply to complaints filed, and to investiga-tions or hearings initiated, on or after January 19, 1995.

### Sec. 807—Validity of period for visas

Subsection (a) amends section 221(c) to provide that an immi-grant visa shall be valid for a period of six months.

Subsection (b) amends section 221(c) to provide that the period for validity of a nonimmigrant visa issued to an alien of one nation-ality who has been granted refugee status and been firmly reset-tled in another country shall be based on the treatment granted by the country of resettlement to alien refugees resettled in the U.S.

### Sec. 808—Limitation on adjustment of status of individuals not lawfully present in the United States

Subsection (a) amends section 245(i)(1)(B), as added by section 605(b) of the Department of State and Related Agencies Appropria-tions Act, 1995 (Public Law 103-317, 108 Stat. 1765) by requiring an application for adjustment of status under this provision to pay a fee of $2,500.

Subsection (b) strikes section 212(o).

### Sec. 809—Limited access to certain confidential INS files

Subsection (a) amends section 245(A)(c)(5) by redesignating sub-paragraphs (A) through (C) and by adding a new subparagraph (C) to permit the Attorney General to make an application to a Federal judge, and for such Federal judge to authorize disclosure of infor-mation in an application for legalization for the following purposes: to identify an alien believed to be dead or severely incapacitated; or for criminal law enforcement purposes if the alleged criminal ac-tivity occurred after the legalization application was filed and in-volves terrorist activity, a crime prosecutable as an aggravated fel-ony (without regard to length of sentence) or poses an immediate risk to life or national security. Information limited to the date and disposition of the application, the alien's immigration status (but only for the purpose of determining eligibility for relief from depor-tation or removal), or criminal convictions (if any) after the date of the application, may be disclosed for immigration enforcement pur-poses without petition to a Federal judge.

Subsection (b) makes parallel amendments to the confidentiality provisions in section 210(b) (Special Agricultural Worker Program).

The purpose of this section is to amend the provisions in sections 210 and 245A protecting the confidentiality of applications for le-galization and to ensure that information contained in such appli-

276

cations would not be used for purposes of immigration law enforcement. A limited waiver of such confidentiality, subject to prior approval by a federal judge, is appropriate in order to identify an alien who is dead or severely incapacitated, or if the alien is alleged to have committed a serious criminal offense after the date of the application. Disclosure in these limited circumstances will not undermine the initial policy of confidentiality. An alien filing for legalization did not have a reasonable expectation, under the laws existing at that time, that information in his or her application could not be used for the purpose of identifying that alien for compelling circumstances, unrelated to immigration enforcement, that would arise after the filing of the application. The government interest in securing such information is compelling, and the requirement of judicial approval will further ensure that the legitimate confidentiality rights of legalization applicants are protected.

This section also clarifies that information outside of the actual application for legalization, as well as information limited to the date and disposition of the application, does not fall within the original confidentiality provisions on sections 210 and 245A, and can be used for immigration enforcement or other purposes without prior judicial approval. This clarification is needed because in certain circumstances, these confidentiality provisions have been erroneously interpreted to prohibit the disclosure of information in INS files pertaining to the disposition of the application, but not information contained in the application itself. The plain language in sections 245A(c)(5) and 210(b) is addressed solely to the contents of the application, not to information regarding the disposition of the application or the alien's subsequent immigration status.

*Sec. 810—Change of nonimmigrant application*

This section amends section 248 to provide that an alien whose status is changed under section 248 may apply directly to the Secretary of State for a visa without having to leave the United States.

Subtitle B—Other Provisions.

*Sec. 831—Commission report on fraud associated with birth certificates*

This section amends section 141(c) of the Immigration Act of 1990 to require that the Commission on Immigration Reform shall study and submit to Congress, not later than January 1, 1997, a report containing recommendations of methods to reduce or eliminate the fraudulent use of birth certificates for the purposes of obtaining identification documents that may be used to obtain benefits relating to immigration and employment. The Commission shall consider proposals to adopt national standards for issuing birth certificates and to limit the issuance of an individual's birth certificate to any person other than the individual or his or her representative.

*Sec. 832—Uniform vital statistics*

This section requires the Secretary of Health and Human Services, within 2 years of the date of enactment, to establish a pilot program for 3 of the 5 States with the largest population of un-

277

documented aliens for linking through electronic network the vital statistics records of such States. The network shall provide for the matching of deaths and births and shall institute measures to protect the integrity of the records, specifically to prevent fraud against the Government through use of false birth and death certificates. The Secretary shall issue a report to Congress not later than 180 days after establishment of the pilot program with recommendations on how the pilot program could be implemented as a national network.

*Sec. 833—Communication between state and local government agencies, and the immigration and naturalization service*

This section provides that notwithstanding any other provision of Federal, State, or local law, no State or local government entity shall prohibit or in any way restrict any government entity or official from sending to or receiving from the INS information regarding the immigration status of an alien in the United States.

The Committee intends to give State and local officials the authority to communicate with the INS regarding the presence, whereabouts, and activities of illegal aliens. This section is designed to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials and the INS. The Committee believes that immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and that illegal aliens do not have the right to remain in the U.S. undetected and unapprehended.

*Sec. 834—Criminal alien reimbursement costs*

This section provides that amounts appropriated to carry out section 501 of the Immigration Control and Reform Act of 1986 shall be available to carry out section 242(j) of the INA with respect to undocumented criminal aliens incarcerated by the political subdivisions of a State.

*Sec. 835—Female genital mutilation*

This section requires aliens from certain countries specified by the INS in consultation with the Secretary of State to be advised prior to or at the time of entry into the United States of the severe harm caused by female genital mutilation and the potential legal consequences in the United States of performing female genital mutilation or of allowing a child to be subjected to female genital mutilation.

*Sec. 836—Designation of portugal as a visa waiver pilot program country with probationary status*

This section designates Portugal as a visa waiver pilot program country with probationary status under section 217(g) for each of the fiscal years 1996, 1997, and 1998.

278

Subtitle C—Technical Corrections.

*Sec. 851—Miscellaneous technical corrections*

This section makes a number of entirely technical corrections to the Immigration Reform and Control Act of 1986, the Immigration and Nationality Technical Corrections Act of 1994, the Immigration and Nationality Act, and other legislation.

AGENCY VIEWS

The Administration has not provided a statement of its views regarding H.R. 2202 as reported by the Committee on October 24, 1996. The following is a statement of views received from the Attorney General regarding H.R. 2202 as introduced on August 4, 1995.

OFFICE OF THE DEPUTY ATTORNEY GENERAL,
*Washington, DC, September 15, 1995.*

Hon. HENRY J. HYDE,
*Chairman, Committee on the Judiciary,*
*House of Representatives, Washington, DC.*

DEAR CHAIRMAN HYDE: This letter presents the views of the Administration concerning H.R. 2202, the "Immigration in the National Interest Act of 1995," as introduced on August 4, 1995.

Many of the provisions in H.R. 2202 advance the Administration's four-part strategy to control illegal immigration. This strategy calls for regaining control of our borders; removing the job magnet through worksite enforcement; aggressively pursuing the removal of criminal aliens and other illegal aliens; and securing from Congress the resources to assist states with the costs of illegal immigration that are a result of failed enforcement policies of the past. The Administration's legislative proposal to advance that strategy is H.R. 1929, the "Immigration Enforcement Improvements Act of 1995," introduced by Representative Howard Berman on June 27, 1995. We are pleased that the bill before the Committee follows our policies to a significant extent. Our positions on the provisions in the bill are summarized in the following discussion.

TITLE I—DETERRENCE OF ILLEGAL IMMIGRATION THROUGH IMPROVED BORDER ENFORCEMENT AND PILOT PROGRAMS

The Administration has already demonstrated that our borders can be controlled when there is a commitment to do so by the President and Congress. With an unprecedented infusion of resources since 1993, we have implemented a multi-year border control strategy of prevention through deterrence. We have carefully crafted long range strategic plans tailored to the unique geographic and demographic characteristics of each border area to restore integrity to the border.

Border Patrol Agents: We have increased the number of Border Patrol agents by 40% since 1993 and we support a further increase of 700 agents per year to reach a total strength of at least 7,281 Border Patrol agents by the end of FY 1998.

279

Document Security: We support improved security of Border Crossing Cards and other documents, using advanced technology, within a reasonable period of time.

Interior Repatriation: We support pilot programs to deter multiple unauthorized entries, including interior and third country repatriation.

Penalty for illegal entry: We are currently prosecuting more repeat criminal alien illegal entry offenders than ever. Our increase in prosecutions is preferable to a burdensome civil penalty.

TITLE II—ENHANCED ENFORCEMENT AND PENALTIES AGAINST ALIEN SMUGGLING; DOCUMENT FRAUD

The Administration is aggressively investigating, apprehending, and prosecuting alien smugglers. H.R. 2202 and the Administration bill have a common goal of significantly increasing penalties for alien smuggling, document fraud, and related crimes. In face, our bill goes beyond the provisions of H.R. 2202 by making conspiracy to violate the alien smuggling statutes a RICO predicate and by providing for civil forfeiture of proceeds of and property used to facilitate alien smuggling.

Penalty increases: We support increases in the sentences for aliens who fail to obey a deportation order, illegally re-enter the U.S. after deportation, or commit passport of visa fraud.

TITLE III—INSPECTION, APPREHENSION, DETENTION, ADJUDICATION, AND REMOVAL OF INADMISSIBLE AND DEPORTABLE ALIENS

Removals of criminal aliens have increased rapidly during this Administration. More than four times as many criminal aliens were removed in 1994 than in 1988. We will nearly triple the number of criminal alien removals from 20, 138 in FY 93 to 58,200 in FY 96 by streamlining deportation procedures, expending the Institutional Hearing Program, and enhancing the international prisoner transfer treaty program. Immigration and Naturalization Service (INS) technology enhancements have also played a critical role in removing criminal aliens, as have INS alternatives to formal deportation, such as stipulated, judicial, and administrative deportation.

Special exclusion: We support special exclusion provisions which allow the Attorney General to order an alien excluded and deported without a hearing before an immigration judge when extraordinary situations threaten our ability to process cases and in the case of irregular boat arrivals.

Removal procedures: We support consolidating exclusion and deportation into one removal process and facilitating telephone and video hearings which save resources.

Authorization for removals: We urge the Committee to increase the authorization for funding the detention and removal of inadmissible or deportable aliens to $177.7 million, the amount in the President's FY 96 budget request, rather than the $150 million in H.R. 2202.

Relief from deportation: We support consolidating the processes and restricting the grounds which permit relief from deportation.

280

TITLE IV—ENFORCEMENT OF RESTRICTIONS AGAINST EMPLOYMENT

The Administration strongly believes that jobs are the greatest magnet for illegal immigration and that a comprehensive effort to deter illegal immigration, particularly visa overstaying, must make worksite enforcement a top priority. The Administration is concerned by the cautious steps back H.R. 2202 takes with regard to enforcement of employer sanctions and will continue to work with the Committee to address this priority enforcement area.

Enforcement personnel: The President's FY budget request calls for 202 new DOL Wage and Hour personnel while H.R. 2202 calls for 150. We support the levels of new INS investigations personnel and new DOL Wage and Hour personnel requested in the President's FY 96 budget. These resources will enhance enforcement of laws prohibiting employment of illegal aliens and the minimum labor standards laws.

Employment verification: H.R. 2202, in contrast to the Administration's bill, rejects the principle worksite enforcement recommendation of the Commission on Immigration Reform which was to thoroughly test and evaluate verification techniques before implementing them nationwide. We support continued pilot projects which will aid in the development of a system for accurate verification of a potential employee's status. Such a system will greatly assist employers in meeting their obligation to hire only authorized workers. Testing what works—from business impact, cost effectiveness, privacy and discrimination perspectives—is a necessary prerequisite for a nationwide verification system.

Employment documents. We strongly support the reduction in the number of documents that can establish employment authorization.

TITLE V—REFORM OF LEGAL IMMIGRATION SYSTEM

The Administration seeks legal immigration reform that promotes family reunification, protects U.S. workers from unfair competition while promoting the global competitiveness of our employers, and encourages naturalization to encourage full participation in the national community. The Administration supports a reduction in the overall level of legal immigration consistent with these principles.

We are proposing to reform legal immigration in ways that are consistent with the Jordan Commission's recommendations, that reduce annual levels of legal immigration, and that reach those lower numbers faster. We are also proposing a few ideas on how to use naturalization to reduce the second preference backlog numbers, which is a priority for the Commission and the Administration, while maintaining first and third family preferences for reunification of adult children of U.S. citizens.

Refugee admissions: We do not support a statutory cap on the number of refugees resettled in the U.S. Refugee admissions, which have declined in recent years, are better determined through the established consultation process between the President and the Congress.

281

Asylum proceedings: We do not support extensive changes in the asylum process which would reverse the significant progress the Administration has made in the asylum area.

TITLE VI—RESTRICTIONS ON BENEFITS FOR UNAUTHORIZED ALIENS

The Administration supports the denial of benefits to undocumented immigrants. The only exceptions should include matters of public health and safety—such as emergency medical services, immunization and temporary disaster relief assistance—and every child's right to a public education. In so doing, care must be taken not to limit or deny benefits or services to eligible individuals or in instances where denial does not serve the national interest. The Administration also supports tightening sponsorship and eligibility rules for non-citizens and requiring sponsors of legal immigrants to bear greater responsibility through legally enforceable sponsorship agreements for those whom they encourage to enter the United States. The Administration, however, strongly opposes application of new eligibility and deeming provisions to current recipients, including the disabled who are exempted under current law. The Administration also is deeply concerned about the application of deeming provisions to Medicaid and other programs where deeming would adversely affect public health and welfare.

TITLE VII—FACILITATION OF LEGAL ENTRY

The Administration is committed to improving services for legal entrants, and we support the provisions of this bill which enable us to do so. We are already conducting commuter land pilot programs on the Northern border to facilitate traffic at the ports of entry. Revenues from new service charges will enable us to hire additional inspectors and to enhance customer service to the traveling public at land border ports of entry.

As for air travel, our pre-inspection facilities enable us to expedite inspection at the arrival airports. In addition, we are already working with the travel industry to deter illegal traffic and improve customer services. For the past five years we have conducted a Carrier Consultant program at both United States and foreign locations in which we train airline employees and foreign government officials in the detection of fraudulent travel documents. This has resulted in a marked reduction of mala fide arrivals at United States gateway airports.

TITLE VIII—MISCELLANEOUS

Adjustment of status: We do not support limiting the class of aliens who can adjust status under section 245(i) of the Immigration and Nationality Act. This section has eliminated a burdensome paper process, and allowed resources to be shifted to anti-fraud and naturalization efforts.

Mr. Chairman, we want to work with you on bipartisan immigration enforcement legislation that is in the national interest. We look forward to working with you to address the core issues of worksite enforcement, border control, criminal alien deportation and comprehensive immigration law enforcement.

282

The Office of Management and Budget has advised that there is no objection to the submission of this letter from the standpoint of the Administration's program.

Sincerely,

JAMIE S. GORELICK,
*Deputy Attorney General.*

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

# IMMIGRATION AND NATIONALITY ACT

\*       \*       \*       \*       \*       \*       \*

TABLE OF CONTENTS

TITLE I—GENERAL

Sec. 101.   Definitions.
Sec. 102.   Applicability of title II to certain nonimmigrants.
Sec. 103.   Powers and duties of the Attorney General and the Commissioner.

\*       \*       \*       \*       \*       \*       \*

【Sec. 106.   Judicial review of orders of deportation and exclusion.】

TITLE II—IMMIGRATION

CHAPTER 1—SELECTION SYSTEM

Sec. 201.   Worldwide level of immigration.
Sec. 202.   Numerical limitation to any single foreign state.
Sec. 203.   Allocation of immigrant visas.

\*       \*       \*       \*       \*       \*       \*

【Sec. 208.   Asylum procedure.】
*Sec. 208. Asylum.*

\*       \*       \*       \*       \*       \*       \*

CHAPTER 2—QUALIFICATIONS FOR ADMISSION OF ALIENS; TRAVEL CONTROL OF CITIZENS AND ALIENS

Sec. 211.   Documentary requirements.
Sec. 212.   General classes of aliens ineligible to receive visas and excluded from admission; waivers of inadmissibility.
Sec. 213.   Admission of certain aliens on giving bond.
*Sec. 213A.   Requirements for sponsor's affidavit of support.*

\*       \*       \*       \*       \*       \*       \*

*Sec. 216B. Conditional permanent resident status for certain foreign language teachers.*

\*       \*       \*       \*       \*       \*       \*

CHAPTER 3—ISSUANCE OF ENTRY DOCUMENTS

Sec. 221.   Issuance of visas.
Sec. 222.   Applications for visas.
Sec. 223.   Reentry permits.
【Sec. 224.   Immediate relative and special immigrant visas.】
*Sec. 224.   Visas for spouses and children of citizens and special immigrants.*

283

〔CHAPTER 4—PROVISIONS RELATING TO ENTRY AND EXCLUSION

〔Sec. 231.  Lists of alien and citizen passengers arriving or departing; record of resident aliens and citizens leaving permanently for foreign country.
〔Sec. 232.  Detention of aliens for observation and examination.
〔Sec. 234.  Physical and mental examination.
〔Sec. 235.  Inspection by immigration officers.
〔Sec. 236.  Exclusion of aliens.
〔Sec. 237.  Immediate deportation of aliens excluded from admission or entering in violation of law.
〔Sec. 238.  Entry through or from foreign contiguous territory and adjacent islands; landing stations.
〔Sec. 239.  Designation of ports of entry for aliens arriving by civil aircraft.
〔Sec. 240.  Records of admission.

〔CHAPTER 5—DEPORTATION; ADJUSTMENT OF STATUS

〔Sec. 241.  General classes of deportable aliens.
〔Sec. 242.  Apprehension and deportation of aliens.
〔Sec. 242A.  Expedited procedures for deportation of aliens convicted of committing aggravated felonies.
〔Sec. 242B.  Deportation procedures.
〔Sec. 243.  Countries to which aliens shall be deported; cost of deportation.
〔Sec. 244.  Suspension of deportation; voluntary departure.
〔Sec. 244A.  Temporary protected status.〕

CHAPTER 4—INSPECTION, APPREHENSION, EXAMINATION, EXCLUSION, AND REMOVAL

Sec. 231.  Lists of alien and citizen passengers arriving or departing; record of resident aliens and citizens leaving permanently for foreign country.
Sec. 232.  Detention of aliens for physical and mental examination.
Sec. 233.  Entry through or from foreign contiguous territory and adjacent islands; landing stations.
Sec. 234.  Designation of ports of entry for aliens arriving by civil aircraft.
Sec. 235.  Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing.
Sec. 235A.  Preinspection at foreign airports.
Sec. 236.  Apprehension and detention of aliens not lawfully in the United States.
Sec. 237.  General classes of deportable aliens.
Sec. 238.  Expedited removal of aliens convicted of committing aggravated felonies.
Sec. 239.  Initiation of removal proceedings.
Sec. 240.  Removal proceedings.
Sec. 240A.  Cancellation of removal; adjustment of status.
Sec. 240B.  Voluntary departure.
Sec. 240C.  Records of admission.
Sec. 241.  Detention and removal of aliens ordered removed.
Sec. 242.  Judicial review of orders of removal.
Sec. 243.  Penalties relating to removal.
Sec. 244.  Temporary protected status.

CHAPTER 5—ADJUSTMENT AND CHANGE OF STATUS

*          *          *          *          *          *          *

CHAPTER 8—GENERAL PENALTY PROVISIONS

Sec. 271.  Prevention of unauthorized landing of aliens.
Sec. 272.  Bringing in aliens subject to 〔exclusion〕 denial of admission on a health-related ground.
Sec. 273.  Unlawful bringing of aliens into United States.
Sec. 274.  Bringing in and harboring certain aliens.
Sec. 274A.  Unlawful employment of aliens.
Sec. 274B.  Unfair immigration-related employment practices.
Sec. 274C.  Penalties for document fraud.
Sec. 274D.  Civil penalties for failure to depart.
Sec. 275.  Entry of alien at improper time or place; misrepresentation and concealment of facts.

284

Sec. 276.   Reentry of 〔deported〕 *removed* alien.
Sec. 277.   Aiding or assisting certain aliens to enter the United States.

\* \* \* \* \* \* \*

CHAPTER 9—MISCELLANEOUS

Sec. 281.   Nonimmigrant visa fees.
Sec. 282.   Printing of reentry permits and blank forms of manifests and crew lists.
Sec. 283.   Travel expenses and expense of transporting remains of immigration officers and employees who die outside of the United States.

\* \* \* \* \* \* \*

Sec. 293.   Deposit of and interest on cash received to secure immigration bonds.
Sec. 294.   *Undercover investigation authority.*

\* \* \* \* \* \* \*

*TITLE V—SPECIAL REMOVAL PROCEDURES FOR ALIEN TERRORISTS*

Sec. 501.   *Definitions.*
Sec. 502.   *Establishment of special removal court; panel of attorneys to assist with classified information.*
Sec. 503.   *Application for initiation of special removal proceeding.*
Sec. 504.   *Consideration of application.*
Sec. 505.   *Special removal hearings.*
Sec. 506.   *Consideration of classified information.*
Sec. 507.   *Appeals.*
Sec. 508.   *Detention and custody.*

## TITLE I—GENERAL

DEFINITIONS

SECTION 101. (a) As used in this Act—
(1)  \* \* \*

\* \* \* \* \* \* \*

(6) The term "border crossing identification card" means a document of identity bearing that designation issued to an alien who is lawfully admitted for permanent residence, or to an alien who is a resident in foreign contiguous territory, by a consular officer or an immigration officer for the purpose of crossing over the borders between the United States and foreign contiguous territory in accordance with such conditions for its issuance and use as may be prescribed by regulations. *Such regulations shall provide that (A) each such document include a biometric identifier (such as the fingerprint or handprint of the alien) that is machine readable and (B) an alien presenting a border crossing identification card is not permitted to cross over the border into the United States unless the biometric identifier contained on the card matches the appropriate biometric characteristic of the alien.*

\* \* \* \* \* \* \*

〔(13) The term "entry" means any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary: *Provided,* That no per-

285

son whose departure from the United States was occasioned by deportation proceedings, extradition, or other legal process shall be held to be entitled to such exception.**]**

*(13)(A) The terms "admission" and "admitted" mean, with respect to an alien, the entry of the alien into the United States after inspection and authorization by an immigration officer.*

*(B) An alien who is paroled under section 212(d)(5) or permitted to land temporarily as an alien crewman shall not be considered to have been admitted.*

*(C) An alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien—*

   *(i) has abandoned or relinquished that status,*

   *(ii) has engaged in illegal activity after having departed the United States,*

   *(iii) has departed from the United States while under legal process seeking removal of the alien from the United States, including removal proceedings under this Act and extradition proceedings,*

   *(iv) has been convicted of an aggravated felony, unless since such conviction the alien has been granted relief under section 240A(a), or*

   *(v) is attempting to enter at a time or place other than as designated by immigration officers or has not been admitted to the United States after inspection and authorization by an immigration officer.*

      \*     \*     \*     \*     \*     \*     \*

(15) The term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens—

   (A)   \* \* \*

      \*     \*     \*     \*     \*     \*     \*

   (K) an alien who is the fiancée or fiancé of a citizen of the United States and who seeks to enter the United States solely to conclude a valid marriage with the petitioner within ninety days after **[**entry**]** *admission*, and the minor children of such fiancée or fiancé accompanying him or following to join him;

      \*     \*     \*     \*     \*     \*     \*

   (N)(i) the parent of an alien accorded the status of special immigrant under paragraph (27)(I)(i) *(or under analogous authority under paragraph (27)(L))*, but only if and while the alien is a child, or (ii) a child of such parent or of an alien accorded the status of a special immigrant under clause (ii), (iii), or (iv) of paragraph (27)(I) *(or under analogous authority under paragraph (27)(L))*;

      \*     \*     \*     \*     \*     \*     \*

   (R) an alien, and the spouse and children of the alien if accompanying or following to join the alien, who—

      (i) for the 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States; and

286

(ii) seeks to enter the United States for a period not to exceed 5 years to perform the work described in subclause (I), (II), or (III) of paragraph (27)(C)(ii); 【or】

(S) subject to section 【214(j)】 *214(k)*, an alien—

(i)   * * *

(ii) who the Secretary of State and the Attorney General jointly determine—

(I) is in possession of critical reliable information concerning a terrorist organization, enterprise, or operation;

(II) is willing to supply or has supplied such information to Federal law enforcement authorities or a Federal court;

(III) will be or has been placed in danger as a result of providing such information; and

(IV) is eligible to receive a reward under section 36(a) of the State Department Basic Authorities Act of 1956,

and, if the Attorney General (or with respect to clause (ii), the Secretary of State and the Attorney General jointly) considers it to be appropriate, the spouse, married and unmarried sons and daughters, and parents of an alien described in clause (i) or (ii) if accompanying, or following to join, the alien【.】*; or*

*(T) an alien who is the spouse or child of a another alien who is serving on active duty in the Armed Forces of the United States during the period in which the other alien is stationed in the United States.*

*     *     *     *     *     *     *

(17) The term "immigration laws" includes this Act and all laws, conventions, and treaties of the United States relating to the immigration, exclusion, deportation, 【or expulsion】 *expulsion, or removal* of aliens.

*     *     *     *     *     *     *

(27) The term "special immigrant" means—

(A)   * * *

【(B) an immigrant who was a citizen of the United States and may, under section 324(a) or 327 of title III, apply for reacquisition of citizenship;】

(C) an immigrant, and the immigrant's spouse and children if accompanying or following to join the immigrant, who—

(i) for at least 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States;

(ii) seeks to enter the United States—

(I) solely for the purpose of carrying on the vocation of a minister of that religious denomination,

(II) before October 1, 【1997】 *2005*, in order to work for the organization at the request of the organization in a professional capacity in a religious vocation or occupation, or

(III) before October 1, 【1997】 *2005*, in order to work for the organization (or for a bona fide organization

287

which is affiliated with the religious denomination and is exempt from taxation as an organization described in section 501(c)(3) of the Internal Revenue Code of 1986) at the request of the organization in a religious vocation or occupation; and

(iii) has been carrying on such vocation, professional work, or other work continuously for at least the 2-year period described in clause (i);

(D) an immigrant who is an employee, or an honorably retired former employee, of the United States Government abroad, or of the American Institute in Taiwan, and who has performed faithful service for a total of fifteen years, or more, and his accompanying spouse and children: *Provided,* That the principal officer of a Foreign Service establishment (or, in the case of the American Institute in Taiwan, the Director thereof), in his discretion, shall have recommended the granting of special immigrant status to such alien in exceptional circumstances and the Secretary of State approves such recommendation and finds that it is in the national interest to grant such status;

〔(E) an immigrant, and his accompanying spouse and children, who is or has been an employee of the Panama Canal Company or Canal Zone Government before the date on which the Panama Canal Treaty of 1977 (as described in section 3 (a)(1) of the Panama Canal Act of 1979) enters into force, who was resident in the Canal Zone on the effective date of the exchange of instruments of ratification of such Treaty, and who has performed faithful service as such an employee for one year or more;

〔(F) an immigrant, and his accompanying spouse and children, who is a Panamanian national and (i) who, before the date on which such Panama Canal Treaty of 1977 enters into force, has been honorably retired from United States Government employment in the Canal Zone with a total of 15 years or more of faithful service, or (ii) who on the date on which such Treaty enters into force, has been employed by the United States Government in the Canal Zone with a total of 15 years or more of faithful service and who subsequently is honorably retired from such employment or continues to be employed by the United States Government in an area of the former Canal Zone or continues to be employed by the United States Government in an area of the former Canal Zone;

〔(G) an immigrant, and his accompanying spouse and children, who was an employee of the Panama Canal Company or Canal Zone government on the effective date of the exchange of instruments of ratification of such Panama Canal Treaty of 1977, who has performed faithful service for five years or more as such an employee, and whose personal safety, or the personal safety of whose spouse or children, as a direct result of such Treaty, is reasonably placed in danger because of the special nature of any of that employment;

〔(H) an immigrant, and his accompanying spouse and children, who—

288

⟦(i) has graduated from a medical school or has qualified to practice medicine in a foreign state,

⟦(ii) was fully and permanently licensed to practice medicine in a State on January 9, 1978, and was practicing medicine in a State on that date,

⟦(iii) entered the United States as a nonimmigrant under subsection (a)(15)(H) or (a)(15)(J) before January 10, 1978, and

⟦(iv) has been continuously present in the United States in the practice or study of medicine since the date of such entry;⟧

\*        \*        \*        \*        \*        \*        \*

(J) an immigrant (i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State and who has been deemed eligible by that court for long-term foster care, and (ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; except that no natural parent or prior adoptive parent of any alien provided special immigrant status under this subparagraph shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this Act; ⟦or⟧

(K) an immigrant who has served honorably on active duty in the Armed Forces of the United States after October 15, 1978, and after original lawful enlistment outside the United States (under a treaty or agreement in effect on the date of the enactment of this subparagraph) for a period or periods aggregating—

(i) 12 years and who, if separated from such service, was never separated except under honorable conditions, or

(ii) 6 years, in the case of an immigrant who is on active duty at the time of seeking special immigrant status under this subparagraph and who has reenlisted to incur a total active duty service obligation of at least 12 years,

and the spouse or child of any such immigrant if accompanying or following to join the immigrant, but only if the executive department under which the immigrant serves or served recommends the granting of special immigrant status to the immigrant⟦.⟧; or

*(L) an immigrant who would be described in clause (i), (ii), (iii), or (iv) of subparagraph (I) if any reference in such a clause—*

*(i) to an international organization described in paragraph (15)(G)(i) were treated as a reference to the North American Treaty Organization (NATO);*

*(ii) to a nonimmigrant under paragraph (15)(G)(iv) were treated as a reference to a nonimmigrant classifiable under NATO–6 (as a member of a civilian component accompanying a force entering in accordance with the provisions of the NATO Status-of-Forces Agreement, a member of a civilian component attached to or employed by an Allied Head-*

289

*quarters under the "Protocol on the Status of International Military Headquarters" set up pursuant to the North Atlantic Treaty, or as a dependent); and*

*(iii) to the Immigration Technical Corrections Act of 1988 or to the Immigration and Nationality Technical Corrections Act of 1994 were a reference to the Immigration in the National Interest Act of 1995.*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(30) The term "passport" means any travel document issued by competent authority showing the bearer's origin, identity, and nationality if any, which is valid for the ⟦entry⟧ *admission* of the bearer into a foreign country.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(42) The term "refugee" means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or (B) in such circumstances as the President after appropriate consultation (as defined in section 207(e) of this Act) may specify, any person who is within the country of such person's nationality or, in the case of a person having no nationality, within the country in which such person is habitually residing, and who is persecuted or who has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. The term "refugee" does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion. *For purposes of determinations under this Act, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.*

(43) The term "aggravated felony" means—

(A) murder;

\*　　\*　　\*　　\*　　\*　　\*　　\*

(K) an offense that—

(i) relates to the owning, controlling, managing, or supervising of a prostitution business; or

(ii) is described in section 1581, 1582, 1583, 1584, 1585, or 1588⟦,⟧ of title 18, United States Code (relating to peonage, slavery, and involuntary servitude);

\*　　\*　　\*　　\*　　\*　　\*　　\*

290

(N) an offense described in section 274(a)(1) 【of title 18, United States Code】 *of this Act* (relating to alien smuggling) for the purpose of commercial advantage;

(O) an offense described in section 1546(a) of title 18, United States Code (relating to document fraud) 【which constitutes trafficking in the documents described in such section for which the term of imprisonment imposed (regardless of any suspicion of such imprisonment) is at least 5 years】, *for the purpose of commercial advantage*;

\*        \*        \*        \*        \*        \*        \*

(Q) an attempt or conspiracy to commit an offense described in this paragraph.

The term applies to an offense described in this paragraph whether in violation of Federal or State law and applies to such an offense in violation of the law of a foreign country for which the term of imprisonment was completed within the previous 15 years. *Notwithstanding any other provision of law, the term applies for all purposes to convictions entered before, on, or after the date of enactment of the Immigration and Nationality Technical Corrections Act of 1994.*

\*        \*        \*        \*        \*        \*        \*

*(47) The term "stowaway" means any alien who obtains transportation without the consent of the owner, charterer, master or person in command of any vessel or aircraft through concealment aboard such vessel or aircraft. A passenger who boards with a valid ticket is not to be considered a stowaway.*

*(48) The term "conviction" means a formal judgment of guilt entered by a court or, if adjudication of guilt has been withheld, where all of the following elements are present:*

*(A) A judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt.*

*(B) The judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.*

*(C) A judgment or adjudication of guilt may be entered if the alien violates the terms of the probation or fails to comply with the requirements of the court's order, without availability of further proceedings regarding the alien's guilt or innocence of the original charge.*

(b) As used in titles I and II—

(1) The term "child" means an unmarried person under twenty-one years of age who is—

(A) a child born in wedlock;

\*        \*        \*        \*        \*        \*        \*

(D) a child born out of wedlock, by, through whom, or on whose behalf a status, privilege, or benefit is sought by virtue of the relationship of the child to its natural mother or to its natural father if the father has or had a bona fide parent-child relationship with the person;

(E) a child adopted while under the age of sixteen years if the child has been in the legal custody of, and has resided with, the adopting parent or parents for at least two years:

291

*Provided,* That no natural parent of any such adopted child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this Act; 〔or〕

(F) a child, under the age of sixteen at the time a petition is filed in his behalf to accord a classification 〔as an immediate relative under section 201(b)〕 *as a child of a citizen of the United States*, who is an orphan because of the death or disappearance of, abandonment or desertion by, or separation or loss from, both parents, or for whom the sole or surviving parent is incapable of providing the proper care and has in writing irrevocably released the child for emigration and adoption; who has been adopted abroad by a United States citizen and spouse jointly, or by an unmarried United States citizen at least twenty-five years of age, who personally saw and observed the child prior to or during the adoption proceedings; or who is coming to the United States for adoption by a United States citizen and spouse jointly, or by an unmarried United States citizen at least twenty-five years of age, who have or has complied with the preadoption requirements, if any, of the child's proposed residence: *Provided,* That the Attorney General is satisfied that proper care will be furnished the child if admitted to the United States: *Provided further,* That no natural parent or prior adoptive parent of any such child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this Act〔.〕*; or*

(G) *a child of a citizen or national of the United States or lawful permanent resident alien, regardless of age, who has never been married, and who has a severe mental or physical impairment, or combination of mental or physical impairments, which—*

    (i) *is likely to continue indefinitely; and*

    (ii) *causes substantially total inability to perform functions necessary for independent living, including but not necessarily limited to 3 or more of the following areas of major life activity—*

        (I) *self-care,*

        (II) *interpersonal communication,*

        (III) *learning,*

        (IV) *mobility, and*

        (V) *self-direction:*

*Provided, That no child may be considered to be a child within the meaning of this subparagraph on the basis, in whole or in part, of any physical or mental impairment that is not being ameliorated through medical treatment to the maximum extent reasonably possible given the ability and resources of such child and the citizen, national, or lawful permanent resident alien who is the child's parent.*

\*     \*     \*     \*     \*     \*     \*

〔(4) The term "special inquiry officer" means any immigration officer who the Attorney General deems specially qualified to conduct specified classes of proceedings, in whole or in part, required by this Act to be conducted by or before a special inquiry officer and who is designated and selected by the Attorney General, individually or by regulation, to conduct such proceedings. Such special in-

292

quiry officer shall be subject to such supervision and shall perform such duties, not inconsistent with this Act, as the Attorney General shall prescribe.⟧

*(4) The term "immigration judge" means an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under section 240. An immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe, but shall not be employed by the Immigration and Naturalization Service.*

\*       \*       \*       \*       \*       \*       \*

(c) As used in title III—

(1) The term "child" means an unmarried person under twenty-one years of age and includes a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in the United States or elsewhere, and, except as otherwise provided in sections 320⟦, 321, and 322⟧ *and 321* of title III, a child adopted in the United States, if such legitimation or adoption takes place before the child reaches the age of sixteen years, and the child is in the legal custody of the legitimating or adopting parent or parents at the time of such legitimation or adoption.

\*       \*       \*       \*       \*       \*       \*

(f) For the purposes of this Act—

No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—

(1)   \* \* \*

\*       \*       \*       \*       \*       \*       \*

(3) a member of one or more of the classes of persons, whether ⟦excludable⟧ *inadmissible* or not, described in paragraphs (2)(D), (6)(E), and (9)(A) of section 212(a) of this Act; or subparagraphs (A) and (B) of section 212(a)(2) and subparagraph (C) thereof of such section (except as such paragraph relates to a single offense of simple possession of 30 grams or less of marihuana); if the offense described therein, for which such person was convicted or of which he admits the commission, was committed during such period;

\*       \*       \*       \*       \*       \*       \*

(g) For the purposes of this Act any alien ordered deported *or removed* (whether before or after the enactment of this Act) who has left the United States, shall be considered to have been deported *or removed* in pursuance of law, irrespective of the source from which the expenses of his transportation were defrayed or of the place to which he departed.

\*       \*       \*       \*       \*       \*       \*

APPLICABILITY OF TITLE II TO CERTAIN NONIMMIGRANTS

SEC. 102. Except as otherwise provided in this Act, for so long as they continue in the nonimmigrant classes enumerated in this

293

section, the provisions of this Act relating to ineligibility to receive visas and the ⟦exclusion or deportation⟧ *removal* of aliens shall not be construed to apply to nonimmigrants—

(1)  * * *

\*       \*       \*       \*       \*       \*       \*

POWERS AND DUTIES OF THE ATTORNEY GENERAL AND THE COMMISSIONER

SEC. 103. (a)  * * *

\*       \*       \*       \*       \*       \*       \*

(c)(1)  * * *

(2) Such information shall include information on the alien population in the United States, on the rates of naturalization and emigration of resident aliens, on aliens who have been admitted, paroled, or granted asylum, on nonimmigrants in the United States (by occupation, basis for admission, and duration of stay), on aliens who have ⟦been excluded or deported⟧ *not been admitted or have been removed* from the United States, on the number of applications filed and granted for ⟦suspension of deportation⟧ *cancellation of removal*, and on the number of aliens estimated to be present unlawfully in the United States in each fiscal year.

\*       \*       \*       \*       \*       \*       \*

*(e)(1) The Attorney General shall continue to provide for such programs (including intensive language training programs) of inservice training for full-time and part-time personnel of the Border Patrol in contact with the public as will familiarize the personnel with the rights and varied cultural backgrounds of aliens and citizens in order to ensure and safeguard the constitutional and civil rights, personal safety, and human dignity of all individuals, aliens as well as citizens, within the jurisdiction of the United States with whom such personnel have contact in their work.*

*(2) The Attorney General shall provide that the annual report of the Service include a description of steps taken to carry out paragraph (1).*

\*       \*       \*       \*       \*       \*       \*

⟦JUDICIAL REVIEW OF ORDERS OF DEPORTATION AND EXCLUSION

⟦SEC. 106. (a) The procedure prescribed by, and all the provisions of chapter 158 of title 28, United States Code, shall apply to, and shall be the sole and exclusive procedure for, the judicial review of all final orders of deportation heretofore or hereafter made against aliens within the United States pursuant to administrative proceedings under section 242(b) or pursuant to section 242A of this Act or comparable provisions of any prior Act, except that—

⟦(1) a petition for review may be filed not later than 90 days after the date of the issuance of the final deportation order, or, in the case of an alien convicted of an aggravated felony (including an alien described in section 242A), not later than 30 days after the issuance of such order;

⟦(2) the venue of any petition for review under this section shall be in the judicial circuit in which the administrative pro-

294

ceedings before a special inquiry officer were conducted in whole or in part, or in the judicial circuit wherein is the residence, as defined in this Act, of the petitioner, but not in more than one circuit;

⟦(3) the action shall be brought against the Immigration and Naturalization Service, as respondent. Service of the petition to review shall be made upon the Attorney General of the United States and upon the official of the Immigration and Naturalization Service in charge of the Service district in which the office of the clerk of the court is located. The service of the petition for review upon such official of the Service shall stay the deportation of the alien pending determination of the petition by the court, unless the court otherwise directs or unless the alien is convicted of an aggravated felony (including an alien described in section 242A), in which case the Service shall not stay the deportation of the alien pending determination of the petition of the court unless the court otherwise directs;

⟦(4) except as provided in clause (B) of paragraph (5) of this subsection, the petition shall be determined solely upon the administrative record upon which the deportation order is based and the Attorney General's findings of fact, if supported by reasonable, substantial, and probative evidence on the record considered as a whole, shall be conclusive;

⟦(5) whenever any petitioner, who seeks review of an order under this section, claims to be a national of the United States and makes a showing that his claim is not frivolous, the court shall (A) pass upon the issues presented when it appears from the pleadings and affidavits filed by the parties that no genuine issue of material fact is presented; or (B) where a genuine issue of material fact as to the petitioner's nationality is presented, transfer the proceedings to a United States district court for the district where the petitioner has his residence for hearing de novo of the nationality claim and determination as if such proceedings were originally initiated in the district court under the provisions of section 2201 of title 28, United States Code. Any such petitioner shall not be entitled to have such issue determined under section 360(a) of this Act or otherwise;

⟦(6) whenever a petitioner seeks review of an order under this section, any review sought with respect to a motion to reopen or reconsider such an order shall be consolidated with the review of the order;

⟦(7) if the validity of a deportation order has not been judicially determined, its validity may be challenged in a criminal proceeding against the alien for violation of subsection (d) or (e) of section 242 of this Act only by separate motion for judicial review before trial. Such motion shall be determined by the court without a jury and before the trial of the general issue. Whenever a claim to United States nationality is made in such motion, and in the opinion of the court, a genuine issue of material fact as to the alien's nationality is presented, the court shall accord him a hearing de novo on the nationality claim and determine that issue as if proceedings had been initiated under the provisions of section 2201 of title 28, United

295

States Code. Any such alien shall not be entitled to have such issue determined under section 360(a) of this Act or otherwise. If no such hearing de novo as to nationality is conducted, the determination shall be made solely upon the administrative record upon which the deportation order is based and the Attorney General's findings of fact, if supported by reasonable, substantial and probative evidence on the record considered as a whole, shall be conclusive. If the deportation order is held invalid, the court shall dismiss the indictment and the United States shall have the right to appeal to the court of appeals within thirty days. The procedure on such appeals shall be as provided in the Federal rules of criminal procedure. No petition for review under this section may be filed by any alien during the pendency of a criminal proceeding against such alien for violation of subsection (d) or (e) of section 242 of this Act;

〔(8) nothing in this section shall be construed to require the Attorney General to defer deportation of an alien after the issuance of a deportation order because of the right of judicial review of the order granted by this section, or to relieve any alien from compliance with subsections (d) and (e) of section 242 of this Act. Nothing contained in this section shall be construed to preclude the Attorney General from detaining or continuing to detain an alien or from taking him into custody pursuant to subsection (c) of section 242 of this Act at any time after the issuance of a deportation order;

〔(9) it shall not be necessary to print the record or any part thereof, or the briefs, and the court shall review the proceedings on a typewritten record and on typewritten briefs; and

〔(10) any alien held in custody pursuant to an order of deportation may obtain judicial review thereof by habeas corpus proceedings.

〔(b) Notwithstanding the provisions of any other law, any alien against whom a final order of exclusion has been made heretofore or hereafter under the provisions of section 236 of this Act or comparable provisions of any prior Act may obtain judicial review of such order by habeas corpus proceedings and not otherwise.

〔(c) An order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations or if he has departed from the United States after the issuance of the order. Every petition for review or for habeas corpus shall state whether the validity of the order has been upheld in any prior judicial proceeding, and, if so, the nature and date thereof, and the court in which such proceeding took place. No petition for review or for habeas corpus shall be entertained if the validity of the order has been previously determined in any civil or criminal proceeding, unless the petition presents grounds which the court finds could not have been presented in such prior proceeding, or the court finds that the remedy provided by such prior proceeding was inadequate or ineffective to test the validity of the order.

〔(d)(1) A petition for review or for habeas corpus on behalf of an alien against whom a final order of deportation has been issued pursuant to section 242A(b) may challenge only—

296

〔(A) whether the alien is in fact the alien described in the order;

〔(B) whether the alien is in fact an alien described in section 242A(b)(2);

〔(C) whether the alien has been convicted of an aggravated felony and such conviction has become final; and

〔(D) whether the alien was afforded the procedures required by section 242A(b)(4).

〔(2) No court shall have jurisdiction to review any issue other than an issue described in paragraph (1).〕

TITLE II—IMMIGRATION

CHAPTER 1—SELECTION SYSTEM

WORLDWIDE LEVEL OF IMMIGRATION

SEC. 201. (a) IN GENERAL.—Exclusive of aliens described in subsection (b), aliens born in a foreign state or dependent area who may be issued immigrant visas or who may otherwise acquire the status of an alien lawfully admitted to the United States for permanent residence are limited to—

(1) * * *

(2) employment-based immigrants described in section 203(b) (or who are admitted under section 211(a) on the basis of a prior issuance of a visa to their accompanying parent under section 203(b)), in a number not to exceed in any fiscal year the number specified in subsection (d) for that year, and not to exceed in any of the first 3 quarters of any fiscal year 27 percent of the worldwide level under such subsection for all of such fiscal year; 〔and〕

(3) for fiscal years beginning with fiscal year 1995, diversity immigrants described in section 203(c) (or who are admitted under section 211(a) on the basis of a prior issuance of a visa to their accompanying parent under section 203(c)) in a number not to exceed in any fiscal year the number specified in subsection (e) for that year, and not to exceed in any of the first 3 quarters of any fiscal year 27 percent of the worldwide level under such subsection for all of such fiscal year〔.〕*; and*

*(4) for fiscal years beginning with fiscal year 1997, humanitarian immigrants described in section 203(e) (or who are admitted under section 211(a) on the basis of a prior issuance of a visa to their accompanying parent under section 203(e)) in a number not to exceed in any fiscal year the number specified in subsection (f) for that year, and not to exceed in any of the first 3 quarters of any fiscal year 27 percent of the worldwide level under such subsection for all of such fiscal year.*

(b) ALIENS NOT SUBJECT TO DIRECT NUMERICAL LIMITATIONS.—Aliens described in this subsection, who are not subject to the worldwide levels or numerical limitations of subsection (a), are as follows:

(1)(A) Special immigrants described in subparagraph (A) 〔or (B)〕 of section 101(a)(27).

*          *          *          *          *          *          *

297

(C) Aliens whose status is adjusted to permanent residence under section 210⟦, 210A,⟧ or 245A.

(D) Aliens whose ⟦deportation is suspended⟧ *removal is canceled* under section ⟦244(a)⟧ *240A(a).*

(E) Aliens provided permanent resident status under section 249.

(2)(A)(i) ⟦Immediate relatives.—For purposes of this subsection, the term "immediate relatives" means the children, spouses, and parents of a citizen of the United States, except that, in the case of parents, such citizens shall be at least 21 years of age.⟧ *An alien who is a spouse or child of a citizen of the United States.* In the case of an alien who was the spouse of a citizen of the United States for at least 2 years at the time of the citizen's death and was not legally separated from the citizen at the time of the citizen's death, the alien (and each child of the alien) shall be considered, for purposes of this subsection, to remain ⟦an immediate relative⟧ *a spouse of a citizen of the United States* after the date of the citizen's death but only if the spouse files a petition under section 204(a)(1)(A)(ii) within 2 years after such date and only until the date the spouse remarries.

(ii) Aliens admitted under section 211(a) on the basis of a prior issuance of a visa to their accompanying parent who is ⟦such an immediate relative⟧ *a spouse of a citizen of the United States.*

(B) Aliens born to an alien lawfully admitted for permanent residence during a temporary visit abroad.

⟦(c) Worldwide Level of Family-Sponsored Immigrants.— (1)(A) The worldwide level of family-sponsored immigrants under this subsection for a fiscal year is, subject to subparagraph (B), equal to—

⟦(i) 480,000, minus

⟦(ii) the number computed under paragraph (2), plus

⟦(iii) the number (if any) computed under paragraph (3).

⟦(B)(i) For each of fiscal years 1992, 1993, and 1994, 465,000 shall be substituted for 480,000 in subparagraph (A)(i).

⟦(ii) In no case shall the number computed under subparagraph (A) be less than 226,000.

⟦(2) The number computed under this paragraph for a fiscal year is the sum of the number of aliens described in subparagraphs (A) and (B) of subsection (b)(2) who were issued immigrant visas or who otherwise acquired the status of aliens lawfully admitted to the United States for permanent residence in the previous fiscal year.

⟦(3)(A) The number computed under this paragraph for fiscal year 1992 is zero.

⟦(B) The number computed under this paragraph for fiscal year 1993 is the difference (if any) between the worldwide level established under paragraph (1) for the previous fiscal year and the number of visas issued under section 203(a) during that fiscal year.

⟦(C) The number computed under this paragraph for a subsequent fiscal year is the difference (if any) between the maximum number of visas which may be issued under section 203(b) (relating to employment-based immigrants) during the previous fiscal year

298

and the number of visas issued under that section during that year.]

(c) WORLDWIDE LEVEL OF FAMILY-SPONSORED IMMIGRANTS.—

(1) IN GENERAL.—Subject to the succeeding provisions of this subsection, the worldwide level of family-sponsored immigrants under this subsection (in this subsection referred to as the "worldwide family level") for a fiscal year is 330,000.

(2) REDUCTION FOR SPOUSES AND CHILDREN OF UNITED STATES CITIZENS AND CERTAIN OTHER FAMILY-RELATED IMMI-GRANTS.—The worldwide family level for a fiscal year shall be reduced (but not below a number sufficient to provide for the minimum visa numbers described in paragraph (4)) by the number of aliens described in subsection (b)(2) who were issued immigrant visas or who otherwise acquired the status of aliens lawfully admitted to the United States for permanent residence in the previous fiscal year.

(3) FURTHER REDUCTION FOR ANY PREVIOUS EXCESS FAMILY IMMIGRATION.—

(A) IN GENERAL.—If there are excess family admissions in a particular fiscal year (as determined under subparagraph (B)) beginning with fiscal year 1997, then for the following fiscal year the worldwide family level shall be reduced (but not below a number sufficient to provide for the minimum visa numbers described in paragraph (4)) by the net number of excess admissions in that particular fiscal year (as defined in subparagraph (C)).

(B) DETERMINATION OF EXCESS FAMILY ADMISSIONS.—For purposes of subparagraph (A), there are excess family admissions in a fiscal year if—

(i) the number of aliens who are issued immigrant visas or who otherwise acquire the status of aliens lawfully admitted to the United States for permanent residence under section 203(a) or subsection (b)(2) in a fiscal year, exceeds

(ii) 330,000, less the carryforward number of excess admissions for the previous fiscal year (as defined in subparagraph (D)).

For purposes of this subparagraph, immigrant visa numbers issued under section 553 of the Immigration in the National Interest Act of 1995 (relating to certain transition immigrants) shall not be counted under clause (i).

(C) NET NUMBER OF EXCESS ADMISSIONS.—For purposes of subparagraph (A), the "net number of excess admissions" for a fiscal year is—

(i) the excess described in subparagraph (B) for the fiscal year, reduced (but not below zero) by

(ii) the number (if any) by which the worldwide level under subsection (d) for the previous fiscal year exceeds the number of immigrants who are issued immigrant visas or who otherwise acquire the status of aliens lawfully admitted to the United States for permanent residence under section 203(b) in that previous fiscal year.

(D) CARRYFORWARD NUMBER OF EXCESS ADMISSIONS.—For purposes of subparagraph (B)(ii), the carryforward

Case 1:25-cv-10495-IT    Document 246-1    Filed 01/13/26    Page 976 of 1448

299

*number of excess admissions for a particular fiscal year is
the net number of excess admissions for the previous fiscal
year (as defined in subparagraph (C)), reduced by the re-
ductions effected under subparagraph (A) and paragraph
(5) in visa numbers for the particular fiscal year.*

*(4) NO REDUCTION IN NUMBER OF SPOUSES AND CHILDREN OF
LAWFUL PERMANENT RESIDENTS OR PARENTS OF UNITED STATES
CITIZENS.—*

*(A) SPOUSES AND CHILDREN OF LAWFUL PERMANENT RESI-
DENTS.—Any reductions in the worldwide family level for a
fiscal year under paragraph (2) or (3) shall not reduce the
number of visas available to spouses and children of lawful
permanent residents below 85,000.*

*(B) PARENTS OF UNITED STATES CITIZENS.—Any reduc-
tions in the worldwide family level for a fiscal year under
paragraph (2) or (3) shall not reduce the number of visas
available to parents of United States citizens below 25,000.*

*(5) ADJUSTMENT IN CERTAIN EMPLOYMENT-BASED VISA NUM-
BERS IN CASE OF REMAINING EXCESS FAMILY ADMISSIONS.—*

*(A) IN GENERAL.—If there is a remaining excess number
of family admissions (as described in subparagraph (B)) in
a fiscal year (beginning with fiscal year 1997) that is great-
er than zero, then for the following fiscal year there shall
be reductions in immigrant visa numbers made available
under subsection (d) and section 203(b)(4) by the lesser of—*

*(i) the remaining excess number of family admissions
(described in subparagraph (B)), or*

*(ii) ½ of the maximum number of visa numbers that
could (but for this paragraph) otherwise be made avail-
able under section 203(b)(5) in such following fiscal
year.*

*(B) REMAINING EXCESS NUMBER OF FAMILY ADMISSIONS
DESCRIBED.—For purposes of subparagraph (A), the "re-
maining excess number of family admissions" in a fiscal
year is the net number of excess admissions for the fiscal
year (as defined in paragraph (3)(C)), reduced by the reduc-
tion (if any) effected under paragraph (3) in visa numbers
for the succeeding fiscal year.*

〖(d) WORLDWIDE LEVEL OF EMPLOYMENT-BASED IMMIGRANTS.—
(1) The worldwide level of employment-based immigrants under
this subsection for a fiscal year is equal to—

〖(A) 140,000, plus

〖(B) the number computed under paragraph (2).

〖(2)(A) The number computed under this paragraph for fiscal
year 1992 is zero.

〖(B) The number computed under this paragraph for fiscal
year 1993 is the difference (if any) between the worldwide level estab-
lished under paragraph (1) for the previous fiscal year and the
number of visas issued under section 203(b) during that fiscal year.

〖(C) The number computed under this paragraph for a subse-
quent fiscal year is the difference (if any) between the maximum
number of visas which may be issued under section 203(a) (relating
to family-sponsored immigrants) during the previous fiscal year

FRP-FRN-00970

300

and the number of visas issued under that section during that year.❳

*(d) WORLDWIDE LEVEL OF EMPLOYMENT-BASED IMMIGRANTS.—The worldwide level of employment-based immigrants under this subsection for a fiscal year is—*

*(1) 135,000, minus*

*(2) beginning with fiscal year 1998, the total of the reductions (if any) in visa numbers under section 203(a)(3)(C) made for the fiscal year pursuant to subsection (c)(5) and in visa numbers under this subsection for the fiscal year pursuant to section 203(a)(3)(B)(ii)(II).*

❲(e) WORLDWIDE LEVEL OF DIVERSITY IMMIGRANTS.—The worldwide level of diversity immigrants is equal to 55,000 for each fiscal year.❳

*(e) WORLDWIDE LEVEL OF DIVERSITY IMMIGRANTS.—The worldwide level of diversity immigrants is equal to 27,000 for each fiscal year.*

*(f) WORLDWIDE LEVEL OF HUMANITARIAN IMMIGRANTS.—*

*(1) IN GENERAL.—Subject to the succeeding provisions of this subsection, the worldwide level of humanitarian immigrants (in this subsection referred to as the "worldwide humanitarian level") under this subsection for a fiscal year is equal to 70,000.*

*(2) REDUCTION FOR HUMANITARIAN IMMIGRANTS WHO ARE REFUGEES OR ASYLEES.—The worldwide humanitarian level for a fiscal year shall be reduced by the sum of—*

*(A) 50,000, or, if less, the number of aliens who were admitted as refugees under section 207 in the previous fiscal year, and*

*(B) the number of aliens who had been granted asylum whose status was adjusted in the previous fiscal year under section 209(b).*

*(3) REDUCTION FOR PRIOR YEAR CANCELLATION OF REMOVAL AND REGISTRY.—The worldwide humanitarian level for a fiscal year shall be further reduced by the sum of—*

*(A) the number of aliens whose removal was canceled and who were provided lawful permanent resident status in the previous fiscal year under section 240A, and*

*(B) the number of aliens who were provided permanent resident status in the previous fiscal year under section 249.*

*(4) LIMITATION.—In no case shall the worldwide humanitarian level for a fiscal year (taking into account any reductions under paragraphs (2) and (3)) exceed 10,000.*

*(g) REQUIREMENT FOR PERIODIC REVIEW AND REAUTHORIZATION OF WORLDWIDE LEVELS.—*

*(1) CONGRESSIONAL REVIEW.—The Committees on the Judiciary of the House of Representatives and of the Senate shall undertake during fiscal year 2004 (and each fifth fiscal year thereafter) a thorough review of the appropriate worldwide levels of immigration to be provided under this section during the 5-fiscal-year period beginning with the second subsequent fiscal year.*

*(2) CONGRESSIONAL REAUTHORIZATION.—The Congress, after consideration of the reviews under paragraph (1) and by*

301

*amendment to this section, shall specify the appropriate world-wide levels of immigration to be provided under this section during the 5-fiscal-year period beginning with the second subsequent fiscal year.*

*(3) SUNSET IN ABSENCE OF REAUTHORIZATION.—The worldwide levels specified under the previous provisions of this section are applicable only to fiscal years 1997 through 2005. Immigrant visa numbers for fiscal years after fiscal year 2005 that are subject to such levels are only authorized to the extent provided by amendment under paragraph (2) made to this section.*

NUMERICAL LIMITATION TO ANY SINGLE FOREIGN STATE

SEC. 202. (a) PER COUNTRY LEVEL.—

(1) NONDISCRIMINATION.—Except as specifically provided in ⟦paragraph (2)⟧ *paragraphs (2) and (5)* and in sections 101(a)(27), 201(b)(2)(A)(i), and 203, no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence.

*       *       *       *       *       *       *

⟦(4) SPECIAL RULES FOR SPOUSES AND CHILDREN OF LAWFUL PERMANENT RESIDENT ALIENS.—

⟦(A) 75 PERCENT OF 2ND PREFERENCE SET-ASIDE FOR SPOUSES AND CHILDREN NOT SUBJECT TO PER COUNTRY LIMITATION.—

⟦(i) IN GENERAL.—Of the visa numbers made available under section 203(a) to immigrants described in section 203(a)(2)(A) in any fiscal year, 75 percent of the 2–A floor (as defined in clause (ii)) shall be issued without regard to the numerical limitation under paragraph (2).

⟦(ii) 2–A FLOOR DEFINED.—In this paragraph, the term "2–A floor" means, for a fiscal year, 77 percent of the total number of visas made available under section 203(a) to immigrants described in section 203(a)(2) in the fiscal year.

⟦(B) TREATMENT OF REMAINING 25 PERCENT FOR COUNTRIES SUBJECT TO SUBSECTION (e).—

⟦(i) IN GENERAL.—Of the visa numbers made available under section 203(a) to immigrants described in section 203(a)(2)(A) in any fiscal year, the remaining 25 percent of the 2–A floor shall be available in the case of a state or area that is subject to subsection (e) only to the extent that the total number of visas issued in accordance with subparagraph (A) to natives of the foreign state or area is less than the subsection (e) ceiling (as defined in clause (ii)).

⟦(ii) SUBSECTION (e) CEILING DEFINED.—In clause (i), the term "subsection (e) ceiling" means, for a foreign state or dependent area, 77 percent of the maximum number of visas that may be made available under section 203(a) to immigrants who are natives of the

302

state or area under section 203(a)(2) consistent with subsection (e).

⟦(C) TREATMENT OF UNMARRIED SONS AND DAUGHTERS IN COUNTRIES SUBJECT TO SUBSECTION (e).—In the case of a foreign state or dependent area to which subsection (e) applies, the number of immigrant visas that may be made available to natives of the state or area under section 203(a)(2)(B) may not exceed—

⟦(i) 23 percent of the maximum number of visas that may be made available under section 203(a) to immigrants of the state or area described in section 203(a)(2) consistent with subsection (e), or

⟦(ii) the number (if any) by which the maximum number of visas that may be made available under section 203(a) to immigrants of the state or area described in section 203(a)(2) consistent with subsection (e) exceeds the number of visas issued under section 203(a)(2)(A),

whichever is greater.

⟦(D) LIMITING PASS DOWN FOR CERTAIN COUNTRIES SUBJECT TO SUBSECTION (e).—In the case of a foreign state or dependent area to which subsection (e) applies, if the total number of visas issued under section 203(a)(2) exceeds the maximum number of visas that may be made available to immigrants of the state or area under section 203(a)(2) consistent with subsection (e) (determined without regard to this paragraph), in applying paragraphs (3) and (4) of section 203(a) under subsection (e)(2) all visas shall be deemed to have been required for the classes specified in paragraphs (1) and (2) of such section.⟧

*(4) SPECIAL RULES FOR SPOUSES AND CHILDREN OF LAWFUL PERMANENT RESIDENT ALIENS.—*

*(A) 75 PERCENT OF 1ST PREFERENCE NOT SUBJECT TO PER COUNTRY LIMITATION.—Of the visa numbers made available under section 203(a) to immigrants described in paragraph (1) of that section in any fiscal year, 63,750 shall be issued without regard to the numerical limitation under paragraph (2).*

*(B) LIMITING PASS DOWN FOR CERTAIN COUNTRIES SUBJECT TO SUBSECTION (e).—In the case of a foreign state or dependent area to which subsection (e) applies, if the total number of visas issued under section 203(a)(1) exceeds the maximum number of visas that may be made available to immigrants of the state or area under such section consistent with subsection (e) (determined without regard to this paragraph), in applying paragraph (2) of section 203(a) under subsection (e)(2) all visas shall be deemed to have been required for the classes specified in paragraph (1) of such section.*

*(5) PER COUNTRY LEVELS FOR HUMANITARIAN IMMIGRANTS.— The total number of immigrant visas made available to natives of any single foreign state or dependent area under section 203(d) in any fiscal year may not exceed 50 percent (in the case of a single foreign state) or 15 percent (in the case of a depend-*

303

*ent area) of the total number of such visas made available under such subsection in that fiscal year.*

*(6) CONSTRUCTION.—Nothing in paragraph (1) shall be construed to limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications or the locations where such applications will be processed.*

\*        \*        \*        \*        \*        \*        \*

(e) SPECIAL RULES FOR COUNTRIES AT CEILING.—If it is determined that the total number of immigrant visas made available under subsections (a) and (b) of section 203 to natives of any single foreign state or dependent area will exceed the numerical limitation specified in subsection (a)(2) in any fiscal year, in determining the allotment of immigrant visa numbers to natives under subsections (a) and (b) of section 203, visa numbers with respect to natives of that state or area shall be allocated (to the extent practicable and otherwise consistent with this section and section 203) in a manner so that—

(1) the ratio of the visa numbers made available under section 203(a) to the visa numbers made available under section 203(b) is equal to the ratio of the worldwide level of immigration under section 201(c) to such level under section 201(d) *(determined without regard to subsections (c)(4) and (d)(2) of section 201)*;

(2) except as provided in subsection (a)(4), the proportion of the visa numbers made available under each of ⟦paragraphs (1) through (4)⟧ *paragraphs (1) and (2)* of section 203(a) is equal to the ratio of the total number of visas made available under the respective paragraph to the total number of visas made available under section 203(a), and

(3) the proportion of the visa numbers made available under each of paragraphs (1) ⟦through (5)⟧ *through (6)* of section 203(b) is equal to the ratio of the total number of visas made available under the respective paragraph to the total number of visas made available under section 203(b).

Nothing in this subsection shall be construed as limiting the number of visas that may be issued to natives of a foreign state or dependent area under section 203(a) or 203(b) if there is insufficient demand for visas for such natives under section 203(b) or 203(a), respectively, or as limiting the number of visas that may be issued under section ⟦203(a)(2)(A)⟧ *203(a)(1)* pursuant to subsection (a)(4)(A).

\*        \*        \*        \*        \*        \*        \*

ALLOCATION OF IMMIGRANT VISAS

SEC. 203. (a) PREFERENCE ALLOCATION FOR FAMILY-SPONSORED IMMIGRANTS.—Aliens subject to the worldwide level specified in section 201(c) for family-sponsored immigrants shall be allotted visas as follows:

⟦(1) UNMARRIED SONS AND DAUGHTERS OF CITIZENS.—Qualified immigrants who are the unmarried sons or daughters of citizens of the United States shall be allocated visas in a num-

304

ber not to exceed 23,400, plus any visas not required for the class specified in paragraph (4).

⟦(2) Spouses and unmarried sons and unmarried daughters of permanent resident aliens.—Qualified immigrants—

⟦(A) who are the spouses or children of an alien lawfully admitted for permanent residence, or

⟦(B) who are the unmarried sons or unmarried daughters (but are not the children) of an alien lawfully admitted for permanent residence,

shall be allocated visas in a number not to exceed 114,200, plus the number (if any) by which such worldwide level exceeds 226,000, plus any visas not required for the class specified in paragraph (1); except that not less than 77 percent of such visa numbers shall be allocated to aliens described in subparagraph (A).

⟦(3) Married sons and married daughters of citizens.—Qualified immigrants who are the married sons or married daughters of citizens of the United States shall be allocated visas in a number not to exceed 23,400, plus any visas not required for the classes specified in paragraphs (1) and (2).

⟦(4) Brothers and sisters of citizens.—Qualified immigrants who are the brothers or sisters of citizens of the United States, if such citizens are at least 21 years of age, shall be allocated visas in a number not to exceed 65,000, plus any visas not required for the classes specified in paragraphs (1) through (3).⟧

*(1) Spouses and children of lawful permanent resident aliens.—Immigrants who are the spouses and children of an alien lawfully admitted for permanent residence shall be allocated visas in a number not to exceed 85,000, plus any immigrant visas not used under paragraphs (2) and (3).*

*(2) Parents of united states citizens.—*

*(A) In general.—Immigrants who are the parents of an individual who is at least 21 years of age and a citizen of the United States shall be allocated visas in a number, which is not less than 25,000 and does not exceed the lesser of—*

*(i) 45,000, or*

*(ii) the number by which the worldwide level exceeds 85,000.*

*(B) Reference to insurance requirement.—For requirement relating to insurance for parents, see section 212(a)(4)(D).*

*(3) Adult sons and daughters.—*

*(A) In general.—Immigrants who are the qualifying adult sons or daughters (as defined in subparagraph (C)) of an individual who is (i) at least 21 years of age and (ii) either a citizen of the United States or an alien lawfully admitted for permanent residence shall be allocated visas according to the levels established in subparagraph (B).*

*(B) Allocation of visas to adult sons and daughters of united states citizens and permanent resident aliens.—*

(i) IN GENERAL.—Subject to clause (ii), any remaining visas shall be allocated under this paragraph in a number not to exceed the lesser of—

(I) 5,000, or

(II) the number by which the worldwide level exceeds the sum of 85,000 and the number of immigrant visas used under paragraph (2).

(ii) ALLOCATION OF ADDITIONAL VISA NUMBERS.—

(I) IN GENERAL.—If the demand for visa numbers under this paragraph exceeds the number (if any) available under clause (i) in any fiscal year, an additional number of visas shall be made available under this paragraph, but not to exceed 5,000 additional visas numbers in any fiscal year.

(II) OFFSETTING REDUCTION IN THE LEVELS OF EMPLOYMENT-BASED VISAS.—If an additional number of visa numbers are made available under subclause (I) in a fiscal year, the number of visas made available under section 201(a)(2) and paragraphs (1) through (6) of subsection (b) in the fiscal year shall be reduced by a number equal to such additional number reduced by the amount (if any) by which 110,000 exceeds the number of immigrant visas used under paragraphs (1) and (2) of this subsection in the fiscal year. The reduction under each such paragraph of subsection (b) shall be in the same proportion to the total reduction as the ratio of the numerical limitation under each such paragraph specified under such subsection to the worldwide level of employment-based immigrants (as specified in section 201(d)).

(C) QUALIFICATIONS.—For purposes of this paragraph, the term "qualifying adult son or daughter" means an immigrant who, as of the date of approval of the classification petition under section 204(a)(1)—

(i) is at least 21, but not more than 25 years of age,

(ii) has never been married,

(iii) is childless, and

(iv) would qualify as a dependent of the petitioning individual for Federal income tax purposes, except that the immigrant does not meet the residence requirements.

(D) THREE-YEAR CONDITIONAL REQUIREMENT.—

(i) CONDITIONAL BASIS FOR STATUS.—Notwithstanding any other provision of this Act, an alien provided lawful permanent residence status on the basis of being a qualifying adult son or daughter shall be considered, at the time of obtaining the status of an alien lawfully admitted for permanent residence, to have obtained such status on a conditional basis subject to the provisions of this subparagraph.

(ii) REQUIREMENTS OF NOTICE AND PETITIONING FOR REMOVAL OF CONDITIONAL STATUS.—The Attorney General shall establish, by regulation, procedures which

306

*incorporate the requirements of notice and petitioning for removal of conditional status similar to the requirements for removal of conditional status under section 216A.*

*(iii) TERMINATION OF STATUS.—In the case of an alien with permanent resident status on a conditional basis under clause (i), the alien must demonstrate that the alien met the qualifications set forth in subparagraph (C) as of the date of approval of the classification petition under section 204(a). In the absence of such a demonstration by the alien, the alien's status shall be terminated.*

*(iv) SPECIAL RULE.—In applying section 216A under this subparagraph, any reference to the "second" anniversary in such section is deemed a reference to the "third" anniversary.*

(b) PREFERENCE ALLOCATION FOR EMPLOYMENT-BASED IMMIGRANTS.—Aliens subject to the worldwide level specified in section 201(d) for employment-based immigrants in a fiscal year shall be allotted visas as follows:

〔(1) PRIORITY WORKERS.—Visas shall first be made available in a number not to exceed 28.6 percent of such worldwide level, plus any visas not required for the classes specified in paragraphs (4) and (5), to qualified immigrants who are aliens described in any of the following subparagraphs (A) through (C):

〔(A) ALIENS WITH EXTRAORDINARY ABILITY.—An alien is described in this subparagraph if—

〔(i) the alien has extraordinary ability in the sciences, arts, education, business, or athletics which has been demonstrated by sustained national or international acclaim and whose achievements have been recognized in the field through extensive documentation,

〔(ii) the alien seeks to enter the United States to continue work in the area of extraordinary ability, and

〔(iii) the alien's entry into the United States will substantially benefit prospectively the United States.

〔(B) OUTSTANDING PROFESSORS AND RESEARCHERS.—An alien is described in this subparagraph if—

〔(i) the alien is recognized internationally as outstanding in a specific academic area,

〔(ii) the alien has at least 3 years of experience in teaching or research in the academic area, and

〔(iii) the alien seeks to enter the United States—

〔(I) for a tenured position (or tenure-track position) within a university or institution of higher education to teach in the academic area,

〔(II) for a comparable position with a university or institution of higher education to conduct research in the area, or

〔(III) for a comparable position to conduct research in the area with a department, division, or institute of a private employer, if the department, division, or institute employs at least 3 persons

307

full-time in research activities and has achieved documented accomplishments in an academic field.

〔(C) CERTAIN MULTINATIONAL EXECUTIVES AND MANAGERS.—An alien is described in this subparagraph if the alien, in the 3 years preceding the time of the alien's application for classification and admission into the United States under this subparagraph, has been employed for at least 1 year by a firm or corporation or other legal entity or an affiliate or subsidiary thereof and the alien seeks to enter the United States in order to continue to render services to the same employer or to a subsidiary or affiliate thereof in a capacity that is managerial or executive.

〔(2) ALIENS WHO ARE MEMBERS OF THE PROFESSIONS HOLDING ADVANCED DEGREES OR ALIENS OF EXCEPTIONAL ABILITY.—

〔(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 28.6 percent of such worldwide level, plus any visas not required for the classes specified in paragraph (1), to qualified immigrants who are members of the professions holding advanced degrees or their equivalent or who because of their exceptional ability in the sciences, arts, or business, will substantially benefit prospectively the national economy, cultural or educational interests, or welfare of the United States, and whose services in the sciences, arts, professions, or business are sought by an employer in the United States.

〔(B) WAIVER OF JOB OFFER.—The Attorney General may, when he deems it to be in the national interest, waive the requirement of subparagraph (A) that an alien's services in the sciences, arts, professions, or business be sought by an employer in the United States.

〔(C) DETERMINATION OF EXCEPTIONAL ABILITY.—In determining under subparagraph (A) whether an immigrant has exceptional ability, the possession of a degree, diploma, certificate, or similar award from a college, university, school, or other institution of learning or a license to practice or certification for a particular profession or occupation shall not by itself be considered sufficient evidence of such exceptional ability.

〔(3) SKILLED WORKERS, PROFESSIONALS, AND OTHER WORKERS.—

〔(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 28.6 percent of such worldwide level, plus any visas not required for the classes specified in paragraphs (1) and (2), to the following classes of aliens who are not described in paragraph (2):

〔(i) SKILLED WORKERS.—Qualified immigrants who are capable, at the time of petitioning for classification under this paragraph, of performing skilled labor (requiring at least 2 years training or experience), not of a temporary or seasonal nature, for which qualified workers are not available in the United States.

308

⟦(ii) PROFESSIONALS.—Qualified immigrants who hold baccalaureate degrees and who are members of the professions.

⟦(iii) OTHER WORKERS.—Other qualified immigrants who are capable, at the time of petitioning for classification under this paragraph, of performing unskilled labor, not of a temporary or seasonal nature, for which qualified workers are not available in the United States.

⟦(B) LIMITATION ON OTHER WORKERS.—Not more than 10,000 of the visas made available under this paragraph in any fiscal year may be available for qualified immigrants described in subparagraph (A)(iii).

⟦(C) LABOR CERTIFICATION REQUIRED.—An immigrant visa may not be issued to an immigrant under subparagraph (A) until the consular officer is in receipt of a determination made by the Secretary of Labor pursuant to the provisions of section 212(a)(5)(A).

⟦(4) CERTAIN SPECIAL IMMIGRANTS.—Visas shall be made available, in a number not to exceed 7.1 percent of such worldwide level, to qualified special immigrants described in section 101(a)(27) (other than those described in subparagraph (A) or (B) thereof), of which not more than 5,000 may be made available in any fiscal year to special immigrants described in subclause (II) or (III) of section 101(a)(27)(C)(ii).

⟦(5) EMPLOYMENT CREATION.—

⟦(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 7.1 percent of such worldwide level, to qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise—

⟦(i) which the alien has established,

⟦(ii) in which such alien has invested (after the date of the enactment of the Immigration Act of 1990) or, is actively in the process of investing, capital in an amount not less than the amount specified in subparagraph (C), and

⟦(iii) which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens or aliens lawfully admitted for permanent residence or other immigrants lawfully authorized to be employed in the United States (other than the immigrant and the immigrant's spouse, sons, or daughters).

⟦(B) SET-ASIDE FOR TARGETED EMPLOYMENT AREAS.—

⟦(i) IN GENERAL.—Not less than 3,000 of the visas made available under this paragraph in each fiscal year shall be reserved for qualified immigrants who establish a new commercial enterprise described in subparagraph (A) which will create employment in a targeted employment area.

⟦(ii) TARGETED EMPLOYMENT AREA DEFINED.—In this paragraph, the term "targeted employment area" means, at the time of the investment, a rural area or

309

an area which has experienced high unemployment (of at least 150 percent of the national average rate).

⟦(iii) RURAL AREA DEFINED.—In this paragraph, the term "rural area" means any area other than an area within a metropolitan statistical area or within the outer boundary of any city or town having a population of 20,000 or more (based on the most recent decennial census of the United States).

⟦(C) AMOUNT OF CAPITAL REQUIRED.—

⟦(i) IN GENERAL.—Except as otherwise provided in this subparagraph, the amount of capital required under subparagraph (A) shall be $1,000,000. The Attorney General, in consultation with the Secretary of Labor and the Secretary of State, may from time to time prescribe regulations increasing the dollar amount specified under the previous sentence.

⟦(ii) ADJUSTMENT FOR TARGETED EMPLOYMENT AREAS.—The Attorney General may, in the case of investment made in a targeted employment area, specify an amount of capital required under subparagraph (A) that is less than (but not less than ½ of) the amount specified in clause (i).

⟦(iii) ADJUSTMENT FOR HIGH EMPLOYMENT AREAS.— In the case of an investment made in a part of a metropolitan statistical area that at the time of the investment—

⟦(I) is not a targeted employment area, and
⟦(II) is an area with an unemployment rate significantly below the national average unemployment rate,

the Attorney General may specify an amount of capital required under subparagraph (A) that is greater than (but not greater than 3 times) the amount specified in clause (i).⟧

*(1) ALIENS WITH EXTRAORDINARY ABILITY.—Visas shall first be made available in a number not to exceed 15,000 of such worldwide level to immigrants—*

*(A) who have extraordinary ability in the sciences, arts, education, business, or athletics which has been demonstrated by sustained national or international acclaim and whose achievements have been recognized in the field through sufficient documentation,*

*(B) who seek to be admitted into the United States to continue work in the area of extraordinary ability, and*

*(C) whose admission into the United States will substantially benefit prospectively the United States.*

*(2) ALIENS WHO ARE OUTSTANDING PROFESSORS AND RESEARCHERS OR MULTINATIONAL EXECUTIVES AND MANAGERS.—*

*(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 30,000 of such worldwide level, plus any visas not required for the class specified in paragraph (1), to immigrants who are aliens described in subparagraph (B) or (C).*

310

(B) OUTSTANDING PROFESSORS AND RESEARCHERS.—An alien is described in this subparagraph if—

(i) the alien is recognized internationally as outstanding in a specific academic area,

(ii) the alien has at least 3 years of experience in teaching or research in the academic area, and

(iii) the alien seeks to enter the United States—

(I) for a tenured position (or tenure-track position) within a university or institution of higher education to teach in the academic area,

(II) for a comparable position with a university or institution of higher education to conduct research in the area, or

(III) for a comparable position to conduct research in the area with a department, division, or institute of a private employer, if the department, division, or institute employs at least 3 persons full-time in research activities and has achieved documented accomplishments in an academic field.

(C) CERTAIN MULTINATIONAL EXECUTIVES AND MANAGERS.—An alien is described in this subparagraph if the alien, in the 3 years preceding the time of the alien's application for classification and admission into the United States under this subparagraph, has been employed for at least 1 year by a firm or corporation or other legal entity or an affiliate or subsidiary thereof and the alien seeks to enter the United States in order to continue to render services to the same employer or to a subsidiary or affiliate thereof in a capacity that is managerial or executive.

(3) ALIENS WHO ARE MEMBERS OF THE PROFESSIONS HOLDING ADVANCED DEGREES OR ALIENS OF EXCEPTIONAL ABILITY.—

(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 30,000 of such worldwide level, plus any visas not required for the classes specified in paragraphs (1) and (2), to immigrants who are aliens described in subparagraph (B).

(B) ALIENS WHO ARE MEMBERS OF THE PROFESSIONS HOLDING ADVANCED DEGREES OR ALIENS OF EXCEPTIONAL ABILITY.—

(i) IN GENERAL.—An alien is described in this subparagraph if the alien is a member of a profession holding an advanced degree or its equivalent or who because of exceptional ability in the sciences, arts, or business will substantially benefit prospectively the national economy, cultural or educational interests, or welfare of the United States, and whose services in the sciences, arts, professions, or business are sought by an employer in the United States.

(ii) DETERMINATION OF EXCEPTIONAL ABILITY.—In determining under clause (i) whether an immigrant has exceptional ability, the possession of a degree, diploma, certificate, or similar award from a college, uni-

311

versity, school, or other institution of learning or a license to practice or certification for a particular profession or occupation shall not by itself be considered sufficient evidence of such exceptional ability.

(iii) LABOR CERTIFICATION REQUIRED.—An immigrant visa may not be issued to an immigrant under this subparagraph until the consular officer is in receipt of a determination made by the Secretary of Labor pursuant to the provisions of section 212(a)(5)(A).

(iv) NATIONAL INTEREST WAIVER.—The Attorney General may waive the requirement under clause (iii) and the requirement under clause (i) that an alien's services be sought by an employer in the United States only if—

(I) such a waiver is necessary to substantially benefit—

(aa) the national security, national defense, or Federal, State, or local law enforcement;

(bb) health care, housing, or educational opportunities for an indigent or low-income population or in an underserved geographical area;

(cc) economic or employment opportunities for a specific industry or a specific geographical area;

(dd) the development of new technologies; or

(ee) environmental protection or the productive use of natural resources, and

(II) the alien will engage in a specific undertaking to advance one or more of the interests under subclause (I).

(4) SKILLED WORKERS AND PROFESSIONALS.—

(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 45,000 of such worldwide level, plus any visas not required for the classes specified in paragraphs (1) through (3) to immigrants who are described in subparagraph (B) or (C).

(B) SKILLED WORKERS.—An alien described in this subparagraph is an immigrant who is capable, at the time a petition is filed, of performing skilled labor (requiring at least 2 years of training or experience), not of a temporary or seasonal nature, for which qualified workers are not available in the United States, and who has a total of 4 years of training or experience (or both) with respect to such labor.

(C) PROFESSIONALS.—

(i) IN GENERAL.—An alien described in this subparagraph is an immigrant who holds a baccalaureate degree and is a member of the professions and, subject to clause (ii), has at least 2 years of experience in the profession after the receipt of the degree.

(ii) SPECIAL RULE FOR LANGUAGE TEACHERS.—An alien who is a teacher and has (within the previous 5 years) at least 2 years of experience teaching a lan-

312

guage (other than English) full-time at an accredited elementary or middle school may be classified and admitted as a professional under this subparagraph if the alien is seeking admission to teach such language full-time in an accredited elementary or middle school.

(D) LABOR CERTIFICATION REQUIRED.—An immigrant visa may not be issued to an immigrant under this paragraph until the consular officer is in receipt of a determination made by the Secretary of Labor pursuant to the provisions of section 212(a)(5)(A).

(E) EXPERIENCE REQUIREMENT.—Any period of experience acquired as a nonimmigrant under section 101(a)(15)(E), 101(a)(15)(H)(i), or 101(a)(15)(L) may be used to fulfill a requirement for experience under this paragraph.

(5) INVESTORS IN JOB CREATION.—

(A) IN GENERAL.—Visas shall be made available, in a number not to exceed 10,000 of such worldwide level less the reduction in visa numbers under this paragraph required to be effected under section 201(c)(5)(A) for the fiscal year involved, to immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise—

(i) which the alien has established,

(ii) in which the alien has invested (after the date of the enactment of the Immigration Act of 1990), or is actively in the process of investing, capital in an amount not less $1,000,000, and

(iii) which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens or aliens lawfully admitted for permanent residence or other immigrants lawfully authorized to be employed in the United States (other than the immigrant and the immigrant's spouse, sons, or daughters).

(B) PILOT PROGRAM.—For each of fiscal years 1997 and 1998, up to 2,000 visas otherwise made available under this paragraph shall be made available to immigrants who would be described in subparagraph (A) if "$500,000" were substituted for "$1,000,000" in subparagraph (A)(ii) and if "for not fewer than 5" were substituted for "for not fewer than 10" in subparagraph (A)(iii). By not later than April 1, 1998, the Attorney General shall submit to Congress a report on the operation of this subparagraph and shall include in the report information describing the immigrants admitted under this paragraph and the enterprises they invest in and a recommendation on whether the pilot program under this subparagraph should be continued or modified.

(6) CERTAIN SPECIAL IMMIGRANTS.—Visas shall be made available, in a number not to exceed 5,000 of such worldwide level, to qualified special immigrants described in section 101(a)(27) (other than those described in subparagraph (A) thereof), of which not more than 4,000 may be made available

313

in any fiscal year to special immigrants described in subclause (II) or (III) of section 101(a)(27)(C)(ii).

⟦(6)⟧ *(7)* SPECIAL RULES FOR "K" SPECIAL IMMIGRANTS.—

(A) NOT COUNTED AGAINST NUMERICAL LIMITATION IN YEAR INVOLVED.—Subject to subparagraph (B), the number of immigrant visas made available to special immigrants under section 101(a)(27)(K) in a fiscal year shall not be subject to the numerical limitations of this subsection or of section 202(a).

(B) COUNTED AGAINST NUMERICAL LIMITATIONS IN FOLLOWING YEAR.—

(i) REDUCTION IN EMPLOYMENT-BASED IMMIGRANT CLASSIFICATIONS.—The number of visas made available in any fiscal year under paragraphs (1), (2), ⟦and (3) shall each be reduced by ⅓⟧ *(3), and (4) shall each be reduced by the same proportion, as the proportion (of the visa numbers made available under all such paragraphs) that were made available under each respective paragraph,* of the number of visas made available in the previous fiscal year to special immigrants described in section 101(a)(27)(K).

(ii) REDUCTION IN PER COUNTRY LEVEL.—The number of visas made available in each fiscal year to natives of a foreign state under section 202(a) shall be reduced by the number of visas made available in the previous fiscal year to special immigrants described in section 101(a)(27)(K) who are natives of the foreign state.

(iii) REDUCTION IN EMPLOYMENT-BASED IMMIGRANT CLASSIFICATIONS WITHIN PER COUNTRY CEILING.—In the case of a foreign state subject to section 202(e) in a fiscal year (and in the previous fiscal year), the number of visas made available and allocated to each of paragraphs (1) through ⟦(3) of this subsection in the fiscal year shall be reduced by ⅓⟧ *(4) in the fiscal year reduced by the same proportion, as the proportion (of the visa numbers made available under all such paragraphs to natives of the foreign state) that were made available under each respective paragraph to such natives,* of the number of visas made available in the previous fiscal year to special immigrants described in section 101(a)(27)(K) who are natives of the foreign state.

*(8) NOT COUNTING WORK EXPERIENCE AS AN UNAUTHORIZED ALIEN.—For purposes of this subsection, work experience obtained in employment in the United States with respect to which the alien was an unauthorized alien (as defined in section 274A(h)(3)) shall not be taken into account.*

(c) DIVERSITY IMMIGRANTS.—

(1) IN GENERAL.—Except as provided in paragraph (2), aliens subject to the worldwide level specified in section 201(e) for diversity immigrants shall be allotted visas each fiscal year as follows:

314

(A) DETERMINATION OF PREFERENCE IMMIGRATION.—The Attorney General shall determine for the most recent previous 5-fiscal-year period for which data are available, the total number of aliens who are natives of each foreign state and who (i) were admitted or otherwise provided lawful permanent resident status (other than under this subsection) and (ii) were subject to the numerical limitations of section 201(a) (other than paragraph (3) thereof) or who were admitted or otherwise provided lawful permanent resident status as an immediate relative or other alien described in section 201(b)(2).

(B) IDENTIFICATION OF HIGH-ADMISSION AND LOW-ADMISSION REGIONS AND HIGH-ADMISSION AND LOW-ADMISSION STATES.—The Attorney General—

(i) shall identify—

(I) each region (each in this paragraph referred to as a "high-admission region") for which the total of the numbers determined under subparagraph (A) for states in the region is greater than 1/6 of the total of all such numbers, and

(II) each other region (each in this paragraph referred to as a "low-admission region"); and

(ii) shall identify—

(I) each foreign state for which the number determined under subparagraph (A) is greater than 50,000 (each such state in this paragraph referred to as a "high-admission state"),

(II) each other foreign state (each such state in this paragraph referred to as a "low-admission state")**[.]**, *and*

*(III) within each region, the 10 foreign states which had the highest number of registrants for the diversity immigrant program under this subsection for the period beginning October 1, 1994, and ending September 30, 1996, and which are not high-admission states.*

(C) DETERMINATION OF PERCENTAGE OF WORLDWIDE IMMIGRATION ATTRIBUTABLE TO HIGH-ADMISSION REGIONS.—The Attorney General shall determine the percentage of the total of the numbers determined under subparagraph (A) that are numbers for foreign states in high-admission regions.

(D) DETERMINATION OF REGIONAL POPULATIONS EXCLUDING HIGH-ADMISSION STATES AND RATIOS OF POPULATIONS OF REGIONS WITHIN LOW-ADMISSION REGIONS AND HIGH-ADMISSION REGIONS.—The Attorney General shall determine—

(i) based on available estimates for each region, the total population of each region not including the population of any high-admission state;

(ii) for each low-admission region, the ratio of the population of the region determined under clause (i) to the total of the populations determined under such clause for all the low-admission regions; and

315

(iii) for each high-admission region, the ratio of the population of the region determined under clause (i) to the total of the populations determined under such clause for all the high-admission regions.

(E) Distribution of visas.—

(i) No visas for natives of high-admission states.—The percentage of visas made available under this paragraph to natives of a high-admission state is 0.

(ii) For low-admission states in low-admission regions.—Subject to clauses (iv) and (v), the percentage of visas made available under this paragraph to natives (other than natives of a high-admission state) in a low-admission region is the product of—

(I) the percentage determined under subparagraph (C), and

(II) the population ratio for that region determined under subparagraph (D)(ii).

(iii) For low-admission states in high-admission regions.—Subject to clauses (iv) and (v), the percentage of visas made available under this paragraph to natives (other than natives of a high-admission state) in a high-admission region is the product of—

(I) 100 percent minus the percentage determined under subparagraph (C), and

(II) the population ratio for that region determined under subparagraph (D)(iii).

(iv) Redistribution of unused visa numbers.—If the Secretary of State estimates that the number of immigrant visas to be issued to natives in any region for a fiscal year under this paragraph is less than the number of immigrant visas made available to such natives under this paragraph for the fiscal year, subject to clause (v), the excess visa numbers shall be made available to natives (other than natives of a high-admission state) of the other regions in proportion to the percentages otherwise specified in clauses (ii) and (iii).

(v) Limitation on visas for natives of a single foreign state.—The percentage of visas made available under this paragraph to natives of any single foreign state for any fiscal year shall not exceed 7 percent.

*(vi) Ten states eligible in each region.—Only natives of the 10 states identified for each region in subparagraph (B)(ii)(III) are eligible for diversity visas.*

(F) Region defined.—Only for purposes of administering the diversity program under this subsection, 〚Northern Ireland shall be treated as a separate foreign state,〛 each colony or other component or dependent area of a foreign state overseas from the foreign state shall be treated as part of the foreign state〚,〛 and the areas described in each of the following clauses shall be considered to be a separate region:

(i) Africa.

316

   (ii) Asia.
   (iii) Europe.
   (iv) North America 〚(other than Mexico)〛.
   (v) Oceania.
   (vi) South America, 〚Mexico,〛 Central America, and
the Caribbean.
 〚(2) REQUIREMENT OF EDUCATION OR WORK EXPERIENCE.—An
alien is not eligible for a visa under this subsection unless the
alien—
   〚(A) has at least a high school education or its equiva-
lent, or
   〚(B) has, within 5 years of the date of application for a
visa under this subsection, at least 2 years of work experi-
ence in an occupation which requires at least 2 years of
training or experience.〛
  *(2) REQUIREMENT OF JOB OFFER AND EDUCATION OR SKILLED
WORKER.—An alien is not eligible for a visa under this sub-
section unless the alien—*
   *(A) has a job offer in the United States which has been
verified;*
   *(B) has at least a high school education or its equivalent;
and*
   *(C) has at least 2 years of work experience in an occupa-
tion which requires at least 2 years of training.*
  (3) MAINTENANCE OF INFORMATION.—The Secretary of State
shall maintain information on the age, occupation, education
level, and other relevant characteristics of immigrants issued
visas under this subsection.
  *(4) FEES.—Fees for the furnishing and verification of applica-
tions for visas under this subsection and for the issuance of
visas under this subsection may be prescribed by the Secretary
of State in such amounts as are adequate to compensate the De-
partment of State for the costs of administering the diversity
immigrant program. Any such fees collected may be deposited
as an offsetting collection to the appropriate Department of
State appropriation to recover the costs of such program and
shall remain available for obligation until expended.*
  *(5) INELIGIBILITY OF ALIENS UNLAWFULLY PRESENT IN THE
UNITED STATES.—An alien who is unlawfully present in the
United States at the time of filing of an application, within 5
years prior to the filing of such application, or at any time sub-
sequent to the filing of the application is ineligible for a visa
under this subsection.*
 *(d) HUMANITARIAN IMMIGRANTS.—*
  *(1) IN GENERAL.—Aliens subject to the worldwide humani-
tarian level specified in section 201(e) shall be allotted visas
only if the aliens have been selected by the Attorney General
under paragraph (2) as of special humanitarian concern to the
United States.*
  *(2) SELECTION OF IMMIGRANTS.—*
   (A) IN GENERAL.—The Attorney General shall, on a case-
by-case basis and based on humanitarian concerns and the
public interest, select aliens for purposes of this sub-
section.

317

(B) RESTRICTION.—The Attorney General may not select an alien under this paragraph if the alien is a refugee (within the meaning of section 101(a)(42)) unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be admitted into the United States as a humanitarian immigrant under this subsection rather than as a refugee under section 207.

(3) ANNUAL REPORT.—Not later than 90 days after the end of each fiscal year, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report describing the number of immigrant visas issued under this subsection and the individuals to whom the visas were issued.

〖(d)〗 *(e)* TREATMENT OF FAMILY MEMBERS.—A spouse or child as defined in subparagraph (A), (B), (C), (D), or (E) of section 101(b)(1) shall, if not otherwise entitled to an immigrant status and the immediate issuance of a visa under subsection (a)*(2)*, (b), or (c), be entitled to the same status, and the same order of consideration provided in the respective subsection, if accompanying or following to join, the spouse or parent.

〖(e)〗 *(f)* ORDER OF CONSIDERATION.—(1) Immigrant visas made available under subsection (a) or (b) shall be issued to eligible immigrants in the order in which a petition in behalf of each such immigrant is filed with the Attorney General (or in the case of special immigrants under section 101(a)(27)(D), with the Secretary of State) as provided in section 204(a).

(2) Immigrant visa numbers made available under subsection (c) (relating to diversity immigrants) shall be issued to eligible qualified immigrants strictly in a random order established by the Secretary of State for the fiscal year involved.

*(3) Immigrant visa numbers made available under subsection (d) (relating to humanitarian immigrants) shall be issued to eligible immigrants in an order specified by the Attorney General.*

〖(3)〗 *(4)* Waiting lists of applicants for visas under this section shall be maintained in accordance with regulations prescribed by the Secretary of State.

〖(f)〗 *(g)* AUTHORIZATION FOR ISSUANCE.— In the case of any alien claiming in his application for an immigrant visa to be described in section 201(b)(2) or in subsection (a), (b), or (c) of this section, the consular officer shall not grant such status until he has been authorized to do so as provided by section 204.

〖(g)〗 *(h)* LISTS.—For purposes of carrying out the Secretary's responsibilities in the orderly administration of this section, the Secretary of State may make reasonable estimates of the anticipated numbers of visas to be issued during any quarter of any fiscal year within each of the categories under subsections (a), (b), and (c) and to rely upon such estimates in authorizing the issuance of visas. The Secretary of State shall terminate the registration of any alien who fails to apply for an immigrant visa within one year following notification to the alien of the availability of such visa, but the Secretary shall reinstate the registration of any such alien who establishes within 2 years following the date of notification of the avail-

FRP-FRN-00988

318

ability of such visa that such failure to apply was due to cir-
cumstances beyond the alien's control.

PROCEDURE FOR GRANTING IMMIGRANT STATUS

SEC. 204. (a)(1)(A)(i) Any citizen of the United States claiming
that an alien is entitled to classification by reason of a relationship
described in 【paragraph (1), (3), or (4)】 *paragraph (2) or (3)* of sec-
tion 203(a) or 【to an immediate relative status】 *to status as the
spouse or child of a citizen of the United States* under section
201(b)(2)(A)(i) may file a petition with the Attorney General for
such classification.

(ii) An alien spouse described in the second sentence of section
201(b)(2)(A)(i) also may file a petition with the Attorney General
under this subparagraph for classification of the alien (and the
alien's children) under such section.

(iii) An alien who is the spouse of a citizen of the United States,
who is a person of good moral character, who is eligible to be classi-
fied 【as an immediate relative】 *as the spouse of a citizen of the
United States* under section 201(b)(2)(A)(i), and who has resided in
the United States with the alien's spouse may file a petition with
the Attorney General under this subparagraph for classification of
the alien (and any child of the alien if such a child has not been
classified under clause (iv)) under such section if the alien dem-
onstrates to the Attorney General that—

(I) the alien is residing in the United States, the marriage
between the alien and the spouse was entered into in good
faith by the alien, and during the marriage the alien or a child
of the alien has been battered by or has been the subject of ex-
treme cruelty perpetrated by the alien's spouse; and

(II) the alien is a person whose 【deportation】 *removal*, in the
opinion of the Attorney General, would result in extreme hard-
ship to the alien or a child of the alien.

(iv) An alien who is the child of a citizen of the United States,
who is a person of good moral character, who is eligible to be classi-
fied 【as an immediate relative】 *as a child of a citizen of the United
States* under section 201(b)(2)(A)(i), and who has resided in the
United States with the citizen parent may file a petition with the
Attorney General under this subparagraph for classification of the
alien under such section if the alien demonstrates to the Attorney
General that—

(I) the alien is residing in the United States and during the
period of residence with the citizen parent the alien has been
battered by or has been the subject of extreme cruelty per-
petrated by the alien's citizen parent; and

(II) the alien is a person whose 【deportation】 *removal*, in the
opinion of the Attorney General, would result in extreme hard-
ship to the alien.

(B)(i) Any alien lawfully admitted for permanent residence claim-
ing that an alien is entitled to a classification by reason of the rela-
tionship described in 【section 203(a)(2)】 *paragraph (1) or (3) of sec-
tion 203(a)(1)* may file a petition with the Attorney General for
such classification.

(ii) An alien who is the spouse of an alien lawfully admitted for
permanent residence, who is a person of good moral character, who

is eligible for classification under section 〖203(a)(2)(A)〗 *203(a)(1)*, and who has resided in the United States with the alien's legal permanent resident spouse may file a petition with the Attorney General under this subparagraph for classification of the alien (and any child of the alien if such a child has not been classified under clause (iii)) under such section if the alien demonstrates to the Attorney General that the conditions described in subclauses (I) and (II) of subparagraph (A)(iii) are met with respect to the alien.

(iii) An alien who is the child of an alien lawfully admitted for permanent residence, who is a person of good moral character, who is eligible for classification under section 〖203(a)(2)(A)〗 *203(a)(1)*, and who has resided in the United States with the alien's permanent resident alien parent may file a petition with the Attorney General under this subparagraph for classification of the alien under such section if the alien demonstrates to the Attorney General that—

   (I) the alien is residing in the United States and during the period of residence with the permanent resident parent the alien has been battered by or has been the subject of extreme cruelty perpetrated by the alien's permanent resident parent; and

   (II) the alien is a person whose 〖deportation〗 *removal*, in the opinion of the Attorney General, would result in extreme hardship to the alien.

(C) Any alien desiring to be classified under section 〖203(b)(1)(A)〗 *203(b)(1)*, or any person on behalf of such an alien, may file a petition with the Attorney General for such classification.

(D) Any employer desiring and intending to employ within the United States an alien entitled to classification under 〖section 203(b)(1)(B), 203(b)(1)(C), 203(b)(2), or 203(b)(3)〗 *section 203(b)(2), 203(b)(3), or 203(b)(4)* may file a petition with the Attorney General for such classification.

〖(F)〗 *(E)* Any alien desiring to be classified under section 〖203(b)(5)〗 *203(b)(4)* may file a petition with the Attorney General for such classification.

〖(E)〗 *(F)*(i) Any alien (other than a special immigrant under section 101(a)(27)(D)) desiring to be classified under section 〖203(b)(4)〗 *203(b)(6)*, or any person on behalf of such an alien, may file a petition with the Attorney General for such classification.

(ii) Aliens claiming status as a special immigrant under section 101(a)(27)(D) may file a petition only with the Secretary of State and only after notification by the Secretary that such status has been recommended and approved pursuant to such section.

(G)(i) Any alien desiring to be provided an immigrant visa under section 203(c) may file a petition at the place and time determined by the Secretary of State by regulation. Only one such petition may be filed by an alien with respect to any petitioning period established. If more than one petition is submitted all such petitions submitted for such period by the alien shall be voided.

(ii)(I) The Secretary of State shall designate a period for the filing of petitions with respect to visas which may be issued under section 203(c) for the fiscal year beginning after the end of the period.

320

(II) Aliens who qualify, through random selection, for a visa under section 203(c) shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected.

(III) The Secretary of State shall prescribe such regulations as may be necessary to carry out this clause.

(iii) A petition under this subparagraph shall be in such form as the Secretary of State may by regulation prescribe and shall contain such information and be supported by such documentary evidence as the Secretary of State may require.

(H) In acting on petitions filed under clause (iii) or (iv) of subparagraph (A) or clause (ii) or (iii) of subparagraph (B), the Attorney General shall consider any credible evidence relevant to the petition. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General.

*(I) Any alien desiring to be provided an immigrant visa under section 203(d) may file a petition with the Attorney General for such classification, but only if the Attorney General has identified the alien as possibly qualifying for such a visa.*

(2)(A) The Attorney General may not approve a spousal second preference petition for the classification of the spouse of an alien if the alien, by virtue of a prior marriage, has been accorded the status of an alien lawfully admitted for permanent residence as the spouse of a citizen of the United States or as the spouse of an alien lawfully admitted for permanent residence, unless—

(i) a period of 5 years has elapsed after the date the alien acquired the status of an alien lawfully admitted for permanent residence, or

(ii) the alien establishes to the satisfaction of the Attorney General by clear and convincing evidence that the prior marriage (on the basis of which the alien obtained the status of an alien lawfully admitted for permanent residence) was not entered into for the purpose of evading any provision of the immigration laws.

In this subparagraph, the term "spousal second preference petition" refers to a petition, seeking preference status under section 203(a)(2), for an alien as a spouse of an alien lawfully admitted for permanent residence.

(B) Subparagraph (A) shall not apply to a petition filed for the classification of the spouse of an alien if the prior marriage of the alien was terminated by the death of his or her spouse.

(b)*(1)* After an investigation of the facts in each case, and after consultation with the Secretary of Labor with respect to petitions to accord a status under section 203(b)(2) or 203(b)(3), the Attorney General shall, if he determines that the facts stated in the petition are true and that the alien in behalf of whom the petition is made is 【an immediate relative specified in section 201(b)】 *a spouse or child of a citizen of the United States under section 201(b)* or is eligible for preference under subsection (a) or (b) of section 203, approve the petition and forward one copy thereof to the Department of State. The Secretary of State shall then authorize the consular officer concerned to grant the preference status.

321

*(2)(A) The Attorney General may provide that a petition approved with respect to an alien (and the priority date established with respect to the petition) shall expire after a period (specified by the Attorney General and of not less than 2 years) following the date of approval of the petition, unless the petitioner files with the Attorney General a form described in subparagraph (B).*

*(B) The Attorney General shall specify the form to be used under this paragraph. Such form shall be designed—*

*(i) to reconfirm the continued intention of the petitioner to seek admission of the alien based on the classification involved, and*

*(ii) as may be provided by the Attorney General, to update the contents of the original classification petition.*

*(C) The Attorney General may apply subparagraph (A) to one or more classes of classification petitions and for different periods of time for different classes of such petitions, as specified by the Attorney General.*

(c) Notwithstanding the provisions of subsection (b) no petition shall be approved if (1) the alien has previously been accorded, or has sought to be accorded, ⟦an immediate relative or preference⟧ *a preferential* status as the spouse of a citizen of the United States or the spouse of an alien lawfully admitted for permanent residence, by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws or (2) the Attorney General has determined that the alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws.

(d) Notwithstanding the provisions of subsections (a) and (b) no petition may be approved on behalf of a child defined in section 101(b)(1)(F) unless a valid home-study has been favorably recommended by an agency of the State of the child's proposed residence, or by an agency authorized by that State to conduct such a study, or, in the case of a child adopted abroad, by an appropriate public or private adoption agency which is licensed in the United States.

(e) Nothing in this section shall be construed to entitle an immigrant, in behalf of whom a petition under this section is approved, to enter the United States as an immigrant under subsection (a), (b), or (c) of section 203 or as ⟦an immediate relative⟧ *a spouse or child of a citizen of the United States* under section 201(b) if upon ⟦his⟧ *the alien's* arrival at a port of ⟦entry⟧ *admission* in the United States ⟦he⟧ *the alien* is found not to be entitled to such classification.

(f)(1) Any alien claiming to be an alien described in paragraph (2)(A) of this subsection (or any person on behalf of such an alien) may file a petition with the Attorney General for classification under section 201(b)⟦, 203(a)(1), or 203(a)(3)⟧ *or 203(a)(2)*, as appropriate. After an investigation of the facts of each case the Attorney General shall, if the conditions described in paragraph (2) are met, approve the petition and forward one copy to the Secretary of State.

*        *        *        *        *        *        *

(g) Notwithstanding subsection (a), except as provided in section 245(e)(3), a petition may not be approved to grant an alien ⟦imme-

322

diate relative status⟧ *status as a spouse or child of the* *United States or other* or preference status by reason of a marriage which was entered into during the period described in section 245(e)(2), until the alien has resided outside the United States for a 2-year period beginning after the date of the marriage.

\*        \*        \*        \*        \*        \*        \*

*(i) For purposes of applying section 101(b)(1) in the case of issu-* *ance of an immigrant visa to, or admission or adjustment of status* *of, an alien under section 201(b)(2)(A), section 203(a)(1), or 203(e)* *as a child of a citizen of the United States or a permanent resident* *alien, the age of the alien shall be determined as of the date of the* *filing of the classification petition under section 204(a)(1) as such* *a child of a citizen of the United States or a permanent resident* *alien.*

REVOCATION OF APPROVAL OF PETITIONS

SEC. 205. The Attorney General may, at any time, for what he deems to be good and sufficient cause, revoke the approval of any petition approved by him under section 204. Such revocation shall be effective as of the date of approval of any such petition. In no case, however, shall such revocation have effect unless there is mailed to the petitioner's last known address a notice of the revoca-tion and unless notice of the revocation is communicated through the Secretary of State to the beneficiary of the petition before such beneficiary commences his journey to the United States. If notice of revocation is not so given, and the beneficiary applies for admis-sion to the United States, his admissibility shall be determined in the manner provided for by sections 235 and ⟦236⟧ *240.*

UNUSED IMMIGRANT VISAS

SEC. 206. If an immigrant having an immigrant visa is ⟦excluded from admission to the United States and deported⟧ *denied admis-* *sion to the United States and removed,* or does not apply for admis-sion before the expiration of the validity of his visa, or if an alien having an immigrant visa issued to him as a preference immigrant is found not to be a preference immigrant, an immigrant visa or a preference immigrant visa, as the case may be, may be issued in lieu thereof to another qualified alien.

ANNUAL ADMISSION OF REFUGEES AND ADMISSION OF EMERGENCY
SITUATION REFUGEES

SEC. 207. (a)⟦(1) Except as provided in subsection (b), the num-ber of refugees who may be admitted under this section in fiscal year 1980, 1981, or 1982, may not exceed fifty thousand unless the President determines, before the beginning of the fiscal year and after appropriate consultation (as defined in subsection (e)), that admission of a specific number of refugees in excess of such num-ber is justified by humanitarian concerns or is otherwise in the na-tional interest.⟧

*(1) Except as provided in paragraph (2) and subsection (b), the* *number of refugees who may be admitted under this section in any* *fiscal year shall be such number as the President determines, before*

*the beginning of the fiscal year and after appropriate consultation, is justified by humanitarian concerns or is otherwise in the national interest.*

〔(2) Except as provided in subsection (b), the number of refugees who may be admitted under this section in any fiscal year after fiscal year 1982 shall be such number as the President determines, before the beginning of the fiscal year and after appropriate consultation, is justified by humanitarian concerns or is otherwise in the national interest.〕

*(2)(A) Except as provided in subparagraph (B), the number determined under paragraph (1) for a fiscal year may not exceed—*

*(i) 75,000 in the case of fiscal year 1997, or*

*(ii) 50,000 in the case of any succeeding fiscal year.*

*(B) The number determined under paragraph (1) for a fiscal year may exceed the limit specified under subparagraph (A) if Congress enacts a law providing for a higher number.*

(3) Admissions under this subsection shall be allocated among refugees of special humanitarian concern to the United States in accordance with a determination made by the President after appropriate consultation.

〔(4) In the determination made under this subsection for each fiscal year (beginning with fiscal year 1992), the President shall enumerate, with the respective number of refugees so determined, the number of aliens who were granted asylum in the previous year.〕

*(4) For any fiscal year, not more than a total of 1,000 refugees may be admitted under this subsection or granted asylum under section 208 pursuant to a determination under the last sentence of section 101(a)(42) (relating to persecution for resistance to coercive population control methods).*

(b) If the President determines, after appropriate consultation, that (1) an 〔unforeseen〕 emergency refugee situation exists, (2) the admission of certain refugees in response to the emergency refugee situation is justified by grave humanitarian concerns or is otherwise in the national interest, and (3) the admission to the United States of these refugees cannot be accomplished under subsection (a), the President may fix a number of refugees to be admitted to the United States during the succeeding period (not to exceed twelve months) in response to the emergency refugee situation and such admissions shall be allocated among refugees of special humanitarian concern to the United States in accordance with a determination made by the President after the appropriate consultation provided under this subsection.

<center>*       *       *       *       *       *       *</center>

(d)(1) 〔Before the start of each fiscal year〕 *Before June 1 of the preceding fiscal year* the President shall report to the Committee on the Judiciary of the House of Representatives and of the Senate regarding the foreseeable number of refugees who will be in need of resettlement during the fiscal year and the anticipated allocation of refugee admissions during the fiscal year. The President shall provide for periodic discussions between designated representatives of the President and members of such committees regarding changes in the worldwide refugee situation, the progress of refugee

324

admissions, and the possible need for adjustments in the allocation of admissions among refugees.

(2) As soon as possible after representatives of the President initiate appropriate consultation with respect to the number of refugee admissions under subsection (a) or with respect to the admission of refugees in response to an emergency refugee situation under subsection (b), the Committees on the Judiciary of the House of Representatives and of the Senate shall cause to have printed in the Congressional Record the substance of such consultation.

(3)(A) After the President initiates appropriate consultation prior to making a determination under subsection (a), a hearing to review the proposed determination shall be held unless public disclosure of the details of the proposal would jeopardize the lives or safety of individuals.

(B) After the President initiates appropriate consultation prior to making a determination, under subsection (b), that the number of refugee admissions should be increased because of an ⟦unforeseen⟧ emergency refugee situation, to the extent that time and the nature of the emergency refugee situation permit, a hearing to review the proposal to increase refugee admissions shall be held unless public disclosure of the details of the proposal would jeopardize the lives or safety of individuals.

(e) For purposes of this section, the term "appropriate consultation" means, with respect to the admission of refugees and allocation of refugee admissions, discussions in person by designated Cabinet-level representatives of the President with members of the Committees on the Judiciary of the Senate and of the House of Representatives to review the refugee situation or emergency refugee situation, to project the extent of possible participation of the United States therein, to discuss the reasons for believing that the proposed admission of refugees is justified by humanitarian concerns or grave humanitarian concerns or is otherwise in the national interest, and to provide such members with the following information:

(1) A description of the nature of the refugee situation.

(2) A description of the number and allocation of the refugees to be admitted and an analysis of conditions within the countries from which they came.

(3) A description of the proposed plans for their movement and resettlement and the estimated cost of their movement and resettlement.

(4) An analysis of the anticipated social, economic, and demographic impact of their admission to the United States.

(5) A description of the extent to which other countries will admit and assist in the resettlement of such refugees.

(6) An analysis of the impact of the participation of the United States in the resettlement of such refugees on the foreign policy interests of the United States.

(7) Such additional information as may be appropriate or requested by such members.

To the extent possible, information described in this subsection shall be provided at least two weeks in advance of discussions in person by designated representatives of the President with such members. *Such discussions shall occur before July 1 of the fiscal*

325

*year preceding the fiscal year of admissions, except that discussions relating to an emergency refugee situation shall occur not more than 30 days after the President proposes admissions in response to the emergency.*

〔ASYLUM PROCEDURE

〔SEC. 208. (a) The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 101(a)(42)(A).

〔(b) Asylum granted under subsection (a) may be terminated if the Attorney General, pursuant to such regulations as the Attorney General may prescribe, determines that the alien is no longer a refugee within the meaning of section 101(a)(42)(A) owing to a change in circumstances in the alien's country of nationality or, in the case of an alien having no nationality, in the country in which the alien last habitually resided.

〔(c) A spouse or child (as defined in section 101(b)(1) (A), (B), (C), (D), or (E)) of an alien who is granted asylum under subsection (a) may, if not otherwise eligible for asylum under such subsection, be granted the same status as the alien if accompanying, or following to join, such alien.

〔(d) An alien who has been convicted of an aggravated felony, notwithstanding subsection (a), may not apply for or be granted asylum.

〔(e) An applicant for asylum is not entitled to employment authorization except as may be provided by regulation in the discretion of the Attorney General.〕

*ASYLUM*

SEC. 208. (a) AUTHORITY TO APPLY FOR ASYLUM.—

*(1) IN GENERAL.—Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival), irrespective of such alien's status, may apply for asylum in accordance with this section.*

*(2) EXCEPTIONS.—*

*(A) SAFE THIRD COUNTRY.—Paragraph (1) shall not apply to an alien if the Attorney General determines that the alien may be removed, including pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States.*

326

*(B) TIME LIMIT.—Paragraph (1) shall not apply to an alien unless the alien demonstrates by clear and convincing evidence that the application has been filed within 30 days after the alien's arrival in the United States.*

*(C) PREVIOUS ASYLUM APPLICATIONS.—Paragraph (1) shall not apply to an alien if the alien has previously applied for asylum and had such application denied.*

*(D) CHANGED CONDITIONS.—An application for asylum of an alien may be considered, notwithstanding subparagraphs (B) and (C), if the alien demonstrates to the satisfaction of the Attorney General the existence of fundamentally changed circumstances which affect the applicant's eligibility for asylum.*

*(3) LIMITATION ON JUDICIAL REVIEW.—No court shall have jurisdiction to review a determination of the Attorney General under paragraph (2).*

*(b) CONDITIONS FOR GRANTING ASYLUM.—*

*(1) IN GENERAL.—The Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Attorney General under this section if the Attorney General determines that such alien is a refugee within the meaning of section 101(a)(42)(A).*

*(2) EXCEPTIONS.—*

*(A) IN GENERAL.—Paragraph (1) shall not apply to an alien if the Attorney General determines that—*

*(i) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;*

*(ii) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;*

*(iii) there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States;*

*(iv) there are reasonable grounds for regarding the alien as a danger to the security of the United States;*

*(v) the alien is inadmissible under subclause (I), (II), (III), or (IV) of section 212(a)(3)(B)(i) or removable under section 237(a)(4)(B) (relating to terrorist activity), unless, in the case only of an alien inadmissible under subclause (IV) of section 212(a)(3)(B)(i), the Attorney General determines, in the Attorney General's discretion, that there are not reasonable grounds for regarding the alien as a danger to the security of the United States; or*

*(vi) the alien was firmly resettled in another country prior to arriving in the United States.*

*(B) SPECIAL RULES.—*

*(i) CONVICTION OF AGGRAVATED FELONY.—For purposes of clause (ii) of subparagraph (A), an alien who has been convicted of an aggravated felony shall be*

327

considered to have been convicted of a particularly serious crime.

(ii) OFFENSES.—The Attorney General may designate by regulation offenses that will be considered to be a crime described in clause (ii) or (iii) of subparagraph (A).

(C) ADDITIONAL LIMITATIONS.—The Attorney General may by regulation establish additional limitations and conditions under which an alien shall be ineligible for asylum under paragraph (1).

(D) NO JUDICIAL REVIEW.—There shall be no judicial review of a determination of the Attorney General under subparagraph (A)(v).

(3) TREATMENT OF SPOUSE AND CHILDREN.—A spouse or child (as defined in section 101(b)(1)(A), (B), (C), (D), or (E)) of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien.

(c) ASYLUM STATUS.—

(1) IN GENERAL.—In the case of an alien granted asylum under subsection (b), the Attorney General—

(A) shall not remove or return the alien to the alien's country of nationality or, in the case of a person having no nationality, the country of the alien's last habitual residence;

(B) shall authorize the alien to engage in employment in the United States and provide the alien with appropriate endorsement of that authorization; and

(C) may allow the alien to travel abroad with the prior consent of the Attorney General.

(2) TERMINATION OF ASYLUM.—Asylum granted under subsection (b) does not convey a right to remain permanently in the United States, and may be terminated if the Attorney General determines that—

(A) the alien no longer meets the conditions described in subsection (b)(1) owing to a fundamental change in circumstances;

(B) the alien meets a condition described in subsection (b)(2);

(C) the alien may be removed, including pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien cannot establish that it is more likely than not that the alien's life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien is eligible to receive asylum or equivalent temporary protection;

(D) the alien has voluntarily availed himself or herself of the protection of the alien's country of nationality or, in the case of an alien having no nationality, the alien's country of last habitual residence, by returning to such country

328

with permanent resident status or the reasonable possibility of obtaining such status with the same rights and obligations pertaining to other permanent residents of that country; or

(E) the alien has acquired a new nationality and enjoys the protection of the country of his new nationality.

(3) REMOVAL WHEN ASYLUM IS TERMINATED.—An alien described in paragraph (2) is subject to any applicable grounds of inadmissibility or deportability under section 212(a) and 237(a), and the alien's removal or return shall be directed by the Attorney General in accordance with sections 240 and 241.

(4) LIMITATION ON JUDICIAL REVIEW.—No court shall have jurisdiction to review a determination of the Attorney General under paragraph (2).

(d) ASYLUM PROCEDURE.—

(1) APPLICATIONS.—The Attorney General shall establish a procedure for the consideration of asylum applications filed under subsection (a). An application for asylum shall not be considered unless the alien submits fingerprints and a photograph in a manner to be determined by regulation by the Attorney General.

(2) EMPLOYMENT.—An applicant for asylum is not entitled to employment authorization, but such authorization may be provided under regulation by the Attorney General. An applicant who is not otherwise eligible for employment authorization shall not be granted such authorization prior to 180 days after the date of filing of the application for asylum.

(3) FEES.—The Attorney General may impose fees for the consideration of an application for asylum, for employment authorization under this section, and for adjustment of status under section 209(b). The Attorney General may provide for the assessment and payment of such fees over a period of time or by installments. Nothing in this paragraph shall be construed to require the Attorney General to charge fees for adjudication services provided to asylum applicants, or to limit the authority of the Attorney General to set adjudication and naturalization fees in accordance with section 286(m).

(4) NOTICE OF PRIVILEGE OF COUNSEL AND CONSEQUENCES OF FRIVOLOUS APPLICATION.—At the time of filing an application for asylum, the Attorney General shall—

(A) advise the alien of the privilege of being represented by counsel and of the consequences, under paragraph (6), of knowingly filing a frivolous application for asylum; and

(B) provide the alien a list of persons (updated not less often than quarterly) who have indicated their availability to represent aliens in asylum proceedings on a pro bono basis.

(5) CONSIDERATION OF ASYLUM APPLICATIONS.—

(A) PROCEDURES.—The procedure established under paragraph (1) shall provide that—

(i) asylum cannot be granted until the identity of the applicant has been checked against all appropriate records or databases maintained by the Attorney General and by the Secretary of State, including the Auto-

329

*mated Visa Lookout System, to determine any grounds on which the alien may be inadmissible to or deportable from the United States, or ineligible to apply for or be granted asylum;*

*(ii) in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed;*

*(iii) in the absence of exceptional circumstances, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed;*

*(iv) any administrative appeal shall be filed within 30 days of a decision granting or denying asylum, or within 30 days of the completion of removal proceedings before an immigration judge under section 240, whichever is later; and*

*(v) in the case of an applicant for asylum who fails without prior authorization or in the absence of exceptional circumstances to appear for an interview or hearing, including a hearing under section 240, the application may be dismissed or the applicant may be otherwise sanctioned for such failure.*

*(B) ADDITIONAL REGULATORY CONDITIONS.—The Attorney General may provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this Act.*

*(6) FRIVOLOUS APPLICATIONS.—*

*(A) IN GENERAL.—If the Attorney General determines that an alien has knowingly made a frivolous application for asylum and the alien has received the notice under paragraph (4)(A), the alien shall be permanently ineligible for any benefits under this Act, effective as of the date of a final determination on such application.*

*(B) MATERIAL MISREPRESENTATIONS.—An application shall be considered to be frivolous if the Attorney General determines that the application contains a willful misrepresentation or concealment of a material fact.*

*(7) NO PRIVATE RIGHT OF ACTION.—Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.*

ADJUSTMENT OF STATUS OF REFUGEES

SEC. 209. (a)(1) Any alien who has been admitted to the United States under section 207—

(A) whose admission has not been terminated by the Attorney General pursuant to such regulations as the Attorney General may prescribe,

(B) who has been physically present in the United States for at least one year, and

(C) who has not acquired permanent resident status,

330

shall, at the end of such year period, return or be returned to the custody of the Service for inspection and examination for admission to the United States as an immigrant in accordance with the provisions of sections 235, 【236】 *240*, and 【237】 *241*.

(2) Any alien who is found upon inspection and examination by an immigration officer pursuant to paragraph (1) or after a hearing before 【a special inquiry officer】 *an immigration judge* to be admissible (except as otherwise provided under subsection (c)) as an immigrant under this Act at the time of the alien's inspection and examination shall, notwithstanding any numerical limitation specified in this Act, be regarded as lawfully admitted to the United States for permanent residence as of the date of such alien's arrival into the United States.

(b) 【Not more than 10,000 of the refugee admissions authorized under section 207(a) in any fiscal year may be made available by the Attorney General, in the Attorney General's discretion and under such regulations as the Attorney General may prescribe, to adjust】 *The Attorney General, in the Attorney General's discretion and under such regulations as the Attorney General may prescribe, and in a number not to exceed 10,000 aliens in any fiscal year, may adjust* to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who—

(1) applies for such adjustment,

(2) has been physically present in the United States for at least one year after being granted asylum,

(3) continues to be a refugee within the meaning of section 101(a)(42)(A) or a spouse or child of such a refugee,

(4) is not firmly resettled in any foreign country, and

(5) is admissible (except as otherwise provided under subsection (c)) as an immigrant under this Act at the time of examination for adjustment of such alien.

Upon approval of an application under this subsection, the Attorney General shall establish a record of the alien's admission for lawful permanent residence as of the date one year before the date of the approval of the application.

(c) The provisions of paragraphs (4), (5), and (7)(A) of section 212(a) shall not be applicable to any alien seeking adjustment of status under this section, and the Attorney General may waive any other provision of such section (other than paragraph (2)(C) or subparagraph (A), (B), (C), or (E) of paragraph (3)) with respect to such an alien for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.

SPECIAL AGRICULTURAL WORKERS

SEC. 210. (a)  * * *

(b) APPLICATIONS FOR ADJUSTMENT OF STATUS.—

(1)  * * *

*      *      *      *      *      *      *

(5) LIMITATION ON ACCESS TO INFORMATION.—Files and records prepared for purposes of this section by designated entities operating under this section are confidential and the Attorney General and the Service shall not have access to such

331

files or records relating to an alien without the consent of the alien, *except as permitted under paragraph (6)(B).*

(6) CONFIDENTIALITY OF INFORMATION.—【Neither】 *(A) Except as provided in subparagraph (B), neither* the Attorney General, nor any other official or employee of the Department of Justice, or bureau or agency thereof, may—

【(A)】 *(i)* use the information furnished pursuant to an application filed under this section for any purpose other than to make a determination on the application including a determination under subparagraph (a)(3)(B), or for enforcement of paragraph (7)【.】,

【(B)】 *(ii)* make any publication whereby the information furnished by any particular individual can be identified, or

【(C)】 *(iii)* permit anyone other than the sworn officers and employees of the Department or bureau or agency or, with respect to applications filed with a designated entity, that designated entity, to examine individual applications.

*(B) The Attorney General may authorize an application to a Federal court of competent jurisdiction for, and a judge of such court may grant, an order authorizing disclosure of information contained in the application of the alien to be used—*

*(i) for identification of the alien when there is reason to believe that the alien has been killed or severely incapacitated, or*

*(ii) for criminal law enforcement purposes against the alien whose application is to be disclosed if the alleged criminal activity occurred after the special agricultural worker application was filed and such activity involves terrorist activity or poses either an immediate risk to life or to national security, or would be prosecutable as an aggravated felony, but without regard to the length of sentence that could be imposed on the applicant.*

【Anyone】

*(C) Anyone* who uses, publishes, or permits information to be examined in violation of this paragraph shall be fined in accordance with title 18, United States Code, or imprisoned not more than five years, or both.

*(D) Nothing in this paragraph shall preclude the release for immigration enforcement purposes of the following information contained in files or records of the Service pertaining to the application:*

*(i) The immigration status of the applicant on any given date after the date of filing the application (including whether the applicant was authorized to work).*

*(ii) The date of the applicant's adjustment (if any) to the status of an alien lawfully admitted for permanent residence.*

*(iii) Information concerning whether the applicant has been convicted of a crime occurring after the date of filing the application.*

*(iv) The date or disposition of the application.*

\*        \*        \*        \*        \*        \*        \*

(e) ADMINISTRATIVE AND JUDICIAL REVIEW.—

332

(1)  * * *

*        *        *        *        *        *        *

(3) JUDICIAL REVIEW.—

(A) LIMITATION TO REVIEW OF EXCLUSION OR DEPORTA-
TION.—There shall be judicial review of such a denial only
in the judicial review of an order of exclusion or deporta-
tion under section 106 *(as in effect before October 1, 1996)*.

*        *        *        *        *        *        *

GENERAL CLASSES OF ALIENS INELIGIBLE TO RECEIVE VISAS AND 【EX-
CLUDED FROM】 *INELIGIBLE FOR* ADMISSION; WAIVERS OF INADMIS-
SIBILITY

SEC. 212. (a) 【CLASSES OF EXCLUDABLE ALIENS.—Except as oth-
erwise provided in this Act, the following describes classes of ex-
cludable aliens who are ineligible to receive visas and who shall be
excluded from admission into the United States:】 *CLASSES OF
ALIENS INELIGIBLE FOR VISAS OR ADMISSION.—Except as otherwise
provided in this Act, aliens who are inadmissible under the follow-
ing paragraphs are ineligible to receive visas and ineligible to be
admitted to the United States:*

(1) HEALTH-RELATED GROUNDS.—

(A) IN GENERAL.—Any alien—

(i) who is determined (in accordance with regula-
tions prescribed by the Secretary of Health and
Human Services) to have a communicable disease of
public health significance, which shall include infec-
tion with the etiologic agent for acquired immune defi-
ciency syndrome,

*(ii) who seeks admission as an immigrant, or who
seeks adjustment of status to the status of an alien
lawfully admitted for permanent residence, and who
has failed to present documentation of having received
vaccination against vaccine-preventable diseases,
which shall include at least the following diseases:
mumps, measles, rubella, polio, tetanus and diphtheria
toxoids, pertussis, influenza type B and hepatitis B,
and any other vaccinations against vaccine-preventable
diseases recommended by the Advisory Committee for
Immunization Practices,*

【(ii)】 *(iii)* who is determined (in accordance with
regulations prescribed by the Secretary of Health and
Human Services in consultation with the Attorney
General)—

(I) to have a physical or mental disorder and be-
havior associated with the disorder that may pose,
or has posed, a threat to the property, safety, or
welfare of the alien or others, or

(II) to have had a physical or mental disorder
and a history of behavior associated with the dis-
order, which behavior has posed a threat to the
property, safety, or welfare of the alien or others
and which behavior is likely to recur or to lead to
other harmful behavior, or

333

⟦(iii)⟧ *(iv)* who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to be a drug abuser or addict, ⟦is excludable⟧ *is inadmissible.*

(B) WAIVER AUTHORIZED.—For provision authorizing waiver of certain clauses of subparagraph (A), see subsection (g).

(2) CRIMINAL AND RELATED GROUNDS.—

(A) CONVICTION OF CERTAIN CRIMES.—

(i) IN GENERAL.—Except as provided in clause (ii), any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of—

(I) a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime, or

(II) a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), ⟦is excludable⟧ *is inadmissible.*

(ii) EXCEPTION.—Clause (i)(I) shall not apply to an alien who committed only one crime if—

(I) the crime was committed when the alien was under 18 years of age, and the crime was committed (and the alien released from any confinement to a prison or correctional institution imposed for the crime) more than 5 years before the date of application for a visa or other documentation and the date of application for admission to the United States, or

(II) the maximum penalty possible for the crime of which the alien was convicted (or which the alien admits having committed or of which the acts that the alien admits having committed constituted the essential elements) did not exceed imprisonment for one year and, if the alien was convicted of such crime, the alien was not sentenced to a term of imprisonment in excess of 6 months (regardless of the extent to which the sentence was ultimately executed).

(B) MULTIPLE CRIMINAL CONVICTIONS.—Any alien convicted of 2 or more offenses (other than purely political offenses), regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether the offenses involved moral turpitude, for which the aggregate sentences to confinement actually imposed were 5 years or more ⟦is excludable⟧ *is inadmissible.*

(C) CONTROLLED SUBSTANCE TRAFFICKERS.—Any alien who the consular or immigration officer knows or has reason to believe is or has been an illicit trafficker in any such controlled substance or is or has been a knowing

334

assister, abettor, conspirator, or colluder with others in the illicit trafficking in any such controlled substance, ⟦is excludable⟧ *is inadmissible*.

(D) PROSTITUTION AND COMMERCIALIZED VICE.—Any alien who—

(i) is coming to the United States solely, principally, or incidentally to engage in prostitution, or has engaged in prostitution within 10 years of the date of application for a visa, ⟦entry⟧ *admission*, or adjustment of status,

(ii) directly or indirectly procures or attempts to procure, or (within 10 years of the date of application for a visa, ⟦entry⟧ *admission*, or adjustment of status) procured or attempted to procure or to import, prostitutes or persons for the purpose of prostitution, or receives or (within such 10-year period) received, in whole or in part, the proceeds of prostitution, or

(iii) is coming to the United States to engage in any other unlawful commercialized vice, whether or not related to prostitution,

⟦is excludable⟧ *is inadmissible*.

(E) CERTAIN ALIENS INVOLVED IN SERIOUS CRIMINAL ACTIVITY WHO HAVE ASSERTED IMMUNITY FROM PROSECUTION.—Any alien—

(i) who has committed in the United States at any time a serious criminal offense (as defined in section 101(h)),

(ii) for whom immunity from criminal jurisdiction was exercised with respect to that offense,

(iii) who as a consequence of the offense and exercise of immunity has departed from the United States, and

(iv) who has not subsequently submitted fully to the jurisdiction of the court in the United States having jurisdiction with respect to that offense,

⟦is excludable⟧ *is inadmissible*.

(F) WAIVER AUTHORIZED.—For provision authorizing waiver of certain subparagraphs of this paragraph, see subsection (h).

(3) SECURITY AND RELATED GROUNDS.—

(A) IN GENERAL.—Any alien who a consular officer or the Attorney General knows, or has reasonable ground to believe, seeks to enter the United States to engage solely, principally, or incidentally in—

(i) any activity (I) to violate any law of the United States relating to espionage or sabotage or (II) to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information,

(ii) any other unlawful activity, or

(iii) any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States by force, violence, or other unlawful means,

⟦is excludable⟧ *is inadmissible*.

335

(B) TERRORIST ACTIVITIES.—

(i) IN GENERAL.—Any alien who—

(I) has engaged in a terrorist activity, 【or】

(II) a consular officer or the Attorney General knows, or has reasonable ground to believe, *engaged in or* is likely to engage after entry in any terrorist activity (as defined in clause (iii)),

*(III) is a representative of a terrorist organization, or*

*(IV) is a member of a terrorist organization which the alien knows or should have known is a terrorist organization,*

【is excludable】 *is inadmissible.* An alien who is an officer, official, representative, or spokesman of the Palestine Liberation Organization is considered, for purposes of this Act, to be engaged in a terrorist activity.

\*       \*       \*       \*       \*       \*       \*

*(iv) TERRORIST ORGANIZATION DEFINED.—*

*(I) DESIGNATION.—For purposes of this Act, the term "terrorist organization" means a foreign organization designated in the Federal Register as a terrorist organization by the Secretary of State, in consultation with the Attorney General, based upon a finding that the organization engages in, or has engaged in, terrorist activity that threatens the national security of the United States.*

*(II) PROCESS.—At least 3 days before designating an organization as a terrorist organization through publication in the Federal Register, the Secretary of State, in consultation with the Attorney General, shall notify the Committees on the Judiciary of the House of Representatives and the Senate of the intent to make such designation and the findings and basis for designation. The Secretary of State, in consultation with the Attorney General, shall create an administrative record and may use classified information in making such a designation. Such information is not subject to disclosure so long as it remains classified, except that it may be disclosed to a court ex parte and in camera under subclause (III) for purposes of judicial review of such a designation. The Secretary of State, in consultation with the Attorney General, shall provide notice and an opportunity for public comment prior to the creation of the administrative record under this subclause.*

*(III) JUDICIAL REVIEW.—Any organization designated as a terrorist organization under the preceding provisions of this clause may, not later than 30 days after the date of the designation, seek judicial review thereof in the United States Court of Appeals for the District of Columbia Circuit. Such review shall be based solely upon the administrative record, except that the Government may sub-*

336

mit, for ex parte and in camera review, classified information considered in making the designation. The court shall hold unlawful and set aside the designation if the court finds the designation to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, lacking substantial support in the administrative record taken as a whole or in classified information submitted to the court under the previous sentence, contrary to constitutional right, power, privilege, or immunity, or not in accord with the procedures required by law.

(IV) CONGRESSIONAL REMOVAL AUTHORITY.—The Congress reserves the authority to remove, by law, the designation of an organization as a terrorist organization for purposes of this Act.

(V) SUNSET.—Subject to subclause (IV), the designation under this clause of an organization as a terrorist organization shall be effective for a period of 2 years from the date of the initial publication of the terrorist organization designation by the Secretary of State. At the end of such period (but no sooner than 60 days prior to the termination of the 2-year-designation period), the Secretary of State, in consultation with the Attorney General, may redesignate the organization in conformity with the requirements of this clause for designation of the organization.

(VI) REMOVAL AUTHORITY.—The Secretary of State, in consultation with the Attorney General, may remove the terrorist organization designation from any organization previously designated as such an organization, at any time, so long as the Secretary publishes notice of the removal in the Federal Register. The Secretary is not required to report to Congress prior to so removing such designation.

(v) REPRESENTATIVE DEFINED.—

(I) IN GENERAL.—In this subparagraph, the term "representative" includes an officer, official, or spokesman of the organization and any person who directs, counsels, commands or induces the organization or its members to engage in terrorist activity.

(II) JUDICIAL REVIEW.—The determination under this subparagraph that an alien is a representative of a terrorist organization shall be subject to judicial review under section 706 of title 5, United States Code.

(C) FOREIGN POLICY.—

(i) IN GENERAL.—An alien whose entry or proposed activities in the United States the Secretary of State has reasonable ground to believe would have poten-

337

tially serious adverse foreign policy consequences for the United States 〖is excludable〗 *is inadmissible*.

(ii) EXCEPTION FOR OFFICIALS.—An alien who is an official of a foreign government or a purported government, or who is a candidate for election to a foreign government office during the period immediately preceding the election for that office, shall not be excludable or subject to restrictions or conditions on entry into the United States under clause (i) solely because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States.

(iii) EXCEPTION FOR OTHER ALIENS.—An alien, not described in clause (ii), shall not be excludable or subject to restrictions or conditions on entry into the United States under clause (i) because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States, unless the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest.

(iv) NOTIFICATION OF DETERMINATIONS.—If a determination is made under clause (iii) with respect to an alien, the Secretary of State must notify on a timely basis the chairmen of the Committees on the Judiciary and Foreign Affairs of the House of Representatives and of the Committees on the Judiciary and Foreign Relations of the Senate of the identity of the alien and the reasons for the determination.

(D) IMMIGRANT MEMBERSHIP IN TOTALITARIAN PARTY.—

(i) IN GENERAL.—Any immigrant who is or has been a member of or affiliated with the Communist or any other totalitarian party (or subdivision or affiliate thereof), domestic or foreign, 〖is excludable〗 *is inadmissible*.

(ii) EXCEPTION FOR INVOLUNTARY MEMBERSHIP.—Clause (i) shall not apply to an alien because of membership or affiliation if the alien establishes to the satisfaction of the consular officer when applying for a visa (or to the satisfaction of the Attorney General when applying for admission) that the membership or affiliation is or was involuntary, or is or was solely when under 16 years of age, by operation of law, or for purposes of obtaining employment, food rations, or other essentials of living and whether necessary for such purposes.

(iii) EXCEPTION FOR PAST MEMBERSHIP.—Clause (i) shall not apply to an alien because of membership or affiliation if the alien establishes to the satisfaction of the consular officer when applying for a visa (or to the satisfaction of the Attorney General when applying for admission) that—

338

(I) the membership or affiliation terminated at least—

(a) 2 years before the date of such application, or

(b) 5 years before the date of such application, in the case of an alien whose membership or affiliation was with the party controlling the government of a foreign state that is a totalitarian dictatorship as of such date, and

(II) the alien is not a threat to the security of the United States.

(iv) EXCEPTION FOR CLOSE FAMILY MEMBERS.—The Attorney General may, in the Attorney General's discretion, waive the application of clause (i) in the case of an immigrant who is the parent, spouse, son, daughter, brother, or sister of a citizen of the United States or a spouse, son, or daughter of an alien lawfully admitted for permanent residence for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest if the immigrant is not a threat to the security of the United States.

(E) PARTICIPANTS IN NAZI PERSECUTIONS OR GENOCIDE.—

(i) PARTICIPATION IN NAZI PERSECUTIONS.—Any alien who, during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with—

(I) the Nazi government of Germany,

(II) any government in any area occupied by the military forces of the Nazi government of Germany,

(III) any government established with the assistance or cooperation of the Nazi government of Germany, or

(IV) any government which was an ally of the Nazi government of Germany,

ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion 〚is excludable〛 *is inadmissible.*

(ii) PARTICIPATION IN GENOCIDE.—Any alien who has engaged in conduct that is defined as genocide for purposes of the International Convention on the Prevention and Punishment of Genocide 〚is excludable〛 *is inadmissible.*

〚(4) PUBLIC CHARGE.—Any alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is excludable.〛

*(4) PUBLIC CHARGE.—*

*(A) FAMILY-SPONSORED IMMIGRANTS.—Any alien who seeks admission or adjustment of status under a visa number issued under section 203(a), who cannot demonstrate to the consular officer at the time of application for a visa, or*

339

to the Attorney General at the time of application for admission or adjustment of status, that the alien's age, health, family status, assets, resources, financial status, education, skills, or a combination thereof, or an affidavit of support described in section 213A, or both, make it unlikely that the alien will become a public charge (as determined under section 241(a)(5)(B)) is inadmissible.

(B) NONIMMIGRANTS.—Any alien who seeks admission under a visa number issued under section 214, who cannot demonstrate to the consular officer at the time of application for the visa that the alien's age, health, family status, assets, resources, financial status, education, skills or a combination thereof, or an affidavit of support described in section 213A, or both, make it unlikely that the alien will become a public charge (as determined under section 241(a)(5)(B)) is inadmissible.

(C) EMPLOYMENT-BASED IMMIGRANTS.—

(i) IN GENERAL.—Any alien who seeks admission or adjustment of status under a visa number issued under paragraph (2) or (3) of section 203(b) who cannot demonstrate to the consular officer at the time of application for a visa, or to the Attorney General at the time of application for admission or adjustment of status, that the immigrant has a valid offer of employment is inadmissible.

(ii) CERTAIN EMPLOYMENT-BASED IMMIGRANTS.—Any alien who seeks admission or adjustment of status under a visa number issued under section 203(b) by virtue of a classification petition filed by a relative of the alien (or by an entity in which such relative has a significant ownership interest) is inadmissible unless such relative has executed an affidavit of support described in section 213A with respect to such alien.

(D) INSURANCE REQUIREMENTS FOR PARENTS.—

(i) IN GENERAL.—Any alien who seeks admission as a parent under section 203(a)(2) is inadmissible unless the alien demonstrates at the time of issuance of the visa (and at the time of admission) to the satisfaction of the consular officer and the Attorney General that the alien—

(I) will have coverage under an adequate health insurance policy (at least comparable to coverage provided under the medicare program under title XVIII of the Social Security Act), and

(II) will have coverage with respect to long-term health needs (at least comparable to such coverage provided under the medicaid program under title XIX of such Act for the State in which either the alien intends to reside or in which the petitioner (on behalf of the alien under section 204(a)(1)) resides,

throughout the period the individual is residing in the United States.

340

(ii) FACTORS TO BE TAKEN INTO ACCOUNT.—*In making a determination under clause (i), the Attorney General shall take into account the age of the parent and the likelihood of the parent securing health insurance coverage through employment.*

(E) WAIVER AUTHORIZED FOR HUMANITARIAN IMMIGRANTS.—*The Attorney General, in the discretion of the Attorney General, may waive the ground of inadmissibility under subparagraph (A) in the case of an alien seeking admission as a humanitarian immigrant under section 203(d).*

(5) LABOR CERTIFICATION AND QUALIFICATIONS FOR CERTAIN IMMIGRANTS.—

(A) LABOR CERTIFICATION.—

(i) IN GENERAL.—Any alien who seeks to enter the United States for the purpose of performing skilled or unskilled labor ⟦is excludable⟧ *is inadmissible*, unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that—

(I) there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of an alien described in clause (ii)) and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and

(II) the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed.

(ii) CERTAIN ALIENS SUBJECT TO SPECIAL RULE.—For purposes of clause (i)(I), an alien described in this clause is an alien who—

(I) is a member of the teaching profession, or

(II) has exceptional ability in the sciences or the arts.

(B) UNQUALIFIED PHYSICIANS.—An alien who is a graduate of a medical school not accredited by a body or bodies approved for the purpose by the Secretary of Education (regardless of whether such school of medicine is in the United States) and who is coming to the United States principally to perform services as a member of the medical profession ⟦is excludable⟧ *is inadmissible*, unless the alien (i) has passed parts I and II of the National Board of Medical Examiners Examination (or an equivalent examination as determined by the Secretary of Health and Human Services) and (ii) is competent in oral and written English. For purposes of the previous sentence, an alien who is a graduate of a medical school shall be considered to have passed parts I and II of the National Board of Medical Examiners if the alien was fully and permanently licensed to practice medicine in a State on January 9, 1978, and was practicing medicine in a State on that date.

341

(C) APPLICATION OF GROUNDS.—The grounds for ⟦exclusion⟧ *inadmissibility* of aliens under subparagraphs (A) and (B) shall apply to immigrants seeking admission or adjustment of status under paragraph ⟦(2) or (3)⟧ *(3) or (4)* of section 203(b), *and shall not apply to immigrants seeking admissions as humanitarian immigrants under section 203(d)*.

(6) ILLEGAL ENTRANTS AND IMMIGRATION VIOLATORS.—

⟦(A) ALIENS PREVIOUSLY DEPORTED.—Any alien who has been excluded from admission and deported and who again seeks admission within one year of the date of such deportation is excludable, unless prior to the alien's reembarkation at a place outside the United States or attempt to be admitted from foreign contiguous territory the Attorney General has consented to the alien's reapplying for admission.

⟦(B) CERTAIN ALIENS PREVIOUSLY REMOVED.—Any alien who—

⟦(i) has been arrested and deported,

⟦(ii) has fallen into distress and has been removed pursuant to this or any prior Act,

⟦(iii) has been removed as an alien enemy, or

⟦(iv) has been removed at Government expense in lieu of deportation pursuant to section 242(b),

⟦and (a) who seeks admission within 5 years of the date of such deportation or removal, or (b) who seeks admission within 20 years in the case of an alien convicted of an aggravated felony, is excludable, unless before the date of the alien's embarkation or reembarkation at a place outside the United States or attempt to be admitted from foreign contiguous territory the Attorney General has consented to the alien's applying or reapplying for admission.⟧

(A) ALIENS PREVIOUSLY REMOVED.—

*(i) ARRIVING ALIENS.—Any alien who has been ordered removed under section 235(b)(1) or at the end of proceedings under section 240 initiated upon the alien's arrival in the United States and who again seeks admission within 5 years of the date of such removal is inadmissible.*

*(ii) OTHER ALIENS.—Any alien not described in clause (i) who has been ordered removed under section 240 or any other provision of law and who again seeks admission within 10 years of the date of such removal (or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.*

*(iii) EXCEPTION.—Clauses (i) and (ii) shall not apply to an alien seeking admission within a period if, prior to the alien's reembarkation at a place outside the United States or attempt to be admitted from foreign contiguous territory, the Attorney General has consented to the alien's reapplying for admission.*

*(B) ALIENS PRESENT UNLAWFULLY FOR MORE THAN 1 YEAR.—*

342

(i) IN GENERAL.—Any alien who was unlawfully present in the United States for an aggregate period totaling 1 year is inadmissible unless the alien has remained outside the United States for a period of 10 years.

(ii) EXCEPTIONS.—

(I) MINORS.—No period of time in which an alien is under 18 years of age shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

(II) ASYLEES.—No period of time in which an alien has a bona fide application for asylum pending under section 208 shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

(III) ALIENS WITH WORK AUTHORIZATION.—No period of time in which an alien is provided authorization to engage in employment in the United States (including such an authorization under section 244A(a)(1)(B)), or in which the alien is the spouse of such an alien, shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

(IV) FAMILY UNITY.—No period of time in which the alien is a beneficiary of family unity protection pursuant to section 301 of the Immigration Act of 1990 shall be taken into account in determining the period of unlawful presence in the United States under clause (i).

(V) BATTERED WOMEN AND CHILDREN.—Clause (i) shall not apply to an alien described in paragraph (9)(B).

(iii) EXTENSION.—The Attorney General may extend the period of 1 year under clause (i) to a period of 15 months in the case of an alien who applies to the Attorney General (before the alien has been present unlawfully in the United States for a period totaling 1 year) and establishes to the satisfaction of the Attorney General that—

(I) the alien is not inadmissible under clause (i) at the time of the application, and

(II) the failure to extend such period would constitute an extreme hardship for the alien.

(iv) WAIVER.—In the case of an alien who is the spouse, parent, or child of a United States citizen or the spouse or child of a permanent resident alien, the Attorney General may waive clause (i) for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.

(v) NATIONAL INTEREST WAIVER.—The Attorney General may waive clause (i) if the Attorney General determines that such a waiver is necessary to substantially benefit—

343

*(I) the national security, national defense, or Federal, State, or local law enforcement;*

*(II) health care, housing, or educational opportunities for an indigent or low-income population or in an underserved geographical area;*

*(III) economic or employment opportunities for a specific industry or specific geographical area;*

*(IV) the development of new technologies; or*

*(V) environmental protection or the productive use of natural resources; and*

*the alien will engage in a specific undertaking to advance one or more of the interests identified in subclauses (I) through (V).*

(C) MISREPRESENTATION.—

(i) IN GENERAL.—Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or 【entry】 *admission* into the United States or other benefit provided under this Act 【is excludable】 *is inadmissible.*

(ii) WAIVER AUTHORIZED.—For provision authorizing waiver of clause (i), see subsection (i).

(D) STOWAWAYS.—Any alien who is a stowaway 【is excludable】 *is inadmissible.*

(E) SMUGGLERS.—

(i) IN GENERAL.—Any alien who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law 【is excludable】 *is inadmissible.*

(ii) SPECIAL RULE IN THE CASE OF FAMILY REUNIFICATION.—Clause (i) shall not apply in the case of alien who is an eligible immigrant (as defined in section 301(b)(1) of the Immigration Act of 1990), was physically present in the United States on May 5, 1988, and is seeking admission as 【an immediate relative】 *a spouse, child, or parent of a citizen of the United States* or under section 【203(a)(2)】 *203(a)(1)* (including under section 112 of the Immigration Act of 1990) or benefits under section 301(a) of the Immigration Act of 1990 if the alien, before May 5, 1988, has encouraged, induced, assisted, abetted, or aided only the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

(iii) WAIVER AUTHORIZED.—For provision authorizing waiver of clause (i), see subsection (d)(11).

【(F) SUBJECT OF CIVIL PENALTY.—An alien who is the subject of a final order for violation of section 274C is excludable.】

*(F) SUBJECT OF CIVIL PENALTY.—*

*(i) IN GENERAL.—An alien who is the subject of a final order for violation of section 274C is inadmissible.*

344

(ii) WAIVER AUTHORIZED.—For provision authorizing waiver of clause (i), see subsection (d)(12).

(7) DOCUMENTATION REQUIREMENTS.—

(A) IMMIGRANTS.—

(i) IN GENERAL.—Except as otherwise specifically provided in this Act, any immigrant at the time of application for admission—

(I) who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this Act, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 211(a), or

(II) whose visa has been issued without compliance with the provisions of section 203,

[is excludable] is inadmissible.

(ii) WAIVER AUTHORIZED FOR HUMANITARIAN IMMIGRANTS.—The Attorney General, in the discretion of the Attorney General, may waive the ground of inadmissibility under clause (i) in the case of an alien seeking admission as a humanitarian immigrant under section 203(d).

[(ii)] (iii) WAIVER AUTHORIZED.—For provision authorizing waiver of clause (i), see subsection (k).

(B) NONIMMIGRANTS.—

(i) IN GENERAL.—Any nonimmigrant who—

(I) is not in possession of a passport valid for a minimum of six months from the date of the expiration of the initial period of the alien's admission or contemplated initial period of stay authorizing the alien to return to the country from which the alien came or to proceed to and enter some other country during such period, or

(II) is not in possession of a valid nonimmigrant visa or border crossing identification card at the time of application for admission,

[is excludable] is inadmissible.

(ii) GENERAL WAIVER AUTHORIZED.—For provision authorizing waiver of clause (i), see subsection (d)(4).

(iii) GUAM VISA WAIVER.—For provision authorizing waiver of clause (i) in the case of visitors to Guam, see subsection (l).

(iv) VISA WAIVER PILOT PROGRAM.—For authority to waive the requirement of clause (i) under a pilot program, see section 217.

(8) INELIGIBLE FOR CITIZENSHIP.—

(A) IN GENERAL.—Any immigrant who is permanently ineligible to citizenship [is excludable] is inadmissible.

(B) DRAFT EVADERS.—Any person who has departed from or who has remained outside the United States to avoid or evade training or service in the armed forces in time of war or a period declared by the President to be a national

345

emergency 【is excludable】 *is inadmissible*, except that this subparagraph shall not apply to an alien who at the time of such departure was a nonimmigrant and who is seeking to reenter the United States as a nonimmigrant.

*(9) PRESENT WITHOUT ADMISSION OR PAROLE.—*

*(A) IN GENERAL.—An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.*

*(B) EXCEPTION FOR CERTAIN BATTERED WOMEN AND CHILDREN.—Subparagraph (A) shall not apply to an alien who can demonstrate that—*

*(i) the alien qualifies for immigrant status under subparagraphs (A)(iii), (A)(iv), (B)(ii), or (B)(iii) of section 204(a)(1),*

*(ii)(I) the alien has been battered or subject to extreme cruelty by a spouse or parent, or by a member of the spouse's or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, or (II) the alien's child has been battered or subject to extreme cruelty by a spouse or parent of the alien (without the active participation of the alien in the battery or extreme cruelty) or by a member of the spouse's or parent's family residing in the same household as the alien when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty, and*

*(iii) there was a substantial connection between the battery or cruelty described in subclause (I) or (II) and the alien's unlawful entry into the United States.*

【(9)】 *(10)* MISCELLANEOUS.—

(A) PRACTICING POLYGAMISTS.—Any immigrant who is coming to the United States to practice polygamy 【is excludable】 *is inadmissible.*

【(B) GUARDIAN REQUIRED TO ACCOMPANY EXCLUDED ALIEN.—Any alien accompanying another alien ordered to be excluded and deported and certified to be helpless from sickness or mental or physical disability or infancy pursuant to section 237(e), whose protection or guardianship is required by the alien ordered excluded and deported, is excludable.】

*(B) GUARDIAN REQUIRED TO ACCOMPANY HELPLESS ALIEN.—Any alien—*

*(i) who is accompanying another alien who is inadmissible and who is certified to be helpless from sickness, mental or physical disability, or infancy pursuant to section 232(c), and*

*(ii) whose protection or guardianship is determined to be required by the alien described in clause (i),*

*is inadmissible.*

(C) INTERNATIONAL CHILD ABDUCTION.—

(i) IN GENERAL.—Except as provided in clause (ii), any alien who, after entry of an order by a court in the

346

United States granting custody to a person of a United States citizen child who detains or retains the child, or withholds custody of the child, outside the United States from the person granted custody by that order, 【is excludable】 *is inadmissible* until the child is surrendered to the person granted custody by that order.

(ii) EXCEPTION.—Clause (i) shall not apply so long as the child is located in a foreign state that is a party to the Hague Convention on the Civil Aspects of International Child Abduction.

*(D) FORMER CITIZENS WHO RENOUNCED CITIZENSHIP TO AVOID TAXATION.—Any alien who is a former citizen of the United States who officially renounced United States citizenship and who is determined by the Attorney General to have renounced United States citizenship for the purpose of avoiding taxation by the United States is excludable.*

(b) NOTICES OF DENIALS.—【If】 *(1) Subject to paragraph (2), if* an alien's application for a visa, for admission to the United States, or for adjustment of status is denied by an immigration or consular officer because the officer determines the alien to be 【excludable】 *inadmissible* under subsection (a), the officer shall provide the alien with a timely written notice that—

【(1)】 *(A)* states the determination, and

【(2)】 *(B)* lists the specific provision or provisions of law under which the alien is 【excludable or ineligible for entry】 *inadmissible* or adjustment of status.

*(2) With respect to applications for visas, the Secretary of State may waive the application of paragraph (1) in the case of a particular alien or any class or classes of aliens inadmissible under subsection (a)(2) or (a)(3).*

【(c) Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General without regard to the provisions of subsection (a) (other than paragraphs (3) and (9)(C)). Nothing contained in this subsection shall limit the authority of the Attorney General to exercise the discretion vested in him under section 211(b). The first sentence of this subsection shall not apply to an alien who has been convicted of one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of at least 5 years.】

(d)(1) The Attorney General shall determine whether a ground for 【exclusion】 *inadmissibility* exists with respect to a nonimmigrant described in section 101(a)(15)(S). The Attorney General, in the Attorney General's discretion, may waive the application of subsection (a)*(2)* (other than paragraph (3)(E)) in the case of a nonimmigrant described in section 101(a)(15)(S), if the Attorney General considers it to be in the national interest to do so. Nothing in this section shall be regarded as prohibiting the Immigration and Naturalization Service from instituting 【deportation】 *removal* proceedings against an alien admitted as a nonimmigrant under section 101(a)(15)(S) for conduct committed after the alien's admission into the United States, or for conduct or a condition that

347

was not disclosed to the Attorney General prior to the alien's admission as a nonimmigrant under section 101(a)(15)(S).

(3) Except as provided in this subsection, an alien (A) who is applying for a nonimmigrant visa and is known or believed by the consular officer to be ineligible for such visa under subsection (a) (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), and (3)(E) of such subsection), may, after approval by the Attorney General of a recommendation by the Secretary of State or by the consular officer that the alien be admitted temporarily despite his inadmissibility, be granted such a visa and may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General, or (B) who is inadmissible under subsection (a) (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), and (3)(E) of such subsection), but who is in possession of appropriate documents or is granted a waiver thereof and is seeking admission, may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General. The Attorney General shall prescribe conditions, including exaction of such bonds as may be necessary, to control and regulate the admission and return of ⟦excludable⟧ *inadmissible* aliens applying for temporary admission under this paragraph.

(4) Either or both of the requirements of paragraph (7)(B)(i) of subsection (a) may be waived by the Attorney General and the Secretary of State acting jointly (A) on the basis of unforeseen emergency in individual cases, or (B) on the basis of reciprocity with respect to nationals of foreign contiguous territory or of adjacent islands ⟦and residents⟧, *residents* thereof having a common nationality with such ⟦nationals,⟧ *nationals, and aliens who are granted permanent residence by the government of the foreign contiguous territory and who are residing in that territory* or (C) in the case of aliens proceeding in immediate and continuous transit through the United States under contracts authorized in section 238(c).

⟦(5)(A) The Attorney General may, except as provided in subparagraph (B) or in section 214(f), in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

⟦(B) The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 207.⟧

*(5)(A) Subject to the provisions of this paragraph and section 214(f)(2), the Attorney General, in the sole discretion of the Attorney General, may on a case-by-case basis parole an alien into the United States temporarily, under such conditions as the Attorney General may prescribe, only—*

348

*(i) for an urgent humanitarian reason (as described under subparagraph (B)); or*

*(ii) for a reason deemed strictly in the public interest (as described under subparagraph (C)).*

*(B) The Attorney General may parole an alien based on an urgent humanitarian reason described in this subparagraph only if—*

*(i) the alien has a medical emergency and the alien cannot obtain necessary treatment in the foreign state in which the alien is residing or the medical emergency is life-threatening and there is insufficient time for the alien to be admitted through the normal visa process;*

*(ii) the alien is needed in the United States in order to donate an organ or other tissue for transplant into a close family member; or*

*(iii) the alien has a close family member in the United States whose death is imminent and the alien could not arrive in the United States in time to see such family member alive if the alien were to be admitted through the normal visa process.*

*(C) The Attorney General may parole an alien based on a reason deemed strictly in the public interest described in this subparagraph only if—*

*(i) the alien has assisted the United States Government in a matter, such as a criminal investigation, espionage, or other similar law enforcement activity, and either the alien's presence in the United States is required by the Government or the alien's life would be threatened if the alien were not permitted to come to the United States; or*

*(ii) the alien is to be prosecuted in the United States for a crime.*

*(D) The Attorney General may not use the parole authority under this paragraph to permit to come to the United States aliens who have applied for and have been found to be ineligible for refugee status or any alien to whom the provisions of this paragraph do not apply.*

*(E) Parole of an alien under this paragraph shall not be considered an admission of the alien into the United States. When the purposes of the parole of an alien have been served, as determined by the Attorney General, the alien shall immediately return or be returned to the custody from which the alien was paroled and the alien shall be considered for admission to the United States on the same basis as other similarly situated applicants for admission.*

*(F) Not later than 90 days after the end of each fiscal year, the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and the Senate describing the number and categories of aliens paroled into the United States under this paragraph. Each such report shall contain information and data concerning the number and categories of aliens paroled, the duration of parole, and the current status of aliens paroled during the preceding fiscal year.*

(7) The provisions of subsection (a) (other than paragraph (7)) shall be applicable to any alien who shall leave Guam, Puerto Rico, or the Virgin Islands of the United States, and who seeks to enter the continental United States or any other place under the jurisdiction of the United States. Any alien described in this paragraph,

349

who is 【excluded from】 *denied* admission to the United States, shall be immediately 【deported】 *removed* in the manner provided by section 【237(a)】 *241(c)* of this Act.

    *       *       *       *       *       *       *

    (11) The Attorney General may, in his discretion for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest, waive application of clause (i) of subsection (a)(6)(E) in the case of any alien lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of 【deportation】 *removal*, and who is otherwise admissible to the United States as a returning resident under section 211(b) and in the case of an alien seeking admission or adjustment of status as 【an immediate relative】 *a spouse or child of a citizen of the United States* or 【immigrant under section 203(a) (other than paragraph (4) thereof)】 *an immigrant under section 203(a)* if the alien has encouraged, induced, assisted, abetted, or aided only the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

    *(12) The Attorney General may, in the discretion of the Attorney General for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest, waive application of clause (i) of subsection (a)(6)(F)—*

        *(A) in the case of an alien lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation and who is otherwise admissible to the United States as a returning resident under section 211(b), and*

        *(B) in the case of an alien seeking admission or adjustment of status under section 201(b)(2)(A) or under section 203(a),*

*if the violation under section 274C was committed solely to assist, aid, or support the alien's spouse, parent, son, or daughter (and not another individual).*

    *       *       *       *       *       *       *

    (f) Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate. *Whenever the Attorney General finds that a commercial airline has failed to comply with regulations of the Attorney General relating to requirements of airlines for the detection of fraudulent documents used by passengers traveling to the United States (including the training of personnel in such detection), the Attorney General may suspend the entry of some or all aliens transported to the United States by such airline.*

    (g) The Attorney General may waive the application of—

        (1) subsection (a)(1)(A)(i) in the case of any alien who—

            (A) is the spouse or the unmarried son or daughter, or the minor unmarried lawfully adopted child, of a United States citizen, or of an alien lawfully admitted for permanent residence, or of an alien who has been issued an immigrant visa, or

350

(B) has a son or daughter who is a United States citizen, or an alien lawfully admitted for permanent residence, or an alien who has been issued an immigrant visa⟦, or

⟦(2) subsection (a)(1)(A)(ii) in the case of any alien, in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in his discretion after consultation with the Secretary of Health and Human Services, may by regulation prescribe.⟧;

*in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe;*

*(2) subsection (a)(1)(A)(ii) in the case of any alien—*

*(A) who receives vaccination against the vaccine-preventable disease or diseases for which the alien has failed to present documentation of previous vaccination, or*

*(B) for whom a civil surgeon, medical officer, or panel physician (as those terms are defined by 42 C.F.R. 34.2) certifies, according to such regulations as the Secretary of Health and Human Services may prescribe, that such vaccination would not be medically appropriate; or*

*(3) subsection (a)(1)(A)(iii) in the case of any alien, in accordance with such terms, conditions, and controls, if any, including the giving of bond, as the Attorney General, in the discretion of the Attorney General after consultation with the Secretary of Health and Human Services, may by regulation prescribe.*

(h) The Attorney General may, in his discretion, waive the application of subparagraphs (A)(i)(I), (B), (D), and (E) of subsection (a)(2) and subparagraph (A)(i)(II) of such subsection insofar as it relates to a single offense of simple possession of 30 grams or less of marijuana if—

(1)(A) in the case of any immigrant it is established to the satisfaction of the Attorney General that—

(i) the alien is ⟦excludable⟧ *inadmissible* only under subparagraph (D)(i) or (D)(ii) of such subsection or the activities for which the alien is ⟦excludable⟧ *inadmissible* occurred more than 15 years before the date of the alien's application for a visa, ⟦entry⟧ *admission*, or adjustment of status,

(ii) the admission to the United States of such alien would not be contrary to the national welfare, safety, or security of the United States, and

(iii) the alien has been rehabilitated; or

(B) in the case of an immigrant who is the spouse, parent, son, or daughter of a citizen of the United States or an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the alien's ⟦exclusion⟧ *denial of admission* would result in extreme hardship to the United States citizen or lawfully resident spouse, parent, son, or daughter of such alien; and

\*        \*        \*        \*        \*        \*        \*

351

〔(i) The Attorney General may, in his discretion, waive application of clause (i) of subsection (a)(6)(C)—

〔(1) in the case of an immigrant who is the spouse, parent, or son or daughter of a United States citizen or of an immigrant lawfully admitted for permanent residence, or

〔(2) if the fraud or misrepresentation occurred at least 10 years before the date of the immigrant's application for a visa, entry, or adjustment of status and it is established to the satisfaction of the Attorney General that the admission to the United States of such immigrant would not be contrary to the national welfare, safety, or security of the United States.〕

*(i) The Attorney General may, in the discretion of the Attorney General, waive the application of clause (i) of subsection (a)(6)(C)—*

*(1) in the case of an immigrant who is the spouse, son, or daughter of a United States citizen; or*

*(2) in the case of an immigrant who is the spouse or son or daughter of an alien lawfully admitted for permanent residence, if it is established to the satisfaction of the Attorney General that the refusal of admission to the United States of such immigrant alien would result in extreme hardship to the lawfully resident spouse or parent of such an alien.*

(j)(1) The additional requirements referred to in section 101(a)(15)(J) for an alien who is coming to the United States under a program under which he will receive graduate medical education or training are as follows:

(A) * * *

*        *        *        *        *        *        *

(D) The duration of the alien's participation in the program of graduate medical education or training for which the alien is coming to the United States is limited to the time typically required to complete such program, as determined by the Director of the United States Information Agency at the time of the alien's 〔entry〕 *admission* into the United States, based on criteria which are established in coordination with the Secretary of Health and Human Services and which take into consideration the published requirements of the medical specialty board which administers such education or training program; except that—

(i) such duration is further limited to seven years unless the alien has demonstrated to the satisfaction of the Director that the country to which the alien will return at the end of such specialty education or training has an exceptional need for an individual trained in such specialty, and

(ii) the alien may, once and not later than two years after the date the alien 〔enters〕 *is admitted to* the United States as an exchange visitor or acquires exchange visitor status, change the alien's designated program of graduate medical education or training if the Director approves the change and if a commitment and written assurance with respect to the alien's new program have been provided in accordance with subparagraph (C).

*        *        *        *        *        *        *

352

(k) Any alien, 【excludable】 *inadmissible* from the United States under paragraph (5)(A) or (7)(A)(i) of subsection (a), who is in possession of an immigrant visa may, if otherwise admissible, be admitted in the discretion of the Attorney General if the Attorney General is satisfied that 【exclusion】 *inadmissibility* was not known to, and could not have been ascertained by the exercise of reasonable diligence by, the immigrant before the time of departure of the vessel or aircraft from the last port outside the United States and outside foreign contiguous territory or, in the case of an immigrant coming from foreign contiguous territory, before the time of the immigrant's application for admission.

(l)(1) * * *

(2) An alien may not be provided a waiver under this subsection unless the alien has waived any right—

(A) to review or appeal under this Act of an immigration officer's determination as to the admissibility of the alien at the port of entry into Guam, or

(B) to contest, other than on the basis of an application for asylum, any action for 【deportation against】 *removal of* the alien.

*       *       *       *       *       *       *

(n)(1) No alien may be admitted or provided status as a nonimmigrant described in section 101(a)(15)(H)(i)(b) *(in this subsection referred to as an "H–1B nonimmigrant")* in an occupational classification unless the employer has filed with the Secretary of Labor an application stating the following:

(A) The employer—

(i) is offering and will offer during the period of authorized employment to aliens admitted or provided status as a 【nonimmigrant described in section 101(a)(15)(H)(i)(b)】 *H–1B nonimmigrant* wages that are at least—

(I) * * *

*       *       *       *       *       *       *

*(E)(i) If the employer, within the period beginning 6 months before and ending 90 days following the date of filing of the application or during the 90 days immediately preceding and following the date of filing of any visa petition supported by the application, has laid off or lays off any protected individual with substantially equivalent qualifications and experience in the specific employment as to which the nonimmigrant is sought or is employed, the employer will pay a wage to the nonimmigrant that is at least 110 percent of the arithmetic mean of the last wage earned by all such laid off individuals (or, if greater, at least 110 percent of the arithmetic mean of the highest wage earned by all such laid off individuals within the most recent year if the employer reduced the wage of any such laid off individual during such year other than in accordance with a general company-wide reduction of wages for substantially all employees).*

*(ii) Except as provided in clause (iii), in the case of an H–1B-dependent employer which employs an H–1B nonimmigrant, the employer shall not place the nonimmigrant with another employer where—*

353

(I) the nonimmigrant performs his or her duties in whole or in part at one or more worksites owned, operated, or controlled by such other employer, and

(II) there are indicia of an employment relationship between the nonimmigrant and such other employer.

(iii) Clause (ii) shall not apply to an employer's placement of an H–1B nonimmigrant with another employer if—

(I) the other employer has executed an attestation that it, within the period beginning 6 months before and ending 90 days following the date of filing of the application or during the 90 days immediately preceding and following the date of filing of any visa petition supported by the application, has not laid off and will not lay off any protected individual with substantially equivalent qualifications and experience in the specific employment as to which the H–1B nonimmigrant is being sought or is employed, or

(II) the employer pays a wage to the nonimmigrant that is at least 110 percent of the arithmetic mean of the last wage earned by all such laid off individuals (or, if greater, at least 110 percent of the arithmetic mean of the highest wage earned by all such laid off individuals within the most recent year if the other employer reduced the wage of any such laid off individual during such year other than in accordance with a general company-wide reduction of wages for substantially all employees).

(iv) For purposes of this subparagraph, the term "laid off", with respect to an individual—

(I) refers to the individual's loss of employment, other than a discharge for inadequate performance, cause, voluntary departure, or retirement, and

(II) does not include any situation in which the individual involved is offered, as an alternative to such loss of employment, a similar job opportunity with the same employer (or with the H–1B-dependent employer described in clause (ii)) carrying equivalent or higher compensation and benefits as the position from which the employee was laid off, regardless of whether or not the employee accepts the offer.

(v) For purposes of this subparagraph, the term "protected individual" means an individual who—

(I) is a citizen or national of the United States, or

(II) is an alien who is lawfully admitted for permanent residence, is granted the status of an alien lawfully admitted for temporary residence under section 210(a), 210A(a), or 245(a)(1), is admitted as a refugee under section 207, or is granted asylum under section 208.

\*      \*      \*      \*      \*      \*      \*

(2)(A) The Secretary shall establish a process for the receipt, investigation, and disposition of complaints respecting a petitioner's failure to meet a condition specified in an application submitted under paragraph (1) or a petitioner's misrepresentation of material facts in such an application. Complaints may be filed by any aggrieved person or organization (including bargaining representatives), except that the Secretary may only file such a complaint in the case of an H–1B-dependent employer (as defined in subpara-

graph (E)) or when conducting an annual review of a plan pursuant to subparagraph (F)(i) if there appears to be a violation of an attestation or a misrepresentation of a material fact in an application. No investigation or hearing shall be conducted with respect to a non–H–1B-dependent employer except in response to a complaint filed under the previous sentence. No investigation or hearing shall be conducted on a complaint concerning such a failure or misrepresentation unless the complaint was filed not later than 12 months after the date of the failure or misrepresentation, respectively. The Secretary shall conduct an investigation under this paragraph if there is reasonable cause to believe that such a failure or misrepresentation has occurred.

\*       \*       \*       \*       \*       \*       \*

(C) If the Secretary finds, after notice and opportunity for a hearing, a failure to meet a condition of paragraph (1)(B) *or (1)(E)*, a substantial failure to meet a condition of paragraphs (1)(C) or (1)(D), a willful failure to meet a condition of paragraph (1)(A), or a misrepresentation of material fact in an application—

(i) the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed 〚$1,000〛 *$5,000* per violation) as the Secretary determines to be appropriate, and

〚(ii) the Attorney General shall not approve petitions filed with respect to that employer under section 204 or 214(c) during a period of at least 1 year for aliens to be employed by the employer.〛

*(ii) the Attorney General shall not approve petitions filed with respect to that employer (or any employer who is a successor in interest) under section 204 or 214(c) for aliens to be employed by the employer—*

*(I) during a period of at least 1 year in the case of the first determination of a violation or any subsequent determination of a violation occurring within 1 year of that first violation or any subsequent determination of a nonwillful violation occurring more than 1 year after the first violation;*

*(II) during a period of at least 5 years in the case of a determination of a willful violation occurring more than 1 year after the first violation; and*

*(III) at any time in the case of a determination of a willful violation occurring more than 5 years after a violation described in subclause (II).*

(D) If the Secretary finds, after notice and opportunity for a hearing, that an employer has not paid wages at the wage level specified under the application and required under paragraph (1), the Secretary shall order the employer to provide for payment of such amounts of back pay as may be required to comply with the requirements of paragraph (1), whether or not a penalty under subparagraph (C) has been imposed. *If a penalty under subparagraph (C) has been imposed in the case of a willful violation, the Secretary shall impose on the employer a civil monetary penalty in an amount equalling twice the amount of backpay.*

355

(E) In this subsection, the term "H–1B-dependent employer" means an employer that—

(i)(I) has fewer than 21 full-time equivalent employees who are employed in the United States, and (II) employs 4 or more H–1B nonimmigrants; or

(ii)(I) has at least 21 but not more than 150 full-time equivalent employees who are employed in the United States, and (II) employs H–1B nonimmigrants in a number that is equal to at least 20 percent of the number of such full-time equivalent employees; or

(iii)(I) has at least 151 full-time equivalent employees who are employed in the United States, and (II) employs H–1B nonimmigrants in a number that is equal to at least 15 percent of the number of such full-time equivalent employees.

In applying this subparagraph, any group treated as a single employer under subsection (b), (c), (m), or (o) of section 414 of the Internal Revenue Code of 1986 shall be treated as a single employer. Aliens employed under a petition for H–1B nonimmigrants shall be treated as employees, and counted as nonimmigrants under section 101(a)(15)(H)(i)(b) under this subparagraph. In this subsection, the term "non-H–1B-dependent employer" means an employer that is not an H–1B-dependent employer.

(F)(i) An employer who is an H–1B-dependent employer as defined in subparagraph (E) can nevertheless be treated as a non-H–1B-dependent employer for five years on a probationary status if—

(I) the employer has demonstrated to the satisfaction of the Secretary of Labor that it has developed a reasonable plan for reducing its use of H–1B nonimmigrants over a five-year period to the level of a non-H–1B-dependent employer, and

(II) annual reviews of that plan by the Secretary of Labor indicate successful implementation of that plan.

If the employer has not met the requirements established in this clause, the probationary status ends and the employer shall be treated as an H–1B-dependent employer until such time as the employer can prove to the Secretary of Labor that it no longer is an H–1B-dependent employer as defined in subparagraph (E).

(ii) The probationary program set out in clause (i) shall be effective for no longer than five years after the date of the enactment of this subparagraph.

(G) Under regulations of the Secretary, the previous provisions of this paragraph shall apply to complaints respecting a failure of an other employer to comply with an attestation described in paragraph (1)(E)(iii)(I) in the same manner that they apply to complaints with respect to a failure to comply with a condition described in paragraph (1)(E)(i).

(3) For purposes of determining the actual wage level paid under paragraph (1)(A)(i)(I), an employer shall not be required to have and document an objective system to determine the wages of workers.

(4) For purposes of determining the actual wage level paid under paragraph (1)(A)(i)(I), a non-H–1B-dependent employer of more than 1,000 full-time equivalent employees in the United States may demonstrate that in determining the wages of H–1B nonimmigrants, it utilizes a compensation and benefits system that has been pre-

356

*viously certified by the Secretary of Labor (and recertified at such intervals the Secretary of Labor may designate) to satisfy all of the following conditions:*

*(A) The employer has a company-wide compensation policy for its full-time equivalent employees which ensures salary equity among employees similarly employed.*

*(B) The employer has a company-wide benefits policy under which all full-time equivalent employees similarly employed are eligible for substantially the same benefits or under which some employees may accept higher pay, at least equal in value to the benefits, in lieu of benefits.*

*(C) The compensation and benefits policy is communicated to all employees.*

*(D) The employer has a human resources or compensation function that administers its compensation system.*

*(E) The employer has established documentation for the job categories in question.*

*An employer's payment of wages consistent with a system which meets the conditions of subparagraphs (A) through (E) of this paragraph which has been certified by the Secretary of Labor pursuant to this paragraph shall be deemed to satisfy the requirements of paragraph (1)(A)(i)(I).*

*(5) For purposes of determining the prevailing wage level paid under paragraph (1)(A)(i)(II), employers may provide a published survey, a State Employment Security Agency determination, a determination by an accepted private source, or any other legitimate source. The Secretary of Labor shall, not later than 180 days from the date of enactment of this paragraph, provide for acceptance of prevailing wage determinations not made by a State Employment Security Agency. The Secretary of Labor or the Secretary's designate must either accept such a non-State Employment Security Agency wage determination or issue a written decision rejecting the determination and detailing the legitimate reasons that the determination is not acceptable. If a detailed rejection is not issued within 45 days of the date of the Secretary's receipt of such determination, the determination will be deemed accepted. An employer's payment of wages consistent with a prevailing wage determination not rejected by the Secretary of Labor under this paragraph shall be deemed to satisfy the requirements of paragraph (1)(A)(i)(II).*

*(6) In carrying out this subsection in the case of an employer that is a non-H–1B-dependent employer—*

*(A) the employer is not required to post a notice at a worksite that was not listed on the application under paragraph (1) if the worksite is within the area of intended employment listed on such application for such nonimmigrant; and*

*(B) if the employer has filed and had certified an application under paragraph (1) with respect to one or more H–1B nonimmigrants for one or more areas of employment—*

*(i) the employer is not required to file and have certified an additional application under paragraph (1) with respect to such a nonimmigrant for an area of employment not listed in the previous application because the employer has placed one or more such nonimmigrants in such a nonlisted area so long as either (I) each such nonimmigrant*

357

*is not placed in such nonlisted areas for a period exceeding 45 workdays in any 12-month period and not to exceed 90 workdays in any 36-month period, or (II) each such nonimmigrant's principal place of employment has not changed to a nonlisted area, and*

*(ii) the employer is not required to pay per diem and transportation costs at any specified rates for work performed in such a nonlisted area.*

*(7) In computing the prevailing wage level for an occupational classification in an area of employment for purposes of paragraph (1)(A)(i)(II) and subsection (a)(5)(A) in the case of an employee of (A) an institution of higher education (as defined in section 1201(a) of the Higher Education Act of 1965), or a related or affiliated non-profit entity, or (B) a nonprofit scientific research organization, the prevailing wage level shall only take into account employees at such institutions and entities in the area of employment.*

⟦(o) An alien who has been physically present in the United States shall not be eligible to receive an immigrant visa within ninety days following departure therefrom unless—

⟦(1) the alien was maintaining a lawful nonimmigrant status at the time of such departure, or

⟦(2) the alien is the spouse or unmarried child of an individual who obtained temporary or permanent resident status under section 210 or 245A of the Immigration and Nationality Act or section 202 of the Immigration Reform and Control Act of 1986 at any date, who—

⟦(A) as of May 5, 1988, was the unmarried child or spouse of the individual who obtained temporary or permanent resident status under section 210 or 245A of the Immigration and Nationality Act or section 202 of the Immigration Reform and Control Act of 1986;

⟦(B) entered the United States before May 5, 1988, resided in the United States on May 5, 1988, and is not a lawful permanent resident; and

⟦(C) applied for benefits under section 301(a) of the Immigration Act of 1990.⟧

\*        \*        \*        \*        \*        \*        \*

ADMISSION OF CERTAIN ALIENS ON GIVING BOND

SEC. 213. An alien ⟦excludable⟧ *inadmissible* under paragraph (4) of section 212(a) may, if otherwise admissible, be admitted in the discretion of the Attorney General upon the giving of a suitable and proper bond or undertaking approved by the Attorney General, in such amount and containing such conditions as he may prescribe, to the United States, and to all States, territories, counties, towns, municipalities, and districts thereof holding the United States and all States, territories, counties, towns, municipalities, and districts thereof harmless against such alien becoming a public charge. Such bond or undertaking shall terminate upon the permanent departure from the United States, the naturalization, or the death of such alien, and any sums or other security held to secure performance thereof, except to the extent forfeited for violation of the terms thereof, shall be returned to the person by whom fur-

358

nished, or to his legal representatives. Suit may be brought thereon in the name and by the proper law officers of the United States for the use of the United States, or of any State, territory, district, county, town, or municipality in which such alien becomes a public charge, irrespective of whether a demand for payment of public expenses has been made.

*REQUIREMENTS FOR SPONSOR'S AFFIDAVIT OF SUPPORT*

SEC. 213A. (a) ENFORCEABILITY.—(1) No affidavit of support may be accepted by the Attorney General or by any consular officer to establish that an alien is not inadmissible as a public charge under section 212(a)(4) unless such affidavit is executed by a sponsor of the alien as a contract—

(A) that is legally enforceable against the sponsor by the Federal Government and by any State (or any political subdivision of such State) that provides any means-tested public benefits program, subject to subsection (b)(4); and

(B) in which the sponsor agrees to submit to the jurisdiction of any Federal or State court for the purpose of actions brought under subsection (b)(2).

(2)(A) An affidavit of support shall be enforceable with respect to benefits provided under any means-tested public benefits program for an alien who is admitted to the United States as the parent of a United States citizen under section 203(a)(2) until the alien is naturalized as a citizen of the United States.

(B) An affidavit of support shall be enforceable with respect to benefits provided under any means-tested public benefits program for an alien who is admitted to the United States as the spouse of a United States citizen or lawful permanent resident under section 201(b)(2) or 203(a)(2) until—

(i) 7 years after the date the alien is lawfully admitted to the United States for permanent residence, or

(ii) such time as the alien is naturalized as a citizen of the United States,

whichever occurs first.

(C) An affidavit of support shall be enforceable with respect to benefits provided under any means-tested public benefits program for an alien who is admitted to the United States as the minor child of a United States citizen or lawful permanent resident under section 201(b)(2) or section 203(a)(2) until the child attains the age of 21 years.

(D)(i) Notwithstanding any other provision of this subparagraph, a sponsor shall be relieved of any liability under an affidavit of support if the sponsored alien is employed for a period sufficient to qualify for old age benefits under title II of the Social Security Act and the sponsor or alien is able to prove to the satisfaction of the Attorney General that the alien so qualifies.

(ii) The Attorney General shall ensure that appropriate information pursuant to clause (i) is provided to the System for Alien Verification of Eligibility (SAVE).

(b) REIMBURSEMENT OF GOVERNMENT EXPENSES.—(1)(A) Upon notification that a sponsored alien has received any benefit under any means-tested public benefits program, the appropriate Federal,

359

*State, or local official shall request reimbursement by the sponsor in the amount of such assistance.*

*(B) The Attorney General, in consultation with the Secretary of Health and Human Services, shall prescribe such regulations as may be necessary to carry out subparagraph (A).*

*(2) If within 45 days after requesting reimbursement, the appropriate Federal, State, or local agency has not received a response from the sponsor indicating a willingness to commence payments, an action may be brought against the sponsor pursuant to the affidavit of support.*

*(3) If the sponsor fails to abide by the repayment terms established by such agency, the agency may, within 60 days of such failure, bring an action against the sponsor pursuant to the affidavit of support.*

*(4) No cause of action may be brought under this subsection later than 10 years after the alien last received any benefit under any means-tested public benefits program.*

*(5) If, pursuant to the terms of this subsection, a Federal, State, or local agency requests reimbursement from the sponsor in the amount of assistance provided, or brings an action against the sponsor pursuant to the affidavit of support, the appropriate agency may appoint or hire an individual or other person to act on behalf of such agency acting under the authority of law for purposes of collecting any moneys owed. Nothing in this subsection shall preclude any appropriate Federal, State, or local agency from directly requesting reimbursement from a sponsor for the amount of assistance provided, or from bringing an action against a sponsor pursuant to an affidavit of support.*

*(c) REMEDIES.—Remedies available to enforce an affidavit of support under this section include any or all of the remedies described in section 3201, 3203, 3204, or 3205 of title 28, United States Code, as well as an order for specific performance and payment of legal fees and other costs of collection, and include corresponding remedies available under State law. A Federal agency may seek to collect amounts owed under this section in accordance with the provisions of subchapter II of chapter 37 of title 31, United States Code.*

*(d) NOTIFICATION OF CHANGE OF ADDRESS.—(1) The sponsor of an alien shall notify the Federal Government and the State in which the sponsored alien is currently residing within 30 days of any change of address of the sponsor during the period specified in subsection (a)(1).*

*(2) Any person subject to the requirement of paragraph (1) who fails to satisfy such requirement shall be subject to a civil penalty of—*

*(A) not less than $250 or more than $2,000, or*

*(B) if such failure occurs with knowledge that the sponsored alien has received any benefit under any means-tested public benefits program, not less than $2,000 or more than $5,000.*

*(e) DEFINITIONS.—For the purposes of this section—*

*(1) SPONSOR.—The term "sponsor" means, with respect to an alien, an individual who—*

*(A) is a citizen or national of the United States or an alien who is lawfully admitted to the United States for permanent residence;*

360

*(B) is 18 years of age or over;*

*(C) is domiciled in any State;*

*(D) demonstrates, through presentation of a certified copy of a tax return or otherwise, (i) the means to maintain an annual income equal to at least 200 percent of the poverty level for the individual and the individual's family (including the alien and any other aliens with respect to whom the individual is a sponsor), or (ii) for an individual who is on active duty (other than active duty for training) in the Armed Forces of the United States, the means to maintain an annual income equal to at least 100 percent of the poverty level for the individual and the individual's family including the alien and any other aliens with respect to whom the individual is a sponsor); and*

*(E) is petitioning for the admission of the alien under section 204 (or is an individual who accepts joint and several liability with the petitioner).*

*(2) FEDERAL POVERTY LINE.—The term "Federal poverty line" means the income official poverty line (as defined in section 673(2) of the Community Services Block Grant Act) that is applicable to a family of the size involved.*

*(3) MEANS-TESTED PUBLIC BENEFITS PROGRAM.—The term "means-tested public benefits program" means a program of public benefits (including cash, medical, housing, and food assistance and social services) of the Federal Government or of a State or political subdivision of a State in which the eligibility of an individual, household, or family eligibility unit for benefits under the program, or the amount of such benefits, or both are determined on the basis of income, resources, or financial need of the individual, household, or unit.*

ADMISSION OF NONIMMIGRANTS

SEC. 214. (a)  *  *  *

*      *      *      *      *      *      *

(c)(1)  *  *  *

(2)(A) The Attorney General shall provide for a procedure under which an importing employer which meets requirements established by the Attorney General may file a blanket petition to import aliens as nonimmigrants described in section 101(a)(15)(L) instead of filing individual petitions under paragraph (1) to import such aliens. Such procedure shall permit the expedited processing of visas for ⟦entry⟧ *admission* of aliens covered under such a petition.

*      *      *      *      *      *      *

(5)(A)  *  *  *

(B) In the case of an alien who ⟦enters⟧ *is admitted to* the United States in nonimmigrant status under section 101(a)(15)(O) or 101(a)(15)(P) and whose employment terminates for reasons other than voluntary resignation, the employer whose offer of employment formed the basis of such nonimmigrant status and the petitioner are jointly and severally liable for the reasonable cost of return transportation of the alien abroad. The petitioner shall pro-

361

vide assurance satisfactory to the Attorney General that the reasonable cost of that transportation will be provided.

\*       \*       \*       \*       \*       \*       \*

(d) A visa shall not be issued under the provisions of section 101(a)(15)(K) until the consular officer has received a petition filed in the United States by the fiancée or fiancé of the applying alien and approved by the Attorney General. The petition shall be in such form and contain such information as the Attorney General shall, by regulation, prescribe. It shall be approved only after satisfactory evidence is submitted by the petitioner to establish that the parties have previously met in person within 2 years before the date of filing the petition, have a bona fide intention to marry, and are legally able and actually willing to conclude a valid marriage in the United States within a period of ninety days after the alien's arrival, except that the Attorney General in his discretion may waive the requirement that the parties have previously met in person. In the event the marriage with the petitioner does not occur within three months after the 【entry】 *admission* of the said alien and minor children, they shall be required to depart from the United States and upon failure to do so shall be 【deported】 *removed* in accordance with sections 【242】 *240* and 【243】 *241.*

\*       \*       \*       \*       \*       \*       \*

(f)(1) Except as provided in paragraph (3), no alien shall be entitled to nonimmigrant status described in section 101(a)(15)(D) if the alien intends to land for the purpose of performing service on board a vessel of the United States (as defined in section 2101(46) of title 46, United States Code) or on an aircraft of an air carrier (as defined in 【section 101(3) of the Federal Aviation Act of 1958】 *section 40102(a)(2) of title 49, United States Code*) during a labor dispute where there is a strike or lockout in the bargaining unit of the employer in which the alien intends to perform such service.

\*       \*       \*       \*       \*       \*       \*

【(j)】 *(k)*(1)  \*  \*  \*

\*       \*       \*       \*       \*       \*       \*

(4) As a condition for the admission, and continued stay in lawful status, of such a nonimmigrant, the nonimmigrant—

(A)  \*  \*  \*

\*       \*       \*       \*       \*       \*       \*

(C) must have executed a form that waives the nonimmigrant's right to contest, other than on the basis of an application for withholding of 【deportation】 *removal*, any action for 【deportation】 *removal* of the alien instituted before the alien obtains lawful permanent resident status; and

\*       \*       \*       \*       \*       \*       \*

【(k)】 *(l)*(1)  \*  \*  \*

\*       \*       \*       \*       \*       \*       \*

(3) Notwithstanding any other provision of this subsection, the two-year foreign residence requirement under section 212(e) shall apply with respect to an alien described in clause (iii) of that section【, who has not otherwise been accorded status under section

362

101(a)(27)(H),〛 if at any time the alien practices medicine in an area other than an area described in paragraph (1)(C).

\*     \*     \*     \*     \*     \*     \*

CONDITIONAL PERMANENT RESIDENT STATUS FOR CERTAIN ALIEN SPOUSES AND SONS AND DAUGHTERS

SEC. 216. (a)  \* \* \*

(b) TERMINATION OF STATUS IF FINDING THAT QUALIFYING MARRIAGE IMPROPER.—

(1) IN GENERAL.—In the case of an alien with permanent resident status on a conditional basis under subsection (a), if the Attorney General determines, before the second anniversary of the alien's obtaining the status of lawful admission for permanent residence, that—

(A) the qualifying marriage—

(i) was entered into for the purpose of procuring an alien's 〛entry〛 *admission* as an immigrant, or

(ii) has been judicially annulled or terminated, other than through the death of a spouse; or

\*     \*     \*     \*     \*     \*     \*

(2) HEARING IN 〛DEPORTATION〛 *REMOVAL* PROCEEDING.—Any alien whose permanent resident status is terminated under paragraph (1) may request a review of such determination in a proceeding to 〛deport〛 *remove* the alien. In such proceeding, the burden of proof shall be on the Attorney General to establish, by a preponderance of the evidence, that a condition described in paragraph (1) is met.

(c) REQUIREMENTS OF TIMELY PETITION AND INTERVIEW FOR REMOVAL OF CONDITION.—

(1)  \* \* \*

(2) TERMINATION OF PERMANENT RESIDENT STATUS FOR FAILURE TO FILE PETITION OR HAVE PERSONAL INTERVIEW.—

(A)  \* \* \*

(B) HEARING IN 〛DEPORTATION〛 *REMOVAL* PROCEEDING.—In any 〛deportation〛 *removal* proceeding with respect to an alien whose permanent resident status is terminated under subparagraph (A), the burden of proof shall be on the alien to establish compliance with the conditions of paragraphs (1)(A) and (1)(B).

(3) DETERMINATION AFTER PETITION AND INTERVIEW.—

(A)  \* \* \*

\*     \*     \*     \*     \*     \*     \*

(D) HEARING IN 〛DEPORTATION〛 *REMOVAL* PROCEEDING.—Any alien whose permanent resident status is terminated under subparagraph (C) may request a review of such determination in a proceeding to 〛deport〛 *remove* the alien. In such proceeding, the burden of proof shall be on the Attorney General to establish, by a preponderance of the evidence, that the facts and information described in subsection (d)(1) and alleged in the petition are not true with respect to the qualifying marriage.

363

(4) HARDSHIP WAIVER.—The Attorney General, in the Attorney General's discretion, may remove the conditional basis of the permanent resident status for an alien who fails to meet the requirements of paragraph (1) if the alien demonstrates that—

(A) extreme hardship would result if such alien is 〔deported〕 *removed*,

\* \* \* \* \* \* \*

(d) DETAILS OF PETITION AND INTERVIEW.—

(1) CONTENTS OF PETITION.—Each petition under subsection (c)(1)(A) shall contain the following facts and information:

(A) STATEMENT OF PROPER MARRIAGE AND PETITIONING PROCESS.—The facts are that—

(i) the qualifying marriage—

(I) was entered into in accordance with the laws of the place where the marriage took place,

(II) has not been judicially annulled or terminated, other than through the death of a spouse, and

(III) was not entered into for the purpose of procuring an alien's 〔entry〕 *admission* as an immigrant; and

\* \* \* \* \* \* \*

(2) PERIOD FOR FILING PETITION.—

(A) 90-DAY PERIOD BEFORE SECOND ANNIVERSARY.—Except as provided in subparagraph (B), the petition under subsection (c)(1)(A) must be filed during the 90-day period before the second anniversary of the alien's obtaining the status of lawful admission for permanent residence.

(B) DATE PETITIONS FOR GOOD CAUSE.—Such a petition may be considered if filed after such date, but only if the alien establishes to the satisfaction of the Attorney General good cause and extenuating circumstances for failure to file the petition during the period described in subparagraph (A).

(C) FILING OF PETITIONS DURING 〔DEPORTATION〕 *REMOVAL*.—In the case of an alien who is the subject of 〔deportation〕 *removal* hearings as a result of failure to file a petition on a timely basis in accordance with subparagraph (A), the Attorney General may stay such 〔deportation〕 *removal* proceedings against an alien pending the filing of the petition under subparagraph (B).

\* \* \* \* \* \* \*

(f) TREATMENT OF CERTAIN WAIVERS.—In the case of an alien who has permanent residence status on a conditional basis under this section, if, in order to obtain such status, the alien obtained a waiver under subsection (h) or (i) of section 212 of certain grounds of 〔exclusion〕 *inadmissibility*, such waiver terminates upon the termination of such permanent residence status under this section.

(g) DEFINITIONS.—In this section:

364

(1) The term "alien spouse" means an alien who obtains the status of an alien lawfully admitted for permanent residence (whether on a conditional basis or otherwise)—

(A) as ⟦an immediate relative (described in section 201(b)) as the spouse of a citizen of the United States⟧ *the spouse of a citizen of the United States (described in section 201(b))*,

(B) under section 214(d) as the fiancee or fiance of a citizen of the United States, or

(C) under section 203(a)⟦(2)⟧ *(1)* as the spouse of an alien lawfully admitted for permanent residence,

by virtue of a marriage which was entered into less than 24 months before the date the alien obtains such status by virtue of such marriage, but does not include such an alien who only obtains such status as a result of section ⟦203(d)⟧ *203(e).*

(2) The term "alien son or daughter" means an alien who obtains the status of an alien lawfully admitted for permanent residence (whether on a conditional basis or otherwise) by virtue of being the son or daughter of an individual through a qualifying marriage.

(3) The term "qualifying marriage" means the marriage described to in paragraph (1).

(4) The term "petitioning spouse" means the spouse of a qualifying marriage, other than the alien.

CONDITIONAL PERMANENT RESIDENT STATUS FOR CERTAIN ALIEN ENTREPRENEURS, SPOUSES, AND CHILDREN

SEC. 216A. (a)   * * *

(b) TERMINATION OF STATUS IF FINDING THAT QUALIFYING ENTREPRENEURSHIP IMPROPER.—

(1) IN GENERAL.—In the case of an alien entrepreneur with permanent resident status on a conditional basis under subsection (a), if the Attorney General determines, before the second anniversary of the alien's obtaining the status of lawful admission for permanent residence, that—

(A) the establishment of the commercial enterprise was intended solely as a means of evading the immigration laws of the United States,

(B)(i) a commercial enterprise was not established by the alien,

⟦(ii) the alien did not invest or was not actively in the process of investing the requisite capital; or⟧

*(ii) subject to paragraph (3), the alien did not invest (and maintain investment of) the requisite capital, or did not employ the requisite number of employees, throughout substantially the entire period since the alien's admission; or*

(iii) the alien was not sustaining the actions described in clause (i) or (ii) throughout the period of the alien's residence in the United States, or

(C) the alien was otherwise not conforming to the requirements of section 203(b)(5),

then the Attorney General shall so notify the alien involved and, subject to paragraph (2), shall terminate the permanent

365

resident status of the alien (and the alien spouse and alien child) involved as of the date of the determination.

(2) Hearing in 【deportation】 *removal* proceeding.—Any alien whose permanent resident status is terminated under paragraph (1) may request a review of such determination in a proceeding to deport the alien. In such proceeding, the burden of proof shall be on the Attorney General to establish, by a preponderance of the evidence, that a condition described in paragraph (1) is met.

*(3) Exceptions.—*

*(A) Good faith exception.—Paragraph (1)(B)(ii) shall not apply to an alien to the extent that the alien continues to attempt in good faith throughout the period since admission to invest (and maintain investment of) the requisite capital, and to employ the requisite number of employees, but was unable to do so due to circumstances for which the alien should not justly be held responsible.*

*(B) Extension.—In the case of an alien to whom the exception under subparagraph (A) applies, the application period under subsection (d)(2) (and period for termination under paragraph (1)) shall be extended (for up to 3 additional years) by such additional period as may be necessary to enable the alien to have had the requisite capital and number of employees throughout a 2-year period. Such extension shall terminate at any time at which the Attorney General finds that the alien has not continued to attempt in good faith to invest such capital and employ such employees.*

(c) Requirements of Timely Petition and Interview for Removal of Condition.—

(1) * * *

(2) Termination of permanent resident status for failure to file petition or have personal interview.—

(A) * * *

(B) Hearing in 【deportation】 *removal* proceeding.— In any 【deportation】 *removal* proceeding with respect to an alien whose permanent resident status is terminated under subparagraph (A), the burden of proof shall be on the alien to establish compliance with the conditions of paragraphs (1)(A) and (1)(B).

(3) Determination after petition and interview.—

(A) * * *

* * * * * * *

(D) Hearing in 【deportation】 *removal* proceeding.— Any alien whose permanent resident status is terminated under subparagraph (C) may request a review of such determination in a proceeding to 【deport】 *remove* the alien. In such proceeding, the burden of proof shall be on the Attorney General to establish, by a preponderance of the evidence, that the facts and information described in subsection (d)(1) and alleged in the petition are not true with respect to the qualifying commercial enterprise.

(d) Details of Petition and Interview.—

(1) * * *

366

(2) PERIOD FOR FILING PETITION.—
    (A) * * *

\*    \*    \*    \*    \*    \*    \*

        (C) FILING OF PETITIONS DURING 〖DEPORTATION〗 *RE-MOVAL.*—In the case of an alien who is the subject of 〖deportation〗 *removal* hearings as a result of failure to file a petition on a timely basis in accordance with subparagraph (A), the Attorney General may stay such 〖deportation〗 *removal* proceedings against an alien pending the filing of the petition under subparagraph (B).

\*    \*    \*    \*    \*    \*    \*

(f) DEFINITIONS.—In this section:
    (1) The term "alien entrepreneur" means an alien who obtains the status of an alien lawfully admitted for permanent residence (whether on a conditional basis or otherwise) under section 203(b)〖(5)〗*(4)*.

\*    \*    \*    \*    \*    \*    \*

*CONDITIONAL PERMANENT RESIDENT STATUS FOR CERTAIN FOREIGN LANGUAGE TEACHERS*

*SEC. 216B. (a) IN GENERAL.—Subject to the succeeding provisions of this section, section 216A shall apply to an alien foreign language teacher (as defined in subsection (d)(1)) and to an alien spouse or alien child (as defined in subsection (d)(2)) in the same manner as such section applies to an alien entrepreneur and an alien spouse or alien child.*

*(b) TIMING FOR PETITION.—*
    *(1) IN GENERAL.—In applying section 216A under subsection (a), any reference to a "second anniversary of an alien's lawful admission for permanent residence" is deemed a reference to the end of the time period described in paragraph (2).*
    *(2) TIME PERIOD FOR DETERMINATION.—The time period described in this paragraph is 5 years less the period of experience, during the 5-year period ending on the date the alien foreign language teacher obtains permanent resident status, of teaching a language (other than English) full-time at an accredited elementary or middle school.*

*(c) REQUIREMENT FOR TOTAL OF 5 YEARS' TEACHING EXPERIENCE.—In applying section 216A under subsection (a), the determination of the Attorney General under section 216A(b)(1) shall be whether (and the facts and information under section 216A(d)(1) shall demonstrate that) the alien has been employed on a substantially full-time basis as a foreign language teacher at an accredited elementary or middle school in the United States during the period since obtaining permanent residence status (instead of the determinations described in section 216A(b)(1) and of the facts and information described in section 216A(d)(1)).*

*(d) DEFINITIONS.—In this section:*
    *(1) The term "alien foreign language teacher" means an alien who obtains the status of an alien lawfully admitted for permanent residence (whether on a conditional basis or otherwise)*

367

*under section 203(b)(4)(C)(ii) on the basis of less than 5 years' teaching experience.*

*(2) The term "alien spouse" and the term "alien child" mean an alien who obtains the status of an alien lawfully admitted for permanent residence (whether on a conditional basis or otherwise) by virtue of being the spouse or child, respectively, of an alien foreign language teacher.*

VISA WAIVER PILOT PROGRAM FOR CERTAIN VISITORS

SEC. 217. (a)  * * *

(b) WAIVER OF RIGHTS.—An alien may not be provided a waiver under the pilot program unless the alien has waived any right—

(1) to review or appeal under this Act of an immigration officer's determination as to the admissibility of the alien at the port of entry into the United States, or

(2) to contest, other than on the basis of an application for asylum, any action for ⟦deportation against⟧ *removal of* the alien.

(c) DESIGNATION OF PILOT PROGRAM COUNTRIES.—

(1)  * * *

*    *    *    *    *    *    *

(3) CONTINUING AND SUBSEQUENT QUALIFICATIONS.—For each fiscal year (within the pilot program period) after the initial period—

(A) CONTINUING QUALIFICATION.—In the case of a country which was a pilot program country in the previous fiscal year, a country may not be designated as a pilot program country unless the sum of—

(i) the total of the number of nationals of that country who were ⟦excluded from admission⟧ *denied admission at the time of arrival* or withdrew their application for admission during such previous fiscal year as a nonimmigrant visitor, and

(ii) the total number of nationals of that country who were admitted as nonimmigrant visitors during such previous fiscal year and who violated the terms of such admission,

was less than 2 percent of the total number of nationals of that country who applied for admission as nonimmigrant visitors during such previous fiscal year.

*    *    *    *    *    *    *

(f) DEFINITION OF PILOT PROGRAM PERIOD.—For purposes of this section, the term "pilot program period" means the period beginning on October 1, 1988, and ending on September 30, 1996.

(g) PILOT PROGRAM COUNTRY WITH PROBATIONARY STATUS.—

(1) IN GENERAL.—The Attorney General and the Secretary of State acting jointly may designate any country as a pilot program country with probationary status if it meets the requirements of paragraph (2).

(2) QUALIFICATIONS.—A country may not be designated as a pilot program country with probationary status unless the following requirements are met:

368

(A) NONIMMIGRANT VISA REFUSAL RATE FOR PREVIOUS 2-YEAR PERIOD.—The average number of refusals of nonimmigrant visitor visas for nationals of the country during the two previous full fiscal years was less than 3.5 percent of the total number of nonimmigrant visitor visas for nationals of that country which were granted or refused during those years.

(B) NONIMMIGRANT VISA REFUSAL RATE FOR PREVIOUS YEAR.—The number of refusals of nonimmigrant visitor visas for nationals of the country during the previous full fiscal year was less than 3 percent of the total number of nonimmigrant visitor visas for nationals of that country which were granted or refused during that year.

(C) LOW EXCLUSIONS AND VIOLATIONS RATE FOR PREVIOUS YEAR.—The sum of—

(i) the total number of nationals of that country who were ⟦excluded from admission⟧ *denied admission at the time of arrival* or withdrew their application for admission during the preceding fiscal year as a nonimmigrant visitor, and

(ii) the total number of nationals of that country who were admitted as nonimmigrant visitors during the preceding fiscal year and who violated the terms of such admission,

was less than 1.5 percent of the total number of nationals of that country who applied for admission as nonimmigrant visitors during the preceding fiscal year.

(D) MACHINE READABLE PASSPORT PROGRAM.—The government of the country certifies that it has or is in the process of developing a program to issue machine-readable passports to its citizens.

(3) CONTINUING AND SUBSEQUENT QUALIFICATIONS FOR PILOT PROGRAM COUNTRIES WITH PROBATIONARY STATUS.—The designation of a country as a pilot program country with probationary status shall terminate if either of the following occurs:

(A) The sum of—

(i) the total number of nationals of that country who were ⟦excluded from admission⟧ *denied admission at the time of arrival* or withdrew their application for admission during the preceding fiscal year as a nonimmigrant visitor, and

(ii) the total number of nationals of that country who were admitted as visitors during the preceding fiscal year and who violated the terms of such admission,

is more than 2.0 percent of the total number of nationals of that country who applied for admission as nonimmigrant visitors during the preceding fiscal year.

(B) The country is not designated as a pilot program country under subsection (c) within 3 fiscal years of its designation as a pilot program country with probationary status under this subsection.'".

(4) DESIGNATION OF PILOT PROGRAM COUNTRIES WITH PROBATIONARY STATUS AS PILOT PROGRAM COUNTRIES.—In the case of

a country which was a pilot program country with probation-
ary status in the preceding fiscal year, a country may be des-
ignated by the Attorney General and the Secretary of State,
acting jointly, as a pilot program country under subsection (c)
if—

    (A) the total of the number of nationals of that country
who were [excluded from admission] *denied admission at
the time of arrival* or withdrew their application for admis-
sion during the preceding fiscal year as a nonimmigrant
visitor, and
    (B) the total number of nationals of that country who
were admitted as nonimmigrant visitors during the preced-
ing fiscal year and who violated the terms of such admis-
sion,

was less than 2 percent of the total number of nationals of that
country who applied for admission as nonimmigrant visitors
during such preceding fiscal year.

\*    \*    \*    \*    \*    \*    \*

CHAPTER 3—ISSUANCE OF ENTRY DOCUMENTS

ISSUANCE OF VISAS

SEC. 221. (a) Under the conditions hereinafter prescribed and
subject to the limitations prescribed in this Act or regulations is-
sued thereunder, a consular officer may issue (1) to an immigrant
who has made proper application therefor, an immigrant visa
which shall consist of the application provided for in section 222,
visaed by such consular officer, and shall specify the foreign state,
if any, to which the immigrant is charged, the immigrant's particu-
lar status under such foreign state, the preference[, immediate rel-
ative,] or special immigrant classification to which the alien is
charged, the date on which the validity of the visa shall expire, and
such additional information as may be required; and (2) to a non-
immigrant who has made proper application therefor, a non-
immigrant visa, which shall specify the classification under section
101(a)(15) of the nonimmigrant, the period during which the non-
immigrant visa shall be valid, and such additional information as
may be required.

\*    \*    \*    \*    \*    \*    \*

(c) An immigrant visa shall be valid for such period, not exceed-
ing [four months] *six months*, as shall be by regulations pre-
scribed, except that any visa issued to a child lawfully adopted by
a United States citizen and spouse while such citizen is serving
abroad in the United States Armed Forces, or is employed abroad
by the United States Government, or is temporarily abroad on
business, shall be valid until such time, for a period not to exceed
three years, as the adoptive citizen parent returns to the United
States in due course of his service, employment, or business. A non-
immigrant visa shall be valid for such periods as shall be by regu-
lations prescribed. In prescribing the period of validity of a non-
immigrant visa in the case of nationals of any foreign country who
are eligible for such visas, the Secretary of State shall, insofar as
practicable, accord to such nationals the same treatment upon a re-

370

ciprocal basis as such foreign country accords to nationals of the United States who are within a similar class; *except that in the case of aliens who are nationals of a foreign country and who either are granted refugee status and firmly resettled in another foreign country or are granted permanent residence and residing in another foreign country, the Secretary of State may prescribe the period of validity of such a visa based upon the treatment granted by that other foreign country to alien refugees and permanent residents, respectively, in the United States.* An immigrant visa may be replaced under the original number during the fiscal year in which the original visa was issued for an immigrant who establishes to the satisfaction of the consular officer that he was unable to use the original immigrant visa during the period of its validity because of reasons beyond his control and for which he was not responsible: *Provided,* That the immigrant is found by the consular officer to be eligible for an immigrant visa and the immigrant pays again the statutory fees for an application and an immigrant visa.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(f) Each nonimmigrant shall present or surrender to the immigration officer at the port of entry such documents as may be by regulation required. In the case of an alien crewman not in possession of any individual documents other than a passport and until such time as it becomes practicable to issue individual documents, such alien crewman may be admitted, subject to the provisions of this title, if his name appears in the crew list of the vessel or aircraft on which he arrives and the crew list is visaed by a consular officer, but the consular officer shall have the right to 【exclude】 *deny admission to* any alien crewman from the crew list visa.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(h) Nothing in this Act shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to 【enter】 *be admitted* the United States, if, upon arrival at a port of entry in the United States, he is found to be inadmissible under this Act, or any other provision of law. The substance of this subsection shall appear upon every visa application.

\*　　\*　　\*　　\*　　\*　　\*　　\*

APPLICATIONS FOR VISAS

SEC. 222. (a)　\*　\*　\*

\*　　\*　　\*　　\*　　\*　　\*　　\*

*(g) In the case of an alien who has entered and remained in the United States beyond the authorized period of stay, the alien is not eligible to be admitted to the United States as a nonimmigrant on the basis of a visa issued other than in a consular office located in the country of the alien's nationality (or, if there is no office in such country, at such other consular office as the Secretary of State shall specify).*

\*　　\*　　\*　　\*　　\*　　\*　　\*

FRP-FRN-01041

371

〔IMMEDIATE RELATIVE AND SPECIAL IMMIGRANT VISAS〕

*VISAS FOR SPOUSES AND CHILDREN OF CITIZENS AND SPECIAL IMMIGRANTS*

SEC. 224. A consular officer may, subject to the limitations provided in section 221, issue an immigrant visa to a special immigrant or 〔immediate relative〕 *a spouse or child of a citizen of the United States* as such upon satisfactory proof, under regulations prescribed under this Act, that the applicant is entitled to special immigrant or 〔immediate relative status〕 *status or status as a spouse or child of a citizen of the United States.*

〔CHAPTER 4—PROVISIONS RELATING TO ENTRY AND EXCLUSION〕

*CHAPTER 4—INSPECTION, APPREHENSION, EXAMINATION, EXCLUSION, AND REMOVAL*

LISTS OF ALIEN AND CITIZEN PASSENGERS ARRIVING OR DEPARTING; RECORD OF RESIDENT ALIENS AND CITIZENS LEAVING PERMANENTLY FOR FOREIGN COUNTRY

SEC. 231. (a) 〔Upon the arrival of any person by water or by air at any port within the United States from any place outside the United States, it shall be the duty of the master or commanding officer, or authorized agent, owner, or consignee of the vessel or aircraft, having any such person on board to deliver to the immigration officers at the port of arrival typewritten or printed lists or manifests of the persons on board such vessel or aircraft.〕 *In connection with the arrival of any person by water or by air at any port within the United States from any place outside the United States, it shall be the duty of the master or commanding officer, or authorized agent, owner, or consignee of the vessel or aircraft, having such person on board to deliver to the immigration officers at the port of arrival, or other place designated by the Attorney General, electronic, typewritten, or printed lists or manifests of the persons on board such vessel or aircraft.* Such lists or manifests 〔shall be prepared〕 *shall be prepared and submitted* at such time, be in such form and shall contain such information as the Attorney General shall prescribe by regulation as being necessary for the identification of the persons transported and for the enforcement of the immigration laws. *Such lists or manifests shall contain, but not be limited to, for each person transported, the person's full name, date of birth, gender, citizenship, travel document number (if applicable) and arriving flight number.* This subsection shall not require the master or commanding officer, or authorized agent, owner, or consignee of a vessel or aircraft to furnish a list or manifest relating (1) to an alien crewman or (2) to any other person arriving by air on a trip originating in foreign contiguous territory, except (with respect to such arrivals by air) as may be required by regulations issued pursuant to section 239.

\*        \*        \*        \*        \*        \*        \*

372

〖DETENTION OF ALIENS FOR OBSERVATION AND EXAMINATION〗

*DETENTION OF ALIENS FOR PHYSICAL AND MENTAL EXAMINATION*

SEC. 232. *(a) DETENTION OF ALIENS.*—For the purpose of determining whether aliens (including alien crewmen) arriving at ports of the United States belong to any of the classes 〖excluded by〗 *inadmissible under* this Act, by reason of being afflicted with any of the diseases or mental or physical defects or disabilities set forth in section 212(a), or whenever the Attorney General has received information showing that any aliens are coming from a country or have embarked at a place where any of such diseases are prevalent or epidemic, such aliens shall be detained by the Attorney General for a sufficient time to enable the immigration officers and medical officers to subject such aliens to observation and an examination sufficient to determine whether or not they belong to 〖the excluded classes〗 *inadmissible classes.*

*(b) PHYSICAL AND MENTAL EXAMINATION.*—The physical and mental examination of arriving aliens (including alien crewmen) shall be made by medical officers of the United States Public Health Service, who shall conduct all medical examinations and shall certify, for the information of the immigration officers and the 〖special inquiry officers〗 *immigration judges*, any physical and mental defect or disease observed by such medical officers in any such alien. If medical officers of the United States Public Health Service are not available, civil surgeons of not less than four years' professional experience may be employed for such service upon such terms as may be prescribed by the Attorney General. Aliens (including alien crewmen) arriving at ports of the United States shall be examined by at least one such medical officer or civil surgeon under such administrative regulations as the Attorney General may prescribe, and under medical regulations prepared by the Secretary of Health and Human Services. Medical officers of the United States Public Health Service who have had special training in the diagnosis of insanity and mental defects shall be detailed for duty or employed at such ports of entry as the Attorney General may designate, and such medical officers shall be provided with suitable facilities for the detention and examination of all arriving aliens who it is suspected may be 〖excludable〗 *inadmissible* under paragraph (1) of section 212(a), and the services of interpreters shall be provided for such examination. Any alien certified under paragraph (1) of section 212(a) may appeal to a board of medical officers of the United States Public Health Service, which shall be convened by the Secretary of Health and Human Services, and any such alien may introduce before such board one expert medical witness at his own cost and expense.

*(c) CERTIFICATION OF CERTAIN HELPLESS ALIENS.*—If an examining medical officer determines that an alien arriving in the United States is inadmissible, is helpless from sickness, mental or physical disability, or infancy, and is accompanied by another alien whose protection or guardianship may be required, the officer may certify such fact for purposes of applying section 212(a)(10)(B) with respect to the other alien.

373

ENTRY THROUGH OR FROM FOREIGN CONTIGUOUS TERRITORY AND
ADJACENT ISLANDS; LANDING STATIONS

SEC. 〔238.〕 *233.* (a) The Attorney General shall have power to
enter into contracts with transportation lines for the 〔entry and〕
inspection *and admission* of aliens coming to the United States
from foreign contiguous territory or from adjacent islands. No such
transportation line shall be allowed to land any such alien in the
United States until and unless it has entered into any such con-
tracts which may be required by the Attorney General.

\*        \*        \*        \*        \*        \*        \*

DESIGNATION OF PORTS OF ENTRY FOR ALIENS ARRIVING BY CIVIL
AIRCRAFT

SEC. 〔239.〕 *234.* The Attorney General is authorized (1) by regu-
lation to designate as ports of entry for aliens arriving by aircraft
any of the ports of entry for civil aircraft designated as such in ac-
cordance with law; (2) by regulation to provide such reasonable re-
quirements for aircraft in civil air navigation with respect to giving
notice of intention to land in advance of landing, or notice of land-
ing, as shall be deemed necessary for purposes of administration
and enforcement of this Act; and (3) by regulation to provide for
the application to civil air navigation of the provisions of this Act
where not expressly so provided in this Act to such extent and
upon such conditions as he deems necessary. Any person who vio-
lates any regulation made under this section shall be subject to a
civil penalty of $2,000 which may be remitted or mitigated by the
Attorney General in accordance with such proceedings as the Attor-
ney General shall by regulation prescribe. In case the violation is
by the owner or person in command of the aircraft, the penalty
shall be a lien upon the aircraft, and such aircraft may be libeled
therefor in the appropriate United States court. The determination
by the Attorney General and remission or mitigation of the civil
penalty shall be final. In case the violation is by the owner or per-
son in command of the aircraft, the penalty shall be a lien upon
the aircraft and may be collected by proceedings in rem which shall
conform as nearly as may be to civil suits in admiralty. The Su-
preme Court of the United States, and under its direction other
courts of the United States, are authorized to prescribe rules regu-
lating such proceedings against aircraft in any particular not other-
wise provided by law. Any aircraft made subject to a lien by this
section may be summarily seized by, and placed in the custody of
such persons as the Attorney General may by regulation prescribe.
The aircraft may be released from such custody upon deposit of
such amount not exceeding $2,000 as the Attorney General may
prescribe, or of a bond in such sum and with such sureties as the
Attorney General may prescribe, conditioned upon the payment of
the penalty which may be finally determined by the Attorney Gen-
eral.

〔PHYSICAL AND MENTAL EXAMINATION

〔SEC. 234. The physical and mental examination of arriving
aliens (including alien crewmen) shall be made by medical officers

374

of the United States Public Health Service, who shall conduct all medical examinations and shall certify, for the information of the immigration officers and the special inquiry officers, any physical and mental defect or disease observed by such medical officers in any such alien. If medical officers of the United States Public Health Service are not available, civil surgeons of not less than four years' professional experience may be employed for such service upon such terms as may be prescribed by the Attorney General. Aliens (including alien crewmen) arriving at ports of the United States shall be examined by at least one such medical officer or civil surgeon under such administrative regulations as the Attorney General may prescribe, and under medical regulations prepared by the Secretary of Health and Human Services. Medical officers of the United States Public Health Service who have had special training in the diagnosis of insanity and mental defects shall be detailed for duty or employed at such ports of entry as the Attorney General may designate, and such medical officers shall be provided with suitable facilities for the detention and examination of all arriving aliens who it is suspected may be excludable under paragraph (1) of section 212(a), and the services of interpreters shall be provided for such examination. Any alien certified under paragraph (1) of section 212(a) may appeal to a board of medical officers of the United States Public Health Service, which shall be convened by the Secretary of Health and Human Services, and any such alien may introduce before such board one expert medical witness at his own cost and expense.]

⟦INSPECTION BY IMMIGRATION OFFICERS⟧

[SEC. 235. (a) The inspection, other than the physical and mental examination, of aliens (including alien crewmen) seeking admission or readmission to, or the privilege of passing through the United States shall be conducted by immigration officers, except as otherwise provided in regard to special inquiry officers. All aliens arriving at ports of the United States shall be examined by one or more immigration officers at the discretion of the Attorney General and under such regulations as he may prescribe. Immigration officers are hereby authorized and empowered to board and search any vessel, aircraft, railway car, or other conveyance, or vehicle in which they believe aliens are being brought into the United States. The Attorney General and any immigration officer, including special inquiry officers, shall have power to administer oaths and to take and consider evidence of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, pass through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service, and, where such action may be necessary, to make a written record of such evidence. Any person coming into the United States may be required to state under oath the purpose or purposes for which he comes, the length of time he intends to remain in the United States, whether or not he intends to remain in the United States permanently and, if an alien, whether he intends to become a citizen thereof, and such other items of information as will aid the immigration officer in determining whether he is a national of the Unit-

375

ed States or an alien and, if the latter, whether he belongs to any of the excluded classes enumerated in section 212. The Attorney General and any immigration officer, including special inquiry officers, shall have power to require by subpena the attendance and testimony of witnesses before immigration officers and special inquiry officers and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service, and to that end may invoke the aid of any court of the United States. Any United States district court within the jurisdiction of which investigations or inquiries are being conducted by an immigration officer or special inquiry officer may, in the event of neglect or refusal to respond to a subpena issued under this subsection or refusal to testify before an immigration officer or special inquiry officer, issue an order requiring such persons to appear before an immigration officer or special inquiry officer, produce books, papers, and documents if demanded, and testify, and any failure to obey such order of the court may be punished by the court as a contempt thereof.

〔(b) Every alien (other than an alien crewman), and except as otherwise provided in subsection (c) of this section and in section 273(d), who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer. The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien, whose privilege to land is so challenged, before a special inquiry officer for further inquiry.

〔(c) Any alien (including an alien crewman) who may appear to the examining immigration officer or to the special inquiry officer during the examination before either of such officers to be excludable under subparagraph (A) (other than clause (ii)), (B), or (C) of section 212(a)(3) shall be temporarily excluded, and no further inquiry by a special inquiry officer shall be conducted until after the case is reported to the Attorney General together with any such written statement and accompanying information, if any, as the alien or his representative may desire to submit in connection therewith and such an inquiry or further inquiry is directed by the Attorney General. If the Attorney General is satisfied that the alien is excludable under any of such paragraphs on the basis of information of a confidential nature, the disclosure of which the Attorney General, in the exercise of his discretion, and after consultation with the appropriate security agencies of the Government, concludes would be prejudicial to the public interest, safety, or security, he may in his discretion order such alien to be excluded and deported without any inquiry or further inquiry by a special inquiry officer. Nothing in this subsection shall be regarded as requiring an inquiry before a special inquiry officer in the case of an alien crewman.〕

376

*INSPECTION BY IMMIGRATION OFFICERS; EXPEDITED REMOVAL OF INADMISSIBLE ARRIVING ALIENS; REFERRAL FOR HEARING*

SEC. 235. (a) INSPECTION.—

(1) ALIENS TREATED AS APPLICANTS FOR ADMISSION.—*An alien present in the United States who has not been admitted, who arrives in the United States (whether or not at a designated port of arrival), or who is brought to the United States after having been interdicted in international or United States waters shall be deemed for purposes of this Act an applicant for admission.*

(2) STOWAWAYS.—*An arriving alien who is a stowaway is not eligible to apply for admission or to be admitted and shall be ordered removed upon inspection by an immigration officer. Upon such inspection if the alien indicates an intention to apply for asylum under section 208 or a fear of persecution, the officer shall refer the alien for an interview under subsection (b)(1)(B). A stowaway may apply for asylum only if the stowaway is found to have a credible fear of persecution under subsection (b)(1)(B). In no case may a stowaway be considered an applicant for admission or eligible for a hearing under section 240.*

(3) INSPECTION.—*All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers.*

(4) WITHDRAWAL OF APPLICATION FOR ADMISSION.—*An alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States.*

(5) STATEMENTS.—*An applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States, including the applicant's intended length of stay and whether the applicant intends to remain permanently or become a United States citizen, and whether the applicant is inadmissible.*

(b) INSPECTION OF APPLICANTS FOR ADMISSION.—

(1) INSPECTION OF ALIENS ARRIVING IN THE UNITED STATES.—

(A) SCREENING.—*If the examining immigration officer determines that an alien arriving in the United States (whether or not at a port of entry) is inadmissible under section 212(a)(6)(C) or 212(a)(7) and the alien—*

(i) *does not indicate either an intention to apply for asylum under section 208 or a fear of persecution, the officer shall order the alien removed from the United States without further hearing or review; or*

(ii) *indicates an intention to apply for asylum under section 208 or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).*

(B) ASYLUM INTERVIEWS.—

(i) CONDUCT BY ASYLUM OFFICERS.—An asylum officer shall promptly conduct interviews of aliens referred under subparagraph (A)(ii).

(ii) REFERRAL OF CERTAIN ALIENS.—If the officer determines at the time of the interview that an alien has a credible fear of persecution (within the meaning of clause (v)), the alien shall be detained for further consideration of the application for asylum.

(iii) REMOVAL WITHOUT FURTHER REVIEW IF NO CREDIBLE FEAR OF PERSECUTION.—

(I) IN GENERAL.—Subject to subclause (II), if the officer determines that an alien does not have a credible fear of persecution, the officer shall order the alien removed from the United States without further hearing or review.

(II) REVIEW OF DETERMINATION BY SUPERVISORY OFFICER.—The Attorney General shall promulgate regulations to provide for the immediate review by a supervisory asylum officer at the port of entry of a determination under subclause (I).

(iv) INFORMATION ABOUT INTERVIEWS.—The Attorney General shall provide information concerning the asylum interview described in this subparagraph to aliens who may be eligible. An alien who is eligible for such interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General. Such consultation shall be at no expense to the Government and shall not delay the process.

(v) CREDIBLE FEAR OF PERSECUTION DEFINED.—For purposes of this subparagraph, the term "credible fear of persecution" means (I) that it is more probable than not that the statements made by the alien in support of the alien's claim are true, and (II) that there is a significant possibility, in light of such statements and of such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 208.

(C) LIMITATION ON ADMINISTRATIVE REVIEW.—A removal order entered in accordance with subparagraph (A)(i) or (B)(iii)(I) is not subject to administrative appeal, except that the Attorney General shall provide by regulation for prompt review of such an order under subparagraph (A)(i) against an alien who claims under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, after having been warned of the penalties for falsely making such claim under such conditions, to have been lawfully admitted for permanent residence.

(D) LIMIT ON COLLATERAL ATTACKS.—In any action brought against an alien under section 275(a) or section 276, the court shall not have jurisdiction to hear any claim attacking the validity of an order of removal entered under subparagraph (A)(i) or (B)(iii)(I).

378

(E) ASYLUM OFFICER DEFINED.—As used in this paragraph, the term "asylum officer" means an immigration officer who—

(i) has had professional training in country conditions, asylum law, and interview techniques, and

(ii) is supervised by an officer who meets the condition described in clause (i).

(2) INSPECTION OF OTHER ALIENS.—

(A) IN GENERAL.—Subject to subparagraph (B), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a hearing under section 240.

(B) EXCEPTION.—Subparagraph (A) shall not apply to an alien—

(i) who is a crewman,

(ii) to whom paragraph (1) applies, or

(iii) who is a stowaway.

(3) CHALLENGE OF DECISION.—The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien whose privilege to be admitted is so challenged, before an immigration judge for a hearing under section 240.

(c) REMOVAL OF ALIENS INADMISSIBLE ON SECURITY AND RELATED GROUNDS.—

(1) REMOVAL WITHOUT FURTHER HEARING.—If an immigration officer or an immigration judge suspects that an arriving alien may be inadmissible under subparagraph (A) (other than clause (ii)), (B), or (C) of section 212(a)(3), the officer or judge shall—

(A) order the alien removed, subject to review under paragraph (2);

(B) report the order of removal to the Attorney General; and

(C) not conduct any further inquiry or hearing until ordered by the Attorney General.

(2) REVIEW OF ORDER.—(A) The Attorney General shall review orders issued under paragraph (1).

(B) If the Attorney General—

(i) is satisfied on the basis of confidential information that the alien is inadmissible under subparagraph (A) (other than clause (ii)), (B), or (C) of section 212(a)(3), and

(ii) after consulting with appropriate security agencies of the United States Government, concludes that disclosure of the information would be prejudicial to the public interest, safety, or security,

the Attorney General may order the alien removed without further inquiry or hearing by an immigration judge.

(C) If the Attorney General does not order the removal of the alien under subparagraph (B), the Attorney General shall specify the further inquiry or hearing that shall be conducted in the case.

379

(3) *SUBMISSION OF STATEMENT AND INFORMATION.*—The alien or the alien's representative may submit a written statement and additional information for consideration by the Attorney General.

(d) *AUTHORITY RELATING TO INSPECTIONS.*—

(1) *AUTHORITY TO SEARCH CONVEYANCES.*—Immigration officers are authorized to board and search any vessel, aircraft, railway car, or other conveyance or vehicle in which they believe aliens are being brought into the United States.

(2) *AUTHORITY TO ORDER DETENTION AND DELIVERY OF ARRIVING ALIENS.*—Immigration officers are authorized to order an owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft bringing an alien (except an alien crewmember) to the United States—

(A) to detain the alien on the vessel or at the airport of arrival, and

(B) to deliver the alien to an immigration officer for inspection or to a medical officer for examination.

(3) *ADMINISTRATION OF OATH AND CONSIDERATION OF EVIDENCE.*—The Attorney General and any immigration officer shall have power to administer oaths and to take and consider evidence of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, transit through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service.

(4) *SUBPOENA AUTHORITY.*—(A) The Attorney General and any immigration officer shall have power to require by subpoena the attendance and testimony of witnesses before immigration officers and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service, and to that end may invoke the aid of any court of the United States.

(B) Any United States district court within the jurisdiction of which investigations or inquiries are being conducted by an immigration officer may, in the event of neglect or refusal to respond to a subpoena issued under this paragraph or refusal to testify before an immigration officer, issue an order requiring such persons to appear before an immigration officer, produce books, papers, and documents if demanded, and testify, and any failure to obey such order of the court may be punished by the court as a contempt thereof.

*PREINSPECTION AT FOREIGN AIRPORTS*

SEC. 235A. (a) *ESTABLISHMENT OF PREINSPECTION STATIONS.*—(1) Subject to paragraph (4), not later than 2 years after the date of the enactment of this section, the Attorney General, in consultation with the Secretary of State, shall establish and maintain preinspection stations in at least 5 of the foreign airports that are among the 10 foreign airports which the Attorney General identifies as serving as last points of departure for the greatest numbers of passengers who arrive from abroad by air at ports of entry within

FRP-FRN-01050

380

the United States. Such preinspection stations shall be in addition to any preinspection stations established prior to the date of the enactment of this section.

(2) Not later than November 1, 1995, and each subsequent November 1, the Attorney General shall compile data identifying—

(A) the foreign airports which served as last points of departure for aliens who arrived by air at United States ports of entry without valid documentation during the preceding fiscal years,

(B) the number and nationality of such aliens arriving from each such foreign airport, and

(C) the primary routes such aliens followed from their country of origin to the United States.

(3) Subject to paragraph (4), not later than 4 years after the date of enactment of this section, the Attorney General, in consultation with the Secretary of State, shall establish preinspection stations in at least 5 additional foreign airports which the Attorney General, in consultation with the Secretary of State, determines based on the data compiled under paragraph (2) and such other information as may be available would most effectively reduce the number of aliens who arrive from abroad by air at points of entry within the United States without valid documentation. Such preinspection stations shall be in addition to those established prior to or pursuant to paragraph (1).

(4) Prior to the establishment of a preinspection station the Attorney General, in consultation with the Secretary of State, shall ensure that—

(A) employees of the United States stationed at the preinspection station and their accompanying family members will receive appropriate protection,

(B) such employees and their families will not be subject to unreasonable risks to their welfare and safety, and

(C) the country in which the preinspection station is to be established maintains practices and procedures with respect to asylum seekers and refugees in accordance with the Convention Relating to the Status of Refugees (done at Geneva, July 28, 1951), or the Protocol Relating to the Status of Refugees (done at New York, January 31, 1967).

(b) ESTABLISHMENT OF CARRIER CONSULTANT PROGRAM.—The Attorney General shall assign additional immigration officers to assist air carriers in the detection of fraudulent documents at foreign airports which, based on the records maintained pursuant to subsection (a)(2), served as a point of departure for a significant number of arrivals at United States ports of entry without valid documentation, but where no preinspection station exists.

[EXCLUSIONS OF ALIENS

[SEC. 236. (a) A special inquiry officer shall conduct proceedings under this section, administer oaths, present and receive evidence, and interrogate, examine, and cross-examine the alien or witnesses. He shall have authority in any case to determine whether an arriving alien who has been detained for further inquiry under section 235 shall be allowed to enter or shall be excluded and deported. The determination of such special inquiry officer shall be

381

based only on the evidence produced at the inquiry. No special inquiry officer shall conduct a proceeding in any case under this section in which he shall have participated in investigative functions or in which he shall have participated (except as provided in this subsection) in prosecuting functions. Proceedings before a special inquiry officer under this section shall be conducted in accordance with this section, the applicable provisions of sections 235 and 287(b), and such regulations as the Attorney General shall prescribe, and shall be the sole and exclusive procedure for determining admissibility of a person to the United States under the provisions of this section. At such inquiry, which shall be kept separate and apart from the public, the alien may have one friend or relative present, under such conditions as may be prescribed by the Attorney General. A complete record of the proceedings and of all testimony and evidence produced at such inquiry, shall be kept.

⟦(b) From a decision of a special inquiry officer excluding an alien, such alien may take a timely appeal to the Attorney General, and any such alien shall be advised of his right to take such appeal. No appeal may be taken from a temporary exclusion under section 235(c). From a decision of the special inquiry officer to admit an alien, the immigration officer in charge at the port where the inquiry is held may take a timely appeal to the Attorney General. An appeal by the alien, or such officer in charge, shall operate to stay any final action with respect to any alien whose case is so appealed until the final decision of the Attorney General is made. Except as provided in section 235(c) such decision shall be rendered solely upon the evidence adduced before the special inquiry officer.

⟦(c) Except as provided in subsections (b) or (d), in every case where an alien is excluded from admission into the United States, under this Act or any other law or treaty now existing or hereafter made, the decision of a special inquiry officer shall be final unless reversed on appeal to the Attorney General.

⟦(d) If a medical officer or civil surgeon or board of medical officers has certified under section 234 that an alien has a disease, illness, or addiction which would make the alien excludable under paragraph (1) of section 212(a), the decision of the special inquiry officer shall be based solely upon such certification. No alien shall have a right to appeal from such an excluding decision of a special inquiry officer.

⟦(e)(1) Pending a determination of excludability, the Attorney General shall take into custody any alien convicted of an aggravated felony upon release of the alien (regardless of whether or not such release is on parole, supervised release, or probation, and regardless of the possibility of rearrest or further confinement in respect of the same offense).

⟦(2) Notwithstanding any other provision of this section, the Attorney General shall not release such felon from custody unless the Attorney General determines that the alien may not be deported because the condition described in section 243(g) exists.

⟦(3) If the determination described in paragraph (2) has been made, the Attorney General may release such alien only after—

⟦(A) a procedure for review of each request for relief under this subsection has been established,

382

〖(B) such procedure includes consideration of the severity of the felony committed by the alien, and

〖(C) the review concludes that the alien will not pose a danger to the safety of other persons or to property.〗

*APPREHENSION AND DETENTION OF ALIENS NOT LAWFULLY IN THE UNITED STATES*

SEC. 236. (a) ARREST, DETENTION, AND RELEASE.—*On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General—*

*(1) may continue to detain the arrested alien; and*

*(2) may release the alien on—*

*(A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or*

*(B) conditional parole; but*

*(3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.*

(b) REVOCATION OF BOND OR PAROLE.—*The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien.*

(c) ALIENS CONVICTED OF AGGRAVATED FELONIES.—

*(1)* CUSTODY.—*The Attorney General shall take into custody any alien convicted of an aggravated felony when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.*

*(2)* RELEASE.—*The Attorney General may release the alien only if—*

*(A) the alien was lawfully admitted to the United States and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding;*

*(B) the alien was not lawfully admitted to the United States, cannot be removed because the designated country of removal will not accept the alien, and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding; or*

*(C) the Attorney General decides pursuant to section 3521 of title 18, United States Code, that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation.*

383

*A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.*

(d) IDENTIFICATION OF ALIENS CONVICTED OF AGGRAVATED FELONIES.—*(1) The Attorney General shall devise and implement a system—*

*(A) to make available, daily (on a 24-hour basis), to Federal, State, and local authorities the investigative resources of the Service to determine whether individuals arrested by such authorities for aggravated felonies are aliens;*

*(B) to designate and train officers and employees of the Service to serve as a liaison to Federal, State, and local law enforcement and correctional agencies and courts with respect to the arrest, conviction, and release of any alien charged with an aggravated felony; and*

*(C) which uses computer resources to maintain a current record of aliens who have been convicted of an aggravated felony and who have been removed.*

*(2) The record under paragraph (1)(C) shall be made available—*

*(A) to inspectors at ports of entry and to border patrol agents at sector headquarters for purposes of immediate identification of any such previously removed alien seeking to reenter the United States, and*

*(B) to officials of the Department of State for use in its automated visa lookout system.*

GENERAL CLASSES OF DEPORTABLE ALIENS

SEC. 【241.】 *237.* (a) CLASSES OF DEPORTABLE ALIENS.—Any alien (including an alien crewman) 【in the United States】 *in and admitted to the United States* shall, upon the order of the Attorney General, be 【deported】 *removed* if the alien is within one or more of the following classes of deportable aliens:

(1) 【EXCLUDABLE】 *INADMISSIBLE* AT TIME OF ENTRY OR OF ADJUSTMENT OF STATUS OR VIOLATES STATUS.—

(A) 【EXCLUDABLE】 *INADMISSIBLE* ALIENS.—Any alien who at the time of entry or adjustment of status was within one or more of the classes of aliens 【excludable】 *inadmissible* by the law existing at such time is deportable.

【(B) ENTERED WITHOUT INSPECTION.—Any alien who entered the United States without inspection or at any time or place other than as designated by the Attorney General or is in the United States in violation of this Act or any other law of the United States is deportable.】

*(B) PRESENT IN VIOLATION OF LAW.—Any alien who is present in the United States in violation of this Act or any other law of the United States is deportable.*

\*        \*        \*        \*        \*        \*        \*

(E) SMUGGLING.—

(i) IN GENERAL.—Any alien who (prior to the date of entry, at the time of any entry, or within 5 years of the date of any entry) knowingly has encouraged, induced, assisted, abetted, or aided any other alien to

384

enter or to try to enter the United States in violation of law is deportable.

(ii) SPECIAL RULE IN THE CASE OF FAMILY REUNIFICA-TION.—Clause (i) shall not apply in the case of alien who is an eligible immigrant (as defined in section 301(b)(1) of the Immigration Act of 1990), was physically present in the United States on May 5, 1988, and is seeking admission as 【an immediate relative】 *a spouse, child, or parent of a citizen of the United States* or under section 【203(a)(2)】 *203(a)(1)* (including under section 112 of the Immigration Act of 1990) or benefits under section 301(a) of the Immigration Act of 1990 if the alien, before May 5, 1988, has encouraged, induced, assisted, abetted, or aided only the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

(iii) WAIVER AUTHORIZED.—The Attorney General may, in his discretion for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest, waive application of clause (i) in the case of any alien lawfully admitted for permanent residence if the alien has encouraged, induced, assisted, abetted, or aided only the alien's spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of law.

【(F) FAILURE TO MAINTAIN EMPLOYMENT.—Any alien who obtains the status of an alien lawfully admitted for temporary residence under section 210A who fails to meet the requirement of section 210A(d)(5)(A) by the end of the applicable period is deportable.】

(G) MARRIAGE FRAUD.—An alien shall be considered to be deportable as having procured a visa or other documentation by fraud (within the meaning of section 212(a)(6)(C)(i)) and to be in the United States in violation of this Act (within the meaning of subparagraph (B)) if—

(i) the alien obtains any 【entry】 *admission* into the United States with an immigrant visa or other documentation procured on the basis of a marriage entered into less than 2 years prior to such 【entry】 *admission* of the alien and which, within 2 years subsequent to any 【entry】 *admission* of the alien in the United States, shall be judicially annulled or terminated, unless the alien establishes to the satisfaction of the Attorney General that such marriage was not contracted for the purpose of evading any provisions of the immigration laws, or

(ii) it appears to the satisfaction of the Attorney General that the alien has failed or refused to fulfill the alien's marital agreement which in the opinion of the Attorney General was made for the purpose of procuring the alien's 【entry】 *admission* as an immigrant.

(H) WAIVER AUTHORIZED FOR CERTAIN MISREPRESENTA-TIONS.—The provisions of this paragraph relating to the 【deportation】 *removal* of aliens within the United States

FRP-FRN-01055

385

on the ground that they were ⟦excludable⟧ *inadmissible* at the time of ⟦entry⟧ *admission* as aliens described in section 212(a)(6)(C)(i), whether willful or innocent, may, in the discretion of the Attorney General, be waived for any alien (other than an alien described in paragraph (4)(D)) who—

    (i) is the spouse, parent, son, or daughter of a citizen of the United States or of an alien lawfully admitted to the United States for permanent residence; and

    (ii) was in possession of an immigrant visa or equivalent document and was otherwise admissible to the United States at the time of such ⟦entry⟧ *admission* except for those grounds of inadmissibility specified under paragraphs (5)(A) and (7)(A) of section 212(a) which were a direct result of that fraud or misrepresentation.

A waiver of ⟦deportation⟧ *removal* for fraud or misrepresentation granted under this subparagraph shall also operate to waive ⟦deportation⟧ *removal* based on the grounds of inadmissibility ⟦at entry⟧ directly resulting from such fraud or misrepresentation.

(2) CRIMINAL OFFENSES.—

    (A) GENERAL CRIMES.—

        (i) CRIMES OF MORAL TURPITUDE.—Any alien who—

            (I) is convicted of a crime involving moral turpitude committed within five years (or 10 years in the case of an alien provided lawful permanent resident status under section ⟦245(i)⟧ *245(j)*) after the date of ⟦entry⟧ *admission*, and

            (II) either is sentenced to confinement or is confined therefor in a prison or correctional institution for one year or longer,

    is deportable.

        (ii) MULTIPLE CRIMINAL CONVICTIONS.—Any alien who at any time after ⟦entry⟧ *admission* is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable.

        (iii) AGGRAVATED FELONY.—Any alien who is convicted of an aggravated felony at any time after ⟦entry⟧ *admission* is deportable.

        (iv) WAIVER AUTHORIZED.—Clauses (i), (ii), and (iii) shall not apply in the case of an alien with respect to a criminal conviction if the alien subsequent to the criminal conviction has been granted a full and unconditional pardon by the President of the United States or by the Governor of any of the several States.

    (B) CONTROLLED SUBSTANCES.—

        (i) CONVICTION.—Any alien who at any time after ⟦entry⟧ *admission* has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign coun-

386

try relating to a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable.

(ii) DRUG ABUSERS AND ADDICTS.—Any alien who is, or at any time after ⟦entry⟧ *admission* has been, a drug abuser or addict is deportable.

(C) CERTAIN FIREARM OFFENSES.—Any alien who at any time after ⟦entry⟧ *admission* is convicted under any law of purchasing, selling, offering for sale, exchanging, using, owning, possessing, or carrying, or of attempting or conspiring to purchase, sell, offer for sale, exchange, use, own, possess, or carry, any weapon, part, or accessory which is a firearm or destructive device (as defined in section 921(a) of title 18, United States Code) in violation of any law is deportable.

(D) MISCELLANEOUS CRIMES.—Any alien who at any time has been convicted (the judgment on such conviction becoming final) of, or has been so convicted of a conspiracy or attempt to violate—

(i) any offense under chapter 37 (relating to espionage), chapter 105 (relating to sabotage), or chapter 115 (relating to treason and sedition) of title 18, United States Code, for which a term of imprisonment of five or more years may be imposed;

(ii) any offense under section 871 or 960 of title 18, United States Code;

(iii) a violation of any provision of the Military Selective Service Act (50 U.S.C. App. 451 et seq.) or the Trading With the Enemy Act (50 U.S.C. App. 1 et seq.); or

(iv) a violation of section 215 or 278 of this Act, is deportable.

(3) FAILURE TO REGISTER AND FALSIFICATION OF DOCUMENTS.—

(A) CHANGE OF ADDRESS.—An alien who has failed to comply with the provisions of section 265 is deportable, unless the alien establishes to the satisfaction of the Attorney General that such failure was reasonably excusable or was not willful.

(B) FAILURE TO REGISTER OR FALSIFICATION OF DOCUMENTS.—Any alien who at any time has been convicted—

(i) under section 266(c) of this Act or under section 36(c) of the Alien Registration Act, 1940,

(ii) of a violation of, or an attempt or a conspiracy to violate, any provision of the Foreign Agents Registration Act of 1938 (22 U.S.C. 611 et seq.), or

(iii) of a violation of, or an attempt or a conspiracy to violate, section 1546 of title 18, United States Code (relating to fraud and misuse of visas, permits, and other entry documents),

is deportable.

〚(C) DOCUMENT FRAUD.—Any alien who is the subject of a final order for violation of section 274C is deportable.〛

*(C) DOCUMENT FRAUD.—*

> *(i) IN GENERAL.—An alien who is the subject of a final order for violation of section 274C is deportable.*
>
> *(ii) WAIVER AUTHORIZED.—The Attorney General may waive clause (i) in the case of an alien lawfully admitted for permanent residence if the alien's civil money penalty under section 274C was incurred solely to assist, aid, or support the alien's spouse, parent, son, or daughter (and no other individual).*

(4) SECURITY AND RELATED GROUNDS.—

(A) IN GENERAL.—Any alien who has engaged, is engaged, or at any time after 〚entry〛 *admission* engages in—

> (i) any activity to violate any law of the United States relating to espionage or sabotage or to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information,
>
> (ii) any other criminal activity which endangers public safety or national security, or
>
> (iii) any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States by force, violence, or other unlawful means,

is deportable.

(B) TERRORIST ACTIVITIES.—Any alien who has engaged, is engaged, or at any time after 〚entry〛 *admission* engages in any terrorist activity (as defined in section 212(a)(3)(B)(iii)) is deportable.

(C) FOREIGN POLICY.—

> (i) IN GENERAL.—An alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable.
>
> (ii) EXCEPTIONS.—The exceptions described in clauses (ii) and (iii) of section 212(a)(3)(C) shall apply to deportability under clause (i) in the same manner as they apply to 〚excludability〛 *inadmissibility* under section 212(a)(3)(C)(i).

(D) ASSISTED IN NAZI PERSECUTION OR ENGAGED IN GENOCIDE.—Any alien described in clause (i) or (ii) of section 212(a)(3)(E) is deportable.

〚(5) PUBLIC CHARGE.—Any alien who, within five years after the date of entry, has become a public charge from causes not affirmatively shown to have arisen since entry is deportable.〛

*(5) PUBLIC CHARGE.—*

> *(A) IN GENERAL.—Any alien who, within 7 years after the date of entry or admission, becomes a public charge is deportable.*
>
> *(B) EXCEPTIONS.—(i) Subparagraph (A) shall not apply if the alien establishes that the alien has become a public*

388

*charge from causes that arose after entry or admission. A condition that the alien knew (or had reason to know) existed at the time of entry or admission shall be deemed to be a cause that arose before entry or admission.*

*(ii) The Attorney General, in the discretion of the Attorney General, may waive the application of subparagraph (A) in the case of an alien who is admitted as a refugee under section 207 or granted asylum under section 208.*

(C) INDIVIDUALS TREATED AS PUBLIC CHARGE.—

(i) IN GENERAL.—*For purposes of this title, an alien is deemed to be a "public charge" if the alien receives benefits (other than benefits described in subparagraph (E)) under one or more of the public assistance programs described in subparagraph (D) for an aggregate period, except as provided in clauses (ii) and (iii), of at least 12 months within 7 years after the date of entry. The previous sentence shall not be construed as excluding any other bases for considering an alien to be a public charge, including bases in effect on the day before the date of the enactment of the Immigration in the National Interest Act of 1995. The Attorney General, in consultation with the Secretary of Health and Human Services, shall establish rules regarding the counting of health benefits described in subparagraph (D)(iv) for purposes of this subparagraph.*

(ii) DETERMINATION WITH RESPECT TO BATTERED WOMEN AND CHILDREN.—*For purposes of a determination under clause (i) and except as provided in clause (iii), the aggregate period shall be 48 months within 7 years after the date of entry if the alien can demonstrate that (I) the alien has been battered or subject to extreme cruelty in the United States by a spouse or parent, or by a member of the spouse or parent's family residing in the same household as the alien and the spouse or parent consented or acquiesced to such battery or cruelty, or (II) the alien's child has been battered or subject to extreme cruelty in the United States by a spouse or parent of the alien (without the active participation of the alien in the battery or extreme cruelty), or by a member of the spouse or parent's family residing in the same household as the alien when the spouse or parent consented or acquiesced to and the alien did not actively participate in such battery or cruelty, and the need for the public benefits received has a substantial connection to the battery or cruelty described in subclause (I) or (II).*

(iii) SPECIAL RULE FOR ONGOING BATTERY OR CRUELTY.—*For purposes of a determination under clause (i), the aggregate period may exceed 48 months within 7 years after the date of entry if the alien can demonstrate that any battery or cruelty under clause (ii) is ongoing, has led to the issuance of an order of a judge or an administrative law judge or a prior determination of the Service, and that the need for the benefits*

389

*received has a substantial connection to such battery or cruelty.*

*(D) PUBLIC ASSISTANCE PROGRAMS.—For purposes of subparagraph (B), the public assistance programs described in this subparagraph are the following (and include any successor to such a program as identified by the Attorney General in consultation with other appropriate officials):*

*(i) SSI.—The supplemental security income program under title XVI of the Social Security Act, including State supplementary benefits programs referred to in such title.*

*(ii) AFDC.—The program of aid to families with dependent children under part A or E of title IV of the Social Security Act.*

*(iii) MEDICAID.—The program of medical assistance under title XIX of the Social Security Act.*

*(iv) FOOD STAMPS.—The program under the Food Stamp Act of 1977.*

*(v) STATE GENERAL CASH ASSISTANCE.—A program of general cash assistance of any State or political subdivision of a State.*

*(vi) HOUSING ASSISTANCE.—Financial assistance as defined in section 214(b) of the Housing and Community Development Act of 1980.*

*(E) CERTAIN ASSISTANCE EXCEPTED.—For purposes of subparagraph (B), an alien shall not be considered to be a public charge on the basis of receipt of any of the following benefits:*

*(i) EMERGENCY MEDICAL SERVICES.—The provision of emergency medical services (as defined by the Attorney General in consultation with the Secretary of Health and Human Services).*

*(ii) PUBLIC HEALTH IMMUNIZATIONS.—Public health assistance for immunizations with respect to immunizable diseases and for testing and treatment for communicable diseases.*

*(iii) SHORT-TERM EMERGENCY RELIEF.—The provision of non-cash, in-kind, short-term emergency relief.*

\*        \*        \*        \*        \*        \*        \*

(c) Paragraphs (1)(A), (1)(B), (1)(C), (1)(D), and (3)(A) of subsection (a) (other than so much of paragraph (1) as relates to a ground of ⟦exclusion⟧ *inadmissibility* described in paragraph (2) or (3) of section 212(a)) shall not apply to a special immigrant described in section 101(a)(27)(J) based upon circumstances that existed before the date the alien was provided such special immigrant status.

⟦IMMEDIATE DEPORTATION OF ALIENS EXCLUDED FROM ADMISSION OR ENTERING IN VIOLATION OF LAW

⟦SEC. 237. (a)(1) Any alien (other than an alien crewman) arriving in the United States who is excluded under this Act, shall be immediately deported, in accommodations of the same class in which he arrived, unless the Attorney General, in an individual

390

case, in his discretion, concludes that immediate deportation is not practicable or proper. Deportation shall be to the country in which the alien boarded the vessel or aircraft on which he arrived in the United States, unless the alien boarded such vessel or aircraft in foreign territory contiguous to the United States or in any island adjacent thereto or adjacent to the United States and the alien is not a native, citizen, subject, or national of, or does not have a residence in, such foreign contiguous territory or adjacent island, in which case the deportation shall instead be to the country in which is located the port at which the alien embarked for such foreign contiguous territory or adjacent island. The cost of the maintenance including detention expenses and expenses incident to detention of any such alien while he is being detained, shall be borne by the owner or owners of the vessel or aircraft on which he arrived, except that the cost of maintenance (including detention expenses and expenses incident to detention while the alien is being detained prior to the time he is offered for deportation to the transportation line which brought him to the United States) shall not be assessed against the owner or owners of such vessel or aircraft if (A) the alien was in possession of a valid, unexpired immigrant visa, or (B) the alien (other than an alien crewman) was in possession of a valid, unexpired nonimmigrant visa or other document authorizing such alien to apply for temporary admission to the United States or an unexpired reentry permit issued to him, and (i) such application was made within one hundred and twenty days of the date of issuance of the visa or other document, or in the case of an alien in possession of a reentry permit, within one hundred and twenty days of the date on which the alien was last examined and admitted by the Service, or (ii) in the event the application was made later than one hundred and twenty days of the date of issuance of the visa or other document or such examination and admission, if the owner or owners of such vessel or aircraft established to the satisfaction of the Attorney General that the ground of exclusion could not have been ascertained by the exercise of due diligence prior to the alien's embarkation, or (C) the person claimed United States nationality or citizenship and was in possession of an unexpired United States passport issued to him by competent authority.

〔(2) If the government of the country designated in paragraph (1) will not accept the alien into its territory, the alien's deportation shall be directed by the Attorney General, in his discretion and without necessarily giving any priority or preference because of their order as herein set forth, either to—

〔(A) the country of which the alien is a subject, citizen, or national;

〔(B) the country in which he was born;

〔(C) the country in which he has a residence; or

〔(D) any country which is willing to accept the alien into its territory, if deportation to any of the foregoing countries is impracticable, inadvisable, or impossible.

〔(b) It shall be unlawful for any master, commanding officer, purser, person in charge, agent, owner, or consignee of any vessel or aircraft (1) to refuse to receive any alien (other than an alien crewman), ordered deported under this section back on board such

391

vessel or aircraft or another vessel or aircraft owned or operated by the same interests; (2) to fail to detain any alien (other than an alien crewman) on board any such vessel or at the airport of arrival of the aircraft when required by this Act or if so ordered by an immigration officer, or to fail or refuse to deliver him for medical or other inspection, or for further medical or other inspection, as and when so ordered by such officer; (3) to refuse or fail to remove him from the United States to the country to which his deportation has been directed; (4) to fail to pay the cost of his maintenance while being detained as required by this section; (5) to take any fee, deposit, or consideration on a contingent basis to be kept or returned in case the alien is landed or excluded; or (6) knowingly to bring to the United States any alien (other than an alien crewman) excluded or arrested and deported under any provision of law until such alien may be lawfully entitled to reapply for admission to the United States. If it shall appear to the satisfaction of the Attorney General that any such master, commanding officer, purser, person in charge, agent, owner, or consignee of any vessel or aircraft has violated any of the provisions of this section, such master, commanding officer, purser, person in charge, agent, owner, or consignee shall pay to the Commissioner the sum of $2,000 for each violation. No such vessel or aircraft shall have clearance from any port of the United States while any such fine is unpaid or while the question of liability to pay any such fine is being determined, nor shall any such fine be remitted or refunded, except that clearance may be granted prior to the determination of such question upon the deposit with the Commissioner of a bond or undertaking approved by the Attorney General or a sum sufficient to cover such fine.

〔(c) An alien shall be deported on a vessel or aircraft owned by the same person who owns the vessel or aircraft on which the alien arrived in the United States, unless it is impracticable to so deport the alien within a reasonable time. The transportation expense of the alien's deportation shall be borne by the owner or owners of the vessel or aircraft on which the alien arrived. If the deportation is effected on a vessel or aircraft not owned by such owner or owners, the transportation expense of the alien's deportation may be paid from the appropriation for the enforcement of this Act and recovered by civil suit from any owner, agent, or consignee of the vessel or aircraft on which the alien arrived.

〔(d) The Attorney General, under such conditions as are by regulations prescribed, may stay the deportation of any alien deportable under this section, if in his judgment the testimony of such alien is necessary on behalf of the United States in the prosecution of offenders against any provision of this Act or other laws of the United States. The cost of maintenance of any person so detained resulting from a stay of deportation under this subsection and a witness fee in the sum of $1 per day for each day such person is so detained may be paid from the appropriation for the enforcement of this title. Such alien may be released under bond in the penalty of not less than $500 with security approved by the Attorney General on condition that such alien shall be produced when required as a witness and for deportation, and on such other conditions as the Attorney General may prescribe.

392

【(e) Upon the certificate of an examining medical officer to the effect that an alien ordered to be excluded and deported under this section is helpless from sickness or mental and physical disability, or infancy, if such alien is accompanied by another alien whose protection or guardianship is required by the alien ordered excluded and deported, such accompanying alien may also be excluded and deported, and the master, commanding officer, agent, owner, or consignee of the vessel or aircraft in which such alien and accompanying alien arrived in the United States shall be required to return the accompanying alien in the same manner as other aliens denied admission and ordered deported under this section.】

EXPEDITED 【DEPORTATION】 *REMOVAL* OF ALIENS CONVICTED OF COMMITTING AGGRAVATED FELONIES

SEC. 【242A.】 *238.* (a) 【DEPORTATION】 *REMOVAL* OF CRIMINAL ALIENS.—

(1) IN GENERAL.—The Attorney General shall provide for the availability of special 【deportation】 *removal* proceedings at certain Federal, State, and local correctional facilities for aliens convicted of aggravated felonies (as defined in section 101(a)(43)). Such proceedings shall be conducted in conformity with section 【242】 *240* (except as otherwise provided in this section), and in a manner which eliminates the need for additional detention at any processing center of the Service and in a manner which assures expeditious 【deportation】 *removal*, where warranted, following the end of the alien's incarceration for the underlying sentence. *Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.*

(2) IMPLEMENTATION.—With respect to an alien convicted of an aggravated felony who is taken into custody by the Attorney General pursuant to section 【242(a)(2)】 *236(c)*, the Attorney General shall, to the maximum extent practicable, detain any such felon at a facility at which other such aliens are detained. In the selection of such facility, the Attorney General shall make reasonable efforts to ensure that the alien's access to counsel and right to counsel under section 292 are not impaired.

(3) EXPEDITED PROCEEDINGS.—(A) Notwithstanding any other provision of law, the Attorney General shall provide for the initiation and, to the extent possible, the completion of 【deportation】 *removal* proceedings, and any administrative appeals thereof, in the case of any alien convicted of an aggravated felony before the alien's release from incarceration for the underlying aggravated felony.

(B) Nothing in this section shall be construed as requiring the Attorney General to effect the 【deportation】 *removal* of any alien sentenced to actual incarceration, before release from the penitentiary or correctional institution where such alien is confined.

(4) REVIEW.—(A) The Attorney General shall review and evaluate 【deportation】 *removal* proceedings conducted under this section. Within 12 months after the effective date of this section, the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate concerning

393

the effectiveness of such 【deportation】 *removal* proceedings in facilitating the 【deportation】 *removal* of aliens convicted of aggravated felonies.

(B) The Comptroller General shall monitor, review, and evaluate 【deportation】 *removal* proceedings conducted under this section.

(b) 【DEPORTATION】 *REMOVAL* OF ALIENS WHO ARE NOT PERMANENT RESIDENTS.—

(1) The Attorney General may, in the case of an alien described in paragraph (2), determine the deportability of such alien under section 【241(a)(2)(A)(iii)】 *237(a)(2)(A)(iii)* (relating to conviction of an aggravated felony) and issue an order of 【deportation】 *removal* pursuant to the procedures set forth in this subsection or section 【242(b)】 *240.*

(2) An alien is described in this paragraph if the alien—

(A) was not lawfully admitted for permanent residence at the time at which proceedings under this section commenced; and

(B) is not eligible for any relief from 【deportation】 *removal* under this Act.

(3) The Attorney General may not execute any order described in paragraph (1) until 30 calendar days have passed from the date that such order was issued, unless waived by the alien, in order that the alien has an opportunity to apply for judicial review under section 【106】 *242.*

(4) Proceedings before the Attorney General under this subsection shall be in accordance with such regulations as the Attorney General shall prescribe. The Attorney General shall provide that—

(A) the alien is given reasonable notice of the charges and of the opportunity described in subparagraph (C);

(B) the alien shall have the privilege of being represented (at no expense to the government) by such counsel, authorized to practice in such proceedings, as the alien shall choose;

(C) the alien has a reasonable opportunity to inspect the evidence and rebut the charges;

(D) a record is maintained for judicial review; and

(E) the final order of 【deportation】 *removal* is not adjudicated by the same person who issues the charges.

【(d)】 *(c)* JUDICIAL 【DEPORTATION】 *REMOVAL.*—

(1) AUTHORITY.—Notwithstanding any other provision of this Act, a United States district court shall have jurisdiction to enter a judicial order of 【deportation】 *removal* at the time of sentencing against an alien whose criminal conviction causes such alien to be deportable under section 241(a)(2)(A), if such an order has been requested by the United States Attorney with the concurrence of the Commissioner and if the court chooses to exercise such jurisdiction.

(2) PROCEDURE.—

(A) The United States Attorney shall file with the United States district court, and serve upon the defendant and the Service, prior to commencement of the trial or entry of a guilty plea a notice of intent to request judicial 【deportation】 *removal.*

394

(B) Notwithstanding section 242B, the United States Attorney, with the concurrence of the Commissioner, shall file at least 30 days prior to the date set for sentencing a charge containing factual allegations regarding the alienage of the defendant and identifying the crime or crimes which make the defendant deportable under section 241(a)(2)(A).

(C) If the court determines that the defendant has presented substantial evidence to establish prima facie eligibility for relief from 【deportation】 *removal* under this Act, the Commissioner shall provide the court with a recommendation and report regarding the alien's eligibility for relief. The court shall either grant or deny the relief sought.

(D)(i) The alien shall have a reasonable opportunity to examine the evidence against him or her, to present evidence on his or her own behalf, and to cross-examine witnesses presented by the Government.

(ii) The court, for the purposes of determining whether to enter an order described in paragraph (1), shall only consider evidence that would be admissible in proceedings conducted pursuant to section 【242(b)】 *240*.

(iii) Nothing in this subsection shall limit the information a court of the United States may receive or consider for the purposes of imposing an appropriate sentence.

(iv) The court may order the alien 【deported】 *removed* if the Attorney General demonstrates that the alien is deportable under this Act.

(3) NOTICE, APPEAL, AND EXECUTION OF JUDICIAL ORDER OF 【DEPORTATION】 *REMOVAL*.—

(A)(i) A judicial order of 【deportation】 *removal* or denial of such order may be appealed by either party to the court of appeals for the circuit in which the district court is located.

(ii) Except as provided in clause (iii), such appeal shall be considered consistent with the requirements described in section 【106】 *242*.

(iii) Upon execution by the defendant of a valid waiver of the right to appeal the conviction on which the order of 【deportation】 *removal* is based, the expiration of the period described in section 【106(a)(1)】 *242(b)(1)*, or the final dismissal of an appeal from such conviction, the order of 【deportation】 *removal* shall become final and shall be executed at the end of the prison term in accordance with the terms of the order. If the conviction is reversed on direct appeal, the order entered pursuant to this section shall be void.

(B) As soon as is practicable after entry of a judicial order of 【deportation】 *removal*, the Commissioner shall provide the defendant with written notice of the order of 【deportation】 *removal*, which shall designate the defendant's country of choice for 【deportation】 *removal* and any alternate country pursuant to section 243(a).

395

(4) Denial of judicial order.—Denial without a decision on the merits of a request for a judicial order of ⟦deportation⟧ *removal* shall not preclude the Attorney General from initiating ⟦deportation⟧ *removal* proceedings pursuant to section ⟦242⟧ *240* upon the same ground of deportability or upon any other ground of deportability provided under section 241(a).

*INITIATION OF REMOVAL PROCEEDINGS*

Sec. 239. (a) Notice to Appear.—

(1) In general.—*In removal proceedings under section 240, written notice (in this section referred to as a "notice to appear") shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any) specifying the following:*

(A) *The nature of the proceedings against the alien.*

(B) *The legal authority under which the proceedings are conducted.*

(C) *The acts or conduct alleged to be in violation of law.*

(D) *The charges against the alien and the statutory provisions alleged to have been violated.*

(E) *The alien may be represented by counsel and the alien will be provided (i) a period of time to secure counsel under subsection (b)(1) and (ii) a current list of counsel prepared under subsection (b)(2).*

(F)(i) *The requirement that the alien must immediately provide (or have provided) the Attorney General with a written record of an address and telephone number (if any) at which the alien may be contacted respecting proceedings under section 240.*

(ii) *The requirement that the alien must provide the Attorney General immediately with a written record of any change of the alien's address or telephone number.*

(iii) *The consequences under section 240(b)(5) of failure to provide address and telephone information pursuant to this subparagraph.*

(G)(i) *The time and place at which the proceedings will be held.*

(ii) *The consequences under section 240(b)(5) of the failure, except under exceptional circumstances, to appear at such proceedings.*

(2) Notice of change in time or place of proceedings.—

(A) In general.—*In removal proceedings under section 240, in the case of any change or postponement in the time and place of such proceedings, subject to subparagraph (B) a written notice shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any) specifying—*

(i) *the new time or place of the proceedings, and*

(ii) *the consequences under section 240(b)(5) of failing, except under exceptional circumstances, to attend such proceedings.*

(B) Exception.—*In the case of an alien not in detention, a written notice shall not be required under this paragraph*

396

*if the alien has failed to provide the address required under paragraph (1)(F).*

*(3) CENTRAL ADDRESS FILES.—The Attorney General shall create a system to record and preserve on a timely basis notices of addresses and telephone numbers (and changes) provided under paragraph (1)(F).*

*(b) SECURING OF COUNSEL.—*

*(1) IN GENERAL.—In order that an alien be permitted the opportunity to secure counsel before the first hearing date in proceedings under section 240, the hearing date shall not be scheduled earlier than 10 days after the service of the notice to appear, unless the alien requests in writing an earlier hearing date.*

*(2) CURRENT LISTS OF COUNSEL.—The Attorney General shall provide for lists (updated not less often than quarterly) of persons who have indicated their availability to represent pro bono aliens in proceedings under section 240. Such lists shall be provided under subsection (a)(1)(E) and otherwise made generally available.*

*(c) SERVICE BY MAIL.—Service by mail under this section shall be sufficient if there is proof of attempted delivery to the last address provided by the alien in accordance with subsection (a)(1)(F).*

*(d) PROMPT INITIATION OF REMOVAL.—(1) In the case of an alien who is convicted of an offense which makes the alien deportable, the Attorney General shall begin any removal proceeding as expeditiously as possible after the date of the conviction.*

*(2) Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.*

*REMOVAL PROCEEDINGS*

*SEC. 240. (a) PROCEEDING.—*

*(1) IN GENERAL.—An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien.*

*(2) CHARGES.—An alien placed in proceedings under this section may be charged with any applicable ground of inadmissibility under section 212(a) or any applicable ground of deportability under section 237(a).*

*(3) EXCLUSIVE PROCEDURES.—Unless otherwise specified in this Act, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States. Nothing in this section shall affect proceedings conducted pursuant to section 238.*

*(b) CONDUCT OF PROCEEDING.—*

*(1) AUTHORITY OF IMMIGRATION JUDGE.—The immigration judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses. The immigration judge may issue subpoenas for the attendance of witnesses and presentation of evidence. The immigration judge shall have authority (under regulations prescribed by the Attorney General) to sanction by civil money penalty any action (or*

397

inaction) in contempt of the judge's proper exercise of authority under this Act.

(2) FORM OF PROCEEDING.—

(A) IN GENERAL.—The proceeding may take place—

(i) in person,

(ii) through video conference, or

(iii) subject to subparagraph (B), through telephone conference.

(B) CONSENT REQUIRED IN CERTAIN CASES.—An evidentiary hearing on the merits may only be conducted through a telephone conference with the consent of the alien involved after the alien has been advised of the right to proceed in person or through video conference.

(3) PRESENCE OF ALIEN.—If it is impracticable by reason of an alien's mental incompetency for the alien to be present at the proceeding, the Attorney General shall prescribe safeguards to protect the rights and privileges of the alien.

(4) ALIENS RIGHTS IN PROCEEDING.—In proceedings under this section, under regulations of the Attorney General—

(A) the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings,

(B) the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government, and

(C) a complete record shall be kept of all testimony and evidence produced at the proceeding.

(5) CONSEQUENCES OF FAILURE TO APPEAR.—

(A) IN GENERAL.—Any alien who, after written notice required under paragraph (1) or (2) of section 239(a) has been provided to the alien or the alien's counsel of record, does not attend a proceeding under this section, shall be ordered removed in absentia if the Service establishes by clear, unequivocal, and convincing evidence that the written notice was so provided and that the alien is removable (as defined in subsection (e)(2)). The written notice by the Attorney General shall be considered sufficient for purposes of this subparagraph if provided at the most recent address provided under section 239(a)(1)(F).

(B) NO NOTICE IF FAILURE TO PROVIDE ADDRESS INFORMATION.—No written notice shall be required under subparagraph (A) if the alien has failed to provide the address required under section 239(a)(1)(F).

(C) RESCISSION OF ORDER.—Such an order may be rescinded only—

(i) upon a motion to reopen filed within 180 days after the date of the order of removal if the alien demonstrates that the failure to appear was because of exceptional circumstances (as defined in subsection (e)(1)), or

(ii) upon a motion to reopen filed at any time if the alien demonstrates that the alien did not receive notice in accordance with paragraph (1) or (2) of section

398

239(a) or the alien demonstrates that the alien was in Federal or State custody and did not appear through no fault of the alien.

The filing of the motion to reopen described in clause (i) or (ii) shall stay the removal of the alien pending disposition of the motion.

(D) EFFECT ON JUDICIAL REVIEW.—Any petition for review under section 242 of an order entered in absentia under this paragraph shall (except in cases described in section 242(b)(5)) be confined to (i) the validity of the notice provided to the alien, (ii) the reasons for the alien's not attending the proceeding, and (iii) whether or not the alien is removable.

(6) TREATMENT OF FRIVOLOUS BEHAVIOR.—The Attorney General shall, by regulation—

(A) define in a proceeding before an immigration judge or before an appellate administrative body under this title, frivolous behavior for which attorneys may be sanctioned,

(B) specify the circumstances under which an administrative appeal of a decision or ruling will be considered frivolous and will be summarily dismissed, and

(C) impose appropriate sanctions (which may include suspension and disbarment) in the case of frivolous behavior.

Nothing in this paragraph shall be construed as limiting the authority of the Attorney General to take actions with respect to inappropriate behavior.

(7) LIMITATION ON DISCRETIONARY RELIEF FOR FAILURE TO APPEAR.—Any alien against whom a final order of removal is entered in absentia under this subsection and who, at the time of the notice described in paragraph (1) or (2) of section 239(a), was provided oral notice, either in the alien's native language or in another language the alien understands, of the time and place of the proceedings and of the consequences under this paragraph of failing, other than because of exceptional circumstances (as defined in subsection (e)(1)) to attend a proceeding under this section, shall not be eligible for relief under section 240A, 240B, 245, 248, or 249 for a period of 10 years after the date of the entry of the final order of removal.

(c) DECISION AND BURDEN OF PROOF.—

(1) DECISION.—

(A) IN GENERAL.—At the conclusion of the proceeding the immigration judge shall decide whether an alien is removable from the United States. The determination of the immigration judge shall be based only on the evidence produced at the hearing.

(B) CERTAIN MEDICAL DECISIONS.—If a medical officer or civil surgeon or board of medical officers has certified under section 232(b) that an alien has a disease, illness, or addiction which would make the alien inadmissible under paragraph (1) of section 212(a), the decision of the immigration judge shall be based solely upon such certification.

(2) BURDEN ON ALIEN.—In the proceeding the alien has the burden of establishing—

399

(A) *if the alien is an applicant for admission, that the alien is clearly and beyond doubt entitled to be admitted and is not inadmissible under section 212; or*

(B) *by clear and convincing evidence, that the alien is lawfully present in the United States pursuant to a prior admission.*

*In meeting the burden of proof under subparagraph (B), the alien shall have access to the alien's visa or other entry document, if any, and any other records and documents, not considered by the Attorney General to be confidential, pertaining to the alien's admission or presence in the United States.*

(3) BURDEN ON SERVICE IN CASES OF DEPORTABLE ALIENS.—*In the proceeding the Service has the burden of establishing by clear and convincing evidence that, in the case of an alien who has been admitted to the United States, the alien is deportable. No decision on deportability shall be valid unless it is based upon reasonable, substantial, and probative evidence.*

(4) NOTICE.—*If the immigration judge decides that the alien is removable and orders the alien to be removed, the judge shall inform the alien of the right to appeal that decision and of the consequences for failure to depart under the order of removal, including civil and criminal penalties.*

(5) MOTIONS TO RECONSIDER.—

(A) IN GENERAL.—*The alien may file one motion to reconsider a decision that the alien is removable from the United States.*

(B) DEADLINE.—*The motion must be filed within 30 days of the date of entry of a final administrative order of removal.*

(C) CONTENTS.—*The motion shall specify the errors of law or fact in the previous order and shall be supported by pertinent authority.*

(6) MOTIONS TO REOPEN.—

(A) IN GENERAL.—*An alien may file one motion to reopen proceedings under this section.*

(B) CONTENTS.—*The motion to reopen shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material.*

(C) DEADLINE.—

(i) IN GENERAL.—*Except as provided in this subparagraph, the motion to reopen shall be filed within 90 days of the date of entry of a final administrative order of removal.*

(ii) ASYLUM.—*There is no time limit on the filing of a motion to reopen if the basis of the motion is to apply for relief under sections 208 or 241(b)(3) and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding.*

(iii) FAILURE TO APPEAR.—*A motion to reopen may be filed within 180 days after the date of the final order*

400

*of removal if the order has been entered pursuant to subsection (b)(5) due to the alien's failure to appear for proceedings under this section and the alien establishes that the alien's failure to appear was because of exceptional circumstances beyond the control of the alien or because the alien did not receive the notice required under section 239(a)(2).*

*(d) STIPULATED REMOVAL.—The Attorney General shall provide by regulation for the entry by an immigration judge of an order of removal stipulated to by the alien (or the alien's representative) and the Service. A stipulated order shall constitute a conclusive determination of the alien's removability from the United States.*

*(e) DEFINITIONS.—In this section and section 240A:*

*(1) EXCEPTIONAL CIRCUMSTANCES.—The term "exceptional circumstances" refers to exceptional circumstances (such as serious illness of the alien or serious illness or death of the spouse, child, or parent of the alien, but not including less compelling circumstances) beyond the control of the alien.*

*(2) REMOVABLE.—The term "removable" means—*

*(A) in the case of an alien not admitted to the United States, that the alien is inadmissible under section 212, or*

*(B) in the case of an alien admitted to the United States, that the alien is deportable under section 237.*

*CANCELLATION OF REMOVAL; ADJUSTMENT OF STATUS*

*SEC. 240A. (a) CANCELLATION OF REMOVAL FOR CERTAIN PERMANENT RESIDENTS.—The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—*

*(1) has been an alien lawfully admitted for permanent residence for not less than 5 years,*

*(2) has resided in the United States continuously for 7 years after having been admitted in any status, and*

*(3) has not been convicted of an aggravated felony or felonies for which the alien has been sentenced, in the aggregate, to a term of imprisonment of at least 5 years.*

*(b) CANCELLATION OF REMOVAL AND ADJUSTMENT OF STATUS FOR CERTAIN NONPERMANENT RESIDENTS.—*

*(1) IN GENERAL.—The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien—*

*(A) has been physically present in the United States for a continuous period of not less than 7 years immediately preceding the date of such application;*

*(B) has been a person of good moral character during such period;*

*(C) has not been convicted of an aggravated felony; and*

*(D) establishes that removal would result in extreme hardship to the alien or to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.*

*(2) SPECIAL RULE FOR BATTERED SPOUSE OR CHILD.—The Attorney General may cancel removal in the case of an alien who*

401

is inadmissible or deportable from the United States if the alien—

    (A) has been battered or subjected to extreme cruelty in the United States by a spouse or parent who is a United States citizen or lawful permanent resident (or is the parent of a child of a United States citizen or lawful permanent resident and the child has been battered or subjected to extreme cruelty in the United States by such citizen or permanent resident parent);

    (B) has been physically present in the United States for a continuous period of not less than 3 years immediately preceding the date of such application;

    (C) has been a person of good moral character during such period;

    (D) is not inadmissible under paragraph (2) or (3) of section 212(a), is not deportable under paragraph (1)(G) or (2) through (4) of section 237(a), and has not been convicted of an aggravated felony; and

    (E) establishes that removal would result in extreme hardship to the alien, the alien's child, or (in the case of an alien who is a child) to the alien's parent.

In acting on applications under this paragraph, the Attorney General shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General.

    (3) ADJUSTMENT OF STATUS.—The Attorney General may adjust to the status of an alien lawfully admitted for permanent residence any alien who the Attorney General determines meets the requirements of paragraph (1) or (2). The number of adjustments under this paragraph shall not exceed 4,000 for any fiscal year. The Attorney General shall record the alien's lawful admission for permanent residence as of the date the Attorney General's cancellation of removal under paragraph (1) or (2) or determination under this paragraph.

  (c) ALIENS INELIGIBLE FOR RELIEF.—The provisions of subsections (a) and (b)(1) shall not apply to any of the following aliens:

    (1) An alien who entered the United States as a crewman subsequent to June 30, 1964.

    (2) An alien who was admitted to the United States as a nonimmigrant exchange alien as defined in section 101(a)(15)(J), or has acquired the status of such a nonimmigrant exchange alien after admission, in order to receive graduate medical education or training, regardless of whether or not the alien is subject to or has fulfilled the two-year foreign residence requirement of section 212(e).

    (3) An alien who—

      (A) was admitted to the United States as a nonimmigrant exchange alien as defined in section 101(a)(15)(J) or has acquired the status of such a nonimmigrant exchange alien after admission other than to receive graduate medical education or training,

      (B) is subject to the two-year foreign residence requirement of section 212(e), and

402

(C) has not fulfilled that requirement or received a waiver thereof.

(4) An alien who is inadmissible under section 212(a)(3) or deportable under subparagraph (B) or (D) of section 237(a)(4).

(d) SPECIAL RULES RELATING TO CONTINUOUS RESIDENCE OR PHYSICAL PRESENCE.—

(1) TERMINATION OF CONTINUOUS PERIOD.—For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear under section 239(a).

(2) TREATMENT OF CERTAIN BREAKS IN PRESENCE.—An alien shall be considered to have failed to maintain continuous physical presence in the United States under subsections (b)(1) and (b)(2) if the alien has departed from the United States for any periods in the aggregate exceeding 180 days, unless the Attorney General finds that return could not be accomplished within that time period due to emergent reasons.

(3) CONTINUITY NOT REQUIRED BECAUSE OF HONORABLE SERVICE IN ARMED FORCES AND PRESENCE UPON ENTRY INTO SERVICE.—The requirements of continuous residence or continuous physical presence in the United States under subsections (a) and (b) shall not apply to an alien who—

(A) has served for a minimum period of 24 months in an active-duty status in the Armed Forces of the United States and, if separated from such service, was separated under honorable conditions, and

(B) at the time of the alien's enlistment or induction was in the United States.

### VOLUNTARY DEPARTURE

SEC. 240B. (a) CERTAIN CONDITIONS.—

(1) IN GENERAL.—The Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense under this subsection, in lieu of being subject to proceedings under section 240 or prior to the completion of such proceedings, if the alien is not deportable under section 237(a)(2)(A)(iii) or section 237(a)(4)(B).

(2) PERIOD.—Permission to depart voluntarily under this subsection shall not be valid for a period exceeding 120 days.

(3) BOND.—The Attorney General may require an alien permitted to depart voluntarily under this subsection to post a voluntary departure bond, to be surrendered upon proof that the alien has departed the United States within the time specified.

(4) TREATMENT OF ALIENS ARRIVING IN THE UNITED STATES.—In the case of an alien who is arriving in the United States and with respect to whom proceedings under section 240 are (or would otherwise be) initiated at the time of such alien's arrival, paragraph (1) shall not apply. Nothing in this paragraph shall be construed as preventing such an alien from withdrawing the application for admission in accordance with section 235(a)(4).

(b) AT CONCLUSION OF PROCEEDINGS.—

(1) IN GENERAL.—The Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense if, at the conclusion of a proceeding under section 240, the

403

*immigration judge enters an order granting voluntary departure in lieu of removal and finds that—*

*(A) the alien has been physically present in the United States for a period of at least one year immediately preceding the date the notice to appear was served under section 239(a);*

*(B) the alien is, and has been, a person of good moral character for at least 5 years immediately preceding the alien's application for voluntary departure;*

*(C) the alien is not deportable under section 237(a)(2)(A)(iii) or section 237(a)(4); and*

*(D) the alien has established by clear and convincing evidence that the alien has the means to depart the United States and intends to do so.*

*(2) PERIOD.—Permission to depart voluntarily under this subsection shall not be valid for a period exceeding 60 days.*

*(3) BOND.—An alien permitted to depart voluntarily under this subsection shall be required to post a voluntary departure bond, in an amount necessary to ensure that the alien will depart, to be surrendered upon proof that the alien has departed the United States within the time specified.*

*(c) ALIENS NOT ELIGIBLE.—The Attorney General shall not permit an alien to depart voluntarily under this section if the alien was previously permitted to so depart after having been found inadmissible under section 212(a)(9).*

*(d) CIVIL PENALTY FOR FAILURE TO DEPART.—If an alien is permitted to depart voluntarily under this section and fails voluntarily to depart the United States within the time period specified, the alien shall be subject to a civil penalty of not less than $1,000 and not more than $5,000, and be ineligible for a period of 10 years for any further relief under this section and sections 240A, 245, 248, and 249.*

*(e) ADDITIONAL CONDITIONS.—The Attorney General may by regulation limit eligibility for voluntary departure under this section for any class or classes of aliens.*

*(f) APPEALS OF DENIALS.—An alien may appeal from denial of a request for an order of voluntary departure under subsection (b) in accordance with the procedures in section 242. Notwithstanding the pendency of such appeal, the alien shall be removable from the United States 60 days after entry of the order of removal. The alien's removal from the United States shall not moot the appeal.*

RECORDS OF ADMISSION

SEC. 【240.】 *240C.* (a) The Attorney General shall cause to be filed, as a record of admission of each immigrant, the immigrant visa required by section 221(e) to be surrendered at the port of entry by the arriving alien to an immigration officer.

(b) The Attorney General shall cause to be filed such record of the 【entry】 *admission* into the United States of each immigrant admitted under section 211(b) and of each nonimmigrant as the Attorney General deems necessary for the enforcement of the immigration laws.

404

SEC. 241. (a) DETENTION, RELEASE, AND REMOVAL OF ALIENS OR-
DERED REMOVED.—

(1) REMOVAL PERIOD.—

(A) IN GENERAL.—Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period").

(B) BEGINNING OF PERIOD.—The removal period begins on the latest of the following:

(i) The date the order of removal becomes administratively final.

(ii) If the removal order is judicially reviewed and such review serves to stay the removal of the alien, the date of the court's final order.

(iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

(C) SUSPENSION OF PERIOD.—The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien willfully fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

(2) DETENTION AND RELEASE BY THE ATTORNEY GENERAL.—During the removal period, the Attorney General shall detain the alien. If there is insufficient detention space to detain the alien, the Attorney General shall make a specific finding to this effect and may release the alien on a bond containing such conditions as the Attorney General may prescribe.

(3) SUPERVISION AFTER 90-DAY PERIOD.—If the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General. The regulations shall include provisions requiring the alien—

(A) to appear before an immigration officer periodically for identification;

(B) to submit, if necessary, to a medical and psychiatric examination at the expense of the United States Government;

(C) to give information under oath about the alien's nationality, circumstances, habits, associations, and activities, and other information the Attorney General considers appropriate; and

(D) to obey reasonable written restrictions on the alien's conduct or activities that the Attorney General prescribes for the alien.

(4) ALIENS IMPRISONED, ARRESTED, OR ON PAROLE, SUPERVISED RELEASE, OR PROBATION.—Except as provided in section 343(a) of the Public Health Service Act (42 U.S.C. 259(a)), the Attorney General may not remove an alien who is sentenced to

405

*imprisonment until the alien is released from imprisonment. Parole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal.*

*(5) REINSTATEMENT OF REMOVAL ORDERS AGAINST ALIENS IL-LEGALLY REENTERING.—If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of re-moval, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, and the alien shall be removed under the prior order at any time after the reentry.*

*(6) INADMISSIBLE ALIENS.—An alien ordered removed who is inadmissible under section 212 may be detained beyond the re-moval period and, if released, shall be subject to the terms of supervision in paragraph (3).*

*(7) EMPLOYMENT AUTHORIZATION.—No alien ordered removed shall be eligible to receive authorization to be employed in the United States unless the Attorney General makes a specific finding that—*

*(A) the alien cannot be removed due to the refusal of all countries designated by the alien or under this section to receive the alien, or*

*(B) the removal of the alien is otherwise impracticable or contrary to the public interest.*

*(b) COUNTRIES TO WHICH ALIENS MAY BE REMOVED.—*

*(1) ALIENS ARRIVING AT THE UNITED STATES.—Subject to paragraph (3)—*

*(A) IN GENERAL.—Except as provided by subparagraphs (B) and (C), an alien who arrives at the United States and with respect to whom proceedings under section 240 were initiated at the time of such alien's arrival shall be re-moved to the country in which the alien boarded the vessel or aircraft on which the alien arrived in the United States.*

*(B) TRAVEL FROM CONTIGUOUS TERRITORY.—If the alien boarded the vessel or aircraft on which the alien arrived in the United States in a foreign territory contiguous to the United States, an island adjacent to the United States, or an island adjacent to a foreign territory contiguous to the United States, and the alien is not a native, citizen, subject, or national of, or does not reside in, the territory or island, removal shall be to the country in which the alien boarded the vessel that transported the alien to the territory or is-land.*

*(C) ALTERNATIVE COUNTRIES.—If the government of the country designated in subparagraph (A) or (B) is unwilling to accept the alien into that country's territory, removal shall be to any of the following countries, as directed by the Attorney General:*

*(i) The country of which the alien is a citizen, sub-ject, or national.*

*(ii) The country in which the alien was born.*

*(iii) The country in which the alien has a residence.*

*(iv) A country with a government that will accept the alien into the country's territory if removal to each*

406

*country described in a previous clause of this subparagraph is impracticable, inadvisable, or impossible.*

(2) OTHER ALIENS.—*Subject to paragraph (3)—*

(A) SELECTION OF COUNTRY BY ALIEN.—*Except as otherwise provided in this paragraph—*

(i) *any alien not described in paragraph (1) who has been ordered removed may designate one country to which the alien wants to be removed, and*

(ii) *the Attorney General shall remove the alien to the country the alien so designates.*

(B) LIMITATION ON DESIGNATION.—*An alien may designate under subparagraph (A)(i) a foreign territory contiguous to the United States, an adjacent island, or an island adjacent to a foreign territory contiguous to the United States as the place to which the alien is to be removed only if the alien is a native, citizen, subject, or national of, or has resided in, that designated territory or island.*

(C) DISREGARDING DESIGNATION.—*The Attorney General may disregard a designation under subparagraph (A)(i) if—*

(i) *the alien fails to designate a country promptly;*

(ii) *the government of the country does not inform the Attorney General finally, within 30 days after the date the Attorney General first inquires, whether the government will accept the alien into the country;*

(iii) *the government of the country is not willing to accept the alien into the country; or*

(iv) *the Attorney General decides that removing the alien to the country is prejudicial to the United States.*

(D) ALTERNATIVE COUNTRY.—*If an alien is not removed to a country designated under subparagraph (A)(i), the Attorney General shall remove the alien to a country of which the alien is a subject, national, or citizen unless the government of the country—*

(i) *does not inform the Attorney General or the alien finally, within 30 days after the date the Attorney General first inquires or within another period of time the Attorney General decides is reasonable, whether the government will accept the alien into the country; or*

(ii) *is not willing to accept the alien into the country.*

(E) ADDITIONAL REMOVAL COUNTRIES.—*If an alien is not removed to a country under the previous subparagraphs of this paragraph, the Attorney General shall remove the alien to any of the following countries:*

(i) *The country from which the alien was admitted to the United States.*

(ii) *The country in which is located the foreign port from which the alien left for the United States or for a foreign territory contiguous to the United States.*

(iii) *A country in which the alien resided before the alien entered the country from which the alien entered the United States.*

(iv) *The country in which the alien was born.*

407

*(v) The country that had sovereignty over the alien's birthplace when the alien was born.*

*(vi) The country in which the alien's birthplace is located when the alien is ordered removed.*

*(vii) If impracticable, inadvisable, or impossible to remove the alien to each country described in a previous clause of this subparagraph, another country whose government will accept the alien into that country.*

*(F) REMOVAL COUNTRY WHEN UNITED STATES IS AT WAR.—When the United States is at war and the Attorney General decides that it is impracticable, inadvisable, inconvenient, or impossible to remove an alien under this subsection because of the war, the Attorney General may remove the alien—*

*(i) to the country that is host to a government in exile of the country of which the alien is a citizen or subject if the government of the host country will permit the alien's entry; or*

*(ii) if the recognized government of the country of which the alien is a citizen or subject is not in exile, to a country, or a political or territorial subdivision of a country, that is very near the country of which the alien is a citizen or subject, or, with the consent of the government of the country of which the alien is a citizen or subject, to another country.*

*(c) REMOVAL OF ALIENS ARRIVING AT PORT OF ENTRY.—*

*(1) VESSELS AND AIRCRAFT.—An alien arriving at a port of entry of the United States who is ordered removed either without a hearing under section 235(a)(1) or 235(c) or pursuant to proceedings under section 240 initiated at the time of such alien's arrival shall be removed immediately on a vessel or aircraft owned by the owner of the vessel or aircraft on which the alien arrived in the United States, unless—*

*(A) it is impracticable to remove the alien on one of those vessels or aircraft within a reasonable time, or*

*(B) the alien is a stowaway—*

*(i) who has been ordered removed in accordance with section 235(a)(1),*

*(ii) who has requested asylum, and*

*(iii) whose application has not been adjudicated or whose asylum application has been denied but who has not exhausted all appeal rights.*

*(2) STAY OF REMOVAL.—*

*(A) IN GENERAL.—The Attorney General may stay the removal of an alien under this subsection if the Attorney General decides that—*

*(i) immediate removal is not practicable or proper; or*

*(ii) the alien is needed to testify in the prosecution of a person for a violation of a law of the United States or of any State.*

*(B) PAYMENT OF DETENTION COSTS.—During the period an alien is detained because of a stay of removal under subparagraph (A)(ii), the Attorney General may pay from*

408

the appropriation "Immigration and Naturalization Service—Salaries and Expenses"—

(i) the cost of maintenance of the alien; and

(ii) a witness fee of $1 a day.

(C) RELEASE DURING STAY.—The Attorney General may release an alien whose removal is stayed under subparagraph (A)(ii) on—

(i) the alien's filing a bond of at least $500 with security approved by the Attorney General;

(ii) condition that the alien appear when required as a witness and for removal; and

(iii) other conditions the Attorney General may prescribe.

(3) COSTS OF DETENTION AND MAINTENANCE PENDING REMOVAL.—

(A) IN GENERAL.—Except as provided in subparagraph (B) and subsection (d), an owner of a vessel or aircraft bringing an alien to the United States shall pay the costs of detaining and maintaining the alien—

(i) while the alien is detained under subsection (d)(1), and

(ii) in the case of an alien who is a stowaway, while the alien is being detained pursuant to—

(I) subsection (d)(2)(A) or (d)(2)(B)(i),

(II) subsection (d)(2)(B)(ii) or (iii) for the period of time reasonably necessary for the owner to arrange for repatriation or removal of the stowaway, including obtaining necessary travel documents, but not to extend beyond the date on which it is ascertained that such travel documents cannot be obtained from the country to which the stowaway is to be returned, or

(III) section 235(b)(1)(B)(ii), for a period not to exceed 15 days (excluding Saturdays, Sundays, and holidays) commencing on the first such day which begins on the earlier of 72 hours after the time of the initial presentation of the stowaway for inspection or at the time the stowaway is determined to have a credible fear of persecution.

(B) NONAPPLICATION.—Subparagraph (A) shall not apply if—

(i) the alien is a crewmember;

(ii) the alien has an immigrant visa;

(iii) the alien has a nonimmigrant visa or other documentation authorizing the alien to apply for temporary admission to the United States and applies for admission not later than 120 days after the date the visa or documentation was issued;

(iv) the alien has a reentry permit and applies for admission not later than 120 days after the date of the alien's last inspection and admission;

(v)(I) the alien has a nonimmigrant visa or other documentation authorizing the alien to apply for tem-

409

porary admission to the United States or a reentry permit;

(II) the alien applies for admission more than 120 days after the date the visa or documentation was issued or after the date of the last inspection and admission under the reentry permit; and

(III) the owner of the vessel or aircraft satisfies the Attorney General that the existence of the condition relating to inadmissibility could not have been discovered by exercising reasonable care before the alien boarded the vessel or aircraft; or

(vi) the individual claims to be a national of the United States and has a United States passport.

(d) REQUIREMENTS OF PERSONS PROVIDING TRANSPORTATION.—

(1) REMOVAL AT TIME OF ARRIVAL.—An owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft bringing an alien (except an alien crewmember) to the United States shall—

(A) receive an alien back on the vessel or aircraft or another vessel or aircraft owned or operated by the same interests if the alien is ordered removed under this part; and

(B) take the alien to the foreign country to which the alien is ordered removed.

(2) ALIEN STOWAWAYS.—An owner, agent, master, commanding officer, charterer, or consignee of a vessel or aircraft arriving in the United States with an alien stowaway—

(A) shall detain the alien on board the vessel or aircraft, or at such place as the Attorney General shall designate, until completion of the inspection of the alien by an immigration officer;

(B) may not permit the stowaway to land in the United States, except pursuant to regulations of the Attorney General temporarily—

(i) for medical treatment,

(ii) for detention of the stowaway by the Attorney General, or

(iii) for departure or removal of the stowaway; and

(C) if ordered by an immigration officer, shall remove the stowaway on the vessel or aircraft or on another vessel or aircraft.

The Attorney General shall grant a timely request to remove the stowaway under subparagraph (C) on a vessel or aircraft other than that on which the stowaway arrived if any travel documents necessary for departure or repatriation of the stowaway have been obtained and removal of the stowaway will not be unreasonably delayed.

(3) REMOVAL UPON ORDER.—An owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel, aircraft, or other transportation line shall comply with an order of the Attorney General to take on board, guard safely, and transport to the destination specified any alien ordered to be removed under this Act.

(e) PAYMENT OF EXPENSES OF REMOVAL.—

410

(1) COSTS OF REMOVAL AT TIME OF ARRIVAL.—*In the case of an alien who is a stowaway or who is ordered removed either without a hearing under section 235(a)(1) or 235(c) or pursuant to proceedings under section 240 initiated at the time of such alien's arrival, the owner of the vessel or aircraft (if any) on which the alien arrived in the United States shall pay the transportation cost of removing the alien. If removal is on a vessel or aircraft not owned by the owner of the vessel or aircraft on which the alien arrived in the United States, the Attorney General may—*

(A) *pay the cost from the appropriation "Immigration and Naturalization Service—Salaries and Expenses"; and*

(B) *recover the amount of the cost in a civil action from the owner, agent, or consignee of the vessel or aircraft (if any) on which the alien arrived in the United States.*

(2) COSTS OF REMOVAL TO PORT OF REMOVAL FOR ALIENS ADMITTED OR PERMITTED TO LAND.—*In the case of an alien who has been admitted or permitted to land and is ordered removed, the cost (if any) of removal of the alien to the port of removal shall be at the expense of the appropriation for the enforcement of this Act.*

(3) COSTS OF REMOVAL FROM PORT OF REMOVAL FOR ALIENS ADMITTED OR PERMITTED TO LAND.—

(A) THROUGH APPROPRIATION.—*Except as provided in subparagraph (B), in the case of an alien who has been admitted or permitted to land and is ordered removed, the cost (if any) of removal of the alien from the port of removal shall be at the expense of the appropriation for the enforcement of this Act.*

(B) THROUGH OWNER.—

(i) IN GENERAL.—*In the case of an alien described in clause (ii), the cost of removal of the alien from the port of removal may be charged to any owner of the vessel, aircraft, or other transportation line by which the alien came to the United States.*

(ii) ALIENS DESCRIBED.—*An alien described in this clause is an alien who—*

(I) *is admitted to the United States (other than lawfully admitted for permanent residence) and is ordered removed within 5 years of the date of admission based on a ground that existed before or at the time of admission, or*

(II) *is an alien crewman permitted to land temporarily under section 252 and is ordered removed within 5 years of the date of landing.*

(C) COSTS OF REMOVAL OF CERTAIN ALIENS GRANTED VOLUNTARY DEPARTURE.—*In the case of an alien who has been granted voluntary departure under section 240B and who is financially unable to depart at the alien's own expense and whose removal the Attorney General deems to be in the best interest of the United States, the expense of such removal may be paid from the appropriation for the enforcement of this Act.*

(f) ALIENS REQUIRING PERSONAL CARE DURING REMOVAL.—

411

*(1) I*N GENERAL.—*If the Attorney General believes that an alien being removed requires personal care because of the alien's mental or physical condition, the Attorney General may employ a suitable person for that purpose who shall accompany and care for the alien until the alien arrives at the final destination.*

*(2) C*OSTS.—*The costs of providing the service described in paragraph (1) shall be defrayed in the same manner as the expense of removing the accompanied alien is defrayed under this section.*

*(g) P*LACES OF DETENTION.—

*(1) I*N GENERAL.—*The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal. When United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the Attorney General may expend from the appropriation "Immigration and Naturalization Service—Salaries and Expenses", without regard to section 3709 of the Revised Statutes (41 U.S.C. 5), amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available) necessary for detention.*

*(2) D*ETENTION FACILITIES OF THE IMMIGRATION AND NATURALIZATION SERVICE.—*Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.*

*(h) S*TATUTORY CONSTRUCTION.—*Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.*

【(j)】 *(i)* INCARCERATION.—

(1) If the chief executive officer of a State (or, if appropriate, a political subdivision of the State) exercising authority with respect to the incarceration of an undocumented criminal alien submits a written request to the Attorney General, the Attorney General shall, as determined by the Attorney General—

(A) enter into a contractual arrangement which provides for compensation to the State or a political subdivision of the State, as may be appropriate, with respect to the incarceration of the undocumented criminal alien; or

(B) take the undocumented criminal alien into the custody of the Federal Government and incarcerate the alien.

(2) Compensation under paragraph (1)(A) shall be the average cost of incarceration of a prisoner in the relevant State as determined by the Attorney General.

(3) For purposes of this subsection, the term "undocumented criminal alien" means an alien who—

(A) has been convicted of a 【felony and sentenced to a term of imprisonment】 *felony or two or more misdemeanors*; and

412

(B)(i) entered the United States without inspection or at any time or place other than as designated by the Attorney General;

(ii) was the subject of exclusion or deportation proceedings at the time he or she was taken into custody by the State or a political subdivision of the State; or

(iii) was admitted as a nonimmigrant and at the time he or she was taken into custody by the State or a political subdivision of the State has failed to maintain the nonimmigrant status in which the alien was admitted or to which it was changed under section 248, or to comply with the conditions of any such status.

(4)(A) In carrying out paragraph (1), the Attorney General shall give priority to the Federal incarceration of undocumented criminal aliens who have committed aggravated felonies.

(B) The Attorney General shall ensure that undocumented criminal aliens incarcerated in Federal facilities pursuant to this subsection are held in facilities which provide a level of security appropriate to the crimes for which they were convicted.

(5) There are authorized to be appropriated such sums as may be necessary to carry out this subsection, of which the following amounts may be appropriated from the Violent Crime Reduction Trust Fund:

(A) $130,000,000 for fiscal year 1995;

(B) $300,000,000 for fiscal year 1996;

(C) $330,000,000 for fiscal year 1997;

(D) $350,000,000 for fiscal year 1998;

(E) $350,000,000 for fiscal year 1999; and

(F) $340,000,000 for fiscal year 2000.

*(6) In this subsection, the term "incarceration" includes imprisonment in a State or local prison or jail the time of which is counted towards completion of a sentence or the detention of an alien previously convicted of a felony or misdemeanor who has been arrested and is being held pending judicial action on new charges or pending transfer to Federal custody.*

〖CHAPTER 5—DEPORTATION; ADJUSTMENT OF STATUS〗

*CHAPTER 5—ADJUSTMENT AND CHANGE OF STATUS*

〖APPREHENSION AND DEPORTATION OF ALIENS〗

〖SEC. 242. (a)(1) Pending a determination of deportability in the case of any alien as provided in subsection (b) of this section, such alien may, upon warrant of the Attorney General, be arrested and taken into custody. Except as provided in paragraph (2), any such alien taken into custody may, in the discretion of the Attorney General and pending such final determination of deportability, (A) be continued in custody; or (B) be released under bond in the amount of not less than $500 with security approved by the Attorney General, containing such conditions as the Attorney General may prescribe; or (C) be released on conditional parole. But such bond or parole, whether heretofore or hereafter authorized, may be revoked at any time by the Attorney General, in his discretion, and the

413

alien may be returned to custody under the warrant which initiated the proceedings against him and detained until final determination of his deportability. Any court of competent jurisdiction shall have authority to review or revise any determination of the Attorney General concerning detention, release on bond, or parole pending final decision of deportability upon a conclusive showing in habeas corpus proceedings that the Attorney General is not proceeding with such reasonable dispatch as may be warranted by the particular facts and circumstances in the case of any alien to determine deportability.

〔(2)(A) The Attorney General shall take into custody any alien convicted of an aggravated felony upon release of the alien (regardless of whether or not such release is on parole, supervised release, or probation, and regardless of the possibility of rearrest or further confinement in respect of the same offense). Notwithstanding paragraph (1) or subsections (c) and (d) but subject to subparagraph (B), the Attorney General shall not release such felon from custody.

〔(B) The Attorney General may not release from custody any lawfully admitted alien who has been convicted of an aggravated felony, either before or after a determination of deportability, unless the alien demonstrates to the satisfaction of the Attorney General that such alien is not a threat to the community and that the alien is likely to appear before any scheduled hearings.

〔(3)(A) The Attorney General shall devise and implement a system—

〔(i) to make available, daily (on a 24–hour basis), to Federal, State, and local authorities the investigative resources of the Service to determine whether individuals arrested by such authorities for aggravated felonies are aliens;

〔(ii) to designate and train officers and employees of the Service within each district to serve as a liaison to Federal, State, and local law enforcement and correctional agencies and courts with respect to the arrest, conviction, and release of any alien charged with an aggravated felony; and

〔(iii) which uses computer resources to maintain a current record of aliens who have been convicted of an aggravated felony and who have been deported; such record shall be made available to inspectors at ports of entry and to border patrol agents at sector headquarters for purposes of immediate identification of any such previously deported alien seeking to reenter the United States.

〔(B) The Attorney General shall submit reports to the Committees on the Judiciary of the House of Representatives and of the Senate at the end of the 6–month period and at the end of the 18–month period beginning on the effective date of this paragraph which describe in detail specific efforts made by the Attorney General to implement this paragraph.

〔(b) A special inquiry officer shall conduct proceedings under this section to determine the deportability of any alien, and shall administer oaths, present and receive evidence, interrogate, examine, and cross-examine the alien or witnesses, and as authorized by the Attorney General, shall make determinations, including orders of deportation. Determination of deportability in any case shall be made only upon a record made in a proceeding before a special in-

414

quiry officer, at which the alien shall have reasonable opportunity to be present, unless by reason of the alien's mental incompetency it is impracticable for him to be present, in which case the Attorney General shall prescribe necessary and proper safeguards for the rights and privileges of such alien. If any alien has been given a reasonable opportunity to be present at a proceeding under this section, and without reasonable cause fails or refuses to attend or remain in attendance at such proceeding, the special inquiry officer may proceed to a determination in like manner as if the alien were present. In any case or class of cases in which the Attorney General believes that such procedure would be of aid in making a determination, he may require specifically or by regulation that an additional immigration officer shall be assigned to present the evidence on behalf of the United States and in such case such additional immigration officer shall have authority to present evidence, and to interrogate, examine and cross-examine the alien or other witnesses in the proceedings. Nothing in the preceding sentence shall be construed to diminish the authority conferred upon the special inquiry officer conducting such proceedings. No special inquiry officer shall conduct a proceeding in any case under this section in which he shall have participated in investigative functions or in which he shall have participated (except as provided in this subsection) in prosecuting functions. Proceedings before a special inquiry officer acting under the provisions of this section shall be in accordance with such regulations, not inconsistent with this Act, as the Attorney General shall prescribe. Such regulations shall include requirements that are consistent with section 242B and that provide that—

⟦(1) the alien shall be given notice, reasonable under all the circumstances, of the nature of the charges against him and of the time and place at which the proceedings will be held,

⟦(2) the alien shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose,

⟦(3) the alien shall have a reasonable opportunity to examine the evidence against him, to present evidence on his own behalf, and to cross-examine witnesses presented by the Government, and

⟦(4) no decision of deportability shall be valid unless it is based upon reasonable, substantial, and probative evidence.

Except as provided in section 242A(d), the procedure so prescribed shall be the sole and exclusive procedure for determining the deportability of an alien under this section. In any case in which an alien is ordered deported from the United States under the provisions of this Act, or of any other law or treaty, the decision of the Attorney General shall be final. In the discretion of the Attorney General, and under such regulations as he may prescribe, deportation proceedings, including issuance of a warrant of arrest, and a finding of deportability under this section need not be required in the case of any alien who admits to belonging to a class of aliens who are deportable under section 241 if such alien voluntarily departs from the United States at his own expense, or is removed at Government expense as hereinafter authorized, unless the Attorney General has reason to believe that such alien is deportable under

415

paragraph (2), (3), or (4) of section 241(a). If any alien who is authorized to depart voluntarily under the preceding sentence is financially unable to depart at his own expense and the Attorney General deems his removal to be in the best interest of the United States, the expense of such removal may be paid from the appropriation for the enforcement of this Act.

〔(c) When a final order of deportation under administrative processes is made against any alien, the Attorney General shall have a period of six months from the date of such order, or, if judicial review is had, then from the date of the final order of the court, within which to effect the alien's departure from the United States, during which period, at the Attorney General's discretion, the alien may be detained, released on bond in an amount and containing such conditions as the Attorney General may prescribe, or released on such other conditions as the Attorney General may prescribe. Any court of competent jurisdiction shall have authority to review or revise any determination of the Attorney General concerning detention, release on bond, or other release during such six-month period upon a conclusive showing in habeas corpus proceedings that the Attorney General is not proceeding with such reasonable dispatch as may be warranted by the particular facts and circumstances in the case of any alien to effect such alien's departure from the United States within such six-month period. If deportation has not been practicable, advisable, or possible, or departure of the alien from the United States under the order of deportation has not been effected, within such six-month period, the alien shall become subject to such further supervision and detention pending eventual deportation as is authorized in this section. The Attorney General is hereby authorized and directed to arrange for appropriate places of detention for those aliens whom he shall take into custody and detain under this section. Where no Federal buildings are available or buildings adapted or suitably located for the purpose are available for rental, the Attorney General is hereby authorized, notwithstanding section 3709 of the Revised Statutes, as amended (41 U.S.C. 5), or section 322 of the Act of June 30, 1932, as amended (40 U.S.C. 278a), to expend, from the appropriation provided for the administration and enforcement of the immigration laws, such amounts as may be necessary for the acquisition of land and the erection, acquisition, maintenance, operation, remodeling, or repair of buildings, sheds, and office quarters (including living quarters for officers where none are otherwise available), and adjunct facilities, necessary for the detention of aliens. For the purposes of this section an order of deportation heretofore or hereafter entered against an alien in legal detention or confinement, other than under an immigration process, shall be considered as being made as of the moment he is released from such detention or confinement, and not prior thereto.

〔(d) Any alien, against whom a final order of deportation as defined in subsection (c) heretofore or hereafter issued has been outstanding for more than six months, shall, pending eventual deportation, be subject to supervision under regulations prescribed by the Attorney General. Such regulations shall include provisions which will require any alien subject to supervision (1) to appear from time to time before an immigration officer for identification;

416

(2) to submit, if necessary, to medical and psychiatric examination at the expense of the United States; (3) to give information under oath as to his nationality, circumstances, habits, associations, and activities, and such other information, whether or not related to the foregoing, as the Attorney General may deem fit and proper; and (4) to conform to such reasonable written restrictions on his conduct or activities as are prescribed by the Attorney General in his case. Any alien who shall willfully fail to comply with such regulations, or willfully fail to appear or to give information or submit to medical or psychiatric examination if required, or knowingly give false information in relation to the requirements of such regulations, or knowingly violate a reasonable restriction imposed upon his conduct or activity, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

⟦(e) Any alien against whom a final order of deportation is outstanding by reason of being a member of any of the classes described in section 241(a), who shall willfully fail or refuse to depart from the United States within a period of six months from the date of the final order of deportation under administrative processes, or, if judicial review is had, then from the date of the final order of the court, or shall willfully fail or refuse to make timely application in good faith for travel or other documents necessary to his departure, or who shall connive or conspire, or take any other action, designed to prevent or hamper or with the purpose of preventing or hampering his departure pursuant to such order of deportation, or who shall willfully fail or refuse to present himself for deportation at the time and place required by the Attorney General pursuant to such order of deportation, shall upon conviction be guilty of a felony, and shall be imprisoned not more than four years, or shall be imprisoned not more than ten years if the alien is a member of any of the classes described in paragraph (1)(E), (2), (3), or (4) of section 241(a).: *Provided,* That this subsection shall not make it illegal for any alien to take any proper steps for the purpose of securing cancellation of or exemption from such order of deportation or for the purpose of securing his release from incarceration or custody: *Provided further,* That the court may for good cause suspend the sentence of such alien and order his release under such conditions as the court may prescribe. In determining whether good cause has been shown to justify releasing the alien, the court shall take into account such factors as (1) the age, health, and period of detention of the alien; (2) the effect of the alien's release upon the national security and public peace or safety; (3) the likelihood of the alien's resuming or following a course of conduct which made or would make him deportable; (4) the character of the efforts made by such alien himself and by representatives of the country or countries to which his deportation is directed to expedite the alien's departure from the United States; (5) the reason for the inability of the Government of the United States to secure passports, other travel documents, or deportation facilities from the country or countries to which the alien has been ordered deported; and (6) the eligibility of the alien for discretionary relief under the immigration laws.

⟦(f) Should the Attorney General find that any alien has unlawfully reentered the United States after having previously departed or been deported pursuant to an order of deportation, whether be-

417

fore or after the date of enactment of this Act, on any ground described in any of the paragraphs enumerated in subsection (e), the previous order of deportation shall be deemed to be reinstated from its original date and such alien shall be deported under such previous order at any time subsequent to such reentry. For the purposes of subsection (e) the date on which the finding is made that such reinstatement is appropriate shall be deemed the date of the final order of deportation.

〔(g) If any alien, subject to supervision or detention under subsections (c) or (d) of this section, is able to depart from the United States under the order of deportation, except that he is financially unable to pay his passage, the Attorney General may in his discretion permit such alien to depart voluntarily, and the expense of such passage to the country to which he is destined may be paid from the appropriation for the enforcement of this Act, unless such payment is otherwise provided for under this Act.

〔(h) An alien sentenced to imprisonment shall not be deported until such imprisonment has been terminated by the release of the alien from confinement. Parole, supervised release, probation, or possibility of rearrest or further confinement in respect of the same offense shall not be a ground for deferral of deportation.

〔(i) In the case of an alien who is convicted of an offense which makes the alien subject to deportation, the Attorney General shall begin any deportation proceeding as expeditiously as possible after the date of the conviction.〕

*JUDICIAL REVIEW OF ORDERS OF REMOVAL*

SEC. 242. (a) APPLICABLE PROVISIONS.—

(1) GENERAL ORDERS OF REMOVAL.—*Judicial review of a final order of removal (other than an order of removal without a hearing pursuant to section 235(b)(1)) is governed only by chapter 158 of title 28 of the United States Code, except as provided in subsection (b) and except that the court may not order the taking of additional evidence under section 2347(c) of such title.*

(2) LIMITATIONS ON REVIEW RELATING TO SECTION 235(b)(1).—*Notwithstanding any other provision of law, no court shall have jurisdiction to review—*

(A) except as provided in subsection (f), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 235(b)(1),

(B) a decision by the Attorney General to invoke the provisions of such section,

(C) the application of such section to individual aliens, including the determination made under section 235(b)(1)(B), or

(D) procedures and policies adopted by the Attorney General to implement the provisions of section 235(b)(1).

(3) TREATMENT OF CERTAIN DECISIONS.—*No alien shall have a right to appeal from a decision of an immigration judge which is based solely on a certification described in section 240(c)(1)(B).*

418

(b) REQUIREMENTS FOR ORDERS OF REMOVAL.—With respect to review of an order of removal under subsection (a)(1), the following requirements apply:

(1) DEADLINE.—The petition for review must be filed not later than 30 days after the date of the final order of removal.

(2) VENUE AND FORMS.—The petition for review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings. The record and briefs do not have to be printed. The court of appeals shall review the proceeding on a typewritten record and on typewritten briefs.

(3) SERVICE.—

(A) IN GENERAL.—The respondent is the Attorney General. The petition shall be served on the Attorney General and on the officer or employee of the Service in charge of the Service district in which the initial proceedings under section 240 were conducted.

(B) STAY OF ORDER.—

(i) IN GENERAL.—Except as provided in clause (ii), service of the petition on the officer or employee stays the removal of an alien pending the court's decision on the petition, unless the court orders otherwise.

(ii) EXCEPTION.—If the alien has been convicted of an aggravated felony, or the alien has been ordered removed pursuant to a finding that the alien is inadmissible under section 212, service of the petition does not stay the removal unless the court orders otherwise.

(4) DECISION.—Except as provided in paragraph (5)(B)—

(A) the court of appeals shall decide the petition only on the administrative record on which the order of removal is based,

(B) the administrative findings of fact are conclusive if supported by reasonable, substantial, and probative evidence on the record considered as a whole, and

(C) a decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law.

(5) TREATMENT OF NATIONALITY CLAIMS.—

(A) COURT DETERMINATION IF NO ISSUE OF FACT.—If the petitioner claims to be a national of the United States and the court of appeals finds from the pleadings and affidavits that no genuine issue of material fact about the petitioner's nationality is presented, the court shall decide the nationality claim.

(B) TRANSFER IF ISSUE OF FACT.—If the petitioner claims to be a national of the United States and the court of appeals finds that a genuine issue of material fact about the petitioner's nationality is presented, the court shall transfer the proceeding to the district court of the United States for the judicial district in which the petitioner resides for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of title 28, United States Code.

419

(C) LIMITATION ON DETERMINATION.—The petitioner may have such nationality claim decided only as provided in this paragraph.

(6) CONSOLIDATION WITH REVIEW OF MOTIONS TO REOPEN OR RECONSIDER.—When a petitioner seeks review of an order under this section, any review sought of a motion to reopen or reconsider the order shall be consolidated with the review of the order.

(7) CHALLENGE TO VALIDITY OF ORDERS IN CERTAIN CRIMINAL PROCEEDINGS.—

(A) IN GENERAL.—If the validity of an order of removal has not been judicially decided, a defendant in a criminal proceeding charged with violating section 243(a) may challenge the validity of the order in the criminal proceeding only by filing a separate motion before trial. The district court, without a jury, shall decide the motion before trial.

(B) CLAIMS OF UNITED STATES NATIONALITY.—If the defendant claims in the motion to be a national of the United States and the district court finds that—

(i) no genuine issue of material fact about the defendant's nationality is presented, the court shall decide the motion only on the administrative record on which the removal order is based and the administrative findings of fact are conclusive if supported by reasonable, substantial, and probative evidence on the record considered as a whole; or

(ii) a genuine issue of material fact about the defendant's nationality is presented, the court shall hold a new hearing on the nationality claim and decide that claim as if an action had been brought under section 2201 of title 28, United States Code.

The defendant may have such nationality claim decided only as provided in this subparagraph.

(C) CONSEQUENCE OF INVALIDATION.—If the district court rules that the removal order is invalid, the court shall dismiss the indictment for violation of section 243(a). The United States Government may appeal the dismissal to the court of appeals for the appropriate circuit within 30 days after the date of the dismissal.

(D) LIMITATION ON FILING PETITIONS FOR REVIEW.—The defendant in a criminal proceeding under section 243(a) may not file a petition for review under subsection (a) during the criminal proceeding.

(8) CONSTRUCTION.—This subsection—

(A) does not prevent the Attorney General, after a final order of removal has been issued, from detaining the alien under section 241(a);

(B) does not relieve the alien from complying with section 241(a)(4) and section 243(g); and

(C) except as provided in paragraph (3), does not require the Attorney General to defer removal of the alien.

(c) REQUIREMENTS FOR PETITION.—A petition for review or for habeas corpus of an order of removal shall state whether a court has

420

upheld the validity of the order, and, if so, shall state the name of the court, the date of the court's ruling, and the kind of proceeding.

(d) *REVIEW OF FINAL ORDERS.*—A court may review a final order of removal only if—

(1) the alien has exhausted all administrative remedies available to the alien as of right, and

(2) another court has not decided the validity of the order, unless the reviewing court finds that the petition presents grounds that could not have been presented in the prior judicial proceeding or that the remedy provided by the prior proceeding was inadequate or ineffective to test the validity of the order.

(e) *LIMITED REVIEW FOR NON-PERMANENT RESIDENTS CONVICTED OF AGGRAVATED FELONIES.*—

(1) *IN GENERAL.*—A petition for review filed by an alien against whom a final order of removal has been issued under section 238 may challenge only whether—

(A) the alien is the alien described in the order,

(B) the alien is an alien described in section 238(b)(2) and has been convicted after entry into the United States of an aggravated felony, and

(C) proceedings against the alien complied with section 238(b)(4).

(2) *LIMITED JURISDICTION.*—A court reviewing the petition has jurisdiction only to review the issues described in paragraph (1).

(f) *JUDICIAL REVIEW OF ORDERS UNDER SECTION 235(b)(1).*—

(1) *APPLICATION.*—The provisions of this subsection apply with respect to judicial review of orders of removal effected under section 235(b)(1).

(2) *LIMITATIONS ON RELIEF.*—Regardless of the nature of the action or claim and regardless of the identity of the party or parties bringing the action, no court shall have jurisdiction or authority to enter declaratory, injunctive, or other equitable relief not specifically authorized in this subsection, or to certify a class under Rule 23 of the Federal Rules of Civil Procedure.

(3) *LIMITATION TO HABEAS CORPUS.*—Judicial review of any matter, cause, claim, or individual determination made or arising under or pertaining to section 235(b)(1) shall only be available in habeas corpus proceedings, and shall be limited to determinations of—

(A) whether the petitioner is an alien,

(B) whether the petitioner was ordered removed under such section, and

(C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence and is entitled to such further inquiry as prescribed by the Attorney General pursuant to section 235(b)(1)(C).

(4) *DECISION.*—In any case where the court determines that the petitioner—

(A) is an alien who was not ordered removed under section 235(b)(1), or

(B) has demonstrated by a preponderance of the evidence that the alien is a lawful permanent resident,

421

*the court may order no remedy or relief other than to require that the petitioner be provided a hearing in accordance with section 240. Any alien who is provided a hearing under section 240 pursuant to this paragraph may thereafter obtain judicial review of any resulting final order of removal pursuant to subsection (a)(1).*

*(5) SCOPE OF INQUIRY.—In determining whether an alien has been ordered removed under section 235(b)(1), the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.*

*(g) LIMIT ON INJUNCTIVE RELIEF.—Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of chapter 4 of title II, as amended by the Immigration in the National Interest Act of 1995, other than with respect to the application of such provisions to an individual alien against whom proceedings under such chapter have been initiated.*

〚DEPORTATION PROCEDURES

〚SEC. 242B. (a) NOTICES.—

〚(1) ORDER TO SHOW CAUSE.—In deportation proceedings under section 242, written notice (in this section referred to as an "order to show cause") shall be given in person to the alien (or, if personal service is not practicable, such notice shall be given by certified mail to the alien or to the alien's counsel of record, if any) specifying the following:

〚(A) The nature of the proceedings against the alien.

〚(B) The legal authority under which the proceedings are conducted.

〚(C) The acts or conduct alleged to be in violation of law.

〚(D) The charges against the alien and the statutory provisions alleged to have been violated.

〚(E) The alien may be represented by counsel and the alien will be provided a list of counsel prepared under subsection (b)(2).

〚(F)(i) The requirement that the alien must immediately provide (or have provided) the Attorney General with a written record of an address and telephone number (if any) at which the alien may be contacted respecting proceedings under section 242.

〚(ii) The requirement that the alien must provide the Attorney General immediately with a written record of any change of the alien's address or telephone number.

〚(iii) The consequences under subsection (c)(2) of failure to provide address and telephone information pursuant to this subparagraph.

〚(2) NOTICE OF TIME AND PLACE OF PROCEEDINGS.—In deportation proceedings under section 242—

〚(A) written notice shall be given in person to the alien (or, if personal service is not practicable, written notice shall be given by certified mail to the alien or to the alien's

422

counsel of record, if any), in the order to show cause or otherwise, of—

〚(i) the time and place at which the proceedings will be held, and

〚(ii) the consequences under subsection (c) of the failure, except under exceptional circumstances, to appear at such proceedings; and

〚(B) in the case of any change or postponement in the time and place of such proceedings, written notice shall be given in person to the alien (or, if personal service is not practicable, written notice shall be given by certified mail to the alien or to the alien's counsel of record, if any) of—

〚(i) the new time or place of the proceedings, and

〚(ii) the consequences under subsection (c) of failing, except under exceptional circumstances, to attend such proceedings.

In the case of an alien not in detention, a written notice shall not be required under this paragraph if the alien has failed to provide the address required under subsection (a)(1)(F).

〚(3) FORM OF INFORMATION.—Each order to show cause or other notice under this subsection—

〚(A) shall be in English and Spanish, and

〚(B) shall specify that the alien may be represented by an attorney in deportation proceedings under section 242 and will be provided, in accordance with subsection (b)(1), a period of time in order to obtain counsel and a current list described in subsection (b)(2).

〚(4) CENTRAL ADDRESS FILES.—The Attorney General shall create a system to record and preserve on a timely basis notices of addresses and telephone numbers (and changes) provided under paragraph (1)(F).

〚(b) SECURING OF COUNSEL.—

〚(1) IN GENERAL.—In order that an alien be permitted the opportunity to secure counsel before the first hearing date in proceedings under section 242, the hearing date shall not be scheduled earlier than 14 days after the service of the order to show cause, unless the alien requests in writing an earlier hearing date.

〚(2) CURRENT LISTS OF COUNSEL.—The Attorney General shall provide for lists (updated not less often than quarterly) of persons who have indicated their availability to represent pro bono aliens in proceedings under section 242. Such lists shall be provided under subsection (a)(1)(E) and otherwise made generally available.

〚(c) CONSEQUENCES OF FAILURE TO APPEAR.—

〚(1) IN GENERAL.—Any alien who, after written notice required under subsection (a)(2) has been provided to the alien or the alien's counsel of record, does not attend a proceeding under section 242, shall be ordered deported under section 242(b)(1) in absentia if the Service establishes by clear, unequivocal, and convincing evidence that the written notice was so provided and that the alien is deportable. The written notice by the Attorney General shall be considered sufficient for pur-

423

poses of this paragraph if provided at the most recent address provided under subsection (a)(1)(F).

⟦(2) No notice if failure to provide address information.—No written notice shall be required under paragraph (1) if the alien has failed to provide the address required under subsection (a)(1)(F).

⟦(3) Rescission of order.—Such an order may be rescinded only—

⟦(A) upon a motion to reopen filed within 180 days after the date of the order of deportation if the alien demonstrates that the failure to appear was because of exceptional circumstances (as defined in subsection (f)(2)), or

⟦(B) upon a motion to reopen filed at any time if the alien demonstrates that the alien did not receive notice in accordance with subsection (a)(2) or the alien demonstrates that the alien was in Federal or State custody and did not appear through no fault of the alien.

The filing of the motion to reopen described in subparagraph (A) or (B) shall stay the deportation of the alien pending disposition of the motion.

⟦(4) Effect on judicial review.—Any petition for review under section 106 of an order entered in absentia under this subsection shall, notwithstanding such section, be filed not later than 60 days (or 30 days in the case of an alien convicted of an aggravated felony) after the date of the final order of deportation and shall (except in cases described in section 106(a)(5)) be confined to the issues of the validity of the notice provided to the alien, to the reasons for the alien's not attending the proceeding, and to whether or not clear, convincing, and unequivocal evidence of deportability has been established.

⟦(d) Treatment of Frivolous Behavior.—The Attorney General shall, by regulation—

⟦(1) define in a proceeding before a special inquiry officer or before an appellate administrative body under this title, frivolous behavior for which attorneys may be sanctioned,

⟦(2) specify the circumstances under which an administrative appeal of a decision or ruling will be considered frivolous and will be summarily dismissed, and

⟦(3) impose appropriate sanctions (which may include suspension and disbarment) in the case of frivolous behavior.

Nothing in this subsection shall be construed as limiting the authority of the Attorney General to take actions with respect to inappropriate behavior.

⟦(e) Limitation on Discretionary Relief for Failure to Appear.—

⟦(1) At deportation proceedings.—Any alien against whom a final order of deportation is entered in absentia under this section and who, at the time of the notice described in subsection (a)(2), was provided oral notice, either in the alien's native language or in another language the alien understands, of the time and place of the proceedings and of the consequences under this paragraph of failing, other than because of exceptional circumstances (as defined in subsection (f)(2)) to attend a proceeding under section 242, shall not be eligible for relief

424

described in paragraph (5) for a period of 5 years after the date of the entry of the final order of deportation.

⟦(2) VOLUNTARY DEPARTURE.—

⟦(A) IN GENERAL.—Subject to subparagraph (B), any alien allowed to depart voluntarily under section 244(e)(1) or who has agreed to depart voluntarily at his own expense under section 242(b)(1) who remains in the United States after the scheduled date of departure, other than because of exceptional circumstances, shall not be eligible for relief described in paragraph (5) for a period of 5 years after the scheduled date of departure or the date of unlawful reentry, respectively.

⟦(B) WRITTEN AND ORAL NOTICE REQUIRED.—Subparagraph (A) shall not apply to an alien allowed to depart voluntarily unless, before such departure, the Attorney General has provided written notice to the alien in English and Spanish and oral notice either in the alien's native language or in another language the alien understands of the consequences under subparagraph (A) of the alien's remaining in the United States after the scheduled date of departure, other than because of exceptional circumstances.

⟦(3) FAILURE TO APPEAR UNDER DEPORTATION ORDER.—

⟦(A) IN GENERAL.—Subject to subparagraph (B), any alien against whom a final order of deportation is entered under this section and who fails, other than because of exceptional circumstances, to appear for deportation at the time and place ordered shall not be eligible for relief described in paragraph (5) for a period of 5 years after the date the alien was required to appear for deportation.

⟦(B) WRITTEN AND ORAL NOTICE REQUIRED.—Subparagraph (A) shall not apply to an alien against whom a deportation order is entered unless the Attorney General has provided, orally in the alien's native language or in another language the alien understands and in the final order of deportation under this section of the consequences under subparagraph (A) of the alien's failure, other than because of exceptional circumstances, to appear for deportation at the time and place ordered.

⟦(4) FAILURE TO APPEAR FOR ASYLUM HEARING.—

⟦(A) IN GENERAL.—Subject to subparagraph (B), any alien—

⟦(i) whose period of authorized stay (if any) has expired through the passage of time,

⟦(ii) who has filed an application for asylum, and

⟦(iii) who fails, other than because of exceptional circumstances, to appear at the time and place specified for the asylum hearing,

shall not be eligible for relief described in paragraph (5) for a period of 5 years after the date of the asylum hearing.

⟦(B) WRITTEN AND ORAL NOTICE REQUIRED.—Subparagraph (A) shall not apply in the case of an alien with respect to a failure to be present at a hearing unless—

425

⟦(i) written notice in English and Spanish, and oral notice either in the alien's native language or in another language the alien understands, was provided to the alien of the time and place at which the asylum hearing will be held, and in the case of any change or postponement in such time or place, written notice in English and Spanish, and oral notice either in the alien's native language or in another language the alien understands, was provided to the alien of the new time or place of the hearing; and

⟦(ii) notices under clause (i) specified the consequences under subparagraph (A) of failing, other than because of exceptional circumstances, to attend such hearing.

⟦(5) RELIEF COVERED.—The relief described in this paragraph is—

⟦(A) voluntary departure under section 242(b)(1),

⟦(B) suspension of deportation or voluntary departure under section 244, and

⟦(C) adjustment or change of status under section 245, 248, or 249.

⟦(f) DEFINITIONS.—In this section:

⟦(1) The term "certified mail" means certified mail, return receipt requested.

⟦(2) The term "exceptional circumstances" refers to exceptional circumstances (such as serious illness of the alien or death of an immediate relative of the alien, but not including less compelling circumstances) beyond the control of the alien.

⟦COUNTRIES TO WHICH ALIENS SHALL BE DEPORTED; COST OF DEPORTATION

⟦SEC. 243. (a) The deportation of an alien in the United States provided for in this Act, or any other Act or treaty, shall be directed by the Attorney General to a country promptly designated by the alien if that country is willing to accept him into its territory, unless the Attorney General, in his discretion, concludes that deportation to such country would be prejudicial to the interests of the United States. No alien shall be permitted to make more than one such designation, nor shall any alien designate, as the place to which he wishes to be deported, any foreign territory contiguous to the United States or any island adjacent thereto or adjacent to the United States unless such alien is a native, citizen, subject, or national of, or had a residence in such designated foreign contiguous territory or adjacent island. If the government of the country designated by the alien fails finally to advise the Attorney General within three months following original inquiry whether that government will or will not accept such alien into its territory, such designation may thereafter be disregarded. Thereupon deportation of such alien shall be directed to any country of which such alien is a subject, national, or citizen if such country is willing to accept him into its territory. If the government of such country fails finally to advise the Attorney General or the alien within three months following the date of original inquiry, or within such other period as the Attorney General shall deem reasonable under the

426

circumstances in a particular case, whether that government will or will not accept such alien into its territory, then such deportation shall be directed by the Attorney General within his discretion and without necessarily giving any priority or preference because of their order as herein set forth either—

⟦(1) to the country from which such alien last entered the United States;

⟦(2) to the country in which is located the foreign port at which such alien embarked for the United States or for foreign contiguous territory;

⟦(3) to the country in which he was born;

⟦(4) to the country in which the place of his birth is situated at the time he is ordered deported;

⟦(5) to any country in which he resided prior to entering the country from which he entered the United States;

⟦(6) to the country which had sovereignty over the birthplace of the alien at the time of his birth; or

⟦(7) if deportation to any of the foregoing places or countries is impracticable, inadvisable, or impossible, then to any country which is willing to accept such alien into its territory.

⟦(b) If the United States is at war and the deportation, in accordance with the provisions of subsection (a), of any alien who is deportable under any law of the United States shall be found by the Attorney General to be impracticable, inadvisable, inconvenient, or impossible because of enemy occupation of the country from which such alien came or wherein is located the foreign port at which he embarked for the United States or because of reasons connected with the war, such alien may, in the discretion of the Attorney General, be deported as follows:

⟦(1) If such alien is a citizen or subject of a country whose recognized government is in exile, to the country in which is located that government in exile if that country will permit him to enter its territory; or

⟦(2) if such alien is a citizen or subject of a country whose recognized government is not in exile, then to a country or any political or territorial subdivision thereof which is proximate to the country of which the alien is a citizen or subject, or, with the consent of the country of which the alien is a citizen or subject, to any other country.

⟦(c) If deportation proceedings are instituted at any time within five years after the entry of the alien for causes existing prior to or at the time of entry, the cost of removal to the port of deportation shall be at the expense of the appropriation for the enforcement of this Act, and the deportation from such port shall be at the expense of the owner or owners of the vessels, aircraft, or other transportation lines by which such alien came to the United States, or if in the opinion of the Attorney General that is not practicable, at the expense of the appropriation for the enforcement of this Act: *Provided,* That the costs of the deportation of any such alien from such port shall not be assessed against the owner or owners of the vessels, aircraft, or other transportation lines in the case of any alien who arrived in possession of a valid unexpired immigrant visa and who was inspected and admitted to the United States for permanent residence. In the case of an alien crewman, if deportation

427

proceedings are instituted at any time within five years after the granting of the last conditional permit to land temporarily under the provisions of section 252, the cost of removal to the port of deportation shall be at the expense of the appropriation for the enforcement of this Act and the deportation from such port shall be at the expense of the owner or owners of the vessels or aircraft by which such alien came to the United States, or if in the opinion of the Attorney General that is not practicable, at the expense of the appropriation for the enforcement of this Act.

⟦(d) If deportation proceedings are instituted later than five years after the entry of the alien, or in the case of an alien crewman later than five years after the granting of the last conditional permit to land temporarily, the cost thereof shall be payable from the appropriation for the enforcement of this Act.

⟦(e) A failure or refusal on the part of the master, commanding officer, agent, owner, charterer, or consignee of a vessel, aircraft, or other transportation line to comply with the order of the Attorney General to take on board, guard safely, and transport to the destination specified any alien ordered to be deported under the provisions of this Act, or a failure or refusal by any such person to comply with an order of the Attorney General to pay deportation expenses in accordance with the requirements of this section, shall be punished by the imposition of a penalty in the sum and manner prescribed in section 237(b).

⟦(f) When in the opinion of the Attorney General the mental or physical condition of an alien being deported is such as to require personal care and attendance, the Attorney General shall, when necessary, employ a suitable person for that purpose who shall accompany such alien to his final destination, and the expense incident to such service shall be defrayed in the same manner as the expense of deporting the accompanied alien is defrayed, and any failure or refusal to defray such expenses shall be punished in the manner prescribed by subsection (e) of this section.

⟦(g) Upon the notification by the Attorney General that any country upon request denies or unduly delays acceptance of the return of any alien who is a national, citizen, subject, or resident thereof, the Secretary of State shall instruct consular officers performing their duties in the territory of such country to discontinue the issuance of immigrant visas to nationals, citizens, subjects, or residents of such country, until such time as the Attorney General shall inform the Secretary of State that such country has accepted such alien.

⟦(h)(1) The Attorney General shall not deport or return any alien (other than an alien described in section 241(a)(4)(D)) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

⟦(2) Paragraph (1) shall not apply to any alien if the Attorney General determines that—

⟦(A) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

428

〔(B) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

〔(C) there are serious reasons for considering that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States; or

〔(D) there are reasonable grounds for regarding the alien as a danger to the security of the United States.

For purposes of subparagraph (B), an alien who has been convicted of an aggravated felony shall be considered to have committed a particularly serious crime.〕

*PENALTIES RELATED TO REMOVAL*

SEC. 243. (a) PENALTY FOR FAILURE TO DEPART.—

(1) IN GENERAL.—*Any alien against whom a final order of removal is outstanding by reason of being a member of any of the classes described in section 237(a), who—*

(A) *willfully fails or refuses to depart from the United States within a period of 90 days from the date of the final order of removal under administrative processes, or if judicial review is had, then from the date of the final order of the court,*

(B) *willfully fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure,*

(C) *connives or conspires, or takes any other action, designed to prevent or hamper or with the purpose of preventing or hampering the alien's departure pursuant to such, or*

(D) *willfully fails or refuses to present himself or herself for removal at the time and place required by the Attorney General pursuant to such order,*

*shall be fined under title 18, United States Code, or imprisoned not more than four years (or 10 years if the alien is a member of any of the classes described in paragraph (1)(E), (2), (3), or (4) of section 237(a)), or both.*

(2) EXCEPTION.—*It is not a violation of paragraph (1) to take any proper steps for the purpose of securing cancellation of or exemption from such order of removal or for the purpose of securing the alien's release from incarceration or custody.*

(3) SUSPENSION.—*The court may for good cause suspend the sentence of an alien under this subsection and order the alien's release under such conditions as the court may prescribe. In determining whether good cause has been shown to justify releasing the alien, the court shall take into account such factors as—*

(A) *the age, health, and period of detention of the alien;*

(B) *the effect of the alien's release upon the national security and public peace or safety;*

(C) *the likelihood of the alien's resuming or following a course of conduct which made or would make the alien deportable;*

(D) *the character of the efforts made by such alien himself and by representatives of the country or countries to which the alien's removal is directed to expedite the alien's departure from the United States;*

429

(E) the reason for the inability of the Government of the United States to secure passports, other travel documents, or removal facilities from the country or countries to which the alien has been ordered removed; and

(F) the eligibility of the alien for discretionary relief under the immigration laws.

(b) WILLFUL FAILURE TO COMPLY WITH TERMS OF RELEASE UNDER SUPERVISION.—An alien who shall willfully fail to comply with regulations or requirements issued pursuant to section 241(a)(3) or knowingly give false information in response to an inquiry under such section shall be fined not more than $1,000 or imprisoned for not more than one year, or both.

(c) PENALTIES RELATING TO VESSELS AND AIRCRAFT.—

(1) CIVIL PENALTIES.—

(A) FAILURE TO CARRY OUT CERTAIN ORDERS.—If the Attorney General is satisfied that a person has violated subsection (d) or (e) of section 241, the person shall pay to the Commissioner the sum of $2,000 for each violation.

(B) FAILURE TO REMOVE ALIEN STOWAWAYS.—If the Attorney General is satisfied that a person has failed to remove an alien stowaway as required under section 241(d)(2), the person shall pay to the Commissioner the sum of $5,000 for each alien stowaway not removed.

(C) NO COMPROMISE.—The Attorney General may not compromise the amount of such penalty under this paragraph.

(2) CLEARING VESSELS AND AIRCRAFT.—

(A) CLEARANCE BEFORE DECISION ON LIABILITY.—A vessel or aircraft may be granted clearance before a decision on liability is made under paragraph (1) only if a bond approved by the Attorney General or an amount sufficient to pay the civil penalty is deposited with the Commissioner.

(B) PROHIBITION ON CLEARANCE WHILE PENALTY UNPAID.—A vessel or aircraft may not be granted clearance if a civil penalty imposed under paragraph (1) is not paid.

(d) DISCONTINUING GRANTING VISAS TO NATIONALS OF COUNTRY DENYING OR DELAYING ACCEPTING ALIEN.—On being notified by the Attorney General that the government of a foreign country denies or unreasonably delays accepting an alien who is a citizen, subject, national, or resident of that country after the Attorney General asks whether the government will accept the alien under this section, the Secretary of State shall order consular officers in that foreign country to discontinue granting immigrant visas or nonimmigrant visas, or both, to citizens, subjects, nationals, and residents of that country until the Attorney General notifies the Secretary that the country has accepted the alien.

〔SUSPENSION OF DEPORTATION; VOLUNTARY DEPARTURE

〔SEC. 244. (a) As hereinafter prescribed in this section, the Attorney General may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence, in the case of an alien (other than an alien described in section 241(a)(4)(D))) who applies to the Attorney General for suspension of deportation and—

430

⟦(1) is deportable under any law of the United States except the provisions specified in paragraph (2) of this subsection; has been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application, and proves that during all of such period he was and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence;

⟦(2) is deportable under paragraph (2), (3), or (4) of section 241(a); has been physically present in the United States for a continuous period of not less than 10 years immediately following the commission of an act, or the assumption of a status, constituting a ground for deportation, and proves that during all of such period he has been and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in exceptional and extremely unusual hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence; or

⟦(3) is deportable under any law of the United States except section 241(a)(1)(G) and the provisions specified in paragraph (2); has been physically present in the United States for a continuous period of not less than 3 years immediately preceding the date of such application; has been battered or subjected to extreme cruelty in the United States by a spouse or parent who is a United States citizen or lawful permanent resident (or is the parent of a child of a United States citizen or lawful permanent resident and the child has been battered or subjected to extreme cruelty in the United States by such citizen or permanent resident parent); and proves that during all of such time in the United States the alien was and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or the alien's parent or child.

⟦(b)(1) The requirement of continuous physical presence in the United States specified in paragraphs (1) and (2) of subsection (a) of this section shall not be applicable to an alien who (A) has served for a minimum period of twenty-four months in an active-duty status in the Armed Forces of the United States and, if separated from such service, was separated under honorable conditions, and (B) at the time of his enlistment or induction was in the United States.

⟦(2) An alien shall not be considered to have failed to maintain continuous physical presence in the United States under paragraphs (1) and (2) of subsection (a) if the absence from the United States was brief, casual, and innocent and did not meaningfully interrupt the continuous physical presence.

⟦(c) Upon application by any alien who is found by the Attorney General to meet the requirements of subsection (a) of this section the Attorney General may in his discretion suspend deportation of such alien.

431

〔(d) Upon the cancellation of deportation in the case of any alien under this section, the Attorney General shall record the alien's lawful admission for permanent residence as of the date the cancellation of deportation of such alien is made.

〔(e)(1) Except as provided in paragraph (2), the Attorney General may, in his discretion, permit any alien under deportation proceedings, other than an alien within the provisions of paragraph (2), (3), or (4) of section 241(a) (and also any alien within the purview of such paragraphs if he is also within the provisions of paragraph (2) of subsection (a) of this section), to depart voluntarily from the United States at his own expense in lieu of deportation if such alien shall establish to the satisfaction of the Attorney General that he is, and has been, a person of good moral character for at least five years immediately preceding his application for voluntary departure under this subsection.

〔(2) The authority contained in paragraph (1) shall not apply to any alien who is deportable because of a conviction for an aggravated felony.

〔(f) The provisions of subsection (a) shall not apply to an alien who—

〔(1) entered the United States as a crewman subsequent to June 30, 1964;

〔(2) was admitted to the United States as a nonimmigrant exchange alien as defined in section 101(a)(15)(J), or has acquired the status of such a nonimmigrant exchange alien after admission, in order to receive graduate medical education, or training, regardless of whether or not the alien is subject to or has fulfilled the two-year foreign residence requirement of section 212(e); or

〔(3)(A) was admitted to the United States as a nonimmigrant exchange alien as defined in section 101(a)(15)(J) or has acquired the status of such a nonimmigrant exchange alien after admission other than to receive graduate medical education or training, (B) is subject to the two-year foreign residence requirement of section 212(e), and (C) has not fulfilled that requirement or received a waiver thereof.

〔(g) In acting on applications under subsection (a)(3), the Attorney General shall consider any credible evidence relevant to the application. The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General.〕

TEMPORARY PROTECTED STATUS

SEC. 〔244A.〕 *244.* (a) GRANTING OF STATUS.—

(1) IN GENERAL.—In the case of an alien who is a national of a foreign state designated under subsection (b) (or in the case of an alien having no nationality, is a person who last habitually resided in such designated state) and who meets the requirements of subsection (c), the Attorney General, in accordance with this section—

(A) may grant the alien temporary protected status in the United States and shall not 〔deport〕 *remove* the alien from the United States during the period in which such status is in effect, and

432

(B) shall authorize the alien to engage in employment in the United States and provide the alien with an "employment authorized" endorsement or other appropriate work permit.

(2) DURATION OF WORK AUTHORIZATION.—Work authorization provided under this section shall be effective throughout the period the alien is in temporary protected status under this section.

(3) NOTICE.—

(A) Upon the granting of temporary protected status under this section, the Attorney General shall provide the alien with information concerning such status under this section.

(B) If, at the time of initiation of a 【deportation】 *removal* proceeding against an alien, the foreign state (of which the alien is a national) is designated under subsection (b), the Attorney General shall promptly notify the alien of the temporary protected status that may be available under this section.

(C) If, at the time of designation of a foreign state under subsection (b), an alien (who is a national of such state) is in a 【deportation】 *removal* proceeding under this title, the Attorney General shall promptly notify the alien of the temporary protected status that may be available under this section.

    *     *     *     *     *     *     *

(b) DESIGNATIONS.—

(1)  * * *

    *     *     *     *     *     *     *

(5) REVIEW.—

(A) DESIGNATIONS.—There is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection.

(B) APPLICATION TO INDIVIDUALS.—The Attorney General shall establish an administrative procedure for the review of the denial of benefits to aliens under this subsection. Such procedure shall not prevent an alien from asserting protection under this section in 【deportation】 *removal* proceedings if the alien demonstrates that the alien is a national of a state designated under paragraph (1).

(c) ALIENS ELIGIBLE FOR TEMPORARY PROTECTED STATUS.—

(1)  * * *

(2) ELIGIBILITY STANDARDS.—

(A)  * * *

(B) ALIENS INELIGIBLE.—An alien shall not be eligible for temporary protected status under this section if the Attorney General finds that—

(i) the alien has been convicted of any felony or 2 or more misdemeanors committed in the United States, or

433

(ii) the alien is described in section 【243(h)(2)】 *208(b)(2)(A)*.

\*      \*      \*      \*      \*      \*      \*

(e) Relation of Period of Temporary Protected Status to 【Suspension of Deportation】 *Cancellation of Removal*.—With respect to an alien granted temporary protected status under this section, the period of such status shall not be counted as a period of physical presence in the United States for purposes of section 【244(a)】 *240A(a)*, unless the Attorney General determines that extreme hardship exists. Such period shall not cause a break in the continuity of residence of the period before and after such period for purposes of such section.

\*      \*      \*      \*      \*      \*      \*

ADJUSTMENT OF STATUS OF NONIMMIGRANT TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE

Sec. 245. (a)   \*   \*   \*

\*      \*      \*      \*      \*      \*      \*

(c) Subsection (a) shall not be applicable to (1) an alien crewman; (2) an alien (other than 【an immediate relative as defined in section 201(b)】 *a spouse or child of a citizen of the United States under section 201(b) or a parent of a citizen under section 203(a)(2)* or a special immigrant described in section 【101(a)(27)(H), (I),】 *101(a)(27)(I)*, (J), or (K)) who hereafter continues in or accepts unauthorized employment prior to filing an application for adjustment of status or who is in unlawful immigration status on the date of filing the application for adjustment of status or who has failed (other than through no fault of his own or for technical reasons) to maintain continuously a lawful status since entry into the United States; (3) any alien admitted in transit without visa under section 212(d)(4)(C); (4) an alien (other than 【an immediate relative as defined in section 201(b)】 *a spouse or child of a citizen of the United States under section 201(b) or a parent of a citizen under section 203(a)(2)*) who was admitted as a nonimmigrant visitor without a visa under section 212(l) or section 217; 【or】 (5) an alien who was admitted as a nonimmigrant described in section 101(a)(15)(S)*, or (6) an alien who is deportable under section 237(a)(4)(B)*.

(d) The Attorney General may not adjust, under subsection (a), the status of an alien lawfully admitted to the United States for permanent residence on a conditional basis under section 216. The Attorney General may not adjust, under subsection (a), the status of a nonimmigrant alien described in section 101(a)(15)(K) (relating to an alien fiancee or fiance or the minor child of such alien) except to that of an alien lawfully admitted to the United States on a conditional basis under section 216 as a result of the marriage of the nonimmigrant (or, in the case of a minor child, the parent) to the citizen who filed the petition to accord that alien's nonimmigrant status under section 101(a)(15)(K).

(e)(1) Except as provided in paragraph (3), an alien who is seeking to receive an immigrant visa on the basis of a marriage which was entered into during the period described in paragraph (2) may not have the alien's status adjusted under subsection (a).

434

(2) The period described in this paragraph is the period during which administrative or judicial proceedings are pending regarding the alien's right to 〚enter〛 *be admitted* or remain in the United States.

(3) Paragraph (1) and section 204(g) shall not apply with respect to a marriage if the alien establishes by clear and convincing evidence to the satisfaction of the Attorney General that the marriage was entered into in good faith and in accordance with the laws of the place where the marriage took place and the marriage was not entered into for the purpose of procuring the alien's 〚entry〛 *admission* as an immigrant and no fee or other consideration was given (other than a fee or other consideration to an attorney for assistance in preparation of a lawful petition) for the filing of a petition under section 204(a) or 214(d) with respect to the alien spouse or alien son or daughter. In accordance with regulations, there shall be only one level of administrative appellate review for each alien under the previous sentence.

(f) The Attorney General may not adjust, under subsection (a), the status of an alien lawfully admitted to the United States for permanent residence on a conditional basis under section 216A.

\*    \*    \*    \*    \*    \*    \*

(i)(1) Notwithstanding the provisions of subsections (a) and (c) of this section, an alien physically present in the United States who—
    (A) entered the United States without inspection; or
    (B) is within one of the classes enumerated in subsection (c) of this section
may apply to the Attorney General for the adjustment of his or her status to that of an alien lawfully admitted for permanent residence. The Attorney General may accept such application only if the alien remits with such application a sum equalling 〚five times the fee required for the processing of applications under this section as of the date of receipt of the application,〛 *$2,500* but such sum shall not be required from a child under the age of seventeen, or an alien who is the spouse or unmarried child of an individual who obtained temporary or permanent resident status under section 210 or 245A of the Immigration and Nationality Act or section 202 of the Immigration Reform and Control Act of 1986 at any date, who—
    (i) as of May 5, 1988, was the unmarried child or spouse of the individual who obtained temporary or permanent resident status under section 210 or 245A of the Immigration and Nationality Act or section 202 of the Immigration Reform and Control Act of 1986;
    (ii) entered the United States before May 5, 1988, resided in the United States on May 5, 1988, and is not a lawful permanent resident; and
    (iii) applied for benefits under section 301(a) of the Immigration Act of 1990. The sum specified herein shall be in addition to the fee normally required for the processing of an application under this section.

(2) Upon receipt of such an application and the sum hereby required, the Attorney General may adjust the status of the alien to that of an alien lawfully admitted for permanent residence if—

435

(A) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence; and

(B) an immigrant visa is immediately available to the alien at the time the application is filed.

(3) Sums remitted to the Attorney General pursuant to paragraphs (1) and (2) of this subsection shall be disposed of by the Attorney General as provided in sections 286 (m), (n), and (o) of this title.

〖(i)〗 *(j)*(1) If, in the opinion of the Attorney General—

(A) a nonimmigrant admitted into the United States under section 101(a)(15)(S)(i) has supplied information described in subclause (I) of such section; and

\*        \*        \*        \*        \*        \*        \*

(3) Upon the approval of adjustment of status under 〖paragraphs (1) or (2)〗 *paragraph (1) or (2)*, the Attorney General shall record the alien's lawful admission for permanent residence as of the date of such approval and the Secretary of State shall reduce by one the number of visas authorized to be issued under sections 201(d) and 203(b)〖(4)〗 *(6)* for the fiscal year then current.

ADJUSTMENT OF STATUS OF CERTAIN ENTRANTS BEFORE JANUARY 1, 1982, TO THAT OF PERSON ADMITTED FOR LAWFUL RESIDENCE

SEC. 245A. (a) TEMPORARY RESIDENT STATUS.—The Attorney General shall adjust the status of an alien to that of an alien lawfully admitted for temporary residence if the alien meets the following requirements:

(1) TIMELY APPLICATION.—

(A) DURING APPLICATION PERIOD.—Except as provided in subparagraph (B), the alien must apply for such adjustment during the 12-month period beginning on a date (not later than 180 days after the date of enactment of this section) designated by the Attorney General.

(B) APPLICATION WITHIN 30 DAYS OF SHOW-CAUSE ORDER.—An alien who, at any time during the first 11 months of the 12-month period described in subparagraph (A), is the subject of an order to show cause issued under section 242 *(as in effect before October 1, 1996)*, must make application under this section not later than the end of the 30-day period beginning either on the first day of such 12-month period or on the date of the issuance of such order, whichever day is later.

\*        \*        \*        \*        \*        \*        \*

(c) APPLICATIONS FOR ADJUSTMENT OF STATUS.—

(1)  \*  \*  \*

\*        \*        \*        \*        \*        \*        \*

(5) CONFIDENTIALITY OF INFORMATION.—〖Neither〗 *(A) Except as provided in this paragraph, neither* the Attorney General, nor any other official or employee of the Department of Justice, or bureau or agency thereof, may—

〖(A)〗 *(i)* use the information furnished pursuant to an application filed under this section for any purpose other than to make a determination on the application or for en-

forcement of paragraph (6) or for the preparation of reports to Congress under section 404 of the Immigration Reform and Control Act of 1986,

〖(B)〗 *(ii)* make any publication whereby the information furnished by any particular individual can be identified, or

〖(C)〗 *(iii)* permit anyone other than the sworn officers and employees of the Department or bureau or agency or, with respect to applications filed with a designated entity, that designated entity, to examine individual applications〖;〗.

〖except that the〗

*(B) The* Attorney General may provide, in the Attorney General's discretion, for the furnishing of information furnished under this section in the same manner and circumstances as census information may be disclosed by the Secretary of Commerce under section 8 of title 13, United States Code.

*(C) The Attorney General may authorize an application to a Federal court of competent jurisdiction for, and a judge of such court may grant, an order authorizing disclosure of information contained in the application of the alien under this section to be used—*

*(i) for identification of the alien when there is reason to believe that the alien has been killed or severely incapacitated; or*

*(ii) for criminal law enforcement purposes against the alien whose application is to be disclosed if the alleged criminal activity occurred after the legalization application was filed and such activity involves terrorist activity or poses either an immediate risk to life or to national security, or would be prosecutable as an aggravated felony, but without regard to the length of sentence that could be imposed on the applicant.*

*(D)* Anyone who uses, publishes, or permits information to be examined in violation of this paragraph shall be fined in accordance with title 18, United States Code, or imprisoned not more than five years, or both.

*(E) Nothing in this paragraph shall preclude the release for immigration enforcement purposes of the following information contained in files or records of the Service pertaining to the application:*

*(i) The immigration status of the applicant on any given date after the date of filing the application (including whether the applicant was authorized to work) but only for purposes of a determination of whether the applicant is eligible for relief from deportation or removal and not otherwise.*

*(ii) The date of the applicant's adjustment (if any) to the status of an alien lawfully admitted for permanent residence.*

*(iii) Information concerning whether the applicant has been convicted of a crime occurring after the date of filing the application.*

*(iv) The date or disposition of the application.*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

437

(f) ADMINISTRATIVE AND JUDICIAL REVIEW.—
    (1)  * * *

\*      \*      \*      \*      \*      \*      \*

    (4) JUDICIAL REVIEW.—
        (A) LIMITATION TO REVIEW OF DEPORTATION.—There shall be judicial review of such a denial only in the judicial review of an order of deportation under section 106 *(as in effect before October 1, 1996)*.

\*      \*      \*      \*      \*      \*      \*

RESCISSION OF ADJUSTMENT OF STATUS

SEC. 246. (a) If, at any time within five years after the status of a person has been otherwise adjusted under the provisions of section 245 or 249 of this Act or any other provision of law to that of an alien lawfully admitted for permanent residence, it shall appear to the satisfaction of the Attorney General that the person was not in fact eligible for such adjustment of status, the Attorney General shall rescind the action taken granting an adjustment of status to such person and cancelling ⟦deportation⟧ *removal* in the case of such person if that occurred and the person shall thereupon be subject to all provisions of this Act to the same extent as if the adjustment of status had not been made. *Nothing in this subsection shall require the Attorney General to rescind the alien's status prior to commencement of procedures to remove the alien under section 240, and an order of removal issued by an immigration judge shall be sufficient to rescind the alien's status.*

\*      \*      \*      \*      \*      \*      \*

ADJUSTMENT OF STATUS OF CERTAIN RESIDENT ALIENS TO
NONIMMIGRANT STATUS

SEC. 247. (a) The status of an alien lawfully admitted for permanent residence shall be adjusted by the Attorney General, under such regulations as he may prescribe, to that of a nonimmigrant under paragraph (15)(A), (15)(E), or (15)(G) of section 101(a), if such alien had at the time of ⟦entry⟧ *admission* or subsequently acquires an occupational status which would, if he were seeking admission to the United States, entitle him to a nonimmigrant status under such sections. As of the date of the Attorney General's order making such adjustment of status, the Attorney General shall cancel the record of the alien's admission for permanent residence, and the immigrant status of such alien shall thereby be terminated.

\*      \*      \*      \*      \*      \*      \*

CHANGE OF NONIMMIGRANT CLASSIFICATION

SEC. 248. The Attorney General may, under such conditions as he may prescribe, authorize a change from any nonimmigrant classification to any other nonimmigrant classification in the case of any alien lawfully admitted to the United States as a nonimmigrant who is continuing to maintain that status, except in the case of—

438

(1) an alien classified as a nonimmigrant under subparagraph (C), (D), (K), or (S) of section 101(a)(15),

\*    \*    \*    \*    \*    \*    \*

(4) an alien admitted as a nonimmigrant visitor without a visa under section 212(l) or section 217.

*Any alien whose status is changed under this section may apply to the Secretary of State for a visa without having to leave the United States and apply at the visa office.*

RECORD OF ADMISSION FOR PERMANENT RESIDENCE IN THE CASE OF CERTAIN ALIENS WHO ENTERED THE UNITED STATES PRIOR TO JULY 1, 1924 OR JANUARY 1, 1972

SEC. 249. A record of lawful admission for permanent residence may, in the discretion of the Attorney General and under such regulations as he may prescribe, be made in the case of any alien, as of the date of the approval of his application or, if entry occurred prior to July 1, 1924, as of the date of such entry, if no such record is otherwise available and such alien shall satisfy the Attorney General that he is not inadmissible under section 212(a)(3)(E) or under section 212(a) insofar as it relates to criminals, procurers and other immoral persons, subversives, violators of the narcotic laws or smugglers of aliens, and he establishes that he—

(a) entered the United States prior to January 1, 1972;

(b) has had his residence in the United States continuously since such entry;

(c) is a person of good moral character; and

(d) is not ineligible to citizenship *and is not deportable under section 237(a)(4)(B).*

\*    \*    \*    \*    \*    \*    \*

CHAPTER 6—SPECIAL PROVISIONS RELATING TO ALIEN CREWMEN

\*    \*    \*    \*    \*    \*    \*

CONDITIONAL PERMITS TO LAND TEMPORARILY

SEC. 252. (a)  \* \* \*

(b) Pursuant to regulations prescribed by the Attorney General, any immigration officer may, in his discretion, if he determines that an alien is not a bona fide crewman, or does not intend to depart on the vessel or aircraft which brought him, revoke the conditional permit to land which was granted such crewman under the provisions of subsection (a)(1), take such crewman into custody, and require the master or commanding officer of the vessel or aircraft on which the crewman arrived to receive and detain him on board such vessel or aircraft, if practicable, and such crewman shall be 【deported】 *removed* from the United States at the expense of the transportation line which brought him to the United States. Until such alien is so 【deported】 *removed*, any expenses of his detention shall be borne by such transportation company. Nothing in this section shall be construed to require the procedure prescribed

439

in section 【242】 *240* of this Act to cases falling within the provisions of this subsection.

\*       \*       \*       \*       \*       \*       \*

CONTROL OF ALIEN CREWMEN

SEC. 254. (a) The owner, agent, consignee, charterer, master, or commanding officer of any vessel or aircraft arriving in the United States from any place outside thereof who fails (1) to detain on board the vessel, or in the case of an aircraft to detain at a place specified by an immigration officer at the expense of the airline, any alien crewman employed thereon until an immigration officer has completely inspected such alien crewman, including a physical examination by the medical examiner, or (2) to detain any alien crewman on board the vessel, or in the case of an aircraft at a place specified by an immigration officer at the expense of the airline, after such inspection unless a conditional permit to land temporarily has been granted such alien crewman under section 252 or unless an alien crewman has been permitted to land temporarily under section 212(d)(5) or 253 for medical or hospital treatment, or (3) to 【deport】 *remove* such alien crewman if required to do so by an immigration officer, whether such 【deportation】 *removal* requirement is imposed before or after the crewman is permitted to land temporarily under section 212(d)(5), 252, or 253, shall pay to the Commissioner the sum of $3,000 for each alien crewman in respect of whom any such failure occurs. No such vessel or aircraft shall be granted clearance pending the determination of the liability to the payment of such fine, or while the fine remains unpaid, except that clearance may be granted prior to the determination of such question upon the deposit of a sum sufficient to cover such fine, or of a bond with sufficient surety to secure the payment thereof approved by the Commissioner. The Attorney General may, upon application in writing therefor, mitigate such penalty to not less than $500 for each alien crewman in respect of whom such failure occurs, upon such terms as he shall think proper.

(b) Except as may be otherwise prescribed by regulations issued by the Attorney General, proof that an alien crewman did not appear upon the outgoing manifest of the vessel or aircraft on which he arrived in the United States from any place outside thereof, or that he was reported by the master or commanding officer of such vessel or aircraft as a deserter, shall be prima facie evidence of a failure to detain or 【deport】 *remove* such alien crewman.

(c) If the Attorney General finds that 【deportation】 *removal* of an alien crewman under this section on the vessel or aircraft on which he arrived is impracticable or impossible, or would cause undue hardship to such alien crewman, he may cause the alien crewman to be 【deported】 *removed* from the port of arrival or any other port on another vessel or aircraft of the same transportation line, unless the Attorney General finds this to be impracticable. All expenses incurred in connection with such 【deportation】 *removal*, including expenses incurred in transferring an alien crewman from one place in the United States to another under such conditions and safeguards as the Attorney General shall impose, shall be paid by the owner or owners of the vessel or aircraft on which the alien

440

arrived in the United States. The vessel or aircraft on which the alien arrived shall not be granted clearance until such expenses have been paid or their payment guaranteed to the satisfaction of the Attorney General. An alien crewman who is transferred within the United States in accordance with this subsection shall not be regarded as having been landed in the United States.

\*     \*     \*     \*     \*     \*     \*

### LIMITATIONS ON PERFORMANCE OF LONGSHORE WORK BY ALIEN CREWMEN

SEC. 258. (a)   \* \* \*

(b) LONGSHORE WORK DEFINED.—

(1)   \* \* \*

(2) EXCEPTION FOR SAFETY AND ENVIRONMENTAL PROTECTION.—The term "longshore work" does not include the loading or unloading of any cargo for which the Secretary of Transportation has, under the authority contained in chapter 37 of title 46, United States Code (relating to Carriage of Liquid Bulk Dangerous Cargoes), section 311 of the Federal Water Pollution Control Act (33 U.S.C. 1321), section 4106 of the Oil Pollution Act of 1990, or 〚section 105 or 106 of the Hazardous Materials Transportation Act (49 U.S.C. App. 1804, 1805)〛 *section 5103(b), 5104, 5106, 5107, or 5110 of title 49, United States Code* prescribed regulations which govern—

(A) the handling or stowage of such cargo,

(B) the manning of vessels and the duties, qualifications, and training of the officers and crew of vessels carrying such cargo, and

(C) the reduction or elimination of discharge during ballasting, tank cleaning, handling of such cargo.

\*     \*     \*     \*     \*     \*     \*

### PROVISIONS GOVERNING REGISTRATION OF SPECIAL GROUPS

SEC. 263. (a) Notwithstanding the provisions of sections 261 and 262, the Attorney General is authorized to prescribe special regulations and forms for the registration and fingerprinting of (1) alien crewmen, (2) holders of border-crossing identification cards, (3) aliens confined in institutions within the United States, (4) aliens under order of 〚deportation〛 *removal,* 〚and (5)〛 *(5) aliens who are or have been on criminal probation or criminal parole within the United States, and (6)* aliens of any other class not lawfully admitted to the United States for permanent residence.

\*     \*     \*     \*     \*     \*     \*

### FORMS AND PROCEDURE

SEC. 264. (a)   \* \* \*

\*     \*     \*     \*     \*     \*     \*

*(f) Notwithstanding any other provision of law, the Attorney General is authorized to require any alien to provide the alien's social*

441

*security account number for purposes of inclusion in any record of the alien maintained by the Attorney General or the Service.*

\*        \*        \*        \*        \*        \*        \*

PENALTIES

SEC. 266. (a)  \* \* \*

(b) Any alien or any parent or legal guardian in the United States of any alien who fails to give written notice to the Attorney General, as required by section 265 of this title, shall be guilty of a misdemeanor and shall, upon conviction thereof, be fined not to exceed $200 or be imprisoned not more than thirty days, or both. Irrespective of whether an alien is convicted and punished as herein provided, any alien who fails to give written notice to the Attorney General, as required by section 265, shall be taken into custody and 【deported】 *removed* in the manner provided by chapter 【5】 *4* of this title, unless such alien establishes to the satisfaction of the Attorney General that such failure was reasonably excusable or was not willful.

(c) Any alien or any parent or legal guardian of any alien, who files an application for registration containing statements known by him to be false, or who procures or attempts to procure registration of himself or another person through fraud, shall be guilty of a misdemeanor and shall, upon conviction thereof, be fined not to exceed $1,000, or be imprisoned not more than six months, or both; and any alien so convicted shall, upon the warrant of the Attorney General, be taken into custody and be 【deported】 *removed* in the manner provided in chapter 【5】 *4* of this title.

\*        \*        \*        \*        \*        \*        \*

CHAPTER 8—GENERAL PENALTY PROVISIONS

\*        \*        \*        \*        \*        \*        \*

BRINGING IN ALIENS SUBJECT TO 【EXCLUSION】 *DENIAL OF ADMISSION* ON A HEALTH-RELATED GROUND

SEC. 272. (a) Any person who shall bring to the United States an alien (other than an alien crewman) who is 【excludable】 *inadmissible* under section 212(a)(1) shall pay to the Commissioner for each and every alien so afflicted the sum of $3,000 unless (1) the alien was in possession of a valid, unexpired immigrant visa, or (2) the alien was allowed to land in the United States, or (3) the alien was in possession of a valid unexpired nonimmigrant visa or other document authorizing such alien to apply for temporary admission to the United States or an unexpired reentry permit issued to him, and (A) such application was made within one hundred and twenty days of the date of issuance of the visa or other document, or in the case of an alien in possession of a reentry permit, within one hundred and twenty days of the date on which the alien was last examined and admitted by the Service, or (B) in the event the application was made later than one hundred and twenty days of the date of issuance of the visa or other document or such examination and admission, if such person establishes to the satisfaction of the Attorney General that the existence of the 【excluding condition】

442

*condition causing inadmissibility* could not have been detected by the exercise of due diligence prior to the alien's embarkation.

(b) No vessel or aircraft shall be granted clearance papers pending determination of the question of liability to the payment of any fine under this section, or while the fines remain unpaid, nor shall such fines be remitted or refunded; but clearance may be granted prior to the determination of such question upon the deposit of a sum sufficient to cover such fines or of a bond with sufficient surety to secure the payment thereof, approved by the Commissioner.

(c) Nothing contained in this section shall be construed to subject transportation companies to a fine for bringing to ports of entry in the United States aliens who are entitled by law to exemption from the ⟦excluding⟧ provisions of section 212(a).

(d) As used in this section, the term "person" means the owner, master, agent, commanding officer, charterer, or consignee of any vessel or aircraft.

UNLAWFUL BRINGING OF ALIENS INTO UNITED STATES

SEC. 273. (a)*(1)* It shall be unlawful for any person, including any transportation company, or the owner, master, commanding officer, agent, charterer, or consignee of any vessel or aircraft, to bring to the United States from any place outside thereof (other than from foreign contiguous territory) any alien who does not have a valid passport and an unexpired visa, if a visa was required under this Act or regulations issued thereunder.

*(2) It is unlawful for an owner, agent, master, commanding officer, person in charge, purser, or consignee of a vessel or aircraft who is bringing an alien (except an alien crewmember) to the United States to take any consideration to be kept or returned contingent on whether an alien is admitted to, or ordered removed from, the United States.*

(b) If it appears to the satisfaction of the Attorney General that any alien has been so brought, such person, or transportation company, or the master, commanding officer, agent, owner, charterer, or consignee of any such vessel or aircraft, shall pay to the Commissioner a fine of $3,000 for each alien so brought and, except in the case of any such alien who is admitted, or permitted to land temporarily, in addition, an amount equal to that paid by such alien for his transportation from the initial point of departure, indicated in his ticket, to the port of arrival, such latter fine to be delivered by the Commissioner to the alien on whose account the assessment is made. No vessel or aircraft shall be granted clearance pending the determination of the liability to the payment of such fine or while such fine ⟦remain⟧ *remains* unpaid, except that clearance may be granted prior to the determination of such question upon the deposit of an amount sufficient to cover such fine, or of a bond with sufficient surety to secure the payment thereof approved by the Commissioner.

＊　　　＊　　　＊　　　＊　　　＊　　　＊　　　＊

⟦(d) The owner, charterer, agent, consignee, commanding officer, or master of any vessel or aircraft arriving at the United States from any place outside the United States who fails to deport any alien stowaway on the vessel or aircraft on which such stowaway

443

arrived or on another vessel or aircraft at the expense of the vessel or aircraft on which such stowaway arrived when required to do so by an immigration officer, shall pay to the Commissioner the sum of $3,000 for each alien stowaway, in respect of whom any such failure occurs. Pending final determination of liability for such fine, no such vessel or aircraft shall be granted clearance, except that clearance may be granted upon the deposit of an amount sufficient to cover such fine, or of a bond with sufficient surety to secure the payment thereof approved by the Commissioner. The provisions of section 235 for detention of aliens for examination before special inquiry officers and the right of appeal provided for in section 236 shall not apply to aliens who arrive as stowaways and no such alien shall be permitted to land in the United States, except temporarily for medical treatment, or pursuant to such regulations as the Attorney General may prescribe for the ultimate departure or removal or deportation of such alien from the United States.]

\*        \*        \*        \*        \*        \*        \*

BRINGING IN AND HARBORING CERTAIN ALIENS

SEC. 274. (a) CRIMINAL PENALTIES.—(1)(A)  \*  \*  \*
(B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—

(i) in the case of a violation of subparagraph (A)(i) *or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain*, be fined under title 18, United States Code, imprisoned not more than 10 years, or both;

\*        \*        \*        \*        \*        \*        \*

*(C) Any person who engages in any conspiracy to commit, or aids or abets the commission of, any of the acts described in—*

*(i) subparagraph (A)(i) shall be fined under title 18, United States Code, imprisoned not more than 10 years, or both; or*

*(ii) clause (ii), (iii), or (iv) of subparagraph (A) shall be fined under title 18, United States Code, imprisoned not more than 5 years, or both.*

(2) Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, [for each transaction constituting a violation of this paragraph, regardless of the number of aliens involved] *for each alien in respect to whom a violation of this paragraph occurs*—

(A) be fined in accordance with title 18, United States Code, or imprisoned not more than one year, or both; or

(B) in the case of—

(i) a second or subsequent offense,

(ii) an offense done for the purpose of commercial advantage or private financial gain, [or]

(iii) an offense in which the alien is not upon arrival immediately brought and presented to an appropriate immigration officer at a designated port of entry, *or*

444

*(iv) an offense committed with the intent or with reason to believe that the alien unlawfully brought into the United States will commit an offense against the United States or any State punishable by imprisonment for more than 1 year,*

⟦be fined in accordance with title 18, United States Code, or in the case of a violation of subparagraph (B)(ii), imprisoned not more than 10 years, or both; or in the case of a violation of subparagraph (B)(i) or (B)(iii), imprisoned not more than 5 years, or both..⟧ *be fined under title 18, United States Code, and shall be imprisoned not less than 3 years or more than 10 years.*

\*　　\*　　\*　　\*　　\*　　\*　　\*

UNLAWFUL EMPLOYMENT OF ALIENS

SEC. 274A. (a) MAKING EMPLOYMENT OF UNAUTHORIZED ALIENS UNLAWFUL.—

(1)  \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(3) DEFENSE.—*(A)* A person or entity that establishes that it has complied in good faith with the requirements of subsection (b) with respect to the hiring, recruiting, or referral for employment of an alien in the United States has established an affirmative defense that the person or entity has not violated paragraph (1)(A) with respect to such hiring, recruiting, or referral.

*(B) FAILURE TO SEEK AND OBTAIN CONFIRMATION.—Subject to subsection (b)(7), in the case of a hiring of an individual for employment in the United States by a person or entity that employs more than 3 employees, the following rules apply:*

*(i) FAILURE TO SEEK CONFIRMATION.—*

*(I) IN GENERAL.—If the person or entity has not made an inquiry, under the mechanism established under subsection (b)(6), seeking confirmation of the identity, social security number, and work eligibility of the individual, by not later than the end of 3 working days (as specified by the Attorney General) after the date of the hiring, the defense under subparagraph (A) shall not be considered to apply with respect to any employment after such 3 working days, except as provided in subclause (II).*

*(II) SPECIAL RULE FOR FAILURE OF CONFIRMATION MECHANISM.—If such a person or entity in good faith attempts to make an inquiry during such 3 working days in order to qualify for the defense under subparagraph (A) and the confirmation mechanism has registered that not all inquiries were responded to during such time, the person or entity can make an inquiry in the first subsequent working day in which the confirmation mechanism registers no nonresponses and qualify for the defense.*

FRP-FRN-01115

445

(ii) FAILURE TO OBTAIN CONFIRMATION.—If the person or entity has made the inquiry described in clause (i)(I) but has not received an appropriate confirmation of such identity, number, and work eligibility under such mechanism within the time period specified under subsection (b)(6)(D)(iii) after the time the confirmation inquiry was received, the defense under subparagraph (A) shall not be considered to apply with respect to any employment after the end of such time period.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(6) TREATMENT OF DOCUMENTATION FOR CERTAIN EMPLOYEES.—

(A) IN GENERAL.—For purposes of paragraphs (1)(B) and (3), if—

(i) an individual is a member of a collective-bargaining unit and is employed, under a collective bargaining agreement entered into between one or more employee organizations and an association of two or more employers, by an employer that is a member of such association, and

(ii) within the period specified in subparagraph (B), another employer that is a member of the association (or an agent of such association on behalf of the employer) has complied with the requirements of subsection (b) with respect to the employment of the individual,

the subsequent employer shall be deemed to have complied with the requirements of subsection (b) with respect to the hiring of the employee and shall not be liable for civil penalties described in subsection (e)(5).

(B) PERIOD.—The period described in this subparagraph is—

(i) up to 5 years in the case of an individual who has presented documentation identifying the individual as a national of the United States or as an alien lawfully admitted for permanent residence; or

(ii) up to 3 years (or, if less, the period of time that the individual is authorized to be employed in the United States) in the case of another individual.

(C) LIABILITY.—

(i) IN GENERAL.—If any employer that is a member of an association hires for employment in the United States an individual and relies upon the provisions of subparagraph (A) to comply with the requirements of subsection (b) and the individual is an unauthorized alien, then for the purposes of paragraph (1)(A), subject to clause (ii), the employer shall be presumed to have known at the time of hiring or afterward that the individual was an unauthorized alien.

(ii) REBUTTAL OF PRESUMPTION.—The presumption established by clause (i) may be rebutted by the employer only through the presentation of clear and convincing evidence that the employer did not know (and

446

*could not reasonably have known) that the individual at the time of hiring or afterward was an unauthorized alien.*

(b) Employment Verification System.—The requirements referred to in paragraphs (1)(B) and (3) of subsection (a) are, in the case of a person or other entity hiring, recruiting, or referring an individual for employment in the United States, the requirements specified in the following three paragraphs:

(1) Attestation after examination of documentation.—

(A)  * * *

(B) Documents establishing both employment authorization and identity.—A document described in this subparagraph is an individual's—

(i) United States passport; *or*

[(ii) certificate of United States citizenship;

[(iii) certificate of naturalization;

[(iv) unexpired foreign passport, if the passport has an appropriate, unexpired endorsement of the Attorney General authorizing the individual's employment in the United States; or]

[(v)] *(ii)* resident alien card [or other alien registration card, if the card], *alien registration card, or other document designated by regulation by the Attorney General, if the document—*

(I) contains a photograph of the individual or such other personal identifying information relating to the individual as the Attorney General finds, by regulation, sufficient for purposes of this subsection, and

(II) is evidence of authorization of employment in the United States.

[(C) Documents evidencing employment authorization.—A document described in this subparagraph is an individual's—

[(i) social security account number card (other than such a card which specifies on the face that the issuance of the card does not authorize employment in the United States);

[(ii) certificate of birth in the United States or establishing United States nationality at birth, which certificate the Attorney General finds, by regulation, to be acceptable for purposes of this section; or

[(iii) other documentation evidencing authorization of employment in the United States which the Attorney General finds, by regulation, to be acceptable for purposes of this section.]

*(C) Social security account number card as evidence of employment authorization.—A document described in this subparagraph is an individual's social security account number card (other than such a card which specifies on the face that the issuance of the card does not authorize employment in the United States).*

447

(D) DOCUMENTS ESTABLISHING IDENTITY OF INDIVID-
UAL.—A document described in this subparagraph is an
individual's—

(i) driver's license or similar document issued for the
purpose of identification by a State, if it contains a
photograph of the individual or such other personal
identifying information relating to the individual as
the Attorney General finds, by regulation, sufficient
for purposes of this section; or

(ii) in the case of individuals under 16 years of age
or in a State which does not provide for issuance of an
identification document (other than a driver's license)
referred to in clause (i), documentation of personal
identity of such other type as the Attorney General
finds, by regulation, provides a reliable means of
identification.

⟦(2) INDIVIDUAL ATTESTATION OF EMPLOYMENT AUTHORIZA-
TION.—The individual must attest, under penalty of perjury on
the form designated or established for purposes of paragraph
(1), that the individual is a citizen or national of the United
States, an alien lawfully admitted for permanent residence, or
an alien who is authorized under this Act or by the Attorney
General to be hired, recruited, or referred for such employ-
ment.

⟦(3) RETENTION OF VERIFICATION FORM.—After completion of
such form in accordance with paragraphs (1) and (2), the per-
son or entity must retain the form and make it available for
inspection by officers of the Service, the Special Counsel for
Immigration-Related Unfair Employment Practices, or the De-
partment of Labor during a period beginning on the date of the
hiring, recruiting, or referral of the individual and ending—

⟦(A) in the case of the recruiting or referral for a fee
(without hiring) of an individual, three years after the date
of the recruiting or referral, and

⟦(B) in the case of the hiring of an individual—

⟦(i) three years after the date of such hiring, or
⟦(ii) one year after the date the individual's employ-
ment is terminated,

whichever is later.⟧

*(2) INDIVIDUAL ATTESTATION OF EMPLOYMENT AUTHORIZATION
AND PROVISION OF SOCIAL SECURITY ACCOUNT NUMBER.—The
individual must—*

*(A) attest, under penalty of perjury on the form des-
ignated or established for purposes of paragraph (1), that
the individual is a citizen or national of the United States,
an alien lawfully admitted for permanent residence, or an
alien who is authorized under this Act or by the Attorney
General to be hired, recruited, or referred for such employ-
ment; and*

*(B) provide on such form the individual's social security
account number.*

*(3) RETENTION OF VERIFICATION FORM AND CONFIRMATION.—
After completion of such form in accordance with paragraphs
(1) and (2), the person or entity must—*

448

(A) retain the form and make it available for inspection by officers of the Service, the Special Counsel for Immigration-Related Unfair Employment Practices, or the Department of Labor during a period beginning on the date of the hiring, recruiting, or referral of the individual and ending—

(i) in the case of the recruiting or referral for a fee (without hiring) of an individual, three years after the date of the recruiting or referral, and

(ii) in the case of the hiring of an individual—

(I) three years after the date of such hiring, or

(II) one year after the date the individual's employment is terminated,

whichever is later; and

(B) subject to paragraph (7), if the person employs more than 3 employees, seek to have (within 3 working days of the date of hiring) and have (within the time period specified under paragraph (6)(D)(iii)) the identity, social security number, and work eligibility of the individual confirmed in accordance with the procedures established under paragraph (6), except that if the person or entity in good faith attempts to make an inquiry in accordance with the procedures established under paragraph (6) during such 3 working days in order to fulfill the requirements under this subparagraph, and the confirmation mechanism has registered that not all inquiries were responded to during such time, the person or entity shall make an inquiry in the first subsequent working day in which the confirmation mechanism registers no nonresponses.

(4) COPYING OF DOCUMENTATION PERMITTED.—Notwithstanding any other provision of law, the person or entity may copy a document presented by an individual pursuant to this subsection and may retain the copy, but only (except as otherwise permitted under law) for the purpose of complying with the requirements of this subsection.

(5) LIMITATION ON USE OF ATTESTATION FORM.—A form designated or established by the Attorney General under this subsection and any information contained in or appended to such form, may not be used for purposes other than for enforcement of this Act and sections 1001, 1028, 1546, and 1621 of title 18, United States Code.

(6) EMPLOYMENT ELIGIBILITY CONFIRMATION PROCESS.—

(A) IN GENERAL.—Subject to paragraph (7), the Attorney General shall establish a confirmation mechanism through which the Attorney General (or a designee of the Attorney General which may include a nongovernmental entity)—

(i) responds to inquiries by employers, made through a toll-free telephone line or other electronic media in the form of an appropriate confirmation code or otherwise, on whether an individual is authorized to be employed by that employer, and

(ii) maintains a record that such an inquiry was made and the confirmation provided (or not provided).

449

(B) EXPEDITED PROCEDURE IN CASE OF NO CONFIRMA-
TION.—In connection with subparagraph (A), the Attorney
General shall establish, in consultation with the Commis-
sioner of Social Security and the Commissioner of the Serv-
ice, expedited procedures that shall be used to confirm the
validity of information used under the confirmation mecha-
nism in cases in which the confirmation is sought but is
not provided through the confirmation mechanism.

(C) DESIGN AND OPERATION OF MECHANISM.—The con-
firmation mechanism shall be designed and operated—

(i) to maximize the reliability of the confirmation
process, and the ease of use by employers, recruiters,
and referrers, consistent with insulating and protecting
the privacy and security of the underlying information,
and

(ii) to respond to all inquiries made by employers on
whether individuals are authorized to be employed by
those employers, recruiters, or referrers registering all
times when such response is not possible.

(D) CONFIRMATION PROCESS.—(i) As part of the confirma-
tion mechanism, the Commissioner of Social Security shall
establish a reliable, secure method, which within the time
period specified under clause (iii), compares the name and
social security account number provided against such infor-
mation maintained by the Commissioner in order to con-
firm (or not confirm) the validity of the information pro-
vided and whether the individual has presented a social se-
curity account number that is not valid for employment.
The Commissioner shall not disclose or release social secu-
rity information.

(ii) As part of the confirmation mechanism, the Commis-
sioner of the Service shall establish a reliable, secure meth-
od, which, within the time period specified under clause
(iii), compares the name and alien identification number (if
any) provided against such information maintained by the
Commissioner in order to confirm (or not confirm) the va-
lidity of the information provided and whether the alien is
authorized to be employed in the United States.

(iii) For purposes of this section, the Attorney General (or
a designee of the Attorney General) shall provide through
the confirmation mechanism confirmation or a tentative
nonconfirmation of an individual's employment eligibility
within 3 working days of the initial inquiry. In cases of ten-
tative nonconfirmation, the Attorney General shall specify,
in consultation with the Commissioner of Social Security
and the Commissioner of the Service, an expedited time pe-
riod not to exceed 10 working days within which final con-
firmation or denial must be provided through the confirma-
tion mechanism in accordance with the procedures under
subparagraph (B).

(iv) The Commissioners shall update their information in
a manner that promotes the maximum accuracy and shall
provide a process for the prompt correction of erroneous in-
formation.

450

(E) PROTECTIONS.—(i) In no case shall an individual be denied employment because of inaccurate or inaccessible data under the confirmation mechanism.

(ii) The Attorney General shall assure that there is a timely and accessible process to challenge nonconfirmations made through the mechanism.

(iii) If an individual would not have been dismissed from a job but for an error of the confirmation mechanism, the individual will be entitled to compensation through the mechanism of the Federal Tort Claims Act.

(F) TESTER PROGRAM.—As part of the confirmation mechanism, the Attorney General shall implement a program of testers and investigative activities (similar to testing and other investigative activities assisted under the fair housing initiatives program under section 561 of the Housing and Community Development Act of 1987 to enforce rights under the Fair Housing Act) in order to monitor and prevent unlawful discrimination under the mechanism.

(G) PROTECTION FROM LIABILITY FOR ACTIONS TAKEN ON THE BASIS OF INFORMATION PROVIDED BY THE EMPLOYMENT ELIGIBILITY CONFIRMATION MECHANISM.—No person shall be civilly or criminally liable for any action taken in good faith reliance on information provided through the employment eligibility confirmation mechanism established under this paragraph (including any pilot program established under paragraph (7)).

(7) APPLICATION OF CONFIRMATION MECHANISM THROUGH PILOT PROJECTS.—

(A) IN GENERAL.—Subsection (a)(3)(B) and paragraph (3) shall only apply to individuals hired if they are covered under a pilot project established under this paragraph.

(B) UNDERTAKING PILOT PROJECTS.—For purposes of this paragraph, the Attorney General shall undertake pilot projects for all employers in at least 5 of the 7 States with the highest estimated population of unauthorized aliens, in order to test and assure that the confirmation mechanism described in paragraph (6) is reliable and easy to use. Such projects shall be initiated not later than 6 months after the date of the enactment of this paragraph. The Attorney General, however, shall not establish such mechanism in other States unless Congress so provides by law. The pilot projects shall terminate on such dates, not later than October 1, 1999, as the Attorney General determines. At least one such pilot project shall be carried out through a non-governmental entity as the confirmation mechanism.

(C) REPORT.—The Attorney General shall submit to the Congress annual reports in 1997, 1998, and 1999 on the development and implementation of the confirmation mechanism under this paragraph. Such reports may include an analysis of whether the mechanism implemented—

(i) is reliable and easy to use;

(ii) limits job losses due to inaccurate or unavailable data to less than 1 percent;

(iii) increases or decreases discrimination;

451

*(iv) protects individual privacy with appropriate policy and technological mechanisms; and*

*(v) burdens individual employers with costs or additional administrative requirements.*

\*        \*        \*        \*        \*        \*        \*

(e) COMPLIANCE.—

(1) COMPLAINTS AND INVESTIGATIONS.—The Attorney General shall establish procedures—

(A) for individuals and entities to file written, signed complaints respecting potential violations of subsection (a) or (g)(1),

(B) for the investigation of those complaints which, on their face, have a substantial probability of validity,

(C) for the investigation of such other violations of subsection (a) or (g)(1) as the Attorney General determines to be appropriate, ⟦and⟧

(D) for the designation in the Service of a unit which has, as its primary duty, the prosecution of cases of violations of subsection (a) or (g)(1) under this subsection⟦.⟧, *and*

*(E) under which a person or entity shall not be considered to have failed to comply with the requirements of subsection (b) based upon a technical or procedural failure to meet a requirement of such subsection in which there was a good faith attempt to comply with the requirement unless (i) the Service (or another enforcement agency) has explained to the person or entity the basis for the failure, (ii) the person or entity has been provided a period of not less than 10 business days (beginning after the date of the explanation) within which to correct the failure, and (iii) the person or entity has not corrected the failure voluntarily within such period, except that this subparagraph shall not apply with respect to the engaging by any person or entity of a pattern or practice of violations of subsection (a)(1)(A) or (a)(2).*

\*        \*        \*        \*        \*        \*        \*

⟦(i) EFFECTIVE DATES.—

⟦(1) 6-MONTH PUBLIC INFORMATION PERIOD.—During the six-month period beginning on the first day of the first month after the date of the enactment of this section—

⟦(A) the Attorney General, in cooperation with the Secretaries of Agriculture, Commerce, Health and Human Services, Labor, and the Treasury and the Administrator of the Small Business Administration, shall disseminate forms and information to employers, employment agencies, and organizations representing employees and provide for public education respecting the requirements of this section, and

⟦(B) the Attorney General shall not conduct any proceeding, nor issue any order, under this section on the basis of any violation alleged to have occurred during the period.

⟦(2) 12-MONTH FIRST CITATION PERIOD.—In the case of a person or entity, in the first instance in which the Attorney Gen-

452

eral has reason to believe that the person or entity may have violated subsection (a) during the subsequent 12-month period, the Attorney General shall provide a citation to the person or entity indicating that such a violation or violations may have occurred and shall not conduct any proceeding, nor issue any order, under this section on the basis of such alleged violation or violations.

⟦(3) DEFERRAL OF ENFORCEMENT WITH RESPECT TO SEASONAL AGRICULTURAL SERVICES.—

⟦(A) IN GENERAL.—Except as provided in subparagraph (B), before the end of the application period (as defined in subparagraph (C)(i)), the Attorney General shall not conduct any proceeding, nor impose any penalty, under this section on the basis of any violation alleged to have occurred with respect to employment of an individual in seasonal agricultural services.

⟦(B) PROHIBITION OF RECRUITMENT OUTSIDE THE UNITED STATES.—

⟦(i) IN GENERAL.—During the application period, it is unlawful for a person or entity (including a farm labor contractor) or an agent of such a person or entity, to recruit an unauthorized alien (other than an alien described in clause (ii)) who is outside the United States to enter the United States to perform seasonal agricultural services.

⟦(ii) EXCEPTION.—Clause (i) shall not apply to an alien who the person or entity reasonably believes meets the requirements of section 210(a)(2) of this Act (relating to performance of seasonal agricultural services).

⟦(iii) PENALTY FOR VIOLATION.—A person, entity, or agent that violates clause (i) shall be deemed to be subject to an order under this section in the same manner as if it had violated subsection (a)(1)(A), without regard to paragraph (2) of this subsection.

⟦(C) DEFINITIONS.—In this paragraph:

⟦(i) APPLICATION PERIOD.—The term "application period" means the period described in section 210(a)(1).

⟦(ii) SEASONAL AGRICULTURAL SERVICES.—The term "seasonal agricultural services" has the meaning given such term in section 210(h).

⟦(j) GENERAL ACCOUNTING OFFICE REPORTS.—

⟦(1) IN GENERAL.—Beginning one year after the date of enactment of this section, and at intervals of one year thereafter for a period of three years after such date, the Comptroller General shall prepare and transmit to the Congress and to the taskforce established under subsection (k) a report describing the results of a review of the implementation and enforcement of this section during the preceding twelve-month period, for the purpose of determining if—

⟦(A) such provisions have been carried out satisfactorily;

⟦(B) a pattern of discrimination has resulted against citizens or nationals of the United States or against eligible workers seeking employment; and

453

⟦(C) an unnecessary regulatory burden has been created for employers hiring such workers.

⟦(2) DETERMINATION ON DISCRIMINATION.—In each report, the Comptroller General shall make a specific determination as to whether the implementation of this section has resulted in a pattern of discrimination in employment (against other than unauthorized aliens) on the basis of national origin.

⟦(3) RECOMMENDATIONS.—If the Comptroller General has determined that such a pattern of discrimination has resulted, the report—

⟦(A) shall include a description of the scope of that discrimination, and

⟦(B) may include recommendations for such legislation as may be appropriate to deter or remedy such discrimination.

⟦(k) REVIEW BY TASKFORCE.—

⟦(1) ESTABLISHMENT OF JOINT TASKFORCE.—The Attorney General, jointly with the Chairman of the Commission on Civil Rights and the Chairman of the Equal Employment Opportunity Commission, shall establish a taskforce to review each report of the Comptroller General transmitted under subsection (j)(1).

⟦(2) RECOMMENDATIONS TO CONGRESS.—If the report transmitted includes a determination that the implementation of this section has resulted in a pattern of discrimination in employment (against other than unauthorized aliens) on the basis of national origin, the taskforce shall, taking into consideration any recommendations in the report, report to Congress recommendations for such legislation as may be appropriate to deter or remedy such discrimination.

⟦(3) CONGRESSIONAL HEARINGS.—The Committees on the Judiciary of the House of Representatives and of the Senate shall hold hearings respecting any report of the taskforce under paragraph (2) within 60 days after the date of receipt of the report.

⟦(l) TERMINATION DATE FOR EMPLOYER SANCTIONS.—

⟦(1) IF REPORT OF WIDESPREAD DISCRIMINATION AND CONGRESSIONAL APPROVAL.—The provisions of this section shall terminate 30 calendar days after receipt of the last report required to be transmitted under subsection (j), if—

⟦(A) the Comptroller General determines, and so reports in such report, that a widespread pattern of discrimination has resulted against citizens or nationals of the United States or against eligible workers seeking employment solely from the implementation of this section; and

⟦(B) there is enacted, within such period of 30 calendar days, a joint resolution stating in substance that the Congress approves the findings of the Comptroller General contained in such report.

⟦(2) SENATE PROCEDURES FOR CONSIDERATION.—Any joint resolution referred to in clause (B) of paragraph (1) shall be considered in the Senate in accordance with subsection (n).

⟦(m) EXPEDITED PROCEDURES IN THE HOUSE OF REPRESENTATIVES.—For the purpose of expediting the consideration and adop-

454

tion of joint resolutions under subsection (l), a motion to proceed to the consideration of any such joint resolution after it has been reported by the appropriate committee shall be treated as highly privileged in the House of Representatives.

⟦(n) EXPEDITED PROCEDURES IN THE SENATE.—

⟦(1) CONTINUITY OF SESSION.—For purposes of subsection (l), the continuity of a session of Congress is broken only by an adjournment of the Congress sine die, and the days on which either House is not in session because of an adjournment of more than three days to a day certain are excluded in the computation of the period indicated.

⟦(2) RULEMAKING POWER.—Paragraphs (3) and (4) of this subsection are enacted—

⟦(A) as an exercise of the rulemaking power of the Senate and as such they are deemed a part of the rules of the Senate, but applicable only with respect to the procedure to be followed in the Senate in the case of joint resolutions referred to in subsection (l), and supersede other rules of the Senate only to the extent that such paragraphs are inconsistent therewith; and

⟦(B) with full recognition of the constitutional right of the Senate to change such rules at any time, in the same manner as in the case of any other rule of the Senate.

⟦(3) COMMITTEE CONSIDERATION.—

⟦(A) MOTION TO DISCHARGE.—If the committee of the Senate to which has been referred a joint resolution relating to the report described in subsection (l) has not reported such joint resolution at the end of ten calendar days after its introduction, not counting any day which is excluded under paragraph (1) of this subsection, it is in order to move either to discharge the committee from further consideration of the joint resolution or to discharge the committee from further consideration of any other joint resolution introduced with respect to the same report which has been referred to the committee, except that no motion to discharge shall be in order after the committee has reported a joint resolution with respect to the same report.

⟦(B) CONSIDERATION OF MOTION.—A motion to discharge under subparagraph (A) of this paragraph may be made only by a Senator favoring the joint resolution, is privileged, and debate thereon shall be limited to not more than 1 hour, to be divided equally between those favoring and those opposing the joint resolution, the time to be divided equally between, and controlled by, the majority leader and the minority leader or their designees. An amendment to the motion is not in order, and it is not in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

⟦(4) MOTION TO PROCEED TO CONSIDERATION.—

⟦(A) IN GENERAL.—A motion in the Senate to proceed to the consideration of a joint resolution shall be privileged. An amendment to the motion shall not be in order, nor

455

shall it be in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

〔(B) DEBATE ON RESOLUTION.—Debate in the Senate on a joint resolution, and all debatable motions and appeals in connection therewith, shall be limited to not more than 10 hours, to be equally divided between, and controlled by, the majority leader and the minority leader or their designees.

〔(C) DEBATE ON MOTION.—Debate in the Senate on any debatable motion or appeal in connection with a joint resolution shall be limited to not more than 1 hour, to be equally divided between, and controlled by, the mover and the manager of the joint resolution, except that in the event the manager of the joint resolution is in favor of any such motion or appeal, the time in opposition thereto shall be controlled by the minority leader or his designee. Such leaders, or either of them, may, from time under their control on the passage of a joint resolution, allot additional time to any Senator during the consideration of any debatable motion or appeal.

〔(D) MOTIONS TO LIMIT DEBATE.—A motion in the Senate to further limit debate on a joint resolution, debatable motion, or appeal is not debatable. No amendment to, or motion to recommit, a joint resolution is in order in the Senate.〕

UNFAIR IMMIGRATION-RELATED EMPLOYMENT PRACTICES

SEC. 274B. (a) PROHIBITION OF DISCRIMINATION BASED ON NATIONAL ORIGIN OR CITIZENSHIP STATUS.—

(1)  * * *

*       *       *       *       *       *       *

(3) DEFINITION OF PROTECTED INDIVIDUAL.—As used in paragraph (1), the term "protected individual" means an individual who—

(A) is a citizen or national of the United States, or

(B) is an alien who is lawfully admitted for permanent residence, is granted the status of an alien lawfully admitted for temporary residence under section 210(a)〔, 210A(a),〕 or 245A(a)(1), is admitted as a refugee under section 207, or is granted asylum under section 208; but does not include (i) an alien who fails to apply for naturalization within six months of the date the alien first becomes eligible (by virtue of period of lawful permanent residence) to apply for naturalization or, if later, within six months after the date of the enactment of this section and (ii) an alien who has applied on a timely basis, but has not been naturalized as a citizen within 2 years after the date of the application, unless the alien can establish that the alien is actively pursuing naturalization, except that time consumed in the Service's processing the application shall not be counted toward the 2-year period.

*       *       *       *       *       *       *

456

(6) TREATMENT OF CERTAIN DOCUMENTARY PRACTICES AS EMPLOYMENT PRACTICES.—[For] *(A) Subject to subparagraph (B), for* purposes of paragraph (1), a person's or other entity's request, for purposes of satisfying the requirements of section 274A(b), for more or different documents than are required under such section or refusing to honor documents tendered that on their face reasonably appear to be genuine shall be treated as an unfair immigration-related employment practice relating to the hiring of individuals.

*(B) A person or other entity—*

*(i) may request a document proving a renewal of employment authorization when an individual has previously submitted a time-limited document to satisfy the requirements of section 274A(b)(1); or*

*(ii) if possessing reason to believe that an individual presenting a document which reasonably appears on its face to be genuine is nonetheless an unauthorized alien, (I) may inform the individual of the question about the document's validity, and of such person or other entity's intention to verify the validity of such document, and (II) upon receiving confirmation that the individual is unauthorized to work, may dismiss the individual with no benefits or rights accruing on the basis of the period employed.*

*Nothing in this provision prohibits an individual from offering alternative documents that satisfy the requirements of section 274A(b)(1).*

\*        \*        \*        \*        \*        \*        \*

(g) DETERMINATIONS.—

(1) ORDER.—The administrative law judge shall issue and cause to be served on the parties to the proceeding an order, which shall be final unless appealed as provided under subsection (i).

(2) ORDERS FINDING VIOLATIONS.—

(A) IN GENERAL.—If, upon the preponderance of the evidence, an administrative law judge determines that any person or entity named in the complaint has engaged in or is engaging in any such unfair immigration-related employment practice, then the judge shall state his findings of fact and shall issue and cause to be served on such person or entity an order which requires such person or entity to cease and desist from such unfair immigration-related employment practice. *Such order also shall require the person or entity to comply with the requirements of clauses (ii) and (vi) of subparagraph (B).*

(B) CONTENTS OF ORDER.—[Such an order] *Subject to the second sentence of subparagraph (A), such an order* also may require the person or entity—

(i) to comply with the requirements of section 274A(b) with respect to individuals hired (or recruited or referred for employment for a fee) during a period of up to three years;

\*        \*        \*        \*        \*        \*        \*

457

(vi) to educate all personnel involved in hiring and complying with this section or section 274A about the requirements of this section or such section *and to certify the fact of such education*;

\*　　\*　　\*　　\*　　\*　　\*　　\*

PENALTIES FOR DOCUMENT FRAUD

SEC. 274C. (a) ACTIVITIES PROHIBITED.—It is unlawful for any person or entity knowingly—

(1) to forge, counterfeit, alter, or falsely make any document for the purpose of satisfying a requirement of this Act,

(2) to use, attempt to use, possess, obtain, accept, or receive or to provide any forged, counterfeit, altered, or falsely made document in order to satisfy any requirement of this Act,

(3) to use or attempt to use or to provide or attempt to provide any document lawfully issued to a person other than the possessor (including a deceased individual) for the purpose of satisfying a requirement of this Act, 【or】

(4) to accept or receive or to provide any document lawfully issued to a person other than the possessor (including a deceased individual) for the purpose of complying with section 274A(b)【.】,

*(5) in reckless disregard of the fact that the information is false or does not relate to the applicant, to prepare, to file, or to assist another in preparing or filing, documents which are falsely made for the purpose of satisfying a requirement of this Act,*

*(6) to present before boarding a common carrier for the purpose of coming to the United States a document which relates to the alien's eligibility to enter the United States and to fail to present such document to an immigration officer upon arrival at a United States port of entry, or*

*(7) to prepare or assist in the preparation and submission of immigration forms, petitions, and applications if the person or entity is not authorized to represent aliens, or to prepare or assist in the preparation and submission of such forms, petitions, and applications pursuant to regulations promulgated by the Attorney General.*

*For purposes of this section, the term "falsely made" includes, with respect to a document or application, the preparation or provision of the document or application with knowledge or in reckless disregard of the fact that such document contains a false, fictitious, or fraudulent statement or material representation, or has no basis in law or fact, or otherwise fails to state a material fact pertaining to the document or application. The Attorney General may, in the discretion of the Attorney General, waive the penalties of this section with respect to an alien who knowingly violates paragraph (6) if the alien is granted asylum under section 208 or withholding of deportation under section 243(h).*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(d) ENFORCEMENT.—

458

(1)  * * *

*     *     *     *     *     *     *     *

(3) CEASE AND DESIST ORDER WITH CIVIL MONEY PENALTY.—
With respect to a violation of subsection (a), the order under
this subsection shall require the person or entity to cease and
desist from such violations and to pay a civil penalty in an
amount of—

(A) not less than $250 and not more than $2,000 for
⟦each document used, accepted, or created and each in-
stance of use, acceptance, or creation⟧ *each instance of a*
*violation under subsection (a)*, or

(B) in the case of a person or entity previously subject
to an order under this paragraph, not less than $2,000 and
not more than $5,000 for ⟦each document used, accepted,
or created and each instance of use, acceptance, or cre-
ation⟧ *each instance of a violation under subsection (a)*.

In applying this subsection in the case of a person or entity
composed of distinct, physically separate subdivisions each of
which provides separately for the hiring, recruiting, or refer-
ring for employment, without reference to the practices of, and
not under the control of or common control with, another sub-
division, each such subdivision shall be considered a separate
person or entity.

*     *     *     *     *     *     *

*(e) CRIMINAL PENALTIES FOR FAILURE TO DISCLOSE ROLE AS*
*DOCUMENT PREPARER.—*

*(1) If a person is required by law or regulation to disclose the*
*fact that the person, on behalf of another person and for a fee*
*or other remuneration, has prepared or assisted in preparing an*
*application for asylum pursuant to section 208, or the regula-*
*tions promulgated thereunder, and the person knowingly and*
*willfully fails to disclose, conceals, or covers up such fact, and*
*the application was falsely made, the person shall—*

*(A) be imprisoned for not less than 2 nor more than 5*
*years, fined in accordance with title 18, United States*
*Code, or both, and*

*(B) be prohibited from preparing or assisting in prepar-*
*ing, regardless of whether for a fee or other remuneration,*
*any other such application for a period of at least 5 years*
*and not more than 15 years.*

*(2) Whoever, having been convicted of a violation of para-*
*graph (1), knowingly and willfully prepares or assists in pre-*
*paring an application for asylum pursuant to section 208, or*
*the regulations promulgated thereunder, regardless of whether*
*for a fee or other remuneration, in violation of paragraph (1)(B)*
*shall be imprisoned for not less than 5 years or more than 15*
*years, fined in accordance with title 18, United States Code, or*
*both, and prohibited from preparing or assisting in preparing*
*any other such application.*

CIVIL PENALTIES FOR FAILURE TO DEPART

SEC. 274D. (a) IN GENERAL.—*Any alien subject to a final order*
*of removal who—*

459

(1) *willfully fails or refuses to—*
(A) *depart from the United States pursuant to the order,*
(B) *make timely application in good faith for travel or other documents necessary for departure, or*
(C) *present for removal at the time and place required by the Attorney General; or*
(2) *conspires to or takes any action designed to prevent or hamper the alien's departure pursuant to the order,*

*shall pay a civil penalty of not more than $500 to the Commissioner for each day the alien is in violation of this section.*

*(b) CONSTRUCTION.—Nothing in this section shall be construed to diminish or qualify any penalties to which an alien may be subject for activities proscribed by section 243(a) or any other section of this Act.*

ENTRY OF ALIEN AT IMPROPER TIME OR PLACE; MISREPRESENTATION
AND CONCEALMENT OF FACTS

SEC. 275. (a) Any alien who (1) enters or attempts to enter the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers, or (3) attempts to enter or obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall, for the first commission of any such offense, be fined under title 18, United States Code, or imprisoned not more than 6 months, or both, and, for a subsequent commission of any such offense, be fined under title 18, United States Code, or imprisoned not more than 2 years, or both.

*(b) Any alien who is apprehended while entering (or attempting to enter) the United States at a time or place other than as designated by immigration officers shall be subject to a civil penalty of—*
(1) *at least $50 and not more than $250 for each such entry (or attempted entry), or*
(2) *twice the amount specified in paragraph (1) in the case of an alien who has been previously subject to a civil penalty under this subsection.*

*Civil penalties under this subsection are in addition to, and not in lieu of, any criminal or other civil penalties that may be imposed.*

〖(b)〗 *(c)* An individual who knowingly enters into a marriage for the purpose of evading any provision of the immigration laws shall be imprisoned for not more than 5 years, or fined not more than $250,000, or both.

〖(c)〗 *(d)* Any individual who knowingly establishes a commercial enterprise for the purpose of evading any provision of the immigration laws shall be imprisoned for not more than 5 years, fined in accordance with title 18, United States Code, or both.

REENTRY OF 〖DEPORTED〗 *REMOVED* ALIEN

SEC. 276. (a) Subject to subsection (b), any alien who—
(1) has been arrested and 〖deported or excluded and deported〗 *denied admission or removed*, and thereafter
(2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place

460

outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously 〔excluded and deported〕 *denied admission and removed*, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act,

shall be fined under title 18, United States Code, or imprisoned not more than 2 years, or both.

(b) Notwithstanding subsection (a), in the case of any alien described in such subsection—

(1) whose 〔deportation〕 *removal* was subsequent to a conviction for commission of three or more misdemeanors involving drugs, crimes against the person, or both, or a felony (other than an aggravated felony), such alien shall be fined under title 18, United States Code, imprisoned not more than 10 years, or both; 〔or〕

(2) whose 〔deportation〕 *removal* was subsequent to a conviction for commission of an aggravated felony, such alien shall be fined under such title, imprisoned not more than 20 years, or both〔.〕*; or*

*(3) who has been removed from the United States pursuant to subsection 235(c) because the alien was inadmissible under subsection 212(a)(3)(B) or who has been removed from the United States pursuant to the provisions of title V, and who thereafter, without the permission of the Attorney General, enters the United States or attempts to do so shall be fined under title 18, United States Code, and imprisoned for a period of 10 years, which sentence shall not run concurrently with any other sentence.*

For the purposes of this subsection, the term "〔deportation〕 *removal*" includes any agreement in which an alien stipulates to 〔deportation〕 *removal* during a criminal trial under either Federal or State law.

AIDING OR ASSISTING CERTAIN ALIENS TO ENTER THE UNITED STATES

SEC. 277. Any person who knowingly aids or assists any alien 〔excludable〕 *inadmissible* under section 212(a)(2) (insofar as an alien 〔excludable〕 *inadmissible* under such section has been convicted of an aggravated felony) or 212(a)(3) (other than subparagraph (E) thereof) to enter the United States, or who connives or conspires with any person or persons to allow, procure, or permit any such alien to enter the United States, shall be fined under title 18, United States Code, or imprisoned not more than 10 years, or both.

\*        \*        \*        \*        \*        \*        \*

JURISDICTION OF DISTRICT COURTS

SEC. 279. 〔The district courts of the United States shall have jurisdiction of all causes, civil and criminal, arising under any of the provisions of this title.〕 *The district courts of the United States shall have jurisdiction of all causes, civil and criminal, brought by*

461

*the United States that arise under the provisions of this title.* It shall be the duty of the United States attorney of the proper district to prosecute every such suit when brought by the United States. Notwithstanding any other law, such prosecutions or suits may be instituted at any place in the United States at which the violation may occur or at which the person charged with a violation under section 275 or 276 may be apprehended. No suit or proceeding for a violation of any of the provisions of this title shall be settled, compromised, or discontinued without the consent of the court in which it is pending and any such settlement, compromise, or discontinuance shall be entered of record with the reasons therefor. *Nothing in this section shall be construed as providing jurisdiction for suits against the United States or its agencies or officers.*

COLLECTION OF PENALTIES AND EXPENSES

SEC. 280. (a) Notwithstanding any other provisions of this title, the withholding or denial of clearance of or a lien upon any vessel or aircraft provided for in section 231, 【237, 239, 243】 *234, 243(c)(2),* 251, 253, 254, 255, 256, 271, 272, or 273 of this title shall not be regarded as the sole and exclusive means or remedy for the enforcement of payments of any fine, penalty or expenses imposed or incurred under such sections, but, in the discretion of the Attorney General, the amount thereof may be recovered by civil suit, in the name of the United States, from any person made liable under any of such sections.

【(b) Notwithstanding section 3302 of title 31, United States Code, the increase in penalties collected resulting from the amendments made by sections 203(b), 543(a), and 544 of the Immigration Act of 1990 shall be credited to the appropriation—

  【(1) for the Immigration and Naturalization Service for activities that enhance enforcement of provisions of this title, including—

    【(A) the identification, investigation, and apprehension of criminal aliens,

    【(B) the implementation of the system described in section 242(a)(3)(A), and

    【(C) for the repair, maintenance, or construction on the United States border, in areas experiencing high levels of apprehensions of illegal aliens, of structures to deter illegal entry into the United States; and

  【(2) for the Executive Office for Immigration Review in the Department of Justice for the purpose of removing the backlogs in the preparation of transcripts of deportation proceedings conducted under section 242.】

*(b)(1) There is established in the general fund of the Treasury a separate account which shall be known as the "Immigration Enforcement Account". Notwithstanding any other section of this title, there shall be deposited as offsetting receipts into the Immigration Enforcement Account amounts described in paragraph (2) to remain available until expended.*

  *(2) The amounts described in this paragraph are the following:*

    *(A) The increase in penalties collected resulting from the amendments made by sections 203(b) and 543(a) of the Immigration Act of 1990.*

462

*(B) Civil penalties collected under sections 240B(d), 274C, 274D, and 275(b).*

*(3)(A) The Secretary of the Treasury shall refund out of the Immigration Enforcement Account to any appropriation the amount paid out of such appropriation for expenses incurred by the Attorney General for activities that enhance enforcement of provisions of this title, including—*

*(i) the identification, investigation, apprehension, detention, and removal of criminal aliens;*

*(ii) the maintenance and updating of a system to identify and track criminal aliens, deportable aliens, inadmissible aliens, and aliens illegally entering the United States; and*

*(iii) for the repair, maintenance, or construction on the United States border, in areas experiencing high levels of apprehensions of illegal aliens, of structures to deter illegal entry into the United States.*

*(B) The amounts which are required to be refunded under subparagraph (A) shall be refunded at least quarterly on the basis of estimates made by the Attorney General of the expenses referred to in subparagraph (A). Proper adjustments shall be made in the amounts subsequently refunded under subparagraph (A) to the extent prior estimates were in excess of, or less than, the amount required to be refunded under subparagraph (A).*

CHAPTER 9—MISCELLANEOUS

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

DISPOSITION OF MONEYS COLLECTED UNDER THE PROVISIONS OF THIS TITLE

SEC. 286. (a)　\*　\*　\*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(h) DISPOSITION OF RECEIPTS.—(1)(A) There is established in the general fund of the Treasury a separate account which shall be known as the "Immigration User Fee Account". Notwithstanding any other section of this title, there shall be deposited as offsetting receipts into the Immigration User Fee Account all fees collected under subsection (d) of this section, to remain available until expended. At the end of each 2-year period, beginning with the creation of this account, the Attorney General, following a public rulemaking with opportunity for notice and comment, shall submit a report to the Congress concerning the status of the account, including any balances therein, and recommend any adjustment in the prescribed fee that may be required to ensure that the receipts collected from the fee charged for the succeeding two years equal, as closely as possible, the cost of providing these services.

(B) Notwithstanding any other provisions of law, all civil fines and penalties collected pursuant to sections 【271】 *243(c), 271,* and 273 of this title and all liquidated damages and expenses collected pursuant to this Act shall be deposited in the Immigration User Fee Account.

(2)(A) The Secretary of the Treasury shall refund out of the Immigration User Fee Account to any appropriation the amount paid out of such appropriation for expenses incurred by the Attorney

463

General in providing immigration inspection and preinspection services for commercial aircraft or vessels and in—

(i) providing overtime immigration inspection services for commercial aircraft or vessels;

(ii) administration of debt recovery, including the establishment and operation of a national collections office;

(iii) expansion, operation and maintenance of information systems for nonimmigrant control and debt collection;

(iv) detection of fraudulent documents used by passengers traveling to the United States, *including training of, and technical assistance to, commercial airline personnel regarding such detection*; 【and】

(v) providing detention and 【deportation】 *removal* services for【: excludable】 *inadmissible* aliens arriving on commercial aircraft and vessels【; and】 *and for* any alien who is 【excludable】 *inadmissible* under section 212(a) who has attempted illegal entry into the United States through avoidance of immigration inspection at air or sea ports-of-entry【.】; *and*

(vi) providing 【exclusion】 *removal* and asylum proceedings at air or sea ports-of-entry for【: excludable】 *inadmissible* aliens arriving on commercial aircraft and vessels including immigration 【exclusion】 *removal* proceedings resulting from presentation of fraudulent documents and failure to present documentation【; and】 *and for* any alien who is 【excludable】 *inadmissible* under section 212(a) who has attempted illegal entry into the United States through avoidance of immigration inspection at air or sea ports-of-entry.

*The Attorney General shall provide for expenditures for training and assistance described in clause (iv) in an amount, for any fiscal year, not less than 5 percent of the total of the expenses incurred that are described in the previous sentence.*

(B) The amounts which are required to be refunded under subparagraph (A) shall be refunded at least quarterly on the basis of estimates made by the Attorney General of the expenses referred to in subparagraph (A). Proper adjustments shall be made in the amounts subsequently refunded under subparagraph (A) to the extent prior estimates were in excess of, or less than, the amount required to be refunded under subparagraph (A).

\*      \*      \*      \*      \*      \*      \*

(q) LAND BORDER INSPECTION FEE ACCOUNT.—(1) Notwithstanding any other provision of law, the Attorney General is authorized to establish, by regulation, 【a project】 *projects* under which a fee may be charged and collected for inspection services provided at one or more land border points of entry. 【Such project】 *Such projects* may include the establishment of commuter lanes to be made available to qualified United States citizens and aliens, as determined by the Attorney General.

\*      \*      \*      \*      \*      \*      \*

【(5)(A) The program authorized in this subsection shall terminate on September 30, 1993, unless further authorized by an Act of Congress.

【(B) The provisions set forth in this subsection shall take effect 30 days after submission of a written plan by the Attorney General

464

detailing the proposed implementation of the project specified in paragraph (1).

〖(C) If implemented, the Attorney General shall prepare and submit on a quarterly basis, until September 30, 1993, a status report on the land border inspection project.〗

(r) BREACHED BOND/DETENTION FUND.—

(1)  * * *

\*      \*      \*      \*      \*      \*      \*

(4) The amount required to be refunded from *the* Fund for fiscal year 1994 and thereafter shall be refunded in accordance with estimates made in the budget request of the Attorney General for those fiscal years: *Provided,* That any proposed changes in the amounts designated in said budget requests shall only be made after notification to the Committees on Appropriations of the House of Representatives and the Senate in accordance with section 606 of Public Law 102–395.

\*      \*      \*      \*      \*      \*      \*

(6) For fiscal year 1993 only, the Attorney General may transfer up to $1,000,000 from the Immigration User Fee Account to *the* Fund for initial expenses necessary to enhance collection efforts: *Provided,* That any such transfers shall be refunded from Fund back to the Immigration User Fee Account by December 31, 1993.

\*      \*      \*      \*      \*      \*      \*

POWERS OF IMMIGRATION OFFICERS AND EMPLOYEES

SEC. 287. (a) Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

(2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, 〖or expulsion〗 *expulsion, or removal* of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States;

\*      \*      \*      \*      \*      \*      \*

(4) to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, 〖or expulsion〗 *expulsion, or removal* of aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be taken without unneces-

465

sary delay before the nearest available officer empowered to commit persons charged with offenses against the laws of the United States; and

\*        \*        \*        \*        \*        \*        \*

(c) Any officer or employee of the Service authorized and designated under regulations prescribed by the Attorney General, whether individually or as one of a class, shall have power to conduct a search, without warrant, of the person, and of the personal effects in the possession of any person seeking admission to the United States, concerning whom such officer or employee may have reasonable cause to suspect that grounds exist for ⟦exclusion from⟧ *denial of admission to* the United States under this Act which would be disclosed by such search.

\*        \*        \*        \*        \*        \*        \*

(f)(1) Under regulations of the Attorney General, the Commissioner shall provide for the fingerprinting and photographing of each alien 14 years of age or older against whom a proceeding is commenced under section ⟦242⟧ *240.*

(2) Such fingerprints and photographs shall be made available to Federal, State, and local law enforcement agencies, upon request.

\*        \*        \*        \*        \*        \*        \*

CENTRAL FILE; INFORMATION FROM OTHER DEPARTMENTS AND AGENCIES

SEC. 290. (a) There shall be established in the office of the Commissioner, for the use of the security and enforcement agencies of the Government of the United States, a central index, which shall contain the names of all aliens heretofore ⟦admitted to the United States, or excluded therefrom⟧ *admitted or denied admission to the United States*, insofar as such information is available from the existing records of the Service, and the names of all aliens hereafter ⟦admitted to the United States, or excluded therefrom⟧ *admitted or denied admission to the United States*, the names of their sponsors of record, if any, and such other relevant information as the Attorney General shall require as an aid to the proper enforcement of this Act.

(b) Any information in any records kept by any department or agency of the Government as to the identity and location of aliens in the United States shall be made available to the Service upon request made by the Attorney General to the head of any such department or agency.

⟦(c) The Secretary of Health and Human Services shall notify the Attorney General upon request whenever any alien is issued a social security account number and social security card. The Secretary shall also furnish such available information as may be requested by the Attorney General regarding the identity and location of aliens in the United States.⟧

*(c)(1) Not later than 3 months after the end of each fiscal year (beginning with fiscal year 1995), the Commissioner of Social Security shall report to the Committees on the Judiciary of the House of Representatives and the Senate on the aggregate number of social security account numbers issued to aliens not authorized to be employed*

466

*to which earnings were reported to the Social Security Administration in such fiscal year.*

*(2) If earnings are reported on or after January 1, 1996, to the Social Security Administration on a social security account number issued to an alien not authorized to work in the United States, the Commissioner of Social Security shall provide the Attorney General with information regarding the name and address of the alien, the name and address of the person reporting the earnings, and the amount of the earnings. The information shall be provided in an electronic form agreed upon by the Commissioner and the Attorney General.*

<div align="center">*    *    *    *    *    *    *</div>

<div align="center">BURDEN OF PROOF</div>

SEC. 291. Whenever any person makes application for a visa or any other document required for entry, or makes application for admission, or otherwise attempts to enter the United States, the burden of proof shall be upon such person to establish that he is eligible to receive such visa or such document, or is not ⟦subject to exclusion⟧ *inadmissible* under any provision of this Act, and, if an alien, that he is entitled to the nonimmigrant; ⟦immigrant, special immigrant, immediate relative⟧ *immigrant status, special immigrant status, status as a spouse or child of a citizen of the United States,* or refugee status claimed, as the case may be. If such person fails to establish to the satisfaction of the consular officer that he is eligible to receive a visa or other document required for entry, no visa or other document required for entry shall be issued to such person, nor shall such person be admitted to the United States unless he establishes to the satisfaction of the Attorney General that he is not ⟦subject to exclusion⟧ *inadmissible* under any provision of this Act. In any ⟦deportation⟧ *removal* proceeding under chapter ⟦5⟧ *4* against any person, the burden of proof shall be upon such person to show the time, place, and manner of his entry into the United States, but in presenting such proof he shall be entitled to the production of his visa or other entry document, if any, and of any other documents and records, not considered by the Attorney General to be confidential, pertaining to such entry in the custody of the Service. If such burden of proof is not sustained, such person shall be presumed to be in the United States in violation of law.

<div align="center">RIGHT TO COUNSEL</div>

SEC. 292. In any ⟦exclusion or deportation⟧ *removal* proceedings before ⟦a special inquiry officer⟧ *an immigration judge* and in any appeal proceedings before the Attorney General from any such ⟦exclusion or deportation⟧ *removal* proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose.

<div align="center">*    *    *    *    *    *    *</div>

*UNDERCOVER INVESTIGATION AUTHORITY*

SEC. 294. (a) IN GENERAL.—*With respect to any undercover investigative operation of the Service which is necessary for the detection and prosecution of crimes against the United States—*

*(1) sums appropriated for the Service may be used for leasing space within the United States and the territories and possessions of the United States without regard to the following provisions of law:*

*(A) section 3679(a) of the Revised Statutes (31 U.S.C. 1341),*

*(B) section 3732(a) of the Revised Statutes (41 U.S.C. 11(a)),*

*(C) section 305 of the Act of June 30, 1949 (63 Stat. 396; 41 U.S.C. 255),*

*(D) the third undesignated paragraph under the heading "Miscellaneous" of the Act of March 3, 1877 (19 Stat. 370; 40 U.S.C. 34),*

*(E) section 3648 of the Revised Statutes (31 U.S.C. 3324),*

*(F) section 3741 of the Revised Statutes (41 U.S.C. 22), and*

*(G) subsections (a) and (c) of section 304 of the Federal Property and Administrative Services Act of 1949 (63 Stat. 395; 41 U.S.C. 254 (a) and (c));*

*(2) sums appropriated for the Service may be used to establish or to acquire proprietary corporations or business entities as part of an undercover operation, and to operate such corporations or business entities on a commercial basis, without regard to the provisions of section 304 of the Government Corporation Control Act (31 U.S.C. 9102);*

*(3) sums appropriated for the Service, and the proceeds from the undercover operation, may be deposited in banks or other financial institutions without regard to the provisions of section 648 of title 18, United States Code, and of section 3639 of the Revised Statutes (31 U.S.C. 3302); and*

*(4) the proceeds from the undercover operation may be used to offset necessary and reasonable expenses incurred in such operation without regard to the provisions of section 3617 of the Revised Statutes (31 U.S.C. 3302).*

*The authority set forth in this subsection may be exercised only upon written certification of the Commissioner, in consultation with the Deputy Attorney General, that any action authorized by paragraph (1), (2), (3), or (4) is necessary for the conduct of the undercover operation.*

*(b) DISPOSITION OF PROCEEDS NO LONGER REQUIRED.—As soon as practicable after the proceeds from an undercover investigative operation, carried out under paragraphs (3) and (4) of subsection (a), are no longer necessary for the conduct of the operation, the proceeds or the balance of the proceeds remaining at the time shall be deposited into the Treasury of the United States as miscellaneous receipts.*

*(c) DISPOSITION OF CERTAIN CORPORATIONS AND BUSINESS ENTITIES.—If a corporation or business entity established or acquired as part of an undercover operation under paragraph (2) of subsection*

468

*(a) with a net value of over $50,000 is to be liquidated, sold, or otherwise disposed of, the Service, as much in advance as the Commissioner or Commissioner's designee determines practicable, shall report the circumstances to the Attorney General, the Director of the Office of Management and Budget, and the Comptroller General. The proceeds of the liquidation, sale, or other disposition, after obligations are met, shall be deposited in the Treasury of the United States as miscellaneous receipts.*

*(d) FINANCIAL AUDITS.—The Service shall conduct detailed financial audits of closed undercover operations on a quarterly basis and shall report the results of the audits in writing to the Deputy Attorney General.*

## TITLE III—NATIONALITY AND NATURALIZATION

\*    \*    \*    \*    \*    \*    \*

### CHAPTER 2—NATIONALITY THROUGH NATURALIZATION

\*    \*    \*    \*    \*    \*    \*

REQUIREMENTS AS TO RESIDENCE, GOOD MORAL CHARACTER, ATTACHMENT TO THE PRINCIPLES OF THE CONSTITUTION, AND FAVORABLE DISPOSITION TO THE UNITED STATES

SEC. 316. (a) No person, except as otherwise provided in this title, shall be naturalized, unless such applicant, (1) immediately preceding the date of filing his application for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years and during the five years immediately preceding the date of filing his application has been physically present therein for periods totaling at least half of that time, and who has resided within the State or within the district of the Service in the United States in which the applicant filed the application for at least three months, (2) has resided continuously within the United States from the date of the application up to the time of admission to citizenship, 【and】 (3) during all the periods referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States, *and (4) in the case of an applicant that has received assistance under a means-tested public benefits program (as defined in subsection (f)(3) of section 213A) administered by a Federal, State, or local agency and with respect to which amounts may be owing under an affidavit of support executed under such section, provides satisfactory evidence that there are no outstanding amounts that may be owed to any such Federal, State, or local agency pursuant to such affidavit by the sponsor who executed such affidavit, except as provided in subsection (g).*

\*    \*    \*    \*    \*    \*    \*

(f)(1) Whenever the Director of Central Intelligence, the Attorney General and the Commissioner of Immigration determine that an applicant otherwise eligible for naturalization has made an extraordinary contribution to the national security of the United States or


469

to the conduct of United States intelligence activities, the applicant may be naturalized without regard to the residence and physical presence requirements of this section, or to the prohibitions of section 313 of this Act, and no residence within a particular State or district of the Service in the United States shall be required: *Provided,* That the applicant has continuously resided in the United States for at least one year prior to naturalization: *Provided further,* That the provisions of this subsection shall not apply to any alien described in ⟦subparagraphs (A) through (D) of paragraph 243(h)(2)⟧ *clauses (i) through (v) of section 208(b)(2)(A)* of this Act.

\* \* \* \* \* \* \* \*

*(g) Clause (4) of subsection (a) shall not apply to an applicant where the applicant can demonstrate that—*

    *(A) either—*

        *(i) the applicant has been battered or subject to extreme cruelty in the United States by a spouse or parent or by a member of the spouse or parent's family residing in the same household as the applicant and the spouse or parent consented or acquiesced to such battery or cruelty, or*

        *(ii) the applicant's child has been battered or subject to extreme cruelty in the United States by the applicant's spouse or parent (without the active participation of the applicant in the battery or extreme cruelty), or by a member of the spouse or parent's family residing in the same household as the applicant when the spouse or parent consented or acquiesced to and the applicant did not actively participate in such battery or cruelty;*

    *(B) such battery or cruelty has led to the issuance of an order of a judge or an administrative law judge or a prior determination of the Service; and*

    *(C) the need for the public benefits received as to which amounts are owing had a substantial connection to the battery or cruelty described in subparagraph (A).*

PREREQUISITE TO NATURALIZATION; BURDEN OF PROOF

SEC. 318. Except as otherwise provided in this title, no person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of this Act. The burden of proof shall be upon such person to show that he entered the United States lawfully, and the time, place, and manner of such entry into the United States, but in presenting such proof he shall be entitled to the production of his immigrant visa, if any, or of other entry document, if any, and of any other documents and records, not considered by the Attorney General to be confidential, pertaining to such entry, in the custody of the Service. Notwithstanding the provisions of section 405(b), and except as provided in sections 328 and 329 no person shall be naturalized against whom there is outstanding a final finding of deportability pursuant to a warrant of arrest issued under the provisions of this or any other Act; and no application for naturalization shall be considered by the Attorney General if there is pending against the applicant a ⟦deportation⟧ *removal* proceeding pursuant to a warrant of arrest issued under the provisions of this or any

470

other Act: *Provided,* That the findings of the Attorney General in terminating 〚deportation〛 *removal* proceedings or in 〚suspending〛 *canceling* the 〚deportation〛 *removal* of an alien pursuant to the provisions of this Act, shall not be deemed binding in any way upon the Attorney General with respect to the question of whether such person has established his eligibility for naturalization as required by this title.

\*        \*        \*        \*        \*        \*        \*

### CHAPTER 3—LOSS OF NATIONALITY

\*        \*        \*        \*        \*        \*        \*

#### RESTRICTIONS ON LOSS OF NATIONALITY

SEC. 351. (a) Except as provided in paragraphs (6) and (7) of section 349(a) of this title, no national of the United States can lose United States nationality〚,〛 under this Act while within the United States or any of its outlying possessions, but loss of nationality shall result from the performance within the United States or any of its outlying possessions of any of the acts or the fulfillment of any of the conditions specified in this chapter if and when the national thereafter takes up a residence outside the United States and its outlying possessions.

\*        \*        \*        \*        \*        \*        \*

### CHAPTER 4—MISCELLANEOUS

\*        \*        \*        \*        \*        \*        \*

#### PROCEEDINGS FOR DECLARATION OF UNITED STATES NATIONALITY IN THE EVENT OF DENIAL OF RIGHTS AND PRIVILEGES AS NATIONAL

SEC. 360. (a) If any person who is within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States, such person may institute an action under the provisions of section 2201 of title 28, United States Code, against the head of such department or independent agency for a judgment declaring him to be a national of the United States, except that no such action may be instituted in any case if the issue of such person's status as a national of the United States (1) arose by reason of or in connection with any 〚exclusion〛 *removal* proceeding under the provisions of this or any other act, or (2) is in issue in any such 〚exclusion〛 *removal* proceeding. An action under this subsection may be instituted only within five years after the final administrative denial of such right or privilege and shall be filed in the district court of the United States for the district in which such person resides or claims a residence, and jurisdiction over such officials in such cases is hereby conferred upon those courts.

\*        \*        \*        \*        \*        \*        \*

(c) A person who has been issued a certificate of identity under the provisions of subsection (b), and while in possession thereof,

471

may apply for admission to the United States at any port of entry, and shall be subject to all the provisions of this Act relating to the conduct of proceedings involving aliens seeking admission to the United States. A final determination by the Attorney General that any such person is not entitled to admission to the United States shall be subject to review by any court of competent jurisdiction in habeas corpus proceedings and not otherwise. Any person described in this section who is finally ⟦excluded from⟧ *denied* admission to the United States shall be subject to all the provisions of this Act relating to aliens seeking admission to the United States.

\*　　\*　　\*　　\*　　\*　　\*　　\*

## TITLE IV—MISCELLANEOUS AND REFUGEE ASSISTANCE

\*　　\*　　\*　　\*　　\*　　\*　　\*

### CHAPTER 2—REFUGEE ASSISTANCE

\*　　\*　　\*　　\*　　\*　　\*　　\*

AUTHORIZATION FOR PROGRAMS FOR DOMESTIC RESETTLEMENT OF AND ASSISTANCE TO REFUGEES

SEC. 412. (a)　\*　\*　\*
(b) PROGRAM OF INITIAL RESETTLEMENT. —(1)　\*　\*　\*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(3) The Secretary is authorized⟦,⟧ to make arrangements (including cooperative arrangements with other Federal agencies) for the temporary care of refugees in the United States in emergency circumstances, including the establishment of processing centers, if necessary, without regard to such provisions of law (other than the Renegotiation Act of 1951 and section 414(b) of this chapter) regulating the making, performance, amendment, or modification of contracts and the expenditure of funds of the United States Government as the Secretary may specify.

(4) The Secretary⟦,⟧ shall—

(A) assure that an adequate number of trained staff are available at the location at which the refugees enter the United States to assure that all necessary medical records are available and in proper order;

\*　　\*　　\*　　\*　　\*　　\*　　\*

## *TITLE V—SPECIAL REMOVAL PROCEDURES FOR ALIEN TERRORISTS*

### *DEFINITIONS*

*SEC. 501. In this title:*

*(1) The term "alien terrorist" means an alien described in section 241(a)(4)(B).*

*(2) The term "classified information" has the meaning given such term in section 1(a) of the Classified Information Procedures Act (18 U.S.C. App.).*

472

(3) The term "national security" has the meaning given such term in section 1(b) of the Classified Information Procedures Act (18 U.S.C. App.).

(4) The term "special attorney" means an attorney who is on the panel established under section 502(e).

(5) The term "special removal court" means the court established under section 502(a).

(6) The term "special removal hearing" means a hearing under section 505.

(7) The term "special removal proceeding" means a proceeding under this title.

ESTABLISHMENT OF SPECIAL REMOVAL COURT; PANEL OF ATTORNEYS TO ASSIST WITH CLASSIFIED INFORMATION

SEC. 502. (a) IN GENERAL.—The Chief Justice of the United States shall publicly designate 5 district court judges from 5 of the United States judicial circuits who shall constitute a court which shall have jurisdiction to conduct all special removal proceedings.

(b) TERMS.—Each judge designated under subsection (a) shall serve for a term of 5 years and shall be eligible for redesignation, except that the four associate judges first so designated shall be designated for terms of one, two, three, and four years so that the term of one judge shall expire each year.

(c) CHIEF JUDGE.—The Chief Justice shall publicly designate one of the judges of the special removal court to be the chief judge of the court. The chief judge shall promulgate rules to facilitate the functioning of the court and shall be responsible for assigning the consideration of cases to the various judges.

(d) EXPEDITIOUS AND CONFIDENTIAL NATURE OF PROCEEDINGS.— The provisions of section 103(c) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1803(c)) shall apply to proceedings under this title in the same manner as they apply to proceedings under such Act.

(e) ESTABLISHMENT OF PANEL OF SPECIAL ATTORNEYS.—The special removal court shall provide for the designation of a panel of attorneys each of whom—

(1) has a security clearance which affords the attorney access to classified information, and

(2) has agreed to represent permanent resident aliens with respect to classified information under section 506 in accordance with (and subject to the penalties under) this title.

APPLICATION FOR INITIATION OF SPECIAL REMOVAL PROCEEDING

SEC. 503. (a) IN GENERAL.—Whenever the Attorney General has classified information that an alien is an alien terrorist, the Attorney General, in the Attorney General's discretion, may seek removal of the alien under this title through the filing of a written application described in subsection (b) with the special removal court seeking an order authorizing a special removal proceeding under this title. The application shall be submitted in camera and ex parte and shall be filed under seal with the court.

(b) CONTENTS OF APPLICATION.—Each application for a special removal proceeding shall include all of the following:

473

(1) The identity of the Department of Justice attorney making the application.

(2) The approval of the Attorney General or the Deputy Attorney General for the filing of the application based upon a finding by that individual that the application satisfies the criteria and requirements of this title.

(3) The identity of the alien for whom authorization for the special removal proceedings is sought.

(4) A statement of the facts and circumstances relied on by the Department of Justice to establish that—

(A) the alien is an alien terrorist and is physically present in the United States, and

(B) with respect to such alien, adherence to the provisions of title II regarding the removal of aliens would pose a risk to the national security of the United States.

(5) An oath or affirmation respecting each of the facts and statements described in the previous paragraphs.

(c) RIGHT TO DISMISS.—The Department of Justice retains the right to dismiss a removal action under this title at any stage of the proceeding.

CONSIDERATION OF APPLICATION

SEC. 504. (a) IN GENERAL.—In the case of an application under section 503 to the special removal court, a single judge of the court shall be assigned to consider the application. The judge, in accordance with the rules of the court, shall consider the application and may consider other information, including classified information, presented under oath or affirmation. The judge shall consider the application (and any hearing thereof) in camera and ex parte. A verbatim record shall be maintained of any such hearing.

(b) APPROVAL OF ORDER.—The judge shall enter ex parte the order requested in the application if the judge finds, on the basis of such application and such other information (if any), that there is probable cause to believe that—

(1) the alien who is the subject of the application has been correctly identified and is an alien terrorist, and

(2) adherence to the provisions of title II regarding the removal of the identified alien would pose a risk to the national security of the United States.

(c) DENIAL OF ORDER.—If the judge denies the order requested in the application, the judge shall prepare a written statement of the judge's reasons for the denial.

(d) EXCLUSIVE PROVISIONS.—Whenever an order is issued under this section with respect to an alien—

(1) the alien's rights regarding removal and expulsion shall be governed solely by the provisions of this title, and

(2) except as they are specifically referenced, no other provisions of this Act shall be applicable.

SPECIAL REMOVAL HEARINGS

SEC. 505. (a) IN GENERAL.—In any case in which the application for the order is approved under section 504, a special removal hearing shall be conducted under this section for the purpose of determining whether the alien to whom the order pertains should be re-

474

moved from the United States on the grounds that the alien is an alien terrorist. Consistent with section 506, the alien shall be given reasonable notice of the nature of the charges against the alien and a general account of the basis for the charges. The alien shall be given notice, reasonable under all the circumstances, of the time and place at which the hearing will be held. The hearing shall be held as expeditiously as possible.

(b) USE OF SAME JUDGE.—The special removal hearing shall be held before the same judge who granted the order pursuant to section 504 unless that judge is deemed unavailable due to illness or disability by the chief judge of the special removal court, or has died, in which case the chief judge shall assign another judge to conduct the special removal hearing. A decision by the chief judge pursuant to the preceding sentence shall not be subject to review by either the alien or the Department of Justice.

(c) RIGHTS IN HEARING.—

(1) PUBLIC HEARING.—The special removal hearing shall be open to the public.

(2) RIGHT OF COUNSEL.—The alien shall have a right to be present at such hearing and to be represented by counsel. Any alien financially unable to obtain counsel shall be entitled to have counsel assigned to represent the alien. Such counsel shall be appointed by the judge pursuant to the plan for furnishing representation for any person financially unable to obtain adequate representation for the district in which the hearing is conducted, as provided for in section 3006A of title 18, United States Code. All provisions of that section shall apply and, for purposes of determining the maximum amount of compensation, the matter shall be treated as if a felony was charged.

(3) INTRODUCTION OF EVIDENCE.—The alien shall have a right to introduce evidence on the alien's own behalf.

(4) EXAMINATION OF WITNESSES.—Except as provided in section 506, the alien shall have a reasonable opportunity to examine the evidence against the alien and to cross-examine any witness.

(5) RECORD.—A verbatim record of the proceedings and of all testimony and evidence offered or produced at such a hearing shall be kept.

(6) DECISION BASED ON EVIDENCE AT HEARING.—The decision of the judge in the hearing shall be based only on the evidence introduced at the hearing, including evidence introduced under subsection (e).

(7) NO RIGHT TO ANCILLARY RELIEF.—In the hearing, the judge is not authorized to consider or provide for relief from removal based on any of the following:

(A) Asylum under section 208.

(B) Withholding of removal under section 241(b)(3).

(C) Cancellation of removal under section 240A.

(D) Voluntary departure under section 240B.

(E) Adjustment of status under section 245.

(F) Registry under section 249.

(d) SUBPOENAS.—

(1) REQUEST.—At any time prior to the conclusion of the special removal hearing, either the alien or the Department of Jus-

475

*tice may request the judge to issue a subpoena for the presence of a named witness (which subpoena may also command the person to whom it is directed to produce books, papers, documents, or other objects designated therein) upon a satisfactory showing that the presence of the witness is necessary for the determination of any material matter. Such a request may be made ex parte except that the judge shall inform the Department of Justice of any request for a subpoena by the alien for a witness or material if compliance with such a subpoena would reveal evidence or the source of evidence which has been introduced, or which the Department of Justice has received permission to introduce, in camera and ex parte pursuant to subsection (e) and section 506, and the Department of Justice shall be given a reasonable opportunity to oppose the issuance of such a subpoena.*

*(2) PAYMENT FOR ATTENDANCE.—If an application for a subpoena by the alien also makes a showing that the alien is financially unable to pay for the attendance of a witness so requested, the court may order the costs incurred by the process and the fees of the witness so subpoenaed to be paid from funds appropriated for the enforcement of title II.*

*(3) NATIONWIDE SERVICE.—A subpoena under this subsection may be served anywhere in the United States.*

*(4) WITNESS FEES.—A witness subpoenaed under this subsection shall receive the same fees and expenses as a witness subpoenaed in connection with a civil proceeding in a court of the United States.*

*(5) NO ACCESS TO CLASSIFIED INFORMATION.—Nothing in this subsection is intended to allow an alien to have access to classified information.*

*(e) INTRODUCTION OF CLASSIFIED INFORMATION.—*

*(1) IN GENERAL.—When classified information has been summarized pursuant to section 506(b) or where a finding has been made under section 506(b)(5) that no summary is possible, classified information shall be introduced (either in writing or through testimony) in camera and ex parte and neither the alien nor the public shall be informed of such evidence or its sources other than through reference to the summary provided pursuant to such section. Notwithstanding the previous sentence, the Department of Justice may, in its discretion and, in the case of classified information, after coordination with the originating agency, elect to introduce such evidence in open session.*

*(2) TREATMENT OF ELECTRONIC SURVEILLANCE INFORMATION.—*

*(A) USE OF ELECTRONIC SURVEILLANCE.—The Government is authorized to use in a special removal proceedings the fruits of electronic surveillance and unconsented physical searches authorized under the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.) without regard to subsections (c), (e), (f), (g), and (h) of section 106 of that Act.*

*(B) NO DISCOVERY OF ELECTRONIC SURVEILLANCE INFORMATION.—An alien subject to removal under this title shall*

476

*have no right of discovery of information derived from electronic surveillance authorized under the Foreign Intelligence Surveillance Act of 1978 or otherwise for national security purposes. Nor shall such alien have the right to seek suppression of evidence.*

*(C) CERTAIN PROCEDURES NOT APPLICABLE.—The provisions and requirements of section 3504 of title 18, United States Code, shall not apply to procedures under this title.*

*(3) RIGHTS OF UNITED STATES.—Nothing in this section shall prevent the United States from seeking protective orders and from asserting privileges ordinarily available to the United States to protect against the disclosure of classified information, including the invocation of the military and state secrets privileges.*

*(f) INCLUSION OF CERTAIN EVIDENCE.—The Federal Rules of Evidence shall not apply to hearings under this section. Evidence introduced at the special removal hearing, either in open session or in camera and ex parte, may, in the discretion of the Department of Justice, include all or part of the information presented under section 504 used to obtain the order for the hearing under this section.*

*(g) ARGUMENTS.—Following the receipt of evidence, the attorneys for the Department of Justice and for the alien shall be given fair opportunity to present argument as to whether the evidence is sufficient to justify the removal of the alien. The attorney for the Department of Justice shall open the argument. The attorney for the alien shall be permitted to reply. The attorney for the Department of Justice shall then be permitted to reply in rebuttal. The judge may allow any part of the argument that refers to evidence received in camera and ex parte to be heard in camera and ex parte.*

*(h) BURDEN OF PROOF.—In the hearing the Department of Justice has the burden of showing by clear and convincing evidence that the alien is subject to removal because the alien is an alien terrorist. If the judge finds that the Department of Justice has met this burden, the judge shall order the alien removed and detained pending removal from the United States. If the alien was released pending the special removal hearing, the judge shall order the Attorney General to take the alien into custody.*

*(i) WRITTEN ORDER.—At the time of rendering a decision as to whether the alien shall be removed, the judge shall prepare a written order containing a statement of facts found and conclusions of law. Any portion of the order that would reveal the substance or source of information received in camera and ex parte pursuant to subsection (e) shall not be made available to the alien or the public.*

CONSIDERATION OF CLASSIFIED INFORMATION

*SEC. 506. (a) CONSIDERATION IN CAMERA AND EX PARTE.—In any case in which the application for the order authorizing the special procedures of this title is approved, the judge who granted the order shall consider each item of classified information the Department of Justice proposes to introduce in camera and ex parte at the special removal hearing and shall order the introduction of such information pursuant to section 505(e) if the judge determines the information to be relevant.*

*(b) PREPARATION AND PROVISION OF WRITTEN SUMMARY.—*

477

(1) PREPARATION.—The Department of Justice shall prepare a written summary of such classified information which does not pose a risk to national security.

(2) CONDITIONS FOR APPROVAL BY JUDGE AND PROVISION TO ALIEN.—The judge shall approve the summary so long as the judge finds that the summary is sufficient—

(A) to inform the alien of the general nature of the evidence that the alien is an alien terrorist, and

(B) to permit the alien to prepare a defense against removal.

The Department of Justice shall cause to be delivered to the alien a copy of the summary.

(3) OPPORTUNITY FOR CORRECTION AND RESUBMITTAL.—If the judge does not approve the summary, the judge shall provide the Department a reasonable opportunity to correct the deficiencies identified by the court and to submit a revised summary.

(4) CONDITIONS FOR TERMINATION OF PROCEEDINGS IF SUMMARY NOT APPROVED.—

(A) IN GENERAL.—If, subsequent to the opportunity described in paragraph (3), the judge does not approve the summary, the judge shall terminate the special removal hearing unless the judge makes the findings described in subparagraph (B).

(B) FINDINGS.—The findings described in this subparagraph are, with respect to an alien, that—

(i) the continued presence of the alien in the United States would likely cause serious and irreparable harm to the national security or death or serious bodily injury to any person, and

(ii) the provision of the required summary would likely cause serious and irreparable harm to the national security or death or serious bodily injury to any person.

(5) CONTINUATION OF HEARING WITHOUT SUMMARY.—If a judge makes the findings described in paragraph (4)(B)—

(A) if the alien involved is an alien lawfully admitted for permanent residence, the procedures described in subsection (c) shall apply; and

(B) in all cases the special removal hearing shall continue, the Department of Justice shall cause to be delivered to the alien a statement that no summary is possible, and the classified information submitted in camera and ex parte may be used pursuant to section 505(e).

(c) SPECIAL PROCEDURES FOR ACCESS AND CHALLENGES TO CLASSIFIED INFORMATION BY SPECIAL ATTORNEYS IN CASE OF LAWFUL PERMANENT ALIENS.—

(1) IN GENERAL.—The procedures described in this subsection are that the judge (under rules of the special removal court) shall designate a special attorney to assist the alien—

(A) by reviewing in camera the classified information on behalf of the alien, and

478

(B) by challenging through an in camera proceeding the veracity of the evidence contained in the classified information.

(2) RESTRICTIONS ON DISCLOSURE.—A special attorney receiving classified information under paragraph (1)—

(A) shall not disclose the information to the alien or to any other attorney representing the alien, and

(B) who discloses such information in violation of subparagraph (A) shall be subject to a fine under title 18, United States Code, imprisoned for not less than 10 years nor more than 25 years, or both.

APPEALS

SEC. 507. (a) APPEALS OF DENIALS OF APPLICATIONS FOR ORDERS.—The Department of Justice may seek a review of the denial of an order sought in an application by the United States Court of Appeals for the District of Columbia Circuit by notice of appeal which must be filed within 20 days after the date of such denial. In such a case the entire record of the proceeding shall be transmitted to the Court of Appeals under seal and the Court of Appeals shall hear the matter ex parte. In such a case the Court of Appeals shall review questions of law de novo, but a prior finding on any question of fact shall not be set aside

unless such finding was clearly erroneous.

(b) APPEALS OF DETERMINATIONS ABOUT SUMMARIES OF CLASSIFIED INFORMATION.—Either party may take an interlocutory appeal to the United States Court of Appeals for the District of Columbia Circuit of—

(1) any determination by the judge pursuant to section 506(a)—

(A) concerning whether an item of evidence may be introduced in camera and ex parte, or

(B) concerning the contents of any summary of evidence to be introduced in camera and ex parte prepared pursuant to section 506(b); or

(2) the refusal of the court to make the findings permitted by section 506(b)(4)(B).

In any interlocutory appeal taken pursuant to this subsection, the entire record, including any proposed order of the judge or summary of evidence, shall be transmitted to the Court of Appeals under seal and the matter shall be heard ex parte.

(c) APPEALS OF DECISION IN HEARING.—

(1) IN GENERAL.—Subject to paragraph (2), the decision of the judge after a special removal hearing may be appealed by either the alien or the Department of Justice to the United States Court of Appeals for the District of Columbia Circuit by notice of appeal.

(2) AUTOMATIC APPEALS IN CASES OF PERMANENT RESIDENT ALIENS IN WHICH NO SUMMARY PROVIDED.—

(A) IN GENERAL.—Unless the alien waives the right to a review under this paragraph, in any case involving an alien lawfully admitted for permanent residence who is denied a written summary of classified information under section 506(b)(4) and with respect to which the procedures

479

described in section 506(c) apply, any order issued by the judge shall be reviewed by the Court of Appeals for the District of Columbia Circuit.

(B) USE OF SPECIAL ATTORNEY.—With respect to any issue relating to classified information that arises in such review, the alien shall be represented only by the special attorney designated under section 506(c)(1) on behalf of the alien.

(d) GENERAL PROVISIONS RELATING TO APPEALS.—

(1) NOTICE.—A notice of appeal pursuant to subsection (b) or (c) (other than under subsection (c)(2)) must be filed within 20 days after the date of the order with respect to which the appeal is sought, during which time the order shall not be executed.

(2) TRANSMITTAL OF RECORD.—In an appeal or review to the Court of Appeals pursuant to subsection (b) or (c)—

(A) the entire record shall be transmitted to the Court of Appeals, and

(B) information received pursuant to section 505(e), and any portion of the judge's order that would reveal the substance or source of such information, shall be transmitted under seal.

(3) EXPEDITED APPELLATE PROCEEDING.—In an appeal or review to the Court of Appeals pursuant to subsection (b) or (c):

(A) REVIEW.—The appeal or review shall be heard as expeditiously as practicable and the Court may dispense with full briefing and hear the matter solely on the record of the judge of the special removal court and on such briefs or motions as the Court may require to be filed by the parties.

(B) DISPOSITION.—The Court shall uphold or reverse the judge's order within 60 days after the date of the issuance of the judge's final order.

(4) STANDARD FOR REVIEW.—In an appeal or review to the Court of Appeals pursuant to subsection (b) or (c):

(A) QUESTIONS OF LAW.—The Court of Appeals shall review all questions of law de novo.

(B) QUESTIONS OF FACT.—(i) Subject to clause (ii), a prior finding on any question of fact shall not be set aside unless such finding was clearly erroneous.

(ii) In the case of a review under subsection (c)(2) in which an alien lawfully admitted for permanent residence was denied a written summary of classified information under section 506(b)(4), the Court of Appeals shall review questions of fact de novo.

(e) CERTIORARI.—Following a decision by the Court of Appeals pursuant to subsection (b) or (c), either the alien or the Department of Justice may petition the Supreme Court for a writ of certiorari. In any such case, any information transmitted to the Court of Appeals under seal shall, if such information is also submitted to the Supreme Court, be transmitted under seal. Any order of removal shall not be stayed pending disposition of a writ of certiorari except as provided by the Court of Appeals or a Justice of the Supreme Court.

(f) APPEALS OF DETENTION ORDERS.—

480

(1) IN GENERAL.— The provisions of sections 3145 through 3148 of title 18, United States Code, pertaining to review and appeal of a release or detention order, penalties for failure to appear, penalties for an offense committed while on release, and sanctions for violation of a release condition shall apply to an alien to whom section 508(b)(1) applies. In applying the previous sentence—

(A) for purposes of section 3145 of such title an appeal shall be taken to the United States Court of Appeals for the District of Columbia Circuit, and

(B) for purposes of section 3146 of such title the alien shall be considered released in connection with a charge of an offense punishable by life imprisonment.

(2) NO REVIEW OF CONTINUED DETENTION.—The determinations and actions of the Attorney General pursuant to section 508(c)(2)(C) shall not be subject to judicial review, including application for a writ of habeas corpus, except for a claim by the alien that continued detention violates the alien's rights under the Constitution. Jurisdiction over any such challenge shall lie exclusively in the United States Court of Appeals for the District of Columbia Circuit.

*DETENTION AND CUSTODY*

SEC. 508. (a) INITIAL CUSTODY.—

(1) UPON FILING APPLICATION.—Subject to paragraph (2), the Attorney General may take into custody any alien with respect to whom an application under section 503 has been filed and, notwithstanding any other provision of law, may retain such an alien in custody in accordance with the procedures authorized by this title.

(2) SPECIAL RULES FOR PERMANENT RESIDENT ALIENS.—An alien lawfully admitted for permanent residence shall be entitled to a release hearing before the judge assigned to hear the special removal hearing. Such an alien shall be detained pending the special removal hearing, unless the alien demonstrates to the court that—

(A) the alien, if released upon such terms and conditions as the court may prescribe (including the posting of any monetary amount), is not likely to flee, and

(B) the alien's release will not endanger national security or the safety of any person or the community.

The judge may consider classified information submitted in camera and ex parte in making a determination under this paragraph.

(3) RELEASE IF ORDER DENIED AND NO REVIEW SOUGHT.—

(A) IN GENERAL.—Subject to subparagraph (B), if a judge of the special removal court denies the order sought in an application with respect to an alien and the Department of Justice does not seek review of such denial, the alien shall be released from custody.

(B) APPLICATION OF REGULAR PROCEDURES.—Subparagraph (A) shall not prevent the arrest and detention of the alien pursuant to title II.

481

(b) CONDITIONAL RELEASE IF ORDER DENIED AND REVIEW SOUGHT.—

(1) IN GENERAL.—If a judge of the special removal court denies the order sought in an application with respect to an alien and the Department of Justice seeks review of such denial, the judge shall release the alien from custody subject to the least restrictive condition or combination of conditions of release described in section 3142(b) and clauses (i) through (xiv) of section 3142(c)(1)(B) of title 18, United States Code, that will reasonably assure the appearance of the alien at any future proceeding pursuant to this title and will not endanger the safety of any other person or the community.

(2) NO RELEASE FOR CERTAIN ALIENS.—If the judge finds no such condition or combination of conditions, the alien shall remain in custody until the completion of any appeal authorized by this title.

(c) CUSTODY AND RELEASE AFTER HEARING.—

(1) RELEASE.—

(A) IN GENERAL.—Subject to subparagraph (B), if the judge decides pursuant to section 505(i) that an alien should not be removed, the alien shall be released from custody.

(B) CUSTODY PENDING APPEAL.—If the Attorney General takes an appeal from such decision, the alien shall remain in custody, subject to the provisions of section 3142 of title 18, United States Code.

(2) CUSTODY AND REMOVAL.—

(A) CUSTODY.—If the judge decides pursuant to section 505(i) that an alien shall be removed, the alien shall be detained pending the outcome of any appeal. After the conclusion of any judicial review thereof which affirms the removal order, the Attorney General shall retain the alien in custody and remove the alien to a country specified under subparagraph (B).

(B) REMOVAL.—

(i) IN GENERAL.—The removal of an alien shall be to any country which the alien shall designate if such designation does not, in the judgment of the Attorney General, in consultation with the Secretary of State, impair the obligation of the United States under any treaty (including a treaty pertaining to extradition) or otherwise adversely affect the foreign policy of the United States.

(ii) ALTERNATE COUNTRIES.—If the alien refuses to designate a country to which the alien wishes to be removed or if the Attorney General, in consultation with the Secretary of State, determines that removal of the alien to the country so designated would impair a treaty obligation or adversely affect United States foreign policy, the Attorney General shall cause the alien to be removed to any country willing to receive such alien.

(C) CONTINUED DETENTION.—If no country is willing to receive such an alien, the Attorney General may, notwithstanding any other provision of law, retain the alien in cus-

482

*tody. The Attorney General, in coordination with the Secretary of State, shall make periodic efforts to reach agreement with other countries to accept such an alien and at least every 6 months shall provide to the attorney representing the alien at the special removal hearing a written report on the Attorney General's efforts. Any alien in custody pursuant to this subparagraph shall be released from custody solely at the discretion of the Attorney General and subject to such conditions as the Attorney General shall deem appropriate.*

*(D) FINGERPRINTING.—Before an alien is transported out of the United States pursuant to this subsection, or pursuant to an order of removal because such alien is inadmissible under section 212(a)(3)(B), the alien shall be photographed and fingerprinted, and shall be advised of the provisions of subsection 276(b).*

*(d) CONTINUED DETENTION PENDING TRIAL.—*

*(1) DELAY IN REMOVAL.—Notwithstanding the provisions of subsection (c)(2), the Attorney General may hold in abeyance the removal of an alien who has been ordered removed pursuant to this title to allow the trial of such alien on any Federal or State criminal charge and the service of any sentence of confinement resulting from such a trial.*

*(2) MAINTENANCE OF CUSTODY.—Pending the commencement of any service of a sentence of confinement by an alien described in paragraph (1), such an alien shall remain in the custody of the Attorney General, unless the Attorney General determines that temporary release of the alien to the custody of State authorities for confinement in a State facility is appropriate and would not endanger national security or public safety.*

*(3) SUBSEQUENT REMOVAL.—Following the completion of a sentence of confinement by an alien described in paragraph (1) or following the completion of State criminal proceedings which do not result in a sentence of confinement of an alien released to the custody of State authorities pursuant to paragraph (2), such an alien shall be returned to the custody of the Attorney General who shall proceed to carry out the provisions of subsection (c)(2) concerning removal of the alien.*

*(e) APPLICATION OF CERTAIN PROVISIONS RELATING TO ESCAPE OF PRISONERS.—For purposes of sections 751 and 752 of title 18, United States Code, an alien in the custody of the Attorney General pursuant to this title shall be subject to the penalties provided by those sections in relation to a person committed to the custody of the Attorney General by virtue of an arrest on a charge of a felony.*

*(f) RIGHTS OF ALIENS IN CUSTODY.—*

*(1) FAMILY AND ATTORNEY VISITS.—An alien in the custody of the Attorney General pursuant to this title shall be given reasonable opportunity to communicate with and receive visits from members of the alien's family, and to contact, retain, and communicate with an attorney.*

*(2) DIPLOMATIC CONTACT.—An alien in the custody of the Attorney General pursuant to this title shall have the right to contact an appropriate diplomatic or consular official of the alien's country of citizenship or nationality or of any country providing*

483

*representation services therefore. The Attorney General shall notify the appropriate embassy, mission, or consular office of the alien's detention.*

———————

## TITLE 18, UNITED STATES CODE

\*      \*      \*      \*      \*      \*      \*

# PART I—CRIMES

\*      \*      \*      \*      \*      \*      \*

## CHAPTER 46—FORFEITURE

\*      \*      \*      \*      \*      \*      \*

### § 982. Criminal forfeiture

(a)(1) The court, in imposing sentence on a person convicted of an offense in violation of section 5313(a), 5316, or 5324 of title 31, or of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property. However, no property shall be seized or forfeited in the case of a violation of section 5313(a) of title 31 by a domestic financial institution examined by a Federal bank supervisory agency or a financial institution regulated by the Securities and Exchange Commission or a partner, director, or employee thereof.

\*      \*      \*      \*      \*      \*      \*

*(6) The court, in imposing sentence on a person convicted of a violation of, or conspiracy to violate, section 1541, 1542, 1543, 1544, or 1546 of this title, or a violation of, or conspiracy to violate, section 1028 of this title if committed in connection with passport or visa issuance or use, shall order that the person forfeit to the United States any property, real or personal, which the person used, or intended to be used, in committing, or facilitating the commission of, the violation, and any property constituting, or derived from, or traceable to, any proceeds the person obtained, directly or indirectly, as a result of such violation.*

(b)(1) Property subject to forfeiture under this section, any seizure and disposition thereof, and any administrative or judicial proceeding in relation thereto, shall be governed—

(A) in the case of a forfeiture under subsection (a)(1) of this section, by subsections (c) and (e) through (p) of section 413 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853); and

(B) in the case of a forfeiture under subsection (a)(2) *or (a)(6)* of this section, by subsections (b), (c), (e), and (g) through (p) of section 413 of such Act.

\*      \*      \*      \*      \*      \*      \*

### § 986. Subpoenas for bank records

(a) At any time after the commencement of any action for forfeiture in rem brought by the United States under section *1028, 1541,*

484

*1542, 1543, 1544, 1546,* 1956, 1957, or 1960 of this title, section 5322 or 5324 of title 31, United States Code, or the Controlled Substances Act, any party may request the Clerk of the Court in the district in which the proceeding is pending to issue a subpoena duces tecum to any financial institution, as defined in section 5312(a) of title 31, United States Code, to produce books, records and any other documents at any place designated by the requesting party. All parties to the proceeding shall be notified of the issuance of any such subpoena. The procedures and limitations set forth in section 985 of this title shall apply to subpoenas issued under this section.

\*        \*        \*        \*        \*        \*        \*

## CHAPTER 47—FRAUD AND FALSE STATEMENTS

\*        \*        \*        \*        \*        \*        \*

### §1015. Naturalization, citizenship or alien registry

(a) * * *

\*        \*        \*        \*        \*        \*        \*

(d) Whoever knowingly makes any false cer-tificate, acknowledgment or statement concerning the appearance before him or the taking of an oath or affirmation or the signature, attestation or execution by any person with respect to any application, declaration, petition, affidavit, deposition, certificate of naturalization, certificate of citizenship or other paper or writing required or authorized by the laws relating to immigration, naturalization, citizenship, or registry of aliens〖—〗*; or*

*(e) Whoever knowingly makes any false statement or claim that he is, or at any time has been, a citizen or national of the United States, with the intent to obtain on behalf of himself, or any other person, any Federal benefit or service, or to engage unlawfully in employment in the United States; or*

*(f) Whoever knowingly makes any false statement or claim that he is a citizen of the United States in order to register to vote or to vote in any Federal, State, or local election (including an initiative, recall, or referendum)—*

Shall be fined under this title or imprisoned not more than five years, or both.

\*        \*        \*        \*        \*        \*        \*

### §1028. Fraud and related activity in connection with identi-fication documents

(a) * * *

(b) The punishment for an offense under subsection (a) of this section is—

(1) *except as provided in paragraphs (3) and (4),* a fine of under this title or imprisonment for not more than 〖five〗 *15* years, or both, if the offense is—

(A) * * *

\*        \*        \*        \*        \*        \*        \*

485

(2) *except as provided in paragraphs (3) and (4),* a fine of under this title or imprisonment for not more than three years, or both, if the offense is—

    (A) any other production or transfer of an identification document or false identification document; or

    (B) an offense under paragraph (3) of such subsection; 〖and〗

*(3) a fine under this title or imprisonment for not more than 20 years, or both, if the offense is committed to facilitate a drug trafficking crime (as defined in section 929(a)(2) of this title);*

*(4) a fine under this title or imprisonment for not more than 25 years, or both, if the offense is committed to facilitate an act of international terrorism (as defined in section 2331(1) of this title); and*

〖(3)〗 *(5)* a fine of under this title or imprisonment for not more than one year, or both, in any other case.

\*      \*      \*      \*      \*      \*      \*

## CHAPTER 75—PASSPORTS AND VISAS

\*      \*      \*      \*      \*      \*      \*

## § 1546. Fraud and misuse of visas, permits, and other documents

(a) \* \* \*

\*      \*      \*      \*      \*      \*      \*

Whoever knowingly makes under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document 〖containing any such false statement〗 *which contains any such false statement or which fails to contain any reasonable basis in law or fact*—

Shall be fined under this title or imprisoned not more than 10 years, or both.

\*      \*      \*      \*      \*      \*      \*

## CHAPTER 96—RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS

\*      \*      \*      \*      \*      \*      \*

## § 1961. Definitions

As used in this chapter—

(1) "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to

486

bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), *section 1028 (relating to fraud and related activity in connection with identification documents),* section 1029 (relating to fraud and related activity in connection with access devices), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), sections 1461–1465 (relating to obscene matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), *section 1542 (relating to false statement in application and use of passport), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud and misuse of visas, permits, and other documents), sections 1581–1588 (relating to peonage and slavery),* section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), sections 2251–2252 (relating to sexual exploitation of children), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2321 (relating to trafficking in certain motor vehicles or motor vehicle parts), sections 2341–2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of that title), fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States, ⟦or⟧ (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act*, or (F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain*

487

*aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose).*

\*　　\*　　\*　　\*　　\*　　\*　　\*

## CHAPTER 119—WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS

\*　　\*　　\*　　\*　　\*　　\*　　\*

### §2516. Authorization for interception of wire, oral, or electronic communications

(1) The Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy Assistant Attorney General or acting Deputy Assistant Attorney General in the Criminal Division specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation, or a Federal agency having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of—

(a) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(n) any violation of section 5861 of the Internal Revenue Code of 1986 (relating to firearms); 〖and〗

*(o)(1) a felony violation of section 1028 (relating to production of false identification documentation), section 1541 (relating to passport issuance without authority), section 1542 (relating to false statements in passport applications), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud or misuse of visas, permits, or other documents) of this title; or*

*(2) a violation of section 274, 277, or 278 of the Immigration and Nationality Act (relating to the smuggling of aliens); or*

〖(o)〗 *(p)* any conspiracy to commit any offense described in any subparagraph of this paragraph.

\*　　\*　　\*　　\*　　\*　　\*　　\*

# PART III—PRISONS AND PRISONERS

\*　　\*　　\*　　\*　　\*　　\*　　\*

## CHAPTER 306—TRANSFER TO OR FROM FOREIGN COUNTRIES

\*　　\*　　\*　　\*　　\*　　\*　　\*

488

### §4113. Status of alien offender transferred to a foreign country

(a) An alien who is deportable from the United States but who has been granted voluntary departure pursuant to 〖section 1252(b) or section 1254(e) of title 8, United States Code,〗 *section 240B of the Immigration and Nationality Act* and who is transferred to a foreign country pursuant to this chapter shall be deemed for all purposes to have voluntarily departed from this country.

(b) An alien who is the subject of an order of 〖deportation〗 *removal* from the United States pursuant to 〖section 1252 of title 8, United States Code,〗 *section 240 of the Immigration and Nationality Act* who is transferred to a foreign country pursuant to this chapter shall be deemed for all purposes to have been 〖deported〗 *removed* from this country.

(c) An alien who is the subject of an order of 〖exclusion and deportation〗 *removal* from the United States pursuant to section 〖1226 of title 8, United States Code〗 *240 of the Immigration and Nationality Act*, who is transferred to a foreign country pursuant to this chapter shall be deemed for all purposes to have been excluded from admission and 〖deported〗 *removed* from the United States.

\*        \*        \*        \*        \*        \*        \*

---

### IMMIGRATION AND NATIONALITY TECHNICAL CORRECTIONS ACT OF 1994

\*        \*        \*        \*        \*        \*        \*

# TITLE I—NATIONALITY AND NATURALIZATION

**SEC. 101. EQUAL TREATMENT OF WOMEN IN CONFERRING CITIZENSHIP TO CHILDREN BORN ABROAD.**

(a) \* \* \*

\*        \*        \*        \*        \*        \*        \*

(d) 〖Application to Transmission of Citizenship.—This〗 *Applicability of Transmission Requirements.—This* section, the amendments made by this section, and any retroactive application of such amendments shall not effect 〖any residency or other retention requirements for〗 *the application of any provision of law relating to residence or physical presence in the United States for purposes of transmitting United States* citizenship 〖as in effect before October 10, 1978, with respect to the transmission of citizenship.〗 *to any person whose claim is based on the amendment made by subsection (a) or through whom such a claim is derived.*

**SEC. 102. NATURALIZATION OF CHILDREN ON APPLICATION OF CITIZEN PARENT.**

(a) \* \* \*

\*        \*        \*        \*        \*        \*        \*

489

*(e) TRANSITION.—In applying the amendment made by subsection (a) to children born before November 14, 1986, any reference in the matter inserted by such amendment to "five years, at least two of which" is deemed a reference to "10 years, at least 5 of which".*

\*     \*     \*     \*     \*     \*     \*

# TITLE II—TECHNICAL CORRECTIONS OF IMMIGRATION LAWS

\*     \*     \*     \*     \*     \*     \*

## SEC. 207. TECHNICAL AMENDMENT REGARDING ONE-HOUSE VETO.

Section 13(c) of the Act of September 11, 1957 (8 U.S.C. 1255b(c)) is amended—

    (1) by striking the third sentence; and

    (2) in the fourth sentence, by striking "If neither the Senate nor the House of Representatives passes such a resolution within the time above specified, the" and inserting "The".

\*     \*     \*     \*     \*     \*     \*

## SEC. 209. FINES FOR UNLAWFUL BRINGING OF ALIENS INTO THE UNITED STATES.

(a) IN GENERAL.—Section 273 of the Immigration and Nationality Act (8 U.S.C. 1323) is amended—

    (1) in subsections (b) and (d) by striking "the sum of ⟦$3000⟧ *$3,000*" and inserting "a fine of $3,000" each place it appears;

\*     \*     \*     \*     \*     \*     \*

(b) EFFECTIVE DATE.—The amendments made by this ⟦sub-section⟧ *section* shall apply with respect to aliens brought to the United States more than 60 days after the date of enactment of this Act.

\*     \*     \*     \*     \*     \*     \*

## SEC. 219. OTHER MISCELLANEOUS AND TECHNICAL CORRECTIONS TO IMMIGRATION-RELATED PROVISIONS.

(a) * * *

\*     \*     \*     \*     \*     \*     \*

(cc) Section 204(a)(1)(C) of the Immigration Reform and Control Act of 1986 is amended by striking ⟦"year 1993 the first place it appears"⟧ *"year 1993" the first place it appears* and inserting "years 1993".

\*     \*     \*     \*     \*     \*     \*

(ee)(1) * * *

\*     \*     \*     \*     \*     \*     \*

*(3) The amendments made by this subsection shall take effect on the date of the enactment of this Act.*

\*     \*     \*     \*     \*     \*     \*

## SEC. 221. VISAS FOR OFFICIALS OF TAIWAN.

Whenever the President of Taiwan or any other high-level official of Taiwan shall apply to visit the United States for the purposes

490

of discussions with United States Federal or State government offi-
cials concerning—

(1) trade or business with Taiwan that will reduce the Unit-
ed States-Taiwan trade deficit【;】,

(2) prevention of nuclear proliferation【;】,

(3) threats to the national security of the United States【;】,

(4) the protection of the global environment【;】,

(5) the protection of endangered species【;】, or

(6) regional humanitarian disasters【.】,

【The】 *the* official shall be admitted to the United States, unless the
official is otherwise 【excludable】 *inadmissible* under the immigra-
tion laws of the United States.

\*        \*        \*        \*        \*        \*        \*

**SEC. 225. CONSTRUCTION OF EXPEDITED DEPORTATION REQUIRE-
MENTS.**

No amendment made by this Act 【and nothing in section 242(i)
of the Immigration and Nationality Act (8 U.S.C. 1252(i))】 shall be
construed to create any substantive or procedural right or benefit
that is legally enforceable by any party against the United States
or its agencies or officers or any other person.

———————

**IMMIGRATION ACT OF 1990**

\*        \*        \*        \*        \*        \*        \*

# TITLE I—IMMIGRANTS

## Subtitle A—Worldwide and Per Country Levels

\*        \*        \*        \*        \*        \*        \*

**SEC. 104. ASYLEE ADJUSTMENTS.**

(a) \* \* \*

\*        \*        \*        \*        \*        \*        \*

(d) ADJUSTMENT OF CERTAIN FORMER ASYLEES.—

(1) IN GENERAL.—Subject to paragraph (2), the provisions of
section 209(b) of the Immigration and Nationality Act shall
also apply to an alien—

(A) who was granted asylum before the date of the en-
actment of this Act (regardless of whether or not such asy-
lum has been terminated under section 【208(b)】 *208* of the
Immigration and Nationality Act),

\*        \*        \*        \*        \*        \*        \*

# Subtitle C—Commission and Information

**SEC. 141. COMMISSION ON IMMIGRATION REFORM.**

(a) \* \* \*

\*        \*        \*        \*        \*        \*        \*

491

(b) FUNCTIONS OF COMMISSION.—The Commission shall—

(1) review and evaluate the impact of this Act and the amendments made by this Act, in accordance with subsection (c); 〔and〕

(2) transmit to the Congress—

(A) not later than September 30, 1994, a first report describing the progress made in carrying out paragraph (1), and

(B) not later than September 30, 1997, a final report setting forth the Commission's findings and recommendations, including such recommendations for additional changes that should be made with respect to legal immigration into the United States as the Commission deems appropriate〔.〕; and

*(3) transmit to Congress, not later than January 1, 1997, a report containing recommendations (consistent with subsection (c)(3)) of methods of reducing or eliminating the fraudulent use of birth certificates for the purpose of obtaining other identity documents that may be used in securing immigration, employment, or other benefits.*

(c) CONSIDERATIONS.—

(1) * * *

(2) DIVERSITY PROGRAM.—The Commission shall analyze the information maintained under section 203(c)(3) of the Immigration and Nationality Act and shall report to Congress in its report under subsection (b)(2) on—

(A) the characteristics of individuals admitted under section 203(c) of the Immigration and Nationality Act, and

(B) how such characteristics compare to the characteristics of family-sponsored immigrants and employment-based immigrants.

The Commission shall include in the report an assessment of the effect of the requirement of paragraph (2) of section 203(c) of the Immigration and Nationality Act on the diversity, educational, and skill level of aliens admitted.

*(3) FOR REPORT ON REDUCING BIRTH CERTIFICATE FRAUD.—In the report described in subsection (b)(3), the Commission shall consider and analyze the feasibility of—*

*(A) establishing national standards for counterfeit-resistant birth certificates, and*

*(B) limiting the issuance of official copies of a birth certificate of an individual to anyone other than the individual or others acting on behalf of the individual.*

\*        \*        \*        \*        \*        \*        \*

# Subtitle D—Miscellaneous

\*        \*        \*        \*        \*        \*        \*

**SEC. 154. PERMITTING EXTENSION OF PERIOD OF VALIDITY OF IMMIGRANT VISAS FOR CERTAIN RESIDENTS OF HONG KONG.**

(a) * * *

(b) ALIENS COVERED.—An alien is described in this subsection if the alien—

492

(1)(A) * * *

(B)(i) is residing in Hong Kong as of the date of the enactment of this Act and is issued an immigrant visa under paragraph (1), (2), (4), or (5) of section 203(a) of the Immigration and Nationality Act (as in effect on the date of the enactment of this Act) or under section 203(a) or 203(b)(1) of such Act (as in effect on and after October 1, 【1991】 *1991, and before October 1, 1996) or under section 203(a), 203(b)(1), or 203(b)(2) (as in effect on and after October 1, 1996),* or (ii) is the spouse or child (as defined in subsection (d)) of an alien described in clause (i), if accompanying or following to join the alien in coming to the United States; or

\*        \*        \*        \*        \*        \*        \*

# Subtitle E—Effective Dates; Conforming Amendments

**SEC. 161. EFFECTIVE DATES.**

(a) * * *

(c) GENERAL TRANSITIONS.—

(1) * * *

\*        \*        \*        \*        \*        \*        \*

(3) In the case of an alien who is described in section 203(a)(8) of the Immigration and Nationality Act (as in effect before October 1, 1991) as the spouse or child of an alien admitted for permanent residence as a preference immigrant under section 203(a)(3) or 203(a)(6) of such Act (as in effect before such date) and who would be entitled to enter the United States under such section 203(a)(8) but for the amendments made by this title, such an alien shall be deemed to be described in section 203(d) of such Act as the spouse or child 【an an】 *of an* alien described in section 203(b)(2) or 203(b)(3)(A)(i), respectively, of such Act with the same priority date as that of the principal alien.

\*        \*        \*        \*        \*        \*        \*

# TITLE II—NONIMMIGRANTS

# Subtitle A—General and Permanent Provisions

\*        \*        \*        \*        \*        \*        \*

**SEC. 204. TREATY TRADERS (E NONIMMIGRANTS).**

(a) * * *

(b) APPLICATION OF TREATY TRADER FOR CERTAIN FOREIGN STATES.—Each of the following foreign states shall be considered, for purposes of section 101(a)(15)(E) of the Immigration and Nationality Act, to be a foreign state described in such section if the foreign state extends reciprocal nonimmigrant treatment to nationals of the United States:

493

(1) The largest foreign state in each region (as defined in section 203(c)(1) of the Immigration and Nationality Act) which (A) has 1 or more dependent areas (as determined for purposes of section 202 of such Act) and (B) does not have a treaty of commerce and navigation with the United States.

\*        \*        \*        \*        \*        \*        \*

### SEC. 206. INTRA-COMPANY TRANSFEREES (L NONIMMIGRANTS).

(a) CLARIFICATION OF TREATMENT OF CERTAIN INTERNATIONAL ACCOUNTING FIRMS.—In applying sections 101(a)(15)(L) and [203(b)(1)(C)] *203(b)(2)(C)* of the Immigration and Nationality Act and section 124(a)(3)(A) of this Act, in the case of a partnership that is organized in the United States to provide accounting services and that markets its accounting services under an internationally recognized name under an agreement with a worldwide coordinating organization that is owned and controlled by the member accounting firms, a partnership (or similar organization) that is organized outside the United States to provide accounting services shall be considered to be an affiliate of the United States partnership if it markets its accounting services under the same internationally recognized name under the agreement with the worldwide coordinating organization of which the United States partnership is also a member.

\*        \*        \*        \*        \*        \*        \*

# TITLE III—FAMILY UNITY AND TEMPORARY PROTECTED STATUS

### SEC. 301. FAMILY UNITY.

(a) TEMPORARY STAY OF [DEPORTATION] *REMOVAL* AND WORK AUTHORIZATION FOR CERTAIN ELIGIBLE IMMIGRANTS.—The Attorney General shall provide that in the case of an alien who is an eligible immigrant (as defined in subsection (b)(1)) as of May 5, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(B) or (b)(2)(C)) or as of December 1, 1988 (in the case of a relationship to a legalized alien described in subsection (b)(2)(A)), who has entered the United States before such date, who resided in the United States on such date, and who is not lawfully admitted for permanent residence, the alien—

(1) may not be [deported] *removed* or otherwise required to depart from the United States on a ground specified in paragraph (1)(A), (1)(B), (1)(C), (3)(A), of section 241(a) of the Immigration and Nationality Act (other than so much of section 241(a)(1)(A) of such Act as relates to a ground of [exclusion] *inadmissibility* described in paragraph (2) or (3) of section 212(a) of such Act), and

\*        \*        \*        \*        \*        \*        \*

(e) EXCEPTION FOR CERTAIN ALIENS.—An alien is not eligible for the benefits of this section if the Attorney General finds that—

(1) the alien has been convicted of a felony or 3 or more misdemeanors in the United States, or

494

(2) the alien is described in section 〔243(h)(2)〕 *208(b)(2)(A)* of the Immigration and Nationality Act.

\*       \*       \*       \*       \*       \*       \*

**SEC. 303. SPECIAL TEMPORARY PROTECTED STATUS FOR SALVA-DORANS.**

(a) \* \* \*

\*       \*       \*       \*       \*       \*       \*

(d) ENFORCEMENT OF REQUIREMENT TO DEPART AT TIME OF TER-MINATION OF DESIGNATION.—

(1) \* \* \*

(2) SANCTION FOR FAILURE TO APPEAR.—If an alien is provided an order to show cause under paragraph (1) and fails to appear at such proceedings, except for exceptional circumstances, the alien may be deported in absentia under section 〔242B〕 *240(b)(5)* of the Immigration and Nationality Act (inserted by section 545(a) of this Act) and certain discretionary forms of relief are no longer available to the alien pursuant to such section.

\*       \*       \*       \*       \*       \*       \*

# TITLE V—ENFORCEMENT

\*       \*       \*       \*       \*       \*       \*

## Subtitle D—General Enforcement

\*       \*       \*       \*       \*       \*       \*

**SEC. 545. DEPORTATION PROCEDURES; REQUIRED NOTICE OF DEPOR-TATION HEARING; LIMITATION ON DISCRETIONARY RE-LIEF.**

(a) \* \* \*

\*       \*       \*       \*       \*       \*       \*

(g) EFFECTIVE DATES.—

(1) NOTICE-RELATED PROVISIONS.—

(A) \* \* \*

(B) The Attorney General shall certify to the Congress when the central address file system (described in section 〔242B(a)(4)〕 *239(a)(4)* of the Immigration and Nationality Act) has been established.

\*       \*       \*       \*       \*       \*       \*

# TITLE VI—EXCLUSION AND DEPORTATION

**SEC. 601. REVISION OF GROUNDS FOR EXCLUSION.**

(a) \* \* \*

\*       \*       \*       \*       \*       \*       \*

495

(c) REVIEW OF EXCLUSION LISTS.—The Attorney General and the Secretary of State shall develop protocols and guidelines for updating lookout books and the automated visa lookout system and similar mechanisms for the screening of aliens applying for visas for admission, or for admission, to the United States. Such protocols and guidelines shall be developed in a manner that ensures that in the case of an alien—

(1) whose name is in such system, and

(2) who either (A) applies for 【entry】 *admission* after the effective date of the amendments made by this section, or (B) requests (in writing to a local consular office after such date) a review, without seeking admission, of the alien's continued 【excludability】 *inadmissibility* under the Immigration and Nationality Act,

if the alien is no longer 【excludable】 *inadmissible* because of an amendment made by this section the alien's name shall be removed from such books and system and the alien shall be informed of such removal and if the alien continues to be 【excludable】 *inadmissible* the alien shall be informed of such determination.

\*        \*        \*        \*        \*        \*        \*

_____

## SECTION 128 OF THE FOREIGN RELATIONS AUTHORIZATION ACT, FISCAL YEARS 1992 AND 1993

### SEC. 128. VISA LOOKOUT SYSTEMS.

(a) VISAS.—The Secretary of State may not include in the Automated Visa Lookout System, or in any other system or list which maintains information about the 【excludability】 *inadmissibility* of aliens under the Immigration and Nationality Act, the name of any alien who is not 【excludable】 *inadmissible* from the United States under the Immigration and Nationality Act, subject to the provisions of this section.

(b) CORRECTION OF LISTS.—Not later than 3 years after the date of enactment of this Act, the Secretary of State shall—

(1) correct the Automated Visa Lookout System, or any other system or list which maintains information about the 【excludability】 *inadmissibility* of aliens under the Immigration and Nationality Act, by deleting the name of any alien not 【excludable】 *inadmissible* under the Immigration and Nationality Act; and

(2) report to the Congress concerning the completion of such correction process.

\*        \*        \*        \*        \*        \*        \*

(e) LIMITATION.—

(1) The Secretary may add or retain in such system or list the names of aliens who are not 【excludable】 *inadmissible* only if they are included for otherwise authorized law enforcement purposes or other lawful purposes of the Department of State. A name included for other lawful purposes under this paragraph shall include a notation which clearly and distinctly indicates that such person is not presently 【excludable】 *inadmissible*. The Secretary of State shall adopt procedures to en-

496

sure that visas are not denied to such individuals for any reason not set forth in the Immigration and Nationality Act.

\*    \*    \*    \*    \*    \*    \*

―――――――

### SECTION 1073 OF THE NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 1995

**SEC. 1073. SENSE OF CONGRESS CONCERNING VISAS FOR HIGH-LEVEL OFFICIALS OF TAIWAN.**

It is the sense of Congress that no visa should be denied for a high-level official of Taiwan to enter the United States unless the official is otherwise ⟦excludable⟧ *inadmissible* under the immigration laws of the United States.

―――――――

### SECTION 401 OF THE REFUGEE ACT OF 1980

SEC. 401. (a) \* \* \*

\*    \*    \*    \*    \*    \*    \*

(c) This section applies with respect to any alien in the United States (1) who has applied before November 1, 1979, for asylum in the United States, (2) who has not been granted asylum, and (3) with respect to whom a final, nonappealable, and legally enforceable order of ⟦deportation or exclusion⟧ *removal* has not be entered.

\*    \*    \*    \*    \*    \*    \*

―――――――

### SECTION 501 OF THE REFUGEE EDUCATION ASSISTANCE ACT OF 1980

AUTHORITIES FOR OTHER PROGRAMS AND ACTIVITIES

SEC. 501. (a) \* \* \*

\*    \*    \*    \*    \*    \*    \*

(e) As used in this section, the term "Cuban and Haitian entrants" means—

(1) any individual granted parole status as a Cuban/Haitian Entrant (Status Pending) or granted any other special status subsequently established under the immigration laws for nationals of Cuba or Haiti, regardless of the status of the individual at the time assistance or services are provided; and

(2) any other national of Cuba or Haiti—

(A) who—

(i) was paroled into the United States and has not acquired any other status under the Immigration and Nationality Act;

(ii) is the subject of ⟦exclusion or deportation⟧ *removal* proceedings under the Immigration and Nationality Act; or

(iii) has an application for asylum pending with the Immigration and Naturalization Service; and

497

(B) with respect to whom a final, nonappealable, and le-
gally enforceable order of 【deportation or exclusion】 *re-
moval* has not been entered.

\*        \*        \*        \*        \*        \*        \*

────────

## VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1994

\*        \*        \*        \*        \*        \*        \*

# TITLE II—PRISONS

\*        \*        \*        \*        \*        \*        \*

## Subtitle C—Alien Incarceration

**SEC. 20301. INCARCERATION OF UNDOCUMENTED CRIMINAL ALIENS.**
　(a) \* \* \*

\*        \*        \*        \*        \*        \*        \*

　(c) TERMINATION OF LIMITATION.—Notwithstanding section
【242(j)(5)】 *241(h)(5)* of the Immigration and Nationality Act, as
added by subsection (a), the requirements of section 【242(j)】 *241(h)*
of the Immigration and Nationality Act, as added by subsection (a),
shall not be subject to the availability of appropriations on and
after October 1, 2004.

\*        \*        \*        \*        \*        \*        \*

# TITLE VI—DEATH PENALTY

\*        \*        \*        \*        \*        \*        \*

**SEC. 60024. ENHANCED PENALTIES FOR ALIEN SMUGGLING.**
　Section 274(a) of the Immigration and Nationality Act (8 U.S.C.
1324(a)) is amended—
　　(1) in paragraph (1)—
　　　(A) \* \* \*

\*        \*        \*        \*        \*        \*        \*

　　　(F) by striking "shall be fined in accordance with title
18, *United States Code,* or imprisoned not more than five
years, or both, for each alien in respect to whom any viola-
tion of this paragraph occurs" and inserting "shall be pun-
ished as provided in subparagraph (B)"; and

\*        \*        \*        \*        \*        \*        \*

# TITLE XIII—CRIMINAL ALIENS AND IMMIGRATION ENFORCEMENT

\*        \*        \*        \*        \*        \*        \*

498

### SEC. 130002. CRIMINAL ALIEN TRACKING CENTER.

〚(a) OPERATION.—The Attorney General shall, under the authority of section 242(a)(3)(A) of the Immigration and Nationality Act (8 U.S.C. 1252(a)(3)(A)), operate a criminal alien tracking center.〛

*(a) OPERATION AND PURPOSE.—The Commissioner of Immigration and Naturalization shall, under the authority of section 236(d) of the Immigration and Nationality Act (8 U.S.C. 1252(a)(3)(A)), operate a criminal alien identification system. The criminal alien identification system shall be used to assist Federal, State, and local law enforcement agencies in identifying and locating aliens who may be subject to removal by reason of their conviction of aggravated felonies, subject to prosecution under section 275 of such Act, not lawfully present in the United States, or otherwise removable. Such system shall include providing for recording of fingerprint records of aliens who have been previously arrested and removed into appropriate automated fingerprint identification systems.*

\*　　\*　　\*　　\*　　\*　　\*　　\*

### SEC. 130003. ALIEN WITNESS COOPERATION AND COUNTERTERRORISM INFORMATION.

(a) \* \* \*

(b) CONDITIONS OF ENTRY.—

(1) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(3) PROHIBITION OF CHANGE OF STATUS.—Section 248(1) of the Immigration and 〚Naturalization〛 *Nationality* Act (8 U.S.C. 1258(1)) is amended by striking "or (K)" and inserting "(K), or (S)".

\*　　\*　　\*　　\*　　\*　　\*　　\*

### SEC. 130005. EXPEDITIOUS 〚DEPORTATION〛 *REMOVAL* FOR DENIED ASYLUM APPLICANTS.

(a) IN GENERAL.—The Attorney General may provide for the expeditious adjudication of asylum claims and the expeditious 〚deportation〛 *removal* of asylum applicants whose applications have been finally denied, unless the applicant remains in an otherwise valid nonimmigrant status.

\*　　\*　　\*　　\*　　\*　　\*　　\*

### SEC. 130007. EXPANDED SPECIAL DEPORTATION PROCEEDINGS.

(a) IN GENERAL.—Subject to the availability of appropriations, the Attorney General may expand the program authorized by section 〚242A(d)〛 *238(a)(3)* and 〚242(i)〛 *239(d)* of the Immigration and Nationality Act to ensure that such aliens are immediately deportable upon their release from incarceration.

\*　　\*　　\*　　\*　　\*　　\*　　\*

———————

## SECTION 7 OF CENTRAL INTELLIGENCE AGENCY ACT OF 1949

SEC. 7. Whenever the Director, the Attorney General and the Commissioner of Immigration shall determine 〚that the entry〛 *that the admission* of a particular alien into the United States for

499

permanent residence is in the interest of national security or essential to the furtherance of the national intelligence mission, such alien and his immediate family shall be 〔given entry into〕 *admitted to* the United States for permanent residence without regard to their inadmissibility under the immigration or any other laws and regulations, or to the failure to comply with such laws and regulations pertaining to admissibility: *Provided,* That the number of aliens and members of their immediate families 〔entering〕 *admitted to* the United States under the authority of this section shall in no case exceed one hundred persons in any one fiscal year.

––––––––––

## SECTION 4 OF THE ATOMIC WEAPONS AND SPECIAL NUCLEAR MATERIALS REWARDS ACT

SEC. 4. If the information leading to award under section 3 is furnished by an alien, the Secretary of State, the Attorney General, and the Director of Central Intelligence, acting jointly, may determine that the 〔entry〕 *admission* of such alien into the United States is in the public interest and, in that event, such alien and the members of his immediate family may receive immigrant visas and may be admitted to the United States for permanent residence, notwithstanding the requirements of the Immigration and Nationality Act.

––––––––––

## SECTION 8 OF THE FOREIGN AGENTS REGISTRATION ACT OF 1938

### ENFORCEMENT AND PENALTIES

SEC. 8. (a) * * *

\* \* \* \* \* \* \*

(c) Any alien who shall be convicted of a violation of, or a conspiracy to violate, any provisions of this Act or any regulation thereunder shall be subject to 〔deportation in the manner provided by sections 241, 242, and 243 of the Immigration and Nationality Act.〕 *removal pursuant to chapter 4 of title II of the Immigration and Nationality Act.*

\* \* \* \* \* \* \*

––––––––––

## SECTION 9 OF THE PEACE CORPS ACT

### PARTICIPATION OF FOREIGN NATIONALS

SEC. 9. In order to provide for assistance by foreign nationals in the training of volunteers, and to permit effective implementation of Peace Corps projects with due regard for the desirability of cost-sharing arrangements, where appropriate, the President may make provision for transportation, housing, subsistence, or per diem in lieu thereof, and health care or health and accident insurance for foreign nationals engaged in activities authorized by this Act while they are away from their homes, without regard to the provisions of any other law: *Provided, however,* That per diem in lieu of subsistence furnished to such persons shall not be at rates higher than

500

those prescribed by the Secretary of State pursuant to section 12 of Public Law 84–885 (70 Stat. 890). Such persons, and persons coming to the United States under contract pursuant to section 10(a)(5), may be admitted to the United States, if otherwise qualified, as nonimmigrants under section 101(a)(15) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15)) for such time and under such conditions as may be prescribed by regulations promulgated by the Secretary of State and the Attorney General. A person admitted under this section who fails to maintain the status under which he was admitted or who fails to depart from the United States at the expiration of the time for which he was admitted, or who engages in activities of a political nature detrimental to the interests of the United States, or in activities not consistent with the security of the United States, shall, upon the warrant of the Attorney General, be taken into custody and promptly 【deported pursuant to sections 241, 242, and 243 of the Immigration and Nationality Act. Deportation】 *removed pursuant to chapter 4 of title II of the Immigration and Nationality Act* proceedings under this section shall be summary and the findings of the Attorney General as to matters of fact shall be conclusive.

————————

### SECTION 6 OF THE ACT OF AUGUST 1, 1956

SEC. 6. (a) * * *
   (b) Any alien convicted of a violation of this Act or any regulation thereunder is subject to deportation in the manner provided by 【chapter 5, title II, of the Immigration and Nationality Act (66 Stat. 163)】 *chapter 4 of title II of the Immigration and Nationality Act.*

\*        \*        \*        \*        \*        \*        \*

————————

### SECTION 2 OF THE VIRGIN ISLANDS NONIMMIGRANT ALIEN ADJUSTMENT ACT OF 1982

ADJUSTMENT OF IMMIGRATION STATUS

SEC. 2. (a) * * *

\*        \*        \*        \*        \*        \*        \*

   (c)(1) * * *
   (2) The Secretary of State, in his discretion and after consultation with the Secretary of the Interior and the Governor of the Virgin Islands of the United States, may limit the number of immigrant visas that may be issued in any fiscal year to aliens with respect to whom second preference petitions *or first or third family preference petitions* (filed by aliens who have had their status so adjusted) are approved.
   (3) Notwithstanding any other provision of law, no alien shall be eligible to receive an immigrant visa (or to otherwise acquire the status of an alien lawfully admitted to the United States from permanent residence)—
      (A) by virtue of a fourth or fifth preference petition filed by an individual who had his status adjusted under this section unless the individual establishes to the satisfaction of the At-

501

torney General that exceptional and extremely unusual hardship exists for permitting the alien to receive such visa (or otherwise acquire such status); 【or】

(B) by virtue of a second preference petition filed by an individual who was admitted to the United States as an immigrant by virtue of an immediate relative petition filed by the son or daughter of the individual, if that son or daughter had his or her status adjusted under this section【.】*; or*

*(C) by virtue of a first or third family preference petition filed by an individual who was admitted to the United States as an immigrant by virtue of a second family preference petition filed by the son or daughter of the individual, if that son or daughter had his or her status adjusted under this section.*

(4) For purposes of this subsection, the terms "second preference petition", "fourth preference petition", "fifth preference petition", and "immediate relative petition" mean, in the case of an alien, a petition filed under section 204(a) of the Act to grant preference status to the alien by reason of the relationship described in section 203(a)(2), 203(a)(4), 203(a)(5), or 201(b), respectively, of the Act (as in effect before October 1, 1991) or by reason of the relationship described in section 203(a)(2), 203(a)(3), or 201(b)(2)(A)(i), respectively, of such Act (as in effect 【on or after such date).】 *on or after such date and before October 1, 1996). For purposes of this subsection, the terms "first family preference petition", "second family preference petition", and "third family preference petition" mean, in the case of an alien, a petition filed under section 204(a) of the Act to grant preference status to the alien by reason of the relationship described in section 203(a)(1), 203(a)(2), or 203(a)(3), respectively (as in effect on and after October 1, 1996).*

\*        \*        \*        \*        \*        \*        \*

———————

## SECTION 2 OF THE CHINESE STUDENT PROTECTION ACT OF 1992

**SEC. 2. ADJUSTMENT TO LAWFUL PERMANENT RESIDENT STATUS OF CERTAIN NATIONALS OF THE PEOPLE'S REPUBLIC OF CHINA.**

(a) \* \* \*

\*        \*        \*        \*        \*        \*        \*

(d) OFFSET IN PER COUNTRY NUMERICAL LEVEL.—

(1) \* \* \*

(2) ALLOTMENT IF SECTION 202(e) APPLIES.—If section 202(e) of the Immigration and Nationality Act is applied to the People's Republic of China in an applicable fiscal year, in applying such section—

(A) 300 immigrant visa numbers shall be deemed to have been previously issued to natives of that foreign state under section 【203(b)(3)(A)(i)】 *203(b)(4)(B)* of such Act in that year, and

502

(B) 700 immigrant visa numbers shall be deemed to have been previously issued to natives of that foreign state under section 203(b)(5) of such Act in that year.

\*　　\*　　\*　　\*　　\*　　\*　　\*

---

## SECTION 1821 OF TITLE 28, UNITED STATES CODE

### § 1821. Per diem and mileage generally; subsistence

(a) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(e) An alien who has been paroled into the United States for prosecution, pursuant to section 212(d)(5) of the Immigration and Nationality Act (8 U.S.C. 1182(d)(5)), or an alien who either has admitted belonging to a class of aliens who are deportable or has been determined pursuant to section 【242(b)】 *240* of such Act (8 U.S.C. 1252(b)) to be deportable, shall be ineligible to receive the fees or allowances provided by this section.

\*　　\*　　\*　　\*　　\*　　\*　　\*

---

## IMMIGRATION REFORM AND CONTROL ACT OF 1986

### TITLE II—LEGALIZATION

\*　　\*　　\*　　\*　　\*　　\*　　\*

#### SEC. 202. CUBAN-HAITIAN ADJUSTMENT.

(a) ADJUSTMENT OF STATUS.—The status of any alien described in subsection (b) may be adjusted by the Attorney General, in the Attorney General's discretion and under such regulations as the Attorney General may prescribe, to that of an alien lawfully admitted for permanent residence if—

(1) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(3) the alien is not an alien described in section 243(h)(2) of such Act;

\*　　\*　　\*　　\*　　\*　　\*　　\*

#### SEC. 204. STATE LEGALIZATION IMPACT-ASSISTANCE GRANTS.

(a) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(c) PROVIDING ASSISTANCE.—(1) Of the amounts allotted to a State under this section, the State may only use such funds, in accordance with this section—

(A) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(D) to make payments for public education and outreach (including the provision of information to individual applicants) to inform temporary resident aliens regarding—

503

(i) the requirements of sections 210【, 210A,】 and 245A of the Immigration and Nationality Act regarding the adjustment of resident status,

\*    \*    \*    \*    \*    \*    \*

(j) DEFINITIONS.—For purposes of this section:
(1) \* \* \*

\*    \*    \*    \*    \*    \*    \*

(4) The term "eligible legalized alien" means an alien who has been granted lawful temporary resident status under section 210【, 210A,】 or 245A of the Immigration and Nationality Act, but only until the end of the five-year period beginning on the date the alien was first granted such status, except that the five-year limitation shall not apply for the purposes of making payments from funds appropriated under the fiscal year 1995 Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act for providing public information and outreach activities regarding naturalization and citizenship; and English language and civics instruction to any adult eligible legalized alien who has not met the requirements of section 312 of the Immigration and Nationality Act for purposes of becoming naturalized as a citizen of the United States.

### TITLE III—REFORM OF LEGAL IMMIGRATION

\*    \*    \*    \*    \*    \*    \*

**Part B—Other Changes in the Immigration Law**

\*    \*    \*    \*    \*    \*    \*

**SEC. 315. MISCELLANEOUS PROVISIONS.**

(a) \* \* \*

\*    \*    \*    \*    \*    \*    \*

(c) SENSE OF CONGRESS RESPECTING TREATMENT OF CUBAN POLITICAL PRISONERS.—It is the sense of the Congress that the Secretary of State should provide for the issuance of visas to nationals of Cuba who are or were imprisoned in Cuba for political activities without regard to section 【243(g)】 *243(d)* of the Immigration and Nationality Act (8 U.S.C. 【1253(g)】 *1253(d)*).

\*    \*    \*    \*    \*    \*    \*

### TITLE IV—REPORTS TO CONGRESS

**SEC. 401. TRIENNIAL COMPREHENSIVE REPORT ON IMMIGRATION.**

(a) TRIENNIAL REPORT.—The President shall transmit to the Congress, not later than January 1, 1989, and not later than January 1 of every third year thereafter, a comprehensive immigration-impact report.

(b) DETAILS IN EACH REPORT.—Each report shall include—
(1) the number and classification of aliens admitted (whether as 【immediate relatives】 *spouses and children of citizens*, special immigrants, refugees, or under the preferences classifica-

FRP-FRN-01174

504

tions, or as nonimmigrants), paroled, or granted asylum, during the relevant period;

\*     \*     \*     \*     \*     \*     \*

_____

## SECTION 702 OF THE DEPARTMENTS OF COMMERCE, JUSTICE, AND STATE, THE JUDICIARY, AND RELATED AGENCIES APPROPRIATIONS ACT, 1988

SEC. 702. (a) \* \* \*

(b) PROCESSING OF IMMIGRANT VISA APPLICATIONS OF CUBAN NATIONALS IN THIRD COUNTRIES.—Notwithstanding section 212(f) and section 【243(g)】 *243(d)* of the Immigration and Nationality Act, on and after the date of the enactment of this Act, consular officers of the Department of State shall process immigrant visa applications by nationals of Cuba located in third countries on the same basis as immigrant visa applications by nationals of other countries.

\*     \*     \*     \*     \*     \*     \*

_____

## SECTION 903 OF THE FOREIGN RELATIONS AUTHORIZATION ACT, FISCAL YEARS 1988 AND 1989

SEC. 903. PROCESSING OF CUBAN NATIONALS FOR ADMISSION TO THE UNITED STATES.

(a) \* \* \*

(b) PROCESSING OF IMMIGRANT VISA APPLICATIONS OF CUBAN NATIONALS IN THIRD COUNTRIES.—Notwithstanding section 212(f) and section 【243(g)】 *243(d)* of the Immigration and Nationality Act, on and after the date of the enactment of this Act, consular officers of the Department of State shall process immigrant visa applications by nationals of Cuba located in third countries on the same basis as immigrant visa applications by nationals of other countries.

\*     \*     \*     \*     \*     \*     \*

_____

## SECTION 6 OF THE FOOD STAMP ACT OF 1977

ELIGIBILITY DISQUALIFICATIONS

SEC. 6. (a) \* \* \*

\*     \*     \*     \*     \*     \*     \*

(f) No individual who is a member of a household otherwise eligible to participate in the food stamp program under this section shall be eligible to participate in the food stamp program as a member of that or any other household unless he or she is (1) a resident of the United States and (2) either (A) a citizen or (B) an alien lawfully admitted for permanent residence as an immigrant as defined by sections 101(a)(15) and 101(a)(20) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(15) and 8 U.S.C. 1101(a)(20)), excluding, among others, alien visitors, tourists, diplomats, and students who enter the United States temporarily with

505

no intention of abandoning their residence in a foreign country; or (C) an alien who entered the United States prior to June 30, 1948, or such subsequent date as is enacted by law, has continuously maintained his or her residence in the United States since then, and is not ineligible for citizenship, but who is deemed to be lawfully admitted for permanent residence as a result of an exercise of discretion by the Attorney General pursuant to section 249 of the Immigration and Nationality Act (8 U.S.C. 1259); or (D) an alien who has qualified for conditional entry pursuant to sections 207 and 208 of the Immigration and Nationality Act (8 U.S.C. 1157 and 1158); or (E) an alien who is lawfully present in the United States as a result of an exercise of discretion by the Attorney General for emergent reasons or reasons deemed strictly in the public interest pursuant to section 212(d)(5) of the Immigration and Nationality Act (8 U.S.C. 1182(d)(5)); or (F) an alien within the United States as to whom the Attorney General has withheld deportation pursuant to section 243 of the Immigration and Nationality Act (8 U.S.C. 1253(h)). No aliens other than the ones specifically described in clauses (B) through (F) of this subsection shall be eligible to participate in the food stamp program as a member of any household. The income (less a pro rata share) and financial resources of the individual rendered ineligible to participate in the food stamp program under this subsection shall be considered in determining the eligibility and the value of the allotment of the household of which such individual is a member.

\*    \*    \*    \*    \*    \*    \*

––––––––––

## SECTION 214 OF THE HOUSING AND COMMUNITY DEVELOPMENT ACT OF 1980

SEC. 214. (a) Notwithstanding any other provision of law, the Secretary of Housing and Urban Development may not make financial assistance available for the benefit of any alien unless that alien is a resident of the United States and is—

(1) \* \* \*

\*    \*    \*    \*    \*    \*    \*

(5) an alien who is lawfully present in the United States as a result of the Attorney General's withholding deportation pursuant to section 【243(h)】 *241(b)(3)* of the Immigration and Nationality Act (8 U.S.C. 1253(h)); or

\*    \*    \*    \*    \*    \*    \*

––––––––––

## SECTION 304 OF THE MISCELLANEOUS AND TECHNICAL IMMIGRATION AND NATURALIZATION AMENDMENTS OF 1991

SEC. 304. CORRECTIONS RELATING TO TITLE III OF THE IMMIGRATION ACT OF 1990.

(a) \* \* \*

\*    \*    \*    \*    \*    \*    \*

506

(c)(1) In the case of an alien described in paragraph (2) whom the Attorney General authorizes to travel abroad temporarily and who returns to the United States in accordance with such authorization—

(A) the alien shall be inspected and admitted in the same immigration status the alien had at the time of departure if—

(i) in the case of an alien described in paragraph (2)(A), the alien is found not to be excludable on a ground of exclusion referred to in section 301(a)(1) of the Immigration Act of 1990, or

(ii) in the case of an alien described in paragraph (2)(B), the alien is found not to be excludable on a ground of exclusion referred to in section 244A(c)(2)(A)(iii) of the Immigration and Nationality Act; and

(B) the alien shall not be considered, by reason of such authorized departure, to have failed to maintain continuous physical presence in the United States for purposes of section 〖244(a)〗 *240A(a)* of the Immigration and Nationality Act if the absence meets the requirements of section 〖244(b)(2)〗 *240A(b)(2)* of such Act.

\*       \*       \*       \*       \*       \*       \*

───────────

## SOVIET SCIENTISTS IMMIGRATION ACT OF 1992

\*       \*       \*       \*       \*       \*       \*

### SEC. 3. WAIVER OF JOB OFFER REQUIREMENT.

The requirement in section 〖203(b)(2)(A) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(2)(A))〗 *203(b)(3)(B)(i) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(3)(B)(i))* that an alien's services in the sciences, arts, or business be sought by an employer in the United States shall not apply to any eligible independent states or Baltic scientist who is applying for admission to the United States for permanent residence in accordance with that section.

### SEC. 4. CLASSIFICATION OF INDEPENDENT STATES SCIENTISTS AS HAVING EXCEPTIONAL ABILITY.

(a) IN GENERAL.—The Attorney General shall designate a class of eligible independent states and Baltic scientists, based on their level of expertise, as aliens who possess "exceptional ability in the sciences", for purposes of section 〖203(b)(2)(A) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(2)(A))〗 *203(b)(3)(B)(i) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(3)(B)(i))*, whether or not such scientists possess advanced degrees.

(b) REGULATIONS.—The Attorney General shall prescribe regulations to carry out subsection (a).

(c) LIMITATION.—Not more than 750 eligible independent states and Baltic scientists (excluding spouses and children if accompanying or following to join) within the class designated under subsection (a) may be allotted visas under section 〖203(b)(2)(A) of the

507

Immigration and Nationality Act (8 U.S.C. 1153(b)(2)(A))〗 *203(b)(3) of the Immigration and Nationality Act (8 U.S.C. 1153(b)(2)).*

\*        \*        \*        \*        \*        \*        \*

---

## SECTION 9 OF THE IMMIGRATION AND NATIONALITY AMENDMENTS OF 1976

〖SEC. 9. (a) The amendments made by this Act shall not operate to affect the entitlement to immigrant status or the order of consideration for issuance of an immigrant visa of an alien entitled to a preference status, under section 203(a) of the Immigration and Nationality Act, as in effect on the day before the effective date of this Act, on the basis of a petition filed with the Attorney General prior to such effective date.

〖(b) An alien chargeable to the numerical limitation contained in section 21(e) of the Act of October 3, 1965 (79 Stat. 921), who established a priority date at a consular office on the basis of entitlement to immigrant status under statutory or regulatory provisions in existence on the day before the effective date of this Act shall be deemed to be entitled to immigrant status under section 203(a)(8) of the Immigration and Nationality Act and shall be accorded the priority date previously established by him. Nothing in this section shall be construed to preclude the acquisition by such an alien of a preference status under section 203(a) of the Immigration and Nationality Act, as amended by section 4 of this Act. Any petition filed by, or on behalf of, such an alien to accord him a preference status under section 203(a) shall, upon approval, be deemed to have been filed as of the priority date previously established by such alien. The numerical limitation to which such an alien shall be chargeable shall be determined as provided in sections 201 and 202 of the Immigration and Nationality Act, as amended by this Act.〗

---

## SECTION 19 OF THE IMMIGRATION AND NATIONALITY AMENDMENTS OF 1981

〖SEC. 19. The numerical limitations contained in sections 201 and 202 of the Immigration and Nationality Act shall not apply to any alien who is present in the United States and who, on or before June 1, 1978—

〖(1) qualified as a nonpreference immigrant under section 203(a)(8) of such Act (as in effect on June 1, 1978);

〖(2) was determined to be exempt from the labor certification requirement of section 212(a)(14) of such Act because the alien had actually invested, before such date, capital in an enterprise in the United States of which the alien became a principal manager and which employed a person or persons (other than the spouse or children of the alien) who are citizens of the United States or aliens lawfully admitted for permanent residence; and

508

〔(3) applied for adjustment of status to that of an alien lawfully admitted for permanent residence.〕

───────────

**INTERNAL REVENUE CODE OF 1984**

# Subtitle A—Income Taxes

\*　　\*　　\*　　\*　　\*　　\*　　\*

# CHAPTER 1—NORMAL TAXES AND SURTAXES

\*　　\*　　\*　　\*　　\*　　\*　　\*

## Subchapter A—Determination of Tax Liability

\*　　\*　　\*　　\*　　\*　　\*　　\*

### PART IV—CREDITS AGAINST TAX

\*　　\*　　\*　　\*　　\*　　\*　　\*

#### Subpart B—Foreign Tax Credits, Etc.

\*　　\*　　\*　　\*　　\*　　\*　　\*

**SEC. 32. EARNED INCOME.**
  (a) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

  (c) DEFINITIONS AND SPECIAL RULES.—For purposes of this section—
    (1) ELIGIBLE INDIVIDUAL.—
      (A) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

      *(F) IDENTIFICATION NUMBER REQUIREMENT.—The term "eligible individual" does not include any individual who does not include on the return of tax for the taxable year—*
        *(i) such individual's taxpayer identification number, and*
        *(ii) if the individual is married (within the meaning of section 7703), the taxpayer identification number of such individual's spouse.*

\*　　\*　　\*　　\*　　\*　　\*　　\*

  (k) IDENTIFICATION NUMBERS.—For purposes of subsections (c)(1)(F) and (c)(3)(D), a taxpayer identification number means a social security number issued to an individual by the Social Security Administration (other than a social security number issued pursuant to clause (II) (or that portion of clause (III) that relates to clause (II)) of section 205(c)(2)(B)(i) of the Social Security Act).

\*　　\*　　\*　　\*　　\*　　\*　　\*

509

# Subtitle F—Procedure and Administration

\*    \*    \*    \*    \*    \*    \*

## CHAPTER 63—ASSESSMENT

\*    \*    \*    \*    \*    \*    \*

## Subchapter B—Deficiency Procedures in the Case of Income, Estate, Gift, and Certain Excise Taxes

\*    \*    \*    \*    \*    \*    \*

**SEC. 6213. RESTRICTIONS APPLICABLE TO DEFICIENCIES; PETITION TO TAX COURT**

(a) \* \* \*

\*    \*    \*    \*    \*    \*    \*

(g) DEFINITIONS.—For purposes of this section—

(1) \* \* \*

(2) MATHEMATICAL OR CLERICAL ERROR.—The term "mathematical or clerical error" means—

(A) \* \* \*

\*    \*    \*    \*    \*    \*    \*

(D) an omission of information which is required to be supplied on the return to substantiate an entry on the return, ⟦and⟧

(E) an entry on a return of a deduction or credit in an amount which exceeds a statutory limit imposed by subtitle A or B, or chapter 41, 42, 43, or 44, if such limit is expressed—

(i) as a specified monetary amount, or

(ii) as a percentage, ratio, or fraction,

and if the items entering into the application of such limit appear on such return⟦.⟧*, and*

*(F) an omission of a correct taxpayer identification number required under section 23 (relating to credit for families with younger children) or section 32 (relating to the earned income tax credit) to be included on a return.*

\*    \*    \*    \*    \*    \*    \*

_____

# THE DEPARTMENTS OF COMMERCE, JUSTICE, AND STATE, THE JUDICIARY, AND RELATED AGENCIES APPROPRIATION ACT, 1994

## TITLE I—DEPARTMENT OF JUSTICE AND RELATED AGENCIES

\*    \*    \*    \*    \*    \*    \*

## DEPARTMENT OF JUSTICE

\*    \*    \*    \*    \*    \*    \*

FRP-FRN-01180

510

IMMIGRATION AND NATURALIZATION SERVICE

SALARIES AND EXPENSES

For expenses, not otherwise provided for, necessary for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration, including not to exceed $50,000 to meet unforeseen emergencies of a confidential character, to be expended under the direction of, and to be accounted for solely under the certificate of, the Attorney General; purchase for police-type use (not to exceed 597 of which 302 are for replacement only) without regard to the general purchase price limitation for the current fiscal year, and hire of passenger motor vehicles; acquisition, lease, maintenance and operation of aircraft; and research related to immigration enforcement; $1,048,538,000, of which not to exceed $400,000 for research shall remain available until expended, and of which not to exceed $10,000,000 shall be available for costs associated with the Training program for basic officer training: *Provided,* That none of the funds available to the Immigration and Naturalization Service shall be available for administrative expenses to pay any employee overtime pay in an amount in excess of $25,000: *Provided further,* That uniforms may be purchased without regard to the general purchase price limitation for the current fiscal year: *Provided further,* That not to exceed $5,000 shall be available for official reception and representation expenses[: *Provided further,* That the Land Border Fee Pilot Project scheduled to end September 30, 1993, is extended to September 30, 1996 for projects on the northern border of the United States only].

\*        \*        \*        \*        \*        \*        \*

---

## SECTION 506 OF THE INTELLIGENCE AUTHORIZATION ACT, FISCAL YEAR 1990

REQUIREMENTS FOR CITIZENSHIP FOR STAFF OF UNITED STATES ARMY RUSSIAN INSTITUTE

SEC. 506. (a) For purposes of section 319(c) of the Immigration and Nationality Act (8 U.S.C. 1430(c)), the United States Army Russian Institute, located in Garmisch, Federal Republic of Germany, shall be considered to be an organization described in clause (1) of [this section] *such section.*

\*        \*        \*        \*        \*        \*        \*

---

## SECTION 140 OF THE FOREIGN RELATIONS AUTHORIZATION ACT, FISCAL YEARS 1994 AND 1995

SEC. 140. VISAS.

(a) * * *

\*        \*        \*        \*        \*        \*        \*

(f) Not later than December 31, 1996, the Secretary of State and the Director of the Federal Bureau of Investigation shall jointly submit to the Committee on Foreign Affairs and the Committee on the Judiciary of the House of Representatives, and the Committee

511

on Foreign Relations and the Committee on the Judiciary of the Senate, a report on the effectiveness of the procedures authorized in subsections (d) and (e).

【(g) This subsection shall】 *(g) Subsections (d) and (e) shall* cease to have effect after December 31, 1997.

ADDITIONAL VIEWS OF REP. ELTON GALLEGLY

One of the most critical challenges facing the 104th Congress is the passage of comprehensive and effective immigration reform legislation. For many years, the American people have expressed frustration that its leaders in Congress have failed to enact policies to eliminate the unacceptably high levels of illegal migration to our country. Under the able leadership of Representative Lamar Smith, Chairman of the House Subcommittee on Immigration and Claims, the Judiciary Committee has approved legislation, H.R. 2202, which finally addresses in a serious manner the public's concern over this problem.

In an effort to find solutions to this on-going crisis, Speaker Newt Gingrich earlier this year appointed me Chairman of the Congressional Task Force on Immigration Reform, which was comprised of fifty-four Members of Congress, both Republicans and Democrats. We were asked to provide a report to the Speaker and relevant congressional committees by June 30, 1995. In preparing its findings, the Task Force on Immigration Reform reviewed existing laws; committee reports; testimony before Committees of Congress; and various existing reports prepared by a wide-range of organizations and individuals. To enhance the expertise of the panel and obtain a first-hand view of the problem, the Task Force conducted fact-finding missions to San Diego, California; New York, New York; and Miami, Florida.

The Task Force was organized into six working groups to focus on the most crucial areas of immigration policy most in need of reform. The groups were: Border Enforcement, Chaired by Congressman Royce (R–CA); Workplace Enforcement, Chaired by Congressman Deal (R–GA); Public Benefits, Chaired by Congressman Goss (R–FL); Political Benefits, Chaired by Congressman Goss (R–FL); Political Asylum, Chaired by Congressman McCollum (R–FL); Deportation, Chaired by Congressman Condit (D–CA); and Visa Overstays, Chaired by Congressman Goodlatte (R–VA). These working groups met individually and made specific recommendations to the entire Task Force.

The Task Force has worked closely with Chairman Smith to include over 80% of these recommendations in H.R. 2202—the Immigration in the National Interest Act. Many measures were incorporated in the original bill, while others have been successfully added to the legislation through amendments.

At the time of introduction, H.R. 2202 included over twenty-five Task Force recommendations. In the area of border enforcement, these recommendations included the doubling of the number of border patrol agents stationed at the border over a five year period, increasing penalties for immigrant smuggling and the construction of a triple-barrier fencing along the U.S.-Mexico border.

(512)

513

H.R. 2202 also incorporated in its entirety H.R. 1765, a bill which I introduced earlier this year that targets long-term illegal immigration. This legislation prohibits anyone who has been in this country illegally for more than one year from receiving a visa for a ten-year period. This will serve as a strong encouragement for illegal immigrants—both persons who overstayed their visa and those who crossed the border illegally—to return to their native countries and re-enter through legal channels.

During markup of the bill in the Immigration and Claims Subcommittee, I offered four amendments, including three en bloc amendments which were accepted. The first amendment authorized full reimbursement to state and local governments for the costs of providing emergency health care service to illegal immigrants. Hospitals are required to verify with INS that the patient is illegally in the U.S. as a condition for such reimbursement.

A major focus of the three en bloc amendments involved bolstering enforcement efforts targeted at criminal aliens. They provided for improving the identification of criminal aliens by state and local authorities; mandatory detention of all illegal aliens caught re-entering the United States on three occasions; increasing penalties for immigrant smuggling; increasing funds for investigators and border patrol located in the interior; increasing criminal penalties for possessing, producing or transferring fraudulent documents; and increasing the amount reimbursable for states and local governments for the costs of incarcerating criminal aliens. Another important measure dealing with criminal aliens authorizes the President to enter into negotiations with foreign countries for the purpose of reaching agreement on the transfer of alien prisoners.

Furthermore, the en bloc amendments authorized a major expansion in the number of asylum officers and more than doubled the number of detention spaces available to the Immigration and Naturalization Service. This latter provision will allow the INS to house illegal entrants determined to be high-flight risk or pose a danger to the community.

As H.R. 2202 was considered by the full Judiciary Committee, I offered nine additional amendments, all of which were accepted. Two amendments strengthened measures against criminal aliens, including one providing that upon the request of a state governor, the INS will assist state courts in the identification of illegal aliens pending criminal prosecution.

Several other measures specifically targeted illegal aliens who attempt to receive government benefits. One important amendment requires the Department of Education to verify the immigration status of persons who apply for higher education benefits. This provision was promoted by an Education Department report which found that ineligible aliens are awarded over $70 million in Pell Grants and $45 million in Stafford Loans each year. Another measure ensures that state officials are able to communicate with the Immigration and Naturalization Service for the purpose of verifying the immigration status of aliens who are applying for public benefits. This measure also ensures that state government entities can report to the INS when an alien is illegally attempting to access taxpayer financed programs.

514

Finally, in an effort to protect American jobs and discourage illegal immigration, I introduced an amendment to close a major loophole in the existing immigration law. Under existing law, an alien who applies for permanent residency based on a job offer must demonstrate to INS and the Department of Labor that, depending on the visa category, they possess at least a specific level of work experience. However, illegal work is currently allowed to be counted as valid experience for this purpose. This encourages persons to come to the U.S., work illegally and then apply for a green card based on that illegal work experience. My amendment, which was adopted by the Judiciary Committee, would prohibit aliens from using this illegal work as evidence that he or she possesses sufficient experience and skills to obtain a green card.

The bill reported by the Judiciary Committee represents a watershed in our attempt to once and for all address the perplexing issues of illegal immigration. We have a good product. However, several additional provisions need to be added to the H.R. 2202 when it comes to the House floor. At this time, there are several possible amendments under consideration, including amendments to give states the option of denying free public education benefits to illegal aliens and close the loopholes in current law that allow many illegal immigrants to improperly receive free public housing.

Above all else, this landmark legislation is firmly rooted in the rule of law. As a society, we simply cannot allow anyone, regardless of motivation, to illegally cross our borders or overstay their legal welcome in this country with impunity. If enacted, this legislation will represent a major step in restoring the confidence of our people in the ability of the federal government to respond effectively to this crisis.

ELTON GALLEGLY.

# ADDITIONAL VIEWS

We want to explain the reasons for two amendments, adopted by voice vote in the Judiciary Committee markup. One kept the TWOV fine at the current level. The second defined "stowaway."

The effect of the first amendment was to keep the civil penalty assessed against airlines for bringing inadmissible aliens from contiguous countries, those commonly referred to as aliens "traveling without visa" (TWOVs), at its current level of $3,000. The original bill would have raised the fee to $5,000.

This amendment, which received the strong bipartisan support of our colleagues, was offered for several reasons. In our view, this is not the time to raise the fine amount.

First, we believe the airlines have made significant compliance efforts, especially considering that the number of passengers has risen at the same time as the amount collected in fines has dropped. The airlines paid $21.4 million in fines in fiscal year 1992, $18.3 million in fiscal year 1993, and $13.4 million in fiscal year 1994. The airlines also invest much effort each year in training their staffs in proper documentation screening.

Second, the Immigration and Naturalization Service has not yet acted on the direction of Congress in 1994 to establish a fine mitigation program. We are concerned that this program, as required under Section 273(e) of the Immigration and Nationality Act, has yet to be established. Therefore, we urge the INS to propose as soon as possible a rule establishing a fine mitigation program, pursuant to Congressional intent in Public Law 103–416.

Finally, it should be remembered that the airlines already pay for the detention of TWOV passengers through a 1986 agreement, a $6 per ticket user fee. The user fee, which goes to the INS, generated $288 million in fiscal year 1994 alone, including a surplus of nearly $40 million. Yet the INS maintains a policy that forces U.S. air carriers to assume custody and financial responsibility for improperly documented passengers, contrary to the 1986 accord.

This current policy continues to be contrary to Congressional intent as expressed in H.R. Rept. No. 197, 99th Congress, 1st Sess. 38 (1985) and H.R. Rept. No. 669, 99th Congress, 2nd Sess 35 (1986), and reconfirmed in Linea Area Nacional de Chile v. Meissner, No. 94–6288 (2d Cir., Sept. 11 1995). We believe such passengers should be detained at Federal detention centers by trained law enforcement officers, rather than at accommodations paid for by private transportation lines. The INS should therefore assume custodial responsibility for all such improperly documented aliens, and should pay for these detention costs from the Immigration User Fee Account. Funds in this account are intended to cover expenses incurred in the provision of various INS services, including the detention costs of excludable aliens.

(515)

516

The second amendment defines "stowaway" as someone who boards a vessel without consent through concealment. This definition comports with the "stowaway" definition in 18 U.S.C. 2199. Further, the definition excludes someone who boards an aircraft or other vessel with a ticket. In plain language, someone boarding with a ticket does not stow himself away seeking to obtain transportation without official consent. Thus, it would do violence to plain English language to call someone a "stowaway" who boards a vessel in plain view and by normal means.

In defining the term "stowaway," the language in the bill as amended is intended to include those who use normal boarding procedures. We are aware of the trend in the airline industry toward so-called "ticketless" travel. We intend that the term "ticket" as used in this section of the bill would apply as well to those passengers boarding with a boarding pass or other indication, including electronic entries, of proper boarding authorization in a developing "ticketless" environment.

       Sincerely,

                         ED BRYANT.
                         HOWARD COBLE.
                         FRED HEINEMAN.
                         STEVEN SCHIFF.
                         MARTIN R. HOKE.
                         BOB BARR.
                         MELVIN L. WATT.
                         STEVE CHABOT.
                         SONNY BONO.

ADDITIONAL VIEWS OF CONGRESSMAN REED

I voted for H.R. 2202, but did so with certain reservations. I believe the United States must take action to address the problem of widespread illegal immigration, and H.R. 2202 takes many important and necessary steps in this regard.

However, I have serious concerns about the provisions on legal immigration, and believe the House should address these very different issues in separate legislation. The issue of legal immigration should not be considered in the context of the emotionally charged debate on illegal immigration. Addressing illegal immigration involves criminal laws, border enforcement, deportation issues, and workplace enforcement. The policy decisions to be made regarding legal immigration are completely different.

I support reasonable restrictions on legal immigration: The United States has the right and responsibility to ensure that only those who are likely to become productive citizens may immigrate to our shores. However, this bill goes too far. For example, it arbitrarily denies millions of U.S. citizens who have played by the rules and waited in line, in many cases for as long as a decade after having paid fees and gotten applications approved, the opportunity to sponsor and reunite with an overseas family member. The bill also adopts a new definition of "family member" for immigration purposes which excludes brothers and sisters as well as most children over age 21. Most Americans do not believe that any of their children, regardless of how old they are, are distant family members. These are but a few of the most troubling legal immigration provisions.

I am also opposed to the cap on refugee admissions, and voted to lift the cap, and reform the consultation process. Unfortunately, this amendment by Representative Schiff narrowly failed on a 16 to 15 vote, with several Members absent. It is my hope that this statutory cap will be eliminated when H.R. 2202 is considered on the House floor. The admission of refugees to the United States is intimately connected to our foreign policy concerns. We must be able to adjust to swiftly changing international conditions. Legislating a cap on refugee admissions would send the wrong message to nations that share the responsibility for the world's refugees and needlessly jeopardize the international system of protection and resettlement of those fleeing persecution, torture, and other life-threatening situations.

The current system of consultation between the Administration and Congress requires an annual analysis of worldwide conditions and provides for emergency situations. It is a responsible and flexible system that includes Congressional participation in setting annual admissions and determining our response to emerging international crises.

(517)

FRP-FRN-01188

518

Finally, I would like to commend Subcommittee Chairman Lamar Smith and Ranking Member John Bryant for their willingness to address these issues. I received assurances from Mr. Smith that the House would have the opportunity to address the concerns that I have outlined above when the bill is considered on the floor. I look forward to working with him to make further improvements to this legislation.

JACK REED.

## ADDITIONAL VIEWS CONCERNING EMPLOYMENT VERIFICATION SYSTEM

Amazingly, at a time when many argue that Government is too intrusive and bureaucratic and spends too much, Title IV of H.R. 2202 proposes a computerized national employment registry under the guise of immigration reform. This "employment verification system" represents a perilous threat to our Constitutional rights. By forcing the government to maintain a file on every single individual within a covered state and to approve every single hiring decision within that state, H.R. 2202 will truly usher in the era of a "Big Brother," all-intrusive federal bureaucracy. Even more ominously, since the telephone verification system will inevitably be subject to government errors and discrepancies, it may will be a mere prelude to a full-fledged national ID card, complete with voice, retina and fingerprint identifiers.[1]

Although styled a "pilot program," the registry would take place in the five states with the largest illegal alien population (i.e., California, Texas, New York, Florida, and Illinois)[2] and cover 92.8 million people.[3] Businesses in these States would understandably desire to see Congress quickly impose the verification system on the rest of the country, less they be placed at an unfair economic disadvantage.

Under the pilot project, no individuals in these States will be hired without the express approval of the Federal Government. H.R. 2202 requires that all employers in these states—from General Motors to households with domestic help—report new employees to the Federal Government by a telephone 1–800 number or through computer E-mail within three days. The Federal Government would then check the employee's name and social security number through its database. If the Government does not verify that the person is authorized to work, the worker would have 10 days to try to verify his or her eligibility and two weeks in which to appeal the decision pursuant to the Federal Tort Claims Act. These procedures would apply any time anyone begins a new job, and burdens business with an additional layer on top of the current I–9 document verification requirements.

The employee verification system will not be foolproof. During hearings on the bill it was conceded that the SSA and INS computers do not even have the capacity to read each other's data.[4] A recent study by the INS found a 28 percent error rate in the Social

---

[1] This is in addition to provision in Title I providing for a "biometric identifier" (e.g., finger or hand print for aliens frequently crossing the Mexican border).

[2] U.S. Commission on Immigration Reform, U.S. Immigration Policy: Restoring Credibility, September 1994 at 64 [hereinafter Commission Report].

[3] Cato Institute, Statistical Abstract of the United States. (1993 figures).

[4] See Transcript of Oversight Hearing on Work Site Enforcement of Employer Sanctions, Friday, March 3, 1995, U.S. House of Representatives, Subcommittee on Immigration and Claims, Committee on the Judiciary.

FRP-FRN-01190

520

Security Administration (SSA) database.[5] This verification require-
ment therefore creates huge possibilities for flawed information
being disseminated to employers which will deny American citizens
and lawful permanent residents the opportunity to work. Even if
the error rate could be substantially reduced, it will still translate
into millions of postponed or lost job opportunities.

The "verification system" is no answer to the problem of discrimi-
nation. In order to avoid the disruptions resulting from government
errors and discrepancies, employers would most likely continue to
avoid including individuals whose appearance, name, accent or
family background make their profile appear "foreign." Moreover,
as amended, H.R. 2202 would require that a person alleging dis-
crimination under the existing employer sanctions provision show
that the employer intended to discriminate, a burden of proof that
is extremely difficult to satisfy.

And the tester program included in the bill[6] will not redeem a
bad program. We doubt the Republican Majority will be clamoring
to appropriate funds for testers in the present budget environment.
Even if they did, the program would be able to effect only a small
fraction of the nation's employers.

The verification system proposed in this bill will also dangerously
increase the Federal Government's ability to monitor individuals.
Although the legislation purports to limit the use of the informa-
tion maintained in these new files to "employment verification"
purposes only, the system is bound to be subject to unauthorized
disclosures and leaks. Just as supposedly sacrosanct census data
were used to identify Japanese-Americans for internment during
World War II, the massive new data base necessitated by the Re-
publican immigration bill will prove a tempting target for future
legislation intent on cracking down on tax cheaters, "deadbeat"
dads, or unpopular dissident groups.

The U.S. Commission on Immigration Reform estimates the cost
of design and development of the combined SSA/INS database at
$4 million over a two year period.[7] The Commission further esti-
mates the annual cost of maintaining and operating the verification
system at $32 million.[8] Whatever the cost, we believe that the ver-
ification system is a poor allocation of scarce resources. And the
costs to the private sector will be many, many times greater, as
employers will be forced to incur major operational and administra-
tive costs in order to verify new employees.[9] Worst of all, inevitable
system errors will result in economic injustice to those individuals
whose right to work will be lost to computer error.

---

[5] Telephone Verification System (TVS) Pilot, Report on the Demonstration Pilot-Phase I (1993)
(9 company test) [hereinafter TVS Pilot Report].
[6] This requires the Attorney General implement a "tester" program which includes individuals
posing as genuine applicants, in order to monitor and ensure that the verification system is
being applied fairly.
[7] Commission Report, supra note 2 at 70.
[8] The report also states that correcting errors in the database will require the largest financial
output. Discrepancies referred to the Social Security Administration will cost approximately
$122 million initially with an annual cost of $30 million. Commission Report, supra note 2 at
64.
[9] The INS pilot project indicated compliance costs of $5,000 for each company, but actual com-
pliance costs would be several times that, since the pilot project only checked prospective em-
ployees who identified themselves as immigrants, not every individual offered a job. See TVS
Pilot Report, supra note 5.

521

Certainly illegal immigration is a problem. But to adopt a system that punishes honest employers and lawful residents and citizens in order to deter others from breaking the law is to lose all sense of perspective. We urge the Members to oppose the employment verification provisions of H.R. 2202.

JOHN CONYERS, Jr.
PAT SCHROEDER.
ZOE LOFGREN.
JERROLD NADLER.
SHEILA JACKSON-LEE.
MELVIN L. WATT.
JOSÉ E. SERRANO.
XAVIER BECERRA.

## ADDITIONAL VIEWS CONCERNING INVESTORS
PREFERENCE PROGRAMS

On whichever side of the immigration debate one falls, we should all be able to agree that maintaining the Investor's Preference Program is unconscionable in a bill otherwise reducing the number of legal immigrants in most categories. Yet, H.R. 2202 reserves 10,000 spots for anyone who happens to be wealthy enough to spend $1 million to start a business in the U.S. (or $500,000 under a special pilot program), even though only 400 immigrants were admitted through this program last year.

Simply being wealthy should not entitle immigrants to a place in line for themselves and their families. By maintaining this program, we are sending the message that wealth for the sake of wealth is a virtue, regardless of the individual's ability or character.

Proponents of the Investor's Preference Program argue there is nothing inappropriate about an immigration policy that gives a priority to those who can contribute to this country's financial wellbeing. We agree. We believe that typical legal immigrants, with their entrepreneurial spirits and work ethic, make such contributions. Few come here with a million dollars in their pockets, yet many become successful entrepreneurs. Some are millionaires today. This is what America is about—opportunity, not birthright.

Not surprisingly, wealthy foreigners have discovered ways to exploit the Investor's Preference Program to their advantage. In fact, an entire cottage industry has emerged where "investment advisors" take the money, invest it in what they advertise as "INS approved" businesses and then guarantee residence status AND a return of the investment.

Suffice it to say there is no due diligence required to confirm that the invested funds come from legitimate sources. Thus, deposed dictators could raid their countries' treasuries and then find themselves at the front of our immigration line. Drug cartel kingpins escaping prosecution in their home countries could do the same.

It is worth noting that there is nothing in our current immigration policy to prevent a foreign national from starting a business here or investing in an existing American venture. The fact that America is one of the strongest consumer markets in the world provides ample incentive for foreign investment here.

FRP-FRN-01193

523

We do not need to bribe foreign investors with an offer of permanent residence status, particularly since such status is the first step to American citizenship. American citizenship simply is not a commodity for sale. Not for a million dollars. And not at any other price.

For these reasons, we dissent from the investor preference provisions in H.R. 2202.

JOHN CONYERS, Jr.
JOHN BRYANT.
BOBBY SCOTT.
MELVIN L. WATT.
JERROLD NADLER.
JOSÉ E. SERRANO.
XAVIER BECERRA.
BARNEY FRANK.

ADDITIONAL VIEWS CONCERNING H–1B TEMPORARY VISA
PROGRAM

We oppose the provisions in Title VIII relating to the H–1B, or "temporary" visa program for skilled workers. We agree with other opponents that the H–1B program displaces American workers, drives down wages in certain sectors, creates an indentured class of foreign workers, and discourages Americans from entering certain fields (most notably, science and engineering).

As Secretary Reich has said:

We have seen numerous instances in which American businesses have brought in foreign skilled workers after having laid off skilled American workers, simply because they can get the foreign workers more cheaply. The program has become a major means of circumventing the costs of paying skilled American workers or the costs of training them.[1]

Moreover, H.R. 2202 would require that only "depending" H–1B employers abide by all Department of Labor H–1B program regulations.[2] Other employers will not be required to obtain a "joint attestation" from clients stating that they have not and will not lay off any U.S. worker doing the same job as the contract H–1B employee or that they will pay the H–1B employee 100% of the mean of the laid-off worker's wage. They will not be required to post notices informing U.S. workers of the employment of H–1B foreign workers when they move them to new job sites.[3] They will not be required to file a new Labor Condition Application when an H–1B employee is moved to work or temporarily travels to work in a city not listed on the original application, unless the principal place of employment changes. They will not be required to pay per diem when temporarily sending H–1B foreign workers to other job sites. And, they will not be subject to Department of Labor compliance inves-

------

[1] *Washington Post,* October 21, 1995.

Among other criticisms of the current H–1B program is that it does not require any labor market test for availability of qualified American workers before seeking H–1B workers, and there is no prohibition against laying off American workers and replacing them with H–1B foreign workers. Businesses have sprung up for the sole function of bringing in H–1B foreign workers and shopping them around to other businesses for a fee. Certain companies (see e.g., AIG (American International Group), Washington Post, October 21, 1995; Sealand Inc., a division of CSX Corp., Wall Street Journal, October 9, 1995) have laid off entire departments to utilize these H–1B job contractors.

[2] Section 806(b) of the bill defines a dependent H–1B employer as one with less than 21 employees, four or more of whom are H–1B nonimmigrant foreign workers; employers with at least 21 but not more than 150 employees, 20% of whom are H–1B nonimmigrant foreign workers; and, employers with at least 151 employees, 15% of whom are H–1B nonimmigrant foreign workers. However, dependent employers who file plans with the Department of Labor to reduce their dependency over time are treated the same as non-dependent employers.

[3] Central to the proper working of the entire H–1B system is the provision of notice to U.S. workers that the employer is bringing H–1B foreign workers to the job site. If an American worker is unaware of the occurrence or the terms and conditions, or subsequently finds the employer is not fulfilling the H–1B visa requirements—i.e., paying the H–1B foreign worker the prevailing wage—then the American worker would know a complaint can be filed with the Department of Labor. Without the notice requirement, the predominantly compliance-driven H–1B enforcement system collapses.

(524)

525

tigations unless someone files a complaint with the Department against them—i.e., the Department cannot initiate such investigations.

At the same time, the Department of Labor is given only 45 days to accept or reject "private source" wage information. We believe the combination of these changes will lead to grave mischief and serious harm to American workers. It also would result in shifting some compliance burdens from the employers who benefit from the H–1B program to the government (i.e., the taxpayers).

Although we understand required that foreign workers be paid "110% of the mean" laid-off worker's wages rule as one meant to be an incentive against laying off U.S. workers, we consider it a modest one at best, and—if history is any guide—one subject to easy circumvention. In addition, why should any employer—at any price—be permitted to lay off American workers in order to hire foreign workers with impunity?

Finally, it must not go unnoted that—at the same time Congress is cutting the Department of Labor's appropriations—this Committee is increasing the Department's workload under the H–1B program and imposing serious time constraints in accomplishing much of that additional work, but providing no additional resources.

Instead we believe, as Secretary Reich has urged since 1993, the displacement of American workers through the use of the H–1B program must be faced head on. To do this, the H–1B program must be returned to its original purpose—to provide temporary assistance to domestic businesses to fill short-term unique, high-skilled needs. There must be a flat prohibition against laying off American workers and replacing them with H–1B foreign workers. U.S. employers must be required to take timely, specific steps to recruit and retain American workers to wean themselves from the use of H–1B foreign workers. The length of time for an H–1B "temporary" visa must be reduced—from the current 6 year maximum to a maximum of three years. Further, the existing Department of Labor regulations on the H–1B program are salutary to the operation of the program and must be maintained for all employers of H–1B foreign workers.

JOHN CONYERS, Jr.
JERROLD NADLER.
HOWARD L. BERMAN.
BOBBY SCOTT.
JOHN BRYANT.
SHEILA JACKSON-LEE.
MELVIN L. WATT.
JOSÉ E. SERRANO.
XAVIER BECERRA.

DISSENTING VIEWS

Although, we support legislation which would more effectively prevent illegal immigration, we strongly oppose the bill's historically shortsighted and dramatic reductions and attacks against legal immigrants, refugees, and asylum seekers. The lawful and orderly admission of close family relatives of U.S. citizens—their children, spouses, parents, brothers and sisters—strengthens American families, upholds family values, and benefits the Nation as a whole. If enacted, H.R. 2202 would create myriad hardships and inequities for millions of U.S. citizens who would be prohibited from reuniting with close family members. Moreover, according to the State Department, an estimated 2.5 million U.S. citizens who have pending petitions to secure visas for close relatives and have waited for years for the visa to be issued would have their hopes of reuniting their families arbitrarily destroyed by the bill.[1]

H.R. 2202 also makes it virtually impossible for those legitimately fleeing persecution to claim political asylum. In addition, the bill imposes a cap that will result in a reduction of admissions of refugees in fleeing persecution. This will close America's doors to many Cubans fleeing Castro, Bosnians uprooted by civil war, and Jews, Christians and other religious or ethnic minorities seeking safe haven and protection.

Some argue that dramatic cuts in legal immigration and protection of refugees are supported by the American people. Unlike this bill, however, voters draw a clear distinction between illegal and legal immigration.[2] More than eight out of ten voters believe that Congress should settle the problem of illegal immigration before worrying about reducing the number of legal immigrants.[3] In addition, by a margin of seven to one, voters reject measures which would unfairly penalize prospective legal immigrants who are following the rules in their efforts to enter the United States.[4]

The House should enact an immigration bill to address legitimate issues and concerns regarding illegal immigration. The House should *reject* the proposed dramatic reductions and restrictions in legal immigration, refugee admissions and access to political asylum which H.R. 2202 seeks to impose.

---

[1] See infra note 70.
[2] Research by Public Opinion Researcher Dr. Vincent J. Breglio on the Public's View of U.S. Immigration Policy (February 27, 1996).
[3] Id.
[4] Id.

FRP-FRN-01197

527

TITLE I. DETERRENCE OF ILLEGAL IMMIGRATION THROUGH IMPROVED
   BORDER ENFORCEMENT, PILOT PROGRAMS, AND INTERIOR ENFORCE-
   MENT

### Triple tier fence endangers lives

Section 102, which would mandatorily institute a 14-mile three-tier fence along the U.S.-Mexico border in San Diego, constitutes a dangerous attempt to micromanage the Immigration and Naturalization Service's (INS) authority. The INS already uses fencing where the topography, support personnel, and technology make it an effective component of its overall deterrence strategy; this bill will require fencing where its use would be ineffective and even dangerous to INS personnel. Douglas Kruhm, Chief of Border Patrol has written that installing triple-tier fencing along 14 miles of the San Diego sector would:

   [I]ncrease the danger to agents by enclosing them in areas without easy escape routes . . . [O]ur experience tells us that multiple fencing with intervening roads presents multiple dangers for the physical safety of our agents [and] has shown that when we travel in a single, predictable line, aliens will attack vehicles and agents with rocks.[5]

Although section 102 authorizes appropriations of $12 million to build the fencing, the INS estimates that its cost, including land purchase, construction, and maintenance, would be between $85 and $115 million.[6] At a time when the United States economy is becoming increasingly integrated with the economies of other countries, it seems particularly inappropriate to erect more fences and walls between ourselves and friends, neighbors and trading partners.

TITLE III. INSPECTION, APPREHENSION, DETENTION, ADJUDICATION,
   AND REMOVAL OF INADMISSIBLE AND DEPORTABLE ALIENS

### I. "Streamlined" Deportation Procedures Are Unnecessary and Unfair

Subtitle A restructures the exclusion and deportation provisions of the immigration laws in a manner which strips the process of essential due process safeguards. Although the purported purpose for many of these changes is to "streamline" existing procedures and eliminate fraud in the system, many of the new procedures will serve only to prevent individuals from knowing about, or effectively asserting, their rights under U.S. law. It would be far preferable to rely on current law, under which increased staffing and enhanced INS procedures have resulted in significant gains in expediting decisions and reducing backlogs.[7] Deportations of criminal and illegal aliens in 1995 exceeded 51,600, a 15% increase over the

---

   [5] Letter from Douglas Kruhm, Chief, Border Patrol Immigration and Naturalization Service, U.S. Department of Justice, to Honorable Henry Hyde, Chairman, Committee on the Judiciary, U.S. House of Representatives (September 18, 1995).
   [6] Letter from Jamie S. Gorelick, Deputy Attorney General, U.S. Department of Justice, to Honorable Henry J. Hyde, Chairman, Committee on the Judiciary, U.S. House of Representatives (September 15, 1995) [hereinafter, House Judiciary Views Letter].
   [7] CFR Part 208 (1995). See also John M. Goshko, Revised Political Asylum System Shows Promise in Early Stages, The Washington Post, July 9, 1995, at A16.

528

preceding year, and a 75% increase over 1990.[8] The simplified, new asylum procedures have reduced the incentives for false claims and resulted in a drastic reduction in the asylum case load (new cases dropped by 57%) and a doubling of INS's productivity (completing 126,000 cases during 1995 compared with 61,000 in 1994).[9]

The bill includes several harsh new bans on the ability of aliens to seek lawful entry into this country. Sec. 301(c)(A) of the bill lengthens the period for which an individual is barred from the United States from one to five years in the case of an alien who has been turned away upon his or her arrival to the United States; and from five to ten years (20 years in the case of an aggravated felon) in the case of an alien who is deported from the United States. Sec. 301(c)(B) bans persons who have resided in the United States without lawful documentation for a total of 12 months from reentry for 10 years. These inflexible provisions would create great hardship, not just to new immigrants, but to their American families. As Mr. Bryant of Texas, a cosponsor of this legislation, argued:

> I think it is a mistake for us to put [the 10-year ban] into the law because I think undoubtedly thousands of people are going to accidentally be caught by this provision when we pass this law and suddenly will be faced with not being able to reenter the United States for 10 years . . . I think that situation is going to result in a flood of individual cases coming before this committee trying to get relief . . . and every one of the cases, undoubtedly, every one of the cases, are going to be heart-rending and tear-jerking and probably meritorious and we are going to turn this committee into a virtual immigration court for the next several years. I just don't think it will work.[10]

Although a few modest exceptions to this punitive provision were added during Committee markup,[11] the 10-year ban on reentry will inevitably divide families that have been waiting in line for immigrant visas for many years and inflict extreme hardship on U.S. citizens and permanent residents who will be forced to make the impossible choice of having their family divided until a visa is available or leaving the U.S. themselves to keep their families together. The Justice Department has also asserted that enforcing the 10-year ban "would generate needless and costly litigation."[12]

Section 302, providing for the expedited removal of aliens, will unfairly result in bona fide asylum seekers being expelled to face persecution. Under this section, aliens could be removed based merely on the unreviewed judgment of an immigration officer and his or her supervisor. Such "expedited" removal may be ordered if the examining immigration officer determines that an alien is inadmissible under INA sections 212(a)(6)(C) (fraud or misrepresentation) or 212(a)(7) (lack of valid documents). The notion that fraudulent documents, or the absence of appropriate documents, can be

---

[8] Immigration and Naturalization Service, INS Ends 1995 with New Record in Alien Removals (December 28, 1995).
[9] INS News Release, INS Successfully Reforms U.S. Asylum System, January 4, 1996 [hereinafter INS News Release].
[10] Judiciary Committee Markup Transcript on H.R. 2202, September 20, 1995 p. 134.
[11] The Committee agreed to a number of limited exceptions, including not counting toward 12 month unlawful documentation period during which an alien is a minor, a bona fide asylum applicant, has Family Unity protection, or has work authorization. Similarly an amendment offered by Representative Berman authorizes the Attorney General to provide a waiver for the 10-year reentry ban "to assure family unity, or when it is otherwise in the public interest" for the spouse, parent or child of either a U.S. citizen or permanent resident. And an amendment added by Representative Lofgren provides that waivers would be available for certain "national security interests."
[12] House Judiciary Views Letter, supra note 6 at 17–18.

529

used to trigger this procedure virtually guarantees that individuals genuinely fleeing persecution and therefore least likely to obtain appropriate documents from their persecutors will be returned to the persecutors.

The new substantive standard for determining whether an alien may be subjected to expedited exclusion is similarly unworkable in the context of initial screening. Under proposed section 235(B)(v) of the INA, in order to establish a credible fear of persecution, the applicant for asylum would need to establish that "it is more probable than not that the statements made by the alien in support of the alien's claim are true, and * * * there is a significant possibility, in light of such statements * * * that the alien could establish eligibility for asylum." This is simply too onerous a standard for an asylee to meet who has just escaped dangerous persecution.

Current law and procedure strike a far more appropriate balance between the need to screen out truly frivolous claims and to afford applicants due process. Under current procedures, a person who fears persecution may go before an immigration judge to prove eligibility for asylum and can seek an administrative appeal if the claim is rejected. The asylum seeker may be represented at no cost to the government during this process.[13]

Section 304 of H.R. 2202 would eliminate the Attorney General's discretionary section 212(c) or "cancellation of removal" authority if a person is sentenced to five years, in the aggregate, for one or more aggravated felony convictions. This change would needlessly deprive the Attorney General of the discretion to provide relief to an individual who, having been convicted, did not serve a single day in prison.

## II. Using Secret Evidence To Deport Aliens Poses a Threat to Due Process

Section 321 of the bill would for the first time allow aliens (including permanent residents) to be deported based on classified evidence submitted on an *ex parte* basis. An alien alleged to be involved in "terrorism" would not be permitted to receive a summary of the evidence against him or her if the 5-judge panel finds that his or her presence or the preparation of the summary would likely cause serious and irreparable harm or injury. Although permanent residents are permitted to have a member of a panel of specially approved attorneys review the secret evidence, the bill does not permit the permanent resident to select his or her own attorney—even from the pre-approved panel—or confer with such counsel concerning the secret evidence. Section 321 also provides for immediate detention without bail and limited one-sided appellate rights only for the government. Further, there is no requirement that the government disclose any exculpatory evidence to the alien or even to the special court.

This provision is a clear violation of the right to due process as guaranteed by the Fifth and Fourteenth Amendments.[14] The car-

---

[13] 8 CFR 3.16(b) (1995).

[14] Provisions limiting an alien's right to select an attorney and denying the attorney the ability to discuss the evidence with his or her client also raise serious ethical and lawyer-client privilege issues. It has also been noted that the section is inconsistent with U.S. treaty obliga-

Continued

530

dinal rule of due process is that evidence used against a party must
be fully disclosed to that party. The Supreme Court and lower
courts have consistently held that aliens who have entered the
United States gain the full protections of the Constitution's due
process clause, and cannot be deported on the basis of evidence not
disclosed to them.[15] In the 1976 case of *Matthews* v. *Diaz,* the
Court wrote:

> There are literally millions of aliens within the jurisdiction of the United States.
> The Fifth Amendment as well as the Fourteenth Amendment, protects every one of
> these persons from deprivations of life, liberty, or property without due process of
> law. Even one whose presence in this country is unlawful, involuntary, or transitory
> is entitled to that constitutional protection.[16]

In *American-Arab Anti-Discrimination Committee* v. *Reno*,[17] the
Ninth Circuit recently reaffirmed this principle when it found that
"[a]liens who reside in this country are entitled to full due process
protections" and noted that "the very foundation of the adversary
process assumes the use of undisclosed information will violate due
process. * * *"[18] The Court acknowledged that while "not all of
the rights of criminal defendants are applicable in the civil context,
the procedural due process notice and hearing requirements have
'ancient roots' in the rights to confrontation and cross-examination"
and should be fully provided for in deportation proceedings.[19]

### III. Excluding Individuals Based on Mere Membership in Designated Organizations Threatens Freedom of Speech and Association

We also object to section 331 of the bill which specifies that membership in any organization designated as "terrorist" constitutes
grounds for deporting or excluding an alien from the United States,
regardless of whether or not the individual has engaged in or supported any unlawful acts.[20] This provision would resurrect the infa-

---

tions pertaining to due process protections and freedom of association under the International
Covenant on Civil and Political Rights. *See* Letter from Lawyers Committee for Human Rights
to Subcomm. on Crime, Committee on the Judiciary, U.S. House of Representatives (May 12,
1995).

[15] *See Kwong Hai Chew* v. *Colding,* 344 U.S. 590 (1953) (INS could not subject returning permanent resident alien to "summary exclusion" based on secret evidence); *Rafeedie* v. *INS,* 795
F. Supp. 13 (D.D.C. 1992) (INS attempt to expel a permanent resident alien on the basis of undisclosed classified information held to be unconstitutional).

[16] *Matthews* v. *Diaz,* 426 U.S. 67, 77 (1976).

[17] 70 F.3d 1045 (9th Cir. 1995).

[18] *Id.* at 1067.

[19] *Id.* at 1066.

Although we have previously allowed the use of secret evidence to exclude aliens who have
not yet entered this country, our experience with such procedures highlights the dangers present
in denying any party due process. In the infamous case *U.S. ex rel. Knauff* v. *Shaughnessy,* 338
U.S. 537 (1950), secret evidence was used to exclude from the United States the German wife
of a U.S. citizen who had fled to England when Hitler came to power. In his dissenting opinion,
Justice Jackson argued, "[t]he plea that evidence of guilt must be secret is abhorrent to free
men, because it provides a cloak for the malevolent, the misinformed, the meddlesome, and the
corrupt to play the role of informer undetected and uncorrected." In a subsequent hearing necessitated by public outrage over the denial of Mrs. Knauff's visa it was learned that the "confidential source" offering the secret evidence was a jilted lover. When the INS sought to use secret
evidence to expel an alien several years ago, the D.C. Circuit likened the alien's position to that
of "Joseph K. in The Trial," finding that "[i]t is difficult to imagine how even someone innocent
of all wrongdoing could meet such a burden." *Rafeedie* v. *INS,* 880 F.2d 506, 516 (D.C. Cir.
1989).

[20] Under current law, a person who has engaged in terrorism, or about whom a consular officer or the Attorney General has a reasonable ground to believe is likely to engage in any terrorism, is already excludable from the United States. *See* 8 U.S.C. § 1182(a)(3)(B)(i).

531

mous McCarran-Walter Act,[21] which was repealed by Congress in 1990 after it was held to be unconstitutional as applied to several aliens.[22]

The fact that aliens in this country are entitled to full First Amedment rights was also forcefully reaffirmed in *American-Arab Anti-Discrimination Committee* v. *Reno*.[23] The Ninth Circuit found that the proposed deportation of seven Palestinians and a Kenyan for their alleged ties to the Popular Front for the Liberation of Palestine was inconsistent with First Amendment freedom of association protections, holding that "the values underlying the First Amendment require the full applicability of First Amendment rights to the deportation setting."[24]

*IV. Waiver of Exclusion and Deportation for Certain 274C Violations Too Narrow To Ensure Against Extreme Hardship on Families of Citizens and Lawful Permanent Residents*

The Committee agreed to authorize the Attorney General to waive exclusion or deportation for an alien who is already a lawful permanent resident and who has temporarily proceeded abroad and has committed document fraud on behalf of a spouse, parent, or son or daughter.[25] Although this waiver improves current law and is a welcome addition to the bill, we believe that it should be expanded to ensure that the law does not impose extreme hardship on families of any alien who commits a 274C violation. An alien who is the spouse, parent, son or daughter of a United States citizen or lawful permanent resident whould not be excluded or deported for committing a 274C violation if the refusal of admission would result in extreme hardship to the citizen or lawful permanent resident family member. The Attorney General should at least be granted this limited amount of discretion when considering the permanent separation of close families.

---

[21] The McCarran-Walter Act allowed, among other things, for the deportation of aliens who "advocate the economic, international and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship, or who are members of or affiliated with any organization" that so advocates. 8 U.S.C. 1251(a)(6)(D) & (H) (1988). That law, which applied to aliens who were members of the communist party or advocated communist doctrine, was used to exclude Pierre Trudeau, the former Prime Minister of Canada, French actor Yves Montand, British author Grapham Greene, and Columbian Nobel laureate Gabriel Garcia Marquez. See Counter Terrorism Legislation, Hearing before the Subcomm. on Terrorism, Technology, and Government Information of the Senate Comm. on the Judiciary, 104th Cong., 1st Sess. 21 (May 4, 1995) (statement of Professor David Cole).

[22] See Immigration Act of 1990, Pub. L. No. 101–649 (repealing McCarran-Walter Act); *Rafeedie* v. *INS*, 795 F. Supp. 13, 22–23 (D.D.C. 1992); *American-Arab Anti-Discrimination Comm.* v. *Meese*, 714 F. Supp. 1060 (C.D. Cal. 1989), vacated, *American-Arab Anti-Discrimination Comm.* v. *Thornburgh*, 970 F.2d 501 (9th Cir. 1991) (holding the McCarran-Walter Act to be unconstitutional as applied).

[23] 70 F.3d 1045 (9th Cir. 1995).

[24] Id. at 1063. A Washington Post editorial emphasized the fundamental fairness of the American-Arab Anti-Discrimination Comm. decision:

"[T]he bottom line from the appellate court is this: Aliens present in the United States have the same right to political speech and association as citizens. Aliens cannot be singled out for deportation because they exercise those rights. * * * These clear and principled determinations are on firm constitutional ground.

Aliens and Speech, Wash. Post, Nov. 13, 1995 at A20.

[25] H.R. 2202 § 362 (1995). Under current law, section 274C of the INA, at 8 U.S.C. 1324c prohibits the use or creation of a fraudulent document for immigration purposes. Violation of this provision would subject an alien to both a civil penalty as well as exclusion under section 212(a)(6)(F) of the INA, at 8 U.S.C. 1182 (a)(6)(F)) or deportation under section 241(a)(3)(C) of the INA, at 8 U.S.C. 1251 (a)(3)(C)).

TITLE IV. ENFORCEMENT OF RESTRICTIONS AGAINST EMPLOYMENT

A wide range of views exists regarding whether and to what extent the proposed new worker verification "pilot project" established under Section 403 represents sound public policy. There is no disagreement among us, however, on two key points: (i) if a verification system is ultimately adopted, protections should be afforded innocent employers and workers who might be adversely affected by inaccurate information; and (ii) regardless of whether it is adopted, the INS and Department of Labor must be granted enhanced authority to penalize unscrupulous employers who consistenly hire undocumented aliens and exploit them in near "slave-labor" conditions.

### I. Protecting the rights of employees and employers under the verification system

In recognition of the potential liability that innocent employers may face by dismissing or refusing to hire job applicants due to errors in government databases or in the operation of the verification pilot program, the Committee adopted an amendment protecting from liability those employers who, in "good faith," rely on the verification confirmation mechanism. It is important to note, in this context, that the amendment should not be interpreted to prevent dismissed employees or unsuccessful job applicants from challenging employers who had other, unlawful motivations to dismiss or refuse to hire such employees and applicants. The intent is carefully limited to protect employers only under circumstances in which the relevant hiring decision is triggered solely by inaccurate information provided by the confirmation mechanism.

Equally important in this regard is an amendment offered by Representative Frank (and approved by the Committee by voice vote) protecting innocent employees from errors arising from the verification mechanism, by allowing them to seek compensation under the Federal Tort Claims Act (FTCA).[26] Because the verification process would (like employer sanctions) be administered at the time of hire, all authorized workers who may be adversely affected by errors in the pilot verification system will be afforded redress through at least one of several existing mechanisms. For example, any employee who is hired, if even for a few hours, and who is subsequently dismissed because of inaccurate information provided by the confirmation mechanism will automatically be entitled to compensation under the FTCA. In this connection, we note that the amendment's wording "shall be entitled to compensation" indicates that the employee in such circumstances need only to demonstrate, based on a preponderance of evidence, that the dismissal was attributable to an error in the confirmation mechanism. No proof of negligence is required and none of the existing exemptions from liability in the FTCA (including for harm flowing from policy decisions or claims arising from "misrepresentation, deceit, or interference with contract rights") are applicable to this new form of redress.

---

[26] 28 U.S.C. §§ 2671–2680.

533

To the extent that employers verify prospective employees selectively, or apply the results of information differently based, for example, on national origin or citizenship status, such employers would be liable for discrimination claims brought by the affected job applicants. In such cases job applicants have several avenues to pursue redress. First, selective application of verification procedures is already prohibited under INA §274B ("Unfair Immigration-Related Employment Practices"). Second, such actions may also be prohibited (depending on the specific circumstances), under Title VII of the Civil Rights Act and/or under 42 U.S.C. §1981, both of which address employment discrimination claims based on race and national origin. In this respect, we note that the "good faith" immunity provision does not protect employers who abuse the verification system by applying it in ways not required by the law.

The Committee also tried to strike a careful balance between protecting the rights of the employer and the rights of the employee in certain unusual circumstances arising from the temporary or time-limited nature of employment authorization documents possessed by certain individuals, or cases in which employers have reason to believe that individuals presenting what appear to be genuine documents are nonetheless unauthorized to work. At issue is the existing provision of INA §274A, which prohibits employers who have been provided documents which on their face appear genuine from requiring the production of a specific document or additional documents.[27] The Frank amendment addresses two specific circumstances in which it may be permissible for employers to request additional documents from individuals. It permits employers to request from an employee who previously submitted a time-limited employment authorization document an additional document demonstrating continuing employment eligibility. In addition, if an employer has a reasonable basis to believe that an individual who presents a document which appears on its face to genuine is in fact unauthorized to work, the bill only permits such employer to: (1) inform the individual of his intention to verify the validity of the document; and (2) dismiss the individual upon receiving confirmation that the individual is authorized to work.

Nothing in the legislation, however, prohibits the individual from offering alternative documents which demonstrate employment authorization. In addition, while verification is pending, the employer may not delay the hiring of, refuse to hire, or dismiss, or take any adverse employment-related action incident to the hiring against the individual, unless such action is wholly unrelated to the eligibility issue. In this context, nothing in the bill can or should be read to permit any action related to the document verification process in general, or to the request for additional documents or additional verification of documents presented in particular, that is a mere pretext for unlawful discrimination.

---

[27] Adopted as part of the Immigration Act of 1990, this provision is designed to prevent adverse impact on authorized workers who have been required by employers to produce additional documents, even after presenting legitimate documents demonstrating employment authorization. Some employers, apparently fearing the consequences of requiring such employees to produce additional or subsequent documents, have requested a clarification of what is and what is not permitted in such circumstances.

534

*II. The legislation fails to recognize that labor law enforcement is
vital to employer sanctions enforcement*

The opportunity for employment is the single most important and pervasive incentive for illegal immigration. There are industries which rely upon and, more often than not, exploit the work of undocumented workers. H.R. 2202 fails to recognize the important role played by the Department of Labor in helping combat illegal immigration by complementing enforcement of employer sanctions. The bill would authorize only 150 additional staff positions for the Wage and Hour Division to investigate violations of wage and hour laws in areas where there are high concentrations of undocumented workers,[28] a substantially weaker commitment to worksite enforcement than the President's FY96 budget request calling for (202 additional positions).[29] Even this weak provision is meaningless, since the Republican Majority has previously voted to cut funding for DOL Wage and Hour Division.[30] In this sense the bill lacks teeth by refusing to allow the Administration to complete its comprehensive anti-illegal immigration strategy which has thus far been highly successful at the border.[31]

The Committee rejected, by a party line vote, an important amendment offered by Representative Berman which would have authorized funding the new Wage and Hour inspectors, given the Secretary of Labor authority to issue subpoenas and collect evidence against violating employers and doubled the penalties for employers found to have violated both labor standards and immigration laws. This would assist the INS and Department of Labor in uncovering horrible situations like the incarceration and enslavement of Thai immigrants in El Monte, California by garment manufacturers,[32] and crack down on employers who treat the penalties available under current law as a mere cost of doing business.[33] In rejecting Representative Berman's amendment, the Majority signals an unwillingness to enforce the law. Minor and sporadic sanctions will never be sufficient to overcome the economic and competitive advantages that unscrupulous employers may achieve by hiring and exploiting illegal immigrants, thereby undercutting competitors who provide fair wages and working conditions.

TITLE V. REFORM OF LEGAL IMMIGRATION SYSTEM

Under the bill, legal immigration would be reduced from 800,000 admissions to a nominal 535,000 immigrants a (thirty percent reduction).[34] In addition, the bill includes a whole host of new proce-

---

[28] H.R. 2202, § 102 (2).

[29] House Judiciary Views Letter, supra note 6. See also Worksite Enforcement of Employer Sanctions: Hearing Before the Subcom. on Immigration and Claims, 104th Cong., 1st Sess. (1995) (statement of Maria Echaveste, Administrator, Wage and Hour Division, U.S. Department of Labor) [hereinafter Statement of Maria Echaveste].

[30] 141 Cong. Rec. H3281–H3303 (daily ed. March 16, 1995). See also Statement of Maria Echaveste supra note 29.

[31] "A Good Border Year: 1995 was a Year of Progress and Innovation", San Diego Union-Tribune, December 29, 1995. See also "Encouraging Progress on Deportations: Statistics Support the Steady, Measured Approach of the INS," Los Angeles Times, January 12, 1996.

[32] Editorial, Slavery's Long Gone? Don't Bet on it, L.A. Times, August 4, 1995, at B8. (Thais paid $1.60 an hour and found confined in illegal garment factory in El Monte). See also George White, Workers held in Near-Slavery, Officials Say, L.A. Times, August 3, 1995, at A1.

[33] Id.

[34] See CRS Report for Congress, Immigration: Analysis of Major Proposals to Revise Family and Employment Admissions, February 14, 1996.

535

dural rules which would push the numbers far below the 535,000 cap.[35] Moreover, after a short transition period, through category elimination or new restrictions, U.S. citizens will be virtually unable to sponsor their mother, father, brother, sister or adult child for immigration. The bill sets up a false dichotomy between the "nuclear family" of permanent residents on the immigration waiting lists and the relatives of U.S. citizens. Title V's reductions in the number of legal immigrants and in access to legal immigration reflect a fundamental misunderstanding of the character and benefits of America's historic commitment to legal immigration, family reunification and protection of refugees.

Title V's premise is that legal immigration and refugee admissions are higher than ever, and create problems and costs rather than benefits and opportunities. This is a false and distorted understanding, belied by numerous government and private sector studies and the reality of how today's immigrants are revitalizing communities across the country. Last year's legal immigrant and refugee admissions roughly equaled the level of immigration in the early 1900's, but as a proportion of the population, today's admissions are about one third the level of that time period.[36]

According to both conservative and liberal analysts, from organizations such as the CATO Institute, the Urban Institute and the Councils of Economic Advisors of Presidents Reagan and Bush, immigrants pay much more in taxes than the cost of services to them (although most taxes are paid to the Federal Government and most services, especially education and health care, are provided by local governments).[37] Indeed, the Urban Institute concluded in 1994 after reviewing all relevant studies that immigrants pay $25–30 billion annually more in total taxes than the total cost of services.[38] A 1990 survey of leading U.S. economists, including seven Nobel laureates, found that 80% believed immigration has had a "very favorable impact" on economic growth.[39] The Department of Labor and the AFL–CIO have also concluded that in the aggregate immigrants stimulate the economy.[40] Moreover, a 1990 study found that there is no correlation between the levels of immigration and unemployment either in states or on the national level.[41]

Perhaps more important than the economic contributions are the familial, social and political contributions of immigrants. Legal immigrants, refugees and persons granted asylum are "new Americans" who do not threaten, but rather strengthen the great American experiment in freedom and democratic pluralism. Immigrants have died defending American interests in foreign wars and have

---

[35] See discussion, infra.

[36] Current Population Reports (1994 March Supplement), U.S. Bureau of Census. On an annual basis, total legal immigration constitutes only three immigrants for every 1,000 Americans, and immigrants comprise only 8.7% of the U.S. population.

[37] Julian N. Simon, Immigration: The Demographic and Economic Facts published by CATO Institute and the National Immigration Forum.

[38] Fix, Michael and Jeffery Passel, Setting the Record Straight: Immigration and Immigrants (Urban Institute Press: 1994) (Washington, D.C.) [hereinafter Setting the Record].

[39] Survey of Economists, conducted by the Alexis de Tocqueville Institution cited in An Analysis of H.R. 2202: The Immigration in the National Interest Act of 1995 by Stuart Anderson, (September 1995) at p. 12 [hereinafter Anderson Analysis]. See also Stuart Anderson, Employment Based Immigration and High Technology February 1996

[40] See, Press Release—United States Department of Labor, July 11, 1989. See also Resolutions 59–61, AFL–CIO 1995 Resolution Book One, October 23–26, 1995.

[41] Richard Vedder, Lowell Gallaway, and Stephen Moore, Immigration and Unemployment: New Evidence, Alexis de Tocqueville Institution, July 1994.

536

made discoveries which have strengthened our military capacity. Immigrants who have fled tyranny and oppression deeply appreciate the freedom which America offers, and their work and perspective serves to enhance the American commitment to freedom and democracy.

### I. Dramatically reduces family-sponsored immigration and punishes those who have waited to lawfully enter the United States

As noted above after a short transition period, the bill would make it virtually impossible for U.S. citizens to sponsor their mother, father, brother, sister, or adult child for immigration. In addition, the bill would set an annual cap on family immigration of 330,000—more than one-third below current levels. This arbitrary cap is inadequate to meet the needs of U.S. citizen families and would create immediate backlogs for spouses and minor children of lawful permanent residents as well as parents of U.S. citizens. We also object to the bill's arbitrary reduction to 85,000 in the number of visas granted to spouses and minor children of lawful permanent residents. [42] Immigration by spouses and minor children of lawful permanent residents is currently set at approximately 98,000 per year, [43] a number that does not meet current demand and is already creating massive backlogs.

We object to the arbitrary exclusion of parents from the immediate relative category, thereby subjecting them to a 45,000 cap and a 25,000 floor. [44] There is no justification for limiting immigration by parents who may be the main source of childcare and other familial support for working families. [45] The 25,000 visa limit would mean that 50% of U.S. citizen sponsors who wish to reunite with their parents would be prevented from doing so a massive new blacklog would be created. While we agree that spouses and minor children should receive priority, we see no rationale for this arbitrary limit on parents of U.S. citizens.

In addition, Section 512(b)'s requirement that parents of citizens procure health insurance before they can obtain a visa represents a nearly insurmountable obstacle to their immigration. The Administration estimates that even where it may be possible to purchase the required health insurance for an elderly parent, it would cost an average of $9,000 or more a year, prohibitively high for most American families. [46] We are also concerned that insurers may not agree to offer health insurance for immigrating parents at any cost. [47]

---

[42] H.R. 2202, § 512(a)(1).

[43] Immigration and Naturalization Factbook Summary of Recent Immigration Data, August 1995, at p. 8 [hereinafter Factbook].

[44] H.R. 2202, § 512(a)(2)(A).

[45] Parent immigration currently numbers approximately 56,000 per year. As the number of spouses and children of citizens increase, the number of visas available for spouses and children of permanent residents decrease. Since that category is guaranteed of minimum of 85,000, the residuum that is left for parents of United States citizens decreases. Thus the overall family cap, combined with projected need, means that immigration by parents under H.R. 2202's would immediately meet the 25,000 floor set by the bill. The cap of 45,000 would be meaningless, as other superseding categories would prevent this number from being reached. See Factbook supra, note 43 at 13.

[46] Letter from Jamie Gorelick, Deputy Attorney General, U.S. Department of Justice, to Orrin G. Hatch, Chairman, Committee on the Judiciary, U.S. Senate (February 14, 1996).

[47] Id.

537

H.R. 2202 also unfairly eliminates immigration by married adult children of U.S. citizens, siblings of U.S. citizens, and most unmarried adult children of both citizens and residents. It is disturbing to think that government policy would keep American parents and their children apart simply because a child is older than 21 years of age. Of all immigrants, children on the brink of entering the workforce are exactly the type of new Americans this country needs, they will be here in their most productive years and they will be here to care for their parents in their golden years. [48]

We also find little rationale for eliminating immigration by siblings of U.S. citizens.[49] Brothers and sisters help to reinforce the family unit. They contribute to the economic and emotional strength of a family in many ways, such as pooling money to open businesses and sharing in the care of parents of each other's children.[50]

### II. Unjustifiable cap on refugees

We strongly object to the bill limiting admissions of refugees to 50,000 per year—reducing current admissions by approximately half.[51] Such a cap would undermine our efforts to encourage the international community to be more forthcoming on refugee resettlement and send the wrong signal to those governments who may question our commitment to promoting human rights around the world. Given the political and economic instability in almost every region of the world, it is imperative that the United States maintain its current flexible admissions policy for domestic resettlement that allows for expansion and contraction of numbers in response to changing conditions.

A cap on refugee admissions would represent an historic shift in the country's commitment to protecting people worldwide who have been persecuted or fear persecution because of their race, religion, nationality, political opinion, or membership in a particular group. Current law provides an orderly but flexible process in which the Administration can, in consultation with Congress, set the number of annual refugee admissions at a level that accounts for both the global situation and our international commitments.[52] Congress maintains the final say over refugee admissions through the appropriations process, even as the President has the authority to provide additional slots if justified by "urgent humanitarian concerns

---

[48] Representative Smith's amendment allowing immigration by certain adult sons and daughters of U.S. citizens and lawful permanent residents is so narrow as to be virtually meaningless. We see no logic in barring all adult children who are over age 25 and imposing a requirement that the son/daughter has "never been married" is absolutely unjustified. This requirement would bar a 21-year-old daughter whose husband has died and who remains dependent on the family for emotional and physical support, especially in a time of grief and transition. Similarly, this requirement would bar a daughter who has fled from an abusive situation and sought a divorce in order to save her own life. And imposing a requirement that the son or daughter be childless serves only to harm innocent dependents who might at that point be in dire need of the support that grandparents can provide.

[49] At a minimum, this category should be maintained at least until those who have been waiting lawfully in line with approved petitions are allowed to immigrate to the United States.

[50] Immigration by brothers and sisters of U.S. citizens currently numbers approximately 65,000, while adult unmarried sons and daughters number only approximately 46,000 per year. Moreover, immigration by married sons and daughters of U.S. citizens are limited to 23,400. These are modest numbers and should be maintained.

[51] H.R. 2202 §521(a)(2)(A). In FY 1995, 98,000 refugees were admitted, and in FY 1996 90 slots have been set aside. See CRS Report: Immigration, Public Policy Institute, Ruth Wassen, Joyce Vialet, William Krouse, January 17, 1996.

[52] 8 U.S.C. 1157 §207.

538

or are otherwise in the national interest." H.R. 2202 would take the dramatic step of requiring a full-fledged act of Congress to allow any additional refugees to meet compelling humanitarian needs.

H.R. 2202's proposed policy shift could not come at a more inappropriate time. The United Nations High Commissioner for Refugees has estimated that since 1992 the number of refugees worldwide has risen to 20 million.[53] The consequences of a refugee cap are neither abstract nor theoretical: it would require dramatic reductions not only in the number of former Soviet Jews, Evangelical Christians, and Ukrainian Catholics admitted as refugees, but also in the number of Vietnamese, Bosnian and Cuban admissions. By forcing the government to choose among equally worthy groups, the cap would politicize refugee admissions and endanger the lives of thousands of people worldwide.[54] For example, we expect to admit 40,000 Jewish refugees from the former Soviet Union over the next several years, but we are also committed to accepting between 7,000 to 14,000 Cubans as part of our agreement with Cuba. Just these two programs could exceed the 50,000 cap.[55]

An amendment was made by Chairman Hyde to permit the annual 50,000 cap to be exceeded in the event of an "emergency" at some time after the annual consultation with Congress on refugee numbers. It is unlikely, however, that the cap would be pierced. Once the State Department has squeezed the numbers down to 50,000 for a given year, by shutting down or reducing ongoing programs it is most unlikely to reverse itself by raising the numbers and re-establishing these same programs in mid-year no matter how compelling the circumstances.

*III. Severely limits attorney general's humanitarian parole authority*

We oppose the bill's sweeping new restrictions on the Attorney General's parole authority. Section 524 of the bill states that the Attorney General may parole aliens on a case by case basis only for urgent humanitarian reasons or for a reason deemed strictly in the public interest. We believe that there is no rationale for this legislative change. The current law provides the Attorney General with appropriate flexibility to deal with compelling immigration situations.[56] For example, the amendment would not permit the parole of an alien to attend the funeral of a close family member or of a parent to accompany a child paroled into the United States for an organ transplant.[57] In light of the proposed refugee cap, this provision unwisely ties the Administration's hand in an area where

---

[53] Letter from Reno von Rooyen, Representative of the United Nations High Commissioner for Refugees, to Hon. Henry J. Hyde, Chairman, Committee on the Judiciary, U.S. House of Representatives (October 25, 1995).

[54] The refugee cap is in direct conflict with the will of the House of Representatives. On May 28, 1995, the House adopted an amendment to H.R. 1561 that questions the potential forced repatriation of Vietnamese asylum seekers held in detention throughout Southeast Asia. It also foresaw the potential resettlement of these Vietnamese, which would put additional pressures on the U.S. refugee admissions program just as a refugee cap of 50,000 is enacted. The amendment, sponsored by Representative Chris Smith, requires the United States to offer as many as 40,000 of these people the opportunity to resettle here or in other free countries would be impossible to implement under a "hard cap" of 50,000 refugees per year.

[55] *Anderson Analysis, supra,* note 39, p. 26.

[56] 8 U.S.C. §1157.

[57] Letter from Jamie S. Gorelick, Deputy Attorney General, U.S. Department of Justice, to Henry J. Hyde, Chairman, Committee on the Judiciary, U.S. House of Representatives (September 15, 1995) at 4.

539

flexibility is always needed to deal with unforeseen emergency migration circumstances.

## IV. Asylum procedures contravene international norms

Section 531 represents an unnecessary and dangerous effort to reform the system by which asylum is granted to persons who have a well-founded fear of persecution and need protection in the United States. As a result of the regulatory changes adopted in January of 1995,[58] and the increases in appropriations provided under the 1994 Crime Bill, the asylum process has been improved substantially.[59] Additional asylum officers and the increases in the immigration judge corps have allowed us to gain control over the potential fraud in asylum applications and increase our effectiveness in completing cases within 180 days of application. New asylum claims filed with the INS since the reforms have decreased by 57 percent, from 123,000 in 1994 to 53,000 in 1995.[60] And the asylum process was able to process more than 126,000 cases as compared to only 61,000 cases in the previous year.[61] Eighty-four percent of cases are now heard within 60 days of applications,[62] ensuring that applicants obtain access to a speedy procedure. At the same time, the INS has redirected their sources to focus on fraud investigations concerning asylum, and several cases have resulted in convictions.[63] Yet, in the face of these positive developments, H.R. 2202 unnecessarily imposes time limits on applications and restricts the Attorney General's discretionary authority to withhold deportation.

The 30-day time limit for filing asylum applications set forth in Section 531 will create a complex layer of adjudication and divert resources from resolving the merits of the asylum applications.[64] The 30-day time limit will also result in increased applications which have not been carefully prepared, since asylum seekers will be forced to submit by the deadline or be categorically denied. Most meritorious applicants rarely make their first contact with human rights organizations, much less find legal assistance for the preparation of their applications, within such a short time period.[65]

The requirement that asylum applications be filed within 30 days also violates U.S. international obligations. Article 33 of the 1967 Protocol regarding the Status of Refugees binds signatories to the duty of not returning any refugee who could face a threat to his or her life or liberty in the country of reared persecution, regardless of when the person makes known the claim to need such pro-

---

[58] 59 Fed. Reg. 62284–62303 (1994) (amending 8. C.F.R. § 228 effective January 4, 1995).

[59] See Celia W. Dugger, Immigration Bills' Deadlines May Imperil Asylum Seekers, N.Y. Times, February 12, 1996, at B1.

[60] INS News Release supra note 9.

[61] Id.

[62] Id.

[63] William Branigin, INS Chief Highlights Reform in Political Asylum System: Year-Long Campaign Slashes New Claims by 57 Percent, Wash. Post, January 5, 1996, at A2.

[64] Since the bill rightfully does not apply a 30 day limit to withholding of deportation, the Attorney General will have to decide the merits of a refugee's claim regardless of the timeliness of the application. Also, while the Committee correctly amended the bill to incorporate a waiver of the 30 day time limit where there has been a change of in any circumstances, the INS will now not only have to divert resources to adjudicate the timeliness of the application, but to adjudicate the waivers available for changed personal circumstances as well as country conditions.

[65] Since many asylum seekers flee their home countries with few resources, many persons cannot afford private attorneys and have to rely on church groups, charitable organizations and other low cost legal service providers. See David Cole, Making Time for Freedom Thirty-Day Deadline for Political Asylum Requests Defies Reality, Legal Times, December 4, 1995, at 20.

540

tection. While the United Nations High Commissioner for Refugees has acknowledged that some countries can impose filing deadlines, they have forcefully stated that the failure to abide by such deadlines cannot be a reason by which the application is not considered at any future time.[66]

Section 305 of the bill eliminates the Attorney General's current discretionary authority of "withholding of deportation." This is a serious breach of current policy and U.S. obligations under United Nations conventions.[67] Under current law, if a person is denied discretionary asylum, he or she can still seek protection under a higher standard for withholding of deportation. This requires that the applicant show that it is more likely than not that his or her life or freedom would be threatened in the country of origin. By eliminating such withholding of deportation discretion, the bill abrogates international refugee law requiring that a country not forcibly return (refoul) a person to a place of persecution.[68]

We would also note that under section 531 asylum may be precluded if the Attorney General, pursuant to bilateral agreements with third countries, is able to find another country that is willing to accept that person. In our view it is essential that the third country return provision be construed to retain a high level of discretion for the Attorney General to decide what is most appropriate in individual cases, consistent with humanitarian circumstances and United States security concerns.[69]

### IV. Keeps families separated and fails to eliminate backlogs

While the formula for backlog reduction set forth in section 553 of the bill addresses a substantial portion of the existing backlog for spouses and minor children of lawful permanent residents, it does nothing to address the issue of equity for those in eliminated family categories who have been waiting lawfully for their turn to immigrate for many years.[70] Even with the visas provided to ad-

---

[66] During Committee mark-up of the bill, the Majority stated the Committee's expectation that the application itself could be simplified, so that asylum seekers could submit a short and simplified application within the 30 day time limit, with a second opportunity to amplify and strengthen the application at a later date. While this is not the best or the preferred solution, if necessary the Committee should make this understanding very clear to the Administration so that the regulations clearly allow for a subsequent opportunity for the applicant to supplement, amplify, and complete the formal application at a later date after the 30-day period.

[67] U.N. Convention on the Status of Refugees—Article 33 (1951).

[68] During deliberations at the Committee mark-up, there were several statements by the Majority that it is their intent that withholding of deportation will be restored as the bill moves to a floor vote. *See* Judiciary Committee Markup Transcript October 11, 1995, at p. 101–103. We fully expect such a change to be made, consistent with current law and obligations under international refugee law, and are willing to work with the Majority to ensure that this vital protection remains in the U.S. law.

[69] In this regard, the discussion at the Committee mark-up highlighted the common understanding about this flexibility for the Attorney General, and the inclusion of a public interest exception in this discretionary authority. We view the potential of these return agreements with caution. Assurances must be obtained that the intent of the agreement now being negotiated with Canada, and other future schemes with other countries, will not serve to diminish refugee protection for those who need it. In this regard, we urge that such agreements be based not on the concept of entry, but targeted to reduce the number of double applications. What is important is not necessarily the route which a refugee goes through before applying for asylum in a given country, but rather that an asylum seeker can make a claim in one country, and if found not to be refugee under a fair and substantive procedure, he or she would be prevented from shopping around and making unfounded claims in other countries. Return agreements should not focus on the method, time or process of transit and entry; they should focus on the need to prevent duplicate applications in various nations, when their cases have been already fairly determined not to be well founded and are clearly abusive.

[70] There are approximately 2.5 million eligible relatives in the potentially eliminated categories whose visa petitions have been approved according to Testimony by Cornelius D. Scully,

541

dress the backlog of spouses and minor children of lawful perma-
nent residents, there will remain as estimated 300,000 people in
the backlog at the end of five years.[71] Tragically, the bill would re-
sult in the permanent separation of the families of U.S. citizens, in
a purported effort to benefit the immediate relatives of lawful per-
manent residents in the second family preference category.

Proponents of this legislation have argued that the elimination
of the adult children and siblings family preference categories is
necessary in order to expedite the reunification of the "nuclear fam-
ilies" of permanent residents—for which there is a 1.1 million per-
son backlog. Approximately 850,000 of the people in the backlog
are the spouses and minor children of permanent residents who
were undocumented immigrants who were granted legalized status
according to the legalization provisions of the Immigration Reform
and Control Act of 1986 (IRCA).[72] It has been estimated that up
to half[73] of the 850,000 are already in the country under quasi-
legal resident status under the Family Unity protection provisions
of the Immigration Act of 1990.[74]

Nearly all of the immigrants legalized by IRCA have now satis-
fied the five-year residency requirement for naturalization.[75] The
newly gained eligibility for naturalization of legalized permanent
residents is contributing greatly to the record surge of naturaliza-
tion applications being filed at INS district offices throughout the
United States.[76] The families of those who are naturalizing will be-
come eligible to immigrate immediately and subject to no numeri-
cal limits as the spouses and minor children of new citizens.

At the same time, as noted above, this legislation would elimi-
nate forever, the ability of United States citizens and lawful perma-
nent residents to petition for the immigration of their children over
the age of 21 or to bring in their siblings. Given these changes, a
more equitable solution to the backlog problem would be to "grand-
father in" all those with approved visa petitions, or at least those
within a year or two after enactment of reaching their "priority
date." A new legal immigration system that begins with backlogs
is not a system that has been meaningfully reformed.

*V. Sunset provision is backdoor attempt to stop all immigration*

We are extremely troubled by Section 505 which amends Section
201 of the INA to require Congressional review of the numerical
limits placed on immigration. Although, the review provision has
been described as merely requiring a "periodic" revisitation of im-
migration policy by Congress, we are concerned, however, that the
sunset provision, could end all numerically limited immigration

---

Director, Office of Legislation, Regulation and Advisory Assistance, U.S. State Department, at
Markup of H.R. 1915, Immigration in the National Interest Act of 1995, U.S. House of Rep-
resentatives, Subcomm. on Immigration and Claims, Committee on the Judiciary, (July 17,
1995).
  [71] *Id.*
  [72] *Id.*
  [73] *See* CRS Report for Congress, Immigration: Analysis of Major Proposals to Revise Family
and Employment Admissions, February 14, 1996.
  [74] Pub. L. No. 101–649, 105 Stat. 322, §301 (1990).
  [75] *See* 8 U.S.C. §1447.
  [76] Harry Pachon, *Prop. 187 Isn't All That's Propelling Latinos to INS, The Sacramento Bee,*
May 22, 1995, at B7.

542

into the United States after the fiscal year 2004, the year the bill designates as the first period of review.

This provision could be construed as a backdoor attempt at a moratorium on immigration. Under this provision determined immigration opponents would be given significant leverage in blocking new immigration legislation. If, for example, during a review period, a small group of Senators who are opponents of all immigration decide to filibuster the required reauthorization bill, the sunset requires that all numerically limited immigration be halted. Ultimately, this section could have the effect of eliminating immigration to the United States, with the exception of the immediate relatives of U.S. citizens who fall within a numerically unrestricted category.[77]

### TITLE VI. RESTRICTIONS ON BENEFITS FOR ILLEGAL ALIENS

Title VI effectuates a number of redundant[78] and unneeded changes relating to the availability of public benefits not only to undocumented but also to legal aliens, and imposes a series of harsh new restrictions and burdens on families seeking to sponsor immigrants.

### I. Unfunded mandates on state and local governments and harsh restrictions on public assistance available to legal immigrants

Section 601(b) would require state and local governments to deny any contracts, loan agreements, and professional or commercial licenses funded by the state to aliens not lawfully present in the United States. This would impose significant new unfunded mandates on state and local governments, and slow down services for all residents, aliens and citizens alike.[79] Although section 603 contains a list of programs that would be excepted from the requirements of section 601 and 602 (e.g., for "non-cash, in-kind, short-term emergency disaster relief"), the language is too narrowly drawn to relieve states and localities from most of these time-consuming, administrative requirements.

The "public charge" provisions of section 622 are also far too rigid.[80] For example, it would require the deportation of someone for having received public benefits even if the individual later becomes completely self-reliant. Another example of the rigidity of

---

[77] See also Letter from Larry M. Eig, Legislative Attorney, American Law Division, Congressional Research Service, to Honorable Patsy T. Mink, Member, U.S. Congress (February 28, 1996).

[78] Most major needs-based programs are already denied to illegal aliens. Generally, those programs that do not check immigration status provide crisis intervention, public health service or services for small children; or small programs such as soup kitchens and baseball leagues that are administered by non-profit charities or church groups. See, Larry Eig and Joyce Vialet, CRS Report 93–1046A, Alien Eligibility Requirements for Major Federal Assistance Programs (December 8, 1993).

[79] This provision would require that federal, state and local government entities that issue such licenses develop a system to verify the immigration status of every applicant for such licenses. For example, section 601(b)'s prohibition on state and local governments' provision of professional or commercial licenses to persons not lawfully present implicitly requires that all federal, state and local government entities that issue such licenses develop systems to verify the immigration status of every applicant for such licenses. Not only would this likely result in discriminatory treatment, it would also pose an enormous unfunded burden on state and local entities that would inhibit their ability to provide services to all applicants and residents in their states or localities.

[80] Current law already provides for the deportation of immigrants who become public charges, and we feel it more appropriate that we encourage the Immigration and Naturalization Service to step up its enforcement of existing law. See 8 U.S.C. 1251(a)(1)(A).

543

section 622 is its subjecting refugees or asylees who become "public charges" to deportation notwithstanding the fact that requirement is waived at the time of entry.[81] We are also troubled by the list of programs in section 622 for which receipt by an immigrant would constitute being a "public charge." For instance, Title XX Social Service Block Grants to states (used for emergency needs such as homeless shelters, soup kitchens, and battered spouse shelters) are included on the list even though these programs are provided through state and local governments and are often administered by private charities.[82]

### II. Harsh restrictions on sponsors of immigrants

Under section 631's "deeming" provision, the income and resources of an immigrant's sponsor would be attributed to the immigrant for purposes of determining eligibility for public benefits without regard to whether the sponsor is actually making any contribution to the immigrant's well-being or whether the sponsor is able to meet his or her own family obligations. Section 631 also dramatically expands the number of federal programs that are "deemed" (SSI, AFDC, and Food Stamps) to include nearly every federal means-tested benefit—both cash and non-cash.

Programs that receive federal funds and would be forced to implement these burdensome restrictions include child protective services, foster care, prenatal care, job training, teen crisis centers, soup kitchens, homeless shelters, Pell grants for education, and student loans. This means that state and local governments, colleges and universities, and private charities would have to ask all of their clients, including U.S. citizens, whether they came to the U.S. as immigrants and whether they had sponsors. Furthermore, these individuals would have to demonstrate their sponsors' incomes before they could be considered eligible for services.

These punitive changes are being made despite the fact that many of the programs for which immigrants would be "deemed" are relatively low-cost and are of vital importance to the immigrant (e.g., programs to assist the homeless, the hungry, abused and neglected children, and emergency Medicaid). If immigrants cannot get access to health care, the entire community suffers.

Section 631 would also repeal the current exemption from "deeming" for sponsored immigrants who become disabled after entry and create new administrative complexities and requirements for state and local governments and private charities. Further, by attributing 100 percent of a sponsor's income and resources to the immigrant, the bill is inconsistent with current practice in the major entitlement programs and could cause severe problems where the spouse of a signatory to an affidavit of support becomes separated or divorced from the sponsor.

---

[81] Under current law a refugee or asylee who is admitted to the United States is admitted without regard to whether they may later become a public charge because it is thought their flight from persecution and our offer of safe harbor should not be dependent on their financial circumstance. See 8 U.S.C. §§ 1157(c)(3), 1159(c). Yet, section 622 would subject these individuals to public charge deportation if they were to use more than 12 months of public services within their first seven years in the United States.

[82] See 42 U.S.C. 1397(o).

544

*III. Deters individuals from becoming sponsors*

We also object to section 632's requirement that a sponsor earn more than 200% of the Federal poverty income guideline to be eligible to execute an affidavit of support for a family member. The 200% income requirement constitutes nothing less than "class warfare," and tells the world that immigration is only for the wealthy. This would require that a sponsor with a family of four maintain an income above $35,420 to qualify as a sponsor,[83] and mean that 91 million people in America could not sponsor a family member for immigration.[84] The requirement is unnecessary since current law already provides that an immigrant may not be admitted to the United States unless he or she can prove that they are unlikely to become a public charge.[85]

Section 632 also requires that the sponsor be the petitioner and prevents organizations from sponsoring individuals. Since the bill unilaterally eliminates whole categories of family reunification, this would preclude U.S. citizens from sponsoring all but their "nuclear family" as immigrants. Under this harsh and nonsensical provision a child would be precluded from sponsoring his or her stepparents or grandparents; an immigrant spouse would be unable to sponsor his or her brothers and sisters; and a church could not sponsor a parishioner's child. The fact that these relatives were otherwise fully eligible to immigrate to the United States would be of no avail.

*IV. Unreasonable requirements of paying off benefits before naturalization*

We also oppose section 632(c)'s requirement that sponsored immigrants "pay off" certain benefits that they may have received before they are permitted to become naturalized U.S. citizens. This would deny citizenship simply because a person temporarily fell on hard times. Under this provision an immigrant who, as a child, received school lunch benefits would be obligated to pay back those benefits before becoming a naturalized U.S. citizen.

We are also troubled by Section 632's requirement that a family-based immigrant's sponsor notify the government within thirty days of any time he or she changes residences.[86] This burdensome provision would necessitate the creation of a recordkeeping bureaucracy at the state and Federal level to monitor and penalize U.S. citizens or lawful permanent residents who have sponsored the immigration of a close family member.

*V. Denying benefits to legal permanent residents and citizens based on parent's citizenship*

We are also troubled by language in section 607 which precludes the provision of any benefit (even to U.S. citizens) if that benefit

---

[83] Current Population Survey (March 1994 Supplement) from the U.S. Bureau of the Census. Poverty level determined by the U.S. Department of Labor.
[84] Anderson Analysis supra note 39 at 16.
[85] 8 U.S.C. 1182 (a)(4). Nearly all incoming immigrants quickly support themselves, and do not have to rely on the help of their sponsors. According to a 1995 study by the Urban Institute, 93.4 percent of foreign born in America survive without public assistance. See Setting the Record, supra note 38.
[86] H.R. 2202, §632.

545

is being administered by someone who is not lawfully present in the United States. Under this provision, a child who is a U.S. citizen would not be able to receive food stamps or housing assistance simply because his or her parent is not lawfully present in the United States. This provision is blatantly disrespectful of an individual's 14th Amendment citizenship and equal protection rights, and could impose a "caste" system on innocent children.

*VI. Unrealistic requirements for hospital reimbursement*

Section 604 provides state and local governments with reimbursements of emergency medical services provided to undocumented aliens. Although we support the goal of reimbursement, we are concerned that language denying reimbursement unless the identity and immigration status of the individual has been verified with the INS. The INS does not have a data base listing illegal immigrants nor does it have a database that lists all U.S. citizens, making verification nearly impossible. The provision would also require that all hospital personnel become experts in citizenship verification forms. In addition, because the bill requires each person be verified, it would create a huge administrative burden for hospitals. The verification requirement will also keep many ill aliens away from emergency rooms, raising severe public health risks.

CONCLUSION

We believe it is imperative that the Congress pass legislation increasing enforcement against illegal immigration. However, reforming immigration does not mean denying asylees' rights to legitimate due process, drastically capping family immigrant and refugee admissions, or endangering our public heath by denying crucial benefits to children. We urge the Members to reject H.R. 2202 and pass immigration reform that respects our heritage as a "nation of immigrants" and invests in our country's future.

> JOHN CONYERS, Jr.
> PATRICIA SCHROEDER.
> SHEILA JACKSON-LEE.
> HOWARD L. BERMAN.
> MELVIN L. WATT.
> ZOE LOFGREN.
> JERROLD NADLER.
> BOBBY SCOTT.
> BARNEY FRANK.
> JOSÉ E. SERRANO.
> XAVIER BECERRA.

○

**Dispatch Magazine** (1995)

Return to:  Index of Dispatch Magazine Archives     Index of 1995 Issues

Index of "Briefings and Statements"     Electronic Research Collection

ERC Reference Desk     Alphabetic Index     Sitemap     ERC Homepage

http://dosfan.lib.uic.edu/ERC/briefing/dispatch/1994/html/Dispatchv5no37.html

U.S. DEPARTMENT OF STATE DISPATCH
VOLUME 5, NUMBER 37, SEPTEMBER 12, 1994
PUBLISHED BY THE BUREAU OF PUBLIC AFFAIRS

ARTICLE 5:

U.S.-Cuba Joint Communique on Migration
Following is the text of the U.S.-Cuba Joint
Communique on migration, New York City, September 9,
1994

Representatives of the United States of America and
the Republic of Cuba today concluded talks
concerning their mutual interest in normalizing
migration procedures and agreed to take measures to
ensure that migration between the two countries is
safe, legal, and orderly.

Safety of Life at Sea

The United States and the Republic of Cuba recognize
their common interest in preventing unsafe
departures from Cuba which risk loss of human life.
The United States underscored its recent decisions
to discourage unsafe voyages.  Pursuant to those
decisions, migrants rescued at sea attempting to
enter the United States will not be permitted to
enter the United States, but instead will be taken
to safe haven facilities outside the United States.
Further, the United States has discontinued its
practice of granting parole to all Cuban migrants
who reach U.S. territory in irregular ways.  The
Republic of Cuba will take effective measures in
every way it possibly can to prevent unsafe
departures using mainly persuasive methods.

Alien Smuggling

The United States and the Republic of Cuba reaffirm
their support for the recently adopted United
Nations General Assembly resolution on alien
smuggling.  They pledged their cooperation to take
prompt and effective action to prevent the transport
of persons to the United States illegally.  The two
governments will take effective measures in every
way they possibly can to oppose and prevent the use

of violence by any persons seeking to reach, or who arrive in, the United States from Cuba by forcible diversions of aircraft and vessels.

Legal Migration

The United States and the Republic of Cuba are committed to directing Cuban migration into safe, legal and orderly channels consistent with strict implementation of the 1984 joint communique. Accordingly, the United States will continue to issue, in conformity with United States law, immediate relative and preference immigrant visas to Cuban nationals who apply at the U.S. Interests Section and are eligible to immigrate to the United States. The United States also commits, through other provisions of United States law, to authorize and facilitate additional lawful migration to the United States from Cuba. The United States ensures that total legal migration to the United States from Cuba will be a minimum of 20,000 Cubans each year, not including immediate relatives of United States citizens. As an additional, extraordinary measure, the United States will facilitate in a one-year period the issuance of documentation to permit the migration to the United States of those qualified Cuban nationals in Cuba currently on the immigrant visa waiting list. To that end, both parties will work together to facilitate the procedures necessary to implement this measure. The two governments agree to authorize the necessary personnel to allow their respective interests sections to implement the provisions of this communique effectively.

Voluntary Return

The United States and the Republic of Cuba agreed that the voluntary return of Cuban nationals who arrived in the United States or in safe havens outside the United States on or after August 19, 1994 will continue to be arranged through diplomatic channels.

Excludables

The United States and the Republic of Cuba agreed to continue to discuss the return of Cuban nationals excludable from the United States.

Review of Agreement

The representatives of the United States and the Republic of Cuba agree to meet no later than 45 days from today's announcement to review implementation of this Joint Communique. Future meetings will be scheduled by mutual agreement.

For the Government of The United States of America:
(Michael Skol)
Principal Deputy Assistant Secretary
Inter-American Affairs

For the Government of The Republic of Cuba:
(Ricardo Alarcon)
President
Cuban National Assembly

New York, September 9, 1994

(###)


[END OF DISPATCH VOL 5, NO 37]

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 17-112

# MIGRATION AND REFUGEES

Joint Statement Between the

**UNITED STATES OF AMERICA**

**and CUBA**

Signed at Havana January 12, 2017



NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966
(80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued
under the authority of the Secretary of State shall be competent
 evidence . . . of the treaties, international agreements other than
treaties, and proclamations by the President of such treaties and
international agreements other than treaties, as the case may be,
therein contained, in all the courts of law and equity and of maritime
jurisdiction, and in all the tribunals and public offices of the
United States, and of the several States, without any further proof
or authentication thereof."

FRP-FRN-01221

# CUBA

## Migration and Refugees

*Joint Statement signed at Havana
January 12, 2017;
Entered into force January 12, 2017.*

# JOINT STATEMENT

**MOTIVATED** by an interest in the normalization of bilateral relations consistent with the Purposes and Principles enshrined in the Charter of the United Nations, including those related to the sovereign equality of States, settlement of international disputes by peaceful means, respect for the territorial integrity and political independence of States, respect for equal rights and self-determination of peoples, non-interference in the internal affairs of States, and promotion and encouragement of respect for human rights and fundamental freedoms for all;

**ENCOURAGED** by the re-establishment of diplomatic relations on July 20, 2015 based on mutual respect and the political will to strengthen bilateral relations and establish new understandings in various areas of common interest;

**AWARE** of the necessity to facilitate regular migration to the benefit of both countries, and to discourage irregular migration;

**COMMITTED** to preventing irregular migration, impeding departures from the Republic of Cuba that risk loss of human life, combating acts of violence associated with irregular migration, such as trafficking in persons and alien smuggling; and beginning the regular return of Cuban nationals, as set forth in this Joint Statement.

The United States of America and the Republic of Cuba have agreed to take a major step toward the normalization of their migration relations, in order to ensure a regular, safe and orderly migration. The Joint Communiqués dated December 14, 1984 and September 9, 1994 and the Joint Statement of May 2, 1995 remain in effect except as modified by this Joint Statement (collectively known as 'Migration Accords'). This Joint Statement is not intended to modify the Migration Accords with respect to the return of Cuban nationals intercepted at sea by the United States or the return of migrants found to have entered the Guantanamo Naval Base illegally.

In this framework, the United States of America shall henceforth end the special parole policy for Cuban nationals who reach the territory of the United States (commonly referred to as the wet foot-dry foot policy), as well as the parole program for Cuban health care professionals in third countries. The United States shall henceforth apply to all Cuban nationals, consistent with its laws and international norms, the same migration procedures and standards that are applicable to nationals of other countries, as established in this Joint Statement.

1. From the date of this Joint Statement, the United States of America, consistent with its laws and international norms, shall return to the Republic of Cuba, and the Republic of Cuba, consistent with its laws and international norms, shall

receive back all Cuban nationals who after the signing of this Joint Statement are found by the competent authorities of the United States to have tried to irregularly enter or remain in that country in violation of United States law.

The United States of America and the Republic of Cuba state their intention to promote changes in their respective migration laws to enable fully normalized migration relations to occur between the two countries.

2.  The United States of America and the Republic of Cuba shall apply their migration and asylum laws to nationals of the other Party avoiding selective (in other words, discriminatory) criteria and consistent with their international obligations.

3.  The United States of America shall continue ensuring legal migration from the Republic of Cuba with a minimum of 20,000 persons annually.

4.  The United States of America and the Republic of Cuba, determined to strongly discourage unlawful actions related to irregular migration, shall promote effective bilateral cooperation to prevent and prosecute alien smuggling and other crimes related to migration movements that threaten their national security, including the hijacking of aircraft and vessels.

5.  The Republic of Cuba shall accept that individuals included in the list of 2,746 to be returned in accordance with the Joint Communiqué of December 14, 1984, may be replaced by others and returned to Cuba, provided that they are Cuban nationals who departed for the United States of America via the Port of Mariel in 1980 and were found by the competent authorities of the United States to have tried to irregularly enter or remain in that country in violation of United States law. The Parties shall agree on the specific list of these individuals and the procedure for their return.

6.  The Republic of Cuba shall consider and decide on a case-by-case basis the return of other Cuban nationals presently in the United States of America who before the signing of this Joint Statement had been found by the competent authorities of the United States to have tried to irregularly enter or remain in that country in violation of United States law. The competent authorities of the United States shall focus on individuals whom the competent authorities have determined to be priorities for return.

As from the date of signing of this Joint Statement, the Parties shall carry out the necessary procedures for its implementation. The Parties may meet and revise such procedures from time to time to ensure effective implementation.

FRP-FRN-01224

The competent authorities of the United States of America and the Republic of Cuba shall meet on a regular basis to ensure that cooperation under these Migration Accords is carried out in conformity with their respective laws and international obligations.

Signed on the 12th day of January, 2017, in Havana, Cuba, in the English and Spanish languages, both texts being equally authentic.

For the Government of the
United States of America:

For the Government of the
Republic of Cuba:

3

FRP-FRN-01225

## DECLARACIÓN CONJUNTA

**MOTIVADOS** por el interés de normalizar las relaciones bilaterales, sobre la base de la observancia de los propósitos y principios consagrados en la Carta de las Naciones Unidas, incluidos los relacionados con la igualdad soberana de los Estados, la solución de controversias internacionales por medios pacíficos, el respeto a la integridad territorial y la independencia política de los Estados, el respeto por la igualdad de derechos y la autodeterminación de los pueblos, la no intervención en los asuntos internos de los Estados y la promoción y el estímulo del respeto a los derechos humanos y a las libertades fundamentales de todos;

**ALENTADOS** por el restablecimiento de las relaciones diplomáticas el  20 de julio del **2015**, basadas en el respeto mutuo y la voluntad política de fortalecer las relaciones bilaterales y establecer nuevos entendimientos en diversos temas de interés común;

**CONSCIENTES** de la necesidad de facilitar la migración regular que beneficia a ambos países y desalienta la migración irregular;

**COMPROMETIDOS** en la prevención a la migración irregular, en impedir las salidas riesgosas de la República de Cuba que ponen en peligro la vida humana y en luchar contra los actos de violencia relacionados con la

1

REPUBLICA DE CUBA

FRP-FRN-01226

**migración irregular, como la trata y el tráfico de personas; y en comenzar el retorno regular de los ciudadanos cubanos como se establece en esta Declaración Conjunta.**

Los Estados Unidos de América y la República de Cuba han alcanzado un acuerdo para dar un paso importante en la normalización de sus relaciones migratorias, a los efectos de garantizar una migración regular, segura y ordenada. Los Comunicados Conjuntos de fecha 14 de diciembre de 1984 y 9 de septiembre de 1994 y la Declaración Conjunta con fecha 2 de mayo de 1995, permanecen en vigor salvo lo dispuesto por la presente Declaración Conjunta (colectivamente los "Acuerdos Migratorios"). La presente Declaración Conjunta no tiene por objeto modificar los Acuerdos Migratorios con respecto al retorno de los ciudadanos cubanos interceptados en el mar por los Estados Unidos o el regreso de migrantes que han entrado ilegalmente en la Base Naval de Guantánamo.

En este contexto, los Estados Unidos de América en lo adelante eliminará la política especial de parole para los ciudadanos cubanos que llegan a territorio de los Estados Unidos (comúnmente llamada política "pies secos-pies mojados"), así como el programa de admisión provisional (parole) para profesionales cubanos de la salud, en terceros países. Los Estados Unidos en lo adelante aplicará a todos los ciudadanos cubanos, de conformidad a sus leyes y normas internacionales, el mismo procedimiento y normas migratorias aplicados a los ciudadanos de otros países, en

2

REPUBLICA DE CUBA

correspondencia con lo que establece la presente Declaración Conjunta.

1.- A partir de la fecha de esta Declaración Conjunta, los Estados Unidos de América, consistente con sus leyes y las normas internacionales, devolverá a la República de Cuba, y la República de Cuba, consistente con sus leyes y las normas internacionales, recibirá a todos los ciudadanos cubanos, quienes con posterioridad a la firma de esta Declaración Conjunta, sean detectados por las autoridades competentes de los Estados Unidos de América cuando trataban de ingresar o permanecer irregularmente en ese país, violando las leyes de Estados Unidos.

Los Estados Unidos de América y la República de Cuba declaran su intención de promover cambios en sus respectivas leyes migratorias, con el propósito de alcanzar la plena normalización de las relaciones migratorias entre los dos países.

2.- Los Estados Unidos de América y la República de Cuba aplicarán sus leyes de migración y asilo a los ciudadanos de la otra parte, de manera no selectiva, en otras palabras no discriminatoria, y de conformidad con sus obligaciones internacionales.

3.- Los Estados Unidos de América seguirán garantizando la migración legal desde la República de Cuba con un mínimo de 20 mil personas anuales.

3

REPUBLICA DE CUBA

4.- Los Estados Unidos de América y la República de Cuba, decididos a desalentar resueltamente los actos ilícitos vinculados con la migración irregular, promoverán la cooperación bilateral eficaz para prevenir, y procesar el tráfico de personas, así como los delitos asociados a los movimientos migratorios, que ponen en peligro su seguridad nacional, incluyendo el secuestro de aeronaves y embarcaciones.

5.- La República de Cuba aceptará que personas incluidas en la lista de 2746 que serían devueltas, según el Comunicado Conjunto de fecha 14 de diciembre de 1984, sean sustituidas por otras personas y devueltas a Cuba, siempre que sean ciudadanos cubanos que hubiesen salido hacia los Estados Unidos de América por el puerto de Mariel en 1980 y hubiesen sido detectados por las autoridades competentes de los Estados Unidos cuando trataban de entrar o permanecer irregularmente en ese país, violando las leyes de EE.UU. Ambas partes se pondrán de acuerdo sobre la lista específica de estas personas y el procedimiento para su devolución.

6.- La República de Cuba considerará y decidirá caso por caso la devolución de otros ciudadanos cubanos que están actualmente en los Estados Unidos  y antes de la firma de esta Declaración Conjunta habían sido detectados por las autoridades competentes de los Estados Unidos cuando trataban de entrar o permanecer irregularmente en ese país, violando las leyes de EE.UU. Las autoridades competentes de los Estados Unidos se enfocarán en las personas a quienes dichas autoridades competentes han determinado como prioridad para devolución.

4

REPUBLICA DE CUBA

A partir de la fecha en que se firme esta Declaración Conjunta, ambas partes aplicarán los procedimientos necesarios para su cumplimiento. Las partes podrán reunirse y revisar dichos procedimientos periódicamente para garantizar su implementación eficaz.

Las autoridades competentes de los Estados Unidos de América y la República de Cuba se reunirán de forma periódica para asegurarse de que la cooperación en virtud de los Acuerdos Migratorios se lleva a cabo de conformidad con sus respectivas leyes y obligaciones internacionales.

Firmado el 12 de enero de 2017, en La Habana, Cuba, en los idiomas inglés y español, siendo ambos textos igualmente auténticos.

Por el Gobierno de los
Estados Unidos de América

Por el Gobierno de la
República de Cuba

5

REPUBLICA DE CUBA

An official website of the United States Government <u>Here's how you know</u>



# Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente

**READOUT**

**OFFICE OF THE SPOKESPERSON**

JULY 2, 2025

The below is attributable to Spokesperson Tammy Bruce:

Today, Secretary of State Marco Rubio spoke with Mexican Foreign Secretary Juan Ramón de la Fuente to reaffirm the importance of U.S.-Mexico security cooperation as key pillar of regional stability.  The Secretaries reaffirmed their mutual commitment to working together to dismantle the transnational criminal and terrorist organizations that poison our communities, threaten Mexico's sovereignty, and kill our citizens.  Both leaders expressed their commitment to promote North America's economic security and prosperity for the benefit of the peoples of both nations.

---

TAGS

<u>Bilateral Relations and Engagement</u>    <u>Bureau of Western Hemisphere Affairs</u>    <u>Mexico</u>

Cookie Settings
FRP-FRN-01231

Office of the Spokesperson    The Secretary of State

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

America 250



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

An official website of the United States Government  <u>Here's how you know</u>



Home  >   ...   >  Secretary Rubio's Call with Mexican Foreign Secret..

# Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente

**READOUT**

**OFFICE OF THE SPOKESPERSON**

MARCH 31, 2025

The below is attributable to Spokesperson Tammy Bruce:

Today, Secretary of State Marco Rubio spoke with Mexican Foreign Secretary Juan Ramón de la Fuente to address actions to protect the U.S. automobile industry and strengthening security coordination and collaboration.

Regarding border security, Secretary Rubio and Foreign Secretary de La Fuente discussed actions to strengthen our borders, dismantle cartels, and stop the flow of illicit drugs, firearms, and illegal aliens. Secretary Rubio welcomed Mexico's demonstrated commitment to achieve results, including the deployment of 10,000 National Guard troops to our shared border, major fentanyl and precursor chemicals seizures, the transfer of 29 high-value targets, including major cartel figures, to U.S. custody to stand trial for their crimes, and the recent capture in Mexico and extradition to the United States of MS-13 leader Francisco Javier Roman-Bardales. The Secretary thanked Mexico for coordinating efforts to decrease illegal immigration, continuing to receive deportation flights, and repatriating illegal aliens to their home countries.

Cookie Settings

TAGS

Bilateral Relations and Engagement     Bureau of Western Hemisphere Affairs     Mexico

Office of the Spokesperson     The Secretary of State

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

America 250



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

An official website of the United States Government    Here's how you know



Home > ... > Secretary Rubio's Call with Mexican Foreign Secret..

# Secretary Rubio's Call with Mexican Foreign Secretary de la Fuente

**READOUT**

**OFFICE OF THE SPOKESPERSON**

MAY 30, 2025

The below is attributable to Spokesperson Tammy Bruce:

Today, Secretary of State Marco Rubio spoke with Mexican Foreign Secretary Juan Ramón de la Fuente to drive further progress on our shared security priorities, including efforts to secure the U.S.-Mexico border, dismantle cartel organizations, and promote economic security in North America. They agreed on the need to intensify our cooperation between our two countries, improving the safety and welfare of Americans and Mexicans.

---

TAGS

Bilateral Relations and Engagement    Bureau of Western Hemisphere Affairs    Mexico

Office of the Spokesperson    The Secretary of State

Cookie Settings

FRP-FRN-01235

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

America 250



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

An official website of the United States Government Here's how you know



Home > ... > Visa Restrictions on Travel Agencies Facilitating Ille.

# Visa Restrictions on Travel Agencies Facilitating Illegal Immigration to the United States

**PRESS STATEMENT**

**TAMMY BRUCE, DEPARTMENT SPOKESPERSON**

MAY 19, 2025

The Department of State is taking steps today to impose visa restrictions on owners, executives, and senior officials of travel agencies based and operating in India for knowingly facilitating illegal immigration to the United States.  Mission India's Consular Affairs and Diplomatic Security Service work every day across our Embassy and Consulates to actively identify and target those engaged in facilitating illegal immigration and human smuggling and trafficking operations.  We will continue to take steps to impose visa restrictions against owners, executives, and senior officials of travel agencies to cut off alien smuggling networks.  Our immigration policy aims not only to inform foreign nationals about the dangers of illegal immigration to the United States but also to hold accountable individuals who violate our laws, including facilitators of illegal immigration.

Enforcing U.S. immigration laws and policies is critical to upholding the rule of law and protecting Americans.  This visa restriction policy is global and even applies to individuals who otherwise qualify for the Visa Waiver Program.  These actions are taken pursuant to section 212(a)(3)(C) of the Immigration and Nationality Act.

Cookie Settings

FRP-FRN-01237

TAGS

Bureau of Consular Affairs     Immigration     Office of the Spokesperson

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

America 250

     

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

FRP-FRN-01238

An official website of the United States Government Here's how you know

Home > **Office of the Spokesperson** > **Press Releases** > Priorities and Mission of the Second Trump Administration's Department of State

# Priorities and Mission of the Second Trump Administration's Department of State

**PRESS STATEMENT**

**MARCO RUBIO, SECRETARY OF STATE**

JANUARY 22, 2025

Serving as America's 72nd Secretary of State is the highest honor of my professional life. President Trump has given me a clear direction to place our core national interest as the guiding mission of American foreign policy. Every dollar we spend, every program we fund, and every policy we pursue must be justified with the answer to three simple questions:

Does it make America safer?

FRP-FRN-01239

Cookie Settings

Does it make America stronger?

Does it make America more prosperous?

To advance our national interest, we will build a more innovative, nimble, and focused State Department. This will require replacing some priorities, deemphasizing some issues, and eliminating some practices.

First, we must curb mass migration and secure our borders. The State Department will no longer undertake any activities that facilitate or encourage mass migration. Our diplomatic relations with other countries, particularly in the Western Hemisphere, will prioritize securing America's borders, stopping illegal and destabilizing migration, and negotiating the repatriation of illegal immigrants.

Next, we must reward performance and merit, including within the State Department ranks. President Trump issued an executive order eliminating "DEIA" requirements, programs, and offices throughout the government. This order will be faithfully executed and observed in both letter and spirit.

Relatedly, we must return to the basics of diplomacy by eliminating our focus on political and cultural causes that are divisive at home and deeply unpopular abroad. This will allow us to conduct a pragmatic foreign policy in cooperation with other nations to advance our core national interests.

We must stop censorship and suppression of information. The State Department's efforts to combat malign propaganda have expanded and fundamentally changed since the Cold War era and we must reprioritize truth. The State Department I lead will support and defend Americans' rights to free speech, terminating any programs that in

FRP-FRN-01240

any way lead to censoring the American people.While we will combat genuine enemy propaganda, we will do so only with the fundamental truth that America is a great and just country whose people are generous and whose leaders now prioritize Americans' core interests while respecting the rights and interests of other nations.

Finally, we must leverage our strengths and do away with climate policies that weaken America. While we will not ignore threats to our natural environment and will support sensible environmental protections, the State Department will use diplomacy to help President Trump fulfill his promise for a return to American energy dominance.

In short, President Trump's forward-looking agenda for our country and foreign relations will guide the State Department's refocus on American national interests. Amid today's reemerging great power rivalry, I will empower our talented diplomatic corps to advance our mission to make America safer, stronger, and more prosperous.

TAGS

Office of the Spokesperson    The Secretary of State

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

An official website of the United States Government Here's how you know

Passports

Visas

Home > **Office of the Spokesperson** > **Press Releases** > Secretary Rubio's Meeting with Salvadoran President Nayib Bukele

# Secretary Rubio's Meeting with Salvadoran President Nayib Bukele

**READOUT**

**OFFICE OF THE SPOKESPERSON**

FEBRUARY 3, 2025

The below is attributable to Spokesperson Tammy Bruce:

Secretary of State Marco Rubio met today with Salvadoran President Nayib Bukele in San Salvador. It was a tremendously successful meeting that will make both countries stronger, safer, and more prosperous.

Multiple agreements were struck to fight the waves of illegal mass migration currently destabilizing the entire region. President Bukele agreed to take back all Salvadoran MS~

FRP-FRN-01243

FRP-FRN-01244

Secretary Rubio's Meeting with Salvadoran President Nayib Bukele - United States Department of State

Cookie Settings

4/30/25, 9:20 PM

13 gang members who are in the United States unlawfully. He also promised to accept and incarcerate violent illegal immigrants, including members of the Venezuelan Tren de Aragua gang, but also criminal illegal migrants from any country. And in an extraordinary gesture never before extended by any country, President Bukele offered to house in his jails dangerous American criminals, including U.S. citizens and legal residents.

Secretary Rubio and President Bukele concluded a civil nuclear cooperation MOU, which was signed by the Secretary and Salvadoran Foreign Minister Alexandra Hill Tinoco hours later.

Secretary Rubio informed President Bukele that the United States will issue a waiver to unfreeze assistance to support the two countries' joint work to detect suspicious travelers at El Salvador's National Passenger Analysis Center (CNAP), resume operations at El Salvador's Border Security Information Group (GCIF), and support El Salvador's vetted units working with U.S. law enforcement.

Secretary Rubio also raised strategies to counter the influence of the Chinese Communist Party in the hemisphere to safeguard the sovereignty and interests of both nations and the region.

TAGS

Bilateral Relations and Engagement    Bureau of International Security and Nonproliferation

Bureau of Western Hemisphere Affairs    El Salvador    Office of the Spokesperson    The Secretary of State

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

FRP-FRN-01245

FRP-FRN-01246

Secretary Rubio's Meeting with Salvadoran President Nayib Bukele - United States Department of State

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

An official website of the United States Government Here's how you know

Passports

Visas

Home > **Office of the Spokesperson> Press Releases** > Secretary Rubio's Meeting with Panamanian President Mulino

**READOUT**

**OFFICE OF THE SPOKESPERSON**

FEBRUARY 2, 2025

# Secretary Rubio's Meeting with Panamanian President Mulino

The below is attributable to Spokesperson Tammy Bruce:

Secretary of State Marco Rubio met with Panamanian President José Raúl Mulino and Foreign Minister Javier Martínez-Acha today in Panama City to address critical regional and global challenges. Secretary Rubio informed President Mulino and Minister Martínez-Acha that President Trump has made a preliminary determination that the current position of influence and control of the Chinese Communist Party over the Panama Canal area is a threat to the canal and represents a violation of the Treaty Concerning the Permanent Neutrality and Operation of the Panama Canal. Secretary Rubio made clear that this status quo is unacceptable and that absent immediate changes, it would require the United States to take measures necessary to protect its rights under the Treaty.

FRP-FRN-01247

Cookie Settings    d

Secretary Rubio also emphasized the importance of collaborative efforts to end the hemisphere's illegal migration through the thanked President Mulino for his support of a joint repatriation program, which has reduced illegal migration through the Darien Gap. The Secretary underscored the desire for an improved investment climate and ensuring a level playing field for fair competition by U.S. firms. The Secretary also praised President Mulino's regional leadership in support of a democratic, free Venezuela.

Secretary Rubio expressed his gratitude for the productive discussion and underscored the United States' dedication to making both nations safer, stronger, and more prosperous. He noted this meeting marks an important step in reinvigorating the strategic relationship between the United States and Panama, in line with President Trump's vision.

TAGS    Bureau of Western Hemisphere Affairs    Office of the Spokesperson    Panama    The Secretary of State

White House

FRP-FRN-01248

FRP-FRN-01249

Secretary Rubio's Meeting with Panamanian President Mulino - United States Department of State

USA.gov

Office of the Inspector General

Archives

Contact Us

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

**THE WHITE HOUSE**

Office of the Press Secretary

May 2, 1995

**JOINT STATEMENT**

The United States of America and the Republic of Cuba have reached agreement on steps to normalize further their migration relationship. These steps build upon the September 9, 1994 agreement and seek to address safety and humanitarian concerns and to ensure that migration between the countries is safe, legal, and orderly.

Humanitarian Parole

The United States and the Republic of Cuba recognize the special circumstances of Cuban migrants currently at Guantanamo Bay. Accordingly, the two governments have agreed that the process of humanitarian parole into the United States should continue beyond those eligible for parole under existing criteria. The two governments agree that if the United States carries out such paroles, it may count them towards meeting the minimum number of Cubans it is committed to admit every year pursuant to the September 9, 1994 agreement. Up to 5,000 such paroles may be counted towards meeting the minimum number in any one year period beginning September 9, 1995, regardless of when the migrants are paroled into the United States.

Safety of Life at Sea

The United States and the Republic of Cuba reaffirm their common interest in preventing unsafe departures from Cuba. Effective immediately, Cuban migrants intercepted at sea by the United States and attempting to enter the United States will be taken to Cuba. Similarly, migrants found to have entered Guantanamo illegally will also be returned to Cuba. The United States and the Republic of Cuba will cooperate jointly in this effort. All actions taken will be consistent with the parties' international obligations. Migrants taken to Cuba will be informed by United States officials about procedures to apply for legal admission to the United States at the U.S. Interests Section in Havana.

The United States and the Republic of Cuba will ensure that no action is taken against those migrants returned to Cuba as a consequence of their attempt to immigrate illegally. Both parties will work together to facilitate the procedures necessary to implement these measures. The United States and the Republic of Cuba agree to the return to Cuba of Cuban nationals currently at Guantanamo who are ineligible for admission to the United States.

September 9, 1994 Agreement

The United States and the Republic of Cuba agree that the provisions of the September 9, 1994 agreement remain in effect, except as modified by the present Joint Statement. In particular, both sides reaffirm their joint commitment to take steps to prevent unsafe departures from Cuba which risk loss of human life and to oppose acts of violence associated with illegal immigration.

*The* WHITE HOUSE

**BRIEFINGS & STATEMENTS**

Readout of President Donald J. Trump's Call with President Nayib Bukele

The White House

January 23, 2025

NEWS

ADMINISTRATION

ISSUES

Today, President Donald J. Trump held a call with President Nayib Bukele of the Republic of El Salvador. The two leaders discussed working together to stop illegal immigration and crack down on transnational gangs like Tren de Aragua. President Trump also praised President Bukele's leadership in the region and the example he sets for other nations in the Western Hemisphere.

FRP-FRN-01251

CONTACT

EOP

VISIT

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS



THE WHITE HOUSE

1600 Pennsylvania Ave NW

Washington, DC 20500

FRP-FRN-01252

FRP-FRN-01253

Readout of President Donald J. Trump's Call with President Nayib Bukele – The White House

WH.GOV

Copyright

Privacy



FRP-FRN-01254

Statement from the Press Secretary – The White House

*The* WHITE HOUSE

**BRIEFINGS & STATEMENTS**

Statement from the Press Secretary

The White House

January 26, 2025

"The Government of Colombia has agreed to all of President Trump's terms, including the unrestricted acceptance of all illegal aliens from Colombia returned from the United States, including on U.S. military aircraft, without limitation or delay. Based on this agreement, the fully drafted IEEPA tariffs and sanctions will be held in reserve, and not signed, unless Colombia fails to honor this agreement. The visa sanctions issued by the State Department, and enhanced inspections from Customs and Border Protection, will remain in effect until the first planeload of Colombian deportees is successfully returned. Today's events make clear to the world that America is respected again. President Trump will continue to fiercely protect our nation's sovereignty, and he expects all other nations of the world to fully cooperate in accepting the deportation of their citizens illegally present in the United States."

NEWS

ADMINISTRATION

ISSUES

CONTACT

EOP

VISIT

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS



THE WHITE HOUSE

FRP-FRN-01256

3/3

Statement from the Press Secretary – The White House

1600 Pennsylvania Ave NW

Washington, DC 20500

WH.GOV

Copyright

Privacy







# Why Six Countries Account for Most Migrants at the U.S.-Mexico Border

Migrants and displaced people from across the world are arriving at the U.S.-Mexico border in droves. More than half come from six Latin American countries, where worsening violence, poverty, and other factors are pushing them to leave.

EAGLE PASS, TEXAS: U.S. Border Patrol agents organize migrants who have recently arrived in the United States after crossing over from Mexico in December 2023. John Moore/Getty Images

By **Will Freeman**, **Steven Holmes**, and **Sabine Baumgartner**, Photo Editor

July 09, 2024

The dynamics and scale of migration in and throughout the Americas have changed since the COVID-19 pandemic. Millions of migrants and displaced people are arriving every year to the U.S.-Mexico border, hailing not just from Mexico and northern Central America, but also from countries further south and from across the globe.

FRP-FRN-01258

# Migration on an Unprecedented Scale

EAGLE PASS: A late-year migration surge in 2023 resulted in long lines at the border as immigrants waited to be processed by U.S. authorities. John Moore/Getty Images

U.S. Customs and Border Protection (CBP) registered close to 2.5 million migrant encounters at the southern U.S. border in fiscal year 2023. Such high levels of migration are increasingly putting pressure on border infrastructure and personnel, contributing to a humanitarian crisis, and inflaming domestic political debate on the future of U.S. asylum, border, and immigration policy.


A U.S. Border Patrol agent speaks with immigrants at a transit center near the U.S.-Mexico border on December 19, 2023 in Eagle Pass, Texas.

EAGLE PASS: A U.S. Border Patrol agent speaks with immigrants who recently crossed the Rio Grande River into the United States. John Moore/Getty Images

So far, in 2024, encounter numbers have decreased overall, but they remain high for certain countries. In the first five months of the year, CBP agents encountered more than nine hundred thousand migrants and asylum seekers at the U.S.-Mexico border. The majority hailed from just

six countries: Mexico, Guatemala, Venezuela, Cuba, Ecuador, and Colombia, in descending order.



EAGLE PASS: As many as twelve thousand migrants crossed the border per day in December 2023, overwhelming U.S. authorities. John Moore/Getty Images

The Joe Biden administration has responded by designing policies to mitigate "root causes" of migration and displacement, enacting temporary humanitarian protections for individuals from certain countries, while making it more difficult for migrants to apply for asylum in the United States. But push factors—including organized crime-fueled violence and extortion and a lack of economic opportunities—combined with the pull of a strong U.S. labor market, make it unlikely migration flows will decrease substantially in the near future.

When taking a closer look at the conditions driving people to leave these six countries, it's clear why the challenge of managing large-scale migration and displacement is seemingly here to stay.



# Mexico

TILA, MEXICO: The remains of burnt-out vehicles litter the streets after armed gang violence forced many residents to evacuate. Manuel Orbegozo/Reuters

Mexicans have migrated to the United States in large numbers for decades. Despite a decline in numbers during the 2010s, CBP encounters with Mexicans at the U.S. southern border are rising again. While Mexicans previously migrated mostly to seek out economic opportunities—

and most of the migrants were young men traveling alone—recently, the share of Mexican families migrating has increased. Many are fleeing states in southern Mexico, such as Guerrero, Chiapas, and Oaxaca, that have been hit hard by intracommunal and criminal violence and extortion.

Mexico's army members guard people fleeing the violence generated by armed groups in recent days in Tila, Chiapas state, Mexico.

TILA: Mexican soldiers guard residents as they seek safety from gang violence. Isaac Guzman/AFP/Getty Images

A 2022 UN International Organization for Migration survey found that 90 percent of Mexican migrants left the country due to violence, extortion, or organized crime. The United States and Mexico have historically cooperated on countering organized crime, but during the six-year

term of outgoing Mexican President Andrés Manuel López Obrador, Mexico's federal government often took a hands-off approach to cartels and gangs, allowing them to expand their territorial presence. Meanwhile, bilateral security cooperation has faltered.



MAJOMUT, MEXICO: Indigenous Tzotzil women cry after being displaced from the town of Santa Martha due to violent conflict between armed groups. Jacob Garcia/Reuters



PETALCINGO, MEXICO: Many residents who were forced to flee their homes are staying in displacement camps set up by the government. Jacob Garcia/Reuters

Mexico could be positioned to revise its approach as President-Elect Claudia Sheinbaum takes office in October. If she develops a new and more effective strategy to curb organized crime and convinces governors of southern states to work with her, Mexico's migration and displacement numbers could once again begin to decline. But if the south's security crisis persists, migration from Mexico is expected to continue, if not grow.

# Guatemala

EL AGUACATE, GUATEMALA: Maria Concepcion Rodriguez and her family survive on less than $2 per day, barely enough to purchase basic food, such as a packet of noodles. Pilar Olivares/Reuters

Extortion by gangs, poverty, and the effects of worsening climate change on farmers are all driving displacement in Guatemala and fueling migration. Most Guatemalan migrants come from the departments of Guatemala, San Marcos, and Quiché. The department of Guatemala,

which includes the capital, has the fourth-highest homicide rate in the country and is an extortion hot spot. San Marcos and Quiché face widespread poverty and struggle to attract commercial activity and investment.



Soldiers patrol during an anti-drug operation at the "El Gallito" neighbourhood in Guatemala City, on February 6, 2024. "El Gallito" is considered one of the main drug distribution centers in the Guatemalan capital.

GUATEMALA CITY, GUATEMALA: Soldiers patrol the El Gallito neighborhood, considered a main distribution center for drugs. Orlando Estrada/AFP/Getty Images

Rising gang and cartel violence along Guatemala's border with Mexico has also displaced locals. Meanwhile, climate change is taking a toll on subsistence farmers in a region known as the "dry corridor," pushing many from this part of the country to head north.



LAS TUNAS, GUATEMALA: With many farmers relying solely on rainwater for irrigation, increasing temperatures and shifting rain patterns have decreased crop yields. Pilar Olivares/Reuters

FRP-FRN-01270



LAKE ATESCATEMPA, GUATEMALA: The lake, which once supported fishing and tourism industries, has dried up due to persistent drought and high temperatures, underscoring the devastating effects of climate change. Marvin Recinos/AFP/Getty Images

The Biden administration has pledged $170 million in development assistance to Guatemala since President Bernardo Arévalo—an anticorruption reformer—took office in January. Arévalo recently rolled out a cash transfer program that provides assistance to one hundred thousand families in impoverished parts of the country to slow emigration. Arévalo has also launched a crackdown on extortion. If successful, migration and displacement from Guatemala could slow during his term, but they will not likely experience a major decline. Managing the consequences of climate change and decreasing the poverty rate will take years, if not decades.

# Venezuela

CARACAS, VENEZUELA: The precarious housing of the Petare neighborhood, the largest slum in the country, is considered one of Venezuela's most violent areas. Marvin Recinos/AFP/Getty Images

Since 2014, nearly eight million Venezuelans have left their homes, fleeing an economic crisis and authoritarian repression under President Nicolás Maduro. Of all Venezuelan migrants surveyed in a 2022 poll by Centro de Investigaciones Populares, 72 percent said economic problems, including hyperinflation, poverty, and food insecurity, pushed them to migrate.


Children get water from a tank at the Petare neighborhood in Caracas.

CARACAS: Children gather water from a tank in Venezuela's Petare neighborhood as the country faces a shortage of food, medicine, and other basic necessities. Matias Delacroix/AFP/Getty Images

Violence and abuse by security forces have also forced Venezuelans to flee. The country remains one of the most violent in the region, despite the homicide rate dropping last year.

In the first four months of 2024, tens of thousands of Venezuelans left the country, accounting for 64 percent of all migrants who have so far crossed Panama's Darién Gap. The exodus of Venezuelans will likely accelerate if Maduro secures another six-term year in elections scheduled for July 28, which almost certainly won't be free or fair.

# Cuba

HAVANA, CUBA: Cuba's shortage of food, water, electricity, and medicine is exacerbating an already dire economic situation. Enrico Dagnino/Paris Match/Getty images

Cubans are also fleeing a broken economy and authoritarian repression. Last year, Cuba's economy shrunk by 2 percent, leaving it as much as 10 percent smaller than in 2019, and in its worst state in more than three decades. The island's inflation rate is one of the highest in the region and wages have stagnated, while food and fuel prices have shot up in recent years. Shortages of food and medicine have placed added pressure on Cubans to leave.



HAVANA: The government imposed a 500 percent hike in fuel prices in March 2024, part of a series of economic measures aimed at reducing the island's massive budget

deficit. Yamil Lage/AFP/Getty Images



HAVANA: Cuba's worst economic crisis in decades has pushed many residents to ration food and take to the streets in the country's largest antigovernment protests since 2021. Yamil Lage/AFP/Getty Images

Today, Cubans are opting to head to the southern U.S. border via overland routes because of slow processing times for U.S. humanitarian parole programs and the availability of flights to Nicaragua. Since the Nicaraguan government lifted visa requirements for Cubans in 2021, Cubans have taken as many as fifty flights per month to the Central American country to begin their journey north.

# Ecuador

DURÁN, ECUADOR: A soldier stands watch as the military and police conduct a joint anti-gang operation. Santiago Armas/Reuters

Since 2021, hundreds of thousands of Ecuadorians have fled a surge in drug- and gang-related violence and extortion. Last year, Ecuador had the highest homicide rate in Latin America, with 44.5 homicides per 100,000 people, after previously ranking among the region's most peaceful countries. The ongoing security crisis has prompted President Daniel Noboa to declare a state of "internal armed conflict", mobilize the military against gangs, and arrest more than sixteen thousand people since January.



Soldiers in an armoured vehicle patrol the city's historic centre following an outbreak of violence.

QUITO, ECUADOR: The military is being deployed against the country's gangs, which the government has labeled as terrorist groups. Karen Toro/Reuters

But these policies have not pacified the country. While the national homicide rate has dropped slightly in the first five months of 2024, nine of Ecuador's twenty-four provinces have seen murders increase compared to last year, and extortions and kidnappings are also on the rise,

FRP-FRN-01278

according to figures from the National Police. Corruption, which has enabled the rise of gangs, has also sapped Ecuadorians' confidence in the state to protect them.



GUAYAQUIL, ECUADOR: Thousands of people have been arrested since President Noboa declared a state of emergency to combat surging gang violence. John Moore/Getty Images



ATACAMES, ECUADOR: Soldiers patrol the beach during Carnival celebrations in February 2024, as the government says the violent crime rate is dropping. John Moore/Getty Images

The United States has agreed to provide more than $100 million in logistical and material support to Ecuador's security forces to fight gangs and cartels, but progress is likely to be slow if it happens at all. Ecuador has become a strategic transit point for cocaine in South America, and its heavily armed and well-financed gangs will not easily give up control.

# Colombia

JAMUNDÍ, COLOMBIA: A Colombian soldier stands guard as part of an increased military presence in the wake of an explosion that killed two police officers in June 2024. Joaquin Sarmiento/AFP/Getty Images

Persistent violence and insecurity stemming from the country's ongoing internal armed conflict, combined with slow economic growth, are driving tens of thousands of Colombians to migrate and seek asylum in the United States. Colombians also cite the search for better economic opportunities in their decision to leave.

Belen, a migrant from Colombia, holds her five-year-old daughter Sofia as they stare towards a fire in the dry riverbed of the Rio Grande while searching for an entry point into the United States along the international boundary between Ciudad Juarez, Mexico and El Paso, Texas

CIUDAD JUÁREZ, MEXICO/EL PASO, TEXAS: Migrants spend the night on the riverbed of the Rio Grande as they search for an entry point into the United States. Adrees Latif/Reuters

Policies that make it easier for Colombians to travel north may also be contributing to the consistently high numbers. Unlike other nationalities discussed here, Colombians can travel to Mexico visa-free. If they have the money to fly, they can skip the dangerous Darién Gap crossing between Colombia and Panama (although close to twenty thousand Colombians [PDF] still took that route in 2023, according to data from the Panamanian government).

# The Need for a Regional Strategy

LUKEVILLE, ARIZONA: U.S. border authorities closed the town's border crossing in response to a December 2023 surge in the number of immigrants from Mexico. John Moore/Getty Images

The Biden administration has responded to this unprecedented displacement in a number of ways. It has expanded the availability of legal migration pathways, establishing a humanitarian parole program for Cubans, Haitians, Nicaraguans, and Venezuelans that allows a combined

thirty thousand individuals from these four countries to enter the United States each month. The program reduced CBP migrant encounters with Cubans and Nicaraguans by 88 percent and 77 percent, respectively, in 2023.

## A Large Share of Irregular Migration Is From Mexico

Encounters at the southwestern border by nationality, January to May 2024

| | |
|---|---|
| Mexico | 308K |
| Guatemala | 86K |
| Venezuela | 72K |
| Cuba | 65K |
| Ecuador | 62K |
| Colombia | 55K |
| Honduras | 49K |
| Haiti | 48K |
| El Salvador | 21K |
| Peru | 20K |
| Nicaragua | 16K |
| Brazil | 14K |

*Source:* U.S. Customs and Border Protection.

COUNCIL *on*
FOREIGN
RELATIONS

Hundreds of asylum seekers who used a CBP phone app to make an appointment, are led to their interviews with U.S. customs agents at the San Ysidro Border Crossing.

TIJUANA, MEXICO: Asylum seekers arrive for their interviews with U.S. customs agents after making an appointment via the new CBP One app, in April 2024. Robert Gauthier/Los Angeles Times/Getty Images

The administration has also tightened asylum processes. It raised the standards for "credible fear" interviews (used to gauge whether asylum seekers have a reasonable chance of winning their cases) and enacted a rule that disqualifies broad categories of asylum seekers. Additionally, in June, Biden signed an executive order that suspends migrant entries at the U.S.-Mexico border once the daily number of illegal crossings exceeds a certain threshold. But, like past deterrence-based measures, these policies are unlikely to dramatically slow the pace of new arrivals at the border.

U.S. Border Patrol agents assist Venezuelan immigrant Argeiris Ramos, 22, to pass through razor wire at the U.S.–Mexico border on September 29, 2023 in Eagle Pass, Texas.

EAGLE PASS: U.S. Border Patrol agents meet a group of Venezuelan asylum seekers, who had traveled overland for weeks to reach the southern U.S. border, in September 2023. John Moore/Getty Images

A more promising approach is for the United States to work with its Latin American partners to manage migration flows and mitigate the forces driving displacement. In 2022, the U.S. government and twenty others from across the Western hemisphere signed the Los Angeles Declaration, a first-of-its-kind framework to jointly address the root causes of regional migration, expand available legal pathways, and strengthen border enforcement. The Biden administration also set up new screening centers, known as safe mobility offices, in Colombia, Costa Rica, Ecuador, and Guatemala that allow migrants to apply for asylum from these countries.



LEHIGH ACRES, FLORIDA: Five years after fleeing from Venezuela to Colombia, Alexis Llanos and his family have built a life in the United States. Rebecca Blackwell/AP Photo



GUATEMALA CITY: Guatemalan President Bernardo Arévalo and U.S. Secretary of State Antony Blinken discuss efforts to address growing regional migration. Johan Ordonez/AFP/Getty Images

The United States can and should do more to support Latin American countries that are absorbing most of the region's displaced people and migrants. The UN refugee agency estimates that more than twenty-two million people were in transit throughout the hemisphere in 2023; 80 percent of those migrants and displaced people remain within the region. Latin American countries have, in most cases, handled the influx remarkably well, providing migrants access to temporary visas, basic services, and work permits. But they have limited capacity to keep absorbing newcomers.


Migrants take part in a caravan towards the border with the United States in Tapachula, Chiapas State, Mexico.

TAPACHULA, MEXICO: Thousands of migrants head toward the southern U.S. border in December 2023, after the Mexican government announced it would step up efforts to curb irregular migration flows. STR/AFP/Getty Images

The United States should work with regional allies, development finance institutions, the private sector, and nonprofits to mobilize the financial resources needed to bolster host communities and countries. Washington and its partners should also seek to deepen security partnerships and train police, prosecutors, and judges to fight extortion. Migration and displacement on an unprecedented scale are testing the governments of the Americas. But managed well, migration could translate into opportunity, boosting labor markets and helping countries meet looming demographic challenges.

## Recommended Resources

This photo essay explores the treacherous journey migrants take through Panama's Darién Gap.

This Backgrounder dives into migration from Central America's Northern Triangle.

These Backgrounders explain the U.S. asylum and refugee systems.

This CFR Infoguide examines the global migrant crisis and the strains it places on the international refugee system.

At this CFR event, the International Rescue Committee's David Miliband and the White House's John Podesta discuss the relationship between climate vulnerability and conflict zones.

*Diana Roy edited this article.*

NBER WORKING PAPER SERIES

THE EARNINGS OF UNDOCUMENTED IMMIGRANTS

George J. Borjas

Working Paper 23236
http://www.nber.org/papers/w23236

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
March 2017

This research was supported by the U.S. Social Security Administration through grant #RRC08098400-07 to the National Bureau of Economic Research as part of the SSA Retirement Research Consortium. The findings and conclusions expressed are solely those of the author(s) and do not represent the views of SSA, any agency of the Federal Government, or the NBER. I am particularly grateful to Mark Lopez and Jeffrey Passel of the Pew Research Center for their generosity in sharing data files. The views expressed herein are those of the author and do not necessarily reflect the views of the National Bureau of Economic Research.

NBER working papers are circulated for discussion and comment purposes. They have not been peer-reviewed or been subject to the review by the NBER Board of Directors that accompanies official NBER publications.

© 2017 by George J. Borjas. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

The Earnings of Undocumented Immigrants
George J. Borjas
NBER Working Paper No. 23236
March 2017
JEL No. J31,J61,J68

## ABSTRACT

Over 11 million undocumented persons reside in the United States, and there has been a heated debate over the impact of legislative or executive efforts to regularize the status of this population. This paper examines the determinants of earnings for undocumented workers. Using newly developed methods that impute undocumented status for foreign-born persons sampled in microdata surveys, the study documents a number of findings. First, the age-earnings profile of undocumented workers lies far below that of legal immigrants and of native workers, and is almost perfectly flat during the prime working years. Second, the unadjusted gap in the log hourly wage between undocumented workers and natives is very large (around 40 percent), but half of this gap disappears once the calculation adjusts for differences in observable socioeconomic characteristics, particularly educational attainment. Finally, the adjusted wage of undocumented workers rose rapidly in the past decade. As a result, there was a large decline in the wage penalty associated with undocumented status. The relatively small magnitude of the current wage penalty suggests that a regularization program may only have a modest impact on the wage of undocumented workers.

George J. Borjas
Harvard Kennedy School
79 JFK Street
Cambridge, MA 02138
and NBER
gborjas@harvard.edu

# The Earnings of Undocumented Immigrants

## George J. Borjas[*]

## I. Introduction

The Department of Homeland Security (DHS) estimates that over 11 million undocumented persons resided in the United States in January 2012. In the past few years, Congress considered (but failed to enact) a number of proposals that would regularize the status of the undocumented population and provide a "path to citizenship." Similarly, President Obama issued executive orders that would grant some form of amnesty to about half of this population, but courts ruled that the executive branch may lack such authority.

Given the size of the undocumented population, any future change in the immigration status of this group is bound to have significant effects on the labor market and the broader economy. However, any evaluation that attempts to predict the economic impact of regularization immediately runs into a major roadblock. It is difficult to conduct such a calculation because we know little about the economic status of the 11 million undocumented persons already living in the United States.

The documentation of the economic status of this population is obviously hampered by the fact that no widely available microdata survey reports whether a particular foreign-born person is undocumented or not. In recent years, however, there has been progress in developing methods that attempt to impute the undocumented status of foreign-born persons at the individual level in microdata sets, such as the Current Population Surveys or the American

[*] This research was supported by the U.S. Social Security Administration through grant #RRC08098400-07 to the National Bureau of Economic Research as part of the SSA Retirement Research Consortium. The findings and conclusions expressed are solely those of the author(s) and do not represent the views of SSA, any agency of the Federal Government, or the NBER. I am particularly grateful to Mark Lopez and Jeffrey Passel of the Pew Research Center for their generosity in sharing data files.

4

Community Surveys. These attempts build on the framework first proposed by Warren and Passel (1987) that attempts to estimate the size of the undocumented population. The Passel-Warren methodology, in fact, underlies the "official" estimates of this population as reported by DHS.

Jeffrey Passel (now at the Pew Research Center) and various colleagues have continued to improve and extend the initial methodology over the past two decades. As part of this work, they have constructed micro-level CPS files that contain a variable indicating if a foreign-born person is "likely authorized" or "likely unauthorized." I was granted access to the 2012-2013 Annual Socioeconomic and Economic Supplements (ASEC) created by the Pew Research Center that contains the undocumented status identifier. After carefully examining the Pew methodology, I adapted and extended their approach so that I could create an undocumented status identifier in other micro data files, including all the ASEC files where foreign-born status is reported (i.e., all the ASEC files beginning in 1994) and the American Community Surveys (ACS). This extension of the Pew approach yields a time series of individual-level data that allows us to document and examine the determinants of key characteristics of the undocumented population.

Borjas (2018) began such an analysis by studying differences in labor supply behavior among undocumented immigrants, legal immigrants, and natives. The differences in work propensities were striking. Undocumented men had much larger labor force participation and employment rates than other groups in the population; the gap widened substantially over the past two decades; and the labor supply elasticity of undocumented men was close to zero, suggesting that their labor supply is very inelastic. In contrast, undocumented women had much lower participation and employment rates than other groups in the population.

5

Building on this earlier work, this paper extends the analysis to an examination of the wage differences that exist among the various groups. The analysis of both the CPS and the ACS yields a number of potentially important findings:

1. The (cross-section) age-earnings profiles of undocumented workers lies far below that of legal immigrants and of native workers. Moreover, the (cross-section) age-earnings profile of undocumented workers is almost perfectly flat during much of the prime working years.

2. Although the unadjusted gap in the log hourly wage between undocumented workers and natives is large (around 40 percent for both men and women), half of the gap disappears after adjusting for differences in observable socioeconomic characteristics. The wage gap between observationally equivalent undocumented workers and natives (adjusted for age, education, and state of residence) is less than 20 percent for both men and women.

3. The adjusted wage of undocumented workers rose rapidly in the past decade, relative to that of both native workers and legal immigrants.

4. The rise in the adjusted wage of undocumented workers implies that the wage penalty to undocumented status fell dramatically in the past few years. This wage penalty, defined as the wage gap between observationally equivalent undocumented and legal immigrants, was about 10 percent in 2005, but fell to less than 4 percent by 2014. The small magnitude of the current wage penalty suggests that the enactment of a regularization program may only have modest effects on the wage of undocumented workers.

5. The higher employment rates of undocumented men imply that the total earnings gap (the gap that includes both the difference in the wage rate and differences in labor supply) is far smaller than suggested by the gap in the hourly wage rate. In contrast, the lower employment

rates of undocumented women imply that the total earnings gap is far larger than suggested by the gap in the hourly wage rate.

This diverse set of findings provides a foundation upon which any eventual impact analysis of the various regularization proposals can be based. It is important to acknowledge at the outset, however, that the robustness of the evidence depends on the validity of the procedure used to impute undocumented status at the micro level.


## II. Imputing Undocumented Status in Microdata Files

Warren and Passel (1987) introduced the "residual" methodology used by the DHS to calculate the size of the undocumented population. The first step involves estimating how many legal immigrants should reside in the United States at a point in time. Over the years, immigration officials have tracked the number of legal immigrants admitted to the country (i.e., the number of "green cards" granted each year). We also know how many foreign-born persons live in the United States temporarily (e.g., foreign students, business visitors, diplomats, etc.). These data enable us to apply mortality tables to the cumulative count of green cards and predict how many legal immigrants should be residing in the United States at any given point in time.

At the same time, many government surveys, such as the decadal census, enumerate or sample the U.S. population and specifically ask where each person was born. These surveys provide estimates of how many foreign-born people are actually living in the country. In rough terms, the difference between the number of foreign-born persons who are actually living in the

United States and the number of legal immigrants who should be living in the United States is the Warren-Passel (and now "official" DHS) estimate of the number of undocumented persons.[1]

Jeffrey Passel has continued to work on the identification and enumeration of undocumented immigrants over the past two decades. As a result of these efforts,  Passell (and colleagues at the Pew Research Center) have developed a comparable methodology that attempts to identify the undocumented immigrants at the *individual level* in survey data. This important extension of the Warren-Passel methodology relies on the same residual approach that was initially used to calculate the size of the undocumented population.

Passel and Cohn (2014) describe the methodology used to add an undocumented status identifier to the Annual Social and Economic Supplement (ASEC) files of the CPS. In rough terms, the methodology identifies the foreign-born persons in the sample who are likely to be legal, and then classifies the residual group as likely to be undocumented. In particular:

> All immigrants entering the U.S. before 1980 are assumed to be legal immigrants. Then, the CPS data are corrected for known over-reporting of naturalized citizenship on the part of recently arrived immigrants…and all remaining naturalized citizens from countries other than Mexico and those in Central America are assigned as legal. Persons entering the U.S. as refugees are identified on the basis of country of birth and year of immigration…Then, individuals holding certain kinds of temporary visas (including students, diplomats and "high-tech guest workers") are...assigned a specific legal temporary migration status…Finally, some individuals are assigned as legal immigrants because they are in certain occupations (e.g., police officer, lawyer, military occupation, federal job) that require legal status or because they are receiving public benefits (e.g.,

---

[1] Note that government surveys, including the decadal census, miss many people. Some of the people missed are undocumented immigrants who wish to avoid detection. To calculate an estimate of the size of the undocumented population, the Warren-Passel methodology must make an assumption about the undercount rate. The DHS assumes that the undercount for undocumented persons is 10 percent (Baker and Rytina, 2013, p. 6).

welfare or food stamps) that are limited to legal immigrants. As result of these steps, the foreign-born population is divided between individuals with "definitely legal" status…and a group of "potentially unauthorized" migrants…[There is also] a check to ensure that the legal statuses of family members are consistent; for example, all family members entering the country at the same time are assumed to have the same legal status (Passel and Cohn, p. 23).

Passel and Cohn (2014) observe that this approach leads to "too many" undocumented immigrants. They then apply a filter to ensure that the counts from the microdata agree with the reported DHS numbers: "To have a result consistent with the residual estimate of legal and unauthorized immigrants, probabilistic methods are employed to assign legal or unauthorized status to these potentially unauthorized individuals." The CPS sample is then reweighted so that the aggregate count of undocumented immigrants matches as closely as possible the DHS estimates.

I was granted access to the 2012-2013 ASEC files that are maintained by the Pew Research Center. Figure 1 illustrates the percent of the U.S. population by age that is imputed to be undocumented in the Pew ASEC files. The DHS official counts imply that 3.7 percent of the U.S. population is undocumented. The Pew files suggest that a very high fraction (almost 10 percent) of persons in their early 30s are undocumented.

After being granted access to the Pew ASEC files (but not to the underlying code), I examined the demographic characteristics of those persons identified as undocumented immigrants in the pooled 2012-2013 cross-sections. Despite the inherent complexity in the residual method of identifying the subsample of the likely undocumented, it turns out that only a relatively small number of variables "matter" in the mechanical process of creating the undocumented identifier. This fact suggests that it may be possible to reverse engineer the

method to create a comparable undocumented identifier in *all* of the ASEC files since 1994 as well as in other data sets.

The algorithm I use to create a comparable undocumented status identifier in all the relevant ASEC files is as follows. A foreign-born person is classified as a legal immigrant if any of the following conditions hold:

a.  that person arrived before 1980;

b.  that person is a citizen;

c.  that person receives Social Security benefits, SSI, Medicaid, Medicare, or Military Insurance;

d.  that person is a veteran, is currently in the Armed Forces;

e.  that person works in the government sector;

f.  that person resides in public housing or receives rental subsidies, or that person is a spouse of someone who resides in public housing or receives rental subsidies;

g.  that person was born in Cuba (as practically all Cuban immigrants were granted refugee status);

h.  that person's occupation requires some form of licensing (such as physicians, registered nurses, air traffic controllers, and lawyers);

i.  that person's spouse is a legal immigrant or citizen.

The residual group of all other foreign-born persons is then classified as undocumented. Unlike the Pew methodology, my reconstruction of the undocumented identifier does not involve any kind of probabilistic sampling to account for the "excess" number of undocumented immigrants that this method yields, nor does it reweight the data to ensure that the total counts of the undocumented match the DHS official counts.

As Figure 1 shows, the predicted fraction of undocumented immigrants in the population at any particular age is essentially the same regardless of whether I use the Pew files or the

reconstructed CPS files. This similarity suggests that it may be possible to extend the exercise to create an undocumented status identifier for all foreign-born persons sampled by the CPS throughout the entire 1994-2014 period, as well as extend the methodology to other microdata files, such as the American Community Surveys (ACS), which contain much larger samples of the population.

I applied the algorithm to the pooled 2011-2012 ACS files, and Figure 1 also illustrates the age profile in the fraction of the population that is undocumented.[2] It is evident that the fraction of persons who are imputed to be undocumented closely tracks the fraction predicted by the Pew CPS files, suggesting that the ACS can perhaps be fruitfully used to study differences in the wage structure among the various groups. It is crucial to emphasize yet again, however, that the validity of the evidence obviously depends on the accuracy of the process used to impute undocumented status in the original Pew algorithm. In the absence of administrative data on the characteristics of the undocumented population, it is not possible to quantify the direction and magnitude of any potential bias.

Table 1 reports summary statistics for the male sample of working natives, legal immigrants, and undocumented persons in each of the three data extracts (i.e., the Pew CPS files, my reconstruction of the CPS files, and the ACS). The sample is restricted to men aged 25-64 who are not enrolled in school, are not self-employed, and report positive wage and salary income, positive weeks worked, and positive usual hours worked weekly.

There is a lot of similarity in the characteristics of the three groups across the data extracts. The fraction of the population that is undocumented is 6.9 percent in the Pew CPS, 7.4 percent in the reconstructed CPS, and 6.8 percent in the ACS). The average age of

---

[2] The only difference in the algorithms applied to the CPS and ACS data arises because the ACS does not identify whether a particular household is living in public housing or is receiving subsidized rents.

undocumented immigrants is practically identical in all three files (at 37.2 years). Similarly, 45.5 of undocumented persons in the Pew files are high school dropouts, as compared to 42.2 percent in the reconstructed ASEC files, and 43.7 percent in the ACS files.

I also calculated the hourly wage rate for each worker in the sample (defined as wage and salary income divided by the product of weeks worked in the past year and usual hours worked weekly). Table 1 shows that the log wage gap between undocumented workers and natives is similar across the data sets. The wage disadvantage of undocumented workers is -0.455 log points in the Pew CPS; -0.452 log points in the reconstructed CPS; and -0.404 in the ACS data.

### III. Wage Differences across Groups

I begin by examining the determinants of the differences in the log hourly wage rate across the various groups. Initially, I use the pooled 2012-2013 ASEC files created by Passel and colleagues at the Pew Research Center and restricted to workers aged 21-64, as well as the reconstructed CPS files and ACS files described in the previous sections that cover the same time period.[3] Throughout this section, I will pool the two cross-sections and treat them as a single data set.

It is useful to begin by simply illustrating the differences in the age-earnings profiles across the three groups implied by the raw data. Figure 2 shows the age-earnings profiles in the sample of working men, while Figure 3 shows the corresponding profiles in the sample of working women. Figure 4 summarizes by contrasting the age-earnings profiles of undocumented

---

[3] Because the CPS reports earnings in the previous calendar years, the analysis uses the comparable 2011 and 2012 cross-sections of the ACS.

workers across the three data extracts. The figures suggest a number of interesting findings that are common across the different data sets examined.

First, and most important, the (cross-section) age-earnings profiles of undocumented workers lie far below those of the other two groups *and* are relatively flat. At the age of 25, for example, the hourly wage of undocumented workers in the ACS is 0.23 log points below that of natives and 0.17 log points below that of legal immigrants. By age 45, the wage gap between natives and undocumented immigrants rose to 0.51 log points, while the wage gap between legal immigrants and undocumented workers rose to 0.39 log points.

Second, note that the pattern of lower and flatter age-earnings profiles for undocumented workers is observed both among working men and among working women. In each case, the hourly wage rate of undocumented workers reveals remarkably little growth during the prime working years between the ages of 30 and 50.

Finally, as Figure 4 shows, the three alternative data sets show very similar age-earnings profiles for undocumented workers. In other words, the application of the reverse-engineered Pew algorithm to alternative data sets provides a consistent picture of earnings over the life cycle for undocumented workers. It is worth noting that the much larger samples available in the ACS smooth out the year-to-year noise.

It is important to emphasize that it is difficult to interpret the cross-section age-earnings profiles of both legal, and particularly, undocumented workers as measuring some type of wage evolution over the life cycle. It is well known (Borjas, 1985) that cross-section age-earnings profiles of immigrants are affected by both assimilation effects, the wage growth that occurs as a particular immigrant gets older, and by cohort effects, the differences in earnings potential across waves of immigrants that entered the United States at different times. The wage evolution of the

13

undocumented sample is also affected by the fact that some of the undocumented will be able to "filter themselves" out and obtain green cards as they age, joining the legal sample, and by the fact that changes in the legal infrastructure regulating illegal immigration (such as non-enforcement of existing laws or enactment of new penalties) might affect the flow of undocumented workers in and out of the country over time. Some of these issues are discussed in greater detail in subsequent sections.

To document the determinants of the large wage disadvantage experienced by undocumented workers, particularly when compared to native workers, I estimated the following regression model:

(1)     $\log w_i = \delta_t + \theta X_i + \beta_1 L_i + \beta_2 U_i + \varepsilon_i,$

where $w_i$ is the hourly wage rate of worker $i$; $\delta_t$ is a dummy variable indicating if the observation is drawn from the 2012 or 2013 cross-section in the CPS (or the 2011 or 2012 cross-section in the ACS); $X_i$ is a vector of socioeconomic characteristics described below; $L_i$ is a dummy variable indicating if the worker is a legal immigrant; $U_i$ is a dummy variable indicating if the worker is an undocumented immigrant; and the excluded group indicates if worker $i$ is native-born. The coefficients $\beta_1$ and $\beta_2$ measure the log wage gaps between the two foreign-born groups and the native-born workforce. The regressions are estimated separately for men and women.

The first two columns of Table 2 report the regression coefficients for men, while the last two columns report the respective coefficients for women. Each panel in the table reports the estimated coefficients in each of the three alternative data files. As row 1 of each panel shows, the unadjusted log wage gap between undocumented immigrants and natives is -0.46 in the Pew

files; -0.45 in the reconstructed CPS, and -0.40 in the ACS. It is evident that much of the wage gap between undocumented immigrants and natives can be explained by differences in educational attainment. The education- and age-adjusted wage disadvantage of undocumented men reported in row 3 falls to -0.18 in the Pew CPS, -0.19 in the reconstructed CPS, and -0.15 in the ACS. Even after adjusting for the fact that undocumented immigrants tend to cluster in a small number of states, the wage disadvantage of undocumented workers relative to natives remains sizable, hovering around -0.20 log points in the various data extracts.

The regression coefficients also imply that even holding age, education, and state of residence constant, there is a wage gap between legal immigrants and undocumented workers. Depending on the data set examined, this "wage penalty" to undocumented status ranges between 10 and 12 percent. The determinants and trends in this wage penalty will be discussed in much greater detail in the next section.

The last two columns of Table 2 report the respective wage gaps in the female workforce. It is again evident that undocumented workers earn about 20 percent less than natives, after controlling for the various socioeconomic characteristics, and that there is a wage penalty to undocumented status, again ranging around 10 to 12 percent.

Note that the ACS provides similar estimates of the wage gaps as the CPS *and* that it provides a much larger sample for examining the earnings of undocumented workers. As a result, it may be fruitful to use the ACS to document trends in the wage of undocumented workers over the 2001-2014 period. This period witnessed both a rapid increase in the size of the undocumented population (from 8.5 million to over 11 million between 2000 and 2006 according to the DHS), as well as the stabilization of the size of the undocumented population since 2006.

15

I estimated the regression model in equation (1) for each separate year in the ACS between 2001 and 2014 (separately for men and women). The two panels of Figure 5 illustrate the key trend in the wage gaps (i.e., the coefficients $\beta_1$ and $\beta_2$) between the two types of immigrants and the baseline native workforce. The figure illustrates the trend in both the unadjusted wage gap (as in row 1 of Table 2), and the wage gap adjusted for age, education, and state of residence differences (as in row 4 of the table).

The relative wage of legal immigrant men has shown little trend in the past 15 years. Note further that the adjusted wage gap for legal immigrants is smaller than the unadjusted wage gap, implying that part of the relative success of legal immigrants arises because they have slightly more valuable observable characteristics. The adjusted wage gap for legal immigrants has hovered at around -0.1 log points over much of the past 15 years.

In contrast, the adjusted wage gap for undocumented immigrants is far above the unadjusted wage, implying that much of the poor performance of undocumented immigrants arises because they lack observable socioeconomic characteristics that are valued in the labor market. Equally important, the adjusted relative wage of undocumented immigrants began to increase around 2008. In 2007, the adjusted wage gap between undocumented men and natives was -0.25 log points. By 2014, this statistic had shrunk to -0.16 log points. In other words, there was a decline in the wage disadvantage of undocumented men of about 10 percentage points in a very short time period. it is also evident that there was also an improvement in the earnings of undocumented women, although the improvement was smaller for women (about 7 percentage points).

The relatively constant adjusted wage of legal workers and the increase in the wage of undocumented workers suggest that there was an important shrinkage in the wage penalty arising because of undocumented status.


## IV. Trends in the Wage Penalty

I define the wage penalty to undocumented status as the difference between what the average legal worker earns relative to what an observationally equivalent undocumented immigrant earns. This wage penalty can be easily calculated by conducting an Oaxaca decomposition of the wage difference between legal and undocumented immigrants. In particular, I estimate the regression models (separately for each gender):


(2)     Legal Immigrant Earnings Function:     $\log w_L = \beta_L \, h_L + \varepsilon_L,$

Undocumented Immigrant Earnings Function:     $\log w_U = \beta_U \, h_U + \varepsilon_U,$


where $w_j$ gives the hourly wage of group $j$ ($j = L$ for legal immigrants and $U$ for undocumented immigrants); and $h_j$ gives a vector of socioeconomic characteristics that affect earnings (including a constant term). The coefficients in the vector $\beta_L$ give the payoff to these socioeconomic characteristics for legal immigrants, while the respective coefficients in the vector $\beta_U$ gives the payoff for undocumented immigrants.

The wage penalty associated with being an undocumented worker is then given by:


(3)          $P = (\beta_L - \beta_U) \overline{h}_U,$

where $\overline{h}_U$ gives the mean value of the characteristics for undocumented immigrants. It is obvious from equation (3) that the wage penalty will be a positive number as long as the labor market values the socioeconomic characteristics of a legal immigrant by more than it values the respective characteristics of an undocumented worker.

I initially estimate the wage penalty in the pooled 2012-2013 CPS cross-sections (and the comparable 2011-2012 ACS cross-sections). The socioeconomic characteristics of the various groups were indeed valued at very different rates in the U.S. labor market at that time (i.e., $\beta_L \neq \beta_U$). To illustrate, Table 3 reports the differences associated with a particularly important socioeconomic characteristic, years of educational attainment. It is evident that the rate of return to schooling (i.e., shorthand for the coefficient of years of schooling in the log wage regression) is highest for native workers, and lowest for undocumented immigrants. Among men in the ACS, for example, the rate of return to schooling is 0.112 for native workers, 0.079 for legal immigrants, and 0.061 for undocumented immigrants.

Table 4 reports the wage penalty using alternative specifications of the vector of socioeconomic characteristics, $h$. The wage penalty to undocumented status is obviously best identified when the exercise adjusts for as many of these observed characteristics as possible. The vector $h$, therefore, includes age, educational attainment, years since migration, and state of residence. In the larger ACS sample, the regression also includes country of birth. It is notable that the wage penalty to undocumented status was relatively small circa 2012-2013, ranging between 5 and 8 percent for men, and 3 to 11 percent for women.

I also used the Oaxaca decomposition to calculate the wage penalty (using the full specification that includes country of birth) in each year of the ACS. Figure 6 illustrates the trend

in the wage penalty for both men and women. The figure reveals a very interesting trend: The penalty was relatively constant until about 2007, at which point the wage penalty to undocumented status began to shrink (i.e., the wage penalty became less negative). In 2005, for example, the wage penalty for men was 9.1 percent; by 2010, the wage penalty stood at 5.7 percent; and by 2014, the wage penalty had fallen to 3.4 percent. The trends illustrated in Figure 6 have an obvious (and potentially important) implication: The wage impact of any widespread regularization of undocumented status may have only a minor effect on the average wage of undocumented workers currently residing in the United States.[4]

It is of interest to compare this wage penalty estimated using the imputed undocumented identifier in microdata files to existing estimates of how much legalization raises the wage of undocumented workers. Almost all existing estimates of this wage penalty come from studies that examine what happened to the earnings of the persons who received amnesty in 1986 as part of the Immigration Reform and Control Act (IRCA). Nearly 3 million illegal immigrants received amnesty at the time, and contemporaneous surveys tracked those immigrants as they received their legal working papers (Kossoudji and Cobb-Clark, 2002; and Kaushal. 2006). Their wage rose by at most 6 percent between 1989 and 1992. The estimates of the wage penalty implied by the ACS around 2001 (the earliest year available), are somewhat higher (around 9 percent).

---

[4] The comparable trend estimated in the reconstructed CPS is noisier, but also suggests a drop in the wage penalty after 2010. The difference between the trends calculated in the two data sets may arise for several reasons. First, there are well-known differences in the evolution of wages as measured by the CPS and the ACS. Second, the smaller CPS sample likely generates more random noise. And, finally, the value of the years-since-migration variable for newly arrived immigrants is not fully consistent across CPS cross-sections, contaminating the predicted wages. The decline in the CPS estimate of the wage penalty is more consistent with the ACS trend when that variable is excluded from the CPS regressions.

It is difficult to identify precisely which factor is driving the observed decline in the wage penalty to undocumented status. One stumbling block is that the composition of the undocumented population has changed in unknown ways during this period. As noted earlier, the estimated number of undocumented immigrants rose sharply between 2000 and 2006, but has held steady since then. The constant number of undocumented persons, however, does *not* imply that the flow of undocumented immigrants stopped altogether in 2006. After all, some of the undocumented persons in the United States in 2006 may have left the country and many may have been able to adjust their immigration status and obtain a green card. These "exits" from the undocumented population were then replaced by a similarly sized flow of new undocumented immigrants. In short, we simply lack the requisite information that would enable us to precisely net out how much of the decline in the wage penalty to undocumented status can be accounted for by changes in the sample composition of the relevant populations over the past decade.

A number of sensitivity exercises can be conducted, however, that help to document that the sizable decline in the wage penalty was a widespread phenomenon across the U.S. labor market. For example, one can examine what happened to the entry wage disadvantage of *new* undocumented immigrants over the past 15 years. The top panel of Figure 7 re-estimates the wage penalty of undocumented immigrants by focusing on the sample of workers who have been in the United States exactly one year at the time of the ACS enumeration.[5] It is evident that the wage penalty associated with undocumented status for the brand new immigrants also shrank substantially in the post-2008 period.

---

[5] The wage penalty documented in Figure 7 adopts a simpler empirical strategy to ensure that small sample sizes do not create a lot of noise in the calculations. Rather than pursuing the Oaxaca decomposition strategy that allows all regression coefficients to differ between legal and undocumented immigrants, the

It may seem easy to dismiss the trend in the wage penalty for the cohort of new immigrants by arguing that perhaps there are trends in unobservable characteristics that changed fundamentally after 2008, leading to a higher relative level of economic performance for the new undocumented immigrants that arrived in recent years. This hypothesis, however, cannot explain the trend. The bottom panel of Figure 7 shows the respective trend in the undocumented wage penalty accruing to immigrants who have been in the United States between 10 and 20 years as of the time of the survey, so that the migration decision was made many years prior to the changed legal environment that may have affected undocumented workers in the post-2008 period. The trend in the wage penalty paid by these older undocumented immigrants, particularly for men, is again quite similar; it shows a substantial decline in the post-2008 period.

An obvious hypothesis that may explain the decline in the wage penalty paid by all undocumented workers (whether brand new immigrants or long-time residents) is that there has been a favorable shift in the legal environment regarding undocumented immigration in the past decade, particularly during the years of the Obama administration. Unfortunately, the aggregate time-series in Figures 6 and 7 do not provide sufficient information that would help identify the impact of such economy-wide changes in the legal environment.

However, it may be possible to document that more local changes in the employment restrictions faced by undocumented workers affected the wage penalty. At the same time that the executive and legislative branches of the federal government were

---

analysis pools the two samples and simply introduces a dummy variable indicating if the worker is an undocumented immigrant.

taking actions to regularize the status of many undocumented workers, some states took state-specific actions that made the economic status of undocumented workers less secure. In particular, several states enacted legislation further restricting and penalizing undocumented immigrants. The best known of these attempts was the 2010 legislation in Arizona that, among many things, "[required] law enforcement officers to determine immigration status during any lawful stop; [created] state crimes and penalties for failure to carry federally-issued alien registration documents; [made] it unlawful for an unauthorized alien to knowingly apply for or perform work in Arizona; and [permitted] an officer to make a warrantless arrest if the officer has probable cause to believe the person has committed any public offense that makes the person removable from the United States" (National Conference of State Legislatures, 2012).

One common provision in some of the state-level statutes was the requirement that employers use E-Verify to authenticate the legal status of new hires. As the Department of Homeland Security describes it: "E-Verify is an Internet-based system that compares information from an employee's Form I-9, Employment Eligibility Verification, to data from U.S. Department of Homeland Security and Social Security Administration records to confirm employment eligibility."[6] During the period under analysis, four states enacted legislation mandating that *all* private employers in those states use the E-Verify system to confirm the employment eligibility of new hires: Arizona beginning in 2008, Alabama in 2012, Mississippi in 2011, and South Carolina in 2010.[7]

---

[6] https://www.uscis.gov/e-verify/what-e-verify.

[7] NumbersUSA (2016); see also National Council of State Legislatures (2012).

To determine whether such state-level legislation affected the wage penalty, I stacked all the 2001-2014 ACS cross-sections and estimated the following regression model in the pooled sample of legal and undocumented immigrants:

(3)     $log\ w_{ist} = \delta_{Lt} + \delta_{Ls} + \delta_{st} + \theta\ h_{ist} + \beta_0\ L_i + \beta_1\ V_{st} + \gamma\ (L_i \times V_{st}) + \varepsilon_{ist},$

where $w_{ist}$ is the hourly wage of worker $i$ in state $s$ at time $t$; $h$ represents a vector of socioeconomic characteristics; $L_i$ is a dummy variable indicating if the worker is a legal immigrant; and $V_{st}$ is a dummy variable indicating if state $s$ mandated employers to use E-Verify at time $t$. Note that the regression includes a vector of immigration status-year interaction fixed effects $\delta_{Lt}$ designed to capture economy-wide changes in the wage penalty; a vector of immigration status-state interaction fixed effects $\delta_{Ls}$ designed to capture permanent differences across states in the labor market for undocumented workers; and a vector of state-year interaction fixed effects $\delta_{st}$ designed to capture state-specific trends in immigrant wages. The coefficient $\gamma$ then indicates if the state's requirement that employers use E-Verify affected the wage penalty experienced by undocumented immigrants. The regressions were estimated separately for men and women.

The first row of Table 5 reports the estimates of the triple-difference coefficient $\gamma$ in the ACS. The evidence shows that the coefficient is positive and significant when estimated in the sample of men, with a point estimate of 0.019 (and a standard error of 0.008). As reported earlier, the male wage penalty in the post-2010 period hovered around 5 percent, so that the state-level restrictions on undocumented employment seemed to have

increased the wage penalty by around 40 percent. In short, it seems as if the legal infrastructure surrounding undocumented status matters in the labor market.[8] Note, however, that although the point estimate of the coefficient $\gamma$ is also positive for women, it is not significant. It is difficult to ascertain the reasons for the weak effect measured in the sample of working women, but the evidence may be indicating that the labor force participation of undocumented women may be particularly sensitive to state-specific restrictions, making it more difficult to identify how the wage penalty is affected by the legislation.

The next two rows of Table 5 re-estimate the ACS regressions in the sample of new immigrants (who have been in the United States at most one year) and older immigrants (tose who have been in the United States at least 10 years). The state-mandated implementation of E-Verify affects mainly new hires, so that it seems likely that newly arrived undocumented workers would be most affected by the legislation. The regression analysis confirms this expectation. The impact of the legislation on the wage penalty paid by new immigrant men is numerically very large (a point estimate of .144, with a standard error of .066), while the impact on earlier immigrants is not significantly different from zero.

Finally, to assess the robustness of the evidence, I estimated the regression in equation (3) using the reconstructed CPS data that contains the undocumented identifier. To make the CPS analysis comparable to that of the ACS, I restricted the CPS sample to the

---

[8] Several studies examine labor market outcomes following adoption of the E-Verify program, including Amuedo-Dorantes and Bansak (2012), Bohn, Lofstrom, and Raphael (2015), and Orrenius and Zavodny (2015). The specific findings differ from study to study, but both Amuedo-Dorantes and Orrenius-Zavodny document a worsening in the wage of undocumented immigrants after the mandated adoption of the electronic system.

2002-2015 surveys. The CPS evidence is, in fact, similar to that revealed by the ACS. The mandated use of E-Verify increased the wage penalty for undocumented men, but the point estimate (although positive) is not statistically significant for undocumented women.

In sum, the state-level evidence suggests that the legal environment faced by undocumented workers affects their labor market opportunities. The secular decline in the wage penalty paid by undocumented workers documented in Figure 6, however, partly reflects *economy-wide* changes in the set of opportunities available to the undocumented population. It would seem important to detail the specific aspects of the changed nationwide environment that reduced the average wage penalty so dramatically after 2008.

### V. Labor Supply and Annual Earnings

Up to this point, the analysis has examined the determinants of the hourly wage rate of undocumented *workers* relative to that of other workers. Borjas (2018) shows that there are sizable differences in labor supply between undocumented workers and both natives and legal immigrants. In particular, undocumented men are much more likely to work than other men, while undocumented women are far less likely to work than other women. In the early 2010s, for example, the typical undocumented man had a 92 percent probability of being employed at some point during the calendar year, as compared to 85 percent for legal immigrants, and 81 percent for native men. In contrast, the typical undocumented women had a 61 percent probability of working, as compared to 64 percent for legal immigrants, and 72 percent for native women. These sizable labor supply differences imply that the gaps in the hourly wage rate do not provide complete information on the differences in the economic well-being of the groups.

25

I now extend the analysis to examine how group differences in labor supply affect the total earnings of persons in each of the groups. In particular, I shift the focus of attention to an analysis of the *annual earnings* of undocumented workers, legal immigrants, and natives, and estimate the difference in annual earnings both in the sample of working persons (as in the previous section) as well as in the sample of all persons, which include all the persons who did not work at all during a particular year.

Table 6 summarizes the key evidence resulting from this exercise. Specifically, the table reports regression coefficients from specifications similar to equation (1) estimated earlier, which pooled all three groups in the years 2012-2013 in the CPS sample extracts and the 2011-2012 ACS, and includes regressors indicating whether a particular person is a legal immigrant or an undocumented immigrant. The dependent variable is annual earnings (measured in thousands of dollars). Note that the dependent variable is *not* the log of annual earnings because the purpose of the exercise is to include in the analysis those persons who do not work and, therefore, have zero earnings. For simplicity, the table reports the coefficients resulting from the Pew CPS files and the much larger ACS files. It is evident that the two data extracts lead to roughly similar results, so that the discussion focuses exclusively on the results from the analysis that uses the larger ACS data.

Among working men, the adjusted annual earnings of undocumented workers in the early 2010s was about $9,900 lower than that of native men in the ACS. Note, however, that if we include all persons in the regression, including the non-workers with zero annual earnings, the relative disadvantage of undocumented men narrows significantly, with the gap in annual earnings falling to only $4,100. Among women, the opposite is true because undocumented women are less likely to work than other women. The adjusted gap in annual earnings among

working women is $6,900, but grows to $8,000 if one includes the non-working women with zero earnings in the analysis.

One easy way to interpret the numerical importance of these effects is to restate the adjusted annual earnings gaps in percentage terms, which I construct by dividing the dollar gap implied by the regression coefficient by the mean annual earnings of natives. In addition, I estimated the regression model separately in each ACS cross-section.

Figure 8 illustrates the trend in these adjusted percent gaps for both men and women. Note that in 2015, the adjusted percent earnings gap for undocumented working men was around 15 percent, but falls to less than 10 percent when the calculation accounts for the disproportionately larger number of undocumented persons who are employed. The figures again document the improvement in the economic status of the male undocumented workforce after 2007. In 2007, the adjusted earnings gap (including non-workers) was around 16 percent. By 2014, this gap had shrunk to 8 percent.

## VI. Summary

The past decade has witnessed a series of attempts to create some type of "path to citizenship" for the over 11 million undocumented immigrants now residing in the United States. This paper uses newly developed algorithms that attempt to impute undocumented status for each person in microdata files, including the Current Population Surveys and the American Community Surveys, to examine the determinants of what is perhaps the key indicator of their economic well being, their earnings in the U.S. labor market.

The analysis yields a number of new insights into the determination of earnings for the large undocumented population:

1. The age-earnings profiles of undocumented workers lies far below that of legal immigrants and of native workers. Moreover, the age-earnings profile of undocumented workers is almost perfectly flat during the prime working years.

2. The unadjusted gap in the log hourly wage between undocumented workers and natives is large (around 40 percent for both men and women). Half of this gap disappears once the calculation adjusts for differences in observable socioeconomic characteristics, including age, education, and state of residence.

3. The adjusted wage of undocumented workers rose rapidly in the past decade. As a result, there was a large decline in the wage penalty to undocumented status from about 10 percent in 2005 to less than 4 percent in 2014, where the wage penalty is defined as the wage gap between observationally equivalent undocumented and legal immigrants. The small magnitude of the current wage penalty suggests that the enactment of a regularization program may have only a modest effect on the wage of undocumented workers.

It is important to emphasize that the analysis reported in this paper represents but a first step in any evaluation of the various regularization proposals being discussed among policy makers. Much more information about the economic well being of the undocumented population needs to be documented before a full evaluation can be made. Similarly, it is crucial to continue to assess the validity of the imputation methods that must be used to determine a person's undocumented status in large survey data.

# References

Amuedo-Dorantes, Catalina, and Cynthia Bansak. 2012. "The Labor Market Impact of Mandated Employment Verification Systems," *American Economic Review Papers and Proceedings* 102(3): 543-548.

Baker, Bryan, and Nancy Rytina. 2013. "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2012," Washington, DC Department of Homeland Security, Office of Immigration Statistics.

Bohn, Sarah, Magnus Lofstrom, and Steven Raphael. 2015. "Do E-Verify Mandates Improve Labor Market Outcomes of Low-Skilled Native and Legal Immigrant Workers?" *Southern Economic Journal* 81(4), 960-979.

Borjas, George J. 1985. "Assimilation, Changes in Cohort Quality, and the Earnings of Immigrants," *Journal of Labor Economics* 3(4): 463-489

Borjas, George J. 2018. "The Labor Supply of Undocumented Immigrants," *Labour Economics*, forthcoming.

Hotchkiss, Julie L., and Fernando Rios-Avila. 2013. "Identifying Factors Behind the Decline in the U.S. Labor Force Participation Rate." *Business and Economic Research*, Macrothink Institute 3 (1): 257-275.

Kossoudji, Sherrie A. and Deborah A. Cobb-Clark. 2002. "Coming Out of the Shadows: Learning about Legal Status and Wages from the Legalized Population." *Journal of Labor Economics* 20(3): 598-628.

Kaushal, Neeraj. 2006. "Amnesty Programs and the Labor Market Outcomes of Undocumented Workers." *Journal of Human Resources* 16(3): 631-647.

National Conference of State Legislatures. 2012. "State Omnibus Immigration Legislation and Legal Challenges," August 27. Website: http://www.ncsl.org/research/immigration/omnibus-immigration-legislation.aspx.

National Conference of State Legislatures. 2012. "E-Verify," August 27. Website: http://www.ncsl.org/research/immigration/everify-faq.aspx.

NumbersUSA. 2016. "Map of States with E-Verify Laws," December 18. Website: https://www.numbersusa.com/resource-article/everify-state-map.

Orrenius, Pia M. and Madeline Zavodny, 2015. "The Impact of E-Verify Mandates on Labor Market Outcomes," *Southern Economic Journal* 81(4): 947-959.

Passel, Jeffrey S. and D'Vera Cohn. 2014. "Unauthorized Immigrant Totals Rise in 7 States, Fall in 14 States: Decline in Those From Mexico Fuels Most State Decreases." Washington, DC: Pew Research Center.

Warren, Robert E. and Jeffrey S. Passel. 1987. "A Count of the Uncountable: Estimates of Undocumented Aliens Counted in the 1980 United States Census." *Demography* 24(3): 375–393.

**Figure 1. Percent of population that is undocumented, by age
(Pooled 2012-2013 CPS-ASEC files, pooled 2011-2012 ACS)**



Notes: The figure calculates the percent of the population (at a particular age) that is foreign-born and is classified as undocumented using either the "likely unauthorized" status indicator created by Jeffrey Passel and colleagues at the Pew Research Center or my reconstruction of the undocumented status indicator in the CPS or the ACS (see text for details).

**Figure 2. Age-earnings profiles of working men, 2012-2013**

**A. Pew CPS**



**B. Reconstructed CPS**



**C. ACS**



Notes: The age-earnings profiles report the average log hourly wage of workers in each of the nativity groups at each age.

FRP-FRN-01320

**Figure 3. Age-earnings profiles of working women, 2012-2013**

**A. Pew CPS**



**B. Reconstructed CPS**



**C. ACS**



Notes: The age-earnings profiles report the average log hourly wage of workers in each of the nativity groups at each age.

**Figure 4. Age-earnings profiles of undocumented workers across data sets**

**A. Men**



**B. Women**



Notes: The age-earnings profiles report the average log hourly wage of undocumented workers at each age.

34

**Figure 5. Trends in log hourly wage of legal and undocumented immigrants, relative to natives, ACS**

**A. Men**



**B. Women**



Notes: The figures illustrate the trend in the regression coefficient of dummy variables indicating whether a person is a legal immigrant or an undocumented immigrant, and the dependent variable in the regression is the log hourly wage rate. The unadjusted coefficient comes from a regression that does not include any additional regressors; the adjusted coefficient comes from a regression that controls for age, educational attainment, and state of residence.

**Figure 6. Trend in the wage penalty to undocumented workers, 2001-2014**



Notes: The wage penalty is the adjusted difference between the log hourly wage of undocumented and legal immigrants calculated in the ACS. It is calculated using the Oaxaca decomposition [see equations (2) and (3) in the text], adjusting for differences in age, educational attainment, state of residence, years-since-migration, and country of birth. The Oaxaca decomposition is conducted separately in each cross-section.

**Figure 7. Wage penalty for undocumented workers in specific cohorts**

## A. Immigrants in the United States one year



## B. Immigrants in the United States 10-20 years



Notes: The wage penalty is the adjusted difference between the log hourly wage of undocumented and legal immigrants calculated in the ACS. It is given by the regression coefficient of a dummy variables indicating whether a person is an undocumented immigrant, the dependent variable is the log hourly wage rate, and the regression is estimated separately in each cross-section using the sample of all foreign-born workers. The regression adjusts for age, educational attainment, state of residence, and country of birth.

**Figure 8. Trend in annual earnings of undocumented men
(relative to natives)**

**A.  Adjusted percent earnings gap, men**



**B. Adjusted percent earnings gap, women**



Notes: The figures illustrate the trend in the regression coefficient of dummy variables indicating whether a person is an undocumented immigrant, and the dependent variable in the regression is total annual earnings, relative to average earnings in the cell. The unadjusted coefficient comes from a regression that also controls for whether the person is a legal immigrant, age, educational attainment, and state of residence. The "workers only" regression only includes persons with positive annual earnings; the "all persons" regression includes non-workers and assigns a value of zero to their annual earnings.

**Table 1. Comparison of summary statistics for working men, 2012-2013**

| | Natives | Legal Immigrants | Undocumented immigrants |
|---|---|---|---|
| A. Pew CPS files: | | | |
| Percent of population | 80.6 | 12.5 | 6.9 |
| Average age | 41.5 | 42.4 | 37.3 |
| Education: | | | |
|    High school dropouts | 5.3 | 20.5 | 45.5 |
|    High school graduates | 31.3 | 23.5 | 29.3 |
|    Some college | 29.2 | 17.4 | 10.0 |
|    College graduates | 34.2 | 38.6 | 15.4 |
| State of residence: | | | |
|    California | 9.2 | 26.4 | 22.7 |
|    New York | 5.4 | 11.2 | 6.7 |
|    Texas | 8.2 | 10.2 | 15.0 |
| Log wage gap relative to natives | 0.0 | -0.068 | -0.455 |
| Sample size | 62,247 | 15,059 | 6,851 |
| | | | |
| B. Reconstructed CPS files: | | | |
| Percent of population | 81.0 | 11.6 | 7.4 |
| Average age | 41.8 | 43.2 | 37.2 |
| Education: | | | |
|    High school dropouts | 4.7 | 19.7 | 42.2 |
|    High school graduates | 30.4 | 24.4 | 27.8 |
|    Some college | 29.1 | 18.7 | 9.2 |
|    College graduates | 35.7 | 37.3 | 20.9 |
| State of residence: | | | |
|    California | 9.2 | 24.9 | 22.4 |
|    New York | 5.7 | 11.3 | 7.4 |
|    Texas | 8.4 | 10.5 | 15.5 |
| Log wage gap relative to natives | 0.0 | -0.069 | -0.452 |
| Sample size | 54,120 | 8,058 | 4,933 |
| | | | |
| C. ACS files: | | | |
| Percent of population | 81.6 | 11.6 | 6.8 |
| Average age | 41.8 | 43.0 | 37.2 |
| Education: | | | |
|    High school dropouts | 5.8 | 20.5 | 43.7 |
|    High school graduates | 31.9 | 26.7 | 27.8 |
|    Some college | 31.4 | 20.1 | 10.5 |
|    College graduates | 31.0 | 32.8 | 18.0 |
| State of residence: | | | |
|    California | 9.0 | 25.6 | 24.5 |
|    New York | 5.4 | 11.3 | 7.9 |
|    Texas | 7.0 | 10.2 | 13.3 |
| Log wage gap relative to natives | 0.0 | -0.042 | -0.404 |
| Sample size | 950,171 | 119,077 | 56,636 |

Notes: The statistics are calculated in the sample of persons aged 21-64 who are not enrolled in school, are not self-employed, and report positive wage and salary income, weeks worked, and usual hours worked weekly.

**Table 2. Log differences in hourly wage rates (relative to natives)**

| Regression specification: | Men | | Women | |
|---|---|---|---|---|
| | Legal immigrants | Undocumented immigrants | Legal immigrants | Undocumented immigrants |
| **A. Pew CPS** | | | | |
| 1. No controls | -.060 | -.455 | -.047 | -.404 |
| | (.008) | (.010) | (.008) | (.013) |
| 2. Adds age | -.107 | -.417 | -.076 | -.401 |
| | (.010) | (.010) | (.008) | (.012) |
| 3. Adds age, education | -.073 | -.182 | -.040 | -.154 |
| | (.007) | (.009) | (.007) | (.012) |
| 4. Adds age, education, geography | -.110 | -.211 | -.087 | -.193 |
| | (.007) | (.010) | (.007) | (.012) |
| **B. Reconstructed CPS** | | | | |
| 1. No controls | -.069 | -.452 | -.048 | -.437 |
| | (.009) | (.011) | (.009) | (.014) |
| 2. Adds age | -.116 | -.404 | -.079 | -.432 |
| | (.009) | (.010) | (.008) | (.014) |
| 3. Adds age, education | -.067 | -.194 | -.041 | -.187 |
| | (.008) | (.010) | (.008) | (.013) |
| 4. Adds age, education, geography | -.100 | -.224 | -.085 | -.228 |
| | (.008) | (.010) | (.008) | (.013) |
| **C. ACS** | | | | |
| 1. No controls | -.042 | -.404 | -.017 | -.396 |
| | (.002) | (.003) | (.002) | (.004) |
| 2. Adds age | -.093 | -.350 | -.051 | -.381 |
| | (.002) | (.003) | (.002) | (.003) |
| 3. Adds age, education | -.048 | -.150 | -.010 | -.143 |
| | (.002) | (.003) | (.002) | (.003) |
| 4. Adds age, education, geography | -.091 | -.188 | -.074 | -.199 |
| | (.002) | (.003) | (.002) | (.003) |

Notes: Standard errors are reported in parentheses. The dependent variable gives a worker's log hourly wage rate. The regressions control for age by including a vector of fixed effects indicating the worker's age in five-year bands (20-24, 25-29, and so on). The regressions control for educational attainment by including a vector of fixed effects indicating if the person is a high school dropout, a high school graduate, has some college, or is a college graduate. The controls for geography include a vector of fixed effects indicating the person's state of residence. All regressions also include a dummy variable indicating if the observation was drawn from the 2012 cross-section. The male (female) regressions estimated in the Pew files have 84,151 (76.034) observations. The male (female) regressions estimated in the reconstructed files have 67,111 (64,775) observations. The male (female) regressions estimated in the reconstructed files have 1,125,884 (1,068,609) observations.

**Table 3. Returns to schooling, 2012-2013**

|  | Natives | Legal Immigrants | Undocumented immigrants |
|---|---|---|---|
| A. Men | | | |
| 1. Pew CPS files | .115 | .092 | .074 |
| | (.001) | (.002) | (.002) |
| 2. Reconstructed CPS files | .117 | .092 | .065 |
| | (.001) | (.001) | (.002) |
| 3. ACS | .112 | .079 | .061 |
| | (.000) | (.001) | (.001) |
| | | | |
| B. Women | | | |
| 1. Pew CPS files | .125 | .098 | .065 |
| | (.001) | (.002) | (.003) |
| 2. Reconstructed CPS files | .126 | .095 | .065 |
| | (.001) | (.002) | (.003) |
| 3. ACS | .113 | .085 | .054 |
| | (.000) | (.001) | (.001) |

Notes: Standard errors are reported in parentheses. The dependent variable is the worker's log hourly wage rate. The regressors also include age fixed effects and state of residence fixed effects.

FRP-FRN-01329

**Table 4. Wage penalty to undocumented status in 2012-2013 cross-section**

| Sample | Specification | | | | | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| A. Men | | | | | | |
| 1. Pew CPS | .387 | .343 | .321 | .076 | .072 | --- |
| | (.011) | (.011) | (.011) | (.011) | (.011) | |
| 2. Reconstructed CPS | .383 | .304 | .277 | .084 | .087 | --- |
| | (.013) | (.014) | (.015) | (.014) | (.014) | |
| 3. ACS | .361 | .271 | .229 | .067 | .065 | .050 |
| | (.004) | (.004) | (.004) | (.004) | (.004) | (.004) |
| | | | | | | |
| B. Women | | | | | | |
| 1. Pew CPS | .358 | .342 | .311 | .082 | .074 | --- |
| | (.012) | (.013) | (.013) | (.012) | (.013) | |
| 2. Reconstructed CPS | .389 | .371 | .337 | .107 | .107 | --- |
| | (.016) | (.016) | (.017) | (.016) | (.016) | |
| 3. ACS | .379 | .340 | .283 | .071 | .064 | .033 |
| | (.004) | (.005) | (.005) | (.004) | (.004) | (.005) |
| | | | | | | |
| Controls for: | | | | | | |
| Age | No | Yes | Yes | Yes | Yes | Yes |
| Years-since-migration | No | No | Yes | Yes | Yes | Yes |
| Education | No | No | No | Yes | Yes | Yes |
| State of residence | No | No | No | No | Yes | Yes |
| Country of birth | No | No | No | No | No | Yes |

Notes: The dependent variable gives a worker's log hourly wage rate. The statistics reported in the table are the results from an Oaxaca decomposition [see equations (2) and (3) in the text] that estimates the wage gap between observationally equivalent undocumented and legal immigrants. The years-since-migration variable is introduced as a fourth order polynomial; the age, education, and state of residence variables are introduced as vectors of fixed effects.

### Table 5. Impact of state-level E-Verify mandate on wage penalty

|  | Men | Women |
|---|---|---|
| <u>Sample:</u> | | |
| ACS, 2001-2014 | | |
| All immigrants | .019 | .012 |
|  | (.008) | (.013) |
| New immigrants (1 year or less in United States) | .144 | .115 |
|  | (.066) | (.083) |
| Older immigrants (at least 10 years in United States) | -.012 | .015 |
|  | (.011) | (.013) |
| | | |
| Reconstructed CPS, 2002-2015 surveys | .060 | .067 |
|  | (.020) | (.060) |
| | | |
| Fixed effects included: | | |
| Year, education, age, state, and country of birth | Yes | Yes |
| Immigration status-year and immigration status-state | Yes | Yes |
| State-year | Yes | Yes |

Notes: Standard errors are reported in parentheses and are clustered at the state level. The statistics reported in the table are the coefficients of an interaction between a dummy variable indicating whether a worker is a legal immigrant and whether that worker lived in a state-year cell that mandated all employers to use E-Verify to authenticate the employment eligibility of job applicants. The regressions are estimated in the sample of foreign-born workers and pool all the indicated cross-sections. All regressions include the variable indicating whether the state-year cell mandates the use of E-Verify and a fourth order polynomial giving the number of years since migration. The number of observations for the ACS regressions are 982,147 for men, and 789,816 for women. The number of observations for the regressions using the sample of new immigrant men (women) in the ACS is 33,928 (19,385); the number of observations for the regressions using the sample of older immigrant men (women) in the ACS is 719,045 (609,842). The number of observations for the CPS regressions are 89,669 and 67,698 for men and women, respectively.

FRP-FRN-01331

**Table 6. Interaction between relative earnings and labor supply**
**(annual earnings in thousands of dollars)**

| | All persons | | Sample of workers | |
|---|---|---|---|---|
| | (1) | (2) | (1) | (2) |
| A. CPS Pew, men | | | | |
| Legal | -2.03 | -5.38 | -4.31 | -8.60 |
| | (.65) | (.64) | (.76) | (.75) |
| Undocumented | -17.93 | -5.50 | -26.42 | -10.87 |
| | (.89) | (.88) | (1.02) | (1.03) |
| B. CPS Pew, women | | | | |
| Legal | -4.52 | -5.50 | -.92 | -3.62 |
| | (.37) | (.37) | (.51) | (.51) |
| Undocumented | -14.59 | -7.08 | -15.28 | -6.59 |
| | (.57) | (.56) | (.83) | (.82) |
| C. ACS, men | | | | |
| Legal | .60 | -2.34 | -2.13 | -6.13 |
| | (.15) | (.14) | (.17) | (.16) |
| Undocumented | -14.44 | -4.14 | -23.07 | -9.86 |
| | (.19) | (.18) | (.22) | (.21) |
| D. ACS, women | | | | |
| Legal | -2.44 | -3.32 | .35 | -2.83 |
| | (.09) | (.09) | (.12) | (.11) |
| Undocumented | -14.58 | -7.99 | -14.60 | -6.88 |
| | (.13) | (.13) | (.19) | (.18) |
| Controls for: | | | | |
| Educational attainment, age, and state of residence | No | Yes | No | Yes |

Notes: Standard errors are reported in parentheses. The regressions use the pooled sample of the 2012-2013 CPS Pew files, or the pooled sample of the 2011-2012 ACS. The dependent variable gives a worker's annual earnings, which equals zero if the person did not work at all during the year. All regressions include a dummy variable indicating if the observation was drawn from the 2012 cross-section. The male (female) regressions estimated in the Pew files have 114,614 (121,608) observations in the "all-persons" sample, and 91,444 (82,165) observations in the sample of workers. The male (female) regressions estimated in the ACS have 1,611,907 (1,625,742) observations in the "all-persons" sample, and 1,202.031 (1,104,444) observations in the sample of workers.





Home    News    Sport    Business    Innovation    Culture    Arts    Travel    Earth    Audio    Video    Live    Documentaries

# Trump says India 'will do what's right' on illegal immigration

28 January 2025

Share    Save

**Meryl Sebastian**
BBC News, Kochi



Getty Images

Since taking office on 20 January, President Trump has announced a number of immigration-related executive orders

US President Donald Trump has said India "will do what's right" on the deportation of illegal migrants following a phone call with Prime Minister Narendra Modi.

The leaders spoke on Monday, their first conversation since Trump's inauguration last week.

They discussed immigration, security issues and trade in what the White House described as a "productive call".

Trump told reporters after the call that Modi was likely to visit the United States "sometime in February".

ADVERTISEMENT

Since taking office on 20 January, Trump has announced a number of immigration-related executive orders, paving the way for a widespread effort to crack down on undocumented migrants in the US.

According to the Pew Research Center, there are an estimated 725,000 undocumented Indian immigrants in the US as of 2024.

Last week, India's foreign ministry said Delhi would take in Indians overstaying "anywhere in the world" as long as their documents were shared and nationality was verified.

In their phone call on Monday, the ministry said, Trump and Modi discussed the bilateral relationship, "including in the areas of technology, trade, investment, energy and defence".

The two leaders also discussed security in the Indo-Pacific, the Middle East and Europe.

According to a White House statement, Trump emphasised the importance of India increasing its procurement of US-made security equipment and moving towards a "fair" bilateral trading relationship.

In a post on X (formerly Twitter), Modi called Trump a "dear friend" and said they were "committed to a mutually beneficial and trusted partnership".

The White House said both leaders emphasised their commitment to advancing their countries' strategic partnership and the Indo-Pacific Quad partnership, which also includes Japan and Australia.

India will be hosting Quad leaders for the first time later this year.

Modi and Trump shared cordial relations during the US president's first term between 2017 and 2021.

But India faced a bitter tariff war with the Trump administration that affected businesses on both sides.

In November, following Trump's election victory, India's Foreign Minister S Jaishankar said the country was not nervous about working with the US president.

Trump had called Modi a "great leader" last year but also accused India of charging excessive tariffs.

Analysts say it will be interesting to watch if the bonhomie between the two will help overcome concerns about trade and immigration.

Immigration     Narendra Modi     US immigration     India     Donald Trump     United States

Trade

**RELATED**

Musk says H-1B visas being 'gamed' by outsourcing firms

US halts all asylum claim decisions after National Guard shooting

How were Afghan evacuees vetted under Biden?

**MORE FROM THE BBC**

51 mins ago

### Tracking build-up of US military planes and warships near Venezuela

The US has justified its air and naval campaign as necessary to fight drug smuggling into the US.



51 mins ago

58 mins ago

### Honduras election on a knife edge as Trump-backed man slightly ahead

The US president is threatening to cut aid to Honduras if his favoured right-wing presidential candidate does not win.



58 mins ago

2 hrs ago

### US and UK agree zero tariffs deal on pharmaceuticals

The deal follows threats of tariffs as high as 100% on branded drug imports.



2 hrs ago

2 hrs ago

### Trump releases fraudster executive days into prison sentence

The former investment manager was convicted of defrauding thousands of investors.



2 hrs ago

ADVERTISEMENT

2 hrs ago

### Appeals court disqualifies ex-Trump lawyer Alina Habba as New Jersey prosecutor

An appeals court disqualified Alina Habba, Trump's former personal attorney, from serving as US Attorney for New Jersey.



2 hrs ago



Home    News    Sport    Business    Innovation    Culture    Arts    Travel    Earth    Audio    Video    Live    Documentaries    Weather    BBC Shop    BritBox

BBC in other languages ▾

**Follow BBC on:**    𝕏    f    ⬤    ♪    in    ▶

Terms of Use    Subscription Terms    About the BBC    Privacy Policy    Cookies    Accessibility Help    Contact the BBC    Advertise with us    Do not share or sell my info

BBC.com Help & FAQs    Content Index

Copyright 2025 BBC. All rights reserved. The BBC is not responsible for the content of external sites. **Read about our approach to external linking.**

FRP-FRN-01336





Home › Topics › Latin America › Panama Receives First US Deportation Flight Under Trump Administration

## Panama Receives First US Deportation Flight Under Trump Administration

 By *Tico Times*   *February 16, 2025*



*Illustration Purposes (Photo by JAIME SALDARRIAGA / AFP)*

Panama said it had received a first US military plane transporting 119 deportees of various nationalities, who will now be repatriated to their own countries. President Jose Raul Mulino, who has offered his country as a stopover for migrants expelled from the United States by the Donald Trump administration,

FRP-FRN-01337

said the plane arrived Wednesday with "people of the most diverse nationalities," many from Asia. US Secretary of State Marco Rubio visited Panama two weeks ago, meeting Mulino in the midst of a dispute over ownership of the Panama Canal, which Trump had vowed the United States would be "taking back."

After the visit, Rubio voiced optimism Panama would address US concerns, including over alleged Chinese influence on the operation of the critical US-built waterway. Mulino also promised to step up cooperation on the new administration's top priority — repatriating undocumented migrants.

He offered Rubio the use of an airstrip in the town of Meteti in Darien, the dense jungle that has become a major crossing point for migrants seeking to exit South America en route to the United States. Trump's predecessor Joe Biden had already sealed a deal after Mulino's election last year to provide $6 million to assist in expelling migrants.

Since then, Panama has closed several routes in the Darien and deported migrants on flights to countries including Colombia and Ecuador. On his first day in office last month, Trump declared a national emergency at the southern US border and vowed to deport "millions and millions" of migrants. – Flown out soon – Mulino said a US Air Force plane landed at Howard west of the capital Panama City Wednesday, and the 119 migrants onboard were taken to hotels.

From there, they will be transported to a shelter in the Darien, and flown home on repatriation flights from an airstrip in the jungle. "We hope to get them out of there as soon as possible," said Mulino, as he underlined the "contribution that Panama is making on the migration issue."

The deportees included citizens of China, Pakistan and other Asian countries, said the president, adding more planes are expected from the United States soon. Latin America is the original home of most of the United States estimated 11 million undocumented migrants. Many had made the dangerous journey through the Darien, braving treacherous terrain, wild animals and criminal gangs for a chance at a better life. On Tuesday, Panamanian police turned back dozens of migrants, mostly Venezuelans, trying to return home after abandoning their journey to the United States over Trump's deportation intentions.

Riot police forced the group to return to Costa Rica for an orderly repatriation process. Since Trump took office on January 20, undocumented migrants have also flown to Colombia, Venezuela, Brazil and Guatemala, as well as the notorious Guantanamo US military base in Cuba.

FRP-FRN-01340



**FIGURE 1: REMITTANCE GROWTH IN LAC, 2001-2024**

— LAC (24 countries)    — Top 10 recipt.

FRP-FRN-01341

**THEDIALOGUE** (https://thedialogue.org/)

Leadership for the Americas

**AUGUST 6, 2024**

# Family Remittances in 2024: Looking Ahead amid Possible Shifts in Flows

This briefing offers a descriptive perspective regarding remittance transfer growth in 2024. This year's flows will experience less than six percent growth. The memo highlights some insight on migration, historic growth, competition in the marketplace, and what growth can be expected for 2024.

Today, migration continues to be a social, political, and economic reality across the world – perhaps more intensely than before. As a result, migrants working in Dubai, Rome, and Los Angeles, amongst other cities, are sending record amounts of money home to their friends, families, and other loved ones. In 2023, roughly US$857 billion were sent in remittances across the globe[1] of which approximately US$160 billion went to Latin America and the Caribbean (LAC). Amounting to five percent of the region's gross domestic product (GDP), these flows represent an economic lifeline to a region contending with state fragility, emigration, and global economic crises. In addition to exploring the migration patterns driving these flows, this note explores in detail the scale, composition, and nature of remittances.



Rochu_2008 / Adobe Stock / Enhanced license

**SHARE**

**AUTHORS**

Manuel Orozco (https://thedialogue.org/expert/manuel-orozco)

Patrick Springer (https://thedialogue.org/expert/patrick-springer)

**PROGRAM**

**BLOG & TOPICS**

Central America (https://thedialogue.org/blogs/topic/central-america-2), Central America & the Caribbean (https://thedialogue.org/blogs/topic/central-america-the-caribbean), Economics (https://thedialogue.org/blogs/topic/economics-2), Economy and Trade (https://thedialogue.org/blogs/topic/economy-and-trade)

Source: Central Bank data

and-trade), Migration, Remittances & Development (https://thedialogue.org/blogs/topic/migration-remittances-development) Voces (https://thedialogue.org/blogs/topic/voces)

## Migration Patterns Driving Growth

Last year, migration from LAC to the United States grew more than six percent from 36.9 million to over 45.3 million migrants living in the US. The US remains the destination for one out of five migrants worldwide[2] and, as a result, more migrants are being encountered across the country than at any other time in recent history.

The US will receive at least three million people by the end of this year, and border encounters as a share of the US population are expected to remain above 0.7 percent for the fourth straight year. For context, in the decade before the Covid-19 pandemic, this number hovered around 0.1-0.2 percent.

**FIGURE 2: BORDER ENCOUNTERS AS A SHARE OF THE US POPULATION, 1991-2024**



(https://thedialogue.org/wp-content/uploads/2024/07/f2-1.png)

Source: Department of Homeland Security (DHS) National Encounters

Recent growth among migrants from LAC has come largely from fragile states experiencing social, political, or economic crises. These countries include Cuba, Haiti, Nicaragua, Venezuela, Guatemala, and Honduras. Following the heights reached by these countries post-pandemic, there has been a downward trend in encounters in the short-term.

Factors determining whether or not a person decides to migrate are complex and are the result of a mix of reasons. Among these are climatic, economic, social, aspirational, transnational, and political considerations. According to survey data in Northern Triangle countries and Nicaragua – which together represent an estimated 15 percent of all migration from LAC – the intention to migrate has reduced, roughly mirroring pre-pandemic levels.

FRP-FRN-01342

**FIGURE 3: US NATIONWIDE ENCOUNTERS, 2019-2024**



(https://thedialogue.org/wp-content/uploads/2024/07/f3-1.png)

Source: Department of Homeland Security (DHS) National Encounters

**FIGURE 4: INTENTION TO MIGRATE IN CENTRAL AMERICA, 2019-2024**

(https://thedialogue.org/wp-content/uploads/2024/07/f4.png)

Source: Survey data collected by author.

While migration appears to be showing signs of slowing[3], migration to the US is continuing at record levels and will continue to positively impact remittance volumes sent back to the region. As a result, the US will remain the top remitting country to LAC for the foreseeable future. Over 80 percent of remittances sent to the region originate in the US, while 17 percent come from Europe and the rest of the world, and three percent are intraregional remittances.

FRP-FRN-01343

# Current Remittance Trends

Future flows of remittances for the next five years will likely show similar characteristics albeit at a slower pace. The following sections explore current remittance trends from 2023 and 2024 in order to draw conclusions regarding estimates for the future. In general, the scale, composition, and nature of remittances in LAC have all changed since 2020.

## Scale

As aforementioned, remittances to LAC have grown by over nine percent from US$146 billion in 2022 to US$160 billion in 2023. Last year, the top 10 remittance receiving countries received US$142 billion, growing by over eight percent in 2023. Based on trends so far this year, these countries will see 5.1 percent growth totaling an estimated US$150 billion received in 2024.

Lastly, remittances volumes for all countries to the region are estimated to increase 5.1 percent in 2024 to US$168 billion.

At the country level, the highest year over year (YoY) growth rates seen in 2023 were in Nicaragua (51 percent), Cuba (33 percent), and Argentina (18 percent). In general, since 2020, the highest YoY growth rates have been seen in countries experiencing political crises or other forms of political conflict. This pattern is illustrated in the table below with the clear exception of Haiti, where remittances have only grown one percent between 2020 and 2023.

**TABLE 1: REMITTANCE VOLUME GROWTH LEVELS, 2001-2023**

| Country | 2001-2005 | 2005-2010 | 2010-2015 | 2015-2020 | 2020-2023 |
|---|---|---|---|---|---|
| **Cuba** | 3% | 2% | 4% | -16% | 43% |
| **Nicaragua** | 13% | 6% | 8% | 9% | 27% |
| **Argentina** | 18% | 8% | -5% | 6% | 23% |
| **Venezuela** | | | | 2% | 17% |
| **Guatemala** | 37% | 7% | 9% | 12% | 15% |
| **Honduras** | 24% | 8% | 7% | 9% | 14% |

FRP-FRN-01344

| Country | | | | | |
|---|---|---|---|---|---|
| Mexico | 12% | 9% | 4% | -1% | 18% |
| Ecuador | 11% | 7% | -2% | 1% | 12% |
| Colombia | 10% | 8% | 3% | 4% | 10% |
| Peru | 9% | 1% | 1% | 12% | 14% |
| Panama | 9% | -7% | 6% | 26% | 12% |
| Brazil | 9% | 4% | -1% | 2% | 14% |
| El Salvador | 8% | 7% | 4% | 3% | 9% |
| Bolivia | 7% | -1% | 4% | 23% | 20% |
| Costa Rica | 7% | -2% | 1% | 5% | 16% |
| Guyana | 6% | 7% | -4% | 13% | 55% |
| Dominican Republic | 6% | 10% | 6% | 7% | 7% |
| Suriname | 5% | 79% | 9% | 2% | 81% |
| Belize | 5% | 7% | 2% | 12% | 9% |
| Jamaica | 4% | 5% | 3% | 3% | 11% |
| Uruguay | 4% | 4% | -6% | 10% | 562% |

FRP-FRN-01345

| | | | | | |
|---|---|---|---|---|---|
| **Trinidad and Tobago** | 18% | 0% | 11% | 5% | 2% |
| **Paraguay** | 3% | 21% | 6% | 1% | 2% |
| **Haiti** | 10% | 8% | 8% | 8% | 1% |
| **LAC (24 countries)** | 15% | 3% | 4% | 11% | 11% |
| **Top 10 recipt.** | 15% | 3% | 4% | 11% | 11% |

Source: Central Bank data.

## Composition

Total transactions in the region are estimated to surpass 45 million within the next five years, up from 41.4 million in 2023. These transactions are largely initiated from the United States by migrant workers sending payments home. Seventy-three percent of person to person (P2P) are estimated to be taking place from the US, 18 percent are from Europe and the rest of the world, while nine percent are intraregional transactions. A smaller, but noteworthy portion of transactions is attributable to business to business (B2B) and person to business (P2B) transfers.

The monthly average principal for nearly every one of the top 10 remittances receiving countries has increased significantly since 2020. This is partly due to global inflationary trends as well as increases in remittance frequency. In other words, migrants are remitting more money, more often, remitting two to three times more a year in 2024 than they did in 2020. Annually, migrants are sending home roughly US$4,076 in annual principal. This principal is larger if the sender is sending from the United States (US$4,463) than senders in LAC (US$843) or elsewhere (US$3,968).

Last year's global market share distribution(https://thedialogue.org/analysis/2023-in-remittances-the-year-in-review/) found 12 percent of remittances were serviced by Western Union, followed by Remitly (four percent), Intermex, MoneyGram, and Ria (three percent) and Viamericas (1.5 percent). In addition, digital remittance transactions to LAC are steadily increasing and are projected to reach over 45 percent of total transactions by 2030. Of the total digital market (36 percent), Remitly captures the most at 19 percent, Western Union captures six percent, while MoneyGram and Ria (Euronet) together capture three percent. Other companies together capture roughly eight percent (five percent coming from Paypal's "Xoom"). Adoption of digital remittance services has been assisted by improvements in mobile payments technology and systems as well as the increased digitization of the economy at large. However, migrants still largely use conventional, in-person remittance methods.

While preference, trustworthiness, and convenience color the debate on digital transfers (https://thedialogue.org/analysis/perspectives-on-remittances-in-2024/) among RSPs, over 62 percent of senders are still choosing to use in-person methods. While regional payment system innovations like cryptocurrencies or Central Bank Digital Currencies (CBDCs) promise to expand digital options for migrants sending remittances back home, their success will depend on various factors such as successful "off-ramps" for currency use as well as the purchasing power and wealth diversification capacity of migrants.

**FIGURE 5: DIGITAL REMITTANCE MARKET IN LAC, 2016-2032**




(https://thedialogue.org/wp-content/uploads/2024/07/f5-1.png)

Source: Author estimates based on remittance service provider (RSP) data.

**Nature**

In 2024, remittances continue to grow as a function of migration. This is more visible in the relationship between border encounters from eight nationalities (Colombia, Ecuador, El Salvador, Guatemala, Haiti, Honduras, Mexico, and Nicaragua) that capture over 80 percent of the flows to LAC. This growth can be best seen in Nicaragua and Haiti where remittances increased as a result of the worsening of their political crises in both countries since 2021.

FRP-FRN-01347

**FIGURE 6: BORDER ARRIVALS AND REMITTANCE TRANSFER VOLUME, 2019-2024**



(https://thedialogue.org/wp-content/uploads/2024/07/f6-1.png)

Source: Central Bank and DHS. Log values are utilized to control for country differences in volume and border arrivals.

In the near future, remittance growth will resemble periods before the Covid-19 pandemic, as the demographic factors driving post-pandemic growth are no longer present. For example, once a migrant population reaches roughly 17-20 percent of the origin countries' population, emigration and remittance tend to decrease. Emigration decreases because more socioeconomic pressures are placed on mobility prone populations and there is more pressure to stay put. As a result of this decrease in migration, changes in remittance growth tend to follow. After the diaspora reaches 20 percent, for each one percent increase in migration, there is 2.7 percent less emigration.

FRP-FRN-01348

# FIGURE 7: MIGRANTS AS A SHARE OF POPULATION AND ANNUAL MIGRATION GROWTH



(https://thedialogue.org/wp-content/uploads/2024/07/f7-1.png)

Source: UNDESA

Nonetheless, growth is continuing as a result of migration. For example, within the Central American migrant community, over 70 percent of this population sends remittances home. As a result, any increase in the migrant population necessarily yields new senders who expand the pool of those already sending money back home. The number of senders is likely to diminish due to a combination of factors, including enforcement actions and demographic growth.

Migration, however, is not the only factor that affects remittance volumes. The economy in the US other host country affects the principal sent as well. While unemployment rates have remained historically low and the post-pandemic economy in the US has been characterized by a labor shortage (a pull factor for migration), monetary tightening by the Federal Reserve System may have effects on employment (https://www.reuters.com/markets/us/fed-rate-cut-debate-view-us-job-market-cools-2024-07-05/) in the short term. Therefore, average remittance sending will remain below three percent per year due to an expected rise in unemployment and post-pandemic cost of living increases (https://www.federalreserve.gov/econres/notes/feds-notes/inflation-perceptions-during-the-covid-pandemic-and-recovery-20240119.html#:~:text=On%20net%2C%20the%20dominant%20pressure,not%20seen%20in%20the%20years).

## Future Flows of Remittances

By the end of 2024, the LAC region will see remittance growth rates of not more than six percent.

The top 10 remitting countries, for their part, will see more muted growth at five percent. According to our projections, Peru (14 percent), Nicaragua, and Haiti (both 13 percent) will see some of the highest YoY growth rates, Colombia, Ecuador (both 10 percent), and Guatemala (nine percent) will conti'

show strong growth, while other countries measured will show growth either on par with, or below, the region.

As discussed above, increases in remittances will continue to be influenced by migration largely to the US. The intention to migrate is a strong sentiment and is reflected in aspirational issues of modern society. Regardless of policy interventions relating to migration, people will continue to find ways to migrate. Specifically, in Central America, growth will stand at five percent annually for the next three years and represents a return to pre-pandemic levels. Negative economic factors will also continue to blunt remittance volumes sent in the years ahead as migrants face down the macroeconomics of inflation in the US.

TABLE 2: LAC REMITTANCE VOLUMES, 2021-2024

| Country | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|
| Argentina | $739,802,367 | $776,792,486 | $1,500,000,000.00 | $1,680,000,000 |
| Belize | $141,199,835 | $148,259,826 | $152,707,621.25 | |
| Bolivia | $1,386,915,536 | $1,456,261,312 | $1,500,000,000.00 | |
| Brazil | $4,172,476,743 | $4,381,100,580 | $4,937,500,353.85 | |
| Colombia | $8,597,240,000 | $9,416,242,000 | $10,043,426,214 | $11,047,768,835 |
| Costa Rica | $585,000,000 | $614,250,000 | $651,105,000 | |
| Cuba | $1,164,734,554 | $1,222,971,282 | $2,458,459,584 | |
| Dominican Republic | $10,402,469,200 | $9,856,497,461 | $10,212,164,230 | $10,722,772,441 |
| Ecuador | $4,362,384,920 | $4,624,128,015 | $5,044,335,428 | $5,573,990,647 |
| El Salvador | $7,517,140,000 | $7,855,411,300 | $8,187,065,383,893 | $8,065,383,893 |

| Country | | | | |
|---|---|---|---|---|
| Guatemala | $21,571,047,135 | $19,789,951,500 | $18,507,779,092 | $15,295,685,200 |
| Guyana | | $452,651,559.35 | $443,776,039 | $422,643,846 |
| Haiti | $3,853,172,797 | $3,440,332,855 | $3,316,282,132 | $3,655,760,565 |
| Honduras | $9,775,353,334 | $9,399,378,206 | $8,477,862,215 | $7,372,054,100 |
| Jamaica | $3,521,847,255 | $3,486,977,481 | $3,521,832,732 | $3,630,755,394 |
| Mexico | $65,651,262,515 | $63,739,089,821 | $58,502,781,700 | $51,585,680,000 |
| Nicaragua | $5,511,727,550 | $4,877,635,000 | $3,224,900,000 | $2,146,900,000 |
| Panama | | $576,637,758 | $559,842,483 | $533,183,317 |
| Paraguay | | $621,000,000 | $591,093,864 | $562,946,537 |
| Peru | $4,657,801,733 | $4,121,948,437 | $3,707,556,166 | $3,607,625,054 |
| Suriname | | $656,788 | $637,658 | $607,293 |
| Trinidad and Tobago | | $224,160,302 | $218,692,977 | $208,279,026 |
| Uruguay | | $139,415,590 | $136,015,210 | $129,538,295 |
| Venezuela, RB | | $4,618,394,814 | $4,198,540,740 | $3,998,610,229 |

FRP-FRN-01351

| | | | | LAC (24 countries) | Top 10 recipt. |
|---|---|---|---|---|---|
| $168,288,701,264 | $160,174,953,582 | $145,759,507,270 | $132,219,632,011 | | |
| $150,352,128,140 | $142,342,264,212 | $131,011,272,814 | $118,173,694,433 | | |

Source: Central Bank data

**FIGURE 8: ANNUAL MIGRATION FROM CENTRAL AMERICA, 2018-2027**



(https://thedialogue.org/wp-content/uploads/2024/07/f8-1.png)

Source: DHS Statistics

FRP-FRN-01352

The Dialogue is a hemispheric organization that builds FOR MORE DETAILED INFORMATION ABOUT OUR WORK ON MIGRATION AND REMITTANCES PLEASE CONSULT THE sustainable development across the Americas. We imp FOLLOWING PRESENTATION (HTTPS://THEDIALOGUE.ORG/WP-meaningful change in the Western Hemisphere.

CONTENT/UPLOADS/2024/07/FUTURE-FLOWS-OF-FAMILY-REMITTANCES-07.27.2024.PDF)

Search The Dialogue

PowerPoint Presentation    1 / 87    —    54%    +

**QUICK LINKS**

About(https://thedialogue.org/about/)

Experts(https://thedialogue.org/experts/)

Programs(https://thedialogue.org/programs/)

Analysis(https://thedialogue.org/analysis/)

Events(https://thedialogue.org/events/)

Rentals(https://thedialogue.org/contact-us/#rentals)

**DONATE**

Donate Now (https://thedialogue.org/donate)

Become a Sponsor (https://thedialogue.org/donate/#sponsorship)

Privacy Policy(https://thedialogue.org/privacy-policy-new/) Contact Us(https://thedialogue.org/contact-us/)

© 2025 Inter-American Dialogue



Inter-American Dialogue

155 15th Street NW | Suite 800

Washington, DC 20005

(https://maps.app.goo.gl/a5CEsEz4r333XdjW9)

P: +1-202-822-9002 (tel:+1-202-822-9002)

F: +1-202-822-9553

**Endnotes**

[1] "Migration and Development Brief 40 – Remittances Slowed in 2023, Expected to Grow Faster in 2024." *World Bank Group and KNOMAD*. June 2024 https://knomad.org/publication/migration-and-development-brief-40 (https://knomad.org/publication/migration-and-development-brief-40)

[2] UNDESA, 2025 projections based on entry to the US

[3] Orozco, Manuel and Patrick Springer. "An Unprecedented Migration Crisis: Characterizing and Analyzing its Depth" *Inter-American Dialogue*. November 28, 2023 https://thedialogue.org/analysis/an-unprecedented-migration-crisis-characterizing-and-analyzing-its-depth/ (https://thedialogue.org/analysis/an-unprecedented-migration-crisis-characterizing-and-analyzing-its-depth/)

*This briefing, and accompanying presentation, are products of the Remittance Industry Observatory (https://thedialogue.org/?p=14145) at the Inter-American Dialogue.*

FRP-FRN-01353

FRP-FRN-01354

# Family Remittances to Latin America and the Caribbean 2023

**Manuel Orozco**
**Inter-American Dialogue**

**09.08.2023**

# Main Trends

- Remittances to top 10 recipient countries in the region will grow 9 percent in 2023
- Annual volume for top 10 countries is US$143 billion;
- Projected volume for all the region US$157 billion
- Increase continues to be influenced by migration and principal amount sent
- Nicaragua will experience another 50 percent increase
- Haiti and Jamaica will experience negative growth
- These flows will still amount to 5 percent of the region's GDP

FRP-FRN-01355

 THEDIALOGUE

Remittances to Latin America and the Caribbean

# Annual Flows and Growth



FRP-FRN-01356


THEDIALOGUE

# Annual Volumes

| Country Name | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| Argentina | $ 507,477,468 | $ 532,851,342 | $ 632,309,716 | $ 739,802,367 | $ 776,792,486 | |
| Belize | $ 92,512,739 | $ 97,138,376 | $ 120,683,619 | $ 141,199,835 | $ 148,259,826 | |
| Bolivia | $ 1,391,583,100 | $ 1,327,163,177 | $ 1,122,088,964 | $ 1,386,915,536 | $ 1,456,261,312 | |
| Brazil | $ 2,933,489,276 | $ 2,921,939,191 | $ 3,566,219,438 | $ 4,172,476,743 | $ 4,381,100,580 | |
| Colombia | $ 6,367,489,861 | $ 6,922,185,706 | $ 6,873,553,689 | $ 8,597,240,000 | $ 9,416,242,000 | $ 10,043,426,214 |
| Costa Rica | $ 533,509,663 | $ 518,197,025 | $ 500,000,000 | $ 585,000,000 | $ 614,250,000 | |
| Cuba | | $ 1,531,537,875 | $ 995,499,619 | $ 1,164,734,554 | $ 1,222,971,282 | |
| Dominican Republic | $ 6,814,200,000 | $ 7,103,181,292 | $ 8,219,262,926 | $ 10,402,469,200 | $ 9,856,497,461 | $ 10,212,164,230 |
| Ecuador | $ 3,039,078,509 | $ 3,250,250,092 | $ 3,336,696,164 | $ 4,362,384,920 | $ 4,624,128,015 | $ 5,044,335,428 |
| El Salvador | $ 5,388,142,174 | $ 5,650,270,000 | $ 5,936,157,615 | $ 7,517,140,000 | $ 7,855,411,300 | $ 8,187,025,042 |
| Guatemala | $ 9,490,600,000 | $ 10,508,307,400 | $ 11,402,842,290 | $ 15,295,685,200 | $ 18,507,779,092 | $ 20,333,951,500 |
| Guyana | $ 285,501,612 | $ 299,776,693 | $ 361,234,057 | $ 422,643,846 | $ 443,776,039 | |
| Haiti | $ 2,417,296,755 | $ 2,509,973,822 | $ 3,509,390,924 | $ 4,040,937,551 | $ 3,710,275,074 | $ 3,150,468,025 |
| Honduras | $ 4,776,545,983 | $ 5,424,037,908 | $ 5,576,000,000 | $ 7,372,054,100 | $ 8,477,862,215 | $ 9,399,378,206 |
| Jamaica | $ 2,501,614,919 | $ 2,486,021,740 | $ 2,956,233,324 | $ 3,630,755,394 | $ 3,521,832,732 | $ 3,486,977,481 |
| Mexico | $ 33,677,227,200 | $ 36,438,758,100 | $ 40,604,553,800 | $ 51,585,680,000 | $ 58,502,781,700 | $ 63,739,089,821 |
| Nicaragua | $ 1,501,200,000 | $ 1,682,400,000 | $ 1,851,400,000 | $ 2,146,900,000 | $ 3,224,900,000 | $ 4,877,635,000 |
| Panama | $ 537,800,000 | $ 509,519,333 | $ 455,712,237 | $ 533,183,317 | $ 559,842,483 | |
| Paraguay | $ 682,869,966 | $ 568,433,190 | $ 583,714,989 | $ 562,946,537 | $ 591,093,864 | |
| Peru | $ 3,224,754,055 | $ 3,336,055,951 | $ 2,904,045,864 | $ 3,607,625,054 | $ 3,707,556,166 | $ 4,121,948,437 |
| Suriname | $ 519,054 | $ 545,007 | $ 519,054 | $ 607,293 | $ 637,658 | |
| Trinidad and Tobago | $ 138,708,323 | $ 145,643,739 | $ 178,016,261 | $ 208,279,026 | $ 218,692,977 | |
| Uruguay | $ 104,268,963 | $ 103,557,798 | $ 110,716,491 | $ 129,538,295 | $ 136,015,210 | |
| Venezuela, RB | $ 2,432,714,508 | $ 3,115,900,211 | $ 2,492,720,169 | $ 3,998,610,229 | $ 4,198,540,740 | |
| LAC (24 countries) | $ 88,839,104,128 | $ 97,488,650,606 | $ 104,289,571,209 | $ 132,604,808,997 | $ 146,153,500,213 | $ 157,000,000,000 |
| Top 10 recipients | $ 79,198,149,455 | $ 85,311,442,011 | $ 93,170,136,595 | $ 118,558,871,420 | $ 131,405,265,757 | $ 142,596,399,383 |



THE DIALOGUE

FRP-FRN-01357

# Year on Year Remittance Growth

FRP-FRN-01358

| Country | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Argentina | 5% | 16% | 17% | 5% | |
| Belize | 5% | 20% | 17% | 5% | |
| Bolivia | -5% | -18% | 24% | 5% | |
| Brazil | 0% | 18% | 17% | 5% | |
| Colombia | 8% | -1% | 25% | 10% | |
| Costa Rica | -3% | -4% | 17% | 5% | |
| Cuba | 5% | -54% | 17% | 5% | |
| Dominican Republic | 4% | 14% | 27% | -5% | 4% |
| Ecuador | 6% | 3% | 31% | 6% | 9% |
| El Salvador | 5% | 5% | 27% | 4% | 4% |
| Guatemala | 10% | 8% | 34% | 21% | 10% |
| Guyana | 5% | 17% | 17% | 5% | |
| Haiti | 4% | 28% | 15% | -8% | -7% |
| Honduras | 12% | 3% | 32% | 15% | 11% |
| Jamaica | -1% | 16% | 23% | -3% | -1% |
| Mexico | 8% | 10% | 27% | 13% | 9% |
| Nicaragua | 11% | 9% | 16% | 50% | 51% |
| Panama | -6% | -12% | 17% | 5% | |
| Paraguay | -20% | 3% | -4% | 5% | |
| Peru | 3% | -15% | 24% | 3% | 11% |
| Suriname | 5% | -5% | 17% | 5% | |
| Trinidad and Tobago | 5% | 18% | 17% | 5% | |
| Uruguay | -1% | 6% | 17% | 5% | |
| Venezuela, RB | 22% | -25% | 60% | 5% | |
| LAC (24 countries) | 7% | 7% | 27% | 10% | 9% |
| Top 10 recipt. | 8% | 9% | 27% | 11% | 9% |



THE DIALOGUE

# Remittances as Percent of Gross Domestic Product

| Pais | 1990 | 2000 | 2010 | 2015 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| Argentina | 0.0 | 0.0 | 0.2 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | |
| Belize | 3.4 | 2.2 | 4.5 | 3.8 | 4.0 | 4.0 | 5.8 | 5.4 | | |
| Bolivia | 0.1 | 1.5 | 4.9 | 3.6 | 3.4 | 3.3 | 3.1 | 3.5 | 3.5 | |
| Brazil | 0.1 | 0.2 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | | |
| Colombia | 1.0 | 1.6 | 1.4 | 1.7 | 2.0 | 2.2 | 2.6 | 2.7 | 2.8 | 2.9 |
| Costa Rica | 0.2 | 0.9 | 1.4 | 1.0 | 0.9 | 0.9 | 0.8 | 0.9 | 1.0 | |
| Dominican Republic | 4.5 | 7.6 | 7.2 | 7.3 | 8.0 | 8.3 | 10.6 | 11.4 | 10.3 | 8.4 |
| Ecuador | 0.3 | 7.2 | 3.7 | 2.4 | 2.8 | 3.0 | 3.4 | 4.1 | 4.2 | 4.1 |
| El Salvador | 7.6 | 15.0 | 18.8 | 18.2 | 20.7 | 21.0 | 24.1 | 26.1 | 26.7 | 24.5 |
| Guatemala | 1.6 | 3.1 | 10.4 | 10.4 | 12.9 | 13.8 | 14.7 | 17.9 | 20.0 | 20.0 |
| Guyana | .. | 3.8 | 10.7 | 7.1 | 7.0 | 7.4 | 7.8 | 6.8 | 6.8 | |
| Haiti | .. | 8.5 | 12.4 | 14.8 | 18.0 | 20.5 | 23.8 | 20.0 | 17 | 13.0 |
| Honduras | 1.3 | 6.6 | 16.5 | 17.5 | 19.8 | 21.5 | 23.5 | 25.3 | 28.8 | 28.0 |
| Jamaica | 5.0 | 9.7 | 15.3 | 16.6 | 15.9 | 16.2 | 22.2 | 25.3 | 25.6 | 20.2 |
| Mexico | 1.2 | 1.1 | 2.1 | 2.2 | 2.9 | 3.1 | 3.9 | 4.3 | 4.6 | 3.8 |
| Nicaragua | .. | 6.3 | 9.4 | 9.4 | 11.6 | 13.4 | 14.7 | 15.3 | 22.2 | 29.1 |
| Panama | 1.7 | 0.1 | 1.4 | 1.0 | 0.8 | 0.9 | 0.8 | 0.9 | 0.9 | |
| Paraguay | 0.6 | 1.7 | 1.5 | 1.5 | 1.7 | 1.8 | 1.6 | 1.5 | 1.3 | |
| Peru | 0.3 | 1.4 | 1.7 | 1.4 | 1.4 | 1.5 | 1.5 | 1.6 | 1.7 | 1.5 |
| Suriname | 0.1 | 0.1 | 0.1 | 0.1 | 2.5 | 2.4 | 4.3 | 4.9 | 4.9 | |
| Trinidad and Tobago | 0.1 | 0.5 | 0.4 | 0.6 | 0.6 | 0.6 | 0.9 | 1.0 | 1.0 | |
| Uruguay | .. | .. | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | |
| Venezuela, RB | 0.0 | 0.0 | 0.0 | .. | .. | .. | .. | .. | 5.3 | |

Source: Central Bank and IMF (for GDP in 2023)

THE DIALOGUE

FRP-FRN-01359

# Central America: Migration and Remittances

## Annual migration

| Annual migration | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 est |
|---|---|---|---|---|---|---|
| El Salvador | 54,146 | 86,229 | 16,579 | 65,343 | 64,141 | 37,166 |
| Guatemala | 150,938 | 205,349 | 32,631 | 152,738 | 106,973 | 62,158 |
| Honduras | 109,383 | 211,589 | 28,337 | 173,095 | 126,089 | 84,557 |
| Nicaragua | 4,161 | 11,034 | 2,265 | 92,300 | 225,725 | 49,340 |
| Four countries | 317,888 | 513,391 | 79,495 | 482,239 | 521,444 | 231,439 |

## Remittances

| Remittances | 2020 | 2021 | 2022 | 2023 | Share of GDP |
|---|---|---|---|---|---|
| El Salvador | $ 5,936,157,615 | $ 7,517,140,000.00 | $ 7,855,411,300.00 | $ 7,933,965,413.00 | 24% |
| Guatemala | $ 11,402,842,290 | $ 15,295,685,200.00 | $ 18,507,779,092.00 | $ 19,315,400,000.00 | 21% |
| Honduras | $ 5,576,000,000 | $ 7,372,054,100.00 | $ 8,477,862,215.00 | $ 9,410,427,058.65 | 29% |
| Nicaragua | $ 1,855,400,000 | $ 2,145,000,000.00 | $ 3,203,000,000.00 | $ 4,964,650,000.00 | 33% |

## Apprehensions

| Apprehensions | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| EL SALVADOR | 41,981 | 85,059 | 21,051 | 116,477 | 85,813 | 41,862 |
| Guatemala | 161,845 | 228,575 | 61,488 | 311,739 | 216,098 | 122,420 |
| Honduras | 116,845 | 233,812 | 52,594 | 352,838 | 193,947 | 127,742 |
| Nicaragua | 3,000 | 14,000 | 3,000 | 87,305 | 217,956 | 44,864 |
| Four countries | 323,671 | 561,446 | 138,133 | 868,359 | 713,814 | 336,887 |

## Irregular entry estimates

| Irregular entry estimates | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| El Salvador | 36,523 | 74,001 | 10,104 | 55,909 | 54,062 | 26,373 |
| Guatemala | 140,805 | 198,860 | 29,514 | 149,635 | 103,727 | 58,761 |
| Honduras | 101,655 | 203,416 | 25,245 | 169,362 | 122,187 | 80,477 |
| Nicaragua | 1,800 | 8,400 | 960 | 89,051 | 222,315 | 45,761 |
| Four countries | 280,784 | 484,678 | 65,824 | 463,957 | 502,291 | 211,372 |

## Legal permanent status arrivals

| Legal permanent status arrivals | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| El Salvador | 16,014 | 10,605 | 5,343 | 7,787 | 8,176 | 8,585 |
| Guatemala | 9,188 | 5,479 | 2,302 | 2,703 | 2,838 | 2,980 |
| Honduras | 6,997 | 6,045 | 2,250 | 3,156 | 3,314 | 3,479 |
| Nicaragua | 1,972 | 2,248 | 1,077 | 3,199 | 3,359 | 3,527 |
| Four countries | 34,171 | 24,377 | 10,972 | 16,845 | 17,687 | 18,572 |



THE DIALOGUE

FRP-FRN-01360

FRP-FRN-01361

**US$10 billion;
6.5% Growth;
2.9% of GDP**



THE**DIALOGUE**
Leadership for the Americas

# Colombia



**Colombia**

**Month to Month Principal sent and Monthly Aggregate Flows**

— Personal Remit        — Remittances (US$,000,000)

FRP-FRN-01362

THEDIALOGUE



**Colombia**

Migrant Apprehensions in US border and Aggregate Monthly Flows

— Irregular entry    — Remittances (US$,000,000)

FRP-FRN-01363

THEDIALOGUE

# Colombia



Month to Month Aggregate Flows and Principal Sent

FRP-FRN-01364



THEDIALOGUE

FRP-FRN-01365

**US$10.2 billion;
4% Growth;
8.4% of GDP**

# Dominican Republic



THE **DIALOGUE**
Leadership for the Americas



**Dominican Republic**

**Month to Month Aggregate Flows and Principal Sent**

Remittances (US$,000,000)

—Remittances (US$,000,000)  —Personal Remit

FRP-FRN-01366



THEDIALOGUE



FRP-FRN-01367

**US$5 billion;
9% Growth;
4.1% of GDP**



THE**DIALOGUE**
Leadership for the Americas

# Ecuador



# Ecuador

**Migration to the US and Volume of Remittances, 2018-2023**

FRP-FRN-01368



# Ecuador



**Quarter to Quarter Volume and Principal Sent**

FRP-FRN-01369



THEDIALOGUE

FRP-FRN-01370

**US$8.2 billion;
4% Growth;
24.5% of GDP**



THE**DIALOGUE**
Leadership for the Americas

# EL Salvador



# El Salvador

**Month to Month Principal sent and Aggregate flows**

Remittances (US$,000,000)

Personal Remit — Remittances

FRP-FRN-01371



THEDIALOGUE



El Salvador

Month to Month Migration and Aggregate Flow of Remittances 2018-2023

— Irregular entry    — Remittances (US$,000,000)

FRP-FRN-01372

THEDIALOGUE



**El Salvador**

**Month to Month Principal average and monthly flows**

FRP-FRN-01373



THE DIALOGUE

US$20.3 billion;
10% Growth;
20% of GDP

FRP-FRN-01374



THEDIALOGUE
Leadership for the Americas

# Guatemala



## Guatemala

**Month to Month Aggregate Remittances and Principal Sent, 2018-2023**

Remittances (US$,000,000) —— Personal Remit

FRP-FRN-01375

THEDIALOGUE



**Migration and Remittances, 2018-2023**

FRP-FRN-01376

THE DIALOGUE

FRP-FRN-01377

# Guatemala



**Principal sent and Monthly volume**



**US$3.15 billion;
-7% Growth;
13% of GDP**

FRP-FRN-01378



THEDIALOGUE
Leadership for the Americas

# Haiti



**Migration to the US and Monthly Flows**

Haiti

— Remittances (US$,000,000)  — Irregular entry

FRP-FRN-01379

THEDIALOGUE

FRP-FRN-01380



**US$9.4 billion;
11% Growth;
28% of GDP**



THEDIALOGUE
Leadership for the Americas

# Honduras



**Honduras**

**Principal Sent and Monthly Flows, 2018-2023**

Personal Remit — Remittances (US$,000,000)

FRP-FRN-01381

THEDIALOGUE



**Honduras**

**Month to Month Migration and Remittances, 2018-2023**

—— Irregular entry    —— Remittances (US$,000,000)

FRP-FRN-01382

THEDIALOGUE



**Honduras**

**Monthly flows and principal sent, 2018-2023**

FRP-FRN-01383

THEDIALOGUE

FRP-FRN-01384

US$3.5 billion;
-1% Growth;
20% of GDP



THEDIALOGUE
Leadership for the Americas

# Jamaica



## Jamaica

**Month to month flows (US$,000,000)**

FRP-FRN-01385

THEDIALOGUE

FRP-FRN-01386



**US$63.7 billion;
9% Growth;
3.8% of GDP**



Leadership for the Americas

# Mexico



**Mexico**

Personal Remit — Remittances (US\$,000,000)

**Month to Month Principal Sent and Aggregate Flow of Remittances, 2018-2023**

FRP-FRN-01387

 THEDIALOGUE



FRP-FRN-01388

THE DIALOGUE

# Mexico



**Month to month principal sent and aggregate volume, 2018-2023**

FRP-FRN-01389

THEDIALOGUE

FRP-FRN-01390

**US$4.9 billion;
51% Growth;
29% of GDP**



THE**DIALOGUE**
Leadership for the Americas

# Nicaragua



**Month to Month Remittance Flows and Principal Sent, 2019-2023**

Nicaragua

Remittances (US$,000,000)

Remesa promedio enviada

FRP-FRN-01391

THEDIALOGUE



**Nicaragua**

### Month to Month Aggregate Flows and Migration to the US, 2019-2023

— Remittances (US$,000,000) — Irregular entry

FRP-FRN-01392



THEDIALOGUE

FRP-FRN-01393

# Nicaragua



**Month to Month Aggregate Flows and Principal Sent**

THE DIALOGUE



FRP-FRN-01394



**US$4.1 billion;
11% Growth;
1.5% of GDP**

THEDIALOGUE
Leadership for the Americas

Peru



**Peru**

Remittances (US$,000,000) — Personal Remit

**Quarterly Principal Sent and Aggregate flows**

FRP-FRN-01395



THEDIALOGUE

FRP-FRN-01396



FRP-FRN-01397

# Future Flows of Family Remittances to Latin America and the Caribbean

Manuel Orozco
Inter-American Dialogue

07.27.2024

*Future Flows of Remittances*

## About the Future

- **A conversation about the future invariably is tied to the expectations of change we have in relationship to the present (or the past); will it be different?, more challenging?, better?, chaotic or highly uncertain?**
- **We try to analyze the interplay between existing patterns and imponderable circumstances with probabilistic and risk-based assessments that allow for predicting, forecasting or foretelling.**

## About the Future of Remittances

- **Observations on future flows are based on trends and patterns relating to determinants of remittances: Growth in remittance flows and competition in particular.**
- **Remittances grow if *migration* or *average send* changes and if intervening variables like *market intermediation* change sending behavior.**
- **Here we explore what next year looks like and then the next five years by understanding migration and sending patterns;**
- **On intermediation the flux between legacy and newcomer businesses and the persistence in the business model above innovation will be issues for observation. Remitly and Viamericas; Western Union and Xoom.**
- **Overall, there is continued growth, with a prevalence of business models over innovation**
- **Remittance flows to Central America 2024-2027 will experience modest growth associated to slower migration, stalled principal amount sent, and an annual 3% growth in digital transfers.**



FRP-FRN-01398

*The scale, composition, and nature of remittances in the Americas has changed since 2020: future flows of remittances for the next five years will likely show similar characteristics albeit in a lower pace*

## Scale

- **Remittances to top 10 recipient countries in the region will grow 5.5 percent in 2024**
- **Annual volume for top 10 countries is US$150 billion;**
- **Projected volume for all the region US$168 billion (80% from the US; 3% from Latin America and the Caribbean; 17% from Europe and rest of the world)**
- **Argentina's dependence on remittances doubles in few years to $1.6 billion**

## Composition

- **Market share by volume is 36% digital, 2% informal, 62% in person and will reach over 45% by 2030**
- **The United States is primary originator of flows ($80% volume) and will prevail so**
- **These flows will still amount to 5 percent of the region's GDP**
- **40 million Person to Person Transactions in 2023 raising to more than 45 million in 5 years**
  - *29 million month-to-month transactions originate in the US,*
  - *3.7 million from Latin America and the Caribbean and*
  - *7 million from Europe and the rest of the world*

## Nature

- **Increase continues to be influenced by migration: Haiti and Nicaragua illustrate this growth.**
- **Future remittance growth may register a trend closer to previous periods, but not the post pandemic growth due to demographic trends and less impactable factors of migration: Mexico will show 5% growth**
- **Continued migration may support growth, however, there is a trend that as the share of migrants increases above 17% of the population remittances grow less**
- **Payment technology is increasingly prevailing, mostly on conventional digital based transfers. The use of digital currency will only depend on the purchasing power and wealth diversification capacity of migrants to rely.**



FRP-FRN-01399

# International Migration from Latin America and the Caribbean

- An increased reality in the midst of regional uncertainty and problems

- Intention to migrate is a strong sentiment reflected on aspirational issues of the modern society

- The United States is again since 2019 the main destination

THEDIALOGUE

FRP-FRN-01400

# Migrants from LAC increased from 33 million in 2015 to 45 million in 2023 – *six million of which since 2020*





FRP-FRN-01401



**Despite the large inflow of migration, the US continues to be 20% of the world's destination of migrants**

Source: UNDESA, for 2025 projections based on entry to the US

FRP-FRN-01402

THE DIALOGUE

# A shifting trend in migration?



**Border Encounters as Share of the US Population**



FRP-FRN-01403

# While the US is receiving migrants, there is a downward trend in the short term, but will receive at least 1.5 million people



**Monthly Nationwide Encounters**

All nationalities



FRP-FRN-01404

# Recent migration growth is originating from fragile states

| Countries | 2020 | 2024 | Growth (2015-2020) |
|---|---|---|---|
| Venezuela, RB | 5,415,337 | 8,100,000 | 51% |
| Guatemala | 1,577,375 | 2,525,819 | 7% |
| Nicaragua | 850,000 | 1,189,020 | 7% |
| Honduras | 985,077 | 1,408,868 | 6% |
| Haiti | 1,869,671 | 2,200,000 | 5% |
| Cuba | 1,897,128 | 2,300,000 | 4% |
| LAC | 41,395,895 | 45,000,000 | 4% |
| Brazil | 1,850,000 | | 4% |
| D. Republic | 1,724,189 | | 3% |
| Argentina | 1,076,148 | | 3% |
| Bolivia | 927,244 | | 2% |
| Colombia | 3,024,273 | | 2% |
| Peru | 1,519,635 | | 2% |
| Jamaica | 1,118,931 | | 2% |
| Costa Rica | 150,241 | | 1% |
| Trinidad and Tobago | 330,519 | | 1% |
| Paraguay | 896,484 | | 1% |
| El Salvador | 1,599,058 | | 1% |
| Mexico | 12,185,737 | | 0% |
| Ecuador | 1,127,891 | | 0% |
| Panama | 139,520 | | -1% |
| Guyana | 438,413 | | -2% |
| Belize | 52,756 | | -4% |
| Suriname | 273,209 | | -8% |
| Uruguay | 367,060 | | 9% |

FRP-FRN-01405


THEDIALOGUE

# Remittances to Latin America and the Caribbean: Economic Cycles



**Annual Flows and Growth**

FRP-FRN-01406



THE DIALOGUE

# Annual Volumes

| Country Name | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Argentina | $507,477,468 | $532,851,342 | $632,309,716 | $739,802,367 | $776,792,486 | $1,500,000,000.00 | $ 1,680,000,000. |
| Belize | $92,512,739 | $97,138,376 | $120,683,619 | $141,199,835 | $148,259,826 | $152,707,621.25 | |
| Bolivia | $1,391,583,100 | $1,327,163,177 | $1,122,088,964 | $1,386,915,536 | $1,456,261,312 | $1,500,000,000.00 | |
| Brazil | $2,933,489,276 | $2,921,939,191 | $3,566,219,438 | $4,172,476,743 | $4,381,100,580 | $4,937,500,353.85 | |
| Colombia | $6,367,489,861 | $6,922,185,706 | $6,873,553,689 | $8,597,240,000 | $9,416,242,000 | $10,043,426,214 | $ 11,047,768,835 |
| Costa Rica | $533,509,663 | $518,197,025 | $500,000,000 | $585,000,000 | $614,250,000 | $651,105,000 | |
| Cuba | | $1,531,537,875 | $995,499,619 | $1,164,734,554 | $1,222,971,282 | $2,458,459,584 | |
| Dominican Republic | $6,814,200,000 | $7,103,181,292 | $8,219,262,926 | $10,402,469,200 | $9,856,497,461 | $10,212,164,230 | $10,722,772,441 |
| Ecuador | $3,039,078,509 | $3,250,250,092 | $3,336,696,164 | $4,362,384,920 | $4,624,128,015 | $5,044,335,428 | $5,573,990,647 |
| El Salvador | $5,388,142,174 | $5,650,270,000 | $5,936,157,615 | $7,517,140,000 | $7,855,411,300 | $8,187,025,042 | $8,465,383,893 |
| Guatemala | $9,490,600,000 | $10,508,307,400 | $11,402,842,290 | $15,295,685,200 | $18,507,779,092 | $19,789,951,500 | $21,571,047,135 |
| Guyana | $285,501,612 | $299,776,693 | $361,234,057 | $422,643,846 | $443,776,039 | $452,651,559.35 | |
| Haiti | $2,417,296,755 | $2,509,973,822 | $3,268,203,146 | $3,655,760,565 | $3,316,282,132 | $3,440,332,855 | $3,853,172,797 |
| Honduras | $4,776,545,983 | $5,424,037,908 | $5,576,000,000 | $7,372,054,100 | $8,477,862,215 | $9,399,378,206 | $9,775,353,334 |
| Jamaica | $2,501,614,919 | $2,486,021,740 | $2,956,233,324 | $3,630,755,394 | $3,521,832,732 | $3,486,977,481 | $3,521,847,255 |
| Mexico | $33,677,227,200 | $36,438,758,100 | $40,604,553,800 | $51,585,680,000 | $58,502,781,700 | $63,739,089,821 | $65,651,262,515 |
| Nicaragua | $1,501,200,000 | $1,682,400,000 | $1,851,400,000 | $2,146,900,000 | $3,224,900,000 | $4,877,635,000 | $5,511,727,550 |
| Panama | $537,800,000 | $509,519,333 | $455,712,237 | $533,183,317 | $559,842,483 | $576,637,758 | |
| Paraguay | $682,869,966 | $568,433,190 | $583,714,989 | $562,946,537 | $591,093,864 | $621,000,000 | |
| Peru | $3,224,754,055 | $3,336,055,951 | $2,904,045,864 | $3,607,625,054 | $3,707,556,166 | $4,121,948,437 | $4,657,801,733 |
| Suriname | $519,054 | $545,007 | $519,054 | $607,293 | $637,658 | $656,788 | |
| Trinidad and Tobago | $138,708,323 | $145,643,739 | $178,016,261 | $208,279,026 | $218,692,977 | $224,160,302 | |
| Uruguay | $104,268,963 | $103,557,798 | $110,716,491 | $129,538,295 | $136,015,210 | $139,415,590 | |
| Venezuela, RB | $2,432,714,508 | $3,115,900,211 | $2,492,720,169 | $3,998,610,229 | $4,198,540,740 | $4,618,394,814 | |
| LAC (24 countries) | $88,839,104,128 | $97,488,650,606 | $104,048,383,432 | $132,219,632,011 | $145,759,507,270 | $160,174,953,582 | $168,288,701,264 |
| Top 10 recipt. | $79,198,149,455 | $85,311,442,011 | $92,928,948,818 | $118,173,694,433 | $131,011,272,814 | $142,342,264,212 | $150,352,128,140 |

FRP-FRN-01407


THEDIALOGUE

# Remittance Growth Patterns

**Growth is largely from politically conflictive countries**

| Country | 2001-2005 | 2005-2010 | 2010-2015 | 2015-2020 | 2020-2023 |
|---|---|---|---|---|---|
| Cuba | 3% | 2% | 4% | -16% | 43% |
| Nicaragua | 13% | 6% | 8% | 9% | 27% |
| Argentina | 18% | 8% | -5% | 6% | 23% |
| Venezuela | | | | 2% | 17% |
| Guatemala | 37% | 7% | 9% | 12% | 15% |
| Honduras | 24% | 8% | 7% | 9% | 14% |
| Mexico | 18% | -1% | 4% | 9% | 12% |
| Ecuador | 12% | 1% | -2% | 7% | 11% |
| Colombia | 10% | 4% | 3% | 8% | 10% |
| Peru | 14% | 12% | 1% | 1% | 9% |
| Panama | 12% | 26% | 6% | -7% | 9% |
| Brazil | 14% | 2% | -1% | 4% | 9% |
| El Salvador | 9% | 3% | 4% | 7% | 8% |
| Bolivia | 20% | 23% | 4% | -1% | 7% |
| Costa Rica | 16% | 5% | 1% | -2% | 7% |
| Guyana | 55% | 13% | -4% | 7% | 6% |
| Dominican Republic | 7% | 7% | 6% | 10% | 6% |
| Suriname | 81% | 2% | 9% | 79% | 5% |
| Belize | 9% | 12% | 2% | 7% | 5% |
| Jamaica | 11% | 3% | 3% | 5% | 4% |
| Uruguay | 562% | 10% | -6% | 4% | 4% |
| Trinidad and Tobago | 18% | 0% | 11% | 5% | 2% |
| Paraguay | 3% | 21% | 6% | 1% | 2% |
| Haiti | 10% | 8% | 8% | 8% | 1% |
| LAC (24 countries) | 15% | 3% | 4% | 11% | 11% |
| Top 10 recipt. | 15% | 3% | 4% | 11% | 11% |

FRP-FRN-01408

 THE DIALOGUE

FRP-FRN-01409

# Year on Year Remittance Growth

| Country | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| Argentina | 5% | 18% | 39% | 41% | 18% | 5% |
| Belize | 5% | 20% | 17% | 1% | 3% | |
| Bolivia | -4% | -19% | 26% | 3% | 3% | |
| Brazil | 0% | 18% | 17% | 5% | 13% | 10% |
| Colombia | 8% | -1% | 25% | 10% | 7% | 10% |
| Costa Rica | -3% | -4% | 19% | 4% | 6% | |
| Cuba | -176% | 3% | 205% | 33% | 33% | |
| Dominican Republic | 4% | 14% | 27% | -5% | 4% | 5% |
| Ecuador | 6% | 3% | 31% | 6% | 9% | 10% |
| El Salvador | 5% | 5% | 27% | 4% | 4% | 3% |
| Guatemala | 10% | 8% | 34% | 21% | 7% | 9% |
| Guyana | 25% | 11% | 13% | 28% | 2% | |
| Haiti | 4% | 23% | 12% | -9% | 4% | 13% |
| Honduras | 12% | 3% | 32% | 15% | 11% | 4% |
| Jamaica | -1% | 16% | 23% | -3% | -1% | 1% |
| Mexico | 8% | 10% | 27% | 13% | 9% | 3% |
| Nicaragua | 11% | 9% | 16% | 50% | 51% | 13% |
| Panama | 7% | -50% | 47% | -7% | 3% | |
| Paraguay | -20% | 3% | -4% | 5% | 5% | |
| Peru | 3% | -15% | 24% | 3% | 11% | 14% |
| Suriname | -3% | 22% | 19% | 0% | 3% | |
| Trinidad and Tobago | 4% | 26% | 20% | -13% | 2% | |
| Uruguay | -2% | -1% | 13% | -1% | 2% | |
| Venezuela, RB | 22% | -25% | 60% | 5% | 10% | |
| **LAC (24 countries)** | **7%** | **6%** | **27%** | **11%** | **9%** | **6%** |
| **Top 10 recipt.** | **7%** | **9%** | **27%** | **11%** | **8%** | **5%** |



THEDIALOGUE

FRP-FRN-01410

# The Larger Latin American and Caribbean Trend

**THEDIALOGUE**
Leadership for the Americas

# Global Flows to Latin America and the Caribbean 2024

| Region | Volume | Transactions | Annual Personal Remitted | |
|---|---|---|---|---|
| World | $168,288,701,264 | 41,289,445 | $4,076 | |
| United States | $134,630,961,011 | 30,163,777 | $4,463 | 80% |
| Latin America and Caribbean | $3,365,774,025 | 3,991,250 | $843 | 2% |
| Europe and Rest of World | $30,291,966,227 | 7,634,419 | $3,968 | 18% |

FRP-FRN-01411

 THEDIALOGUE

# Is the digital market growing?

### Remittance Transactions, Migration and Digital Transfer Share of Total

- Remitly: 19%,
- WU: 6%
- MG & RIA: 3%
- Others (Xoom [5%],): 8%



**Digital share** — **Total Transactions** — **Latin American Migration to US**

Digital share values: 9%, 14%, 18%, 21%, 32%, 35%, 34%, 36%, 36%, 38%, 38%, 38%, 39%, 42%, 47%, 47%, 51%

Years: 2016 2017 2018 2019 2020 2021 2022 2023 2024 2025 2026 2027 2028 2029 2030 2031 2032

Millions

FRP-FRN-01412

THEDIALOGUE

# Global Remittance Flows and Global Transfer Market Share, 2018-2023

| Global Flows and RSPs | Volume transferred US$,000,000 | | | | | | Volume growth 2023 (%) | Global transfers | |
|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | | Market share 2020 (%) | Market share 2023 (%) |
| Low & middle income | $478,108 | $497,095 | $500,716 | $568,103 | $588,102 | $669,000 | 14% | 76% | 78% |
| Latin America & Caribbean | $90,137 | $97,596 | $104,251 | $131,693 | $146,387 | $158,831 | 9% | 16% | 18% |
| World | $633,956 | $658,224 | $657,451 | $739,456 | $766,848 | $860,000 | 12% | | |
| Western Union | | | $96,100 | $109,000 | $96,800 | $99,046 | 2% | 15% | 12% |
| Remitly | | | $17,000 | $20,500 | $28,700 | $37,347 | 30% | 3% | 4% |
| Intermex | | | $12,127 | $17,348 | $21,000 | $24,381 | 16% | 1% | 3% |
| MoneyGram | | | $24,000 | | | $25,000 | 4% | 4% | 3% |
| RIA | | | $25,000 | | | $26,000 | 4% | 4% | 3% |
| Viamericas | | | $4,323 | | | $11,900 | | 0.7% | 1.5% |

FRP-FRN-01413

 THEDIALOGUE

# MTO Market for US-Latin America and the Caribbean Remittances

| MTOs in the Market for US to Latin America and the Caribbean | 2023 Volume (US$,000,000) | 2023 Average remittance sent (US$) | Share of remittance volume 2020 | 2023 |
|---|---|---|---|---|
| US-LAC | 139,040 | | | |
| Intermex | 21,943 | 387 | 13% | 16% |
| MG | 6,345 | 385 | 7% | 5% |
| Remitly | 26,145 | 445 | 14% | 19% |
| RIA | 6,500 | 385 | 7% | 5% |
| WU | 24,762 | 400 | 29% | 18% |
| Viamericas | 11,809 | 440 | 5% | 9% |
| Other competitors (Dolex, Xoom, WorldRemit, JN Money, Jc.) | 54,076 | 405 | 24% | 31% |
| Within LAC | 4,765 | | | |
| Rest to LAC | 15,026 | | | |
| All to Latin America and the Caribbean | 158,831 | | | |

- A flux between legacy and newcomers in the business,
- A persistence in the business model above innovation points that changes in market share are shaped by the latter:
  - a staying and resilient effort to hold to a business model focused on their base.
    - Remitly and Viamericas;
    - Western Union and Xoom.

 THE DIALOGUE

FRP-FRN-01414

FRP-FRN-01415

# Remittances to Central America

THEDIALOGUE
Leadership for the Americas

# Remittance growth is a function of migration, amount remitted, and business intermediation

- Migration will continue in slower pace and likely faced with more restrictions against irregular entry;

- Growth will stand at 5% annual for the next three years

- Average remittance sending will remain low, below 3% per year due to rise in unemployment and cost of living;

- Intermediation will continue to change towards digital transfers but at a slow pace at 3% annual growth;

- In turn, annual remittance growth will be 6% average, with El Salvador exhibiting the lowest, Nicaragua the highest growth for a total of 8 million transactions by 2027 and more than US$50 billion

FRP-FRN-01416


THEDIALOGUE

# Growth of Remittances to Central America



FRP-FRN-01417



# Regular, legal migration as percent of all migration

- Central American migration has historically been led by irregular entry to the US;
- Future migration will be shaped by irregularity due to limited legal migration and guest worker mobility

| Regular Migration as Share of Total Migration | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| El Salvador | 30% | 12% | 32% | 12% | 21% | 25% | 31% |
| Guatemala | 6% | 3% | 7% | 2% | 7% | 4% | 5% |
| Honduras | 6% | 3% | 8% | 2% | 6% | 5% | 9% |
| Nicaragua | 47% | 21% | 49% | 3% | 1% | 2% | 2% |
| Four Countries | 11% | 5% | 14% | 3% | 6% | 7% | 8% |

| H2A&H2B visas | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| El Salvador | 740 | 810 | 317 | 1,237 | 4,471 | 5,365 | 5,633 |
| Guatemala | 7,232 | 5,806 | 3,805 | 5,893 | 7,072 | 8,486 | 8,910 |
| Honduras | 1,150 | 1,135 | 1,317 | 2,668 | 5,116 | 6,139 | 6,446 |
| Nicaragua | 549 | 704 | 758 | 845 | 1,006 | 1,026 | 1,077 |
| Four Countries | 9,671 | 8,455 | 6,197 | 10,643 | 17,665 | 21,016 | 22,067 |

FRP-FRN-01418

 THEDIALOGUE

# Legal permanent status arrivals

| LPR–Green Card | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| El Salvador | 16,014 | 10,605 | 5,343 | 7,787 | 15,670 | 16,454 | 17,276 |
| Guatemala | 9,188 | 5,479 | 2,302 | 2,703 | 7,259 | 7,622 | 8,003 |
| Honduras | 6,997 | 6,045 | 2,250 | 3,156 | 7,563 | 7,941 | 8,338 |
| Nicaragua | 1,953 | 2,327 | 1,126 | 3,216 | 2,067 | 1,894 | 1,989 |
| Four Countries | 34,152 | 24,456 | 11,021 | 16,862 | 32,559 | 33,911 | 35,606 |

FRP-FRN-01419



THEDIALOGUE

# US-Mexico Border Irregular Encounters of Central American Migrants

**Migration from Central America**



FRP-FRN-01420



# Annual migration from Central America

## Levelling to 2018, Pre-pandemic Years





# Unemployment among Latino migrants, from 4.3% January 2020 to 5% at December 2024 will reduce the demand of migrants



**Latino Migrant Unemployment**

FRP-FRN-01422





# Average Remitted per Transaction

FRP-FRN-01423





# Volume of Remittances

FRP-FRN-01424

# Total Migrant and Remittance Sending Population

| Countries | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|
| El Salvador | 1,375,633 | 1,423,146 | 1,494,053 | 1,582,027 | 1,665,302 |
| Guatemala | 2,354,317 | 2,525,819 | 2,751,003 | 2,989,425 | 3,222,252 |
| Honduras | 1,310,453 | 1,408,868 | 1,534,987 | 1,668,526 | 1,798,964 |
| Nicaragua | 1,152,495 | 1,189,020 | 1,308,808 | 1,419,003 | 1,520,590 |
| Four countries | 6,192,898 | 6,546,853 | 7,088,851 | 7,658,981 | 8,207,109 |
| Senders | 4,557,973 | 4,818,484 | 5,217,394 | 5,637,010 | 6,040,432 |

FRP-FRN-01425



THEDIALOGUE

# Payers' Competition in Central America, 2023

| Payer | El Salvador |
|---|---|
| Banco Davivienda | 8% |
| Fedecrédito | 16% |
| Fedecases | 14% |
| Banco Agrícola | 11% |
| Airpak | 14% |
| Other | 37% |
| P2P | 1,428,571 |

| Payer | Guatemala |
|---|---|
| Banrural | 40% |
| Banco Industrial | 32% |
| Banco G&T | 9% |
| Airpak | 4% |
| Banco Azteca | 3% |
| Banco Promérica | 1% |
| BAM | 2% |
| BAC | 1% |
| BANTRAB | 4% |
| P2P | 2,550,000 |

| Payer | Honduras |
|---|---|
| Banco Atlántida | 36% |
| Banco Ficohsa | 22% |
| Airpak | 11% |
| Banco Azteca | 21% |
| Other | 9% |
| P2P | 1,152,000. |

| Payer | Nicaragua |
|---|---|
| Banpro | 35% |
| Airpak | 25% |
| Others (BAC, Lafise, others) | 40% |
| P2P | 1,085,000 |

FRP-FRN-01426

 THE DIALOGUE

# Transactions and Volume (2023)

| Country IB | 2023 Transactions | Monthly Transactions | Person to Person | Volume |
|---|---|---|---|---|
| Guatemala | 42,400,000 | 3,533,333 | 2,494,118 | $19,803,959,789 |
| Nicaragua | 18,444,400 | 1,537,033 | 1,084,965 | $4,877,635,000 |
| El Salvador | 25,524,382 | 2,127,032 | 1,501,434 | $8,091,960,000 |
| Honduras | 22,000,000 | 1,816,667 | 1,152,941 | $9,173,678,584 |
| Four Countries | | 5,935,000 | | $41,947,233,374 |

FRP-FRN-01427

 THEDIALOGUE

# Central Americans in the US

| El Salvador | Guatemala | Honduras | Nicaragua |
|---|---|---|---|
| California (32%), | California (27%), | Texas (20%), | Florida (37%), |
| Texas (14%), | Florida (8%), | Florida (14%), | California (25%), |
| Maryland (8%), | Texas (8%), | California (10%), | Texas (8%), |
| New York (8%) | New York (5%) | New York (8%) | New York (3%) and |
| Virginia (7%). | New Jersey (4%) | North Carolina (5%) | Maryland (3%). |

FRP-FRN-01428

 THEDIALOGUE

# Asylum applicants by district court

| City | Asylum |
|------|--------|
| Arlington | 16% |
| Boston | 3% |
| Chicago | 12% |
| Houston | 12% |
| Los Angeles | 6% |
| Miami | 16% |
| New Orleans | 2% |
| New York | 8% |
| Newark | 8% |
| San Francisco | 5% |
| Tampa | 11% |

Note: Central Americans are among the top 10 asylum applicants who capture 80%. People from Venezuela, Haiti, Colombia, and Cuba are among the rest. Weighting for those populations above with strong presence in Florida, Central American newly arrived migrants may be concentrated in these cities.

FRP-FRN-01429

 THE DIALOGUE

# Remittances as Percent of Gross Domestic Product

| País | 1990 | 2000 | 2010 | 2015 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| Argentina | 0.0 | 0.0 | 0.2 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | |
| Belize | 3.4 | 2.2 | 4.5 | 3.8 | 4.0 | 4.0 | 5.8 | 5.4 | | |
| Bolivia | 0.1 | 1.5 | 4.9 | 3.6 | 3.4 | 3.3 | 3.1 | 3.5 | 3.5 | |
| Brazil | 0.1 | 0.2 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | | |
| Colombia | 1.0 | 1.6 | 1.4 | 1.7 | 2.0 | 2.2 | 2.6 | 2.7 | 2.8 | 2.9 |
| Costa Rica | 0.2 | 0.9 | 1.4 | 1.0 | 0.9 | 0.9 | 0.8 | 0.9 | 1.0 | |
| Dominican Republic | 4.5 | 7.6 | 7.2 | 7.3 | 8.0 | 8.3 | 10.6 | 11.4 | 10.3 | 8.4 |
| Ecuador | 0.3 | 7.2 | 3.7 | 2.4 | 2.8 | 3.0 | 3.4 | 4.1 | 4.2 | 4.1 |
| El Salvador | 7.6 | 15.0 | 18.8 | 18.2 | 20.7 | 21.0 | 24.1 | 26.1 | 26.7 | 24.5 |
| Guatemala | 1.6 | 3.1 | 10.4 | 10.4 | 12.9 | 13.8 | 14.7 | 17.9 | 20.0 | 20.0 |
| Guyana | .. | 3.8 | 10.7 | 7.1 | 7.0 | 7.4 | 7.8 | 6.8 | 6.8 | 13.0 |
| Haiti | .. | 8.5 | 12.4 | 14.8 | 18.0 | 20.5 | 23.8 | 20.0 | 17 | |
| Honduras | 1.3 | 6.6 | 16.5 | 17.5 | 19.8 | 21.5 | 23.5 | 25.3 | 28.8 | 28.0 |
| Jamaica | 5.0 | 9.7 | 15.3 | 16.6 | 15.9 | 16.2 | 22.2 | 25.3 | 25.6 | 20.2 |
| Mexico | 1.2 | 1.1 | 2.1 | 2.2 | 2.9 | 3.1 | 3.9 | 4.3 | 4.6 | 3.8 |
| Nicaragua | .. | 6.3 | 9.4 | 9.4 | 11.6 | 13.4 | 14.7 | 15.3 | 22.2 | 29.1 |
| Panama | 1.7 | 0.1 | 1.4 | 1.0 | 0.8 | 0.9 | 0.8 | 0.9 | 0.9 | |
| Paraguay | 0.6 | 1.7 | 1.5 | 1.5 | 1.7 | 1.8 | 1.6 | 1.5 | 1.3 | |
| Peru | 0.3 | 1.4 | 1.7 | 1.4 | 1.4 | 1.5 | 1.5 | 1.6 | 1.7 | 1.5 |
| Suriname | 0.1 | 0.1 | 0.1 | 0.1 | 2.5 | 2.4 | 4.3 | 4.9 | 4.9 | |
| Trinidad and Tobago | 0.1 | 0.5 | 0.4 | 0.6 | 0.6 | 0.6 | 0.9 | 1.0 | 1.0 | |
| Uruguay | .. | .. | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | | 0.2 | |
| Venezuela, RB | 0.0 | 0.0 | 0.0 | 0.0 | .. | .. | .. | .. | 5.3 | 6.0 |

Source: Central Bank and IMF (for GDP in 2023)

THE DIALOGUE

FRP-FRN-01430

**Over time, migration growth slows down when the diaspora is over 20% of its population: 1% increase of migrants relative to their homeland population, decreases growth by 2.7%.**



Migrants as Share of Population and Annual Migr. Growth

FRP-FRN-01431


THEDIALOGUE



**Growth of Remittances, 2015-2021 and Share of Migrants relative to Population (2021): Remittance flows slow down during normal times across countries with large diasporas and decades-long migration**

FRP-FRN-01432





**Political stability correlates negatively to migration**

 THEDIALOGUE

FRP-FRN-01433

# Migration, informality and labor productivity



FRP-FRN-01434



# Migration and Env. Vulnerability in Latin America and the Caribbean, 2000 – 2020: not a correlation but...



FRP-FRN-01435



# Climate Change and Migration in Central America (2000-2021)

- The regularized effect of natural disasters creates displacement or gradual wearing out of resources over time.

- In turn, some relationship between migration and climate change exists

- Statistically, there is no relationship because these events do not always have immediate effects, with some exceptions as a massive event like Hurricane Eta.

- However, is important to consider diaspora engagement on issues related to conservation and climate adaptation among Caribbean countries and some from Central America.

| Type of Disaster | El Salvador | Guatemala | Honduras | Nicaragua | Four Countries |
|---|---|---|---|---|---|
| Flood | 8 | 18 | 9 | 13 | 48 |
| Tropical Cyclone | 7 | 4 | 5 | 8 | 24 |
| Epidemic | 6 | 3 | 6 | 3 | 18 |
| Drought | 4 | 4 | 5 | 3 | 16 |
| Earthquake | 5 | 5 | 2 | 2 | 14 |
| Tech. Disaster | 2 | 8 | | | 10 |
| Severe Local Storm | 2 | 2 | 1 | 4 | 9 |
| Volcano | 2 | 6 | | | 8 |
| Land Slide | 1 | 4 | | 1 | 6 |
| Other | | 2 | 1 | 1 | 4 |
| Cold Wave | | 3 | | | 3 |
| Wildfire | | | 2 | 1 | 3 |
| Mud Slide | | 1 | | 1 | 2 |
| Extreme Temperature | | 1 | | | 1 |
| Fire | | | 1 | | 1 |
| Mudslide | | 1 | | | 1 |
| Storm Surge | 1 | | | | 1 |
| Tornadoes | | | | 1 | 1 |
| Wave | | | 1 | | 1 |
| Total | 38 | 62 | 33 | 38 | 171 |

FRP-FRN-01436

 THEDIALOGUE

FRP-FRN-01437



**US$10.1 billion;
7% Growth;
2.8% of GDP**



THE**DIALOGUE**
Leadership for the Americas

# Colombia



**Colombia**

**Month to Month Principal sent and Monthly Aggregate Flows**

— **Remittances (US$,000,000)**    — **Personal Remit**

FRP-FRN-01438

THEDIALOGUE



# Colombia

**Migrant Apprehensions in US border and Aggregate Monthly Flows**

— Irregular entry   — Remittances (US$,000,000)

FRP-FRN-01439

THE**DIALOGUE**



**Colombia**

**Month to Month Aggregate Flows and Principal Sent**

FRP-FRN-01440



FRP-FRN-01441

US$10.2 billion;
3.1% Growth;
8.4% of GDP

# Dominican Republic



THE**DIALOGUE**

Leadership for the Americas



FRP-FRN-01442

THEDIALOGUE