YAAKOV M. ROTH
*Acting Assistant Attorney General*
DREW C. ENSIGN
*Deputy Assistant Attorney General*

KATHERINE J. SHINNERS
*Senior Litigation Counsel*

ELISSA FUDIM
*Trial Attorney*

U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-6073
Email: elissa.p.fudim@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| Svitlana Doe, *et al.*, | ) Civil Action No. 1:25-cv-10495 |
| Plaintiffs, | ) |
| v. | ) Leave to File Granted on 1/15/26 |
| Kristi Noem, in her official capacity as Secretary of Homeland Security, *et al.*, | ) |
| Defendants. | ) |

---

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND/OR STAY OF THE TERMINATION OF EXISTING GRANTS OF FRP PAROLE

## TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Background ............................................................................................................ 3

Argument .............................................................................................................. 6

    I.    The Court Lacks Jurisdiction Over Claims Challenging Parole Termination ................................................................................................ 6

    II.    The Secretary's Termination of Parole Was Not Arbitrary and Capricious ........................................................................................... 7

        i.    The Secretary Appropriately Considered Whether FRP Programs Had Discouraged Irregular Migration ........................................ 7

        ii.    The Secretary Considered Reliance Interests ........................... 10

        iii.    The Secretary Adequately Considered Alternatives ................ 11

    III.    The Secretary Did Not Exceed Her Statutory Authority ....................... 13

    IV.    The Notice Was Sufficient and Complied with the Law ........................ 16

        i.    DHS's Notice Satisfies the Regulatory Requirements .............. 17

        ii.    DHS's Notice Satisfies the Constitution .................................. 20

    V.    Notice and Comment Was Not Required ............................................... 22

    VI.    The Balance of the Equities Favors the Government ............................. 23

    VII.    The Court Should Require Bond Under Fed. R. Civ. P. 65(c) ............... 25

Conclusion .......................................................................................................... 25

# TABLE OF AUTHORITIES

Cases

*Aldea-Tirado v. PricewaterhouseCoopers, LLP*,
    101 F.4th 99 (1st Cir. 2024) ........................................................... 19

*Am. Hosp. Ass'n v. NLRB*,
    499 U.S. 606 (1991) ....................................................................... 16

*Am. Mining Cong. v. MSHA*,
    995 F.2d 1106 (D.C. Cir. 1993) ..................................................... 23

*Arizona v. United States*,
    567 U.S. 387 (2012) ....................................................................... 24

*Bank of Commerce v. Bd. of Governors*,
    513 F.2d 164 (10th Cir. 1975) ....................................................... 18

*Board of Regents v. Roth*,
    408 U.S. 564 (1972) ................................................................. 20, 21

*Chow v. U.S.I.N.S.*,
    74 F. App'x 733 (9th Cir. 2003) .................................................... 21

*City of Brookings Mun. Tele. Co. v. F.C.C.*,
    822 F.2d 1153 (D.C. Cir. 1987) ..................................................... 13

*Conn. Bd. of Pardons v. Dumschat*,
    452 U.S. 458 (1981) ................................................................. 20, 21

*DHS v. Thuraissigiam*,
    591 U.S. 103 (2020) ....................................................................... 21

*Doe v. Noem*,
    152 F.4th 272 (1st Cir. 2025) .................................................. passim

*Fed. Power Comm'n v. Texaco, Inc.*,
    377 U.S. 33 (1964) ......................................................................... 16

*General Elec. Co. v. EPA*,
    290 F.3d 377 (D.C. Cir. 2002) ...................................................... 22

*Greenholtz v. Neb. Penal Inmates*,
    442 U.S. 1 (1979) .................................................................... 20, 21

*Heckler v. Campbell,*
 461 U.S. 458 (1983)..................................................................................... 16

*INS v. Legalization Assistance Project,*
 510 U.S. 1301 (1993).................................................................................. 24

*Kiobel v. Royal Dutch Petroleum Co.,*
 569 U.S. 108 (2013)..................................................................................... 24

*Kisor v. Wilkie,*
 588 U.S. 558 (2019)..................................................................................... 19

*Kucana v. Holder,*
 558 U.S. 233 (2010)....................................................................................... 6

*Lincoln v. Vigil,*
 508 U.S. 182 (1993)..................................................................................... 22

*Lyng v. Payne,*
 476 U.S. 926 (1986)..................................................................................... 21

*Mak v. INS,*
 435 F.2d 728 (2d Cir. 1970)........................................................................ 16

*Maryland v. King,*
 567 U.S. 1301 (2012).................................................................................. 23

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,*
 463 U.S. 29 (1983)................................................................................. 7, 12

*Nken v. Holder,*
 556 U.S. 418 (2009)..................................................................................... 23

*Noem v. Doe,*
 145 S. Ct. 1524 (2025)................................................................................ 25

*Reno v. Flores,*
 507 U.S. 292 (1993)..................................................................................... 16

*S.A. v. Trump,*
 363 F. Supp. 3d 1048 (N.D. Cal. 2018) ...................................................... 11

*Vainisi v. Comm'r,*
 599 F.3d 567 (7th Cir. 2010)....................................................................... 18

*Vermont Yankee Nuclear Power Corp. v. NRDC,*
 435 U.S. 519 (1978)..................................................................................... 18

*Webster v. Doe*,
   486 U.S. 592 (1988).................................................................................... 7

*Winter v. Nat. Resource Def. Counsel*,
   555 U.S. 7 (2008)...................................................................................... 24

*Yang v. INS*,
   79 F.3d 932, *cert. denied* 519 U.S. 824 (1996)...................................... 16

Statutes

5 U.S.C. § 701(a)(1)....................................................................................... 7

8 U.S.C. § 1182(d)(5).................................................................... 6, 13, 21, 23

44 U.S.C. § 1507........................................................................................... 18

Rules

Fed. R. Civ. P. 65(c)...................................................................................... 25

Regulations

8 C.F.R. § 103.8(a)(1)................................................................................... 17

8 C.F.R. § 212.5......................................................................... 14, 15, 16, 17

## <u>INTRODUCTION</u>

Plaintiffs seek preliminary relief from the government's termination of the parole of aliens who received parole under the family reunification parole programs for nationals of Cuba, Haiti, Colombia, Ecuador, El Salvador, Guatemala, and Honduras and their immediate family members (the FRP programs). The FRP programs, which were created or modernized in 2023, relied on categorical reasons that the parole statute's requirements were met to permit parole into the United States of inadmissible aliens who otherwise would be required to await an available immigrant visa. Parolees were advised that their parole could be terminated at any time.

