**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SVITLANA DOE, et al.,<br><br>              Plaintiffs,<br><br>     *v.*<br><br>KRISTI NOEM, in her official capacity as<br>Secretary of Homeland Security, et al.,<br><br>              Defendants. | Civil Action No.: 1:25-cv-10495-IT |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION AND/OR STAY OF THE *EN MASSE* TRUNCATION OF ALL EXISTING GRANTS OF FAMILY REUNIFICATION PAROLE (Doc. No. 216)**

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES.................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

    A.  Administrative Record (Doc. No. 246)............................................................. 2

    B.  Kernochan Declaration (Doc. No. 250-1)......................................................... 4

I.     THE KERNOCHAN DECLARATION MAY ONLY BE CONSIDERED FOR LIMITED PURPOSES ....................................................................................... 6

II.    THIS COURT HAS JURISDICTION AND THE FRP FRN IS REVIEWABLE ............. 6

III.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR ARBITRARY AND CAPRICIOUS CLAIM ................................................................................. 9

IV.   PLAINTIFFS ARE LIKELY TO SUCCEED IN PROVING THAT SECRETARY NOEM'S DECISIONS REGARDING NOTICE WERE UNLAWFUL ON NUMEROUS GROUNDS .................................................................................. 14

V.    THE MASS TRUNCATION OF FRP PAROLE WAS A LEGISLATIVE RULE ........... 17

VI.   THE AR MAKES PLAIN THE BALANCE OF THE EQUITIES TIPS OVERWHELMINGLY IN FAVOR OF PLAINTIFFS.................................................... 18

VII.  GOOD CAUSE EXISTS TO EXTEND THE TRO ......................................................... 19

CONCLUSION...................................................................................................................... 20

CERTIFICATE OF SERVICE .......................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*American Hospital Ass'n v. Kennedy*,
  __ F.4th __, 2026 WL 49499 (1st Cir. Jan. 7, 2026) ...............................................6

*Bouarfa v. Mayorkas*,
  604 U.S. 6 (2024) ...................................................................................................8

*Camp v. Pitts*,
  411 U.S. 138 (1973) ...............................................................................................6

*Castaneira v. Noem*,
  138 F.4th 540 (D.C. Cir. 2025) ...........................................................................7, 9

*Chow v. INS*,
  74 F. App'x 733 (9th Cir. 2003) ...........................................................................17

*City of Taunton, Mass. v. U.S. Environmental Protection Agency*,
  895 F.3d 120 (1st Cir. 2018) ..................................................................................6

*Department of Commerce v. New York*,
  588 U.S. 752 (2019) ...............................................................................................6

*DHS v. Regents of the University of California*,
  591 U.S. 1 (2020) .............................................................................................6, 13

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) .............................................................................................12

*Greenholtz v. Nebraska Penal Inmates*,
  442 U.S. 1 (1979) .................................................................................................16

*Jean v. Nelson*,
  472 U.S. 846 (1985) .............................................................................................19

*Kucana v. Holder*,
  558 U.S. 233 (2010) ............................................................................................7, 9

*Louis v. Nelson*,
  544 F. Supp. 973 (S.D. Fla. 1982) ...................................................................18, 19

*Lyng v. Payne*,
  476 U.S. 926 (1986) .............................................................................................17

*Maine v. Fri*,
  483 F.2d 439 (1st Cir. 1973) ................................................................................20

*Mata Velasquez v. Kurzdorfer*,
    794 F. Supp. 3d 128 (W.D.N.Y. 2025) ...................................................................9, 17

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ...................................................................................................17

*McNary v. Haitian Refugee Center, Inc*,
    498 U.S. 479 (1991) .....................................................................................................7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................................ *passim*

*Mennonite Board of Missions v. Adams*,
    462 U.S. 791 (1983) ...................................................................................................17

*Mohammadi v. Larose*,
    No. 3:25-cv-3450, 2025 WL 3731737 (S.D. Cal. Dec. 26, 2025) ...........................16

*Morrissey v. Brewer*,
    408 U.S. 471 (1972) ...................................................................................................16

*Mullane v. Central Hanover Bank & Trust Co*,
    339 U.S. 306 (1950) ...................................................................................................17

*S.A. v. Trump*,
    363 F. Supp. 3d 1048 (N.D. Cal. 2018) ...................................................................11

*S.A. v. Trump*,
    2019 WL 990680 (N.D. Cal. Mar. 1, 2019) .............................................................11

*S.A. v. Trump*,
    No. 18-cv-3539, 2019 WL 1593229 (N.D. Cal. Apr. 12, 2019) ..............................11

*Samirah v. Holder*,
    627 F.3d 652 (7th Cir. 2010) (Posner, J.) ..............................................................8, 9

*Soltane v. U.S. Dep't of Justice*,
    381 F.3d 143 (3d Cir. 2004) (Alito, J.) .....................................................................7

*Succar v. Ashcroft*,
    394 F.3d 8 (1st Cir. 2005) ...........................................................................................8

*Valerio-Ramirez v. Sessions*,
    882 F.3d 289 (1st Cir. 2018) .......................................................................................7

*Webster v. Doe*,
    486 U.S. 592 (1988) .................................................................................................6, 9

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ..................................................................................................8

**Statutes and Regulations**

5 U.S.C. § 701(a) ....................................................................................................8

8 U.S.C. § 1154 .......................................................................................................8

8 U.S.C. § 1155 .......................................................................................................8

8 U.S.C. § 1182(d)(5)(A) .................................................................................. *passim*

8 U.S.C. § 1184(f) ............................................................................................. *passim*

8 U.S.C. § 1252(a)(2)(B)(ii) .............................................................................. *passim*

8 C.F.R. § 103.2(b)(19) ..........................................................................................15

8 C.F.R. § 212.5 ................................................................................................ *passim*

**Federal Register Notices** (in reverse chronological order)

*Termination of Family Reunification Parole Processes for Colombians, Cubans,*
    *Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans*, 90 Fed. Reg.
    58032 (Dec. 15, 2025) (Doc. No. 216-1) ...................................................... *passim*

