UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SVITLANA DOE, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 1:25-cv-10495-IT |
| | * | |
| KRISTI NOEM, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

MEMORANDUM & ORDER

January 24, 2026

TALWANI, D.J.

This class action challenges steps taken by the Department of Homeland Security ("DHS") regarding humanitarian parole programs. Most recently, in December 2025, DHS terminated certain Family Reunification Parole programs and announced the termination of all unexpired initial grants of parole awarded under these programs, effective January 14, 2026. See Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans, 90 Fed. Reg. 58032 (Dec. 15, 2025) [Doc. No. 216-1] (the "Federal Register Notice" or the "Notice"). On January 10, 2026, after Plaintiffs filed a Supplemented Second Amended Complaint [Doc. No. 239] and the court entered an Order Modifying Class Definition and Appointing Additional Named Plaintiffs [Doc. No. 241], this court granted an emergency fourteen-day stay of the Federal Register Notice insofar as it revokes previously granted parole and work authorization issued to noncitizens paroled into the United States pursuant to the relevant Family Reunification Parole programs. See Temporary Restraining Order [Doc. No. 243]. Now pending before this court is Plaintiffs' Motion for a Preliminary Injunction and/or Stay of En Masse Truncation of Family Reunification Parole [Doc.

No. 216] seeking further preliminary relief or stay. For the reasons stated below, Plaintiffs'

Motion is GRANTED.

## I.    Background[1]

Under the Immigration and Nationalization Act ("INA"), as amended:

> The Secretary of Homeland Security may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A).[2] Pursuant to this authority, DHS has established various parole

programs granting temporary parole to noncitizen applicants who meet program requirements.

Four of these programs, referred to as the "CHNV Parole Programs," were addressed

earlier in this litigation. As the First Circuit summarized,

> DHS under the Biden Administration announced a new parole process to address an increasingly high number of encounters with Venezuelan nationals at the southern border. . . . This new process allowed Venezuelan nationals to obtain advance authorization to "travel to the United States to seek a discretionary, case-by-case grant of parole for up to two years."

Doe v. Noem, 152 F.4th 272, 279 (1st Cir. 2025) (quoting Implementation of a Parole Process

for Venezuelans, 87 Fed. Reg. 63507, 63508 (Oct. 19, 2022)). The Venezuela parole program

---

[1] The court presumes familiarity with the factual background and procedural history of this litigation and incorporates by reference this court and the First Circuit's previous discussions of both. See Doe v. Noem, 784 F. Supp. 3d 437 (D. Mass. 2025), appeal dismissed per stipulation, Doe v. Noem, No. 25-1715 (1st Cir. Nov. 5, 2025); Doe v. Noem, 2025 WL 2201108 (D. Mass. Aug. 1, 2025); Doe v. Noem, 152 F.4th 272 (1st Cir. 2025). That background and the legal findings, as relevant here, are discussed further below.

[2] An "alien" is "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).

specified that discretionary grants of parole would be for a temporary period of up to two years, during which time individuals could seek humanitarian relief or other benefits and receive work authorization. See, e.g., Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. at 63508. "Modeled after the Venezuelan parole program, DHS launched similar programs for nationals of Cuba, Haiti, and Nicaragua in January 2023." Doe, 152 F.4th at 279–80 (citing Implementation of Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023)).

Like the CHNV Parole Programs, Family Reunification Parole processes also provide for humanitarian parole. They differ, however, in that the Family Reunification Parole processes are limited to applicants who are beneficiaries of a previously approved Form I-130 immigration petition filed by a U.S. citizen or lawful permanent resident. See, e.g., Implementation of a Family Reunification Parole Process for Salvadorans, 88 Fed. Reg. 43611, 43613 (July 10, 2023); see also Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58033. Parole also is only available under the Family Reunification Parole processes after the petitioning U.S. citizen or lawful permanent resident is invited by the United States government to apply for parole for their Form I-130 approved family member. See, e.g., Implementation of a Family Reunification Parole Process for Salvadorans, 88 Fed. Reg. at 43613; see also Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58033. Under these processes, the timing of such invitations is in the Secretary's discretion, based on multiple factors that could include the expected period of time until the beneficiary's immigrant visa becomes

available.[3] See Implementation of a Family Reunification Parole Process for Salvadorans, 88 Fed. Reg. at 43618. Thus, while CHNV Programs anticipated that parolees not granted asylum or other immigration benefits would need to leave the United States at the expiration of their authorized period of parole or be placed in removal proceedings after the period of parole expires, see, e.g., Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. at 63508, the Family Reunification Parole processes anticipated that the process "will allow family members to reunite in the United States while they wait for their immigrant visas to become available." Implementation of a Family Reunification Parole Process for Salvadorans, 88 Fed. Reg. at 43611.

Nine Family Reunification Parole programs covering nationals of seven countries (the "FRP Programs") are at issue here. The first seven Programs are "for aliens from Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras, and their immediate family members, under the Family Reunification Parole processes announced, or updated, by DHS in 2023[.]" Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58032.[4] The

---

[3] Immigrant visas for family-sponsored immigrant preference categories are numerically limited and the visas therefore are not necessarily available when the visa petition is approved. 8 U.S.C. § 1153.

[4] See Implementation of a Family Reunification Parole Process for Guatemalans, 88 Fed. Reg. 43581 (July 10, 2023); Implementation of a Family Reunification Parole Process for Colombians, 88 Fed. Reg. 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Hondurans, 88 Fed. Reg. 43601 (July 10, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 Fed. Reg. at 43611; Implementation of Changes to the Haitian Family Reunification Parole Process, 88 Fed. Reg. 54635 (Aug. 11, 2023); Implementation of Changes to the Cuban Family Reunification Parole Process, 88 Fed. Reg. 54639 (Aug. 11, 2023); Implementation of a Family Reunification Parole Process for Ecuadorians, 88 Fed. Reg. 78762 (Nov. 16, 2023). The programs are referred to here and in the challenged Federal Register Notice as the "modernized FRP programs."

final two programs are older programs for noncitizens from Cuba and Haiti,[5] which were first implemented by U.S. Citizenship and Immigration Services ("USCIS") in 2007 and 2014, respectively.

## II.    The Termination of the Family Reunification Parole programs

The Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans, 90 Fed. Reg. 58032 (Dec. 15, 2025), announced that the "temporary parole period of aliens who have been paroled into the United States under the FRP programs, and whose initial period of parole has not already expired by January 14, 2026[,] will terminate on that date." Id.[6] The Federal Register Notice identified two exceptions where parole will not terminate on that date. First, parole will not terminate if a parolee has filed a Form I-485, Application to Register Permanent Residence or Adjust Status,[7] that has been postmarked or electronically filed by December 15, 2025, and that is still pending adjudication as of that date. Id. at 58032–33. Second, parole will not terminate on the announced termination date if the Secretary of Homeland Security "determines otherwise on a case-by-case

---

[5] See Cuban Family Reunification Parole Program, 72 Fed. Reg. 65588 (Nov. 21, 2007); Implementation of Haitian Family Reunification Parole Program, 79 Fed. Reg. 75581 (Dec. 18, 2014). These programs are collectively referred to as the "legacy FRP programs."

[6] The Notice reported that since July 10, 2023, DHS granted parole to roughly 14,000 noncitizens through the modernized FRP programs, and that all of these parolees are within the initial three-year grant of parole. Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58043. The Notice reported further that approximately 1,060 Cubans and 100 Haitians are in the United States with valid grants of parole under legacy programs, but did not identify how many of these parolees are within an initial three-year grant. Id.

[7] Generally, the Form I-485, Application to Register Permanent Residence or Adjust Status, may not be filed until an immigrant visa is immediately available to the applicant. See U.S. CITIZENSHIP AND IMMIGRATION SERVS., I-485 FORM (2025).

5

basis." Id. at 58033.[8]

The Federal Register Notice also stated that all parolees "without a lawful basis to remain in the United States following the termination of their parole must depart the United States before their parole termination date." Id. at 58033. The Federal Register Notice provided further that "[f]ollowing this termination, . . . DHS generally intends to promptly remove aliens, consistent with law, who entered the United States under the FRP programs and who stay in the United States beyond their parole termination date with no lawful basis to remain in the United States." Id. at 58043.

A. *Rationale for Termination*

The Federal Register Notice concluded that the FRP Programs no longer "serve a significant public benefit, are not necessary to reduce levels of unlawful immigration, and are not serving all their intended purposes." Id. at 58034. The Notice stated that the Secretary found that these reasons together supported termination of the program. Id.

