**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

SVITLANA DOE, et al.,

               Plaintiffs,

     *v.*

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, et al.,

               Defendants.

Civil Action No.: 1:25-cv-10495-IT

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND STAY OF USCIS BENEFITS SUSPENSION AS TO THE CERTIFIED CLASS (Doc. No. 264)

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

   I.   Procedural History ....................................................................................................... 2

   II.   USCIS's Dec. 2, 2025 Immigration Benefits Moratorium ...................................... 3

ARGUMENT ...................................................................................................................... 7

   I.   PLAINTIFFS ARE LIKELY TO SUCCEED IN PROVING THE DECEMBER 2 USCIS MEMORANDUM IS ULTRA VIRES AND CONTRARY TO LAW ............................... 7

   II.   THE BENEFITS MORATORIUM IS LIKELY ARBITRARY AND CAPRICIOUS ...... 11

      a.   No reasonable explanation ............................................................................ 11

      b.   Failure to consider factors Congress intended the agency to consider ......................... 13

      c.   Failure to consider reliance interests and alternatives ................................................... 14

   III.   THE BENEFITS MORATORIUM WAS LIKELY A LEGISLATIVE RULE ................. 15

   IV.   PRELIMINARY RELIEF IS NECESSARY TO STOP IRREPARABLE INJURY ......... 16

   V.   THE BALANCE OF EQUITIES & PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF PRELIMINARY RELIEF IN FAVOR OF THE CERTIFIED CLASS ...................... 19

CONCLUSION ................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
　　522 U.S. 359 (1998) ................................................................................. 11

*Am. Hosp. Ass'n v. Kennedy*,
　　___ F.4th __, No. 25-2236, 2026 WL 49499 (1st Cir. Jan. 7, 2026) ....................................... 11

*Biden v. Nebraska*,
　　600 U.S. 477 (2023) ................................................................................. 9

*Brito v. Garland*,
　　22 F.4th 240 (1st Cir. 2021) ....................................................................... 9

*Citizens to Pres. Overton Park v. Volpe*,
　　401 U.S. 402 (1971) ................................................................................. 13

*City of Providence v. Barr*,
　　954 F.3d 23 (1st Cir. 2020) ........................................................................ 9

*CMM Cable Rep., Inc. v. Ocean Coast Props.*,
　　48 F.3d 618 (1st Cir. 1995) ........................................................................ 16

*Colorado v. U.S. Dep't of Health and Human Services*,
　　788 F. Supp. 3d 277 (D.R.I. 2025) .................................................................. 9

*Dep't of Com. v. New York*,
　　588 U.S. 752 (2019) ................................................................................. 13

*DHS v. Regents of the Univ. of Cal.*,
　　591 U.S. 1 (2020) ............................................................................... 11, 15

*Doe v. Trump*,
　　288 F. Supp. 3d 1045 (W.D. Wash. 2017) ............................................................ 19

*East Bay Sanctuary Covenant v. Trump*,
　　932 F.3d 742 (9th Cir. 2018) .................................................................... 10-11

*FCC v. Fox Television Stations, Inc.*,
　　556 U.S. 502 (2009) .......................................................................... 12-13, 14

*FEC v. Ted Cruz for Senate*,
　　596 U.S. 289 (2022) ................................................................................. 7

*Grace v. Barr*,
    965 F.3d 883 (D.C. Cir. 2020) ............................................................ 13

*Hawaii v. Trump*,
    859 F.3d 741 (9th Cir. 2017),
    *vacated and remanded on other grounds*, 583 U.S. 941 (2017) ............................................ 19

*Housatonic River Initiative v. EPA*,
    75 F.4th 248 (1st Cir. 2023) ............................................................ 13

*Judulang v. Holder*,
    565 U.S. 42 (2011) ............................................................ 13

*Liu v. Noem*,
    780 F. Supp. 3d 386 (D.N.H. 2025) ............................................................ 11

*Louisiana Public Service Comm'n v. FCC*,
    476 U.S. 355 (1986) ............................................................ 7

*Miot v. Trump*,
    No. 25-cv-02471, 2026 WL 266413 (D.D.C. Feb. 2, 2026) ................................ 12, 16, 17, 19

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ass'n*,
    463 U.S. 29 (1983) ............................................................ 11, 13, 14

*New Hampshire Hospital Ass'n v. Azar*,
    887 F.3d 62 (1st Cir. 2018) ............................................................ 15

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................ 19

*Refugee & Immigrant Center & Legal Services v. Noem*,
    793 F. Supp. 3d 19 (D.D.C. 2025) ............................................................ 10

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
    No. 22-cv-11091, 2023 WL 3660689 (D. Mass. May 25, 2023) ............................................ 20

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ............................................................ 10

*United States v. Freeman*,
    147 F.4th 1 (1st Cir. 2025) ............................................................ 9

*Voice of the Arab World, Inc. v. MDTV Medical News Now, Inc.*,
    645 F.3d 26 (1st Cir. 2011) ............................................................ 7

*Winter v. Nat. Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ............................................................ 7, 19

**Statutes & Regulations**

5 U.S.C. § 555(b) ................................................................................................. 9

5 U.S.C. § 705 ........................................................................................... 1, 2, 20

8 U.S.C. § 1151(b)(2)(A)(i) ................................................................................ 13

8 U.S.C. § 1152(a)(1)(A) ............................................................................... 8, 10

8 U.S.C. § 1153(a) .............................................................................................. 13

8 U.S.C. § 1158(d)(1) ........................................................................................... 8

8 U.S.C. § 1182 ...................................................................................... 8, 9, 10, 13

8 U.S.C. § 1255(a) .......................................................................................... 8, 10

8 U.S.C. § 1447(b) ................................................................................................ 8

8 U.S.C. § 1571(b) ................................................................................................ 8

8 C.F.R. § 1.2 ........................................................................................................ 5