On December 15, 2025, the Secretary of Homeland Security terminated the FRP programs, which included terminating, as of January 14, 2026, any existing periods of parole granted to aliens under the FRP programs, unless the aliens filed an application for adjustment of status as of December 15, 2025 or the Secretary decides not to terminate their parole on a case-by-case basis. *Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans,* 90 Fed. Reg. 58032 (Dec. 15, 2025) (the "FRP FRN"). On January 10, 2026, the Court granted a temporary restraining order (the TRO) staying the effect of the termination of individual parole grants as to a certified class of affected parolees for 14 days, relying on the Court's preliminary view that the notice of termination provided did not comply with the governing regulation or due process. Doc. No. 243.

As an initial matter, Plaintiffs are unlikely to succeed on their claim that the parole termination was effected without proper notice. Contrary to the Court's preliminary conclusion, the Secretary was not required to provide notice to all FRP parolees individually by mail. The notice provided via the FRN satisfies the written notice requirements in the regulation. Further, there is no constitutional dimension to this notice claim—because parole is a discretionary benefit and its termination is also discretionary. But even if there were, notice by publication has routinely

been found to satisfy due process. But even if this Court disagrees, the notices that went out, and those that were scheduled to go out but for the Court's TRO, via parolees' USCIS online accounts and via mail for FRP parolees who do not have online accounts (Cubans and Haitians paroled under the FRP programs for those countries before those programs were modernized in 2023) also satisfy the regulations' notice provision. Further, once the Court's stay is lifted, USCIS intends to provide new individualized notice to affected parolees 30 days in advance of the termination of their parole grants, which should remedy the Court's concerns regarding notice.

Plaintiffs' remaining arguments are also unlikely to succeed. Plaintiffs contend the Secretary's termination decision was arbitrary and capricious, contrary to law, and unlawful for lack of notice-and-comment. *See* Doc. No. 218. These arguments lack merit. The Secretary's parole termination decision was reasonable and reasonably explained. She explained that the FRP programs did not meet one of their goals—the reduction in irregular migration from the FRP countries. Plaintiffs deny that reduction in irregular migration was a goal of the FRP programs, but the Federal Register Notices announcing the new programs belie that assertion. *See, e.g.*, Doc. No. 24-28, 88 Fed. Reg. 43581, 43583 (Jul. 10, 2023). Those Notices state that the FRP programs were intended to reduce irregular migration in two ways—first by reducing unlawful migration by parole beneficiaries themselves, and second by reducing unlawful migration by the friends, family, and communities of the beneficiaries, to whom the beneficiaries would send remittances. *Id*. Relying upon empirical data, the Secretary explained that this goal had not been meaningfully realized. 90 Fed. Reg. at 58034-44. Plaintiffs argue this explanation supports only the Secretary's decision to terminate the FRP programs but not grants of parole. Not so. The failure of the programs to meet their stated goals supports not only the termination of the programs but also grants of parole thereunder. *Doe v.  Noem*, 152 F.4th 272, 290 (1st Cir. 2025). The Secretary discussed other reasons for terminating grants of parole, including concerns with inadequate

vetting in the new and modernized FRP programs and resulting national-security and public-safety risks, as well as the fact that administering the programs, including the review of re-parole applications by parolees, uses agency resources that could be allocated elsewhere. 90 Fed. Reg. at 58045. And contrary to Plaintiffs' conclusory arguments, the Secretary considered reliance interests and alternatives. *Id* at 58041-45.

Neither was the Secretary's decision contrary to law. Plaintiffs argue the Secretary did not determine that the purposes of parole "have been served," as the statute requires, but that is plainly not true. *Id*. at 58045. Plaintiffs also argue that the Secretary was obligated to make such a determination on a case-by-case basis, but the First Circuit held that they were not likely to succeed on that argument when it reversed the grant of preliminary relief from the CHNV[1] parole termination. *Doe*, 152 F.4th at 285. That holding controls this new motion for a preliminary injunction pressing the same argument, regarding the same statutory text, in the same procedural posture. Plaintiffs' arguments that parole terminations were required to undergo notice-and-comment is also plainly wrong, as the Secretary did not engage in rulemaking by using the discretion given to her by Congress to terminate parole.

Thus, the Court should deny Plaintiffs' motion for a preliminary injunction and/or stay.

## BACKGROUND[2]

On December 15, 2025, the Secretary announced that DHS had evaluated the FRP programs and was terminating them because they "do not serve a significant public benefit, are not necessary to reduce levels of unlawful immigration, and are not serving all their intended purposes." 90 Fed. Reg. at 58034. The Secretary announced that existing parole grants will

---

[1] CHNV refers to the parole programs for Cubans, Haitians, Nicaraguans, and Venezuelans instituted 2023. *See, e.g., Doe v. Noem*, 152 F.4th 272, 279–80 (1st Cir. 2025).
[2] This incorporates by references the background provided in Doc. No. 233.

3

terminate as of January 14, 2026, unless (1) the alien filed an application for adjustment of status that is postmarked as of December 15, 2025, that is still pending adjudication as of January 14, 2026; or (2) the Secretary determines otherwise on a case-by-case basis. *Id.* at 58032–33.

The Secretary explained her decision, addressing each of the goals of the various FRP programs. First, the Secretary acknowledged that the programs were created to promote family unity, but determined that national security and fraud concerns, as well as the current Administration's policy priorities, outweighed that interest. *Id.* Unlike with consular processing for a visa, under the modernized FRP programs there was no collection of biometrics or in-person interview abroad for the beneficiary and "minimal public safety and national security vetting of potential beneficiaries" before issuing an advance travel authorization. *Id.* at 58034–35. Accordingly, the programs created "security gaps not present in" consular processing and created an "untenable likelihood" of the entry of bad actors, "posing an unacceptable level of risk to the United States' national security and public safety." *Id.* at 58035. The Secretary also addressed the risk of abuse and fraud where biometrics collection does not occur before arrival in the United States and where beneficiaries are from countries with weak civil registry systems. *See id.* DHS "determined that the desire to reunite families" does not outweigh these weighty fraud, national security, and public safety concerns. *Id.*

Next, the Secretary addressed the goal of furthering prior Administrations' foreign policy objectives. She determined that those policy objectives did not align with this Administration's. This Administration is not pursuing the same regional migration management strategy, but instead aims to reduce and deter unlawful immigration through other means. *Id.* at 58035–37.