*Termination of the Cuba, Haiti, Nicaragua, and Venezuela Parole Processes*, 90 Fed.
    Reg. 13611 (Mar. 15, 2025) (Doc. No. 71-1) ..........................................................11

*Agency Info. Collection Activities; Application for Travel Doc. Removal of Instructions*
    *Regarding the Haitian Family Reunification Program and Filipino World War II*
    *Veteran Parole Program*, 85 Fed. Reg. 84362 (Dec. 28, 2020) (Doc. No. 216-2) ...............11

*Termination of the Central American Minors Parole Program*, 82 Fed. Reg. 38926
    (Aug. 16, 2017) ....................................................................................................11

*Electronic Processing of Immigration Benefit Requests*, 79 Fed. Reg. 64299 (Oct. 29,
    2014) ..................................................................................................................15

*Parole Documentation and Determination of Inadmissibility*, 47 Fed. Reg. 30044 (July
    9, 1982) ..............................................................................................................18

**Other Authorities**

Federal Rule of Civil Procedure 65(b)(2) ................................................................20

## INTRODUCTION

Since the Court's temporary restraining order ("TRO"), Defendants produced the administrative record ("AR") and an extra-record declaration on USCIS's efforts to notify 8,404 Family Reunification Parole ("FRP") parolees that their parole would end on January 14.

According to the declaration (Doc. No. 250-1), Defendants' first and only attempt to notify class members occurred on January 5—a full three weeks after the FRP Federal Register Notice ("FRN") was published—when electronic notices were "pushed" to fewer than half of the parolees who were to be deemed unlawfully present on January 14, and only half of those "successfully accessed" the notification as of January 12. The declaration avers that, but for the TRO, USCIS would have sent the other 58 percent of the notices at some point, but Defendants do not claim they would have done so before the mass termination took effect. For good reason: when the TRO was issued, only two business days remained before January 14, and Defendants had hundreds of notices yet to mail to "legacy" parolees in addition to the thousands of electronic notices yet to send to the "modernized" FRP parolees. Defendants offer no explanation for this timeline, which makes clear that appropriate notice was not a priority.

Meanwhile, the extent to which the AR supports the mass truncation of FRP parole is reflected by the number of times Defendants cite it in their brief (Doc. No. 251): zero. That silence speaks volumes. Indeed, the AR is mostly makeweight. More than a third of it is a single 550-page House committee report from 1996 that accompanied never-enacted legislation; more than a third of the remainder are printouts from the Federal Register and Defendants' websites. Over 92 percent of the AR's pages were already publicly available. Most importantly, virtually nothing in the AR is even about FRP or FRP parolees. It includes the FRNs creating the processes and statistics on outcomes at various processing steps, but little more. Remarkably, there is nothing whatsoever to substantiate Defendants' *post-hoc* justifications that Secretary Noem decided to terminate

thousands of grants of FRP parole due to fraud or burden concerns—not even the "internal audit" that Secretary Noem referenced in the FRP FRN, 90 Fed. Reg at 58042. And of course, the information in Defendants' new declaration is likewise absent from the AR.

In short, the information that has come out since the TRO confirms the Court's concerns with notice, while also revealing that there is nothing in the AR supporting any aspect of the FRP FRN. As explained further below, Plaintiffs are thus likely to succeed on multiple claims, amply supporting preliminary relief as to the class members while this case proceeds to final judgment.

## BACKGROUND[1]

Defendants produced the AR for the FRP FRN (Doc. No. 246) on January 13 and filed the Kernochan Declaration (Doc. No. 250-1) two days later with their supplemental opposition (Doc. No. 251). Defendants' brief selectively incorporates the Background section of their prior brief (Doc. No. 233) and adds subsections on the parole termination regulation and due process, Doc. No. 251 at 17-21, but most of the rest of Doc. No. 251 is copied from Doc. No. 233.

### A. Administrative Record (Doc. No. 246)

The Administrative Record ("AR") for the FRP FRN consists of 77 entries (including the FRP FRN itself) totaling 1,572 pages, but both numbers overstate the AR's substance. More than 20 entries (totaling nearly 400 pages) were also in the CHNV AR (Doc. No. 203); another dozen entries (mostly Federal Register notices) were also already filed on the docket in this case. Over one-third of AR's page count comes from a 550-page 1996 House Judiciary Committee Report that was also cited in the CHNV FRN but not made part of its administrative record.[2] Sixty-seven

---

[1] Plaintiffs incorporate by reference their prior memorandum of law in support of preliminary relief as to the FRP FRN, Doc. No. 218, which Plaintiffs endeavor not to repeat herein.

[2] This report accompanied legislation that was never enacted. *See* Plaintiffs-Appellees' Petition for Rehearing at 2-5, Doe v. Noem, No. 25-1384 (1st Cir. Oct. 15, 2025).

of the AR entries totaling 1,455 of its pages (92.4%) were already publicly available. These publicly available pages reveal nothing about Secretary Noem's decisionmaking.

The ten documents (120 pages) that were not already public are a one-page, heavily redacted "Decision Document" (FRP-FRN-00017); a 16-page National Environmental Policy Act memo certifying that terminating FRP qualifies for a "categorical exclusion" from environmental review (FRP-FRN-00589); a 14-page statistical report dated January 23, 2025, half of which concerns FRP (FRP-FRN-00618); two entries of one page each with statistics on southwest border encounters (FRP-FRN-01484 & 1485); and five entries totaling 87 pages of spreadsheets with FRP invitation, filing, approval, and arrival statistics (FRP-FRN-01486 through 1572) cited in the FRP FRN's footnotes 44, 45, 50, and 67 through 70.

There are several important topics germane to the request for a preliminary injunction about which the AR is entirely silent. Most notably, even though Secretary Noem twice referenced a "recent internal audit" as allegedly raising fraud or security concerns about the FRP processes,[3] that "internal audit" is not in the AR; nor does anything in the AR even corroborate its existence or alleged findings. The AR is likewise devoid of any information about the alleged "administrative burdens on DHS" imposed by the FRP processes, 90 Fed. Reg. at 58042; any information related to the three alternatives that Secretary Noem allegedly considered, *id.* at 58044; and any information relevant to Secretary Noem's decisions about notice, *id.* at 58045. These key points made in the FRN are entirely unsupported by the administrative record.