1. Purposes of the Programs

The Federal Register Notice acknowledged that DHS, when creating these parole processes, had found that the parole processes would provide a significant public benefit for the United States by

> (i) promoting family unity; (ii) furthering important foreign policy objectives; (iii) providing a lawful pathway and timely alternative to unlawful migration at the southwest land border; (iv) reducing strain on limited U.S. resources; and (v) addressing the root causes of migration through economic stability and development supported by increased remittances.

_____

[8] The Federal Register Notice stated that parolees may apply for re-parole, which would be adjudicated and may be approved on a case-by-case basis, by filing Form I-131 and "must demonstrate urgent humanitarian reasons or significant public benefit specific to his or her case and that he or she merits a favorable exercise of discretion for parole[.]" Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58043.

Id. The Federal Register Notice acknowledged further that the programs sought to promote family unity by providing a faster pathway for United States citizens and lawful permanent residents to reunite with family members while awaiting availability of their immigrant visas. Id. DHS acknowledged "that aliens paroled into the United States under the FRP programs may have been able to reunite with family members in the United States." Id.

DHS concluded, however, that "that national security and fraud concerns, and the current Administration's priorities outweigh[ed] those interests" and supported termination. Id. As to national security, the Federal Register Notice compared the FRP Programs' vetting process to that of individuals pursuing lawful permanent resident status through consular processing. Id. In the latter case, applicants' consular processing requires "an in-person interview outside the United States, and submission of various documents to establish the necessary family relationship with the petitioner[,]" while still outside of the United States. Id. The Federal Register Notice contrasted this process with that of the modernized FRP Programs, where beneficiaries would seek parole at a point of entry ("POE"), at which point, DHS asserted, they would undergo "minimal public safety and national security vetting[.]" Id. at 58035. The Federal Register Notice asserted that "biometrics were not submitted by each potential beneficiary until they arrived at the interior POE to seek parole," id., which prevented the U.S. government from conducting additional vetting of applicants prior to their arrival. Id. Based on this factor, alongside others listed in the Federal Register Notice, DHS concluded that the FRP Programs created "an unacceptable level of risk to the United States' national security and public safety." Id.

DHS similarly concluded that the programs "presented an unacceptable risk of abuse and fraud." Id. The Federal Register Notice pointed to a greater risk of fraud "[w]hen biometrics

collection and interviews do not occur prior to a beneficiary's arrival" in the United States,
where sponsors could misrepresent family relationships and falsely claim a familial tie, and
where beneficiaries from countries with "weak civil registry systems" could potentially submit
fraudulent documents to support their claims. Id.

      As to the Administration's priorities, DHS pointed to "current enforcement-based
priorities, namely to better 'achieve the total and efficient enforcement, including through lawful
incentives and detention capabilities' of U.S. immigration law," and concluded that "[t]he
modernized FRP programs, initiatives of the prior administration, do not align with this
Administration's emphasis on enforcing immigration law, deterring unlawful immigration, and
eliminating fraud and abuse." Id. (quoting Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 29,
2025))

      The Federal Register Notice also concluded that the programs did not further the
Administration's foreign policy objectives. Id. It explained that, given the Administration's
"pivot to a foreign policy that prioritizes the United States' interests in reducing and deterring
unlawful migration[,]" this Administration was pursuing a "regional migration management
strategy" different from the prior administration. Id. at 58036. Accordingly, the Administration
sought to focus on "other measures to deter and prevent the entry of illegal aliens into the United
States." Id. at 58037.

      The Federal Register Notice concluded further that the FRP Programs failed to
accomplish their goal of discouraging unlawful migration because "the confirmed beneficiaries
of the FRP programs constitute a tiny fraction of the total population of aliens from the seven
FRP countries that unlawfully attempted to enter the country during this time period." Id. The
Notice stated that DHS had found that roughly 16,100 noncitizens were granted parole under the

FRP Programs, while Customs and Border Patrol encountered over 888,000 noncitizens from FRP countries in FY2024. Id. DHS accordingly "determined that the FRP programs did not meaningfully reduce unlawful migration at the southwest border and are not needed to achieve that goal." Id. Instead, DHS determined that alternative policy actions, such as "increasing interior enforcement actions, ramping up removals, building physical barriers along the border, and deploying advanced surveillance technology[,]" represented "a more prudent approach" to addressing unlawful migration. Id.

DHS also determined that the FRP Programs' failure to reduce unlawful migration resulted in an increase to DHS workload without any offset. Id. at 58039. The Notice stated that DHS personnel were still required to invest resources in detention, monitoring, processing, and removal while also processing FRP applications. Id. Noting that noncitizens who would have otherwise sought lawful permanent resident status from the Department of State now applied for parole under FRP, DHS concluded that the FRP programs "shifted the strain from the Department of State to DHS personnel" and that the "reallocation of limited DHS personnel resources caused by the FRP programs is unsustainable." Id. at 58039–40.

The Federal Register Notice reported further that DHS found that FRP parolees did not meaningfully affect the economic conditions of their countries of origin. Id. at 58040. DHS originally intended that such beneficial effects would arise because parolees would earn higher wages working under lawful employment authorization and then send money home through remittances. Id. Analyzing the rates at which parolees participated in remittances, DHS determined that "any contribution FRP parolees may make to the remittance volumes in their home country is too small to substantially impact the overall economic stability of the country or address the root causes of migration." Id. DHS found that the United States was incapable of

bearing "sole responsibility for the development and economic stability of other nations" and stated that "U.S. immigration policy cannot serve as a surrogate for long-term development solutions in foreign countries." Id. at 58041.

2. Reliance Interests

The Federal Register Notice considered separately the reliance interest of prospective parolees and current parolees. Id. at 58041–45.

As to current FRP parolees, DHS "recognize[d] the costs incurred by some aliens who have been granted parole and moved to the United States." Id. at 58044. Indeed, as DHS acknowledged, "[p]arolees will have departed their native country; traveled to the United States; obtained housing, employment authorization, and means of transportation; and perhaps commenced the process of building connections to the community where they reside." Id. DHS recognized that the termination of FRP parole grants would also affect parolees' employers, parolees' landlords, and businesses patronized by parolees. Id. Nonetheless, DHS stated, such reliance interests cannot outweigh "the U.S. government's strong interest in promptly returning parolees when the basis for the underlying parole no longer exists." Id. Further, DHS declined to assign parolees' reliance interests significant weight due to the discretionary and term-limited nature of FRP. Id.

B. *Notice*

DHS published the Federal Register Notice on December 15, 2025—thirty days prior to the date for termination of existing grants of parole. Id. at 58032, 58044. The Federal Register Notice stated that after the January 14, 2025 termination, DHS "intend[ed] to promptly remove" FRP parolees from the United States, regardless of the term length of the parolee's grant. Id. at 58043. The Federal Register Notice asserted that its publication served as "constructive notice" to parolees of the suspension and termination of the FRP grants and that, in DHS's view,

10

"publication of this notice in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance." Id. at 58045 (citing 44 U.S.C. § 1507). In addition, DHS stated its intent to "provide individual notice to each parolee through their USCIS online account." Id. For legacy parolees, who DHS acknowledged would not have an online account (a "myUSCIS account"), DHS committed to providing "personal, individual notice by mail." Id.

DHS reports that on January 5, 2026, USCIS sent 3,501 FRP parolees, including five FRP parolees who are Class Representatives, electronic notice of the January 14, 2026 parole termination via their myUSCIS accounts. See Kernochan Decl. ¶¶ 15, 17 [Doc. No. 250-1].[9] DHS reports that approximately 1,841 termination notices had been accessed by January 12, 2026, including by two of the Class Representatives. Id. ¶¶ 16–17. On January 10, 2026, DHS halted the issuance of electronic termination notices to 4,213 "modernized FRP parolees" in light of the court's TRO. Id. ¶ 16. As of January 15, 2026, DHS had not yet mailed notice to the 628 legacy parolees who are in their initial period of parole. Id. ¶¶ 18–19.

Defendants have represented to this court their intent, once this court's stay is lifted, "to issue new notices to all impacted FRP parolees providing notice that their parole will terminate 30 days from the date of the notice." Id. ¶ 22. The new notices "will also provide that any associated [employment authorization documents] will be revoked no sooner than 30 days from the date of the notice, unless the FRP recipient submits countervailing evidence demonstrating

---

[9] The notices stated that both parole and parole-based employment authorization would be terminated on January 14, 2026. Kernochan Decl. at ECF 7 [Doc. No. 250-1]. Defendants report that the notices "included a typo, indicating that the [employment authorization documents] would be revoked as of January 14, 2026, the date of parole termination, rather than January 20." Id. ¶ 20.

their continued eligibility for parole-based employment authorization before that date." Id.