**Legislative Materials**

H. Rep. No. 89-745 (1965) ................................................................................ 10

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 .................................... 13

**Executive and Administrative Authorities**

Dep't of Homeland Sec., Privacy Impact Assessment for The Continuous Immigration Vetting (Feb. 2019), www.dhs.gov/publication/dhsuscispia-076-continuous-immigration-vetting ... 12

Fed. Bureau of Investigation, Overview of the U.S. Government's Terrorist Watchlisting Process and Procedures (Apr. 2024), www.fbi.gov/file-repository/counterterrorism/terrorist-watchlisting-transparency-document-april-2024-050224.pdf/view ........................................ 12

Executive Order 14161, Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats (Jan. 20, 2025) .................................................. 3

*Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries*, PM-602-0192 (Dec. 2, 2025) (Doc. No. 224) ....... *passim*

*Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High Risk Countries*, PM-602-0194, at 5 (Jan. 1, 2026) (Doc. No. 264-1) ................................................ 6

Lyndon B. Johnson, Remarks at the Signing of the Immigration Bill, 1 Weekly Comp. Pres. Doc. 364 (Oct. 3, 1965) ................................................................................................ 10

Proclamation. No. 10949, Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists & Other National Security & Public Safety Threats, 90 Fed. Reg. 24497 (June 10, 2025)....................................................................................................... 3, 4

USCIS Policy Manual, Vol. 1, Pt. B, Ch. 1 (Submission of Benefits Requests –Purpose), www.uscis.gov/policy-manual/volume-1-part-b-chapter-1 ........................................................ 6

USCIS Policy Manual, Vol. 1, Pt. C, Ch. 1 (Biometrics Collection and Security Checks – Purpose and Background), www.uscis.gov/policy-manual/volume-1-part-c-chapter-1 ......... 12

USCIS Policy Manual, Vol. 7, Pt. A, Ch. 6 (Adjustment of Status – Adjudicative Review), www.uscis.gov/policy-manual/volume-7-part-a-chapter-6 ........................................................ 12

USCIS Policy Manual, Vol. 8 (Admissibility), www.uscis.gov/policy-manual/volume-8 ........... 12

## INTRODUCTION

Plaintiffs respectfully request a preliminary injunction and 5 U.S.C. § 705 stay of USCIS's December 2, 2025 memorandum that categorically suspends immigration benefits for noncitizens already in the United States who are from specified countries, Policy Mem., *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries*, PM-602-0192 (Dec. 2, 2025) ("Dec. 2 Memo" or "Memo") (Doc. No. 224), as it applies to two certified subclasses, *see* Doc. No. 107 at 43; Doc. No. 108 at 1. That sweeping directive replaces Congress's scheme of individualized immigration benefit adjudications with an indefinite adjudicative suspension of applications where the immigration benefit would go to a noncitizen with certain nationalities or countries of birth. The resulting benefit moratorium affects Plaintiffs and class members from Afghanistan, Cuba, Haiti, and Venezuela, whose lawful status, work authorization, and family unity depend on USCIS complying with its statutory duties to adjudicate their applications. Noncitizens like Class Member L, a Cuban CHNV parolee with a pending adjustment of status application that is subject to the indefinite suspension, face the impossible choice between family separation and uprooting their U.S. citizen or Legal Permanent Resident ("LPR") children. Doc. No. 264-7 ¶ 17. Still others, such as Class Member A, another Cuban CHNV parolee, are left without the ability to support themselves or their families.[1] Defendants' actions have left Plaintiffs and class members in increasingly desperate situations even though they have complied with the government's instructions, are eligible for the benefit requested, and have followed the law. The agency action challenged here cannot be viewed devoid of its context, including this administration's unrelenting assault on parolees.

---

[1] *See* Doc. No. 264-5 ¶¶ 11-12 (describing how he cannot work while his application for work authorization remains indefinitely suspended, causing tremendous hardship for his family, including his wife who requires regular medication to manage a chronic illness).

In taking this action, USCIS acted without lawful authority and without due regard for the Administrative Procedure Act's prohibition on arbitrary and capricious agency action or its procedural requirements. Plaintiffs seek a preliminary injunction and/or § 705 stay of Defendants' indefinite suspension of benefits adjudications (other than asylum) as applied to the certified class.

## BACKGROUND

### I. PROCEDURAL HISTORY

Since January 20, 2025, Defendants have taken a series of heretofore unprecedented actions targeting for adverse agency action noncitizens here in the United States by virtue of the statutory parole authority. Whereas the federal government had never before sought to mass revoke the immigration status of noncitizens in the United States, this Administration did so twice in less than a year as to parolees: first, of approximately 432,000 parolees who arrived through the processes for Cubans, Haitians, Nicaraguans, and Venezuelans ("CHNV"), then of at least 8,404 Family Reunification Parole ("FRP") parolees. *See* Doc. Nos. 97, 258. Similarly, there appears to be no pre-2025 documented instance of the federal government suspending the adjudication of benefit requests for noncitizens in the United States based on nationality, but there were at least three last year: the January 23 Higgins Email (Doc. No. 41-2) and the February 14 Davidson Memorandum (Doc. No. 41-3), which were limited to parolees, and then the subject of the instant motion, the (unsigned) December 2 USCIS Memo (Doc. No. 224), which is not limited to parolees.

This Court preliminarily stayed the Higgins Email and Davidson Memorandum on May 28 of last year as to subclasses the Court certified. *See* Doc. Nos. 107, 108. Defendants initially appealed those decisions, Doc. No. 158, but abandoned their appeal before filing their opening brief, *see* Doc. No. 206. To date, Defendants have provided only selective evidence of compliance with the May 28 Order, and evidence from other sources continues to suggest noncompliance. *See, e.g.*, Doc. Nos. 171, 192; *see also* Doc. No. 253 at 5 n.5.