The Secretary then turned to key goals of each of the FRP programs: encouraging orderly entry and discouraging irregular migration, thereby reducing strain at the Southwest border. *See id.* at 58037, 58039. The Secretary acknowledged that the FRP programs were not meant to, "on

4

their own, substantially decrease the number of encounters along the southwest border" and recognized that some aliens may have pursued FRP rather than seeking to enter unlawfully. *Id.* at 58037. But the Secretary determined that the relatively small number of parolees as compared to the huge numbers of illegal entrants during the relevant period did not warrant maintaining this pathway, particularly because other immigration enforcement policies serve to discourage visa-petition beneficiaries from undertaking the dangerous journey. *See id.* at 58037, 58039. In sum, "the FRP programs did not noticeably decrease unlawful migration, or at the very least were not nearly as effective as other policies[.]" *Id.* at 58038. The programs in fact led to "an increased strain on DHS personnel and resources" to process parole requests. *Id.* at 58039–40.

The Secretary then evaluated the final significant-public-benefit factor underlying the FRP programs: increased remittances to sending countries. She determined that the low volume of participants in the FRP programs "fell short of addressing underlying economic drivers of unlawful migration." *Id.* at 58040. Overall, the Secretary concluded that the FRP programs did not meet their intended goals, strained DHS resources, and posed national security risks. *Id.* at 58041.

The Secretary also acknowledged reliance interests. As to current parolees, the Secretary noted that reliance interests were diminished because parole was terminable at the Secretary's discretion at any time and the initial parole period was always time-limited. *Id.* at 58044. She found the government's interest in promptly returning parolees when the basis for the programmatic parole is no longer served outweighed any reliance interests. *See id.* The Secretary emphasized that a longer wind-down period or allowing parolees' current parole period to expire would defeat the Administration's policy of realigning the use of parole with the statutory language, because those alternatives would "allow continued reliance on parole as a pathway to adjustment of status" and would not resolve the risk posed by the "insufficient vetting they received prior to entry." *Id.*

Following publication of the FRN, on January 5, 2026, USCIS sent 3,501 FRP parolees

5

electronic notice of the parole termination via their myUSCIS accounts. *See* Doc. No. 250, Declaration of James Kernochan ("Kernochan Decl.") at ¶ 15. Every parole beneficiary of the modernized FRP programs has a myUSCIS account. *Id*. at ¶ 13. As to the 628 legacy FRP parolees who are part of the class, mailed notice to them had not yet been sent. *Id*. at ¶¶ 18-19. If the stay is lifted, USCIS intends to issue new notices to all FRP parolees terminating parole and employment-based work authorization thirty days after notification. *Id*. at ¶ ¶¶ 20-23.

Any parolee whose parole will terminate under the FRN may still seek an additional period of parole by filing a Form I-131 and demonstrating urgent humanitarian reasons or significant public benefit based on his or her individual circumstances and that he or she merits a favorable exercise of discretion. *Id.* at 58043 & n.90.

## ARGUMENT

### I.    The Court Lacks Jurisdiction Over Claims Challenging Parole Termination.

Threshold grounds preclude granting Plaintiffs' motion for preliminary injunctive relief.

*First*, 8 U.S.C. § 1252(a)(2)(B)(ii) precludes jurisdiction over claims challenging the Secretary's discretionary decision to terminate individual grants of parole. The Secretary may terminate parole when, in her "opinion," the "purposes" of parole "have been served." *See* 8 U.S.C. § 1182(d)(5)(A). The parole statute thus specifies that terminating parole is in the Secretary's discretion, and § 1252(a)(2)(B)(ii)'s judicial-review bar applies. *See* 8 U.S.C. § 1252(a)(2)(B)(ii); *Kucana v. Holder*, 558 U.S. 233, 247–48 (2010). The INA makes clear that review is precluded where the statute makes a determination discretionary, *regardless* of whether that discretion is exercised appropriately. *Cf. Kucana*, 558 U.S. at 247–48. All agree that an *individual* parole-termination decision is discretionary and thus not judicially reviewable. *See, e.g.*, Doc. No. 125 at 15–16. Such a decision does not become reviewable if made alongside approximately 10,000 others. Had the Secretary issued separate notices terminating each alien's parole—with no

explanation—that would be unreviewable. Yet, under Plaintiffs' view, those determinations become reviewable when combined and set forth in a notice explaining in detail the common reasons behind the parole terminations, with explicit consideration of reliance interests. Nothing in the statutory text suggests that Congress intended—or created—such a scheme.

*Second*, even if § 1252(a)(2)(B)(ii) did not preclude review, the parole termination decision is "committed to agency discretion by law." *Webster v. Doe*, 486 U.S. 592, 600 (1988); 5 U.S.C. § 701(a)(1); *see also* Doc. No. 114 at 15. No "meaningful judicial standard of review," *Webster*, 486 U.S. at 600, exists to evaluate whether the Secretary's opinion was that the purposes of parole have been served. This forecloses, at minimum, any substantive review of the rationales for the Secretary's opinion that the purposes of parole have been served.

## II.    The Secretary's Termination of Parole Was Not Arbitrary and Capricious.

The termination of parole is committed to the Secretary's "opinion," and the APA does not compel the Secretary to provide a reasoned explanation for her opinion, let alone painstakingly justify it. But the Secretary did thoroughly explain her decision—addressing each of the justifications cited for the FRP programs and explaining why they did not justify the continuation of parole or the parole programs. The parole termination decision thus withstands APA review. *See Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency need only "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.''). Plaintiffs may disagree with the Secretary's discretionary decision, but the Court cannot substitute its judgment for that of the agency. *Id.*; *Doe*, 152 F.4th at 290.

### (i)    The Secretary Appropriately Considered Whether FRP Programs Had Discouraged Irregular Migration.

Plaintiffs acknowledge that that the Secretary explained her rationale for terminating the

FRP programs. Doc. 218 at 10. But they argue that her rationale is arbitrary and capricious because it focuses in substantial part on whether the FRP programs had reduced unlawful migration at the Southwest border. Plaintiffs contend there is a mismatch between this rationale and the reasons for implementing the FRP programs because, they claim, none of the FRP programs were "designed or intended to provide a deterrent to irregular migration." *Id.* This argument misrepresents the Secretary's reasoning and is contradicted by the notices announcing the programs.

DHS justified each of the legacy FRP programs by claiming they served the "significant public benefit" of providing an alternative pathway to discourage aliens from making the often-dangerous journey to try to enter the United States through irregular means. *See* Doc. No. 24-34, 72 Fed. Reg. 65588 (legacy Cuban FRP); Doc. No. 24-23, 79 Fed. Reg. 75581 (legacy Haitian FRP). And each of the new 2023 FRP programs *specifically* relied on the reduction of migration at the Southwest border and a concomitant reduction in strain on DHS resources and on border communities as a "significant public benefit" of those programs. *See* Doc. No. 24-26, 88 Fed. Reg. at 43593; Doc. No. 24-27, 88 Fed. Reg. at 78768; Doc. No. 24-30, 88 Fed. Reg. at 43613; Doc. No. 24-28, 88 Fed. Reg. at 43583; Doc. No. 24-29, 88 Fed. Reg. at 43603. DHS "expected" and "anticipate[d]" that the FRP processes would "reduce the number of irregular migrants who may be exploited by [organizations] engaged in human smuggling" and "minimize the burden" on border communities. *See, e.g.*, Do. No. 24-27, 88 Fed. Reg. at 76767–68.