---

[3] 90 Fed. Reg. at 58042 ("[A] recent internal audit revealed that over 700 requests to be a [FRP] supporter were filed under the names of deceased individuals of which USCIS confirmed approximately half," and that the "vetting standards applied to co-supporters under the modernized FRP programs" were weaker than those applied to the principal sponsor).

**B. Kernochan Declaration (Doc. No. 250-1)**

Defendants' declaration is from James Kernochan, a political appointee who became the USCIS Deputy Director on December 22, 2025 (one week *after* the FRP FRN issued). Doc. No. 250-1 ¶ 1. Before that, Mr. Kernochan was the CBP Chief of Staff for eleven months. *Id.* Below are charts summarizing what Mr. Kernochan reports (mostly in passive voice, obscuring accountability) regarding notice to FRP parolees. This information is not in the AR.

| Modernized FRP Parolees (electronic myUSCIS message) | | |
|---|---|---|
| **Category** | **Number** | **Source** |
| Modernized FRP parolees who "were identified to have their parole terminated under the terms of the FRN": | 7,776 | ¶ 15 |
| "[T]ermination notices … pushed out to FRP parolees' myUSCIS accounts on January 5, 2026"[4]: | 3,501 | ¶ 15 |
| "[T]ermination notices [that] had been successfully accessed by the recipients from their myUSCIS accounts" as of Jan. 12: | ~1,841 | ¶ 17 |
| "[M]odernized FRP parolees who had not yet been sent" a termination notice on Saturday, January 10, when "USCIS halted the issuance of parole termination notices pursuant to the TRO": | ~4,213 | ¶ 16 |
| "[T]ermination notices … pushed out to FRP parolees' myUSCIS accounts on January 5, 2026" that had *not* "been successfully accessed by the recipients from their myUSCIS accounts" as of Jan. 12: | ~1,660 | ¶¶ 16-17 (derived) |
| Legacy FRP Parolees (mailed written notice) | | |
| **Category** | **Number** | **Source** |

---

[4] Mr. Kernochan references (in ¶ 14) a "Case Status Online (CSOL) message" generated when a document (like a termination notice) is uploaded to a recipient's myUSCIS account; that CSOL message is (just like the termination notice) sent via myUSCIS and is not a separate notification mechanism.

| | | |
|---|---|---|
| "[L]egacy FRP beneficiaries who are in an initial period of parole (3 years) and do not have a pending Form I-485 filed with USCIS on or before December 15, 2025, whose parole will be terminated under the FRP termination FRN" | ~628 | ¶ 18 |
| "[A]liens who are still in an initial period of parole granted under legacy HFRP [Haitians] whose parole will be terminated by the FRP termination": | 0 | ¶ 19 |
| "[A]liens in an initial period of parole granted under legacy CFRP" for Cubans: | ~628 | ¶¶ 18-19 (derived) |
| Paper notices mailed to legacy FRP parolees | 0 | ¶ 19 |

Among its other omissions, Mr. Kernochan's declaration does not explain why notices did not go out earlier and to all affected parolees; nor, for that matter, does Mr. Kernochan suggest that Defendants intended to send notices earlier or differently than what occurred. Mr. Kernochan's declaration also does not explain the fate of the hundreds of legacy FRP beneficiaries who are on grants of re-parole and have adjustment of status applications pending. *See* Doc. No. 250-1 ¶¶ 18-19 (giving statistics regarding legacy parolees only for those "who are in an initial period of parole"). Nor does Mr. Kernochan explain how the FRP FRN terminates the parole of 628 legacy Cuban FRP parolees when, per the AR, there were fewer than 500 Cubans on grants of legacy parole who did not have a pending I-485 application as of April 2 of last year.[5] FRP-FRN-01571.

---

[5] Comparing Defendants' declaration with the AR and the FRP FRN reveals other unexplained discrepancies and omissions in the information provided regarding "legacy" FRP parolees and any parolee who has sought re-parole over the last year. For example, nothing that Defendants have disclosed explains how they are applying the FRP FRN to current re-parolees, to those with pending re-parole requests when Defendants suspended the FRP processes a year ago, or to those who filed requests for re-parole over the last year. The only relevant information in the AR is that there were 59 requests for "legacy" re-parole pending as of April 2, 2025. FRP-FRN-01571-01572. These gaps in the record confirm that the FRP FRN lacks a reasoned basis—and suggest either that Defendants do not know how their rule applies to these individuals or that they are unwilling to say. *See also* Doc. No. 97 (May 28, 2025 order preliminarily staying, *inter alia*, Defendants' suspension of processing of re-parole requests). Plaintiffs respectfully request that the Court order

## I.   THE KERNOCHAN DECLARATION MAY ONLY BE CONSIDERED FOR LIMITED PURPOSES.

Under the APA, the Court's review as to the merits is generally limited to "the administrative record already in existence, not some new record made initially in the reviewing court." *City of Taunton, Mass. v. U.S. Env't Prot. Agency*, 895 F.3d 120, 127 (1st Cir. 2018) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)); *see also Am. Hosp. Ass'n v. Kennedy*, __ F.4th __, 2026 WL 49499, at *3 (1st Cir. Jan. 7, 2026) ("Judicial review of agency action is limited to the grounds that the agency invoked when it took the action." (quoting *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020)). There are exceptions to that general rule, *see id.* at *4; *Taunton*, 895 F.3d at 127, but Defendants do not claim an exception applies here. Defendants' declaration therefore cannot be considered as to the merits of Plaintiffs' claims, *Am. Hosp. Ass'n*, 2026 WL 49499, at *3-*4, with the possible, solitary exception of the due process claim.[6] The Kernochan Declaration may, however, be considered for non-merits issues, including the balance of the equities and jurisdictional issues. *See, e.g.*, *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (assessing standing in an APA case based on the evidence adduced at a bench trial).