Defendants state further that "notices will be transmitted electronically to parolees who were

granted parole through an electronic application process, and sent in paper form to the current

address of record to parolees who were granted parole by filing a paper request." Id. ¶ 23.

### III.    Jurisdiction

Defendants contend that 8 U.S.C. § 1252(a)(2)(B)(ii) bars the court from exercising

jurisdiction here. Defs.' Opp'n 6 [Doc. No. 251] This argument is incorrect.

Section 1252(a)(2)(B)(ii) establishes that no court shall have jurisdiction to review:

> [A]ny . . . decision or action of the Attorney General or the Secretary of Homeland
> Security the authority for which is specified under this subchapter to be in the
> discretion of the Attorney General or the Secretary of Homeland Security, other
> than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B)(ii). Defendants point out that the decision whether to terminate FRP

grants of parole is within the Secretary's discretion under 8 U.S.C. § 1182(d)(5)(A) and is

therefore precluded from review by Section 1252(a)(2)(B)(ii). Defs.' Opp'n 6 [Doc. No. 251].

That position is not controversial: the parole statute, which is in the same subchapter,

provides that an alien's parole may be terminated "when the purposes of such parole shall, in the

opinion of the Secretary of Homeland Security, have been served[.]" 8 U.S.C. § 1182(d)(5)(A)

(emphasis added). Section 1252(a)(2)(B)(ii) applies to matters where discretion is conferred by

statute on the Secretary, see Kucana v. Holder, 558 U.S. 233, 251–52 (2010) (emphasis added).

Under 8 U.S.C. § 1182(d)(5)(A), Congress has placed, by statute, individual parole

determinations, and the decision of whether to revoke such individual grants of parole, within the

Secretary's discretion.

But there is a separate question as to whether Congress, by statute, also sought to divest

courts of jurisdiction to hear challenges to the procedures employed by the Secretary to reach

such determinations. In short, at issue is not whether the Secretary may exercise her discretion to terminate an individual's parole—she may—but rather whether the procedures adopted in this case for the exercise of such discretion are in accordance with law. See, e.g. Castaneira v. Noem, 138 F.4th 540, 549 (D.C. Cir. 2025) ("In other words, the issue before us is whether 8 U.S.C. § 1154(a)(1)(A)(viii)(I), in granting USCIS 'sole and unreviewable discretion' to 'determine[ ] that the citizen poses no risk,' also affords the agency discretion to depart from its own binding regulations or precedents in making this determination. We hold that it does not."). The answer to that question is no.

Here, Plaintiffs seek to challenge the procedure, or lack thereof, relied upon to terminate Plaintiffs' grants of parole. Plaintiffs challenge how the decision was made and contend that the Secretary's reasoning was arbitrary and capricious because DHS failed to properly consider the purpose of the FRP programs, the reliance interests of Plaintiffs, and the alternatives available to the agency. Pls.' Mem. ISO Prelim. Inj. and/or Stay of En Masse Truncation of Family Reunification Parole 10–14 [Doc. No. 218] ("Pls.' Mem."). Relatedly, Plaintiffs allege that the Secretary exceeded her authority by failing to adhere to statutory requirements. Id. at 14–16. Plaintiffs also challenge how the decision was communicated, alleging that notice to parolees was deficient. Id. at 17–18. And finally, Plaintiffs challenge the approach taken to promulgate the decision itself, claiming that such a decision could only be issued following a notice-and-comment period. Id. at 18–19. None of these challenges go to the Secretary's ultimate decision to terminate parole. Instead, they speak to whether the steps taken to do so were proper.

The statute is silent on whether the procedures employed by Secretary to terminate grants of parole are likewise left to the discretion of the Secretary. In Kucana v. Holder, 558 U.S. 233 (2010), in considering whether Section 1252(a)(2)(B)(ii) barred judicial review of an

administrative determination, the Supreme Court emphasized "a familiar principle of statutory construction: the presumption favoring judicial review of administrative action." Id. at 251. "When a statute is 'reasonably susceptible to divergent interpretation, [the Court] adopt[s] the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review." Id. (internal quotations omitted). Pursuant to Kucana, the First Circuit has further held that "a statutory provision must expressly and specifically vest discretion in the Attorney General (for example, by explicitly using the words 'in the discretion of the Attorney General') rather than simply leave to the executive branch certain decisions and determinations that happen to be discretionary in nature." Valerio-Ramirez v. Sessions, 882 F.3d 289, 294 (1st Cir. 2018). Here, where the statute does not explicitly state that the procedures employed by the Secretary are left entirely to her discretion, the court declines to adopt an interpretation would run counter to the presumption of reviewability. Accordingly, the court finds Section 1252(a)(2)(B)(ii) does not bar the court's jurisdiction.[10]

Defendants also briefly contend that even if § 1252(a)(2)(B)(ii) did not preclude review, review under the Administrative Procedures Act ("APA") is unavailable where "the parole termination decision is 'committed to agency discretion by law.'" Defs.' Opp'n 7 [Doc. No. 251] (quoting Webster v. Doe, 486 U.S. 592, 600 (1988)).

The APA "establishes a 'basic presumption of judicial review [for] one 'suffering legal wrong because of agency action[,]'" but that presumption may rebutted, including by a showing

---

[10] Plaintiffs raise additional arguments in support of this court's jurisdiction. See Pls. Reply 6–9 [Doc. No. 253]. Where the court finds that it has jurisdiction, it need not reach these additional grounds at this time.

that the "agency action is committed to agency discretion by law." <u>Dep't of Homeland Sec. v.
Regents of the Univ. of Cal.</u>, 591 U.S. 1, 16-17 (2020) (first alteration in original) (citations
omitted). The Supreme Court has read this exception "quite narrowly, restricting it to those rare
circumstances where the relevant statute is drawn so that a court would have no meaningful
standard against which to judge the agency's exercise of discretion." <u>Dep't of Com. v. New
York</u>, 588 U.S. 752, 772 (2019) (quotation omitted).

Here, despite the broad discretion accorded to the Secretary, the parole statute does
include meaningful standards for the Secretary's exercise of discretion both in granting parole—
in that such grants must be made on a case-by-case basis for urgent humanitarian reasons or
public benefit—and in terminating the grant of parole, by requiring a determination by the
Secretary that "the purposes of such parole . . . have been served[.]" 8 U.S.C. § 1182(d)(5)(A).
Moreover, the Secretary's own regulations import notice requirements which limit her discretion.

This court finds further support for the view that Plaintiffs' challenge to the Federal
Register Notice is reviewable in the Supreme Court's decision in <u>Department of Homeland
Security v. Regents of the University of California</u>, 591 U.S. 1 (2020). Rejecting the
government's argument that decisions related to Deferred Action for Childhood Arrivals
("DACA") were committed to agency discretion by law, the Court determined that DACA was
not an unreviewable non-enforcement policy, but was rather a program for conferring affirmative
immigration relief, including the conferral of eligibility for work authorization and Social
Security. <u>Id.</u> at 18–19. On that basis, the Court reasoned that "[t]he creation of that program—
and its rescission—is an 'action [that] provides a focus for judicial review.'" <u>Id.</u> at 18 (second
alteration in original) (quoting <u>Heckler v. Chaney</u>, 470 U.S. 821, 832 (1985)).

For these reasons, the court is not without jurisdiction over Plaintiffs' challenge to Defendants' *en masse* termination of existing grants of parole.

## IV.    Standard of Review

A preliminary injunction is an "extraordinary remedy" that shall enter only if a plaintiff makes a clear showing of entitlement to such relief. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). In evaluating a motion for a preliminary injunction, the court considers four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Esso Standard Oil Co. v. Monroig–Zayas, 445 F.3d 13, 17–18 (1st Cir.2006) (quoting Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 11 (1st Cir. 2004)).

The first factor is the most important: if the moving party cannot demonstrate a likelihood of success on the merits, "the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (quoting Respect Maine PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010)).

## V.    Likelihood of Success on the Merits

### A. *Exceeds Authority*

Plaintiffs argue that the Secretary's *en masse* termination of parole granted under the FRP Programs exceeded her statutory authority because she did not properly determine that the "purpose" of the FRP Programs (i.e. family reunification) had been accomplished. Pls.' Mem.

16

14–16 [Doc. No. 218]; see Doe, 152 F.4th at 286 ("Congress allows the Secretary to terminate parole 'when the purposes of such parole shall, in [her] opinion . . . have been served.'") (quoting 8 U.S.C. § 1182(d)(5)(A)). But the Secretary may also terminate parole, even if the purpose is not accomplished, "[o]nce the executive branch determines . . . that achieving the [previously established] policy aim is no longer possible or desired[.]" Doe, 152 F.4th at 286. Here, the Secretary determined that family reunification no longer warranted the FRP parolees' presence in the United States. Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58034–35. For the purposes of the *ultra vires* inquiry, that determination is sufficient. See Doe, 152 F.4th at 291 (accepting "somewhat conclusory" statement in the CHNV parole termination notice). Accordingly, for the purposes of a motion for a preliminary injunction, Plaintiffs have not shown a substantial likelihood of success as to this claim.