## II.    USCIS'S DEC. 2, 2025 IMMIGRATION BENEFITS MORATORIUM

In a post to his social media company on Thanksgiving Day of last year, President Trump announced that he would "permanently pause migration from all Third World Countries" and "terminate all of the millions of Biden illegal admissions." Over the next few days, USCIS announced a raft of policy changes, some of which were then codified in the Dec. 2 Memo.

Therein, USCIS announced an indefinite suspension of adjudications of all pending immigration benefit requests for anyone born in or a national of one of nineteen countries designated in President Trump's travel ban from six months prior. *See* Doc. No. 224 at 1.[2] As relevant here, four of those countries are Afghanistan, Cuba, Haiti, and Venezuela. The directive applies categorically and makes no distinction between type of request, how long it has been pending, or whether the beneficiary is already inside the United States or remains abroad. This suspension is significantly broader than the prior suspensions this Court considered, which were limited to Military Parole-In-Place ("MPIP") requests and all requests from those who entered through particular parole pathways within a specified timeframe; this suspension is not limited by time or manner of entry. The Dec. 2 Memo does not cite any legal authority for the actions it directs. It references two presidential actions—the June 2025 travel ban for certain nationals of the same 19 countries and Executive Order 14161—but it relies on neither. It is also materially broader than the June entry ban, which does not apply to noncitizens born in one of those countries who are of a different nationality. *Compare* Doc. No. 224 at 1 n.3, *with* Proclamation No. 10949,

---

[2] Although not the subject of the instant motion, the Memo also indefinitely suspends adjudication of affirmative requests for asylum and withholding of removal for all nationalities and requires a re-review of all approved benefit requests for any noncitizen from the 19 designated countries who entered the United States on or after the day Joseph Biden became President. Doc. No. 224 at 1.

Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats, 90 Fed. Reg. 24497 (June 10, 2025).

For noncitizens who are nationals of or were born in those countries, the Dec. 2 Memo is indiscriminate: it suspends adjudications for *all* immigration benefit requests. This benefits moratorium applies even where the delay in adjudication will render the requestor removable (or result in accrual of unlawful presence) and where it will result in the loss of employment, in-state tuition, driver's licenses, and the inability to support oneself. The moratorium applies even to benefits made entirely non-discretionary by statute or regulation and even where USCIS has determined the noncitizen meets all legal requirements.

Like the Davidson Memo, the Dec. 2 Memo's suspension is expressly indefinite. It has no trigger for lifting the suspension; nor does it identify criteria or timeline for doing so. During the suspension, USCIS personnel are to conduct a "thorough review on a case-by-case basis to assess benefit eligibility including whether" the noncitizen is inadmissible on terrorism or public safety grounds, *see* Doc. No. 224 at 3 (items 1 through 3), or is "unable to establish their identity as outlined in [the June 2025 travel ban],"[3] *id.* (item 4). These assessments have long been part of USCIS's process to determine benefit eligibility for all noncitizens, regardless of nationality. Notwithstanding their "thorough review" of "benefit eligibility," USCIS personnel do not have discretion to adjudicate applications that meet the eligibility requirements, even if required by court order: "Any requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director." Doc. No. 224 at 3; *see also* Doc. No. 107 at 49 ¶ 3 (preliminarily staying same requirement in the Davidson memorandum).

---

[3] This assessment appears to refer to the June 2025 travel ban's exception for "immediate family immigrant visas," which imposes a heightened "clear and convincing" evidentiary standard to prove identity. Proclamation No. 10949 § 4(b)(v), 90 Fed. Reg. at 24503.

The Memo justifies its suspension with reference to "identified concerns" based on the isolated acts of two Afghan nationals here because in their home country they worked for the CIA, which vetted and sponsored them. *See* Doc. No. 224 at 2. One is alleged to have committed the National Guard shooting that sparked President Trump's call to "permanently pause migration from all Third World Countries" and the other was arrested in 2024 for conspiring to commit terrorism. *Id.* The Memo claims their actions show "what a lack of screening, vetting, and prioritizing expedient adjudications can do to the American people," but cites no reason to believe the premise that expedience was prioritized or that there was a lack of screening or vetting. *Id.*

The Memo contains two sentences addressing the adverse impact of the benefits moratorium. The Memo acknowledges only that its combined directives—an indefinite "hold" on all asylum adjudications (regardless of nationality) and all benefit requests for nationals of the 19 countries, plus a "comprehensive re-review of approved benefit requests" for any nationals of the same countries who entered since the day President Biden was inaugurated—"may result in delay to the adjudication of some pending applications." *Id.* at 1, 3. It asserts that the "burden of processing delays that will fall on some . . . is necessary and appropriate in this instance when weighed against the agency's obligation to protect and preserve national security." *Id*. at 3.

The moratorium applies to all "benefit requests," which is broadly defined. *See* 8 C.F.R. § 1.2 ("Benefit request means any application, petition, motion, appeal, or other request relating to an immigration or naturalization benefit"); USCIS Policy Manual, Vol. 1, Pt. B, Ch. 1 § A n.2 (even more expansive definition), www.uscis.gov/policy-manual/volume-1-part-b-chapter-1. Among others, the Memo's benefits moratorium applies to requests for employment authorization (and renewals thereof), MPIP, re-parole, family-based visas, adjustment of status, and naturalization.

The Memo has but one exception, for "screening activities" incidental to removal, such as for credible fear. Doc. No. 224 at 1 n.2.

A month after issuing the Dec. 2 Memo, on January 1, USCIS issued another unsigned memorandum that expanded the benefits moratorium to another 20 countries (16 of them African) plus those traveling on documents from the Palestinian Authority, in parallel with President Trump's expanded travel ban. *See* Policy Mem., *Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High Risk Countries*, PM-602-0194, at 5 (Jan. 1, 2026) (Doc. No. 264-1). None of the added countries correspond to classes in this case. The New Year's Day memo is explicit that it "does not supersede" the Dec. 2 Memo but for its new exceptions. *Id.* at 2. Those exceptions are for requests: to replace certain documents; for a certificate of citizenship (proof of derivative citizenship); that are supported by law enforcement or serve the national interest; required to be adjudicated by a specified injunction; filed by athletes (and their families) to participate in, e.g., the World Cup or Olympics; mooted by the requestor becoming an LPR or naturalized citizen; and "benefit requests" for "any program" that is "terminated or discontinued," including "the associated underlying benefits."[4] *Id.* at 4-5.