As a reduction in irregular migration was, indeed, a key justification for those programs, the Secretary reasonably and appropriately considered whether the FRP programs actually provided this significant public benefit. 90 Fed. Reg. at 58037. Relying on data and evidence, the Secretary concluded they did not. 90 Fed. Reg. at 58037-38. The Secretary observed that in the first five months of 2024, CBP encountered over 900,000 migrants and asylum seekers seeking to cross the Southwest border. The majority hailed from just six countries: Mexico, Guatemala,

Venezuela, Cuba, Ecuador, and Colombia, four of which had dedicated parole programs. *Id.* at 58038. In fact, in 2024 alone, CBP encountered over 888,000 aliens from the seven FRP countries trying to cross the Southwest Border. *Id*. at 58037. The Secretary provided more examples of the programs' failures to produce a meaningful reduction in irregular migration. For example, CBP encounters of Haitians at the Southwest border increased year-by-year since the modernized and expanded FRP program for Haiti. *Id.* at 58038. Her conclusion that the FRP processes did not decrease illegal migration was fully supported by data.

Plaintiffs argue, however, that to the extent the FRP programs were intended to discourage unlawful migration—which they explicitly were—they were not intended to deter unlawful migration of *third parties*, but rather of the intended beneficiaries themselves. Doc. 218 at 11-12. But that is not entirely true. While the FRP programs were intended to deter unlawful migration by visa-petition beneficiaries who might in the absence of the programs choose to unlawfully migrate to the United States while awaiting visa availability, one of the other stated purposes of the programs was to "address[] root causes of migration through economic stability and development supported by increased remittances." *See, e.g.*, 88 Fed. Reg. at 43613. The idea was that FRP parolees would be able to work in the United States, earning far more than they would in their home countries, and then be able to send money back to their families and communities. *Id*. at 43616. Those remittances would "provide a crucial financial lifeline that enhances economic development and promotes economic stability" for the friends, family and community of the beneficiary, which was intended to "impact[] individual decisions on whether to leave the region," *id*., thus decreasing unlawful migration from those seven countries. That did not occur. Indeed, the Secretary observed that because a relatively low percentage of invited petitioners decided to participate in the program, "the volume of remittances sent by supporters or beneficiaries was minimal and had little to no measurable impact on the economies of their home countries," and

thus did not "address the root causes of migration." 90 Fed. Reg. at 58040.

(ii)    **The Secretary considered reliance interests.**

Plaintiffs argue that the Secretary did not meaningfully consider reliance interests, because her discussion of reliance interests has some similarities to her discussion of the reliance interests with respect to the CHNV termination. Doc. No. 218 at 12-13. But merely using similar language does not mean she failed to consider such interests or invalidate her conclusions.

According to Plaintiffs, the Secretary failed to consider that FRP parolees are different from CHNV parolees because they have a path to lawful permanent resident status and a close relationship to a supporter, were invited to apply for parole by the government, and will be separated from their families if parole is terminated. Doc. No. 218 at 13. But these interests are not unique to FRP parolees. CHNV parolees likewise were often eligible to pursue asylum or other pathways to lawful permanent resident status (including under the Cuban Adjustment Act), had a supporter in the United States, and often had relatives within the United States. *See, e.g.*, Doc. No. 68 at ¶¶ 226–27, 249–51. Indeed, Plaintiffs' invocation of the term "family separation" in this context is misleading. Because of the nature of the FRP programs—which primarily provided a means of entry to those who would otherwise need to wait for available visas—those aliens whose parole is being terminated are primarily adult or married children of USCs or LPRs and adult siblings of USCs who had already left those family members behind to reside in the United States. *See, e.g.*, Doc. No. 239 at ¶ 133, 293(a)-(b), (l). And while FRP supporters were invited to apply on behalf of their visa-petition beneficiaries, whereas CHNV supporters were not, the Secretary did consider this unique factor. *See, e.g.*, 90 Fed. Reg. at 58041 ("DHS recognizes that this notice announces a reversal of a prior policy of which many stakeholders have taken advantage after being invited to participate."). More to the point, the reliance interests of CHNV parolees and beneficiaries and FRP parolees and beneficiaries are overall more similar than different. Indeed,

10

they are most similar in a critical respect: the inherently discretionary and time-limited nature of parole. FRP parolees always risked having to return to their home countries before a visa number became available. *See* 90 Fed. Reg. at 58044. At oral argument, Plaintiffs' counsel acknowledged that FRP Plaintiffs always knew that their parole could "run out" before they obtain a visa but argued that "historically" USCIS would grant re-parole, and thus beneficiaries had no expectation of having to leave the United States. Tr. at 18:17-19:16. But the government's past exercise of grace should not heighten the parolees' reliance interests, because it cannot turn a discretionary decision into a mandatory one. *S.A. v. Trump*, 363 F. Supp. 3d 1048, 1086 (N.D. Cal. 2018) (prior 99% parole rate created no entitlement to parole going forward where "USCIS told participants that applications would be considered for parole 'on a case-by-case basis,' and nothing in the [] Parole Program materials suggested that parole was guaranteed."); "A liberal award of parole in the past under the Program does not create a "serious reliance interest" in being approved for parole." *Id*. Regardless, the Secretary weighed the tempered expectations of parolees against the government's interests in discontinuing the use of parole as a pathway to adjustment of status and in mitigating the risk posed by the continued presence of parolees whose entrance to the United States was marked by insufficient vetting and introduced significant opportunities for fraud. 90 Fed. Red. at 58041. Thus, the Secretary appropriately considered FRP parolees' reliance interests; Plaintiffs simply disagree with the weight she placed on those interests. *See Doe*, 152 F.4th 290.