## II.   THIS COURT HAS JURISDICTION AND THE FRP FRN IS REVIEWABLE.

Defendants renew their argument that 8 U.S.C. § 1252(a)(2)(B)(ii) strips this Court of jurisdiction to review Plaintiffs' claims. Doc. No. 251 at 6-7. This Court has rejected this argument twice already, Doc. Nos. 97 at 20-25 and 107 at 26-28, and correctly so. For § 1252(a)(2)(B)(ii) to

---

Defendants to address these omissions, as the Court cannot fully assess the FRP FRN's rationality or the balance of the equities without knowing whom the FRP FRN affects.

[6] The Supreme Court has suggested the record rule might not preclude *plaintiffs* from introducing evidence beyond the AR to support constitutional claims. *Webster v. Doe*, 486 U.S. 592, 604 (1988). Plaintiffs are unaware of authority for agency defendants relying on extra-record evidence as to a constitutional claim, but acknowledge that given the procedural posture, the Court likely has the discretion to consider it for purposes of the due process claim.

apply, "a statutory provision must expressly and specifically vest discretion in the Attorney General (for example, by explicitly using the words 'in the discretion of the Attorney General') rather than simply leave to the executive certain decisions and determinations that happen to be discretionary in nature." *Valerio-Ramirez v. Sessions*, 882 F.3d 289, 294 (1st Cir. 2018); *see also Kucana v. Holder*, 558 U.S. 233, 243 n.10 (2010) ("§ 1252(a)(2)(B)(ii) speaks of authority 'specified'—not merely assumed or contemplated—to be in the Attorney General's discretion. 'Specified' is not synonymous with 'implied' or 'anticipated.'"). Without that textual specification, § 1252(a)(2)(B)(ii) does not apply, no matter how discretionary the decision. *Id.*; *see also Soltane v. U.S. Dept. of Justice*, 381 F.3d 143, 147-48 (3d Cir. 2004). And as Defendants seem to recognize, *see* Defs. Br. at 7, even where § 1252(a)(2)(B)(ii) applies to a substantive determination, it does not preclude challenges to the procedures used to make that decision. *See, e.g.*, *Castaneira v. Noem*, 138 F.4th 540, 549-50 (D.C. Cir. 2025) ("Congress may shield from judicial review an agency's ultimate determination without precluding courts from reviewing the 'practice[s] or procedure[s] employed in making' such individual determinations (quoting *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991) (alteration in original)).

The parole statute expressly labels as discretionary only the decision to grant an individual parole ("The Secretary of Homeland Security may, except as provided …, in his discretion parole into the United States any alien applying for admission"). 8 U.S.C. § 1182(d)(5)(A). Defendants argue that the "purposes served" determination is also covered by § 1252(a)(2)(B)(ii) because it is a matter of the Secretary's "opinion." But even assuming *arguendo* that the *substance* of the "purposes served" determination is shielded from review, the *procedures* used to make that determination remain reviewable.

Moreover, numerous aspects of the parole authority are plainly *not* specified to be

discretionary and are therefore reviewable. 5 U.S.C. § 701(a).[7] These include that parole may be granted on just two statutory grounds; that its "conditions" must be "prescribe[d] only on a case-by-case basis"; that it must be "temporar[y]"; that it "shall not be regarded as an admission"; that when parole ends, the noncitizen "shall continue to be dealt with in the same manner as would any other applicant for admission"; and additional restrictions and requirements concerning refugees and labor disputes. *See* 8 U.S.C. § 1182(d)(5)(A)-(B); *id*. § 1184(f). The existence of so many statutory limits on and requirements for the parole authority makes plain that Congress did not intend to shield it entirely from judicial review.[8]

Section 1252(a)(2)(B)(ii) is inapplicable to Plaintiffs' claims, which seek review of the extent of the Secretary's authority and her failure to adhere to legal limits and requirements—none of which Congress made discretionary.[9] The "extent of [statutory] authority," for example, "is not a matter of discretion." *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001) (holding § 1252(a)(2)(B)(ii) inapplicable); *accord Succar v. Ashcroft*, 394 F.3d 8, 19-20 (1st Cir. 2005) (same holding regarding claims that a regulation on parole was contrary to law and arbitrary and capricious); *Mata Velasquez v. Kurzdorfer*, 794 F. Supp. 3d 128, 141 (W.D.N.Y. 2025) (holding § 1252(a)(2)(B)(ii)

---

[7] Defendants' argument that APA review is unavailable is coterminous with their argument about § 1252(a)(2)(B)(ii). *See* Defs.' Br. at 7 (citing § 701(a)(1)). The exception in § 701(a)(2) is also plainly inapplicable. *See* Doc. No. 97 at 25-27.

[8] In contrast, *Bouarfa v. Mayorkas*, 604 U.S. 6 (2024), held § 1252(a)(2)(B)(ii) stripped jurisdiction to review the Secretary's revocation of a prior visa petition approval because the statute (8 U.S.C. § 1155) provides in its entirety that "[t]he Secretary may, at any time, for what he deems to be good and sufficient cause, revoke the approval of any petition approved [under 8 U.S.C. § 1154]."

[9] Defendants claim "[a]ll agree that an *individual* parole termination decision is discretionary and thus not judicially reviewable," Doc. No. 251 at 6 (emphasis in original), but that is false. Courts routinely review individual parole termination decisions for their compliance with procedural requirements in particular. *See, e.g.*, *Samirah v. Holder*, 627 F.3d 652, 663 (7th Cir. 2010) (Posner, J.); Doc. No. 209 at 12 n.9, 16 n.13, 17 n.14, and 19 n.16 (collecting cases).

inapplicable to procedural claims regarding parole revocation because "even when a statute strips jurisdiction over a substantive discretionary decision, [it] does not strip jurisdiction over procedural challenges" (alteration in original) (internal quotation marks omitted)). Defendants have never argued § 1252(a)(2)(B)(ii) precludes constitutional claims, and for good reason. *See Webster*, 486 U.S. at 603. The law is likewise clear that § 1252(a)(2)(B)(ii) does not apply to regulatory violations. *Kucana*, 558 U.S. at 242-43 (inapplicable to claims that regulatory discretion was abused); *Castaneira*, 138 F.4th at 550-51 (inapplicable to *Accardi* claims); *Samirah*, 627 F.3d at 663 (same). Indeed, given that § 1252(a)(2)(B)(ii) is inapplicable to *Accardi* claims and that the agency's parole termination regulation (8 C.F.R. § 212.5) parallels the statute in material respects, even the narrow review precluded by § 1252(a)(2)(B)(ii) is at least partially available, as a functional matter, via *Accardi*.