B. *Arbitrary and Capricious*

"An agency's decision is arbitrary and capricious if the agency relied on improper factors, disregarded 'an important aspect of the problem, offered an explanation that runs counter to the evidence,' or when a reasonable explanation for the agency's decision cannot be discerned." Gulluni v. Levy, 85 F.4th 76, 82 (1st Cir. 2023) (quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983)). "[A] court 'is not to substitute its judgment for that of the agency' but rather determine 'whether there has been a clear error of judgment.'" Id. (quoting Fed. Commc'ns Comm'n v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009)).

1.    Rationale for Terminating the Parole of Parolees under the FRP Processes

Plaintiffs object that the Secretary "justified terminating the FRP processes using the same template and reasoning she applied to CHNV" when the FRP processes "differ so fundamentally" from the CHNV Programs. Pls.' Mem. 9 [Doc. No. 218]. They contend that the

Federal Register Notice fails to recognize that the FRP Programs, unlike the CHNV Programs, were not designed or intended to provide a deterrent to irregular migration but instead were directed at family reunification. Id. at 10. But as Defendants point out, deterring irregular migration was included as a factor (albeit a minor one) in the notices establishing the FRP Programs, and the Secretary was within her discretion in considering whether that purpose was served by the termination of the FRP Programs. Mem. in Opp'n to Pls.' Emergency Mot. for a TRO and/or Stay 11–12 [Doc. No. 233]; Implementation of a Family Reunification Parole Process for Colombians, 88 Fed. Reg. 43591, 43593 (Jul. 10, 2023).

       2.      Weighing of Reliance Interests

Plaintiffs also contend that the Secretary failed to adequately weigh Plaintiffs' reliance interests such that the termination of existing parole grants was arbitrary and capricious.

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221 (2016). "[I]n explaining its changed position, an agency must be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" Id. (quoting F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 515(2009)). "The agency must 'assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns.'" Am. Hosp. Ass'n v. Kennedy, No. 25-2236, 2026 WL 49499, at *3 (1st Cir. Jan. 7, 2026) (quoting DHS v. Regents of the Univ. of Cal., 591 U.S. 1, 33 (2020)).

The court agrees that Plaintiff has established a strong likelihood of success on this ground for two reasons. First, the Secretary improperly understated the reliance interests of FRP parolees. Second, the Secretary overstated countervailing concerns regarding insufficient vetting

and fraud where these concerns were unsupported by the Administrative Record and the Federal Register Notice itself.

a.    Plaintiffs' Reliance Interests

Plaintiffs contend that the Secretary failed to adequately consider FRP parolees' reliance interests and accordingly did not engage in reasoned decisionmaking. Pls.' Mem. 12 [Doc. No. 218]. First, Plaintiffs highlight that the Secretary's "discussion of FRP reliance interests is nearly identical to what she said about CHNV" despite the significant differences between the two groups of parolees. Id. Specifically, Plaintiffs contend that the Secretary did not consider that every FRP parolee is a beneficiary of an I-130 petition, and as a result is on a path to becoming a lawful permanent resident once their priority date became current; that FRP parolees had close U.S. citizen and lawful permanent resident relatives in the United States; that these relatives were invited to participate in the program by the State Department; that FRP was meant to serve as a bridge for future adjustment of status; and that the purpose of the program was to promote family unity and that terminating parole would instead produce family separation. Id. at 13.

Defendants respond that the Secretary's use of similar language across the Federal Register Notices "does not mean she failed to consider" the FRP parolees' reliance interests. Defs.' Opp'n 10 [Doc. No. 251]. Further, Defendants contend that while some differences exist, "the reliance interests of CHNV parolees and beneficiaries and FRP parolees and beneficiaries are overall more similar than different." Id. And, to the extent that the two groups do differ, Defendants contend that the Secretary considered at least one difference, that the FRP supporters had received an invitation. Id.

The Federal Register Notice acknowledged that it was "announc[ing] a reversal of a prior policy of which many stakeholders have taken advantage after being invited to participate."

Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58041. The Notice recognized

> the costs incurred by some aliens who have been granted parole and moved to the United States. Parolees will have departed their native country; traveled to the United States; obtained housing, employment authorization, and means of transportation; and perhaps commenced the process of building connections to the community where they reside.

Id. at 58044. Still, the reliance interests of FRP Parolees are considerably more significant.

FRP Parolees have arrived in the United States after a long process, following all directives from USCIS, to obtain lawful permanent residence in this country. The process began when a United States citizen or Long-term Permanent Resident petitioner submitted a Form I-130 petition. It can take a year, often more, for an I-130 petition to be approved. David Doe Decl. ¶ 5 (I-130 submitted in October 2012, approved February 2020) [Doc. No. 214-2]; Francisca Doe Decl. ¶ 5 (I-130 approved after one year) [Doc. No. 214-3]; John Doe Decl. ¶ 6 (I-130 approved after one year) [Doc. No. 214-4]; Luciana Doe Decl. (I-130 approved after three years) [Doc. No. 214-6].

After this approval, an invitation from the United States government was sent to the U.S. Citizen or Lawful Permanent Resident petitioner who submitted the I-130 petition. This invitation allowed the petitioner to "file a request and initiate consideration" under the FRP Process. Implementation of a Family Reunification Parole Process for Colombians, 88 Fed. Reg. at 43598. The time between the approval of an I-130 petition and the issuance of an invitation may also take years. David Doe Decl. ¶ 5–6 [Doc. No. 214-2] (over three years between approval of I-130 petition and issuance of invitation); Francisca Doe Decl. ¶¶ 6, 9 [Doc. No. 214-3] (I-130 petition approved in 2013, petitioner received invitation in 2023); John Doe Decl. ¶¶ 6, 10 [Doc.

No. 214-4] (nearly four years between approval and invitation); Jose Doe Decl. ¶¶ 6, 8 [Doc. No. 214-5] (ten years between approval and invitation).

Because the FRP Programs are designed for individuals who are in line to adjust to permanent lawful status, many parolees, upon receiving approval to travel to the United States and seek parole, prepare for a permanent move. See USCIS, FAMILY REUNIFICATION PAROLE PROCESSES – AFTER THE BENEFICIARY IS PAROLED INTO THE UNITED STATES ("We expect beneficiaries who are paroled into the United States under these processes to apply, when eligible, for a Green Card once their visa becomes available.") https://www.uscis.gov/FRP (last visited Jan. 24, 2026). This often means individuals have given up their entire lives in their home countries. Francisca Doe Decl. ¶10 [Doc. No. 214-3] ("We had to sell our car in Guatemala to be able to afford [the medical exams]. We also sold the rest of our property in Guatemala, like our house and the bookstore, to afford the move to the United States"); John Doe Decl. ¶ 11 [Doc. No. 214-4] ("I sold my vehicle and other belongings and ended the lease on my rented apartment"); Jose Doe Decl. ¶ 10 [Doc. No. 214-5] ("We sold everything we had to come to the United States through the FRP process."); Luciana Doe Decl. ¶ 8 [Doc. No. 214-6] ("I believed I was making a permanent move to the U.S.; I believed in good faith I would never return to Colombia. I sold my car, my apartment, and all of my possessions. I also left my university studies[.]").

The Federal Register Notice failed to acknowledge these reliance interests. The Notice did acknowledge that parolees have incurred costs moving to the U.S., and while they have lived in the U.S., but it did not consider what parolees gave up in their home countries after being invited by the United States to apply. Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58041. Nor did the Notice consider how feasible it would be for parolees to return to

their home countries after selling their homes and belongings and giving up their jobs to move to the United States. See Luciana Doe Decl. ¶ 11 [Doc. No. 214-6] ("Returning would mean starting completely from scratch. I would not have a job to go back to, and I wouldn't be able to finish my degree, since enough time has passed that I would no longer be eligible to restart at the university where I left off; I would have to start over with my education.")

The Secretary could not provide a reasoned explanation of the agency's change in policy without acknowledging these interests. Accordingly, failure to do so was arbitrary and capricious.

b.    Weighing the Countervailing Interests: Insufficient Vetting and Fraud

The Secretary's consideration of reliance interests was also arbitrary and capricious because it overstated the agency's countervailing interests, namely, DHS's purported concerns regarding insufficient vetting and fraud. These concerns were unsupported by the factual record and, as introduced in the Federal Register Notice, not relevant to the Secretary's decision to terminate grants of parole. Pls.' Reply 12–13 [Doc. No. 253]. Defendants contend that these factors were appropriately considered. Mem. in Opp'n to Pls.' Emergency Mot. for a TRO and/or Stay 14 [Doc. No. 233] ("First Opp'n").