Subject to these narrow exceptions that principally serve the Administration's interests, the December 2 and January 1 memos combined suspend adjudication of more than a million pending asylum applications (from all nationalities) and, Plaintiffs estimate, more than a million pending requests for other benefits filed by those subject to the country-specific benefits moratorium. Specific to the certified class here, the Dec. 2 Memo suspends all benefits for Afghans who were paroled pursuant to Operation Allies Welcome (OAW); Venezuelans paroled through CHNV; and

---

[4] This exception appears directed at actions like the FRP FRN (Doc. No. 225), which denied tens of thousands of pending requests for FRP parole and mass terminated existing parole grants.

Cubans and Haitians paroled via CHNV or FRP. Based on the statistics produced as part of the CHNV FRN and FRP FRN, Doc. Nos. 203, 246, the Memo likely suspends more than 100,000 pending benefit requests filed by class members, mostly for adjustment of status, employment authorization, and re-parole. Additionally relevant here, the country-specific suspension applies to requests for initial parole and re-parole via Military Parole-In-Place, which is granted in one-year renewable increments and is available only where the beneficiary entered without inspection.

## ARGUMENT

Plaintiffs' request for preliminary equitable and statutory relief is governed by the familiar four-factor test under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). *See also Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011). Plaintiffs are likely to succeed on their claims because, like the benefit suspensions directed by the Higgins Email and the Davidson Memo, the indefinite moratorium on immigration benefits is *ultra vires* and contrary to the Immigration and Nationality Act ("INA") and also defies the guardrails for agency decision-making set out in the Administrative Procedure Act ("APA").

## I.  PLAINTIFFS ARE LIKELY TO SUCCEED IN PROVING THE DECEMBER 2 USCIS MEMORANDUM IS *ULTRA VIRES* AND CONTRARY TO LAW

USCIS may only exercise the authority Congress has given it. *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 301 (2022) ("An agency, after all, 'literally has no power to act'—including under its regulations—unless and until Congress authorizes it to do so by statute.") (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). Yet Congress has not granted USCIS the authority to suspend the adjudication of immigration benefit requests that are duly filed pursuant to the applicable statutory and regulatory scheme (much less to do so on the immutable characteristic of where one was born). To the contrary, through the INA Congress set out, often in excruciating detail, the eligibility and ineligibility criteria for the benefits it created, while also

giving USCIS authority to exercise and constrain its own discretionary authority via regulation, as the agency has done in even further detail. Notwithstanding the highly reticulated statutory and regulatory scheme, the Dec. 2 Memo does not identify any basis for its action or for refusing to adjudicate benefit requests based only on nationality and place of birth. Indeed, there is none.

Rather than providing authority to suspend immigration benefits (akin to the authority to suspend entry in 8 U.S.C. § 1182(f)), Congress directed USCIS to adjudicate immigration benefit applications according to the eligibility criteria it provided. *See, e.g.*, 8 U.S.C. § 1158(d)(1) (providing the agency "shall" establish a procedure for adjudication of asylum applications). Congress also provided extensive *in*eligibility criteria, *see, e.g.*, *id.* § 1182 (inadmissibility grounds), and prohibited the consideration of other criteria, *id.* § 1152(a)(1)(A) (prohibiting discrimination regarding immigrant visas, discussed more below). Congress also directed the Executive to promulgate regulations to establish certain criteria and/or processes. *See, e.g.*, *id.* § 1255(a) ("The status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, in his discretion and *under such regulations* as he may prescribe, to that of [LPR] if" three criteria are met) (emphasis added); *id.* § 1182 (containing more than 15 rulemaking directives). Congress even specified how long adjudications should take, further illustrating the incompatibility of an indefinite suspension with the statutory scheme. *See id.* § 1571(b) ("It is the sense of Congress that the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application."); *see also, e.g.*, *id.* § 1447(b) (providing *de novo* judicial review of naturalization applications still pending

120 days after interview); *cf.* 5 U.S.C. § 555(b) ("within a reasonable time, each agency shall proceed to conclude a matter presented to it").[5]

Had Congress intended USCIS to have the authority to suspend benefit adjudications altogether, it would have said so explicitly, akin to the President's authority to "suspend the entry" of designated noncitizens under § 1182(f). *See, e.g.*, *City of Providence v. Barr*, 954 F.3d 23, 41 (1st Cir. 2020) ("If Congress meant to give the Assistant AG the wide-ranging discretionary authority envisioned by the DOJ, we think it would have done so in clearer terms and in a more prominent place in the statute."). Given that "Congress knows how" to grant the Executive the authority to impose broad suspensions related to noncitizens, as in § 1182(f), the absence of any vaguely comparable authority for the benefits moratorium is strong evidence that Congress did *not* intend the Executive to have the authority Defendants now claim for themselves. *See Brito v. Garland*, 22 F.4th 240, 251 (1st Cir. 2021).

Indeed, USCIS "has never previously claimed powers of this magnitude," and such a significant expansion of the agency's authority demands express congressional authorization under the major questions doctrine. *Biden v. Nebraska*, 600 U.S. 477, 501 (2023). There is no discernible limit on the authority that USCIS claims here: to indefinitely suspend (or "permanently pause") immigration benefits for millions based solely on nationality and place of birth, notwithstanding all legal requirements being met, and even as to benefits Congress made mandatory. Authority of that magnitude requires express statutory authorization. *See id.*; *see also United States v. Freeman*, 147 F.4th 1 (1st Cir. 2025) (extensively discussing major questions doctrine); *Colorado v. U.S. Dep't of HHS*, 788 F. Supp. 3d 277, 302-03 (D.R.I. 2025).