### (iii)    The Secretary adequately considered alternatives.

Plaintiffs briefly argue that the Secretary failed to adequately consider alternatives to terminating individual grants of FRP parole. Doc. 218 at 14. Not so. The Secretary considered and rejected three alternatives: One, allowing each of the FRP parolees' current parole period to expire and notifying the beneficiary to either seek lawful immigration status or voluntarily depart the United States prior to expiration. The Secretary explained that, among other problems, this option

11

would "require individualized outreach and ongoing monitoring by DHS, imposing a significant administrative burden on the agency." 90 Fed. Reg. at 58044. Two, allowing FRP parolees to continue to seek re-parole until a visa is available. The Secretary rejected this option because it "fails to meaningfully implement the policy shift outlined in [the] Federal Register Notice," by allowing parole to continue to be used as a pathway to adjustment of status, and it also would allow beneficiaries to "continue to remain in the United States despite the lackluster or insufficient vetting they received prior to entry," thus leaving in place the safety and national security risks she outlined as a reason for terminating FRP. *Id*. Three, providing longer than thirty-days' notice of termination because the Secretary recognized that regardless of the length of the period, beneficiaries, employers, friends and communities would likely still incur the same costs. Given that likely reality, she decided "to employ the path that will most expeditiously allow the Department to reallocate resources currently assigned to handle the FRP programs" to other issues and programs deemed more essential and beneficial to the United States. *Id*.

Plaintiffs complain, however, that the Secretary failed to consider letting existing grants remain in effect until their natural expiration. Doc. No. 218 at 14. But this option is not meaningfully different from the first option the Secretary rejected. While Plaintiffs have suggested that the Secretary incorporated proposed outreach to aliens simply to have a basis to reject the alternative based on administrative burden, Tr. 10:9-13:20, that argument does not work. The Secretary's discussion of reliance interests makes the basis for her reasoning clear: if parole terms are allowed to expire naturally, outreach to parolees before expiration is necessary to ensure they seek lawful status or depart the United States, because the longer FRP beneficiaries are allowed to remain in the United States without evaluating their entitlement to immigrant or other lawful status, the longer the country is exposed to the "vulnerabilities" created by the "lackluster or insufficient vetting" of parolees. 90 Fed. Reg. at 58044; *see also State Farm*, 463 U.S. at 43 (courts will uphold

decisions "of less than ideal clarity if the agency's path may reasonably be discerned"). And whether such outreach were to be conducted or not, there is still an administrative burden to overseeing and tracking existing grants of parole.

Furthermore, the Secretary was not required to consider every conceivable alternative. *City of Brookings Mun. Tele. Co. v. F.C.C.*, 822 F.2d 1153, 1169 (D.C. Cir. 1987). She considered alternatives to the parole termination and explained why she rejected them. No more is required.

### III.    The Secretary Did Not Exceed Her Statutory Authority.

There is no dispute that the Secretary possesses statutory authority to terminate parole. The parole statute empowers the Secretary to terminate parole "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served." 8 U.S.C. § 1182(d)(5)(A). The phrase "in the opinion of the Secretary of Homeland Security" is exceptionally deferential. And the Court of Appeals has explained that the Secretary need not terminate parole on a case-by-case basis; rather, Congress "made the deliberate" choice in § 1182(d)(5)(A) to permit the Secretary terminate parole individually or *en masse*. *Doe*, 152 F.4th at 285.

Plaintiffs argue that the Secretary still exceeded her authority because, to terminate parole, she had to determine that "the purposes of such parole shall. . . have been served," and according to Plaintiffs, the Secretary never reached that conclusion. Doc. No. 198 at 16-17. Plaintiffs are wrong. The Secretary explained that the FRP programs, inclusive of parole grants bestowed upon beneficiaries, did not accomplish several of their intended purposes. 90 Fed. Reg. at 58034-44. She then explained that for the "same reasons set forth above . . . neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of aliens paroled under the FRP programs and the purposes of such parole therefore have been served." *Id*. at 58045.

Plaintiffs argue that the Secretary cannot dispense with her obligation to consider whether the purposes of parole have been served in just one sentence. Doc. 218 at 15. This argument lacks

any basis. The Secretary is not barred from relying on the same considerations to terminate individual parole grants that she relied on to terminate the FRP programs, where the rationales substantially overlap. And indeed, in response to a virtually identical argument made by Plaintiffs with respect to the Secretary's decision to terminate CHNV parole grants, the Court of Appeals "agree[d] with the Government" that the appropriate scope of review requires consideration of the termination notice as a whole, including the overlapping rationales for terminating the parole programs and the individual grants issued under them. *Doe*, 152 F.4th at 290.

Plaintiffs' argument also rests on a faulty premise, seemingly conflating "have been served" with "have been accomplished." *See* Doc. No. 218 at 15 (asserting that the Secretary's "explanation says nothing about whether the individual parolees have *accomplished* the family reunification purposes of their parole . . . . Had she considered that purpose, she would have had difficulty explaining how it 'has been served' with regards to FRP parolees who are not yet eligible to apply to adjust status to LPR.") (emphasis added). Plaintiffs seemingly believe that for the Secretary to determine that the purposes of parole "have been served," she must establish that *all* the objectives of the parole—including family reunification—were successfully "accomplished" to completion. *Id.* The statute imposes no such requirement. A grant of parole may rest on multiple purposes, and the Secretary may determine that those purposes have been served even if some objectives have not been fully realized. The statute requires only a judgment that—in *the opinion of* the Secretary— the purpose has run its course, not that it succeeded, concluded, or achieved every hoped-for result. *Doe*, 152 F.4th at 286 ("Once the executive branch determines . . . that achieving the policy aim is *no longer possible or desired*, then it takes no individualized determination in any way to ascertain those persons for whom it can no longer be said that parole furthers the country's interest.") (emphasis added); 8 C.F.R. § 212.5(e)(2)(i) ("upon accomplishment of the purpose for which parole was authorized or when in the opinion [of the Secretary] . . . neither humanitarian reasons

14

nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated."). Here, the Secretary determined that the goals of FRP parole were outweighed by the national security and public safety risks engendered by its insufficient vetting.

Plaintiffs also take issue with the verbiage the Secretary used to justify her termination of individual grants of parole. Doc. No. 218 at 15-16. They contend that the Secretary unlawfully conflated two distinct bases for termination—whether the purposes of parole have been served and whether parolees' continued presence is warranted—because the regulation lists those grounds in the disjunctive. Doc. No. 218 at 15–16 (citing 8 C.F.R. § 212.5(e)(2)(i)). This argument misconstrues the regulation. Section 212.5(e)(2)(i), the regulation implementing § 1182(d)(5), clarifies that the purposes of parole may be "served" in more than one way. Again, a purpose may be served because it has been accomplished. But it may also be served because continuing to pursue it is no longer possible, worthwhile or desirable, *Doe*, 152 F.4th at 286—such that neither urgent humanitarian reasons nor significant public benefit justifies the parolee's continued presence in the United States. The regulation thus reflects the common-sense understanding that a purpose has been served once it has run its course, whether by completion or by exhaustion.