## III.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR ARBITRARY & CAPRICIOUS CLAIM

*Rationale for overall termination.*[10] Defendants persist in defending Secretary Noem's mischaracterization of the FRP processes as principally designed to deter unlawful migration, when their actual stated purpose was family reunification. *See* Doc. No. 218 at 10-12. Defendants nonetheless concede, as they must, that to the extent the FRNs creating the FRP processes discussed irregular migration, they were concerned solely with I-130 visa-petition beneficiaries themselves and the promotion of family unification—not with deterring unlawful migration by third parties. Doc. No. 251 at 9.

---

[10] Plaintiffs do not seek preliminary relief as to the overall termination of the FRP processes but address Secretary Noem's rationale for doing so because the FRP FRN asserts the mass truncation of FRP parole is warranted for the same reasons. 90 Fed. Reg. at 58045.

Notwithstanding this critical concession, Defendants argue that Secretary Noem could properly justify terminating the FRP processes for failing to deter third-party migration by pointing to some processes' aspirational goal of addressing "root causes of migration through economic stability and development supported by increased remittances." Doc. No. 251 at 9 (quoting 88 Fed. Reg. at 43613). In other words, Defendants' position is that Secretary Noem satisfied the requirement that she examine the relevant data and grapple with the facts underlying the policy she reversed—not by engaging with the FRP processes' core purpose of family reunification, but by faulting them, after barely two years of operation, for failing to transform the economies of seven countries through parolees' wire transfers. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

This argument is meritless. The remittance rationale was a minor, aspirational consideration with an explicitly long-term time horizon. Only five of the seven FRP processes (those created in 2023) mentioned it at all, and those that did framed it as a distant possibility, not a near-term objective. *See, e.g.*, 88 Fed. Reg. at 43616 ("Additional remittances sent back to El Salvador, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns *may* promote economic development and address *some* of the root causes of migration." (emphases added)). Justifying termination of the FRP processes on this basis is arbitrary and capricious for at least three reasons: the remittance rationale played a minimal role in the processes' creation; Defendants have no data on whether the processes affected remittances (the AR is silent on the subject[11]); and even if such data existed, the explicitly long-

---

[11] The AR contains general information about remittances to these countries through 2023, FRP-FRN-01341 through 01483, but nothing more detailed. The first FRP parolees from Colombia, El Salvador, Guatemala, and Honduras arrived in October 2023 and the first FRP parolee from Ecuador arrived on February 15, 2024. Most arrived in 2024 or later—far too recently to measure any macroeconomic effect on remittance flows. *See* FRP-FRN-01532 through 01562.

term time horizon makes it absurd to evaluate the processes' success on this metric after just 16 months of parolee arrivals across the five countries combined.

Whatever the merits of this rationale as applied to the prospective termination of the FRP processes—and there are none—it is even more irrational as a justification for the mass truncation of existing grants of parole. Parolees who have already arrived, secured employment, and established lives in the United States are precisely the individuals most likely to be sending remittances. Terminating their parole does not advance the remittance objective; it abandons it. And it does so at the cost of upending the lives of thousands of individuals whom the government invited to come, who are on the cusp of eligibility for permanent residence, and who are now being stripped of their lawful status based on a policy rationale that has nothing to do with them.

**Reliance interests**. Defendants assert support for Secretary Noem's dismissive treatment of the class members' reliance interests from *S.A. v. Trump*, 363 F. Supp. 3d 1048 (N.D. Cal. 2018). *See* Doc. No. 251 at 11. Far from it. That case held that in ending the Central American Minors ("CAM") Parole process, DHS under the first Trump Administration acted arbitrarily and capriciously in rescinding *en masse* 2,714 "conditional approvals" of potential CAM beneficiaries who were still abroad without adequately considering their reliance interests.[12] 363 F. Supp. 3d at 1089-91 (denying motion to dismiss that claim); *S.A. v. Trump*, 2019 WL 990680, at *2, 13 (N.D. Cal. Mar. 1, 2019) (granting preliminary injunction on that claim).[13] In 2019, the first Trump

---

[12] The FRP FRN did the same regarding conditionally approved FRP parolees, 90 Fed. Reg. at 58042, presumably including the conditional approval of Plaintiff Valentin Rosales's daughter and granddaughter, Doc. No. 24-12, although it seems unlikely that the promised notices to affected individuals have been sent yet.

[13] As was the norm before March 2025, the CAM termination did not seek to claw back existing grants of parole. 82 Fed. Reg. 38926, 38927 (Aug. 16, 2017); *see also* 85 Fed. Reg. 84362, 84364-65 (Dec. 28, 2020); *accord* 90 Fed. Reg. 13611, 13619-20 (Mar. 25, 2025) (acknowledging historical norm of letting grants of parole expire naturally).

Administration settled that suit on noteworthy terms.[14] Rescinding pre-arrival conditional approvals for potential CAM beneficiaries warranted injunctive relief there; here, Secretary Noem terminated the parole of future lawful permanent residents the government had invited to come, and notwithstanding that many are mere months from being able to apply to adjust status. Defendants' attempt to analogize this case to *S.A.* only highlights the magnitude of Secretary Noem's error. The reliance interests here are categorically stronger, and Secretary Noem's cursory treatment of them fails *State Farm*'s requirement that an agency provide a "reasoned explanation" for "disregarding facts and circumstances that underlay or were engendered by the prior policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); *see also* Doc. No. 218 at 12-13.