As Defendants note, an agency need only "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quotation omitted); First Opp'n 10–11 [Doc. No. 233]. DHS alleged numerous possible ways an applicant could fraudulently acquire a grant of parole. Yet, it provided no credible facts to suggest that fraud had actually occurred.

DHS justified terminating existing grants of parole on the ground that "allowing parolees under the FRP programs to continue to remain in the United States despite the lackluster or

insufficient vetting they received prior to entry creates vulnerabilities for the U.S., undermining efforts to safeguard national security and public safety." Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58044; id. at 58035 (reporting that DHS concluded the "procedures set forth under the modernized FRP programs created an untenable likelihood that malicious actors could enter the interior of the United States without proper vetting, thereby posing an unacceptable level of risk to the United States' national security and public safety"). Plaintiffs contend that "even if [the Secretary's] vetting theory had merit, the [Administrative Record] is completely devoid of information support it." Pls.' Reply 13 [Doc. No. 253]. Plaintiffs assert that "[t]here is no analysis of whether FRP parolees pose security risks, no comparison of vetting outcomes, no data whatsoever." Id. The court agrees.

As evidence of the purported fraud by parolees whose parole is being terminated, DHS cited "a recent internal audit [that] revealed that over 700 requests to be a supporter were filed under the names of deceased individuals of which USCIS confirmed approximately half." Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58041. This audit also reportedly concluded that "the vetting standards applied to co-supporters under the modernized FRP programs were even weaker than those for primary supporters, further compromising program integrity." Id. Defendants' administrative record, however, includes no such audit, nor any other information to suggest Defendants' fraud concerns are supported by the record. Moreover, even if 350 fraudulent Form I-134As were confirmed, there is no evidence in the record that any individuals who were awarded parole were associated in any way with those fraudulent applications.

Instead, while a supporter's confirmed Form I-134A would allow a beneficiary to submit additional information, including biographic and biometric information to USCIS, travel

approval still would not be granted until the beneficiary "passes all the requisite vetting." Implementation of a Family Reunification Parole Process for Colombians, 88 Fed. Reg. at 43598. Accordingly, it is not possible to conclude from the one data point regarding I-134A Forms that any parolees fraudulently acquired parole.

The Federal Register Notice also asserted that, under the modernized program, DHS would only conduct "minimal public safety and national security vetting of [FRP] supporters based on biographic information" provided by the supporters on their Form I-134A. Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58034–35. For example, DHS would verify that the supporter listed on the Form I-134A was the same person as the named petitioner on the Form I-130—the initial form submitted by the supporter—and that supporters were confirmed to be LPRs. Id. at 58035. Additionally, the notice suggested that U.S.-based petitioners *could* misrepresent or falsely claim familial ties, or that relationships might change between the time a form I-130 is filed and the grant of parole (e.g. where spouses decide to divorce). Id.

This suggestion of minimal supporter vetting ignores the extensive vetting of supporters by USCIS, as required under the FRP programs prior to the issuance of travel documents for the beneficiary. DHS fails to take into account as to USCIS's vetting: (1) the petitioner (a U.S. citizen or lawful permanent resident) had to initiate the visa process for their family member through a Form I-130; (2) only after USCIS approved that petition, and with consideration of numerous factors, including when an immigrant visa would be available, would an invitation be sent by USCIS to the petitioner; (3) the petitioner was required to then submit a Form I-134A and evidence establishing their income, assets, and family relations; and (4) USCIS would then conduct a background check on the petitioner before allowing the parole beneficiary to create an

24

online account so that USCIS could confirm the beneficiary's eligibility. See, e.g.,
Implementation of a Family Reunification Parole Process for Colombians, 88 Fed. Reg. at
43598. The Federal Register Notice is silent as to this additional vetting of supporters.

As for the parole applicants themselves, the Federal Register Notice highlighted various
factors that could increase the risk of fraud. Termination of Family Reunification Parole
Processes, 90 Fed. Reg. at 58035. First, it noted that DHS would not collect certain biometric
data or conduct an interview before a beneficiary's arrival in the U.S. Id. The Notice further
explained that adjudicators could also miss key indicators of fraud and that beneficiaries from
countries with "weak civil registry systems" could submit fraudulent documents. Id. The Notice
asserted that requiring interviews and "having in-country experts familiar with local
documentation" could help prevent such instances of possible fraud. Id.

Plaintiffs suggest that the Secretary's security concerns with respect to insufficient
vetting do not bear a rational relation to the termination of grants of parole. Pls.' Reply 13 [Doc.
No. 253]. Specifically, Plaintiffs note that even if there were insufficient vetting concerns, this
concern would have been salient when parole recipients first arrived 12 to 28 months ago. Id.
Plaintiffs contend that now

> every class member has been interviewed in person (at least once), had their
> biometrics collected, undergone further vetting if they applied for other benefits
> (such as work authorization), and lived in the United States without incident.
> Secretary Noem offers no explanation for why the timing of their initial interview
> and biometrics collection—when they arrived at the port of entry rather than
> before—creates any ongoing security concern.

Id. (emphasis omitted).

The court agrees in part with Plaintiffs' argument. Plaintiffs are not challenging the
termination of the FRP programs. Plaintiffs are challenging the termination of grants of parole
held by individuals already in the United States. The Notice alleged various concerns

surrounding how beneficiaries <u>may</u> perpetuate fraud. Termination of Family Reunification

Parole Processes, 90 Fed. Reg. at 58035. It also presented possible solutions to these concerns,

such as requiring applicants to interview and submit biometrics while abroad. <u>Id.</u> Yet, as noted,

at no point did the Federal Register Notice or the Administrative Record suggest that fraud has

occurred involving the affected parolees. That Plaintiffs have since been further vetted is not

directly relevant. More relevant is that the Notice identified potential concerns with vetting

generally and then relied on these concerns to look backwards and justify the termination of

grants that have already been awarded, without ever presenting tangible evidence that individuals

currently holding grants of parole were responsible for fraud. <u>See</u> Termination of Family

Reunification Parole Processes, 90 Fed. Reg. at 58035.

Finally, the Secretary's security justification fails on another, related, ground. The

Federal Register Notice specifies that the agency's national security concerns specifically apply

to the modernized FRP programs. <u>Id.</u> ("Given these critical differences, the procedures set forth

under the modernized FRP programs created an untenable likelihood that malicious actors could

enter the interior of the United States without proper vetting, thereby posing an unacceptable

level of risk to the United States' national security and public safety."). At the same time, the

Federal Register Notice acknowledged that "processing of applications that were pending under

legacy CFRP continued according to the process established in December 2014." <u>Id.</u> at 58033

n.2. And the Notice reported "USCIS continued to interview pending legacy CFRP beneficiaries

at the USCIS Field Office in Havana, Cuba through January 2025 when processing was paused."

<u>Id.</u> at 58035 n.14.[11] Despite recognizing that the concerns raised regarding the modernized

---

[11] The Legacy Haitian Family Reunification Parole program also required interviews. <u>See</u>
Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58035 ("In the legacy

programs did not apply to the legacy programs, the Federal Register Notice nonetheless announced termination for legacy parolees in their initial grant of parole. Id. at 58033.

In sum, Plaintiffs have demonstrated a strong likelihood that they will prevail on their claim that the termination of existing awards of parole was arbitrary and capricious because DHS both improperly weighed Plaintiffs' reliance interests and used unsupported allegations regarding insufficient vetting and fraud of current parolees as countervailing factors.

C. *Notice-and-Comment Rulemaking*

Plaintiffs argue further that the "mass truncation" of existing FRP grants was a legislative rule that required notice-and-comment rulemaking under the APA. Pls.' Mem. 18 [Doc. No. 218] (citing 5 U.S.C. § 553(b)).[12] They contend that, where the termination of existing FRP grants "binds both the agency and the public" and "impos[es] new obligations where none previously existed," the termination was necessarily a legislative rule for which DHS was required to undertake notice-and-comment rulemaking. Id. at 18–19. Defendants respond that the decision to terminate parole grants was not a rule, but a policy statement exempt from the notice-and-comment requirement, where it neither imposes any rights or obligations nor binds the agency in light of "the discretion the notice expressly preserves." Defs.' Opp'n 22–23 [Doc. No. 251].

As relevant here, "general statements of policy" are "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." Lincoln v. Vigil, 508 U.S. 182, 197 (1993) (quoting Chrysler Corp. v.