---

[5] Plaintiffs are not asserting an unreasonable delay claim, but that will not prevent Defendants from arguing otherwise. *See* Doc. No. 107 at 27-28.

The fact that the benefits moratorium is based on nationality and country of origin is yet another indication that it is unauthorized and, in fact, directly contrary to law. Prior to 1965, the United States' immigration law contained strict quotas based on national origin to maintain "the ethnic composition of the American people." H. Rep. No. 89-745, at 9 (1965). Under that "harsh" and "un-American" regime, "[f]amilies were kept apart because a husband or a wife or a child had been born in the wrong place." Lyndon B. Johnson, Remarks at the Signing of the Immigration Bill, 1 Weekly Comp. Pres. Doc. 364, 365 (Oct. 3, 1965). When Congress abolished the national-origins quota system in 1965, it also directed that, "[e]xcept as specifically provided," henceforth "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." 8 U.S.C. § 1152(a)(1)(A). The Dec. 2 Memo flouts this prohibition, explicitly discriminating against class members based on two prohibited grounds (nationality and place of birth), including as to their applications for immigrant visas that they are eligible for and are available for them to adjust their status to LPR.[6] *See* 8 U.S.C. § 1255(a).

USCIS also cannot rely on Presidential authority under 8 U.S.C. § 1182(f) or the particular invocation of it in the June 2025 travel ban. Section 1182(f) grants authority to the President alone. *See Refugee & Immigrant Ctr. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 80 (D.D.C. 2025) (rejecting argument that "the President's authority under § 1182(f) is delegable to USCIS"). Moreover, § 1182(f) grants no authority vis-à-vis noncitizens who already entered. *See E. Bay*

---

[6] *Trump v. Hawaii* held that a nationality-based entry suspension pursuant to § 1182(f) did not conflict with § 1152(a)(1)(A) by interpreting the nondiscrimination provision as being inapplicable to noncitizens who are physically outside the United States and subject to a § 1182(f) entry suspension. 585 U.S. 667, 695 (2018). In contrast, the nationality-based benefits moratorium here lacks express statutory authorization and applies to people who are already in the United States and thus entitled to the protections of our Constitution.

*Sanctuary Covenant v. Trump*, 932 F.3d 742, 773 (9th Cir. 2018). In any case, the Dec. 2 Memo must be justified, if at all, solely on the grounds given by the agency. *Am. Hosp. Ass'n v. Kennedy*, __ F.4th __, 2026 WL 49499, at *3 (1st Cir. Jan. 7, 2026) ("Judicial review of agency action is limited to the grounds that the agency invoked when it took the action.") (quoting *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020)). Here, USCIS chose not to justify its actions on any authority, finding, or directive of the President—and understandably so, given that the Memo is plainly the product of the Thanksgiving tirade—and so cannot defend it on any such basis either.

## II.    THE BENEFITS MORATORIUM IS LIKELY ARBITRARY AND CAPRICIOUS

Plaintiffs are likely to succeed on their claim that USCIS's imposition of an indefinite benefits moratorium was not the product of reasoned decision-making. *See, e.g.*, *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.") (emphasis omitted). As with the prior indefinite suspensions, the agency again (1) failed to provide a reasonable explanation for its action; (2) failed to consider relevant factors, such as material differences in the various benefit adjudications it suspends and the circumstances of the noncitizens affected, as well as Congress's stated goals in creating the benefits that USCIS has stopped granting; (3) and failed to consider the nature of the reliance interests or any alternatives whatsoever. Each omission is independently sufficient to warrant relief.

### a.    *No reasonable explanation*

USCIS failed to "'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Liu v. Noem*, 780 F. Supp. 3d 386, 402 (D.N.H. 2025) (quoting *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ass'n*, 463 U.S. 29, 43 (1983)). The solitary factual basis USCIS provides for the benefits moratorium is reference to the isolated acts of two individuals from one country, but the Memo does not explain, as it must,

why that justifies an indefinite suspension of all benefit applications for millions of people from many other countries, including those (like members of the class) who have lived here for years. *See* Doc. No. 107 at 38 (nothing "explains the agency's decision to suspend benefit adjudications for <u>any</u> individual . . . until <u>every single</u> such person has been screened or vetted"); *see also Miot v. Trump*, 2026 WL 266413, at *28 (D.D.C. Feb. 2, 2026) ("[I]t says something that DHS was able to cite to all of *one* TPS holder as allegedly being a public menace," notwithstanding alleged criminality being a stated basis for terminating Temporary Protected Status for 350,000 Haitians).

Even the Memo's description of what USCIS will be doing during the benefits moratorium raises more questions than it gives answers. The Memo says that "USCIS will conduct a thorough review on a case-by-case basis to assess benefit eligibility including whether"—and then lists four specific assessments. Doc. No. 224 at 3. Yet USCIS already conducts those exact same four assessments (along with *many* others) as part of the standard adjudicatory process for all nationalities.[7] Continuous interagency vetting of immigrants in the United States (from initial filing until naturalization) started no later than 2017.[8] At minimum, USCIS needed to explain why, for apparently the first time in its history, it must suspend benefit adjudications for entire nationalities in order to assess eligibility for those benefits. USCIS did not even acknowledge its sudden about-face on a decades-long policy of individualized benefit adjudications. *See FCC v.*

---

[7] USCIS Policy Manual, Vol. 1, Pt. C, Ch. 1 ("USCIS promotes national security and public safety by conducting screening and vetting in all immigration programs"), www.uscis.gov/policy-manual/volume-1-part-c-chapter-1; *id.*, Vol. 7, Pt. A, Ch. 6 (requiring security check completion before adjudication), www.uscis.gov/policy-manual/volume-7-part-a-chapter-6; *id.*, Vol. 8 (Admissibility), www.uscis.gov/policy-manual/volume-8; FBI, Overview of the U.S. Government's Terrorist Watchlisting Process and Procedures (Apr. 2024) (showing USCIS uses TSDS), www.fbi.gov/file-repository/counterterrorism/terrorist-watchlisting-transparency-document-april-2024-050224.pdf.