In concluding that "neither urgent humanitarian reasons nor significant public benefit warrants the continued presence of aliens paroled under the FRP programs" and that "the purposes of such parole therefore have been served," 90 Fed. Reg. at 58045, the Secretary made a judgment squarely contemplated by the statute: parole no longer furthers the interests that justified it in the first place, including because certain of those interests are no longer desired objectives and are outweighed by other interests. Continued presence is not an extraneous consideration divorced from parole's purposes; it is the practical manifestation of them. As the Court of Appeals has explained, parole may be terminated en masse "[o]nce the executive branch determines . . . that achieving the policy aim is no longer possible or desired." *Doe*, 152 F.4th at 286.

Plaintiffs next argue that the Secretary was required to terminate parole on a "case-by-case" basis. Doc. No. 218 at 16. However, the First Circuit held that Plaintiffs were unlikely to succeed on their argument that the parole statute's "case-by-case" limitation applies to parole terminations. *Doe*, 152 F.4th at 286. "The statutory text . . . favors an interpretation that the 'case-by-case' requirement only limits the Secretary's discretion to grant parole." *Id.*[3]

In response, Plaintiffs argue that the FRP FRN "plainly" "chang[ed] or add[ed]" the "conditions" of parole rather than terminating parole. Doc. No. 218 at 16. This characterization makes no sense—Plaintiffs point to no conditions of their parole that are modified, or what modifications were made. And if Plaintiffs are arguing that changing the duration of each grant of parole is a modification of conditions, this is an odd reframing of a much more straightforward description of what happened: their parole was terminated. Nor does the duration of parole fall into the category of parole "conditions" like "periodic reporting" or "bond" that are in place for the duration of parole. *See* 8 C.F.R. § 212.5(c) (addressing "conditions" of parole).

## IV. The Notice Was Sufficient and Complied with the Law.

The Secretary's method of notifying parolees of their parole termination through the

---

[3] Regardless, even if the INA imposed some sort of case-by-case requirement on parole terminations, that would not preclude the Secretary from establishing generally applicable criteria to guide her exercise of discretion. Even when Congress "requires individualized determinations," that requirement does not displace decisionmakers' "authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority." *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 612 (1991); *see also, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 467 (1983) (agency may rely on generally applicable medical-vocational guidelines even where statute requires individualized determinations of disability); *Fed. Power Comm'n v. Texaco, Inc.*, 377 U.S. 33, 44 (1964) (similar, under Natural Gas Act). Indeed, longstanding regulations implementing § 1182(d)(5)(A) take that approach. *See* 8 C.F.R. § 212.5. Courts have repeatedly observed that generally applicable determinations are appropriate elsewhere in the immigration context. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 313 (1993) (the agency need not "forswear use of reasonable presumptions and generic rules" even where statute required "'some level of individualized determination'") (citation omitted); *Yang v. INS*, 79 F.3d 932, 936 (9th Cir.) (similar), *cert. denied*, 519 U.S. 824 (1996); *Mak v. INS*, 435 F.2d 728, 730 (2d Cir. 1970) (similar).

Federal Register was not arbitrary and capricious, accords with agency regulations requiring "written notice," and does not contravene constitutional due process. *See* Doc. 218 at 17–18. Additionally, but for the TRO, USCIS would have also completed the process of individually notifying FRP beneficiaries of the termination either by mail (for legacy FRP) or via their myUSCIS online accounts—which likewise satisfies any applicable legal requirements.

      **(i)    DHS's notice satisfies the regulatory requirements.**

      Plaintiffs' claim that DHS's notice violated regulatory requirements is wrong. The regulation requires that "parole shall be terminated upon written notice to the alien[.]" 8 C.F.R. § 212.5(e)(2)(i). The Court held in its TRO that the requirement in 8 C.F.R. § 212.5(e)(2)(i) that parole be terminated "upon written notice <u>to the alien</u>" demands individualized, direct notice to each parolee and that publication in the Federal Register therefore cannot qualify as "written notice to the alien." ECF No. 243 at 3 (emphasis in original). Respectfully, that reading is incorrect. It adds words to the regulation that are not there, conflicts with the structure of DHS's regulations as a whole, and disregards settled principles of administrative law regarding notice.

      DHS has a well-developed regulatory framework governing service of notices. Section 103.8 defines "routine service" to include sending a notice by ordinary mail to the affected party's last known address or, if requested, electronic delivery via the USCIS account. 8 C.F.R. § 103.8(a)(1). That framework, however, applies only where another provision explicitly requires "service" or otherwise invokes § 103.8. *See, e.g.*, 8 C.F.R. § 281.1(d) (requiring notice of decision imposing civil penalties to be provided "either in person or using routine service as outlined in § 103.8(a)(1)(i)"). Unlike other DHS regulations, § 212.5(e)(2)(i) contains no reference to "service" and does not invoke § 103.8. Instead, it simply provides that "parole shall be terminated upon written notice to the alien." 8 C.F.R. § 212.5(e)(2)(i). The regulation does not limit what constitutes "written notice," does not specify a method of delivery, and does not require that notice be

individually delivered.

The phrase "to the alien" does not fill in the blank left open by those omissions. The phrase "to the alien" specifies the *audience* for the notice, not the *method* of delivery. It requires the alien to be a recipient of the notice, but that requirement can be met even in the absence of individuated notice. Consider these hypotheticals: A notice terminating the parole of Jane Doe, mailed or emailed to her husband, John Doe, would not satisfy the "to the alien" language in § 212.5(e)(2)(i). That is because Jane Doe was not a recipient of the notice. By contrast, a single notice terminating the parole of both Jane and John Doe would satisfy the "to the alien" language in § 212.5(e)(2)(i) if that notice was mailed to John and Jane Doe jointly at their home (Dr. Mr. and Mrs. Doe), or emailed to them at their individual email addresses in a singular email. That is because the issue is not whether notice was individualized, but whether the beneficiary is a recipient of it. By statute, publication in the federal register constitutes notice to every person "subject to or affected by it." 44 U.S.C. § 1507; *see Bank of Commerce v. Bd. of Governors*, 513 F.2d 164, 167 (10th Cir. 1975) ("By Act of Congress notice by publication in the Federal Register is declared to be notice to all persons residing within the States of the Union and the District of Columbia," unless "statute []or any regulation compels the [government] to furnish individual notice."). On its face, § 212.5(e)(2)(i) does not require individualized notice.

Reading the phrase "to the alien" to require individualized notice adds words to the regulation. Courts "cannot rewrite statutes and regulations merely because [they] think they imperfectly express congressional intent or wise social policy." *Vainisi v. Comm'r*, 599 F.3d 567, 572 (7th Cir. 2010). Nor may courts impose procedural obligations on agencies not required by statute or regulation. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524 (1978).