*Alternatives*. Secretary Noem's failure to consider the alternative of merely letting existing grants of parole expire naturally was arbitrary and capricious and warrants preliminary relief by itself. *See* Doc. No. 218 at 14. Defendants' attempts to rehabilitate Secretary Noem's consideration of alternatives only highlights further irrationality. *See* Doc. No. 218 at 11-13.

In defense of Secretary Noem's rejection of the first alternative she considered, Defendants claim she reasonably explained that "allowing parolees under the FRP programs to continue to remain in the United States despite the lackluster or insufficient vetting they received prior to entry creates vulnerabilities for the U.S., undermining efforts to safeguard national security and public safety." 90 Fed. Reg. at 58044; Doc. No. 251 at 12. Defendants' reliance on security concerns is a

---

[14] *S.A. v. Trump*, 2019 WL 1593229, at *1 (N.D. Cal. Apr. 12, 2019 ("USCIS agrees to process the approximately 2700 individuals who were conditionally approved for parole prior to the CAM Parole program's termination and then issued rescission notices …. Specifically, USCIS agrees that the conditionally approved beneficiaries shall be processed pursuant to the CAM policies, guidance, and practices in effect on January 1, 2017…. The Parties anticipate that as a result of this agreement, most conditionally approved beneficiaries will be paroled into the United States, so long as they and their U.S.-based parents continue to remain eligible, are able to pay the associated costs for medical exams and travel, and desire parole.").

post-hoc rationalization that the Court cannot credit. *See Regents*, 591 U.S. at 20. The FRP FRN rejected this alternative not because of security vulnerabilities, but because allowing existing parolees to remain "would require individualized outreach and ongoing monitoring by DHS, imposing a significant administrative burden on the agency." 90 Fed. Reg. at 58044. Having chosen that rationale, Secretary Noem must stand or fall on it—and it cannot stand, including because there is nothing in the AR that supports any aspect of that explanation.

Even if the Court were to consider the security rationale Defendants now advance, it fails for at least two independent reasons. First, the "insufficient vetting" Secretary Noem references consists of the fact that modernized FRP parolees were not interviewed in person and did not have their biometrics collected until they arrived at the port of entry. 90 Fed. Reg. at 58034-35. But that was 12 to 28 months (or more) ago.[15] Since then, every class member has been interviewed in person (at least once), had their biometrics collected, undergone further vetting if they applied for other benefits (such as work authorization), and lived in the United States without incident. Secretary Noem offers no explanation for why the <u>timing</u> of their initial interview and biometrics collection—when they arrived at the port of entry rather than before—creates any ongoing security concern. There is none. Second, even if this vetting theory had merit, the AR is completely devoid of any information supporting it. There is no analysis of whether FRP parolees pose security risks, no comparison of vetting outcomes, no data whatsoever. Secretary Noem was speculating—and speculation is not reasoned decisionmaking. *See State Farm*, 463 U.S. at 43.

---

[15] Some modernized FRP parolees have been here nearly 28 months; the median modernized FRP parolee arrived 21 months ago, in April 2024. FRP-FRN-01532 through 1562. The AR has no information about when "legacy" parolees arrived.

IV.    **PLAINTIFFS ARE LIKELY TO SUCCEED IN PROVING THAT SECRETARY NOEM'S DECISIONS REGARDING NOTICE WERE UNLAWFUL ON NUMEROUS GROUNDS.**

Defendants' new arguments seek to defend Secretary Noem's decision to give the class members constructive notice via Federal Register publication and, beyond that, to say only that DHS "will" send electronic notices via myUSCIS to modernized FRP parolees and "will" mail printed notices to legacy FRP parolees at some unspecified time in the future. *See* Doc. No. 251 at 16-21; 90 Fed. Reg. at 58045. Defendants' arguments and the information they have now revealed leave no doubt that the Court correctly held that Plaintiffs are likely to succeed on the notice claims.

**8 C.F.R. § 212.5(e)(2)(i).** Defendants spend much of their argument defending compliance with the parole regulation ("parole shall be terminated upon written notice to the alien") by discussing different regulations that, where applicable, specify permissible methods of service. Doc. No. 251 at 17-19. Defendants seem to argue that because other regulations specify service methods, and the parole regulation does not, Defendants can give notice however they want. *See id.* However, Defendants erroneously conflate notice with service, and the parole regulation demands only the former, as Defendants themselves previously argued.[16] Doc. No. 140 at 18 ("[T]he parole and employment authorization regulations . . . . do not require 'service' at all. They require only 'written notice.'" (citations omitted)). Moreover, the parole regulation *conditions* parole termination on written notice to that parolee; without notice, parole has not been terminated. *See* Doc. No. 218 at 17. For that reason, Plaintiffs are likely to succeed in proving Secretary Noem violated the parole regulation when she decided that class members' parole would be terminated—

---

[16] Defendants similarly try to move the goalposts by asserting that this Court held that the Secretary "was required to provide notice to all FRP parolees individually by mail," Doc. No. 251 at 1, when the Court merely held (and Plaintiffs only need prove) that Secretary Noem's decision was not in accordance with law. Doc. No. 243.

and the U.S. government would thereafter treat them as unlawfully present—without regard to whether they had the actual, written notice that is the condition precedent for termination. 90 Fed. Reg. at 58045 ("regardless of actual knowledge or hardship resulting from ignorance").