---

CFRP program and legacy HFRP program, interviews provided an opportunity to gather additional information about the beneficiary and identify any discrepancies between their application and their in-person statements, as well as to surface any other potential concerns through their testimony.").

[12] Plaintiffs do not argue that notice-and-comment rulemaking was required for the termination of the FRP processes themselves. Pls.' Mem. 19 n.23 [Doc. No. 218].

Brown, 441 U.S. 281, 302 n.31 (1979)) (emphases added). Whether an agency has issued a policy statement or a legislative rule is an inquiry "enshrouded in considerable smog." Northwest Bypass Grp. v. U.S. Army Corps of Eng'rs, 552 F. Supp. 2d 97, 120 n.27 (D.N.H. 2008) (quoting Community Nutrition Inst. v. Young, 818 F.2d 943, 946 (D.C. Cir. 1987)); see Lincoln, 508 U.S. at 197 ("Whatever else may be considered a general statement of policy, the term surely includes an announcement . . . that an agency will discontinue a discretionary allocation of unrestricted funds from a lump-sum appropriation." (cleaned up)). Nevertheless, a key distinction between the two is whether "an agency has issued a binding norm[.]" Wilderness Soc'y v. Norton, 484 F.3d 584, 595 (D.C. Cir. 2006); see Northwest Bypass Grp., 552 F. Supp. 2d at 120; Conservation L. Found. of New England, Inc. v. Harper, 587 F. Supp. 357, 368 (D. Mass. 1984) (documents issued by Department of Interior and Department of Agriculture not properly categorized as general policy statements where they may have "establish[ed] binding norms effectively supplanting administrative discretion"). A critical issue, then, is whether the statement has "genuinely left the agency and its decisionmakers free to exercise discretion." Northwest Bypass Grp., 552 F. Supp. 2d at 120 (quoting CropLife Am. v. EPA, 329 F.3d 876, 883 (D.C. Cir. 2003) (cleaned up)); see also Wilderness Soc'y, 484 F.3d at 595 (considering whether the action has binding effects on private parties or on the agency). Where the categorization of agency action as a legislative rule or policy statement largely turns on whether the agency action is binding or permits the exercise of discretion, see CropLife Am., 329 F.3d at 883 and General Elec. Co. v. EPA, 290 F.3d 377, 383–85 (D.C. Cir. 2002), the court focuses the inquiry there.

"[I]f a statement denies the decisionmaker discretion in the area of its coverage, so that [the agency] will automatically decline to entertain challenges to the statement's position, then

the statement is binding, and creates rights or obligations." General Elec. Co., 290 F.3d at 382 (quotation omitted). Here, the Federal Register Notice emphasizes the termination of all grants of parole under the FRP Programs. See, e.g., 90 Fed. Reg. at 58043 ("DHS has determined that . . . the parole of all aliens who have been paroled into the United States under the FRP programs described in this notice, and whose initial period of parole has not already expired by January 14, 2026, will terminate on that date."). Nonetheless, the Notice also explicitly references the Secretary's continuing discretion to determine "on a case-by-case basis" whether to keep an affected noncitizen's parole status in place. See id. ("There are two circumstances where an alien's parole will not terminate: (1) the alien filed a Form I-485[13] before December 15, 2025 that is still pending adjudication as of January 14, 2026; or (2) the Secretary determines otherwise on a case-by-case basis."); see also id. at 58043 n.90 ("[A]liens paroled into the United States have been able, and will continue to be able, to apply for re-parole on a case-by-case basis by filing Form I-131"); id. at 58043 ("[W]ith respect to re-parole requests filed by aliens who were initially paroled under one of the FRP programs. . . . [t]he alien still must demonstrate urgent humanitarian reasons or significant public benefit specific to his or her case and that he or she merits a favorable exercise of discretion for parole[.]"); id. at 58047 ("As of the date of this notice Form I–131 may not be used to request an initial or new period of parole under one of the FRP programs, but it may be used by a previous FRP beneficiary to request a new period of parole, or re-parole, under DHS's existing parole authority, on a case-by-case basis for urgent humanitarian reasons or significant public benefit.").

---

[13] A Form I-485 is an Application to Register Permanent Residence or Adjust Status and is used to apply for lawful permanent residency (a "green card").

Accepting that discretionary review prior to *en masse* termination of FRP parole grants is in fact available as the Federal Register Notice asserts, the Federal Register Notice is a policy statement for purposes of notice-and-comment that does not interfere with, change, or augment the statutorily discretionary nature of the parole revocation. See Chrysler Corp., 441 U.S. at 302 (whether an agency rule is one "affecting individual rights and obligations" is "an important touchstone for distinguishing those rules that may be 'binding'"); see also CropLife Am., 329 F.3d at 883 ("little doubt" that an agency directive bound private parties and agency with the force of law where it "clearly establishe[d] a substantive rule declaring that third-party human studies are now deemed immaterial in" regulatory decision-making under two statutory schemes); General Elec. Co., 290 F.3d at 385 (an EPA guidance document "impose[d] binding obligations upon applicants to submit applications that conform to the Document and upon the Agency not to question an applicant's use of [a particular toxicity factor]"); Conservation L. Found., 567 F. Supp. at 367–68 (documents describing agencies' "departmental procedures for inventorying, selling or otherwise disposing of federal properties according to the Property Review Board's program" potentially binding where they may "effectively supplant[] administrative discretion" in this area of agency action).

In sum, the court finds that Plaintiffs have not demonstrated a substantial likelihood of success on their claim that notice-and-comment was required prior to the *en masse* termination of FRP parole grants.[14]

---

[14] The court notes, however, that, contrary to the assurances that a noncitizen's parole "will not terminate" if the Secretary exercises her discretion otherwise, and the further assurance that parolees may "continue to be able to apply for re-parole on a case-by-case basis by filing a Form I-131," the electronic notice sent on January 5, 2026, made no mention of this discretionary process. See Kernochan Decl. at ECF 7 [Doc. No. 250-1]. Instead, the notice is captioned "Termination of Parole" and states, without exception, that DHS "is terminating your parole by

D. *Notice*

Plaintiffs contend that DHS failed to give proper notice of termination, and that this failure violated both DHS regulation and constitutional due process requirements. Here, Plaintiffs have demonstrated a substantial likelihood of success on their claims.

    1.    DHS Regulations

Under DHS regulations, "[p]arole shall be automatically terminated without written notice" in two circumstances only: (1) upon the noncitizen's departure from the United States; and (2) at the expiration of the time for which parole was authorized. 8 C.F.R. § 212.5(e)(1). In all other circumstances, parole may only "be terminated upon written notice to the alien[.]" See 8 C.F.R. § 212.5(e)(2)(i). Defendants do not dispute that the "written notice" requirement applies here. See 90 Fed. Reg. at 58043 n.89 (citing 8 C.F.R. § 212.5(e)(2)).

    a.    Notice by Publication

Defendants contend that Federal Register publication serves as "constructive notice" to the parolees, sufficient for termination of their parole. 90 Fed. Reg. at 58045; Defs.' Opp'n 17–20 [Doc. No. 251]. But publication in the Federal Register does not directly communicate the grant termination to the parolee. And, contrary to Defendants' interpretation, the regulation does not allow for constructive notice.

Defendants rely on 44 U.S.C. § 1507, which states in part that filing of a document with the Office of the Federal Register, with a copy available for public inspection, "is sufficient to

---

issuing this Notice of Termination of Parole." Id. The electronic notice states further that "[y]our parole will terminate upon the earlier of (1) your original parole expiration date or (2) January 14, 2026." Id. (emphasis added). If DHS continues to use notices in this form, without reference to the purported re-parole process as an exception to the termination, Plaintiffs may renew their argument that notice-and-comment is required.

give notice of the contents of the document to a person subject to or affected by it." Id. However,

that provision includes two significant caveats: (1) "[u]nless otherwise specifically provided by

statute," and (2) "except in cases where notice by publication is insufficient in law." Id. The

court finds that a plain reading of the pertinent DHS regulation renders the latter caveat

applicable; notice by publication "is insufficient," id., where the law requires "written notice to"

the parolee. 8 C.F.R. § 212.5(e)(2)(i).

Defendants cite inapposite caselaw in support of their assertion that notice by publication

suffices in this case. See Defs.' Opp'n 18 [Doc. No. 233] (citing Bank of Com. v. Bd. of

Governors of Fed. Reserve Sys., 513 F.2d 164 (10th Cir. 1975)). The Tenth Circuit found that

bank charter applicants, who were not directly involved in the proceeding and claimed no direct

deprivation of property, had notice via publication that a competitor's application was to be filed

because, inter alia, the applicants were represented by competent counsel and knew that notices

of such applications were published in the Federal Register. Id. at 167. Moreover, no applicable

statute or regulation required notice to competitors, and instead, the Board's regulations required

publication in the Federal Register. Id. at n.4. Notably, the court explicitly stated, "We do not say

that notice by publication in the Federal Register would be sufficient in all cases." Id. at 167.