[8] Dep't of Homeland Sec., Privacy Impact Assessment for the Continuous Immigration Vetting (Feb. 2019), www.dhs.gov/publication/dhsuscispia-076-continuous-immigration-vetting.

*Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also Housatonic River Initiative v. EPA*, 75 F.4th 248, 270 (1st Cir. 2023) (explaining that when an agency "change[s] its existing position on an issue," "[a] 'more detailed justification' may be required.") (citations omitted). In short, there is a profound "disconnect between the decision made and the explanation given." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

### b. Failure to consider factors Congress intended the agency to consider

The Memo is additionally arbitrary and capricious for failing to consider numerous important factors, including those Congress identified as relevant. *See State Farm*, 463 U.S. at 54-56 (agency must consider factors made relevant by statute); *accord Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 411-13 (1971) (same, and discussing statutory directive to prioritize certain considerations). The Dec. 2 Memo's singular focus on enforcement ignores that the primary purpose of the INA is to *provide* the immigration benefits (and on the specified statutory terms) that USCIS is refusing to grant, in order to further even more particularized goals, like family unity[9] and responding to humanitarian crises.[10] Agency action must be tied to statutory purposes—all of them—and USCIS's decision to ignore all but a subset was arbitrary and capricious. *See Judulang v. Holder*, 565 U.S. 42, 55 (2011); *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020).

USCIS also ignored other important factors, like the enormous heterogeneity in the suspended benefits and the diversity of circumstances of those affected. There is no evidence the agency considered, for example, that different interests are at stake with different benefits:

---

[9] *See, e.g.*, 8 U.S.C. § 1151(b)(2)(A)(i) (providing for immigration of spouses, unmarried children, and parents of U.S. citizens without numerical restrictions); *id.* § 1153(a) (establishing preference categories for family members of LPRs); *id.* § 1182(a)(9)(B)(i), (v) (permitting waivers of inadmissibility to prevent "extreme hardship" to a U.S. citizen or LPR spouse or parent).

[10] *See, e.g.*, Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102, 102 ("Congress declares that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands").

employment authorization renewal, an I-130 petition, and naturalization petition each present qualitatively different considerations, none of which USCIS considered. Nor did USCIS consider the different ways its suspension will affect differently situated noncitizens, some of whom will fall out of status even though USCIS has completed all vetting and determined that they are eligible for a statutory benefit that would keep them in lawful status. The APA does not permit USCIS to ignore the purposes of the statutes it purports to administer. *See State Farm*, 463 U.S. at 43.

### c. *Failure to consider reliance interests and alternatives*

USCIS failed to consider adequately the serious reliance interests created by the decades-long policy of individualized benefit determinations, *contra Fox Television Stations*, 556 U.S. at 515, which in turn Plaintiffs and millions of others relied upon in making consequential life decisions, such as electing to uproot their lives in their home countries and restart their lives in the United States. *See* Doc. No. 107 at 39 (finding that the Plaintiffs' reliance interests "are sufficiently strong to necessitate that the agency acknowledge them, at minimum, before effectively rendering individuals who lawfully entered the United States ineligible for more lasting forms of immigration relief."). Because of the Memo, lawfully present noncitizens will be rendered unlawful and noncitizens with jobs will lose them. USCIS ignores this.

USCIS acknowledges only that delay "may" result for "some pending applications," while eliding all consequences that will result. Doc. No. 224 at 3. USCIS asserts the bald conclusion that the delay that might occur "is necessary and appropriate in this instance when weighed against the agency's obligation to protect and preserve national security." *Id*. This consideration is plainly inadequate; USCIS must address the specific consequences and why it made its decision notwithstanding them (or because of them, as the case may be). *See* Doc. No. 258 at 18-22. What is more, USCIS has *always* had that "obligation," yet never before has it determined that this

obligation requires the agency to impose a remotely comparable benefits suspension (much less to do so when it causes law-abiding noncitizens to lose status and livelihoods), further demonstrating just how little this "explanation" actually explains. *See id.* at 22-26.

USCIS likewise did not consider reasonable "alternatives that are within the ambit of the existing policy," *Regents*, 591 U.S. at 30 (cleaned up), including those this Court already identified with respect to USCIS's prior indefinite suspension. Doc. No. 107 at 38. The most obvious alternative the agency failed (again) to "even consider" was "performing screening and vetting . . . as part of the adjudication of an application for immigration benefits, rather than pausing adjudications altogether for vetting to be performed separately." *Id.* at 38. Nor did USCIS consider not delaying adjudication where it would cause a lapse of legal status or employment authorization.

## III.    THE BENEFITS MORATORIUM WAS LIKELY A LEGISLATIVE RULE

Plaintiffs are also likely to succeed in proving that USCIS's indefinite suspension of benefit adjudications is a legislative rule that was required to, but did not, go through notice and comment rulemaking. "[A] legislative rule is one that 'creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself.'" *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citation omitted). The Memo undeniably imposes new burdens on the rights of class members; but for its issuance, their benefit requests could be adjudicated. The Memo does not hide this purpose—it is the second of the three listed items in the Memo's opening section, entitled "Purpose." Doc. No. 224 at 1 ("2. Place a hold on pending benefit requests for aliens from countries listed in [the June 2025 entry ban] . . . regardless of entry date") (footnotes omitted).