Had DHS intended the phrases "written notice" or "to the alien" to require individualized service of notice, it could have made that clear by saying "individualized written notice" or

invoking the phrase "routine service" or referencing § 103.8. It did not do so, confirming that the regulation does not require individualized or mailed notice. This conclusion is reinforced by comparison to other immigration regulations, which expressly mandate individualized notice or specify the method of delivery. *See, e.g.*, 8 C.F.R. § 244.10 (requiring TPS denials be provided to applicants "in writing served in person or by mail to the alien's most recent address."); 8 C.F.R. § 281.1(d) (requiring notice of decision imposing civil penalties be provided "either in person or using routine service as outlined in § 103.8(a)(1)(i)"). And were there any doubt, the agency is entitled to deference in its reasoned and considered interpretation of ambiguous regulations—as set forth in the FRN. *Kisor v. Wilkie*, 588 U.S. 558 (2019). The agency's interpretation is undoubtedly at least reasonable, for the reasons just explained. Appropriate and feasible means of affording notice of parole terminations also fall within the agency's expertise.

Plaintiffs also incorrectly argue that the Secretary "confessed indifference" to whether parolees received notice of the termination. Doc. No. 218 at 17. But the Secretary explained that she found publication more practicable in light of potential noncompliance with change-of-address requirements and outdated email addresses. 90 Fed. Reg. at 58045. The Secretary also explained that aliens who used the modernized FRP processes were required to set up an online account, and thus individual notice would be provided through that account to those parolees, and that notice would be mailed to legacy FRP parolees. *Id*. Indeed, on January 5, 2026, notices went out to about half of those with USCIS online accounts. Notices to the other half of those with USCIS online accounts, and mailed notices to legacy beneficiaries, would have gone out but for the TRO issued on January 10. The contemplated electronic notice is countenanced by the regulation that provides for electronic notice where, as here, the parole application was filed electronically, 8 C.F.R. § 103.2(b)(19)(ii)(B), and satisfies the parole regulation's notice requirement. *Cf. Aldea-Tirado v.*

*PricewaterhouseCoopers, LLP*, 101 F.4th 99, 103-06 (1st Cir. 2024) (email notice sufficient).[4]

### (ii)    DHS's notice satisfies the Constitution.

Plaintiffs argue that DHS's notice of parole revocation also fails to satisfy procedural due process under *Mathews v. Eldrige*. *See* Doc. No. 218 at 17. But *Mathews* is inapplicable because parole is discretionary and, as a result, beneficiaries do not have a protected interest in parole subject to constitutional protection. *Conn. Bd. of Pardons v. Dumschat,* 452 U.S. 458, 463 (1981). Accordingly, Plaintiffs can at most assert a claim that the agency failed to follow its own procedures—but, as shown above, DHS did follow its regulations regarding notice.

The Court suggested at oral argument that *Dumschat*, and the case it relies upon, *Greenholtz v. Neb. Penal Inmates*, 442 U.S. 1 (1979), cut against the government's argument because *Greenholtz* draws a distinction between initial grants of parole (to which procedural protections do not attach) and parole revocations (to which procedural protections do attach). Tr. at 33:6-20. True, but context is key. *Greenholtz* and *Dumschat* confirm the governing principle: to trigger constitutional due process protections, a person must have a protected interest, not merely a hope or expectation of a discretionary benefit. *See Greenholtz*, 442 U.S. at 7 ("[T]o obtain a protectible right 'a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'") quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)); *Greenholtz*, 442 U.S. at 11 ("hope [] is not protected by due process"); *Dumschat*, 452 U.S. at 463.

---

[4] The Court questioned whether § 103.2(b)(19)(ii) countenanced electronic notice to unrepresented individuals. Doc. No. 243 at 3. But § 103.2(b)(19)(ii) distinguishes between unrepresented and represented applicants only to specify who receives the notice. For unrepresented applicants, USCIS sends notices to the applicant; for represented applicants, notices go to both the applicant and counsel. It in no way precludes electronic notice to unrepresented applicants. Here, electronic notice makes sense because FRP applications were submitted electronically. The regulation simply confirms that providing notice electronically is consistent with USCIS practice.

*Greenholtz* does not support plaintiffs. That decision concerned criminal parole, not immigration parole. In the criminal parole context, initial denial of parole is discretionary, but revocation of parole once parole has been granted is a "wholly retrospective factual question," not a matter of discretion. *Greenholtz*, 442 U.S. at 9-10. A criminal parolee released on parole subject to certain conditions has a protected interest—a right to remain on parole provided he has complied with the conditions of his parole. But that provides no support for plaintiffs, because immigration parole—unlike criminal parole—is explicitly terminable at any time, and the termination decision is discretionary and subjective. 8 U.S.C. § 1182(d)(5). Unlike the criminal parolee in *Greenholtz*, FRP parolees have no entitlement to continued parole; they have only a hope for it, which the Supreme Court has repeatedly held is insufficient to create a protected due process interest. *Board of Regents*, 408 U.S. at 577 (1972); *Dumschat*, 452 U.S. at 463.[5]

Even if they had a protected interest, Plaintiffs fail to show that additional procedures were required to safeguard their interests. They have provided no argument as to the *Mathews* factors or explained what additional process is required. FRP parolees received notice of the parole termination via the Federal Register. That satisfies constitutional due process. *Lyng v. Payne,* 476 U.S. 926, 942 (1986) ("the notice published in the Federal Register . . . was more than ample to satisfy any due process concerns."); *Chow v. U.S.I.N.S.*, 74 F. App'x 733, 734 (9th Cir. 2003) (same). Indeed, Plaintiffs filed this class action before the effective date of the parole termination, and the Court issued a TRO staying the termination pending judicial review. As a result, the notice can be presumed to be adequate and satisfy constitutional due process.[6]

---

[5] If Plaintiffs argue they are entitled to procedural protections before *removal*, that implicates different interests, and removal processes supply those protections. In any event, aliens who have not been granted admission—like parolees—are on the threshold of entry and entitled only to those procedures provided by Congress. *DHS v. Thuraissigiam*, 591 U.S. 103, 107 (2020).

[6] Moreover, the FRN provides an avenue for individualized consideration: beneficiaries may seek

## V.    Notice and Comment Was Not Required.

Plaintiffs are unlikely to prevail on their argument that "the mass truncation of FRP grants" was required to go through notice and comment. Plaintiffs concede that the Secretary's decision to terminate the FRP programs was not required to go through notice-and-comment, Doc. No. 218 at n. 23, but they contend that the Secretary's subsidiary discretionary decision to terminate grants of parole issued pursuant to those programs does require notice-and-comment. Doc. No. 218 at 18-19. This distinction is illusory. If the Secretary may, without notice-and-comment, terminate the FRP programs altogether, she may likewise exercise that same discretion to terminate parole grants issued under those programs, and Plaintiffs cite no authority holding otherwise.