Defendants argue that electronic messages sent via "myUSCIS" satisfy the parole regulation's notice requirement because "electronic notice is countenanced by [a different] regulation that provides for electronic notice where, as here, the parole application was filed electronically." Doc. No. 251 at 19 (citing 8 C.F.R. § 103.2(b)(19)(ii)(B)). As the Court correctly held, that regulation only applies to represented noncitizens, Doc. No. 243 at 3, and many (if not most) FRP parolees were unrepresented, *see* Doc. No. 218 at 17 n.20. Moreover, that regulation governs only "actions taken on [individuals'] immigration benefit requests" when those benefit requests were filed electronically. 79 Fed. Reg. 64299, 64300 (2014); *accord* 8 C.F.R. § 103.2 ("Submission and adjudication of benefit requests"). It does not authorize electronic notification of government-initiated adverse actions—which are governed by a different regulation requiring "personal service" for government-initiated proceedings "with proposed adverse effect." 8 C.F.R. § 103.8(c)(1). Third and finally, Secretary Noem justified Federal Register publication by citing "the potential for outdated email addresses." 90 Fed. Reg. at 58045. Defendants now argue that messages sent via myUSCIS—which then generate an email to the account holder telling them to login to their account for a new message—are legally adequate. Both positions cannot be correct.

**Due process.** The Court was likewise correct to hold that Plaintiffs are likely to succeed on their due process claim. Doc. No. 243 at 4. Other than promising to do something different the next time, now that their actions have come to light (but without acknowledging they did anything wrong in the first place), Doc. No. 250-1 ¶¶ 20-23, Defendants press two meritless arguments.

First, Defendants' repeat their argument that class members have no protectable interest in

the parole that they already have because, Defendants claim, "they have only a hope" that their parole will continue. Doc. No. 251 at 20-21. This Court already explained at argument that the cases that Defendants rely upon stand for the precise opposite conclusion—individuals may not have a protectable interest in the initial, discretionary grant of parole, but they *do* have a protected interest in maintaining it once it has been granted. *See* Tr. (Doc. No. 244) at 33; *see also Greenholtz v. Neb. Penal Inmates*, 442 U.S. 1, 9 (1979); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) ("The liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others. It is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a 'right' or a 'privilege.' By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment. Its termination calls for some orderly process, however informal."); *see also, e.g.*, *Mohammadi v. Larose*, 3:25-cv-3450, 2025 WL 3731737, at *3 (S.D. Cal. Dec. 26, 2025) (explaining in habeas case involving Afghan Operation Allies Welcome parolee, "[f]or humanitarian parole under § 1182(d)(5)(A), courts have held that such parole status entitles the [parolee] to certain rights under both procedural due process and the APA."); *Mata Velasquez*, 794 F. Supp. 3d at 150 (same due process holding in habeas involving CHNV parolee).

Second, Defendants argue that Federal Register publication "satisf[ies] constitutional due process" and that "Plaintiffs fail to show that additional procedures were required to safeguard their interests." Doc. No. 251 at 21. Defendants' premise is wrong. The Constitution requires notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 318 (1950). Publication satisfies this standard only when individual notice is impossible. *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 (1983). Here, the government knew exactly who would be

affected and had their contact information, and so publication is constitutionally inadequate.[17] *Id.*

Given that Defendants' choice of notice is constitutionally inadequate on its face, there is no need to balance the *Mathews* factors, but they clearly favor Plaintiffs: the government could have (and should have) informed each parolee directly that would deem them unlawfully present, and with sufficient time for them to seek alternative relief or to prepare for the consequences.

**Arbitrary and capricious agency action**. Finally, and independent of compliance with the regulatory and constitutional requirements, Plaintiffs are likely to succeed in proving that Secretary Noem's decisions regarding notice were arbitrary and capricious. Doc. No. 218 at 17-18. Defendants argue otherwise, pointing to the Secretary's statement that Federal Register publication was "the most practicable approach in light of the potential noncompliance with change-of-address reporting requirements and the potential for outdated email addresses." 90 Fed. Reg. at 58045; Doc. No. 251 at 19. Secretary Noem's repeated use of the word "potential" here suggests she was speculating, and the AR confirms it: it contains nothing even related to these topics. Secretary Noem had no rational basis for her notice decisions. *See* Doc. No. 218 at 7.

## V.    THE MASS TERMINATION OF FRP PAROLE WAS A LEGISLATIVE RULE.

As to the members of the class, the FRP FRN does not announce a policy—it terminates the parole of at least 8,404 specific individuals. That is quintessential legislative action requiring notice-and-comment rulemaking. Doc. No. 218 at 18-19.

Defendants' legislative-rule argument defeats itself. They claim the FRP FRN's *en masse* termination of at least 8,404 individuals' grants of parole is merely an announcement of "generally

---

[17] Defendants claim support from *Lyng v. Payne*, 476 U.S. 926 (1986), *see* Doc. No. 251 at 21, but they omit that the statement they quote concerned only "applicants for benefits, as distinct from those already receiving them." 476 U.S. at 942. The other opinion Defendants cite, *Chow v. INS*, 74 F. App'x 733, 734 (9th Cir. 2003), held only that an individual was not denied due process by the predictable application to his case of a valid regulation.

applicable guidelines" that are "not binding." Doc. No. 251 at 22-23. Yet Defendants also insist

that the FRP FRN validly terminated those grants of parole in accordance with the statutory and

regulatory requirements. Both cannot be true. Either the FRN's mass termination binds—in which

case it is a legislative rule—or it does not—in which case it terminates no one's parole.

Defendants forget history in asserting that there is no precedent for holding that actions of

this nature are legislative rules. *See id.* at 22. The parole regulation is itself a product of a federal

district court holding that the Executive's policy decision regarding the exercise of the statutory

parole authority as to a particular group of noncitizens (Haitians) was a legislative rule that should

have, but did not, go through notice and comment rulemaking. *Louis v. Nelson*, 544 F. Supp. 973,

993-97 (S.D. Fla. 1982); *see also* 47 Fed. Reg. 30044 (July 9, 1982) (*codified as amended at* 8

C.F.R. § 212.5). The district court's conclusion in that case could scarcely be more applicable here:

> [T]he new policy had an immediate and substantial impact on the Plaintiffs. The
> Court cannot think of any administrative action that would have a greater impact
> on a regulated group of people than a change in policy which results in their
> indefinite incarceration where, under the previous policy, they would have been
> free. It is true that the prior policy was never formalized by a written requirement
> or by its adoption in a formal rulemaking proceeding. It is equally true that under
> the old policy, Haitians could not claim a substantive right to parole. But a change
> in a longstanding informal practice is as much a rule as repeal of a formal regulation
> if the result has a substantial impact on those regulated. Here the policy change had
> a substantial impact, it constitutes a substantive rule and it should have been
> adopted in accordance with the APA's rulemaking provisions.