This court finds notice by publication insufficient here. Where a plain reading of 8 C.F.R.

§ 212.5(e)(2)(i) requires that DHS provide "written notice to" parolees whose grant is being

terminated, those parolees are being deprived of far more than property, they are not

sophisticated business entities, and they have no reason to anticipate that the parole termination

would occur through the Federal Register, notice by publication cannot suffice. Accord Camp v.

U.S. Bureau of Land Mgmt., 183 F.3d 1141, 1145 (9th Cir. 1999) (notice by publication was

"insufficient in law" because the BLM had an "independent legal duty" to provide personal notice to adjoining landowner of land exchange under federal regulations).

      b.    Individual Notices

In the Federal Register Notice, DHS described its intention to notify parolees in the modernized FRP Programs of the termination through their online myUSCIS accounts. 90 Fed. Reg. at 58045; Kernochan Decl. ¶ 12 [Doc. No. 250-1] (parolee applicants "were required to create a myUSCIS online account in order to participate in the [modernized] FRP process."). For the legacy FRP program parolees, DHS stated that it intended to notify that group by mail. 90 Fed. Reg. at 58045.

Although the Federal Register Notice was issued on December 15, 2025, giving a termination date of January 14, 2026, by the end of December, when Plaintiffs filed their emergency motion, no electronic or mail notice had yet issued to the parolees. See Kernochan Decl. ¶¶ 15–16, 18–19.

Instead, on January 5, 2026, after Plaintiffs sought emergency relief, DHS sent electronic notices to a portion of the affected parolees. Kernochan Decl. ¶ 15 [Doc. No. 250-1] ("Of the 7,776 FRP parolees who were identified to have their parole terminated under the terms of the Federal Register Notice, 3,501 terminations were pushed out to FRP parolees' myUSCIS accounts."). Accordingly, even at that late date, DHS sent emails to a little less than half of the affected parolees, "notifying them to check their case on their my USCIS account[;]" after logging onto their accounts, the parolees would be able to view the electronic termination notice. Id. at ¶ 14.

As noted above, the electronic notices announced a firm decision, effective just days away, and made no mention of the Secretary's discretionary review. Id. at ECF 7 (Electronic Termination Notice, dated Jan. 5, 2026). The electronic notices also informed the recipient FRP

parolees that their work authorizations would be revoked as of January 14, 2026, the same date as the effective FRP Programs termination. Id. DHS regulations require that beneficiaries receive fifteen days' notice prior to the revocation of their work authorization. 8 C.F.R. § 274a.14(b)(2). Pursuant to the January 5, 2026 electronic notices (which only a portion of parolees received), DHS only provided nine days' notice. See Kernochan Decl. at ECF 7 [Doc. No. 250-1] ("your unexpired parole-based employment authorization will be revoked as of January 14, 2026"). Thus, the affected parolees did not receive proper notice of the revocation of their work authorizations. See id.; 8 C.F.R. § 274a.14(b)(2).[15]

Roughly half of the affected parolees did not receive any type of actual notice, let alone the faulty January 5 electronic notice. DHS failed to send electronic notices to over four thousand FRP parolees who had online accounts. Id. ¶ 16. DHS also failed to mail written notices to the legacy FRP parolees, despite stating in the Federal Register Notice that such written notices would be mailed to them. Id. ¶ 18. In sum, DHS's attempt to comply with the regulation's "written notice" requirement failed. 8 C.F.R. § 212.5(e)(2)(i). Less than a quarter of the affected FRP parolees viewed any type of written notice, and those that did viewed a notice with faulty information, Kernochan Decl. ¶¶ 17, 20 [Doc. No. 250-1], in contravention of DHS's regulations, see 8 C.F.R. §§ 212.5(e)(2)(i); 274a.14(b)(2), and without notice of the discretionary re-parole specified in the Federal Register Notice. See 90 Fed. Reg. at 58043.

---

[15] DHS states that the January 14 date for the revocation of employment authorization was a "typo" and that DHS intended to list the date as January 20. Kernochan Decl. ¶ 20 [Doc. No. 250-1]. That assertion is not credible, as it would mean that DHS intended to terminate employment authorization based on parole status five days after parole had already expired, an untenable outcome.

Therefore, the court finds that Plaintiffs have a high likelihood of success on showing that Defendants did not provide the FRP parolees with written notice of the termination, as required by regulation. The court acknowledges that Defendants have represented that, should the court's stay be lifted, "USCIS intends to provide new individualized notice to affected parolees 30 days in advance of the termination of their parole grants, which should remedy the Court's concerns regarding notice." Defs.' Opp'n 2 [Doc. 251].[16] The parties are welcome to update the court as to any supplemental notice issued to the parolees. At present, the court finds that proper notice was not provided.

     2.    Due Process

Plaintiffs also are likely to prevail on their claim that Defendants' failure to provide written notice of the grant terminations violated the FRP parolees' due process rights. See A.A.R.P. v. Trump, 605 U.S. 91, 94 (2025) (the Fifth Amendment's Due Process Clause extends to all persons in the United States, regardless of status). When USCIS invited the FRP parolees to submit their I-130 Petitions and move to this country, and DHS granted them multi-year terms of parole, the parolees had reasonable expectations that they would be entitled to retain their

---

[16] The court notes that, contrary to Defendants' representation, the USCIS website currently includes no such assurance of a 30-day notice period. Referring to the court's Temporary Restraining Order [Doc. No. 243], a December 12, 2025 press release states:

> The stay will be in effect until Jan. 24, 2026, which means that the parole and corresponding employment authorization of those who are affected by the parole revocation will not terminate before Jan. 25, 2026. USCIS vehemently disagrees with and continues to contest the court's order but we will follow the terms of the order pending further actions by the court.

USCIS, DHS Ends the Abuse of the Humanitarian Parole Process and Terminates Family Reunification Parole Programs, https://www.uscis.gov/newsroom/alerts/dhs-ends-the-abuse-of-the-humanitarian-parole-process-and-terminates-family-reunification-parole (last visited Jan. 24, 2026).

liberty pursuant to some additional quantum of process. See Perry v. Sindermann, 408 U.S. 593, 601–03 (1972) (finding reliance on governmental representations may establish a legitimate claim of entitlement to a constitutionally-protected interest).

Defendants maintain that notice by publication satisfies due process requirements, see Defs.' Opp'n 20–21 [Doc. No. 251], but the court finds it highly unlikely that any parolees were made aware of their grant terminations by a Federal Register Notice.[17]

Defendants cannot render the FRP parolees' presence in the United States unlawful without minimally informing the parolees of such a decision. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 318 (1950) (The Constitution requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action[.]"). Due process demands that DHS provide parolees with individualized and meaningful notice. See Morrissey v. Brewer, 408 U.S. 471, 481–82 (1972) (a parolee's "liberty is valuable and must be seen as within the protection of" due process). That notice is particularly critical here where Defendants defend the termination of existing grants of parole on the ground that exceptions to termination may be made in the Secretary's case-by-case discretion. See Defs.' Opp'n 23 [Doc. No. 251]; 90 Fed. Reg. at 58033. Also of crucial importance, Plaintiffs, in many cases, have waited for more than a decade for an immigrant visa, see Francisca Doe Decl. ¶ 7 [Doc. No. 214-3], and may forfeit that opportunity if they remain in this country after being stripped of their parole, and concomitant legal status, without notice. See supra Sections V.B.2.a ("Plaintiffs' Reliance Interests), infra VI ("Irreparable Harm").

---

[17] Cf. California ex rel. Lockyer v. F.E.R.C., 329 F.3d 700, 707–11 (9th Cir. 2003) (notice by publication sufficient for "a public utility that participates in a heavily regulated industry" and non-violative of 5th Amendment rights).

## VI.    Irreparable Harm[18]

"'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." <u>Rio Grande Cmty. Health Ctr., Inc. v. Rullan</u>, 397 F.3d 56, 76 (1st Cir. 2005). "[T]he measure of irreparable harm is not a rigid one; it has been referred to as a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." <u>Vaqueria Tres Monjitas, Inc. v. Irizarry</u>, 587 F.3d 464, 485 (1st Cir. 2009). "[T]he issuance of a preliminary injunction requires a showing of irreparable harm to the movant rather than to one or more third parties." <u>CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.</u>, 48 F.3d 618, 622 (1st Cir. 1995) (emphasis omitted). And "plaintiffs seeking preliminary relief [are required] to demonstrate that irreparable injury is likely in the absence of an injunction." <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 22 (2008) (emphasis omitted).