Agency actions of this nature—that alter the "basic tenor" of how existing law is applied to real people—are legislative in nature and so, as Congress directed, must go through notice and comment. *N.H. Hosp. Ass'n*, 887 F.3d at 70. What is more, the Memo plainly binds agency personnel: not only does it prohibit adjudicating the benefit requests even when vetting is complete

and all existing statutory and regulatory requirements are met, the Memo does not even permit agency personnel to grant a benefit when court ordered. *See* Doc. No. 224 at 3 ("Any requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director."). This, too, makes clear that it is a legislative rule. *See* Doc. No. 258 at 28 ("[T]he categorization of agency action as a legislative rule or policy statement largely turns on whether the agency action is binding or permits the exercise of discretion").

Defendants' forthcoming arguments for why the benefits moratorium is not a legislative rule will rely entirely on mischaracterization and post-hoc reasoning. Defendants cannot rewrite the Memo; nor can they deny the practical consequences or binding nature of its directives.

## IV.    PRELIMINARY RELIEF IS NECESSARY TO STOP IRREPARABLE INJURY

Preliminary relief is necessary to stop Defendants from subjecting Plaintiffs, class members, and their families to irreparable harm because of the benefits moratorium. *See CMM Cable Rep., Inc. v. Ocean Coast Props.*, 48 F.3d 618, 620 (1st Cir. 1995) (noting salutary "purpose of a preliminary injunction is to preserve the status quo" and "freez[e] an existing situation" while the court engages in "full adjudication"); *see also* Doc. No. 107 at 39-40.

As this Court recognized in its previous stay order, absent preliminary relief, Plaintiffs and class members will once again be caught in the middle of "two injurious options: continue following the law and leave the country on their own, or await removal proceedings." *Id.* at 39 (citing Doc. No. 97 at 37); *see also Miot*, 2026 WL 266413, at \*34-37 (extended discussion of irreparable harm and the government's arguments to the contrary). Specifically, USCIS preventing parolees from accessing other more durable immigration benefits, *see* Second Omar Doe Decl. (Doc. No. 264-3) ¶ 6 (adjustment application pending)—combined with the government's related actions in stripping most of these same individuals of parole and work authorization prematurely and targeting them for removal—places them at imminent risk of deportation, and if removed, at

risk of danger, violence, and otherwise unsafe conditions in their home countries. *See, e.g.*, Second Wilhen Pierre Victor Decl. (Doc. No. 264-2) ¶¶ 3, 14-15 (Wilhen's brother—who has been in the process to achieve permanent residence in the U.S. for nearly two decades and was in the last stages of processing before the benefits moratorium—faces danger if he and his family were to return to Haiti); Maria C. Otto-Jacobs Decl. (Doc. No. 264-4) ¶ 15 (attorney's Haitian parolee clients, Class Member O and her two young children, face danger in Haiti if they were to return); Class Member N Decl. (Doc. No. 264-9) ¶ 9 (Venezuelan CHNV parolee facing unstable and unsafe conditions in Venezuela, which "is not open to the idea of same-sex couples.").

Relatedly, as the Court predicted in its first stay order (*see* Doc. No. 97 at 37), the loss of parole has led to the arrest and detention of many CHNV parolees. *See* Second Haitian Bridge Alliance (HBA) Decl. (Doc. No. 264-10) ¶ 9. This has included many Haitian CHNV parolees with pending applications for TPS filed prior to August 2025 that remain pending and are now suspended.[11] *See id.* ¶¶ 10-14. Since the Dec. 2 Memo issued, HBA has seen its impact, as it has prevented release from detention of at least two Haitian class members who were arrested, detained, and will likely be removed notwithstanding having pending (but suspended) TPS applications. *See id.* ¶ 13 (describing how Class Member P remains in detention and separated from his family due to the termination of his parole and the indefinite hold on his pending TPS application); *id.* ¶ 14 (describing same as to Class Member Q).

For many, the risk of immediate removal is concomitant with the risk of family separation from their loved ones here. *See, e.g.*, Doc. No. 264-6 ¶¶ 5, 18 (Class Member K at risk

---

[11] Secretary Noem's attempt to terminate Haitian TPS was stayed yesterday. *See Miot*, 2026 WL 266413, at *39. "During the stay, the Termination . . . . has no effect on the eligibility for work authorization and protection from detention and deportation for individuals, if any, with pending applications." Order at 1, *Miot v. Trump*, No. 25-cv-02471 (D.D.C. Feb. 2, 2026), ECF No. 123.

of being separated from her parents and brother here in the U.S., and her young daughter who is now a legal permanent resident); Doc. No. 264-7 ¶¶ 8, 17 (Class Member L at risk of being separated from her close relatives, including her mother and sister who entered on FRP parole, as well as her children, three of whom are legal permanent residents and the other, a two-year-old, who is a U.S. citizen); Doc. No. 264-4 ¶ 15 (Class Member O and her two young children would be separated from Class Member O's U.S. citizen husband, who is the children's father). And for Class Member N and others similarly situated, removal would mean abandoning pending green card applications and being outside the country with no other options to seek lawful admission due to the current travel ban. *See* Doc. No. 264-9 ¶¶ 4, 9.

Without immigration status, work authorization, and the ability to access these benefits provided for by statute due to the Dec. 2 Memo, Plaintiffs and class members will lose their ability to work and provide for themselves and their families, if they have not already due to the termination of their parole. *See* Doc. No. 264-5 ¶ 11 (without parole work authorization and access to work authorization through adjustment of status, Class Member A does not have the financial means to purchase his wife's medication for her chronic illness); Doc. No. 264-7 ¶¶ 14-16 (Cuban Class Member L and her husband with pending green card and work authorization applications cannot support their four children since their CHNV parole work permits were terminated); Doc. No. 264-8 ¶ 4 (due to the mass revocation of CHNV parole and work authorization, Class Member M is without work authorization while his pending work authorization application related to his adjustment of status application is indefinitely suspended); Doc. No. 264-4 ¶ 16 (Class Member O cannot access work authorization through her adjustment of status application).