The APA also does not require notice and comment for discretionary decisions terminating individual grants of parole, even when the agency announces those decisions through generally applicable guidelines. That is because the decision to terminate parole does not constitute rulemaking. That does not change merely because the Secretary chose to terminate multiple parole grants in a single action. Rather, she correctly identified her decision as a "general statement of policy," exempt from notice-and-comment. 90 Fed. Reg. at 58045. A general statement of policy is a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993).

Plaintiffs argue that the termination of parole grants is not a general statement of policy because "[a] policy statement does not 'impose any rights and obligations' and 'genuinely leaves the agency and its decisionmakers free to exercise discretion.'" Doc. No. 221 at 19 (quoting *General Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002)). But contrary to Plaintiffs' argument, the termination of FRP parole grants did not impose any rights or create any obligations. Parole is

---

an additional period of parole by filing Form I-131 and demonstrating urgent humanitarian reasons or significant public benefit based on their individual circumstances. 90 Fed. Reg. at 58043 & n.90.

temporary and terminable at any time, and it confers no entitlement to remain in the United States, to employment authorization, or to future re-parole. *See* 8 U.S.C. § 1182(d)(5). An "obligation" for APA purposes refers to an affirmative legal duty imposed by agency action, not the loss of discretionary benefits or consequences that flow from that loss. *See Am. Mining Cong. v. MSHA*, 995 F.2d 1106, 1109–12 (D.C. Cir. 1993). Plaintiffs conflate the fact that practical *consequences* may follow from the termination of parole with the imposition of new, legally binding *obligations* created by the termination. Any consequences flowing from the termination of parole—including the need to depart the country, the loss of work authorization or accrual of unlawful presence— arise by operation of existing law, not because the Secretary promulgated a new rule.

Further, Plaintiffs' contention that the Secretary's decision to terminate existing grants of parole is "binding," Doc. No. 218 at 18, ignores the discretion the notice expressly preserves. The Secretary retained authority to exempt individual parolees from termination, 90 Fed. Reg. at 58033, and the statute, § 1182(d)(5) does the same work by giving the Secretary discretion to grant parole, re-parole on a case-by-case basis. Simply put, what Plaintiffs characterize as a "mass truncation" is simply the uniform application of a discretionary policy choice within the bounds of existing statutory authority. The APA does not require notice-and-comment rulemaking whenever an agency exercises discretion in a way that affects many people, nor is it required here.

### VI.    The Balance of the Equities Favors the Government.

A stay of the parole termination on a class-wide basis imposes irreparable harm on the government and public, whose interests "merge" here, *Nken v. Holder*, 556 U.S. 418, 435 (2009). The United States suffers a form of irreparable harm to its democratic system when it is prohibited from effectuating the President's policies. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Those concerns escalate when, as here, the preliminary injunction would undermine the Executive Branch's constitutional and statutory authority over immigration

and the admission of aliens, thereby engaging in "unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013). Moreover, the Legislative Branch's prerogatives are injured as well where, as here, the temporary injunctive relief bypasses a judicial-review bar. The relief Plaintiffs seek would stymie the government's ability to terminate parole grants that the Secretary has determined undermine U.S. interests, raise national security concerns, and thus inhibit the government's pursuit of its foreign policy goals. Further, the Secretary explained that administering the parole programs, including the application and adjudication process for re-parole under the process, consumes agency resources that this Administration has determined would be better focused elsewhere. 90 Fed. Reg. at 58045. In this way, staying parole terminations improperly encroaches on the core Executive function of managing the immigration system. *See Arizona v. United States*, 567 U.S. 387, 394-396 (2012); *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-1306 (1993) (O'Connor, J., in chambers) (warning against "intrusion by a federal court into the workings of a coordinate branch of the Government"). A stay by the district court would force DHS to individually terminate each grant of parole, costing the agency time and resources, while at the same time, delaying DHS's ability to address the national security and public safety concerns that animated, in part, the Secretary's decisions to terminate parole grants.

On the flip side, Plaintiffs do not establish that they or the class are likely to suffer irreparable injury in the absence of temporary injunctive relief. *See Winter v. Nat. Resource Def. Counsel*, 555 U.S. 7, 20, 22 (2008) ("[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction."). Plaintiffs and class members are aware that parole is a discretionary benefit, terminable at any time—not least because Secretary Mayorkas repeated that admonition when establishing and updating these parole programs. *See*, *e.g.*, Doc. No. 24-28, 88 Fed. Reg. at 45583. At no point was parole or re-parole guaranteed. *See*

*id.* at 43588 (providing that all steps of the parole process were "entirely discretionary and not subject to appeal on any grounds"). Further, each of the new Plaintiffs and any member of the class they seek to represent may apply for another period of parole. *See* 90 Fed. Reg. at 58034 ("[T]he Secretary retains discretion to grant a new period of parole, also known as re-parole, to any alien who was paroled into the United States under the FRP programs . . . .").[7] And parolees whose parole terminates can still pursue a family-based immigrant visa from abroad. There was never any guarantee to any beneficiary of the FRP programs that he or she would ultimately be eligible for adjustment or warrant a favorable exercise of discretion. *See, e.g.*, Doc. No. 24-28, 88 Fed. Reg. at 43588. Finally, those parolees whose adjustment applications have been or will be denied before January 25, when the TRO expires, lack any argument to remain in the United States.

Considering similar issues with respect to the balance of the equities, the Supreme Court stayed this Court's order preliminarily enjoining CHNV parole terminations. *Noem v. Doe*, 145 S. Ct. 1524 (2025). According to the dissent, the Court "determined that the equity balance weighs in the Government's favor." *Id.* at 1528 (Jackson, J., dissenting). There is no meaningful distinction here that should lead to a different result.

## VII.    The Court Should Require Bond Under Fed. R. Civ. P. 65(c).

If the Court grants temporary injunctive relief, it should impose "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

## <u>CONCLUSION</u>

The Court should deny Plaintiffs' motion for a preliminary injunction.

---

[7] There is currently a hold on applications for Haitians and Cubans. *See* Doc. No. 233 at 25 n.2.

DATED: January 15, 2026

Respectfully submitted

YAAKOV M. ROTH
*Acting Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

KATHERINE J. SHINNERS
*Senior Litigation Counsel*

By: /s/ *Elissa Fudim*
ELISSA FUDIM
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
*Counsel for Defendants*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 15, 2025, I electronically filed this motion with the Clerk of the Court for the United States Court of for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Elissa Fudim*
ELISSA FUDIM
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation

*Counsel for Defendants*

27