*Id.* at 997 (footnote and citations omitted); *see also Jean v. Nelson*, 472 U.S. 846, 849-51, 855

(1985) (holding that the Court need not reach the constitutional question of whether the

aforementioned policy change unlawfully discriminated against Haitians on the ground that the

new parole regulation was facially non-discriminatory, as ordered by the district court).

## VI.    THE ADMINISTRATIVE RECORD MAKES PLAIN THE BALANCE OF THE EQUITIES TIPS OVERWHELMINGLY IN FAVOR OF PLAINTIFFS.

Other than assuming that they will win on the merits and asserting, quite royally, that the

United States is irreparably harmed whenever President Trump does not get to do what he wants, Doc. No. 251 at 23, Defendants identify two ways that granting preliminary relief could harm the government. First and most prominently, Defendants assert that Secretary Noem has "determined" that the parole grants to class members "raise national security and public safety concerns." *Id.* at 23-24. That is not quite accurate: in the FRN, Secretary Noem said parolees received "lackluster or insufficient vetting . . . prior to entry," and that this "creates vulnerabilities for the U.S." 90 Fed. Reg. at 58045. As discussed above, this is a post-hoc rationalization that is unsupported by anything in the record and irrational on its face. *Supra* at 13-14.

Defendants identify one other putative harm preliminary relief could cause them: the agency resources used to adjudicate re-parole requests. Doc. No. 251 at 23; *cf.* 90 Fed. Reg. at 58044 (rejecting the second alternative to mass termination because "permitting current parolees under the FRP programs to repeatedly seek re-parole would do little to reduce the current administrative workload"). In contrast to most everything else Defendants argue, the AR has relevant information here: DHS's estimate of what it costs the government to adjudicate a Form I-134A request (which is what FRP parolees would use to request re-parole). That cost to the government is $64.65. FRP-FRN-00644. As Plaintiffs have explained, moreover, Secretary Noem did not seem to realize that no FRP parolee should need more than one grant of re-parole, and many should not need one at all. Doc. No. 218 at 5; *accord* FRP-FRN-01570 (breaking down response rates by "under 3" years and "3-5" years until priority date). Monetary harm is not irreparable, and so even that $64.65 does nothing for Defendants on the balance of the equities.

## VII.    GOOD CAUSE EXISTS TO EXTEND THE TRO.

Should the Court require additional time to rule on Plaintiffs' preliminary injunction request, Rule 65(b)(2) authorizes a 14-day extension "for good cause." Good cause exists here: briefing completed only on January 20, a few short days before the TRO expires; the 1,500-page

AR was produced January 13; Defendants' further opposition introduced an extra-record declaration; and the legal issues are complex and contested. The Court has already found Plaintiffs likely to succeed and that the equities favor relief. Doc. No. 243. A brief extension to permit thorough consideration would be well-justified. *Maine v. Fri*, 483 F.2d 439, 441 (1st Cir. 1973).

## CONCLUSION

The AR speaks volumes through its silence. It contains nothing to support Secretary Noem's assertions about fraud, security concerns, or administrative burdens. It does not contain the "internal audit" the FRN cites. It has no analysis of reliance interests, no consideration of letting grants expire naturally, no reasoned explanation for why over 8,000 future LPRs and U.S. citizens should be stripped of their lawful status and rendered removable. And Defendants' declaration confirms that, absent the TRO, most class members would have learned their parole had been terminated only after it was too late to do anything about it. That is not governance; it is caprice.

Dated: January 20, 2026                     Respectfully submitted,


                                            */s/ Justin B. Cox*
Esther H. Sung (*pro hac vice*)             Justin B. Cox (*pro hac vice*)
Karen C. Tumlin (*pro hac vice*)            LAW OFFICE OF JUSTIN B. COX
Hillary Li (*pro hac vice*)                 *JAC Cooperating Attorney*
Laura Flores-Perilla (*pro hac vice*)       PO Box 1106
Brandon Galli-Graves (*pro hac vice*)       Hood River, OR 97031
JUSTICE ACTION CENTER                       (541) 716-1818
P.O. Box 27280                              justin@jcoxconsulting.org
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org         John A. Freedman (BBO#629778)
karen.tumlin@justiceactioncenter.org        Laura Shores (*pro hac vice* pending)
hillary.li@justiceactioncenter.org          Katie Weng (*pro hac vice* pending)
laura.flores-perilla@justiceactioncenter.org   ARNOLD & PORTER KAYE SCHOLER LLP
brandon.galli-graves@justiceactioncenter.org   601 Massachusetts Ave, NW
                                             Washington, D.C. 20001-3743
                                             Telephone: (202) 942-5316
                                            john.freedman@arnoldporter.com
Anwen Hughes (*pro hac vice*)               laura.shores@arnoldporter.com
HUMAN RIGHTS FIRST                          katie.weng@arnoldporter.com
75 Broad St., 31st Fl.
New York, NY 10004                          H. Tiffany Jang (BBO#691380)

20

Telephone: (212) 845-5244
HughesA@humanrightsfirst.org

Robert Stout (*pro hac vice*)
Sarah Elnahal (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
rob.stout@arnoldporter.com
sarah.elnahal@arnoldporter.com

**ARNOLD & PORTER KAYE SCHOLER LLP**
200 Clarendon Street, Fl. 53
Boston, MA 02116
Telephone: (617) 351-8053
tiffany.jang@arnoldporter.com

Daniel B. Asimow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3142
daniel.asimow@arnoldporter.com

*Attorneys for Plaintiffs*

21

## CERTIFICATE OF SERVICE

I, <u>Justin B. Cox</u>, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: January 20, 2026

*/s/ Justin B. Cox*

Justin B. Cox