Here, Defendants contend that Plaintiffs have not established a likelihood of irreparable harm where Plaintiffs and the class "are aware that parole is a discretionary benefit, terminable at any time[,]" were "at no point" guaranteed parole or re-parole, and are not necessarily foreclosed from alternative paths to remaining in the country. Defs.' Opp'n 24–25 [Doc. No. 251]; <u>see</u> <u>id.</u> at 25 (arguing that litigants "may apply for another period of parole" or "pursue a family-based immigrant visa from abroad" and stating that "those parolees whose adjustment applications have been or will be denied . . . when the TRO expires[] lack any argument to remain in the United States").

---

[18] Defendants argue irreparable harm, balance of the equities, and the public interest together. <u>See</u> Defs.' Opp'n 23–25 [Doc. No. 251].

But Defendants do not meaningfully engage with the significant real-world harms identified by Plaintiffs. Centrally, Plaintiffs, many of whom left jobs or school and sold their homes, cars and other possessions, came to the United States to reunite with their family members, pursuant to a program to which the government invited them to apply. See Termination of Family Reunification Parole Processes, 90 Fed. Reg. at 58034, 58041–42. They are now faced with two injurious choices should the Secretary's Federal Register Notice take effect: (1) separate from those families, communities, and jobs, leave the United States, potentially abandon or moot their APA claims challenging the Notice, and return to countries in which they no longer have homes and jobs; or (2) remain in the United States, begin accruing unlawful presence here, and risk consequences ranging from detention and removal, forfeiture of their priority date for an immigrant visa, to multi-year bans[19] on readmission. See, e.g., David Doe Decl. ¶ 17 [Doc. No. 214-2] ("If we [Doe, his wife, and two sons] had to leave, I would have to give up my job, and we do not have jobs or possessions to return to in Ecuador, which will make it hard to ensure we can provide for our family consistently."); id. ("We would have to return to a situation in Ecuador that is not stable or safe for our family."); Francisca Doe Decl. ¶¶ 7, 16 [Doc. No. 214-3] (attesting to frequent gang threats faced by parolee and her children in their native country and stating that "going back would mean returning to the same economic hardships and threats to our safety that we had escaped before."); Jose Doe Decl. ¶ 18 [Doc. No. 214-5] ("We have nothing to go back to in Honduras. No car, no roof, no bed."). The harm

---

[19] See 8 U.S.C. § 1182(a)(9)(B)(i)(I) (noncitizens who voluntarily depart after accruing more than six months but less than one year of unlawful presence are barred from admission for three years); id. § 1182(a)(9)(B)(i)(II) (noncitizens who voluntarily depart or are removed after accruing one year or more of unlawful presence are barred from admission for ten years).

flowing to Plaintiffs is thus significant, immediate, and very likely impossible to rectify through final relief that may come at an indeterminate future point.

Accordingly, the court finds that Plaintiffs have sufficiently demonstrated that irreparable harm is likely to occur should the court deny Plaintiffs' Motion for preliminary relief [Doc. No. 216].

## VII.    Balance of Equities and the Public Interest

The balance of equities and public interest factors "'merge when the [g]overnment is the opposing party.'" Does 1-6 v. Mills, 16 F.4th 20, 37 (1st Cir. 2021) (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)) (alteration in original).

Plaintiffs point to "the concrete and irreparable injury facing Plaintiffs and other FRP parolees, as well as their U.S. citizen and LPR families," described supra, as support for their position that the balance of equities and the public interest weigh in favor of preliminary injunctive relief. Pls.' Mem. 20 [Doc. No. 218]. Defendants assert, inter alia, that the nation "suffers a form of irreparable harm to its democratic system when it is prohibited from effectuating the President's policies" and that preliminary injunctive relief would constitute "'unwarranted judicial interference in the conduct of foreign policy'" (quoting Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108, 116 (2013)); injure the "Legislative Branch's prerogatives" by "bypass[ing] a judicial-review bar"; "improperly encroach[] on the core Executive function of managing the immigration system"; and unnecessarily consume DHS resources with individual parole terminations while delaying the agency's "ability to address the national security and public safety concerns that animated, in part, the Secretary's decisions to terminate parole grants." Defs.' Opp'n 23–24 [Doc. No. 251].

The Secretary, and the Executive Branch more broadly, possess significant discretion in the administration of this country's immigration system. See Trump v. Hawaii, 585 U.S. 667,

702 (2018) ("[T]he admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." (quotation omitted)). And, as Defendants rightly emphasize, the Secretary's discretion in the particular area of immigration law with which this case is concerned—the grant or termination of parole—is made plain in the statutory language. See 8 U.S.C. § 1182(d)(5). The court's order here does not restrain that discretion writ large—if the Secretary chooses to prioritize "enforcement-based priorities" over reunification of law-abiding family members, that certainly falls within her discretion. But the court must also weigh the "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." New York v. McMahon, 784 F. Supp. 3d 311, 372 (D. Mass. 2025) (quoting League of Women Voters of the United States v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016)).

The court further considers the limited nature of the relief contemplated in this order. Preliminary relief in this instance does not authorize the entry of any individual or class of individuals into the United States, compel the Secretary to alter criteria for the admission of individuals into the United States, or extend or re-issue the FRP grants of parole at issue. Instead, the court's order would only maintain the status quo: noncitizens living in the United States under FRP grants of parole that have not yet expired would continue to live in this country with legal status, just as they would have absent the Secretary's procedurally defective FRP Federal Register Notice. Nor does the court's order prohibit early termination of FRP grants of parole following an administrative process that fairly weighs reliance interests, avoids unsubstantiated fraud allegations, provides proper notice of changes, and allows time for the Secretary's discretionary review before such termination.

Accordingly, the court finds the balance of equities and public interest weigh in favor of preliminary relief.

## VIII.   Defendants' Bond Request

Defendants request that, should the court grant "temporary injunctive relief," it should impose a bond on Plaintiffs pursuant to Federal Rule of Civil Procedure 65(c). Defs.' Opp'n 25 [Doc. No. 251].

Under Rule 65(c), the court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The First Circuit has noted the "ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond." Int'l Ass'n of Machinists & Aerospace Workers v. Eastern Airlines, Inc., 925 F.2d 6, 9 (1st Cir. 1991).

The court considers the damages and costs Defendants would incur if they were wrongfully enjoined. Defendants indicate that "[a] stay by the district court would force DHS to individually terminate each grant of parole, costing the agency time and resources[.]" Defs.' Opp'n 24 [Doc. No. 251]. But Defendants do not state such costs with specificity and, in any event, the objection contradicts Defendants' repeated statements that the Secretary retains discretion as to individual parole decisions. Nor do Defendants explain what, if any, monetary damages they will sustain should it later be determined that the court erred in granting Plaintiffs' motion. See, e.g., Liu v. Noem, 780 F. Supp. 3d 386, 405 (D.N.H. 2025) (waiving bond requirement where defendants requested that plaintiff post bond but did not "request a specific amount," "explain any costs they will incur by complying with the preliminary injunction," or

describe "any damages they will have sustained" if the preliminary injunction was later found to be erroneous).

Where Defendants have not sufficiently demonstrated the loss they will purportedly incur, and where the court finds that the imposition of a bond would pose a substantial hardship and unduly burden Plaintiffs' ability to seek to enforce their procedural rights, the court waives the bond requirement under Rule 65(c). See Crowley v. Local No. 82, Furniture and Piano Moving, 679 F.2d 978, 1000 (1st Cir. 1982) ("[I]n non-commercial cases, the court should consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant[,]" and "[s]econd, in order not to restrict a federal right unduly, the impact that a bond requirement would have on enforcement of the right[.]").

## IX.    Conclusion

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction and/or Stay of En Masse Truncation of Family Reunification Parole [Doc. No. 216] is GRANTED as follows:

The Termination of Family Reunification Parole Processes for Colombians, Cubans, Ecuadorians, Guatemalans, Haitians, Hondurans, and Salvadorans, 90 Fed. Reg. 58032 (Dec. 15, 2025) is hereby preliminarily ENJOINED under Fed. R. Civ. P. 65 and STAYED pursuant to 5 U.S.C. § 705 insofar as it terminates previously granted parole and revokes work authorization issued to noncitizens paroled into the United States pursuant to the FRP Programs prior to the noncitizens' originally stated parole expiration dates.

IT IS SO ORDERED.

January 24, 2026                              /s/ Indira Talwani
                                             United States District Judge