These injuries do not exist on their own. In the backdrop is the government's continued attempts to prematurely and *en masse* terminate parolees' lawful parole status and work

authorization. Individually and cumulatively, these injuries amount to irreparable harm, notwithstanding the fact that being granted the benefit is not guaranteed. Doc. No. 107 at 24 ("[W]hile it is true that adjudications of many benefits are significantly delayed, lifting the indefinite benefits suspensions would mean the chance of a final benefits adjudication before the expiration of parole would no longer be effectively zero. That change is meaningful where, as here, the potential harm to Plaintiffs is of such a significant magnitude.").

## V.    THE BALANCE OF EQUITIES & PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF PRELIMINARY RELIEF IN FAVOR OF THE CERTIFIED CLASS

The balance of the equities and the public interest, which merge here, tip strongly in favor of Plaintiffs' request for preliminary relief. *See Winter*, 555 U.S. at 20; *Nken v. Holder*, 556 U.S. 418, 435 (2009). To the extent Defendants argue that their purported and vague national security interests referenced in the Memo outweigh Plaintiffs and class members' interests, they will not be able to substantiate it with record evidence. "National security is not a 'talismanic incantation' that, once invoked, can support any and all exercise of executive power." *Hawaii v. Trump*, 859 F.3d 741, 774 (9th Cir. 2017), *vacated and remanded on other grounds*, 583 U.S. 941 (2017); *see also Doe v. Trump*, 288 F. Supp. 3d 1045, 1084 (W.D. Wash. 2017) (holding national security "does not always override all other public interests"). And as this Court reasoned as to a subset of this exact population, the public interest is not served when Defendants "manufacture a circumstance in which hundreds of thousands of individuals will, over the course of several months, become unlawfully present in the country, such that [they] cannot legally work in their communities or provide for themselves and their families." Doc. No. 107 at 41; *accord* Doc. No. 258 at 39-40; *see also Miot*, 2026 WL 266413, at *38 (noting public interest regarding mixed-status families).

The limited nature of the preliminary relief contemplated here also supports granting it. *See* Doc. No. 258 at 40. Plaintiffs seek preliminary relief only as to the "Other Immigration

Benefits Subclass"[12] and the "Re-Parole Subclass"[13] that this Court already certified; two groups that had their benefit applications suspended before. Doc. No. 107 at 43; *see also* Doc. No. 108 (order certifying these subclasses). Because the Dec. 2 Memo duplicates the prior suspensions in relevant part, the same logic and analysis the Court applied in its previous class certification order applies here. Doc. No. 108. As with the Higgins Email and Davidson Memorandum, "answering the question of whether the [Dec. 2 Memo] was lawfully issued will effectively resolve, on a class-wide basis, the issue of whether Plaintiffs' [and class members'] applications for other immigration benefits were properly suspended." Doc. No. 107 at 45.

As the Court has found in its prior stay orders, any preliminary relief ordered here should not be subject to bond. *See* Doc. No. 107 at 41 n.40 ("[T]he court rejects Defendants' argument that any preliminary relief ordered should be subject to bond."). Furthermore, bond is not required for a section 705 stay. *See* 5 U.S.C. § 705; *see also Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 2023 WL 3660689, at *3 (D. Mass. May 25, 2023) ("Unlike a preliminary injunction, a stay under 5 U.S.C. § 705 does not expressly require the movant post a bond.").

## CONCLUSION

Plaintiffs respectfully request that the Court preliminarily enjoin and stay Defendants' latest attempt to delay class members' immigration benefits long enough to deport them or to coerce them into permanently reversing their migration to the United States.

---

[12] "All individuals who have received humanitarian parole through already established humanitarian parole processes and have a pending application for any additional immigration benefit (besides re-parole)" who remain inside the United States and have otherwise chosen not to opt out of the class in order to seek relief in separate litigation. Doc. No. 108 at 1.

[13] "All individuals who have received humanitarian parole through already established humanitarian parole processes that provide for re-parole, such as the U4U, OAW, FRP, MPIP, and CAM parole processes, with any pending applications for re-parole" who remain inside the United States and have otherwise not chosen to opt out of the class in order to seek relief in separate litigation. Doc. No. 108 at 1.

Dated: February 3, 2026

Esther H. Sung (*pro hac vice*)
Karen C. Tumlin (*pro hac vice*)
Hillary Li (*pro hac vice*)
Laura Flores-Perilla (*pro hac vice*)
Brandon Galli-Graves (*pro hac vice*)
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
hillary.li@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org

Anwen Hughes (*pro hac vice*)
**HUMAN RIGHTS FIRST**
75 Broad St., 31st Fl.
New York, NY 10004
Telephone: (212) 845-5244
HughesA@humanrightsfirst.org

Robert Stout (*pro hac vice*)
Sarah Elnahal (*pro hac vice*)
Javier Ortega Alvarez (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
rob.stout@arnoldporter.com
sarah.elnahal@arnoldporter.com
javier.ortega@arnoldporter.com

Respectfully submitted,

/s/ Justin B. Cox
Justin B. Cox (*pro hac vice*)
**LAW OFFICE OF JUSTIN B. COX**
*JAC Cooperating Attorney*
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

John A. Freedman (BBO#629778)
Laura Shores (*pro hac vice*)
Katie Weng (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
Telephone: (202) 942-5316
john.freedman@arnoldporter.com
laura.shores@arnoldporter.com
katie.weng@arnoldporter.com

H. Tiffany Jang (BBO# 691380)
**ARNOLD & PORTER KAYE SCHOLER LLP**
200 Clarendon Street, Fl. 53
Boston, MA 02116
Telephone: (617) 351-8053
tiffany.jang@arnoldporter.com

Daniel B. Asimow (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3142
daniel.asimow@arnoldporter.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Justin B. Cox, hereby certify that this document and any attachments thereto filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: February 3, 2026

*/s/ Justin B. Cox*
Justin B. Cox